IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - - -
                                    )
   UNITED STATES OF AMERICA,        )
                                    )
                                    )    CRIMINAL ACTION NO.
   v.                               )    4:08cr16
                                    )
   DAVID ANTHONY RUNYON,            )
                                    )
          Defendant.                )
- - - - - - - - - - - - - - - - - - - - -


                   TRANSCRIPT OF PROCEEDINGS

                      Norfolk, Virginia

                     February 11, 2014


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States Chief District Judge



APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Lisa R. McKeel
               Brian Samuels
               Assistant United States Attorney
               Counsel for the United States


          JENNIFER T. STANTON, ESQUIRE




                JODY A. STEWART, Official Court Reporter

I N D E X

WITNESS                                                    PAGE

 RUTH E. FRIEDMAN
      Direct Examination By Ms. Stanton                     21
      Cross-Examination By Mr. Samuels                      29

E X H I B I T S

NO.                 DESCRIPTION                            PAGE

 1 & 2              Documents                               9
 3                  Document                               13
 4                  Document                               14
 5                  Document                               15
 6                  Document                               15
 7                  Document                               16
 8                  Document                               42

(Hearing commenced at 11:02 a.m.)

THE CLERK:  In the matter of the show cause order for J.T. Stanton.

Mr. Samuels, Ms. McKeel, is the government ready to proceed?

MR. SAMUELS:  The United States is ready.  Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Stanton, are you ready to proceed?

MS. STANTON:  I am.  Good morning, Your Honor.

THE COURT:  Good morning.  All right.  We are here today pursuant to the Court's show cause order that was issued, and I'll give you the exact date of that order. There was a first order on December 20th, and then the resulting show cause on January 24, 2014.  We are here on that matter at this time on the show cause issues that were raised in that order.

So the Court would first address you, Ms. Stanton, to come forward in response to the issues that the Court raised, particularly, and summarized them for you on Page 4 of that order.

MS. STANTON:  Of the January 24 order, Judge?

THE COURT:  Yes.  The first issue was the number and types of contact you had with the defendant himself prior to filing the motion.

MS. STANTON:  Yes, ma'am.  And before we get started, I would just like to point out to the Court that Ms. Friedman and John Nidiry from the Capital Habeas Project have come down from Maryland, so they are present and accounted for and certainly able to address concerns that, in the event that I'm not able to address them, Judge, if the Court would allow them to do so.

THE COURT:  It will depend upon the concerns, since they have not filed any appearance in the case.  When you say the Capital Habeas Project, are you referring to the Virginia Capital Habeas Project or the Maryland?

MS. STANTON:  Maryland.  Yes, ma'am.

THE COURT:  All right.

MS. STANTON:  And I guess I would ask the Court, as opposed to consider them a witness, if you will, for purposes of this show cause, if the Court needs to inquire of them because they haven't obviously entered an appearance as counsel.

THE COURT:  I understand.

MS. STANTON:  Yes, ma'am.  Thank you.  With respect to the first issue, of the number and types of contact I had with the defendant, the answer is none.  I was contacted by the Capital Habeas Project group in October of last year, specifically Miriam Gohara, who is one of the counsel with their office, as well, and she explained to me about the

process that they go through, which requires them to contact the Chief Judge of the Circuit where the representation would take place.

I have here, Your Honor, a memorandum dated October the 8th of 2008 from the AO of the United States Courts to all the Federal Public Community Defenders with respect to the requirements that they are subject to as far as getting into post-representation cases out of district. So I would just ask if I could submit a copy of this, Judge?

THE COURT: Do you have a copy for Mr. Samuels?

MS. STANTON: I, unfortunately, do not. I literally was just handed this this morning, but I can certainly make a copy for him. I just don't have a separate copy with me today.

THE COURT: Let me take a look at it. This predates any trial of Mr. Runyon. Mr. Runyon's trial was actually in 2009, and it's still pending. So this is an October 8th, 2008 memorandum to all Federal Public Community Defenders. So I'm assuming that would include our own Federal Public Defender, the Eastern District of Virginia?

MS. STANTON: One would assume, yes, ma'am. But the tenor of that particular memorandum is that the administrative office has to be contacted, and then the Chief Judge of the Circuit where the representation would take place needs to be contacted. In this particular case, my

understanding is that the AO's office was the one that actually did contact Chief Judge Traxler, and I have a copy of his return e-mail in response to their contact with him, as well.

THE COURT:  I'm going to have a copy made for Mr. Samuels.

MR. SAMUELS:  Thank you, Your Honor.

MS. STANTON:  Judge, I did manage to bring copies of everything else.

THE COURT:  Okay.  Let's make this copy and let me give it to Mr. Samuels and Ms. McKeel so they can take a look at it.

MS. STANTON:  Yes, ma'am.

MR. SAMUELS:  Thank you, Your Honor.

THE COURT:  All right.  Well, you say that you just got this this morning?

MS. STANTON:  You talking about the memo from the administrative office, Judge?

THE COURT:  Yes.

MS. STANTON:  I just got a copy of that this morning, yes, ma'am.

THE COURT:  Didn't you ask, when you were being contacted, I assume by the Federal Public Defender, what is your authority?  Can you send me copies of those things?

MS. STANTON:  Well, I certainly spoke with them,

Your Honor, about what their authority was.  I didn't ask them to provide me a written copy of that authority, and, in fact, when they contacted me initially, I didn't go solicit this.  I was contacted by them.  I specifically said, well, let me think about this, and I will get back with you.

