**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **No. 4:08-CR-00016** |
| | : | **CAPITAL § 2255 PROCEEDINGS** |
| **DAVID ANTHONY RUNYON,** | : | Hon. Rebecca Beach Smith |
| | : | |
| Defendant/Movant. | : | |

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE,**
**OR CORRECT A SENTENCE**

Michele J. Brace, VSB No 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana Hansen Chavis, *Pro Hac Vice*
Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
dana_hansen@fd.org

**COUNSEL FOR DEFENDANT/MOVANT DAVID ANTHONY RUNYON**

## Table of Contents

Table of Contents............................................................................................................i

**Preliminary Statement** .............................................................................................1

**Factual Background** .................................................................................................1

**Procedural History**...................................................................................................8

**Claims for Relief**....................................................................................................12

**Claim 1:**    **The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.** ...........................................................................................12

    **A.**    **The United States Failed To Timely Disclose The Participation Of Two "Dirty Cops," Which Tainted Runyon's Trial.** .........................................12

        **1.**    **Robert Glenn Ford**.........................................................................12

        **2.**    **Clifford Dean Posey** .....................................................................15

**Claim 2:**    **The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**..........................................................................................16

**Claim 3:**    **Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight And/Or Argue Evidence Of Innocence.**.........................................................................................18

    **A.**    **Chad Costa**....................................................................................19

    **B.**    **Cat Voss**........................................................................................22

    **C.**    **Scott Linker** ..................................................................................23

    **D.**    **Rose Wiggins** ................................................................................24

    **E.**    **David Runyon's Whereabouts the Day of the Crime** ............................24

    **F.**    **Cell Tower Testimony Regarding Michael Draven**................................26

G.      Runyon's Shopping List.................................................................................27

Claim 4:    Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstance Of Substantial Planning. ...........................................28

Claim 5:    Trial Counsel Was Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial. ......32

Claim 6:    Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health. ...............................................................34

A.      Counsel Hudgins Appeared In The Case Too Late To Effectively Investigate And Present Mitigation.................................................................35

B.      Counsel Abandons The Incomplete Mental Health Investigation And Presents Repetitive Lay Person Testimony. ...............................................39

C.      A Complete Psycho-Social History And Its Implications Would Have Added Weight To Mitigating Factors, Reduced The Weight Of Aggravating Factors And Informed The Jurors About Runyon's Lesser Moral Culpability. ..............43

1.    Readily-Available Records. ...............................................................44

2.    Readily-available lay witness accounts ............................................48

3.    Readily-Available Expert Analysis And Opinions .........................61

D.      Counsel's Failure To Investigate And Present Mitigating Evidence Undermines Confidence In Runyon's Death Sentence.........................................73

Claim 7:    Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt.................................................................................76

Claim 8:    Ineffective Assistance Of Counsel On Direct Appeal..........................................78

Claim 9:    Runyon's Conviction Under 18 U.S.C. § 924(C) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution. *Johnson V. United States*, 135 S. Ct. 2551 (2015)......................................80

A.    Introduction...........................................................................................................80

B.    Relevant Statutes..................................................................................................81

C.    The Definition of "Crime of Violence" is Unconstitutional. ................................83

D.    Runyon's Conviction for Murder with a Firearm in Relation to a Crime of
      Violence is Unconstitutional. ..............................................................................85

      1.    Carjacking is Not a Crime of Violence.......................................................86

      2.    Conspiracy is Not a Crime of Violence......................................................89

E.    Resentencing is Required Because Runyon Was Sentenced to Death Based
      on an Unconstitutional Statute. ..........................................................................89

Claim 10:    The Jury Instructions at the Sentencing Phase Unconstitutionally Lowered
            the Government's Burden of Proof in Violation of the Fifth, Sixth, and Eight
            Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003). ...............................90

Claim 11:    The Death Sentences Are Unconstitutional Because They Are Based On
            Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary
            And Overbroad. ......................................................................................92

Claim 12:    Runyon Was Denied Due Process Of Law, Equal Protection Of The Law,
            The Right To Be Free Of Cruel And Unusual Punishment, And Effective
            Assistance Of Counsel Because The Death Penalty Was Disproportionately
            And Unconstitutionally Applied According To Race, And Trial And Appellate
            Counsel Made No Objection Based On This Fact....................................95

Claim 13:    Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of
            The Fifth And Eighth Amendment.........................................................96

Claim 14:    Runyon's Death Sentence Violates The Eighth Amendment Because He Is
            Severely Mentally Ill.............................................................................98

Claim 15:    Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's
            Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And
            Examine The Jury Selection Records. ...................................................100

      A.    Selection Of The Grand Jury And/Or Petit Jury Venire Jury Was Tainted... 101

      B.    Trial Counsel Unreasonably Failed To Request Or Examine Any Jury
            Selection Records, In Violation Of The Sixth Amendment. .............................102

Claim 16:    The Prosecution Engaged In Racial And Gender Discrimination In Its
            Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To

Object To These Unconstitutional Strikes..................................................... 102

A.     The Relevant Law.................................................................................. 103

    1.    The Prosecution Engaged In Racial Discrimination In Its Exercise Of Peremptory Strikes.......................................................... 105

    2.    The Prosecution Engaged In Gender Discrimination In Its Exercise Of Peremptory Strikes.......................................................... 107

B.     Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes. ................................. 108

Claim 17:    The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Trial Counsel Unreasonably Failed To Object. ........................................... 110

A.     The Voir Dire Was Constitutionally Inadequate................................. 110

B.     Trial Counsel Rendered Ineffective Assistance Regarding Voir Dire. ........... 114

Claim S2:    The Trial Court Unlawfully Excluded the Potential Jurors Based Solely on Their Juror Questionnaire Responses Without Voir Dire, and Trial Counsel Unreasonably Failed to Object and Unreasonably Participated. ..................... 116

Prayer for Relief................................................................................................. 117

## List of Attachments and Exhibits

1      BOP Records Request

2      Merikangas Report, 9/25/15

3      McNally Declaration, 3/11/09

4      Cronin Declaration, 9/26/15

5      Hudgins Declaration, 9/22/15

6      Woodward Declaration, 9/24/15

7      Costa Declaration, 9/30/15

8      Cunningham Declaration, 9/25/15

9      Cat Voss Declaration, 9/10/15

10     David Dalton Declaration, 9/28/15

11     Paula Dalton Declaration, 9/28/15

12     Matt Long Declaration, 9/29/15

13     Scott Linker Declaration, 9/24/15

14     Excerpt – Cell Phone Tracking Evidence

15     Babineau letter regarding death authorization, 2/10/09

16     Portsmouth Jail Records, 2008

17     David Dombrowski progress notes

18     Lake Martin Community Hospital response

19     Hudgins time schedule with mark-ups ECF No. 165

20     Dr. Mirsky letter, 7/2/09

21     Mirsky & Hudgins emails, 7/22-23/09

22     Dr. Mirsky letter, 9/18/09

23     Army medical records

24      Runyon's handwritten letter regarding 1996 car accident

25      Suk Cha Runyon medical records

26      David Dombrowski declaration, 9/23/15

27      Mark Runyon declaration, 9/25/15

28      Maria Runyon declaration, 9/16/15

29      Dr. Dudley report, 9/29/15

30      Thomas Preston interview, 10/4/08

31      Robert Seeger declaration, 8/24/15

32      Deborah Seeger declaration, 8/24/15

33      Capt. Harris, Fayetteville, GA police dept. interview, 8/31/08

34      Scotty Fleming criminal history

35      Dr. Mirsky report, 8/28/15

36      Teresa Norris declaration, 9/29/15

S-1     Filed under seal with Sealed Claim S2

Petitioner, David Anthony Runyon, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings ("2255 Rules"), requests that this Court vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentence imposed.[1]

## Preliminary Statement

At the time of this filing, investigation of Runyon's claims for relief continues. Runyon has noted, *infra*, the claims which remain under investigation. In addition, Runyon's medical records were requested from the Bureau of Prisons months ago but they still have not been provided. BOP records request, Ex. 1. Thus, Runyon is currently unable to include in support of any claim(s) any of the facts contained within those records. Runyon's Motion for Jury Selection Documents, ECF No. 465, was granted on Friday, October 2, 2015. ECF No. 475. The instant motion is filed without knowledge of the jury selection documents. Thus, Runyon has been unable to plead those facts in support of any claim(s). One of Runyon's mental health experts has requested further testing of Runyon. Merikangas report 9/25/15 p. 3, Ex. 2. The attorney at USP Terre Haute has been contacted about this test and undersigned counsel is in the process of drafting a motion for an order authorizing and requiring the Warden at USP Terre Haute to provide such testing at Runyon's expense. Until that test is complete, it is unknown whether the results will be supportive of any claim(s).

## Factual Background

Catherina (Cat) Voss, the wife of a Newport News naval officer, Cory Voss, and mother of two small children, used her husband's time at sea to engage in a series of affairs. The culmination of these was an intense extramarital affair with co-defendant Michael Draven. Wishing to be together, Voss and Draven hatched a plan to: (1) kill her husband when he returned to shore; (2) plan the killing

---

[1] In accordance with Rule 2 of the Rules Governing Section 2255 Proceedings, Runyon sets forth the facts and claims entitling him to relief but does not provide full legal argument or citation.

in a manner so that they would not be implicated; and, (3) use the proceeds of his Navy gratuity death benefit and his life insurance, approximately $300,000, to bankroll their new "family." Setting the scheme in motion, Draven began scouring the internet, soliciting, unsuccessfully, the assistance of people to commit a "murder for hire." Draven and Voss decided to make the killing look like a robbery and they scouted locations. They decided upon the ATM at the Langley Federal Credit Union (LFCU) in Newport News.

It was then that Draven met the movant, David Runyon. At 5 feet 3 inches tall, Runyon is a small, slim Asian-American man. His mother is Korean and his father is a white American. Runyon's face is asymmetrical due to paralysis on the right side of his face. He has small marks over his face and head from the impact of shattered glass during a car accident. Runyon, an honorably-discharged Army veteran, had subsequently been unable to maintain gainful employment for reasons that are discussed below. Ultimately, he supported himself by participating in clinical drug trials. Draven, who had never really held down any job, met Runyon in March 2007, at one such drug trial when the two were placed in adjoining beds for a few weeks. According to the prosecution, Draven used this time to recruit Runyon to kill Cory Voss.

On April 20, 2007, Cat Voss opened an account at the Langley Federal Credit Union, depositing only the minimum amount of $5.00. No further funds were ever deposited.

On April 29, 2007, in Runyon's hometown of Morgantown, West Virginia, Runyon met with a gentleman named George Koski. Runyon purchased a handgun from Koski, they engaged in leisurely conversation, and Runyon provided Koski with his full name and driver's license information. Runyon engaged in a transaction at an ATM in Morgantown and placed three cell phone calls that day. According to cell phone records, Runyon was still in West Virginia at 8:37 p.m.

Shortly before 11:30 p.m. that same day, Cat Voss asked her husband, who had by then returned home from sea, to drive to the LFCU and (notwithstanding the impossibility of the task)

2

make a withdrawal. Cell phone records indicated he spoke with Cat Voss along the way and the ATM camera recorded his futile attempts at completing her request. Data from area cell towers indicated Draven was near the credit union at this time. The ATM camera recorded an unidentified person entering the passenger side of Cory Voss's truck and the two driving away from the ATM. A few minutes later, the ATM camera showed Cory Voss had returned to the ATM, made a second unsuccessful attempt at withdrawing money, and drove away. The next day, Cory Voss was found dead in his truck in a parking lot adjacent to the credit union. He had been shot five times.

The following day, Cat Voss collected a $100,000 Navy gratuity death benefit. In three months, Voss and Draven had spent it all.

Voss and Draven knew they were suspects in the crime and gave false statements to police. Throughout the remainder of 2007, law enforcement officers monitored multiple cell phones owned by Voss and used by her and Draven, as well as Voss's landline. Incoming and outgoing phone numbers, as well as conversations, were recorded. Law enforcement officers spoke with Voss, Draven, their family, friends and acquaintances. Voss sought help from Navy personnel and even an elected official, to collect the life insurance proceeds. The life insurance company withheld the death pay-out because the police had not cleared Voss as a suspect. Gov't Tr. Ex. 281, 281-011. Draven's parents counseled him about how to divert suspicion. They helped Draven remove his belongings from Voss's house to give a false appearance that Draven was not living there. Draven's mother falsely claimed he was at their house at the time of the crime and, later, that he delivered newspapers with her, an alibi rebutted by cell tower data.

On November 13, 2007, law enforcement officers approached Runyon in West Virginia about the death of Cory Voss. Runyon voluntarily provided a sample for DNA testing. Runyon's DNA was not connected to the crime.

Voss and Draven learned their friends had been summoned before a grand jury. They encouraged their friends to lie about their intimate relationship. Tr. 994-99; 1009-12, 7/9/09.

On December 11, 2007, the police searched the house where Runyon lived in West Virginia, his car, his storage unit, and a prior residence. The prosecutors later used at trial items found during those searches, including: phone numbers for Cat Voss and Michael Draven; a box of .357 magnum bullets with five missing hollow point bullets; papers mentioning the LFCU and a length of time consistent with travel to Virginia; and a *list* of items (but not the actual items) including: tarp, trash bag, Taser, Spyderco knife, contacts, watch cap, black hoody sweatshirt, black BDU pants, black jungle boots, black dress socks, gel shoe inserts, leather gloves. *United States v. Runyon*, 707 F.3d 475, 486 (2013); Tr. 1034-36, 1043-45, 7/9/09, Gov't Tr. Ex. 217, 217-001.

Also on December 11, 2007, Runyon was taken to the Morgantown, West Virginia, Police Department and interrogated on video tape. Although Runyon denied involvement in the crime, he was arrested on state charges.

On December 13, 2007, into the early morning hours of December 14, 2007, police interrogated and arrested Michael Draven. At their request, Draven telephoned Voss and asked her to come to the police station. When Voss arrived, she was arrested and interrogated. Voss inculpated herself, said she did not know Runyon but once spoke to him by phone when Draven was incarcerated, and said she did not pay Runyon to kill her husband.

A federal indictment issued on February 13, 2008, charging Catherina Voss, her boyfriend, Michael Draven, and David Runyon with five counts: (1) conspiracy to commit murder for hire, 18 U.S.C. § 1958(a); (2) carjacking resulting in death, 18 U.S.C. § 2119 and 18 U.S.C. § 2; (3) bank robbery resulting in death, 18 U.S.C. § 2113(a) & (e) and 18 U.S.C. § 2; (4) conspiracy to commit robbery affecting interstate commerce, 18 U.S.C. § 1951(a); and (5) murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1), (j) and 18 U.S.C. § 2. ECF No. 3.

4

On March 4, 2008, Lawrence H. Woodward, Jr. and Jon M. Babineau were appointed to represent Runyon.

Two months later, on May 5, 2008, defense counsel for Voss, Draven and Runyon went before the Department of Justice's authorization panel to determine whether any of them would be subject to the death penalty.

On July 17, 2008, the prosecution filed a death notice for Runyon and a notice that death would not be sought against Draven. ECF Nos. 67, 68. The next day, in exchange for a sentence of life in prison without parole, Voss pled guilty to all five counts in the indictment. ECF No. 69.

On February 13, 2009, Babineau was removed from Runyon's case due to a conflict of interest. Stephen Hudgins was then appointed to represent Runyon. ECF No. 161. Counsel Woodward moved for a continuance of the March 13, 2009 trial date, stating that the Court had appointed new counsel and the case involved "tens of thousands of documents and potentially more than 100 witnesses," that counsel Hudgins would need time to review and analyze the investigative and mitigation material and meet with and discuss the case with Runyon. ECF No. 160. The trial date was re-scheduled to begin on May 4, 2009. ECF No. 162.

Counsel Hudgins moved for a further trial continuance and attached as exhibits schedules for himself and Woodward. ECF Nos. 164, 165. Counsel Woodward had a five-day medical malpractice trial, two appellate briefs and a two-week federal trial scheduled in the weeks leading up to and immediately following Runyon's May 4th trial date. Counsel Hudgins was newly appointed to the case and had a "full schedule" including a seven-day mortgage fraud case set to begin two weeks before Runyon's trial. ECF No. 165, p. 2. Runyon's trial was moved to June 30, 2009. ECF No. 171.

A month and a half before the new trial date, counsel requested more time to prepare for the trial. ECF No. 179. The Court did not move the start date for the guilt phase of the trial.

5

The guilt phase took place June 30-July 17, 2009.[2] Voir dire comprised the first two days. The overwhelming majority of evidence established Draven and Voss's illicit affair, their plans to kill Voss's husband, and the manner in which the $100,000 Navy gratuity death benefit was spent. The case against Runyon consisted of:

(a)     The fact that, from the end of February to March 14, 2007, Runyon and Draven were employed as test subjects for an experimental drug investigation and thereafter maintained periodic contact;

(b)     The fact of an un-recorded telephone call between Runyon and Voss on March 24, 2007, when Draven was in jail;

(c)     The fact that Runyon purchased a gun between noon and 2 p.m. on April 29th, the day of the crime, and made a 1:30 p.m. withdrawal from an ATM machine in West Virginia;

(d)     The fact that Runyon allegedly asked for $500 before the killing but about a month later he received a $275 Western Union money order from Draven's brother;

(e)     The fact that Runyon pawned a .357 handgun in September and again in November 2007;

(f)     Items seized from Runyon's house, car and storage unit;

(g)     Statements of Voss and Draven characterized as referencing Runyon;

(h)     Witness testimony that Runyon talked about killing a military member or an unidentified person for money.

*Runyon*, 707 F.3d at 485-86.

---

[2] The trial commenced 15 months post-indictment; the average time between indictment and trial in a federal capital case is 31.8 months. McNally declaration, Ex. 3.

The court dismissed the bank robbery count. Tr. 1519, 7/15/09. The jury convicted Runyon of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a crime of violence. Tr. 1714, 1721, 7/16/09; Tr. 1725, 1730, 7/17/2009; ECF No. 245, and acquitted him of conspiracy to commit robbery. ECF No. 245.

The eligibility hearing took place on July 22, 2009. The defense presented no evidence against the prosecution's arguments for death eligibility or against the statutory aggravating circumstances. *Runyon*, 707 F.3d at 485. After deliberating one hour, the jury found Runyon intentionally killed the victim. ECF No. 255; s*ee* 18 U.S.C. § 3591(a)(2)(A). Two statutory aggravating circumstances were also found: (1) Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value;" and (2) he "committed the offense after substantial planning and premeditation to cause the death of a person." *Id.*, pp. 5-6; s*ee* 18 U.S.C. § 3592(c)(8), (9).

The penalty phase took place August 19-27, 2009. The prosecution presented sixteen witnesses. *Runyon*, 707 F.3d at 487. The prosecution also played a videotape of law enforcement officers' interrogation of Runyon during which they referenced Runyon's race and religion. The court of appeals subsequently determined that "the video had no place at this sentencing proceeding," because "such references are legally irrelevant, [and] they violate a defendant's rights to due process and equal protection of the laws." *Runyon*, 707 F.3d at 493-94.

Deliberations began the afternoon of August 26th. During deliberations the jury inquired as follows: "We are seeing a conflict between Jury Instruction No. 26 and the paragraph on the recommendation page. If we are not unanimous on the death penalty, do we have to be unanimous on the other choices?" Tr. 2707, 8/7/09. After a total of eight hours, the jurors returned a split-sentencing verdict: two death sentences and a sentence of life without the possibility of release. ECF No. 291. The jury found the prosecution proved four non-statutory aggravators, that Runyon "caused

7

injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends"; "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army"; "engaged in acts of physical abuse toward women"; and, "demonstrated a lack of remorse [.]" *Runyon*, 707 F.3d at 487.

The jurors found two statutory mitigating circumstances and eight of twelve non-statutory mitigators proposed by defense counsel: (1) no serious criminal record; (2) other persons equally culpable will not be punished by death; (3) if not sentenced to death, Runyon will serve a life sentence without the possibility of release; (4) & (5) Runyon's son and mother will suffer emotional harm if Runyon is executed; (6) Runyon served his country in the Army and was honorably discharged; (7) Runyon graduated high school, earned an associate's degree and took college courses to expand his education; (8) Runyon worked all his life; (9) Runyon committed acts of kindness and generosity for his neighbors and community; (10) Runyon grew up, witnessed, and experienced domestic violence and parental conflict until his mother and biological father separated.

The jurors also found the following mitigators of their own accord: (1) Runyon continued to witness and experience domestic violence and parental conflict /abuse from his mother and adoptive father; (2) Runyon's brother will suffer emotional harm if Runyon is executed; (3) Runyon was given the impression that the victim was molesting his daughter.

As demonstrated below, the convictions and sentences were imposed in violation of the constitution or laws of the United States.

**Procedural History**

Runyon is in federal custody, housed on death row at USP Terre Haute. A jury convicted him, in the United States District Court for the Eastern District of Virginia at Newport News, of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a

8

crime of violence; the jury imposed and was given two death sentences and one sentence of life imprisonment without the possibility of release.

Judgment was entered on December 4, 2009. A notice of appeal was timely filed on the same day. ECF No. 312.

On appeal to the Fourth Circuit, in case number 09-11, Runyon was represented by Teresa Norris and Seth Farber. The following issues were raised:

(i)     A series of erroneous rulings and improper prosecution arguments licensed jurors to hold against Runyon his invocation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to trial;

(ii)    The district court erroneously permitted the government to rely on improper and prejudicial non-statutory aggravating factors;

(iii)   The government advanced arguments that improperly appealed to jurors' emotions, invited speculation, and presented an incorrect, distorted picture of the jury's role;

(iv)    The district court committed a series of errors in substituting alternate jurors;

(v)     The district court erroneously failed to instruct the jury that it could only impose a death sentence if it found the aggravating factors outweigh the mitigating factors beyond a reasonable doubt;

(vi)    Because Runyon's sentencing hearing was fundamentally flawed and influenced by passion, prejudice, and arbitrary factors, his death sentence must be reversed under the cumulative error doctrine and 18 U.S.C. § 3595;

(vii)   The death penalty is unconstitutional;

(viii)  The murder-for-hire and the carjacking statutes exceed Congress' power under the Commerce Clause and violate the Tenth Amendment;

(ix)     In the alternative, because there was no evidence that Runyon traveled in interstate commerce, the court should have granted Runyon's motion for acquittal on murder-for-hire;

(x)      Runyon's conviction for using and carrying a firearm during and in relation to a crime of violence must be vacated because he is not guilty of any of the predicate offenses.

The court of appeals affirmed the convictions. It found that there were four legal errors but ultimately determined each was harmless:

(a)      The Court's replacement of a juror for the eligibility phase violated due process because it occurred outside the presence of defense counsel. *Runyon*, 707 F.3d at 516-18. The court applied a plain error standard instead of a harmless error standard because defense counsel failed to object. The plain error standard was not met because the replacement juror was selected in voir dire when all parties were present, and because defense counsel's failure to object and request a continuance indicated the substitution was not prejudicial.

(b)      The Court's allowing jurors to consider the 42-minute video interrogation of Runyon in the penalty phase was error because exclusion of the entire video was warranted. *Runyon*, 707 F.3d at 493-96. Statements capable of inflaming juror's racial, ethnic, or religious prejudices "degrade the administration of justice[,]" *Runyon*, 707 F.3d at 494 (quoting *Battle v. United States*, 209 U.S. 36, 39 (1908)), are legally irrelevant, and violate a defendant's rights to due process, equal protection of the laws, and the First Amendment right to freedom of religious beliefs. The references to Runyon's race and religion came directly from the mouths of law enforcement, directly referred to Runyon, were irrelevant, stereotypical and insulting. The court found the error was harmless based on the jury instructions, the fact that the jurors nevertheless would

10

have found the lack-of-remorse aggravator because defense counsel never argued against it, and the jurors accepted the equally-culpable-codefendants mitigator.

(c)     The prosecution presented improper argument regarding: (1) Runyon's exercise of his Sixth Amendment right to a trial by jury, and (2) Runyon's exercise of his Fifth Amendment right against self-incrimination. *Runyon*, 707 F.3d at 507-10. The harmless error finding was based on the fact that defense counsel failed to object to the prosecutor's arguments, the lack-of-remorse aggravator was established by other evidence, and the jurors found the equally-culpable-codefendants mitigator.

(d)     The prosecution presented improper argument when it exhorted the jury to "do your duty" and to "send a message to the community" with the verdict. *Runyon*, 707 F.3d at 514-15. The determination that the error was harmless was based on the fact that the comments were isolated, did not mislead or inflame the jury, and jury instructions minimized the risk of harm.

Runyon filed a petition for writ of certiorari on August 21, 2013. The questions presented were: (1) Whether, in order to demonstrate that evidentiary errors in a capital sentencing proceeding were harmless, the government must establish that the errors did not affect the verdict of the jury that actually heard the case or whether the government may instead meet its burden by demonstrating that such errors would not have affected a hypothetical, reasonable jury; and (2) Whether, under the cumulative error doctrine, a reviewing court must reverse if the government cannot establish that preserved errors are harmless beyond a reasonable doubt, or is reversal required only if the errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness." After granting the United States eleven extensions, the Supreme Court denied certiorari on October 6, 2014. *United States v. Runyon*, No. 13-254, 135 S. Ct. 46 (2014) (Mem.).

11

**Claims for Relief**

The claims and allegations set forth in all sections of this Motion are realleged and incorporated by reference in all other sections and claims.

