# MARK D. CUNNINGHAM, PH.D., ABPP

*Board Certified in Clinical Psychology  -  Board Certified in Forensic Psychology*
*American Board of Professional Psychology*

610 Brazos Street, Suite 680
Austin, Texas  78701

737-210-8336     Fax 737-210-8339
mdc@markdcunningham.com

*Licensed psychologist: Alabama #1564, Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Florida #PY8347, Illinois #071-006010, Indiana #20041376A, Iowa #1316, Kentucky #1717,*
*Louisiana #794, Nevada #PY0625, New Mexico #0768, New York #017111 [inactive], Oklahoma #1002, Oregon #1333,*
*Pennsylvania #PS016942, South Carolina #764, Tennessee #2255, Texas #22351, Washington #PY60207411*

## Declaration of Mark D. Cunningham, Ph.D., ABPP

I, Mark D. Cunningham, Ph.D., ABPP, depose and state as follows:

1.       I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of Alabama, Arizona, Arkansas, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kentucky, Louisiana, Nevada, New Mexico, New York [inactive], Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, and Washington.  I attach my curriculum vitae. I am over age 21. I have personal knowledge of the facts contained in this declaration and am competent to testify about them.

2.       Counsel for David Runyon has requested that I provide expert evaluation regarding developmental factors in Mr. Runyon's background that singly and cumulatively increased his risk of adverse adolescent and adult outcomes, that could have been presented in mitigation at his death penalty sentencing phase in 2009. I am the same Mark D. Cunningham who was retained by defense counsel and testified at sentencing in 2009 regarding my violence risk assessment for prison of Mr. Runyon. Had it been requested, I could have provided a broader evaluation of adverse developmental factors (i.e., mitigation) as well. I outline below qualifications and experience that I have in providing such expert consultation and testimony at capital sentencing.

### Special Qualifications

3.       *Board certification:*  I am one of approximately 300 psychologists in North America who are board certified in *forensic psychology* by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP).  This credential is intended to signify the highest levels of expertise and practice in forensic psychology. I am one of approximately 1200 psychologists who are board certified in *clinical psychology* by the American Board of Clinical Psychology (ABPP).

EXHIBIT 8

4.      *Capital sentencing testimony:*  I have been recognized as a clinical and forensic psychology expert in testifying regarding capital sentencing determinations including adverse developmental factors (i.e., "mitigation") and violence risk assessment (i.e., "future dangerousness") in both state and federal courts. Since 1995, I have testified as a clinical and forensic psychology expert regarding sentencing issues at trial in approximately 140 state capital cases and approximately 65 federal capital cases, as well as in numerous postconviction and federal habeas proceedings. I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Nevada, Ohio, Oklahoma, Pennsylvania, Oregon, Puerto Rico, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia. Where qualification was made available by the court, I have never failed to qualify as an expert in clinical and/or forensic psychology.

5.      *Scholarship regarding capital sentencing considerations:*  As my curriculum vitae will demonstrate, I am extensively involved in research and the authoring of scholarly publications relevant to evaluations at capital sentencing. These scholarly publications include peer-reviewed papers addressing standards of practice and complex considerations specific to evaluations of mitigating factors in capital cases, as well as evidentiary standards and associated scientific support for various violence risk assessment methodologies at capital sentencing. I am lead investigator or co-investigator of large-scale research projects examining inmate correlates of serious violence in prison. I am the invited author of *Evaluation at Capital Sentencing* (2010), a volume in the Oxford University Press series of texts on "Best Practices" in forensic mental health evaluations. I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12-volume *Handbook of Psychology* (2003, 2013), as well as author of chapters on capital sentencing evaluations in other edited texts. I was the guest editor for a special issue regarding capital sentencing considerations for the *Journal of Psychiatry and Law*.

6.      *Recognition for research, scholarship, and professional practice:*  My scholarly activities have been noted by my peers. I am the 2012 co-recipient of the *National Register of Health Service Psychologists A. M. Wellner, Ph.D. Lifetime Achievement Award.* This annual award is the highest honor bestowed, from among 12,000 Registrant psychologists, by the National Register to commemorate numerous and significant contributions to psychology during a distinguished career. I am the recipient of the highly prestigious *2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy*. The American Psychological Association, a professional organization of 160,000 members, confers this award on one psychologist annually who has made distinguished empirical and/or theoretical contributions to research in public policy, either through a single extraordinary achievement or a lifetime of work. I was awarded the *2005 Texas Psychological Association Award for*

EXHIBIT 8

*Outstanding Contribution to Science.* This is an annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge. I am a *Fellow* of the American Psychological Association, a peer-reviewed distinction reflecting outstanding contribution to the profession of psychology at a national level. I was the recipient of the *2004 National Association of Sentencing Advocates John Augustus Award.*

7.	*Continuing education instruction:*  The American Academy of Forensic Psychology is an association of board certified forensic psychologists (ABPP). Under the auspices and at the request of the Academy, I have provided full-day workshops on "The role of the forensic psychologist in death penalty litigation" in Milwaukee, Wisconsin; Austin, Texas; Monterey, California; San Diego, California; Cincinnati, Ohio; LaJolla, California; and San Francisco, California.  These workshops emphasized research literature, statistics, and conceptualizations relevant to assessments of capital defendants. I have also provided a full-day workshop for psychologists regarding capital sentencing evaluations under the auspices of the Texas Psychological Association.

**Evaluation procedures**

8.	My evaluation consisted of reviewing records, including mitigation investigation summaries.  Records relied upon in forming my opinion:

**INTERVIEW BINDER**
1. Affidavit of Deborah Seeger
2. Affidavit of Robert Seeger
3. Mitigation packet on Maria Runyon
4. Mitigation packet on Mark Runyon
5. Mitigation packet on Wren Fleming
6. Scotty Fleming – Kansas Criminal Justice System Records
7. Declaration of Catherina Voss
8. Declaration of Scott Linker
9. Declaration of David Dalton, Sr.
10. Declaration of Paula Dalton
11. Declaration of Matt Long
12. Declaration of Maria Runyon
13. Interview with Suk Cha 09/01/15
14. Handwritten Note re: David Runyon
15. Declaration of Deborah Seeger
16. Declaration of Robert Seeger
17. Interview Notes from Meeting with David & Carol Dombrowski by Jessica Johnson 09/14/2015
    a. Part 1 – History
    b. Part 2 – David Dombrowski mental health issues

EXHIBIT 8

**BINDER 1**

1. Affidavit of Sheila M. Cronin
2. Social History of David A. Runyon by Sheila Cronin 08/08/09
3. Memo to Counsel: Phone call to Jon Babineau and Lawrence Woodword re: David Harold Runyon (adoptive dad) 08/21/08
4. David Dombrowski (biological father) Trial Testimony Transcript
5. Suk Cha Runyon (mother) Trial Testmony Transcript
6. Mark Runyon (brother) Trial Testimony Transcript
7. Suk Cha Runyon Medical Records
8. David Dombrowski VA Clinic Records
9. Charles Ferguson – High School Friend;
    a. Interview 07/04/09
    b. Trial Testimony Transcript
10. Robert Lockwood – Childhood Friend;
    a. Interview 06/14/09
    b. Trial Testimony Transcript
11. Michael Grbic and Parents brief Interview 04/26/09
12. Kansas Department of Corrections Employee Records 1994
13. Letter from Former Employer - Premiere Palace No Date
14. Letter from David regarding his voluntary re-enlistment in the ARMY No Date
15. Thomas Preston – U.S. Army friend – Interview 10/04/08
16. Scott Linker – Former Brother in Law;
    a. Interview No Date
    b. Trial Testimony Transcript No Date
17. Robert & Debbie Seeger – Friends – Interview 11/09/08
18. U.S. Army Friends;
    a. Larry Eaglebear Interview 11/22/08 & Trial Testimony
    b. Edgar Hannaman Interview No date
19. Family:
    a. Maria Runyon – Ex-Wife – Interviews 04/26/08 & 04/30/08
    b. Maria Runyon – Trial Testimony Transcript
    c. Robin & Jim Carol Friends of Ex-Wife Interview 04/27/08
20. Captain Jeffrey Harries – Fayetteville Police Department, David's Supervisor – Interview 08/31/08
21. Fayetteville Police Department Employment Records including Disciplinary Records
22. Robin Carroll – friend of Maria Runyon – Interview 01/27/09
23. Thomas Kumorowski – Friend & coworker – Interview 06/10/09 and Trial Testimony Transcript
24. Phyllis Provost, Ph. D., - Friend, ex-wife of Tom Kumorowski – Interview 06/14/09 & Trial Testimony Transcript
25. Police Affidavit – Maria Runyon – re: Domestic Violence 2/07/01

EXHIBIT 8

26. David Runyon Resume
27. Virginia Pina – Former Girlfriend:
    a.  Interview 12/27/08
    b.  Trial Testimony Transcript
28. Handwritten Letter from David to Sarah – Girlfriend at the time of his arrest
29. Chad Costa – Friend – Interview 08/16/08
30. Clinical Trial Drug List by Sheila Cronin 04/08/09
31. Statement of George Koski (Sold David a gun)
32. David Runyon – School Records
33. David Runyon – Medical Records
34. David Runyon – Military Records
35. Mental Health Evaluations – Summary of prior testing
36. Mental Health Evaluations – Dr. Evan Nelson
    a.  Pre-lim Report
    b.  MMPI-2
37. Dr. Raymond Patterson Evaluation
38. Dr. Paul Montalbano
    a.  Evaluation
    b.  Client Interview
    c.  MMSE Test
    d.  VIP Test
    e.  MMPI-2
    f.  WAIS-III
39. Dr. Allan Mirsky
    a.  Preliminary Report
    b.  Email to Attorney 07/23/09
    c.  Letter to Attorney 09/18/09
40. Dr. James Merikangas – Preliminary Report
41. Presentence Report – Physical & Mental Health Excerpt
42. David Runyon writings from journal 2006 – 2007
43. Memos on pre-trial interviews with David Runyon
44. David Runyon Pre-Trial Correspondence
    a.  List of lives saved
    b.  Letter to biological father
    c.  Letter to mitigation Specialist – Sheila Cronin
    d.  Letters to Attorneys
45. Court Records:
    a.  Guilt Phase Closing Arguments
    b.  Eligibility Phase Arguments
    c.  Penalty Phase Arguments
46. Direct Appeal Opinion – Facts of the Case

EXHIBIT 8

**BINDER 2**
1. Sentencing Phase Transcripts of Proceedings
   a. Guilt Phase – Closing Arguments July 22, 2009
   b. August 19, 2009
      i. Sgt. William Stevens
      ii. David Dalton
      iii. Virginia Pina
      iv. Nick Schmidle
      v. William Banks
      vi. Debbie Bratton
      vii. Mitchell Jones
      viii. Capt. Jeff Harris
      ix. Jennifer Lynn Kime
      x. Lt. Jeremy Chayer
   c. August 20, 2009
      i. Erin Skiba
      ii. Barbara Wilson
      iii. Kristen Smith
      iv. Rose Wiggins
      v. Dr. Mark D. Cunningham pg. 2084
   d. August 24, 2009
      i. Eric WestDavid
      ii. Lauretta Johnson
      iii. Brandy Anderson
      iv. Candace Mabry
      v. Erica Singledecker
      vi. Hector Diaz
      vii. William Banks
      viii. Larry Eaglebear
      ix. Thomas Kumorowski
      x. Michael J. Grbic
      xi. Charles Ferguson
      xii. Scott Linker
      xiii. Tiffany Linker
      xiv. David Dombrowski
      xv. David H. Runyon
      xvi. Suk Cha Runyon
   e. August 25, 2009
      i. Robert Lockwood
      ii. Mark Runyon
      iii. Maria Runyon
      iv. Phyllis W. Provost
      v. Theodore Schlossman

EXHIBIT 8

vi. Larry Rilee
f. August 26, 2009
g. August 27, 2009

**Conceptual Considerations**

9.     In a death penalty case, once the jury convicted Mr. Runyon of capital murder, its attention would turn to his culpability. Moral culpability is a concept at the heart of mitigation (*Burger v. Kemp*, 1987), citing *Woodson v. North Carolina* (1976) (see also other SCOTUS decisions, e.g., *Coker v. Georgia*, 1977; *Lockett v. Ohio*, 1978; *California v. Brown*, 1987; *Franklin v. Lynaugh*, 1988; *Penry v. Lynaugh*, 1989; *South Carolina v. Gathers*, 1989; *Payne v. Tennessee*, 1991. An understanding of the concept of moral culpability is critical to the jury's consideration of the nexus between the mitigating factors presented to the jury and the capital offense of which it has just convicted the defendant. To explain, the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows the degree of "blameworthiness" of an individual may vary depending on what factors and experiences shaped, influenced, or compromised that choice. The relationship of developmental damage and other impairing factors to the exercise of choice, and subsequently to moral culpability, is illustrated in the graphic models below. As the damage and impairing factors (e.g. neglect, abuse, psychological disorder, corruptive socialization, substance dependency/intoxication, etc.) increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced.



10.     The greater the damaging or impairing factors, the steeper the angle or slope on which the choices are made; and thus the lower the level of moral culpability. The

formative or limiting impact from any source of developmental damage or impairment is relevant in weighing moral culpability. An appraisal of moral culpability involves an examination of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and the exercise of volition or free will. Stated more plainly, how steep was the angle from which the choices were made?

11. The typical theory of the State at capital sentencing is that the defendant's criminal conduct, including the capital offense, is the result of the totally volitional, unfettered, free exercise of choice of the defendant arising solely from his malignantly evil heart. It was incumbent upon defense counsel to be able to rebut this theory.

**Findings**

12. Available history, however, demonstrates that Mr. Runyon suffered from a myriad of malignant formative influences that he did not choose. Such evidence is consistent with and supports the primary theory of the defense at capital sentencing.

13. Unfortunately, the defense did not present or explain the relevance of the damaging developmental experiences that impacted Mr. Runyon. Thus the jury did not hear testimony that would allow them to make an informed test of the role of unfettered volition as opposed to the influence of bio-psycho-social factors.

14. Review of the sentencing transcript demonstrates Mr. Runyon's defense did not:

   a. articulate a coherent theory of mitigation,

   b. aggregate his experiences and history into meaningful categories of developmental adversity and other impairment, and/or

   c. provide expert testimony regarding the nexus between the adverse developmental or other impairing factors, as well as psychological/psychiatric disorders, that mitigate the crime of which Mr. Runyon was convicted.

