## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

UNITED STATES OF AMERICA,

-v-

DAVID ANTHONY RUNYON,
Defendant/Movant

No. 4:08-CR-00016

**CAPITAL § 2255 PROCEEDINGS**

HON. REBECCA BEACH SMITH

## MOVANT'S FIRST MOTION FOR DISCOVERY AND
## CONSOLIDATED MEMORANDUM OF LAW

Movant David Anthony Runyon, by counsel, hereby files his first motion for discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, the Equal Protection and Due Process clauses of the Fifth Amendment, and the Eighth Amendment. In this motion Runyon asks for the production of documents, for leave to propound interrogatories, and for subpoenas to third parties.

### Relevant Procedural History

On July 17, 2009, Runyon was found guilty in this Court of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a crime of violence.

1

Following an eligibility hearing and a separate sentence selection hearing, the jury on August 27, 2009, returned sentencing verdicts of death on the counts of conspiracy to commit murder for hire and murder with a firearm in relation to a crime of violence, and a sentencing verdict of life without possibility of release on the count of carjacking resulting in death.

On December 4, 2010, this Court formally sentenced Runyon to two death sentences and one sentence of life without possibility of release.

Runyon timely appealed these judgments to the United States Court of Appeals for the Fourth Circuit, which affirmed his convictions and sentences on February 25, 2013. *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013).

Runyon timely petitioned the United States Supreme Court for a writ of certiorari, which that Court denied. *Runyon v. United States*, 135 S. Ct. 46 (October 6, 2014) (Docket No. 13-254).

On October 5, 2015, Runyon filed in this Court a Motion for Relief Pursuant to 28 U.S.C. § 2255.

On October 6, 2015, this Court directed the United States to file a responsive pleading within 60 days. The Court subsequently granted an extension and directed the United States to respond by January 11, 2016.

## Rules Regarding Discovery

The Supreme Court mandates that district courts "arrange for procedures which will allow development ... of the facts relevant to disposition of a habeas corpus petition." *Harris v. Nelson*, 394 U.S. 286, 298 (1969). Facts are relevant when a discovery movant establishes the standard of "good cause." Pursuant to Rule 6(a) of the RULES GOVERNING SECTION 2255 PROCEEDINGS FOR

2

THE UNITED STATES DISTRICT COURTS: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(b) requires the party requesting discovery to "provide reasons for the request. The request must also include any proposed interrogatories and requests for admissions, and must specify any requested documents." The Advisory Committee Notes to Rule 6 of the § 2254 Rules, which are "fully applicable to discovery under the[] rules for § 2255 motions[,]"[1] direct that "when there is a showing of good cause why discovery should be allowed" the district court's discretion to grant discovery is "to be exercised[.]" Advisory Committee Notes to Rule 6, RULES GOVERNING SECTION 2254 CASES (1976).

"Good cause" for discovery exists when (1) the movant makes credible allegations of a constitutional violation; and (2) the requested discovery will enable the movant to investigate and prove his claims. *Bracy v. Gramley*, 520 U.S. 899, 904, 908-09 (1997). In *Bracy*, the Supreme Court noted the movant's allegations were "only a theory at this point" and "not supported by any solid evidence[.]" *Id.* at 908. The allegations, however, were specific enough to establish good cause for factual development even if the defendant ultimately "will be unable to obtain evidence sufficient" for actual relief. *Id.* at 909.

A sufficient showing of good cause, as required by Rule 6(a), therefore exists when a "petitioner makes a specific allegation that shows reason to believe that the petitioner *may* be able to demonstrate that he is entitled to relief." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (emphasis added), citing, *Harris v. Nelson*, 394 U.S. at 300. In *Blackledge v. Allison*, the Supreme Court described "specific factual allegations" as not "vague (or) conclusory," "palpably

---

[1] Advisory Committee Notes to Rule 6, RULES GOVERNING SECTION 2255 PROCEEDINGS (1976).

incredible," or "patently frivolous or false." 431 U.S. 63, 75-76 (1977) (internal quotation marks and citations omitted). A "plausible indication" that the discovery request "might demonstrate" an entitlement to relief satisfies Rule 6(a). *Hill v. Ozmit*, 339 F.3d 187, 201 (4th Cir. 2003). "More specifically, a petitioner must 'state what he hope[s] to find'" and how the information will "'help him prosecute his [action].'" *Lenz v. True*, 370 F. Supp. 2d 446, 455 n.2 (W.D. Va. 2005), quoting, *Smith v. United States*, 618 F.2d 507, 509 (8th Cir. 1980). When good cause is established, discovery must be allowed. *Harris*, 394 U.S. at 299-300; *see also id.* at 291 ("It is now established beyond the reach of reasonable dispute that the federal courts not only may grant evidentiary hearings to applicants, but must do so upon an appropriate showing."); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991) ("A court should grant discovery in its discretion where there is 'good cause' why discovery should be allowed.").

Once good cause is established, the type and scope of discovery is broad. A § 2255 motion is "a continuing part of the criminal proceeding" and the remedy is "analogous to habeas corpus by state prisoners" under § 2254, making both the civil and criminal discovery rules applicable. Advisory Committee Notes to Rule 6, RULES GOVERNING SECTION 2255 PROCEEDINGS (1976). In addition to formal discovery rules, "district court judges [are to] fashion their own rules in the context of individual cases." Advisory Committee Notes to Rule 6, RULES GOVERNING SECTION 2254 CASES (1976). This is consistent with the Supreme Court's decision in *Harris v. Nelson*, 394 U.S. at 300, which held:

> it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry. Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the 'usages and principles of law.'

Accordingly, "district courts have power to require discovery when essential to render a habeas corpus proceeding effective[.]" *Id.* at 300 n.7. This is never more so than in the context of a capital case, where the unique finality and irreversibility of the sentence require heightened procedural safeguards. *See, e.g., Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("The penalty of death is qualitatively different from any other sentence. We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.") (internal quotation marks and citation omitted).

For the reasons set forth below, Runyon has good cause for each item of requested discovery.

### Introduction and Instructions

This request invokes methods of discovery available under both the criminal and civil rules of procedure, including production of documents, interrogatories, and third party subpoenas.

Runyon requests an order requiring Respondent to produce and permit undersigned to inspect or copy documents in Respondent's possession, custody, or control at a time and in a manner designed to reasonably reduce any burden of production. Runyon requests exact copies of such documents (excluding duplicates) in either paper or electronic format (.pdf). Respondent need not produce the same document in more than one form. Both sides of any double-sided document must be provided. For spreadsheets, Runyon requests exact copies that display all horizontal and vertical gridlines and column headers. For electronic documents in audio format, Runyon requests

exact copies in MP3 format. For electronic documents in video format, Runyon requests exact copies in MPEG2 format.

