## DECLARATION OF SHEILA CRONIN

1. My name is Sheila Cronin. I have over 25 years of experience as a psychiatric social worker. I began working as an investigator in 1996. At the time I became involved in David Runyon's capital case, I had over eight years of experience in capital case mitigation work.

2. In April 2008, attorney Jon Babineau hired me as a mitigation specialist to work on David Runyon's federal capital case. My job was to collect records and conduct interviews regarding Runyon's social history, and amass mitigation evidence for trial. I also provided recommendations regarding areas for exploration by mental health experts.

3. Robert Glenn Ford was an investigator who was also hired by Runyon's defense counsel. Witnesses were spread across the continental United States, as well as Alaska and Hawaii, so Ford and I collaborated to complete as many interviews as possible before trial. Ford did not have much mitigation experience and I often provided him a list of questions to ask witnesses. Both Ford

EXHIBIT 4

and I kept Runyon's defense counsel apprised of our witness interviews.

4. During the time I was working with Ford, he was under considerable stress from the fall-out of the infamous "Norfolk Four" case, a rape-murder case that resulted in the wrongful conviction of four men. A non-fiction book had recently been published detailing Ford's involvement, including obtaining coerced confessions from two of the defendants.

5. I also provided defense counsel with status updates on the investigation including summaries of the records we had received.

6. In the midst of the guilt-phase of trial, counsel requested that I prepare an affidavit describing the status of the mitigation investigation. I have been informed by Runyon's current counsel that my affidavit is attached as sealed Exhibit A to a motion to continue the capital sentencing hearing, ECF No. 240.

7. My observations of Runyon are that he had a calm, soft-spoken demeanor and appeared unhealthy, almost anemic. He over idealized his family life, had impaired reality testing, and exhibited extremely poor judgment. He was markedly grandiose.

EXHIBIT 4

Runyon often compared himself to great figures in history. I thought these references were sad. Counsel Woodward thought they were funny. Runyon repeatedly talked about how many lives he had saved. After a member of his defense team visited with Runyon in jail, he would write a letter detailing the discussion. It was as if he felt he had not gotten his point across during the visit. Runyon's letters had a rambling quality. Attached to this declaration as Exhibit A is an example of such a letter; it contains a list describing how he saved the lives of seven people. We clearly needed the assistance of mental health experts.

8. Runyon's mother had a history of severe trauma, was unstable, and likely suffered from bipolar disorder. There were obvious problems with how she raised Runyon. Essentially, she emasculated Runyon. Runyon's adoptive father was emotionally remote and exhibited no affection towards Runyon. His trial testimony could be fairly described as "throwing Runyon under the bus." His demeanor was very cold and he had no compassion for Runyon at all. Runyon spent his childhood and adult life

EXHIBIT 4

trying to please his parents, make them proud, and earn their approval.

9. A sad component of Runyon's life is that every time he tried to achieve something, he underachieved or was fired from a job. He had multiple failed career attempts. He also had a series of failed relationships because he chose women who, like his mother, were mentally unstable.

10.    Runyon appeared to perform relatively well in the military until late 1996, when he was involved in a serious head on collision with a drunk driver. I tried to obtain medical records from the civilian hospital where Runyon was transported and treated but was unsuccessful. I did, however, obtain Runyon's military medical records from 1994 – 1997. The records document that Runyon sought follow-up treatment for effects of the accident. Runyon suffered from vertigo, short-term memory loss, headaches, insomnia, and a personality change. David's ex-wife reported a change in David's personality in that he was less able to cope and deal with frustration; he was much more irritable and short-fused. David's former employer at the Fayetteville Police Department (a

EXHIBIT 4

position he obtained after his Army discharge) said that David constantly forgot things and had to have instructions repeated. The military records contain diagnoses of Post-Traumatic Stress Syndrome/Disorder, depression and anxiety. I summarized those records for counsel. I also suggested to counsel that neuropsychological testing might clarify if Runyon's symptoms and behavioral changes were related to the closed head injury, PTSD, or both.

