

# SAUNDERS BARLOW RIDDICK BABINEAU, PC

*Attorneys and Counselors at Law*

Jon M. Babineau
William K. Barlow
Wallace W. Brittle, Jr.
Adam M. Carroll

Jeanette L. Ojeda\*
William H. Riddick, III
Whitney G. Saunders
Windley Hofler Walden

\*Also admitted in Florida

**Jon M. Babineau**
jbabineau@saundersbarlow.com

February 10, 2009

Brian J. Samuels, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA 23606

Lisa Rae McKeel, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA 23606

Re:   United States of America v. David Anthony Runyon
Case No.: 4:08cr16

Dear Mr. Samuels and Ms. McKeel:

On behalf of co-counsel and the defendant, David Anthony Runyon, I write to request that you recommend to the Attorney General that the United States withdraw its Notice of Intent to Seek the Death Penalty ("Notice") against David Anthony Runyon ("Mr. Runyon" or "David") in this matter. As you are well aware, this matter is set for a jury trial just a few short weeks from now beginning on March 13, 2009. As a practical matter, therefore, this will be our last opportunity to persuade you to withdraw your Notice.

As a threshold matter, this letter is written with the understanding, pursuant to Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410, that any statement made here cannot be used against Mr. Runyon in any way. This would include use of this submission in any fashion in any pleading filed with the Court.

Since we first appeared before the Committee for the Attorney General in March of 2008, we have been engaged in the laborious process of reviewing thoroughly the volumes of

08-0140

**SUFFOLK**
705 West Washington Street
SMITHFIELD                          Suffolk, Virginia 23434                          NORFOLK
(757) 357-4314                      Tel: (757) 934-1313                             (757) 622-8631
Fax: (757) 934-1318
Real Estate Fax: (757) 934-1299
www.saundersbarlow.com

EXHIBIT 15

Page 2 of 10
February 10, 2009

discovery provided by the United States, having Mr. Runyon evaluated by a forensic psychologist, and conducting the in-depth social history investigation that this case requires. Based on our discoveries over the past several months, it has become increasingly clear that Mr. Runyon is *not* the type of individual for which the federal death penalty was intended.

First, the evidence against Mr. Runyon is not strong enough to produce a verdict that contains the certainty required for imposition of the death penalty. Second, the two co-conspirators charged in this murder-for-hire case were equally if not more culpable than Mr. Runyon and the death penalty was not authorized as punishment for them. Third, Mr. Runyon has no appreciable prior criminal record of any kind, save for a misdemeanor domestic incident with questionable circumstances of guilt. Fourth, from Mr. Runyon's earliest childhood days, he was raised in an atmosphere of physical violence and emotional oppression, resulting in an adult individual who lacks the tools necessary to navigate society successfully. Fifth, despite his circumstances, Mr. Runyon has exhibited exemplary behavior during his time of incarceration, making him an ideal candidate for a sentence less than death. Finally, other cases with much more heinous circumstances than this have failed to gain authorization for the death penalty, further illuminating how the authorization of the death penalty for Mr. Runyon in this case is an arbitrary and capricious application of the ultimate penalty.

Based on all of the above, as further detailed below, we beseech you on behalf of Mr. Runyon to recommend to the Attorney General that the United States be allowed to withdraw its Notice of Intent to Seek the Death Penalty against Mr. Runyon.

A.    **The evidence cannot produce a verdict certain enough to warrant death.**

A review of the evidence against Mr. Runyon reveals that the United States' case will rest entirely on debatable circumstantial evidence including statements made by co-conspirators whose credibility is next to nothing. The United States does not possess a single piece of forensic evidence linking Mr. Runyon to the murder of Cory Voss. There was no DNA evidence recovered from the crime scene to implicate Mr. Runyon, no fingerprints recovered, and no weapon that has ever been located. Further, Mr. Runyon made no confessions or inculpatory statements of any kind to law enforcement during the course of their investigation. The statements made by co-conspirators Catherina Voss ("Voss") and Michael Draven ("Draven") prior to the murder provide little probative value as to Mr. Runyon's actual involvement and in fact some of those statements tend to exculpate Mr. Runyon. Finally, there

EXHIBIT 15

Page 3 of 10
February 10, 2009

is a strong argument to be made that any noncustodial statements made by Voss and Draven *after* the murder were not in furtherance of the charged conspiracy (murder-for-hire) and therefore cannot be admitted against Mr. Runyon at his trial under the co-conspirator exception to the hearsay rule.

