## RICHARD G. DUDLEY, JR., M.D.

210 WEST 101ST STREET, SUITE 11K, NEW YORK, NEW YORK 10025

212-222-5122

29 September 2015
PSYCHIATRIC EVALUATION

## IN RE: DAVID RUNYON

Presenting Problem:

David Runyon is a now 44 year old (DOB 7 January 1971) male of mixed parentage (Korean mother and white American father). In 2009, Mr. Runyon was convicted of first-degree murder and sentenced to death, and he is now on the Federal Death Row at USP Terra Haute in Indiana.

Although Mr. Runyon's trial team presented no real mental health testimony during the penalty phase of his capital trial, the combination of information available to the trial team and information gathered by his current legal team has caused his current team to suspect that Mr. Runyon has been suffering from mental health difficulties of such severity that they have had a significant impact on him and his ability to function, that could have been considered for presentation at the time of his trial. Therefore, Mr. Runyon's current counsel referred him to this psychiatrist for an evaluation, focused on the question of whether or not Mr. Runyon has been suffering from clinically significant mental health issues that could have been presented at the time of his trial.

Qualifications:

I'm a physician, licensed to practice medicine in the State of New York, and board certified in psychiatry by the American Board of Psychiatry and Neurology. I received my medical degree from the Temple University School of Medicine in 1972, and completed my residency training in psychiatry at Northwestern University Medical Center's Institute of Psychiatry in 1975. After the completion of my training, I started working for what was then called the New York City

1

EXHIBIT 29

Department of Mental Health, Mental Retardation & Alcoholism Services, where I eventually became Deputy Commissioner. I left the Department to become the Medical Director of the Community Mental Health Center that served the West Harlem, Washington Heights and Inwood Communities of New York City, where I developed and then directed a full-service community mental health center.

In 1976, I also started a small private practice in psychiatry, and then in 1984, I expanded that practice into a full-time private practice, equally divided between a clinical practice, primarily focused on the evaluation and treatment of men of color, and a forensic practice, through which I have been retained as an expert in psychiatry in both civil and criminal matters. The forensic part of my practice has included capital litigation, and in that regard, I have testified at the trial level and post-conviction, in State and Federal Courts throughout the United States. In addition, I have taught at both the City University of New York Medical School at City College, and the New York University School of Law.

A copy of my current curriculum vitae is attached to this report.

The Evaluation Process:

My psychiatric evaluation of Mr. Runyon included my own psychiatric examination of him, performed at USP Terra Haute on 2 and 3 September 2015. That examination included a review of his individual and family history, a mental status examination, and a more detailed exploration of any symptoms or signs of mental illness that emerged.

I also reviewed a large number of records and documents. These included a Social History for Mr. Runyon, prepared by Sheila M. Cronin, Mitigation Specialist, and the records and documents that were used in the development of that Social History; various records for Mr. Runyon, including school records, medical records and military records, as well as records and reports of mental health evaluations performed just prior to his trial; and declarations of family members and others who have known Mr. Runyon, and medical records for some of his biologically related family members. The records and documents I reviewed also included Court records, Mr. Runyon's interrogation video, and critical arguments offered during this trial; trial testimony of those family members who testified at his trial; and Mr. Runyon's pre-trial correspondence. In addition, I have reviewed the most recent reports of evaluations performed by Mark D. Cunningham, Ph.D., ABPP, James R. Merikangas, M.D., L.L.C., and Allan F. Mirsky, Ph.D., ABPP-CN, all of whom were retained at the time of Mr. Runyon's trial. Drs. Merikangas and Mirsky were not called to testify. Dr. Cunningham's testimony was limited to future dangerousness.

The above noted records and documents are of the type commonly reviewed when performing psychiatric evaluations in connection with capital trials, and the critical importance of such a review has made such the standard of practice when performing psychiatric evaluations in connection with capital trials. More specifically, the information contained in such records and documents are used to confirm the reports of the individual being evaluated, raise questions

2

EXHIBIT 29

about the credibility and/or accuracy of his/her reports, and/or provide additional information that the individual being evaluated is unwilling or unable to provide for whatever reason. Therefore, the responsibility of the legal team to rigorously gather such information is central to the psychiatric evaluation process.

Based on the information obtained through my own psychiatric examination of Mr. Runyon and the records and documents reviewed, and employing knowledge gained through my training and experience, I developed a psychiatric formulation for or opinion regarding Mr. Runyon's mental state both at present and in the past, and the impact of his mental state on his ability to function.

Brief Summary of Information:

Since awareness of Mr. Runyon's mental status/the findings of his mental status examination are so central to efforts to make sense of the information he reported and the relationship of that information to the information available from the above noted other sources, I will start this summary with his mental status examination (which I traditionally describe at the end of this section of my reports).

Mr. Runyon is a now 44 year old (DOB 7 January 1971) male of mixed parentage (Korean mother and white American father) who is short but of average weight for his height, and who appears to be about his stated age. He was dressed in a prison uniform, and he was reasonably groomed. His face was asymmetrical; he had small marks all over his face and head; but he otherwise grossly appeared to be physically healthy despite the fact that he complained of the various physical health difficulties reported by other evaluators. He could clearly speak non-stop if not stopped and given direction by this psychiatrist; his speech was pressured and overly detailed; and he exhibited very loose associations and tangential thinking. However, he appeared to be open and cooperative with the examination process.

- His long-term memory was good, but his short-term memory was only fair
- He acknowledged having been depressed at times, but at the time of the examination, his mood was somewhat elevated/hypomanic
- Taking into consideration his facial asymmetry, his affect was consistent with the other findings of this mental status examination
- The content of his thinking revealed considerable grandiosity and paranoia
- He also described multiple 'near death experiences' and reported having nightmares about some of those experiences, and he reported that those nightmares are superimposed on nightmares about 'someone being out to get him' that he has had since he was a teenager
- Although his intellectual capacity appeared to be within the average range (based mostly on his verbal skills), the executive functions of his brain appeared to be impaired, and his reports to this psychiatrist indicated that there was also considerable impulsivity
- His insight was extremely poor
- His judgment was poor

3

EXHIBIT 29

In essence, Mr. Runyon's reports were in no particular order; he was often difficult to follow; and it took considerable effort to repeatedly redirect him to the specific question at hand. However, for the purpose of this report, I've attempted to organize the information gathered from Mr. Runyon in a more coherent manner.

