**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| | : | |
| DAVID ANTHONY RUNYON, | : | No. 4:15-cv-108 |
| Petitioner, | : | Initial Criminal No. 4:08-cr-16-3 |
| | : | CAPITAL §2255 PROCEEDINGS |
| v. | : | |
| | : | HON. REBECCA BEACH SMITH |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |
| | : | |
| | : | |

**PETITIONER'S REPLY TO RESPONSE OF THE UNITED STATES TO
MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**

Petitioner David Runyon hereby replies in support of his Motion to Vacate, Set Aside, or Correct the Sentence in his capital case. *See* ECF No. 522; *Ray v. U.S.*, 301 U.S. 158, 161 (1937) (when court grants extension to specific date that is a Sunday, filing is due on Monday). Runyon's motion for leave to exceed the page limit is pending. ECF No. 523.

**AFFIRMATIVE DEFENSES**

The Government's answer, ECF No. 497, pp.13-16, references several affirmative defenses including statute of limitations, procedural default and nonretroactivity. *See Day v. McDonough*, 547 U.S. 198, 205 (2006) (describing affirmative defenses in a §2254 context). These are nonjurisdictional defenses that a collateral respondent is "'obligated to raise'" in the first instance "if it is not to 'lose the right to assert the defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)). The burden rests with the Respondent to prove such defenses. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010). A petitioner has no duty to anticipate or address any affirmative defense in his §2255 motion. To the extent the Government has not raised or adequately presented an affirmative defense to a claim, the Court can deem that defense waived. *See*

*Hudson v. Hunt*, 235 F.3d 892, 895 n.1 (4th Cir. 2000) (finding statute of limitations defense waived); *Riggs v. U.S.*, No. CIVA 7:06-cv-439, 2006 WL 3746674, at *1 fn.1 (W.D. Va. Dec. 15, 2006) (finding procedural default defense waived).

### A. Statute of Limitations

None of Runyon's claims are time-barred. Respondent has acknowledged Runyon's §2255 motion is timely filed, ECF No. 504, p.3, and has not alleged any claims are time-barred.

Nonetheless, the Government discusses this defense generally. It points out that there is a statutory one-year limitations period, and it says that this period begins when the defendant's conviction becomes final by the Supreme Court's denial of certiorari following direct appeal. The Government's description is true but incomplete. Under 28 U.S.C. §2255(f), the one-year limitations period actually runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*. If the basis for an additional new claim subsequently accrues, Runyon can timely present that claim in a supplemental §2255 motion so long as he does so within one year of the relevant triggering event.

### B. Procedural Default

The Government alleges that many of Runyon's claims are procedurally defaulted. Runyon disagrees, and he addresses the Government's specific allegations *infra* in his replies on individual claims.

No federal statute or constitutional requirement bars a §2255 petitioner from raising an issue for the first time on collateral review. *Massaro v. U.S.*, 538 U.S. 500, 504 (2003). Claims not raised on direct appeal may be raised for the first time on §2255 review subject to the judicial doctrine of procedural default if the doctrine is asserted by the Government. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984) (noting that the exhaustion rule is not a federal jurisdictional bar); *Yeatts v. Angelone*,

166 F.3d 255, 261 (4th Cir. 1999) ("[T]he issue of procedural default generally is an affirmative defense that the [government] must plead in order to press the defense thereafter."). Under the doctrine of procedural default, a §2255 claim is defaulted only if it could have been "fully and completely addressed on direct review based on the record created" in the trial court, but was not raised on direct appeal. *Bousley v. U.S.*, 523 U.S. 614, 622 (1998). The doctrine does not apply to claims that could not have been raised on direct appeal because they required development of facts outside the trial record. *Id.* at 621 (citing *Waley v. Johnston*, 316 U.S. 101 (1942)) (per curiam), and describing it as a case in which "we held that there was such an exception [to procedural default] for a claim that a plea of guilty had been coerced by threats made by a Government agent, when the facts were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal'").[1] *Id.* at 621-22 (quoting *Waley*, 316 U.S. at 104).

The Government acknowledges that in §2255 proceedings the procedural default doctrine never applies to a claim of ineffective assistance of counsel, regardless whether that claim could have been raised on direct appeal. *Massaro*, 538 U.S. at 503-04.

The Government also recognizes that a procedural default is excused—and the claim must be considered on its merits—if the petitioner demonstrates "cause and prejudice." In this context, "cause" means that "some objective factor external to the defense impeded counsel's efforts to comply with the … procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Circumstances in which cause

---

[1] The Ninth Circuit ruled that Waley had defaulted his claim because he was represented by counsel and had consulted with counsel, yet he failed to allege any facts about FBI coercion at the plea colloquy. *Waley v. Johnston*, 124 F.2d 587, 588 (9th Cir. 1941). The Supreme Court reversed. In *Bousley*, the Court distinguished *Waley* on the ground that the facts necessary to adjudicate Waley's claim were outside the trial record and their effect on the judgment was not open to consideration and review on appeal, whereas the facts necessary to adjudicate Bousley's claim were in the plea colloquy and therefore could have been addressed on direct review. *Bousley*, 523 U.S. at 622 ("This type of claim can be fully and completely addressed on direct review based on the record created at the plea colloquy.").

can be present include, but are not limited to, those where evidentiary facts that were critical to establishment of the claim were unavailable to the defense, *Strickler v. Greene*, 527 U.S. 263, 286 (1999); where interference by governmental officials made compliance with the procedural rule impracticable, *Banks v. Dretke*, 540 U.S. 668, 691 (2004); or where defense counsel rendered ineffective assistance, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

"Prejudice" in this context is established if the petitioner demonstrates "that 'there is a reasonable probability' that the result of the [proceeding] would have been different" absent the error. *Strickler*, 527 U.S. at 289 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). This parallels the showing required to demonstrate prejudice under *Strickland, supra*, or materiality under *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court emphasizes that in determining prejudice, "a different result" is not calculated by asking "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289-90.

A procedural default also is excused if the petitioner shows "a fundamental miscarriage of justice." *Carrier*, 477 U.S. at 495-96. Although the contours of this exception are not well defined, it is undisputed that a petitioner meets the standard by showing that in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Although not mentioned by the Government, a penalty-phase default can be excused under the "miscarriage of justice" exception even if the defendant cannot show that he is innocent of the crime. Under *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), such a default is excused if the petitioner shows "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." The Supreme Court has not excluded the possibility that additional circumstances may rise

4

to "a fundamental miscarriage of justice" and excuse a procedural default.

### C.  Retroactivity of New Rules

The "new rule" doctrine is an affirmative defense. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). The Government alleges that this doctrine precludes consideration of all or parts of Runyon's claims 9, 10, 11, 13, 14, 17, and S2. Runyon disagrees on two grounds. First, this doctrine does not apply to §2255 motions in the first instance.[2]

The "new rule" doctrine, first announced in *Teague v. Lane*, 489 U.S. 288 (1989), limits the retroactive application of new rules of criminal procedure. *Teague* itself was limited to claims by state prisoners under 28 U.S.C. §2254, and the Court did not address whether its rule would extend to claims by federal prisoners. *See Teague*, 489 U.S. at 327 n.1 (Brennan, J., dissenting). This remains an open issue. In *Danforth v. Minnesota*, 552 U.S. 264 (2008), the Court held that *Teague* does not apply in state collateral proceedings, but reserved "whether the *Teague* rule applies to cases brought under 28 U.S.C. §2255." *Id.* at 269 n.4. In *Chaidez v. U.S.*, 133 S.Ct. 1103 (2013), the Court again reserved whether "*Teague*'s bar on retroactivity does not apply when a petitioner challenges a federal conviction." *Id.* at 1113 n.16.

In *Martinez v. U.S.*, 139 F.3d 412, 416 (4th Cir. 1998), the court of appeals held that *Teague* does apply to federal collateral claims, predicting that "it can safely be assumed that the Court would apply *Teague*'s nonretroactivity principle to suits under §2255." Notwithstanding the Fourth Circuit's confidence, the Supreme Court has repeatedly avoided taking that step.

In her plurality opinion in *Teague*, Justice O'Connor weighed the need to respect and preserve

---

[2] Runyon acknowledges that this Court is bound by circuit precedent holding that *Teague* "applies to *federal* prisoners' actions … under 28 U.S.C. § 2255." *Martinez*, 139 F.3d at 416. He presents the issue here to preserve it for further review.

constitutional rights and ensure accuracy and integrity of convictions, against the State's interest in comity and finality. *Teague*, 489 U.S. at 308, 309 (plurality). There are no comity interests when federal courts review federal convictions. Federal courts are not intruding into state criminal proceedings, are not imposing any costs on States by retroactive application of new rules, are not forcing States to marshal resources to defend their judgments, and are not overturning convictions of a coordinate jurisdiction. *See also Danforth*, 552 U.S. at 272-73 ("the text and reasoning of Justice O'Connor's opinion illustrate that the rule was meant to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions"). In light of these recognitions, other courts of appeals have expressed reservations. *See, e.g., Reina-Rodriguez v. U.S.*, 655 F.3d 1182, 1189 (9th Cir. 2011) ("[T]here is some doubt under current Supreme Court jurisprudence whether *Teague* applies to federal prisoners … who seek federal habeas relief."); *Duncan v. U.S.*, 552 F.3d 442, 444 n.2 (6th Cir. 2009) ("It is not entirely clear that *Teague*'s framework is appropriate for federal habeas petitions under 28 U.S.C. §2255, because many of the comity and federalism concerns animating *Teague* are lacking."). *See also U.S. v. Payne*, 894 F. Supp. 534, 543 (D. Mass. 1995) (pointing out that §2255 proceedings are "'an integral part of a continuous criminal proceeding that is segmented by no event or condition decisive of finality'") (quoting James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* §22A.6, at 272-74 (Supp. 1993)).

Second, even if *Teague* applies to §2255 claims, it is expressly limited to new rules of procedure. A rule is procedural if it "regulat[es] '*the manner of determining* the defendant's culpability.'" *Montgomery v. Louisiana*, 136 S.Ct. 718, 730 (2016) (plurality) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)). In contrast, "*Teague* requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings." *Id.* at 728. A rule is substantive when the Supreme Court has decided the meaning of a criminal statute enacted by Congress, *Bousley*, 523 U.S. at 620, or it "has

eliminated [the Government's] power to proscribe the defendant's conduct or to impose a given punishment." *Montgomery*, 136 S.Ct. at 730. The mere fact that a new rule includes a process does not mean that it is a procedural rule. As the Court counseled in *Montgomery*, courts must be careful not to conflate a procedural requirement that is necessary to implement a substantive guarantee, with a rule that regulates the manner of determining the defendant's culpability. *Id.* at 734-35. Only the latter is a procedural rule governed by *Teague*'s nonretroactivity doctrine.

Another type of rule which must be applied retroactively is a new "watershed" procedural rule. Such a rule is "implicit in the concept of ordered liberty" and crucial to the accuracy of the adjudication. *Graham v. Collins*, 506 U.S. 461, 478 (1993); *Teague*, 489 U.S. at 311 (plurality) (a "watershed" rule must contribute to fact-finding reliability and "alter our understanding of the *bedrock procedural elements*" essential to the fairness of a proceeding.).

A three-part analysis must be undertaken to determine if *Teague* bars relief, but it differs from the Government's three-step analysis.[3] First, the Court must determine if the rule on which the petitioner relies is one of substance or criminal procedure, *Bousley*, 523 U.S. at 620, as those concepts are defined in *Montgomery*. If the rule is substantive, retroactive application is required, *Montgomery*, 136 S.Ct. at 728, and the analysis ends. If the rule is one of criminal procedure that constitutes a "watershed" rule of procedure, retroactive application also is required, *id.*, and the analysis ends. Second, if the rule is one of criminal procedure, the Court must ascertain the date when the petitioner's

---

[3] The Government's analysis begins with a presumption that the new rule is one of criminal procedure, whereas *Montgomery* requires a threshold determination of whether it is the kind of issue that is subject to the limit on retroactivity. The Government's analysis also retains the nomenclature of *Teague,* which describes new substantive rules and watershed procedural rules as "exceptions" to the bar on retroactive application of procedural rules. The Supreme Court has since recognized that those two categories of new rules "'are more accurately characterized as ... not subject to the bar.'" *Montgomery*, 136 S.Ct. at 728 (quoting *Schriro*, 542 U.S. at 352 n.4).

conviction and sentence became final. *Caspari*, 510 U.S. at 390. Runyon's conviction became final on October 6, 2014, when the Supreme Court denied his petition for a writ of certiorari. Only a decision announced after that date can be "new." Third, if the procedural rule was announced after the date that the conviction became final, the Court must determine whether the rule is actually "new." *Id.* The required inquiry is typically phrased in the negative: a new procedural rule is one that was not dictated by precedent existing at the time the defendant's conviction became final. *Whorton v. Bockting*, 549 U.S. 406 (2007). Stated differently, the Court must survey the legal landscape and determine whether a court, at the time the conviction became final, "would have felt compelled by existing precedent" to apply the subsequently announced procedural rule. *Caspari*, 510 at 390; *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997). If not, then the rule is "new," and it does not apply retroactively.

As necessary, Runyon further discusses the Government's specific *Teague* allegations in his replies on individual claims.

**Claim 1:     The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

The Government correctly recognizes that this claim could not have been raised at trial because the facts were known only to the Government. *See Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (where county officials concealed facts that would have allowed defendant to challenge composition of jury, the concealment was an "'objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule'" and excused procedural default) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quoting *Murray*, 477 U.S. 488 (default excused if factual basis for claim was "'not reasonably available to counsel'" or "'some interference by officials … made compliance impracticable'").

The Government argues instead that this claim is defaulted because Runyon did not raise it on direct appeal. The Government skips over the fact that even during direct appeal proceedings, it

never told Runyon's counsel that Ford or Posey engaged in criminal acts of dishonesty. Runyon's original appellate counsel Woodward knew about the charges against Ford, but he had a conflict of interest. Because he represented Ford, he could not even suggest to anyone that Ford might have been dishonest. The Government did not disclose any information to Runyon's other appellate counsel, who were located in South Carolina and New York.

The Government also does not identify any fact about Ford or Posey that is in the record of Runyon's trial and that could have been a subject of Runyon's appeal. There is none. No part of his §2255 claim could have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. Like the claim that could not have been raised on direct review in *Waley*, the facts necessary for this claim "were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal.'" *Id.* (quoting *Waley* 316 U.S. at 104).

If appellate counsel knew the facts concerning Ford and/or Posey, and if the nature of this claim is one that could appropriately have been raised on direct appeal rather than collateral review, appellate counsel were ineffective in failing to do so. *See* Claim 8.

### A. Robert Glenn Ford.

On the merits, the Government mistakenly treats the claim involving Ford as equivalent to a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). It says that Runyon has failed to identify favorable evidence "stemming from Ford's impeachment related behavior," and it argues that "impeachment evidence for those who do not testify lacks relevance and materiality." ECF No. 497, p.20. But Runyon has not alleged that the Government failed to disclose exculpatory or impeachment information. Ford's history of criminal conduct did not exculpate Runyon. And because Ford did not testify against Runyon, the fact of his dishonesty could not have been used to impeach him.

9

The Government knew as early as November 7, 2008 (when Marcus Adams was debriefed), that Ford was a "dirty cop," and it was preparing to charge Ford with multiple counts of extortion, false statements, and other crimes. Just as the Government would not have retained a person like Ford to investigate a crime because of his misconduct, it knew that Ford could not be trusted to conduct an honest investigation for Runyon's defense. Because of its superior knowledge about Ford, and because of its duty to elevate justice over winning a case, the Government had a due process obligation to inform defense counsel or inform the Court, so that Ford could be replaced with an honest and reliable investigator. The Government's protestation that it had no duty to do so is contrary to *Berger v. U.S.*, 295 U.S. 78 (1935).

The Government objects that Runyon has failed to identify any witness reports prepared by Ford that were fabricated or unreliable. Runyon suggests this is not necessary and that deprivation of the honest services of an investigator is inherently prejudicial.

The Government's premise, however, is false. Ford was an experienced investigator (and experienced deceiver), and there is no reason to think he would have done anything so amateurish as submitting affirmatively false statements about an individual that he knew was likely to be called as a defense witness. He would know that his lies would be quickly exposed during pretrial preparation. The false statements in Runyon's case would more likely be by omission. If, for example, Ford found a potential witness who wanted to avoid becoming embroiled in this case, Ford was in a position (for sufficient compensation) to file a report stating that the witness could not be located. Or he could file a report saying that he went to a neighborhood where Runyon's family had once lived and interviewed people who lived in the area, but no one there remembered Runyon or his family. In fact, there may have been one or two neighbors who remembered Runyon or his family and had helpful information, but who decided to pay Ford a bribe so they could avoid involvement in this case. Because Ford's

10

reports may well have omitted the names or locations of such people, retracing his steps to find evidence of actual dishonesty is very difficult, although Runyon's investigation is ongoing.

The Government's reliance on Woodward's statement that Ford did a good job investigating the case is misplaced. Woodward's duty of loyalty to Ford precludes him from taking any other position.[4] Hudgins says he relied on Ford's reports, but he cannot vouch for their veracity. Cronin knew that Ford was under public pressure for his overzealousness in obtaining confessions in the Norfolk Four case, but that is a very different kind of misconduct than the extensive extortion and false statements that the Government failed to disclose to Runyon's defense. Runyon is entitled to discovery and an evidentiary hearing on this claim to develop and present evidence about the extent to which Ford's misconduct may have affected the investigation and the way this case was defended.

### B. Clifford Dean Posey.

The Government again treats this as equivalent to a *Brady* claim, arguing that "there was nothing for the Government to even turn over at the time of [Runyon's] trial." ECF No. 497, p.21. At this point, Runyon has asserted a *Berger* claim, although he cannot rule out the possibility that the requested discovery will reveal a *Brady* violation based on exculpatory or impeachment information that the Government possessed at the time of trial but failed to disclose. Runyon is entitled to discovery so he can make a determination himself, and an evidentiary hearing so he can present his case to the Court, if the facts warrant. There is no dispute that at all of the times he was investigating Cory Voss' death and helping to prepare the Government's case for trial, Posey also was engaging in criminal misconduct that involved stealing evidence from the Government and making false

---

[4] Woodward likely had a conflict of interest when he agreed to represent Ford. Runyon has not alleged the conflict of interest as a claim in his §2255 motion because the conflict did not arise until after Runyon's trial, when Woodward agreed to be Ford's attorney. But the conflict is a fact that the Court can consider.

statements in his reports. The Government does not, and cannot, deny that Posey may have engaged in criminal conduct in preparing Runyon's case. It cannot deny that this may have tainted Runyon's trial. It cannot deny that it alone knows the work Posey was assigned to perform on this case, the recorded conversations he transcribed, the evidence he handled, the extent to which anyone checked his work product, and the effect he had on Runyon's trial. It also cannot deny that it knew about Posey's misconduct not later than October 2010, when Runyon's case was still on direct appeal.[5] Because the Government gave the defense no information, Runyon does not rule out any possibilities.

