IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | CRIMINAL ACTION NO.: 4:08cr16 |
| | ) | CIVIL ACTION NO.: 4:15cv108 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONSE OF THE UNITED STATES TO DEFENDANT'S
## AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States Attorney, and submits this Response of the United States to Petitioner's Amended Motion to Vacate, Set Aside or Correct a Sentence filed by DAVID ANTHONY RUNYON, ("Runyon"), pursuant to Title 28, United States Code, § 2255.

## INTRODUCTION

On February 4, 2016, Runyon filed an amended motion under 28 U.S.C. §2255 to vacate, set aside, or correct a sentence. ECF 511. Runyon filed this amended motion pursuant to Federal Rule of Civil Procedure 15(a)(1), which allows an amendment as a matter of course 21 days after the filing of a responsive pleading. ECF 502, p. 2. The primary purpose behind Rule 15's amendment is to allow one amendment as a matter of course in response to a responsive pleading. *See* Fed. R. Civ. P. 15(a)(1), Reporter's Comments, 2009 Amendment ("This provision will force the pleader to consider carefully and promptly the wisdom of amending to

1

meet the arguments in the motion . . . . The responsive pleading may point out issues that the original pleader had not considered and persuade the pleader that amendment is wise.")

But Runyon's amended motion adds little substance to his original § 2255 motion. In large measure the amended motion is simply an edited version of the original with little change to the language used in each claim. Moreover, the amended motion fails to answer any of the procedural defenses the United States lodged in its response to the original § 2255 motion. To be sure, Runyon has added arguments to some of his claims and clarified his position on others. To the extent that he has added claims—as opposed to clarifying arguments—Runyon has failed to demonstrate, much less argue, that the added claims relate back the original claims in his § 2255 motion as required by Fed. R. Civ. P. 15(c)(1)(B).

Fourth Circuit law provides that the filing of an amended motion supersedes the original motion. *See Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.") Because of this, the United States' response here, much like Runyon's amended motion, appears similar to the original response. *See* ECF 497.

I.       **PROCEDURAL HISTORY**

On February 13, 2008, a federal grand jury returned a five-count indictment charging defendant David Runyon, and co-defendants Michael Draven and Catherina Voss, with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count 1); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count 2); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a),(e) and 2 (Count 3); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count 4); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j)

(Count 5). ECF 3. The indictment also provided the notice of special findings for the death penalty pursuant to 18 U.S.C. §§ 3591, 3592. *Id.*

On July 17, 2008, the government filed its notice of intent to seek a death sentence. ECF 67. On August 28, 2008 and September 2, 2008, defendant filed numerous pretrial motions, which were denied. ECF 77–92. Defendant's objections to proposed non-statutory aggravating factors were filed on May 8, 2009, and denied by the court on June 17, 2009. ECF 195 and 217.

The trial of Runyon and Draven began on June 30, 2009, and the guilt phase continued until July 17, 2009, involving over 50 witnesses and over 300 exhibits. On July 15, 2009, the district court dismissed Count 3 pursuant to Rule 29. On July 17, 2009, the jury found both defendants guilty on Counts 1, 2 and 5, and not guilty on Count 4. ECF 245. The eligibility phase was held on July 22, 2009. No evidence was presented and following argument the jury found Runyon intentionally killed Cory Voss. ECF 255. The jury also found the United States had proven the two noticed statutory aggravating factors. *Id.* at pgs. 5–6.

The selection phase of trial began on August 19, 2009. On August 21, 2009, Runyon submitted mitigating factors. ECF 285. The jury returned its verdict on August 27, 2009, and found four additional non-statutory aggravating factors, two statutory mitigating factors, and a number of non-statutory mitigating factors. ECF 291. The jury recommended death on Counts 1 and 5 and life imprisonment on Count 2. *Id.* at p. 5. On September 30, 2009, Runyon filed a motion to set aside the verdict, challenging certain victim-impact evidence. ECF 297. The court denied Runyon's motion on October 27, 2009. ECF 299. Runyon was sentenced to death and filed a timely notice of appeal. ECF 312.

Voss pled guilty to the indictment and was sentenced to life in prison on Counts 1, 2, 3 and 5, and 20 years in prison on Count 4.  ECF 69, 127.  Draven was sentenced to life in prison on Counts 1, 2 and 5, (ECF 304), and his convictions have been affirmed on direct appeal.  *United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011).

On February 25, 2013, Runyon's conviction and sentence were affirmed on direct appeal.  *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013).  On October 6, 2014, Runyon's petition for a writ of certiorari was denied.  *Runyon v. United States*, No. 13-254 (Oct. 6, 2014).  On October 5, 2015, pursuant to 28 U.S.C. § 2255, Runyon filed a motion to vacate, set aside, or correct his sentence and the next day the court ordered the government to respond.  ECF 478, 479.  The United States filed its response to Runyon's § 2255 motion on January 11, 2016.  ECF 497.  On February 4, 2016, Runyon filed an amended § 2255 motion, adding little to his original motion.  ECF 511.

## II.    **STATEMENT OF FACTS**

Defendant David Runyon, a contract killer, murdered Cory Allen Voss, a young Naval officer, in Newport News, Virginia.  Runyon was hired for a few hundred dollars by Cory's wife and her lover so that they could collect life insurance proceeds from Cory's death.  Runyon shot Cory five times and left him to bleed to death in his truck after arranging the murder to look like a late night robbery.  An experienced former police and Army officer, Runyon put his training to use to carry out the murder and conceal who was responsible.  He showed no remorse afterwards, as he and his co-defendants strived mightily and desperately to conceal their roles in the crime and obtain the life insurance payout.

A.    The Guilt Phase

1.    The Murder of Cory Voss on April 29, 2007

In the morning hours of April 30, 2007, Newport News Police responded to a report of a subject sleeping in a truck in a parking lot and found Cory Voss dead inside the vehicle.  Trial Transcript ("TT"), p. 268.  He had been shot multiple times. Cory's wife, co-defendant Catherina Voss, told detectives that Cory had left the house the night before to get some money from Langley Federal Credit Union (LFCU).  The last images of Cory alive were captured by the video surveillance system attached to the ATM at LFCU on April 29, 2007.  TT, pgs. 398 – 410; Gov't. Ex., (hereinafter "GX") 28 - 28GG.  The images showed Cory driving up to the ATM, attempting to make a transaction, someone entering his vehicle and then Cory driving away from the ATM.  TT, pgs. 406-407. Approximately four minutes later, Cory returned and attempted another cash withdrawal through the ATM. TT, p. 408.  Financial records from LFCU confirmed Voss opened an account in her name nine days before the murder with a $5.00 deposit.  TT, pgs. 443-446; GX 31-31F.   On April 29, 2007, Cory attempted three withdrawals, but each transaction was denied for insufficient funds. TT, pgs. 459-461; GX 31GG – II.

2.    The Defendants Who Planned the Murder

Draven and Catherina Voss began having an affair while Cory was deployed on board the USS Elrod.  TT, pgs. 481, 483.  To free themselves of Cory, and to collect insurance and other benefits from his death, Draven and Voss decided to have Cory murdered and hired Runyon as a contract killer.  During interviews with detectives, both Runyon and Draven acknowledged they met through a medical research company where they participated in drug-studies.  TT, pgs. 1310, 1314.  Other than income Runyon and Draven received from participating in these studies, none of the three defendants had regular employment.  TT, pgs. 481, 483, 711, 717.  Runyon had no

5

bank account, did not pay utilities, and the only financial records found for him were for two reloadable credit cards.  TT, pgs. 713, 714.  Following Cory's murder on April 29, 2007, Voss received approximately $133,000 in death gratuity, Social Security payments and Navy housing allowance.  TT, pgs. 949, 950.  Within three months, she had spent the money on trips, jewelry, household items, debt payments, and payments to Draven.  TT, pgs. 951, 952. She also sought a $400,000 military life insurance policy held by Cory.

### 3. Runyon's Purchase of Firearm

On the day of the murder, Runyon, a West Virginia resident, purchased a .357 handgun from George Koski in West Virginia sometime between the hours of noon and 2:00 p.m.  Koski also gave Runyon some ammunition with the firearm.  TT, pgs. 843-851; GX 103-103B.  This firearm was later pawned in West Virginia by a friend of Runyon's, in October and November 2007.  TT, pgs. 1190-1195.

### 4. Crime Scene Evidence

An autopsy confirmed that Cory died as a result of three separate gunshot wounds to his chest and abdomen fired, most likely, from less than two or three feet away.  TT, pgs. 319-329; GX 18.  The jacketed, hollow-point bullets that killed Cory were fired from the same firearm and were characteristic of .38 class—a .38 caliber revolver or a .357 magnum firearm.  TT, pgs. 359-366; GX 5, 22, 23.  The firearm was not recovered.  TT, pgs. 367, 368.

### 5. Search Warrants

In December 2007, search warrants were executed in West Virginia for Runyon's residence, vehicle and storage unit.  Agents recovered a map of Newport News, Virginia in the center console of Runyon's vehicle.  TT, pgs. 1025-1030, 1324-1326; GX 214.  The map contained the following written words: "Langley Federal Credit Union, '97 gray Ford Ranger,

FL hubcap missing, tailgate down, J. Morris Boulevard, Cory." TT, p. 1027; GX 214. Found with the map was a photograph of Voss and Draven, with their names, addresses and social security numbers written on the back. TT, p. 1028; GX 215. Items recovered from Runyon's residence included papers referencing the credit union and phone numbers belonging to Voss, Draven and Runyon. TT, pgs. 1035, 1036. In Runyon's former residence, agents recovered a box of Winchester .357 magnum, hollowpoint bullets with five missing from the box. TT, p. 1044; GX 236, 237. Agents also found notebook paper with a list of items including tarp, trash bag, taser, Spyderco knife, black hoodie sweatshirt, black BDU pants, boots and gloves. TT, p. 1034; GX 217. A separate notebook page made reference to the time it would take to travel to Virginia and the location of LFCU. TT, p. 1035; GX 217.

### 6.  Payments to Runyon

A Western Union money order, dated June 1, 2007, showed that Randy Fitchett, Draven's brother, sent Runyon $275.00. TT, p. 804; GX 293. Fitchett denied sending the money order, but recalled that Draven took him to a grocery store, saying that he needed a money order to pay a debt to a friend. TT, pgs. 804-805.

### 7.  Phone Calls and Emails

The United States introduced various phone calls and emails between Voss, Draven, and Runyon, establishing their relationship, the murder-for-hire-scheme and its cover-up. GX 159-173A. Prior to the murder, Draven was incarcerated on unrelated charges in the Newport News jail. During that incarceration, he made 36 outgoing calls, portions of which were played for the jury. GX 159-173A. In one recorded call on March 29, 2007, Draven and Voss discussed Runyon's request for more money—namely, $500 up front—and their fear that Runyon had

turned on them. TT, pgs. 890-893; GX 168, 168A. During the investigation, Voss, Draven, and Runyon communicated via email and phone calls. In one email, dated May 5, 2007, Brownells.com sent Runyon information related to the purchase of a .38 /.357 pistol stainless bore brush, which was billed to a different name at Runyon's address in West Virginia. TT, pgs. 1463-1464; GX 156.

The emails showed a pattern of Draven and Runyon getting their stories straight about their relationships and their alibis. TT, pgs. 1066-1109. Importantly, Draven emailed Runyon on December 7, 2007 about not meeting each other at a Waffle House, money owed, the grand jury and Runyon's talking to Voss on the phone. TT, pgs. 1102-1103; GX 143A. During the course of a wiretap authorized on the phones of Draven, Voss and Runyon, the defendants conspired with one another and others to obstruct justice and tamper with witnesses. TT, pgs. 1354-1491; GX 174-205B. In one call on December 8, 2007, Draven was upset after his interview with detectives and told Runyon the questions he was asked and how he answered them. TT, p. 1403; GX 197, 197B. Runyon responded to Draven that he'd "hang tough to the bitter end." *Id.*

Finally, phone records introduced at trial revealed regular calls to telephones associated with Runyon, Draven and Voss before and after the murder. GX 104-110, 136. Analysis performed on these records revealed multiple calls between Draven and Runyon leading up to and on the night of the murder. TT, pgs. 1414-1417; GX 136. Following the murder, calls with Draven and Runyon continued for months. Several calls occurred just before and after the time that the Western Union wire transfer was sent to Runyon in West Virginia. TT, pgs. 1422-1423; GX 136, 293. Cell tower analysis was also introduced, showing activity that occurred the day leading up to the murder of Cory Voss. TT, pgs. 1435-1465; GX 134, 135, 135A. Toll records revealed a number of calls between Draven and Voss in the hours preceding the murder and calls

8

between Draven and pay telephones off of Jefferson Avenue (close to LFCU) beginning at 10:12 pm.  TT, p. 1445.  Calls continued indicating that Draven's cell phone had changed location, traveling toward the direction of the pay telephones, past the LFCU, and then back past LFCU towards the residence of Draven. TT, pgs. 1452-1454.

### 8.      Runyon's Statements

On December 3, 2007, Runyon was interviewed in West Virginia by detectives with the Newport News Police Department.  TT, pgs. 1309-1314.  Runyon admitted knowing Draven and that the two met at a drug study.  TT, p. 1310.  He denied that he owned any firearms.  TT, p. 1314.  When asked where he was on April 29 and 30, he could not provide a location to validate his whereabouts on those two days.  TT, pgs. 1312-1313.

Following execution of the search warrants in West Virginia on December 11, 2007, Runyon was interviewed a second time. This interview was voluntary; however, Runyon was advised of his *Miranda* rights, waived those rights and agreed to be interviewed at the Morgantown Police Department.  TT, pgs. 1322-1323. He again denied that he owned firearms despite the fact that firearms were found in his vehicle.  TT, p. 1323.  When confronted with the map and photograph found in his vehicle, Runyon appeared overwhelmed and did not immediately answer the detectives' questions.   TT, pgs. 1324-1325. While he eventually admitted that the handwriting on the map of Hampton Roads was his, he denied that he wrote on the back of the photograph.  *Id.*  This interview was videotaped.

Evidence was introduced that Runyon confessed and bragged to several people that he killed Cory Voss.  Runyon told his girlfriend Sarah Baker that he murdered Cory with a firearm. TT, pgs. 1135-1137. He told her that he was supposed to get a big sum of money from the insurance, but was never paid.  *Id.*  Runyon told Virginia Pina, an ex-girlfriend, that he killed

9

someone for money. TT, p. 1857. After his arrest Runyon confessed to two other inmates that he murdered Cory Voss - he told Jamal Knowles that he killed a Navy guy with a .38 and the firearm was in a pawn shop in West Virginia. TT, pgs. 1208-1209. He told Knowles that $600.00 was wired to him and that he was going to get the rest of the money from the insurance claim "on the guys life." TT., p. 1209. Runyon told Theodore Schlossman that he drove from West Virginia to Newport News and killed a military man, but got paid only "chump change." TT, pgs. 1219-1222.

### B. The Eligibilty Phase

Before the eligibility phase started, the court excused juror Robin Foreman after learning her mother had passed away the previous night and replaced her with an alternate juror. TT, pgs. 1748, 1751-1753. No additional evidence beyond that introduced during the guilt phase was presented on the gateway eligibility factors, and after hearing argument and receiving jury instructions, the jury found that defendant was over the age of 18, possessed the threshold intent and satisfied both statutory aggravating factors. TT, pgs. 1797-1799.

### C. The Penalty Selection Phase

#### 1. Non-Statutory Aggravating Factors

Before trial, the government filed a notice outlining four non-statutory aggravating factors: Runyon (1) harmed the victim's family and friends; (2) used his education and training to kill Cory Voss; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse. ECF 67, p. 3.

a.     Physical Abuse

Runyon had a history of physically abusing women, including a conviction for simple battery and other charges for domestic assault as well as protective orders against him.  TT, pgs. 1824-1825, 1865-1868, GX 311, 313, 314A, 314B, 316.

b.     Education and Training

Several witnesses testified to Runyon's specialized military education and training over a twenty-year period that included training in firearms, police tactics, close-quarter situations, crime-scene processing and other forensic techniques.  Runyon served as a military officer, police officer and corrections officer at various times and received hundreds of hours of documented training. Runyon also received extensive firearms training.  TT, pgs. 1911-1914; GX 322, 323.

c.     Victim Impact

1.     Navy Co-Workers

Cory Voss began his naval career as an enlisted sailor and worked to receive a commission as a Naval Officer.  TT, p. 1997.  His co-worker, Jennifer Kime, met Cory in January 2006.  TT, p. 1990.  They became friends and she described Cory as "excellent" in his job as communications officer aboard the USS Elrod.  TT, p. 1996.  Cory's shipmates were shocked and upset to learn of his death.  TT, p. 2004.  Jeremy Chayer, a lieutenant in the Navy, was friends with Cory and worked with him in the operations department.  TT, pgs. 2006–07. Chayer testified that everyone aboard the Elrod "from the captain all the way down to the new seaman recruit . . loved [Cory]."  TT, p. 2009.  Chayer provided the Navy with photographs of Cory during his time on board the ship.  The photos were used in a video that was produced by the Navy and played at Cory's memorial service and at trial.  TT, pgs. 2014–15; GX 327.  A

11

second video, recovered during a search of Voss' home was also played at trial.  TT, p. 2018; GX 328.  The video was approximately nine minutes and contained music and pictures of Cory with his friends and family.

<div align="center">2. <u>Friends and Family</u></div>

Cory's friend, Erin Skiba, socialized with Cory.  TT, p. 2043.   She described him as an "excellent father," who was "always with his children."  *Id.*  Cory's mother, Barbara Wilson, spoke of "Allen's" (her name for Cory) childhood growing up in Illinois.  TT, pgs. 2046–47. She described the effect Cory's death had on her, on her son and daughter, as well as on her grandchildren.  She read a prepared statement describing her loss, "my son was murdered for the insurance money."  TT, pgs. 2052–55.  Cory's sister, Kristen Smith, summarized the impact Cory's death had on her life, "there is no more time for us. I miss him so much, and I'm so angry that he was taken away. . . I'm sad for me, and I'm sad and I'm so mad for his children, because their father was taken away."  TT, p. 2062.  Rose Wiggins took custody of Cory's two children after the murder.  TT, p. 2069.  Wiggins testified that both children suffered from depression and had been in counseling since Cory's death.  TT, p. 2068.  Both children offered victim impact statements that were read at trial.  TT, p. 2070; GX 369, 370.

<div align="center">d. <u>Lack of Remorse</u></div>

Evidence of Runyon's lack of remorse had been provided during the guilt phase through phone calls and emails showing Runyon and Draven trying to get their stories straight for police and Runyon's effort to get money.  After his arrest, Runyon bragged to Schlossman that he was "a hired gun," "a hit man."  TT, p. 2545.  Runyon also admitted to Sarah Baker and Virginia Pina that he had "killed somebody" and did it for money.  TT, pgs. 1135–37, 1857.

<div align="center">12</div>

2.      Defense Mitigation Case

In mitigation, the defense called 21 witnesses over two days who testified to Runyon's conduct in jail, his character, friendships and employment, as well as his ability to adjust to prison should he receive a life sentence.  TT, pgs. 2126-2527.  After the mitigation testimony, the plea agreement and statement of facts for Catherina Voss were admitted into evidence. Runyon Ex. 4 and 7.

3.      Rebuttal Evidence

The United States offered two witnesses in rebuttal to Runyon's mitigation evidence. Detective Larry Rilee described interviews of the two co-defendants, contrasted with a videotaped interview of Runyon.  GX 330.  During Det. Rilee's testimony at the guilt phase of trial, counsel asked about the December 11, 2007 interview of Runyon, "during this interview you all talked to him for some more time about this, confronted him with some things.  He never admitted being involved in the murder."  TT, p. 1353.  Det. Rilee answered, "No, he didn't." *Id.* Counsel asked, "He denied it?" Det. Rilee responded, "That's correct."  *Id.*  Once Runyon requested an attorney, the interview was terminated.  *Id.*  No prior suppression challenge was made to the video interrogation.  In the penalty phase of trial, however, counsel objected to the introduction of the videotaped interview.  TT, pgs. 2529-2531. The court overruled the objection and the videotape, showing Runyon's demeanor and reaction when confronted with evidence of the crime, was played for the jury.  TT, pgs. 2536, 2549–50; GX 330.  The court gave a specific instruction to the jury that the tape was offered for the "limited purpose of demonstration of remorse in regard to the alleged non-statutory aggravating factor to this effect, and for relevant culpability in regard to the alleged statutory mitigating factor to this effect."  TT, p. 2668.  The jury was also instructed, "the defendant did not testify during the penalty phase.  You may not

13

attach any significance to this fact or even discuss it in the course of your deliberations."  TT, pgs. 2685, 2686.

The government also offered the testimony of Theodore Schlossman concerning an incident that happened in the jail while Runyon awaited trial.  Runyon learned that Schlossman was on the witness list when they were housed together and Schlossman was assaulted.  TT, p. 2542.  During the assault Runyon commented "don't black his eyes, don't punch him in his face.  Hit him in his head and in his body."  TT, p. 2543.  He did not want him to go to court "bruised up." *Id.*  Schlossman did not report the incident to officers in the jail.  TT, p. 2544.

### 4. Jury Deliberation

The jury exited the courtroom to begin deliberations at 4:30 p.m. on August 26, 2009.  TT, p. 2696.  At 5:30 p.m. the jury notified the court that it would like to be excused for the evening, TT, p. 2697, and the court dismissed the jury until 9:30 a.m. the next day.  TT, p. 2698.  The jury returned its verdict at 6:00 p.m., recommending a sentence of death for Counts 1 and 5, and a sentence of life imprisonment for Count 2.  The Court confirmed this verdict by polling each individual juror.  TT, pgs. 2715–16.

## III.   LEGAL STANDARDS

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed.  The grounds for relief under § 2255 are narrower than those for relief on direct appeal.  With very limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane*, 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

A.      Cognizable Claims

While § 2255 provides a comprehensive remedy, not every alleged error can be corrected on collateral review. *United States v. Foote*, 784 F.3d 931, 932 (4th Cir. 2015). Only those errors presenting a "fundamental defect which inherently results in a complete miscarriage of justice" are cognizable. *Davis v. United States*, 417 U.S. 333, 346 (1974). This standard is only satisfied when a court is presented with "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Foote*, 784 F.3d at 936 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962).

B.      Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence. 28 U.S.C. §2255(f); *United States v. Segers*, 271 F.3d 181, 184 (4th Cir. 2001). The limitations period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing. *Segers*, 271 F.3d at 184.

C.      Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982). The procedural default doctrine is adhered to by the courts to conserve judicial resources and respect the law's important interest in the finality of judgments. *Massaro v. United States*, 538 U.S. 500, 504 (2003). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised

15

in a collateral attack rather than a direct appeal.  *United States v. Williams*, 977 F.2d 866, 871 (4th Cir. 1992).

Apart from claims of ineffective assistance of counsel, courts may consider otherwise procedurally defaulted claims in two instances.  First, they may consider defaulted claims when a movant demonstrates that the constitutional error "has probably resulted in the conviction of one who is actually innocent."  *Bousley v. United States*, 523 U.S. 614, 623–24 (1998).  Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice.  *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999).  "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The standard for prejudice is that the alleged error that led to the issue not being raised worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error."  *Frady*, 456 U.S. at 170.

D.  Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion.  *Withrow v. Williams*, 507 U.S. 680, 720–21 (1993) (Scalia, J., concurring) (collecting cases); *Boeckenhaupt v. United States*, 537 U.S. 1182 (4th Cir. 1976).  The only notable exception to this bar is when there has been an intervening change in the law, usually a new judicial decision narrowly construing the statute of conviction.  *Davis v. United States*, 417 U.S. 333 (1974).

E.  New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law.  *Teague v. Lane*, 489 U.S. 288, 310 (1989).  When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending direct review.  As to convictions that are already final, however,

16

the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. *Id*. at 351–52. A court employs a three-step analysis to ascertain whether a new rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id*. Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted). Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*. *Id*. at 167. The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. *Id*.

   F.  <u>Harmless Error</u>

  Even assuming a § 2255 motion demonstrates error, a movant's claims are subject to harmless error review. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013). Thus, absent a showing that the case involves one of a rare group of structural errors that effect the framework of the trial and require reversal without showing prejudice, a § 2255 movant cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *Id*. (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

G.    Claims of Ineffective Assistance of Counsel

Although the doctrine of procedural default generally bars claims not previously raised, a freestanding claim of ineffective assistance of counsel may properly be asserted for the first time in a § 2255 petition.  *United States v. DeFusco*, 949 F.2d 114, 120-21 (4th Cir. 1991).  To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  A petitioner's failure to satisfy either prong of the *Strickland* test renders it unnecessary for a reviewing court to consider the other element.  *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).  First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness.  To show that defense counsel's performance was objectively unreasonable, the petitioner must articulate specific acts or omissions whereby counsel's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *Id.* at 689-90.

Second, the petitioner must show that he was prejudiced by counsel's deficient performance, in that it is "reasonably likely" that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  *Harrington v. Richter*, 131 S. Ct. 770, 791-92 (2011) (citing *Strickland*, 466 U.S. at 696).  "The likelihood of a different result must be substantial, not just conceivable." *Id*. (citing *Strickland*, 466 U.S. at 693).  The burden is on the petitioner to affirmatively prove prejudice.  *Strickland*, 466 U.S. at 693.  A petitioner's failure to satisfy either prong of the *Strickland* test renders it unnecessary for a reviewing court to consider the other element.  *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).

18

The Supreme Court has repeatedly stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight," so that the conduct can be evaluated "from counsel's perspective at the time" and in light of all the circumstances. *Bell v. Cone,* 535 U.S. 685, 698 (2002) (quoting *Strickland,* 466 U.S. at 689). The requirement that counsel's performance be scrutinized deferentially is based on the recognition that it is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all too easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful." *Strickland,* 466 U.S. at 689. Accordingly, courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Bell v. Cone,* 535 U.S. at 702 (quoting *Strickland,* 466 U.S. at 689).

H.     Limitations Bar to Amended Claims

The Rules Governing Section 2255 Proceedings do not specify a procedure for amending motions. Courts, therefore, have typically applied the Federal Rule of Civil Procedure 15 to the amendment of a §2255 motion. *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). Rule 15(a)(1) provides, "A party may amend a pleading once as a matter of course within (A) 21 days after serving it, or (B) . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

When proposed claims in an amendment are barred by the statute of limitations, Rule 15(c) provides for the relation back of amendments to the original pleading under certain circumstances. Relation back is permitted when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(2).

## IV.    **ARGUMENT**

The defendant has raised numerous claims against his trial and appellate counsel, as well as multiple constitutional claims. At trial Runyon was represented by capital qualified counsel, Lawrence H. Woodward, Jr., and Stephen A. Hudgins. On appeal Runyon was represented by attorneys Teresa Norris and Seth C. Farber. The Government will address each of the claims below:

### Claim 1:    **Runyon fails to establish prejudice from the participation of Robert Glenn Ford and Clifford Posey.**

Runyon claims that two purported dishonest law enforcement officers were involved in the investigation of the case against him, and that the United States failed to disclose this fact to his trial counsel. Although Runyon concludes that this prejudiced both his representation and the evidence presented against him, he cannot point to any action on the part of either individual that prejudiced him in anyway. Rather, he summarily concludes that neither the Court nor the parties can have confidence in the work product of either investigator due to their post-trial convictions.

### A.    Procedural Default

At a threshold level, Runyon failed to raise this claim in the course of his direct appeal, thus, he is procedurally defaulted from doing so now. *Bousley*, 523 U.S. at 622. Runyon fails to demonstrate cause for his procedural default or actual prejudice. *Frady*, 456 U.S. at 170. Procedural default notwithstanding, Runyon's claim lacks merit and he is entitled to no relief.

### B.    Merits

#### 1.    Robert Glenn Ford

Runyon claims that his own investigator, Robert Glenn Ford, who subsequent to Runyon's trial was charged and tried of certain criminal offenses, was tainted such that the results of Ford's investigative efforts in Runyon's case were not reliable. Ford was charged in a

20

sealed indictment on May 7, 2010. (Docket No. 2:10cr83, ECF No. 1). This was some six months after Runyon was sentenced and nearly a year after his trial had occurred.

Runyon suggests that Ford did not conduct an honest investigation or produce accurate reports based on the later proven facts that Ford had been involved in separate criminal conduct. Specifically, he speculates that Ford could have submitted false reports here in exchange for bribes. Other than speculation, Runyon points to no evidence to support his assertion that Ford conducted an improper investigation. Runyon identifies no witness reports that were fabricated or unreliable in any way. Ford did not testify at trial and no witness testified based on interactions with him.

Furthermore, the factual record compiled by Runyon belies his claims. Attorney Lawrence Woodward indicated that "Mr. Ford and Ms. Cronin [a mitigation investigator] worked very hard and did a good job investigating the case and David's background." Pet. Ex. 6, ¶ 4. Attorney Stephen Hudgins indicated that though he relied on Ford and investigator Shelia Cronin's interview reports to inform him of the witnesses' knowledge of Runyon, he interviewed the witnesses before the penalty phase began. Pet. Ex. 5, ¶ 8. Cronin stated that she often provided Ford with a list of questions to ask and she and Ford kept Runyon's counsel apprised of the witnesses the two interviewed. Pet. Ex. 4, ¶ 3. It further appears that it was known by Runyon's defense team that Ford had come under scrutiny for certain matters related to his prior performance as a police officer. Pet. Ex. 4, ¶ 4. But even years later, neither trial counsel nor Ford's co-investigator have raised any questions concerning the reliability of reports Ford submitted or tasks he performed.[1]

---

[1] It appears that trial counsel were not even made aware that this claim would be raised. Pet. Ex. 6, ¶ 17.

