**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

|  |  |  |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner, | : | No. 4:15-cv-108 |
|  | : | Original Criminal No. 4:08-cr-16-3 |
|  | : | CAPITAL §2255 PROCEEDINGS |
| v. | : |  |
|  | : | HON. REBECCA BEACH SMITH |
| UNITED STATES OF AMERICA,<br>Respondent. | : |  |
|  | : |  |
|  | : |  |

## PETITIONER'S REPLY TO RESPONSE OF THE UNITED STATES TO AMENDED MOTION TO VACATE SET ASIDE, OR CORRECT SENTENCE

Michele J. Brace, VSB No 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana Hansen Chavis, *Pro Hac Vice*
Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
dana_hansen@fd.org

**COUNSEL FOR PETITIONER DAVID ANTHONY RUNYON**

TABLE OF CONTENTS

AFFIRMATIVE DEFENSES .................................................................................................**1**

    A.   Statute of Limitations..................................................................................1

    B.   Procedural Default .....................................................................................2

    C.   Retroactivity of New Rules .......................................................................4

    D.   Temporal Limitation on Amended Claims................................................8

Claim 1:   The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial. .............................................................................................................**10**

    A.   Robert Glenn Ford.....................................................................................11

    B.   Clifford Dean Posey....................................................................................13

Claim 2:   The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution. 15

    A.   The withheld evidence is material. .............................................................16

    B.   Runyon's *Brady* claim is not procedurally defaulted. ................................19

    C.   The withheld evidence would have been admissible, it is not cumulative, and the harmless error doctrine is inapplicable. ..................................................20

    D.   Discovery and an evidentiary hearing should be granted. .........................21

Claim 3:   Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence......................**22**

    A.   Chad Costa ................................................................................................22

    B.   Cat Voss ....................................................................................................24

    C.   Scott Linker ...............................................................................................26

    D.   Rose Wiggins .............................................................................................27

    E.   David Runyon's Whereabouts The Day Of The Crime .............................27

    F.   Cell Tower Testimony Regarding Michael Draven .....................................28

    G.   Runyon's Shopping List.............................................................................33

    H.   Testimony regarding the bullets. ...............................................................34

Claim 4:   Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstances. .**40**

Claim 5:   Trial Counsel Were Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**.............................42**

Claim 6:   Counsel Rendered Ineffective Assistance By Failing To Investigate And Present

Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health. ................................................................................47

A.    All mental health experts consulted by defense counsel indicated Runyon was suffering from a mental disease or defect but the experts lacked the information, testing, and time required for a complete examination. ................................................48

B.    Counsel did not reasonably abandon the psycho-social investigation. .........................51

C.    Counsel did not abandon the investigation upon receipt of the prosecution experts' reports. ...............................................................................................52

D.    Reports of the prosecution experts did not contain additional aggravating evidence and were not inconsistent with defending the proposed aggravating circumstances or establishing mitigating circumstances. ......................................................53

E.    Counsel abandoned the investigation despite several red flags signaling the existence of substantial mitigating evidence. ...........................................................56

F.    Counsel's deficient performance resulted in prejudice. ...............................................59

Claim 7:    Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt. .........................................................61

Claim 8:    Ineffective Assistance Of Counsel On Direct Appeal. ....................................................64

Claim 9:    Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015). .........................................................................................67

A.    Introduction ............................................................................................................67

B.    Legal Background ....................................................................................................67

C.    Argument .................................................................................................................70

    1.    This Court May Review Runyon's *Johnson* Claim. ...................................................71

    2.    Documented Judicial Confusion Does Not Create Vagueness. ..............................72

    3.    The Absence Of Enumerated Offenses Does Not Render 924(c) Constitutional. 72

    4.    Section 924(c) Is Not More Narrowly Drawn Than The ACCA (Or The Distinctions The Government Notes Are Constitutionally Irrelevant). ................73

    5.    Section 924(c)(3)(B) Is Vague As Applied To Runyon. .............................................75

    6.    Carjacking And Conspiracy To Commit Murder For Hire Are Not Crimes Of Violence Under The Force Clause Of Section 924(c)(3)(A). ..................................75

    7.    The Death Sentence On Count One Was Tainted By The Sentence For Count

Five...........................................................................................................79

Claim 10:  The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered The
Government's Burden Of Proof In Violation Of The Fifth, Sixth, And Eighth
Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003). ..........................................81

Claim 11:  The Death Sentences Are Unconstitutional Because They Are Based On Aggravating
Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad.....84

    A.  The statutory aggravating circumstances failed to perform the constitutionally
required narrowing function. .................................................................................84

    B.  This claim is not barred by the doctrines of procedural default or non-retroactivity.
...............................................................................................................................86

    C.  The non-statutory aggravators negated any narrowing that might have previously
occurred, they are arbitrary and capricious, and at least one is overbroad..................87

Claim 12:  Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right
To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel
Because The Death Penalty Was Disproportionately And Unconstitutionally Applied
According To Race, And Trial And Appellate Counsel Made No Objection Based On
This Fact......................................................................................................................88

Claim 13:  Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The
Fifth And Eighth Amendments.....................................................................................90

Claim 14:  Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely
Mentally Ill .................................................................................................................92

Claim 15:  Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was
Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury
Selection Records.........................................................................................................94

    A.  Selection Of The Grand Jury And/Or The Petit Jury Venire Was Tainted................94

    B.  There Was a Failure To Fully And Accurately Comply With The Jury Selection Plan
And The Provisions Of 28 U.S.C. §1861 *et. seq.*................................................94

    C.  A Person Who Did Not Qualify Participated In Runyon's Trial. ...........................100

    D.  Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection
Records, In Violation Of The Sixth Amendment. ....................................................100

Claim 16:  The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of
Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These
Unconstitutional Strikes............................................................................................105

    A.  Runyon's Claim Is Not Defaulted, Or Counsel's Deficient Performance Is Cause To
Overcome The Default.............................................................................................107

    B.  The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of
Peremptory Strikes. ................................................................................................111

        1.  The Prosecution Unlawfully Struck Jurors Based on Their Race........................112

        2.   The Prosecution Unlawfully Struck Jurors Based on Their Gender. ................... 122

    C.   Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes. ...................................................................................... 126

Claim 17:   The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Counsel Rendered Ineffective Assistance. .................................................................................................... 131

    A.   The Voir Dire Was Constitutionally Inadequate. ......................................... 131

    B.   Counsel Rendered Ineffective Assistance Regarding Voir Dire. ............................... 138

        1.   Trial Counsel ......................................................................................... 138

        2.   Appellate Counsel .................................................................................. 139

Claim S2:   The Trial Court Unlawfully Excluded the Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated. .................................................................... 140

iv

LIST OF EXHIBITS

1    Stephen Hudgins Declaration dated June 22, 2016

2    John Nixon Declaration dated May 18, 2016

3    Joseph Kennedy Declaration dated July 6, 2016

4    Stephen Hudgins Calendar from Appointment to Beginning of Runyon Trial

5    USA Strikes of Black Veniremen Report

Petitioner David Runyon hereby replies in support of his Amended Motion to Vacate, Set Aside, or Correct the Sentence in his capital case. *See* ECF No. 511. Runyon's motion for leave to exceed the page limit was filed this date. ECF No. 547. The Court granted the motion to exceed the page limit for this reply. ECF No. 550.

**AFFIRMATIVE DEFENSES**

The Government's answer to the amended §2255 motion, ECF No. 536, pp.14-19, references several affirmative defenses including statute of limitations, procedural default and nonretroactivity, and temporal limitations on amended claims. *See Day v. McDonough*, 547 U.S. 198, 205 (2006) (describing affirmative defenses in a §2254 context).

Affirmative defenses are nonjurisdictional defenses that a collateral respondent is "'obligated to raise'" in the first instance "if it is not to 'lose the right to assert the defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)). The burden rests with the Respondent to raise and prove such defenses. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010). A petitioner has no duty to anticipate or address any affirmative defense in his §2255 motion or in his amended §2255 motion. To the extent the Government did not raise or adequately present an affirmative defense to a claim in its answer to the amended §2255 motion, the Court can deem that defense waived. *See Hudson v. Hunt*, 235 F.3d 892, 895 n.1 (4th Cir. 2000) (finding statute of limitations defense waived); *Riggs v. U.S.*, No. CIVA 7:06-cv-439, 2006 WL 3746674, at *1 fn.1 (W.D. Va. Dec. 15, 2006) (finding procedural default defense waived); *see also Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001) (amended pleading supersedes original pleading).

### A. Statute of Limitations

Respondent has acknowledged Runyon's §2255 motion was timely filed, ECF No. 504, p.3, and has not alleged any original claims are time-barred. Nonetheless, the Government discusses this

1

defense generally. It points out that there is a statutory one-year limitations period, and it says that this period begins when the defendant's conviction becomes final by the Supreme Court's denial of certiorari following direct appeal. The Government's description is true but incomplete. Under 28 U.S.C. §2255(f), the one-year limitations period actually runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*. If the basis for an additional new claim subsequently accrues, Runyon can timely present that claim in a supplemental §2255 motion so long as he does so within one year of the relevant triggering event.

The Government alleges that some of the amendments to Runyon's §2255 motion are untimely. That allegation is addressed below in Section D.

### B. Procedural Default

The Government alleges that many of Runyon's claims are procedurally defaulted. Runyon disagrees, and he addresses the Government's specific allegations *infra* in his replies on individual claims.

No federal statute or constitutional requirement bars a §2255 petitioner from raising an issue for the first time on collateral review. *Massaro v. U.S.*, 538 U.S. 500, 504 (2003). Claims not raised on direct appeal may be raised for the first time on §2255 review subject to the judicial doctrine of procedural default if the doctrine is asserted by the Government. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984) (noting that the exhaustion rule is not a federal jurisdictional bar); *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) ("[T]he issue of procedural default generally is an affirmative defense that the [government] must plead in order to press the defense thereafter."). Under the doctrine of procedural default, a §2255 claim is defaulted only if it could have been "fully and completely addressed on direct review based on the record created" in the trial court, but was not raised on direct appeal. *Bousley v. U.S.*, 523 U.S. 614, 622 (1998). The doctrine does not apply to claims that could not

2

have been raised on direct appeal because they required development of facts outside the trial record. *Id.* at 621 (citing *Waley v. Johnston*, 316 U.S. 101 (1942)) (per curiam), and describing it as a case in which "we held that there was such an exception [to procedural default] for a claim that a plea of guilty had been coerced by threats made by a Government agent, when the facts were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal'").[1] *Id.* at 621-22 (quoting *Waley*, 316 U.S. at 104).

The Government acknowledges that in §2255 proceedings the procedural default doctrine never applies to a claim of ineffective assistance of counsel, regardless whether that claim could have been raised on direct appeal. *Massaro*, 538 U.S. at 503-04.

The Government also recognizes that a procedural default is excused—and the claim must be considered on its merits—if the petitioner demonstrates "cause and prejudice." In this context, "cause" means that "some objective factor external to the defense impeded counsel's efforts to comply with the … procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Circumstances in which cause can be present include, but are not limited to, those where evidentiary facts that were critical to establishment of the claim were unavailable to the defense, *Strickler v. Greene*, 527 U.S. 263, 286 (1999); where interference by governmental officials made compliance with the procedural rule impracticable, *Banks v. Dretke*, 540 U.S. 668, 691 (2004); or where defense counsel rendered ineffective assistance, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

---

[1] The Ninth Circuit ruled that Waley had defaulted his claim because he was represented by counsel and had consulted with counsel, yet he failed to allege any facts about FBI coercion at the plea colloquy. *Waley v. Johnston*, 124 F.2d 587, 588 (9th Cir. 1941). The Supreme Court reversed. In *Bousley*, the Court distinguished *Waley* on the ground that the facts necessary to adjudicate Waley's claim were outside the trial record and their effect on the judgment was not open to consideration and review on appeal, whereas the facts necessary to adjudicate Bousley's claim were in the plea colloquy and therefore could have been addressed on direct review. *Bousley*, 523 U.S. at 622 ("This type of claim can be fully and completely addressed on direct review based on the record created at the plea colloquy.").

"Prejudice" in this context is established if the petitioner demonstrates "that 'there is a reasonable probability' that the result of the [proceeding] would have been different" absent the error. *Strickler*, 527 U.S. at 289 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). This parallels the showing required to demonstrate prejudice under *Strickland*, *supra*, or materiality under *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court emphasizes that in determining prejudice, "a different result" is not calculated by asking "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289-90.

A procedural default also is excused if the petitioner shows "a fundamental miscarriage of justice." *Carrier*, 477 U.S. at 495-96. Although the contours of this exception are not well defined, it is undisputed that a petitioner meets the standard by showing that in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). As shown in Claim 3, further factual development may enable Runyon to show a fundamental miscarriage of justice. Although not mentioned by the Government, a penalty-phase default can be excused under the "miscarriage of justice" exception even if the defendant cannot show that he is innocent of the crime. Under *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), such a default is excused if the petitioner shows "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." The Supreme Court has not excluded the possibility that additional circumstances may rise to "a fundamental miscarriage of justice" and excuse a procedural default.

### C. Retroactivity of New Rules

The "new rule" doctrine is an affirmative defense. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). The Government alleges that this doctrine precludes consideration of all or parts of Runyon's claims

4

9, 10, 11, 13, 14, 17, and S2. Runyon disagrees on two grounds. First, this doctrine does not apply to §2255 motions in the first instance.[2]

The "new rule" doctrine, first announced in *Teague v. Lane*, 489 U.S. 288 (1989), limits the retroactive application of new rules of criminal procedure. *Teague* itself was limited to claims by state prisoners under 28 U.S.C. §2254, and the Court did not address whether its rule would extend to claims by federal prisoners. *See Teague*, 489 U.S. at 327 n.1 (Brennan, J., dissenting). This remains an open issue. In *Danforth v. Minnesota*, 552 U.S. 264 (2008), the Court held that *Teague* does not apply in state collateral proceedings, but reserved "whether the *Teague* rule applies to cases brought under 28 U.S.C. §2255." *Id.* at 269 n.4. In *Chaidez v. U.S.*, 133 S.Ct. 1103 (2013), the Court again reserved whether "*Teague*'s bar on retroactivity does not apply when a petitioner challenges a federal conviction." *Id.* at 1113 n.16. Most recently in *Welch v. U.S.*, 136 S.Ct. 1257 (2016), the Court again reserved the question. It noted the assumption of the parties before it that the *Teague* framework applies in collateral challenges to federal convictions, and said "we proceed on that assumption." *Id.* at 1264. It then granted relief on grounds that would have applied regardless whether *Teague* limited §2255 cases.

In *Martinez v. U.S.*, 139 F.3d 412, 416 (4th Cir. 1998), the court of appeals held that *Teague* does apply to federal collateral claims, predicting that "it can safely be assumed that the Court would apply *Teague*'s nonretroactivity principle to suits under §2255." Notwithstanding the Fourth Circuit's confidence, the Supreme Court has repeatedly avoided taking that step.

In her plurality opinion in *Teague*, Justice O'Connor weighed the need to respect and preserve constitutional rights and ensure accuracy and integrity of convictions, against the State's interest in

---

[2] Runyon acknowledges that this Court is bound by circuit precedent holding that *Teague* "applies to *federal* prisoners' actions … under 28 U.S.C. §2255." *Martinez*, 139 F.3d at 416. He presents the issue here to preserve it for further review.

comity and finality. *Teague*, 489 U.S. at 308, 309 (plurality). There are no comity interests when federal courts review federal convictions. Federal courts are not intruding into state criminal proceedings, are not imposing any costs on States by retroactive application of new rules, are not forcing States to marshal resources to defend their judgments, and are not overturning convictions of a coordinate jurisdiction. *See also Danforth*, 552 U.S. at 272-73 ("the text and reasoning of Justice O'Connor's opinion illustrate that the rule was meant to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions"). In light of these recognitions, other courts of appeals have expressed reservations. *See, e.g., Reina-Rodriguez v. U.S.*, 655 F.3d 1182, 1189 (9th Cir. 2011) ("[T]here is some doubt under current Supreme Court jurisprudence whether *Teague* applies to federal prisoners … who seek federal habeas relief."); *Duncan v. U.S.*, 552 F.3d 442, 444 n.2 (6th Cir. 2009) ("It is not entirely clear that *Teague*'s framework is appropriate for federal habeas petitions under 28 U.S.C. §2255, because many of the comity and federalism concerns animating *Teague* are lacking."). *See also U.S. v. Payne*, 894 F. Supp. 534, 543 (D. Mass. 1995) (pointing out that §2255 proceedings are "'an integral part of a continuous criminal proceeding that is segmented by no event or condition decisive of finality'") (quoting James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 22A.6, at 272-74 (Supp. 1993)).

Second, even if *Teague* applies to §2255 claims, it is expressly limited to new rules of procedure. A rule is procedural if it "regulat[es] '*the manner of determining* the defendant's culpability.'" *Montgomery v. Louisiana*, 136 S.Ct. 718, 730 (2016) (plurality) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004), emphasis in original). In contrast, "*Teague* requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings." *Montgomery*, 136 S.Ct. at 728. "'This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond

6

the State's power to punish.'" *Welch*, 136 S.Ct. at 1265 (quoting *Schriro,* 542 U.S. at 351-52). A rule is substantive when the Supreme Court has decided the meaning of a criminal statute enacted by Congress, *Bousley*, 523 U.S. at 620, or it "has eliminated [the Government's] power to proscribe the defendant's conduct or to impose a given punishment." *Montgomery*, 136 S.Ct. at 730. The mere fact that a new rule includes a process does not mean that it is a procedural rule. As the Court counseled in *Montgomery*, courts must be careful not to conflate a procedural requirement that is necessary to implement a substantive guarantee, with a rule that regulates the manner of determining the defendant's culpability. *Montgomery*, 136 S.Ct. at 734-35. Only the latter is a procedural rule governed by *Teague*'s nonretroactivity doctrine. Similarly, the fact that a right is protected by the due process clause does not mean that an interpretation or application of that right is necessarily procedural. "[W]hether a new rule is substantive or procedural [is determined by] the function of the rule, not its underlying constitutional source." *Welch*, 136 S.Ct. at 1265.

Another type of rule which must be applied retroactively is a new "watershed" procedural rule. Such a rule is "implicit in the concept of ordered liberty" and crucial to the accuracy of the adjudication. *Graham v. Collins*, 506 U.S. 461, 478 (1993); *Teague*, 489 U.S. at 311 (plurality) (a "watershed" rule must contribute to fact-finding reliability and "alter our understanding of the bedrock procedural elements" essential to the fairness of a proceeding.).

A three-part analysis must be undertaken to determine if *Teague* bars relief, but it differs from the Government's three-step analysis.[3] First, the Court must determine if the rule on which the

---

[3] The Government's analysis begins with a presumption that the new rule is one of criminal procedure, whereas *Montgomery* requires a threshold determination of whether it is the kind of issue that is subject to the limit on retroactivity. The Government's analysis also retains the nomenclature of *Teague,* which describes new substantive rules and watershed procedural rules as "exceptions" to the bar on retroactive application of procedural rules. The Supreme Court has more recently recognized that those two categories of new rules "'are more accurately characterized as ... not subject to the bar.'" *Montgomery*, 136 S.Ct. at 728 (quoting *Schriro*, 542 U.S. at 352 n.4).

petitioner relies is one of substance or criminal procedure, *Bousley*, 523 U.S. at 620, as those concepts are defined in *Montgomery*. If the rule is substantive, retroactive application is required, *Montgomery*, 136 S.Ct. at 728, and the analysis ends. If the rule is one of criminal procedure that constitutes a "watershed" rule of procedure, retroactive application also is required, *id.*, and the analysis ends. Second, if the rule is one of criminal procedure, the Court must ascertain the date when the petitioner's conviction and sentence became final. *Caspari*, 510 U.S. at 390. Runyon's conviction became final on October 6, 2014, when the Supreme Court denied his petition for a writ of certiorari. Only a decision announced after that date can be "new." Third, if the procedural rule was announced after the date that the conviction became final, the Court must determine whether the rule is actually "new." *Id.* The required inquiry is typically phrased in the negative: a new procedural rule is one that was not dictated by precedent existing at the time the defendant's conviction became final. *Whorton v. Bockting*, 549 U.S. 406 (2007). Stated differently, the Court must survey the legal landscape and determine whether a court, at the time the conviction became final, "would have felt compelled by existing precedent" to apply the subsequently announced procedural rule. *Caspari*, 510 at 390; *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997). If not, then the rule is "new," and it does not apply retroactively.

As necessary, Runyon further discusses the Government's specific *Teague* allegations in his replies on individual claims.

### D. Temporal Limitation on Amended Claims

Any amendments to Runyon's §2255 motion are timely. Timeliness can be based on any of three grounds. First, as noted above, the one-year limitations period runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*:

(1)  the date on which the judgment of conviction becomes final;

(2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if

the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2255.

A claim added by amendment is thus timely if it is filed within one year of the latest of these triggering events. Second, a claim that is added to the §2255 motion by amendment, even after expiration of the applicable statute of limitations, will be deemed timely if it relates back to a claim that was timely presented. Fed. R. Civ. P. 15(d); Rule 12 of Rules Governing §2255 Proceedings. In the collateral context, a claim added by amendment relates back unless "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"). *Mayle v. Felix*, 545 U.S. 644, 650 (2005). Third, limitations periods in collateral cases are subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631 (2010).

In *Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012), the court held that new instances of a previously alleged violation can be considered without the need to amend, and thus without the need to consider the timeliness of such an amendment. In that case, the original habeas petition alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Fourth Circuit held that an amendment was not necessary for the petitioner to present evidence of additional instances of such violations. *Wolfe*, 691 F.3d at 422.

As necessary, Runyon further discusses the Government's specific timeliness allegations in his replies on individual claims.

9

**Claim 1:      The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

The Government correctly recognizes that this claim could not have been raised at trial because the facts were known only to the Government, which had concealed them. *See Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (where county officials concealed facts that would have allowed defendant to challenge composition of jury, the concealment was an "'objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule'" and excused procedural default) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quoting *Carrier*, 477 U.S. at 488 (default excused if factual basis for claim was "'not reasonably available to counsel'" or "'some interference by officials … made compliance impracticable'")).

The Government argues instead that this claim is defaulted because Runyon did not raise it on direct appeal. The Government skips over the fact that even during direct appeal proceedings, it never told Runyon's counsel that Ford or Posey engaged in criminal acts of dishonesty. Runyon's original appellate counsel Woodward knew about the charges against Ford, but he had a conflict of interest. Because he represented Ford on the criminal charges, he could not even suggest to anyone that Ford might have been dishonest. The Government did not disclose any information to Runyon's other appellate counsel, who were remotely located in South Carolina and New York.

The Government also does not identify any fact about Ford or Posey that is in the record of Runyon's trial and that could have been a subject of Runyon's appeal. There is none. No part of this §2255 claim could have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. Like the claim that could not have been raised on direct review in *Waley*, the facts necessary for this claim "were 'dehors the record and their effect on

10

the judgment was not open to consideration and review on appeal.'" *Id.* (quoting *Waley* 316 U.S. at 104). *See supra*, Affirmative Defenses.

If appellate counsel knew the facts concerning Ford and/or Posey, and if the nature of this claim is one that could appropriately have been raised on direct appeal rather than collateral review, appellate counsel were ineffective in failing to do so. *See* Claim 8.

### A.  Robert Glenn Ford.

On the merits, the Government mistakenly treats the claim involving Ford as equivalent to a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). It says that Runyon has failed to identify favorable evidence "stemming from Ford's impeachment related behavior," and it argues that "impeachment evidence for those who do not testify lacks relevance and materiality." ECF No. 536, p.22. But Runyon has not alleged in this claim that the Government failed to disclose exculpatory or impeachment information. Ford's history of criminal conduct did not exculpate Runyon. And because Ford did not testify against Runyon, the fact of his dishonesty could not have been used to impeach him.

The Government knew as early as November 7, 2008—when Marcus Adams was debriefed nearly eight months before Runyon's trial—that Ford was a "dirty cop." From that day forward, it was preparing to charge Ford with multiple counts of extortion, false statements, and other crimes. Just as the Government at that time would not have retained a person like Ford to investigate a crime because of his misconduct, it knew that Ford could not be trusted to conduct an honest investigation for Runyon's defense. Because of its superior and secret knowledge about Ford's criminal conduct, and because of its duty to elevate justice over winning a case, the Government had a due process obligation to inform defense counsel or inform the Court, so that Ford could be replaced with an honest and reliable investigator. The Government's protestation that it had no duty to do so is contrary to *Berger v. U.S.*, 295 U.S. 78 (1935).

11

The Government objects that Runyon has failed to identify any witness reports prepared by Ford that were fabricated or unreliable. Runyon suggests this is not necessary, and that deprivation of the honest services of an investigator is inherently prejudicial, that the deprivation is particularly acute when that investigator has been appointed by the Court to assist the defense.

The Government's premise, moreover, is false. Ford was an experienced investigator (and experienced deceiver), and there is no reason to think he would have done anything so amateurish as submitting affirmatively false statements about an individual that he knew was likely to be called as a defense witness. He would know that his lies could be quickly exposed during pretrial witness preparation. The false statements in Runyon's case would more likely be by omission. If, hypothetically, Ford found a potential witness who had helpful information but who wanted to avoid becoming embroiled in this case, Ford was in a position (for sufficient compensation) to file a report stating that the witness could not be located. Or, again hypothetically, he could file a report saying that he went to a neighborhood where Runyon's family had once lived and interviewed the people who lived in the area, but no one there remembered Runyon or his family. In fact, there may have been neighbors who remembered Runyon and had helpful information, but who preferred to pay Ford a bribe and avoid involvement in a murder case. Because Ford's reports would have omitted the names and locations of people who paid bribes, finding evidence to prove Ford's dishonesty—especially so many years later—is very difficult, although Runyon's investigation is ongoing.

The most knowledgeable source of information, Ford himself, is inaccessible. His post conviction litigation is still active, and he is represented by counsel.4 Because of a potential overlap in the subjects of representation, Virginia Rule of Professional Conduct 4.2 prohibits Runyon's

---

4 This Court issued an order on April 11, 2016, denying Ford's §2255 motion. *United States v. Ford*, E.D. Va. 2:10-cr-83, ECF No. 137. His informal opening brief was filed in the Fourth Circuit on June 27, 2016. *United States v. Ford*, CA4 16-6680, ECF No. 13.

counsel from attempting to communicate with Ford without the consent of Ford's attorney. Runyon requested permission, but Ford's attorney has not granted it. The documents requested in discovery may provide additional information or leads for further investigation.

The Government's reliance on Woodward's statement that Ford did a good job investigating Runyon's case is misplaced. Ford wrote the affidavit without knowing what would be in Runyon's §2255 motion. Woodward's duty of loyalty to Ford also precludes him from taking any other position.[5] Moreover, if Ford took bribes and concealed information, Woodward would be ignorant of that fact. Hudgins says he relied on Ford's reports to inform him of the penalty phase witnesses' knowledge of Runyon, ECF No. 511-5, p.2 ¶8, but Hudgins also would be ignorant of information that Ford concealed. Cronin knew that Ford was under public pressure for having obtained coerced confessions from two defendants in the Norfolk Four case, ECF No. 511-4, p.2 ¶4, but that is a very different kind of misconduct than the extensive extortion and false statements that the Government failed to disclose to Runyon's defense, and of which Ford was later convicted. Runyon is entitled to discovery and an evidentiary hearing on this claim to develop and present evidence about the extent to which Ford's misconduct may have affected the investigation and the way this case was defended.

## B. Clifford Dean Posey.

The Government again treats this as equivalent to a *Brady* claim, arguing that "there was nothing for the government to even turn over at the time of [Runyon's] trial." ECF No. 536, p.23. At this point, Runyon has asserted a *Berger* claim, although he cannot rule out the possibility that the

---

[5] Woodward likely had a conflict of interest when he agreed to represent Ford. Runyon has not alleged the conflict of interest as a claim in his amended §2255 motion because the conflict did not arise until after Runyon's trial, when Woodward agreed to become Ford's attorney. But the conflict is a fact that the Court can consider.

13

requested discovery will reveal a *Brady* violation based on exculpatory or impeachment information that the Government possessed at the time of trial but failed to disclose.

As with Ford, the Government chastises Runyon for failing to identify any concrete prejudice. But all the facts about Posey's work on Runyon's case, and about Posey's criminal activities (except as memorialized in the tiny court file), are in the Government's sole possession.6 That is why Runyon has requested discovery, and has asked for an evidentiary hearing so he can present his case to the Court, if the facts warrant. There is no dispute that at all of the times he was investigating Cory Voss' death and helping to prepare the Government's case for trial, Posey also was engaging in criminal misconduct that involved stealing evidence from the Government and making false statements in his reports. The Government does not, and cannot, deny that Posey may have engaged in criminal conduct in preparing Runyon's case. It cannot deny that this may have tainted Runyon's trial. It cannot deny that it alone knows the work Posey was assigned to perform on this case, the recorded conversations he transcribed, the evidence he handled, the extent to which anyone checked his work product, and the effect he had on Runyon's trial. It also cannot deny that it knew about Posey's misconduct not later than October 2010, when Runyon's case was still on direct appeal.[7] Because the Government gave the defense no information, Runyon does not rule out any possibilities.

The Government opines that Posey's involvement in Runyon's case was minor and error-free. But because this is Runyon's claim, and because adverse parties often draw different inferences from the same materials, Runyon must be allowed to obtain and review the documents he has requested in discovery, and to draw his own conclusions from those documents. As an example of the reason

---

6 Posey is not presently an available source of information. He is no longer in prison, but he has evaded all attempts by Runyon's investigator to talk to him.

[7] Runyon's notice of appeal was filed on December 4, 2009. His opening brief on appeal was not filed until February 29, 2012.

14

Runyon should not have to rely on the Government's assessment, we note that the Government does not address the fact that Posey's criminal conduct reportedly included converting firearms and ammunition that had been confiscated by ATF, and the possibility that Posey may have converted firearms or ammunition that belonged to Runyon, which could have affected litigation regarding the handgun used to kill Voss.

**Claim 2:    The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

"Under *Brady*, the [prosecution] violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S.Ct. 627, 630 (2012). Here, the prosecution decided one year before the penalty phase began that it would pursue a non-statutory aggravating circumstance on the basis that Runyon "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend." ECF No. 67, p.3. It had a concomitant duty to learn of any favorable evidence possessed by law enforcement or members of the prosecution team that could be used in defense of this aggravator and to disclose that evidence to Runyon's counsel. *Kyles*, 514 U.S. at 437. The prosecution also knew Runyon's penalty-phase defense was centered on the differential treatment afforded the other co-defendants with respect to punishment and it had a duty to disclose evidence that was favorable to this defense and the "equally-culpable co-defendant" mitigator. *Id.*

The prosecution possessed information about co-defendant Draven's history of violence against a man, girlfriends, a disabled teenager, and children under the age of seven. Respondent characterizes the information as "the background of Draven's youth," ECF No. 536, p.26, but Draven's violent conduct continued to be reported to police less than one year before the instant crime. *See* ECF No. 511, pp.18-19. For example, as an adult, Draven was charged with aggravated

15

assault of his girlfriend, bomb threats and death threats against a former girlfriend, harassment and intimidation of girlfriends, intimidation of a male acquaintance, and grand larceny as well as larceny. As a teenager, he sexually assaulted a developmentally-delayed teenager and at least six children under the age of seven. ECF No. 511, pp.18-19.

