concern. But that is not the case before the court. Here, the jury found the Petitioner eligible for death after finding the age requirement, a gateway factor, and two statutory aggravators during the eligibility phase. Special Verdict Form – Eligibility Phase, ECF No. 255. The aggravating factors of committing the crime in expectation of pecuniary gain and after substantial planning do serve to narrow the class of defendants. Not all murders are committed with substantial planning, and many murders are done without any promise or intent of payment.[49] These factors are not vague, and they apply to only a subclass of those convicted of murder. See Tuilaepa, 512 U.S. at 972 (stating that an aggravating circumstance must "not apply to every defendant convicted of a murder," but instead must "apply only to a subclass of defendants convicted of murder").

For the above reasons, the court finds that these statutory factors performed the required narrowing function to prevent

---

[49] The Fourth Circuit has recognized that a "murder for hire" aggravator performs a proper narrowing function, even if the underlying conviction for first-degree murder required a finding of that same murder contract. Grandison v. Corcoran, 225 F.3d 654, 2000 WL 1012953, at *11 (4th Cir. 2000) (unpublished table decision) ("[T]here is no question that Maryland's 'murder for hire' aggravating circumstance narrows the death-eligible pool of murderers, as not every person convicted of first-degree murder will have taken out a murder contract on his victims."). This factor is similar to the pecuniary gain aggravator in the Petitioner's case.

arbitrary application of the death penalty. That they overlap with facts of the Petitioner's specific crime of conviction does not mean he suffered a violation of his constitutional rights. As this claim has no merit and it is not clearly stronger than any claim raised on appeal, the Petitioner's appellate counsel was not ineffective for failing to argue it on appeal. Thus, the claim is not only without merit, but it is also procedurally defaulted.

### 4. The Petitioner's Non-Statutory Aggravating Factor Claim

In addition to the two statutory aggravating factors found during the eligibility phase, the jury also found four non-statutory aggravating factors during the penalty selection phase.[50] The Petitioner now argues that these factors were "arbitrarily determined by the prosecutors, limited only by

---

[50] These factors are that the Petitioner (1) "caused injury, harm, and loss to the victim . . . and the victim's family and friends"; (2) "utilized training, education, and experience" gained during criminal justice college courses and his time in the Kansas National Guard, as a law enforcement officer, and as a member of the United States Army; (3) "engaged in acts of physical abuse towards women"; and (4) "demonstrated a lack of remorse." Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

their imaginations," and were not based on any clear, objective standard. Mot. at 104.[51]

### a. Bar on Relitigation

The government argues that this claim is barred because it was raised on direct appeal, and regardless, it has no merit. Resp. at 117. The Petitioner did challenge the non-statutory aggravating factors on appeal. Runyon, 707 F.3d at 492-507. Although the factor involving the use of his education and law enforcement training during commission of the crime was challenged for being vague or overbroad,[52] which is part of his current argument, the other factors were challenged for different evidentiary or constitutional reasons. Therefore, there is no relitigation bar to the aggravating factors of harm to the victim and his family, lack of remorse, and abuse of women.

---

[51] The court notes that the Petitioner brought this same challenge before trial. At that time, the Petitioner argued that the non-statutory aggravators were not based on clear and objective criteria, but were "restricted only by the imagination of the prosecutor," thus presenting a risk that the "death penalty [would] be imposed arbitrarily and capriciously." ECF No. 91, at 52-54. The Petitioner later filed an objection arguing that the factors were vague and overbroad. ECF No. 195. The court denied the motions and overruled the objections. ECF Nos. 143, 217.

[52] The Fourth Circuit found that this factor was neither vague nor overbroad. Runyon, 707 F.3d at 502-03.

153

**b. The Prosecution's Use of Non-Statutory Aggravating Factors in the Petitioner's Case**

To begin, it is established that the FDPA permits the inclusion of non-statutory aggravating factors during the penalty selection phase. See 18 U.S.C. § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists."). The purpose for an aggravating factor, either statutory or non-statutory, is to "genuinely narrow the class of persons eligible for the death penalty" and "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877. "Once a defendant has been rendered eligible for the death penalty by the jury's finding of a statutory aggravating factor, the use of nonstatutory aggravating factors serves only to individualize the sentencing determination." United States v. Higgs, 353 F.3d 281, 320 (4th Cir. 2003).

To prevent an arbitrary and capricious application of the death penalty, aggravating circumstances may not be vague or overbroad. See Tuilaepa, 512 U.S. at 973. A factor is unconstitutionally overbroad "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty." Arave v. Creech, 507

154

U.S. 463, 474 (1993); see also Tuilaepa, 512 U.S. at 972 (explaining that a factor "must apply only to a subclass of defendants convicted of murder"). A factor is vague if it lacks "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding'". Id. at 973 (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976) (White, J., concurring)). As vagueness review "often 'is not susceptible of mathematical precision,'" it is "quite deferential." Id. (quoting Walton v. Arizona, 497 U.S. 639, 655 (1990)).

The court now finds that the non-statutory factors in the Petitioner's case are not vague or overbroad, and did not lead to an arbitrary and capricious application of the death penalty. There is a common-sense meaning to the factors, which is easily understood by a jury, and the factors could not fairly apply to every defendant eligible for the death penalty. Many defendants do feel remorse for their crimes, and do not attempt to constantly hinder the investigation in an attempt to receive monetary gain for their illegal acts. While many defendants may have a criminal history, their criminal history does not necessarily involve abuse of women. That is a specific category of violence used to narrow those individuals subject to the death penalty, and the Petitioner fails to show how this factor is overreaching. Although the impact on the victim's family may

155

apply to most crimes, the Supreme Court has held that such evidence is not barred by the Eighth Amendment, as it may aid the jury in its individualized determination about whether to apply the death penalty. See Payne v. Tennessee, 501 U.S. 808, 827 (1991). Further, these factors do not require technical knowledge to be understood, and could not be considered vague. Although the Petitioner may not relitigate this issue, the court also notes the Fourth Circuit's holding on direct appeal that the aggravating factor of using military and law enforcement training in commission of a crime is not vague or overbroad. Runyon, 707 F.3d at 502-03.[53] As such, the Petitioner has failed to convince the court that these factors led to an arbitrary or capricious application of the death penalty, or failed to perform a proper narrowing function.

---

[53] The Petitioner acknowledges that he challenged this factor on direct appeal for being vague or overbroad, but he claims his new argument is that the factors are arbitrary and capricious. Reply at 87 n.34. The court notes, however, that he includes an overbreadth argument in this challenge, Mot. at 102-03, and evaluating whether the factors are arbitrary and capricious involves looking at whether they are vague or overbroad. For that reason, the court finds that he cannot relitigate this claim. Regardless, the court finds it has no merit. As seen in the Fourth Circuit's ruling, this factor is not vague or overbroad, and the Petitioner fails to show that the prosecutor improperly chose this factor or that a factor related to using the skills acquired in law enforcement training to murder someone is in any way arbitrary or capricious.

