statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors.").

Here, the Petitioner's argument for a prima facie case relies mainly on statistics regarding the use of peremptory strikes by the government. Mot. at 127. Sixty-two (62) individuals were called for voir dire on the first day, and ten (10) were excused for cause. Strike List, ECF No. 424. The make-up of the remaining potential jurors was ten (10) individuals who were African American, one (1) who was Asian, and forty-one (41) who were white. Of the twelve members of the petit jury, nine (9) were white and three (3) were African American. The government used only nineteen (19) of its twenty (20) peremptory strikes, and seven (7) of those strikes were against African Americans. Id.

The Petitioner argues that the government struck seventy percent (70%) of the African American potential jurors, and that based on the Fisher Exact test used by the Petitioner, this is statistically significant. Mot. at 127-28; Reply at 115, Attach. 5. While that is true, the statistics also show that the government used only thirty-five percent (35%) of its available peremptory strikes against African Americans, who made up nineteen percent (19%) of the venire on the first day. Although

there is a difference between those percentages, it is not as alarming as the Petitioner makes it out to be. The end result was a jury that was seventy-five percent (75%) white and twenty-five percent (25%) African American. The government also had one remaining peremptory strike, meaning it could have struck an additional African American juror, if that was its goal. These statistics do not show that the government engaged in discrimination in its use of peremptory strikes.

The only other piece of evidence the Petitioner cites in his Motion is the prosecution's introduction into evidence of an interrogation video that referenced Asian stereotypes. Mot. at 128. While the Fourth Circuit held that admitting the video was error, it recognized such error was harmless, and noted the video was less than an hour in a trial and sentencing that lasted longer than three weeks. Runyon, 707 F.3d at 492, 498-99. The fact that the prosecution introduced a short video clip that touched on race during a weeks-long trial is hardly enough to show a discriminatory intent during voir dire.

In his Reply, the Petitioner also cites the lists created at the court's request before voir dire. Reply at 116-17. Counsel for both parties used the juror questionnaires to make three lists: (1) jurors the parties agreed should be called for voir dire; (2) jurors the parties agreed should not be called

for voir dire; and (3) jurors upon whom the parties could not agree. Id. The Petitioner now argues that the proportion of African American to white jurors on these lists shows discrimination. Id. at 117. However, these are just more statistics, and these statistics involve choices by both parties. The Petitioner's argument that a higher percentage of African Americans were on List Three — the list of jurors upon whom the parties could not agree — than the other lists does not support a claim of discrimination. As the Petitioner recognizes, it is not apparent which side wanted the jurors on List Three to come in for voir dire and which side did not. The court will not assume the government objected to all the African American jurors on that list. Jurors could have been placed on List Three for many reasons, and the Petitioner's unsupported conclusion that it must have been due to race is not persuasive.

Accordingly, after looking at all the information put forth by the Petitioner, and the lack of any other history of discrimination or discriminatory statement by the government, the Petitioner is unable to make out a prima facie case of racial discrimination.

**b. The Government's Race-Neutral Reasons for the Strikes and the Petitioner's Response**

Even though the Petitioner has failed to carry his burden of making a prima facie case, the court recognizes that the government has provided race-neutral reasons for its strikes. The government asserts that the seven African American potential jurors who were struck answered on their questionnaires that they were either opposed to the death penalty or both generally opposed and generally in favor of it. Resp. at 148; see Keel, 162 F.3d at 271 (holding that peremptory strikes did not violate Batson when "[g]iven these jurors' opposition to, or hesitation toward, imposing the death penalty, it is clear that the prosecutor acted well within constitutional bounds in excusing them").

The Petitioner argues that two non-African American potential jurors who were not struck also indicated general opposition to the death penalty. Reply at 121-22. It is established that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be

considered at <u>Batson</u>'s third step." <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241 (2005).[65]

Although the court considers that these other jurors indicated opposition to the death penalty but were not struck by the government, the court does not find this to be enough to show that the government's reasons were pretextual. Other than the video clip, the Petitioner can point to no statement that is even arguably discriminatory, and the court has already concluded that the references to strike percentages and the lists does not prove discrimination. Accordingly, not only does the Petitioner fail to make a prima facie case, the government also exercised race-neutral reasons for its strikes, and the

---

[65] In the <u>Miller-El</u> case, the Court considered the government's reasoning for its peremptory strikes, along with multiple other actions by the government, when deciding the defendant's <u>Batson</u> claim. The Court noted that the government had the order in which the prospective jurors were seated reshuffled several times in order for more of the African American jurors to be near the back of the panel, making them less likely to be chosen for the jury. <u>Id.</u> at 253-54. More graphic questions were presented to a higher proportion of African American jurors than white jurors, and the questioning about minimum sentences varied by the potential jurors' race, in a way referred to by the Court as "trickery." <u>Id.</u> at 254-63. Further, the District Attorney's Office had a history of excluding African Americans from the jury, and even had a formal written policy on the matter that was used until 1976. <u>Id.</u> at 264. This is much different from showing a video clip that made several brief mentions of race and not striking two jurors who were generally against the death penalty.

Petitioner fails to show that such reasons were pretextual. The Petitioner has failed to make a <u>Batson</u> claim.

### 4. The Petitioner's <u>J.E.B.</u> Claim

The Petitioner also brings a claim based on <u>J.E.B.</u>, in which he argues that the government exercised its peremptory strikes in a discriminatory manner based on gender. Mot. at 129-30. The court will now examine the Petitioner's argument to determine if he has made a prima facie case.

#### a. Prima Facie Case

After strikes for cause, fifty-two (52) potential jurors remained in the venire for the first day. Strike List, ECF No. 424. Twenty-nine (29) were women and twenty-three (23) were men. The government struck thirteen (13) women and six (6) men. <u>Id.</u> The petit jury was made up of eight (8) women and four (4) men. Thus, the end result was a jury that was sixty-seven percent (67%) female and thirty-three percent (33%) male.

The Petitioner argues that this use of peremptory strikes shows discrimination; however, the court disagrees. Fifty-six percent (56%) of the potential jurors remaining after for-cause strikes were women, and the government used only sixty-five percent (65%) of its available peremptory strikes against women. Although the government did strike more women than men, the percentage of its strikes used versus the percentage of women in

206

the venire that day is not enough to show even an inference of discrimination. These statistics do not convince the court that the Petitioner has made a prima facie case that the government used its strikes in a discriminatory manner.

