

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

> FILED
> IN OPEN COURT
>
> JUL 18 2008
>
> CLERK, U.S. DISTRICT COURT
> NEWPORT NEWS, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:08cr16 |
| | ) | |
| CATHERINA ROSE VOSS, | ) | |
| a/k/a "Cat Voss" | ) | |
| a/k/a "Cathleen Wiggins" | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

If this matter were to proceed to trial, the United States of America would prove beyond a reasonable doubt, by competent and admissible evidence, the following facts:

1. From on or about March 11, 1999, to on or about April 29, 2007, defendant CATHERINA ROSE VOSS (hereinafter "VOSS") was married to Cory Allen Voss. The couple resided in Newport News, Virginia, within the Eastern District of Virginia. In 2006, after graduating from Old Dominion University, Cory was commissioned as an officer in the United States Navy. He was stationed at the Norfolk Naval Base aboard the USS Elrod as the Communications Officer. During the course of their marriage, they had two children: Casey, age 8, and Cory Jr., age 7.

2. As a member of the United States Navy, Cory Allen Voss had a life insurance policy in the amount of $400,000 through the Office of Servicemember's Group Life Insurance (hereinafter "SGLI"). The primary beneficiary on this policy was VOSS.

3. In or about the late Summer to Fall of 2006, within the Eastern District of Virginia, defendant VOSS began an extramarital affair with co-defendant MICHAEL ANTHONY ERIC DRAVEN (hereinafter "DRAVEN"), a resident of Newport News, Virginia. The affair began while



Case 4:08-cr-00016-RBS-DEM   Document 70   Filed 07/18/08   Page 2 of 8 PageID# 270

VOSS's husband, Cory Allen Voss, was on a six-month deployment aboard the USS Elrod. VOSS and DRAVEN continued the affair after Cory Allen Voss returned from deployment in November 2006. During the affair, VOSS and DRAVEN took overnight trips together, communicated frequently by telephone and electronic mail (hereinafter "e-mail"), discussed marriage with each other and referred to each other as husband and wife.

4.    In or about the Fall of 2006 through April 30, 2007, VOSS and Cory Allen Voss were experiencing financial difficulties, resulting from outstanding and overdue mortgage, student loans, and credit card payments and VOSS' prolific spending habits. During this time period, VOSS had no regular source of income.

5.    In or before January 2007, VOSS and DRAVEN began contemplating the murder of Cory Allen Voss. In early 2007, DRAVEN called a cooperating witness to discuss killing Cory Allen Voss. On January 2, 2007, DRAVEN sent an e-mail to an individual inquiring as to whether this individual had done a "swipe or hit on someone before."

6.    In or about February 2007, DRAVEN met co-defendant DAVID ANTHONY RUNYON (hereinafter "RUNYON"), a resident of West Virginia, while the two were employed as subjects for a medical research study in Baltimore, Maryland. RUNYON, a former enlisted member of the United States Army and former police officer, was experienced with firearms.

7.    In or about February or March 2007, RUNYON and DRAVEN discussed the contract killing of Cory Allen Voss. RUNYON and DRAVEN were released from the Baltimore research study on or about March 14, 2007, and made arrangements to further discuss the killing later in the month.

8.    On or about March 24, 2007, VOSS and RUNYON discussed a plan for

2




RUNYON to murder Cory Allen Voss, the amount of money to be paid to RUNYON and the timing of both the payment and the planned murder of Cory Allen Voss. Their conversation lasted approximately an hour and a half, as confirmed by telephone records. On or about March 26, 2007, VOSS relayed the details of her March 24, 2007 conversation with RUNYON to DRAVEN.

9.      Between in or about March 2007 and April 29, 2007, VOSS, RUNYON and DRAVEN crafted a plan to murder Cory Allen Voss at the Langley Federal Credit Union, Oyster Point Branch, (hereinafter "LFCU"), located at 11742 Jefferson Avenue, in Newport News, Virginia, in order to obtain life insurance proceeds and other benefits that VOSS would receive upon her husband's death. LFCU is a credit union, the deposits of which are insured by the National Credit Union Administration Board. The activities of LFCU operate in and affect interstate commerce.

