IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Criminal Action No.: 4:08cr16 |
| | ) | Civil Action No. :4:15cv108 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | **CAPITAL § 2255 PROCEEDINGS** |
| Respondent. | ) | |
| | ) | HON. REBECCA BEACH SMITH |

## MOTION IN LIMINE OF THE UNITED STATES
## TO PRECLUDE TESTIMONY OF JEAN D. BARRETT, ESQ.

COMES NOW the United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, Brian J. Samuels, and Lisa R. McKeel, Assistant United States Attorneys, and Carrie L. Ward, Trial Attorney for the Department of Justice and submits this Motion in Limine related to the proposed testimony of Jean D. Barrett, Esq.   The United States understands that Ms. Barrett will offer the opinion that the performance of trial counsel in this matter, Lawrence H. Woodward, Jr., and Stephen A. Hudgins, fell below the standard of care for representation in capital cases.

### PROCEDURAL HISTORY AND POSTURE OF THE CASE

In August 2009, DAVID ANTHONY RUNYON (hereafter "RUNYON," or "defendant," or "petitioner") was convicted and sentenced death by a federal jury after pleading not guilty to the charges against him. The jury recommended a sentence of death for two of the three convictions of Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a), and Use of a Firearm

1

Resulting in Death, in violation of 18 U.S.C. § 1924(c)(1), (j)(1). The jury recommended a sentence of life for Carjacking Resulting in Death, in violation of 18 U.S.C. § 2119. This Court imposed the sentences in December 2009.

The defendant appealed his convictions and sentence to the United States Court of Appeals for the Fourth Circuit which affirmed. *United States v. Runyon*, 994 F.3d 192 (4th Cir. 2021). Thereafter, the Supreme Court denied a Writ of Certiorari. RUNYON then filed a motion pursuant to 28 USC §2255 to vacate his sentence. This Court denied his motion and denied a certificate of appealability. RUNYON then appealed to the United States Court of Appeals for the Fourth Circuit, which granted a certificate of appealability on four issues to include Petitioner's Claim 6.   This claim alleges that his trial counsel provided ineffective assistance by failing to investigate and present mitigating evidence of a brain injury and potential mental illness.   ECF 511 and appendices.

In support of this claim, petitioner alleged that counsel appeared in the case too late to effectively investigate and present mitigation; that counsel abandoned an incomplete mental health investigation and presented repetitive lay person testimony; and that a complete psycho-social history and its implications would have added weight to mitigating factors, reduced the weight of aggravating factors, and informed the jurors about petitioner's lesser moral culpability.   On February 12, 2021, the Fourth Circuit affirmed the District Court's ruling on all issues, but vacated and remanded Claim 6 to this Court to hold an evidentiary hearing to resolve factual questions related to the claim.   *United States v. Runyon,* 994 F.3d 192 (4th Cir. 2021).

On November 1, 2022, the petitioner identified Ms. Jean Barrett, as a possible witness at the evidentiary hearing, without further detail. ECF 698. On January 3, 2023, counsel for Petitioner disclosed a 21-page report generated by Ms. Barrett, identifying herself as a licensed attorney and learned counsel, along with Ms. Barrett's 15-page curriculum vitae. Government Exh.'s. 1 and 2.

Presumably, Ms. Barrett will testify as an expert witness (a "*Strickland*" expert), although disclosures pursuant to Federal Rules of Criminal Procedure Rule 12.2 and the newly amended Rule 16 have not yet been provided in full.[1]

Ms. Barrett's report claims that trial counsel had "abundant information" that "would help explain, not only Mr. Runyon's involvement in the killing of Cory Voss, but also his peripatetic lifestyle, which the Government dwelled on repeatedly to damaging effect."   Government Exh. 1 at 1-2.   In so doing, Ms. Barrett repeatedly asserts that such information would have explained the defendant's involvement in the crime – a crime which the defendant repeatedly denied committing.   Ms. Barrett references certain defense experts (but not all of those retained) in support of her contention that trial counsel should have done more to investigate and present the defendant's mental health history.

