# RUHNKE & BARRETT
ATTORNEYS AT LAW

47 PARK STREET
MONTCLAIR, N.J. 07042
973 744 1000

29 BROADWAY, SUITE 1412
NEW YORK, N.Y. 10006
212 608 7949

973 746 1490 (FAX)

DAVID A. RUHNKE (davidruhnke@ruhnkeandbarrett.com)   ◊   JEAN D. BARRETT (jeanbarrett@ruhnkeandbarrett.com)

**GOVERNMENT EXHIBIT**
**1**
4:08cr16 / 4:15cv108

## REPORT OF JEAN D. BARRETT, ESQ.

### *Summary of Opinions*

A jury convicted David Anthony Runyon of murder-for-hire, carjacking resulting in death, and use of a firearm resulting in death by shooting and killing naval officer Cory Allen Voss. Following the conviction, the jury found Mr. Runyon eligible for the death penalty because he had engaged in substantial planning and premeditation and committed the murder for pecuniary gain. That same jury was minutes from deliberating whether he should be sentenced to death when defense counsel told them:

> So a legitimate question, then, would be, well, what happened? What happened to the person that they described that gave his last $5 bill, instead of going shopping, gave it to the homeless guy or the one that helped the child with some personality disorder that Ms. Provost talked about? *And I don't have a glib answer. I don't have you know, a pat response, where I stand up and say, you know, right here is what caused Mr. Runyon to get involved in this and to be where we are today.*

T2645.

In truth, the "glib" part was counsel's claim that there was no response to that question when counsel had abundant information that would help explain, not only Mr. Runyon's involvement in the killing of Cory Voss, but also his peripatetic lifestyle which the

1

RUHNKE & BARRETT
ATTORNEYS AT LAW

Government dwelled on repeatedly to damaging effect. Defense counsel had evidence of multiple head traumas beginning at age three, including two blast injuries during military training and multiple traumatic injuries when Mr. Runyon was in a head-on motor vehicle collision while still in the service. They had the military medical records of his medical treatment after the car crash with multiple relevant diagnoses including PTSD, anxiety, vertigo, short-term memory loss and sleeplessness. They had records documenting mental health issues in both biological parents and jail records recommending ruling out schizo-affective disorder and/or bipolar disorder. There were reports of Mr. Runyon's head injuries by *Government* mental health professionals who could not rule out "brain dysfunction." And they had a neuropsychologist whose preliminary testing pointed to PTSD and brain injury resulting from the repeated head trauma and a neuropsychiatrist whose preliminary diagnosis was frontal lobe brain impairment. Finally, they had an MRI of Mr. Runyon's brain that they did not know, but had they shown it to the doctor who ordered it they would have known, revealed "multiple white matter hyperintensities" consistent with brain injury.

The jury heard none of this and there has, to date, been no viable explanation for the abrupt halt to the mental health investigation. No attorney who represented Mr. Runyon has offered a rationale on the record for failing to pursue this line of inquiry, but it was clearly not due to any inconsistency with the three mitigation themes they presented. Certainly, there was no conflict with the argument that equally culpable codefendants were not facing death. There is nothing inconsistent for a person who has frontal lobe brain impairment to behave

2

well in a structured environment like prison, nor is it inconsistent that he had some good qualities and family and friends who cared about him. And we know that it was not for fear of the prosecution's experts since defense counsel has said in a sworn statement that he would never use the possibility of prosecution rebuttal as a reason not to present mental health evidence. Furthermore, the Government experts agreed on behavioral symptoms, processing-speed deficits, short term memory problems and PTSD, the etiology of which the defense experts attributed to the uncontested incidences of brain injury.

This was not an "either-or situation," that is, it did not require counsel to choose between or among strategies. This was an "and" option, offering context to Mr. Runyon's behavior in connection with the offense, with his estrangement from family and friends, his volatility, his emotional detachment and his inability to maintain both a steady job and a steady relationship.

