January 19, 2023

## Review of materials related to US v Runyon

### Geoffrey K Aguirre, MD, PhD

I am a practicing Behavioral Neurologist with a research focus upon structural and functional brain imaging. My training, certifications, and research output are described in my attached CV.

I considered in my review if there is evidence to support the following assertions:
- Mr. Runyon suffered a brain injury prior to the instant offense of April 2007
- This brain injury produced an alteration in behavior that persisted until April 2007

To preview, I find that a motor vehicle accident involving Mr. Runyon in 1996 likely produced a mild, non-focal traumatic brain injury (i.e., a concussion), and that this injury likely produced a temporary (~6 month) change in some cognitive abilities (e.g., concentration and memory). However, I do not find evidence in the record to support a claim that Mr. Runyon sustained a focal or diffuse brain injury with lasting behavioral changes (such as loss of impulse control).

I reviewed the following materials:
- Report of Allan Mirsky, 06-26-2009
- Report of Raymond Patterson, 06-24-2009
- Report of Paul Montalbano, 06-27-2009
- Report of Allan Mirsky, 08-28-2015
- Report of James Merikangas, 09-25-2015 (which also includes his 08-05-2009 report as an attachment)
- Report of Richard Dudley, 09-29-2015
- MRI images of the brain obtained on 08-13-2009
- Radiology report of Drs. Cheshire and Davis regarding the August 2009 MRI
- BoP Health Services Health Problems list, generated 08-28-2020
- Report of Siddhartha S. Nadkarni, 11-09-2022

## Review of potential mechanisms of injury

Reports by the defense and prosecution experts describe several incidents that (as of 2007) could have produced a traumatic brain injury:
- A reported altercation with his father at the age of 3
- Playing football as an adolescent
- Proximity to a simulated grenade during a training exercise in 1989
- Car accidents in 1990 and 1996

Generally, an episode of trauma sufficient to produce a meaningful brain injury also produces a loss of consciousness. Mr. Runyon reported being "knocked out" while playing football as a child, and on one occasion during a hand grenade simulation exercise. I am not aware of



GOVERNMENT EXHIBIT

1

PENGAD 800-631-6989

evidence, however, that these episodes resulted in a need for Mr. Runyon to seek medical attention, or in some change in behavior, cognition, or work performance after the event. Dr. Nadkarni's report identifies other incidents (exposure to a pyrotechnic explosion, being hit with a rifle while in the military). There is no report of loss of consciousness from these episodes and similarly there is no associated report of medical treatment or altered neurologic function. A 1990 car accident is described by Dr. Nadkarni as being associated with a loss of consciousness, but this event is omitted on other occasions on which Mr. Runyon was asked to provide an account of head injuries. Dr. Nadkarni refers to medical records regarding this car accident in 1990 (Nadkarni 2022, p.9). If contemporaneous medical records arising at the time of the car accident itself are available, I have not had the opportunity to review them, and I cannot find reference to such medical records in the reports by other experts. Overall, I judge that there is no documentation to support that these events produced a meaningful brain injury.

Several expert reports contain a description by Mr. Runyon of a physical altercation with his father that took place when the defendant was 3 years old and reportedly resulted in a loss of consciousness. The recall of memories in adulthood from this early period of life is famously unreliable, and the narrative does not include a description of resulting medical care. Mr. Runyon reportedly attributes to this event a life-long asymmetry in the appearance of his face. Dr. Nadkarni describes this as left facial weakness:

- "Facial asymmetry with left eyelid closure slower, less excursion of left Nasolabial Fold on smiling" (Nadkarni 2022, p.8)

although Dr. Merikangas describes this as right sided:

- "His right forehead does not wrinkle with facial expression and his right lip sags from a peripheral nerve injury" (Merikangas 2009, p.1)
- "His face is asymmetrical with his lip drooping down on the right and with a slight ptosis of the left eye…trouble closing right eye independent of the left…Left brow and forehead wrinkles and right does not" (Merikangas 2015, p3)

I am unable to reconcile these conflicting descriptions of the neurological examination. The details of this event are likely to remain difficult to corroborate. However, as this event reportedly took place at a very early age, we may consider below if there is evidence of a pervasive impairment in intellectual function, or MRI scan evidence of a brain injury, that might support the claim of a significant brain injury.

A substantial and documented event was the 1996 motor vehicle accident in which Mr. Runyon was driving a car that was struck head-on by another vehicle. Although Mr. Runyon reports not losing consciousness after the accident in some accounts (Patterson 2009, p.13; Montalbano 2009, p.20), he was sufficiently injured to receive treatment at a local hospital. He underwent physical therapy for 4-5 months following the event, which seems to have been focused upon injuries to his left knee (including an anterior cruciate ligament tear). Even without loss of consciousness, it is plausible that Mr. Runyon sustained a concussion from the rapid

2

deacceleration during the accident. While I understand that there is contemporaneous documentation of medical treatment arising at the time of this car accident, I have not had access to those records.

