$Exhibit$ "A"                    SEALED DOCUMENTS

## AFFIDAVIT OF SHEILA MARY CRONIN

1. I am Sheila Cronin, Mitigation Specialist and Investigator, and I reside in Norfolk, Virginia. I am over the age of 18 and otherwise competent to make this statement.

2. I have been a Clinical Medical and Psychiatric Social Worker for over 25 five years, during which I worked in private, military and university hospital settings. I provided family and individual short-term counseling, staff consultation, psychiatric evaluations, crisis intervention counseling, grief counseling, substance abuse counseling, and counseling regarding end of life decisions. I have worked on virtually every clinical service from child and adolescent psychiatry to the trauma service, ICU, neonatal intensive care, cardiology, neurology and neurosurgery services.

3. Since 1996, I have been a Mitigation Specialist performing life history evaluations in California and Virginia, with two cases requiring family history investigations in Mexico. In addition I completed the 6000 hours of requisite training and experience necessary to take the California Licensing Examinations for Private Investigators. I have been licensed in California since 2001.

4. On April 14, 2008, I was asked by attorneys, Jon Babineau and Lawrence Woodward to work as mitigation specialist in the case of United States v. David Anthony Runyon. I accepted the case with the understanding that I would not be able to give 100% of my time until July, 2008.

### Investigative Findings to Date

1. We have conducted multiple interviews with the defendant to obtain his social history and to develop interview and document lists for the mitigation investigation. The defendant is intelligent and was very cooperative in sharing his life story, but there are striking contradictions between his over idealized perception of his "blessed" and perfect family and what we have found to be reality. Our investigation reveals a childhood marked by exposure to violence, divorce, an unstable mother with impaired parenting compounded by cultural issues, an emotionally detached stepfather, and unstable living situations. His adulthood has been marked by extremely poor judgment, impaired reality testing, failed relationships and multiple failed career attempts. He married a woman with psychiatric issues and they had one child, who he adores. He did well in the military until he was involved in a serious head on collision that left him with vertigo, headaches, short term memory loss. His wife reported a significant personality change concurrent with the accident. He seemed less able to cope and deal with frustration. His military functioning declined and he had difficulty with subsequent jobs. His marriage fell apart, and his life took a downhill course.

EX. A

NORFOLK, VIRGINIA
CLERK US DISTRICT COURT

2023 FEB -6  A 8 49

RECEIVED

2. We interviewed the defendant's mother over the course of four days. She likely suffers from bipolar disorder. While sharing her life story she exhibited severe mood swings with angry, irrational tirades. Korean born, she had a childhood filled with war trauma, the loss of her mother, physical and emotional abuse at the hands of her stepmother and brother, and the suicide of her sister. She left home after high school determined to make a life for herself. She met and married an American soldier and shortly thereafter became pregnant with the defendant. Her pregnancy was marked by two near miscarriages from bleeding, an inability to gain any weight due to an inability to keep food down, and a delivery during which the doctors feared she would not survive. She had another son a year and a half later. While stationed in Panama with her husband, the marriage disintegrated. Her husband drank heavily, allegedly assaulted her and the children, and became addicted to pain medications. During this the defendant's mother tried to commit suicide and was hospitalized in Panama. She left her husband when the defendant was four and married another enlisted man when the defendant was five. Her second husband adopted the defendant and his brother. The defendant was her favorite child, but she essentially shut him out of her life when he married a woman not to her liking. She refused involvement with her grandson as well and threatened to attack the defendant's wife.

3. The defendant's birth father suffers from Major Depression with anxiety and mood instability for which he is on multiple medications. His father was a violent alcoholic who as a teen was arrested for homicide. When released, he married and had nine children, of which the defendant's father was the second oldest. He continued to drink heavily and regularly assaulted his wife and children. The defendant's father's four youngest siblings were born with "mental retardation." Two were institutionalized for life and two grew up in group homes. Of those two, one lives independently but may also have psychiatric problems and the other lives with an older sister. The defendant's birth father was placed in a group home as a teen because he was a chronic runaway. He started drinking at age fifteen and drank more heavily after his war experience in which he had to kill three men. He has a history of a very bad temper and rage episodes. MP's were called to the apartment three times related to domestic violence against defendant and his wife. He reported that his wife was also violent when angry and could not cope with a baby and a toddler. She spanked them when they cried and he had to stop her on several occasions.

