N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 4:08cr16 |
| DAVID ANTHONY RUNYON, | ) | |
| Defendant. | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | CIVIL ACTION NO. |
| | ) | 4:15cv108 |
| V. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |
| | ) | |

- - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

(Status hearing)

Norfolk, Virginia

June 16, 2023


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge


JODY A. STEWART, Official Court Reporter

APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Brian Samuels
               Lisa R. McKeel
               Assistant United States Attorneys
               Counsel for the United States


          VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
          By:  Elizabeth J. Peiffer
                         And
          ALI & LOCKWOOD LLP
          By:  Kathryn M. Ali
               Counsel for the Defendant

(Hearing commenced at 12:04 p.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; and case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels and Ms. McKeel, is the government ready to proceed?

MR. SAMUELS:  The government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Peiffer, Ms. Ali, is the defense ready to proceed?

MS. ALI:  Yes, Your Honor.  Good afternoon.

THE COURT:  Good afternoon.

Counsel, I will briefly review the current status of where we've been since the last hearing, and I will then address outstanding matters.  I would recognize Mr. Runyon. You are David Anthony Runyon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So Mr. Runyon is here with his counsel, and counsel for the United States are present.  On February 7, 2023, Petitioner's evidentiary hearing began following the Fourth Circuit's remand on the limited issue of whether Petitioner's trial counsel, "Failed to provide him with effective assistance in violation of the Sixth Amendment by

failing to investigate adequately his brain injury and potential mental illness and introduce such evidence in mitigation during the penalty phase of the trial."

That's from *United States v. Runyon*, 924 F.3d 192 at 204.  It's a 2021 Fourth Circuit case.  I will not go through all of the lengthy history that has occurred to date, but the last time that we convened on this case was in February of 2023.  Petitioner's counsel from the Federal Public Defender services in Eastern Tennessee were withdrawn from the case, and for the reasons I ruled on the bench, as stated from the bench and in court and for further reasons, that have occurred in the Eastern District of Tennessee.  On February 24, 2023, the Court continued the evidentiary hearing.

The Court by written order also directed Ms. Peiffer and the United States, "To come to an agreement regarding the discovery schedule moving forward, including the necessary lengths of any continuance of the evidentiary hearing and to submit the proposed schedule to the Court by close of business on Friday, March 24, 2023."  That order is ECF Number 796.

On March 23, 2023, petitioner, by counsel, filed an unopposed motion to continue the scheduling deadline until April 14, 2023, which the Court granted the following day. On April 14, 2023, petitioner, by counsel, filed a motion to

continue the scheduled deadline until May 5, 2023, which the Court granted on April 18th, 2023.  On May 5, 2023, petitioner filed a status report and proposed schedule in which counsel suggested that discovery should be due on August 31, 2023, and that the evidentiary hearing could begin in October of 2023.  The United States responded to that status report on May 17, 2023.  In its response the United States objected to that length of a delay and, "Requested that the Court hold a prompt status hearing to discuss the status of discovery and the lack of agreement regarding the continuation of the evidentiary hearing."  So that was why we were initially here today, and we certainly will get to that.

In the meantime, on April 12, 2023, petitioner, by counsel, moved to appoint a second attorney, Kathryn Ali, and the Court granted that motion, and Ms. Ali was appointed on May 17, 2023.  I note that the Court had the discretion whether to appoint Ms. Ali or not, because the second attorney is discretionary, and the defendant was already represented by Ms. Peiffer and the Virginia Capital Resources Center, who have been in this case for some time since it started the collateral proceedings.

Then on June 7, 2023, Ms. Peiffer moved to withdraw from her representation of the petitioner due to her mother's cancer diagnosis.  I would note that there is an

outstanding motion to seal Ms. Peiffer's declaration, and I have reviewed that because it contains personal information relating to her mother's diagnosis and care.

Is there any objection to the Court sealing that document?

MR. SAMUELS:  No, ma'am.

THE COURT:  Ms. Peiffer, I assume that you still want that sealed?

MS. PEIFFER:  Yes, Your Honor.  Thank you.

THE COURT:  Well, I grant the outstanding motion to seal, and that declaration will be sealed.

Now, the first issue we will take up is Ms. Peiffer's withdrawal, and I will tell you at a threshold level that I am not inclined to allow you to withdraw at this point, Ms. Peiffer, and there are a number of reasons. I will state my reasons.  You can then respond.

There is no indication here that you are not still going to be with the Virginia Capital Resource Center, and if you're going to be with that Center, even if you can't at this juncture necessarily take a lead role, Ms. Ali is certainly capable of taking a lead role.  She was a law clerk in this court for Judge Doumar.  She has experience in death penalty cases, and that is why the Court admitted her, because of her experience, and she moved, as did Ms. Peiffer, to allow her in.  That was allowing her in on

the Court's discretion without having any information in regard to Ms. Peiffer's mother's condition.

So at a threshold level, there are already two attorneys in this case, and Ms. Ali is certainly qualified. If she's not, she shouldn't have submitted all that she did to the Court saying she was totally qualified to go forward with this case, and those submissions were verified, her experience by the Court, and the Court is familiar with her, her having served as a law clerk in this court. I didn't work directly with her, but I certainly am familiar with her.

Secondly, as I said, there is no indication that Ms. Peiffer is leaving the Virginia Capital Resource Center or that the Virginia Capital Resource Center is in any way closing. Every case needs some kind of institutional memory and continuity, in other words, an attorney that's been with the case. I am certainly not inclined to let an attorney or the Capital Resource Center withdraw. Ms. Brace started this habeas with the Center, then the Court was assured she was ill. The Court was assured that Ms. Peiffer would take over and proceed in this case, and that the Virginia Capital Resource Center would proceed.

Certainly, at this juncture, this case started in 2008. It started a bit before that, but filed in 2008, and so, consequently, at this juncture this Court is not

inclined to let the habeas attorney withdraw.  I'm very sympathetic to Ms. Peiffer's family illness.  I'm sympathetic to family situations, and she may not for a while be able to take the lead here, but you've got very capable co-counsel.  Now, if you want to make some remarks to that, certainly, Ms. Peiffer, I will let you, and I will let the United States respond.

Ms. Peiffer.

MS. PEIFFER:  Your Honor, since most of the explanation and reasons why I believe I'm required to withdraw as set forth in the motion and declaration, I'll have very brief responses to Your Honor's comments.  The first is that, although I had elected to, after reviewing the ethical rules and consulting with the bar of ethics department, I believe it is appropriate and necessary for me to withdraw because I can't fulfill my ethical obligations to Mr. Runyon due to my personal conflict of interest that has arisen and disabled by that conflict of interest and particularly to the Rules 1.1, 1.3 and 1.7, I feel obligated to withdraw, and I have done that after consultation with ethics counsel at the bar.

THE COURT:  I haven't received any ethics opinion, and I don't know of any cases on point.  Are you staying with the Virginia Capital Resource Center?  Are you employed by them?

MS. PEIFFER:  Your Honor, I am currently employed by the Capital Representation Resource Center.  I have not been working my normal schedule.  I have been unable to work my normal schedule since April 28th due to my involvement and responsibilities for caring for my mother, and my schedule has been very unpredictable, and I have had a great degree of flexibility, and because of that, that is why I believe that I am not able to competently represent Mr. Runyon because of the degree of unpredictability that has taken over my schedule and my life at this point due to my mother's illness.

