IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Criminal Action No.: 4:08cr16 |
| | ) | Civil Action No. :4:15cv108 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | **CAPITAL § 2255 PROCEEDINGS** |
| Respondent. | ) | HON. REBECCA BEACH SMITH |
| | ) | |

**UNITED STATES MOTION IN LIMINE AS TO
CERTAIN PROPOSED EVIDENCE and EXPERT WITNESSES**

NOW COMES the United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Carrie L. Ward, Trial Attorney for the Department of Justice, and moves this Honorable Court to strike any evidence of *post hoc* mental health experts, namely, proposed evidence, reports and testimony of petitioner's noticed experts—Dr. Daniel Martell, Dr. Mark Cunningham, and Dr. Siddartha Nadkarni, all of whom offer opinions beyond the limited nature of the issue before the Court, as established by the mandate of the Court of Appeals on remand. To the extent that Petitioner has previously introduced irrelevant evidence, given the limited ambit of the Fourth Circuit's mandate, the Court should bar him from doing so when the hearing recommences on November 1, 2023.[1]

---

[1] The United States has raised concerns with the scope of the hearing and the proposed Petitioner experts in prior pleadings and during the evidentiary hearing. For convenience to the Court and counsel, the United States refreshes and collects these arguments in one pleading.

## SUMMARY OF THE ARGUMENT

On appeal from the denial of Runyon's motion for collateral relief, the Court of Appeals remanded for an evidentiary hearing to determine **whether trial counsel provided ineffective assistance by failing to investigate and present mitigating evidence of Runyon's brain injury and potential mental illness**. *United States v. Runyon,* 994 F.3d 192, 197 (4th Cir. 2021).[2] Petitioner originally presented this issue as part and parcel of a larger claim, ("Claim 6", ECF 551, Case #4:08-cr-00016), to wit: "Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health." In its ruling, the Court of Appeals relied heavily upon assertions that trial counsel abandoned an incomplete mental health investigation by failing to provide the Petitioner's neuropsychiatrist, Dr. James Merikangas, with MRI and PET scans that had been ordered prior to the penalty phase of the trial. Petitioner contended that trial counsel essentially stopped communicating with Dr. Merikangas after he provided a preliminary report on August 5, 2009, and never shared the brain imaging scans with Dr. Merikangas. (ECF No. 511-2). But the Court of Appeals declined to remand claims involving trial counsels' investigation or presentation of Petitioner's "generational trauma" and "Psycho-Social History." (ECF No. 607). Nonetheless, Petitioner has attempted to broaden the remanded issue before the Court to include such claims. During the evidentiary hearing, which commenced February 7, 2023, Petitioner repeatedly elicited testimony and sought to introduce evidence that exceeded the scope of the appellate mandate.

Despite onboarding new counsel, Petitioner continues to consistently reference facts, seek

---

[2] When the Court of Appeals recently affirmed the denial of attorney Elizabeth Peiffer's motion to withdraw it once again identified the sole issue on remand: "whether trial counsel provided ineffective assistance by failing to investigate and present mitigating evidence of Runyon's brain injury and potential mental illness." (ECF No. 855 at 3-4.)

discovery, and present arguments that are irrelevant to the mandated issue before this Court. Because the mandate bars consideration of extraneous evidence, this Court should restrict Petitioner accordingly.  During the evidentiary proceedings conducted to date, Petitioner has sought evidence of generational trauma and his psycho-social history, despite numerous objections from the government. Days were spent as he elicited testimony from lay witnesses such as Maria Runyon and David Dombrowski, who provided no evidence responsive to the remanded claim.

Although the Court has made clear its intention to properly dissect the evidence at the conclusion of the hearing, it should take a stricter view in light of the discovery irregularities that led to habeas counsel's withdrawal and the ongoing postponement of proceedings.  This hearing was continued because Petitioner made a serious—and likely dispositive—disclosure violation, by failing to turn over direct evidence that his pre-trial mental health expert, Dr. Merikangas, reviewed his brain scans, consulted with defense counsel, and advised that they avoid a mental health strategy at his presentencing proceedings.  Those events and the surrounding circumstances may warrant further evidentiary exploration.  But Petitioner does not appear poised to offer evidence in that vein:  toward the end of the February proceedings, he averred that he had five remaining witnesses, all experts subject to pending challenges for relevance and necessity.  In the interest of judicial economy and the fact that Petitioner appears unlikely to overcome the Merikangas revelations, the Court should examine the outstanding experts for relevance and necessity and prohibit petitioner from presenting evidence that is prohibited by the law of the mandate.

Dr. Merikangas did review the brain imaging scans and discussed his views with trial counsel.  Accordingly, Petitioner cannot establish the relevance of any *post hoc* mental health expert, including Dr. Merikangas.[3]   Petitioner could attempt to elicit readily impeachable

---

[3] On October 2, 2023, Petitioner filed Dr. Merikangas's revised declaration, which appears

3

testimony from or about Dr. Merikangas, identifying mental health issues he failed to diagnose before trial, but such testimony would have no bearing on the Sixth Amendment issue at hand. This Court was not tasked to judge Dr. Merikangas's performance, nor would there be a legal or constitutional basis to do so. There is no due right to an effective expert witness, and Dr. Merikangas's supposed errors do not bear on counsel's performance. *See, e.g., Joseph v. Angelone*, 184 F.3d 320, 327 (4th Cir. 1999). Petitioner has asserted that it would take over a week or more to elicit the testimony of the experts he has retained to provide *post hoc* findings about his mental health, an unjustifiable expenditure of time and resources to present irrelevant evidence. This Court should employ the law of the mandate, restrict Petitioner's case accordingly, and preclude him from exploring and/or presenting irrelevant and unnecessary evidence.

