N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - - -
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
v.                                        )    CRIMINAL ACTION NO.
                                          )    4:08cr16
DAVID ANTHONY RUNYON,                     )
                                          )
         Defendant.                       )
                                          )
                                          )
         AND                              )
                                          )
DAVID ANTHONY RUNYON,                     )
                                          )
         Petitioner,                      )    CIVIL ACTION NO.
                                          )    4:15cv108
V.                                        )
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
         Respondent.                      )
                                          )
- - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

(Motion hearing)

Norfolk, Virginia

October 17, 2023

BEFORE:  THE HONORABLE REBECCA BEACH SMITH
         United States District Judge

JODY A. STEWART, Official Court Reporter

APPEARANCES:

            UNITED STATES ATTORNEY'S OFFICE
            By:  Brian Samuels
                 Lisa R. McKeel
                 Assistant United States Attorneys
                      And
            DEPARTMENT OF JUSTICE
            By:  Carrie L. Ward
                 Counsel for the United States

            VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
            By:  Elizabeth J. Peiffer (Via Zoom)
                      And
            ALI & LOCKWOOD LLP
            By:  Kathryn M. Ali
                 Counsel for the Defendant

(Hearing commenced at 12:01 p.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, United States of America versus David Anthony Runyon.

Ms. McKeel, Mr. Samuels, and Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  Government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Ali, is the defense ready to proceed?

MS. ALI:  Yes.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.  You need to call Ms. Peiffer, too.  She is here via zoom.

THE CLERK:  I apologize.  Ms. Peiffer, is the defense ready to proceed?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  Good afternoon, Ms. Peiffer.

MS. PEIFFER:  Good afternoon.

THE COURT:  Good afternoon, Ms. Ali.

Sir, are you David Anthony Runyon?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Mr. Runyon, you are here today on some motions that have been filed.  Are you aware of that?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Also, one of your counsel, Ms. Peiffer, is appearing by zoom and it was represented to the Court that you were in agreement for her to appear by zoom.  Is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Can you see her on the screen?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  I would note that Ms. Ali is here in person and sitting beside the defendant.

Counsel, I'll briefly make a background statement, and then we'll proceed.  We'll take the motions seriatim, and we will start with the earliest filed motion, which was the motion for discovery.

As we go through the proceedings, Ms. Peiffer, at any point if you aren't connected or you can't hear us or we can't see you, we will advise you, and you can advise us. Do you agree to that?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  Also, I would tell you that when there is argument, I will also consult you after Ms. Ali, and you will have an opportunity to respond to anything that's presented here that you deem appropriate.  Do you understand?

MS. PEIFFER:  I understand.  Thank you, Your Honor.

JODY A. STEWART, Official Court Reporter

THE COURT:  Let me give just a background on the motion.  We will start, as I indicated, with the motion to compel discovery.  On January 27, 2022, the Court entered an order providing the schedule for the evidentiary hearing. The order required the government to "complete review of its files and produce any matters relevant to petitioner's habeas claim 6" and to "provide all matters, should they exist, related to petitioner's brain injury and mental illness, such matters that would have been disclosed if mental health evidence had been fully exchanged between the parties and presented to the jury."  That is ECF Number 657, and that would come from Page 3.

The Court originally ordered the government to provide all relevant materials by January 31, 2022, but later amended the deadline for both parties to complete all discovery by 5:00 p.m. on August 31, 2023, because of intervening events, which we won't go into detail at this juncture.  That's in ECF Number 820 at 3, is the continuation.

On August 1, 2023, petitioner filed a motion to compel discovery, and that's ECF Number 828, the motion for discovery, and 829 is the memorandum in support.  The motion for discovery requested the Court to compel the United States to provide "all records in the government's possession, custody, or control relating to two government

JODY A. STEWART, Official Court Reporter

trial experts," namely, Dr. Daniel Martell and Dr. Michael Batipps. That's at ECF Number 829 at 1 and 2.

Prior to the penalty phase of the petitioner's trial in 2009, the United States disclosed these experts to petitioner's counsel. That is, again, set forth in ECF Number 829 at 1. Petitioner's habeas counsel sought records relating to these experts during a meet and confer with the United States on June 23, 2023, and e-mailed counsel for the United States to ask for these records on July 25, 2023. That's at ECF Number 829-7 at Page 3 on that exhibit.

Dr. Martell further provided petitioner with records indicating that he performed at least 10.75 hours of work on the government's case between June 27, 2009, and August 18, 2009. That's at ECF 829 at 4, ECF 829-7 at 1, and ECF Number 829-5 at 1 through 8. The United States has not provided petitioner with any records related to these expert witnesses and has told petitioner that they have nothing to produce.

Petitioner argues that the "opinions, notes, communications with the government, and any other records pertaining to" basically Dr. Martell and Dr. Batipps are relevant to petitioner's case and that the United States is required to produce such records pursuant to the Court's discovery order. That's at ECF Number 829 at 8.

If the Court finds that these records do not fall

under the Court's discovery order, petitioner alternatively moves for discovery of these records under Rule 6 of the rules governing Section 2255 proceedings for the United States District Courts.  That's at 10 in ECF Number 829.

On August 15, 2023, the United States filed a response in opposition to the motion for discovery.  That's ECF Number 835.  On August 21, 2023, petitioner filed a reply in support of the motion for discovery, ECF Number 837.

The motion for discovery is now ripe for decision.

Ms. Ali, you can go forward on your motion.

MS. ALI:  Thank you, Your Honor.  Should I approach the podium?

THE COURT:  Yes, you should.

MS. ALI:  I think the issues are pretty well set out in our briefing, and I don't want to belabor the point or rehash what's already been briefed, but I'd just make a few comments.

What we are seeking here is pretty limited and straightforward.  Number one, clarity regarding whether the government has documents concerning either of these trial experts, Dr. Martell or Dr. Batipps, and if so, a determination of whether those documents must be produced pursuant to the discovery order.

Before the United States filed its opposition to

our motion, it had repeatedly claimed that neither Dr. Martell nor Dr. Batipps had done any substantive work in 2009 before the trial and that there were no records relating to either expert.

For example, as we said in our brief and as laid out at 829-6, in a May 16, 2022, e-mail, the government stated, "The government affirms that it has provided all information related to Dr. Martell.  He was not hired at the time of trial, and nothing related to the government's potential trial experts has been withheld."  During a June 22nd, 2023, meet and confer, the government reiterated that position, saying that neither expert had really done any work in that case.

Given that both experts were both disclosed as trial experts, it seems odd that there would be nothing in the United States's files regarding them, and then we learned, when we spoke with Dr. Martell for the first time, that he had billed at least 10.7 hours of work.

Now, that work was spent reviewing records and test data relating to Mr. Runyon, and it was only after those records surfaced, which, again, we got from Dr. Martell, not from the government, that the government suggested for the first time, or at least in its opposition brief does not seem to deny, that it may have some documents that it withheld on relevance grounds.  That's just inconsistent

with its prior representation.

What the government said in that May 16 e-mail, and when we met and conferred on June 22nd of this year, is that no documents had been related, nothing -- I'm quoting now -- "Nothing related to the government's potential trial experts has been withheld. All has been produced." So as an initial matter, what we are really trying to do is get to the bottom of what exists with respect to these two experts and get an explanation for the government's seemingly inconsistent position.

It would seem, based on the little information that we have received from Dr. Martell, that there must be some discoverable documents. For example, the government must have transmitted the records and test data, that Dr. Martell reviewed, to him. It would be discoverable to learn what those documents were and what is in their files regarding it and whether he provided any opinions about them.

It's also not clear from the government's brief whether, if they do have documents, they are being withheld on relevance grounds, on work product, something else. Again, that's inconsistent with what their prior representation was.

If the documents did exist at one point but were not preserved, then we would request, as we did in our motion, that the government be ordered to produce

information about the destruction of records relating to this case in claim 6.  This really is not meant to be a fishing expedition, Your Honor.  We have legitimate concerns based on the government's representations, inconsistent representations in this matter, and Mr. Runyon is entitled to answers to these questions as part of the truth-seeking function of these proceedings.

So as I said at the outset, I think our arguments are pretty well set out in our briefing, but I'm, of course, happy to answer any questions the Court may have.

THE COURT:  Well, the only thing I would tell you is that I didn't have any trouble reading the brief and understanding the reasons.  They were very clear.  They said, number one, that anything they had was either attorney-client privileged, and you then agreed in your reply that if it was attorney-client privileged material, you weren't seeking it.

