IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,                )
                                         )
v.                                       )   CRIMINAL ACTION NO.
                                         )   4:08cr16
DAVID ANTHONY RUNYON,                    )
                                         )
        Defendant.                       )
                                         )
                                         )
        AND                              )
                                         )
DAVID ANTHONY RUNYON,                    )
                                         )
        Petitioner,                      )   CIVIL ACTION NO.
                                         )   4:15cv108
v.                                       )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
        Respondent.                      )
                                         )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

DAY 1

Norfolk, Virginia

February 7, 2022


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge


JODY A. STEWART, Official Court Reporter

APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Brian Samuels
               Lisa R. McKeel
               Assistant United States Attorneys
                    And
          DEPARTMENT OF JUSTICE
          By:  Carrie L. Ward
               Counsel for the United States

          FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE
          By:  Dana C.H. Chavis
               Helen Susanne Bales
               Assistant Federal Community Defender
                    And
          VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
          By:  Elizabeth J. Peiffer
               Counsel for the Defendant


                         **I N D E X**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEPHEN A. HUDGINS | 15 | 105 | | |

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| 11 | 141 |
| 12 | 145 |
| 14 | 168 |
| 19 | 149 |
| 20 | 146 |
| 21 | 147 |
| 22 | 148 |
| 23 | 149 |
| 24 | 152 |
| 25 | 151 |
| 26 | 154 |
| 27 | 157 |
| 28 | 159 |
| 29 | 160 |
| 30 | 119 |
| 31 | 163 |
| 32 | 165 |
| 33 | 188 |
| 34 | 168 |
| 35 | 169 |
| 36 | 171 |
| 37 | 174 |
| 38 | 174 |
| 39 | 175 |
| 40 | 176 |
| 41 | 177 |
| 42 | 177 |
| 43 | 178 |
| 44 | 179 |
| 45 | 180 |
| 46 | 181 |
| 47 | 181 |
| 48 | 186 |
| 49 | 186 |
| 50 | 190 |
| 51 | 191 |
| 52 | 191 |
| 53 | 192 |
| 54 | 193 |
| 55 | 194 |
| 55A | 194 |
| 55B | 203 |

| GOVERNMENT EXHIBITS: | PAGE |
|---|---|
| 56 | 209 |
| 57 | 212 |
| 58 | 213 |
| 59 | 214 |
| 60 | 215 |
| 60A | 217 |
| 61 | 127 |
| 62 | 219 |
| 63 | 108 |
| 64 | 222 |
| 65 | 137 |
| 117 | 47 |
| 135 | 137 |
| 144 | 85 |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 14 | 45 |
| 20 | 48 |
| 21 | 90 |
| 22 | 92 |
| 41 | 95 |
| 46 | 77 |
| 93 | 87 |
| 110 | 91 |
| 111 | 85 |
| 113 | 68 |
| 114 | 46 |
| 116 | 41 |
| 122 | 59 |
| 126 | 39 |
| 140 | 29 |
| 157 | 43 |
| 158 | 89 |

(Hearing commenced at 11:07 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent, and case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, and Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The government is ready.  Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Chavis and Ms. Peiffer, is the defendant ready to proceed?

MS. CHAVIS:  Yes, we are.  Good morning, Your Honor.

THE COURT:  Good morning.

Sir, you are David Anthony Runyon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You may be seated.

Counsel, let me make a few quick announcements, and then we'll proceed into the hearing.  First, I will give you the announcement of the schedule that we will be following. We will start each day at noon, and we will go straight through, so you should have had your breakfast, you should have had a full lunch, and we will go straight through with two breaks, and then we will complete for the day whenever

it is appropriate with the witnesses.

In the meantime, you can use your mornings to catch up on any other legal work that you may need to and also to arrange your witnesses.  There will be no delay in terms of witnesses.  You have plenty of notice that we are going to be in this hearing, and you have plenty of notice of our schedule.  So that's the first thing that the Court would mention.

The second thing that the Court will mention is I will not tolerate any further eleventh-hour motions unless they are an absolute emergency and something you could not have possibly anticipated.  Things are coming in here every night, and have been, last week and even last night, without the United States even having a chance to respond or the Court not being able to see it until the next morning when I come into court.

So this hearing has been pending for a few years now.  It has been set for months, and you know the case, and it's not acceptable to the Court for you to constantly be filing eleventh-hour motions every single evening, and that is what you are doing.  So that is number two.  I'm certainly not going to rule on them without the United States having a chance to respond.

Number three, there is a motion, I believe, to expand the record.  An expert doesn't want to come to

testify, and so you want to just present his report.  That motion is denied.  The Court made it clear early on that we were not going to take video testimony in something of this importance or a report where the United States is entitled to cross-examine the expert.  The Court certainly is entitled not only to ask questions but to observe that individual to determine their credibility and the viability of their report.

We went through this before, that someone doesn't want to come is not a valid reason.  I have excused one of the doctors because of health reasons, and I'll put a caveat on that, that if the testimony could not be sufficiently taken, then we would have to reschedule that individual.

So I hope that the Court's instructions are clear, and these motions will stop flowing in.  I don't know of anything that is of immediate nature this morning that has to be heard.

Call your first witness, Ms. Peiffer.

MS. PEIFFER:  Your Honor, Ms. Chavis will present the first witness.

THE COURT:  Ms. Chavis, whoever is going to call the first witness, call your first witness.

MS. CHAVIS:  Thank you, Your Honor.

We would ask that -- we did have an outstanding motion to have a companion for Mr. Runyon to help him

through these proceedings to explain what is happening, and in order to address his concerns and his questions as we are going through these proceedings so that Ms. Peiffer and I can attend to the matters at issue.  So that motion is outstanding, and because we are beginning the proceedings right now, we would ask for a ruling on that motion.

THE COURT:  That was one of your eleventh-hour motions, was it not?

MS. CHAVIS:  Your Honor, I can look and see.

THE COURT:  It was.  It was one of your eleventh-hour motions, but, in any event, my response to it is threefold.

Number one, the United States has not had an opportunity to respond.  Number two, Mr. Runyon has two counsel, which is what he is entitled to, and that is your job, both of you, Ms. Peiffer and Ms. Chavis, to keep him informed.  You've provided no valid authority.  You've provided an act.  You do not provide any caselaw, and that motion is conditionally denied unless you can provide better authority and the United States has a chance to respond.

I consider that an eleventh-hour motion.  If that was the case, you have known how many attorneys you had. You've been working with Mr. Runyon now for years.  I find no authority, there was no caselaw cited, just the Americans with Disabilities law.  I deny the motion.

JODY A. STEWART, Official Court Reporter

MS. CHAVIS:  Your Honor, with respect to the beginning of these proceedings and another motion that's pending that we believe -- or that we would request a ruling on because we -- it is pertinent to the testimony that is about to be received.  We have a motion *in limine* to exclude testimony, evidence that violates petitioner's protections under the attorney-client privilege.  That was ECF numbers 731 and 732.  That was filed January 23rd.  The government did respond to that.

THE COURT:  730 and 732.

MS. CHAVIS:  730 and 732?

THE COURT:  Yes.  You said 731.

MS. CHAVIS:  Okay.

THE COURT:  I think you meant 730 and 732.

MS. CHAVIS:  Okay.

THE COURT:  The United States has responded to that motion.  I agree with the United States' position.  I deny that motion.  Mr. Runyon has put at issue these matters, and the law is clear, when you put at issue the matters before the Court in terms of effective assistance of counsel and ineffective assistance of counsel, you've waived any privilege in regard to those issues.

So in regard to any issues in regard to his attorney-client privilege or *Strickland*, when it comes to the ineffective assistance of counsel issue that's before

the Court, the law is clear that those privileges do not apply at this juncture.  The motions are overruled.

MS. CHAVIS:  With respect to our motion to exclude evidence unrelated to the *Strickland* inquiry because we are beginning with trial counsel, we believe that that motion -- or we would request a ruling on that motion.

THE COURT:  Which motion?  Which number?

MS. CHAVIS:  It is ECF number 742.  I'm sorry. It's ECF number 729 and 730.  The government did respond to ECF 742.

THE COURT:  I don't see 730 here on my outstanding motion list.  You just did 729, 731.  You are talking about 728 in regard to Barrett?  What are you talking about?

MS. CHAVIS:  No, Your Honor.  There is a motion with respect to information that was undeveloped or unavailable.  It's to limit the scope of the government's presentation of evidence beyond what they presented at trial because the *Strickland* inquiry is based on looking back to what could have been presented -- oh, I'm sorry.

THE COURT:  If you don't know the numbers of your own motions, I don't know how you expect the Court to find it.  You have filed a dozen motions.  I've got them listed by number, and I've reviewed them.  But you can't just say this motion.  You have to give the Court the number and specifically what the motion deals with.

11

MS. CHAVIS:  Yes, Your Honor.  And I have written down 729, and I have actually the motion right here.

THE COURT:  I just denied 729.  I just denied 729, and I just denied 731.  729 was the motion *in limine* regarding *Strickland*, and 731 was your motion *in limine* regarding the attorney-client privilege.  I just denied both of those for the reasons that I've said.

MS. CHAVIS:  Oh, okay.  Okay, Your Honor.  Thank you.

With respect to our second motion for discovery, number 737, we had requested the government's notes from their interviews with trial counsel.  Trial counsel is now about to testify, and we would request those interview notes.

THE COURT:  The government will produce those notes.

I believe you objected to producing them?

MR. SAMUELS:  We objected not to producing the notes of our agent who is present.  We objected to producing any attorney notes.

THE COURT:  I agree.  We've been through this a number of times.  So I deny that motion to the extent you're trying to get their attorney-client work product.  To the extent you are trying to get the notes of the agent, I find that the government has produced what it should.  You've

12

brought this motion two or three times. It's denied. In other words, you don't get their attorney-client privileged work. You've put this at issue. They're entitled to examine these attorneys and find out what went on, and we are trying to find out if there is ineffective assistance, and you are simply not entitled to them.

MS. CHAVIS: And we did receive one report from the agents concerning one interview, but we do know that there were several interviews with trial counsel, and that is why we requested -- we made another request after we received the one agent's notes, that we were requesting the subsequent agent's notes.

THE COURT: Are you finished? It's time to get on with the hearing. If there are motions outstanding, and they pertain to a particular witness, we can deal with those motions when the witness is available. We are not going to stand here now and go through this litany of motions that you have piled upon the Court and counsel over the last ten days, and particularly on matters that the Court has already ruled upon during the course of this hearing.

If there is something that the Court needs to rule on that the Court has not ruled upon that pertains to the witness that you're going to call, then you should so inform the Court.

MS. CHAVIS: I think those are all the motions that

are relevant to this witness, Your Honor.

THE COURT:  Let me just see if Mr. Samuels or Ms. McKeel has anything they want to add to what the Court has said or done before we call the witness.

MR. SAMUELS:  No, Your Honor.  We produced the only agent report that was developed from the interview of counsel.  We did meet with counsel over the last week, but just to review materials related to the hearing, including portions of his trial file.  That was all we did.

THE COURT:  I have reviewed everything that has been filed over the last week or so.  I've got it all here. I've read it.  I've read the cases.  I want that to be clear.

Mr. Samuels and Ms. McKeel, if you need to add something to what the Court rules, if you would please stand up, and then I will recognize you at the appropriate time.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Ms. Chavis.

MS. CHAVIS:  Your Honor, we call Mr. Stephen Hudgins, please.

THE COURT:  Mr. Hudgins, if you would please come forward and be sworn.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Hudgins.

(Witness was sworn.)

MS. CHAVIS:  Your Honor, one more item to rule on witnesses before we begin.

THE COURT:  One more item?  What is it?

MS. CHAVIS:  So that any witnesses that are going to testify do not sit in.

THE COURT:  You want a sequester motion?

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  If there is anyone in the courtroom that is scheduled to testify that isn't an attorney or an official representative, you would need to leave.

Is there anyone that you see, Mr. Samuels?

MR. SAMUELS:  No, ma'am.

THE COURT:  Anyone that you see, Ms. Peiffer?

MS. PEIFFER:  No, Your Honor.

THE COURT:  Thank you.

All right, Ms. Chavis.

MS. CHAVIS:  Your Honor, before I begin the examination of Judge Hudgins, I'd ask for him to be declared an adverse witness.

THE COURT:  I think that's a pretty antiquated rule at this point.  I don't think we proceed that way in federal court.  You've called him as your witness.  He's a witness on direct until he turns hostile, at which point you then get permission to go into the cross-examination mode.

MS. CHAVIS:  Okay.

Hudgins, S. - Direct                                        15

STEPHEN A. HUDGINS, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Good morning, Judge Hudgins.  How are you?

A.  Good morning.  Fine, thank you.

Q.  Good.  Good.

How do you know David Runyon?

A.  I represented him in this case in 2009.

Q.  Would you happen to remember the exact date that you were appointed?

A.  It was in February, but I don't remember the exact date.

Q.  If the record reflects that it was February 20th, 2009, would you have any reason to doubt that?

A.  I would not.

Q.  Okay.  Just to establish a timeline here, would you happen to remember the first day of trial?

A.  It was in June.  The first day -- the date I would not remember.

Q.  Okay.  If the record reflects that it was June 30th, 2009, do you have any reason to doubt that?

A.  I do not.

Q.  Do you have a memory of when the penalty phase began in this case?

Hudgins, S. - Direct                                        16

A.   I believe it was August.

Q.   And if the record reflects that it was August 19th, 2009, do you have any reason to doubt that?

A.   I do not.

Q.   How did you become involved in Mr. Runyon's case?

A.   There was an attorney who preceded me in the representation and he developed a conflict, and so I was called to replace him.

Q.   What was the name of that attorney?

A.   Jon Babineau.

Q.   And do you know what Mr. Babineau's responsibilities in the case had been?

A.   I was told that he was primarily responsible for the mitigation phase but that it was -- that didn't mean he was not part of all of the case, but that his primary responsibility was mitigation.

Q.   And what role did you assume in the case?

A.   The same.

Q.   And how did you receive Mr. Babineau's case file?

A.   I met him somewhere, I don't remember where, somewhere that I think we were both going to be, and got it from him.

Q.   Did you review the case file that you received from Mr. Babineau?

A.   I did.

Q.   Did you sit down with Mr. Babineau to discuss the case?

Hudgins, S. - Direct                                          17

A.  I did not.

Q.  Did you call him to discuss the case?

A.  I didn't.

Q.  Did you speak with him on the phone about the case?

A.  I did not.

Q.  Did you ever talk to Mr. Babineau about the case?

A.  Not that I can recall.

Q.  At the time that you were appointed in this case, were you ready to go to trial on the scheduled date?

A.  I was not.

Q.  I'd like to show you a document, and that's going to be at tab 10 that's in the notebook that you have, and I'll put it up on the viewer as well.

A.  Am I suppose to have a notebook?

Q.  The first one.

        THE COURT:  Does he have a screen?

        THE WITNESS:  I have a screen.  Okay.

        THE COURT:  It's in a binder, too?

        MS. CHAVIS:  Yes, ma'am.

        THE COURT:  What is the exhibit number in the binder?

        MS. CHAVIS:  10.

        THE WITNESS:  All right.  I have it.  It's on the screen, and I have the binder.

BY MS. CHAVIS:

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                                  18

Q.   Okay.  Thank you.

          What is this document that I'm showing you?

A.   This was the memorandum that was submitted in support of the request for a continuance right after I got in the case.

Q.   And is there a date at the top of that document?

A.   Filed February 26th, '09.

Q.   Is there an ECF or a document number on there?

A.   165.

Q.   Okay.  Does this indicate the date of the trial?

A.   At that time, March the 13th, '09.

Q.   And does it indicate that there was a date that was rescheduled?

A.   May 4th, 2009.

Q.   Okay.  Does this document refresh your memory as to the volume of materials that was in David Runyon's case that you needed to review?

A.   Yes.

Q.   What was the volume of material from this case?

A.   At the office of my co-counsel, Mr. Woodward, 80 binders of information.

Q.   There is an exhibit to this document, Exhibit A.  It's on Page 5 of 8.  Can you please tell us what this is?

A.   It's an exhibit that purports to lay out my schedule for February 25 th through May 5th.

Q.   And it continues on to Page 6?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                              19

A.   Continues on to Page 7.

Q.   Continues on to Page 7, actually.

     And can you look, please, at tab number 11.

A.   I have it.

Q.   And does this appear to be the same schedule that we just looked at, but it has some annotations to it?

A.   It has some highlighting on the one that I have and some calculations at the end.

Q.   Okay.

A.   Yes.  But other than that, it seems to be the same.  And you're right, it has an annotation there about a trial on Page 7.

Q.   If we look at those calculations at the end, could you please read what it says?

A.   It says 18 full days in court, plus 14 trial -- plus 14-day trial in Garries, 32 full days in court, 25 days with scheduled court appearances.

Q.   And so if we added the 32 full days in court with the 25 days that you were going to make appearances in court, would that equal 57 days when you had to be in court during this time period running up to the day the trial was set for Mr. Runyon?

A.   It would show 57 days on this schedule.  Obviously, I couldn't have been in all of these.  I couldn't have done all of these, so they didn't all happen, but, yeah, it would show

Hudgins, S. - Direct                                          20

that.

THE COURT:  This is not a court schedule, this is Mr. Woodward's estimated schedule?

THE WITNESS:  This is my schedule.

THE COURT:  Your schedule?

THE WITNESS:  This was my schedule.  I don't know when this was done, but, for instance, they show a two-day jury trial on -- now I don't see it -- a two-day jury trial on March 23rd, two to three days.  But then it's got on March 24th, it has me in one, two, three, four -- three different courts.  March 25th it has me in different courts.  Obviously, I could not have done all of those things.

THE COURT:  So, in other words, without going back and looking at what occurred, you don't know whether you were in court all of those days or not?

THE WITNESS:  Oh, no.  I couldn't tell.

THE COURT:  This is the way attorneys book?  In other words, this was your booking of cases and hearings, the same way as courts book cases and hearings that don't always go forward?

THE WITNESS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  So by providing this information to the Court on February 4th, what are you trying to relay?

A.  That it was going to be difficult for me to be prepared

Hudgins, S. - Direct                                        21

for a trial to start on March 13th.

Q.  And after you submitted this on February 26th of 2009, would you have added more court dates, or would you have -- would you have added more court dates?

A.  We would have added more court dates and taken dates out.

Q.  Would you have continued to receive more clients after February 26th, 2009?

A.  Yes.  I can't say that I did, but, I mean, it's certainly possible that I did.

Q.  Was it your standard practice to continue to receive clients on a weekly basis?

A.  Yes.

Q.  Could you please go to Exhibit 79?

MR. SAMUELS:  Judge, I'm sorry.  Are these being offered for admission?

THE COURT:  I don't know.

MS. CHAVIS:  These are documents that are already in the record, that are filed with the Court, so they can be entered again as exhibits if we'd like, or we can just refer to them as they're already filed in the docket.

MR. SAMUELS:  Well, Your Honor, the document that was shown, Exhibit 10, has all sorts of highlighting on it that I don't think is in the record.

The document on Exhibit 11 I think has some annotations that I don't know that Judge Hudgins put on

Hudgins, S. - Direct                                          22

there.  I don't know that that foundation has been established.

I don't have an objection to court documents that are in the record being admitted and then identified to show the witness, but I just want to make it clear that if there is an annotation on it in some way, that's not in the court file, that's not a part of that.

THE COURT:  Are these court documents in this case?

MS. CHAVIS:  Yes, Your Honor.  Exhibit Number 10 is document 165 in this case.  Exhibit Number 11 is document 511-19.

THE COURT:  Then use the ECF numbers.  If they are electronic numbers, then use those documents that would be in the case.

MS. CHAVIS:  Okay.  So as I identify them by the exhibit number, I will identify the ECF number immediately after that.

THE COURT:  All right.

MS. CHAVIS:  Okay.

BY MS. CHAVIS:

Q.  So Exhibit Number 79 is also ECF number 551-4?

A.  Yes, it is.

Q.  This is just the same information taken from the schedule that you provided the Court placed in a calendar format?

MR. SAMUELS:  Judge, I would object to this.

JODY A. STEWART, Official Court Reporter

Case 4:08-cr-00016-RBS-DEM  Document 894  Filed 12/14/23  Page 23 of 226 PageID# 8938

Hudgins, S. - Direct                                              23

THE WITNESS:  I have no idea --

THE COURT:  Wait.  Let the objection finish.

Go ahead.

MR. SAMUELS:  Thank you, Judge.

Unless Judge Hudgins can say that he created this and recognizes this, I would object to him being asked to speak about this document.

THE COURT:  Lay a proper foundation, Ms. Chavis.

BY MS. CHAVIS:

Q.  Judge Hudgins, do you recognize the dates on this document as correlated to the documents that you previously looked at?

A.  You mean all of these entries?

Q.  If you --

A.  I have no idea.

Q.  If you could view the documents that we just looked at --

A.  Do you want me to do that, to take all those dates and compare them to this?  Because I've never seen this before.

Q.  Correct.

THE COURT:  Sustain the objection.

BY MS. CHAVIS:

Q.  Please go back to the document that we were just looking at.

A.  I'm sorry, was that 49?

Q.  It was 11.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                           24

A.   11?

Q.   Yes, sir.

A.   I have that.

          THE COURT:  While we're here, Ms. Chavis, I'm looking at this on the screen.  It has white blocks.  It has yellow blocks.  It has blue blocks.  It might have a green block there.  Is this a document you created or someone in your office created?

          MS. CHAVIS:  Yes, ma'am, it is.

          THE COURT:  So at most it's a demonstrative exhibit?

          MS. CHAVIS:  It is, yes, ma'am.

          THE COURT:  Well, he said he has never seen it and doesn't know anything about it, so go ahead from there.  I sustained Mr. Samuels' objection.

          I just wanted it on the record what this document is or purports to be that I'm looking at on the screen.

          MS. CHAVIS:  I'm going to have to pull a different document.  Excuse me, Your Honor.

BY MS. CHAVIS:

Q.   Could you please go to Defendant's Exhibit 158.  It's going to be in a separate binder, probably a small one.

A.   I'm sorry, the binder popped open here.  Anyway, I have the exhibit number.  All right.  158?

Q.   Yes, sir.  Page 5 of 24.

Hudgins, S. - Direct                                                  25

A.  All right.  I have it.

Q.  Do you recognize this document?

A.  I recognize what it is, yes.

Q.  What is it?

A.  It's the detail for a submission for an invoice.

Q.  What invoice?

A.  The invoice for Mr. Runyon's case.

Q.  Whose invoice is it?

A.  Mine.

Q.  This is your writing?

A.  It is.

Q.  Do you see the entries for March 27th and March 28th?

A.  I do.

Q.  What does that say?

A.  FDPA conference, ten hours.

Q.  And what does that mean?

A.  That was a federal defense conference that we attended. We were invited to attend it because we had Mr. Runyon's case.  It was a conference for anybody who had a federal death penalty case in the country.

Q.  Where did that conference take place?

A.  This one was in New Orleans.

Q.  So that conference was an invitation based on the fact that you were representing Mr. Runyon in a capital case.  Was it something referred to as an authorized case training?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                26

A.   Yes.

Q.   Does that sound familiar?

A.   Yes.

Q.   I'm showing you a document that's marked as Exhibit 140.

MR. SAMUELS:  Judge, I'm sorry.  Are we admitting these exhibits?  Because I think there needs to be a record if they're not admitted.  I don't know how it gets referred to down the road.

THE COURT:  I don't know what she's doing.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  She is showing him.

MS. CHAVIS:  Right now we are just looking at his time sheets.

THE COURT:  She showed him his time sheet.

MS. CHAVIS:  This was a long time ago.

THE COURT:  She showed him his time sheets, and there were two entries for ten hours.  He said he was at a conference, and I think she's now showing him the conference schedule.

MR. SAMUELS:  Yes, ma'am.

MS. CHAVIS:  Yes, ma'am.

THE WITNESS:  I can see it on here.

BY MS. CHAVIS:

Q.   Yes.  If it is easier for you to look at the screen, you don't need to go to the book; however, it is easier for you,

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                           27

Judge Hudgins.

A.  I see it.

        Was there a question?

Q.  Yes.  Does this appear to be an agenda from the conference training that you went to, the authorized case training conference in New Orleans?

A.  It does.

Q.  So I have highlighted an entry from one of the sessions there.  Could you read it for us, please?

A.  "How to effectively present your client's life story."

Q.  And who is the presenter there?

A.  Jean Barrett.

Q.  Did you attend all of the sessions?

A.  I did.

Q.  Who went to that training with you?

A.  It was plenary, so I assume that Mr. Woodward and Ms. Cronin went, but I don't recall who was there.  We were all three at this conference, so I'm assuming we all went.

Q.  Had you been to training like this before?

A.  No, not for a federal death penalty case.

Q.  Did you discuss Mr. Runyon's case at this training?

A.  If I'm not mistaken, if it was plenary, it was the whole group, and then we broke out for other things into smaller groups where we had an opportunity to discuss.

Q.  So, for example, at the next session --

Hudgins, S. - Direct                                           28

A.   Yes, the small groups, "How to effectively present your client's life story."

Q.   And so that was the remainder of the day?

A.   Yes.

Q.   And then if we look at page 2, to the next day of your training, from 11:00 to 11:20 is another plenary session, and what is that titled?

A.   "Effectively presenting your client's mental health case and protecting it from the government."

Q.   And then again you break into small groups, correct?

A.   Correct.

Q.   For the remainder -- well, for another session?

A.   Yes.

Q.   This is something you did in preparation of David Runyon's trial?

A.   Yes.

        MS. CHAVIS:  Your Honor, I would move to admit Defendant's Exhibit 140.

        MR. SAMUELS:  No objection, Your Honor.

        THE COURT:  Was that the schedule, the conference schedule?

        MS. CHAVIS:  Yes, the program agenda.

        THE COURT:  That's admitted.

        MR. SAMUELS:  Your Honor, the only issue I would have is that I assume when it comes in, it's not going to

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                           29

have the highlights and the annotations that Ms. Chavis has

put on it; is that correct?

       THE COURT:  You need to admit a clean copy.

       MS. CHAVIS:  Yes.  The Court's copy does not have

the highlights.

       THE COURT:  All right.

       MR. SAMUELS:  Thank you, Your Honor.

       (Defendant's Exhibit 140 received in evidence.)

BY MS. CHAVIS:

Q.  We talked about the date that the trial was scheduled and

seeking a continuance.  What do you recall about the actual

date of the trial?

A.  The March 13th date?

Q.  I'm sorry?

A.  The March 13th date?

Q.  Yes.

A.  What do I recall about it?

Q.  Did you seek another continuance after that?

A.  Yes.

Q.  Was that -- do you remember the government's position on

that continuance?

A.  The second one?  I think they joined.  I think they

agreed with the continuance but, I mean, it should be in

the -- I think they agreed.

       THE COURT:  The record is there, Ms. Chavis, of

Hudgins, S. - Direct                                        30

everything that occurred and any continuances.  If you have a relevant question, why that's important, go ahead and ask the question directly.  The record is there.  It's a voluminous record.  Any order that was entered, any continuance, any speedy trial, anything, whatever is there, I mean, nobody can just recall a record that long.  If there is a specific point you're trying to make, please ask the question.

MS. CHAVIS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Mr. Hudgins, I'm showing you what's marked as Defendant's Exhibit 17 and ECF number 240.  What is this document?

