227

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
                          Newport News Division


     - - - - - - - - - - - - - - - - - - - - - - -
                                              )
       UNITED STATES OF AMERICA,              )
                                              )
         v.                                   )    CRIMINAL ACTION NO.
                                              )    4:08cr16
       DAVID ANTHONY RUNYON,                  )
                                              )
               Defendant.                     )
                                              )
                                              )
               AND                            )
                                              )
       DAVID ANTHONY RUNYON,                  )
                                              )
               Petitioner,                    )    CIVIL ACTION NO.
                                              )    4:15cv108
         V.                                   )
                                              )
       UNITED STATES OF AMERICA,              )
                                              )
               Respondent.                    )
                                              )
     - - - - - - - - - - - - - - - - - - - - - - -


                         TRANSCRIPT OF PROCEEDINGS

                                  DAY 2

                            Norfolk, Virginia

                          February 8, 2022



     BEFORE:   THE HONORABLE REBECCA BEACH SMITH
               United States District Judge
```

JODY A. STEWART, Official Court Reporter

APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Brian Samuels
               Lisa R. McKeel
               Assistant United States Attorneys
                    And
          DEPARTMENT OF JUSTICE
          By:  Carrie L. Ward
               Counsel for the United States

          FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE
          By:  Dana C.H. Chavis
               Helen Susanne Bales
               Assistant Federal Community Defender
                    And
          VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
          By:  Elizabeth J. Peiffer
               Counsel for the Defendant


                         **I N D E X**

| **GOVERNMENT'S WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| NONE | | | | |

| **DEFENDANT'S WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| STEPHEN A. HUDGINS | --- | 231 | 311 | |
| JON BABINEAU | 315 | 354 | | |
| LAWRENCE WOODWARD | 389 | 398 | 423 | |


                 JODY A. STEWART, Official Court Reporter

229

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| 3 | 365 |
| 4 | 373 |
| 5 | 374 |
| 6 | 377 |
| 7 | 378 |
| 8 | 380 |
| 13 | 384 |
| 15 | 386 |
| 16 | 408 |
| 30 | 412 |
| 64 | 415 |
| 66 | 234 |
| 67 | 234 |
| 68 | 235 |
| 69 | 237 |
| 70 | 241 |
| 71 | 244 |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 108 | 331 |
| 124 | 324 |
| 125 | 326 |
| 129 | 394 |
| 130 | 333 |
| 141 | 352 |
| 164 | 316 |
| 165 | 317 |

JODY A. STEWART, Official Court Reporter

230

(Hearing commenced at 12:10 p.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent, and case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, and Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Chavis, Ms. Peiffer, and Ms. Bales, is the defendant ready to proceed?

MS. CHAVIS:  Yes, we are.

THE COURT:  Good afternoon.

And Mr. Runyon is here at counsel table with his attorneys.

I believe that we were in the cross-examination of Mr. Hudgins, who is in the courtroom.

If you would please come forward, and you're still under oath.

THE WITNESS:  Yes, ma'am.  I understand.  Good afternoon.

THE COURT:  Good afternoon.

MR. SAMUELS:  Judge, may I proceed?

THE COURT:  Yes, you may.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                     231

MR. SAMUELS:  Thank you, Your Honor.

STEPHEN A. HUDGINS, called by the Defendant, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Continued)

BY MR. SAMUELS:

Q.  Good afternoon, Judge Hudgins.

A.  Good afternoon.

Q.  Sir, I'm just going to show you -- this is just a demonstrative that I just want to use to orient us to where you were when we left off yesterday.  This is a calendar of August 2009, and if you recall, we had discussed a number of matters leading up to the penalty phase, which I have marked as August 19th.  That's the day it began, correct?

A.  Correct.

Q.  And so going up to the top of the list, and I don't have boxes for it, but the first date, July 29th, that's when Dr. Merikangas came to visit Mr. Runyon in the jail; is that right?

A.  It is.

Q.  Then the next day, July 30th, we had Government's Exhibit 60 that was moved in, that's when you moved for an MRI and a PET scan as advised by Dr. Merikangas?

A.  Correct.

Q.  And then taking us forward about a week later to

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    232

August 5th, that's when Dr. Merikangas did his report, which was dated August 5th.  This is Government's Exhibit 63.  You remember we discussed this?

A.  Yes.

Q.  And also, sir, on that same day, there were some e-mails in Government's Exhibit 62 back and forth with resource counsel and some other folks.  You remember that?

A.  Yes.

Q.  The next day, August 6th, is when you went ahead and filed Dr. Merikangas's report with the Court.  That's Government's Exhibit 63?

A.  Yes.

Q.  And then the day after that, we had some additional e-mails, including Government's Exhibit 60A, which was an e-mail from Dr. Mirsky?

A.  Yes.

Q.  And then we also had Government's Exhibit 64, which was the e-mail from Sheila Cronin, also dated August 7th?

A.  Yes.

        I do have a question about Government's Exhibit 63. It looks like it appears on August 5th and August 6th.  Was that the way it was numbered?

Q.  It does, sir, and let me show you that.  Government's Exhibit 63 is actually your cover letter, dated August 6th.

A.  Okay.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                  233

Q.  When you filed the report, it's actually dated August 5th.  That's why I doubled it up there.

A.  All right.

Q.  But that's the chronology as it takes us to Government's Exhibit 65, which I believe was the last exhibit we discussed last night.  This was the report of Ms. Cronin.  Do you recall that?

A.  Yes.

Q.  So, again, looking at the calendar, this is about two weeks prior to the mitigation phase beginning.  Things are happening almost every day here pertaining to your ongoing investigation?

A.  Yes.

    MR. SAMUELS:  Madam Clerk, could we now switch over to the government's exhibit system, please, on the laptop.

BY MR. SAMUELS:

Q.  Judge Hudgins, I'd next like to show you -- we have been going through this chronology -- Government's Exhibit 66. Sir, showing you 66, which is document 269, filed August 10th, 2009, a motion to allow the defendant to supplement his mental health reports.  Do you recognize that, sir?

A.  I do.

    MR. SAMUELS:  Your Honor, we'd offer Government's Exhibit 66.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                      234

THE COURT:  It's admitted.

MR. SAMUELS:  Thank you, Judge.

Your Honor, may I have just one moment?  We are having a technical issue here.

(Government's Exhibit 66 received in evidence.)

BY MR. SAMUELS:

Q.  And, Judge, as we see in this motion, even though you've got a date of August 6th to provide the expert reports -- do you remember we discussed that yesterday?

A.  Yes.

Q.  In this motion you're asking for additional time because of the recent testing.  Do you recall doing that?

A.  Yes.

Q.  Let me next take you to Government's Exhibit 67.  Showing you Government's Exhibit 67, which is document 274, filed August 14th, 2009, a motion to release test results to counsel.  Do you recognize that, Judge Hudgins?

A.  I do.

MR. SAMUELS:  Your Honor, we would offer Government's Exhibit 67.

THE COURT:  It's admitted.

(Government's Exhibit 67 received in evidence.)

BY MR. SAMUELS:

Q.  Judge, do you recognize this as a request to be able to send any results and films directly to your experts?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    235

A.   It was a request to allow me to pick up the records from the sheriff or the marshal, whoever had them, so that I could get them to the defense expert.

Q.   And, Judge Hudgins, if you had these results, would there have been any reason you would not have sent them on to your experts?

A.   No.

Q.   Let me next take you to Government's Exhibit 68.  Judge, showing you 68, which is document 278, filed August 17th, 2009, do you recognize this as an order from the Court regarding your request to supplement the expert reports?

A.   Yes.

        MR. SAMUELS:  Your Honor, I would offer Government's Exhibit 68.

        THE COURT:  It's admitted.

        (Government's Exhibit 68 received in evidence.)

BY MR. SAMUELS:

Q.   Now, Judge, if we notice the date on this, this is August 17th, 2009.  That's two days before the penalty phase is scheduled to start; is that right?

A.   Correct.

Q.   Looking at the top of this order, this is an 11-page order that discusses in some detail the request to supplement the reports, the issues that you're confronting, and the timing to do so?

Hudgins, S. - Cross                                              236

A.   Yes.

Q.   And, Judge, this is an order that you would have gotten and you would have reviewed prior to beginning the penalty phase?

A.   Yes.

Q.   Looking at the last page of this report, and we've looked -- excuse me -- the order.  We have looked at some orders, Judge Hudgins, which are just one- or two-page orders regarding being allowed to provide test results or get test results from the jail or getting approved for an expert, but this is a more lengthy order; is that right?

A.   Yes.

Q.   I just wanted to see, does this have a date on it by which you can supplement your reports?

A.   Before noon on August 20th, 2009.

Q.   Did you ever get any supplemental reports from Dr. Merikangas or Dr. Mirsky?

A.   Not that I recall.

Q.   If you had, they would have been in your file, sir?

A.   Yes.

Q.   Which you have not had access to?

A.   Correct.

Q.   Let me next show you Government's Exhibit 69.  Sir, showing you 69, which is document 285, filed on August 21st, 2009, a list of mitigating factors, do you recognize that,

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              237

Judge Hudgins?

A.    I do.

MR. SAMUELS:  Your Honor, we would offer Government's Exhibit 69.

THE COURT:  It's admitted.

(Government's Exhibit 69 received in evidence.)

BY MR. SAMUELS:

Q.    Judge Hudgins, how was this list of mitigating factors put together, sir?  Do you recall?

A.    Going through the evidence that we knew we would be able to present at the mitigation phase, these were the factors that we had evidence to present on.

Q.    And did you put this list together in connection with Mr. Woodward?

A.    Yes.

Q.    And did your investigative team, including Ms. Cronin, have some input into this as well?

A.    Yes.

Q.    And looking at the date of the filing, sir, this is August 21st, 2009.  This would have been after that August 20th deadline for any supplemental reports; is that right?

A.    Correct.

Q.    But on August 20th, you had no supplemental reports to file?

Hudgins, S. - Cross                                                    238

A.   Correct.

Q.   You had received nothing additional from your experts?

A.   Correct.

Q.   At this point we are two days into the penalty phase of the trial; is that right?

A.   Correct.

Q.   At this point did you have to make a determination as to what you had evidence on to present as mitigating factors?

A.   Yes.

Q.   Did that include mental health at that time, sir?

A.   It didn't include mental health as far as the most recent things that we were working on, but it included -- we had mental health information from earlier.

Q.   Let me ask it a better way.  Did you make a decision to include what you did on here and not include the mental health that you'd gotten to date?

A.   Yes.  We made that decision based on what we did have.

Q.   Okay.

        THE COURT:  Did you make it based upon what you've testified to as the past conversations and past experiences with your experts?

        THE WITNESS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.   Judge Hudgins, on that note, was there anything that your experts requested that you do or get that you did not do?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                     239

A.   No.

Q.   In fact, I recall Dr. Mirsky asked for the -- I believe it was the MMPI data from one of the government's experts. Do you recall that?

A.   I do.

Q.   Was that provided to Dr. Mirsky?

A.   It was.

Q.   Did Dr. Merikangas ask you to get these scans of David Runyon?

A.   Yes.

Q.   And did you go ahead and do that?

A.   I did what I needed to do for them to be done.

Q.   Was David Runyon receptive to getting those scans done?

A.   He was not, but he did it.

Q.   Did he say why he wasn't receptive to doing it?

A.   He wasn't receptive to the mental health mitigation.

Q.   Looking through these mitigators, were you able to present evidence on these mitigators that we see here on the first page?  If you will just look through it, sir.

A.   Yes.

Q.   If we could go to the next page.  I can scroll down. Excuse me.

      Looking at 6 or 7 that reference parental conflict and domestic violence, did you present evidence on that that you had obtained in your investigation?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    240

A.   I can't remember if we did it or not.

Q.   Did you present family members of Mr. Runyon?

A.   I did.

Q.   All right.  And, sir, we could certainly look at the verdict sheet to see what the jury found on these different mitigators; is that right?

A.   Yes.

Q.   This information about a positive adjustment to incarceration and respect for correctional officers, did you present information on that?

A.   Yes.

Q.   And was some of that related to Dr. Cunningham's testimony?

A.   It was.

Q.   Now, do you recall, sir, that Dr. Cunningham did not interview David Runyon?

A.   I do not believe he did.

Q.   Judge Hudgins, looking through these factors that David Runyon has no disciplinary write-ups, that he's contributed to the well-being of his fellow inmates through Bible study, were these intended to show David Runyon's humanity?

A.   Yes.  Humanity and positive reaction to the jail setting.

Q.   And then going down to the last page here, that David Runyon's mother will suffer harm if her son is executed, did you present his mother as a witness?

Hudgins, S. - Cross                                                241

A.   Yes.

Q.   Were there also some factors related to his military service and his education that you presented?

A.   Yes.

Q.   I'd next like to -- Judge Hudgins, I think the verdict came down sometime in late August.  Do you recall that, sir?

A.   Yes.

Q.   And there was a special verdict form where the jury could indicate which aggravating factors and which mitigating factors it found?

A.   Yes.

Q.   After the jury came back with their verdict, did you have some continued contact with the experts in terms of preparing invoices or making sure they got paid?

A.   Yes.

Q.   Let me show you Government's Exhibit 70.  And do you recognize -- let me show you this.  This is an e-mail train from yourself and Dr. Nelson dated early September 2009.  Do you recognize the e-mail addresses there, sir?

A.   Yes.

        MR. SAMUELS:  Your Honor, we'd offer Government's Exhibit 70.

        THE COURT:  It's admitted.

        (Government's Exhibit 70 received in evidence.)

BY MR. SAMUELS:

Hudgins, S. - Cross                                                     242

Q.   Judge, if I could start with the bottom e-mail where you're letting Dr. Nelson know about the status of the case, read that second sentence for us, please, sir.

A.   "We did not present a mental health defense, *per se*, but did put on evidence of his childhood and life as we had previously discussed."

Q.   Sir, was that part of some of the prior e-mails we saw with Dr. Nelson, where he was describing that he perhaps shouldn't testify as an expert, but there may be ways to show David Runyon's social history?

A.   Yes.

Q.   And then you asked, "Since I was not around when you were retained, let me know if you were paid for your services. Thank you."

     Was this part of making sure that Dr. Nelson got paid for his work in the case?

A.   Yes.

Q.   What would have had to happen for him to do so?  What would you have had to do, sir?

A.   He would have to submit an invoice to me, which I would submit to the Court and request payment.

Q.   Is that something that you would have kept in your file, sir?

A.   Yes.

Q.   Do you know off-hand, even a ballpark, how much

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                243

Dr. Nelson got paid?

A.   I do not.

Q.   Now, the top of this e-mail is Dr. Nelson's response to you, and would you read that for us, please, sir.

A.   It says, addressed to me, "Alas, this is not a surprise. It's what all of us had been trying to tell him for months -- he would likely lose the trial, and if he did, then the jury's perception of him for the penalty phase was that he is a cold-blooded, planful hired gun.  As they say, you can lead a horse to water, but you cannot make him drink, and that is what happened when Mr. Runyon was given good advice but completely chose to gamble on refusing it."

Q.   Does it say "completely" or "competently chose to gamble"?

A.   "Competently," I'm sorry.  "Was given good advice but competently chose to gamble on refusing it."

Q.   The next paragraph relates to paperwork on the case?

A.   Correct.

Q.   Does this e-mail reflect your discussions, your ongoing discussions with Dr. Nelson that occurred throughout the summer of 2009, as you were headed into the penalty phase?

A.   Yes.

Q.   Does it reflect the advice that he had given you about Mr. Runyon?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                         244

Q.   Taking you next to Government's Exhibit 71, sir.  71, a letter from you dated September 10th, 2009, regarding a payment for invoice for Dr. Mirsky.  Do you recognize that, Judge Hudgins?

A.   Yes.

Q.   Then just scrolling through here, there is what appears to be an invoice paperwork; is that right?

A.   Yes.

Q.   And then we've also attached to it the letter, that I think Ms. Chavis discussed with you yesterday, that Dr. Mirsky had sent to you on September 18th, 2009.  Remember we talked about that?

A.   Yes.

        MR. SAMUELS:  Your Honor, we'd offer Government's Exhibit 71.

        THE COURT:  It's admitted.

        (Government's Exhibit 71 received in evidence.)

BY MR. SAMUELS:

Q.   Now, again, Judge Hudgins, should there be similar paperwork for each and every expert that you dealt with?

A.   Yes.

Q.   Now, we saw some paperwork from Dr. Bender yesterday.  Do you recall that?

A.   Yes.

Q.   We saw some paperwork that I just showed you from

Hudgins, S. - Cross                                                    245

Dr. Nelson, some correspondence about that, right?

A.  Yes.

Q.  This is with respect to Dr. Mirsky.

Would there also be some paperwork somewhere with respect to Dr. Merikangas and Dr. Cunningham?

A.  There should be.

Q.  Have you seen it, sir?

A.  I have not.

Q.  Do you have any idea as to how much Dr. Cunningham got paid?

A.  No.

Q.  How about Dr. Merikangas?

A.  No.

Q.  Let's take a look at Dr. Mirsky.  Does this reflect Dr. Mirsky's claimed compensation, $10,312.50?

A.  Yes.

Q.  And going through his letter to you, again, we see that Dr. Mirsky provides some additional information to consider; is that right?

A.  Yes.

Q.  Now, this is after the jury verdict?

A.  Correct.

Q.  And in this letter you have reported to Dr. Mirsky that the scans of David Runyon were normal?

A.  Yes.

Hudgins, S. - Cross                                            246

Q.   And he has other information to consider past that; is that right?

A.   Correct.

Q.   Let me take you back, Judge Hudgins, to Government's Exhibit 60A, if you could pull that up.  It's already in evidence.  And this is the e-mail from Dr. Mirsky in response to your e-mail of August 5th to the experts asking for supplemental reports.  Do you remember that, sir?

A.   I do.

Q.   Now, in this e-mail from Dr. Mirsky on Friday, August 7th, he says in the second line, "I don't have anything else to add until I know the results of the imaging tests on Mr. Runyon"; is that right?

A.   Yes.

Q.   But in that letter from September, even after he knows the tests are normal, he has a number of different pieces of information to add?

A.   Yes.

Q.   Then down here he does say -- excuse me, sir, I'm sorry. After the ROTC, he says, "I don't think the results of the other testing were very informative so far as I am concerned."  Do you see that?

A.   Yes.

Q.   Now, the other testing, that would have been the testing that Dr. Montalbano did; is that right?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                        247

A.  I assume that's what he's talking about because I'm not aware of any other.

THE COURT:  Not what?

THE WITNESS:  I'm not aware of any other.

BY MR. SAMUELS:

Q.  And so if we could go to Government's Exhibit 36, page -- and I'll scroll down.  This is the actual evaluation of Dr. Mirsky.  Do you remember that, Judge Hudgins?

A.  Yes.

Q.  If we go down to Page 6, this reveals his evaluation, but on the last page here, Dr. Mirsky says, "It would be very helpful to have available the results of other psychological and neuropsychological tests, including, but not limited to the MMPI."  Do you see that?

A.  I do.

Q.  And so these must be the tests that he's referring to in his e-mail when he says those tests weren't particularly helpful?

A.  That makes sense.

Q.  Then the last piece on this that I'll show you is Government's Exhibit 50B.

Madam Clerk, could we switch over to the Elmo?  I can pivot and make that work.

A.  You want me to just look it up in here?

Q.  I may have the number wrong.  I'm sorry.  I'm sorry, it

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              248

is --

MR. SAMUELS:  I apologize, Your Honor.  The Court's indulgence for just one moment.

BY MR. SAMUELS:

Q.  I see.  Here it is.  It's the report of Dr. Montalbano.  Yes, thank you, 55B.  I knew it was in the 50s.

Judge, showing you the report of Dr. Montalbano that we looked at yesterday.

Ms. Young, can you get me all the way down to Page 25, please.

And so on Page 25, it reveals that back when David Runyon was evaluated by Dr. Montalbano in February of 2009, this MMPI test was done?

A.  Yes.

Q.  But Dr. Mirsky says he didn't find this particularly useful?

A.  Correct.

Q.  Judge, if we talk a little bit further about the mitigation case --

And, Ms. Armstrong, if we could flip over, please.

Sir, do you recall calling about 21 witnesses in that case in mitigation?

A.  Yes.

Q.  All right.  And just showing you this as a demonstrative, there were a number of different categories, were there not,

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                    249

sir?

A.  Yes.

Q.  That included Dr. Cunningham related to his analysis on David Runyon's adjustment in prison?

A.  Yes.

Q.  That included a number of different deputies that talked about their interactions with David Runyon?

A.  Yes.

Q.  Chip Banks I believe testified about David Runyon's military history and some of his records there?

A.  Yes.

Q.  There were a number of different friends and associates from Larry Tybow all the way down the Linkers.  Do you see that, sir?

A.  I do.

Q.  Then there were a number of family members and other friends; Dombrowski, Runyon, Lockwood, Mark and Maria Runyon, and then Phyllis Provost; is that right?

A.  Yes.

Q.  And Ms. Provost was the last witness that you called in in the penalty phase; do you recall that?

A.  I do.

Q.  What was her background, sir, do you remember?

A.  She was -- I'm not positive she was a priest.  She was a religious leader.

Hudgins, S. - Cross                                           250

Q.  Did Ms. Provost -- did she have a child that David Runyon had some involvement with?

A.  She did, a special needs child.

Q.  Do you recall his name being John, sir?

A.  I don't recall that.  I just recall the child.

Q.  Sir, I'm going to show you -- and it's just demonstrative -- a portion of that transcript.  This is August 25th, 2009, in the United States versus David Runyon.  Do you recall that, sir?

A.  I do.

Q.  This is Page 2442.  Up at the top here, it looks like you've got your ending examination with Dr. Provost.  Do you see that, sir?

A.  Yes.

Q.  What was the last question that you asked Dr. Provost on line 3, sir?

A.  "Can you describe for the jury David Runyon?  What characteristics of him would you want them to be aware of?"

Q.  Sir, would you read her answer for us, beginning on line 5.

A.  All right.  "Patience.  Again, I'm thinking with John. He was a wonderful houseguest.  I'm not sure if you can say it, but I didn't think there was ever a man that volunteered to take out the trash.  It was just he was helpful.  He wanted to do what he could for you.  He went over and above.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    251

It was like he was living -- it was like he was living his life in gratitude.  He was a joy to have around.  Quiet.  Gentle.  Fun.  Generous.  Kind.  Those are the words that come to my mind when I think about him.  He wanted to help."

Q.  Judge Hudgins, this last paragraph of this last witness in your mitigation phase, is that the image you wanted to present of David Runyon to the jury?

A.  Absolutely.

Q.  Sir, did you have concerns that the mental health information that had been developed to date could have clouded that image?

A.  Yes.  Very strong concerns.

Q.  What were those concerns, can you tell us, please?

A.  Yes.  That if you brought in the mental health, which to me were not definite enough, without being able to find direct evidence of the blast injuries and the car accidents, you know, to see what the description of it was and that kind of thing, and we didn't have -- I mean, we had the mental health information from Dr. Evan Nelson and Dr. Bender that we knew would then come in.  We had, of course, the government experts who would also testify at that point.  And to try to -- to put that on, when we've put on this kind of case, and then to put on a mental health case that basically -- as I said yesterday, he has pled not guilty, he has been found guilty, he maintains his innocence, and yet we

are going to put on a mental health case that's going to say, this is why he, you know -- this is why you should not hold him accountable to the extent of death for doing what he did. So it just flies in the face of each other. It was incongruent. And, again, I know you can do that, legally you can do that, but we weren't thinking legally what can we do. We were thinking what can we do to convince this jury not to give David Runyon the death penalty.

Q. So, Judge, was this a strategic decision not to put on the mental health information you had developed to date?

A. I'm sorry. I didn't hear the beginning.

Q. Sure. Was this a strategic decision that you made not to present the mental health information that had been developed to date?

A. Absolutely.

Q. Was it discussed and made with your co-counsel, Mr. Woodward?

A. It was.

Q. Was it made after considering the available information as well as the impact that information would have on the case?

A. That is what drove the decision.

Q. Even though David Runyon did not want to do this, did not want to present a mental health defense, we talked about that yesterday, did you still continue to try and develop it?

Hudgins, S. - Cross                                              253

A.   Yes.  We were developing it, as we saw today, right up into the third phase.

Q.   Now, in terms of what you had back then, Judge, you did have some various social history threads about abuse that David Runyon had sustained as a child and his motor vehicle accident; is that right?

A.   Yes.

Q.   But you also had some reports from Dr. Nelson indicating narcissism?

A.   Yes.

Q.   You had some government reports that said David Runyon had a personality disorder?

A.   Yes.

Q.   And these same reports, Dr. Nelson, Dr. Patterson, and Dr. Montalbano, all indicated that David Runyon denied responsibility for the offense?

A.   Yes.

Q.   You had Dr. Bender saying that he shouldn't be called in the case?

A.   Yes.

Q.   You had David Runyon saying he did not want to pursue a mental health defense?

A.   Yes.

Q.   That's what you had.  And then on the stage in terms of where this was set, you knew this jury had found him guilty?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                254

A.   Yes.

Q.   You knew the jury had found that he intentionally killed Cory Voss?

A.   Yes.

Q.   You knew they had found that he did it for money?

A.   Yes.

Q.   You knew they had found that he did it after substantial planning?

A.   Yes.

Q.   In terms of some of the evidence of that, you recall that David Runyon had a list of items to be used in the crime that was found in his truck?

A.   Yes.

Q.   Do you recall he had a map in his truck that indicated the distance from West Virginia to Newport News, Virginia, about six hours and 300-and-some-odd miles?