So I proceeded to contact Deidre Enright, who is Rob Lee's wife, who also works in the capital arena.  I contacted David Brock of VC3.  I contacted Donald Salzman of Skadden up in Washington, D.C., and, of course, Jerry Zerkin of the Federal Public Defender's office in Richmond about, you know, the reputation of the Capital Habeas Project in Maryland.  So I wanted to make sure that if I were getting involved, that these were people that were, you know, upstanding and in good standing with the courts.

THE COURT:  All right.  Well, I'm going to let you get to all of that, but you're getting a little bit ahead of yourself.  I'm going to go through the questions that I have. I think you've moved all the way down to question number 4 at this point.

MS. STANTON:  So the answer to number one is zero. I certainly have an explanation for that when we get to the appropriate time, Judge.  The answer for number two is, again, zero.  I had no contact with the defendant's appellate counsel.

The specific contact with Judge Traxler, Your Honor,

was not made by me directly.  It was made by, again, I believe the Federal Defender himself for Maryland.  The District of Maryland contacted the AO's office who then made the contact with Judge Traxler.  Judge Traxler sent a return e-mail, which was copied to Sam Phillips and Jim Wyda, who is the Federal Defender in Maryland, and a number of other individuals about this particular notification of possible out-of-district representation, and I have a copy of that e-mail here for the Court.  You had inquired about that in your order.

THE COURT:  All right.  So this went to Cait Clarke.  What went to Cait Clarke?

MS. STANTON:  Judge, I am not privy to that.  I do not know.  All I know, and have been told about, again, by Ms. Friedman and Mr. Nidiry, is that their immediate supervisor, boss, Mr. Wyda, I believe, contacted the AO.  The AO then contacted Judge Traxler, and this was the return response.  So I was not privy to whatever the communication was that went from Mr. Wyda to the AO and then from the AO to Judge Traxler.

THE COURT:  Without that background information, this e-mail says little to nothing to the Court.  It says, Dear Cait, thanks for letting me know about the out-of-district representation for David Runyon in Virginia.  I see no problem.

Well, I see no problem with what?  I see no problem with your taking the case?  I see no problem with you seeking an attorney to take the case?  I see no problem with what you've suggested, which is, to wait until the proceedings are over and then make an appearance?  In other words, without saying what was suggested to Chief Judge Traxler, it's impossible for the Court to know what he sees no problem with.  Certainly, it's an approval that would have to be made, but I don't know what he's approving.

Please take your October 8, 2008 memorandum and make it Exhibit 1, and this e-mail and make it Exhibit 2.  All Exhibit 1 does, it's a 2008 memorandum that says these are the procedures to be followed.  I'm not sure if they've been followed or not except for what you were told.  This e-mail from the Chief Judge on 11-1-2013 just says, I see no problem.  He has to approve a potential out-of-district appointment, but he's not the one, Chief Judge Traxler, who makes the appointment.  No one makes that appointment but the District Judge who, at a threshold level, is to review and to hear the habeas.

(The documents were received in evidence and marked as Exhibit Nos. 1 and 2.)

MS. STANTON:  Your Honor, as I mentioned, I believe that the AO memorandum cites that the Chief Judge is to be notified.  No one was actually, quote, seeking his

JODY A. STEWART, Official Court Reporter

permission, if you will, because certainly we were aware that it was ultimately up to this Court to approve or not appointment of counsel for purposes of any potential 2255 in this case.

But their procedures required them to do the notification, and that is evidence of the notification.  If the Court would like, certainly Ms. Friedman can elaborate on what the procedure is, who got contacted, how she learned of it, and how ultimately they contacted me.

THE COURT:  If you desire to present that, I will certainly let you present it.  That would be something that I would let you present as part of your evidence.

MS. STANTON:  Yes, I would like to do that at the appropriate time, Judge.

THE COURT:  All right.

MS. STANTON:  And with respect to 4 and 5 on that order, again, those are a little bit hand in hand, if you will.  By way of historical background, I was contacted in early October by their office.  They, as I said, explained this entire AO procedure to me where they have to do this notification process, and that they had, in fact, gone through this process, to be clear that I was getting involved with persons or a group that I would hope would be good standing with the Court.  I, as I said, contacted David Brock of the VC3, Donald Salzman.

THE COURT:  David Brock of what?

MS. STANTON:  It's Virginia Capital Clearing House. We, in the community, refer to it as VC3.

THE COURT:  For the record, let's fully state it.

MS. STANTON:  Yes, ma'am.  The Virginia Capital Clearing House, and then, of course, Jerry Zerkin of the Federal Public Defender's Office in Richmond about what their reputation was, and I was advised, hands down, that they were extremely well thought of, did very good work, and that I would be doing them a great service by agreeing to be local counsel if I were so inclined.

When I am asked to be local counsel, I don't normally contact the client.  That is not my function.  My function is to act as the interface, if you will, between whoever lead counsel may be and the Court.

THE COURT:  You are local counsel.  In other words, under our rules, the whole aspect of this is you were lead counsel.  You were local counsel.  That's why you had to file a pro hac vice application for the Federal Public Defender of Maryland.  The Federal Public Defender of Maryland cannot practice in this Court just because they are a public defender.  They have to be admitted pro hac vice like any other foreign attorney.  So you and the Court, under our rules specifically, makes it very clear.  We do not look to any type of out-of-area counsel.  We always look to our local

counsel to know our rules, to follow our rules, and to be the lead counsel.

So as far as the Court is concerned, you filed all the papers.  You filed to be appointed as counsel, and then you filed another pro hac vice motion, or signed off on it, for Ms. Friedman to be admitted.  So if your plan wasn't to be lead counsel, then you shouldn't have filed anything in the first place.