**Claim 1:**    **The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

There were two "dirty cops" involved in this case, each to Runyon's detriment. These former law enforcement agents engaged in multiple criminal acts involving dishonesty before and/or during their involvement in Runyon's case. Because of the pervasive dishonesty of these individuals, neither the Court nor the parties can have confidence that their work product with respect to Runyon's case was truthful, accurate, and complete. The presence of these individuals denied Runyon his right to a fair trial in violation of due process. *Berger v. United States*, 295 U.S. 78 (1935). To the extent trial counsel knew information about these individuals and failed to take action, trial counsel was ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.**    **The United States Failed To Timely Disclose The Participation Of Two "Dirty Cops," Which Tainted Runyon's Trial.**

**1.**    **Robert Glenn Ford**

The first "dirty cop" was Robert Glenn Ford, a homicide detective with the Norfolk Police Department who retired from public service in 2007—just short of thirty years with the Department. Ford went into practice as a private investigator. Three weeks before this Court appointed Ford to assist Runyon's defense counsel as an investigator, this Court issued a warrant for the arrest of Ford's long-time confidential informant, Marcus Adams, on charges of being a felon in possession of a firearm. Adams entered into a plea agreement, and as part of the cooperation component he was debriefed on November 7, 2008. During that interview, he:

> divulged a scheme in which he acted as the go-between for former homicide detective Robert Glenn Ford, who accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations. As a result of these false statements, the

12

defendants received reduced sentences or dismissal of their charges. Adams provided intricate details of the scheme, including the names of the defendants, approximate dates and amounts of the bribes. Subsequent investigation by the Federal Bureau of Investigation corroborated the information provided by Adams.

*United States v. Adams,* No. 2:08-cr-103 (E.D. Va.), ECF No. 37, pp. 2-3.

On April 15, 2008, this Court authorized Ford's work on Runyon's case. ECF No. 41 (sealed order). Ford investigated and interviewed witnesses, and provided reports to defense counsel, while the United States investigated Ford and mustered evidence to prosecute him for taking bribes and making false statements in his reports to prosecutors and judges during his tenure as a police officer. Shortly after this Court entered judgment against Runyon, the United States charged Ford with making false statements, conspiracy, and multiple counts of extortion.

Runyon's trial counsel relied on Ford to conduct an honest investigation and to produce reports that were reliable. The United States did not inform Runyon's counsel that it had evidence indicating that Ford extorted bribes in connection with his prior investigations and submitted reports to prosecutors and judges that contained false statements. It should have disclosed the kind of information contained in the instant claim, including the fact that there was evidence indicating that Ford had engaged in a pattern of criminal conduct involving dishonesty in his prior investigations.[3] This information would have been sufficient for any reasonable defense counsel to question whether they could have confidence in the reliability of Ford's investigations and reports. If the United States had disclosed this information, any reasonable counsel would have recognized the risk that Ford's investigations and reports in Runyon's case might be materially unreliable, would have asked this Court to substitute a different investigator, and would have moved the Court to continue Runyon's case to ensure an untainted reinvestigation. Alternatively, the United States might have informed the Court

---

[3] Runyon recognizes that the investigation of Ford's prior misconduct was highly confidential, and that disclosure by the United States would have been subject to strict requirements of secrecy.

13

(rather than defense counsel) that there was evidence of Ford's pattern of criminal conduct involving dishonesty, and the Court could have worked with Runyon's counsel to terminate Ford's appointment, substitute a different investigator, and continue Runyon's case to ensure an untainted investigation.

The government's obligation to promptly notify Runyon that it had evidence of criminal conduct by the defendant's court-appointed investigator was grounded on two different constitutional provisions. First, it was based on Fifth Amendment due process principles concerning the fundamental fairness of trials. *Berger v. United States*, 295 U.S. 78 (1935). As a result of its investigation of Ford, the United States knew or should have known that Runyon was unwittingly using an investigator who had committed criminal acts of dishonesty and who lied in reports to prosecutors and judges. If Ford similarly accepted bribes or made false statements to Runyon's counsel, defense counsel would have been given inaccurate information about the relevant facts thus depriving Runyon of a fair trial.

Second, the government's obligation was based on the Sixth Amendment right to counsel. Although an attorney's own acts or omissions are the most common causes of ineffective assistance under the Sixth Amendment, the acts or omissions of others also can render counsel's representation ineffective. In *Williams v. Martin*, 618 F.2d 1021, 1027 (4th Cir. 1980), for example, the court of appeals held that the trial court's refusal to provide a necessary expert deprived the defendant of the effective assistance of counsel. *See also Strickland*, 466 U.S. at 686 (stating that "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense[,]" and citing examples).[4] Moreover, if

---

[4] When the prosecution is aware that defense counsel has a conflict of interest, it has a duty to bring that conflict to the court's attention. *United States v. Tatum*, 943 F.2d 370, 379-80 (4th Cir. 1991). By the same reasoning, when the prosecution is aware that the defendant's court-appointed investigator has engaged in criminal acts involving dishonesty that may render the investigator's work product untrustworthy, it has an analogous duty to bring that fact to the attention of defense counsel or the court. In both cases, the prosecution's duty derives from *Berger*, 295 U.S. at 88, which famously

counsel did have information about Ford, trial counsel's failure to take appropriate action was deficient performance. *Strickland*, 466 U.S. at 687.

Because of the government's failure to promptly disclose information that was uniquely in its possession, Runyon was completely in the dark and lacked the ability to take any corrective steps while his case was still in the district court.[5]

### 2. Clifford Dean Posey

The second "dirty cop" was Clifford Dean Posey, a Special Agent of the Bureau of Alcohol, Tobacco, and Firearms. Posey was one of the government agents investigating Cory Voss' death and developing evidence for prosecution. He worked behind the scenes and did not testify at trial. As a result, the United States knows the scope and nature of Posey's assignments on this matter, but that information will only be available to Runyon's collateral counsel through discovery. Posey's name appears on the government's trial exhibit 181 as the transcriber of a recorded telephone call. Gov't Tr. Ex. 181, 181B-002. It appears equally briefly on a few unadmitted documents that the United States provided to trial counsel. Runyon believes, but cannot yet confirm, that Posey played a substantial role in investigating and preparing the evidence in this matter.

Court records suggest the government was aware of Posey's misconduct, at the latest, on October 12-13, 2010. *United States v. Posey,* No. 3:11-cr-94, (E.D. Va.), ECF No. 14, p. 5. At that time, Runyon's case was on direct appeal. After investigation, the United States brought charges against Posey in Richmond on April 5, 2011. The United States knew that starting no later than 2007 (the year

---

pronounces that "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

[5] Runyon's mitigation investigator was unaware of the federal investigation into Ford's bribes, dishonesty, and false statements. However, she was aware of Ford being under pressure because of media coverage into his involvement in coercing confessions from two defendants in the "Norfolk Four" case. Cronin declaration, Ex. 4.

of Cory Voss' death), there were multiple instances of Posey making false statements, engaging in wire fraud, embezzling U.S. property, possessing or receiving stolen firearms, and money laundering. *Id.*, ECF No. 9. Posey entered into a plea agreement days after his arrest, and judgment was entered against him on September 21, 2011. *Id.*, ECF No. 38. At that time, Runyon's case was still on direct appeal.

By the time of Posey's indictment, at the latest, the United States knew that Posey had been engaging in criminal acts involving dishonesty over a period of three to four years, including the time he was developing evidence and preparing the case against Runyon. The United States knew or should have known that the work Posey performed in relation to the prosecution of David Runyon might therefore be compromised and unreliable. It did not disclose to Runyon's trial or appellate counsel the fact that Posey was being investigated for, nor the fact that he was arrested for, nor the fact that he was convicted of, crimes involving dishonesty.

On information and belief, Posey's participation in the preparation and prosecution of this case resulted in the government's presentation of false or unreliable evidence against Runyon. *Brady v. Maryland*, 373 U.S. 83 (1963). Alternatively, if trial counsel knew of Posey's improper conduct, trial counsel was ineffective for failing to investigate and present evidence of the same.

**Claim 2:**     **The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

In addition to the government's failure to disclose evidence about Ford and Posey, the government also possessed, but did not disclose, voluminous evidence demonstrating that co-defendant Draven was far more deserving of death than Runyon. Soon after Draven was indicted, the government provided Draven's trial counsel with thousands of pages of documents demonstrating:

- Draven has an extensive juvenile history of violent criminal conduct, including, but not limited to, the sexual assault of numerous children;
- Draven had been placed in a residential facility for child sexual assault;
- Draven had been diagnosed as having conduct disorder, undifferentiated type, a precursor to anti-social personality disorder;

16

- Draven had been diagnosed as having Pedophilia.

Such evidence could not have been more important to Runyon's case in mitigation. The "centerpiece" to counsel's case in mitigation was that he was no more culpable than Draven and Voss, both of whom the government deemed unworthy of the punishment of death. *Runyon*, 707 F.3d at 508. Runyon's trial counsel had specifically requested that his sentencing jury be instructed that it could consider as mitigation that Runyon was no more culpable than the architects of Cory Voss' murder. Much of the evidence trial counsel presented went to that very argument.

Similarly, much of the evidence presented by the government to rebut Runyon's mitigation case focused on Runyon's history of violent conduct. The government pointed to his assaults on various women, going so far as to play a video of what it described as his manipulation of a helpless female victim. Tr. 2611, 8/26/09. Indeed, Runyon's sentencing jury found that the government had proved the non-statutory aggravating factor of "abuse of women" beyond a reasonable doubt.

The evidence demonstrated that Runyon's history of violence against women paled in comparison to that of Draven, the man the government deemed unworthy of death. Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely slap or punch his victims, he raped them. Draven's victims were not merely physically smaller, they were little children; children who were near the age of the Voss children, the children who, under his plan to murder Cory Voss, would have been permanently placed at Draven's fingertips.

Though clearly exculpatory, none of this evidence was provided to Runyon's counsel. The government's failure to provide such evidence thus violated the Fifth, Sixth, and Eighth Amendments, and *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995). Moreover, there is a reasonable possibility that, had Runyon's sentencing jury known that Draven, whom the government decided did not deserve death, had a far more violent past than Runyon and carried with him the specter of a far more violent future, one or more jurors would

17

have refused to sentence Runyon to death. *Cone v. Bell*, 556 U.S. 449, 452 (2009) (vacating death sentence because withheld evidence would have altered "at least one juror's assessment" of appropriate penalty). The evidence the government withheld was therefore clearly material. Accordingly, Runyon is entitled to relief. [6] This claim is specifically alleged as to all phases of Runyon's trial, including pretrial, guilt, eligibility and selection phases, and there is a reasonable probability that had this evidence been disclosed, Runyon would not have been convicted and/or sentenced to death.

The prosecution failed to disclose evidence which would have impeached its witnesses and failed to disclose evidence which would have caused the jury to find Runyon not guilty. The prosecution also failed to disclose evidence which would have supported a sentence of less than death.

**Claim 3:     Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight And/Or Argue Evidence Of Innocence.**

David Runyon adamantly asserted his innocence. Hudgins declaration, ¶3, Ex. 5; Woodward declaration, ¶3, Ex. 6. The defense counsel with primary responsibility for guilt-phase preparations was Lawrence Woodward. ECF No. 179 p. 10; Hudgins declaration, ¶1, Ex. 5; Woodward declaration, ¶2, Ex. 6. There was no direct evidence of Runyon's participation. Most of the evidence presented by the prosecution involved the co-defendants, Michael Draven and Cat Voss. Woodward declaration, ¶9, Ex. 6. The guilt-phase theory of the case was reasonable doubt. *Id.* This involved portraying the co-defendants as bad actors and creating doubt regarding David Runyon being the person who shot Cory Voss. *Id.* Trial counsel, however, was ineffective for failing to investigate, present, and highlight evidence of innocence. *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[6]Investigation regarding the government's failure to provide exculpatory information is ongoing and supplemental information will be provided when available.

**A.      Chad Costa**

Cory Voss was shot five times: bullets entered his chest. Gov't Tr. Ex. 18, 018-002, Autopsy report pp. 1-2.[7] The prosecution argued that Runyon owned a five-shot handgun and emptied the gun on Cory Voss. Tr. 1593, 1595, 1611-12, 7/16/09. Since defense counsel did not present any witnesses who had known Runyon during the "years" that preceded the murder, the prosecution urged the jury to conclude that there was no evidence about the man who was on trial; except, of course, that he was a cold, calculated killer. Tr. 2610, 8/26/09. In fact, the prosecution elicited testimony that Runyon told people he was a hit man. The prosecution argued that Runyon had changed; he was not the same person who was described by the testifying character witnesses as a good friend, a charitable person, a considerate and helpful guest, and a caring father.

Chad Costa met David Runyon in the second half of 2007. Costa declaration, p. 1, Ex. 7. They took approximately three trips to New Jersey to work in drug studies and had a lot of time to talk during the seven-hour drives. *Id.* Costa learned that Runyon was in the Army and had been a police officer for a while, but Runyon didn't like the politics. *Id.* Runyon talked a whole lot about his son Little Davy. He didn't talk much about any other family: Runyon had a brother but the brother was mad because Runyon hadn't stayed in contact; Runyon was never close to his parents and left home as soon as he could. *Id.* Runyon said his ex-wife, Maria, messed-up his whole life: she broke down his self-esteem and caused him a lot of heart ache. *Id.* He said Maria had a lot of problems in her life and brought problems to their marriage. *Id.* Costa had heard of Jenny, Runyon's ex-girlfriend, and knew

---

[7] Defense counsel failed to highlight how the random spray of five gunshots and the two shell casings left at the scene were inconsistent with the prosecution's argument—in support of guilt and a non-statutory aggravator—that Runyon utilized special skills as an expert marksman and training to avoid leaving behind evidence. Tr. 1593, 1595, 1611, 8/19/09. Nor did counsel counter the prosecution's penalty phase closing argument that Runyon's specialized training taught him to aim for "center mass" because that was the most deadly target. Tr. 2611-12, 8/26/09. In fact, soldiers and law enforcement are taught to shoot at "center mass" because it is the biggest, not the deadliest, target.

she also caused a lot of problems for Runyon. *Id.* Runyon told Costa that both Maria and Jenny had taken out assault warrants against him and he went along with it because he did not want the conflict in court. *Id.* Costa had met David's girlfriend, Sarah, and knew she was a drug addict and that relationship was also doomed to fail. *Id.*

Runyon told Costa he liked to brag about things and make-up things to impress women so he'd have a chance with them. Costa declaration, p. 1, Ex. 7. Runyon wanted people to think he was a "thug" and bought a hoodie, baggy pants and boots to look like a "thug," but he was so small and thin that he just didn't look the part. *Id.* An example of one of Runyon's boasts was a story about road rage. *Id.* Runyon told Costa that a truck driver cut him off and Runyon was able to pull alongside the driver and have him park alongside the road. *Id.* The driver exited his truck with a crowbar. *Id.* Runyon said they fought, he took the crowbar from the driver, and was going to kill him but his friends pulled him away from the man. *Id.* Costa didn't believe this story because it appeared to him that Runyon couldn't harm anyone. *Id.* Throughout those long car rides, Runyon never told Costa that he had killed anyone. *Id.*

Costa had seen Runyon with a black, six-shot revolver.[8] *Id.* Costa was certain it held six bullets. *Id.* Two detectives who questioned Costa about Runyon said the gun Costa described was definitely the murder weapon and they wanted to find it. *Id.*

The detectives told Costa that Runyon had never been a police officer (which was not true). Costa declaration, p. 2, Ex. 7. Costa didn't know anything about the murder and the detectives told him a lot of information over the course of two hours. *Id.* The detectives said Runyon met a man named Michael Draven at a drug study who, along with his girlfriend Catherina Voss, hired Runyon

---

[8] The fact that Runyon's gun was black or was "blued" is undisputed. Counsel failed to point out that the ATM photo, Gov't Tr. Ex.28W, showing a "shine" off the perpetrator's gun, contradicted Runyon's guilt because a "blued" gun reduces glare from light.

to commit murder for $250,000. *Id.* The detectives convinced Costa that Runyon committed the murder and they had the evidence they needed for a conviction. *Id.* This influenced Costa's testimony in front of the grand jury and caused him to agree with the prosecutor that Runyon could have committed this crime. *Id.* When Costa said anything positive about Runyon in front of the grand jury the prosecutor gave him a dirty look and changed the subject. *Id.*

Defense counsel had Chad Costa flown-in for the trial but never called him as a witness.[9] ECF No. 220, p. 2; ECF No. 256, p. 2. This failure was prejudicial. Costa's testimony could have cast doubt on the reliability of the police investigation and the prosecution since the police were convinced that Runyon's six-shot revolver was the murder weapon, they lied about Runyon not being a police officer, they tainted witnesses who had no knowledge of the crime by supplying them with details, and the prosecutor cast aspersions on a witness's honest testimony before the grand jury.

Costa's testimony undermining the reliability of the police investigation would have supported Sarah Baker's allegation that the police threatened to permanently separate her from her children. Tr. 1146, 7/13/09. Costa would have supported the contention that police coerced Baker to testify that Runyon said he killed someone.[10] This further undermines the prosecution's case and creates doubt.

Costa's testimony about Runyon's braggadocious nature could have explained why Runyon would describe himself as a "hit man." Costa's testimony could have provided the jurors with reasonable doubt. *See* Woodward declaration, ¶9, Ex. 6

Had Costa testified, the prosecution could not have argued that *the absence of testimony* from persons who knew Runyon during the time period preceding the crime *was evidence* that Runyon was

---

[9] Counsel does not remember why witnesses who were subpoenaed and who were present did not testify. Hudgins declaration, ¶9, Ex. 5.

[10] Investigation regarding Sarah Baker is ongoing and supplemental information will be provided when available.

not the person portrayed by the defense witnesses.[11] Costa also would have provided evidence of Runyon's inability to escape the predispositions to poor decision-making regarding romantic partners and to a pattern of failed relationships. As explained below, such predispositions arising from hereditary and childhood experiences are important perspectives for the subsequent explanation of Runyon's reduced moral culpability. *See* Cunningham declaration, Ex. 8.

Trial counsel was prejudicially ineffective for failing to present Costa's testimony. *Strickland v. Washington*, 466 U.S. 668 (1984); *see, e.g., Mosley v. Butler*, 762 F.3d 579 (7th Cir. 2014) (trial counsel ineffective for failing to call witnesses who would have rebutted State's theory of guilt).

### B.    Cat Voss

The prosecution entered into evidence statements and electronic communications of Cat Voss that were not subjected to cross-examination. Although her plea agreement required her to testify, ECF No. 69, p. 7, the prosecution did not call her as a witness. Defense counsel also did not call Voss as a witness. The prosecutors told Counsel Woodward that Voss would testify that she hired Runyon and that Runyon and Michael Draven were lying in wait for Cory Voss. Woodward declaration, ¶11, Ex. 6.

In fact, Voss *did not have any personal or independent knowledge* that Runyon was the person who shot Cory Voss. Cat Voss declaration, ¶¶5, 11, 19, Ex. 9. Voss suspects that Draven killed Cory. *Id.*, ¶¶16, 24. When she was speaking with Draven on the telephone just minutes before Cory was killed, Cat did not hear Runyon in the background and suspects that Runyon was not with Draven. *Id.*, ¶16. Furthermore, Draven had been prepared to kill Cory himself.[12] One day when Cory was home, Draven

---

[11] Other persons who knew David in the years leading up to the crime, and who were available to testify, were David Dalton, Sr., Paula Dalton, and Matt Long. D. Dalton declaration, Ex. 10; P. Dalton declaration, Ex. 11; Long declaration, Ex. 12. Investigation regarding this area is ongoing and supplemental information will be provided when available.

[12] Cat Voss identified the handwriting on the map found in Runyon's car as Draven's handwriting. Voss declaration ¶17, Ex. 9. Counsel contemplated a theory that Draven made Runyon

called Cat Voss and said he wanted to come over and kill Cory. *Id.*, ¶24. Cat Voss told him no because her children were also at home.[13] *Id.*

An expression of doubt as to whether Runyon was the triggerman -- from the co-defendant who was crucial to executing the murder plan -- would have raised a reasonable doubt for the jury. *See* Woodward declaration, ¶9, Ex. 6 (the defense theory involved creating doubt regarding David Runyon being the person who shot Cory Voss). Accordingly, counsel's failure to speak with Cat Voss and present her as a witness was prejudicial.

### C.      Scott Linker

Scott Linker, David Runyon's former brother-in-law, describes Runyon as "passive not aggressive." Linker declaration, p. 1, Ex. 13. Had he been asked, Linker would have testified as follows:

> David loved guns. He was a gun enthusiast but not a "gun nut." David was very knowledgeable about guns and he was a responsible gun owner. David respected the power of a gun and did not take it lightly.

> David collected and traded guns like some people do baseball cards. It is what he knew and loved. It was common for David to buy a gun, turn around, and sell it quickly. I remember David bought a Taurus, Raging Bull revolver. He sold it to me two days later because he did not like the way it fired. David did the same thing with ammunition.

> David was also an expert marksman. We hunted together a lot. The craziest thing I've ever seen is when David shot a deer from 400 yards away. We were on our way to our hunting spot one day when we saw three deer from the roadway. I wanted to drive closer before taking a shot but David insisted I stop the car. David laid across the car and fired two shots: the first one went through the deer's ear and the second one in his head.

> It doesn't make sense to me that David committed this crime because the victim was shot five times. To say David would have to shoot anyone more than once (especially from close range) is ludicrous.

---

the "fall guy." The jurors could have had a reasonable doubt on this basis given Draven's writing on the map, Runyon's eagerness to please other people, *see, e.g.,* Cunningham declaration, p. 37, Ex. 8, and the fact Draven could have accessed Runyon's car when they were housed together for a three-week drug study just prior to the crime.

[13] Investigation of this matter is ongoing and supplemental information will be provided when available.

> David was also a smart guy. He was educated but also had common sense. I can't believe that David would leave items in his car that implicated him in a murder, especially after he knew the police had talked to him about a murder. This defies all common sense and David would never be that stupid.

Linker declaration, p. 2, Ex. 13.

Counsel rendered ineffective assistance by failing to elicit this testimony because it provided context for Runyon's gun purchase and supplied reasonable doubt.

### D.    Rose Wiggins

Rose Wiggins, Cat Voss's mother, was called by the prosecution to establish a timeline for the killing. Although she testified that she drove by the scene of the crime at 3 a.m. and did not see Cory's truck in the parking lot, Tr. 259-60, 7/6/09, defense counsel failed to highlight this fact. Moreover, when counsel tried to argue that there was a period of time that did not account for Cory Voss's location, Tr. 1634-35, 7/16/09, the prosecution again argued that the *lack of evidence* was proof of guilt because only Runyon could have known what occurred but Runyon wasn't talking. Tr. 2659-60, 8/26/09. Had counsel utilized Wiggins' testimony to support his argument, the jury may have had a reasonable doubt about Runyon's involvement. *See* Woodward declaration, ¶9, Ex. 6 (the defense theory was reasonable doubt). Trial counsel's failure to do so prejudiced Runyon's defense.

### E.    David Runyon's Whereabouts the Day of the Crime[14]

David Runyon lived in Morgantown, West Virginia. Witnesses and electronic transactions placed Runyon in West Virginia on April 29, 2007, at least until 8:37 p.m. The crime occurred on April 29th at 11:33 p.m. over six hours away in Newport News, Virginia.

Runyon owned two cell phones. One was his primary phone. His son Davy and his son's babysitter used the other cell phone so the three could remain in contact when they were apart.

---

[14] Investigation is ongoing and supplemental information will be provided when available.

Between noon and 2 p.m. on April 29, 2007, Runyon met with George Koski to purchase a handgun. Tr. 847, 7/8/09. That transaction was friendly and the two men engaged in conversation. Tr. 851, 856, 7/8/09. Runyon was not in a hurry and he provided Koski with his full name and driver's license. Tr. 854-56, 7/8/09.

At 1:30 p.m., Runyon withdrew $80 from an ATM in Morgantown. Gov't Tr. Ex. 65, 065-006. Runyon used his cellphone to call Davy at 1:20 p.m. and 2:08 p.m., Gov't Tr. Ex. 109, 109-014, before and after the ATM transaction. The only other cellphone call Runyon placed that day was at 8:37 p.m. and that call was also to Davy.[15] None of the calls made by Runyon on April 29th incurred roaming charges, meaning the calls were placed within the state of West Virginia. *Id.*

Davy's babysitter was Paula Dalton and her boyfriend, Matt Long, or her father David Dalton. *See* Paula Dalton declaration, ¶5, Ex. 11; Long declaration, ¶3 Ex. 12; David Dalton declaration.¶5, Ex. 10. Although Paula Dalton was called by the prosecution as a witness, defense counsel did not elicit testimony that she never received a phone call on Davy's phone from a caller other than David Runyon. Furthermore, the prosecution did not ask Paula Dalton whether Runyon provided her with a different phone number to reach him on April 29, 2007. If asked, Paula Dalton would have testified that the only number she used to contact David Runyon was his primary number and the only calls she received from that primary number where placed by David Runyon. Because the prosecutor argued that Runyon might have left his cell phone in West Virginia and went to Newport News to commit the crime, Runyon was prejudiced by counsel's failure to elicit this testimony.

---

[15] The vast majority of calls placed by Runyon between April 18 and May 17, 2007, were to Davy. Gov't. Tr. Ex. 109, 109-014. Notably, no calls were placed to a Virginia phone number during that time period.

F.        **Cell Tower Testimony Regarding Michael Draven**

The prosecution presented testimony that Draven was moving away from the credit union at the time of the killing. Tr. 1445-48, 1452-53, 7/14/09. To support this theory, the prosecution presented a map of cell tower locations as an exhibit through Paul Swartz. Gov't Tr. Ex. 135. Circles had been drawn around each tower to represent the radius in which the tower allegedly would service a cell phone. *Id.* The prosecution elicited testimony that the "movement" of Draven's cellphone signal between the towers proved Draven was located within and moving between the radii of the towers. Tr. 1461, 7/14/09.