15. **No coherent theory of mitigation:** The defense did not explain to the jury how they were to apply the mitigating developmental history they heard. More specifically, the defense did not articulate the role of "moral culpability" as the jury weighed these factors and the associated death-worthiness of David Runyon. Rather, the defense only vaguely specified in an opening statement at sentencing:

   The defense will put on evidence that we believe will make you think that the death penalty is not warranted, things like his history as far as his schooling, his family perhaps mental health information, how he has done since he has been

EXHIBIT 8

incarcerated, those kind of things. We will put on a lot of evidence so you know David Runyon. [07/22/09, p. 1771]

It is a monumental decision that you are called upon to weigh, and as the government said, you will hear the aggravating factors that they will bring evidence to you on. When you are listening to those factors as have been described, we ask you to think about, do these things make David Runyon the worst of the worst? Is he someone who the appropriate penalty for the crime he has been convicted is death? [08/19/09, p. 1818]

16. **Inadequate presentation of mitigating history and its implications:** A psychosocial investigation was undertaken pre-trial by Sheila Cronin, with interviews of some immediate and extended family members and retrieval of records. Only a fraction of this social history or other available history of adverse developmental factors, however, was presented in mitigation to Mr. Runyon's sentencing jury. Though some historical information regarding developmental adversity was elicited from lay witnesses at Mr. Runyon's capital sentencing trial, this illuminated only a very small portion of the damaging formative factors, and these incompletely.

17. The social history presented regarding Mr. Runyon was so fractional that the Government argued in closing:

When you look at these mitigators, ladies and gentlemen, I will submit to you that the defendant has tried to make it very much quantity versus quality… [08/26/09, J.A. 3134]

He [Mr. Runyon] had a good upbringing. Again, he rejected that, and he walked away from that over five years ago. [08/26/09, J.A. 3138].

18. Even those family and other formative experiences that were referenced were left largely unexplained in terms of their implications for a criminally violent outcome, as the defense did not call a mental health expert to describe the implications of these experiences.

19. Specific to Mr. Runyon, there are a number of adverse developmental and life trajectory factors (detailed subsequently) that singly and collectively increased the likelihood of his having adverse and criminally violent outcomes in adulthood. Had the defense sponsored mental health expert testimony regarding the relationship of development to adverse outcomes, this testimony could have aggregated these toxic formative factors and experiences into developmentally meaningful categories. These scholarly and case-specific perspectives were critically important if Mr. Runyon's sentencing jury was to have knowledge of and have an informed mechanism to give weight to adverse factors in his background.

EXHIBIT 8

20.     The defense had obtained a preliminary evaluation by Dr. Mirsky, neuropsychologist, but did not receive funding for James R. Merikangas, M.D., psychiatrist and neurologist, until 07/22/09. This is the same day the jury found Mr. Runyon eligible for the death penalty. The delay in obtaining mental health consultation however, provided inadequate time to prompt additional social history investigation based on the findings of this evaluation. These experts, of course, did not have the benefit of a full mitigation investigation to inform their findings nor adequate time to conduct a comprehensive evaluation of Mr. Runyon.

21.     Had a mental health expert been provided with a complete mitigation investigation from which to evaluate the social history and adverse developmental factors in Mr. Runyon's background, the defense could have elicited and the sentencing jury would have had available for its consideration, a well-established and prevailing developmental perspective in 2009 that adult outcome is a function of the interaction and balance of predisposing, risk, and protective factors in childhood (see Hawkins et al., 2000; Masten & Garmezy, 1985; U.S. Department of Justice, 1995). In other words, as predisposing and risk factors increase, and protective factors decrease, there is an increasing probability of dysfunction as an adult.

22.     The defense also could have elicited testimony that the nexus between development and adult behavior is typically neither conscious nor simplistically obvious. Childhood developmental adversity is rarely a "gunshot" that creates an obvious and immediate path of "tissue" destruction. Rather, developmental adversity is analogous to radiation exposure. The child may exhibit only minimal symptoms at the time of exposure. The associated damage is not in kind: years later, as an adult, the person irradiated as a child does not begin emitting radioactivity. Rather, he grows cancers. That these malignancies do not immediately emerge following the exposure, do not "look like" the radiation in their characteristics, may be of different types and in different locations in different patients, and result from a complex interaction with the metabolism and predispositions of the affected patient, does not reflect that the cancer has no nexus to the radiation. Rather, the nexus is demonstrated by the increased rate of malignancy in persons subjected to radiation. Similarly, expectations of an immediate and/or overtly obvious nexus between developmental adversity and criminally violent outcome are both simplistic and inconsistent with well-established psychological science on how pathological exposures in childhood produce dysfunctional adult behaviors This nexus is demonstrated by increased rates of psychological disorder, substance abuse, interpersonal pathology, and criminal behavior, in adulthood among those who were psychologically impaired or injured as children. That said, there is a logical nexus between the adverse developmental factors in Mr. Runyon's background and the capital offense, as will be detailed in later sections of this declaration.

EXHIBIT 8

23.     Further, in considering the nexus between damaging developmental factors and adverse outcomes in adulthood, the defense did not explain or sponsor testimony that everyone need not totally succumb to adverse developmental exposures in order for a "toxic" effect to be implicated. Correspondingly, all similarly situated persons need not commit acts of criminal violence or suffer adverse life outcomes in order to demonstrate a relationship between background and outcome. The analysis of risk, vulnerabilities, and protective factors in the etiology of adverse life outcomes is quite similar to explanations of why some individuals contract cancer and others do not (i.e., carcinogen exposure, predisposing factors, and protective factors).  All of the children growing up in a neighborhood built on top of a toxic waste dump do not get cancer – rather these children as a group experience a markedly increased incidence of cancer as compared to more benign settings. Similarly, only 20% of heavy smokers eventually suffer from lung cancer – yet the role of this exposure in these cancers is well established. A history of adverse developmental experiences does not invariably result in or markedly impaired adult outcome – only a much-increased likelihood of it.

24.      To illustrate these categories that could have been specified at trial, analysis of Mr. Runyon's background finds numerous distinct toxic formative influences and compromising factors, each with malignant implications for Mr. Runyon's life trajectory.

### Transgenerational

1.  **Transgenerational family dysfunction and distress**
2.  **Hereditary predisposition to psychological/psychiatric disorder and personality pathology**

### Neuro-developmental

3.  **Minimal weight gain and near miscarriages in utero**
4.  **Head injury in motor vehicle accident and subsequent personality change**
5.  **Chronic stress in childhood**
6.  **Neuropsychological dysfunction**

### Parenting and family

7.  **Mother's inadequate bonding to David**
8.  **Mother's emotional neglect and rejection**
9.  **Physical and emotional abuse**
10. **Father's alcohol abuse**
11. **Parental volatility, marital conflict, and family violence**
12. **Abandonment by father**
13. **Residential instability**

EXHIBIT 8

### 14. Transcultural relocation

25.     If called to testify regarding the above adverse developmental factors, I would have offered testimony regarding the history associated with each and their nexus with Mr. Runyon's life trajectory.  Such testimony is detailed in the sections that follow.

26.     A number of conventions will be utilized in my findings that follow. First, information heard at the 2009 sentencing phase is referenced in *italics*. Information that could have been discovered in 2009, but was not presented at the sentencing phase is in standard font. Second, Mr. Runyon will be referred to as "David" as this reduces confusion with other male relatives and more accurately reflects his developmental status at the time of the described events. Third, clinical and research perspectives regarding the implications of the various adverse factors will be based on clinical perspectives and scholarly data available in 2009. This will be reflected in the dates of publication of scholarly references. Fourth, the numbering of paragraphs will be discontinued in favor of numbering the adverse developmental factors.

## Transgenerational

### 1.     Transgenerational family dysfunction and distress

Extremely limited information was presented at sentencing regarding David's generational history and associated adverse factors.

*David Dombrowski, biological father, testified his father was intoxicated on weekends and took out his frustrations on the children of the family [0064]. He also described his father as abusing his spouse (Dombrowski's mother) [0065].*

*The Government objected and the Court sustained objections to Suk Cha Runyon (mother) testifying regarding her history as a war refugee [0093]. The defense did not proffer mental expert testimony regarding the developmental (mitigating) implications of transgenerational history.*

The above minimal references to the paternal family system did nothing to convey to the jury the profound transgenerational family dysfunction and distress in the paternal and maternal family systems, or the implications of such history. This transgenerational family dysfunction and distress included the following:

**Maternal family system:**

The pre-trial mitigation investigation of Sheila Cronin provided some illumination of the maternal family system. This history, however, was not presented to David Runyon's sentencing jury.

EXHIBIT 8

**Mother:**

*Suk Cha Chung was born* 05/20/*45* in Hambuk, Korea (now *North Korea*). She was the youngest of five children. Her mother died a week after giving birth. Her stepmother was present in the home from her earliest memory.

When Suk Cha was age five, the Korean War broke out. This event and the ensuing dislocations, losses, and traumas are critical to appreciating the limitations she brought to her parenting of David. Because her family was educated and financially well off, the North Korean government targeted them. Her grandfather was captured and killed by the North Koreans, as were her father's in-laws who were hiding him. *Suk Cha's father had gone to China* the day before the war started, as he had a bicycle business there. *Suk Cha's stepmother, Suk Cha and her siblings*, and extended family members began a dangerous *escape to South Korea. The stepmother tied the children together so they would not become separated and lost.* She brought along cash and jewelry to use as bribes along the escape route. Suk Cha recalls walking through soggy rice patties at night and *surviving on edible vegetation found along the way*. One night they boarded a boat in absolute silence so as not to signal their presence to soldiers on shore who would start shooting at them. Suk Cha recalled a baby began to cry and, under pressure from other refugees, the child's mother held the child over the side of the boat and drowned her. Suk Cha reported she did not see the baby drown, but observed the mother holding her arms over the side of the boat. Suk Cha said: "The baby's mother never seemed to stop crying after that."

When their group neared the 38th parallel and was preparing to enter a tunnel, bombers appeared and a bombing attack ensued. They took cover. Mothers were lying on top of their children to protect them. People who were already in the tunnel were killed. When the bombing stopped, Suk Cha observed a cousin of the same age crawl out from under the child's dead mother. Suk Cha recalled: "I keep remembering the blood on my cousin's hand; one of her fingers was gone."

After they crossed the 38th parallel, they stayed in a refugee camp. Food was scarce. They scavenged for discarded turnips. After staying in the refugee camp for an uncertain period of time, the family continued south. Suk Cha described it was known at the time that American soldiers raped teenage girls. She recalled staying at a farmhouse and American soldiers coming around and saying "Sexy? Sexy?" Suk Cha was grabbed by a teenage girl, who quickly put a blanket around her and cradled her in her arms, so that soldiers would think that she had a baby. This ruse was successful. Another teenage girl in the house was not so lucky; she was taken to another room by a soldier and raped.

EXHIBIT 8

*Suk Cha's father came from China* on foot *and found the family*. She recalled he was very thin and had long hair and a long beard. The family settled in Seoul and some sense of normalcy was restored for a period of time.

When Suk Cha was approximately 12, her stepmother became involved with a missionary group who turned out to be more of a cult. Marital discord developed and one morning Suk Cha awakened to find her stepmother gone: "She didn't even say good-bye." Suk Cha never saw her again. There was little time for Suk Cha to come to terms with this loss. She recalled the next day her father brought home another woman and there was a big party. This began a painful period in Suk Cha's life, as her second stepmother treated the children very differently when the father was not present, treating the children, paternal grandmother, and servants badly. Suk Cha discontinued her schooling because her stepmother would not give her the tuition money, and Suk Cha did not want to complain to her father. Eventually, the stepmother instructed one of Suk Cha's older brothers to beat Suk Cha. Suk Cha reported this brother would pull her hair out, hit her, and/or drag her out of the house. She reported that the last time, he used a lead pipe to beat her on her shoulders. Suk Cha was determined to make a better life for herself, though her survival skills were impacted by her second stepmother: "You absorb a lot when you're a teen. I'm smart, I watched my stepmother and I learned how to manipulate to get what I wanted."

Suk Cha ran away from home and stayed with relatives who hid her. She described being befriended by a U.S. Army captain who got her employment as a bartender at a U.S. Army officer's event and teaching English to Korean soldiers working for the Criminal Investigative Division. When the captain returned to the United States, Suk Cha began working for a tailor shop across the street from the base. Under pressure from a CID officer friend of Suk Cha, the tailor sold the shop to Suk Cha who kept him as an employee.

Suk Cha reported the second stepmother threw the paternal grandmother out of the house. Suk Cha went to the house and physically attacked the stepmother. A fight ensued with each pulling out each other's hair, and others had to intervene to pull them apart.

*Suk Cha met David Dombrowski (David Runyon's father) when he came into the tailor shop. Dombrowski was U.S. Army enlisted. They were married* on 04/23/70 after dating for several months.

Suk Cha self-described additional instances of volatile emotional reactivity and aggressiveness following her marriage to Dombrowski. She described an angry confrontation with a landlord after they arrived at Ft. Hood. Suk Cha described going to Dombrowski's command in Panama and screaming threats when this officer refused to transfer Dombrowski to other duty *[Dombrowski testified Suk Cha went to his command*

EXHIBIT 8

*"fussing and a-cussing", J.A. 2871]*. She described confronting Dombrowski with much anger after he *stayed out late gambling*.

As will be detailed subsequently, *Suk Cha described Dombrowski drinking and gambling*. She described his beating her and David while intoxicated. She described feeling trapped as she had no money of her own and did not drive. *Suk Cha reported as her depression deepened, she determined to take her own life. She described an intention to kill herself in front of Dombrowski* and the children. *She conceived a plan to take an overdose*, ingesting half the pills as he drove up and the remainder as he entered the apartment. Her timing was spoiled, however, as he was delayed coming into the apartment and she became too drowsy, and realized the children were not in the room. *She was hospitalized* for 5-6 days.

Soon after, Suk Cha separated from Dombrowski and returned to the United States. In late 1975, she *met David Harold Runyon (stepfather) while working as a waitress*. She divorced Dombrowski on 02/22/76 and *married Runyon* on 04/06/76. Within the first two years of the marriage, *Runyon adopted Suk Cha's two children by Dombrowski*, David (dob 01/07/71) and Mark (dob 08/22/73), and they were issued new birth certificates.