The term "documents" is used in its broadest sense and includes copies, different versions, and drafts; and includes, without limitation: writings, drawings, graphs, charts, photographs, audiotapes, videotapes, CDs, DVDs, ledgers, records, diaries, receipts, forms, messages, notes, and any other data compilation (including messages and data stored in a computer, mobile device, or external storage device) from which information can be obtained.

A document "relating to" or "referring to" a given subject matter means a document or statement that constitutes, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, concerns, responds to, describes, analyzes, contains information concerning, or is in any way pertinent to, that subject matter.

If there is an objection to any document request or a failure to answer any document request on the grounds that either the attorney-client privilege or the work-product doctrine, or both, or any other claim of privilege applies, then as to such documents allegedly subject to such asserted privilege, the Respondent is requested to supply the following information: (i) the nature of the document; (ii) the sender or author; (iii) the sender's agency or institutional affiliation as shown on the document; (iv) the date of the document; (v) the name of each person to whom the original or any copy was circulated; (vi) the names occurring on any circulation list associated with such document; (vii) a summary statement of the subject matter of the document; and (viii) the privilege(s) claimed with respect to the document.

If in answering any of these document requests, Respondent encounters any ambiguity in construing the document request or any ambiguity in construing a definition or instruction relevant

6

to the document request, Respondent is requested to set forth the matter deemed ambiguous and the construction selected or used in answering the document request. In that regard, undersigned are available and willing to provide clarification regarding any discovery request.

As to any document previously destroyed, Respondent is requested to specify the author thereof, its date, its content, the identity of persons who received copies, and when and under what circumstances the document was destroyed. As to any destroyed document that was previously stored in electronic format, Respondent is additionally requested to identify the agency or company (if any) that may have a recoverable or archive copy of the document.

## **Specific Requests for Production of Documents**

### **I.    Information regarding the selection of jurors in this case.**

In Claim 16, Runyon has alleged that the trial prosecutors exercised peremptory challenges in violation of the Equal Protection clause because they struck 70 percent of the otherwise qualified African-American jurors on account of their race, and struck an overwhelming proportion of female jurors on account of their gender. Corroborating evidence of the prosecution's intent to use racial stereotyping in its jury selection decisions is the fact that the prosecution introduced a racially pejorative videotape at trial. The prosecution then defended that act by asserting that stereotypical comments about Runyon's ethnicity and religion were relevant aspects of Runyon's identity. *See United States v. Runyon*, 707 F.3d 475, 493-94 (4th Cir. 2013). Statistics and specific allegations regarding how race impermissibly influenced Runyon's death sentence are also set forth in Claim 12. The prosecutors' use of race-based or gender-based peremptory strikes may have been limited to this trial or may be part of a pattern of discriminatory striking in other cases.

7

It is unconstitutional either way, although the legal standards may vary. Runyon requests discovery to substantiate his claim under *Batson*'s first and third steps.

**Step One.** As the United States Supreme Court has made clear, a *prima facie* case of discrimination in jury selection is established at Step One if there is a "suspicion[]" of discrimination. *Johnson v. California*, 545 U.S. 162, 170, 172 (2005) (rejecting preponderance of the evidence standard and holding that a *prima facie* case is established by "producing evidence sufficient to permit the trial judge to draw an inference that discrimination occurred. . . . The *Batson* framework is designed to provide actual answers to suspicions and inferences that discrimination may have infected the jury selection process"). Through the combined effect of percentages and the prosecution's broader embrace of racial stereotypes, as alleged in the § 2255 motion, Runyon has alleged a *prima facie* case of race and gender discrimination, and has satisfied Step One.

**Step Two.** Under either a merits-based claim or an ineffective assistance claim, the burden is now on the United States to identify race-neutral and gender-neutral reasons for its peremptory strikes. Because the trial was more than six years ago, the prosecutors cannot credibly claim to remember any ephemeral reasons for these strikes, such as a particular juror rolling his eyes or having facial hair. Instead, the United States will have to consult the portions of the trial record that relate to jury selection (juror questionnaires and voir dire responses), and its own notes and documents about potential jurors.

**Step Three.** It will be Runyon's obligation to show that the reasons for strikes proffered by the United States are pretextual. To make such a showing, Runyon will need to examine the prosecutors' notes and documents to see how they took race and gender into consideration. A common indicator of pretext, although not the only one, is evidence that some Caucasians and/or

8

males—who the government chose not to remove—shared the characteristic identified by the prosecution as a basis for its peremptory strikes.[2] The prosecutors' notes and documents also may reveal race- or gender-related comments in the prosecutors' notes.

Runyon has also alleged that these prosecutors have exercised race- or gender-based strikes in at least one other capital case. Such a pattern is highly relevant to this Court's determination in Step Three. For instance, such a pattern of discrimination would be relevant when assessing the credibility of the reasons offered by the prosecution in Step Two for the use of their strikes against women, and thus is relevant to the overall determination of discrimination in the third step.

The information Runyon seeks to discover has been critical to the Supreme Court's consideration of claims that the government engaged in discrimination in its exercise of peremptory strikes. In *Foster v. Chapman*, No. 14-8349, for example, argued before the Supreme Court on November 1, 2015, habeas counsel obtained all of the prosecutors' notes and documents. This trove included a copy of the court's list of potential jurors, which the prosecutors had color-coded by race, and a draft affidavit from the prosecution's investigator relating his view that "if it comes down to having to pick one of the black jurors, [Marilyn] Garrett, might be okay." Merits

---

[2] Two of the most common tools used at Step Three of a *Batson* claim are presently unavailable to Runyon. One is a comparative juror analysis, which examines differences in the language, emphases, and follow-ups used by prosecutors when questioning jurors of color on voir dire, as compared with the way they question white jurors on the same issue. Because the Court not only conducted all of the oral voir dire, but also directed few questions to individual jurors, this window on the prosecutors' decision-making is closed. The other unavailable tool is juror interviews. The potential jurors were both witnesses to and participants in the jury selection process, and juror interviews have been helpful in cases in other jurisdictions. Runyon recognizes that he is prohibited from communicating with any jurors or potential jurors without permission from the Court, and he will continue to comply with the Court's order.

Brief of Petitioner, available at http://www.scotusblog.com/wp-content/uploads/2015/08/14-8349-ts.pdf.