11.    Runyon loved his son very much. He also loved Maria's children as if they were his own. Witness accounts were overwhelming consistent regarding Runyon's parenting skills and ability to relate to children. He was universally described as a great father and a person who was loved by children who knew him.

12.    This case was extremely difficult for me to work on. I had very little communication with counsel. I remember Woodward remarked about mitigation, "we'll throw a couple of relatives on the stand and that will be enough." Hudgins was a very nice person. He was primarily responsible for the penalty phase. I felt

Page 5 of 8

EXHIBIT 4

bad for him because having to prepare for the penalty phase in just four months seemed to overwhelm him. I had a very difficult time getting in touch with Hudgins.

13.     I remember that counsel seemed to pursue mental health evidence throughout the guilt phase of trial and up to the beginning of the penalty phase. Counsel did not share with me the reports from Dr. Mirsky or Dr. Merikangas and I don't remember if I ever knew what the reports said.

14.     Witness preparation for the penalty phase was unlike any I've experienced in a capital case. All the witnesses were from out of state. They were brought to Virginia the weekend before the penalty phase was scheduled to begin. There was not enough time to speak with all of the witnesses about their testimony.

15.     I observed the trial. At one point during the penalty phase, the Judge chastised Hudgins. That seemed to be the final straw for Hudgins. In my view, he essentially quit. I heard Hudgins ask Woodward to present the closing argument. There were mitigation witnesses that had been flown in for the trial, who were ready to testify, but who were not called as witnesses.

Page **6** of **8**

EXHIBIT 4

16.     I remember that Runyon wrote constantly throughout the trial. I would characterize it as excessive or obsessive. I did not look at the content of his writings. It concerned me, particularly when Runyon continued to write during the testimony of the victim's mother. I wanted him to stop writing but I was not sitting close enough to counsel's table to communicate that message. It has been the practice in other capital cases in which I've been involved that the defendant is told to be very respectful during a victim's testimony. In my opinion, the fact that Runyon was self-absorbed in his writings made a poor impression on the jurors.

17.     I have been told by Runyon's current counsel that the jury found their own mitigating circumstance that Runyon was led to believe that Cory Voss molested Voss's daughter. I was unaware of this jury finding. I also did not know that Runyon's step-daughter, Kendi, was molested by her biological father after Runyon left her behind to escape the volatile situation with his wife Maria.

EXHIBIT 4

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 26th day of September, 2015.

Sheila Cronin

EXHIBIT 4

CHARACTER TRAITS (continued on the back of next page)

1) (JENNY) VIRGINIA PINA — SAVED HER LIFE. SHE CP'D ON MY KITCHEN FLOOR IN MISSOURI 200. NO PULSE, HAD TO GIVE CPR → 1512.

LIST of LIVES I HAVE SAVED OVER THE YEARS → I HELP PEOPLE NOT HURT THEM!

2) WHILE IN AIRBORNE SCHOOL DEC 94 I SAVED A MAN'S LIFE IN MY STICK. SHORT ORIENTAL GUY, INFANTRYMAN, DRAGON GUNNER, #375? I THINK I WAS #371 OR 373 & HE WAS ONLY A COUPLE OF GUYS DOWN THE LINE. 1ST WEEK OF SCHOOL ON A TRAINING APPARATUS, A TOWER W/2 CABLES GOING FROM THE TOWER ACROSS TO 2 TELEPHONE POLES ON A BURM. PULLEY'S HOOKED TO THE CABLES & A SET OF PARACHUTE RISERS THAT YOU ATTACH TO YOUR HARNESS. A SIMULATED/MOCK DOOR OF A PLANE THAT YOU EXIT OUT OF & ARE GRADED ON YOUR GOOD OR BAD BODY POSITION/POSTURE. YOU SLIDE DOWN THE CABLE BOUNCING THROUGH THE AIR WHILE YOUR GRADER WATCHES YOU & DETACH YOURSELF WHEN YOU LAND ON THE BURM.