In sum, even though the legal standard for conviction in this case will be "beyond a reasonable doubt" as it is in every other criminal case, the shockingly large number of capital prisoners who have been exonerated over the past several years has raised the public's demand that convictions in capital cases be made only where the evidence proves guilt to an almost absolute certainty. Evidence from the scientific community can often provide this degree of certainty, but not in this case. Neither scientific evidence nor any other clear-cut proof of culpability will show that it was certainly Mr. Runyon and not any other person who actually killed Cory Voss. This case simply can never yield the type of certainty that the public demands for imposition of the federal death penalty.

**B.    Mr. Runyon's two alleged co-conspirators charged in this murder-for-hire case were equally if not more culpable than Mr. Runyon and the death penalty was *not* authorized as punishment for either. This mitigates against imposition of the death penalty. 18 U.S.C. § 3592(a)(4).**

According to the United States' theory of the alleged conspiracy-for-hire, as set forth in Voss' Statement of Facts incorporated into her guilty plea, as well as statements made by the United States at Voss' sentencing, Voss was without question the mastermind of the scheme to murder her husband, Cory Voss. Voss and Draven together created a plan to kill Cory Voss with or without Mr. Runyon's assistance. The United States has acknowledged this fact, stating that "[s]ometime in January of 2007 at least three individuals were approached [by Voss and Draven] and asked about murdering Cory." See Tr. of Sentencing for Catherina Voss at p. 5 (Attached as **Exhibit A).** The United States characterized Mr. Runyon as merely the tool that Voss and Draven ultimately used to execute their murderous plan. Id. The United States repeatedly refers to the murder plan as being Voss' and/or Draven's plan, not Mr. Runyon's plan. In fact, at Voss' sentencing, the United States characterized the plan to kill Cory Voss as almost exclusively the work of Voss in her fit of greed and lust. Id. at 5, lines 10-11, 21; p. 6, lines 21-22.

Even according to the United States, it was Voss and Draven not Mr. Runyon that engaged in the extensive planning and premeditation of the type that constitutes the aggravating factor contained in 18 U.S.C. § 3592(c)(9). The United States stated that

EXHIBIT 15

Page 4 of 10
February 10, 2009

"[Runyon] certainly seemed perfect for Cat Voss and Michael Draven *to carry out their plan*" before they began to conspire with Runyon in February and March, 2007. Tr. at p. 5, lines 9-12 (emphasis added). Indeed, the United States never alludes to any participation by Mr. Runyon in preparing the plan to kill Cory Voss nor does any of the evidence suggest that Mr. Runyon played such a role in the conspiracy. The evidence suggests at best that Mr. Runyon did as he was told by Voss and Runyon, as the United States concedes when it asserts that "Runyon had been provided the location, had been provided a description of Cory's car, and about the time that he would be there, and David Runyon traveled from West Virginia to meet Cory Voss." Id. at pp. 6-7. Mr. Runyon's role, therefore, was markedly different from the role of Voss and Draven, who spent months engaged in detailed planning and scheming to murder Cory Voss. Mr. Runyon's role does not rise to the level of the type of "substantial planning" that § 3594(c)(9) contemplates as justifying application of that statutory aggravator.

As set forth above, Voss and her lover, co-conspirator Draven, concocted the intricate plan for having Cory Voss killed so that they could be together and live lavishly off the proceeds from Cory Voss' life insurance proceeds, which they did with flair beginning almost immediately after they murdered Cory Voss. Voss is the person who set up the bank account at the federal credit union in a remote location as part of her murder plan, so that she could send Cory Voss out in the dead of night to meet his killer, who she and Draven pre-arranged to be waiting at the credit union at the appointed time. Voss is the individual who callously made the deliberate decision that her children's father would be murdered at a specific time, at a specific place, and in a specific way. On the night of the murder, it was Draven who let the shooter know the exact time Cory Voss would arrive at the federal credit union, Cory Voss' exact physical description, and the exact description of the car Cory Voss was driving. Telephone records show that Voss was on the telephone with Cory Voss almost the entire time it took him to drive to the credit union, up until approximately two minutes before the hired gunman entered Cory Voss' vehicle.