Mr. Runyon described his mother as a very tough, very strict, Korean woman, who is only a little over 4 feet tall, and he attributed her behavior to 'that stubborn streak that many Asians have' and her tough childhood. Upon further exploration about her 'tough childhood', he reported what he knew about her 'hard, traumatic and tragic upbringing' and noted that that made her tough and a survivor. He reported that he and his mother had a strong bond; he tried to protect her from his father's physical abuse of her; and ultimately, she left his father because of him. He noted that it is clear to him that she left his father because of him because his mother is traditional, and if it wasn't because of him, she would have stayed with his father and continued to take the beatings. He reported that things were very difficult for his mother after she left his father; he described having little to eat, etc.; and he noted that since he was the older child, he grew up quickly.

Mr. Runyon reported that after his mother became involved with his stepfather, who was also a white American, they went to visit his family; his stepfather's mother was extremely racist and said things that really hurt his mother; and although his mother never said anything to his stepfather's mother, when he found his mother crying he realized that his stepfather's mother's behavior was clearly breaking her heart. Therefore, he threatened his stepfather's mother and told her that she had been mean to his mother, and they never visited his stepfather's family again. Mr. Runyon noted that he has always been 'the protector'; he has strong feelings about what is right and what is wrong, and he hates bullies; and when he has seen bullies he has always intervened. He described such an encounter when he was about 6 years old; he took on and knocked out a 16 year old boy; and he noted that although he was much smaller than the other boy, he has always been stronger than he appears to be.

Upon further exploration about his mother, Mr. Runyon acknowledged that although his mother is a 'sensitive spirit', she can become 'a firecracker', in that if she gets angry, she can become physical. Upon further exploration, he reported that when angry, she breaks dishes and glassware; he has seen her pound on his stepfather's chest and otherwise go after him; but he never saw his stepfather hit her back. He noted that instead, his stepfather would just hold his head up so that his mother couldn't hit his face, and otherwise just wait for her to calm down. Mr. Runyon then noted that although he has been accused of domestic violent, in relationships he is actually just like his stepfather; he noted that he has been accused of domestic violence because women have been angry at him after he has rejected them; but once he realized that women don't want to give him up and get angry at him when he tries to leave, he learned to take more care when trying to get out of a relationship.

Mr. Runyon also acknowledged that he suspects that his mother suffers from depression. He noted however that although he knows that his mother has lots of problems, he can't really diagnose her; he has had little-to-no contact with her since he was in high school; and he noted that once he left home, he left. When asked how that could be given his report of having such a close bond with his mother, he explained that for a while his mother, stepfather and brother were

4

EXHIBIT 29

out of the country, but then he acknowledged that his mother can smother, which has made it hard for him to have her in his life. Upon further exploration, Mr. Runyon became agitated as he noted that he tries to look at the positive things that have happened to him; he tries to focus on, and remember, and cling to those positive things; and he noted that that is what has helped him cope throughout the course of his life. He went on to note that when he thinks about negative things or negative feelings, those thoughts and feelings just 'snow ball', and he can't get them out of his mind; and then he becomes really depressed. He noted that although there are times when he becomes depressed for no apparent reason, he has plenty of reasons to get depressed, and he just doesn't want to focus on them.

Mr. Runyon described his stepfather as his 'role model'; he reported that he always looked up to his stepfather; and he noted that he learned so much from him. He noted that he was always much more aware than his brother about the big difference his stepfather made in his life, and how horrible things could have been without him. Upon further exploration, Mr. Runyon acknowledged that his stepfather worked a lot and rarely had any time to spend with him. He noted however that he misses his stepfather; he wishes that things were not so bad between them now; but his stepfather believed others instead of him, and sees what he has been accused of and been convicted of and sentenced for as a black mark on the family name. Upon further exploration, he also acknowledged that his stepfather never really showed any emotions; there was never any hugs or other forms of tenderness; but his stepfather did support them, and his stepfather did give him his last name.

When asked about how he got along with peers during his childhood and adolescent years, Mr. Runyon reported that during his childhood years and early adolescent years, he was an outcast. He described himself as a skinny little Asian-looking kid. He noted that he wanted things like a social life, friends, sports, etc., just like the other boys had, but he just couldn't get it, and the fact that his mother was overprotective made it even more difficult for him. He noted that in addition, because his father and then his stepfather were in the military, his family was constantly moving; that made it all the more difficult for him to develop friendships with peers; and all of that, in turn, made it difficult for him to even learn about girls and how to deal with girls.

Mr. Runyon noted that it always seemed impossible for him to find a group where he fit in; he was always different and always seemed to stand out; and he noted that actually, that never improved/his life just continued to be like that. Upon further exploration, he noted that he self-identifies as Asian v. mixed race, and he noted that clearly one of the reasons that he never fit in has been racism against Asians. He noted that because his mother was always so controlling, he also eventually learned to be independent and to fight against being controlled by others, and possibly that is also why it has been hard for him to fit in. Mr. Runyon then noted that his mother was always extremely focused on being an American, so much so that she didn't even speak Korean; she wanted to blend in and wanted him to blend in too; and she always said that that was about her hopes for having a better future. However at the same time, his mother was so extremely Korean; she had the sense of her own authority over him that she never let go; and yet she just never understood why therefore they clashed so much that he had to get away from her.

5

EXHIBIT 29

Mr. Runyon reported that then during his junior year in high school, he started working out, taking supplements, etc.; within one year he grew considerably; and then he got into wrestling, at which point at least some of the other boys and girls started to try to befriend him. However at that point, he couldn't take advantage of this increased interest n befriending him, in part because he was so socially awkward and in part because he was so totally focused on doing well in school so that he could get into college. He reported that then in addition, his desire to wrestle caused a battle at home; neither his mother nor his stepfather supported that interest; and it was like he was fighting to become a young man. It was against that backdrop that when he left home to attend the military academy, he pulled away from his family.

Mr. Runyon noted that he loves his mother, but he stayed away from her because he couldn't stand being so smothered by her. His mother is just so emotional; you tell her something and she breaks down; and so it is difficult to talk with her about anything. She over reacts to things; there is lots of drama and expectation that he will do what she wants him to do; and if that all of that drama doesn't work, she will do what she feels she need to do to intimidate you.