The Government opines that Posey's involvement in Runyon's case was minor and error-free. But because this is Runyon's claim, and because adverse parties often draw different inferences from the same materials, Runyon must be allowed to obtain and review the documents he has requested in discovery, and to draw his own conclusions from those documents. As an example of the reason Runyon should not have to rely on the Government's assessment, we note that the Government does not address the fact that Posey's criminal conduct included converting firearms and ammunition that had been confiscated by ATF, and the possibility that Posey may have converted firearms or ammunition that belonged to Runyon, which could have affected litigation regarding the handgun used to kill Voss.

**Claim 2:     The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

"Under *Brady*, the [prosecution] violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S.Ct. 627, 630 (2012). Here, the prosecution decided one year before the penalty phase began that it would pursue a non-statutory aggravating circumstance on the basis that Runyon

---

[5] Runyon's opening brief on appeal was not filed until February 29, 2012.

"engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend." ECF No. 67, p.3. It had a concomitant duty to learn of any favorable evidence possessed by law enforcement or members of the prosecution team that could be used in defense of this aggravator and to disclose that evidence to Runyon's counsel. *Kyles*, 514 U.S. at 437. The prosecution also knew Runyon's penalty-phase defense was centered on the differential treatment afforded the other co-defendants with respect to punishment and it had a duty to disclose evidence that was favorable to this defense and the "equally-culpable co-defendant" mitigator. *Id.*

The prosecution possessed information about co-defendant Draven's history of violence against women and children. Respondent acknowledges that this evidence was disclosed to Draven's counsel at least one year before Runyon's penalty phase began. ECF No. 497, p.22. Respondent admits Draven's violent background, criminal history, and mental health assessments were material to Draven's punishment and further admits this information was not disclosed to Runyon's counsel.[6] ECF No. 497, pp.22, 24. The *Brady* element in dispute is whether the withheld evidence is material to Runyon's punishment.

### A. The withheld evidence is material.

The materiality standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In other words, "the question is not whether the defendant would more likely than not have

---

[6] Before trial, the parties entered an agreed discovery motion that included *Brady* material. ECF No. 31, pp.3-4. The prosecution represented it intended to comply fully with its *Brady* obligations, it had complied, and it was aware of its continuing duty of disclosure. ECF No. 98, pp.9-10. In turn, the Court made findings that the prosecution "has provided defendant with all of the Rule 16 material that is in its possession," ECF No. 114, p.3, and recounted the prosecution's representation "that it has already provided discovery pursuant to the Discovery Order and, to the extent that it becomes aware of and obtains additional discoverable material, will continue to make the materials available to [Runyon]." ECF No. 115, p.2.

received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

In *Banks*, 540 U.S. at 700-01, the Supreme Court found withheld evidence was material because it was significant to a predicate for capital murder and it related to the defendant's eligibility for the death sentence and the prosecution's argument for imposing death. The withheld evidence left the jurors ignorant of an informant's "true role" in the case and undermined confidence that the defendant had received a fair trial. *Id.* at 702-03. This was especially so because the informant's testimony was the centerpiece of the prosecution's penalty-phase case. *Id.* at 701.

In this case, inequitable punishment was the centerpiece of Runyon's penalty-phase defense. *U.S. v. Runyon*, 707 F.3d 475, 508 (4th Cir. 2013). The withheld information regarding co-defendant Draven's background would have been advantageous to Runyon's defense because it demonstrates that despite ample facts supporting several aggravating factors for Draven, and despite all co-defendants' "integral[] involve[ment] in the murder, [Runyon] had received differential treatment, with the Government pursuing the death penalty against Runyon but not against Cat or Draven." *Id.* Draven's severe sexual, physical and emotional abuse of women and children was a relevant comparison-point for the "abuse of women" non-statutory aggravator. Had the jurors known the magnitude of Draven's true culpability, the "equally-culpable co-defendant" mitigator could have transformed into a "co-defendant with greater culpability" mitigating circumstance, especially since Draven was also charged with more statutory aggravators than Runyon. ECF No. 3, pp.13-14.

A history of violent crimes is "arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty[.]" *U.S. v. Beckford*, 964 F. Supp. 993, 1000 (E.D. Va. 1997) (internal quotation marks and citation omitted). The fact that the prosecution failed to seek death for Draven despite his pattern of violent criminal behavior and propensity for

14

future violence was highly relevant to Runyon's comparative punishment defense. As explained by the Court when it agreed to charge the "abuse of women" non-statutory aggravator against Runyon: "[v]iolent adjudicated criminal acts that tend to show a pattern of violence against women are relevant, probative, and helpful to the sentence in distinguishing those who deserve capital punishment," and are "relevant to the inquiry of who should live and who should die." ECF No. 217, p.10, n.6 (citing *U.S. v. Grande*, 353 F. Supp. 2d 623, 631, 637 (E.D. Va. 2005)); *U.S. v. Beckford, supra.* It was necessary for the jurors in this case to distinguish between Runyon and his co-defendants in order to justify a death sentence for only Runyon and the prosecution's failure to disclose probative facts relevant to the disparity of punishment among the co-defendants impaired Runyon's defense and denied the jurors an accurate accounting of the co-defendants' relative culpability.

The *Brady* violation tainted the jury's determination regarding the "abuse of women" aggravating circumstance, the "equally-culpable co-defendants" mitigators, and its sentencing verdict. The prosecution's argument for a death sentence based on Runyon's conviction of misdemeanor simple battery for grabbing his wife's arm and poking her nose encouraged the jurors to infer that Runyon engaged in more serious violent acts "behind closed doors." Tr.2609, 8/26/09. The jurors were invited to condemn Runyon because "he left his wife and children and didn't provide support for them." Tr.2610, 8/26/09. At the same time, the prosecution kept from the jurors' consideration a plethora of information illustrating Draven's sexual assault of children and his pattern of felonious sexual and physical abuse of women. A penalty phase proceeding where the jurors were informed of Draven's violent history is significantly different than the actual proceeding where the jurors decided—without knowledge of Draven's pattern of violence—that Runyon should be the sole person to die, based in part on the "abuse of women" aggravator. The withheld evidence was advantageous to Runyon's defense and could reasonably have put the penalty phase in such a different light that it

15

undermines confidence in the jury's death verdict. *See, e.g.*, *U.S. v. Hammer*, 404 F. Supp. 2d 676, 799 (M.D. Pa. 2005) (citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992)) ("Under a weighing statute such as the Federal Death Penalty Act of 1994, a death sentence resulting from a tainted aggravating circumstance cannot stand.").

### B. Runyon's *Brady* claim is not procedurally defaulted.

The *Brady* claim is based on information outside the trial record and unknown to trial counsel because it was not disclosed by the prosecution. There is no procedural default because this due process violation could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley v. U.S.*, 523 U.S. at 622 *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (a claim is not procedurally defaulted when the facts are "dehors the record and their effect on the judgment was not open to consideration and review on appeal.").

Even if this claim is somehow defaulted, Runyon is still entitled to develop and prove his claim because a meritorious *Brady* claim subsumes and satisfies the "cause and prejudice" standard. *Wolfe v. Clarke*, 691 F.3d 410, 420 (4th Cir. 2012). "Cause and prejudice" to overcome a procedural bar "parallel two of the three components of the alleged *Brady* violation itself." *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (internal quotation marks omitted)) (addressing *Brady* claim in a §2254 case). "Cause" is already established because Respondent concedes the newly discovered "evidence [was] not turned over to Runyon" prior to trial. ECF No. 497, p.24. The "prejudice" requirement "exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks*, 540 U.S. at 691 (citing *Strickler*, 527 U.S. at 282). Accordingly, this claim is reviewed on its merits and the ultimate question remains one of materiality.

16

**C. The withheld evidence is not cumulative and the harmless error doctrine is inapplicable.**

"Assuming this evidence was discoverable to Runyon," Respondent argues (without explanation) that "it would have been cumulative and any error would be harmless." ECF No. 497, p.24.

A defendant "may benefit from the 'cumulativeness' of evidence that is 'favorable' under *Brady.*" *McHone v. Polk*, 392 F.3d 691, 703 (4th Cir. 2004). Nevertheless, co-defendant Draven's violent criminal history is material to any evidence presented in this case. In fact, evidence of Draven's past violence against women and children is entirely new information and the withheld evidence simply cannot be cumulative.

Finally, the Supreme Court has made clear that harmless error is not a consideration in *Brady* claims. Once the materiality of withheld evidence is established, the *Brady* violation cannot subsequently be found harmless. *Kyles*, 514 U.S. at 435-36. Runyon can demonstrate materiality, as discussed above and in his amended §2255 motion, and Respondent's assertion of harmlessness cannot defeat the *Brady* claim.

**D. Discovery and an evidentiary hearing should be granted.**

Materiality is a fact-driven issue. An adverse determination cannot be made at this stage of the proceedings. *U.S. v. White*, 366 F.3d 291, 297 (4th Cir. 2004). Instead, factual development is warranted because Runyon has alleged facts which, if true, entitle him to relief. *Raines v. U.S.*, 423 F.2d 526, 529-30 (4th Cir. 1970) (discussing fact-finding procedures); *see also* RULES GOVERNING SECTION 2255 PROCEEDINGS, Rules 6-8. Runyon has already filed a discovery request that sets forth good cause for the release of information relevant to materiality. ECF No. 491, pp.21-25; ECF No. 506, pp.13-16. This request should be granted.

17

An evidentiary hearing should also be granted because Respondent's answer creates material factual disputes with respect to Runyon's non-frivolous *Brady* allegations. *White*, 366 F.3d at 297 (citing *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977)); 28 U.S.C. §2255 (requiring an evidentiary hearing on a habeas claim "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"). Respondent not only disputes the significance of the withheld evidence but alternatively asserts that the withheld evidence is cumulative. ECF No. 497, p.24. These disputes require fact-finding on the newly-discovered evidence about co-defendant Draven. *Townsend v. Sain*, 372 U.S. 293, 313 (1963); *Wolfe*, 691 F.3d at 421-22.

For all these reasons, Runyon is entitled to discovery and an evidentiary hearing on this claim followed by a grant of relief.

**Claim 3:      Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.**

Respondent primarily argues that the guilt-phase performance of Runyon's counsel was not deficient. ECF No. 497, p.25. In doing so, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

**A. Chad Costa[7]**

The prosecution presented evidence and argument: (1) about Runyon's character; (2) that

---

[7] Respondent points to an error in the initial §2255 motion that has been corrected in the amended §2255. Chad Costa met Runyon after the crime but before Runyon's arrest. The claims regarding Costa remain valid with this time-frame. Costa's knowledge regarding Runyon's romantic relationships is relevant to the penalty phase and this information was re-organized in the amended §2255.

Runyon made incriminating statements to others; (3) that Runyon's shopping list was connected to the crime; and (4) that attempted to tie Runyon's revolver to the crime. Respondent asserts (without explanation) that counsel's failure to present Costa as a witness does not constitute deficient performance because Costa's testimony was inadmissible. The rules of evidence, however, would not have precluded Costa's testimony. *See, e.g.*, FED. R. EVID. Rules 104(e), 401, 404(a)(2)(A), 405, 602, 801. Respondent further alleges Costa's testimony would have been duplicative of other (undescribed) defense evidence. To the contrary, Costa's testimony was unique, relevant and probative of Runyon's reasonable doubt defense.

Costa's contacts with, and knowledge of, Runyon and Runyon's revolver were relevant to counter the prosecution's evidence and narrative in the four areas described above and would have made the facts asserted by the prosecution less probable. Costa possessed knowledge and an opinion of Runyon's character that differed from the prosecution's theory and Costa could have testified to the nature and extent of his observations regarding Runyon. Costa handled and observed Runyon's revolver and his description of the six-shot black revolver is inconsistent with the prosecution's evidence that the murder weapon was a five-shot handgun from which the five recovered bullets were fired. This testimony was significant in light of a recently issued report from the National Academy of Sciences that described the unreliability of forensic testimony purporting to match a specific firearm to specific bullets. Costa could have testified that Runyon did not confess the crime to him which supports the argument that Runyon did not confess to others. Costa also could have corroborated other witnesses' allegations of police influence and coercion to obtain certain testimony. This could have raised doubts regarding that testimony. Costa's testimony was consistent with the defense theory and counsel's failure to call him as a witness was prejudicial.

**B.  Cat Voss**

Respondent argues counsel was not ineffective for failing to speak with co-defendant Cat Voss and present her as a witness because it is "highly doubtful" that Voss would have testified and "highly doubtful" that Voss's attorney "would have let her testify[.]" ECF No. 497, pp.26-27. Respondent also questions the weight that her testimony would have carried with the jury. *Id.* p.27.

First, Voss's attorneys could not have prevented her from testifying. Second, courts should not assume that a potential witness will not testify. *U.S. v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). Third, it is a fundamental premise of the criminal trial system that determinations as to weight and credibility of witness testimony belong to the jury. *U.S. v. Scheffer*, 523 U.S. 303, 313 (1998); *U.S. v Luciano*, 343 F.2d 172, 173 (4th Cir. 1965) ("No matter how impaired [the] evidence, the jury had the right to believe all or so much of it as they thought proper."). To the extent the jurors found discrepancies between Voss's statement of facts and her testimony, "their natural intelligence and their practical knowledge of [human nature,]" *Scheffer*, 523 U.S. at 313, could have led them to conclude that Cat Voss would have signed any statement placed in front of her by the prosecution to avoid the death penalty. This is especially true because some assertions in the statement of facts were obviously not personally known by Voss.[8]

Finally, Respondent argues that counsel's penalty phase performance somehow renders counsel's failure to call Voss in the guilt phase "harmless" error. ECF No. 497, p.27. This argument overlooks the fact that Runyon was both convicted and sentenced to death and counsel's guilt-phase

---

[8] Examples include: the deposits of the credit union "are insured by the National Credit Union Administration Board"; "the activities of the credit union operate in and affect interstate commerce"; the number of phone and text communications between Draven and Runyon during particular time periods; Cory Voss's truck "had been transported and shipped in interstate commerce"; the findings of the medical examiner; and the forensic analysis on the bullets. ECF No. 70.

20

deficiencies left the jurors unaware that Voss did not hire Runyon to kill her husband and she believed co-defendant Draven was the actual perpetrator. ECF No. 478-9, ¶¶9, 10, 18, 24.

### C.  Scott Linker

Respondent argues counsel was not ineffective in failing to call Scott Linker at the guilt phase because his testimony would have been irrelevant and inadmissible. Alternatively, Respondent argues that Linker's testimony could have supported the prosecution's "hit man" theory. ECF No. 497, pp.27-28. The latter argument has no significance. The jurors convicted Runyon on the prosecution's "hit man" theory without hearing from Linker. The former argument is incorrect. Linker's testimony explained items of physical evidence—long guns and ammunition—which the prosecution introduced into evidence.

"Few rights are more fundamental than that of the accused to present witnesses in his own defense[.]" *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). This right is tempered only by procedural rules that govern the orderly presentation of facts. *Id.* at 410-11. Although Respondent seemingly would have this Court adopt a narrower definition of relevance than provided by the Rules of Evidence or would have the Court curtail defense evidence on the belief that evidence of guilt is strong, rules cannot be applied mechanistically where constitutional rights directly affecting the ascertainment of guilt are implicated. *Chambers*, 410 U.S. at 302; *Holmes v. South Carolina*, 547 U.S. 319, 329-30 (2006).

In this case, the prosecution placed into evidence a rifle and shotgun owned by Runyon, neither of which were the murder weapon. Gov't Trial Ex. 212, 212A. Runyon was entitled to present evidence demonstrating that his ownership of the firearms was not related to the crime or to a propensity to commit a crime. Linker's testimony would have provided such an explanation for Runyon's possession, knowledge, and use of firearms and it was therefore relevant and probative of

21

the issues before the jury.

### D.  Rose Wiggins

Respondent points out an error in a record citation to the prosecution's closing argument. ECF No. 497, p.28. That error has been corrected in the amended §2255 motion.

### E.  David Runyon's Whereabouts The Day Of The Crime

Respondent asserts that it was more important to know when the co-defendants spoke to each other than to corroborate the electronic information placing Runyon in West Virginia at the time of the crime. ECF No. 497, p.29. It is within the jurors' purview to assign importance to evidence, but even based on the weight assigned by Respondent to the co-defendant's communications, this, too, is an area in which trial counsel performed deficiently.

Counsel did not directly argue the fact that records showed David Runyon did not speak with the co-defendants on the day of the crime. Nor did counsel argue that there was no such contact the day before the crime. In fact, there was a significant time span before the crime from Runyon's last call with co-defendant Draven and their next contact after the crime. Counsel failed to argue that the evidence showed no contact between the co-defendants immediately before, during and after the crime and thus no opportunity to plan and coordinate the crime with the victim's whereabouts.

### F.  Cell Tower Testimony Regarding Michael Draven

Counsel did not investigate the validity of cell-tower tracking testimony nor present evidence or argument that such testimony could not exclude the possibility that co-defendant Draven was at the scene at the time of the crime.[9] Such evidence and argument would have supported the defense

---

[9] Prosecution witness Paul Swartz relied upon a map of Newport News that reflected three cell phone towers to which Draven's phone had connected on the night of the crime. Gov't. Tr. Ex. 135. Runyon's initial §2255 motion discussed the Government's exhibit and stated there were three towers within the area of the credit union. ECF No. 478, p.26. Respondent has pointed out that there

theory that someone else—such as co-defendant Draven—committed the crime. *See, e.g.*, *Elmore v. Ozmint*, 661 F.3d 783, 786 (4th Cir. 2011) (counsel ineffective for "blind acceptance of the State's forensic evidence" and failure to investigate or adequately challenge that evidence); *Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014) (counsel's handling of cell tower tracking evidence was ineffective).

Respondent contests the strength of evidence Runyon has initially proffered in support of this claim. ECF No. 497, p.29. He criticizes Exhibit 14 while overlooking that courts have found cell-tower tracking evidence to be unreliable. *See, e.g.*, *Roberts*, *supra*; *U.S. v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). Respondent is critical of the fact that Runyon has not designated an expert for this claim, however, an expert designation is not required at this stage of the case or for Runyon to demonstrate an entitlement to fact-finding proceedings and an evidentiary hearing.

Respondent also disputes that trial counsel could be ineffective in this manner because counsel presented the general theory of another perpetrator. ECF No. 497, p.29. The fact that counsel presented a theory of defense is not determinative of whether counsel presented that defense in a constitutionally ineffective manner. *Strickland* requires consideration of that evidence which was presented at trial in conjunction with post-conviction evidence to determine whether counsel's performance prejudiced the defense. *See Elmore*, 661 F.3d at 868-70. Here, counsel failed to support the alternate perpetrator theory by not challenging the cell-tower testimony in addition to other instances of deficient performance set forth in Runyon's §2255 motion.

### G.  Runyon's Shopping List

Trial counsel failed to argue that Runyon's shopping list was unrelated to the crime and, in

---

were more towers than what the map represented. ECF No. 497, p.29. The fact that there are additional towers in the vicinity does not demonstrate a weakness in Runyon's claim. It demonstrates that Swartz's testimony omitted certain variables impacting the reliability of cell tower evidence to reflect a caller's location. *See Roberts*, 13 F. Supp. 3d at 1092-93, 1102-03.

particular, the list omitted those items that the prosecution argued were utilized by the perpetrator: a gun and a mask. Respondent asserts that counsel made this argument, but he didn't. ECF No. 497, p.30 (alleging that "Runyon is wrong" in alleging counsel did not argue that the listed items were not used in the crime).