21

Runyon must do more than attempt to link Ford's efforts in his case to Ford's unrelated criminal activity. This separate activity was related to Ford accepting bribes fabricating reports in exchange for bribes that state *defendants* had assisted in investigations in order to obtain reduced sentences. Runyon speculates that this separate pattern of conduct could have conceivably impacted his investigation or trial. But it is just speculation. In order to win habeas relief, Runyon must set forth specific facts in support of each ground for relief. *Roane*, 378 F.3d at 400–01. Conclusory and unsupported statements are insufficient for habeas relief. *Id.*

Moreover, the United States was under no duty to advise Runyon's counsel (who later represented Ford and advocated for his acquittal at his trial on the matter) that Ford was under investigation, particularly when he had not yet been charged. Although no favorable evidence has been identified stemming from Ford's impeachment related behavior, generally, impeachment evidence for those who do not testify lacks relevance and materiality for disclosure purposes. *See United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997). Runyon's trial counsel identified no investigative actions that would have been done differently or adverse impact that the participation of Ford had on the investigation or defense of Runyon's case. In short, there is no evidence that would permit a finding that Runyon was denied the effective assistance of counsel based on Ford's involvement as his investigator.

  2.  Clifford Dean Posey

Runyon next claims that Clifford Dean Posey, a former Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives was a second "dirty cop" that engaged in acts that resulted in the presentation of false or unreliable evidence against Runyon. As with the claim related to Ford, Runyon identifies no prejudice beyond speculation.

As Runyon recognizes, Posey was not indicted until April 2011.  (Docket No. 3:11cr94). The Statement of Facts filed in Posey's criminal case makes apparent that his misconduct was not identified until October 2010, well over a year after Runyon's trial had concluded.  ECF 14. Thus, there was nothing for the government to even turn over at the time of trial.  Additionally, the government had no continuing duty to disclose any of the post-trial information.  *See Dist. Atty's Office v. Osborne*, 129 S. Ct. 2308, 2319-20 (2009); *see also United States v. Jones*, 399 F.3d 640, 646-47 (6th Cir. 2005) (holding that evidence that did not exist at the time of trial was not *Brady* material).

Moreover, Runyon identifies no impact whatsoever stemming from the minor involvement of Posey.  Runyon's claim that "he believes, but cannot yet confirm, that Posey played a substantial role in investigating and preparing the evidence in this matter," (ECF 511, p.15), is false and without any support.  Full discovery, including interview and investigative reports and search warrant affidavits were produced.  Posey prepared neither of these types of documents.  Posey did not testify at trial or before the grand jury.  The record reveals that Posey apparently assisted in transcribing a recorded telephone call as part of the Title III wiretap that was in operation during the investigation.  As Runyon was provided with the full audio of all telephone calls and stipulated that the accompanying transcriptions were authentic, he can show no prejudice from Posey's involvement in this aspect of the investigation.  ECF 239.  There is, thus, no merit to his claim that Posey performed work that was materially false or unreliable. Moreover, like the argument Runyon makes against Ford, his claim here is based solely on speculation.  For the foregoing reasons, Runyon is entitled to no relief on this claim.

**Claim 2:**    **The United States did not violate the defendant's constitutional rights by failing to disclose the background of co-defendant Draven.**

Runyon contends that the United States violated his rights under *Brady v. Maryland*, 373

U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972) and *Kyles v. Whitley*, 514 U.S. 419 (1995), by failing to provide him co-defendant Draven's background and mitigation evidence prior to trial. This claim has been procedurally defaulted, as the claim could have been raised at trial and on appeal. In the alternative, the information that the defendant claims should have been disclosed to him was not discoverable. Specifically, the information on Draven's background, criminal history as a juvenile and his mental health assessments, was given in discovery by the United States to Draven after indictment, but before the Attorney General's decision to authorize seeking the death penalty against Draven. This information was not material to Draven's guilt or innocence, but was material to Draven on the issue of punishment. Accordingly, the information was not material to Runyon regarding his guilt or innocence nor was it material to his punishment. As Runyon notes in his motion, the centerpiece of his case during the punishment phase that he presented to the jury, was that equally culpable defendants, Draven and Voss, would not receive the death penalty. The jury found that Runyon proved this mitigating factor. ECF 291.

### A.    Procedural Default

Because Runyon did not raise this issue at sentencing, or on direct appeal, he must demonstrate "cause" excusing his procedural default, and "actual prejudice" resulting from the errors of which he complains. *Frady*, 456 U.S. at 168. Runyon fails to make any argument demonstrating cause and prejudice for his default of this claim. This claim should be denied on this basis alone.

### B.    Draven's Background Evidence

Runyon asserts that the United States should have disclosed co-defendant Draven's background evidence to him because it was material to Runyon's defense on guilt or innocence

24

and also material to his sentencing. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that when the government withholds material evidence on the issue of guilt or punishment, it violates the due process rights of the defendant. The Supreme Court defined "material" in *United States v. Bagley*, 473 U.S. 667, 682 (1985) as "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

The documents Runyon claims should have been disclosed to him involve the personal background of co-defendant Draven. Runyon argues, in essence, that Draven was more deserving of the death penalty than Runyon because his background was so much worse. He posits that had Draven's background been presented to the jury, there is a reasonable probability that the jury may not have convicted Runyon and sentenced him to death. But Runyon fails to show how this evidence would be admissible at trial on the issue of guilt or innocence or in the punishment phase. Rather, he makes a conclusory statement that this evidence would have persuaded the jury. *See Roane*, 378 F.3d at 400–01 (conclusory statements insufficient for habeas relief).

The facts remain that Runyon was hired by Draven and Voss to kill Cory Voss, a young Naval officer, so as to obtain insurance proceeds. Runyon traveled from West Virginia to Newport News, Virginia and shot Cory Voss at least five times at close range in Cory's vehicle. Neither Draven, nor Voss pulled the trigger to kill Cory in such brutal manner. The evidence against Runyon was overwhelming—Runyon planned the murder in advance, purchased the firearm the day of the murder and drove to the location of the murder with a map of Hampton and Newport News, Virginia. The map, found in Runyon's vehicle in West Virginia, had the

25

name of the bank, the description of Cory's vehicle, Cory's name and the exit to take off the interstate to get to the bank. Also found in Runyon's vehicle was a picture of co-defendants Voss and Draven. Runyon fails to explain how the evidence of Draven's background would be admissible at trial on guilt or innocence and further absolves him of guilt. Likewise, Runyon fails to explain how evidence of Draven's background would be admissible at the punishment phase so as to persuade a jury that he should not be given the death penalty for the murder of Cory Voss. Contrary to Runyon's assertion, this evidence was not exculpatory nor was it impeachment evidence. Ultimately, this evidence was not material within the meaning of *Brady*. This case is distinguishable from *Cone v. Bell*, 556 U.S. 449 (2009). In *Cone*, the evidence suppressed by prosecutors included witness statements and police reports that corroborated the defense that he committed the crimes because of his drug addiction. Here, the evidence not turned over to Runyon was the background of Draven's youth. Accordingly, this evidence was not material to Runyon on the issue of guilt or innocence nor on the issue of punishment for his role in the crime.

Assuming this evidence was discoverable to Runyon, it would have been cumulative and any error here would be harmless. Runyon did present mitigation evidence that equally culpable defendants, Draven and Voss, would not receive the death penalty. The jury found this mitigating factor in Runyon's favor. ECF 291.

**Claim 3**:     <u>**Runyon's trial counsel were not ineffective for failing to investigate and present evidence of innocence at the guilt phase of trial.**</u>

Runyon argues that he is innocent of being a contract killer hired to murder Cory Voss. He argues that his trial counsels were ineffective and failed to present evidence of his innocence pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). As stated above, in order to prevail on an ineffective assistance claim, a criminal defendant must show both (1) that counsel's

representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id*. at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id*. at 697.

Runyon argues that had trial counsel presented or highlighted certain evidence, then the jurors could have reasonably doubted that Runyon was involved in the carjacking and murder of Cory Voss. Runyon is wrong—he cannot demonstrate that trial counsels' performance was deficient.

### 1. Chad Costa

Costa, a friend of the defendant's, did not testify at trial on the issue of guilt or innocence. Runyon now accuses his trial counsel of a deficient performance for failing to call Costa as a witness to elicit Runyon's statements during car trips together after the murder of Voss. He further argues that but for this error, the outcome of the trial would have been different. This claim lacks merit.

The testimony that Runyon says Costa would provide is inadmissible hearsay. According to his declaration, ECF 511-7 at ¶ 2, Costa met Runyon sometime in "the second half of 2007". Costa and Runyon took three car trips together and they talked. Trial counsel did not call Costa because they understood the rules of evidence. Trial counsel could not have presented, through Costa, the defendants statements. It is important to note, that Runyon in his petition, states that Costa knew him *before* the crime, however according to Costa's declaration, this is false. Numerous arguments are premised on this notion as to why Costa's testimony was crucial. Runyon murdered Cory Voss on April 29, 2007. He did not meet Costa until *after* the murder, sometime "in the second half of 2007." Accordingly, the arguments that have been put forth that

27

counsel was deficient lack merit.

Likewise, Runyon speculates that Costa's purported testimony about his recollection of Runyon's gun being a six-shot revolver would not have changed the outcome of this case.  Given the ballistics evidence from the recovered bullets and the overwhelming evidence demonstrating Runyon's guilt, Costa's recollection of a gun he may have seen would have had no effect on the verdict.

As for the allegations that Costa's testimony would have cast doubt about the reliability of the police investigation, the defendant fails to state with specificity how the police investigation was unreliable.  Certainly, the defense at trial made this very argument.  So, Costa's testimony would add nothing.  Likewise, Costa's opinions on Runyon's braggadocios nature and his poor decision making regarding romantic partners adds nothing to whether he murdered Cory Voss and was irrelevant.

Accordingly, trial counsels were not deficient in their performance. To establish counsel's representation was deficient, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  Since the testimony offered by Costa was inadmissible for various reasons, the defendant has not made a showing of deficient performance and thus the Court need look no further to the second prong of *Strickland.*  Even if the testimony was admissible, for the reasons stated above Runyon suffered no prejudice.

2. Cat Voss

Runyon accuses trial counsel of failing to call co-defendant Cat Voss to testify on his behalf that she doubted Runyon was the triggerman.  Despite the fact that Voss pled guilty to having her husband murdered by a hit man and signed a statement of facts, ECF 69, 70; Defense

Trial Ex. 4 and 7, admitted August 25, 2009, (penalty phase), she now, eight years later, knows very little about what happened to her husband according to her declaration.  ECF 511-9. Apparently, she is now recanting her signed statement of facts and Runyon now seeks to rely on her testimony.  It is doubtful that in July of 2009, Cat Voss would have taken the witness stand to testify for Runyon after having pled guilty in light of Runyon's defense that one of the other co-defendants was responsible for the murder of Cory Voss.  Cat Voss was represented by counsel and it is likewise doubtful that her attorneys would have let her testify to what she now declares under oath.  Voss risked her plea agreement of life imprisonment instead of the death penalty with the United States should she have testified falsely in contravention of her Statement of Facts.  Pet. Ex 4, ¶¶ 5 and 13 and ECF 69.  For Runyon to now suggest that her testimony would have raised reasonable doubt is speculative.  It is just as likely the jury would not believe a word she said since she would have been impeached by the statement of facts she signed.  Runyon has failed to show that counsels' failure to call Cat Voss as a witness at trial was deficient.  Trial counsel made a tactical decision to use the documents instead of Cat Voss' testimony to argue that she, as an equally culpable defendant, did not receive the death penalty.  Trial counsel was successful in this endeavor, as the jury found this mitigating factor for Runyon.  Any error here is thus harmless. *Brecht*, 507 U.S. at 637.

### 3.  Scott Linker

Runyon argues that had Linker been called as a witness during the guilt phase, his testimony would have created reasonable doubt.  In addition, Runyon argues that his trial counsel were ineffective for failing to object to the admission of guns and ammunition found in Runyon's possession.  Neither of these arguments have merit.

According to Linker's declaration, ECF 511-13, Runyon loved guns, traded and collected them, was an expert marksman and he doesn't think that Runyon killed Cory Voss. All of this testimony is irrelevant and thus inadmissible at the guilt phase of trial. Certainly, none of the proposed testimony goes to the guilt or innocence of Runyon. Runyon argues that this testimony puts in context the gun purchase the day of the murder and therefore supplied reasonable doubt. This testimony does not put into context the sale of the gun on the day of the murder. Linker's testimony easily could have the opposite effect—that Runyon's love of guns and that he was an excellent marksman make him a good candidate to be a hit man or contract killer. Counsel was not deficient in their performance at trial for failing to call Linker. Nor has Runyon demonstrated any prejudice for this purported error. Linker's testimony would not have changed the outcome of Runyon's case. *Strickland*, 466 U.S. at 694, 696.

Trial counsels' performance was likewise not deficient for failing to object to evidence of other guns and ammunition found in Runyon's possession. Runyon fails to explain how this evidence was irrelevant. Moreover, his contention that trial counsel failed to argue that this evidence

### 4. Rose Wiggins

Runyon argues that his counsel was deficient for failing to "effectively utilize" Wiggins's testimony to create doubt as to his involvement in the murder. He contends that Wiggins's testimony was inconsistent with the United States' timeline of the murder. This claim lacks merit.

Rose Wiggins, Cory Voss' mother-in-law, "drove by the scene" and did not see Cory's truck at 3:00 a.m. TT, pg. 259. She offered to look for Cory because her daughter, Cat Voss, was home with her sleeping children. *Id*. at 260. Wiggins testified that she looked for both

30

Cory's truck and the family BMW that Cat Voss normally drove.    *Id*.  Wiggins did not see either vehicle when she drove by the Langley Federal Credit Union bank. *Id*. at 261.  Later that morning, Wiggins drove through the bank parking lot to look for Cory on her way to Cat Voss's home. *Id*. at 261–62.  She did not see either Voss vehicle. *Id*. at 262.

Runyon contends that his trial counsel was prejudicially ineffective for failing to ask Wiggins why she did not know which vehicle Voss was driving, the whereabouts of the Voss BMW, and question why Wiggins did not immediately go to the Voss home while Cat Voss searched for Cory.  Runyon claims that the answers to these questions would have created reasonable doubt as to his involvement in the conspiracy and murder.

Trial counsel was not deficient in his questioning of Wiggins and Runyon cannot demonstrate prejudice from counsel's failure to ask the above questions.  Wiggins testified that she looked for both vehicles when she drove by the bank.  She also testified that she offered to search for Cory because Cat Voss was home with her sleeping children.  The jury heard the fact that Wiggins did not see Cory's vehicle when she twice went to the bank.  Trial counsel used this testimony to argue that there was doubt as to Cory Voss's location and that someone else could have entered his vehicle prior to its return to the ATM the second time.  TT pgs. 1634–35.

Moreover, Runyon fails to demonstrate how his trial counsel could have used Wiggins's testimony to demonstrate he was not involved in the murder.  There is nothing in the record that indicates Wiggins was involved in the substantial planning of the murder or that she knew Runyon.  Runyon's claim is speculative and he cannot demonstrate prejudice.

### 5. Runyon's Whereabouts On The Day of the Murder

Runyon fails to make a clear argument on counsel's deficiencies except to write, "defense counsel did not elicit testimony that she (Paula Dalton) never received a phone call on Davy's

31

phone from a caller other than David Runyon." Presumably, Runyon's claim is that trial counsel failed to ask a question of the government's witness Paula Dalton. Runyon next states, in a conclusory manner, that he was prejudiced by this failure to ask Dalton this question. Runyon fails to show by asking this one question or even a series of questions that trial counsel was deficient. Moreover, he must prove prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Bacon v. Lee,* 225 F.3d 470, 478 (4th Cir.2000), *cert. denied*, 532 U.S. 950 (2001) (citing *Strickland*, 466 U.S. at 694). In order to do so, the petitioner must show a "probability sufficient to undermine confidence in the outcome." *Roane,* 378 F.3d at 405 (citing *Strickland,* 466 U.S. at 694). Government witness Paul Swartz testified regarding the phone calls made to and from Runyon, Cat Voss and Draven. What is important at trial is not when Runyon may or may not have spoken with Dalton, but when the co-conspirators spoke to each other. TT, pgs. 1378-1464. Trial counsel cross-examined Paul Swartz on the phone analysis presented at trial. TT, pgs. 1476-1488. Runyon fails to adequately explain how he was prejudiced. His claim fails as counsel was not deficient in his performance at trial.

### 6.   Cell Tower Testimony by Paul Swartz regarding Draven

Runyon argues that trial counsel was deficient in failing to challenge the testimony of Paul Swartz regarding cell tower analysis of co-defendant Draven. Importantly, Runyon is wrong when he states "Three cell towers are located within twenty miles of the credit union." ECF 511, pg. 30. Specifically, Paul Swartz testified, "No, there are more nTelos cellular towers than what are represented on that map." TT, pg. 1469. Runyon again makes a conclusory statement that trial counsel were deficient in their investigation of this matter. He proffers no specific argument or evidence that trial counsel could use to challenge Swartz's testimony. The

evidence Runyon presents for this proposition are articles written by persons that have not been represented to be experts. One of those articles (ECF 511-14) has not been published.

The use of cell phone location records has been widely accepted by numerous federal courts. *See United States v. Eady*, No. 2:12-cr-00415-DCN-3, 2013 WL 4680527, at *4 (D. S.C. Aug. 30, 2013) (collecting cases). Runyon's reliance on *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012), is misplaced. In that case, the court found testimony related to a theory known as "granulization"—a theory that estimates the range of cell sectors—was unreliable and thus inadmissible. *Id*. at 956–57. Here, Swartz did not testify to any inadmissible theory regarding cell sector location. Runyon fails to demonstrate any deficient performance by his trial counsel.

At trial, Runyon's defense was that someone else was responsible for killing Cory Voss. To that end, his trial counsel used the evidence presented on cell phone location to bolster the defense theory. For example, Swartz testified that Draven's location was unknown between 11:11 p.m. and 11:45 p.m. on the night of the murder based on the cell phone location records, TT, pgs. 1477–78, and argued that the evidence lacked any demonstration that Runyon's phone was in Newport News during the time of the murder. TT, pgs. 1636–53. Trial counsel was not deficient in their performance nor was there any prejudice, as their theory of the case was presented to the jury.

### 7. Runyon's Shopping List

Runyon argues that his trial counsel failed to *highlight* that the checklist of items found in Runyon's belongings in his bedroom were not items used in the crime. GX 217, TT, pgs. 1034–1035. Runyon is wrong. Trial counsel brought up the fact during his cross-examination of ATF Special Agent William Banks that some of the items were not recovered. TT, pgs. 1050–1052.

Accordingly, Runyon's trial counsel were not deficient in their performance. Furthermore, trial counsel was correct NOT to highlight this exhibit in closing argument. This damaging piece of evidence also had written on it the following word and numbers; "6.25 hours", "380 miles", "LANGLEY FED. CREDIT UNION", "Exit 252", "Jefferson", "1742 Jefferson Ave", "11742 Jefferson", "873–3944". It is important to note that evidence was adduced at trial to verify the information on this US trial Exhibit 217. Jefferson Avenue is the street that one would have to travel to get to Langley Federal Credit Union. TT, pgs. 271–273. 11742 Jefferson Avenue is the address of Langley Federal Credit Union. TT, p. 397.  It takes roughly six hours to get from Morgantown, West Virginia to Newport News, Virginia. TT, p. 1030. To be sure, a competent counsel would not ask the jury to look at this document again. Runyon's argument that his trial and appellate counsel were deficient in their failure to highlight this evidence is absurd.

### 8. Testimony Regarding the Bullets

Runyon adds an argument to his original § 2255 motion contending that his trial counsel were ineffective for failing to challenge the expert scientific evidence that was presented. In a conclusory fashion, Runyon argues that "new evidence undermining the reliability of the three prosecution experts' testimony," requires an evidentiary hearing. ECF 511, pg. 34. But, other than a citation to the full National Academy of Sciences 2009 report on the state of forensic evidence, Runyon does not proffer any new evidence that calls into question the expert testimony in his trial. He only argues that his trial counsel were ineffective for failing to challenge the cell tower and ballistics evidence.

The amended claim that counsel failed to investigate and challenge the ballistics evidence is untimely since it was not filed within the one-year period required by 28 U.S.C. §§ 2255(f)(1) and(f)(3). Runyon does not demonstrate, much less argue, that this claim relates back to any of

34

his previous claims.  The timeliness of this claim notwithstanding, Runyon fails to demonstrate that the claim has merit.

Runyon contends that the ballistics evidence and testimony of John Willmer were unreliable.  Specifically, he claims his trial counsel were ineffective for failing to challenge the scientific validity of Willmer's testimony and failing to correct the "mis-impression" that the bullets found in this case could have been fired from Runyon's Taurus .357.

Willmer, a forensic firearms and toolmark expert, testified that a microscopic analysis of the bullets recovered from the victim's truck and the bullet jacket and lead fragments recovered from the victim's body, demonstrated that the bullets were fired from the same firearm.  TT, pgs. 361–62; GX 23.[2]  The bullets were found to be characteristic of .38 class bullets, encompassing a couple of calibers together.  TT, pg. 362.  The analysis also found that "the bullets are characteristic of being revolver ammunition components, and the predominate ammunition component in that caliber is .38 special and .357 magnum revolvers that would be typical of firing this particular bullet with the rifling specifications that it has."  *Id*.  Because only the bullets were recovered, there was no way to determine whether the ammunition came from .38 special or .357 magnum cartridges, but the ammunition could be used for both the .38 and .357 firearms.  *Id*. at 363–64.  Finally, Willmer testified that that the list of firearms that could have fired the bullets in GX 23 was not all inclusive—there could be other firearms not listed that could have fired the bullets in this case.  *Id*. at 369–70.

The gravamen of Runyon's claim is that trial counsel was ineffective for failing to challenge Willmer's testimony as exaggerated, inaccurate or misleading.  First, there was nothing unreliable in the scientific validity of Willmer's testimony.  Runyon offers no study or

---

[2] In addition to his independent examination of the bullets and bullet jacket, Willmer relied on the analysis completed by another forensic expert.  *See* TT, pgs. 359–60; GX 23.

evidence that rebuts the validity of the analysis that Willmer or other experts performed on the bullets. Second, there was nothing misleading about Willmer's analysis or testimony. Runyon contends that the list of firearms that could have fired the bullets only named Astra and Llama brand firearms. ECF 511, pg. 32. But Willmer testified that the list was not all-inclusive. TT, pg. 370. Moreover, the list in GX 23 does include the Taurus brand firearm as producing the general rifling characteristics like those present on the recovered bullets.

Given this evidence, it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence. Runyon offers no credible theory challenging Willmer's testimony. In addition, even without the ballistics evidence, the evidence of guilt against Runyon was overwhelming. *See Runyon*, 707 F.3d at 521 ("There is simply no question that Runyon fired five bullets into the body of an innocent naval officer—at close range and in cold blood.") Runyon fails to demonstrate that trial counsel fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. Likewise, Runyon fails to show prejudice resulting from counsel's alleged error. Given the mountain of evidence demonstrating guilt, Runyon cannot show a reasonable likelihood that the result of his trial would have been different had trial counsel more fully challenged the ballistics evidence. This claim should be denied.

**Claim 4:**     **Trial Counsel did not provide ineffective assistance to Runyon by failing to advocate on his behalf at the eligibility phase of the trial.**

Runyon claims that trial counsel failed to advocate for him at the eligibility phase by failing to address the relevant issue, and otherwise failing to discuss established facts that weighed against the aggravating factor of substantial planning. As with his other claims, Runyon cannot establish that his counsel provided less than adequate representation in his argument. Moreover, the evidence of Runyon's eligibility for the death penalty was overwhelming, such

36

that he cannot establish that the outcome would have been different even had trial counsel advocated in a different manner.

As Runyon indicates and as outlined above, the guilt and sentencing proceedings were trifurcated, such that the eligibility and penalty phases were separated into two distinct proceedings. A defendant is not eligible for a death sentence unless certain statutory criteria are satisfied. First, the government must prove beyond a reasonable doubt that the defendant was more than 18 years old at the time of the murder and that the defendant acted with any one of four mental states specified in the FDPA. *See* 18 U.S.C. § 3591(a)(2)(A)-(D). Second, the government must prove beyond a reasonable doubt the existence of at least one statutory aggravating factor. *See* 18 U.S.C. § 3592(c)(1)-(16). In the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), all of these eligibility factors operate as the functional equivalent of elements of the offense and are treated as such. *United States v. Barnette*, 390 F.3d 775, 784 (4th Cir. 2004) ("the *Ring* Court made clear that when a statute requires the finding of an aggravating factor as a condition to imposition of the death penalty, the aggravating factor requirement functions as an element of the offense"), *vacated and remanded on other grounds*, 546 S. Ct. 803 (2005).

In this case, the gateway factors (also known as "threshold findings") consisted of the following:

(a).   The defendant was more than 18 years of age at the time of the murder. Section 3591(a);

(b).   The defendant, DAVID ANTHONY RUNYON, intentionally killed Cory Allen Voss. Section 3591(a)(2)(A);

(c).   The defendant, DAVID ANTHONY RUNYON, intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss. Section 3591(a)(2)(B);

(d).   The defendant, DAVID ANTHONY RUNYON, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

force would be used in connection with a person, other than one of the participants in the offense, and Cory Allen Voss died as a direct result of the act. Section 3591(a)(2)(C);

(e).    The defendant, DAVID ANTHONY RUNYON, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.  Section 3591(a)(2)(D).

The statutory aggravating factors consisted of the following:

(a).    The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, as consideration for the receipt, or in the expectation of the receipt, of anything of value.  Section 3592(c)(8).

(b).    The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, after substantial planning and premeditation to cause the death of a person.  Section 3592(c)(9).

Thus, for Runyon to be eligible for a death sentence, the jury had to find: (1) the defendant was more than 18 years old at the time that he killed Cory Voss; (2) at least one gateway factor; and (3) at least one statutory aggravating factor.

The United States had no additional evidence to present at the eligibility phase—all of the evidence that made Runyon eligible to be considered for the death penalty had been introduced at the guilt phase.  That evidence clearly established, as was required for the jury to find at the eligibility phase, that Runyon had deliberately shot and killed Cory Voss, and that he did so with the expectation of being paid after substantial planning had occurred.[3]

Runyon does not contest that the evidence was clear that he was over 18 and that he committed the offense in expectation of pecuniary gain.[4]  This intent finding and one statutory

---

[3] Oddly, in his argument in Claim 6, Runyon states that the jury could not have given much weight to the aggravating factors of pecuniary gain and substantial planning because such factors were inherent in the charged crime of murder for hire.  In that claim, at least, Runyon does not even challenge that these aggravating factors were not present.

[4] Runyon does make reference that counsel did not address the pecuniary gain aggravating circumstance in the eligibility phase.  ECF 511, pg. 38 n. 23.  Even assuming Runyon's footnote

aggravating factor alone would have been enough to render him eligible to face the death penalty. In arguing, however, that his trial counsel failed to discuss facts related to the substantial planning aggravating factor, Runyon relies not on the trial evidence, but on a letter sent to the United States in advance of trial requesting that the death penalty be withdrawn. ECF 511–15. This letter related to the relationship between Voss, Runyon and Draven and could be perhaps taken as an argument that the three were equally culpable—an argument that trial counsel successfully advanced at the penalty phase as a mitigating factor. It had little to do with the evidence introduced during trial that showed the substantial efforts by all three defendants to plan this murder.

Trial counsel did, in fact, urge the jury to look at the evidence anew and indicated that the guilty verdict could not be determinative in deciding whether Runyon was eligible for death. TT, p. 1772. Counsel stressed to the jury that a death sentence is never required and explained that this eligibility phase was a separate proceeding. Contrary to Runyon's current claims, however, his trial counsel made a strategic decision to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt. Counsel Woodward indicated that the theory of defense at the eligibility phase was to avoid alienating jurors. ECF 511–6, ¶ 10. Counsel recognized that Runyon was clearly eligible for the death penalty. After arguing that the evidence did not support his convictions, Runyon's trial counsel made the strategic decision to not make the same arguments to a jury that had already rejected them in finding Runyon guilty of the murder of Cory Voss. What counsel did do was start the foundation for its penalty phase argument. By arguing that the death penalty is never

---

constitutes an argument that counsel was ineffective, it fails because conclusory allegations without more do not warrant habeas relief. *See United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013).

required, Runyon's trial counsel was later able to argue that it was not required for someone like Runyon because he was not the worst of the worst.

Furthermore, notwithstanding any argument that counsel failed to make, the evidence of substantial planning and premeditation was overwhelming. In its argument at the eligibility phase, the United States reviewed the evidence on which the jury could determine that the substantial planning aggravating factor had been proven beyond a reasonable doubt. Such planning was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death. This conspiracy began months prior to the actual murder; Runyon and Draven met in February and March 2007 at Parexel drug studies in Baltimore, Maryland; phone calls between Runyon, Draven and Voss occurred in March-April 2007, including an 88 minute call between Runyon and Voss; days before the murder Voss opened an LFCU bank account with a secluded drive through ATM; the murder occurred right in the middle of a Runyon drug study where he was supposed to be out of town; a list of items was seized from Runyon's residence with the address of LFCU; a week before the murder, Runyon makes plans to buy a gun from George Koski; the planned use of pay phones on the day of the murder; the six-hour drive from West Virginia to Newport News; the fact that after the murder Runyon purchased a bore brush to scope out the .357 firearm; the map of the murder location found in Runyon's vehicle; the effort to make the crime look like a random act of violence by trying to get Cory to make ATM withdrawals. TT, pgs. 1763-1767.

In addition to instructing the jury that the government had to prove each aggravating factor beyond a reasonable doubt, the Court instructed the jury with respect to the substantial planning aggravating factor as follows:

> The government has alleged that the defendant killed Cory Allen Voss after substantial planning and premeditation. Again, the government must prove these factors to your

40

unanimous satisfaction and beyond a reasonable doubt. The words "substantial planning and premeditation" should be given their ordinary everyday meaning.