Respondent concedes that this evidence was disclosed to Draven's counsel at least one year before Runyon's penalty phase began. ECF No. 536, p.24. Respondent also admits Draven's violent background, criminal history, and mental health assessments were material to Draven's punishment and further admits this information was not disclosed to Runyon's counsel.[8] ECF No. 536, pp. 24-25. The *Brady* element in dispute is whether the withheld evidence is material to Runyon's punishment.

### A. The withheld evidence is material.

The materiality standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In other words, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

In *Banks*, 540 U.S. at 700-01, the Supreme Court found withheld evidence was material because it was significant to a predicate for capital murder and it related to the defendant's eligibility for the death sentence and the prosecution's argument for imposing death. The withheld evidence left

---

[8] Before trial, the parties entered an agreed discovery motion that included *Brady* material. ECF No. 31, pp.3-4. The prosecution represented it intended to comply fully with its *Brady* obligations, it had complied, and it was aware of its continuing duty of disclosure. ECF No. 98, pp.9-10. In turn, the Court made findings that the prosecution "has provided defendant with all of the Rule 16 material that is in its possession," ECF No. 114, p.3, and recounted the prosecution's representation "that it has already provided discovery pursuant to the Discovery Order and, to the extent that it becomes aware of and obtains additional discoverable material, will continue to make the materials available to [Runyon]." ECF No. 115, p.2.

the jurors ignorant of an informant's "true role" in the case and undermined confidence that the defendant had received a fair trial. *Id.* at 702-03. This was especially so because the informant's testimony was the centerpiece of the prosecution's penalty-phase case. *Id.* at 701.

Respondent agrees that inequitable punishment was the centerpiece of Runyon's penalty-phase defense. ECF No. 536, p.24; *see also U.S. v. Runyon*, 707 F.3d 475, 508 (4th Cir. 2013). The withheld information regarding co-defendant Draven's background would have been advantageous to Runyon's defense because it demonstrates that despite ample facts supporting several aggravating factors for Draven, and despite all co-defendants' "integral[] involve[ment] in the murder, [Runyon] had received differential treatment, with the Government pursuing the death penalty against Runyon but not against Cat or Draven." *Runyon*, 707 F.3d at 508. Draven's severe sexual, physical and emotional abuse of women and children was a relevant comparison-point for the "abuse of women" non-statutory aggravator. Hudgins declaration, Ex. 1 ¶14. The prosecutors urged the death penalty for Runyon based on one misdemeanor conviction for grabbing his wife's arm and poking her nose, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. The prosecution introduced incidents of domestic abuse involving Runyon that paled in comparison to Draven's violent conduct. Hudgins declaration, Ex. 1 ¶14. Had the jurors known the magnitude of Draven's true culpability, the "equally-culpable co-defendant" mitigator could have transformed into a "co-defendant with greater culpability" mitigating circumstance, especially since Draven was also charged with more statutory aggravators than Runyon. ECF No. 3, pp.13-14.

A history of violent crimes is "arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty[.]" *U.S. v. Beckford*, 964 F. Supp. 993, 1000 (E.D. Va. 1997) (internal quotation marks and citation omitted). The fact that the prosecution failed to seek death for Draven despite his pattern of violent criminal behavior and propensity for

future violence was highly relevant to Runyon's comparative punishment defense. The defense argued that co-defendant Voss was a bad actor and would have used co-defendant Draven's background to support the argument that he, too, was a bad actor. Hudgins declaration, Ex. 1 ¶13. The information about co-defendant Draven also would have rebutted the prosecution's argument regarding Runyon's alleged bad personal characteristics. *Id.* ¶14. It was likewise relevant to the guilt-phase defense of portraying the co-defendants as bad actors. *Id.* ¶12. As explained by the Court when it agreed to charge the "abuse of women" non-statutory aggravator against Runyon: "[v]iolent adjudicated criminal acts that tend to show a pattern of violence against women are relevant, probative, and helpful to the sentence in distinguishing those who deserve capital punishment," and are "relevant to the inquiry of who should live and who should die." ECF No. 217, p.10, n.6 (citing *U.S. v. Grande*, 353 F. Supp. 2d 623, 631, 637 (E.D. Va. 2005)); *U.S. v. Beckford, supra.* It was necessary for the jurors in this case to distinguish between Runyon and his co-defendants in order to justify a death sentence for only Runyon and the prosecution's failure to disclose probative facts relevant to the disparity of punishment among the co-defendants impaired Runyon's defense and denied the jurors an accurate accounting of the co-defendants' relative culpability.

The *Brady* violation tainted the jury's determination regarding the "abuse of women" aggravating circumstance, the "equally-culpable codefendants" mitigator, and its sentencing verdict. The prosecution's argument for a death sentence based on Runyon's conviction of misdemeanor simple battery for grabbing his wife's arm and poking her nose also encouraged the jurors to infer that Runyon engaged in more serious violent acts "behind closed doors." Tr.2609, 8/26/09. The jurors were invited to condemn Runyon because "he left his wife and children and didn't provide support for them." Tr.2610, 8/26/09. At the same time, the prosecution kept from the jurors' consideration a plethora of information illustrating Draven's sexual assault of children and his pattern of felonious

18

sexual, physical and emotional abuse of women. A penalty phase proceeding where the jurors were informed of Draven's violent history is significantly different than the actual proceeding where the jurors decided—without knowledge of Draven's violent and abusive nature—that Runyon should be the sole person to die, based in part on the "abuse of women" aggravator. The withheld evidence was advantageous to Runyon's defense and could reasonably have put the penalty phase in such a different light that it undermines confidence in the jury's death verdict. Hudgins declaration, Ex. 1 ¶16. *See, e.g.*, *U.S. v. Hammer*, 404 F. Supp. 2d 676, 799 (M.D. Pa. 2005) (citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992)) ("Under a weighing statute such as the Federal Death Penalty Act of 1994, a death sentence resulting from a tainted aggravating circumstance cannot stand.").

### B.  Runyon's *Brady* claim is not procedurally defaulted.

The *Brady* claim is based on information outside the trial record and unknown to trial counsel because—as Respondent admits—it was not disclosed by the prosecution. There is no procedural default because this due process violation could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley v. U.S.*, 523 U.S. at 622; *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (a claim is not procedurally defaulted when the facts are "dehors the record and their effect on the judgment was not open to consideration and review on appeal.").

Even if this claim is somehow defaulted, Runyon is still entitled to develop and prove his claim because a meritorious *Brady* claim subsumes and satisfies the "cause and prejudice" standard. *Wolfe v. Clarke*, 691 F.3d 410, 420 (4th Cir. 2012). "Cause and prejudice" to overcome a procedural bar "parallel two of the three components of the alleged *Brady* violation itself." *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (internal quotation marks omitted)) (addressing *Brady* claim in a §2254 case). "Cause" is already established because Respondent concedes the newly discovered

19

"evidence [was] not turned over to Runyon" prior to trial. ECF No. 536, p.26. The "prejudice" requirement "exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks*, 540 U.S. at 691 (citing *Strickler*, 527 U.S. at 282). Accordingly, this claim is reviewed on its merits and the ultimate question remains one of materiality.

### C. The withheld evidence would have been admissible, it is not cumulative, and the harmless error doctrine is inapplicable.

Respondent incorrectly implies the information about Draven was inadmissible. ECF No. 536, p.25. "[T]he fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes." *Sears*, 561 U.S. at 950. When presenting penalty phase evidence, "[t]he relevant inquiry … is not whether the [evidence] was admissible under the Federal Rules of Evidence (which do not apply in capital sentencing proceedings), but whether the [evidence] was so unreliable that its admission violated due process." *United States v. Fulks*, 454 F.3d 410, 436 (4th Cir. 2006); *see also United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). Respondent cannot argue the evidence of Draven's violent past was unreliable because the prosecution presented police reports, police officer testimony, a protective order, and victim testimony in support of the "abuse of women" aggravator against Runyon and Runyon could have introduced the same evidence relating to Draven.

"Assuming this evidence was discoverable to Runyon," Respondent argues (without explanation and in contradiction to the argument that the evidence was inadmissible) that "it would have been cumulative and any error would be harmless." ECF No. 536, p.26. A defendant, however, "may benefit from the 'cumulativeness' of evidence that is 'favorable' under *Brady*." *McHone v. Polk*, 392 F.3d 691, 703 (4th Cir. 2004). In this case, the withheld evidence simply cannot be cumulative because evidence of Draven's past violence against women and children is entirely new information.

20

It would have substantially strengthened the equally-culpable codefendant mitigator and weakened the abuse of women aggravator.

Moreover, the Supreme Court has made clear that harmless error is not a consideration in *Brady* claims. Once the materiality of withheld evidence is established, the *Brady* violation cannot subsequently be found harmless. *Kyles*, 514 U.S. at 435-36. Runyon can demonstrate materiality, as discussed above and in his amended §2255 motion, and Respondent's assertion of harmlessness cannot defeat the *Brady* claim.

### D. Discovery and an evidentiary hearing should be granted.

Materiality is a fact-driven issue. An adverse determination cannot be made at this stage of the proceedings. *U.S. v. White*, 366 F.3d 291, 297 (4th Cir. 2004). Instead, factual development is warranted because Runyon has alleged facts which, if true, entitle him to relief. *Raines v. U.S.*, 423 F.2d 526, 529-30 (4th Cir. 1970) (discussing fact-finding procedures); *see also* RULES GOVERNING SECTION 2255 PROCEEDINGS, Rules 6-8. Runyon has already filed a discovery request that sets forth good cause for the release of information relevant to materiality. ECF No. 491, pp.21-25; ECF No. 506, pp.13-16. This request should be granted.

An evidentiary hearing should also be granted because Respondent's answer creates material factual disputes with respect to Runyon's non-frivolous *Brady* allegations. *White*, 366 F.3d at 297 (citing *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977)); 28 U.S.C. §2255 (requiring an evidentiary hearing on a habeas claim "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"). Respondent not only disputes the significance of the withheld evidence but alternatively asserts that the withheld evidence is cumulative. ECF No. 497, p.24. These disputes require fact-finding on the newly-discovered evidence about co-defendant Draven. *Townsend v. Sain*, 372 U.S. 293, 313 (1963); *Wolfe*, 691 F.3d at 421-22.

21

For all these reasons, Runyon is entitled to discovery and an evidentiary hearing on this claim followed by a grant of relief.

**Claim 3:      Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.**

Respondent primarily argues that the guilt-phase performance of Runyon's counsel was not deficient. ECF No. 536, p.27. In doing so, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

In addition, although Runyon has presented areas of prejudicially deficient performance by topic or individual source, counsel's performance in all aspects and all stages of the case is to be evaluated cumulatively. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010).

### A. Chad Costa[9]

The prosecution presented evidence and argument: (1) about Runyon's character; (2) that Runyon made incriminating statements to others; (3) that Runyon's shopping list was connected to the crime; and (4) that attempted to tie Runyon's revolver to the crime. Respondent's amended response does not contest that counsel failed investigate and present Costa's testimony. Instead, it asserts (without explanation) that counsel's failure to present Costa as a witness does not constitute deficient performance because Costa's testimony was inadmissible. Respondent fails to reconcile this

---

[9] Respondent's amended response persists with the accusation that "Runyon in his petition" pled a "false" fact. ECF No. 536, p.27. The amended response fails to recognize that the amended §2255 corrected an innocent and inconsequential error from the original §2255 and accurately stated when Chad Costa and Runyon met. They met after the crime but before Runyon's arrest. The claims regarding Costa remain valid with this time-frame.

statement with the rules of evidence which would not have precluded Costa's testimony. *See, e.g.*, Fed. R. Evid. Rules 104(e), 401, 404(a)(2)(A), 405, 602, 801. Respondent alternatively alleges that, even if admissible, Runyon suffered no prejudice when Costa's testimony was not presented to the jury. To the contrary, Costa's testimony was unique, relevant and probative of Runyon's reasonable doubt defense and it would have foreshadowed a mitigation defense that presented Runyon's psychosocial history and his compromised mental health.[10]

Costa's contacts with, and knowledge of, Runyon and Runyon's revolver were relevant to counter the prosecution's evidence and narrative in the four areas described above and would have made the facts asserted by the prosecution less probable. Costa possessed knowledge and an opinion of Runyon's character that differed from the prosecution's theory and Costa could have testified to the nature and extent of his observations regarding Runyon. For example, Runyon's braggadocios personality and attempts to portray himself as a "thug" through his clothing choices constitute an accurate account of Runyon that counters the prosecution theory that Runyon was a skilled "hit man." For the same reason, Costa's testimony would have previewed the sentencing-phase defense.

The amended response asserts that ballistics evidence from the recovered bullets and the "overwhelming evidence" of guilt shields from scrutiny the jury's guilty verdict and counsel's performance. Yet, Costa handled and observed Runyon's revolver and his description of the six-shot black revolver is inconsistent with the prosecution's evidence that the murder weapon was a five-shot handgun from which the five recovered bullets were fired. This testimony was significant in light of the 2009 report from the National Academy of Sciences (NAS Report) that described the unreliability

---

[10] The amended response states: "Runyon speculates that Costa's purported testimony about his recollection of Runyon's gun being a six-shot revolver would not have changed the outcome of this case." ECF No. 536, p.28. This is not so. Runyon argues there is a reasonable probability of a different outcome if the jury had heard Costa's testimony (and all other guilt-phase evidence counsel failed to investigate and present).

of forensic testimony purporting to match a specific firearm to specific bullets. Counsel failed to present Costa's testimony about Runyon's gun, failed to cross-examine the prosecution's ballistics expert with the NAS report, and failed to consult with a ballistics expert to investigate the true "strength" of the physical evidence. *See* Nixon declaration, Ex. 2.

Costa could have testified that Runyon did not confess the crime to him. This supports the argument that Runyon did not confess to others. Costa also could have corroborated other witnesses' allegations of police influence and coercion to obtain certain testimony, such as Sarah Baker's. ECF No. 511 p.24. This could have raised doubts regarding that testimony. Costa's testimony was consistent with the defense theory and counsel's failure to call him as a witness was prejudicial.

### B. Cat Voss

Respondent does not contest that counsel failed to speak with co-defendant Cat Voss and present her as a witness but argues that counsel was not ineffective because it is "doubtful" that Voss would have testified and "doubtful" that Voss's attorney "would have let her testify[.]" ECF No. 536, p.29. Respondent also questions the weight that her testimony would have carried with the jury. *Id.* Reacting to Runyon's assertion that Voss's testimony supported the reasonable doubt defense Respondent asserts: "It is just as likely the jury would not believe a word she said[.]" *Id.*

First, Voss's attorneys could not have prevented her from testifying. Second, courts should not assume that a potential witness will not testify. *U.S. v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). Third, it is a fundamental premise of the criminal trial system that determinations as to weight and credibility of witness testimony belong to the jury. *U.S. v. Scheffer*, 523 U.S. 303, 313 (1998); *U.S. v Luciano*, 343 F.2d 172, 173 (4th Cir. 1965) ("No matter how impaired [the] evidence, the jury had the right to believe all or so much of it as they thought proper."). To the extent the jurors found discrepancies between Voss's statement of facts and her testimony, "their natural intelligence and their

24

practical knowledge of [human nature,]"*Scheffer*, 523 U.S. at 313, could have led them to conclude that Cat Voss would have signed any statement placed in front of her by the prosecution to avoid the death penalty. This is especially true because some assertions in the statement of facts were obviously not personally known by Voss.[11] Defense counsel could have argued that the statement of facts appears to have been written as much to assist the government in its prosecution of Runyon and Draven as it was to memorialize a basis for Voss's guilt. Respondent's argument that it is just as likely they jury would not have believed Voss implicitly concedes a 50-50 probability that Voss would have been believed. Runyon need not demonstrate prejudice by even a preponderance of the evidence, therefore, the issue of fact raised by Respondent is resolved in Runyon's favor.

Finally, Respondent argues that counsel's use of Voss's statement of facts in the penalty phase somehow renders counsel's failure to call Voss in the guilt phase "harmless" error because the jurors found the equally-culpable codefendant mitigator. ECF No. 536, p.29.[12] If Respondent's reference to "harmlessness" refers to a lack of prejudice, that argument overlooks the fact that Runyon was both convicted and sentenced to death (even with the mitigator). Counsel's guilt-phase deficiencies left the jurors unaware that Voss did not hire or agree to pay Runyon to kill her husband and she believed co-defendant Draven was the actual perpetrator. ECF No. 511-9, ¶¶9, 10, 18, 24. This information was

---

[11] Examples include: the deposits of the credit union "are insured by the National Credit Union Administration Board[;]" "the activities of the credit union operate in and affect interstate commerce[;]" the number of phone and text communications between Draven and Runyon during particular time periods; Cory Voss's truck "had been transported and shipped in interstate commerce[;]" the findings of the medical examiner; and, the forensic analysis on the bullets. ECF No. 70.

[12] Respondent's reliance on *Brecht* is inapplicable because the *Strickland* standard controls ineffective assistance of counsel claims. A finding that counsel rendered ineffective assistance is determinative of the claimed constitutional violation; it ends all further inquiry. *Williams v. Taylor*, 529 U.S. 362, 375 (2000) (reiterating the well-settled rule that the deprivation of the right to the effective assistance of counsel is an error that undermines confidence in the fundamental fairness of the trial and such error cannot be deemed harmless).

relevant to the guilt and sentencing phases and would have supplied substantial weight for the mitigating circumstance. As Respondent implicitly conceded, the jurors were likely to believe Voss's in-court testimony. Moreover, the information is not in the statement of facts which counsel admitted as a trial exhibit. Counsel could not have made a tactical decision to deprive the jury of this information because counsel did not know about it. ECF No. 511-6, ¶11.

### C. Scott Linker

Respondent does not contest that counsel failed to investigate and present Linker's testimony. Respondent instead argues counsel was not ineffective in failing to call Scott Linker at the guilt phase because his testimony would have been irrelevant and inadmissible. Alternatively, Respondent argues that Linker's testimony could have supported the prosecution's "hit man" theory. ECF No. 536, p.30. The latter argument has no significance. The jurors convicted Runyon on the prosecution's "hit man" theory without hearing from Linker. The former argument is incorrect. Linker's testimony provided context for Runyon's gun purchase the day of the crime and made the prosecution's theory of the case less probable. It also explained items of physical evidence—long guns and ammunition—which the prosecution introduced into evidence.

"Few rights are more fundamental than that of the accused to present witnesses in his own defense[.]" *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). This right is tempered only by procedural rules that govern the orderly presentation of facts. *Id.* at 410-11. Although Respondent seemingly would have this Court adopt a narrower definition of relevance than provided by the Rules of Evidence or would have the Court curtail defense evidence on the belief that evidence of guilt is strong, rules cannot be applied mechanistically where constitutional rights directly affecting the ascertainment of guilt are implicated. *Chambers*, 410 U.S. at 302; *Holmes v. South Carolina*, 547 U.S. 319, 329-30 (2006).

26

In this case, the prosecution placed into evidence a rifle and shotgun owned by Runyon, neither of which were the murder weapon. Gov't Trial Ex. 212, 212A. Runyon was entitled to present evidence demonstrating that his ownership of the firearms was not related to the crime or to a propensity to commit a crime. Linker's testimony would have provided such an explanation for Runyon's possession, knowledge, and use of firearms. It was relevant and probative of the issues before the jury.

### D. Rose Wiggins

Runyon relies on the allegations in his amended §2255. ECF No. 511, pp.27-28.

### E. David Runyon's Whereabouts The Day Of The Crime

Respondent does not contest the fact that counsel failed to investigate or present evidence (such as Paula Dalton's testimony) corroborating the electronic data which places Runyon in Morgantown, West Virginia at a time that makes it impossible for Runyon to be committing the crime in Newport News, Virginia. ECF No. 511, pp.28-29.

Instead, Respondent asserts that it was more important to know when the co-defendants spoke to each other than to corroborate the electronic information placing Runyon in West Virginia at the time of the crime. ECF No. 536, p.32. It is within the jurors' purview to assign importance to evidence, but even based on the weight assigned by Respondent to the co-defendant's communications, this, too, is an area in which trial counsel performed deficiently.

Counsel did not directly argue the fact that records showed David Runyon did not speak with the co-defendants on the day of the crime. Nor did counsel argue that there was no such contact the day before the crime. In fact, there was a significant time span before the crime from Runyon's last call with co-defendant Draven and their next contact after the crime. Counsel failed to argue that the evidence showed no contact between the co-defendants immediately before, during and after the

27

crime and thus no opportunity to plan and coordinate the crime with the victim's whereabouts.

### F.  Cell Tower Testimony Regarding Michael Draven

Respondent does not dispute that counsel failed to investigate the validity of cell-tower tracking testimony, failed to obtain expert assistance on this issue, and failed to present evidence establishing the possibility that co-defendant Draven was at the scene at the time of the crime.[13]  Such evidence and argument would have made the prosecution's theory less probable and would have supported the defense theory that someone else—such as co-defendant Draven—was the triggerman. Courts have found counsel ineffective for not investigating forensic evidence, including cell-tower tracking testimony. *See, e.g.*, *Elmore v. Ozmint*, 661 F.3d 783, 786 (4th Cir. 2011) (counsel ineffective for "blind acceptance of the State's forensic evidence" and failure to investigate or adequately challenge that evidence); *Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014) (counsel's handling of cell tower tracking evidence was ineffective). Although some courts have permitted the use of cell-tower testimony, "[n]o federal court of appeals has yet said authoritatively that historical cell-site analysis is admissible to prove the location of a cell phone user."[14]  *U.S. v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016).

---

[13]  Respondent's amended response persists with the accusation that Runyon is "wrong" about the number of cell towers in the Newport News area. ECF No. 536, p.32. The amended response fails to recognize that Runyon's amended §2255 clarified that prosecution witness Paul Swartz relied upon a map of Newport News that reflected three cell phone towers to which Draven's phone had connected on the night of the crime. ECF No. 511, p.30. Respondent's admission that there are additional towers in the vicinity demonstrates that Swartz's testimony omitted certain variables impacting the reliability of cell tower evidence to reflect a caller's location. *See Roberts*, 13 F. Supp. 3d at 1092-93, 1102-03.

[14]  The Fourth Circuit very recently issued an opinion involving historical cell-site location information (CSLI). In the course of determining that the Fourth Amendment does not apply when the government obtains CSLI from a cell phone provider, the court of appeals expressly noted, "No government tracking is at issue here." *United States v. Graham*, Nos. 12-4659, 12-4825, ___ F.3d ___, 2016 WL 3068018, at *3 (4th Cir. Mar. 31, 2016). The court commented that a cell phone user "conveys" the location of the cell towers his phone connects with, and CSLI identifies the equipment used to route calls. *Id.* at *5, *8. It "does not enable the government to 'place an individual' at home or at other private locations. The historical CSLI at issue here does not provide location information anywhere near that specific." *Id.* at *2 n.3.

28

Respondent contests the strength of evidence Runyon has initially proffered in support of this claim. ECF No. 536, pp.32-33. The government criticizes Exhibit 14 and seeks to distinguish the circumstances in this case from those in cases where courts have found cell-tower tracking evidence to be unreliable. *See, e.g.*, *Roberts*, *supra*; *U.S. v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). Respondent asserts that the testimony of prosecution expert Paul Swartz did not rely on the inadmissible theory known as granulation. ECF No. 536, p.33. This assertion is incorrect.

To determine the location of a cell phone using the theory of granulization, the cell towers used by the subject phone are identified, the range of the towers' coverage is estimated, and predictions are made as to where the coverage area of one tower will overlap with the coverage area of another. *U.S. v. Reynolds*, 626 F. App'x. 610, 614-17 (6th Cir. 2015) (explaining *Evans*, 892 F.Supp.2d at 952-57). Courts which have applied the rigors of *Daubert* have excluded cell-tower tracking testimony that uses this theory because it rests on the questionable assumption that the subject phone connects to the closest tower. *Evans*, 892 F.Supp.2d at 955-57; *U.S. v. Sepulveda*, 115 F.3d 882, 891 (11th Cir. 1997) (cell site analysis contains inherent uncertainties such as calls bouncing across sites and sectors).

In this case, the testimony of Paul Swartz employed the same faulty theories. Swartz specifically stated that a cellphone call will generally register at the closest tower, Tr.1452, 7/14/09, and his testimony was based on this assumption. Swartz relied upon a map of Newport News that indicated the locations of three cell towers and their alleged signal strengths. Gov't Ex.135. Circles were drawn around each tower to estimate the tower's coverage area and predict the overlap between the towers. Swartz testified that if a call is within a circled area it will "register with that cell tower." Tr.1437, 7/14/09.

> [Prosecutor] Q: Mr. Swartz what do these circles show us in terms of someone using a cell phone and being able to identify their location?

[Swartz] A: It shows that if they are using the cell phone and it registers with that tower they would be within that radius.

THE COURT: So in other words, you cannot only tell that a call is coming from a particular cell phone, but you can put it within a certain area, because it goes through a signal and cell phone tower, and that signal only has a certain radius.

THE WITNESS: That is correct.

*Id.*

Swartz testified that "[if] you are within that red circle and you are not within that green circle, then the call is going to be registered with that cell tower that is represented by that red dot." Tr.1438, 7/14/09. Specifically, Swartz testified that, when Draven placed a call from his cellphone, Draven was located within the circle drawn around the cell tower that was used by the cellphone. Tr.1441-42, 7/14/09. Based on the towers that Draven's cellphone utilized, Swartz placed Draven at his house between 2:53 to 6:06 p.m. *Id.* Swartz then asserted Draven moved north, Tr. 1446, 7/14/09, and at 10:51 p.m. Draven was located within the upper circle which encompassed the Waffle House payphone. Tr.1448, 7/14/09. At 11:45 p.m. Draven placed a call that showed "he is now—the telephone is now within" the circle encompassing his home. Tr.1454, 7/14/09. This testimony was the basis for the prosecution's argument that Draven was not at the credit union at the time of the crime. It was, however, without a scientific basis. When a cell phone connects to a particular tower the most that can be said about its location is that it is within approximately 21 miles of that tower. Kennedy declaration, Ex. 3 ¶6. A cell phone could be located beyond that distance if repeaters are in use. *Id.*

Respondent is critical of the fact that Runyon's amended §2255 motion did not designate an expert for this claim, however, an expert designation is not required at this stage of the case or for Runyon to demonstrate an entitlement to fact-finding proceedings and an evidentiary hearing. In any event, an expert has reviewed the cell-tower tracking evidence and testimony from Runyon's trial and

has concluded that the evidence cannot place codefendant Draven at a certain location at a certain time. Kennedy declaration, Ex. 3 ¶12. The use of circles to represent the cell tower coverage area on Government Exhibit 135 (the map of Newport News) is not accurate. *Id.*, Ex. 3 ¶10. The signal strength of the towers, as indicated on the map, are not the industry standard and underrepresent the coverage area of each tower. *Id.* ¶9. Also, the format of the call history data from Michael Draven's cell phone does not appear to be the original data released from nTelos.[15] *Id.* ¶8.

More important, a cell phone does not necessarily connect to the closest tower. A cell phone connects to the clearest tower. Kennedy declaration, Ex. 3 ¶5. The industry standard formula for selecting the clearest tower is based on Signal, Interference and Noise Ratios (S/(I+N)). *Id.*, ¶10. According to the scale on the map of Newport News, the three cell towers and the location of the Waffle House, the credit union and Draven's house are within approximately ten linear miles. Gov't Ex.135. When Draven's cell phone connected with any of the three cell towers, Draven could have been located anywhere within that ten mile area or an area up to twice that size. *See id.*, ¶11. This means that Draven could have been at the credit union and could have carried out the crime.

Respondent now argues (and seemingly agrees with Runyon) that the trial evidence proved "Draven's location was unknown between 11:11 p.m. and 11:45 p.m. on the night of the murder." ECF No. 536, p.33. But at trial the prosecutor argued the opposite: that the cell-tower evidence proved Draven was not the triggerman because it showed Draven was driving away from the crime scene to his home:

> At the same time, where is Michael Draven? Well, we know where he is. He is traveling up to meet David Runyon. He is on the move. From 11:11 -- and we have shown you the evidence of this -- he is talking on his cell phone and he is moving down the

---

[15] Trial counsel was ineffective for stipulating to the authenticity and validity of all this information instead of investigating its accuracy. *See* ECF No. 239, pp. 15-16, Trial Stipulation 81. Based on the information currently available, Runyon's expert questions the validity of the signal strengths indicated for the three towers. Kennedy declaration, Ex. 3 ¶9.

corridor of Jefferson Avenue to go down to that Waffle House, which is just right off the exit of 64 and Jefferson Avenue. That Waffle House is right there with those pay phones. And we know that Michael Draven goes down there, and he meets David Runyon. They talk moments, probably, and then Michael Draven heads back to his home at the trailer with his mother and her husband.

Tr. 1595, 7/16/09.

Defense counsel did not counter this argument with evidence or argument. In fact, counsel could not counter this argument because counsel failed to consult with an expert or investigate the cell tower evidence. *Standards of Practice for Indigent Defense Counsel*, Standard 4.1(a), 4.1(b)(6), 7.1(b)(3) (Virginia Indigent Defense Comm'n.) ("*Standards of Practice*") (counsel has a duty to obtain expert assistance to prepare the defense and rebut the prosecution's case). To the contrary, defense counsel vouched for the prosecution's witness, Paul Swartz, and asserted he was "a good investigator and an honest guy." Tr. 1639, 7/16/09.

Respondent also disputes that trial counsel could be ineffective for failing to investigate this aspect of the case because counsel presented the general theory of another perpetrator and counsel argued that the evidence did not place Runyon's cellphone in Newport News at the time of the crime. ECF No. 536, p.33. Respondent fails to acknowledge that defense counsel equivocated and told the jury that the evidence "[d]oesn't mean that [Runyon] has it [his cellphone], doesn't mean he doesn't." Tr. 1638, 7/16/09. The fact that counsel presented a theory of defense does not mean that counsel presented that defense in a constitutionally effective manner. *Strickland* requires consideration of that evidence which was presented at trial in conjunction with post-conviction evidence to determine whether counsel's performance prejudiced the defense. *See Elmore*, 661 F.3d at 868-70. Here, counsel failed to support the alternate perpetrator theory by not challenging the cell-tower testimony in addition to other instances of deficient performance set forth in Runyon's amended §2255 motion.