Moreover, although the government has discretion in choosing the non-statutory factors, such a decision is not determined by the mere whim of the prosecutor. The factors have to be narrow and contain a common-sense meaning, and be designed to aid the jury in making its decision. The non-statutory factors at issue here follow these rules. The Petitioner can point to no convincing reason why such narrow and specific factors caused the death penalty to be imposed in an unconstitutional manner; nor does he present any evidence that the prosecution acted arbitrarily or capriciously in using its discretion to choose these factors. Accordingly, the court finds this claim has no merit.

### c. Ineffective Assistance of Counsel

The Petitioner also briefly alleges ineffective assistance of appellate counsel for not raising this specific challenge to the non-statutory factors on appeal. Reply at 87. Considering that the court now finds this claim lacks merit, the Petitioner is unable to show that the arguments raised on appeal are weaker than this claim, or that there is a reasonable probability of a different outcome had appellate counsel included this argument in their brief. As such, the Petitioner fails to prove ineffective assistance of appellate counsel with regard to the non-statutory aggravating factor claim.

157

## 5. Conclusion

The challenge to the statutory aggravating factors is procedurally defaulted, as well as without merit, and the challenge to the non-statutory aggravating factors is without merit. The Petitioner also fails to show ineffective assistance of appellate counsel for not raising this specific challenge to the non-statutory factors on appeal. Thus, Claim Eleven is DENIED.

### L. CLAIM TWELVE – THE PETITIONER ARGUES THAT THE GOVERNMENT ENGAGED IN SELECTIVE PROSECUTION BASED ON RACE, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM DURING DIRECT PROCEEDINGS.

In this claim, the Petitioner argues that his rights were violated when the prosecution unconstitutionally sought the death penalty against him based on his race, and his trial and appellate counsel were ineffective for not challenging this decision or raising this claim on appeal. Mot. at 105.[54] He also

_____

[54] The government treats this claim as a single claim for ineffective assistance of counsel. Resp. at 118. In his Reply, the Petitioner clarifies that Claim Twelve involves "intertwined claims of selective prosecution . . . and trial counsel's ineffectiveness for failing to pursue that claim." Reply at 88. Likely due to this misunderstanding, the government has failed to raise the affirmative defense of procedural default for the underlying selective prosecution claim. See Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999) (treating procedural default as an affirmative defense that must be pled by the government). As such, the court will examine the merits to determine if the

seeks extensive discovery for this claim. First Mot. for Discovery at 12-21.

### 1. Standard for Selective Prosecution Claims

Selective prosecution claims require a "court to exercise judicial power over a 'special province' of the Executive." United States v. Armstrong, 517 U.S. 456, 464 (1996). The Attorney General and United States Attorneys are designated by statute as the President's delegates to ensure the faithful execution of the nation's laws, and they have broad discretion in how to discharge this duty. Id. To prevent a chilling effect on law enforcement and the impairment of an executive function, courts require clear evidence of an equal protection violation to overcome the deference given to these executive officers. See id. at 465.

When arguing selective prosecution, "[t]he claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Id. at 465 (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)). To establish a discriminatory effect in a race case, the petitioner "must show that similarly

---

Petitioner has shown either selective prosecution or ineffective assistance for failing to raise such a challenge.

situated individuals of a different race were not prosecuted."
Id.; see also United States v. James, 257 F.3d 1173, 1179 (10th
Cir. 2001) ("[A] defendant cannot satisfy the discriminatory
effect prong by providing statistical evidence which simply
shows that the challenged government action tends to affect one
particular group. Rather, the proffered statistics must address
the critical issue of whether that particular group was treated
differently than a similarly-situated group."). Discriminatory
intent is shown through evidence that "the decision to prosecute
was 'invidious or in bad faith.'" United States v. Olvis, 97
F.3d 739, 743 (4th Cir. 1996) (quoting United States v.
Greenwood, 796 F.2d 49, 52 (4th Cir. 1986)).

When attempting to prove discriminatory effect, a
petitioner must do more than provide vague conclusory statements
or generalities. See United States v. Roane, 378 F.3d 382,
400-01 (4th Cir. 2004) (holding that such statements were not
even enough for an evidentiary hearing). Further, it is not
enough for a petitioner to rely on raw statistics to prove
selective prosecution. In United States v. Bass, 536 U.S. 862,
863-64 (2002) (per curiam), the Supreme Court held that
discovery for a selective prosecution claim was not warranted
based on nationwide statistics showing differences in the
percentage of death-eligible charging decisions, based on race.

160

The Court stated that the petitioner must make a showing of discriminatory effect by comparing himself to similarly situated defendants, not merely by showing a nationwide pattern of charging decisions. Id. at 864.

### 2. The Petitioner's Argument for Selective Prosecution

To support his claim, the Petitioner cites several studies regarding imposition of the death penalty. Mot. at 106-07. These reports include a declaration by Lauren Cohen Bell, Ph.D.; a report by a subcommittee to the Judiciary Committee from 1994; and a Department of Justice survey of death penalty cases from 1988 to 2000. Id. All of these studies deal with nationwide statistics, and the focus is quite broad. There is no way to narrow down the statistics to find cases with defendants who are similarly situated to the Petitioner. See Bass, 536 U.S. at 863-64 ("Even assuming that the Armstrong requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants."). Simply relying on raw data about the race and gender of the defendants, sometimes with a brief mention of the charge, is not enough to show selective prosecution. The court further recognizes that many of the studies deal with statistics from

161

the 1980s and 1990s, while the crime at issue occurred in 2007, and was prosecuted in 2008-09.

Even the broad statistics in these studies do not necessarily involve the same issues as the Petitioner's case. The Lauren Cohen Bell ("Bell") study cited by the Petitioner evaluates sentencing outcomes when the victim is a white female. Mot. Attach. 38. In this case, the victim is a white male. Also, the Bell study evaluated sentencing outcomes, see id. at 3, but the Petitioner challenges the actual charging decision made by the prosecutor. Further, the Bell study, as with the other reports cited by the Petitioner, relies simply on raw statistics and fails to explore cases in enough depth to determine how similarly situated defendants are treated. See id. at 3-6. The Petitioner does mention statistics from the Eastern District of Virginia, see Mot. at 107, but the statistics fail to show anything other than the race and gender of the defendant and victim. They do not explain how the Petitioner was allegedly treated differently from defendants who were similarly situated to him, as an individual whose "mother is Korean" and whose "father is a white American." See id. at 2.