### b. The Government's Gender-Neutral Reasons for the Strikes and the Petitioner's Response

Although the Petitioner fails to make a prima facie case, the court recognizes that the government cites the jurors' answer to Question Sixty-One, regarding views on the death penalty, as a proper gender-neutral reason for its strikes. Resp. at 148. The Petitioner argues that the government did not strike two male jurors who gave the same answer to Question Sixty-One as the female jurors who were struck. Reply at 125-26. As with the <u>Batson</u> claim, this is not enough to show that the government's reasons were pretextual. Further, unlike with race, where the Petitioner also cites the video and lists as proof of discrimination, the Petitioner offers no additional evidence to suggest even a possibility of discrimination based on gender. He merely speculates that the government may have wanted male jurors, as it would be easier to persuade male jurors "that Cat's moral culpability was not greater than Runyon's". <u>Id.</u> at 84. Interestingly, the reasoning the Petitioner provides for this speculation is his belief that the male and female jurors

likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as titillating and give it diminished weight; female jurors were more likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars and with men would more likely be viewed by females, especially those with children, as contributing to greater moral culpability.

Id. at 84-85.

This reasoning, thought up by the Petitioner and which has no support in the record, just perpetuates negative stereotypes about both men and women, when the reasoning behind the ruling in J.E.B. was largely to eliminate such stereotypes from jury selection. See J.E.B., 511 U.S. at 130-31 ("Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women."). Accordingly, based on the evidence presented, the Petitioner has failed to show that the government exercised its peremptory strikes in a discriminatory way based on gender.

208

### 5. Ineffective Assistance of Counsel

The Petitioner challenges the effectiveness of both his trial and appellate counsel. He argues that such ineffectiveness will excuse the procedurally defaulted Fifth Amendment claim, and that his trial counsel's ineffectiveness is also a distinct constitutional claim.

### a. Ineffective Assistance of Trial Counsel

The Petitioner claims that his trial counsel was ineffective for failing to object to the use of the government's peremptory strikes. Mot. at 130. He raises this argument both as a distinct claim and as a means to excuse procedural default. To show ineffective assistance of counsel, he must prove that his counsel's representation was deficient and that there was resulting prejudice. Strickland, 466 U.S. at 687. To establish that there was deficient representation, the Petitioner must show that counsel's representation "fell below an objective standard of reasonableness." Id. at 688.

The basis for the Petitioner's ineffective assistance claim is that counsel should have known about the existence of Batson and J.E.B. and the necessity of raising "pertinent objections" to questionable strikes, and that by failing to object to the strikes, counsel acted deficiently. Mot. at 130-31. The court, however, finds nothing to suggest that experienced counsel did

209

not know about the <u>Batson</u> or <u>J.E.B.</u> standards. The government was not striking an inordinate amount of African American or women venire members when compared to their representation after for-cause strikes, and there appear to be no other signs that should have alerted counsel to potential discrimination. Knowing that one piece of evidence, the video, would briefly and once mention the Petitioner's Asian race is not enough for defense counsel to object to all peremptory strikes of African American jurors.

Further, defense counsel may have had its own reasons for wanting to exclude the challenged individuals from the jury, and thus did not object to the government's peremptory strikes. Perhaps that reason was related to those juror's military connections, as suggested by the government. Resp. at 148. Regardless of the reason, the court will give deference to what appears to be a reasonable decision on the part of counsel not to object to strikes that presented no appearance of discrimination. Accordingly, the Petitioner is unable to show that counsel's actions fell below an objective standard of reasonableness. He is also unable to show prejudice, as the above analysis has shown a <u>Batson</u> or <u>J.E.B.</u> challenge would have been meritless. The Petitioner has failed to prove ineffective

assistance of trial counsel, and has yet to overcome the procedural default on his Fifth Amendment claim.

### b. Ineffective Assistance of Appellate Counsel

To overcome the procedural default, the Petitioner also argues that appellate counsel was ineffective for not requesting the strike sheets and raising a Batson/J.E.B. challenge on appeal. Reply at 109-10. One of the Petitioner's appellate attorneys, Teresa Norris, has stated that the failure to request the strike sheets and questionnaires was not a strategic decision. Mot. Attach. 36, ¶¶ 5-7. Regardless of whether counsel had a good reason for not requesting the documents, the court has already concluded that the Petitioner cannot even make out a prima facie case of discriminatory use of peremptory strikes by the government. The Petitioner is unable to prove that he suffered prejudice by counsel's failure to request the strike sheets, as even with the strike sheets, counsel would not have been able to present a meritorious argument on appeal. Accordingly, the Petitioner fails to make a claim of ineffective assistance of appellate counsel, and he cannot excuse the procedural default. Claim Sixteen is **DENIED**.

### 6. Discovery

In order to provide additional support for his claim, the Petitioner requests discovery of extensive jury selection

211

records created by the government, not only for his case but also for other cases tried by the same prosecuting attorneys. First Mot. for Discovery at 7-12. Although the good cause standard for discovery is a lower standard than required for ineffective assistance and Batson/J.E.B. claims, it still requires making specific allegations that may be proven by the requested materials. See United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004) ("Specifically, discovery is warranted, 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" (quoting Bracy v. Gramley, 520 U.S. 899, 908-09 (1997))); see also United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief).

Here, the Petitioner appears to be going on a "fishing expedition," and nothing more. The statistics and video clip cited by the Petitioner are not enough to show the good cause necessary to warrant discovery of the prosecuting attorney's internal jury selection records.[66] The court will not allow the

---

[66] As an aside, these records likely constitute privileged attorney work product, and the Petitioner has made no showing to

212

Petitioner to receive the extraordinary volume of documents he requests simply to search through them for a possible claim, when he fails to make out even a prima facie case of discriminatory peremptory strikes based on race or gender.[67] The request for discovery is **DENIED**.

> **Q. CLAIM SEVENTEEN – THE PETITIONER ALLEGES THAT THE VOIR DIRE VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS, AND COUNSEL'S FAILURE TO OBJECT TO VOIR DIRE PROCEDURES WAS UNREASONABLE.**

The Petitioner next alleges that the voir dire procedures violated his Fifth and Sixth Amendment rights to a fair trial and impartial jury. Mot. at 133. He asserts that there were several errors made during voir dire, including that the scope of the questioning was limited, that the court collectively asked the jury questions, and that the court did not ask questions required by Morgan v. Illinois, 504 U.S. 719 (1992).

---

overcome such privilege. See Upjohn Co. v. United States, 449 U.S. 383, 401 (1981).