10.     VOSS and/or DRAVEN communicated with RUNYON by telephone or text message approximately 13 times between on or about March 24, 2007, and April 29, 2007 — the date of the murder — and approximately three (3) times on May 8, 2007. DRAVEN communicated with RUNYON by telephone or text message approximately 30 times between on or about March 22, 2007, and April 29, 2007, and approximately 83 times between on or about May 8, 2007, and September 26, 2007.

11.     On April 20, 2007, VOSS opened a bank account with $5.00 at LFCU. No other deposits were made to this account. VOSS and Cory Allen Voss had a total of four (4) other bank accounts at Navy Federal Credit Union.

12.     On or about April 24, 2007, VOSS prepared on her home computer a Power of Attorney document, which attempted to grant VOSS power over financial matters in the event of the death of Cory Allen Voss. Earlier she had Cory Allen Voss obtain a similar Power of Attorney through the United States Navy; however, this document did not grant VOSS power over financial

3



matters at LFCU in the event of Cory Allen Voss' death. On Saturday April 28, 2007, the day before the murder of Cory Allen Voss, VOSS hand delivered to the LFCU Oyster Point branch these two (2) Powers of Attorney documents.

13.   On April 29, 2007, RUNYON purchased a .357 caliber revolver in or around Morgantown, West Virginia, and traveled in his vehicle from Morgantown, West Virginia, to Newport News, Virginia, to kill Cory Allen Voss.

14.   Around 11:00 p.m., on April 29, 2007, VOSS sent Cory Allen Voss to the the LFCU Oyster Point branch to withdraw $40.00 or $60.00 dollars from the account that VOSS had opened on April 20, 2007, with $5.00. VOSS made two (2) telephone calls from her home to Cory Allen Voss on his cellular phone while he was en route and after he had arrived at LFCU. Cory Allen Voss drove to the LFCU in his 1997 Ford Ranger pick-up truck. The Ford Ranger pick-up truck with Virginia license plate number, JDS-7544, had been transported and shipped in interstate commerce.

15.   On or about April 29, 2007, VOSS, DRAVEN and RUNYON communicated with one another by telephone or text message approximately 23 times leading up to the time of Cory Allen Voss's trip to the LFCU. Specifically, DRAVEN placed or received four (4) telephone calls between 10:12 p.m. to 10:16 p.m. to/from RUNYON, as RUNYON stopped at pay telephones off of Interstate 64 in the City of Newport News. During one of these calls or in person, DRAVEN passed on to RUNYON specific details regarding Cory Allen Voss's pick-up truck, including its make and model, and the location of the LFCU where Voss would be that night. The identification details given to RUNYON were found written down on a map of the Hampton Roads area that was subsequently found in RUNYON's vehicle in December 2007.

4




16.    On or about April 29, 2007, Cory Allen Voss appeared at the drive-up ATM of the LFCU Oyster Point branch in his Ford Ranger at 11:31 p.m. He first attempted a transaction with a bank card belonging to VOSS, but entered a wrong Personal Identification Number (PIN). Video still shots and phone records reveal Cory Allen Voss talking on his cellular phone to VOSS at this time. At approximately 11:33 p.m., RUNYON, while armed with a firearm, entered Cory Allen Voss's truck while Voss was at the ATM machine at the LFCU and caused Cory Allen Voss at gunpoint to drive around the LFCU building and reenter the ATM drive-up. RUNYON directed Cory Allen Voss to make three attempted withdrawals of United States currency from an automated teller machine at the LFCU. These withdrawals were unsuccessful because sufficient funds did not exist in the account opened by VOSS.

17.    Between approximately 11:45 p.m. and midnight on April 29th, RUNYON shot Cory Allen Voss five (5) times in his vehicle in the vicinity of LFCU, within the Eastern District of Virginia. His lifeless body was discovered, riddled with bullets, at approximately 6:45 a.m. on April 30th. A subsequent autopsy report performed by the Virginia Medical Examiner's Office found that the cause of death was three separate gunshot wounds to the chest and abdomen (although the victim was shot five times). Forensics analysis on the bullets found at the crime scene indicated that the rounds were Caliber .38 Class and the markings on the bullets were consistent with that of a .357 magnum revolver, the same type of firearm purchased by RUNYON in West Virginia sometime in the late morning or early afternoon on the day of the murder.