For the reasons stated below and pursuant to Federal Rule of Evidence (Fed. R. Evid.) Rule 702(a), this Court should preclude the defendant from presenting Ms. Barrett's testimony, report, or opinions regarding the adequacy of trial counsel's mitigation investigations or their penalty phase presentation.   *Strickland's* test for deficient performance is an objective one; thus, Ms. Barrett's opinions are irrelevant and inadmissible for purposes of this evidentiary hearing.   *See* Fed. R. Evid. 401, 402. Further, the submission of opinion seeks to subvert this Court's role and responsibility to faithfully assess the facts and evidence in this case. This report impermissibly inserts a subjective legal opinion to answer the ultimate and objective question: Whether counsels' performance satisfied prevailing professional norms at the time of trial.   For these reasons, Ms.

---

[1]   A 15-page curriculum vitae was attached to Ms. Barrett's report, listing those cases in which she has been appointed learned counsel. Missing is a list of any cases in which she has testified as an expert (Rule 16((a)(1)(G)(iii), requiring a list of all publications authored in the previous ten years, and a list of all cases in which, during the previous four years, the witness has testified as an expert at trial or by deposition. (See also, Rule 16(b)(1), for reciprocal disclosure requirements.

Barrett's testimony and materials should be excluded.

## BACKGROUND

Originally, the petitioner was represented by attorneys Jon Babineau and Lawrence H. Woodward, Jr.   The defense team was assisted by Dr. Evan Nelson, a board-certified psychologist [2], Ms. Sheila Cronin, a mitigation specialist, and Mr. Glenn Ford, a defense investigator.   Mr. David Bruck assisted as resource counsel.   On February 5, 2009, Mr. Babineau acted upon Dr. Nelson's recommendation to obtain a neuropsychological evaluation and Dr. Bender was contacted. Government Exh. 3.   Dr. Bender's role and accomplishments in the case are somewhat unclear, although he did submit invoices for payment, consulted with Mr. Hudgins yet noticeably did not produce a report.   Later the same month, Mr. Babineau severed his relationship due to a conflict of interest and attorney Hudgins was appointed as counsel.

Multiple witnesses with expertise in mental health were appointed to consult with Mr. Runyon's trial defense team.   A brief description of these experts follows:

1.  **Dr. Evan Nelson.**

Despite the change in counsel, Dr. Nelson remained in contact with the trial defense team through verdict, provided information to trial counsel that will be revealed during the evidentiary hearing (as summarized in part below), and continued to consult with trial counsel through and after Petitioner's date of conviction.   Counsel "did not believe his opinions were favorable to the defense" and trial counsel moved away from Dr. Nelson and his opinions, transitioning focus of the mitigation investigation to Dr. Allan Mirsky and Dr. James Merikangas.   (Hudgins' declaration, ECF 511-5).   However, at least as late as July 16, 2009, Dr. Nelson was

---

[2]   Ms. Barrett's report makes no mention of any opinions rendered by Dr. Nelson, which were decidedly adverse to the defendant.

communicating with trial counsel, asking "I have not heard back how the trial is going, if there is a strategy for mitigation in the event he is found guilty." Government Exh. 4, p. 1. Mr. Hudgins informed Dr. Nelson of the guilty verdict on July 17, 2009, to which Dr. Nelson asked whether he should be preparing for the penalty phase proceeding. He asked, "did the trial portray him as a highly scheming individual and therefore you don't want expert testimony? Please give me some preview of which way we're going." Government Exh. 4, p. 6. On July 20, 2009, Mr. Hudgins informed Dr. Nelson that they did not anticipate calling him as a witness but may wish to consult with him. After Mr. Hudgins notified Dr. Nelson of the sentencing verdict, Dr. Nelson replied, "it's what all of us had been trying to tell him for months - he would likely lose… and if he did the jury's perception of him for the penalty phase was that he was a cold blooded, planful hired gun. As they say, you can lead a horse to water, but you cannot make him drink, and that is what happened when Mr. Runyon was given good advice but competently chose to gamble on refusing it." Government Exh. 5, p. 1. Mr. Hudgins responded that they did not present a mental health defense, per se, but did put on evidence of childhood and life, *as we had previously discussed.* (Id., emphasis added). Of note, none of this information was apparently considered by Ms. Barrett.

## 2. Dr. Allan Mirsky

Dr. Allan Mirsky (a neuropsychologist) conducted a pretrial neuropsychological evaluation of Petitioner on June 26, 2009 and generated a preliminary report. He found that petitioner had some superior to very superior cognitive skills. Exceptions were seen in (i) sustained attention (continuous performance tasks, especially visual) – indicative of dysfunction in a brainstem-cortical system responsible for maintaining alertness; and (ii) attention and manual dexterity, consistent with some mild, diffuse brain damage. Dr. Mirsky found that the test results and reported symptoms merited further intensive neurological investigation, triggering counsels'

request to appoint Dr. Merikangas (approved shortly after the jury's guilty verdict was announced) ECF 511-20.