Based on the records I have reviewed, it is my opinion that Mr. Runyon's trial counsel unreasonably ended the mental health investigation prematurely and the resulting penalty phase investigation fell well below the "prevailing professional norms" of 2008-2009. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

### *Background and Qualifications*

I am an attorney at law admitted to practice in the states of Colorado, New Jersey and New York, the United States District Courts of Colorado, New Jersey, the Eastern and Southern Districts of New York, the District of Vermont and the Eastern and Western

Districts of Michigan. I have been admitted *pro hac vice* in seven additional districts. In each of those 14 districts, I have been appointed at least once, pursuant to 18 U.S.C. § 3005, as learned counsel in a potential federal death penalty prosecution.

I began my legal career as a trial attorney in the New Jersey State Public Defender's Office over 40 years ago, where I handled both jury trials and appeals. When the modern death penalty was enacted by the State of New Jersey in 1982, I was assigned to a team of state public defenders to develop protocols for capital representation. The following year, I worked on the trial team of an early capital case before moving to private practice.

Since 1983, I have been a member of the firm Ruhnke & Barrett. The firm's practice has involved criminal trial, appellate, state post-conviction and federal habeas corpus litigation. Since joining the firm, I have tried 11 capital murder cases, including four federal cases, all jury trials resulting in life verdicts. I have litigated three New Jersey capital post-conviction cases to life sentences, the last as a result of the mid-litigation legislative repeal of the New Jersey death penalty in 2007. During the pendency of the modern state death penalty in New Jersey, I argued two death penalty appeals before the New Jersey Supreme Court and was on the briefs in three others.

I have been appointed as learned counsel in more than 70 federal death penalty cases by courts in 14 different federal districts and in the 2nd and 8th Circuits. Eight[1] cases were authorized for capital prosecution by the Attorney General of the United States. Five went

---

[1]In one of the cases, my law firm was retained and my participation was limited to the mitigation investigation.

to trial resulting in guilty verdicts, followed by penalty phases, one was resolved by a guilty plea to a life sentence and the remaining two were de-authorized by the Attorney General. I have participated in briefing and arguing a capital appeal in the United States Court of Appeals for the Eighth Circuit and was on the brief in two capital appeals in the Second Circuit.

From January 2007 through September 2017, I was a member of the Federal Death Penalty Resource Counsel Project, a project of the Defender Services Office of the Administrative Office of the United States Courts. Since its founding in early 1992, the Project has monitored all federal death penalty trial level cases and has collected information for use by both lawyers and judges involved in federal capital cases. As a member of the Project, I responded to inquiries from the federal courts regarding all aspects of the defense function in federal capital prosecutions. I also supported and assisted court-appointed defense counsel in federal capital cases, providing on-site and telephone consultation concerning the role of learned counsel, identifying experts, mitigation specialists, investigators, paralegals, defense victim outreach specialists, and other defense team members, assisting with pleadings and legal research and aiding defense counsel in capital trial preparation and litigation.

Since 1995, I have been a presenter in federal capital training for CJA programs in the Southern, Eastern and Western Districts of New York, the District of Puerto Rico, the Federal Defender's Office in Puerto Rico and the Bar Association of the City of New York. I have participated in and occasionally lectured at death penalty training programs sponsored by the

Administrative Office of the United States Courts Defender Services Training Division and the Bryan R. Shechmeister Death Penalty College, Santa Clara University School of Law. I have lectured at the NAACP Legal Defense Fund Death Penalty Conference, the National Association of Criminal Defense Lawyers Death Penalty Conference, the Association of Criminal Defense Lawyers New Jersey death penalty seminars and the New Jersey Office of the Public Defender. I have regularly attended and continue to attend seminars and conferences relating to the defense of capital cases at trial.

***Prevailing Norms in the Development of Mitigating Evidence in Capital Cases, 2008-09***

One of the core responsibilities of defense counsel in a capital case is to conduct a "mitigation investigation" by exploring the client's background, character, life experiences and mental health issues, and molding the information into a comprehensive life history. When the American Bar Association published its second edition of its STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980), Standard 4.4-1 of the Defense Function described the lawyer's duty to investigate as the duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." *Id*. at 4:54. (Emphasis added). The Commentary describes the penalty investigation as developing information about "the defendant's background, education, employment record, mental and emotional stability, family relationships, (and) . . . mitigating circumstances surrounding the commission of the crime itself." *Id*. at 4:55, *cited in Williams v. Taylor*, 529 U.S. 362, 396 (2000).