There are stereotyped alterations in neurologic function that follow a concussion, including headaches, dizziness, sleep disturbance, irritability, and impairments in concentration and short-term memory. Mr. Runyon reported several of these symptoms. He apparently was treated with the medication meclizine during this time (Patterson 2009, p.12) , which is used for management of the symptoms of vertigo (dizziness). There are also reports of forgetfulness and irritability (Mirsky 2009, p.2).

In the great majority of cases, the symptoms of a concussion improve gradually over weeks and are resolved after 6 months. Consistent with this, Mr. Runyon was able to return to "jump status" after 6 months with his airborne unit in the army. Expert reports include statements from Mr. Runyon that he largely recovered from this accident:

- "...he described how the jump pulled everything back into place and essentially healed him." (Dudley 2015, p.9)
- "He reported that his memory has improved but that he still gets vertigo at times." (Montalbano 2009, p.20)

In summary, a review of the history provided by both the defense and prosecution experts reveals one documented episode (the 1996 motor vehicle accident) that plausibly resulted in a brain injury. The description of this event is consistent with a "mild" traumatic brain injury, also known as a concussion. Concussions are a common, non-focal neurologic injury that result in a stereotyped change in mood and behavior that resolves over an approximately 6 month period.

While a large number (hundreds) of sub-concussive injuries are now understood to produce persistent, diffuse injury to the brain (e.g., as is seen in boxers and football players), Mr. Runyon did not have a history of such an accumulation of injuries.

**An unremarkable MRI scan of the brain**

Mr. Runyon underwent an MRI scan of the brain on August 13, 2009. This study was presumably obtained as part of his evaluation by defense experts, as opposed to a clinical evaluation for a new or altered neurological symptom. If Mr. Runyon had sustained a focal or diffuse brain injury sufficient to produce a lasting change in behavior, then this MRI scan would be expected to reveal an abnormal finding. A focal brain injury would appear as a visible area of scarring and loss of the normal structure of the brain. A substantial, diffuse injury to the brain would cause atrophy (shrinking) of the entire volume of the brain, with concomitant enlargement of the normal, fluid filled spaces in the center of the brain (the ventricles) and enlargement of the spaces between the folds of the brain (the sulci). Additionally, substantial traumatic brain injury is associated with deposits of old blood inside the substance of the brain (termed hemosiderin).

3

As is the usual practice for imaging studies performed on clinical equipment, the images from this study were reviewed by radiologists (Kirstin Fiona Davis, MD and Glenn Cheshire, MD) and were described in a radiology report. The summary of this report was "Impression: Normal Brain MRI". The detailed list of findings are all normal. Critically, the first finding is: "The ventricles and sulci are normal in size, shape, and position. No susceptibility artifact to suggest hemosiderin." These statements specifically indicate that the MRI scan does not show signs of a prior, substantial traumatic injury.

I have reviewed the images from this MRI scan and agree with the interpretation of Drs. Davis and Cheshire: In August of 2009 Mr. Runyon's brain was unremarkable without signs of a focal or diffuse brain injury.

In his 2015 report, Dr. Merikangas offers the opinion (p.4) that the 2009 study "...revealed multiple white matter hyperintensities on the MRI consistent with his history of head injuries and migraine." In his 2022 report, Dr. Nadkarni states (p.9) that this 2009 MRI scan "shows multiple white matter hyperintensities consistent with David Runyon's history of head injuries." I suspect Drs. Merikangas and Nadkarni are referring to punctate T2 signal hyper-intensities that can be seen (for example) on slices 17 and 18 of the FLAIR sequence in the left hemisphere white matter. These tiny "white dots" are an extremely common and unremarkable finding in healthy people without neurologic injury. There is no plausible biological basis to claim that this imaging feature could be associated with a substantial alteration in behavior or cognition.

A positron emission tomography (PET) scan was reportedly obtained in 2009. This study is not described in the defense materials apart from Dr. Merikangas reporting (Merikangas 2015, p4) that "The PET scan was non-diagnostic".

As Dr. Nadkarni (2022) notes (p.9), a Bureau of Prisons Health Services "Health Problems" document (generated in 2020) indicates that a repeat MRI scan of the brain was obtained in April of 2018, and is accompanied by the comment "Encephalomalacia – history of traumatic brain injury reported", and that a CT scan in 2017 shows a suspected "small lacunar infarct left hemisphere." I was not otherwise provided with these images or clinical reports. It is of course possible that Mr. Runyon has sustained injuries (traumatic or medical) subsequent to August of 2009 and that the effect of these injuries might be present on subsequent studies.

**Absence of persistent changes in behavior**

While Mr. Runyon may have sustained a concussion in the 1996 motor vehicle accident (or in other claimed prior events), I do not find evidence in the materials that I reviewed to support a claim that this injury (or the other listed traumatic events) resulted in a change in cognition and behavior that persisted until 2007.