4. The defendant's brother, who is two years younger, is also in treatment for depression related to his childhood. His view of his upbringing is significantly different from the defendant's. While the defendant described his childhood as "blessed" and his mother and adoptive father as ideal parents, his brother describes it quite differently. He described his mother as rigid, controlling, emotionally unstable, highly critical and physically unaffectionate. He does not recall ever receiving praise from his mother and said it was impossible to communicate with her because she was unable to listen and was completely rigid in her views. Family routine was regimented and discipline was harsh. The defendant described his adoptive father as the best father in the world, whereas his brother described him as completely detached, non-

communicative and unaffectionate. The defendant's brother ran away from home several times and once reported his parents to protective services for emotional abuse. Nothing came of it. Conflict with his parents reached a turning point when he was fifteen and they were living in Korea. They decided to let him fly back to the United States by himself and live on his own. He was homeless for a period of time, but eventually joined the Army. Prior to his discharge he was court-martialed for having a handgun in the barracks, making threats, and firing a gun in the barracks. He spent 12 months in prison. Though he now is married with three young children, and leading a very stable life, his mother wants nothing to do with him or her grandchildren despite his attempts to re-connect with her.

5. The defendant's adoptive father was cooperative in providing his social history but it was primarily limited to a chronology of dates and events. He described himself as a loner from early childhood on. He was never close to his mother and had more "in common" with his father. Though he adopted the defendant and his brother, most of the parenting was left to their mother. He expressed concern for the defendant, but displayed no emotion, and did not answer direct questions regarding his feelings for the defendant. He is very rational and very detached. We have not been able to interview members of his extended family as he is estranged from them because they did not accept his wife. He does not see the need for us to learn more about his family.

6. In summary, the defendant's family history is significant for major psychiatric illnesses as well as neurological/cognitive/developmental disabilities. Maternal history is significant for severe trauma, abuse, loss and depression/suicide and probable bipolar disorder. Her pregnancy with the defendant was high risk due to bleeding and poor nutrition. Paternal history is significant for major mental illness, substance abuse and familial genetic disabilities. Defendant was exposed to home violence and physical abuse, maternal instability with impaired parenting, and unstable living situations and frequent re-locations due to military lifestyle. In addition, defendant was involved in a major MVA which according to his wife resulted in a personality change as well as physical symptoms.

*Ongoing Investigative Tasks/Issues*

1. Based on the above information, we requested the defendant's mother's prenatal and delivery records from the Army, but as yet, they are unable to locate these records. The pregnancy and birth records would document defendant's prenatal health and health at delivery. In light of recent testing that revealed a need for further neurological evaluation, this would be very important. Maternal medical records would also contain information regarding his mother's suicide attempt and hospitalization.

2. We requested, but have not yet received any of defendant's pediatric records. His mother's recollections of milestones are very vague. He has always been extremely small for his age and he has a partial facial paralysis for which we have no explanation.

3. We requested, but have not received his birth father's military records. These records could provide documentation regarding disciplinary problems, including an Article 15 related to his temper, and documentation of the three domestic violence incidents when the MP's were called to the home.

4. We requested and received only partial military medical records for the defendant's birth father. They go back ten years and do not include any medical records from his twenty years in the service when his alcohol, rage episodes and prescription drug dependence were major issues.

5. We received and reviewed defendant's military personnel file and military medical records. Reference was made to his symptoms following the MVA in 1996, but we still do not yet have the medical records from the civilian hospital where he was initially transported and treated. The details of the injury would assist the neurologist in evaluating the deficits identified by Dr. Mirsky. The defendant's wife reported that he underwent a personality change following the accident. Post accident military records and subsequent employment problems seem to coincide with the accident.

6. We were unable to contact and meet the defendant's birth father until this March. Based on the history he provided, we need more documentation regarding the specific developmental disabilities of his four sisters for the neurologist to review. The defendant's father is estranged from his siblings and we are in the process of locating the sister who has more information. We need to obtain releases of information so that we can obtain medical and institutional records for the disabled sisters. We also need to find and interview as many siblings as possible to obtain and verify family information.

7. We have been unable to interview maternal relatives as mother states her two remaining siblings in Korea are likely deceased. We are still trying to get more information regarding her life as an Army life, though what little information we have indicates that she is/was unable to sustain friendships and may have been discriminated against as well.

8. We have requested and are waiting for the defendant's brother's psychiatric records.

9. We requested, but have not received the defendant's adoptive father's military personnel file. The Army has not yet located them. These records will provide information regarding the family addresses, living situations, and the adoptive father's functioning in the Army.

10. We have been unable to obtain elementary school transcripts or visit the schools on all of the military bases where he lived.

11. We have reviewed Wentworth Military Academy transcripts but have not yet located teachers. The defendant has a poor memory in this area. We have located two classmates, one of which is assisting us with other names.

12. We have interviewed employers from most of the defendant's significant jobs, but may need to re-interview several due to issues related to personality change, short term memory, etc. following the MVA in 1996.

13. We are actively trying to locate high school teachers and friends, but many have moved on. Many also seem to have common names that make location more difficult.