I have not been working in the way that I would need to to prepare for his evidentiary hearing or to support Ms. Ali as co-counsel in the case.  I have not been able to do that due to my other obligations.  I have the option of taking compassionate relief from the Resource Center, and I will do so if that's needed to address my mother's medical situation.

But the situation is evolving and changing, and I'm not -- to be frank with the Court, it changes every day, and I am not sure of my stance for the future, but that degree of unpredictability and my concern that I cannot adequately represent Mr. Runyon with an approaching evidentiary hearing and the work that would need to be done to prepare for that is to prepare and to follow the Court's orders regarding the

discovery in this case, I don't feel like I can fulfill those obligations, and that's why I did move to withdraw in this case.

THE COURT:  The Court is of the opinion you are not fulfilling your obligation to withdraw.  There's probably not a person in this room that has not had a close family member very will or had a difficult family situation, including the undersigned judge, a very similar family situation, and I'm not saying I'm not sympathetic but there are still ways to meet your obligations because that's what a person has had to do at some junctures, and as far as I'm concerned, that's why you have Ms. Ali to take a lead role.

You would be, in my opinion, violating your duties to Mr. Runyon by not staying in this case because you have the institutional memory, and it doesn't mean that you have to work on the case every day, but there are computers, there are e-mails, there's telephones.  Ms. Ali is in the State of Virginia.  Her office is in Northern Virginia, as I understand it, and you're in Charlottesville.  So there are certainly means to communicate, and nobody is saying that you have to be lead counsel necessarily, but you're co-counsel, and if you leave, I'm still going to require the Capital Resource Center to be in this case.  So you can let Mr. Lee know that.  You can't take on a case like this and then the attorneys one by one -- there is an obligation.

You have the records, you've done the discovery, you've filed the motions. One of the experts is now deceased. One of the attorneys, I believe, had cancer. This case is getting too stale at this point. We've got to continue on with it, and we are going to continue on with it, absent another reason other than you've told me. If it was your health, that would be different. It may be hard on you. But nobody is saying that you've got to file the briefs and do everything because you've got Ms. Ali, your co-counsel.

So nobody from the bar has told me you have to withdraw. I've looked at the caselaw. There is a family illness, but that doesn't mean if you take leave, then Mr. Lee will have to step in, even if you take compassionate leave, you are still with the Resource Center. So at this juncture, unless I hear something more persuasive, I'm going to deny your motion. In my opinion, the interest of justice requires that you and the Capital Resource Center stay in this case.

Let me hear from the United States, but at this juncture, unless I hear something more persuasive from you, and you're saying you don't have anything any more than what you've told me. I'm not granting withdrawal.

MS. PEIFFER: Your Honor, may I address several of your points, response?

THE COURT: You can, but don't repeat. Be as quick

12

as possible.  We have other matters to address.

MS. PEIFFER:  Absolutely.  The first regarding the Resource Center, we have operated under the Court's instructions that I was appointed to the case and not the office.  The office institutionally has had very little involvement with the case.  I have performed the brunt of the work in this case, the relationship with Mr. Runyon, and participation in the evidentiary hearing so far.

THE COURT:  Wait just a minute, please.  I want to interject something.  Ms. Brace was let out because she was ill, and you took Ms. Brace's place.  You were both with the Capital Resource Center.  So Ms. Brace was with this case, the continuity through the habeas action, and appeared in this case at the inception of it.  She got out right at the inception of when we had to have the evidentiary hearing. She was in the case as was the Capital Resource Center.  So she got out with the understanding that the Capital Resource Center would still be in the case, and you would be the attorney from the Capital Resource Center.  I agreed to let you all associate the Federal Public Defender of Tennessee and you lost control of that one.

MS. PEIFFER:  Well, Your Honor, I was appointed from the Resource Center, but the other attorneys at the Resource Center did not have a substantial involvement in the case.  And that was -- they are currently impacted by my

JODY A. STEWART, Official Court Reporter

situation, which also has made me unavailable to work on our other cases.  We are a very small office of only three attorneys.  So my inability to work at full capacity, and the need to accommodate that on our other cases, and my reduced contribution, has had a proportionately great effect on the office.  And in the interest of efficiency and moving it forward, which I know is in the interest of all of the parties, that was why we suggested substitute counsel who would be able to move the case forward on the schedule that we had proposed, which we would not be able to do if I was involved -- I would not be able to commit to a hearing because of my current situation and to just -- I'm trying to keep it brief as directed by Your Honor, but I just want to clarify, I believe I am currently operating under a conflict of interest because I am -- my personal commitment and my personal responsibilities are creating a significant risk that the representation of Mr. Runyon is materially limited. So that is the reason why I believe, and the bar advised, that it is appropriate, and that's why I moved to withdraw from the representation.

THE COURT:  As far as the Court is concerned, if the Capital Resource Center did you not have enough resources, it needs to seek more.  That's number one. Number two, I would be interested, and I may inquire, if necessary, a list of all the cases that you have because

this is certainly one of the oldest cases that you have.  So if you are taking on new cases, and you're putting Mr. Runyon's case behind those, that is unethical, in my opinion.

In other words, if you're taking on new capital cases, and you're not getting out of more recent capital cases that haven't been nearly as far as this case, that is not right.  This case had a full jury trial.  He was convicted with three segments for a death penalty case.  The jury rendered the verdict, not the Court.  The law required the jury to render the death penalty verdict, and not the Court, which is then directed under the law to impose that sentence of the jury.

The case went to the Fourth Circuit on appeal and was affirmed.  Then it went to the Supreme Court, with cert. denied.  Then it came back here.  It was a habeas petition that had things even in there alleging that the attorneys hadn't used the correct font.  That was actually one of the numerous grounds.  Then it gets ruled on by this court, and it goes to the Fourth Circuit on appeal.  Everything is upheld but the one issue of whether the two attorneys were ineffective because they didn't pursue or produce certain evidence on potential mental health issues.  They testified.  The habeas evidentiary hearing started at lasted seven to eight days.  They, the attorneys, have testified here why

they didn't and what was going on.

Then when Ms. Chavis appeals, it comes out on the objection of the government that certain documents haven't been seen, certain documents haven't been produced, and the record will show this. Then, as I understand it, a closet with at least 40 bankers boxes of evidence was found at the Tennessee Federal Public Defender's office that Ms. Chavis had put there.

So, consequently, this case has been going on an inordinate amount of time, and it needs to move forward, and the Court itself has not dragged its feet. This came back to court on this one issue in 2021, and then I continually notified counsel we need to set a hearing. I set a hearing, I believe, at the insistence of the government about a year later. So it needs to keep moving along. People are going to have problems. That is one of the issues now. There are problems. There are problems with the experts, one has died. There's problems with the trial attorneys getting ill. At least they have testified at this point. Then there were problems with, and it wasn't the government, withholding discovery information. It was the petitioner's counsel withholding that. That was a nightmare for the Court, for Mr. Runyon, and for everybody involved with what occurred and with the case.

So, consequently, we all have problems. It's human

nature.  I know you have a problem, Ms. Peiffer, but there are attorneys and other people in that office, and there is you, you can communicate.  You can communicate with Ms. Ali, who is extremely competent.  So she's in the case, and the case can move forward.  If she has a question about something thus far, at least she has someone to ask.  Can you tell me why this was filed?  You don't necessarily have to do all the substantive work, but the continuity has to be there, and it has to be there now through you, and if not through you, through the Virginia Capital Resource Center. Mr. Lee, the director of the Center, is an attorney.