## BACKGROUND

This matter is well familiar to the Court and recounted in countless pleadings. As relevant to this motion, on January 27, 2022, this Court entered the parties' agreed upon scheduling order. (ECF No 657).  No later than January 31, 2022, Petitioner was to complete production of all discoverable matters relevant to his claim of ineffective assistance of counsel, "to include documents related to relevant communications with any expert[s]." *Id.*  On September 23, 2022, Petitioner served his amended exhibit and witness list, designating Drs. Merikangas, Cunningham,

---

to reflect information provided to him, by counsel, about the information the defense failed to share with the government.  But the United States, with the Court's blessing, had requested that Petitioner forgo such interactions with witnesses. (February 14, 2003, Tr. At 1003.)   Dr. Merikangas should have responded to this information on the witness stand, not in a carefully curated declaration that sidestepped and dismissed the documentation of his efforts to advise trial counsel not to present a mental health defense.  The expert's efforts at revisionism should be excluded, especially given that they postdate the death of the person who could directly contradict them, trial counsel Stephen A. Hudgins.  Moreover, the declaration does not and cannot erase an earlier sworn statement (ECF 754-3, p.1) in which Dr. Merikangas stated that he never received the MRI scans and never discussed any mental health mitigation with trial counsel.

Nadkarni, Evan Nelson, and Raymond Patterson as potential witnesses. On February 15, 2023, Petitioner confirmed to the Court that he completed his lay witnesses and all that remained were his experts on mental health and *Strickland*.

<u>**LAW and ARGUMENT**</u>

### I.      Scope of Claim 6

Only one claim has survived for collateral review following appeal to the Court of Appeals: Whether trial counsel provided ineffective assistance by failing to investigate and present mitigating evidence of Runyon's brain injury and potential mental illness. *Runyon*, 994 F.3d at 197; (ECF Nos. 607, 623, 855)-.  Central to that claim is whether trial counsel abandoned an incomplete mental health investigation.  In support of that claim, Petitioner has repeatedly asserted that trial counsel failed to provide Dr. Merikangas with MRI and PET scans that would have revealed brain damage had he reviewed them in August 2009.  In support of his motion for collateral relief, Petitioner attached a declaration from trial counsel Hudgins that stated, "I filed with the court preliminary reports from Dr. Merikangas and Dr. Mirsky.  Dr. Merikangas wanted brain scans of Runyon. I do not remember the results of the scans.  I cannot remember why Dr. Merikangas and Dr. Mirsky did not testify in the penalty phase." (ECF No. 511-5,¶ 6).  But Before obtaining the declaration, Petitioner's § 2255 counsel did not provide Mr. Hudgins with access to his own files, which contained the recently disclosed contradictory documents.

In a second declaration, again prepared by Petitioner's habeas team, Mr. Hudgins stated:

I still do not remember the result of the scans. David Runyon's current attorneys nformed me that a radiologist reported a 'normal brain MRI.'  This report would not have supplied me with enough information to make a decision to cease investigation of David Runyon's mental health or social history.  I understand the difference between a radiologist's reading and a neuropsychiatrist's/neurologist's reading of such scans.

David Runyon's current attorneys informed me that Dr. Merikangas recently read

5

the film from the 2009 scans and that one scan revealed brain damage.  This is the type of information I would have been looking for at the penalty phase.

(ECF No. 551-1).

These representations echoed in the Court of Appeals' opinion, with the intimation that

trial counsel may have been ineffective for not providing such scans to the defense expert:

- The brain scans that Dr. Merikangas ordered were in fact provided to Hudgins, along with a radiologist's report that the scans were 'normal.' But Hudgins recognized, as he later stated, that readings by a neuropsychiatrist, rather than a radiologist, were necessary.  Yet, he never provided the scans to Dr. Merikangas, as Dr. Merikangas had requested, nor to Dr. Mirsky." *United States v. Runyon,* 994 F.3d 192, 205 (4th Cir. 2021).

- Dr. Merikangas, who had requested but never received Runyon's brain scans, conducted a review of those scans in 2015. He reported that "[t]hey revealed multiple white matter hyperintensities ... consistent with [Runyon's] history of head injuries and migraine," which, in Dr. Merikangas's opinion, "resulted in impaired executive functioning and decision making." He also reported that Runyon exhibited signs of paranoia and delusions, which could be "a consequence of his brain injuries, mood disorder, and [pos-traumatic stress disorder]."  Dr. Merikangas stated that had he testified at trial, he "would have testified that in [his] expert opinion [Runyon] was a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process."