Number two, they said the only other thing they had were contracting documents, and that would not be relevant.  So I found that their response was very clear.  There are only two things there.  There is some attorney-client privilege, and they're not entitled to it, and you agreed to that, and that the others were contracting documents, which would not fall under the Court's discovery order.

So I didn't find their position unclear at all.

JODY A. STEWART, Official Court Reporter

There is no indication whatsoever of destruction of records. In any event, they released Dr. Martell to you. So they released him and said he could talk with you and do whatever he wanted.

So if there are records, and he has them, you can get them from him. But I don't understand, they released Dr. Martell, you can talk to him about what he did for the 10.75 hours and anything else he did or reviewed. I think you are throwing up some insinuations here that may not be appropriate. They had to list experts. That's a requirement. That you list an expert does not mean you use an expert. So, yes, they might have listed that person, but they told you the reasons that they decided not to use them, because there was no evidence presented at trial by the defendant at the time of brain injury.

So I found it to be very clear, and I'm not sure what you find to be unclear because they had to list him. They had to list him. They didn't use him because they didn't need him because of the evidence that came in at trial, and they released him, and they released him to you, and that they have nothing.

How can a Court make them produce something that they don't have? If it falls under attorney-client privilege, it is privileged. If it falls under contracting documents, that's not relevant to the Court's order. It's

just a contract, and they released him.  You have no evidence whatsoever of destruction of records.

There is certainly a lot of evidence in this case of records not being produced, but it's not by the government at this juncture.  So I don't understand your arguments, I don't understand what you don't understand.  Do you want to try to clarify it or not?

MS. ALI:  Yes, Your Honor.  Thank you.  I think what we are trying to get -- again, what we are trying to get to the bottom of here is what the government said initially in that May 16th, 2022, e-mail and again in its June 22nd, 2023, meet and confer is not, We have given you everything that is not privileged.  It is not, We have given you everything that's relevant.  What they said was, He was not hired at the time of trial and nothing related to the government's potential trial experts have been withheld.

That's different than saying we have given you everything relevant, we have given you everything non-privileged.  That is saying we don't have anything, and to the extent we had anything, it's all been turned over without withholding on the basis of any grounds; relevance, privilege, anything else.

So I don't understand -- the thing I don't understand is the inconsistency between those representations and the arguments made in their opposition,

which suggests that some documents do exist that were withheld on bases that were not provided in this e-mail.

With respect to the fact, Your Honor's point that Dr. Martell has now been retained by us as an expert, Dr. Martell does not have preservation obligations the way that the United States does. He doesn't have an obligation to keep his records through the life of this case, and so there is no guarantee that what he happens to have in his files is the full sweep of records that might have been in existence in 2009, almost 15 years ago.

The fact that there may be some alternate source to get to some of the documents doesn't satisfy the government's disclosure obligations, and the fact that, as the government notes in its brief, Martell doesn't remember what opinions he had at the time of trial makes it all the more important to get the records. And that also doesn't solve the problem with respect to the other expert at issue in this motion, Dr. Batipps, who we have no contact with and have gotten no records from.

THE COURT: They say they don't have any.

MS. ALI: Well, I agree, Your Honor. They say they don't have any in their brief, but what they said to us before is, we don't have any records. Now what they say in their brief is we don't have anything that's relevant or non-privileged, which is different than saying -- again, I

JODY A. STEWART, Official Court Reporter

14

don't want to be a broken record -- but he wasn't hired at the time of trial, which is just not true.  We know that he was hired.  I understand he didn't produce a report.  I'm not suggesting that the government is hiding some secret report that he produced, but we know he was hired.  He's billed at least 10.75 hours to the case that was substantive work.  He was reviewing records and test data, and he was paid for that work by the government.  That is -- he was hired at the time of trial.  And something exists, and so I understand that the government is now saying that it is withholding those documents on relevance or privilege grounds or both, but that's different than the prior representations that were made.

THE COURT:  Well, do you think contracting documents where somebody enters into a contract with an expert is subject to this discovery order?

MS. ALI:  No, Your Honor, and that wasn't the point of our -- what I was trying to say with respect to the subcontracting and the billing records is just that it is evidence that he was, in fact, hired at the time of trial, which is contrary to the representation made in that May 16th e-mail at ECF 829-6.  It's just contrary to the representations that were made, and I think that Mr. Runyon deserves an explanation for why he was told in May of 2022 that Dr. Martell wasn't even hired at the time of trial when

we know from the billing records that he was.

I'm not saying that the contract or the billing records are necessarily relevant in their own right, but their existence suggests that there may be other documents. That is particularly underscored by the fact that the billing records show that he did some substantive work in the case. This wasn't ten hours of conversations, you know, reading background materials. He was looking at test data from the experts in this case. That's substantive work, and he's now issued a declaration saying that based on what he has reviewed, he would have reached the same conclusions at trial.

It seems relevant that if the government has information in its files about what was given to Dr. Martell at the time, that clearly bears on these proceedings.

THE COURT: Ms. Peiffer, do you have anything to add?

MS. PEIFFER: Nothing to add, Your Honor.

THE COURT: All right.

MS. ALI: Thank you, Your Honor.

THE COURT: Mr. Samuels.

MR. SAMUELS: Yes, ma'am. Your Honor, in our response, we set forth the chronology of this matter going back to the 2009 hearing and the time period between the trial and the penalty phase, and perhaps it shows sometimes

the difficulties of using these e-mails.  Once we looked back in the system, we did learn that we had contracted with Dr. Martell in 2009.  I've got those documents.  I'm happy to give them to the Court to look at.  They are just the contractual documents, the statement of work, the type of materials that we used to obtain an expert.

We have similar documents to Dr. Batipps, but, Your Honor, these experts were contracted, as we set forth in our response, for rebuttal experts.  They were contracted in anticipation of rebutting potential testimony of Drs. Mirsky or Merikangas.

As the Court recalls, Dr. Mirsky and Dr. Merikangas, even though they produced preliminary reports, did not testify.  It appears that Dr. Martell was sent data.  He wasn't sent data by us, Your Honor.  We didn't have that raw data.  He would have been sent that data by the other experts in the case, Dr. Montalbano and Dr. Mirsky.  They would have provided the data to Dr. Martell, but he did not produce any opinion to us.  We don't have any record -- and I think that his letter of February 3rd, 2023, which we've attached as Government's Exhibit 1 to our filing, corroborates that, that he doesn't recall working on the case, what his opinions were, if any.

And if the Court recalls, there was a very truncated time period leading up to the penalty phase in

this case, and there were a number of motions that were permitting Dr. Merikangas to get these additional brain scans.  That all happened in the first two weeks of August. And the Court had allowed the experts to supplement their opinions, if they chose to, up until the point really that the penalty hearing was started.  I believe the penalty hearing started August 19th, 2009, and they were permitted to supplement their opinions up until August 20th.

So, yes, we had Dr. Martell in line.  He did review some records.  We had Dr. Batipps.  I don't think Dr. Batipps reviewed any records.  We don't see any billing that went out to him.  Dr. Martell was compensated for his review of the records, but there were no opinions produced. There were no records of any results of his review of those records.

So, respectfully, Your Honor, I do submit that this is somewhat of a fishing expedition to try to somehow connect what Dr. Martell is saying now with what he did back in 2009.  But by his own statements, he doesn't recall working on the case or what his opinions are.  So I do have these contractual records for the two experts.  I don't think that those fall within the discovery worries of the Court, but I'm happy to submit to the Court to review if the Court would like.

THE COURT:  Well, I agree that any contracting

JODY A. STEWART, Official Court Reporter

18

records, such, would not fall within the Court's discovery order.  That's number one.  Number two, I would require that you present them for *in camera* review, and I will do an *in camera* review, make them part of the record *in camera*, and if I find that they should be produced, I'll order them produced.  Otherwise, I do not find that contracting documents, or anything that would be produced here, to help Mr. Runyon, that you contracted but then you didn't use the expert.  Was there any updated report on August 20th, 2009?

MR. SAMUELS:  No, there was no updated reports filed by the petitioner's experts, Dr. Merikangas or Dr. Mirsky.  So at that point there was nothing to rebut, and I think even some of the e-mails that were attached to petitioner's motion where the lawyers are asking how would Dr. Martell, who is a neuropsychologist, I believe, rebut the opinion of Dr. Merikangas, a neurologist. Dr. Merikangas, didn't produce anything updated other than that preliminary report, so there was nothing else for Dr. Martell to update and nothing for him to rebut on.

THE COURT:  All right.  I know nothing was produced, but I wanted that to be on this record, that there were no updated reports produced on August 20th, 2009.