A.  The title is "Supplemental Motion to Continue Capital Sentencing Hearing."

If you're going to go from page to page, let me get the exhibit so I can do that, too.  I have it.

I'm sorry, did you ask me a question?

Q.  Not yet.  I was waiting for you to get to your page.

A.  I told you I have it.

Q.  I'm sorry.  I didn't hear that.  Thank you, Judge.

Page number 2, down at the bottom, there is some highlighting there, I believe, in the copy that you have.

A.  It's not highlighted here.

Q.  It's not highlighted on your copy.  The copy on the screen, could you please read that for us?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          31

A.   Just the highlighted part?

Q.   Yes.

A.   "A recent specialized mental health examination has uncovered evidence tending to suggest the existence of a significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability."

Q.   Okay.  And so this is a statement that you've written within this motion to continue --

A.   Well, I don't know -- did I --

Q.   -- the trial date?

A.   Let me go back.

Q.   If we go back to the back of the motion.

A.   Yes.  Yes, this is my motion, yes.

Q.   Yes.  That was filed by you, correct?

A.   Yes.  I said so.

Q.   Thank you.  I'm sorry.  I didn't hear you.

     Does it also indicate some record-gathering that you are still trying to do?

A.   Yes.

Q.   And what does it say about that?

A.   "Important medical records remain to be gathered, and additional collateral investigation of the defendant's social and family history conducted, in order to either corroborate or rule out the presence of serious mental abnormalities."

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          32

Q.   If you continue on in that document, there is an Exhibit A?

A.   Yes.

Q.   What is that exhibit?

A.   This was an affidavit from Sheila Cronin, who was the mitigation expert.

Q.   Who hired Sheila Cronin?

A.   I believe Jon Babineau.  She was in the case before I was in the case.

Q.   And do you see down near the bottom of the page it says, "Investigative findings to date"?

A.   Yes.

Q.   Do you see this highlighted section here?

A.   I do.

Q.   Could you please read that?

A.   "The defendant is intelligent and was very cooperative in sharing his life story, but there are striking contradictions between his overidealized perception of his blessed and perfect family and what we have found to be reality.  Our investigation reveals a childhood marked by exposure to violence, divorce, an unstable mother with impaired parenting compounded by cultural issues, an emotionally detached stepfather and unstable living situations.  His adulthood has been marked by extremely poor judgment, impaired reality testing, failed relationships, and multiple failed career

Hudgins, S. - Direct                                          33

attempts.  He married a woman with psychiatric issues, and they had one child, who he adores.  He did well in the military until he was involved in a serious head-on collision that left him with vertigo, headaches, short-term memory loss.  His wife reported a significant personality change concurrent with the accident.  He seemed less able to cope and deal with frustration.  His military functioning declined, and he had difficulty with subsequent jobs.  His marriage fell apart and his life took a downhill course."

THE COURT:  Who signed that?

THE WITNESS:  That is Ms. Cronin, the mitigation person.

THE COURT:  Who is Allan F. Mirsky?

THE WITNESS:  This is a different document, Your Honor.  I don't know what this is.

THE COURT:  The document on the screen in front of us, that's signed by Dr. Mirsky?

THE WITNESS:  Yes, ma'am.  That's -- the one I just read from is the one that she just put back on there.

MS. CHAVIS:  Yes.  I'm now flipping to the next attachment, which is attachment B, and I'm going to Page 2 of that.  This is the first page of that, Your Honor.

THE WITNESS:  This is Exhibit B?

MS. CHAVIS:  Yes.  It says down here this is Exhibit B.  This is the Center for Psychological Evaluation

Hudgins, S. - Direct                                                    34

and Consultation, Allan F. Mirsky.

THE COURT:  So you are off of Ms. Cronin?

MS. CHAVIS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  If you could please turn to Exhibit B.

MR. SAMUELS:  Your Honor, again, I don't know what we are doing on admitting these, but I don't have an objection to Judge Hudgins considering that, because clearly it was part of his motion, but we would object to any of the hearsay in there for those statements being considered as the truth.  I don't have an objection to Judge Hudgins reviewing them, but I don't know what it's being offered for, and I would note that for the record.

THE COURT:  I understand.  What you're saying is that if it's being offered as a document that he had access to and he reviewed, that's one thing.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  If it's being offered as the opinion of Dr. Mirsky, then Dr. Mirsky or somebody has to come forward.  This isn't Mr. Hudgins' opinion.

MR. SAMUELS:  Correct.  And the same thing with Ms. Cronin.  If she is writing all of that in an affidavit, I would object to that being considered for the truth.  I understand it can be offered for the effect it had on Mr. Hudgins.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                    35

THE COURT:  I agree.  I will admit it for that purpose.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  Limited purpose.

BY MS. CHAVIS:

Q.  So we are looking at Page 2 here of Exhibit B, Dr. Mirsky's report of June 26, 2009.  Could you please read the highlighted portion here.

A.  "Prior injuries of potential relevance to Mr. Runyon's mental status include incidents of grenades being detonated quite close to him during training exercises while in service.  These occurred between 1989 and 1991.  He also reports two serious car accidents with cognitive sequelae, one in 1990 and the other in 1996.  These incidents produced a variety of symptoms, according to Mr. Runyon, including brief unconsciousness, vertigo (from which he still suffers occasionally), temporary deafness, numbness, impaired memory, 'jumbled thoughts,' and according to a report from his estranged wife, marked personality changes including a short temper.  Some of the medical professionals who saw David raised the possibility of a post-traumatic stress disorder."

Q.  If you turn to Page 5 of this report, down at the bottom, can you please read the highlights there.

A.  "The low score on the Purdue Pegboard is consistent with some mild, diffuse brain damage, but the poor CPT scores are

Hudgins, S. - Direct                                    36

clearly indicative of dysfunction in a brainstem cortical system responsible for maintaining alertness and attention. These poor scores, as well as his continuing symptoms of vertigo, would indicate that he is unable to persist in any attention-demanding activity for a sustained interval, and may explain his spotty and uneven work history.  In any event, the symptoms merit further intensive neurological investigation.  They are entirely consistent with brainstem injury, which could have resulted from his earlier motor vehicle injuries or possibly the blast from the grenade explosions.  Blast injury" -- this is taking a part of a sentence out -- "blast injury can have profound effects on neurocognitive functions."

            MR. SAMUELS:  Your Honor, we have the same position with respect to that report to be considered by Judge Hudgins, but not necessarily for the truth, given that Dr. Mirsky is not here.

            THE COURT:  I agree.

            MR. SAMUELS:  Thank you.

            THE COURT:  That's the way the Court will consider it.

BY MS. CHAVIS:

Q.  Was David Runyon willing to meet with you?

A.  Yes.

Q.  Did he meet with the investigator in your case?

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                       37

A.  Mr. Ford?

Q.  Yes, sir.

A.  I don't know.  If he did, he did it before I was in the case.

Q.  Did you instruct Mr. Ford to meet with David Runyon to gather any information?

A.  No.

Q.  Did David Runyon meet with Sheila Cronin?

A.  He did.

Q.  Did you instruct Sheila Cronin to meet with David Runyon to gather any information?

A.  I don't know that I instructed her.  We worked kind of in tandem, and I knew when she was going, and she knew when I was going.  Sometimes we went together, and sometimes we went separate.

Q.  Did David Runyon write you letters with additional information following up on your conversations that you had had in the jail?

A.  That is possible.  I haven't had access to my file, and so I haven't seen such things.  It's possible.

Q.  All right.  I'm not asking you to try to -- I'm just asking you, based on your memory, if you remember or not.

A.  I cannot remember that.

Q.  I understand it's been a very long time.

        Did David Runyon submit to testing by experts?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          38

A.   Yes.

Q.   We do have a report from Dr. Mirsky, so David Runyon submitted to testing by Dr. Mirsky?

A.   Yes.

Q.   He submitted to testing by two government experts?

A.   Yes.

Q.   And there was another defense expert as well, Dr. Merikangas, that David Runyon submitted to that testing?

A.   Yes.

Q.   David Runyon also submitted to some brain scans that Dr. Merikangas ordered?

A.   Yes.

Q.   When you were appointed to the case, had Mr. Babineau already retained mental health experts?

A.   Yes.

Q.   Who had he retained?

A.   Evan Nelson and Dr. Bender, and I don't remember his full name.

Q.   Showing you what's marked Defendant's Exhibit 126, what is this document?

A.   It says that it's a letter from Dr. Nelson to Mr. Babineau.

Q.   And what is the date on that document?

A.   December 2nd, 2008.

Q.   Can you please read the highlighted paragraph.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                         39

A.   "Based upon my evaluation of Mr. Runyon thus far, I recommend that you ask the U.S. District Court to authorize a neuropsychological evaluation of your client.  Given his reported history of losing consciousness, a longstanding problem with sagging on the right side of his face (a potential soft neurological sign), and repeated failures to achieve at a level commensurate with his intellectual ability, it is plausible that neuropsychological deficits are a defining element of his personality and behavior.  If so, that would be relevant to mitigation if there is a death penalty phase."

        MS. CHAVIS:  I would ask that this Exhibit 126 be admitted.

        MR. SAMUELS:  No objection, Your Honor, as long as it doesn't have the highlights.

        THE COURT:  It's a letter to Mr. Babineau?

        MR. SAMUELS:  We were going to ask either Mr. Babineau or Judge Hudgins about it, so I don't have a problem with admitting it now.

        THE COURT:  Then I'll admit it.

        MR. SAMUELS:  Thank you, Judge.

        (Defendant's Exhibit 126 received in evidence.)

BY MS. CHAVIS:

Q.   Judge Hudgins, you indicated that you had received Mr. Babineau's file, correct?

Hudgins, S. - Direct                                              40

A.   Correct.

Q.   And you reviewed his file?

A.   I did.

Q.   I'm showing you another document that's dated February 2nd, 2009.  What is this document?

A.   It says that it's a letter from Evan Nelson to Jon Babineau.

Q.   Could you please read the highlighted portion.

A.   "The data collection process is still ongoing but you asked for a summary of my opinions thus far."

        MR. SAMUELS:  I'm sorry.  What exhibit number was that?

        MS. CHAVIS:  This is your Exhibit Number 11.  We don't have it marked as an exhibit of ours because we noticed that it was an exhibit of yours.

BY MS. CHAVIS:

Q.   Could you please read the two highlighted lines on the second page.

A.   "It remains to be seen if neuropsychological deficits contributed to why Mr. Runyon had such poor achievement in school, work, and relationships, but from the current data, it is my" -- and then we go to the next highlight.  "Please continue to send me more information as the various collateral witnesses from around the country are located."

Q.   Showing you a document that's labeled Defendant's Exhibit

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          41

116.  What is this document?

A.  This is a -- I guess it's an e-mail from Dr. Nelson to myself and Mr. Woodward.

Q.  And what's the date on it?

A.  May 22nd, 2009.

Q.  And what is Dr. Nelson saying in this e-mail?

A.  "It has been a very long time since I have heard from anyone on the Runyon case -- was a neuropsych eval ever conducted?"

          MR. SAMUELS:  Judge, if the record could just be clear that Judge Hudgins is just reading the highlighted portions of some of these documents, not reading the entire document.

          THE COURT:  I understand.

          MR. SAMUELS:  Thank you.

          THE COURT:  The document, the whole document will be in evidence.

          MR. SAMUELS:  Yes, Your Honor.

          MS. CHAVIS:  Yes.  I was just going to ask that Defendant's Exhibit 116 be admitted.

          THE COURT:  It's admitted.

          MS. CHAVIS:  Thank you.

          (Defendant's Exhibit 116 received in evidence.)

BY MS. CHAVIS:

Q.  Defendant's Exhibit 113 is being placed before you,

Hudgins, S. - Direct                                          42

Judge Hudgins.  This is dated July 16th, 2009.  What is this document?

A.  It appears to be an e-mail from Dr. Nelson to me.

Q.  And what is Dr. Nelson saying here?

A.  He says, "Just touching base.  I have not heard back how the trial is going.  If there is a strategy for mitigation in the event he is found guilty of capital murder, what, if anything, you need from my by way of paperwork or preparation, et cetera."

Q.  There is a typo there, right?

A.  Yes.  It looks like it should be, "From me."

Q.  You obtained different mental health experts to substitute for Dr. Nelson, correct?

A.  Correct.

Q.  Those experts were Dr. Mirsky and Dr. Merikangas?

A.  Correct.

Q.  I'm showing you what is marked Defendant's Exhibit 157.  What is this document?

A.  It is a cover letter from me to the Court enclosing notice to offer mental health evidence in David Runyon's case, and enclosing the reports of Dr. Cunningham and Dr. Mirsky.

Q.  What is the date on that?

A.  July 20th, 2009.

          MS. CHAVIS:  I would offer this as an exhibit.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          43

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit 157 received in evidence.)

BY MS. CHAVIS:

Q.  Then I'm showing Defendant's Exhibit 16, which is also ECF Number 230, and is dated June 29th, 2009.  What is this document?

A.  It's a supplemental notice regarding mental health experts for Dr. Mirsky.

Q.  Is there another expert that you're giving notice of?

A.  Dr. Merikangas.

Q.  I'm showing you Defendant's Exhibit 14, which is also ECF 511-20 that was filed on February 4th, 2016, but this document, the original document is dated July 2nd, 2009. What is this document, Judge Hudgins?

A.  This is a correspondence from Dr. Mirsky saying he had spent six hours testing Mr. Runyon and that we needed to have a neurologist evaluate him.

Q.  Do you mind please reading that.

A.  "I have spent six hours testing your client, Mr. David Runyon, at the Portsmouth City Jail on Friday, June 26th, 2009.  My review and analysis of the information is not yet complete.  However, it is clear from the data that there is strong evidence that he is suffering from a neurological disorder.  It would be essential for Mr. Runyon to be

Hudgins, S. - Direct                                                    44

evaluated by a neurologist and have the necessary tests to establish the nature of his disorder.  Please let me know if you require any additional information on this matter."

Q.  Thank you.

What did you do based on this letter?

A.  I think we already had Dr. Merikangas in line to do this kind of testing.  Anyway, we asked the Court to allow that testing to be done.

THE COURT:  The Court allowed it?

THE WITNESS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  Defendant's Exhibit 18 is also ECF document 242.  That was filed on July 17th, 2009.  What is this document?

A.  This is the statement of counsel requesting that we be allowed to engage Dr. Merikangas to do neurological testing.

Q.  Just as you described?

A.  Yes.

MS. CHAVIS:  Your Honor, I believe I did not move to admit Defendant's Exhibit 14.  I would ask that it be admitted.  That was the letter from Dr. Mirsky to Judge Hudgins, this one.

MR. SAMUELS:  I'm sorry.  That's just the one page, that one letter?

MS. CHAVIS:  Yes.

MR. SAMUELS:  That's the exhibit?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                            45

MS. CHAVIS:  Right here.

MR. SAMUELS:  Judge, I just have the same objection to this being considered for a truth of the matter asserted purpose.  I understand it can be considered for the effect it would have had on Judge Hudgins, but I would object to it being considered for a non-hearsay purpose since we don't have Dr. Mirsky.

THE COURT:  It's admitted that it's something that Mr. Hudgins received, but the content and the truth of the matter does not pass muster.

MR. SAMUELS:  Thank you, Judge.

(Defendant's Exhibit 14 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 114.  It's dated July 20th, 2009.  What is this document?

A.  This is a correspondence from me to Dr. Merikangas.  Do you want me to read the highlight?

Q.  Yes, please.

A.  "I wanted to notify you that the jury came back on Friday and found David Runyon guilty of two capital counts.  We will go back to court on Wednesday for some hearings, one of which will be to determine whether or not the Court is going to appoint you to help us with the psychiatric phase of the case."

MS. CHAVIS:  I would ask that Defendant's Exhibit

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          46

114 be moved into evidence.

      MR. SAMUELS:  No objection, Your Honor.

      THE COURT:  It's admitted.

      (Defendant's Exhibit 114 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 117.  It's dated July 22nd, 2009.  What is this document?

A.  This is correspondence from me to Evan Nelson, telling him that the jury had determined that David Runyon was eligible for the death penalty.

Q.  Who else is on this e-mail?  Who else are you sending it to?

A.  I'm sorry.  Evan Nelson, Allan Mirsky, James Merikangas, and Sheila Cronin.

Q.  Can you please read the e-mail.

A.  "Today the jury determined that David Runyon is eligible for the death penalty, and the judge scheduled the trial of that matter for August 19th at 10:00 a.m.  She set a deadline for all defense mental health reports for August 6th, 2009, and all government rebuttal reports for August 14th, 2009.  I will be contacting our mitigation witnesses to notify them of the beginning trial date.  The Marshals Service will make arrangements for all non-expert witnesses' travel.  The Court has said the defense case will begin on Monday, August 24, so we will be bringing our non-expert witnesses in over the

Hudgins, S. - Direct                                          47

weekend.  I will keep you informed."

MS. CHAVIS:  I'd ask that Defendant's Exhibit 117 be placed into evidence.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit 117 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 20, dated July 23rd, 2009.  I'll see if I can make that a little bit bigger.  It's sort of challenging.  What is this document?

A.  Correspondence from Allan Mirsky to me.

Q.  Can you please read the highlighted paragraph.

A.  This is from Dr. Mirsky.  "I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blasts he sustained when undergoing training exercises in the ROTC.  These were compounded by the effects of the motor vehicle accidents.  His impaired attention seen in the poor continuous performance test scores in my report is one of the classical symptoms of blast injury and impact injury after a car accident.  Other symptoms such as quickness to anger and impulsivity are also well documented in the brain injury literature.  The occasional dizziness he shows is also symptomatic of brainstem injury.  In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrior, and this should be considered

Hudgins, S. - Direct                                          48

in his sentencing."

MS. CHAVIS:  I move for the admission of Defendant's Exhibit 20.

MR. SAMUELS:  Judge, I object to the hearsay, but not to the effect on Judge Hudgins.

THE COURT:  This was Exhibit 20?

MR. SAMUELS:  Yes, ma'am.

THE COURT:  I conditionally admit it.

MR. SAMUELS:  Thank you, Judge.

(Defendant's Exhibit 20 received in evidence.)

THE COURT:  Who wrote that exhibit?  Who was the author of that?

THE WITNESS:  Dr. Mirsky.

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 139.  This is dated July 23rd, 2009.  What is this document?

A.  It's a letter to Dr. Merikangas from me enclosing copies of the evaluations performed by the government mental health experts.

Q.  And the government's mental health experts' names are?

A.  Raymond Patterson and Paul Montalbano.

Q.  I'm showing you Defendant's Exhibit 45.  This is also ECF number 277 that was filed June 30th, 2009.  What is this document?

A.  It says that it's a document created by Paul Montalbano,

Hudgins, S. - Direct                                                    49

and it is sent to Brian Samuels and Lisa McKeel.  And it starts out describing who David Runyon is.

Q.  The title of the document is?

A.  "Forensic psychological evaluation."

Q.  I'm showing you page 17 of this report from Dr. Patterson.  There are a couple of statements that are highlighted here.  Could you please read those to us.

A.  "In November of 1996 he was in a motor vehicle accident." That is one statement.  The second is, "Mr. Runyon stated that Captain Hannaman was unsympathetic after his accident and yelled at him for being unshaven on the Monday after the accident when 'my sensory process was out of whack.'"  "My sensory process was out of whack" was quoted, in quotations.

Q.  This is Page 20 of Dr. Patterson's report.  Would you please read the highlighted portions.

A.  "Runyon reported that he was in a bad car accident in 1996 when he was hit by a drunk driver in a head-on collision.  His former wife corroborated this during her Grand Jury testimony.  Mr. Runyon reported that the drunk driver was going well over 100 miles an hour and that objects from the back of the truck hit him in the back of the head and his knees went up into the steering column.  He did not believe he lost consciousness.  He reportedly was treated at a local hospital and released.  He received follow-up treatment at an Army hospital.  He reported that he sustained

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                           50

tremendous muscle damage and tore his anterior cruciate ligament, ACL, in his left knee.  He received physical therapy for four or five months.  He indicated that he had memory problems, and his wife told him he would forget things.  He would get vertigo at times.  He reported that his memory has improved but that he still gets vertigo at times.  In one of his e-mails, he also writes that he has 'hearing loss and two bad knees.'  Being knocked out playing football, he ran into a telephone pole and was briefly knocked out.  Knocked out by a hand grenade simulator.  After losing consciousness, he was dragged through the woods by two soldiers.  During another military exercise, he reported that a C-4 explosive went off as he was diving into a bunker.  Thought that there might be additional head trauma but could not recall any."

THE COURT:  Okay.  Two things.  Number one, Dr. Patterson is scheduled to testify, is he not?

MS. CHAVIS:  Your Honor, counsel, we -- counsel for defense and the government have entered into a stipulation regarding Dr. Patterson and Dr. Montalbano.

THE COURT:  All right.  Is this something, Mr. Hudgins, that you were privy to, this report?

THE WITNESS:  I got the report after the guilt and innocence phase of the trial.

THE COURT:  All right.

THE WITNESS:  The second or the third part of this that you wanted me to read is, "Mr. Runyon has had no disciplinary infractions at the time of his report and was credited with providing emergency first aid to a cellmate who suffered a seizure and associated head injury. Dr. Cunningham noted that Mr. Runyon was placed in the general population, reflective of an appraisal that he was at low risk for violence in his correctional environment."

MS. CHAVIS:  I apologize.  I have been saying Dr. Patterson this whole time, but we have been actually looking at the report of Paul Montalbano.  I need to make that correction.

THE COURT:  Everything he's read so far, or started with that very long quote?

MS. CHAVIS:  Yes.  Defendant's Exhibit 45 is from Dr. Paul Montalbano.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  This is Page 23, if you could read the highlighted portion, please, Judge Hudgins.

A.  "Validity Scales on the MMPI-2 indicated significant defensiveness.  He was pervasively self-favorable and minimizing of weaknesses; therefore, his own assessment of his faults, problems, or distress may underrepresent what is actually occurring."

Hudgins, S. - Direct                                        52

Q.  On Page 24, there is a box chart in the middle of the page.  Do you see that?

A.  I do.

Q.  Can you tell us what that represents, what information is in there?

A.  It's an IQ score, confidence of the results, rank, percentage rank of what it is, and then a qualitative description such as high, average.

Q.  And under the first column that says "scale," do you see where it says "verbal" and "performance"?

A.  I do.

Q.  And the second column says "IQ score"?

A.  I do.

Q.  The verbal IQ score is 111, and the performance IQ score is 122?

A.  I see that.

Q.  And the percentile rank for the verbal IQ score is 77, and the percentile rank for the performance IQ score -- for the performance IQ is 93?

A.  I see that.

Q.  And do you know what the discrepancy between those two scores indicates?

A.  I do not.  I mean, I imagine I can -- if you want to point me to something in here that I can read, I can figure it out.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                         53

Q.   Okay.  Would you agree that there is a gap between those two scores?

A.   I do, yeah.

THE COURT:  Well, one is high IQ, one is superior; is that correct?

THE WITNESS:  Yes.

BY MS. CHAVIS:

Q.   Page 26, would you please read us those sentences that are highlighted.

MR. SAMUELS:  Judge, I think I'm going to object at this point.  I have let this go for a little while.  But I think we are just cherry-picking statements from the report. The report is going to come in as a whole.  If we are going to continue this, I will have to go through, with Judge Hudgins, the entire report.  I think we are just picking these isolated portions of it without reference to what's in context in the report.

THE COURT:  Seems to me the way to move this along is to ask him if he's seen this report and did he read it, and then it's admitted into evidence at some point, and then you argue what's in there, rather than have him sitting here reading into the record all of this.  This will go on forever.  I mean, we are moving at an extremely slow pace, but that's fine, but if there is a better way to do it.  I don't understand why you can't just ask him if he's seen the

Hudgins, S. - Direct                                          54

report, if it was something he considered, and then you can argue the report later.

MS. CHAVIS:  Under the *Strickland* inquiry, Your Honor, I think it's important to understand or to know what counsel -- what information counsel had at the time of his representation so that we know whether counsel should have followed up on his investigation, whether there were red flags that pointed to areas that counsel should have continued to investigate and then did not continue on down those avenues of investigation, and I'm not sure of another way to get before the Court those -- that type of information that counsel, you know, did possess and was aware of other than pointing out what that information was.

THE COURT:  Well, I can read the report, and if it is an exhibit, I'm going to consider it.  So I don't understand exactly what you're saying.  You're assuming that I'm not going to look at the exhibits or read the report. What I was suggesting is that you ask him if it's a document he had and considered, and then you admit it into evidence, and then you can argue that to the Court later, or if you have a specific question of him, did you read that?  What did it mean to you?  But just sitting here reading lines from reports won't enhance, in my opinion, your argument because the document will be in.  You can argue these things to the Court from the document if this is something

Hudgins, S. - Direct                                    55

Mr. Hudgins and/or Mr. Woodward considered.

You will have your experts who will say why they wrote it and what they did.  In any event, this is a particularly laborious way to proceed.  Not only is it laborious, but in the end, the Court is not going to just pick one line out.  It's the totality.  What did they know?

MS. CHAVIS:  Yes, Your Honor.  It is the totality of what they knew, so I'm trying to put the totality in front of the Court.  I understand, I mean, it is the government's job to show the other side of it, and I would expect them to do that.  So we are trying to present our side of it, and that's just the nature of the claim and of the case and what this hearing is about.  I think that's what the remand is about, is to present these facts for the Court, but I understand that the government has an objection.

THE COURT:  And I ruled.

MS. CHAVIS:  You would like me to just have him acknowledge the documents, that he saw them?

THE COURT:  I ruled.  As an attorney, you will have to follow up on that ruling, but I would, frankly, suggest that you get the document admitted, get that he saw something.  If you want to call attention to something in the document, ask him how he proceeded on it.  Just having him read a portion of the document, you're not getting any

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          56

information from him as an attorney.  Call his attention to the highlighted portion and say, what did you do to follow up?  This is getting nowhere, just somebody reading portions of a document that are on the record.  I can't tell you any better how to proceed.

If you want to laboriously go through the documents and have a witness read the portion in, you've asked no follow-up question.  You're going to have your document in, and the Court is going to read it.  The Court is going to read the entire document, and you can argue the highlighted portions if you want.  You can also call the witness's attention to something and ask was there any follow-up.

BY MS. CHAVIS:

Q.  Judge Hudgins, what was the follow-up on this information that is contained in Dr. Montalbano's report that we have reviewed so far?

A.  We sent the reports to our experts for their input on what was said.

Q.  Was there any other follow-up?

A.  There is none that I can specifically recall.  I mean, the report is 34 pages long, I think, so it's hard for me to, you know, pinpoint what we might have done about one piece of information.

THE COURT:  Who were your experts that you sent it to?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                      57

THE WITNESS:  Mirsky and Merikangas.

BY MS. CHAVIS:

Q.  Sir, this document is ECF document 277, that is already in the record.  I think I might have indicated that initially.

With respect to the facts that were listed in the document, did you instruct either your investigator or your mitigation specialist to follow-up on them?

A.  Well, yes.  I mean, we were following up trying to get the information, some of which I've just read, up till the last day of the trial.