A.   Yes.

Q.   Do you recall that there was evidence that he had bought the weapon, the murder weapon a week before from someone named George Koski?

A.   Yes.

Q.   Do you recall that there was evidence that he bought a bore brush after the murder and had it sent to his address under the name of Andy Garcia?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                                    255

Q.  Sir, did you also have some e-mails and wire intercepts where David Runyon contrived to fabricate an alibi and conceal his involvement?

A.  I remember that.  I don't have the -- I don't have those documents.

Q.  Sure.  Let me just show you and see if it refreshes your recollection.  This is Government's Exhibit 197 that was admitted at the trial.  197B is the transcript of one of those wire calls.

Do you recall that there were a number of this type of pieces of evidence that were introduced at the trial?

A.  Oh, yes.

Q.  So at the end here, you've got Runyon right down at the bottom saying, "Yeah, I'll hang tough to the bitter end."  And then he kind of describes his views on cops.  Do you remember some of those statements coming in?

A.  Yes.

Q.  In view of that, Judge, were you concerned about presenting Runyon's continuing denial and views of the case through some of these experts?

A.  Yes.

Q.  If you had put on the mental health information you had -- and you did have some.  You had the reports of Mirsky and Merikangas, right?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                    256

Q.   And they both said that these are preliminary reports, but he's got some issues, correct?

A.   Yes.

Q.   If you had put that on, could it have affected your effort to show that Runyon was not the worst of the worst?

A.   Yes, that was the concern.

Q.   Were you concerned that the reports of Dr. Mirsky and Dr. Merikangas might not be persuasive?

A.   Yes.

Q.   Did you consider that information that they would have provided in context with the government's rebuttal?

A.   Yes.

Q.   We looked at the argument or the statement right here from Dr. Provost where she talks about how kind he is.

        Were you concerned if you put on mental health information, it might make him seem less kind or even dangerous?

A.   It would.  Yes, I was concerned.

Q.   There's a claim, Judge, that you should have presented both types, the image that you see on the screen here of him doing kind and generous things, but also present the information about his mental health and damage.  Do you understand that, sir?

A.   I do.

Q.   What's your response to that, Judge Hudgins?

Hudgins, S. - Cross                                                    257

A.    Who stands in front of the jury and argues both of those things?  I mean, we are not talking to a bunch of academics about what we can do.  We are talking to a jury who's going to make the decision.  And when you put on both of those, you know, they are going to throw their hands up and say, well, this is just -- he's guilty, and we found that.  And they are going to give him the death penalty, in my opinion.  It would be just -- it would negate -- you'd negate the possibility that they would buy the he is a good person, this is a -- you know, this is out of character for him, and that kind of argument.

        MR. SAMUELS:  All right.  Your Honor, may I have just one moment, please?

        Thank you, Judge.  That is all I have.

        Thank you, Judge Hudgins.

        THE COURT:  Let me ask you one quick question.  Do you recall any of the items on the list?

        THE WITNESS:  Which list?

        THE COURT:  The list that Mr. Samuels referred to.

        THE WITNESS:  The items of?

        THE COURT:  The items that were found in Mr. Runyon's glove compartment.

        THE WITNESS:  Yes, ma'am, I recall them all.  That was part of the overwhelming guilt phase of the case.  I recall all those items.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                         258

THE COURT:  Was there a videotape of the ATM, the event?

THE WITNESS:  There was a videotape of him at the ATM -- of Mr. Voss at the ATM.

THE COURT:  Were any of the things in the video on the list?

THE WITNESS:  I don't recall that you could see any of those things on the video.  The video was -- the video was poor quality, and I don't recall that you could see any of those items on the list.  Those items were all found in his vehicle, as I recall, when he was arrested.

THE COURT:  They were in the guilt phase?

THE WITNESS:  They were in the guilt phase.  None of that was in the penalty phase.

THE COURT:  All right.

MR. SAMUELS:  Your Honor, can I ask a follow-up question on that?

THE COURT:  Ms. Chavis?

MS. CHAVIS:  Yes, Your Honor, you picked up on something that -- I was very slow.  Mr. Samuels is a quick speaker, and I had wanted to object, but he continued on, and because I was so slow, I wasn't able to make an objection there, but I believe that misstates the evidence with respect to the list of items and perhaps where certain things were found, but the items that were on that

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Cross                                              259

particular list were not found in Mr. Runyon's car, and, as a matter of fact, do not appear on the video and were not used in conjunction with this crime.  That's actually part of our claim, I believe claim 5 in our petition.

THE COURT:  That's not before the Court.

MS. CHAVIS:  No, Your Honor.  It was before the Court previously.

THE COURT:  Previously.

MS. CHAVIS:  Those are contested facts.

THE COURT:  But that's previously before the Court, and that's been resolved.  In other words, that's something that was before the Court.

In any event, three things:  Number one, I don't view it as relevant except to his testimony that he, as an attorney, was of the opinion that it was overwhelming guilt. In terms of the items, if it is at all relevant, you can go back and look at the transcript.  I was just following up on Mr. Samuels' unobjected-to question, and that issue has been resolved.

We are not here on that issue.  It just goes to the mindset of the attorneys, in particular here Mr. Hudgins, about the way he was viewing a case that had transpired over an entire summer in three different phases when he got to the penalty phase.  That's the only significance of it, and whether it's correct or not, that can easily be verified.

Hudgins, S. - Redirect                                          260

MR. SAMUELS:  Judge, I think I was asking about the list.

BY MR. SAMUELS:

Q.  And, Judge Hudgins, I believe the list was found in the truck.  I don't know that the items were found in the truck.

A.  That could be.

Q.  I believe the list was, or in his --

A.  As we said before, my file is my file, and I haven't seen it in 13 years, so I could be mistaken about --

THE COURT:  Well, whatever the evidence was, the evidence was.  There was a list.  There were some items, and where they were found or where they weren't found is of the record, and it's not particularly significant, as I said. It's not significant, really, to anything we are doing here other than to establish Mr. Hudgins's, and potentially Mr. Woodward's, decision-making when they get to the penalty phase going before the same jury.

MR. SAMUELS:  Yes, Your Honor.

Thank you, Judge.

THE WITNESS:  Thank you.

THE COURT:  Ms. Chavis.

REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Hello, Mr. Hudgins.

A.  Good morning.  Good afternoon, sorry.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                    261

Q.  Before your testimony today, you had an opportunity to review all of the exhibits that were going to be presented here, did you not?

A.  I did.  Well, I had an opportunity to review all of them that I have seen, whatever else might be presented, but all that, I've seen.

Q.  Yes.  You reviewed them at the U.S. Attorney's office, correct?

A.  Correct.

Q.  How much time did you spend at the U.S. Attorney's office reviewing them?

A.  About four hours.

THE COURT:  This was before your testimony?

THE WITNESS:  Yes, ma'am.

THE COURT:  I just want the record to be clear.

THE WITNESS:  Yes.  The attorneys weren't with me while I was reviewing them anyway, but, yes, this was before.

THE COURT:  You said the attorneys were not?

THE WITNESS:  Were not present.  They brought what appears to be these volumes into a room where they put me, gave me those volumes, and said, if you need anything, I'm down the hall, and then they left me.

THE COURT:  I just wanted to be clear it wasn't last night.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                    262

THE WITNESS:  Oh, no, ma'am.

BY MS. CHAVIS:

Q.  And between the time when court adjourned yesterday and we convened today, did you speak with anybody about your testimony?

A.  No.

Q.  And you began yesterday telling us a lot about your experience in litigating asbestos cases and your work with experts --

A.  Uh-huh.

Q.  -- in those cases.

What was your experience in capital cases at the time that you were appointed to David Runyon's case?

A.  You mean how many had I done?

Q.  What was your experience, yes, how many cases, how many you've been appointed to, what --

A.  I had been appointed to I think three, maybe four in state court.

Q.  Three capital cases in state court?

A.  Yes.

Q.  And what were your responsibilities there, in those cases?

A.  I was the primary attorney on all of the ones I was appointed to.

Q.  For both phases of the case?

Hudgins, S. - Redirect                                          263

A.   Yes.

Q.   And what were the defendants' names?

A.   I don't know.

Q.   What were the courts?

A.   Newport News Circuit Court, all of them.

Q.   And what were the results?

A.   No one got -- they all got life in prison.

Q.   Did they -- all those cases go to trial?

A.   No.

Q.   How many went to trial?

A.   I don't think any of them went to trial.

Q.   So they resolved in plea agreements?

A.   Yes.

Q.   Did you have co-counsel in any of those cases?

A.   All of them.  In fact, one of them we had as kind of a ride-along.  They had just started ginning up the Virginia capital -- whatever they call it.  Anyway, it's like a public defender capital defense, and that person rode along with me and my co-counsel in one of the cases just to see how it worked.

Q.   Okay.

        THE COURT:  Ms. Chavis, you've got to pick up the pace a little bit.  The record won't reflect it, but you spend at least a minute, maybe sometimes up to three minutes between questions, and you've really got to pick up the

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          264

pace.

I've been keeping a time schedule, and, frankly, we spent so much time yesterday, and if you look at it, there won't be a reflection of a thick transcript or a number of questions *vis-à-vis* the proceedings after that.  So I've kept a time schedule.

You ask a question, and I'm just going to put on the record, you stand there, you look down at your pages, you look back at the witness, sometimes you look at the Court, and minutes are passing between questions.

These are your witnesses you're calling, and I assume that you have prepared what you wanted to ask of them and the documents that you wanted to present.  You are going to have to move a little bit faster without all of these pauses.

MS. CHAVIS:  Understood, Your Honor.

BY MS. CHAVIS:

Q.  Mr. Hudgins, you testified that in Dr. Merikangas's report you had some concerns about his reference to experimental drugs?

A.  Yes.

Q.  Did you -- you didn't discuss Dr. Merikangas's report with him?

A.  Did I discuss his report with him?

Q.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                 265

A.   Yes.

Q.   Did you discuss that section of his report with him?

A.   I don't know.

Q.   You don't know?

A.   I don't remember.

Q.   You don't remember.

     Okay.  But you filed that report with the Court, with the language in there that you were concerned about?

A.   What else could I do?  Would you have me have him change his report because I don't like it?

Q.   Well, when you worked with experts in your asbestos cases and you had some concerns about -- if you have concerns about issues with your experts, do you not raise questions about them and ask them what the basis of their opinions might be and ask them to double-check their facts or provide them more facts?

A.   As a rule.

Q.   As a rule, you do?

A.   (Nods head.)

Q.   Did you do that in this case?

A.   I can't remember.

Q.   Would it have been a good idea for you to do that in this case if you were concerned about something that was in Dr. Merikangas's report?

A.   Would it have been a good idea?  Yeah, it would have been

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          266

a good idea.

Q.  If you thought there was something damaging in his report, was it a good idea to submit a report with damaging contents?

A.  It's his report.  I'm not going to have him change his report.

Q.  But in asbestos cases you can hire an expert who you know will provide an opinion that's favorable to your client?

A.  Yes.  But I don't recall ever asking them to change the report that they provided.

Q.  I'm showing you Defendant's Exhibit 41.  I'll try to make this bigger.  The government spoke about this.  This is the letter that Dr. Mirsky sent to you on September 18th?

A.  Yes.

Q.  And you had obtained permission to supplement your experts' reports?

A.  Yes.

Q.  And you said you didn't receive any supplements from your experts?

A.  Well, just -- yes.

Q.  But Dr. Mirsky did have supplemental information?

A.  After the trial was complete, yes.

Q.  And that's because you told him after the trial about the result of the scans, correct?

A.  I told him after the trial about the results of the

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                              267

scans?

Q.  Yes.  That is what Dr. Mirsky is indicating here in this letter.  "Pursuant to our conversation yesterday afternoon" -- and this is September 18th, well after the trial.

A.  Where does it say that that's when I told him, or that I even told him about the results of the tests?

Q.  "Your report to me indicated that the recent MRI and PET imaging...were read as normal."  "Per our conversation yesterday."

A.  That is in the paragraph before that.  I don't know that that's what that means.  I don't know.  Frankly, I don't know when I gave him the report, but I doubt that I sent it to him September the 17th or -- besides, that says, "In our conversation yesterday."

Q.  Yes.  "Pursuant to our conversation yesterday afternoon, I wish to make sure that the Court is aware of certain mitigating circumstances."  And then he says, "Your report to me indicated that the recent MRI and PET imaging studies of Mr. Runyon were read as normal, and I have several comments to make."  And then he makes four comments.

A.  I'm not going to say that that's when I -- I don't know because I don't have that information available to me, but I'm not going to say that that's -- that I gave him that information the day before, after the trial was over.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                            268

Q.   Well, Dr. Mirsky had been communicating information to you throughout, had he not?  There's been several e-mails to you.

A.   He had sent e-mails.

Q.   In the e-mails he is reporting to you his opinions, correct?

A.   He had.

Q.   And here he is continuing to report his opinions, and here he is providing additional information --

A.   Yes.

Q.   -- based on new information that you had given him that the scans were read as normal.  And he's telling you that his opinions have not changed?

A.   Yes.

Q.   And he's giving you reasons why his opinions have not changed?

A.   Yes.  He's giving the same opinion he has given me all along.

Q.   And he is telling you why, correct?

A.   Yes.

Q.   And if you had told Dr. Mirsky this information before the penalty phase, then you would have obtained this information before the penalty phase began?

A.   Well, I'm not going say that I didn't, and I can't answer that because I don't know what Dr. Mirsky would do.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                  269

Q.  Do you have reason to believe that he would do anything different?

A.  I have no idea.

Q.  You think he would act inconsistent with the ways that he acted on September 17th and 18th?

A.  Ma'am --

MR. SAMUELS:  Your Honor, speculation.

THE WITNESS:  -- you're asking --

THE COURT:  Wait just a minute.

MR. SAMUELS:  Speculation as to what Dr. Mirsky would do or think, Your Honor.

THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  What information did you provide to your experts after -- throughout, as you were working up to the penalty phase?  We have heard a lot about how you continued to work on the mitigation up to the penalty phase.

A.  Are you asking me in a vacuum to tell you what?  I have no idea.  If you show me something, I can say, yes, I did that.  But not having my file, I can't go back and get any idea of what I did.  This is 13 years ago.  I don't remember what I did.  I remember the things I'm testifying to because I'm being shown exhibits.  Some of them, sounds like, came from my file.  I don't know how that happened.  But if you show me exhibits, and I can say, yes, yes, I recall that,

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          270

yes, I did that.  But if you're going to say what did you do in a vacuum, I can't answer that.  You want me to answer what I said and sent to Dr. Mirsky; I can't answer that.  Did you look in my file?  Maybe you can tell.

Q.  You've seen --

A.  You don't want me to know.

THE COURT:  Wait just a minute.  The question is way too broad.  You can't ask a witness to say, tell me everything you gave to your experts.  Everybody's got the files and whatever.

If you want to show him things, as he's indicated, but I wouldn't expect any witness this long ago to be able to say in June I gave him this, and then I gave him this, and then I gave him this.  Because as you can see by these numbers, there are hundreds of documents here.

So ask a specific question and go to the document rather than saying tell me everything you gave to your experts.

MS. CHAVIS:  Okay.  I'm going to move on from this for the moment.

BY MS. CHAVIS:

Q.  You testified that you didn't want to present evidence that would counter the jury's finding of guilt, correct?  That the jury had just found your client guilty?

A.  I said that we did not think it would be productive to do

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                    271

that.

Q. Okay. Yet your lay witnesses, the family members and friends that testified, they all testified that they believed that David Runyon was innocent; did they not?

A. I don't know. I don't remember that.

Q. If the record reflects that, do you have a reason to doubt it?

A. Yes. I would say that if the record reflects it, that's what they said.

Q. But to get to Government's Exhibit Number 45 that was introduced yesterday -- just one second, please.

Do you recall the government going over this e-mail with you?

A. Yes.

Q. And in this e-mail Dr. Nelson tells you that he has not heard back about whether there is a strategy for mitigation in the event that David Runyon is found guilty, correct?

A. Yes.

Q. So it's fair to say that as of this time, the date of the e-mail, July 16th, that he doesn't know what the mitigation strategy is, correct?

A. Correct.

Q. I believe you testified yesterday that Government's Exhibit 46, which is the next exhibit, that this exhibit reflected your discussions with Dr. Nelson about the

Hudgins, S. - Redirect                                                    272

viability of using a mental health defense; is that correct?

A.  Yes.

Q.  Okay.  And when did those discussions occur?

A.  I mean, I had ongoing discussions with Dr. Nelson.  I can't tell you -- I mean, they started before the penalty -- I mean, the guilt phase.

Q.  They started before the guilt phase, correct, and it was --

A.  Yes.

Q.  -- it was before the culpability phase, correct?

A.  Yes.

Q.  Okay.  And it was -- you had discussed the June 5th conversation, correct?

A.  Discussed the June 5th conversation?

Q.  Yesterday there was -- let me pull this out for you.

I'm sorry.  This is the June 5th conversation.  Dr. Nelson is memorializing a conversation that you had with him?

A.  Yes.

Q.  And he's indicating that he believes that the experts won't look credible if they are just relying on the reports of David Runyon, correct?

A.  It says, "So, testimony based on what the defendant self-reported will not be of much use and will generate cross-examinations that highlight that he probably lied, and

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          273

make the expert look like he relied upon evidence that is not credible."

Q.   Right.  But, of course, you know, having worked with experts, that they don't just rely on self-reports, correct?

A.   Some of them do.

Q.   Some of them do?

A.   Are you talking about every expert that I ever was involved with, did they ever rely on self-reports?

Q.   Did your experts in this case just rely on self-reports?

A.   For some of the injuries and things, yes.

Q.   Who were they?  Which experts?

A.   Well, the experts who relied on the report of the grenade explosions.  There was never any confirmation of that from anybody other than Mr. Runyon.  That's an example.

Q.   What about the physical examinations that were made of Mr. Runyon?

A.   What does that have to do -- that is not what you asked me.  You asked me if any of them relied on anything that was just self-reported by Mr. Runyon, and the answer is yes.  And that was an example of it.

Q.   I asked you did they solely rely on Mr. Runyon's self-report?

A.   Yes, and the answer is yes.

Q.   And who is "they"?

A.   Merikangas and Mirsky and anybody else who relied on the

Hudgins, S. - Redirect                                                    274

report of the grenades going off.

Q.  Okay.  So they did not rely on the physical examinations?

A.  Well, they made a physical examination, but it didn't confirm or deny that there had been these grenade explosions.

Q.  Okay.  And what about a test battery; does that confirm or deny a head injury or head trauma?

A.  It doesn't confirm or deny a specific description of something that happened.

Q.  Okay.  Does it confirm or deny a head trauma?

A.  It can.

Q.  Okay.  What about a neurological examination; does that confirm or deny head trauma?

A.  That's not what you were asking me --

Q.  That's what I'm asking you.

A.  -- but if you want to go down this road, I can answer these questions, too.

        What is your question?

Q.  Does a neurological examination confirm or deny head trauma?

        MR. SAMUELS:  Your Honor, Judge Hudgins is not an expert.  He is not a scientist.  Unless he feels like he can answer that question, I object.

        THE COURT:  Can you rephrase it?  I'm not exactly sure that I understand your question.  Are you talking about generally or a specific expert?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                  275

BY MS. CHAVIS:

Q.  Okay.  I'm talking about within his knowledge, does he know that a neurological examination can confirm head trauma?

A.  I really don't know that.

Q.  You don't know that?

A.  I'm sure there is more to it than just that.

Q.  Okay.  What else would be involved?

A.  Well, I don't know.  I'm not a doctor.  That's why we bring the doctors in.

Q.  Okay.  I'm asking for your answer.  That's all I need you to do, is just answer the question.

A.  I don't know that.

Q.  You sound like you're getting frustrated.

A.  I am --

Q.  I just need an answer to the question.

A.  -- very frustrated.

        MR. SAMUELS:  Argumentative, Your Honor.

        THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  So can collateral reports also help prove up a head trauma?

A.  I don't know.

        Collateral reports?  Collateral reports of what?

Q.  From witnesses, from third parties.

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                        276

Q.  Is that something experts rely on?

A.  I don't know what experts rely on, but that could help.

Q.  But you worked with experts in asbestos cases extensively?

A.  We didn't talk about head trauma in asbestos cases.

Q.  I'm sorry?

A.  We did not talk about head trauma in asbestos cases.

Q.  Right.

A.  We also wouldn't talk about things -- well, yeah, we had witnesses who talked about exposure, so, yes.

Q.  But you knew what your experts relied on, though, correct, the type of information?

A.  No.

Q.  No, you didn't know what they relied on?

A.  I knew they didn't rely on that.  They relied on pathology, X-rays, breathing tests, things like that.  They didn't rely on collateral information from lay witnesses.

Q.  Okay.  And so you brought up a good point.  The scans, those types of things would also confirm head trauma?

A.  I don't know the answer to that.  I know that that's the kind of thing they'd ask for.

Q.  Did Dr. Nelson tell you that any of these things could also confirm a head trauma?

A.  Any of what things?

Q.  Any of those things that we just went through, physical

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          277

examinations, neurological examinations, test batteries, third-party reports, scans --

A.   I believe so.

Q.   -- did Dr. Nelson tell you that any of those things can confirm?

A.   I believe so because I believe he suggested those things --

Q.   He did.

A.   -- in some of the information that I had.

Q.   Okay.  And Dr. Nelson had a negative opinion about David Runyon, correct?

A.   He had a negative opinion about his mental health condition.

Q.   Correct.  Yet, you say you continued to consult with him throughout the case up to the penalty phase?

A.   Yes.

Q.   Continued to pay him even though he had a negative opinion?

A.   Yes.

Q.   And you didn't think that negative opinion affected him in any way when he's giving this advice?

A.   He was giving -- no, I -- I mean, that was his opinion. So that was his opinion.  You know, did it affect him in giving me advice?  I don't think so.

Q.   But the jury would not find an expert credible because

Hudgins, S. - Redirect                                                   278

their opinion would be based on self-report?

A.   That was a factor.  None of these things are that one thing, and you pick that out.  That was a factor in how credible the report was.

Q.   I'm reading what he's telling you here.

A.   Yeah.  That was a factor.

Q.   He is not saying it was a factor.  I'm reading what he is telling you there.

     Further on down in this letter, he's also indicating how he believes it would be better for you not to present expert testimony because you could prevent the government's experts from testifying, correct?

A.   Yes.

Q.   But you hadn't even received the government's experts' reports at that time, had you?

A.   No.

Q.   So you didn't know what the government's experts were going to say, correct?

A.   Correct.

Q.   And you had previously indicated in a declaration that you knew that the government was going to have experts, correct?

A.   Yes.

Q.   You knew that they might have a contrary opinion, correct?

Hudgins, S. - Redirect                                                          279

MR. SAMUELS:  Judge, I'm going to object.  I'm going to object to any reference to a declaration as hearsay.

THE COURT:  What were you talking about?  A declaration of what?

MS. CHAVIS:  Judge Hudgins provided a declaration that was attached to the 2255, Your Honor.

THE COURT:  Well, go to it specifically.  If you've got a question about it, go to the declaration.  Don't just do a general.

I want to ask you one thing.  Go back to this letter.

MS. CHAVIS:  Yes, ma'am.

THE COURT:  It looks like Dr. Evans is making a forecast.  From the way I read it, he said something about, "We discussed that if you believe you can muster them to testify about the important pieces of the story, then it would probably be better not to call me to testify so that, strategically, you also prevent the USA's expert from testifying."

He's not saying he has an expert report.  He's just strategizing, knowing litigation and that the expert would receive a report.  That's at least the way I perceive the letter, Ms. Chavis, unless you perceive it another way.  There is no indication in here that he has a United States

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                      280

expert report.  It is just a strategy on preventing any future report.  There is nothing in here that says he has a USA expert report.

MS. CHAVIS:  Correct.  He is providing strategies before being informed about the contents of the report.

THE COURT:  Yes.

MS. CHAVIS:  I agree.

MR. SAMUELS:  Judge, I think Ms. Chavis has his declaration there, and what I would say about that is she didn't go into it on her direct.  I didn't go into it on cross.  If it is something that she wants to use to impeach something he is saying now, that might be appropriate, but just getting into it direct in a declaration that hasn't been talked about on direct or cross, it would be outside of the scope.

THE COURT:  I agree, and it's of record.

MR. SAMUELS:  It is, Your Honor, but not in this hearing.

THE COURT:  I understand.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  She hasn't examined that at this hearing.  It's just a matter that it's of record if somebody wanted to cite it at some point.

MR. SAMUELS:  Yes, Your Honor.

BY MS. CHAVIS:

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          281

Q.  So the fact that the government was going to have their own experts that might present an unfavorable opinion was not a reason for you to not investigate or not present the mental health mitigation evidence, was it, Judge Hudgins?

A.  It was not, and, in fact, we did investigate.

Q.  But you did not present the mental health?

A.  We did not.

Q.  And the fact that the government has their own experts was not the reason?

A.  It was a factor.  It was not the reason.

Q.  Okay.  I'm showing you your declaration, Defendant's Exhibit 78, Declaration of Stephen Hudgins.  This is also ECF 551-1.

MR. SAMUELS:  Judge, again, I would just object. This is hearsay.  I understand it was filed in the case, but it is hearsay and outside the scope of the cross-examination because it hasn't been raised.  If it is used to impeach Judge Hudgins in some way, I understand that, that's the proper evidentiary basis, but in order to impeach him, he's got to say something contrary to the declaration.  And then it doesn't come in substantively; it is just used to impeach him.