MS. STANTON:  Judge, in retrospect, I probably should have filed a motion for leave to file all of the appropriate documents, and, you know, unfortunately, I didn't handle it that way.  I would certainly agree that that would have been the better form in which to proceed.

But in any event, Mr. Runyon is being held in Terre Haute, Indiana.  I don't have any contact with him, at least not to date.  At best, in the future, I don't anticipate having any personal contact with him because part of the mandate of the Capital Habeas Project is that they are allowed to go to death row and visit the clients and things of that nature.

Now, the Court had inquired again about my contact with appellate counsel.  I have had no contact with appellate counsel.  I relied on what was being represented to me by the Capital Habeas Project.

Now, I do have an affidavit from Teresa Norris, who

JODY A. STEWART, Official Court Reporter

is current appellate counsel for Mr. Runyon, outlining that she has had contact with Ms. Friedman and that she and Mr. Farber, who is co-appellate counsel, had agreed to let the Capital Habeas Project visit with him and discuss with him possible representation in any potential 2255.

I would submit to the Court, this is a copy of the affidavit that was PDF'd to us by Teresa Norris with respect to her understanding and her agreement that there was contact with the client and that the Capital Habeas Project was allowed to speak with him about 2255 representation. They also indicate, or she also, rather, indicates in Paragraph 5 that the client had, in fact, communicated to her that he was aware of the possibility, if you will, of my being local counsel because, as the Court has pointed out, the Capital Habeas Project in Maryland couldn't just step into the case without local counsel, pursuant to the local rules.

THE COURT: I'll make this, Ms. Stanton, your Exhibit Number 3.

(The document was received in evidence and marked as Exhibit No. 3.)

MS. STANTON: And, Your Honor, I likewise have an original letter from Mr. Runyon directly addressed to yourself indicating that he was provided with a copy of the show cause order and that he had met and spoken with Ms. Friedman and others at length about the 2255 process. He

had spoken with them about myself and the Capital Habeas Project representing him in any pending 2255, and so I would just ask that this be admitted as an exhibit, as well.

Mrs. Friedman, as I said, is certainly present and can outline the specific contact that she's had with Mr. Runyon, both in writing and in person, because she has been out a number of times to Terre Haute to see the client.

THE COURT:  I'll make this your Exhibit Number 4.  I am not familiar with Mr. Runyon's handwriting.  It's not notarized or any such thing.  I'll admit it as something that you have received.  In other words, it's not an affidavit.  It's not certified.  There is no certificate to the United States.  It's just a handwritten letter, and I will accept it under your representation as evidence in your show cause, let's put it that way, but nothing more.

MS. STANTON:  Yes, ma'am.  Thank you.  I will tell the Court that Mr. Runyon wrote me directly, and that at least as far as I can tell, without being an expert, that the handwriting in that matches the handwriting in the letter that he sent to me directly.

THE COURT:  I will admit this as your Exhibit Number 4.

(The document was received in evidence and marked as Exhibit No. 4.)

MS. STANTON:  Judge, I have a few other exhibits, if

JODY A. STEWART, Official Court Reporter

I could.  First is a copy of my resume.  A copy of that was provided to the Capital Habeas Project so that they could see what my qualifications were.  I also will tell the court that it is my understanding that I'm not the only attorney that the Capital Habeas Project people contacted about the possibility of acting as local counsel.  They, likewise, did their research.  They didn't just contact only me.  They contacted, I believe, a few other people, as well.

THE COURT:  I'll admit this as your Exhibit Number 5.

(The document was received in evidence and marked as Exhibit No. 5.)

MS. STANTON:  Another exhibit, Judge, is the letter to the Court directly dated January 21, 2014 from Ruth Friedman.

THE COURT:  I received that letter, and it's in our file.  It's under private entry, because letters go in as letter entries and not pleadings, but I obviously have read this letter and it is part of the file.  I'll make it your Exhibit Number 6.

MS. STANTON:  Thank you, Judge.

(The document was received in evidence and marked as Exhibit No. 6.)

MS. STANTON:  Two final exhibits:  One of them is a December 18, 2007 memorandum from the Honorable John Gleeson

out of New York, which introduces, if you will, the Federal Capital Habeas Project to all of the judges of the U.S. Courts of Appeals, all of the District Court Judges and all of the Magistrate Judges of the federal courts.

THE COURT:  All right.  That can be your Exhibit Number 7.

MS. STANTON:  Thank you, Judge.

(The document was received in evidence and marked as Exhibit No. 7.)

MS. STANTON:  Your Honor, I offer that, obviously, as evidence of what it is actually that the Capital Habeas Project does and that the tenor of the memorandum being that the judges across the United States within the federal system would certainly consider them as being qualified in post-conviction and specifically capital habeas matters.

Lastly, Judge, I would offer to the Court an order that was signed by J. Harvey Wilkinson, III, in originally October of 1996 but later amended in October of 2008 just expressing issues concerning appointment of Federal Public Defenders in post-conviction cases.

THE COURT:  That was back when he was Chief Judge. What is the import of this order from Chief Judge Wilkinson when he was Chief Judge?

MS. STANTON:  Judge, I think that I offer it as evidence, if you will, of this particular Circuit's general

JODY A. STEWART, Official Court Reporter

policies on appointments for capital habeas representation.