Defense counsel's failure to challenge the validity of this testimony was prejudicial. Cell-tower-tracking testimony that purports to locate a person's precise location *is not valid.* This is due to a faulty, underlying presumption that a cell phone connects to the closest tower. *See United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). There are a number of factors that determine which tower a phone connects to and whether it remains connected to that tower, or switches towers, during the duration of a call. Those factors include the technical characteristics of the tower, antennas and phone, environmental and geographical features, and indoor or outdoor usage. Aaron Blank*, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J. L. & TECH. 3, at *7 (Fall 2011); *see also* Larry E. Daniel, *Cell Phone Tracking Evidence*, Ex. 14. At best, cell tower information indicates that a person is located within twenty linear miles (up to 500 square miles) of any particular cell tower. *See* Judge Herbert B. Dixon, Jr., *Scientific Fact or Junk Science? Tracking a Cell Phone Without GPS*, 53 The Judges Journal, 1 (American Bar Association 2014).

Three cell towers are located within twenty miles of the credit union. Gov't Tr. Ex. 135. Draven's cell phone could have connected to any or all of those towers with or without him changing locations. Accordingly, there was *no reliable evidence* definitively proving that Draven was moving away from the credit union at the time of the crime. Draven could have been at the credit union committing

26

the crime himself, as Cat Voss suspected. This information could have created a reasonable doubt about Runyon's involvement. *See* Woodward declaration, ¶9, Ex. 6 (the defense theory "involved portraying the co-defendants as bad actors and creating doubt regarding David Runyon being the person who shot Cory Voss.").

Trial counsel's investigation of this evidence was deficient, *Strickland, supra; see Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) (ineffectiveness for failure to consult expert). To the extent that any of this information was not available at the time of Runyon's trial, it constitutes newly-discovered, scientific evidence of innocence.

### G.    Runyon's Shopping List

The prosecution introduced a list of twelve items--written at an unknown time--that was found among Runyon's belongings and characterized it as a checklist for the crime.[16] Gov't Tr. Ex. 217.

Counsel failed to point out that the shopping list does not contain items used in the crime. Most obvious, it does not list a gun. Yet the prosecution argued that Runyon needed to purchase a gun on the day of the crime in order to kill the victim. Tr. 1593, 7/16/09. The list also does not include the mask that the prosecution said Runyon wore at the time of the crime to hide his face. Tr. 2598, 8/26/09.

Items on the list like the taser, Spyderco knife, tarp, trash bags, black dress socks, gel shoe inserts, and clothing did not have any role in the crime. If anything, the clothing on the list—a black hoody, cap, BDU pants and jungle boots—was consistent with Chad Costa's statement that Runyon bought clothes to look like a "thug" in order to impress people. Costa declaration, p. 4, Ex. 7. Both trial and appellate counsel's failure to counter the prosecution's use of this list as "a checklist of items to be used in the murder," *Runyon*, 707 F.3d at 504, was prejudicial since this exhibit is one more

---

[16] The government did not introduce into evidence any of the items on the undated shopping list.

example of using facts unconnected to the actual crime as "evidence" of Runyon's guilt. Had counsel highlighted this point, along with the others mentioned herein, the jurors could have reasonably doubted that Runyon was involved in this crime.

The doubts raised by presenting and highlighting the above facts, coupled with the undisputed fact that Runyon placed a non-roaming phone call on the night of the crime at 8:37 p.m., Gov't. Tr. Ex. 109, 109-014, establishes reasonable doubt that Runyon was involved in the crime. The prosecution's circumstantial case was by no means overwhelming and, in certain respects, it contradicted a finding of guilt. At the close of the prosecution's case, the Court dismissed the bank robbery charge. *Runyon*, 707 F.3d at 486. The jury found Runyon not guilty of conspiracy to commit robbery. *Id.* Clearly, the jurors were willing to acquit Runyon.

*Strickland* requires the Court to determine whether trial counsel's deficiencies "alter[ed] the … evidentiary picture." *Strickland v. Washington*, 466 U.S. at 696. Had counsel presented all of the evidence discussed herein, the evidentiary picture would have been dramatically altered. Counsel's failure to do so was prejudicial and undermines confidence in the outcome of the case.[17] *Id.*

**Claim 4:       Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstance Of Substantial Planning.**

Defense counsel requested that Runyon's capital trial be trifurcated, meaning that if the jury convicts, the decision regarding whether Runyon is eligible for a death sentence should occur in a proceeding separate from the decision whether Runyon should be sentenced to life or death. ECF No. 93 p. 3. Counsel argued that maintaining the presumption of innocence in the context of a capital case is difficult with a death qualified jury and this procedure would protect Runyon's Fifth

---

[17] Investigation into Runyon's innocence is ongoing and supplemental information will be provided when available.

Amendment right to enter the eligibility phase cloaked in the presumption that he is innocent of the death penalty. ECF No. 93 p. 4. Counsel also argued that a separate phase where the jury deliberates whether the government has met its burden of proving eligibility factors, would prevent that decision from being infected by evidence presented in the selection phase. ECF No. 93 p. 8. The Court granted the request to trifurcate the proceedings. ECF No. 132.

Defense counsel's constitutional obligation was to hold the government to its burden of proof on every element in the case. Counsel has an "overarching duty to advocate the defendant's cause" and "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. In short, counsel's role is "to ensure that the adversarial testing process works to produce a just result." *Strickland*, 466 U.S. at 686. In this case, counsel failed to guard the presumption of innocence or hold the government to its burden when he abdicated the role of advocate at the eligibility phase. Counsel did not present any evidence regarding the eligibility factors. *Runyon*, 707 F.3d at 485. In a three-page argument, counsel told the jurors there were "a couple of things that I would like for you to be considering when you are looking at this eligibility phase." Tr. 1769-70, 7/22/09. Those things were: (1) that the law never requires the death penalty; and, (2) that the jurors were not then-deciding whether Runyon should be sentenced to death. *Id.*, 1770, 1771. Those points failed to address the discrete task at hand, which was the purpose for the trifurcated proceeding. Counsel's argument, which intertwined the eligibility phase with the penalty phase, had the opposite effect. Counsel did not address the factors which the government had to prove and which the jurors would be considering. Counsel did not argue facts that weighed against the "substantial planning" statutory aggravating circumstance. Counsel simply requested that the jurors, when arriving at a decision, look at the evidence "with new eyes," in accordance with the court's instructions. *Id.*, 1772. Counsel, however, had previously argued against the application of the "substantial planning" statutory aggravator and should have placed this argument before the jury for its consideration. *See*

29

*Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005) ("[D]efense counsel's job is to counter the [prosecution's] evidence of aggravated culpability with evidence in mitigation.").

Five months before the trial, defense counsel submitted a ten-page letter to the United States Attorney's Office requesting that the death notice be withdrawn. Ex. 15. That letter sets forth established facts demonstrating that the co-defendants, Voss and Draven, engaged in extensive planning of the crime and Runyon was merely a tool.[18] Ex. 15, p. 3 (citing 18 U.S.C. § 3592(c)(9)).

> According to the United States' theory of the alleged conspiracy for hire as set forth in Voss' Statement of Facts incorporated into her guilty plea as well as statements made by the United States at Voss' sentencing, Voss was without question the mastermind of the scheme to murder her husband Cory Voss. Voss and Draven together created a plan to kill Cory Voss with or without Mr. Runyon's assistance. The United States has acknowledged this fact stating that "[s]ometime in January of 2007 at least three individuals were approached by Voss and Draven and asked about murdering Cory." *See* Tr. of Sentencing for Catherina Voss at p. 5 (Attached as Exhibit A). The United States characterized Mr. Runyon as merely the tool that Voss and Draven ultimately used to execute their murderous plan. Id. The United States repeatedly refers to the murder plan as being Voss' and/or Draven's plan, not Mr. Runyon's plan. In fact, at Voss' sentencing, the United States characterized the plan to kill Cory Voss as almost exclusively the work of Voss in her fit of greed and lust. Id. at 5 lines 10-11, 21; p. 6, lines 21-22.

> Even according to the United States it was Voss and Draven not Mr. Runyon that engaged in the extensive planning and premeditation of the type that constitutes the aggravating factor contained in 18 U.S.C. § 3592(c)(9). The United States stated that "[Runyon] certainly seemed perfect for Cat Voss and Michael Draven *to carry out their plan*" before they began to conspire with Runyon in February and March, 2007. Tr. at p. 5, lines 9-12 (emphasis added). Indeed the United States never alludes to any participation by Mr. Runyon in preparing the plan to kill Cory Voss nor does any of the evidence suggest that Mr. Runyon played such a role in the conspiracy. The evidence suggests at best that Mr. Runyon did as he was told by Voss and Runyon, as the United States concedes when it asserts that "Runyon had been provided the location, had been provided a description of Cory's car, and about the time that he would be there, and David Runyon traveled from West Virginia to meet Cory Voss." Id. at pp. 6-7. Mr. Runyon's role therefore was markedly different from the role of Voss and Draven who spent months engaged in detailed planning and scheming to

---

[18] The letter also sets forth the factual basis for objecting to the "substantial planning" aggravator based on the principle that the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. *United States v. Fulks*, 683 F.3d 512, 524 (4th Cir. 2012). Counsel were ineffective for failing to make this objection at trial and/or on direct appeal.

murder Cory Voss. Mr. Runyon's role does not rise to the level of the type of substantial planning hat § 3594(c)(9) contemplates as justifying application of that statutory aggravator.

As set forth above, Voss and her lover, co-conspirator Draven concocted the intricate plan for having Cory Voss killed so that they could be together and live lavishly off the proceeds from Cory Voss' life insurance proceeds, which they did with flair beginning almost immediately after they murdered Cory Voss. Voss is the person who set up the bank account at the federal credit union in a remote location as part of her murder plan so that she could send Cory Voss out in the dead of night to meet his killer, who she and Draven pre-arranged to be waiting at the credit union at the appointed time. Voss is the individual who callously made the deliberate decision that her children's father would be murdered at a specific time, at a specific place, and in a specific way. On the night of the murder it was Draven who let the shooter know the exact time Cory Voss would arrive at the federal credit union, Cory Voss' exact physical description, and the exact description of the car Cory Voss was driving. Telephone records show that Voss was on the telephone with Cory Voss almost the entire time it took him to drive to the credit union up until approximately two minutes before the hired gunman entered Cory Voss' vehicle.

If not for Voss's and Draven's actions Cory Voss would never have been at the federal credit union on the night he was murdered.

Ex. 15.

This may not have convinced the government to withdraw the death authorization, but these were strong arguments that the jury could have considered and could have established a reasonable doubt regarding the "substantial planning" aggravator. At the eligibility hearing, defense counsel failed to mention the "substantial planning" aggravator at all, let alone advocate for Runyon by countering the prosecution's evidence. Presenting an argument like the one above, may have resulted in one less statutory aggravator, and—at the very least—could have reduced the weight assigned to this aggravator by the jurors once they advanced to the penalty phase. Runyon was prejudiced by counsel's failure to do so. Therefore, counsel rendered ineffective assistance due to a failure to challenge the government's case at the eligibility phase.

**Claim 5:      Trial Counsel Was Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Runyon exhibited signs of severe mental illness and incompetence from the moment he was arrested. There were numerous red flags that suggested Runyon was, through no fault of his own, unable to assist his counsel.

While Runyon was incarcerated at the Portsmouth City Jail, he was "seen by Dr. Kolongo because he believed he has mustard gas in his head (sinus)." Dr. Kolongo reported Runyon was "somewhat grandiose. His thoughts were flighty and rambled on. He verbalized some delusional material." Dr. Kolongo did not make a final diagnosis but believed schizo-affective disorder and bi-polar disorder needed to be ruled out. Portsmouth City Jail records, Ex. 16.

Mitigation specialist Sheila M. Cronin advised trial counsel that Runyon's family history is significant for major psychiatric illnesses as well as neurological/cognitive/developmental disabilities. Cronin declaration, Ex. 4. For example, Runyon's mother exhibited severe mood swings with angry irrational tirades and probably suffers from "bipolar disorder." Runyon's biological father suffered major depression. VA progress note, Ex. 17.

Dr. Merikangas informed counsel that Runyon "is either in a fantasy world of grandiose wishful thinking, or suffering from delusions." Merikangas report, Attachment p. 2, Ex. 2.

Runyon's grandiose delusions were apparent in conversations with his legal team. He repeatedly compared himself to great historical figures. Cronin declaration ¶7, Ex. 4. Runyon's delusions were apparent in letters he wrote to his legal team. One such letter is a "list of lives I have saved over the years." Cronin declaration, Attachment, Ex. 4. Other letters to the defense team reflect fixed delusional beliefs. This correspondence has been reviewed by Drs. Mirsky, Merikangas and Dudley, all of whom note Runyon suffers from a delusional disorder. See Claim 6.C.3 for full discussion of their findings.

Federal law defines incompetency as follows: "[T]he defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense …." 18 U.S.C. § 4241(d).

Pursuant to 18 U.S.C. § 4241(a), the defense is entitled to "file a motion for a hearing to determine the mental competency of the defendant." Upon the filing of such motion, "[t]he court shall grant the motion … if there is a reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable … to assist properly in his defense." *Id.*

The Fourth Circuit has explained that § 4241 "provides a mechanism to secure a judicial determination of a criminal defendant's competency, thereby protecting the defendant's fair trial rights and the integrity of judicial proceedings." *United States v. Broncheau*, 645 F.3d 676, 682 n.8 (4th Cir. 2011). *United States v. White*, 620 F.3d 401, 404 (4th Cir. 2010) (Defendant suffered from delusional disorder, grandiose type, and not competent to stand trial); *United States v. Culp*, 930 F.2d 23 (4th Cir. 1991) (paranoid schizophrenia and delusional behavior were sufficient to establish a mental disease or defect). Consistent with Fourth Circuit case law, Runyon was incompetent to stand trial.

The Supreme Court has affirmed its understanding of competency in *Godinez v. Moran*, 509 U.S. 389, 396 (1993):

> In *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*, we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding" of the proceedings against him." *Accord Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

Throughout the trial, Runyon expressed beliefs that the Court, the prosecution and the court reporter were conspiring to commit premeditated prosecutorial misconduct and to commit illegal and immoral acts to attempt his murder. He repeatedly remarked that events were not recorded by the court reporter in order to conceal this conspiracy and misconduct. "[T]he conviction of an accused person while he is legally incompetent violates due process[.]" *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Trial counsel, of course, had a duty to protect Runyon's due process rights. Failure to protect Runyon's right to be competent during trial qualifies as ineffective assistance of counsel and resulted in the denial of his rights guaranteed by the Fifth, Sixth, and Eighth Amendments. *Strickland v. Washington, supra*; *Newman v. Harrington*, 726 F.3d 921 (7th Cir. 2013) (IAC for failure to raise the issue of client's competency); *Hummel v. Rosemeyer*, 564 F.3d 290 (3d Cir. 2009) (same).

**Claim 6:** **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

In *Strickland v. Washington,* the Supreme Court explained that constitutionally effective counsel "plays a crucial role in the adversarial system," is "necessary to accord defendants the ample opportunity to meet the case of the prosecution," 466 U.S. at 685, and ensures the trial is "a reliable adversarial testing process." *Id.* at 689. In assessing prejudice, the court must assess the totality of the evidence: "Some of the errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695-96. Runyon's case is the former – the errors had a pervasive effect because the jurors did not have an accurate picture of David Runyon, counsel failed to subject the prosecution's case to adversarial testing when available evidence was not presented to counter-balance the aggravating circumstances, and counsel failed to offer persuasive evidence of traumatic brain damage and mental illness, both mitigating factors entitled to great weight.

A. **Counsel Hudgins Appeared In The Case Too Late To Effectively Investigate And Present Mitigation.**

Just four months before the trial began, Stephen Hudgins replaced attorney Jon Babineau, ECF No. 179 pp. 12-13, and assumed Babineau's responsibility for the penalty phase of the case. It was Hudgins who had the most contact with the defense experts and prepared the witnesses for the penalty phase. ECF No. 247 p. 2, n.1; Hudgins declaration, ¶1, Ex. 5; Woodward declaration, ¶¶2, 7, Ex. 6. At the time of Hudgins' appointment, Runyon's counsel had already requested and obtained authorization to hire clinical psychologist Evan Nelson.[19] Although Babineau consulted with Dr. Nelson, an appropriate examination had not been conducted. *See* Hudgins declaration, ¶4, Ex. 5; *see also* Woodward declaration, ¶6, Ex. 6. Dr. Nelson had, however, informed counsel that neuropsychological deficits are a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153 p. 1. Hudgins scrambled to find appropriate mental health experts.

On April 13, 2009, Hudgins moved to continue the trial date for six months, expressing a "firm belief that to require the defendant to proceed to trial on June 30, 2009, will deprive the defendant of his constitutional right to the effective assistance of counsel[.]" ECF No. 179 p. 9.[20]

---

[19] Counsel had represented that Dr. Nelson would:

present a reliable social history of David Runyon and his family. The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning.

ECF No. 135 p. 1.

[20] After Hudgins was appointed on February 20th, Counsel Woodward obtained a continuance of the trial date from March 13th to May 4, 2009. ECF Nos. 160, 162; Hudgins declaration, ¶ 2, Ex. 5. Although Woodward was ready to proceed to trial, Hudgins needed time to become familiar with the case and to prepare the penalty phase defense. Woodward declaration, ¶7, Ex. 6.

Counsel cited Supreme Court precedent, circuit court cases, and ABA Guidelines which set forth the obligations and prevailing norms of counsel in capital cases to conduct a thorough penalty phase investigation and asserted that more time was required "to perform the minimally required functions of counsel[.]" *Id.* The defense had yet to obtain medical records for Runyon, his mother, and his biological father, and asserted that "these records are absolutely necessary" before mental health experts "can perform testing and render opinions." *Id.*, p. 12.

In addition, counsel wanted documentation about injuries Runyon sustained in a head-on collision with a drunk driver.[21] Hudgins declaration, ¶5, Ex. 5; Woodward declaration, ¶5, Ex. 6. Runyon had also been exposed to grenade blasts in Army training exercises. Hudgins declaration, ¶5, Ex. 5. Counsel knew injuries that affected Runyon's reasoning abilities were important for mitigation. *Id.*

In the continuance motion, counsel recounted the change of defense counsel in February, but indicated that, regardless, the case could not have gone to trial on the original date of March 13, 2009, because "[t]he mitigation investigation for the penalty phase was not complete and still is not complete at this time." ECF No. 179 p. 13. Accordingly, counsel requested that the trial date be moved to October. Hudgins declaration, ¶2, Ex. 5. In fact, from the date of appointment to the date of trial, Hudgins had 91 working days to investigate and prepare. At least 32 of those days he spent in court on other cases, including a 14-day federal trial. Hudgins declaration, ¶2, Ex.5; Hudgins schedule (with mark-ups), ECF No. 165 pp. 5-7, Ex. 19. Twenty-five additional days were partially spent in court. Ex. 19.

---

[21] Counsel were never going to obtain records from Runyon's Emergency Room visit in 1996, because Lake Martin Community Hospital destroys its records after seven years. Ex. 18, p. 3.

Given counsel's representations regarding the inability to provide effective representation for a June 30th trial date, "and after having considered the numerous legal authorities cited[,]" the prosecution did not object to a six-month extension of the trial date. ECF No. 181 p. 1.

Since defense counsel requested additional time in order to complete investigation, discovery, and expert testing related only to the penalty phase of trial, the court declined to move the June 30th date for the guilt/innocence phase of trial, but indicated that counsel could renew a continuance motion for the eligibility and penalty phases should the jury convict Runyon. ECF No. 194 pp. 2-4, 9-10 & n.12.

Hudgins secured the appointment of Dr. Mirsky, who conducted a brief examination of Runyon four days before trial began. He informed counsel that there is strong evidence that Runyon is suffering from a neurological disorder and it was essential for Runyon to be evaluated by a neurologist. Mirsky letter 7/2/09, Ex. 20. Counsel then requested funding for neuropsychiatrist James R. Merikangas. As set forth below, this request was not granted until the jury found Runyon eligible for the death penalty. ECF No. 257.

The day before trial began on June 30, 2009, counsel filed another notice regarding mental health experts, but it contained a qualification: "this notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents." ECF No. 230 p. 1. Counsel indicated: (1) Dr. Mirsky is a neuropsychologist who will do psychological testing on the defendant if deemed appropriate once the medical records of defendant and his family are received; and (2) Dr. Merikangas is a psychiatrist who will be testifying to factors discovered in defendant's medical records and those of his family and who may interview defendant on issues discovered in the medical records, all as determined to be necessary and appropriate once the medical records are received. ECF No. 230 pp. 1-2.

37

The jury convicted Runyon on Friday, July 17, 2009, after 4 ½ hours of deliberation. Counsel moved to continue only the penalty phase, ECF No. 254 p. 2 n.4, stating, he "will simply not be ready to present the defendant's case for life at the conclusion of the guilt or innocence phase[.]" ECF No. 240 p. 2 (duplicate filing at ECF No. 247). Counsel asserted that a "mental health examination has uncovered evidence tending to suggest the existence of a significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability." ECF No. 240 pp. 2-3. Dr. Mirsky's testing revealed deficits that required further neurological testing by Dr. Merikangas, ECF No. 242 p. 1, but counsel's motion to fund Dr. Merikangas remained pending. ECF No. 240 p. 3. Counsel also said that they still lacked medical records and the mitigation investigation had not been adequately completed. ECF No. 242 p. 1.

The Court continued the penalty phase for four weeks, with a start-date of August 19, 2009. ECF No. 254.

At the eligibility phase, counsel presented no evidence and a three-page argument. *See* Claim 4, *infra*. The jury determined that Runyon was eligible for the death penalty. Thereafter, the court granted defense counsel authorization to hire Dr. Merikangas. ECF No. 257.

After learning from counsel that the jury had determined Runyon was death-eligible, Dr. Mirsky responded:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accidents. His impaired attention, seen in the poor Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he shows is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warri[o]r, and this should be considered in his sentencing.

Hudgins/Mirsky email, 7/22-7/23/09, Ex. 21.

38

Dr. Merikangas evaluated Runyon on July 29, 2009. Merikangas Report, p. 1, Ex. 2. Both Dr. Merikangas and Dr. Mirsky "noted deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury accounting for these deficiencies," and Dr. Merikangas had ordered scans of Runyon's brain. ECF No. 269 pp. 1-2. The earliest the scans could be scheduled was five days before the penalty phase. *Id.*, p. 2.[22]

Although counsel had obtained permission to supplement the defense experts' reports, *see* ECF No. 269, he failed to do so.

### B.    Counsel Abandons The Incomplete Mental Health Investigation And Presents Repetitive Lay Person Testimony.

Although counsel promised the jury he would "put on … mental health information," he failed to do so. Tr. 1770, 7/22/09. Counsel presented twenty-one witnesses; however, neither Dr. Mirsky nor Dr. Merikangas testified and the jury was not informed of Runyon's brain damage and its impact on his behavior and moral culpability.

One-third of the defense's penalty phase evidence, not only in number of witnesses but also in number of transcript pages, consisted of testimony about Runyon's good behavior as a jail inmate, Tr. 2084-92, 8/20/09; Tr. 2199-2242, 8/24/09, and/or that Runyon's "likelihood of serious violence in prison is very low." Tr. 2158, 8/20/09. It was evidence the jury rejected. *See* ECF No. 291, p. 3.

Counsel attempted to present some evidence of Runyon's psycho-social history. The prosecution, however, moved to prevent Dr. Cunningham from testifying about developmental factors in Runyon's background which increase the risk of an adverse outcome because Dr. Cunningham's report did not include this information. Tr. 2079, 8/20/09. The Court sustained the

---

[22] We now know the scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

motion after counsel seemingly conceded the issue. *Id.* Counsel were ineffective in failing to object and preserve this issue for appeal.

Counsel attempted to present family life history through Runyon's adoptive father. The Court commented, however, that the testimony was "so attenuated" and seemed unrelated to the enumerated mitigating factors. Tr. 2399-2401, 8/24/2009. Runyon's mother, Suk Cha Runyon, testified. When she began to explain her childhood war-time flight from North Korea, the prosecutor objected: "we are going into an area far outside the mitigating factors and far outside preliminary background, where she is starting to give more of her life story." Tr. 2411, 8/24/2009. The Court agreed Suk Cha's background was not needed and questioned what it had to do with Runyon. *Id.* Counsel were ineffective in failing to object and preserve this issue for appeal. As explained below, transgenerational dysfunction is critical to understanding the formative influences on Runyon's character, psychological limitations, and life trajectory. Simply put, history repeats itself and Runyon was unable to escape the patterns recurrent in his family history. *See, e.g.*, Cunningham declaration, p. 27, Ex. 8. The remaining penalty phase witnesses briefly touched on Runyon's childhood and character, his relationships and employment history. *Runyon*, 707 F.3d at 499. The testifying character witnesses described Runyon as a good friend, a charitable person, a considerate and helpful guest, and a caring father.

At closing, the prosecution argued that Runyon had "a good upbringing" but, "he rejected that, and he walked away from that over five years ago." Tr. 2622, 8/26/09. The prosecution made a number of—what Runyon's appellate counsel later described as—

> "derogatory and superfluous" comments about Runyon's own life, asserting that he "left his wife and children and didn't provide support for them"; "abandoned more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven"; met his girlfriend "at a strip bar"; and "play[ed] video games" while his girlfriend held down three jobs.

*Runyon*, 707 F.3d at 512.

40

Defense counsel's closing argument focused on the inequity of the co-defendants' life sentences and the effect of a death sentence on Runyon's mother, son and friends.[23] Tr. 2640-50, 8/26/09.

> Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven. In particular, the defense introduced Cat's plea agreement and the accompanying statement of facts, which recited her role in the crime in stark detail, and argued vigorously and repeatedly before the jury that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence.

*Runyon*, 707 F.3d at 508.

Counsel told the jury, "There is a reason why we bring you evidence sort of from the cradle to the day we are sitting here in court, to the extent we can get it, because the law allows, in fact, requires us, if we can, to let you know as much about Mr. Runyon as we can." Tr. 2652, 8/26/09.