Suk Cha appears to have continued to struggle with mood disorder following her divorce from Dombrowski. Mark recalled Suk Cha was not a happy person and was often tearful. This was in marked contrast to her presentation at a social event, when she would act lively and happy. He characterized her as a rigid and controlling person. He described a regimented and harsh family environment. Mark described Suk Cha had a violent temper and would have "meltdowns" 1-2 times yearly. During these episodes, she screamed and yelled, and on one occasion broke every dish in the house – as well as the television, which she targeted with a dish. At least monthly he caught her crying. Sheila Cronin described Suk Cha as hypomanic at times during their interviews, as well as tangential. *Suk Cha's testimony also had a pressured, disorganized quality that was apparently frustrating to defense counsel and the Court.* In her affidavit, Sheila Cronin stated Suk Cha likely suffers from Bipolar Disorder. Suk Cha also exhibits posttraumatic responses. Mark described that she startles and wets her pants in response to hearing a gunshot.

A progress note dated 03/01/93 diagnosed Suk Cha with "moderate depression" [000181]. On 06/27/93 she is diagnosed with "depression" [000182]. On 03/15/94, it was noted she was resistant to taking antidepressants though these made her feel better. A hospital note dated 09/19/07 described her as being loud and cursing about her food tray not corresponding to the graphic art on the cover of the menu. She demanded to see the commander of the hospital.

Suk Cha's marriage with Runyon appears to have been detached. Mark did not observe physical affection between them and did not feel they were happy together. Mark recalled they often fought, but always behind closed doors. Suk Cha is estranged from both of her

EXHIBIT 8

sons. She reported her relationship with David was spoiled by his marriage to Maria in 1995, with their communication essentially ending at that point. Suk Cha reported her relationship with Mark was particularly conflicted. She described she has not seen Mark since his wedding in 2000, and previously had not seen him since he left home at age 15 (1988).

### Maternal uncle and aunt:

As described above, Suk Cha reported an older brother was enlisted by the second stepmother to beat her. This went far beyond sibling torment, as he ultimately beat her with a lead pipe about the shoulders.

Suk Cha's sister attempted to cheat Suk Cha out of her share of an inheritance, an intention that was foiled by Suk Cha's appearance in South Korea when Runyon (adoptive father) was stationed there.

### Paternal family system:

The paternal family system history that follows is based on the summary of the federal habeas investigation interview of David Dombrowski (defendant's father, hereafter "Dombrowski") in September 2014.

### Paternal grandparents:

Paternal grandfather, Anthony "Tony" Thomas Dombrowski (1912-1978): *Dombrowski testified at sentencing to only part of his father's history:*

> *...I was born and raised in Chicago. Unfortunately, my father – although he was a construction worker, worked hard all the time, his Friday nights, when he got his paycheck, he spent a lot of time in the bars, and he came home routinely intoxicated and would get pretty upset if dinner wasn't still there and hot an ready for him.*
>
> *Or if he had a bad week or whatever, if he had a bad experience at one of the bars and so forth, we as kids would suffer some of those consequences, inasmuch as he would roust us out of bed in the middle of the night or morning, whichever you want to call it, and, you know, give us the third degree about some little something that Mom had told him earlier in the week about school maybe or something. [J.A. 2855]*

The above testimony, however, provided a profoundly incomplete picture of Tony's history, brutality, and the terror his violence had for the family. A portion of this history was identified in the pre-trial mitigation investigation of Sheila Cronin (see Social

EXHIBIT 8

History) and additional information was uncovered in the federal habeas investigation interviews of Dombrowski.

On federal habeas investigation interview, Dombrowski reported his father, Tony, was one of four children. Little is known of his family of origin. Tony was an "enforcer" or hit man for Anthony LeBarbera, a mobster. Tony was charged with murder at age 15, apparently this murder was a hit commissioned by LeBarbera. He was initially sent to Boys Town in Nebraska. At age 18 he was transferred to an adult correctional facility to finish his sentence. He was released in his mid-thirties. Dombrowski reported Tony was released from prison early because he volunteered for a federal study testing treatment for tuberculosis. The health implications for Tony of participating in this medical study are unknown. However, Dombrowski reported he had a positive TB test while in the U.S. Army and subsequently was treated with medication for over a year.

The connection to the mob returned later in Tony's life. Dombrowski described LeBarbera had moved his operation to Las Vegas, but returned to Chicago and was looking for men. LeBarbera found Tony and wanted him to work for him. By this time, Tony was married and had four children. LaBarbera allegedly threatened to harm Tony's family if he did not work for LeBarbera. Dombrowski recalled being around 7-8 years old and being sent to live with his aunt, Viola. Dombrowski's other siblings were each sent to live with a different relative. At the time, there was no explanation for why this was happening. Dombrowski is uncertain how long he lived with this aunt, but eventually he and his siblings returned home.

Dombrowski reported later learning his father was continually asked to work for LeBarbera and refused. In order to make the point he was not going to work for the mob, Tony went after and beat the men who were working for LeBarbera to send the message he was not going to be recruited. After Tony beat each person, he would ask if he was out and if the answer was "no," he would hunt down another of LeBarbera's men and beat them. Finally, LeBarbera left Tony alone.

Dombrowski reported his father would never speak of his mob ties (or any history) while sober, but when drunk would talk to Dombrowski about almost anything. Dombrowski described being 100% confident these accounts of mob involvement were factually accurate. Dombrowski described his father as a very violent and aggressive man who operated under a mob mentality. There were associated strong themes that ran through the family: protect your family at all costs, never let anyone disrespect you or your home, stand by your beliefs and morals no matter what the cost, and the man protects the family. Dombrowski recalled his paternal grandmother as being the same way. All problems were solved with violence, usually beating.

Tony received training in prison and spent the majority of his life working in the construction industry. The majority of Dombrowski's childhood the family lived in or

EXHIBIT 8

around greater Chicago. The family moved many times within greater Chicago as Tony relocated them to be closer to any job site where he would be working for more than three months.

Tony was a severe alcoholic who regularly beat his wife, Elinore. Extreme violence was commonplace and the primary mechanism to solve any problem. Dombrowski characterized Tony as a "functional drunk," in that he would work, but then would get drunk every night and on weekends. When sober, Tony was attentive and almost loving to his children, but when he drank he was violent and abusive – "his evil side came out." Every time Tony drank, there was a high probability he would become violent.

Dombrowski recalled hearing Tony beat Elinore from the other room and subsequently seeing bruises all over Elinore. He described at about age 12-13 attempting to intercede to protect his mother. Dombrowski would run into the room when he heard the sounds of a beating, yelling at his father to stop or pulling at his father's clothing. Tony would yell at Dombrowski to leave and, if he did not, would chase Dombrowski and beat him. Even if Elinore did everything Tony wanted, he still beat her when drunk. Dombrowski recalled Tony was very degrading of Elinore as well. Tony would come home from the bar and demand to know why his supper was not waiting on the table for him. Elinore had his plate in the oven or the refrigerator, but Tony would demand to know why it was not on the table, waiting for him. Tony made Elinore sit down in the kitchen and watch him get his plate and heat it up, demeaning her by saying things like: "Do you see how I'm doing this? Does this look too hard to you?" Dombrowski described the family environment as being very violent and volatile. Dombrowski recalled walking on eggshells with a constant feeling of dread about what was to come. Though most of the violence centered on Elinore, there were times his discipline of the children was probably considered abusive. Certainly, his beatings of Dombrowski when he interceded in the domestic violence were abusive.

Dombrowski described Tony kept Elinore isolated and alone, making it nearly impossible for her to report the abuse. Not that she would have anyway; Elinore was completely dependent on Tony for everything.

Tony was violent with others as well. Dombrowski recalled beating up a peer who had recurrently bullied him. When the father of this bully opened the door and walked into Tony's house demanding for the medical bills to be paid, Tony beat this man inside and out of the house, then kicked him down the apartment steps.

Tony also recalled his father getting into a dispute with a local bar owner where Tony hung out. Dombrowski had a vague recollection of the bar owner attempting to blackmail Tony regarding his prison past. Around this time, Dombrowski observed his father making pipe bombs at their home. Tony had all the parts laid out and showed Dombrowski how to assemble a bomb, telling Dombrowski something to the effect of:

EXHIBIT 8

"If you are going to sit there and watch, you might as well help." About two weeks later, the bar burned down. Dombrowski used this story to illustrate how vengeful his father was and that he never made a threat he did not follow through with.

Dombrowski reported his father died around age 66 of cirrhosis.

<u>Paternal grandmother, Elinore Ruth Birdsell Dombrowski:</u>

Elinore was approximately 10 years younger than Tony. Dombrowski described his mother as "slow." He characterized her as "borderline," describing she had limited intellectual functioning. She had to be "led around." Elinore never worked outside of the home. The expectations of her were quite concrete: care for the children, cook, and clean. Even in these repetitive functions Elinore had to be given constant reminders about almost everything. Dombrowski detailed his father, Tony, taught his mother how to cook, but had to give her constant reminders to take something out of the freezer to let it thaw out before she could cook it. Tony had somewhat of a schedule and routine set up for Elinore and she could function adequately, as long as her routine did not change. As long as nothing happened, throughout the day, she would be fine. However, any little kink in her day would throw her off.

Elinore was not able to drive and was therefore completely dependent on Tony to take her anywhere. Tony handled all of the finances and Dombrowski does not recall his mother ever paying a bill or handling money. Elinore did not have a life outside of the home. She did not socialize with others and was essentially dependent on her husband for everything. She was easily persuaded and gullible and was almost childlike in the way you could persuade her.

In hindsight, Dombrowski believes his mother was "handicapped," but was never formally diagnosed. Within the above external structures and routines, she was able to physically care for herself and the children. Dombrowski perceived that his mother loved him and attempted to protect him from his father's abuse. This, however, was a "passive kind of love", as he does not recall her tucking him in or reading to him. At about age 46 (approximately 1968), Elinore left Tony. Dombrowski is not certain of when or how she died.

**Father:**

David Dombrowski was born in 1949 and was a twin (with James "Jimmy"). Dombrowdki described himself as a "slow learner" in school, having difficulty with both reading comprehension and math. He and Jimmy both repeated 3rd grade.

During Dombrowski's childhood, he was recurrently exposed to the alcoholism, domestic violence, his father's community violence, and the vengeful volatility of his father and

EXHIBIT 8

the associated household chaos. These traumas were inadequately mitigated by his mother, who was intellectually deficient in her own right.

There were other corruptive exposures as well. Dombrowski reported that as young as age 10, he would go with his father to the bar, so that he could drive his father home after Tony got drunk. When 12-13 years old, Dombrowski would pull his little red wagon to the local bar, load up on beer, and take it back to sell at his father's poker parties. As a means to make money, he also hung out in the bar and shined shoes. This put him in contact with a lot of "drunk people making bad decisions." He characterized this "crude lifestyle" became commonplace for him.

Not surprising in the face of the drunkenness, violence, and vengefulness of his father and the inadequacies of his mother, Dombrowski's childhood and adult adjustment reflected the legacy of this trauma and neglect. He described that at age 10 he *started running away from home [testified to running away at age 13-14, J.A. 2856]*. Often this was *prompted by beatings of* him or *his mother*. Dombrowski recalled he was not worried about running away or what he would do, always having a sense he could take care of himself and was better off anywhere than his house. *He always attended school*, simply arriving in the same clothes he ran away in. His chronic runaways eventually resulted in children's services becoming involved *[court-ordered foster care]*. Dombrowski spent two years in a group home and then went to live with a foster family where Jimmy (his twin) had already been placed – also due to runaways.

*Dombrowski testified he began to run away from approximately age 13-14, packing a suitcase and staying at a friend's house. He still attended school. He testified that at age15 he went to a group home and about 15 months later to a foster family, staying with them into his junior year in high school.*

 Dombrowski reported working at a movie theater while living in the foster home and stealing a handgun from another employee. He hid the gun in the bedroom where it was discovered by the son of the foster parents. Dombrowski walked in on the boy playing with the gun and the boy accidentally shot Dombrowski in the chest.

*Dombrowski testified to taking the gun from his boss's trenchcoat and hiding it in his bedroom. He detailed the ensuing gunshot accident. [J.A. 2857]. Dombrowski testified that after several months of convalescence following the gunshot, he enlisted in the U.S. Army on 08/21/67.*

This incident appears to have had a posttraumatic impact. Dombrowski described:

> I felt like I cheated death and after that I really didn't care what happened to me. Sometimes, I still feel like that." [p. 23, Social History of Sheila Cronin]

EXHIBIT 8

Dombrowski also described posttraumatic reactions to shooting three North Korean soldiers in the DMZ, describing: "I had to do it, but I never forgot their faces and I still dream about them" [p. 23, Social History of Sheila Cronin]. He described this experience leaving him with a startle response and also drinking to bury these feelings.

Dombrowski continued to exhibit the sequelae of his family background during his adulthood. *Dombrowski testified while in the Army and married to Suk Cha (David Runyon's mother) he had difficulties with both drinking and gambling:*

> *I got into a little bit of a drinking problem. I got into a little bit of a gambling problem, and it did affect me [J.A. 2869]...I would find a casino somewhere, sit down. And drinks were free in the casino, you know, so I would drink myself drunk and gamble myself broke [J.A. 2873].*

*Dombrowski testified that marital conflicts would ensue when he came home drunk, with David being awakened, observing Dombrowski restraining Suk Cha from hitting Dombrowski, and attempting to intervene [J.A. 2874].*

Suk Cha reported Dombrowski while intoxicated beat her and David. She recalled an instance of him grabbing David by the wrist and dangling him in the air. She ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. Suk Cha cried as she described Dombrowski's drinking and abuse. She described:

> I tried yelling. I tried begging, crying, manipulation, but nothing worked. Davy tried to protect me and I tried to protect him. I was never so scared in my life. All I could do when he'd beat us is hug little Davy and tell him how sorry I was. [social history by Sheila Cronin]

Though not acknowledging this family violence, he did admit to David being in a volatile environment. Dombrowski reported he has a pattern of being quick-tempered and aggressive, finally admitting to himself in 1991 he had a problem. He described this followed a driving incident where a man cut him off. Dombrowski pulled up to the man's Jeep, pulled him out, and began beating him. Dombrowski's spouse, Carol, described it happened so quickly Dombrowski was beating the man before she could get out of the car. There were other occasions when he "went off the deep end" and got very aggressive with coworkers. Dombrowski described one of his supervisors demanded he seek help for his anger and aggression.

Dombrowski described that in 1991 he went to a local VA clinic and began seeing a psychiatrist. Eventually, a medication regimen was settled on which he regards as benefitting him greatly. He reported being maintained on Prozac (antidepressant) and

EXHIBIT 8

Buspar (antianxiety). A progress note dated 06/17/09 noted the prescription of Trazadone (antidepressant) in addition to the Prozac and Buspar. The diagnosis was specified as: Major Depression [000197]. Dombrowski acknowledged that when he has attempted to go off the medication or even skips a dose, he quickly reverts to being easily frustrated and quick-tempered.