In *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (*Miller-El I*), the Court noted that evidence of an office-wide culture of discrimination can be relevant to a *Batson* challenge, and it reaffirmed this proposition in *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*). Both *Miller-El* decisions demonstrate that discovery about past practice would be relevant to Runyon's claims.[3]

Accordingly, Runyon requests production of the following documents which he anticipates will provide additional proof that the prosecutors engaged in discriminatory practices in the selection of jurors:

**A.** Documents that singly or in aggregate identify all federal first-degree murder trials prosecuted in the Eastern District of Virginia since enactment of the Federal Death Penalty Act in 1994.

**B.** For each case listed in "A" above, identify those cases in which AUSA Lisa McKeel, Esq., and/or AUSA Brian Samuels, Esq., were part of the prosecution team.

**C.** For each case listed in "B" above for which any party alleged the discriminatory use of one or more peremptory strikes, Runyon requests (i) the trial transcript from the beginning of the oral voir dire through the swearing of the jury and (ii) all pleadings, motions, exhibits, rulings, orders, and opinions in the trial court that relate to the challenge to the peremptory strikes.

---

[3] Runyon's § 2255 motion alleges additional facts indicating that the discovery requested below might demonstrate an entitlement to relief on different grounds. Claim 16(B) alleges that trial counsel rendered ineffective assistance when they failed to make a *Batson* or *J.E.B.* objection even though there was a *prima facie* case of racial discrimination and gender discrimination in the selection of jurors. If these facts are true, Runyon is entitled to a new trial. It is anticipated that this discovery request will produce additional facts of the *Batson* and *J.E.B.* violations.

**D.** For each case listed in "B" above, identify whether the defendant presented a challenge in collateral proceedings to the government's allegedly discriminatory use of peremptory strikes, either directly or with respect to an allegation of ineffective assistance of counsel, prosecutorial misconduct, or other basis for relief.

**E.** For each case listed in "B" or "D" above (including Runyon's trial) for which any party alleged the discriminatory use of one or more peremptory strikes, Runyon requests production of all notes made by prosecutors, their agents, or their co-counsel during the oral voir dire and jury selection in that case.

**F.** For each case listed in "B" or "D" above (including Runyon's trial) for which any party alleged the discriminatory use of one or more peremptory strikes, Runyon requests production of all research, investigative reports, photographs, analyses, court records, law enforcement documents, spreadsheets, journals, cards, forms, notes, and other documents, including drafts of any documents, (i) that relate to the selection of jurors in that case; and (ii) that were made, collected, compiled, written, or used by prosecutors, their agents, or their co-counsel in preparation for oral voir dire and jury selection in that case. Documents that contain colored highlights, circles, or other marks should be produced in color. Documents that identify jurors or prospective jurors by name should be produced under seal, and should be placed in envelopes that are clearly labeled with the caption and docket number of the trial or collateral proceeding to which they relate. No envelope should contain documents related to more than one trial or collateral proceeding.

**G.** For Runyon's case, Runyon requests all juror lists, juror questionnaires, and portions of such lists or questionnaires in his case (i) to the extent they are not already produced

11

in response to requests (E) and (F) above, and (ii) to the extent they include writings, circles, highlights, or any other marks made by prosecutors, their agents, or their co-counsel. For this purpose, each version of a document with any unique marks is considered to be a different document. Documents that contain colored highlights, circles, or other marks should be produced in color. Documents that identify jurors or prospective jurors by name should be produced under seal, and should be placed in envelopes that are clearly labeled with the caption and docket number of the trial or collateral proceeding to which they relate. No envelope should contain documents related to more than one trial or collateral proceeding.

**H.** All training manuals that (i) address considerations for jury selection, including the use and/or defense of peremptory strikes; and (ii) that were available to McKeel or Samuels, or any other attorney or person who advised or assisted one or each of them with respect to jury selection in Runyon's case, at any time during that attorney's employment in any office of the United States Attorney.

Runyon has good cause to request this information because he anticipates it will provide highly probative evidence in support of the § 2255 motion that might demonstrate an entitlement to relief.

**II. Information regarding the application of the death penalty in this case.**

In Claim 12, Runyon alleges that the Federal Death Penalty Act is administered in a racially biased manner and the government improperly selected the death penalty for Runyon based upon his race. If these allegations are true, Runyon is entitled to a new trial or a reduction of his sentence to life in prison.

In *Wayte v. United States*, 470 U.S. 598 (1985), the Supreme Court held that "[i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards." *Id.* at 608 (footnote omitted). The same applies to Runyon's claims. To succeed on his claims, Runyon must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent.[4] *United States v. Armstrong*, 517 U.S. 456, 465 (1996). To obtain discovery Runyon need only allege "*some evidence* tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Id.*, 517 U.S. at 468 (emphasis added). This showing of some evidence satisfies the good cause standard under Rule 6.

Runyon's § 2255 motion asserts some evidence of discriminatory effect. Statistics provided in Claim 12 show the authorization process by which the Department of Justice selects defendants who will face the death penalty is impermissibly influenced by race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment. In addition, to undersigned counsel's knowledge, 35 out of the 44 death-authorized cases in the Eastern District of Virginia (80%) are prosecutions of African-American men. An overwhelming 42 out of 44 death-authorized cases in the Eastern District of Virginia (95%) are prosecutions of non-white men.[5] While Runyon has proffered compelling statistics about the disproportionate use of the federal death penalty against racial minorities, *McCleskey v.*

---

[4] Initially, Runyon can show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. 79, 94 (1986). The burden then shifts to the prosecution to defend its conduct. To do so, the government must offer concrete factual explanations. It "cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Id.*

[5] In addition to the 35 African-American men, five Hispanic men were death-authorized, two white men were death-authorized, and one Asian man (in addition to Runyon) was death-authorized. No women have been authorized for the death penalty in the Eastern District of Virginia.

*Kemp*, 481 U.S. 279 (1987), held that such statistics alone were insufficient to demonstrate discriminatory application of the death penalty. *McCleskey* does not mean that Runyon's statistical proffer does not warrant discovery, but that statistics alone may not be sufficient to prove his claim.

Runyon's § 2255 motion also specifically alleges some evidence of discriminatory intent. In this case, three co-defendants were charged with the same crimes and statutory aggravating circumstances, Runyon is the only non-white co-defendant, and he is the only co-defendant for whom death was sought.[6] The prosecution deliberately introduced Runyon's race and religion into the trial, conveying—what the Fourth Circuit described as—"frankly, stereotyping and insulting notions[.]" *Runyon*, 707 F.3d at 494. As discussed in Claim 16, the prosecution demonstrated a bias against persons of color when peremptory challenges were exercised against 70% of potential African-American jurors.