ANYWAYS I'M #4 MAN IN LINE, #3 MAN, MY BUDDY (ABOVE) HOOKED UP HIS RISERS TO HIS HARNESS ON EACH SHOULDER. THERE WAS ALOT OF TENSION, ALL 4 OF US HAD TO PULL ON OUR RISERS TO BRING THE CABLES CLOSER TO THE TOWER JUST SO WE COULD HOOK UP. WHEN YOU EXIT THE DOOR IT PULLS YOU OUT FORCEFULLY TO SIMULATE THE AIR SUCKING YOU OUT OF AN ACTUAL AIRCRAFT. #1 & #2 MAN EXITED THE TOWER. JUST AS #3 MAN IN FRONT OF ME MOVED UP I NOTICED SOMETHING DIDN'T LOOK RIGHT. SOMEHOW THE 2 RISER STRAPS HOOKED TO HIS RIGHT SHOULDER HARNESS WERE SEPARATED & BASICALLY WRAPPED AROUND HIS HELMET & NECK. I RAPPED BOTH OF MY ARMS AROUND HIM & BEGAN YELLING WHAT WAS WRONG WHILE PULLING BACK WITH ALL OF MY MIGHT SO HE WOULDN'T JUMP OUT & SNAP HIS NECK. THE INSTRUCTOR LOST HIS TEMPER WITH MY BUDDY B/C HE WASN'T OBEYING THE "GO" COMMAND & GRABBED HIM TRYING TO THROW HIM OUT THINKING HE WAS PROBABLY JUST SCARED. I WRAPPED MY RIGHT ARM ON #3'S RIGHT RISERS TRYING TO FIX THE PROBLEM BUT THERE WAS TOO MUCH TENSION ALL THE WHILE YELLING AT THE TOP OF MY LUNGS. FINALLY THE INSTRUCTOR SAW MY ARM IN #3'S RISER & NOTICED THE PROBLEM. HE STOPPED TRYING TO THROW #3 OUT, I UNWRAPPED MY ARMS WHILE THE INSTRUCTOR RIDICULED THE "STUPID LEG" #3 FOR ALMOST KILLING HIMSELF TO THE GRADER ON THE GROUND. & HE WAS UNHOOKED & FIXED. LATER AT AN AWARDS CEREMONY THAT INSTRUCTOR GOT A MEDAL FOR SAVING "AIRBORNE'S LIFE." AFTER FORMATION #3 THANKED ME AGAIN FOR SAVING HIS LIFE STATING HE KNEW WHO REALLY DESERVED THE CREDIT. HE WANTED TO PUSH THE ISSUE WITH MY STICK SERGEANT SO I WOULD GET A MEDAL TOO. I TOLD HIM NOT TO BOTHER WITH IT I DON'T CARE ABOUT MEDALS & I DIDN'T SAVE HIS LIFE SEEKING GLORY. I DID IT INSTINCTIVELY BECAUSE IT WAS THE RIGHT THING TO DO & I TOLD HIM I BELIEVED HE WOULD HAVE DONE IT FOR ME.

#3) CALVIN HAMPTON AN INMATE AT NEWPORT NEWS CITY JAIL. ON MORNING OF IMAGE? FELL OFF OF HIS TOP BUNK & CRACKED HIS HEAD OPEN. BLOOD WAS GUSHING OUT. I KNEW THAT IF I COULDN'T STOP THE BLEEDING HE WAS DONE BEFORE HELP COULD ARRIVE. I HESITATED THINKING ABOUT THE

*(margin note, left side: Read H from mem/a copy of this to the jury during Airborne (show your book.))*