If not for Voss's and Draven's actions, Cory Voss would never have been at the federal credit union on the night he was murdered. At all times, it was within Voss' power to spare Cory Voss' life by choosing not to send him to the credit union at the appointed time, or by calling off the murder entirely at any point, or at the very least by warning Cory Voss as he drove toward the credit union to forget her prior directions, turn around, and come home. Yet she did none of these things. Draven could have at any time refused to facilitate Voss' plan.

EXHIBIT 15

Page 5 of 10
February 10, 2009

Instead, Voss chose to send Cory Voss out to the credit union, directly to his death, according to her plan to satisfy her own selfish material desires. These actions make Voss and Draven just as culpable, just as responsible for Cory Voss' death as if each of them had actually pulled the trigger on the gun themselves. Yet the United States seeks the death penalty for David Runyon alone, who never would have been at the credit union had it not been for Voss and Draven's desires and plans to murder Cory Voss. The authorization of the ultimate penalty of death for Mr. Runyon alone, then, simply defies logic and reeks of the very type of arbitrariness and capriciousness that the federal death penalty, with all its supposed statutory safeguards, seeks to prevent. Continuing to prosecute Mr. Runyon as the sole capital defendant in this conspiracy cannot meet the Attorney General's requirements for fairness and consistency.

**C.    Mr. Runyon has no appreciable prior criminal record of any kind, which mitigates against imposition of the death penalty. 18 U.S.C. § 3592(a)(5).**

Mr. Runyon is not a person with a lengthy record of past violent criminal behavior. To the contrary, Mr. Runyon has no felony convictions for any crimes at all and only one prior misdemeanor conviction that stemmed from a domestic situation with questionable facts. The instant charges represent Mr. Runyon's only serious involvement with the criminal justice system. This factor mitigates against death, as more clearly set forth by Mark D. Cunningham, Ph.D, ABPP, in the attached summary of his opinions regarding Mr. Runyon's negligible capacity for future dangerousness. See Letter from Dr. Mark D. Cunningham (**Exhibit B**).

**D.    Mr. Runyon suffers from a past of physical abuse and emotional oppression which mitigates against imposition of the death penalty. 18 U.S.C. § 3592(a)(8).**

David Anthony Runyon was born in 1971 to David and Suk Cha Dombrowski. His parents met when his father was in the Army and stationed in Korea. His mother, Suk Chad was born in North Korea. Her childhood was marked by the Korean War, her mother's death, her sister's suicide, rejection and emotional abuse by her stepmother and physical abuse at the hands of her older brother. Suk Cha's childhood experiences left her with a mood disorder characterized by rapidly cycling moods, in which a vicious anger is the most prominent. When angry, she makes no attempt to modulate her responses and instead screams, yells, and at times becomes physically violent.

EXHIBIT 15

Page 6 of 10
February 10, 2009

David's biological father, David Dombrowski was born and raised in the United States. Dombrowski's childhood was marked by divorce and domestic violence. Suk Cha and David Dombrowski married in 1970 and had two children, David and Mark. The marriage lasted only a little more than five years, during which time Mr. Dombrowski drank heavily, developed a gambling addiction, and physically abused his wife and his son, David. The marital discord eventually led to a suicide attempt by David's mother, after which the marriage dissolved. David was five years old when his parents divorced and the only memory he has of his father is being thrown across the room by him.

In 1976, Suk Cha met and married David H. Runyon ("Runyon, Sr."), who was also in the Army. Runyon, Sr. was raised in a middle class family but has been a self described "loner" all of his life. He tells of a stable upbringing but admits that he has no affection for his mother. He is intelligent and pleasant, but emotionally detached. Runyon, Sr. adopted Suk Cha's children, David and Mark. Because of his military career, the family had to relocate frequently. Over the course of his childhood, David Runyon, lived in Texas, Panama, Germany, Missouri, Korea and Virginia. He rarely went to the same school for more than three years and never had the opportunity to develop any lasting friendships or roots. To make matters worse, he was unusually small framed for his age. David's parents describe him as passive and very naive about people. In that regard, they feel he is highly vulnerable to manipulation.

Suk Cha was the primary disciplinarian, though Runyon, Sr. often used a paddle as corporal punishment against the children. The paddle contained holes in it to increase the physical sting. Other punishment included forced ingestion of a half a pack of cigarettes, and the children being made to stand in a corner for long periods of time while holding a heavy can in the air, with the children's arms outstretched over their heads. Suk Cha is described by David as possessive, and by Mark as overbearing and emotionally abusive.