Mr. Runyon reported that in 1989, after he graduated from high school he entered the military; he was in the military in some shape or form until 1997; and he explained that 'he had learned the ideals of duty, honor and country' from his military stepfather. Mr. Runyon described his experiences in the military academy. More specifically, he reported that during his first year (when he was 18/19 years old) he was constantly under attack; he felt that someone in authority there was trying to force him out; and so he always had to be alert. Upon further exploration, he reported, for example, that the hazing was particularly intense; but he was 'confident and strong mentally'; and since therefore, the hazing wasn't working on him, he became the center of focus. He was up/unable to sleep for days at a time; but even when he fell to the floor he would get right back up; and he was able to take anything that they tossed at him, which made them all the more angry at and jealous of him. He reported that his second year at the academy was better; after that second year he was slated to enter college, but the government funding for college wasn't paid on time, so he couldn't go on to college, and so he decided to get a job, save money and then go to college later.

Mr. Runyon reported that after working in private security for a short while, he started working as a corrections officer; but he left that job after about 1.5 years because he couldn't get a schedule that would allow him to go to college; and he also left because of 'more moral issues' that caused conflicts between him and his boss. Upon further exploration about those 'moral issues', he noted that he felt that they were trying to use him to harass inmates, and he didn't agree with that, and in so doing, they were also trying to put him in harm's way.

Mr. Runyon reported that while at the military academy, he was also involved in the National Guard on weekends, and that continued after he graduated from the military academy. After he left his job as a corrections officer and still hadn't figured out how to go on to college, he gave up his commission in the National Guard; he then enlisted in the regular military; and he explained that although he had rank in the National Guard, he couldn't just move into the military as an officer without a college degree. Mr. Runyon then noted that actually, a lot of guys didn't make it through the military academy that he attended and graduated from; they were just not physically perfect and/or just not mentally strong, etc.; but his problem was different, in

6

EXHIBIT 29

that he was both physically and mentally strong. In his case, he had graduated from the military academy; he just then found himself on his own/without family support; and he just couldn't get the money and arrange for a schedule that would allow him to move on to college. Mr. Runyon reported that after his initial basic training he anticipated going on to airborne school, but instead, he ended up being a parachute rigger from 1995 to 1997. He reported that he finally left the military because he found himself in too much conflict with military leaders, and he explained that the standards had just kept decreasing since the time that he graduated from the military academy.

Mr. Runyon reported that after the military he entered the police academy; he talked about how after becoming a police officer, his focus on 'protect and serve' was inconsistent with what he experienced; and he noted that it soon became obvious that his beliefs and his behavior were not valued by the police department. Mr. Runyon then began to describe how he can 'sense a malignant spirit'; how this ability helps him identify evil, go after evil people and protect good people; and how this often places him in the thick of things. He noted that he learned to trust that capacity; he described multiple incidences where, because of that capacity, he was able to jump in and save someone's life; and he noted that he has repeatedly done this despite the risk of harm to himself.

When asked about intimate relationships, Mr. Runyon reported that he really didn't get involved with girls until he was in college, and therefore he was less experienced than the girls that he met. He then reported, however, that his libido is so strong and women feel so safe with him, that after one night with him they move into his life. He noted that after they are in his life he realizes that they have problems; but then he can't kick them out of his life; and he noted that in addition, he has a 'hero complex' that causes him to want to help those in distress.

Mr. Runyon reported that he had his first girlfriend when he was in the military college; when that relationship ended it broke his heart; and so he didn't even have a casual encounter with another woman for about 1.5 years, and ever since then it has been hard for him to fully trust another woman. When asked about his wife/the mother of his child, Mr. Runyon reported that he wasn't emotionally attached to her either, because she was so selfish; he got married to her for the kids (he wanted to give the 2 children she had when he met her what his stepfather gave to him) and he stayed with her for about 6 or 7 years because of those children and the child they had together; and like the other women in his life, she wouldn't give him up/agree to a divorce until about 7 or 8 years after they separated and he was being detained in jail for this matter.

At numerous times during the course of the examination, Mr. Runyon talked about how smart he is, how quickly he learns things, what a good leader and strong manager he is, what an over achiever he is, how bored he gets when he isn't challenged, etc., etc. When asked then why he has had so much difficulty keeping a job, he reported that there is a pattern there. He reported that in many cases, his boss takes the credit for all of the wonderful work that he has done; then the higher ups realize that it was, in fact, him who had done the wonderful work, and so then his boss feels threatened and gets him fired. In other cases, his co-workers become jealous of him and they work to knock him off the pedestal. He then noted that it is not that he is a 'glory hound'; it is just that he holds himself to a higher standard than others; and he noted that he always has to do his best, while others are working below capacity. Then upon reflection, he

EXHIBIT 29

noted that maybe the fact that he kept moving from job to job was simply the result of his having moved from place to place as an army brat.

When asked about his physical health, Mr. Runyon reported that he has always suffered from hay fever. He is also sensitive to cigarette smoke since he had lung problems. Upon further exploration about the 'lung problems', he described a military exercise where he ended up being exposed to tear gas for too long; he was passed out for hours; and although finally a military doctor got him back, he has had lung problems ever since. Then when he was a police officer, he entered a burning building to save a child; that was the second time his lungs were filled with smoke and chemicals; and that episode resulted in even more problems with his lungs.

When asked about other physical injuries, Mr. Runyon reported that when he was about 3 or 4 years old and living with his mother and biological father in Panama, he tried to stop his father from killing his mother; he bit his father on the back of his knee, which was at his head level; and although that stopped his father from killing his mother, his father then turned on him. He reported that his father squeezed his head and told him to let go, but he kept at it; then his father squeezed his neck until he almost blacked out and the room was spinning; and then, according to his mother, his father threw him against the wall, but his next memory is waking up on the floor. The next day his mother took him and his brother and left his father, and he noted that that incident and all of the times that his father beat his mother contributed to his appreciation for his stepfather, who took care of all of them. When told that it is this psychiatrist's understanding that that incident caused the asymmetry of his face, Mr. Runyon noted that although it seems to him that his face has always been asymmetrical, he had been told that his facial difficulties were a result of that incident.