Counsel questioned the ATF agent about whether the listed items were recovered in the searches of Runyon's property. Tr.1050, 7/9/09. The agent answered: "I can't comment to that sir. We took a lot of clothing out of Lot 67, and I'm not comfortable saying whether or not some of those clothing items – I can tell you we never recovered a taser. I'm not sure about a Spyderco knife." Tr.1050-51, 7/9/09. This answer indicated that some, if not all, of the listed items were missing. Respondent fails to recognize how eliciting testimony that the items were missing places them in the same category as Runyon's gun, which the prosecution argued Runyon had disposed of because it was the murder weapon. This is an incriminating presentation of evidence by defense counsel rather than an exculpatory demonstration that the listed items were inconsistent with the crime.

Respondent provides a rationale for counsel's failure to persuasively argue about the shopping list and asserts that trial counsel "correctly" did not highlight the list because of notations related to the credit union that were on the same piece of paper. ECF No. 497, p.30. Yet, in closing argument, counsel mentioned the map. The map had notations related to the credit union *as well as* notes about the victim's truck and the victim's name. Gov't Tr. Ex. 214. Counsel told the jurors, "I admit that's a hard thing to explain, having that map. That's suspicious." Tr.1654, 7/17/09. Respondent's assertion that competent counsel would not reference the shopping list should equally apply to the map which contained even more information related to the crime.

To be sure, competent counsel can address the prosecution's evidence in a light favorable to the defense. Counsel did not do so in this case although he did mention that Runyon was not asked

24

when the notes on the map were written. Tr.1654, 7/17/09. The prosecution presented a significant amount of testimony about a trip to Nags Head shortly after the crime taken by Draven, Voss and her children, and Draven's brother and his girlfriend. The group spent thousands of dollars on hotels, jewelry, food and champagne. Counsel failed to point out that inside the map was the photograph of Draven and Voss at Nags Head. The photo could have been taken *after the crime*, during that May vacation. Tr.1605, 7/17/09. The jurors could have inferred that Runyon came into possession of the map at the same time as the photograph—after the crime.

**Claim 4:      Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstances.**

Respondent argues that counsel's performance cannot be deemed ineffective because there was overwhelming evidence of the statutory aggravating factors and the "substantial planning" aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." ECF No. 497, p.34. Respondent also asserts it was a reasonable strategic decision for counsel "to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt." *Id.*, p.33. Counsel's decision to forgo presenting proof at a separate trial stage and in support of a separate issue on the belief that it wouldn't make a difference or it would "alienate the jury" is not reasonable. Counsel had a duty to investigate and respond to the prosecution's case in aggravation. *Rompilla*, 545 U.S. 374, 385-87 (2005).

Counsel's failure to discuss the issue of eligibility or the statutory aggravating circumstances is not addressed in Respondent's answer. This deficient performance was prejudicial because two statutory aggravating circumstances were carried into the selection phase without any attempt by counsel to mitigate their weight. Conceding through silence two aggravating factors that the jurors

were to weigh in favor of a death sentence is not a reasonable "start" for the penalty phase as Respondent suggests. ECF No. 497, p.33. Constitutionally effective counsel would have submitted evidence to mitigate the aggravators and to do so would not have alienated the jurors; it would have fulfilled counsel's duty "to ensure that the adversarial testing process work[ed] to produce a just result." *Strickland*, 466 U.S. at 687.

**Claim 5:    Trial Counsel Were Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Respondent argues that counsel had no duty to investigate Runyon's mental health because, in Respondent's view, the facts of this case were not as "bizarre" as a case where a man raped and robbed a 67-year-old woman. ECF No. 497, p.37. The test for whether counsel is on notice of a reasonable avenue for investigation is not limited to whether the facts surrounding the crime are illogical. The test is whether a reasonable attorney would follow leads based on facts that were known or should have been known. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). In this case, facts counsel knew or should have known about their client and the case signaled a need for a mental health investigation, above and beyond the pre-existing duty to investigate.

First, "facts, which were either known or ascertainable with reasonable diligence by counsel prior to trial, provided a reasonable basis for believing th[at] defenses based on [Runyon's] mental capacity might have been plausible." *Becton v. Barnett*, 920 F.2d 1190, 1193 (4th Cir. 1990) (citation omitted). Mental health records from the local jail stated that Runyon was suffering anxiety attacks, he was grandiose and delusional, and his thoughts were flighty and rambling. ECF No. 478-16, pp.3-4. If counsel were not observant enough to see the scars on Runyon's face, head, and body or the asymmetry in Runyon's face, a medical screening of Runyon conducted in conjunction with his

26

employment in a drug study recorded the facial asymmetry and at least one prominent scar.[10] *See* Exhibit A, Bristol-Myers Squibb Clinical Research Center, Clinical Pharmacology Unit Screening Information, 8/30/04. In conversations with counsel, Runyon displayed a very rigid thought process. ECF No. 478-5, ¶3. He reported grenade-blast injuries from the Army and trauma from an automobile accident. ECF No. 478-5, ¶5; ECF No. 478-6, ¶5. Runyon compared himself to great historical figures and recounted the many lives he had saved. ECF No. 478-4, p.3 ¶7; He wrote long, rambling letters before trial that indicated communication problems with counsel. ECF No. 478-4, p.3 ¶7; ECF No. 478-4, pp.9-14. During trial Runyon wrote obsessively. ECF No. 478-4 p.7 ¶16; ECF No. 478-5, p.3 ¶11. Counsel knew Runyon's mother had a history of trauma and a mood disorder, his father was cold and unfeeling, and they were very strict disciplinarians toward Runyon when he was growing up. *See, e.g.*, ECF No. 478-4, p.3 ¶8; ECF No. 478-6, p.2 ¶14; ECF No. 478-15, pp.5-6.

Second, even under Respondent's "bizarre facts" test for investigation, counsel were aware that facts in this case simply do not make sense. According to the prosecution's theory, Runyon agreed, with a man he just met and a woman he never met, to kill a man he did not know, for absolutely no money up front. Runyon then waited until *the day of the crime* to purchase a gun (the alleged murder weapon) from a man he did not know and under circumstances where there was no certainty that the transaction would actually occur. At the point of purchase Runyon gave the seller his license and personal information and spent time discussing personal, family details with the seller. Runyon then allegedly drove from Morgantown, West Virginia late that afternoon—without accounting for any travel delays and leaving no room for error—to arrive in Newport News, Virginia, in time to encounter

---

[10] Respondent states that "various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence." ECF No. 497, pp.37-38. Undersigned are unaware of mental health examinations performed in relation to the studies and Respondent has not produced any.

27

the victim at the credit union. Runyon allegedly used .38 caliber bullets in the .357 revolver even though he owned .357 ammunition. Runyon would have then left Virginia without receiving any payment although the co-defendants obtained $100,000 approximately 24 hours after the victim's death. Runyon kept the alleged murder weapon and created a paper trail of the .357 at a pawn shop. He also kept notes on the credit union and a map of Newport News along with a photograph of the co-defendants *even after* police interviewed him about the murder and during which he voluntarily gave a DNA sample. These are strange facts especially when considered in light of the assertion that Runyon used specialized education, training and experience to carry-out the crime and "avoid" detection.

Third, the Sixth Amendment right to counsel "imposes a correlative duty on defense counsel to undertake reasonable steps to investigate all open avenues of defense." *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978). This includes a pre-existing duty to investigate and raise mitigating mental health factors both pre-trial to the prosecutor and court and to the jury and court at sentencing. *Wiggins*, 539 U.S. at 524-25 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, pp.4-55 (2d ed. 1982), and, ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C), p.93 (1989)).

"The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case[.]" *U.S. v. Williams*, 615 F.2d 585, 594 (3d Cir. 1980) (quotation and citations omitted). Thus, when objective facts signal the need to explore a client's mental health, the "[f]ailure to adequately investigate the possibility of an insanity defense has been held to fall below the standard of competence despite the deference accorded an attorney's judgment in evaluating the effectiveness of representation." *Becton*, 920 F.2d at 1192. As set forth in the §2255 motion and above, there were facts indicating a "reasonable cause to believe" that Runyon was

28

"suffering from a mental disease or defect" that rendered him unable "to assist properly in his defense."[11] 18 U.S.C. §4241(a) (setting forth the standard under which a competency hearing shall be granted). Under such circumstances, Runyon has satisfied the performance prong of *Strickland* because he need only demonstrate that the Court would have held a competency hearing; he does not need to show that he would actually have been found incompetent. *Becton*, 920 F.2d at 1193–94. Even if the hearing did not result in a finding of incompetence the examination would have revealed Runyon's serious mental illness and would have supported substantial mitigation. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (describing mitigation that arose from court-ordered competency evaluations).

Finally, Respondent argues that Runyon's defense was not prejudiced because "counsel did make a full examination for any identifiable mental health issues." ECF No. 497, p.38. A full examination of Runyon's psycho-social history and mental health was not completed before the trial began because counsel Hudgins had less than 59 full working days to learn about and investigate the case for mitigation purposes, ECF No. 478-5, and the mental health experts had not conducted full examinations before trial began. *See also* Claim 6.

For example, Dr. Nelson had not completed a full examination and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Dr. Mirsky began an examination of Runyon four days before trial. ECF No.478-20. He informed counsel that his review and analysis was not complete and that it was essential for Runyon to undergo a neurological examination. *Id.* Counsel requested the assistance of Dr. Merikangas to conduct that examination, but the trial court declined to appoint him at that point. As a result, Dr. Merikangas was unable to examine Runyon until *after* Runyon was convicted and found eligible for the death penalty. ECF No.478-2, p.5 of 6, Dr.

---

[11] The fact that Runyon is above average intelligence does not negate a determination of incompetency or mental disease or defect.

29

Merikangas August 5, 2009 preliminary report. Dr. Merikangas issued only a preliminary report because he required more information and test results. *Id.* This incomplete effort at investigating Runyon's mental health cannot, under any measure, be considered "a full examination for any identifiable mental health issues."

**Claim 6:**     **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

Respondent characterizes this claim as an attack on counsel's sentencing-phase strategy and avoids the central issue of counsel's deficient investigation by ignoring the specific factual allegations and by incorrectly characterizing information known and unknown by counsel. Accordingly, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

*Strickland v. Washington* prescribes the proper framework and focus for this claim. It provides that a failure to uncover and present mitigating evidence at sentencing cannot be justified as a tactical decision to focus on a particular defense theory when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, Commentary, pp.4-55 (2d ed. 1980)). The reasonableness of the mitigation theory actually proffered by counsel is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory. *Sears v. Upton*, 561 U.S. 945, 954-55 (2010). "[R]egardless of how much or how little mitigation evidence was presented during the initial penalty phase," *Sears*, 561 U.S. at 956, the inquiry into whether counsel exercised reasonable professional judgment "focus[es] on

30

whether the investigation supporting counsel's decision not to introduce mitigating evidence … was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In this case, there was no "decision" to forego the introduction of mitigating evidence. Counsel did not present certain mitigating evidence because they failed to conduct an adequate investigation and uncover the available evidence.

### A. All mental health experts consulted by defense counsel indicated Runyon was suffering from a mental disease or defect but the experts lacked the information, testing, and time required for a complete examination.

Respondent concedes that Drs. Mirsky and Merikangas made only preliminary findings. ECF No. 497, p.54 ("Their reports were preliminary in nature[.]"). The prosecution never received a full report from Dr. Merikangas and Dr. Mirsky did not supplement his report. ECF No. 497, p.55. Respondent repeatedly asserts, however, that the defense experts were not favorable, *see*, *e.g.*, ECF No. 497, pp.54, 65, and states that "counsel cannot be held accountable for relying on experts after providing them sufficient evidence." *Id.*, p.46. Respondent is incorrect. The defense experts' preliminary assessments *were* favorable to the defense. Counsel did *not* timely obtain expert assistance nor provide the experts sufficient information for an adequate examination.[12]

First, the preliminary findings of the defense experts contained classic mitigating evidence and warranted further investigation. Dr. Mirsky found: (a) "strong evidence that he [Runyon] is

_____

[12] The first expert counsel contacted, Dr. Nelson, did not conduct a complete examination or a psycho-social history and assessment. He did, however, inform counsel that neuropsychological deficits were a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Counsel then sought assistance from experts in that field. In *Sears*, 561 U.S. at 951, the Court held that "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking … were features, in another well-credentialed expert's view, of a 'profound personality disorder.'"(Citation omitted). The performance of Runyon's counsel failed in this regard.

31

suffering from a neurological disorder," ECF No. 478-20; (b) Runyon has classic symptoms and suffers the effects of blast and impact injuries and brain injury, ECF No. 478-21; (c) Runyon is properly classified as having mild traumatic brain injury, ECF No. 478-22; (d) Runyon displays symptoms of Post Traumatic Stress Disorder, *id.*; and, (e) Runyon has a very impaired ability to sustain attention and has impairments in reaction time. *Id.*, pp.1-3. All of these findings are mitigating. *See, e.g., Porter*, 558 U.S. at 41 (evidence of poor mental health or mental impairment could influence a jury's appraisal of the defendant's moral culpability); *Sears*, 561 U.S. at 949 (describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla*, 545 U.S. at 392 (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

Dr. Merikangas reported: (a) that the prosecution experts' evaluations suggested Runyon suffers from Migraine like headaches, Attention Deficit Disorder and Post Traumatic Stress Disorder, ECF 478-2, p.5; (b) Runyon has physical signs of trauma, *id.*; (c) he has Post Traumatic Stress Disorder, *id.*; (d) he suffers severe headaches, *id.*; (e) withdrawal from experimental drugs may have affected him at the time of the crime, *id.*, pp.5-6; (f) he was currently either in a fantasy world of grandiose thinking or suffering from delusions; *id.*, p.6; and, (g) he has impaired executive functioning suggestive of frontal lobe brain impairment. *Id.* All of these findings are mitigating. *Ibid.*

Second, counsel failed to timely obtain expert assistance. Respondent concedes that—the day before trial began—defense counsel provided notice of their intent to substitute Drs. Mirsky and Merikangas as the defense experts but the doctors had not yet begun or concluded their evaluations of Runyon. ECF No. 497, p.50 (citing ECF No. 230). Once retained, the experts requested more

information and testing but received neither. They were not given Runyon's medical records or other relevant background materials.

Dr. Mirsky reported to counsel: (a) that an evaluation by a neurologist was essential, ECF No. 478-20; (b) testing information sent to him by the prosecution expert was "not especially useful or informative," ECF No. 478-21; (c) counsel's report that the brain scans "were read as normal" was not conclusive on whether Runyon had brain damage, ECF No. 478-22, p.1; (d) Diffusion Tensor Imaging had not been done, *id.*; and, (e) Post Traumatic Stress Disorder had not been ruled out. *Id.*

Dr. Merikangas was not appointed until the day the jury found Runyon eligible for the death sentence. ECF No. 257. He requested: (a) a chronology and details of the experimental drugs Runyon was administered before the crime, and (b) brain imaging, including MRI, PET, and EEG. ECF No. 478-2, pp.5-6. He was not given the brain scans performed during the penalty trial. Dr. Merikangas recently reviewed the scans from August 2009. "They revealed multiple white matter hyperintensities … consistent with his [Runyon's] history of head injur[i]es and migraine." ECF 478-2, p.4.

Respondent nevertheless discounts the scans based on defense counsel's representation to Dr. Mirsky that the scans were read as normal. *See*, *e.g.*, ECF No. 497, p.58. Counsel made that remark to Dr. Mirsky *after* Runyon was sentenced to death. ECF. 478-22, p.1. Even then, when Dr. Mirsky informed counsel that his opinion regarding Runyon's brain injury and PTSD was unchanged, counsel failed to act. *Id.*

The fact that Runyon suffers from a mental disease or defect, in part based on injuries incurred during his military service, was mitigating. The available mental health mitigation was consistent with non-statutory mitigators regarding Runyon's childhood experiences of domestic

violence and parental conflict and Runyon's military service. It was not inconsistent with the defense theories of equally-culpable co-defendants and family sympathy. Based on what counsel learned (or should have learned) from the mental health experts, the investigation was incomplete and prematurely abandoned.

### B.  Counsel did not reasonably abandon the psycho-social investigation.

Respondent argues that counsel's limited mental health investigation was adequate because offering expert testimony would have opened the door to harmful testimony from the prosecution's experts and because counsel did not have a factual basis to follow-through with the investigation. Neither contention is supported by the evidence before the Court.

#### 1.  Counsel did not abandon the investigation upon receipt of the prosecution experts' reports.

Respondent implies that defense counsel abandoned the mental health investigation once the prosecution experts' reports were revealed. ECF No. 497, p.51 (the defense filed its notices of intent to introduce mental health testimony before defense counsel received reports from the prosecution's experts). The causation Respondent claims does not exist. Counsel received the reports the day the jury found Runyon eligible for the death penalty. ECF No. 252. Nine days before the penalty phase began, counsel re-asserted an intent to present mental health experts and requested permission to supplement the defense experts' reports. ECF No. 269. Thus, counsel clearly contemplated mental health testimony even after they received the prosecution experts' reports.

Respondent argues as if counsel in this case were uniquely confronted with the proposition that if they "opened the door to a mental health defense, the Government would have presented mental health experts in rebuttal." ECF No. 497, pp.51-52. This is the nature of the adversarial system. "If there is one area where expert witnesses are almost always diametrically opposed, it is the field of psychiatry." *U.S. v. Mansfield*, 24 M.J. 611, 618 (A.F.C.M.R. 1987) (rejecting the argument

34

that abandoning expert evidence was reasonable because the prosecution could respond with damaging information). The fact that the prosecution will present its own experts does not justify counsel's failure to present mental health mitigation in support of a life sentence. *Porter*, 558 U. S. at 43 ("it was not reasonable to discount entirely the effect that [a defense expert's] testimony might have had on the jury" just because the prosecution's expert provided contrary testimony).

### 2. Reports of the prosecution experts did not contain additional aggravating evidence and were not inconsistent with defending the proposed aggravating circumstances or establishing mitigating circumstances.

The record before the Court does not support Respondent's theory that counsel avoided damaging prosecution evidence by abandoning the mental health investigation. The reports of the prosecution's experts, Drs. Patterson and Montalbano, were not so detrimental to Runyon's defense that they rendered non-prejudicial counsel's failure to complete the mental health investigation and offer mitigating evidence. In fact, Respondent concedes that Dr. Patterson, who opined Runyon met the criteria for a personality disorder with narcissistic features, concluded "no mitigating *or aggravating* mental health factors existed." ECF No. 497, p.53 (emphasis added). Dr. Patterson stated: "Although [Runyon's] personality traits have affected relationships and job performance, they do not, in my opinion, represent a serious mental illness that has any impact as mitigating *or aggravating factors regarding sentencing* on his current charges if found guilty." ECF No. 276, p.23 (emphasis added). Dr. Patterson noted that Dr. Montalbano's findings were consistent with his own. ECF No. 276, p.24. The reports of the prosecution experts would not have established additional aggravation and accordingly do not support Respondent's speculation as to a possible "strategy" behind counsel's abandonment of the mental health investigation.