"Planning" means mentally formulating a method for doing something or achieving some end. "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand.

"Substantial planning and premeditation" means a considerable or significant amount of planning and premeditation. The fact that the killing occurred does not satisfy this requirement. However, the government need not prove that the defendant planned or deliberated for any particular period of time before killing the victim.

TT, pgs. 1787-1788.

Clearly, the evidence presented at trial overwhelmingly supported this aggravating factor. The jury found it beyond a reasonable doubt on all three counts of conviction.  ECF 255.  Thus, in view of the extensive amount of evidence of planning in this crime, and the standard the government had to meet, Runyon cannot show a reasonable probability that the jury's decision would have been different in the eligibility phase had his trial counsel adopted a more adversarial posture.

**Claim 5:**          **Trial counsel was not ineffective for failing to raise a claim that Runyon was not competent to stand trial.**

Runyon next alleges that his trial counsel was ineffective for failing to investigate, discover, and present evidence that Runyon was incompetent to stand trial.  Specifically, Runyon asserts that trial counsel should have filed a motion for a hearing to determine his mental competency, pursuant to 18 U.S.C. §4241(a).  Runyon's claim fails under *Strickland v. Washington*, 466 U.S. 668 (1984) and should be denied.[5]

---

[5] Both Claims 5 and 6 relate to Runyon's mental health and what steps trial counsel took to investigate before trial and the sentencing phase.  In its response to Claim 6, the United States sets forth a more comprehensive recitation of the actions taken by counsel with respect to a mental health mitigation investigation.  Many of these actions also address Runyon's claim that his counsel failed in not seeking a competency evaluation.

As stated above, to prevail on a claim of ineffective assistance, the petitioner must satisfy the two-pronged test set forth in *Strickland.*  First, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Bacon v. Lee*, 225 F.3d 470, 489 (4th Cir. 2000), *cert. denied*, 532 U.S. 950 (2001) (quoting *Strickland*, 466 U.S. at 688 (1984)).  Petitioner's counsel is entitled to a "strong presumption" that his or her strategy and tactics at trial fell "within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  The objectiveness of counsel's assistance should be based on his or her perspective at the time of the alleged error, under a "highly deferential" standard.  *Id.*

Second, Petitioner must prove prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  *Id.* at 694. A petitioner's failure to show either of the two prongs makes it unnecessary for the court to consider the remaining requirement.  *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004), *cert. denied*, 546 U.S. 810 (2005) (citing *Williams v. Kelly*, 816 F.2d 939, 946-47 (4th Cir. 1987)).

The burden is on Petitioner to "identify acts or omissions of counsel" that are alleged to be unreasonable.  *Strickland*, 466 U.S. at 690.  A reviewing court must then determine whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland* does not require lawyers to pursue frivolous legal avenues that have no merit in order to build a record that would fend off future claims of ineffective assistance.  An attorney is not required to advance frivolous claims and may in fact commit an ethical violation by doing so.  *See Virginia Rules of Professional Conduct* R 3.1 (an attorney may not assert a frivolous claim or issue).

42

None of these situations is present in the instant case. Counsel's conduct during the trial satisfied the "highly deferential" standard of attorney conduct. *Roane*, 378 F.3d at 404-05 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689).

> A.    Counsel's representation did not fall below an objective standard of reasonableness because counsel investigated petitioner's mental status.

In *Wood v. Zahradnick*, the court stated that "counsel has an affirmative obligation to make further inquiry" where she has facts known and available that raise a reasonable doubt as to a defendant's mental condition. 430 F. Supp. 107, 111 (E.D. Va. 1977), *aff'd* 578 F.2d 980 (4th Cir. 1978). In that case, where a man raped and robbed a 67-year old woman for no apparent reason, the "crime itself was of such a bizarre nature as to call into question the petitioner's mental condition." *Id.* Defense counsel did not even take the first step of requesting a mental examination. *Id.* at 112. Thus, the court indicated that counsel's assistance was not "vigorous" enough. *Id.* Similarly, in *Becton v. Barnett*, the court stated that "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation." 920 F.2d 1190, 1193 (4th Cir. 1990). In that case, the defendant also committed a bizarre and senseless crime, but the record was "devoid of any investigation" into defendant's mental health. *Id.* Thus, the court concluded that counsel did not make a reasonable investigation. *See id.*

By extension, no finding of ineffectiveness will lie for failing to challenge a defendant's competence, if the record does not show that a reasonable attorney would have been on notice of a need to assess competence. *See Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999); *United States v. Rivas*, 862 F. Supp. 208, 212 (N.D. Ill. 1994). Here, Runyon's crime was not so bizarre as to immediately put counsel on notice that the defendant's mental condition was questionable. *See Wood*, 420 F. Supp at 111. Prior to trial, no mental health professional that evaluated

Runyon raised an issue as to his competence.  Furthermore, Runyon had regularly participated in drug studies, the records of which were made available to counsel in discovery.  The various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence.  *See infra* Response to Claim 6.

Nevertheless, Runyon's counsel did make a full examination for any identifiable mental health issues.  Attorney Hudgins looked for "an injury in Runyon's past that affected his reasoning ability."  Pet. Ex. 5, ¶ 5.  He also filed preliminary reports from Dr. Merikangas and Dr. Mirsky with the court.  Pet. Ex. 5, ¶ 6.  He even removed a mental health expert because he did not believe that that expert's opinions were favorable to the defense.  Pet. Ex. 5, ¶ 4.  Attorney Woodward recalled efforts to seek Runyon's military medical records and evidence of a serious car accident, but recalls that they could not verify that the car accident happened either through files or from speaking with Runyon's family.  Pet. Ex. 6, ¶ 5.  He also recalled that the defense "retained mental health experts to replace Dr. Nelson" and that "[t]hese experts evaluated Mr. Runyon."  Pet. Ex. 6, ¶ 13.  Unlike counsel in *Wood* and *Becton*, Mr. Woodward and Mr. Hudgins reasonably investigated Runyon's mental health.

The fact that counsel chose not to file a motion for a hearing to determine Runyon's mental competency is not *per se* evidence that they acted unreasonably, where the record shows that they reasonably investigated and considered the possibility that the defendant might have mental health issues, and there was nothing demonstrating that Runyon did not understand the charges against him or that he was unable to assist in his defense.  Runyon fails to present any evidence that trial counsels' representation fell outside of the wide range of reasonable professional assistance.  Counsel was not required to advance claims that they believed were frivolous.  Additionally, as set forth below in response to Claim 6, the information available to

44

counsel indicated that Runyon possessed above average intelligence and had no indication of mental illness.

      B.   Runyon provides no evidence that there is reasonable probability that, but for a lack of a 18 u.s.c. § 4241 hearing, the trial result would be different.

In *Becton*, the court ruled that the defendant was probably prejudiced, in part because the record showed that "counsel put forth no evidence at all in Becton's behalf." *Becton*, 920 F.2d at 1194. The court lamented that, "[h]ad counsel investigated Becton's mental capacity, he . . . may have been able to prove that Becton was not competent to stand trial." *Id.* In *Mann v. United States*, 66 F.Supp.3d 728, 739 (E.D. Va. 2014), the court ruled that, given "numerous indicators of petitioner's competence," the petitioner could not "demonstrate a reasonable probability that he would have been declared incompetent to stand trial had Counsel moved for a hearing pursuant to 18 U.S.C. § 4241 to determine petitioner's competence . . ." In that case, some indicators that the petitioner was competent included that "petitioner's crime was not bizarre . . . petitioner [did] [not] exhibit withdrawal symptoms . . . or unresponsiveness to Counsel's questions in the preparation of his case." *Id.* at 738.

In the instant case, Runyon's contracted murder of Cory Voss for expected payment, although cruel and calculating, could hardly be classified as bizarre. It was driven by greed on the part of Runyon and planned to appear as a random act of violence with no physical evidence left behind. Runyon provides no evidence that he exhibited withdrawal symptoms throughout the trial, nor does he provide evidence that he was unresponsive to Counsel's questions. Runyon relies on his disordered thoughts and "somewhat grandiose" statements as the only evidence that the Court would rule that he was unfit to stand trial. *See* ECF 511, at 38–39. But neither the declarations from his counsel, the various statements and testimony from friends and family that averred to his intelligence, nor Court's own interactions with Runyon support any indication that

45

a competency exam was required. Runyon had a history of attending various institutions, completing assignments in the military and had worked in various law enforcement capacities — in none of these settings, the records of which were fully available, was any issue raised as to his competency. In fact, as set forth below in response to Claim 6, Runyon was found by all who examined him to be an individual of above average intelligence with a high verbal IQ.

Runyon references *United States v. White* and *United States v. Culp* as examples of cases where delusional and grandiose thinking were grounds to find a defendant incompetent. ECF 511, at 40. A closer look at these cases, however, shows that the proof of incompetence is not comparable to the proof of alleged incompetence in the present case. In *White*, the defendant's doctors found her not competent to stand trial in their preliminary psychological evaluations. *United States v. White*, 620 F.3d 401, 405 (4th Cir. 2010). In the present case, there is no evidence that any of the doctors, either on the side of the defense or the prosecution, stated that Runyon was not competent to stand trial in any of what appears to be numerous evaluations. Additionally, in *White*, the defendant believed that she had cured AIDS and breast cancer. *Id.* at 406. This clear delusion seems far more clearly indicative of a mental health issue than Runyon's mere comparisons of himself to great historical figures. Similarly, in *Culp*, the defendant was diagnosed with paranoid schizophrenia and an independent psychiatrist appointed by the court stated that "he became very psychotic without medication." *United States v. Culp*, 1991 U.S. App. LEXIS 5715 at *3 (4th Cir. N.C. Apr. 9, 1991). The fact that Petitioner might "suffer from delusions" or "grandiose wishful thinking" does not equate him to a paranoid schizophrenic.

Lastly, Petitioner also relies on the standard in *Dusky v. United States* as evidence that he would have been deemed incompetent to stand trial. *See* ECF 511, at 40. The Fourth Circuit has

ruled, however, that "reliance on *Dusky* is misplaced in the context of an ineffective assistance of counsel case." *Becton*, 920 F.2d at 1193. Petitioner has failed to provide any evidence that a reasonable probability exists that the outcome of his case would have been different but for counsel's alleged unreasonably ineffective assistance.

Furthermore, as more fully discussed below, the evidence available at the time of trial precludes Runyon from establishing that he was prejudiced by his attorneys' failure to challenge his competence. Given Runyon's demeanor and ability to effectively assist his lawyers with such matters as composing examination and choosing witnesses, he cannot show that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings." *Walker v. Gibson*, 228 F.3d 1217, 1231 (10th Cir. 2000) (internal quotes omitted), *abrogated on other grounds in Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). Because Runyon cannot show any reasonable likelihood that the outcome of his trial was affected by his attorneys' omission of any challenge to his competence, he cannot show prejudicial ineffectiveness. *Id.* In short, Runyon's claim fails both prongs of *Strickland* and should be denied.

**Claim 6**:  **Trial counsel was not ineffective in failing to investigate and present mental health mitigation evidence.**

In this claim, Runyon primarily contends that his trial counsel provided ineffective assistance in the penalty phase of his sentencing by: (1) failing to subject the prosecution's case to adversarial testing when evidence was not presented to counter the aggravating factors; and (2) failing to offer evidence of traumatic brain damage and mental illness.[6] He claims that his counsel's inadequacy had a pervasive effect because counsel also failed to challenge the application of the death penalty and failed to ensure Runyon's competence at trial—challenges

---

[6] Other than grammatical, sentence structure and word choice edits, this claim remains unchanged from the original § 2255 motion.

he raises in Claims 13, 14 and 5. In making this claim, Runyon faults his trial counsel for not pursuing a strategy largely based on mental health related or psychosocial evidence that would have been duplicative of evidence already presented at sentencing, or was uncovered after his sentencing and of undetermined weight and admissibility at the penalty phase. There is no objective evidence, however, that this proposed strategy offered any greater promise than defense counsel's chosen course at Runyon's sentencing.

In this case, trial counsel's mitigation strategy at sentencing focused on: (1) the conspirators (Voss and Draven) that were equally culpable in the offense, but were not subject to the death penalty; (2) that Runyon had done decent things in his past and was of good character such that he was not the "worst of the worst;" and (3) that Runyon would not be a risk of future violence in prison. The jury accepted the first two approaches, but rejected the third, in part, based on the paucity of information offered by the testifying deputies contrasted with the evidence of a jail assault orchestrated by Runyon and also based on a complete rejection of Dr. Cunningham's testimony (upon whom Runyon now relies heavily). Defense counsel's approach led to most or all of the jury finding eight of the thirteen mitigating factors proffered and offering three of their own additional mitigators. The mental health evidence proffered in the Petition was either considered by counsel or not available at the time of the sentencing hearing. Moreover, the information that *was* available indicated that Runyon did not suffer from any mental health issues that would have been of useful mitigation value when balanced against his counsel's chosen strategy at the sentencing hearing.

The fact that defense counsel did not prevail in avoiding a death sentence does not transform its chosen mitigation strategy into ineffective assistance. *See Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction

48

or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) (noting that, to pursue a particular theory at sentencing, though it may ultimately fail, often "reflects not incompetence, but rather a sound strategic choice.")  For the following reasons, Runyon cannot meet his burden on either prong of the *Strickland* test.

> I.    Legal Standards

This claim is governed by the highly deferential standard announced in *Strickland v. Washington*.   As stated above, Runyon must demonstrate that his trial counsel performed deficiently and that he suffered prejudice as a result of counsel's alleged error.  In evaluating an ineffective assistance claim, particularly this claim, this Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  In doing so, *Strickland* requires reviewing courts to be "highly deferential" to attorneys' strategic choices to avoid the "distorting effects of hindsight."  *Strickland*, 466 U.S. at 689.  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  *Id.* 688-89; *see also Lovitt*, 403 F.3d at 179 (4th Cir. 2005) ("In many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice.")

"*Strickland* does not require defense counsel 'to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'"  *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (quoting *Wiggins v. Smith*, 539

U.S. 510, 533 (2003)).  Counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691; *see Wiggins*, 539 U.S. at 533.  Even when the record fails to explain all of trial counsels' decision making, Runyon "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Bell v. Cone*, 535 U.S. 685, 698 (2002)

Runyon's counsel, of course, had a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987).  "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct."  *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006).  The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted).  Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to

50

investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

"Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91). Investigations into mitigating evidence should involve efforts to "discover all reasonably available mitigating evidence." *Wiggins*, 539. U.S. at 524.

In this case, as will be recounted herein, counsel did just that—employing mental health experts, attempting to find records, obtaining additional tests. Clearly, counsel considered and made all reasonably available inquiry into Runyon's mental health condition. Contrary to other reported cases where counsel ignored red flags and failed to investigate mental health evidence (*Gray*, 529 F.3d at 229; *Rompilla v. Beard*, 545 U.S. 374 (2005)) counsel actively investigated an area of mitigation that did not result in any significant evidence of mental impairment.

Additionally, "[n]o *per se* rule requires the presentment of such evidence at trial. In fact, there are many strategically valid reasons why defense counsel may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a "flight into theory" without proper grounding in the facts of the case." *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007) ("No *per se* rule requires the presentment of [mental health mitigation] evidence at trial.").

In terms of *Strickland's* second prong, Runyon must show a reasonable probability that counsel's deficient performance prejudiced the outcome of the case. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

51

*Id.* In a case involving failure to investigate mitigation evidence, prejudice occurs when "the likelihood of a different result if the [missing] evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694).

      II.     <u>Trial counsel was not ineffective for failing to investigate mental health.</u>

      A.     <u>Trial counsel conducted a thorough mental health investigation.</u>

Runyon claims that attorney Stephen Hudgins appeared too late in the case to effectively investigate mitigation and also claims that Hudgins abandoned the investigation following the guilt phase. The record belies these claims. Hudgins was not starting a mitigation investigation anew. He was building upon the substantial work done by attorney Babineau, as recognized by the Court in its orders related to the requests for a continuance. Hudgins effectively built on this work, finding new experts, arranging for Runyon to be examined, and continuing to try and find medical records in advance of the sentencing phase. This effort continued beyond the guilt and eligibility phases through to the penalty phase.

The record, including the exhibits presented by Runyon in the Petition, reveals that counsel took reasonable steps to investigate and discover evidence regarding Runyon's mental health condition. There were no signs from Runyon that would have alerted his counsel at the time of sentencing to a contrast with the various expert reports that he had no mental disease. Trial counsel cannot be held accountable for relying on experts after providing them sufficient evidence. *See Bell v. Thompson*, 545 U.S. 794, 810 (2005). Thus, "[t]his is not a case in which the defendants attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have

obtained[.]" *Van Hook*, 558 U.S. 4, 11 (2009).  As set forth herein, the information at hand at the time of the sentencing hearing did not reveal of mitigation defense based on mental health.

The procedural record of the case reveals the various documented steps that counsel took to examine Runyon's mental health.  Shortly after the indictment of Runyon, the government filed a motion regarding mental health evidence, to which Runyon responded.  ECF 46, 52.  This motion came for a hearing before the court on May 30, 2008.  Thereafter, on June 16, 2008, the Court entered orders, agreed to by counsel for all three defendants, setting forth a comprehensive scheme for mental health testing and the notice to be provided by the parties. ECF 66, 67.

The order required the defendants to provide written notice not later than 90 days prior to the commencement of jury selection that a particular defendant intended to introduce expert mental health evidence at the penalty phase.  The order also indicated that a defendant's failure to provide the required notice could result in the forfeiture of the right to present mental health testimony at trial.

On December 12, 2008, approximately three months prior to the initial trial date of March 13, 2009, and prior to the substitution of attorney Hudgins for attorney Babineau, Runyon filed the required notice and indicated that two mental health experts, Dr. Evan Nelson, a licensed clinical psychologist and Dr. Mark Cunningham, also a licensed clinical psychologist, might be used by the defense at trial.  ECF 135.  In this December 12, 2008 notice, Runyon also referred to an unnamed neuropsychologist for which Runyon sought Court approval.  No mention was made of the need for a psychiatrist or a neurologist.  It is apparent that Dr. Nelson did examine Runyon and the result was not favorable, however, no report was ever provided and no indication was made as to the length or number of sessions Runyon had with him.

53

Based on Runyon's notice, the United States retained its own mental health experts and proceeded to have these experts examine Runyon in February 2009. All of Runyon's background materials in the possession of the government, relating to Runyon's employment and education, were also provided to the government's experts. The reports of these examinations were then filed, under seal, with the Court prior to jury selection in accordance with the June 13, 2008 order. The government also caused the raw data from the examinations of its experts to be sent to Runyon's then designated experts.

On February 13, 2009, following a motion into a potential conflict of interest, attorney Babineau withdrew from the case. ECF 151, 154 and 155. On February 20, 2009, the Court appointed attorney Hudgins as Runyon's second attorney. ECF 161. Runyon moved to continue the trial date and, on March 13, 2009, the Court held a hearing on this motion. In the course of that hearing, attorney Lawrence Woodward represented that "Mr. Hudgins has been working assiduously going through the file with me and has met with the client since he got appointed," but that additional time was needed so he could get fully prepared. Mot. Hearing Tr., p. 7. All counsel had initially agreed on a trial date in September 2009. Though Woodward expressed concern about moving the date to June 2009, in part due to Hudgins' recent entry, the Court reviewed that Babineau had spent extensive time with the case prior to his withdrawal. Hudgins did indicate that he wanted to be sure he had adequate time to be prepared. The Court took counsels' views into consideration and set the trial date for June 30, 2009.

On April 8, 2009, Runyon filed a notice for additional mental health experts— neuropsychologist, Dr. Scott Bender, and a psychiatrist, Dr. Seymour Halleck. ECF 177. Runyon claimed that Dr. Bender would do psychological testing on the defendant, if deemed appropriate, once medical records of Runyon and his family were received for the time that

54

Runyon was in the Army and he and his mother were Army dependents.  The notice further advised that Dr. Halleck would review the defendant's medical records and conduct an interview of the defendant.  This notice for Dr. Halleck was the first indication that the defendant intended to utilize a psychiatrist.  Thus, after being appointed to the case for just six weeks, Hudgins had taken steps to preserve and investigate a possible mental health defense.

Thereafter, on April 13, 2009, Runyon filed a motion to continue the trial date. ECF No. 179.  In a 17-page pleading, attorney Hudgins addressed various issues related to the capital investigation.  Defense counsel was clearly aware of his duty to conduct a thorough investigation.  Hudgins requested a six-month extension to complete the investigation.  Hudgins also explained various issues with the mitigation investigation, revealing certain challenges, but also Hudgins' familiarity with the progress to date.  Hudgins expressed concern over the lack of medical records for Runyon and his mother.  ECF 179, p. 12.

In its response to the motion to continue, the government noted that it had provided voluminous background materials to Runyon's counsel, including school, employment and military records.  ECF 181.   The pre-indictment investigation conducted by the government did not reveal a background of abuse or hospitalization of the defendant, which appeared to serve as the justification for obtaining certain types of records.  *Id.*

On May 7, 2009, the Court denied the motion to continue.  ECF 194.  The Court recognized that arguments in favor of a continuance focused on the penalty phase, not the guilt/innocence phase.  The Court noted that previous counsel, attorney Babineau, had been paid "for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon relating to the penalty phases of the proceedings."  ECF 194, at note 4, 5.  The Court found the request of an additional six

months to be unsupported by the record of legal and investigative services claimed to have been rendered and reimbursed after Court review.    The Court denied the motion to continue, but indicated it would consider whether to continue any penalty phase hearings following the conclusion of the guilt/innocence phase.

On June 8, 2009, Runyon filed an *ex parte* Supplemental Motion for Psychiatrist and to Change the Designation of the Neuropsychologist Expert Previously approved by the Court. ECF 204.  The motion referenced continuing difficulty in obtaining medical records from the military.  The record is clear that counsel continuously attempted to obtain these records.  Even without the benefit of these records, and considering the nearness of the trial date, counsel took the effort to obtain additional mental health experts.

On June 29, 2009, one day prior to the start of jury selection, Runyon filed another notice for two replacement experts—Dr. Allan Mirsky, a neuropsychologist, and Dr. James Merikangas, a psychiatrist. ECF 230.  Runyon again claimed that both doctors would do testing and interviews of the defendant based upon the receipt of medical records.    The government understood that Dr. Mirsky was intended to substitute for Dr. Bender and that Dr. Merikangas was intended to substitute for Dr. Halleck.  On June 29 and 30, the government filed, under seal, the reports of its own retained experts—Dr. Raymond Patterson and Dr. Paul Montalbano.  ECF 276, 277.

On July 17, 2009, following the close of evidence in the guilt/innocence phase, Runyon filed a Supplemental Motion to Continue Capital Sentencing Hearing, as well as sealed exhibits in support of this motion. ECF 240, 241.  Attorney Hudgins requested at least 90 additional days to prepare for any penalty phase.  In support of this request, Hudgins asserted that: (1) a recent medical exam uncovered evidence suggesting the existence of a significant mental disorder that

56

bore a potentially strong relationship to defendant's behavior; and (2) that additional medical records had to be gathered and collateral investigation of the defendant's social and family history had to conducted. Hudgins also filed a Statement of Counsel, which provided additional details as to the status of the mental health investigation. ECF 242. Specifically, the Statement of Counsel noted that Runyon had been evaluated by neuropsychologist Dr. Mirsky and that such evaluation revealed a need for neurological testing and evaluation by a neurologist. Counsel noted that Dr. Merikangas, a psychiatrist, was also a neurologist that could perform both functions. Counsel noted that needed testing could be performed immediately.

On July 17, 2009, the jury returned its verdict. In conformance with the June 13, 2008, order regarding mental health related evidence, the Court directed that Runyon confirm or disavow his intent to use mental health evidence at the penalty phase by July 20, 2009. Thereafter, expert reports would be exchanged. On July 20, 2009, the sealed reports of Drs. Mirsky and Cunningham were filed with the Court. ECF 246. Also on July 20, 2009, Runyon renewed his recently filed motion to continue the penalty phase and filed a Notice of Intent to Introduce Mental Health Testimony. ECF 247, 248. The Notice advised that Runyon would rely on testimony from Dr. Cunningham, Dr. Mirsky and possibly Dr. Merikangas. Notably, the above-referenced filings were all made *prior* to the defendant's receipt of the reports of the government's experts. The government received these reports on July 21, 2009. ECF 250. Runyon received the reports of the government's experts on July 22, 2009. ECF 252.

The reports of Drs. Montalbano and Patterson, ECF 276 and 277, are certainly relevant both to the claimed mental issues Runyon currently faces and to trial counsel's decision not to proceed with a mental health defense beyond that offered by Dr. Cunningham (which was not based on an examination of Runyon). Had Runyon opened the door to a mental health defense,

57

the rebuttal mental health information offered by Drs. Montalbano and Patterson would have contrasted not only with that information, but also with other proposed mitigating factors that Runyon had offered, including that he had worked and been legally employed (Mitigator No. 2); committed acts of kindness and generosity (Mitigator No. 3); had demonstrated an ability to make a positive adjustment to incarceration, had the respect and support of correctional officers and did not present a risk of future violence (Mitigator No's. 6 – 8); served as a member of the U.S. Army and was honorably discharged (Mitigator No. 11); and took steps to further his education (Mitigator No. 12). ECF 285.

Dr. Montalbano conducted a forensic psychological evaluation of Runyon. ECF 277. His comprehensive 31 page report contained a detailed summary of records reviewed and sources of information, including consultation with Dr. Patterson and interviews and testing of Runyon for over 13 hours in February 2009. The report reviews psychosocial history, educational and occupational history, substance abuse history and medical and mental health history. The reports of prior car accidents and possible concussions are included.

Dr. Montalbano noted that Runyon displayed high average intellectual functioning and no significant evidence of any major mental disorders. Dr. Montalbano did note impairment associated with personality dysfunction and that the traits of such dysfunction predated a claimed car accident in 1996. Dr. Montalbano did discuss the reported car accident, but noted that the results of cognitive testing did not reveal significant cognitive impairment and there was no decline in general intelligence since the time of the claimed automobile accident. Intelligence testing at the time prior to trial revealed Runyon's full scale score to be in the 86th percentile, equating to a qualitative description of "high average." Of note, Runyon flatly denied any

58

involvement in the alleged offense to Dr. Montalbano.  He disagreed with any strategy to absolve him of responsibility or culpability for his actions.

Dr. Patterson produced a similarly extensive twenty-four page report dated June 24, 2009.  ECF 276.  This report also summarized the various sources of information and records reviewed by Dr. Patterson, as well as summaries of the offense, Runyon's background and psychosocial history.  The report contains a description and results of a February 4, 2009 psychiatric exam performed on Runyon by Dr. Patterson.  Runyon did report various concussive accidents to Dr. Patterson, but denied any ongoing treatment or that he suffered from any mental illness.  As with Dr. Montalbano, Runyon denied any participation in the murder of Cory Voss.  Runyon, in fact, distinguished the amount of planning involved in the crime with any prior episodes of short-term memory loss that he related to his prior accident.

Dr. Patterson reported that Runyon was properly oriented and his recall and attention span, ability to abstract and perception of reality were adequate.  Dr. Patterson concluded that Runyon did not suffer from any serious mental illness, mental disorder, or brain pathology and no mitigating or aggravating mental health factors existed.  Dr. Patterson further opined that Runyon met the criteria for a personality disorder with narcissistic features.  In terms of the self-reported history of concussions and short term memory problems, Dr. Patterson concluded that these issues did not represent serious or severe impairments suggestive of significant brain damage or dysfunction.

Both Drs. Montalbano and Patterson noted that Runyon had a history of not taking responsibility for his mistakes or misbehavior and that features of externalizing responsibilities are characteristic of narcissistic disorders.  Runyon also displayed a sense of entitlement and deserving of special consideration, related to his sense of honor.

In terms of defense expert reports released at this time, Dr. Cunningham's report, dated February 5, 2009, was directed toward a capital violence risk assessment for Runyon.  ECF 246. Dr. Cunningham opined that capital juries are prone to make inferences regarding future violence risk based on "perceived remorse" and "perceived personality pathology."  Thus, testimony from two government experts that Runyon failed to accept responsibility for his actions and had a personality disorder could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence.

Runyon's additional experts were not definite or consistent in determining that a mental health issue existed prior to sentencing.  Their reports were preliminary in nature and expressed a reliance on forthcoming brain testing, which would reveal no abnormalities.  Dr. Mirsky's June 26, 2009, six-page report revealed that a neuropsychological evaluation was performed on June 26, 2009.  ECF 246.  The report contained information concerning alleged incidents of close proximity grenade detonations and car accidents in 1990 and 1996.  Dr. Mirsky's report indicated that Runyon had superior cognitive skills and otherwise normal performance and the majority of tests administered by Dr. Mirsky noted normal to exceptional performance by Runyon.  Dr. Mirsky did note certain scores consistent with what he termed mild, diffuse brain damage—linked to problems persisting in attention demanding activity for sustained intervals. Such results did not occur in the post-sentencing testing done by Dr. Mirsky.  *See* ECF 511–35.

On July 2, 2009, Dr. Mirsky sent Hudgins a letter indicating that Runyon needed to be evaluated by a neurologist.  ECF 511–20.  Hudgins arranged for that to be done through Dr. Merikangas.  On July 22, 2009, the eligibility phase commenced and the jury determined that the defendant was eligible for consideration of the death penalty.  ECF 255.  Also on July 22, 2009, the Court issued an order granting the defendant's motion to continue the penalty phase for

approximately one month, until August 19, 2009.  ECF 254.  The Court also authorized the appointment of Dr. Merikangas and it was understood that Dr. Merikangas could start the evaluation immediately.  TT, p. 1800.  Additional deadlines were established for the receipt of Dr. Merikangas' report and any response or rebuttal by the United States.  TT, p. 1801.