32

### G. Runyon's Shopping List

The amended response couches this claim as a failure to highlight that the list of items were not used in the crime. ECF No.536, p.33. Runyon asserts that trial counsel failed to argue that Runyon's shopping list was unrelated to the crime and, in particular, the list omitted those items that the prosecution argued were utilized by the perpetrator: a gun and a mask. Failing to account for Runyon's initial reply, Respondent again asserts that counsel made this argument, but he didn't. *Id.* (alleging that "Runyon is wrong" in alleging counsel did not argue that the listed items were not used in the crime).

Counsel questioned the ATF agent about whether the listed items were recovered in the searches of Runyon's property. Tr.1050, 7/9/09. The agent answered: "I can't comment to that sir. We took a lot of clothing out of Lot 67, and I'm not comfortable saying whether or not some of those clothing items – I can tell you we never recovered a taser. I'm not sure about a Spyderco knife." Tr.1050-51, 7/9/09. This answer indicated that some, if not all, of the listed items were missing. Respondent fails to recognize how eliciting testimony that the items were missing places them in the same category as Runyon's gun, which the prosecution argued Runyon had disposed of because it was the murder weapon. This is an incriminating presentation of evidence by defense counsel rather than an exculpatory demonstration that the listed items were inconsistent with the crime.

Respondent's amended response asserts the same rationale for counsel's failure to persuasively argue about the shopping list and asserts that trial counsel "was correct" not to discuss the list because of notations related to the credit union that were on the same piece of paper. ECF No. 536, p.34. Counsel could not have contemplated this rationale because in closing argument, counsel mentioned the map which had similar information noted on it. The map had notes related to the credit union *as well as* notes about the victim's truck and the victim's name. Gov't Tr. Ex. 214. Counsel told the jurors,

33

"I admit that's a hard thing to explain, having that map. That's suspicious." Tr.1654, 7/17/09. Respondent's assertion that competent counsel would not reference the shopping list should equally apply to the map which contained even more information related to the crime. Under Respondent's theory, counsel was ineffective for discussing the map.

To be sure, competent counsel can address the prosecution's evidence in a light favorable to the defense. Counsel did not do so in this case although he did mention that Runyon was not asked when the notes on the map were written. Tr.1654, 7/17/09. Counsel missed the opportunity to argue that the prosecution's evidence established the notes were written after the crime. The prosecution presented a significant amount of testimony about a trip to Nags Head shortly after the crime taken by Draven, Voss and her children, and Draven's brother and his girlfriend. The group spent thousands of dollars on hotels, jewelry, food and champagne. Counsel failed to point out that inside the map was the photograph of Draven and Voss at Nags Head. The photo could have been taken *after the crime*, during that May vacation. Tr.1605, 7/17/09. The jurors could have inferred that Runyon came into possession of the map at the same time as the photograph—after the crime. Counsel, however, failed to address the prosecution's evidence in a light favorable to, or consistent with, the defense.

### H. Testimony regarding the bullets.

Respondent initially argues that Runyon has not proffered any evidence that undermines the expert testimony in his trial. ECF No. 536, p.34. First, Runyon has requested access to the evidence upon which his convictions are based (records of the forensic examination of the bullets) and has not yet been granted such access. ECF No. 530, Second Motion for Discovery; ECF No. 545, Supplement to Second Motion for Discovery; ECF No. 545-1, Nixon declaration. Respondent has opposed that motion without acknowledging that the bullets entered into evidence at trial are missing and, therefore, cannot be examined. The records Runyon has requested will contain information useful to Runyon's

34

expert, who (based on the record currently available) questions the trial testimony that allegedly ties the bullets to Runyon's gun. ECF No. 545-1, Nixon declaration. Second, Respondent argues that Runyon has not offered a study or evidence to rebut the validity of the bullet analysis. ECF No. 532, p.4. Runyon therefore also includes herein examples of scientific studies and legal articles scrutinizing the validity of firearms and toolmark testimony that he provided in his reply in support of the second discovery motion. *See* ECF No. 533 & 533-1, 533-2, 533-3.

Runyon's §2255 motion noted that counsel should have been aware of the fact that about five months before Runyon's trial, the National Academy of Sciences ("NAS") issued a landmark report regarding the unreliable state of forensic science in this country. ECF No. 511, p.33 n.20 (citing Nat'l Acad. of Sci., *Strengthening Forensic Science in the United States: A Path Forward* (Feb. 2009)) ("NAS report") (ECF NO. 511-1) (Partial: pp.1-53 (introduction); pp.150-55 (toolmark and firearms identification)). The NAS Report concluded that "[w]ith the exception of nuclear DNA analysis … no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." (ECF NO. 511-1, NAS Report, p.7). As the NAS Report recognized, "there is a notable dearth of peer-reviewed, published studies establishing the scientific bases and validity of many forensic methods," *id.*, p.8, and the report makes clear that these deficient methods include the precise types of scientific evidence presented at Runyon's trial: toolmark and firearm identification. *Id.*, pp.150-55. "The fact is that many forensic tests—such as those used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny." *Id.*, p.42. Although the NAS Report is perhaps the most renowned publication revealing the unreliable and unscientific nature of this type of forensic testimony, it is not the first nor the last.

Even before the 2009 NAS Report, counsel should have been aware of published criticism regarding the reliability of "ballistics" or firearms identification testimony. For example, scholarly and legal scrutiny of firearms identification testimony since 2005—four years before Runyon's trial—is collected and discussed in an article by Lanigan Bonnie: *Firearms identification: the need for a critical approach to, and possible guidelines for, the admissibility of "ballistics" evidence*, 17 Suffolk J. of Trial & Appellate Advocacy, 54 & notes 2, 7-9, 12, 13, 45, 58, 83-95, 115, 120 (Feb. 1, 2012). *See also* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 The Columbia Sci. and Tech. L. Rev. 1, 2 (2005) (discussing *United States v. Kain*, Crim. No. 03-573-1 (E.D. Pa. 2004), and demonstrating that "because of the systemic scientific problems, firearms and toolmark identification testimony should be inadmissible across-the-board.").[16] Accordingly, counsel should have been aware of scientific and legal scrutiny of the validity of testimony such as that given by

---

[16] Such criticism and concern continues today. In 2014, the National Institute of Standards and Technology reported on a project goal to develop objective toolmark identification criteria and error rate estimates so "examiners in court will not only present their subjective opinion of identification, but also will have an independent objective measurement of similarity between the evidence items." In 2015, the Attorney General endorsed a charter for the National Commission on Forensic Science (NCFS), a purpose of which is to "strengthen the validity and reliability of the forensic sciences" and "develop proposed guidance concerning the intersection of forensic science and the courtroom[.]" (ECF No. 533-2, Charter). It is the view of the NCFS that "[a] trusted and impartial process of judging scientific merit of forensic practices and the presentation of data must be developed to ensure that all forensic results are based on sound and current science." (ECF No. 533-3, Nat'l. Comm. on Forensic Sci., Views of the Commission: Validation of Forensic Science Methodology, p.3 (Feb. 29, 2016).

In March 2016, the Principal Deputy Assistant Attorney General and head of the Justice Department's Office of Legal Policy presented materials to the NCFS for the purpose of addressing testimonial inaccuracies of forensic examiners in disciplines including firearms/ballistics. Office of Legal Policy Presentation, The Forensic Science Discipline Framework, pp.4, 6, 7, available at: https://www.justice.gov/ncfs/file/835636/download. The materials set forth the framework for adopting and implementing "correct testimonial standards" and for reviewing closed cases involving FBI forensic testimony for "testimonial inaccuracies." *Id.*, pp.8, 9, 11. Runyon's case will not be selected for review because his case is not closed and the examiner who testified—although trained by the FBI—was not an FBI agent.

prosecution witness John Willmer. Counsel was ineffective when he failed to investigate and present evidence exposing the weakness of Willmer's testimony.

Respondent also briefly claims that this amended allegation is untimely. ECF No. 536, p.34-35. The assertion of untimeliness is incorrect. The amendment was filed within the time allowed by Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure. It also relates back to Runyon's original §2255 motion which pled that trial counsel failed to investigate and present evidence supporting the reasonable doubt defense and countering the prosecution's evidence and argument that Runyon's revolver was the murder weapon. This subclaim asserts the same type of attorney ineffectiveness and arises "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(a)(1)(B); *Mayle*, 545 U.S. at 659 (relation-back is allowed when the claim added by amendment arises from the same core facts). There is nothing completely new about this subclaim and Respondent does not allege there is. *Wolfe v. Clarke*, 691 F.3d 410, 422 (4th Cir. 2012) (where habeas petition alleged Brady violations, amendment was not necessary to add evidence of additional instances of such violations).

This subclaim relates-back to Runyon's original §2255 which sufficiently put Respondent on notice that trial counsel were ineffective for failing to investigate and present evidence of innocence, in particular, evidence countering the prosecution's attempt to connect Runyon's Taurus .357 to the crime. ECF No. 511, pp.19-22 and n.9, pp.23-24, 27-28; *see also* ECF No. 526, pp.18-19, 21, 23-24 (further discussing counsel's failure to present testimony that was inconsistent with idea that Runyon's gun was the murder weapon). Runyon pled facts regarding the physical characteristics of Runyon's revolver which are inconsistent with the prosecution's evidence. For example, Runyon owned a black or "blued" six-shot revolver but the victim was shot five times with an unspecified type of handgun and with an ATM photo showing a "shine" off the perpetrator's gun. The original §2255 presented

37

additional facts undermining the prosecution theory that Runyon's revolver was the murder weapon: the list of items portrayed by the prosecution as items needed for the crime did not include a gun, although Runyon did not own the revolver before the day of the crime; Runyon was in West Virginia at the time of the crime; and, Runyon's ownership and purchase of firearms was not consistent with the idea that Runyon was the trigger man.

Runyon's amendment details further facts and argument in support of the original allegations based on counsel's failure to investigate and present evidence supporting a reasonable doubt that Runyon's gun was not the murder weapon. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 469-70 (4th Cir. 2007) (Rule 15 seeks to ensure that a factual nexus exists between the amendment and the prior pleading and that a defendant had sufficient notice of new claims such that defendant does not suffer prejudice). The additional details and allegation that the prosecution's presentation of Willmer's firearms and ballistics testimony should have been investigated by counsel, therefore, arise out of the conduct, transaction or occurrence attempted to be set forth in the original §2255.

In the main, Respondent argues that Runyon has not demonstrated this claim has merit. ECF No. 536, p.35. Respondent does not dispute that counsel failed to investigate the ballistics evidence in this case or consult with a ballistics expert or zealously cross-examine the ballistics testimony. Indeed, counsel had a duty to conduct an independent investigation and obtain expert assistance to prepare the defense and rebut the prosecution's case. *Standards of Practice, supra*, Standard 4.1(a), 4.1(b)(6), 7.1(b)(3). Instead, Respondent asserts "it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence[]" because Willmer testified that the list of .357 firearms that could have fired the bullets "was not all-inclusive." ECF No. 536, p.36. Under Respondent's theory, although the Certificate of Analysis named two brands of .357 firearms and neither were the brand of Runyon's .357, the list actually included *all* brands of .357 firearms or at least *could have included* the

38

brand of Runyon's firearm. Such wide-sweeping testimony is of little worth in identifying the actual perpetrator.

Counsel was ineffective because consultation with an expert would have revealed that a search for brands and models of guns producing the characteristics noted on the Certificate of Analysis reveals 383 brand and models of 9mm / 380 semiautomatic pistols, 67 brands and models of .38 revolvers, and 36 brands and models of .357 revolvers. ECF No. 545-1 ¶10, Nixon declaration. Moreover, a defense expert could have explained that any inference or conclusion that the bullets were fired from a particular firearm is speculative, especially when the particular firearm was not available for comparison purposes. *Id.* ¶7. A defense expert also could have rebutted Willmer's testimony which inferred that Runyon's cleaned his gun with a wire bore brush in order to cover-up the crime. This testimony "was exaggerated, both in terms of the aggressiveness of such brushes, and their rarity. It is common to use stainless steel bore brushes to clean firearms. Such brushes will not easily affect rifling characteristics." *Id.* ¶9. This testimony would make the prosecution's theory of guilt less probable. Confidence in the jury verdict would have been undermined had counsel countered the prosecution evidence because there is a reasonable probability that jurors would have had a reasonable doubt that Runyon was the triggerman.[17]

---

[17] Respondent asserts that Runyon cannot show prejudice due to the "mountain of evidence demonstrating guilt." Runyon's §2255 motion has shown that there was not a "mountain of evidence" and, instead, the prosecution's case was strategically built on an *absence* of evidence of guilt which was substantially aided by counsel's failure to investigate and present evidence that countered the prosecution theory and tended to show Runyon's innocence. Regardless, to prevail on his ineffective assistance of counsel claim, Runyon need not overcome an alleged mountain of evidence. He "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Prejudice exists when there is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

**Claim 4:**     **Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstances.**

Respondent does not contest that counsel had a duty to investigate and respond to the prosecution's case in aggravation, *Rompilla v. Beard*, 545 U.S. 374, 385-87 (2005), that counsel had an "overarching duty to advocate the defendant's cause" and that counsel was required to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Instead, Respondent argues that counsel's performance cannot be deemed ineffective because there was overwhelming evidence of the statutory aggravating factors based on the guilt-phase evidence and convictions. ECF No. 536, pp.36-37. Respondent's amended response, like the initial response, again proffers an incorrect legal standard when he states that "the evidence of Runyon's eligibility for the death penalty was overwhelming, such that he cannot establish that the outcome would have been different even had trial counsel advocated in a different manner." ECF No. 536, pp.36-37. Runyon need not show the outcome would have been "different." He need only demonstrate that there is "a probability sufficient to undermine confidence in the outcome" if counsel had presented evidence and argument to mitigate the aggravating factors. *Strickland*, 466 U.S. at 694. *See also* Note 17, *supra*.

Respondent also asserts it was a reasonable strategic decision for counsel "to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt." ECF No. 536, p.39.[18] The issues of prejudice and deficient performance are fact intensive and require further factual development and an evidentiary hearing. *See Blackledge*, 431

---

[18] In contradiction, Respondent praises counsel for urging the jury to look at the guilt-phase evidence anew. ECF No. 536, p.39. Counsel, however, failed to provide a fact-based argument that provided a new way of viewing the guilt-phase evidence in light of the unique inquiries of the eligibility and selection phases that determine a defendant's sentencing fate.

40

U.S. at 80-81; *Townsend*, 372 U.S. at 313.

Counsel's decision to forgo presenting proof at a separate trial stage and in support of a separate issue on the belief that it wouldn't make a difference or it would "alienate the jury" is not reasonable. This is particularly true because the statutory aggravators carried-over to the penalty phase to be weighed in the jury's selection of a sentence. It was imperative for counsel to mitigate the weight of these factors. *See Rompilla v. Beard*, 545 U.S. 374, 385-87 (2005) (counsel has a duty to investigate proposed aggravating factors and mitigate those factors with readily-available evidence). By essentially conceding the two statutory aggravating circumstances counsel "seriously compromise[ed] their opportunity to respond to [the prosecution's] case for aggravation." *Id.* at 385.

With respect to the "substantial planning" aggravator, Respondent appears to argue that counsel had no duty to advocate for Runyon because the aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." ECF No. 536, p.40. Respondent fails to address the argument that was available to counsel to mitigate the "substantial planning" aggravator. *See* ECF No. 511, pp.36-37. This argument demonstrated that the other two co-defendants recruited Runyon, planned the crime, and also laid a foundation in support of the "equally culpable co-defendants" mitigating circumstance. Respondent fails to explain how defending against the aggravating weight of this factor would alienate the jury.

With respect to the "pecuniary gain" aggravator, Respondent alleges that Runyon put forth mere conclusory allegations. ECF No. 536, p.38 n.4. An allegation is conclusory only when it is not supported by "facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Note to Rule 4, Rules Government Habeas Corpus Cases). Runyon asserted such facts. At the eligibility hearing, counsel failed to address the

41

"pecuniary gain" aggravator. Importantly, the jury had acquitted Runyon of conspiracy to commit robbery. The aggravator was supported only by a receipt indicating Randy Fitchett sent $275 to Runyon two months after the crime. ECF No. 511, p.38 n.23. Voss and Draven received $100,000 almost immediately after the crime and spent the entire amount in about three months, *id.*, p.3; *see also id.*, p.6, and that Draven and Voss denied paying Runyon for the crime. *Id.*, p.113. A declaration from Voss states that she did not agree to pay Runyon to kill her husband. ECF No. 511-9, ¶9. There is nothing conclusory about the facts supporting this claim.

Counsel's failure to discuss and mitigate the two statutory aggravating circumstances was prejudicial because they were carried into the selection phase without any attempt by counsel to mitigate their weight. Conceding through silence two aggravating factors that the jurors then weighed in favor of a death sentence is not a reasonable "start" for the penalty phase as Respondent suggests. ECF No. 536, p.39-40. "[N]o single point in a criminal case is more consequential than sentencing. Representation of a client at sentencing is not a separate aspect of the criminal case, but should be a final step in a case-long plan." *Standards of Practice*, *supra*, Standard 8.1(b) & Comment. Counsel was duty-bound to "take the steps necessary to advocate fully for the requested sentence[,] to protect the client's interest[,] … [and] to present supporting evidence … to establish the facts favorable to the client." *Id.*, Standard 8.5(a) & (b). Constitutionally effective counsel would have submitted evidence to mitigate the aggravators and to do so would not have alienated the jurors; it would have fulfilled counsel's duty "to ensure that the adversarial testing process work[ed] to produce a just result." *Strickland*, 466 U.S. at 687.

**Claim 5:    Trial Counsel Were Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Respondent's amended response, like the initial response, argues that counsel had no duty to investigate Runyon's mental health because, in Respondent's view, the facts of this case were not as

42

"bizarre" as a case where a man raped and robbed a 67-year-old woman. ECF No. 536, p.43. The test for whether counsel is on notice of a reasonable avenue for investigation is not limited to whether the facts surrounding the crime are illogical. The test is whether a reasonable attorney would follow leads based on facts that were known or should have been known. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). In this case, facts counsel knew or should have known about their client and the case signaled a need for a mental health investigation, above and beyond the pre-existing duty to investigate. Moreover, regardless of the facts of the crime, standards of practice required counsel to gather information and evidence of the client's competence and mental state at the time of the offense. *See, e.g., Standards of Practice, supra*, Standard 2.1(c)(7); *see also* Standard 3.3 (continuing responsibility to raise issue of client's incompetence).

First, "facts, which were either known or ascertainable with reasonable diligence by counsel prior to trial, provided a reasonable basis for believing th[at] defenses based on [Runyon's] mental capacity might have been plausible." *Becton v. Barnett*, 920 F.2d 1190, 1193 (4th Cir. 1990) (citation omitted). Mental health records from the local jail stated that Runyon was suffering anxiety attacks, he was grandiose and delusional, and his thoughts were flighty and rambling. ECF No. 511-16, pp.3-4. If counsel were not observant enough to see the scars on Runyon's face, head, and body or the asymmetry in Runyon's face, a medical screening of Runyon conducted in conjunction with his employment in a drug study recorded the facial asymmetry and at least one prominent scar.[19] *See* ECF No. 526-1. In conversations with counsel, Runyon displayed a very rigid thought process. ECF No.

---

[19] Respondent states that "various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence." ECF No. 536, pp.44. Undersigned are unaware of mental health examinations performed in relation to the studies and Respondent has not produced any.

511-5, ¶3. He reported grenade-blast injuries from the Army and trauma from automobile accidents. ECF No. 511-5, ¶5; ECF No. 511-6, ¶5. Runyon compared himself to great historical figures and recounted the many lives he had saved. ECF No. 511-4, p.3 ¶7. He wrote long, rambling letters before trial that indicated his failure to understand concepts communicated by counsel. ECF No. 511-4, p.3 ¶7; *id.*, pp.9-14. During trial Runyon wrote obsessively. ECF No. 511-4 p.7 ¶16; ECF No. 511-5, p.3 ¶11. Counsel knew Runyon's mother had a history of trauma and a mood disorder. Runyon's father was cold, unfeeling and silent. Runyon grew up in a strictly-disciplined and extremely isolated environment. *See, e.g.,* ECF No. 511-4, p.3 ¶8; ECF No. 511-6, p.2 ¶14; ECF No. 511-15, pp.5-6. Respondent ignores the facts that were known or should have been known by counsel and, instead, argues that counsel "had no indication of mental illness." ECF No. 536, p.45.

Second, even under Respondent's "bizarre facts" test for investigation, counsel were aware that facts in this case simply do not make sense. Respondent has chosen not to acknowledge this reality. *See, e.g.,* ECF No. 536, p.43 ("Runyon's crime was not so bizarre"). According to the prosecution's theory, however, Runyon agreed, with a man he just met and a woman he never met, to kill a man he did not know, for absolutely no money up front. Runyon then waited until *the day of the crime* to purchase a gun (the alleged murder weapon) from a man he did not know and under circumstances where there was no certainty that the transaction would actually occur. At the point of purchase Runyon gave the seller his license and personal information and spent time discussing personal, family details with the seller. Runyon then allegedly drove from Morgantown, West Virginia late that afternoon—without accounting for any travel delays and leaving no room for error—to arrive in Newport News, Virginia, just in time to encounter the victim at the credit union's drive-up ATM. Runyon allegedly used .38 caliber bullets in the .357 revolver even though he owned .357 ammunition. Runyon then left Virginia without receiving any payment although the co-defendants obtained

44

$100,000 approximately 24 hours after the victim's death. Runyon kept the alleged murder weapon and created a paper trail of the .357 at a pawn shop. He also kept notes on the credit union and a map of Newport News along with a photograph of the co-defendants *even after* police interviewed him about the murder and during which he voluntarily gave a DNA sample. These are strange facts especially when considered in light of the assertion that Runyon used specialized education, training and experience to carry-out the crime and "avoid" detection.

Third, the Sixth Amendment right to counsel "imposes a correlative duty on defense counsel to undertake reasonable steps to investigate all open avenues of defense." *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978). This includes a pre-existing duty to investigate and raise mitigating mental health factors both pre-trial to the prosecutor and court and to the jury and court at sentencing. *Wiggins*, 539 U.S. at 524-25 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, pp.4-55 (2d ed. 1982), and, ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C), p.93 (1989)).

"The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case[.]" *U.S. v. Williams*, 615 F.2d 585, 594 (3d Cir. 1980) (quotation and citations omitted). Thus, when objective facts signal the need to explore a client's mental health, the "[f]ailure to adequately investigate the possibility of an insanity defense has been held to fall below the standard of competence despite the deference accorded an attorney's judgment in evaluating the effectiveness of representation." *Becton*, 920 F.2d at 1192. As set forth in the §2255 motion and above, there were facts indicating a "reasonable cause to believe" that Runyon was "suffering from a mental disease or defect" that rendered him unable "to assist properly in his

defense."[20] 18 U.S.C. §4241(a) (setting forth the standard under which a competency hearing shall be granted). Under such circumstances, Runyon has satisfied the performance prong of *Strickland* because he need only demonstrate that the Court would have held a competency hearing; he does not need to show that he would actually have been found incompetent. *Becton*, 920 F.2d at 1193–94. Even if the hearing did not result in a finding of incompetence the examination should have revealed Runyon's brain damage and severe mental illness and would have supported substantial mitigation. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (describing mitigation that arose from court-ordered competency evaluations).

Finally, Respondent raises a material issue of fact by arguing that Runyon's defense was not prejudiced because "counsel did make a full examination for any identifiable mental health issues." ECF No. 536, p.44. This is incorrect. A full examination of Runyon's psycho-social history and mental health was not completed before the trial began, in large part because penalty-phase counsel did not have enough preparation time. Hudgins declaration ¶4, Ex. 1. Counsel Hudgins was appointed 91 working days before the trial. At most, he had 32 full business days to learn about and investigate Runyon's case and prepare for trial before it began. ECF No. 511-5, ¶2 and ECF No. 511-19; *see also* Hudgins' calendar, Ex. 4.

Counsel's investigation was inadequate because the mental health experts had not conducted full examinations before trial began. *See also* Claim 6. For example, Dr. Nelson had not completed a full examination and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Dr. Mirsky began an examination of Runyon four days before trial. ECF No.511-20. He informed counsel that his review and analysis was not complete and that it was essential for Runyon to undergo

---

20 The fact that Runyon has above-average intelligence does not negate a determination of incompetency or mental disease or defect. *Cf.* ECF No. 536, p.45 (stating, "the information available to counsel indicated that Runyon possessed above average intelligence").

a neurological examination. *Id.* Counsel requested the assistance of Dr. Merikangas to conduct that examination, but the trial court declined to appoint him at that point. As a result, Dr. Merikangas was unable to examine Runyon until *after* Runyon was convicted and found eligible for the death penalty. ECF No.511-2, p.5 of 6, Dr. Merikangas August 5, 2009 preliminary report. Respondent concedes that both Dr. Mirsky and Dr. Merikangas issued only preliminary reports, ECF No. 536, p.44, and complains about not receiving full information or complete reports from the defense experts. *Id.*, pp.61-62. This incomplete effort at investigating Runyon's mental health cannot, under any measure, be considered "a full examination for any identifiable mental health issues."

**Claim 6:**     **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

Respondent characterizes this claim as an attack on counsel's sentencing-phase strategy and avoids the central issue of counsel's deficient investigation by ignoring the specific factual allegations and by incorrectly characterizing information known and unknown by counsel. Respondent asserts contrary facts and disputes many of the factual allegations pled by Runyon. Accordingly, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

*Strickland v. Washington* prescribes the proper framework and focus for this claim. It provides that a failure to uncover and present mitigating evidence at sentencing cannot be justified as a tactical decision to focus on a particular defense theory when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, Commentary, pp.4-55 (2d ed. 1980)). The reasonableness of the mitigation theory actually proffered by counsel is not relevant when evaluating

the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory. *Sears v. Upton*, 561 U.S. 945, 954-55 (2010). "[R]egardless of how much or how little mitigation evidence was presented during the initial penalty phase," *Sears*, 561 U.S. at 956, the inquiry into whether counsel exercised reasonable professional judgment "focus[es] on whether the investigation supporting counsel's decision not to introduce mitigating evidence … was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In this case, there was no "decision" to forego the introduction of the unpresented mitigating evidence. Counsel did not present certain mitigating evidence because an adequate investigation was not conducted and available mitigating evidence was not uncovered.

### A. All mental health experts consulted by defense counsel indicated Runyon was suffering from a mental disease or defect but the experts lacked the information, testing, and time required for a complete examination.

Respondent concedes that Drs. Mirsky and Merikangas made only preliminary findings. ECF No. 536, p.60 ("Their reports were preliminary in nature[.]"). In fact, Respondent complains about not receiving full information or complete reports from the defense experts. *Id.*, pp.61-62. The prosecution never received a full report from Dr. Merikangas and Dr. Mirsky did not supplement his report. *Id.* Respondent asserts, however, that the defense experts were not favorable, *see*, *e.g.*, ECF No. 536, pp.64, and states that "counsel cannot be held accountable for relying on experts after providing them sufficient evidence." *Id.*, p.52. Notably, Respondent fails to explain what was "unfavorable" about the defense experts and fails to indicate what "evidence" defense counsel gave the experts and why that "evidence" was "sufficient."[21]

---

[21] The first expert counsel contacted, Dr. Nelson, did not conduct a complete examination or a psycho-social history and assessment. He did, however, inform counsel that neuropsychological deficits were a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Counsel then sought assistance from experts in that field. In *Sears*, 561 U.S. at 951, the Supreme Court held that "[c]ompetent counsel

48

The basic premise for Respondent's argument against counsel's ineffectiveness is incorrect. The defense experts' preliminary assessments *were* favorable to the defense and "do not contain negative information about David Runyon." Hudgins declaration ¶8, Ex. 1. Counsel did *not* timely obtain expert assistance nor provide the experts sufficient information for an adequate examination.

First, the preliminary findings of the defense experts contained classic mitigating evidence and warranted further investigation. Dr. Mirsky found: (a) "strong evidence that he [Runyon] is suffering from a neurological disorder," ECF No. 511-20; (b) Runyon has classic symptoms and suffers the effects of blast and impact injuries and brain injury, ECF No. 511-21; (c) Runyon is properly classified as having mild traumatic brain injury, ECF No. 511-22; (d) Runyon displays symptoms of Post Traumatic Stress Disorder, *id.*; and, (e) Runyon has a very impaired ability to sustain attention and has impairments in reaction time. *Id.*, pp.1-3. All of these findings are mitigating. *See, e.g., Porter*, 558 U.S. at 41 (evidence of poor mental health or mental impairment could influence a jury's appraisal of the defendant's moral culpability); *Sears*, 561 U.S. at 949 (describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla*, 545 U.S. at 392 (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

Dr. Merikangas reported: (a) that the prosecution experts' evaluations suggested Runyon suffers from Migraine like headaches, Attention Deficit Disorder and Post Traumatic Stress Disorder, ECF No. 511-2, p.5; (b) Runyon has physical signs of trauma, *id.*; (c) he has Post Traumatic Stress

---

should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking … were features, in another well-credentialed expert's view, of a 'profound personality disorder.'"(Citation omitted). The performance of Runyon's counsel failed in this regard.

Disorder, *id.*; (d) he suffers severe headaches, *id.*; (e) withdrawal from experimental drugs may have affected him at the time of the crime, *id.*, pp.5-6; (f) he was currently either in a fantasy world of grandiose thinking or suffering from delusions; *id.*, p.6; and, (g) he has impaired executive functioning suggestive of frontal lobe brain impairment. *Id.* All of these findings are mitigating. *Ibid.*

Second, counsel failed to timely obtain expert assistance. Respondent concedes that—the day before trial began—defense counsel provided notice of their intent to substitute Drs. Mirsky and Merikangas as the defense experts but the doctors had not yet begun or concluded their evaluations of Runyon. ECF No. 536, p.56 (citing ECF No. 230). Once retained, the experts requested more information and testing but received neither. They were not given Runyon's medical records or other relevant background materials.

Dr. Mirsky reported to counsel: (a) that an evaluation by a neurologist was essential, ECF No. 511-20; (b) testing information sent to him by the prosecution expert was "not especially useful or informative," ECF No. 511-21; (c) counsel's report that the brain scans "were read as normal" was not conclusive on whether Runyon had brain damage, ECF No. 511-22, p.1; (d) Diffusion Tensor Imaging had not been done, *id.*; and, (e) Post Traumatic Stress Disorder had not been ruled out. *Id.*

Dr. Merikangas was not appointed until the day the jury found Runyon eligible for the death sentence. ECF No. 257. He requested: (a) a chronology and details of the experimental drugs Runyon was administered before the crime, and (b) brain imaging, including MRI, PET, and EEG. ECF No. 511-2, pp.5-6. He was not given the brain scans performed during the penalty trial. Dr. Merikangas recently reviewed the scans from August 2009. "They revealed multiple white matter hyperintensities … consistent with his [Runyon's] history of head injur[i]es and migraine." ECF 511-2, p.4.