The Petitioner also references his own co-defendants as proof that similarly situated defendants were not given the death penalty. Id. at 108-10. He argues that his two white

162

co-defendants were not authorized for the death penalty, even though they both had three statutory aggravating factors, and he only had two. Id. at 108. He also argues that the aggravating factors were stronger in the cases of his co-defendants than in his case. Id. at 109.[55]

It is not enough for the Petitioner to simply point to his co-defendants to show unequal treatment, when there are many differences between their cases and the Petitioner's. Cat Voss pled guilty, and thereby avoided any chance of the death penalty. While Draven exercised his right to go to trial, that is not enough to show discriminatory effect. The prosecution had any number of distinctions to take into account when considering all the facts of the crime, including the fact that the Petitioner was the individual who waited for the victim at the ATM machine, actually pulled the trigger and shot the victim, multiple times, and agreed to receive payment to kill a man he did not know; these factors are important considerations when

---

[55] The court has already addressed parts of this argument in Claim Two, Part IV.B, which alleges that Draven had a more violent past than the Petitioner, and in Claim Four, Part IV.D, which alleges that the Petitioner's co-defendants were more involved in the planning of the crime than the Petitioner. The court denies both claims, and incorporates its reasoning into the relevant parts of this claim.

making the decision about whether to seek the death penalty.[56]
Accordingly, the Petitioner fails to show that he was treated
differently from similarly situated defendants, because his co-
defendants were not similarly situated to him.

Further, the Petitioner is unable to provide proof that
there was discriminatory intent, as he does not present evidence
that the decision to seek death authorization was invidious or
in bad faith. See Olvis, 97 F.3d at 743. The Petitioner points
to the prosecution's introduction of an interrogation video in
which law enforcement commented on the Petitioner being "an
honorable Asian man," when trying to get a confession. Mot.
at 110. While the Fourth Circuit held that admitting the video
was error, it held that it was harmless error. Runyon, 707 F.3d

---

[56] The Fourth Circuit noted that

> the prosecution exercised its discretion on the
> basis of a number of distinctions between Runyon
> and the other defendants — including that Runyon
> was the actual triggerman in the murder-for-hire
> scheme; that he accepted payment for killing
> someone who was essentially a complete stranger;
> and that he not only never cooperated with the
> investigation but sought to thwart it at
> virtually every turn.

Runyon, 707 F.3d at 520 n.6. The court then stated that based on
this evidence, overturning the Petitioner's sentence would
exceed its authority, as the Petitioner provided no evidence of
an impermissible basis for seeking the death penalty, such as
race or religion. Id.

at 498. The trial lasted several weeks, and the video was just over forty-two minutes long, with the reference to the Petitioner's race just a small part of that length. Id. at 492. The introduction of this video, which provided partial support to one non-statutory aggravator, is not enough to show that the government had an invidious or bad faith motive in seeking the death penalty against the Petitioner. As the Petitioner fails to show both discriminatory effect and discriminatory intent, he does not make out a claim for selective prosecution.

### 3. Ineffective Assistance of Counsel

The Petitioner also argues that his trial and appellate counsel were ineffective for not objecting during direct proceedings to this allegedly discriminatory application of the death penalty. Mot. at 105. To prove a claim of ineffective assistance of counsel, the Petitioner must show deficient action by counsel and resulting prejudice. See Strickland, 466 U.S. at 687. Counsel was not deficient in failing to raise this meritless challenge at the trial or appellate level. As to the trial level, counsel's choice not to raise a claim, with a high burden of proof and little, if any, supporting evidence, does not fall below objectively reasonable norms. At the appellate stage, this claim is not any stronger than the claims counsel

did raise, and the circuit court noted its assessment of the exercise of prosecutorial discretion in the case. Runyon, 707 F.3d at 520 n.6.[57] Additionally, the Petitioner cannot show any prejudice from failure to raise this argument earlier, as the claim is without merit, and there is no reasonable probability of a different outcome had this claim been raised by trial or appellate counsel. Claim Twelve is **DENIED**.

### 4. Discovery

The Petitioner requests discovery of fourteen different categories of documents dealing with the prosecution's death eligibility determination. First Mot. for Discovery at 18-20. To obtain discovery in a selective prosecution claim, the petitioner must be able to produce "'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." Olvis, 97 F.3d at 743 (quoting Armstrong, 517 U.S. at 469). The reason for this heightened standard is that the costs associated with the government's response to a prima facie case of selective prosecution, such as diverting prosecutorial resources and intruding on the Executive's function, are also implicated and imposed by discovery. See Armstrong, 517 U.S. at 468. Therefore, a

---

[57] See supra note 56 and accompanying text.

petitioner must do more than simply provide raw nationwide statistics to be granted such discovery. See Bass, 536 U.S. at 863-64.

As discussed above, Part IV.L.2, the Petitioner does not meet even the threshold requirements for a selective prosecution claim. While the discovery standard is lower than actually proving selective prosecution, the Petitioner still does not meet the discovery standard. The studies the Petitioner cites do not make a credible showing of discriminatory intent and effect. The studies are limited in time, are based on nationwide data, and do not involve an analysis of similarly situated individuals who did not receive the death penalty. Further, based on the differences between the involvement of the Petitioner's co-defendants in the crime, and Cat Voss's decision to plead guilty, the Petitioner is unable to make a credible showing that similarly situated defendants were not authorized for the death penalty. His reference to the brief mention of race in the interrogation video hardly meets the requirement of showing some evidence of an invidious or bad faith prosecutorial intent. Accordingly, the court finds that the Petitioner fails to make even a good cause showing for discovery, let alone some evidence of a credible showing of discriminatory intent or effect. His

167

request for discovery and corresponding interrogatories is DENIED.

### M. CLAIM THIRTEEN – THE PETITIONER ARGUES THAT HIS DEATH SENTENCE IS DISPROPORTIONATE AND IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS, AND COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS CHALLENGE DURING DIRECT PROCEEDINGS.

In this claim, the Petitioner argues that his sentence is disproportionate and in violation of the Fifth and Eighth Amendments. Mot. at 111. He asserts this is because his two co-defendants were not death authorized, and he claims that this implies an arbitrary and capricious application of the death penalty. Id. He also presents a separate argument that his trial and appellate counsel were ineffective for failing to raise this claim during earlier stages of the proceeding. Id.

### 1. Procedural Arguments

The government argues that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 126. The court fails to understand the purpose of this argument, as there has been no change in the relevant procedural law since the Petitioner's conviction became final. As such, it finds the claim is not barred by the Teague non-retroactivity doctrine.[58]

---

[58] See supra Part III.A.4.