[67] The court acknowledges that the Petitioner does not know the reasoning for the placement of jurors on List Three, but that is not enough for discovery. This request is a "fishing expedition" for a "red herring," and it lacks even the hint of materiality. The Petitioner can point to nothing suggesting discrimination, and his unsupported assumption that the government must have wanted to exclude the African American jurors on List Three is not enough to show good cause. Importantly, the jury was selected from the agreed upon list, List One, without the necessity to reach Lists Two or Three. See infra note 69 and accompanying text.

Id. at 133-37.[68] He also claims that trial counsel was ineffective for not objecting to these procedures, id. at 138-39, and suggests that appellate counsel was ineffective for then not raising the issue on appeal. See Reply at 131.

### 1. Procedural Arguments

The government argues that the claim is barred by the Teague non-retroactivity doctrine and that it is procedurally defaulted. Resp. at 149-50. The Teague argument is irrelevant. As the Petitioner notes, the right to adequate voir dire is not new, and there has been no change in the relevant law since the Petitioner's conviction became final. Reply at 131. As to procedural default, the Petitioner asserts that his argument that trial counsel was ineffective for not objecting to the relevant procedures should constitute cause to excuse default. Id. He further argues that appellate counsel's failure to raise this issue on appeal was ineffective, and should also excuse default. Id.

To determine whether the Petitioner can prove his claim of ineffective assistance of counsel, both in its own right and to

---

[68] The Petitioner also incorporates by reference his argument in Claim S-2 that the questionnaire was flawed. Mot. at 133. The court now incorporates by reference its analysis and decision on that claim. See infra Part IV.R.

excuse default, the court will now examine the various arguments in Claim Seventeen.

### 2. Collective Questioning of the Potential Jurors

The Petitioner argues that the manner of conducting voir dire, which involved asking collective questions to all sixty-two individuals present, was unconstitutional. Mot. at 134-35. After asking the collective questions, the court asked potential jurors to stand depending on their answers, and then further questioned those individuals who stood. Id. In this way, each potential juror was not individually asked each question. Id. The Petitioner argues that this permitted twenty-one of the sixty-two jurors to remain silent during voir dire. Id. at 135. He complains that those jurors who stayed silent may have harbored biases, but the court never engaged in individual questioning to root out those feelings. Id. This argument is far-fetched and frivolous.

"Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury." United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996). This is because voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).

215

The conduct of voir dire is committed to the sound discretion of the trial court, as the court has the opportunity and ability to observe the demeanor and actions of those participating in voir dire, and assess credibility and impartiality. Lancaster, 96 F.3d at 738-39. "[I]t is well established that a trial judge may question prospective jurors collectively rather than individually." United States v. Bakker, 925 F.2d 728, 734 (4th Cir. 1991). Additionally, the Constitution does "not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." Morgan, 504 U.S. at 729. Based on this established precedent, the court was well within its discretion to ask collective questions to those present and then ask specific follow-up inquiries to those jurors who responded in a certain way, even if this meant that some potential jurors were allowed to remain silent.

The Petitioner cites as support that one of the jurors did not stand in response to a question about employment with Langley Federal Credit Union, even though her employer was related to the credit union. Mot. at 135-36. This juror was not employed at the Langley Federal Credit Union in Newport News, Virginia, but at another affiliated entity. Id. at 135. Importantly, the court had already ordered the potential jurors to fill out questionnaires, so much of the information that may

216

normally be brought out during voir dire, such as detailed employment information, was already of record and known by counsel. Thus, this one example does not convince the court that the decision to exercise its discretion and ask collective questions, as the Supreme Court has established that it may do, violated the Petitioner's constitutional rights in his capital case.

### 3. Use of Questions Designed to Determine Bias and Ability to Follow the Law and the Court's Instructions

The Petitioner also claims the voir dire was flawed because at several points the court asked whether the potential jurors understood the law, not whether they would or could comply with the law. Mot. at 136-37. This claim is not supported by the record, as it ignores the totality of the voir dire and focuses only on the following five questions by the court:

> THE COURT: Now, do you understand that as a juror, however, your first duty is to determine whether a defendant is guilty or not guilty, without consideration of any possible penalty? Is there anyone who doesn't understand that? If so, please stand.
> (No response.)
>
> THE COURT: If your answer is "no" to the following questions, please stand.
> Do you understand that the law never requires that a person be sentenced to death?
> (No response.)
>
> THE COURT: Again if your answer is "no" to any of the following questions, please stand.

217

Do you understand that the law never requires a person to be sentenced to death, even if they have been convicted of being the triggerman in a murder-for-hire case?
(No response.)

THE COURT: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of a carjacking is so convicted?
(No response.)

THE COURT: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of a bank robbery?
(No response.)

Tr. at 59, 123-24.

The Petitioner states that the above questions ask only whether a juror understands the law, not whether the person could or would follow the law, and that that these were not proper reverse-Witherspoon questions. Mot. at 136-37; Reply at 135. He argues that because the court did not explicitly ask if the jurors could comply with the law, his conviction and sentence were obtained in violation of the Constitution. Id. at 137. In support for his argument against the final four questions, he also cites Morgan, 504 U.S. at 733, which held that a defendant has a right to inquire into whether any juror would ignore the instructions of the court and automatically vote for death after a finding of guilt. He argues that these four questions did not allow for such an inquiry. Mot. at 137.

218

At a threshold level, the Petitioner overlooks the entire voir dire conducted and isolates a few questions. The court specifically asked whether there was anyone who did not understand a juror's first duty would be to determine guilt, without consideration of any possible penalty. Tr. at 59, 171. The process made it clear that any determination of whether to impose the death penalty would only take place after an additional hearing. See id.

However, "[j]ust how an inquiry adequate for this specific purpose should be conducted is committed to the discretion of the district courts." Tipton, 90 F.3d at 878. The facts of the instant case are different from Morgan, where the judge asked variations on the following questions: (1) "Do you know of any reason why you cannot be fair and impartial?" (2) "Do you feel you can give both sides a fair trial?" and (3) "Would you follow my instructions on the law even though you may not agree?" 504 U.S. at 723-24. Morgan held these "general fairness and 'follow the law'" type of questions are inadequate in determining jurors who would automatically vote for the death penalty. Id. at 734.

Although the Petitioner argues that the questions in Morgan are similar to the instant case, the Morgan questions are vague and focus on general fairness and ability to apply the law. There is no mention of the death penalty. Here, the court

219

specifically asked if the jurors understood the law in relation to the death penalty and the charged crimes. Tr. at 59, 123-24, 171, 174-75. The jury was not provided with vague generic questions, but with questions that focused on the specific issues that would be introduced at trial, and such questions did not violate the Petitioner's rights.