18.    During the early morning hours of April 30, VOSS attempted to create an alibi for herself as a concerned wife by calling area hospitals, police, and other numbers trying to find Cory Allen Voss before ultimately calling the police at approximately 6:15 a.m. to report Cory Allen Voss



missing. Furthermore, in the early morning hours of April 30, VOSS enlisted her mother to ride around Newport News to search for Cory Allen Voss.

19.     On or about May 1, 2007, in the Eastern District of Virginia, VOSS received a $100,000 death gratuity from the United States Navy due to the death of Cory Allen Voss and of that amount deposited $96,100.00 into a Navy Federal Credit Union account. Shortly thereafter, VOSS signed and submitted a claim for the $400,000 SGLI life insurance policy.

20.     After receiving this death gratuity payment, VOSS made a number of purchases for and payments to DRAVEN. On May 17, 2007, VOSS purchased a $1,300 cashier's check made payable to DRAVEN. Between on or about May 20, 2007, through on or about May 21, 2007, VOSS purchased over $10,000 in jewelry for DRAVEN and herself during a trip to the Outer Banks of North Carolina financed by VOSS.   On May 23, 2007, VOSS paid $5,638 to an apartment complex for six months advance rent for DRAVEN.

21.     On June 1, 2007, a Western Union money gram for $275.00 was sent to RUNYON in Morgantown, West Virginia, and was purportedly signed by DRAVEN's brother.

22.     On June 11, 2007, VOSS submitted the SGLI Claim for Death Benefits form in connection with Cory Allen Voss' $400,000 life insurance policy. VOSS made repeated inquiries to SGLI as to why these funds were not being disbursed to her. From May 1, 2007 through July 2007, VOSS spent the $100,000 death gratuity benefit.

23.     During the investigation by law enforcement authorities into the murder of Cory Allen Voss, VOSS, DRAVEN and RUNYON communicated with one another by e-mail and telephone in order to coordinate false alibis, cover the nature of their relationships and provide false information to law enforcement.

6



24.    In the early morning hours of December 14, 2007, Newport News Police Department officers arrested VOSS for the murder of Cory Allen Voss. After being advised of her *Miranda* rights, VOSS agreed to speak with law enforcement. VOSS admitted that she and DRAVEN had had an affair and conspired with RUNYON to murder Cory Allen Voss. VOSS stated that she agreed to pay RUNYON $20,000 to murder her husband, but that she refused to pay him after the murder. As a result, RUNYON kept increasing the amount he was owed. VOSS stated that she had not yet paid RUNYON the $20,000 as originally agreed.

25.    The acts taken by the defendant, CATHERINA ROSE VOSS, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to murder Cory Allen Voss and violate the law.

Respectfully Submitted,

CHUCK ROSENBERG
UNITED STATES ATTORNEY

By:    _____
Lisa R. McKeel
Assistant United States Attorney

By:    _____
Blair C. Perez
Assistant United States Attorney

By:    _____
Brian J. Samuels
Assistant United States Attorney

After consulting with my attorneys and pursuant to the plea agreement entered into this date between the defendant CATHERINA ROSE VOSS, and the United States, I hereby stipulate that the above Statement of Facts is a partial summary of the evidence which is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt. The defendant further acknowledges that she is obligated under her plea agreement to provide additional information about this case beyond that which is described in this Statement of Facts

_____
CATHERINA ROSE VOSS
Defendant


We are counsel for CATHERINA ROSE VOSS. We have carefully reviewed the above Statement of Facts with her. To our knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Paul G. Gill
Counsel for the Defendant

_____
Gerald Zemkin
Counsel for the Defendant

_____
Larry M. Dash
Counsel for the Defendant

_____
Jeffrey A. Swartz
Counsel for the Defendant

8