In 2015, Dr. Mirsky conducted another clinical evaluation and found that Petitioner's testing performance was generally consistent with those administered in 2009.  ECF 511-35.  He again found symptoms consistent with a diagnosis of post-traumatic stress disorder ("PTSD") and found a likely comorbid diagnosis of brain damage and schizophrenia.  He determined that petitioner's marked impulsiveness is a noted characteristic of frontal lobe injury, wherein an individual may not appreciate the consequences of his actions.  Noting that petitioner reported a 2009 prison assault that resulted in a right head injury that left lingering tinnitus in his right ear, Dr. Mirsky concluded that the testing was consistent with significant damage to the right side of the brain, as well as a psychotic disorder.  It is possible that the injuries contributed to the development of a psychotic disorder. ECF 511-35, p. 6.  Dr. Mirsky did not reference or incorporate the 2009 MRI or PET scans in either report.

### 3. Dr. James Merikangas

In July 2009, Dr. Merikangas conducted a pretrial clinical examination of petitioner, and subsequently ordered an MRI, PET, and EEG of the brain be accomplished. ECF 511-2.   The MRI and PET scans were ordered by Dr. Merikangas, with instructions to return findings to the ordering clinician.   Pending results of these tests, Dr. Merikangas generated a preliminary report, and his impressions note a history of multiple head injuries, childhood beatings, and current headaches. Dr. Merikangas further indicated that psychiatric evaluations suggest that, at the time of the crime, Petitioner was suffering from the side effects and/or withdrawal from experimental drugs administered as a control source in drug trials for pay.   Dr. Merikangas noted that petitioner expressed grandiose wishful thinking or delusions and that he had clearly impaired executive

functioning suggestive of frontal lobe brain impairment.

Although petitioner has asserted a claim that his trial defense counsel redirected those reports and failed to provide them to the mental health experts, there is little evidence to support this assertion. Dr. Merikangas did not provide a final report, nor did he testify at petitioner's penalty phase proceeding, and no communications between the trial team members provides insight into this decision. However, in August 2009, the defense team reviewed the mental health reports of government expert's Dr. Paul Montalbano and Dr. Patterson. It was noted by the team that both experts "were soft on the guy." "Hell, these prosecution expert witnesses could end up being more helpful than the defense witnesses." "There really isn't a big attack to be mounted… work that needs doing is putting together a defense presentation." Government Exh. 6. That assessment, conflated with the likely requirement to disclose Dr. Nelson's unfavorable opinions, would have factored into counsels' mitigation strategy and ultimate penalty phase presentation.

In a 2015 report, Dr. Merikangas does not discuss or claim that he did not receive the scans and radiology reports prior to trial. ECF 511-2. Rather, he summarizes his earlier work and then notes that, he "reviewed the MRI and PET scans of August 2009. They revealed multiple white matter hyperintensities on the MRI consistent with his history of head injures [sic] and migraine. The PET scan was non-diagnostic." ECF 511-2. He reported the following impressions: petitioner suffered brain damage from age 3, including a 1996 motor vehicle accident and a jail assault (presumably in 2009) that resulted in impaired executive functioning and decision making. He notes that psychiatric tests suggest paranoid delusions. He finds continued evidence of PTSD, as previously diagnosed, which may account for some of his disordered mood and cognition. He concludes that symptoms may be the consequence of brain injuries, a functional mood disorder, and PTSD. Dr. Merikangas asserted that he would have testified at trial that petitioner suffered

from brain damage, disorder of executive functioning, combined with a psychotic thought process. ECF 511-2, p. 1 and 4.

Although the United States summarizes certain reports above that were done in 2009 and 2015 for context, this should not be taken as an indication that it is appropriate for the Court to consider information that may not have been available to trial counsel in 2009.   The performance inquiry should be focused on the circumstances existing at the time of representation. Additionally, as the United States will present and argue, even the further reporting done by these experts did not and does not explain what Ms. Barrett asserts they do – namely, the defendant's intentional killing of Cory Voss in a murder for hire plot.