Those standards were not specific to capital cases. However, as early as 1979, Dennis

Balske, a capital defense attorney, wrote of the importance of a complete mitigation investigation. Balske, D., *New Strategies for the Defense of Capital Cases*, 13 AKRON L. REV. 331, 358 (1979). Balske was followed in 1983 by Professor Gary Goodpaster, of the University of California Davis School of Law, who published an article entitled, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299 (1983). In the article, Professor Goodpaster outlined the steps an attorney handling a capital case must follow, including the absolute duty of trial counsel

> to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses. There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings." . . . The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized.

*Id.* at 324.

Likewise, since the 1980s, it has been the standard of care for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. A thorough investigation of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposure and head injuries. *See* Stebbins, D. *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 36 (discussing value of neuropsychologist or neurologist in cases with head trauma).

Professor Goodpaster's and others' descriptions of the duties of a capital defense

attorney were later codified in 1989, when the American Bar Association first promulgated standards for counsel in death penalty cases. In 2003, those guidelines were modified and updated.[2] With regard to trial and penalty-phase investigation and preparation, the ABA Guidelines provide that:

> Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

31 HOFSTRA L.REV. at 1015. In discussing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the Commentary emphasizes that counsel must explore the client's medical history, including mental and physical injury and possible neurological damage. 2003 ABA Guidelines, 31 HOFSTRA L.REV. at 1022. (Footnotes omitted). In *Wiggins v. Smith*, in the course of overturning a sentence of death in a Maryland capital case because the attorneys conducted an inadequate investigation, the Supreme Court cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. 539 U.S. 510, 524 (2003).

***Applicability of the Standard of Care in Capital Mental Health Investigations***

The investigative standards outlined above were well-developed and broadly recognized by the time the investigation in this case was proceeding. Indeed, the Supreme Court has not hesitated to apply these investigative standards to capital cases tried as early

---

[2]The official and final version of the 2003 Guidelines, together with approved commentary, is published in the Hofstra Law Review: "American Bar Association: Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L. REV. 913 (2003).

as the 1980s. *See Williams v. Taylor*, *supra*; *Wiggins v. Smith*, *supra*; *Rompilla v. Beard***,** 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam). Indeed, the Court has made clear that the investigative standards are particularly applicable where a client's mental health is at issue. For instance, in *Rompilla*, counsel were found deficient despite consulting three mental health experts and despite assertions of family members that no mitigating evidence was available, because they failed to conduct a thorough investigation into the prosecution's own case in aggravation which would have revealed historic records of childhood trauma and mental illness. 545 U.S. at 377, 379. Mental health investigative failures by counsel resulted in new a penalty phase in *Porter,* where Porter's counsel failed to present evidence of "brain damage that could manifest in impulsive, violent behavior." 558 U.S. at 36. Similarly, in a case tried in 1993, the Court found counsel ineffective, despite having presented significant mitigation, for failing to uncover evidence of frontal lobe brain damage. *Sears v. Upton*, 561 U.S. 945, 946,  954 (2010).

Evidence that a defendant suffers from brain damage or other mental disabilities, may explain the succession of facts and circumstances that led to the crime and the impact of those disabilitieson  the client's judgment and behavior. *See Porter v. McCollum, supra*, 558 U.S. at 36, 42. Empirical research by social scientists who have studied the process of actual juror decision-making in capital cases demonstrates that mental health evidence resonates with jurors precisely because it can provide a context to explain the capital crime and past behaviors as more than simply bad choices. *See* Garvey, S., *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) *and* Garvey, S. *The*

*Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness); *see also* Blume, J., et. al., *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, 1051 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. . . . [E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is [] mitigating to almost half of all jurors.").