4

First, it is notable that formal neuropsychological testing of Mr. Runyon conducted by prosecution and defense consistently demonstrated intellectual functioning that was well above average. Dr. Montalbano reports (2009, p.29):

> Overall, intellectual function was in the high average range. An administration of the WAIS-III yielded scores in various cognitive domains from average to high average to superior. The results of the WAIS-III found his working memory to be near the 81st percentile.

The 2009 evaluation by Dr. Mirsky for the defense emphasizes Mr. Runyon's strong performance on neuropsychological testing (Mirsky 2009, p.5):

> The test results, in general, indicate that Mr. Runyon has some superior to very superior cognitive skills, mirrored by a high Verbal IQ. His verbal and visual-spatial perceptual and memory abilities are almost without exception in the superior to very superior range…His scores on tests of the ability to focus on a task are generally normal to superior…as is his ability to shift attentional focus in a flexible manner

Dr. Mirsky goes on to write "Exceptions to this otherwise stellar performance are seen in two spheres" and then describes impaired performance on the Continuous Performance Test (CPT; another test of attention) and the Purdue Pegboard (a test of manual dexterity).

It is to be expected that in a battery of tests, normal individuals will have varying performance, both due to day-to-day variability and because people have normal variation in their ability to do different things. Consistent with this, Mr. Runyon's performance on the CPT was in the normal range when re-tested by Dr. Mirsky in 2015 (p.6). Overall, Mr. Runyon's neuro-psychological testing does not indicate a pattern of pervasive changes in cognitive function consistent with a brain injury.

The 2009 report of Dr. Montalbano reviews Mr. Runyon's work history prior to and following the 1996 car accident. Dr. Montalbano's observes that (p.29) "problems with lateness and conflicts with peers and/or supervisors predated the accident." The 2009 report by Dr. Patterson notes that Mr. Runyon received reprimands and unsatisfactory performance evaluations in 1993 and 1994 due to chronic tardiness (p.9). The types of difficulties that Mr. Runyon encountered in the work environment in the years after his car accident can be found in his work history prior to this event, leading me to doubt that the accident produced a persistent change in Mr. Runyon's behavior.

In his 2022 report, Dr. Nadkarni offers the opinion (p.9) that the described altercation with his father at the age of 3 left Mr. Runyon with facial weakness, and that this is "a sign of direct and severe injury to the frontal lobe." Leaving aside the fact that no frontal lobe lesion is seen on an MRI scan of the brain, I note that this interpretation is in conflict with the reports of other defense experts, and in conflict with neuroanatomical localization. In his 2009 and 2015 examinations, Dr. Merikangas reports that there is weakness of the right side of the face,

5

including the forehead. Weakness of the face that includes the forehead is the result of peripheral damage to the nerve of facial expression (the 7th cranial nerve), as opposed to damage to the brain itself. In his 2009 report, Dr. Merikangas correctly notes (p.1) that such a combination of findings is consistent with "a peripheral nerve injury".

In his 2015 report, Dr. Merikangas concludes that (p.4) "[Mr. Runyon's] brain injury has resulted in impaired executive function and decision making." In his 2015 report (p.6), Dr. Mirksy offers that Mr. Runyon has "significant damage to the right side of the brain", and speculates that his findings can be attributed to frontal lobe damage. Leaving aside the absence of a mechanism for the creation of this focal brain injury, and again ignoring the absence of frontal lobe damage on the 2009 MRI scan, we might ask if a frontal lobe lesion *in principle* could account for Mr. Runyon's actions around the April 2007 instant offence.

There is a coarse mapping between regions of the brain and aspects of behavior and cognition. Depending upon the particular location, substantial damage to the frontal lobe can be associated with disordered behavior (e.g., loss of executive function) and/or loss of impulse control. Importantly, however, these changes in cognitive function are not confined to a single act but instead impact every aspect of behavior. Thus, someone with loss of impulse control from a frontal lobe lesion tends to skip dinner and eat desert, hoard shiny items, blurt out secrets, and be unable to follow a long-term plan. It is difficult to reconcile the actual features of clinical frontal lobe dysfunction with the Government's version of the events around the instant offense, which involved multiple weeks of organized planning, note taking, and deception.

**Summary**

There is no particular reason to have suspected in 2009 that Mr. Runyon was anything but normal in his neurologic health. Millions of Americans each year experience a concussion. Mr. Runyon's symptoms and improvement following his 1996 car accident was typical for this event. He consistently performed above-average on tests of intellectual function. An MRI scan of his brain in 2009 was unremarkable. The Government's version of the events around the instant offense are consistent with intact planning and impulse control, and are inconsistent with the pervasive and disordered changes in cognitive function that would be found in someone with a brain injury.

Geoffrey K Aguirre, MD, PhD

6