# CENTER FOR PSYCHOLOGICAL EVALUATION AND CONSULTATION

*Allan F. Mirsky, Ph.D., ABPP*

5502 SPRUCE TREE AVENUE, BETHESDA, MD 20814-1623 ʋ (301) 530-9332 ʋ FAX (301) 564-9562

JUL 20 2009

CLERK, US DISTRICT COURT
NORFOLK, VA

SEALED

## NEUROPSYCHOLOGICAL CONSULTATION-PRELIMINARY REPORT

<u>Name of Patient</u>: David Runyon
<u>Date of Birth</u>: 01/07/71
<u>Age</u>: 38
<u>Interview and Report by</u>: Allan F. Mirsky, Ph.D., ABPP-CN
<u>Date of Evaluation</u>: 06/26/09

## REASON FOR REFERRAL

Mr. David Runyon was referred by Mr. Stephen A. Hudgins, Esq. for a neuropsychological evaluation, which was conducted on 06/26/09. Mr. Runyon is a defendant in a capital murder trial, accused of committing a murder for hire. Mr. Hudgins is defending Mr. Runyon. In addition to conducting the testing described below, I reviewed all the documents supplied to me concerning his family history, his military history, the arrest and criminal history and the current family status.

Mr. Runyon was seen in the Portsmouth, Virginia City Jail. The duration of the evaluation, including the taking of a history, was six hours. There was a brief break. Mr. Runyon appeared in a prison jump suit, and was unshackled during the entire evaluation. He is a small, slim Asian-American man who speaks softly and without appreciable accent of any kind. His speech was articulate and free of any sign of defect. His affect was flat, but probably appropriate to his being held in prison prior to a trial for murder. He was offered lunch, but declined. Mr. Runyon participated in the testing without complaint, and noted that he had seen some of the tests earlier. Although I had been prepared to administer the Minnesota Mutiphasic Personality Inventory, he stated that he had taken the "MMPI" twice before, and as recently as one month ago. I therefore did not administer the MMPI, in the belief that the prior results would be made available to me. This has not occurred as of this writing.

Mr. Runyon's educational background includes an Associate of Arts degree, awarded in 1991 from Wentworth Military Academy. He reported as well that he was trained as a classical pianist as a child. Mr. Runyon reports serving as an officer in the U.S. Army from 1989 to 1997, but his recollection of the exact dates was a bit unclear. He also stated that he reenlisted in the service as an enlisted man, and that his military occupational specialty was parachute rigger. When questioned about this somewhat unusual sequence, he said that his reenlistment was motivated by a "strong sense of responsibility to serve my country." He noted that he had two honorable discharges, and that both his biological and adoptive fathers (and grandfathers) were military men. He reports that his work history in recent years

RECEIVED

2023 FEB -6 A 8 45

CLERK US DISTRICT COURT
NORFOLK, VIRGINIA

Re: David Runyon
6/26/09                                                                                              2

has been varied: law enforcement, construction, and tree work. He did not discuss the fact that (according to other information supplied to me) most recently he has been supported by payments for participating in pharmaceutical drug trials, as a normal control.

Prior injuries of potential relevance to Mr. Runyon's mental status include two incidents of grenades being detonated quite close to him during training exercises while in service. These occurred between 1989 and 1991. He also reports two serious car accidents with cognitive sequelae—one in 1990 and the other in 1996. These incidents produced a variety of symptoms, according to Mr. Runyon, including brief unconsciousness, vertigo (from which he still suffers occasionally), temporary deafness, numbness, impaired memory, "jumbled thoughts," and according to a report from his estranged wife, marked personality changes including a short temper. Some of the medical professionals who saw David raised the possibility of a post-traumatic stress disorder. These incidents, especially the severe automobile accidents, were never followed up with brain imaging studies

Mr. Runyon denies that alcohol consumption was ever a problem, and states that he never used illegal drugs. However, he described extensive alcohol abuse in his wife, from whom he has been separated since 2002.

I believe that the current results are an accurate reflection of Mr. Runyon's cognitive status.

| TESTS ADMINISTERED | SCORE | INTERPRETATION |
|---|---|---|

(Note that in scores below, SD refers to Standard Deviation, a measure of dispersion about the mean or average score. A score 2 or more SDs below the mean is worse than approximately 90% of the age-matched healthy population. Positive, i.e., +SD scores indicate performance *better* than comparable controls).

*Wechsler Adult Intelligence Scale-III (WAIS-III) Subtests*\*

| | | |
|---|---|---|
| Vocabulary | 13 | -Superior vocabulary |
| Arithmetic | 13 | -Superior score |
| Digit Span | 17 | -Very superior memory for digit strings |
| Digit Symbol Substitution | 11 | -Very good visual- |

Re: David Runyon
6/26/09                                                                                  3

|  |  | motor coordination |
| Similarities | 14 | -Superior conceptual skill |
| Comprehension | 12 | -Very good understanding of concepts and social practices |
| Information | 11 | -Good general knowledge |

*Expected standard score = 10;  Verbal IQ = 135; very superior.