I will do what I have to do to keep the Virginia Capital Resource Center in this case.  Three attorneys and Mr. Lee apparently have not stopped taking new cases.  I'd be interested in the cases that you have.  I bet you don't have many that go back to 2008.  I would be very interested.

So unless you can produce something other than what you have told the Court that, number one, I understand your situation.  I'm very sympathetic to your situation.  But the situation, in my mind, is not grounds to withdraw.  If you feel you have a conflict, I don't feel you have a conflict. I don't see any conflict because a family member is ill.  I just don't see the conflict.  So I find that you don't have a conflict that prevents you from proceeding on with this case, even if on a limited basis, and I find that you don't

JODY A. STEWART, Official Court Reporter

have an ethical obligation to withdraw.  I find you have an ethical obligation not to withdraw at this late juncture.

Now, is there anything else?

MS. PEIFFER:  I'll consult with my co-counsel, Your Honor.

All right.  Nothing further at this point, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Samuels, Ms. McKeel.

MR. SAMUELS:  Thank you, Judge.  Your Honor, we certainly have a great sympathy for Ms. Peiffer's family situation.  When we were investigating this case, and we were doing the early litigation on it, Ms. McKeel, my colleague, had some very difficult family situations, as well, during that time that we worked through.

But the concern that the United States has is the concern that the Court had referenced, which is the issue of continuity, the issue of institutional memory.  I think it is just important to note that Ms. Brace was appointed in this case back in 2015 from the Virginia Capital Resource Center at the onset of the habeas proceedings.  Ms. Peiffer assumed her responsibilities in late 2021, and that was through the Court's order, ECF 649, and the Court permitted that substitution with the understanding that it would not cause a further delay in the proceedings.

I think it's also important to note that since Ms. Peiffer has been involved in late 2021, it's been about a year and a half, there has been significant ground plowed in this case. There has been a lot of discovery exchanged. We went a long way down the road on this evidentiary hearing. The lawyers testified. Lay witnesses testified. There were many prehearing pleadings that were filed.

The concern of the United States is that there be a thread in counsel's team, in habeas counsel's team, that's linking to what has been done before, and that would be Ms. Peiffer, Your Honor. So for those reasons, we agree that she should be involved in this and not the capacity that she was, but she does provide the link between what's going to go on in the future and what has happened in the past. She has had a lot of contact with the attorneys at the Federal Defender's office, and that's where all these discovery issues and these disclosures should stem from, so we do think it's an important link to maintain, Your Honor. Thank you.

THE COURT: One thing that I would add is that if Ms. Peiffer or the Virginia Capital Resource Center is not in the case, they have the electronic database of this case, and so if something comes up, they know where to go. In other words, it is not just transferring a database, it's having the memory and the knowledge to know where to go and

get things.

So the reasons that I've said, as far as I'm concerned, I just don't see anything that would serve the interests of justice in Mr. Runyon's case to allow Ms. Peiffer to withdraw.  She can certainly take a lesser role, as Mr. Samuels and the Court indicated, and the Court understands that.  But certainly to completely withdraw and to withdraw basically the firm, the group that has been representing Mr. Runyon throughout these habeas proceedings, would not serve the interest of justice from his standpoint, in my opinion.

Now, is there anything else that you want to say, Ms. Ali?

MS. ALI:  Just briefly, Your Honor, if I may.  I understand that the Court has -- I think I understand the Court has ruled on the motion.

THE COURT:  No, I'm asking you if you have any comment about the motion.  I've indicated upfront how I feel about the motion, and it's been pending, and that's why I didn't just rule on it.  I knew we are going to have this hearing, and I wanted to articulate my reasons on record, and if you all wanted to respond, I certainly will consider any response.  I have left out Ms. McKeel, but Mr. Samuels has responded.

MS. ALI:  I won't repeat the argument that

Ms. Peiffer made. I'll just add, you know, we think that it is critical that Mr. Runyon have more than one counsel here for the reasons that we said in our motion, and I understand that technically if Ms. Peiffer is still in the case, then he's got two appointed counsel. But functionally, that's not going to be the case. Ms. Peiffer has really had significant constraints on her time over the last month since all of this unfolded, and my understanding that that will continue for at least the next three to four months.

The Court acknowledged in the order appointing me, and I'll note also that I was appointed in that order as second counsel solely for the purposes of this hearing. This is a complex case. There is a lot of discovery yet to be completed, and I am getting up to speed. I'm trying to learn the case, but I'm not sure that Ms. Peiffer continuing to be in the case functionally serves those two counsel. The Court made a judgment in the appointment order that it was appropriate for him to have two counsel.

I understand that that doesn't mean that both have to be serving a lead counsel function. But Ms. Peiffer is not in a position, as I understand it, and based on the constraints on her time, to really competently represent Mr. Runyon in any capacity right now. I understand the Court's comments about the office and the Resource Center and Mr. Lee, but they are aware of the case. They have been

doing some work on the case, but they are not -- they do not have the personal relationship with Mr. Runyon.  They are not up to speed on all the developments in the case, and they have not been involved in the way that Ms. Peiffer has.

So I'm not sure -- it's not a substitute to have somebody else from that office come in, especially -- we put all this in our motion, but we have substitute counsel standing ready to come into the case.  I see Your Honor shaking your head, so I'm happy to move on.

THE COURT:  I haven't responded to that yet, but that's a different issue whether I'm going to let five attorneys come in here *pro hac vice*.  We had a problem with that before with Ms. Bales, Ms. Chavis, and the Tennessee Public Defender.  I did that against my better judgment, but we will get to that in a minute.  There are five attorneys sitting in here.  Do you know what a hearing is like with various attorneys jumping up and down and, well, Ms. Bales prepared this witness so she has to do it, and the record will go back and show that, and then there was conflict between the *pro hac vice* counsel.

I mean, there were a lot of problems, even admitting Ms. Bales from the Federal Public Defender's office in Tennessee.  They would say, well, I didn't prepare that witness.  I can't do that.  And this person has been admitted *pro hac vice*, so they need to do it.  We will get

to that in a minute, but that is not bearing, in my opinion, on whether Ms. Peiffer stays in the case or not.  If you want me to, I'll do an amended order and make you lead counsel, and I'll make you both co-counsel.  I'll do it right now.  Then you two can decide how you split your responsibilities.

MS. ALI:  Again, I'm not going to repeat the arguments Ms. Peiffer made, but I think the Court understands our position.  We put it in our motion.  But from our perspective, it is not a substitute for him having two counsel.  I understand the Court's position that it is discretionary, but as we put in our motion, the CJA plan for this district specifically says that the Court should consider having at least two counsel in a capital 2255, and as we said in our motion as well, every other person litigating -- every other person litigating a capital 2255 has at least two lead counsel of record and in many instances many more than two.

So Mr. Runyon would really functionally only have one counsel of record in the case if Ms. Peiffer is not permitted to withdraw and no additional counsel are permitted to appear as counsel of record.  Mr. Runyon would be standing alone in that posture.

THE COURT:  I don't agree with you because this habeas has gone on, and is at the final stage.  It's not

like the inception of a habeas case where all of -- I've forgotten, what was it 60 grounds or something was fully briefed, ruled upon, argued, and so forth.  I don't know how many grounds, I'd have to look back.  This isn't the inception of a habeas case where the petition hasn't been filed.  It's been heard on appeal.  It's now here on one narrow ground.  So this is quite distinctive and distinguishable from what you're saying because this is not a new habeas proceeding from the inception where -- I don't know how many hundred pages I wrote where I went through every single ground, and it went up to the Fourth Circuit and one ground came back, and that's the only ground.  So it's a very narrow habeas case at this point, and, in fact, that's why I was hesitant to even appoint a second counsel in the middle of the evidentiary hearing, because it is within my discretion.  It is not required, and the Virginia Capital Resource Center and Ms. Peiffer, since it got to this narrow issue, have been in this case, and Ms. Brace from the Center before that.  On all of that, I still appointed you, and exercised my discretion, but it's not required, and it's only on one narrow issue.  If you're not up to it, tell me.  I'll let you withdraw.  We will get somebody else.  Are you up to it, Ms. Ali?