- When told that Dr. Merikangas in fact reviewed the 2009 scans in 2015 and identified brain damage, Hudgins responded, "This is the type of information I would have been looking for at the penalty phase." He said the same thing about the Army records that had been uncovered. Most significantly, he stated that he could not "remember why Dr. Merikangas and Dr. Mirsky did not testify in the penalty phase."

*Id.* at 205-207.

## II. Scope of the Present Evidentiary Hearing

### A. Evidence within the scope of the  mandate.

When the evidentiary hearing began, habeas counsel examined Mr. Hudgins and his former

co-counsel, Lawrence H. Woodward, Jr., about the purported failure to provide scans to Dr.

Merikangas. For example, on direct examination, habeas counsel showed Mr. Hudgins a variety

of documents, noting that Dr. Merikangas ordered an MRI and PET scan of Mr. Runyon. Asking

the witness to read aloud, counsel elicited that he requisitioned those scans on July 30, 2009, "MRI scan of brain. Reason is several brain injuries. Please return CD images to Dr. Merikangas." (TR. Vol. 1, p. 87, Referencing DE 93). Counsel then referenced a motion filed and approved by this Court on August 14, 2009, authorizing release of the scans directly to trial counsel. (ECF Nos. 274, 275). However, counsel then presented Defense Exhibit (DE) 158 to the witness, a portion of Mr. Hudgins' invoice worksheet, produced to the government on February 6, 2023. The witness read aloud an entry for August 17, 2009, "to jail for med scans, scans to marshal." (TR. Vol. 1, p. 88). Mr. Hudgins testified that he was unsure of the meaning and stated, "[my] file might indicate more detail on that." (TR Vol. 1, p. 88). Counsel elicited that this same document reflected a "TC" or telephone call with Dr. Merikangas on August 11 and 13, 2009. (TR Vol. 1, p. 89). Habeas counsel refused to show trial counsel their files, prior to their testimony, and capitalized on the witnesses' inability to recall by allowing the inference that the files, in habeas counsels' possession, were silent on this issue as to whether the brain imaging were ever considered and properly investigated.[4]

Additionally, habeas counsel provided a supplemental declaration of James R. Merikangas, M.D., signed by Dr. Merikangas, under penalty of perjury, on February 2, 2023. This declaration was submitted in support of a motion for Dr. Merikangas' alternative testimony, i.e., by remote

---

[4] As an example, Ms. Chavis had the following interaction with Mr. Hudgins:

A. I haven't had access to my file, and so I haven't seen such things. It's possible.
Q: All right. I'm not asking you to try to – I'm just asking, based on your memory, if you remember or not.

(Vol. I, EH 2-7-20230, TR 37).

Q: Well, Judge Hudgins, if these records were found in your – within your case files, would you have not reviewed them?
A: I would have, but I don't know what was in my case file. Nobody has shown it to me. I'm surprised. Do you have my case file?
Q: Yes.

(Vol I, EH 2-7-2023, TR 64-65).

means, or declaration alone. (ECF No. 754-3). In this declaration, Dr. Merikangas avers, in pertinent part that after examining Mr. Runyon and forming initial impressions:

> I prepared a brief report, dated August 5, 2009.
>
> I did not hear anything further from Mr. Runyon's attorney. Mitigation investigator Shelia Cronin was my main contact with the trial defense team. Although I ordered the MRI and the PET scan, I never saw the images. A disk of the scans was not in my file. The first time I saw the imaging was when habeas counsel subsequently provided a copy to me.

(ECF No. 754-3, p.1).

In the pleading related to this declaration, habeas counsel emphasized these claims by Dr. Merikangas related to the scans, habeas counsel represented that:

> His testimony will provide relevant evidence supporting both *Strickland* prongs of Runyon's Claim 6. Trial counsel retained Dr. Merikangas, a neuropsychiatrist, in Mr. Runyon's case, but failed to provide Dr. Merikangas with all the information he requested and simply ceased communicating with him. Dr. Merikangas ordered brain scans but counsel did not provide those scans to Dr. Merikangas. When, in 2015, Dr. Merikangas finally reviewed the 2009 MRI at habeas counsel's request, he identified white matter hyperintensities indicative of brain damage. Dr. Merikangas's testimony is relevant to demonstrating Mr. Runyon was a brain-damaged individual at the time of the crime, and that trial counsel acted unreasonably in not providing the MRI to him or discussing with Dr. Merikangas the findings of his examination of Mr. Runyon. His testimony is necessary, and good cause and compelling circumstances exist to permit him to testify remotely."

(ECF No. 754, p. 3). Dr. Merikangas was prepared to testify via remote means, following this Court's ruling on the Motion, on February 14, 2023, prior to the present adjournment.

### B. Evidence improperly beyond the scope of the mandate.

Throughout the evidentiary hearing, habeas counsel elicited evidence that exceeded the scope of the issue on remand. Petitioner presented multiple lay witnesses: Maria Runyon (his ex-wife), Wren Fleming (stepson), Debbie and Robert Seeger (former neighbors), Mark Runyon (brother), David Dombrowski (biological father), and Sheila Cronin (the trial team's mitigation specialist). The witnesses were frequently asked about Petitioner's psycho-social history or

transgenerational and cultural history.  The government objected frequently, and the Court agreed, but permitted certain testimony to continue as the Court would be in a position to ascertain what was relevant to the remanded claim.