MR. SAMUELS:  There were not, Your Honor, and I have these two documents.  I can either submit them with a notice, or I can just provide them to the deputy, whichever

the Court would prefer.

THE COURT:  Submit them with a notice, please.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  For *in camera* review.

MR. SAMUELS:  May I do that under seal because of the nature of the review?

THE COURT:  You may do it *ex parte* under seal.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  They are two different things, and I would make that clear, that under seal means under seal, which a lot of times means both sides get to see it. *Ex parte* is when only one side submits it.  So you submit it *ex parte* for *in camera* review.  It will be on the record, I will review them, and if I'm of the opinion that they are subject to production, under the discovery order in this case and under the law, I will order that they be produced. If not, they will not be produced and remain on record as *ex parte* and sealed.

So I would ask you, Ms. Peiffer, you've been part of the case for quite a while, do you know anything contrary to what Mr. Samuels has just represented to the Court?

MS. PEIFFER:  All I know is what was filed with the motion, Your Honor, in terms of the documents, the timing and the documents that we received from Dr. Martell.  And that was the first time I was aware of there being any

JODY A. STEWART, Official Court Reporter

documents related to his retention by the government, but I don't know anything further.

THE COURT:  So you don't have anything that would contradict what Mr. Samuels would say?

MS. PEIFFER:  No.

THE COURT:  It's your burden as filing the motion, when you all argued that the United States asserts no such records exist, and they tell you what does exist, you've presented no evidence to the contrary.  So why is this not a fishing expedition?

MS. PEIFFER:  Well, I would defer to Ms. Ali, Your Honor, who filed the motion, to answer that question.  But just briefly, before Ms. Ali speaks, it's because it's based on the documents that we did receive from Dr. Martell and things like the review of the records and the more than ten hours that he billed for that, we believed that there might be additional records, and the fact that that contradicted my understanding before that there were no records at all and that he did not work on the case.  But I'll defer to Ms. Ali.

THE COURT:  You need to repeat that.  It was a little garbled.

MS. PEIFFER:  I apologize.  Just that when we received those records from Dr. Martell recently, that contradicted my prior understanding that I had from the

communications that the government that he had done no work on the case, but I'll defer to Ms. Ali who filed the motion for any further information.

THE COURT:  What is it that Dr. Martell produced recently that gives you pause?  You said it's because of what he produced recently.  What in that gives you pause?

MS. PEIFFER:  What gave me pause was, my understanding from prior communications were that he had done no work on the case, and the documents Dr. Martell produced indicated that he reviewed records, including test results, which I would call work on the case, and he was remunerated for work on the case, even though he did not write a report.

THE COURT:  Mr. Samuels has explained that.  Do you have anything contrary?  I understand everyone's trying to straighten this out, but do you have anything to the contrary of what Mr. Samuels has just represented to the Court about why the hours were there, and they would have paid him, but there was no report, he just reviewed records, and they were not records that Mr. Samuels sent them; is that correct?

MR. SAMUELS:  That's my understanding, Your Honor.

THE COURT:  You've got Dr. Martell to ask him.  I'm asking, as petitioner's filed the motion, petitioner has the burden, do you have any evidence to the contrary here, other

than what you've said to the Court?

MS. PEIFFER:  If, Your Honor, that question is directed to me, I will defer to Ms. Ali who filed and prepared the motion.

THE COURT:  Anything else, Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  Thank you for the clarification as to how the documents should be filed.  We will do so.

THE COURT:  Ms. Ali, is there anything else you want to present to the Court?

MS. ALI:  Just very, very briefly, Your Honor.  I think just in response to the Court's question about whether there is any evidence, I think the best evidence here is the fact that what the government said -- there was a discovery order requiring the government to turn over all documents.

I understand the government is now saying that anything they have in their files related to these experts is, you know, administrative or otherwise privileged or not relevant, but it still doesn't explain, it doesn't answer the question of why what Mr. Runyon was told by the government in May of 2022 was that Dr. Martell was not hired, and that there was nothing withheld.

Again, it was not the fact -- was not saying we only have contracting documents.  It was not saying we only have administrative documents.  It was not saying we don't

have privileged documents that you're not entitled to.  The quote could not have been clearer.  It was nothing related to the government's potential trial experts have been withheld.  That is the -- we don't have more information because we are the party that doesn't have the information.  That's the nature of discovery.  It's not a fishing expedition, Your Honor.  We are not trying to insinuate anything here, but Dr. Martell is a highly relevant expert in these proceedings.  He was hired by the government in 2009 and again in habeas proceedings.  He's offered an opinion that Mr. Runyon is brain damaged.

I think his opinions are relevant, understanding how he came to reach that opinion, what he relied on to reach that opinion, what he might have looked at in 2009, is certainly relevant to the question of what evidence would have come in had trial counsel completed their investigation into Mr. Runyon's brain damage and mental illness.  Thank you, Your Honor.

THE COURT:  You now have Dr. Martell, and he should know what his opinion is, and if he doesn't know what his opinion is, and he can't remember it, then you can't present it.  But, in any event, the United States said they never got an opinion from him, that he looked at records, and then they didn't file anything for that expert.

So I accept their representations to that effect,

and I do not find that any attorney-client privileged information would fall under the discovery order, nor any contracting documents.  But I'm going to have Mr. Samuels produce what they have, and I will review them *in camera*, and if I don't agree with him that they fall into those categories, then I will order that they be produced.

MS. ALI:  Thank you, Your Honor.

THE COURT:  In turning to petitioner's argument under good cause for discovery under Rule 6, I do not find that there has been any good cause shown.  Do you have any more to say than you've put in your brief?

MS. ALI:  No, Your Honor.

THE COURT:  Thank you.

MS. ALI:  Thank you, Your Honor.

THE COURT:  Do you have anything more to say than you put in your brief, Ms. Peiffer?

MS. PEIFFER:  No, Your Honor.

THE COURT:  Petitioner's alternative argument was that the Court should order discovery of the requested material for "good cause under Rule 6 of the rules governing Section 2255 proceedings for the United States District Courts because the requested documents 'may well contain favorable, material information' that would support Runyon's claim of brain damage," and that is at ECF 829 at 10 with an internal quotation from *Pham v. Terhume*, 400 F.3d 740 at

743.  It's a 2005 Ninth Circuit case.

The United States argues and puts forward that the petitioner has not shown "good cause for discovery" because the petitioner has not demonstrated that any speculative or favorable opinions even existed, and any other requested records are not relevant to the habeas petition.  This is petitioner's burden.  Petitioner presented to the Fourth Circuit that counsel was ineffective for not pursuing this defense, and they certainly should then be able to establish the basis for pursuing that defense.

We are talking about a habeas petition here that consisted of 18 separate grounds with multi-parts and resulted in a 245-page opinion from this Court and was then completely affirmed by the Fourth Circuit except one portion of claim 6.  There was an ineffective assistance of counsel claim, and the only thing that was returned to this Court, and we've reiterated that over and over and over, if there should have been evidence or a defense presented of brain damage or basically the mental health defense based upon brain injury damage, and so, consequently, you had that ground.  You presented it, and we will get to that later.

There is really some question here, when you read the Fourth Circuit's opinion, and see that they based a lot of this on Dr. Merikangas.  As it turns out, what was represented to the Fourth Circuit was not correct under the

information that petitioner's counsel had at the time.  So, consequently, the petitioner, if there is something there, you ought to have it at this point.  This case has been going on for years.  We have gone through a full habeas. You're down to one small portion of 18 claims with multi-parts.  When I say multi-segments, there were many. If you broke down the segments, I haven't actually sat and counted how many separate issues the Court and the Fourth Circuit have had to address, but it took 245 pages from this Court to address it.

So you haven't shown good cause here in your arguments under discovery, at least yet, and if you have, then I'll let you have whatever they say they have, but you can't get what they don't have.  In terms of good cause, the case law supports the United States' position.  The case law specifically holds that a habeas "petitioner 'is not entitled to discovery as a matter of ordinary course,'" but "must 'show good cause before he is afforded an opportunity for discovery.'"  That's in *Albritton v. Clarke*, 2018 Westlaw 1178083 at 14.  That is an Eastern District of Virginia opinion, February 1, 2018, from Judge Leonard, and the report and recommendation was adopted at 2:16cv737 -- that's the case number -- at 2018 Westlaw 1177343, and that was by Judge Allen of this Court on March 6, 2018.