Q.  Tell me about that.

A.  Well, the automobile accident, we tried to corroborate that.

Q.  In what way?

A.  Well, Mr. Runyon didn't know what state the accident was in, as I recall.  Certainly didn't know what hospital he had gone to.  So we couldn't get any direct information.  We tried to and didn't.  I don't know if there was a later effort made to do that, but we never had any direct information on that.  We did have medical records that indicated he had given information in what I would call follow-up for that.  We tried to get information on the grenade explosions.  The last that we had was that his records that would have contained that were in a warehouse

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                    58

that experienced a flood, and they could not locate such records, and so they presumed that the records were destroyed in the flood.  We actually asked for a continuance to try to continue to get information about these things.  That was denied.  We weren't able to provide any information that there was a means to further investigate those things, so that request was denied.

Q.   Judge Hudgins, I'm showing you what's marked Defendant's Exhibit 122.  This is dated May 5th, 2009.  What is this document?

A.   This is a -- I'd say a memorandum, maybe, to myself and Mr. Woodward from Sheila Cronin regarding David Runyon's military medical record review covering the years '94 to '97.

Q.   Turn to Page 2 of this document, and there is highlighting in yellow and pink.  Could you please read that.

A.   "David was involved in a high-speed, head-on collision with a drunk driver.  He had his seatbelt on, but his vehicle had no airbags.  He had to be removed from the car with the Jaws of Life and was transported to a civilian hospital in Alabama" -- "had no loss of consciousness and skull films were negative."

        THE COURT:  Was he kept at the hospital, or was he released?

        THE WITNESS:  I don't know, Your Honor.  We couldn't get the medical records from the hospital.

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                      59

THE COURT:  I think it said in there.

THE WITNESS:  This was --

THE COURT:  Put that back on.  You stopped the page.

Where he was treated and released, doesn't it say?

THE WITNESS:  That's what that says, but I think that this is Sheila Cronin's review of the Army records, not the hospital records where this occurred.

THE COURT:  Okay.

THE WITNESS:  We never had -- we had the Army records that were the follow-up things.  We could not find the records where he went to the hospital after the accidents.  So this is Ms. Cronin's interpretation of the Army records that weren't the initial records.

THE COURT:  Thank you for the clarification.

MS. CHAVIS:  I'd ask that Exhibit 122 be admitted.

MR. SAMUELS:  Judge, we object to the hearsay but not to the fact that Judge Hudgins had seen that and for that limited purpose.

THE COURT:  It is admitted for that purpose.

MR. SAMUELS:  Thank you, Judge.

(Defendant's Exhibit 122 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you Defense Exhibit 9.  Actually, let me wait on this for one minute.  I'm doing this out of order.

Hudgins, S. - Direct                                          60

Let me show you Exhibit 42 first.  Exhibit 42 is also ECF document 511-23, that was filed on February 4th, 2016. You see at the bottom -- what does this document appear to be?

A.  It appears to be an Army medical record.

Q.  And does it indicate who the person is?

A.  David Runyon.

Q.  Could you see the date on this report?

A.  Looks like maybe 9 August '95, I think.

Q.  So this is a handwritten document, correct?

A.  It is.

Q.  It's not typed?

A.  With a highlighting over it, and then it's a copy, so --

Q.  So the quality makes it challenging to read the handwriting?

A.  It is.

Q.  So I know what it says because I've studied this document a lot, so if you don't mind, just to speed things along, I will read it, and maybe you can --

MR. SAMUELS:  Judge, I am going to object to this.

MS. CHAVIS:  -- let me know if you agree with my interpretation, or you can try to read it yourself, Judge Hudgins, and we can --

MR. SAMUELS:  Unless Judge Hudgins can authenticate this and knows what it is, there is no foundation other than

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          61

these records being filed, but in 2016, when Judge Hudgins was no longer on the case. These are not records that he filed. If he can authenticate it, that's one thing, but I haven't heard that question asked.

THE COURT: Number one, it would need to be authenticated; and, number two, the attorney's interpretation is not acceptable. It would be the witness's after he read it, but you haven't authenticated it and laid a proper foundation. He just says it appears to be an Army record.

BY MS. CHAVIS:

Q. Judge Hudgins, have you seen these records? Did you receive these records?

A. I received medical records from Sheila Cronin. I don't remember specifically this record, or nor would I remember probably any specific record, but I did receive medical records from Sheila.

Q. And you received memorandums from Sheila Cronin like the one we just reviewed that summarized medical records?

A. Yes.

Q. And the memorandum that we just reviewed was summarizing medical records from '95 to '97?

A. (Nods head.)

Q. If we flip through these records --

THE COURT: Excuse me. What is the ECF number on

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          62

this?

MS. CHAVIS:  511-23.

THE COURT:  Can you pull it down so I can see the ECF?

MS. CHAVIS:  I'm sorry, Your Honor.

THE COURT:  This was filed in this court on February 4, 2016?

MS. CHAVIS:  Yes, Your Honor.  This is an attachment to our amended petition.

THE COURT:  All right.  Go ahead.

BY MS. CHAVIS:

Q.  Okay.  So if we flip through here, we have records dated from '95 to '96 to '97 that seem to correlate with the summaries, the memos that Sheila Cronin had summarized?

A.  Yes.  Yes.

Q.  Would it be fair to say that these are the records that she was summarizing in that memo to you?

A.  I presume they are.

Q.  Would you have any other -- did you represent any other person named David Runyon?

A.  No.

THE COURT:  That doesn't mean he got the records.  You've got Ms. Cronin is supposed to testify, is she not?

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  So she should know what she put with

Hudgins, S. - Direct                                         63

her report.  I think you have to establish with him, has he seen this, does he remember it, and so forth, because Ms. Cronin is the one to say whether she sent it or not, if he doesn't know.

BY MS. CHAVIS:

Q.  Do you remember reviewing David Runyon's medical records?

A.  I do.

Q.  Do these appear to be them?

A.  They are David Runyon's medical records from that time frame, and they are the time frame that she says in the memo, but, you know, I can't tell you that I remember these documents 13 years ago.  I've looked at thousands of medical records since then.  I can't tell you these are the ones I saw that day or at that time.

        MS. CHAVIS:  I could proffer this testimony, Your Honor, or I guess we could recall Judge Hudgins after we have Sheila Cronin come in and establish the foundation to indicate that these are the records she provided to Judge Hudgins.

        THE COURT:  If she provided them, then you can argue it to the Court.  He is sitting here saying he doesn't remember whether he saw them or not.  Her testimony will establish whether she sent them or not.

        MS. CHAVIS:  Yes, Your Honor, but I want to ask him questions about it.

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                    64

THE COURT:  Then you can recall him.  How is that?

MS. CHAVIS:  Okay.

THE COURT:  Because you haven't laid a foundation that these were the records that Ms. Cronin sent with that report because his testimony is he doesn't know.

Am I mischaracterizing your testimony?

THE WITNESS:  No, ma'am, you're not.

THE COURT:  He doesn't know, and he said he has seen thousands of records.  So you can put on Ms. Cronin, and she can say whether she sent them, and then if we need to call him back, you can call Judge Hudgins back, and you can ask him if he saw them.  I don't know that his testimony is going to be any different, if he acted upon them or what.

I mean, I think to me it's an argument that you make to the Court, but it's up to you how to proceed.  But you've got to lay a foundation first that these were records that were sent by Ms. Cronin with this report that you've referenced.

BY MS. CHAVIS:

Q.  Well, Judge Hudgins, if these records were found in your -- within your case files, would you have not reviewed them?

A.  I would have, but I don't know what was in my case file.  Nobody has shown it to me.  I'm surprised.

Do you have my case file?

Hudgins, S. - Direct                                    65

Q.  Yes.

THE WITNESS:  Sorry, Your Honor.  You should probably declare me an adverse witness at this point because I can't believe what I'm hearing.  I will be adverse from this point forward.

THE COURT:  Judge Hudgins has said that he views himself as an adverse witness at this point, he can't believe what he's hearing, and so you have him on cross-examination mode, if that's what you desire to do.

MS. CHAVIS:  All right.  Thank you.

BY MS. CHAVIS:

Q.  As part of your mitigation investigation, you were looking for an injury in Mr. Runyon's past that would affect his reasoning ability, correct?

A.  Correct.

Q.  And what did you do to look for something like that?

A.  Well, I described what we did as far as following up on the car accidents and the grenade explosions.  We had experts who were doing testing on him.  Those were the things that we did to follow up on that area.

Q.  Do you remember a couple, couple meaning two people, who lived in Alaska?

A.  Yes.

Q.  Do you remember that they were here at the time of trial?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          66

Q.   They did not testify, correct?

A.   Correct.

Q.   Was that your decision to send them home without testifying?

A.   It was.

Q.   When did you remember that that was your decision to send them home without testifying?

A.   Well, I was the one who interviewed all of the people who came in from various places, and so I was the person who talked to them directly and would have made that decision.

Q.   When did you remember those?

A.   I don't remember it specifically.  There is nobody else who would have made that decision.

Q.   So you made the decision with respect to the mitigation witnesses in the penalty phase?

A.   At that point.

        THE COURT:  Who were the two witnesses from Alaska?

        THE WITNESS:  Their name was Seeger, I think.  It was somebody who we had sent the investigator to talk to, and I had a report from the investigator.  That was before I was in the case.  And then based on what they said in the investigation -- and I'm speaking generally.  I don't remember them specifically, but I brought the people here to testify at the trial, but I met with them the weekend before.  They all came into the hotel here, and I came over

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                              67

and met with all of them ahead of time, and some of them I put on, some of them I did not.

BY MS. CHAVIS:

Q.   And Investigator Ford videotaped Debbie Seeger, correct?

A.   There were some videotapes.  I don't remember who they were specifically, but there were videotapes.

Q.   If Investigator Ford videotaped his interview with Debbie Seeger, would you have watched it?

A.   Yes.

        MS. CHAVIS:  Excuse me, Your Honor.  I'm looking for our exhibit number.

        I'd now like to play Exhibit Number 81.

        THE COURT:  Is this going to be a videotape?

        MS. CHAVIS:  It's very short, Your Honor, yes.  The government has a copy of it.

        MR. SAMUELS:  Judge, again, I think Ms. Seeger was on their witness list.  I don't know if there is going to be -- if this is going to be shown to ask Judge Hudgins some follow-up questions, to the effect on Judge Hudgins, I understand, but if it is offered for the truth, I would object to that because she is not here.

        THE COURT:  Well, she's on their witness list.

        MR. SAMUELS:  Yes.

        THE COURT:  So I agree, if it's offered for the truth, and if it's a video that he saw.

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                              68

MR. SAMUELS:  He testified to that, yes, ma'am.

THE COURT:  Then if it's offered for the truth of what's in there, she will have to come on the stand and testify and be subject to cross-examination.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  With that, we are going to take a 25-minute recess.  We have been here for a little over two hours now, and we will be on recess until 1:30.  We started earlier today.  The Court stands in recess until 1:30.

(Recess from 1:05 p.m. to 1:31 p.m.)

THE COURT:  Mr. Hudgins is still on the stand.

Continue your examination, if you would please, Ms. Chavis.  Mr. Runyon is here with his counsel.

MS. CHAVIS:  Yes, Your Honor.  Before we get started, my co-counsel, Ms. Peiffer, pointed out to me that there was one exhibit that I forgot to move for admission, and that was Exhibit 113.  It's the e-mail from Dr. Nelson to Judge Hudgins dated July 16th, 2009.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

MS. CHAVIS:  Thank you.

(Defendant's Exhibit 113 received in evidence.)

BY MS. CHAVIS:

Q.  I believe we left off, Judge Hudgins, with discussing the video that Investigator Ford took of Debbie Seeger.  So I'd

Hudgins, S. - Direct                                          69

like to play that, just a short clip of that video, and that is our Exhibit 81.

(Video playing.)

You don't remember why the Seegers weren't called to testify, correct?

A.   Correct.

Q.   We saw in Dr. Montalbano's report a reference to Maria Runyon's Grand Jury testimony, and the government had disclosed that Grand Jury testimony to you before trial. Would you have read that?

A.   Yes.

MS. CHAVIS:  May I show the testimony?

THE COURT:  Yes.

MS. CHAVIS:  Thank you.  This is a document that I do not have marked.  We could mark it.

THE COURT:  It should be under seal if it's Grand Jury testimony.

MS. CHAVIS:  Okay.  Thank you, Your Honor.

THE COURT:  So if you mark it, you have to mark it as an under-seal document.

MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.   This is her testimony dated January 25th, 2008.  In here, Maria Runyon is indicating that, "David Runyon was involved in a motor vehicle accident.  He had his neck brace on.  It

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          70

messed up his arms and stuff.  He had a sling on his arm and a sling on one of his legs.  He had problems with vertigo for a long time.  He was on medication for it, as far as I know. As far as I know, he still has problems with vertigo."

Do you see that testimony?

A.  I do.

Q.  On page 27, one of the grand jurors is asking, "Well, what is his medical condition?  What is vertigo?"

And Maria Runyon says, "Vertigo is real bad dizziness.  He would have to be propped up in order to sleep. If he tried to lay flat, he would pass out.  It did get better, but it never went away as far as I knew."

Do you see that Marie Runyon testified to that at the Grand Jury?

A.  I do.  Yes.

Q.  Maria Runyon testified at trial, correct?

A.  Yes.

Q.  She did not testify to these facts, did she?

A.  She did not.

MR. SAMUELS:  Judge, I'm going to object to that as hearsay.  I mean, again, if he is reviewing it, if there's a question about what he did as a result of it, that is appropriate, but just showing him a transcript and then imputing that that is a true statement, that's not appropriate without the witness here.

MS. CHAVIS:  Well, he read the testimony, and I just asked if he presented it at trial, and he said he did not.

MR. SAMUELS:  Judge, Ms. Runyon is on the witness list, and there has been this practice of just showing him and having him read testimony and read quotes, but there is never any follow-up.  It just seems to be an end run around the way to get these statements in without putting them in for a non-hearsay purpose, which is affecting his state of mind or he did something as a result of it.

THE COURT:  Well, I'm going to overrule the objection to this extent.  It would be Grand Jury testimony under oath, so that adds an indicia of reliability to it.  It's being filed under seal, and he said he would have gotten it, and he would have looked at it.

He doesn't remember, or I assume that you didn't present it at trial?

THE WITNESS:  I did not, Judge.  And I was told that I got it.  Would I have looked at it?  The answer was yes.  If I got it, I would have looked at it.

THE COURT:  But you don't have your file now?

THE WITNESS:  I don't have my file.

THE COURT:  Well, the testimony is what it is.  It's Grand Jury testimony.  It's under seal.  She testified it wasn't presented at trial.  He doesn't have his file, and

Hudgins, S. - Direct                                            72

he doesn't know whether he got it or not.  It was never an issue of it, that I recall, at trial.

THE WITNESS:  It was not an issue at trial.

THE COURT:  It was not an issue at trial.

All right.  Move on.

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 46, which is also ECF document 276, filed on June 29th, 2009.  This is the report of Dr. Patterson.  It is his forensic psychiatric evaluation of David Runyon, dated June 24th, 2009.  Do you see that report?

A.  I do.

Q.  And you received this report prior to the penalty phase, correct?

A.  Prior to what?

Q.  The penalty phase.

A.  Yes, I did.

Q.  In this report Dr. Patterson says that, "Mr. Runyon added that the reason that his mother separated from his biological father was because he was 'beating on my mom.'  He pointed to an area on the right side of his face and said that his lip sagged.  He believed that this sag was in response to a physical interaction he had with his biological father.  He elaborated that he heard his mother screaming, and his dad threw his mother across the room after he came into the room.

Hudgins, S. - Direct                                          73

He stated he remembers going up and biting him around the right area -- the right knee area 'as hard as I could,' and Mr. Runyon stated he recalls his biological father choking him and hitting him, and he believes he passed out."

        Do you see that paragraph?

A.  I do.

Q.  What did you do as a result of that paragraph?

A.  That was part of the material that we sent to Drs. Merikangas and Mirsky.

Q.  Did you do anything else?

A.  I mean, we talked to him about it.

Q.  Who is "him"?

A.  David.  I went to visit his mother in Oklahoma and talked to her about it.

Q.  You talked to her about this incident?

A.  I talked to her about that David said that this had occurred.

Q.  What else did you do?

A.  I don't recall anything else.

        THE COURT:  What is this?  You read a paragraph.  What is it?

        MS. CHAVIS:  This is in Dr. Patterson's report, the government expert's report.

        THE COURT:  He said that he forwarded that on to his two experts and talked to Mr. Runyon's mother?

JODY A. STEWART, Official Court Reporter

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  Okay.

MR. SAMUELS:  I'm sorry.  Are you moving that into evidence?

MS. CHAVIS:  This is already on the docket as ECF document 276.

THE COURT:  Can I see the top filing?

MS. CHAVIS:  Yes, ma'am.  I'll put it to the first page.

THE COURT:  Do you want it in evidence at this hearing?  Everything that's on the docket wouldn't necessarily be in evidence at this hearing.

MS. CHAVIS:  So I thought at the very beginning, when we started, that we had indicated that if things were on the docket, we weren't going to duplicate them by then entering them into evidence.

THE COURT:  I think what was said was that you needed to identify it by the ECF number, and then if you gave it another number here and entered it into evidence.  Everything on the docket is not in evidence at this hearing.  First of all, there would be a lot of irrelevance; and, secondly, that's just not the way it goes.  You have to put before the Court what you want the Court to consider.

MS. CHAVIS:  Okay.

THE COURT:  I recall what was said was that if it's

Hudgins, S. - Direct                                        75

on the docket, identify it, and then if you've got another number here for this hearing, identify it, and then move it into evidence here.

MS. CHAVIS:  Okay.  Understood.

THE COURT:  Are you moving it into evidence or not?

MS. CHAVIS:  Not at this time, Your Honor.

THE COURT:  All right.

MR. SAMUELS:  Well, Judge, I am going to object to just reading pieces of the documents when we're not moving them into evidence.  I thought that was the ruling, that we were moving them into evidence and then she could highlight a portion of the document.

THE COURT:  All she is doing is just reading pieces of documents into evidence.  I don't know why she is doing it.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Maybe she will argue later, and it will become evidence.  But at this point, it's just something read into the record, and he said what he did in relationship to it.  She's not moving the document into evidence.

Am I understanding you correct, Ms. Chavis?

MS. CHAVIS:  Yes, Your Honor.

MR. SAMUELS:  My concern, Your Honor, is that is just sort of cherry-picking from the document to just put in

Hudgins, S. - Direct                          76

that one portion of the document.  We agree the document can come into evidence.  I think it should come into evidence, and then if she wants him to read certain portions of it, then the rest of it can be considered in its totality.  But otherwise it just seems a vehicle to try to isolate these certain portions without dealing with the balance of the document.

THE COURT:  Admit the document.  If she doesn't, I'll make it a court-admitted document --

MR. SAMUELS:  Thank you.

THE COURT:  -- so we don't have isolated pieces of reading.

MS. CHAVIS:  I'm fine with that, Your Honor, if you want me to go back and move to admit them all or all of the ECF numbers.

THE COURT:  I'm not going to go back and try whatever you're doing because we have been here all day, and if you've done it, you've done it.  You can check with the clerk what you've admitted.  But you can't just be reading pieces into evidence, and we don't have the context of the whole document.

Are you going to admit this document into evidence for this hearing, yes or no?

MS. CHAVIS:  Yes, it can be admitted, if Your Honor will accept it, yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                                    77

THE COURT:  Yes.  What would be the number?

MS. CHAVIS:  It is our Defendant's Exhibit 46.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  Okay.

(Defendant's Exhibit 46 received in evidence.)

BY MS. CHAVIS:

Q.  Judge Hudgins, do you recall why David Runyon was engaged in participating in drug trials?

A.  To make money.

Q.  Do you recall another motivation?

A.  No.

Q.  Okay.  I understand it's been a long time, and that's the reason why we are using these documents.

On Page 12 of Dr. Patterson's report, he states -- Mr. Runyon is telling Dr. Patterson about his involvement with drug trials, and he states that his mother was in a lot of physical pain, and David Runyon found out about drug trials because he was doing research online resulting in his decision to participate in drug trials while he was in West Virginia.

A.  Wait a minute.

Q.  On Page 13 --

A.  Can I see that again if you are going to ask me about it.

THE COURT:  Stop testifying.  What are you doing, Ms. Chavis?  I mean, ask him.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                                78

MS. CHAVIS:  I'm asking him if --

THE COURT:  You asked him why, to his knowledge, he was in drug trials.

MS. CHAVIS:  Yes.

THE COURT:  He told you to make money.  You asked him, I believe, if there was any other reason, and he said no.

MS. CHAVIS:  Yes.

THE COURT:  Now, are you going to have this doctor in to testify?

MS. CHAVIS:  Dr. Patterson is part of the stipulation, Your Honor, so he's not testifying.  But, Your Honor, I mean, I'm presenting these facts to Judge Hudgins.

THE COURT:  Show him the portion and ask if he recalls that.  It's not right for you to just be reading all of this stuff into the record like you're testifying.

MS. CHAVIS:  I understand what you're saying, Your Honor.  These are facts that were before Judge Hudgins, and so in order to determine what he did in the next steps to follow up on these facts, that's where this whole line of questioning is going.

THE COURT:  Well, show it to him.  You just stood there and read a portion yourself.  Show the witness what you're referring to and ask him if it refreshes his recollection.  Do something more than you standing there

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                      79

reading from a document.  Show the witness.

        MS. CHAVIS:  I was trying to speed things along because he's now been declared an adverse witness, so that's what I was trying to do.  We can go back to the other way, and I can have him look at the -- I'm sorry.  I don't mean to speak over you.

        THE COURT:  You haven't successfully moved things along yet, but I appreciate your trying.  But it doesn't speed things along for you to read paragraphs into the record.  Show the witness and let him look at it.  He doesn't have to read it into the record.  Just show him and ask him if he recalls that.

        MS. CHAVIS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Judge Hudgins, looking at the bottom of Page 12 at this highlighted sentence that begins with "He stated his mother," if you read that sentence, does that refresh your recollection of another motivation?

A.  You want me to just read it?  It doesn't refresh my recollection as far as another motivation.  It says his mother was in a lot of pain, he was doing some research, I suppose, on what her pain medicines was, and that's when he first found out about drug trials and started doing them.

Q.  If you flip to --

A.  It doesn't say much about motivation.

Hudgins, S. - Direct                                              80

THE COURT:  Let him finish his answer.

Go ahead.  She was talking over you.

THE WITNESS:  I said it doesn't say anything to me about his motivation.

Then he says -- the doctor says, "Mr. Runyon also reported he feels like he is doing something good for people, and he had only seen three or four other Asians so that he is representing that culture."  And Mrs. Runyon recalled, and then that's all that --

BY MS. CHAVIS:

Q.  And you are saying you don't have a recollection of that?

A.  Of what?

Q.  Of these facts.

A.  This part?

Q.  Of this motivation.

A.  I said it doesn't make me recall anything about a motivation because it doesn't speak to me about a motivation. It just says he was doing research on drugs because his mother was in a lot of pain.  It doesn't say he then went and did these trials because of anything.  That's when he found out.

Q.  It says he felt like he was doing something good for people and that he was representing his culture.

A.  Okay.  That says that, yes.  It says, "He reported he feels like he is doing something good for people."  To me

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          81

that doesn't speak to motivation for why he's doing it, but, I mean, I guess he's doing it and that makes him feel good, you know, that he's representing that culture and doing something good for people; at least that's what he told the doctor.

Q.  So if you had read this at the time before the penalty phase, you would not have read this as another motivation, and that would be your reason for not presenting it?

A.  I wouldn't have presented this.  The thing about his mother doesn't say that he's doing this because his mother is in a lot of pain and taking medication.  It just says he was researching something, and that's when he learned about these things.

Q.  Did you ever ask David Runyon about this?

A.  I don't think so.

Q.  On Page 18 of this report of Dr. Patterson, if you could take a look at this last sentence that's highlighted.  Do you remember anything about Mr. Runyon discussing with you that people are aware of his short-term memory loss and that they take advantage of him because he's a nice person?

A.  No, I don't recall that.  I'm not saying he didn't, but I don't recall it.

Q.  Did you take any action based on this statement that's in Dr. Patterson's report?

A.  That statement?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          82

Q.  Yes, sir.

A.  That you just read?  No, not that I recall.  I mean, I don't know that it would be in that vein, but we presented evidence of him being a nice person.

Q.  Judge Hudgins, I would just request that you just be responsive to my questions.

A.  Well, I was trying to.  I was thinking that that might be part of --

Q.  Say yes or no.

THE COURT:  He doesn't have to say yes or no.  He can always explain his answer.  No witness has to say yes or no.  They can say yes or no and then proceed to explain.

BY MS. CHAVIS:

Q.  Page 23 of Dr. Patterson's report, do you recall that Dr. Patterson indicated that there are no mental health factors that are mitigating or aggravating in this case?

A.  I do.

Q.  Did you take any action based on that?

A.  I mean, we sent it to our experts, but other than that and discussing their findings, no.

Q.  I'm showing you what's marked Defendant's Exhibit 111.  This is dated August 5th, 2009.  It's an e-mail from David Bruck to Sheila Cronin and Larry Woodward and yourself.  Do you recall receiving this e-mail?

A.  I don't specifically recall receiving the e-mail, no.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                                    83

I'm confident I did.

Q.   Does reading this e-mail -- well, what is the subject matter of this e-mail?

A.   It's an e-mail from David Bruck, who was our regional death penalty representative, to Sheila Cronin, Larry Woodward, and myself, and they had apparently sent Patterson and Montalbano's reports to a colleague of his named David Freedman and what he -- what his opinion was as a result.

Q.   Does this refresh your recollection about what other people in the death penalty community were saying about the government's expert reports in this case?

A.   I do recall that opinion, yes.

Q.   And here David Freedman is saying, "Much of the personality disorder stuff, which is exceptionally soft here, sounds like traumatic brain injury from the car accident." Is that correct?

A.   That's what it says.

Q.   And what did you do based on this?

A.   Talked to my experts, I assume.  Frankly, I don't recall specifically what I did as I don't recall specifically getting this, but that would have been what I would have done.

Q.   And this is Defendant's Exhibit 144.  This is another e-mail from David Bruck dated August 5th, 2009.  You're copied on it as well as Larry Woodward and Sheila Cronin.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                              84

And this appears to be Lisa Greenman, an opinion from Lisa Greenman about the government's expert report.  Do you remember receiving this e-mail?

A.   The same answer.  I am sure that I did.  Specifically remember receiving it, I don't, but I do remember these opinions were out there.

Q.   And Lisa Greenman's opinion is that she almost thinks Montalbano and Patterson were soft on the guy?

A.   Yes.

Q.   "There really isn't a big attack to be mounted.  The work that needs doing is putting together a defense presentation"?

A.   Yes.

Q.   And what did you do based on this e-mail?

A.   I mean, we were working on putting together the defense presentation.

Q.   And Lisa Greenman points out that, "Montalbano suggests the existence of mitigation in the history that he's unaware of."  Correct?

A.   Point me to that, if you would.

Q.   Sure.

A.   Thank you.  "Montalbano suggests the existence of mitigation in the history he's unaware of."  That doesn't make sense to me.  I don't know what he means by that -- or she means by that.

Q.   Did you go back to Montalbano's report to try to figure

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          85

out the questions that Montalbano had raised about mitigation that exists that needs further investigation?

A.  I don't recall.

MS. CHAVIS:  Your Honor, I'd ask that Defendant's Exhibits 111 and 144 be admitted into evidence.

MR. SAMUELS:  No objection as long as it's not offered for the truth of the matter asserted, Your Honor. It's just for the effect and the awareness of Judge Hudgins.

THE COURT:  Admitted on that basis.