THE COURT:  I agree.  In other words, he is here as a witness, so whatever questions you want to ask him, ask him.  He's under oath and he's a witness.

Hudgins, S. - Redirect                                        282

MS. CHAVIS:  Yes.

THE COURT:  If there is something in there that impeaches him, then you can ask him about that.

MS. CHAVIS:  Yes, Your Honor.  He just testified that this was a factor in his decision not to present mental health evidence.  And in his declaration he says, "I would not have ceased an investigation into, or decided not to present, David Runyon's mental health and social history based on the fact that one or two prosecution experts issued unfavorable reports."

MR. SAMUELS:  Judge, that's not inconsistent with what Judge Hudgins just testified about.

THE COURT:  I agree.

MS. CHAVIS:  Well, he said it was not the reason.  He emphasized that it was a factor.

THE COURT:  You will have to rely on his testimony here.  That is not impeachment evidence.  It doesn't impeach anything he said here.  In fact, it is what he just said here.  He was going to keep on looking into mental health, that he did up until the time, and you haven't established that he stopped doing something because of a government report.

MS. CHAVIS:  Okay.  Perhaps I read it too fast, because he said he would not have "decided not to present."

THE COURT:  How is that different from what he just

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                    283

said?

      MS. CHAVIS:  Okay.  I was going off of what he just said about his investigation.  That's why I was just trying to clarify --

      THE COURT:  Does the court reporter want to read back the last question and his answer?

      You started in with Dr. Nelson, and Dr. Nelson was giving a strategy, and then you followed that up with a question to the effect then that would mean that if the government reports were negative, you wouldn't pursue mental health evidence.  He said, no, that wasn't the case, he kept pursuing it.

      So I'm not sure what you're doing.  I don't understand what you're doing, and since I've got to decide this, I need to understand what you're doing.

      MS. CHAVIS:  Yes, that's why I was trying to be clear, Your Honor.  So there is a difference between investigating and presenting this evidence.  In here he is saying he would continue to investigate and he would present the evidence in the penalty phase.

      THE WITNESS:  It does not say that.  It doesn't say that.  It doesn't say I would present in the penalty phase.

BY MS. CHAVIS:

Q.  It says, "I would not have ceased an investigation into, or decided not to present" --

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          284

A.   Yes.

Q.   -- "David Runyon's mental health and social history based on the fact that one or two prosecution experts issued unfavorable reports."

THE COURT:   That was his testimony here.   So I find that that is consistent with the testimony that is here on this record, and it is not impeachment.

BY MS. CHAVIS:

Q.   There was testimony about a narcissistic personality disorder in one of the government experts' reports?

A.   Yes.

Q.   And you indicated that that was something that you did not want coming out during the trial, and that was a reason why you didn't present mental health mitigation, correct?

A.   A factor, correct.

Q.   It was a factor?   Okay.

And if you had previously said that a personality disorder was not a concern to you?

A.   Can you show me that?   I don't have a lot of confidence in your representation of what it says.

Q.   Okay.   Your declaration says, "A personality disorder was not a reason to cease investigation into Runyon's mental health and social history nor a reason to forego presentation of mental health and social history mitigation."

A.   I stand by that.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          285

Q.   Okay.  So the personality disorder, narcissism is not a reason not to present mental health investigation, correct?

A.   Not by itself, no.  It's a factor to be considered.

Q.   And if you had received the reports back on the MRI that indicated that the brain scan was read as normal, what would you have done at that point?

A.   Nothing, nothing based on that.  I mean, that's just one of the -- again, that is a factor.  I still would have moved forward because we had gotten those brain scans for Merikangas to review.  So I sent them on to -- or however Merikangas got them.  That was a factor, though, because that's something that would come out in the trial, you see.

     What did the report come out as?  Well, they said that it was normal.  That's a factor.  The government would have been hammering the jury with that.  So that's a factor that we considered.  It doesn't mean we stop.  It doesn't mean we don't present it because of just that.  We consider it.

Q.   Okay.  And so you raised the issue of the jury.  All of those issues are questions for the jury, correct?

A.   All of what issues?

Q.   Well, when there is an issue of fact, if there is a lab report that says it's read as normal, but then you have another expert that actually reads the scan and sees something different --

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                    286

A.  Yes.

Q.  -- and can testify to it, that's a jury question, the fact?

A.  It is.

        MR. SAMUELS:  Judge, I would just note that there was no evidence that there was any reading of an expert report that looked at anything other than normal.  So that sort of assumes a fact that hasn't been presented in evidence, that there is any expert that read those scans as anything but normal.

        THE COURT:  I agree.  Also, it was asked in the form of a hypothetical, "if you."  In any event, she's asked it, he's answered it, and that's the record.

        MR. SAMUELS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Are you aware that PTSD, post-traumatic stress disorder and brain damage are rule-outs for a diagnosis of a personality disorder?

A.  No.

Q.  Dr. Nelson didn't tell you that?

A.  I don't know if he told me that then, and I don't know if I knew that then.  I don't know it now.

        THE COURT:  What did you say?

        THE WITNESS:  I said I don't know if I knew it then.  I don't know if he told me that then.  I don't know

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                              287

it now.

BY MS. CHAVIS:

Q.   Dr. Nelson, he is not a medical doctor, correct?

A.   He's a psychiatrist, I think.

Q.   A psychologist?

A.   Psychiatrist, I believe.  I would have to look, but...

Q.   Well, I'll pull up his report, and we can see.  He has a Ph.D., meaning he's a psychologist?

A.   He may be.

        THE COURT:  Is he the one at the University of Virginia?

        THE WITNESS:  No, that was Dr. Bender.

        THE COURT:  Dr. Bender.

        THE WITNESS:  He may well have been a psychologist because he's the one who suggested the neuropsychological testing.

BY MS. CHAVIS:

Q.   So we can just look at his e-mail here where he put his credentials right in his e-mail line.

A.   I don't know what those things stand for, but Ph.D., yes.

Q.   Okay.  So Ph.D. stands for psychologist, correct?

A.   No.  It stands for some Latin term that means --

Q.   A doctor of psychology?

A.   I don't know.  Ph.D. refers -- I mean, you refer to all kinds of people who have Ph.D.s.  You can have a Ph.D. in

Hudgins, S. - Redirect                                           288

business law.  So I don't think Ph.D. refers to -- I don't know.  Maybe it does.  Ph.D. doesn't mean psychologist to me.

Q.  Okay.

A.  It means you have that doctorate.

Q.  But it doesn't say M.D. for medical doctor?

A.  Correct, not M.D., yes.

Q.  Okay.

A.  And I don't know what those other things after his name stand for.

Q.  Okay.  You testified that you met with Dr. Bender in Charlottesville on March 30th, 2009, correct?

A.  I think so.  I don't remember the date, but I did meet with him in Charlottesville.

Q.  I'm going to show you Defendant's Exhibit 158.  This is 158.  We have looked at this before.  This indicates the date here, March 30th?

A.  Yes.

Q.  You're meeting with Dr. Bender.  And how much time did you meet with him?

A.  This says two hours.

Q.  Okay.  Do you remember what time of day the meeting took place?

A.  No.

Q.  Do you remember where you actually met with him?

A.  It was at the medical school in some room that they

Hudgins, S. - Redirect                                            289

provided.

Q.  Do you remember who was present at that meeting?

A.  He had a -- I don't know if it was an intern or a graduate student, but there was another person there.

Q.  Okay.  What did you talk about for two hours?

A.  David Runyon.

Q.  Okay.  And at what point in the conversation did he tell you that he had an unfavorable opinion?

A.  Early on.

Q.  And you continued to talk for two hours?

A.  Yes.

Q.  But at that point how much information had Dr. Bender reviewed when you had talked to him?

A.  I don't know.  I wasn't the person who retained him.  I didn't provide him with the materials that he had, so I couldn't tell you that.  I'm sure we talked about that, but I don't remember it.  I did make notes, but I haven't seen those.

        THE COURT:  Mr. Babineau was the one who had contacted him?

        THE WITNESS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  I'm going to show you Government's Exhibit 39.  We looked at this yesterday.  Do you recall this document?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                       290

Q.   And it indicates your meeting with Dr. Bender on March 30th, correct?

A.   Yes.

Q.   Okay.  And as of that time, prior, what had Dr. Bender done?  How much time had he spent on this case?

A.   He says 120 minutes in one record review and 60 minutes in another.

Q.   And he notes 30 minutes for this meeting, correct?

A.   Yes.

Q.   There is only one meeting with Dr. Bender; is that right?

A.   Correct.

     I'm sorry, then there was another review of documents, 60 minutes by him in May.  I don't know where those records came from.  I know they came from Veterans Administration, but I don't know why he got those.

Q.   Right.  That is taking place in May, after he gives you his bad opinion, correct?

A.   Yes.

Q.   And that's because even though he gives you a bad opinion, just a few days later, on April 8th, you disclose him as a witness for the defense, correct?

A.   Yes.

Q.   So giving notice of Dr. Bender as an expert witness for the defense, consistent with your claim that he had a bad opinion of David Runyon?

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          291

A.   He was the person who had been named.  At that point I was kind of place holding until we could regroup and do something different.

Q.   So you didn't intend for Dr. Bender to be your expert; you just disclosed him to the Court as your expert?

A.   Yes.

Q.   And you continued to pay him as your expert out of the Court funds, although you knew you weren't going to use him?

A.   You know, I don't really -- I don't understand where that review of records from the V.A. came from.  I didn't send him any other records that I recall, so I don't know if that is something that he already had that he reviewed afterwards that had been sent to him.  I just don't know.

Q.   So he still submitted this bill to you, correct?

A.   Yes.

Q.   And you signed off on it?

A.   I did.

Q.   Dr. Bender did not do any type of examination of David Runyon, did he?

A.   Not in person.

Q.   All right.  Not in person or not any type of evaluation of David Runyon, did he?

A.   You asked me if he wrote a report.

Q.   He did not do any type of evaluation of David Runyon, did he?

Hudgins, S. - Redirect                                    292

A.  He reviewed the records that he had and evaluated them.

Q.  He did a records review?

A.  Yes.

Q.  But he did not evaluate David Runyon, correct?

A.  I'm not sure what your definition of "evaluation" is.  He took the records --

          THE COURT:  I think she meant in person.

          Is that what your question is, in person?

          MS. CHAVIS:  Sure.

BY MS. CHAVIS:

Q.  Did he do an in-person evaluation?

A.  I thought you asked me that.  No, he did not.  I thought you had already asked me that.

Q.  And he did not administer any testing to David Runyon?

A.  No.

Q.  And he did not review the brain scans of David Runyon?

A.  He did not.

Q.  You testified that you would have talked to Dr. Merikangas about the brain scans, correct?

A.  I would have talked to him, yes, if I had them.

Q.  Okay.  So there was testimony yesterday about this date of August 13th.  That happened to be the date of Government's Exhibit 61 of this lab report?

A.  Yes.

Q.  Okay.  It also happened to be a date when you had a

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                 293

telephone call with Dr. Merikangas?

A.  I'll accept your representation of that.  I don't know.

Q.  There is your billing records.

A.  All right.  I agree, then.

Q.  And you agreed with the government that you probably, during this telephone call on the 13th, were talking about this report, this lab report that has the procedure date of the 13th, and there is some sort of date down here of the 13th that was being pointed out, and you agreed with the government that you had probably talked to Dr. Merikangas about this lab report during this telephone call on the 13th?

A.  Yes.

Q.  I'd like to show you Defendant's Exhibit 162.  It's ECF document 274.  That's actually filed August 14th, the day after August 13th?

A.  Yes.

Q.  And you're asking the Court to release the test results and the films to you?

A.  Yes.

Q.  So you don't have the lab report on the 13th?

A.  (Shakes head.)

Q.  So you couldn't have talked to Dr. Merikangas on the 13th about that lab report?

A.  Well, apparently not.  You know, could I have gotten it ahead of time?  I don't know.  I don't know.  And we said

Hudgins, S. - Redirect                                            294

probably, just based on the dates.  So if I didn't have it, I didn't talk to him about it.

Q.  You testified yesterday that if you had presented mental health mitigation, that everything negative would come in. What did you mean by that?

A.  All of the negative information that we had seen and heard about in the reports would come in, would come in through those witnesses, through those experts.

Q.  Okay.  So could you please indicate what the negative information is?

A.  Well, the information from Dr. Nelson, the information from Dr. Bender, the information from the two government experts.

Q.  How is information from Dr. Nelson coming in to the penalty phase of trial?

A.  Well, I'm assuming the government would call him as an expert that we had.

Q.  How does the government know that Dr. Nelson was your expert?

A.  They have his report, I think.

Q.  How does the government have --

A.  I mean, he was listed at the beginning.  They were ready for trial when we got into the case.  They were four weeks from trial.  So all those disclosures and everything had been made.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                           295

Q.  So if Dr. Nelson's report had not been disclosed to the government, how would --

A.  They knew that Dr. Nelson was there.  They knew that Dr. Nelson was a factor.

Q.  Okay.  So were you planning to call Dr. Nelson?

A.  No, I wasn't.

Q.  Okay.  If you had just called Dr. Mirsky and Dr. Merikangas, how is the government going to know about Dr. Nelson?  How would they know about his report?

A.  I don't know.  I think they knew.

Q.  How?

A.  I don't know.  I didn't tell them.

Q.  Would you give them his report?

A.  I did not.

Q.  Would Mr. Woodward give them --

A.  I don't know what Mr. Woodward would do.

Q.  I'm sorry?

A.  Not that I'm aware of.  I don't know what Mr. Woodward would do.

Q.  So the government would not know about Dr. Nelson's preliminary report?

A.  I think they did.  I don't know that for a fact, not now.  I don't know that now.

Q.  You think they did?

A.  I think they did.  I think that was one of the things we

Hudgins, S. - Redirect                                              296

were looking at.

Q.   And what is this thought based on?

A.   Well, we would have to disclose who our experts had been if we hadn't already done that.

Q.   You disclosed Dr. Mirsky and Dr. Merikangas in your Rule 12.2 notice, correct?

A.   Yes.

Q.   Okay.  How are you disclosing Dr. Nelson, if you're just presenting Dr. Mirsky and Dr. Merikangas?

A.   Because they had been experts we had consulted and had reports from.

Q.   So you're saying you have to disclose your consulting experts to the government and disclose your consulting experts' reports?

A.   No.  I think they -- I don't know.  That was our thought, was that they would know all of those negatives from those witnesses as well.

Q.   So you would have disclosed your consulting experts' reports, if you had presented Dr. Merikangas and Dr. Mirsky?  Is that what you believed you had to do?

A.   Merikangas and Mirsky, and we did disclose them.

Q.   Yes.

     Did you believe that if you presented mental health mitigation, that you had to disclose reports on Dr. Evan Nelson and Dr. Bender?

Hudgins, S. - Redirect                                          297

A.   No, because he would not be presenting anything.

          THE COURT:  Evans, Nelson, and Bender?

          MS. CHAVIS:  Correct.

BY MS. CHAVIS:

Q.   So, I'm sorry.  I didn't hear your answer.

A.   No, because he was not going to testify.

Q.   So the government would not know about Nelson and Bender's?

A.   I thought they already did, but not through anything that we -- that I had done since I was part of this.

Q.   So let's assume that they did know.  What are they going to do with it?

          MR. SAMUELS:  Judge, I'm going to object.

          THE COURT:  Wait.  Who?  Nelson, Evans, and Bender were all through Mr. Babineau?

          THE WITNESS:  Well, it's Evan Nelson.

          THE COURT:  Evan Nelson, Nelson and Bender.

          THE WITNESS:  And Bender were through Mr. Babineau, yes.

          THE COURT:  Were through Mr. Babineau?

          THE WITNESS:  Yes.

          MR. SAMUELS:  I'm going to object to what the government would have done, Your Honor.

          THE COURT:  I sustain that objection.

BY MS. CHAVIS:

                    JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                      298

Q.  Well, Mr. Hudgins, are you saying that you formed a strategy based on what the government would have done?

A.  Well, what we thought the government would do.

Q.  Okay.

MS. CHAVIS:  Well, can I not ask questions based on what he thought the government would have done, if his strategy is based on what he thought the government would have done?

THE COURT:  He said that had he called those witnesses, and he said why he didn't call those witnesses. I don't understand your question, honestly.  I mean, I just don't even understand what you're asking.

MS. CHAVIS:  Well, I think the confusion is coming from, perhaps, the answers, because I'm trying to get a clear answer and -- but we had an objection to the question about his strategy based on what he thinks the government is going to do with information.

THE COURT:  At what point?

MS. CHAVIS:  At the time that he is making his decisions about whether or not to present mental health mitigation.

THE COURT:  That would be at what phase?

MS. CHAVIS:  Before the penalty phase, when he has to make his decision.

THE COURT:  Then let's limit your questions to

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                          299

before the penalty phase.  That's when he has to make this decision.

BY MS. CHAVIS:

Q.  Okay.  So at the time you made your decision whether or not to present mental health mitigation, what did you think the government was going to do with information held by Dr. Nelson and information held by Dr. Bender?

A.  Nothing.  I guess I misunderstood or misspoke.  I was -- not Dr. Bender, but Dr. Nelson, I was talking to him about what was going on and getting information from him about strategizing.  So they wouldn't have any information from Dr. Nelson unless -- well, they wouldn't because we weren't going to name him.  He wasn't somebody who they would use.

Q.  So that's not part of the everything negative that would come in?

A.  No.  No.

Q.  So what is part of the everything negative?

A.  The information that appeared in the government expert witnesses about what his personality was, what his historical -- the way that he relayed historical things that was not accurate, and he -- just the negative of the things that were reported by him that were false or not confirmable.

Q.  And did you talk to Dr. Mirsky and Dr. Merikangas about those things that concerned you --

A.  Yes.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                              300

Q.  -- that were in the government's expert reports?

A.  Yes.  And I'm certainly not saying that what I just said is an end-all of what we were talking about.  I mean, you've got the file.  You know what's in it.  I don't have the file, and I don't remember everything that's in it.  But those were highlights that I recall because of the documents that I have seen since I have been testifying.

Q.  What did you do with your file at the end of this case?

A.  I turned it over to Mr. Woodward, as he was going to be the appeal attorney, and, of course, there would be another appeal attorney appointed, and so I turned it over to Mr. Woodward.

Q.  And appeals are a natural part of a death penalty case, correct?

A.  Yes.

Q.  Let's see Government's Exhibit 41.  You discussed this e-mail with the government.  This is an e-mail from David Bruck to Sheila Cronin and yourself and Larry Woodward, also the investigator.  This is a suggestion for a Korean cultural expert.  And Mr. Samuels was asking you about your relationship with David Bruck, and you indicated that you took David Bruck's advice.

A.  I said I listened to his advice.

Q.  You listened to his advice.

A.  I didn't do everything that he advised that we do.

Hudgins, S. - Redirect                                              301

Q.   I'm sorry?

A.   I did not do everything that he advised that we do.  I listened to what he said, and then I talked to my co-counsel, and we made decisions about what to do.

Q.   You didn't seek a Korean cultural expert, did you?

A.   I remember dealing with the Korean cultural expert issue, and I remember getting a lot of information from somebody about what David's mother's story had been coming out of Korea and putting on some evidence about that, and then it was objected to after -- it was felt that we had gone farther than was relevant.

I don't remember what we did specifically about hiring one, or just talking to one, or not doing anything about the Korean cultural expert, but I remember there was a great deal of research and whatnot done about her background by somebody.

Q.   The government asked you about all of the records from the drug studies and whether or not they had any red flags contained within them that you needed -- any red flags with respect to further investigation, things that you should follow up on, and you've indicated, no, they did not.

Do you recall the record that indicated that David Runyon's face had a sag to it?

A.   Do I recall that?  No.

Q.   If there was a record --

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                         302

A.  I don't doubt it.  I mean, I knew his face had a sag to it.

Q.  You knew that?

A.  Yes.

Q.  And you said that you had presented evidence that David could live peacefully in prison, and a lot on your mitigation testimony went towards that.  That's what Dr. Cunningham had testified to during the penalty phase, correct?

A.  Yes.

Q.  Of course, the jury rejected that mitigating factor, didn't they?

A.  I think so.

Q.  Are you aware that sometimes mentally ill people don't know that they are mentally ill?

A.  Yes.

Q.  So if David Runyon is stating to you that he's not mentally ill, do you take that as a fact?

A.  No.

Q.  Can mentally ill people be kind?

A.  Yes.

Q.  Can they be helpful?

A.  Yes.

Q.  Can they be generous?

A.  Yes.

Q.  Can they be fun?

Hudgins, S. - Redirect                                                    303

A.  Yes.

Q.  So evidence of mental illness is not inconsistent with the testimony that Ms. Provost gave at the penalty phase, is it?

A.  Evidence of mental illness is not, but then the evidence of the crime and all the other things would be.

Q.  Yet, you still presented her testimony?

A.  Yes.

Q.  Do you know the criteria for traumatic brain injury?

A.  No.

Q.  The criteria for post-traumatic stress disorder?

A.  No.

Q.  The criteria for delusional disorder?

A.  No.

Q.  The criteria for psychosis?

A.  No.

Q.  So you wouldn't know how to investigate for those things?

A.  No.

Q.  Were you part of a motorcycle group or club?

        MR. SAMUELS:  Judge, I would object to the relevance.

        THE COURT:  You'd have to lay a foundation for that.  That last set of questions, I don't understand why you didn't ask him on direct.  I mean, you are asking him a lot of things now that I don't understand why you didn't go

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Redirect                                                    304

through that litany that you just went through on direct.

You've got to lay a foundation for the springing out with a question, are you a member of a motorcycle club.

MS. CHAVIS:  It would be -- yeah.  It would be connected up later, Your Honor.

THE COURT:  Well, you have to lay a foundation now.

MS. CHAVIS:  Okay.  I'll move on.

BY MS. CHAVIS:

Q.  Sir, you indicated that if you had put on Dr. Mirsky and Dr. Merikangas, that it could have affected your attempts to show that Mr. Runyon was not the worst of the worst, correct?

A.  Yes.

Q.  And yet that really is a question for the jury, correct --

A.  Yes.

Q.  -- weighing that evidence?

A.  My function is to impact their -- how they're going to make that decision.

Q.  And you were concerned that Dr. Mirsky and Dr. Merikangas would not be found persuasive, correct?

A.  I was concerned that I didn't have a basis to put them on that made me think that they would be persuasive, yes.

Q.  Again, the issue of persuasion or credibility, that's an issue for the jury, correct?

A.  It's an issue for the jury, but that's what I'm supposed

Hudgins, S. - Recross                                         305

to be doing, is putting on the thing -- the evidence to persuade them.

Q.  I'm just asking a yes or no question.

THE COURT:  That's not a yes or no question, and he he's entitled to answer it.  It's an obvious question, but it's not a yes or no question.

MS. CHAVIS:  May I have a minute, please, Your Honor?

THE COURT:  Yes.

MS. CHAVIS:  Thank you.

Your Honor, I don't have anything further at this time.  I would ask that Mr. Hudgins be subject to recall once they establish the foundation for those records that we had spoke about earlier.  I believe I can do that through Sheila Cronin.

THE COURT:  Well, if you establish new evidence that lays the foundation to bring Mr. Hudgins back, that will be determined at that time.

MS. CHAVIS:  Thank you, Your Honor.

MR. SAMUELS:  Thank you, Judge.

RECROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good afternoon, Judge.  I'll be brief.

Sir, you had, going into the summer of 2009, four experts; is that correct?  You had -- let me lay them out for

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Recross                                                306

you.  You had Dr. Nelson that you had talked to, correct?

A.  Yes.

Q.  You had, prior to the summertime, Dr. Bender?

A.  Correct.

Q.  Both of those experts were somewhat antagonistic to presenting evidence on mental health in favor of David Runyon?

A.  Yes.

Q.  Then you've got Dr. Mirsky and Dr. Merikangas. Dr. Merikangas in his report is focused on these experimental drugs?

A.  As one part.

Q.  In the preliminary report?

A.  Yes.  Yes.

Q.  Dr. Mirsky does rely on these blasts that David Runyon reported.  Those blasts are a recurring theme in the information he provides, correct?

A.  Yes.

Q.  Did any of that information, in terms -- none made a diagnosis that you felt mitigated against moral culpability in terms of what you wanted to present to the jury?

A.  Correct.

Q.  But if you had put them on, would it have opened the door to the government's experts?

A.  Yes.

Hudgins, S. - Recross                                              307

Q.   Ms. Chavis asked you about the situation with the scans and Dr. Merikangas.  Do you recall that, sir?

A.   Yes.

Q.   Showing you Government's Exhibit 61, that's the request for the forms that Dr. Merikangas sent to you.  Do you see that, sir?

A.   Yes.

Q.   And then if you see here on the forms itself that, "Please give a copy of the films or the CD images to Dr. Merikangas" and that "patient" is scratched out there?

A.   Yes.

Q.   The report itself is dated August 13th.  We see that, sir; is that right?

A.   Yes.

Q.   Is there any reason that you wouldn't have talked to Dr. Merikangas about the results of the scans but then still tried to get the actual film or tangible results of the reports?

A.   I mean, that's possible.

Q.   Okay.  You had a conversation, by your records, with Dr. Merikangas on August 13th, correct?

A.   Correct.

Q.   And seeing that this -- at least the examination was done on August 13th, would it have been likely that you talked to Dr. Merikangas about the examination that was done on that

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Recross                                                    308

day?