THE COURT:  Well, I'm certainly aware of those.  The problem here, obviously, is that the Federal Public Defender for the Eastern District of Virginia has a conflict, since that office and attorneys in that office represented Ms. Voss, who was a co-defendant and pled guilty and testified in the case.  So they have a conflict.

Then when it comes to the appointment of counsel, and I think the Court has already made it clear, I've already ruled that I am not appointing counsel now, that I'm not here to revisit the December 20th order of the Court.  I ruled, and I said that the Court is not appointing counsel right now, that, number one, it's premature; number two, at the appropriate time the Court will consider appropriate counsel, whether to appoint one or two.  I would say most likely it would be two.

Still, that's something that's within the discretion of the Court, and obviously while the Court consults its Public Defender, the Court can't consult its Public Defender of the Eastern District of Virginia because it has a conflict.  I'm required to appoint two qualified, or one qualified and perhaps a second, but I've made it clear this is not a hearing on the appointment because I have said the appointment at this juncture is premature.

I'm not making an appointment now for the reasons

that I specifically said, and when I do make the appointment, I'll determine whether it's one attorney, two attorneys, and who those attorneys would be.

There is also, in our own state, the Virginia Capital Resource Center.

MS. STANTON:  Your Honor, Mr. Lee is present if you need to inquire of him, as well.

THE COURT:  As far as I know I wouldn't be inquiring now because I don't view him as part of the process yet.  I'm just saying that we have a Capital Resource Center here in Virginia, and certainly Mr. Lee and that Center have appeared in our courts in numerous cases, and the Court is familiar with his qualifications, as well as the Virginia Capital Resource Center and the qualifications from its inception forward.  So certainly that is a consideration in any future appointment the Court would make.

So whether the Court reaches outside of the state because our Federal Public Defender has a conflict, that is certainly a consideration, and I'm aware of all of the parameters attached thereto.  Right now I think we're here to determine whether you've reached past any type of ethical boundaries by *sua sponte*, more or less, filing pleadings with the Court listing yourself as counsel for Mr. Runyon.

So you've got a problem, Ms. Stanton, because you've listed yourself as counsel.  I haven't appointed you.  So at

this point, unless I let you withdraw, you're counsel unpaid. You've come into the case, you've listed yourself as counsel. You can't just remove yourself on the pleading, which you did the last time, once you appear in a case, and you signed your name, counsel for David Runyon, and there's been no motion to withdraw.

So right now you've taken it upon yourself, from an altruistic standpoint, the Court would assume, to do pro bono representation of Mr. Runyon. So that's basically where we are. You have to think before you file pleadings. You don't just come into a court and make an appearance and sign yourself as counsel for somebody when, A, you haven't discussed it with the person; B, you haven't been appointed by the Court.

Just because the Public Defender from Maryland calls and says, this would be nice, that doesn't give you, from my standpoint, any rules authority, any legal authority, or any ethical authority to come in and present pleadings to this Court. I mean, did everybody just think I was just going to sign off and say, this looks great, I've got somebody coming in to Court and saying I'm counsel, appoint me?

MS. STANTON:  Your Honor, as I said, I took my role then and I take my role now as attempting to facilitate their request, and, as I said, in retrospect, I probably should have filed a motion for leave to file the documents, which I

did not do, admittedly.  I would certainly move to withdraw my notice of appearance as counsel, since the Court is not in a position to proceed with any kind of appointment at this stage for 2255 matters for Mr. Runyon.

I would like the Court to allow Mrs. Friedman to be addressed so that she can explain their end of this, if you will, and their contact with me, and how they normally handle these things, upon which I was relying.

THE COURT:  I'll certainly let you present Ms. Friedman and anybody else that you want to and any other documents.  So these are all your documents?

MS. STANTON:  I believe those are all the documents I wish to submit, Judge, yes.

THE COURT:  All right.  Let me see if there is anything Mr. Samuels wants to say, and then I'll let you present Mrs. Friedman.

MS. STANTON:  Yes, ma'am.  Just lastly, prior to anything being filed in this case, you know, we contacted Mr. Samuels and inquired, and they effectively have, at least up until today, been taking no position on anything.

THE COURT:  All right.  Mr. Samuels.

MR. SAMUELS:  Let me just correct that last statement, Your Honor.  When I noticed that Ms. Stanton had filed her motion seeking leave to introduce these documents, whether it was last week or two tweaks ago, I did note that

Friedman, R. - Direct                                          21

she had filed as counsel for David Runyon, and I told her that I did not have an agreement with her filing as counsel for David Runyon because she had not been appointed so by the Court, and in that we have not taken a position.

Judge, I think the Court has raised any concerns that I would have at present, and I'll withhold any comments for a later time, if that's appropriate.

THE COURT:  All right.  That is fine.

All right.  Ms. Stanton, do you want to call anyone?

MS. STANTON:  Your Honor, I would ask Ms. Friedman to come forward, Judge.

THE COURT:  Mrs. Friedman, you can come forward, be sworn, and take the witness chair.

(Witness was sworn.)

RUTH E. FRIEDMAN, called by Ms. Stanton, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. STANTON:

Q.  Could you just tell the Court your name, please?

A.  Ruth Friedman.

Q.  Mrs. Friedman, can you tell the judge what your position is?

A.  I'm director of the Federal Capital Habeas Project, which is a program of the Federal Public Defender system which exists to help courts and lawyers and defendants in

JODY A. STEWART, Official Court Reporter

Friedman, R. - Direct                                          22

post-conviction, federal capital post-conviction process.  We help recruit, identify qualified counsel, help recruit.  We train, we advise, we do budgeting, and we represent clients on occasion.