Because counsel did not follow up on his promise to "put on ... mental health information," Tr. 1770, 7/22/09, counsel could not explain the significance of "the fact that he [Runyon] couldn't hold a job or that he would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job?" Tr. 2651, 8/26/2009. Without an explanation, the prosecution's arguments in favor of aggravation could not be counter-balanced. Counsel could not answer the question obvious to all persons in the courtroom:

> So the legitimate question, then, would be, well, what happened? What happened to the person that they described that gave his last $5 bill, instead of going shopping, gave it to the homeless guy or the one that helped the child with some

---

[23] Guilt-phase counsel presented the penalty-phase closing argument. *See* Cronin declaration, ¶15, Ex. 4. Early on in the case, he had remarked about mitigation: "we'll throw a couple of relatives on the stand and that will be enough." *Id.*, ¶12. He displayed an insensitivity to signs of mental illness and thought Runyon's grandiose ideation was funny. *Id.*, ¶7. Counsel failed to recognize that Runyon's conspiracy theories, verbosity, pattern of bouncing from job to job, and series of problem relationships were indicators of brain damage and/or mental illness that required exploration. Guilt-phase counsel's ability to effectively present mitigation was severely impaired by his belief that, in order for mental health evidence to be mitigating, it has to be a mental disease or defect that is not the defendant's fault and, but for it, the defendant would not have committed the crime.

41

personality disorder[24] that Ms. Provost talked about? And I don't have a glib answer. I don't have, you know, a pat response, where I stand up and say, you know, right here is what caused Mr. Runyon to get involved in this and to be where we are today.

But that's not what your point is.

Tr. 2645, 8/26/09.

The jury deliberated eight hours and sentenced Runyon to death after finding that two statutory aggravators and four non-statutory aggravators "outweigh[ed] any mitigating factor or factors."[25] *Runyon*, 707 F.3d at 519; ECF No. 291. The jurors found ten of the fourteen statutory and nonstatutory mitigating circumstances proposed by the defense[26] but also found three mitigating factors that the defense had not proposed: (1) Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father;" (2) Runyon's brother "will suffer emotional harm if his brother is executed;" and, (3) that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter." *Runyon*, 707 F.3d at 487-88. Given that the jurors found over twice as many mitigators as aggravators, it is clear that they were unable to assign much

---

[24] Phyllis Provost testified that her child was diagnosed with Pervasive Developmental Disorder Not Otherwise Specified (PPDNOS) which is on the autistic spectrum. Tr. 2521, 8/25/2009. This is a mental disorder classified on Axis I by the Diagnostic and Statistical Manual of Mental Disorders, IV-TR, pp. 14, 84 (2000). It is not a personality disorder classified on Axis II.

[25] The statutory aggravators found were: "pecuniary gain" and "substantial planning." 18 U.S.C. §§ 3592(c)(8) & (c)(9). The non-statutory aggravators were (1) "lack of remorse;" (2) "abuse of women;" (3) "specialized training;" and, (4) "victim impact."

[26] The ten mitigators found were: Runyon did not have a serious criminal record; other persons equally culpable in the crime will not be punished by death; Runyon would serve a life without parole if not sentenced to death; Runyon has worked and has been legally employed all his life; he has committed acts of kindness and generosity for his neighbors and community; Runyon witnessed and experienced domestic violence and parental conflict until his biological father and mother separated; Runyon's son will suffer emotional harm if his dad is executed; Runyon's mother will suffer emotional harm if her son is executed; Runyon was honorably discharged from the U.S. Army and Runyon has a high school diploma, college degree and took further college courses. ECF No. 291, pp. 2-4.

The four rejected mitigators were: Runyon "has demonstrated his ability to make a positive adjustment to incarceration;" Runyon has the respect and support of correctional officers;" Runyon "has had no disciplinary write-ups while incarcerated and has helped other inmates conduct themselves in non-violent or non-aggressive ways; Runyon "does not present a risk of future violence or danger to the public while in prison for the rest of his life;" ECF No. 291, p. 3.

weight to the mitigation evidence that was presented. Indeed, the prosecution had argued to the jurors that "the defendant has tried to make it [mitigation] very much about quantity versus quality[.]" Tr. 2618, 8/26/09.

Twenty-two days after the jurors sentenced Runyon to death, Dr. Mirsky, who had not testified, told counsel, "I wish to make sure that the Court is aware of certain mitigating circumstances that should affect the sentence of your client, Mr. David Runyon." Mirsky letter, 9/18/09, Ex. 22. Dr. Mirsky explained—without having seen Runyon's brain scans[27]—that with blast injuries, such as Runyon experienced in ROTC, "[t]here can be extensive damage to white matter tracts, which serve the vital function of connecting various cortical areas." *Id.* Persons with mild traumatic brain injury (mTBI), such as Runyon,

> may have symptoms of abnormal behavior, including poor ability to concentrate, committing impulsive acts, and other indications of poor "cognitive control." They can be symptoms of what is referred to as Post Traumatic Stress Disorder, or PTSD, which has not been ruled out in the case of Mr. Runyon. You will recall that in my test of Mr. Runyon, he performed in the very impaired range on tests of sustained attention. This can be symptomatic of mTBI, as well as PTSD.

*Id.*

### C.     A Complete Psycho-Social History And Its Implications Would Have Added Weight To Mitigating Factors, Reduced The Weight Of Aggravating Factors And Informed The Jurors About Runyon's Lesser Moral Culpability.

Mental health mitigation would have: (1) been consistent with the evidence defense counsel presented at the penalty phase; (2) provided context and an explanation for Runyon's life trajectory; (3) countered the aggravating evidence; (4) established substantial statutory and non-statutory mitigating circumstances; and, (5) added substantial weight to the mitigators already found by the jury. In short, mental health mitigation was the missing ingredient for a life sentence.

---

[27] The scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

Counsel were either rendered ineffective by a lack of time to conduct an adequate investigation or counsel failed to effectively investigate and/or ignored red flags suggesting Runyon's brain damage and mental health difficulties.[28] Runyon's brain damage substantially affects his problem-solving abilities. His actions are substantially affected by brain damage, mental illness, and other predisposing factors. This powerful mitigation evidence was easily provable at the time of trial through records, lay witnesses and expert witnesses. The information provided below is not exhaustive but is representative of substantial mitigation that Runyon's jurors never heard.

### 1.    Readily-Available Records.

Records illustrated Runyon's compromised mental state and helped to provide the origins of brain damage and mental illness. None of the following records were discussed or introduced at trial.

### 1.1    Medical records

David Runyon is 5 feet 3 inches tall and, when he was in the Army, he weighed less than 130 pounds. Army medical records, p. 1, Ex. 23. Medical records document two motor vehicle accidents and associated problems suffered by Runyon. Defense counsel wanted medical records on Runyon's head injuries, in particular, the 1996 car accident. Hudgins declaration, ¶5, Ex. 5. The initial treatment records could not be located and counsel believed that Runyon had not followed-up with Army medical providers. *Id.* In fact, Runyon did seek follow-up treatment.

In 1995, Runyon sought treatment for cysts on his forehead that he reported had been recurring following a car accident where pieces of glass embedded in his face. Army medical records, p. 1, Ex. 23. Runyon said glass remained under his skin. *Id.*

In November 1996, a drunk-driver collided head-on with Runyon. He was extracted from his vehicle with the "jaws of life" and taken to the emergency room. A few days later, Runyon followed

---

[28] Some documents filed by counsel are sealed and their contents are not discussed herein.

up with an Army doctor. Runyon had multiple injuries to his legs, knee, calf, shoulder, and neck. *Id.*, pp. 2-3. He was prescribed physical therapy and was restricted from running, jumping, and marching. *Id.*, pp. 3-5. Runyon continued to follow-up with complaints of vertigo, short-term memory loss, headaches, and insomnia. *Id.*, pp. 8, 12.

In January 1997, two months after the car accident, Runyon was still experiencing short-term memory loss and insomnia. *Id.*, p. 12. He was informed that PTSD and life stressors could be possible etiologies. *Id.* The plan was to "[e]xplore possible symptoms of depression and antidepressant drugs at the next visit." *Id.* Runyon and his wife, Maria, were in counseling and if that did not improve his symptoms the plan was to begin a course of SSRI antidepressants. *Id.* Also, Runyon was finally diagnosed with a knee/ACL sprain. Army medical records, pp. 14, 16, 17, Ex. 23.

A February 1997, memo regarding a telephone consultation states: "INRE: Post Traumatic Stress Syndrome/Needs recommendation/States urgent/1st Sgt. wants paper work ASAP." *Id.*, p. 15. A doctor noted that, after speaking with Runyon's wife, Maria, and their counselor, he "will recommend/refer patient for further psychiatric evaluation[.]" *Id.*

In August 1997, Runyon complained of ongoing vertigo with accompanying headaches that lasted 3-4 days. *Id.*, p. 19. The doctor's assessment was Positional Vertigo secondary to Vestibular Dysfunction.

The physical examination conducted in conjunction with Runyon's separation from the Army lists: "Poor health. Presently on Meclizine for some kind of positional vertigo. Sleeplessness and constant pain in joints." *Id.*, p. 23. A checklist verifies Runyon's knee and shoulder problems, other symptoms of swollen or painful joints, frequent or severe headache, dizziness or fainting spells, fever, head injury, shortness of breath, frequent trouble sleeping, depression or excessive worry, and loss of memory or amnesia. Physical injuries resulting from the motor vehicle accident, including torn ACL,

45

rotator cuff and calf muscle, were noted. The records end with "Depression diagnosis, Post Traumatic Stress Syndrome." *Id.,* pp. 23-24.

### 1.2    Letters from Runyon

David Runyon wrote counsel to inform them of the 1996 car accident, Ex. 24, and about how he had saved a number of people's lives. Cronin declaration, Attachment, Ex. 4.

### 1.3    Jail Records

Portsmouth Jail records signaled significant mental health issues. In March 2008, Runyon expressed concern about HIV exposure after aiding his cellmate who fell and lacerated his head. Portsmouth Jail record, p. 2, Ex. 16. Runyon's hands "became covered with blood" and he was worried because he had a hang-nail and open cuts on his hand. He also reported losing 30 pounds since December, occasional dizziness, and light-headedness. *Id.*

In August 2008, Runyon reported a sudden onset of runny nose, watery eyes and feeling sick. *Id.*, p. 3. The episode lasted 30 minutes and Runyon was able to cure himself by washing his face. *Id.* He said he was exposed to mustard gas while in the military and the gas was still in his sinuses, causing them to occasionally flare up. *Id.* Personnel assessed this as a possible anxiety attack caused by an old recollection and planned to refer Runyon to the psychiatrist. *Id.* A doctor saw Runyon for the complaint of "mustard gas in his head (sinus)." *Id.*, p. 4. The record notes:

> O: Although he was generally cooperative, he ten[d]ed to be somewhat gran[io]se. His thoughts were flighty & rambled on. He verbalized some delusional material. … Insight & judgment lacking (poor). He is not experiencing any sleep disturbance. However, he did report not sleeping in the last 24 hours & he has night sweats. … He is not overtly depressed or suicidal.
>
> A: Axis I: R/O Schizo-Affective Disorder, R/O Bi-Polar Disorder.
>
> *Id.*

46

### 1.4    Brain Scans

Brain scans completed in August 2009 revealed multiple white matter hyperintensities consistent with Runyon's history of head injuries and migraine. Merikangas report, 9/23/15, p. 4, Ex. 2.

### 1.5    Prosecution Expert Reports

Guilt-phase counsel believed the prosecution experts determined that "Runyon did not have any mental or emotional issues that would be mitigating." Woodward declaration, ¶12, Ex. 6. But Dr. Merikangas had reported that the government experts "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder." Merikangas report, Attachment, p. 1, Ex. 2. Furthermore, the prosecution and defense experts agreed on certain aspects of Runyon's psycho-social history.[29]

### 1.6    David Dombrowski (Biological Father) Medical Records

Runyon's biological father had been diagnosed with major depression that was being managed with medications. A progress note dated June 2009, reads: "he [Dombrowski] is feeling ambivalent about the past decision to not have conflict with his ex-wife [Suk Cha] about access to his children. Now that they are adults, he hears things which cause him to question their parenting." Dombrowski Progress Note, Ex. 17.

### 1.7    Suk Cha Runyon (Biological Mother) Medical Records

Medical records dating back to 1976 indicate chronic complaints of pain for which multiple tests failed to reveal a physical cause. Psychosomatic complaints signal mental illness. There is a record noting, "she had a couple of episodes of coughing up blood when she was pregnant," and this is relevant to Runyon's neonatal development. Suk Cha Runyon medical records, p. 10, Ex. 25. While

---

[29] The reports of Dr. Montalbano, ECF No. 277, and Dr. Patterson, ECF No. 276, are sealed, thus, the contents are not discussed herein. *But see* Memorandum Order, ECF No. 278, p. 4 (sealed).

still married to Runyon's biological father she sought treatment for pain associated with hitting her lower back on the couch; a complaint consistent with domestic violence. *Id.*, p. 2. As early as 1977, symptoms of Suk Cha's mental illness are noted: she is described as "active and loud" and "very talkative;" *id.*, pp. 3, 8, 15, she has incontinence associated with stress, i*d.* p. 5; and, she is diagnosed with moderate depression and anhedonism. *Id.*, pp. 14, 15.

### 2.      Readily-Available Lay Witness Accounts

A psycho-social investigation was undertaken pre-trial by Sheila Cronin. "Only a fraction of [Runyon's] social history or other available history of adverse developmental factors, however, was presented in mitigation to Mr. Runyon's sentencing jury." Cunningham declaration, 9/25/15, p. 9 ¶16, Ex. 8. "Even those family and other formative experiences that were referenced were left largely unexplained in terms of their implications for a criminally violent outcome, as the defense did not call a mental health expert to describe the implications of these experiences." *Id.*, ¶18.

Sheila Cronin's global observations about Runyon were:

> My observations of Runyon are that he had a calm, soft-spoken demeanor and appeared unhealthy, almost anemic. He over idealized his family life, had impaired reality testing, and exhibited extremely poor judgment. He was markedly grandiose. Runyon often compared himself to great figures in history. I thought these references were sad. Counsel Woodward thought they were funny. Runyon repeatedly talked about how many lives he had saved. After a member of his defense team visited with Runyon in jail, he would write a letter detailing the discussion. It was as if he felt he had not gotten his point across during the visit. Runyon's letters had a rambling quality. Attached to this declaration as Exhibit A is an example of such a letter; it contains a list describing how he saved the lives of seven people. We clearly needed the assistance of mental health experts.

> Runyon's mother had a history of severe trauma, was unstable, and likely suffered from bipolar disorder. There were obvious problems with how she raised Runyon. Essentially, she emasculated Runyon. Runyon's adoptive father was emotionally remote and exhibited no affection towards Runyon. His trial testimony could be fairly described as "throwing Runyon under the bus." His demeanor was very cold and he had no compassion for Runyon at all. Runyon spent his childhood and adult life trying to please his parents, make them proud, and earn their approval.

> A sad component of Runyon's life is that every time he tried to achieve something, he underachieved or was fired from a job. He had multiple failed career

48

attempts. He also had a series of failed relationships because he chose women who, like his mother, were mentally unstable.

Runyon appeared to perform relatively well in the military until late 1996, when he was involved in a serious head on collision with a drunk driver. I tried to obtain medical records from the civilian hospital where Runyon was transported and treated but was unsuccessful. I did, however, obtain Runyon's military medical records from 1994-1997. The records document that Runyon sought follow-up treatment for effects of the accident. Runyon suffered from vertigo, short-term memory loss, headaches, insomnia, and a personality change. David's ex-wife reported a change in David's personality in that he was less able to cope and deal with frustration; he was much more irritable and short-fused. David's former employer at the Fayetteville Police Department (a position he obtained after his Army discharge) said that David constantly forgot things and had to have instructions repeated. The military records contain diagnoses of Post-Traumatic Stress Syndrome/Disorder, depression and anxiety. I summarized those records for counsel. I also suggested to counsel that neuropsychological testing might clarify if Runyon's symptoms and behavioral changes were related to the closed head injury, PTSD, or both.

Runyon loved his son very much. He also loved Maria's children as if they were his own. Witness accounts were overwhelming consistent regarding Runyon's parenting skills and ability to relate to children. He was universally described as a great father and a person who was loved by children who knew him.

Cronin declaration, ¶¶7-11, Ex. 4.

Cronin further observed that Runyon wrote constantly throughout the trial, to the point of excessiveness or obsessiveness. *Id.*, ¶16.

### 2.1    Witnesses Relevant to the "Abuse of Women" Aggravator

**Dr. Mark Cunningham,** who testified at trial, could have described and explained the importance of transgenerational family dysfunction and distress on David Runyon's mental state and behaviors. Cunningham declaration, pp. 12-27, 45-46, Ex. 8. Runyon's mother and biological father were raised in violent households, and they created the same environment for Runyon and his brother, Mark.

[O]bservation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (citation omitted) These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

49

*Id.*, p. 46.

The following witnesses testified at trial but were not asked to relay information that would have provided background and context to counter the "abuse of women" aggravator.

**David Dombrowski**, David Runyon's father, states:

My father was born November 2, 1914. He grew up without a father. At approximately age 15 he went to prison for murder. My father worked for the mob, more specifically, Anthony "Tony" LaBarbera. My father was an "enforcer" or hit man for LaBarbera. I think the murder that my father went to prison for was a hit for LaBarbera.

My father was released from prison early because he volunteered for a medical study, while in Boys Town, Nebraska. He was a "test dummy" for a federal study testing treatment for TB. I don't know what effect this had on my father but, when I was in the military, I had a TB test and had a positive reaction. I had to take medication for over a year.

* * *

My father ruled the family with an iron fist. He was a severe alcoholic and regularly beat my mother. My father was a "functional drunk." He worked during the day but got very drunk at night and on the weekends. I cannot recall a time in my childhood when my father was not an abusive alcoholic. I think my father did not have a positive male role model when he was a child and he really did not know how to love. Instead, he had the role as "enforcer" and "Billy Bad Ass" and he treated his family the same way. When he was drunk, his "evil side" came out.

* * *

Our family environment was very violent and very volatile. Every time my father drank there was a high probability he would become violent. I walked on eggshells all the time with a constant feeling of dread about what was to come. I think my mother took the abuse, and maybe even provoked it, to keep my father from abusing me and my brothers and sisters. My mother would tell me not to get involved in their fighting and to stay away.

My father kept my mother isolated and alone, which made it nearly impossible to report the abuse—not that she would have done that anyway. She was completely dependent on him for everything. Even if she did everything the way he wanted it, my father still got drunk and beat her. On top of being physically abusive, my father degraded my mother. There were times when he came home late from the bar and demanded to know why his supper was not waiting on the table for him. Although my mother had his plate of food in the oven or the refrigerator my father would demand to know why it was not on the table, waiting for him. He made my mother sit down in the kitchen and watch him get his plate out and heat it up. He would yell at her

50

saying things like—do you see how I'm doing this, does this look too hard for you? He kept my mother beat down in every way possible.

\* \* \*

I have come to realize that I mirrored my father's bad behavior, including his quick temper and aggressiveness. Around 1991, I admitted to myself that I had a problem. I began seeing a psychiatrist at the VA hospital. It took a while to get my medication regulated but once it was, I benefitted greatly. Currently, I take Prozac and Buspar. I see the psychiatrist every three months for check-ins and medication management. There have been times when I feel better and think I can manage without medication and will stop taking it. My wife can tell immediately if I've skipped a dose. She says I'm like "night and day." Without medication, I am easily frustrated and very quick tempered; with medication, I am easy going and pleasant to be around. I do not know my exact diagnosis but my problems stem from anxiety and depression.

Dombrowski declaration, ¶¶10-11, 17, 21, 22, 30, Ex. 26.

**Mark Runyon**, David Runyon's brother, states:

Our mother was unstable. She had mental breakdowns. The household would feel a buildup of stress and tension and then she just exploded. She would go "postal," screaming and breaking dishes and lost all control. She could destroy a room in 30 seconds. During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

Our father would work to calm mother down. He often physically restrained her. When she stopped screaming they would go on as if nothing happened. My parents never discussed these breakdowns. My family simply did not talk to each other. David and I were left to deal with it on our own.

Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns. He always sided with our mother and we could not count on him to stand up for us.

Mark Runyon declaration, ¶¶14-16, Ex. 27.

**Scott Linker**, David's former brother-in-law, states:

There came a time that David's commanding officers said he could not re-enlist if he remained with Maria because she had caused so much trouble on the base. Maria called the CO's repeatedly and complained about anything she did not like about David. She also wrote bad checks all over the base. This reflected poorly on David and his CO's wanted her gone. It really bothered David that he could not continue his military career.

51

Eventually, David and Maria moved back to Kansas. My father Fred had a house in Wichita that was broken into apartments. David and Maria lived in one of those apartments.

Because they lived in separate apartments but in the same house, my father observed David and Maria's relationship and David's relationship with Maria's children, Wren and Kendi, and with their son, Davy. My father heard Maria yell at and berate David. One time, Maria called David a "ying yang mother fucker." My father thought that David should leave Maria because of how badly she treated him. My father thought highly of David because he not only treated Wren and Kendi like his own, but also worked hard and tried to care for the children whereas their own mother (Maria) did not.

It bothered me to see how hard David worked when Maria did not contribute to the family in any manner. Their house was filthy dirty. Dirty laundry and food was everywhere. Maria sat home all day, drank alcohol, and smoked cigarettes.

Linker declaration, ¶¶5-8, Ex. 13.

**Maria Runyon**, David Runyon's ex-wife, states:

In July 1994, there was an incident with my sister Teresa Linker. There was bad blood between us because we had both dated David and he was spending all his time with me. Late one night, Teresa called and said she was coming over to pick up a shirt. David knew Teresa was just asking for trouble so he took the shirt outside to give it to Teresa. I watched from the window and thought I saw shoving but was unsure about who touched who. I ran outside and jumped on Teresa. We started shoving and yelling at each other. Teresa got in her car and left. I thought that was the end of it. A couple of weeks later I learned there were warrants for both me and David. Teresa did not show up for court multiple times. I ended up pleading guilty to a lesser charge. I was told someone had to be held responsible because Teresa had a bloody lip. I don't remember Teresa having a bloody nose when she left my house. David was getting ready to go active duty and his charges were dropped.

* * *

There were times when David and I fought and became physical with each other. I would say that each of us were to blame for these incidents "50/50." Most of the incidents were a result of my drinking and David trying to calm me down. I was never afraid of David nor did he ever do anything to that made me fear for my life.

In regards to the domestic violence incident on February 7, 2001, I remember that my daughter [Kendi] was sick and I was late getting home because I had to pick up medications. David was upset because he needed the car to go to work. I wanted David to put oil in the car before driving it because it needed oil every few days. David refused. We began fighting over the keys. David grabbed my arm to try to take the keys. At some point, David grabbed me by the neck. I was never scared or worried David was really going to hurt me. I called the police because I was mad that David

52

wanted the car and refused to put oil in it. I did not want to press charges and recanted later because I was not hurt, I was just mad. After this incident, we briefly separated because a restraining order was issued.

David and I separated and got back together a few times. In July 2002, David left me and the kids. Wren was eleven, Kendi was eight and Davy was around five years old. I had no idea where David was or how to get in touch with him. He sent no money. I now realize that David was desperate to get away and he could not handle my drinking. I wish he would've supported the kids but he doesn't hold all the blame for leaving.

Maria Runyon declaration, ¶¶7, 26-28, Ex. 28.

## 2.2     <u>Witnesses Relevant To the Family Violence Mitigating Factors</u>

**Suk Cha Runyon**, David Runyon's mother, could have testified about how she and Runyon were beaten by David Runyon's biological father (David Dombrowski). She could have testified about one episode that is noteworthy because it left Runyon with a crooked smile, in other words, one side of his face droops. When David Runyon was three years old, Dombrowski grabbed David by the wrist and dangled him in the air. Suk Cha ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. David was rendered unconscious. Cunningham declaration, pp. 21, 30, Ex. 8; Dudley report, p. 8, Ex. 29.

**David Dombrowski**, David Runyon's biological father, states:

David was a sickly child and I attribute that to Suk Cha not getting the prenatal care she needed. Suk Cha did not want to breast feed and David was fed formula. Suk Cha did not know what to do with David. It seemed like her behavior was much deeper than just first-time mom anxiety. She did not bond with David or Mark. She was not emotionally connected to them in any way. She did not know how, and did not try, to soothe David when he cried. She exhibited no maternal nurturing; she was cold as a fish and David and Mark could sense this. I remember walking in the house and seeing Suk Cha holding David while he cried and wondering who was more scared of who? She held David with semi-outstretched arms; not in any sort of close or connective way. Although Suk Cha would hold David while he cried, she did not try to soothe him. I could walk over to David and simply rub his head or kiss him and he would stop crying, but he would resume crying when I walked away. I always felt like the babies knew their mother was afraid and they—even as infants—picked up on that. I think this was a big part of the reason why David cried a lot.

As the children aged, Suk Cha's treatment or discipline of them became excessive and borderline physically abusive. Suk Cha wanted them to act as adults. When David was barely old enough to walk, Suk Cha would yank him up and start spanking him if he touched something on the coffee table. I did not think that it was appropriate to spank children at that age for touching something on a table. Also, Suk Cha's spankings were hard and she hit David several times in a row. It was excessive. Suk Cha would not allow the kids to be kids. She wanted to keep a very, very clean home with all her home decorations displayed in their proper places. I thought that was unrealistic with young children in the house but Suk Cha made it a point to try.