Dombrowski reported that within a year after Suk Cha married David Runyon, she sent papers for him to relinquish his parental rights. He described that though he was reluctant to do so, after much badgering from Suk Cha he signed the papers relinquishing his parental rights to his sons, David and Mark.

Dombrowski married Oderay Alverola on 04/01/76. She had a son, Jean Paul, by a prior marriage and together they had a son, Anthony. The marriage ended after 13 years secondary to his alcoholism. They divorced 09/04/90. He described a rage attack one day where he came home to an empty house and tore it to pieces.

Dombrowski married Carol in 1992 and they remain married to date. He retired from the U.S. Army in 1987. He is estranged from his siblings.

### Paternal uncles and aunts:

Limited history regarding paternal aunts and uncles (Dombrowski's siblings) reflects problematic life outcomes as well.

Paternal uncle, James "Jimmy" (dob 1949): Jimmy is a twin of Dombrowski (David Runyon's father). Jimmy was a "con man" and "swindler." He used Dombrowski's Social Security Number and ran up debts in Dombrowski's name. Jimmy has been in and out of trouble for "con man" type things. His substance abuse and mental health history are unknown.

Paternal aunt, Joyce (dob 1950): Dombrowski had little information regarding his sister. He had heard she had suffered from mental health problems.

Paternal aunt, Patricia Ann "Patti" (dob 1952): Dombrowski reported Patti has a problem with alcohol and becomes aggressive when she drinks. Dombrowki and Patti together forcibly retrieved Lynette, Patti's daughter, from Lynette's father while Dombrowski was home on leave from the military. Lynette was later raped and murdered in California, and Patti became obsessed with finding the person she believed to be responsible. Patti may have been charged with misusing her private investigators license in pursuing this individual. Ultimately, DNA revealed Lynette's killer to be another individual who was already serving time on another conviction.

EXHIBIT 8

Paternal aunt, Virginia: Virginia's last know residence was Wisconsin. Dombrowski has no other information regarding her.

Paternal aunt, Freda: Freda was born severely intellectually deficient and handicapped. Dombrowski believes she never came home from the hospital after birth, instead going to an institution. Dombrowski identified fetal risk factors of his father's drinking, "bad genes," and Tony beating Elinore during the pregnancy.

Paternal aunt, Catherine: Catherine was also born intellectually disabled, though not as severely as Freda. She attended special classes in school. She has some self-care skills, but her expressive language skills are deficient. Dombrowski noted Catherine shared many characteristics with her mother, Elinore. She is very impressionable and gullible. Catherine is unable hold employment and receives Supplemental Social Security Income (SSI). She did well with a routine, though still requiring reminders. She could not figure out what to do if her routine were disrupted.

**Adoptive father:**

*David Harold Runyon (dob 1950): Runyon, adoptive father*, is the oldest of four children. Suk Cha is his only marriage and his two adoptive sons, David and Mark, are his only children. Like Dombrowski, Runyon is estranged from his family. Though his parents are alive and well, he has not seen them for many years, apparently secondary to their disapproval of his marriage to Suk Cha. Runyon last saw his brother in 1982 and his sisters in 1986. His interpersonal isolation appears to be of longstanding. Runyon recalled having only one long friendship growing up and spending most of his time alone in the woods. He characterized himself as a quiet man who is very self-contained.

Mark described his adoptive father as completely detached from everyone, with unchanging mood and expression. When *taking the boys on joint activities, such as fishing*, he communicated with them very little. That the family activities were accompanied by a lack of conversation or meaningful interaction was a critically important context in light of testimony by the adoptive father and Mark (younger brother) regarding these events.

**Siblings:**

Younger brother, Mark (dob 1973): *Mark is also the product of the relationship of Dombrowski and Suk Cha. He was age two at the time of their separation*. He characterized himself as always having felt "detached" from other people. He attributed this in part to family dysfunction and in part to moving frequently in childhood.

Mark described constantly being in trouble as a child, with *Suk Cha finding fault no matter how hard he tried to please her*. She was not physically affectionate with him.

EXHIBIT 8

*Mark testified that in response to this treatment he first ran away at age five and subsequently ran away approximately annually.* Reminiscent of the deprivations Suk Cha experienced at the hands of her second stepmother, Mark described in high school wearing cheap clothes and having no replacements for two front teeth that had been knocked out from a fall from a bicycle. He recalled his mother telling him they could not afford to have them fixed and that he needed to get used to it – that she was preparing him for the real world.

Runyon had been stationed in Korea with the family. After a major confrontation, *Mark returned to the United States alone at age 15*. He lived with roommates and on the streets at times. When he scraped together enough money for a car, he lived in it for six months, bathing in a local creek. He enrolled in a cooking class at a community college so he would be assured of a meal at least three times weekly.

Mark also exhibited a volatile temper. He reported he once hit an employer with a baseball bat and on another occasion smashed a car with a tire iron.

*In 1991, Mark joined the Virginia National Guard* and later transferred to the Kansas National Guard. While at Ft. Benning in 1991 or 1992, he was arrested for theft of military gear. In 1994, he joined the U.S. Army. Also that year, Mark became depressed and started drinking heavily. He characterized he was marginally suicidal during this period. Mark was *deployed to Korea for a year. He was then was stationed at Ft. Campbell, Kentucky* where he met and *married* Tracy Allen. *He was deployed to Haiti.* Mark described becoming increasingly upset and depressed. He recalled having felt a lot of aggression, felt disconnected from people, had no patience with people, and had trouble sleeping. *He described having symptoms of PTSD [J.A. 3003].* He saw a counselor once or twice, but the counselor seemed to not know what to do with him.

On his return to Ft. Campbell he filed for divorce, secondary to *her affair* with his best friend. When she refused him access to their apartment to retrieve his gear, he physically took the keys from her and was arrested for domestic violence.

Seven months prior to his discharge, *Mark got into a fistfight with two other soldiers in the barracks. In the course of this he pulled out his gun and fired it in the air. He was convicted of three felony counts at courts martial and served 11 months in prison.*

Paternal half-brother, Anthony Dombrowski:  No information is available.

Summary:  David Runyon's family history is characterized by marked dysfunction that can be traced across generations. His paternal grandfather was mob-affiliated and had committed murder by age 15. He was an alcoholic who was brutally violent to his spouse and children, as well as community members. He constructed a pipe bomb in front of his son, which was ostensibly used to blow up a local bar. The paternal grandmother was

EXHIBIT 8

intellectually deficient and inadequate to mitigate the effects of this volatile, violent home. A <u>paternal uncle</u> is characterized as a con man and swindler, and paternal aunts are intellectually deficient or have had significant life adjustment problems of their own. The <u>father</u> was in bars from childhood, a chronic runaway by his early teens, spent years in a group home and foster care, stole a handgun from his employer, and was subsequently accidentally shot in the chest with this gun. Early in his marriage to David Runyon's mother, he was routinely drunk, gambling heavily, and physically abusive of his spouse and David. Further reflecting his own limited attachment capability, he relinquished his parental rights to his two sons soon after the divorce. Another marriage also ended secondary to his alcoholism. He exhibits explosive reactivity and mood disorder, now controlled by medication. The father has been estranged from his siblings for many years.

The maternal family system is similarly dysfunctional. The <u>maternal grandmother</u> died a week after giving birth to the mother. A <u>stepmother</u> precipitously abandoned the mother at age 12 without saying goodbye. A <u>subsequent stepmother</u> was rejecting and neglectful.

In addition to the above disruptions in parental bonding, the <u>mother</u> in middle childhood was subjected to the ravages of the Korean War. Members of her extended family were executed by the North Korean government and the remainder of the family became refugees in fleeing to the South. In route, the mother experienced marked deprivations, saw civilians killed by combat and a baby drowned to silence it. She was aware of the rapes of teenage girls and was in the next room when this occurred. She suffered beatings at the hands of an <u>older brother</u>. The mother has exhibited explosive reactivity, exhibits posttraumatic reactions, and has been treated for mood disorder. Her presentation implicates Bipolar Disorder. The mother was detached in her marriages and in her relationship with her sons.

The <u>stepfather</u> has a lifelong pattern of interpersonal detachment, a characteristic he continued in his interactions with his spouse and adoptive sons. He has been estranged from his parents and siblings for decades.

The <u>brother</u> also has a pattern of interpersonal detachment. He felt rejected as a child and has been emancipated since age 15. He has had periods of alcohol abuse and depression, as well as episodes of reactive aggression. He has exhibited posttraumatic symptoms. He has been convicted of three felonies associated with the discharge of a firearm in a fight and served 11 months in prison.

**Implications of transgenerational family dysfunction and distress:** Family history is critically important to character and background through several fundamental processes. First, as will be discussed further below, some psychological/psychiatric disorders, personality characteristics, behavior patterns, and social vulnerabilities are genetically transmitted. Thus, independent of whether David had interaction with or knowledge of these

EXHIBIT 8

individuals in his family system; inherited predispositions, personality aberrations, and behavioral tendencies placed his life trajectory and choices at greater risk.

Second, many characteristics and behaviors are transmitted across generations by "family scripts." Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family. School dropout, early pregnancy, early marriage, criminal activity, domestic violence, parental abandonment, substance abuse, poor social reciprocity, and/or many other maladaptive behaviors may be extensively represented in a family system from one generation to the next.

Third, modeling of specific behaviors or coping responses is also an important aspect of family influence - for good or ill. In David's immediate observation, there were parental models for family and community relationship detachment, poor marital choices, marital volatility, parental irresponsibility and abandonment, and explosive reactivity.

Fourth, maladaptive behaviors, including criminal activity and violence, may result from "sequential emotional damage." In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Crockenberg (1987) summarized research concluding: "parents reenact patterns of caregiving they experienced as children" (p. 964). Consistent with this observation, Green (1988) reported: "The childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these neglectful or abusive parents are then, in turn, emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including child abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect characterized by deficient parental care and attachment is particularly damaging, as it results in fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment, disrupted primary parental attachment, or other disruptions may not be evident until adolescence or early adulthood.

Both Dombrowski and Suk Cha were damaged and limited by the predispositions, traumas, and exposures of their own childhoods. As these damaged people proceeded to parent David and his brother, Mark, they did so through the life-lens, interpersonal impairments, and psychological/personality disorders of these predispositions and limitations. Understanding the extent of their limitations in parenting David rests on knowledge of what happened to them growing up.

David's own life has reflected this generational legacy. There is historical information that would have demonstrated that David was the product of a disturbed family system with associated genetic predispositions, disturbed scripts, pathological modeling, and sequential damage. This generational history was critically important for a capital

EXHIBIT 8

sentencing jury to have as they examined the formative influences in David's history, his character, and his psychological limitations. This history provides vital insights into the origin and nature of his psychological vulnerabilities.

Equally important in the weighing of his moral culpability, David had no choice regarding the family system that was fundamental to his development. David's participation in the charged offenses is thus not a singularly individual story, but instead occurs within a multigenerational context. While this does not obviate individual responsibility, the above multigenerational context does illustrate that David did not arrive at his offense conduct unassisted by pathological family influences, injury, norms, and modeling.

**2.      Hereditary predisposition to psychological/psychiatric disorder and personality pathology**

*As noted above, testimony at sentencing regarding problems in the family system was limited to brief description of the paternal grandfather's (Tony Dombrowski's) drinking and volatility; the father's (David Dombrowski's) teen runaways, taking a gun, and his heavy drinking and gambling during the marriage of his parents during David's early childhood; and Suk Cha's excessive discipline of David in his early childhood.* There was no testimony regarding demonstrations of psychological/psychiatric disorder and/or personality pathology in their behavior or that of other family members, or the implications of this for David's psychological/psychiatric status and personality dysfunctions.

Three psychological/personality disturbances are evident across generations in David's family system:

Mood disorder: Dombrowski (father), Suk Cha (mother), and Mark (brother) have all exhibited and/or been treated for mood disorder. Their symptoms of this were detailed in the earlier section.

Explosive reactivity: Also as detailed in the earlier section, Tony (paternal grandfather), Dombrowski (father), Suk Cha (mother), maternal uncle, and Mark (brother) have exhibited recurrent explosive reactivity.

Interpersonal detachment, inadequate social reciprocity, and antisocial conduct:  A constellation of personality characteristics is present in both the paternal and maternal family systems associated with inadequate recognition and/or appreciation of the experience of others.

This is variously exhibited in poor social reciprocity, deficient emotional resonance (i.e., empathy), irresponsibility, manipulation, criminality, and aggression. To capsule such maladaptive behaviors from the more detailed discussion above, the paternal grandfather

EXHIBIT 8

was mob-affiliated and had committed murder by age 15, spending the next 15-20 years in custody. He was subsequently brutal with his spouse and children, and violent with community members. A paternal uncle is a con man. The father was a gambler, violent with his spouse and David. He continued to provoke violent domestic conflicts even when aware David was present and attempting to intervene as a small child. The father abandoned his sons soon after the divorce. He is estranged from his siblings. The mother has initiated violent confrontations, exploited/extorted her employer out of his business, left her family of origin to emigrate without a second thought, was emotionally detached from her sons, has been chronically estranged from them, and has been noted to be remarkably entitled and demanding in a health care context. The brother is chronically emotionally detached from others, has engaged in weapons assaults including pulling a firearm, and has served 11 months in prison.

**Implications of hereditary predisposition to psychological/psychiatric disorder and personality pathology:**

Mood disorder: Regarding hereditary factors associated with mood disorders, DSM-IV-TR (American Psychiatric Association, 2000) describes that Major Depressive Disorder is 1.5-3 times more common among first-degree relatives of persons with this disorder than among the general population. There is also increased risk for Alcohol Dependence in first-degree relatives, and there may be an increased risk of Anxiety Disorder [page 373]. It is thus notable that Dombrowski (father) has a history of depressive and anxiety symptoms, in addition to Alcohol Dependence.

DSM-IV-TR also describes that first-degree relatives of persons with Bipolar Disorder have increased rates of various forms of Bipolar Disorder, as well as Major Depressive Disorder.

Klein, Depue, and Slater (1985) found mood disorders occur 7.6 times as often in children with at least one affectively ill parent (38%) compared to those without (5.0%). Akiskal et al. (1985) in a prospective investigation of the offspring and younger siblings of patients with Bipolar Disorder found that 57% of these close family relatives were diagnosed with a disorder on the Bipolar spectrum within four years.