In *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998), an African-American defendant claimed that the government's decision to prosecute him in federal court instead of state court was discriminatory. The court recognized that "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue." *Id.* at 978. A defendant need only produce "some evidence" of discriminatory prosecution in order to obtain discovery. The "some evidence" standard reflects two competing considerations, although the first is primarily a pre-trial consideration:

> Forcing the defendant to come forward with some evidence to support a charge of selective prosecution protects the interests in open and frank discussions within prosecutorial offices; protects the government from harassment or delay by criminal defendants; and frees the judicial system of criminal trials [from] irrelevant massive discovery. At the same time, the relatively low burden recognizes that most

---

[6] All co-defendants were charged with two statutory aggravators under 18 U.S.C. § 3592(c)(8) and (c)(9), but Voss and Draven were charged with a third statutory aggravator under § 3592(c)(7). (ECF No. 3 pp. 13-14).

of the relevant proof in selective prosecution claims will normally be in the Government's hands.

*United States v. Heidecke*, 900 F.2d 1155, 1158 (7th Cir. 1990) (internal quotation marks and citations omitted).

In *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir. 1986), the Fourth Circuit determined that "[a] 'nonfrivolous showing' of both elements of the claim is sufficient to support a hearing and related discovery on selective prosecution." *Id.*, quoting, *Wayte*, 470 U.S. at 615 (Marshall, J., dissenting). The information sought below is in the exclusive possession of the government and may provide additional support for Runyon's non-frivolous claim. Runyon has satisfied the good cause requirement of Rule 6 by providing "plausible indication[s]" that the discovery requested below "might demonstrate" an entitlement to relief. *Hill v. Ozmit*, 339 F.3d at 201.

Runyon's § 2255 motion alleges additional facts indicating that the discovery requested below might demonstrate an entitlement to relief on different grounds. Claim 13 asserts violations of the Fifth and Eighth Amendments based on the arbitrary and disparate imposition of the death penalty in this case where two co-defendants did not face exposure to the death penalty. If these allegations are true, Runyon is entitled to a reduction of his sentence to life in prison.

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court established that the Eighth and Fourteenth Amendments do not tolerate the infliction of a death sentence under legal systems that permit the death penalty to be arbitrarily, capriciously and inconsistently imposed. *Id.* at 310. (Stewart, J., concurring). *Furman* established that "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and

15

those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *see also Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (*Furman* established that "if a State wishes to authorize capital punishment it has a constitutional responsibility to ... apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."). The same is true for the federal government.

The Constitution requires some form of meaningful review of death sentences to guard against arbitrary and inconsistent results. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976); *Proffitt v. Florida*, 428 U.S. 242, 258-60 (1976). Accordingly, courts must "carefully scrutinize" sentencing decisions "to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Spaziano v. Florida*, 468 U.S. at 460 n.7; *Zant v. Stephens*, 462 U.S. 862, 873-80 (1983) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."). When determining whether a death sentence is arbitrary, the Supreme Court has directed courts to evaluate a defendant's culpability both individually and in terms of the sentences of co-defendants and accomplices in the same case. *Enmund v. Florida*, 458 U.S. 782, 788, 798 (1982).

Runyon's § 2255 motion sets forth specific, plausible allegations of a constitutional violation involving the government's choice not to seek death against co-defendants Voss and Draven. The same two statutory aggravators were charged against Voss, Draven and Runyon and a third statutory aggravator was charged against Voss and Draven. (ECF No. 3 pp. 13-14). Voss

16

pled guilty but Draven, like Runyon, proceeded to trial. Draven and Voss were instrumental in planning the crime, Draven recruited Runyon for the crime, and Draven and Voss orchestrated the execution of the crime. Afterwards, Draven and Voss—and not Runyon—spent the proceeds of the crime ($100,000). Draven engaged in an orchestrated cover-up with Voss, he and Voss attempted to influence grand jury witnesses, Draven attempted to influence Runyon's statements to police, he and Voss lied to police for months, and Voss lied to military and federal officials and insurance providers in an attempt to receive additional proceeds from her husband's death.

In addition, as further alleged in Claim 2, the government possessed egregious facts regarding Draven's adjudicated and unadjudicated criminal conduct. The facts alleged in support of the "abuse of women" non-statutory aggravator used against Runyon pale in comparison to Draven's criminal history of sexually abusing children and his outstanding charges of second degree assault and deadly weapon with intent to injure resulting from his violent attack on a girlfriend.

These allegations establish good cause for factual development of this claim because additional information regarding the disparity in sentencing might demonstrate the absence of a valid penological reason for choosing to seek death against Runyon and not the two co-defendants. *See Spaziano v. Florida*, 468 U.S. at 460 n.7

For these reasons, Runyon requests production of the following documents which will enable him to investigate and demonstrate the unconstitutional, discriminatory application of the death sentence and the unconstitutional disparity of the death sentence:

17

**A.**    All policies, formal or informal, regarding selection of defendants for authorization of the federal death penalty in existence at any time since enactment of the Federal Death Penalty Act in 1994.

**B.**    All policies, formal or informal, relied upon in determining whether to authorize David Runyon for the death penalty in this case.

**C.**    All policies, formal or informal, relied upon in determining whether to authorize Michael Draven for the death penalty in this case.

**D.**    All policies, formal or informal, relied upon in determining whether to authorize Catherina Voss for the death penalty in this case.

**E.**    All documents regarding guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty in existence at any time since enactment of the Federal Death Penalty Act in 1994.

**F.**    All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the death penalty which were relied upon in determining whether to authorize David Runyon for the death penalty in this case.

**G.**    All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the death penalty which were relied upon in determining whether to authorize Michael Draven for the death penalty in this case.

**H.**    All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the death penalty which

18

were relied upon in determining whether to authorize Catherina Voss for the death penalty in this case.

**I.**       All written communication and/or documents between attorneys for David Runyon and the Department of Justice and/or the prosecuting attorneys in this case regarding the decision whether to authorize the death penalty for David Runyon.

**J.**       All written communication and/or documents between attorneys for Michael Draven and with the Department of Justice and/or the prosecuting attorneys in this case regarding the decision whether to authorize the death penalty for Michael Draven.