EXHIBIT 4

2 OPEN CUTS ON MY HANDS & THE POSSIBILITY OF THE OLD MAN WHO HAS A HISTORY OF DRUG ABUSE HAD AIDS, HIV, & OR STD'S. I ONLY HESITATED FOR A MOMENT THOUGH KNOWING I COULDN'T LIVE W/ MYSELF IF HE DIED & I COULD HAVE MADE A DIFFERENCE. I USED THE MOST STERILE THING I COULD THINK OF IN THE CELL, TOILET PAPER. OF COURSE IT SOAKED UP THE BLOOD LIKE A SPONGE BUT IF I WOULD HAVE USED A TOWEL OR SHEET WHICH ONLY GETS WASHED ONCE A WEEK OR A BLANKET WHICH ONLY GETS CLEAN ONCE A MONTH HE WOULD HAVE SURELY GOTTEN STAFF INFECTION THROUGH HIS CUT. SO I GOT BLOOD ALL OVER MY HANDS BUT I GOT THE BLEEDING TO STOP & YELLED LOUD ENOUGH TO WAKE EVERYONE UP IN MY CELL BLOCK SO THEY COULD HELP MAKE NOISE TO GET HELP. THERE IS A FULL INCIDENT REPORT FILED AT NNCJ W/ INTERNAL AFFAIRS. I WOULD ALSO LIKE TO KNOW IF CALVIN HAMPTON IS DOING OK. LAST I HEARD HE HAD BEEN IN THE HOSPITAL FOR 3 DAYS ALREADY. TELL THE GUYS AT NNCJ ON CELL BLOCK 5B I'M DOING GOOD. ALSO TELL LEON & "T" THAT I'D LIKE MY LITTLE BLUE BIBLE BACK. I HAD TO LEAVE IT B/C THE DEPUTY TOLD ME I COULDN'T BRING ANYTHING WITH ME WHEN THE FEDS PICKED ME UP. A US MARSHALL AT THE FED BLDG. SAID THAT WAS FALSE, I COULD HAVE BROUGHT MY BIBLE. A DEPUTY AT NNCJ TOLD ME THERE WAS A VA LAW STATING THAT I DIDN'T NEED MY BIBLE TO PRACTICE MY RELIGION OF CHRISTIANITY. I WAS PRETTY UPSET & WOKE UP MOST ON MY CELLBLOCK COMPLAINING ABOUT THE INCREDIBLE INJUSTICES IN THIS SYSTEM OF OURS. MY NEIGHBOR CHRISTIAN FRIEND PASSED ME A NOTE TO CALM ME DOWN. THEY APPARENTLY HAVE BEEN DOING IT TO INMATES FOR AWHILE. IF IT IS AT ALL POSSIBLE I WOULD LIKE MY "COWBOYS FOR CHRIST" WTBC little blue BIBLE back. Nobody really comes up here to my cell block to share or fellowship with us. If I had my blue bible I could share w/ my cell mates, especially w/ all of my notes & footnotes in my blue bible. These notes help me find the right scriptures to share w/ others at just the right time of need. Also the blue bible has sentimental value. It is a testimony about "turning the other cheek." I earned a black eye while at NCFJ in WV & by not hitting the other inmate while I obviously had plenty of opportunity I was able to give testimony to a violent inmate. While sharing scripture I checked out his little blue bible & was able to get me of my own right before I was transferred to VA.

#4  As a 2nd Lieutenant with 1/137th INFANTRY, MECHANIZED (KSANG) during annual summer training at FT. Carson, Colorado (summer of 1993,?) While traveling we stopped because of darkness. The LT. COL decided we would continue traveling to our training site 1st thing in the morning. We were ordered to sleep in a 360° security perimeter w/ 0° security since technically we hadn't started training yet. I personally checked on each soldier in my platoon & found one of my men in his sleeping bag stretched out in the middle of the road on the soft grass. I made him move. He was rebellious & complaining about tree roots & rocks everywhere. He picked a spot on the side of the road but I made him move further to at least put a decent size tree between him & the road. I slept on the other side of the road just inside the treeline so he could see me to ensure he wouldn't sneak back out. Sometime during the night a tracked vehicle from some other unit came flying through. It was going so fast I didn't have time to get out of my sleeping bag before it had passed by me. I chased after it yelling. (continued)