David's adult life has been marked by under achievement and a steady decline in the quality and length of employment. He desperately hoped to have a military career like his father and step-father, but failed to perform well in the Army. After David's failed attempt at an Army career, he decided to join the police force, but failed at that job and was fired. David also worked as a Correctional Officer but lost that job as well. David self-sabotages in all aspects of his life, but has absolutely no insight into his behavior. His relationships with women have all failed, largely because he chooses women who are incapable of mature relationships due to

EXHIBIT 15

Page 7 of 10
February 10, 2009

mental illness and/or substance abuse.

All these factors present the picture of an individual who was never given the tools required for an adult to cope successfully with the challenges life presents. Consequently, David's social history mitigates against imposition of the death penalty.

**E.      Mr. Runyon has exhibited exemplary behavior during his period of incarceration, demonstrating that if convicted, he is an ideal candidate for a sentence less than death.**

Mr. Runyon has been incarcerated on the present charges for over a year in the penal facilities of the Virginia Department of Corrections. A review of his prison records reveals that during this lengthy period of incarceration, Mr. Runyon has not been involved in a single incident requiring discipline or even any type of incident at all. Mr. Runyon has in fact been a model prisoner, even providing emergency first aid to a prisoner in need on one occasion, and generally spending his time concentrating on his own case and staying completely out of the prison population's general fray, which is no small feat for any prisoner.

As supported by Dr. Cunningham's studies and findings in this case, Mr. Runyon's exemplary behavior, coupled with his relative lack of any serious criminal history, demonstrates without question that death is *not* the only available means of protecting the public from Mr. Runyon. See Letter of Dr. Cunningham (Exhibit B). The death penalty should be reserved for the most heinous, the most dangerous, and the most vile among us who cannot be trusted to refrain from committing violent acts against others even in a tightly-regulated, maximum security prison environment. Mr. Runyon is simply not such an individual and his life should be spared.

**F.      Other cases handled by counsel in this federal circuit with much more heinous circumstances have failed to gain authorization for the death penalty, highlighting the arbitrary and capricious nature of the authorization for imposition of the death penalty against Mr. Runyon.**

The undersigned counsel, along with co-counsel, has been practicing criminal defense attorneys for over twenty years in Virginia, and specifically in the Eastern District of Virginia. During this time, both counsel have defended some of the most notorious and violent criminals. While not discounting the seriousness of the facts involved in any case where

EXHIBIT 15

murder is involved, counsel have defended several non-capital murder cases involving facts and proof of crimes much more heinous and deplorable than those facts associated with Mr. Runyon's case.    Listed below in bullet-point fashion is a sampling of cases federally prosecuted in the United States District Court for the Eastern District of Virginia, Norfolk Division, for which the death penalty was either not authorized or not sought:

- **Larry Speed (Case No. 2:00cr00092):**  Speed was a long-time violent drug dealer in the Norfolk, Virginia area.  He ran one conspiracy from 1987-2001.  Speed had a lengthy history of numerous drug and violent crime convictions.   He was finally prosecuted at a federal level and was convicted of three murders in the Norfolk federal court.   One of the federal murders involved kidnapping a rival drug dealer at gunpoint in front of his house, torturing the victim before shooting him, and dumping his body on the side of the road.  Despite these aggravating facts, the death penalty was neither sought nor authorized in Speed's federal prosecution.

- **Travis Reese (Case No. 4:08cr00038):**  Reese was a drug dealer who had one prior felony for distribution of drugs but no crimes of violence.  He picked up a rival dealer who sold him some fake cocaine and shot him in the head at point blank range.  The death penalty was not authorized in his federal prosecution.

- **DeMario Boyd (Case No. 4:07cr00123):**  Boyd was involved in a drug-related murder.  He shot a drug dealer in the head and robbed him of drugs.  Boyd had a lengthy record for drug offenses but no violent offenses.  After the murder, Boyd fled the Commonwealth, but was later apprehended and prosecuted by the United States for the murder in the Norfolk federal court.  The death penalty was not authorized in his federal prosecution.

- **Jason Ortega (Case No. 2:98cr00047):**  Ortega was a member of a large drug conspiracy.  Ortega committed murder by shooting the victim on the orders of the drug king.  The victim was believed to be cooperating with a federal investigation of the drug conspiracy.  Ortega had a lengthy record of drug convictions and assaults dating back to his juvenile days.   The death penalty was not authorized in his federal prosecution.