Mr. Runyon reported that he has always been extremely active and athletic, and noted that in the context of that activity he has hit/knocked his head on several occasions. He reported, for example, that when he was about 6 or 7 years old, he was playing football; the ball was thrown too far and when running to get it he hit the front of his head on a telephone poll; and his next memory was waking up on the ground, holding the ball, and being told that they couldn't get the ball out of his hands. Mr. Runyon also reported that during his first year at the military academy, he was knocked out by a hand grenade simulator; then reportedly, when 2 guys grabbed his legs in order to drag him to safety his head was banging on the ground; and when he woke up, he wa told that he had been out for a while. Mr. Runyon reported that then, when returning to the military academy for his second year, he was in a car accident; he had fallen asleep; and when he ran into a semi that was trying to get out of his way, the window glass exploded and particles of glass got imbedded all over his face and head. Many of those pieces of glass remained under his skin, causing infections; he noted that the last piece of glass didn't come out until about 4 or 5 years after that incident; and he reported that this is why he has all of those small marks on his face and head that were clearly visible to this psychiatrist. He also reported that when he woke up on the day after that car accident, he fell to the floor; the left side of his body wasn't working and it felt as if that entire side of his body had fallen asleep; but then after a while, he was OK and that never happened again.

Mr. Runyon noted that he doesn't like doctors; in addition, since he feels that the body can fix itself, going to see a doctor is a waste of time; and so he didn't usually seek medical treatment

8

EXHIBIT 29

when injured unless he was convinced that the injury was so serious that his body just couldn't fix itself. He acknowledged that there were times when he initially thought that what ended up to be a more serious injury wasn't so serious; as a result, required treatment was delayed; but then he explained that that was due to the fact that he has a high pain tolerance, which has ultimately served him well.

Mr. Runyon reported that he was in another car accident in the fall of 1996, when a drunk driver hit him head on; he thought he was going to die; and he ended up trapped in his car, and they had to use the 'jaws of life' to cut him out of the car. He noted that the fact that he didn't have any broken bones was due to the fact that he 'relaxed his body so that the energy passed through him'; but there was muscle and tissue damage and so he was still in a lot of pain; and the pain medication that he was given knocked him out so much that it made it difficult for him to get up in the morning and get to work. He was in the military then; although his job was preparing parachutes, he had to jump out of a plane every 6 months to keep his job, and he only had 4 months to heal before he had to jump again. However, he wasn't healed by then; but he jumped anyway; and he described how the jump pulled everything back into place and essentially healed him. Mr. Runyon reported that when he left the military a year later, he was deemed to be in "perfect health"; but since they wouldn't give him his records he couldn't go to the VA hospital, etc.; and he noted that he believes that this was all part of a scam to keep too many veterans from getting follow-up medical care and other services.

Mr. Runyon reported that while still in the military, he was also diagnosed with Posttraumatic Stress Disorder following that car accident; he noted that he still has flashbacks to the accident; but he reported that at the time he felt, and told the doctor that made the diagnosis, that his response to the accident was perfectly normal and that he could face his fears. Mr. Runyon then noted that he was experiencing flashbacks and nightmares before that accident; he would wake up all wet, his heart would be racing and he would be ready to fight; then there was the way he dealt with situations; and he noted that given all of that and the fact that he had had many 'near death experiences' prior to that accident, he just felt that how he felt was just a normal part of his life.

Mr. Runyon then noted that even when he was a child he knew that evil spirits can influence this world; he has seen ghost and entities that he was certain were not shadows or reflections of light; and he noted that he knew that what he was seeing was real because of the way they moved and the fact that he could feel their presence. He reported that he was never afraid of any of that; so he never ran, knowing that he could manage any of that; and as an example, he described an incident that occurred when he was a child, where a glass was moving across the table and he simply caught it. Mr. Runyon then went on to note that there have been times when that evil has tried to use others to cause him harm, either intentionally or through their carelessness; he has been able to foresee that and thereby avoid that; and he gave numerous examples of this happening in his life.

Mr. Runyon noted that *if* he is afraid of anything, he is afraid to fail. He noted that he has known since he was about 18 or 19 years old that he had to make important decisions, and if he didn't, someone might die, and that is how he has saved so many lives. He noted however that there

9

EXHIBIT 29

have been many close calls, and he noted that some of his nightmares involve close calls or his actually failing.

Mr. Runyon described in great detail how he was attacked while being held for trial and how his head was slammed on the cement floor, and he reported that although he doesn't know if he was rendered unconscious or not, he knows that he was at least stunned as he laid there on the floor. He then went on to report that he believes that he was set up for this beating by the corrections officers, who were persuaded to do that by the prosecutor; he believes that they were trying to create a situation where he would get violent so that such violence could be used against him at his trial; and he reported that when that didn't work, they used the guy who beat him as a snitch and the guy then testified against him at his trial.

Mr. Runyon then described multiple irregularities that occurred at this trial and how the prosecutor lied and used every trick possible to influence the jury. He reported that they even threatened his girlfriend to get her to say whatever they wanted her to say at his indictment. He noted that given that he had worked within 'the system' and believed in the system, he was sitting there in shock at all of this misbehavior for most of his trial. Mr. Runyon then went on to point out numerous other indicators of this conspiracy against him; these included, for example, that his trial was set for a Friday the 13th; and he noted that he isn't paranoid if what he is telling this psychiatrist is true and done on purpose.

Mr. Runyon reported that since being on death row, he has come to understand some things about himself, prompted by a combination of the gravity of his situation, the conditions of his confinement, the fact that he has nothing else to do but think, and the fact that his pen pals have gotten him to talk about things and express his emotions in ways that he had never done before. He has come to realize, for example, that there are lots of things in his life that have had an impact on him that he has never dealt with. He has realized that he gets certain thoughts in his head, those thoughts then 'snow ball' and take over, and he then finds it impossible to let those thoughts go.

***

Given that the information contained in the records and documents reviewed by this psychiatrist is otherwise available to reviewers of this report, all of that information will not be repeated here. Instead I will simply list at least some of the information or categories of information that are particularly relevant to the opinions listed below.

- Mr. Runyon's mother's pregnancy with him was a high risk pregnancy in that she had no prenatal care during most of the pregnancy; she failed to gain weight during the course of the pregnancy; and she had a couple threatened miscarriages during the course of the pregnancy and complications at the time of delivery.
- Mr. Runyon appeared to have no real knowledge about his family history of major mental illness. Of significance is the fact that there is a clear history of major mental illness on both sides of his family; the etiology of most of the disorders includes genetic

10

EXHIBIT 29

transmission; and so therefore, both of Mr. Runyon's parents and Mr. Runyon himself were genetically at increased risk for the development of similar disorders.

- By all reports, both of Mr. Runyon's parents did, in fact, suffer from some of the major psychiatric difficulties that ran in their respective families, in that his mother suffered from a Mood Disorder and was explosive, and his father also suffered from a Mood Disorder and was explosive, and also appears to have abused alcohol.