The expert testimony Respondent asserts would have been harmful contained facts that were

already before the jury.[13] Respondent states that the prosecution experts would have testified "that Runyon failed to accept responsibility for his actions[.]" ECF No. 497, pp.53-54. Similar testimony was already before the jury as it was a central prosecution theme: Runyon lacked remorse because he failed to take responsibility for the crime. The prosecution presented testimony and exhibits attempting to establish a pattern of conflicts that arose during Runyon's various jobs and attempting to show that Runyon consistently denied fault, shifted blame, and rationalized such conflicts. The prosecutor argued: "we see a recurring theme, ladies and gentlemen, with this education and this employment experience, in that he is reprimanded, and then he resigns. It's never his fault. It's never his fault that he is late and given a suspension. It is never his fault that he has had unsatisfactory job performance and he is barred from reenlistment." Tr.2614, 8/26/09. The prosecutor also presented evidence regarding domestic battery charges and argued they had shown how Runyon "will do what he can to avoid responsibility for this, and it is a trend that we have seen continue into this case as well." Tr.2608, 8/26/09; *see also* Tr.2611, 8/26/09 ("Runyon is a manipulator who will do what he can to avoid responsibility. Again we see this same theme in the aftermath of the murder[.]").

The jurors found the lack-of-remorse non-statutory aggravating circumstance without testimony from the Government's experts. Counsel's failure to complete the mental health investigation and present expert testimony did not close the door to additional aggravating evidence, it prevented the jurors from considering a true depiction of David Runyon and his moral culpability. For example, Dr. Montalbano's report would have provided the jurors with the explanation that Runyon's "strong ego" and tendency to "externalize blame and to rationalize his own behavior" are products of his personality dysfunction. ECF No. 277, pp.26, 27; *see also* ECF No. 276, p.23 (Runyon

---

[13] Not all of the testimony would have been duplicative of other prosecution evidence; some had mitigating value. *See infra* 6(B)(3).

36

demonstrates personality features including "externalizing his responsibilities for conflicts" and not taking responsibility).

Respondent contemplates that the prosecution experts "could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence." ECF No. 497, pp.53-54. Respondent acknowledges, however, that the jurors rejected Dr. Cunningham's risk-assessment testimony without hearing from the prosecution's experts. ECF No. 497, p.42. Dr. Montalbano's report on Runyon's "correctional course and adjustment" would have likely supported Dr. Cunningham's risk-assessment testimony since it found: (a) Runyon "had no disciplinary infractions" during his year-and-a-half in pre-trial custody; (b) Runyon "was credited with providing emergency first aid to a cellmate, who suffered a seizure and associated head injury;" (c) Runyon's placement in general population reflected an appraisal that he was at low risk for violence in the prison environment; and (d) Runyon was "an isolative individual, who spent much of his time in his cell … engaging in activities such as reading." ECF No. 277, p.20. Again, counsel's failure to complete the mental health investigation and present expert testimony did not prevent the admission of additional aggravating evidence; it resulted in the jurors making a moral culpability determination based on an incomplete picture of David Runyon.

### 3. Counsel abandoned the investigation despite several red flags signaling the existence of substantial mitigating evidence.

In addition to facts signaling the need for investigation, *see supra* Claim 5, and the mitigating information conveyed to counsel by their own experts, *see supra* 6(A), the reports of the prosecution's experts (Drs. Montalbano and Patterson) included information warranting further investigation.

The prosecution experts confirmed some of Runyon's psycho-social history, including his head injuries. Each expert noted Runyon's head trauma at about age three when he was abused by his biological father, a run-in with a telephone pole around age five, being "knocked out" during high

37

school wrestling matches, concussions from military training involving explosions, and "a bad car accident" in 1996. ECF No. 276, pp.11-12; ECF No. 277, p.20. Dr. Montalbano found evidence of the 1996 car accident: the main reason Runyon was barred from reenlistment in the Army was a problem with attention to detail and a failure to follow instructions. ECF No. 277, p.29. This was a problem that did not predate the car accident and Dr. Montalbano opined that "problems such as attention to detail may have been the part of the sequalae from this event." *Id.* Maria Runyon's grand jury testimony also corroborated the car accident. ECF No. 277, p.20. Dr. Montalbano's testing revealed a substantial variance between Runyon's verbal and performance IQ scores and significant deficits in working memory. ECF No. 277, pp.24-25. "[O]nly a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction[.]" ECF No. 277, p.30. If counsel had followed these leads and conducted an adequate investigation the jurors would have learned of Runyon's brain damage.

Dr. Patterson's report noted that the "sag" on the right side of Runyon's face resulted from abuse by his biological father. ECF No. 276, p.11. Had counsel pursued this information they could have presented such evidence to the jurors and strengthened the non-statutory mitigating circumstances based on Runyon's childhood environment. This information also would have rebutted the prosecution's argument that Runyon's appearance in the interrogation videotape evidenced a lack of remorse. *See* ECF No. 478, pp.71-72, 74.

Dr. Montalbano's report discussed the effect of adverse developmental factors in Runyon's life. He found several adverse factors which "may well have contributed to his [Runyon's] personality disorder[.]" ECF No. 277, p.30. Runyon's personality disorder, in turn, "contributed significantly to his poor vocational performance and his unstable interpersonal history." ECF No. 277, pp.30-31. Dr. Montalbano devoted multiple pages in his report to explaining how various personality-driven factors

38

resulted in Runyon's "significant underachievement" and inability to maintain consistent employment, lack of self-awareness and rigid tendency to deny or minimize problems, apparent lack of remorse, lack of consistent contact with his family, poor impulse control and poor judgment in establishing relationships with unstable females. *Id.*, pp.25-30. Had counsel followed-up on Dr. Montalbano's discussion of adverse factors they could have obtained favorable testimony on this subject matter from Dr. Cunningham.[14]  *See* ECF No. 478, pp.64-68.

At trial the prosecution portrayed Runyon's participation in drug studies as an intentional "[abandonment of] more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven." Tr.2610, 8/26/09. In contrast, Dr. Patterson reported that when Runyon's "mother was in a lot of physical pain, and he first found out about drug trials because he was doing research online resulting in his decision to participate in drug trials while he was in West Virginia." ECF No. 276, p.12. Runyon felt like he was doing "something good for people and he had only seen three or four other Asians so that he [wa]s 'representing that culture.'" ECF No. 276, p.13. Had counsel pursued information in Dr. Patterson's report, the jurors could have been provided with context regarding Runyon's motivations for participating in drug studies that would have countered the prosecution's argument.

In light of information that was known (or should have been known) by counsel, the failure to conduct an adequate psycho-social investigation was unreasonable.

---

[14] Respondent states that "developmental factors were both known and put forward by counsel for Runyon," ECF No. 497, p.59, but only some were "put forward" by counsel in a letter to the United States Attorneys. ECF No. 478-15. Counsel did not present evidence *to the jurors* regarding how development factors impacted Runyon's cognition, emotions, and behaviors. Subsequently, replacement counsel failed to present at either the eligibility or selection phase the mitigation narrative reflected in that letter and developed by his predecessor.

### C.       Counsel's deficient performance resulted in prejudice.

Respondent argues that the unpresented mitigating evidence was "of [d]ubious [v]alue," ECF No. 497, p.57, and asserts that "counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on positive aspects of Runyon's character."[15] *Id.*, p.60. Respondent would have the Court *assume* that defense counsel made informed choices not to present certain mitigating evidence. However, penalty-phase counsel did not believe mental health evidence was "dubious."[16] Counsel wanted to present evidence of trauma and Runyon's diminished ability to reason. ECF No. 478-5, pp.1-2, ¶5; ECF No. 478-6, p.1 ¶5. This evidence was available and was not inconsistent with the evidence which was presented at the penalty phase.

Finally, Respondent argues that trial counsel presented a reasonable defense based on the fact that "Runyon was a decent person who deserved mercy." ECF No. 497, p.62. When advocating for a life sentence there is a substantial difference between: (a) a presentation based on the fact that Runyon was a decent person who killed someone, and (b) a presentation based on the fact that Runyon was a decent person who had experienced lifelong traumas resulting in mental illness, personality dysfunction, and brain damage that affected his cognitive functioning and made him susceptible to being used as a tool by the codefendants to kill co-defendant Voss's husband. Unfortunately, counsel were not in a position to "choose" among these presentations because the psycho-social investigation

---

[15] Respondent also asserts that the jury imposed a death sentence because it found in the eligibility phase that Runyon "intentionally killed Cory Allen Voss, that he did so for money, [and] he did so after substantial planning." ECF No. 497, p.68. Under this view, prejudice could not be established because the selection phase of trial and mitigation were irrelevant. Respondent effectively says the jury determined the aggravating factors and decided upon death as early as the guilt phase and no later than the eligibility phase.

[16] Respondent repeatedly downplays the unpresented mitigation evidence even though it is the type of evidence that the Supreme Court has declared could influence a jury's appraisal of a defendant's moral culpability. *See supra* 6(A).

was inadequate.

**Claim 7:** **Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt.**

The jury was told that co-defendant Draven said on the night of the crime he called and spoke to Runyon, who was at a payphone located near the crime scene. Draven also said in a separate statement that he hired a "friend" to commit the crime. Trial counsel failed to make contemporaneous objections or request a curative instruction when these statements were admitted through the testimony of Detective Rilee, who obtained the first statement while interrogating Draven, and jailhouse informant Edward Fodrey who recounted the second statement.

Respondent first defends the Confrontation Clause violations by claiming that Detective Rilee's description of co-defendant Draven's admission was otherwise admissible as a statement made in furtherance of a conspiracy. ECF No. 497, p.74. Draven's admission that he spoke to Runyon while Runyon was at a location within a short distance from the scene of the crime is unrelated to any conspiracy, including a conspiracy to cover-up the crime. Draven's statement is the only evidence that places Runyon in Newport News, Virginia shortly before the crime occurred. Draven and Runyon certainly did not "conspire" to place Runyon in that location when all other evidence demonstrated Runyon was in Morgantown, West Virginia at a time that made it impossible for Runyon to commit the crime in Newport News.[17]

---

[17]Respondent's assertion that "Draven was attempting to clear Runyon from suspicion" with this statement is nonsensical. ECF No. 497, p.75. Draven places Runyon near the crime scene and admits they were in contact right before the crime occurred. These are not statements of a person "attempting to clear himself" and others. *See id.*

Respondent alternatively suggests that Draven's statement was not inculpatory as to Runyon because the connection between Draven's admission and the Voss murder is not apparent from the face of the statement itself. ECF No. 497, pp.75-76 (citing *U.S. v. Lighty*, 616 F.3d 321 (4th Cir. 2010)). Again, Respondent ignores that this is the only evidence that placed Runyon in Newport News, Virginia near the time of the crime. Runyon's jurors heard from Detective Rilee that Draven identified Runyon as the person at the Waffle House payphone, *i.e.*, the person within a short distance of the scene of the crime, and this contradicted Runyon's account of his whereabouts. *Lighty* is a case that involved redactions of proper names from a non-testifying co-defendant's statement and it cannot support Respondent's argument because Runyon was specifically named in co-defendant Draven's statement.

As to Edward Fodrey's recitation of Draven's statements, Respondent again relies upon *Lighty* and its progenitor *U.S. v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999), and insists that Fodrey's recitation of Draven's statement was not inculpatory because it did not mention Runyon by name. ECF No. 497, p.78. In *Lighty* and *Akinkoye* the statements in question could have referred to a number of other persons and in *Akinkoye* the redaction pointed to a person other than the defendant raising the Confrontation Clause challenge. S*ee Akinkoye*, 185 F.3d at 198. Here, no such possibility exists. The jurors had no basis to conclude that Draven's statement to Fodrey referred to anyone but Runyon.

In *Lighty*, the prosecution presented a non-testifying codefendant's redacted out-of-court statement that replaced the defendant's proper name with a general reference. The court found that the defendant could not be identified as the subject of the co-defendant's statement absent additional evidence. It reasoned that the prosecution would have to present additional witnesses, who could be confronted, in order to connect the defendant to the statement. *Lighty*, 616 F.3d at 377. The *Lighty* court approved the admission of such a redacted statement but admissibility was also dependent upon

42

the administration of a proper limiting jury instruction. *Id.* (citing *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987)).

Here, Fodrey testified that Draven said he "hired some other guy" that "was a friend of his" to murder Corey Voss. Respondent argues that this reference is ambiguous enough to pass Sixth Amendment scrutiny because there was evidence that Draven had "reached out" to other people. ECF No. 497, p.78. However, there was one person and one person alone who had already been identified as Draven's "friend" and that was Runyon.

The jurors were clear that the three defendants were Draven, his girlfriend Cat Voss and his friend David Runyon. In opening statement, the prosecutor said that in order for co-defendants Draven and Voss to make a life together they had to get rid of Voss's husband: "Enter the defendant, David Runyon, a friend of Michael Draven's from hospital drug studies that the two men did together." Tr.214, 7/2/09. The jurors heard a phone conversation between Voss and Draven that referred to Draven's "friend" as the person Draven was supposed to have lunch or dinner with before Draven was arrested. Gov't Tr. Ex. 163A. Voss referenced having a conversation with Draven's "friend" and the prosecution alleged this conversation involved Voss asking Runyon to kill her husband. Four and a half days into the prosecution's case, when Fodrey testified that Draven said he hired a "friend," that term obviously referred to Runyon or involved that inference which the jurors could make without any additional evidence. *See Lighty*, 616 F.3d at 376-77. *See also*, *U.S. v. Ramirez*, 29 Fed. App'x 111, 115 (4th Cir. 2002) (Although "partner" may be, in isolation, a "neutral pronoun," in the context of prior evidence it was "facially incriminating.").

Respondent attempts to sweep aside trial counsel's failure to make a contemporaneous objection to these violations and failure to request a limiting instruction with the conclusory statement that such an instruction would have drawn unwanted attention to the un-confronted, inculpatory

43

statements. ECF No. 497, p.77. This argument fails because a jury is rightfully presumed to follow a judge's cautionary instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). If fact-finding procedures reveal that this was the reason counsel did not to object or request limiting instructions, then counsel's decision was unreasonable and legally unsupportable.

Finally, Respondent asserts that Runyon has not shown cause and prejudice for the procedural default resulting from the fact that the Confrontation Clause claim was not raised on direct appeal. ECF No. 497, p.72. Runyon has alleged, however, that his direct appeal counsel were ineffective for not raising the Confrontation Clause claim and the claim's probable merit establishes prejudice. *See* Claim 8.

**Claim 8:       Ineffective Assistance Of Counsel On Direct Appeal.**

Runyon raises the issues of ineffective assistance of appellate counsel as both a substantive claim and as "cause" for any claim that may be deemed procedurally defaulted.

Respondent asserts that counsel did not have a duty to appeal every non-frivolous issue if counsel made a strategic decision to forgo such issues. ECF No.497, p.80. Respondent does not argue, however, that those circumstances are present in Runyon's case. Respondent's argument is focused against a finding of prejudice from counsel's deficient performance.

Appellate counsel rendered deficient performance because one or more issues were not raised even though they are clearly stronger than two issues presented in the appellate brief. *See*, *Smith v. Robbins*, 528 U.S. 259, 288 (2000). This is an easy determination because it requires only a comparison of the strength of the ignored issue and the strength of the issues raised, *id.*, and the Fourth Circuit identified two very weak claims in Runyon's appellate brief. The claim based on an alleged Commerce Clause violation had been rejected by "all of the circuits to address the question" and was contrary to

44

binding and long-standing circuit authority. *Runyon*, 707 F.3d at 489. The boilerplate challenge to the constitutionality of the death penalty in all circumstance similarly failed by a wide margin. *Id.* at 521 n.7.

With respect to the contested issue of prejudice, Respondent mis-states the *Strickland* standard. Respondent argues against prejudice stating: "Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case;" "Runyon fails to demonstrate that he would have prevailed on this issue on direct appeal;" and, "the additional issues Runyon suggests have no merit[.]" ECF No. 497, pp.81, 82-83.

Runyon need not show that there would have been a different outcome or that he would have prevailed on direct appeal had an omitted issue been raised. He does not even have to establish by a preponderance of the evidence that the result would have been different. *Williams*, 529 U.S. at 405-06. Runyon need only demonstrate "a reasonable probability that … the result of the proceeding would have been different." *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Such a determination may require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

**Claim 9:     Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015).**

### A.  Introduction

In *Johnson v. U.S.*, 135 S.Ct. 2551 (2015), the Supreme Court found the residual clause of the Armed Career Criminal Act ("ACCA") unconstitutionally vague. The residual clause of the ACCA defines a "violent felony" as an offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924 (e)(2)(B)(ii). The Supreme Court found this language

unconstitutional for two reasons: first, it requires a court to imagine the "ordinary case" of a crime, an "inherently indeterminate" task; second, the judicial assessment of risk is untethered to any sort of standards. *Johnson*, 135 S.Ct. at 2558-59. Runyon alleges his convictions under 924(c), which has a similar residual clause,[18] is unconstitutional under *Johnson, supra. See* Claim 9, ECF No. 478, pp.80-90.

Respondent asserts Runyon's case is not affected by *Johnson,* offering numerous contentions as to why this is so. Runyon addresses each contention in turn.

## B.  Legal Background

As discussed in Runyon's motion for §2255 relief, multiple provisions of the federal law contain, or incorporate, a definition of "violent felony" or "crime of violence." *See* 18 U.S.C. §924(e) ("ACCA"); 18 U.S.C. §16(b) ("General Provisions" definition of crime of violence); 18 U.S.C. §924(c) (brandishing or carrying a firearm during commission of a crime of violence).

Courts regularly compare the similarities between the residual clause in the ACCA to the clause at issue here. Although the comparison tends to specifically address 18 U.S.C. §16(b), that statute is identical to §924(c)(3)(B). *See, e.g., Chambers v. U.S.*, 555 U.S. 122, 133, n.2 (2009) (citing circuit splits on §16(b) in the context of a residual clause case because §16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring). *See also U.S. v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under §924(c)(3)(B)); *U.S. v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *U.S. v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and §16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th

---

[18] In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924(e)(2)(B)(ii). The 924(c)(3)(B) residual clause defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

46

Cir. 2014) (using both ACCA cases and §16(b) cases to define the same "ordinary case" analysis); *U.S. v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and §16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under §16(b)").

After *Johnson*, the lower courts, and this Court, are confronted with cases raising questions about how the *Johnson* opinion affects these other similarly worded provisions, including 924(c)(3)(B) and/or 16(b), which are at issue in Runyon's case.

As of this filing, there is a circuit split on whether the concerns underlying the *Johnson* opinion are also present in convictions resting on 18 U.S.C. §§16(b) and 924(c)(3)(B). The Fifth, Seventh, and Ninth Circuits have held that 924(c)(3)(B) suffers the same constitutional frailties that resulted in 924(e)'s downfall. *U.S. v. Gonzalez-Longoria*, 813 F.3d 225, 235 (5th Cir. 2016) *reh'g granted*, No. 15-40041, 2016 WL 766980 (5th Cir. Feb. 26, 2016) ("Under *Johnson*, this means that §16 is unconstitutionally vague, and we so hold."); *U.S. v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015) ("Applying *Johnson*'s reasoning here, we conclude that §16(b) is unconstitutionally vague."); *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015) (18 U.S.C. §16(b) is unconstitutional because it requires judicial imagination of an ordinary case of a crime and because vague and uncertain standards are relied upon in determining risk; by implication, the identically worded portion of 924(c) is unconstitutional). One Circuit has held that *Johnson* does not render 924(c)(3)(B) unconstitutional. *U.S. v. Taylor*, No. 09-5517, 2016 WL 537444, at *35 (6th Cir. Feb. 11, 2016) (reh'g pending).