On the same day as the verdict in the eligibility phase was returned, attorney Hudgins sent an email to Dr. Mirsky regarding the schedule of the next phase of the sentencing proceedings.  ECF 511–21.  Dr. Mirsky responded to Hudgins, reiterating the information in his prior report and claiming that "because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrier [sic], and this should be considered in his sentencing."  *Id.*

On August 6, 2009, the United States was provided with a page and a half report by Dr. Merikangas, who conducted a neurological and psychiatric evaluation of the defendant.  ECF 263.  Although Dr. Merikangas did indicate that he was awaiting results of an MRI and a PET scan, he opined that his psychiatric evaluation suggested that the defendant was suffering from the effects of, or withdrawal from experimental drugs and that the defendant is either in a fantasy world of "grandiose wishful thinking, or suffering from delusions."  No discussion of the psychiatric evaluation was provided and there was no basis provided for this opinion reached by Dr. Merikangas, who had been appointed as both a neurologist and a psychiatrist. Counsel for the United States made repeated inquiries for any underlying data that would support this psychiatric conclusion and received none.  ECF  273.  Dr. Merikangas indicated that a full report would follow results of brain imaging, however, the United States never received any such report.  In conclusive fashion, Dr. Merikangas stated that Runyon "clearly has impaired executive functioning suggestive of frontal lobe brain impairment."  Similarly, Dr. Mirsky, in his report received by the United States after the conclusion of the guilt phase, indicated that he awaited

not only neurological test results, but the results of psychological tests administered by Dr. Montalbano, the psychologist retained by the United States.  These results were provided to Dr. Mirsky prior to August 6, 2009; however, Dr. Mirsky did not supplement his report by that date.[7]

On August 10, 2009, Runyon filed a Motion to Allow Defendant to Supplement his Mental Health Reports.  ECF  269.  Defendant contended that both Drs. Merikangas and Mirsky noted "deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury account for these deficiencies."  ECF 269, ¶ 1.  Also on August 10, 2009, Runyon filed a motion to take the testimony of Dr. Cunningham out of order.  ECF 270.  The Court granted this motion on August 13, 2009.  ECF 272.  On August 14, 2009, Runyon filed a motion to release the test results of the MRI and PET scan directly to counsel so that providing these materials to the defense expert could be expedited.  ECF. 274.  This motion was granted the same day.  ECF 275.  On August 17, 2009, the Court issued a sealed order on Runyon's motion to supplement his mental health reports.  ECF  278.

The parties also litigated the issue of the scope of Dr. Cunningham's testimony prior to the onset of the penalty phase.  ECF 267, 283.  This litigation resulted in rulings from the Court that limited the scope of Dr. Cunningham's testimony.  TT, pgs. 2076 – 2083.  Dr. Cunningham testified on behalf of Runyon as a board certified clinical and forensic psychologist.   His testimony took a number of hours and spanned over 100 pages of transcript.  TT, pgs. 2084 – 2192.

One of counsel's chosen mitigation strategies, shown through the testimony of Dr. Cunningham and that of various deputies at the Portsmouth City Jail where Runyon was housed

---

[7] It was clear that both Drs. Mirsky and Merikangas awaited the results of neurological testing before finalizing their reports.  The results of this testing, accomplished before the sentencing proceeding, revealed no abnormalities in the brain scans.  Pet. Br. at Ex. 22.  Counsel cannot be faulted for not investigating further once these normal results were obtained.

prior to trial, was to put forward positive prisoner evidence, i.e., that Runyon would be a low risk of violence were he to receive a sentence of life imprisonment.  Dr. Cunningham based this on the defendant's age, educational background (indicating that inmates who have at least a GED have better adjustments in prison, TT, p. 2132, and work history (gainful employment have a positive nonviolent adjustment). *Id.* at 2134.  Dr. Cunningham ultimately testified that the Runyon had a very low risk or serious violence in prison. *Id.* at 2158.  Dr. Cunningham did not testify as to his review of any mental health reports that had been done by other experts.

B.  <u>Trial counsel presented a mitigation case that countered the aggravating factors and did not include mental health mitigation of dubious value.</u>

Beyond the record establishing the investigative efforts counsel took and what related reports and evidence counsel had at the time of the sentencing hearing, the declarations submitted by Runyon's trial counsel affirm that an adequate mental health investigation was performed, as well as counsel's chosen mitigation strategy.  In his attached declaration to Runyon's Petition, attorney Hudgins claims that Runyon's thinking was very rigid—he adamantly asserted his innocence and would not plead guilty.  ECF 511–5, at ¶ 3.  Hudgins recounted that Dr. Evan Nelson had been hired prior to his appointment.  Dr. Nelson's opinions were not favorable to the defense and Hudgins decided a different expert was needed. *Id*. at ¶ 4.  Hudgins thereafter obtained Drs. Merikangas and Mirsky. *Id.*  Hudgins further recounts that he was looking for an injury in Runyon's past that affected his reasoning ability. *Id.* at ¶ 5.  Although Hudgins attempted to obtain medical reports documenting the claimed injuries, he was apparently not able to obtain such records. *Id.*   Hudgins' declaration further reveals that he worked with the mental health evidence in the interim between the eligibility and penalty phases

63

and filed preliminary reports of Dr. Merikangas and Dr. Mirsky.  Dr. Merikangas requested brain scans and the record is clear that Hudgins obtained such scans.  *Id.* at ¶ 6.[8]

In his declaration, attorney Woodward also confirmed that Runyon would not agree to plead guilty.  ECF 511–6, at ¶ 3.  Woodward indicated that the claimed car accident could not be verified and that Runyon's family did not know anything about it.  *Id.* at ¶ 5.  Additionally, military medical records were sought in the pretrial investigation.  *Id*.  Woodward also attested that prior attorney Babineau indicated that Dr. Nelson's report was not helpful and that the defense team decided not to use him.  *Id*. at ¶ 6.  Woodward also recalled that Drs. Patterson and Montalbano expressed the strong opinions that Runyon did not have any mental or emotional issues that would be mitigating.  *Id.* at ¶ 12.  Woodward indicated that the defense did retain mental health experts to replace Dr. Nelson and these experts evaluated Runyon.  *Id.*

Woodward's view was that the strongest arguments at closing were that it was not fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences and that family sympathy weighed in Runyon's favor.  *Id.* at ¶ 13.[9]  These two approaches, when combined with positive prisoner evidence that required the jury to find that Runyon would not be violent in prison, were the three-legged mitigation strategy chosen by Runyon's trial counsel for the penalty phase.  This was certainly reasonable in view of the lack of indication that Runyon was suffering from any mitigating mental illness.  Woodward and Hudgins were faced with three unfavorable expert reports—one performed by Dr. Nelson, a defense expert.  The report of Dr. Cunningham was based on factors that did not relate to mental

_____

[8] Although Hudgins indicates that he does not recall the results of such scans, the correspondence between Hudgins and Dr. Mirksy post-sentencing indicates that the scans revealed no abnormalities.  (ECF 511–22).

[9] Significantly, Woodward (and presumably Hudgins as well) were not advised as to the nature of the claims prior to making their declarations.  (ECF 511–6, at ¶ 17).  Thus, neither counsel was permitted to fully explain the mental health investigative steps taken or their chosen mitigation strategy in the view of the counterveiling reports from various experts.

health and may have been adversely impacted by its inclusion.  The reports of the other two experts were not consistent or complete and relied on pending brain scans that were read as normal.  Pet. Ex. 22.  Finally, the accidents claimed by Runyon as a basis for his head trauma could not be verified by family members or any medical records.  Thus, counsel had no basis for undertake additional investigation.  *See Bacon*, 224 F.3d at 481.

Investigator Shelia Cronin's observations of Runyon that he "often compared himself to great figures in history" and that he repeatedly "talked about how many lives he had saved" were consistent with the narcissistic personality features described by Drs. Patterson and Montalbano, which counsel certainly could have considered to be an untenable defense.  ECF 511–4, at ¶ 7.  Cronin also agreed that she did not obtain medical records from the civilian hospital where Runyon was treated after his auto accident.  *Id.* at ¶ 10.  Cronin did obtain Runyon's military medical records, although no timing is provided.  *Id.*

In addition to the declarations of Woodward, Hudgins and Cronin, Runyon also offers the February 10, 2009, letter from attorney Babineau to the United States, requesting that the notice of intent to seek the death penalty be withdrawn.  ECF 511–15.  Counsel reveals that Runyon was evaluated by a forensic psychologist and that "he was raised in an atmosphere of physical violence and emotional oppression, resulting in an adult individual who lacks the tools necessary to navigate society successfully."   ECF 511–2, p. 2.  Thus, these developmental factors were both known and put forward by counsel for Runyon.  Although attorney Babineau was involved in the mitigation investigation for over a year prior to his substitution, no declaration was submitted from him.  Thus, Runyon presents a somewhat incomplete picture of the efforts taken by his counsel.  He cannot rely upon an incomplete picture in claiming that counsel's performance was similarly incomplete.  That Runyon's counsel chose a strategy based on

65

different factors than currently highlighted by Runyon does not establish that counsel failed to consider such factors or that such factors would have resulted in a different outcome. "Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91).

In view of this available information, counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on the positive aspects of Runyon's character. Most of the mitigating factors focused on Runyon's work and educational history, his positive relationships with his parents and children. To this end, the mitigators proposed by Runyon were designed to address certain aggravating factors that had been put forward by the government.

For example, Runyon addressed the aggravating factor relating to his military and law enforcement service by showing his accomplishments in those fields and submitting mitigating factors based on his military service and education, which the jury found had been established. ECF 291, p. 4. Runyon called William Banks and Larry Eaglebear to testify as to Runyon's military background. TT, pgs. 2239-2274. Defense counsel attempted to show that Runyon had performed well in the military through the earning of various awards and testimony concerning his accomplishments. *Id*. at 2247–2253. One recommendation for award, dated August 25, 1997, that followed various claimed accidents and head injuries, stated that "Private First Class Runyon performed magnificently as a parachute packer by packing over 5,000 malfunction-free personal parachutes while assigned to the parachute pack platoon. His skills and attention to detail allowed over one thousand basic, airborne, jumpmaster, pathfinder, and ranger students to

safely complete their qualifying jumps." *Id*. at 2253;  Defense Trial Ex. 2E, admitted August 25, 2009, (penalty phase).

Various witnesses testified along with this strategy that Runyon was a good father and did other kind and generous acts, including working with a special needs child.  TT, pgs. 2267, 2281, 2320, 2490, 2512, 2516, 2521.  This served to establish mitigating factors and counter the aggravating factors related to Runyon's abuse of women, his lack of remorse and even the victim impact testimony related to Cory Voss.  Runyon called some eight witnesses to discuss his positive attributes.  One of the last witnesses described Runyon as having the characteristics of "patience" and that "[i]t was just he was helpful.  He wanted to do what he could for you.  He went over and above.  It was like he was living – it was like he was living his life in gratitude. He was a joy to have around.  Quiet.  Gentle.  Fun.  Generous.  Kind." *Id*. at 2524.  His son even authored a letter attesting to the great times he had with Runyon and asking the jury to spare his life.  *Id*. at 2516.    Various family witnesses also testified as to Runyon's family upbringing – including his mother, biological and adoptive fathers and his brother and former wife.

Thus, Runyon's counsel made a clear decision to present him as a family man of character in the hope that this would counter the aggravating evidence presented concerning his background.  In their opening to the penalty phase, counsel highlighted Runyon's 13-year old son.  *Id*. at 1817.  Counsel raised the question repeatedly as to whether Runyon's background – his military experience, his regular work history, his minimal criminal history, made him the worst of the worst such that the death penalty would be appropriate.  *Id*. at 1818–1820.  A significant portion of the mitigation case was also spent on his positive adjustment to incarceration.

In closing during the penalty phase, counsel for Runyon relied on the impact of the sentencing on his family and his son. *Id.* at 2640. Counsel discussed that Runyon had various friends who cared for him, that described his positive qualities, including how well he interacted with children. *Id.* at 2643–2645. Counsel for Runyon minimized problems with Runyon's employment – the same problems they now seek to highlight – claiming that being late to work should not result in a death sentence. *Id.* at 2650–2651. Counsel stated: "But again when you think about the magnitude of what you are being asked to do, what does that really have to do with anything, the fact that he couldn't hold a job or that would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job? I would submit to you that that is not something that you should consider at all. That has no bearing on distinguishing a person who receives a death sentence from someone who would not." *Id.* at 2651. Their theory of defense was that Runyon was a decent person who deserved mercy, not that he killed Cory Voss because of some mental illness or that any such problems with family or problems with focus should be considered in determining whether Runyon deserved the death penalty.

III.    Runyon's counsel did not fail to locate available evidence.

Runyon claims that his counsel failed to locate or focus on a series of items that would have compelled a more in-depth mental health mitigation defense. His claim in this regard is largely predicated on information that either was presented already, or was not in the possession of counsel. Hudgins and Cronin confirmed that sought after medical records could not be obtained, despite their continuing efforts and the record confirms this fact.

There is no indication that Runyon's trial counsel failed to take efforts to obtain the medical records that could have been provided to his medical experts and the experts for the

68

government.  There are no records supporting that Runyon experienced "blast injuries" while undergoing military training as he claims.  Although submitted military records reveal that Runyon reported an automobile accident in November 1996, there are no civilian medical records that reveal the extent of his injuries.   No head trauma or long term effects are revealed in the military medical records.  ECF 511–23.   Runyon reported that army medical personnel refused to talk to him about head pain and refused to do an MRI scan.  ECF 511–24.  This reported accident, on which Runyon bases his claim of head trauma, was certainly known at the time of trial.  Both Patterson and Montalbano found no permanent mental health effect from this accident.  ECF 276, 277.  Runyon does not link current lay opinion testimony to any mitigation other than the fact of the accident.  Again, brain scans at the time of sentencing were read as normal.  ECF 511–22.

Runyon does not address the fact that the medical records from various drug testing companies, including Kendall International, Bristol Myers-Squibb and Parexel, that were all produced in the course of discovery revealed no abnormalities.  Runyon reported no history of headaches, head trauma, delusions or any symptoms of psychological or neurological distress.  Entry, exit and duration exams confirmed this reporting.  Runyon had done various drugs tests for a period of years so his record was more developed that that of an average defendant.

The various employment records introduced into evidence similarly did not reveal any mental health issues.  Runyon's application to become a Georgia police officer included a physician's affidavit indicating he was free from physical, emotional or mental conditions.  This affidavit post-dated the reported 1996 car accident.  GX 320.

Runyon relies on his letters that contain grandiose claims of life saving conduct, but this

69

information was already contained in prosecution expert reports and the claim of saving lives contributed to an impression of Runyon as suffering from a personality disorder with narcissistic features. Runyon also introduces various jail medical records, which predated the prosecution expert reports and are similarly unavailing. No mental health interventions occurred and, in fact, Runyon presented several deputies that testified on his behalf at the penalty phase as to his good behavior. ECF 511–16.

The information as to Runyon's family background that he claims was not found was contained in some form in either the prior testimony of these family members or the reports of Drs. Montalbano and Patterson. Much of the information concerning the abusive behavior of family members was already presented at trial and the jury found that Runyon had been exposed to domestic violence. ECF 291. Various witnesses did testify to Runyon experiencing family violence and such information was already presented as a mitigating factor. The jury found various mitigating factors related to the violence Runyon experienced. ECF 291. Eleven jurors found that Runyon witnessed and experienced domestic violence and parental conflict until his mother and biological father separated. Jurors added that Runyon continued to witness and experience domestic violence and parental conflict and abuse from his mother and adoptive father. Thus, the jury was presented with this information about Runyon's background.

Runyon's current attempts to add to this are cumulative. In terms of the backgrounds of individual family members, Runyon's counsel attempted to have his mother describe her background, but as this was not relevant to mitigators pertaining to Runyon, the Court rightly sustained the government's objection in this regard. TT, pgs. 2412–2413.

Runyon also concludes that if his counsel had presented expert testimony, it would have established the statutory mitigating circumstances of "impaired capacity" and "disturbance."

70

Runyon is incorrect (1) that such mitigating circumstances would have been established and (2) that expert testimony at the time would have done so.  A review of the available reports reveals expressly to the contrary—that Runyon was of above average intelligence.  Moreover, such reports would have run contrary to the mitigation strategy chosen by Runyon's counsel.

The prosecution expert reports do contain repeated statements from Runyon in terms of his belief in his innocence, his views on women and various high-minded views of himself, the introduction of which certainly would have been at odds with the portrait that Runyon tried to paint through the testimony of his family and friends.  Runyon was administered intelligence testing prior to joining the military and Dr. Montalbano noted no significant decline in intelligence when the pre-military scores were compared with the 2009 scores.  ECF  277.

Dr. Nelson was the mental health expert that was retained to present a social history of Runyon.  Specifically, the notice regarding Nelson stated "The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning."  ECF 135.  By all accounts, however, the results of Dr. Nelson's review were not favorable to Runyon.

Both reports of Drs. Mirsky and Merikangas were preliminary in nature and neither expert produced any updated report until well after trial, even though the brain scans requested had been performed.  Counsel for Runyon, thus, was left with the prosecution expert reports and the very brief and preliminary reports of Drs. Mirsky and Merikangas, which were not further developed even after counsel requested and obtained permission to have neurological testing done and the results released to the defense experts.  As these reports hinged on brain scans that proved to be normal, Runyon's counsel cannot be faulted for not continuing to investigate a mitigation issue.

71

In his June 2009 report, Mirsky identified no deficits in functioning that would bear on mitigation in the face of the reports that counsel had received from the other experts.  ECF 246.  Mirsky's 2009 testing noted that Runyon had a Verbal IQ of 135 (very superior); that he had superior vocabulary, very superior memory for digit strings; very good visual motor coordination; superior conceptual skill; very good understanding of concepts and social practices and good general knowledge.  The results revealed fast scores of visual-spatial tasks, a normal score on test of ability to focus and superior verbal memory subtest scores.  Although Runyon reportedly did not perform well at tests of attention or concentration or manual dexterity, there is no explanation as to how these findings were proper mitigation factors.  Similarly, there is little doubt that the jury would have given these much weight given that the jury found the defendant had purposefully planned to kill and then killed Cory Voss.  Dr. Mirsky's 2009 conclusion noted "superior to very superior cognitive skills" a "high verbal IQ", strong performances on memory and ability to focus.  Dr. Mirsky only noted that the poor scores on sustained attention and manual dexterity would indicate that Runyon was unable to persist in any attention-demanding activity for a sustained interval and may explain uneven employment work history.

The more recent reports of the experts that rely on information and affidavits not available at the time of trial do not call into question the competence of Runyon's trial counsel in declining to pursue a mental health defense based on information available at the time.

Dr. Mirsky performed a second evaluation of Runyon on August 28, 2015, some six years past his sentencing.  ECF 511–35.  Much of the information in the seven-page report is a repeat of the June 26, 2009 report.  Although brain imaging scans were done in August 2009, the 2015 report does not refer to these and it is clear these were read as normal.  ECF 511–22.  In the Continuous Performance Test, which in 2009 Dr. Mirsky previously found to be consistent with

72

mild brain damage, Runyon improved to 100% correct. Despite the recorded improvements, Dr. Mirsky now adds a diagnosis of psychosis, possibly schizophrenia, to the prior diagnosis of brain damage and suggests that prior brain injuries contributed to an underlying psychotic disorder.

As discussed, evidence that Runyon was schizophrenic would have sharply contrasted with the portrait that the defense tried to portray at the sentencing hearing and on which the mitigating factors were based. If anything, Runyon appeared to improve many of his prior test scores that Dr. Mirsky found lacking and suggestive of brain disorder. These inconsistent reports over six years with varying diagnoses could have only caused the jury to doubt the legitimacy of the diagnoses. It does not appear that Dr. Mirsky administered the Purdue Pegboard test in 2015, the 2009 score on which he indicated was consistent with mild diffuse brain damage.

Dr. Merikangas provided a four-page declaration dated September 25, 2015, that claims he would have testified at trial in 2009 that Runyon was a brain damaged individual with migranious headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process. ECF 511–2. Dr. Merikangas does not reveal the basis for such opinion, particularly in contrast to his brief August 5, 2009 letter to counsel stating that Runyon was suffering from sort of delusions caused by his drug testing medication. Since that time, Dr. Merikangas reviewed additional information, including trial testimony and medical records. There is a reference to Even Nelson, Ph.D., whose notes or opinions were not provided to the government. In short, Dr. Merikangas' position has not appreciably changed since his initial report. ECF 263.

Dr. Cunningham provided an additional report as an exhibit to the Petition, now claiming that various developmental factors impacted Runyon's moral culpability. ECF 511–8. Dr. Cunningham did testify at trial and the jury rejected his testimony, finding that Runyon failed to

establish that he was not a risk of violent behavior.  ECF  291.  Moreover, many of the factors Dr. Cunningham now relies on—including Runyon's upbringing and family influences—were presented by family witnesses at trial.  Dr. Cunningham's review of records consist of materials that were not available to Runyon's counsel at the time of his sentencing or the trial testimony transcript (in which case, the jury heard from these witnesses and were in the position as they noted, to express their own mitigators).  ECF 511–8, ¶ 8.

Furthermore, Dr. Cunningham essentially attempts to usurp the function of the jury by opining that damaging or impairing factors reduced Runyon's moral culpability.  But this is not the role of any expert—to opine on whether Runyon is morally culpable such that his free will was diminished.  The jury already found that Runyon intentionally killed Cory Voss.  The jury also made findings on mitigation related to Runyon's upbringing and the abuse he witnessed and experienced.  Furthermore, Cunningham's proffered testimony that Runyon's moral culpability was lessened by developmental factors contrasts with (1) the fact that Runyon repeatedly denied any participation in the murder of Cory Voss and (2) the violence risk assessment on which Dr. Cunningham did testify.

The jury specifically found Runyon to be culpable in the manner that Dr. Cunningham resists: it found that Runyon intentionally killed Cory Allen Voss, that he did so for money, that he did so after substantial planning.  This is why the jury sentenced him to death.  It is difficult to imagine a murder that does not involve such a heightened degree of choice and planning. Additionally, Runyon does not establish that Cunningham's developmental report would have been admissible.

Finally, Runyon also attaches a report of a Dr. Dudley, based on an examination conducted in 2015, which indicates that Runyon had a difficult childhood and was exposed to

74

physical abuse.  ECF 511–29.  Such information was presented at the sentencing phase and associated mitigators were found by the jury.  ECF 291.  Rather than link Runyon's purported problems to the car accident and brain damage, as did the other examining experts, Dr. Dudley links Runyon's problems to his childhood, history of family mental disorders.  Dr. Dudley offers his opinion that Runyon is suffering from various ailments—PTSD, borderline personality disorder, schizoaffective disorder, bipolar type and neurocognitive disorder.  ECF 511–29, p. 14.  He indicates that given enough time and adequate records, these diagnoses would have been apparent prior to trial.

But other experts who had access to these same records offered different conclusions.  ECF 276, 277.  These diagnoses also fail to take into account that Runyon repeatedly denied any involvement in the crime so it is reasonable that his counsel would decline to offer evidence seemed designed to explain behavior that he denied committing.  A jury convicted Runyon of the cold-blooded murder of Cory Allen Voss.  Dr. Dudley's opinion (even if available) that Runyon suffered from a mental/emotional disturbance and his ability to conform to the requirements of the law is certainly at odds with this.  These opinions were also contrary to the many character witnesses called by his counsel.

Runyon's trial counsel did not fail to find information related to his mental health or psychosocial history.  To the extent it was mitigating, such information was put before the jury.  But counsel made the strategic decision not to proceed with mental health evidence that could have contrasted with his chosen mitigation strategy.  The evidence of personality disorder observed by Drs. Patterson and Montalbano would have been aggravating evidence against Runyon.  A decision not proceed with this approach was the result of "reasonable professional judgments."  *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 534.

IV.    Runyon cannot establish a reasonable probability that the outcome would have been different had his counsel introduced available mental health evidence.

Finally, Runyon can establish no prejudice from the claimed errors of counsel. Each category of evidence that Runyon faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). Considering this danger, even with the diagnoses proffered by Runyon, the Court must consider whether a reasonable attorney put that information before a jury. *See Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"). Much of the evidence Runyon faults his counsel for not presenting would have been double-edged in terms of mental health and/or duplicative of that already provided by various friends and relatives. Additionally, such evidence would likely have been contrary to the various mitigators focused on Runyon having a low risk of future violence and making a positive adjustment to incarceration.

Although Runyon now submits that such mitigation would have turned the tide in his favor, he cannot discount the substantial evidence in aggravation presented as a result of this calculated and cruel crime. These aggravators revealed a calculated crime, made possible by years of law enforcement and military experience that was born out of a desire for money.

In terms of the non-statutory aggravating factors, the victim impact evidence in the form of evidence from Cory Voss' parents, siblings, children and fellow service members was powerful. Also, the fact that Runyon used the training he received as a military service member

76

and law enforcement professional carried significant weight.  His history of abuse of women and his manipulation of Virginia Pina in trying to get her to recant her allegations of abuse displayed a character inconsistent with that testified to by his friends and family.  Finally, the lack of remorse demonstrated not only by his interrogation video, but by his statements to others and in the course of various emails and phone conversations revealed his culpable mental state while committing this crime. When a person kills someone coolly, calmly, and without any concern or care, this is morally aggravating and informative about the mental state at the time of crime. Runyon fails to show how the mental health evidence he has uncovered would have impacted these non-statutory aggravating factors, which the jury found beyond a reasonable doubt.

Furthermore, evidence concerning Runyon's mental health may have discounted the mitigating factors concerning Runyon's prior acts of kindness and generosity; his prior work, military and educational experience, and the impression that Cory Voss was molesting his daughter.  Thus, five out of the eleven found factors could have been affected.  Any such mental health evidence would have also made clear that Runyon denied any participation in the plot to kill Cory Voss.  Even crediting the evidence presented now would not have mitigated his crime. Runyon relies on indications that he lacked impulse control or had PTSD stemming from various head injuries.  There is no tie in to how this mitigates Runyon's participation as a contract killer that planned the execution of Cory Voss and then schemed to avoid apprehension.  The behavior was criminal, not clinical.

Runyon summarily concludes that mental health mitigation made the difference between a life sentence and that imposed by the jury.  There is no merit to this contention.  The aggravators found by the jury related to the degree of planning and skill employed by Runyon—a documented and trained military service member, police officer and corrections employee.

77

This was a planned and purposeful murder. Runyon was contacted well in advance, planned his trip, what equipment he would bring, the firearm he would use, and further planned the concealment of the evidence after the crime. Runyon had consistently denied guilt. A strategy that attempted to somehow attribute his participation in a crime he never admitted to mental health would have run the risk of further offending the jury.

Defense counsel fully and adequately investigated Runyon's mental health background and it was not error for counsel to forgo available information to this end in favor of a strategy that highlighted the positive attributes of Runyon's character. Moreover, he cannot establish a reasonable probability that had mental health evidence played a larger role at sentencing, the outcome would have been different. It is clear that the jury viewed Runyon as a calculating, remorseless killer. While the jury did find and consider certain positive attributes of Runyon's character, Runyon has not shown how a mental health defense that would have opened the door to even greater rebuttal showing him to be a more dangerous individual would have resulted in a different sentence.

**Claim 7:**  **Runyon's Sixth Amendment rights were not violated by the presentation of statements from co-defendant Draven and his trial counsel did not fail to object to the admission of such statements.**

Runyon claims that his Sixth Amendment right to confront witnesses was violated when the government presented statements of co-defendant Draven in its case-in-chief.[10] As a corollary to this claim, Runyon claims that his trial counsel were ineffective in failing to object to the admission of such testimony and in failing to ask the Court for an appropriate limiting instruction. These related claims are without merit and afford Runyon no relief.

As a threshold matter, Runyon did not raise this claim in his appeal, thus, he is procedurally defaulted from doing so barring a showing of cause and prejudice, which he has not

---

[10] Runyon's claim here is unchanged from the claim filed in his original § 2255 motion.

78

made.  Moreover, as set forth below, Runyon is incorrect that his counsel failed to object to the admission of such statements, as these very statements to which he now objects were the subject of pre-trial motions raised by his trial counsel.

> A.     The statements of Draven did not violate Runyon's Sixth Amendment right to confront witnesses against him.

Runyon focuses on the pre-arrest, non-custodial statements that co-defendant Draven made to law enforcement, during the course of the conspiracy that continued through the investigation of the murder of Cory Voss.  The defendant claims that the introduction of such statements was in violation of *Crawford v. Washington*, 541 U.S. 36, 51 (2004).  The defendant also claims that his trial counsel failed to object to such statements.

The government offered Draven's pre-arrest statements made to law enforcement during the course of the investigation into the murder of Cory Voss under two complementing theories: (1) that such statements were made prior to arrest and in furtherance of the conspiracy; and/or (2) that such statements were not offered for the truth of the matter asserted.  The proof at trial established that an object of the conspiracy was for the conspirators to obtain the proceeds of the life insurance policy on Cory Voss.  It was a part of the conspiracy that the defendants used various methods to conceal the conspiracy and to insure the conspiracy's continuing success including obstructing justice, creating false alibis and providing false information to law enforcement.

Prior to indictment and while the investigation was ongoing, all three defendants made statements to law enforcement officers during the course of the investigation.  Draven, was interviewed three times. On two of those occasions, the interviews were non-custodial and prior to arrest. The final interview was custodial and post-arrest.  The pre-arrest statements that

Draven provided during the course of the investigation to law enforcement officers consisted of lies, sprinkled with some truths to try and persuasively obstruct the investigation.