Respondent's amended response, like the initial response, fails to acknowledge the facts alleged in Runyon's amended §2255 motion and initial reply which demonstrate that the defense experts did

not see the brain scans and that the scans were consistent with brain injuries. Respondent repeatedly mis-represents that the brain scans did not reveal brain damage. *See, e.g.*, ECF No. 536, pp.62 n.7, 65, 69, 72. Respondent relies upon the fact that defense counsel told Dr. Mirsky (after Runyon was sentenced to death) that the scans were read as normal and then ignores the fact that Dr. Mirsky immediately informed counsel that his opinion regarding Runyon's brain injury and PTSD was unchanged. ECF. 511-22, p.1. Runyon's trial counsel understands the difference between a radiologist's reading and a neuropsychiatrist's/neurologist's reading of a brain scan. Hudgins declaration ¶5, Ex. 1. They look for different things. A radiologist's report of a normal brain MRI was not a reason to cease investigation into Runyon's mental health or social history. *Id.*

Respondent also suggests that neurological testing requested by the defense experts is the same as the brain scans and then hypothesizes that the defense experts did not complete their evaluations because the scans "revealed no abnormalities." ECF No. 536, pp.62 n7. Neither suggestion is true. The fact that Runyon suffers from a mental disease or defect, in part based on blast injuries incurred during his military service, was mitigating. The available mental health mitigation was consistent with non-statutory mitigators regarding Runyon's childhood experiences of domestic violence and parental conflict and Runyon's military service. It was not inconsistent with the defense theories of equally-culpable co-defendants and family sympathy. It was the type of information counsel wanted to present at the penalty phase. Hudgins declaration ¶¶6, 9, Ex. 1. Based on what counsel learned (or should have learned) from the mental health experts, the investigation was incomplete and prematurely abandoned.

**B. Counsel did not reasonably abandon the psycho-social investigation.**

Respondent argues that counsel's limited mental health investigation was adequate because offering expert testimony would have opened the door to harmful testimony from the prosecution's

51

experts and because counsel did not have a factual basis to follow-through with the investigation.[22] Neither contention is supported by the evidence before the Court.

### C. Counsel did not abandon the investigation upon receipt of the prosecution experts' reports.

Respondent's amended response, like the initial response, implies that defense counsel abandoned the mental health investigation once the prosecution experts' reports were revealed. ECF No. 536, p.57 (the defense filed its notices of intent to introduce mental health testimony before defense counsel received reports from the prosecution's experts). The causation Respondent continues to claim still does not exist. Counsel received the reports the day the jury found Runyon eligible for the death penalty. ECF No. 252. Nine days before the penalty phase began, counsel re-asserted an intent to present mental health experts and requested permission to supplement the defense experts' reports. ECF No. 269. Counsel did not cease an investigation or decide not to present Runyon's mental health and social history based on the prosecution-experts' reports. Hudgins declaration ¶7, Ex. 1. Counsel clearly contemplated mental health testimony even after the prosecution-experts' reports were disclosed.

Respondent argues as if counsel in this case were uniquely confronted with the proposition that if they "opened the door to a mental health defense," the Government would have presented mental health experts in rebuttal." ECF No. 536, p.57-58. Counsel expected the prosecution's experts to express differing, if not unfavorable opinions of Runyon. Hudgins declaration ¶7, Ex. 1. This is the nature of the adversarial system. "If there is one area where expert witnesses are almost always diametrically opposed, it is the field of psychiatry." *U.S. v. Mansfield*, 24 M.J. 611, 618 (A.F.C.M.R.

---

[22] Respondent incorrectly states that Runyon's recent expert reports "rely on information and affidavits not available at the time of trial[.]" ECF No. 536, p.72. The expert and lay-witness declarants affirmed they could have provided information at the time of trial and the records and evidence are either dated before trial or existed before trial.

1987) (rejecting the argument that abandoning expert evidence was reasonable because the prosecution could respond with damaging information). The fact that the prosecution will present its own experts does not justify counsel's failure to present mental health mitigation in support of a life sentence. *Porter*, 558 U. S. at 43 ("it was not reasonable to discount entirely the effect that [a defense expert's] testimony might have had on the jury" just because the prosecution's expert provided contrary testimony). In this case, reports from the prosecution's experts were not the reason why an adequate investigation and psycho-social history was not completed or presented to the jurors. Hudgins declaration ¶7, Ex. 1.

### D. Reports of the prosecution experts did not contain additional aggravating evidence and were not inconsistent with defending the proposed aggravating circumstances or establishing mitigating circumstances.

The record before the Court does not support Respondent's theory that counsel avoided damaging prosecution evidence by abandoning the mental health investigation. The reports of the prosecution's experts, Drs. Patterson and Montalbano, were not so detrimental to Runyon's defense that they rendered non-prejudicial counsel's failure to complete the mental health investigation and offer mitigating evidence. For example, the prosecution experts' reports did not negate the mitigating value of the jail records indicating Runyon's mental distress, delusions, grandiose ideations, and psychosis. *See* ECF No. 536, p.70 (jail records predating the prosecution expert reports are unavailing). Importantly, the prosecution's experts were unaware of the jail records at the time they evaluated Runyon.

Respondent concedes that Dr. Patterson, who opined Runyon met the criteria for a personality disorder with narcissistic features, concluded "no mitigating *or aggravating* mental health factors existed." ECF No. 536, p.59 (emphasis added). Dr. Patterson stated: "Although [Runyon's] personality traits have affected relationships and job performance, they do not, in my opinion, represent a serious

53

mental illness that has any impact as mitigating *or aggravating factors regarding sentencing* on his current charges if found guilty." ECF No. 276, p.23 (emphasis added). Dr. Patterson noted that Dr. Montalbano's findings were consistent with his own. ECF No. 276, p.24. A personality disorder diagnosis was not the reason for the incomplete investigation or the reason for not presenting Runyon's mental health and psycho-social history to the jurors. Hudgins declaration ¶11, Ex. 1. The reports of the prosecution experts would not have established additional aggravation and accordingly do not support Respondent's speculation as to a possible strategy behind counsel's abandonment of the mental health investigation.

Respondent fails to acknowledge—even after Runyon's initial reply demonstrated otherwise—that the supposedly harmful facts contained in the prosecution experts' reports were already before the jury.[23] Respondent states that the prosecution experts would have testified "that Runyon failed to accept responsibility for his actions[.]" ECF No. 536, p.60. Similar testimony was already before the jury as it was a central prosecution theme: Runyon lacked remorse because he failed to take responsibility for the crime. The prosecution presented testimony and exhibits attempting to establish a pattern of conflicts that arose during Runyon's various jobs and attempting to show that Runyon consistently denied fault, shifted blame, and rationalized such conflicts. The prosecutor argued: "we see a recurring theme, ladies and gentlemen, with this education and this employment experience, in that he is reprimanded, and then he resigns. It's never his fault. It's never his fault that he is late and given a suspension. It is never his fault that he has had unsatisfactory job performance and he is barred from reenlistment." Tr.2614, 8/26/09. The prosecutor also presented evidence regarding domestic battery charges and argued they had shown how Runyon "will do what he can to avoid responsibility

---

[23] Not all of the testimony would have been duplicative of other prosecution evidence; some had mitigating value. *See infra* Claim 6(B)(3).

for this, and it is a trend that we have seen continue into this case as well." Tr.2608, 8/26/09; *see also* Tr.2611, 8/26/09 ("Runyon is a manipulator who will do what he can to avoid responsibility. Again we see this same theme in the aftermath of the murder[.]"). Any testimony by a prosecution expert that Runyon does not accept responsibility for his actions is simply cumulative to evidence already before the jury. This is demonstrated by the fact that the jurors found the lack-of-remorse non-statutory aggravating circumstance without testimony from the Government's experts.

Counsel's failure to complete the mental health investigation and present expert testimony was not based on a reasonable strategy to close the door to additional aggravating evidence; it prevented the jurors from considering a true depiction of David Runyon and his moral culpability. For example, Dr. Montalbano's report would have provided the jurors with the explanation that Runyon's "strong ego" and tendency to "externalize blame and to rationalize his own behavior" are products of his personality dysfunction. ECF No. 277, pp.26, 27; *see also* ECF No. 276, p.23 (Runyon demonstrates personality features including "externalizing his responsibilities for conflicts" and not taking responsibility). Instead, the jurors did not hear from any expert about how adverse developmental factors in Runyon's life impacted his cognitive ability, his personality, his judgment and behaviors.

Respondent repeatedly asserts—without explanation—that Runyon's above-average intelligence would have run contrary to the mitigation presented by Runyon's counsel. *See*, *e.g.*, ECF No. 536, pp.58-59, 71. This is incorrect. Runyon's counsel did not present evidence that he had below-average intelligence. (Elsewhere, Respondent asserts that "testimony from friends and family … averred to his intelligence[.]" ECF No. 536, p.45). The unpresented mitigation—including brain damage, diminished executive functioning, and psychosis—and a higher intelligence quotient are not mutually exclusive. Runyon's trial counsel understands that an above-average I.Q. does not rule out the possibility of mental illness and it is not inconsistent with mental health mitigation. Hudgins

55

declaration ¶10, Ex. 1. Runyon's I.Q. was not a reason why counsel ceased investigation into Runyon's mental health and social history. *Id.*

Respondent further contemplates that the prosecution experts "could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence." ECF No. 536, p.60. Respondent also acknowledges, however, that the jurors rejected Dr. Cunningham's risk-assessment testimony without hearing from the prosecution's experts. ECF No. 536, p.48. The prosecution's experts could have only helped support Dr. Cunningham.

Dr. Montalbano's report on Runyon's "correctional course and adjustment" would have likely supported Dr. Cunningham's risk-assessment testimony. Dr. Montalbano found: (a) Runyon "had no disciplinary infractions" during his year-and-a-half in pre-trial custody; (b) Runyon "was credited with providing emergency first aid to a cellmate, who suffered a seizure and associated head injury;" (c) Runyon's placement in general population reflected an appraisal that he was at low risk for violence in the prison environment; and (d) Runyon was "an isolative individual, who spent much of his time in his cell … engaging in activities such as reading." ECF No. 277, p.20. Counsel's failure to complete the mental health investigation and present expert testimony did not prevent the admission of additional aggravating evidence; it left the jurors without knowledge that the prosecution experts provided explanations for David Runyon's behavior and that there were areas of agreement between the prosecution and defense experts. This resulted in the jurors making a moral culpability determination based on an incomplete picture of David Runyon.

### E. Counsel abandoned the investigation despite several red flags signaling the existence of substantial mitigating evidence.

In addition to facts signaling the need for investigation, *see supra* Claim 5, and the mitigating information conveyed to counsel by their own experts, *see supra* Claim 6(A), the reports of the prosecution's experts (Drs. Montalbano and Patterson) included information warranting further

56

investigation. Respondent's amended response, like the initial response, fails to acknowledge or address the red flags signaling the existence of mitigating evidence and requiring investigation.

Respondent ignores the proof Runyon has proffered and asserts counsel did not perform deficiently because there were no records or evidence corroborating Runyon's head injuries. ECF No. 536, p.69. Yet, the prosecution experts confirmed some of Runyon's psycho-social history, including his head injuries. Each expert noted Runyon's head trauma at about age three when he was abused by his biological father, a run-in with a telephone pole around age five, being "knocked out" during high school wrestling matches, concussions from military training involving explosions, and "a bad car accident" in 1996. ECF No. 276, pp.11-12; ECF No. 277, p.20. Dr. Montalbano found evidence of the 1996 car accident: the main reason Runyon was barred from reenlistment in the Army was a problem with attention to detail and a failure to follow instructions. ECF No. 277, p.29. This was a problem that did not predate the car accident and Dr. Montalbano opined that "problems such as attention to detail may have been the part of the sequalae from this event." *Id.* Maria Runyon's grand jury testimony also corroborated the car accident. ECF No. 277, p.20. Dr. Montalbano's testing revealed a substantial variance between Runyon's verbal and performance IQ scores and significant deficits in working memory. ECF No. 277, pp.24-25. "[O]nly a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction[.]" ECF No. 277, p.30. If counsel had followed these leads and conducted an adequate investigation the jurors would have learned of Runyon's brain damage.

Dr. Patterson's report noted that the "sag" on the right side of Runyon's face resulted from abuse by his biological father. ECF No. 276, p.11. Had counsel pursued this information they could have presented such evidence to the jurors and strengthened the non-statutory mitigating circumstances based on Runyon's childhood environment. This information also would have rebutted

57

the prosecution's argument that Runyon's appearance in the interrogation videotape evidenced a lack of remorse. *See* ECF No. 511, pp.71, 74, 79-80.

Dr. Montalbano's report discussed the effect of adverse developmental factors in Runyon's life. He found several adverse factors which "may well have contributed to his [Runyon's] personality disorder[.]" ECF No. 277, p.30. Runyon's personality disorder, in turn, "contributed significantly to his poor vocational performance and his unstable interpersonal history." ECF No. 277, pp.30-31. Dr. Montalbano devoted multiple pages in his report to explaining how various personality-driven factors resulted in Runyon's "significant underachievement" and inability to maintain consistent employment, lack of self-awareness and rigid tendency to deny or minimize problems, apparent lack of remorse, lack of consistent contact with his family, poor impulse control and poor judgment in establishing relationships with unstable females. *Id.*, pp.25-30. Had counsel followed-up on Dr. Montalbano's discussion of adverse factors they could have obtained favorable testimony on this subject matter from Dr. Cunningham or another experienced mental health professional.[24] *See* ECF No. 511, pp.72-76.

At trial the prosecution portrayed Runyon's participation in drug studies as an intentional "[abandonment of] more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven." Tr.2610, 8/26/09. In contrast, Dr. Patterson reported that when Runyon's "mother was in a lot of physical pain, and he first found out about drug trials because he was doing research online resulting in his decision to

---

[24] Respondent states that "developmental factors were both known and put forward by counsel for Runyon," ECF No. 536, p.65, but only some were "put forward" by counsel Babineau in a letter to the United States Attorneys. ECF No. 511-15. Counsel who replaced Babineau was unable to speak with Babineau about the case. Hudgins declaration ¶3, Ex. 1.The time Babineau spent on the case was not much benefit to replacement counsel. *Id.* Replacement counsel did not present evidence *to the jurors* substantiating the mitigation narrative reflected in the letter and developed by his predecessor.

participate in drug trials while he was in West Virginia." ECF No. 276, p.12. Runyon felt like he was doing "something good for people and he had only seen three or four other Asians so that he [wa]s 'representing that culture.'" ECF No. 276, p.13. Had counsel pursued information in Dr. Patterson's report, the jurors could have been provided with context regarding Runyon's motivations for participating in drug studies that would have countered the prosecution's argument. This also would have mitigated the prosecution's comparative-worth argument made in support of the victim-impact aggravator. *See Runyon*, 707 F.3d at 512.

In light of information that was known (or should have been known) by counsel, the failure to conduct an adequate psycho-social investigation was unreasonable.

### F.  Counsel's deficient performance resulted in prejudice.

Respondent argues that the unpresented mitigating evidence was "of dubious value," ECF No. 536, p.63, and asserts that "counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on positive aspects of Runyon's character."[25] *Id.*, p.66. However, penalty-phase counsel did not believe mental health evidence was "dubious."[26] Counsel wanted to present evidence of trauma and Runyon's diminished ability to reason. ECF No. 511-5, pp.1-2, ¶5; ECF No. 511-6, p.1 ¶5; Hudgins declaration ¶¶6, 9, Ex. 1. This evidence was available and was not inconsistent with the evidence which was presented at the penalty phase, including mitigators based on Runyon's abusive upbringing, his kindness and generosity, his military experience, and the

---

[25] Respondent also asserts that the jury imposed a death sentence because it found in the eligibility phase that Runyon "intentionally killed Cory Allen Voss, that he did so for money, [and] he did so after substantial planning." ECF No. 536, p.74. Respondent essentially says the jury determined the aggravating factors and decided upon death as early as the guilt phase and no later than the eligibility phase. Under this view, prejudice could not be established because the selection phase of trial and mitigation were irrelevant.

[26] Respondent repeatedly downplays the unpresented mitigation evidence even though it is the type of evidence that the Supreme Court has declared could influence a jury's appraisal of a defendant's moral culpability. *See supra* Claim 6(A).

impression that Cory Voss was molesting his daughter.

Respondent incorrectly states that Runyon has failed to show how the unpresented mitigation would have impacted non-statutory aggravating factors. ECF No. 536, p.77. Runyon demonstrated how the unpresented mitigation would have added meaningful weight to the existing mitigators, supported two statutory mitigating circumstances and reduced the weight of statutory and non-statutory aggravating circumstances. *See, e.g.*, ECF No. 511, pp.81-83.

Finally, Respondent argues that trial counsel presented a reasonable defense based on the fact that "Runyon was a decent person who deserved mercy." ECF No. 536, p.68. When advocating for a life sentence there is a substantial difference between: (a) a presentation based on the fact that Runyon was a decent person who killed someone, and (b) a presentation based on the fact that Runyon was a decent person who had experienced lifelong traumas resulting in mental illness, personality dysfunction, and brain damage that affected his cognitive functioning and made him susceptible to being used as a tool by the codefendants to kill co-defendant Voss's husband. This is a point lost on the government whose amended response, like the initial response, asserts that the fact that Runyon was convicted of murder is inconsistent with any presentation of reduced moral culpability based on the adverse developmental factors in Runyon's life.[27] *See, e.g.*, ECF No. 536, pp.74, 75, 77, 78.

---

[27] For example, Respondent states: "[a]ny such mental health evidence would have also made clear that Runyon denied any participation in the plot to kill Cory Voss." ECF No. 536, p.77. But it was already "clear" to the jury in the guilt phase that Runyon denied participation and the prosecution made this denial a central theme at the penalty phase by focusing on the "lack of remorse" aggravator. Respondent repeatedly fails to acknowledge the different objectives of the different stages of the capital trial. Runyon entered the penalty phase with a murder conviction. The relevant inquiry was the appropriate punishment based on Runyon's individual characteristics and moral culpability. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

Ultimately, what is relevant under a *Strickland* analysis is that counsel were not in a position to "choose" among these presentations because the mental health and psycho-social investigation was inadequate.

**Claim 7:**     **Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt.**

The jury was told that co-defendant Draven said on the night of the crime he called and spoke to Runyon, who was at a payphone located near the crime scene. Draven also said in a separate statement that he hired a "friend" to commit the crime. Trial counsel failed to make contemporaneous objections or request a curative instruction when these statements were admitted through the testimony of Detective Rilee, who obtained the first statement while interrogating Draven, and jail-house informant Edward Fodrey who recounted the second statement.

Respondent first defends the Confrontation Clause violations by claiming that Detective Rilee's description of co-defendant Draven's admission was otherwise admissible as a statement made in furtherance of a conspiracy. ECF No. 536, p.80. Draven's admission that he spoke to Runyon while Runyon was at a location within a short distance from the scene of the crime is unrelated to any conspiracy, including a conspiracy to cover-up the crime. Draven's statement is the only evidence that places Runyon in Newport News, Virginia shortly before the crime occurred. Draven and Runyon certainly did not "conspire" to place Runyon in that location when all other evidence demonstrated Runyon was in Morgantown, West Virginia at a time that made it impossible for Runyon to commit the crime in Newport News.[28]

_____

[28] Respondent's assertion that "Draven was attempting to clear Runyon from suspicion" with this statement is nonsensical. ECF No. 536, p.81. Draven places Runyon near the crime scene and

Respondent alternatively suggests that Draven's statement was not inculpatory as to Runyon because the connection between Draven's admission and the Voss murder is not apparent from the face of the statement itself. ECF No. 536, pp.82 (citing *U.S. v. Lighty*, 616 F.3d 321 (4th Cir. 2010)). Again, Respondent ignores that this is the only evidence that placed Runyon in Newport News, Virginia near the time of the crime. Runyon's jurors heard from Detective Rilee that Draven identified Runyon as the person at the Waffle House payphone, *i.e.*, the person within a short distance of the scene of the crime, and this contradicted Runyon's account of his whereabouts. *Lighty* is a case that involved redactions of proper names from a non-testifying co-defendant's statement and the jurors received a proper limiting instruction. It cannot support Respondent's argument because Runyon was specifically named in co-defendant Draven's statement and there was no such jury instruction.

As to Edward Fodrey's recitation of Draven's statements, Respondent again relies upon *Lighty* and its progenitor *U.S. v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999), and insists that Fodrey's recitation of Draven's statement was not inculpatory because it did not mention Runyon by name. ECF No. 536, p.84. In *Lighty* and *Akinkoye* the statements in question could have referred to a number of other persons and in *Akinkoye* the redaction pointed to a person other than the defendant raising the Confrontation Clause challenge. S*ee Akinkoye*, 185 F.3d at 198. Here, no such possibility exists. The jurors had no basis to conclude that Draven's statement to Fodrey referred to anyone but Runyon.

In *Lighty*, the prosecution presented a non-testifying codefendant's redacted out-of-court statement that replaced the defendant's proper name with a general reference. The court found that the defendant could not be identified as the subject of the co-defendant's statement absent additional evidence. It reasoned that the prosecution would have to present additional witnesses, who could be

---

admits they were in contact right before the crime occurred. These are not statements of a person "attempting to clear himself" and others. *See id.*

confronted, in order to connect the defendant to the statement. *Lighty*, 616 F.3d at 377. The *Lighty* court approved the admission of such a redacted statement but admissibility was also dependent upon the administration of a proper limiting jury instruction. *Id.* (citing *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987)).

Here, Fodrey testified that Draven said he "hired some other guy" that "was a friend of his" to murder Corey Voss. Respondent argues that this reference is ambiguous enough to pass Sixth Amendment scrutiny because there was evidence that Draven had "reached out" to other people. ECF No. 536, p.84. However, there was one person and one person alone who had already been identified as Draven's "friend" and that was Runyon.

The jurors were clear that the three defendants were Draven, his girlfriend Cat Voss and his friend David Runyon. In opening statement, the prosecutor said that in order for co-defendants Draven and Voss to make a life together they had to get rid of Voss's husband: "Enter the defendant, David Runyon, a friend of Michael Draven's from hospital drug studies that the two men did together." Tr.214, 7/2/09. The jurors heard a phone conversation between Voss and Draven that referred to Draven's "friend" as the person Draven was supposed to meet before Draven was arrested. Gov't Tr. Ex.163A. Voss referenced having a conversation with Draven's "friend" and the prosecution alleged this conversation involved Voss asking Runyon to kill her husband. Four and a half days into the prosecution's case, when Fodrey testified that Draven said he hired a "friend," that term obviously referred to Runyon or involved that inference which the jurors could make without any additional evidence. *See Lighty*, 616 F.3d at 376-77. *See also U.S. v. Ramirez*, 29 Fed. App'x 111, 115 (4th Cir. 2002) (Although "partner" may be, in isolation, a "neutral pronoun," in the context of prior evidence it was "facially incriminating.").

63

Respondent attempts to sweep aside trial counsel's failure to make a contemporaneous objection to these violations and failure to request a limiting instruction with the conclusory statement that such an instruction would have drawn unwanted attention to the un-confronted, inculpatory statements. ECF No. 536, p.83. This argument fails because a jury is rightfully presumed to follow a judge's cautionary instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). If fact-finding procedures reveal that this was the reason counsel did not to object or request limiting instructions, then counsel's decision was unreasonable and legally unsupportable.

Finally, Respondent asserts that Runyon has not shown cause and prejudice for the procedural default resulting from the fact that the Confrontation Clause claim was not raised on direct appeal. ECF No. 536, pp.78-79. Runyon has alleged, however, that his direct appeal counsel were ineffective for not raising the Confrontation Clause claim and the claim's probable merit establishes prejudice. *See* Claim 8.

**Claim 8:       Ineffective Assistance Of Counsel On Direct Appeal.**

Runyon raises the issues of ineffective assistance of appellate counsel as both a substantive claim and as "cause" for any claim that may be deemed procedurally defaulted.

Respondent asserts that counsel did not have a duty to appeal every non-frivolous issue if counsel made a strategic decision to forgo such issues. ECF No.536, p.87. Respondent does not argue, however, that those circumstances are present in Runyon's case. Respondent's argument is focused against a finding of prejudice from counsel's deficient performance.

Appellate counsel rendered deficient performance because one or more issues were not raised even though they are clearly stronger than two issues presented in the appellate brief. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). This is an easy determination because it requires only a comparison

64

of the strength of the ignored issue and the strength of the issues raised, *id.*, and the Fourth Circuit identified two very weak claims in Runyon's appellate brief. The claim based on an alleged Commerce Clause violation had been rejected by "all of the circuits to address the question" and was contrary to binding and long-standing circuit authority. *Runyon*, 707 F.3d at 489. The boilerplate challenge to the constitutionality of the death penalty in all circumstance similarly failed by a wide margin. *Id.* at 521 n.7.

With respect to the contested issue of prejudice, Respondent mis-states the *Strickland* standard. Respondent argues against prejudice stating: "Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case;" "the additional issues Runyon suggests have no merit[;]" and, Runyon "does not demonstrate he would have prevailed on appeal." ECF No. 536, pp.88, 90.

Runyon need not show that there would have been a different outcome or that he would have prevailed on direct appeal had an omitted issue been raised. He does not even have to establish by a preponderance of the evidence that the result would have been different. *Williams*, 529 U.S. at 405-06. Runyon need only demonstrate "a reasonable probability that … the result of the proceeding would have been different." *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Such a determination may require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

Finally, Respondent asserts part of the instant Claim 8 is time-barred because Runyon has "added claims" that do not relate-back to his initial §2255 motion. ECF No. 536, p.85. This assertion is incorrect. In particular, Respondent incorrectly asserts that Runyon added a reference to the confrontation clause claim, Claim 7. ECF No. 536, p.85. The confrontation clause claim, Claim 7, is

specifically discussed in the initial §2255 motion. *See* ECF No. 478, p.79. Moreover, initial Claims 12 and 13 alleged trial and appellate counsel ineffectiveness. ECF No. 478, pp.95, 98 n.38.

Respondent is likewise incorrect that additional references to Claims 11-14 and 16 are time-barred. Runyon's amended Claim 8 was timely filed under Fed. R. Civ. P. 15(a)(1)(B). The inclusion of those claims relates back to the initial Claim 8 because they were either referenced in the initial Claim, they were incorporated by reference, ECF No. 478, p.12, they initially contained their own IAC allegations, or they are referenced for purposes of overcoming Respondent's asserted procedural bar defense.

Runyon's initial Claim 8 expressly stated: "Should this Court find any other claims are defaulted for failure to have been raised on appeal, Runyon specifically alleges appellate counsel was ineffective for failing to do so." ECF No. 478, p.80. Runyon's initial reply also stated that procedural default is an affirmative defense. A petitioner has no duty to anticipate or address any affirmative defense in his §2255 motion and the burden rests with Respondent to prove the defense. ECF No. 526, p.1. Runyon again expressly alleged that a procedural default can be overcome "where defense counsel rendered ineffective assistance [of counsel.]" *Id.,* p.4. The initial reply for Claims 11, 13, 14 and 16 alleged that counsel's ineffectiveness overcomes the procedural default asserted in Respondent's initial answer. ECF No. 526, p.62, 67, 69, 74-76. Accordingly, there is nothing completely new about referencing these additional instances of appellate counsel ineffectiveness because they arise "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleadings." Fed. R. Civ. P. 15(c)(1)(B); *Mayle v. Felix*, 545 U.S. at 659; *Wolfe v. Clarke*, 691 F.3d at 422. Amended Claim 8, in its entirety, is timely.

**Claim 9:**   **Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015).**

### A. Introduction

In *Johnson v. U.S.*, 135 S.Ct. 2551 (2015), the Supreme Court found the residual clause of the Armed Career Criminal Act ("ACCA") unconstitutionally vague. The residual clause of the ACCA defines a "violent felony" as an offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924 (e)(2)(B)(ii). The Supreme Court found this language unconstitutional for two reasons: first, it requires a court to imagine the "ordinary case" of a crime, an "inherently indeterminate" task; second, the judicial assessment of risk is untethered to any sort of standards. *Johnson*, 135 S.Ct. at 2558-59. Runyon alleges his convictions under 924(c), which has a similar residual clause,[29] is unconstitutional under *Johnson, supra. See* Claim 9, ECF No. 511, pp.88-98.

Respondent asserts Runyon's case is not affected by *Johnson,* offering numerous contentions as to why this is so. Runyon addresses each contention in turn.

### B. Legal Background

As discussed in Runyon's motion for §2255 relief, multiple provisions of the federal law contain, or incorporate, a definition of "violent felony" or "crime of violence." *See* 18 U.S.C. §924(e) ("ACCA"); 18 U.S.C. §16(b) ("General Provisions" definition of crime of violence); 18 U.S.C. §924(c) (brandishing or carrying a firearm during commission of a crime of violence).

Courts regularly compare the similarities between the residual clause in the ACCA to the clause

---

[29] In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924(e)(2)(B)(ii). The 924(c)(3)(B) residual clause defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

at issue here. Although the comparison tends to specifically address 18 U.S.C. §16(b), that statute is identical to §924(c)(3)(B). *See, e.g., Chambers v. U.S.*, 555 U.S. 122, 133, n.2 (2009) (citing circuit splits on §16(b) in the context of a residual clause case because §16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring). *See also U.S. v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under §924(c)(3)(B)); *U.S. v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *U.S. v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and §16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and §16(b) cases to define the same "ordinary case" analysis); *U.S. v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and §16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under §16(b)").

After *Johnson*, the lower courts, and this Court, are confronted with cases raising questions about how the *Johnson* opinion affects these other similarly worded provisions, including §924(c)(3)(B) and/or §16(b), which are at issue in Runyon's case.

As of this filing, there is a circuit split on whether the concerns underlying the *Johnson* opinion are also present in convictions resting on 18 U.S.C. §§16(b) and 924(c)(3)(B). The Fifth, Seventh, and Ninth Circuits have held that 924(c)(3)(B) suffers the same constitutional frailties that resulted in 924(e)'s downfall. *U.S. v. Gonzalez-Longoria*, 813 F.3d 225, 235 (5th Cir. 2016) *reh'g granted*, 815 F.3d 189 (5th Cir. 2016) (Mem) ("Under *Johnson*, this means that §16 is unconstitutionally vague, and we so hold."); *U.S. v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015) ("Applying *Johnson*'s reasoning here, we conclude that §16(b) is unconstitutionally vague."); *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015) (18 U.S.C. §16(b) is unconstitutional because it requires judicial imagination of an ordinary case of a crime and because vague and uncertain standards are relied upon in determining risk; by

68

implication, the identically worded portion of 924(c) is unconstitutional). One Circuit has held that *Johnson* does not render 924(c)(3)(B) unconstitutional. *U.S. v. Taylor*, 814 F.3d 340, 378-79 (6th Cir. 2016).