168

The government's next procedural challenge is that the ineffective assistance claim is untimely because that claim appeared for the first time in the amended Motion, id. at 128, which was filed more than one year after the Petitioner's conviction became final. See 28 U.S.C. § 2255(f). However, the claim for ineffective assistance is grounded in the failure by trial and appellate counsel to raise the underlying claim of disproportionality in seeking the death penalty. The court finds that because the same conduct that gave rise to the underlying claim forms the basis of the ineffective assistance of counsel claim, the ineffective assistance claim is timely.[59]

The government also asserts that Claim Thirteen is procedurally defaulted. Resp. at 125. The Petitioner argues that the claim is based on information that the government failed to provide under Brady, which would provide cause to excuse default, Reply at 91, but it is unclear what materials the government supposedly withheld that would provide support for this claim. The Petitioner also argues that trial and appellate counsel were ineffective for not raising this claim earlier, and that such ineffectiveness should excuse the default. Id. As such, the court will now examine the claim to determine if the

_____

[59] See supra note 43.

169

Petitioner can prove ineffective assistance of counsel, both as its own independent constitutional claim and as a means to overcome procedural default.

## 2. Disproportionality of the Petitioner's Sentence

The Petitioner contends that the imposition of the death penalty was arbitrary and inconsistent, and it was disproportionate when compared with his co-defendants, who were not death-authorized. Mot. at 111. In support, he relies on Furman v. Georgia, 408 U.S. 238 (1972). In that case, the court addressed the application of the death penalty and stated that it may not be applied in an arbitrary or capricious manner. Furman, 408 U.S. at 309-10 (Stewart, J., concurring). Due to the severity and finality of such a punishment, the Eighth and Fourteenth Amendments could not allow the death penalty to be "so wantonly and so freakishly imposed." Id. at 310. To avoid such an application of the death penalty, a meaningful objective system of review is required. See Proffitt v. Florida, 428 U.S. 242, 259-60 (1976); see also Spaziano v. Florida, 468 U.S. 447, 460 (1984), overruled on other grounds by Hurst v. Florida, 136 S. Ct. 616 (2016) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish

170

between those individuals for whom death is an appropriate sanction and those for whom it is not.").

The Petitioner claims that such an objective system of review was not used in his case, because his co-defendants were not death-authorized, even though he argues that they were more involved with the planning of the crime than him. Mot. at 112-13. Draven and Cat Voss were also charged with three statutory aggravating factors, whereas the Petitioner was charged with only two. See Indictment at 13-14.

In the event this claim is meant as a claim for proportionality review in general, the Petitioner fails to make such a case. Precedent provides that proportionality review, while a safeguard against arbitrary death sentences, is by no means constitutionally required. See Pulley v. Harris, 465 U.S. 37, 44-45 (1984) ("Needless to say, that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. . . . Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement."). Further, as the Petitioner even recognizes, see Reply at 90 n.37, the lack of proportionality review by the FDPA does not make the statute unconstitutional. See United States v. Higgs, 353 F.3d 281, 320-21 (4th Cir. 2003) (rejecting claim that the FDPA violates

171

the Eighth Amendment "because it does not require proportionality review of a death sentence").

As to the issue of the involvement by the Petitioner versus his co-defendants, just because the Petitioner's participation in the crime differed from that of his co-defendants, does not mean that it was arbitrary or capricious to seek the death penalty against only him. Deciding whether to authorize a defendant for the death penalty requires a look at the individual person and his involvement in the crime. As the court in Enmund v. Florida stated:

> The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for [the defendant's] own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence."

458 U.S. 782, 798 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605 (1978)).

The Petitioner argues that this case supports his contention that courts should look at the sentences of co-defendants and accomplices when determining a defendant's culpability. Mot. at 112. To the extent Enmund addressed the comparison of co-defendants' conduct, it was to note that the defendant was only a minor participant in the crime, and did not

172

actually shoot or rob the victim. Enmund, 458 U.S. at 787-88. The Supreme Court then looked at the defendant's individual culpability for just the acts he performed to determine if the death sentence was warranted. Id. at 801 ("For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt.").

Accordingly, this court needs to look at the Petitioner's own involvement in the crime when determining if the death penalty was imposed in an arbitrary and capricious manner. Here, as already discussed in addressing selective prosecution in Claim Twelve, Part IV.L.2, the facts show extensive involvement by the Petitioner, and the Fourth Circuit stated that

> the prosecution exercised its discretion on the basis
> of a number of distinctions between Runyon and the
> other defendants—including that Runyon was the actual
> triggerman in the murder-for-hire scheme; that he
> accepted payment for killing someone who was
> essentially a complete stranger; and that he not only
> never cooperated with the investigation but sought to
> thwart it at virtually every turn.

Runyon, 707 F.3d at 520 n.6. Unlike the defendant in Enmund, who was a minor participant and did not shoot the victim, the evidence showed that the Petitioner was actively involved in the planning of the crime. He had numerous discussions with his

173

co-defendant, Draven, to plot the murder. He assembled the necessary items in his "shopping list" to carry out the crime; he brought the .357 magnum the day of the crime; and he traveled from West Virginia to Hampton, Virginia, and waited for the victim at the Langley Federal Credit Union ATM. Finally, he was the one who pulled the trigger and killed Cory Voss. While his co-defendants were also engaged in the planning of the crime, that does not lower the Petitioner's culpability, especially as Cat Voss, the victim's spouse, pled guilty and was able to avoid the death penalty, and instead received four concurrent life sentences.

The Petitioner further argues that the other aggravating factors in his case are evidence of disproportionality. Mot. at 112-13. He contends that Draven had a much more violent background than him, and that this should have decreased the weight of the violence against women aggravator introduced against him. Id. This argument was fully discussed in Claim Two, Part IV.B, and the court again finds that Draven's background was not material to the Petitioner's case. Draven's past, albeit violent, does not affect the Petitioner's culpability, nor does it negate the prosecutor's decision to seek the death penalty for the Petitioner, given an individualized assessment of the Petitioner's background and involvement in the crime.

174

The Petitioner also argues that he never received payment for the murder, and that the most the prosecution could do was suggest he received a $275 money order from Draven's brother as payment for the crime. Id. at 113. The statutory aggravating factor is not that the Petitioner received pecuniary gain for the commission of the crime, but that he "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value." Special Verdict Form – Eligibility Phase, at 5, ECF No. 255 (emphasis added). The evidence showed that he committed the murder in consideration for, and in expectation of, the receipt of payment, and that he did, in fact, receive some money. The fact that he never received full payment does not take away from his motive to kill a person he did not know for monetary gain. Regarding the Petitioner's argument that his mental health and brain damage make him less culpable than his two co-defendants, id. at 114, the court addresses, and denies, that argument in Claim Fourteen, Part IV.N.