Importantly, at the start of voir dire, the court explained to the jurors that they would have to put aside any passions or prejudices, and decide the case based on the law given by the court and the evidence presented. Tr. at 52-53. The court then asked anyone who felt that he or she could not do that to stand in response. Id. at 53. Later, the court again asked about personal and moral biases regarding the death penalty, and whether such feelings would affect the jurors' ability to weigh aggravating and mitigating factors and follow the court's instructions on the death penalty. Id. at 124-25. All of these questions were in addition to the detailed questions about the application of the death penalty in the questionnaire. ECF No. 211-1 at 11-13.

There is no one way to conduct voir dire, so long as voir dire allows for the selection of an impartial jury. See Morgan, 504 U.S. at 729; see also Darbin v. Nourse, 664 F.2d 1109, 1113 (9th Cir. 1981) ("[A] particular question [need not] be asked if

220

the substance of the inquiry is covered in another question, differently phrased, or in the voir dire as a whole."). Just because the phrasing of the questions is slightly different from Morgan does not mean that the Petitioner's rights were violated. The jurors were clearly informed of their duty in relation to applying the law on the death penalty, and the court made sure that they understood this duty. Accordingly, the Petitioner is unable to show that the court's choice of questions violated his constitutional right to an impartial jury.

### 4. Scope and Structure of the Proceedings

The Petitioner also argues that voir dire was minimal and limited. Mot. at 134. What matters, however, is not a quantitative comparison of the length of voir dire, but whether an impartial jury was selected. See United States v. LaRouche, 896 F.2d 815, 830 (4th Cir. 1990) ("Such quantitative comparisons are unhelpful—the only issue is whether [the court's] voir dire was sufficient to impanel an impartial jury."). In the instant case, prior to voir dire, the parties agreed to use a detailed, fifteen-page questionnaire to gather information from the potential jurors. ECF No. 211. After reviewing the questionnaires, the parties submitted three lists: (1) those jurors the parties agreed should be called for voir dire, (2) those jurors the parties agreed should not be called

221

for voir dire, and (3) those jurors upon whom the parties could not agree. ECF No. 236. The court then conducted voir dire of sixty-two (62) potential jurors on the first list.[69] The attorneys were told they could object or ask the court to give follow-up questions. Tr. at 44. The jurors were specifically told that they must ignore any prejudice or passion, and must follow the instructions of the court and consider the evidence presented when making a decision. Id. at 52-53, 174.

The court was able to effectively question the potential jurors during voir dire to expose any bias or prejudice not exposed in the questionnaires. Unlike other criminal cases, the jurors had already filled out lengthy questionnaires. This information aided in the voir dire process and allowed the court and parties to efficiently focus on specific issues. Between the questionnaire, collective questions, and follow-up inquiries, the court was able to search for any bias or prejudice held by the jurors and to provide the Petitioner with an impartial jury. Trial counsel was afforded a full opportunity at every juncture of the voir dire process to make and express objections. See Tr. at 10-130. Accordingly, not only is the Petitioner unable to show that a biased juror was seated, but more importantly, the

---

[69] As a panel was selected from the first list, it was unnecessary to reach the second and third lists.

222

Petitioner is unable to show that his voir dire was constitutionally infirm.

### 5. Ineffective Assistance of Counsel

The Petitioner also argues that his trial counsel was ineffective for not objecting to the above procedures. He makes this argument as its own claim and as a way to excuse default. He also argues that his appellate lawyers were ineffective for not including this claim in their appellate brief, and such ineffectiveness should allow him to overcome the procedural default. The court will now address both arguments.

### a. Ineffective Assistance of Trial Counsel

The Petitioner argues that trial counsel rendered ineffective assistance regarding voir dire, first because counsel failed to review the juror questionnaires for evidence of bias and did not conduct outside research to determine such bias. This allegation is simply unsupported by the record and the Petitioner asserts no grounded basis for this accusation against trial counsel. Moreover, whether counsel did or did not do outside research beyond the juror questionnaires is irrelevant, as a proper jury was selected.[70] Next, the Petitioner asserts that counsel was ineffective for failing to object to

---

[70] See infra Part IV.R.3.

the lack of guidance about the standards that would govern the jury's decision, both at and before voir dire. There was nothing here to which to object.[71] Next, the Petitioner asserts that counsel was ineffective for failing to object to the oral voir dire procedures, which permitted some potential jurors to stay silent during the proceedings. This allegation is meritless.[72] Finally, the Petitioner asserts that counsel was ineffective for failing to object to the questions discussed above that asked whether jurors understood the law, not whether they could comply with the law. However, the Petitioner has not referenced all of the voir dire, but has singled out specific questions the jury was asked. Again, there was nothing here to which to object.[73]

To prove ineffective assistance, the Petitioner must show (1) that his attorney's conduct was deficient because it fell below an objective standard of reasonableness, and (2) that he suffered prejudice as a result. Strickland, 466 U.S. at 687-88. The Petitioner fails to meet either prong. First, counsel's performance was not deficient. As to the allegation that counsel failed to review the questionnaires for bias and perform

---

[71] See supra Parts IV.Q.2, IV.Q.3, IV.Q.4.

[72] See supra Part IV.Q.2.

[73] See supra Part IV.Q.3.

224

Internet research to discover such bias, the Petitioner provides no support beyond the one-sentence claim. The court cannot say that counsel acted deficiently, as there is no evidence before it to suggest that counsel did not carefully review the questionnaires or investigate bias.

While the Petitioner alleges that there was insufficient information given, both at and before voir dire, on the proper standards for the jurors to apply, the Petitioner cites no law requiring that the court explain such detailed information prior to oral voir dire. See Mot. at 138. During voir dire, the court did cover the proper legal standards for jurors to be able to follow the evidence and to make their decision based solely on the law as instructed by the court and the evidence as presented at trial. Tr. at 10-130. The court inquired whether the jurors understood this direction and whether they could follow it. Id. at 52-53, 174. Counsel did not act unreasonably by choosing not to object to this level of instruction at this stage. Moreover, preliminary instructions were then given to the selected jurors, before opening statements and the presentation of evidence, id. at 199-213; and the final instructions on the statutes, burden and elements of proof, assessing the credibility of the witnesses, and so forth, were all given with great specificity at the conclusion of the case, after final arguments and before

225

submission to the jury for decision. <u>Id.</u> at 1666-1713. Jurors were thoroughly and properly instructed at all junctures and phases of trial.