## ARGUMENT

A.  **The Court should preclude the testimony of a *Strickland* Expert. Ms. Barrett's conclusions are irrelevant to the scope of the evidentiary hearing**.

Ms. Barrett will presumably testify as an expert witness regarding the objective standards of practice and prevailing norms at the time of the representation.   Expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.   But that is unnecessary in this case, as a federal judge is certainly "qualified to understand the legal analysis required by *Strickland*."   *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995) (finding no abuse of discretion in the district court's refusal to permit testimony by a *Strickland* expert).   The government notes that similar expert testimony has been allowed in some cases, but "it is within a district court's discretion to exclude proposed expert testimony concerning a legal standard of care and to rely solely on the briefs."   *Heishman v. Ayers*, 621 F.3d 1030, 1042 (9th Cir. 2010); *see also Hovey v. Ayers,* 458 F.3d 892, 910-11 (9th Cir. 2006) (finding no abuse of discretion from exclusion of expert testimony concerning legal standard of care).

In this case, the Fourth Circuit noted the district court originally found trial counsel had

8

"thoroughly investigated the Petitioner's mental health and found that there was not enough to present a viable mitigation argument. Accordingly, counsel was not deficient for deciding to forego certain mental health evidence and instead present a mitigation strategy that focused on codefendant culpability, positive prison evidence, and family sympathy." *United States v. Runyon*, 994 F.3d 192, 207 (4th Cir. 2021) (citing *United States v. Runyon*, 228 F.Supp.3d 569, 616 (E.D. Va., January 19, 2017). In remanding this claim for further investigation to conduct this evidentiary hearing, the Fourth Circuit cited a litany of information, revealed in Mr. Runyon's postconviction investigation, and found that while further investigation into petitioner's mental health may have been sound, "*the record remains unclear whether such a strategic choice was made.*" *Runyon,* 994 F.3d at 208. (Emphasis in original).

The remand order obviates the need for Ms. Barrett's testimony. The seminal authority in all ineffective assistance claims eschews the application of specific rules of practice, and the question before the Court is simply one of fact and reasonableness.

> [T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like. *e.g.,* ABA Standards for Criminal Justice 4— 1.1 to 4—8.6 (2d ed. 1980)("The Defense Function"), are guides to determining what is reasonable but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Strickland*, 466 U.S. at 688-89; *see, Bobby v. Van Hook*, 558 U.S. 4, 7, 10-12 (2009).

In view of this rule and the Fourth Circuit's articulated concerns regarding the scope of counsels' investigation, the Court has no need of evidence concerning a purported legal expert's opinions regarding prevailing professional norms. The question is not whether counsels' performance adhered to guidelines, but whether this investigation and penalty phase strategy were reasonable at the time. This Court is certainly well versed in the relevant law and standards

9

governing trial counsel's representation in the penalty phase proceeding.   An expert to explain the prevailing standard of care would not assist the Court in understanding the evidence relevant to the claim of ineffective assistance of counsel, or in determining any fact in issue.   Fed. R. Evid. 702(a).

Ms. Barrett played no role in the defendant's case and has no personal knowledge as to the factors influencing counsels' investigative and trial strategies.   Her review of materials pursuant to her report was limited and one-sided.   Nonetheless, per her report, Ms. Barrett opined trial counsel "failed to provide their experts with important relevant documents and rendered those experts powerless" to complete their pretrial responsibilities.   In support of this assertion, Ms. Barrett loosely references various emails, letters and reports from the defense's pretrial mental health experts, Dr. Merikangas and Dr. Mirsky, as bolstered by their 2015 investigations, examinations, and resulting reports.   She finds that counsel "unreasonably ended the mental health investigation prematurely and the resulting penalty phase investigation fell well below the 'prevailing professional norms' of 2008-2009." Government Exh. 1, p. 3, (citing *Strickland v. Washington,* 466 U.S. 668, 688 (1984)).

The proffered report and possible testimony is simply not relevant. *Strickland's* performance inquiry is an objective standard. *See Harrington v. Richter,* 131 S .Ct. 770, 790 (2011)("*Strickland...* calls for an inquiry into the *objective* reasonableness of counsel's performance, not counsel's *subjective* state of mind.")(emphasis added); *Strickland*, 466 U.S. at 688 (identifying question as whether investigation "fell below an objective standard of reasonableness").   The District Court is entrusted to hold the evidentiary hearing, assess all relevant and material evidence, and assess trial counsels' credibility in making the *Strickland* determination whether counsels' performance was reasonable in that context.