### Review of the Case of David Runyon

At the request of Mr. Runyon's attorneys in his 18 U.S.C. § 2255 proceeding on remand from the United States Court of Appeals for the Fourth Circuit, I have reviewed the following materials: the District Court docket and trial and penalty phase transcripts in the *United States v. Voss, et al. (Runyon)*, Case No. 4:08-CR-00016, United States District Court for the Eastern District of Virginia, Newport News Division; Amended Motion to Vacate with attachments, filed February 14, 2016; Reply to Response of the United States, filed July 7, 2016; Opinion, *Runyon v. United States*, Civil No. 4:15 cv 108, Case No. 4:08-CR-00016 (filed Jan. 19, 2017); Reports of Paul A. Montalbano, Ph.D. Forensic Psychological Evaluation, dated June 27, 2009, and, Raymond F. Patterson, M.D., Forensic Psychiatric Evaluation, dated June 24, 2009. I have reviewed the Fourth Circuit opinion, *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) (*Runyon I*) and *United States v. Runyon* (*Runyon II*) 994 F.3d 192 (4th Cir. 2020). I also have reviewed three memoranda to defense counsel from mitigation specialist Sheila Cronin, dated May 12, 2008, August 6, 2008 and September 23,

2008 and Ms. Cronin's social history report dated August 8, 2009.

### Trial Counsel's Mental Health Investigation

Cory Allen Voss, an officer in the United States Navy, was shot and killed in his pickup truck in Newport News, Virginia in April, 2007. *Runyon II*, 994 F.3d at 197. The Government prosecuted three defendants: the victim's wife Catherina Voss, her lover Michael Draven and David Runyon. *Id*. at 198. The Government's evidence at trial established that Catherina Voss and Draven plotted to kill Cory Voss and hired Mr. Runyon to do the shooting. *Id*. All three faced the possible punishment of death under the Federal Death Penalty Act, 18 U.S.C. 3591, *et seq*.

On March 4, 2008, Lawrence H. Woodward and Jon M. Babineau were appointed to represent Mr. Runyon. ECF No. 27. Catherina Voss pleaded guilty in return for a life sentence. *Runyon II*, 994 F.3d at 198. Draven and Mr. Runyon were tried together, however, the Government sought death as a possible punishment only against Mr. Runyon. *Id*. Trial was set to begin March 13, 2009, however, on February 13, 2009, Babineau was relieved due to a conflict of interest and the Court appointed Stephen Hudgins to take Babineau's place. ECF No. 161. On February 23, 2009, the Court granted defense counsels' motions to continue the trial, setting the trial to begin on June 30, 2009. ECF No. 171.

The jury return guilty verdicts as to both defendants on July 17, 2009. *Runyon II*, 994 F.3d at 198.; ECF No. 245. Mr. Runyon's case proceeded to a one-day eligibility phase on July 22, 2009 and he was found eligible for consideration by the jury whether he should be sentenced to death. ECF No. 255. The penalty phase commenced on August 19, 2009, and

Mr. Runyon was sentenced to death on two counts on August 27, 2009. *Runyon II,* 994 F.3d at 198-99; ECF No. 291.

The mental health investigation had been begun by Babineau, who consulted with a clinical psychologist, Evan S. Nelson and on December 8, 2008, filed a Fed.R.Crim.Pro. 12.2[3] notice stating that Dr. Nelson "would present a reliable social history of David Runyon and his family" including Mr. Runyon's psycho-social development. ECF No. 135. In the same notice, Babineau stated, that after consulting with Dr. Nelson, he was "in the process of seeking Court budget approval for retaining a neuropsychologist." *Id*. The records I have received do not reflect that Babineau had retained a neuropsychologist at the time he withdrew as counsel.

In February, 2009, Mr. Runyon was examined by Government experts, a psychologist, Paul Montalbano, Ph.D. and a psychiatrist, Raymond Patterson, M.D., examinations presumably triggered by the Rule 12.2(b) filing. Each concluded that Mr. Runyon did not suffer from serious mental illness or a brain disorder. *Runyon II*, 994 F.3d at 205. However, both experts reported about "several possible concussions." Montalbano Report, page 20. The psychologist described Mr. Runyon reporting that he had been knocked unconscious twice during elementary school and twice as an adult, the adult incidents involving a hand grenade simulator and a C-4 explosive device used during his participation in military training exercises. *Id.* He also told the psychiatrist of other instances of head trauma when

---

[3]Rule 12.2(b) requires that a defendant who intends to offer expert evidence relating to mental disease or defect provide notice to the Government which may trigger a governmental examination.

he was beaten by his biological father and lost consciousness, when he ran into a telephone pole playing football, when he was wrestling, when he was exposed to concussions from weapons in the military and when he was in a serious car accident and nearly died. He reported being medicated for vertigo and suffering from short-term memory loss since the car accident. Patterson Report, pages 11-12, 18.