## Tests of Attention/Concentration

Continuous Performance Tests (CPT)**

Visual X task                    81.6% correct

-Very impaired score in simple visual sustained attention (-7 SD); slow responses; high response variability


Visual  AX  task                 86% correct

-Severe impairment in more complex visual attention task (- 3 SD); high response time variability


Degraded X task                  45% correct

-Severe impairment in difficult visual attention task (- 4 SD); high response time variability

Auditory (tones) task            92% correct

-Mildly impaired auditory attention (-1 SD)

**Scores are % correct responses; expected scores X, AX and Auditory  tasks >95%; Degraded X task, circa 88% correct.


Trail Making Test

Re: David Runyon
6/26/09

4

| | | |
|---|---|---|
| Part A | 15 sec | -Very fast on this visual-spatial task; +2 SD |
| Part B | 40 sec | -Fast score on this more complex visual-spatial task; +1 SD |
| Wisconsin Card Sorting Test (WCST) | | -Grasped concept of task early - 6 categories; 88% correct responses, no perseverative errors |
| Cancellation Test | 71 (mean correct) | -Normal score |
| Stroop Test | 47 (mean T score) | -Normal score on test of ability to focus |

*Tests of Memory*

Wechsler Memory Scale-III

<u>Verbal Memory Subtests</u> (Expected standard score = 10)

| | | |
|---|---|---|
| Logical Memory I | 13 | -Superior short-term recall of prose passages and themes |
| Logical Memory II | 11 | -Very good retention of passages and themes |
| Verbal Paired Associates I | 11 | -Good learning score |
| Verbal Paired Associates II | 13 | -Excellent recall of pairs |
| Word Lists I | 17 | -Superior learning of score |
| Word Lists II | 16 | -Superior recall score |

<u>Visual-Spatial memory</u>

Re: David Runyon
6/26/09

5

Rey-Osterrieth Complex Figure    (36, 32, 32)+        -Good appreciation of gestalt; superior immediate and delayed recall

+ = raw scores for copy, Recall I, Recall II;

*Tests of Verbal Fluency (Raw Scores)*

Boston Naming Test          56                -Normal score

Controlled Oral Word
Association                 34                -Normal Score

*Test of Manual Dexterity*

Purdue Pegboard             39                -Total of L, R and Both Hands; mild to moderate impairment of dexterity

*Test of Symptom Magnification*

Rey-20 Item Test    Mr. Runyon recalled correctly 19 of the 20 items, indicative of effort to perform well on the tests.

## SUMMARY AND CONCLUSIONS-PRELIMINARY

The test results, in general, indicate that Mr. Runyon has some superior to very superior cognitive skills, mirrored by a high Verbal IQ. His verbal and visual-spatial perceptual and memory abilities are almost without exception in the superior to very superior range (Wechsler Memory Scale subtests, Rey-Osterrieth Complex Figure). His scores on tests of the ability to focus on a task are generally normal to superior (Digit Symbol Substitution, Stroop, Trail Making, Cancellation), as is his ability to shift attentional focus in a flexible manner (Wisconsin Card Sorting Test). There was no indication of symptom magnification. Exceptions to this otherwise stellar performance are seen in two spheres: sustained attention (Continuous Performance Tasks or CPT), especially visual, and manual dexterity (Purdue Pegboard). The low score on the Purdue Pegboard is consistent with some mild, diffuse brain damage, but the poor CPT scores are clearly indicative of dysfunction in a brainstem-cortical system responsible for maintaining alertness

Re: David Runyon
6/26/09                                                                                   6

and attention (Mirsky et al., 1991). These poor scores, as well as his continuing symptoms of vertigo, would indicate that he is unable to persist in any attention-demanding activity for a sustained interval, and may explain his spotty and uneven work history. In any event, the symptoms merit further intensive neurological investigation. They are entirely consistent with brainstem injury, which could have resulted from his earlier motor vehicle injuries (or possibly the blast from the grenade explosions). It is becoming clear from study of wounded soldiers in Iraq and Afghanistan that blast injury can have profound effects on neurocognitive functions. It would also be extremely helpful to have available the results of the other psychological and neuropsychological tests, including , but not limited to the MMPI. Until such time as the full data are available, this report must be considered as preliminary, only.


DIAGNOSIS (DSM-IV) Deferred pending receipt of further information.


---

Allan F. Mirsky, Ph.D., ABPP
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology

References

Mirsky, A.F., Anthony, B.J., Duncan, C.C., Ahearn, M.B., & Kellam, S.G. Analysis of the elements of attention: A neuropsychological approach. *Neuropsychology Review*, 1991, 2, 109-145.