MS. ALI:  I am prepared to stay in this case and represent Mr. Runyon, as I have agreed to do and as I

represented to the Court.

THE COURT:  All right.

MS. ALI:  Nothing further, Your Honor.

THE COURT:  Anything further from anyone?

MR. SAMUELS:  Not from the United States, Your Honor.  Thank you.

THE COURT:  Ms. Peiffer, anything further from you?

MS. PEIFFER:  Not at this time.

THE COURT:  Well, for the reasons that I've stated, I deny Ms. Peiffer's motion to withdraw as counsel.  I designate the two attorneys as co-counsel, and they can determine how to divide the responsibilities as between them in Mr. Runyon's case at this juncture.  As for the reasons I've said, Ms. Peiffer must remain in the case, but I'm not going to repeat them all.  The institutional memory of the whole Virginia Capital Resource Center that's been in this case since 2015 is necessary, in my opinion, to serve the interests of justice for Mr. Runyon.

So, consequently, I would also suggest if the Virginia Capital Resource Center -- this is a suggestion -- is overworked, then they review their cases and decide that they can't take on any new cases, but you don't drop cases that you have been in for coming on soon almost nine to ten years.  So you just can't drop cases.  You stop adding cases.  But for any reason, for all the reasons I've said, I

exercise my discretion and find that in the interest of justice, and the interest of justice that I am interested in is Mr. Runyon and the continuity of counsel for his case, particularly on this very narrow issue of whether his trial counsel was ineffective for not pursuing the mental health route in the case.

Again, I appointed Ms. Ali, and she can -- they can serve as co-counsel.

The next matter I think we need to look at it, in Ms. Peiffer's motion to withdraw she renews her request for Covington, it's a very large national firm, attorneys to be admitted *pro hac vice* to represent petitioner *pro bono*.  I would note that despite this request, no *pro hac vice* motions have been filed at this time.  So you can't be admitted *pro hac vice* until the individual attorneys file a motion to this effect.  That's number one.

Number two, I see no reason to admit, at least it appears five attorneys in here to be *pro hac vice* because that can put the hearing out of control.  To the extent they want to volunteer their time to you, Ms. Ali and Ms. Peiffer, they can.  There is nothing that keeps them from acting *pro bono*.  They can certainly, if their firm wants it and permits it, they can act *pro bono*.  They can advise you, and you and Ms. Peiffer can use them however you deem appropriate.  But I see no reason to start admitting

attorneys *pro hac vice* to be here for this continued evidentiary hearing.  The record will show what happened before with the *pro hac vice* situation.  So, consequently, I welcome any *pro bono* help you can get.  That's up to you, Ms. Peiffer and Ms. Ali, whether you need *pro bono* help.  Number one, that's up to you.  Number two, it's up to their attorneys and their law firm.  I permit the attorneys to be *pro bono*, but the Court is not inclined to admit them *pro hac vice* in this case.  They can be present at the hearing, whatever you decide, but not as counsel in the case.  There is no requirement that they be admitted *pro hac vice* to be present.  So if they want to file the motions, you can file them, but be prepared for my decision, unless there are other factors to consider.

My decision at this juncture is no for the above reasons.  Now let's go to why we were supposedly here in the first place, which is to look at the schedule going forward for discovery and a continued evidentiary hearing date.

You asked for the conference, status conference, Mr. Samuels, and I'll let you speak first.

MR. SAMUELS:  I did, Your Honor, and thank you. I'd just like to put on the record where we are with this. Since we took our break at the end of February, and I believe at that time the Court had ordered the government and Ms. Peiffer at the time to come together and to come up

with a prosed schedule for the disclosure of additional materials and resumption of the evidentiary hearing by March 24th, but we have been unable to do that, Your Honor.  The government has agreed to, I believe, two extensions of the Court's original order.  We moved it first to April 14th and then to May 5th, and then there was a status report, I believe, filed by Mr. Runyon's counsel that asked us to commit to August 31st for a deadline for turning over materials.

Your Honor, this is about six months after we paused the hearing.  Let me tell the Court what we have received to date and the manner of it so the Court can understand some of the challenges we have had.  We have received two disclosures of documents.  Both of those only since we set this hearing.  We had asked for the hearing on May 17th.  The Court granted that, I believe the same day, and said we had to do it within 30 days.  We are at the end of that time period, the end of the 30 days.  We received the first disclosure on May 31st.  These disclosures are coming to us, Your Honor, through Covington's document platform, so they are involved in the case.

THE COURT:  They can't be coming through that platform.  They can assist *pro bono*.  But if you're not admitted in a case as counsel, you're not on the docket sheet as any type of counsel of record, and local counsel of

record are responsible.  The responsible attorneys, reportable to the Court, are Ms. Ali and Ms. Peiffer.

MR. SAMUELS:  To be clear, Your Honor, it is Ms. Ali that is informing us that the documents are ready, but then we have to go through a platform that I understand is Covington's platform to actually get the documents.  That has caused us a little bit of a delay in the first instance where we didn't actually get the documents until June 1st.

The second one we received notice of yesterday at 4:00.  We were not able to get that until this morning. There are these indices that have accompanied the disclosures.  The first set of documents was about 315 pages, and the second set was about 437.  The indices don't really tell us anything about what the documents are or where they came from other than they came from some Winston & Strawn boxes, but we don't know their relation to the penalty phase of this case or whose folder they came from or anything like that, which did seem to us as contrary to what the Federal Defender in Tennessee said they would do, which is they would have all these indices when they produced the documents.  There's no indication as to whether these documents have been turned over to us before, and as we have gone through them, we have recognized a good number of them are documents we have seen before and have been introduced in the hearing.

JODY A. STEWART, Official Court Reporter

In the first production there were about 25 pages or so that were entirely redacted. I don't mean partially redacted. I mean the page is blacked out, and we don't really understand why that has occurred.

But in the second production, I mentioned 437 pages, over 250 of those 437 pages are fully redacted, fully blacked out. I know there has been a claim of disorganization that occurred with the Federal Defender's Office in Tennessee, but it just seems that that disorganization is being passed on to the government.

And to put this in perspective, Your Honor, I brought with us these binders at the end of our table there. Those binders, and there is several of them, they constitute about 1,600 documents. Those are the documents that we received between February 14th and February 21st. No redactions. There were a number of key documents in there that should have been provided that we would have used at the hearing.

Now it has taken counsel four months to give us these 700 documents, many of which we already have, a good number of which are redacted. We have to go through these hundreds of documents to determine what has already been produced.

Now, Ms. Ali has kept us updated. She sends us e-mails, but it does appear, Your Honor, that the goalpost

and problems that they are having are constantly shifting here.  With every e-mail there are more documents or more problems or more review needed.  I think we started with 45 boxes, and then we moved to 57, then we moved them to 70.  Certain boxes are needing to be scanned.  I think again Covington has been involved in that.

There are now new digital devices and CDs being found, and the phrase that we have come to expect is that this is a tremendous volume of materials that would require significant time and effort to review and also unexpected complications and disorganized materials.