### III.   Law of the Mandate

#### A.   The Mandate Rule

Under the mandate rule, "a lower court generally is bound to carry the mandate of the upper court into execution and may not consider the questions which the mandate laid at rest." *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (cleaned up). "Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *Juniper v. Hamilton*, 529 F.Supp.3d 466, 482 (E.D. Va., March 29, 2021) (internal citations omitted).  The mandate rule "prohibits [a district court] from altering 'rulings impliedly made by the appellate court.'" *Id.*  "Thus, the mandate rule would ordinarily prevent the Court from reconsidering its previous dismissal of any of [Petitioner's] amended claims that he did not appeal and the Fourth Circuit did not remand." *Id.*  The "mandate rule" prohibits the Court from granting an expansion of the record beyond the claim, or considering such evidence when the claim has been decided by the higher court.  *Ellis v. United States*, 313 F.3d 636 (1st Cir. 2002).

Despite this brightline rule, Petitioner's counsel persistently attempts to expand the scope of the claim in discovery pleadings, arguing the claim before the Court concerns "Runyon's psycho-social history, brain damage, and mental health." (ECF 829, at 1-2).  Even after the hearing was paused, Petitioner has suggested that he intends to the proceeding as a fishing expedition for "favorable" evidence. For example, in his recent motion to compel discovery related to Government's potential rebuttal experts, he speculates that the requested disclosures "'may well contain favorable, material information,' that would support Runyon's claim of brain damage."

(ECF 829 at 10, citing *Dung The Pham v. Terhune*, 400 F.3d 740 (9th Cir. 2005)).

The two central fallacies of Petitioner's approach justify the Court's enforcement of the mandate's limits. First, extant proof of Petitioner's alleged brain damage will not assist Petitioner at this time, because the Court can only determine whether trial counsel conducted a reasonable investigation of that condition based on the information at hand. Second, the rules do not provide Petitioner with a pass to explore issues that are not properly before the Court. Petitioner did not, at any point, raise a stand-alone claim of brain damage or otherwise allude to his competency, and any such claim is precluded for purposes of this hearing. The Rules governing § 2255 cases authorize discovery when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (citing Rule 6 of the Rules foll. 28 U.S.C. § 2255). Necessarily, a § 2255 petitioner cannot satisfy that standard by pointing to procedurally defaulted claims, time-barred claims, or claims outside the scope of permissible review under the mandate rule.

Nonetheless, Petitioner salted the first seven days of the evidentiary hearing with attempts to exceed the scope of the mandate. His remaining witness list and purported Rule 16 disclosures do the same, currying time-barred expert opinions to bolster Dr. Merikangas's *post hoc* declarations. This is particularly improper in light of the disclosures that caused the withdrawal of defense counsel and months of delay. Accordingly, the Court should bar Petitioner from presenting evidence beyond the limited claim of ineffective assistance of counsel.

**B. Petitioner's late disclosures materially impacted the validity of his claim.**

Petitioner presaged the belated production of discovery on February 3, 2023, when he provided the government with his amended exhibit list on February 3, 2023 (ECF No. 758), which

included a reference to DE 158 – the billing records of attorney Hudgins.  These records had never been disclosed to the United States but reflected conversations with Dr. Merikangas past the date of his August 5, 2009 report – in apparent contradiction to his February 2, 2023 declaration.  On February 13, 2023, habeas counsel produced DE 167 for the first time.  This exhibit is an email communication from trial counsel's file, reflecting scheduling concerns with Dr. Mark Cunningham, who testified as a risk assessment expert during the penalty phase.  At the end of the court day on February 13, the United States raised the issue of late-disclosed materials to the Court.

The next day, former habeas counsel, Ms. Bales, notified the Court that additional materials were discovered and seemed to bear indicia of materiality and relevance to their experts, Dr. Merikangas and Dr. Cunningham. Habeas counsel proposed "rolling disclosures" and the Court ordered disclosures completed by 3:30 p.m. (EST) on February 15, 2023.  Ms. Bales did provide a selection of newly disclosed material, recovered after utilizing a "key word search" of the defense's electronic files. Several of these documents undermined Petitioner's longstanding claim that his mental health experts did not receive his "brain scans."

For example, contrary to many representations about Dr. Merikangas and the scans, the following documents have been provided:

- A titled <u>Memo To File</u> from attorney Hudgins that reflects an August 13, 2009, telephone conference with attorney Woodward and Dr. Merikangas.  According to this document, Dr. Merikangas relayed he did not believe that the defense was in a good position to present a mental health defense as it would result in the Government presenting its mental health picture.  Dr. Merikangas indicated that the examination of Mr. Runyon was not abnormal and that Mr. Runyon was not truthful.  Dr. Merikangas indicated that unless there was something glaring in the MRI or PET scan, he did not recommend a mental health defense and, even if there was a defect shown in the scans or testing, it would be a risk the defense counsel would have to weigh as to whether or not to present a mental health defense absent a very bad injury or defect.

- Two invoices from Dr. Merikangas to Mr. Hudgins, both reflecting the August 2009 time period; one of which reflects "MRI and PET 8/17/2009 Review" for two hours

at $100 per hour accompanied by a court reimbursement invoice signed by Dr. Merikangas that has the written description of "review of MRI and PET scans"; and the other invoice of which reflects "MRI and PET 8/17/2009" also for two hours at $100 per hour.