That quoted *Stephens v. Branker*.  That is at 570

F.3d 198, 213.  That's a 2009 Fourth Circuit case.  Quote from that opinion quoting *Stephens*:  "The Fourth Circuit has held that" -- and this is the internal quote -- "'a showing of good cause must include specific allegations suggesting that the petitioner will be able to demonstrate that he is entitled to *habeas corpus* relief once the facts are fully developed,'" and that's quoting *Stephens*.

The Fourth Circuit's standard places the burden on the petitioner to show how records he seeks will help his case.  As discussed above, they say there are no expert reports, and the petitioner is not seeking attorney work product or privileged communications.  That's right in the brief.

Thus, petitioner must explain how non-privileged communications with experts regarding any analysis or the government contracting records he seeks would help him prove that his prior counsel was constitutionally ineffective. Although petitioner has asserted that such records are likely or may exist, he's not provided any explanation as to how these records would help his case.  It's just that we want to see them; there may be something in there.

The United States is saying we don't have them.  We don't have opinions.  We simply don't.  All we have is some attorney-client communications and some contracting documents.  There has been nothing shown to the Court to

demonstrate otherwise, and under Rule 6, it's up to the petitioner to show the good cause.

So I would find here that petitioner has not shown good cause, that he has not demonstrated how discovery of, I don't know, records I guess that don't exist, and the records that do exist are apparently attorney-client privileged or contracting documents, and I'm going to review them.  If you're entitled to them, then under the discovery order, or even if the Court determines that good cause exists, they will be produced.  I cannot determine it at this point based upon the filings before the Court.  I would also cite to *Truman v. White*, it's a 2021 Westlaw case 150204 at star 19, and that's Eastern District of Virginia, January 14, 2021, denying a motion for discovery where the petitioner did not "demonstrate how the alleged discovery would entitles him to relief."  *Alee v. Streeval*, 2022 Westlaw 3969945 at star 5, and the reason these are unpublished cases, discovery issues are not generally ones that end up in published decisions because discovery is something that the Court reviews and exercises a great deal of discretion regarding.  But I will certainly let you have any records that are presented to me from the government that would show good cause or would show that they fall under the Court's discovery order.

There is also *Shanklin v. Director of the*

*Department of Corrections.*  That's 2012 Westlaw 443521 at star 6.  That's another Eastern District of Virginia case, February 10, 2012, denying a motion for discovery where a petitioner did not demonstrate how "further development of the facts surrounding his claim would entitle him to habeas relief."  I would find that the petitioner has not made the requisite showing either under the Court's discovery order or under Rule 6 of the rules governing *habeas corpus* petitions or proceedings in district courts.

So I am denying the motion at this juncture subject to the requirement that the United States disclose for *in camera* review any records related to non-privileged communications regarding Dr. Martell's analysis as well as any contracting documents.  So it is being denied subject to the *in camera* review and denied for the reasons that I've set forth here, and I will make an *in camera* review, and if they are appropriate to produce, they will be produced.

That then brings us to the renewed motion to appoint counsel.  I would start this with two things.  I've read your motion, and you can certainly argue it, but in going through it, I didn't find anything new that hasn't been addressed by this Court and by the Fourth Circuit.

In other words, we have gone through this, and there is certainly nothing new here that has been raised that the Court hasn't already covered.  The Court ruled on

this matter.  The Court wrote an opinion on it.  You filed for a stay with the Fourth Circuit.  The Fourth Circuit did not stay the order, but they have now ruled on the appeal of it in regards to Ms. Peiffer.  So that has been litigated. You haven't added anything except, well, we still want Ms. Peiffer out, and wouldn't it be nice to have Mr. Coburn either in her place or as additional counsel?  Well, I've ruled on Ms. Peiffer staying in the case.  I've reviewed on the need for additional counsel.  I don't see how any of this has changed in any way.  That's number one.

Number two, I would note that Ms. Ali has hired a new associate, because the Court just approved a new budget, and the question was raised because it was reviewed by the Fourth Circuit budget attorney Mr. Dash, and the Court approved it after it had been fully reviewed.  One of the factors that was caught on review was that the new attorney was listed as a service provider.  It was made clear that new attorneys are not service providers.  They are attorneys.  So to the extent you have a new associate, that doesn't mean they're admitted in the case, but they can certainly work with you.

So, again, we have additional attorneys available. So from the last time the Court reviewed this, the Fourth Circuit has reviewed it, the Court and the Fourth Circuit budget attorney has reviewed a budget, you've added an

associate attorney, and you still have the same resources that you had when the Court last ruled. So the only thing additional that you've added is an affidavit from Ms. Peiffer.

Have you received that affidavit, Mr. Samuels?

MS. McKEEL: Yes, Judge, we have.

THE COURT: Well, I will listen to argument, but I didn't see anything in that affidavit that the Court didn't already know. There is just nothing new in there. I understand, and I'm very sympathetic to her mother's condition. The Fourth Circuit understands, and is very sympathetic to her mother's condition, but she has an obligation here to Mr. Runyon and to this proceeding. There has never been presented to this Court any medical records under seal with any kind of indication. I'm not saying that her affidavit isn't correct, and there has never been presented under oath that there is no one else to do the things that Ms. Peiffer says she has to do.

The Court has been very understanding to Ms. Peiffer. The Court is giving her every leeway, but that doesn't mean that there is not another family member, relative, or the ability to retain somebody to do the things that Ms. Peiffer says she has to do. That has not come to the Court under oath, and even if it did, it may not be an excuse because there has got to be a friend, a family

member, someone who could do the things that Ms. Peiffer says she has to do.  The Court has let her on all of these hearings appear remotely and will continue to allow her to appear remotely up to a point.

But what I am saying is that there is nothing in that affidavit that the Court didn't know.  If you can point something else to me, and I'm very sympathetic and the Fourth Circuit was.  So you keep offering this argument.  Ms. Peiffer obviously wants out of the case, but this Court has ruled and set forth a very lengthy ruling, and it's gone all the way up to the Fourth Circuit and been affirmed.

So if you have seen the affidavit, then I will grant the motion to seal Ms. Peiffer's affidavit, and it is now of record under seal.

So if you have anything else, Ms. Ali, you can add it, but it's not the time at this juncture for repetition.  We have a hearing coming up, and particularly adding a new attorney within a couple of weeks of this renewed proceeding to begin.  We are already in the middle of it.  It's got to go forward, and you've got everything set up, the dates and the experts, and to add a new attorney would just be more fodder for a continuance or something else when another attorney isn't needed at this juncture.

So I think I've made it clear, I think the Fourth Circuit has made it clear, but if you want to persist in it

and argue it, you can come up to the podium and do so.

MS. ALI:  Thank you, Your Honor.  I understand the Court's comments.  I'll be very, very brief.  As a housekeeping matter, I apologize if my associate was incorrectly in putting into the system as a service provider.  That was not intentional, and if there is an error I need to correct, I'm happy to reach out to Mr. Dash.

THE COURT:  It's been corrected.

MS. ALI:  Okay.

THE COURT:  It's been corrected.  In the budget that I approved, that attorney was not approved as a service provider.

MS. ALI:  Okay.  I apologize, Your Honor.  I'm not sure what happened there, but that was not the intent.

THE COURT:  It was my understanding that Mr. Dash had gone through it with you.

MS. ALI:  That's right.

THE COURT:  Then went through it with the Court and to be sure that I was on the same page, and I was.

MS. ALI:  Okay.  I understand the Court has already ruled on this.  I will not belabor any of this.  I think the -- I'll say a couple of brief things.  Number one, we don't intend to seek any continuance.  We don't intend to seek any delays, no matter what happens with the counsel situation.  We will be prepared to go forward on November

1st.

The issue here is the hearing on November 1st and Ms. Peiffer's participation in it. I understand the Court has ruled that she has a continuing obligation to represent Mr. Runyon. I understand the Court's concerns about the continuity of counsel issue.

We have addressed some of those in our brief, including that Ms. Peiffer was not previously involved in preparing any of these experts, and so her function in ensuring continuity of counsel is of less value than during the discovery phase of the case. We've tried to offer a solution here with Mr. Coburn that would not in any way delay the proceedings or require any alteration of the budget that we've proposed to the Court and that the Court approved.

We really are trying to find a way here to accommodate going forward on November 1st, making sure that Mr. Runyon's rights are protected, that his ability to present this evidence is -- that he has a full and fair opportunity to present the evidence in support of his claims, and understanding that the Court has ruled on whether Ms. Peiffer can withdraw from the case, we would submit that the proceedings will be both more just, more fair, and in line with Mr. Runyon's rights and also more efficient if another attorney is able to come in and present

evidence and it's not all falling on me.