(Defendant's Exhibits 111 and 144 received in evidence.)

BY MS. CHAVIS:

Q.  Were you aware that at the time of trial the government had a third expert involved in this case?

A.  That doesn't ring a bell.

Q.  The name Daniel Martell?

A.  That doesn't -- I don't recall that.

Q.  If that expert, Dr. Martell, had the opinion that David Runyon suffers from longstanding brain dysfunction, is that something you would have wanted to know?

MR. SAMUELS:  I'm going to object, facts not in evidence, Your Honor.

THE COURT:  Sustained.

THE WITNESS:  I wouldn't make any --

THE COURT:  Sustained.

Hudgins, S. - Direct                                        86

THE WITNESS:  Oh, I'm sorry.

THE COURT:  You said you didn't know about this expert, right?

THE WITNESS:  Correct.

THE COURT:  Sustained.

THE WITNESS:  I don't remember whether I knew or not, but I could probably look in my file and tell.

MS. CHAVIS:  So to be clear, is the ruling that I cannot ask a hypothetical question?

THE COURT:  He's not an expert.  You only ask hypothetical questions of experts.  He's a fact witness.

BY MS. CHAVIS:

Q.  In working with Dr. Merikangas, you learned that he wanted brain scans of David Runyon, correct?

A.  Correct.

Q.  And he actually ordered an MRI and PET scan of David Runyon?

A.  He did.

Q.  I'm showing you Defendant's Exhibit 93.  What is that document?

A.  It is a document from Dr. Merikangas, and it's sent to me regarding Runyon.  It says, "See forms for MRI and PET."

Q.  What is the date of that document?

A.  7-30-09.

Q.  The next page of the document, just describe it for us.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                        87

A.   It says, "Requisition for radiological consultation."  It names David Runyon at the Portsmouth jail, his date of birth, and identifying information.  It says, "MRI scan of brain.  Reason is several brain injuries.  Please return CD images to Dr. Merikangas."  And he has signed it and dated it July 30th.

Q.   The next page is the identical information, but instead of an MRI scan, it indicates a PET scan, correct?

A.   Correct.

Q.   So these are the orders from Dr. Merikangas for those scans?

A.   Correct.

Q.   Were those scans performed?

A.   I don't know.  I assume they were.

Q.   I'm sorry?

A.   I assume they were.

Q.   You assume that they were?

A.   I think we had reports from them.

Q.   I'm sorry?

A.   I think there were reports from them.

         MS. CHAVIS:  I would move to admit Defendant's Exhibit 93.

         MR. SAMUELS:  No objection, Your Honor.

         THE COURT:  Admitted.

         (Defendant's Exhibit 93 received in evidence.)

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                              88

BY MS. CHAVIS:

Q.  Do you recall you filed a motion with the Court requesting that the brain scans be released directly to you?

A.  I don't recall that, but --

Q.  If that's what the record reflects, you have no reason to doubt it?

A.  I would not.

Q.  I'm showing you Defendant's Exhibit 158 on Page 17. Again, can you identify what this record is?

A.  That's an hourly worksheet for an invoice on David Runyon's case.

Q.  Okay.  And there is an entry here for August 17th, 2009, and it says, "To jail for med scans, scans to marshal," correct?

A.  Yes.

Q.  That's indicating that you picked up the brain scans, correct?

A.  That's an interpretation.  You know, that's shorthand just to show them why I billed for time.  Can I see it again?

Q.  Oh, I'm sorry, yes.

A.  Yeah, it says, "To jail for med scans, scans to marshal." I don't know why I would be taking scans to the marshal. That's what it says.  I mean, you know, the file might indicate more detail on that, but it says, "To jail for med scans, scans to marshal."

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                      89

Q.   Are there any other scans involved in this case other than the MRI and PET scans that Dr. Merikangas ordered?

A.   I don't think so.

Q.   And you see up above that entry there is an entry on August 11th and an entry on August 13th.  It says "TC," and then there is some people's names here for August 11th, and here is the name Dr. Merikangas?

A.   Yes.

Q.   Then again August 13th, it says, "TC."  I think that says "witnesses" and "TC Dr. Merikangas."

A.   Yes.

Q.   What is that indicating?

A.   Telephone call to Dr. Merikangas on the 11th and the 13th of August.

Q.   If I turn the page to Page 18, this is indicating the time when you're coming up to trial -- or to the penalty phase, correct, because then you have your travel to Norfolk?

A.   Yes.

         MS. CHAVIS:  Your Honor, I did not move to admit this exhibit earlier, but I'll move to admit the exhibit now as Exhibit 158.

         MR. SAMUELS:  No objection, Your Honor.

         THE COURT:  It's admitted.

         (Defendant's Exhibit 158 received in evidence.)

BY MS. CHAVIS:

Hudgins, S. - Direct                                                    90

Q.   This is Exhibit 21.  It's also ECF number 511-2, that was filed February 4th, 2016.  This is Page 5 of 6.  It's dated August 5th, 2009, signed by James Merikangas.  This is Dr. Merikangas, the expert that you retained in this case, correct?

A.   Yes.

Q.   Do you remember this report from Dr. Merikangas?

A.   I do.

Q.   This is the report that you lodged with the Court, correct?

A.   It is.

Q.   Dr. Merikangas did not testify at the penalty phase, correct?

A.   He did not.

        MS. CHAVIS:  I move to admit that exhibit, Your Honor.

        MR. SAMUELS:  Your Honor, the same objection; objection to hearsay but not for the non-hearsay purposes of Judge Hudgins considering it.

        THE COURT:  It's admitted for that purpose.

        (Defendant's Exhibit 21 received in evidence.)

BY MS. CHAVIS:

Q.   This is Defendant's Exhibit 110.  It is dated August 7th, 2009.  It's an e-mail from Dr. Mirsky, and this says to Arla, but it says "Dear Steve."

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                                91

A.   That was my assistant at that time.

Q.   This is still an e-mail to you, correct?

A.   Correct.

Q.   Do you remember this e-mail?

A.   Yes, I do.

Q.   Dr. Mirsky is indicating that he is confident that his tests showed the effects for blast injuries plus the automobile accidents, correct?

A.   Correct.

Q.   You gave notice of Dr. Mirsky as an expert in this case?

A.   I did.

Q.   Dr. Mirsky did not testify at the penalty phase?

A.   He did not.

        MS. CHAVIS:  I'd ask that Defendant's Exhibit 110 be admitted.

        THE COURT:  It's admitted.

        MR. SAMUELS:  No objection, Judge.

        MS. CHAVIS:  Thank you.

        (Defendant's Exhibit 110 received in evidence.)

BY MS. CHAVIS:

Q.   This is Defendant's Exhibit 22.  It's a document that was filed through ECF on August 10th, 2009.  It's document number 269.  Please identify this document, Judge Hudgins.

A.   This was the motion to allow the defendant to supplement his mental health reports.

Hudgins, S. - Direct                                                        92

Q.   Do you remember this motion?

A.   I do.

Q.   What are you indicating in this motion?

A.   That we wanted to supplement our tests -- our reports with testing, and I pointed out some information in the government's own expert reports that supported that request.

Q.   And what is that information that you pointed out specifically?

A.   That in Dr. Montalbano's report he noted injuries, and that the expert, Raymond Patterson, noted the same history, and that Montalbano had an opinion that only a more detailed neuropsychological and neurological and biopsychological investigation would definitely rule in or out brain dysfunction.

        MS. CHAVIS:   I ask that Defendant's Exhibit 22 be admitted.

        MR. SAMUELS:   No objection, Judge.

        THE COURT:   It's admitted.

        (Defendant's Exhibit 22 received in evidence.)

BY MS. CHAVIS:

Q.   This is Defendant's Exhibit 41.   It's a letter dated September 18th.   I'll see if I can make it a little bit bigger for us.   This is a letter from Dr. Mirsky to you, Judge Hudgins.   Do you remember this letter?

A.   Yes.

Hudgins, S. - Direct                                        93

Q.   Did this letter come before or after the penalty phase?

A.   After.

Q.   And what is the message of this letter?

A.   He continues to talk about serving in the ROTC, which I don't know where he got that.  I don't think that was what Mr. Runyon was in.  But in any event, he said that there were training exercises.  He describes the training exercises with the grenade blasts, talks about information coming from Iraq and Afghanistan.  It identifies injury by blast injury or -- yeah, injury by blast injury, the effects of which on the brain are not well understood, talks about the damage that can be caused, that they are starting to see from folks coming back from Iraq and Afghanistan who have suffered blast injuries.

Q.   Dr. Mirsky is saying that apparently you had a conversation with him and you told him that the imaging studies were read as normal?

A.   Yes.

Q.   And so this letter is in response to you telling him that the imaging studies were read as normal; is that correct?

A.   Yes.

Q.   He has four points that he has in response to that, that he wanted the Court to know?

A.   Yes.

Q.   Did you ever advise the Court of these points that

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                        94

Dr. Mirsky is setting forth here?

A.  I don't believe so.

Q.  How did you do that?

A.  I said I don't believe so.

Q.  Oh, you don't believe so, okay.  Thank you.

A.  If I did, it would be indicated in the file.  I don't remember doing such a thing.

Q.  And attached to this letter, Dr. Mirsky provided you with these charts.  Do you remember seeing these charts?

A.  I can't recall, or I can't say that I recall seeing the charts.  I remember the letter.  I remember the information. They were attached.  I'm sure I saw them, but I don't recall.

Q.  And this is the chart about David Runyon's performance on the continuous performance test, and Dr. Mirsky is just giving us a visual and indicating that for the first three tests David Runyon's scores are worse than approximately 99 percent of the comparable subjects, correct?

A.  Are you telling me that's what this is?

Q.  That's what he is stating right here in this letter to you.

A.  That's what it says.

Q.  He gave another graphic to you about David Runyon's scores on the mean reaction time, and he says that they indicated a similar pattern of impairment in his reaction time, and he provided that information to you, correct?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                    95

A.   I don't know.  Was it in my file?

Q.   It was attached to this e-mail.

A.   Then I assume he did if it was attached to the e-mail that's in my file.

           MS. CHAVIS:  I move to admit Exhibit 41 into evidence.

           MR. SAMUELS:  Same position, Your Honor, object to the hearsay but not to the fact that Judge Hudgins received it.

           THE COURT:  Same ruling.

           (Defendant's Exhibit 41 received in evidence.)

BY MS. CHAVIS:

Q.   You'd agree that David Runyon had a childhood history of domestic violence, correct?

A.   There was history of domestic violence.

Q.   During his childhood?

A.   Yes.

Q.   He was also physically and emotionally abused as a child?

A.   Per his report.

Q.   You didn't receive that information through anyone else?

A.   I received it from many people who got it from him.

Q.   I'm sorry?

A.   I received it from many sources, all of them originating with him.

Q.   Did you receive information from David Runyon's aunt,

Hudgins, S. - Direct                                        96

Patricia Ann Aaron, about an incident where she saw David Runyon's mother, Suk Cha, where she was holding David Runyon in one hand while beating him with a wooden spoon with the other hand, and blood was running down his bottom and his legs, and she was also kicking him in the stomach, and she grabbed him and threw him against the wall, and she was calling him a bastard and a son of a bitch, and that throughout the two weeks when the aunt was visiting, she witnessed Suk Cha hitting little David, pushing him, and continuing to throw him against the wall?

        MR. SAMUELS:  Judge, I object to this.  This is from a declaration that has just been done.  Judge Hudgins hasn't seen this.

        MS. CHAVIS:  Well, that was my question.  Does he know this information?

        THE COURT:  Then you know he hasn't seen it.

        MS. CHAVIS:  I don't know that.

        THE COURT:  Wait.  That is disingenuous if it's from a declaration that has just been done, and you've read the whole thing in the record.  Why don't you ask him if he ever saw a declaration from whoever this was without reading it into the record.

        This is something that's been done for this hearing?

        MR. SAMUELS:  I believe so, Your Honor.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                        97

THE COURT:  You can ask him if he's ever seen a declaration, but don't read it into the record like that.

BY MS. CHAVIS:

Q.  Did you ever speak to the aunt, Patty Ann Aaron?

A.  Not that I recall.  I'm not saying I didn't, but not that I recall.  You have the file.

Q.  Did you ever hear about this incident?

A.  I don't recall that incident.

Q.  Did you ever hear about incidents like this?

A.  I recall hearing about incidents where he was struck.

Q.  David Runyon's mother testified at the penalty phase, correct?

A.  Yes.

Q.  She didn't testify to anything like that, though, correct?

A.  Correct.

Q.  And David Runyon's step-father, David H. Runyon, testified at the penalty phase, correct?

A.  He did.

Q.  But he didn't testify to anything like that --

A.  He did not.

Q.  -- correct?

And Mark Runyon, David's brother, testified at the penalty phase, correct?

A.  Correct.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                              98

Q.   Did he testify to anything like that?

A.   Probably not.  I don't remember his testimony specifically, but I would say probably not.

Q.   You had another expert at trial whose name is Dr. Cunningham, right?

A.   Yes.

Q.   And at trial you asked -- you started to ask Dr. Cunningham questions about David Runyon's social history, correct?  Do you remember?

A.   I don't remember the specifics of that, no.

Q.   Maybe you might remember that the government objected when you started asking about social history.  Does that jog your memory at all?

A.   No.

Q.   If the record reflects that that objection was sustained because Dr. Cunningham's report didn't include information about David Runyon's social history --

         MR. SAMUELS:  Objection to his testimony, Your Honor.

         THE COURT:  Sustained.

         THE WITNESS:  Are you waiting for me to answer? She sustained the objection.

BY MS. CHAVIS:

Q.   Yes.  I'm reformulating a question.

A.   Okay.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                                99

Q.  Do you agree that it's the attorney's duty to review an expert's report before it's submitted?

A.  Yes.

Q.  Do you remember witnesses Scott Linker and Tiffany Linker who testified at the penalty phase?

A.  I remember the names.

Q.  Do you remember that they did not testify about David's car accident in 1996?

A.  I did not remember what their specific testimony was.

Q.  Do you remember a man called Jeffrey Harris, who testified at the penalty phase?

A.  I don't remember that name.

Q.  So you would not remember his testimony either?

A.  I don't remember his name so, no.

Q.  Do you remember Wren Fleming?

A.  That name sounds familiar.  Wren sounds familiar.  I don't know anything about the testimony.

Q.  Do you remember anything about David, Jr., David Runyon's son?

A.  Yes.

Q.  What do you remember?

A.  Where he lived, to talk to him.  I think they were in Texas at the time.

Q.  David Runyon, Jr. and Maria were in Texas?

A.  Yes.  It might not have been Texas.  It was in West,

Hudgins, S. - Direct                                        100

Midwest somewhere.  Might have been Oklahoma, I'm not positive.  It was out that way.

Q.  Do you remember the questions you asked him?

A.  I don't.  I remember the big thing with the child was trying to get Maria to agree to let him come and testify, and she didn't want to do that.  So I think we had him write something.

THE COURT:  What?  Your voice is trailing off.

THE WITNESS:  I'm sorry, Your Honor.  Maria did not want him to come and testify, and we were sympathetic to that.  We did get him to write sort of a statement that was presented at trial.

THE COURT:  Maria was his mother?

THE WITNESS:  Yeah, David's ex-wife and his mother.

BY MS. CHAVIS:

Q.  Do you agree the evidence of prior brain injury is relevant to brain functioning?

A.  You know, that's not my expertise.  I would say that prior brain injury could be relevant to functioning.

Q.  Do you agree that it's relevant to mitigation?

A.  It could -- yes, it's something to be considered, yes.

Q.  Were you aware of David's diagnosis of PTSD?

A.  I believe --

MR. SAMUELS:  Judge, I'm going to object unless there is some document that shows that.  That's not in

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Direct                                          101

evidence.

THE COURT:  I agree.  The question assumes a fact not in evidence.

BY MS. CHAVIS:

Q.  Is PTSD something you would have wanted to know about?

A.  It would have been something we considered, yes.

MS. CHAVIS:  Your Honor, may I have a minute?

THE COURT:  Yes.

MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.  So, Judge Hudgins, I'm looking at Defendant's Exhibit 21 that was admitted into evidence, Dr. Merikangas's report.

MR. SAMUELS:  Judge --

THE COURT:  Can I see the top of the report, please.

MS. CHAVIS:  Yes, ma'am.  It is document 511-12 (sic).

THE COURT:  That came in, in 2016.  Wait.  I need to see the document.  You are moving it all over the screen.  I want to see it.  I need to see the document number, when it was filed, and the date of it.

Now, what is your question?

MS. CHAVIS:  I believe my question was --

MR. SAMUELS:  Your Honor, I just want to be clear, we had agreed to the 2009 letter here.  There seems to be

all of this other documentation associated with this exhibit. I don't agree that additional documentation beyond the 2009 letter should be admitted.

MS. CHAVIS: That's fine.

THE COURT: The exhibit number would be document 511-2.

MS. CHAVIS: Yes, pages 5 and --

THE COURT: ECF 511-2, part of Exhibit 21.

MS. CHAVIS: Yes, page 5 and page 6, yes, ma'am.

BY MS. CHAVIS:

Q. The question is, PTSD is something that you believe is relevant to mitigating evidence?

A. I thought I answered that. Yes.

Q. Yes. There was the objection to assuming a fact not in evidence.

MR. SAMUELS: Your Honor, this is, it looks like hearsay within hearsay. It references these other reports of Dr. Patterson and Dr. Montalbano as those being the source of post-traumatic stress disorder, and I don't know that those reports say that.

THE COURT: Somebody needs to just hand me up the exhibit. There are too many exhibits. I need to look at these exhibits.

This can go back to Ms. Chavis.

Put it on the screen, Ms. Chavis. What is your

Hudgins, S. - Direct                                          103

question?

BY MS. CHAVIS:

Q.  You believe that PTSD is it relevant to mitigating evidence, correct, Judge Hudgins?

A.  I do, but I have difficulty with what this says.  It says he has multiple scars on his head and face from trauma, including an automobile accident.  Your witness on the video said he didn't have any scarring or injuries that were visible from the car accident, and it says that he was rendered unconscious, and there are other -- I think the medical records from the Army said he didn't lose consciousness.  So this is the problem with these reports, is that the facts change.  So if those are the two things they are talking about that make PTSD part of this, you've got conflicting reports, and conflicting reports that came from somebody other than Mr. Runyon.

Q.  Did you talk your expert about what to do in that circumstance?

A.  Yes.

Q.  You talked to Dr. Mirsky and Dr. Merikangas about that?

A.  I talked to Dr. Nelson.

Q.  Dr. Nelson was your expert?

A.  He was an expert that had been hired earlier --

Q.  Right.

A.  -- before I was in the case.

Hudgins, S. - Direct                                          104

Q.   You previously testified that you replaced him with Dr. Mirsky and Dr. Merikangas?

A.   For the moving forward with the testing, things like that.  He was still somebody, as you've seen from my e-mails and things, that was kept informed of what was going on and where we were.  He was somebody that I still used as a resource.

Q.   You kept Dr. Nelson informed?

A.   To an extent.  I mean, I didn't keep him informed like -- I didn't send him the materials I was sending Mirsky and Merikangas, but I still talked to him and told him what was happening in the case.

          MS. CHAVIS:  One more minute, Your Honor.

          THE COURT:  All right.

          MS. CHAVIS:  Thank you.  Your Honor, I do have one more point.  Given the prior objection, I need to find a document, and I apologize.  I just need to find it real quick, or hopefully it will be real quick.

          THE COURT:  What is the document you are looking for?

          MS. CHAVIS:  The Dr. Merikangas report.  I apologize, Your Honor.

BY MS. CHAVIS:

Q.   I have one more point that I need to cover with you, Judge Hudgins.  With respect to mitigating evidence, do you

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    105

think that delusions or delusional disorder is relevant to mitigation?

A.  It would be a factor that we would consider.

MS. CHAVIS:  Your Honor, I think that's it for now. Thank you.

THE COURT:  Judge Hudgins, do you need a break before we start into this?

THE WITNESS:  No, thank you.

THE COURT:  Go ahead then, Mr. Samuels.

MR. SAMUELS:  Thank you, Judge, if I could just get a moment to get myself situated here.

THE COURT:  That's fine.

                    CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good afternoon, Judge.

A.  Good afternoon.

Q.  Sir, I'm going to go through your background, but I do want to pick up on a couple of points that we just finished with while they're fresh.

A.  All right.

Q.  Let me first show you what I believe has been marked and admitted as Defendant's Exhibit 41.

MR. SAMUELS:  Madam Clerk, if we could turn that back on.  Thank you.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                106

Q.   Now, Judge, you received this letter from Dr. Mirsky after the trial of David Runyon, correct?

A.   Correct.

Q.   After the guilt verdict, after the jury had recommended him for a sentence of death?

A.   Correct.

Q.   And this first line here where Dr. Mirsky is talking about serving in the ROTC, "Mr. Runyon was on two training exercises when training grenades exploded quite close to him."  Sir, do you see that?

A.   I do.

Q.   You were never able to find any records to show that David Runyon had sustained any blast injuries from training grenades, were you?

A.   I was not.

Q.   And this type of information that Dr. Mirsky is reporting and relying on just comes from Mr. Runyon's own self-reporting?

A.   The only source I'm aware of.

Q.   Were there a number of incidents like that throughout your investigation where the background came from Mr. Runyon's own self-reporting?

A.   There were.

Q.   I'd next like to show you -- but, Judge Hudgins, is it fair to say that you considered all of this information, and

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                     107

you pursued any information regarding mental health all the way up until the time of the penalty phase?

A.   Yes.  In fact, as far as this particular one was concerned, we went to great lengths to try to locate the military records to back up the claim of the grenade explosions.

Q.   I'm next going to show you, and I'm going to switch to our system shortly here, what we have marked as Government's Exhibit 63.

        MR. SAMUELS:  Your Honor, I'll tell the Court we do have some of the same exhibits and they are overlapping, but I would like to use the government numbers because they go in a chronological fashion, and I think it would be easier at the end for them to be assembled in that way, and that's largely how I intend to proceed with Judge Hudgins.

        THE COURT:  That's fine.

        MR. SAMUELS:  Thank you.

BY MR. SAMUELS:

Q.   Showing you Exhibit 63, Judge Hudgins, on the screen. Sir, do you recognize this to be the report that you sent to the Court regarding the preliminary report of Dr. Merikangas, dated August 5th?

A.   What I'm looking at is the cover letter for that.

Q.   If we go to the next page, do you recognize that letter dated August 5th as the actual preliminary report?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    108

A.  I do.

Q.  Was this the only written report that you got from Dr. Merikangas?

A.  It was.

MR. SAMUELS:  Your Honor, before I go further into it, I will offer Government's Exhibit 63 into evidence.

THE COURT:  It's admitted.

MR. SAMUELS:  Thank you, Judge.

(Government's Exhibit 63 received in evidence.)

BY MR. SAMUELS:

Q.  Judge Hudgins, looking at the bottom, this is just a two-page report or about a page and a half; is that right, sir?  A page and a little bit more?

A.  Yes.

Q.  Dr. Merikangas says at the bottom, when he is talking about impression, "His psychiatric evaluations, including my own, suggest at the time of the crime in question, he was suffering from the affects of, the withdraw from, the experimental drugs that he was taking as a paid experimental subject."  Do you see that, sir?

A.  I do.

Q.  Did Dr. Merikangas ever provide you any information as to what drugs he would have been taking that caused this?

A.  No.

Q.  You mention that earlier in the report, on direct

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    109

examination, that there were references about the automobile accident that you had trouble with. Do you recall that, sir?

A. I do.

Q. When there is this diagnosis of taking experimental drugs and the drugs causing problems, did that cause you to have concerns as well about presenting this type of information?

A. It did.

Q. What kind of concerns?

A. Well, it was in his report, and so the report would obviously be something that could be -- that he could be questioned directly on, and there was no evidence -- that's the first that I ever heard of it and the last I ever heard of it was that reference right there.

Q. Judge Hudgins, would you have wanted to present a report from an expert that showed that David Runyon was suffering some sort of delusions from experimental drugs without any information to back that up?

A. No, I would not have.

Q. Did that cause you some concern about that report?

A. It did.

Q. Judge Hudgins, Ms. Chavis read to you a portion of a declaration about an aunt. Do you remember that?

A. Yes.

Q. And this was just a few minutes ago, sir?

A. Yes.

Hudgins, S. - Cross                                                    110

Q.   Judge Hudgins, you were out of this case in 2009 after the sentencing; is that right?

A.   Correct.

Q.   So if this declaration was dated October 1st, 2022, not something you would have ever seen, right?

A.   Correct.  I would not.

Q.   Sir, let me next take you and talk a little bit about your background, if we could.  Judge Hudgins, would you tell us about your educational background, please, sir.

A.   I went to the University of Richmond business school, graduated there in 1977, and then went to law school at the University of Richmond and graduated there.  I actually graduated in '79, took the bar in '80.

Q.   When did you become a judge, sir?

A.   2012.

Q.   From 1980 to 2012, were you a practicing lawyer that entire time?

A.   I was.

Q.   What areas of practice did you have at that time, sir?

A.   I started out in an asbestos defense firm, so I did a lot of asbestos work, where I met the Judge here.  And then as our asbestos clients withered, I became involved in court-appointed work here in the federal court, started doing court-appointed work in the state courts as well, and did that pretty much -- that started probably around 1990, and

Hudgins, S. - Cross                                                    111

did that up until the time I went on the bench.

Q.   Judge Hudgins, prior to your involvement in this case, which I believe we learned began in about February of 2009, had you handled murder cases on the state or federal level?

A.   Yes.

Q.   Was that on both levels, sir?

A.   Yes.

Q.   You mentioned work in asbestos cases.  When you are working in asbestos cases, does that require you to deal with experts?

A.   That's what I did.  I dealt with medical experts.

Q.   And were there times when you had to decide whether to use a particular expert or to use an expert at all?

A.   There were.

Q.   And was that a frequent part of your practice, sir?

A.   That was the constant question, basically.

Q.   And had you done a number of state trials and federal trials from 1980 through 2012?

A.   I had.

Q.   Can you give us any kind of ballpark about how many cases you tried to a jury, Judge Hudgins?

A.   All of the asbestos cases were to juries.  I probably tried maybe 10 of those, which doesn't sound like a lot, but that was -- we were the most active jurisdiction at that time, so that was a lot of trials.  In state court, I

Hudgins, S. - Cross                                                    112

probably tried 50, and in federal court, other than the asbestos, I probably tried 15.

Q.  Sir, talk to us about the differentiation between your criminal practice and your civil practice?

A.  Well, the civil practice was the asbestos early on, but then I was doing civil insurance defense work and they were -- if you went to trial, it was a jury.  It was always a jury trial.  They all, all of the civil cases involved extensive medical questions.  That's usually what the big question was, was how serious is the injury, you know.  And, frankly, in the asbestos litigation, the plaintiffs had their experts, we had our experts.  You know, I hate to say it, but we paid our guys to say what we wanted them to say, and they paid their guys to say what they wanted them to say.

Q.  Did you consider, though, in those cases -- did you have a process that you used to determine whether or not you would proceed with an expert medical defense?