A.   It's likely I talked to him about the examination, but probably didn't have the report that quickly.  So if the examination was done on the 13th, for me to have the report in hand on the 13th is unlikely.  It's possible, but unlikely.

Q.   But if you got the report, you would have sent it to Dr. Merikangas?

A.   Yes.

Q.   And we had looked at a number of the orders from the Court and your motions to the Court.  You weren't stopping with your investigation even after the time you got the scan, correct?

A.   Correct.

Q.   And you got nothing back from Dr. Merikangas, no updated report even after sending the scans?

A.   No.

Q.   And lastly, sir, Ms. Chavis asked you about Dr. Mirsky and that report that he -- or that letter that he sent you on September 18th.  Do you recall that?

A.   Uh-huh.

Q.   That was actually triggered by, if you remember, you sending him a request for him to fill out the voucher?

A.   I don't remember, but...

Q.   Okay.  But in that letter he has some additional

Hudgins, S. - Recross                                            309

information that he provides, correct?

A.  Yes.

Q.  But back on August 7th, he says, "I won't have anything to add until I know the results of the imaging tests on Mr. Runyon."  Do you see that, sir?

A.  I see that.

Q.  And he refers again to these blast injuries.  Do you see that?

A.  Yes.

Q.  The blast injuries that are self-reported by Mr. Runyon?

A.  Yes.

Q.  And the results of the imaging tests were read as normal, correct?

A.  Yes, by the radiologist, or whatever they're called, who performed them, yes.

Q.  You gave Dr. Mirsky the opportunity to provide you with additional information, but he never did until after the verdict?

A.  Mirsky?

Q.  Yes, sir.

A.  Yes.

Q.  Both experts had the opportunity to provide you with additional information that you could have continued to pursue; is that right?

A.  Yes.

Hudgins, S. - Recross                                          310

Q.  And Ms. Chavis also asked you about the jury making decisions and that sort of thing, and negative aspects in various reports.

When you're considering this, do you consider all of it together in terms of coming up with your strategy and how to present the mitigation case?

A.  Yes.  I mean, it's not -- you don't take one piece that somebody says and make a decision that, okay, we will use that, but we won't use the rest of it, because that's not how it works.  You've got to look at all of every report, all of every letter, because it's all going to come in, and think about what this is going to trigger as far as what other information is going to come in because we present this, and then you've got to consider how is it going to impact the jury.

Q.  Is that something that you discussed with Mr. Woodward?

A.  Yes.

Q.  Did you two concur in the decision as to how to present the mitigation case?

A.  Yes.

MR. SAMUELS:  Your Honor, may I have just one moment?

Thank you, Judge.  That's all I have.

THE COURT:  Mr. Hudgins, the Court is going to excuse you.

Hudgins, S. - Further Redirect                                    311

MS. CHAVIS:  Excuse me, Your Honor.  I just need to make one clarification based on this Exhibit 162 that the Government was just using or just referring to.  Based on the line of questioning that the government just engaged in, there does need to be a clarification.

REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Mr. Hudgins, I'm showing you Defendant's Exhibit 162 that you filed with the Court the day after August 13th.  This is August 14th.  You are asking the Court for the test results and the films to be released directly to you so that getting -- you can get the materials to the defense expert, correct?

A.  Yes.

Q.  You would need those materials to get them to the defense expert, and then again --

THE COURT:  Which expert?

THE WITNESS:  I'm sorry, I thought you were asking her, because I don't know.  It doesn't say.

THE COURT:  It doesn't say which expert?

THE WITNESS:  No.

BY MS. CHAVIS:

Q.  Who ordered the scans?

A.  Dr. Merikangas, and ordered that they be given directly to him.

Hudgins, S. - Further Redirect                                    312

Q.  And then you filed the court order asking that they be sent directly to you, correct?

MR. SAMUELS:  Judge, I think we have gone beyond the scope of my recross here.  The motion speaks for itself.

BY MS. CHAVIS:

Q.  You just explained --

A.  Yes, it does say that.

Q.  You just explained the testimony.

Then on the 13th, where you have logged your telephone calls with respect to David Runyon, there is no call to the lab --

A.  No.

Q.  -- discussing any results with respect to David Runyon, is there?

A.  There is not.

MS. CHAVIS:  Thank you.

THE COURT:  You could argue all of that to me at the appropriate time based on the records that have been admitted.

Counsel, I am going to tell you both something, and I know it's laborious, and you're trying to move these things along, at least I detect that from the questioning of the United States, and Ms. Chavis is improving, but it's just there were times, again, two or three minutes in getting exhibits.

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Further Redirect                                    313

But that aside, I am going to require that you object, if you want to keep examining the witness.  In other words, if you sit there, and the witness testifies to something, and you don't object, then I'm not going to keep letting you come back and forth back to the podium.  I know this is a bench matter, but it's moving extremely slowly.  So if you keep wanting to jump back and forth up and ask questions.

This last round of questions, Ms. Chavis, was something that had been covered, and what you asked was really nothing new.  You could have argued all of that to the Court from those documents, which have been admitted, his time records and the motion.

So I want you all to be cognizant that you do have a duty to object if you want to keep jumping up and asking questions after you have finished your examination or your part of the examination of the witness.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Mr. Hudgins, thank you for your patience and your coming to testify.  The Court will excuse you with two caveats:  Number one, you still may not discuss your testimony with anyone because the hearing is still going on, and I know that your co-counsel and some of these individuals that have been referred to are going to testify, and I know you know all this, and you know you have that

JODY A. STEWART, Official Court Reporter

Hudgins, S. - Further Redirect                              314

duty.

THE WITNESS:  He and I have had the discussion, we can't talk to each other.

THE COURT:  You know the rules.

THE WITNESS:  Yes, ma'am.

THE COURT:  The second is, if you are subject to any kind of recall, you will receive adequate notice that you need to be here, and we will schedule you accordingly. We won't call you one night and say you have got to be here the next day.  We will give you time to make your schedule work with where we are in the proceeding.

THE WITNESS:  Thank you, Your Honor.  It's good to see you.

THE COURT:  Nice to see you.

Counsel, it's 2:15.  We have been going for over two hours now, and we will take a brief afternoon recess for approximately 15 minutes.

(Recess from 2:15 p.m. to 2:35 p.m.)

THE COURT:  Call your next witness, Ms. Chavis.

MS. CHAVIS:  Your Honor, I call Jon Babineau.

THE COURT:  Mr. Babineau, if you could please come forward and be sworn.

THE WITNESS:  Good afternoon, Judge.  Thank you.

THE COURT:  Good afternoon.

(Witness was sworn.)

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                        315

MS. CHAVIS:  Your Honor, I do have a preliminary matter that I need to bring up regarding the exhibits from yesterday and one from the past examination that I did not move to admit.

THE COURT:  That you what?

MS. CHAVIS:  That I failed to move to admit.

THE COURT:  I've asked that you all do that, not to waste the time of the witness or the Court, and you can go through them with the clerk and do it with other counsel. If there is something I need to take up, I will, but that's an administrative matter that you need to go through, and if there is an objection, Mr. Samuels can let me know, if it is something you should have and you didn't, and he objects.

MS. CHAVIS:  Okay.  Thank you.

JON BABINEAU, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Good morning, Mr. Babineau.  How are you?

A.  Good.  Thank you.

Q.  Okay.  How do you know David Runyon?

A.  I was appointed by the Court to represent David Runyon along with Mr. Woodward in 2007 or so.

Q.  If the docket reflects that you were appointed on March 4th, 2008, do you have any reason to doubt that?

Babineau, J. - Direct                                                    316

A.  I do not.

Q.  I'm going to show you what is ECF number 151.  Here it is.  I'm sorry.  Defendant's Exhibit 164, and it is also ECF number 151, filed on February 4th, 2009.  Can you identify that document, please?

A.  Just what it says, "A motion for inquiry into potential conflict of interest in the case of the United States of America versus David Anthony Runyon."

Q.  Can you please look at Paragraph 21.  And what did you and Mr. Woodward conclude after you investigated the issue of a conflict?

A.  That I had an actual conflict and would no longer be able to remain in the case representing Mr. Runyon.

        MS. CHAVIS:  I'd move to admit this Exhibit 164 into evidence, please.

        THE COURT:  It's admitted.

        MS. CHAVIS:  Thank you.

        (Defendant's Exhibit 164 received in evidence.)

BY MS. CHAVIS:

Q.  Did counsel for the United States agree you should be disqualified for counsel as Mr. Runyon?

A.  I don't recall.

Q.  I'm going to show you Defendant's Exhibit 165, which is also ECF document 159 that was filed on February 13th, 2009.  Can you please identify this document?

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                            317

A.   It's an order issued by Chief Judge Rebecca Beach Smith allowing me out of the case, finding that I was disqualified from any further representation of Mr. Runyon on account of a conflict and upon agreement of the United States, through its attorneys, Lisa McKeel and Brian Samuels.

MS. CHAVIS:  Okay.  Thank you.

Your Honor, I move to admit Defendant's Exhibit 165 into evidence.

THE COURT:  It's admitted.

MS. CHAVIS:  Thank you.

(Defendant's Exhibit 165 received in evidence.)

THE COURT:  It's document 159 on the ECF record.

MS. CHAVIS:  Yes.

BY MS. CHAVIS:

Q.   Did you wait to receive this order before you stopped working on Mr. Runyon's case?

A.   My recollection is, is that once I believed there to be an actual conflict, that everything was essentially frozen at that point in time until the Court ruled on the matter, which was, my recollection was, it was in pretty quick order.

THE COURT:  Just keep your voice up, Mr. Babineau.

THE WITNESS:  Yes, ma'am.

THE COURT:  Your answer trailed off.

THE WITNESS:  Yes, ma'am.  So essentially I froze my representation, if you will, anything that I was doing

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                           318

actively at the time in furtherance of Mr. Runyon's

representation until there was a ruling by the Court.  My

recollection is, is that Judge Smith, consistent with how

this case had proceeded, was always very available, and we

got a hearing quickly on this, and I was out of the case --

or this matter was brought to the Court's attention very

quickly, and I was out of the case very soon after filing

the motion.

BY MS. CHAVIS:

Q.  How long have you been practicing law?

A.  A little over 35 years, since October of 1987.

Q.  So at the time of Mr. Runyon's trial, how long had you

been practicing?

A.  13 and another 8, so 21 years.

Q.  About 21 years?

A.  Yes.

Q.  And how many capital defendants have you represented?

A.  I'd guess somewhere in the neighborhood of 20, maybe a

couple less, maybe a couple more, but somewhere in that

neighborhood.

Q.  Have those all been in the Virginia area?

A.  They have, either in the United States District Court or

in the various circuit courts for the Hampton Roads cities.

Q.  How many of those cases did you prepare for the penalty

phase?

Babineau, J. - Direct                                                    319

A.  All of them.

THE COURT:  Let me ask you this.  Speak to the ones that you had done when you were in this case.  Are you talking about all the cases through the years, Mr. Babineau?

THE WITNESS:  Yes, ma'am.

THE COURT:  Or your experience when you came into this case?

THE WITNESS:  The lion share of the capital cases that I had tried had been prior to, or been involved in, had been prior to my representation of Mr. Runyon.  So I came to Mr. Runyon's case with a wealth of experience in state and federal capital cases.  I'm not sure, I did maybe one or two after Mr. Runyon's case.  The lion share were prior to, my recollection is, prior to Mr. Runyon's case.

BY MS. CHAVIS:

Q.  And how many of those capital cases that you've been involved in with did you prepare for a penalty phase?

A.  All of them.  Typically, in all of the cases there were two lawyers in those cases, both by federal statute as well as by state statute, and it may have been one of either myself or my co-counsel's responsibility primarily to do one phase or the other, guilt/innocence, or the sentencing phase.  But I was always actively involved in all aspects of the case, including the sentencing phases.

Q.  How many of the approximately 20 capital cases that

Babineau, J. - Direct                                              320

you've participated in have you conducted a mental health investigation?

A.   I believe in all of them.

THE COURT:   I want to know one thing.  Did any of those plea or did they all go to trial?

THE WITNESS:   There were several of them were pleas, and probably half a dozen were trials.

THE COURT:   So half a dozen of those would have been trials?

THE WITNESS:   Yes, ma'am.

THE COURT:   How many of them was a federal case that went through all three phases?  In other words, you have a guilt or innocence phase, you have a mitigation phase, and then you have the penalty phase.

THE WITNESS:   I don't believe -- I'm trying to think.  I think there was just only one -- my recollection is just one federal case which went through all of the phases.

THE COURT:   All right.

BY MS. CHAVIS:

Q.   In Mr. Runyon's case, you had co-counsel, correct?

A.   I did.

Q.   Who was he?

A.   Larry Woodward.

Q.   How did you divide the work in Mr. Runyon's case with

Babineau, J. - Direct                                                    321

Mr. Woodward?

A.    Well, we both were looking at everything and speaking regularly to each other, meeting regularly.  In fact, the Magistrate Judge that was assigned to this case was Tommy Miller, Magistrate Judge Tommy Miller, and we had -- he authorized funds for -- we had a separate office with a copy machine and clerical staff to be able to assist us in all the things that we needed to do.

So Woody and I would meet regularly there at that office, which was in Downtown Norfolk on East Main Street, and then otherwise meet and speak regularly.  What we did mostly, I guess primarily was Woody was focusing on the guilt or innocence phase, and I was focusing primarily on the mitigation or sentencing phase.

Q.    Did Mr. Woodward direct what you did in the investigation of the penalty phase?

A.    He did not.

Q.    Were you responsible for obtaining the mitigation investigator in this case?

A.    We did that together.  All of the decisions on these cases were -- this case were done together, so it wasn't me telling him what to do or him telling me what to do.  We, the two of us are pretty experienced, and we both value each other's judgment, and so it was a collective effort.

Q.    Do you remember who located the mitigation investigator?

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                    322

A.  I do not.  The only reason I remembered who the person was is because when you and I met last week, you told me who she was.

Q.  Okay.  Thank you.  Do you remember anything about the mitigation specialist in this case?

A.  I do not.  I couldn't even pick her out of a lineup.

THE COURT:  Couldn't what?

THE WITNESS:  I couldn't pick her out of a lineup. I don't even recall what she looked like, Judge.

BY MS. CHAVIS:

Q.  It's been a while.

When it came to identifying experts to use in this case, how did that come about?

A.  Well, some of them are just prior experience, experts that had been used by me and/or Woody, as he is affectionately called, in the past.  And from a psychological standpoint, I wanted to involve Evan Nelson, and Woody agreed with that.  He is a psychologist in Northern Virginia, who I have used many times over the years prior to this event, or representation of Mr. Runyon, and also after that.

I had had great experience with him, valued his judgment.  The courts valued his judgment.  He was a bright guy, spent a lot of time with all of the clients that he was appointed to represent, or I had him -- or I retained him to represent, and always did a very good, thorough job.  So he's

JODY A. STEWART, Official Court Reporter

the only one I absolutely remember having, you know, insisted on, if you will, in this case.

Q.  Do you remember another expert named Mark Cunningham?

A.  I remember the name, but I only remember the name because you reminded me of Mr. Cunningham when we met.

Q.  Okay.  Thank you.

What kind of records would you provide to Dr. Nelson?

A.  Well, he would have been provided everything about the case.  Typically, what Evan wants is he wants all the facts, a copy of the indictment, relevant portions of the discovery that relate to the events that are alleged to have been committed by, in this case, Mr. Runyon.  He would have wanted us to provide him as much of a social history as possible.  So, you know, where was he born?  You know, his parents, were they married, were they divorced?  You know, where did he grow up?  What kind of jobs did he have, his education, training, all of those things, any -- any known mental health or medical issues that he had that he had reported that we had discovered, and any interviews that we had with individuals that would bear on either the evidence in the case or on David Runyon individually.

So I typically would give Dr. Nelson an exhaustive list of everything I could possibly think of or gather on Mr. Runyon, and that's what I did in this case.

Q.  So was that a one-time production of information to

Babineau, J. - Direct                                             324

Dr. Nelson?

A.   No.  It would have been evolving as we got information.  One of the great things about Dr. Nelson is, is that he doesn't ever just cut off and say, okay, that's enough, I don't want any more, I got all I need.  The more information you provide him, as you gather information, and if you get new information, he always wants to hear that and see that so that his opinion may be evolving also as the facts and other evidence that comes forward in the case is evolving.

Q.   I'm showing you what's marked Defendant's Exhibit 124.  What is this document?

A.   That's just a letter from me to Evan Nelson including copies of material for him to consider in performing his evaluation.

Q.   That looks like a cover letter that would have accompanied all the background materials that you were just describing?

A.   Correct.

          MS. CHAVIS:  I'd move this into evidence as Defendant's Exhibit Number 124.

          THE COURT:  It's admitted.

          (Defendant's Exhibit 124 received in evidence.)

BY MS. CHAVIS:

Q.   Then this is Defendant's Exhibit 125, and I'm not trying to trick you.  This does look like a very similar letter, but

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                    325

it's addressed to a different person, so I'm just going to point out the difference of that letter.  Otherwise, can you identify it?

A.   It just appears to be or is a letter from me, the law firm I was in at the time, to Dr. Cunningham with the information that's represented with the bullet points.

Q.   Do you see on the second page, it appears to be an extra message that's typed in there at the bottom of the letter?

A.   I see that.

Q.   What does that say?

A.   "I requested the jail records via subpoena duces tecum. These documents are to be produced on November 28th, 2008."

Q.   Why would it be important to review the jail records?

A.   Well, all of the psychologists, as well as me as a lawyer, preparing for a case, I like to know what my client has been doing in jail.  Sometimes folks exhibit behaviors in jail that are reported to the jail staff that then become relevant.  There is anything from outward signs of psychosis to just aberrant behavior that then becomes significant for the psychologist, particularly to consider in terms of what's going on with that person and how that may impact from the presentation of mitigation evidence on the issue of life or death.

         MS. CHAVIS:  I'd move Exhibit 125 into evidence, please.

Babineau, J. - Direct                                              326

THE COURT:  It's admitted.

(Defendant's Exhibit 125 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you what has been marked as Defendant's 44.
Can you identify this document?

A.  This looks like a fax cover sheet from the then sheriff
of Portsmouth City Jail, Bill Watson.

Q.  Who is it addressed to?

A.  It's to my law firm and regarding David Runyon, and it
said eight pages.

Q.  This is also to identify Defendant's Exhibit 44, is also
ECF 511-16.  I'm going to turn to Page 4 of 4.

MR. SAMUELS:  Judge, I'm going to object to this
unless Mr. Babineau has reviewed it, and then even if he
has, I'm going to have a hearsay objection to it.

THE COURT:  All right.  First, you'll have to
establish that he remembers getting it and reviewing it, and
otherwise you'll have to establish -- you'd have to bring a
custodian of records or somebody in to authenticate this
document.  I mean, you have shown a document from a jail.
You haven't shown that he remembered.  You showed a P.S. on
a letter.

MS. CHAVIS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Mr. Babineau, do you remember receiving these records

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                          327

from the jail in this case?

A.   I do not.

Q.   Are these the type of records that you ordinarily receive in cases such as these?

A.   Yes.

Q.   If you had received a fax of jail records, would you have reviewed them?

A.   Yes.

Q.   Are these the type of records that you receive in the course of your representation of clients?

A.   Yes.

Q.   When you receive these records, do you keep them in your client file?

A.   I do.

          THE COURT:   Where is your client's file?

          THE WITNESS:   I gave it to Mr. Hudgins in this case.  He got every, every stitch of it, every piece of paper.  I just gave it all to him.

          THE COURT:   So you don't have your file?

          THE WITNESS:   No, ma'am.  I didn't keep any copies of the file.  I gave everything to Mr. Hudgins.  Most of it were in -- they were in binders, and then they were -- I want to say it was like tubs of Rubbermaid had the rest of the material in it.  It was a lot of material.

BY MS. CHAVIS:

                    JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                  328

Q.   And what do you do with this type of information?

A.   This information I would utilize not only for myself and co-counsel but also would be provided to the healthcare or medical experts that we had in this case, would have been Dr. Cunningham, based upon the letter you showed me, and Dr. Nelson and anybody else that we got that was involved in the case, would be part of the salient records that were necessary for that psychological, medical evaluation of Mr. Runyon.

         MR. SAMUELS:  Judge, Mr. Babineau testified what his general practice is, but he still testified that he doesn't recall receiving and reviewing these specific records, so I think that is the authentication issue here.

         THE COURT:  I agree.  He said he turned his file over to Mr. Hudgins, and that's been well over ten years ago, and he does not remember getting these records or receiving these records or reviewing these records.  So it would appear that the information would have to come in through another witness, if you're going to try to get it in.  I don't even know if -- you've got Dr. Cunningham and these individuals listed, and you might ask them if it's a record that they reviewed, but he can't authenticate it if he doesn't remember.

         MS. CHAVIS:  He can't authenticate the document as being from the jail or being a document that he received?

                    JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                        329

THE COURT:  It's not authenticated.  You can get anything.  You can appear, but it's got to be authenticated.

It's hearsay.  It's got to be authenticated or fall under one of the hearsay exceptions.  You're offering it for the truth of the matter, are you not?

MS. CHAVIS:  I'm offering it for the effect of what it would have had on his investigation.

THE COURT:  Well, you're offering it for the truth of what's in there and then what that truth would have had on his investigation.  What you're going to do now is go into the substance of this document, and you're offering it for the truth, or that's my ruling, because I don't know what else you would be offering it for.

You're offering it for the truth of what's in there and then what effect it would have on his investigation.  He is saying he does not remember the document or reviewing the document.  It's hearsay.  You've got to follow the rule.  You are offering it for the truth.

BY MS. CHAVIS:

Q.  Mr. Babineau, when you receive a document such as this, and you follow up on facts that are contained in this document, why do you follow up on the facts that are in the document?

A.  Because all of the information I receive is relevant to my zealous and effective representation of, in this case

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              330

Mr. Runyon, and it contains information regarding his medical and mental health and his otherwise behavior while incarcerated, all of which is relevant, are relevant mitigation issues ultimately to be considered by the Court, and most importantly, the experts that are appointed and working on the case.

So it's all information that they need to have, along with all the other bullet points that I previously provided in the letters, the exhibits that you've shown me to Dr. Cunningham and Dr. Nelson.

Q.   Mr. Babineau, I'm showing you Defendant's Exhibit 108. What is this document?

A.   It's a letter from my office, not signed by me but by somebody on my behalf, and it is addressed to Dr. Nelson. It's a copy of the DVD of Glenn Ford, who is the investigator appointed by the Court to assist in the defense of Mr. Runyon.  He traveled to Alaska and interviewed a witness in the case.  That would be a Mrs. Seeger, S-e-e-g-e-r.

Q.   And when you received this DVD of Mrs. Seeger, would you have viewed the DVD?

A.   Yes.

Q.   Why would you have reviewed the DVD?

A.   Because it was evidence in the case.  It was a witness -- it was a witness statement, and I review everything that comes in, every document, every piece of discovery that I

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                331

possibly can go through, including watching videos and listening to audio tapes, whatever it is.  So it's evidence in the case, and you can't leave any stone unturned, so to speak.  You have to look at everything.

MS. CHAVIS:  I move for the admission of Defendant's Exhibit 108, please.

THE COURT:  What is 108, the letter or the video?

MS. CHAVIS:  Yes, ma'am, the letter.

THE COURT:  That's fine.

(Defendant's Exhibit 108 received in evidence.)

BY MS. CHAVIS:

Q.  We know that you hired Dr. Nelson.  What was his specific job in this case?

A.  He was to perform a psychological evaluation in hopes that he would be in a position to testify, to provide mitigation testimony that would affect the decision on whether the death penalty could be imposed.

Q.  I'm showing you Defendant's Exhibit 130, which is also ECF 104.  What is this document?

A.  It's just a motion for support services to be approved as part of our initial litigation budget for expert investigative and other expenses, and this is all done *ex parte*, so the government is not aware that we are filing these, and they're not present at the hearing.  My recollection is we met in chambers, Magistrate Judge Tommy

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              332

Miller's chambers and went over, Mr. Woodward and I went over our budget and the things that we needed and why we needed them to represent Mr. Runyon.

Q. On Page 12 of this document, is there a heading on that page?

A. "Forensic psychologist, Evan S. Nelson, Ph.D., ABPP."

Q. So this section of your budget is addressing Dr. Nelson?

A. Yes.

Q. Can you tell us, does it indicate what Dr. Nelson was going to be doing?

A. That he was going to -- it says verbatim, "Dr. Nelson, in conjunction with other team members, will prepare and present a reliable social history of David Runyon and his family that will constitute the centerpiece of the penalty phase defense."  Then it goes on to talk about social history and the things that influenced Mr. Runyon's life, culturally, ethnic, background, and the like.

Q. On Page 13, if you could look at this second paragraph here.  Do you recall there being an issue regarding post-traumatic stress disorder in this case?

A. I do not.

Q. Okay.  Does this document indicate that that was something that you were going to investigate?

A. Clearly.

Q. Has Dr. Nelson given social histories in other cases that

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              333

you've been involved in with him?

A.   He has.

Q.   And when I say given social history, I mean he's testified as an expert and presented your client's life history, as a testifying expert in that respect?

A.   Correct, because it's one of the significant factors that he considers in rendering any opinion.  A relevant portion of that would be the social history.

          MS. CHAVIS:  I'd move for the admission of Exhibit 130, please.

          THE COURT:  It's admitted.

          (Defendant's Exhibit 130 received in evidence.)