Q.  Now, with respect to Mr. Runyon's case in particular, what contact, if any, did you have with Mr. Samuels prior to any contact with me?

A.  As part of our work, we -- first we get permission.  When a case has been affirmed on appeal, we help look for counsel for 2255 because unless cert is granted, the case is going to come into 2255, and very few certs are granted.  Sometimes takes awhile to find qualified counsel to offer to the Court.

Q.  Now, at the time that you contacted me in October, do you recall what the date was that you anticipated the Government brief to be filed in the Supreme Court on the direct appeal?

A.  I have notes on this.  I don't have them in my hand, but it was due soon.  The Government -- I remember when the motion was filed that the Government's response was due in a week, and therefore had it been filed on time, the cert would have been ruled on in a couple of weeks following that motion.  I don't remember where --

Q.  It would have been sometime in November because the motion was filed in November?

A.  I think that was already after an extension, so I think when you were contacted, and I'm sorry I don't remember

JODY A. STEWART, Official Court Reporter

Friedman, R. - Direct                                    23

exactly, but I believe when you were contacted, it may have been due before then.  I don't remember.

Q.  Now, can you just explain to the Court what your mandate is as far as out-of-district representation?

A.  It's not just our mandate.  A rule was passed by the executive committee, I believe the judicial conference to -- I'm not sure if that's the body, but it was a rule approved by judges and by the administrative office of the federal courts that anytime a defender may move ultimately for appointment outside of his home district, there needs to be notification to the Chief Judge of where they are intending to practice.

Q.  That would be Chief Judge Traxler?

A.  In this case it would be Chief Judge Traxler.  So what we have done in the past, in many of the 2255s out-of-district defenders sometimes appear, and the administrative office of the courts contacts the judge.  But they ask us for information about the case and why that defender might be particularly appropriate, for cost saving reasons or particular knowledge about issues in the case or something like that.

Q.  Now, we've provided the judge with a copy of this response e-mail from Judge Traxler?

A.  Right.

Q.  Can you explain who Jim Wyda is to the judge?

JODY A. STEWART, Official Court Reporter

Friedman, R. - Direct                                        24

A.  Certainly.  Jim Wyda is the defender for the District of Maryland, and we are administratively hosted by his office.

Q.  And do you know what the contact was between, I guess, Mr. Wyda and the administrative office?

A.  I don't a hundred percent know.  We are actually not copied on -- I certainly was not copied on the letter that the administrative office wrote to Chief Judge Traxler.  And I don't know if Mr. Wyda was originally copied on that or not.  I believe he probably was given the e-mail, but I was not copied on that, and it was not sent to me.

        THE COURT:  So, Mrs. Friedman, what would be the process, then, as you understand it?  It was just a call into the AO?

        THE WITNESS:  No.  It was a letter written from the AO to Chief Judge Traxler.

        THE COURT:  What preceded the letter from the AO to Chief Judge Traxler?  I know that you said that you understand there was a letter from the AO to Chief Judge Traxler and you weren't copied on that letter.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Review with the Court again what would have precipitated the letter from the AO to Chief Judge Traxler?

        THE WITNESS:  Jim Wyda and I both contacted the AO and said that we were considering my project and therefore it

                    JODY A. STEWART, Official Court Reporter

Friedman, R. - Direct                                                    25

was under the auspices, his office, as an out-of-district defender seeking appointment or request for appointment in the Runyon case.  And before we could do that, we knew we needed to notify Chief Judge Traxler before we could even get the motion or make any kind of filing.

So I contacted Mr. Blaskey of the administrative office of the courts, and I believe Mr. Wyda probably did, as well.

BY MS. STANTON:

Q.  And was part of your concern -- is part of your job, you normally track the capital direct appeals across the country?

A.  That's part of our mandate.  We monitor the cases so we know when counsel will be needed.

Q.  So that's the timing of when, at least then, you believed there may be a forthcoming decision out of the Supreme Court on the direct appeal, prompted the movement, if you will, from contact to yourself and Mr. Wyda to the AO and then ultimately the letter from the AO to Chief Judge Traxler?

A.  Well, it was because we, in our mandate, realized that it would be possible, if the Court permitted, of course, to seek the appointment ourselves given where our docket was and given some of the budgetary concerns.  It was when we realized that we thought that we might offer ourselves for appointment.  But before we could come and do that, we needed to get -- it's a notification procedure, but we needed to do

JODY A. STEWART, Official Court Reporter

Friedman, R. - Direct                                    26

that.  We needed to notify Chief Judge Traxler before we could file any kind of motion in the Court.

Q.  And you indicated that your office has its own separate budget to deal with these types of cases?

A.  Yes, we do.  Well, excuse me.  We have our own separate budget that's separate from the Federal Defender budget.  And when we take representation, there's a separate budgeting process for that with a committee of judges, the defender services committee.

Q.  Now, again, I'm sorry, what contact did you have directly with Mr. Runyon and Mr. Runyon's appellate counsel prior to ever contacting me?

A.  I remember seeking permission from -- we go out regularly to Terre Haute to visit clients.  Sometimes lawyers who can't afford to go out there ask us to see their clients.  Whenever a case has been affirmed, we contact appellate counsel and they always ask us please to go see their client.  They've never not -- well, once, one time out of all the many times asked for us to please go see the client and explain the 2255 process, get some sense of what they think is happening or what they might be interested in.  And we did that here with Mr. Runyon.