One time when David was two or three years old, Suk Cha instructed David to finish his dinner and he did not want to. Suk Cha force-fed him until he threw up. She pinned David and forced food down his mouth. David was upset and was crying. A combination of the crying and the food being shoved down his throat caused David to throw up. Suk Cha then got mad and spanked him because he threw up. I tried to intercede and console David but Suk Cha became very angry at me.

There were many instances of normal kid behavior that made Suk Cha very irate. On one occasion, Suk Cha put collared shirts on the boys and one of them ran outside to play and came back with his collar messed up. Suk Cha immediately slapped him across the face and fixed the collar. The boys were terrified of her and they would stop, at the drop of a hat, when they heard her voice.

Suk Cha was extremely difficult to live with. Every little occurrence was blown out of proportion. She wanted everything in her control and if things were not exactly how she envisioned them, she quickly became agitated and spun out of control. Any little thing would send Suk Cha over the edge. If she did not like something I said, she picked up a dish and threw it at me. If the David or Mark touched something she wanted left alone, she grabbed their hand and hit it with a ruler until it was almost bleeding. If she tried to open a can and the can opener was not fast enough, she threw it across the room. It made for a miserable home environment and left everyone anxious and walking on eggshells.

Nothing anyone did was ever good enough or pleased Suk Cha. There came a point in time when I did not want to go home. I began staying out late until so I could avoid having to see Suk Cha.

David was the son who tried to keep the peace. He was a "clinger." When Suk Cha and I would argue, David tried to physically hold onto his mother and calm her down - saying things such as "I'm here mommy," "it's okay." David would do anything to get Suk Cha to calm down. When Suk Cha was hitting the children, David would say, "please stop" and "don't hurt us anymore." At times when I came home from work, David would tell me that their mother had been hitting them. If I tried to take up for the kids or confront Suk Cha, it only seemed to make things worse.

Dombrowski declaration, ¶¶36-42, Ex. 26.

54

**Mark Runyon**, David Runyon's brother, states:

I remember my mother caught me with her cigarettes when I was about twelve years old. She made me smoke an entire pack of cigarettes, hoping I would get sick, but I did not. She then made me eat the cigarettes, still trying to make me sick.

\* \* \*

Our mother was unstable. She had mental breakdowns. The household would feel a buildup of stress and tension and then she just exploded. She would go "postal," screaming and breaking dishes and lost all control. She could destroy a room in 30 seconds. During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

Our father would work to calm mother down. He often physically restrained her. When she stopped screaming they would go on as if nothing happened. My parents never discussed these breakdowns. My family simply did not talk to each other. David and I were left to deal with it on our own.

Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns. He always sided with our mother and we could not count on him to stand up for us.

Mark Runyon declaration, ¶¶13, 14-16, Ex. 27.

### 2.3 <u>Witnesses to the 1996 Car Accident and Runyon's Personality Change</u>

**Thomas Preston** was a parachute rigger at Fort Benning with Runyon. Preston interview, p. 2, Ex. 30. They were friends, they went hunting together, and their wives socialized together. *Id.* Preston recalled a weekend when Runyon went out of town and didn't return to work on time. *Id.* Preston learned that Runyon had been in a serious car accident and was lucky to be alive. *Id.* pp. 2-3. Preston did not testify at trial.

**Robert and Deborah Seeger** were friends with David and Maria Runyon when both couples were stationed at Fort Benning. R. Seeger declaration, ¶ 8, Ex. 31; D. Seeger declaration, ¶8, Ex.32. They remember David Runyon went out of town to pick up his brother's truck for safe-keeping. *Id.* On the return trip home, a drunk driver collided head-on with Runyon. *Id.* The truck was totaled. *Id.* Robert Seeger picked-up Runyon and brought him back to Fort Benning. R. Seeger declaration, ¶8,

55

Ex. 31. Deborah Seeger remembers Runyon was in a lot of pain afterwards. D. Seeger declaration, ¶8, Ex. 32.

Deborah Seeger noticed that Runyon's behavior changed after the accident: "Before the accident David always tried his best to succeed, look sharp and get the job done. He offered a lot of laughter and smiles for everyone he met. After the accident I noticed that he became angry more easily." *Id.*, ¶9. Runyon would become upset with his wife if dinner was not on the table when he wanted it or if Maria moved something in the house that he believed should be kept in a certain place." *Id.*, ¶10. Runyon became unpredictable and stopped following through on promises. *Id.*

The Seegers were present at Runyon's trial. D. Seeger declaration, ¶¶14-15, Ex. 32. Although deemed to "be essential parts of [the] mitigation case," ECF No. 220 p. 3, they did not testify. Counsel cannot remember why the Seegers were not witnesses. Hudgins declaration, ¶9, Ex. 5.

**Maria Runyon**, David Runyon's ex-wife, did not testify about the car accident and its effects on David Runyon. Maria remembers the car accident; David's physical pain, vertigo, and drastic personality change. After the accident, David became easily frustrated, was easily angered, had less discipline and restraint, did not think things through before he did them, and became paranoid and very vigilant about his surroundings. Maria Runyon declaration, Ex. 28. Maria believes the car accident "changed David forever." *Id.*, ¶35.

> At one point when we were at Fort Benning, David's brother Mark was serving prison time in Fort Knox. Mark asked David to get Mark's truck and his belongings. When David was driving in Dadeville, Alabama, he was hit head on by a drunk driver. David was trapped in the truck and had to be cut out. I can't remember the name of the person who hit David. This person was required to pay restitution, which he did for a few months and then he just stopped.

> After the wreck, David was in a lot of pain and did not want to take medicine. David's pride often kept him from taking medicine when I knew he was feeling really bad. David did not like to take any medicine - even aspirin. He went out of his way to avoid putting anything unnatural in his body. He rarely drank and never did drugs. He even hated the fact that I smoked.

56

As a result of the wreck, David experienced severe vertigo and every time he laid down he felt he would pass out. David went to the emergency room on a couple of different occasions due to the vertigo.

I think the wreck was a very significant event in our lives because David's personality changed dramatically. He was meaner and easily frustrated. The guy I married had good morals, discipline and restraint and, for the most part, this changed. He was easily angered and quick tempered.

When and David and I would fight I sometimes called and talked with his CO (commanding officer) about David's behavior. The CO made us attend counseling. Then, David was barred from re-enlisting in the Army.

After David was discharged from the Army we moved to the metro Atlanta area, around Fayetteville. David worked with the Fayetteville Police Department.

I think sometimes David did not think things through before he did them. When he was a police officer he helped the apartment manager at our complex with a tenant who owed back rent. David was not on duty and it was not his jurisdiction but he took his badge and service weapon. Those things are bad ideas yet it never occurred to David that he could get in trouble.

* * *

David acted paranoid and was very vigilant of his surroundings. If we went to a restaurant he would not sit down unless he could sit with his back to the wall. He did not like the fact that I smoked because he said it put me in contact with "unsavory characters." When I went outside to smoke people sometimes approached me and asked for a cigarette. David did not like this. I remember David saying that you had to "watch your six and twelves."

One time I was outside of our house smoking. The house was close to the street and a man came walking down the sidewalk. The man then started walking toward our house. Out of nowhere David appeared and had his gun at his hip. I don't remember if David said anything to the man but he got back on the sidewalk and kept walking. I think the man was probably just going to ask for a cigarette. David describes this episode as saving my life from a would-be rapist.

* * *

When I found out that David was arrested for murder I was surprised to learn that he was involved in drug trials. When I met David he had an aversion to taking medicine. He went to extreme lengths to avoid taking even an aspirin. It was hard to believe David would volunteer for drug trials. David never told me that the reason he went out of town was for drug trials. He told me he was doing some sort of computer work for a hospital.

57

> I was also very surprised that David would even associated with, what he would probably call, "unsavory characters." I can't count the number of times David talked about not hanging around or associating with people with a questionable background or shady characters. I was amazed to hear that David had been associating with the type of people who would be involved in a murder.

Maria Runyon declaration, ¶¶14-20, 23-24. 32-33, Ex. 28.

**Mark Runyon**, David Runyon's brother, did not testify about the car accident. Mark learned about the accident and tried to speak with the drunk driver who totaled Mark's truck when David was driving it back to Georgia. Mark Runyon declaration, ¶26, Ex. 27. Following the accident, David suffered dizzy spells and "saw stars." *Id.*, ¶27. David's personality changed, although Mark attributed the change to David and Maria's high-conflict marriage. *Id.*

Mark says David really wanted to continue his military career; he seemed to function well in the military but the issues with Maria kept him from reenlisting. *Id.,* ¶30; *see also* Linker declaration, ¶5, Ex. 13. Mark also believes Maria was a factor in David losing his job as a police officer. *Id.* After he lost that job,

> David kept moving around and each place they lived was worse than the last. One of the last times I saw David in Georgia, he and the family were living in a trailer with no running water. David just wasn't together anymore and he stopped being my big brother.
>
> When I learned that David had left Maria I believed that the constant stress of his marriage and being the only partner pulling any weight took its toll on David. I think David got to the point that the only way he could better the situation was to leave.

*Id.*, ¶¶31-32.

**Captain Jeffrey Harris**, of the Fayetteville Police Department where Runyon worked after leaving the Army, remembers training Runyon. In Captain Harris's opinion, Runyon had a problem retaining things. Harris interview, p. 4, Ex. 33. Every time the class started to move ahead with the training, Captain Harris would have to go back to the first day because Runyon couldn't retain what

he learned from the first day. *Id.* They had to start from scratch just about every day. *Id.* Captain Harris did not testify at trial.

### 2.4    Witnesses Who Knew Runyon Immediately Preceding the Crime

Defense counsel indicated that Runyon "had absolutely no ties to the local community" in Morgantown, West Virginia, where he lived before his arrest in 2007. ECF No. 179 p. 10.

The prosecution emphasized the fact that none of the penalty-phase witnesses called by defense counsel had recent contact with Runyon. Tr. 2610, 2613, 2618, 2619, 8/26/09. There were, however, witnesses available to testify about Runyon during the years immediately before the crime.

**Chad Costa** met David Runyon in the second half of 2007. He states:

> I took approximately three trips to New Jersey with Runyon to work in drug studies. We had a lot of time to talk during the seven-hour drives.

> I learned that Runyon was in the Army and had been a police officer for a while, but Runyon didn't like the politics and left that job.

> Runyon talked a whole lot about his son Little Davy. He didn't talk much about any other family members. I know Runyon had a brother. They weren't speaking because the brother was mad that Runyon hadn't stayed in contact. Runyon said he was never close to his parents and left home as soon as he could. Runyon said his ex-wife, Maria, messed-up his whole life: she broke down his self-esteem and caused him a lot of heartache. He said Maria had many problems in her life and brought problems to their marriage. I heard about Jenny, Runyon's ex-girlfriend, and knew she also caused many problems for Runyon. Runyon told me that both Maria and Jenny had taken out assault warrants against him and he went along with it because he did not want the conflict in court. I met David's girlfriend, Sarah, and knew she was a drug addict and that relationship was also doomed to fail.

> Runyon told me he liked to brag about things and make-up things to impress women so he would have a chance with them. Runyon wanted people to think he was a "thug" and bought clothes like a hoodie, baggy pants, and boots, to look like a "thug," However, he was so small and thin that he just didn't look the part. An example of one of Runyon's boasts was a story about road rage. Runyon told me that a truck driver cut him off and Runyon was able to pull alongside the driver and have him park alongside the road. The driver exited his truck with a crowbar. Runyon said they fought, he took the crowbar from the driver, and was going to kill him but his friends pulled him away from the man. I didn't believe this story because it appeared to me that Runyon couldn't harm anyone.

59

Throughout those long car rides, Runyon never told me that he had killed anyone.

Costa declaration, Ex. 7.

Costa was present at Runyon's trial and deemed to be an essential part of the mitigation case. ECF No. 220 p. 3. However, he did not testify.

**Matt Long** and **Paula Dalton**[30] knew David Runyon from about 2006-2007. Long declaration, ¶2, Ex. 12; P. Dalton declaration, ¶2, Ex.11. They were roommates for a short period and Matt Long and Runyon hunted together. Long declaration, ¶2, Ex. 12; P. Dalton declaration, ¶3, Ex. 11. Long says "David was an all-around good guy" who loved his son. Long declaration, ¶¶2-3, Ex. 12. Paula Dalton describes David as very nice and kind, polite, and "the perfect gentleman" who tried hard to be a good father to his son. P. Dalton declaration, ¶¶4-5, Ex. 11. Matt Long and Paula Dalton helped keep Davy when Runyon was working out of town. Long declaration, ¶3, Ex. 12; P. Dalton declaration, ¶5, Ex. 11. Matt Long says Runyon always helped him when he needed it. Long declaration, ¶3, Ex. 12. Matt Long never heard Runyon talk about coming into a large amount of money or about being hired to kill someone. *Id.*, ¶4.

**David Dalton**, Paula Dalton's father, also knew Runyon. They hunted and fished together. D. Dalton declaration, ¶3, Ex.10. Runyon rented a room from David Dalton and his wife. *Id.*, ¶2. David Dalton trusted Runyon and Runyon never talked about coming into a lot of money or being hired to kill anyone. *Id.*, ¶¶3-4. David Dalton also helped watch Davy when Runyon was out of town at a drug study. *Id.*, ¶5. Runyon "made sure his son was taken care of when he went out of town for work." *Id.*

---

[30] The prosecution called Paula Dalton to testify at trial.

60

### 2.5    Evidence Relevant To the Juror-Created Mitigator That Runyon Was Led To Believe Cory Voss Was Molesting His Daughter

**Maria Runyon**, David Runyon's ex-wife, could have testified that after Runyon left her and the children behind, the step-children's biological father came back in their lives. Unfortunately, he molested Kendi. Maria Runyon declaration, ¶31, Ex. 28. Kendi testified against her biological father and he was convicted and sent to prison. *Id.*; Fleming DOC record, Ex. 34. This occurred within a year prior to Cory Voss' death and Runyon was aware of what had happened to Kendi.

### 3.    Readily-Available Expert Analysis And Opinions

Defense counsel does not remember the results of the brain scans or why Dr. Mirsky and Dr. Merikangas did not testify. Hudgins declaration, ¶6, Ex. 5. Had counsel presented expert testimony, it would have established the statutory mitigating circumstances of "impaired capacity" and "disturbance." 18 U.S.C. §§ 3592(a)(1) & (a)(6). Expert testimony also would have explained that Runyon's impaired mental state and impaired decision-making abilities are not of his own volition which bears directly on Runyon's lesser moral culpability.[31] Finally, expert evidence reveals the type of brain abnormality and cognitive defects that the Supreme Court has deemed highly relevant to assessing a defendant's moral culpability. *Porter v. McCollum*, 558 U.S. 30, 41, 43 (2009); *see also Sears v. Upton*, 561 U.S. 945, 949 (2010)(describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 223, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (discussing how organic brain damage

---

[31] *Compare*, Tr. 2621-22, 2658 (prosecution argument that Runyon walked away from a good family upbringing, rejected his past life, and made a different choice). The prosecutor argued: "He had the power to take the life or to walk away and save a life, and when he exercised this power, when he chose this course, he made that decision to be treated on his own, to be treated differently. He acted with complete free will in doing so." Tr. 2659

is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

### 3.1    Allan F. Mirsky, Ph.D., ABPP-CN

Dr. Mirsky conducted neuropsychological evaluations of David Runyon on June 26, 2009, and August 28, 2015. Mirsky report, p. 1, Ex. 35. At trial, Dr. Mirsky could have testified as follows:

> the test results of David Runyon, supported by the relevant scientific literature, indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder. The numerous affidavits strongly suggest that there was a marked change in his behavior subsequent to a significant head injury. It is entirely possible that the injuries contributed to the development of a psychotic disorder. While the association between cerebral injury and psychosis is complex, traumatic brain injury and the onset of psychosis was early documented in the classic text of Lishman (1998) and has been the subject of considerable research efforts. Review of the family histories of David's relatives suggest strongly that a genetic precursor for psychosis could have been present as well; in effect the psychosis was "released" or expressed by the cumulative effect of the head injuries.

> *Id.*, p. 6.

Dr. Mirsky's conclusions are based on Runyon's test results, Runyon's head injuries, and a prior diagnosis of Post-Traumatic Stress Disorder (PTSD). Runyon's test results reveal he has frontal lobe damage, especially of the right ventrolateral prefrontal cortex. *Id.* Runyon's history of head injuries include two incidents of grenades being detonated quite close to him during training exercises while in service. These occurred between 1989 and 1991. Runyon was involved in two serious car accidents with cognitive sequelae-one in 1990 and the other in 1996. These incidents produced symptoms including brief unconsciousness, vertigo (from which he still suffers occasionally), temporary deafness, numbness, impaired memory, "jumbled thoughts," and according to a report from his estranged wife, marked personality changes including a short temper. *Id.* Dr. Mirsky finds these circumstances consistent with the diagnosis of PTSD, explaining:

> [Runyon's] history resembles that of many injured service members diagnosed with mTBI (mild traumatic brain injury) I have seen at Walter Reed National Military Medical Center. Many of these service members develop PTSD, despite the diagnosis of "mild." These incidents, especially the severe automobile accidents, were never

followed up, to my knowledge, with brain imaging studies. Such studies, in a number of cases, especially if the imaging reveals demonstrable brain damage, can change the diagnosis to "moderate brain injury."

*Id.*, p. 2.

Dr. Mirsky contacted defense counsel *before and after* Runyon's trial about speaking on Runyon's behalf. Mirsky emails, Ex. 21; Mirsky 9/18/09 letter, Ex. 22. Counsel rendered ineffective assistance by failing to present Dr. Mirsky's testimony. Given that Runyon's military service significantly contributed to his brain damage and deficits in functioning, the jurors could have assigned substantial weight to the "military service" mitigating circumstance. Concomitantly, the "special training" aggravator could not reasonably have been given great weight by the jurors because that same evidence simultaneous established offsetting mitigating evidence in terms of Runyon's honorable military service. *See Porter*, 558 U.S. at 43 ("Our Nation has a long tradition of according leniency to veterans in recognition of their service[.]"); s*ee also, Rompilla*, 545 U.S. at 386 (absent the un-presented mitigating evidence, the jury "could give more relative weight" to aggravation because counsel missed an opportunity to place significant mitigating evidence on life's side of the sentencing scale).

### 3.2     James R. Merikangas, M.D., L.L.C.

Dr. Merikangas conducted neurological examinations of David Runyon on July 29, 2009, and August 24, 2015. Upon examination in 2009, Dr. Merikangas observed that Runyon "was either in a fantasy world of grandiose wishful thinking, or suffering from delusions." Merikangas report, 9/23/15, Attachment p. 2, Ex. 2. Dr. Merikangas would have testified at trial that Runyon is "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." Merikangas report, 9/23/15, p. 1, Ex. 2.

Runyon sustained brain damage from the age of three when he was thrown across a room by his father and rendered unconscious. *Id.*, p. 4; *Id.*, Attachment p. 1. Runyon's brain damage was exacerbated by a car accident in 1996 that resulted in a personality and mood change and contributed

to his Post-Traumatic Stress Disorder. *Id.*, p. 4; *Id.*, Attachment p. 1. Brain scans completed in August 2009 revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." *Id.*, p. 4.

Dr. Merikangas finds that Runyon's "brain injury has resulted in impaired executive functioning and decision making." *Id.* His psychological testing also indicates paranoia and delusions. Runyon's history of Post-Traumatic Stress Disorder "may account for some of his disordered mood and cognition." *Id.* "The paranoia and delusions may represent a formal thought disorder, which may be a consequence of his brain injuries, mood disorder, and PTSD." *Id.* Brain damage, cognitive defects, PTSD, Schizophrenia and other disorders are substantially mitigating but Runyon's jurors were not provided with this information and, therefore, had an inaccurate view of David Runyon. *See Porter*, 558 U.S. at 36 n.4 (discussing the mitigating value of PTSD); *Rompilla*, 545 U.S. at 390 (An investigation of schizophrenia and other disorders "would have destroyed the benign conception of Rompilla's upbringing[.]"). Thus, counsel rendered ineffective assistance by failing to present Dr. Merikangas's testimony.

### 3.3    Mark D. Cunningham, Ph.D., ABPP

In 2009, Dr. Cunningham testified about his prison violence risk assessment of David Runyon. Dr. Cunningham was available to provide an evaluation of adverse factors in Runyon's background and the implications of developmental factors so that the jury would have an informed mechanism for determining their weight and nexus. Cunningham declaration, 9/25/15, p. 50, Ex. 8. Such an evaluation provides an individualized consideration based on the well-established principle that adult outcome is a function of the interaction and balance of predisposing, risk, and protective factors in childhood. *Id.*, p. 10 ¶21. As predisposing and risk factors increase, and protective factors decrease, there is an increasing probability of dysfunction as an adult. *Id.*

The nexus between development and adult behavior is typically neither conscious nor simplistically obvious. *Id.*, ¶22. There is, however, a logical nexus between the adverse developmental factors in Runyon's background and the capital offense, *id.*, as well as statutory and non-statutory mitigating circumstances. This is important because the predispositions to mental illness and certain personality traits arising from hereditary and childhood experiences counters attempts by the prosecution to characterize Runyon's conduct and decision-making ability as "willfully self-selected, rather than acknowledging its origins in his heredity, childhood, and/or family experience." *Id.*, p. 29. It was therefore critical that the jurors were informed about the formative influences in Runyon's history, his character, and his psychological limitations. *Id.*, p. 27. Those formative influences, unknown and/or unexplained to Runyon's jurors, are set forth below.

**(a)** The following have a genetic predisposition/component: Major Depressive Disorder, Anxiety Disorder, Bipolar Disorder, and explosive reactivity and both sides of David Runyon's family have these disorders, or associated traits, in their genetic heritage. Cunningham declaration, 9/25/15, pp. 28, 29, Ex. 8. "Such genetic predispositions coupled with developmental vulnerabilities and childhood maltreatment, increased the risk David would possess traits such as irresponsibility, intermittent callousness, and manipulative behavior." *Id.*, p. 29. This is relevant because the prosecution characterized as aggravation: Ruynon's tardiness at work; abandonment of his child and step-children; and, the self-serving video tape of Virginia Pina where Runyon elicits a recantation of the domestic assault.

**(b)** Suk Cha's inability to bond with Runyon, the biological father's abandonment of Runyon, and the adoptive father's frequent absences and emotional unavailability also "result[ed] in lasting fundamental psychological harm." *Id.*, pp. 35-36. In particular,

> Suk Cha was not maternally bonded to David. [Dombrowski] described David as responding much more readily to Dombrowski's soothing than that of Suk Cha. This suggests that, in spite of Dombrowski's alcoholism and family violence, David had a more secure attachment to him than to Suk Cha. Thus when Dombrowski abandoned

him, David not only lost some protection from his mother's punitive volatility, he also lost a primary emotional attachment.

*Id.*, pp. 46-47.

The lack of parental/family attachment was reinforced by residential instability that disrupted attachments outside the family unit. *Id.*, p. 47. Runyon's brother explains, "The message was: don't get attached to anything because you will not be here long, people are expendable and everything changes." *Id.*

The lack of attachment provides an explanation for family estrangement which the prosecution capitalized upon, stating that Runyon "walked away from" his "good upbringing" and ceased contact with his parents. *See, e.g.*, Tr. 2619, 2621-23, 2658, 2659, 8/26/09. Even more central to the prosecution's plea for a death sentence were the "lack of remorse" and "victim impact" aggravators. The connection between inadequate attachment and deficits in empathy is an important factor in Runyon's development and provides:

a context for the deficits in empathy for the victim reflected in David's perpetration of the capital offense. The gravity of disrupted attachment and its implications for later deficiency in the ability of that individual to meaningfully relate to and empathize with others (such as romantic partners), as well as the vulnerability that this fundamental developmental injury has for antisocial conduct and criminal violence are critically important conceptualizations in mitigating his offense.

*Id.*, p. 37.

**(c)** Runyon "suffered chronic stress in childhood including deficient maternal bonding, paternal alcoholism, observed domestic violence, emotional neglect, physical and emotional abuse, father abandonment, extended absences of adoptive father, recurrent moves, and transcultural relocation." Cunningham declaration, p. 32, Ex. 8. Such trauma can "activate various systems in the brain that actually change neuron response and cognitive pathways. Children that experience on-going high levels of arousal due to trauma will develop systems in their brains that cause them to be constantly hyper-aroused and hypervigilant." *Id.*, p. 32. Alterations in the brain can result in severe

problems for children, adolescents, and adults in learning ability, mood, bonding and attachment, problem solving, and increased likelihood of reactivity. *Id.*, p. 32.

> [O]bservation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Hershorn & Rosenbaum, 1985; Jaffe et al., 1986; Jaffe, Hurley, & Wolfe, 1990). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

*Id.*, p. 46.

In addition, Runyon's experiences with childhood physical abuse and neglect:

> disrupt[ed] not just the subjective experience of childhood, but also the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood (see Schwarz & Perry, 1994). The bridge between childhood and adulthood experiences of PTSD is consistent with the diagnosis of this disorder in David when he was in the military.

*Id.*, p. 42.

Traumatic childhood experiences have a lasting effect with "potentially broad adverse effects on personality structure, subsequent vulnerability to psychological/psychiatric disorder, life trajectory, behavior, and relationships." *Id.*, p. 43. The particularized childhood experiences of abuse and neglect – which presumably most jurors have never experienced – affect each individual in a distinct manner thus requiring an expert explanation. *Abdul-Kabir*, 550 U.S. at 261. Accordingly, Runyon's jurors should have been informed of the effects of a traumatic childhood when determining his moral culpability. *See, e.g., Porter*, 558 U.S. at 33 (abusive childhood, trauma from military service, and impaired mental health and mental capacity); *Sears*, 561 U.S. at 948 (parents had a physically abusive relationship and divorced when the defendant was young and the defendant was disciplined with age-inappropriate military-style drills); *Rompilla*, 545 U.S. at 392 (parental alcoholism, parental violence, physical abuse, terrifying home environment, no expressions of parental love, affection or approval).