Explosive reactivity:  There is also a hereditary component to explosive reactivity. DSM-IV-TR specifies:

> Mood Disorders, Substance Abuse Disorders, Intermittent Explosive Disorder, and other Impulse-Control Disorders may be more common among first-degree relatives of individuals with Intermittent Explosive Disorder than among the general population. [p. 665]

Regarding interpersonal detachment, inadequate social reciprocity, and antisocial conduct: The empathy deficits, distorted morality, and low levels of parental bonding / commitment /

EXHIBIT 8

protection exhibited by David's parents and multiple members of his family system, as well as the criminal activity of some family members, reflect traits on the Antisocial Personality Disorder continuum that have a genetic predisposition/component, particularly virulent in their transmission when these are exhibited by female relatives (see DSM-IV-TR, p. 704). The deficits exhibited by David's mother place him at particular risk for these traits, as does his genetic heritage of these deficits on both sides of his family. Such genetic predispositions coupled with developmental vulnerabilities and childhood maltreatment, increased the risk David would possess traits such as irresponsibility, intermittent callousness, and manipulative behavior.

The predispositions to such traits arising from hereditary and childhood experience are important perspectives in explaining the presence of disturbed personality traits and criminal violence in David. This was particularly important in light of attempts by the Government at the sentencing phase to characterize David's criminal conduct and personality defects as willfully self-selected, rather than acknowledging its origins in his heredity, childhood, and/or family experience. Note that this discussion is not intended to represent that David suffers from Antisocial Personality Disorder, rather that he exhibits traits on this continuum that have a hereditary component, as well as being secondary to inadequate attachment, trauma exposure, and other developmental factors. Importantly, the personality disturbance resulting from such predispositions and maltreatment is not willfully chosen by the person exhibiting these characteristics. Rather, it is the net result of predisposing influences and damaging developmental experience.

# Neuro-developmental

**3. Minimal weight gain and near miscarriages in utero**

Suk Cha did not receive prenatal care until late in the second trimester when she began spotting and experiencing abdominal pain. She reported she fainted and *suffered a near miscarriage in July 1970 when at the airport for a flight to the United States.* She suffered a second experience of bleeding during the pregnancy.

Suk Cha reported she was unable to keep food down and gained no weight during the pregnancy. She further reported the doctors did not expect her or the baby to survive labor and delivery. Despite these complications, David was born by natural childbirth weighing 6 lbs. 13 oz. on 01/07/71. Dombrowski believes David may have had a breach presentation.

**Implications of minimal weight gain and near miscarriages in utero:** Suk Cha's failure to have prenatal care or gain weight during the pregnancy raises concerns with the quality of nutrition available to David in utero. This is illustrated by increased infant mortality rates among women who do not gain adequate with pregnancy. Note normal weight women are expected to gain 25-35 lbs. during gestation. Pregnancy complications have been associated with increased risk of delinquency in some studies.

EXHIBIT 8

**4.       Head injury in motor vehicle accident and subsequent personality change**

In November 1996, David was involved in a head-on collision with a drunk driver, totaling the truck he was driving [see declaration of Deborah Seeger, 000883; correspondence from Sheila Cronin to Stephen Hudgins, 05/05/09, 000405]. Maria Runyon, former spouse, considers this accident to be a "very significant" event in their lives, as David changed dramatically in its aftermath. She described his personality changed so that he was meaner and more easily frustrated. Maria characterized: "The guy I married had good morals, discipline, and restraint, and, for the most part, this changed" [interview summary, 000892]. David complained of vertigo, sleep disturbance, and memory loss in medical consultations over the next 10 months months [correspondence from Sheila Cronin to Stephen Hudgins, 05/05/09, 000406-407]. At a consultation on 09/09/97, the progress note ends: "Depression diagnosis, Posttraumatic Stress Disorder" [correspondence from Sheila Cronin to Stephen Hudgins, 05/05/09, 000408].

It is notable that this MVA head injury was cumulative in its effect with a number of other head injuries David suffered. David (report of Raymond F. Patterson, M.D., 06/24/09) and Suk Cha (Social History of Sheila Cronin) reported that while living Panama in David's early childhood, he was thrown across the room by Dombrowski. This injury resulted in a crooked smile, as his right lip sags. David also advised Dr. Patterson and Dr. Montalbano, (report Paul Montalbano, Ph.D., 06/27/09) of two additional head injuries resulting in loss of consciousness. One of these occurred in his elementary school years when he ran into a telephone pole. He advised Dr. Patterson of being "knocked out wrestling" (p. 12) as well.

Perhaps most important of the head injuries prior to the MVA, David described loss of consciousness from explosions in military training (reports of Dr. Patterson, Dr. Montalbano, and Dr. Mirsky). Dr. Mirsky detailed two incidents of training grenades exploding in close proximity to David on two occasions in training (correspondence to Stephen A. Hudgins, 09/18/09).  Dr. Mirsky (email correspondence to Stephen A. Hudgins, Esq., 07/23/09) described the interactive brain injury implications of these blast exposures and the MVA:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accident. His impaired attention, seen in the Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he show is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrior, and this should be considered in his sentencing.

EXHIBIT 8

**Implications [mechanisms] of head injuries:** A clear understanding of brain anatomy and the nature of the forces that create brain damage is essential in coming to informed conclusions regarding the potential for head injuries to result in brain damage. Begali (1987) described brain tissue as being about 75% water. This brain tissue takes up approximately 80% of the space within the skull with the other 20% being occupied by cerebral spinal fluid (CSF), blood, arteries, and veins. Recognition of this <u>gelatinous</u> quality of the brain makes more understandable the mechanical forces and stresses of brain damage. The gelatinous structure of the brain is described microscopically by Begali as "an intricately patterned collection" of nerve cell bodies, which are called neurons, and their transmission fibers (axons and dendrites) with surrounding support cells (glia). The descending fibers of one cell (axon) and the receiving fibers of another neuron (dendrites) meet in a space called a synapse. Chemicals moving within this synapse trigger the firing of electrical impulses, whereby brain activity and transmission occur.

Begali (1987) identified two distinct mechanical forces that produce brain damage in closed head injury: 1. Direct contact forces and 2. Inertial forces. Direct contact forces refer to damage that results from the inward compression of the skull at the point of impact, the compensatory adjacent outbending that follows, and rebound effects (citing Lezak, 1983; Paug, 1985). The point of original impact is referred to as coup. The effect of the blow literally bouncing the brain off the opposite side of its bony container is referred to as contrecoup (citing Levine, Benton, and Grossman, 1982; Lezak, 1983). Contrecoup results in bruising the brain tissue where it strikes the skull opposite the original impact. Coup and contrecoup lesions are identified as accounting for specific, localized behavior alterations that accompany closed head injuries (citing Lezak, 1983).

Additionally relevant to David's head injury history, Begali noted inertial forces are at play in a motor vehicle accident where acceleration and deceleration forces additionally occur (citing Alexander, 1984; Pang, 1985). Begali described the continuation of brain movement and rotation within the skull following initial impact puts strain on delicate nerve fibers and blood vessels and results in shearing (citing Langfitt and Gennarelli, 1982; Strich, 1969). As brain surfaces are pushed against the inner surface of the skull with sudden deceleration, the brain sustains bruising (citing Lezak, 1983; Pang, 1985). Focal or specific localized bruises or contusions may be caused by inertial impact against irregularities of the skull. These most often occur to the undersides of the frontal and temporal lobes (citing Alexander, 1984; Levine et al., 1985). Lesions to the undersides of the frontal and temporal lobes may have negative consequences on behavior, affect, emotions, memory, and attention (citing Alexander, 1984). Begali noted, in addition to the direct mechanical injuries occurring in closed head injury, secondary phenomena such as brain swelling, elevated intercranial pressure, brain shifting or herniation, infection, and unusual bleeding may ensue and may further traumatize or damage brain tissue (citing Jellinger, 1983; Ransohof and Koslow, 1978; Sharpiro, 1983).

Begali described the tissue damage produced by the primary injury or by the secondary

EXHIBIT 8

phenomena as permanent and irreversible regardless of rehabilitative therapy (citing Nork, 1984; Pang, 1985; Rosen and Gerring, 1986).

Please see Adverse Factor #6 for the functional expression of brain damage/dysfunction.

**5. Chronic stress in childhood**

As is detailed elsewhere, David's childhood and adolescence were impacted by chronic stress, including deficient maternal bonding, paternal alcoholism, observed domestic violence, emotional neglect, physical and emotional abuse, father abandonment, extended absences of adoptive father, recurrent moves, and transcultural relocation.

***Implications of chronic stress in childhood:*** Current research confirms that trauma can activate various systems in the brain that actually change neuron response and cognitive pathways. Children that experience on-going high levels of arousal due to trauma will develop systems in their brains that cause them to be constantly hyper-aroused and hyper-vigilant. These changes can result in severe problems for children, adolescents, and adults in learning ability, mood, bonding and attachment, and in problem solving (Perry, 2003). Some of the enduring effects of trauma exposure in childhood may occur through misshaping of the brain's architecture and processing as well as faulty learning. Schwarz and Perry (1994) described:

> "The sustained neurobiological impact of trauma on the developing individual occurs through the "plasticity" of the developing brain – making it "more susceptible to the formation of malignant memories that affect not only the stress response system but also the emerging organization of neuro networks regulating other basic states and characteristics of the individual" (313).

Stated more simply, chronic stress in childhood does more than create bad memories. Rather it alters the reaction patterns (i.e., psycho-physiologic effects), the chemistry (i.e., neuro-hormonal effects), and the architecture (neuro-anatomical effects) of the brain (van der Kolk, 1996). Such changes may increase the likelihood of reactivity.

Please see the next section for the functional expression of brain dysfunction.

**6. Neuropsychological dysfunction**

It is my understanding the neurological/neuropsychological assessment of David Runyon as part of the federal habeas investigation has revealed the presence of dysfunction.

Evidence of neuropsychological dysfunction had emerged in evaluations performed in 2009 as well. Dr. Allan Mirsky described David's performance on some neuropsychological assessment as consistent with brain injury, and noted the history of

EXHIBIT 8

MVA and blast exposures (report, 06/26/09). James K. Merikangas, M.D. observed: "He [Runyon] clearly has impaired executive functioning suggestive of frontal lobe impairment" (correspondence to Stephen A. Hudgins, 08/05/09)

**Implications of neuropsychological deficits for functioning:**

There is an extensive literature on social/interpersonal deficits exhibited by persons with brain injury, particularly deficits associated with the frontal lobes. To illustrate, Milner (1970) described patients suffering frontal lobe injury as often displaying normal scores on standard intelligence tests but displaying personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in their having difficulty holding employment. Milner cited research extending over several decades demonstrating that individuals with frontal lobe damage had difficulty switching from one task to another. He described:

> The "frontal" patients were not at all capable of solving the problem intellectually...but once they became fixated on one of the solutions they seemed to forget that any other was possible..."frontal" patients have difficulty in changing their behavior when it ceases to be appropriate (p.421)....a great many experiments have indicated that "frontal" animals, including man, are perserverative. The subjects find it difficult to change from one solution of a problem or one form of response to a different one (p. 422).

Milner summarized:

> Frontal patients are often found to be impulsive and incapable of responding according to rules that they can nevertheless verbalize...the frontal cortex has the function of increasing the flexibility of a well-organized subcortical motivational system. In that case, the frontal lobes could be responsible for switching in and out the multiple and sometimes contradictory motivations required to adjust to the complex rules and regulations of social living.

Burton and Volpe (1988) summarized research regarding long-term social emotional consequences of head trauma. They cited Thomsen (1984) who followed head trauma patients over a 10 - 15 year period. Thomsen found persistent emotional lability, irritability, listlessness, and generally disturbed behavior in his long-term follow-up sample. One fifth were overly aggressive or sexually disinhibited. Burton and Volpe described Lezak (1987) as demonstrating a pattern of persistent behavioral and social dysfunction in male head trauma patients studied up to 5 years post trauma. Oddy and Humphrey (1980) were described as reporting that two years after the trauma, head injured patients displayed a decrease in social functioning, although 90% were working in some capacity. Burton and Volpe described that impulsivity and poor anticipation are particularly associated with frontal lobe damage. Burton and Volper described that men more than women react to head

EXHIBIT 8

trauma with anger and impulsivity. Burton and Volpe summarized that significant amount of long lasting emotional disturbance has been reported in head trauma samples with this emotional dyscontrol appearing to represent an interaction of trauma effects and premorbid factors.

Pontius (1972) described that the frontal lobes may be directly or indirectly involved with the process of patterning of ethical behavior. Pontius noted that frontal lobe dysfunction may result in disruption of the evaluation of personal behavior, reduced problem solving and flexibility, and marked difficulty in reprogramming an ongoing chain of behavior.

Yeudall et al. (1982) reported abnormal neuropsychological test profiles indicative of anterior dysfunction (frontal temporal) were more common in delinquent than in non-delinquent groups, consistent with findings of Lishman and others. Yeudall et al. identified frontal lobe mediated issues of planning and perceiving consequences of actions as being deficient in the neuropsychologically compromised and delinquent group as well as finding agreement with the research by Pontius indicating juvenile delinquents have an inability to appropriately change an action once started in order to achieve the original goal.

**Implications of neurological insults and deficits for violent offending:** Brain dysfunction from neurological insults and deficits is a risk factor for multiple adverse outcomes that may increase the likelihood of criminal conduct or violent offense. These adverse effects include social dysfluency, impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance. In 1991, there was a growing body of psychological, psychiatric, and neurological literature reporting brain dysfunction/damage is present in disproportionately high incidence among violent offenders, including murderers.

To illustrate, Lewis et al. (1986), in a study of 15 death row inmates, identified all 15 had histories of severe head injury. Langevin et al., (1987) found neuropsychological variables to be significant in one fifth to one quarter of violent offenders and found that 1 in 3 killers exhibited clinically significant neuropsychological impairment. Elliott (1987) stated: "Over the past twenty years it has become increasingly evident that overt and covert neurological and neuropsychological impairments are far more common in recurrently violent individuals than in non-violent population."

Of course the presence of brain dysfunction represented a critically important mitigating factor as the jury considered David's judgment and decision-making capability, particularly as the jury found the statutory aggravators of "substantial planning" and "murder for renumeration."

EXHIBIT 8

# Parenting and family

### 7.      Mother's inadequate bonding to David

Suk Cha's history of profound traumatic exposure, superimposed on maternal figure abandonment and rejection, was a poor foundation for establishing a nurturing maternal relationship with her own children. These deficits began to be exhibited toward David before he was even born. Dombrowski reported Suk Cha refused to get prenatal care until the end of the second trimester. It was not until she began spotting and experiencing abdominal pain in the 5th-6th month that Dombrowski prevailed in making her consult a physician. Subsequently, Suk Cha did not want to breastfeed David and he was placed on formula.