**K.**       All written communication and/or documents between attorneys for Catherina Voss and the Department of Justice and/or the prosecuting attorneys in this case regarding the decision whether to authorize the death penalty for Catherina Voss.

**L.**       All documents regarding mitigating and aggravating factors in David Runyon's background possessed by the government for purposes of deciding whether to pursue the death penalty. This includes, but is not limited to, documents the government obtained from any source or that the government generated in its background investigation of David Runyon for the purpose of assessing aggravating and mitigating factors. There is a good faith belief that such documents exist. For example, a federal agent called Runyon's mother "to talk about David RUNYON and his family background." (See Exhibit 1 p. 1 ¶2, ATF Report of Investigation dated Feb. 2, 2009). This conversation was documented as "Report Number 26." (*Id.*). The prosecutors also represented to the Court that "[t]he pre-indictment investigation conducted by the United States did not reveal a background of abuse or hospitalization of the defendant," and they indicated Runyon's counsel

19

had been provided "with voluminous background materials, including school, employment and military records." (ECF No. 181 p. 1 n.1).

**M.** All documents regarding mitigating and aggravating factors in Catherina Voss's background possessed by the government for purposes of deciding whether to pursue the death penalty.

Upon information and belief, similar to the background investigation of David Runyon, the government conducted a background investigation of Catherina Voss for the purpose of assessing aggravating and mitigating factors. The government provided a disk of documents, perhaps Disk 36, only to counsel for Voss. (Exhibit 2). This disk may contain information regarding mitigating and aggravating factors with respect to Voss.

**N.** All documents regarding mitigating and aggravating factors in Michael Draven's background possessed by the government for purposes of deciding whether to pursue the death penalty.

Upon information and belief, similar to the background investigation of David Runyon, the government conducted a background investigation of Michael Draven for the purpose of assessing aggravating and mitigating factors. The government provided a disk of documents, perhaps Disk 37, only to counsel for Draven. (Exhibit 2). This disk may contain information regarding mitigating and aggravating factors with respect to Draven.

Runyon has good cause to request this information because he anticipates he will receive information demonstrating that aggravating factors existed for Voss and Draven which warranted authorization of the death penalty for each, thus illustrating the arbitrary and disparate application

20

of the death penalty in this case. This "might demonstrate" an entitlement to relief. *Hill v. Ozmit*, 339 F.3d at 201.

### III.     Information regarding co-defendants Michael Draven and Catherina Voss.

In Claim 2, Runyon has alleged that the prosecution failed to disclose evidence material to Runyon's case in mitigation.  If these allegations are true, Runyon is entitled to new eligibility and selection proceedings.

When the prosecution withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation has three elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, *i.e.*, it must have prejudiced the defense at trial. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). In this case, materiality is determined under "the far lesser standard that a defendant must satisfy to qualify evidence as mitigating in a penalty hearing in a capital case." *Cone v. Bell*, 556 U.S. 449, 474 (2009).

"[T]he prosecutorial obligation to turn over material exculpatory or impeachment evidence continues throughout the judicial process," *Carter v. Bigelow*, 787 F.3d 1269, 1282 (10th Cir. 2015) (internal quotation marks and citation omitted), and Runyon specifically requests discovery

21

regarding information believed to be within the government's possession. The requested information might demonstrate that Runyon is entitled to relief on his *Brady* claim.[7]

As set forth in Claim 2, the "centerpiece" of counsel's mitigation case was the "equally-culpable" mitigating circumstance.

> Indeed, Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven. In particular, the defense introduced Cat's plea agreement and the accompanying statement of facts, which recited her role in the crime in stark detail, and argued vigorously and repeatedly before the jury that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence.

*Runyon*, 707 F.3d at 508.

Trial counsel did not, however, know that co-defendant Draven has an extensive history of violent criminal conduct including the sexual assault of children; Draven was placed in a residential facility for child sexual assault; and, Draven has been diagnosed with Pedophilia. This information could have transformed the "equally-culpable" mitigating circumstance into a "greater culpability" mitigator if for no other reason than Draven's motive for the crime was to have Voss and her small children to himself.

---

[7] To the extent that counsel was ineffective for failing to investigate and present the information requested, this discovery request is properly granted for Claims 4 and 6 of Runyon's § 2255 motion. In those claims, Runyon must demonstrate that counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). Runyon has alleged that counsel failed to advocate for Runyon at the eligibility phase by not presenting evidence and argument removing or reducing the weight of the "substantial planning" statutory aggravating circumstance, and, at the penalty phase, counsel failed to investigate and present evidence to counter the aggravating circumstances with facts reducing the weight of the aggravators and evidence to substantiate mitigating circumstances. If the facts set forth in either Claim 4 or Claim 6 are true, Runyon is entitled to a new sentencing hearing.

Before Draven's sentencing hearing, but more than two months after the jury's verdict for death in Runyon's case, the government revealed to Draven's counsel that Draven "sexually assaulted / abused / stalked or otherwise assaulted a number of individuals, including his younger brother and sister," and asserted: "Certainly a history of violence and sexual assault by a defendant who has been convicted of a conspiracy to commit murder is relevant to the imposition of punishment." (ECF No. 301 p. 5). The government said it possessed "sworn testimony" and "source documents" on Draven's violent and sexual proclivities but did not provide this information to Runyon's counsel. (*Id.*, p. 6).

Information possessed by the government also included Draven's history of violence toward women and an instance of threatening to harm a man. This information would have supported Runyon's mitigation case especially since the prosecutors urged the death penalty for Runyon based on one misdemeanor conviction for grabbing his wife's arm and poking her nose, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. There is a reasonable probability that one or more jurors would not have sentenced Runyon to death if presented with evidence that Draven had a far more violent past of severely abusing, not only his girlfriends, but the most-vulnerable victims (children and impaired persons) and he carried with him the specter of a far more violent future.

For these reasons, Runyon requests production of the following documents and he anticipates this discovery will show the information was in the prosecution's possession and was favorable and material to Runyon's mitigation defense:

**A.**      All documents in the government's possession related to Michael Draven's history of sexually abusing others, including, but not limited to, police reports, Draven's court

23

records, Draven's social services records, Draven's treatment center records, Draven's medical and mental health records, and victim statements. This request specifically includes, but is not limited to, records from:

1.      Shenandoah County Department of Social Services

2.      Newport News Department of Social Services

3.      The Pines Residential Treatment Center

4.      Northwestern Community Services Board

5.      Shenandoah Valley Sex Offender Treatment Program

6.      Newport News Child Protective Services Department

7.      Newport News Juvenile Detention Center records

Runyon anticipates this request will produce information substantiating Michael Draven's history as a sexual predator, including sexual abuse of: a five-year-old girl; two six-year-old boys; his six-year-old brother and his four-year-old sister; a five-year-old child; and, a developmentally delayed 15-year-old girl. This information would have supported Runyon's mitigation defense and might demonstrate an entitlement to relief.