EXHIBIT 4

Several of us finally got there attention & they stopped. Apparently they had taken a wrong turn & were lost. The soldier I had moved out of the road earlier that evening later thanked me for saving his life. He told me that he didn't ever wake up in time to see the vehicle go by let alone get out of the way if he had still been sleeping in the middle of the road. I told him it was no big deal. It was just a part of my job & that I take the responsibility of taking care of all of my men seriously. I told him I was thankful for having many good teachers. "Mission first, people always!" He also apologized for giving me a hard time & appreciated me explaining his danger by sleeping in the middle of the road. He said he knew I was right at the time but he still didn't care. If I had left he would have just stretched back out in the road. I never received a medal for this incident. That's not important to me anyways. I'm not even sure if many people even knew about it. I didn't talk about it either. I believe the soldier was embarrassed about it. After all every infantryman should know better than to sleep in a "danger area" regardless if we're training or not. Many soldiers die in training for poor decision making every year. I didn't want to lose any of my soldiers if their was anything I could do about it. If I'm not mistaken there was a casualty. That same vehicle drove through another platoon on that same road just a little earlier without even knowing they were there. But it could just have been a rumour. They were keeping the incident on the "hush, hush" side. So I'm not really sure. My BNCO was LT. COL. Crane and I believe he was there when we stopped the (M113?) tracked vehicle. I did receive a medal at the end of that training cycle from LT. COL. Crane but that was for superb unit performance. My men earned that medal. Anyway I guess it all evens out! I told Sergeant Flippo & my soldiers I wish I could give them all medals, they deserved & it & earned it. I was so proud of them. Our performance rating was higher than our active duty counterparts, 5th ID. Hoo-rah for E. CO 1/137th (m) INF!

#6 While serving with the United States Airborne School for 3 years I received several medals; 1 Army Achievement Medal for packing over 7,000 malfunction free parachutes (life support equipment) in 14 months, 2 presidential unit citations, & 1 superior unit citation. During this time I also am responsible for preventing 100's of injuries during the course of my duties to include last minute inspections of personnel & gear just prior to all kinds of airborne operations. I have personally repacked a live parachute for a general while he watched day & night & upon his request grabbed another live chute & proceeded to jump with him out of his "huey" helicopter. I have also noticed & fixed defaults on parachutes from the back of my fellow "Airborne" minutes & sometimes seconds before we "jumped out" or exited the aircraft anywhere from 500 ft to 2,500 ft on average. We suffered no "loss of life" during my 3 years with the school despite gross overload on the number of students per class or "cycle." I am proud to have been a part of that great accomplishment.

EXHIBIT 4

#7 When I was a police officer for the Fayetteville Police Department (Fayetteville, GA in Fayette County just south of Atlanta) I also worked as a courtesy officer for my local apartment complex. I was pretty much on call there when I was off duty. I had a take home squad car so everyone knew when I was off duty. I earned a reputation & many of the tenants talked & confided in me. One night I answered the door to frantic pounding. One of the female tenants I knew from across the street told me the scenario. I immediately used my radio to call directly to dispatch & reported a bad fire. The building held 8 3 & 4 bedroom apartments side by side. Even in the night sky I could see the massive amount of black smoke billowing from the entire rooftop. A preteen girl had apparently started a grease fire on the stove. I pulled my car up in front of the building w/ lights on to mark the building for the responding firemen & hit my siren hoping to wake up the tenants still inside. I had the female tenant get her boys & start beating on doors ___ while I grabbed my fire extinguisher out of the back of my patrol car. The preteen girl that apparently started the fire was standing dumbfounded on the sidewalk. I quickly talked to her & found out her little sister was still inside. I held my breath & went in. I found the little girl crying on the steps & quickly brought her outside to her little sister. I called dispatch & relayed to the FIRE Marshall the apartment # & the cause of the fire. The FIRE MARSHALL asked me if I could see & give details on the kitchen. So I took a deep breath, ran in & peeked around the refrigerator at the stove ~~                    ~~. I quickly ran back outside & closed the door to stop the oxygen flow to the fire. I just peeked for a half second & the heat was so intense I felt an instant sunburn sensation & my eyebrows & hair curl. I actually saw the metal stove & metal smoke exhaust tray? above the stove melting & dripping down to the floor. The entire ceiling had fire billowing or rolling across it similar to waves of water. When I told the FIRE MARSHALL he told me under no circumstances was I to go back in & especially not to open the door for fear of a backdraft or something. I think it only took about 3 or 4 minutes for the first fire truck to arrive. By then everyone had been evacuated & accounted for outside on the sidewalk. I moved my patrol car back home. ~~          ~~ I then helped