- **Carlos Malone (Case No. 2:97cr00117):**  Malone was a long-time violent drug dealer in Norfolk.  He was linked to several shootings and had a significant criminal history of violence.  Malone was prosecuted by the United States for an abduction and murder.  Malone rode around with the victim alive, bound and gagged in the trunk of Malone's car.  He then killed the victim and dumped the victim's bound and gagged body.  The death penalty was not authorized in the federal prosecution.

- **Jamar Hodge (Case No. 4:02cr00030):**  Hodge had a lengthy criminal record of violent crime and was linked to several prior shootings and killings. Hodge was federally prosecuted for murdering a rival drug dealer by walking up to the victim in

EXHIBIT 15



Page 9 of 10
February 10, 2009

front of many witnesses and shooting him at point blank range. The death penalty was not authorized in the federal prosecution.

- **Lorenzo Butts (Case No. 2:00cr00067):** Butts has been considered by the United States Attorney's office in Norfolk as one of the most violent individuals ever prosecuted in the Eastern District of Virginia, Norfolk Division. Butts had a long criminal history of violence. Butts ran a huge drug conspiracy which included a number of contract killings. After he killed his last victim, a murder for which he was federally prosecuted, he stuffed the victim's body into a 55 gallon drum and threw the drum into the Elizabeth River to avoid detection. The death penalty was not authorized in the federal prosecution.

- **Samuel Manning (Case No. 4:07cr00081):** Manning has a lengthy criminal history of violence as well as a recent conviction for possession with intent to distribute drugs, for which he is currently serving a ten year prison term. At this time, he is the subject of a federal prosecution for murder during the course of a drug conspiracy. The death penalty was not authorized in the federal prosecution.

The absence of death as a possible penalty for any of the above criminals and/or for any of the above crimes underscores the fact that the decision to seek the death penalty is and must be made with extreme caution, and reserved only for the absolute worst of the worst of the criminal element. Foregoing the death penalty does not in any way diminish a community's abhorrence for violent crime, nor does it discount the impact that even one murder has on a victim, the victim's family and friends, and the community as a whole. Rather, foregoing the death penalty for all but the most egregious of criminals in the most heinous of cases demonstrates how serious the community regards a decision to seek the federal death penalty. The cases cited above include defendants with lengthy criminal histories of drugs and violence, defendants who tortured victims before killing them, killed victims in order to silence them as federal prosecution witnesses, and killed victims in order that their complex drug conspiracies could continue to operate to the detriment of their communities. If the death penalty was not deemed appropriate for those defendants for the crimes they committed, it stretches the imagination to try to understand how the death penalty can fairly be deemed appropriate for Mr. Runyon in this particular case.

## G.    Conclusion

In conclusion and as detailed above, much has been discovered about Mr. Runyon and the crimes alleged since the United States first sought and received authorization to seek the

EXHIBIT 15

Page 10 of 10
February 10, 2009

death penalty against Mr. Runyon.  Even if Mr. Runyon were to be found guilty of the crimes of which he is accused, this is not a case where society will benefit from a state-sanctioned killing of Mr. Runyon.  Mr. Runyon does not have a criminal history of any significance.  As recognized by the United States, Mr. Runyon did not engage in any of the detailed and substantial planning with Voss and Draven regarding the murder.  There is no evidence of any kind of torture associated with this crime.  And unlike many of the drug/murder defendants detailed above, Mr. Runyon has no history of exercising any kind of detrimental criminal enterprise in the communities encompassed within the Eastern District of Virginia.  Finally, Mr. Runyon simply would not pose a risk of committing future dangerous or harmful acts on anyone if he were committed to a life in prison rather than to the death chamber.  Looking at these factors as a whole, it is clear that the death penalty is not warranted for Mr. Runyon in this matter and that no higher purpose will be served by continuing along the costly course of seeking to have Mr. Runyon put to death in this case.  As such, we ask that you recommend to Attorney General Holder, forthwith, that the United States be allowed to withdraw its Notice of Intent to Seek the Death Penalty against David Anthony Runyon.  By copy of this letter directly to Attorney General Holder, we will be seeking this relief directly from him as well.  I remain,

Very truly yours,

Jon M. Babineau

JMB/kh
Enclosures
cc:  Lawrence H. Woodward, Jr., Esquire (w/o enclosures)
     David Anthony Runyon

EXHIBIT 15