- Also of significance is the fact that his mother's and his father's developmental years were influenced/impacted upon by the mental illnesses in their respective families of origin; this negatively impacted upon their development; and this impact on their development, superimposed upon their above noted psychiatric difficulties, rendered them even less able to adequately parent Mr. Runyon.

- In addition, both of Mr. Runyon's parents have a significant trauma history, resulting in trauma-related difficulties that further impaired their ability to function. More specifically, as children, both of his parents were repeatedly exposed to violence, and his mother was also traumatized by the problems she endured in Korea and during her escape from Korea.

- Given all of the above noted, it is not surprising that during Mr. Runyon's early childhood years, the relationship between his parents involved a level of domestic violence that was extremely frightening to him. It is also not surprising that during those years, his parents were unable to provide him with the type of nurture, support or parental protection that might have helped to mitigate the impact of such an exposure to domestic violence or otherwise fostered his development.

- However, Mr. Runyon's only understanding of his father was that he was a man who was likely to kill his mother and who eventually turned on him too. Similarly, Mr. Runyon never had and has never really gained any clear understanding of his mother's erratic, at times explosive, and extremely controlling behavior. Therefore, his experience with both of his parents has been and continues to be confusing and extremely distressful.

- After Mr. Runyon's mother left his father, the next couple years were characterized by rather severe financial hardship, which made it all the more difficult for her to care for and provide for Mr. Runyon and his younger brother.

- When Mr. Runyon's mother became involved with his stepfather, his stepfather did stabilize the family financially. However, although his stepfather was not as frightening as his biological father, he was not the idealized father that Mr. Runyon reports him to be. Although Mr. Runyon acknowledges that his stepfather rarely showed emotions and was rarely available to him, by all other reports he was an extremely detached and uninvolved parent. In fact, when this psychiatrist confronted Mr. Runyon about his characterization of his stepfather, even Mr. Runyon couldn't come up with anything that suggested otherwise, except for the fact that his stepfather adopted him and his brother and financially provided for them.

- The other sources of information available to this psychiatrist offered a clearer picture of Mr. Runyon's military service and subsequent employment history. Although Mr. Runyon repeatedly described himself in superlatives and as noted above, always blamed others for the work-related difficulties that he has had, these other sources of information didn't support his assertions.

- Based on Mr. Runyon's reports to this psychiatrist and the records and documents reviewed by this psychiatrist, it appears that he has had various types of difficulties for

11

EXHIBIT 29

most of his life that have compromised his ability to function (as discussed below). However, the records and documents reviewed by this psychiatrist indicate that his difficulties became even more severe following the automobile accident that he was in when he was about 25 years old.  Although Mr. Runyon acknowledges at least some increased difficulty after that accident, the records and documents reviewed by this psychiatrist indicate that the difference in his behavior and ability to function was much more significant.

- Some of the records and documents reviewed by this psychiatrist broaden the picture of Mr. Runyon's thinking and behavior leading up to and at the time of his trial. Collectively, Mr. Runyon's reports and the records and documents reviewed by this psychiatrist indicate that he was extremely distressed, and that his affect was consistent with the level of distress that he was experiencing.

- Both the report of the evaluation of Mr. Runyon by Dr. Mrikangas and the report of the evaluation of Mr. Runyon by Dr. Mirsky confirm that Mr. Runyon suffers from organic brain damage involving the frontal lobe of his brain, resulting in impaired executive functioning.  Both doctors also opined that Mr. Runyon was suffering from a psychotic process.

- The report of the evaluation of Mr. Runyon by Dr. Cunningham describes the numerous factors that put Mr. Runyon at increased risk for the development of mental health difficulties; the mental health difficulties that Mr. Runyon developed; and the impact of those mental health difficulties on Mr. Runyon's ability to function.

Summary & Discussion:

The information currently available to this psychiatrist indicates that Mr. Runyon had an extremely difficult childhood, and that the numerous difficulties that he endured had an extremely negative impact on his development, which then significantly impaired his ability to function.

More specifically, during his earliest years, Mr. Runyon was repeatedly exposed to the physical abuse of his mother by his biological father, which he experienced as so severe that he felt that his father was going to kill his mother.  This exposure to domestic violence occurred in the absence of the type of parental nurture and support that might have at least helped to mitigate the impact of this exposure on Mr. Runyon's development.

Such repeated exposure to violence in the absence of parental nurture and support results in the development of psychological trauma-related symptoms such as hypervigilance and over-reactivity, and Mr. Runyon reported a long history of such symptoms.  When a parental figure repeatedly fails to calm a repeatedly traumatized/frightened child, the child is unable to learn to calm his/her physiological response to frightening situations; this can impact on the development of the child's brain, and as a result, the child becomes physiologically hyper aroused and anxious as well; and Mr. Runyon evidences this difficulty too.

12

EXHIBIT 29

It is important to note that although Mr. Runyon's mother took him and his brother and left his father when Mr. Runyon was still quite young, just prior to that separation, Mr. Runyon's father also severely physically abused him, which was also extremely traumatic. Furthermore, after that separation, Mr. Runyon continued to be repeatedly exposed to his mother's erratic and often violent behavior. He also continued to experience the absence of parental nurture and support, both in relationship to his mother and later in relationship to his stepfather as well.

In addition to the fact that the absence of parental nurture, support and protection increases the damage caused by repeated exposure to violence during early developmental years, such poor parenting negatively impacts on other aspects of development as well. More specifically, as a result of such poor parenting, children fail to learn how to develop stable relationships, they fail to develop a stable and positive sense of themselves, they fail to learn how to regulate their mood, and they are impulsive. Mr. Runyon evidences all of these psychiatric difficulties too. In addition, there were also other problems that Mr. Runyon endured during his childhood and early adolescent years that also contributed to the development of these same psychiatric difficulties, such as feeling like an outcast in relationship to his peers, not having access to any extended family members who might have offered him at least some nurture and support, and being so frequently moved that he was unable to develop any other outside support from other adults or his peers.

Mr. Runyon's mother's own trauma history, her other psychiatric difficulties, and her cultural background and experiences were all factors that contributed to her erratic and often violent behavior and her inability to appropriately parent him and his brother; In fact, each of these factors complicated and exacerbated the other, resulting in a level of impairment that was far greater than the simple sum of these difficulties. This same combination of factors rendered her unable to see the impact of all of these difficulties on Mr. Runyon's development; in turn, she failed to get him the type of help he required; and as a result, the psychiatric difficulties that he developed during his childhood and early adolescent years went unidentified and unaddressed, and so he continued to suffer from these difficulties.