District courts have also reached inconsistent conclusions. *See, e.g., U.S. v. Tiffany Renee Edmundson,* No. PWG-13-15 (D. Md. Dec. 30, 2015) ECF No. 67. (18 U.S.C. §924(c)(3)(B) is void for vagueness); *but see U.S. v. Pedro Anthony Romero Cruz*, No. 1:14-CR-306-GBL (E.D. Va. Mar. 8, 2016) ECF No. 738 (18 U.S.C. §924(c)(1) and (2) unaffected by *Johnson*).

47

This Court is likewise confronted with a shifting legal landscape. At bottom, though, Runyon's convictions suffer the same infirmities that caused the Supreme Court to act in *Johnson*. Section 924(c)(3)(B), like the ACCA residual clause, requires the two-step analysis condemned in *Johnson*: an "ordinary case" analysis followed by an imprecise risk analysis. Because these are the steps condemned in *Johnson*, §924(c)(3)(B) cannot withstand scrutiny. It violates the due process principles reaffirmed in *Johnson*. Relief is warranted.

## C. Argument

The Government's numerous contentions may be broadly described as follows:

1) Runyon's *Johnson* claim is procedurally barred.

2) There is less documented judicial confusion about application of 18 U.S.C. §924(c) than there is about ACCA; thus, 924(c) is constitutional.

3) Section 924(c) is not plagued by a confusing list of enumerated offenses; thus it is constitutional;

4) Section 924(c) is more narrowly drafted than the ACCA; thus it is constitutional.

5) Alternatively, the Government asserts Runyon's convictions do not implicate the residual clause at all. They are based on the force clause of 924(c), which was not affected by *Johnson*.

6) Finally, the Government argues Runyon's sentencing hearing is not tainted.

### 1. This Court May Review Runyon's *Johnson* Claim.

Respondent faults Runyon for failing to raise this claim sooner. But Runyon raised the claim as soon as it became available. The *Johnson* holding is "new" because it expressly overruled two prior decisions—*James v. U.S.*, 550 U.S. 192 (2007), and *Sykes v. U.S.*, 131 S.Ct. 2267 (2011)—that had affirmed sentences imposed under the residual clause. *Johnson*, 135 S.Ct. at 2563 ("Our contrary

holdings in *James* and *Sykes* are overruled."). That *Johnson* expressly overruled prior precedent demonstrates that the decision is "new." *See Teague*, 489 U.S. at 301 ("[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.").

Respondent also asserts *Johnson* will not apply retroactively. A Supreme Court decision applies retroactively to cases on collateral review if it announces a "new" rule that is "substantive." *Schriro*, 542 U.S. at 351. *Johnson* satisfies both requirements. In addition to being new, the *Johnson* holding is "substantive." Under Supreme Court precedent, a decision is considered "substantive" if it "narrow[s] the scope of a criminal statute by interpreting its terms." *Schriro*, 542 U.S. at 351. A decision is also "substantive" if it "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997) (internal quotation marks and citation omitted). Such decisions "apply retroactively because they 'necessarily carry a significant risk that a defendant . . .' faces a punishment that the law cannot impose upon him." *Schriro,* 542 U.S. at 352 (quoting *Bousley*, 523 U.S. at 620). Applying these standards, a decision that narrows the reach of the ACCA—as *Johnson* does by declaring one of its provisions unconstitutional—is "substantive." *Johnson* meets the standard for retroactive application. The Supreme Court granted certiorari in *Welch v. U.S.*, No. 15-6418, to review the retroactivity of *Johnson*.[19]

This Court should reject Respondent's procedural default argument and review the merits of

---

[19] After filing a response in Runyon's case, the United States filed its merits brief in *Welch,* in which it agreed with Welch that the rule in *Johnson* is substantive rather than procedural and that it applies retroactively. Brief for the United States, *Welch v. U.S.*, No. 15-6418, available at http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs_2015 _2016/15-6418_resp_UnitedStates.authcheckdam.pdf. Given the Government's position in *Welch*, the retroactive application of *Johnson* to Runyon's case should no longer be contested. Nonetheless, Runyon replies here to the argument in the Government's pre-*Welch* response.

Runyon's claim.

### 2. Documented judicial confusion does not create vagueness.

Respondent contends that the ACCA residual clause is unconstitutional because the Supreme Court repeatedly failed to construe it in a workable manner. Respondent also relies on the fact that the lower courts have not been as "confused" by §924(c)(3)(B).

Respondent misinterprets the import of the prior case law. Prior judicial debate about the application of a law does not create vagueness. At most it may confirm "its hopeless indeterminacy." *Johnson*, 135 S.Ct. at 2558. *See also Dimaya*, 803 F.3d at 1119; *Vivas-Ceja,* 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 235.

Moreover, in *Johnson*, the Supreme Court was clear that its basis for finding the residual clause unconstitutional was its reliance on the ordinary case assessment and the vague standard for assessing risk. *Johnson*, 135 S.Ct. at 2561.

### 3. The absence of enumerated offenses does not render 924(c) constitutional.

Respondent claims that because the enumerated offenses in ACCA are absent from 924(c), it is constitutional.

It is true that the Supreme Court lamented the confusing list of enumerated offenses that accompany the ACCA definition of "a crime of violence." *Johnson*, 135 S.Ct. at 2558. But the Court also noted the enumerated offenses "did not succeed in bringing clarity" because it "did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime." *Johnson*, 135 S.Ct. at 2559. The *Johnson* Court made clear that the "ordinary case" problem was the key feature: "More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual engages on a particular occasion…. The residual clause, however, requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime." *Johnson,* 135 S.Ct. at

2561. More plainly stated, the enumerated offenses are best understood as a way to salvage the unconstitutional definition. The fact that §924(c)(3) does not have a possibly salvaging list of enumerated offenses arguably makes it more vague, not less. *See Dimaya*, 803 F.3d at 1117-18; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 232.

Further, as a matter of logic, the absence of the enumerated offenses is irrelevant. This is because the threshold question is how to determine the ordinary case of a predicate offense. Only *after* determining the ordinary case would a reviewing court consider the enumerated offenses. The question of how to define the ordinary case is the problem. The list of enumerated offenses did not solve the problem but neither did it create it.

### 4. Section 924(c) is not more narrowly drawn than the ACCA (or the distinctions the Government notes are constitutionally irrelevant).

Respondent claims that §924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct; thus §924(c)(3)(B) is constitutional. Respondent is in error.

Initially, Respondent overlooks that the Supreme Court has equated the scope of these two statutes. *See, e.g., Begay v. U.S.*, 556 U.S. 137, 144-45 (2008). *See also* p.46 for discussion of Supreme Court, appeals court and district court cases noting similarities between the statutes.

The ACCA and 18 U.S.C. §924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is the risk of injury, and the risk at issue in §924(c) is a risk that force will be used, the difference is immaterial to the due process problem. In *Johnson,* the Court's holding did not turn on the type of risk, but rather how a court assesses or quantifies the risk. This process is the same under both the ACCA and §924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the quantum of risk posed by the "ordinary case."

The Fourth Circuit applied the "ordinary case" analysis in *U.S. v. Avila*, 770 F.3d 1100, 1107

51

(4th Cir. 2014), in construing §16(b): "As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. §16(b)." *Avila* controls here because §§16(b) and §924(c)(3)(B) are identical. And of course, the Fourth Circuit has applied the "ordinary case" inquiry to the §924(c) residual clause. *U.S. v. Fuertes*, 805 F.3d 485, 500 n.6 (4th Cir. 2015); *see also U.S. v. Naughton*, 621 Fed. App'x. 170, 178 (4th Cir. Sept. 2, 2015).

Respondent also claims §924(c)(3)(B) is limited to "'offenses that naturally involve a person acting in direct disregard of the risk that physical force might be used ….'" ECF No. 497, p.91 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004)). The Government continues that under §924(c)(3)(B), the ordinary case is limited to the elements of the offense. *Id.* But such an assertion cannot be reconciled with the Fourth Circuit's holdings in *Avila* and *Fuertes*, applying the problematic "ordinary case" analysis. Moreover, by focusing on the risk during the predicate offense, §924(c)(3)(B) is as broad as the ACCA's residual clause.

At bottom, this argument cannot win the day because the fundamental problem with the residual clauses of the ACCA and §924(c)(3)(B) is the threshold "ordinary case" inquiry that the Supreme Court determined is impossibly arbitrary.

### 5. Section 924(c)(3)(B) is vague as applied to Runyon.

Respondent argues Runyon may not challenge his §924(c) conviction because his conduct was clearly violent. But this argument ignores the fact that in the context of interpreting §924(c), courts apply the categorical approach. This entails the court envisioning an idealized "ordinary case," and asking whether that "ordinary case" involves a substantial risk that violent force will be used. *See Johnson*, 135 S.Ct. at 2557-58. Under the categorical approach, Runyon's actual conduct has no bearing on the resolution of this question.

Moreover, in Justice Thomas' opinion concurring in the judgment, he opined the ACCA's residual clause covered an "unmistakable core of forbidden conduct" and thus it was not facially invalid. *See Johnson*, 135 S.Ct. at 2573 (Thomas, J., concurring in the judgment). The *Johnson* majority rejected this argument and this Court should as well.

### 6. Carjacking and conspiracy to commit murder for hire are not crimes of violence under the force clause of section 924(c)(3)(A).

The next question here is whether Runyon's carjacking and conspiracy offenses qualify as crimes of violence under the force clause of §924(c). Runyon explained in his 2255 motion that carjacking does not qualify as a crime of violence. ECF No. 478, pp.86-89. He explained this conclusion is consistent with the Fourth Circuit's holding in *U.S. v. Torres-Miguel*, 701 F.3d 165 (2012). Runyon continues to rely on the arguments raised in the §2255 motion and only addresses matters not previously discussed. Respondent argues that because a death resulted from the carjacking, "it can hardly be said that this charge does not require force under any definition." Respondent also notes that 18 U.S.C. §2119 contains a *mens rea* that the defendant act with the intent to cause death or serious bodily harm. ECF No. 497, p.95. Carjacking is defined as follows: "Whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle … from the person or presence of another by force and violence or by intimidation…." 18 U.S.C. §2119. In *Johnson*, the Supreme Court defined physical force, as used in §924(c)(3)(A) to mean "violent force—that is, force capable of causing physical pain or injury to another person." Carjacking does not qualify as a "crime of violence" under §924(c)(3)(A) because it does not include as a necessary element, "the use, attempted use, or threatened use," of "force capable of causing physical pain or injury to another." *Johnson*, 559 U.S. at 140.[20]

---

[20] Runyon notes the Eleventh Circuit and the Second Circuit have found carjacking qualifies as a crime of violence. *U.S. v. Moore*, 43 F.3d 568, 573 (11th Cir. 1994); *U.S. v. Mohammed*, 27 F.3d 815,

Nor is this conclusion altered by the sentencing provision of the carjacking statute, which notes that if death occurred, Runyon may face the death penalty. This sentencing provision does not require that the death result from using physical force. *See U.S. v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009). *See also Torres-Miguel*, 701 F.3d at 168 (explaining that the fact that serious bodily injury occurs does not per se establish a crime of violence).

Conspiracy to commit murder for hire is also not a crime of violence under the force provision of 18 U.S.C. §924(c). As explained in Runyon's §2255 motion, conspiracy does not qualify as a crime of violence under the force provision of §924. ECF No. 478, p.89. The fact that death resulted does not alter this conclusion. *See Torres-Miguel, supra.*

Respondent also contends that a different outcome is required because the Supreme Court overruled *Torres-Miguel* in *U.S. v. Castleman*, 134 S.Ct. 1405 (2014). ECF No. 497, p.97. Respondent is in error.

In *Torres-Miguel,* at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which *will result in death or great bodily injury to another. Torres-Miguel*, 701 F.3d at 168 (citing Cal. Penal Code §422(a)) (emphasis added). The specific question in the case was whether the statute had an element equating to a threat of violent force under the force clause of U.S.S.G. 2L1.2, a clause that is identical in all relevant respects to the §924(c) force clause. *Id.* Despite the death or great bodily injury element in the California statute, the Fourth Circuit found that the offense was missing a violent force element, and thus, could never qualify as a crime of violence under the force clause. *Id.* at 168-69. The court held that [a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines

_____

819 (2d Cir. 1994). But these opinions were issued well before the 2010 Supreme Court opinion in *Johnson*.

54

definition of crime of violence. *Id.* at 168. The court, in strong words, proclaimed that "*of course*, a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* (emphasis added).

Relying on several appellate decisions from various Circuits, the Fourth Circuit reasoned that there are many ways in which physical injury, even death, can result without use of violent force. *Id.* at 168-69. For example, as the Fifth Circuit has noted, a defendant can violate statutes like California Penal Code 422(a) by threatening to poison another, which involves no use or threatened use of force. *Torres-Miguel*, 701 F.3d at 168-69 (citing *U.S. v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010)); *see also U.S. v. Gomez*, 690 F.3d 194, 201 (4th Cir. 2012) (child abuse statute which required sustaining physical injury to child can be violated by an affirmative act or by neglecting to act, neither of which necessarily requires the use of physical force against the child). In reaching its decision, the *Torres-Miguel* court also relied on the Second Circuits' decision in *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003). In that case, at issue was whether a prior Connecticut conviction for third degree assault qualified as a crime of violence under the force clause.

For even further support, in *Torres-Miguel*, 701 F.3d at 169, the Fourth Circuit embraced the Tenth Circuit's decision in *U.S. v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005). In that case, "the [Tenth Circuit] explained that, although the Colorado [third degree assault] statute required [an act causing] bodily injury [by means of a dangerous weapon], imposing that injury does not necessarily include the use or threatened use of physical force as required by the Guidelines and so the Colorado crime was not categorically a crime of violence under U.S.S.G. §2L1.2." *Torres-Miguel*, 701 F.3d at 169 (citing *Perez-Vargas*, 414 F.3d at 1287) (internal quotation marks omitted). The Tenth Circuit reasoned that "several examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals." *Perez-Vargas*, 414 F.3d at 1286.

55

Contrary to Respondent's assertions, *U.S. v. Castleman,* 134 S.Ct. 1405 (2014) did not overrule *Torres-Miguel.* In *Castleman,* the Supreme Court held that a prior Tennessee domestic violence offense that had an element of physical injury qualified as a misdemeanor crime of domestic violence under the force clause of 18 U.S.C. §922(g)(9). *Id.* at 1413-15. However, the force clause of 922(g)(9) is critically different from that applicable here and in *Torres-Miguel.* In fact, in *Castleman,* the Supreme Court, in great length, explained that it was applying a definition of physical force to 922(g)(9) that was starkly different from that of the ACCA/§924(c)(3) force clause, which requires violent physical force. 134 S.Ct. at 1410-15. Unlike the definition of physical force at issue here (and in *Torres-Miguel*), the *Castleman* Court applied the common law definition of physical force that encompassed even the slightest offense of touching, *i.e.*, *de minimis* force. *Id.* at 1410. In this context, the Court held that physical injury necessarily requires de minimis force. *Id.* at 1413-15.

But more importantly, the Supreme Court in *Castleman* explicitly refused to evaluate the validity of the logic rejecting *Torres-Miguel.* The *Castleman* Court wrote that "[*w*]*hether or not the causation of bodily injury necessarily entails violent force [is] a question we do not reach.*" *Id.* at 1413 (emphasis added). That, of course, is the question any decision abrogating *Torres-Miguel* must answer. Because *Castleman* failed to reach the question *Torres-Miguel* answered, *Torres-Miguel* retains its vitality and remains binding precedent that this Court has no choice but to follow.

### 7. The death sentence on Count One was tainted by the sentence for Count Five.

Respondent erroneously asserts that Runyon offers no authority in support of his request for a new sentencing hearing. In his motion, Runyon cited the Eighth Amendment, which requires heightened reliability in capital sentencing proceedings. He also cited *Kennedy v. Louisiana*, 554 U.S. 407 (2008). Finally, he cited case law from the Fifth and Seventh Circuits. ECF No. 478, pp.89-90.

Respondent also complains that Runyon wrongly seeks to have this Court consider the totality

of the circumstances in determining whether to grant a new sentencing hearing, while also seeking to have this Court apply "Runyon's categorical approach" in reviewing whether recent Supreme Court precedent affects his capital convictions. There is no inconsistency because these are two separate inquiries requiring different analyses. The categorical approach was recognized by the Supreme Court in *Taylor v. U.S.*, 495 U.S. 575 (1990), and is among the controlling precedent to be applied to Runyon's substantive claim.

Once this Court strikes Runyon's death sentence under *Johnson*, as it must, the Eighth Amendment requires this Court to conduct an exhaustive review of the constitutionality of Runyon's death sentence. Such review would necessary entail consideration of the fact that the jury returned a mixed verdict. Furthermore, the Government has not and cannot argue the *Johnson* error is harmless. The *Johnson* error is harmful and relief is warranted.

**Claim 10:       The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered The Government's Burden Of Proof In Violation Of The Fifth, Sixth, And Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003).**

Respondent contends Runyon is barred from raising this claim on collateral review because it was raised on direct appeal. Runyon acknowledges he raised this issue on direct appeal, *U.S. v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided against him. *Runyon*, 707 F.3d at 516. However, where there is an intervening change in law, a prior adjudication may not be dispositive. *Davis v. U.S.*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where intervening law clarified the issue, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the … conviction, precluded him from securing relief under §2255 on the basis of an intervening change in law"). *See also English v. U.S.,* 998 F.2d 609, 612-13 (8th Cir. 1993) (relying upon *Davis* for the proposition that if there is an intervening change in law, an issue that was decided on direct appeal

may be raised again in §2255 motion); *Underwood v. U.S.,* 15 F.3d 16, 18 (2d Cir.1993) (if an issue was raised on direct appeal, it may not be raised again in a §2255 setting unless there was an intervening change in law); *U.S. v. Palumbo*, 608 F.2d 529 (3d Cir. 1979) (an intervening change in law is an exception to the general rule that a claim may not be brought for a second time in a 2255 motion); Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (7th ed.), section 41.7[e] (discussing previous determination of an issue as an affirmative defense that may be overcome if there has been an intervening change of law).

Respondent also asserts (without explanation) that the decision in *Hurst* represents a "new rule" that is not retroactively applied to Runyon's case. Runyon disagrees that *Teague* bars relief on this claim. As discussed *supra* the law is unsettled as to whether *Teague* applies in the context of a 2255 motion. If *Teague* does apply in the §2255 setting, it does not bar review of Runyon's claim because *Hurst* does not meet *Teague*'s definition of "new" rule. This is so because *Hurst* was dictated by prior precedent. *See Butler v. McKellar* 494 U.S. 407(1990).