In *Crawford v. Washington*, 541 U.S. 36 (2003), the Supreme Court ruled that testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and the defendant has had a prior opportunity to cross-examine the witness. 541 U.S. at 59. The Court also stated that co-conspirators statements made in furtherance of the conspiracy were not testimonial; "Most of the hearsay exceptions covered statements that by their nature were not testimonial- for example, business records or statements in furtherance of a conspiracy."  541 U.S. at 56.  Further, the Court stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  541 U.S. at 59 n. 9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Contrary to Runyon's claims then and now, the admission at trial of Draven's pre-arrest statements to law enforcement did not implicate *Bruton* or *Crawford.*  These statements were made during the course of the conspiracy and were, thus, properly admissible under Rule 801 (d)(2)(E) of the Federal Rules of Evidence . *See  United States v. Shores*, 33 F.3d 438 (4th Cir. 1994) ( "We have held, however, that the *Bruton* rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801 (d)(2)(E).") (citing *Folston V. Allsbrook*, 691 F.2d 184, 187 (4th Cir. 1982), *cert. denied*, 461 U.S. 939 (1983));  *see also Crawford*, 541 at 56 ( "Most of the hearsay exceptions covered statements that by their nature were not testimonial- for example, business records or statements in furtherance of a conspiracy.".)   Accordingly, the statements made by Draven during the course of the investigation were admissible and did not implicate *Bruton* or *Crawford* as they were made for

80

the purpose of accomplishing the object of the conspiracy, that is, obtaining the life insurance proceeds of Cory Voss.

Moreover, many of the statements made by all the defendants to law enforcement officers were not offered for the truth of the matter asserted, but to show defendants' efforts to mislead law enforcement and the nature of the relationships and activities of the defendants. As such, these statements did not implicate the Confrontation Clause. *Crawford*, 541 U.S. at 59 n. 9; *see also United States v. Williams*, 445 F.3d 724, 736 (4th Cir. 2006); *United States v. Stewart*, 433 F.3d 273, (2d Cir. 2006); *United States v. Postal*, 589 F.2d 862, 888 (5th Cir. 1979) (finding that nonhearsay statements survive *Bruton*).

Runyon, thus, confuses statements that are excluded under *Crawford* and the *Bruton* rule with statements made by non-testifying co-conspirators in furtherance of the conspiracy, which are admissible against all conspirators under Fed. R. Evid. 801(d)(2)(E). As Draven made these pre-arrest statements during the course and in furtherance of the conspiracy, *Bruton* is inapplicable, and the statements are fully admissible against the three defendants. *See United States v. Brooks*, 957 F.2d 1138, 1146 (4th Cir. 1992).

Even if *Bruton* did apply to these statements, Draven's express references to Runyon in the course of the pre-arrest did not violate *Bruton* because the references could not fairly be understood to incriminate Runyon. *See United States v. Locklear*, 24 F.3d 641, 646 (4th Cir. 1994) (observing that co-defendant's redacted statement could not fairly be understood to incriminate defendant Locklear, where in redacted statement co-defendant admitted "that he was familiar with the Locklear brothers and that he had known them all his life"). In fact, Draven was attempting to clear Runyon from suspicion the same way he was attempting to clear himself. Additionally, the fact that Draven admitted to having an affair with Voss did not directly

incriminate Runyon and, thus, raises no confrontation problem.  Runyon identifies no specific pre-arrest statements from Draven that directly incriminated him beyond the admission that Draven had an affair with Voss or that Draven spoke with Runyon at a payphone.  But this latter statement by Draven was not incriminating in and of itself—it only became incriminating when linked to other evidence.  *See United States v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010).

> B.      Runyon's counsel did object to the admission of Draven's statements in the course of pre-trial motions.

Contrary to Runyon's claim, his trial counsel *did* object to the admission of co-defendant Draven's statements.     Following the filing of a pre-trial motion objecting to the admission of the above-referenced statements, the matter was argued at a pretrial motions hearing on December 8, 2008.  The pre-arrest statements of both Draven and Voss were discussed and counsel rightly conceded that *Bruton* and *Crawford* were not implicated if the pre-arrest statements at issue were made in furtherance of the conspiracy.  Mot. Hearing Tr., Dec. 8, 2008, pgs. 8-9.  Following such argument, the Court determined that such statements were admissible as statements in furtherance of the conspiracy. *Id.* at p. 15. The Court further indicated that it would issue a limiting instruction if such an instruction proved necessary. *Id.* at p. 16.  The government agreed not to use and did not use Draven's post-arrest statements in its case-in-chief at trial.

During the course of trial, the government also filed a motion *in limine* to limit the defense from offering self-serving hearsay through the pre-arrest statements of the conspirators. ECF 238.  The Court denied this motion, thus, allowing the defendants the ability to elicit any portion of the pre-arrest statements in cross examination that was to the defendant's advantage. TT, pgs. 1293-1297.  Thus, Runyon was, in fact, permitted to use the pre-arrest statements to his own advantage at trial.

Prior to the testimony about Draven claiming he spoke to Runyon at a pay phone near the Waffle House, Detective Rilee testified that Runyon stated that he had visited Draven once in the spring of 2007 on his way to Florida and that they met at a Waffle House.  TT, pgs. 1311, 1313. Thus, the pay phone testimony from Draven linked to the prior admission from Runyon concerning a claimed innocent purpose for the meeting while Runyon was on a fishing trip. Following this interview with Runyon, law enforcement went back to interview Draven again. Draven denied that Runyon had ever visited him in Newport News, but claimed that he met him at a Waffle House in D.C.  TT, pgs. 1315-1316.  After being confronted with evidence of his relationship with Cat Voss, Draven acknowledged that he did have a relationship with her.  TT, p. 1320.

No prejudice accrued to Runyon from these statements as they did not directly incriminate him.  The evidence of such relationship was pervasive throughout the trial and this admission in no way prejudiced Runyon any more than all of the other evidence of the affair did. When confronted with a six-minute call to the Waffle House payphone, Draven admitted that he spoke to Runyon.  TT, p. 1321.  Following this testimony, counsel for Draven and Runyon then elicited various denials and explanations from both Draven and Runyon.  TT, pgs. 1328-1353. Specifically, counsel for Runyon elicited that in the first interview of Draven, there was no mention of Runyon.  TT, p. 1341.  Thus, counsel for Runyon utilized these pre-arrest statements of Draven to try and show an absence of relationship between the conspirators.

Finally, it was not an error for trial counsel to decline to request a limiting instruction that would have likely served to draw additional attention to the statements of Draven that trial counsel in fact made use of.  Runyon does not offer any such suggested limiting instruction in making this claim.

C.    The testimony of Edward Fodrey did not infringe upon Runyon's Sixth Amendment rights.

Runyon also claims that trial testimony by witness Edward Fodrey, regarding statements made by Draven, infringed upon Runyon's *Bruton* rights due to Runyon's inability to cross-examine Draven concerning the statements.  But Fodrey made no mention of Runyon in the course of his testimony that would arise to a Confrontation Clause violation.  Fodrey testified to admissions made by Draven while the two were incarcerated at Western Tidewater Regional Jail.  TT, p. 1233.  Fodrey testified that Draven told him "that he hired some other guy" that was "a friend of his, and - - that he found on the internet."  TT, pgs. 1236-1237.  There was no indication that this "guy" or "friend" was a redacted reference to Runyon absent other linking evidence.  Draven deal with various individuals on the internet and had reached out to others (including Charles Smith and Lawrence Ford) about the murder plot.  In fact, Fodrey testified that Draven tried to contact a number of people through the internet.  *Id*.

Thus, Even if the testimony of Fodrey contained a redacted reference to Runyon, there is no confrontation problem when a confession is redacted to eliminate any reference to the existence of  the defendant, *Richardson v Marsh*, 481 U.S. 200, 211 (1987) or "if the defendant's name is replaced by a symbol or neutral pronoun." *United States v Vogt*, 910 F.2d 1184, 1191-1192 (4th Cir. 1990).  The Fourth Circuit allows redacted statements that generally refer to another co-defendant  through symbols or neutral pronouns or phrases such as "another person" or "another individual" which do not facially implicate the defendant.  *United States v Akinkoye*, 185 F.3d192,198 (4th Cir.1999).  As there was no direct reference to Runyon, no *Bruton* error occurred.  *See Lighty*, 616 F.3d at 376 (indicating that if a proffered statement of one non-testifying co-defendant becomes incriminating against another by virtue of an inference from

other evidence at trial, the Confrontation Clause may not be offended if those statements are redacted).

**Claim 8:**    **Appellate counsel was not constitutionally ineffective for failing to raise a *Batson* challenge or Confrontation Clause challenge on direct appeal.**

Runyon contends that he received ineffective assistance of counsel during his direct appeal.  Specifically, he argues that his appellate counsel (1) failed to investigate and raise a *Batson*[11] challenge (*see* Claim 16), (2) failed to raise a Confrontation Clause challenge (*see* Claim 7), and (3) failed to use a smaller font in the opening brief which purportedly would have allowed more space in which to add claims in the opening brief.  *See Petitioner Brief* at 78–80. In his amended motion, Runyon adds claims of ineffective assistance of appellate counsel for claims 7, 11, 12, 13, 14, and 16.[12]  These added claims are time-barred and they do not relate back to Runyon's original claim of ineffective assistance of appellate counsel.  As explained below, Runyon fails to show either constitutionally deficient performance or prejudice resulting therefrom. Accordingly, he is not entitled to substantive relief or an evidentiary hearing or discovery on his claims.

A.    Legal Principles

1.    Statute of Limitations

Claims made in a § 2255 motion must be made within the one-year period required by 28 U.S.C. § 2255(f)(1) and (f)(3).  Specifically, § 2255(f) provides:

The limitation period shall run from the latest of—

(1)  the date on which the judgment of conviction becomes final;

---

[11] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[12] These added claims are made in a conclusory sentence without any additional argument.

(2)    the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

The one-year limitations period began on the date the Supreme Court denied Runyon's petition for writ of certiorari. *See United States v. Segers*, 271 F.3d 181, 184 (4th Cir. 2001). The Supreme Court denied Runyon's petition for writ of certiorari on October 6, 2014. *Runyon v. United States*, No. 13–254 (Oct. 6, 2014). Runyon filed his § 2255 motion on October 5, 2015. The additional claims of ineffective assistance of appellate counsel were not included in his timely original motion. They are thus now time-barred. Runyon fails to dispute, much less argue, that his claims are not untimely.

When claims in an amended pleading are barred by the statute of limitations, Fed. R. Civ. P. 15(c) "provides for the relation back of amendments to the original pleading under certain circumstances." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). Claims "relate back" when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Fed. R. Civ. P. 15(c)(2). Again, Runyon fails to address whether the claims of ineffective assistance of appellate counsel he raises here relate back to his contention in Claim 8.

These claims do not relate back to his claims of ineffective assistance of appellate counsel originally raised in Claim 8. In Claim 8, Runyon alleges that his appellate counsel were ineffective for failing to raise a *Batson* challenge, a Confrontation Clause claim, and for failing to use a smaller font in the appellate brief. ECF 478, pgs. 78–80. None of the added claims

relate to any issue that was raised originally in Claim 8. The claims are thus newly added and cannot be deemed timely. Moreover, even if the claims were timely, for the reasons stated in the United States' response to claims 7, 11, 12, 13, 14, and 16, Runyon is not entitled to relief on the merits.

    2.    <u>Runyon is not entitled to relief on the merits.</u>

The statute of limitation bar notwithstanding, Runyon fails to demonstrate he is entitled to relief on the merits. To show that counsel was ineffective on direct appeal, a defendant must show that counsel omitted issues that were clearly stronger than those presented. It is insufficient to show that counsel merely failed to raise a nonfrivolous issue. Counsel is more likely to be effective on appeal when he focuses on quality instead of quantity. As to prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 288 (2000); *Jones v. Barnes*, 463 U.S. 745, 753 (1983); *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008), (quoting *Strickland*, 466 U.S. at 689). In order to prevail, the defendant must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. A defendant alleging ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to prevail. *See United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004). Where a court finds that "the defendant makes an insufficient showing on one" of the prongs, consideration of the other is unnecessary. *Merzbacher v. Shearin*, 406 F.3d 356, 365–66 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 697).

In applying *Strickland* to claims of ineffective assistance of appellate counsel, the Fourth Circuit affords appellate counsel the "presumption that he decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1989). Effective

assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000), and the court "must accord [] counsel the presumption that he decided which issues were most likely to afford relief on appeal," *id*. internal quotation marks omitted).

In *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that due process of law requires that a defendant receive effective assistance of appellate counsel on direct appeal. Claims for ineffective assistance of appellate counsel, like those for trial counsel, are properly analyzed under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984); *Smith v. Murray,* 477 U.S. 527, 535–36 (1986) (applying *Strickland* to claim of attorney error on appeal). The Supreme Court, however, also has held that appellate counsel has no constitutional duty to raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The *Barnes* Court determined that appellate counsel must be allowed to exercise reasonable professional judgment in selecting those issues most promising for review. *Id*. at 752-53. The *Barnes* Court specifically stated that "[a] brief that raises every colorable issue runs the risk of burying good arguments...." *Id.* The professional judgment of appellate counsel includes the determination of which colorable claims to raise—counsel is not ineffective for failing to raise every colorable claim. *Id*. at 753–54; *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) (noting difficulty of proving claim of ineffective assistance of appellate counsel). Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case, and has therefore failed to show prejudice as required under the second prong of the *Strickland*. *See Griffin v. Aiken*, 775 F.2d 1226, 1235-36 (4th Cir. 1985).

        B.        Runyon cannot meet his burden under *Strickland v. Washington.*

        1.        Ineffective Assistance of Counsel for failing to raise *Batson* claim (Claim 16)[13].

Runyon contends that his appellate counsel were constitutionally ineffective for failing to raise a *Batson* challenge on direct appeal. He argues that appellate counsel were ineffective for failing to obtain the court record of juror strikes and copies of questionnaires of potential jurors in order to investigate *Batson* violations. *See Petitioner Brief* at 85. Runyon cannot show there is a reasonable probability that, but for counsel's unprofessional errors, the result of his trial would have been different.

As set forth in the Government's response to Claim 16, Runyon cannot show that appellate counsel's oversight to raise this claim on appeal amounted to constitutional ineffectiveness on the part of his appellate counsel because he cannot show deficient performance or prejudice stemming from their alleged failure to press any *Batson* claim. For the reasons set forth in the Government's response to Claim 16—that the alleged *Batson* challenge lacks any merit—Runyon fails to establish that his appellate counsel's failure to raise a *Batson* claim was deficient or that he suffered actual prejudice. Runyon fails to proffer any evidence of discriminatory intent on behalf of the United States, and any Batson claim would have lacked merit. Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Failure to raise a futile constitutional challenge did not violate Runyon's Sixth Amendment right to effective assistance. *See Higgs v. United States*, 711 F. Supp. 2d 479, 506 (D. Md. 2010).

---

[13] Claim 16, the substantive *Batson* challenge, is procedurally defaulted because Runyon failed to raise the claim below or on direct appeal. The Government's position in Claim 16 is that the claim has no merit in any event.

2.     Ineffective Assistance of Counsel for failing to raise a Confrontation ClauseClaim

Runyon contends that his appellate counsel were ineffective for failing to raise a Confrontation Clause challenge—the same challenge he raises in Claim 7 of his amended § 2255 motion. *See* ECF 511, pgs. 84–86. For the reasons stated in the Government's response to Claim 7, incorporated herein by reference, Runyon fails to show that his appellate counsel performed deficiently or that he suffered actual prejudice.

As stated in response to Claim 7, the statements made by co-defendant Draven that were admitted at trial did not implicate *Bruton* or *Crawford* and were properly admissible under Fed. R. Evid. 801(d)(2)(E). The Confrontation Clause issue Runyon alleges has no merit. As such, appellate counsel was not ineffective for failing to raise this issue on direct appeal. *See, e.g., Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome"). Runyon fails to demonstrate that he would have prevailed on this issue on direct appeal.

3.     Appellate counsel was not constitutionally ineffective for failing to use a different font in the opening brief on appeal.

Runyon argues that his appellate counsel were ineffective for failing to switch to a 14-point Garamond font in the opening brief on appeal. He contends that use of this font would have added space for approximately seven additional pages in which appellate counsel could have used for raising additional issues. As stated above, however, the additional issues Runyon suggests have no merit, therefore the use of a different font does not demonstrate he would have prevailed on appeal. Runyon fails to show actual prejudice and is not entitled to relief.

**Claim 9:**    **Runyon's conviction under 18 u.s.c. § 924(j) is not affected by the Supreme Court's decision in _Johnson v. United States_**

Runyon claims that in view of the Supreme Court's recent decision in _Johnson v. United States_, 135 S. Ct. 2551 (2015), that his conviction on Count Five for Murder in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j), is unconstitutional, because the predicate convictions underlying the Section 924(j) charge are not crimes of violence.  Runyon also attacks his sentence of death on Count One for Conspiracy to Commit Murder for Hire Resulting in Death, in violation of 18 U.S.C. § 1958(a), claiming that the evidence and arguments presented with respect to the Section 924(j) conviction painted an inappropriate picture of the conspiracy offense and contributed to the jury's sentencing decision on that charge.  As a threshold matter, Runyon has waived and/or procedurally defaulted in raising this claim.  In addition, relief here is barred under the non-retroactivity doctrine under _Teague_.  Even should the Court reach this claim on its merits, however, it is clear that Runyon is entitled to no relief.

At a threshold level, this claim should be dismissed as procedurally defaulted.  Runyon failed to raise this claim at any earlier stage of litigation and has failed to show "cause" and "prejudice" to excuse his default.  _Frady_, 456 U.S. at 170; _Coleman v. Thompson_, 501 U.S. 722, 753 (1991).  In addition, even if _Johnson_ applied here, Runyon would not be entitled to relief because his case is on collateral review.  _Teague_, 489 U.S. at 310.  Runyon's convictions and sentences were final as of October 6, 2014—prior to _Johnson_.  Moreover, the Supreme Court recently granted certiorari review in _Welch v. United States_, 15–6418 (cert. grant Jan. 8, 2014).  Runyon is not entitled to relief.

Count Five of the indictment charged Runyon with Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j).  The jury convicted the defendant of this charge and recommended the death penalty at the sentencing phase.  Section 924(j) requires that

91

the defendant cause the death of a person through the use a firearm during and in relation to a predicate crime of violence.  In this case, the predicate crimes of violence at issue were Conspiracy to Commit Murder for Hire Resulting in Death,  in violation of 18 U.S.C. § 1958(a), as charged in Count One, and Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2, as charged in Count Two.  In addition to the Section 924(j) conviction, the jury also convicted the defendant of both predicate crimes of violence.  Due to the additional element for both underlying crimes that death resulted, both predicate crimes were also eligible for the death penalty and the jury recommended the death penalty on Count One and a sentence of life imprisonment on Count Two.  18 U.S.C. §§ 1958(a), 2119.

Section 924(j) itself provides for an enhanced penalty for a violation of Section 924(c) when a defendant causes a death through the use of a firearm.  18 U.S.C. § 924(j).  If the killing is a murder, the maximum penalty is death.  Id.  Thus, to be convicted of a Section 924(j) charge, a defendant must commit a murder, using a firearm, in the course of a Section 924(c) violation.

Section 924(c)(3) defines "crime of violence" as an offense that is a felony and:

(A)     has an element the use, attempted use, or threatened use of physical force against the  person or property of another, or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Subsection (A) is often referred to as the "force clause;" with subsection (B) referred to as the "residual clause."   Relying on Johnson, which interpreted provisions of the similarly worded Armed Career Criminal Act (ACCA – Section 924(e)(2)(B)), Runyon first contends that the definition of "crime of violence" as contained in the residual clause is unconstitutional.  Of course, as set forth below, should the Court determine that the predicate crimes meet the crime of violence definition under the "force clause," the Court need not entertain this challenge to the

under the rubric of the residual clause. But the government submits that Johnson did not invalidate the residual clause.

I.      The Residual Clause of Section 924(c)(3)(B) survives Johnson.

Runyon contends that the residual clause cannot survive constitutional scrutiny because it requires the "ordinary case" analysis to assess the risk involved in a predicate offense—an analysis that the Supreme Court determined was unconstitutionally vague in Johnson. In Johnson, the Supreme Court held that ACCA's residual clause, i.e., the provision that defines a "violent felony" to include an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), is vague and "violates the Constitution's guarantee of due process." *See Johnson*, 135 S. Ct. at 2563. But a combination of factors not present in § 924(c)(3)(B) "conspired" to convince the Court in Johnson to find ACCA's residual clause vague. 135 S. Ct. at 2557.

The Court determined that the ACCA's residual clause "leaves grave uncertainty about how to estimate the risk posed by a crime." *Id.* at 2557. The Court also found that ACCA "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. In particular, the Court held that ACCA's structure "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes." *Id.* This approach was problematic because the degree of risk posed by the enumerated crimes was "'far from clear.'" *Id.* The Court was also concerned that the risk assessment was tied to considering risk in an "ordinary case," but without accounting for "real-world facts or statutory elements." *Id.* Additionally, the Court stressed that it had repeatedly attempted to craft a principled standard for the residual clause but had failed to do so, which further supported its vagueness. *Id.*

93

Importantly, *Johnson* concluded that "the uncertainties in [ACCA's] residual clause may be tolerable in isolation," but their presence together led the Court to its holding.  Id. at 2560. But unlike the ACCA's residual clause, § 924(c)(3)(B) contains no confusing list of enumerated offenses; it has been limited to a narrow risk of force during the commission of the offense; and the Supreme Court never has disagreed about its proper construction.

A.      The ordinary-case analysis does not itself invalidate § 924(c)(3)(B).

Runyon insists that the key to what makes § 924(c)(3)(B) impossibly vague is its reliance on courts evaluating the "ordinary case" of an offense.  *See, e.g., Avila*, 770 F.3d at 1107 (analyzing "ordinary case" under 18 U.S.C. § 16(b)); *United States v. Keelan*, 786 F.3d 865, 871 (11th Cir. 2015) (collecting cases).  The Ninth Circuit's opinion in *Dimaya v. Lynch*, 803 F.3d 1110, 1114–20 (9th Cir. 2015), invalidating § 16(b), also made this point central to its analysis.

But what Runyon and *Dimaya* fail to address is that courts at every sentencing must evaluate where a defendant's conduct falls on the spectrum of ways of committing the offense— and hence how a defendant's case compares to a norm.  Congress has commanded such an analysis under 18 U.S.C. § 3553(a) and in particular under § 3553(a)(6).  The Supreme Court has never suggested that there is a valid constitutional challenge to such statutory rules or the courts' application of them.  An inquiry about the risk that force will be used is not an unusual aspect of assessing the gravity of a crime.  And § 924(c)(3)(B) requires federal courts to evaluate federal offenses, a topic familiar to the judges who must apply the legal standard.  The problem also cannot be eliminated by claiming that § 3553(a)(6) simply asks courts to compare individual cases.  Rather, § 3553(a)(6) has long been applied using the general, abstract, and national standards—such as the U.S. Sentencing Guidelines.  See, e.g., *Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guideline

94

range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Indeed, the Fourth Circuit has repeatedly cautioned against drawing comparisons from a handful of cases because of the dangers that each case has its own unique characteristics, making them dissimilar. *See*, *e.g*., *United States v. Chandia*, 675 F.3d 329, 342 (4th Cir. 2012) (citing *United States v. Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008)). General standards and assessments of the ordinary case are indispensable.

Runyon does not contest, and *Johnson* requires finding, that the force clause of § 924(c)(3)(A) is constitutionally permissible. Thus, on Runyon's view, the force clause would be suddenly transformed into an unconstitutional provision if it were redrafted as follows: "An offense is a crime of violence if it is a felony and its elements involve the use of force, attempted use of force, threatened use of force, or substantial risk that force will be used." This straightforward inquiry is not difficult to apply to robbery offenses or other potential predicates for § 924(c) and encompasses the type of analysis that courts frequently perform.

> B.   The Supreme Court has not "repeatedly" failed to construe § 924(c)(3)(B) in a workable way.

*Johnson* emphasized its own "repeated" inability to develop a "principled and objective standard" for ACCA. 135 S. Ct. at 2558. This concern, absent here, further animated the Court's decision to find ACCA vague. *See id.* at 2559 (noting that Johnson was the Supreme Court's "fifth [case] about the meaning of the [ACCA] residual clause"); *see also Sykes v. United States*, 131 S. Ct. 2267, 2287 (2011) (Scalia, J., dissenting) (stating that the Court's repeated failure in addressing ACCA is "[w]hat sets ACCA apart" and "confirms" its vagueness). *Johnson* concluded that its ACCA decisions had been a "failed enterprise." 135 S. Ct. at 2560.

But the Court has rendered only one significant § 16(b) decision, which occurred over ten years ago and caused no controversy among the Justices. *See Leocal*, 543 U.S. at 1. In *Leocal,* a

95

unanimous Court expressed no uncertainty and had no difficulty in adopting an interpretive framework that identified one offense (burglary) as the "classic example" of a § 16(b) qualifying offense, and another (DUI) that was not.  *Id*. at 10.  The Court's analysis belies a claim that § 924(c)(3)(B) is too uncertain to be readily applied.

C.      Runyon has not shown the same degree of confusion by lower courts about Section 924(c)(3)(B) as about ACCA.

*Johnson* also observed that there were numerous lower court splits about "the nature of the inquiry" that a court should conduct under ACCA.  *Johnson,* 135 S. Ct. at 2560.  Significantly, the disagreements "went beyond matters of degree."  *Id.*  Runyon has not shown anywhere near the same level of confusion among lower courts about § 924(c)(3)(B) (or § 16(b)).

Moreover, "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."  *United States v. Petrillo*, 332 U.S. 1, 5 (1947); see also Johnson, 135 S. Ct. at 2560 ("even clear laws produce close cases").

D.      The enumerated offenses in ACCA are absent.

Section 924(c)(3)(B)'s structure differs from the ACCA because it does not contain an introductory list of enumerated crimes followed by an "otherwise" provision that *Johnson* treated as qualified by the predicate offenses.  The presence of the enumerated list of offenses in ACCA was a determinative factor in *Johnson*.  The enumerated list had troubled members of the Court since *James*.  *See, e.g., James*, 550 U.S. at 215-16, 230 n.7 (Scalia, J., dissenting).  And in *Begay v. United States*, even the majority was concerned that "the examples are . . . far from clear with respect to the degree of risk each poses."  553 U.S. 137, 143 (2008).

The continuing confusion over how to interpret the list, in conjunction with the residual clause, ultimately convinced the Court in *Johnson* of the ACCA's residual clause's vagueness and pervaded the Court's analysis. For example, the Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes— burglary, arson, extortion, and crimes involving the use of explosives." *Johnson*, 135 S. Ct. at 2558. The Court again referred to the enumerated crimes in explaining why its decisions in *Begay* and *Sykes* did "not succeed in bringing clarity to the meaning of the residual clause." *Id.* at 2559 (*Begay's* test, which turned on the similarity of a crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to one another in kind than in degree of risk posed"); *id.* ("common sense" used in *Sykes* was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes"). And, critically, the Court distinguished other statutes requiring risk-based assessments in part because they do not "link[] a phrase such as 'substantial risk' to a confusing list of examples." *Id.* at 2561. Section 924(c)(3)(B), like the statutes the Court distinguished in *Johnson*, contains no "confusing list" to cloud its analysis.

Moreover, § 924(c)(3)(B) contains language identical to many other federal and state statutes. *See*, *e.g.,* 18 U.S.C. § 16(b); 18 U.S.C. § 3142(f)(1)(A) and (g)(1) (bail statute); 18 U.S.C. § 521(d)(3)(C) (enhanced sentence for criminal gang members); 18 U.S.C. § 3663A(c)(1)(A) (mandatory restitution); 18 U.S.C. § 5032 (juvenile transfer statute); R.I. Gen. Laws 1956, § 21-28-4.07.2(a); Utah Code Ann. § 76-9-802(5)(b)(i). Thus, while the Supreme Court believed that striking ACCA's residual clause would have little effect on other risk-based

statutes, *see Johnson*, 135 S. Ct. at 2561, a decision striking § 924(c)(3)(B) would significantly affect other federal and state laws.

E.      Section 924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct.

Another uncertainty about the ACCA that the Supreme Court identified in *Johnson*, but that is absent from § 924(c)(3)(B), is the necessity for courts to go "beyond evaluating the chances that the physical acts that make up the crime injure someone" and to evaluate the risk for injury even "after" completion of the offense. *Id.* at 2557; see *also id*. at 2559 (noting that "remote" physical injury could qualify under ACCA, but that the clause does not indicate "how remote is too remote"). ACCA's inquiry into whether a crime "involves conduct" that presents too much risk of injury goes beyond the offense elements. *Id*. at 2557. The consideration of post-offense conduct was therefore part of ACCA's indeterminate "wide-ranging inquiry." *Id.*

By contrast, and as discussed above, § 924(c)(3)(B) is significantly narrower. As the Supreme Court expressly observed in *Leocal,* unlike the ACCA residual clause, where the "substantial risk" inquiry relates "to the possible effect of a person's conduct," § 16(b) (and Section 924(c)(3)(B)) address "the use of force" "'in the course of committing the offense.'" 543 U.S. at 10 & n.7 (quoting 18 U.S.C. § 16(b)). See also *Fuertes,* 2015 WL 4910113, at *9. This narrower approach means that the assessment is confined to the risks that arise during the commission of the offense. *Leocal,* 543 U.S. at 7 (court must "look to the elements and the nature of the offense of conviction"). Unlike the ACCA, § 924(c)(3)(B) does not go beyond "the physical acts that make up the crime." *Johnson*, 135 S. Ct. at 2557. Further, § 924(c)(3)(B) looks at the risk of the "use of force" rather than the much broader "risk of injury."

F.      Section 924(c)(3)(B) is materially narrower than ACCA.

Under *Leocal*, an aggravated felony for purposes of § 16(b) (and, by extension, a "crime of violence" for purposes of § 924(c)(3)(B)) is limited to "offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal,* 543 U.S. at 10; *see also United States v. Taylor*, 814 F.3d 340, 376–77 (6th Cir. 2016) (finding the Johnson analysis inapplicable because § 924(c)(3)(B) is distinctly narrower than ACCA residual clause).  To qualify as a predicate offense under this framework, the offense must proscribe conduct that (1) naturally involves a disregard of a substantial risk of force against another, and (2) the risk of force must arise during the course of committing (3) an active, violent offense.  Id. at 10-11; *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (clarity may be provided by judicial gloss on an otherwise uncertain statute). *See also Fuertes*, 2015 WL 4910113, at *9.