District courts have also reached inconsistent conclusions. *See, e.g., U.S. v. Tiffany Renee Edmundson,* No. PWG-13-15 (D. Md. Dec. 30, 2015) ECF No. 67. (18 U.S.C. §924(c)(3)(B) is void for vagueness); *but see U.S. v. Pedro Anthony Romero Cruz*, No. 1:14-CR-306-GBL (E.D. Va. Mar. 8, 2016) ECF No. 738 (18 U.S.C. §924(c)(1) and (2) unaffected by *Johnson*).

It is significant to note that the Fourth Circuit Court of Appeals has authorized the filing of capital successive 2255 motions for relief raising the claim that 924(c) is void under *Johnson. See In re Chadrick E. Fulks*, No. 16-9 (4th Cir. June 17, 2016) (authorizing the filing of a capital 2255 motion where the claim is convictions of that use of a firearm in furtherance of kidnapping and carjacking are void under *Johnson*); *In re Brandon Leon Basham*, No. 16-5 (4th Cir. June 17, 2016)(authorizing the filing of a capital 2255 motion where the claim is convictions for use of a firearm in furtherance of carjacking resulting in death and kidnapping are void under *Johnson*); *In re Richard Allen Jackson*, No. 16-10 (4th Cir. June 16, 2016) (authorizing the filing of a successive capital 2255 motion where the claim is convictions of use of a firearm in furtherance of murder, kidnapping, and aggravated sexual assault are void under *Johnson*); *but see In re Dustin John Higgs*, No. 16-8 (4th Cir. June 27, 2016) (denying authorization to file a capital 2255 motion raising the claim that use of a firearm in support of premeditated murder, felony murder, and kidnapping resulting in murder is void under *Johnson* by a 2-1 vote); *see also In re James H. Roane, Jr.,* No. 16-6 (4th Cir. June 6, 2016) (denying authorization to file a capital successive 2255 motion raising the claim that use of a firearm in support of multiple killings, in furtherance of a continuing criminal enterprise, and in aid or racketeering, are void under *Johnson*).

Also, the Fourth Circuit Court of Appeals has authorized numerous noncapital successive

69

2255 motions for relief raising the claim that convictions based on 18 U.S.C. § 924(c) are void pursuant to *Johnson. See, e.g., In re James Powell*, No 16-398 (4th Cir. May 3, 2016 (authorizing a successive 2255 filing raising the claim that conviction for use of a firearm during conspiracy to commit Hobbs Act robbery is void pursuant to *Johnson*); *In re Terrence Smith,* No. 16-388 (4th Cir. May 13, 2016) (authorizing a successive 2255 filing raising the claim that convictions for use of a firearm during conspiracy to commit witness tampering and witness tampering are void pursuant to *Johnson)*; *In re. Gerald Rice,* No. 16-591 (4th Cir. May 18, 2016) (authorizing a successive 2255 filing raising the claim that possession of a firearm during Hobbs Act robbery is void pursuant to *Johnson*). Accordingly, there is a split of authority, numerous cases in the Fourth Circuit are raising the issue.

This Court is likewise confronted with a shifting legal landscape. At bottom, though, Runyon's convictions suffer the same infirmities that caused the Supreme Court to act in *Johnson.* Section 924(c)(3)(B), like the ACCA residual clause, requires the two-step analysis denounced in *Johnson*: an "ordinary case" analysis followed by an imprecise risk analysis. Because these are the steps condemned in *Johnson*, §924(c)(3)(B) cannot withstand scrutiny. It violates the due process principles reaffirmed in *Johnson.* Relief is warranted.

## C. Argument

The Government's numerous contentions may be broadly described as follows:

1) Runyon's *Johnson* claim is procedurally barred.

2) There is less documented judicial confusion about application of 18 U.S.C. §924(c) than there is about ACCA; thus, 924(c) is constitutional.

3) Section 924(c) is not plagued by a confusing list of enumerated offenses; thus it is constitutional;

4) Section 924(c) is more narrowly drafted than the ACCA; thus it is constitutional.

70

5) Alternatively, the Government asserts Runyon's convictions do not implicate the residual clause at all. They are based on the force clause of 924(c), which was not affected by *Johnson*.

6) Finally, the Government argues Runyon's sentencing hearing is not tainted.

### 1. This Court May Review Runyon's *Johnson* Claim.

Respondent faults Runyon for failing to raise this claim sooner. But Runyon raised the claim as soon as it became available. The *Johnson* holding is "new" because it expressly overruled two prior decisions—*James v. U.S.*, 550 U.S. 192 (2007), and *Sykes v. U.S.*, 131 S.Ct. 2267 (2011)—that had affirmed sentences imposed under the residual clause. *Johnson*, 135 S.Ct. at 2563 ("Our contrary holdings in *James* and *Sykes* are overruled."). That *Johnson* expressly overruled prior precedent demonstrates that the decision is "new." *See Teague*, 489 U.S. 288, 301 (1989) ("[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.").

Respondent also asserts *Johnson* will not apply retroactively. The Supreme Court resolved this contention with its holding in *Welch v. United* States, 136 S.Ct. 1257, 1264 (2016) that "*Johnson* announced a new rule" of constitutional law that applies retroactively. *See also In Re: Creadell Hubbard*, No. 15-276, 2016 WL 3181417 (4th Cir. June 8, 2016) (recognizing and following the holding in *Welch*) (published opinion). [30]

---

[30] As this Court is aware, a Supreme Court decision applies retroactively to cases on collateral review if it announces a "new" rule that is "substantive." *Schriro*, 542 U.S. at 351. *Johnson* satisfies both requirements. In addition to being new, the *Johnson* holding is "substantive." Under Supreme Court precedent, a decision is considered "substantive" if it "narrow[s] the scope of a criminal statute by interpreting its terms." *Schriro*, 542 U.S. at 351. A decision is also "substantive" if it "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997) (internal quotation marks and citation omitted). Such decisions "apply retroactively because they 'necessarily carry a significant risk that a defendant . . .' faces a punishment that the law cannot impose upon him." *Schriro*, 542 U.S. at 352 (quoting *Bousley*, 523 U.S.

71

This Court should reject Respondent's procedural default argument and review Runyon's claim on the merits.

### 2. Documented Judicial Confusion Does Not Create Vagueness.

Respondent contends that the ACCA residual clause is unconstitutional because the Supreme Court repeatedly failed to construe it in a workable manner. Respondent also relies on the fact that the lower courts have not been as "confused" by §924(c)(3)(B).

Respondent misinterprets the import of the prior case law. Prior judicial debate about the application of a law does not create vagueness. At most it may confirm "its hopeless indeterminacy." *Johnson*, 135 S.Ct. at 2558. *See also Dimaya*, 803 F.3d at 1119; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 235.

Moreover, in *Johnson*, the Supreme Court was clear that its basis for finding the residual clause unconstitutional was its reliance on the ordinary case assessment and the vague standard for assessing risk. *Johnson*, 135 S.Ct. at 2561.

### 3. The Absence Of Enumerated Offenses Does Not Render 924(c) Constitutional.

Respondent claims that because the enumerated offenses in ACCA are absent from 924(c), it is constitutional.

It is true that the Supreme Court lamented the confusing list of enumerated offenses that accompany the ACCA definition of "a crime of violence." *Johnson*, 135 S.Ct. at 2558. But the Court also noted the enumerated offenses "did not succeed in bringing clarity" because it "did not (and

---

at 620). Applying these standards, a decision that narrows the reach of the ACCA—as *Johnson* does by declaring one of its provisions unconstitutional—is "substantive." *Johnson* meets the standard for retroactive application. In *Welch*, the Supreme Court unambiguously held *Johnson* applies retroactively. 136 S.Ct. at 1264. Runyon includes this discussion here out of an abundance of caution.

72

could not) eliminate the need to imagine the kind of conduct typically involved in a crime." *Johnson*, 135 S.Ct. at 2559. The *Johnson* Court made clear that the "ordinary case" problem was the key feature: "More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual engages on a particular occasion…. The residual clause, however, requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime." *Johnson,* 135 S.Ct. at 2561. More plainly stated, the enumerated offenses are best understood as a way to salvage the unconstitutional definition. The fact that §924(c)(3) does not have a possibly salvaging list of enumerated offenses arguably makes it more vague, not less. *See Dimaya*, 803 F.3d at 1117-18; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 232.

Further, as a matter of logic, the absence of the enumerated offenses is irrelevant. This is because the threshold question is how to determine the ordinary case of a predicate offense. Only *after* determining the ordinary case would a reviewing court consider the enumerated offenses. The question of how to define the ordinary case is the problem. The list of enumerated offenses did not solve the problem but neither did it create it.

### 4. Section 924(c) Is Not More Narrowly Drawn Than The ACCA (Or The Distinctions The Government Notes Are Constitutionally Irrelevant).

Respondent claims that §924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct; thus §924(c)(3)(B) is constitutional. Respondent is in error.

Initially, Respondent overlooks that the Supreme Court has equated the scope of these two statutes. *See, e.g., Begay v. U.S.*, 556 U.S. 137, 144-45 (2008). *See also* p.___ for discussion of Supreme Court, appeals court and district court cases noting similarities between the statutes.

The ACCA and 18 U.S.C. §924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is the risk of injury, and the risk

73

at issue in §924(c) is a risk that force will be used, the difference is immaterial to the due process problem. In *Johnson,* the Court's holding did not turn on the type of risk, but rather how a court assesses or quantifies the risk. This process is the same under both the ACCA and §924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the quantum of risk posed by the "ordinary case."

The Fourth Circuit applied the "ordinary case" analysis in *U.S. v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014), in construing §16(b): "As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. §16(b)." *Avila* controls here because §16(b) and §924(c)(3)(B) are identical. And of course, the Fourth Circuit has applied the "ordinary case" inquiry to the §924(c) residual clause. *U.S. v. Fuertes*, 805 F.3d 485, 500 n.6 (4th Cir. 2015); *see also U.S. v. Naughton*, 621 Fed. App'x. 170, 178 (4th Cir. Sept. 2, 2015).

Respondent also claims §924(c)(3)(B) is limited to "'offenses that naturally involve a person acting in direct disregard of the risk that physical force might be used ….'" ECF No. 536, p.99 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004)). The Government continues that under §924(c)(3)(B), the ordinary case is limited to the elements of the offense. *Id.* But such an assertion cannot be reconciled with the Fourth Circuit's holdings in *Avila* and *Fuertes*, applying the problematic "ordinary case" analysis. Moreover, by focusing on the risk during the predicate offense, §924(c)(3)(B) is as broad as the ACCA's residual clause.

At bottom, this argument cannot win the day because the fundamental problem with the residual clauses of the ACCA and §924(c)(3)(B) is the threshold "ordinary case" inquiry that the Supreme Court determined is impossibly arbitrary.

74

### 5. Section 924(c)(3)(B) Is Vague As Applied To Runyon.

Respondent argues Runyon may not challenge his §924(c) conviction because his conduct was clearly violent. But this argument ignores the fact that in the context of interpreting §924(c), courts apply the categorical approach. This entails the court envisioning an idealized "ordinary case," and asking whether that "ordinary case" involves a substantial risk that violent force will be used. *See Johnson*, 135 S.Ct. at 2557-58. Under the categorical approach, Runyon's actual conduct has no bearing on the resolution of this question.

Moreover, in Justice Thomas' opinion concurring in the judgment, he opined the ACCA's residual clause covered an "unmistakable core of forbidden conduct" and thus it was not facially invalid. *See Johnson*, 135 S.Ct. at 2573 (Thomas, J., concurring in the judgment). The *Johnson* majority rejected this argument and this Court should as well.

### 6. Carjacking And Conspiracy To Commit Murder For Hire Are Not Crimes Of Violence Under The Force Clause Of Section 924(c)(3)(A).

The next question here is whether Runyon's carjacking and conspiracy offenses qualify as crimes of violence under the force clause of §924(c). Runyon explained in his 2255 motion that carjacking does not qualify as a crime of violence. ECF No. 511, pp.94-97. He explained this conclusion is consistent with the Fourth Circuit's holding in *U.S. v. Torres-Miguel*, 701 F.3d 165 (2012). Runyon continues to rely on the arguments raised in the §2255 motion and only addresses matters not previously discussed. Respondent argues that because a death resulted from the carjacking, "it can hardly be said that this charge does not require force under any definition." Respondent also notes that 18 U.S.C. §2119 contains a *mens rea* that the defendant act with the intent to cause death or serious bodily harm. ECF No. 536, p.103. Carjacking is defined as follows: "Whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle … from the person or presence of another by

75

force and violence or by intimidation…." 18 U.S.C. §2119. In *Johnson*, the Supreme Court defined physical force, as used in §924(c)(3)(A) to mean "violent force—that is, force capable of causing physical pain or injury to another person." Carjacking does not qualify as a "crime of violence" under §924(c)(3)(A) because it does not include as a necessary element, "the use, attempted use, or threatened use," of "force capable of causing physical pain or injury to another." *Johnson v. U.S.*, 559 U.S. 133, 140 (2010).[31]

Nor is this conclusion altered by the sentencing provision of the carjacking statute, which notes that if death occurred, Runyon may face the death penalty. This sentencing provision does not require that the death result from using physical force. *See U.S. v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009). *See also Torres-Miguel*, 701 F.3d at 168 (explaining that the fact that serious bodily injury occurs does not per se establish a crime of violence).

Conspiracy to commit murder for hire is also not a crime of violence under the force provision of 18 U.S.C. §924(c). As explained in Runyon's §2255 motion, conspiracy does not qualify as a crime of violence under the force provision of §924. ECF No. 511, p.97. The fact that death resulted does not alter this conclusion. *See Torres-Miguel, supra.*

Respondent also contends that a different outcome is required because the Supreme Court overruled *Torres-Miguel* in *U.S. v. Castleman*, 134 S.Ct. 1405 (2014). ECF No. 536, p.105. Respondent is in error.

In *Torres-Miguel,* at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which *will result in death or great bodily injury to another. Torres-*

---

[31] Runyon notes the Eleventh Circuit and the Second Circuit have found carjacking qualifies as a crime of violence. *U.S. v. Moore*, 43 F.3d 568, 573 (11th Cir. 1994); *U.S. v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). But these opinions were issued well before the 2010 Supreme Court opinion in *Johnson*.

76

*Miguel*, 701 F.3d at 168 (citing Cal. Penal Code §422(a)) (emphasis added). The specific question in the case was whether the statute had an element equating to a threat of violent force under the force clause of U.S.S.G. §2L1.2, a clause that is identical in all relevant respects to the §924(c) force clause. *Id.* Despite the death or great bodily injury element in the California statute, the Fourth Circuit found that the offense was missing a violent force element, and thus, could never qualify as a crime of violence under the force clause. *Id.* at 168-69. The court held that "[a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168. The court, in strong words, proclaimed that "[*o*]*f course*, a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* (emphasis added).

Relying on several appellate decisions from various Circuits, the Fourth Circuit reasoned that there are many ways in which physical injury, even death, can result without use of violent force. *Id.* at 168-69. For example, as the Fifth Circuit has noted, a defendant can violate statutes like California Penal Code 422(a) by threatening to poison another, which involves no use or threatened use of force. *Torres-Miguel*, 701 F.3d at 168-69 (citing *U.S. v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010)); *see also U.S. v. Gomez*, 690 F.3d 194, 201 (4th Cir. 2012) (child abuse statute which required sustaining physical injury to child can be violated by an affirmative act or by neglecting to act, neither of which necessarily requires the use of physical force against the child). In reaching its decision, the *Torres-Miguel* court also relied on the Second Circuits' decision in *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003). In that case, at issue was whether a prior Connecticut conviction for third degree assault qualified as a crime of violence under the force clause.

For even further support, in *Torres-Miguel*, 701 F.3d at 169, the Fourth Circuit embraced the Tenth Circuit's decision in *U.S. v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005). In that case, "the [Tenth Circuit] explained that, although the Colorado [third degree assault] statute required [an act

causing] bodily injury [by means of a dangerous weapon], imposing that injury does not necessarily include the use or threatened use of physical force as required by the Guidelines, and so the Colorado crime was not categorically a crime of violence under U.S.S.G. §2L1.2." *Torres-Miguel*, 701 F.3d at 169 (citing *Perez-Vargas*, 414 F.3d at 1287) (internal quotation marks omitted). The Tenth Circuit reasoned that "several examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals." *Perez-Vargas*, 414 F.3d at 1286.

Contrary to Respondent's assertions, *Castleman* did not overrule *Torres-Miguel*. In *Castleman,* the Supreme Court held that a prior Tennessee domestic violence offense that had an element of physical injury qualified as a misdemeanor crime of domestic violence under the force clause of 18 U.S.C. §922(g)(9). *Castleman*, 134 S. Ct. at 1413-15. However, the force clause of 922(g)(9) is critically different from that applicable here and in *Torres-Miguel*. In fact, in *Castleman,* the Supreme Court, in great length, explained that it was applying a definition of physical force to 922(g)(9) that was starkly different from that of the ACCA/§924(c)(3) force clause, which requires violent physical force. *Id.* at 1410-15. Unlike the definition of physical force at issue here (and in *Torres-Miguel*), the *Castleman* Court applied the common law definition of physical force that encompassed even the slightest offense of touching, *i.e.*, *de minimis* force. *Id.* at 1410. In this context, the Court held that physical injury necessarily requires de minimis force. *Id.* at 1413-15.

But more importantly, the Supreme Court in *Castleman* explicitly refused to evaluate the validity of the logic rejecting *Torres-Miguel.* The *Castleman* Court wrote that "[*w*]*hether or not the causation of bodily injury necessarily entails violent force [is] a question we do not reach.*" *Id.* at 1413 (emphasis added). That, of course, is the question any decision abrogating *Torres-Miguel* must answer. Because *Castleman* failed to reach the question *Torres-Miguel* answered, *Torres-Miguel* retains its vitality and remains binding

78

precedent that this Court has no choice but to follow.

### 7. The Death Sentence On Count One Was Tainted By The Sentence For Count Five.

Respondent erroneously asserts that Runyon offers no authority in support of his request for a new sentencing hearing. In his motion, Runyon cited the Eighth Amendment, which requires heightened reliability in capital sentencing proceedings. He also cited *Kennedy v. Louisiana*, 554 U.S. 407 (2008). Finally, he cited case law from the Fifth and Seventh Circuits. ECF No. 511, p.98.

Respondent also complains that Runyon wrongly seeks to have this Court consider the totality of the circumstances in determining whether to grant a new sentencing hearing, while also seeking to have this Court apply "Runyon's categorical approach" in reviewing whether recent Supreme Court precedent affects his capital convictions. There is no inconsistency because these are two separate inquiries requiring different analyses. The categorical approach was recognized by the Supreme Court in *Taylor v. U.S.*, 495 U.S. 575 (1990), and is among the controlling precedent to be applied to Runyon's substantive claim. Once this Court strikes Runyon's death sentence under *Johnson*, as it must, the Eighth Amendment requires this Court to conduct an exhaustive review of the constitutionality of Runyon's death sentence. The Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Accordingly, capital sentencing decisions cannot be made on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983). In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Supreme Court ruled that a death sentence must be reversed if it was based "on a reversed conviction." *Id.* at 585. In *Johnson v. Mississippi*, the defendant had been sentenced to death based, in part, on a prior conviction for assault which was overturned after the defendant was sentenced to death. *Id.* at 581. Even though there were aggravating circumstances unrelated to the

assault conviction that remained undisturbed, the Supreme Court held that a new sentencing was constitutionally required because the jury considered the subsequently invalidated prior conviction, this conviction "provided no legitimate support for the death sentence imposed on petitioner," and there was "a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* at 586 (internal citations omitted).

The need for a resentencing when a prior conviction is subsequently invalidated is reinforced by the sentencing package doctrine. Under sentencing package theory, courts have recognized that convictions cannot be viewed in isolation for the purposes of sentencing, but as an entire "sentencing package." *See United States v. Watkins*, 147 F.3d 1294, 1297 (11th Cir. 1998) (listing cases). Accordingly, under the sentencing package doctrine, when a defendant has been convicted and sentenced on a number of convictions simultaneously and one of those convictions is vacated, the defendant should be resentenced on all of the convictions as they are part of one sentencing package. The sentencing package doctrine has been largely accepted by federal courts, *Watkins*, 147 F.3d at 1296 n.3, and was adopted by the Fourth Circuit. *See United States v. Hillary*, 106 F.3d 1170 (4th Cir. 1997) (holding that where a defendant had successfully attacked his § 924(c) conviction in collateral proceedings, the district court had the authority to resentence him on the remaining charges, as the sentence must be viewed in the "aggregate"); *see also United States v. Smith*, 115 F.3d 241, 245 (4th Cir. 1997) (same, and explicitly endorsing "sentencing package theory").

The jury found numerous mitigating factors, including: David Runyon did not have a serious criminal record; Runyon worked and was legally employed during his life; he committed acts of kindness and generosity for his neighbors and his community; he grew up and witnessed domestic

80

violence and parental conflict between his mother and father; his son, mother and brother will suffer emotional harm if he is put to death; he served his country and was honorably discharged; he furthered his education; he continued to witness and experience domestic violence and parental conflict and abuse from mother and adoptive father; and, Runyon was given the impression that the victim was molesting his daughter.

The jury credited and weighed the mitigating evidence they heard when determining his sentence. The mitigating factors found by the jury were numerous and powerful. As a part of their weighing process, however, the jury also considered and weighed Runyon's invalid convictions. Because these convictions are invalid, the jurors were exposed to, and improperly considered, information which "provided no legitimate support for the death sentence imposed on Petitioner." *Johnson v. Mississippi*, 486 U.S. at 586. There is "a possibility that the jury's belief that petitioner had been convicted of a prior felony was 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* at 586 (internal citations omitted). Accordingly, Runyon is entitled to a new sentencing proceeding.

Such review would necessary entail consideration of the fact that the jury returned a mixed verdict. Furthermore, the Government has not and cannot argue the *Johnson* error is harmless. The *Johnson* error is harmful and relief is warranted.

**Claim 10:    The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered The Government's Burden Of Proof In Violation Of The Fifth, Sixth, And Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003).**

Respondent contends Runyon is barred from raising this claim on collateral review because it was raised on direct appeal. ECF No. 536, p.112. Runyon acknowledges he raised this issue on direct appeal, *U.S. v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided against him. *Runyon*, 707 F.3d at 516. However, where there is an intervening change in

81

law, a prior adjudication may not be dispositive. *Davis v. U.S.*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where intervening law clarified the issue, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the … conviction, precluded him from securing relief under §2255 on the basis of an intervening change in law"). *See also English v. U.S.,* 998 F.2d 609, 612-13 (8th Cir. 1993) (relying upon *Davis* for the proposition that if there is an intervening change in law, an issue that was decided on direct appeal may be raised again in §2255 motion); *Underwood v. U.S.,* 15 F.3d 16, 18 (2d Cir.1993) (if an issue was raised on direct appeal, it may not be raised again in a §2255 setting unless there was an intervening change in law); *U.S. v. Palumbo*, 608 F.2d 529 (3d Cir. 1979) (an intervening change in law is an exception to the general rule that a claim may not be brought for a second time in a 2255 motion); Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (7th ed.), section 41.7[e] (discussing previous determination of an issue as an affirmative defense that may be overcome if there has been an intervening change of law).

Respondent also asserts (without explanation) that the *Teague* non-retroactivity doctrine bars review. ECF No. 536, p.114. Runyon disagrees that *Teague* bars relief on this claim. As discussed *supra* the law is unsettled as to whether *Teague* applies in the context of a 2255 motion. If *Teague* does apply in the §2255 setting, it does not bar review of Runyon's claim because *Hurst* does not meet *Teague*'s definition of "new" rule. This is so because *Hurst* was dictated by prior precedent. *See Butler v. McKellar* 494 U.S. 407(1990).

Runyon's case is similar to *Stringer v. Black*, 503 U.S. 222 (1992), where the petitioner sought relief under *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Clemons v. Mississippi*, 494 U.S. 738 (1990), both of which were issued after his case was decided on direct appeal but while his case was pending on federal collateral review. The Supreme Court noted that while the cases were released after the

petitioner's conviction was final, *Teague* did not bar review because the cases were not "new"—that is, they were dictated by prior precedent. *Stringer*, 503 U.S. at 227-28.

Respondent also argues if *Hurst* does apply, Runyon cannot prevail. ECF No. 536, p.114. Respondent is in error.

In *Hurst v. Florida*, 136 S.Ct. 616 (2016), the Supreme Court struck Florida's capital sentencing scheme, finding it violates the Sixth Amendment because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 621-22. The State of Florida argued that because the jury found the facts necessary to establish eligibility, the Sixth Amendment was satisfied. The Supreme Court rejected this argument as follows:

> The State fails to appreciate the central and singular role the judge plays under Florida law. … [T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' Fla. Stat. § 775.082(1)(emphasis added). The trial court *alone* must find 'the facts … [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

*Hurst*, 136 S.Ct. at 622.

The *Hurst* Court recognized the unworkable nature of the distinction between eligibility and selection, and held a judicial finding that aggravators outweighed mitigators is unconstitutional. *Id.*

*Hurst* therefore makes clear that it is a jury function to weigh aggravating and mitigating circumstances because the result determines whether a death sentence is imposed. When the weighing function—whether aggravating circumstances outweigh mitigating circumstances—results in an affirmative finding, that finding constitutes the final element required for a death sentence. *Hurst*, 136 S.Ct. at 623-24 (specific findings authorizing the imposition of the sentence of death must be made by the jury). It is beyond question that all elements leading to a greater punishment must be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). It is also beyond questions that all elements must be found beyond a reasonable doubt. *Alleyne v. U.S.*, 133 S.Ct.

83

2151, 2156 (2013). Accordingly, a jury must find—beyond a reasonable doubt—that aggravating circumstances outweigh mitigating circumstances in order to impose a death sentence.

The fact that Runyon's jurors made the specific finding that aggravators "sufficiently" outweighed mitigators is not constitutionally sufficient. They were required to make this final finding that determines a death sentence over a life sentence "beyond a reasonable doubt." The jury instructions did not include the required burden of proof and the jurors did not find the final element required for a death sentence beyond a reasonable doubt. The sentence, therefore, should be vacated.

Just as in *Hurst*, here, the jury was instructed to make its ultimate determination to impose death based on whether the aggravating factors "sufficiently outweigh" mitigating factors. Tr.2672-73, 2675, 2682-84, 2694, 8/26/09; Tr.2707, 8/27/09. Given the fact that the Sixth Amendment applies to this ultimate, final determination to impose death, the jury should have been required to make its finding beyond a reasonable doubt.

**Claim 11:      The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad**

To be constitutional, aggravating circumstances must genuinely narrow the class of persons eligible for the death penalty from all persons convicted of a given offense and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

**A. The statutory aggravating circumstances failed to perform the constitutionally required narrowing function.**

Respondent concedes that the jurors relied upon two statutory aggravating factors that duplicated elements of the offense of conviction. ECF No. 536, p.116 ("The fact that two statutory aggravating factors mirror elements of the offenses ... does not violate any constitutional principle."). The same evidence established the convictions and the statutory aggravating circumstances.

84

Respondent concedes the evidence supporting the eligibility findings had been found by the jury beyond a reasonable doubt in all three counts of conviction. *Id.*, p.41. The substantial planning statutory aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." *Id.*, p.40. The fact that the statutory aggravating factors duplicated elements of the offense means that the aggravators did not perform a narrowing function in this case and Runyon's death sentence is unconstitutional.

As in the initial answer, Respondent argues that no constitutional violation occurred because "[a]n element of the underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are [sic] narrowed at the guilt stage, as opposed to the penalty phase." ECF No. 536, p.116. Runyon pointed out in his initial reply that this argument fails because under the FDPA narrowing does not occur at the guilt phase of the case. Narrowing occurs at the eligibility phase where at least one statutory aggravating circumstance must be found.[32] *U.S. v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010); *U.S. v. Higgs*, 353 F.3d 281, 294 (4th Cir. 2003) ("Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible."); *U.S. v. Jones*, 132 F.3d 232, 248-49 (5th Cir. 1998) ("Although the federal death penalty regime defines capital offenses, the narrowing function does not occur until the penalty phase of the trial."); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003) ("'[M]urder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter*.") (Scalia, Rehnquist, and Thomas, JJ.). Respondent's amended answer fails to acknowledge this controlling authority. Neither statutory aggravating factor

---

[32] Although *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Tuilaepa v. California*, 512 U.S. 967 (1994), contain applicable principles of law, this claim is not controlled by the outcomes of those cases. *Lowenfield* involved a non-weighing statutory scheme that, like the statute in *Tuilaepa*, accomplished narrowing at the guilt-phase through a narrowed definition of capital murder. The FDPA is a weighing scheme that narrows through the application of statutory aggravating factors.

elevated Runyon's moral culpability above that already determined by his conviction thus the death sentence is unconstitutional. *See* Amended §2255 motion, ECF No. 511, pp.102-103.

Respondent's second argument is equally unavailing. Respondent again asserts that the mental state finding at the eligibility phase fulfilled the narrowing requirement. ECF No. 536, p.116. Like in the initial answer, Respondent cites no authority for the proposition that a jury finding of an intentional killing, standing alone, sufficiently placed Runyon in a narrowed class of persons eligible for the death sentence from all persons convicted of the offense. To the contrary, the mental state requirement in 18 U.S.C. §3591(a) "codifies the command in *Enmund* … and *Tison* … to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself."[33] *U.S. v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998). The finding of a statutory aggravating circumstance is mandatory to achieve narrowing under the FDPA. If no statutory aggravating factor is found to exist, the court must impose a sentence other than death. 18 U.S.C. §3593(d).

**B. This claim is not barred by the doctrines of procedural default or non-retroactivity.**

In reply to Respondent's assertion of procedural default, Runyon asserts that the ineffective assistance of counsel constitutes cause and prejudice to overcome any such bar to litigating the merits of this claim. *See also* Claim 8.

---

[33] In this case, felony participation is not an issue because Runyon was charged as a principal. The jury's eligibility-phase finding under §3591(a)(2)(A) that Runyon committed an intentional killing is duplicative, in other words, it does not super-add any fact different from what the jurors were required to find in order to convict Runyon. The jurors merely re-confirmed their earlier finding of intent at the guilt phase.

86

Respondent also asserts that this claim is barred by the non-retroactivity doctrine but Runyon's claim is not dependent upon a "new procedural law." The applicable principles of law were announced before Runyon's conviction became final.

**C.  The non-statutory aggravators negated any narrowing that might have previously occurred, they are arbitrary and capricious, and at least one is overbroad.**

Respondent argues Runyon's constitutional claims regarding the non-statutory aggravators were "thoroughly analyzed" on direct appeal. ECF No. 536, p.117. The challenges addressed by the court of appeals, however, dealt with evidentiary and statutory concerns.[34] Appellate counsel did not raise the claim asserted here: that the non-statutory aggravators resulted in an unprincipled, arbitrary and capricious imposition of the death penalty. Respondent does not contest this specific point. Counsel's failure to properly present these meritorious claims to the court of appeals constitutes ineffective assistance.