Further, assuming the Petitioner intends this claim as an argument that the government unlawfully exercised its discretion in seeking the death penalty against him, and not Draven or Cat Voss, the claim fails, as "our constitutional system leaves it to the discretion of the Executive Branch to decide who will

175

face prosecution." United States v. Passaro, 577 F.3d 207, 219 (4th Cir. 2009). A petitioner may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987).

This is not to say that prosecutors have absolute unchecked discretion. Rather, "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id. at 297. The Petitioner fails to provide that exceptionally clear proof. As discussed in more detail in Claim Twelve, Part IV.L, the Petitioner is unable to show that the government unlawfully sought death authorization for him based on race. In this claim, he is unable to prove any other arbitrary or capricious reason for seeking the death penalty against him, and not his co-defendants. Based on the Petitioner's involvement in the crime, the aggravating factors, and all individual circumstances, seeking the death penalty against the Petitioner, and not his co-defendants, was not disproportionate.

### 3. Ineffective Assistance of Counsel

The Petitioner also raises a challenge of ineffective assistance of trial and appellate counsel for their failure to

argue disproportionality. Mot. at 111. He raises this ineffectiveness both as its own claim, and as cause to excuse procedural default. Id.; Reply at 91. He also claims that appellate counsel was ineffective for failing to show that the government exercised its discretion on some impermissible basis. Mot. at 113 n.48. To prove ineffective assistance of counsel, he must show that counsel did not act as an otherwise objectively reasonable attorney would have under the circumstances, and that such deficient conduct resulted in prejudice to the Petitioner. Strickland, 466 U.S. at 687.

After having examined the merits of the underlying claim, the court finds that the death penalty was not applied in a disproportionate, arbitrary, or capricious manner. Accordingly, trial and appellate counsel were not ineffective for failing to raise this claim. As to trial counsel, the Petitioner's trial attorneys did raise a variant of this claim when arguing that equally culpable co-defendants did not receive the death penalty. Tr. at 2639-49. The jury found this factor in favor of the Petitioner. Special Verdict Form – Selection Phase, at 2, ECF No. 291. Counsel's failure to bring this challenge in the exact manner that the Petitioner does now is not deficient or prejudicial. Although some of the facts may have amounted to a mitigating factor, they fail to show a constitutional violation,

177

and counsel cannot be faulted for declining to raise a meritless argument. As to appellate counsel, this argument is not stronger than the claims brought on direct appeal, and since the argument has no merit, there is no reasonable probability of a different outcome had appellate counsel made this argument in their brief. For these reasons, the court finds that trial and appellate counsel were not ineffective for their decision not to raise this specific proportionality challenge, and the Petitioner cannot overcome the procedural default.

Appellate counsel also was not ineffective for failing to show that the government exercised its discretion on some impermissible basis. The court has determined that the government did not unlawfully decide to impose the death penalty, so the Petitioner would not have been able to make a successful claim at an earlier point in the proceedings. Accordingly, he is unable to prove that counsel's actions were ineffective.

The Petitioner fails to make a showing of ineffective assistance of trial and appellate counsel, and his disproportionality claim is procedurally defaulted as well as lacking in merit. Claim Thirteen is **DENIED**.

N. CLAIM FOURTEEN – THE PETITIONER ARGUES THAT HIS DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS SEVERELY MENTALLY ILL, AND COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS CHALLENGE DURING TRIAL AND ON APPEAL.

The Petitioner's next argument is that he is severely mentally ill, and that sentencing him to death violates the Eighth Amendment's ban on cruel and unusual punishment. Mot. at 115. As this claim was not raised on direct appeal, the government argues that it is procedurally defaulted. Resp. at 129.[60] The Petitioner contends that his attorneys were ineffective for not raising this claim, and that such ineffectiveness is its own constitutional claim, as well as cause to excuse procedural default. Reply at 94. Accordingly, to determine if counsel was ineffective for failing to raise this argument, the court will now examine the substance of Claim Fourteen.

### 1. Existing Exceptions to Application of the Death Penalty

When arguing that the court should prohibit the use of the death penalty against defendants with severe mental illness, the Petitioner relies on Atkins v. Virginia, 536 U.S. 304 (2002),

---

[60] The government also argues that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 130. As there has been no change in the relevant procedural law on this issue since the Petitioner's conviction, the Teague doctrine does not apply.

179

which held that it is an Eighth Amendment violation to give the death penalty to those defendants considered mentally retarded, and Roper v. Simmons, 543 U.S. 551 (2005), which held that the execution of individuals who were under age eighteen at the time of the crime is unconstitutional.

In Atkins, the court held that it is unconstitutional to apply the death penalty to those who are mentally retarded. 536 U.S. at 321. The court reasoned that those individuals "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318. There is also a concern that such defendants "may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. at 320-21. There is no evidence here that the Petitioner is mentally retarded.

In Roper, the court looked at the differences between juveniles and adults, and noted that juveniles lack maturity and have "an underdeveloped sense of responsibility," which results "in impetuous and ill-considered actions and decisions." Roper, 543 U.S. at 569 (internal quotation marks omitted). Further,

180

juveniles are "more vulnerable or susceptible to negative influences and outside pressures," and their character "is not as well formed as that of an adult." Id. at 569-70. Accordingly, the court found it unlikely that either of the justifications for the death penalty — retribution and deterrence — would be advanced by imposing the death penalty against those who were juveniles at the time of the crime. Id. at 571-72. The evidence here is that the Petitioner was thirty-six years old when he committed the murder of Cory Voss.

### 2. The Petitioner's Argument to Extend the Holdings in Atkins and Roper

As both parties recognize, the Supreme Court has never held that applying the death penalty against someone who is mentally ill, even severely mentally ill, violates the Eighth Amendment. The Petitioner, however, argues that this court should promulgate a new constitutional rule prohibiting just that. Mot. at 115-17. The Petitioner argues that the same concerns addressed in Atkins and Roper apply to those defendants who are severely mentally ill. Mot. at 115-17. As he claims to be severely mentally ill, such a prohibition would categorically exclude him from application of the death penalty. Id. at 115 n.50.

To support his claim of extending a ban on capital punishment to those with severe mental illness, the Petitioner argues that national public consensus generally opposes use of the death penalty against defendants suffering from serious mental illness. Mot. at 115-16. He also contends that norms of international law support a prohibition against capital punishment for mentally ill defendants. Id. at 115. He cites various studies and reports to support these assertions. Id. at 115-16. In his Reply, the Petitioner also cites Trop v. Dulles, 356 U.S. 86, 101 (1958), to argue that the "evolving standards of decency" in society require the court not to subject the mentally ill to the death penalty. Reply at 92.