It is incorrect that counsel failed to object to the collective questioning. Before trial, counsel filed a motion requesting that (1) prospective jurors complete questionnaires, which was granted and done; (2) counsel be permitted to directly question jurors; (3) individual questioning of jurors be permitted, particularly when evaluating the jurors' views about the death penalty and ability to follow the law; and (4) the Petitioner be given additional peremptory challenges. ECF No. 156. The court ruled on this Motion before the beginning of voir dire, and in relevant part, held that it would conduct collective questioning first, but would proceed with individual questioning as appropriate. Tr. at 5. This procedure was then followed at voir dire. Tr. at 10-130. Moreover, the defendants were given their twenty (20) peremptory challenges. Tr. at 7. Counsel cannot now be faulted for not further objecting to the court's decision to proceed as it did, under established precedent permitting collective questioning by the court, followed by individual questioning.

Finally, as to the claim that counsel failed to object to the questions that asked about understanding versus following

226

the law, counsel did raise Morgan.[74] Tr. at 76-77, 116-17. It is clear that counsel knew of Morgan and raised the issue for the questions that they thought might be problematic. The Petitioner is unable to show that counsel did not reasonably consider the various questions when choosing what objections to make under Morgan, and that the court's rulings thereon were flawed.

For the above reasons, the Petitioner cannot show that counsel acted deficiently. Trial counsel did raise many of the above objections, and the ones not raised lack merit and/or foundation in the record. The Petitioner also fails to show that he suffered any prejudice from the actions of counsel or the rulings of the court during voir dire. Accordingly, he fails to make a claim of ineffective assistance of trial counsel, and is unable to excuse default.

### b. Ineffective Assistance of Appellate Counsel

The Petitioner also suggests that his appellate counsel was ineffective for not raising this argument on direct appeal, and such ineffectiveness should excuse default. Reply at 131. After considering the instant claim and finding it to be without merit, the Petitioner is unable to show that this claim was stronger than any raised on appeal, or that had it been raised,

---

[74] See supra Part IV.Q.3.

227

there would have been a reasonable probability of a different outcome.

As the Petitioner fails to show ineffective assistance of either trial or appellate counsel, the Petitioner does not have cause to excuse default. Claim Seventeen is procedurally defaulted and without merit, and is **DENIED**.

### R. CLAIM S-2 – THE PETITIONER ARGUES THAT THERE WERE PROBLEMS WITH THE JUROR QUESTIONNAIRE AND ITS USE BY THE COURT, AND COUNSEL UNREASONABLY FAILED TO OBJECT.

Claim S-2 is filed under seal pursuant to the court's Order of October 5, 2015. ECF No. 476. [75] The discussion of this claim need not be under seal, as no personal identity information is divulged about any potential juror.

In his final claim, the Petitioner argues that the use of the juror questionnaire violated his Fifth and Sixth Amendment rights. Mot. at S2-1, ECF No. 508. Before beginning voir dire, the court ordered counsel for both parties to review the completed juror questionnaires and to submit three lists: (1) a

---

[75] On October 2, 2015, the Petitioner filed a "Motion to File Under Seal Three Claims and One Exhibit to His Forthcoming Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255." ECF No. 471. On October 5, 2015, the court granted that Motion in part, permitting the Petitioner to file Claim S-2 and Exhibit S-1 under seal. ECF No. 476. Claim S-1 is addressed herein as Claim Sixteen, Part IV.P, and Claim S-3 is addressed herein as Claim Seventeen, Part IV.Q.

228

list of those jurors that the parties agreed should be called for voir dire; (2) a list of those jurors the parties agreed should not be called; and (3) a list of those upon whom the parties could not agree. ECF No. 210. Counsel complied with this request. ECF No. 236.

The Petitioner now complains of several errors with this procedure. He argues that excluding the persons on List Two, who the parties agreed should not be called, without oral voir dire violated his Fifth Amendment rights to due process and equal protection and his Sixth Amendment right to an impartial jury. Mot. at S2-1. He further argues that there were flaws in the questionnaire, and he points to several individuals who he argues were improperly excluded based on their answers to the questionnaire and without voir dire. Id. at S2-8-16. He also alleges ineffective assistance of trial counsel for their failure to object and decision to participate in the process. Id. at S2-16-19.

### 1. Procedural Default

As with most of the Petitioner's claims, this argument was not raised on appeal. Since it is being raised for the first time on collateral review, the claim is procedurally defaulted.

229

Resp. to Claim S-2 at 3, ECF No. 537.[76] The Petitioner argues that this default should be excused, as his attorneys were ineffective for not challenging and bringing this claim earlier. Reply at S2-1, ECF No. 525. In order to determine if the Petitioner can prove his independent ineffective assistance claim, and ineffective assistance to excuse default, the court will now examine the arguments in this claim.

### 2. Exclusion Based Solely on Answers to Questionnaire Inquiries about the Death Penalty

The Petitioner argues that excluding jurors without oral voir dire based on their opinions about capital punishment violated his constitutional rights. Mot. at S2-1. The Supreme Court has held that a potential juror may be excluded for cause based on his or her views about the death penalty, if those views would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). This standard is broader than excluding only those who would never vote for, or against, the death penalty. Id.

---

[76] The government again asserts that Teague bars review of this claim. Resp. at 3-4. As there has been no change in the relevant law since the Petitioner's conviction became final, the court finds that Teague does not apply.

To support his argument, the Petitioner relies on <u>United States v. Chanthadara</u>, 230 F.3d 1237 (10th Cir. 2000). <u>Id.</u> at S2-2. In <u>Chanthadara</u>, the trial court excused several potential jurors without conducting voir dire, and the appellate court reviewed the decisions de novo. 230 F.3d at 1269-70. Based on the specific facts of the case before it, the court found that the questionnaire answers of one of the potential jurors were not sufficient to show that she would be unable to follow the court's direction on the law regarding the death penalty. <u>Id.</u> at 1270-73. The court held that exclusion of the juror based on the answers in her questionnaire was constitutional error. <u>Id.</u> at 1272-73. The Tenth Circuit, however, declined to create a per se rule against excusing a juror for cause before voir dire in a capital case, based on that person's view of the death penalty. <u>Id.</u> at 1269.

The Eighth Circuit declined to follow the <u>Chanthadara</u> decision to review de novo the dismissal of a juror based on her questionnaire answers about the death penalty. <u>United States v. Purkey</u>, 428 F.3d 738, 750 (8th Cir. 2005). Instead, it used an abuse of discretion standard, noting that reasons such as judges' expertise, respect for the judicial process, and conservation of judicial resources — not just the ability of a trial judge to assess the credibility of a potential juror

231

during voir dire — command deference. Id. at 750. Based on the facts before it, the court held that the district court did not abuse its discretion in dismissing jurors for cause based on their views on the death penalty. Further, in United States v. Quinones, 511 F.3d 289, 301-04 (2d Cir. 2007), the Second Circuit permitted the use of for-cause exclusions in a capital case based only on pre-voir dire questionnaire answers. The court reasoned that "[h]owever strongly we recommend some oral voir dire in capital cases, we do not conclude that the procedure is constitutionally mandated." Id. at 301.