**B.  This Court Can and Should Evaluate the Reasonableness of Trial Counsel's Performance Without the Assistance of a "*Strickland* Expert"**

In this case, trial counsel consulted with multiple experts to explore the possibility of mental health in the context of mitigation, no small feat after presenting a "not guilty" defense to the jury.   Moreover, as will be presented at the hearing, the defendant was adamantly opposed to any mental health defense.   As noted above, each expert found preliminary evidence of mental health issues, potentially related to social or genetic conditions, and some provisional diagnoses that were possibly related to the defendant's reports of head trauma.   All of the experts considered the anecdotal evidence of head trauma as fact.   This resulted in findings that support diagnoses of mental health conditions, to include PTSD, and the likely comorbidity with additional disorders such as bipolar disorder, schizoaffective disorder, and psychopathy or psychosis.   Experts in 2015 revisited the issue and noted that the defendant's psychiatric test results remained consistent with those conducted in 2009.   Dr. Merikangas considered the 2009 brain scan, which read as "normal" even if depicting some white matter indications, as well as newly discovered corroborating evidence of some of the reported trauma incidents.   However, and most importantly, that information reported by the mental health experts in 2015 did not substantially impact those preliminary findings in 2009.   This was not "new" information, it was just more information which further substantiated claims of childhood trauma, genetic predispositions towards mental illness, and the defendant's self-reports of head trauma.

Trial counsels' strategy still hinged on risk assessments to determine whether the evidence would be sufficiently mitigating, following a guilt/innocence phase denying involvement in the premeditated murder for hire.   The indications of PTSD and depression, along with aggravating comorbid conditions had to be weighed against the anticipated testimony of the government' experts, the exploration of the psychologically damning comorbid diagnoses, and the fact that the

11

defendant's clinical examination and test performances would be tainted by the "jury's perception of him for the penalty phase was that he was a cold blooded, planful hired gun." Government Exh. 5. Counsel would also have to discern whether presentation of vague claims of mental defects, particularly those that manifested in impulsivity and poor judgment, would be worth risking the unfavorable opinions of Dr. Nelson (and possibly Dr. Bender). Finally, counsel would have to address how traumatic injuries, the last reported in 1996, had no notable impact on his behavior until 2007, when he participated in a murder-for-hire.

While those questions may foster discussion as to whether those strategies were reasonable, an expert is not required to assist this Court in finding the answers. In attempting to do so, Ms. Barrett's expert opinion subverts the role of the Court and seeks to answer the ultimate question, whether counsel was ineffective and whether petitioner was prejudiced by any finding of deficient performance.

Counsels' duty to investigate petitioner's psycho-social history was long held. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background… may be less culpable than defendants who have no excuse." *Penry v. Lynaugh,* 109 S. Ct. 2934, 2938 (1998).

In the context of a capital case, Ms. Barrett acknowledges the core responsibility of a capital defense counsel to conduct a mitigation investigation was defined long before 2008, referencing the American Bar Association's Standards for Criminal Justice (2d ed. 1980), Standard 4.4-1. (P. 6). This particularized responsibility was incorporated by the U.S. Supreme Court, finding a duty to investigate "the defendant's background, education, employment record, mental and emotional stability, family relationships, (and) … mitigation circumstances surrounding the

12

Commission of the crime itself." *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Government Exh. 1, p. 6. In *Wiggins v. Smith*, the Supreme Court again cited the ABA Standards to determine "what is reasonable" in assessing the performance of capital defense counsel. Government Exh. 1, p. 8. The Court is assuredly familiar with the standards of practice, long held before 2008 and the facts at issue, and needs no assistance from a *Strickland* expert, to determine whether – objectively – petitioner's counsel were effective in their mitigation investigation and penalty phase presentation.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests the Court exclude the testimony of Ms. Barrett and her report.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:   /s/

Brian J. Samuels
Lisa R. McKeel
Assistant United States Attorneys
Carrie L. Ward, Trial Attorney,
Department of Justice
Attorneys for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov
Email: Lisa.McKeel@usdoj.gov
Email: Carrie.Ward@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of January 2023, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system who will send notice to all filers.

By: /s/_____
Lisa R. McKeel
Assistant United States Attorney
Virginia Bar Number: 23652
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov

14