It appears that the Government's expert reports which had been prepared and filed under seal immediately before jury selection began on June 30, 2009, were received by defense counsel within a day of the guilty verdict on July 17, 2009 in accordance with the order regarding mental health evidence issued by the Court on June 13, 2008. ECF No. 65, par.2. The significance of the information the reports contained was later highlighted by one of defense counsels' own experts. Merikangas letter to Hudgins dated August 5, 2009, Exhibit 2 to the Amended Petition at p.5 of 6 ("These evaluations suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder (sic).").

This should have come as no surprise to defense counsel. There were abundant "red flags" which should "have prompted a reasonable attorney to conduct additional investigation." *Wiggins, supra*, 539 U.S. at 425. In a May, 2008 memorandum to defense counsel, mitigation specialist Sheila Cronin reported on her first meeting with Mr. Runyon. In that meeting, Mr. Runyon described his early childhood experience of observing his father physically abuse his mother on numerous occasions and being himself thrown across the room by his father when he was a toddler. Following that last incident, his mother left with

Mr. Runyon and his younger brother. As a result of leaving, the three experienced significant financial hardship which led to them living in a trailer and a shortage of food. Other information Ms. Cronin learned included frequent moves while Mr. Runyon's stepfather served in the Army and a diagnosis of post-traumatic stress disorder (PTSD) during treatment after a serious auto accident in his twenties.

In an interview memo to defense counsel three months later, Ms. Cronin reported that Mr. Runyon described a blast injury suffered while in the military and a head injury as a youngster playing football. He again told Ms. Cronin about the auto accident and the PTSD diagnosis. Mr. Runyon also showed signs of paranoia and grandiosity during interviews, according to Ms. Cronin.

Jail records received by the defense team in December, 2008, reflected referral to the jail psychiatrist who also reported grandiosity and delusional thinking and saw the need to rule out schizo-affective and/or bipolar disorder. The doctor noted that Mr. Runyon reported not sleeping during the previous 24 hours and that he experienced night sweats. Defense counsel also had in hand records indicating that both Mr. Runyon's biological parents suffered from depression.

As of April 2009, counsel had Mr. Runyon's military health records which contained strong corroboration of the severe nature of the injuries Mr. Runyon suffered in the auto accident. The records included diagnoses of PTSD, depression and anxiety and the mitigation specialist advised defense counsel "that neuropsychological testing might clarify if Runyon's symptoms and behavioral changes were related to the closed head injury, PTSD

or both." Cronin declaration, Amended Motion Ex. 4, p.5. The medical records also reported that after the 1996 motor vehicle accident, Mr. Runyon suffered from short-term memory loss, insomnia, vertigo, sleeplessness, headaches and blurred vision which continued through the end of his military career. Medical Records, Amended Motion, Ex. 23, pp. 12, 15, 19-23.

The need for consultation regarding not only the potential brain injury, but also mental illness, was unmistakable. The record is unclear whether defense counsel ever provided these records to any experts since no expert reports were ever finalized. However, despite defense counsel having told the jury of the possibility that mental health evidence would be presented in the next phase of the trial in his closing at the eligibility phase , Tr. 1770, 7/22/09, no such testimony was presented.

Although Babineau claimed to be "in the process" of retaining a neuropsychologist in December, 2008, a defense neuropsychologist, Allen Mirsky, Ph.D. did not see Mr. Runyon until June 26, 2009, four days before the trial began. Mirsky letter to Hudgins dated July 2, 2009, Amended Motion Ex. 20. Dr. Mirsky reported to Hudgins on July 2, 2009 that he had spent six hours administering tests to Mr. Runyon but his review and analysis was incomplete. Dr. Mirsky added that the data he had accumulated reflected that Mr. Runyon was suffering from a neurological disorder and that evaluation by a neurologist was "essential . . . to establish the nature of the disorder." Mirsky letter at Amended Motion Ex. 20. Funding to retain neurologist/neuropsychiatrist, James R. Merikangas, M.D., had not been requested until June and was not authorized until after the conclusion of the eligibility phase on July 22, 2009, ECF No. 257. The evaluation did not occur until July 29, 2009.