Your Honor, we have asked for the status conference because we need to get this done.  We are here on this narrow issue.  We believe we have most of the documents that are germane to this hearing, including very critical documents that had been withheld that very much undercut some of the claims that had been made, particularly with respect to what Dr. Merikangas knew with respect to these brain scans.  That was such a critical piece of the argument that was presented to the Fourth Circuit, and even Dr. Merikangas, in his affidavit, said he never got these brain scans.  Then we later found out that he did.

We would like to get a firm schedule where we can expect these documents.  We don't think the burden of deciding what has been given to us and what has not been

given to us should fall on us.  If there are going to be these serious redactions that are done, perhaps they can be submitted to the Court *in camera* because it does seem like those are excessive.  We just want a date where this can be set so we can plan for the resumption of this evidentiary hearing.

We had asked habeas counsel to also proffer how they expect this hearing is going to go.  We have gone a long road on this.  We have put in trial counsel.  We are up to the point.  I think we are about to do experts.  But given what has been disclosed, given this new information, that does seem to impact how they would proceed with their claim that trial counsel was ineffective.

We think before we restart this hearing, there should be some sort of proffered explanation how they intend to proceed, given what we have uncovered in these new documents, Your Honor.  We would propose a sooner date for the full disclosure of the documents, perhaps in a month's time, and then working to set this evidentiary hearing.

I know there has been some discussion with former trial counsel, Mr. Woodward and Mr. Hudgins.  They do have some avoid dates in July and August.  We would really like to move forward and get this scheduled, Your Honor.  We think we need the Court's assistance to move this along. I'm sorry it's come to that, Your Honor.

THE COURT:  Well, I am too.  I'm quite disappointed.

MR. SAMUELS:  I understand.

THE COURT:  I would say that, number one, it is petitioner's burden here.  This is a habeas proceeding.  This is his burden, not the United States' burden.  That's number one.  Number two, you only produce relevant documents.  The Court is not going to sift through all the documents in this case.  We have had a full trial.  We have had a full habeas petition briefed and ruled upon, and you're not going to do "a document dump."  That's not the way this is going to proceed.  And if it proceeds that way after I have said it's not going to proceed that way, I'm warning everybody we are going to have some possible sanction or contempt proceedings because this is just not proper and contrary to the Court's orders.

The documents may not come from Covington.  If you want to get them, Ms. Ali, and you want to sift through them for relevance, then you do it with whatever help you can get in your office or *pro bono*, but we are not going to have attorneys who aren't even admitted in the case producing them directly to the government through their servers and their indices.  You are responsible for their production to opposing counsel and the Court.  You're in the case, Ms. Ali, and you're in the case, Ms. Peiffer, and it is your

role as attorneys to produce relevant documents.  This is not happening here.  This is everything that could possibly be.  It's just not going to be.  If the Court has to sit down and look through hundreds of these documents and determines there are a lot of irrelevant documents after I said you produce only relevant documents to the issue at hand, we are going to have problems.  Not only are we going to look to sanctions or contempt, we are going to look to it from whoever is doing this.  Because this isn't right. We've got one narrow issue, and there were just a couple of things with a couple of doctors and information.  We've heard already all the testimony from the lay witnesses.

MR. SAMUELS:  Your Honor, if I can clear something, I do think there has been an effort to narrow down the documents from the much larger subset so that they are trying to give us relevant documents, but the problem is they can't tell us whether they have given us the documents before.  So then we have to look through and decide are these new documents or there's documents we have seen before.  There is no way to cross-reference it, and that creates the difficulty, Your Honor.  Thank you, Judge.

THE COURT:  Ms. Ali.

MS. ALI:  Thank you, Your Honor.  If I could just respond to some of the points that Mr. Samuels made.  The first is I think, as he just attempted to explain, I don't

34

think the complaint here is that we are doing a document dump.  I think we have been making enormous effort to only produce relevant documents and that actually explains the redactions issue.  Under the protective order in this case, only material relevant to claim six can be produced.  The language of the protective order prevents disclosure of information not relevant to claim six, and so that explains the redaction.

Some of the documents, and trial counsel, for example, let's say it's a memo with guilt phase information and penalty phase information about all kinds of things.  We have made -- we have endeavored to comply with the protective order here to redact information that is not relevant to claim six.  So that is the only basis of redactions in this case, that is the only reason the United States is getting information that is redacted, and I have explained that to Mr. Samuels in e-mail exchanges.

In terms of the aegis location and not understanding the provenance of the documents, we share those problems.  We share that frustration.  The documents that we received from counsel, which we didn't receive from Tennessee counsel until April, some of them have an index, and where that exists, we, of course, provided it to the government, and where it doesn't exist, we have tried to create it.

JODY A. STEWART, Official Court Reporter

But we can't create documents that don't exist, and we are trying to provide the documents in as orderly and efficient fashion as possible.  But these files were -- I think it will not surprise Your Honor, given the water under the bridge here -- incredibly disorganized.  I have never seen anything like it.

These are boxes full of loose documents where we don't know if these were Tennessee counsel's files, which has required an enormous effort to review these documents.  We don't know where they came from.  We don't have an index, just as the United States doesn't have an index.  We are also trying to get to the bottom of this, but if the documents don't say, some of them are undated, unsigned memos.  If they don't say what they are, we can't fix that.  We can't create that out of thin air.

I think in terms of the volume, I understand the government's frustration that the ground keeps shifting.  We share that frustration.  We received 57 bankers boxes between April 6 and the 10th.  These are the boxes that we have described as ECF 808 in the status report.  We completed an initial review of that volume very quickly, and I narrowed it down to something around 1,000 documents that are potentially relevant to claim six.

We then made an effort to identify which documents have been turned over to prior counsel, but, again, we are

really limited in our ability to do that because Tennessee counsel had primary responsibility or maybe exclusive responsibility over the documents, and not only did they just provide us documents in the disorganized fashion that I just explained, but the attorneys who were involved with preparing those documents, collecting those documents, keeping those documents in Tennessee aren't there anymore. So the people who are providing us the documents also themselves had nothing to do with the documents.

So the chain of custody is broken here, and we don't have a way to fix that. Just as the government is frustrated, we were also frustrated. We learned in May that the Tennessee counsel had additional documents that had not been provided to us that we had never heard about before, and we received 13 additional boxes in the beginning of May. We were told that these were paper files, and while they were, there were 13 boxes full of files. In those boxes were also electronic files on USB drives that we didn't know anything about on -- I'm sorry, on USB drives, on CDs and including on floppy disks. So we are now trying to get through that electronic volume.

But just as the government is frustrated that the number of documents keeps changing, we are dealing with the same problem, and we trying to get through them as quickly as possible, but that is -- we are doing the very best that

we can, Your Honor, under the circumstances, but we are making significant effort to try to only produce documents that are relevant to claim six to produce a narrow set of material and to provide documents that have not been turned over to the government. Again, that's difficult for us to do.

There is no way that -- you know, typically in a big case you would have metadata or some way to de-duplicate electronic documents. We don't have that there. This is all a manual review and is a manual review being done by people who weren't involved in the prior production.

So our ability to de-duplicate manually is significantly limited in that way. So I can assure the Court that we are making every effort possible to get through the documents as quickly as possible to make an orderly production, to be incredibly responsive when the government has raised issues, both in terms of accessing the documents, but also question the provenance of documents or redactions, but the situation is what it is.