- Billing records from Mr. Woodward that reflect an entry entitled "Memo to file regarding Dr. Merikangas interview" on August 13, 2009; and an entry entitled "Memo to file regarding mental health evidence/interview with Dr. Merikangas" on August 16, 2009. To date, neither memo has been found or produced.

The documents produced reveal that Dr. Merikangas did, in fact, receive and review the 2009 brain imaging scans and discussed those results with trial counsel. These records directly contradict his 2015 report and his more recent February 2, 2023 declaration.[5] The contemporaneous records demonstrate that Dr. Merikangas did review the MRI and PET scans (indeed, he billed $200 for this work), that Dr. Merikangas talked with trial counsel after the brief report, and that he them that he should not testify because Petitioner did not have defects and had lied to him.

In a meet and confer on September 4, 2023, habeas counsel could not confirm whether they intend to call Dr. Merikangas when the hearing resumes. Surely, counsel can foresee difficulties in relying on Dr. Merikangas's testimony. Presumably, in his absence, Petitioner would attempt to rely on *post hoc* experts to testify about alleged brain damage and/or mental illness. But given the strictures of the mandate rule, and the irrelevancy of any *post hoc* expert, the Court should not permit such testimony, as the government demonstrates in regard to each proposed witness:

(1) Dr. Merikangas. Though he can testify to relevant facts concerning the claim of deficient performance, Dr. Merikagnas has falsely at worst, or inaccurately at best, claimed in 2015 and 2023 that trial counsel cut off communications with him after his 2009 exam of Mr. Runyon, that

---

[5] Even the most recent October 2, 2023, declaration of Dr. Merikangas, while purporting to address the billing records and the memorandum document the attorney call, does not fully address the substance of these newly provided documents or explain the clear contradictions with the early declarations.

he never reviewed the ordered brain imaging, and that he did not discuss the images with trial counsel. Those allegations drove the Court of Appeals's decision to order this evidentiary hearing. The government does not challenge the relevancy of Dr. Merikangas's testimony (although may challenge his creation of a new declaration using newly discovered documents), but highlights the likelihood that it will prove fatal to Petitioner's claim for relief despite his belated efforts to sidestep his earlier misstatement in his October 2, 2023 declaration.

(2) Ms. Jean Barrett. On February 13, 2023, the Court orally approved the witness, but limited her testimony as to what the prevailing standards of care were at the time of trial and precluding subjective testimony or opinion regarding the performance of Petitioner's trial counsel.

(3) Dr. Cunningham. A clinical psychologist who testified at Mr. Runyon's penalty phase proceeding who trial counsel describes as follows in a Fed. R. Crim. P., Rule 12.2 notice:

> Dr. Cunningham would "describe developmental factors in the defendant's background that singly and cumulatively increased his risk of adverse adolescent and adult outcomes, including delinquency, criminality, and criminal violence. Dr. Cunningham will describe and particularize to the defendant scholarly findings supporting the nexus that such risk factors have with adverse outcomes, providing the jury with a basis for giving informed weight to the defendant's history as it considers mitigation. Dr. Cunningham's testimony will be accompanied by numerous digital demonstrative exhibits to facilitate the jury's understanding of the defendant's history, the implications of this history, and the associated scholarly perspectives.

(ECF 135). Dr. Cunningham submitted a report in line with this notice and testified as an expert discussing Petitioner's risk amongst the prison population. He testified that he did not interview anyone prior to his testimony. The Court specifically asked if Dr. Cunningham interviewed Mr. Runyon, and he said he did not. (TR. Vol III, p. 2171). But in an incomplete portion of Mr. Woodward's invoices, an entry reflects Mr. Woodward "traveled to and from Portsmouth to meet e/expert Cunningham (120 miles)." (OAF 14953). In a separate copy of this copy, Mr. Woodward

included a handwritten addendum to this line, "with client." (OAF 15059). In a November 2008 billing filed with the Court, the attorneys filed requests for expert fees to Mr. Cunningham, in the amount of $3300, and an additional $397.90 in travel expenses. (OAF 13085).

In his 2015 declaration (ECF 511-8), Dr. Cunningham proffered additional bases on which he could have testified at trial. Nearly all of this new report discusses the "psychosocial investigation" that was undertaken by Ms. Cronin. (ECF 511-8, p. 9). Dr. Cunningham states that "[t]he delay in obtaining mental health consultation however, provided inadequate time to prompt additional social history investigation". (ECF 511-8, p. 10). "The defense also could have elicited testimony that the nexus between development and adult behavior is typically neither conscious nor simplistically obvious." (ECF 511-8, p. 10). In his projected evidentiary hearing testimony, Dr. Cunningham wishes to discuss factors such as transgenerational, neuro-developmental, parenting and family, and transcultural relocation. (ECF 511-8, p. 11-12). These avenues of testimony were not included by the Fourth Circuit in its limited remand.