I think Ms. Peiffer understands she can stay involved as a continuity of counsel rule, but in terms of actually preparing and presenting witnesses and leaving her family for two to three weeks, however long the hearing goes, is a very different order than being available to answer questions and fulfilling that continuity of counsel rule.  That's the concern, Your Honor.

It's just the time away from her family, the extended period of the hearing, and so I understand, you know, we are not trying to take end run around the Court's ruling.  We are trying to find a solution here that allows the hearing to go forward and proceed in a just and efficient way without the burden falling on Ms. Peiffer and her family.

THE COURT:  Well, I will make three comments there. Number one, the Court has already ruled that the proceeding will go forward in a just and efficient way with the resources that you have.  I'm not going to go back over the full record from the last hearing and the opinion that I rendered.  Those resources haven't changed.

The addition of Mr. Coburn doesn't change anything about the resources that you have.  You have you, you have the *pro se* counsel that you mentioned, you have Ms. Peiffer, and you have a new attorney in your office.  So the addition

of Mr. Coburn adds nothing to what you already had that the Court found was sufficient and that the Fourth Circuit has found was sufficient.  That's number one.

Number two, I don't know how Mr. Coburn at this late stage, you can take all the *pro se* help you want, but adding him as an attorney in this case is just going to create the same things that the Court has said before, and I don't know how he can be more prepared on the experts in two weeks than you should already be prepared.  So nothing you've said changes anything about the Court's previous ruling or the Fourth Circuit's affirmance of that ruling.

Do you have anything else to add, Ms. Peiffer?

MS. PEIFFER:  Just a few things, Your Honor.  I will keep it brief.  The new declaration that was submitted, I was under the impression that additional information would be helpful based on the government's reply and expressed concerns that I haven't provided up-to-date information and that the information might have changed since this issue was first addressed by the Court in June.  That is why I provided the updated declaration.

THE COURT:  I'm not criticizing you for filing the declaration.  It updated but it didn't provide anything that would change the Court's opinion, but I thank you.

MS. PEIFFER:  I understand, and to the extent that medical records were required, I did not realize that may be

a requirement.  I thought as an officer of the Court my description of my mother's condition would be sufficient, and I tried to do that and provide as much information as I could for the Court's purpose while protecting her privacy and my family's privacy.

I'll just add, without restating the motion, that I want to make sure that the Court is aware that this is the only case on my docket that I have been working on actively, the only case of a scheduled evidentiary hearing in the near term.  I just wanted to clarify that for the Court and clarify that although I have worked extremely hard over the past month to fulfill my obligations both to my family and Mr. Runyon, I have felt that that is impossible, and I've been forced to take leave in a way that I would not have preparing for this hearing if the circumstances with my family had been different, and I have been forced to work on a reduced schedule and reduced capacity, which has really left Ms. Ali with really the lion's share of the work and with very little assistance, although I have remained available for consultation and communicated with her and would certainly plan to do so no matter what the Court orders going forward.

THE COURT:  Well, a couple of things.  First of all, medical records aren't required.  I just indicated that there was nothing there to show a change in what you had

previously represented, and I appreciate the fact that you gave the affidavit and updated it, but records weren't required.  I just indicated that the affidavit, in my opinion, didn't add any more to my knowledge than I already knew, and I certainly accept your representations as an officer of the Court.

The other is that, again, the situation hasn't changed when all of this was argued before.  Ms. Ali took the case, and she said she could be ready, and she's been granted help and she's got help in her firm.  She has the *pro se* counsel from a large D.C. firm.  I'm not going to repeat it all again.  I stand by everything I said before. She took it.  She said she could be ready.  She's represented she can be ready.  You have been there to offer input, and, consequently, the situation hasn't changed.

The United States objects, and I'll let them state if they want their objections for the record.  But basically they say, and I agree with them, they argue the Court should deny the motion because "the facts and circumstances have not materially changed since the last hearing on June 16, 2023, or during the pendency of the interlocutory appeal."

So, consequently, the current arrangement provides adequate representation, and I found that before, and the Fourth Circuit has affirmed the rulings in that regard, that you have Ms. Ali, you have the *pro se* help that you seek,

and you have Ms. Peiffer, and that Mr. Runyon is adequately represented.

I reiterate. This is not a full-blown habeas proceeding. It is a hearing on part of one claim, and so, consequently, unless Mr. Samuels has something to add, I read the response, and frankly I agree.

Ms. McKeel.

MS. McKEEL: Judge, we have nothing to add, just that there has been no material change since the last motion was filed. The Fourth Circuit has settled this, in either the interlocutory appeal or the writ of mandamus that the Covington lawyer's filed and upheld this Court's decision.

THE COURT: Anything else, Ms. Ali?

MS. ALI: No. Well, just very briefly, Your Honor. I understand nothing has changed. I will say that what has changed is that in June, when the Court first heard this motion and when the facts first arose, it was unclear what Ms. Peiffer's mother's condition would be and what the care plan and what Ms. Peiffer's role would be now at the time of the hearing. We are now just a few weeks out from the hearing.

We have much better understanding of what that looks like. At the time in June, when the motion was first raised and argued, we could only speculate about that. But we know now what the demands on Ms. Peiffer's time are, what

her commitments to her family are in the current moment. So I understand from the Court's perspective nothing has materially changed, but that in itself is somewhat of a change. We know now what the situation is and what it will be during the hearing in November.

THE COURT: The Court denies the motion for the reasons that were stated back on June 16, 2023, and in the affirmance of the Fourth Circuit and what I said today about appointing additional counsel, which at this point is an individual named Barry Coburn, and the Court denies any motion to appoint him as additional counsel.

To the extent that Ms. Ali seeks to get *pro se* help from other attorneys, that's one thing. But to the extent that they are admitted in this case as additional counsel, for all the reasons that have previously been stated, that motion is denied.

Also, and I don't know that this will be granted, to the extent that Ms. Peiffer is to appear at the hearing itself via zoom, you would have to file that motion and the reasons therefore. I don't know that the Court would grant that motion, maybe on a limited basis, but we can work that out at the time.

That takes care of three of the motions; the discovery motion, the motion to appoint additional counsel, and the motion to seal Ms. Peiffer's affidavit.

That brings us now to the motion for leave to disclose witness testimony, asking the Court to revise an oral ruling, and I'll just give a brief history there.  On September 26, 2023, petitioner filed a motion for leave to disclose witness testimony to experts.  That's ECF Number 847, motion for leave; and 848, memorandum in support.  The motion for relief requests the Court to revise its oral ruling made during the February 2023 hearing that prohibited expert witnesses who will testify at the November hearing from reviewing testimony of fact witnesses from the February 2023 hearing.  That's at ECF 848.

As an aside, I would make one comment that we will get to when we get to the motion *in limine*.  It looks like to me this rule may have already been violated.  It's the old principle, violate now and ask permission later, because it seems violated, in the Court's mind, with Dr. Merikangas.

So I'm very concerned with the tactic of, well, I'll do as I please and violate it now, but I'll ask permission later.  That's the way the Court is looking at a lot of this, because with Dr. Merikangas the testimony, apparently, was shared with him because he's now changed his affidavit.

In any event, you can go forward with this motion that would allow you to show all the fact witness testimony to your experts.

MS. ALI:  Your Honor, I'll start by saying that we have not shared fact witness testimony with any expert, including Dr. Merikangas, and the government has not suggested the contrary.  Their objection to the supplemental Merikangas declaration is that we showed him documents that were produced to the government in February.  We have not shown any witness -- I think the Court's ruling is clear, that's why I filed this motion -- that we are not permitted under the Court's ruling in February to share fact witness testimony with the experts, and I just want to be clear that we have not.

THE COURT:  Did you tell him what the testimony was?

MS. ALI:  We have not, Your Honor.  We have not spoken to any expert witness about the content of the testimony.  We have not shared the actual testimony.  We have not referenced fact witness testimony from February, have been extremely careful about that, in light of the Court's ruling.  I don't read anything that the government's filed to suggest anything to the contrary about this ruling. I think their point is something different.

THE COURT:  Well, there's a motion *in limine*, and I look at it as in response to this motion because it came in after you filed this motion.  So I'm looking at your motion for leave to disclosure witness testimony to the experts,

and the ruling on any motion *in limine* would resolve this.