A.  Oh, yes.

Q.  And did you apply that same process in this case in defending Mr. Runyon?

A.  Yes.  I mean, I'd say that's how I kind of cut my teeth in the '80s on the medical issues.

Q.  Ms. Chavis spent a fair bit of time showing you different pieces of different reports.  Did you recall that?

A.  I did.

Hudgins, S. - Cross                                                    113

Q.   Judge Hudgins, in addition to those pieces, did you consider the entirety of the report?

A.   That's the only way I would consider it, was the entire report.  And you have to look at it also in relation to everything else that you have, the other reports you have from other people.  I mean, none of those things are viewed in a vacuum, and you also have to view them in the vain of you're trying a case to a jury.  We are not trying a case to protect ourselves from what's happening here.  So we are not basically saying, okay, well, we have got to put this on, because we are saying we are going to put this on and not that, or that and not this, because we have got to convince that jury to not give him the death penalty.

Q.   What was your goal in defending David Runyon at the penalty phase?

A.   To not have him have the death penalty.

Q.   And in view of that goal, did you consider all of this mental health information?

A.   Absolutely.  We were running up right to immediately before the trial beginning back, starting back in, and really getting information I think even after that on the mental health front.

Q.   As a trial lawyer, do you often have to work with constraints of time and resources in terms of money in putting a case together?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                       114

A.   Absolutely.

Q.   Did you have to face any of those constraints in this case, sir?

A.   We did.

Q.   And were there times when you sought continuances or you sought relief that sometimes wasn't granted?

A.   There were.

Q.   And when that happens, do you have to go through and make the best decision and the best choice you can in view of that?

A.   Absolutely.

Q.   Did you do that in the case, sir?

A.   We did.  I will say as far as resources, we were well -- we didn't have a problem with resources.  That was part of what you said earlier, and it wasn't a resource problem.  It was more time.

Q.   Well, let me ask it this way.  In terms of resources, could you go out and hire your own experts?

A.   No.

Q.   Did that have to be approved by the Court?

A.   Everything had to be approved by the Court.  I'm just saying we didn't have a difficult -- the Court was generous in letting us do pretty much what we wanted to do as far as hiring experts and whatnot.

Q.   And you requested experts all the way up through the

Hudgins, S. - Cross                                        115

summer of 2009, and into the penalty phase of the trial; is that right, sir?

A.  Yes.

Q.  Judge Hudgins, you said in 2012 you became a judge.  Tell us what court you sit on, sir.

A.  General District Court in the Ninth Judicial District.

Q.  And in the course of that, have you tried preliminary hearings and other matters for the past ten years?

A.  Yes.

MS. CHAVIS:  Objection, Your Honor.  I don't understand the relevance of this.  This is after the trial, and this is way beyond the scope of direct.

MR. SAMUELS:  Well, Judge, I think it goes to Judge Hudgins being able to establish his experience and his background, which I can lay a further foundation that he relied on that experience in making decisions, and I think it goes to his credibility.

THE COURT:  Well, I agree with Ms. Chavis that in terms of his experience and decision-making on the trial, it would go through the trial of this case.  In terms of his credibility, you can ask him these questions, although he's practiced a long time before this Court and certainly had a reputation of, and I would just say, of honesty and integrity and credibility, but you can ask if you want to go past it.  I do think it's relevant to the decisions he made

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    116

here, what he's making now.

          MR. SAMUELS:  Yes, Your Honor, the point taken.

BY MR. SAMUELS:

Q.  Fair to say, though, Judge Hudgins, that at the time you took this case you had been a full-time practicing lawyer from 1980 through 2009?

A.  Yes.

Q.  So about 29 years?

A.  Yes.

Q.  And the majority of that time period was involved in trial work and litigation?

A.  Yes, all of it.

Q.  Judge Hudgins, one of the claims here is that you halted your investigation and didn't go as far as you could and didn't present what you had or didn't find, and part of this relates to those scans that were done of David Runyon.  Do you recall that, sir?

A.  That that's a claim, yes.

Q.  Yes, sir.  Let me set the stage for that.

          Judge Hudgins, do you recall that the eligibility phase that happened after the guilt phase was on or about July 22nd, 2009?

A.  Yes.  I don't recall the date, but I recall the event.

Q.  Do you recall it being just a one-day period where we went in front of the jury and asked them to find David Runyon

Hudgins, S. - Cross                                              117

eligible to face the death penalty?

A.  I do.

Q.  And do you recall that at that time the jury came back and found certain intent factors about David Runyon?

A.  I do.

Q.  And do you recall the jury found that David Runyon intentionally killed Cory Voss?

A.  Yes.

Q.  Do you recall that the jury found beyond a reasonable doubt --

        THE COURT:  I didn't hear an answer.

        THE WITNESS:  I do recall that.

        THE COURT:  Okay.

BY MR. SAMUELS:

Q.  And do you recall that the jury found that David Runyon had done this for pecuniary gain?

A.  Yes.

Q.  Do you recall that the jury also found another aggravating factor that David Runyon engaged in substantial planning?

A.  I do.

Q.  And was that sort of the stage that was set when you prepared for the penalty phase?

A.  Yes.

Q.  Now, I think Ms. Chavis showed you this, but you sought a

Hudgins, S. - Cross                                                118

continuance after that eligibility phase to get ready for the penalty phase?

A.  Yes.

Q.  And that was granted.  You asked I think for about 90 days.  Do you recall that, sir?

A.  I don't recall how much I asked for, but I do recall asking.

Q.  Do you remember how much you got?

A.  I remember I asked for more than I got.  Thirty days.

Q.  And in that time period you had Dr. Merikangas approved as a neurologist and psychiatrist; do you recall that?

A.  I do.

Q.  And so even though you had Dr. Merikangas lined up, he wasn't actually approved until that eligibility phase; is that right.

A.  That's right.

Q.  So his time period was -- he wasn't involved early on, he was involved later?

A.  Correct.

Q.  And when you were preparing for the penalty phase, you and Mr. Woodward had discussed that; is that right?

A.  Yes.

Q.  And how did you communicate with Mr. Woodward when you were preparing for the phases of the trial, sir?

A.  Primarily telephone.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                           119

Q.   Were there some e-mails that went back and forth?

A.   There were.

Q.   And had you all discussed even earlier, prior to the
guilt phase, what you planned to do on the penalty phase?

A.   We had.

Q.   Okay.  I'd like to show you what's been marked as
Government's Exhibit 30.  Again, Judge, this has some
highlighting on it.  That's not for you to worry about.  Do
you recognize the participants on this e-mail, June 4th,
2009?

A.   I do.

Q.   And is your e-mail on there, sir?

A.   It is.

Q.   And is this from Mr. Woodward to Ms. Cronin and you and
someone named John McCormick?

A.   Yes.

Q.   And in this e-mail what is Mr. Woodward telling
Ms. Cronin?

A.   Actually, telling us both --

        MR. SAMUELS:  Let me offer this for admission
first, Your Honor, Government's Exhibit 30.

        THE COURT:  It's admitted.

        (Government's Exhibit 30 received in evidence.)

        MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    120

Q.  Go ahead, Judge.

A.  So Mr. Woodward says that he had met with David yesterday and discussed the entire case being guilt at sentencing, that he is going to request approval of new experts, which that is talking about me.  "I think we both feel that it is most likely that their sentencing case will not be based on psychiatric/psychological impairment, but we will continue to explore that."

Q.  And so this was the direction you were heading in June of 2009; is that right, Judge Hudgins?

A.  Correct.

Q.  Did you continue to be open to this idea of mental health mitigation?

A.  We did.  In fact, we got the other experts and worked toward giving them everything they needed, the PET scan and MRI and whatnot.  We were continuing to prepare that, just so it was an avenue for us to have.

Q.  This was June 4th, 2009, that is about a month before the guilt phase started; is that right, sir?

A.  Correct.

Q.  Down towards the bottom of this e-mail, there is an e-mail train that looks like it starts with Mr. Woodward on June 4th, 2009, regarding a DVD interview of Virginia Pina. Do you see that?

A.  Yes.  Do you mean it ends?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    121

Q.   Yes, sir, the end of that highlighted portion.

A.   Yes.

Q.   Which reads, "It is not helpful to us and shows him to be

manipulative and calculating in my opinion."  Do you see

that?

A.   Yes.

Q.   And was that video, in fact, played at the penalty phase?

A.   Yes.

Q.   Now, this e-mail talks -- this is in June of 2009 -- it

talks about Mirsky, Merikangas, but you still had

Dr. Cunningham at that point, right?

A.   Correct.

Q.   And you had still a relationship with Dr. Nelson; is that

fair to say?

A.   Yes.

Q.   Was he advising or consulting on the case?

A.   Yes.

Q.   All right.

A.   Not extensively, but he was.

Q.   Let me show you what's been marked as Government's

Exhibit 33.  Do you recognize that, Judge Hudgins?

A.   I do.

Q.   What's the date on that, sir?

A.   June 7th, 2009.

Q.   And is this really just two days or three days after the

Hudgins, S. - Cross                                          122

e-mail we saw from Mr. Woodward?

A.  Yes.

Q.  And does this reflect a discussion between you and Dr. Nelson on Friday, June 5th?

A.  It does.

Q.  And what is Dr. Nelson telling you, sir?

A.  Well, he's relaying our conversation.  He says it's --

        MS. CHAVIS:  Objection, Your Honor.  This is hearsay.  I believe Dr. Nelson is on the witness list and he will be in here to testify.

        MR. SAMUELS:  Well, certainly, Judge, this can be considered by Judge Hudgins for what it says in terms of how he viewed the case and the decisions that he made.

        THE COURT:  Again, for the truth of it --

        MR. SAMUELS:  Yes, ma'am.

        THE COURT:  -- I would make the same ruling, although I will certainly let the witness testify that he received this e-mail, and this is what it said and what he did and how he acted on it.  For the truth of it, you can ask Dr. Nelson, but that he received this, and this was one of his experts, and this is what he did.

BY MR. SAMUELS:

Q.  So at this time, Judge Hudgins, in the second paragraph here, Dr. Nelson is your expert, right?

A.  Correct.

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                  123

Q.  He's telling you that the psychological stance of this case is Runyon is denying being a planned or organized hitman, and his co-defendants are testifying that he is lying and was the actual shooter.

Does this e-mail talk about risks of putting on experts for a mental health defense when Mr. Runyon is denying being the hitman?

A.  Yes.  It talks about the fact that if the jury convicts him, all these things that he's reported to experts will be -- that they used in forming their opinions will be reviewed by the jury as unreliable because he's pled not guilty, he has been found guilty, and now he's coming into the position of saying -- well, that was our problem.  How do you present that to the jury?  And, again, this is to a jury, not a textbook.  You are going to tell the jury he still maintains his innocence and did it all along, and I don't know if he still does, but that's what the jury has heard, and they have found him guilty, and now you are going to present an excuse for why he did it, and that's -- how do you sell that to a jury?

Q.  And was that part of the strategizing and the decision-making process that you and Mr. Woodward took in the summer of 2009?

A.  Absolutely, that's what we were wrestling with.

Q.  Down at the bottom here it says that -- the last

Hudgins, S. - Cross                                                  124

paragraph here -- "My guess is that most of the sentencing will rest upon the collateral witnesses:  Friends, family co-workers.  We discussed that if you believe you can muster them to testify about important pieces of the story, then it probably would be better not to call me to testify so that strategically you can prevent the USA's experts from testifying."  Did that go into your thinking as to how you were looking at presenting your mitigation case?

A.   It did.

Q.   Now, this is in early June 2009.  Did you continue to try and get records for Mr. Runyon?

A.   Absolutely.

Q.   Did you continue to try and get mental health experts appointed for him and to examine him?

A.   We did.

Q.   Did you continue to consider the reports and information that those experts provided?

A.   Absolutely.

Q.   But was this analysis that Dr. Nelson presents, was that something that you considered as well?

A.   It was.  And we didn't have -- I mean, we continued to -- we asked for more time to try to get those records that we hadn't had that would bolster the mental health defense, which are the records of the grenades and records of the car accidents.  We asked for a continuance.

Hudgins, S. - Cross                                                    125

Q.   So that's in June of 2009.  And Dr. Nelson references friends, families, colleagues.  Did you work with all those types of folks in presenting a mitigation defense?

A.   Yes.

Q.   Did you present approximately 21 witnesses at the mitigation phase of the trial?

A.   I will accept your estimate of the number.  We presented numerous, quite a few.

Q.   Were you trying to show that Mr. Runyon was not the worst of the worst and could be safe in prison?

A.   Absolutely.  In fact, we had, if I'm not mistaken, I know we planned to, we had some of the guards from the jail that he's in there to show that he was doing well there.

Q.   Did you also want to show that it wasn't fair that he was subject to the death penalty but his two co-defendants, Michael Draven and Cat Voss were not?

A.   Yes.

Q.   Did you want to try and show Runyon's humanity and avoiding alienating a jury that had just found that he intentionally killed Cory Allen Voss?

A.   Yes.  That was our purpose ultimately and how we came down with what we did.

Q.   But did you keep considering this mental health information?

A.   Absolutely, up till even while away were presenting, we

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                      126

were still looking at the mental health picture.

Q.  And, in fact, did you present the testimony of
Dr. Cunningham?

A.  We did.

Q.  But at the end of the day, did you decide to present it
as you did, focusing on equally culpable and that Runyon had
done good things in the past and would not be a danger in
prison?

A.  Yes.

Q.  Was that a decision you made after considering this
mental health information?

A.  Absolutely.  We had that information.

Q.  Was it discussed with Mr. Woodward?

A.  Yes.

Q.  Did he agree with it?

A.  Yes.

Q.  So getting back to Dr. Merikangas, do you recall that the
he got appointed sometime at the end of July 2009?

A.  Yes.

Q.  And I think I showed you the Exhibit, where he came to
see David Runyon on August 5th.  Do you recall that, sir?

A.  I'm sorry, I was distracted.

Q.  That's all right.  Do you recall that Dr. Merikangas came
to see David Runyon on August 5th?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      127

Q.   And then he gave you the report and said this is the result of the experimental drugs?

A.   Yes.

Q.   Did you ever get any follow-up from him as to what those drugs were or anything?

A.   No.

Q.   But he did request that you do the scans; is that right?

A.   Yes.

Q.   I'm going to show you Government's Exhibit 61.  Do you see that, sir?

A.   I do.

Q.   And showing you the request for the scans.  Do you remember looking at this?  It was a different number with Ms. Chavis.  Do you recall looking at that?

A.   I do.

Q.   And looking at this, do you recognize this to be the report that was done of those scans?

A.   By the people who did the scans?

Q.   Yes, sir.

A.   Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 61.

        THE COURT:  It's admitted.

        (Government's Exhibit 61 received in evidence.)

BY MR. SAMUELS:

Hudgins, S. - Cross                                                      128

Q.  Now, Judge Hudgins, when we look at this, it references these scans, "Trauma in 1996," and then these findings.  Do you see that, sir?

A.  I do.

Q.  No hemorrhage identified, no lesion identified, no infarction identified.  Do you see all that?

A.  I do.

Q.  On the second page at the top, it says, "Normal brain MRI."  Do you see that?

A.  I see that.

Q.  Now, Judge Hudgins, these scans were ordered, in fact, by Dr. Merikangas, correct?

A.  Correct.

Q.  And on the order form, it says that those films, or the CD images are to go to Dr. Merikangas.  Do you see that?

A.  I do.

Q.  And, Judge Hudgins, had you got something here, had you got some issue, would you have gone to the Court to seek more time?

A.  Yes.

Q.  And, sir, do you understand that the claim is that you basically stopped communications with Dr. Merikangas after he filed his report on August 5th.  Do you understand that, sir?

A.  Yes.

Q.  And specifically, Judge Hudgins -- I'm just showing you

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    129

this for reference, sir, not offering it -- do you see that
there is a declaration of James Merikangas filed
February 3rd, 2023?

A.  I do.

Q.  Do you see that it says, "I prepared a brief report dated
August 5th, 2009"?

A.  Yes.

Q.  And then you see it says, "I did not hear anything
further from Mr. Runyon's attorney"?

A.  I see that.

Q.  And Dr. Merikangas swears that under oath, under penalty
of perjury, February 2nd, 2023, just a few days ago, sir.  Do
you see that?

A.  I see it.

Q.  So Dr. Merikangas says you dropped the ball.  After the
August 5th report, you had no contact with him whatsoever.
Do you see how he says that, sir?

A.  I see that.

Q.  Now --

        MS. CHAVIS:  Your Honor, I object.  Dr. Merikangas
did not say that Judge Hudgins dropped the ball.  He said
that he did not have any more contact with him.

        MR. SAMUELS:  Fair enough, Your Honor.  That was my
characterization in the question.

        MS. CHAVIS:  He did not have any more contact with

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    130

him about the scan.

THE COURT:  Well, the implication is there, but just rephrase your question.

MR. SAMUELS:  Yes, ma'am.

BY MR. SAMUELS:

Q.  Judge, referring to my question, Dr. Merikangas said he did not have any more contact with you after August 5th.  You saw that?

A.  I saw that in the statement.

Q.  Okay.  And then these, sir, we just got these, your billing records apparently related to this case.  I think this was Government's Exhibit 158.  Do you see that, Judge Hudgins?

A.  I see it.

Q.  Now, sir, you had been permitted to look at a number of things from your file in preparation for your testimony today by the United States; is that right?

A.  That's correct.

Q.  You've also met with habeas counsel, too, correct?

A.  Correct.

Q.  Did they show you anything from your file?

A.  I didn't know they had my file.

Q.  Looking at this report, 8-5, sir, we see you e-mailed Cronin, Dr. Mirsky, Dr. Merikangas, Dr. Cunningham, and talked to Maria Runyon.  Do you see that, sir?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                       131

A.  Yes.

Q.  After the report, following Merikangas' report, 8-6, TC Dr. Merikangas, David Bruck, Woodward, one hour.  Do you see that?

A.  Yes.

Q.  David Bruck was who?

A.  He was the regional death penalty public defender, I guess you'd call him.

Q.  Was he a resource for you?

A.  He was a resource.  That is what he was called, actually, resource.

Q.  Was he someone that you were able to rely on in preparation for the penalty phase?

A.  Yes.  He is -- I believe he is the source of the names Merikangas and Mirsky.

Q.  Okay.  So that's 8-6.  We've got one conversation with Dr. Merikangas on 8-6.  Down here again I see 8-10, talked to Dr. Merikangas for a half an hour on August 10th; is that right?

A.  Yes.

Q.  Is that TC, is that telephone conference?

A.  Telephone call.

Q.  Going to the next page, this is August 11th, TC with witnesses, marshals, Woodward, investigator, Dr. Merikangas, 3.6 hours total; is that right?

Hudgins, S. - Cross                                          132

A.   Yes.  8-11, yes.

Q.   That may have been a sum of those hours for all those
different individual representatives?

A.   Yes.  I was looking further down.  I do see that.

Q.   Then down here it says, telephone conference
Dr. Merikangas.  Do you see that, sir?

A.   I do.

Q.   That's on August 13th, 2009?

A.   Yes.

Q.   That's for 30 minutes.  Do you see that, sir?

A.   I do.

Q.   If we go back to Government's Exhibit 63, the reports
from the Harbour View Health Center, do you see a date on
that?

A.   August 13, 2009.

Q.   So seeing that this report was produced on August 13th,
2009, and you had a telephone conversation with
Dr. Merikangas, would you have discussed the scans with
Dr. Merikangas?

A.   Yes.

Q.   So when Dr. Merikangas says in his sworn statement that
he had -- let me make sure that I've got it accurately here.
When he says in his sworn statement, "I prepared a brief
report dated August 5th, 2009.  I did not hear anything
further from Mr. Runyon's attorney," do you see that, Judge

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    133

Hudgins?

A.  I see it.

Q.  Based on the records that you looked at with your conversations with Dr. Merikangas, is that statement accurate?

A.  No.

Q.  Judge Hudgins, did you continue to work on this mental health aspect up until the time of the trial?

A.  The penalty phase?

Q.  Yes, sir.

A.  Yes.

Q.  You would have talked to Dr. Merikangas all the way up to at least August 13th, which was just six days before the trial began on August 19th; is that right, sir?

A.  Yes.

Q.  Did you consider what he told you?

A.  Yes.

Q.  Did you factor in the information you were getting from the experts?

A.  Yes.

Q.  Did it change the decision that we kind of saw being percolated in June of 2009 about not using a mental health defense?

A.  Ultimately, that was our decision.  I wouldn't say that that -- what was percolating back then remained indefinite

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    134

and throughout the time.  I mean, we -- especially when we were getting information about injuries and things like that, and, you know, we were waiting to see if it was going to turn into something strong and definite.  Still, we had to consider the negatives that would come about if we used that.  But, yeah, ultimately, that was the decision that was made.

Q.  And was that made after a full consideration of all the mental health work you'd done in the summer of 2009?

A.  Absolutely.

Q.  Sir, I know Ms. Chavis talked to you a little bit about the timeline in the case.  I would like to do likewise.

MR. SAMUELS:  And if we could now switch to the government system, please, Ms. Armstrong.

Your Honor, if I could have a moment to collect my mouse here.

THE COURT:  Certainly.

BY MR. SAMUELS:

Q.  Judge, I'd like to take you back and kind of walk through your participation in this case and footnote that with some of the documents, sir.  Those documents are going to come up on the screen.

MR. SAMUELS:  Can we have the books for Judge Hudgins, if he needs them?

Your Honor, with the assistance of the court security officer, could we provide our books to Judge

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                135

Hudgins?

THE COURT:  Yes.

MR. SAMUELS:  Thank you.

BY MR. SAMUELS:

Q.  Judge, as you're getting oriented there, and hopefully there is a table you can put that on.  I'm going to try to pull them on the screen for you as well.

THE COURT:  Is there a table there?

THE WITNESS:  I've got it.

THE COURT:  Okay.

BY MR. SAMUELS:

Q.  Judge, I'd first like to show you what's been marked as Government's Exhibit, we will start with 9A, which is document 65 that was filed in this case.  Sir, if it's easier to read it on the record, or on the screen, that's fine.  If you'd like to take a look at it, that's fine.

A.  I have it in both places.

Q.  Okay.  When you got involved in the case, Judge Hudgins, did you obtain the file from Mr. Babineau who preceded you?

A.  I did.

Q.  And do you recall that Mr. Runyon had been indicted in this case in or around, I think it was, February of 2008?

A.  I do.

Q.  So do you recall that Mr. Babineau had been involved for almost a year --

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    136

A.   Yes.

Q.   -- by your entry?

A.   Yes.

Q.   So had Mr. Babineau done some work on the case that you were able to build on?

A.   Yes.  In fact, they were only four weeks, approximately, from start of the trial when that happened.

Q.   And that's why one of your first steps was to move for a continuance in the case?

A.   Yes.

Q.   But in this 9A I'm showing you, this is an order regarding mental health evidence, and it sets out a framework that has to be followed in terms of producing mental health evidence.  Do you recall that, sir?

A.   I do.

Q.   And the Court had actually set out a schedule that 90 days before the guilt phase experts had to be provided; is that right?

A.   Yes.

Q.   But, Judge Hudgins, you were able to try and go and supplement your experts and provide reports almost all the way up to what was a couple of weeks before the penalty phase; is that right?

A.   Yes.

Q.   And you sought permission from the Court to do that?

Hudgins, S. - Cross                                          137

A.  Yes.

Q.  You kept working on that to try to make sure that you had this information available to use if you decided to?

A.  Yes.

Q.  Looking at Government's Exhibit 9, which is document 135, Judge Hudgins --

MR. SAMUELS:  I'm sorry, Your Honor.  I'd offer Government's Exhibit 9A, and I'll go ahead and offer Government's Exhibit 9, which is the order and then the notice that's provided pursuant to that order.

THE COURT:  For the record, that's document 135, and it's Government's Exhibit 9, and then the others are attachments to it?

MR. SAMUELS:  Well, 9A is the order that sets forth the requirements, and then 9 is just the notice itself, Your Honor.

THE COURT:  Well, does 9A have a different number?

MR. SAMUELS:  I'm sorry.  9A is document 65 in the case.

THE COURT:  Document 65, 9A, and document 135, 9, are entered in evidence in this hearing.

(Government's Exhibits 65 and 135 were received in evidence.)

BY MR. SAMUELS:

Q.  Judge Hudgins, looking at this notice, do you recognize

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    138

this to be filed 12-12-2008, 90 days before the initial trial date of, I believe it was March 12th, 2009?

A.  Yes.

Q.  Dr. Nelson is indicated as a critical psychologist who will provide a social history of David Runyon.

A.  Yes.

Q.  Do you see that?

A.  I do.

Q.  Next page, please.

Then we see that Dr. Cunningham is also listed, and there is a couple of categories that he is listed on.  He might be describing the mental health factors, he might be describing correctional records.  Do you see that?

A.  I do.

Q.  And then the last page, please.  And then there is this reference to a neuropsychologist based on the information provided by Dr. Nelson, Runyon's in the process of seeking approval for that.  Do you see that?

A.  I do.

Q.  Judge, that ultimately ended up being Dr. Bender initially?

A.  Yes.

Q.  Dr. Bender was involved throughout the spring of 2009, and then Dr. Bender ended up getting replaced; is that right?

A.  Correct.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          139

Q.   Do you remember why Dr. Bender was replaced?

A.   When I got in the case, it was -- I didn't have any materials on him, so I set up a meeting to go to Charlottesville -- he's at UVA, is where he was -- and talk to him, and when I talked to him, he said I didn't write a report because you don't want me to be -- you know, to report what I have found.

Q.   How did you take that in terms of "you don't want me to report what I have found"?

A.   I met with him for about an hour.  We talked about the reasons, how his report would be very negative on David.

Q.   If I could just go back on -- I'm sorry, can we switch over one more time, please.

     I'm sorry to do this, Judge, but, again, looking back at your worksheets, which you've got here, this is Defense Exhibit 158.  This shows travel to Charlottesville on March 30th, 2009, and it shows a meeting with Dr. Bender, it looks like, for two hours.  Do you see that, sir?

A.   I do.

Q.   Dr. Bender --

          THE COURT:  Is that in evidence?

          MR. SAMUELS:  It is, Your Honor.  It's Defendant's Exhibit 158.

          THE COURT:  All right.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      140

Q.  So you had this neuropsychologist involved in the fall of 2009.  To your recollection, was Dr. Bender telling you you needed to do any particular types of tests or anything?

A.  No.

Q.  Dr. Bender told you that his opinion would be adverse, I think you said?

A.  Correct.

        THE COURT:  Was he at the University of Virginia?

        THE WITNESS:  Yes, ma'am.

        MR. SAMUELS:  Your Honor, I'll have some materials from Dr. Bender in just a moment.

BY MR. SAMUELS:

Q.  Let me next ask you to take a look at Government's Exhibit 11, which will come up on the screen as well.  I believe this was shown to you also by Ms. Chavis under defense number.  So do you recognize this letter to Mr. Babineau but from Dr. Nelson?

A.  Yes.

Q.  And was this something that you would have had access to in his file?

A.  Yes.

        MS. CHAVIS:  What exhibit number is that?

        MR. SAMUELS:  Of course, Government's Exhibit 11. Your Honor, we would move for Government's Exhibit 11.

        THE COURT:  It's admitted.

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      141

(Government's Exhibit 11 received in evidence.)

BY MR. SAMUELS:

Q.  Now, I think Ms. Chavis showed you a couple of lines on the letter, but when you would get a report or a letter like this, be it a two-page letter or a 30-page report, would you consider all of that report?

A.  Yes.

Q.  And in the second paragraph, would you just read that for us, sir, in terms of what information is being conveyed by Dr. Nelson in February of 2009?