BY MS. CHAVIS:

Q.   I'm showing you Defendant's Exhibit 109.  What is this document?

A.   This is a notice, copy of the notice pursuant to Federal Rules of Criminal Procedure 12.2 giving notice that we may introduce evidence at the penalty phase, which would be expert mental health evidence bearing on the issue of punishment, and it identifies the mental health experts that were intended to be called at that juncture.

          THE COURT:  Who did it identify?

          THE WITNESS:  I see Evan S. Nelson, Ph.D., as the only person, is number one on the page that's in front of me, Page 1.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              334

BY MS. CHAVIS:

Q.   And what does it indicate that Dr. Nelson will present?

A.   "That Dr. Nelson will present a reliable social history of David Runyon and his family, the social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psychosocial development and function."

         THE COURT:  Turn to the next page.  There is more than one here.

         THE WITNESS:  Mark Cunningham is the second person identified.

BY MS. CHAVIS:

Q.   Yes, sir.

         And what does it indicate that Dr. Cunningham will do?

A.   "That he will describe the developmental factors in Mr. Runyon's background that singly and cumulatively increase his risk of adverse adolescent and adult outcomes, including delinquency, criminality, and criminal violence. Dr. Cunningham would describe and particularize to this defendant scholarly findings supporting the nexus that such risk factors have with adverse outcomes, providing the jury with a basis for giving informed weight to the defendant's history as it considers mitigation."

         It said, "Dr. Cunningham's testimony will be

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                      335

accompanied by numerous digital demonstrative exhibits to facilitate the jury's understanding of the defendant's history, the implications of this history, and the associated scholarly perspectives."  Then it also goes on to say that there would be -- there is a pending review and analysis of correctional records and other factors, as well as strategic determinations by counsel that he would be asked to address.

Q.   He would be asked to address a separate topic?

A.   This was going to relate to his -- "the factors that increase the likelihood of the defendant making a positive adjustment to a life term in the Federal Bureau of Prisons; i.e., positive prisoner evidence.  If called upon to provide such analysis and testimony, Dr. Cunningham will particularize to the defendant's scholarly and research findings regarding rates and correlates of prison misconduct and violence, including the effectiveness of the Bureau of Prisons in securely managing prisoners and in limiting serious violence among staff and other inmates."

         THE COURT:  Do we have to have him just read the document into the record?

         MS. CHAVIS:  No.

         THE COURT:  If you're going to admit it, the document speaks for itself.

         MS. CHAVIS:  Yes, Your Honor.

BY MS. CHAVIS:

Babineau, J. - Direct                                          336

Q.  So for completeness, I was just turning the page.  It appears that there is a placeholder here, correct?

A.  There is.  That's for a neuropsychologist.

Q.  So when you indicate a placeholder, you don't name a person, you just indicate the type of expert that you wanted to use?

A.  That's correct.  And based upon -- in this case based upon recent information that Dr. Nelson had provided, by my recollection is, a letter from Dr. Nelson saying you should get a neuropsychologist based upon what I've seen in my meetings with Mr. Runyon, so I was in the process of filing -- I think I did file a motion seeking approval with the Judge for a neuropsychologist to do an evaluation.  Then shortly after that I was out of the case.  So I never saw any report from a neuropsychologist or met with a neuropsychologist regarding any report that they may have done.

        MS. CHAVIS:  Did I move for admission of the last exhibit?

        THE COURT:  Yes.

        MS. CHAVIS:  Was it moved into evidence?

        THE COURT:  What number was it?

        MS. CHAVIS:  It was number 109.

        THE COURT:  It's admitted.

        MS. CHAVIS:  Thank you.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                            337

THE COURT:  It was the one that you filed, Mr. Babineau, that you signed?

THE WITNESS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  Defendant's Exhibit 121, what is this document?

A.  It's a report of interview on Sheila Cronin, capital case mitigation.

Q.  And who is the report addressed to?

A.  To myself and Mr. Woodward.

Q.  And does it indicate in the introduction just the topic of the interview?

A.  Interviews with David Runyon's parents, David Harold Runyon and Suk Cha Runyon.

Q.  Did you review the information in this document at the time that you received it?

A.  Yes, but as I sit here today, I can't tell you what it says or what I -- I don't remember anything other than -- this having been the first time I have seen it in 17 years or 16 years, however many years it's been.

Q.  That's fair.

MS. CHAVIS:  I move this document into evidence, please.

MR. SAMUELS:  Object to the hearsay, Your Honor.

THE COURT:  Which document is it?

MS. CHAVIS:  It's Defendant's 121, the report of

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              338

the interviews from the mitigation specialist, Sheila

Cronin, to Mr. Babineau.

THE COURT:  Why can't you ask Sheila Cronin about

it?  She's the one who's writing this to him.

MS. CHAVIS:  Yes, but the -- yes, Your Honor.

THE COURT:  You seem so baffled sometimes about a

ruling.  You're just going back to a minute when you showed

the witness the jail records, and he said he doesn't

remember them, he doesn't know if he had them.  Well, you've

obviously got them some way, Ms. Chavis.  You either

subpoenaed them yourself, so you could either bring in

whoever sent them to you, or you must have gotten them from

Mr. Hudgins's file if he had them, and you could have asked

Mr. Hudgins about them, if they were in his file, but you

didn't; or if an expert has them, how they got them and ask

them.  You seem so baffled like you don't know how to

proceed on things like that.  Now you are seeming very

baffled that here is a letter that's coming to him with a

report on interviews.

What is the date of the letter?

MS. CHAVIS:  December 22nd, 2008.

THE COURT:  And when did you get out of the case?

THE WITNESS:  In February, early February 2009.

THE COURT:  You've got to establish that he got

this letter, he read it, what he did for it, or you can ask

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                          339

Ms. Cronin.  These are not difficult things to do.  But I can't just let in evidence because it is what you say it is.  You've got to lay foundations for these things, Ms. Chavis.  You just seem so puzzled by the Court's ruling on the jail records, and it was so easy.  You got them from somewhere.

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  When Mr. Hudgins was here, you didn't ask him the questions about them.

MS. CHAVIS:  Yes, Your Honor.  With respect to the jail records and the issue regarding authentication, the government has indicated -- we had several conversations about whether authentication was going to be an issue during the hearing.

THE COURT:  I'm not dealing with that now.  I'm not dealing with what your conversations were, and we are not getting into a back and forth.  If you all have some written agreement or something in writing about records, that's one thing, but I'm not going to entertain now in the middle of the hearing he said, she said, I said, they said.  If you have an agreement on authentication, you can show it to the Court.  Mr. Samuels is an officer of the Court, objected to it, and I ruled on it.  You didn't mention any agreement then, and there are ways.  When you have a ruling on hearsay, it's hornbook law.  You can't offer a document like that for the truth of what's in it without at least laying a

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                           340

foundation and a basis for it.  You obviously got it from somewhere.  My assumption is you got it from Mr. Hudgins's file, and you chose not to ask him about it, or you subpoenaed it yourself, and you chose not to call in the records custodian, or as I indicated, an expert got it.

So go back to this letter and lay a proper foundation before I'm going to admit it.  It's just a letter from Ms. Cronin to them about interviews.  So if there is an important question you need to ask about it, do so, but lay a foundation.

BY MS. CHAVIS:

Q.  Mr. Babineau, if Ms. Cronin had mailed you this report of her interview, what would you have done with this report?

THE COURT:  Ask him if he got it, and if he read it, and then ask him what he did, if he did anything, not what he would have done, but if he got it, and he remembers it, and what did he do.

BY MS. CHAVIS:

Q.  Did you receive this letter, Mr. Babineau?

A.  I don't know.

THE COURT:  It appears your next option is, if Ms. Cronin signed it, examine her about it.

BY MS. CHAVIS:

Q.  Do you recognize that writing?

A.  You're talking about the writing that says --

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                    341

Q.  The handwriting.

A.  I don't.  That's not mine or anyone that -- any of my staff members that I recall writing that way.

Q.  Do you remember that there was an investigator in this case named Robert Glenn Ford?

A.  I do.

Q.  Do you remember that he wrote reports of his investigations?

A.  I do.

Q.  Do you remember receiving those reports?

A.  I know I received lots of reports from Glenn Ford.

Q.  And did you read those reports at some point in time after you received them?

A.  I did.  I read all the reports I received from the investigators, the mitigation specialist, the experts.

Q.  I'm showing you Defendant's Exhibit's 85.  Does that reflect one of the reports that Mr. Ford wrote in this case?

A.  As best I can recall, yes.

Q.  What is the subject matter of that report?

        MR. SAMUELS:  Judge, object to the hearsay.

        THE COURT:  Sustained.

        You've got to lay a foundation for it.

BY MS. CHAVIS:

Q.  Mr. Babineau, what would you do with this report -- when you received this report, what would you do?  What did you do

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                    342

with it?

THE COURT:  Did you receive it?  Do you remember receiving it?

THE WITNESS:  I don't remember receiving -- I don't remember -- this is the first time I have seen any of this since -- if I saw it in 2008, which I can only assume I did, but I can't -- I'm under oath.  I can't tell you that I got it and reviewed it.  But it would have been in 2008 that I would have received this.

I do remember directing Glenn Ford to go to Fairbanks, Alaska, to interview witnesses.  I 100 percent, you know, remember that, and that was information that was provided by David Runyon that then caused me to direct Mr. Ford to go to Alaska, and then he generated a report.

BY MS. CHAVIS:

Q.  Did you put that report in your case file?

A.  Absolutely.

Q.  You gave that case file to Mr. Hudgins when Mr. Hudgins took your place?

A.  He did.  And as you saw, to Dr. Cunningham and Dr. Nelson, they would have been provided reports of all the interviews, too.  So if I had this, this would have been a report of interview that would have been provided to Dr. Nelson and Dr. Cunningham.

Q.  Do you recall that David Runyon was in a couple of car

Babineau, J. - Direct                                              343

accidents?

A.   I don't.  You told me he was, but I had no independent recollection.

Q.   Would you have directed Sheila Cronin to interview David Runyon's parents?

A.   Yes.

Q.   Did Mr. Runyon cooperate with examinations by experts?

A.   To my knowledge, yes.  I never had -- I have no recollection that anyone made any statement that Mr. Runyon was not cooperative.  He was always very cooperative with me, was polite, responsive, appropriate always in my interactions.  So I don't recall any negative interaction at all with any expert or any other person from Mr. Runyon.

Q.   We saw that you made a Rule 12.2 designation of mental health experts.  Did David Runyon have any issues with that?

A.   He did not, that I recall.

Q.   As far as you remember, did David Runyon cooperate with the mitigation investigator when she was attempting to do her job?

A.   Yes.  I don't recall, like I said, anyone ever making any negative reference to their interaction with Mr. Runyon.  He was always helpful, polite, and cooperative with everyone who was working to help him in this case.

Q.   Mr. Babineau, I'm showing you Defendant's Exhibit 126.  What is this document?

Babineau, J. - Direct                                                  344

A.   It's a letter from Dr. Nelson suggesting to me, recommending to me that I seek authorization for a neuropsychological evaluation of Mr. Runyon.

Q.   Did you follow up on that recommendation?

A.   Based upon my last week review of the document, yes, I did follow up and ask the Court to appoint a neurologist or neuropsychologist to perform an evaluation of Mr. Runyon.

Q.   Once you obtained the results of that neuropsychological evaluation, what would you have done with them?

A.   I would have --

          THE COURT:  Well, did you obtain the results?

          THE WITNESS:  No, ma'am.  I was out of the case before the evaluation even happened.  I got Your Honor to authorize the funds for appointment of the neuropsychologist, and then I was out of the case.

          THE COURT:  So the report didn't come to you?

          THE WITNESS:  No, ma'am.  I never even spoke to the doctors, but I don't believe I ever spoke to the doctor.

          THE COURT:  You were removed because of a conflict?

          THE WITNESS:  Actual conflict, yes, ma'am.

BY MS. CHAVIS:

Q.   Once you received -- if you had received them, what would you have done with them?

          MR. SAMUELS:  Judge, I think he said he didn't receive them.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              345

THE COURT:  That would be a hypothetical question, "if you had received them."  He didn't receive it.  He wasn't in the case.  He had a conflict.  I'm not going to let you inquire of an attorney who's had a conflict in a case to then say what he would have done.  He's out of the case.  He had an actual conflict.

MS. CHAVIS:  Mr. Babineau has a lot of experience in capital cases, and so I was asking him, based on his experience in about 20 capital cases, what he would do in that circumstance.  I think it reflects --

THE COURT:  He's not been designated as an expert.  You're standing up, Mr. Samuels.  I assume you're going to object because he is not designated as an expert.  He is a fact witness over what he did in this case.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  I'm not going to let you ask a hypothetical of him as an expert witness.  You haven't named him as such.  You have named one, and there has been an objection to it, but I haven't ruled on that.  What I'm telling you is he is not an expert, he is a fact witness.  He had a conflict, and he was no longer attorney in the case, and you cannot ask that hypothetical of him as an expert, which is what you are trying to do.

BY MS. CHAVIS:

Q.  Let's see Government's Exhibit 11.  What is this

Babineau, J. - Direct                                        346

document, Mr. Babineau?

A.  It's a letter from Evan Nelson, Forensic Psychology

Associates, P.C., providing me an update on the information

that he had regarding Mr. Runyon at that juncture or that

point in time, which is February 2nd, 2009.

Q.  Okay.  And have you recently reviewed this document to

refresh your memory about it?

A.  I did.

         THE COURT:  Were you still in the case?

         THE WITNESS:  I was.  I believe I got out

February 9th, Judge, so a week later.

BY MS. CHAVIS:

Q.  Okay.  And Dr. Nelson indicates that the data collection

process is still ongoing, but you had asked for a summary of

his opinions?

A.  Yes.  We were close to trial, and I wanted to get an

update on where we were and what he thought in the event that

I needed to change directions or have additional experts or

other folks ready to be able to testify, again, since the

trial was so close.

Q.  Did you consider this to be a final report from

Mr. Nelson?

A.  Clearly, I didn't, because it said the data collection

process is still ongoing.  So we were still gathering

information, and as information is gathered, it would be

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                                347

passed on to Dr. Nelson and any other expert that we had. You just had shown me a letter requesting a neuropsychologist, so clearly I didn't have that, so that would continue to be ongoing information that would -- could affect his opinion.

Q.   And, in fact, at the end, he is asking you to continue to send information?

A.   Absolutely.  That's always been Evan Nelson.  That's just the -- that's the way he operates.  He wants to continue to have as much information as possible.  He's never a one-and-done guy.  He's the guy who works hard to try to get it right, so he wants as much information as he can possibly get all the time.  And I'm the same way.  That's why I have a good relationship in using him as an expert.

Q.   So as of February 2nd, 2009, did you consider the mitigation investigation to be complete?

A.   Absolutely not.

Q.   If there was something that was contained in this report by Mr. Nelson that you found problematic, what would you do?

        MR. SAMUELS:  Your Honor, objection to speculation.

        THE COURT:  Ask him if there is anything in there that he found problematic.

BY MS. CHAVIS:

Q.   Is there anything in this letter that you find problematic?

Babineau, J. - Direct                                                    348

A.  Well, if the Court will give me the time to read the letter so I can go through that.

            THE COURT:  Did you find it problematic at the time?

            THE WITNESS:  Yes.  Probably the only thing I really remember about this case in any particularity was the concern I had based upon my conversations with Evan Nelson regarding Mr. Runyon and the way he was presenting himself to him, and this is essentially reflected in the letter of February 2nd, 2009.

BY MS. CHAVIS:

Q.  So what did you do?

A.  In terms of what?

Q.  In encountering something troublesome within this letter.

A.  I would pick up the phone and talk to Dr. Nelson and say, what do we need to do?  What else do you need to see?  How can you help me, is my recollection, in this case.  And then up to the point that I was in the case, Evan Nelson at that point, not having had all the information, had a pretty emphatic opinion as to his involvement in the case.

            THE COURT:  As to his what?  I'm sorry.

            THE WITNESS:  His involvement in the case, from the standpoint of testifying as an expert.

            THE COURT:  You got out of the case a few days later.  Did you do any follow-up on this letter?

                    JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                          349

THE WITNESS:  I don't recall.

BY MS. CHAVIS:

Q.  In working with Dr. Nelson in other cases, have you provided him with additional information, and has he changed his opinion based on additional information?

A.  Yes.  Dr. Nelson is always -- I think I've already said this at least once.  He likes to get things right.  That's why the Court likes him.  That's why I like him.  I even think the government probably likes him, too, because he's very, very thorough, and he doesn't give his final opinion, if you will, until he's collected all the data and has satisfied himself that he has every piece of the puzzle in its proper place in order to render an opinion.

Q.  So do you read this letter as a conclusion that Dr. Nelson --

MR. SAMUELS:  Objection to the leading, Your Honor.

THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  What do you read this letter -- what message do you get from this letter?  Does it invite you to do anything?

A.  Well, knowing a lot of the history of Mr. Runyon at this point in time in which I received this letter, his upbringing, his history, his obvious facial deformity or palsy, based upon being thrown against a wall by his -- I believe it was his -- maybe his stepfather at the time, and

all of his self-aggrandizing and narcissistic behavior and the like, I was struggling to continue to find a reason why he was the way he was in presenting the way he was.  And it seemed to be the same struggle that Dr. Nelson was having beyond the narcissism and the other things that he reports in the letter of February 2nd, 2009.

Q.  So did you consider your mitigation investigation complete or ongoing at this point?

A.  It was absolutely ongoing at this point.

Q.  Showing you Defendant's Exhibit 141, what is this document?

A.  This is a letter that I authored to Mr. Samuels and Ms. McKeel asking that they recommend to the Attorney General of the United States that he withdraw -- that they withdraw its notice of intent to seek the death penalty in the case, and then I set out a basis as to why I believed that would be appropriate.

Q.  Do you recall writing this letter?

A.  I do.

Q.  I'm just going to flip through the pages just so you can see.

THE COURT:  I thought you said you were out of the case on February 9th?

THE WITNESS:  I thought I was, Judge.  This is clearly dated February 10th.  My recollection is I was out

Babineau, J. - Direct                                              351

the 9th of February.

THE COURT:  You wrote this after you were out?

THE WITNESS:  No.

MS. CHAVIS:  I believe the order says the 13th.

THE WITNESS:  The 13th, Judge.  I'm sorry.  Maybe I filed it on the 9th.  I don't know.  I remember the 9th, but -- so it's the 13th, Judge.

MS. CHAVIS:  There's the order.

THE WITNESS:  So three days before I was out of this case.

BY MS. CHAVIS:

Q.  Still hard at work?

A.  Yes.

Q.  So you have one ground here, another ground, some more grounds.  The point here is these same reasons that you're asking for the government to reconsider seeking death, are some of these reasons -- or could they also be themes for mitigation in the penalty phase?

A.  Absolutely.  Yeah, there is some -- I quote some cases in which the death penalty was not authorized in the end of the letter, but virtually all the rest of the letter contains mitigating evidence that would have been presented to the trier of fact in this particular case.

MS. CHAVIS:  I move for the admission of Defense Exhibit 141, please.

Babineau, J. - Direct                                              352

MR. SAMUELS:  Judge, no objection as long as it's for the limited purpose of non-hearsay, just that he wrote it, not for the truth of the matter asserted, because it is an out-of-court statement.

THE COURT:  Also, he's an advocate at that point. Turn to the first page of the letter just so I can see something that caught my eye.

MS. CHAVIS:  Yes, ma'am.

THE COURT:  I just wanted to be sure, you were writing this as his attorney to the other two attorneys at this point?

THE WITNESS:  Yes, ma'am.

THE COURT:  I'll admit it.

(Defendant's Exhibit 141 received in evidence.)

BY MS. CHAVIS:

Q.  Have you ever taken over a case from another attorney?

A.  Yes.

Q.  And at that point you received their case file?

A.  Yes.

Q.  Did you sit down and talk with them about the case?

A.  Yes.

Q.  What's the purpose of doing that?

MR. SAMUELS:  Judge, I'm going to object to the relevancy.  This seems like an effort to try and turn Mr. Babineau into some sort of expert in what should be done

JODY A. STEWART, Official Court Reporter

Babineau, J. - Direct                                              353

when you take a case over from an attorney.  He is a fact witness here.

THE COURT:  You can ask him if he had a conversation with Mr. Hudgins when he turned the file over and if he recalls what it was.  That's the facts.

MS. CHAVIS:  Sure.

BY MS. CHAVIS:

Q.  Did you ever receive a phone call from Steve Hudgins about Mr. Runyon's case?

A.  Yes.

Q.  Did you ever talk with him about Mr. Runyon's case?

A.  Yes, just that the file would be prepared and ready for him, and, if he needed anything else, just to, once he got the material, to contact me.

THE COURT:  He knew you were conflicted out?

THE WITNESS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  So he received the file from you?

A.  He came to my office and picked it up.  I wasn't even at the office when he came and picked it up.  I do recall that.

Q.  But you did not have a discussion with him about the case?

A.  No.

THE COURT:  To follow up on one of those questions, you said you had taken over cases from other attorneys.  Is

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                              354

that in conflict situations and non-conflict situations?

THE WITNESS:  Yes, ma'am, both.

THE COURT:  When it's a conflict situation, do you normally then discuss the case with the other attorney?

THE WITNESS:  Only insofar as the way their file or documents have been organized, nothing substantive as to what you were doing, why you were doing it, what you were planning on doing, because at that point in time the person is conflicted out, and it wouldn't be ethically appropriate to do that.

THE COURT:  All right.

MS. CHAVIS:  Nothing further, Your Honor.

THE COURT:  Mr. Samuels.

MR. SAMUELS:  Yes, ma'am.

CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good afternoon, Mr. Babineau.

A.  Good afternoon.

Q.  So, Mr. Babineau, when you got out of the case in February of 2009, it was like a wall came down, and you didn't have any further contact; is that right?

A.  Correct.

Q.  You wouldn't have had any contact with the experts?

A.  No.

Q.  That would include Dr. Nelson, you wouldn't have talked

Babineau, J. - Cross                                                   355

to him any further about the case?

A.   No.

Q.   So other than that letter and maybe a subsequent conversation that you had with him as a result of that, that Ms. Chavis just discussed with you, you didn't track Dr. Nelson's ongoing opinions or progress with the case?

A.   I did not.  I didn't even come to the trial to see what happened.

Q.   Well, that's a good point.  So you don't know what evidence was presented at the guilt phase of the trial?

A.   I do not.

Q.   You don't know what non-statutory aggravators that the government may have alleged in aggravation?

A.   I do not.

Q.   You don't --

A.   Insofar as the only thing I do know is what was filed at the time I was still in the case.

Q.   And what was filed would have been the indictment with the statutory aggravators, correct?

A.   Correct.

Q.   Then you understand that later, from doing capital cases, non-statutory aggravators can later be filed?

A.   Yes.

Q.   And noticed to the defense?

A.   That's correct.  We had not received that notice by the

Babineau, J. - Cross                                            356

time -- prior to me getting out of the case.

Q. As you say, you didn't sit through the trial or keep track of the evidence that was produced in the trial?

A. I did not.

Q. The neuropsychologist, you arranged for the appointment of one, but then you were not involved with any neuropsychologist; is that correct?

A. That's correct.

Q. Well, let me take you back through some of the timeline on this case, sir. I'm going to use some of the government's exhibit numbers because we are just trying to establish this chronologically.

I think you told us you got involved in the case in about March of 2008, does that sound right?

A. I was corrected, yes. March of 2008.

Q. And that was shortly after Mr. Runyon had been indicted?

A. I don't have a copy of the indictment, so I would only assume, yes.

Q. You don't have a copy of any of the records pertaining to this case; is that right?

A. Nothing.

Q. And you haven't seen those records or your file in over ten years?

A. That's correct.

Q. And the only thing you have seen on this case is that

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                 357

two-page letter that Ms. Chavis showed you, which was the

February 2nd report from Dr. Nelson; is that right?

A.   Well, when I met with Ms. Chavis and Ms. Peiffer, I went

over a few other -- they showed me a few other documents or

letters.

Q.   Did they let you look through your file, or did they just

show you select items?

A.   They just showed me select items.

Q.   Who determined the items to show you?  They did or you

did?

A.   They did.

Q.   And after you got involved in this case, Mr. Babineau,

did you then arrange for the appointment of some

investigators and other staff to help put this together?

A.   I did.  Or we did, both myself and Mr. Woodward.

Q.   When you got out of the case, I think you testified that

you had turned over your material to Mr. Hudgins; is that

right?

A.   That's correct.

Q.   And I think you said that there were some tubs of

material that you had?

A.   That's correct.

Q.   Did that include -- I'm sorry, sir?

A.   That's my recollection.

Q.   Did that include any notes that you had?

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                           358

A.   Yes.

Q.   Would you have had notes of your conversations with Dr. Nelson?

A.   Yes.

Q.   How did you maintain those notes, sir?

A.   I would just -- typically, I just write them down on a legal pad, and I would leave the legal pad in the file.

Q.   And those legal pads were turned over to Mr. Hudgins?

A.   I would have no reason to keep them, so yes.  I say they were; that's my typical way in which I would handle turning over a case file, would be to provide that information.

Q.   Have you seen any of your notes since you turned them over to Mr. Hudgins?

A.   I have not.

Q.   Do you know what has happened to them at all, if they have been maintained in any way?

A.   I do not.

Q.   Let me show you what we have marked as Government's Exhibit 1.

         Ms. Armstrong, if we could switch over, please.

         Mr. Babineau, showing you Government's Exhibit 1, an e-mail from Ms. Cronin dated April 10, 2008.  Do you recognize that e-mail coming to you, sir?