I don't remember if it was the first time or the second time someone from our project was out there that we said we are considering that we might seek appointment

Friedman, R. - Direct                                          27

ourselves and we would also have to have local counsel under the rules, and let him know that.  At some point, and I don't know what time it was, told him about Ms. Stanton.

Q.   Whom else, if you recall, did your office contact about local counsel?

A.   I did not make those contacts but Miriam Gohara, as you mentioned, in my office did, and she contacted a couple of firms, local firms.  I remember -- I don't know the names offhand.  I remember somebody wasn't practicing criminal law anymore who was recommended.  Another person just couldn't take the case.  Another person just didn't get back to us in time.  So we made a couple of other contacts.

Q.   And so would it be fair to say that I didn't seek you all out, you all contacted me?

A.   Yes, we contacted you.

Q.   And based on our conversations and -- you made all the same representations to me, when I say you, I mean your office, with respect to the process and the notification procedure and things of that nature?

A.   We explained the notification procedure.  We explained that we had gone out to see Mr. Runyon with permission of counsel and that we had spoken to appellate counsel.

Q.   And you also made me aware that, at least your belief was, that Judge Traxler had been notified and, quote, had no problem, according to his e-mail?

JODY A. STEWART, Official Court Reporter

Friedman, R. - Direct                                      28

A.   Well, we are not allowed to do anything until we get that approval from the administrative office of the Court, so we were waiting on that.  Yes, I did tell you that.

Q.   And so based on that, your office and myself had several subsequent conversations and ultimately ended up filing the motion from November?

A.   Yes.

        MS. STANTON:  Answer any questions that the Court or the Government might have for you, please.

        THE WITNESS:  Certainly.

        THE COURT:  Mrs. Friedman, did you review Ms. Stanton's pleadings before she filed them?

        THE WITNESS:  Yes.

        THE COURT:  You didn't notice anything wrong with those?

        THE WITNESS:  I did not.  I can't say that I remember.  I don't remember noticing that there should have been a motion for leave for appointment of local counsel.  I was paying attention to what our -- what would be appropriate for potential appointment of us as learned counsel.

        THE COURT:  Haven't you done this a number of times before?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Do you have any questions, Mr. Samuels?

        MR. SAMUELS:  If I may, Your Honor, just a couple.

Friedman, R. - Cross                                              29

CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good morning, Mrs. Friedman.

A.  Good morning.

Q.  Ms. Friedman, the pleading that the Court asked you about, and I believe it was docket number 391, was the appearance of counsel, and 392 was the motion for appointment of counsel.  392-1 was the memorandum of the law in support of that.  You indicated you reviewed those pleadings?

A.  We were instrumental in drafting them, as well.

Q.  That was my next question.  Who actually prepared those pleadings?

A.  We prepared much of it with Ms. Stanton's help.

Q.  Okay.  And then it was provided to her to file?

A.  That's correct.

Q.  These exhibits that Ms. Stanton has introduced, the letter from the administrative office of the courts, the e-mail from Judge Traxler, were any of those documents provided to Ms. Stanton prior to filing the motion seeking appointment of counsel?

A.  I don't remember.  Can you go through them?

Q.  Certainly.  The Exhibit 1, which is the letter from the administrative office of the United States courts dated October 8th, 2008?

A.  Is that the introduction of our project or is that the

JODY A. STEWART, Official Court Reporter

Friedman, R. - Cross                                        30

protocol?

Q.  I believe it's the protocol for out-of-district representation.

A.  I don't think so.  I think we just explained it to her verbally.

Q.  What about the e-mail from Judge Traxler?  Had that been provided to her prior to her filing?

A.  I actually don't remember the answer to that.  I certainly know we told her that we had gotten but I don't remember if we actually provided the e-mail.  I know we told her because we couldn't file otherwise.

Q.  Excuse me.  That was Exhibit 2.

Exhibit 3, which is the February 5th, 2014 affidavit from Mrs. Norris, I assume that was not provided to her in any form?

A.  No.

Q.  And was there anything written from Mr. Runyon's appellate counsel, either Mr. Farber or Ms. Norris, was that provided to Ms. Stanton?

A.  No.

Q.  And Mr. Farber and Ms. Norris were appointed under 3599, 18 U.S.C. 3599, correct?

A.  That's correct.

Q.  And doesn't subsection (e) of that statute require that once counsel is appointed under 3599, they are appointed and

JODY A. STEWART, Official Court Reporter

Friedman, R. - Cross                                          31

they take place in any subsequent proceedings, be it the trial, the appeal, the petition for certiori and so on?

A.   Actually, 3599 says unless made by motion of the defendant to change counsel.  I would say that it's generally changed in most cases at this point.  Appellate counsel does not stay on in almost all of the cases.

THE COURT:  That's a decision depending upon, number one, whether appellate counsel feels it has the time and the resources; number two, whether they foresee some potential conflict; number three, how well they are getting along with the defendant.  As far as the Court is concerned, appellate appointed counsel represents that individual until, for some legitimate reason, they are legally and procedurally withdrawn from the case.

So Mr. Runyon had counsel, and he still has counsel.

THE WITNESS:  That's correct, Your Honor.  If I might add, that's why we talk to appellate counsel in all of these cases, and we do it for every case that is affirmed on appeal, to see if they are interested in staying on, to see if they have the expertise, not just on direct appeal but in capital habeas.

There is another project that helps recruit counsel for direct appeals, and when those people help recruit for direct appeal, they don't -- they ask whether they are willing to do the appeal.  I don't know that they ask whether

JODY A. STEWART, Official Court Reporter

Friedman, R. - Cross                                          32

they are willing to stay on.