67

(d) Runyon has a history of traumatic brain injury, from the age of three (at the hands of his biological father) and culminating at the age of 25 with a head-on motor vehicle collision. Frontal lobe damage can result in "personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in … difficulty holding employment." Cunningham declaration, p. 33, Ex. 8. These effects of Runyon's brain damage shine a different and mitigating light on the prosecution's arguments in aggravation: that Runyon's tardiness at work was irresponsible; that he "chose" not to complete college and instead "chose" to follow a different path; and, that he failed at every career attempt but placed the blame on his employers. *Id. See also Sears*, 561 U.S. at 946, 949 (cognitive impairments caused by significant frontal lobe damage suffered as a child).

Additionally, persons with frontal lobe damage are impulsive, have poor anticipation, and once they become fixated on a course of action, they seem to forget that any other is possible. *Id.* Frontal lobe damage reduces the ability to plan and to perceive consequences of actions, results in deficiencies of judgment, and imposes difficulty in reprogramming an ongoing chain of behavior. *Id.*, p. 34. Brain damage, thus, not only informs Runyon's pattern of moving from job to job and place to place, and pattern of unstable volatile relationships, but it is a critically important mitigating factor as the jury considered David's judgment and decision-making capability, particularly in light of the statutory aggravators of "substantial planning" and "pecuniary gain," *id.*, and the prosecution's argument that Runyon could have changed course and saved Cory Voss at the last minute. Tr. 2621-22, 2659, 8/26/09.

For all these reasons, counsel rendered ineffective assistance for failing to present this testimony from Dr. Cunningham.

68

a.    **Richard G. Dudley, Jr., M.D.**

Dr. Dudley evaluated Runyon on September 2nd and 3rd, 2015. Dudley report, p. 2, Ex. 29. Dr. Dudley concludes that, in 2009, it would have been evident to him or another experienced psychiatrist that Runyon was suffering a combination of effects from an extremely difficult childhood, brain damage, and multiple major psychiatric disorders prior to and at the time of the crime. *Id.*, pp. 14-15. This would have impaired Runyon's capacity to function at the time of the crime, *id.* p. 14, and there was evidence that Runyon was extremely distressed leading up to the time of the crime. *Id.*, p. 12. Dr. Dudley finds:

> Specifically, with regard to statutory mitigation, it is my opinion, to within a reasonable degree of medical certainty, that these psychiatric difficulties constitute a severe mental or emotional disturbance. It is also my opinion, to within a reasonable degree of medical certainty, that as a result of these psychiatric difficulties, Mr. Runyon's capacity to conform to the requirements of law was significantly impaired.

> *Id.*, p. 15.

Dr. Dudley explains the factors that led to Runyon's compromised mental state, beginning with an extremely difficult childhood that had an extremely negative impact on Runyon's development, which then significantly impaired his ability to function. *Id.*, p. 12.

> More specifically, during his earliest years, Mr. Runyon was repeatedly exposed to the physical abuse of his mother by his biological father, which he experienced as so severe that he felt that his father was going to kill his mother. This exposure to domestic violence occurred in the absence of the type of parental nurture and support that might have at least helped to mitigate the impact of this exposure on Mr. Runyon's development.

> Such repeated exposure to violence in the absence of parental nurture and support results in the development of psychological trauma-related symptoms such as hypervigilance and overreactivity, and Mr. Runyon reported a long history of such symptoms. When a parental figure repeatedly fails to calm a repeatedly traumatized/frightened child, the child is unable to learn to calm his/her physiological response to frightening situations; this can impact on the development of the child's brain, and as a result, the child becomes physiologically hyper aroused and anxious as well; and Mr. Runyon evidences this difficulty too.

> Dudley report, p. 12, Ex. 29.

In addition to the fact that the absence of parental nurture, support and protection increases the damage caused by repeated exposure to violence during early developmental years, such poor parenting negatively impacts on other aspects of development as well. More specifically, as a result of such poor parenting, children fail to learn how to develop stable relationships, they fail to develop a stable and positive sense of themselves, they fail to learn how to regulate their mood, and they are impulsive. Mr. Runyon evidences all of these psychiatric difficulties too. In addition, there were also other problems that Mr. Runyon endured during his childhood and early adolescent years that also contributed to the development of these same psychiatric difficulties, such as feeling like an outcast in relationship to his peers, not having access to any extended family members who might have offered him at least some nurture and support, and being so frequently moved that he was unable to develop any other outside support from other adults or his peers.

*Id.*, p. 13.

Added to the psychiatric difficulties caused by his traumatic childhood, Dr. Dudley further notes that, "Runyon's family history of mental illness and the role of genetic transmission in the etiology of these types of mental illness placed him at increased risk for developing such psychiatric difficulties." *Id.*, p. 13. In fact, Runyon's experience is "characterized by an even more severe disturbance of his mood and more clearly defined psychotic symptoms." *Id.*

Mr. Runyon then noted that even when he was a child he knew that evil spirits can influence this world; he has seen ghost and entities that he was certain were not shadows or reflections of light; and he noted that he knew that what he was seeing was real because of the way they moved and the fact that he could feel their presence. He reported that he was never afraid of any of that; so he never ran, knowing that he could manage any of that; and as an example, he described an incident that occurred when he was a child, where a glass was moving across the table and he simply caught it. Mr. Runyon then went on to note that there have been times when that evil has tried to use others to cause him harm, either intentionally or through their carelessness; he has been able to foresee that and thereby avoid that; and he gave numerous examples of this happening in his life.

*Id.*, p. 9.

Dr. Dudley describes the convergence of many adverse factors: "episodes of depression and episodes of at least hypomania were superimposed upon the above noted difficulties regulating his mood that he had been experiencing since he was a child." *Id.* p. 13. "In addition, clearly delusional thoughts of both the grandiose and the paranoid type were superimposed upon immature

70

psychological defenses that he had been using and thoughts that he had had for some [time] about

evil and the possibility that someone was out to get him." Dudley report, p. 13, Ex. 29.

The psychiatric difficulties arising from Runyon's traumatic childhood and genetic pre-

disposition to mental illness are further superimposed on traumatic brain injury resulting in trauma-

related psychiatric difficulties and cognitive deficits.

> The possibility that subsequent trauma to his brain contributed to the further increased severity of these difficulties, as suggested by other evaluators, cannot be ruled out.
>
> In addition to being a problem in and of themselves, these additional psychiatric difficulties also interacted with and further complicated his above described trauma-related difficulties and other developmental difficulties. For example, the emergence of paranoid delusions that someone was trying to harm him clearly exacerbated his trauma-related hypervigilance and over reactivity. For example, as his mania and grandiose delusions became more severe, they served as a defense against some of his anxiety and fears, but also caused his behavior to become all the more erratic, unpredictable and impulsive.
>
> As noted above, during his young adult years, Mr. Runyon continued to experience traumatic events. These 'near death experiences' further exacerbated his trauma-related difficulties.
>
> Then furthermore, there is the matter of Mr. Runyon's cognitive deficits, seen clinically and confirmed by neurological and neuropsychological testing. Such cognitive deficits further impaired Mr. Runyon's decision-making capacity beyond the impairments resulting from the distorted perceptions of reality, the impairments in judgment, and the impulsivity associated with his other psychiatric disorders.

*Id.*, p. 14. The existence and synergistic effect of all these factors constitute substantial

mitigation that Runyon's jurors never heard.

In addition to expert testimony regarding adverse factors resulting in brain damage and mental

illness which affected Runyon's judgment and decision-making abilities, expert testimony was required

to explain how those same factors "are a major determinate" of Runyon's facial expression and affect.

*Id.*

During penalty-phase argument, the prosecution emphasized Runyon's alleged "lack of

remorse" as a major aggravating factor. Tr. 2588, 2591, 2593, 2615-17, 2657, 2660, 8/26/09. In

71

particular, the prosecutor argued that Runyon's appearance was proof of remorselessness. "You saw his demeanor when being questioned in the second interview yesterday by Detective Rilee … you can see there, you can see by his demeanor, of his guilt. But you can also see how unaffected he is by the crime that he has committed." Tr. 2616-17, 8/26/09. "He sat stone-faced after being confronted with all this evidence and expressed no remorse, no regret whatsoever." Tr. 2617, 8/26/09.

Dr. Dudley explains, "facial expression is among the most significant components of 'affect', which is the external representation of what a person is thinking and feeling." Dudley report, p. 15, Ex. 29. One cannot make an accurate determination of what a person may be thinking or feeling based solely on facial expression. That determination must be made in the context of other information. *Id.* For example, "a flattening of the affect is likely a symptom of a psychotic process[.]" *Id.* "[A] blunting of the affect may be a symptom of a clinically significant depression[.]" *Id.* "[A]n inappropriate affect could be due to a variety of psychiatric, neuropsychiatric or other medical condition, all of which would have to be considered and explored … before attributing such an inappropriate affect to something else." *Id.* In other words:

> Mr. Runyon's facial expression and affect is among the things for which a mental health professional/expert witness should have been called to assist the jury, given that members of the jury wouldn't be expected to be able to do this on their own.
>
> As noted above, it is my opinion that Mr. Runyon has been suffering from multiple major psychiatric disorders. With many of those disorders, alteration of facial expression and affect is a symptom. Therefore, I, or any other experienced psychiatrist, could have been called to opine that Mr. Runyon's psychiatric disorders are a major determinate of his facial expression. In addition, the nature of the injuries that have caused Mr. Runyon's facial asymmetry are also a major determinate of his facial expression. During the course of my examination of Mr. Runyon, it was clear that as a result of the injuries to his face, he had an extremely limited capacity for facial expression, which significantly impaired his affective expression. Here too, I, or any other experienced psychiatrist, neurologist or other similar professional, could have been called to opine that the injuries to Mr. Runyon's face must be taken into consideration when assessing his facial expression.
>
> *Id.*

Jurors must be able to give *meaningful* effect to the mitigating qualities of evidence of childhood neglect and abandonment, neurological damage, mental illness and a troubled childhood. *Abdul-Kabir*, 550 U.S. at 262. Thus, counsel had an absolute duty to not only present this information, but to present it in a *meaningful* manner. Counsel's failure to do so deprived Runyon of the effective assistance of counsel.

### D.     Counsel's Failure To Investigate And Present Mitigating Evidence Undermines Confidence In Runyon's Death Sentence.

Runyon had a "constitutionally protected right[] to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). When assessing the probable effect of unpresented mitigation, the strength of the prosecution's case in aggravation must be considered against the totality of mitigating evidence.

The two statutory aggravating factors found by Runyon's jury during the eligibility phase of his capital sentencing were largely, if not totally, encompassed by the finding of guilt and could not have reasonably been given great weight because jurors had been instructed that the fact of guilt itself was, as a matter of law, insufficient to support a sentence of death. Tr. 1781-85, 7/22/09, hearing on motions. The "pecuniary gain" aggravating circumstance could not have reasonably been given great weight because the jurors were aware that the only difference in culpability between Runyon and the two co-defendants against whom the prosecution did not seek death was that the former had the financial wherewithal to hire another to carry out their criminal intentions. Furthermore, it is undisputed that the two co-defendants spent the $100,000 death gratuity benefit in a matter of months while the prosecution could only *suggest* that Runyon received $275 as compensation for the victim's death. In addition, this aggravator could not have been too weighty because the jurors found a mitigating circumstance suggestive of a different motive; that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter." ECF No. 291, p. 4.

The "substantial planning" aggravating circumstance should have been rebutted not only with the argument that Runyon was simply "a tool" for Catherina Voss, *see supra* Claim 4, IAC eligibility, but also with evidence of Runyon's brain damage and its effect on his judgment and decision-making abilities. *See, e.g.* Dudley report pp. 14-15, Ex. 29; Cunningham declaration pp.33-34, Ex. 8.

The non-statutory aggravators also were not entitled to great weight. The only fact differentiating the "victim impact" in the instant case from that in every other case of first-degree murder was that no weight could be attributed to the impact on Cory Voss's surviving spouse as she was the financier, instigator of, and mastermind behind Cory Voss's murder. Furthermore, this aggravator was balanced against two family sympathy mitigators proposed by the defense based on emotional harm to Runyon's mother and son, plus, the jurors' own finding of family sympathy in that Runyon's brother "will suffer emotional harm if his brother is executed" Penalty phase verdict form, ECF No. 291 p. 4.

The "abuse of women" aggravator was not entitled to great weight because it was partially based on uncharged conduct and dismissed charges involving stale events and it did not make Runyon the worst of the worst. As previously explained, the weight of this aggravator could have been reduced with an explanation about Runyon's upbringing where he witnessed and modeled domestic violence between his parents and inherited limited problem-solving abilities and explosive tendencies. Maria Runyon also could have provided context and explanation for the charges related to her and her sister, Teresa Linker. Maria Runyon declaration, ¶¶ 7, 26-28, Ex. 28.

The "lack of remorse" aggravator could have been countered by explaining Runyon's facial asymmetry and explaining that mental illnesses "flatten" and "blunt" affect. Dudley report, p. 15, Ex. 29. The "specialized training" was counter-balanced by the jurors' finding that Runyon's military service and education were also mitigating. Penalty phase verdict form, ECF No. 291 p. 4.

Without knowledge of the wealth of existing mitigation specifically individualized to David Runyon that explains exactly who he is, the overwhelming prosecutorial theme heard by the jurors was that Runyon had "a good upbringing" and law-and-order-type careers which he chose to forsake.[32] This argument, coupled with the defense presentation of only good character witnesses, served to *heighten* Runyon's moral culpability. The "centerpiece" of the defense was the "equally-culpable-codefendants" mitigator. *Runyon*, 707 F.3d at 508. This failed to reduce Runyon's moral culpability, especially when the bar had been set so high, and it failed to address any of Runyon's individual characteristics. As pointed out by the prosecutor during closing argument:

> And when you look at all of these mitigators, *most of which have nothing to do with the David Runyon who sits before you today*, it deals with *his unrelated past*, it deals with his uncertain future, it cannot match up against the weight of the aggravating factors that deal with the defendant that is sitting in this courtroom today, that deal with the crime that he caused, and the impact on the family.
>
> Tr. 2623, 8/26/09.

Runyon's jurors deliberated twice as long for the penalty-phase as for the guilt-phase. The jurors demonstrated they were open to the mitigation contained in Runyon's psycho-social history, as they found on their own that Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father." Had counsel presented the available mitigating evidence set forth above which explains how and why Runyon's past relates to who he was at the time of the crime, it might well have influenced the jury's appraisal of Runyon's moral culpability. *Williams*, 529 U.S. at 398. For all these reasons, Runyon was denied the effective assistance of counsel at the penalty phase of his capital trial.

---

[32] This argument is reminiscent of the racial stereotype regarding Asians and "honor" invoked by the police during Runyon's videotaped interrogation and which the court of appeals found was erroneously admitted.

**Claim 7:**     **Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt.**

Detective Rilee focused upon Draven and Runyon as suspects in the Voss murder and was gathering evidence upon which to convict them. Detective Rilee interrogated Draven and then, at trial, the prosecution presented Rilee to testify as to the contents of Draven's statements. Tr. 1300, 1334, 7/13/09. These statements were incriminating to both Draven and to Runyon and the prosecution highlighted those statements in its closing arguments of the guilt phase.

The admission of Draven's statements to the police as evidence against Runyon was a violation of his Sixth Amendment right of confrontation. Statements taken by police officers in the course of interrogations are "testimonial" in nature. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). They are testimonial because the circumstances indicate that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Hammon v. Indiana*, 547 U.S. 813, 822 (2006). "Testimonial evidence" is only admissible where the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. Because Draven could not be called as a witness and was thus, unavailable, Runyon never had any opportunity to cross-examine him on his statements to Rilee.

Once Draven's statements were admitted into evidence, defense counsel should have objected and, at least, requested a limiting instruction. Such instructions would have been given had defense counsel asked for them. Tr. 16, 12/8/08, Hearing on Motions. However, no instruction was requested and no instruction was given.

The effectiveness of any such limiting instruction is questionable, even if one had been given. *See Bruton v. United States*, 391 U.S. 123 (1968) (recognizing the difficulty jurors would have in

76

considering one co-defendant's statement against that co-defendant while disregarding it in the other co-defendant's case). Here, where Draven and Runyon were tried together and where the prosecution alleged a joint scheme to commit murder, jurors would have had a difficult time using Draven's statement only against him. However in this case that question is academic since no such instruction was ever sought and none was given.

Runyon was prejudiced because Draven admitted that he was having an intimate affair with Catherina Voss. Tr. 1320, 7/13/09. This was essential to the government's theory that Draven hired Runyon to kill his lover's husband. It also contradicted the statement that Runyon gave to the police. Tr. 1312, 7/13/09. Draven also claimed that he spoke with Runyon when he called the pay phone at the Waffle House near the crime scene. Tr. 1321, 7/13/09. The prosecution highlighted this fact in its closing argument. Tr. 1593, 7/15/09. All of this information came from Draven's statement and was offered for the truth of the matter asserted and was used by the prosecution to support its charges of capital murder against Runyon.

In addition, the United States presented statements made by Draven to a jail-house informant named Edward Fodrey. Fodrey's testimony could only be considered by the jury as evidence against Draven, yet no limiting instruction was given because Runyon's counsel never asked for one. Fodrey's testimony was prejudicial to Runyon because Fodrey said that Draven admitted to hiring some guy to kill Draven's girlfriend's husband. Tr. 1236, 7/13/09. Runyon had no opportunity to cross-examine Draven on this statement.

The admission of this hearsay evidence prejudiced Runyon's constitutional right to a fair trial because his Sixth Amendment right to confront the witnesses against him through cross-examination was abridged. Trial counsel were ineffective for failing to object to this testimony. For these reasons, this Court must grant Runyon a new trial.

**Claim 8:       Ineffective Assistance Of Counsel On Direct Appeal.**

In *Massaro v. United States*, 538 U.S. 500 (2003), the Court resolved a division in the lower courts and held that all claims of ineffective assistance of counsel may be brought for the first time in collateral proceedings under § 2255, regardless whether that claim could have been raised on direct appeal. *Id.* at 508. This rule governs even when the defendant was represented by new counsel on appeal, and even when trial counsel's ineffectiveness was so apparent from the record that it could have been raised on appeal. *Id.* Appellate counsel must be faulted, however, for their failure to appeal other errors that are based in the trial record and thus could have been raised on direct appeal. To the extent there are such claims in this motion, appellate counsel rendered ineffective assistance in failing to timely raise them.

When counsel has filed a brief on appeal, the presumption of effective appellate assistance generally can be overcome only when ignored issues are stronger than those presented. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). That rule may not apply when appellate counsel failed to obtain and review the full trial record and consequently were unaware that a potentially meritorious issue existed. *See generally Johnson v. Johnson*, No. 3:10-cv-502, 2011 WL 2708328, at *6 (E.D. Va. July 12, 2011).

Appellate counsel Norris appropriately compiled a list of trial exhibits and sealed pleadings that were needed for the appeal, including "court record of jury selection/strikes used and Juror Questionnaires for Seated Jurors/Alternates." Teresa Norris Declaration, Ex. 36. But appellate counsel did not obtain or attempt to obtain the court record of strikes, nor did they attempt to obtain the questionnaires of potential jurors other than those seated or alternates. As a result, appellate counsel unreasonably lacked the record necessary to investigate *Batson* violations, or to recognize other errors involving jury selection. Appellate counsel were constitutionally deficient in failing to raise claims regarding the selection of jurors or any other claim that required the information in the juror questionnaires.

Appellate counsel were also deficient for failing to raise the denial of Runyon's confrontation rights. *See* Claim 7, confrontation claim. A review of the transcript would have revealed that there was substantial evidence admitted at Runyon's trial in violation of his confrontation rights. Counsel on appeal were ineffective for failing to raise this claim. *Robbins, supra; Strickland, supra.*

In two respects, the direct appeal in Runyon's case also satisfies the requirement in *Robbins.* First, at least one of the issues that was presented on appeal is weaker than the ignored issues. Runyon alleged on appeal that the murder-for-hire and carjacking indictments were unconstitutional because they exceeded Congress' power under the Commerce Clause and impermissibly intruded on the police power reserved to the states under the Tenth Amendment. The Fourth Circuit did not dismiss this allegation as "frivolous," but it made very clear that the claim was very weak. It said the jurisdictional challenge to the murder-for-hire indictment "fails by a wide margin," and it observed that "all of the circuits to address the question" agree that the statute is constitutional. *Runyon,* 707 F.3d at 489. It also held that "Runyon's constitutional attack on the federal carjacking statute [met] the same fate" because it was contrary to binding and long-standing circuit authority. *Id.* The Fourth Circuit similarly regarded as weak Runyon's boilerplate challenge to the constitutionality of the death penalty in all circumstances. *Id.* at 521 n.7.

Second, it was not necessary for Runyon to delete a claim in order to add an ignored issue. The Fourth Circuit granted Runyon 100 pages for his opening brief; he consumed 99 pages using 14-point Times New Roman font, with the last page containing only six lines of text and a vertical signature block. Switching to 14-point Garamond font would have reduced the length of the opening brief to 93 pages with no change in content. Garamond is a highly readable font that typesetters have used since the 16th Century, and experienced lawyers commonly use that space-efficient font when

faced with a length limitation.[33] In fact, Runyon has used 12-point Garamond throughout this motion to illustrate its properties.

Nor was this a case where extra space would have been superfluous because counsel had said everything they wanted to say within the space allotted. Appellate counsel moved the Fourth Circuit twice for additional space. See CA-ECF Nos. 59 and 61. The first request was granted in part; the second request was denied.

Appellate counsel was ineffective for failing to raise meritorious issues on appeal. This discussion specifically references the *Batson* claim, Claim 16; and the Confrontation Clause claim, Claim 7. Should this Court find any other claims are defaulted for failure to have been raised on appeal, Runyon specifically alleges appellate counsel was ineffective for failing to do so.

**Claim 9:      Runyon's Conviction Under 18 U.S.C. § 924(C) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution.** *Johnson V. United States***, 135 S. Ct. 2551 (2015).**

### A.      Introduction

Runyon was convicted of conspiracy to commit murder for hire, 18 U.S.C. § 1958(a); carjacking resulting in death, 18 U.S.C. § 2119; and murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), (j), and received death for the conspiracy and 924(c) charges. This claim alleges that in light of a Supreme Court opinion, issued after Runyon's conviction became final, Runyon's conviction for the § 924 offense (and its accompanying death sentence) must be vacated. It also alleges that Runyon's death sentence for the conspiracy conviction must be vacated because the evidence and arguments presented at trial with respect to the § 924 offense painted an inappropriate

---

[33] The Fourth Circuit's certificate of compliance for briefs specifies that parties must use "a proportionally spaced typeface (such as Times New Roman)," which must include serifs and must be 14-point or larger, or "a monospaced typeface (such as Courier New)," which must be 12-point or larger. http://www.ca4courts.gov/docs/pdfs/certcomp.pdf. Garamond satisfies all the requirements of the first option.

picture of the conspiracy offense and consequently contributed to the jury's sentencing decision for the conspiracy charge.

Recently, the Supreme Court released its opinion in *United States v. Johnson*, 135 S. Ct. 2551 (2015), which calls in to question whether conspiracy and carjacking may be relied upon to establish the crime of violence element of 924(c). In *Johnson*, the Supreme Court held that the definition of violent felony used in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), is unconstitutional because it is vague and does not provide adequate notice. *Johnson*, *supra*. The reasoning in *Johnson* applies with equal force to the definition of crime of violence found in 18 U.S.C. § 924(c). This Court should vacate Runyon's 924(c) conviction and remand for a new sentencing hearing. In this case, the jury was instructed that the conspiracy and carjacking charges qualified as crimes of violence supporting the 924(c) charge. Tr. 1703-04, 7/16/09.

## B.    Relevant Statutes

Several statutes attempt to define violent criminal conduct which may support enhanced punishment. In the "General Provisions" section of the criminal code, crime of violence is defined as follows:

> (a)    an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b)    any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C § 16(a), (b).

This same definition, verbatim, is present in 18 U.S.C. § 924(c), the statute supporting Runyon's conviction.

81

Similarly, the ACCA enhances punishment for defendants who have three prior violent felonies, defined as offenses that:

> (i) has as an element, the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(i), (ii).

Subsection (i) is often called the "force clause;" subsection (ii), the residual clause. U.S.S.G. 2L1.2 (prior conviction for crime of violence enhances sentence for unlawful reentry).

Closely related definitions are found in the Sentencing Guidelines. U.S.S.G. 4.B1.1 (prior conviction for crime of violence supports career offender determination).

The Fourth Circuit regularly relies on case law interpreting the ACCA to interpret 18 U.S.C. § § 16(b) as well as 18 U.S.C. § 924(c). *See United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same).[34]

---

[34] *See also United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and § 16(b) "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)").

*See Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) "perfectly mirrored" each other). *See also United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008); *United States v. Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer*, 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial" and that interpreting U.S.S.G. § 4.1.1, which uses the ACCA language, "is controlled by" a decision that interprets § 16(b)).

###### C.     The Definition of "Crime of Violence" is Unconstitutional.

In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior convictions as violent felonies is too "wide-ranging" and "indetermina[te]." 135 S. Ct. at 2557. As a result, the ACCA "both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.*

The Court began its analysis by explaining that, under *Taylor v. United States*, 495 U.S. 575 (1990), the ACCA requires the categorical approach to determine whether a particular statute qualifies as a violent felony. *Id.* at 2557. Courts must assess whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion." *Id.* (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

The Court further clarified that the residual clause "requires a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* (citation omitted). The Court linked the "ordinary case" framework to *James v. United States*, 550 U.S. 192 (2007), in which it held,

> We do not view that approach as requiring that every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury before the offense can be deemed a violent felony.
>
> Rather, the proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another."