Dombrowski observed that Suk Cha did bond with David or Mark, and was not emotionally connected to them in any way. She did not exhibit any maternal nurturing. He characterized: "She was cold as a damn fish." Suk Cha did not know how or did not attempt to soothe David when he cried. Dombrowski recalled walking in and seeing her holding David while he cried and wondering who was more scared of who. Dombrowski said he could walk over to David and simply rub his head or kiss him and he would stop crying, but then would resume crying as soon as he walked away.

The legacy of this bonding failure became evident in Suk Cha's relationships with her sons as they became teens and adults. She has been estranged from both David and Mark for decades.

This history of inadequate bonding is in sharp contrast to the "doting" description of the maternal relationship Suk Cha had with David as described by Charles A. Ferguson, high school friend of David in his sentencing testimony:

> *Her face would light up every time she would see him. I mean, every time. I mean, if I picked David up to see a movie and brought him back a couple of hours later and she saw him – and she always had a serious look on her face except when she saw him. Just a huge smile, and it is one of the things that I – I used to talk to my mom about. I thought that was so odd, but kind of beautiful at the same time. [J.A. 2832]*

Though Ferguson had oriented to something being odd in Suk Cha's interactions with David, this was not explored or placed in a context of inadequate bonding.

**Implications of mother's inadequate bonding to David:**

Psychological impact of deficient bonding (attachment):  Psychological research extending over three decades prior to David's capital sentencing trial had unequivocally demonstrated that a secure bonding to a parent figure is crucial to healthy psychological development,

EXHIBIT 8

not only in infancy, but in later childhood as well (e.g., see Ainsworth, 1979; Cantelon, 1994; Curtis, 1980; Lewis, 1985; Matas, Arend, & Sroufe,1978; Pardeck, 1983; Sroufe, 1979; Sroufe, & Waters, 1977; Yarrow, Goodwin, Manheimer, & Milowe, 1973). Conversely, numerous studies demonstrated that when a child is deprived of the opportunity to develop secure, nurturing bonds early in life; physical, intellectual, and emotional development may be seriously retarded – and such early life experiences can have lasting effects which are not easily remedied (Curtis, 1980). Similarly, recurrently disrupted or broken attachments in childhood – such as occur when a child is moved from caretaker to caretaker - also result in lasting fundamental psychological harm.

The role of secure, nurturing attachment in healthy psychological development: To simplify, an infant is not born because he is ready for independent functioning. Rather he is born while still extraordinarily dependent because he has outgrown the womb. The physical and emotional nurturance of intensive parental care forms a secondary "womb" that is essential for continued development. The attachment to a parental figure, particularly across the first several years of life, is the "umbilical cord" that provides the essential conduit for emotional nurturance in this family womb. It is through a secure, caring relationship with a parent figure that the child establishes the foundation for a stable identity, emotional self-regulation, empathy, capacity for intimacy, and responsible social behavior. As has been described, neither of David's parents gave evidence of having established a meaningful bond with him.

Nexus between inadequate bonding and antisocial behavior: Inadequate bonding in early childhood, whether from failure to establish a secure attachment or the loss of it, is frequently quite central to the etiology of conduct disorders in childhood and antisocial behaviors in adolescence and adulthood – including violent offenses (see Meloy; 1988; Patterson, DeBaryshe, & Ramsey, 1989). It is illuminating to note that callousness and potential criminality can be conceptualized in many cases as severe attachment damage "all grown up" (Meloy, 1988). Green (1988) described the impact of deprivations like David suffered:

> Early and persistent exposure to parental rejections, assault, and deprivation impairs the child's capacity to form subsequent relationships….Most abused children are unable to achieve Erikson's (1950) stage of basic trust. They learn to regard violence and rejection as the major ingredients of human encounters. (850)

David's self-perception, self-esteem, and view of the world as a child was largely shaped by who he saw reflected in his parents' eyes. Children are very egocentric in their perceptions, interpreting their experience of the world in a self-referential fashion. Stated more simply, if a child's father does not seek relationship with or exhibit love for the child, the child does not conclude that the father is irresponsible and/or emotionally deficient. Rather, the child concludes that he [the child] is unlovable. This is the inescapable legacy of this parental disinterest, scapegoating, and rejection. The capacity to value, care, and respond

EXHIBIT 8

benevolently to others is not *taught* in childhood; it is *absorbed*. As the child *experiences* these from parent figures, they become an integral part of identity, self-perception, and relationship proclivity.  When these crucial emotional experiences are not provided, the capacity to extend these to others is stunted.

The clear delineation of inadequate attachment and its implication as a mitigating factor in David's development is particularly important in providing a context for the deficits in empathy for the victim reflected in David's perpetration of the capital offense. The gravity of disrupted attachment and its implications for later deficiency in the ability of that individual to meaningfully relate to and empathize with others (such as romantic partners), as well as the vulnerability that this fundamental developmental injury has for antisocial conduct and criminal violence are critically important conceptualizations in mitigating his offense.

**8.      Mother's emotional neglect and rejection**

Mark Runyon, brother, characterized that he and David grew up in a very cold, repressed, very strict Christian family [federal habeas interview, 000897]. He recalled no one showed affection – there was no touching, kissing, holding, or comforting from either their mother or adoptive father. Mark recalled sitting on his mother's lap occurred so infrequently, it felt strange when it occurred. Both parents were emotionally detached, from the children and each other. There was no physical affection and little communication shown between the parents.  The message was – we are simply surviving. This family theme was conveyed by both parents.

The sense of family alienation was so profound that Mark ran away at five years old. He realized even at that age that he was not receiving love the way other kids did.

Mark described it was impossible to please Suk Cha. *He recalled her overtly telling him he was bad and could never do anything right.* David could also not please her. David, however, kept trying to be attentive to Suk Cha and do things he thought would make her proud of him.  Mark described realizing early on this was pointless so quit trying. From his need for her approval, David learned to lie and hide, where Mark got in his parents' face. As a teenager and adult, David's friends described him as very eager to please the people around him.

The descriptions of Suk Cha's emotional detachment and neglect by Dombrowski and Mark are quite discrepant from the characterizations of David Runyon (adoptive) father in sentencing testimony:

> *No, the way she handled the boys was very loving, very dear. She was always worried, I think, about the boys being at the babysitter's so much. [J.A. 2886]*

EXHIBIT 8

**Implications of emotional neglect:** Regardless of whether physical or psychological, neglect has been identified as more psychologically and developmentally damaging than physical abuse. Widom (1989) described neglected children as being at *greater* risk for adult violence than abused children. This is a function of insufficient stability and/or security in parental attachments, daily life, or practical care; as well as unmet physical and emotional needs.

It is important to note that parental neglect is not an indication that the parent or parent-figure does not "love" the child. Rather, the quality of love that the neglectful parent provides is inadequate. "Love" in this context is most accurately viewed as a continuum from healthy and affirming to destructive and injurious. This is consistent with the earlier discussion of sequential emotional damage and other trans-generational influences that may result in poor parenting and "love" expressions that are on the lower end of the continuum. Again, the capacity to value, care, and respond benevolently to others is not taught in childhood; it is absorbed. As the child experiences these from parent figures, they become an integral part of identity, self-perception, and relationship proclivity. When these crucial emotional experiences are not provided, the capacity to extend these to others is stunted or expressed in an inconsistent and uneven fashion. Again, this was a crucial perspective in mitigating the capital conduct.

The lack of consistent and well-modulated parental supervision and limit setting in childhood constituted another form of neglect that David experienced. Healthy child development requires not only stable and secure relationships with parents, but also limit-setting and guidance through appropriate and consistent discipline. In the absence of either of these fundamental parenting factors, there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (e.g., Patterson, DeBaryshe, & Ramsey, 1989). The risks are multi-fold. First, the child is unable to establish a clear identity without a stable, limit-setting parent to "bounce" off of. Second, the child experiences the absence of appropriate limits as terrifying, with associated deficits in perceived self-competency. Third, the child does not master essential rules and skills for social interactions and relationships. And fourth, without order and external structure, the child does not develop internal structures and capacity for self-guidance. Quite simply, the lack of appropriately modulated parental behavior and well-reasoned discipline contributes to aggressiveness and predisposes to violence in the community. Thus, as Dombrowski (in early childhood) and Suk Cha (throughout childhood) reacted in a volatile and unpredictable fashion, David's self-control was impacted. Similarly, the discipline David received from Suk Cha was reactive and abusive (e.g., ruler slaps to hand as a toddler, stress positions, severe spankings) and thus not the sort that would instill appropriate internal structures. There was no testimony at sentencing that established a nexus between the reactivity and volatility of David's parents in his developmental years with his criminal history and/or the capital offense.

EXHIBIT 8

Further, socialization of children and adolescents is integrally influenced by the value system and behavioral modeling of their parents. Corruptive parental models contribute to faulty moral compasses in their children, with much increased risk of criminal outcome.

The critically important role of the family in shaping lifelong attitudes and behaviors, for good or ill, is widely accepted. There is extensive empirical research on the role of relationship, modeling, instruction, structure, and reinforcement on socialization and behavior acquisition within the family. Socialization of children and adolescents is integrally influenced by the value system and behavioral modeling of their parents, as well as by the quality of the parent-child relationship. Corruptive parental models contribute to a faulty moral compass in the child, with much increased risk of unethical conduct and criminal outcome.

Further, healthy child development requires constructive family and community values, structure, modeling, and guidance for the child. Children need positive order and external structures to develop internal psychological structures, moral controls, and capacity for self-guidance. The chaos and abusive discipline of David's experience gave little opportunity for the internalization of family order and structure. When such guidance and structure is not provided, self-control does not develop and aggression can unfold.

Strong positive male role models and relationships are a particularly important part of male child development. In adolescence this assumes additional significance as the teenage male is creating a more adult identity and as the presence of an older male to whom the male teen is well bonded provides limit-setting guidance. In David's case, he had no well-bonded relationship to a constructive father figure.

## 9. Physical and emotional abuse

*Dombrowski testified that Suk Cha was overly punitive with David as a child, repeatedly slapping his hand until it was bright red for simply touching an object she did not want moved or disturbed [J.A. 2867]. He also described her excessively spanking David as he got older:*

> *She would go to town with him. You could swear she was trying to put him through the chair, as opposed to just spanking him a little bit. It was like, man, his bottom was like seriously red pink. [J.A. 2867]*

On interview, Dombrowski described Suk Cha's maltreatment of David and Mark as stemming from her excessive needs for control and *unrealistic expectation of small children. Thus, not just the severity, but the context of the "discipline" was inappropriate.* He described that Suk Cha wanted David and Mark, even as small children, to act like adults. For example, when David was barely old enough to walk, she would yank him up and *start spanking him if he touched anything on the coffee table.* This included using a ruler on his

EXHIBIT 8

hand until it almost bled. *Dombrowski did not think it appropriate to spank a young child for touching something on a table and further thought the number and force of the blows were excessive.* He characterized that Suk Cha could not allow the kids to be kids. She wanted to keep a very, very clean home with all her home decorations displayed in their proper places. This was nearly impossible with small children.

Dombrowski recalled another instance of Suk Cha attempting to force feed David when he was 2-3 years old. The combination of the crying and the food being shoved down his throat resulted in his vomiting. Suk Cha then became angrier and spanked David for throwing up. When Dombrowski attempted to intervene and console David, she became very angry at him.

There were many other instances of Suk Cha having unrealistic expectations of her children. Dombrowski recalled an occasion when she put the boys in collared shirts and one ran out to play. He came back with his collar messed up and Suk Cha immediately slapped him across the face and fixed the collar. Dombrowski perceived the boys were terrified of their mother, recalling they would stop, at the drop of a hat, when they heard her voice.

Dombrowski recalled that when Suk Cha was hitting the boys, David would tell her to please not hurt them anymore. He also recalled coming in from work and David telling him his mother had been hitting them.

Suk Cha reported Dombrowski while intoxicated was abusive to David as well as her. As previously described, she recalled an instance of his grabbing David by the wrist and dangling him in the air. She ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. Suk Cha cried as she described Dombrowski's drinking and abuse. She described:

> I tried yelling. I tried begging, crying, manipulation, but nothing worked. Davy tried to protect me and I tried to protect him. I was never so scared in my life. All I could do when he'd beat us is hug little Davy and tell him how sorry I was. [social history by Sheila Cronin]

Mark (younger brother) described Suk Cha yelling at him (he could never please her), *making him or David assume stress positions such as holding a can of marbles high over his head* for 20-60 minutes, and *beating them with a flyswatter. He recalled his adoptive father beating him with a paddle that had holes drilled in it.* Mark was less than 8-years-old when subjected to this "discipline" with the paddle [social history of Sheila Cronin].

**Implications of physical and emotional abuse:** The deleterious effects of child maltreatment are well recognized among scholars. To illustrate, the conclusions of the American Psychological Association Presidential Task Force on Violence and the Family

EXHIBIT 8

(1996) summarized that abused or neglected children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including low self esteem; depression; anger, exaggerated fears; suicidal feelings; poor concentration; eating disorders; excessive compliance; regressive behavior; health problems; withdrawal; poor peer relations; acting out; anxiety disorders; sleep disturbance; lack of trust; secretive behavior; excessively rebellious behavior; distorted cognitive, perceptual, emotional, and interpersonal capacities; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; drug or alcohol problems; and violent and criminal conduct. The task force further identified the following broad conclusions:

1.      Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulty in self-control.

2.      Abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

3.      When abused children are not given appropriate treatment for the effects of the abuse, the lifetime cost to society for an abused child is very high.

It should be noted, however, that emotional abuse can have psychologically injurious effects that are equal to or surpass those from physical abuse. The saying that "cuts on the skin heal faster than wounds on the heart" captures this concept.

Widom (1989) described neglected children as being at greater risk for adult violence than abused children.  Neglected and/or abused children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects (Widom, 2000). The relationship of childhood maltreatment and family violence to adolescent and adult criminal activity and violence is demonstrated in other large-scale studies, as well. To illustrate, Kelly, Thornberry, and Smith (1997) reported on the findings of the Rochester Youth Development Study. This study began in 1988 with the selection of 1,000 7th and 8th graders in Rochester, New York, 14% of whom had an official record of maltreatment. These youths and their primary caretakers were subsequently interviewed every six months regarding violence incidence. This study measured self- or caretaker-report of serious violence among these youth rather than official arrest.  Sixty-nine percent of the abused/neglected children had exhibited criminal violence, compared to 56% of the controls.