**B.**     All documents in the government's possession related to Michael Draven and incidents of domestic violence and/or assault and other violent or threatening behavior. This request includes all "source documents" referenced in the prosecution's sentencing memorandum for Draven. (ECF No. 301 p. 6). This request also specifically includes, but is not limited to, the following incidents involving persons identified in a separate, sealed addendum (ECF No. 490) to this request:

24

1.      second-degree assault and/or counts of deadly weapon with intent to injure and/or intimidation and/or threats of death or bodily injury regarding C.R.

2.      intimidation and/or harassment regarding A.D.

3.      assault and/or intimidation and/or harassment and/or bomb threats and/or threats of death or bodily injury regarding A.E. and/or J. E.

4.      intimidation and/or threats of physical violence against M.L.

Runyon anticipates this request will produce information substantiating Draven's serious incidents of violence and threats of violence against others that would have supported Runyon's mitigation defense and might demonstrate an entitlement to relief.

**C.**      All testimony in the government's possession regarding Michael Draven's violent and/or threatening behavior and/or physical, emotional, and/or sexual abuse of persons. This request includes all "sworn testimony" referenced in the prosecution's sentencing memorandum for Draven. (ECF No. 301 p. 6). Upon information and belief, C.R. and J.H. testified at the grand jury in this case and the prosecution called other witnesses before the grand jury to establish evidence in aggravation against the defendants (including Michael Draven). This request includes, but is not limited to, such grand jury testimony, as well as any testimony of Draven's former-girlfriend J.W., M.L., A.E., J.E., and former-girlfriend A.D..

Runyon has good cause to request this information because he anticipates receiving information substantiating Michael Draven's history of violence, threats of violence, and sexual assault and this information would have supported Runyon's mitigation defense and might demonstrate an entitlement to relief.

25

**IV.     Information on the illegal activities of Posey and Ford.**

Claim 1 alleges that Clifford Dean Posey (ATF Special Agent), and Robert Glenn Ford (Runyon's investigator) were engaged in illegal conduct involving dishonesty, including falsifying documents and providing false statements and/or testimony, and were under federal investigation during their involvement with this case.

Discovery will provide the only way to prove the allegations of prosecutorial misconduct in Claim 1. *Banks v. Dretke*, 540 U.S. 668, 675 (2005) (court ordered discovery permitted "long suppressed evidence" to come to light); *Strickler v. Greene*, 527 U.S. at 278 (district court's grant of discovery of "all of the police and prosecution files in the case" led to counsel's uncovering prior inconsistent statements by witnesses); *White v. Helling*, 194 F.3d 937, 943 (8th Cir. 1999) (discovery of "notes and memoranda from police files"); *Cherrix v. True*, 177 F. Supp. 2d 485, 493 (E.D. Va. 2001) (discovery of documents in the custody of the police department concerning the murder).

**A.**     Clifford Dean Posey, Special Agent of the Bureau of Alcohol, Tobacco, and Firearms, was noticed as one of the prosecution's witnesses. He investigated Cory Voss's death and developed evidence for prosecution, including transcriptions of telephone calls, one of which was admitted into evidence. (Gov't Tr. Ex. 181, 181B-002). Posey's name also appears on documents the United States provided to trial counsel. (Exhibit 3, fax listing Posey as witness).

After the government procured a death sentence against Runyon, it brought charges against Posey. *United States v. Posey*, No. 3:11-cr-94 (E.D. Va.). Based on the indictment, since 2007, Posey engaged in wire fraud, embezzlement of public property, making and submitting false statements about ATF investigations, and money laundering. (*Id.* ECF No. 3 pp. 3, 9, 12-13). Posey

26

made false statements about government investigations and "began falsifying documents relating to firearms [] to embezzle and convert them to his own use." (*Id.*, pp. 3, 12-13). He used his status as a law enforcement officer to gain access to investigative information via "wire and radio communication." (*Id.*, pp. 7-8). Posey acknowledged his guilt. (*Id.*, ECF No. 13 pp. 49-50).

Posey was convicted of acts of dishonesty related to his unique access to communications via "wire and radio communication." Those acts occurred "not later than in 2007," (*Id.*, ECF No. 14 p. 64), and throughout his involvement in this case. Runyon does not know the extent of Posey's involvement in his case, but is aware that Posey transcribed telephone calls in November 2007, at least one of which was admitted into evidence during Runyon's trial. The prosecution's case against Runyon rested in no small part on telephone and internet communications. Runyon believes, but cannot yet confirm, that Posey played a substantial behind-the-scenes role in investigating and preparing the evidence in this case. In addition, there has always been an issue in this case regarding Runyon's firearms that were kept in the storage facility searched by authorities but never produced. Ballistics evidence might have shown that the bullets in this case were not fired from any of Runyon's firearms but his firearms went missing. The prosecution did not produce a murder weapon at trial.

Good cause exists to discover the scope and nature of Posey's work relating to the death of Cory Voss and to discover all evidence related to the government's investigation of Posey. This evidence is relevant to Runyon's *Brady* claim that the government failed to disclose exculpatory evidence undercutting its case in chief and might demonstrate entitlement to relief. Runyon respectfully requests the Court enter an order for the following documents:

27

1.      All documents in the government's possession (including, but not limited to, ATF, DOJ, NCIS, USAO) that both refer or relate to Clifford Dean Posey and the investigation and/or prosecution of David Runyon, Michael Draven and/or Catherina Voss.

2.      All documents in the government's possession (including, but not limited to, ATF, DOJ, NCIS, USAO) that refer or relate to Clifford Dean Posey's involvement in the investigation and/or prosecution of David Runyon, Michael Draven and/or Catherina Voss.

3.      All documents in the government's possession (including, but not limited to, ATF, DOJ, NCIS, USAO) that both were created in whole or in part by Clifford Dean Posey and relate to the investigation and/or prosecution of David Runyon, Michael Draven and/or Catherina Voss.

4.      All documents in the government's possession relating to the recusal of all or part of the United States Attorney's Office for the Eastern District of Virginia from the prosecution of Clifford Dean Posey. This includes, but is not limited to, all documents prepared in connection with, or submitted in accordance with, 3-2.170 (Recusals) of the United States Attorneys Manual.