EXHIBIT 4

the tenants wherever I could. It took 2 fire departments several hours (maybe 4 or 6) to get the fire out. No casualties. Smoke damage to seven apartments nothing that a fresh coat of paint couldn't fix. The entire roof & the kitchen of the one apartment had to be rebuilt. Apparently the stove fire travelled through the exhaust vent straight up into the attic where it spread rapidly. Thank God for the female tenant smelling smoke, looking outside & seeing her neighbor's little girl standing on the sidewalk stupified. If it wasn't for her quick thinking to come get me for help it could very easily have been much worse. The housing complex was so new it wasn't even on the FIRE DEPT's maps but I had given quick directions & the lights on my patrol car made it easy to see from the main road. The female tenant & her two boys did a great job beating on doors to tell the other tenants about the fire & to evacuate out to the street out front. The FIRE MARSHALL also said the info I gave him allowed him to assess the situation & he had already issued instructions on what needed to be done before the first FIREMAN even arrived. So when they pulled up they got right to work. It also helped him when he arrived that all the tenants were organized outside & he could quickly verify that everyone was accounted for. It was a heck of a fire. These firemen did an awesome job. I got names & phone #'s where they could be reached since they were new here at for the FIRE MARSHALL. I let the tenants use my phone. They called friends & family etc.... to make sleeping arrangements for the rest of the night. It was a very long night.... not much else to say about it. Thank God nobody died or even got burned, well besides my little sunburn & a little toxic smoke inhalation that stopped irritating me after a month or so. They say that most people die from the toxic smoke from a house fire. Think about all the different materials in paint, insulation, varnish on wood cabinets, plastics that are made with oil, etc.... all released into the smoke from a fire. That's the junk that burned my eyes & sinuses even though I was holding my breath.

EXHIBIT 4

FindLaw for Legal Professionals - Case Law, Federal and State Resources, Forms, and C...    Page 5 of 5

(#2)

spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless -
(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
(aa) the case was tried by a jury, or
(bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.
(34) The term "secure gun storage or safety device" means -
(A) a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;
(B) a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or
(C) a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

(35) The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.
(b) For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

[Notes]                                    Next

Sponsored Links

Help | Site Map | Contact Us | Media Kit | About Us | FindLaw Local | Disclaimer | Privacy Policy        Copyright © 1994-2008 FindLaw a Thomson business