The information currently available to this psychiatrist indicates that as Mr. Runyon moved into his late adolescent/early adult years, other psychiatric difficulties emerged, characterized by an even more severe disturbance of his mood and more clearly defined psychotic symptoms. As noted above, Mr. Runyon's family history of mental illness and the role of genetic transmission in the etiology of these types of mental illness placed him at increased risk for developing such psychiatric difficulties.

More specifically, episodes of depression and episodes of at least hypomania were superimposed upon the above noted difficulties regulating his mood that he had been experiencing since he was a child. I say "at least hypomania" because he was hypomanic when he was examined by this psychiatrist, but many of his reports and the information available from other sources of information indicate that he has likely experienced full manic episodes. In addition, clearly delusional thoughts of both the grandiose and the paranoid type were superimposed upon immature psychological defenses that he had been using and thoughts that he had had for some type about evil and the possibility that someone was out to get him.

13

EXHIBIT 29

The first such episode of this combined combination of emerging psychiatric difficulties seems to have occurred during Mr. Runyon's first year at the military academy; he described a fixed belief that there was a conspiracy to get rid of him; he was quite grandiose with regard to his sense of himself compared to all the other students; and he reported being up for nights at a time, unable to sleep. Over time, these episodes became more severe; this tends to be the clinical course of such difficulties when they go untreated; and there were also episodes characterized by a clinically significant depression. The possibility that subsequent trauma to his brain contributed to the further increased severity of these difficulties, as suggested by other evaluators, can not be ruled out.

In addition to being a problem in and of themselves, these additional psychiatric difficulties also interacted with and further complicated his above described trauma-related difficulties and other developmental difficulties. For example, the emergence of paranoid delusions that someone was trying to harm him clearly exacerbated his trauma-related hypervigilance and over reactivity. For example, as his mania and grandiose delusions became more severe, they served as a defense against some of his anxiety and fears, but also caused his behavior to become all the more erratic, unpredictable and impulsive.

As noted above, during his young adult years, Mr. Runyon continued to experience traumatic events. These 'near death experiences' further exacerbated his trauma-related difficulties.

Then furthermore, there is the matter of Mr. Runyon's cognitive deficits, seen clinically and confirmed by neurological and neuropsychological testing. Such cognitive deficits further impaired Mr. Runyon's decision-making capacity beyond the impairments resulting from the distorted perceptions of reality, the impairments in judgment, and the impulsivity associated with his other psychiatric disorders.

I have purposely focused on describing the symptoms of Mr. Runyon's psychiatric difficulties, because it is through an understanding of his symptoms and how they interact with and exacerbate each other that one comes to appreciate how his psychiatric difficulties impact on his ability to function. This, of course, is what makes these difficulties potentially mitigating. However, to confirm that it is my opinion that these psychiatric difficulties are a product of mental illness, I also offer the following diagnoses. It is my opinion that Mr. Runyon has been suffering from Posttraumatic Stress Disorder (quite possibly with an organic brain/physiological component further complicating the psychological symptoms of his PTSD); Borderline Personality Disorder; Schizoaffective Disorder, Bipolar Type; and Neurocognitive Disorder.

Given an adequate amount of time, and armed with an adequate set of records and documents and information gathered from family members and others who new Mr. Runyon, at the time of his trial, I, or another experienced psychiatrist, could have discovered that Mr. Runyon was suffering from the same above noted combination of psychiatric difficulties. All of these psychiatric difficulties are chronic and long-standing. Therefore, in the absence of treatment, they would have impaired his capacity to function at the time of the crime for which he has been convicted and sentenced to death, and they would be have been evident at the time of his trial.

14

EXHIBIT 29

Furthermore, I, or another experienced psychiatrist would have recognized that the combination of Mr. Runyon's extremely difficult childhood and these psychiatric difficulties was the type of information that should have been offered to Mr. Runyon's legal team for consideration as mental health mitigation. Specifically, with regard to statutory mitigation, it is my opinion, to with a reasonable degree of medical certainty, that these psychiatric difficulties constitute a severe mental or emotional disturbance. It is also my opinion, to within a reasonable degree of medical certainty, that as a result of these psychiatric difficulties, Mr. Runyon's capacity to conform to the requirements of law was significantly impaired.

Finally, I have been asked to comment on what the defense team might have said when the prosecutor instructed the jury to look at Mr. Runyon's face (as seen in his interrogation video and as seen in court) and see that he lacks remorse.

First of all, facial expression is among the most significant components of 'affect', which is the external representation of what a person is thinking and feeling. As noted above, an assessment of affect is part of the mental status examination which is performed by psychiatrists and other mental health professionals during the course of a mental health examination; it is performed within the context of other information gathered during the course of such an examination; and such an assessment requires much more than simply looking at a person's face. More specifically, for example, the evaluator must know about and appreciate the significance of the fact that a flattening of the affect is likely a symptom of a psychotic process, which would be evident from other information obtained, and thereby not wrongfully attributing such an affect to something else. For example, the evaluator must know about and appreciate the significance of the fact that a blunting of the affect may be a symptom of a clinically significant depression, which would then be otherwise explored for during the course of the examination before wrongfully attributing it to something else. For example, an inappropriate affect could be due to a variety of psychiatric, neuropsychiatric or other medical conditions, all of which would have to be considered and explored for before attributing such an inappropriate affect to something else. In other words, for these and the specific reasons discussed below, an assessment of Mr. Runyon's facial expression and affect is among the things for which a mental health professional/expert witness should have been called to assist the jury, given that members of the jury wouldn't be expected to be able to do this on their own.

As noted above, it is my opinion that Mr. Runyon has been suffering from multiple major psychiatric disorders. With many of those disorders, alteration of facial expression and affect is a symptom. Therefore, I, or any other experienced psychiatrist, could have been called to opine that Mr. Runyon's psychiatric disorders are a major determinate of his facial expression. In addition, the nature of the injuries that have caused Mr. Runyon's facial asymmetry are also a major determinate of his facial expression. During the course of my examination of Mr. Runyon, it was clear that as a result of the injuries to his face, he had an extremely limited capacity for facial expression, which significantly impaired his affective expression. Here too, I, or any other experienced psychiatrist, neurologist or other similar professional, could have been called to opine that the injuries to Mr. Runyon's face must be taken into consideration when assessing his facial expression.