Runyon's case is similar to *Stringer v. Black*, 503 U.S. 222 (1992), where the petitioner sought relief under *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Clemons v. Mississippi*, 494 U.S. 738 (1990), both of which were issued after his case was decided on direct appeal but while his case was pending on federal collateral review. The Supreme Court noted that while the cases were released after the petitioner's conviction was final, *Teague* did not bar review because the cases were not "new"—that is, they were dictated by prior precedent. *Stringer*, 503 U.S. at 227-28.

Respondent also argues if *Hurst* does apply, Runyon cannot prevail. Respondent is in error.

In *Hurst v. Florida*, 577 U.S. __, 136 S.Ct. 616 (2016), the Supreme Court struck Florida's capital sentencing scheme, finding it violates the Sixth Amendment because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 621-22. The State

58

of Florida argued that because the jury found the facts necessary to establish eligibility, the Sixth

Amendment was satisfied. The Supreme Court rejected this argument as follows:

> The State fails to appreciate the central and singular role the judge plays under Florida law. … [T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' Fla. Stat. § 775.082(1)(emphasis added). The trial court *alone* must find 'the facts … [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

*Hurst*, 136 S.Ct. at 622.

The *Hurst* Court recognized the unworkable nature of the distinction between eligibility and selection, and held a judicial finding that aggravators outweighed mitigators is unconstitutional. *Id.*

*Hurst* therefore makes clear that it is a jury function to weigh aggravating and mitigating circumstances because the result determines whether a death sentence is imposed. When the weighing function—whether aggravating circumstances outweigh mitigating circumstances—results in an affirmative finding, that finding constitutes the final element required for a death sentence. *Hurst*, 136 S.Ct. at 623-24 (specific findings authorizing the imposition of the sentence of death must be made by the jury). It is beyond question that all elements leading to a greater punishment must be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). It is also beyond questions that all elements must be found beyond a reasonable doubt. *Alleyne v. U.S.*, 570 U.S. ___, 133 S.Ct. 2151, 2156 (2013). Accordingly, a jury must find—beyond a reasonable doubt—that aggravating circumstances outweigh mitigating circumstances in order to impose a death sentence.

The fact that Runyon's jurors made the specific finding that aggravators "sufficiently" outweighed mitigators is not constitutionally sufficient. They were required to make this final finding that determines a death sentence over a life sentence "beyond a reasonable doubt." The jury instructions did not include the required burden of proof and the jurors did not find the final

59

element required for a death sentence beyond a reasonable doubt. The sentence, therefore, should be vacated.

Just as in *Hurst*, here, the jury was instructed to make its ultimate determination to impose death based on whether the aggravating factors "sufficiently outweigh" mitigating factors. Tr.2672-73, 2675, 2682-84, 2694, 8/26/09; Tr.2707, 8/27/09. Given the fact that the Sixth Amendment applies to this ultimate, final determination to impose death, the jury should have been required to make its finding beyond a reasonable doubt.

**Claim 11:    The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad**

To be constitutional, aggravating circumstances must genuinely narrow the class of persons eligible for the death penalty from all persons convicted of a given offense and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

**A. The statutory aggravating circumstances failed to perform the constitutionally required narrowing function.**

Respondent concedes that the jurors relied upon two statutory aggravating factors that duplicated elements of the offense of conviction. ECF No. 497, p.108 ("The fact that two statutory aggravating factors mirror elements of the offenses . . . does not violate any constitutional principle."). Respondent asserts the eligibility findings were "very obvious and apparent in the jury's determination of guilt." *Id.*, p.33. The same evidence established "that Runyon had deliberately shot and killed Cory Voss, and that he did so with the expectation of being paid after substantial planning had occurred." *Id.*, p.32. The substantial planning statutory aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." *Id.*, p.34. The fact that the statutory aggravating factors duplicated elements of the offense means that the

aggravators did not perform a narrowing function in this case and Runyon's death sentence is unconstitutional.

Respondent argues that no constitutional violation occurred because "[a]n element of the underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are [sic] narrowed at the guilt stage, as opposed to the penalty phase." ECF No. 497, p.107. This argument fails because under the FDPA narrowing does not occur at the guilt phase of the case. Narrowing occurs at the eligibility phase where at least one statutory aggravating circumstance must be found.[21] *U.S. v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010); *U.S. v. Higgs*, 353 F.3d 281, 294 (4th Cir. 2003) ("Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible."); *U.S. v. Jones*, 132 F.3d 232, 248-49 (5th Cir. 1998) ("Although the federal death penalty regime defines capital offenses, the narrowing function does not occur until the penalty phase of the trial."). Neither statutory aggravating factor elevated Runyon's moral culpability above that already determined by his conviction thus the death sentence is unconstitutional. *See* §2255 motion, ECF No. 478, pp.92-93.

Respondent's second argument is equally unavailing. Respondent asserts that the mental state finding at the eligibility phase fulfilled the narrowing requirement. ECF No. 497, p.108. Respondent cites no authority for the proposition that a jury finding of an intentional killing, standing alone, sufficiently placed Runyon in a narrowed class of persons eligible for the death sentence from all persons convicted of the offense. To the contrary, the mental state requirement in 18 U.S.C. §3591(a)

---

[21] Although *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Tuilaepa v. California*, 512 U.S. 967 (1994), contain applicable principles of law, this claim is not controlled by the outcomes of those cases. *Lowenfield* involved a non-weighing statutory scheme that, like the statute in *Tuilaepa*, accomplished narrowing at the guilt-phase through a narrowed definition of capital murder. The FDPA is a weighing scheme that narrows through the application of statutory aggravating factors.

"codifies the command in *Enmund* … and *Tison* … to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself."[22] *U.S. v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998). The finding of a statutory aggravating circumstance is mandatory to achieve narrowing under the FDPA. If no statutory aggravating factor is found to exist, the court must impose a sentence other than death. 18 U.S.C. §3593(d).

## B.  This claim is not barred by the doctrines of procedural default or non-retroactivity.

In reply to Respondent's assertion of procedural default, Runyon asserts that the ineffective assistance of counsel constitutes cause and prejudice to overcome any such bar to litigating the merits of this claim. *See also* Claim 8.

Respondent also asserts that this claim is barred by the non-retroactivity doctrine but Runyon's claim is not dependent upon a "new procedural law." The applicable principles of law, including *Apprendi v. New Jersey* and *Ring v. Arizona*, were announced before Runyon's conviction became final.

## C.  The non-statutory aggravators negated any narrowing that might have previously occurred, they are arbitrary and capricious, and at least one is overbroad.

Respondent argues Runyon's constitutional claims regarding the non-statutory aggravators were "thoroughly analyzed" on direct appeal. ECF No. 497, p.109. The challenges addressed by the court of appeals, however, dealt with evidentiary and statutory concerns.[23] Appellate counsel did not

---

[22] In this case, felony participation is not an issue because Runyon was charged as a principal. The jury's eligibility-phase finding under §3591(a)(2)(A) that Runyon committed an intentional killing is duplicative, in other words, it does not super-add any fact different from what the jurors were required to find in order to convict Runyon. The jurors merely re-confirmed their earlier finding of intent at the guilt phase.

[23] Appellate counsel did not challenge "the propriety of the prosecution proposing" the lack-of-remorse aggravator but challenged the evidence introduced to support it. *Runyon*, 707 F.3d at 492.

62

raise the claim asserted here: that the non-statutory aggravators resulted in an unprincipled, arbitrary and capricious imposition of the death penalty. Counsel's failure to properly present these meritorious claims to the court of appeals constitutes ineffective assistance.

Regarding the non-statutory aggravators placed into the sentencing balance, Respondent stretches *Tuilaepa* too far. Neither *Tuilaepa*, nor the court of appeals' opinion in this case, *Runyon,* 707 F.3d at 491, hold that aggravating circumstances need not be scrutinized once narrowing has occurred. Indeed, Justice Scalia specifically recognized this in his concurrence where he was the sole member of the Court to announce such a viewpoint. *Tuilaepa*, 512 U.S. at 980 (Scalia, J. concurring) ("Today's decision adheres to our cases which acknowledge additional requirements" for factors that guide the jury in selecting which defendants receive the death sentence.). A two justice concurrence noted that the aggravating factor at issue *did* channel the jury's sentencing discretion and recounted that protections against arbitrary sentencing focus "on the eligibility determination and the actual sentencing decision." *Id.* at 981-82 (Stevens, J., joined by Ginsburg, J., concurring in the judgment).

Aggravating circumstances that influence the jurors' decision-making process must be analyzed for clarity, objectivity, and principled guidance.[24] *Maynard v. Cartwright,* 486 U.S. 356, 364 (1988); *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Godfrey v. Georgia,* 446 U.S. 420, 428 (1980). This

---

With respect to the "victim impact" aggravator, appellate counsel challenged the scope of the evidence introduced to support it. *Id.* at 499, 501. Three bases were asserted against the aggravator based on Runyon's education, training and experience: that it was vague and overbroad; that it relied upon elements of his background that were actually mitigating; and, that the evidence supporting it was insufficient. *Id.* at 502-03. The "abuse of women" aggravator was challenged: (1) as a circumvention of the prior-conviction aggravator expressly contained in the FDPA because it was based on unadjudicated and on "minor misconduct;" and, (2) as improperly supported by evidence which should have been excluded. *Id.* at 505-06.

[24] For example, the "victim impact" aggravator is constitutionally infirm because the sentencer fairly could conclude that it applies to every defendant eligible for the death penalty. *See Arave v. Creech*, 507 U.S. 463, 474 (1993).

is because when jurors are instructed to weigh an arbitrary and capricious or overbroad aggravating circumstance an arbitrary thumb is placed on death's side of the scale. *Stringer v. Black*, 503 U.S. 222, 232 (1992). Accordingly, Runyon's death sentence is unconstitutional because the prosecutor's unrestricted selection of facts to be designated as aggravating circumstances was included in the jury's sentencing determination.

**Claim 12:**      **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

Respondent avers that Runyon is entitled to neither relief, nor even discovery, on his intertwined claims of selective prosecution based upon Runyon's race (Runyon is first generation Korean-American) and trial counsel's ineffectiveness for failing to pursue that claim. ECF No. 497, p.115 ("Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful."). Respondent's argument, however, is largely irrelevant for two reasons. First, Runyon did not merely cite national statistics regarding the Government's disturbing pattern of disproportionately seeking death against non-whites. Runyon pled that the prosecution *in this case* sought death against the non-white Runyon while not seeking death against his white co-defendants and then emphasized their racial differences during trial. ECF No. 478, p.96. It is well-established that that the co-defendants were charged with the same crimes and Runyon has argued from the beginning, and throughout his §2255 motion, that the codefendants were equally culpable.[25] The jurors found that the codefendants were equally culpable. ECF No. 291, p.2. Second, Respondent implicitly

-------

[25] The allegations set forth in all sections of Runyon's §2255 motion were realleged and incorporated by reference in all other sections and claims. ECF No. 478, p.19. Runyon's First Motion for Discovery and Reply (ECF Nos. 491, 506)—filed before Respondent's Answer—and his Amended §2255 Motion provide additional facts supporting this claim. ECF No. 511, pp.105-10.

concedes that the codefendants were similarly situated when arguing in response to Claim 13 that "the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants." ECF No. 497, p.117.

Respondent cannot make those facts "go away" simply by failing to acknowledge that they exist and that they have been pled. Runyon has alleged thus far uncontested evidence that the prosecutors in this case added to the statistical evidence that the FDPA is administered in a racially-discriminatory manner by seeking death against a non-white defendant while eschewing that penalty for his equally-culpable (if not more culpable) white co-defendants. Runyon is entitled to discovery for the reasons contained in his pending discovery motion and reply. ECF No. 491, pp.12-21 and ECF No. 506, pp.5-10. Relief from the unconstitutional death sentences should follow.

**Claim 13:    Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendments.**

Respondent characterizes this claim as "nothing more than a claim for proportionality review."[26] ECF No. 497, p.117. Runyon claims, under the circumstances of his case, the death penalty is disproportionate and arbitrary and contrary to the Eighth Amendment's "'precept of justice that punishment for crime should be graduated and proportioned to the offense'" and the offender. *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002) (quoting *Weems v. U.S.*, 217 U.S. 349, 367 (1910).

If the implementation of the federal death penalty in a particular case does not result an evenhanded, rational and consistent imposition of the death penalty, there must be means to ensure the death sentence was not wantonly or freakishly imposed. *Compare, Pulley v. Harris*, 465 U.S. 37, 49-

---

[26] This claim *does not* present the issue in *U.S. v. Higgs*, 353 F.3d 281 (4th Cir. 2003), where the defendant argued that the FDPA is facially unconstitutional because it does not require proportionality review in all cases. *Id.* at 320-21.

50 (1984). Supreme Court precedent requires that a decision-maker's discretion to determine whether a human life should be taken or spared "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Zant v. Stephens*, 462 U.S. 862, 874 (1983). Similarly, the FDPA requires appellate review to determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. 18 U.S.C. §3595(c). Here, the prosecution's decision to seek a death sentence against Runyon but not his co-defendants resulted in a disproportionate and arbitrary application of the death penalty.

Respondent's claim that *McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987), allows the Government unfettered discretion in selecting a death sentence for only one of three equally culpable co-defendants goes too far. ECF No. 497, pp.117-18. "[A]t all stages of the proceedings the Due Process and Equal Protection Clauses protect persons … from invidious discriminations." *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). Invidious discrimination occurs "[w]hen the law lays an unequal hand on those who have committed precisely the same offense[.]" *Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 880 (1984). The Court in *McCleskey*, 481 U.S. at 305, noted that there must be rational criteria establishing that a particular defendant's case should be subject to the death penalty. A defendant can demonstrate an abuse of prosecutorial discretion with exceptionally clear proof. *Id.* at 297. Here, the existence of such proof has been pled and Runyon is entitled to present evidence of the same.

Respondent also suggests such a claim would be barred by the *Teague* doctrine or, even were it not, would be barred by the failure of Runyon's counsel to present this claim at the time of trial. *Teague* is inapplicable. This claim does not rely on a new procedural rule but on principles established before Runyon's case became final. For example, *McCleskey* was decided over fifteen years prior to

Runyon's trial. To the extent that Respondent suggests this claim could have been raised during direct proceedings, the Government's failure to reveal the factual basis of the claim as it was required to do under *Brady* provides cause to excuse any default. *See* Claim 2. Furthermore, to the extent that Respondent now claims those facts could have been discovered earlier, trial or appellate counsel's ineffectiveness in failing to discover and present them earlier would also provide such cause.

**Claim 14:      Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill**

Respondent argues that the execution of the severely mentally ill does not violate the Eighth Amendment because there exists no national consensus to that effect. ECF No. 497, pp.120-23. Accordingly, Respondent contends that Runyon seeks a "new rule" that would be barred by *Teague*. *Id.*, pp.119-20.

This claim, however, seeks only an application of the firmly established rule set out in *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958), and reaffirmed and applied in a different context every few years. *See, e.g.*, *Miller v. Alabama*, 132 S.Ct. 2455, 2463-64 (2012), *Graham v. Florida*, 560 U.S. 48, 58-62 (2010); *Kennedy v. Louisiana*, 554 U.S. 407, 419-22 (2008); *Roper v. Simmons*, 543 U.S. 551, 560-64 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 818-38 (1988); *Ford v. Wainwright*, 477 U.S. 399, 405-06 (1986) *Enmund v. Florida*, 458 U.S. 782, 789-93 (1982); *Coker v. Georgia*, 433 U.S. 584, 593-96 (1977). The rule of *Trop* and its progeny is that punishments which are contrary to the evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. *Trop*, 356 U.S. at 101.

Thus, Runyon should be allowed to demonstrate that mental illness of the nature he alleges in his §2255 motion, *see* ECF No. 478, p.100; *see also* Claims 5 & 6, meets those standards outlined in *Trop*, *Roper*, and *Atkins*. Runyon's severe mental illness results in a "diminished capacity to understand

and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-20. His execution would violate evolving standards of decency.

Respondent suggests that evolving standards of decency may be determined solely from country-wide legislation. ECF No. 497, p.121. A long line of Supreme Court precedent dictates the standard is not so easily gleaned. Inquiry into evolving standards of decency involves not merely what is impermissible under presently existing statutes, but also what is actually practiced. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1997-98 (2014); *Roper*, 543 U.S. at 564-65; *Atkins*, 536 U.S. at 316. Moreover, it is not only the legislation and practice within the states and federal government from which the standard is gleaned but also the legislation and practices within other countries and international authorities. *Roper*, 543 U.S. at 575-78. The prohibition on executing the severely mentally ill is an established norm of international law.[27] Finally, the Court's own independent judgment must also be

---

[27] *U.N. Human Rights Comm'n., Sahadath v. Trinidad and Tobago*, Communication No. 684/1996, CCPR/C/74/D/684/1996, Apr. 15, 2002 (issuance of an execution warrant in the case of a mentally ill prisoner violates Article 7 of the ICCPR); *U.N. Human Rights Comm'n., Francis v. Jamaica, Communication No. 606/1994*, U.N. Doc. CCPR/C/54/D/606/1994, Aug. 3, 1995 (incarceration on death row of a prisoner whose mental health had "seriously deteriorated" amounted to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR). The U.N. Commission on Human Rights has adopted a series of resolutions urging states that retain the death penalty not to impose it "on a person suffering from any form of mental disorder." U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of Rights of those Facing the Death Penalty, p.51, para. 1(d), ECOSOC Res. 1989/64, U.N. Doc. E/1989/91, 1989; U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of the Rights of those Facing the Death Penalty, ECOSOC Res. 1996/15, U.N. Doc. E/CN.15/1996/15, Jul. 23, 1996); U.N. Comm'n on Human Rights Res., "Question of the Death Penalty," E/CN.4/RES/1999/61, adopted April 28, 1999; U.N. Comm'n on Human Rights Res., "The Question of the death penalty," E/CN.4/RES/2000/65, adopted April 27, 2000; U.N. Comm'n on Human Rights Res., "Question of the death penalty," E/CN.4/20050L.77 2005/59, adopted April 20, 2005. The European Union has likewise declared that the execution of persons "suffering from any form of mental disorder … [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." European Union, Delegation of the European Comm'n to the USA, EU Memorandum on the Death Penalty, presented to U.S. Assistant Secretary of State for Human Rights, http://www.eurunion.org/eu/EU-

brought to bear. *See id.* at 564.

Respondent alternatively argues this claim is procedurally defaulted by prior counsel's failure to properly present it during direct proceedings. ECF No. 497, p.119. Runyon alleges that, even if this claim could have been raised during direct proceedings, counsel rendered ineffective assistance by failing to do so and that counsel's failure constitutes both an independent constitutional violation and cause and prejudice excusing any alleged procedural default. *See* Claims 5, 6 & 8.

In conclusion, because Runyon invokes no "new rule of law," *Teague* is not implicated here. Moreover, under the firmly established Eighth Amendment standards of *Trop*, *Roper*, and *Atkins*, Runyon can demonstrate that he is entitled to relief.

**Claim 15:      Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

When Runyon filed his §2255 motion, he did not know what information the jury selection documents would contain. Collateral counsel thus alleged what they hoped would describe the universe of claims that might be evidenced by those documents. Runyon's Amended §2255 motion contains more specific allegations, which the Government will answer in due course, and to which Runyon will then reply. The amended claim is outside the scope of the instant reply.