Under § 924(c)(3)(B) (and § 16(b)), the ordinary case is defined by the elements of the offense, and a court does not, as in ACCA, consider risks that arise only after the physical acts constituting the crime have been completed.  The court asks whether the offense elements would "naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense."  *Leocal,* 543 U.S. at 11.  The analysis is non-speculative and consistent with *Johnson*.  If the risk of the use of force is naturally present in the elements of the offense, it qualifies as a crime of violence under § 924(c)(3)(B) (or § 16(b)). This alleviates *Johnson's* concern about ACCA's far ranging inquiry.

There is nothing vague or speculative about asking whether an offense "naturally" involves a risk of the use of force during its commission.  The phrase "by its nature" in § 924(c)(3)(B) simply triggers application of the categorical approach, which looks at offense

elements. See *United States v. Aragon*, 983 F.2d 1306, 1312 (4th Cir. 1993). Furthermore, the Supreme Court has long examined the "nature" of predicate offenses in applying enhancements. *See, e.g., Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013). As for the degree of risk necessary, courts have made clear that the need for a "substantial" risk is not vague. *Aragon*, 983 F.2d at 1313-15 (easily applying "substantial risk" standard).

Acts of Congress enjoy a strong presumption of validity. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). A court's duty is to construe, rather than to condemn, a statute. *See Skilling v. United States*, 561 U.S. 358, 403 (2010). The Supreme Court was convinced by "[n]ine years' experience," and by multiple prior decisions, that ACCA's residual clause was not susceptible to principled construction. *Johnson,* 135 S. Ct. at 2560. Section 924(c)(3)(B) does not possess the "sum" of factors that led Johnson to its conclusion. *Id.*

G.      Runyon cannot present a vagueness challenge because § 924(c)(3)(B) is not unconstitutionally vague as applied to him.

Under the vagueness doctrine, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)); see also, e.g., *United States v. Williams*, 553 U.S. 285, 304 (2008); *United States v. McDonnell*, 792 F.3d 478, 509 (4th Cir. 2015).

*Johnson* indicated that a law need not be vague in all its applications to be unconstitutional, but the Court did not decide whether a party must first show a law is vague *as applied* to him before he may make a facial challenge. 135 S. Ct. at 2560-61. Nor did *Johnson* overrule the Supreme Court's numerous cases requiring a court to analyze a vagueness challenge outside of the First Amendment context on the facts of the particular case before it. *See, e.g.,*

*Chapman v. United States*, 500 U.S. 453, 467 (1991); *United States v. Powell*, 423 U.S. 87, 92 (1975); *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

Further, while *Johnson* did reject that a provision cannot be facially vague merely because "some conduct clearly falls within the provision's grasp," 135 S. Ct. at 2561, the Court did not hold that any possibility of a vague application requires finding a statute void for vagueness. Rather, it concluded that the residual clause was void for vagueness because of its inherent inability to produce "evenhanded, predictable, or consistent" applications. *Id.* at 2563. The provision was "a judicial morass that defies systemic solution, a black hole of confusion and uncertainty that frustrates any effort to import some sense of order and direction." *Id.* at 2562 (internal quotation marks omitted). But "there are other statutes that by their terms or as authoritatively construed apply without question to certain activities, but whose application to other behavior is uncertain." *Smith v. Goguen*, 415 U.S. 566, 577-78 (1974). For those statutes, the general rule is that a vagueness challenge is not available to one who violates the "hard core" of the statute. *Id.* Facial vagueness challenges should therefore be reserved for statutes that "simply ha[ve] no core," "in the sense that no standard of conduct is specified at all." *Id.* (citation and quotation marks omitted).

The Sixth Circuit recently rejected an identical vagueness challenge to § 924(c)(3)(B) in *Taylor*, 814 F.3d at 375–79. Citing many of the above reasons that *Johnson* does not affect § 924(c)(3)(B), the court found that § 924(c)(3)(B) is considerably narrower than the statute invalidated in *Johnson*, and much of the analysis in *Johnson* is not applicable to § 924(c)(3)(B). *Id.*

Section 924(c)(3)(B) is clearly not a statute that "simply has no core." *See Leocal*, 543 U.S. at 10 (describing burglary as a "classic example" of a crime that satisfies § 16(b) because,

101

"by its nature, [it] involves a substantial risk that the burglar will use force against a victim in completing the crime").

Runyon was charged with and convicted of murdering Cory Voss with a firearm in relation to the crimes of conspiracy to commit murder for hire and carjacking - conduct which even he cannot not deny falls within the "core" of § 924(c)(3)(B) and "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Cf. *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) ("Here, the indictment charges a pattern of violent racketeering activities, including murder, kidnapping, and robbery.  It is hard to imagine a conspiracy which, by its nature, poses more of a risk that physical force will be used against persons or property.").  Both of the predicate crimes had as additional elements that death resulted in the course of the crime – not only was there a risk, for Runyon to be convicted on these crimes, the use of force was a certainty.  Thus, his vagueness challenge must fail.

II.     Carjacking Resulting in Death and Conspiracy to Commit Murder for Hire Resulting in Death are both Crimes of Violence under the Force Clause of Section 924(c)(3)(A).

Although acknowledging that Johnson did not invalidate the "force clause" contained in Section 924(c)(3)(A), Runyon contends that neither predicate crime properly qualifies as a crimes of violence under the "force clause."  Runyon asserts that the "physical force" required under the force clause is a "violent force" or "strong physical force" capable of causing physical injury to another person.

A.     Carjacking is a Crime of Violence.

Runyon contends that carjacking does not meet the requirements of the force clause because it can be accomplished by putting someone in fear of future injury, which does not

require the use (actual, attempted or threatened) of "violent force."  Additionally, Runyon claims that because the act of putting someone in fear of injury can be done without an intentional threat of physical force, it fails to satisfy the intentional *mens rea* required by the force clause.

Runyon overlooks that he was convicted of the crime of Carjacking Resulting in Death – which required the jury to find the specific element that death resulted from the carjacking.  It can hardly be said that this charge does not require force under any definition.  Moreover, the carjacking statute, Section 2119, contains the specific *mens rea* that a defendant act with the "intent to cause death or serious bodily harm."  18 U.S.C. § 2119.  Thus, for the defendant to violate the statute, the jury had to determine that he took a motor vehicle, with the intent to cause death or serious bodily harm, and that death resulted.  The Fourth Circuit has held, "[u]nder the definitional requirements of § 924(c)(3), the carjacking statute is a crime of violence."  *United States v. Johnson*, 32 F.3d 82, 85 (4th Cir. 1994).  *Cf. United States v. Seay*, 553 F.3d 732, 737-38 (4th Cir. 2009) (state statute that required proof that "the conduct must *objectively* cause distress by placing the person in fear of bodily harm" satisfied U.S.S.G. § 4B1.2(a)(1)'s standard of threatened use of physical force).

Runyon argues, however, that carjacking does not qualify under the elements clause of § 924(c)(3)(A) because it can be accomplished by 'fear of injury' which does not require the use, attempted use, or threatened use of 'violent force,'" which is the level of "physical force" required pursuant to *Johnson v. United States*, 559 U.S. 133 (2010).   In *Johnson*, the Court held that the phrase "physical force," for the purposes of ACCA's elements clause (which is similar to § 924(c)(3)(A)) means violent force, "that is, force capable of causing physical pain or injury to another person."  Id. at 140.  Despite Runyon's argument to the contrary, however, carjacking

(even absent the additional element of death resulting) is a crime of violence under the elements clause of § 924(c)(3)(A).

An offense is committed under the carjacking statute when the defendant "takes a motor vehicle . . . from the person or presence of another . . . by force and violence or by intimidation, or attempts to do so." 18 U.S.C. § 2119. "To obtain a conviction for carjacking, the government must prove that the defendant, (1) with intent to cause death or serious bodily harm, (2) took a motor vehicle, (3) that had been transported, shipped, or received in interstate or foreign commerce, (4) from the person or presence of another (5) by force and violence or by intimidation." *United States v. Fekete*, 535 F.3d 471 (6th Cir. 2008). Satisfying these requirements of the carjacking statute "encompasses 'the use, attempted use, or threatened use of physical force….'" *United States v. Moore*, 43 F.3d 568, 572-73 (11th Cir. 1995); see also *United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). Thus, carjacking is a crime of violence and appropriately qualifies as a predicate crime under § 924(c)(3)(A).

Additionally, the carjacking statute need not contain a "stand-alone" "threatening physical force" element in order for this court to conclude that such an element is encompassed within the elements of the offense. See *United States v. Anderson,* 695 F.3d 390, 401 (6th Cir. 2012) (element of force present where offense required proof of serious physical injury; "stand-alone physical force element" not required). Simply put, "[t]he term 'crime of violence' as Congress defined it in 18 U.S.C. § 924(c)(3) clearly includes carjacking. 'Tak[ing] or attempt[ing] to take by force and violence or by intimidation,' 18 U.S.C. § 2119, encompasses 'the use, attempted use, or threatened use of physical force....'" *Moore*, 43 F.3d at 572-73; *see also United States v. Brown*, 200 F.3d 700, 706 (10th Cir. 1999) ("The … offense of carjacking

104

is always a crime of violence because § 2119 requires taking or attempting to take a vehicle by force and violence or by intimidation….").

Runyon's argument depends on claiming that the "fear of injury" standard fails to satisfy § 924(c)(3)(A)'s requirement of a threatened use of "physical force." In his view, a carjacking victim could be intimidated through means that would not constitute force. In making this argument, he relies on *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), a case that neither examined carjacking offenses or Section 924(c)(3). According to Runyon, *Torres-Miguel* establishes that some degree of violent force is required to establish a "crime of violence," such that a fear of future injury could not suffice. If a bank robber entered a bank, donned a gas mask, and threatened to kill everyone inside using poison gas, the robber's threat to gas everyone to death would not constitute a threatened use of the necessary physical force, according to the defendant. But Runyon reads too much into *Torres-Miguel* and fails to take into account later Supreme Court precedent in *United States v. Castleman*, 134 S. Ct. 1405, 14-14-15 (2014).

   B.    The Fourth Circuit has already rejected Runyon's narrow reading of "physical force" under federal robbery statutes.

Runyon is simply mistaken that the act of putting another in fear of injury fails to satisfy "physical force" under § 924(c)(3)(A) and in relying on interpretations of the intimidation element in the federal bank robbery statute (18 U.S.C. § 2113(a)). Applying § 924(c)(3)(A), the Fourth Circuit has previously held, "Armed bank robbery is unquestionably a crime of violence, because it 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" *United States v. Adkins*, 937 F.2d 947, 950 n.2 (4th Cir. 1991) (quoting § 924(c)(3)(A) and citing *United States v. Shavers*, 820 F.2d 1375 (4th Cir. 1987)).

C.      Defendant's reading of "physical force" cannot be squared with the Supreme Court's definitions of "physical force."

Runyon's argument also fails because the Supreme Court has defined physical force as "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).  In measuring the degree of force needed to count as "physical force" for a violent felony, *Johnson* drew the line at force that is sufficient to cause injury.  Poisoning and other means of killing a person satisfy that standard.  Notably, in keeping with both *Johnson* and Fourth Circuit precedent holding that robbery is a crime of violence, the Fourth Circuit explained that "[t]he test in this circuit for intimidation under § 2113(a) is whether 'an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts.'"  *Woodrup*, 86 F.3d at 363 (*quoting Wagstaff*, 865 F.2d at 627; *Higdon*, 832 F.2d at 315).  Moreover, the Supreme Court stated that a permissible definition of "physical force" is "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim."  *Johnson*, 559 U.S. at 139 (quoting Black's Law Dictionary 717 (9th ed. 2009)).  It makes little sense to accept that "physical force" may be defined by the force used to accomplish robbery but then hold that robbery fails to satisfy the definition of physical force.

In *Castleman*, the Supreme Court rejected a Runyon's argument about Leocal and uses of force just like the one adopted in *Torres-Miguel*:

> [T]he knowing or intentional application of force is a "use" of force.  Castleman is correct that under Leocal v. Ashcroft, 543 U.S. 1 (2004), the word "use" "conveys the idea that the thing used (here, 'physical force') has been made the user's instrument."  Brief for Respondent 37.  But he errs in arguing that although "[p]oison may have 'forceful physical properties' as a matter of organic chemistry, . . . no one would say that a poisoner 'employs' force or 'carries out a purpose by means of force' when he or she sprinkles poison in a victim's drink," ibid.  The "use of force" in Castleman's example is not the act of "sprinkl[ing]" the poison; it is the act of employing poison knowingly as a device to cause physical harm.  That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter.  Under Castleman's logic, after all, one could say

106

that pulling the trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that actually strikes the victim. *Leocal* held that the "use" of force must entail "a higher degree of intent than negligent or merely accidental conduct," 543 U.S., at 9; it did not hold that the word "use" somehow alters the meaning of "force."

Castleman, 134 S. Ct. at 1414-15.

*Castleman* said it was not addressing whether knowingly or intentionally causing bodily injury counts as "physical force" under the definition used in the Armed Career Criminal Act. 134 S. Ct. at 1414-15. But, again, the Supreme Court's 2010 *Johnson* opinion defined physical force as "force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. *Johnson* also endorsed a definition of physical force as "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim." *Johnson,* 559 U.S. at 139. And the author of Johnson, Justice Scalia, concurred in *Castleman,* reaffirming what *Johnson* said about the ACCA. 134 S. Ct. at 1416-17.

D.   Defendant's reading of *Torres-Miguel* would improperly treat it as overruling the Fourth Circuit's prior precedent and would cause § 924(c)(3) to cover no federal criminal offense.

The Fourth Circuit's cases like *Adkins* preclude adopting a reading of "physical force" that excludes first-degree murder and carjacking. Courts interpret statutory language "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)). These "tools of divining meaning—not to mention common sense, which is a fortunate (though not inevitable) side benefit of construing statutory terms fairly" support that federal robbery offenses that can be accomplished through "intimidation" or "fear of injury" satisfy § 924(c)(3)(A). *Id. Cf. United States v. Washington*, 743 F.3d 938, 943 (4th Cir. 2014) ("In the time since circuit courts first interpreted [18 U.S.C.] § 2423(a) . . . Congress has

amended the statute numerous times but has never changed it to require the result [the defendant] urges here."). *Abbott*, 562 U.S. at 23 (noting numerous amendments that "expanded the reach or increased the severity of § 924(c)").

Taken collectively, Runyon's theories result in virtually no federal criminal offenses falling within § 924(c)(3)(A). That is true because federal criminal offenses routinely encompass means of causing serious bodily harm that are broader than defendant's interpretation of "physical force." Indeed, even a statute that seemingly tracks the language of § 924(c)(3)(A)— such as 18 U.S.C. § 1512(a)(2)—turns out to rely on a broader definition of "physical force" than defendant's. See 18 U.S.C. § 1515(a)(2) (defining "physical force" as "physical action against another . . . includ[ing] confinement"). Runyon's reading of "physical force" not only leaves § 924(c)(3)(A) with little application, *Castleman*, 134 S. Ct. at 1434, his reading essentially destroys the provision. And courts "cannot interpret federal statutes to negate their own stated purposes." *King v. Burwell*, 135 S. Ct. 2480, 2493 (2015) (*quoting New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973)). In Leocal, the Supreme Court observed that "we cannot forget that we ultimately are determining the meaning of the term "crime of violence." 543 U.S. at 383. First-degree murder and carjacking are crimes of violence, and they have as elements the use, attempted use, and threatened use of physical force.

Both *Leocal* and *Garcia* dealt with offenses that had a *mens rea* of recklessness or negligence, but carjacking is not such an offense. A defendant cannot be guilty of carjacking— taking a vehicle from a person against that person's will—through a recklessness or negligence mens rea. Runyon's theory both misunderstands the *mens rea* for carjacking and misconstrues *Leocal* and *Garcia.* As to the mens rea, in analyzing bank robbery under § 2113(a), the Supreme Court has explained that "we read subsection (a) as requiring proof of general intent—that is,

that the defendant possessed knowledge with respect to the actus reus of the crime (here, the taking of property of another by force and violence or intimidation.).” *Carter v. United States*, 530 U.S. 255, 267 (2000).  Although a defendant need not intend to intimidate the person from whom the defendant is taking property against that victim's will, the defendant must know (a) that he is taking property against the victim's will and (b) that the defendant's actions in accomplishing that involve force or are objectively intimidating.  See, e.g., United States v. *Bradshaw*, 580 F.3d 1129, 1132-33 (10th Cir. 2009) (citing Carter and noting that the "jury could infer that [the defendant] acted with a knowing intent to intimidate").  This *mens rea* exceeds negligence and recklessness and hence satisfies *Leocal and Garcia.*

E.  <u>Conspiracy to Commit Murder for Hire Resulting in Death is a Crime of Violence.</u>

Runyon also contends that a conspiracy to commit murder for hire is not a crime of violence because it is the agreement that is the crime.  As carjacking is clearly a crime of violence under the force clause and was a predicate for the Section 924(j) charge, there is no reason for the Court to reach this claim.  Should the Court do so, however, the conspiracy charge at issue does constitute a crime of violence.

In contending that a conspiracy charge cannot constitute a crime of violence under the force clause, Runyon overlooks the clear fact that his conviction under 18 U.S.C. § 1958(a) expressly required the jury to find that death resulted from the agreement.  It was the finding of this additional element – that death resulted - that increased the maximum penalty to death and even made him eligible for the death penalty on Count One.  18 U.S.C. § 1958(a).  A conviction of conspiracy to commit murder for hire resulting in death does meet the requirements of the force clause because the elements require a resulting death, which arises from the use of physical force being set in motion to cause that death.  In this vein, the charge is not an inchoate crime

because the object of the conspiracy must occur for a defendant to be subject to the enhanced penalty.

Other courts have determined that a conspiracy to commit murder for hire constitutes a crime of violence for purposes of Section 924(c).  See *United States v. Walker*, 596 Fed. Appx. 302, 313, cert. denied 135 S. Ct. 2393 (June 1, 2015).  As the Fourth Circuit opined in *United States v. Laskin*, 926 F.2d 372, 379 (4th Cir. 1991) in finding that a violation of related Section 1952A constituted a crime of violence, "[o]ne can hardly conceive of a more cold-blooded violent act than murder-for-hire."  Although acknowledging that the Fourth Circuit has determined conspiracy to be a crime of violence under the residual clause, *United States v. White,* 571 F.3d 365 (4th Cir. 2009), Runyon claims that under Johnson, this finding is invalidated.  For the reasons already set forth, it continues to qualify as a crime of violence under the residual clause.  But the additional element of death resulting also meets the requirements of the force clause.

> F.   The sentence of death on Count One was not improperly tainted by the sentence on Count Five.

Runyon concludes that the death sentence he received on Count One must also be vacated because the evidence and arguments presented at trial with respect to the Section 924(j) offense "painted an in inappropriate picture of the conspiracy offense and contributed to the jury's sentencing decision for the conspiracy charge."  *See* ECF 478, pgs. 80-81.

Runyon asserts, with no authority, that a new sentencing is required.  Though Runyon's categorical approach to reviewing the Section 924(j) conviction requires a review of the statute and not the underlying facts, he submits that those same underlying facts should be considered in granting a new sentence because this was a "close case" and the jury questioned the result if it could not agree on a sentence.  But the jury found that the government had proven all

aggravating factors alleged beyond a reasonable doubt and many of the aggravating factors related to the planning, pecuniary gain and training that Runyon had to commit this murder for hire. In short, the Conspiracy to Commit Murder for Hire charge was, if anything, a murder crime of the highest culpability.

Runyon wrongly claims, however, that the Section 924(j) conviction required a higher level of culpability than that of the Conspiracy to Commit Murder for Hire conviction. He offers no authority for this claim and it is without merit. The two predicate offenses behind the Section 924(j) conviction were death eligible offenses that, even by Runyon's argument, were properly before the jury. The Section 924(j) count did not result in the jury determining that additional criminal activity took place because the predicate offenses in Counts One and Two contained the same activity as did the predicate crimes of violence for the Section 924(j) charge.

With respect to the Count One conviction, the jury also had to determine that the defendant intended to murder Cory Voss. Moreover, prior to the case proceeding to the penalty phase, the jury had to first determine that the defendant did, in fact, intend to murder Cory Voss in order for the defendant to be eligible for the death penalty. The jury made this finding with respect to both Counts One and Two along with finding the aggravating factor of substantial planning. ECF No. 255. With these findings firmly in place with respect to Counts One and Two prior to the penalty phase, there is no merit to the claim that the Section 924(j) conviction on Count Five required an enhanced culpability that somehow impacted the jury's sentencing decision.

111

**Claim 10 :   <u>Runyon is barred from relitigating whether the jury instructions
impermissibly lowered the burden of proof regarding the weighing of
aggravating factors.</u>**

Runyon claims that the jury instructions given in his case that permitted a finding that
aggravating factors "sufficiently outweigh" mitigating factors impermissibly lowered the burden
of proof in violation of his Fifth, Sixth, and Eighth Amendment rights.  *See* ECF 478, pgs. 97–
99.  He concedes, as he must, that this claim was raised and rejected in his direct appeal.  *See
United States v. Runyon*, 707 F.3d 475, 515–16 (4th Cir. 2013).  He argues, however, that any
bar to relitigating his claim does not apply because the claim is related to the issue presented in
*Hurst v. Florida*, 136 S. Ct. 616 (2016), a case in which the Supreme Court recently decided that
Florida's death penalty scheme violates *Ring v. Arizona*, 536 U.S. 584 (2003).  But the decision
in *Hurst* does not affect the issue Runyon raises here, and no exception to the relitigation bar
applies.  Further, this claim is barred under the non-retroactivity doctrine.

A.      <u>Legal Principles</u>

Issues raised on direct appeal may not be raised in a collateral attack, such as a Section
2255 motion.  *Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976).  A federal prisoner
generally cannot raise on collateral review a claim that was previously decided on direct review.
*See Withrow v. Williams*, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring) (collecting cases);
*United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *United States v. Perez*, 129 F.3d
255, 260 (2d Cir. 1997); *Argencourt v. United States*, 78 F.3d 14, 16 n.1 (1st Cir. 1996);
*Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995); *Thompson v. United States*, 7 F.3d
1377, 1378-79 (8th Cir. 1993) (per curiam); *Cabrera v.United States*, 972 F.2d 23, 25 (2d Cir.
1992); *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993); *Kastenbaum v. United
States*, 588 F.2d 138, 139 (5th Cir. 1979) (per curiam); *Oliver v. United States*, 90 F.3d 177, 180

(6th Cir. 1996). This rule extends the law-of-the-case doctrine to the federal-prisoner habeas context. The law-of-the-case doctrine is discretionary and subject to override based on the existence of exceptional circumstances. *See United States v. U.S. Smelting Refining & Mining Co.*, 339 U.S. 186, 199 (1950). An exercise of that discretion is rarely warranted. *See, e.g., United States v. McGee*, 201 F.3d 1022, 1023 (8th Cir. 2000) (per curiam); *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999). Typically, only an intervening change in the law—usually a new decision narrowly construing the statute of conviction—forms the basis form the basis for an order permitting relitigation, *See, e.g., Jones*, 178 F.3d at 796; *Davis v. United States*, 417 U.S. 333 (1974).

Collateral relief is further limited to claims based on established law. *Teague* at, 489 U.S. at 310 (1989). When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. *Id*. at 351–52.

    B.    Argument

Runyon attempts to circumvent the relitigation bar by claiming that *Hurst v. Florida*, represents a change in the law. But *Hurst* is not helpful to Runyon for two reasons: (1) the Supreme Court's decision in *Hurst* does not represent a change in the law with respect to the issue Runyon raised on direct appeal, and (2) even if *Hurst* did represent a change in the law, relief here is barred under *Teague*.

The issue the Supreme Court decided in *Hurst* was whether Florida's death sentencing scheme violated the Sixth Amendment or Eighth Amendment in light of *Ring v. Arizona*, 536 U.S. 584 (2002). *Hurst*, 136 S. Ct. at 621. Florida's sentencing scheme allowed a jury to recommend a death sentence, but required a judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing a death sentence. *Id*. at 620. The Supreme Court found that Florida's sentencing scheme violated the Sixth Amendment and its *Ring* decision because Florida did not allow a jury to make the critical findings necessary to impose death. *Id*. at 622.

Runyon's claim is not affected by the decision in *Hurst*. Here, Runyon does not allege that the critical decision necessary to impose death was taken from the jury. To the contrary, the claim raised here challenges whether the jury needed to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. But, as the Fourth Circuit found, the plain language of the FDPA provides that the jury must determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." *Runyon*, 707 F.3d at 516. Moreover, other courts have found that the reasonable doubt standard does not apply to the weighing of aggravating and mitigating factors, "reasoning that that process constitutes not a factual determination, but a complex moral judgment." *Id*.; *United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013) (en banc) (citing cases). Runyon is barred from relitigating this claim.

Finally, even if *Hurst* did represent a change in the law, Runyon would not be entitled to relief because his conviction and sentence was final on October 6, 2014, and new rules do not apply to cases on collateral review. *Teague*, 489 U.S. at 310. Further, neither of the *Teague* exceptions to non-retroactivity apply here. For these reasons, this claim should be dismissed.

114

**Claim 11:**    **<u>Runyon is procedurally barred from raising a claim that the aggravating factors fail to narrow, or are vague and overbroad; the claim lacks merit in any event.</u>**

In Claim 11, Runyon contends his death sentences are unconstitutional because they are based on aggravating factors that fail to narrow the class of death eligible defendants, and are arbitrary and overbroad.  ECF 478 at 99–101.[14]  Specifically, he argues that the aggravating factors in his case—pecuniary gain and substantial planning and premeditation—are unconstitutional because they mirror the conduct required for conviction.  In addition, Runyon claims that the non-statutory aggravating factors presented at trial are arbitrary and overbroad.

A.    <u>Statutory Aggravating Factors</u>

Runyon's claim that the statutory aggravating factors are unconstitutional is procedurally barred.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  This claim was not raised in his direct appeal and Runyon fails to demonstrate cause for his procedural default or actual prejudice.  The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error.  *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

This claim is also barred by the non-retroactivity doctrine.  *See Teague v. Lane*, 489 U.S. 288, 310 (1989).  As of October 6, 2014, when Runyon's convictions and death sentence became final, existing precedent did not dictate a grant of relief on Runyon's claim.  There is no precedent or statute prohibiting the use of aggravating factors that mirror the offense elements as violative of the Eighth Amendment.  *See United States v. Coonce*, No. 10-3029-01-CR-S-GAF,

---

[14] Other than different paragraph breaks, the content of this claim is unchanged from the original motion.

2014 WL 1018081, at *5–6 (W.D. Mo. March 14, 2014); *United States v. Sablan*, 2013 WL 5423621, at *7 (E.D. Cal. Sep. 26, 2013).  Runyon's reliance on *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000), to argue a Sixth Amendment violation is misplaced.  *Apprendi* held that the Sixth Amendment required a jury to determine any fact that increases the penalty for a crime beyond the prescribed statutory maximum.  *Id*. at 490.  Here, the jury determined the aggravating factors beyond a reasonable doubt and the Sixth Amendment does not prohibit aggravating factors that mirror the elements of the offense.

Procedural default and non-retroactivity notwithstanding, Runyon's claim regarding the statutory aggravating factors lacks merit.  An element of an underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are narrowed at the guilt stage, as opposed to the penalty phase.  *Lowenfield v. Phelps,* 484 U.S. 231, 246 (1988). Thus, "the aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."  *Tuilaepa,* 512 U.S. at 972 (citing *Lowenfield,* 484 U.S. at 244–46). The presentation of aggravating factors assists the jury in the penalty phase in its role of making "an individualized determination on the basis of the character of the individual and the circumstances of the crime" to decide which defendants eligible for the death penalty "will actually be sentenced to death."  *Zant v. Stephens,* 462 U.S. 862, 878–79 (1983). The use of special findings that mirror offense elements therefore is permissible.

Moreover, the intent factors that were proven beyond a reasonable doubt under the procedural structure of the FDPA serve to narrow the class of eligible defendants.  *See* 18 U.S.C. § 3591(a)(2)(A–D).   The fact that two statutory aggravating factors mirror elements of the offenses Runyon was convicted of does not violate any constitutional principle.  The jury is entitled to consider the circumstances of the offense in making the individualized determination

116

of "whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972.  This claim should be denied.

> B.    Nonstatutory Aggravating Factors

Runyon also claims that the non-statutory aggravating factors were vague and overbroad and asks that his death sentence be vacated.  Runyon did challenge the non-statutory aggravating factors on direct appeal.  *Runyon*, 707 F.3d at 491–507.  As noted, issues raised on direct appeal may not be raised in a collateral attack such as a Section 2255 motion.  *Withrow*, 507 U.S. at 720–21.  Runyon fails to cite any intervening change in the law excusing this re-litigation bar. This claim is thus barred from consideration here.