Regarding the non-statutory aggravators placed into the sentencing balance, Respondent stretches *Tuilaepa* too far. Neither *Tuilaepa*, nor the court of appeals' opinion in this case, *Runyon,* 707 F.3d at 491, hold that aggravating circumstances need not be scrutinized once narrowing has occurred. Indeed, Justice Scalia specifically recognized this in his concurrence where he was the sole member of the Court to announce such a viewpoint. *Tuilaepa*, 512 U.S. at 980 (Scalia, J. concurring) ("Today's decision adheres to our cases which acknowledge additional requirements" for factors that guide the

---

[34] Appellate counsel did not challenge "the propriety of the prosecution proposing" the lack-of-remorse aggravator but challenged the evidence introduced to support it. *Runyon*, 707 F.3d at 492. With respect to the "victim impact" aggravator, appellate counsel challenged the scope of the evidence introduced to support it. *Id.* at 499, 501. Three bases were asserted against the aggravator based on Runyon's education, training and experience: that it was vague and overbroad; that it relied upon elements of his background that were actually mitigating; and, that the evidence supporting it was insufficient. *Id.* at 502-03. The "abuse of women" aggravator was challenged: (1) as a circumvention of the prior-conviction aggravator expressly contained in the FDPA because it was based on unadjudicated and on "minor misconduct;" and, (2) as improperly supported by evidence which should have been excluded. *Id.* at 505-06.

jury in selecting which defendants receive the death sentence.). A two justice concurrence noted that the aggravating factor at issue *did* channel the jury's sentencing discretion and recounted that protections against arbitrary sentencing focus "on the eligibility determination and the actual sentencing decision." *Id.* at 981-82 (Stevens, J., joined by Ginsburg, J., concurring in the judgment).

Aggravating circumstances that influence the jurors' decision-making process must be analyzed for clarity, objectivity, and principled guidance.[35] *Maynard v. Cartwright,* 486 U.S. 356, 364 (1988); *Spaziano v. Florida,* 468 U.S. 447, 460 (1984); *Godfrey v. Georgia,* 446 U.S. 420, 428 (1980). This is because when jurors are instructed to weigh an arbitrary and capricious or overbroad aggravating circumstance an arbitrary thumb is placed on death's side of the scale. *Stringer v. Black,* 503 U.S. 222, 232 (1992). Accordingly, Runyon's death sentence is unconstitutional because the prosecutor's unrestricted selection of facts to be designated as aggravating circumstances was included in the jury's sentencing determination.

**Claim 12:** **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

Respondent avers that Runyon is entitled to neither relief, nor even discovery, on his intertwined claims of selective prosecution based upon Runyon's race (Runyon is first generation Korean-American) and trial counsel's ineffectiveness for failing to pursue that claim. ECF No. 536, p.124 ("Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful."). Respondent's argument, however, is largely irrelevant for two reasons. First, Runyon did not merely cite national statistics regarding the Government's disturbing pattern of

---

[35] For example, the "victim impact" aggravator is constitutionally infirm because the sentencer fairly could conclude that it applies to every defendant eligible for the death penalty. *See Arave v. Creech,* 507 U.S. 463, 474 (1993).

disproportionately seeking death against non-whites. Runyon pled that the prosecution *in this case* sought death against the non-white Runyon while not seeking death against his white co-defendants and then emphasized their racial differences during trial. ECF No. 511, p.107-110. It is well-established that that the co-defendants were charged with the same crimes and Runyon has argued from the beginning, and throughout his Amended §2255 motion, that the codefendants were equally culpable.[36] The jurors found that the codefendants were equally culpable. ECF No. 291, p.2. Second, Respondent implicitly concedes that the codefendants were similarly situated when arguing in response to Claim 13 that "the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants." ECF No. 536, p.127.

Respondent cannot make those facts "go away" simply by failing to acknowledge that they exist and that they have been pled. Runyon has alleged thus far uncontested evidence that the prosecutors in this case added to the statistical evidence that the FDPA is administered in a racially-discriminatory manner by seeking death against a non-white defendant while eschewing that penalty for his equally-culpable (if not more culpable) white co-defendants. This, together with the reasons contained in Runyon's pending discovery motion and reply. ECF No. 491, pp.12-21 and ECF No. 506, pp.5-10, constitutes "a credible showing of different treatment of similarly situated persons" entitling Runyon to discovery. *See Armstrong*, 517 U.S. at 470. Relief from the unconstitutional death sentences should follow.

---

[36] The allegations set forth in all sections of Runyon's Amended §2255 motion were realleged and incorporated by reference in all other sections and claims. ECF No. 511, p.11. Runyon's First Motion for Discovery and Reply (ECF Nos. 491, 506) provide additional facts supporting this claim.

**Claim 13:      Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendments.**

Respondent characterizes this claim as "nothing more than a claim for proportionality review."[37] ECF No. 536, p.127. Runyon claims, under the circumstances of his case, the death penalty is disproportionate and arbitrary and contrary to the Eighth Amendment's "'precept of justice that punishment for crime should be graduated and proportioned to the offense'" and the offender. *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002) (quoting *Weems v. U.S.*, 217 U.S. 349, 367 (1910).

If the implementation of the federal death penalty in a particular case does not result an evenhanded, rational and consistent imposition of the death penalty, there must be means to ensure the death sentence was not wantonly or freakishly imposed. *Compare*, *Pulley v. Harris*, 465 U.S. 37, 49-50 (1984). Supreme Court precedent requires that a decision-maker's discretion to determine whether a human life should be taken or spared "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Zant v. Stephens*, 462 U.S. 862, 874 (1983). Similarly, the FDPA requires appellate review to determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. 18 U.S.C. §3595(c). Here, the prosecution's decision to seek a death sentence against Runyon but not his co-defendants resulted in a disproportionate and arbitrary application of the death penalty.

Respondent's claim that *McClesky v. Kemp*, 481 U.S. 279, 296-97 (1987), allows the Government unfettered discretion in selecting a death sentence for only one of three equally culpable co-defendants goes too far. ECF No. 536, pp.127. "[A]t all stages of the proceedings the Due Process and Equal

---

[37] This claim *does not* present the issue in *U.S. v. Higgs*, 353 F.3d 281 (4th Cir. 2003), where the defendant argued that the FDPA is facially unconstitutional because it does not require proportionality review in all cases. *Id.* at 320-21.

90

Protection Clauses protect persons … from invidious discriminations." *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). Invidious discrimination occurs "[w]hen the law lays an unequal hand on those who have committed precisely the same offense[.]" *Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.,* 468 U.S. 841, 880 (1984). The Court in *McCleskey*, 481 U.S. at 305, noted that there must be rational criteria establishing that a particular defendant's case should be subject to the death penalty. A defendant can demonstrate an abuse of prosecutorial discretion with exceptionally clear proof. *Id.* at 297. Here, the existence of such proof has been pled and Runyon is entitled to present evidence of the same.

Respondent also suggests such a claim would be barred by the *Teague* doctrine or, even were it not, would be barred by the failure of Runyon's counsel to present this claim at the time of trial. *Teague* is inapplicable. This claim does not rely on a new procedural rule but on principles established before Runyon's case became final. For example, *McCleskey* was decided over fifteen years prior to Runyon's trial. To the extent that Respondent suggests this claim could have been raised during direct proceedings, the Government's failure to reveal the factual basis of the claim as it was required to do under *Brady* provides cause to excuse any default. *See* Claim 2. Furthermore, to the extent that Respondent now claims those facts could have been discovered earlier, trial or appellate counsel's ineffectiveness in failing to discover and present them earlier would also provide such cause.

Finally, Respondent's new argument that Amended Claim 13 added an untimely claim of ineffective assistance of trial and appellate counsel for failing to raise this issue is incorrect. ECF No. 536, p.125. Runyon's initial §2255 motion alleged trial and appellate counsel ineffectiveness. ECF No. 478, p.98 n.38. The initial reply for Claim 13 alleged that counsel's ineffectiveness overcomes the procedural default asserted in Respondent's initial answer. ECF No. 526 p.67. Runyon's amended Claim 13, including allegations of counsel's ineffectiveness, was timely filed under Fed. R. Civ. P.

15(a)(1)(B). Accordingly, there is nothing completely new about these allegations and Amended Claim 13, in its entirety, is timely.

**Claim 14:       Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill**

Respondent argues that the execution of the severely mentally ill does not violate the Eighth Amendment because there exists no national consensus to that effect. ECF No. 536, pp.130-33. Accordingly, Respondent contends that Runyon seeks a "new rule" that would be barred by *Teague*. *Id.*, p.130.

This claim, however, seeks only an application of the firmly established rule set out in *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958), and reaffirmed and applied in a different context every few years. *See, e.g., Miller v. Alabama*, 132 S.Ct. 2455, 2463-64 (2012), *Graham v. Florida*, 560 U.S. 48, 58-62 (2010); *Kennedy v. Louisiana*, 554 U.S. 407, 419-22 (2008); *Roper v. Simmons*, 543 U.S. 551, 560-64 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 818-38 (1988); *Ford v. Wainwright*, 477 U.S. 399, 405-06 (1986) *Enmund v. Florida*, 458 U.S. 782, 789-93 (1982); *Coker v. Georgia*, 433 U.S. 584, 593-96 (1977). The rule of *Trop* and its progeny is that punishments which are contrary to the evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. *Trop*, 356 U.S. at 101.

Thus, Runyon should be allowed to demonstrate that mental illness of the nature he alleges in his Amended §2255 motion, (*see* ECF No. 511, p.123-25; *see also* Claims 5 & 6), meets those standards outlined in *Trop*, *Roper*, and *Atkins*. Runyon's severe mental illness results in a "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-20. His execution would violate evolving standards of decency.

Respondent suggests that evolving standards of decency may be determined solely from country-wide legislation. ECF No. 536, p.131. A long line of Supreme Court precedent dictates the standard is not so easily gleaned. Inquiry into evolving standards of decency involves not merely what is impermissible under presently existing statutes, but also what is actually practiced. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1997-98 (2014); *Roper*, 543 U.S. at 564-65; *Atkins*, 536 U.S. at 316. Moreover, it is not only the legislation and practice within the states and federal government from which the standard is gleaned but also the legislation and practices within other countries and international authorities. *Roper*, 543 U.S. at 575-78. The prohibition on executing the severely mentally ill is an established norm of international law.[38] Finally, the Court's own independent judgment must also be brought to bear. *See id.* at 564.

---

[38] *U.N. Human Rights Comm'n., Sahadath v. Trinidad and Tobago*, Communication No. 684/1996, CCPR/C/74/D/684/1996, Apr. 15, 2002 (issuance of an execution warrant in the case of a mentally ill prisoner violates Article 7 of the ICCPR); *U.N. Human Rights Comm'n., Francis v. Jamaica, Communication No. 606/1994*, U.N. Doc. CCPR/C/54/D/606/1994, Aug. 3, 1995 (incarceration on death row of a prisoner whose mental health had "seriously deteriorated" amounted to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR). The U.N. Commission on Human Rights has adopted a series of resolutions urging states that retain the death penalty not to impose it "on a person suffering from any form of mental disorder." U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of Rights of those Facing the Death Penalty, p.51, para. 1(d), ECOSOC Res. 1989/64, U.N. Doc. E/1989/91, 1989; U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of the Rights of those Facing the Death Penalty, ECOSOC Res. 1996/15, U.N. Doc. E/CN.15/1996/15, Jul. 23, 1996); U.N. Comm'n on Human Rights Res., "Question of the Death Penalty," E/CN.4/RES/1999/61, adopted April 28, 1999; U.N. Comm'n on Human Rights Res., "The Question of the death penalty," E/CN.4/RES/2000/65, adopted April 27, 2000; U.N. Comm'n on Human Rights Res., "Question of the death penalty," E/CN.4/20050L.77 2005/59, adopted April 20, 2005. The European Union has likewise declared that the execution of persons "suffering from any form of mental disorder … [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." European Union, Delegation of the European Comm'n to the USA, EU Memorandum on the Death Penalty, presented to U.S. Assistant Secretary of State for Human Rights, http://www.eurunion.org/eu/EU-Memorandum-on-the-Death-Penalty-February-25-2000.html, Feb. 25, 2000; see also, Council of the European Union, EU Guidelines on Death Penalty, III (iv), April 12, 2013, http://eeas.europa.eu/human_rights/guidlines/death_penalty/docs/guidelines_death-penalty-st08416_en.pdf.

93

Respondent alternatively argues this claim is procedurally defaulted by prior counsel's failure to properly present it during direct proceedings. ECF No. 536, p.129. This same defense was made in Respondent's initial answer. In response, Runyon's initial reply alleged that, even if this claim could have been raised during direct proceedings, counsel rendered ineffective assistance by failing to do so and that counsel's failure constitutes both an independent constitutional violation and cause and prejudice excusing any alleged procedural default. ECF No. 526, p.69. *See also* Amended Claims 5, 6 & 8.    In conclusion, because Runyon invokes no "new rule of law," *Teague* is not implicated here. Moreover, under the firmly established Eighth Amendment standards of *Trop*, *Roper*, and *Atkins*, Runyon can demonstrate that he is entitled to relief.

**Claim 15:      Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

Runyon acknowledges that his statutory claim for substantive relief is untimely under 28 U.S.C. §1867(a) because he did not bring the claim before voir dire examination began, or within seven days after he discovered or could have discovered the grounds for such a claim. Because trial counsel could have obtained and analyzed the jury selection records within the timeframe of §1867(a), counsel's deficient performance is cause for this default. If some external impediment impeded counsel from obtaining the necessary jury selection records or otherwise made timely compliance with §1867(a) "impracticable," the impediment is cause for the default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

**A.  Selection Of The Grand Jury And/Or The Petit Jury Venire Was Tainted.**

Runyon stands on the statement in his §2255 motion.

**B.  There Was a Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. §1861 *et. seq.***

The Jury Selection & Service Act (JSSA) and the district's Jury Selection Plan (the Plan) both require the clerk to note the specific reasons for every disqualification, excusal, exemption, or

94

exclusion of every prospective juror.[39] 28 U.S.C. §1866(d), Plan at pp. 5 & 7-8. The Government agrees. ECF No. 536, p.140. The Government also agrees that a violation of the JSSA is substantial if it frustrates the basic goal of "'use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions.' [*U.S. v.*] *Paradies*, 98 F.3d [1266,] 1277[11th Cir. 1996]." *Id.*, pp.140-41. The Government further agrees that the Court provided the §2255 parties with an "excused table listing" identifying the codes of 26 grounds for disqualification, excuse, exemption, or exclusion; that about 96 potential jurors in Runyon's case were excluded using the code for "court order"; and that 53 potential jurors were given no exclusion code.[40]

The Government suggests that the Court "may very well have had reasons for these disqualifications, excuses, exemptions, or exclusions that have not been provided to counsel at this point." ECF No. 536, p.141. That would be inconsistent with the Court's previous ruling. The Court clearly understood the reason why Runyon requested this information, and its order did not hint that it would withhold any relevant information:

> The Defendant also requests a statement explaining any exemptions or disqualifications so that he may evaluate such exemptions to ensure that they were based on objective reasons. As the Defendant has explained why this information is necessary to determine if there was a violation of the Act, he will be provided with a document stating the number of individuals excused, disqualified, or exempted, and the reason for such action, along with each individual's race, gender, and age.

---

[39] Although portions of Runyon's claim focus on the clerk's actions, this claim is not meant to fault the clerk individually or fix responsibility for what occurred. As the court explained in *United States v. Jackman*, 46 F.3d 1240, 1245 (2d Cir. 1995), the clerk's "*actions* are necessarily what we must review. But responsibility is another matter, one that is understandably not clear on this record, but is also of no relevance to the validity of [petitioner's] contention." (emphasis in original)

[40] To avoid quibbling over what appears to be an unimportant point, Runyon is using here the numbers as calculated by the Government. The 53 potential jurors with no exclusion code are described by the Government as jurors who "were not accounted for in a category of disqualification/exemption." ECF No. 536, p.140 n.21. Runyon describes the same group as jurors who "were excluded … for no stated reason" or with "no reason given." ECF No. 511, p.120.

ECF No. 475, p.12. If information about the reasons for any disqualification, excuse, exemption, or exclusion was withheld, Runyon is entitled to receive it under the Court's order. It should be provided to the parties promptly, with opportunity for further briefing.

The Government speculates that the 53 individuals excluded with no reason given may simply have been deferred, or failed to return their juror qualification questionnaire to the Court, or failed to appear on a summons.[41] ECF No. 536, p.141 n.22. These hypotheticals are unlikely. The "excused table listing" contains multiple codes for deferrals including, but not limited to, deferrals for vacations, job-related reasons, illness, and care for small children. The table also lists a code for "other."[42] If any of these 53 individuals were simply deferred, codes were available. Both the JSSA and the Plan explicitly mandate that the reasons be recorded.

Failures to return a jury qualification questionnaire or respond to a summons are also unlikely explanations because the court is required to follow-up in these circumstances. *See* §§1864(a)&(b) (setting out procedures and punishments when individual fails to return questionnaire); §1866(g) (authorizing court to issue show-cause order to any person who fails to comply with summons, and to impose fine, imprisonment, or community service for failure to show good cause). The clerk's office appears to have been diligent in following up on individuals who failed to return a questionnaire or to respect a summons, because it noted its efforts on the qualified wheel, if not also elsewhere, as directed by §1866(d) and the Plan. *See, e.g.,* 2007 Norfolk Qualified Wheel, Part. Nos. 100743060, 100753163,

---

[41] Runyon recognizes that there are distinctions between disqualifications, excuses, exemptions, and exclusions. Because the rules for recording all of these appear to be identical, Runyon's pleadings often use the term "exclusion" or "removal" to refer to all of these collectively.

[42] The uninformative "other" code would have been objectionable for the same reasons as the "court order" code. But the listing of the "other" code on the exclusion table removes the possibility that there was no available code that could be assigned to the 53 individuals. In Runyon's case, the "other" code was not used for any removals.

96

100753546, 100756110, 100765814, 100780874, 100782606 (containing notes showing follow-ups for nonresponse to summons). [43] The clerk's office also appears to have been conscientious about following up on prospective jurors' other reasons for unavailability. *See, e.g.,* 2007 Norfolk Qualified Wheel, Part. Nos. 100736917 (noting death in juror's family), 100745392 (noting follow-up on no-show), 100757873 (noting follow-up on juror form). There is no notation on the 2007 Norfolk Qualified Wheel for any of the 53 individuals who were excluded for no stated reason.

As for the 96 jurors who were excluded with the code "court order," the Government argues that this is a specific category of exemptions, and it says there is no merit to "the defendant's argument that it is not a category." ECF No. 536, p.141. But Runyon has never claimed that the "court order" code does not identify a specific category. Runyon's argument is that this category is devoid of content or standards. ECF No. 511, p.120 ("records [for this category] contain no reason why an order was needed or given"). It contains no information showing that a disqualification, excuse, exemption, or exclusion resulted from the use of objective criteria. Because removing a juror is necessarily an individualized decision, the juror's mere membership in a category called "court order" does not indicate that her removal was based on the use of objective criteria. There is no notation on the 2007 Norfolk Qualified Wheel for any person who was given the code "court order."

When jury records give no reason for exclusions, or the reasons have a title (such as "court order") but no content or standards, those exclusions must be treated as having been made without "use of objective criteria." Any other course would undermine Congress' purpose in strictly limiting exclusions to those set out in §1866(c), and commanding "the jury commission or clerk" to note "the *specific* reason therefor." §1866(d) (emphasis added). Noncompliance with these requirements is "'a

---

[43] Runyon has referenced these entries for illustrative purposes. They do not constitute a comprehensive listing of notes relating to individual jurors on the 2007 Norfolk Qualified Wheel.

frustration of the Act's underlying principle of exclusions on the basis of objective criteria only.'" *U.S. v. Calabrese*, 942 F.2d 218, 228 (3d Cir. 1991) (quoting *U.S. v. Bearden*, 659 F.2d 590, 607 (5th Cir. 1981)). The legislative history of the Jury Selection and Service Act (JSSA) supports this position. As the court recognized in *U.S. v. Branscome*, 529 F. Supp. 556, 559 (E.D. Va. 1982), *aff'd*, 682 F.2d 484 (4th Cir. 1982), the JSSA was intended to prohibit jury selection officials, even when well-intentioned, from making subjective decisions about the inclusion or exclusion of potential jurors. *See* H.R. Rep. No. 1076, 90th Cong., 2d Sess. 5 (1968), reprinted in U.S. Code Cong. & Ad. News 1795 (1968); S. Rep. No. 891, 9th Cong., 1st Sess. 17-18 (1967). The court further pointed out in *Calabrese* that mandating the use of objective criteria created "a 'bulwark against impermissible forms of discrimination and arbitrariness.'" *Calabrese*, 942 F.2d at 221 (quoting U.S. Code Cong. & Ad. News at 1793, and also citing National Jury Project, *Jurywork: Systematic Techniques* §5.04[4][3][b] (1990)). Recording the specific reason for every exclusion operates as a critical check on the jury selection officials and furthers Congress' intent. [44]

Assuming the materials made available to counsel constitute the totality of the relevant records regarding the exclusions of the 180 individuals, Runyon has shown a substantial failure to comply with the jury selection procedures in §§1865 & 1866, as well as the procedures in the Plan. Excluding 53 of 180 individuals for no stated reason is *quantitatively* substantial. Excluding 96 individuals for "court order"—a reason that has a title but no content or standards—also is quantitatively substantial. Each

---

[44] The Government suggests that an 83 percent failure to comply with an explicit requirement in the JSSA can be disregarded as a technical violation. ECF No. 536, p.141. The cases it cites do not support that argument. Those cases primarily involve minor deviations from the local Plan, rather than the statute, such as calling slightly fewer than 300 individuals for a case when the local Plan specifies at least 300. *See U.S. v. Carmichael*, 685 F.2d 903, 911 (4th Cir. 1982). Runyon's claim, by contrast, is grounded on statutory mandates. Runyon also does not complain that the reasons for each exclusion were not entered in the right place or on the right list, but that the reasons were not recorded at all, and thus fail to show the exclusions were based on objective criteria.

group alone is more than large enough to satisfy the quantitative standard, and together they account for nearly 83 percent of all the exclusions. If there are additional records that identify the reasons for the 53 individuals who were removed for no stated reason, or that provide content and standards for the "court order" basis for excluding 96 individuals, the Court should provide this to the parties.

These exclusions also are *qualitatively* substantial. The proper inquiry is whether the instances of noncompliance have frustrated the principle of exclusions "'on the basis of objective criteria only.'" *Calabrese*, 942 F.2d at 228 (quoting *Bearden*, 659 F.2d at 607). Based on the information provided to counsel, this prong is established because there are simply no objective criteria underlying the exclusion of 53 individuals. For another 96 individuals, the only disclosed reason for exclusion is "court order." A court order can be based on objective criteria, but it also can be based on subjective factors, which Congress prohibits in this context. *Branscome, supra.* The records in Runyon's case contain no reason why a court order was needed or given. As Runyon noted in the §2255 motion, it strains credulity to think that more than half of the 180 potential jurors could be excluded using objective criteria that are not already on the Court's expansive exclusion table. The most logical inference is that these individuals were excluded using nonobjective criteria.

The remedy for substantial failure to comply with the JSSA's jury selection procedures is to vacate Runyon's convictions and remand for a new trial. That is the remedy ordered in *Calabrese*, which is the case that is factually most closely on point. In that case, the jury clerk submitted to the district court the "names of people for whom she believed excusal or exclusion was appropriate, with a brief notation indicating the grounds for each person's removal" *Calabrese*, 942 F.2d at 221. The list included 12 potential jurors who each had indicated, in response to a question on the juror qualification questionnaire, that he or she knew one of the defendants. "The district court signed a blanket excusal for all jurors on the list." *Id.* On appeal, the Third Circuit determined that the exclusions, which were

99

made without inquiry into the nature of any of these acquaintances, were outside the reasons allowed by the Act, and that the failure to comply with the statute was substantial. Vacating the defendants' convictions and remanding for a new trial, the court said:

> The party raising the challenge need not show prejudice. See United States v. Kennedy, 548 F.2d 608, 612 (5th Cir.), cert. denied, 434 U.S. 865 (1977); House Report, 1968 U.S. Code Cong. & Admin. News at 1806 (noting that a committee amendment "eliminates the need to prove prejudice as a condition of judicial intervention when substantial noncompliance with the act is established").

*Calabrese*, 942 F.2d at 221. It further said that "[b]ecause there is no requirement that prejudice be shown, this is not a case in which a remand to the district court for a factual inquiry into the actual relationships between defendants and the excused jurors is appropriate." *Id.* at 230 n.6. In Runyon's case, there also is no requirement that prejudice be shown.

### C. A Person Who Did Not Qualify Participated In Runyon's Trial.

Runyon's Amended §2255 motion said "[i]t is possible that S.G. and S.R. are the same person," but it pointed to a pattern of flip-flopping that did not fit the scenario of a person who simply changed her name because of a marriage or divorce. ECF No. 511, p.123. Although the Government does not resolve that flip-flopping, its response identifies a detail that satisfies Runyon's counsel that S.G. and S.R. are the same person. Consequently, Runyon withdraws this allegation.

### D. Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment.

The Government asserts that there is no case law finding a lawyer ineffective for failing to request jury selection documents. ECF No. 536, p.144. The existence of an identical prior winning claim is not an element of a *Strickland* analysis. There are many winning *Strickland* claims based on counsel's failure to investigate, and investigating compliance with the jury selection procedures for the defendant's own trial is simply a specific application of counsel's well-established obligation to investigate the facts and the law that are relevant to his client's case. *Strickland*, 466 U.S. at 691

("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Wiggins*, 539 U.S. at 533 (counsel's decision not to investigate "must be directly assessed for reasonableness in all the circumstances"); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) ("the attorney must look into readily available sources of evidence"). The purpose of the specific investigation into jury selection procedures is "to determine whether [the defendant] has a potentially meritorious jury challenge." *Test v. U.S.*, 420 U.S. 28, 30 (1975) (emphasis added). Requesting the jury selection documents is essential for this purpose because "without inspection, a party almost invariably would be unable" to discharge that duty. *Id.* Counsel's duty to "exercise … diligence" is explicitly contained in the JSSA, §1867(a).

Runyon also calls the court's attention to *U.S. v. Orange*, 2003 U.S. App. LEXIS 7303, at \*4, \*6-7 (10th Cir. Apr. 17, 2003). In that case, the Tenth Circuit remanded for further proceedings after recognizing that the §2255 petitioner stated a potentially meritorious claim under *Strickland* when he alleged that defense counsel rendered ineffective assistance in failing to investigate and challenge the jury selection system, including counsel's failure to obtain documents under *Test*.

The Government's only other response to this allegation is to make weak conclusory statements. First, it says Runyon cannot show that counsel's performance was deficient because the relevant ABA Guideline 10.10.2 only says counsel should "consider" whether there is a basis to challenge the selection of the venire. Because the appropriateness of such a challenge will depend on the facts of an individual case, the obvious norm of professional performance is for counsel to "consider" the facts and circumstances, and then make an informed decision whether or not to make a challenge.

Although the ABA Guidelines describes counsel's performance in the most pertinent context, Runyon notes that they are not the only source of norms for challenges to jury selection. *See also* Office

101

of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. I10-I12 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-7.2 Selection of Jurors (3d ed. 1993) ("Defense counsel should prepare himself or herself prior to trial to discharge effectively his or her function in the selection of the jury, including the raising of any appropriate issues concerning the method by which the jury panel was selected[.]"); National Legal Aid and Defender Assn.: Performance Guidelines for Criminal Defense Representation 7.2 Voir Dire and Jury Selection (1997) ("counsel should be familiar with the procedures by which a jury venire is selected in the particular jurisdiction and should be alert to any potential legal challenges to the composition or selection of the venire"). The Supreme Court cited with approval each of the foregoing sources of attorney norms in *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010). Requesting and examining the jury selection documents carries no risk to the defense, and to obtain access to otherwise nonpublic jury selection records, counsel must only state in good faith that the records are necessary to investigate and prepare a motion challenging the jury selection procedures.[45] *U.S. v. Alden*, 776 F.2d 771, 773 (8th Cir. 1985). There is no reason for counsel to forgo the request if there is a possibility of a substantial violation of JSSA and if counsel sincerely intends to seek statutory redress if he discovers a meritorious violation.

Second, the Government makes a conclusory assertion that Runyon cannot prove he was prejudiced by counsel's failure. But timely raised jury selection challenges have resulted in relief in numerous cases. In *Branscome, supra*, the Fourth Circuit quashed indictments on the ground that the method used to empanel a grand jury violated the JSSA. In that case, the clerk initially asked a

---

[45] This certification is distinct from the sworn statement required to be filed with a motion under §1867(d).

randomly chosen pool of prospective jurors for volunteers to serve on the grand jury, and then the clerk filled out his quota with additional jurors chosen at random. *See also U.S. v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) (finding substantial violation of JSSA where jury selection plan provided for random removal from jury wheel of one in five non-African-Americans because of their racial status); *U.S. v. Exum*, 744 F. Supp. 803 (N.D. Ohio 1990) (substantial violation of JSSA if jurors on qualified wheel are called to serve as summary jurors where Act limits wheel to calling grand and petit jurors). Moreover, a defendant's timely allegation of substantial violation can result in reversal on appeal or other subsequent proceedings; *Calabrese*, *supra*, (vacating conviction for substantial violation of JSSA and remanding for new trial where trial court issued blanket order excluding potential jurors based merely on jurors' knowledge of defendant, without anything more); *U.S. v. Okiyama*, 521 F.2d 601 (9th Cir. 1975) (reversing conviction with recommendation to dismiss indictment, despite absence of any showing that defendant was prejudiced, where deficiencies in process of selecting grand and petit jurors created serious risk that those selected did not have sufficient proficiency in English to understand proceedings in which they were to participate); *U.S. v. Clay*, 159 F.Supp.2d 1357 (M.D. Ala. 2001) (remanding for new trial where clerk placed names of deferred jurors in separate pool and preferred them disproportionately over jurors drawn directly from qualified wheel). The errors in Runyon's case are as meritorious as these.

There is ample reason to conclude that if Runyon's counsel had obtained the jury selection documents under authority of *Test* and filed a timely challenge, the Court would have had to stay the proceedings. Based on the records Runyon has received, there is also a reasonable probability that the Court would have found there was a substantial failure to comply with the JSSA and the Plan, and thus that the Court would have had to call for a new venire and the selection of a new petit jury in conformity with §1867(d).