In response to the Petitioner's claim, the government first argues that "[t]here is no national consensus in favor of a blanket exemption to capital punishment for the mentally ill," and the court should not create a new constitutional rule extending such protection. Resp. at 130. It also contends that the reasoning in Atkins and Roper does not extend to those defendants with severe mental illness. Id. at 134-36.

The court will first evaluate whether national consensus is in favor of banning the death penalty against mentally ill defendants. The Supreme Court has not instituted a prohibition on applying the death penalty to those with severe mental

182

illness. See Mays v. Stephens, 757 F.3d 211, 219 (5th Cir. 2014) (discussing how neither Atkins nor Roper "created a rule of constitutional law making the execution of mentally ill persons unconstitutional"); Franklin v. Bradshaw, 695 F.3d 439, 455 (6th Cir. 2012) (noting that "no authorities have extended [Atkins or Roper] to prohibit the execution of those with mental illnesses"). Many state high courts have also acknowledged the lack of a bar against imposing the death penalty on the severely mentally ill, and absent meeting the criteria for insanity, courts generally have permitted application of the death penalty against defendants with serious mental illness. See, e.g., Dotch v. State, 67 So. 3d 936, 1006 (Ala. Crim. App. 2010); People v. Hajek, 324 P.3d 88, 173-74 (Cal. 2014); Diaz v. State, 945 So. 2d 1136, 1151-52 (Fla. 2006); State v. Dunlap, 313 P.3d 1, 36 (Idaho 2013); State v. Hancock, 840 N.E.2d 1032, 1059-60 (Ohio 2006); Malone v. State, 293 P.3d 198, 216 (Okla. Crim. App. 2013); Mays v. State, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010).

Rather than focusing on federal and state cases, the Petitioner argues that the court turn to international norms and some public opinion data to evaluate whether evolving standards of decency require the court to create a new constitutional rule prohibiting capital punishment against the severely mentally

ill. Although the citations to state and federal decisions provided by the government are not binding, the court finds them more instructive than the Petitioner's references to international cases and law. After evaluating the decisions by both federal and state courts that have chosen not to extend Roper and Atkins, this court finds it inappropriate to extend the holdings or the reasoning in Atkins and Roper to defendants with severe mental illness, absent Supreme Court authority.[61]

Finally, as applied to the Petitioner's particular case, the Petitioner fails to show how any alleged mental illness deprived him of the ability to control impulses, make logical decisions, or process information. The crime committed was not a spur-of-the-moment, heat of passion crime, that resulted from impulsivity or an inability to understand what was happening. As found by the jury, it was a calculated murder, which was carefully planned and required deliberate conduct. Thus, even were such a ban against the death penalty for severely mentally

---

[61] While the court declines to extend Roper and Atkins, in the context of defendants with severe mental illness, it does note that many difficulties would arise from such an extension due to the varying degrees and types of mental illnesses. A person is either under age eighteen or not, as in Roper, or has a certain IQ or not, as in Atkins. By contrast, mental illness takes many forms, and it is also unclear what would qualify as a severe or serious mental illness.

184

ill defendants to exist, the Petitioner does not show that it would categorically apply to him.

### 3. Ineffective Assistance of Counsel

The Petitioner argues that his trial and appellate counsel were ineffective for not raising this challenge during the direct proceedings. Reply at 94. This ineffectiveness claim is meant as both its own argument and as cause and prejudice to excuse the procedural default of his Eighth Amendment claim. Id.

The Petitioner fails to meet the Strickland requirements of deficient conduct by counsel and resulting prejudice. Strickland, 466 U.S. at 687. As the court finds the claim to extend Roper and Atkins has no merit, the Petitioner has failed to show a reasonable probability of success had counsel presented this argument at trial or on appeal. Further, appellate counsel was not deficient, as this argument is not stronger than any brought on appeal, and trial counsel was not deficient for choosing to forego a claim that is not based on any existing constitutional grounds. Accordingly, the Petitioner is unable to show ineffective assistance of counsel, and this claim is both procedurally defaulted and without merit. Claim Fourteen is **DENIED**.

185

**O. CLAIM FIFTEEN - THE PETITIONER ARGUES THAT SELECTION OF THE GRAND AND/OR PETIT JURY WAS TAINTED, AND COUNSEL UNREASONABLY FAILED TO REQUEST AND INSPECT THE JURY SELECTION RECORDS.**

In Claim Fifteen, the Petitioner brings a four-part challenge to the jury selection process, consisting of three statutory claims and one ineffective assistance claim. Mot. at 117-24. The government argues that the three statutory parts are untimely and procedurally defaulted. Resp. at 137-38. The Petitioner acknowledges that the claim is not timely, but he argues that counsel was ineffective for not requesting certain jury selection records, and such ineffectiveness should create cause and prejudice to excuse the default. Reply at 94. Accordingly, to determine whether the Petitioner can overcome the default, the court will now address the merits of this claim. If the Petitioner can show that a statutory claim would have had merit, then he may be able to prove his ineffective assistance claim for counsel's failure to request certain jury lists and overcome the procedural default on the remaining arguments.

**1. Selection of the Grand and/or Petit Jury Venire**

In this claim, the Petitioner argues that the jury selection process was tainted, and he provides a list of alleged errors in the jury selection process. Mot. at 117-18. This list

186

includes such assertions as "[a]t one or more steps, there was a failure to fully and accurately comply with the procedures described in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia" and "[b]ecause of a computer error, inaccurate computer program, misconduct, or other reason, the names on the master jury wheels, the qualified jury wheels, the grand jury list, and/or the venire called for petit jury service in Runyon's case were not drawn at random from their immediate parent list." Id. He provides no additional supporting information for these claims. He complains that the court has failed to provide him with all the necessary information, but the court has already given him the extensive information available regarding jury selection for both the grand and petit juries, and the court does not know to what, if any, necessary information the Petitioner refers. He simply fails to show how the court denied him any specific information that would actually support any of the claims in his list of "errors."

This claim is simply too broad and overreaching. The Petitioner cannot claim that at some point in time there was some sort of error that caused some type of violation in the jury selection process, without providing any specifics as to

that problem. As set forth before, the court finds that this claim has no merit.