Accordingly, it is established that there is no one constitutionally mandated method of conducting voir dire. A district court has discretion in how to proceed, provided that the process is able to identify unqualified or biased jurors. Morgan, 504 U.S. at 729. This may include oral voir dire, but it also may involve the use of an initial questionnaire. Moreover, it is clear that there is no per se rule against dismissing jurors without voir dire based on their death penalty views.[77] For these reasons, the use of the questionnaire by this court to exclude some jurors before voir dire was not unconstitutional,

---

[77] Had one of these jurors been selected, the Petitioner would now be arguing error and a constitutional violation in that situation.

and nothing to the contrary shows that a biased jury was selected.

### 3. Exclusion of Five Specific Jurors Based on Questionnaire Answers

The Petitioner's next argument deals with the specific questionnaire and dismissed jurors in his case. After jurors returned the questionnaire, the parties created a list of those jurors they agreed should not be called for voir dire. It was only if both parties agreed that the individual was not called. The Petitioner now points to five specific individuals — Jurors 45, 96, 178, 195, and 232 — who he argues were improperly dismissed based on their views about the death penalty, as contained in the questionnaire. Mot. at S-12-18. The Petitioner provides a list of reasons by defense counsel for objecting to specific jurors, and the list gives these five jurors' views on the death penalty as a reason trial counsel placed them on List Two. Mot. Attach. S-1. The Petitioner now argues that this list proves the jurors were dismissed for unconstitutional reasons. Mot. at S2-12.

First, the court has already found there was no error in using the questionnaire as a means to dismiss jurors without oral voir dire. Jury selection involves the experience of counsel and an evaluation of trial strategy. <u>See, e.g.</u>, <u>Romero</u>

233

v. Lynaugh, 884 F.2d 871, 878 (5th Cir. 1989) ("The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities."). Some of the answers by the five jurors indicated that the juror was strongly opposed to the death penalty, or that not only would the juror have a difficult time making a decision because of his or her views on the death penalty, but that he or she would have a difficult time, regardless of the facts and law in the case. Such views could be seen to substantially impair the juror's performance, and counsel reasonably could have wanted to remove jurors who appeared unable to follow the court's instructions.

Further, "[i]t has long been recognized that 'a court can not be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request.'" United States v. Herrera, 23 F.3d 74, 75 (4th Cir. 1994) (quoting Shields v. United States, 273 U.S. 583, 586 (1927)).[78] As the Petitioner points out, the court instructed the parties to compile a list of those jurors that it agreed should be dismissed based on the questionnaires, so the invited error doctrine in Herrera is not fully applicable. However, the court

---

[78] See supra note 35.

234

gave no instruction on how to create the lists. No party made any objection, and this system served to streamline the process by eliminating jurors that <u>both</u> parties agreed should not be called. If defense counsel did not agree with the government's decision to dismiss a juror, counsel could have put the individual on List Three, which was for those jurors upon whom the parties could not agree. The fact that counsel did agree to dismiss the jurors on List Two means that the defense counsel must have seen the benefit in eliminating them from the jury pool.

Finally, the court does not know if the only reason for the dismissal of the jurors was their death penalty views. It appears that the list was emailed between counsel, but nothing suggests it gives the only, or final, reasons for exclusion. For example, the list also provides that one of the jurors' husbands was a police officer, and another juror was a retired Naval officer — and Cory Voss was also a Naval officer. The court will not discount the exclusion of these five jurors, or any other juror to which the Petitioner now may object, based only on a list that is not proven to contain the exclusive reasons for dismissing the jurors. Accordingly, the Petitioner fails to show how those five jurors, who both parties agreed to put on List Two, were improperly dismissed.

235

### 4. Alleged Flaws with the Questions in the Juror Questionnaire

Not only does the Petitioner argue that jurors should not have been dismissed based on their questionnaire answers, he also challenges the questionnaire content itself. Mot. at S2-8-11. He presents the following arguments for why the questionnaire was flawed: (1) the questionnaire did not contain information about the law or procedures that would govern the jury's decision making at trial; (2) it did not contain a question about whether personal or moral opinions about the death penalty would substantially impair the juror's ability to weigh the aggravating and mitigating factors, and follow the judge's instructions; (3) the questionnaire was internally inconsistent; (4) the options to Question Sixty-One were skewed or based on a flawed legal premise; (5) Question Sixty-One presented jurors with several options about their views on the death penalty but did not allow them to express their opinion in their own words; and (6) the information in Question Fifty-Nine may have distorted jurors' views about the sentencing process. Id. The government essentially ignores this claim in its Response.

The court, however, finds that the questionnaire was not constitutionally infirm. It was designed to gather basic

236

information, which could then be expanded upon during voir dire as the parties deemed appropriate. For those jurors whose answers showed hardship, strong views about the death penalty, or some other reason that both parties agreed qualified a juror not to be seated, the questionnaire allowed for proper dismissal. But for the others, it was not necessary at this point to provide background information about the structure of the trial or relevant standards, or to provide opportunities for more in-depth explanations on views about the death penalty. Those topics would be, and were, covered in voir dire. Even assuming that some of the questions could benefit from being reworded, the questions served their purpose of gathering basic information, and that did not violate the Petitioner's rights. As discussed above, a questionnaire can be used in capital cases to assist with voir dire, and the Petitioner has failed to show how the questions and answer choices violated his right to an impartial jury and fair trial. Both the Petitioner and the United States contributed to and agreed upon the questionnaire used in this case. See ECF Nos. 156, 175, 190, 211, 212.

### 5. Ineffective Assistance of Counsel

The Petitioner next claims that trial counsel was ineffective for failing to object to (1) the questionnaire, (2)

237

the court's direction to dismiss some potential jurors based only on answers to the questionnaire, and (3) the actual order of dismissal of the jurors on List Two. Id. at S2-16-18. The Petitioner further argues that counsel was ineffective for actively participating in these procedures. Id. at S2-18. He also argues counsel's ineffectiveness is cause to excuse the procedurally defaulted arguments in this claim. Reply at S2-1.

As discussed throughout this Order, to make a showing of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland, 466 U.S. at 687. The Petitioner fails to meet these Strickland requirements.