Merikangas Report, Amended Motion, Ex.2, p.6.

Dr. Mirsky was concerned about the pace of the investigation. Upon learning from Hudgins that the jury had determine that Mr. Runyon was eligible for the death penalty, Dr. Mirsky emailed his concerns to the defense counsel:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blast injuries he sustained when undergoing training exercises in the [military]. These were compounded by the effects of the motor vehicle accidents. His impaired attention, seen in the poor Continuous Performance Test Scores in my report, is one of the classic symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he shows is also symptomatic of brainstem injury.

Mirsky Email, Amended Motion Ex. 21.

Following his evaluation of Mr. Runyon on July 29, 2009, Dr. Merikangas ordered an MRI, a PET scan and an electroencephalogram because of the history of multiple head injuries, beatings in childhood, and severe headaches. He added that Mr. Runyon "clearly has impaired functioning suggestive of frontal lobe brain impairment." Merikangas Report, Amended Motion, Ex. 2, p. 6. On August 10, 2009, Hudgins filed a motion to permit the filing of supplemental expert reports after the testing scheduled for August 14, 2009 was completed. ECF No. 269.

Since Drs. Mirsky and Merikangas were waiting for the scans, they had only prepared preliminary reports. Merikangas Report, Amended Motion, Ex. 2, p. 5. However, once

having the scans in hand, defense counsel failed to provide them to his own experts. Mirsky letter to Hudgins, September 18, 2009, Amended Motion, Ex. 22. Defense counsel's failure to provide scans to his experts meant that the jury never heard what a later review by Dr. Merikangas revealed: that the MRI scan showed "multiple white matter hyperintensities . . . consistent with his history of head injuries and migraine." Merikangas Report, September 25, 2015, Amended Motion, Ex. 2, p.4. In Dr. Merikangas' overall impression, he cited brain injuries beginning at age 3 and the November 9, 1996 auto accident resulting in personality and mood changes. He opined further that Mr. Runyon's brain injuries "resulted in impaired executive functioning and decision making," while showing evidence of paranoia and delusions. He cited a history of post-traumatic stress disorder (PTSD) causing cognition and mood disorder. Overall, he would have testified that Mr. Runyon suffered from brain damage, disorder of executive functioning, combined with a psychotic thought process. Merikangas Report, September 25, 2015, Amended Motion, ex. 2, p.1 and 4.

Dr. Mirsky, who persisted in his pleas to defense counsel to pursue the mental health investigation even after he learned of the jurors' death verdict, eventually conducted a full neuropsychological evaluation during post-conviction proceedings. He recounted symptoms of Mr. Runyon's brain injuries over time such as PTSD, vertigo, impaired memory and jumbled thoughts and the changes in Mr. Runyon's personality after the 1996 accident that were reported by family and friends. Mirsky Report, Amended Motion, Ex. 35, p. 2. He administered many of the same tests that he had administered in 2009 and the results were consistent. *Id.* at pp. 2-5. The testing showed a marked verbal-performance discrepancy

consistent with the reports of multiple head traumas and indicating significant damage to the right side of the brain. *Id*. at p.6. He noted that the history "resembles that of many injured service members diagnosed with mTBI (mild traumatic brain injury)" he had encountered while treating military patients. *Id*. at p.2.[4]

Counsel also did not pursue lay witnesses who would corroborate incidents where Mr. Runyon had suffered traumatic injuries resulting in loss of consciousness. His mother could have testified that when Mr. Runyon was three, his biological father, David Dombrowski, swung his toddler son by the wrist and threw him across the room rendering him unconscious. Cunningham declaration, Amended Motion, Ex. 8, pp. 21, 30; Dudley report, Amended Motion, Ex. 29, p. 8. Although called as a witness, his mother was never asked about this at the trial. Friends Thomas Preston and Robert and Deborah Seeger, his ex-wife Maria Runyon and his brother Mark all could have testified about the auto accident, its severity, the injuries suffered and the behavioral changes they saw afterward. Preston Interview, Amended Motion, Ex. 30, p.2-3; D. Seeger declaration, Amended Motion, Ex. 32, par.8, 9; R. Seeger declaration, Amended Motion, Ex. 31, par. 8; Maria Runyon declaration, Amended Motion, Ex. 28, par. 14-17; Mark Runyon declaration, Amended Motion, Ex. 27, par. 26-27.