I will say, you know, I think I do my job, counsel's job now in the case to try to clean this up, to try to right the ship here on discovery. I understand what happened in the past with the documents is appalling, and we are here to try to fix it, and we are doing our very best, but there are -- just as the government is frustrated, we

are also frustrated by the continuing issues.  I think, I hope we have got to the bottom -- that we have received the last of the boxes, but, you know, if you had asked me on May 1st are there more documents coming, I would have said I think we have everything, and then we find out there is more.  So we are also dealing with change in circumstances, and, you know, trying to keep things moving forward as quickly and efficiently as possible.

THE COURT:  I understand, Ms. Ali, and very much appreciate your efforts.  But, frankly, that was the responsibility of the Virginia Capital Resource Center, Virginia Capital Representation Resource Center, whatever, because they were always lead counsel.  Tennessee was only appointed *pro hac vice*.  None of the Tennessee counsel.  If you look at the docket, they were Ms. Chavis was *pro hac vice*, then Ms. Bales was *pro hac vice*.  So they were only admitted *pro hac vice*.

So they weren't who the Court would look to.  The Court has always looked to the Virginia Capital Resource Center, and that's another reason.  So if there is any problem here, what happened is, it looks like to the Court, Virginia Capital Resource just relegated or delegated it all to Tennessee.  Now they say, oh, we want out.  This is not the right way to practice law, particularly in a case this serious.  The Court may need to look at your funding,

because this is not right.

The Virginia Capital Resource Center was in this case. I'm looking at the docket of this case. They came in, and it was first Ms. Brace. She got out. Then Ms. Peiffer came in, and then Ms. Ali. So you've got two lead attorneys that you didn't have before. All of this came up with the *pro hac vice* attorneys where everything was relegated to them. Ms. Chavis, *pro hac vice*; Ms. Bales, *pro hac vice*. So, in any event, it looks like to me that the Virginia Capital Resource Center just dropped the ball.

So as far as I'm concerned, lead counsel was responsible for documents, and you're responsible now. Ms. Peiffer is responsible. You took on this case. You represented to the Court you could handle it. The dates were set when you came in. The Court kept granting you continuances, and we are just not going to go through and re-invent this entire situation. It's one narrow issue now.

I am also going to say something about what also came up at the last hearing and whether there were misrepresentations to the Fourth Circuit Court of Appeals. That is extremely serious, because it appeared Ms. Chavis had argued something there or somebody had argued something there, I'd have to go back and look at the record, but it implied things that as turned out to be not fact from the documents finally presented but not earlier disclosed. So

there may be real problems here.

This is concerning to the Court because it was implied that Mr. Hudgins had done one thing when in point of fact, the facts were the other way.  There were certain reports, there were representations.  It was beginning to come out.  And that's when everything fell apart, when they were ordered to produce certain things, and so forth.  So they were *pro hac vice* counsel.  The case apparently was relegated to them or delegated to them, whichever word you want to use.  And it's Virginia Capital Resource Center that has been the lead counsel throughout this habeas petition, and now you are apparently co-counsel, and it's got to be straightened out, Ms. Ali.

We have got to proceed, and I am hopeful you can work all of this out by the end of the proceedings in this court.  And if you're going to familiarize yourself with this case, Ms. Ali, you've got to go through the documents and decide what is relevant.  You have looked at them to determine what is relevant?

MS. ALI:  Yes, Your Honor, of course.  Again, I don't take Mr. Samuels to be saying that we are producing any documents that are not relevant.  I think his complaints was primarily about the pace of the production and the redactions, which were the points that I was trying to address.  Part of it, there is a tension between speed and

an orderly process.  Part of the reason this has taken a long time, because there is an enormous volume of documents, and we are making an enormous effort on our end to narrow it down to things that are only relevant and to comply with the requirements of the protective order, which require redacting material that is not relevant to claim six.

So that explains it.  The volume of production that we have been making to the government is far from a document dump.  We have been trying to produce only documents that are relevant to claim six and documents that have not been produced in the past.

On the latter point, we are having issues because of all of the various points I have raised where we just -- there is no easy way to cross-check documents.  We are attempting to do that manually but it is -- there is no way to make it a perfect process in terms of not producing things that have already been produced, and, of course, we want to err on the side of making sure that anything that is relevant to claim six, if we cannot be certain it has been produced to the government before, that we are producing it this time so that we avoid the problems we had the last time around.

THE COURT:  Okay.  Mr. Samuels.

MR. SAMUELS:  Your Honor, to use an example of what I'm talking about, in the latest production we got this

morning, we got certain reports of interview at the front of the production, and then we got the same reports of interview at the back of the production.  I understand that there has to be some leeway and some possible duplication here, because then at the back of the document here, I've got 90 pages of this, just black pages.  I mean, if this is not relevant, I don't know that I need it, and there may be two pages in there.

THE COURT:  Pass those up to the Court, please.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  The black pages.  How many pages is it?

MR. SAMUELS:  I think this is 90 pages, Your Honor. There might be a couple of pages in there that are not redacted, but that is 90 out of these some over 250 in this production that are fully redacted in that manner.  I don't know what those are.  I don't know where they come from.  I don't know what they pertain to.  That was concerning when we got that this morning, Your Honor, and I haven't had a chance to talk with Ms. Ali about it because we just uncovered it, but I did want to raise it.

THE COURT:  Looks like there is one page with something on it in all of this.

MR. SAMUELS:  There may be one or two, Your Honor, and then the rest, and I believe that came from one electronic file.  When we printed it out, it came that way.

JODY A. STEWART, Official Court Reporter

43

MS. ALI:  I'm happy to explain, Your Honor.

THE COURT:  All right.  Do so, please.

MS. ALI:  So part of the issue here is that the files we received from prior counsel, I don't mean to be a broken record, but they were disorganized.  Sometimes what we received, rather than individual documents, five-page memo, a 20-page interview notes, something like that, we received just loose files or huge files where lots of documents have been produced together.

We don't want to -- because the provenance of the document is important, it felt to us like the better course was to keep the documents in the format, unless it was very clear that certain portions of the document could be -- were separate documents, to produce the entire document.

I think if we had produced just one page out of 100-page document, where even if you only got one page were relevant, I would probably hear complaints that we produced an incomplete portion of the document.  But we don't know what these documents -- the way that they were scanned to us was often at the folder level, and so we would get documents in one file.  Sometimes hundreds or thousands of pages.

We are happy to sit down and meet and confer with the government about how to proceed in a way that complies with the mandate of the protective order and, of course, discovery order.  But they have not asked for that, and when

JODY A. STEWART, Official Court Reporter

they have come to us with questions, we have been very responsive. I understand that they didn't uncover the issue until this morning, so we haven't had a chance to discuss, but I think that this is something that we can work out with the government through a meet and confer process about that.

If they don't want to receive information redacted that is not relevant to claim six, we can talk about a different solution, but what we are trying to do is comply with the letter of the protective order, which requires redacting material that is not relevant to claim six. When we were receiving documents from prior counsel, they look like this. It may be that one page out of 100 documents.

THE COURT: Well, then it's your duty to receive them, to go through them and pull out the documents. This is unacceptable. I'm looking at this. If you say, well, they will ask why we only produced one page. You have only produced one page, because the rest of it is completely blacked out. That's all you have produced, that I can see, is one page. The rest of the 90 pages are just blacked out pages. I'm going to make all of it an exhibit. Do you have a copy of this page?

MR. SAMUELS: I do, Your Honor.