Even assuming Dr. Cunningham's proposed testimony could bear on the issues at hand, habeas counsel failed to lay such a foundation or factual predicate to incorporate it. Habeas counsel did not ask any of the trial attorneys any questions related to Dr. Cunningham's expertise, his consultation, or their communications. (*See* TR. Vols. 1 and 2).

On direct examination at the evidentiary hearing, habeas counsel had the following questions with Mr. Hudgins:

> Q. You had another expert at trial whose name is Dr. Cunningham, right?
> A. Yes.
> Q. And at trial you asked -- you started to ask Dr. Cunningham questions about David Runyon's social history, correct? Do you remember?
> A. I don't remember the specifics of that, no.
> Q. Maybe you might remember that the government objected when you started asking about social history. Does that jog your memory at all?
> A. No.

14

Q. If the record reflects that that objection was sustained because Dr. Cunningham's report didn't include information about David Runyon's social history –

(TR Vol. 1, p. 98).

During the hearing, habeas counsel read the Rule 12.2 notice onto the record. Additional exhibits show that Dr. Cunningham provided the information underlying the notice (TR Vol. 380-409).

On February 17, 2023, habeas counsel provided the government with a "partial" production of new disclosures, relevant to Dr. Cunningham. The disclosure includes emails between Dr. Cunningham and the trial team that fail to delve into the areas of his new, proposed areas of testimony. Indeed, the communications show that Dr. Cunningham provided Mr. Hudgins with his scripted direct examination and the demonstrative evidence to identify and exhibit during his testimony, none of which concerned such issues as neuro-developmental, parenting and family, and transcultural relocation.

In brief, Dr. Cunningham's proposed testimony is simply not relevant to this proceeding. He was hired by trial defense counsel to testify in a certain manner, and ultimately did so. The trial team had a separate social psychologist, Dr. Nelson, who conducted a clinical evaluation of Mr. Runyon and advised he (Dr. Nelson) should not testify. Dr. Nelson even recommended getting someone "who has not evaluated Runyon" (specifically mentioning Dr. Cunningham) using him as a "teaching witness, without kicking open the door to giving opinions about Mr. Runyon specifically." (Government Exhibit 33).  Without an appropriate foundation, Dr. Cunningham should not testify for purposes of this hearing, particularly in the role of a *post hoc* expert, as further addressed below.

Petitioner's trial counsel made a strategic decision as to how the case would proceed and

15

hired experts in accordance with that strategy. See *Forrest v. Steele*, 764 F.3d 848, 858-59 (8th Cir. 2014) (finding trial counsel's decision to hire experts and pursue trial defense strategy was not ineffective, though habeas evidence showed counsel could have hired other experts and pursued different strategy). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choice' that, when made 'after thorough investigation of the law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 134 S. Ct 1081, 1089 (2014) (alterations omitted) (quoting *Strickland*, 466 U.S. at 690).

Dr. Cunningham was not retained to testify regarding psychosocial history or other novel claims identified in his 2016 declaration and 2023 supplement. Indeed, Petitioner retained another expert, Dr. Nelson, to testify about social history in the stead of Dr. Cunningham. He cannot properly return today, to testify as to what trial counsel might have done had events taken a radically different turn. The Court cannot judge trial counsel's performance based on latter-day speculation into what might have been.

(4) <u>Dr. Nadkarni.</u> Dr. Nadkarni is a neuropsychiatrist and epileptologist. He reviewed documents that would not have been available to the attorneys and trial experts in 2008/2009, to include an incomplete BOP record summary of a 2018 MRI brain scan, and Dr. Richard Dudley's 2015 psychiatric evaluation of Mr. Runyon, as well as his own 2022 evaluation and assessment of the Petitioner. Dr. Nadkarni did not review any relevant brain scans or their companion radiology reports. (ECF 743, EX. 2). Likewise, he was not provided the examination and background materials from Dr. Nelson or Drs. Mirsky and Merikangas, other than their 2009 preliminary reports. He did not receive nor review the underlying tests or relevant raw data conducted and documented by these three defense experts. He did review the social history information—as

16

interpreted by Ms. Cronin—noting a variety of purported head injuries without any corroboration.[6]

Dr. Nadkarni was first identified as a potential witness in the Fall of 2022.   He was subsequently noticed as an anticipated expert on at that time disclosing his November 9, 2022 report and a November 11, 2022 letter addressed to habeas counsel.  On January 31, 2023, the government initially objected to Dr. Siddartha Nadkarni's proposed testimony. (ECF No. 743). It continues to object, given recent revelations about the circumstances surrounding trial counsel's performance.

Most significantly, Petitioner can no longer credibly claim that Dr. Merikangas did not review the brain imaging prior to the conclusion of the penalty phase proceeding.  In 2009, Dr. Merikangas advised trial counsel that they should not risk presenting a mental health defense at Petitioner's penalty phase proceeding. No *post hoc* conclusion by Dr. Nadkarni can undermine the fact that counsel consulted with an expert regarding Petitioner's mental health.  Additionally, as stated in the government's prehearing brief, Dr. Nadkarni's proposed testimony is irrelevant to counsel's state of mind at the time of the investigation (based on evidence adduced in 2022), it is procedurally defaulted (with an evaluation and assessment done long after § 2255's strict statute of limitations), and improperly raises novel claims that are specifically defaulted or were otherwise rejected by the Fourth Circuit.