But, in any event, we will find out from Dr. Merikangas at the appropriate time how and why he suddenly changed his affidavit, because the Fourth Circuit relied on that, the Fourth Circuit mentioned it in its published opinion, and it came out, which is what caused this whole continuance in February that documents had been withheld and that Mr. Hudgins, who was then Judge Hudgins, who is now deceased, had, in fact, contacted and consulted with Dr. Merikangas and gotten his opinion not to go forward with the evidence.

This is a serious flaw that has upset the Court because it was a misrepresentation in this court, and it was a misrepresentation to the Fourth Circuit. You can read the Fourth Circuit's opinion. They specifically referred to Dr. Merikangas. When I say you, I don't mean you, Ms. Ali, but petitioner's counsel had that information all along. You have access to billing records that the United States would not, because when you have court-appointed counsel, they file for their reimbursements. The Court approves them. That's all done *ex parte*.

Then when the next set of attorneys get the case, the documents are passed on. This is not a difficult one for the Court to figure out because then those time documents are passed on. So they are passed on to the

44

appellate attorneys.  When the appellate attorneys then submit their charges, their CJA vouchers and the budget, the Court approves them.  They are all done *ex parte*.  The United States never sees those.

Then when they're no longer in the case, the file gets passed along to habeas counsel.  So it's pretty clear to the Court how you had those billing records, and they were there with habeas counsel and were misrepresented to the Fourth Circuit, and we will discuss that later, and to this Court, and the shock from Mr. Hudgins' face, then Judge Hudgins, now he's deceased, was amazing when he said, You have my file?  You have my billing records?  And Ms. Chavis says yes.  Paraphrasing a little bit, but that's pretty accurate.

So you can argue why I should change my ruling, and I'm not making a ruling on that, but I'm just saying that this has become a very complicated web that's been woven regarding Dr. Merikangas.  We will get to the bottom of all that when he testifies.  This is a bench matter.  This is not a jury hearing all this.  It's important for the Court to have truthful testimony under oath and ethical actions by attorneys that appear before it.  But you can go ahead now with what would be the reason that the Court would allow all of these experts to review fact witnesses' testimony. That's exactly what the United States is saying, we are not

looking at after the fact opinions by experts.

But, in any event, I'll let you argue it, and then we will decide whether I should change my ruling or not. I'll let you add in, Ms. Peiffer, as you want to on this argument.

MS. ALI:  Yes, Your Honor.  I think, again, not to -- our arguments are set out in the brief, and I'll note just that the government actually didn't file an opposition to our brief, which is due on October 10th.  I understand that they have sort of gestured at a response to this motion to ECF 847 and 848 in their motion *in limine*, but that was filed after their briefing deadline and I don't think should be considered as an opposition to this brief, which was due on the 10th and waived.

So I consulted with the United States before I filed the motion for leave.  They indicated their opposition, which I noted in our motion, but they didn't actually file a brief in response to that.

THE COURT:  They filed their motion *in limine* on October 6, 2023.

MS. ALI:  But the motion *in limine* does not respond at all to this point.  That came later in the motion they filed last Friday about Dr. Merikangas.

THE COURT:  We are not on Dr. Merikangas yet.

MS. ALI:  Right.

THE COURT:  I just made some comments, but you now want the Court to lift a ruling that it made, and there's a question in the Court's mind that you already violated it. So the question becomes, did you violate the rule and then ask for permission or what?

There are three different things at play here. Number one is whether the Court's oral ruling has been violated, because I'm confused to how Dr. Merikangas was able to do a 180 on his affidavit.  So that's the first question the Court had.  So I was saying that this could be disingenuous if you have already violated it and are then asking for permission.  It's the old rule, do it now and it's easier to ask for permission later.

In any event, now the second issue is, you say you didn't violate it.  For the moment we will move on from that, and let's look at your motion for leave to disclose witness testimony to experts.  I look at the response, and I'll tell you when.  I just wanted to check the deadlines. The deadline for responding to your motion was October 10th, and they filed their motion *in limine* on October 6th.

MS. ALI:  That's right, Your Honor, but the motion *in limine* doesn't address this issue at all.  The place where the government addressed this issue is in the motion, the United States' response to petitioner's notice of supplemental and revised declaration, which was filed on

October 13th.  That was the only point I was making.

THE COURT:  You mumbled a lot there.

MS. ALI:  I'm sorry, Your Honor.  Our brief was filed on September 26.  The United States' response was due on October 10th.  They did not file any response on October 10th.  Instead, they included a paragraph in the brief they filed on October 13th at ECF 861 responding.  So all I was saying there is that any response was due by October 10th and should be considered waived because nothing was filed by them.

THE COURT:  Then what is a rule for one is a rule for another.  You didn't properly file the affidavit of Ms. Peiffer under the local rules, and so, consequently, I let you do it.  You have not been prejudiced by any response that the United States made here, and to the extent they waived it, you are not prejudiced by that waiver.  I don't believe they are agreeing to this, from what I understand. I viewed the motion *in limine* to say you can't go back and look at all these fact witnesses.

But be that as it may, if they are late, it did not prejudice you.  You know their position.  They can argue it, and you can respond to it.  To the extent that there has been a late filing, the affidavit from Ms. Peiffer was late, and the Court caught the lateness, and you didn't follow the rule.  I wouldn't have even had to grant your motion to seal

today.  I could have said, United States, you can respond. So let's move on.

MS. ALI:  Okay, Your Honor.

THE COURT:  You want to make this case rise and fall on a few days, then go ahead.

MS. ALI:  May I just respond to the point about the declaration?  We did submit that declaration the same day that the motion was filed.  I spoke with Ms. Pearson yesterday.  I think there was a clerical error that it didn't get uploaded to ECF, but I just want to respond to that.  The government received it on the same day that we filed that motion in September.

Again, I don't want to belabor the point here, Your Honor.  Our arguments are set out in our brief.  Under Federal Rule of Evidence 615, the exclusionary rule, the Court may order witnesses excluded.  But as a general matter, that rule does not authorize excluding expert witnesses whose presence are essential to presenting the claim or defense.  We cited the case law in our brief supporting this, that among others, *United States versus Rhynes*, 218 F.3d 310 at 318, note 8, which says, the Fourth Circuit opinion from 2000, "Parties or their representatives, as well as expert witnesses, are authorized by Rule 615 to remain in the courtroom, hear testimony, and subsequently testify."  I think we laid out in our brief,

and the other Fourth Circuit cite we put in our brief was *OPUS 3 Limited*.

THE COURT:  You need to enunciate and not move your words together.  You are moving words together.  I want to hear your argument.

MS. ALI:  Yes, Your Honor.  The second case we cited in our brief from the Fourth Circuit is a 1996 decision.  That's *OPUS 3 Limited*, 91 F.3d 625 at 629, and the quote there is, "An expert who is not expected to testify to facts, but only assumes facts for purposes of rendering opinions, might just as well hear all of the trial testimony so as to be able to base his opinion on more accurate factual assumptions."

That's really all we are saying here, Your Honor, is that there are several witnesses whose testimony -- Dr. Cunningham comes to mind as a key example whose testimony is -- relies on input from lay witnesses about facts and events that occurred in Mr. Runyon's life and childhood and those of his family members.  It seems that under Rule 615, and to ensure the integrity of the proceedings and efficiency and make sure that the experts are testifying based on the facts as they came into evidence, rather than based on declarations before these witnesses testified in February, that it makes sense to be able to present these expert witnesses with that fact

testimony so that they can render opinions based on accurate factual assumptions, just as the Fourth Circuit said in that *OPUS* decision.

THE COURT:  But the Court of Appeals declined to remand those claims in this case and specifically said that, "Generational trauma" and "psychosocial history," they did not remand that, and so aren't you going past the remand when you talk about generational trauma and the psychosocial history?

We can go back and look at the Fourth Circuit opinion, but I let you get all of this in in the beginning. I said, well, it's a bench matter, and I'll hear it all, but I know what the remand is, and it was not on generational trauma or psychosocial history.

I just want to go back and add something, respond to something.  When you filed your pleading, you specifically said in there that the United States has indicated that they oppose the motion.  You said that on the first page of the motion.  The United States' deadline was October 10th.

Then in the interim, they filed the motion *in limine* that brought out a lot of these points about generational trauma and the social history and psychosocial history and that the remand was a very limited remand, and we can go back and quote the case.  But go ahead.

These witnesses were basically ones that perhaps the Court shouldn't have even heard, but I let them come because Ms. Chavis said she traveled all around to interview these witnesses, and I heard them.  But the point is that the Fourth Circuit's remand did not include the generational trauma or the psychosocial aspects.  It included brain damage and the injury to his brain and whether the scans, particularly Dr. Merikangas', who was the qualified expert opinion, went into all of that, who was the qualified expert, and that qualified expert had not been called upon to present evidence by defense counsel.