A.  Are you talking about the one that begins, "To briefly summarize"?

Q.  Yes, sir.

A.  All right.  "To briefly summarize the situation, Mr. Runyon is accused of being the triggerman in a murder for hire case wherein a wife conspired to have her husband killed for monetary gain and so that she could be with her boyfriend.  Both the wife and her boyfriend have confessed to the conspiracy, and both named David Runyon as the person they hired to commit the murder.  However, in our interviews Mr. Runyon has consistently denied that he was the shooter.  Nevertheless, the following starts from the assumption that Mr. Runyon is guilty because that is the point of a death penalty mitigation evaluation."

Q.  And then further it goes down, and it says, "Mr. Runyon

Hudgins, S. - Cross                                                    142

can best be described as a wannabe."  And let me find it here, sir.  Let me blow up this third paragraph so we can see it.  It looks like the third sentence.  "Mr. Runyon compensates for this by having a narcissistic personality style."  Do you see that, sir?

A.  I do.

Q.  Judge Hudgins, this kind of information, would you want this presented before a jury?

A.  No.

Q.  Is this sort of the double-edged sword of mental health information, that this type of information can be problematic, in your view?

A.  Certainly.  In fact, that's why we didn't move further with Dr. Nelson.

Q.  This is in February of 2009.  We had looked at an e-mail earlier in June of 2009.  Dr. Nelson is still consulting with you; is that right?

A.  Yes.

Q.  In that June e-mail, Dr. Nelson is telling you, you probably don't want him to testify; is that right?

A.  Yes.

        THE COURT:  Dr. Nelson, does he talk about the abusive father?

        MR. SAMUELS:  Let's go to the next page.

        THE COURT:  I see it in the third paragraph.

JODY A. STEWART, Official Court Reporter

MR. SAMUELS:  I'm sorry, Your Honor.

THE COURT:  It's very small typing.  That's why.

MR. SAMUELS:  Let me bring it up a little larger, Judge.

THE WITNESS:  I see what she's talking about.  It's in the middle of the paragraph that says, "For example."

THE COURT:  It was so small.  I know I'll have the original.

BY MR. SAMUELS:

Q.  Now, this second paragraph on the second page says that, "If the defendant is found guilty of the current murder for hire, it will demonstrate that he has the capacity for violence."  Do you see that?

A.  I do.

Q.  Were you proceeding under some mitigation that David Runyon would be safe and non-threatening in prison?

A.  Yes.  That's the Cunningham defense.

Q.  Was it also some deputies that you called from the jail as well?

A.  We called deputies from the jail to testify that he had done well at the jail.

Q.  Would you have wanted the jury to see this kind of information, that he has the capacity for violence?

A.  No.

Q.  Now, this last paragraph does talk about

Hudgins, S. - Cross                                                    144

neuropsychological deficits contributed to why he had such poor achievement in school, work, and relationships.

A. Yes.

Q. But Dr. Nelson says, from the current data, it's his opinion that his childhood was a more important factor. It talks about the abuse and some other social development factors there. This neuropsychological reference, is that why you had Dr. Bender?

A. I wasn't the attorney at the time that Dr. Bender was retained, but I assume so. I mean, that would be where you would want to get further information on that.

Q. And at the end Dr. Nelson concludes that the key factors in mitigation are the lack of criminal history and his pathological narcissism to cover his emotional inadequacy, and then it asks for additional information. Was lack of criminal history a mitigator that you pursued?

A. Yes.

Q. And did you pursue and present information about David Runyon's upbringing?

A. Yes.

Q. Did you call his mother, his father, and his adoptive father?

A. Yes.

Q. Did you call some other relatives and friends and colleagues to testify to that?

Hudgins, S. - Cross                                                    145

A.   Yes.

Q.   Let me next have you take a look at Government's Exhibit
12, sir.  In looking through 12, if you flip through it, do
you recognize that to be some materials related to
Dr. Bender?

A.   Yes.  His CV.

Q.   I think if you go down to Page 4 there, sir -- I can pull
it up on the screen for you -- there is a letter from
Dr. Bender to Mr. Babineau that's dated February 4th, 2009?

A.   Yes.

          MR. SAMUELS:  Your Honor, I'd offer Government's
Exhibit 12.

          THE COURT:  It's admitted.

          (Government's Exhibit 12 received in evidence.)

BY MR. SAMUELS:

Q.   Going back to the first page, this was Dr. Bender's
resume, and then it indicates that he is at the University of
Virginia, board certified in clinical neuropsychology.

A.   Yes.

          MS. CHAVIS:  I'm sorry, are you offering that for
the truth of the matter?

          MR. SAMUELS:  No.  We're just offering the resume
for the impact on Judge Hudgins.

          MS. CHAVIS:  Okay.

BY MR. SAMUELS:

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              146

Q.  Let me next take you to Government's Exhibit 20.  Showing you Government's Exhibit 20, Judge Hudgins, do you recognize that to be a memo to counsel from Ms. Cronin to yourself and Mr. Woodward?

A.  Yes.

Q.  Okay.  And, again, just for the effect that it has on you here, sir, did you receive that memorandum?

A.  Yes.

Q.  Were you getting regular updates from Sheila Cronin about her efforts to find witnesses and other folks in the mitigation field?

A.  Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 20.

        THE COURT:  It's admitted.

        (Government's Exhibit 20 received in evidence.)

BY MR. SAMUELS:

Q.  And is this memorandum just summarizing the defendant's meeting with Dr. Montalbano?

A.  Yes.

Q.  Judge, you were kept abreast of what information was going on in terms of Ms. Cronin's investigation?

A.  Oh, yes.

Q.  Let me next show you Government's Exhibit 21.  Do you recognize 21 as a letter from Ms. Cronin to yourself and

Hudgins, S. - Cross                                                  147

Mr. Woodward dated April 7, 2009?

A.  Yes.

Q.  Does it reflect this updated mitigation interview list?

A.  It does.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 21.

THE COURT:  It's admitted.

(Government's Exhibit 21 received in evidence.)

BY MR. SAMUELS:

Q.  And just scrolling through this, does it kind of indicate some of the various efforts that were being undertaken to find people related to the mitigation investigation?

A.  Yes.

Q.  And you were kept aware of that?

A.  Yes.

Q.  Next to Government's Exhibit 22, please.  22, do you recognize that, Judge Hudgins, as document 177 filed April 8th, 2009, in this case?

A.  I recognize it as something that I've seen.  It's not something that I originated.

Q.  Let me go to the next page, please.  Was that something you would have filed, sir?

A.  Back it up, please.

Q.  Of course.

A.  Now go back where I can see the date.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                  148

Q.  Sure.

A.  Yes.  Yes.

Q.  So we see Dr. Bender being noticed.  This is April 8th, 2009.  I think about this point we had the trial continued to about June 30th, 2009.  Do you recall that, sir?

A.  Yes.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 22.

THE COURT:  It's admitted.

(Government's Exhibit 22 received in evidence.)

BY MR. SAMUELS:

Q.  We know who Dr. Bender is.  Who was Dr. Halleck?  Do you remember, Judge?

A.  Vaguely.  I believe he was someone whose name I had been given by probably David Bruck, and as I recall, Dr. Halleck just said he didn't want to get involved; he was older and just didn't want to get involved in a capital case.

THE COURT:  I'm sorry.  What was your last statement?

THE WITNESS:  He didn't want to get involved in a capital case.

BY MR. SAMUELS:

Q.  I'll next take you to Government's Exhibit 19.  Judge, after you got involved in the case - this is Government's Exhibit 19.  It has two motions to continue the trial.  One

Hudgins, S. - Cross                                                    149

is dated February 20th, 2009, and it is ECF document 160, and there is also another motion that follows it, ECF number 164, which is February 26, 2009, also to continue the trial.

Judge, when you got involved in this case in February of 2009, did you seek a continuance of the case that was set to start in March?

A.  Yes.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 19.

THE COURT:  It's admitted.

(Government's Exhibit 19 received in evidence.)

BY MR. SAMUELS:

Q.  Let's next go to Government's Exhibit 23.  Exhibit 23, do you recognize this as another memo from Sheila Cronin to yourself and Mr. Woodward?

A.  Yes.

Q.  This one is dated April 8, 2009?

A.  Yes.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 23.

THE COURT:  It's admitted.

(Government's Exhibit 23 received in evidence.)

BY MR. SAMUELS:

Q.  What's the substance or subject of this memo, sir?

A.  This was a memo from Ms. Cronin giving us a list of drug

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              150

trials that Mr. Runyon had participated in.

Q.   Then it continues on to the next page; is that right, sir?

A.   Yes.

Q.   This first page says that, "All these studies were double blind.  We have no way of knowing if David actually took the drugs."  Seeing this, Judge Hudgins, do you know how Dr. Merikangas was saying David was taking experimental drugs that caused issues if we didn't even know whether he took these drugs?

A.   I don't.

Q.   Would you have had concern about putting Dr. Merikangas on the stand with that experimental drug diagnosis hanging out there?

A.   Yes.  It just didn't seem to have any foundation, and it just -- it kind of seemed like a wild Hail Mary.

Q.   Were there other routes that you felt would be more successful to take?

A.   Yes.  Even if we had moved forward with the mental health mitigation, we would have tried to keep that out.  I don't know how we would have done that.

Q.   Let me next take you to Government's Exhibit 25, which is another motion to continue the trial date, document number 179, Government's Exhibit 25, dated April 13th, 2009.  Do you see that, sir?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    151

A.  I do.

        MR. SAMUELS:  Your Honor, I'd offer Government's

Exhibit 25.

        THE COURT:  It's admitted.

        (Government's Exhibit 25 received in evidence.)

BY MR. SAMUELS:

Q.  Now, Judge, this is a lengthier motion to continue the

trial, and it references legal standards related to capital

cases.  Did you consult with people in preparing this motion,

do you recall?

A.  Yes.

Q.  This references the duties of capital case counsel to

conduct a thorough investigation.  Judge Hudgins, were you

aware of those duties?

A.  I was.

Q.  Did you continue to try and conduct a thorough

investigation all the way up until the penalty phase of this

trial?

A.  I did.

Q.  And through the penalty phase?

A.  And through the penalty phase, yes.

Q.  Judge, you filed this, it looks like, about two months

after you got into the Runyon case; is that right, sir?

A.  Yes.

Q.  Do you recall that the guilt phase was not continued but

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                152

the Court indicated that it would be willing to consider a renewed motion to continue the penalty phase based on where we were at that time?

A.   Yes.

Q.   Is that, in fact, what happened; the penalty phase was continued for some time?

A.   It was.

Q.   And, sir, in support of that motion, let me show you Government's Exhibit 24, which is document number 178, dated April 13th, 2009.  Do you recognize that, sir?

A.   I do.

Q.   That's dated the same day as the motion to continue. Would you have provided the Court with some ground and some information upon which to base the request for a continuance?

A.   Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 24.

        THE COURT:  It's admitted.

        (Government's Exhibit 24 received in evidence.)

BY MR. SAMUELS:

Q.   Does this include where you are with trying to get records for David Runyon?

A.   It is.

Q.   Judge, had this records-collection process been an ongoing process from when the case started, even before your

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              153

involvement?

A.   Yes.

Q.   Again, going back to these blast injuries, were you ever able to find any records that showed that?

A.   No.

Q.   With respect to emergency room records from the auto accident, were you ever able to find any emergency records that showed that?

A.   No.

Q.   But did this search go on and was the process ongoing, again, all the way up through the penalty phase?

A.   It was.  And, in fact, we had requested a continuance to try to continue to get those records.

Q.   In fact, Judge Hudgins, did you at one point request subpoenas to go and subpoena the Army and other places to try and get those records?

A.   Yes.

Q.   But were you ever able to tell the Court that these records even existed based on your yearlong efforts to try and obtain them?

A.   No.  And that was the Court's question when I made the last motion for a continuance was, what information do you have that there is any possibility that you're going to find any of these things?  And the answer was none.  At that point we had exhausted all the efforts that we could come up with

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                154

to try to get them.

Q.  Let me next take you to Government's Exhibit 26.  I think Ms. Chavis showed you this as well, May 5th, 2009, a letter from Sheila Cronin to yourself and Mr. Woodward showing you a review of military medical records.  Do you see that, sir?

A.  I do.

        MR. SAMUELS:  Your Honor, I would offer Government's Exhibit 26.

        THE COURT:  It's admitted.

        (Government's Exhibit 26 received in evidence.)

BY MR. SAMUELS:

Q.  Now, Judge Hudgins, you had gotten some records from the military; is that right?

A.  Yes.

Q.  And you were aware of those records and what they showed?

A.  Yes.

Q.  You were aware that David Runyon had episodes of vertigo after his car accident that you were unable to find civilian records for?

A.  Correct.  These were records that were after the fact. These were, I guess, follow-up records after the accident. He wasn't treated in any military or government hospital, that we know of, at the time of the accident.

Q.  These records were from the military, which showed how he went to military doctors after the reported ER visit that you

Hudgins, S. - Cross                                                    155

never could find?

A.  Correct.

Q.  There is a reference here to personality change.  Do you see that his estranged wife reports that his personality changed after the accident, he was much more irritable, short-fused, and difficult to deal with?  Do you see that?

A.  I do.

Q.  You were aware of that claim from Maria Runyon?

A.  Yes.

Q.  Ms. Chavis also showed you Ms. Runyon's Grand Jury transcript dated January 25th, 2008.  Do you recall that, sir?

A.  I do.

Q.  And you had this Grand Jury transcript; is that right?

A.  I'm assuming that I did.  The question that was asked me was, would I have had it, and if it was in my file, I would have had it.  And if I had had it, would I have looked at it, and the answer was yes.

Q.  So if you had it, you would have looked at it?

A.  Yes.

Q.  In this Grand Jury transcript, this is -- make sure I get my date right -- January 25th, 2008.  So this is before David Runyon is charged in this case; is that right?

A.  Correct.

Q.  Before he's noticed for the death penalty?

Hudgins, S. - Cross                                                    156

A.   Yes.

Q.   And Maria Runyon was asked about a personal change observed in David down on line 18.  Do you see that, sir?

A.   I do.

Q.   And do you see her answer there was that he was bitter because the guy that hit him, you know, it was a drunk driver, he was over the legal -- there was an issue about whether he was over the legal limit.  It was a .8 and .10 deal, and he was never really reprimanded for that, and David was very upset.  Do you see that?

A.   I do.

Q.   The next question is, "But you attribute that more to that individual not being prosecuted or suffering any consequences as a result of that accident rather than any physical effect that the accident caused; is that correct?"  The response is, "Yes.  Yes."  Do you see that?

A.   I do.

Q.   So if Maria Runyon had been asked about any kind of personality change, could her Grand Jury testimony have been used to impeach her if she tried to say he had a personality change but she hadn't said that in the Grand Jury?

A.   Yes.

Q.   If we could go back, please, Ms. Armstrong.

     I know there was some discussion about PTSD.  Was that something that was reported by Mr. Runyon, do you

JODY A. STEWART, Official Court Reporter

remember?

A.  I don't remember.  I don't remember him specifically using that term.

Q.  Okay.  If we could next go to Government's Exhibit 27. Judge, this is an e-mail from Dr. Nelson to yourself dated May 22nd, 2009.  I believe that Ms. Chavis showed you this as well.  Do you recall this?

A.  Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 27.

        THE COURT:  It's admitted.

        (Government's Exhibit 27 received in evidence.)

BY MR. SAMUELS:

Q.  In here it talks about "some difficult strategic decisions about mitigation in light of the posture of pleading not guilty."  Do you see that, sir?

A.  I do.

Q.  Now, that's May 22nd, 2009.  Did you have some follow-up conversations with Dr. Nelson about that that resulted in that e-mail we looked at earlier in your testimony?

A.  Yes.

Q.  And did the posture of David Runyon denying his guilt and pleading not guilty factor into that?

A.  Yes.

Q.  And at this point was Dr. Bender still involved, to your

Hudgins, S. - Cross                                                      158

knowledge?

A.   What's the date?

Q.   May of 2009.

A.   I can't say for sure.

Q.   Let me ask it this way, Judge Hudgins.  If we had some records from Dr. Bender that showed what he got paid and when he got paid, that would show whether he was still involved in the case; is that right?

A.   Yes.

Q.   All these experts, how were you paying them, sir?

A.   I was getting the money from the Court.

Q.   All right.  How did you do that?

A.   Filed a motion.

Q.   Was there an invoice or some other kind of document?

A.   Yes.  It could be an invoice from the doctor and then submitted to the Court.

Q.   Was that something that would have been kept in your file?

A.   Yes.

Q.   So if we have an invoice from Dr. Bender, and if we have an invoice from Dr. Mirsky, that would have come from your file, you believe?

A.   It certainly would have been in my file because that's how they got paid.

Q.   Same process with Dr. Merikangas?

Hudgins, S. - Cross                                                    159

A.   Yes.

Q.   Have you seen an invoice?  Do you know how much Dr. Merikangas got paid?

A.   I knew at the time, but I don't know now.

Q.   You haven't seen your file to see that?

A.   Right.

Q.   Let's next go to Government's Exhibit 28.  This is a few days later, June 2nd, 2009, an e-mail from Ms. Cronin -- e-mail chain from Ms. Cronin to yourself and Mr. Woodward.  Do you see that, sir?

A.   I do.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 28.

        THE COURT:  It's admitted.

        (Government's Exhibit 28 received in evidence.)

BY MR. SAMUELS:

Q.   Judge Hudgins, here we are early June 2009, a reference to Dr. Merikangas and his fee schedule, and if we go a little further down here, it looks like Ms. Cronin is writing to Dr. Merikangas thanking for agreeing to take on this difficult case.  Do you see that?

A.   I do.

Q.   Looking at this e-mail, sir, June 1st, 2009, does it help you recall at all how Dr. Merikangas got involved in the case?

                JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          160

A.   Could be that we had Ms. Cronin contact him because of the prep for the trial.

Q.   Okay.  And let's next go to Government's Exhibit 29. Another e-mail June 2nd, 2009, from Ms. Cronin to yourself and Mr. Woodward.  Do you see that, sir?

A.   Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 29.

        THE COURT:  It's admitted.

        (Government's Exhibit 29 received in evidence.)

BY MR. SAMUELS:

Q.   Judge Hudgins, this e-mail references Dr. Merikangas recommending Dr. Mirsky, being a neuropsychologist.

A.   Yes.

Q.   So, Judge Hudgins, here we are in June 2009.  We're about a month away from our guilt phase trial of June 30th, 2009, and you're starting in with Dr. Merikangas and Dr. Mirsky. Do you recall why there was this switch, sir, or change to these experts?

A.   From Evan Nelson and Bender?

Q.   Why was that, sir?

A.   Because they were unfavorable.

Q.   And did you continue to try and find experts?

A.   Yes.

Q.   That reflected in Dr. Mirsky and Dr. Merikangas?

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          161

A.   Yes, and the gentleman who you asked me about who I said was just old and didn't want to do it.

Q.   Was that Dr. Halleck?

A.   That was the same, you know, we were trying to find somebody.

Q.   Let's next go to Government Exhibit 30.  I know I showed you this before.  I believe it's already in evidence, Your Honor, but just to keep the timeline, this is two days later, June 4th, 2009.  It talks about meeting David and discussing the entire guilt case and sentencing.  Do you see that, sir?

A.   I do.

Q.   Did David Runyon have a view on mental health being used in his case?

A.   He did.

Q.   What was that view?

        MS. CHAVIS:  Objection, Your Honor.  For the record, this is part of what we had put forth in our motion *in limine*.  I understand Your Honor overruled that motion, but I just wanted to put that in the record.

        THE COURT:  Your objection is noted.  It's overruled.

        Go ahead.

        MS. CHAVIS:  Thank you.

        MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                   162

Q.  This reflects a meeting with David.  You discussed the entire case, guilt and sentencing, and then two lines down you are saying the sentencing case is not going to be based on psychiatric or psychological impairment.  What was David Runyon's view on presenting a mental health defense?

A.  He did not want to present a mental health defense for two reasons:  He didn't feel like he had a mental health issue, and he denied committing the crime.

Q.  Was it difficult to get David Runyon to agree to meet with some of these different experts?

A.  I don't think it was difficult to get him to meet with them.  I think it was difficult to get him to see why he needed to do these scans.

Q.  And was this the posture that -- did he maintain this posture throughout your involvement in the case?

A.  Yes.

Q.  But did you continue to try and see if there was a mitigation mental health angle you could pursue?

A.  Yes.

Q.  But did you consider that David Runyon, your client, did not want you to pursue this?

A.  We always knew that we were proceeding with that backdrop.

            THE COURT:  With that what?

            THE WITNESS:  That backdrop.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    163

BY MR. SAMUELS:

Q.   And then again here at the bottom, we have the reference to Virginia Pina.  Judge Hudgins, this is June 4, 2009.  We already looked at that summary of the medical records from Sheila Cronin.  Do you recall that?

A.   Yes.

Q.   So you knew about those issues that Ms. Cronin was telling you that were in the Army medical records?

A.   Yes.

Q.   You knew David claimed he had been in an accident?

A.   Yes.

Q.   Next go to Government's Exhibit 31.  Do you recognize 31, Judge Hudgins, as a June 5th letter to you to Dr. Mirsky about getting him appointed?

A.   A letter from me to Dr. Mirsky?

Q.   Yes.  I'm sorry, sir.

A.   Yes, I do.

          MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 31.

          THE COURT:  It's admitted.

          (Government's Exhibit 31 received in evidence.)

BY MR. SAMUELS:

Q.   That's actually a letter to Dr. Mirsky on Page 1, Dr. Merikangas on Page 2.

          Now, Judge, even though you wanted to pull these two

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          164

experts in because you had the not-so-good opinions from
Dr. Nelson and Dr. Bender, could you just make the switch on
your own?

A.   Could not.

Q.   What did you have to do?

A.   I had to request it of the Court.

Q.   Did you have to give reasons for why you would be making
the switch in your request?

A.   I did.

Q.   So do you recall, sir, that Dr. Merikangas wasn't
actually appointed right away?

A.   Yes.

Q.   Was there some period of time, I think it was about
mid-July, after the eligibility phase, that Dr. Merikangas
was appointed?

A.   Correct.

Q.   So if Dr. Merikangas was not appointed, he was not able
to work on the case; is that right?

A.   That's right.

Q.   Didn't stop you from requesting him to be appointed?

A.   Right.

Q.   Didn't stop you from taking all the steps necessary to
get him involved?

A.   Right.

Q.   And this e-mail -- or this letter, excuse me, June 5th,

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              165

2009, that's just a day after that e-mail from Mr. Woodward saying we don't think we are going to go this direction, but we are going to be open to it?

A.  Yes, correct.

Q.  Let me next take you to Government's Exhibit 32.  Judge, do you recognize this to be an e-mail from Dr. Mirsky to you at that Arla address that we spoke of on June 5th, 2009?

A.  Yes.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 32.

THE COURT:  It's admitted.

(Government's Exhibit 32 received in evidence.)

BY MR. SAMUELS:

Q.  Is this just involving and kind of discussing what time Dr. Mirsky is going to take and what tests he wants to administer and that sort of thing?

A.  Yes, trying to get an estimate from him on those things and how much it was going to cost.

Q.  Let's next go to Government's Exhibit 33, which I believe is already in evidence.  Here we are two days later, Judge Hudgins.  This is this e-mail exchange where Dr. Nelson writes to you discussing the call that you had Friday, June 5th; is that right, sir?

A.  Yes.

Q.  Friday, June 5th, again, the same day that you are

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          166

sending the letters to Mirsky and Merikangas and trying to go through the work to get them appointed, Dr. Nelson is still involved with you?

A.  Yes.

Q.  And had Dr. Nelson been in the case for a good long while?

A.  Dr. Nelson, yes.

Q.  Yes, sir.

A.  Longer than I had.

Q.  He was found by Mr. Babineau?

A.  Correct.

Q.  Let's next go to Government's Exhibit 34.  Actually, if we can go back to 33 for just one moment, please.  I'm sorry.

       Going down here to the bottom, there is a reference to introducing testimony in a generic sense as a teaching witness without kicking open the door to giving opinions about Mr. Runyon specifically.  Do you see that?

A.  I do.

Q.  Is there a reference to Dr. Cunningham in that --

A.  There is.

Q.  -- discussion?

A.  Yes.

Q.  Is that what you did; put Dr. Cunningham on the stand to talk about this?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              167

Q.  Did Dr. Cunningham actually give you a script to go over when he testified?

A.  He did.

Q.  Did it cover the aspects that he was permitted to testify as well as some additional areas that he wanted to testify about?

A.  It did.

Q.  Did you try to go into some social development issues with Dr. Cunningham?

A.  I did.

Q.  And was he prevented from doing so by the government's objection?

A.  He was.

Q.  But you tried to do so, didn't you?

A.  Yes.

Q.  And do you remember, Judge Hudgins, that Dr. Cunningham's report was a report that he had done actually before you got on the case?

A.  Yes.

Q.  And let me show you Government's Exhibit 14.  Do you recognize 14?  This is to Mr. Babineau, but it's dated February 5th, 2009.  Would you have reviewed that, sir?

A.  I would.  I seen it, yes.

Q.  Is this the report that Dr. Cunningham prepared and provided when he was noticed for this case?

Hudgins, S. - Cross                                                168

A.  Yes.

          MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 14.

          THE COURT:  It's admitted.

          (Government's Exhibit 14 received in evidence.)

BY MR. SAMUELS:

Q.  I believe I left off with Government's Exhibit 34. Judge, showing you Government's Exhibit 34, this is again all in early June; Sunday, June 7th, 2009.  Here you've got a response from Dr. Merikangas.  Do you see that?

A.  I do.

Q.  And it looks like he is saying he thinks you would need about 20 hours.  Would you like Dr. Merikangas to see him this Friday?  Is he referring to seeing David Runyon?

A.  He is.

Q.  Could Dr. Merikangas see David Runyon until he was approved?

A.  Not and get paid for it.

Q.  Next go to 35.

          THE COURT:  Did you want that admitted?

          MR. SAMUELS:  I'm sorry.  I thought I moved it.

          THE COURT:  You might have.  It's admitted.

          MR. SAMUELS:  Thank you, Judge.

          (Government's Exhibit 34 received in evidence.)

BY MR. SAMUELS:

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    169

Q.   35, Judge Hudgins, which is document 206, filed June 9th, 2009, a motion for a psychiatrist and exchange the designation of the neuropsychologist expert previously approved by the Court.  Do you see that, sir?

A.   Yes.

Q.   Do you recognize that as a motion that you or Mr. Woodward prepared?

A.   Yes.

     MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 35.

     THE COURT:  It's admitted.

     (Government's Exhibit 35 received in evidence.)

BY MR. SAMUELS:

Q.   In this motion there is still this reference with medical records.  Do you see that, sir?

A.   Yes.

Q.   Were you continuing to try to get the medical records?

A.   Yes.

Q.   And then it says, "The subject of a different motion that will be coming to the Court in the near future for subpoenas."  Was that the effort to get subpoenas to get the records?

A.   It was.

Q.   Were you successful in getting subpoenas for these records?

Hudgins, S. - Cross                                                    170

A.   I don't remember.

Q.   Okay.  Do you recall you being not approved to get subpoenas because you couldn't show the records -- a chance of getting the records; you couldn't show the necessary threshold?