A.   It's an e-mail to me.  I don't know if I ever got it, but that is an e-mail that shows that it was sent to me.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                   359

Q.  And if it has this designation down here,
"Runyon-OAF 752," does that mean anything to you, sir?
A.  No.
Q.  Do you remember getting a resume from Ms. Cronin?
A.  No.
Q.  Okay.  Not something you recall getting, sir?
A.  I would have asked for one because it would have been
required by the Court.  If I'm asking the Court for funds, I
have to make sure the folks that are being appointed are
properly educated and experienced in the area of expertise
I'm asking for appointment in.  So that certainly would have
been my normal course of conduct, if you will, would be to
get a resume.
Q.  Let me ask you this.  Do you recognize this -- as you sit
here today, sir, do you recognize this as an e-mail that you
would have kept that would have come from Ms. Cronin in
relation to this case?
A.  It is an e-mail I would have kept.  It would have been in
my file.
        MR. SAMUELS:  Your Honor, I'd offer Government's
Exhibit 1.
        THE COURT:  It's admitted.
        MS. CHAVIS:  Your Honor, I have an objection to
this.  He said he just does not remember receiving it.
        THE COURT:  He just stated definitively it was an

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                              360

e-mail that he would have kept in his file.  What's objectionable about it?

MS. CHAVIS:  I'm stating the same objection that the government raised against the documents when I tried to admit them.

THE COURT:  This is something to him.

MR. SAMUELS:  Judge, I think I laid the foundation for it by asking if he recognized that this would be an e-mail that he would have got and kept in his file.

THE COURT:  It's to him.

MS. CHAVIS:  Yes, so was the fact with the record from the jail was to him.

THE COURT:  What difference does it make?  I'm really confused over this.  You just want to make an objection because Mr. Samuels made an objection.  She's going to be called, is she not, as a witness?

MS. CHAVIS:  Well, Sheila Cronin is going to be called, so Mr. Samuels can question her about this e-mail.

MR. SAMUELS:  Judge, we got this e-mail from the defense.  That Runyon-OAF is his original attorney file, that's down at the bottom there.  Everything that says "Runyon-OAF" is something we got from the defense in this case.

MS. CHAVIS:  Mr. Babineau doesn't know that.  He just testified to that.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                        361

THE COURT:  Who did you get this from?

MR. SAMUELS:  Judge, we, the government, got this from the defense in discovery.

THE COURT:  In the case in chief?

MR. SAMUELS:  In the *habeas* case, yes, ma'am. Anything that says "Runyon-OAF" comes from the defense in their disclosures to us.

THE COURT:  Let me see the resume.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  The Court has seen it because the Court appointed the person.

MR. SAMUELS:  Judge, it's fine.  I can move on.

THE COURT:  Just move on.  You don't need to make an issue of the resume of Ms. Cronin.  I mean, this is not like a jail record that the Court hasn't seen.

She was appointed by the Court, was she not?

THE WITNESS:  Yes, ma'am, she was.

THE COURT:  I would have appointed her based upon that, and so if we go back, it's there.  But just move on. I don't view that as a crucial point.  I don't even know why it's a point of contention.

BY MR. SAMUELS:

Q.  Let me ask you this, though, Mr. Babineau.  Would you -- how soon after you got appointed in the case did you start assembling your team?

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                         362

A.   Immediately, is my recollection.

Q.   Would that have included Glenn Ford?

A.   Yes.

Q.   What role did he play?

A.   He was the investigator in the case.  He was a retired Norfolk Police homicide investigator, and he was the investigator that was appointed.

Q.   And what role did Ms. Cronin play?

A.   Ms. Cronin's level of expertise was as a mitigation specialist.  So her job was to assemble for us all the pieces, identify all the mitigating factors, and then help us put together, assemble through our team the interviews and necessary documents and evidence to be able to ultimately present mitigation, decide whether to present mitigation evidence to the Court, and, if so, what mitigation evidence to present.

Q.   Let me show you Government's Exhibit 2.  As I'm showing you that, Mr. Babineau, would Ms. Cronin provide you and your co-counsel, Mr. Woodward, with updates as to her progress?

A.   Absolutely.  That was a necessary part of our relationship, was that we had to be constantly appraised of what she was doing.  I do recall jail visits in which both Ms. Cronin and I were present, but she also had her own independent access to go and visit with Mr. Runyon in the jail.  She had permission to do that, to have contact visits

Babineau, J. - Cross                                          363

with him there in order to assemble the necessary information for us, for mitigation.

Q.   And did part of her job consist of identifying potential witnesses, potential avenues to explore for mitigation?

A.   Absolutely.

Q.   Mr. Babineau, since you were one of the early attorneys on the case, did you also receive some information from the United States in terms of Mr. Runyon's background?

A.   Yes.

Q.   Would that have included background on his education?

A.   Yes.

Q.   Would that have included background on his time in the Army, insofar as you could get it?

A.   Yes.

Q.   Would that have included, do you recall, certain employment records of Mr. Runyon?

A.   Yes.

Q.   So when you started your mitigation investigation, you weren't starting absolute, from scratch?

A.   I guess that's fair to say.

Q.   You had some things that you could build on through Ms. Cronin?

A.   Correct.

Q.   Did part of Ms. Cronin's responsibilities involve looking for additional employers and records and that sort of thing?

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                    364

A.   Yes.  She was to do an exhaustive search of anything and everything related to David Runyon from birth up until where we were at that time and everything in between; his girlfriends, boyfriends, family members, friends, schools, teachers, employers, healthcare providers, everything.  She was to do an exhaustive search of his life.

Q.   Judge -- Mr. Babineau, I'm sorry.  The last one was with Judge Hudgins, and I've got that on my mind.

     This first notice that I'm showing you is August 8th, and then we go down here, there is another notice behind that, August 13th.  Were you being kept up to date regularly, sir?

A.   Absolutely.  In writing, but also my recollection is there were a lot of phone calls.

Q.   Do you recognize this document, Mr. Babineau?

A.   I recognize it only to the extent that it has my name on it, it's from Sheila Cronin, and relates to Mr. Runyon.

Q.   Fair enough.  We will move on.

     Let's take you next to Government's Exhibit 3.

     THE COURT:  Where is Ms. Cronin now, do you know?

     THE WITNESS:  I have no idea, Judge.

     THE COURT:  Where is Mr. Ford now, do you even know?

     THE WITNESS:  He was in federal prison, and I think he's been -- I think he's out now.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                365

THE COURT:  Go ahead.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Had you had contact with Ms. Cronin after you got out of the case, sir?

A.  No.

Q.  Showing you Government's Exhibit 3, I believe this is one you looked at with Ms. Chavis.  It is document 104, filed 9-26-2008 in the case.  Do you recognize this, sir, as a motion for support services that you would have prepared?

A.  Yes.  And I think this is the same document I previously identified.

MR. SAMUELS:  Your Honor, I would go ahead and offer this for admission under our exhibit numbering scheme, Government's Exhibit 3, please.

THE COURT:  Okay.  It's admitted.

MR. SAMUELS:  Thank you, Judge.

(Government's Exhibit 3 received in evidence.)

BY MR. SAMUELS:

Q.  Mr. Babineau, in the course of this motion, you are laying out some requests for expenditures; is that right?

A.  I am.

Q.  And here we see that -- some information, excuse me, about Dr. Nelson and when he's been retained and what he's been approved for; is that right?

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                  366

A.  That's correct.

Q.  Is it the case, Mr. Babineau, that when you are Court appointed on one of these cases, you have to go to the Court every time you want approval for the expenditure of an expert?

A.  Yes.

Q.  And you have to tell the Court why you want that particular expert and a rough idea of what that expert is going to do for you?

A.  And the cost, the cost of that expert, yes.

Q.  That's a consideration.  There are some financial constraints here; is that right?

A.  That is correct.

Q.  So at the time Dr. Nelson is initially approved an allowance of $7,500; is that right?

A.  Yes.

Q.  You spoke very highly about Dr. Nelson.  When he got involved in this case, did he start looking at things right away?

A.  My recollection is yes, because that's what he always does.  I have never known him not to do that.

Q.  And, again, your dealings with him went all the way up until February 2009, and then anything he said after that, that is not something you would be privy to?

A.  That's correct.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                    367

Q.   This motion, of course, talks that -- mentions that Dr. Nelson is conducting an initial assessment, is in the process of reviewing and gathering other information for the continued evaluation; is that right?

A.   That's correct.

Q.   It also mentions that you've discussed extensively the issues with and among other potential experts as well as federal death penalty resource counsel.  What is that, sir?

A.   My recollection is, as we do in federal cases, is we contact resource counsel, I want to say, in -- I want to say it was in Georgia, but, anyway, and make some inquiries about what's going on in terms of federal death penalties, experts that they have found to be helpful throughout the country, types of evidence of -- particularly mitigation evidence that's helpful, all the things that we can do to try to represent, in this case Mr. Runyon, you know, with the best possible and most up-to-date trends, if you will, in capital defense.

Q.   Mr. Babineau, going a little bit further down here, this is your summary of initial proposed costs; is that right?

A.   It is.

Q.   So we've got some costs for the guilt and innocence phase, and then you are estimating $50,000 for Ms. Cronin; is that right?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                      368

Q.   That's in addition to whatever she's been paid for her work up to date in this case?

A.   I don't know what that -- this just says 500 hours at $100 an hour, so I don't know if that's inclusive of other time or not.

Q.   And then for Dr. Nelson it's 25,500 --

MS. CHAVIS:  Objection, Your Honor, to the relevance of the cost of this litigation to the issue that's before the Court.

MR. SAMUELS:  Judge, I think it's very relevant, the work that was put into this by Mr. Babineau.  It's contained in an exhibit that's already been admitted.  I think it's appropriate for me to review it with him.

THE COURT:  I overrule the objection.

MR. SAMUELS:  Thank you.

BY MR. SAMUELS:

Q.   An additional 25,000 -- $25,000 figure for Dr. Nelson; is that right?

A.   25,500, yes.

Q.   And then the future dangerousness expert, you budget at $30,000?

A.   Yes.

Q.   And I think all told here, the initial cost is 273,000 that you are asking for; is that right, Mr. Babineau?

A.   That's correct.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                              369

Q.   That's outside any attorney's fees, isn't it?

A.   Yes.

Q.   Now, your fees would be reflected in billing records; is that right?

A.   That's correct.

Q.   What would you have done with your billing records when you got out of the case?

A.   The billing records would have been submitted to the Court.  On capital cases, it's my understanding it gets first approval by the District Court Judge.  In this case it would have been Judge Smith.  And then my understanding is it goes up to the Fourth Circuit and gets reviewed up there, and then ultimately gets approved and sent back down for payment.

Q.   Was that part of your file that you would have turned over to Mr. Hudgins, or no?

A.   I don't know.  I don't think so.  I think those financial records would have been kept separately and are in my financial books and records, if you will.

        THE COURT:  Billing records go to the Court.  You were Court appointed?

        THE WITNESS:  I was.

        THE COURT:  It would go to the Court, and it would go into the court appointed e-system and would have been approved and paid through the court.  Other attorneys are not aware, as I know it, of what other attorneys are

                    JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                        370

billing, is that correct, to your knowledge?

THE WITNESS:  I have never known what other lawyers are billing unless they told me.

THE COURT:  It goes directly to the Court and not to the government and not to other attorneys.

MR. SAMUELS:  Thank you, Judge.  I just asked on that because we had seen Mr. Hudgins' billing records.

THE COURT:  Those were his backup support records.

MR. SAMUELS:  I see.

THE COURT:  Weren't they his backup support records?

MR. SAMUELS:  I don't know, Judge.  We just saw them Monday for the first time.

THE COURT:  I assume they were his logs and whatever.

You said that what you would have done is used yours to do a voucher for the Court to approve?

THE WITNESS:  Yes, ma'am, that's correct.

BY MR. SAMUELS:

Q.  And then you were involved in the case for approximately a year and would have billed for that entire time.  You got paid for that, right, Mr. Babineau?

A.  Yes, I got paid for it.

Q.  So, again, in the course of your motion, you are setting forth your justification for these various categories of

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                               371

expenses and what you know to date; is that right?

A.   That's correct.

Q.   This is about six months after you got on the case file in September of 2008; is that right, sir?

A.   That's what it says on the document, it was filed 9-26-2008.

Q.   Mr. Babineau, as part of your investigation, were you trying to get military records for Mr. Runyon and some of his family members, sir?

A.   I don't recall if I was or I wasn't.  I definitely would have, but I don't have any specific recollection of requesting those records.

Q.   Let me show you a document to see if that helps refresh your recollection.

A.   All right.

Q.   Let me take Mr. Babineau, Ms. Young, to Government Exhibit 4, and I'd like to take him to Page 4.  I can just scroll down through it.

          MS. CHAVIS:  Objection, Your Honor.  This is outside the scope of the direct examination.  We did not discuss any military medical records.

          MR. SAMUELS:  I think there was a discussion of the steps that were taken by Mr. Babineau, what he did, and this is an indication of some of the work that he did on the case.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                          372

THE COURT:  I'll let you ask him about that, and I'll let you, if you want to follow up with questioning on it, you can do so, Ms. Chavis.

MS. CHAVIS:  Thank you.

BY MR. SAMUELS:

Q.  Mr. Babineau, if you look at this letter, do you recognize this as a letter, sir, from your office dated November 26, 2008?

A.  Yes.

Q.  And going down so you can see the bottom of it, is that your signature on the letter or an authorized signature, sir?

A.  It's authorized.  I'm not quite -- it's Windley Walden, who was a lawyer that worked with me at the time.

Q.  Is this a letter that you would have kept in your file, sir?

A.  Yes.

Q.  And you do recognize this based on the format of the letter and based on the way it's signed at the bottom?

A.  Yes.

Q.  The substance of this letter is requesting information on David Runyon's parents' background.  Do you recall doing that, sir?

A.  Yes.

Q.  There are some forms attached to it where you are asking individuals to sign off through a request for records.  Do

Babineau, J. - Cross                                          373

you remember doing this, sir?

A.  I do.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 4.

        THE COURT:  It's admitted.

        (Government's Exhibit 4 received in evidence.)

BY MR. SAMUELS:

Q.  Mr. Babineau, I think there were some questions about the experts you had and some discussion of not only Dr. Nelson but Dr. Cunningham.  Do you recall that?

A.  Repeat that question.

Q.  Of course.  It was a little awkwardly phrased.

        There was some discussion not only about Dr. Nelson but also Dr. Cunningham.  Do you recall that?

A.  I don't.  Quite frankly, until Ms. Chavis and Ms. Peiffer said something about Cunningham, I really didn't even remember Dr. Cunningham, until they reminded me of Dr. Cunningham last week.

Q.  Let me show you a document and see if it helps refresh your recollection.

A.  Okay.

Q.  I'd like to show him Government's Exhibit 5, please.

        Showing you this e-mail, let's look at the bottom first.  Do you recognize the name David Bruck?

A.  I do.

Babineau, J. - Cross                                                    374

Q.   Who was Mr. Bruck?

A.   He was the -- I think it was the Capital Defense Clearinghouse at Washington and Lee University.

Q.   If you just take a minute and look at this e-mail, do you recognize this as an e-mail that you received on Wednesday, October 1st, 2008?

A.   That's what it appears to be.  I don't have a specific recollection of receiving that, but I do specifically recall having had conversations with David Bruck.

          MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 5.

          THE COURT:  It's admitted.

          (Government's Exhibit 5 received in evidence.)

BY MR. SAMUELS:

Q.   What was the role that David Bruck played in this matter, sir?

A.   David Bruck has always been a wealth of information as it relates to capital cases, providing updated information, in this case jury consultants, future dangerousness, experts, mitigation specialist.  I mean, he had a bank of folks that had worked well throughout the country and throughout the Commonwealth, and so he was a really strong resource for myself and Mr. Woodward to use in this case as well as other cases.

Q.   Now, did you use Mr. Bruck from when you started in the

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                      375

case up until the time you got out, sir, do you recall?

A.  I don't recall.  I know there were -- there would have been several conversations with him, or e-mails with him, but how many, I don't know.  For over what period of months, I don't know.

Q.  I think you mentioned there that he was a resource to you and Mr. Woodward.  Mr. Babineau, as you're going through this process in defending Mr. Runyon, were you and Mr. Woodward consulting with one another?

A.  Always.

Q.  And even though you sort of had these spheres that you described -- Mr. Woodward is involved in kind of the guilt and innocence, and you are involved in more the penalty and mitigation -- was there some crossover in those areas?

A.  There is lots of crossover.  He wanted to know everything I was doing, and I wanted to know everything he was doing. Even if it was really one or the other of our primary responsibility, area of responsibility, it was important for both of us to know everything that each other was doing, and the decisions, you know, were made jointly on how to proceed in the case.

Q.  When you left the case in February 2009, was Mr. Woodward up to speed on the progress you made on the mitigation investigation?

A.  I'd like to believe he was.

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                  376

Q.   When you say you'd like to believe he was, do you recall
conversations with him to that effect, sir?
A.   Yes.  I recall conversations with him to -- in that
respect.  But in terms of the presentation of evidence, he
certainly would not have been up to speed on the presentation
of evidence because I was the one that was, you know,
primarily dealing with the experts.  And even though he did
meet with David Runyon on lots of occasions, I guess up to
that point, I had spent the lion's share of time with David.
Q.   I'd like to show you another document, Government's
Exhibit 6, please.  This is November 17th, 2008.  Do you
recognize this letter, sir, as you look at it, either by the
format or by the signature?
A.   I recognize the format, but not the content of it.  I
don't have any independent recollection of its content.
Again, it is signed by Windley at the bottom.
Q.   Is that someone who was authorized to sign for you, sir?
A.   Yes, absolutely.  Windley -- you got two for one,
essentially, on this.  Windley is a very bright lawyer who
worked with me, and, anyway, she worked on the case with me
and was fully aware of all that was going on on the case at
the time.  And the letters would have been authored and
reviewed by me.  Just because I may not have been in the
office, I would say, "Can you please sign that and get it
out," because I wanted to make sure things got out quickly.

Babineau, J. - Cross                                      377

          MR. SAMUELS:  Your Honor, I'd offer Government's

Exhibit 6.

          THE COURT:  It's admitted.

          (Government's Exhibit 6 received in evidence.)

BY MR. SAMUELS:

Q.  Mr. Babineau, this looks like it refers to Dr. Cunningham

planning a visit of David Runyon on November 20th, 2008.  Do

you see that, sir?

A.  Yes.

Q.  Do you have any memory of whether that visit actually

took place?

A.  I have no idea.  I didn't even remember Dr. Cunningham

until Ms. Chavis reminded me that Dr. Cunningham was involved

in the case.

Q.  Very good, sir.

          I'll next show you Government's Exhibit 7.  I think

this is one Ms. Chavis discussed with you as well, but I'm

just keeping our numbering system.  Do you recognize and

remember looking at this letter dated December 9th, 2008,

regarding Glenn Ford's interview of Ms. Seeger?

A.  I mean, it's a letter authored by me to Evan Nelson, you

know, with Glenn Ford's interview, the DVD of the interview.

Q.  Part of the process of continuing to keep Dr. Nelson

updated and involved?

A.  Absolutely.

Babineau, J. - Cross                                                    378

MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 7.

THE COURT:  It's admitted.

(Government's Exhibit 7 received in evidence.)

BY MR. SAMUELS:

Q.  We can go to Government's Exhibit 8.  Actually, first, let me go to Government's Exhibit 9A, which is already in evidence.

Mr. Babineau, I'm going to show you 9A, which is document 65, filed June 16th, 2008, an order regarding mental health evidence.  Do you recall that, sir?

A.  I don't.  I mean, if I read it, maybe I will, but as I just looked at it right here, I don't.

Q.  Do you recall -- let me ask it this way.  Do you recall that there was an order in this case that provided disclosure requirements in accordance with Rule 12.2 for mental health information?

A.  Absolutely.

Q.  And those orders are common in such cases, correct?

A.  Yes.

Q.  And those orders require you, if you are going to use mental health in a penalty phase, that you've got to provide some notice?

A.  Correct.  And I think we previously went through with Ms. Chavis an exhibit which identified Dr. Nelson and

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                             379

Dr. Cunningham and a neuropsychologist to be determined.

Q.  That's right.  So let's go to Government's Exhibit 9, which is that notice.  I'll show you, Mr. Babineau, this is document 135, filed December 12th, 2008.

Now, that's about 90 days before the originally scheduled trial date of March, I think it was 12th or 13th, 2009.  Does that sound right?

A.  Sure.

Q.  And it does say here that pursuant to Rule 12.2 and the Court's order of June 16th, 2008?

A.  Correct.

Q.  And so you know that by 90 days out, you've got to provide notice of what you're going to do on the mental health side?

A.  That's correct.

Q.  You've got Dr. Nelson, we saw Dr. Cunningham, and then I think we looked at, there is a potential neuropsychologist yet to be named?

A.  That's correct.

Q.  Let's go to Government's Exhibit 8.  Showing you Government's Exhibit 8, Mr. Babineau, do you recognize this as an e-mail dated Thursday, December 11th, 2008, to yourself and someone named Kay Holland?

A.  Kay Holland was my paralegal at the time, so I definitely recognize Kay Holland.  In terms of the e-mail, I don't have

Babineau, J. - Cross                                                    380

any specific recollection of the e-mail.

Q.  Looking at this, does this help you -- further down the e-mail, a couple of e-mails from Mark Cunningham to you, do you recognize the actual JonBabineau@SaundersBarlow.com?

A.  Yes.  That was my e-mail address at the time, and that was Kay Holland's e-mail address as kholland@SaundersBarlow.com, and Dr. Cunningham is describing what he would testify to.

Q.  And looking at the date, December 11th, 2008, if you had to file your notice on December 12th, 2008, would you have been asking Dr. Cunningham for information as to what to put in that notice?

A.  Yes.

          MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 8.

          THE COURT:  It's admitted.

          (Government's Exhibit 8 received in evidence.)

BY MR. SAMUELS:

Q.  Now, let me take you next to Government Exhibit 11, which I believe is already in evidence.  This is the same document that Ms. Chavis showed you.  Do you remember this, Mr. Babineau?  This is this preliminary letter from Dr. Nelson?

A.  Yes.

Q.  And at the date of this letter, February 2nd, you are

                    JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                                381

about six weeks from trial, right?

A.  Correct.  You did the math.

Q.  Well, the trial date is May 12th, May 13th.  This is February 2nd.  We are five to six weeks away from trial?

A.  I think -- yeah, okay.  Was it March?

Q.  Yes, sir.

A.  Okay.  I think you just said May.

Q.  I apologize.

A.  That's all right.

Q.  Initially March 2009.

     And you're asking Dr. Nelson to put this together for you to get a sense as to what the status is from the mental health perspective?

A.  That's correct.

Q.  You mentioned in your direct testimony -- I wrote it down to make sure I didn't forget -- that Dr. Nelson had an emphatic opinion.  Do you remember using that word?

A.  I do.

Q.  What was that emphatic opinion that Dr. Nelson had?

A.  That he would not be a helpful witness, that we would be better off using lay witnesses because he felt like, based upon what he observed of Mr. Runyon at this point, not having had the neuropsychological evidence or other evidence that was still being accumulated at the time, that because of his severe narcissism, self-aggrandizement, that he believed he

Babineau, J. - Cross                                              382

would not be a helpful witness, because, if asked by the United States, he would have a hard time saying anything helpful other than he believed that Mr. Runyon's actions were willful, deliberate, knowing, that even what he had observed, it still was not an excuse for his conduct.

Q.   Now, it references here in this letter --

        MR. SAMUELS:  Your Honor, if I didn't admit Government's Exhibit 11 -- I believe I did yesterday -- I would go ahead and offer that.

        THE COURT:  Is it admitted?

        THE CLERK:  Yes, ma'am.

        MR. SAMUELS:  Thank you, Judge.  I'm sorry for the overlap.

BY MR. SAMUELS:

Q.   It says here, "In our interviews, Mr. Runyon has consistently denied that he was the shooter."

        Was that the posture that Mr. Runyon took on the case?

A.   With Dr. Nelson, yes.

Q.   Was that the posture he took with you, sir?

A.   Not always.

Q.   Okay.  When you authored your letter to the Department of Justice, there was no offer for Mr. Runyon to plead guilty, was there?

A.   No.

                JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                              383

Q.   You mentioned that you had worked with Dr. Nelson a

number of times in the past.  Did you have confidence in his

opinions?

A.   Absolutely.

Q.   You mentioned that Dr. Nelson was willing to reevaluate

his opinions if new evidence came to light?

A.   Correct.  Even in that letter of February 2nd, 2009, he

said the data collection process is still ongoing, but he --

but I had asked for a summary opinion thus far.  So even the

letter itself qualifies his opinion as being the snapshot up

to that point.

Q.   But you are about five, six weeks from trial.  You have

to start narrowing down at some point, right, Mr. Babineau?

A.   Absolutely.  But, unfortunately, the way cases are, and

you haven't tried cases -- not quite as long as I have,

but --

Q.   No, sir.

A.   -- you have a lot of evidence that continues to pour in,

and you have to constantly be responding to that, and Evan

knew that, so hence the letter.

Q.   You mentioned, as well, that Dr. Nelson had recommended

that you obtain a neuropsych; is that right?

A.   He actually offered that in a letter, saying that, based

upon his observations, that he would recommend appointment of

a -- or evaluation by a neuropsychologist.

Babineau, J. - Cross                                                  384

Q.  And we see this e-mail is dated February 2nd, 2009.  Let me next show you Government's Exhibit 13.  Do you recognize this as being an e-mail exchange between you and Kay Holland and, I think, Windley Walden?