Certainly 3599 envisions that they will stay on unless a motion is made, and in this situation that is definitely why I spoke to appellate counsel before any thoughts about moving for appointment ourselves, and of the two, Ms. Norris is the one that has some capital habeas experience, and she let me know that she was not in a position to remain on at the time.

MR. SAMUELS:  May I follow up with that, Your Honor?

BY MR. SAMUELS:

Q.  Mrs. Friedman, as you indicated, 3599(e) indicates that a replacement motion would be filed either by the defendant himself or the attorney for that defendant, meaning the appointed attorney, correct?

A.  That's correct.

Q.  And you had cited in your motion the motions to substitute counsel that were filed on the appeal for Mr. Runyon, correct?

A.  I don't remember, but if that's what it says.

Q.  And on those motions, it was his current counsel that was seeking either additional counsel or substitute counsel, not the new counsel seeking to come in, correct?

A.  I'm sorry.  Could you ask that again?

Q.  Sure.  Let me use specifics.  On the motion to substitute counsel in the Court of Appeal, in the first instance it was

Friedman, R. - Cross                                                33

Mr. Woodward seeking to have --

A.  Yes, that's correct.

Q.  -- trial counsel --

A.  That's correct.

Q.  -- Mr. Hudgins replaced?

And then in the second motion it was again Mr. Woodward and Ms. Norris --

A.  That's correct.

Q.  -- seeking to bring in Mr. Farber?

A.  That's correct.

Q.  That is not what was done here?

A.  That's exactly right.  In most cases, in other districts, the motions were filed like they were in this case with the counsel who's a member of the Court filing the motion.  What we've discovered in the past is and was true with these appellate lawyers.

THE COURT:  That doesn't make it right just because it's been done.

THE WITNESS:  I understand, Your Honor.

THE COURT:  Because somebody goes out and does it doesn't make it legally right or procedurally correct.

THE WITNESS:  You're absolutely right, Your Honor. Our understanding was they couldn't file the motion because they weren't barred in this court, and in retrospect, we should have found some other way to make that happen.

JODY A. STEWART, Official Court Reporter

Friedman, R. - Cross                                     34

BY MR. SAMUELS:

Q.   And, Mrs. Friedman, you indicated that Judge Traxler was notified before filing.  Do you recall whether he was notified before or after you had the contact with appellate counsel and with contact with Mr. Runyon?

A.   I would imagine after.

        THE COURT:  Can you repeat the question?

        MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.   I was asking Ms. Friedman, when was Judge Traxler notified in the process?  Was he notified before or after you had contact with appellate counsel?

A.   Oh, after.

Q.   So you had contact with appellate counsel, and then contact with Mr. Runyon, and then contact with Judge Traxler?

A.   Well, if appellate counsel, Mr. Runyon, had not wanted us to proceed, we would not have proceeded, especially appellate counsel.  It was very important to have those conversations with appellate counsel.  We don't see the client without permission from counsel.

Q.   And to be clear, it was you or your office that reached out to first appellate counsel and then to Mr. Runyon about your office and Ms. Stanton being appointed to represent Mr. Runyon for purposes of 2255?

A.   Just to be completely clear, we reach out to appellate

                    JODY A. STEWART, Official Court Reporter

Friedman, R. - Cross                                          35

counsel in every case after a case has been affirmed to talk to them, whether we are going to be seeking appointment or we are going to be helping a court or a client or the appellate counsel find appropriate counsel.  So we reach out every time.  Yes, I did speak to them about what they thought about our moving for appointment in the case.

Q.  Sometimes you're reaching out to them to either find out if they are going to continue with representation or who might be able to pick up the representation.  Not every time you reach out to them is when you are seeking representation; is that right?

A.  Yeah.  We don't seek representation very often at all. There is always a question of whether they are -- usually, as I say, in most cases the appellate counsel do not continue into capital 2255, for various reasons, including potential conflict around the issues, but for various reasons they don't generally.

Q.  And did you know whether appellate counsel had intended to continue when you first -- after you contacted them before you contacted Mr. Runyon?

A.  No.  As I said, I called, and that was one of my first questions to Ms. Norris, as someone I have known for many years.

        MR. SAMUELS:  Judge, I don't think I have anything else.  Thank you.

Friedman, R. - Cross                              36

THE COURT:  Do you maintain a log of your calls?

THE WITNESS:  I don't believe so, Your Honor.

THE COURT:  All right.  Anything else from Ms. Friedman?

MS. STANTON:  No, Your Honor.

THE COURT:  All right.  Thank you, Ms. Friedman. You may step down.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Any other evidence, Ms. Stanton?

MS. STANTON:  No other evidence, Judge, just argument.

THE COURT:  All right.  Do you have anything that you want to present, Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  Thank you.

THE COURT:  All right, Ms. Stanton.

MS. STANTON:  Judge, I think that certainly our position is clear at this point.  We probably could have handled things a little differently to satisfy the Court, and we are certainly not going to have, at the Court's direction, any discussion today about who should or should not be appointed as counsel for Mr. Runyon should a 2255 come down the road.

I operated in this case similarly to every other case where I act as or at least am asked to act as local

JODY A. STEWART, Official Court Reporter

counsel in some regard; I investigate it, if you will, the qualifications of the attorneys who are contacting me.  I did not see any problem with any of that.  They made representations to me which, in part, based on my understandings from certainly Mr. Brock and Mr. Zerkin, that this was sort of a normal course of events, if you will.