*Id.* at 208 (citations omitted). "As long as the offense is of a type that, by its nature, presents a serious potential risk of injury to another, it satisfies the requirements of [the ACCA's] residual provision." *Id.* at 209 (emphasis added, brackets supplied).

*Johnson* concluded that the process of determining what is embodied in the "ordinary case" rather than "real-world facts" is fatally flawed, rendering the ACCA unconstitutionally vague. "[G]rave uncertainty" surrounds the method of determining the risk posed by the "judicially imagined 'ordinary

83

case.'" 135 S. Ct. at 2557. "The residual clause offers no reliable way to choose between ... competing accounts of what 'ordinary' ... involves." *Id.* at 2558.

The *Johnson* Court considered and rejected different ways that a court might envision the hypothetical "ordinary case." Specifically, the Court explained that a statistical analysis of reported cases, surveys, expert evidence, Google, and gut instinct are all equally unreliable in determining the "ordinary case." *Id.* at 2557 (quoting *United States v. Mayer*, 560 F.3d 948, 952 (9th Cir. 2009) (Kozinski, J., dissenting from denial of rehearing en banc)). Although earlier ACCA cases relied on statistical analysis and "common sense," *Johnson* concluded that these methods "failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition." *Id.* at 2559 (referring to *Chambers v. United States*, 555 U.S. 122 (2009), and *Sykes v. United States*, 564 U.S ___, 131 S. Ct. 2267 (2011)).

This flaw alone establishes the residual clause's unconstitutional vagueness. The Court, however, explained that a closely related flaw exacerbates the problem. The Court noted that the residual clause lacks a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." *Johnson*, 135 S. Ct. 2258. Although the level of risk required under the residual clause must be similar to the enumerated offenses (burglary, arson, extortion, or crimes involving use of explosives), *Johnson* rejected the notion that comparing a felony's "ordinary case" to the risk posed by certain enumerated offenses cures the constitutional problem. *Id.*

The enumerated offenses failed to save the ACCA residual clause because, according to the majority, comparing felonies to enumerated offenses similarly requires resorting to "a judicially imagined abstraction." *Id.* Before courts may even start the comparison, they must first determine what the "ordinary" enumerated crime entails. But the "ordinary" enumerated crimes, *Johnson* emphasized, like any other crime, "are far from clear in respect to the degree of risk each poses." *Id.*

(quoting *Begay v. United States*, 553 U.S. 137, 143 (2008)). Any attempt to figure out the "ordinary" enumerated offense requires just as much guesswork as figuring out the "ordinary" predicate offense. The Court held that such indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is more than the "Due Process Clause tolerates." *Id.*

Thus, *Johnson* not only invalidated the ACCA residual clause, but it invalidated the "ordinary case" analysis and statutory provisions that compel such an analytical framework. In other words, the only way to apply the residual clause is to use the "ordinary case" analysis, and the "ordinary case" analysis is impossible to apply in a constitutional manner.

### D.    Runyon's Conviction for Murder with a Firearm in Relation to a Crime of Violence is Unconstitutional.

Under *Johnson*, the definition of crime of violence set forth in 18 U.S.C. § 924(c) is unconstitutional. To be sure, 18 U.S.C. § 924(e)(2)(B)(ii) and 18 U.S.C. § 924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is a risk of injury, and the risk at issue in Section 924(c) is a risk that force will be used, this difference is immaterial to the due process problem and has no impact on the *Johnson* analysis. The Court's holding did not turn on the type of risk, but rather how a court assesses and quantifies the risk. That inquiry is the same under both the ACCA and § 924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the risk posed by the "ordinary case."

Relying on *James*, the Fourth Circuit has squarely held that the "ordinary case" analysis applies when construing 18 U.S.C. § 16(b). *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014). The Fourth Circuit stated:

> [E]very set of conceivable facts covered by first-degree burglary does not have to present a serious risk of injury for it to qualify as a crime of violence. It is sufficient if "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U.S. at 208, 127 S.Ct.

1586. As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. § 16(b).

*Id.*

*Avila* controls here because § 16(b) and § 924(c)(3)(B) are identical. The residual clause of 924(c), like the ACCA residual clause, thus requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. *Avila*, 770 F.3d at 1107; *Ayala*, 601 F.3d at 267. Since this is the identical analytical step that brought down the ACCA residual clause, § 924(c)(3)(B) cannot survive constitutional scrutiny under the due process principles reaffirmed in *Johnson*. Conspiracy and carjacking cannot qualify as crimes of violence under 924(c)'s residual clause.

The government may argue conspiracy and carjacking qualify as crimes of violence under 924(c)'s force clause. This Court should reject that argument. The Supreme Court, interpreting the "violent felony" requirement of the Armed Career Criminal Act, 18 U.S.C. § 924(e), explained that "physical force" means "violent force"—"strong physical force" which is capable "of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

### 1.    Carjacking is Not a Crime of Violence.

Carjacking does not meet this requirement because it can be accomplished by putting someone in fear of future injury to his person or property, which does not require the use, attempted use, or threatened use of "violent force." Additionally, because the act of putting someone in fear of injury can be accomplished without an *intentional* threat of physical force, it fails to satisfy the *intentional* mens rea required under the § 924(c)(3)(A) force clause.

The plain language of the carjacking statute provides that the offense can be accomplished by the act of placing another in fear of injury. This action, at best, constitutes a threat of *injury* to another, which squarely does not require the use or threatened use of "violent force." The Fourth Circuit's decision in *United States v. Torres-Miguel,* 701 F.3d 165 (4th Cir. 2012), is directly on point. Indeed, in

86

that case, the Fourth Circuit unequivocally held that the threat of *any physical injury,* even "serious bodily injury or death," does not necessarily require the use of physical force – let alone "violent force."

In *Torres-Miguel,* at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which "will result in death or great bodily injury to another." 701 F.3d at 168 (citing Cal. Penal Code § 422(a)). The specific question in the case was whether the statute had an element equating to a threat of "violent force" under the force clause of U.S.S.G. § 2L1.2–a clause that is identical in all relevant respects to the § 924(c)(3)(A) force clause. *Id.* Despite the "death or great bodily injury" element in the California statute, the Fourth Circuit found that the offense was missing a "violent force" element, and thus, could never qualify as a "crime of violence" under the force clause. *Id.* at 168-69. The Fourth Circuit held that "[a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168. The Court, in strong words, proclaimed that "of course, a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* Because "the full range of conduct" covered by the carjacking statute does not require "violent force," it simply cannot qualify as a "crime of violence" under § 924(c)(3)'s force clause. *Torres-Miguel*, 701 F.3d at 171.

Even more, the act of putting someone in fear of injury, as defined under the carjacking statute, does not constitute a "crime of violence" under the force clause because it does not require an *intentional* threat of physical force. In *Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006), the Fourth Circuit firmly held that an offense can only constitute a "crime of violence" under the force clause if it has an element that requires an "*intentional* employment of physical force [or threat of physical force]." *Id.* (emphasis added). The "fear of injury" element under the carjacking statute does not require a defendant to intentionally place another in fear of injury. Therefore, it is missing the intentional mens rea necessary under *Garcia*.

Federal cases interpreting the "intimidation" element in the federal bank robbery statute (18 U.S.C. § 2113(a)) are instructive here. Federal bank robbery may be accomplished by "intimidation," which means placing someone in fear of bodily harm – the same action required under the carjacking statute. *See United States v. Woodrup*, 86 F.3d 359, 364 (4th Cir. 1996) ("'intimidation' under federal bank robbery statute means "an ordinary person in the [victim's position] reasonably could infer a threat of *bodily harm* from the defendant's acts."); *see also United States v. Pickar*, 616 F.2d 821, 825 (2010) (same); *United States v. Kelley*, 412 F.3d 1240, 1241 (2005) (same); *United States v. Yockel*, 320 F.3d 818, 824 (8th Cir. 2003) (same); *United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987) (same).

"Intimidation" is satisfied under the carjacking statute "whether or not the defendant actually intended the intimidation," as long as "an ordinary person in the [victim's] position reasonably could infer a threat of bodily harm from the defendant's acts." *Woodrup*, 86 F.3d at 36. *See also Yockel*, 320 F.3d at 821 (upholding bank robbery conviction even though there was no evidence that defendant intended to put teller in fear of injury: defendant did not make any sort of physical movement toward the teller and never presented her with a note demanding money, never displayed a weapon of any sort, never claimed to have a weapon, and by all accounts, did not appear to possess a weapon); *Kelley*, 412 F.3d at 1244 ("Whether a particular act constitutes intimidation is viewed objectively, ... and a defendant can be convicted under [federal bank robbery] even if he did not intend for an act to be intimidating."); *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (same). In other words, a defendant may be found guilty of carjacking even though he did not intend to put another in fear of injury. It is enough that the victim reasonably fears injury from the defendant's actions – whether or not the defendant actually intended to create that fear. Due to the lack of this intent, the carjacking statute criminalizes conduct that does not require an intentional threat of physical force. Therefore, carjacking squarely fails to qualify as a "crime of violence" under *Garcia*. Because the carjacking

"intimidation" element is defined the same as the Hobbs Act robbery "fear of injury" element, it follows that carjacking fails to qualify as a "crime of violence" under *Garcia*.

In sum, carjacking is not a "crime of violence" under the § 924(c)(3)(A) Force Clause for two independent reasons. First, the statute does not require a threat of *violent force*. Second, the statute does not require the *intentional* threat of the same.

### 2. Conspiracy is Not a Crime of Violence.

Neither does Runyon's conviction for conspiracy qualify under 924(c)'s force provision. Conspiracy requires merely an agreement to act. Tr. 1689, 7/16/09. A mere agreement cannot qualify as physical force. *Torres-Miguel*, *supra*. The Fourth Circuit has held that conspiracy qualifies as a crime of violence under the residual clause. *See United States v. White*, 571 F.3d 365 (4th Cir. 2009); *United States v. Vann,* 620 F.3d 431 (4th Cir. 2010). The *Johnson* opinion itself uses conspiracy as an example of how the courts have "trouble making sense of the residual clause." *Johnson v. United States*, 135 S. Ct. 2551, 2559-60 (2015). Conspiracy cannot support the 924(c) conviction under the force clause nor the residual clause.

### E. Resentencing is Required Because Runyon Was Sentenced to Death Based on an Unconstitutional Statute.

*Johnson* applies retroactively. It "place[s] particular conduct … beyond the State's power to punish." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). Johnson is a "new substantive rule" that "is categorically retroactive to cases on collateral review." *Benjamin C. Price v. United* States, No. 15-2427, p. 8 (7th Cir. Aug. 4, 2015). *See also* government's statement of position regarding applicability of *Johnson*, p. 5; *United States v. Jeffrey A. Imm*, No. 14-4809-14-4810 (3d Cir. Aug. 6, 2015) (*Johnson* is a new rule of substantive law that should apply retroactively); *United States v. Arnold Richards, III*, No. 2:15-cv-287-DBH (District Ct Maine) (noting government's agreement that *Johnson* applies retroactively and granting relief pursuant to 28 U.S.C. § 2255); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (the Eighth

Amendment prohibits the death penalty for a non-homicide crime).Remand for new sentencing is appropriate. This was a close case. The jury questioned what would happen if they could not agree on a sentence. Tr. 2707-09, 8/2709. The jury rejected Count Four, the bank robbery charge. The jury imposed a life sentence for carjacking. Under these circumstances the government cannot meet its burden of demonstrating the *Johnson* error is harmless beyond a reasonable doubt.

In *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999), the Fifth Circuit remanded for resentencing where it dismissed a portion of the capital convictions for lack of evidence, explaining "it is impossible to say" the death sentences "were not influenced by the fact" that defendants had received three eligible convictions, rather than two." *See also United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986) (excessive number of convictions may prejudice the defendant by "creating the impression of more criminal activity). Further, the trial court's instructions portrayed the 924(j) murder charge as requiring a high level of culpability. The court instructed the jury that a conviction under 924(j) required the jury to find Runyon intended to kill "deliberately and intentionally," or that he acted with "callous and wanton disregard for human life." Tr. 1706, 7/16/09. When the jury was determining the appropriate punishment, the fact that the "murder charge" had been established was likely given great weight. The instructions on the 924(c), (j) charge repeatedly define murder Tr. 1704, 1705, 1706, 1707, 7/16/09. Clearly, the brunt of the prosecution case for death was premised upon the sole charge that required intentional premeditated murder. After *Johnson*, that key basis for that has been eliminated. Justice demands Runyon receive a new sentencing hearing.

**Claim 10:    The Jury Instructions at the Sentencing Phase Unconstitutionally Lowered the Government's Burden of Proof in Violation of the Fifth, Sixth, and Eight Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003).**

The jury instructions that permitted death upon a finding that aggravating factors "sufficiently outweigh[]" mitigating factors impermissibly lowered the burden of proof in violation of the Fifth, Sixth and Eighth Amendments. *Ring v.* Arizona, 536 U.S. 584 (2003). The Court instructed the jury

90

that it must sentence Runyon to death if it found that aggravating factors sufficiently outweighed mitigating factors:

> In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

Tr. 2672-73, 2675, 2682-84, 2694, 8/26/09; Tr. 2707, 8/27/09.

This instruction was error. The Fifth, Sixth, and Eighth Amendments require that the jury find each element beyond a reasonable doubt, including the circumstances upon which the death penalty is based. The Court's instruction was plainly inconsistent with this mandate, as it instead directed the jury to apply a "sufficiently" outweighed standard that lowered the burden of proof.

In *Ring, supra*, the Supreme Court held that the accused has a Sixth Amendment right to have a jury, not merely a judge, find the existence of aggravating circumstances. The Court explained this is so because aggravating circumstances "operate 'as the equivalent of an element of a greater offense'" and result in greater punishment; therefore, the accused is entitled to the protection of a jury. *Ring*, 536 US. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). The reasoning in *Ring* similarly requires the jury to find the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt and further that death is the appropriate punishment. The death sentences should be vacated because they were imposed based on an unconstitutionally low standard.

Runyon acknowledges he raised this issue on direct appeal, *United States v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided it against him. *Runyon*, 707 F.3d at 516. However, in *Hurst v. Florida*, No. 14-7505, 135 S. Ct. 1531 (Mar. 9, 2015) (Mem), the Supreme Court has granted certiorari on whether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of *Ring v. Arizona, supra*.

91

Moreover, that this issue was previously rejected on direct appeal is not dispositive. *Davis v. United States*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where controlling law changed soon thereafter, the appeals court "erred in holding that the law of the case, as determined in the earlier appeal from the [] conviction, precluded him from securing relief under § 2255 on the basis of an intervening change in law"). *See also Sanders v. United States*, 373 U.S. 1, 17 (1963); *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993).

**Claim 11:    The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad.**

To be constitutional, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). "[O]ne of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense." *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976). *See also Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (A constitutional capital sentencing scheme is accomplished by including an element that "may not apply to every defendant convicted of a murder."). In Runyon's case, the statutory aggravators mirror the conduct required for conviction rather than adding an element of additional culpability. The two statutory aggravating circumstances in this case were: (1) Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value, and (2) Runyon "committed the offense after substantial planning and premeditation to cause the death of a person." ECF 255 pp. 5-6. The aggravators are unconstitutional as applied because they add nothing above what was required for a conviction of conspiracy to commit murder for hire. In convicting Runyon, the jurors found he planned with at least one other person to kill the victim for money. As the prosecutor argued, Runyon did not know the victim but planned

92

with Draven and Voss to kill him "for greed." Tr.2663, 8/26/09. Draven and Voss clearly planned to kill Voss's husband to collect a Navy gratuity death benefit and life insurance proceeds and fund their new "family." Tr. 214, 7/23/09. Clearly, the same facts that support Runyon's conviction also support the two statutory aggravating circumstances. Yet, the Sixth Amendment does not permit a defendant to be "expose[d] ... to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000).

The impermissible effect of the statutory aggravating circumstances was to make Runyon automatically eligible for the death penalty upon conviction in violation of the Eighth Amendment.

Even if the statutory aggravating circumstances served a narrowing function, the arbitrary and overbroad non-statutory aggravating circumstances counter-acted any narrowing and rendered imposition of the death sentence inconsistent and irrational.

Although the Constitution and Supreme Court precedents do not require the use of statutory aggravating circumstances, when the statute provides precise and distinct aggravating circumstances, the addition of factors beyond those bounds skews the sentencer's weighing process by "creat[ing] the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be[.]" *Stringer v. Black*, 503 U.S. 222, 235. Such a risk unconstitutionally conflicts with the "constant theme" of post-*Furman* jurisprudence emphasizing "procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner." *Barclay v. Florida*, 463 U.S. 939, 960 (Stevens, J., concurring). Since *Furman v. Georgia*, the Supreme Court has required any statute governing imposition of the death penalty to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (quotations and footnotes omitted); *Gregg v. Georgia*, 428 U.S.153, 192 (1976)

93

(opinion of Stewart, Powell & Stevens, JJ.); *id.* at 222 (opinion of White, J., Burger, C.J., & Rehnquist, J.). Deeming it "virtually unthinkable to follow any other course in a legal system . . . operated by following prior precedents and fixed rules of law[,]" *Gregg* noted that "[i]t is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." 428 U.S. at 193. "No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines." *Id.* at 206-07. Thus, aggravating factors must be narrowly and precisely defined. *Godfrey v. Georgia*, 446 U.S. 420, 429 (1980); *Zant v. Stephens*, 462 U.S. at 877-78 & n.15.

In this case, the non-statutory aggravating factors were arbitrarily determined by the prosecutors, limited only by their imaginations. There was no clear, objective standard that determined those factors increased Runyon's moral culpability. Thus, there were no procedural protections to ensure that the death penalty was imposed in a consistent and rational manner.

The four non-statutory aggravating factors found by Runyon's jury were that Runyon: (1) "caused injury, harm, and loss to the victim … and the victim's family and friends, as shown by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and coworkers;" (2) "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional office, as an office of the Kansas National Guard, and as a member of the United States Army;" (3) "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend;" and (4) "demonstrated a lack of remorse" for the crime." Special Verdict Form – Selection Phase, ECF No. 291. These four factors added improper weight to the aggravation scale in the jury's weighing process resulting in an arbitrary death sentence in violation of the Eighth Amendment.

Accordingly, the death sentences should be vacated.

94

**Claim 12:**    **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

The authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty is impermissibly influenced by race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eight Amendment.

Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. Her analysis is based on data maintained by the Federal Death Penalty Resource counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is three times more likely to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."

While some of the statistics above are based in part on periods after Runyon's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992.[35] Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the government's radically discriminatory actions was deficient performance. Had counsel performed effectively, it is reasonably likely that the government would have been precluded from seeking death.

---

[35]http://www.capdefnet.org/FDPRC/uploadedFiles/Private.pdf; last viewed on Sept. 30, 2015.

Alternatively, the statistics regarding the application of the federal death penalty since Runyon's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the government's authorization process and plea bargaining decisions.

Moreover, Runyon is the only non-white co-defendant and the only co-defendant for whom death was sought. A large portion of the prosecution case for death was based on a video recording of an interrogation of Runyon in which law enforcement commented on Runyon being "an honorable Asian man." *Runyon*, 707 F.3d at 493. The appeals court concluded this video had no place at this sentencing proceeding. *Id.* The appeals court's conclusion that admission of the video was harmless does not obviate the disturbing fact that the video injected impermissible racial overtones into the case. *See also Batson* claim.

Runyon has proffered evidence that shows that the racial discrepancy present in his case is the result of DOJ charging practices, local law enforcement practices, and local prosecution practices This fact renders the above statistics all the more probative of discrimination. This Court should vacate Runyon's death sentence.

**Claim 13:     Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendment.[36]**

Given the relative culpability of the co-defendants in this case, Runyon's sentence of death is disproportional in violation of the Eighth Amendment. The government possesses voluminous evidence demonstrating that co-defendant Draven was, and is far more deserving of death than Runyon, including thousands of pages of documents demonstrating:

---

[36] Investigation is ongoing and supplemental information will be provided when available.

- Draven has an extensive juvenile history of violent criminal conduct, including, but not limited to, the sexual assault of numerous children;
- Draven had been placed in a residential facility for child sexual assault;
- Draven had been diagnosed as having conduct disorder, undifferentiated type, a precursor to anti-social personality disorder;
- Draven had been diagnosed as suffering from Pedophilia.

Notwithstanding this evidence, the government deemed Draven unworthy of the punishment of death.[37] The evidence, however, demonstrates that Runyon's history of violence against women paled in comparison to the criminal history of his co-defendant, Draven. Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely slap or punch his victims, he raped them. His victims were not merely physically smaller, they were little children; children who were near the age of the Voss children, the children who, under his plan to murder Cory Voss, would have been permanently placed at Draven's fingertips.

Given this, the evidence provides no basis for finding Runyon deserving of death and Draven not. *Both went to trial.* At oral argument in front of the court of appeals, "questions arose with regard to the government's selection of defendants for capital punishment." *Runyon*, 707 F.3d at 520 n.6. The government distinguished Runyon and the other defendants by stating "that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn." *Id.* However, there was no evidence that Runyon "accepted payment for killing." Both Draven and Voss denied paying Runyon to kill Cory Voss. They both spoke of Draven owing Runyon money for a loan. The prosecution could only *suggest* that a $275 money order sent by Draven's brother a month after the crime was "payment" for the crime. There was no evidence that Runyon even "accepted" this money order. Furthermore,

---

[37] Counsel for all defendants in this case have indicated that Draven was not authorized for death <u>because</u> of his mental health history. A decision that Draven's mental health warranted mercy when Runyon's severe mental illness and brain damage did not, is wholly arbitrary.

Runyon cooperated with the police investigation by voluntarily providing a DNA sample and speaking with police on two occasions. The statement that Runyon "sought to thwart" the investigation "at virtually every turn" is unfounded and certainly not proven at trial. The fact that Runyon never confessed to the crime does not constitute uncooperativeness or "thwarting" an investigation. Runyon had an absolute and fundamental right not to incriminate himself and to require the prosecution to prove its case at trial.

Assuming without conceding that Runyon may have pulled the trigger, Draven was actively involved in the murder itself. Draven helped choose the location for the crime and, not only recruited Runyon's participation in Draven and Cat Voss's scheme, Draven attempted to recruit others even before he had ever spoken to Runyon. As evidenced by his cell phone records, Draven was at, or near the scene of the actual murder. In the time that followed the murder, it was he that orchestrated the attempted cover-up by: lying to police; attempting to influence grand jury witnesses; using different phone numbers; and telling Runyon the details of his conversations with police to influence any statement Runyon might make. Finally, it cannot be ignored that Draven provided no assistance to the Government until he was in police custody.[38]

Given the disparity in sentencing between the co-defendants and the "clear evidence"[39] regarding the role that race played in Runyon's death sentence, *see* Claim 12, *supra*, the death sentences should be vacated.

**Claim 14:      Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill.**

Executing David Runyon, who is severely mentally ill, violates the Eighth Amendment's prohibition against arbitrary, cruel, excessive and unusual punishment. *See*, *Roper v. Simmons*, 543 U.S.

---

[38] Appellate counsel rendered ineffective assistance to the extent that they failed to show the prosecution exercised its discretion on some impermissible basis.

[39] *United States v. Armstrong*, 517 U.S. 456, 464-465 (1996).

551, 578 (2005) (persons under 18); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (persons with mental retardation); *see also*, *Corcoran v. State*, 774 N.E. 2d 495, 502 (Ind. 2002) (Rucker, J., dissenting); *Bryan v. Mullin*, 335 F.3d 1207, 1246-47 (10th Cir. 2003) (Henry, J., concurring in part and dissenting in part); *State v. Nelson*, 173 N.J. 417, 488 (2002) (Zazzali, J., concurring), *State v. Scott*, 748 N.E. 2d 11, 19 (Ohio 2001) (Pfeifer, J., dissenting). At the time of Runyon's trial, there was (and still is) a growing consensus that it is unacceptable to impose the death penalty upon severely mentally ill persons. *See generally USA: The execution of mentally ill offenders,* pp. 20-23, Amnesty International Index: AMR 51/003/2006 (Amnesty International Jan. 2006). "[T]here is a profound inconsistency in exempting people with mental retardation from the death penalty while those with serious mental illness remain exposed to it." *Id.* at p.20-21.

In *Atkins*, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals who suffered from mental retardation. 536 U.S. at 306. The Court explained that the mentally retarded "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318-20. These deficiencies diminish the culpability of individuals to the extent that neither of the justifications advanced by states in support of the death penalty–retribution and deterrence–would be served by permitting their execution. *Id.* In addition, "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel … and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320-21.

In *Roper v. Simmons*, the Supreme Court held that the Eighth Amendment bars the execution of offenders who were juveniles at the time of the crime. 543 U.S. at 578. In reaching this conclusion, the Court noted that youth results in "impetuous and ill-considered actions and decisions" juveniles "are more vulnerable" to negative influences. *Id.* at 569 (internal quotation marks omitted).

99

Implicit in both opinions is that the death penalty is reserved for only the worst of the worst offenders. "The mentally ill suffer from many of the same limitations that, in Justice Stevens' words [in *Atkins*], do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." Alan A. Stone, M.D., *Supreme Court Decision Raises Ethical Questions for Psychiatry*, Psychiatric Times, Vol. XIX Issue 9 (Sept. 2002). Mental illness can also cause "impetuous and ill-considered actions" similar to those resulting from youth and it can cause a "flat" or "blunt" affect that may create an impression of remorselessness similar to the mentally retarded. These circumstances exist in this case, where the crime was certainly ill-considered but also, Runyon was unable to assist himself or counsel because he refused to consider a guilty plea in exchange for life. Furthermore, as discussed previously, Runyon's mental illness was inherently disadvantageous because it affected his facial expression and played into the prosecutor's theme of remorselessness.