Research sponsored by the U.S. Department of Justice (DOJ) demonstrates a nexus between the experience of childhood maltreatment and delinquent, criminal, and criminally violent outcomes. English, Widom, and Brandford (2001), in a DOJ-published study, reported on 15-24-year follow-up of over 800 children who had been abused or neglected, and a matched group of controls. The abused and/or neglected children were 4.8 times more likely to be arrested as juveniles; 2 times more likely to be arrested as adults; and 3.1 times more

EXHIBIT 8

likely to be arrested for violent crime as adults.

Emotional abuse can be as psychologically injurious as physical abuse. This is consistent with the observation that the wounds on the heart are slower to heal than cuts on the skin.

Childhood maltreatment disrupts not just the subjective experience of childhood, but also the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood (see Schwarz & Perry, 1994). The bridge between childhood and adulthood experiences of PTSD is consistent with the diagnosis of this disorder in David when he was in the military.

The maltreatment the child experiences becomes pathologically engrained into the developing child's personality structure, resulting in pervasively maladaptive and even criminal functioning. The most serious expressions of trauma in childhood may be delayed. This has been analogized as being like rheumatic fever, where the child initially appears to have recovered, but heart damage becomes apparent many years later. In the same way, grave emotional damage may be done to a developing psyche and value system, even though the expression of this damage may not be evident for many years (see Terr, 1991). Trauma-induced influences on development can extend well beyond childhood, resulting in long-term developmental disturbances and undesirable changes in life trajectory (life direction and course) and eventually coalescing into personality disorders in adulthood. These conceptualizations give some understanding to David's life trajectory, including his pattern of failed career objectives, high-rate of job turnover, and failed relationships. Eventually, David's only means of income was as a paid subject for drug companies.

**Implications of observing the maltreatment of siblings:** Mark, as well as David, was targeted for maltreatment growing up. Psychological research is clear that the observation of siblings being abused by a parent is emotionally damaging. These deleterious effects include: negative perceptions and feelings towards their parents, a fearful and hypervigilant posture toward adults in general, feelings of guilt and responsibility, negative or ambivalent feelings towards siblings, behavior problems, anxiety, shyness, fear of failure (Halperin, 1983; Lynch & Roberts, 1982).

**Implications of traumatic experience in childhood:** Traumatic stress in childhood is widely described in the literature as being central to the development of a spectrum of subsequent psychological/psychiatric disorders. In a review of the literature, Terr (1991) [published in the first issue of the 1991 volume] described childhood psychic trauma as a crucial etiological factor in the development of a number of serious psychological/psychiatric disorders both in childhood and adulthood. Terr compared psychic trauma in childhood to rheumatic fever in that both may set in motion a number of

EXHIBIT 8

different problems which may emerge later in life.

Terr identified four characteristics of childhood trauma that appear to last for long period of life regardless of the eventual psychological /psychiatric diagnosis. These characteristics include: (1) visualized or otherwise repeatedly perceived memory of the traumatic event, (2) reenactments of behavior, feelings or defenses associated with the trauma that may recur so frequently as to become distinct personality traits or eventually coalesce into personality disorders in adulthood, (3) trauma specific fears, (4) changed attitudes about people, life, and the future involving a shattering of "the shield of invincibility" and the associated loss of "basic trust" in self and others. Terr described that traumatized children have a permanent recognition of the profound vulnerability of all human beings - particularly themselves.

Terr additionally described that repeated exposure to extreme external events results in massive attempts to protect the psyche and preserve the self involving dysfunctional coping mechanisms of massive denial, repression, dissociation, self anesthesia, self hypnosis, identification with the aggressor, and aggression turned against self. Thus chronic feelings vulnerability may eventually be expressed in reactive behaviors that seem to suggest the opposite. These maladaptive coping patterns may subsequently underlie disturbed behavior, emotions, and relationships. The full nature of the damage may not be evident for many years - hence the rheumatic fever analogy. Terr stated that the repeatedly abused youngster may not settle into a recognizable form of adult character disorder, however, until the late teens or early twenties.

The above cited literature summaries described traumatic experience of childhood having a lasting effect on many of the children who experience trauma with these adverse impacts having potentially broad adverse effects on personality structure, subsequent vulnerability to psychological/psychiatric disorder, life trajectory, behavior, and relationships. It is disturbing to note in the limited longitudinal studies that adverse impacts may arise after many years of apparently well-adjusted function, suggesting that the eventual course of the disorder cannot be reliably predicted from an interval of apparent recovery.

**10.  Father's alcohol dependence**

*Dombrowski testified at trial to having an alcohol problem and drinking heavily in the casino while gambling, then coming home intoxicated in the early morning [J.A. 2873].*

This pattern, however, was far from a situational response to the pressures of the marriage. Dombrowki acknowledged on interview to being alcohol dependent for 15 years after the divorce from Suk Cha. There was no testimony regarding this enduring pattern, its contribution to his failure to remain in David's life, or the implications of parental alcohol abuse and dependence for the children of that household.

EXHIBIT 8

**Implications of alcohol dependence of father:** Alcohol abuse has a number of adverse impacts on parental functioning. First, the alcohol abuse of his father represented a genetic predisposition to alcohol abuse and dependence for David, markedly increasing his own risk of this disorder, as well as mood disorder.

Second, parental substance dependence represents a corruptive model of how to cope with life demands and stresses. A substantial aspect of parental socialization of a child occurs through modeling – as the child absorbs behavior patterns from observing the actions of parents, and subsequently imitates these. When this parental modeling is faulty or corruptive, the patterns that have been instilled from early childhood may wreak substantial havoc in the child's own adult behavior, including substance abuse and dependence.

Third, children who grow up in a home characterized by parental substance dependence are at substantially increased risk of psychological injury. Specifically, a parent who is substance dependent is more likely to be emotionally detached – a product of both being under the influence and being preoccupied with drug-seeking behavior. As is discussed elsewhere in this declaration, there is evidence that David's parents were insufficiently bonded to him. Further, Dombrowski's alcoholism is likely to have been an aspect of his abandoning David following the divorce, with associated psychological injury for David.

Fourth, the children of a substance-abusing parent are more likely to be neglected and inadequately supervised. An alcoholic parent is both more likely to physically or emotionally abuse the children of the household, as well as to fail to protect the children from abuse perpetrated by the other parent of the household. Children in such a home often experience marked inconsistency and unpredictability associated with the wide fluctuations in parental reactions and competency. As is described elsewhere, Suk Cha was quite volatile in her reactions. There was additional need, then, for protective stability from a father figure. In his alcoholism and gambling absences, Dombrowski was both not present to provide this. Quite the contrary, his misconduct exacerbated the instability of the home.

Fifth, in the face of the impairment of a substance-abusing parent, the children of an alcoholic or drug abusing parent are frequently compelled to assume roles of premature responsibility. There are descriptions of *David assuming such a role in attempting to calm his parents when they were in conflict* or reacting precipitously. Such demands for precocious maturity are not a benign developmental event. The role reversal of the child assuming responsibility for the parent in an adaptation of precocious "maturity" is ultimately damaging to the child – who experiences increased traumatic and corruptive exposures, inadequate parental structure and guidance, chronic anxiety regarding the unpredictability of the home, feelings of incompetence in not being able to prevent the parent from drinking, and rejection at being abandoned to this role by the non-alcoholic parent. Profoundly ambivalent feelings toward both parents are common as the child feels protective on one

EXHIBIT 8

hand but harbors much anger on the other at the lack of support, the demand to assume responsibilities that rightly belong to the parent, and the loss of childhood. Not uncommonly, these conflicted feelings are evidenced in significant depression, anger, and behavior problems.

A review of the literature (West & Prinz, 1987) found a relationship between parental alcoholism and offspring risk for interpersonal relationship deficits, substance abuse, delinquency, and school truancy and dropping out. Drake and Vaillant (1988) reported that by midlife, 28% of the sons of alcoholic men had developed alcohol dependence and 25% were diagnosed with at least one personality disorder. Again demonstrating synergistic effects for developmental adversity, alcohol dependence was predicted in the sample by alcoholic relatives, low SES, and school behavior problems. Personality disorder was predicted by total environmental weaknesses, poor maternal relationships, low IQ, and feelings of inadequacy.

In summary, parental alcoholism or substance dependence is a broad social/psychological risk factor for relationship problems, self-control deficits and behavior disorders, feelings of defectiveness, psychological/psychiatric disorders, and criminal behavior.

**11. Parental volatility and family violence**

As has been previous detailed, Suk Cha reported Dombrowski beat her and David when drunk.

Also as previously described, though, Dombrowski was not the sole source of family violence in the household. He described Suk Cha as quickly becoming agitated and spinning out of control when something frustrated her or did not match her expectations. This could be anything. Dombrowski described an occasion of Suk Cha not liking something he said, and responding by picking up a saucer from the kitchen table and throwing it at him. Her *aggressive reactivity to benign behaviors of early childhood such as touching an object on a low table* has been previously detailed. Dombrowski recalled if Suk Cha was attempting to use a can opener and it was not working fast enough, she would throw it across the room. He described this violent volatility as making a miserable home environment and leaving everyone walking on egg shells.

As described in an earlier section, Mark described that Suk Cha had a violent temper and would have "meltdowns" 1-2 times yearly. During these episodes, she screamed and yelled, and on one occasion broke every dish in the house – as well as the television, which she targeted with a dish. Mark recalled one of these blow ups occurred when Runyon (adoptive father) did not get the military assignment Suk Cha wanted him to take. She went "postal." Mark characterized his mother could destroy a room in 30 seconds.

EXHIBIT 8

Dombrowski described David as a kid who tried to keep the peace. When Dombrowski and Suk Cha would argue, David would physically hold onto his mother and try to calm her down, saying things such as: "I'm here Mommy." "It's okay." Similarly, Suk Cha recalled David *holding onto Dombrowski's pants pockets in an attempt to restrain him [testified to by Dombrowski, J.A. 2874]*.

**Implications of parental volatility and family violence:** Psychological research on the effects of observed family violence indicates that children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children who have been exposed to other forms of child maltreatment (American Psychological Association, 1996; Widom, 1989a, b, c; Jaffe et al., 1986). In other words, the deleterious effects of observing violence within the home are equivalent to the direct physical abuse of the child. More specifically, observation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Hershorn & Rosenbaum, 1985; Jaffe et al., 1986; Jaffe, Hurley, & Wolfe, 1990). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

Research sponsored by the U.S. Department of Justice (Thornberry, 1994), has investigated the relationship of family violence to criminally violent outcome. These findings regarding the association of family violence exposure and subsequent rates of serious youth violence from these families are described in the Rochester Youth Development Study. Three types of family violence exposure were studied: spouse abuse, abuse of children, climate of violence and hostility. Among children without a history of family violence, the rate of serious youth violence was 38%. If one type of family violence was present, the rate of serious youth violence was 60%, increasing to 73% and 78% with an exposure history to two and three types of family violence respectively. All three types of family violence exposure were present in David's household in early childhood.

## 12.    Abandonment by father

*Within approximately a year after divorcing Suk Cha in late 1975, Dombrowski relinquished his parental rights*, effectively abandoning David to a woman he knew lacked maternal bonding to David and who he knew to be markedly volatile, including overly punitive if not overtly abusive discipline.

**Implications of abandonment by father:** By Dombrowski's description, Suk Cha was not maternally bonded to David. He described David as responding much more readily to Dombrowski's soothing than that of Suk Cha. This suggests that, in spite of Dombrowski's alcoholism and family violence, David had a more secure attachment to him than to Suk

EXHIBIT 8

Cha. Thus when Dombrowski abandoned him, David not only lost some protection from his mother's punitive volatility, he also lost a primary emotional attachment.

David would have certainly had an egocentric view of his father's abandonment – interpreting that David was unlovable and unimportant, as opposed to viewing his father as having deficient commitment, responsibility, and attachment. This has enduring self-esteem impacts that were not remediated by a detached adoptive father.

### 13.     Residential instability

David's development was characterized by recurrent moves. To capsule, *David was born at Ft. Hood, Texas in 1971. In 1973 the family moved to Panama where Dombrowski was stationed. David moved back to Ft. Hood with his mother and brother in 1975. In 1976, David and Mark, with Suk Cha, lived with their adoptive grandparents for six weeks, before joining David Runyon (adoptive father) and Suk Cha in Germany, where they remained for five years, returning in 1981. The family resided in Missouri for the next several years. They lived on base at Ft. Leonard Wood, Missouri for one year, then moved to Nebo Mission for one year, and then back on base for one year. In 1984, the family moved to Korea. In 1985, they moved to Ft. Belvoir, Virginia where David attended high school. The adoptive father, Suk Cha, and Mark moved to Korea, and David began attending Wentworth Academy in Missouri.*

**Implications of residential instability:** *Mark (younger brother) characterized this residential instability* reinforced the family theme of not making attachments. The message was: don't get attached to anything because you will not be here long, *people are expendable* and everything changes [federal habeas interview, 000897].

A requirement for healthy psychological development in childhood is stability: stability of relationships, rules, routine, guidance and supervision, residence, and school. The stability of these *external* structures in childhood gradually promote *internal* structures within the child and adolescent that support emotional and behavioral self-control. In the absence of these external structures, internal controls do not adequately develop – resulting in behavioral misconduct and problems in modulation of emotions. David's childhood was particularly lacking in such well-conceived structures.

The disrupted attachments that accompanied these transitions have already been discussed. This instability additionally blocked bonding to nonfamily neighboring adults and peer who might have otherwise provided bonding to constructive models.

The friendships of childhood and participation in group activities such as sports teams and scouting are the first critical lessons in citizenship. It is through these friendships that the child learns to value, and have loyalty and regard, for persons who are not blood kin. In participating on teams, the child learns to sacrifice self-interest on behalf of the group

EXHIBIT 8

and to identify with the standards and expectations of the group. These are the building blocks for morality, social responsibility, and citizenship. When a child is deprived of these relationships and activities, they are more than stunted in their social skills, they are at risk of being morally stunted. Developing a functional morality is not simply a cognitive awareness of the rules. It requires identifying with and incorporating these reciprocal social commitments as a part of personality development. Deficiencies in these experiences have a nexus with criminal and violent behavior.

## 14.     Transcultural relocation

Three types of transcultural relocation are implicated in David's family and development: (1) Suk Cha's immigration from South Korea to the United States; (2) David's experience as a first generation Korean-American with the mixed and sometimes conflicting cultural expectations; and (3) David's middle childhood move to Germany and return to the U.S. almost five years later.

(1) Suk Cha's immigration from South Korea to the United States:

*Suk Cha was age 25 when she immigrated, while pregnant with David, to the United States.*

Implications of Suk Cha's immigration from South Korea to the United States:  Suk Cha's immigration in her early adulthood from South Korea to the United States was a significant adaptive challenge. Importantly, this adaptive demand followed a series of destabilizing events during her development. She had already experienced the wartime traumatic uprooting of her family from North to South Korea. She was subsequently abandoned by her stepmother and compelled to adapt to the punitive and rejecting household of her second stepmother. In late adolescence she was emancipated and without significant family support, in a culture where family cohesiveness and belonging are values of primary importance. Her foundation for a move to a profoundly different cultural context was thus fractured.