**B.**     The government possessed information about Robert Glenn Ford's illegal activities as early as November 7, 2008, at which time Ford was Runyon's investigator for this case. *See United States v. Adams*, No. 2:08-cr-103 (E.D. Va.), ECF No. 37 pp. 2-3. Before his retirement from the Norfolk Police Department in 2007, Ford was accepting bribes from criminal defendants

28

in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations. *Id.*

As set forth in Claim 1, the government was obligated to inform Runyon's counsel of Runyon's criminal activity and impending prosecution. If Ford accepted bribes from potential witnesses or made false statements to Runyon's counsel, they would have been given inaccurate information about the facts that shaped their view of the case and perhaps informed their decisions, thus depriving Runyon of a fair trial.

Good cause exists to discover the scope and nature of Ford's criminal acts involving dishonesty and to determine when the government first knew or should have known such information. This evidence is relevant to the government's failure to disclose such information to Runyon's trial attorneys and it might demonstrate entitlement to relief. This information will also indicate when Runyon's counsel knew or should have known about Ford's history of dishonesty and might demonstrate entitlement to relief based on the ineffective assistance of counsel. Runyon respectfully requests the Court enter an order for the following documents:

1.  All documents in the government's possession that both refer or relate to Robert Glenn Ford and this case (4:08-cr-00016).

### Specific Requests for Interrogatories

Runyon incorporates here by reference the reasons why he has shown good cause to engage in discovery. In addition to his requests for production of documents, he also asks the Court to grant him leave to propound the following interrogatories:

1.  Identify the individuals who, on behalf of the United States, including but not limited to the office of the United States Attorney for the Eastern District of

29

Virginia, the Federal Bureau of Investigation, and/or the Bureau of Alcohol Tobacco and Firearms, conducted an investigation into the mitigating and/or aggravating factors in David Runyon's background, or who generated a report about mitigating and/or aggravating factors in David Runyon's background. For each such individual, provide the person's name, his or her most recently known contact information, the government entities for which the person performed the investigation or to which he submitted his report, and a brief description of that person's relevant work, such as, "interviewed David Runyon's brother and talked about abuse by their biological father," or "reviewed court and criminal history records and produced a report about charges alleged against Runyon."

2. Identify the individuals who, on behalf of the United States, including but not limited to the office of the United States Attorney for the Eastern District of Virginia, the Federal Bureau of Investigation, and/or the Bureau of Alcohol Tobacco and Firearms, conducted an investigation into the mitigating and/or aggravating factors in Michael Draven's background, or who generated a report about mitigating and/or aggravating factors in Michael Draven's background. For each such individual, provide the person's name, his or her most recently known contact information, the government entities for which the person performed the investigation or to which he submitted his report, and a brief description of that person's relevant work.

3. Identify the individuals who, on behalf of the United States, including but not limited to the office of the United States Attorney for the Eastern District of

30

Virginia, the Federal Bureau of Investigation, and/or the Bureau of Alcohol Tobacco and Firearms, conducted an investigation into the mitigating and/or aggravating factors in Catherina Voss' background, or who generated a report about mitigating and/or aggravating factors in Catherina Voss' background. For each such individual, provide the person's name, his or her or most recently known contact information, the government entities for which the person performed the investigation or to which he submitted his report, and a brief description of that person's relevant work.

4.      Identify each law enforcement officer and each government attorney who supervised Clifford Dean Posey with respect to Posey's work related to the investigation of Cory Voss' death and/or the prosecution of David Runyon, Michael Draven, and Catherina Voss. For each officer or attorney, provide the person's name, his or her or most recently known contact information, the government entities for which the person performed the investigation or to which he submitted his report, and a brief description of that person's relevant work with respect to the supervision of Posey.

5.      Identify each of the firearms which the government suspected, knew, and/or proved were misappropriated by Clifford Dean Posey or that otherwise relate to Posey's misconduct. For each such firearm, provide the serial number, make, model, and all known identifying characteristics, such as "blued barrel," "squirrel carved on wooden stock," "laser sight," and the like.

31

6.    Identify all law enforcement personnel, government attorneys, and criminal defense attorneys known by the government to have had knowledge, either directly or indirectly, about the investigation and/or prosecution of Clifford Dean Posey at any time between and including January 1, 2006, and April 6, 2011, the latter being the date the indictment of Posey was unsealed. For each such individual, provide the person's name, his or her or most recently known contact information, the individual's position(s) at the time he or she had knowledge about this investigation or prosecution, the approximate date when the individual learned about the investigation and/or prosecution of Posey, and a brief description of the information known to that individual about the investigation or prosecution of Posey.

7.    Identify all law enforcement personnel, government attorneys, and criminal defense attorneys known by the government to have had knowledge, either directly or indirectly, about the investigation and/or prosecution of Robert Glenn Ford at any time between and including February 13, 2008, which is the date the indictment of David Runyon was unsealed, and May 10, 2010, which is the date the indictment of Ford was unsealed. For each such individual, provide the person's name, his or her or most recently known contact information, the individual's position(s) at the time he or she had knowledge about this investigation or prosecution, whether the person was present at the November 7, 2008, debriefing of Marcus Adams (Docket No. 2:08-cr-103), the approximate

32

date when the individual learned about the investigation and/or prosecution of Ford, and a brief description of the relevant information known to that individual.

8.   Identify all law enforcement personnel and government attorneys known by the government to have had knowledge, either directly or indirectly, that Ford was providing investigative assistance to David Runyon's defense attorneys at any time between and including February 13, 2008, which is the date the indictment of David Runyon was unsealed, and May 10, 2010, which is the date the Ford indictment was unsealed.  For each such individual, provide the person's name, his or her or most recently known contact information, the individual's position(s) at the time he or she had knowledge about Ford providing investigative assistance to Runyon's defense attorneys, and the approximate date when the individual learned that Ford was providing or had agreed to provide any investigative assistance to David Runyon's defense attorneys.

## Specific Requests for Subpoenas

### I.   Medical and mental health information related to David Runyon.

Runyon moves the Court for an order directing the issuance of a subpoena to the Portsmouth City Jail, through the Portsmouth Sheriff's Office, and Paul Bell, Medical Director, Portsmouth Sheriff's Office, 701 Crawford Street, Portsmouth, VA 23704, to produce any and all medical records and mental health records pertaining to David Runyon over which they have custody and/or possession. This request includes any parties or entities relied upon by the Portsmouth City Jail and the Portsmouth Sheriff's Office to provide medical treatment and/or mental health treatment and/or to maintain medical and/or mental health records.