VIRGINIA PINA (JENNY), HAD NO PULSE. SHE OD'D ON DRUGS & ALCOHOL ON MY KITCHEN FLOOR IN MISSOURI AFTER HER PARTY BUDDIES LEFT HER ON THE DOORSTEP. I DID CPR & PRAYED W/ ALL OF MY MIGHT. I WAS EXHAUSTED & CRYING WHEN SHE FINALLY CAME BACK. I ENDED UP TAKING 2 DAYS OFF OF WORK TO CARE FOR HER AROUND THE CLOCK. SHE HAD NO MEDICAL INSURANCE & SHE WOULDN'T STAY IN THE HOSPITAL ANYWAYS. SHE WAS MY GIRLFRIEND FOR ABOUT 3 YEARS OFF & ON BUT LIVED W/ ME FOR ABOUT 5. SHE WAS MY ROOMMATE, NOT MY GIRL, FOR A YEAR BEFORE I ASKED HER TO LEAVE/MOVE OUT. SHE COULD NOT KEEP A JOB & WASN'T ABLE TO PAY FOR HER SHARE OF THE RENT, ETC..... SHE WAS A GOOD FRIEND. THAT'S WHY I WAS SHOCKED WHEN I WAS ONCE AGAIN IN COURT BEING ACCUSED OF DOMESTIC VIOLENCE IN JANUARY 2007. APPARENTLY SHE SHOWED UP AT HER STEPMOMS WITH A BLACK EYE & HER STEPMOM CALLED THE COPS ON ME ASSUMING I DID IT. HER STEPMOM DAD HATED ME & WERE EXTREMELY PREJUDICED. I'VE SEEN JENNY HURT HERSELF BEFORE & I'VE EVEN WITNESSED HER GIVE HERSELF A BLACK EYE. AND SOME OTHER GUY DROPPED HER OFF AT HER STEPMOMS ANYWAYS. JENNY LATER STOPPED BY & I ALLOWED HER TO STAY AT MY HOUSE FOR AWHILE & SHE EXPLAINED THAT HER STEPMOM THREATENED TO KICK HER OUT OF THE HOUSE ONTO THE STREET IF SHE DIDN'T TELL THE COPS THAT I HIT HER. SHE ALSO GAVE ME A VIDEO TESTIMONY TO USE IN COURT & HER MENTAL HEALTH RECORDS. SHE REFUSED TO GO TO COURT HERSELF TO TESTIFY & TELL THE TRUTH. SHE WAS AFRAID TO GO TO JAIL FOR LYING TO THE COPS. INSTEAD SHE KEPT HIDING TO AVOID THE COURT SUBPOENA & EVERY MONTH I KEPT SHOWING UP TO DEFEND MY GOOD NAME & SCHEDULING MY WORK AROUND THE COURT DATES THE JUDGE ALLOWED THE PROSECUTOR TO CONTINUE THE CASE MANY TIMES & WHEN IT WAS DISMISSED THREATENED M THAT SHE STILL HAD ANOTHER YEAR TO BRING ME BACK TO COURT IF SHE COULD FIND JENNY.

DETECTIVE RILEY (NEWPORT NEWS) FOUND JENNY WHILE APPARENTLY LOOKING FOR ME. SHE TOLD ME THAT HE WAS TRYING TO PERSUADE HER TO PICKUP THE DV CHARGES AGAINST ME. HE WAS WANTING TO ASK ME QUESTIONS ABOUT A HOMICIDE, HE HAD MY PICTURE, & THAT I WAS A SUSPECT. HE HAD LEFT HIS CARD BUT SHE DIDN'T HAVE HIS # HANDY TO GIVE TO ME.

THE FEDS TOOK INTO EVIDENCE MY BROWN LEATHER BRIEFCASE. IN IT IS:

DV CHARGE #1 A) COURT PAPER I SIGNED PLEADING "NO CONTEST" TO SIMPLE BATTERY
VS. MARIA RUNYON
"SIMPLE BATTERY"      B) COPY OF COURT PAPER MISFILED AT THE COURTHOUSE STATING I PLEAD "GUILTY" TO "SIMPLE BATTERY AGAINST MY SPOUSE"
                      C) VIDEO TESTIMONY OF MARIA RUNYON STATING THAT I NEVER HIT HER & SHE HAD LIED TO THE COPS.

DV CHARGE #2 A) VANILLA ENVELOPE ABOUT ½" THICK FULL OF JENNY'S (VIRGINIA PINA'S) MENTAL HEALTH
VS. VIRGINIA
PINA (JENNY)          RECORDS SHOWING CASES OF SELF HARMING, SUBSTANCE ABUSE, ETC.....
                      B) VIDEO TESTIMONY OF JENNY (VIRGINIA PINA) STATING THAT I NEVER HIT HER & SHE HAD LIED TO THE COPS.

EXHIBIT 4