15

EXHIBIT 29

Richard G. Dudley, Jr., M.D.
Psychiatrist
Diplomate, American Board of Psychiatry & Neurology

16

EXHIBIT 29

# CURRICULUM VITAE

Richard G. Dudley. Jr, M.D.

210 West 101st Street, Suite 11-K
New York, New York 10025

(212) 222-5122

## EDUCATION:

*   Temple University School of Medicine Philadelphia, Pennsylvania
    M.D., 1972

*   Northwestern University Medical Center Chicago, Illinois
    R6 Internship

*   Northwestern University Institute of Psychiatry Chicago, Illinois
    Psychiatric Residency, completed 1975

## LICENSURE AND CERTIFICATION:

*   License for the Practice of Medicine, State of New York

*   Diplomate, American Board of Psychiatry and Neurology

## PAST ACADEMIC APPOINTMENTS:

*   Visiting Associate Professor of Medicine, Department of Behavioral Sciences
    City University of New York Medical School at City College

*   Adjunct Assistant Professor of Law, School of Law
    New York University

EXHIBIT 29

## PROFESSIONAL EMPLOYMENT HISTORY:

\*   January '76 to Present:                                     Private   Practice   of   Psychiatry

At present, the practice includes a clinical practice primarily focused on adolescents and adults (evaluation, consultation, and both individual and family psychotherapy); a forensic practice (I regularly appear as a psychiatric expert in various types of legal proceedings throughout the United States); and consultation/education (the development and/or presentation of continuing medical education programs, as well as education programs for other health professionals, attorneys, and the public).

\*   September '85 to June '05:                      Associate Professor of Medicine
                                                             Behavioral Sciences
                                                             CUNY Med School at City College

From September, 1985 to August, 1992, I was Director of the Department of Behavioral Sciences, at which time my primary responsibility was to direct the full-year/required course in behavioral sciences. The goal of this course was to help students acquire knowledge, skills and attitudes which would assist them in becoming effective primary care physicians, for a range of persons from different cultural backgrounds, through the incorporation of contributions from the fields of psychiatry, psychology, social work, sociology, and anthropology. After I retired from the position of Director, I continued to teach in the course.

\*   September '84 to April '05:                     Adjunct Assistant Professor, then

                                                             Visiting Lecturer
                                                             School of Law
                                                             New York University

Initially, as an Adjunct, I team-taught full seminars on "Expert Evidence" and also team-taught Family Law. Then, I transferred to the Law Clinic, funded under a different mechanism, where I team-taught "Expert Evidence" with various law professors in connection with clinical seminars. Lectures included an exploration of the interface between the behavioral and social sciences and the law, and how lawyers might more appropriately work with psychiatric experts. In other settings I have lectured on various other aspects of law and psychiatry to judges, attorneys, law students and others.

2

EXHIBIT 29

\* July '82 to June '94:

Teaching Attending Physician
Department of Psychiatry
New York Medical College
Lincoln Hospital Division

Responsibilities included course, seminar and case conference teaching, as well as individual psychotherapy case supervision for psychiatry residents, and the direction of the psychotherapy group for psychiatry residents. Previously, through the department's Consultation and Liaison Service, I also taught as part of the Chairman's Rounds for the Department of Internal Medicine.

\* January '79 to October '84:

Assistant Director
Professional Services Dept.
Roche Laboratories, Div. of
Hoffmann-La Roche, Inc.

The principal responsibilities were to actively and creatively participate in the medical aspects of marketing Roche products and services, and to direct the activities of the Professional Services Product Group. As a participant on Marketing Teams, I helped to develop marketing strategies and plans, train Roche Field Representatives and implement various promotional programs. My responsibilities also included the coordination of Phase IV research efforts, and the development of scientific exhibits, medical education films, monographs, and symposia for physicians.

\* April '76 to July '82:

Psychiatric Consultant
Mental Health Programs
Children's Aid Society of
New York City

Responsibilities included teaching, diagnostic evaluations and treatment of selected cases.

\* December '77 to December '78:

Medical Director
Washington Heights-West Harlem
Community Mental Health Center

Responsibilities included the design, development and then day-to-day operation of a full, twelve service community mental health center. When I accepted this position, the center had just been funded, and every program element and support system had to be developed. Once the twelve service chiefs and other key administrative staff were hired, and basic support systems were developed and put into place, I supervised the chiefs, developed in-service training programs and

3

EXHIBIT 29

worked towards the development of program elements not covered by the original grant, for example, research programs, transitional housing programs, and vocational rehabilitation programs.

* January '76 to December '77:                    New York City Department of
                                                  Mental Health, Mental Retardation
                                                  & Alcoholism Services

Assistant to the Commissioner January '76 to November '76

        June Jackson Christmas, M.D. -        Commissioner

Deputy Commissioner              February '77 to December '77

        Primary responsibilities included the development of new clinical programs/services, as well as the ongoing monitoring, evaluating, and upgrading of the existing mental hygiene service system. This system included all of the medical centers, voluntary hospitals and agencies, and the municipal hospitals and public mental hygiene programs in all five boroughs.

        November '76 to January '77:                    [On leave from the Department]

        Coordinator/Team Leader
        Carter-Mondale Transition Planning Group

        The focus of this effort was to develop policy options in the areas of mental health, mental retardation, alcoholism, drug abuse and the developmental disabilities for the incoming administration.

* January '74 to December '75                    Staff Psychiatrist
                                                 Lower North Community
                                                 Mental Health Center
                                                 Chicago Board of Health

Responsibilities included diagnostic evaluations, treatment and some supervision and teaching. In addition, there was primary responsibility for the Center's adolescent program.


**PROFESSIONAL ORGANIZATIONS:**

* American Psychiatric Association - Distinguished Life Fellow
        Scientific Program Committee, 1998-2001
        Delegate, APA Assembly 1979-1983

4

EXHIBIT 29

* New York County District Branch (APA)
    Committee of Black Psychiatrists 1984-1986
    Committee on Legislation 1980-1983
    Committee on Emergency Psychiatry 1978-1979

* American College of Psychiatrists – Fellow
    Awards Committee 1993-2001
    Nominations Committee 1989-1992

* Black Psychiatrists of America
    Nominations Committee 1985-1987
    Program Committee 1980-1982
    President, Metropolitan New York Chapter 1978-1988

* National Medical Association

* New York Academy of Medicine - Fellow

* One Hundred Black Men  1977-1982
    Health Committee 1979-1981

* American Orthopsychiatric Association 1988-1991
    Program Committee 1989-1990

* American Society for Adolescent Psychiatry 1984-1988

* American Academy of Psychiatry & the Law 1984-1988

* American Medical Association 1970-1976
    Council on Long Range Planning and Development 1973-1975
    Council on Mental Health 1971-1975

* American Medical Student Association Foundation 1979-1980
    Board of Directors 1979-1980

* American Medical Student Association 1970-1973
    Director, Video Journal 1971-1973
    Board of Trustees 1971-1972

* Student National Medical Association 1969-1972


## OTHER PROFESSIONAL ACTIVITIES:

* Consultant in creative approaches to medical education, using a variety of media

* Lecturer/speaker for professional health and/or law related organizations and groups, as   well as non-professional groups throughout the United States and, to a limited extent, abroad -- frequent guest on various television programs, as well as host and guest on radio programs.