The Government prophylactically alleges that Runyon's substantive allegations, whatever they may be, are procedurally defaulted. But Claim 15 also includes an allegation of ineffective assistance of counsel, and this excuses any default. The Government responds to that allegation by stating that

---

Memorandum-on-the-Death-Penalty-February-25-2000.html, Feb. 25, 2000; see also, Council of the European Union, EU Guidelines on Death Penalty, III (iv), April 12, 2013, http://eeas.europa.eu/human_rights/guidlines/death_penalty/docs/guidelines_death-penalty-st08416_en.pdf.

there is no case law finding a lawyer ineffective for failing to request jury selection documents. This argument is misplaced for three reasons.

First, investigating compliance with the jury selection procedures *for the defendant's trial* is simply a specific application of counsel's well-established obligation to investigate the facts and the law that are relevant to the defendant's trial. *Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Wiggins*, 539 U.S. at 533 (counsel's decision not to investigate "must be directly assessed for reasonableness in all the circumstances") (internal quotation marks and citation omitted); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (an "attorney must look into readily available sources of evidence"). The purpose of the specific investigation into jury selection procedures is "to determine whether [the defendant] has a potentially meritorious jury challenge." *Test v. U.S.*, 420 U.S. 28, 30 (1975) (emphasis added). Requesting the jury selection documents is essential for this purpose because "without inspection, a party almost invariably would be unable" to discharge that duty. *Id.* Counsel's duty to "exercise … diligence" is explicitly contained in the statute, 28 U.S.C. §1867(a).

Second, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms," *Strickland*, 466 U.S. at 688. Counsel's Sixth Amendment obligation does not depend on the existence of a prior published opinion stating that an attorney's performance was deficient in a specific circumstance. The weight of prevailing professional norms supports the view that counsel must request and examine the jury selection documents before trial. The ABA Guidelines, quoted in Runyon's claim, describe that requirement with the greatest precision and in the most pertinent context, but they are not the only source of norms.[28] *See also* Office of Justice

---

[28] The ABA Guidelines are entitled to particularly great weight because they "are not aspirational. Instead, they embody the current consensus about what is required to provide effective

Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. I10-I12 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-7.2 Selection of Jurors (3d ed. 1993) ("Defense counsel should prepare himself or herself prior to trial to discharge effectively his or her function in the selection of the jury, including the raising of any appropriate issues concerning the method by which the jury panel was selected"); National Legal Aid and Defender Assn.: Performance Guidelines for Criminal Defense Representation 7.2 Voir Dire and Jury Selection (1997) ("Defense counsel should be familiar with the procedures by which a jury venire is selected in the particular jurisdiction and should be alert to any potential legal challenges to the composition or selection of the venire"). The Supreme Court cited with approval each of the foregoing sources of attorney norms in *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010). Requesting and examining the jury selection documents carries no risk to the defense, and to obtain access to otherwise nonpublic jury selection records, counsel must only state in good faith that he is preparing a motion challenging the jury selection procedures. *U.S. v. Alden*, 776 F.2d 771, 773 (8th Cir. 1985). There is no reason for counsel to forgo the request if there is a possibility of a substantial violation of the Jury Selection and Service Act ("JSSA") and if counsel intends to seek redress if he discovers such a violation.

Third, if a jury selection challenge is timely raised, it can result in relief. In *U.S. v. Branscome*, 682 F.2d 484 (4th Cir. 1982), for example, the Fourth Circuit quashed indictments on the ground that the method used to empanel a grand jury violated the JSSA. In that case, the clerk had asked a randomly chosen pool of prospective jurors for volunteers to serve on the grand jury, and then filled out the quota with additional jurors chosen at random. *See also U.S. v. Ovalle*, 136 F.3d 1092 (6th Cir.

---

defense representation in capital cases." ABA Guideline 1.1, *History of Guideline*, *reprinted* at 31 Hofstra L. Rev. 913, 920 (2003).

1998) (substantial violation of JSSA where jury selection plan provided for random removal from jury wheel of one in five non-African-Americans because of their racial status); *U.S. v. Exum*, 744 F. Supp. 803 (N.D. Ohio 1990) (substantial violation of JSSA if jurors on qualified wheel are called to serve as summary jurors where Act limits wheel to calling grand and petit jurors). Moreover, a defendant's allegation of substantial violation can result in reversal on appeal or other subsequent proceedings. *See, e.g., U.S. v. Calabrese*, 942 F.2d 218 (3d Cir. 1991) (vacating conviction for substantial violation of JSSA and remanding for new trial where trial court had blanket order excluding potential jurors based merely on jurors' knowledge of defendant, without anything more); *U.S. v. Okiyama*, 521 F.2d 601 (9th Cir. 1975) (reversing conviction with recommendation to dismiss indictment, despite absence of any showing that defendant was prejudiced, where deficiencies in process of selecting grand and petit jurors created serious risk that those selected did not have sufficient proficiency in English to understand proceedings in which they were to participate); *U.S. v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001) (remanding for new trial where clerk placed names of deferred jurors in separate pool and preferred them disproportionately over jurors drawn directly from qualified wheel).

Because competent counsel can obtain the reversal of a conviction or the quashing of an indictment on direct review if there was an error or misconduct in the jury selection proceedings, counsel's failure to timely investigate and, if warranted, to allege the defects can constitute deficient performance under *Strickland*. And because JSSA itself contains no prejudice component, and because a substantial violation of the JSSA is a structural error because it infects the entire proceeding, the prejudice component of an ineffective assistance claim can be presumed. *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc) (discussing IAC claim in the context of a claim involving structural error and citing *McGurk v. Stenberg*, 163 F.3d 470, 473 (8th Cir. 1998) (noting that the prejudice

72

component of *Strickland* may be presumed if the nature of the deficient performance is that of structural error)).

**Claim 16:    The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.**

### A. The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes.

The Government's sole ground for opposing Claim 16A is that it is defaulted. That is wrong. The claim is not defaulted because it could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. *See supra* at pp.2-4 (discussion of law governing procedural default). The transcript of jury selection begins with the court reporter's descriptive note that "The jury selection process was begun," Tr.127, 6/30/09, and it continues with two more notes that "Jury selection continued," Tr.129, 6/30/09. Consistent with this court's custom, the reporter did not otherwise record the process of striking individual venire members.[29] The conclusion of jury selection is indicated in the transcript by the Court reading the names of 13 individuals who should return the following day, comprised of the 12 selected jurors plus one person held over for the next day's selection of alternates. *Id.* The venire members who had been struck were excused without being named.

The transcript does not identify who was struck peremptorily or by which party, nor does it contain any information about the race and gender of potential jurors—either those struck or not

---

[29] Runyon does not suggest that the reporter failed to capture statements of a party or of the Court. As ECF No. 423, p.2, expressly states, the transcripts and strike lists together "contain the full record of the jury selection process." Rather, counsel understands that the process of peremptory strikes in this Court is silent. The clerk draws a group of tags from a box, each representing a qualified member, and the parties then transfer individual tags from one side of a board to the other to indicate their strikes. The transcript contains no record of the tags that were drawn or any party's transfer of a tag to exercise a strike.

struck. The courtroom deputy had a list of the venire members who participated in oral voir dire and took notes of each for-cause and peremptory strike including the striking party, but these notes—now called the strike lists—were not entered on the docket and made available to counsel until two years after the mandate issued in Runyon's direct appeal. *See* ECF No. 424 (sealed, entered 4/13/15). Even then, the lists were entered as records in the collateral proceedings, not in the trial proceedings. In a Supplemental Order accompanying that filing, the Court explained that these lists came from the courtroom deputy's "internal strike and selection order notes," which was "submitted to the Clerk for statistical purposes following trial." ECF No. 423, p.1.

Because the lists were not entered on the docket and made available to counsel until after the appeal, they were not a part of record on appeal. That record consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). The record on appeal does not include a courtroom deputy's internal notes that were not entered on the docket prior to the appeal, and whose existence was not noted in any transcript or other trial record. Because the facts necessary to identify the existence of the violations described in Claim 16 were outside the trial record, this claim could not have been presented on appeal without further factual development. Consequently, this claim was not open to consideration and review on appeal under *Waley, supra*, and it is not defaulted.

If the trial record was somehow sufficient to present the issue fully and clearly on appeal, appellate counsel were ineffective in failing to do so. Their deficient performance excuses the default, and Runyon is entitled to de novo review.

74

As noted in Claim 8, assembling the record for review was the responsibility of attorney Lawrence Woodward, who was initially one of Runyon's appellate lawyers.[30] ECF No. 478-36, p.1 ¶¶5-6. Co-counsel Teresa Norris compiled a list for Woodward identifying documents that he still had not obtained, including "court record of jury selection/strikes used." *Id.*, p.4. Norris's declaration states that she never received a strike list, and that her failure to obtain that record for the appeal was not a tactical decision. *Id.*, p.2 ¶7. It appears, instead, to have been:

> "the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, [counsel's] conduct fell below constitutionally required standards. *See id.*, at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'")) (quoting *Strickland*, 466 U.S., at 690-691).

> *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005).

In other words, appellate counsel's deficiency was a threshold failure to investigate and obtain the records necessary to determine *whether* there was an error in jury selection. If counsel had obtained those records and decided not to appeal it, their choice would be evaluated under *Jones v. Barnes*, 463 U.S. 745 (1983), and *Smith v. Robbins*, 528 U.S. 259 (2000), which require deference to counsel's professional judgment. But where there was no competent investigation, counsel could not weigh the (unknown) claim against other potential claims and make a reasonable strategic choice in the first instance. *Rompilla*, *supra*.

Runyon was prejudiced by appellate counsel's failure to obtain the record necessary to recognize and pursue a claim that the Government used its peremptory strikes in a discriminatory manner. If counsel had performed competently, they would have discovered a claim that was stronger than some other issues presented in Runyon's direct appeal. Moreover, as noted in Claim 8, a change

---

[30] Nine months before Runyon's opening brief was filed, Woodward was replaced by co-counsel Seth Farber.

of font would have enabled counsel to present the jury selection issue without disturbing other appellate issues.

Even if the record on jury selection was somehow sufficient to present the issue fully and completely on direct appeal, and even if appellate counsel were not ineffective in failing to do so—all of which Runyon contests—the default is excused because trial counsel were ineffective in failing to challenge the Government's discriminatory exercise of peremptory strikes, for the reasons alleged below. As a result, Runyon is entitled to de novo review.

**B. Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.**

The petitioner, not the respondent, has "exclusive authority to define the nature of his or her claims." *Dougherty v. Cerra*, 987 F. Supp. 2d 721, 729 (S.D. W.Va. 2013). In his §2255 motion, Runyon chose to present two discrete claims alleging the discriminatory exercise of peremptory strikes, one based on race and one based on gender. He did this in part because the legal standards for these claims are slightly different and some of the evidence is different. He may prevail on both grounds, but he recognized from the start that the Court could conclude he can go forward on just one, and he structured his motion with that understanding. The Government has responded as if Runyon presented a unitary claim based on a (nonexistent) combined race-gender category. It intermixes its evidence on the two claims, apparently taking the position that Runyon can obtain relief only if he shows that the Government discriminated on both grounds. In this Reply, Runyon attempts to disentangle the Government's arguments, and he addresses independently the Government's evidence relating to each claim.

76

### 1. Strikes Based on Race.

On Claim 16B.1, the Government argues that it did not exercise strikes discriminatorily based on race, and consequently trial counsel's failure to object did not fall below an objective standard of reasonableness. This argument fails by a wide margin.

Under the three-part test in *Batson v. Kentucky*, 476 U.S. 79 (1986), the opponent of the strikes must present a prima facie case of discrimination. A prima facie case "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 170 (2005) (quoting *Batson*, 476 U.S. at 94). And because this step of the analysis requires only an "inference," the standard "is not onerous." *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (internal quotation marks and citation omitted).

The Government argues that Runyon has failed to establish certain factors that allegedly are necessary to make a prima facie case. Without conceding that all of these factors are essential, the facts show that Runyon satisfies them.

First, the Government's argument that Runyon cannot establish the first factor of a prima facie case—that he is a member of a distinct racial group—rests on the egregious misrepresentation that Runyon is not Asian-American, but White. The Government asserts three times that Runyon is "white," ECF No. 497, pp.128, 130, 131, and that for this reason he "patently cannot satisfy" the first factor, *id.*, p.130. But Runyon's race is Asian, and the Government knew this long before trial. It is explicit in the interrogation video the Government intended to play at trial, and did play at trial, and which the Fourth Circuit quoted in its opinion. *Runyon*, 707 at 493 ("Detective Rilee asked Runyon: '[Y]ou're Asian, right, Asian-American? … 'Yes sir,' he answered."). The Government's mental health experts executed reports expressly identifying Runyon as Asian-American. ECF No. 277, p.1; ECF

77

No. 276, p.19.[31] In the current collateral litigation, Runyon asserted in his §2255 motion that he is Asian-American, ECF No. 478, p.2, and again in his motion for discovery that he is Asian, ECF No. 491, p.13 n.5. Asians are a distinct racial group.[32] This factor is satisfied.

Second, the Government states that because Runyon and the victim are both white, Runyon cannot satisfy the second factor—that the prosecutors used peremptory strikes to remove jurors who were members of the defendant's (minority) race. ECF No. 497, p.131. Runyon and the victim are not the same race. As presented by the prosecution at trial, this was an interracial crime in which an Asian man killed a white man. Moreover, Runyon would have had standing under *Powers v. Ohio*, 499 U.S. 400, 415 (1991), to assert the rights of the excluded African-American jurors for this factor even if Runyon were white. The *Powers* right carries even greater weight here because Runyon is Asian. He and the excluded jurors have in common the attribute of being members of a racial minority that has experienced discrimination. This factor is satisfied.

Third, the Government argues that Runyon cannot satisfy the third factor—additional facts and circumstances that raise an inference of discriminatory purpose. Runyon's pending motion for discovery seeks documents that may reveal more of those kinds of facts and circumstances. But even before having the fruits of discovery, Runyon has shown additional facts and circumstances. At the time of voir dire, the prosecutors intended to put into evidence (and did put into evidence) a videotape that conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and contained statements that were "capable of inflaming jurors' racial or ethnic prejudices."

---

[31] Runyon's race is also discussed in pretrial filings. In a pretrial motion for continuance, ECF No. 179, p.10, the defense explained that Runyon's mother is Korean and that Runyon spent time living in Korea. Runyon's race also underlay questions proposed by the defense for the jury questionnaire, ECF No. 156-1, p.9, and for voir dire, ECF No. 158, p.2.

[32] "Asian" is one of the racial classifications used by the Court for its statistical reports, and by the U.S. Census Bureau, *see* https://www.census.gov/topics/population/race/about.html.

*Runyon*, 707 F.3d at 493-94. The prosecutors' knowledge that African-American jurors would see and hear this videotape, and the substantial likelihood that it would evoke memories of analogous statements that had been made to those jurors personally, or made historically to members of their race, raises a strong inference that the Government struck African-American jurors on account of race. The Government did not want black jurors because they would be offended by the statements in the videotape or would sympathize with Runyon as the target of racial insults. This factor is satisfied.

Fourth, the Government argues that more than "raw figures" are required to raise an inference of purposeful discrimination. ECF No. 497, pp.130-31. Runyon already has shown more than raw figures, *see supra*, and he may be able to augment that showing after receiving discovery. But raw figures are well within the "wide variety of evidence" that can contribute to an inference of discriminatory purpose. *Johnson*, 545 U.S. at 169; *see also Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 342 (2003) (statistical evidence alone raises debate when government used peremptory strikes to exclude 91 percent of eligible African-American venire members and "[h]appenstance is unlikely to produce this disparity"); *Batson*, 476 U.S. at 97 (circumstances giving rise to inference of discrimination can include "a 'pattern' of strikes against black jurors included in the particular venire"); *id.* at 93 ("seriously disproportionate exclusion of Negroes from jury venires ... is itself such an unequal application of the law ... as to show intentional discrimination") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)). In Runyon's case, there were 10 African-Americans in the pool of 52 qualified venire members; 100 percent of the strikes against African-Americans were exercised by the Government; the Government excluded 70 percent of the eligible African-Americans through its peremptory strikes; and happenstance was unlikely to produce that disparity. These facts add more weight to the inference of discriminatory purpose.

Addressing the second step of a *Batson* analysis, the Government states that it removed the seven African-American venire members based on their answers to Question 61 in the jury questionnaire. It says it struck Jurors 31, 40, 46, 63, and 81 because they circled option D, indicating that they generally oppose the death penalty; and it struck Jurors 15 and 116 because they circled both option C and option D, indicating both that they generally favor and generally oppose the death penalty.[33] The Government also notes that three of these African-Americans, Jurors 15, 31, and 63, had served in the military or had relatives who presently or previously served in the military, but it does not identify this as a reason for any of its strikes.[34] The Government identifies no reason for any of its challenged strikes other than views on the death penalty, and thus its defense of the *Batson* charge must stand or fall on that reason. *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 252 (2005); *U.S. v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011). Runyon does not contest that the Government has presented a race-neutral reason that satisfies its burden at the second step of the *Batson* analysis.

For the third step of the *Batson* analysis, Runyon anticipates that his pending discovery motion will lead to additional facts showing that the Government's reason for the strikes is a pretext. But a comparative analysis already casts significant doubt that this is the real reason for the strikes of the African-American jurors. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." *Miller-El II*, 545 U.S. at 241. The Court clarified that the term "permitted to serve" is not limited to individuals who were seated as

---

[33] Runyon refers to this as an expression of neutrality about the death penalty because options C and D straddle the center line. Question 61 included no other mechanism for venire members to indicate that they had a neutral view of the death penalty.

[34] The Government struck these jurors but hypothesizes that—for purposes of Runyon's claim of ineffective assistance of counsel—the defense would not have wanted people with military connections serving on the jury.

jurors; it means prospective jurors who were not struck by the prosecution, regardless whether they ultimately served on the jury. *Id.* at 244-45 and n.4; *see also U.S. v. Bell*, 523 Fed. App'x. 956, 960 (4th Cir. 2013) (comparing challenged juror to individuals who were qualified and "nonstruck"); *Hayes v. Thaler*, 361 Fed. App'x. 563, 571-73 (5th Cir. 2010) (comparing excluded black jurors with nonblack jurors who were "not struck").

The Government's stated reason for striking the seven African-American jurors applies just as well to two similar nonblack venire members that it did not strike. One similar member is Juror 2, who is white. He circled option D, indicating that he generally opposes the death penalty. That is the same option circled by five of the excluded black jurors, and it is more anti-death than the neutral position taken by the other two black jurors, who circled options C and D.[35]

The second similar nonblack member is Juror 54, who is Asian. He circled option D, indicating that he generally opposes the death penalty. That is the same position taken by five of the excluded black jurors and more anti-death than the position of the other two. Juror 54 was "permitted to serve" because he was qualified on the first day of jury selection and was not struck by any party, although the Government had an unused strike available that it could have exercised. Juror 54 was carried over to the second day for inclusion in the selection of alternates. On that day he again was neither selected nor struck.[36]

The Government's stated reason for striking two of the African-American jurors also applies equally well to two of the alternate jurors who were not struck. Jurors 143 and 201 are both white,

---

[35] To the extent it is relevant, Juror 2, like three of the African-Americans who were struck, had a military connection because a close family member had previously served in the military. Juror 2 was seated on the jury.