Even if the re-litigation bar does not apply, Runyon's claim lacks merit.  Runyon's trial counsel did raise claims challenging statutory and non-statutory aggravating factors prior to trial. ECF 91, pgs. 61–62 and ECF 195.  Specifically, in ECF 91, Runyon argued that the aggravating factors listed in the FDPA fail to narrow the class of persons eligible for the death penalty from the entire category of persons convicted of crimes involving "intentional" killings.  *Id*. at 61.  He argued, like here, that the aggravating factors were indistinguishable from the elements of the offenses.  *Id*. at 62.  In addition, Runyon challenged the non-statutory aggravating factors by claiming they were overbroad, vague, and that the government's "unconstrained ability to allege various non-statutory aggravators injects impermissible randomness into the process."  *Id*. at 68. *See also* ECF No. 195 (challenging the specific non-statutory aggravating factors alleged by the Government).  This Court denied Runyon's claims that the statutory aggravating factors failed to narrow the class of persons eligible for the death penalty, and that the non-statutory aggravating factors were arbitrary.  ECF  143 at 5–6, and ECF 217.  Moreover, the Fourth Circuit thoroughly analyzed Runyon's constitutional challenge to the non-statutory aggravating factors and denied

117

the claims. *Runyon*, 707 F.3d at 491–507. There has been no intervening change in the law since this Court or the Fourth Circuit denied Runyon's challenge to the aggravating factors. Indeed, Runyon fails to cite any law in support of his contention that the non-statutory aggravating factors were not rational or contributed to an arbitrary death sentence. For the reasons stated in this Court's pretrial orders and the Fourth Circuit's opinion, this claim should be denied.

> **Claim 12:**     **<u>Trial counsel was not ineffective in failing to raise a selective prosecution claim.</u>**

Runyon next contends that the Government's process in which it determines whether to seek the death penalty is influenced by race, in violation of the Fifth and Eighth Amendments to the United States Constitution. Specifically, he claims that his trial and appellate counsel were ineffective for failing to raise this claim below. He also requests discovery and an evidentiary hearing. *See Petitioner Brief* at 103.

In order to prevail, Runyon must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. Runyon must satisfy both prongs of the *Strickland* test in order to prevail. *Roane*, 378 F.3d at 404. Where a court finds that "the defendant makes an insufficient showing on one" of the prongs, consideration of the other is unnecessary. *Merzbacher*, 406 F.3d at 365–66 (quoting *Strickland*, 466 U.S. at 697).

Runyon cannot demonstrate that his counsel performed deficiently or that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He fails to demonstrate a credible showing of discriminatory effect or discriminatory purpose, he necessarily cannot meet his burden in showing that counsel was ineffective for failing to raise this claim. Moreover, because

he has proffered no evidence that meets the rigorous burden establishing a selective prosecution claim, he cannot demonstrate prejudice under *Strickland*.  Any selective prosecution claim would have been denied.  This claim should be denied.

To demonstrate the existence of prejudicial ineffectiveness, Runyon must establish "a reasonable probability that but for" his counsel's failure to raise this claim, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 687.  The selective prosecution claim Runyon presents here would not have changed the outcome of his case.

A person raising a selective prosecution claim, as Runyon does here, must establish: (1) the federal prosecutorial policy had a discriminatory effect and (2) it was motivated by a discriminatory purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012).  This requires a defendant to establish that "similarly situated individuals of a different race were not prosecuted," *Armstrong*, 517 U.S. at 469–70, and that the decision to prosecute was invidious or in bad faith.  *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996).

The standard of proof for a selective prosecution claim is a "demanding" one, *Armstrong*, 517 U.S. at 463, because a claimant is requesting the judiciary to exercise power over a "special province" of the executive branch, *id*. at 464, and judicial review of prosecutorial decisions could "chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id*. at 465.

Runyon proffers little, if any, evidence to support his claim here.  He cites to a study done by Lauren C. Bell, Ph.D., a report by a subcommittee of the Judiciary Committee from 1994, and a survey of death penalty cases from 1988 to 2000 taken by the Department of Justice.  Other

119

than a bald assertion that the Government process is racially influenced, he makes no argument that similarly situated individuals of a different race were not prosecuted, nor does he demonstrate that there is a racially disproportionate pattern of capital charging.  Trial and appellate counsel was not ineffective for failing to raise this claim because the claim lacks merit. Runyon cannot show that he suffered actual prejudice from the failure to raise this claim.

Moreover, conclusory and unsupported statements are insufficient for habeas relief. *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004).  Thus, "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."  *United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013) (quoting *United States v. Thomas,* 221 F.3d 430, 437 (3d Cir. 2000)); s*ee also Jones v. Gomez,* 66 F.3d 19, 204 (9th Cir. 1995) (noting "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief") (internal quotation marks omitted); *Andiarena v. United States,* 967 F.2d 715, 719 (1st Cir. 1992) (holding claim that included "wholly conclusory" "abstract allegation" was "properly subject to summary dismissal").

Runyon is not entitled to discovery on this claim.  The same justifications supporting the "rigorous standard" to prove a selective prosecution claim also require a correspondingly "rigorous standard" to obtain discovery in aid of such a claim.  *Id*. at 468; *Olvis*, 97 F.3d at 743. To obtain discovery on a selective prosecution claim, a defendant must show "some evidence of both discriminatory effect and discriminatory intent."  *United States v. Bass*, 536 U.S. 862, 863 (2002) (citing *Armstrong*, 517 U.S. at 465).  *Armstrong's* "some evidence tending to show" standard is not to be treated lightly.  *See Olvis*, 97 F.3d at 743.  Given the heavy burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution claim must "itself be a significant barrier to the litigation of insubstantial

claims." *Id*. (quoting *Armstrong*, 517 U.S. at 464 (noting that a significant barrier to discovery is necessary because discovery "imposes many of the costs present when the government must respond to a prima facie case of selective prosecution")).[15]

A defendant cannot satisfy the discriminatory effect prong by providing statistical evidence that simply shows that the challenged government action tends to affect one particular group. *James*, 257 F.3d at 1179. Rather, the proffered statistics must address the critical issue of whether the particular group was treated differently than a similarly situated group. *Id*. (rejecting statistical studies); *Armstrong*, 517 U.S. at 470 (rejecting statistical studies that failed to identify similarly-situated persons of other races who were treated differently); *Olvis*, 97 F.3d at 745–46.

In *Bass*, a federal capital defendant moved to dismiss the notice of intent to seek the death penalty on the grounds that the government was seeking the death penalty against him because he was black. 536 U.S. 862–63. In the alternative, like defendant here, Bass sought discovery as to the Government's charging practices. The district court granted the motion for discovery, and dismissed the notice of intent when the Government refused to obey the discovery order. *Id*. at 863. The Sixth Circuit affirmed the district court, finding a DOJ study, Department statements, and other statistical evidence met the *Armstrong* requirements of demonstrating both a discriminatory effect and discriminatory purpose. *United States v. Bass*, 266 F.3d 532, 536 (6th Cir. 2001). The Supreme Court, in a *per curiam* opinion, reversed, holding that the defendant had failed to show evidence of discriminatory effect. 536 U.S. at 863–64. The Court stated:

---

[15] *See also United States v. Wilson*, 262 F.3d 305, 315–16 (4th Cir. 2001) ("Because of th[e] necessary presumption of prosecutorial regularity, a presumption of vindictive prosecution, or any other type of selective prosecution, must be supported by a showing sufficiently strong to overcome the presumption of prosecutorial regularity. Indeed, even before a court allows a defendant to have discovery on the government's prosecutorial decisions, the defendant must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct. The standard is a rigorous one.") (relying on *Armstrong*)).

> Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decision-makers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*.

536 U.S. at 864. The Court held that "[t]he Sixth Circuit's decision is contrary to *Armstrong* and threatens the performance of a 'core executive constitutional function.'" *Id*. Thus, the Court established that the framework set forth for adjudicating selective prosecution claims in *Armstrong* controls.

In order to meet the rigorous standard for discovery set forth in *Armstrong* and *Bass*, Runyon must be able to point to instances where the Government elected not to seek the death penalty against Caucasian men who had committed offenses similar to Runyon's. He must also be able to show that these men had similar personal backgrounds or social histories, similar criminal records, and similar motivations for killing their victims. *See Taylor*, 608 F. Supp.2d at 1266 (indicating defendants are similarly situated when their circumstances present "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions").

Runyon fails to make any argument that the Government elected not to seek the death penalty against similarly situated defendants. He attempts to meet this rigorous standard by citing only to a study conducted by Lauren C. Bell, Ph.D.,[16] and "statistics" kept by the Federal Death Penalty Resource Counsel. *See Petitioner Brief* at 95.

The Bell study and the citation to other statistics, however, represent the same types of broad statistical analyses that were rejected in *Bass* and numerous other federal capital cases.

---

[16] Runyon has provided a declaration from Dr. Bell. This is the same declaration referencing the same study that has been advanced by other capital defendants and rejected as insufficient to support a claim of selective prosecution and request for discovery by federal courts in *United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL 1453527, at *8 (W.D.Tenn. April 14, 2014); *United States v. Sablan*, No. 1:08-CR-00259-PMP, 2014 WL 172533, at *1 (E.D.Cal. January 15,2014); *Lecco*, 2009 WL 3347108, at *4–6.

*See Bass*, 536 U.S. at 864; *Taylor*, 608 F.Supp.2d at 1266-67; *United States v. Lecco*, No. 2:05-00107-01, 2009 WL 3347108, at \*4, \*6 (S.D.WV. October 15, 2009).  These studies do nothing to inform this Court about the actual decision makers in defendant's case here.  Moreover, they do not explore how any of the cited cases truly involve similarly-situated defendants beyond merely showing the race and gender of defendants and victims and bare sketches of the charges in the cases.

The focus of Dr. Bell's study was the outcome of capital cases, not the charging decisions in capital cases.  Thus, her study is not applicable to defendant's future selective prosecution claim in this case.  Moreover, her study actually seems to indicate that the Government does ***not*** seek the death penalty in cases involving white female victims at a higher rate than other types of victims.   Dr. Bell's affidavit indicates that in 397 authorized cases submitted for analysis, only 76 involved white female victims.  Further, Dr. Bell's study looks only at "raw statistics."  There is no analysis of the cases beyond the mere race of the victims to determine if the cases involved "similarly situated" defendants.  Accordingly, this evidence is also insufficient to support Runyon's claim or his request for discovery.

Moreover, the procedure used to determine in which cases capital punishment will be sought demonstrates the absence of discriminatory intent.  Decisions to seek the death penalty within the federal system are made pursuant to a particular protocol which was promulgated by the Department of Justice ("DOJ") shortly after the enactment of the Federal Death Penalty Act and now appears in Title 9, Section 10, of the United States Attorneys' Manual ("USAM").  Under the protocol, a U.S. Attorney must initially decide whether to charge a defendant in her district with a capital-eligible offense.  Once a defendant is charged with such an offense, the U.S. Attorney must make a detailed submission to DOJ that includes a recommendation for or

123

against seeking the death penalty.  *See* USAM § 9–10.040.  The submission is reviewed by the Attorney General's Review Committee on Capital Cases, which makes its own recommendation, but not before providing defense counsel an opportunity to make a submission and to present to the Committee the reasons why the death penalty should not be sought.  *Id*. at § 9–10.120.  The Attorney General then makes the final decision whether to seek or not to seek capital punishment, based on standards that track the factors a jury is required to consider under the FDPA.  *See id*. at §§ 9–10.120, 9–10.130.  The protocol provides that bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty.  *Id*. § 9–10.030.  In fact, in most cases, DOJ's decision-makers are not aware of the race of the defendant or victim.

In sum, Runyon's evidence does not examine the nature and circumstances of the particular defendants who may be similarly situated or the nature of the crimes of which they were accused.  *See Lecco*, 2009 WL 3347108, at \*6.  The statistics also do nothing to examine the backgrounds of the defendants or the victims—the crucial type of information that is used to determine if the Government is justified in seeking the death penalty in a certain case.  Further, Runyon does nothing to explain why these studies or statistics could possibly support a selective prosecution claim.  We are left with endless questions of who in the various data sets is similarly situated, what aggravating factors motivated the decision to seek the death penalty, and what mitigating factors or other prosecutorial considerations may have militated against seeking the death penalty in those cases.  Accordingly, Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful.  Trial counsel was not ineffective for failing to raise this claim.

**Claim 13:**    **Runyon's sentence of death was neither disproportionate or arbitrary.**

Runyon claims that his death sentences are disproportionate and arbitrary based on his belief that his co-defendant Michael Draven is more deserving of death. Based on the disparity in sentencing between Runyon and Draven, and the purported "clear evidence" that race played a role in Runyon's sentencing, Runyon asks this Court to vacate his sentences. In addition, Runyon has added untimely claims of ineffective assistance of trial and appellate counsel for failing to raise this claim.

A.    Runyon's claim is procedurally defaulted.

Runyon could have raised on direct appeal the challenge he raises here, and because he did not, his claim is procedurally defaulted. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). A collateral attack under § 2255 may not substitute for an appeal. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Claims that could have been but were not raised on direct appeal are procedurally barred from review under § 2255, unless the defendant demonstrates "cause" for his default and "actual prejudice" or demonstrates actual innocence. *Id*. The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1983); *Frady*, 456 U.S. at 166. If Runyon cannot show cause and prejudice, he cannot have his claim considered unless he can satisfy the actual innocence exception. *Bousley*, 523 U.S. at 623.

125

Runyon has not presented any argument establishing cause for failing to raise this claim on appeal, nor has he raised any argument demonstrating actual prejudice or actual innocence. He cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 347 (1992)). This claim should be denied as procedurally defaulted.

B.      Runyon's claim is also barred by Teague non-retroactivity.

Runyon's claim is also barred by the non-retroactivity doctrine. Under *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, a defendant may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review. *See Teague*, 489 U.S. at 310. Here, the constitutional rule Runyon proposes, comparative proportionality review between sentences received by similarly charged defendants, is clearly not one dictated by precedent existing as of October 6, 2014—the date Runyon's convictions became final—and indeed is without support in existing precedent. Further, neither of the two *Teague* exceptions to non-retroactivity applies. Accordingly, Runyon's claim is barred for this additional reason.

C.      Procedural default notwithstanding, this claim has no merit.

Finally, Runyon's claims fail on their merits. Runyon argues that his death sentence is arbitrary because the Government selected to seek death against him and not his co-defendant Draven. Specifically, he claims that the evidence demonstrates that Draven, not Runyon, was more worthy of a death sentence. But Runyon provides no evidence demonstrating that the Government unlawfully or discriminatorily exercised its prosecutorial discretion. Moreover, to the extent that Runyon's claim is one of proportionality review, his claim fails because the

126

Constitution does not require comparative proportionality review of sentences received by defendants convicted of the same crime. This claim should be denied.

Runyon's claim is nothing more than a claim for proportionality review. But the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants. *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984); *United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003). A defendant therefore may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987) (emphasis in original). Runyon's claim fails on its merit.

To the extent Runyon claims the Government unlawfully exercised its discretion in noticing death against Runyon and not Draven, the claim likewise fails. "[O]ur constitutional system leaves it to the discretion of the Executive Branch to decide who will face prosecution." *United States v. Passaro*, 577 F.3d 207, 219 (4th Cir. 2009) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996). This discretion includes the decision whether to seek the death penalty. *See McClesky v. Kemp*, 481 U.S. 279, 296–97 (1987). "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id*. at 297.

Runyon fails to proffer "clear proof" that the Government exercised its discretion on some impermissible basis. Draven's background is not relevant to the discretionary decision to seek the death penalty against Runyon. Indeed, the Fourth Circuit found that the "prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants . . . ." *Runyon*, 707 F.3d at 520, n.6. Finally, this Claim is much like the selective

prosecution claim Runyon argues in Claim 12.  For the above reasons, and those argued in Claim 12, this claim should be denied.

D.      Runyon's additional IAC claims are untimely.

Runyon added separate claims of ineffective assistance of both trial and appellate counsel to this claim.  These claims are different in nature than the claim raised in the original § 2255 motion, nor do the new claims arise "out of the conduct, transaction, or occurrence set forth . . . in the original pleading."  Fed. R. Civ. P. 15(c)(2).  The original claim is a constitutional attack on Runyon's death sentence, not a specific challenge to counsels' performance.  There is no "common core of operative facts uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005).  They are wholly different claims that are not related.  *See e.g., United States v. Lynn*, No. 3:08-CR-82, 2014 WL 3858543, at **10–11 (E.D. Va Aug. 5, 2014)(finding additional ineffective assistance of counsel claims different from original claims not timely and not related back under Rule 15).

Even assuming these additional new claims are timely and related back, Runyon cannot demonstrate prejudice for counsels' failure to raise this claim.  As stated above, the claim has no merit and Runyon has failed to demonstrate that the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 696.

**Claim 14:      Runyon's sentence does not violate the Eighth Amendment as there is no precedent to shield mentally ill individuals from the death penalty.**

Runyon contends that his death sentence violates the Eighth Amendment because he is severely mentally ill.  (Doc. 478 at 105–07.)  Relying on *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), Runyon argues that this Court should promulgate a new constitutional rule barring the execution of individuals displaying severe mental illness at the time of their capital offense.  He reasons that such persons are less morally culpable because

the mental illness diminishes their capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."  *See* ECF, pg. 117 (quoting *Atkins*, 536 U.S. at 318–20).

This claim fails for several reasons.  First, the claim is procedurally defaulted and Runyon does not attempt to proffer any argument demonstrating cause and prejudice for his default.  Second, this claim is *Teague*-barred.  Third, the claim fails on its merits.  The Supreme Court has not established a *per se* exemption to capital prosecution for the mentally ill.

A.    Runyon's claim is procedurally defaulted.

As stated above, the procedural default doctrine generally bars § 2255 review of claims that could have been, but were not, presented at an earlier stage of the litigation unless the defendant shows "cause" and "prejudice" to excuse the default.  *Frady*, 456 U.S. at 170.  The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error.  *Id.*; *Coleman*, 501 U.S. at 753.

Here, Runyon does not attempt to make any showing that a factor external to the defense prevented trial counsel from raising this claim.  Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty."  *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 336, 347).

129

B.      Runyon's claim is also barred by Teague non-retroactivity.

Runyon's claim is also barred by the non-retroactivity doctrine.  *See infra* Claim 12.

*Teague*, and its progeny, bar defendants from relying on a "new" rule of procedure in seeking to overturn their convictions on collateral review.  489 U.S. at 310.  The rule Runyon posits here was not dictated by precedent at the time his conviction became final, thus it is a "new" rule under *Teague*.  Indeed, the constitutional rule Runyon proposes is without support in existing precedent.  Further, neither of the two *Teague* exceptions to non-retroactivity applies. Accordingly, Runyon's claim is barred for this additional reason.

C.      Runyon's constitutional claim is without merit in any event.

1.  There is no national consensus in favor of a blanket exemption to capital punishment for the mentally ill.

At the outset, it is clear and undisputed that the Supreme Court has not recognized mental illness as a *per se* bar to execution.  *See Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (holding neither *Roper* nor *Atkins* created a new rule of constitutional law making the execution of mentally ill persons unconstitutional); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with mental illnesses); *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (recognizing Supreme Court's exemptions from execution for the mentally retarded and minors, but that "it has not yet ruled out the execution of persons who kill under a mental illness").[17]  Indeed, in *Atkins*, the Supreme Court expressly limited its holding to the mentally retarded.  *Atkins*, 536 U.S. at 320 ("[Offenders who are not mentally retarded] are unprotected by the exemption and will continue to face the threat of execution.").

---

[17] Albeit in a much different context, it is worth noting that the Supreme Court has recognized that the differences between the mentally retarded and the mentally ill permit states to treat them differently.  *See Heller v. Doe*, 509 U.S. 312, 321-22 (1993).

Nor do the "evolving standards of decency" command that the Supreme Court's reasoning in *Atkins* or *Roper* should be extended to insulate from capital punishment those with mental illness. *See Thacker v. Workman*, Case No. 06-CV-0028, 2010 WL 3466707, \*23-24 (N.D. Okla. Sept. 2, 2010) (declining the petitioner's "invitation to extend the Supreme Court's prohibition on executions of mentally retarded persons and minors to person with mental health issues based on 'evolving standards of decency'"). Indeed, Runyon points to no "objective indicia of society's standards," *Atkins*, 536 U.S. at 312, indicating that modern sensibilities favor such a prohibition on subjecting the mentally ill to capital prosecution. *See id.* ("Proportionality review under those evolving standards should be informed by objective factors to the maximum possible extent." (internal quotations omitted)); *Roper*, 543 U.S. at 563 (holding same).

The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures. *Atkins*, 536 U.S. at 312. For example, at the time *Atkins* was handed down, the Court tallied that 14 states prohibited the death penalty outright, 18 states plus the federal government prohibited imposition of the death penalty upon mentally retarded individuals, and three more states had similar bills pending. *Id.* at 315; *see also id.* ("It is not so much the number of these States that is significant, but the consistency of the direction of change."). Here, however, Runyon has not cited and the Government has not found a single legislative act prohibiting the imposition of capital punishment upon individuals who displayed mental illness at the time they committed a capital offense, other than, of course, those who satisfy the time-tested defense of insanity.

Likewise, several state high courts have refused to recognize a constitutional bar to imposing capital punishment upon mentally ill individuals. In fact, the wave of post-*Atkins* authority from state courts demonstrates that the national consensus is *against* an absolute bar to

capital punishment for the mentally ill. *See People v. Hajek*, 324 P.3d 88, 173-74 (Cal. 2014) (holding serious mental illness does not necessarily negate moral responsibility for killing and declining "to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence" ); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (joining several state and federal courts "in holding that a defendant's mental illness does not prevent imposition of a capital sentence"); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (holding prohibition under *Atkins* against execution of mentally retarded as cruel and unusual punishment did not extend to a mentally ill defendant); *Dotch v. State*, 67 So.3d 936, 1006 (Ala. 2010) ("Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded or the definition of legal insanity . . . and this Court will not extend or expand the constitutional prohibitions against the application of the death penalty in this case.") (citations omitted); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (holding Eighth Amendment's prohibition against execution of mentally retarded persons did not extend to mentally ill defendant; rather, mental illness was mitigating factor that jury could consider); *Diaz v. State*, 945 So.2d 1136, 1152 (Fla. 2006) (holding that even if petitioner could prove he suffered from mental illness, this fact "would not automatically exempt him from execution as there is no per se 'mental illness' bar to execution"), *abrogated in part on other grounds by Darling v. State*, 45 So.3d 444 (Fla. 2010);[18] *People v. Runge*, 917 N.E.2d 940, 985-86 (Ill. 2009) (declining to extend *Atkins* or *Roper*, and holding that even a finding of "guilty but

---

[18] The Florida and Indiana Supreme Courts have also rejected equal protection challenges to the imposition of the death penalty upon mentally ill persons because such persons are not similarly situated to persons with mental retardation or persons aged younger than 18 at the time of their crimes. *See Carroll v. State*, 114 So.3d 883 (Fla. 2013); *Matheny v. State*, 833 N.E.2d 454 (Ind. 2005).

mentally ill" does not preclude imposition of the death penalty); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations"); *Baird v. State*, 831 N.E.2d 109, 115-16 (Ind. 2005) (holding neither evolving standards of decency, changes in legal landscape, nor development of statewide consensus since petitioner was sentenced to death indicated that death sentence had come to constitute cruel and unusual punishment for persons with mental illness); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (stating defendant failed to "cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill," and declining to extend the holding of *Atkins*).

Recognizing there is no national consensus in favor of abolishing the death penalty for mentally ill offenders, this Court's inquiry on the merits should stop here. While the Supreme Court has stated that it must also bring its independent judgment to bear on the question of the acceptability of the death penalty under the Eighth Amendment, *Atkins*, 536 U.S. at 312, the Court has never expressed its independent judgment regarding the propriety of imposing capital punishment upon the mentally ill. Thus, this Court would exercise an extraordinary and unprecedented assumption of power to do so in this case. Instead, this Court should leave to Congress the duty of creating new laws. *Atkins*, 536 U.S. at 324 (Rehnquist, C.J., dissenting) (stating it is undeniable that "the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluat[e] and giv[e] effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments").

133

2.   The rationale underlying *Atkins* and *Roper* does not apply to the mentally ill.

Even ignoring the legal deficiencies of Runyon's claim, he has not set forth a sufficient basis for this Court to "disagree with the judgment reached by the citizenry and its legislators," *Atkins*, 536 U.S. at 313, as well as the several courts cited above, who have refused to establish a categorical bar to the imposition of capital punishment upon mentally ill individuals who do not meet the criteria of an insanity defense.

In *Atkins* and *Roper*, the Supreme Court held that the justifications for the death penalty (retribution and deterrence) did not apply to the mentally retarded or juveniles because they were generally less morally culpable and less susceptible to deterrence. *See id.* at 319-20; *Roper*, 543 U.S. at 569-70. The *Atkins* Court also stated that the reduced mental capacity of the mentally retarded impermissibly enhanced the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. *Id.* at 320-21 (citing concerns with false confessions, the inability of mentally retarded defendants to assist counsel in presentation of mitigation, that mentally retarded defendants make poor witnesses, that their demeanor may create an impression of lack of remorse, and that evidence of mental retardation may also enhance the likelihood that the jury will find future dangerousness as an aggravating factor).

The Court's rationale underlying its decisions in *Atkins* and *Roper* does not come to bear in the present context. The justifications for capital punishment, to wit: retribution and deterrence, apply with full force to mentally ill persons who do not meet insanity standards. Short of the legally insane, legislatures, courts, and the general public have not recognized the mentally ill to be "categorically less culpable than the average criminal." *See Atkins*, 536 U.S. at 316. Nor have they recognized the mentally ill to lack the capacity to be deterred. The facts of this case certainly bear on these points. Assuming Runyon displayed any form of mental illness

134

at the time of the murder, its manner of execution, as found by the jury, required substantial planning and premeditation, and was not impulsive or the product of some diminished ability to understand or process the situation.  Rather, the murder of Cory Voss required planning and deliberate conduct.  This is precisely the type of conduct and thinking that deserves the ultimate punishment and that is intended to be deterred with the federal death penalty.

What is more, classifying a person as mentally ill for the purpose of providing a blanket exemption to capital punishment is fundamentally different from classifying juveniles or the mentally retarded.  A person is either under the age of 18 or he is not.  He is either mentally retarded or he is not.  Mental illness, on the other hand, is subject to varying types and degrees of illness.  Even if mental illness is present, there must also be a question of how that illness affected the offender's ability to understand the wrongfulness of his actions or to conform his conduct to the law.   Further, mental illness is, in most instances, treatable through medications and/or counseling therapy.

The differences between mentally ill and non-mentally ill offenders, unlike the differences between juvenile and adult offenders, are not "too marked and well understood" to allow a mentally ill person to be sentenced to death despite purportedly reduced culpability. *Roper*, 543 U.S. at 572-73.  Further, given the need for individualization in capital sentencing, it would be arbitrary and unnecessary to adopt a categorical rule barring imposition of the death penalty upon the mentally ill.  This Court should not agree to establish this new and ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case. *See Hancock*, 840 N.E.2d at 1059-60.  To do so would, in a great number of cases, turn over the

determination of the appropriateness of capital punishment to mental health professionals of varying qualifications and biases, and leave the sound judgment of juries as an afterthought.

### 3. Other remedies are available.

None of this is to say that individuals with severe mental illness are without recourse. Congress has clearly defined and federal courts have for years applied a defense for the legally insane. It is an affirmative defense . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. § 17(a). Mental disease or defect does not otherwise constitute a defense. *Id*. The defendant bears the burden of proving the defense of insanity by clear and convincing evidence. 18 U.S.C. § 17(b). Should a capital defendant satisfy the elements of the insanity defense, he/she may not only avoid capital punishment, but criminal responsibility altogether. *See* 18 U.S.C. § 4242. Thus, it is wholly unnecessary to hold a separate pretrial hearing to determine whether a capital defendant is mentally fit for capital prosecution.[19]

In sum, neither *Atkins*, nor *Roper* shield mentally ill individuals from capital punishment. Nor does the Constitution or any statute.

---

[19] In a slightly different context, the Supreme Court has held that the Eighth Amendment prohibits the government from carrying out a sentence of death upon a prisoner who is insane. *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986). *See also* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person."). This prohibition applies despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it. *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007). Lower federal courts, however, have refused to extend this rule to mentally ill individuals who do not satisfy the rather strict competency to be executed standard set forth in *Ford*. *See*, *e.g.*, *Ferguson v. Sec'ty, Fla. Dept. of Corrections*, 716 F.3d 1315 (11th Cir. 2013); *Green v. Thaler*, 2012 WL 4800431 (5th Cir. 2012); *Bedford v Bobby*, 645 F.3d 372 (6th Cir. 2011).

**Claim 15:**  **The selection of the grand jury/or petit jury was not tainted, and trial counsel did not unreasonably fail to request and examine the jury selection records.**

A.      Selection of the grand and petit juries were not tainted.

The defendant assigns numerous errors without specificity regarding the selection of the grand and petit juries.  Although the defendant has amended his claim, he has not added a substantive argument. This claim is procedurally defaulted.  The defendant could have made this claim at trial and on appeal, but failed to do so.  The defendant must demonstrate "cause" for his double procedural default and "actual prejudice" resulting from the error.  *Frady,* 456 U.S. at 167-68.  The defendant has failed to address cause for his default and what prejudice he suffered.

Procedural default notwithstanding, Runyon fails to articulate any argument, much less any evidence, that supports his claim that he is entitled to relief.  He claims that he has not received the evidence necessary to substantiate his claim.  The United States disagrees. This claim should be denied.

B. The trial court did not substantially fail to comply with the Jury Selection Plan and the provisions of Title 28 U.S.C. §1861 *et. seq.*

The defendant argues next that the trial court failed to substantially comply with the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia (hereafter the Plan) and the provisions of the Jury Selection and Service Act of 1968, Title 28 U.S.C. §1861 *et. seq.* (hereafter the Act.)  As this claim is being made for the first time since the February 2008 indictment, almost eight years after the fact, this claim is procedurally defaulted (see above) and untimely pursuant to the Act.  Nonetheless, the trial court did not substantially fail to comply with the EDVA Jury Selection Plan and the statute, thus Runyon is not entitled to a new trial.