103

A new venire would have benefitted Runyon because it would not have been tainted by the racial aspect of the noncompliant exclusions. [46] Those exclusions removed both of the Native Americans and half of the Asians called for his trial, either for no stated reason or for "court order." ECF No. 511, p.121. Runyon is Asian. The challenged exclusions reduced the minority jurors available to participate in the selection of his jury, and particularly jurors of Runyon's own race. *See Vasquez v. Hillery*, 474 U.S. 254, 261 (1986) (granting habeas relief because members of defendant's race were excluded from the grand jury that indicted him).

Racial discrimination in jury selection is generally treated as structural error. *See U.S. v. Gonzales-Lopez*, 548 U.S. 140, 149 n.4 (2006) (confirming that error in *Hillery* was structural because of the difficulty of assessing its effect). The Fourth Circuit holds that the prejudice component of a *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error. *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc). Other courts agree. *See, e.g., Johnson v. Sherry*, 586 F.3d 439, 446-47 (6th Cir. 2009); *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008); *Owens v. United States*, 483 F.3d 48, 64-66 (1st Cir. 2007); *McGurk v. Stenberg*, 163 F.3d 470, 473-74 (8th Cir. 1998).

Of the 180 jurors who did not complete case-specific juror questionnaires, 83 percent were excluded with no reason given, or with a reason that contained no content or standard. Trial counsel unreasonably failed to investigate jury selection by timely requesting jury selection documents and analyzing them for evidence of substantial violations of the JSSA. Prejudice is presumed. Moreover,

---

[46] The Government's response speculates that by making reference in the §2255 motion to the race of excluded jurors, Runyon might be trying to make a fair cross-section claim. He is not. But in a case that had a race-related issue on direct appeal and now presents two race-related claims in the Amended §2255 motion, see Claims 12 & 16, neither Runyon nor the Court cannot overlook the fact that a juror's race would not be a permissible reason for exclusion.

104

Runyon was prejudiced by the exclusion of minority jurors. Counsel's deficient performance is a basis for §2255 relief in its own right, and also provides cause to overcome the default of the substantive claim.

**Claim 16:    The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.**

The Government peremptorily struck 70 percent of the qualified African-American jurors. It used 68 percent of its strikes against qualified female jurors. The Government's answer to these charges is that Runyon is foreclosed from making a prima facie showing of discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), because he is white and male. "Given the fact that the defendant and the victim are white males, and Runyon alleges discrimination against blacks and women, he patently cannot satisfy the first two elements of a prima facie case." ECF No. 536, p.146. The Government is wrong on both the law and the facts.

First, it is wrong on the law. A quarter century ago the Supreme Court granted certiorari in *Powers v. Ohio*, 499 U.S. 400 (1991), to decide "whether … a white defendant may object to the prosecution's peremptory challenges of black venirepersons." *Id.* at 404. Ruling in the defendant's favor, the Court held "that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." *Id.* at 416. The Court acknowledged that in *Batson* it had emphasized the racial identity between the black defendant and the struck jurors, but explained that this was merely because such racial identity:

> might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes, and may manifest itself in different forms.

105

*Powers*, 499 U.S. at 416; *see United States v. Bynu*m, 3 F.3d 769, 772 (4th Cir. 1993) (under Powers, a "criminal defendant may challenge race-based use of peremptories whatever the defendant's own race"); *Kandies v. Polk*, 385 F.3d 457, 474 (4th Cir. 2004) (based on Powers, white defendant had standing to bring Batson claim asserting prosecution's improper exclusion of nine African-American jurors because of their race), *vacated and remanded on other grounds*, 545 U.S. 1137 (2005). Based on *Powers*, courts also recognize that a defendant of one racial minority can challenge the discriminatory exclusion of jurors of a different racial minority. *See, e.g.*, *United States v. Mensah*, 737 F.3d 789, 797 (1st Cir. 2013) (holding that African-American defendant could contest prosecution's strikes of two Asian-American jurors because Supreme Court has recognized, at least since Powers, "that whatever the defendant's race, he has 'the right to be tried by a jury whose members are selected by nondiscriminatory criteria'"). Thus, under law that has been firmly established for at least 25 years, the fact that Runyon is not the same race as the excluded jurors is irrelevant to his *Batson* claim, and the Government's assertion that Runyon's race "patently" forecloses his ability to make a prima facie case is patently wrong.

The Government's response also is wrong on the facts. Runyon's race is Asian, not white. Although his race is irrelevant to his standing to challenge the strikes of African-American jurors, it is material to the merits of Runyon's claim that the prosecution's strikes were motivated in substantial part by race, as discussed below. The Government has known since well before trial that Runyon is Asian.[47] In light of this knowledge, the Government's misrepresentation of his race in §2255

---

[47] The fact that Runyon is Asian is explicit in the interrogation video exhibit the prosecutors intended to play at trial, and did play at trial, and which the Fourth Circuit quoted in its opinion: "Detective Rilee asked Runyon: '[Y]ou're Asian, right, Asian-American?' … 'Yes sir,' he answered." *Runyon*, 707 F.3d at 493. The Fourth Circuit later described this video as containing statements about Runyon's Asian race that "were capable of inflaming jurors' prejudices." *Id.* at 494. The Government's mental health experts wrote pretrial reports expressly identifying Runyon as Asian, ECF No. 276, p.19, or Asian-American, ECF No. 277, p.1. Runyon's race was also discussed in pretrial filings submitted by the defense. In a motion for continuance, for example, ECF No. 179, p.10, the defense explained that Runyon's mother, Suk Cha Runyon, is a native Korean. Suk Cha was on the pretrial witness list.

proceedings is disturbing and illustrates a reckless disregard of the importance that race played in this case.[48] At this point it seems clear that the Government—by raising irrelevant legal arguments and making factually indefensible statements about Runyon's race—is attempting to avoid by any means the consequence of having struck 70 percent of the qualified African-American jurors and having used 68 percent of its strikes against females.

The reasons why Runyon has made a prima facie case of discrimination are discussed below. For some of the same reasons the Supreme Court discussed most recently in *Foster v. Chatman*, 136 S.Ct. 1737 (2016), the Government's explanation of its strikes is pretextual, and the record shows the prosecutors were motivated in substantial part by race.

### A. Runyon's Claim Is Not Defaulted, Or Counsel's Deficient Performance Is Cause To Overcome The Default.

The Government's sole ground for opposing Runyon's substantive *Batson* claim is that it is defaulted. That is wrong. It is not defaulted because it could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. *See supra*, Affirmative Defenses (discussing procedural default). On the first day of voir dire, the Court announced that 62 members had been called. Tr.2, 6/30/09. The trial transcript includes the court reporter's descriptive note that "The names of the prospective jurors were called," Tr.10, 6/30/09, but the calling was done off-record, and the individuals' names are not in the transcript. Prospective

---

She testified at trial that she was born in North Korea, and she conceived David after escaping to (and living in) South Korea. Tr.2410, 2414, 8/24/09. Runyon's race also underlay pretrial questions proposed by the defense for the jury questionnaire, ECF No. 156-1, p.9, and for voir dire, ECF No. 158, p.2.

[48] The Government's misrepresentation of Runyon's race must be viewed as intentional, not inadvertent. It made the same assertion that Runyon is white in its answer to the original §2255 motion. ECF No. 497, pp.127, 128, 130. Runyon called the error to the Government's attention in his original reply. ECF No. 526, pp.77-78. Runyon's amended §2255 motion also repeatedly identified his race as Asian. ECF No. 511, pp.2, 83, 107, 110, 121, 128.

jurors who gave individual responses to certain voir dire questions are identified in the transcript because they gave their name or number. But 21 of the 62 members did not respond individually to any voir dire question. *See* Claim 17. After the Court removed 10 members for cause, the court reporter entered a descriptive note in the transcript that "The jury selection process was begun," Tr.127, 6/30/09, and it continues with two more notes that "Jury selection continued," Tr.129, 6/30/09. Consistent with this Court's custom, the reporter did not otherwise record the process of striking individual venire members.[49] The conclusion of jury selection is indicated in the transcript by the Court reading the names of 13 individuals who should return the following day. Context makes clear that these were the 12 selected jurors plus one person held over for the next day's selection of alternates. *Id.* The venire members who had been peremptorily struck were excused without being named.

The transcript does not reveal who was struck peremptorily or by which party, nor does it contain any information about the race and gender of potential jurors—either those struck or not struck. The courtroom deputy had a list of all the venire members who participated in oral voir dire and took notes of each for-cause and peremptory strike including the striking party, but these notes— now called the strike lists—were not entered on the docket and made available to counsel until two years after the mandate had issued following Runyon's direct appeal. *See* ECF No. 424 (sealed, entered 4/13/15). Even then, the lists were entered as records in the collateral proceedings, not in the trial

---

[49] Runyon does not suggest that the reporter failed to capture statements of a party or of the Court, because the Court has stated that the transcripts and strike lists together "contain the full record of the jury selection process." ECF No. 423, p.2. Rather, counsel understands that the exercise of peremptory strikes in this Court is a silent process. The clerk draws a group of tags from a box, each denoting a qualified venire member, and they are placed on a board. The parties then alternately move or remove individual tags to indicate their strikes. Neither the trial transcript nor the strike list shows the sequence in which individual tags were drawn or replenished, and the transcript contains no record of any party's transfer of a tag to show its exercise of a strike.

proceedings. In a Supplemental Order accompanying the entry of that filing, the Court explained that these lists came from the courtroom deputy's "internal strike and selection order notes," which were "submitted to the Clerk for statistical purposes following trial." ECF No. 423, p.1.

Because the lists were not entered on the docket and made available to counsel until after the appeal, they were not a part of the record on appeal. The record on appeal consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). The record on appeal does not include internal notes that were not entered on the docket prior to the appeal, and whose existence was not noted in any trial record. Because facts necessary to identify the existence of the violations described in Claim 16 were outside the trial record, this claim could not have been presented on appeal without further factual development.[50] Consequently, this claim was not open to consideration and review on appeal under *Waley*, *supra*, and it is not defaulted.

If the trial record was somehow sufficient to enable Runyon to present the issue fully and clearly on appeal, appellate counsel were ineffective in failing to do so. Their deficient performance excuses the default, and Runyon is entitled to de novo review. As noted in Claim 8, assembling the record for appeal was the responsibility of attorney Lawrence Woodward, who was initially one of Runyon's appellate lawyers.[51] ECF No. 511-36, p.1 ¶¶5-6. Appellate counsel Teresa Norris compiled a list for Woodward identifying documents that he still had not obtained, including "court record of jury selection/strikes used." *Id.*, p.4. Norris's declaration states that she never received a strike list, and

---

[50] Even *with* these documents, this claim could not have been presented or defended on appeal unless the parties also obtained the venire members' juror questionnaires from the Court. The questionnaires not only identified each member's race and gender, but also contained information about the juror's background, relationships, and views that would be necessary to perform a comparative analysis.

[51] Nine months before Runyon's opening brief was filed, Woodward withdrew and the court of appeals appointed Seth Farber as co-counsel.

that her failure to obtain that record for the appeal was not a tactical decision. *Id.*, p.2 ¶7. It appears, instead, to have been:

> "the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, [counsel's] conduct fell below constitutionally required standards. *See id.*, at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'")) (quoting *Strickland*, 466 U.S., at 690-691).
>
> *Rompilla v. Beard,* 545 U.S. 374, 395-96 (2005).

In other words, appellate counsel's deficiency was a threshold failure to investigate and obtain the records necessary to determine *whether* there might be an error in jury selection. If counsel had obtained those records and decided not to appeal the discriminatory exclusion of potential jurors, the reasonableness of their choice would be evaluated under *Jones v. Barnes*, 463 U.S. 745 (1983), and *Smith v. Robbins*, 528 U.S. 259 (2000), which require deference to appellate counsel's reasonable professional judgment. But where there was no competent investigation, counsel could not weigh the (unknown) claim against other potential claims and make a reasonable strategic choice of issues in the first instance. *Rompilla, supra.*

Runyon was prejudiced by appellate counsel's failure to obtain the record necessary to recognize and pursue a claim that the Government used its peremptory strikes in a discriminatory manner. If counsel had performed competently, they would have discovered a claim that was stronger than some other issues presented in Runyon's direct appeal. *See generally* Claim 8.

Even if the record on jury selection was somehow sufficient to present the issue fully and completely on direct appeal, and even if appellate counsel were not ineffective in failing to do so—all of which Runyon disputes—the default of a *Batson* claim is excused because trial counsel were ineffective in failing to challenge the Government's discriminatory exercise of peremptory strikes, for

110

the reasons alleged below. As a result, Runyon is now entitled to de novo review.[52]

## B. The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes.

The petitioner, not the respondent, has "exclusive authority to define the nature of his or her claims." *Dougherty v. Cerra*, 987 F. Supp. 2d 721, 729 (S.D. W.Va. 2013). In his §2255 motion, Runyon elected to present two claims alleging the discriminatory exercise of peremptory strikes, one based on race and one based on gender. Although there are factual overlaps, Runyon separated these claims because the legal standards appeared to be slightly different and some of the evidence is different. The claims are mutually reinforcing and he may prevail on both, but he recognized from the start that the Court could render different decisions on the two grounds, and he structured his motion with that understanding. The Government responds as if Runyon pleaded a unitary allegation based on a combined race-gender category. The Government intermixes its evidence on the two claims, appearing to argue that Runyon can obtain relief only if he shows that the Government discriminated on both grounds. In this Reply, Runyon attempts to disentangle the Government's arguments, and he addresses independently the Government's evidence relating to each claim.

In addition to the trial transcript, the facts related to strikes based on race or gender are contained in the strike lists and juror questionnaires, both made available in §2255 proceedings.

---

[52] Under Fed. R. Civ. P. 8(d) & (e), which applies to §2255 proceedings under Rule 12 of the Rules Governing Section 2255 Proceedings, a party can present inconsistent claims in the alternative without one constituting an admission against the other. *Zee Co. v. Williams, Mullen, Clark & Dobbins, P.C.*, 547 Fed. Appx. 166 (4th Cir. Va. 2013) (quoting *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir. 1985) ("[A] policy which permits one claim to be invoked as an admission against an alternative or inconsistent claim would significantly restrict, if not eliminate, the freedom to plead inconsistent claims provided by" Rule 8(d)(2))); *see* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1283. Under this rule, Runyon can allege that counsel lacked facts needed to raise *Batson* claims at trial or on appeal and thus the claims are not defaulted. And he can simultaneously allege in the alternative that counsel knew all the relevant facts and could have presented the claims at trial or on appeal, but unreasonably failed to do so.

### 1. The Prosecution Unlawfully Struck Jurors Based on Their Race.

The Government argues that it did not exercise any strikes discriminatorily based on race. Its argument fails by a wide margin.

The "'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster*, 136 S.Ct. at 1747 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). *Batson* established a three-step process for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id.* (quoting *Snyder*, 552 U.S. at 476-77). A prima facie case "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 170 (2005) (quoting *Batson*, 476 U.S. at 94). And because this step of the analysis requires only an "inference," the standard "is not onerous." *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (internal quotation marks and citation omitted); *Brown v. Alexander*, 543 F.3d 94, 103 (2d Cir. 2008) (same); *see also Johnson*, 545 U.S. at 170 (Court did not intend *Batson* prima facie standard to be onerous).

**Step One.** The Government argues that Runyon categorically cannot satisfy certain allegedly required elements of a prima facie case. It paraphrases the elements of a prima facie case as originally set out in *Batson*, but it fails to acknowledge that when the racial relationships differ from those in *Batson,* the elements must be modified to give effect to the Supreme Court's decision in *Powers*.[53] The

---

[53] The elements of a prima facie case, as described in the Government's response, are "'(1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury

112

federal courts of appeals, including the Fourth Circuit, have recognized and promulgated such remedial modification in cases, like Runyon's, that are factually dissimilar to *Batson*. In *United States v. McMillon*, 14 F.3d 948 (4th Cir. 1994), for example, the court reformulated the elements of a prima facie case in a way that avoids a conflict with *Powers*:

> [A]s elaborated in *Powers v. Ohio*, 499 U.S. 400 (1991), the plaintiff first must make out a prima facie case of discrimination. This is a three-step process. First, the defendant must show that the prosecutor used one of his peremptory strikes to remove a member of a cognizable racial group from the venire. Second, the defendant can rely on the fact that peremptory challenges permit those who are of a mind to discriminate to do so. Finally, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96.

*McMillon*, 14 F.3d at 951-52. *See also Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1026 (4th Cir. 1998) (recognizing that in light of *Powers*, the movant establishes a prima facie case by showing that (1) opposing counsel used peremptory strikes to remove members of a cognizable racial group, and (2) the facts and any other relevant circumstances raise an inference that counsel used the strikes to remove venire members on account of their race).

Applying these reformulated elements, Runyon's §2255 motion already makes a prima facie case, or he is entitled at a minimum to evidentiary development and a hearing to do so:

First, Runyon has shown that the prosecutors used peremptory strikes to remove 70 percent of the qualified African-American prospective jurors. There is no question that African-Americans are members of a cognizable racial group.

Second, Runyon relies on the fact that peremptory challenges permit those of a mind to discriminate to do so.

---

pool." ECF 536, p.146. *Powers* rejected the first two of these elements, holding that the defendant does *not* need to be a member of a distinct racial group, and that the struck jurors do *not* need to be the same race as the defendant.

Third, as described below, additional facts and circumstances raise an inference of discriminatory purpose. Runyon's pending motion for discovery seeks categories of documents that were pivotal to the Court's decision in *Foster* and that may reveal more facts and circumstances relevant to Runyon's claim. But even before having the fruits of discovery, Runyon can identify relevant facts and circumstances.

One category of facts and circumstances that raises an inference of discrimination concerns the interrogation videotape exhibit that, at the time of voir dire, the prosecution intended to put into evidence (and did put into evidence). On its face, the videotape conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and contained statements that were "capable of inflaming jurors' racial or ethnic prejudices." *Runyon*, 707 F.3d at 493-94. Although Runyon and the excluded jurors are of different races, they have in common the attribute of being members of a racial minority that has experienced discrimination. The prosecutors' knowledge that African-American jurors would see and hear this videotape, and the substantial likelihood that it would evoke memories of analogous statements that had been made to those jurors personally, or made historically to members of their race, raises a strong inference that the Government struck these African-American jurors on account of race. Simply put, prosecutors would not want African-Americans on the jury because they likely would be offended by the statements in the videotape or would sympathize with Runyon as a target of racial insults. As a result, those jurors would be less trusting of the Government's evidence, more skeptical of Runyon's guilt, and less likely to support a death sentence.

A second category of facts and circumstances that raises an inference of discrimination concerns the disproportionate size of the Government's strikes of African-Americans. There were 10 African-Americans in the pool of 52 qualified venire members; 100 percent of the strikes used against

114

African-Americans were exercised by the Government; and the Government excluded 70 percent of the eligible African-American venire members through its use of peremptory strikes. Runyon again anticipates that he may be able to present additional relevant information after receiving discovery. But the raw figures are well within the "wide variety of evidence" that can contribute to an inference of discriminatory purpose. *Johnson*, 545 U.S. at 169; *see also Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 342 (2003) (statistical evidence alone raises debate when Government used peremptory strikes to exclude 91 percent of eligible African-American venire members and "[h]appenstance is unlikely to produce this disparity"); *Batson*, 476 U.S. at 97 (circumstances giving rise to inference of discrimination can include "a 'pattern' of strikes against black jurors included in the particular venire"); *id.* at 93 ("seriously disproportionate exclusion of Negroes from jury venires ... is itself such an unequal application of the law ... as to show intentional discrimination") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)).

In Runyon's case, the numbers are acute. To determine whether happenstance was likely to produce such a disparity, "the relevant statistical question is whether the number of black jurors excluded by the prosecutor … is statistically significantly larger than the number of black jurors that we expect would be excluded if the prosecutor exercised her peremptory challenges randomly." Jason Kreag, *Prosecutorial Analytics*, WASH. U.L. REV. (forthcoming 2017) (manuscript, at 35, online at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2764399 (last visited July 7, 2016)). The jury was chosen from a qualified venire consisting of 10 black members (19 percent of the venire) and 42 nonblack members (81 percent of the venire). If the prosecutors had used their peremptory strikes randomly, those strikes would have removed 3.6 black members (19 percent of their strikes) and 15.4 nonblack members (81 percent of their strikes). The statistical question is whether the 7 black members actually struck by the prosecutors is statistically significantly larger than the 3.6 black

115

members that would be expected from the random exercise of peremptory strikes.

A generally recognized instrument for answering this statistical question is Fisher's exact test. *See, e.g.,* Kreag, *supra* (manuscript, at 20 n.211) (identifying Fisher's exact test as "one statistical test that can be used to answer this question"); MICHAEL O. FINKELSTEIN & BRUCE LEVIN, STATISTICS FOR LAWYERS 123-25; 154-56 (2001) (describing Fisher's exact test); Joseph L. Gastwirth, *Statistical Testing of Peremptory Challenge Data for Possible Discrimination: Application to Foster v. Chatman*, 69 VAND. L. REV. EN BANC 51 (Mar. 16, 2016) at 55 ("Fisher's exact test is an appropriate statistical method for analyzing the pattern of strikes in the context of a *Batson* challenge"). Employing this test, Runyon assessed the null hypothesis that there is no association between the race of the qualified venire members at his trial and the prosecutor's decision to strike members of a particular race—*i.e.*, the hypothesis that a potential juror's race and the prosecutor's decision to strike that juror were independent of each other. The test results show that at a statistically significant level ($p < .05$), the null hypothesis is disproved when the prosecution chooses to strike 7 of 10 African-Americans in a 52-member venire. In other words, there is less than a 3 percent probability that the prosecution's strikes of the black members were independent of the jurors' race. Exhibit 5.[54] This statistical confirmation adds significant weight to the inference that the prosecutors' strikes of African-American jurors were purposeful and were motivated in substantial part by race.

A third category of facts and circumstances that raises an inference of discriminatory purpose concerns the disproportionate distribution of potential jurors on one of the lists the parties submitted

---

[54] Exhibit 5 displays test results for each of the 11 possible permutations, ranging from the prosecutor striking 0 African-Americans in the 52-member venire to striking all 10 of the African-Americans. It shows that the probability of striking 7 of the 10 black members for reasons independent of race is 0.02595 (2.595 percent). By convention, a probability less than 0.05 (5 percent) is generally considered to be statistically significant. Runyon used the online Easy Fisher Exact Test Calculator at http://www.socscistatistics.com/tests/fisher/Default2.aspx to enter the data and perform the computations.

at the court's request before voir dire. ECF No. 235 (sealed). Of the 243 prospective jurors who completed juror questionnaires, 22.6 percent (55) were African-American and 72.0 percent (175) were white.[55] On List 1—the 129-member group from which all jurors and alternates were drawn—the proportion of African-Americans dropped by nearly a quarter to 17.1 percent (22) and the proportion of whites increased to 78.3 percent (101). On List 2—the 74 potential jurors who would not be called for voir dire—the proportion of African-Americans was 20.3 percent (15) and the proportion of whites was 77.0 percent (57). But on List 3—the 40 individuals on whom the parties could not agree— there was a wild swing: 45 percent (18) on that list were African-American and only 42.5 percent (17) were white. Although African-Americans comprised just over one-fifth of those who completed questionnaires, they outnumbered white potential jurors on List 3 in absolute numbers and percentages.

Runyon does not presently know which party thought particular African-Americans on List 3 belonged on List 1 and which party thought they belonged on List 2. Resolution of that question likely requires discovery and an evidentiary hearing. But race weighs heavy in the composition of List 2. That the government struck 70 percent of the African-American venire members during voir dire while Runyon struck none raises an inference that the government, rather than the defense, leaned toward putting disputed African-Americans on List 2 for summary dismissal. And that the defense leaned toward putting them on List 1, where they would be called for voir dire and potentially seated on the jury.

**Step Two.** The parties exercised their peremptory strikes on June 30, 2009, more than seven years ago, and it is doubtful that the prosecutors have a present recollection of the reasons for their

---

[55] The percentages here do not add up to 100 because Runyon has not included data for Asians, other, or unreported. Together, those three categories account for 5.4 percent of the total.

strikes of the African-American venire members. In cases where there has been a significant passage of time between the strikes and the explanation, some courts direct the Government not only to state a plausible reason for its strikes, but also to "(1) assert that specific, race-neutral reasons were the *actual* reasons for the challenged strikes, and (2) offer some evidence which, if credible, would support the conclusion that those reasons were the *actual* reasons for the strikes." *Shirley v. Yates*, 807 F.3d 1090, 1104 (9th Cir. 2015) (emphases in original). Such direction is based on the Supreme Court's caution that "The *Batson* framework is designed to produce actual answers [from a prosecutor] to suspicions and inferences that discrimination may have infected the jury selection process. . . . It does not matter that the prosecutor might have had good reasons; what matters is the real reason [prospective jurors] were stricken." *Johnson*, 545 U.S. at 172 (internal quotation marks and alterations omitted); *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004); *see also Williams v. Louisiana*, No. 14-9409, 2016 WL 3369515, at *1 (June 20, 2015) (statement of Ginsburg, J., concurring in decision to grant, vacate, and remand) (the court must demand actual answers from the prosecutor; the judge cannot supply possible reasons based on the record because "The judge is an arbiter not a participant in the judicial process"). Runyon suggests it would be appropriate to direct the Government to comply with these requirements. The Court also should grant Runyon's motion for discovery so he can examine whether, as in *Foster*, the requested records contain contrary evidence about the actual reasons for the peremptory strikes.

The Government responds to the §2255 motion by saying that it removed the seven African-American venire members based on their answers to Question 61 in the juror questionnaire, which concerned each member's views about the death penalty. It says it struck Jurors 31, 40, 46, 63, and 81 because they circled option D, indicating they generally oppose the death penalty; and it struck Jurors 15 and 116 because they circled option C *and* option D, indicating both that they generally favor and

118

they generally oppose the death penalty.[56] ECF No. 536, p.148. The Government also reports that three of the African-American venire members, Jurors 15, 31, and 63, had served in the military or had relatives who presently or previously served in the military, although it does not assert that these military connections were a reason for any of its strikes. Because the Government identifies no reason for any of its challenged strikes other than the venire members' views of the death penalty, its defense of Runyon's charge "must stand or fall on the plausibility of the reasons [it] gives." *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 252 (2005); *U.S. v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011); *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011).

If the reasons proffered in the Government's response are the actual reasons for its strikes of the seven African-American venire members, Runyon does not contest that those reasons would be race-neutral and satisfy the Government's burden at the second step of the *Batson* analysis.

**Step Three.** Because the Government's response states a reason for the strikes, it becomes Runyon's turn to show that the reason is pretextual. Runyon anticipates that his pending discovery motion will lead to additional facts showing that the Government's reason for the strikes of African-American jurors is a pretext. "[A] prosecutor's or a prosecutorial office's history of peremptory strikes are relevant at *Batson*'s step three" because that history can show a pattern of discriminatory or near-discriminatory conduct. Kreag (manuscript, at 36); *see also id.* (manuscript, at 37) ("prior *Batson* close calls" can help identify purposeful discrimination). The "culture of the [prosecutors'] office" also is a factor that courts can take into consideration at this step. *Miller-El I,* 537 U.S. 347. In Runyon's pending first motion for discovery, he has requested those kinds of historical records.

But even without having yet received any discovery, there is strong evidence that the

---

[56] Runyon refers to this as an expression of neutrality about the death penalty because options C and D straddle the center line. Question 61 included no other mechanism for venire members to indicate that they had a neutral position on the death penalty.

Government's response at Step Two is pretextual. At Step Three, the defendant is not required to show that the Government's reasons for a strike were exclusively discriminatory in order to demonstrate pretext. *Snyder*, 552 U.S. at 485. It is enough if the defendant demonstrates that the prosecution's strikes were "motivated in substantial part by race." *Foster*, 136 S.Ct. at 1755.

The first reason why the Government's explanation is pretextual is that a side-by-side comparative analysis shows its strikes were based on race. Comparative analysis is commonly used to expose pretext.[57] *See, e.g., Snyder*, 552 U.S. at 483-84; *Miller-El II.* In Runyon's case, a comparative analysis casts significant—if not dispositive—doubt on the prosecutor's claim that its strikes were nondiscriminatory. "'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.'" to be considered at *Batson*'s third step. *Foster*, 136 S.Ct. at 1754 (quoting *Miller-El II*, 545 U.S. at 241). In this context, the term "permitted to serve" means the panelist has not been excused for cause and the prosecutor has chosen not to peremptorily strike him. *See, e.g., Miller-El II*, 545 U.S. at 247-48 (comparing voir dire answer of Joe Warren, a qualified African-American who was struck by the prosecution, with answer of similarly situated white panelist Kevin Duke, who was seated on the jury, and also with answers of similarly situated white panelists Sandra Jenkins and

---

[57] This analysis typically involves comparing the oral voir dire answers given by black members with the answers to the same question given by nonblack members. It also may involve distinguishing the oral voir dire questions a party presents to black venire members from the questions that party presents on the same point to nonblack members. The voir dire in Runyon's case was too limited for such comparisons. The struck African-American members either did not answer any questions except by sitting silently (Jurors 31, 46, and 63); or answered to indicate prior jury service in a civil case (Jurors 15, 40, and 81); or answered to say they knew another member of the venire (Jurors 15 and 116). There can be no examination of disparate questioning because the Court asked all of the voir dire questions itself. Runyon is able to present strong evidence of pretext based on answers in the juror questionnaire, but he notes that the kind of limited voir dire used in this case makes it substantially easier for a party with a mind to discriminate to do so in his peremptory strikes without leaving the kind of telltale signs on which reviewing courts ordinarily must rely to expose unconstitutional strikes.

120

Leta Girard, who were accepted by the prosecution but struck by the defense).

In Runyon's case, there were two similarly situated nonblack venire members that the Government permitted to serve. One was Juror 2, who is white and was seated as a juror. The other was Juror 54, who is Asian and was permitted to serve because he was qualified and was not struck by either party, although the Government had an unused strike available that it could have used to remove him. After selection of the jury, Juror 54 was carried over to the next day for inclusion in the pool from which alternate jurors were selected. On that day he again was neither selected nor struck.

Juror 2 and Juror 54 were similarly situated because they each circled option D on Question 61 of the questionnaire, indicating that they generally oppose the death penalty. That is the option the Government identified as its criterion for exercising peremptory strikes. It is the same option circled by five of the excluded black jurors, and it is *more* anti-death-penalty than the position taken by the remaining two black jurors who were struck, who both circled options C and D.

A second reason why the Government's reason is pretextual is that it is inconsistent with the answers the excluded African-American members gave to Questions 55 and 56 on the juror questionnaire.[58] Inconsistencies are recognized hallmarks of pretext. *See, e.g., Foster*, 136 S.Ct. at 1748-49 (citing inconsistency between prosecution's arguments in *Batson* proceedings and documents in prosecution's files); *Snyder,* 552 U.S. 482-83. Question 55 asks the potential juror whether he supports, opposes, or neither supports nor opposes the death penalty. Question 56 asks how strongly he holds that view—very strongly, moderately, or not strongly at all.