### 2. Compliance with the Jury Selection Plan and the Provisions of 28 U.S.C. § 1861 et seq.

In this portion of Claim Fifteen, the Petitioner argues that there was a substantial failure by the court to comply with the procedures in the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq. (the "Act"), and in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia (the "Plan). Mot. at 118-19. To be an actionable violation of the Act, the violation must be substantial, and a violation is substantial if it affects the twin objectives of the Act: (1) to provide for the random selection of jurors; and (2) to ensure that juror disqualifications, excusals, exemptions, and excuses are based on objective criteria. See United States v. Meredith, 824 F.2d 1418, 1424 (4th Cir. 1987); United States v. Carmichael, 685 F.2d 903, 911 (4th Cir. 1982); Paradies, 98 F.3d at 1279.

Technical violations generally do not warrant dismissal or a stay. See Meredith, 824 F.2d at 1424 ("The fact that the array members were passed over for service on previous juries does not amount to substantial noncompliance with the Act. Mere technical deviations do not constitute substantial noncompliance with the

Act."); <u>Carmichael</u>, 685 F.2d at 911 ("The district court below recognized that there had been a technical violation of the Plan. The Act, however, requires a substantial violation of its provisions before an indictment may be dismissed.").

According to both the Plan and § 1866(d) of the Act, the clerk must note the reason for any person who is disqualified, excused, exempted, or excluded from jury service. The Petitioner argues that the clerk failed to do this, and he uses this as the basis for challenging the court's jury selection procedures. Mot. at 119-21.

In the instant case, four hundred twenty-five (425) jurors were drawn for the petit jury venire, two (2) of whom were deferred and not included on the race/age/gender documents provided to counsel. Out of the remaining four hundred twenty-three (423) potential jurors, two hundred forty-three (243) completed questionnaires. Of the one hundred eighty (180) individuals who did not fill out a questionnaire, the court records provided to counsel show the following facts. Ten (10) jurors were excused for being over the age of seventy; three (3) were deceased; seven (7) had moved out of the jurisdiction; two (2) were emergency personnel; two (2) had job-related or student conflict reasons; two (2) had to care for small children; five (5) had recent previous service; and ninety-six (96) were

189

excused by court order. To reiterate, a complete list of the foregoing excused jurors was provided and available to trial and current habeas counsel.

The Petitioner first argues that the court order category is not acceptable under the Plan or Act. This argument is frivolous. The court order category includes those jurors who asked to be excused and had those requests decided by the court. It is a specific category that accounts for ninety-six (96) jurors, and the Petitioner's mere speculation that the court would dismiss these jurors for non-objective reasons does not support a claim under the Plan or Act. All were properly excused on the basis of written requests about their personal and professional conflicts, careers, and problems. There were no subjective excusals by the court, and to speculate or suggest otherwise has no basis in fact.

After accounting for the jurors excused, exempted, or dismissed by the clerk and by court order, there remain fifty-three (53) potential jurors not included on the list of excusals, disqualifications, and exemptions provided to counsel. These remaining individuals are potential jurors who were nonresponsive because of circumstances such as ignoring the summons to fill out the questionnaire and having their mail returned as undeliverable. These fifty-three (53) jurors are

190

simply not included, and would not be, on any list of excusals or list to counsel _in_ _any_ _case_. For example, when a person fails to respond, they are automatically classified in the computer system as nonresponsive, which is a separate area of the jury management system than the excusal codes. The same applies for the remaining jurors not included in the excusal list. As their status in the computer system is not manually edited, unlike that of the responsive jurors who received formal excusals and disqualifications, they were not on the list given to counsel, _nor_ _would_ _they_ _be_ _in_ _any_ _case_. The court did not exclude them for non-objective reasons. The computer system ministerially accomplishes this task for these jurors by classifying them as nonresponsive.

In sum, the Petitioner's claim that the most obvious reason they were not included is because non-objective criteria were used is not grounded in any facts or the record, and is not persuasive. The Petitioner simply jumps to a negative conclusion without looking at the most likely solution first, that the individuals failed to respond or show up, and were thus input into the computer system in a different manner than those on the excusal list given to counsel.

The Petitioner also summarily presents that of the four hundred twenty-three (423) jurors drawn for the petit jury

191

venire, two (2) self-identified as Native American and sixteen (16) self-identified as Asian. One of those who self-identified as Native American was non-responsive, and the other was excused. Nine (9) of those who self-identified as Asian were excluded for reasons such as failing to respond, failing to appear, or moving from the jurisdiction. If the Petitioner's four sentences describing these statistics are meant as proof that non-objective criteria were used to exclude jurors, it is not enough and is not supported by the record. He must do more than point to some raw figures to show impermissible reasons for excusal.

As the Petitioner can provide no evidence that the excusals and exclusions of potential jurors were done for non-objective reasons, he is unable to make out a substantial violation of the Act or Plan.

### 3. Participation of an Allegedly Unqualified Juror During the Jury Selection Process

The Petitioner withdraws this argument. Reply at 100. The court further notes for the record that no unqualified juror participated in the jury selection process.

192

## 4. Ineffective Assistance of Counsel

In the Petitioner's final challenge to this part of the jury selection process, he makes a blanket allegation of ineffective assistance of counsel for counsel's failure to request and examine jury selection records. Mot. at 123-24. It is not clear to what jury selection records the Petitioner refers.

To prove ineffective assistance of counsel, Strickland requires a showing that counsel was both deficient and that there was resulting prejudice to the petitioner. Strickland, 466 U.S. at 687. It is clear that pursuant to 28 U.S.C. § 1867(f), trial counsel has essentially an unqualified right to inspect jury lists to determine whether the jury selection process complied with statutory and constitutional law. See Test v. United States, 420 U.S. 28, 29-30 (1975) (per curiam). The ability to inspect such lists does not require meeting any burden or standard of proof. Here, trial counsel did not make such a request.[62] The Petitioner claims that was due to ignorance

---

[62] Counsel had all completed juror questionnaires, names, addresses, and so forth, of the petit jurors ultimately available for selection for trial. The court assumes that the Petitioner is referring to the group of jurors excused, dismissed, or exempted, and those who did not appear, for

or sloppiness, and had counsel acted differently, there is a "reasonable probability of a different, untainted jury and a different result." Mot. at 124.[63]

The Petitioner cites an American Bar Association Guideline that suggests "counsel should consider" challenging jury selection procedures, as proof that counsel was deficient. Mot. at 123. He also argues that counsel have been found ineffective for failing to investigate, and that is essentially the case where counsel did not request the jury information. Reply at 100-01. Counsel were actively involved with the jury selection process here and reviewed all two hundred forty-three (243) completed questionnaires of the eligible jurors. That counsel did not pursue information on jurors who did not fill out questionnaires because they did not appear, or who returned their responses late, and counsel did not pursue further those jurors who were excused by the court, does not make them ineffective. The facts show nothing unusual occurring during this procedure, and counsel would not have had reason to

_____

example as set forth in Part IV.O.2, and not to the two hundred forty-three (243) jurors who completed the questionnaire.