The court has already concluded that the general use of a questionnaire to excuse jurors prior to voir dire, even in a capital case, is not unconstitutional. Thus, counsel was not deficient for declining to object when the court suggested the use of the questionnaire. The court also found no constitutional infirmities with the questionnaire itself, so counsel cannot be faulted for not objecting. Additionally, such objections would have been meritless, so the Petitioner is unable to show a

238

reasonable probability of a different outcome had counsel objected.

Regarding the failure to object to the actual dismissal order based on List Two and counsel's participation in the process, the court has concluded such acts did not violate the Petitioner's rights and were not unconstitutional. These procedures were agreed to by both parties to streamline the process. This was not a situation where jurors were excused prior to voir dire due to a challenge by the government or a sua sponte dismissal by the court. Other than a list, the origin of which the Petitioner does not explain, the Petitioner presents no proof that counsel unreasonably excused jurors or felt forced to participate. The Petitioner's counsel was actively involved in the process, and the Petitioner has given the court no reason to question counsel's decisions regarding the questionnaire. Trial counsel had already filed multiple requests related to jury selection. ECF No. 156. If counsel did not want to participate, they certainly would have objected. That counsel declined to object to a procedure that has not been held unconstitutional is not deficient. It means that counsel saw the benefit in the process, and the court will not second guess that choice. Based on the above analysis, the court concludes that

239

trial counsel was not deficient for not objecting to, and for actively participating in, the voir dire procedures.

Regarding prejudice, the Petitioner states only that "[t]here is a reasonable probability that absent counsel's deficient performance, the composition of the jury would have been different, and that at least one juror would have voted for life." Mot. at S2-20. This blanket statement, with nothing more, is not enough to show the prejudice required for an ineffective assistance of counsel claim. The Petitioner is unable to point to any biased juror who was seated, or any juror improperly struck. Moreover, as discussed in this section, any objection would have been meritless, so the Petitioner fails to show a reasonable probability of a different outcome had counsel acted differently. For these reasons, the Petitioner is unable to prove his ineffective assistance of trial counsel claim, both as its own independent claim and as a means to excuse default.

The court also finds that this claim is not stronger than any claim presented on appeal, and that, as this claim has no merit, there is not a reasonable probability of a different outcome had the Petitioner appealed this issue. For these reasons, the Petitioner is unable to show ineffective assistance of appellate counsel.

240

As the Petitioner fails to prove ineffective assistance of counsel, he is unable to overcome the procedural default on his other arguments. Claim S-2 is both procedurally defaulted and lacking in merit, and it is **DENIED**.

## V. CONCLUSION

For the reasons stated herein, the Petitioner's First and Second Motions for Discovery are **DENIED,** and the Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**. The court declines to issue a certificate of appealability for the reasons stated in this Opinion.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.[79]

_____
REBECCA BEACH SMITH
CHIEF JUDGE

January 19, 2017

---

[79] An Index of this Opinion is attached for reference purposes and made a part hereof. Exhibits A, B, C, and D referenced in the Opinion are attached following the Index.

241

INDEX

I. FACTUAL BACKGROUND ..............................................2

II. PROCEDURAL HISTORY .............................................9

III. STANDARDS OF REVIEW ..........................................15

    A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255.............15
        1. Ineffective Assistance of Counsel .....................16
        2. Procedural Default ....................................18
        3. Bar on Relitigating Claims Brought on Direct Appeal ...19
        4. Retroactive Application of New Rules to Cases on
           Collateral Review .....................................20
        5. Evaluation of New Claims Contained in Amended
           Pleadings .............................................21

    B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO
       28 U.S.C. § 2255 ........................................22

IV. THE PETITIONER'S CLAIMS .......................................24

    A. CLAIM ONE – DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN
       CASE ...................................................24
        1. Robert Glenn Ford ....................................25
        2. Clifford Dean Posey ..................................31
        3. Ineffective Assistance of Trial Counsel ..............34
        4. Conclusion ...........................................35

    B. CLAIM TWO – PROSECUTION FAILED TO DISCLOSE EXCULPATORY
       EVIDENCE ABOUT CO-DEFENDANT MICHAEL DRAVEN ...............35
        1. Procedural Default ...................................36
        2. Brady Claim ..........................................38
        3. Ineffective Assistance of Trial Counsel ..............44
        4. Discovery ............................................45

    C. CLAIM THREE – COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT
       GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT,
       HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE............46
        1. Chad Costa ...........................................47
        2. Cat Voss .............................................50
        3. Scott Linker .........................................52
        4. Rose Wiggins .........................................53

5. Whereabouts of the Petitioner on the Day of the
   Murder ............................................... 55
6. Cell Tower Testimony ................................. 57
7. The Petitioner's Shopping List ...................... 61
8. Ballistics Tests .................................... 62
9. Conclusion .......................................... 66

D. CLAIM FOUR – COUNSEL ABDICATED RESPONSIBILITY TO ADVOCATE
   AT ELIGIBILITY PHASE OF TRIAL ........................... 66

E. CLAIM FIVE – TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING  TO
   INVESTIGATE, DISCOVER, AND PRESENT EVIDENCE OF INCOMPETENCY
   TO STAND TRIAL .......................................... 71
   1. Standard for Ineffective Assistance of Counsel for
      Failure to Request Competency Hearing ............... 71
   2. Whether Counsel was Ineffective for Failing to
      Investigate Competency and Request a Hearing on the
      Issue ............................................... 74
   3. Discovery ........................................... 76

F. CLAIM SIX – COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY
   FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE
   REGARDING PSYCHO-SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL
   HEALTH .................................................. 77
   1. Ineffective Assistance Standard ..................... 78
   2. Hudgins's Involvement with the Case ................. 81
   3. Counsel's Mental Health Investigation ............... 82
   4. Counsel's Decision Not to Introduce Mental Health
      as a Mitigating Factor .............................. 90
   5. Decision Not to Present a Complete Psycho-Social
      History ............................................. 95
      a. Various Records, Letters, and Medical Reports ....... 96
      b. Government Experts – Dr. Patterson and
         Dr. Montalbano ................................... 101
      c. Lay Witnesses ................................... 103
      d. Defense Experts – Dr. Mirsky, Dr. Merikangas,
         Dr. Cunningham, and Dr. Dudley ................... 108
   6. Evaluation of Counsel's Strategy Based on All of the
      Above Factors ...................................... 114
   7. Conclusion ......................................... 119

G. CLAIM SEVEN – CONFRONTATION CLAUSE VIOLATED, AND COUNSEL
   UNREASONABLY FAILED TO OBJECT AND ASK FOR A LIMITING
   INSTRUCTION ............................................ 120
   1. Procedural Default ................................. 121