The failure to follow through on the preliminary reports by Drs. Mirsky and Merikangas was in and of itself a violation of the standard of care in a federal capital case

---

[4]In his July 23, 2009 email to Hudgins, Dr. Mirsky had raised this precise issue as potentially mitigating since two of the major concussions Mr. Runyon experienced were "blast injuries," during military service making him a "wounded warrior." Mirsky email, Amended Motion, Ex. 21.

in 2008/2009. Making matters worse, there were additional signs that Mr. Runyon's cognitive impairments were only the tip of the iceberg. The records counsel had on hand disclosed multiple mental health diagnoses, the symptoms of which could have been testified to by available lay witnesses and explained by additional experts.

Defense counsel failed to present to the jury the impact on his mental health of the many traumas Mr. Runyon had experienced. Ironically, defense counsel had retained a forensic psychologist, Dr. Mark Cunningham, with experience testifying about the relationship between a person's traumatic social history and mental illness. As his 2015 declaration demonstrates, Dr. Cunningham could have provided defense counsel with a roadmap leading from childhood adversity to mental illness.

Had they consulted Dr. Cunningham, he would have explained to defense counsel the implications of neuropsychological deficits such as those described by Drs. Mirsky and Merikangas for functioning in everyday life. He would have described the psychological impact of insult to the frontal lobe as Drs. Mirsky and Merikangas reported to counsel at the time of trial. Dr. Cunningham could have told them about the literature describing frontal lobe dysfunction disrupting personal behavior, reducing the capability for problem solving and flexibility and impairing the ability to redirect an ongoing chain of behavior. He could have explained the findings in studies showing that impulsivity and poor anticipation are among the long-term effects of frontal lobe damage. Cunningham Declaration, Amended Motion, Ex. 8,. at p.33-34. Dr. Cunningham could have testified to his conclusion that "the presence of brain dysfunction represented a critically important mitigating factor as the jury

considered David's judgment and decision-making capability . . . ." *Id* . at p. 34.

This, in turn, could have led to testimony by a psychiatrist regarding the effect of the combination of mental illness and cognitive deficits in impairing Mr. Runyon's judgment and decision-making. Dr. Richard G. Dudley, Jr., M.D., examined Mr. Runyon in 2015. Dr. Dudley found that, in addition to the cognitive deficits, Mr. Runyon suffered from multiple major psychiatric disorders, including distorted perceptions of reality, impaired judgment and impulsivity, consistent with the mitigating factor of severe mental or emotional disturbance. Dudley Report, Amended Motion, Ex.29, at p. 14-15. When these psychiatric difficulties are combined with the cognitive deficits discovered through the neurological and neuropsychological testing, there is more reason to conclude that Mr. Runyon suffered from both brain damage and a severe mental disturbance.

### *Conclusions*

To summarize, trial counsel failed to conduct a thorough and expansive investigation of Mr. Runyon' mental health issues, despite the many "red flags" listed here. They failed to provide their experts with important relevant documents and rendered those experts powerless to complete their evaluations and to render conclusions. They failed to develop and assemble witnesses to testify about the circumstances surrounding traumatic events in Mr. Runyon's life, which may have resulted in the brain damage and the many psychiatric diagnoses. They failed to retain mental health experts with expertise in areas other than brain injury, despite clear signs in the records in their possession that Mr. Runyon suffered serious mental health issues. In short, they abandoned the mitigation investigation, depriving the

sentencing jurors of information critical to the decision on punishment. It is my opinion that

trial counsels' performance in Mr. Runyon's case fell far below the standard of care for

representation in capital cases generally accepted in the legal community in 2008 and 2009.


/s/ Jean D. Barrett
JEAN D. BARRETT

Dated:        December 2, 2022