THE COURT: That's the only page that I see in here that has anything on it. I'm flipping through. But that's petitioner's counsel's duty. You don't just send -- you're

wasting paper.  Just sending this bulk over the line, oh, we produced 100 some documents.  But you didn't.  This is not producing a document.  These are blacked out of complete pages.  There is one in here, and it's from John Babineau, and it looks like it's about Dr. Cunningham.  It's his CV, and it's just a very short e-mail.  I'll put this back in the packet where it came from, and I'm going to make the entire packet Court Exhibit Number 1 because this is no way to produce discovery.  This is Court Exhibit Number 1.

(Court Exhibit 1 received in evidence.)

MS. ALI:  Your Honor, the way that we typically would produce documents is that if a document is a single document, we don't just take a piece of it off.  I think that there is an e-mail with an attachment.  The attachment is not relevant to claim six.  The e-mail potentially is relevant to claim six.  So we produced that.  But if we don't produce a complete document, that also is not how you produce discovery.

So we are trying to comply with ordinary ESI protocols, with the protective order in this case, but I will meet and confer with counsel for the government about the process going forward to make this more efficient and streamlined.  What we are trying to do here is not "pepper" the government with documents.  We are trying to get them only what is relevant to claim six out of an enormous volume

of sort of raw materials that we have received.  We are trying to comply with the sort of ordinary production protocols and the protective order, which is why the documents are being produced that way.  It is time consuming to go through and check for redactions.  If there is a more streamlined process to do that, we are happy to discuss with the government and maybe put in the protective order, if that's what we decide in terms of moving forward.  But, again, we haven't had a chance to discuss this because this is the first we are hearing of it.

THE COURT:  It sounds to the Court that all the habeas documents were turned over to the Federal Public Defender in Tennessee, and they obviously were not sorted and prepared to go forward for an evidentiary hearing that was a year and a half after the case had come back.  It was certainly sufficient time to go through the documents on the one issue.  That's what it sounds like to me, is that these are just closets of documents that were, I guess, part of the whole habeas petition, and we had this hearing set, and nobody took the time or the effort to go through them and sort them for the hearing that was set a year and a half after the case was remanded.

MS. ALI:  I can only speak to the documents as we receive them.  I don't, of course, know what they looked like before, but the documents as we received them were not

organized in a way that one would expect in a case like this where the provenance of the documents is important.

Sometimes trial counsel -- the reason the review is time-consuming is that in some instances you have boxes of files that are clearly from one place or another, and in other instances you have material from the 2255 mixed in with trial counsel file, and it is not clear whether they are original documents or copies.  So we are -- I can only provide the Court my word that we are doing our very best to go through that and try to separate out, find everything that is responsive to claim six and produce only that in compliance with the discovery order and the protective order in this case.

THE COURT:  I know that you're doing everything you can, Ms. Ali, and I'm not saying you are not because I think you are.  My concern is exactly with what we were talking about at the inception of this hearing.  I mean, this could go on and on and on.  The attorneys will say, I just got into this case.  Well, I don't have the continuity of the case.  I wasn't there when these documents were in the closet.  That's correct, but it bolsters the Court's earlier ruling because you didn't even know what was presented to the Fourth Circuit from these documents.

This is becoming a real problem, and so that's certainly one of the reasons that the Capital Resource

Center, Ms. Peiffer for now, but that Center has to be responsible and stay in the case. I believe it's funded by the state. I believe the state resources go to the Virginia Capital Resource Center. So it's being funded by public funds, including federal funds for this case. They are responsible. They are attorneys, and they have ethical responsibilities and they are responsible ultimately. They have been in this case, as I said, since the beginning of the habeas proceeding. The docket reflects that. The Tennessee attorneys were only *pro hac vice*, and then now everybody is blaming it all on the *pro hac vice* attorneys. Do you see what happens?

Okay. Let me hear from Mr. Samuels, any suggestions he has. Ms. Ali has given hers.

MR. SAMUELS: She has, Your Honor. Your Honor, I won't belabor the other issues. I'm happy to try and work with Ms. Ali and Ms. Peiffer to see what we can resolve on indices, production, and that sort of thing. But I point those out, Your Honor, just as an example of how the organization, and the need, I think, to set a firm deadline here on when the disclosures are going to be complete so that we can move forward with the resumption of the evidentiary hearing.

The concern I have, and again I don't want to go back into everything that the defender's office in Tennessee

JODY A. STEWART, Official Court Reporter

have, but I understood that some of these materials are put in different electronic databases and were available for searching. This does seem to be a new wholesale search that has taken time. I just think that we all work better with a deadline, Your Honor. We all work better with a firm date for this to be completed. I would ask the Court and ask Ms. Ali as to when she can commit to completing this disclosure.

She has provided us some updates and told us we have gone through certain boxes, we've got so many left to go. Maybe several documents from one pocket of information, but documents doesn't necessarily equal page numbers. What can they commit to in terms of producing and finishing the production of the documents, and when can we get on track for resuming the evidentiary hearing?

I think we had gone a long way on that evidentiary hearing. There may be some things that the United States wants to pursue with former trial counsel now that we have the new information we have. That's why, again, I suggested that there be some sort of outline from habeas counsel as to how they expect the evidentiary hearing to proceed given the disclosures that do seem to effect some of the claims -- the claim that's being pursued here.

So I would like a firm date, an expectation from habeas counsel as to what and how they expect that hearing

to go and then to be able to move forward and reset that hearing, Your Honor.

THE COURT:  Ms. Ali.

MS. ALI:  What we had committed to or said that we thought we could finish discovery in the prior status update was the end of August for producing -- getting through all the documents and making all of our productions to the government.

At the time we made that representation, it was everybody's understanding that Ms. Peiffer would continue to serve as new counsel in the case, and that I would be coming in the case as second counsel, and that we would both be working together on this.  I think if I am alone trying to get through these documents and make progress here, I'm not sure about that.  At the time we made that representation, that was also before we had received the additional documents, unexpectedly received these additional documents from Tennessee counsel, which as I mentioned, not only was a significant volume of paper but also, you know, you pull the file out, and out falls a flash drive with electronic file on it.  So we then have to go through and determine are these duplicates, things we already have, or are they new documents.

So I think I would like to be able to say that we can commit to that -- we can -- despite those additional

significant hurdles, that we can stick with the August 31st deadline, and I think if I may, Your Honor, the issue of witness availability came up briefly when Mr. Samuels was speaking.  It's my understanding he has been in touch with former trial counsel to get their availability.  We also endeavored to reach out to trial counsel.  We have Mr. Woodward, but Mr. Hudgins said he would prefer to speak with the government.

Of the experts that were scheduled to testify in February but did not for all the reasons that are on the record, the first block of availability where everybody would be available is -- are the first three weeks of November.  So there are pockets when one or two or some of the experts are available before that.  But the first time when everybody would be available over a five- or seven- or ten-day period, are the first three weeks of November.  So I don't know if -- it may make sense to start there and work backward.  Obviously, we defer to the Court on how to schedule this, but we are committed to trying to get it done.  We are committed to try to look at the documents as quickly as possible.

I will represent to the Court, I will represent to the United States, that if we get an August 31st deadline, we are not going to drag our feet.  We want to get through the documents too.  This is something we want to get past as

well.  This is the threshold issue that we need to get past to really be able to start preparing for the hearing.

So we have been laser focused on that, we have been spending, I think at this point, you know, many hundreds, if not thousands of hours trying to get through these documents, which were delivered to us in a manner that nobody expected, and we are working hard to get through this, to get this case to a hearing.