(5) <u>Dr. Daniel Martell.</u> Dr. Daniel Martell is a clinical psychologist and was originally retained as a government consultant as a potential rebuttal witness at trial in 2009. The government again sought his services in anticipation of this evidentiary hearing.  After reviewing the brain scans and other relevant information, Dr. Martell confirmed the presence of some white matter

---

[6] The "Army Records" following Mr. Runyon's 1996 Motor Vehicle Accident were available at the time of trial, and considered by all experts for both prosecution and defense. All parties accepted as true that the accident occurred, that Mr. Runyon suffered injuries, to include whiplash and the likelihood of some concussive injury.

hyperintensities on the 2009 MRI imaging. Dr. Martell indicated that a large part of the issue with deciding whether to present a mental health defense was whether there was any evidence to corroborate Mr. Runyon's claims of multiple brain injuries. That information was quickly disclosed to habeas counsel, with an offer to release Dr. Martell from his contract in to facilitate habeas counsel's ability to consult, unfettered, with him.

On February 3, 2023, habeas counsel provided a written opinion from Dr. Martell, who confirmed that "at the time of trial in 2009, [he] only reviewed test data at that time and did not produce a report or testify." Although his present opinion is generally favorable to Petitioner, Dr. Martell lacks the expertise to render a relevant opinion today. Dr. Martell was noticed as a potential government rebuttal expert prior to trial, contingent upon trial counsel presenting mental health evidence during the sentencing proceeding. As Petitioner's resource counsel noted prior to trial, it is unclear "how Merikangas, a neurologist, would be rebutted by Martell, a psychologist." (ECF 829-2). It remains "[a]wfully hard to think through how to defend the defense evidence without knowing even what Merikangas's findings are going to be." (*Id.*). Trial defense counsel did ultimately withdrew the notice of an intent to present mental health evidence beyond Dr. Cunningham, which tracked with the advice of Dr. Merikangas. As such, neither government expert—noticed for rebuttal—were called upon to render opinions.

Trial counsel were ably advised not to pursue a mental health claim by Dr. Merikangas. Petitioner may be unsatisfied with Dr. Merikanagas' pretrial opinions, but there is no due process right to an effective expert witness, and no basis for revisiting the competence of the neurologist's conclusions. *See, e.g., Joseph v. Angelone*, 184 F.3d 320, 327 (4th Cir. 1999). In assessing trial counsel's performance, there is ample evidence that they consulted with resource counsel, retained a well-respected mitigation expert, and consulted multiple mental health experts, none of whom

18

Dr. Martell can meaningfully contradict at this juncture.

Dr. Martell's current opinions concerning evidence of brain damage exceed his expertise and rest on improper evidence, to wit; habeas counsel's expert synopsis and observations, Petitioners 2019-2021 BOP Medical records, and references to an undisclosed 2018 brain MRI. His opinion is otherwise based on a review of the trial experts testing, reports, and notes, both at the time of trial through present day materials.  Finally, the government disclosed Dr. Martell's curriculum vitae and identified him as a potential rebuttal witness at the time of trial. Any evidence or expert opinion would have been readily available during and prior to the expiration of § 2255(f)'s one-year investigative period, and the Petitioner is time-barred from presenting his views as a novel claim at this juncture.

> **IV.**    ***Post Hoc* expert opinions have no relevance to the question of counsel's performance.**

The limited question before this Court is whether trial counsel was effective in their investigation of a potential mental health claim.  There is ample evidence that they consulted with resource counsel, retained a well-respected mitigation expert, utilized resource counsel, training, and subject matters experts to review possible strategies in this specific case, and did consult and retain multiple mental health experts, pursuing funding, resourcing, and testing through the eve of the sentencing proceeding.  They were ably advised not to pursue a mental health claim by Dr. Merikangas, despite his inexplicable present claims to the contrary.  Petitioner may be unsatisfied with Dr. Merikanagas' pretrial opinions, but there is no due process right to an effective expert witness, and his fallacies bear little impact in assessing the performance of counsel.  *See, e.g., Joseph v. Angelone*, 184 F.3d 320, 327 (4th Cir. 1999).  A later expert opinion does not show incompetence of counsel for relying on the first expert that counsel had at trial; *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008); *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008); *Marcrum*

*v. Luebbers*, 509 F.3d 489, 510- 11 (8th Cir. 2007), reversing the grant of the writ; *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008); *Card v. Dugger*, 911 F.2d 1494, 1513, *remanded* 963 F.2d 1440, *superseded* 981 F.2d 481, *reh. den.*, 987 F.2d 776 (11th Cir. 1990). Counsel is entitled to and can rely on the reports of experts who are consulted. *See Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011)(adding that a further duty to investigate the expert's opinion would defeat the whole aim of having experts). *Cullen v. Payton*, 658 F.3d 890, 894 (9th Cir. 2011) (nothing counsel was told at trial would have alerted later claim of PTSD); *Murtishaw v. Woodford*, 255 F.3d 926, 947 (9th Cir. 2001) (entitled to rely on expert consulted); *Moran v. Godinez*, 57 F.3d 690, 699-700 (9th Cir. 1994); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990).