So I just want to make it clear that when you keep talking about all these fact witnesses, what they were here to show, they were not experts.  They could show generational trauma, they could show some of his social trauma, but they were not experts on brain injury, and that's what it came back to this Court on that.

MS. ALI:  May I respond, Your Honor?

THE COURT:  Yes.

MS. ALI:  We disagree about the scope of the claim on remand.  I know that's the subject of a government's motion, which we have not yet had an opportunity, and our response is not due until I think later in this week.  So I would request that given the seriousness of the issues and the gravity of the issues, the importance of the issues, the

JODY A. STEWART, Official Court Reporter

stakes in this case, that we would be entitled to briefing on that before the Court hears argument or decides the issue.

THE COURT:  I certainly will allow you to do that. There is no way that I'm going to deprive you of that opportunity.

MS. ALI:  Thank you, Your Honor.

THE COURT:  I'm just saying to you that that has been culled out, and there are quotes from the Fourth Circuit's remand.  I think you need to look at three things that were extremely important to the appellate court in reviewing the motion.

Number one, the reliance of the Fourth Circuit on the lack of Dr. Merikangas's evidence going forward, and then it turns out that he had recommended not to present it.

Number two, the strictures of the remand and what it did remand.  It basically, frankly, hinged on Dr. Merikangas, a lot of it.  So I'm just telling you that you need to pay very close attention in your response to those two aspects of their motion that I think are extremely important.

When you respond, since we are getting close to the hearing, you can indicate, if you're not intending to call all these experts, then be forthright.  Just say, you know, it's really not an issue on this person and that person.

Let's get it down to the issue that we need to address so that there can be a complete, adequate, and fair ruling for Mr. Runyon.

MS. ALI:  Yes, Your Honor.  If the Court's not inclined to take up the United States' motion *in limine* or the opposition to the notice of filing the supplemental Merikangas declaration today, I'll reserve argument on that, but I'm happy to answer questions or to present argument, if the Court would like, but we do intend to fully respond in briefing later this week and be prepared to address it, if necessary.

THE COURT:  That's fine.  You can certainly have an opportunity to respond when it's ripe, and then the United States, if appropriate, can file a reply.  Then it will be an issue.  A lot of that, on the motion *in limine*, is for trial because it's regarding specific witnesses and whether they can go into certain things at trial.  So the motion *in limine* ultimately may await trial.

In terms of your motion for leave to disclose witness testimony, first of all, the courts do sometimes allow experts at trial.  The only time I have allowed experts to sit in is to hear other experts' testimony.  In other words, an expert forms an opinion, and you have to give a written opinion in advance on what they relied upon. Obviously, in forming their opinions, they haven't relied

upon the fact witnesses at trial, maybe in pretrial depositions. So you disclosed an expert opinion, and that expert opinion has been disclosed, and in terms of allowing the experts to sit in, I don't find any good cause to do so at this point considering that they are all fact witnesses at trial and that there are questions regarding whether a lot of that evidence should have even been presented.

The Court ruled that the experts couldn't sit in, not even to hear other experts. So that is something that courts do very often. There may be some courts that allow experts to sit through the whole trial. I may have done it, but I don't recall doing it. My feeling is, is that you brought this claim, and you can proceed on the basis of your expert witnesses that you named in advance, and they testify as to what they've reviewed for their opinions and the materials from plaintiff's files, and then they say what they relied upon. You've already made those disclosures.

So no one is preventing the experts' testimony, but they can't now review in advance these fact opinions or the fact information because the expert opinions should be already formed, and they have been formed and disclosed before this hearing, and they have been formed on the basis of whatever information they have indicated they used before now.

So expert opinions, remember, there are a lot of

civil aspects here in a *habeas corpus*.  You have to disclose your experts in advance.  You have to disclose expert opinions in advance.  You have to disclose what they relied upon in advance.  So they could not have relied upon the trial testimony for their expert opinions that they formed. So then they would be changing their opinions, and perhaps changing them on irrelevant evidence that shouldn't even be in this case.

The Court ruled earlier that they could not sit in during the trial, and there has been no good reason offered now for them to be able to sit in other than, well, we want them to hear all these generational issues.  Now, I may change that ruling if you convince me on the motion *in limine* that some of this should come in.  That may be a different matter.  But for now I see no reason to change my ruling that has been in effect and I do not.

We are in the middle of a hearing at this point. We are in the middle of a hearing not because of anything that the Court has done or the government has done but because of a misrepresentations from petitioner's former counsel, the Federal Public Defender of Tennessee.  That's where we are now.  We should have been through with the hearing back in February or March.

I think I responded to that, that the experts are essential to your ability to litigate your claim for relief,

but no one is preventing them from testimony.  Then I mentioned that they can't review trial testimony in advance because opinions are formed before trial and disclosed before trial, and they certainly could have interviewed anybody they wanted.  That was a point I wanted to make that I wrote down.  You knew who you were calling.  Nobody prevented them from interviewing those individuals, and then when they formed their opinions, saying I formed my opinions based upon the interviews with the mother, the former wife, whoever.

So I wanted to make that, that no one has prevented them from access to any of your witnesses that you've presented.  Then they would have had to put witnesses they interviewed in advance and the materials from your file that they reviewed in their pre-hearing disclosures.  So they have had access to this.  If you wanted them to have it, then you would have had to have told them to go interview or give them access to the materials from your file in advance or hearing.

The other point I wanted to make is, again, you brought this claim on the basis of the lack of expert witness testimony, and so it's been up to you now to produce this expert witness testimony, and you have to disclose it before trial or before hearing.

Again, as far as I'm concerned, the expert

witnesses, at least from the Court's standpoint, are sometimes allowed to hear the experts but not always fact witnesses, and certainly not in a case like this and the posture that it's in at this point.  I made that ruling, and that ruling stands until it is changed otherwise.

Is there anything you want to add, Ms. McKeel? Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  Thank you.

THE COURT:  Anything you want to add, Ms. Ali?

MS. ALI:  The only thing I'd offer, Your Honor, is that I understand the Court is saying that no one is presenting our experts, who we have argued are essential to presenting the claim, Mr. Runyon's claim here, and I'm not arguing that.  I just want to clarify the scope of what we are asking for here, which is under Federal Rule of Evidence 615, witnesses who may not be excluded from the courtroom include any person whose presence is essential to presenting the claim or defense.

What we've argued in our motion here is that the experts fit that category, and, therefore, under Rule 615 it's no longer discretionary; the Court must permit them to sit in the courtroom.  I understand the Court has ruled otherwise.  I just wanted to clarify the scope of what we are asking for.

THE COURT:  I would focus on the beginning of this

rule.  You keep talking about presumptively, reasonable, and all of these things, is the way this rule reads.  We can't cherry-pick what we want from the rules.  "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony.  Or the Court may do so on its own.  But this rule does not authorize excluding:"  You have gone to the third part, "A person whose presence a party shows to be essential to presenting the party's claim or defense," and that is what I do not believe that you have shown.

So I ordered it, and you had felt it was necessary, then someone should have, at the time, when it was ordered, brought that up and properly argued it.  In any event, I still don't find that you qualify under that rule, and I've made my ruling.  I've made the order to exclude witnesses. I didn't let the fact witnesses here until after their testimony.  Everybody was excluded from each other, and the experts were likewise excluded, and there was never a request to allow the experts to sit in and hear other experts.  That might have been something I would have considered, but I don't even recall that ever being brought up to the Court.

So the ruling is there, I stand by it, and to the extent that the ruling on the motion *in limine* would change that, then you can argue because that's basically what the

United States is saying, that these fact witnesses are not even appropriate because of the limited remand of the Fourth Circuit.

MS. ALI:  May I ask a clarifying question, Your Honor?

THE COURT:  You may, but I may not answer it.

MS. ALI:  Understood.  My understanding is that we are not permitted to share any fact witness testimony, any testimony from February 2023 with our experts in preparation?

THE COURT:  That's the ruling that I made, and it stands for all the reasons that I've said.

MS. ALI:  Right.  My question is whether witnesses will be able to be shown that testimony while they're testifying, like for the first time as they're on the witness stand?  I understand this ruling seems to apply to all of the witnesses, not just our witnesses but also the government's.

THE COURT:  You will have to offer it at the time, and I'd have to make my ruling at the time within the context of why it's being present and what is being presented, whether it's just a little limited excerpt that's not in context, whether it's the whole transcript.  At this time, it would be a hypothetical ruling on the Court's part. It's fact specific to the witness and why the witness would

need that testimony.

MS. ALI:  Okay.  Understood.

THE COURT:  Ms. Peiffer, anything you want to add?

MS. PEIFFER:  No, Your Honor.  Thank you.

THE COURT:  So the United States has nothing more to add, Ms. Ali has nothing more to add, and Ms. Peiffer has nothing more to add.

Counsel, I believe that takes us to the motion *in limine*, which is not ripe.  Does anyone know of any other outstanding matters for the Court to address today?  Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  I believe the Court has addressed all the pending motions that are fully ripe, and I agree that there is some additional time for Ms. Ali to respond, both to the motion *in limine* and if they want to tender any response to our objection to Dr. Merikangas' recent revised declaration.

THE COURT:  Yes.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  Ms. Ali, do you have anything else for the Court to consider?

MS. ALI:  Just some brief housekeeping matters, Your Honor.

THE COURT:  All right.

MS. ALI:  The first is an issue about the

availability of one of our witnesses, and this is Dr. Lipton, who's the rebuttal witness, and so his testimony, unfortunately, is more specific in terms of when it needs to come in the order of witnesses.

He is not available late in the -- in the second week.  So the hearing is scheduled to start November 1st.

THE COURT:  Doctor who?

MS. ALI:  Dr. Lipton.  He is a rebuttal witness.

THE COURT:  I have Nadkarni, Barrett, Martell, Cunningham and Merikangas.  Those were the reports that were filed with the Court.  In other words, we had finished the fact, we were starting experts, and I'm just going on the exhibits that had been submitted to the Court with the expert opinions.  I reviewed those before I came in.

MS. ALI:  Dr. Lipton had also provided a report, but, again, he's a rebuttal witness, but the issue that we have run into is that he is not available November 8th to 10th, which, unfortunately, is when I think he was most likely -- I'm not sure how long -- I don't know exactly when our case in chief will wrap up and when the government will go.  Some of that will depend on how long the trial days are, some of that will depend on how long the government cross-examines our witnesses, how many witnesses the government intends to present.

But my best estimate, based on the limited

information that I do have, is that Dr. Lipton likely would have testified in that November 8th to 10th window when he's just totally unavailable.  He is available to come the next week, if that's available for the Court.  But I did want to raise that and try to come to a solution.

THE COURT:  We will accommodate his schedule.  I don't know how long you plan to -- what you're estimating at this juncture to complete your presentation, and then I don't know how long the United States is anticipating. Based upon where we are right now, how many days do you think you're going to need?

MS. ALI:  Depending on how long the cross-examinations are, which I don't have control over, obviously, my best guess is that we will wrap up our case on Tuesday, the 7th.  Could be a little earlier than that, could be a little longer if the cross-examinations are particularly lengthy, but that's my best estimate.

THE COURT:  Well, we will accommodate Dr. Lipton.

MS. ALI:  I appreciate that, Your Honor.

THE COURT:  We will accommodate his schedule, and if we have a couple of days -- again, it's a bench matter so the Court can keep all of that straight, and he can come in the week of the 13th if that becomes when he can come in and everything's finished.

MS. ALI:  Okay.  Thank you, Your Honor.  I also

wanted to make a request that my paralegal be permitted to sit at counsel table to help with exhibits during the hearing.

THE COURT:  Certainly.

MS. ALI:  Thank you, Your Honor.  Finally, wanted to just get some guidance on the schedule we can expect for each day so that I can share that information with our witnesses and better plan for how to stage them.

THE COURT:  We will probably be starting at 11:00 each day because the Court has to take care of other matters, and once we start into this, I don't want to be diverted with other matters during the day.

The other thing is that some counsel have to come, I think, from across the water, and it can be congested early in the morning.  If we set it earlier, we oftentimes get a call that there is an accident or the tunnel is backed up, through no fault of counsel.  I'm not talking these counsel, I'm talking about counsel in general coming from the peninsula.

MS. ALI:  Does the Court anticipate ending at 5? What I'm trying to figure out --

THE COURT:  I tend to go after 5:00 if we are in the middle of a witness.

MS. ALI:  I'm really just -- I'm not trying to pin the Court down.  I'm just trying to get information so I can

share it with my experts.  They have trickier schedules than lay witnesses, particularly do, and so I'm trying to plan.

THE COURT:  We will plan to start at 11:00 a.m.

MS. ALI:  See where we go.

THE COURT:  At a reasonable hour.  We're not going to be here until 8:00, most likely.

MS. ALI:  That's all for me, Your Honor.  Thank you.

THE COURT:  Ms. Peiffer, do you have anything else?

MS. PEIFFER:  No.  Thank you, Your Honor.  Ms. Ali covered it.

THE COURT:  Thank you.

MR. SAMUELS:  Your Honor, may I raise one housekeeping matter?

THE COURT:  Certainly.

MR. SAMUELS:  Thank you, Judge.  Your Honor, as the Court knows, and this is just something I raised while we are talking about housekeeping matters, I certainly don't need an answer on it today, I don't need Ms. Ali's position, but I will raise it while we are all here together.

As the Court knows, when we took our break in February, that coincided with the United States receiving a pretty fair amount of new discovery.  We received some in February and then some on a rolling basis throughout.  There has been some question in some of the pleadings filed about

the authenticity of some of that discovery, and, of course, the United States was not able to discuss that discovery with the witnesses at the February hearing. They had already testified. Mr. Woodward had testified. We may have to bring him back to address things. Judge Hudgins had already testified, and, of course, unfortunately, has passed away.

But the government doesn't think it should be penalized by the lack of opportunity to introduce and authenticate those documents. They were all produced in discovery from the petitioner.

THE COURT: After the fact.

MR. SAMUELS: After the fact, Your Honor. So for certain of those documents, we would like to be able to offer those into evidence for the Court's consideration without necessarily having to try and bring back every single fact witness such as, perhaps, Ms. Cronin, wherever she may be, or some of these other witnesses when these documents were produced late to us.

There is no question they were produced from petitioner's counsel. We think we should be able to introduce select documents for the Court's consideration without going through all the process of producing specific authenticating witnesses for each and every document, and that's an appropriate recourse for the fact that these

documents were produced late.

I'm not asking the Court to give me a ruling now, but I just wanted to raise that issue because that could affect, if we have to go and find all these witnesses to authenticate these late-found documents and these late-disclosed documents, that could make the hearing run longer than we would otherwise intend to do.  Maybe certain ones we need to.  We may need to bring Mr. Woodward back to address some of these issues.  But for certain of these witnesses, just for authentication purposes, we don't necessarily think the United States should have to do that given the posture in which we were produced the documents.

THE COURT:  Well, this is what I would suggest.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Why don't you meet and confer with Ms. Ali and Ms. Peiffer as appropriate, and if you can reach an agreement, that would be great.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  If you can't, then you can bring those matters to the Court.  But I know the discovery situation, and so if you get an idea of what you want and can discuss it with opposing counsel, you might be able to come up with some agreement that will move the proceedings along.  To the extent you can't, if it's an after-the-fact document, that I would let you recall them as long as it's relevant.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  If it's relevant to the case, and if I find it's relevant, then you would be able to call the witnesses back because you didn't have the documents.  There were I've forgotten how many bankers boxes.  40?

MR. SAMUELS:  Yes.  And, of course, we didn't get 40 boxes of documents, but we got a good number of documents.  For example, there would have been documents that we would have cross-examined Ms. Cronin about had we had those documents when she was testifying, and I think if she is brought back, and I would rather avoid that, we should be able to treat her in a cross-examination manner as if it were the continuation of her cross-examination now that we have just received these documents we would want to ask her about.

THE COURT:  Well, meet with counsel and see what you can agree on.  If you can't agree, then I will take it up.  Also, we probably may have another, just depending upon the motion *in limine* and the responses and so forth, we may have to convene again before the hearing.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  It would just be how close to the hearing, whatever.  So we all have to stay flexible in terms of our schedules, given that this is coming up, and certainly grant leeway to the rebuttal expert.

MR. SAMUELS:  Thank you, Your Honor.

THE COURT:  If there are no other matters to come to the Court's attention, I do reserve the option to reduce any of my rulings to writing, if appropriate, and with that, I'll await your responses to the two outstanding matters, and we may have to reconvene on those.

The Court stands in recess until 3:00.

(Hearing adjourned at 1:46 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

X_____/s/_____x

Jody A. Stewart

X_____10-22-2023 _____x

Date

JODY A. STEWART, Official Court Reporter