A.   That sounds familiar.  I think that we didn't get the subpoenas because there was nothing -- yeah, there was no realistic chance that we were going to get them, that we knew who to subpoena or --

Q.   Judge Hudgins, when you came in the case, Dr. Nelson was already there, Dr. Cunningham was already there, Dr. Bender had just been appointed, and you ultimately noticed him.  How were Drs. Mirsky and Merikangas located, do you recall, sir?

A.   It came -- I think it came from David Bruck.

Q.   And was David Bruck, again, someone you consulted throughout?

A.   Yes.

Q.   Did you listen to his suggestions and advice?

A.   Yes.

Q.   Were the strategy decisions that were made yours and Mr. Woodward still as the counsel?

A.   Yes.  The fact that we were even looking for somebody else was because we knew that as far as mental health as a defense -- or as a mitigator was concerned, what we had was nothing.  So we were looking for something else.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      171

Q.  Next I'd like to take you to Government's Exhibit 36, which is a record that you've seen through the defense examination, the report of Dr. Mirsky.

MR. SAMUELS:  I'll go ahead and offer this, Your Honor, as well.

THE COURT:  It's admitted.

(Government's Exhibit 36 received in evidence.)

BY MR. SAMUELS:

Q.  It looks like Dr. Mirsky visited David Runyon on June 26, 2009; is that right?

A.  Yes.

Q.  Some of the information here in this report, again, seems to refer to these self-reporting by Mr. Runyon.  Was that an ongoing issue, sir?

A.  Yes.

Q.  And these grenades, did you ever find anything that corroborated these grenades?

A.  No.

Q.  Now, this says -- this is referring to these car accidents.  Variety of symptoms, brief unconsciousness, vertigo.  The unconsciousness piece, do you recall whether there was some inconsistencies with that in other reports?

A.  Yes.

Q.  It says, "Some of the medical professionals who saw David raised the possibility of post-traumatic stress disorder."

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    172

Do you see that?

A.   I do.

Q.   Judge Hudgins, do you remember any specific diagnosis where David Runyon was diagnosed with post-traumatic stress disorder?

A.   I don't.

Q.   Then, Judge, they go through the testing here and -- I'm sorry, sir.  I think that the standards -- verbal IQ, 135; very superior.  Do you see that, sir?

A.   I do.

Q.   And then there is some weakness areas that were noted.  Then it refers to, down here on 5 and 6, "Poor CPT scores are indicative of dysfunction...responsible for maintaining alertness and attention."  "These poor scores, as well as his continuing symptoms of vertigo, would indicate that he's unable to persist in any attention-demanding activity for a sustained interval, and may explain his spotty and uneven work history."

      Judge, seeing this type of information, in your view, would this have mitigated against the defendant who traveled six hours, 300 miles to do a planned murder for hire?

A.   I am sure it would have been used in -- to rebut that idea.

Q.   But what decision did you make on using this type of information?

Hudgins, S. - Cross                                        173

A.  That it was not going to carry the day given the whole picture that we had; with the other experts that we had that would be coming in, the experts the government had, the idea that he's pleading not guilty -- or he has pled not guilty and been found guilty.  And putting that together, I mean, something like this is not going to carry the day.

Q.  Judge, did you think that you could just pick and choose what to put in, or if you went down the mental health road, it would open the door to other information coming in?

A.  We thought everything was going to come in that was negative about him.

THE COURT:  That was what?

THE WITNESS:  That was negative about him.

BY MR. SAMUELS:

Q.  Let's next go to Government Exhibit 37.

THE COURT:  Did you move for that?

MR. SAMUELS:  I'm sorry, Judge.  Yes, I thought I did.

THE COURT:  All right.

BY MR. SAMUELS:

Q.  Government's Exhibit 37, Judge Hudgins, document 230, filed June 29th, 2009 -- I think you saw this already as well, the notice regarding mental health experts.  Do you see that, sir?

A.  I do.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    174

Q.  This is actually the -- right before the first day of the guilt phase of the trial noting Dr. Mirsky.  Do you see that?

A.  I do.

MR. SAMUELS:  All right.  We offer Government's Exhibit 37.

THE COURT:  It's admitted.

(Government's Exhibit 37 received in evidence.)

BY MR. SAMUELS:

Q.  Government's Exhibit 38.  Government's Exhibit 38, Judge Hudgins, I think you have seen this as well, July 2nd, 2009, a letter to you from Dr. Mirsky.  Do you recognize this, sir?

A.  I do.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 38.

THE WITNESS:  It's admitted.

(Government's Exhibit 38 received in evidence.)

BY MR. SAMUELS:

Q.  This is the reference to neurological disorder, and it's essentially for Mr. Runyon to be evaluated by a neurologist; is that right?

A.  Yes.

Q.  That is why you had Dr. Merikangas?

A.  Yes.

Q.  Dr. Merikangas did an evaluation and sent scans?

A.  Yes.

Hudgins, S. - Cross                                                    175

Q.   Or you had scans done?

A.   Had scans done.

Q.   You talked to Dr. Merikangas about this?

A.   Yes.

Q.   Government's Exhibit 39.  Judge, showing you 39, a letter
from Dr. Bender to yourself.  It's undated, but I think we
will clarify that in a minute.  Do you recognize that, sir?

A.   Yes.

        MR. SAMUELS:  Your Honor, we'd offer Government's
Exhibit 39.

        THE COURT:  It's admitted.

        (Government's Exhibit 39 received in evidence.)

BY MR. SAMUELS:

Q.   If we go to the next page, please.  I can scroll down.
This indicates some of the work that Dr. Bender had done on
the case between March and May of 2009?

A.   Yes.

Q.   Do you know if this was all the work or just some of the
work?

A.   I don't know.

Q.   Okay.  On May 1st, 2009, there is a review of records
from the Veterans Administration.  Do you remember me showing
you a report that Sheila Cronin had done around that same
time period that was a summary of the Runyon medical records
from the Army?

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                            176

A.  Yes.

Q.  So were those provided to Dr. Bender, to your recollection, if you know?

A.  I don't know.

Q.  Let's next go to Government's Exhibit 40.  Showing you an e-mail, 40, from Dr. Merikangas to yourself, July 6, 2009.  "Do we need to schedule a visit?"  Do you recognize that, sir?

A.  Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 40.

        THE COURT:  It's admitted.

        (Government's Exhibit 40 received in evidence.)

BY MR. SAMUELS:

Q.  There is a reference here, Judge, where you're telling Dr. Merikangas that you need to get approval.  At this point, you still don't have approval for Dr. Merikangas; is that right?

A.  Right.

Q.  And July 6th, 2009, we're actually involved in the guilt phase of the trial at that point?

A.  Yes.

Q.  Let's next go to 41.  41, an e-mail from David Bruck to yourself, Mr. Woodward, Ms. Cronin, looks like Mr. Ford as well.  Do you see that, sir?

                JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          177

A.  I do.

          MR. SAMUELS:  All right.  I'd offer Government's Exhibit 41.

          THE COURT:  It's admitted.

          (Government's Exhibit 41 received in evidence.)

BY MR. SAMUELS:

Q.  Judge, does this reflect Mr. Bruck's continuing involvement in the case, sir?

A.  It does.

Q.  Was he continuing to give advice and offer assistance?

A.  Yes, he was.

Q.  And when he offered that, did you listen to it?

A.  Yes.

Q.  Let's go next to Government's Exhibit 42.  Showing you 42, an e-mail from Dr. Merikangas to, it looks like, yourself, some others, Ms. Cronin, Mr. Woodward, July 9th, 2009, referencing when Dr. Merikangas can evaluate David Runyon.  Do you see that, sir?

A.  I do.

          MR. SAMUELS:  Your Honor, I'd offer Exhibit 42.

          THE COURT:  It's admitted.

          (Government's Exhibit 42 received in evidence.)

BY MR. SAMUELS:

Q.  And then "after July 20th," sir, at this time, the guilt phase ended roughly around July, I think it was the 17th or

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                        178

19th, sir.  Do you recall that?

A.  Yes.

Q.  Then there was a few days when we went back for the eligibility phase, which was on July 22nd?

A.  Yes.

Q.  After that time is when Dr. Merikangas was appointed?

A.  Yes.

Q.  Let's next go to Government Exhibit 43.  Showing you 43, do you recognize that, Judge Hudgins, an e-mail from Dr. Nelson to yourself, July 10th, 2009?

A.  Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 43.

        THE COURT:  It's admitted.

        (Government's Exhibit 43 received in evidence.)

BY MR. SAMUELS:

Q.  This shows Dr. Nelson's continuing involvement in the case; is that right, sir?

A.  Yes.

Q.  Now, down here at the bottom, Friday, July 10th, you were actually asking Dr. Nelson to send some raw data to Dr. Mirsky for his review?

A.  Yes.

Q.  Government's Exhibit 44, please.

        THE COURT:  What's Spruce Tree?

Hudgins, S. - Cross                                        179

MR. SAMUELS:  I'm sorry, Judge?

THE COURT:  I see.  It's an address.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  I see.  It just didn't have a period.  Okay.  I see.  It goes down to the next page.

BY MR. SAMUELS:

Q.  Government's Exhibit 44, please.  Showing you 44, is this another e-mail from Dr. Merikangas -- from yourself, sir, about the status of things?

A.  Yes.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 44.

THE WITNESS:  It's admitted.

(Government's Exhibit 44 received in evidence.)

BY MR. SAMUELS:

Q.  Now, at this point, sir, you're describing the guilt phase has -- it is going on for two weeks, projected to end by mid-July, still attempting to collect records from David Runyon's past that are in the possession of the Department of the Army.

Again, was this a continuing effort throughout?

A.  Correct.

Q.  Let's next go to Government's Exhibit 45.  45, sir, is an e-mail from Dr. Nelson to you on July 16th, 2009, just touching base on the case.  Do you recognize that, sir?

Hudgins, S. - Cross                                                    180

A.  I do.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 45.

THE COURT:  It's admitted.

(Government's Exhibit 45 received in evidence.)

BY MR. SAMUELS:

Q.  There is a reference here, "If there is a strategy for mitigation in the event he is found guilty of capital murder."  Again, was this something that -- beyond that initial report that you had Dr. Nelson do, had he done another report?

A.  Not another report, no.

Q.  Was he just kind of acting as a consultant to you all through the summer?

A.  Yes.

Q.  And helping plan any kind of mental health mitigation phase?

A.  Yes.

Q.  Let's go next to 46, which is the next day, July 17th, 2009, and it's a chain between yourself and Dr. Nelson.  Do you recognize that, sir?

A.  Yes.

MR. SAMUELS:  I'd offer Government's Exhibit 46, Your Honor.

THE COURT:  It's admitted.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                   181

(Government's Exhibit 46 received in evidence.)

BY MR. SAMUELS:

Q.   It looks like you are responding to Dr. Nelson telling him that it's going to the jury.  Do you see that, sir?

A.   I do.

Q.   Then if we go out, would you read what Dr. Nelson writes to you in response Friday, July 17th, 2009.

A.   "Okay.  It's out to the jury, but I am unsure what is on the horizon -- is there something I need to be prepared to produce in writing, or to testify about?  Or, as we predicted, did the trial portray him as a highly scheming individual and therefore you don't want expert testimony?  Please give me some preview of which way we're going."

Q.   Did this reflect your discussions with Dr. Nelson about the viability of using a mental health defense?

A.   It did.

Q.   I'd next show you Government's Exhibit 47.  Showing you 47, sir, you may have looked at this before, it's document 240, filed in the case on July 17, 2009, a motion to continue the capital sentencing hearing.  Do you recognize that, sir?

A.   I do.

        MR. SAMUELS:  Your Honor, I'd offer 47.

        THE COURT:  It's admitted.

        (Government's Exhibit 47 received in evidence.)

BY MR. SAMUELS:

Hudgins, S. - Cross                                                    182

Q.  In this motion, Judge Hudgins, are you referencing your efforts to try and get additional information related to mitigation?

A.  Yes.

Q.  And does it reflect some of the procedural history of how you sought a continuance; in April of 2009, you actually asked for the case to be continued until October?

A.  Yes.

Q.  Going further down, does it reflect various steps that you've taken with respect to safeguarding mental health?

A.  Yes.

Q.  Does it reflect efforts taken to try and get these records?

A.  Yes.

Q.  Do you recall what happened as a result of this motion, sir?

A.  It was denied.  I'm sorry.  This is the one we were given a four-week period between the guilt phase and the punishment phase.

        THE COURT:  Mr. Hudgins, given that this was a federal death penalty case, it's tried in three segments; is that correct?

        THE WITNESS:  Correct.

        THE COURT:  Also, the same jury has to be impaneled for each of those three segments?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    183

THE WITNESS:  That's correct.

THE COURT:  So this trial was going on through the whole summer --

THE WITNESS:  It was.

THE COURT:  -- with an impaneled jury having to be there for each one of these segments?

THE WITNESS:  That's correct.

BY MR. SAMUELS:

Q.  Judge Hudgins, you're still working to try and get this mental health information, but do you also have to consider -- and I don't mean constraints in terms of resources, but just constraints in terms of time and scheduling a jury and all of those factors in putting a case together?

A.  Yes.

Q.  How much did you actually ask for, sir?  Do you see here?

A.  90 days.

THE COURT:  How much were you given?

THE WITNESS:  30 days.

THE COURT:  But you were given 30 days?

THE WITNESS:  Yes.

BY MR. SAMUELS:

Q.  Did you try and fill that 30 days with -- I guess I'm thinking of the unforgiving mind.  Did you try and fill those 30 days with as much work related to mitigation as you could?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                            184

A.   Yes.

Q.   In that 30-day period, did you get Dr. Merikangas
assigned?

A.   Yes.

Q.   Did you get reports from Dr. Mirsky?

A.   Yes.

Q.   Did you have Dr. Merikangas visit and evaluate David
Runyon?

A.   Yes.

Q.   Did you follow up on Dr. Merikangas's request for scans
and make arrangements for that to happen?

A.   Yes.

Q.   Now, Judge Hudgins, is that a matter of just snapping
your fingers and saying, okay, he goes off to the hospital
and gets a scan?

A.   No.

Q.   What has to happen with that?

A.   That has to be approved by the Court.

Q.   Did you seek approval from the Court to do that?

A.   I did.

Q.   Did Dr. Merikangas then fax you or send you the forms
necessary to get those scans?

A.   Yes.

Q.   Did you provide those down to the marshals or to the
hospital to arrange for that to happen?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                          185

A.  Yes.

Q.  And then does your time sheet reflect that you actually had a conversation with Dr. Merikangas on the same day that the report came out on those scans?

A.  Yes.

Q.  And then beyond that, I think that's up to August 13th, did you still try and get the film of those scans, or whatever, sent down to Dr. Merikangas, do you remember?

A.  Yes.  Well, did I -- I'm sorry, I was thinking about something else.  Ask me that again.

Q.  Let me do it by showing you the records, because I don't want -- I'm getting too far ahead of myself.  I don't want to do that when we've got the records.

Let me next take you to Government's Exhibit 48. Judge Hudgins, I'm not sure why, but this is another motion to continue.  This is document 247 dated July 20th, 2009, so it's just a few days after the first one.  It's Exhibit 48. Do you recognize that, sir?

A.  I do.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 48.

THE WITNESS:  I think I was just trying to --

THE COURT:  What?

THE WITNESS:  I think I was just trying to sweeten the pot.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                        186

MR. SAMUELS:  Maybe taking a second step.

THE COURT:  It's admitted.

(Government's Exhibit 48 received in evidence.)

BY MR. SAMUELS:

Q.  Go to the next one, Government's Exhibit 49, please. Showing you Exhibit 49, this is Monday, July 20th, 2009, an e-mail from you to Dr. Nelson.  Do you see that?

A.  I do.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 49.

THE COURT:  It's admitted.

(Government's Exhibit 49 received in evidence.)

THE COURT:  How much more do you have, Mr. Samuels?

MR. SAMUELS:  Judge, I'm sorry.  I do need to go through quite a few more exhibits.

THE COURT:  Well, I think we have been going for three hours, so we probably ought to take a 15-minute recess, and then we will resume and cover what we can and then adjourn for tomorrow.  I was trying to finish so that I didn't interfere with other schedules, but I think that we do need about a 15-minute recess at this point.

MR. SAMUELS:  Your Honor, I'm sorry to ask, but I know Judge Hudgins does have a schedule.  I will try and look through and see how quickly I can finish.  I'm just not sure that we would be able to finish today.  I know if that

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    187

is the case, that Judge Hudgins might need to make some arrangements.

THE WITNESS:  I have already done that.  I could see when we were going earlier.  I made that call at the first break.

THE COURT:  Thank you very much.

THE WITNESS:  Yes, ma'am.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  One thing that I would mention while I'm thinking of it to both you, Mr. Samuels and to Ms. Chavis, as I ask you to always do whenever I'm in a hearing or a trial, check with the clerk.  You will be probably too tired tonight, but check with the clerk first thing in the morning, or when you get here, get here about 10 minutes early and check your exhibits so that if there are exhibits that you think have either been entered or were denied, you can check that, and it's better to keep up with them on a day-to-day basis.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  The Court will take a 15-minute recess.

(Recess from 4:32 p.m. to 4:50 p.m.)

THE COURT:  Everyone is here, including the defendant.

You can resume your cross-examination, Mr. Samuels.

MR. SAMUELS:  Thank you, Your Honor.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                188

BY MR. SAMUELS:

Q.  Ms. Young, could we start by pulling up Government's Exhibit 33, please.

        Judge, we had talked about this previously at the beginning of your testimony and then not long ago.

        MR. SAMUELS:  I don't know that I moved this into evidence, so, Your Honor, I would offer Government's Exhibit 33.

        THE COURT:  It's admitted.

        (Government's Exhibit 33 received in evidence.)

BY MR. SAMUELS:

Q.  Now, sir, let me take you back to your timeline.  We had ended on Government's Exhibit 49, so let me ask you to take a look at that.

        Sir, showing you 49, Monday, July 20th, 2009, from yourself to Dr. Nelson.  Do you recognize that, sir?

A.  I do.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 49.

        THE COURT:  It's admitted.

BY MR. SAMUELS:

Q.  Judge, just to set the stage here, this refers to Friday, which would have been, I guess, July 17th, was when the verdict was returned.

A.  Right.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    189

Q.   Then we are going back to court on Wednesday, which would be July 22nd, to do this eligibility phase.

A.   Yes.

Q.   Then it refers to some other matters.  Were those other matters involved with making a request for Dr. Merikangas, to your recollection?  Would that have been around that time, July 22nd?

A.   Yes, uh-huh.  It was other matters that we were going back to court on, yes.  Yes.

Q.   You say here to Dr. Nelson, "I still do not anticipate calling you as a witness, but I may want to consult with you on how to handle some of their witnesses once I have more information on them."

     Again, why do you not anticipate calling Dr. Nelson as a witness?

A.   Because I don't anticipate using the mental health as a mitigator.

Q.   Next I'd like to --

     THE COURT:  You don't envision using mental health as an indicator?

     THE WITNESS:  As a mitigator.

     THE COURT:  As a mitigator.  Then you earlier indicate that Dr. Nelson's testimony on that issue, from your knowledge, was not favorable to Mr. Runyon?

     THE WITNESS:  Correct.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    190

BY MR. SAMUELS:

Q.  Again, Judge Hudgins, do you still continue to pursue it?

A.  We did.

Q.  Let me next show you Government's Exhibit 50.  Do you see 50, which is document 248, filed July 20th, 2009, a notice of intent to introduce mental health testimony?

A.  Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government Exhibit 50.

        THE COURT:  It's admitted.

        (Government's Exhibit 50 received in evidence.)

BY MR. SAMUELS:

Q.  At this point, sir, you're noticing Dr. Cunningham, Dr. Mirsky, and possibly Dr. Merikangas, depending on the motion of the Court; is that right?

A.  Correct.

Q.  Are you keeping your options open here, Judge Hudgins?

A.  Yes.

Q.  Let me take you next to 51.  51 is a July 20th e-mail, 2009, from yourself to Dr. Merikangas, summarizing the events and the status of the case.  Do you see that, sir?

A.  I do.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 51.

        THE COURT:  It's admitted.

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                        191

(Government's Exhibit 51 received in evidence.)

BY MR. SAMUELS:

Q.  And just so we see, sir, you are continuing to keep in touch with Dr. Merikangas, but you've got to go back to the Court on Wednesday, one of the hearings for which is to determine whether Dr. Merikangas is going to be appointed?

A.  Correct.

Q.  Let me take you next to Government's Exhibit 52.  Showing you 52, which is an e-mail, Monday, July 20th, 2009, from yourself to Sheila Cronin.  Do you see that, sir?

A.  I do.

MR. SAMUELS:  Your Honor, I would offer Government Exhibit 52.

THE COURT:  It's admitted.

(Government's Exhibit 52 received in evidence.)

BY MR. SAMUELS:

Q.  Judge, looking at this e-mail, and there's a reference in the first page that you're writing to Ms. Cronin about an affidavit.  Was that affidavit done in connection with seeking a continuance in the case?

A.  Yes.

Q.  And this was the continuance I think we talked about, you asked for 90 and you got 30?

A.  Yes.

Q.  And in terms of asking for the continuance, you had asked

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    192

Ms. Cronin to put together an affidavit summarizing the status of where you were in the case?

A.   Yes.

Q.   Showing you next Government Exhibit 53.  53, which is document 254, filed July 22nd, 2009, do you recognize this, Judge Hudgins, as an order from the Court pertaining to your motion to continue?

A.   Yes.

          THE COURT:  Do you want that entered?

          MR. SAMUELS:  Yes, Your Honor.  Thank you.

          THE COURT:  It's admitted.

          (Government's Exhibit 53 received in evidence.)

BY MR. SAMUELS:

Q.   This is where the Court decides that you'll get four weeks in the bench trial -- or the phase of the trial, and the jury trial will be set August 19th, 2009?

A.   Yes.

Q.   So, Judge, now you know you've got a month to work with on this case; is that right?

A.   Yes.

Q.   Showing you next Government's Exhibit 54.  54, which is document 257, filed July 22nd, 2009, do you recognize that, sir?

A.   I do.

Q.   And is this the order appointing Dr. Merikangas in the

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      193

case?

A.  It is.

MR. SAMUELS:  Your Honor, I would offer Government's Exhibit 54.

THE COURT:  It's admitted.

(Government's Exhibit 54 received in evidence.)

BY MR. SAMUELS:

Q.  There is a footnote to this, Judge Hudgins, where the Court indicates that you have moved *ex parte* initially on June 9th, 2009.  Do you see that, sir?

A.  I do.

Q.  Does that track with when we first saw the e-mails with Dr. Merikangas that we saw on June 5th, June 4th, June 7th?

A.  Yes.

Q.  It indicates that the Court had sought some clarification on the request.  So was there some back and forth with the Court on getting Dr. Merikangas appointed?

A.  Yes.

Q.  Let me next take you to 55.  Showing you 55, filed -- document, excuse me, 252, filed July 22nd, 2009, an acknowledgment of the receipt of the mental health reports of the government's professionals.  Do you see that?

A.  I do.

Q.  Do you recognize that to be Mr. Woodward's signature, sir?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              194

A.  Yes.

         MR. SAMUELS:  Your Honor, I'd offer 55.

         THE COURT:  It's admitted.

         (Government's Exhibit 55 received in evidence.)

BY MR. SAMUELS:

Q.  And then let me show you 55A.  Do you recognize 55A, sir -- and I believe Ms. Chavis discussed this with you as well -- to be the report of Dr. Patterson that was actually filed 6-29-2009?  It was document 276 in the case.

A.  Yes.

         MR. SAMUELS:  Your Honor, I would offer 55A.

         THE WITNESS:  It's admitted.

         (Government's Exhibit 55A received in evidence.)

BY MR. SAMUELS:

Q.  Judge, this report 55, and actually I think it tell us right at the top here, it's a 24-page report; is that right, sir?

A.  Yes.

Q.  Did you review the report and provide it to your experts?

A.  I did.

Q.  And Ms. Chavis showed you some portions of the report. Did you consider all of the reports, sir?

A.  I did.

Q.  Let me take you down to Page 5 here.  And is there a discussion here of the government's records and how the

Hudgins, S. - Cross                                                      195

murder occurred and what the evidence was?

A.   Yes.

Q.   Was that what was presented at trial, to your recollection, Judge Hudgins?

A.   Was what presented?

Q.   This recitation of the evidence, did that pretty much track with what was presented at trial, do you recall?  If you don't know offhand, that is fine.  We'll keep going.

A.   Offhand I don't know.  I could read it and tell you.

        THE COURT:  What is this?

        MR. SAMUELS:  Judge, this is the forensic report of Dr. Patterson, and it had come up in the defense examination.  It's a 24-page report, and it's multiple pages.  I'm just scrolling through the pages to show Judge Hudgins some of the categories that are discussed in this report.

        THE COURT:  Do you need him to read it?

        MR. SAMUELS:  I'll highlight certain portions of it, Judge, but I just wanted to show him that there were various sections of the report and what they related to, and then I'll ask him to read a couple of things.

        THE COURT:  You had access to this report?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Okay.

BY MR. SAMUELS:

Hudgins, S. - Cross                                              196

Q.  And does it indicate that this is based on an examination of David Runyon and review of some documents received?

A.  It does.

Q.  Now, I think Ms. Chavis showed you some information about a report and an assault at one point.  Does Mr. Runyon indicate here that his father was not physically abusive to him except on one occasion?

A.  Yes.

Q.  It goes on for some time talking about the psychosocial history.  Again, when you got this, did you review the entire report to see what would be presented by the government's experts?

A.  Yes.

Q.  And does it describe a psychiatric examination conducted by Dr. Patterson of Mr. Runyon?

A.  Yes.

Q.  And does Mr. Runyon in the report in this paragraph talk about why he's been doing these drug trials, as I think Ms. Chavis showed you?

A.  Yes.

Q.  Further down here, sir, and, again, I just want to keep scrolling so you can see the length of the report, do you recall that Mr. Runyon talks about his involvement in the offense?

    Let me take you to a specific portion, sir.  Looking

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                           197

at that paragraph, what is Mr. Runyon's view of the case and
the evidence that he's presented to Dr. Patterson as
presented in that paragraph?

A.   That they are taking circumstantial evidence and gossip
and pinning this on him.

Q.   Was that his view of the case as expressed to yourself
and Mr. Woodward?

A.   I don't ever remember him saying that in particular.  He
just -- he always maintained his innocence.

Q.   Ms. Chavis asked you if you recall, sir, early in your
testimony about you going down to New Orleans for a federal
defender's or capital defender's organization.  Do you
remember that, sir?

A.   Yes.

Q.   And she asked you about certain sessions that you
attended and some smaller breakout sessions.  Do you recall
that?

A.   I do.

Q.   And was there advice that you were given at that session
in terms of how to proceed with the case?

A.   Yes.

Q.   Were there any suggested strategies that you were given?

A.   I mean, the primary thing was that the evidence of the
crime was overwhelming, and that we should do everything in
our power to convince Mr. Runyon to accept the plea.  There

Hudgins, S. - Cross                                                              198

was also -- it went so far as there was a person there who did a presentation.  He was an ex-convict who had spent a lot of time in the federal penitentiary on death row in a case that they kept finding ways to get back in court, and finally one of the key witnesses had passed away, and so he ended up getting released.  So his message was that you've just got to save your life, because you never know what's going to happen in the future.

Q.  Did you try that approach with Mr. Runyon?

A.  He didn't want to talk to the person.

THE COURT:  Can you pull the microphone a little closer?  Thanks.

MS. CHAVIS:  Your Honor, I just want to state for the record again my objection.  This is the same type of information that we noted in our motion *in limine* that we were trying to exclude.

THE COURT:  You don't have to stand and state your objection each time unless it is a new objection.

MS. CHAVIS:  Okay.  Thank you.

THE COURT:  I've ruled, and Mr. Runyon has waived any attorney-client privilege by the nature of this *habeas corpus* case and the ineffective assistance of counsel claim.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Judge Hudgins, did you have conversations with David

Hudgins, S. - Cross                                                    199

Runyon about pleading guilty?

A.  Oh, yes.

Q.  What was his response to that?

A.  That he wasn't going to plead guilty to something that he didn't do.

Q.  And is this, if we look at this paragraph, is this what he is telling Dr. Patterson as well?

A.  Yes.  He is actually telling Dr. Patterson that his attorneys are telling him he can't beat this charge.

Q.  And is Dr. Patterson asking him, "I understand you do not agree with your attorney, but have you listened to your attorney to be able to weigh the advice he's given you?"  Is that right, sir?

A.  Yes.

Q.  Now, going to the next page, is there a discussion that's reported with Mr. Runyon about mental illness?

A.  Yes.

Q.  And, again, what was Mr. Runyon's position on whether he had any mental illness?  Let me point out to you a certain portion.

A.  All right.

Q.  Let's see.  If you could start reading from this, "I then advised."  Do you see right where I have my cursor there?

A.  Yes.  This is the doctor speaking.  He says, "I then advised him that the other component of mental illness issues

Hudgins, S. - Cross                                              200

is 'I have a mental illness, and therefore that mental
illness should have something to do with whatever sentence
there might be.'"  And I then said to Mr. Runyon, "Again, I'm
not hearing that from you," and that I really do want to
understand his situation and how he sees it.  And he replied,
"I think you're correct.  I don't think I suffer from any
mental illness or ever have, you know.  I'm not a certified
whatever doctor or whatever, but I don't feel like that, and
I don't think I ever have been.  And I also think that, you
know, it's something that brings shame on me in a way,
because I think a lot of people try to do the insanity plea
to excuse their actions, but I disagree with that line of
thinking altogether."

Q.  Judge Hudgins, was that consistent with your discussions
with Mr. Runyon about his view of using mental health?

A.  Yes.

Q.  These statements that are in the report, when Mr. Runyon
denies any involvement in the offense and denies that he has
any mental health issues and talks about it being used as an
excuse, would you have wanted those statements put before a
jury?

A.  No.

Q.  Ms. Chavis asked you about a number of other aspects of
the report.  Was this something about the report that you
considered, as well, in deciding not to use a mental health

Hudgins, S. - Cross                                                      201

defense because it would open the door to this type of information?

A.  Yes.

Q.  Going down there further here, is there a discussion where Mr. Runyon talks about this car accident?

A.  Yes.

Q.  And you were aware at this point, of course, of the car accident, right?

A.  Yes.

Q.  And Mr. Runyon talks about taking advantage of him because he's a nice person, may borrow something small, and he may forget it, and they just never return it?

A.  Yes.

Q.  The doctor says, "I then said to Mr. Runyon this situation he is in right now is not small, and asked him if he thinks in this situation, which he referred to as 'huge,' that he may have forgotten something he said or did, and he reported, 'I don't think it's possible.  I mean, first of all, I would never conspire to do anything like that, to conspire something like what they're accusing me of.  You would have to do a lot of thinking and talking and planning, you know.'"

Again, would that information have been information you wanted presented in front of a jury?

A.  No.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    202

Q.   Is there a mental status examination portion of the report as well?

A.   Yes.

Q.   Was Mr. Runyon questioned about any delusional thinking or thoughts that weren't consistent with reality?

A.   Yes.

Q.   Let's go down to the forensic opinion.  It indicates, "It is my opinion that Mr. Runyon does not suffer from any serious mental illness, mental disorder, or brain pathology...no mental health factors that are mitigating or aggravating."

     And then it goes on to say, "Criteria for diagnosis of a personality disorder, not otherwise specified with narcissistic features."  Now, narcissism is what we saw on Dr. Nelson's initial report as well, correct?

A.   Correct.

Q.   Would you have wanted the jury to know that these experts, the government experts, Dr. Nelson, was looking at David Runyon as a narcissist?

          THE COURT:  No, not Dr. Nelson.

          MR. SAMUELS:  Dr. Patterson.

          THE COURT:  Dr. Nelson was your expert that you talked to?

          THE WITNESS:  Yes.

          THE COURT:  Dr. Patterson is the government's

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    203

expert and is coming, according to what you're asking him,

to the same conclusion?

        MR. SAMUELS:  Yes, ma'am.

        THE COURT:  All right.

        THE WITNESS:  No, I would not want that coming

before the jury.

BY MR. SAMUELS:

Q.  Does Dr. Patterson discuss this self-reported history of

concussions and short-term memory problems?

A.  He does.

Q.  I'd next like to take you to 55B.  Do you recognize 55B,

which is, I think, Ms. Chavis showed you as well?  It's

document 277, filed June 30th, 2009, the report of

Dr. Montalbano?

A.  Yes.

        MR. SAMUELS:  Your Honor, I'd offer 55B.

        THE COURT:  It's admitted.

        (Government's Exhibit 55B received in evidence.)

BY MR. SAMUELS:

Q.  And was this another document that you would have gotten

and reviewed after the eligibility phase when these were

released to counsel July 22nd, 2009?

A.  Yes.

Q.  Now, this report is also somewhat comprehensive, would

you agree with me, 31 pages?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    204

A.  Yes.

Q.  And this reviews all of the information that's reviewed here, it looks like by Dr. Nelson -- excuse me, Dr. Montalbano?

A.  Yes.

Q.  Now, I think there are some records that are referenced from some of these drug facilities.  Do you remember that, Judge Hudgins?

A.  I mean, I see it in front of me.

Q.  Had you reviewed those records, do you recall, or did you rely on --

A.  Yeah, I reviewed them.

Q.  The records from the drug companies didn't show any neurological or mental issues, did they?

A.  No.

Q.  They didn't show that he had any history of problems or accidents or anything that would make him unsuitable for these drug testing?

A.  No.

Q.  There was no flags in the drug testing records that indicates he could have some sort of mental health disorder?

A.  No.

Q.  On Page 8, it again lists the defendant's version of the offense, and the defendant says here -- and let me ask, Judge Hudgins, do you recall if there was a requirement that the

Hudgins, S. - Cross                                                          205

government, not the defense, but the government had to have an audio recording done of its reports, of its interviews by these experts?

A.   No, I don't recall that.

Q.   If it had been in the order, you wouldn't disagree with it?

A.   Oh, no.

Q.   Okay.  And so there are actually quotes here, and Mr. Runyon states that he was innocent, adamantly denied any involvement in the alleged offense.  He stated, "I know I didn't do it."  "I don't care if the government puts me to death."  And that he, "Will never tell anybody I did something I didn't do."

     Would those have been statements that you wanted to put in front of a jury that was considering what penalty to impose on Mr. Runyon?

A.   No, because he's already been found guilty by them.

Q.   Is there a discussion about Mr. Runyon denying that he's under any significant pressure at the time?

A.   Yes.

Q.   Let me go down.  I don't want to -- this report will be in evidence.

     Ms. Young, can we go to Page 20 so I don't have to skip all the way down, please.  Thank you.

     This is 20, I think, on the prior exhibit.  I need 20

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                206

on 55B.  Thank you.

Again, there is a reference at the top of Page 20, going back to Dr. Montalbano's reports, where he reports that he was in this bad car accident.  Again, you know about the car accident?

A.  Yes.

Q.  And there is a reference here that he did not believe that he lost consciousness.  Do you see that?

A.  I do.

Q.  And then these follow-up treatments at the Army Hospital, is that what you're referring to when you are saying there were some Army records that showed some follow-up and how he progressed through after the accident?

A.  Yes.  Because it also says he was treated at a local hospital and released.  That's where he was treated after the accident.

Q.  There is a reference here to a head trauma that Dr. Montalbano looks into, knocked out playing football, knocked out by a hand grenade simulator.  Any records you ever found of that?

A.  No.

Q.  Losing consciousness, dragged through the woods by two soldiers who apparently thought this was part of a training exercise.  Ever see anything like that, Judge Hudgins?

A.  No.

Hudgins, S. - Cross                                           207

Q.  A C-4 explosive went off as he was diving into a bunker.
Did you ever see anything that supported that?

A.  No.

Q.  The shockwave struck him from the torso down.  He was
stunned but did not believe that he passed out.  Did you see
anything that supported that?

A.  No.

Q.  Looking down to further in the report, there is a section
for collateral interviews.  A number of deputies were
interviewed.  You presented a number of deputies at the
mitigation phase of the trial; is that right?

A.  Yes.

Q.  And the purpose of that was to show that David Runyon was
not dangerous, that he was cooperative, that he could live a
peaceful life in prison?

A.  Yes.

Q.  There is a series of examinations that are given and then
a description of those examinations.  Again, did you review
all this, Judge Hudgins?

A.  I did.

Q.  And it looks like a full-scale IQ of 116.  When you had
your interactions with Mr. Runyon, did you find him to be
intelligent and able to communicate and understand you?

A.  Yes.

Q.  Now, there is reference here, sir, that on this MMPI-2

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    208

Mr. Runyon generated a consistent profile and understood the test items.  However, he omitted 11 items.

Do you recall that Sheila Cronin, in her description of this testing, noted that David Runyon omitted certain items because he thought it would be bad for him?

A.  No, I don't remember that at this point.

Q.  Okay, sir.  And then there is -- again, I'm trying to scroll through to the bottom here.  Dr. Montalbano concludes that Mr. Runyon meets the criteria for a personality disorder, personality dysfunction, also references narcicisstic, anti-social, histrionic, and borderline personality disorder.  Do you see that, sir?

A.  I do.

Q.  Is that consistent with Dr. Patterson's reporting?

A.  Yes.

Q.  Was it consistent with what Dr. Nelson had said in that report that we looked at?

A.  Yes.

Q.  And you also had Dr. Bender that had advised he would be adverse if you put him on the stand?

A.  Yes.

Q.  Would you have wanted the jury to know that there were experts that were finding him narcissistic, anti-social, histrionic, and had borderline personality disorder?

A.  I would not.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    209

Q.   And there is no reference in that line to PTSD?

A.   There is not.

Q.   Were these reports provided to the defense experts, Dr. Mirsky and Dr. Merikangas?

A.   Yes.

Q.   Do you recall if they really addressed them in any way in their reports?

A.   I don't recall them addressing them.

Q.   Let me next take you to Government's Exhibit 56.  Try and move this along, Judge.  This is an e-mail, Wednesday, July 22nd, 2009, from yourself to Dr. Nelson, Dr. Mirsky, Dr. Merikangas, and Sheila Cronin.  Do you see that, sir?

A.   I do.

Q.   Just updating these professionals as to the status and when the mental health reports are due and when the government reports are due; is that right?

A.   Yes.

          MR. SAMUELS:  Your Honor, I'd offer Exhibit 56.

          THE COURT:  It's admitted.

          (Government's Exhibit 56 received in evidence.)

BY MR. SAMUELS:

Q.   Judge, in doing this type of work, there is usually an order or schedule for producing expert reports; is that right?

A.   Yes.

Hudgins, S. - Cross                                              210

Q.   Can't just roll in the day before and present one?

A.   No.

Q.   It talks about the marshals making arrangements for non-expert witness travel.  In addition to dealing with these expert issues, were you also working to build your case from a social and a family and friend perspective?

A.   Yes.

Q.   How were you doing that, Judge Hudgins?

A.   Well, I had reports of interviews from Ms. Cronin and Glenn Ford that had been done actually before I was even in the case, so I had the benefit of those.  There was one or two that were videotaped, and so I had those available to me and reviewed those to see who would be favorable to bring.

       I went to and visited with his mother and stepfather in Oklahoma.  I went to and visited with his ex-wife and son, wherever they were, somewhere in the Midwest.  That was to just prepare them more than -- I wanted to use them all.  I mean, there were hiccups in what we found when we talked to them, but --

Q.   Were there some risks of putting his mother on the stand?

A.   Yes.

Q.   Do you recall what those risks were?

A.   Yes.  When I was talking to her and just kind of setting up what would be happening, I told her that if we were calling you, that the jury will have already found him

Hudgins, S. - Cross                                                          211

guilty, and we'll be trying to keep him from getting the death penalty.  And she just blew up and said, if the jury has found him guilty, he should get the death penalty.

So, you know, I said this is what we are going to have to deal with, you know, to try to corral her doing this on the witness stand is a risk.

Q.  Do you recall when you put her on the stand, you tried to develop some of her background and history going from Korea to the United States and back and forth in the country there?

A.  I specifically recall that because it was very interesting.  She had a very compelling story about that.

Q.  Do you remember at some point there was some objections by the government as to how far you would go with that?

A.  Yes.

Q.  So did you persist, though, in putting Ms. Suk Cha Runyon on the stand even despite some of these risks?

A.  Yes.

Q.  Did you have to be careful in how you did her examination because of that?

A.  Very much.

Q.  Judge, you were asked a number of questions, this is as good a time as any to ask, about the Linkers and about the Seegers.  Do you recall that?

A.  Yes.

Q.  Do you have to make decisions when you have a number of

Hudgins, S. - Cross                                               212

witnesses to present as to who to call and who not to call?

A.  Yes.

Q.  And is there sometimes a concern about witnesses being cumulative or not fitting within the pace or the dynamic of the trial?

A.  Yes.  And not being compelling.  If they are cumulative and they're not compelling, that's another factor that you know you are looking at.

THE COURT:  Your voice trailed off.

THE WITNESS:  I'm sorry.  If they are cumulative and not compelling witnesses, that's another factor to consider as to whether you want to put them on or not.

BY MR. SAMUELS:

Q.  Judge, I'd next like to take you to Government's Exhibit 57, which I believe is a response from Dr. Nelson on July 22nd, 2009, to your prior e-mail, which we see down below here.  Do you recognize that, sir?

A.  I do.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 57.  I'm sorry, Judge.  I offer Government's Exhibit 57.

THE COURT:  I'm sorry.  It's admitted.  I was waiting for a question.

MR. SAMUELS:  I'm sorry, Your Honor.

(Government's Exhibit 57 received in evidence.)

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                213

BY MR. SAMUELS:

Q.   Again, Dr. Nelson continues to be involved in this all the way through the eligibility phase?

A.   Yes.

Q.   Indicates that, "I assume if I'm not testifying that you do not need any kind of report from me?"

A.   Yes.

Q.   And would you have wanted a report from Dr. Nelson, given what he had told you previously and given the e-mail exchanges that we have seen?

A.   No.

Q.   Take you to Government's Exhibit 58.  Showing you 58, another response, this time from Dr. Merikangas, July 22nd, 2009, from Dr. Merikangas to you.  Do you see that, sir?

A.   Yes.

        MR. SAMUELS:  Your Honor, I'd offer Government Exhibit 58.

        THE COURT:  It's admitted.

        (Government's Exhibit 58 received in evidence.)

BY MR. SAMUELS:

Q.   Dr. Merikangas is telling you, Judge, that he needs to go Wednesday, July 29th, because he's got this other matter he has to do?

A.   Yes.

Q.   That's the soonest he can get down and see Mr. Runyon?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    214

A.  Yes.

Q.  Government's Exhibit 59, an e-mail from Dr. Mirsky to you, Thursday, July 23rd, 2009, again, in response to that e-mail you sent to all the experts.  I think Ms. Chavis went through this with you as well.  Do you remember that, sir?

A.  Yes.

        MR. SAMUELS:  Your Honor, we'd offer Government's Exhibit 59.

        THE COURT:  It's admitted.

        (Government's Exhibit 59 received in evidence.)

BY MR. SAMUELS:

Q.  He's telling you that Mr. Runyon is suffering from effects of two blast injuries he sustained when undergoing a training exercise in the ROTC.  Do you see that, sir?

A.  I do.

Q.  Now, Judge, was that self-reported by Mr. Runyon?

A.  Yes.

Q.  Was there anything that you could find that verified that?

A.  No.

Q.  Is this a situation where the concern of Dr. Nelson that if David Runyon had denied involvement in the offense, that there could be concerns, as well, about the information that he provided to the doctors?

A.  Yes.

Hudgins, S. - Cross                                                    215

Q.   And that that could affect the credibility of the information that the doctors provide?

A.   Absolutely.  That's what he said.

Q.   Is that something you considered?

A.   Yes.

Q.   He references "additional testing information that was sent to me not useful or informative."  I think we looked at this earlier.  This was the testing that I think Dr. Nelson and/or Dr. Montalbano had done.  Do you remember that?

A.   Yes.

Q.   Dr. Mirsky does not address that here?

A.   He does not.

Q.   Let's go next to Government's Exhibit 60.  Showing you Government's Exhibit 60, filed July 30th, 2009, document 259.

     Do you recognize that, Judge Hudgins?

A.   Yes.

        MR. SAMUELS:  Your Honor, we'd offer Government Exhibit 60.

        THE WITNESS:  It's admitted.

        (Government's Exhibit 60 received in evidence.)

BY MR. SAMUELS:

Q.   Now, Judge, I think we've seen that Dr. Merikangas had visited David Runyon on July 29th?

A.   Yes.

Q.   After that visit, is that when you would have had

Hudgins, S. - Cross                                                216

discussion with Dr. Merikangas about the need to get scans?

A.  Yes.

Q.  And, again, that's not something that you can do on your own, you've got to ask the Court to do that?

A.  Yes.

Q.  And then here again we see these forms that Dr. Merikangas provided to you to order the scans; is that right?

A.  Yes.

Q.  Down here it says, "Please give copy of films or CD images," and there is a line there that says, "To patient," but that's scratched out.  Do you see that?

A.  I do.

Q.  And what's written in instead?

A.  "To Dr. Merikangas."

Q.  Any reason to think that Dr. Merikangas wouldn't have gotten a copy of the films or the CD images as requested here in these reports?

A.  I don't have any reason to think that.

Q.  Let me next take you to 60A.  It's another e-mail.  This is Friday, August 7th, 2009, from Dr. Mirsky to you.  Do you see that, sir?

A.  I do.

        MR. SAMUELS:  Your Honor, I'd offer Government Exhibit 60A.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                217

THE COURT:  It's admitted.

(Government's Exhibit 60A received in evidence.)

BY MR. SAMUELS:

Q.  If we go down a little further here, and I'm sorry, let me start here.  On August 5th, two weeks before we start the penalty phase, you go to Dr. Mirsky telling him we are trying to get this MRI and this PET scan accomplished, but you've got this report to the Court and the government by August 6th, and you're asking, following up with Dr. Mirsky for anything he can give you; is that right?

A.  Yes.

Q.  And so here is Dr. Mirsky's response.  He says, "I've been on vacation.  I don't have anything to add until I know the results of the imaging tests, but I feel confident that my tests show the effects of the blast injuries plus automobile accidents he suffered while in the ROTC."

Again, self-reported by Mr. Runyon?

A.  Correct.

Q.  "I don't think the results of the other testing were very informative so far as I'm concerned.  He did a little better on the IQ test when I tested him.  This shows a little learning effect, which is to be expected.  To summarize so far, I feel that Mr. Runyon is impaired.  This needs to be considered in his sentencing."

Is there anything else that he gives you on what you

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    218

can use here?

A.   No.

Q.   Let's next go to Government's Exhibit 61.  I believe we have already moved that in.  61, Judge Hudgins, I think we looked at this one before.

          THE COURT:  It's admitted.  If it's not, it is now.

          MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.   Again, this is not only the request for the scans but the report that's issued August 13th, 2009, down here at the bottom.  Do you see that, sir?

A.   I do.

Q.   Same day that you spoke with Dr. Merikangas, according to your reports?

A.   Yes.

Q.   Let me see.  Let's next go to 62.  62 is just this e-mail from David Bruck to you and the team, August 5th, 2009.  Do you see that, sir?

A.   Yes.

Q.   I think you looked at this with Ms. Chavis.

          MR. SAMUELS:  Your Honor, we'd offer Government Exhibit 62.

          THE WITNESS:  Yes, I did.

          THE COURT:  What did you say?

          THE WITNESS:  I did look at it with Ms. Chavis.

Hudgins, S. - Cross                                                    219

          THE COURT:  It's admitted.

          (Government's Exhibit 62 received in evidence.)

BY MR. SAMUELS:

Q.  It does say here, "The government reports are not too bad.  Much of the personality disorder stuff is soft, sounds like traumatic brain injury from the car accident.  But to prove that up, they would need to be able to present before and after witnesses, that the lack of treatment and follow-up, as well as the severity of the injury, caused changes to more than his personality."

          Did you have any of that information, Judge Hudgins?

A.  No.

Q.  And even when they say that these reports aren't too bad, that's the view of those lawyers that are looking at them.  But would you have wanted to present those reports, given that David Runyon denied committing the crime, denied having mental health issues, and there was a finding that he was narcissistic?

A.  No.

Q.  I think there is second e-mail, too.  This is just how another one reviewed the report, another individual.  Again, you're still working with David Bruck all the way up to two weeks before the penalty phase.

A.  Oh, yes.

Q.  Is that right, sir?

Hudgins, S. - Cross                                                          220

A.  Yes.

Q.  Exhibit 63, which I think we did already look at.  I'll just go through it quickly.  Showing you 63, this is the August -- it's dated August 6, but it's the August 5th, 2009, report of Dr. Merikangas.  Do you recall that, sir?

A.  Yes.

        MR. SAMUELS:  Your Honor, if I haven't, I'll offer 63.

        THE COURT:  It's admitted.

        Look to go ahead and wrapping it up for now, Mr. Samuels.

        MR. SAMUELS:  Yes, Your Honor.  I can finish with this document and stop there.

        THE COURT:  Is that a good place as any to stop?

        MR. SAMUELS:  Actually, if I could do two more after this.

        THE COURT:  Sure.

        MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  This is where Dr. Merikangas talks about his -- conducting his neurological examination, ordering an MRI of the brain, a PET scan of the brain, and an EEG.  Those are what we saw referred to in the other documents, correct?

A.  Correct.

Q.  And then there is this reference here that Mr. Runyon had

Hudgins, S. - Cross                                                      221

undergone these extensive psychological examinations by Paul Montalbano and Raymond Patterson.  Those are the evaluations we just looked at, right, sir?

A.  Yes.

Q.  And they said they suggested that Mr. Runyon suffered from migraine-like headaches, attention deficit disorder, and post-traumatic stress disorder.  Do you see that, sir?

A.  I see that.

Q.  We went through those reports in an abridged fashion, but do you recall seeing those diagnoses in the portions of the report in the beginning?

THE COURT:  In what kind of?

MR. SAMUELS:  In an abridged fashion, Your Honor, in a summary fashion.

BY MR. SAMUELS:

Q.  Do you recall seeing those diagnoses in the portions of the report we reviewed?

A.  No.

Q.  And, again, Judge Hudgins, being someone who's experienced with experts from your prior life in litigation and trial work, is that something that you have to try and manage as a trial attorney, sometimes having different views from the experts and deciding how to proceed with that?

A.  You do, because one of the -- one of the problems with experts like that is you don't want the perception that they

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                   222

are just a hired gun who is saying whatever you want them to say.

Q.  Two more.  64, please.

     This is another e-mail from Ms. Cronin to you, August 7th, 2009.  Do you see that, sir?

A.  I do.

Q.  It's also got Mr. Woodward, Mr. Bruck on it.  Do you see that?

A.  Yes.

     MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 64.

     THE COURT:  It's admitted.

     (Government's Exhibit 64 received in evidence.)

BY MR. SAMUELS:

Q.  Now, this is August 7, so this is 12 days, just under two weeks before this penalty phase.  Will you read that e-mail to us that Ms. Cronin is writing to the trial team.

A.  Yes.  It says, "I met with David for three hours today and it was well worth it as he was more open and honest about his feelings and relationship with his parents that he has been before.  In brief, he has tried to live his entire life trying to meet his mother's rigid expectations and to obtain validation from his father, neither of which he succeeded in doing.  In fact, when he left Missouri, his mother disowned him -- something he knew was always a possibility given the

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    223

Korean culture.  That's a pretty powerful threat to grow up under.  I think this is all very powerful.  We just need to decide how to present it."

Q.  And then there is a -- read that last line for us.

A.  "Steve, thank you for sending me a copy of Dr. Merikangas's report."

Q.  And had you, in fact, sent Ms. Cronin a copy of the report of these experts?

A.  Yes.

Q.  Then there is some handwriting that's down below.  Do you recognize that handwriting, sir?

A.  No.

Q.  Okay.  Could you read it for us, sir?

A.  "How does living up to his mother's expectation and stress and pressure of that mitigate a murder for hire?"

Q.  Then the line below, can you make it out?  If you can't --

A.  It looks like "horrendous crime/horrendous person."  Oh, "horrendous crime does not equal horrendous person."

Q.  Okay.  Is that David Runyon is not the worst of the worst, was that part of the strategy you employed here?

A.  Yes.

Q.  So you're not sure if this -- this isn't your writing?

A.  Not my writing.

Q.  Very good.  The last document I'll show you is

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    224

Government's Exhibit 65.

I'm sorry, Ms. Young, can we pull up 65.  Thank you.

Judge, do you recognize this as another one of these memos from Sheila Cronin to the defense team, this one dated August 8th, 2009?

A.  Yes.

Q.  This one says, "Memo to counsel regarding penalty phase theme."  Do you see that?

A.  Yes.

Q.  Again, this is just 10 days -- or 11 days before the start of the trial.

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 65.

THE COURT:  It's admitted.

BY MR. SAMUELS:

Q.  This talks about David presented an overidealized view of his childhood.  Only in the past week has he shared his real feelings.  And it talks about information that David provides on his family.

Did you put various family members on at trial?

A.  Yes.

Q.  And this document, was this something that Ms. Cronin provided to suggest some themes that could be explored?

A.  Yes.

Q.  And as part of your mitigators, do you recall whether you

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      225

had some mitigators that were related to emotional harm that his family would suffer were he to be put to death?

A.  Yes.

Q.  Did that include his son as well?

A.  Yes.

Q.  And I think you testified you had gotten a letter from his son and someone was allowed to read that?

A.  Yes.

Q.  And this looks like this relates to an immaturity that related to failed multiple jobs, failing to meet career goals.  Do you see anything in here about mental health issues or diagnoses or brain injuries or anything like that?

A.  No.

        MR. SAMUELS:  Your Honor, that's a good place for me to stop, if that's acceptable to the Court.

        THE COURT:  That's acceptable.  Thank you.

        MR. SAMUELS:  Thank you, Judge.

        THE COURT:  Mr. Hudgins, for now, as you well know, you are in the middle of your testimony, and you cannot discuss it with anyone.  So if you would be back here tomorrow at noon, the Court would appreciate it, and we will adjourn in a moment, and you can return tomorrow at noon. Do not discuss your testimony.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Counsel, is there anything further for

226

the Court to take up this evening?  Mr. Samuels?

        MR. SAMUELS:  No, ma'am.  Thank you, Judge.

        THE COURT:  Ms. Chavis?

        MS. CHAVIS:  No, thank you.

        THE COURT:  The Court stands in recess on this case until noon tomorrow.

        (Hearing adjourned at 5:37 p.m.)

                      CERTIFICATION


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



        X_____/s/_____x

                  Jody A. Stewart

                  X_____2-7-2023 _____x

                        Date

JODY A. STEWART, Official Court Reporter