A.  Correct.  I copied Windley on it.

Q.  Do you recognize the Thursday, February 5th, 2009, related to a, it looks like a Scott Bender?  Do you see that?

A.  I do.  I did not realize -- did not remember Bender having been appointed in the case, again, until I spoke with Ms. Chavis and Ms. Peiffer last week about the case.  I did not have any independent recollection of Mr. Bender.

Q.  As you look at this e-mail now, does it refresh your recollection that Mr. Bender was the neuropsychologist that you got involved in the case?

A.  What refreshed my recollection was the order of the Court authorizing appointment of Dr. Bender.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 13.

        THE COURT:  It's admitted.

        (Government's Exhibit 13 received in evidence.)

BY MR. SAMUELS:

Q.  Mr. Babineau, I think you testified that you did not talk with Mr. -- or Dr. Bender and don't know what his view of the case was from a neuropsychological perspective?

A.  I don't have -- I don't believe I did.  I don't have any

JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                              385

recollection that I spoke to Dr. Bender.  Again, that would have been this e-mail, being February 5th, 2009.  I was out of the case 13 February 2009, so it would have been unlikely that I had any conversation with him.

Q.  Okay.  So this is February 5th.  Let me next show you Government's Exhibit 15.  This is in a little odd format, but do you recognize this e-mail format, an e-mail dated February 6th, 2009, between yourself, Ms. Holland, and Ms. Walden, and then there is a reference to Dr. Nelson as well?

A.  I mean, I recognize the format of the e-mail.

Q.  Is this e-mail something that would have been kept and maintained in your records in the case?

A.  Absolutely.

Q.  And is that your law firm e-mail address below?

A.  Yes.

Q.  And this was during the time you were still involved in this matter even though you would soon get out?

A.  Yes.  Seven days later, I was out, and that was Mr. Woodward's -- I don't know if that is still his e-mail, but I know that was his e-mail at the time.

Q.  The LWoodward@SRGSlaw.com?

A.  Correct.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 15.

                    JODY A. STEWART, Official Court Reporter

Babineau, J. - Cross                                              386

THE COURT:  It's admitted.

(Government's Exhibit 15 received in evidence.)

BY MR. SAMUELS:

Q.  Mr. Babineau, the way this came out is a -- it's in large font at the bottom here, but it appears to be an exchange between you and Dr. Nelson about a jail visitation for Dr. Nelson to see David Runyon.  And here we see on Friday, February 6th, Dr. Nelson writes, "Jon, I'd like to see Runyon on Monday at 12-ish to give him an MMPI and ask some questions."

A.  Yes.

Q.  Was this part of Dr. Nelson's continuing involvement in the case beyond the February 2nd letter that we saw?

A.  Absolutely.  He was continuing to work at his own insistence as well as mine.

Q.  I think you said, as well, that at the five-week period, five to six weeks before trial, you were still struggling to find some sort of mental health justification or explanation for the conduct; is that right, sir?

A.  Yes, that would carry the day.  Clearly, there was mental health issues that were noted from the narcissism to other records that were previously shown to me about bipolar disorder, et cetera, but you had to weigh, based upon what the experts were saying, the competing interest of what evidence you could present on one hand to show mitigation

Babineau, J. - Cross                                          387

versus the other hand that would negate the mitigation.

And Dr. Nelson's opinion was, is that the mitigation that he had at the time that I was still in the case was not enough to offset the negative impact of all the other stuff, if you will, that would have been presented to the jury.

Q.  Let me show you just a couple more things, Mr. Babineau. Government's Exhibit 12, which I believe has already been admitted.  Sir, do you recall getting a resume and agreement with Dr. Bender, or was that so close to the time you were leaving?

A.  I don't -- I mean, I see what was sent.  I would have filed a motion with the Court for appointment of Dr. Bender, and part of that would have included his curriculum vitae and the fees that he would be charging for his services, so -- and what services he would be providing.  All of that was required under the Rules of the Court by Judge Smith for approval or Magistrate Judge Miller for approval of the funds.

MR. SAMUELS:  Your Honor, may I have just one moment, please?

Thank you, Judge.

Judge, that's all I have for Mr. Babineau.

THE COURT:  All right.  Ms. Chavis.

MS. CHAVIS:  May I have one minute, Your Honor?

THE COURT:  Why don't we take a 15 -minute recess

JODY A. STEWART, Official Court Reporter

and come back so you can review your notes.

MS. CHAVIS:  Thank you.  I appreciate it.

(Recess from 4:28 p.m. to 4:46 p.m.)

THE COURT:  Everyone is back from break, and Mr. Babineau is on the stand.  Mr. Runyon is here with his counsel.

You may resume your examination on your redirect.

MS. CHAVIS:  I have no questions, Your Honor.

Thank you, Mr. Babineau.

THE WITNESS:  Thank you, Ms. Chavis.

THE COURT:  Mr. Babineau, thank you very much for coming to testify, and since you have testified in the case, please don't discuss your testimony with anyone.  I don't know that you'll be subject to recall.  If for some reason you are, we will give you notice, plenty of notice and be in touch with you.  Have a great day.

THE WITNESS:  Yes, ma'am.  Thank you.  Good seeing you.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Next witness, Ms. Chavis.

MS. CHAVIS:  Yes.  We call Larry Woodward, please.

THE COURT:  Mr. Woodward, if you would please come forward and be sworn and take the stand.

THE WITNESS:  Yes, ma'am.  Good afternoon, Your

Woodward, L. - Direct                                                        389

Honor.

THE COURT:  Good afternoon, Mr. Woodward.

(Witness was sworn.)

LAWRENCE WOODWARD, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Hello, Mr. Woodward.

A.  Hello.  How are you?

Q.  I'm fine.  How are you?

A.  I'm good.

Q.  Thank you for being here.

How do you know David Runyon?

A.  I was his -- one of his attorneys when he got indicted in this court.  I think that was 2008 or '0 9.

Q.  Who was your first co-counsel on this case?

A.  Jon Babineau.

Q.  And how did you divide the work on this case with Jon Babineau?

A.  Well, initially with Jon, we kind of both dove into it, and then we sort of decided that I would be mainly responsible for the guilt/innocence phase, and Jon would work on the mitigation part, because, you know, obviously with a capital case, you start working on that at the same time.  I

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    390

mean, it was -- wasn't that I was not aware of what Jon was doing and vice versa, but I would say that was the way I recall, and that's what I believe we did.

Q.  And eventually Jon Babineau had to leave the case; is that correct?

A.  That's correct.

Q.  And who replaced Mr. Babineau?

A.  Steve Hudgins.

Q.  Then how was the work divided when Mr. Hudgins came on the case?

A.  The same.  It was -- obviously, I don't remember the exact timeline, but Jon was on the case a number of months, and we had been working.  So when Steve came on, Steve took over, you know, what Jon had been doing in terms of mitigation and working with the mitigation specialist.  It was probably a clearer division of labor at that time because we were closer to trial and it was -- you know, I spent a lot of time, obviously, with Steve, briefing him on everything, and we -- I don't want to make the Court think -- we communicated, we talked several times a day sometimes, several times a week all the time.  I've known Steve since law school and known him for 40-plus years.  At that time I guess it was 30-some, but, yeah.

Q.  And you said Mr. Hudgins worked with the mitigation investigator.  Did he also work mainly with the mitigation

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                391

witnesses?

A.   Yes.  They traveled -- the way -- I'm sure -- I don't know what everybody else has said, but there is a budget, and there's travel, and Mr. Runyon had been -- his dad, if I recall, had been in the military, and he had lived all over the country and -- so I didn't travel.

        The Court, typically, they pay for one lawyer and the mitigation person, or I think our investigator went sometimes.  But, yes, they track down the people to interview to prepare the mitigation case.

Q.   Did Mr. Hudgins also work with the mitigation expert?

A.   He did.  We -- I believe that when Jon was in the case, Dr. Nelson had reviewed it.  Steve came in, and we had some other folks review it.  When you all prepared me, you reminded me of their names.  I didn't really remember their names.  But, yes, Steve was responsible for all that.  But I was -- I certainly was aware of the decisions and what was going on, but he was on the ground dealing with those folks.

Q.   With respect to releasing the penalty phase witnesses from their subpoenas, who was responsible for those kinds of decisions?

A.   I would say that we -- I don't know that I would explain it in who was responsible.  I assume you all have had testimony.  We had the guilt/innocence phase.  You know, the jury returned the verdict they did, and then we had a break.

I want to say it was three to four weeks.  I don't remember exactly.  I've done a lot of cases, but we had some time.

Of course, at that point, you know, I started -- because it's the guilt/innocence part, so I started focusing and helping Steve.  So I certainly would say that he made recommendations, and we talked about the various witnesses and decided which ones to call and which ones to release.

I don't remember this, but we probably subpoenaed some people that we didn't call.  I mean, I've never, I don't think, done a case where I call every single witness that I subpoena, because, you know, you see how people do on the stand, and you want to have some options.

But, yeah, I would say that that was a collective decision.  In terms of who called them up and told them not to come, was probably Steve or maybe the mitigation person. I don't remember me doing the calling, but I was certainly involved in the decisions.

Q.  I'd like to show you what's marked as Defense Exhibit 129.  What is this document?

A.  This is a letter, on my firm's letterhead, from me to Steve, and obviously, I don't normally sign my letters "Woody," but this is a friend of mine, but, yes, that's a letter from my office to Steve.

Q.  This is dated April 13th, 2009?

A.  It is.

Woodward, L. - Direct                                              393

Q.   And what are you conveying in this letter?

A.   It looks like that I had some notes that perhaps came from a meeting with Mr. Runyon, I don't recall, and I'm forwarding them to Steve, and it looks like -- looks like I'm telling him to, you know, use it as he sees fit, to share with the folks that are doing the -- that he is working with on the mitigation.

     Looking at that date, I don't remember if that's pretrial or between the trial and the sentencing phase.  I just don't have that timeline in my head.

     THE COURT:  It's pretrial.  The trial started in June.

     THE WITNESS:  Okay.

     THE COURT:  Then after that, there was the mitigation in July, and then the sentence, imposition of sentence in August.

     THE WITNESS:  Right.  So I don't know exactly when Steve had come on board, but he came on, so this is probably -- I don't want to guess -- it's more than a guess, but I recall that I would have gone through the file, and Steve is handling this, and he says anything you find that you think might be pertinent to what we are doing, just send it to me.

     And, you know, I can't tell if I scanned -- I don't know if this was snail mail or this was a cover letter and a

Woodward, L. - Direct                                              394

scan and an e-mail.  But my office is at the oceanfront in Virginia Beach, and Steve was over in Center City in Newport News, so, you know, we weren't, like, right down the street from each other.

THE COURT:  Because it's a matter of record, Mr. Hudgins came in the case after February 13th, 2009, when Mr. Babineau withdrew?

THE WITNESS:  Right.

THE COURT:  That's all of record.

THE WITNESS:  Okay.  So this would have just been me sending Steve some information.

MS. CHAVIS:  I need to admit Defendant's Exhibit 129, please.

THE COURT:  It's admitted.

MS. CHAVIS:  Thank you.

(Defendant's Exhibit 129 received in evidence.)

BY MS. CHAVIS:

Q.  Do you remember what you did personally to investigate for the penalty phase in this trial?

A.  To investigate?  Well, I guess, in broad terms, everything that I did in the guilt/innocence phase I would consider investigation that you have to consider in the penalty phase.  I mean, obviously what Mr. Runyon was charged with was a crime that had planning, and I don't remember the exact timeline, but there was -- after the crime was

Woodward, L. - Direct                                              395

committed, there was some period of time before they were arrested, or it was, quote, unquote, solved.

So I think that all of that goes into investigating the mitigation phase, but if your question is do I recall -- I did not travel -- I think, as I told you, the one thing that I recall that I said to Steve and Sheila Cronin in mitigation, when they -- I have a clear memory of this because it's the only time I remember it ever happening.

They interviewed Mr. Runyon's mother, and they -- I don't know where she was.  She was somewhere not in Virginia, and they called me, and they said they were concerned about her approach and what she had to say and whether she would even be a good witness.

And I have a memory of telling them, well, look, if you've got a big list of people, if you interview an old military buddy or an old school buddy that maybe doesn't have something good to say, then we can get another military buddy or another -- but you've only got one mother, so we need to make sure we work on his -- so I don't know if you would call -- I didn't -- they went back and talked to her, I think, again, I don't know, but that sticks out in my mind of the mitigation phase.

Q.   In the months leading up to David Runyon's trial, did you travel to New Orleans to participate in a training, a federal death penalty case training?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    396

A.   I did not, I don't think.  I don't believe that I did.
I've been aware of it, but I don't believe I went to the one
right immediately before Mr. Runyon's case.
Q.   When the trial was over, did Steve Hudgins give you his
complete file?
A.   Yes, he gave me his file.  That's another thing that I
have a clear -- he gave it to me in the parking lot of the
Virginia Beach City Jail.  I remember we both had clients to
see out there, and he brought his entire file that was a
number of Bankers Boxes, and we met in the jail, and he
turned it over to me.
Q.   And what did you do with Mr. Hudgins' file?
A.   I took it back to my office, because as I'm sure you
know -- it's probably a matter of record -- initially I was
Mr. Runyon's counsel on appeal, and, you know, so I had
Steve's file, I had my file.  I started into the appeal.  I
never really thought I was going to be his counsel all the
way through the appeal, because I just know how the cases
work.

        I'm blanking on the name of the lawyer that got
appointed.  She was from South Carolina.  You reminded me of
it in my office.  So she came up to my office and took some
of the file -- took whatever she wanted.  I mean, I don't
remember -- I think she took it all.  And then Michele Brace,
who I've known for a long time, got involved in this case and

Woodward, L. - Direct                                              397

got some more.

But by the time I first met you when you came to interview me, I don't know, was that four years ago? Whenever it was, I didn't have anything that wasn't on PACER. I had turned my whole file over.

And my understanding is that Jon -- I don't know -- Jon told me that he gave Steve his entire file when they made the switchover. I wasn't present for that.

Q. And when you still had Steve Hudgins' file in your custody, did he ever ask to look at it?

A. If he did, I don't remember that. I mean, certainly if he had, I would have allowed him to. But I don't believe that he did, but I wouldn't -- I'm under -- I can't say for sure he did, and I don't recall that, if he did.

But if -- I mean, he went -- as you know, he got appointed to be a judge, and when he took the bench, he got me to close down his -- I took over a bunch of his cases, which I have done for other people. But I don't remember him asking me to look at Mr. Runyon's file, but he could have.

THE COURT: He didn't have any involvement in the appeal or with the case after the trial?

THE WITNESS: No, Your Honor. To my knowledge, the next time he was involved in anything was when this post-conviction proceedings got filed and -- yeah, but he wasn't appointed to the appeal.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                          398

THE COURT:  He turned his file over to you before the appeal or for the appeal?

THE WITNESS:  Yes, ma'am.  I think it was after the verdict, and I probably had noted the appeal, but he turned it over to me, and I had it when the other people -- there was a -- was her name Teresa -- and then there was also a law firm from New York, Teresa -- I know I can't ask you questions.  I'm being a bad witness.

But there was an attorney appointed from South Carolina, and she also -- they had a firm from New York that was doing *pro bono*.  I think the lawyer in New York's name was Seth something, if I recall right.  That's probably too much information.

MS. CHAVIS:  Thank you very much, Mr. Woodward.  I don't have any further questions.

THE COURT:  All right.

CROSS-EXAMINATION

BY MS. McKEEL:

Q.  Good afternoon, Mr. Woodward.  How are you?

A.  Ms. McKeel, I'm just fine.  How are you?

Q.  Good.  Thank you.

Mr. Woodward, I'm just going to go back to that question, then I'll ask you some more questions, this last question.  The file, Mr. Hudgins' file, as of 2015/2016 time frame, did you have any remnants of Mr. Runyon's file, which

JODY A. STEWART, Official Court Reporter

included Judge Hudgins' file?

A.   Not to my knowledge, or either we did.  The reason I don't think we did, I'm pretty sure I didn't, is because we -- my law firm, we bought a building in 2014 and moved in, and I remember right kind of -- we moved into that building, I think, in 2013.  I met with Michele Brace.  When I turned my file over to Teresa --

Q.   Is it Teresa Norris?

A.   Teresa Norris.

      -- we still had an office up in the Mount Trashmore area, and then when the post-conviction proceedings started and Michele Brace got involved, we were down on 30th Street, and Michele came to my office and got stuff, got what I had.

Q.   Okay.  Now, I want to go back a little bit in time.  You, back in 2008, when you got appointed to this case, had you done any death penalty cases?

A.   Yes.  I had been appointed to three post-conviction cases.  They were, you know, when the -- I'm sure you're aware -- when all the cases kicked out of the system, so I had done three federal appointments.  Now, they weren't trials.  And you asked me that.  I have been appointed by this court and by state courts to a lot of capital cases.  Only four of them, that I remember, went to trial, so I don't -- I can't keep the timeline real straight, but I --

Q.   Would you say it's a lot?

Woodward, L. - Cross                                                   400

A.   Yeah -- I mean, I don't know what a lot is.

          MS. CHAVIS:  Objection, Your Honor.  This is outside the scope of the direct examination.

          THE COURT:  You can examine him on what cases he has had.  I'll let you follow up on this if you want to.

          THE WITNESS:  I mean, you know, I know I did -- I know that the pirate cases, we call them, my client's name was Beyle.  That also was heard by Judge Smith.  That case was after Runyon.  But I certainly have had capital cases.

          Now, in terms of federal cases where they went to trial with the death penalty on the table, I don't believe I had any federal ones because -- I mean, I have been around here a long time.  To my knowledge, there has only been, that I'm aware of, four or five cases in this courthouse back to the late '90s, and I was involved on some level in all of them.

          One of them was the Jean-Claude Oscar case.  It was tried by Judge Morgan in this courtroom.  My client wasn't facing the death penalty in that case, but that was a capital case at the beginning.

          The next one that I'm aware of was a guy named Thomas Stitt and Jason Ortega.  Lynn Swartz represented -- and a lawyer from Florida represented Thomas Stitt.  I represented Jason Ortega who -- Fernando Groene was the U.S. Attorney.

                    JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                            401

He was originally -- as I recall it, there was a murder over in Portsmouth.  They originally thought Jason was the triggerman.  He turned out not to be.  He was deauthorized, if that's the word, and then he testified at trial.  Then there was Mr. Runyon's case.  Then there was Mr. Beyle's case.

THE COURT:  Mr. Beyle was not facing the death penalty.

THE WITNESS:  Your Honor, I think they were. Remember, that was the --

THE COURT:  Only Mr. Salad was facing the death penalty in that.

THE WITNESS:  I thought there was three of them, but, you know, whatever.

THE COURT:  He didn't go, let's put it this way.

THE WITNESS:  He didn't get sentenced to death.

THE COURT:  No.

THE WITNESS:  Right.

THE COURT:  So only Mr. Salad was subject to the death penalty.

BY MS. McKEEL:

Q.  So when you took this case, this appointment for Mr. Runyon, by that time you had experience in handling death penalty cases; is that true?

A.  That's true.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                402

Q.  Both state and federal, correct?

A.  Yes.

Q.  Do you recall when you got the case that the government gave you extensive materials with regard to both guilt and innocence of Mr. Runyon and also with regard to mitigation?

A.  Yes.  Extensive would be an understatement.

Q.  And did you read those materials?

THE COURT:  Wait just a minute.

MS. CHAVIS:  Objection, Your Honor.

THE COURT:  Ms. Chavis.

MS. CHAVIS:  Again, this is beyond the scope of direct.

THE COURT:  You can examine on it if you want to.

Go ahead.

THE WITNESS:  Yes, I read -- I believe I read everything that I got.  I mean, you know, we had a budget. Jon had an office in what I call the Decker Building, and we -- actually, I think as I recall, Judge Tommy Miller let us rent like an office and gave us a copy machine, and we had a big war room up there that had all the stuff in it.  I mean, my vouchers, I don't know how many hours I spent on this case, but if anybody cares, they can probably look it up.  I know it was a lot.

BY MS. McKEEL:

Q.  You called someone Jon, is that Jon Babineau?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                403

A.   Yes, Jon Babineau, yes.

Q.   And someone has referred to a person named Woody.  Just for the record, Woody is you; is that correct?  That's a nickname?

A.   I guess, yes, I would assume so.  I don't know anybody else in this case that would be called that.

Q.   Okay.  Now, you've discussed a little bit earlier, when Ms. Chavis asked you the breakdown of your duties, but you do admit that no matter what the breakdown of the duties were, you were involved in the penalty phase in making decisions; is that correct?

A.   Absolutely.  I mean, you know, it was a collaborative effort.  I mean, that's why there is two people on cases like this.  You know, we're certainly -- part of what we're required to do, and that the rule is, you can't have two lawyers in the same firm because you don't want there to be like a one person -- so, sure, you discuss everything, and you make the best judgment that you can.  So, yeah, I was certainly involved.

I don't remember Steve and I having any big disagreements.  I mean, I remember we discussed the mental health issue.  We discussed -- and I don't remember how many witnesses were called in the mitigation phase.  My sense would be ten to -- ten plus of Mr. Runyon's family and colleagues.

JODY A. STEWART, Official Court Reporter

And I do remember that right after the verdict in the guilt/innocence phase, the decision was made that I would do the -- not right after, but sometime in that break between the verdict, Steve and I were meeting almost daily and talking. And he said, Well, I'm doing all this. Why don't you do the closing argument on sentencing, which I, of course, agreed do, with the idea that I would hear everything and, you know, be able to prepare it. So that was the main thing that I did in sentencing. I don't recall examining any of the witnesses. If I did, I did, but I don't -- that certainly wasn't my main job.

Q. So back to what you just said. There were no disagreements about strategy of this case, is that correct, between you and Mr. Hudgins?

A. Well, when you say -- no, there were no disagreements. There were certainly -- we would discuss, and, you know, I'm maybe a little bit known for playing devil's advocate with people. I certainly was -- like I said, I've known Steve forever, and I would say like, why are we doing this, or why aren't we doing this? What is the downside? What is the upside? So, yeah, but there certainly wasn't -- I've been in cases where I've had real disputes with my co-counsel about how a case should be handled, and this certainly wasn't the situation here.

Q. Do you recall, also, David Bruck assisting throughout the

Woodward, L. - Cross                                                405

case?

A.  Yes.  David Bruck was what they call a resource counsel.

Q.  And what is that?

A.  Well, that --

        MS. CHAVIS:  Objection, Your Honor.  Again, this is beyond the scope of direct.

        THE COURT:  I'll let you ask him about David Bruck being a resource counselor.  We already know that in the case, but you can certainly examine on it if you want.

        THE WITNESS:  Yeah.  I mean, David Bruck, I've worked on several cases with him, and he was at W&L, and they had a -- you know, a resource center there for trial-level death penalty work, both state and federal, and he was involved in this case, and, you know, I remember calling him sometime.  I don't remember what, but I remember talking to David.  I think David came to the trial.  I have a memory that David came down and talked to Mr. Runyon about -- but I'm not a hundred percent sure of that.  I know I've had cases where David has talked to my clients, but, yeah, David Bruck was involved.

BY MS. McKEEL:

Q.  And as the resource counsel, his job then is only regarding cases that involve the death penalty, either state or federal; is that correct?

A.  I mean, I don't know what his whole job, but that's the

Woodward, L. - Cross                                              406

only time I ever had any, you know -- anything that I dealt with him on.  I mean, we are -- you know, we are friendly. We are not close, but I saw him at death penalty -- I mean, I have known David for a long time.

Q.  Now, let's talk about the mental health issue that was discussed throughout your case with Mr. Babineau and Mr. Hudgins.  Do you specifically recall conversations with both counsel, Mr. Babineau and Mr. Hudgins, about a mental health defense, that it was talked about and discussed?

A.  Yes.  I recall that it was talked about and discussed, but I told you, and I told everybody, I don't remember.  I mean, I remember we discussed it, but if you ask me did I say X and somebody say Y, I couldn't tell you, but it certainly was a topic of discussion.

Q.  That was my question, was it discussed?

A.  Absolutely.

Q.  Now, did you continue to discuss the mental health issue and the defense up until you all started the mitigation or the penalty phase of this trial, which started in August of 2009?

A.  When you say up to when we started, I'm not -- I know a decision was made at some point not to present that, and that had a lot of elements to it, including the fact that there were, as there are in these cases -- I don't remember.  I know there was a disclosure order and some things were filed

JODY A. STEWART, Official Court Reporter

under seal, and we had some sort of -- I haven't looked at the order, but there was a deadline where we had to sort of say we are putting this on, which would have triggered some things that the government might be able to get in, in aggravation that they wouldn't otherwise.

So I don't want to say it was right up till we started, but we certainly were sensitive to the fact that there were orders and that we had to comply with them and make sure that we followed the -- you know, the Court's schedule for that.

Q.  Do you know Dr. Evan Nelson?

A.  I don't.  I know of Dr. Evan Nelson.  I know I've -- I've never used him in my cases, but I know he was around as a mental health expert in sort of the criminal justice world, yeah, but I don't know him.

Q.  Okay.  I'd like to show you Government's Exhibit 16, please.  Would you take a look at this, Mr. Woodward?

THE COURT:  Do you have an objection?

MS. CHAVIS:  Yes.  If this is regarding Evan Nelson, yes, Your Honor.  This is again beyond the scope of direct.

THE COURT:  You can go into this.  It's just going to be a matter of recalling Mr. Woodward if it doesn't come in.  So you can certainly examine him on it.  This has been a main point of examination of the last two attorneys.  He's

Woodward, L. - Cross                                                408

testified that he and Mr. Hudgins, when he was in there, they worked together on all this, and after the guilt was over, they both turned their attentions to the mitigation and the penalty.

So you certainly knew of Mr. Evans, read his reports, and discussed the matters with your co-counsel?

THE WITNESS:  I did, Your Honor.  And this exhibit that Ms. McKeel just showed me that's on the screen, you know, looks like, if I recall correctly, Kay Holland was Jon's paralegal at the time, and it looked -- I mean, it looks like to me Jon had gotten a report from Evan Nelson and from Mark Cunningham, who had sent them to me, and I looked at them and was -- yeah, I mean, I'm not a big, long, like, paragraph and page kind of e-mailer.  I mean, I was more like, pick up the phone and talk.

But, yeah, this would look like that I received these, and the fact that I'm sending these to Jon, this was obviously while he was still in the case.

MS. McKEEL:  Judge, we would move into evidence Government's Exhibit 16, please.

THE COURT:  It's admitted, and Ms. Chavis can examine on any of this if she wishes to.

(Government's Exhibit 16 received in evidence.)

BY MS. McKEEL:

Q.  So with regard to that e-mail, Dr. Cunningham's -- and do

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                            409

you know Dr. Cunningham?

A.   I know Dr. Cunningham by reputation, and Dr. Cunningham testified in this case.  That was the first time -- I mean, I might have met him at a conference or something, but that was the first time I had had him in a case, yeah, but I know who he is, sure.

Q.   Dr. Cunningham was used by you all.  Do you remember talking to him at all before trial?

A.   No.  I do have a vague memory of Steve and I meeting with Dr. Cunningham, but I believe I did, but -- I guess I can't say I swear to it.  I think I did.

Q.   Okay.  Let's move on, then.  I'm going to show you Government's Exhibit Number 30.  Is that your e-mail, sir, your e-mail address?

A.   Yes.

Q.   And did you receive this e-mail -- or did you send this e-mail to Sheila Cronin?

A.   Yes, it looks like I did.

Q.   Maybe we can scroll down so we can see the bottom of the e-mail.  It might --

A.   It looks like I sent it to Sheila and to Steve Hudgins and to -- I don't know who John McCormick is, but it obviously looks like I sent it to him.

            THE COURT:  I can't hear you.

            THE WITNESS:  I'm sorry, Your Honor.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                410

THE COURT:  He is mumbling a little bit as he is looking down.

THE WITNESS:  I was moving this so I could see.

What do you want me to look at?

MS. McKEEL:  If you can highlight where it says, "Sheila."

BY MS. McKEEL:

Q.  Do you recall that, looking at Virginia Pina's videotape regarding the domestic violence incident with David Runyon?

MS. CHAVIS:  Objection, Your Honor.

MS. McKEEL:  Maybe we can go to the second page.

THE COURT:  What is the objection?  All she is asking is if he remembers.

MS. CHAVIS:  If he remembers about Virginia Pina, and, again, it's beyond the scope.

THE COURT:  Well, I said you can examine.  Frankly, at this point you can examine on any of this that you want to.  That's the best way to save time at this point, because we've got Mr. Woodward here, and it would just be a matter of bringing him back, and he's obviously got a busy law practice.  So while he's here, we will try to do as much as we can, and you can examine on any of this.

MS. McKEEL:  Judge, I would add we noticed that Mr. Woodward would be a government witness.

THE COURT:  I know you have.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              411

THE WITNESS:  Let me ask you a question, Ms. McKeel.  I don't --

MS. CHAVIS:  Excuse me.  If I could just make one request, if he is testifying as a government witness, we had made a request for *Jencks* material, so we would ask for that material at this time.

THE COURT:  I've ordered that it be properly produced under the statute.  I have entered an order on that.  If it's not properly produced, then I'll need to be made aware of it.  I'm not going to anticipate problems if there are no problems.  I entered an order, and if there is a violation of my order or the statute, that can be brought properly to my attention.

THE WITNESS:  Getting back to what you had highlighted about that DVD, as I sit here today, I don't remember looking at it.

BY MS. McKEEL:

Q.  That bottom e-mail?

A.  I mean, you know, right now.  As I look at that, I remember that there was one, but I would say I wouldn't have sent this e-mail --

Q.  Mr. Woodward, excuse me for interrupting.

THE COURT:  You aren't answering her question.

THE WITNESS:  I'm sorry, Your Honor.

BY MS. McKEEL:

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              412

Q.   I'm asking you if it refreshed your recollection, that's all.

     We can go back up to the top of the e-mail.

A.   Yeah.  I thought you asked me if I remembered looking at it.  Yeah, no, okay.

Q.   So with regard to Government's Exhibit 30, do you recall this conversation that, or this e-mail you sent to Sheila Cronin, Steve Hudgins, and then someone named John McCormick?

A.   I recall -- I mean, I admit that I sent it now that I see it.  I mean, yes.

     MS. McKEEL:  Your Honor, we'd introduce Government's Exhibit 30.

     THE COURT:  It's admitted.

     (Government's Exhibit 30 received in evidence.)

BY MS. McKEEL:

Q.   Mr. Woodward, do you recall that you had a meeting with your client, David Runyon, that you and Mr. Hudgins had a discussion regarding the entire case?

A.   I recall we had a lot of meetings like that with Mr. Runyon, yes.  Do I specifically recall one on June 3rd, which that would have been, if I sent this?  No, but we had lots of meetings with him discussing the case.

Q.   Okay.  This is dated June the 4th, so it's just a few weeks before trial; is that correct?  The trial started June 30th.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              413

A.  Yep.

Q.  And, in fact, in this e-mail that you're writing, it says that, "We are going to continue to work but most likely our case won't be based on the psychiatric/psychological impairment, but you will continue to explore that"; is that correct?

A.  Yes, that's what my e-mail says.

Q.  Do you also recall -- and I'd like to show him Government's Exhibit 55A and then 55B.

Do you see what this is, sir?

A.  I do.

Q.  It looks like it's a report from Dr. Patterson, from the government's expert; is that correct?

A.  Yes.

Q.  Did you receive this report?

A.  Yes.  I remember -- I don't remember -- I remember receiving it and reading it and discussing it with Steve Hudgins.  I don't remember right now what it said, but we had that.

Q.  You read it, correct?

A.  Yes.

Q.  And if we could go to Government's Exhibit 55B, please.

Do you see this, sir?

A.  I do.

Q.  And this looks like it's Dr. Montalbano's report; is that

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              414

correct?

A.   Correct.

Q.   Did you also read that report?

A.   I did.

Q.   During the course before trial started, do you recall with Dr. Nelson, I know you don't recall a lot with him, but do you recall that a decision was made that you all were not going to use him, "you all" being you and Mr. Hudgins?

A.   Yes.  I don't know, but I remember we weren't going to use Dr. Nelson.

Q.   Okay.  If we could pull up Government's Exhibit 64.

     Take a look at this exhibit, sir.  Who is Sheila Cronin?

A.   She was the mitigation specialist in Mr. Runyon's case.

Q.   And according to this e-mail that she's writing you, is that she says that she met with David today, three hours, and he was more open and honest than he has been.  That was dated August the 7th of 2008 (sic).

     In your opinion, during the time of your representation of the defendant, of Mr. Runyon, was he always open and honest, that you thought?

A.   Well, I mean, let me answer that question this way.  I never can see into the inside of what somebody's thinking.  There were certainly things that were said that didn't line up with some of the other evidence in terms of that, and the

Woodward, L. - Cross                                                  415

openness is a -- is a moving target.  I don't think -- I think most clients, the longer you spend with them, the more time you develop a relationship, the more open and honest they become.

So if you ask me was he always, I guess I would have to say no, but I don't think any client is.

Q.  Okay.  The e-mail you received, your name is on there, Larry Woodward; is that correct?

A.  Yep.

MS. McKEEL:  Judge, we would introduce Government's Exhibit 64.

THE COURT:  It's admitted.

(Government's Exhibit 64 received in evidence.)

MS. McKEEL:  Judge, if you would just give me one moment.

THE COURT:  All right.

BY MS. McKEEL:

Q.  Let me go to the bottom of this document.  Do you see the handwriting on this document, sir?

A.  Yes, that is my handwriting.

Q.  That is your handwriting.

So would you tell us what it says and what you meant by it?

A.  It says, "How does living up to his mother's expectation and stress and pressure of that mitigate a murder for hire?"

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                416

Then that's a note that says, "A horrendous crime does not equal a horrendous person."  That's an equal sign with a slash.

Q.  Is that your strategy for mitigation, sir?

A.  Looking at that, that looks like a note I made.  I don't know if I sent that.  That looks like a note I made to myself, and I don't know if that was the strategy, but, sure, I mean, I'm always thinking about how the best way to present it is.  So that's certainly a thought I had after I received that e-mail and made a note, yeah.  That's no question.

Q.  In fact, you did closing argument, didn't you?

A.  I did.

Q.  And isn't that, basically, in a nutshell what you argued?  It was a horrendous crime, but it doesn't mean he's a bad person, it doesn't mean David Runyon is bad, right?  Isn't that what you presented?

A.  I hope so.  I mean, I don't remember.  Yes, I'm sure that was part of my closing argument strategy, yes.

THE COURT:  That's your handwriting?

THE WITNESS:  Yes, ma'am, that's my handwriting.

BY MS. McKEEL:

Q.  Did David Runyon want you and Mr. Babineau and then Mr. Hudgins to present a mental health defense for him in the penalty phase of the trial?

A.  My memory is that he did not.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                417

Q.  Did he ever waver from that?

A.  Not with me, not that I recall.

Q.  Did you talk -- did you and Mr. Hudgins talk to David Runyon about spending the rest of his life in prison versus the death sentence?

A.  Yep.

Q.  Did David Runyon tell you he would rather get the death sentence than spend the rest of his life in prison?

A.  Yes, but I'd like to explain if I can.  But the answer to your question is yes, he did say that.

        THE COURT:  You can explain it if you want to.

        THE WITNESS:  I would say this.  A lot of -- I mean, this is, you know, difficult, frustrating work with people that are under a lot of pressure.  So I've had a lot of clients who were potentially facing the death penalty, even ones that didn't get authorized that when you tell them, they are like, well, you know -- I mean, he said that. I don't put a lot of stock in that.  A lot of people say that.

BY MS. McKEEL:

Q.  That is just your opinion?

A.  Yes, that's my opinion.

Q.  Correct?

A.  But, yes, he did -- yes, he --

Q.  But that's what he told you and Mr. Hudgins?

Woodward, L. - Cross                                                    418

THE COURT:  Wait just a minute.  Let him finish his answer.

MS. McKEEL:  Yes, ma'am.

THE WITNESS:  So, yes, he made that statement but --

BY MS. McKEEL:

Q.  The question is, that's what David Runyon --

MS. CHAVIS:  Your Honor, if this is her direct, she is doing an awful lot of leading.

MS. McKEEL:  It's not my direct.  I can recall him if you like, Judge.

THE COURT:  Go ahead.  I have two requests.  Number one, you have a voice that is very powerful and projects, and you're right at that microphone.

MS. McKEEL:  I'm sorry, Judge.  I will stand back.

THE COURT:  If you could just kind of lower it a notch because the microphone that we have controls everything in the court, so I don't want to turn it so low, but if you can just lower it a little bit; that's one.

Number two, go back and ask your question again.  What was your question?

MS. McKEEL:  I asked him, he had just recounted his opinion that he might not have meant it, the defendant might not have meant it.

I said, but did David Runyon tell you and

JODY A. STEWART, Official Court Reporter

Mr. Hudgins he did not want a mental health defense?

THE COURT:  All right.

THE WITNESS:  The answer to that question is yes.

THE COURT:  Let me ask you that.  You say he said yes.  Was that throughout the proceedings even up to the penalty phase?  Was it at the beginning?  You said a lot of clients, you compared it to they learn that they have been certified or they are going to be, they say that.

But in this particular case, was the opinion formed and maintained or was it backed off of?

THE WITNESS:  Well, Your Honor, I want to make sure that I'm clear for the record, two things.  I mean, the thing about not wanting a mental health defense, my recollection is Mr. Runyon maintained that throughout the case.  The other question -- and I factor that in, that's not deciding.  The other question saying about I'd rather get the death penalty than be in prison for my whole life, that is a statement I've heard a lot in my 41 years, and I don't -- I don't, like -- I don't really give that a lot of credence in terms of me making my decisions and formulating my advice towards clients.  So I think there was two things, the mental health and then the, you know, what I would call the "give me liberty or give me death" sort of approach that a lot of defendants take, that's a common saying that people that do what I do for a living hear.

Woodward, L. - Cross                                              420

THE COURT:  The mental health was throughout?

THE WITNESS:  Yes, ma'am, as I recall.

BY MS. McKEEL:

Q.  Did Mr. Runyon ever tell you he was guilty of killing Cory Voss?

A.  No.

Q.  Did he always maintain his innocence throughout the entire time that you represented him?

A.  He did.

Q.  Do you recall looking at the government's mitigation case that we gave you in discovery?

A.  Yes.  I mean, if you say by the mitigation case, it's records and background, I mean, yes.  I recall that I looked at everything you gave me.

Q.  Okay.  Do you recall that Mr. Runyon was employed by doing drug studies?

A.  Yeah.  Yes, that he -- as I recall, that may have been how he met Mr. Draven.  But, yes, I remember he would sign up and get paid and go in a drug study, yes.

Q.  And were those studies from Kendle, Parexel, Bristol Myers Squibb, and Covance?

A.  I don't remember.

Q.  Does that sound correct?

A.  I mean, I couldn't deny that, but I don't remember the drug companies he was working for.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                421

Q.  I would like to show you Government's Exhibit 77, please.

Do you see this document where it says Kendle International, medical history?

A.  Yeah, I see it in front of me on the screen here, yes.

Q.  And does it say that the person's name is David Runyon on here?

A.  It does.

Q.  Do you recall receiving these types of records from the government and reviewing those?

A.  Again, if it was provided in discovery, we reviewed it. So I don't recall this particular document, you know, 15 years later, but I certainly -- it looks to be Mr. Runyon and about the age he was, so if you are representing it was in discovery, I can't deny that, and I would have reviewed it.

Q.  Would it be fair to say that you and Mr. Hudgins and Mr. Babineau looked through to find evidence that corroborated some of Mr. Runyon's claims, such as these blast injuries and a car accident?

A.  Yes.  My recollection is that, particularly Steve, we searched for that.  I have a recollection that there was some government warehouse somewhere where somebody went, either Steve or Sheila, and there had been a flood.  But, yes, the short answer is we were searching for all the records we could find.

Q.  Let's go to Page 2, please.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                  422

MS. CHAVIS:  Objection, Your Honor.  I'm not sure what we are doing with this exhibit, but he has testified that he doesn't remember receiving the document.

THE COURT:  I sustain the objection.  Number one, he's testified he got mitigation information, and he reviewed it.  I think he reviewed it with Mr. Babineau.  He reviewed it with Mr. Hudgins.  He doesn't recall the drug company.  This isn't a form that he filled out.  I don't know where it came from or whatever.  He doesn't remember it, and it's not properly authenticated, in the Court's mind.  He's not the right one to authenticate it, if he doesn't remember it.

MS. McKEEL:  Yes, ma'am.

THE COURT:  I sustain the objection.

BY MS. McKEEL:

Q.  Mr. Woodward, do you recall looking for evidence of blast injury and any neurological injuries the defendant had -- Mr. Runyon had, excuse me?

A.  I certainly recall that our defense team was doing that. Whether I was doing that, I was aware of those efforts and supported them, but I would say that that would have been more Jon, Mr. Babineau, Mr. Hudgins, and the mitigation people as opposed to me personally doing that.

Q.  Was there ever corroboration found of blast injuries?

A.  Not that I'm aware of, but I -- no, not that I'm aware

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                                423

of.

Q.  And with regard to the car accident, did you all find any medical records with regard to a car accident?

A.  Again, I don't recall that we did.

Q.  And did you find any records of a court hearing with regard to a person that may have hit Mr. Runyon in that car accident?

A.  Again, I don't recall.  I mean, I recall the issue of a car accident, but I don't recall what records we found.  I know our team was looking.

Q.  You don't recall seeing any of those types of records; is that correct?

A.  I don't.  I don't recall seeing them, no.

        MS. McKEEL:  That's all I have, Judge.

        THE COURT:  All right.

        Redirect?

                    REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Mr. Woodward, you testified regarding the mental health defense and that a decision was made at some point not to present a mental health mitigation.  You said that a deadline -- there was a deadline that would trigger some things, and the government would then get information that they would put in aggravation.  Could you please tell us more about that.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                               424

A.  I mean, look, the process is that the defense kind of goes first, and if we are going to present that type of evidence, there is a timeline by where we have to notify the government.  The Court enters an order, and once we notify the government that we are going to present something, then, you know, there is usually some period that we have to turn over our reports, and, you know.

So I don't know exactly what you're asking me, but the defense, we were able -- I remember one of the reasons that was important to me in working with Steve at that point was we didn't want to, you know, open the door.

And anybody that's tried cases understands that, you know, mitigation is not just what your witness says on direct examination and then they get to sit down and nobody gets to ask them questions or put on conflicting evidence.  So when I look at that, I look at it broadly, like what is it going to look like at the end of the day.

So, yes, I mean, we did not want -- you know, my thought was, if you want me to explain, we had a jury that had found Mr. Runyon not guilty of one of the charges.  So what that meant was that all 12 people -- now, they found him guilty -- I believe Judge Smith dismissed one on a Rule 29, four of the charges went to the jury, and they found him not guilty on one of them, but guilty of three.

So what I think was a relatively -- people can talk

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                                    425

about my experience, that's not for me to say, but that meant that we had a jury that wasn't just going to, like, do whatever the government asked them to.  They were going to go back there and think about the case and think it through.

And, you know, really in a death penalty case, when we get to that phase, you know, unanimity is not -- you don't -- I don't -- I need one person, really, that will say I'm not doing the death penalty, and that's, you know -- that's a difference from what you -- so I thought with the evidence that had come in, and with the defense -- I mean the government's experts and my sense -- and I haven't read them in 15 years -- is that our mental health stuff was a mixed bag.  It wasn't clear, and that's an impression I had.

I think Steve thought that; that, you know, you had a crime that was carefully planned, covered up successfully for a while, and, you know, you did not have a client that was saying, I'm really sorry, I did this awful thing, but I did it in part at least because of something, you know, that I couldn't control, some kind of mental issue or some kind of problem.  So maybe that's not proper thinking, that's not for me to say.  But we certainly spent a lot of time thinking about that.

Q.  Maybe I need to cabin my question a little more narrow.

THE COURT:  I thought the explanation was responsive to the question.  You asked him about how they

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                              426

made the decision, basically, and he was saying they go first, and then the government gets to respond, and why they made the decision.  I think that's important, because they both are up for ineffective assistance of counsel for these decisions, both Mr. Hudgins and Mr. Woodward.  So I think his explanation is important, and I'm not going to cut him off.

MS. CHAVIS:  Yes.

BY MS. CHAVIS:

Q.  I guess what I think is important to know is if Dr. Mirsky and Dr. Merikangas had been presented, what information --

MS. McKEEL:  Well, I'm going to object because that's speculation.  She is asking if these other doctors were presented, which calls for speculation by the witness.

THE COURT:  I think you can rephrase your question. Just ask, what was your concern if they were presented, because obviously they had concerns, and he was trying to say those concerns.

THE WITNESS:  Right.

BY MS. CHAVIS:

Q.  Mr. Woodward, you had concerns about presenting Dr. Merikangas and Dr. Mirsky, that the government would actually present something in response to that.

What information were you concerned about that the

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                               427

government would present in response to Dr. Mirsky and
Dr. Merikangas?
A.   Let me say this, that I couldn't -- I haven't read
Dr. Mirsky and Dr. Merikangas and Dr. Montalbano's and
Dr. Patterson's reports in 15 years.  So I couldn't sit here
and say, well, I was worried if Merikangas said X, that they
were going to have Patterson say Y, and so on.

I just remember that my impression in trying to get
a sentence of life, not death, was that the mental health
evidence that we had was not going to help us get there,
because I had looked.  I didn't want Mr. Runyon to get the
death penalty.  I still don't want him to get the death
penalty, and I made the best decision, collectively with
Steve, that I could at the time based on what we had.

And what I was saying earlier, and I didn't mean to
go off, but I want you to understand that that's not a --

Look, Judge, let me explain.  I tell young lawyers
in my office all the time, the most important thing a lawyer
does is not talk or not write, it's think.  That's what you
get paid to do.  You get paid to think for your client,
particularly in any kind of serious case.

So I made -- I agreed with that judgment.  I'm not
throwing Steve -- I mean, I would never -- Steve and I made
that judgment together.  He certainly had more understanding
of the details of those reports and had talked to those

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                           428

people, but I didn't feel like -- I mean, look, I have to trust him.  If I had to go interview every witness he interviewed, we'd still -- you know, a case would never get done.  So that -- you know, if that's not right, then that's for the Court to decide, but that's why I did what I did.

THE COURT:  Well, you argued it, though.

THE WITNESS:  Well, I argued.

THE COURT:  You argued that portion of the case to the jury based on the evidence that you all presented.

THE WITNESS:  Yes, ma'am.  And I was thinking about -- I don't remember what the mitigating and aggravating factors, and who found what, but, yes.  But you asked me what I was worried about, about the mental health --

BY MS. CHAVIS:

Q.  I think you answered it.  You were worried about the government's experts?

A.  Well, you're worried about that, but it's not just -- I don't know, it's not just that.  It's also the type of crime.  It's also the fact that this was -- because, you know, look, in my experience -- again, that's not for me to say that's worth listening to, but this was not a somebody runs into a convenience store, gets mad, jerks out a gun and shoots somebody.  I've had a hundred cases like that.

This was a planned, sort of concocted, as I recall,

Woodward, L. - Redirect                                                    429

and I thought about it -- they had some kind of code or kind of coded phone call.  You've got to remember there are 12 people sitting over there that have heard all that, and there hasn't been one word in the case, nobody stood up in opening statement and said David Runyon did something because of anything.

Our whole thing was he didn't do it.  So to sort of pivot to that, I thought that was dangerous, a dangerous trial strategy.  And I also, of course, thought that the government, they are not just going to stand up and go, oh, yeah, that's right.  They had evidence to rebut it, so that's why we made that decision.

Q.  I'm just looking for Government's Exhibit 64.

A.  Right, that's the one I saw a few minutes ago.

Q.  Yes.  And you stated that these were notes to yourself, questions that you had, perhaps, perhaps reflecting part of your strategy?

A.  Yeah.  They were thoughts.  I don't know that -- I don't think -- I think that's what -- yeah, I certainly don't have -- can't testify that I showed that to anybody else, but, yeah, that was --

Q.  Okay.  So that question, how does living up to his mother's expectation and stress and pressure of that mitigate a murder for hire?  Who could help you answer that question?

A.  Who could help me answer it?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                                    430

Q.   Could an expert help you answer that question?

A.   It's possible, sure.  I mean, you think, you know, if --

Q.   You testified that David Runyon maintained that he did not want a mental health mitigation presented.

A.   Yes.

Q.   Did you base any of your decisions on David's position?

A.   Well, let me say it this way.  I can't quantify it.  I mean, it was something I thought about, but I think it was not -- let me answer the question this way.

        If I thought we had had what I considered, in my experience and judgment, a compelling mental health mitigation, I would probably have -- I would have presented it or recommended to Steve that we present it anyway, but -- so did I factor it in at all?  I don't want to say -- it certainly wasn't a big -- you know, the stuff I said earlier was much more important to me than what, you know, he wanted.  But it was out there.  I mean, it wasn't that I didn't know that when we made the decisions we made.

Q.   So I'm hearing you say that it was a factor in your decision-making?

        THE COURT:  I heard him say it was a factor.  It was not necessarily the controlling factor.  The controlling factor was the evidence that he had.

        THE WITNESS:  Yeah.  Like I said, I certainly, you know -- if -- I listen to what my clients have to say, and

JODY A. STEWART, Official Court Reporter

Woodward, L. - Redirect                                            431

like I said, my job is to -- sometimes they're not making --
they're not good decision-makers.  Most of my clients aren't
good decision-makers or they wouldn't be my clients.

But I certainly -- I certainly don't -- if you're
asking me, well, did I think we had this great mitigation
defense and --

BY MS. CHAVIS:

Q.  No.  Mr. Woodward, I'm asking you --

THE COURT:  You are going to have to let him
finish.

THE WITNESS:  -- and we didn't do it because David
said no, no, that wasn't the cause of us not presenting it.

MS. CHAVIS:  No further questions.  Thank you,
Mr. Woodward.

THE WITNESS:  Thank you.

THE COURT:  Mr. Woodward, the Court thanks you for
coming to testify.  You have testified in this proceeding,
and so you cannot discuss your -- I know you know this, but
you know I have to tell you.

THE WITNESS:  Yes, ma'am.

THE COURT:  You cannot discuss your testimony with
anyone, and if you're needed further, because you are on the
government list, and if for some reason you would be needed
further, we would let you know and give you advanced notice
so that you could accommodate any schedule that you have.

JODY A. STEWART, Official Court Reporter

432

THE WITNESS:  I appreciate that, Your Honor.  I think everybody up there, all the lawyers have my cell phone number.

THE COURT:  Thank you for testifying.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Counsel, is there anything further for the Court to take up this evening, Ms. McKeel?

MS. McKEEL:  No, ma'am.

THE COURT:  Ms. Chavis?

MS. CHAVIS:  No.

THE COURT:  Then we will be in recess until tomorrow noon.  I would tell you that you need to, as I've said before, check your exhibits each day.  Then if we have a break or whatever, you can bring it up to me, if necessary then.

The Court stands in recess until tomorrow at 12:00 noon.

(Hearing adjourned at 5:55 p.m.)

JODY A. STEWART, Official Court Reporter

433

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

X_____/s/_____x

Jody A. Stewart

X_____2-8-2023 _____x

Date

JODY A. STEWART, Official Court Reporter