So I relied on them, as I normally do when I am speaking with somebody who is asking me to be local counsel about whatever their representations were.  Again, we had several discussions before anything was filed.  They drafted the memorandum.  I reviewed it.  I filed it.

In retrospect, it would probably have been the better course of action to ask the Court's leave to file all those documents, but that is obviously not what I did with certainly no ill intent and no solicitation to get into the case for, you know, monetary gain or for any other reason than to facilitate their potential participation in the 2255.

I would just ask the Court to dismiss the show cause against me.  I certainly stand prepared to answer any other questions that the Court might have, and for purposes of the record, I would certainly ask that the Court withdraw my notice of appearance as counsel of record until, you know, further notified by the Court, if necessary.

THE COURT:  Mr. Samuels.

MR. SAMUELS:  Thank you, Your Honor.  Your Honor, I

think that part of the issue here is that this comes under 3599 initially, and I know the Court has dealt with the motion to appoint counsel.  But in that context, it's hard to say there is a local counsel because that statute envisions the possible appointment of two lawyers, and that's what the motion asked for, was the appointment of two lawyers.

Of course, as the Court pointed out, the rules under 83.1-57.4, the criminal and civil rules, require local counsel to have as much familiarity with the case as does the out-of-state party.

Ms. Stanton did sign the pleadings indicating that she was Mr. Runyon's attorney, by her own admission has not had any contact with him and does not appear to have had any of these documents prior to doing so.  Ms. Stanton is clearly responsible for the contents of the motion and the memoranda, the various references to Judge Traxler, and the other references and representations contained therein.

Your Honor, the Government sees the Court's concerns, and I think part of this is that it's not who Mr. Runyon may be enthusiastic about appointing him counsel.  It is not who Ms. Stanton or Ms. Friedman may be enthusiastic about being appointed counsel.  That is a future issue for the Court to decide, an issue for the Court to decide using its discretion at the appropriate time.

This matter, coming as it did and the way that it

JODY A. STEWART, Official Court Reporter

did, certainly clouded that issue.  So in terms of what disposition this should have from here, the United States would defer to the Court.  We do think it's problematic in the way that it was brought to the Court's attention here, but we defer to the Court in terms of disposition.

THE COURT:  All right.  Anything else, Ms. Stanton?

MS. STANTON:  No, ma'am.  Thank you, Your Honor.

THE COURT:  All right.  Well, Ms. Stanton and Ms. Friedman and Mr. Samuels, too, although the United States really had no direct involvement in this matter, the way you proceeded was not only in my mind incorrect, but it was a violation of rules of professional responsibility that I have cited in my opinions.

You have to have contact with the client directly or some form of contact with the client.  You can't just haul off and list yourself as counsel for somebody, and once you do it, it can become very dangerous because you could be locked in the case.  Rarely in criminal cases are counsel allowed to withdraw because they're not being paid.

It may be different in civil cases, but in any event, the pleadings, the methodology that was used was incorrect, and in my opinion it was contrary to the law.  Because it's sometimes done that way doesn't make it right.  If everybody else is out there speeding, that doesn't make speeding legitimate.

JODY A. STEWART, Official Court Reporter

So as far as I'm concerned, it was unfortunate the way it was presented to the Court.  It has taken a great deal of the Court's time and effort to basically try to proceed through this and understand how anybody could just be hauling off and filing these pleadings like this.  I reiterate, nobody is asking you to satisfy the Court.  What the Court is asking is that you satisfy the rules, that you follow the rules, and you follow the law.

I do agree, though, Ms. Stanton, that you certainly had no ill-will or ill-motive or unprofessional intentions. I do agree with that.  I don't think Ms. Friedman did either. I think that everyone's intentions were not misplaced, it's just the way you went about it was misplaced, and I certainly don't think, after hearing you, that you were out, as we might say, just seeking business or so forth, appointments improperly with the Court.

So I understand everything that's been said today, and I do think it appropriate to grant your motion to withdraw your appearance as counsel, because the Court is not appointing any counsel yet, and the requirements of 18 U.S.C. 3599 have not been met.  So any pleading that you filed listing yourself as counsel, for all of the reasons that we've discussed here today was an improper appearance in the first instance.

Also, I do dismiss the show cause order against you.

I think that you have, while I'm not in agreement with it legally or procedurally, I think you have shown proper cause that the reasons you did it and why you did it, and I understand. I don't consider it just totally *sua sponte* on your part, given the involvement of the Maryland Federal Public Defender against you. So I do dismiss the show cause order and allow you to withdraw your appearance as counsel.

Obviously, at the appropriate time, I will consider appointment, if appropriate, for Mr. Runyon. As I understand the petition for certiori now is not even due until February 21. I don't know whether that will be extended or not. That is just the last Supreme Court docket sheet that I saw. So at the appropriate time I will certainly, if appropriate, appoint counsel for Mr. Runyon, and will go through those considerations then.

Is there anything further for the Court to consider today, Ms. Stanton?

MS. STANTON: No, ma'am. Thank you.

THE COURT: Anything further?

MR. SAMUELS: No, Your Honor. Thank you.

THE COURT: All right. The clerk reminded me that I hadn't indicated that the Judge Wilkinson order will be your number 8 exhibit.

MS. STANTON: Thank you, Your Honor.

(The document was received in evidence and marked as

42

Exhibit No. 8.)

THE COURT:  All right, then.  The Court stands in recess.

(Hearing adjourned at 12:04 p.m.)

CERTIFICATION


     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



          X_____/s/_____x

                    Jody A. Stewart

                X_____ 2-21-2014_____x

                        Date

JODY A. STEWART, Official Court Reporter