Finally, Runyon's severe mental illness significantly reduces his moral culpability—placing him outside that class of defendants to whom the death penalty may be constitutionally applied. His mental illness diminishes his capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-320.

Thus, Runyon's death sentence violates every standard of decency and is barred by the Eighth Amendment.

**Claim 15:      Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

Runyon moved for copies of various jury selection documents on August 13, 2015. ECF No. 465. On August 14, 2015, the court directed the United States to respond. ECF No. 467. The United States did so on August 27, 2015, agreeing that Runyon was entitled to some of the documents he requested and opposing Runyon's request for others. ECF No. 469. Runyon filed a reply on

100

September 4, 2015. ECF No. 470. The Court granted Runyon's motion in part on October 2, 2015, ECF No. 475, but he has not received any of the documents that would be required for him to present facts in support of this claim.[40] As a result, his allegations are necessarily general.

### A.    Selection Of The Grand Jury And/Or Petit Jury Venire Jury Was Tainted.

Runyon alleges that the procedures used to draw the grand jury and/or the petit jury venire were contrary to law in one or more respects, regardless whether the work was done by the court, by the court's employees or agents, or by an outside vendor or service provider. A nonexclusive list of errors includes the following: (1) At one or more steps, there was a failure to fully and accurately comply with the procedures described in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia ("Plan"). (2) At one or more steps, there was a failure to fully and accurately comply with the jury selection provisions of 28 U.S.C. § 1861 et seq. (3) Because of a computer error, inaccurate computer program, misconduct, or other reason, the names on the master jury wheels, the qualified jury wheels, the grand jury list, and/or the venire called for petit jury service in Runyon's case were not drawn at random from their immediate parent list. (4) The names on the master jury wheel, the qualified wheel, the grand jury list, and/or the venire called for petit jury service did not represent a fair cross-section of the community. (5) The composition of the grand jury and/or the petit jury venire did not reflect the composition of the relevant Division (Newport News or Norfolk), including as to race, gender, or age. (6) Nonqualifying individuals participated in the grand jury and/or the petit jury venire, meaning (a) individuals participated whose names were not on the voter registration list, the relevant master jury wheel and/or the qualified jury wheel; (b) individuals participated who did not reside in the relevant Division or

---

[40] Counsel will examine the materials when they are obtained and supplement this claim.

District at the time of their service; or (c) individuals participated who did not qualify for any other reason.

> ### B.     Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment.

Under 28 U.S.C. § 1867(f), trial counsel have an essentially unqualified right to inspect and copy the relevant jury lists in order to determine *whether* the venire was drawn in a manner that complied with statutory and constitutional law. *See Test v. United States*, 420 U.S. 28, 29-30 (1975) (per curiam). There is no burden that counsel must meet. Investigating the records and procedures used for jury selection is a standard component of competent performance by defense counsel in a capital case:

> Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

ABA Guideline 10.10.2, *reprinted* at 31 Hofstra L. Rev. 1049.

Runyon's counsel unreasonably made no effort to request or examine the jury selection records in Runyon's case. Their failure to do so was a product of unreasonable ignorance or sloppiness, not strategy. If trial counsel had performed competently, there is a reasonable probability of a different result.

> ### Claim 16:     The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.

Of the qualified venire members from which the jury was selected, the prosecution used peremptory strikes to remove 70 percent of the African-Americans who could have served. The prosecution also discriminated on the basis of gender, by overwhelmingly using its peremptory strikes against women. These discriminatory uses of peremptory strikes violated the Equal Protection Clause

of the Fifth Amendment. Defense counsel's failure to object to either or both forms of discrimination violated the Sixth Amendment right to effective assistance of counsel.

## A.    The Relevant Law.

A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986). Particularly, this means that the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89. This protection is necessary, because discriminatory exclusions harm not only the rights of defendants, but also the rights of the excluded jurors and the integrity of the criminal justice system as a whole. *Id.* Indeed, because the harm does not inure solely to the defendant, but also to other parties and even the system as a whole, the defendant need not be of the same race as the excluded jurors to state an Equal Protection claim, and has third-party standing to raise it. *Powers v. Ohio*, 499 U.S. 400 (1991). The discriminatory exclusion of potential jurors is so inimical to the administration of justice that the ban on exercising peremptory challenges on such a basis extends to the defendant, *Georgia v. McCollum*, 505 U.S. 42, 54-55 (1992), as well as to civil proceedings, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 628–29 (1991). *See also Rose v. Mitchell*, 443 U.S. 545, 555-56 (1979) (noting that Constitution bars racial discrimination in grand jury selection procedures, and stating "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice"). As the Court summed up in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994):

> Discrimination in jury selection, whether based on race or gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. . . . The community is harmed by the [striking party's] participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*Id.* at 140.

Moreover, intentional discrimination in the exercise of peremptory strikes is "structural error" and is therefore exempt from harmless-error review. *See Batson*, 476 U.S. at 100; *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *Winston v. Boatwright*, 649 F.3d 618, 632-34 (7th Cir. 2011) (recognizing as structural error violations of *Georgia v. McCollum*); *Williams v. Woodford*, 396 F.4d 1059, 1069-70 (9th Cir. 2005) ("A *Batson* violation is structural error for which prejudice is generally presumed"); *Tankleff v. Senkowski*, 2135 F.3d 235, 248 (2d Cir. 1998) ("Because the effects of racial discrimination during voir dire 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review."). The Fourth Circuit has similarly eschewed harmless error analysis of a *Batson* claim, and has noted decisions of other circuits that have done the same. *See United States v. Legrand*, 483 Fed. App'x 771, 777 n.2 (4th Cir. 2012) (unpublished) (citing *Winston*, supra; *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005); *Tankleff, supra; Ford v. Norris*, 67 F.3d 162, 170-71 (8th Cir. 1995); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir. 1987)).

The now-familiar test for determining whether the rule set forth in *Batson* has been violated involves three steps: (1) the defendant first has the burden to establish a *prima facie* case of discrimination in the use of the prosecution's peremptory strikes; (2) the burden shifts to the prosecution to offer a race-neutral (or gender-neutral) explanation for its peremptory strikes; and (3) the burden returns to the defendant to establish that any neutral explanations offered are pretextual, and that the prosecution in fact is discriminating on an impermissible basis. *Miller-El,* 545 U.S. at 267-68. This is not simply a matter of comparing the numbers of jurors of a particular race or gender who have been struck, and even one juror struck for racially discriminatory reasons violates the rule in *Batson* and requires vacation of the conviction. *See also United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988) ("Striking a single black juror could constitute a *prima facie* case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks."). That said,

104

disproportionate numbers of strikes are strong evidence giving rise to a *prima facie* case of racial

discrimination. *See, e.g.*, *Miller-El*, 545 U.S. at 240 ("The numbers describing the prosecution's use of

peremptories are remarkable.")

> **1.     The Prosecution Engaged In Racial Discrimination In Its Exercise Of
> Peremptory Strikes.**

Of the 243 venire members who completed questionnaires, the Court called 62

members for voir dire on the first day. Runyon refers to this group as the "pseudovenire" because it

constituted the total pool of potential jurors who appeared at court and participated in voir dire for

seating the jury, and the jury was seated at the end of the first day, solely from this group.[41] Of the 62

individuals in the pseudovenire, 10 were African-American, 1 was Asian, 50 were Caucasian, and 1

offered no response when asked about race on the questionnaire. The pseudovenire was drawn in

alphabetical order from the top half of the group of potential jurors that all counsel agreed should be

called for questioning. ECF No. 236 (sealed). Ten of these 62 individuals were excluded for cause.

The Court then announced that it would seat a jury without the voir dire of any additional prospective

jurors because the remaining 52 members were sufficient to afford each side the maximum statutory

20 peremptory strikes if it chose to use them, with at least 12 left to seat as jurors. The 52 members

consisted of 10 African-Americans, 1 Asian, and 41 Caucasians.

The prosecution proceeded to strike 7 of the 10 African-Americans, even though blacks

constituted only 19 percent of the available jurors after exclusions for cause.[42] In other words, it struck

---

[41] The term "venire" ordinarily refers to the entire group of prospective jurors who are summoned for a trial and from which the jury is selected. In this sense, the venire in Runyon's case could consist of 256 people who were assigned juror numbers. In some cases, courts use the word "venire" to refer to the slightly smaller group of prospective jurors who actually show up at the court and complete a juror questionnaire. Under that definition, the venire in Runyon's case could consist of 243 people.

[42] The 10 identifiable African-Americans in the pseudovenire were potential jurors No. 14, 15, 31, 40, 46, 63, 70, 81, 95, and 116. The 7 African-Americans who were peremptorily struck by the government were Nos. 15, 31, 40, 46, 63, 81, and 116.

70 percent of the available and qualified black members. The prevalence of strikes used against African-Americans was sufficient to state a *prima facie* challenge under *Batson*. *Johnson v. California*, 545 U.S. 162, 170 (2005) ("a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred").

Corroborating evidence of the prosecution's intent to use racial stereotyping in its jury selection decisions is the fact that it also intended to introduce (and did, in fact, later introduce) a racially pejorative videotape at trial, which showed police officers interrogating Runyon and repeatedly invoking his Asian heritage and "honor" as a reason for him to confess. The Fourth Circuit agreed with Runyon that this video, with "the officers' comments referencing Runyon's ethnicity and religion . . . had no place at this sentencing proceeding." *United States v. Runyon*, 707 F.3d 475, 493 (4th Cir. 2013). It said, "the error in admitting the statements at issue here is apparent" because they were designed to inflame racial prejudice and "'degrade the administration of justice.'" *Id.* at 494 (quoting *Battle v. United States*, 209 U.S. 36, 39 (1908)).[43]

Notably, the prosecutors had argued on appeal that the video posed no constitutional problem because the officers' statements "appealed not to negative aspects of Runyon's character, but to positive aspects of his identity." *Id.* at 493-94. That argument, however, underscores the prosecutors' continuing propensity to stereotype on the basis of race—the very evil that *Batson* prohibits. When combined with the striking of 70 percent of the black members of the available venire, there can be no doubt that the prosecutors engaged in a pattern of strikes based on the race of the prospective jurors.

---

[43] Although the court of appeals held that the video was unlawfully admitted, it concluded that this error was harmless.

### 2. The Prosecution Engaged In Gender Discrimination In Its Exercise Of Peremptory Strikes.

The prosecutors also engaged in a pattern of strikes based on the gender of the prospective jurors. The government is not only barred from exercising peremptory strikes on the basis of race, but also may not exclude potential jurors because of their gender. "[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality." *J.E.B.* at 129. Though women were long banned from jury service in the United States because they were considered "to be too fragile and virginal," the Court noted the only interest the state could conceivably have in allowing its officers to use peremptory strikes to ban all persons of a particular gender from a jury was whether "peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury." *Id.* at 132-36. When confronted with the idea that one gender may be more sympathetic to one side than the other, the Court noted it would "not accept as a defense to gender-based peremptory challenges 'the very stereotype the law condemns.'" *Id.* at 138 (quoting *Powers*, 499 U.S. at 410). Indeed, "[e]qual opportunity to participate in the fair administration of justice is fundamental to our democratic system," and this ability "reaffirms the promise of equality under the law—that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy." *Id.* at 145-46.

In Runyon's case, the prosecution exercised its peremptory strikes in a manner that discriminated on the basis of gender, by overwhelmingly using them against women. After exclusions for cause, the group of 52 potential jurors was 56 percent women (29 members) and 44 percent men (23 members). The government then used 68 percent of its peremptory strikes (13 of 19) to remove women and less than half that amount—32 percent (6 of 19)—to remove men.[44] This is sufficient to

---

[44] The 13 females struck by the prosecution were potential jurors No. 7, 15, 18, 28, 31, 40, 46, 52, 63, 73, 81, 97, and 116. The 6 males struck by the prosecution were potential jurors No. 24, 35, 66, 91, 100, and 109.

107

create a *prima facie* case that the government not only was discriminating on the basis of race, but also on the basis of gender in its use of peremptory strikes, in violation of the Equal Protection Clause.

**B.      Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.**

Trial counsel failed to object when the prosecution struck 70 percent of the African-American members of the pseudovenire. Counsel also failed to object when the prosecutors used almost 70 percent of their peremptory strikes against women, removing them in a significantly greater proportion than they appeared in the group of qualified potential jurors. Because there was no objection, the prosecution was never called upon to justify these strikes, and the court never determined whether the strikes were motivated by racial, ethnic, or gender-based stereotypes. The "rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 251-52. Counsel's failure to challenge the government's peremptory strikes under *Batson* constitutes deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984).

Runyon satisfies the *Strickland* performance prong because reasonably competent capital defense counsel would have been aware of the importance of *Batson* and related cases, and the necessity of raising such pertinent objections. Counsel's "passivity in light of an obvious pattern of strikes against minority prospective jurors [can fall] below an objective standard of reasonableness and amount[] to deficient performance." *Drain v. Woods,* 902 F. Supp.2d 1006, 1025-26 (E.D. Mich. 2012); *see Richardson v. Hardy*, 855 F. Supp.2d 809, 823 n.3 (N.D. Ill. 2012) (failure to assert *Batson* claim with an appropriate record "unquestionably fell below a standard of objective reasonableness"); *see also Government of the Virgin Islands v. Forte*, 865 F.2d 59 (3d Cir. 1989) (defense counsel's failure to object to prosecutor's use of peremptory challenges to excuse white prospective jurors in prosecution of white male for rape of black female was unreasonable under prevailing professional standards); *State*

*v. Williams*, 679 So.2d 275 (Ala. Crim. App. 1996) (new trial granted where counsel failed to make

*Batson* objection even though *prima facie* case of racial discrimination existed). The fact that Runyon's

counsel did not object reflects a failure "to make the adversarial testing process work." *Strickland*, 466

U.S. at 690.

Prosecutorial zeal in removing jurors who are believed to be unlikely to return a sentence of

death is well-established in the death penalty defense community, so much so that the ABA Guidelines

for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA

Guidelines") has specifically warned about such issues since at least 2003:

> Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations, counsel should determine whether discrimination is involved in the jury selection process. . . . Death qualification often results in the removal of more prospective jurors who are members of minority groups than those who are white, because minority jurors are more likely to express reservations about the death penalty. Neither race nor gender may form a basis for peremptory challenges, but a recent empirical analysis of capital murder cases supports the conclusion that "discrimination in the use of peremptory challenges on the basis of race and gender . . . is widespread." Counsel should listen closely to the prosecutor's voir dire, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record.

ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. 913, 1053-

54 (2003).[45]

As noted previously, a *Batson* violation is structural error, *see supra*. When trial counsel's

deficient performance results in a structural error, the prejudice prong of a *Strickland* claim can be

presumed. Both the majority and dissent acknowledged this principle in an en banc Fourth Circuit

decision. "[T]he prejudice component of the *Strickland* analysis may be presumed if the nature of the

---

[45] The "[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable," though they do not, of course, reflect all reasonable options available to trial counsel. *Strickland*, 466 U.S. at 688 (1984).

deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc majority); *see also id.* at 180 (en banc dissent). [46]

Assuming this Court finds that trial counsel's failure to object to the *Batson* violations satisfies the deficient-performance prong of a *Strickland* claim, it should presume that prejudice resulted from trial counsel's failure to safeguard the fundamental fairness of the jury composition. *Bell, supra; see also Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) (a "fundamental premise of *Batson* is that criminal defendants and excluded jurors alike are denied equal protection of the laws when the trial jury is constructed in a racially discriminatory manner. The remedy for such an equal protection violation is reversal of the conviction without regard to whether we perceive the defendant to be actually innocent or guilty.").

**Claim 17:    The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Trial Counsel Unreasonably Failed To Object.**

**A.    The Voir Dire Was Constitutionally Inadequate.**

Voir dire "plays a crucial function in assuring the criminal defendant that his 6th Amendment right to an impartial jury will be honored." *Rosales-Lopez v. U.S.*, 451 U.S. 182, 188 (1981). Because this function is so important, the Supreme Court has spoken extensively about the imperative of adequate voir dire:

> "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). . . . Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). . . . Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

---

[46] In *United States v. King*, 36 F. Supp.2d 705, 710 (E.D. Va. 1999), this Court wrote "that *Batson* errors are not presumptively prejudicial when raised in an ineffective assistance of counsel claim." That conclusion conflicts with the Fourth Circuit's later en banc opinion in *Bell*.

*Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992).

As Runyon noted elsewhere, the jury in his case was selected from a pseudovenire of 62 potential jurors who had completed juror questionnaires and whose names appeared on the upper half of List 1—the list of individuals that all parties agreed should be called for voir dire. ECF Nos. 210 (sealed), 236 (sealed). In Claim S2, Runyon alleges that the questionnaire used in this case contained flaws that precluded the exclusion of prospective jurors without further inquiry, and he incorporates that allegation here by reference. Of particular importance, the prospective jurors were given no guidance before completing their questionnaires about the standards and procedures that would govern their decisions at trial, and they suffered nearly the same lack of information in responding to the court's oral voir dire questions.

The oral voir dire was minimal.[47] All questions were asked by the court. They were collective: the court asked yes/no questions, addressing them to the entire group of 62, and it instructed jurors to stand if their answer to a question was yes (or no, depending on the question). In other words, the court did not look directly at each individual juror and ask her if she could be impartial; it asked the jurors collectively whether they could be impartial, and said that if their answer was "no," they should stand. The court asked follow-up questions only of those who stood.

---

[47] The transcript does not show the time the court was called into session on June 30. The potential jurors entered the courtroom at Tr. 10, and the court conducted voir dire collectively until Tr. 61, at which point it sent the prospective jurors back to the jury room. It then engaged in colloquy with counsel. At 12:20, it released most of the prospective jurors for lunch, but it retained 17 who had stood in response to questions that required individual follow-up, such as their knowledge about the case based on press accounts. The court conducted the individual follow-up voir dire from Tr. 71 to Tr. 107. After additional colloquy with counsel, the court conducted additional voir dire, again collectively, from Tr. 121 to Tr. 125. That was the conclusion of voir dire, and the jury was immediately picked.

By this process, 21 of the 62 potential jurors completed the entire oral voir dire without speaking, standing, or otherwise interacting with the judge.[48] This procedure violated Runyon's Fifth and Sixth Amendment rights to a fair trial and impartial jury because silence is one of the known tools by which biased jurors avoid being struck. *See, e.g., Williams v. Netherland*, 181 F. Supp.2d 604 (E.D. Va. 2002) (vacating death sentence where juror was silent in response to certain voir dire questions, thus concealing the facts that she was previously married to an important prosecution witness, and that the capital prosecutor had been her attorney at the divorce), *aff'd Williams v. True*, 39 Fed. App'x 830 (4th Cir. 2002); *Consolidated Gas & Equipment Co. of America v. Carver*, 257 F.2d 111 (10th Cir. 1958) (awarding new trial in personal injury case where juror, who had an action pending for similar injuries, remained silent about his circumstance when asked in voir dire).

When the court's questions all are addressed to a group of significant size, rather than to the individual juror, the opportunity for concealment by silence is especially great. Venire members who are part of a sizable group, and who do not speak or stand or otherwise call attention to themselves, are the ones least likely to be seen and studied by the trial judge, whose attention will naturally and necessarily be drawn to the potential jurors who *do* speak and *do* stand up. Determinations of bias are supposed to turn largely on the trial judge's assessments of demeanor and credibility, but potential jurors who call no attention to themselves are the least likely to be observed and scrutinized to evaluate their demeanor and credibility. Voir dire is inadequate when it is performed in a manner that allows

---

[48] The 21 prospective jurors who did not answer any questions, either orally or by standing, break down as follows:

Jurors No. 23, 68, 70, and 98 were seated at trial.

Jurors No. 7, 18, 31, 35, 46, 63, 66, 91, 109, and 111 were peremptorily struck by the prosecution.

Jurors No. 32, 34, 51, 78, 117, and 119 were peremptorily struck by the defense.

Juror No. 54 was neither seated nor struck. He was carried over to the following day to participate in the selection of alternate jurors.

34 percent of the jury pool to remain silent, and largely unnoticed, for the entirety of the voir dire. Such voir dire does not protect the integrity of the jury.

Voir dire was inadequate in Runyon's case in other respects. An important and necessary subject of inquiry in any capital case is whether, in the first phase of trial, the potential jurors can make a decision about the defendant's guilt or innocence without considering the sentencing options that might follow. The court did not ask the jurors that question in Runyon's case, although it intended to do so. Instead, it asked:

> Now do you understand that as a juror, however, your first duty is to determine whether defendant is guilty or not guilty without consideration of any possible penalty? Is there anyone who doesn't understand that? If so, please stand.
>
> (No response.)

Tr. 59, 6/30/2009. A careful reading shows that in this question, the court asked the potential jurors only whether they "understood" the law, not whether they could or would comply with that law. To the extent their collective silence can be deemed to be an adequate answer, the potential jurors must be presumed to have answered the question the court actually asked, not the question the court may have wanted to ask.

The court made the same error again when it purported to ask four questions required by *Morgan*:

> THE COURT: If your answer is "no" to the following question, please stand.
> Do you understand that the law never requires that a person be sentenced to death?
> (No response.)
> THE COURT: Again if your answer is "no" to any of the following questions, please stand.
> Do you understand that the law never requires a person to be sentenced to death even if they have been convicted of being the triggerman in a murder-for-hire case?
> (No response.)
> Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of a carjacking is so convicted?
> (No response.)

113

> Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of a bank robbery?
> (No response.)

Tr. 123-24, 6/30/07. In each case, the jurors were again asked only whether they "understood" the law, not whether they could or would obey that law.

The court easily could have posed questions that properly asked about compliance as well as understanding. It certainly knew how to do so, and in fact it did so in other instances. For example:

> Is there anyone who doesn't understand that, as indicated, if it is appropriate, in the second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? *Do any of you feel you cannot do that*? If so, please stand.

Tr. 59, 6/30/09 (emphasis added).

Because the questions the court failed to ask were essential to the qualification of an impartial jury for purposes of guilt and/or punishment, Runyon's conviction and sentence were obtained in violation of the constitution and must be vacated.

## B.    Trial Counsel Rendered Ineffective Assistance Regarding Voir Dire.

Runyon recognizes that trial counsel filed pretrial motions regarding voir dire, and counsel opposed the court's general procedure for voir dire. But there are additional errors and objections that counsel unreasonably failed to raise, in violation of Runyon's Sixth Amendment right to the effective assistance of counsel.

First, as noted in Claim S2, trial counsel failed to object to the court's failure to give prospective jurors guidance about the standards and procedures that would govern their decisions at trial, and counsel unreasonably failed to make a similar objection to the court's failure to provide this information prior to the oral voir dire.

Second, trial counsel unreasonably failed to object when the trial court conducted oral voir dire in a manner that permitted 34 percent of the prospective jurors to complete the entire voir dire

114

without responding to any questions, except by remaining silent and remaining still. No one in these circumstances could tell whether a prospective juror's silence meant "no" or meant "I choose not to answer that question." As a result, no one can have confidence that the jurors who were seated without responding to any questions except by silence and stillness were qualified for service. No one can have confidence that the court took cognizance of those prospective jurors at all, much less that it was able to assess their demeanor and credibility.

Third, defense counsel unreasonably failed to object to the court's failure to ask five essential questions on voir dire—one question about the ability to be impartial in making a decision about guilt or innocence, and four questions about sentencing that were required by *Morgan*. Trial counsel knew or should have known that the questions posed by the court asked whether the prospective jurors understood the law, but did not ask whether the prospective jurors would comply with the law. To the extent trial counsel themselves may have proposed such questions, they were doubly ineffective. Any speaker of plain English would recognize that when one asks a person whether he "understands" the law, one is not asking whether the person will obey that law.

Because they failed to perform competently in each of the three ways just identified, either separately or together, defense counsel's performance fell below the prevailing professional norms for a capital case. There is a reasonable probability that absent counsel's deficient performance, the result would have been different either as to guilt/innocence or punishment.

115

**Claim S2:** **The Trial Court Unlawfully Excluded the Potential Jurors Based Solely on Their Juror Questionnaire Responses Without Voir Dire, and Trial Counsel Unreasonably Failed to Object and Unreasonably Participated.**

This claim was filed under seal by authority of ECF No. 477.

**Prayer for Relief**

Wherefore, David Runyon respectfully requests the Court:

(a)     direct the United States to answer this motion (2255 Rule 5(a));

(b)     permit Runyon to file a reply to the answer (2255 Rule 5(e)) ;

(c)     provide an opportunity for discovery and expansion of the record (2255 Rule 6 & 7);

(d)     conduct an evidentiary hearing on claims involving material factual disputes (2255 Rule

8);

(e)     vacate the criminal judgment entered against him, grant him a new trial and/or vacate,

set aside, or correct the sentence imposed; and,

(f)     grant all other appropriate relief.


Respectfully Submitted,


_____/s/_____

Dana Hansen Chavis, *pro hac vice*          Michele J. Brace, VSB No. 36748
Federal Defender Services                   Virginia Capital Representation
 Of Eastern Tennessee, Inc.                  Resource Center
800 S. Gay Street, Suite 2400               2421 Ivy Road, Suite 301
Knoxville, TN 37929                         Charlottesville, VA 22903
Telephone (865) 637-7979                    Telephone (434) 817-2970
Dana_Hansen@fd.org                          Mbrace@mindsort.com

October 5, 2015

117

## Verification

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28 day of September, 2015.

David Anthony Runyon

**<u>Certificate of Service</u>**


I hereby certify that on October 5, 2015, I have electronically filed the foregoing Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following.

Brian J. Samuels
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Plaza Three
Newport News, VA 23606
(757) 591-4032
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
(757) 591-4000
JZick@usdoj.gov

Lisa Rae McKeel
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Plaza Three
Newport News, VA 23606
(757) 591-4040
Lisa.McKeel@usdog.gov

_____/S/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Phone: (434) 871-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Defendant/Movant*
*David Anthony Runyon*