Suk Cha then immigrated to the United States alone, without accompanying family members or Korean compatriots who could have provided a nucleus of cultural continuity and emotional support (see Choi, 1997; Kim, 1999). This cultural isolation continued at Ft. Hood and in Panama. In fact, no sooner had she settled at Ft. Hood when Dombrowski got orders to Panama and they relocated there. Added to this were the stresses of pregnancy complications and then being a new mother. Rather than finding her marriage to Dombrowski a source of support (albeit not shared cultural support), it was unstable and abusive. The psychological stresses of such unsupported transitions for Suk Cha were immense. At best, she was in a "survival mode" (see Kim & Wolpin, 2008). Given her suicide attempt, planned to be in front of Dombrowski and her children, she was suffering from a mood disorder. Suk Cha's suicidality, volatility, and bonding failures likely emerged in part from these cross-cultural stresses interacting with the fractures of her development and marital/parenting demands.

EXHIBIT 8

Suk Cha also faced conflicting cultural expectations between Korean culture and American culture: e.g., family harmony vs. individual actualization; stoicism vs. expression of personal feelings and needs; shame at being singled out vs. seeking group recognition; etc. (see Kim & Wolpin, 2008).

*Runyon (adoptive father) testified to marital difficulties during the first six years of marriage to Suk Cha associated with "the culture difference," including differing parenting expectations, and his selfishness [J.A. 2894]*

(2) David's experience as a first generation Korean-American with the mixed and sometimes conflicting cultural expectations:

*David grew up in a household with a Korean national mother and an American father figure.*

Implications of David's experience as a first generation Korean-American with the mixed and sometimes conflicting cultural expectations: David grew up in a household that was at the intersection of two very different cultures. Because of the abandonment of Dombrowski and the passivity/withdrawal of his adoptive father (Runyon), Suk Cha's Korean cultural heritage would have dominated the home. The surrounding community, however, was western European (in Germany) or American. The many conflicting cultural norms and expectations (examples above) created additional challenges to David's ability to form a secure identity and stable value system.

(3) To and from Germany and Korea: *In the Fall of 1976, Runyon (adoptive father) received orders to Germany and relocated there from Ft. Hood, Texas with Suk Cha, David, and Mark. David attended continued Kindergarten there, attending school in Germany through 4th grade. The family then returned to the United States and Runyon was stationed at Ft. Leonard Wood, Missouri. In 1984, the family moved to Korea for one year, returning to the U.S. to Ft. Belvoir, Virginia.*

Implications of transcultural relocation to and from Germany: The above-described international relocation was only an aspect of the adaptation demands impinging on David during these early and middle childhood years. *In the 18 months preceding the move to Germany, David had returned with his mother and brother from Panama to Ft. Hood, separating from his father (Dombrowski). His parents divorced. Both parents remarried and he was faced with incorporating a new father figure. He started Kindergarten and lived in his adoptive grandparents' household. He and his family then moved to another country.* This is an extraordinary series of life changes that would tax the most emotionally resilient child having the most secure parental attachments. For David, these demands were accompanied by none of these supporting assets.

EXHIBIT 8

The cross-cultural re-entry from Germany was also a major adaptive challenge, not only for David, but also for his parents. Re-entry into a home culture after a period of years has been identified as a more difficult transition than going abroad (Adler, 1981).

<u>Implications of transcultural relocation to and from Korea:</u>  When the family was in Korea, Suk Cha had a volatile relationship with her family secondary to her appearance disrupting the plan of a sister to receive Suk Cha's share of an inheritance. Thus the extended family context for David was conflicted rather than supportive. Also problematic, *David and Mark were placed in a Korean school,* but had difficulty with the language barrier *and were moved to a school on base.* These experiences complicated David's identification of himself as Korean, as he did not fit in at school or his extended family. This was followed by another transcultural re-entry to the United States.

### *Summary:*

The above 14 major adverse developmental factors could have been provided to David's capital sentencing jury in an organized and coherent categorization – each described in anecdotal detail so that the jury could have a subjective appreciation of his experience as a child, and each accompanied by a description of the implications so that the jury would have an informed mechanism for determining their weight and nexus. Instead, the jury received a fragmented and disorganized picture of a portion of these. Those that the jury did hear evidence of, the anecdotal detail were inadequate or lacking. None were accompanied by testimony regarding their implications.

I was practicing as a licensed clinical and forensic psychologist in 2009 and was available to provide an evaluation of adverse factors in Mr. Runyon's background in addition to his violence risk if confined for life in prison. I have a vague recollection of meeting with Mr. Runyon's attorneys and explaining broad capital sentencing considerations (i.e., mitigation, adverse developmental factors) for which I could provide expert testimony, in addition to violence risk assessment for prison. Had I or someone with my experience been provided the above detailed supporting records, the same findings and conclusions as detailed above would have been reached and could have been offered in testimony detailing same at his sentencing phase.

I hereby declare under the penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 25th day of September, 2015 at Austin, Texas.

Mark D. Cunningham, Ph.D., ABPP

EXHIBIT 8

# REFERENCES

Adler, N. (1981). Re-entry: Managing cross-cultural transitions. *Group & Organizational Management, 6*, 341-356.

Ainsworth, M. D. S. (1979). Infant-mother attachment. *American Psychologist, 34*, 932-937.

Akiskal, H.S., Downs, J., Jordan, P., Watson, S., Daugherty, D., & Pruitt, D.B. (1985). Affective disorders in referred children and younger siblings of manic-depressives: Mode of onset and prospective course. *Archives of General Psychiatry, 42*, 996-1003

American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorders, Fourth edition, Text revision (DSM-IV-TR)*. Washington, DC: Author.

American Psychological Association (1996). *Effects of abuse on children*. Presidential Task Force on Violence and the Family. Author.

Begali, V. (1987). *Head injury in children and adolescents: A resource and review for school and allied professionals.* Brandon, Vermont: Clinical Psychology Publishing Co.

Burger v. Kemp, 483 U.S. 776 (1987)

Burton, L. A. and Volpe, V. T. (1988). Sex difference in emotional status of traumatically brain-injured patients. *Journal of Neurological Rehabilitation, 2*, 151-157.

California v. Brown, 479 U.S. 538 (1987)

Cantelon, S. L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.

Choi, G. (1997). Acculturative stress, social support, and depression in Korean American families. *Journal of Family Social Work, 2*, 81-97.

Coker v. Georgia, 433 US 584 (1977)

Crockenberg, S. (1987). Predictors and correlates of anger toward and punitive control of toddlers by adolescent mothers. *Child Development, 58*, 964-975.

Curtis, C. (1980). The psychological parent doctrine in custody disputes between foster parents and biological parents. *Columbia Journal of Law and Social Problems, 16,* 149-191.

EXHIBIT 8

Drake, R. E., & Vaillant, G. E. (1988). Predicting alcoholism and personality disorder in 33-year longitudinal study of children of alcoholics. *British Journal of Addiction, 83*, 799-807.

Elliott, F. A. (1987). Neuroanatomy and neurology of aggression. *Psychiatric Annals*, *17*, 385-388.

Franklin v. Lynaugh, 487 U.S. 164 (1988)

Green, A. H. (1988). The abused child and adolescent. In C. J. Kestenbaum & D. T. Williams (Eds.) *Handbook of clinical assessment of children and adolescents* (pp. 842-863). New York: New York University Press.

Halperin, S. M. (1983). Family perceptions of abused children and their siblings. *Child Abuse & Neglect, 7*, 107-115.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hershorn, M. & Rosenbaum, A. (1985). Children of marital violence: A closer look at the unintended victims. *American Journal of Orthopsychiatry, 55,* 260-266.

Jaffe, P. G., Hurley, D. J., & Wolfe, D. (1990). Children's observations of violence: Critical issues in child development and intervention planning. *The Canadian Journal of Psychiatry, 35*, 466-470.

Jaffe, P., Wolfe, D., Wilson, S., & Zak, L. (1986a). Family violence and child adjustment: A comparative analysis of girls' and boys' behavioral symptoms. *American Journal of Psychiatry, 143,* 74-76.

Jaffe, P., Wolfe, D., Wilson, S., & Zak, L. (1986b). Similarities in behavioral and social maladjustment among child victims and witnesses to family violence. *American Journal of Orthopsychiatry, 56,* 142-146.

Kelley, B. T., Thornberry, T. P., & Smith, C. A. (August, 1997). In the wake of childhood maltreatment. *Juvenile Justice Bulletin*. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.

Kim, O. (1999). Mediation effect of social support between ethnic attachment and loneliness in older Korean immigrants. *Research in Nursing & Health, 22,* 169-175

EXHIBIT 8

Kim, E. & Wolpin, S. (2008). The Korean American family: Adolescents versus parents acculturation to American culture. *Journal of Cultural Diversity, 15*, 108-116.

Klein, D.N., Depue, R.A., & Slater, J.F. (1985). Cyclothymia in the offspring of parents with bipolar affective disorder. *Journal of Abnormal Psychology, 94*, 115-127.

Langevin, R., Ben-Aron, M., Wortzman, G., Dickey, R., & Handy, L. (1987). Brain damage, diagnosis, and substance abuse among violent offenders. *Behavioral Sciences & the Law*, *5,* 77-94.

Lewis, M. (1985). Predicting psychopathology in 6 year olds from early parental relations. *Integrative Psychiatry*, *3*, 284-289.

Lewis, D., Pincus, J., Feldman, M., Jackson, L., & Bard, B. (1986). Psychiatric, neurological and psychoeducational chararcteristics of 15 death row inmates in the United States. *American Journal of Psychiatry, 143*, 838-845.

Lindqvist, P. (1991). Homicides committed by abusers of alcohol and illicit drugs. *British Journal of Addiction, 86,* 321-326.

Lockett v. Ohio, 438 U.S. 586, 604 (1978).

Lynch, M. A., & Roberts, J. (1982). *Consequences of child abuse*. San Diego, CA: Academic Press.

Maryland v. Craig, 497 U.S. 836 (1990)

Masten, A.S. & Garmezy, N. (1985). Risk, vulnerability, and protective factors in developmental psychopathology.   In *Advances in clinical child psychology:  Vol. 8* (pp. 1-52). New York: Plenum Press.

Matas, L., Arend, R. A., & Sroufe, L. A. (1978). Continuity of adaptation in the second year:  The relationship between quality of attachment and later competence.  *Child Development, 49,* 547-556.

McNeil, D. E., & Binder, R. L. (1991). Clinical assessment of risk of violence among psychiatric inpatients. *American Journal of Psychiatry, 148,* 1317-1321.

Meloy, J. R. (1988). *Psychopathic mind: origin, dynamics, and treatment.* Northvale, NJ: Aronson.

Meloy, J. R. (1988). *Psychopathic mind: Origin, dynamics, and treatment.* Northvale, NJ: Jason Aronson.

EXHIBIT 8

Milner, P.M. (1970). *Physiological psychology*. New York: Holt, Rinehart, and Winston.

Pardeck, J. T. (1983). Empirical analysis of behavioral and emotional problems of foster children as related to re-placement in care. *Child Abuse and Neglect*, 7, 75-78.

Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. *American Psychologist, 44,* 329-335.

Payne v. Tennessee, 501 U.S. 808 (1991)

Penry v. Lynaugh, 492 U.S. 302 (1989)

Perry, B. D. (2003). The brain: Effects of childhood trauma. Understanding Childhood Trauma Series. (Chief of Psychiatry at Texas Children's Hospital)

Pontius, A. A. (1972). Neurological aspects in some type of delinquency especially among juveniles: Toward a neurological model of ethical action. *Adolescents, 1972,* (7), 289-308.

Schwarz, E. D. and Perry, B. D. (1994). The post traumatic response in children and adolescents. *Psychiatric Clinics of North America, 17,* 311-358.

South Carolina v. Gathers, 490 U.S. 805 (1989)

Sroufe, L. A. (1979). The coherence of individual development: Early care, attachment, and subsequent developmental issues. *American Psychologist, 34,* 834-841.

Sroufe, L. A., & Waters, E. (1977). Attachment as an organizational construct." *Child Development, 48,* 1184-1199.

Stanton, J. (1969). Murderers on parole. *Crime and Delinquency, 15,* 149-155.

Streissguth, A. P., Aase, J. M., Clarren, S. K., Randels, S. P., LaDue, R. A., & Smith, D. F. (1991). Fetal alcohol syndrome in adolescents and adults. *Journal of the American Medical Association, 265,* 1961-1967.

Struve, J., (1990). Dancing with the patriarchy: The politics of sexual abuse. In *The Sexually Abused Male*. New York: Lexington Books.

Swanson, J. W., Holzer, C. E. III, Granju, V. K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. *Hospital and Community Psychiatry, 41,* 761-770.

EXHIBIT 8

Terr, L.C. (1991). Childhood traumas: An outline and overview. *American Journal of Psychiatry, 148 (1),* 10-20.

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders*, Juvenile Justice Bulletin*, Juvenile Justice Clearinghouse, Washington, D.C.

van der Kolk, B.A. (1996). The body keeps score: Approaches to the psychobiology of posttraumatic stress disorder. In B.A. van der Kolk, A.C. McFarlane, & L. Weisaeth. (Eds.) *Traumatic Stress: The effects of overwhelming experience on mind, body, and society.*

Waters, E., Wippman, J., & Sroufe, L. A. (1979). Attachment, positive affect, and competence in the peer group: Two studies in construct validation. *Child Development, 50,* 821-829.

West, M. O., & Prinz, R. J. (1987) Parental alcoholism and childhood psychopathology. *Psychological Bulletin, 102*, 204-218.

Widom, C.S. (1989). Child abuse, neglect, and adult behavior: Research design and findings on criminality, violence, and child abuse. *American Journal of Orthopsychiatric Association, 59,* 355-367.

Widom, C.S. (January, 2000). Childhood victimization: Early adversity, later psychopathology. *National Institute of Justice Journal*.

Woodson v. North Carolina, 438 US 304 (1976)

Yarrow, L. J., Goodwin, M.S., Manheimer, H., & Milowe, I. D. (1973). Infancy experiences and cognitive personality development at 10 years. In L.J. Stone, H.T. Smith, & L.B. Murphy (Eds.) (pp. 1274-1281), *The competent infant: Research and commentary*. New York: Basic Books

EXHIBIT 8