33

Claims 4, 5, and 6 of Runyon's § 2255 motion allege trial counsel was ineffective: at the eligibility phase, for not advocating for Runyon by presenting evidence and argument removing or reducing the weight of the "substantial planning" statutory aggravating circumstance; at the penalty phase, for failing to investigate and present evidence to counter the aggravating circumstances with facts reducing the weight of the aggravators and evidence to substantiate mitigating circumstances; and, pre-trial, for failing to raise the issue of Runyon's competence to proceed to trial. Specifically, Runyon alleges counsel failed to conduct a constitutionally adequate investigation into Runyon's mental illness and brain damage and failed to present compelling mental health evidence at sentencing.

To prevail on those claims, Runyon must demonstrate that counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). Ineffectiveness for failing to investigate and present evidence of mental illness is a common ground for relief in a collateral setting, s*ee*, *e.g.*, *Wiggins v.* Smith, 539 U.S. 510 (2003), and trial counsel has been found ineffective for failing to investigate and present evidence of a defendant's psychotic disorder where the disorder was established in part by incarceration records. *Pruitt v. Neal*, 788 F.3d 248 (7th Cir. 2015).

In support of these claims, Runyon's § 2255 motion includes evidence suggesting he was mentally ill and brain damaged prior to trial and that counsel should have investigated and informed the court and jury about the effects of those conditions on Runyon's mental state and culpability. Before trial, a mental health expert informed counsel that Runyon "was either in a fantasy world of grandiose wishful thinking or suffering from delusions." (ECF No. 478-2 p. 2). Mental health experts have determined that Runyon has significant brain damage, PTSD, and a

34

psychotic disorder. (ECF Nos. 478-2, 478-29, 478-35). It should have been evident before trial that Runyon was suffering a combination of effects from an extremely difficult childhood, brain damage, and multiple major psychiatric disorders. (ECF No. 478-29 p. 2). Had counsel adequately investigated Runyon's mental health, such evidence would have established two statutory mitigating circumstances. If the facts set forth in either Claims 4, 5, or 6 are true, Runyon is entitled to a new trial, new eligibility and/or new sentencing hearing.

Runyon was held in the Portsmouth City Jail from approximately March 4, 2008 until January 7, 2010. Trial counsel Babineau received four pages of records from the jail indicating Runyon was exhibiting signs of a delusional disorder and possibly other serious mental disorders. (ECF No. 478-16). The mental health notes indicate that Runyon was to be re-evaluated in one week but the records produced pre-trial by the Portsmouth City Jail do not include the results of that evaluation or any other subsequent observations or treatment. (ECF No. 478-16 p. 4). To the extent counsel failed to follow-up on the records requested from the Portsmouth City Jail, counsel rendered ineffective assistance.

Runyon anticipates that the medical and mental health records from Runyon's pre-trial incarceration may also support Claim 13 regarding the disproportionate and arbitrary imposition of the death penalty because Runyon's serious mental illness and brain damage illustrates his lesser-culpability vis-à-vis the two co-defendants who escaped death-authorization. The same records may also support Claim 14 which asserts that because Runyon is severely mentally ill, the death sentence constitutes cruel and unusual punishment under the Eighth Amendment. If the allegations asserted in either Claim 13 or Claim 14 are true, Runyon is entitled to sentencing relief.

35

Runyon's current defense team has attempted to obtain a complete copy of Runyon's records while he was held in custody of the Portsmouth Sheriff's Office. This request included medical and mental health records. (Exhibit 4, Oct. 23, 2015 letter). The Portsmouth Sheriff's Office advised that requests for medical records should be submitted to Paul Bell, Medical Director, Portsmouth Sheriff's Office. Runyon submitted a request to the medical director, (Exhibit 5, Nov. 3, 2015 fax), but, to date, has received no response. Due to inaction by the records custodian, Runyon requires the Court's assistance to obtain his medical and mental health records. This Court's authority to order state officials to produce documents is firmly established. *Cherrix v. Braxton*, 131 F. Supp. 2d 756, 780 (E.D. Va. 2001).

Runyon has good cause to request the medical and mental health records generated during Runyon's pretrial incarceration period because they could provide highly probative evidence in support of the § 2255 motion that might demonstrate an entitlement to relief. Wherefore, Runyon respectfully requests the Court issue an order as follows:

**A.** A subpoena to the Portsmouth City Jail, through the Portsmouth Sheriff's Office, and Paul Bell, Medical Director, Portsmouth Sheriff's Office, 701 Crawford Street, Portsmouth, VA 23704, to produce a complete copy of David Runyon's medical and mental health records over which they have custody and/or possession.

### Conclusion

Wherefore, for all the above reasons and those contained in the § 2255 motion, Runyon respectfully requests the following relief:

1. That the Court grant Runyon's requests for the United States to produce the documents described above;

2.      That the Court grant Runyon leave to propound the interrogatories identified above;

3.      That the Court issue an order for the subpoenas identified above;

4.      That if the United States objects to any item of requested discovery, it provide a written response;

5.      That any such written objections include precise descriptions of the documents or things about which the United States objects, along with a description of any withheld item or document, in conformity with Fed. R. Civ. P. 26(b)(5);

6.      That the Court permit Runyon to file a reply following receipt of the United States' response;

7.      That the Court hear argument on this discovery motion;

8.      That the Court conduct an evidentiary hearing on any material fact in controversy that is relevant to the disposition of this discovery motion; and,

9.      That the Court grant this motion in all respects.

Respectfully Submitted,

_____/s/_____

Dana Hansen Chavis, *pro hac vice*           Michele J. Brace, VSB No. 36748
Federal Defender Services                    Virginia Capital Representation
 of Eastern Tennessee, Inc.                   Resource Center
800 S. Gay Street, Suite 2400                2421 Ivy Road, Suite 301
Knoxville, TN 37929                          Charlottesville, VA 22903
Telephone (865) 637-7979                     Telephone (434) 817-2970
Dana_Hansen@fd.org                           mbrace@mindsort.com

Dated: December 9, 2015

37

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2015, I have electronically filed the foregoing Movant's First Motion For Discovery And Consolidated Memorandum Of Law with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
(757) 591-4032
Brian.Samuels@usdoj.gov

Lisa Rae McKeel
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons Suite 300
Newport News, VA 23606
(757) 591-4040
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
Phone: (757) 591-4000
JZick@usa.doj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com
*Counsel for Defendant/Movant*
*David Anthony Runyon*