* Executive Session on Policing and Public Safety, Harvard Kennedy School, sponsored by the National Institute of Justice, 2013-2015

5

EXHIBIT 29

*     Commission on Safety and Abuse in America's Prisons, 2005-2006

*     Housing Works, Inc., Board of Directors 2005-present

*     Vera Institute of Justice, Board of Directors 1989-2014

*     Hospital Audiences, Inc., Clinical Advisory Board

*     Examiner in Psychiatry, American Board of Psychiatry & Neurology

*     Highbridge-Woodycrest Center, Inc., Board of Trustees 1991-2004

*     Co-Principal Investigator, Minority Education, Research & Training Institute [New York State Department of Mental Health] 1990-1994

*     Public Member, Fatality Review Panel, Child Welfare Administration (formerly Special Services for Children), NYC Human Resources Admin. 1990-1992

*     Family Court Advisory Committee, First Judicial Department 1987-1989

*     Program Development Committee, NYU AIDS Mental Health Project (NIMH Contract No. 278-87-005) first 3 years

*     Coordinator of Training for Volunteers Minority Task Force on AIDS 1986-1988

*     Poison Control Advisory Committee, N.Y. City Department of Health 1980-1981

*     Education/Training Consultant, N.Y. State Office of Mental Health 1979

*     Consultant, Conference on Minority Mental Health Manpower, HEW-ADAMHA Minority Advisory Committee 1979

*     Member, Mental Health Committee, Task Force on the New York City Fiscal Crisis 1978

*     Chairperson, Task Panel on the Mental Health of Black Americans, The President's Commission Mental Health 1978

*     Physician Resources, Inc. Board of Consultants 1977-1979

*     Board of Directors, and Chairman of the Ambulance Committee, New York City Regional Emergency Services Council 1977-1978

*     Task Force on Services to Emotionally Disturbed Adolescents, New York City Human Resources Administration 1977

*     Advisory Board, Center for Physician Career Development, American Medical Student Association Foundation 1977

*     American Bar Association -- Young Lawyer's Section Committee on Mental Health, Physician Member/Consultant, 1974-1975

*     The Thresholds (rehabilitation program for young psychiatric patients) Board of Directors 1974-1975

6

EXHIBIT 29

**OTHER SELECTED ACTIVITIES:**

* Walter Nicks Dance Theatre Workshop
  Chairman, Board of Directors 1985-1994

* Amistad World Theatre
  Chairman, Board of Directors 1983-1989

* National Urban League
  Black Executive Exchange Program 1979-1981
  Committee on Mental Health 1976-1979

* National Association for the Advancement of Colored People Advisory
  Committee, Project Rebound 1977-1978

* National Advisory Committee on Ethics 1975-1978

* New York City Black Citizens for a Fair Media Psychiatric Consultant 1977-1978

* Young Life, Inc. 1968-1972

* Big Brothers of America 1970-1972


**SELECTED HONORS:**

* New Jersey Black Achiever of Business and Education 1982

* Award of Merit, Black Psychiatrist of America 1977

* "Who's Who in America" 1976–1977

* American Biographical Institute
  "Community Leaders and Noteworthy Americans" Ninth Edition

* Dictionary of International Biography – Cambridge, England
  "Men of Achievement" Fifth Edition

* Solomon Carter Fuller Institute
  Traveling Fellow 1975

* Outstanding Young Men of America 1972

* National Medical Fellowship Recipient 1969–1971


**PUBLICATIONS:**

Dudley, Richard G. Jr., M.D. Childhood Trauma and Its Effects: Implications for Police. New Perspective in Policing Bulletin. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 2015, NCJ 248686

7

EXHIBIT 29

Davis PC, Chandler E, Dudley RG: The Place of Families in Juvenile Defense: Work After *Miller v. Alabama*. New England Journal on Criminal and Civil Confinement, 19 (No. 2):293-301, 2013

Dudley R.G., Blume Leonard P: Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment. The Hofstra Law Review, 36 (No 3): 963-988, 2008.

Dudley RG: Offering Psychiatric Opinion in Legal Proceedings When Lesbian or Gay Sexual Orientation Is an Issue in Mental Health Issues in Lesbian, Gay, Bisexual, and Transgender Communities, Jones BE & Hill MJ (eds), APA Review Psychiatry. Vol. 21, American Psychiatric Publishing, Inc., Washington, D.C. 2002

Dudley RG: All alike but each one different: orphans of the HIV epidemic in Orphans of the HIV Epidemic, Levine C (ed) Unit Hospital Fund, New York. 1993

Dudley RG: Serotonin partial agonists in the treatment of anxiety and depression: Introduction. Journal of Clinical Psychiatry, 51:30, 1990.

Bing EG, Nichols SE, Goldfinger SM, Fernandez F, Cabaj R, Dudley RG, Krener P, Prager M, Ruiz P: The many faces of AIDS: Opportunities for intervention. New Directions For Mental Health Services - Psychiatric Aspects of AIDS, 48:69-81, 1990.

Dudley R.G: Blacks in policy-making positions in Black Families in Crisis- The Middle Class, Coner-Edwards AF and Spurlock J (eds), Brunner/Mazel, New York, 1988.

Davis PC, Dudley RG: The black family in modern slavery. The Harvard Blackletter Journal - Harvard School 4:9-15, 1987.

Davis P, Dudley RG: Family evaluation and the development of standards for child custody determination. Columbia Journal of Law and Social Problems, 19 (No. 4):505-515, 1985.

## LECTURES, PRESENTATIONS, AND EDUCATIONAL VIDEOTAPES

Described upon request

6/2015

RGD:dw

8

EXHIBIT 29