[36] Like four of the African-Americans who were struck, Juror 54 did not serve in the military, nor did a close family member.

and both were seated as alternates. Each of them circled both option C and option D, which is the same answer marked by excluded black Jurors 15 and 116.

The pretextual nature of the Government's reason is corroborated by the answers to Questions 55 and 56 on the questionnaire.[37] Question 55 asks whether the juror supports, opposes, or neither supports nor opposes the death penalty. Question 56 asks how strongly he holds that view—very strongly, moderately, or not strongly at all. Two of the excluded black members who circled option D, Jurors 31 and 40, marked that they moderately *support* the death penalty. Another two who circled option D, Jurors 63 and 81, marked that they are neutral. The two who circled option C and option D, Jurors 15 and 116, also marked that they are neutral. By comparison, Juror 2 and Juror 54, who are not black and were not struck, circled option D and marked that they are neutral— thus taking a position that is the same as or more anti-death than six of the excluded black jurors. Only one of the seven excluded African Americans, Juror 46, said on Question 55 that she was opposed to the death penalty.

The Government argues that regardless of its own motives, it was not ineffective for defense counsel to refrain from making a *Batson* objection with respect to the three struck African-Americans who had been in the military or had family members who presently or previously were in the military (Jurors 15, 31, and 63) because "[p]resumably Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer." ECF No. 497, p.131. Even if this hypothesis was true, it would not excuse counsel's failure to object to the Government's peremptory

---

[37] The Government's stated reason for striking African-American jurors did not mention Questions 55 and 56, but the Court can consider those limited questions because they address the very same subject as Question 61 and do not expand the inquiry.

strikes of the four black venire members who did not have military connections. But in fact the premise of the hypothesis is false.

First, Runyon himself has a military background, and defense counsel expected this to be a factor for the case in mitigation. *See* ECF No. 291, p.4 (all 12 jurors finding mitigating factors that Runyon "served his country as a member of the United States Army and was honorably discharged," and that he "earned an associate of arts degree from Wentworth Military Academy"). Runyon was helped by having jurors who would understand and appreciate his military service. Second, defense counsel's own pattern of strikes shows they did not oppose the inclusion of jurors with military connections. The venire included a large proportion of individuals with military connections, but the defense used less than half (9 of 20) of its strikes to remove members with military or family military backgrounds (Jurors 4, 32, 50, 51, 65, 74, 84, 118, and 119). If the defense was concerned about having seated jurors with military backgrounds, it easily could have used more of its strikes to remove them— including removing the four people with military backgrounds who sat on the jury (Jurors 2, 23, 86, and 124). In truth, it is the Government that used nearly two-thirds of its strikes (12 of 19) to remove jurors who—under its own hypothesis—might have had sympathy for Cory Voss because of their military backgrounds (Jurors 7, 15, 18, 28, 31, 35, 52, 63, 66, 91, 97, and 100).

Runyon expects to obtain additional facts in discovery, but even in light of the facts above, it should be clear that counsel's failure to make a *Batson* challenge was unreasonable and fell below the prevailing norms of professional performance. To the extent the *Batson* claim is defaulted and not otherwise excused, trial counsel's deficient performance excuses that default. Runyon is entitled, at a minimum, to discovery and an evidentiary hearing on his *Strickland* claim. For the reasons stated in Runyon's §2255 motion, prejudice is presumed.

## 2. Strikes Based on Gender.

Claim 16B.2 alleges gender discrimination under *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Courts use the same three-step analysis as for a *Batson* claim, but the criteria for establishing a prima facie case are not identical. A party alleging gender discrimination in the exercise of peremptory strikes does not need to prove that he is a member of a distinct group, or that the excluded jurors share his gender. Rather:

> We look at all relevant circumstances when determining whether the requisite prima facie showing has been made. *Batson*, 476 U.S. at 96. For example, a pattern of strikes against members of a particular gender may give rise to an inference of discrimination, and similarly so may a disproportionate number of peremptory challenges exercised to exclude members of a particular group. *Harris v. Hardy*, 680 F.3d 942, 949-50 (7th Cir. 2012). So too may a prosecutor's comments and statements. *See Batson*, 476 U.S. at 97. The test is not rigorous. [*U.S. v.*] *McMath*, 559 F.3d [657,] 664 [(7th Cir. 2009)].

*U.S. v. Johnson*, 756 F.3d 532, 536-37 (7th Cir. 2014) (internal citations omitted).

Runyon's §2255 motion shows that the Government peremptorily struck more than twice as many women as men—13 versus 6. Runyon's pending motion for discovery seeks documents that may reveal more of those kinds of facts and circumstances. Even without the benefit of discovery, Runyon can identify a reason why the Government preferred male jurors. The prime mover in the plot to kill Cory Voss was his wife, Cat—a co-defendant who escaped a death sentence by pleading guilty. To obtain a verdict of death for Runyon, the Government knew that it had to persuade jurors that Cat's moral culpability was not greater than Runyon's. Both genders could be expected to assign the same moral weight to Cat's greed and her active participation in the crime. But they likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as somewhat titillating and give it diminished weight; female jurors were likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-

84

strangers or drugging them with cold medicine so that she could party at bars and with men would more likely be viewed by females, especially those with children, as contributing to greater moral culpability. Thus, excluding women from the jury would advance the Government's goal of achieving a death sentence for Runyon.

With respect to the second step of a *J.E.B/Batson* analysis, the Government says that it struck nine females, Jurors 7, 28, 31, 40, 46, 52, 63, 97, and 81, because they circled option D on Question 61, indicating that they generally oppose the death penalty; and it struck four females, Jurors 15, 18, 73, and 116, because they circled both option C and option D, indicating neutrality. The Government also states that six of these females, Jurors 7, 15, 18, 31, 52, and 63, had served in the military or had relatives who presently or previously served in the military.[38] In all other respects the Government's statements regarding the black jurors apply to female jurors. It identifies no reason for any strikes of females other than their views on the death penalty, and Runyon does not contest that this is a gender-neutral reason that satisfies the Government's burden at this step.

For the third step of the *J.E.B./Batson* analysis, Runyon again anticipates that his pending discovery motion will lead to additional relevant facts showing that the Government's reason for the strikes is pretextual. But the same comparative analysis discussed above with respect to African-Americans casts significant doubt on the Government's stated reason for striking females. There were similarly situated males who were not struck. Juror 2 and Juror 54, who both are male, each circled option D on Question 61, indicating that they generally oppose the death penalty. That is the same option circled by nine of the excluded female jurors, and it is more anti-death than the position circled by the other four female jurors who were struck. Like eight of the females who the Government

---

[38] The Government has undercounted. Female Jurors 28 and 97 also had family members who were or had been in the military.

struck, Juror 2 had a military connection because a close family member had previously served in the military. Juror 2 and Juror 54 were both "permitted to serve." Juror 2 was actually seated on the jury. Juror 54 was qualified to sit and was not struck, although the Government had an unused strike that it could have exercised to remove him.

The pretextual nature of the Government's reason is again corroborated by the answers to Questions 55 and 56 on the questionnaire. Two excluded female members, Jurors 31 and 40, circled option D but marked on Questions 55 and 56 that they moderately *support* the death penalty. A third excluded female, Juror 73, circled options C and D, but also marked that she *very strongly supports* the death penalty. By comparison, Juror 2 and Juror 54, who are both male and were not struck, circled option D and marked that they are neutral on the death penalty—thus taking a position that is more anti-death than these three excluded females.

The Government suggests that defense counsel did not make a *J.E.B.* objection because they presumably would not have wanted jurors who had served in the military or had close family members with present or past military service. The record refutes this suggestion for the reasons stated above with respect to strikes based on race. Runyon expects to obtain additional facts in discovery, but even in light of the facts above, it should be clear that counsel's failure to make a *J.E.B./Batson* challenge was unreasonable and fell below the prevailing norms of professional performance. To the extent this claim is defaulted and not otherwise excused, trial counsel's deficient performance excuses that default. Runyon is entitled, at a minimum, to discovery and an evidentiary hearing on his *Strickland* claim. For the reasons stated in Runyon's §2255 motion, prejudice is presumed.

86

**Claim 17:      The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Counsel Rendered Ineffective Assistance.**

**A.      The Voir Dire Was Constitutionally Inadequate.**

The Government's argument that this claim is barred by *Teague* is frivolous. The right to adequate voir dire generally, and regarding the death penalty specifically, is not a new rule. It was firmly established long before Runyon's trial:

> [P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States,* 339 U.S. 162, 171-172 (1950); *Morford v. United States,* 339 U.S. 258, 259 (1950). "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion).

*Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *see also Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (finding constitutional right to adequate voir dire on racial bias where state charged interracial crime as capital offense, even though circumstances would not mandate same voir dire in noncapital case). To the extent Runyon's claim is defaulted, it is excused by the deficient performance of trial counsel (Claim 17B) or appellate counsel (Claim 8).

Voir dire is inadequate if, under the circumstances, it does not enable the parties and court to identify unqualified jurors. The circumstances can include, for example, the nature of the charges, the extent of pretrial publicity, the presence of racial or ethnic issues, or any other circumstance where a potential juror—even when well-meaning—may harbor bias. Minimal voir dire raises a red flag and calls for close examination to ensure that all essential issues were adequately addressed. The voir dire in Runyon's case, which proceeded from "Good morning" to the seating of a jury in one day, was

minimal in multiple ways: it had a short time span,[39] it posed limited questions, and it largely accepted cursory or silent responses rather than eliciting or probing individualized views.

In *Morgan,* the Court found voir dire about the death penalty to be inadequate even though the trial court posed multiple follow-the-law questions and every empaneled juror stated that he could be fair and impartial. Illinois said this was sufficient, but the Court disagreed. "*Witherspoon* and its succeeding cases would be in large measure superfluous were this Court convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734-35.

The Government's response talks about the importance of voir dire and the Court's discretion to conduct all of the questioning, but it does not engage the specific voir dire questions (or their absence) in this case. Those questions speak for themselves. Their required purpose was to identify potential jurors who were unqualified. As noted in the §2255 motion, the Court presented four questions about the death penalty that asked only whether jurors understood a provision of law:

> Tr.123, 6/30/09: If your answer is "no" to the following question, please stand. Do you understand that the law never requires that a person be sentenced to death? (No response.)

> Tr.123, 6/30/09: Again if your answer is "no" to any of the following questions, please stand. Do you understand that the law never requires a person to be sentenced to

---

[39] The Westlaw database contains seven opinions or statements where the Supreme Court reported the length of voir dire in a capital case. Runyon has omitted none: *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) ("Eleven days of the *voir dire* were devoted to determining whether the potential jurors were death qualified."); *Miller-El v. Dretke*, 545 U.S. 231, 275 (2005) ("Jury selection in Miller-El's trial took place over five weeks…."); *Penry v. Johnson*, 532 U.S. 782, 801 (2001) ("*Voir dire* was a month-long process…."); *Johnson v. Texas*, 509 U.S. 350, 357 (1993) ("more than 90 prospective jurors were questioned over the course of 15 days"); *Swindler v. Lockhart*, 495 U.S. 911, 913 (1990) ("[d]uring the five days of *voir dire*") (statement dissenting from denial of certiorari); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 503 (1984) ("the voir dire [in the trial the press wanted to attend] consumed six weeks"); *Irvin v. Dowd*, 366 U.S. 717, 720 (1961) ("[d]uring the course of the voir dire examination, which lasted some four weeks").

death, even if they have been convicted of being the triggerman in a murder for hire case? (No response.)

Tr.123-24, 6/30/09: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of carjacking is so convicted? (No response.)

Tr.124, 6/30/09: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of bank robbery? (No response.)

These questions did nothing to expose unqualified jurors. They were less probative than the inadequate follow-the-law questions posed in *Morgan* because they asked only about understanding, not compliance. They certainly were not phrased to expose jurors who would automatically vote for the death penalty—an inquiry that is mandatory on request in a capital case. *Morgan,* 504 US 719, 729.

The Government says Runyon's criticism of these questions places form over substance, but that is effectively the argument Illinois unsuccessfully made in *Morgan.* There is no evidence that attentive lay jurors would discern and answer the questions the court intended to ask rather than the ones it did ask. And we should be grateful for that, because jury selection would devolve into chaos if potential jurors were free to decide that the court must have meant to ask a different question, and they answered the imagined question rather than the question the Court actually posed.

The Court asked only three other questions about the death penalty.[40] The first, viewed most generously, asked jurors if they could refrain from making a sentencing decision until they heard the penalty phase evidence:

Tr.59, 6/30/09: Is there anyone who doesn't understand that, as I indicated, if it is appropriate, in a second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? Do any of you feel you cannot do that? If so, please stand.

---

[40] Although this reply focuses on voir dire concerning capital punishment questions, Runyon does not concede that voir dire was adequate on any other issues.

89

The other two questions were intended to detect jurors with views preventing or substantially impairing their duties:

> Tr.124, 6/30/09: Please stand if your answer is "yes" to the following question. Do you have personal or moral opinions regarding the imposition of the death penalty that would substantially impair your ability to weigh the aggravating and mitigating factors and follow the court's instructions regarding the death penalty?

> Tr.124, 6/30/09: Again, please stand if your answer is "yes" to the following question. Would your personal or moral views about the death penalty prevent or substantially impair the performance of your duties as juror in accordance with your instructions given to you by the court and your juror's oath? Stand if your answer is "yes."

These questions were important but inadequate to reveal biased jurors. First, the questions ask jurors to judge their own impartiality—a task that few people can perform with objectivity. *See, e.g., Morgan*, 504 U.S. at 735 n.9. *Morgan* appears to contemplate that the court should be the judge of the jurors' impartiality, after hearing each juror's explication of his personal or moral views about the death penalty and about mitigation evidence. Second, the Court needed to ask proper reverse-*Witherspoon* questions, which counsel requested, Tr.116, 6/30/09, and which *Morgan* thus required the court to pose, *id.* at 736: "Do you believe the death penalty should always be imposed if a defendant is found guilty of murder?" "Of being the triggerman in a murder-for-hire?" "Of committing murder in the course of carjacking?" "Of committing murder in the course of bank robbery?" Each of these unasked questions was designed to expose prospective jurors who were disqualified.

Runyon also claims that in the totality of circumstances, voir dire is inadequate when 34 percent of the jury pool can remain silent and effectively unnoticed. All that anyone learned at voir dire about these nonspeaking venire members is that they knew how to sit still and say nothing. When the Court directed venire members to stand if their answer to a question was yes, the fact that a juror remained seated might mean his answer was no; it also might mean he was avoiding the question because a truthful answer would be embarrassing or painful, or because a truthful answer would be

90

inconsistent with the member's desire to increase (or decrease) the likelihood of being seated as a juror in this case. When members are called upon and confronted individually, however, they are forced to respond in some affirmative way. If they engage in subterfuge or evasion, the court (and counsel) can observe and assess their inflection, sincerity, demeanor, candor, body language, and understanding. As the Supreme Court observed in *Reynolds v. U.S.*, 98 U.S. 145, 156-57 (1878), "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words."

The Government argues that Runyon has not proffered evidence suggesting that a qualified juror concealed a bias. The defendant's death sentence in *Morgan* was vacated without such evidence. *Morgan* shows that when voir dire is inadequate to reveal *whether* a juror may be biased, that alone is enough to require reversal. *Morgan,* 504 U.S. at 739. Even if more was required, there are two obvious reasons why Runyon has not identified a qualified venire member who concealed bias. First, venire members answered most questions by silence, so the record contains few if any relevant statements that can be mined for evidence of bias. Second, Runyon cannot investigate concealed bias without communicating with members of the venire, which the Court has ordered him not to do.

### B.      Counsel Rendered Ineffective Assistance Regarding Voir Dire.

Constitutionally inadequate voir dire does not happen by itself. If voir dire is not adequate, it is the fault of the court or of counsel. Runyon alleges in his §2255 motion and above that the Court bears responsibility because it was charged with ensuring the adequacy of voir dire and it conducted all of the questioning itself. It made the ultimate decisions about the questions to ask and how to ask them. If the inadequacies were not the Court's fault, they were counsel's fault. And if a claim of error by the Court is now defaulted, Runyon's counsel bear responsibility for that default.

### 1. Trial Counsel

In Claim 17A, Runyon alleges three respects in which trial counsel's representation regarding jury selection fell below the threshold of professional performance. The Government addresses the substance of none of them. With respect to counsel's performance, it argues only that counsel were not deficient in these respects because they filed *other* motions and made *other* objections concerning jury selection. But the Supreme Court "ha[s] never held that counsel's effort to present *some* [challenges to voir dire] should foreclose" a claim that counsel were ineffective in failing to present others. *Sears v. Upton*, 561 U.S. 945, 955 (2010). In this case, the trial counsel's filing of other motions and objections is evidence that they recognized the supervening importance of voir dire and the need to spare no effort. This is consistent with the conventional wisdom of experienced trial lawyers "that most trials are won or lost in jury selection. ... [and] in many capital cases, jury selection is literally a matter of life or death." Blume, John H.; Johnson, Sheri Lynn; Threlkeld, A. Brian; *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209-11 nn.1&2 (2001) (collecting treatises and journal articles); *see also* ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. at 1049, 1051.

So long as the voir dire was inadequate, it was defense counsel's obligation to try to correct the problem. Where the Court purported to grant Runyon's motions but failed to follow through—such as posing do-you-understand-the-law questions rather than accurate reverse-*Witherspoon* questions—defense counsel had a duty to object and demand the inquiry that *Morgan* required.

As to prejudice, the Government asserts only that the voir dire was not constitutionally infirm in the first instance. It implicitly concedes that Runyon was prejudiced if voir dire was not adequate. Even without such a concession, Runyon would be entitled to relief because inadequate voir dire requires vacating his death sentence without showing that a biased juror was seated. The error is

92

treated as structural, and the prejudice prong of ineffective assistance may be presumed. *Bell v. Jarvis*, 236 F.3d at 165, 180.

### 2. Appellate Counsel

Regardless whether the inadequacy of the trial court's voir dire was preserved in the trial record, appellate counsel rendered ineffective assistance in failing to raise it on direct appeal, as alleged in Claim 8. Even under a plain error standard, it was a winning claim. Trial counsel requested reverse-*Witherspoon* questions, and the Court was mandated by *Morgan* to ask them. It didn't. Runyon was not required to show that a qualified juror was biased. On the merits, there is no ground on which the court of appeals could have refused to vacate Runyon's sentence.

**Claim S2:** **The Trial Court Unlawfully Excluded the Potential Jurors Based Solely on Their Juror Questionnaire Responses Without Voir Dire, and Trial Counsel Unreasonably Failed to Object and Unreasonably Participated.**

The reply on this claim has been provided to the Clerk and is pending a ruling on Runyon's motion for leave to file it under seal.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of Eastern Tenn., Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: March 28, 2016

93

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2016, I have electronically filed the foregoing **Petitioner's Reply To Response Of The United States To Motion To Vacate, Set Aside, Or Correct Sentence** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

94