1.   Timeliness

This claim is untimely. It is important to note that the defendant is not making a Sixth Amendment claim, but rather a statutory and Plan violation claim.[20] Title 28 U.S.C. § 1867, provides a criminal defendant or the United States, upon timely motion, a remedy if a trial court fails to *substantially* comply with the jury selection process as outlined in Title 28, U.S.C. § 1861 *et. seq.;* "(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of due diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury."  The defendant has not made a timely motion. In *United States v. Curry*, 993 F.2d 43, 44 (4th Cir. 1993), the Fourth Circuit held that a defendant who was denied the master grand jury list prior to trial does not in and of itself require a reversal, but may lead to a new trial if he could demonstrate, *upon a timely motion*, a violation of the act which prejudiced him. This case is distinguishable from *Curry*, where the defendant had made a request prior to his trial for the master grand jury list and the trial court denied the request.  Here, such a request was never made until just prior to the filing of the habeas petition.

Other circuits have addressed the timeliness requirement of a statutory violation.  The Fifth Circuit addressed the issue in *United States v. Beardon*, 659 F.2d 590, 597 (5th Cir. Unit B 1981), *cert denied* 456 U.S. 936 (1982).  There, some of the defendants involved in the case filed timely motions before trial, while others did not. On appeal, the court held that the defendant's motions that were untimely filed in the trial court, were not cognizable on appeal, "[T]he timeliness and sworn statement requirement of the Act provide that the motion to dismiss must

---

[20] A Sixth Amendment violation claim may avoid the strict timeliness requirements of a statutory claim.  See *United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir. 1995), *cert denied*  516 U.S.1084  (1996).

state the 'facts' and 'grounds' on which the motion rests. 28 U.S.C.A. §§1867(a), (d). The purpose of these requirements is to allow the court to quickly assess the merits of the motion and to determine whether an evidentiary hearing is warranted." The Eleventh Circuit concurred holding in *United States v. Paradies*, 98 F3d. 1266, 1277 (11th Cir. 1996) that the timeliness of filing a challenge "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act. (*quoting United States v. Beardon*, 659 F.2d at 595). The court stated further, "once voir dire begins, Jury Selection Act challenges are barred, even where the grounds for the challenge are discovered only later." *Paradies*, 98 F3d. at 1278. Accordingly, the Court should deny this claim as untimely filed.

2.   Declaration of Defense Counsel under 28 U.S.C. § 1867 (d)

Counsel for Runyon, Ms. Brace, filed a Declaration, Exhibit 39, ECF 511-39, pursuant to Title 28 U.S.C. § 1867 (d) which states in pertinent part, "Upon motion filed under subsection (a), (b), or (c), of this section, containing a sworn statement of facts which, if true, would constitute failure to comply with the provisions of this title…." Such a declaration is a prerequsite to a claim under the Act. The United States submits, however, that this Declaration has failed to state facts which, if true, constitute any violation of the Act. Runyon has failed to articulate any facts of a violation of the Act, much less a substantial failure by the Court.  *See Paradies*, 98 F3d. at 1278-1279.

3.   "Substantial Failure"

The defendant next claims that the Court substantially failed to comply with the Act because it failed to make notations regarding the disqualifications, excuses, exemptions, and exclusions of some potential jurors.  Even assuming that this claim is cognizable in a habeas petition, the defendant's claim fails because the Court did not substantially fail to comply with

the Act.

Pursuant to Title 28, U.S.C. §1866(d) and the EDVA Plan, the clerk must note the specific reasons for any disqualification, excusal, exemption or exclusion. Specifically, the defendant claims that the Court failed to specify a reason for the disqualification, excusal, exemptions and exclusions of "148 jurors" (94 under the category "court order" plus 54 where no reason was given).[21]  The defendant then posits that because these reasons are not specifically noted there has been a substantial violation of the act that requires reversal of his conviction and a new trial. The defendant cites no case law to support this proposition.

The Court provided counsel, pursuant to Memorandum Orders, ECF 475 and 481, a sealed packet containing a Memorandum dated October 5, 2015 from Amanda Woodall, the Jury Clerk for Norfolk and Newport News Divisions with supporting documents.  The Memorandum contained attachments with a statistical breakdown of the Grand Jury (3), a statistical breakdown of the petit jury (4) and the list of reasons for disqualification, etc. (5). The defendant's argument does not concern the Grand Jury, but the petit jury. While the first page of section (4) of the Memorandum entitled "Source List/Race and Gender Report for Entire Pool" that was provided to counsel shows a total number of jurors called at 425, both the United States and the defense actually counted 423 jurors from section (4) of the attachments to the Memorandum. Two hundred forty three (243) jurors filled out a questionnaire, which leaves 180 jurors. Of those 180 jurors, 127 jurors were disqualified/exempted etc., which leaves 53 jurors that were not accounted in the raw numbers of section (5) of the Memorandum.

"A Jury Selection Act violation is substantial only if it frustrates the Act's two basic goals: '(1) random selection of juror's names; and (2) use of objective criteria for determination

---

[21] The United States actually counts 96 jurors that were excused under the category "court order" and that left 53 jurors that were not accounted for in a category of disqualification/ exemption.

of disqualifications, excuses, exemptions, and exclusions'". *Paradies*, 98 F3d. at 1277, *quoting*

*United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984), *cert denied*, 469 U.S. 1208 (1985)

and *United States v. Carmichael*, 685 F.2d 903, 911 (4th Cir. 1982).  The remedy for a substantial

violation is that the court stay the proceedings or dismiss the indictment, whichever is

appropriate pursuant to Title 28, U.S.C. §1867(d). The United States submits that the Court may

very well have had reasons for these disqualifications, excuses, exemptions, and exclusions that

have not been provided to counsel at this point.[22] But even if this evidence no longer exists, there

has not been a substantial failure by the Court to comply with the Act. The defendant's mere

argument and speculation do not give rise to a substantial failure. Runyon has not produced any

specific evidence that the court failed to use objective criteria for any removals. At most, there

has been a technical violation of the Act and those types of violations are generally not deemed

substantial.  *See Carmichael*, 685 F.2d at 911, *United States v. Meredith*, 824 F.2d 1418, 1424

(4th Cir. 1987), *Gregory*, 730 F.2d at 700 and *Paradies*, 98 F3d. at 1280.  Specifically, the

defendant's argument regarding the number of jurors that he says were excused without notation,

148, fails. First, the exemption category "court order" is a specific category of exemptions.

Accordingly, the defendant's argument that it is not a category is without merit. That leaves 53

jurors unaccounted for in the raw numbers of section (5) of the Memorandum. (Despite the

differences in the United States and defendant's calculation of the numbers, there are slightly

over 50 jurors that the Court's documents do not list a code for disqualification or exemption.)

The defendant concludes that these jurors were excluded using nonobjective criteria, which must

somehow be discriminatory. There is absolutely no evidence to support this argument and the

defendant has not shown any prejudice that has inured to him. The defendant offers *United States*

---

[22] The answer may be as simple as these individuals were deferred or did not return their standard jury
questionnaires to the Court or failed to appear on a summons. *See United States v. Aguero*, 248 F. Supp 2d, 1150,
1152 (S.D. Florida, Miami Division Jan. 23, 2003.)

*v. Royal*, 174 F3d 1, (1st Cir. 1999) as an example of a judge's displeasure of ten unrecorded dismissals of black jurors. However, the court found that those dismissals did not constitute a substantial violation of the Act. In *Carmichael*, 685 F.2d at 911, the Fourth Circuit ruled that technical violations do not qualify as substantial unless the two objectives furthered by the Act have been affected.  These objectives are "random selection of juror names from voter lists and determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only". The defendant has the burden to show that the Court dismissed these jurors using for nonobjective reasons and he has not done so.

The defendant also claims that the petit venire excluded Native Americans and Asians. The defendant claims, according to the records, that one of the Native Americans was excluded by "court order", while the other was not given a reason for the exclusion. There were 16 Asians that were called for jury duty and five were excluded  under a "court order", one because he/she no longer lived in the jurisdiction and three where no reason was given.  The defendant states in his amended motion, "No other group was decimated at this level". If the defendant is making an argument regarding a violation of the fair cross-section requirement of the Act, he has failed.  In order to prevail on this claim, the defendant must show: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to a systematic exclusion of the group in the jury-selection process.  *Duren v. Mississippi*, 439 U.S. 357, 364 (1979) and *United Sates v. Lewis*, 10 F.3d 1086, 1089-90 (4th Cir. 1993).  While Native Americans and Asians are distinctive groups, the defendant has failed to put forth any evidence that "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

142

number of such persons in the community; and (3) that this underrepresentation is due to a systematic exclusion of the group in the jury-selection process". Accordingly, these claims fail.

C.       A person who did not qualify did not participate in Runyon's trial   .

This claim is procedurally defaulted.  Nonetheless, there was no error committed by the court. The defendant contends that a juror with the initials of S.M.G. participated in the trial and is not listed in the qualified jury wheel therefore tainting the jury process. A person with the initials of S.M.G. (juror 84 from sealed Exhibit A list of jurors appearing on June 30, 2009) took part in the petit jury selection process. However, on the juror questionnaire for juror 84, the initials of S.M.R. filled out the questionnaire. The United States submits that the evidence shows that this is the same person. First, while the last initial is different, the first and middle initials are the same. Second, the 2007 Norfolk Qualified Wheel, participation number 100760415, shows a juror with the initials of S.M.R. who lives in Virginia Beach with a zip code of 23464. This person is a white female. The Juror Questionnaire filled out by juror 84 has the initials of S.M.R, who is a white female who lives in Virginia Beach with a zip code of 23464. Additionally, on page 15 of the questionnaire, question 67, the juror wrote that she knew a person on the potential witness list who has the initials of M.D.  On the first day of trial, June 30, 2009, juror S.M.G. told the court that she knew the same potential witness, M.D. TT, p 36. Accordingly, juror 84 is the same person. Perhaps this person changed their name due to a marriage or divorce.  The defendant's claim is without merit and should be denied.

D.       Trial counsel was not ineffective for failing to request and examine the Jury Lists.

While it is true that counsel has a right to inspect jury lists, the failure to make this request does not make counsel's performance deficient. *Test v. United States*, 420 U.S. 28, 30 (1975). According to *Strickland v. Washington*, 466 U.S. 668 (1984), in order to prevail on an

ineffective assistance claim, a criminal defendant must show both (1) that counsel's representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id*. at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id*. at 697.

Runyon has failed to show that his counsel's performance was deficient. He merely quotes from the ABA Guideline, which states only "Counsel should consider…." Runyon cites no case law to support the proposition that counsel was deficient for failing to request the jury lists. Furthermore, Runyon cannot prove that he was prejudiced by such failure; he merely makes a speculative conclusion. Accordingly, this claim fails.

**Claim 16:**   **The United States did not engage in racial and gender discrimination during jury selection and defense counsels were not deficient in their performance for failing to object**.

Runyon asserts that the United States violated his Fifth Amendment Equal Protection right for the peremptory strikes used at trial, and that his trial counsel failed to object in violation of his Sixth Amendment right to effective assistance of counsel. These claims lack merit.

A.   Procedural Default

Runyon's substantive Fifth Amendment claim, that the United States discriminated against blacks and women in the selection of the jury, has been procedurally defaulted. Runyon, who is white, did not make this claim at the time of trial, nor did he raise it on appeal. Instead, he raises this claim for the first time more than six years after his trial. Accordingly, Runyon must show cause for his failure to raise it at an earlier time and actual prejudice resulted from the error. *Frady*, 456 U.S. at 168–70. The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the crime or a denial of an effective

144

assistance of counsel.  *Mikalajunas*, 186 F.3d at 493.  The standard for prejudice is that the alleged error that led to the issue not being raised on appeal worked to the defendant's "actual and substantial disadvantage, infecting his entire trial with error."  *Frady,* 456 U.S. at 170.

Runyon has failed to satisfy the standards set in *Frady* and *Mikalajunas.*  Accordingly, his substantive claim fails.  *See United States v. Lighty*, 2014 WL 5509205 (D. Maryland Oct. 30, 2014).

B.      Ineffective Assistance of Counsel Claim

To prevail on an ineffective assistance of counsel claim, Runyon must show both that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced by that deficient performance.  *See Strickland,* 466 U.S. at 687.  Given there was no discrimination by the United States, Runyon cannot satisfy either of the *Strickland* requirements. Counsel was not ineffective for failing to press this futile motion at trial.

1.  Trial Counsels performance was not deficient.

There were six trial counsel present at trial selecting a jury.  Two counsel a piece for both Runyon and co-defendant Draven and they shared the 20 peremptory strikes.  There were two counsel for the United States.  No objections were made during the jury selection by Runyon's defense counsel or Draven's.

In *Batson v. Kentucky*, the Supreme Court recognized the prohibition against litigants using peremptory challenges "solely on account of race."  476 U.S. at 89.  In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128-29 (1994), the Supreme Court extended *Batson*'s holding and found that a gender-based exercise of a peremptory challenge violates the Equal Protection Clause of the Constitution.  As the Supreme Court detailed in *Rice v. Collins*, the *Batson*

145

decision established the procedure for determining whether a party has improperly relied on race

during jury selection:

> A defendant's *Batson* challenge . . . requires a three-step inquiry. First, the trial
> court must determine whether the defendant has made a prima facie showing that
> the prosecutor exercised a peremptory challenge on the basis of race…. Second,
> if the showing is made, the. . . prosecutor [must] present a race-neutral
> explanation for striking the juror in question. . . . "[T]he second step . . . does not
> demand an explanation that is persuasive, or even plausible"; so long as the
> reason is not inherently discriminatory, it suffices…. Third, the Court must then
> determine whether the defendant has carried his burden of proving purposeful
> discrimination. This final step involves evaluating "the persuasiveness of the
> justification" proffered by the prosecutor, but "the ultimate burden of persuasion
> regarding racial motivation rests with, and never shifts from, the opponent of the
> strike."

546 U.S. 333, 338 (2006).  As detailed below, Runyon has failed to present adequate evidence as

to any of these steps.  Consequently, the Court should deny all claims based upon the

submissions.

Under *Batson*, a defendant may establish a prima facie case of discrimination by showing

that: (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the

challenges to remove from the venire members of the defendant's race; and (3) other facts and

circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in

his or her selection of the jury pool. *Batson*, 476 U.S. at 96-97.  The Supreme Court has modified

*Batson* to allow defendants of races different than the excused jurors to have standing to raise

*Batson* challenges. *See Powers v. Ohio,* 499 U.S. 400, 415 (1991).

Given the fact that the defendant and the victim are white males, and Runyon alleges

discrimination against blacks and women, he patently cannot satisfy the first two elements of a

prima facie case.  *See Keel v. French,* 162 F.3d 263, 271 (4th Cir. 1998) ("First, neither the

defendant nor the victim is of the same race as the jury. While the defendant need not be a

member of the same race as the excused jurors in order to raise a *Batson* challenge, that *Keel* and

146

the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race.") (internal citations omitted). Therefore, to establish a prima facie case here, Runyon must show other facts and circumstances surrounding the proceeding sufficient to raise an inference of purposeful intent by the United States to discriminate based on all of the relevant evidence. *United States v. Joe*, 928 F.2d 99, 102(4th Cir. 1991) (*citing Batson*, 476 U.S. at 96).

Runyon argues that by looking solely at the statistics of the strikes made by the United States, he has made a prima facie case of discrimination in violation of *Batson* and *J.E.B.* Runyon further argues that discrimination and the intent of the United States can be shown based upon the fact that the videotape of Runyon's questioning by police was introduced into evidence at the penalty phase of trial. In that videotape, officers referred to Runyon as "an honorable Asian man." Runyon does not make any further argument about the discrimination of women by the United States.

As the Fourth Circuit has noted, "[t]hough statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply." *Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004). Rather, the defendant must come forward with something beyond mere raw data. *United States v. Tipton*, 90 F.3d 861, 881, n.11 (4th Cir. 1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of four men versus eight women stricken).

The jury which convicted Runyon, a white male, during the guilt phase consisted of eight women and four men, nine whites and three blacks. The four alternates chosen were two white males and two white females. The United States used 19 of its 20 peremptory strikes to select the

147

jury.  The United States struck 13 women, six were white and seven were black.  During the selection of the alternates, the United States struck one white female and one black male. Runyon and Draven struck, 20 whites, consisting of eight women and 12 men.  During the selection of the alternates, Runyon and Draven struck one black male and a female, who failed to identify her race on her questionnaire (juror 166).  Counsel for Runyon were not deficient in their performance in failing to make a *Batson* challenge because the United States struck women and blacks who answered question 61 of the questionnaires that they were either opposed to the death penalty (question 61(d)) (Jurors 7, 28, 52, 97, 81, 31, 40, 63, 46, ) or answered both that they were generally opposed and generally in favor of the death penalty (question 61( c) and (d)) (jurors 18, 73, 116, 15).  Furthermore, a number of these jurors either had served in the military or had relatives serving in the military or had served in the military (Jurors 7, 52, 31, 63, 18, 15). Presumably, Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer.  In *Keel*, 162 F.3d at 271, the Fourth Circuit stated, "Given these jurors opposition to, or hesitation toward, imposing the death penalty, it clear that the prosecutor acted well within constitutional bounds in excusing them." (quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (1985)).

If the government were acting with a purposeful intent to exclude prospective jurors based upon gender or race, it would have used its peremptory remaining strike to exclude another female or black person from the venire.  The various statistical permutations presented by the defendant are not only misleading, under the controlling precedent set forth in *Tipton,* they are inadequate to make a prima facie case of discrimination.  *See also Keel,* 162 F.3d at 271-72 (defendant failed to establish prima facie case based upon the states use of nearly 70% of its peremptory challenges to strike African-American venire members).  Clearly, trial counsels'

failure to raise a *Batson* challenge was based upon the premise that there was racially and gender neutral reasons for the prosecution's use of their peremptory strikes. Accordingly, Runyon cannot make a prima facie case and trial counsels conduct did not fall below the conduct reasonably expected of counsel.

In order to prevail on a *Strickland* claim, a criminal defendant must show both (1) that counsel's representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. 466 U.S. at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id*. at 697. To establish counsel's representation was deficient, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The reasonableness of attorney performance is simply "reasonableness under prevailing professional norms." *Id*. Counsel's performance need do no more than insure the trial was a "reliable adversarial testing process." *Id*.

Runyon fails to demonstrate that his counsel performed deficiently. Moreover, based on this record, Runyon cannot show actual prejudice. He proffers no evidence that the United States used race or gender in exercising its peremptory strikes.

Runyon has failed to produce sufficient evidence to overcome his procedural default and that his trial counsel were ineffective. This claim should be denied.

**Claim 17**:    **Runyon's constitutional challenge to the voir dire procedure is procedurally defaulted and trial counsel did not provide ineffective assistance during jury selection**

A.    Runyon's constitutional challenge is procedurally defaulted and Teague-barred.

Runyon contends that the Court's voir dire procedure used in his trial violated his Fifth and Sixth Amendment rights. Specifically, he claims that the questionnaire used in selecting the

jury was flawed (referencing Claim S2); that this Court gave the jurors no guidance regarding the law before completing the questionnaire; that this Court's oral voir dire was minimal; and that the Court's questions to potential jurors were inadequate.

At a threshold level, this claim is procedurally defaulted. Runyon failed to raise this claim on direct appeal and he fails to demonstrate cause and prejudice for his default. *Frady*, 456 U.S. at 170. This claim should be denied on this basis alone.

This claim is also barred by the non-retroactivity doctrine under *Teague*. As of October 6, 2014, when Runyon's convictions and sentences became final, existing precedent did not dictate a grant of relief on Runyon's claim. Runyon asks this court to apply a new rule contrary to existing precedent giving the trial court discretion to conduct voir dire. Further, neither of the *Teague* exceptions apply here because Runyon's proposal would only take discretion away from the trial court and not exclude certain offenses or offenders from the death penalty, and it is not a watershed rule.

B.    Runyon's claim fails on the merits in any event.

Procedural default notwithstanding, Runyon fails to demonstrate that this Court's voir dire procedure in his trial was constitutionally infirm.    The trial court conducted a proper voir dire and Runyon does not proffer any evidence that the jury was impartial.

Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury. *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Voir dire also "enable[s] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The conduct of voir dire is committed to the sound discretion of the trial court. *United States v. Bakker*, 925 F.2d 728, 733–34 (4th Cir. 1991). The

150

Supreme Court has generally refrained from dictating the form of voir dire questions. *Lancaster*, 96 F.3d at 739 (citing *Mu'Min*, 500 U.S. at 431). It is well settled that the trial court has discretion to question potential jurors without allowing counsel to question them, and to conduct the questioning collectively rather than individual. *Bakker*, 925 F.2d at 734; *see also* Fed.R.Crim.P. 24(a).

To obtain a new trial based on alleged juror dishonesty during voir dire, a defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). In addition, "even where . . . the two parts of the *McDonough* test have been satisfied, a juror's bias is only established . . . if the juror's motives for concealing information or the reasons that affect the juror's impartiality can truly be said to affect the fairness of the trial." *Conaway v. Polk*, 453 F.3d 567, 588 (4th Cir. 2006) (internal quotation marks omitted).

Runyon first complains that the trial court's oral voir dire was minimal, asked follow-up questions of few potential jurors, and only addressed the potential jurors collectively.[23] But a review of the voir dire conducted by the trial court here reveals that the process the trial court conducted was fair and ensured that an impartial jury was impaneled. Runyon proffers no evidence that his jury was impartial.

Prior to jury selection, the parties submitted and the court accepted a jury screening questionnaire to assist in gathering information from potential jurors. ECF 211. After the parties culled the questionnaires and submitted a stipulated list of jurors they agreed were not qualified to serve, the trial court conducted collective questioning of a group of 62 potential

---

[23] Runyon also incorporates his argument in Claim S-2 that the jury questionnaire was flawed. The Government relies on its response to that argument in Claim S-2.

jurors. TT, p. 10. The trial court explained to the parties that they would be given the opportunity to have the court ask any follow-up questions or object to the voir dire process. *Id*. at 44. During questioning of the first group of 62 potential jurors, the trial court instructed them that they would be required to "put aside any feeling of passion or prejudice and decide this case solely on the evidence that would be introduced during the trial and the instructions that I would give you as the judge, as the court, concerning the law of the case." *Id*. at 52-53.

The trial court also asked appropriate screening questions regarding potential jurors opinions regarding the death penalty as required by *Morgan v. Illinois*, 504 U.S. 719 (1992). (*Id*. at 77, 98–99, 102–03, 124; TT, 7/1/09, pg. 175.) After questioning the potential jurors, the trial court gave the parties an opportunity to submit any follow-up questions to be considered, (*Id*. at 115), and did ask follow-up questions proposed by Runyon. *Id*. at 117–18. Throughout the jury selection process the trial court asked the parties if they had any objections to the voir dire process—as to the process, they did not. *Id*. at 62, 108–09, 125; TT, p. 176.

Runyon's complaint that oral voir dire was constitutionally flawed because it was "minimal" is without merit. He cites no case law requiring a quantitative comparison of voir dire. *See Bakker*, 925 F.2d at 733 (rejecting contention that voir dire was not sufficient because it was completed in one day). The relevant question is whether an impartial jury was seated. *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990). Runyon fails to demonstrate that his jury was impartial. The trial court here conducted a sufficient voir dire directed at disclosing those jurors impacted by either media exposure or personal beliefs that had a substantial impact on their ability to serve as jurors.

Runyon also contends that the trial court's collective questioning of potential jurors was inadequate. He argues that 34 percent of the potential jurors did not speak during voir dire and

the trial court therefore did not properly assess their credibility.  Runyon argues that questions addressed to groups of individuals provides an opportunity for potential jurors to conceal bias. The trial court's collective questioning of potential jurors here was not constitutionally infirm. The Constitution "does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury," and the form of voir dire is in large measure left to the discretion of the trial court.  *Morgan,* 504 U.S. at 729.  Questioning potential jurors in a collective setting was well within the trial court's discretion.  *Bakker*, 925 F.2d at 734.

Moreover, Runyon fails to proffer any evidence that a juror concealed any information suggesting that a biased juror served at his trial.  Runyon asserts that this Court's voir dire failed to reveal that Juror 124 was purportedly employed by Langley Federal Credit Union, and that trial counsel was ineffective for failing to strike Juror 124.  Runyon's argument implies that the Court's voir dire process allowed a bias juror to serve on the jury.  The fact that Juror 124's employer was not revealed through oral voir dire does not mean that the juror intentionally concealed the information or that the Court's jury selection process was inadequate.  The juror's employer was revealed through a questionnaire, thus the juror did not conceal the information. In addition, this information was available to counsel, through the questionnaire, for a determination as to whether to make a peremptory challenge.  Furthermore, any claim of bias as to Juror 124 is belied by the Court's dismissal of the bank robbery charge in count 3.  The basis for any bias was thus absent based on the dismissal of the charge.

Runyon points to no evidence that any member of his jury labored under any disqualifying criteria or that any impartiality affected the fairness of his trial.  *McDonough*, 464 U.S. at 556.  Likewise, for the same reasons, Runyon's claim of ineffective assistance of counsel

must fail.  Runyon cannot demonstrate that he was prejudiced by counsel's failure to strike Juror 124.

Runyon argues that the trial court failed to properly inquire whether potential jurors could "make a decision about his guilt or innocence without considering the sentencing options that might follow." *See Petitioner Brief* at 120.  He complains that the trial court simply asked potential jurors whether they "understood" that their duty was to determine guilt or innocence first without consideration of penalty instead of asking whether they could comply with that command.  This argument places form over substance and is without merit.

Both Runyon and the Government submitted proposed voir dire questions, in addition to the jury screening questionnaire, to the trial court prior to jury selection.  ECF 158, 173.   The trial court, for the most part, used those questions in forming its questioning of potential jurors.  At the beginning of the voir dire process, the trial court provided guidance to potential jurors as to their duty as jurors, and informed them that they would be required to put aside any feelings of passion and prejudice and decide the case solely on the evidence that would be presented and the instructions of law given by the court.  TT, pgs. 12–13, 52–53.

Runyon contends that the trial court's questioning regarding consideration of penalty and *Morgan* bias were inadequate because the court asked whether jurors "understood" the law in those areas.  But trial courts need not use precise questions suggested by counsel, "nor need a particular question be asked if the substance of the inquiry is covered in another question, differently phrased, or in the voir dire as a whole." *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981); *see also United States v. Tipton*, 90 F.3d 861, 878 (4th Cir. 1996) (the Constitution dictates no particular catechism for voir dire).  Here, prior to the complained of questions, the trial court had already informed potential jurors that if they were chosen they would need to

154

follow the instruction of law given by the court. TT, pgs. 52–53. Although it may have been better practice to ask whether potential jurors understood "and could follow" the law, it was unnecessary here because the trial court had informed the potential jurors of their duty to follow the court's instructions of law. Moreover, the trial court did ask potential jurors, pursuant to *Morgan*, whether they had a personal or moral opinion regarding the death penalty that would substantial impair their ability to weigh aggravating and mitigating factors and follow the court's instructions regarding the death penalty. *Id.* at 124–25. Runyon fails to demonstrate that the voir dire procedure used by the trial court failed to uncover bias or partiality in the venire. This claim should be denied.

> C.    Trial counsel was not ineffective for failing to object to this Court's voir dire procedure.

Runyon argues that his trial counsel were constitutionally ineffective for failing to object to the following: (1) the trial court's failure to give guidance to potential jurors as to the death penalty in the jury screening questionnaire (Claim S-2), (2) the trial court's oral voir dire procedure, and (3) the trial court's failure to properly ask *Morgan* bias questions and whether potential jurors would comply with the law. A review of these claims above demonstrates that Runyon's contentions are meritless in that counsels' performance was neither deficient nor prejudicial.

In order to prevail on his claim of ineffective assistance of counsel, Runyon must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. A defendant alleging ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to prevail. *See Roane*, 378 F.3d at 404. Where a court finds that "the defendant makes an insufficient showing on one" of

<div align="center">155</div>

the prongs, consideration of the other is unnecessary. *Merzbacher v. Shearin*, 406 F.3d 356, 365–66 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 697).

Runyon cannot satisfy either prong of *Strickland*. Runyon fails to demonstrate that his trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Trial counsel was not deficient for failing to make the objections Runyon now proffers. Prior to trial, counsel filed a motion seeking individual questioning of jurors, attorney questioning, a jury questionnaire, and additional peremptory challenges. ECF 156. Like Runyon's post-conviction counsel here, trial counsel suggested that the court use individual questioning instead of collective. In addition, during voir dire, trial counsel objected to the trial court's *Morgan* question and provided the court with purported corrective language that the court adopted. TT, pgs. 76–77.

Likewise, Runyon fails to demonstrate actual prejudice. In order to satisfy the prejudice prong of *Strickland*, Runyon must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. In other words, he must demonstrate that had counsel objected to the voir dire procedure and the court's questions, the outcome of his case would have been different. But as stated above, the trial court's voir dire procedure here was not constitutionally infirm. Runyon fails to proffer any evidence that the voir dire procedure used by the trial court, including the wording of the trial court's questions, failed to seat an impartial jury. Nor does he demonstrate that counsel was hampered in their ability to exercise peremptory challenges. This claim should be denied.

<div style="margin-left:2em">

**Claim S2:**  **The trial court did not violate Runyon's Fifth and Sixth Amendment rights by excluding potential jurors based solely on their juror questionnaire responses without voir dire and defense counsel did not fail to object and unreasonably participate.**

</div>

The United States' response to this claim is being filed under seal pursuant to the

Court's Order.  ECF 477.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should deny Petitioner's Amended Motion to

Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. §2255.


DANA J. BOENTE
UNITED STATES ATTORNEY

By:          /s/_____

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov


By:          /s/_____

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov


By:          /s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
United States Attorney's Office

157

Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I certify that on April 22, 2016, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system who will send notice of such filing to the following

ECF users:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email: mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org


By:  _____/s /_____
    Lisa R. McKeel
    Assistant United States Attorney
    Attorney for the United States
    United States Attorney's Office
    Fountain Plaza Three, Suite 300
    721 Lakefront Commons
    Newport News, VA 23606
    Ph:  (757) 591-4000
    Fax: (757) 591-0866
    Email: Lisa.McKeel@usdoj.gov