Only one of the excluded African-American members gave an answer on Questions 55 and 56 that was consistent with the Government's position. That person—Juror 46—circled option D on

---

[58] The Court can consider the answers to Questions 55 and 56 on the questionnaire because they address the very same subject as Question 61 and do not expand the inquiry beyond the Government's stated reason for striking the African-American jurors.

Question 61, and also marked that she is very strongly opposed to the death penalty on Questions 55 and 56.

By contrast, Juror 40 circled option D on Question 61, but indicated on Questions 55 and 56 that she moderately *supports* the death penalty. This is inconsistent with the Government's position that it struck Juror 40 because of opposition to the death penalty. Two other excluded African-American members (Jurors 15 and 116) circled option C and option D on Question 61, thus indicating neutrality, and indicated on Question 55 that they neither support nor oppose the death penalty. Their unvarying assertions of neutrality are inconsistent with the Government's position that it struck these members because of their position on the death penalty.

Juror 2 and Juror 54, who are nonblack and were not struck by any party, circled option D and marked on Questions 55 and 56 that they neither support nor oppose the death penalty. Thus nonblack Jurors 2 and 54 stated positions that were the same as or *more* anti-death-penalty than the positions of struck Jurors 15, 40 and 116.[59]

The inconsistencies shown above support the proposition that the prosecutors' stated reason for the strikes of African-American members is pretextual, and that these strikes were motivated in substantial part by race.

### 2. The Prosecution Unlawfully Struck Jurors Based on Their Gender.

The Government also argues that it did not exercise strikes discriminatorily based on gender under *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994). Courts use the same three-step analysis as for a *Batson* claim, but the criteria for establishing a prima facie case are not necessarily identical:

> We look at all relevant circumstances when determining whether the requisite prima

---

[59] Black Jurors 31, 63, and 81, who were struck, gave answers that were the same as those of nonblack Jurors 2 and 54, who were not struck. They all circled option D on Question 61, and they all indicated on Question 55 that they neither supported nor opposed the death penalty.

facie showing has been made. *Batson*, 476 U.S. at 96. For example, a pattern of strikes against members of a particular gender may give rise to an inference of discrimination, and similarly so may a disproportionate number of peremptory challenges exercised to exclude members of a particular group. *Harris v. Hardy*, 680 F.3d 942, 949-50 (7th Cir. 2012). So too may a prosecutor's comments and statements. *See Batson*, 476 U.S. at 97. The test is not rigorous. *[U.S. v.] McMath*, 559 F.3d [657,] 664 [(7th Cir. 2009)].

*U.S. v. Johnson*, 756 F.3d 532, 536-37 (7th Cir. 2014) (internal citations omitted).

**Step One.** Runyon's §2255 motion shows that the Government peremptorily struck more than twice as many women as men—13 versus 6. Although the Government suggests that Runyon "patently" cannot make a prima facie case because he is a different gender than the venire members who were struck, *Powers* forecloses that argument. All defendants have standing to object to strikes that are based on gender. *See, e.g., United States v. Martinez*, 621 F.3d 101(2d Cir. 2010) (constitution bars male defendant from striking male jurors on account of their gender); *United States v. DeGross*, 960 F.2d 1433 (9th Cir. 1992) (en banc) (constitution bars female defendant from striking male juror based on his gender). Runyon's §2255 motion already makes a prima facie case, or he is entitled at a minimum to evidentiary development and a hearing to do so.

First, Runyon has shown that the prosecution used just over two-thirds—68 percent—of its expended strikes to remove female venire members, and it struck more than twice as many women as men. Second, Runyon relies on the fact that peremptory challenges permit those of a mind to discriminate to do so. Third, as described below, additional facts and circumstances raise an inference of discriminatory purpose.

Although these numbers are relevant for making a prima facie case, Runyon acknowledges that they do not disprove the null hypothesis of gender independence at a statistically significant level. Fisher's exact test indicates a probability of 0.24683 (24.683 percent) that the prosecutors' strikes of qualified female venire members at Runyon's trial were independent of the members' gender. To be statistically significant, the probability must be less than 0.05 (5 percent). But Runyon's pending

123

motion for discovery seeks documents that may reveal more facts and circumstances that are relevant to the prosecutors' strikes of female jurors.

Even without the benefit of discovery, Runyon can identify a reason why the Government would prefer male jurors and want to exclude female jurors. As the prosecution intended to present this case to the jury (and did present it to the jury), the prime mover and most culpable participant in the plot to kill Cory Voss was his wife, Cat—a co-defendant who escaped a death sentence by pleading guilty prior to Runyon's trial. To obtain a verdict of death for Runyon, the Government knew it had to persuade jurors that Cat's moral culpability was not greater than Runyon's. Jurors of both genders could be expected to assign the same moral weight to Cat's greed, her lies, and her active participation in the crime. But they likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as somewhat titillating and give it diminished weight; female jurors were likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars and with men (and other women) would more likely be viewed by females as contributing to greater moral culpability. Thus, excluding women from the jury would advance the Government's goal of achieving a death sentence for Runyon.

**Step Two.** With respect to the second step of a *J.E.B./Batson* analysis, the Government says that it struck nine females (Jurors 7, 28, 31, 40, 46, 52, 63, 97, and 81) because they circled option D on Question 61, indicating that they generally oppose the death penalty; and it struck four females (Jurors 15, 18, 73, and 116) because they circled both option C and option D, indicating neutrality. The Government also reports that six of these females (Jurors 7, 15, 18, 31, 52, and 63) served in the military or had relatives who presently or previously served in the military, although it again does not

124

identify that as a reasons for its own strikes.[60] In all other respects the Government's statements at Step Two regarding the strikes of African-American jurors apply to its strikes of female jurors. The Government has identified no reason for any strikes of females other than their views on the death penalty.

If the reasons proffered in the Government's response are the actual reasons for its strikes of the 13 female venire members, *see supra,* Runyon does not contest that those reasons would be gender-neutral and satisfy the Government's burden at Step Two.

**Step Three.** For the third step of the *J.E.B./Batson* analysis, Runyon again anticipates that his pending discovery motion will lead to additional relevant facts showing that the Government's reason for the strikes is pretextual. But even without the fruits of discovery, the same side-by-side comparative analysis discussed above with respect to African-Americans indicates pretext and casts significant doubt on the Government's stated reason for striking females. Specifically, there were similarly situated males that the prosecution did not strike. Juror 2 and Juror 54, who both are male, circled option D on Question 61, indicating that they generally oppose the death penalty. That is the same option circled by nine of the excluded female jurors, who also circled option D, and it is *more* anti-death-penalty than the position circled by the other four female jurors who were struck, who circled option C and option D. Male Jurors 2 and 54 were both permitted to serve.

The pretextual nature of the Government's reason is again corroborated by the inconsistencies that exist between the Government's position and the venire members' answers to questions about the death penalty. Only one excluded female member gave an answer on Questions 55 and 56 that was consistent with the Government's position. That person—Juror 46—circled option D on

---

[60] The Government has undercounted. Female Jurors 28 and 97 also indicated family members who had been in the military.

125

Question 61, and also marked on Questions 55 and 56 that she is very strongly opposed to the death penalty.

But other female jurors gave contrary answers. Juror 40 circled option D on Question 61 but indicated on Questions 55 and 56 that she moderately *supports* the death penalty. Juror 73 circled option C and option D on Question 61, but marked on Questions 55 and 56 that she *very strongly supports* the death penalty. These answers are inconsistent with the Government's position that it struck those jurors because of their views on the death penalty. Three additional female members (Jurors 15, 18, and 116) circled option C and option D on Question 61, thus indicating neutrality, and indicated on Question 55 that they neither support nor oppose the death penalty. Their unvarying assertions of neutrality are inconsistent with the Government's position that it struck these members because of their position on the death penalty.

By comparison, Juror 2 and Juror 54, who are both male and were not struck, circled option D on Question 61 and marked on Questions 55 and 56 that they neither support nor oppose the death penalty—Juror 54 holding that view at a moderate strength, and Juror 2 holding that view "not very strongly." The positions of male Jurors 2 and 54 are *more* anti-death-penalty in one or more respects than those of female Jurors 15, 18, 40, 73, and 116.

In sum, Runyon has made a strong showing that the Government purposefully discriminated in its exercise of peremptory strikes based on race and based upon gender, and thus violated Runyon's rights under the Equal Protection Clause. He is entitled, at the least, to further evidentiary development and a hearing.

### C. Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.

In response to Runyon's *Strickland* claims, the Government presents two categories of arguments. The first is that the prosecutors did not discriminate based on race or gender, and

consequently it would have been futile for defense counsel to object. This is reminiscent of the Government's argument on direct appeal, which the Fourth Circuit found unpersuasive. The Government's dismissive position there was that the references to Runyon's race and religion in the videotape exhibit were not problematic because they "'appealed not to negative aspects of Runyon's character, but to positive aspects of his identity.'" *Runyon*, 707 F.3d at 494 (quoting Appellee's Br. 33). The prosecutors' current argument, like their prior argument on appeal, reflects their understandable—but untenable—desire to avoid acknowledging their racial animus. But for the reasons Runyon has explained above, the evidence shows that the prosecutors *did* discriminate purposefully in exercising their peremptory strikes and *did* violate the Equal Protection Clause. Runyon briefly highlights those arguments in the context of *Strickland*:

1.      The Government argues that trial counsel could not have made a prima facie case because Runyon is white and male, and the struck jurors are not members of his race or gender. Competent trial counsel would have been familiar with the applicable law, would have identified the proper post-*Powers* formulation of the elements of a prima facie case, and would have made a prima facie showing of purposeful discrimination by the prosecution in this case.

2.      The Government argues that raw data alone would have been insufficient to show discrimination. Competent counsel would have been familiar with Supreme Court decisions stating that disproportionate strikes can be sufficient to raise an inference of intentional discrimination if— as Runyon has established at least with respect to racial discrimination—happenstance is unlikely to produce that disparity. Competent counsel also would have shown that Runyon's Equal Protection claim is supported by more than just raw data.

3.      At the time of voir dire, defense counsel knew the Government would put into evidence a videotape that could be racially inflammatory and contained insulting notions about Asian

men. *Runyon*, 707 F.3d at 493-94. Competent counsel would have recognized that the prosecution would not want African-Americans on the jury because black jurors could be offended by the statements in this videotape or could sympathize with Runyon as the target of racial insults. Objecting to the Government's exclusion of 70 percent of the qualified African-American venire members would have been consistent with the Equal Protection Clause and with the standards of professional performance.

4.       At the time of voir dire, defense counsel knew that Runyon's prospects of getting a life sentence would be enhanced if jurors viewed Runyon as less morally culpable than Cat Voss. Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars would more likely be viewed by females as evidence of Cat's enhanced moral culpability, and thus be beneficial to Runyon in a side-by-side comparison. Objecting to the Government's discriminatory exclusion of so many female venire members would have been consistent with the constitution and with the standards of professional performance.

5.       The Government now says it based its peremptory strikes on each potential juror's views about the death penalty, as expressed in Question 61 of the juror questionnaire, and asserts that this reason was race-neutral and gender-neutral. If the Government had made the same argument at trial, competent counsel would have shown that the Government did not strike similarly situated non-black jurors or similarly situated male jurors that gave the same answers. Counsel also would have shown that the Government's reason is inconsistent with the potential jurors' answers to Questions 55 and 56 on the juror questionnaire. Competent counsel would have demonstrated that the Government's reason for these peremptory strikes was pretextual. Doing so would have been in Runyon's interest and consistent with the standards of professional performance.

The Government's second category of arguments in opposition to the *Strickland* claim

128

concerns the personal or family military connections of the struck jurors. The Government argues that even if its own strikes may have been motivated by the venire member's race or gender, it was reasonable for defense counsel to refrain from making a *Batson* objection. It points out that three of the peremptorily struck African-Americans had been in the military or had family members who presently or previously were in the military (Jurors 15, 31, and 63), and it says that six of the peremptorily struck females had served in the military or had family connections to the military (Jurors 7, 15, 18, 31, 52, and 63).[61] The Government then imagines that "Presumably, Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer." ECF No. 497, p.131.

Even if the Government's hypothesis was true, it would not excuse counsel's failure to object to the Government's discriminatory strikes of the four African-American venire members or the five female venire members who did not have military connections. But in truth the premise of the Government's hypothesis is false:

1.     Runyon himself has both a personal and family military background, and defense counsel expected this to be a significant factor for the case in mitigation. *See, e.g.*, ECF No. 291, p.4 (all 12 jurors finding, as mitigating factors, that Runyon "served his country as a member of the United States Army and was honorably discharged," and that he "earned an associate of arts degree from Wentworth Military Academy"). Counsel knew that Runyon's mitigation case would be helped by having jurors who understood and valued his military service. They had no reason to acquiesce in the peremptory exclusion of such jurors.

2.     Defense counsel's own pattern of strikes shows that the Government's speculation is

---

[61] Actually, there were eight, not six, peremptorily female venire with personal or family military connections. The Government appears to have omitted Jurors 28 and 98.

129

erroneous, and that the defense did not fear making a *Batson* challenge with respect to potential jurors with military connections. The military has a large presence in the Norfolk Division, and by undersigned counsel's rough count, nearly half of the 52 qualified prospective jurors or their family members had present or past military connections.[62] Yet the defense used less than half (9 of 20) of its strikes to remove members with military backgrounds (Jurors 4, 32, 50, 51, 65, 74, 84, 118, and 119). If the defense had been concerned about seating jurors with military connections, it undoubtedly would have used more of its strikes to remove them—including removing the four people with military backgrounds who ultimately sat on the jury (Jurors 2, 23, 84, and 124). In truth, it is the Government that used nearly two-thirds of its expended strikes (12 of 19) to remove jurors who—under its own hypothesis—would have had sympathy for Cory Voss because of their own military connections (Jurors 7, 15, 18, 28, 31, 35, 52, 66, 91, 97, and 100).

In sum, Runyon believes that discovery and investigation will reveal additional facts that are relevant to the prosecution's strikes and to his *Strickland* claims. But even based on the facts above, counsel's failure to challenge the strikes of African-Americans and/or of females in this case was unreasonable and fell below the prevailing norms of professional performance. Runyon is entitled, at a minimum, to discovery and an evidentiary hearing on his *Strickland* claim.

Runyon's amended §2255 motion establishes that a *Batson* violation is a structural error. ECF No. 511, pp.125-26. It further establishes that "the prejudice component of the *Strickland* analysis may be presumed" if the "nature of the deficient performance is that of a structural error." *Id.*, p.140 (citing *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc)). The Government does not dispute

---

[62] Undersigned counsel counts 24 qualified venire members who listed personal or family military backgrounds on their juror questionnaire: Jurors 2, 4, 7, 15, 18, 23, 28, 31, 32, 35, 50, 51, 52, 65, 66, 74, 84, 86, 91, 97, 100, 118, 119, and 124. Because the questionnaire answers were sometimes imprecise, the count may be off by a small fraction. This list does not include venire members who described working for the military in a civilian capacity.

130

either of these principles. Although *Bell* is controlling, Runyon calls to the Court's attention that *Bell* is consistent with other courts of appeals. *See, e.g.*, *Johnson v. Sherry*, 586 F.3d 439, 446-47 (6th Cir. 2009), *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008), *Owens v. United States*, 483 F.3d 48, 64-66 (1st Cir. 2007); *McGurk v. Stenberg*, 163 F.3d 470, 473-74 (8th Cir. 1998). Runyon has shown, or with further development and a hearing will be able to show, that he is entitled to relief on his *Batson* claims and associated *Strickland* claim.

**Claim 17:  The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Counsel Rendered Ineffective Assistance.**

**A.  The Voir Dire Was Constitutionally Inadequate.**

Even if *Teague* applies to §2255 motions, which Runyon disputes, *see* Affirmative Defenses, *supra*, the Government's argument that this claim is barred by *Teague* is frivolous. The right to adequate voir dire generally, and regarding the death penalty specifically, is not a new rule. It was firmly established more than two decades before Runyon's conviction became final:

> [P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States,* 339 U.S. 162, 171-172 (1950); *Morford v. United States,* 339 U.S. 258, 259 (1950). "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion).

*Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *see also Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (recognizing constitutional right to adequate voir dire on racial bias where state charged interracial crime as capital offense, even though circumstances would not mandate same voir dire in noncapital case). To the extent Runyon's claim is defaulted, the default is excused by the deficient performance of trial counsel (Claim 17B) or appellate counsel (Claim 8).

131

Voir dire is inadequate if, under the circumstances, it does not provide the parties and court the opportunity and ability to identify unqualified jurors. The circumstances causing disqualification can include the nature of the charges, the extent of pretrial publicity, the jurors' moral or religious beliefs, or any other circumstance where a potential juror—even when well-meaning—might harbor bias. When voir dire is minimal, this raises a red flag and calls for close examination to ensure that all essential issues have been adequately addressed. The voir dire in Runyon's case, which proceeded from "Good morning" to the seating of a purportedly death-qualified jury in just one day, was minimal in multiple ways: it was conducted in an exceedingly truncated time span for a capital case,[63] it posed limited questions, and it largely accepted cursory or silent responses rather than eliciting or probing individualized views.

In *Morgan,* the Court found voir dire about the death penalty to be inadequate even though the trial court posed multiple questions and every impaneled juror was questioned individually and stated that he could be fair and impartial. Illinois said this was sufficient, but the Supreme Court disagreed. "*Witherspoon* and its succeeding cases would be in large measure superfluous were this Court

---

[63] The Westlaw database contains seven opinions or statements where the Supreme Court reported the length of voir dire in a capital case. Runyon has omitted none: *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) ("Eleven days of the *voir dire* were devoted to determining whether the potential jurors were death qualified."); *Miller-El v. Dretke*, 545 U.S. 231, 275 (2005) ("Jury selection in Miller-El's trial took place over five weeks…."); *Penry v. Johnson*, 532 U.S. 782, 801 (2001) ("*Voir dire* was a month-long process…."); *Johnson v. Texas*, 509 U.S. 350, 357 (1993) ("more than 90 prospective jurors were questioned over the course of 15 days"); *Swindler v. Lockhart*, 495 U.S. 911, 913 (1990) ("[d]uring the five days of *voir dire*") (statement dissenting from denial of certiorari); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 503 (1984) ("the voir dire [in the capital trial the press wanted to attend] consumed six weeks"); *Irvin v. Dowd*, 366 U.S. 717, 720 (1961) ("[d]uring the course of the voir dire examination, which lasted some four weeks"). The magnitude of difference between these cases, most of which took two to six weeks to seat a qualified capital jury, and Runyon's case, which seated a purportedly qualified jury in one day, should give the Court pause.

132

convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734-35.

The Government's response talks about the importance of voir dire and the Court's discretion to conduct all of the questioning, but it does not engage the specific voir dire questions (or their absence) in this case that relate to the death penalty. Those questions speak for themselves. Their required purpose was to identify potential jurors who were unqualified. As noted in the amended §2255 motion, the Court presented seven questions about the death penalty. Four of them asked only whether the jurors comprehended a principle of law:

> Tr.123, 6/30/09: If your answer is "no" to the following question, please stand. Do you understand that the law never requires that a person be sentenced to death? (No response.)

> Tr.123, 6/30/09: Again if your answer is "no" to any of the following questions, please stand. Do you understand that the law never requires a person to be sentenced to death, even if they have been convicted of being the triggerman in a murder for hire case? (No response.)

> Tr.123-24, 6/30/09: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of carjacking is so convicted? (No response.)

> Tr.124, 6/30/09: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of bank robbery? (No response.)

These questions did nothing to expose unqualified jurors. They were even less probative than the inadequate follow-the-law questions posed in *Morgan.* These questions called abstract principles of law to the prospective jurors' attention, but they did not ask each juror whether, based on her own views about imposition of the death penalty, she would be able and willing to comply with that law if put to the test. The questions certainly were not phrased to expose jurors who would automatically vote for the death penalty—an inquiry that is mandatory on request in a capital case. *Morgan,* 504 US 719, 729.

133

The Government says Runyon's criticism of these questions places form over substance, but that is effectively the argument Illinois unsuccessfully made in *Morgan*. The questions the Court asked in Runyon's case differed in substance, not merely in form, from those that *Morgan* mandates. There is no evidence that attentive lay jurors would have discerned and answered the questions the trial court was required to ask rather than the ones it did ask. And we should be grateful for that, because jury selection would devolve into chaos if potential jurors were free to decide willy-nilly that the Court really must have meant to ask a different question, and they answered the imagined question rather than the question the Court actually posed.

Other than these four do-you-understand-the-law questions, the Court asked only three other questions related to death qualification.[64] The first, viewed most generously, asked jurors if they could refrain from making a sentencing decision until they had heard the penalty phase evidence:

> Tr.59, 6/30/09: Is there anyone who doesn't understand that, as I indicated, if it is appropriate, in a second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? Do any of you feel you cannot do that? If so, please stand.

The other two questions were intended to detect jurors with views preventing or substantially impairing their duties:

> Tr.124, 6/30/09: Please stand if your answer is "yes" to the following question. Do you have personal or moral opinions regarding the imposition of the death penalty that would substantially impair your ability to weigh the aggravating and mitigating factors and follow the court's instructions regarding the death penalty?

> Tr.124, 6/30/09: Again, please stand if your answer is "yes" to the following question. Would your personal or moral views about the death penalty prevent or substantially impair the performance of your duties as juror in accordance with your instructions given to you by the court and your juror's oath? Stand if your answer is "yes."

---

[64] Although this reply focuses on voir dire concerning capital punishment questions, Runyon does not concede that voir dire was adequate on any other issues.

134

These questions were important, but they were inadequate to carry the entire weight of revealing whether some of the prospective jurors were unqualified to decide on the appropriate sentence. First, these last two questions asked jurors to judge their own impartiality—a task that few people are capable of performing with objectivity, as the Supreme Court observed in *Morgan*, 504 U.S. at 735 n.9; *see also* Christopher Robertson, David Yokum & Matt Palmer, *Can Jurors Self-Diagnose Bias? Two Randomized Controlled Trials*, ARIZONA LEGAL STUDIES DISCUSSION PAPER NO. 12-35 (accepted for 7th Annual Conference on Empirical Legal Studies, draft Feb. 14, 2013) (online at http://www.mslitigationreview.com/files/2013/05/Can-Jurors-self-diagnose-bias-2.pdf)).   Noting the unreliability of such self-diagnoses, *Morgan* appears to contemplate that the court itself should be the judge of each juror's impartiality after hearing the juror's explication of his personal or moral views about the death penalty and about mitigation evidence. Second, the Court needed to ask proper reverse-*Witherspoon* questions, which counsel requested, Tr.116, 6/30/09, and which *Morgan* thus required the court to pose, 504 U.S. at 736: "Do you believe the death penalty should always be imposed if a defendant is found guilty of murder?" "Of being the triggerman in a murder-for-hire?" "Of committing murder in the course of carjacking?" "Of committing murder in the course of bank robbery?" Each of these unasked questions was designed to expose prospective jurors who were disqualified.

Runyon also claims that in the totality of circumstances, voir dire is inadequate when 40 percent of the purportedly qualified jurors—21 out of 52—were able to remain silent and effectively unnoticed during the questioning. All that anyone learned at voir dire about these nonspeaking venire members is that they knew how to sit impassively and say nothing. As noted in the §2255 motion, a potential juror's failure to stand might mean her answer to a question was no; it also might mean she was avoiding the question because a truthful answer would be embarrassing or painful, or because she

was trying to increase (or decrease) the likelihood of being seated in this case. When venire members are called upon individually, however, they are compelled to respond in an affirmative way. If they engage in subterfuge or evasion, the court (and counsel) can observe and assess their inflection, sincerity, demeanor, candor, body language, and understanding. As the Supreme Court observed in *Reynolds v. U.S.*, 98 U.S. 145, 156-57 (1878), "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words."

The Government argues that Runyon has not proffered evidence suggesting that a qualified juror concealed a bias. No proffer is required. The defendant's death sentence in *Morgan* was vacated without any such evidence. *Morgan* shows that when voir dire is inadequate to reveal *whether* a juror may be unqualified, that alone is enough to necessitate reversal. *Morgan,* 504 U.S. at 739. Even if more was required, there are two interrelated reasons why Runyon has not identified a venire member who concealed his disqualification. First, because essential questions were not asked (or were answered by silence), the record does not contain responsive statements that Runyon can mine for evidence of bias—or lack of bias. Second, Runyon cannot further investigate any concealed basis for disqualification without communicating with members of the venire, which the Court has repeatedly ordered him not to do.

The Government's response to Runyon's claim also contains a series of misdirected arguments. First, it asserts that Runyon has failed to demonstrate either prong of an allegation of juror dishonesty under *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984). ECF No. 536, pp.151, 153-54. But Runyon's amended §2255 motion does not presently include a claim under *McDonough*. His claim is one of inadequate voir dire, which is a different legal issue with a different legal standard.[65]

---

[65] The Government apparently interprets Runyon's references to Juror 124's silence (ECF No. 511, pp.135-36) as being a *McDonough* allegation that Juror 124 was disqualified. Those references do not constitute a claim. They show that Runyon was not being fanciful or hypothetical when he said

136

Second, the Government argues there was no error because trial courts have discretion to question potential jurors and to conduct that questioning collectively rather than individually. ECF No. 536, pp.150-51. Runyon has not alleged that the Court lacked such authority, and in different circumstances court-conducted collective voir dire might be unobjectionable. Runyon's amended §2255 motion simply alleges that the voir dire *in this capital case* was inadequate, and that constitutional violations *in this capital case* are attributable to, or were exacerbated by, the Court's manner of conducting voir dire. Whether this is called legal error or abuse of discretion, *Morgan* mandates reversal because the voir dire *in this capital case* did not provide the protections guaranteed by the Fifth and Sixth Amendments.

Third, the Government argues that voir dire about the death penalty was adequate because the court had already informed potential jurors that they would be instructed on the law and would be required to follow that law. ECF No. 536, pp.154-55. But instructions and judicial exhortations are not acceptable substitutes for adequate voir dire because they do not identify "prospective jurors who will not be able impartially to follow the court's instructions." *Rosales-Lopez*, 451 U.S. at 188.

Fourth, citing two Fourth Circuit decisions in noncapital cases that were decided before *Morgan*, the Government argues that voir dire is not per se inadequate just because it is completed in one day. ECF No. 536, p.152. Runyon agrees that impartial juries can be seated in one day or less in many noncapital cases, although some cases will require multiple days of voir dire. But even if adequate voir dire could be completed in one day in a *capital* case, which Runyon doubts and which experience does not bear out, *see supra* note 63, his §2255 motion alleges that the voir dire *in this capital case* was not adequate to impanel an impartial jury because the Court did not ask necessary questions.

---

the Court's method of voir dire made it easy for potential jurors to remain silent rather than being forthcoming with their answers.

**B.  Counsel Rendered Ineffective Assistance Regarding Voir Dire.**

Runyon alleges in his §2255 motion and above that the Court bears responsibility for the constitutional inadequacy of the voir dire because it conducted all of the questioning itself. It made the ultimate decisions on which questions to ask (or not ask) and how to ask them. In the alternative, Runyon alleges that defense counsel rendered ineffective assistance in failing to object to the constitutionally inadequate voir dire. He also asserts that if his claim of error by the Court is defaulted, the deficient performance of trial or appellate counsel is cause for the default.

**1.  Trial Counsel**

Runyon's motion alleges four respects in which trial counsel's conduct regarding voir dire fell below the norm of professional performance. ECF No. 511, p.138. In response, the Government asserts only that counsel's performance was not deficient in these respects because they filed *other* motions and made *other* objections concerning jury selection. But the Supreme Court "ha[s] never held that counsel's effort to present *some* [challenges to voir dire] should foreclose" a claim that counsel were ineffective in failing to present others. *Sears v. Upton*, 561 U.S. 945, 955 (2010). In Runyon's case, trial counsel's filing of other motions and objections is evidence that they recognized the supervening importance of voir dire and the imperative of properly qualified jurors in a capital case. This is consistent with the conventional wisdom of experienced trial lawyers "that most trials are won or lost in jury selection ... [and] in many capital cases, jury selection is literally a matter of life or death." John H. Blume, Sheri Lynn Johnson & A. Brian Threlkeld, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209-11 nn.1&2 (2001) (collecting treatises and journal articles about lawyers' views of voir dire in capital cases); *see also* ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. at 1049, 1051.

*Morgan* contains a clear statement of the law regarding voir dire that concerns the death penalty, and defense counsel failed to protect Runyon's Fifth and Sixth Amendment rights under *Morgan*. When the trial court purported to grant Runyon's motions but failed to follow through—such as by posing do-you-understand-the-law questions rather than accurate reverse-*Witherspoon* questions— defense counsel had a duty to object and demand the inquiry that *Morgan* required. They did not.

As to prejudice, the Government makes conclusory assertions that the voir dire was not constitutionally infirm in the first instance. It implicitly concedes that Runyon was prejudiced if voir dire was not adequate. Even without such a concession, Runyon would be entitled to relief under *Morgan*, because inadequate voir dire requires vacating a death sentence without showing that a biased juror was seated. Because *Morgan* treats the failure to ask certain voir dire questions as structural error—requiring vacation of the sentence without any showing that a biased juror was seated—the prejudice prong of the ineffective assistance claim may be presumed. *Bell v. Jarvis*, 236 F.3d at 165, 180.[66]

### 2. Appellate Counsel

Regardless whether the inadequacy of voir dire was preserved at trial, appellate counsel rendered ineffective assistance in failing to raise it on direct appeal, as alleged in Claim 8. Even under a plain error standard, it was a winning claim: (1) trial counsel requested reverse-*Witherspoon* questions;

---

[66] Although *Strickland* prejudice does not apply to a *Morgan* claim, Runyon notes the Government's response again misstates the *Strickland* test of prejudice. Runyon need not show that there would have been a different outcome or that he would have prevailed on direct appeal if voir dire had been adequate. He does not even have to establish by a preponderance of the evidence that the result would have been different. *Williams*, 529 U.S. at 405-06. Runyon need only demonstrate "a reasonable probability that … the result of the proceeding would have been different." *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Such a determination may require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

(2) the Court was mandated by *Morgan* to ask those questions; (3) the Court didn't. Even without considering the additional ways in which voir dire was inadequate, this would have mandated reversal without any showing that a juror was biased. On the merits, there is no ground on which the court of appeals could have refused to vacate Runyon's sentence, and thus no issue that was actually raised on appeal was stronger.

**Claim S2:    The Trial Court Unlawfully Excluded the Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated.**

Runyon's motion for leave to seal the reply to this claim was filed on this date, ECF No. 546. The Court entered an Order granting the motion to file under seal on this date, ECF No. 548.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: July 7, 2016

140

CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2016, I have electronically filed the foregoing Reply to Response of the United States to Amended Motion to Vacate, Set Aside, or Correct Sentence with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

141