[63] At a threshold level, and importantly, the Petitioner has not shown a tainted jury. See supra Part IV.O.1.

194

consider a possible jury selection challenge. As such, counsel was not deficient for declining to request the lists.[64]

The Petitioner also cannot show prejudice. After receiving the jury lists, the questionnaires, and the information about the race and gender composition of the petit jury venire and grand jury, all of which the Petitioner now claims his trial counsel should have done, but did not, the Petitioner is still unable to make a successful showing of a substantial violation of the Plan or Act. Had counsel requested and inspected the information earlier, they would not have been able to make a meritorious claim at such time. As such, the Petitioner fails to show that counsel was ineffective regarding this decision, and he is unable to overcome the procedural default for his other arguments in this claim. Claim Fifteen is **DENIED**.

**P. CLAIM SIXTEEN – THE PETITIONER ALLEGES THAT THE GOVERNMENT USED ITS PEREMPTORY STRIKES TO DISCRIMINATE BASED ON RACE AND GENDER, AND COUNSEL UNREASONABLY FAILED TO OBJECT.**

In Claim Sixteen, the Petitioner argues that the prosecutors discriminated on the basis of race and gender when using peremptory strikes, in violation of the Fifth Amendment and the holdings in Batson v. Kentucky, 476 U.S. 79 (1986), and

---

[64] See supra notes 62 and 63.

<u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127 (1994). Mot. at 124. He also argues that trial counsel unreasonably failed to object to these strikes. <u>Id.</u>

### 1. Procedural Default

The government argues that the Petitioner's <u>Batson</u>/<u>J.E.B.</u> claim is procedurally defaulted, as counsel did not contemporaneously object to the use of the government's peremptory strikes, nor did counsel raise this issue on appeal. Resp. at 144. In his Reply, the Petitioner argues against default for three reasons: (1) the strike lists were not entered on the record and made part of the docket until after the appeal, so appellate counsel could not have raised this claim based on the facts available at the time; (2) if the record was sufficient to raise the issue on appeal, appellate counsel was ineffective for failing to do so; and (3) trial counsel was ineffective for failing to contemporaneously challenge the government's use of peremptory strikes. Reply at 107-11.

The court is not convinced that the strike lists' entry on the docket after the appeal excuses the procedural default. This is not a case where the court or the government failed to provide information to defense counsel until after direct proceedings, and counsel had no way to know about that information until such time. The Petitioner's attorneys could

196

have made a Batson/J.E.B. challenge during jury selection, or appellate counsel could have requested strike lists and questionnaires had they thought a Batson/J.E.B. claim would be meritorious.

However, the court must also consider the Petitioner's argument that trial and appellate counsel were ineffective for not raising a Batson/J.E.B. challenge during jury selection or on appeal, and such ineffectiveness should excuse the default. In order to determine (1) whether the failure to raise a Batson/J.E.B. challenge during trial or on appeal was ineffective, thus excusing default, and (2) whether the Petitioner can prove his separate ineffective assistance claim for trial counsel's failure to object to the peremptory strikes, the court will now examine the merits of Claim Sixteen.

### 2. Standard for a Batson/J.E.B. Claim

A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Batson, 476 U.S. at 85-86. In Batson, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id. at 89. When a defendant makes a Batson challenge, the court must conduct a three-step inquiry. Rice v. Collins, 546 U.S. 333, 338 (2006). First, the court must determine whether the defendant

197

has met his burden of making a prima facie case that the prosecutor's peremptory challenge was on the basis of race. Id. Second, the prosecutor has the burden to show a race-neutral reason for the strike. Id. ("'The second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." (quoting Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (per curiam))). Third, the court must decide if "the defendant has carried his burden of proving purposeful discrimination." Id. Although this involves evaluating the reasons put forth by the prosecutor, the ultimate burden of proving racial motivation remains with the defendant. Id.

To meet the first step of a Batson challenge, a defendant must make a prima facie case. This requires showing that

> (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool.

Keel v. French, 162 F.3d 263, 271 (4th Cir. 1998); see also Batson, 476 U.S at 96. This standard has since been modified so that a defendant may raise a Batson claim, even if the defendant is of a different race than the excused juror. Powers v. Ohio, 499 U.S. 400, 415 (1991).

198

The Court later extended the holding in <u>Batson</u> and found that gender-based peremptory strikes are unconstitutional. <u>J.E.B.</u>, 511 U.S. at 128-29. As with a <u>Batson</u> challenge, the defendant must first make a prima facie case of intentional discrimination. <u>Id.</u> at 144. If the defendant presents a prima facie case, then the prosecution must provide a gender-neutral reason for the strike. <u>Id.</u> at 144-45. This explanation may not be pretextual, but it does not need to be as strong as a for-cause challenge. <u>Id.</u> at 145.

### 3. The Petitioner's <u>Batson</u> Claim

The court will first address the Petitioner's claim that the prosecutor exercised peremptory strikes based on jurors' race. Mot. at 127-28. Accordingly, the court must start by determining if the Petitioner has met his burden of making a prima facie case.

### a. Prima Facie Case

The Petitioner alleges that the government unlawfully struck African American potential jurors. <u>Id.</u> The Petitioner identifies as Asian, as "his mother is Korean" and "his father is a white American." <u>See</u> <u>id.</u> at 2, 128. Although the Petitioner does not attempt to show unlawful peremptory strikes against potential jurors of Asian descent, he may still attempt to show discrimination in the use of peremptory strikes against jurors

of other distinct races. <u>See</u> <u>Powers</u>, 499 U.S. at 415. <u>But see</u> <u>Keel</u>, 162 F.3d at 271 ("While the defendant need not be a member of the same race as the excused jurors in order to raise a <u>Batson</u> challenge, that Keel and the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race." (internal citation omitted)).

In order to meet the third prong of a prima facie case, a showing of facts and circumstances raising an inference of discrimination is required, and raw data alone is often not enough. <u>See</u> <u>Allen v. Lee</u>, 366 F.3d 319, 330 (4th Cir. 2004) ("Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply"); <u>Keel</u>, 162 F.3d at 271 (holding that there was no <u>Batson</u> claim even when the prosecution used nearly seventy percent (70%) of its peremptory strikes to remove potential African American jurors); <u>United States v. Tipton</u>, 90 F.3d 861, 881 n.11 (4th Cir. 1996) (rejecting a claim of gender discrimination in use of peremptory strikes when the defendant provided only "raw figures" that eight out of twenty women were peremptorily struck by the government while only two out of twenty-one men were struck). <u>But see</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 342 (2003) ("[T]he