2. Confrontation Clause Claim ...........................121
3. Ineffective Assistance of Trial Counsel .............127

H. CLAIM EIGHT – THE PETITIONER ARGUES THAT HIS APPELLATE
COUNSEL RENDERED INEFFECTIVE ASSISTANCE. ................130

I. CLAIM NINE – THE PETITIONER ARGUES THAT THE HOLDING IN
*JOHNSON V. UNITED STATES*, 135 S. CT. 2551 (2015),
INVALIDATES HIS CONVICTION. ...........................133
1. Holding and Retroactivity of
*Johnson v. United States* ............................134
2. Extension of *Johnson* to the Petitioner's Case .......137

J. CLAIM TEN – THE PETITIONER ARGUES THAT THE JURY
INSTRUCTIONS LOWERED THE GOVERNMENT'S BURDEN OF PROOF. ..140
1. Bar to Relitigating Claims Raised on Appeal .........142
2. Extension of *Hurst v. Florida* to the Petitioner's
Case ................................................144

K. CLAIM ELEVEN – THE PETITIONER ARGUES THAT HIS SENTENCE IS
UNCONSTITUTIONAL BECAUSE IT IS BASED ON AGGRAVATING
CIRCUMSTANCES THAT ARE ARBITRARY AND OVERBROAD. .........145
1. Procedural Default and Bar on Relitigation ..........146
2. Standard for Evaluating Aggravating Factors .........148
3. The Petitioner's Statutory Aggravating
Factor Claim ........................................149
4. The Petitioner's Non-Statutory Aggravating
Factor Claim ........................................152
a. Bar on Relitigation...............................153
b. The Prosecution's Use of Non-Statutory Aggravating
Factors in the Petitioner's Case...................154
c. Ineffective Assistance of Counsel.................157
5. Conclusion .........................................158

L. CLAIM TWELVE – THE PETITIONER ARGUES THAT THE GOVERNMENT
ENGAGED IN SELECTIVE PROSECUTION BASED ON RACE, AND COUNSEL
WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM DURING
DIRECT PROCEEDINGS. ....................................158
1. Standard for Selective Prosecution Claims ...........159
2. The Petitioner's Argument for Selective
Prosecution .........................................161
3. Ineffective Assistance of Counsel ...................165
4. Discovery ..........................................166

M. CLAIM THIRTEEN – THE PETITIONER ARGUES THAT HIS DEATH
   SENTENCE IS DISPROPORTIONATE AND IN VIOLATION OF THE FIFTH
   AND EIGHTH AMENDMENTS, AND COUNSEL WAS INEFFECTIVE FOR NOT
   RAISING THIS CHALLENGE DURING DIRECT PROCEEDINGS. .......168
   1. Procedural Arguments ................................168
   2. Disproportionality of the Petitioner's Sentence ......170
   3. Ineffective Assistance of Counsel ...................176

N. CLAIM FOURTEEN – THE PETITIONER ARGUES THAT HIS DEATH
   SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS
   SEVERELY MENTALLY ILL, AND COUNSEL WAS INEFFECTIVE FOR NOT
   RAISING THIS CHALLENGE DURING TRIAL AND ON APPEAL. ......179
   1. Existing Exceptions to Application of the Death
      Penalty ..........................................179
   2. The Petitioner's Argument to Extend the Holdings in
      *Atkins* and *Roper* ...............................181
   3. Ineffective Assistance of Counsel ...................185

O. CLAIM FIFTEEN - THE PETITIONER ARGUES THAT SELECTION OF THE
   GRAND AND/OR PETIT JURY WAS TAINTED, AND COUNSEL
   UNREASONABLY FAILED TO REQUEST AND INSPECT THE JURY
   SELECTION RECORDS. ......................................186
   1. Selection of the Grand and/or Petit Jury Venire ......186
   2. Compliance with the Jury Selection Plan and the
      Provisions of 28 U.S.C. § 1861 et seq. ..............188
   3. Participation of an Allegedly Unqualified Juror During
      the Jury Selection Process ..........................192
   4. Ineffective Assistance of Counsel ...................193

P. CLAIM SIXTEEN – THE PETITIONER ALLEGES THAT THE GOVERNMENT
   USED ITS PEREMPTORY STRIKES TO DISCRIMINATE BASED ON RACE
   AND GENDER, AND COUNSEL UNREASONABLY FAILED TO OBJECT. ..195
   1. Procedural Default ..................................196
   2. Standard for a *Batson/J.E.B.* Claim ...................197
   3. The Petitioner's *Batson* Claim .........................199
      a. Prima Facie Case..................................199
      b. The Government's Race-Neutral Reasons for the Strikes
         and the Petitioner's Response......................204
   4. The Petitioner's *J.E.B.* Claim .........................206
      a. Prima Facie Case..................................206
      b. The Government's Gender-Neutral Reasons for the
         Strikes and the Petitioner's Response..............207

5. Ineffective Assistance of Counsel ....................209
   a. Ineffective Assistance of Trial Counsel...........209
   b. Ineffective Assistance of Appellate Counsel.......211
6. Discovery .........................................211

Q. CLAIM SEVENTEEN - THE PETITIONER ALLEGES THAT THE VOIR DIRE
   VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS, AND
   COUNSEL'S FAILURE TO OBJECT TO VOIR DIRE PROCEDURES WAS
   UNREASONABLE. ........................................213
1. Procedural Arguments ...............................214
2. Collective Questioning of the Potential Jurors .......215
3. Use of Questions Designed to Determine Bias and Ability
   to Follow the Law and the Court's Instructions .......217
4. Scope and Structure of the Proceedings ..............221
5. Ineffective Assistance of Counsel ....................223
   a. Ineffective Assistance of Trial Counsel...........223
   b. Ineffective Assistance of Appellate Counsel.......227

R. CLAIM S-2 - THE PETITIONER ARGUES THAT THERE WERE PROBLEMS
   WITH THE JUROR QUESTIONNAIRE AND ITS USE BY THE COURT, AND
   COUNSEL UNREASONABLY FAILED TO OBJECT. ...................228
1. Procedural Default .................................229
2. Exclusion Based Solely on Answers to Questionnaire
   Inquiries about the Death Penalty ...................230
3. Exclusion of Five Specific Jurors Based on Questionnaire
   Answers ...........................................233
4. Alleged Flaws with the Questions in the Juror
   Questionnaire ......................................236
5. Ineffective Assistance of Counsel ....................237

V. CONCLUSION .............................................241