But I also can't control the witness availability. I'm happy to walk through -- I have the specific conflict from all the witnesses, but these are -- they are going to testify at trials, or out of the country, things like that.

THE COURT:  I don't need that information now. Counsel, the first thing is you need to meet and confer, it seems to me, and only counsel that are admitted in this case will be part of the meet and confer.  You are fully admitted.  I looked at the docket sheet, and you are listed as a lead counsel on the docket sheet, both of you are. Ms. Peiffer and Ms. Ali are listed as lead counsel.  I only require that one of you be there to meet and confer, but it's only record counsel.  Whatever *pro bono* help you get, you get.  But nobody has been admitted *pro hac vice*, and nobody's been admitted as a lead counsel except the two of you, Ms. Peiffer and Ms. Ali.  So the meet and confer will be between record counsel.  That would be one or the other

53

or both.  Ms. McKeel and Ms. Samuels.  Ms. Ward, she's got COVID.

MR. SAMUELS:  She does, Your Honor.

THE COURT:  She is with the Justice Department.

MR. SAMUELS:  She is with the capital case section up there.

THE COURT:  Either one of you, Ms. Peiffer or Ms. Ali, and you can meet and confer, and that needs to be done and completed on or before June 28th.  I would make it a week from today, but there is a holiday in there, and this gives you a few extra days.  So you meet and confer on or before June 28th, and you get what we have talked about, schedule on what you plan to present, the way the presentation is to go, and how you're going to exchange your documents, and any discussions that you need to make that you've mentioned here today, any discussions about the protective order, any discussions about how you're going to exchange the documents, any discussions about how you're going to do to the presentation, organization of the documents, what you've talked about today.  You both said it would be helpful at this juncture to sit down and meet and confer.

If you are not able to do that, and you cannot get along or whatever, I don't anticipate that with either set of counsel, but you need to notify the Court no later than

JODY A. STEWART, Official Court Reporter

5:00 p.m., none of this midnight filing, and I'm going to start setting times deadlines, timing deadlines because my experience has been that you leave your chambers at 7:00, and you come back the next morning, and there have been filings all night or up until midnight.  Because we can see the time filings come in.

Since we are dealing with the summer, we are dealing with the holiday season, and I need to know if there is any reason for us to convene because you have not been able to properly meet and confer.  So you need to report to the Court.  You can do it jointly or you can do it separately.  But you need to report to the Court on or before 5:00 p.m. on June 28th, 2023.  The discovery in this case is to be completed on or before August 31, 2023.

The evidentiary hearing in this case will begin November 1, 2023.  We are not going to repeat any of the evidence that has been presented unless there is additional on that particular point.  In other words, we are not going to repeat evidence, but can add to it.  I didn't get the number of days, but we were in here how many days?

MR. SAMUELS:  I think from the 7th through the 14th, Your Honor.

THE COURT:  We are not going to be repeating that evidence.  That evidence is of record in this case.  So somebody needs to be aware of that, and I'm not saying you

JODY A. STEWART, Official Court Reporter

can't call the trial attorneys again or whatever, but we are not going to have repeat evidence.  The hearing will start on November 1, and you all try to, in your scheduling, get an idea of how long it's going to take because it will start on November 1 and just keep right through until it's done, not taking a break.

I have two trials in that period, but they are civil trials, and I will move them.  So you should block out November 1 through the 10th at minimum.  I think the 10th is a holiday, but we may have to be here.  So I would certainly hope that we can finish it by early the next second week of November.  That way you can be lining up your witnesses and your schedule.  We start at 11:00 each day.  That way the Court can take care of the business that it has to routinely do, and the witnesses can get here.  I know one set of counsel is coming from Newport News, and at least on a daily basis, which can be a problem.  And Ms. Ali will be here from Northern Virginia and Ms. Peiffer from Charlottesville.

Is there anything further?  So you've got your deadlines.  You've got your deadlines for meet and confer with a report to the Court June 28th, 5:00 p.m., 2023.  Discovery completed on or before August 31, 2023, and the hearing to start November 1 at 11:00 a.m. 2023.  Do you have any questions?

MR. SAMUELS:  I do, Your Honor.  We can include

this as part of our meet and confer, but I think as part of this we may have some motions regarding the scope of the resumed hearing, but that's something we can bring to the Court at a later date if acceptable.  Thank you, Judge.

MS. ALI:  If I could just be briefly heard, Your Honor.  I understand the Court has ruled on Ms. Peiffer's request to withdraw from this case.  I make an oral motion that the Court stay that ruling pending appeal.  Here we think we are likely to proceed on the merits.  I understand the Court disagrees, but for the reasons that we stated in our motion and on the record here, most notably, we think there is a significant risk that Ms. Peiffer's continued representation will be materially limited, but that means she is operating under a conflict of interest here under Virginia Rule 1.1, 1.3(a) and 1.7(a)(2).

Again, for the reasons stated in our motion earlier today, we think Mr. Runyon will be irreparably harmed if he is not permitted to have additional counsel of record here given the circumstances that Ms. Peiffer is operating under in which she is not able to competently represent him going forward.  At the same time we have lined up potential substitute counsel.  I understand the Court has indicated that Your Honor will deny -- I mean, likely to deny.

THE COURT:  Let me just say.  I said you could have any *pro bono* help that you want, but I'm not inclined to

admit all these attorneys that you want *pro hac vice* in the case. We had a number of problems before with that. That's all I've said. You can get the help that you need. It's just you're responsible. The Court looks to counsel of record, lead counsel. That's where a Court looks to hold the attorney responsible.

So, consequently, I'm not going to admit *pro hac vice* because they don't have the same level of responsibility to the Court. We need lead counsel, and we've got two lead counsel. I also said that another attorney from Virginia Capital Resource Center could come into the case. So Ms. Peiffer doesn't have to be here for everything between now and then. As I understand it, her mother is very ill. She has Stage IV cancer. I don't know what her prognosis will be, and I'm not going there. But Ms. Peiffer has to stay in the case. You can take the lead, Ms. Ali. Moreover, she can ask to have someone else admitted from the Virginia Capital Resource Center to be substituted for her on the case. I have said that. The Court, and Mr. Runyon, and the government need the continuity of the Virginia Capital Resource Center, that has been in this case since 2015, as counsel, as co-lead attorney.

So that is what I said. You have not offered any substitute for Ms. Peiffer, just she gets out, and the whole

Capital Resource Center gets out, and that is what is not acceptable to the Court.  I will not stay my order.  My order remains.  If you want to -- if Mr. Lee or Ms. Peiffer wants to submit substitute counsel from the Virginia Capital Resource Center, that's fine, and I will approve.  But I'm not going to stay my order to let the Virginia Capital Resource Center out of this case completely at this late juncture.  There's just been too much going on and prejudice to all concerned would occur.  The motion to withdraw is not timely, is not in the interest of justice for Mr. Runyon, and I've considered all of your arguments.  I'm not going to stay my ruling.

MS. ALI:  Understood, Your Honor.  Thank you.

THE COURT:  Pardon?

MS. ALI:  Understood, Your Honor.

THE COURT:  All right.  Is there anything else?

MR. SAMUELS:  No, Your Honor, not from the United States.  Thank you.

THE COURT:  Then the Court stands in recess until Tuesday.

(Hearing adjourned at 1:37 p.m.)

JODY A. STEWART, Official Court Reporter

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

X_____/s/_____x
                Jody A. Stewart
            X_____6-20-2023 _____x
                    Date

JODY A. STEWART, Official Court Reporter