As such, Dr. Martell (as well as Drs. Nadkarni and Cunningham) no longer have a role to play in this case. When trial counsel had defendant examined without favorable results, a later opinion does not establish ineffectiveness; an expert's failure to diagnosis a mental condition does not constitute ineffectiveness. *Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011) (any error of the expert is not a basis for ineffective assistance of counsel, citing *Sims v. Brown*, 425 F.3d 560, 585-86 (9th Cir. 2005); *Earp v. Cullen* 623 F.3d 1065, 1075-76 (9th Cir. 2010) and an expert's failure to identify a diagnosis, even if wrong, does not establish ineffective assistance. *Earp* at 1077; *Fairbank v. Ayers*, 632 F.3d at 612, 619 amended and reh. den., 650 F.3d 1243, 1252 (9th Cir. 2011). Both cases recognize that there is no constitutional right to the effective assistance of experts. *Fairbank*, 650 F.3d at 1252; *Earp* at 1077; *Payton v. Cullen*, 658 F.3d 890, 893-94 (9th Cir. 2011) (counsel had defendant examined by three experts who found no problem and no evidence at the time of the first examination disclosed what petitioner now espouses). This principle is an aspect of the principle described in *Bobby v. Van Hook*, 558 U.S. 4, 11-12, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009) (per curiam) that such a case is not one of failure to act but instead,

a case like *Strickland* itself where defense counsel's "decision not to seek more" fell "well within the range of professionally reasonable judgments, and see *Earp* at 1077-78, and see *Leavitt v. Arave*, 646 F.3d 605, 608-10 (9th Cir. 2011) also citing *Bobby* and noting that *Leavitt* was not a case of last-minute scramble or failure to investigate entire areas but a reasonable conclusion not to seek more in light of what counsel knew.

Counsel need not continue looking for an expert just because an unfavorable opinion has been received. *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008), adding that counsel is not ineffective for structuring a case on the basis of opinion received at the time counsel consulted); *Smith v. Cockrell*, 311 F.3d 661, 676 (5th Cir. 2003); *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995). Counsel need not "shop" for contrary expert opinions. *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995). *See also Dyer v. Calderon*, 113 F.3d 927, 943 (9th Cir. 1997), superseded, 122 F.3d 720, 735, *vacated on other grounds*, 151 F.3d 970 (9th Cir. 1998). In fact, the Court goes further in *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005) to recite that because a later psychiatric expert disagrees with the expert consulted doesn't mean that counsel is ineffective, *affirmed* 503 F.3d 755, 783 n.24 (9th Cir. 2007) (en banc). *See also Sims v. Brown*, 425 F.3d 560, 584 reh 71 and reh en banc den. 430 F.3d 1220 (9th Cir. 2005)(referring to petitioner's claim turning on a prohibited latter day battle of experts); *Crittenden v. Ayers*, 620 F.3d 962, 981, amended 624 F.3d 943, 965 (9th Cir. 2010) (same); *Pinholster v. Ayers*, 525 F.3d 724, 759 (9th Cir. 2008), affd. 590 F.3d 651, 665-66 (9th Cir. 2009) (en banc), *revd. on other grounds, Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011); (when habeas fingerprint expert at best creates a "battle of experts" which doesn't show state expert lying or misinformed although it doesn't in itself mean there is no prejudice but a wealth of other evidence identified petitioner); *Mickey v. Ayers*, 606 F.3d 1223,

21

1248 (9th Cir. 2010) (not ineffective at trial to avoid battle of experts by not introducing expert in rebuttal and it is not prejudicial per se not to get in the last word; counsel had defendant examined by multiple experts so that further examination was reasonably avoided, citing *Wood v. Allen*, 558 U.S. 290, 303, 130 S.Ct. 841, 850-51, 175 L.Ed.2d 738 (2010); and counsel has no authority to manipulate various expert opinions in order to achieve a consistent presentation. *Mickey* at 1246; *Raley v. Ylst*, 444 F.3d 1085, 1090-93 *amended* 470 F.3d 792, 801-03 (9th Cir. 2006) (No prejudice when counsel had petitioner examined by three experts but none totally supportive); *Clark v. Mitchel*l, 425 F.3d 270, 282-83 (6th Cir. 2005) (counsel had petitioner examined and the report suggested no need for further examination, distinguishing failure to investigate or limited investigation despite indications warranting further investigation).

## CONCLUSION

Based on the foregoing reasoning and authority, this Court should preclude and/or limit Ms. Barrett from testifying, due to lack of foundation, and Drs. Martell, Nadarnki and Cunningham from testifying as *post hoc* and improper expert witnesses.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
    Brian J. Samuels
    Assistant United States Attorney
    Virginia State Bar No. 65898
    Lisa R. McKeel
    Assistant United States Attorney
    Carrie L. Ward, Trial Attorney
    Department of Justice
    Attorneys for the United States
    United States Attorney's Office
    Fountain Plaza Three, Suite 300
    721 Lakefront Commons

22

Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov
Email: Lisa.McKeel@usdoj.gov
Email: Carrie.Ward@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of October 2023, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system who will send notice to all filers.

By:    _____/s/_____

Brian J. Samuels
Assistant United States Attorney
Virginia Bar Number: 65898
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov