IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,                )
                                         )
v.                                       )   CRIMINAL ACTION NO.
                                         )   4:08cr16
DAVID ANTHONY RUNYON,                    )
                                         )
        Defendant.                       )
                                         )
        AND                              )
                                         )
DAVID ANTHONY RUNYON,                    )
                                         )
        Petitioner,                      )   CIVIL ACTION NO.
                                         )   4:15cv108
V.                                       )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
        Respondent.                      )
                                         )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

DAY 3

Norfolk, Virginia

February 9, 2022

BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge

JODY A. STEWART, Official Court Reporter

APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE
        By:  Brian Samuels
            Lisa R. McKeel
            Assistant United States Attorneys
               And
        DEPARTMENT OF JUSTICE
        By:  Carrie L. Ward
            Counsel for the United States

        FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE
        By:  Dana C.H. Chavis
            Helen Susanne Bales
            Assistant Federal Community Defender
              And
        VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
        By:  Elizabeth J. Peiffer
            Counsel for the Defendant

## I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARIA RUNYON | 454 | 475 | 494 | |
| WREN FLEMING | 503 | 515 | 524 | |
| WARREN SCOTT LINKER | 527 | 548 | | |
| TIFFANY LINKER | 552 | | | |
| DEBORAH SEEGER | 557 | 565 | | |
| ROBERT SEEGER | 572 | 578 | 583 | |

JODY A. STEWART, Official Court Reporter

435

(Hearing commenced at 12:29 p.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent, in case number 4:08cr16, the United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Chavis, Ms. Peiffer, and Ms. Bales, is the defendant ready to proceed?

MS. CHAVIS:  Yes, we are.  Hello, Your Honor.

THE COURT:  Good afternoon.

Mr. Runyon is here at counsel table with his attorneys.

Before we start, I want to know what caused the delay?  It is 12:30.  I was in the hall waiting to come in at 12:00 and got a notice that there was a computer problem, someone had taken a cord home and had not brought it back, and that Mr. Otero from IT was here.  I don't know the extent of that.  I don't see him here now, but I want some explanation about what the problem was.

Was it your problem, Mr. Samuels, on your side?

MR. SAMUELS:  Not that I'm aware of, Your Honor.

JODY A. STEWART, Official Court Reporter

436

Nothing was brought to my attention.

THE COURT:  Was it your problem, Ms. Chavis, on your side?

MS. CHAVIS:  Your Honor, there was a missing cord from the computers set up at our table, yes.

THE COURT:  Why was the cord missing?

MS. CHAVIS:  We don't know, Your Honor.

THE COURT:  Well, it was relayed to me that someone mistakenly took it home and that Mr. Otero had to get a new cord.

MS. CHAVIS:  When we return to the room that we are working in at our hotel, we will search our hotel room to see if we have a cord that does not belong to us.

THE COURT:  You will do what?

MS. CHAVIS:  When we return to our hotel after court today, we will search the room that we are using to work in to see if we have a computer cord that does not belong to us, and if we do, we will certainly bring it back to the court.

THE COURT:  Well, I would expect that, because this courtroom is locked as soon as everyone leaves, and the only people who are in this courtroom are cleaning staff, who are cleared to be here by the Court, and it's unacceptable if an attorney has taken a cord, that belongs to the Court, home or back to a hotel room, and then it delays us for 30

minutes.  So I do expect a follow-up report, and I will obviously direct the clerk to have Mr. Otero report exactly what the problem was.

You may be seated.

Counsel, before we begin today, there is an administrative matter that has come before the Court.  I wanted to review it with you.  It involves the testimony of Dr. Cunningham.  Now, I want to know, when is Dr. Cunningham going to be called as a witness?

Ms. Bales, this is one of your witnesses?

MS. BALES:  Yes.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. BALES:  We originally had planned to call him on the 14th.  We anticipated he would -- if Dr. Merikangas finished that day, we would ask Dr. Cunningham to testify.

THE COURT:  Well, I received a call late yesterday from a Judge Suzanne Cohen.  She is with the Superior Court of Maricopa in Phoenix, Arizona, and she said that she was in a 10-day capital bench trial on a not guilty, for reason of insanity case, and the parties were in the middle of cross-examining one of the defense experts, Dr. Cunningham, and he would not be done in time to be available for the Runyon hearing during what they said was his scheduled time frame of 14/15.

I had my assistant call back to the Judge's

438

chambers, and he started testifying on the 8th, and he is scheduled to be finished on the 16th.  She has another docket that Friday.

So he would be finished by February 15th.  My concern is his travel here on the 15th, because that would be, I believe, Friday the 17th, it might be better to schedule him, since we are not going to be in court on, I believe we said President's Day.  That would give sufficient time for him to conclude his testimony and for you all to make arrangements for his travel to be here on Monday, the 20th.

MS. BALES:  If the Court would allow us to make that adjustment, we would appreciate it.

THE COURT:  Yes.

MS. BALES:  We can do that.

THE COURT:  I will allow you to make the adjustment.

I will, again, have my chambers call back and say that I've spoken with counsel, and we've adjusted our schedule, and the attorneys will be in touch with him, but he's expected to be here on Monday, the 21st.

MS. BALES:  Okay.  On Monday the 20th?

THE COURT:  Monday the 20th, yes.

MS. BALES:  We appreciate the Court allowing it.  I know that's a federal holiday.

JODY A. STEWART, Official Court Reporter

439

THE COURT:  Monday the 20th.  No, I guess it should be the 21st, because I told you all we weren't going to be in trial on the 20th.

MS. BALES:  So we want Dr. Cunningham here on the 21st?

THE COURT:  On the 21st.  I'm sorry.  I need to be looking at a calendar, is what I need to be, and now I am.

MS. BALES:  Your Honor, there is a complication with that, which is that Dr. Martell is supposed to testify on the 21st, and his schedule is very -- it's very difficult to get him.  His schedule is very difficult.

THE COURT:  Well, how long do you anticipate Dr. Cunningham's testimony to be?

MS. BALES:  Your Honor, he guesstimates that he would probably testify on direct for about four to five hours.  I'm not sure how long the government anticipates crossing him.

Your Honor, Dr. Cunningham suggested -- and this is for the Court's information -- the 23rd or the 24th also.

THE COURT:  That's fine.  It's fine with the Court, and everybody's scheduled to be here, and certainly we'll be willing to adjust the schedule.  It's not a jury trial.  It's not a jury involved, it's a bench hearing.  Is that amenable to you?

MS. BALES:  It is, Your Honor.  There may be a day

JODY A. STEWART, Official Court Reporter

440

between -- the 22nd may be a day that there is not anything happening in Mr. Runyon's case here in court. But Dr. Cunningham did say he could be here on the 23rd or the 24th.

THE COURT: Did he say why he couldn't be here the 22nd?

MS. BALES: He is supposed to offer Zoom testimony in an intellectual disability hearing on the morning of the 22nd, and, you know, he anticipates with cross-examination, he would be unavailable for that day. He did say if it ended quickly, he would be available the afternoon of the 22nd, but, you know, he can't guarantee that, depending on how long the cross-examination lasts.

THE COURT: Who do you have on the 21st?

MS. BALES: Dr. Daniel Martell. He was the witness that's been referred to earlier that was a government consulting witness, but the government released him, and he's prepared to report and will testify for Mr. Runyon.

THE COURT: He is scheduled for the 21st?

MS. BALES: Yes, Your Honor.

THE COURT: You say that Dr. Cunningham can be here the 23rd?

MS. BALES: He can.

THE COURT: We will plan on him being here the 23rd, and we will keep moving forward and arrange other

441

witnesses if need be.

MS. BALES:  Thank you, Your Honor.

THE COURT:  Will you so advise him?

MS. BALES:  I will.

THE COURT:  I'll have my chambers call the other judge's chambers and say that we have taken care of it.

MS. BALES:  Thank you, Your Honor.

THE COURT:  Are we ready to go forward with the next witness?

MS. CHAVIS:  Your Honor, I do have an administrative matter to take up with the Court.

THE COURT:  All right.

MS. CHAVIS:  It's regarding the exhibits, Your Honor.  There are six exhibits that were ECF numbers that I need to move into admission, and then there are two other exhibits that are not ECF numbers that I would like to move into admission, and I understand that the government may have an objection to -- I'm not sure how many of those exhibits.

THE COURT:  We will need to put them on the screen for me to look at them, and then I'll ask the government if they have an objection.  If they do, they can articulate the objection.

MR. SAMUELS:  Yes, ma'am.

MS. CHAVIS:  Okay.  Thank you.

JODY A. STEWART, Official Court Reporter

442

So Defense Exhibit 10, it's also ECF number 165. This is the memorandum in support of the motion to continue. This was discussed with Judge Hudgins.

THE COURT:  What's the relevance of it?  As discussed, everybody agreed the trial was continued, and when it began, and everybody agrees that Mr. Babineau had a conflict, Mr. Hudgins came into this case, and this motion was made, and it was granted, was it not?

MS. CHAVIS:  Yes, it was, Your Honor.  This is talking about --

THE COURT:  What's the relevance of it?

MR. SAMUELS:  Judge, I don't have any objection to this one.

THE COURT:  Then why are we going through ones that there are no objections?  Didn't I tell you all to get together?

Did you tell her you had no objection?

MR. SAMUELS:  Not to that one, Your honor. Ms. Chavis did give me a list.  I have got three of the ones that I think she wants to admit that I have objections to. Maybe we could just go to those three.

THE COURT:  Why don't we just go to those three. There is no reason to take time up.  I told you all to check with the clerk, and if you hadn't gotten something in, to do it each day, and to be sure the clerk had it, and if there

443

was an objection, then the Court would take up any objection.

MR. SAMUELS:  Yes, Your Honor.  I think there is just the three that we would need to discuss.  The first one I believe is Defendant's Exhibit 11.

THE COURT:  All right.

MS. CHAVIS:  That is ECF 511-19, and that would be Mr. Hudgins' time schedule.  We spent quite a bit of time discussing this document with Mr. Hudgins.

THE COURT:  What he said was that was his time schedule, and anybody knows that practiced law in the courts, and particularly in J&D Court and state, most of these are in state general district and J&D Court, that the dates change, and that's what he said.

So if you want to admit it together with his testimony, I don't see any problem with it.  But the caveat on this is I heard the testimony, and I don't accept that as his schedule written in stone and that that's what he did, because he said that's not what he did.

MR. SAMUELS:  Judge, I have some additional points I'd like the make about this if I could.

THE COURT:  Okay.  Go ahead.

MR. SAMUELS:  Can I approach, Your Honor, to point out to the exhibit?

THE COURT:  Yes.

444

MR. SAMUELS:  Your Honor, this is actually part of Government's Exhibit 19.  It's Judge Hudgins' schedule that he filed with the motion to continue, and as the Court recollected, Judge Hudgins did indicate that not all of these dates went.  However, Defense Exhibit 11 has some annotations on it that Judge Hudgins didn't make, such as this one up here on this page.

THE COURT:  Are you telling me that all this is attached to his motion?

MR. SAMUELS:  No, Your Honor.  This one is attached to the *habeas* claim, because it's ECF number 511-19, and these annotations, such as this one down at the bottom, were not made by Judge Hudgins.

So I don't have an objection to his calendar, but these where it doesn't -- this was not put on there by Judge Hudgins.  He didn't make those annotations.  It was done after the fact.  And I think the best evidence is the calendar that was actually offered by Judge Hudgins, which is Defense Exhibit 10, and I also believe it's part of Government's Exhibit 19.

That's the proper evidence that should come in because it was made by Judge Hudgins.  This one was annotated after the fact.

THE COURT:  What do you have to say, Ms. Chavis?

MS. CHAVIS:  Your Honor, when I discussed the

JODY A. STEWART, Official Court Reporter

445

schedule with Judge Hudgins, he agreed with these annotations, and they are on here just for ease of reference, in order to easily calculate the days that he was anticipating being in court with respect to his schedule. We went over these annotations with him, and, you know, he did not dispute any of them.

THE COURT:  I don't recall that.

Who made these marks on it?

MS. CHAVIS:  I did.

THE COURT:  You did.  I don't recall that testimony where you said I'll mark these dates and ask him about them.

You've got a daily copy.  Is it in the transcript or not?

MS. CHAVIS:  Yes, ma'am.

THE COURT:  Then show it to the Court.

MS. CHAVIS:  May we take a minute to find it in the transcript?

THE COURT:  Yes.

Do you have it, Mr. Samuels?

MR. SAMUELS:  I do, Judge.

THE COURT:  Somebody can get it to the Court to look at.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Can you tell Ms. Chavis where it is?

MR. SAMUELS:  Yes.

JODY A. STEWART, Official Court Reporter

446

MS. CHAVIS:  I have it on Page 19.

MR. SAMUELS:  I have it starting on Page 21 --

MS. CHAVIS:  Page 19, line 13.

MR. SAMUELS:  -- where there was an objection to this exhibit.

MS. CHAVIS:  I'm sorry, Mr. Samuels.  I didn't mean to speak over you.

The question is, "If we look at those calculations at the end, could you please read what it says?"  That is where we begin to go on to the calculations.

MR. SAMUELS:  Judge, then there is a whole discussion about whether this is being offered for admission, and then I was making a reference to comparison between Exhibit 10 and Exhibit 11, and then I said, "The document" -- this is at the bottom of Page 21 -- "The document on Exhibit 11 I think has some annotations that I don't know that Judge Hudgins put on there."  And then we had issues with that.

And then I believe Judge Hudgins was asked by Ms. Chavis on Page 23, "Judge Hudgins, do you recognize the dates on this document as correlated to the documents that you previously looked at?"  He answered, "You mean all of these entries?"  And he said, "I have no idea."

I think the problem is this is annotated and it's not annotated by Judge Hudgins.  There is a document that

shows the schedule that he created; that's Exhibit 10. That's filed in the case at the time that he sought the continuance.

This a separate document that's been modified by counsel. He didn't create those entries, and so I would object to this modified exhibit coming in. We've already got the original that was created by Judge Hudgins.

THE COURT: I sustain the objection. I've got Judge Hudgins' testimony, and the testimony that occurred at the time will go forward.

How many days ago was this?

MR. SAMUELS: This was on the first day of our hearing, Judge, on Tuesday.

THE COURT: We are Thursday now. I've told you all to do this every day.

MR. SAMUELS: Yes, ma'am.

THE COURT: In any event, it was not offered. Whatever was testified to, whatever is on the record, that's what's going to stand. I sustain the objection.

What's the next exhibit?

MR. SAMUELS: The next exhibit, Your Honor, that I have an issue with is Defense Exhibit 79. Defendant's Exhibit 79, if I could get it, Your Honor, is a copy of the calendar.

MS. CHAVIS: We are not seeking to admit that.

JODY A. STEWART, Official Court Reporter

MR. SAMUELS:  I'm sorry.  That was on my list.

MS. CHAVIS:  That would be a mistake if I put that on there.

MR. SAMUELS:  Okay.  Then the last one --

THE COURT:  You said 79 is not an issue?

MR. SAMUELS:  Not an issue, Your Honor.

The last one is Defense Exhibit 42, which was these Army records that Judge Hudgins was asked about.  To my recall, he didn't have a clear recollection of reviewing these or looking at these, and there are some Army records later in the defense exhibits.  I think it's Defense Exhibit 83 that these may by part of.

There may be a more appropriate witness down the line to get these documents in, but I don't believe Judge Hudgins testified he reviewed these documents.  I don't think he is the right witness to bring these documents in through.

THE COURT:  Did I rule on that at the time?

MR. SAMUELS:  They were never sought for admission at the time, Judge, and I think that that's around the time when Judge Hudgins was asking were these a part of his file and asking to be declared an adverse witness.  Then we did not go through them in any detail because he did not recognize them.

THE COURT:  I'm not going to admit that.  I

JODY A. STEWART, Official Court Reporter

remember the testimony about these, and he didn't remember them.  You've got to lay a better foundation and authentication for them.  Just because there is claim that a document was in the file, he doesn't remember it in the file.  They are asserting that they were in the file, but he doesn't remember them as being in the file, and he doesn't remember the document.  There is a better way, certainly, to authenticate that particular hearsay.  That document would be full of hearsay.

MR. SAMUELS:  Yes, Your Honor.  I think Ms. Chavis and I can work out the rest of the exhibit numbers that she has.  We don't need to take the Court's time with that.

THE COURT:  Then call your next witness.

MS. CHAVIS:  We call Maria Runyon.

MS. McKEEL:  Judge Smith, can the government be heard on this witness?

THE COURT:  Yes.

MS. McKEEL:  Thank you.

THE COURT:  The witness would need to step out.

Ms. Runyon, you would need to step out into the hall and wait to be called.

MS. McKEEL:  Judge, while we are at it, with regard to any other witnesses in the courtroom, the petitioner asks for a rule of sequestration.  So I just see some people I don't recognize in here.  I would just ask to have the

witnesses leave.

THE COURT:  The attorneys ought to know, and if that happens and a witness is in the courtroom, then the Court refuses to allow that witness to testify.  So you better be very careful about who's coming into the courtroom.  I don't know the witnesses.  I don't know the people that are in here except for the marshals and the attorneys and the petitioner.  So that's the responsibility of the defense attorneys.

So if there is anybody here that's a potential witness, you need to leave immediately.

MS. McKEEL:  Thank you, Your Honor.

Judge, we would just ask, with regard to Maria Runyon, that you give her some warnings of criminal exposure.  This witness testified in the Grand Jury --

THE COURT:  Wait just a minute.  I need to make a note here.

MS. McKEEL:  Yes, ma'am.

THE COURT:  All right.

MS. McKEEL:  This witness testified in the Grand Jury before Mr. Runyon was indicted, and she made some statements, what we believe, that -- she also made a declaration, which was made a part of the Court's record.

In her declaration, and that date is September 16th, 2015.  We believe this is the issue and that she

should be cautioned.

In the declaration she makes a statement, Paragraph 17, "I think the wreck was very significant in our lives because David's personality changed dramatically."  In the federal Grand Jury, she was asked about this accident where she stated:

"QUESTION:  When was the car accident, do you remember, ma'am?

"ANSWER:  It would have been -- I don't remember the year it was.  I'm thinking it was, like, the year before he got out of the military, which would probably have been '96, '97.

"QUESTION:  Did he suffer any serious head trauma from that that had any lingering effects other than vertigo?

"ANSWER:  No, not that I'm aware of, other than the vertigo.  That was really a bad deal.

"QUESTION:  Has he had any mental health problems that you are aware of?

"ANSWER:  No."

A few more questions were asked.

"QUESTION:  Ma'am, after the car accident we talked about a little bit before, was there any personal change that you observed in

JODY A. STEWART, Official Court Reporter

452

David?

"ANSWER:  He was -- he -- it was like he was bitter because the guy that hit him, you know, was a drunk driver.  He was over the legal -- well, there was an issue about whether he was over the legal limit."

THE COURT:  What's the point of all this, that she needs to be cautioned?  I don't know that any of that's incriminating.  I mean, you're entitled to impeach her.

MS. McKEEL:  I am, Judge.

THE COURT:  Do I have to listen to all the information you are going to use to impeach her?

MS. McKEEL:  No, ma'am.  The point I was making is that, if she takes the witness stand and that she testifies according to this declaration, she could be subject to a charge of perjury.  So we just wanted the Court to be aware of that before we began this procedure.

THE COURT:  Well, I wouldn't know.  She's going to come in to testify.  They are calling her as a witness.  You claim you have rebuttal evidence and rebuttal evidence under oath.  What do you want me to do?

MS. McKEEL:  We just thought she should be cautioned that, because she's answered those two questions, what is true, what is not true?  Right.  And so she is subject to perjury.

JODY A. STEWART, Official Court Reporter

453

THE COURT:  I'm not one to make the decision whether she is subject to perjury.  The answers are different enough.  The only thing that I can tell her is that if she's being called as a witness, she will be subject to cross-examination, and any other testimony that she has given under oath can be used in the cross-examination or any other documents she has signed, affidavits or whatever.

MS. McKEEL:  Yes, ma'am.  That's fine, Judge.  Thank you.

THE COURT:  Are you ready to call her, Ms. Chavis?

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  All right.  Have someone on your team get her, please.

Ms. Runyon, if you would please come forward and be sworn.

(Witness was sworn.)

THE COURT:  Ms. Runyon, before you start your testimony, the Court has been asked to advise you that in addition to your testimony that's elicited by the petitioner, you will also be subject to cross-examination, and examination by the Court if appropriate.  You understand that?

THE WITNESS:  Yes, ma'am.

THE COURT:  You understand that any statements you've made under oath, say, for instance, before a Grand

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                    454

Jury, or by affidavit, or whatever, can be brought up on rebuttal to impeach you?

THE WITNESS: Yes, ma'am, I do.

MS. CHAVIS: Your Honor, excuse me. I'd just like to lodge an objection to the request, the further request that the government made. If we're going there, I understood that Your Honor said that you were not going to give the instruction that was requested, but if I misunderstood, I just wanted to make sure.

THE COURT: Then you should probably advise her as your witness. All I'm doing is just telling her that any information under oath can be used against her. If you want to tell her the consequences, you can or not. Go ahead. Go ahead with your examination.

MS. CHAVIS: Thank you, Your Honor.

MARIA RUNYON, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q. Good afternoon.

A. Hi.

Q. Can you tell us your name, please.

A. Maria Runyon, R-u-n-y-o-n.

Q. How do you know David Runyon?

A. He's my ex-husband.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              455

Q.   When did you meet Mr. Runyon?

A.   Oh, gosh.  1994.

Q.   Do you remember the year that you were married?

A.   1995.

Q.   Was your husband in the military?

A.   Yes, he was.

Q.   Where were you stationed?

A.   We were -- well, when we were married, when we first got married, he was stationed in Fort Lee, Virginia, and then we moved to Fort Benning shortly thereafter.

Q.   I want to take you forward to a time in 1996.  Was your husband in a car accident?

A.   Yes.

Q.   Can you please tell us about that accident.

A.   It was pretty bad.

        MS. McKEEL:  I'm going to object at this point. This witness was not with Mr. Runyon at the time of the car accident, so whatever her description would be would be hearsay.

        THE COURT:  Well, lay a foundation for her familiarity with the car accident.

        MS. CHAVIS:  Your Honor, in the death penalty phase, hearsay is allowable.

        THE COURT:  I said lay a foundation.  The Rules of Evidence apply.  Lay a foundation for her knowledge, when

Runyon, M. - Direct                                                    456

she became aware of it.  I didn't say I wasn't going to let her testify, but she wasn't there to describe the accident. She can tell if she came on the scene, if she knew about it afterwards.  Just lay your foundation as I instructed you to.

MS. CHAVIS:  Understood.

BY MS. CHAVIS:

Q.  Did you become aware that your husband was in a car accident in 1996?

A.  Yes, ma'am.

Q.  How did you become aware of that?

A.  One of his sergeants at the time called me, roughly 3:00, 3:30 in the morning.

Q.  And what were you told?

A.  That he was in a bad accident.

Q.  Then what happened?

A.  My understanding is that he was in the hospital.  So one of his sergeants, or maybe more than one, were going to go to where he was, which was in Danville, Alabama, to pick him up. He was going to be released from the hospital, but they went there to pick him up.

Q.  Did somebody else go with the sergeant to pick up David Runyon?

A.  It could have been Sergeant Stone.  It could have been Sergeant Seeger.  And there was also another sergeant,

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                          457

Sergeant Boone, that could have went.  I just -- I know one of them went, and I think there were two of them.

THE COURT:  Did you go?

THE WITNESS:  No, ma'am, I did not.

BY MS. CHAVIS:

Q.  Did you have children at the time?

A.  Yes, ma'am.

Q.  How many children?

A.  Three.

Q.  What were their ages?

A.  David was a baby, gosh, and I don't think he was a year old.  The other two, Wren was like five, and I think my daughter was two, two and a half.

Q.  Did you see pictures of the vehicle that was in the accident?

A.  I did.

Q.  How did the vehicle appear?

A.  It was mangled.  They had to use the Jaws of Life.

MS. McKEEL:  Objection to how she has that knowledge.

THE COURT:  Sustained.

THE WITNESS:  May I continue?

THE COURT:  You can say how it appeared, but if you don't -- you can't testify to something that you didn't do or see.

Runyon, M. - Direct                                                  458

You saw a picture; is that correct?

THE WITNESS:  Yes, ma'am, I did.

THE COURT:  Then you can describe what you saw in the picture.

THE WITNESS:  Okay.

BY MS. CHAVIS:

Q.  I'm sorry.

A.  That's okay.  Go ahead.

Q.  You can continue to describe what you saw in the picture.

A.  The vehicle was unrecognizable.  I had seen the vehicle previously because the truck belonged to his brother, so, obviously, it didn't look the same.  It looked like it had been hit by a semi.  The whole driver's side was caved in, and it was just -- it was bad.

Q.  When your husband returned home, did he tell you what had happened?

A.  He did.

Q.  Did he tell you how he was extracted from the vehicle?

MS. McKEEL:  Objection to hearsay, what the defendant told her, or what Mr. Runyon told her, hearsay.

THE COURT:  Sustained.

MS. CHAVIS:  Your Honor, the Federal Rules of Evidence, Rule 1101(d)(3) and 18 U.S.C. Section 3593(c) allows for hearsay in the selection phase of a federal death penalty case.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                459

THE COURT:  In the what?

MS. CHAVIS:  In the selection phase of a federal death penalty case, hearsay is allowed, so it should be allowed in this proceeding.

THE COURT:  How is this the selection phase?

MS. CHAVIS:  In the selection and --

THE COURT:  She can testify as to what she saw, what she observed of Mr. Runyon, but not hearsay as to what he told her.  If she saw something, when she saw the pictures, she saw him, she interacted with him; she can talk about what she did and saw, and that's my ruling.

MS. CHAVIS:  So for Your Honor, I'd just like to put in the record the case of the *United States versus Basham*.  That's at 561 F.3d 302.  It's the Fourth Circuit 2009.  And *Sears versus Upton*, which is at 561 U.S. 945, 2010.

THE COURT:  What do they stand for?

MS. CHAVIS:  They stand for the proposition that the fact that some of such evidence may have been hearsay does not undermine its value or its admissibility for penalty phase purposes.

THE COURT:  We are not here for that.  We have done a trial.  It has been appealed.  It has gone all the way to the Supreme Court.  Cert was not granted.  It has come back on *habeas*.  The Court has ruled on *habeas*.  It's gone back

JODY A. STEWART, Official Court Reporter

to the Fourth Circuit.  The Court has been affirmed on everything but was directed to have a hearing on ineffective assistance of counsel, and that is it.

We are not at that phase.  We are in a very important -- I've got to determine, and certainly if -- my ruling is my ruling, and those cases are not on point to what we are doing here.

MS. CHAVIS:  Yes, Your Honor, I understand.  This is just evidence that trial counsel was alerted to and that they could have presented at the penalty phase.

BY MS. CHAVIS:

Q.  Ms. Runyon, what injuries did you observe on your husband?

A.  He had a neck brace.  I believe he had some sort of a cast or something on his leg.  He also had a broken arm.  I don't remember which arm it was.  But he was in pretty bad shape.  He had some contusions on his head.

Q.  What kind of problems did he have as a result of the accident?

A.  He got -- the biggest thing was he ended up with vertigo. I say that was the biggest thing.  At the time we thought that was the biggest thing.  He would get dizzy, ringing in his ears.  His whole personality changed.  He became mean. He wasn't like that before.  He just wasn't the same person that he was prior.

Runyon, M. - Direct                                                461

Q.   Tell us more about the vertigo.  What does that entail?

A.   It was bad enough that he would have to lay in bed with -- propped up with three pillows.  And he was scared.  It scared him because if he didn't have three pillows underneath him, he felt like he was going to pass out, and he actually had passed out from it several times.  It scared him enough that, you know, he had to have three pillows.  His head had to be propped up at all times.

Q.   Did you ever call an ambulance for your husband?

A.   Yes, I did.

Q.   Tell us about that.

A.   I believe that we had taken him to the emergency room at Martin Army Hospital a couple of days prior.  He had been given some antibiotics because they were trying to say that his problems with his ears was because he had an ear infection.

Q.   His problems with --

A.   With his ears, with his ringing in his ears and the dizziness and stuff.  So they gave him some antibiotics.  If I remember correctly, they were sulfur drugs.  He did not know that he had an allergy to sulfur medicine.  When I called the ambulance, he was broken out with welts.  He was broken out with welts all over his body.

Q.   Do you have some water up there?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                               462

Q.   Do you want to take a moment?

        Your Honor, may we have just a minute?

A.   I think I'm okay now.

Q.   So he had a reaction to the sulfur drugs?

A.   Yes.

Q.   And you called an ambulance for him?

A.   Yes.  I wasn't able to ride in the ambulance with him, but I knew that I had to make sure and let them know not to lay him flat.  When I got to the hospital --

        THE COURT:  Not to do what?  I'm sorry, I couldn't understand you.  Not to do what?

        THE WITNESS:  Not to lay him flat, ma'am.

        When I got to the hospital after they got him there, I was walking through, and I could hear him yelling because they were trying to lay him flat.

        THE COURT:  Trying to what?

        THE WITNESS:  Trying to lay him flat, ma'am.

BY MS. CHAVIS:

Q.   Trying to lay him flat.  They weren't propping him up --

A.   Correct.

Q.   -- on pillows or having the back of the bad raised --

A.   Correct.

Q.   -- at an angle?

A.   He needed to have it raised up.

Q.   About how many times did you have to take David Runyon to

                    JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                          463

the emergency room because of vertigo issues or ringing in his ears?

A.   I couldn't even -- I couldn't even guess.  I mean, it was constant.

THE COURT:  Over what period of time?

THE WITNESS:  You mean years, ma'am?

THE COURT:  You said you had to take him.  When? You said it was constant.  Are you talking about over a two-year period, a three-year period, a five-year period?

THE WITNESS:  It was a while.  It was at least three years.

THE COURT:  So this would have been in the late '90s?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.

BY MS. CHAVIS:

Q.   Did David Runyon's activities change after the car accident?

A.   Yes.

Q.   How did they change?

A.   He wasn't interested in the same things that he used to be interested in.  He was more interested in hanging out, playing video games.  He really didn't want to do anything as far as socializing.

THE COURT:  Was he still in the military then?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                        464

THE WITNESS:  I don't remember what year it was, ma'am, when he got out.  '97, I believe, is when he got out, so...

BY MS. CHAVIS:

Q.  Did David seek medical help for his injuries and for his continuing symptoms?

A.  I mean, I know when he was in the military, he did.  You know, there was a point where there was no health insurance, so, you know, he just tried to cope with it as best as he could.

Q.  And when he sought medical help while you were still in the military and had health insurance, was he satisfied with the treatment that he received?

A.  I don't think he was ever satisfied with the treatment that he received.

Q.  And why do you think that?

MS. McKEEL:  I'm going to object.  I think it calls for hearsay.

THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  Were you satisfied with the treatment he received?

A.  I was not.

Q.  And why is that?

A.  Because he was mean, and he was mean because he wasn't being treated properly.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                               465

Q.  Did you ever notice David appearing to be in a daze?

A.  That happened often.

Q.  Can you describe that for us?

A.  We'd be talking, and then all of a sudden it was like he was there, and then he wasn't there anymore.

Q.  What would you do when that would happen?

A.  Get his attention.  And then he'd be like, oh, okay, yeah, yeah, yeah, what?

        THE COURT:  When was this?  What was the time period?

        THE WITNESS:  I don't remember the time period, Your Honor.

        THE COURT:  Was it still in the late '90s?

        THE WITNESS:  Probably.

BY MS. CHAVIS:

Q.  Did these issues ever resolve before you separated from David Runyon?

A.  No.

Q.  Did you notice a change in his memory after the car accident?

A.  I did.

        THE COURT:  The next logical question is when did you separate?  Let's keep this orderly.  You stand there and look down for almost a minute and don't ask the next question.

Runyon, M. - Direct                                                   466

When did you separate?

THE WITNESS:  2001, I believe.

THE COURT:  Now go forward.

THE WITNESS:  Actually, Your Honor, it may have been 2002.

THE COURT:  Now, what was your next question?

BY MS. CHAVIS:

Q.  Did you notice a change in your husband's memory after the car accident?

A.  Definitely.

Q.  Was it a positive change or a negative change?

A.  It was a negative change.

Q.  Did you notice David acting paranoid?

A.  Absolutely.

Q.  Could you describe how he would act previous to the accident and how he would act after the accident.

A.  Well, I -- he wasn't paranoid before the accident.  After the accident, there were several occasions where he was -- he acted paranoid.

One of them was I was standing outside on the front porch one night having a cigarette, and a guy started walking up the sidewalk, and he came out on the porch -- or he actually didn't come out on the porch, he got ready to come out on the porch and was going to open the door because the guy looked like he was going to come up on the porch,

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                            467

probably maybe wanting to bum a cigarette, or, I don't know, but he came out -- or was going to come out to make sure that, you know, nothing was going to happen.

Later on, he informed me that the guy was going to rape me. And I was like, no, that's not what happened at all. I mean, that was -- he didn't remember what happened. I mean, it was totally different from what it actually was.

There was another time where we were at the dinner table, and I don't remember what started the conversation, but he wanted to argue with me over the fact that I have green eyes. And I'm like --

MS. McKEEL: Judge, I object to the relevancy of this.

THE COURT: Overruled.

THE WITNESS: I'm like, I've had blue eyes my whole life. You know this. And we have a whole discussion about my eye color. It was bizarre.

BY MS. CHAVIS:

Q. Looking back on all of this, do you now attribute these changes to the car accident?

MS. McKEEL: I'm going to object to leading.

BY MS. CHAVIS:

Q. Looking back on all of these changes in David, what do you attribute them to?

A. He wasn't like what I described before the wreck. After

Runyon, M. - Direct                                                        468

the wreck is when all this started.

Q.  Are you aware of any other car accidents that David has been in?

A.  I am aware of one.

Q.  Can you tell us about that, please.

A.  To my knowledge, he wrecked his father's truck when he was younger.

           MS. McKEEL:  I'm going to object, hearsay.

           THE COURT:  You have to lay a foundation of how she has that knowledge.

           MS. CHAVIS:  Okay.

BY MS. CHAVIS:

Q.  Ms. Runyon, how do you know that David Runyon wrecked his father's truck when he was younger?

A.  He told me, his father told me, his mother told me.  It was a whole big thing, so -- can I continue?

           THE COURT:  No.

           MS. CHAVIS:  I'm sorry, Your Honor?

           THE COURT:  No.

           Did you know him at the time?

           THE WITNESS:  No, ma'am.

BY MS. CHAVIS:

Q.  Did you know that your husband would have some problems with the skin on his face?

A.  Yes.

                   JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                  469

Q.   Did you know what caused those problems?

A.   I know he had bad acne, but I also know that he had gotten glass in his face, and that's what started the stuff on his face.

Q.   How did he get glass on his face?

A.   From a car wreck.

Q.   Where did the glass come from?

A.   Probably the vehicle he was driving.

Q.   Did you -- Ms. Runyon, did you previously drink alcohol?

A.   Yes, ma'am.

Q.   Did you have an alcohol problem?

A.   Yes.

Q.   Are you now sober?

A.   I am.

Q.   And you've been sober quite a long time?

A.   May 26 of 2011.

Q.   Congratulations.

A.   Thank you.

Q.   Did your drinking contribute to problems in your marriage?

A.   It did.

Q.   Are you okay?

A.   (Nods head.)

Q.   Did David talk to you about your drinking problem?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              470

Q.   Did the two of you attend counselling?

A.   We tried.

Q.   And was David diagnosed with PTSD?

A.   Yes.

Q.   PTSD is post-traumatic stress disorder?

        MS. McKEEL:  Counsel has to lay a foundation,
please.

        THE COURT:  Sustained.  You have to lay a
foundation for how she has that knowledge.

BY MS. CHAVIS:

Q.   How do you know that your husband was diagnosed with
PTSD?

A.   He came home and told me.

Q.   Came home from where?

A.   The doctor.

        MS. McKEEL:  Judge, I'd ask that be stricken from
the record.  That's hearsay.

        THE COURT:  Sustained.

BY MS. CHAVIS:

Q.   I'd like to go to the year 2007.

     At the time did you learn about this crime?

A.   Yes.

        THE COURT:  Let me ask you one question.  Are you
still married to Mr. Runyon?

        THE WITNESS:  No, I'm not.


                     JODY A. STEWART, Official Court Reporter

THE COURT:  When did you divorce?

THE WITNESS:  I believe it was either 2009 or 2010, ma'am.

THE COURT:  Go ahead.

BY MS. CHAVIS:

Q.  How did you learn about that David had been arrested for this crime?

A.  The marshals came looking for me.

Q.  And who told you about David's circumstances at that time?

A.  Mr. Samuels.

Q.  And did you know that David was involved in drug studies at that time?

A.  No, I did not.

Q.  When did you learn that David was involved in drug studies?

A.  When Mr. Samuels told me.

Q.  And what was your reaction to learning that Mr. Runyon was involved in drug studies?

MS. McKEEL:  Judge, I'm not sure what relevance this has, her reaction to finding out what jobs the defendant had.

THE COURT:  Sustained.

My question is, was he gone for long periods of time?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              472

THE WITNESS:  I wasn't with him, ma'am.

THE COURT:  So you were separated?

THE WITNESS:  Yes.

THE COURT:  You were separated, but you weren't divorced?

THE WITNESS:  I wasn't with him when he was doing the drug studies.  This was way after.  We were separated, yes, but we weren't divorced.

THE COURT:  So you were separated?

THE WITNESS:  Yes, ma'am.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  When you were living with your husband, did he take medication?

A.  No.  He didn't want to take medication.  He didn't want to put anything impure in his body.  So when I found out about the drug studies, I was floored, because the guy wouldn't take an aspirin for a headache, he wouldn't take a Benadryl for allergies, nothing.  So...

Q.  Being involved in the drug studies was out of character for the David Runyon that you knew?

A.  Very.

Q.  What about the type of people that David Runyon was hanging out with at the time that he was arrested?

MS. McKEEL:  Judge, I'm going to object to this.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                            473

We have asked about his medical history, and I think that goes to potentially the argument of what we are here for, this claim, part of claim 6, but people he hung out with, that's --

THE COURT:  She is not living with him.  She said she was separated and wasn't aware.  She would have to lay a foundation that she knew the time period she is talking about and how she would know.  She said she didn't know about the drug studies because she wasn't living with him and didn't know what he was doing.

You just can't ask a question with no foundation, Ms. Chavis.  Lay your foundation, if she knew.  If she knew, she can testify.  If she knew with proper information, she can testify.

BY MS. CHAVIS:

Q.  Did you learn about the type of people that David Runyon was hanging around after he separated from you?

A.  I didn't know at the time.  It wasn't until after this case came up that I found out.

Q.  How did you find out?

A.  Mr. Samuels told me.

MS. McKEEL:  Judge, this goes to the same objection.

THE COURT:  Sustained.

BY MS. CHAVIS:

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                474

Q.   When you were living with David Runyon, would he associate with strippers?

A.   No, ma'am.

Q.   Would he associate with the type of people who would be employed at drug studies?

A.   No, ma'am.

Q.   Would he associate himself with drug users?

A.   No, ma'am.

Q.   Would it be out of character for him to associate with those types of people?

A.   Absolutely would.

Q.   At the time of this trial, how old was your son, David?

A.   The trial?

Q.   The trial was in 2009.

A.   In '09, okay.  So he would have been 12, 13.  I think he was 12.

        MS. CHAVIS:  May I have a minute, Your Honor?

        THE COURT:  Yes.

        MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.   You testified at David Runyon's trial, correct?

A.   I testified during the penalty phase of the trial.

Q.   Did you talk with defense counsel before your testimony?

A.   I did, but I really don't remember it.  I was drunk.

Q.   If defense counsel had asked you these questions that

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              475

I've asked you today, would you have testified similarly at the trial?

A.   Absolutely.

MS. CHAVIS:   Those are all the questions that I have.

THE COURT:   All right.   Ms. McKeel.

CROSS-EXAMINATION

BY MS. McKEEL:

Q.   Good afternoon, ma'am.   I want to start where Ms. Chavis just ended.

You said that if you had been asked at the time in 2009 the same questions that Ms. Chavis asked you today, you would testify the same way; is that right?

A.   Similarly.

Q.   I'm sorry?

A.   Similarly.

Q.   But didn't you just testify that you were drunk when you testified here in federal court during the penalty phase in 2009?

A.   No, I didn't testify to that just now.   I testified that I was drunk when I spoke with his attorneys.

Q.   You didn't say to this Court now that when you testified, you were drunk?

A.   I was drunk when I testified with -- or talked with his attorneys the night before I testified.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                  476

Q.  Mrs. Runyon, you've had a long battle with alcohol; is that correct?

A.  Maybe.  You could say so.

Q.  When did your alcohol problems begin?

A.  It was inherited.  Off and on.

Q.  Since birth?

A.  I inherited my alcohol problems from my mother.  I think they really got going --

Q.  So are you saying that you had alcohol problems when you were a child, and they just continued until you were sober, I think you said here recently; is that right?

A.  That's --

Q.  May 26th, 2011?

A.  That's not what I said.

Q.  What did you say?

A.  Would you please repeat the question, the first one?

Q.  Yes, ma'am.

    You said that you've had problems with alcohol, you inherited.  I'm trying to find out when you inherited these. You said at birth, but you're saying you've had them all along.  So do you consider yourself of having alcohol problems from birth until May 26th, 2011?

A.  Not from birth, but part of the problem was inherited from my mother.

Q.  Have you taken anything today before your testimony, any

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                             477

type of alcohol or any type of drug?

A.   No, ma'am.

Q.   Okay.

A.   Other than what I'm prescribed.

Q.   Ma'am, what are you prescribed?

A.   I have PTSD, so I'm on 20 milligrams of Prozac.  I am on 37.5 milligrams of Effexor, and I'm on 150 milligrams of amitriptyline at night.

Q.   Do any of those drugs -- how long have you been on them?

A.   A while.

Q.   Do any of those drugs affect your memory?

A.   I don't know if they affect my memory.

Q.   Ma'am, let's go back to the beginning when Ms. Chavis started asking you some questions.  I'm just a little confused about when you married and separated from David Runyon.

     When did you marry him?  Do you know your wedding day?

A.   January 20th, 1995, I believe.

Q.   And what is your separation date?

A.   I don't remember.

Q.   Were you drinking heavily at that time period?

A.   I don't remember that either.  I know I was drinking.  I don't think it matters whether it was heavily or not.  I was drinking.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              478

Q.  Were you taking any other type of drugs during that time period?

A.  No.

Q.  I'm sorry, ma'am?

A.  No.

Q.  No.  So the problems that you were having stem from alcohol; is that right?

A.  At that time?

Q.  Yes, ma'am.

A.  Yes.

Q.  Did you have any other problems with memory after that time?

A.  Ma'am, I was sexually assaulted.

        MS. CHAVIS:  Objection, Your Honor.  She never testified that she had problems with memory.

        THE COURT:  She's on cross-examination.  She's entitled to ask that, particularly given a number of her answers; that she's not sure of time periods, she hesitated on her child's ages.  There's been a lot of uncertainty and unsurity, and I think that is an appropriate question.

BY MS. McKEEL:

Q.  Ma'am, I'm not going into any type of assault on you at all.  I'm just trying to figure out your memory issues because you seem to say some indication, when I asked you about were you drinking heavily, and you are not -- during

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                      479

that time period that you were married, and then you made some statement afterwards, is that you didn't have any other problems at that time.

A.  I'm very confused by your question.  I think you're speaking too quickly.

Q.  Okay.  I will try to slow down for you.

You've had alcohol problems for a long time, up until May of 2011; is that right?

A.  May 26th of 2011, yes.

Q.  Since you're testifying today, up until this time period, have you been addicted to any other type of drugs?

A.  No, ma'am.

Q.  And the drugs that you are on are for medical conditions that have been prescribed by a psychiatrist or a psychologist; is that right?

A.  That is correct.  And PTSD also affects the memory.

Q.  So would it be fair to say, then, ma'am, you do have some memory problems?

A.  I do.

Q.  Ms. Chavis asked you about a car accident that you've talked a little bit about today.  You said you saw some pictures.  Where did you get those pictures from?

A.  One of his sergeants.

Q.  Do you have those pictures?

A.  I do not.

Runyon, M. - Cross                                                    480

Q.   Do you know who has those pictures?

A.   They're in his military records, I'm sure.

Q.   Do you know that for sure, or are you just guessing?

A.   I don't know that for sure, no.

Q.   But you don't have possession of these photos at this time?

A.   I do not.

Q.   Did you ever have possession of those photos?

A.   I believe we had copies of them, yes.

Q.   Where are the copies now?

A.   We've moved several times.

Q.   Did you ever give those copies away to anybody?

A.   Don't think so.

Q.   Has anybody from *habeas* counsel or trial counsel asked you about those photos and tried to obtain those photos?

A.   *Habeas* counsel --

Q.   That would be Ms. Chavis.

A.   -- trial counsel.

        I'm sorry?

Q.   That would be Ms. Chavis, is *habeas* counsel.

A.   I don't recall.

Q.   How about Sheila Cronin or Glenn Ford, do you know who those people are?

A.   I remember them, yes.

Q.   Did you talk to them before trial?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                          481

A.   I did.

Q.   Did you give them the pictures?

A.   It -- I don't remember.  I was drinking at the time.

Q.   You've talked about the car accident, and saying that the injuries that you saw were that David Runyon had a neck brace, he had a, you think, a cast on his leg.  You're not sure about that; is that right?

A.   It's been a while.

Q.   So that would be yes, you're not sure?

A.   I am not sure.

Q.   How about the broken arm, are you sure about that or not?

A.   Yes.

Q.   I'm sorry?

A.   Yes.

Q.   You are sure about that?

A.   Yes, I am.

Q.   So he had a broken arm, for sure, and then he had a neck brace --

A.   Yes, ma'am.

Q.   -- is that correct?

     And you said that the biggest problems he had was vertigo and the dizziness and the ringing in his ears; is that correct?

A.   At the time I thought that was his biggest problems.

Q.   Well, you're saying "at the time."  Has something changed

Runyon, M. - Cross                                        482

your mind?

A.   He became mean.  I'm talking about at the time when the accident had occurred, it was vertigo and ringing in the ears.  It was later when the behavior started happening.

Q.   So during this time period, did you go -- you had problems in your marriage; would that be safe to say?

A.   Yes.

Q.   And did you ever go to David's commanding officer and make complaints about his behavior and how he was treating you?  This was before the car accident.

A.   I don't recall.

Q.   Do you recall ever going to his commanding officer and complaining about David's behavior towards you?

A.   Absolutely.

Q.   You just don't recall the time period; is that correct?

A.   Correct.

Q.   Did the problems from the marriage stem from your drinking?

A.   That wasn't all the problems.  I'm sure he had some, too.  It's a 50/50 deal when you're married.

Q.   Okay.  Did you have money problems?

A.   Of course.

Q.   What other problems did you have in your marriage during this time period, before the accident occurred?

A.   Before the accident occurred?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                    483

Q.  Can you remember that, ma'am?

A.  I don't think there were that many problems before the accident occurred, to be honest with you, other than the fact that I decided to use our checkbook one day, and I spent a bunch of money, and he got in trouble for it.  I do recall that.  So, yeah, there were money problems.

THE COURT:  Let me ask you, while you're on this area, where was Mr. Runyon employed when he got out of the military?

THE WITNESS:  He got a job as a police officer.

THE COURT:  How long was he a police officer?

THE WITNESS:  I cannot remember that, Your Honor.

THE COURT:  Well, was he employed after -- you've said that you separated and you didn't know anything about the drug studies.  Did you know anything about his employment while he was in those drug studies?

THE WITNESS:  No, ma'am.

THE COURT:  So you weren't familiar with his employment?

THE WITNESS:  When he was in the drug studies, no, ma'am.

THE COURT:  Go ahead.  You were touching on those issues.

MS. McKEEL:  Thank you, Judge.

THE COURT:  You all touched on the employment

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                      484

issues.

BY MS. McKEEL:

Q.  Why did David get out of the military?

A.  I think it was because of me.

Q.  Okay.  What were you doing to make him not be able to go back in the military?  In fact, he was barred from reenlisting, right?  And wasn't the reasons given, because of his problems in his marriage, his finances?

        MS. CHAVIS:  Objection, Your Honor.  This is going into speculation.  How would Ms. Runyon know why David Runyon was barred from reenlisting in the military?

        THE COURT:  I think she knows because she said she thought it was, in part, of her.  She did say that.  And they were married at the time, so you can ask if she knows the reasons that he got out of the military and if he was barred from returning.  She did say she was one of the reasons.

        MS. McKEEL:  Yes, ma'am.

BY MS. McKEEL:

Q.  Let's touch upon that, Mrs. Runyon, that you're the reason he got out of the military.  Please explain your answer.

A.  I take full responsibility for everything.  That's just what I do.  When you're a drunk and you're in recovery, you take responsibility.

Runyon, M. - Cross                                          485

Q.  I'm not asking you to take responsibility, ma'am.  I'm just asking you to explain your answer.

A.  Well, you know what, ma'am, I can't.

Q.  Did you know he got barred from reenlisting?

A.  No.

Q.  Your finances were bad during that time period.  Did you know that's one of the reasons that he got barred from reenlisting?

A.  Because of our finances?

Q.  Yes, ma'am.

A.  Okay.  And that would have been my cause.

Q.  Did you get arrested during this time period for forging checks?

A.  No, ma'am.

Q.  Have you ever been convicted of any felony or misdemeanors involving lying, cheating, or stealing?

A.  No, ma'am.

Q.  You've said that he was mean afterwards.  But isn't it true that you all were going through some very significant marital problems?  He had the accident in '96.  He got out in '97.  So during this time period, you all were having a lot of marital problems; isn't that correct?

A.  Probably because of money.

Q.  Okay.  Can you remember the date that you stopped living with David Runyon?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                          486

A.  I don't remember.

Q.  You think it's sometime between 2001 and 2002?

A.  Yes.

Q.  And then after that --

A.  It wasn't 2001.  It was 2002, I believe.

Q.  All right.  After that, did you ever live with him again?

A.  No.

Q.  You tried to reconcile after that time period, didn't you?

A.  Yes.

Q.  What happened to stop you from reconciling, do you remember?

A.  His crazy behavior.

Q.  I'm sorry?

A.  His crazy behavior.  He's never acted that way.  He never acted that way before the wreck.

Q.  Wasn't it because that he had another girlfriend, and he really just wanted to get you to do the taxes with him, and so that's why he was getting back with you?

        MS. CHAVIS:  Objection, Your Honor.  She didn't even answer as to why she did not reconcile.

        THE WITNESS:  Correct, I didn't.

        THE COURT:  She's on cross-examination.  She can say -- she can answer that question.

        THE WITNESS:  Can you repeat it, please?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                      487

BY MS. McKEEL:

Q.   Yes, ma'am.

     Isn't the reason why you didn't reconcile is because he actually had another girlfriend, and he only wanted to reconcile with you because he wanted to pay the taxes?  It was a girlfriend that was a stripper?

A.   To pay what taxes?

Q.   To pay your taxes.

A.   What taxes did we need to pay?

Q.   I'm asking you, do you remember that?

A.   That we had to pay taxes, no.

Q.   As a married couple?

A.   No.  I don't remember having to pay taxes.

Q.   Okay.  Ma'am, I'd like to show you --

A.   You mean like home taxes and things like that?

Q.   Ma'am, do you recall testifying in a federal Grand Jury on January 25th, 2008?

A.   I do remember testifying, yes.

Q.   I'm going to show you, please, your Grand Jury testimony.

A.   What page am I looking at?

Q.   I just wanted to make sure you had it and you're ready to answer questions.

A.   Okay.

Q.   Do you remember being advised in Grand Jury that you had a Fifth Amendment right not to give any testimony or answer

Runyon, M. - Cross                                                           488

any questions that would incriminate yourself?

A.   I don't remember that.

Q.   That's on Page 2 of the Grand Jury transcript, the bottom of the page.

A.   You said Page 2 at the bottom?

Q.   Yes, ma'am, the bottom.

A.   Okay.  It says, "Remember you've taken an oath to tell the truth," is that what you're talking about?

Q.   Well, I think that's on Page 3.  The page number is on the top, to the right.  We can go to that.

A.   Okay.  I have it.

Q.   It says:

               "QUESTION:  Finally, you have taken an
          oath to tell the truth."
          Do you see that?  Go to the next page.

A.   Yes.

Q.   Now, do you see where it says, "You are advised if you give any false testimony that you could be prosecuted for perjury or obstruction of justice?"  That's at the top of that page.

A.   On Page 2 or 3?

Q.   Page 4, ma'am, the very top of Page 4.

A.   I do see that, yes.

Q.   And do you see that, still on that page, that you're asked:

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                          489

"QUESTION:  In the course of these dealings, in about a week, have you been treated fairly?"

Do you see your answer?

A.  Where is that?

Q.  That's on line 12, 13, and then 14.

A.  Yes, I see my answer.

Q.  Okay.  You were asked a number of questions about your marriage.

THE COURT:  What is the answer?

MS. McKEEL:  I'm sorry?

THE COURT:  She said she saw her answer.  What is the answer?

BY MS. McKEEL:

Q.  Would you tell us your answer, please.

A.  "Yes, I have."

Q.  You said you understood, once you were advised, that you could be charged with perjury or obstruction of justice, and if you told any lie to the Grand Jury, correct?  You understood that?

A.  I'm sorry.  Could you repeat that.

Q.  You were advised that if you gave any false testimony, that you could be charged with perjury or obstruction of justice.  Did you answer that question?

A.  I believe that's in here, yes.

Runyon, M. - Cross                                                  490

Q.  Go to line 4, and please read your answer.

A.  Yes.  It says, "Yes, I do."

Q.  So with regard to Grand Jury, do you remember that day?

A.  Somewhat.  I've actually tried to forget that day.

        MS. CHAVIS:  Is that being offered as an exhibit?

        MS. McKEEL:  Not at this time.

BY MS. McKEEL:

Q.  I'm going to take you to Page 13 of that Grand Jury transcript.  Go to line 14.

A.  13, line 14?

Q.  Line 14, yes, ma'am, 14 and 15.

        The question was:  "What were the circumstances of his leaving the military?"

A.  Yes, I see that.

Q.  Would you read your answer, just to yourself.  Would you read your answer.

A.  I see that.

Q.  That's different from what you've testified today; is that correct?

A.  I don't actually remember what I testified to today.

Q.  Would you read your answer, please, to the Court.

A.  Line 16?

Q.  Yes, ma'am.

A.  "He just didn't want to reenlist.  He didn't feel like they were giving him a good enough reenlistment bonus.  He

                    JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                        491

had only been able to move up one rank, from an E-3 to an E-4.  He didn't feel like he was getting promoted fast enough, so he just wanted out and decided he wanted to go through the police academy and become a law enforcement officer, so he was discharged."

Q.   Judge Smith asked you about him working with employment as a police officer.

A.   Yes.

Q.   Do you remember that?

A.   Yes.

Q.   Go to the next page, Page 14.

A.   Okay.

Q.   Do you remember why he didn't last long as a police officer?

A.   You directed me to this page, so --

Q.   I'm just asking you a question now.  Do you remember, on your own, why he didn't stay long as a police officer?

A.   Yes.

Q.   And what was that?

A.   He didn't stay long as a police officer because he got in trouble for using his badge for -- in a different jurisdiction.

Q.   After he became a police officer -- after he failed at being a police officer, do you know what job he had?  Were you still with him?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                      492

A.  I don't recall.  I know I was still with him, but I don't recall.

Q.  If you'd go to Page 20 of your Grand Jury transcript, I'm going to take you to line 7.

A.  Okay.

Q.  Line 7, you were asked:

               "QUESTION:  What's been your type of contact with him since you all split in 2002?"

          Can you tell us what your answer is.

A.  "Well, we tried to reconcile in February of '03.  I went to St. Robert, Missouri, where he was living close to his parents and spent about a week with him, and we had pretty much decided at that point that we were going to reconcile.  And I went back to Wichita, and within two weeks, he had called me to tell me that he had met a dancer at a strip club and that he decided that he was going to move her in with him and that we were through."

Q.  Ma'am, if you would, please go to Page 23.

A.  Okay.  All right.

Q.  At the bottom of the page, line 25 -- excuse me, line 23:

               "QUESTION:  When was that car accident, do you remember, ma'am?"

          What's your answer?

A.  "It would have been -- I don't remember the year.  It was -- I'm thinking it was like the year before he got out of

                    JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                       493

the military, which probably would have been '96 or '97."

Q.  You were then asked the question, "Did he suffer any serious head trauma from that, have any lingering effects other than his vertigo?"

What's your answer?

A.  "Not that I'm aware of, other than the vertigo.  That was a really bad deal."

Q.  The next question you were asked, "Has he had any mental health problems that you're aware of?"

What is your answer?

A.  "Not that I'm aware of, no."

Q.  If you go down to line 18, the question, ma'am, "After that car accident we talked about a little before, was there any personal change that you observed in David?"

What was your answer?

A.  "It was like he was bitter because the guy that hit him, you know, it was a drunk driver.  He was over the legal -- he was over the legal -- well, there was an issue about whether he was over the legal limit."

Shall I continue?

Q.  Yes, ma'am.

A.  "There was a .8 and a .10 deal.  He was never really reprimanded for that, and David was very upset over that."

Q.  The next question you were asked, "But you attribute that more to the individual not being prosecuted or suffering any

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                                494

consequence as a result of the accident, rather than any physical effect that the accident caused; is that correct?"

What is your answer?

A.   "Yes.  Yes."

Q.   Go down to Page 25, line 14.  Are you there?

A.   I am.

Q.   The question was, "Is he a loner," talking about David, "or more of a social person?"

Your answer was?

A.   "He's a social person."

Q.   Question:  "Is he intelligent?"

What is your answer?

A.   "He is very intelligent."

Q.   Ma'am, would you agree with me that what you've told Judge Smith today is different from what you said when you testified under oath in a federal Grand Jury on January 25th, 2008?

A.   Probably.

MS. McKEEL:  If I may have a moment, Judge.

That's all the questions I have, Judge.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.   Are there reasons why that testimony might be a little bit different?

Runyon, M. - Redirect                                                495

A.   Sure.

Q.   With respect to your reasons -- or your answers regarding why David did not reenlist in the military, we heard you take full responsibility for that; is that correct?

A.   Yes.

Q.   Which is different from the answers that you gave to the Grand Jury, correct?

A.   Yes.

Q.   Do you attribute that to the change in your personal circumstances today?

        MS. McKEEL:  Objection, leading.

        THE COURT:  Ask her what does she attribute that to.

BY MS. CHAVIS:

Q.   What do you attribute that to?

A.   To what, ma'am?  I'm sorry.  Could you repeat that, please?

Q.   Yes.  Yes.  The differing answers that you gave to the reason why David was barred from reenlistment in the military, what do you attribute that to?

A.   My spending money and stuff and him getting in trouble for it.

Q.   You're taking responsibility for that today, but you didn't take responsibility for that when you testified in front of the Grand Jury.  Why would that be?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                        496

A.   I don't even -- I don't even remember anything that I said to the Grand Jury.  I mean, I don't remember any of this.

Q.   And why is that?

A.   It's been so long ago.  This whole thing has been really tragic, trying to explain to your son about his dad.  I was also actually sexually assaulted.  As a result of that, I ended up with PTSD.  I lost my mother a year and a half ago.  You know, it's just a lot.  I almost lost my dad in 2009 when all this was going on, too.  I almost lost him when I was testifying during the penalty phase.

Q.   What else was happening at the time of your Grand Jury testimony?

A.   We had moved to a new city, and I just was -- I was drunk all the time.  All I wanted to do was drink.  It was an escape for me.

Q.   I understand this is difficult.  Would you like to take a minute?

THE COURT:  So when you talked to Mr. Runyon's attorneys, it was in this same time period that you say you were having these problems, so you would have said the same things to them that you would say to the Grand Jury?  The Grand Jury testimony was simultaneous with all of this happening and then your penalty phase testimony?

THE WITNESS:  Your Honor, I don't know.  Okay?  I'm

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                              497

so confused right now about all of this.  I don't know.  I mean, all I can do is just tell you what I remember and what I know, okay, and all I did was drink.  That's all I did. So, you know, all the stuff that goes with that; you black out, you pass out.  I mean, you know, I really don't want to sit here and say everything that happened because it's not real attractive but -- I don't know, Your Honor.

THE COURT:  But that was the time when you were talking to Mr. Runyon's attorneys that were representing him in this trial?

THE WITNESS:  The first ones.

THE COURT:  Yes.

BY MS. CHAVIS:

Q.  Mrs. Runyon, were you talking to Mr. Runyon's attorneys at this time?

A.  I was talking to them but not on a regular basis.  I mean, I would talk to them if they flew in to see me or anything.

Q.  How many times did they fly in to see you?

MS. McKEEL:  Your Honor, this is irrelevant.

THE COURT:  Well, she can ask it.  She's already said she talked to them the night before her Grand Jury testimony, and she said that they interviewed her.

You can ask that question --

THE WITNESS:  No.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                         498

THE COURT:  -- Ms. Chavis, if she knows.

THE WITNESS:  I didn't talk to them the night before my Grand Jury testimony.  I talked to them the night before I testified in the penalty phase.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  And how many times did they come out to see you?

A.  They came out -- if my memory serves me, they came out once together, and then Mr. Ford came out a couple of times. They all took me out to restaurants.  We had discussions, and while we were eating, I was drinking.

THE COURT:  I obviously misspoke on the Grand Jury testimony.  It was the night before she testified in court.

BY MS. CHAVIS:

Q.  Ms. McKeel brought out the fact that your husband left you for a stripper and that that was the reason why you didn't reconcile.  Is that part of the crazy behavior that you had referred to on your direct testimony?

A.  Well, he didn't leave me for a stripper, but when I found out that he was with one, yeah, that's crazy behavior.  Those are people that he would not associate with, ever.

Q.  There was also discussion about your husband, David Runyon, getting in trouble for using his police badge when you were in Fayetteville, Georgia.

A.  Yes, ma'am.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                                    499

Q.  Can you tell us about that, please.

A.  We had lived in some new apartments.  They were brand new.  I'm trying to remember.  I'm sorry.  Can I have a moment, please?

Q.  Yes.

A.  We had moved into some new apartments, they had just built them, and he was trying to get a deal with the office to where he could become a courtesy officer there, and in so doing, our rent would be comp'd, or we wouldn't have to pay hardly anything.  They hadn't quite gotten to that point yet, where they had decided whether they were going to do that with him or not because there was also another officer that was competing for the position, if you will.

But they called him one day and said that they had a problem tenant, the guy was destroying the apartment, and he was very behind on rent, and they wanted him out.  They had -- I don't know if they had tried to serve him previous or -- I don't think so, because they wanted to go in and serve him with paperwork, and he had basically barricaded himself in the apartment, if memory serves me.

So they called David, and, oh, nice David, you know, oh, yeah, I'll come help you.  And I told him then, don't do it, it's not a good idea.  I said, it's in the wrong jurisdiction, you know, you're going to lose your job.

He took his badge and his gun and helped them get

Runyon, M. - Redirect                                                    500

in, and the guy was upset.  He called the police department that he was employed at, and he ended up losing his job.  He wouldn't have done that, never would have dreamed of doing that.

Q.  He never would have dreamed of doing that before the accident?

A.  Correct.

Q.  Is that an example of his change in judgment after the accident?

            MS. McKEEL:  Objection, leading.

            THE COURT:  Sustained.  Rephrase your question.

BY MS. CHAVIS:

Q.  How would you characterize his change in judgment after the accident?

A.  He never would have done something like that before the accident.  He loved being in the military.  He loved being in law enforcement, you know.  Never would have done it.  And he tried to assure me that it was going to be okay, and it wasn't.

Q.  You mentioned that there were memory issues associated with PTSD.

A.  With myself or with him?

Q.  With you.

A.  Okay.

Q.  Is that correct?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                            501

A.  Yes.

Q.  How sure are you of the things that you've testified to today?

A.  I wish I could give you a hundred percent, but I can't.

THE COURT:  You said what?  I'm sorry.  I just couldn't understand you.

THE WITNESS:  I'm so sorry, ma'am.  I wish I could give you a hundred percent, but I just can't.

BY MS. CHAVIS:

Q.  Well, nothing is 100 percent in life, correct?

A.  Correct.

THE COURT:  Would you describe your memory better in 2023 or back when you were hearing from Mr. Samuels and meeting with the Grand Jury and then talking with the attorneys and testifying at the penalty phase?  Is your memory better now, or was it better then?

THE WITNESS:  I think it's better now.

THE COURT:  Why do you say that?

THE WITNESS:  I don't know.  My whole mindset has changed.  I don't drink anymore.

MS. CHAVIS:  I don't have any further questions. Thank you, Ms. Runyon.

MS. McKEEL:  Nothing further, Judge.

THE COURT:  Ms. Runyon, thank you for coming to testify.

JODY A. STEWART, Official Court Reporter

MS. CHAVIS:  I'm sorry, Your Honor.  I'd ask that the witness be excused.

THE COURT:  All right.

MS. CHAVIS:  Thank you.

THE COURT:  Thank you for coming to testify.  You have testified.  You may not discuss your testimony with anyone.  You are excused.  The attorney has indicated that you can be excused and not be recalled.

THE WITNESS:  Thank you, ma'am.  And you have a good day.  Can I please sit out there in the court?

THE COURT:  Yes.  You have been excused, so you can sit out there, yes.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Counsel, it's time.  We have been here for a couple of hours, so we will take a 20-minute recess.

(Recess from 2:18 p.m. to 2:41 p.m.)

THE COURT:  Your next witness?

MS. PEIFFER:  Good afternoon.

THE COURT:  Good afternoon.

MS. PEIFFER:  Our next witness is Wren Fleming.

THE COURT:  All right.  Mr. Fleming, if you will just come forward and be sworn.

(Witness was sworn.)

WREN FLEMING, called by the Defendant, having been

JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                                    503

first duly sworn, was examined and testified as follows:

                        DIRECT EXAMINATION

BY MS. PEIFFER:

Q.  Good afternoon, Mr. Fleming.  Would you please state your name and spell your last name for the court reporter.

A.  Yes.  Wren Fleming, W-r-e-n, last name F-l-e-m-i-n-g.

Q.  Can you tell us how you're employed, please?

A.  I work for the U.S. Department of Labor, Occupational Safety and Health Administration.  I'm a safety technician, and I'm also a Marine Corps veteran.

        THE COURT:  Also a Marine Corps what?

        THE WITNESS:  A Marine Corps veteran.

BY MS. PEIFFER:

Q.  What is your relationship with David Runyon?

A.  He is my stepfather.

Q.  Who is he married to?

A.  Maria Runyon, who is my mother.

Q.  What do you call Mr. Runyon?

A.  Dad, Father, and Pop.

Q.  What was it like having Mr. Runyon, your dad, come into your life as your mother's boyfriend?

A.  It was absolutely extraordinary.  We built a connection right off the bat.  It was electric.  Because I didn't have a father figure in my life at the time.  So when I met him, it just seemed like we meshed extremely well.

                JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                              504

THE COURT:  Can you ask what is his age and when he came in?  Establish so that we have, for the record, the time frame of this.

MS. PEIFFER:  I'm sorry.  His age now or his age when he met Mr. Runyon?

THE COURT:  His age now.  She testified before about three children.

Can you just tell us your age and when Mr. Runyon came into your life.

THE WITNESS:  I'm 33.  And I was young.  I can't tell you exactly the date or the age of when he entered my life.

THE COURT:  So you're not Randall?

THE WITNESS:  I don't know who that person is, Your Honor.

MS. PEIFFER:  His name is Wren.

THE COURT:  Is that what he said before?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  I thought she said Randall because she was speaking so low.

So you are Wren.  So I understand now.  I was looking back at my notes.

So this is Wren, who was approximately five years old, or early, four, five, three, something like that.

MS. PEIFFER:  That's correct, Your Honor.

JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                                    505

Mr. Runyon, I believe, was born in 1990.

BY MS. PEIFFER:

Q.  Is that correct?

A.  That's correct; I was born in 1990.

Q.  And the record reflects, I believe, the marriage was in 1995?

THE COURT:  So you're Wren Fleming, and you call him Dad, Father, Pop.  You were born in 1990, and you're 33?

THE WITNESS:  That's correct, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  No worries.  I'll slow it down a little bit.  Usually when everybody gives their job title, I just kind of say it so fast, so I apologize about that.  All right.

BY MS. PEIFFER:

Q.  And do you have any siblings, Mr. Fleming?

A.  I do.  I have a half-brother, David Anthony Runyon, Jr.; and I have one sister, her name is Kendi Fleming.

Q.  And who is David Anthony Runyon's biological father?

A.  David Runyon, or David Anthony Runyon.

Q.  What was your early childhood like when you were growing up with Mr. Runyon as your dad?

A.  Absolutely.  I would say that it was just a traditional American family or household, with structure, with value, with morals and ethics.  We were very happy and financially

JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                                506

stable.

Q.   And what, in particular, was Mr. Runyon like when he first came into your life, your dad?

A.   He had a lot of energy and a lot of, seemed like, electricity, I guess is the word to use.  He was very open to knowing who I was, and my sister, and stepping into a father-figure type of role right away.

Q.   What kind of things did you and your dad do together?

A.   We went fishing.  We played sports.  We went out to eat. We went to Go-Karts, and just did a lot of things in the town that you would do as a father and a son -- a dad would do.

Q.   Were there any things in particular that he helped you out with when you were a child?

A.   Yes.  One thing that stands out the most is my grammar, when I was younger, wasn't the greatest.  I had a speech impediment, so it was hard for me to pronunciate (sic) words or spell words correctly.

         And to this day, one thing that he helped me, late at night with my homework, is C-H.  Any words that start with that, he used a hand and arm signal to help me learn that C-H was a hard sound.  So he would say it's hard, "CH."  So, like, Chad or Chaz, those are hard sounds, make sure I pronunciate that very correctly.  And then S-H was soft-spoken, "SH," you know, like you're soothing.  So those were a way for me to help remember how to pronunciate or

Fleming, W. - Direct                                                      507

spell those type of words, so...

Q.   Just to clarify for the Court, that's something that your dad taught you and helped you with; is that correct?

A.   That is correct, yes.

Q.   Do you have any knowledge of a time that your dad was in a car accident?

A.   I do, yes.

Q.   And did you see photographs of the car accident?

A.   I do.  It was somewhat vague, but I do remember seeing something to another of a vehicle aftermath.

Q.   What was your dad like personality-wise before the accident?

A.   Again, very energetic, a lot of -- he would put in a lot of effort.  He had high confidence about himself.  He stood tall.  The way he -- his character was extremely proud of his service to others, his military service, and then being a stepfather figure and a role model.

Q.   And what was he like after the accident?

A.   It seemed like he was kind of shifty.  It seemed like he was unbalanced, hard edges, rough around the edges.  It seemed like whenever we had open dialogue, it would be very difficult for him to remember certain events or times or things; very weary about himself, in a sense.  It seemed like that there was a piece that was -- a small piece that was torn from him or tooken apart from him at some point.  He

JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                              508

wasn't whole, I guess is what I'm saying.

Q.   Were there any symptoms involving his head or his ears that you recall?

A.   Repeat the question one more time.

Q.   Of course.  Were there any symptoms regarding his ears and hearing or his head, that you recall?

A.   Right.  So initially when I first realized after the situation, the injury incident occurred, it appeared that he had some type of head injury, or it appeared that he might have had a bruise somewhere in that area to -- part of his -- the back of his head or whatnot.

Hearing, it seemed like he possibly had -- maybe had tinnitus.  It was hard for him to hear things.  And any bright lights definitely impacted or affected his usual day-to-day life.

Q.   How was his memory after the car accident?

A.   Right, it wasn't the greatest.  Again, it seemed like he was a little broken.  You ask him a question, like, for example, what did you have for lunch the day prior, he wouldn't be able to remember, or if he did, it would take some time.  Or a certain date or a time or a meeting, let's say, he had to take place or do, and he wouldn't remember that date and time of that date or meeting.

Q.   Are there any other changes that you recall seeing in your dad after the car accident?

Fleming, W. - Direct                                                     509

A.  He seemed like he wasn't fully himself.  Again, he was whole, it seemed, before.  After the event, he just seemed like he was kind of torn a little bit, like there was something off.  And it seemed like there was something going on.  I couldn't really wrap my head around it during that time, or what have you.

THE COURT:  Try not to trail your voice.  Slow down and try not to trail your voice off at the end of sentences.

THE WITNESS:  Yes, Your Honor.  Sorry about that.

BY MS. PEIFFER:

Q.  And what about at nighttime, did you notice anything about his sleep habits that changed?

A.  Yes.  I would wake up in the middle of the night, and I would hear him walk around.  It seemed like he had some type of sleep disturbances that impacted him.  He was -- it just felt like unnatural, and it wasn't the same.

Q.  I'm going to change topics a little, Mr. Fleming.

A.  Okay.

Q.  After your dad left the military, do you recall where you lived?

A.  Say the question one more time.  I'm so sorry.

Q.  After your dad left the military -- do you recall that he left the military at some point?

A.  Yes, I do recall that, uh-huh.

Q.  And where did you live after that?

JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                              510

A.   Fayetteville, Georgia.

Q.   Do you recall what he was doing for employment at that time?

A.   He was in law enforcement for the Fayetteville County or Fayetteville Police Department.

Q.   Did you eventually move from Fayetteville and leave?

A.   That is correct.  We did relocate.

Q.   Do you recall why you were relocated or needed to relocate?

A.   Financial reasons.  We thought maybe a place or location that would have been more suitable for our financial needs at the time would have been more beneficial for us.

        MS. WARD:  I object.  Lack of foundation, personal knowledge.

        MS. PEIFFER:  Your Honor, he testified --

        THE COURT:  I overrule.

BY MS. PEIFFER:

Q.   And after you left Fayetteville, Georgia, where did you move to?

A.   After Fayetteville, we moved to a trailer park near -- located near a prison, to my recollection.

        THE COURT:  Near a what?

        THE WITNESS:  My memory.

        THE COURT:  Montgomery?

        THE WITNESS:  No.  Forgive me, Your Honor.

                    JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                                      511

          THE COURT:  You are talking so fast and trailing your voice so much.  I don't know if the court reporter can get this, but I'm having a hard time.

          (Clarification by the court reporter.)

          THE WITNESS:  It was a trailer park near a prison.

          THE COURT:  A trailer park near a prison?

          THE WITNESS:  That's correct, Your Honor.

BY MS. PEIFFER:

Q.  Mr. Fleming, it might be helpful to adjust your microphone a little bit.

A.  I'm sorry.  I'm tall.  Can you hear me a little bit better?

Q.  Thank you.

     So you moved from Fayetteville and lived in a trailer park.  Was there a time after that you left Georgia and moved somewhere else?

A.  Yes.

Q.  Where did you move?

A.  Wichita, Kansas.

Q.  And what do you recall your dad was like during this time?

A.  He seemed depressed, hard to sleep.  When he did sleep, he would sleep in in the mornings.  He felt like -- again, it just seemed he wasn't fully the same.

Q.  Was he working during this time?

                    JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                        512

A.  Yes.

Q.  And do you recall there was a time when your dad left the family?

A.  Yes, that is correct.

Q.  Can you give an approximation of when that was for the Court?

A.  It was the summer before my eighth grade year.

THE COURT:  What year was that?

THE WITNESS:  I can't recall.

THE COURT:  The summer before your eighth grade year?  What summer was it?  When were you in the eighth grade?

THE WITNESS:  2003, Your Honor.

BY MS. PEIFFER:

Q.  Just to clarify, Mr. Fleming, you were in eighth grade in 2003; is that correct?

A.  I believe so.  If I can do the numbers off the top of my head right now, if I can do the math.  I'm not the greatest at math, but I believe so, yes.

Q.  After your dad left, did you have any contact with him?

A.  Yes, I did.

Q.  And when was that?

A.  It was brief, shortly after, via mail and by telephone.

Q.  And did there come a point --

THE COURT:  Via mail and what?

Fleming, W. - Direct                                              513

THE WITNESS: Via mail and by telephone, Your Honor.

BY MS. PEIFFER:

Q.   Did there come a point when you saw him again?

A.   Yes.  That is correct.

Q.   When was that, approximately, if you don't remember the exact?

A.   Approximately maybe less than two years later.

Q.   Okay.  And after that, did you have a -- continue your relationship?

A.   Yes, I did.

Q.   And what was the nature of that relationship at that point?

A.   At first it was kind of standoffish, because it had been some time since the last time I seen or spoken to him in person, but once we had a brief period of time of seeing one another, we were able to build that connection right away.

Q.   And where were you in the year 2008 and 2009?

A.   I was in Wichita, Kansas, just recently graduated from high school.

Q.   How old were you about that time?

A.   19 years old.

Q.   And were you in touch with your family members?

A.   Yes.

Q.   And they knew where you were located?

JODY A. STEWART, Official Court Reporter

Fleming, W. - Direct                                             514

A.  That is correct.

Q.  Did you have an opportunity to meet with anyone working on your dad's case prior to his trial?

A.  No, I did not.  No one ever approached me or communicated with me whatsoever.

Q.  Did anyone try to?

A.  No, negative.

Q.  If someone had communicated with you and asked you the type of questions that you were asked today, would you have given the same answers?

A.  Yes, I would.  That is correct.

            THE COURT:  Go ahead.

BY MS. PEIFFER:

Q.  I'm just going to go back.  I don't recall if Mr. Fleming answered this question.

            If you had been asked the questions that you were asked today, prior to the trial that your dad had in 2009, would you have given the same answers?

A.  Yes, I would have.

Q.  If you had been asked, would you have been willing to testify at the trial?

A.  Yes, I would have.

            MS. PEIFFER:  One moment, Your Honor.

            No further questions for Mr. Fleming at this time.

            THE COURT:  Cross-examination.

JODY A. STEWART, Official Court Reporter

MS. WARD:  Thank you, Your Honor.

Thank you, Mr. Fleming.

CROSS-EXAMINATION

BY MS. WARD:

Q.  You testified that you were quite young when you first met David Runyon, right?

A.  That is correct.

Q.  Approximately 1994, and he married your mother in 1995?

A.  I was quite young.  I don't know the actual dates or the years.

Q.  And he left your mother, he left home in approximately 2002?

A.  I would say so, that is correct.  Again, I don't know the dates or the years.

Q.  Do you recall meeting with any investigators in this case either before or after the trial?

A.  No, I do not.

Q.  You don't recall giving an interview with the defense investigator at some point?

A.  No, I do not.

Q.  If I have notes from that interview, do you think you could take a look at that and help refresh your recollection?

A.  I can take a look at it, but I'm not going to remember.

MS. WARD:  If I could finish at the Elmo, Your Honor.

Fleming, W. - Cross                                        516

THE COURT:  All right.

It's time to move forward.

MS. PEIFFER:  Can I have a copy of this, Your Honor?  I believe that's required to refresh the witness's recollection, and we haven't completed reading this.

THE COURT:  She asked him if he had been interviewed, and he said no.  She is using the document to refresh his recollection.  It's permitted under the rules.  You show an individual a document, they look at it.  If it refreshes their recollection, it does.  If it doesn't, it doesn't.

MS. PEIFFER:  I'm aware of that, Your Honor, but the rule also requires that opposing counsel have a chance to look at it, and we haven't finished reviewing it, so I was asking if there is another copy so we could do that as she continues on.

THE COURT:  Do you have another copy?  You want to give them that?  How long is it going to take them to read it?

MS. WARD:  I don't, Your Honor.  I got it from their discovery, but it's three and a half pages.

THE COURT:  You got it from their discovery?

MS. WARD:  Yes, Your Honor.

THE COURT:  You should have a copy if it's part of your discovery.

JODY A. STEWART, Official Court Reporter

Fleming, W. - Cross                                        517

You got it from petitioner's discovery?

MS. WARD:  Yes, Your Honor.

THE COURT:  Go ahead.

MS. WARD:  Thank you.

THE COURT:  Can we see the top?  Read what the top of the document says, Ms. Ward, so we have it for the record.

MS. WARD:  Yes, Your Honor.  Top of it is just labeled with the witness's name, Wren Fleming, a phone number --

THE COURT:  Slow down.

MS. WARD:  I'm sorry, Your Honor.  The top of it is a header with the witness's name, Wren Fleming, a phone number in Wichita, and an address in Wichita, Kansas, and his date of birth.

THE COURT:  Go forward with your questions, and you're not being paid by the word.

MS. WARD:  Yes, Your Honor.

BY MS. WARD:

Q.  Mr. Fleming, if you can take a quick glance at this and tell me if you recall.

A.  I don't recall this, and I don't know what this is.  I don't know if it is -- someone looked like they might have. I don't know what this is.  I don't remember or recall.

Q.  Does it purport to summarize an interview that you gave

JODY A. STEWART, Official Court Reporter

Fleming, W. - Cross                                          518

to an investigator for Mr. Runyon?  I can show you the additional pages if that would help.

A.  If you'd like.  Again, I don't recall.

THE COURT:  You need to look at the whole document, then.  Glance for a minute on the screen and say you don't recall.  Look at the document.

THE WITNESS:  Yes, again, I don't recall.

BY MS. WARD:

Q.  Take a look at Page 2.

A.  Maybe there is another page, but, again, I don't recall.

Again, I don't recall.

Q.  Just a little bit more.

A.  Okay.  I don't recall.

Q.  Okay.  You don't recall the interview.  You don't recall being interviewed?

A.  I don't recall the interview, and I don't recall this document.

Q.  I understand.  So have you ever been interviewed?

A.  I don't recall.  I believe, no, I have not.

MS. PEIFFER:  Objection, Your Honor.  Could counsel clarify the question for a timeframe?  Has he ever been interviewed?  The question is very unclear.

THE COURT:  About this case?

MS. PEIFFER:  Until current, present time?  Or is this about prior to trial?

JODY A. STEWART, Official Court Reporter

Fleming, W. - Cross                                           519

MS. WARD:  Let me ask it a different way.

BY MS. WARD:

Q.  Mr. Fleming, when was the first time you were approached in relation to this case?

A.  Regarding this moment right here, like right now?

Q.  When was the first time you were approached by any defense attorney, any defense investigator who was working on behalf of Mr. Runyon?

A.  Again, I don't recall.

Q.  It's fair to say that while your mother and David Runyon were married and living together that you had a very volatile home life?

A.  Not necessarily, no.

Q.  Your mother had a drinking problem?

A.  She did have an issue or a problem, but it wasn't -- I can't remember the word you just used.  Volatile, it wasn't like that at all, no.

Q.  You would hear the fighting, verbally fighting?

A.  No, not at all.

Q.  They didn't have issues about money?

A.  I think every marriage or relationship has issues about financial stress.

Q.  At the age of six, you probably would not be aware of that, right?

A.  Again, I don't know the age or the timeline that you're

JODY A. STEWART, Official Court Reporter

Fleming, W. - Cross                                                    520

asking, but I was young.

Q.   Okay.  You have a rough relationship with your mother, Maria Runyon?

A.   I do not.

Q.   You left home when you were 15?

A.   I did.

Q.   And you blamed your mother for Mr. Runyon leaving?

        MS. PEIFFER:  Objection, Your Honor.  This is outside the scope of the direct.

        THE COURT:  It's proper impeachment; motive, bias. It goes to the credibility of the witness and the witness's testimony, and it is proper impeachment.

        THE WITNESS:  I don't blame anyone for the reason why I left.  I took the initiative to leave on my own accord.

BY MS. WARD:

Q.   When David sat you down, when Mr. Runyon sat you down and told you he was leaving your mother, at that time you blamed your mother for him leaving?

A.   I don't recall having blamed anyone for why I left or took the initiative to leave.

Q.   At that time you thought that it was safest for your father, David Runyon, to be away from your mother?

A.   Can you repeat the question one more time?  I'm sorry.

Q.   At the time, when he told you that he was leaving because

JODY A. STEWART, Official Court Reporter

Fleming, W. - Cross                                              521

that was in his best interest, you thought it was safest for Mr. Runyon to leave your mother?

A.   That's up to Mr. David Runyon and his thoughts if he thought it would be better for him to leave to better his life.

Q.   But you believed that?  You understood that that was the reason he needed to leave?

A.   I would say yes, I understood what was going on or the reason behind him possibly leaving and why he did.

Q.   And then you said that you left your mother at about age 15; is that accurate?

A.   That's correct.

Q.   So that would be approximately 2005 if you were born in 1990?

A.   That is correct.  That would be roughly, approximately.

Q.   Okay.  And you love David Runyon?  He's your father?

A.   He is my father.  With all my heart, I do love him.

Q.   And he was always kind to you?

A.   Yes.

Q.   He treated you like a son?

A.   Absolutely.

Q.   He treated you the exact same way he treated his own biological son?

A.   That's correct, yes.

Q.   That was always your feeling for him?

Fleming, W. - Cross                                                              522

A.   Yes.

Q.   And you said that you continued a relationship with him?

A.   Yes, that is correct.

Q.   Has that ever changed?

A.   No, nothing has ever changed.

Q.   He was never abusive to you?

A.   Not at all.

Q.   He was never abusive to your mother?

A.   No, he was never abusive to myself or my mother.

Q.   In fact, you've never seen him lash out at anybody?

A.   No, not at all.

Q.   All you ever saw from him was kindness?

A.   Loving, kindness, and caring individual.

Q.   That's never changed?

A.   Never changed.

Q.   You mentioned earlier that you were a Marine Corps veteran?

A.   I am, yes, ma'am.

Q.   And you've gone through the process of military transitioning?

A.   I have, yes.  That is correct.

Q.   And you struggled with that a little bit?

A.   I would say every veteran that gets out of the military, no matter what they do or what branch they're in, they have to face some type of adversity and go through a transitioning

Fleming, W. - Cross                                                    523

process.

Q.   Absolutely.  That would include Mr. Runyon?

A.   That would include everyone, yes.  That is correct.

Q.   And that would be for many reasons.  It would be because the military is a very controlled environment, your day is planned?

        MS. PEIFFER:  Objection, Your Honor.  This is outside the scope of the direct, and it calls for speculation about -- he hasn't testified to know specifically what was happening with Mr. Runyon and his military transition.

        THE COURT:  Overruled.  Go ahead.

BY MS. WARD:

Q.   So part of the challenges with the military transition is that you leave that very stable, very controlled environment; would that be fair to say?

A.   I would say it's fair to say that transition is difficult, depending on the situation with the individual, their character, where they were stationed, deployments, what they did in the military, what branch, combat-related, X, Y, and Z.

Q.   Sure.  As you experienced that military transition, you felt a certain sympathy for Mr. Runyon, understanding that that was difficult for him in 1997 as well?

A.   I would say it was more difficult in 1997 than it is now

JODY A. STEWART, Official Court Reporter

Fleming, W. - Redirect                                    524

because veterans back then had no resources to reach out to have any type of assistance, and with technology and social media being a backbone of American politics and the way we communicate and do things, it is easier to transition now than it was in 1997.

MS. WARD:  I appreciate that.

Can I have just one moment, Your Honor?  Thank you.

Thank you, Mr. Fleming.

No further questions, Your Honor.

THE COURT:  Redirect.

MS. PEIFFER:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. PEIFFER:

Q.  I'm just going to put the document that was used in cross-examination back on the screen.  I have a couple of questions.

MS. WARD:  Your Honor, I object to this.  He said he didn't recognize the document or the contents.

THE COURT:  He said the document did not refresh his recollection, so it was never offered into evidence, and I'll have to listen to the kind of questions.  I don't know what you're going to ask.

MS. PEIFFER:  Of course, Your Honor.  It's just several questions.  I was going to ask if Mr. Fleming had signed this document.

JODY A. STEWART, Official Court Reporter

Fleming, W. - Redirect                                            525

THE COURT:  Go ahead.

MS. PEIFFER:  I'm trying to get this on the screen.

THE COURT:  I didn't see a signature on it.  Maybe there is, but I didn't see one when you were flipping the pages on the screen.

BY MS. PEIFFER:

Q.  This is the first page.  I'm going to go through fairly quickly because you don't need to read it to look to see if you have any kind of signature.

Am I giving you enough time?

A.  No, you're giving me good time.  You're fine.

Q.  That was the entire document.  Did you see any kind of signature or indication that you had adopted or seen this document before?

A.  No signature is seen, no signature was present, no date and time stamp.  It appeared to be just a printed paper.  It wasn't like a PDF format or any of those things, so, again, I never seen or recall this document, and no signature is present.

Q.  And if the document describes something that you were doing in 2015, could it have been created before 2009?

A.  Possibly so.

Q.  If it describes that you were released from the military in 2015, would it have had to be created after that date?

A.  I would say so, yes.

JODY A. STEWART, Official Court Reporter

Fleming, W. - Redirect                                                    526

Q.  And you don't recall who might have interviewed you and created this document or when it was created; is that correct?

A.  That is correct; I don't recall any interview.

Q.  You were asked a little bit about the feelings that you had when your dad left.  Do you think it's possible that you might have different feelings about the situation now than you did when you were going into eighth grade?

A.  My feelings have not changed, how I feel about Mr. Runyon.  He is my father, and I love him dearly.  And everything he taught me when I was younger I use in today's life to help me to be successful.

Q.  And you would -- you were asked some questions about the relationship between your mother and your father and things in the home.  Could it have been possible that their relationship, when you were not observing, was different than when you were observing?

MS. WARD:  Objection, speculation.

THE COURT:  You can argue that to the Court.

MS. PEIFFER:  Okay.  No further questions.  I'd ask that Mr. Fleming be released, Your Honor.

THE COURT:  Thank you for coming to testify, Mr. Fleming.  You may not discuss your testimony with anyone, but you are released from any further testimony in this case.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                        527

THE WITNESS:  Thank you, Your Honor.  Apologies for the microphone issues.

(Witness excused.)

THE COURT:  Your next witness.

MS. PEIFFER:  Yes, Your Honor.  We could call Scott Linker.

THE COURT:  All right.  Mr. Linker, if you would please come forward and be sworn.

(Witness was sworn.)

WARREN SCOTT LINKER, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. PEIFFER:

Q.  Good afternoon, Mr. Linker.  You might want to adjust the microphone so that you're speaking into it directly.

Could you please state your name for the Court.

A.  Sure.  It's Warren Linker.

Q.  And your middle name?

A.  Scott.

Q.  Thank you.

And where did you come from today to be here?

A.  I came from Wichita, Kansas.

Q.  How did you come to know David Runyon?

A.  He was married to my oldest sister.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                      528

Q.  And did you know him before she married him?

A.  Yes.  He -- when I first met him, he was dating my youngest sister.

Q.  And what is your oldest sister's name?

A.  Maria Linker.  Actually, Runyon now.

Q.  If you could maybe adjust the microphone slightly so we can hear you a little better, that would be helpful.

A.  Is that better?

Q.  Much.  Thank you.

Did you come to develop your own relationship with David Runyon?

A.  Yes, ma'am.

Q.  How would you describe that relationship?

A.  Um, we got to be pretty good friends, spent quite a bit of time together.

Q.  And what kind of things would you and David do together as friends?

A.  We would hunt, fish, watch football games, just generally hang out.

Q.  And how would you describe David?

A.  He's a pretty easygoing, likable, well-rounded person.

Q.  And how would you have described your sister Maria at the time that she and David were married and in a relationship?

A.  She was a pretty dysfunctional person, an alcoholic, not a real great character, not real good sister, not a real good

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                              529

daughter.  I was a little bit taken back that they were like -- they were like -- whatever the attraction was, we'll put it that way.

Q.  And when David and Maria got together, did Maria have children from a prior marriage?

A.  She did.  She had two.

Q.  What were their names?

A.  Wren and Kendi.

Q.  How was David with Wren and Kendi?  What kind of father was he?

A.  He treated those two just like he did Davy, which was his own son.  He was a great dad to them.  He spent a lot of time with them, helped with homework.  Pretty much, you couldn't tell anything different with those two as with Davy.

Q.  And did David and Maria get married?

A.  Yes.

Q.  Do you recall approximately when that was?

A.  I don't remember exactly, but my recollection is mid-1990s.

Q.  And what was David doing for work at the time he and Maria married?

A.  He was in the military.

Q.  Did they move after he finished his training?

A.  Maria and the kids moved to Fort Benning after David got out of basic training.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                            530

Q.   And where did they live in Fort Benning?

A.   They lived on the base, I believe, for the majority of the time they were there.

Q.   During the time they were living at Fort Benning, what was Maria's behavior like on the base?

A.   From what I understand, what I've been told --

MS. WARD:  Objection, hearsay.

THE COURT:  Sustained.

MS. PEIFFER:  May I respond, Your Honor?

This evidence is not being presented for the truth, it's being presented to demonstrate what evidence defense counsel could have discovered and presented at the sentencing phase of Mr. Runyon's trial, which is the issue that this case has been remanded for.  And it's very clearly stated by the Supreme Court and by law that the Federal Rules of Evidence would not apply, and hearsay would not keep out evidence at the sentencing phase of a capital trial.

THE COURT:  Yeah, but there's some caveats to that. The hearsay rule still applies.  It just has to be particularly reliable.  The cases don't just say it automatically comes in.  It comes in with certain caveats.

And the other thing that I'm a little bit confused here on is, are we just retrying the whole penalty phase? The Fourth Circuit's remand was on the issue of mental

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                531

health.  In other words, you're putting forward all of these witnesses that say, you know, he was a good person, a good father, all these things.

The remand was very narrow.  It was on the issue of whether the attorneys were ineffective for not having investigated and pursued a mental health defense.  Am I wrong?

MS. PEIFFER:  Your Honor, that is what the remand was for.

We are making a record, and counsel testified --

THE COURT:  You're making a record, but we make a record based upon why it's before the Court.  We are not, in my opinion, retrying the penalty phase and what could have been presented in the penalty phase and whether hearsay could have been presented in the penalty phase.

What we are here on is a very narrow issue of the mental health, whether there should have been a mental health defense presented.  This has nothing to do with -- except that he had good mental health.  This is just the opposite, as far as I'm concerned.

This witness is saying, you know, he was likeable, he was surprised that his sister was married to him.  This shows good mental health.

I believe you're misreading those cases.  I have only glanced at them, but there are a lot of caveats in it.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                    532

It doesn't just open up the penalty phase to hearsay.  It has to have some indicia of reliability, and it's held to a pretty high standard.  You just don't say in the penalty phase, we are opening it up to hearsay.  In my opinion, you are mis-citing the case.  You are mis-citing it for a general proposition that has caveats put on it.

But, in any event, as far as I'm concerned, this particular witness, and the witness before, goes outside of the mandate, the remand of the Fourth Circuit, not Maria Runyon because she was testifying about his mental state and so forth.  The son, Wren, was, A, very young, and not, from my standpoint, not a particularly strong witness, but that's just an initial garnering of observing and his credibility and so forth.  But this witness has said nothing that applies to the issue before the Court, so why don't you explain that.

MS. PEIFFER:  Of course.  There is several things.  First of all, I was laying the background, and we are going to get into more specifics.  Second of all, the Fourth Circuit's remand specifically mentions the opinions of Dr. Cunningham, who will be presented later, and Dr. Dudley, who considered many of the factors that we are presenting evidence about at this hearing.  They underlie the testimony of Dr. Cunningham and the report of Dr. Dudley.

THE COURT:  Well, offer this witness after you've

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                    533

offered that.

MS. PEIFFER:  I'm sorry?

THE COURT:  Then offer this witness in context after you've offered that.  I'm not saying you can't present Dr. Cunningham or Dr. Dudley.  You are just throwing things out.  If this witness has something to do with Dr. Cunningham's opinion, then put him on at the proper time.

MS. PEIFFER:  Your Honor, you issued an order directing us to present our lay witnesses after trial counsel and before the experts, and we are following the Court's order.

THE COURT:  I know you are, but the Court didn't say you could present any witness you wanted.  The Court said present your lay witnesses.  The lay witnesses have to be relevant to the issue before the Court.  You all keep just broadly interpreting everything, like we are going to re-try this whole penalty phase.  The Court's order just set out an order of witnesses, but that witness still has to be relevant to the issues before the Court.

MS. PEIFFER:  I understand, Your Honor, and our position is that Mr. Linker's testimony is relevant.

There is one other additional thing, in response to a previous question that I didn't have the opportunity to say, which is that trial counsel testified at length that

Linker, S. - Direct                                                     534

when they considered decisions, and arguably the decisions that have been -- that this Court is required to address on remand, whether those decisions were strategic, they look at the whole picture of what a witness would testify to, the good and the bad, and so that is part of what we are trying to present to the Court so that all of that information is in the record.

THE COURT:  No.  In my opinion, you are trying to redo the whole penalty phase.  They said that they considered the totality of the circumstances and what they knew, and they were talking about, particularly, the mental health issues of weighing Dr. Nelson and some of the other doctors who had said there was a narcissistic personality, and so forth.  They would weigh the totality of all of that in deciding to go forward.

Both Mr. Woodward and Mr. Hudgins said that they made a strategic decision not to present certain mental health evidence because of the totality of what they knew and the fact that the United States could counter all of that.  I'm not going to re-go through the testimony.  It's there.

But as far as I'm concerned, so far you're wasting time by presenting this witness without connecting it to anything else.  Keep on presenting, but you're wasting a lot of time if it's not going to connect to anything.

Linker, S. - Direct                                                        535

MS. PEIFFER:  Yes, Your Honor.  So I can keep on presenting Mr. Linker's testimony; is that correct?

THE COURT:  My ruling is my ruling.

BY MS. PEIFFER:

Q.  Mr. Linker, what did you understand happened as a result of Maria's behavior in Georgia, on the base?

A.  It came to light that --

MS. WARD:  Your Honor, I object to the question.  I object with the way the question was phrased.  It's overbroad and irrelevant.

THE COURT:  Sustained.  It's overbroad at minimum.

BY MS. PEIFFER:

Q.  Did David talk to you, your friend, about leaving the military, and what did he tell you about his feelings?

MS. WARD:  Objection, hearsay.

THE COURT:  Sustained.

MS. PEIFFER:  Your Honor, may I respond?

It's a statement of his then-existing emotional condition of Mr. Runyon that he expressed to Mr. Linker.

THE COURT:  What?

MS. PEIFFER:  Federal Rule of Evidence 803, subsection 3, Mr. Runyon's statement to Mr. Linker was a statement of his then-existing emotional condition.

THE COURT:  You are saying he was talking about his emotional condition, why he was leaving?

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                        536

MS. PEIFFER:  How he felt about leaving the military.

THE COURT:  A feeling is an emotional condition?

MS. PEIFFER:  What Mr. Runyon told him about his feelings about leaving the military.

THE COURT:  803 what?

MS. PEIFFER:  Subsection 3, "Then-existing mental, emotional, or physical condition."

THE COURT:  "But not including a statement of memory or belief to prove the facts remembered."

MS. PEIFFER:  I'm not offering it to prove the facts, Your Honor.  I'm offering it to prove -- to show Mr. Linker's understanding.

THE COURT:  I tell you what, just go ahead.  I can sort through what is admissible and what's not admissible. We are not in front of a jury, but I'm telling you that I also can sort between what's relevant and irrelevant.

BY MS. PEIFFER:

Q.  Did Mr. Runyon express to you how he felt about leaving the military?

A.  Yes.

Q.  And how was that?

A.  He was upset.  He wanted to do 20 years.  He didn't want to leave the military.  And I think he blamed my sister for having to leave.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                    537

Q.  Why was that?

A.  He said that, you know, that he would have never left if they hadn't kind of forced him to leave over some things that she had done.

Q.  Did Mr. Runyon suffer any injuries while he was in the military, that you were aware of?

A.  Yes.

Q.  Would you describe them, please?

        THE COURT:  Lay a foundation.

BY MS. PEIFFER:

Q.  Did you discuss with Mr. Runyon injuries that he suffered while he was in the military?

A.  Yes.

        MS. WARD:  Object to offering hearsay.

        THE COURT:  What rule does that follow?

        MS. PEIFFER:  Your Honor, I would submit that this is relevant to the issue before the Court, and it would be relevant to sentencing.  We are presenting evidence to show what counsel would have discovered with reasonable investigation, and that it could have pursued and presented it to jurors.

        THE COURT:  How is it not hearsay?

        MS. PEIFFER:  The issue in the case is what counsel should have discovered in their investigation, and so if counsel had asked Mr. Linker this question, I'm presenting

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                     538

to the Court what they would have learned.

THE COURT:  What was your question?  What did he tell you?

MS. PEIFFER:  My question -- I don't remember the exact question.

THE COURT:  You have to lay a foundation.  How does he have this information?  You've got to lay a foundation.  The whole thing that the attorneys were claiming, the problem was it was just Mr. Runyon and just Mr. Runyon saying these things.  That was one of the things that they made a point of.

So how does he know?  Did he see a picture?  Does he have independent knowledge through a record?  That's been the whole point here, is that they were unable to corroborate any of this.  They just were unable to.  There are no records.  I let you ask it of Mrs. Runyon because she said she saw a picture or something.  But just because Mr. Runyon says it doesn't make it so.  That's been one of the problems here.

MS. PEIFFER:  I understand, Your Honor, but this is what counsel could have discovered with reasonable investigation.  And part of the foundation I would lay is asking when Mr. Runyon discussed these issues with him, which was years before the 2008 crime and the 2009 trial.

THE COURT:  Well, what are you asking that he

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                        539

discussed with him?

MS. PEIFFER:  About the injuries he received in the military.

THE COURT:  You have got to lay a foundation for how he knew this, not just that Mr. Runyon told him.  That was my ruling.  That was my ruling with Mrs. Runyon.  It's the same ruling here.  I can't help it if you all are not able to respond to the Court's rulings.  That was the same ruling I made for Mrs. Runyon.  I make the same ruling here. You have got to lay a foundation of how he knows, other than just Mr. Runyon telling him so.

MS. PEIFFER:  I understand your ruling, Your Honor. And the purpose of this testimony is to show what trial counsel could have learned had they asked Mr. Linker, and then could have pursued in a reasonable investigation and presented to jurors.  That is part of the issue that is clearly before this Court on the remand.

THE COURT:  Trial counsel have testified that Mr. Runyon told them these things, the same as, apparently, he told other people, and they did pursue it.  They tried. They couldn't find it.

So all you're doing is asking him what Mr. Runyon told him.  Mr. Runyon told -- they couldn't put this witness on to just, again, Mr. Runyon told.

MS. PEIFFER:  But the part of the question before

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                540

the Court is about --

THE COURT:  I'm not going to rule anymore.  I have ruled.  You must lay a foundation.  Do you understand?

MS. PEIFFER:  I do.

May I present his testimony as a proffer for the record, if the Court will accept it?

THE COURT:  First I want you to lay a foundation for this witness and the question you're asking him.

MS. PEIFFER:  Your Honor, the foundation is the same.  It hasn't changed.

THE COURT:  Then I'm not going to allow it, if all the testimony is going to be is Mr. Runyon told him, and he has nothing else to go on other than Mr. Runyon told him.

BY MS. PEIFFER:

Q.  When did Mr. Runyon tell you that he sustained injuries in the military?  Do you recall approximately when he would have told you that?

A.  Probably about a year after they moved to Fort Benning.

Q.  And can you give a ballpark of when that would have been?  Would it have been before 2008?

A.  Yes, ma'am.  I'd say mid- to late '90s.

Q.  Shifting a little bit.

Where did Maria and David eventually move?

A.  They moved back to Wichita and lived in the front apartment of my father's home.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                          541

Q.  And how often did you see David during that time period, when they were living in Wichita?

A.  Some weeks, several times a week; some weeks, not at all. I would say five, six, seven times a month.

Q.  And how often did your father have a chance, an opportunity to observe Maria and David's relationship?

MS. WARD:  Objection, relevance.

THE COURT:  Were you living with them?

THE WITNESS:  No, ma'am.  I spent lots of time with my father, though.

MS. PEIFFER:  Your Honor, part of what this Court has been tasked to consider is the prejudice component of the *Strickland* inquiry, and that requires looking at what happened at trial, including the aggravators.

THE COURT:  Is the father dead?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  Then ask him this, how many times he thinks, through his experience of being there.

You said you were in and out of the house?

THE WITNESS:  Yes, ma'am.

BY MS. PEIFFER:

Q.  How often do you think your father had an opportunity to observe Maria and David's relationship?

A.  Daily.

Q.  And how often were you seeing your father during this

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                    542

time period?

A.   Probably three or four times a week.

Q.   Is your father deceased?

A.   Yes, ma'am.

Q.   Do you recall when he passed away?

A.   He passed away in 2010.

Q.   So what was your father's opinion of David and his relationship with Maria?

          MS. WARD:  Objection, hearsay.

          THE COURT:  It doesn't add anything really.  Just let her ask it.

          MS. WARD:  Yes, Your Honor.

          THE COURT:  The father's reaction of Maria's relationship, I have heard from Maria what her relationship was.

          Go ahead.

BY MS. PEIFFER:

Q.   You may answer the question.  Would you like me to ask again?

A.   Sure.

Q.   What was your father's opinion of David and his relationship with Maria?

A.   I think he had a great opinion of David.  He also knew that it was a dysfunctional relationship because he had seen it daily.  So in answer to your question, he thought a lot of

Linker, S. - Direct                                                        543

David.  He didn't think a lot of maybe the way David was
being treated.

Q.  And did you know anything about an assault charge against
David that occurred during this time?

A.  Yes.  My sister and him got into some kind of an argument
when she was drunk, and she called the police and said that
he had hit her.  I was not there, but my father said that it
was all nonsense, and he reminded me that she had done the
same thing with her ex-husband, which was Wren and Kendi's
father, multiple times.  And we kind of agreed in the
conversation just because of the David I knew and what he had
told me.

Q.  What was David doing for work in Kansas?

A.  He worked at a car dealership, at a gun range, and would
deliver pizzas on the -- as his third job, kind of a side
type of deal.

Q.  And how did Maria spend her time --

A.  Well --

Q.  -- during that time?

A.  -- she didn't work, so she was home all of the time, and
most of the time just drinking.

Q.  Did she do the housework or take care of the house?

A.  I mean, I'm not going to tell you she never did, but not
on a regular basis, no.

Q.  Who did take -- do the housework that was done in the

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                544

house?

A.   David or the kids.

Q.   How did Maria treat David, from what you observed?

A.   Not real well.  When I tell you it was dysfunctional, it was, like, seriously dysfunctional.

Q.   Can you provide any examples of the things that she did?

A.   I can remember being over there one time that is really vivid.  She spit in his face, called him racial things, like, yang and gook, those type of things.  I have seen her slap him, just a whole lot of different things.

Q.   And what was David's reaction, for example, when she spit in his face?

A.   He left the room and, I assume, went to the bathroom to clean himself up, and it was probably 10 minutes before I seen him again.  But as far as retaliation or yelling, screaming, none of that.  It just wasn't in his character. He wasn't that kind of person.

Q.   Did you ever see David react aggressively to what Maria did?

A.   I never seen him act aggressively to anyone.

Q.   Toward the end of David's relationship with Maria, when he was living in Kansas and you were seeing him, how would you have described his mental state?

          MS. WARD:  Objection, lack of foundation.

          THE COURT:  Sustained.

JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                                        545

BY MS. PEIFFER:

Q.  Did you have an opportunity in your friendship with David

to observe how he was feeling and his demeanor?

A.  Yes.

Q.  And could you describe what that was prior to -- right at

the end of the relationship?

            THE COURT:  I will give it such weight as I think

it deserves.

            MS. WARD:  Yes, Your Honor.  Thank you.

BY MS. PEIFFER:

Q.  You can answer.

A.  It's kind of a hard question for me because the David

that I first met wasn't the David that I knew in the end, so

I'm not sure what you want me to -- which David do you want

me to describe?

Q.  Could you describe the change, please, between the David

you first met and the David you knew at the end.

A.  I think there was maybe some cognitive decline, maybe

memory loss, sharpness.  He just wasn't really quite the same

person that I knew before he went into the Army.

Q.  Can you describe or give an example, some examples of

what you mean by memory loss or what was different?

A.  I remember one time where there was a restaurant in

Wichita that had a chicken fried steak day, and it was on

Wednesday, and we loved this place.  And I don't remember

                    JODY A. STEWART, Official Court Reporter

Linker, S. - Direct                                            546

what day it was -- I'm going to say maybe Friday -- and he's like, yeah, we can go have chicken fried steak, and it's just like, I do this on Wednesday.  It was just something that I know he would know, and it took him a few minutes to even understand it wasn't Wednesday.  I remember that sticking out, and I actually talked to my father about that.  That was a vivid memory.

There were other things, the sharpness part, you know, something that you and I would recognize right away like a red light, maybe take an extended period before we hit the brakes, just a few things that led me to believe that wasn't the same David Runyon that I knew prior to the Army.

Q.  And so to just clarify, you described a change.  What was the time frame that you saw this change?

A.  Three to five years.

Q.  And was the three to five years the end point?  Was that when David left --

A.  Yes, ma'am.

Q.  -- Kansas?

Approximately when was that?

A.  I think it was late '90s, '99, 2000, somewhere in there, at the latest.

Q.  Was it after they moved back to Kansas from Georgia?

A.  Yes.

Q.  Did you talk to anyone from David's defense team prior to

Linker, S. - Direct                                                  547

his capital trial in 2009?

A.  I spoke to an investigator.  I don't remember his name, but I know he was a former homicide detective from somewhere. He actually came to my house to talk to me, and -- but as far as lawyers or anybody like that, no, ma'am.

Q.  So did you speak to his attorneys?  Were you interviewed by them prior to his capital trial?

A.  No, ma'am.

Q.  Did you testify at the capital trial?

A.  Yes.

Q.  Did you speak to David's post-conviction counsel in 2015?

A.  Yes.

Q.  If you had been asked in -- prior to David's trial, would you have told his attorneys and his investigator the information that you testified to today?

A.  Of course.

Q.  Would you have told them what you recalled about David's injuries in the military?

A.  If they asked me, sure.

Q.  If you had been asked, would you have testified about that information?  If you had been asked by the attorneys, would you have testified about that information at David's capital trial?

A.  Yes.

        MS. PEIFFER:  One moment, please.

                    JODY A. STEWART, Official Court Reporter

Linker, S. - Cross                                                    548

No further questions.

CROSS-EXAMINATION

BY MS. WARD:

Q.  Hi, Mr. Linker.

A.  Hi, there.

Q.  Do you recall meeting with either the investigator or one of David's post-conviction attorneys in 2015?

A.  Yes.

Q.  Do you remember giving a declaration after that meeting?

A.  Yes, ma'am.

Q.  Okay.  And do you remember saying that you don't remember whether or not you spoke with David's attorneys prior to your trial testimony?

A.  No, I don't remember that.

Q.  Do you remember saying that if you did, it was a very brief conversation?

A.  No, I don't remember.

Q.  If I showed you that, your declaration, and let you review that, do you think that might help refresh your recollection?

A.  Sure.

Q.  Just to orient you, this is Page 1, with your header at the top "Declaration of Scott Linker."

A.  Uh-huh.

Q.  The pertinent part, if you could read Paragraph 15 to

Linker, S. - Cross                                                    549

yourself.

A.   Yes.   It says, "I don't remember speaking with David's attorney before I testified.   If I did, it was a very brief conversation."

Q.   Since this is in your signed declaration, does that refresh your recollection?

THE COURT:   You mumbled.

MS. WARD:   I'm sorry?

THE COURT:   You mumbled.

BY MS. WARD:

Q.   Since that is in your signed declaration, Mr. Linker, does that refresh your recollection as to that fact?

A.   Yes.

Q.   Thank you.

Now you said that you did testify in David's defense at the penalty phase of this trial?

A.   Yes.

Q.   And you indicated that you knew David Runyon because he dated both of your sisters?

A.   (Nods head.)

Q.   But you became very good friends with him after he was out of the Army and he moved to Kansas?

A.   I became pretty good friends with him before then, too. Once he started dating my oldest sister, we had become pretty good friends then, better after, yes.

JODY A. STEWART, Official Court Reporter

Linker, S. - Cross                                                    550

Q.  Is it fair to say that, as you testified, that when he left the military and then came back to Kansas, you got to know him real well then?

A.  Yes.

Q.  Thank you.

And during the course of that time while he lived near you in Kansas, you saw Maria acting very abusive towards David?

A.  Yes, ma'am.

Q.  You saw David working multiple jobs?

A.  Yes.

Q.  Sometimes three and four jobs?

A.  Yes.

Q.  Sometimes he would come home briefly before going straight back to work?

A.  Yes, ma'am.

Q.  And you noticed that he wasn't sleeping well?  I'm sorry.  I should rephrase that.  That he didn't have a lot of opportunity to sleep?

A.  I think he had plenty of opportunity, but -- I mean, I don't think he worked past 10:00 at night, and the car dealership opened at 8:00.

Q.  He was also delivering pizzas?

A.  Yeah, that ended by 10:00 at night.

Q.  He would come home briefly and expect to have meals, and

Linker, S. - Cross                                                      551

Maria wouldn't prepare food for him?

A.   Yes, ma'am.

Q.   So David would often have to go without food?

A.   Or make it himself, yes.

Q.   And then during the course of that time, you felt that he was being abused by his wife?

A.   Yes.

Q.   And you thought that David was responsible?

         THE COURT:   For what?

BY MS. WARD:

Q.   For his family, you thought he was a responsible person?

A.   Oh, yes, one hundred percent.

Q.   You thought that he was focused on taking care of his family?

A.   Yes.

Q.   And you thought that he felt he had to do it alone because Maria wouldn't help?

A.   Yes.

Q.   And you thought that he was doing that well?

A.   Yes, ma'am.

         MS. WARD:   I appreciate your time, Mr. Linker.

         THE COURT:   Redirect, Ms. Peiffer?

         MS. PEIFFER:   No further questions, Your Honor.  I would ask that Mr. Linker be released as a witness.

         THE COURT:   Thank you, Mr. Linker, for coming here

JODY A. STEWART, Official Court Reporter

Linker, T. - Direct                                              552

from Kansas to testify.  You may not discuss your testimony with anyone, but you are excused as a witness in this case.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Your next witness.

MS. PEIFFER:  Your Honor, we would call Tiffany Linker.

THE COURT:  Ms. Linker, if you will please come forward and be sworn.

(Witness was sworn.)

TIFFANY LINKER, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. PEIFFER:

Q.  Good afternoon, Ms. Linker.

A.  Hi.

Q.  You might want to adjust your microphone so that it's right in front of your mouth.

A.  Okay.

Q.  It will help the court reporter.

Could you please state your name for the Court.

A.  Tiffany Linker.

Q.  And where did you come from to be here today?

A.  Wellington, Kansas.

JODY A. STEWART, Official Court Reporter

Linker, T. - Direct                                                    553

Q.  Who is your husband?

A.  Warren Scott Linker, who I call Scott.

Q.  And could you tell the Court when you first met David Runyon?

A.  I would say in the mid-'90s.

Q.  How did you come to know Mr. Runyon?

A.  He was Maria's boyfriend.

Q.  Who is Maria?

A.  Scott's sister.

Q.  Did Maria have any children at that time?

A.  Yes, she had two.

Q.  What were their names?

A.  Wren and Kendi Fleming.

Q.  As you observed David with Maria's children.  What kind of father was he?

A.  He was amazing.  I mean, he took them to go hunting, fishing, play video games.  He was very good to them.

Q.  And at the time David and Maria got married, what was he doing for work?

A.  He had joined the military.

Q.  Did he leave the military at some point after that?

A.  Yes, and they moved back to Kansas.

Q.  How did he feel about leaving the military?  What did he tell you about that?

A.  That he wasn't really happy about it.

Linker, T. - Direct                                                  554

Q.   And why not?

A.   He enjoyed his career.

Q.   Did there come a time when you began to see David and Maria more frequently?

A.   Yes.

Q.   When was that?  Why did you get to see them more frequently?

A.   They lived in the front apartment of where Scott's dad lived, and we used to go over there frequently to visit.

Q.   And at that time what was David doing for work?

A.   He worked for a hotel doing maintenance, and he also worked at the Bullet Stop.

Q.   Did he have more than one job during this time?

A.   Yes.  He worked, he always worked multiple jobs.

Q.   I believe -- I apologize -- I was talking over you a little bit.

     Did Maria work?

A.   No.

Q.   Did she take care of the house or do things around the house?

A.   No.

Q.   From what you observed, what was Maria and David's relationship like?

A.   I think when they first met it was good, but as time went on, Maria began to drink.  She drank a lot, and she didn't

Linker, T. - Direct                                                  555

keep house.  She didn't do laundry.  She didn't take care of
the children.

Q.  Did you ever observe David being violent with Maria?

A.  No.

Q.  I'm sorry.  Can you repeat your answer?

A.  No.

Q.  After David moved back to Georgia, was there anything
that you noticed about his personality -- or, I'm sorry,
moved back from Georgia to Kansas, was there anything that
you noticed about his personality?

A.  It seemed like he was --

        MS. WARD:  Objection, Your Honor.  Overbroad.

        THE COURT:  Sustained.  You haven't established
what his personality, what you were talking about before,
and now you're moving to Kansas, but I thought you were
already in Kansas.

        MS. PEIFFER:  Yes, Your Honor.  This was a summary
question, and I'll restate the question.

        THE COURT:  All right.

BY MS. PEIFFER:

Q.  After David moved back from Georgia, and you were seeing
him in Kansas, did you notice anything about his cognitive
process?

A.  He just seemed like he was a little slower in speaking
with him and him explaining something, his thought process

Linker, T. - Direct                                                    556

was a little slower.

Q.  Can you give an example of that or describe a little bit more what you mean?

A.  Maybe just like he had to think about what you were talking about, and his words were a little slower than like I'm speaking now.  His words were a little bit more spaced out.

Q.  And if you had been asked about this -- did you meet with his attorneys prior to the trial, or an investigator?

A.  We met with an investigator.

Q.  And if they had asked you these questions, would you have given the same answers?

A.  Yes.

Q.  If they had asked you to testify about this, would you have testified about it --

A.  Yes.

Q.  -- as part of your testimony?

A.  Yes.

MS. PEIFFER:  One moment, please.

No further questions.

THE COURT:  All right.

MS. WARD:  No questions, Your Honor.

MS. PEIFFER:  Your Honor, I would request that Mrs. Linker be released.

THE COURT:  Thank you, Ms. Linker, for coming to

Seeger, D. - Direct                                              557

testify.

THE WITNESS:  Thank you.

THE COURT:  You cannot discuss your testimony with anyone, but you are released from further service here.

THE WITNESS:  Thank you very much.

(Witness excused.)

THE COURT:  Your next witness.

MS. CHAVIS:  We call Deborah Seeger, please.

THE COURT:  Mrs. Seeger, if you would please come forward and be sworn.

(Witness was sworn.)

MS. CHAVIS:  Thank you for your patience, Your Honor.  I just wanted to make sure if we needed to do anything with this video.  We are good.  I think I saved us some time.

DEBORAH SEEGER, called by the Defendant, having been first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Hello.  How are you?

A.  I'm fine.  Thank you.

Q.  Please tell us your name.

A.  Deborah Seeger.

Q.  And where do you live?

JODY A. STEWART, Official Court Reporter

Seeger, D. - Direct                                                    558

A.   Fairbanks, Alaska.

Q.   Is your husband here with you today?

A.   He is.

Q.   What is his name?

A.   Robert Seeger.

Q.   And how do you know David Runyon?

A.   I know David Runyon by -- we lived on the same block on Fort Benning, Georgia.

        THE COURT:  Where?

        THE WITNESS:  Same block on Fort Benning, Georgia.

BY MS. CHAVIS:

Q.   When did you meet David Runyon?

A.   I believe it was in 2004, when they drove up to the curb. They were in the next house section from us.  There is four houses in a unit, and so we were in one, and they were in the other, and they drove up to start their life there.

Q.   Okay.

        MS. McKEEL:  I can't hear the witness.

BY MS. CHAVIS:

Q.   Can you move the microphone a little bit closer to you. Okay.  That's great.  So it's going to seem a little odd, but if you could keep it real close to you.

A.   All right.

Q.   That's really good.

        Now, you said 2004.  Is that the year that you

Seeger, D. - Direct                                                      559

intended to say?

A.   Oh, no.  I'm sorry.  It's not the year I intended to say.

We were there in -- it was 1994.  Sorry about that.

Q.   That's okay.

What was your relationship with David?

A.   He was married to Maria, who we became family friends.
Maria and I and our children did lots of things together.

Q.   How many children did you have or do you have?

A.   I have four children; two girls and one boy.  Our boy
came last.

Q.   How old were your children in 1994?

A.   Okay.  In '94, Thomas, our youngest, would have been 4,
which would have made our third daughter 10, and then 11, and
then 12.  I'm sorry, I went backwards, 12, 11, 10, and 4.

Q.   And you said that they played with Maria and David's
children?

A.   Yes.  Kendi and Wren, and more Thomas played with them,
and my daughters kind of babysat or kind of were the
overseers of the playtime.

Q.   Did you work at the time?

A.   No.  Stay-at-home mom.

Q.   Did your children go to school?

A.   No, we home schooled our children.

Q.   So you were --

A.   Home all the time.

Seeger, D. - Direct                                                    560

Q.   -- home throughout the day?

A.   Yes.

Q.   What sorts of things did you and Maria do together?

A.   We would go shopping together, or we would sit and have coffee together, we would play games together, went to church together.  Anything that your next door neighbor would do as a friend, we did.

Q.   And did you ever observe David interacting with Maria's children?

A.   Yes.  That was one of the first things that I noticed when they drove up, was that they were a very happy family, getting out of the vehicle to walk up to their new home that they were going to be living in.  Then afterwards, whenever David would come home from work, the kids were usually the first ones out of the door to go and meet him.

Q.   Were you aware of his relationship with the children, with his official relationship with the children?

          THE COURT:  Wait just a minute.

          MS. McKEEL:  Judge, I believe we have a stipulation to the video that is coming in.

          Is that correct?

          MS. CHAVIS:  Yes.

          MS. McKEEL:  So this is redundant.  If we could just move to whatever is outside the video, it might speed things along.

JODY A. STEWART, Official Court Reporter

Seeger, D. - Direct                                                        561

MS. CHAVIS:  Sure.

MS. McKEEL:  Since we've made that agreement for it to come in.

MS. CHAVIS:  Sure.  I can do that.

BY MS. CHAVIS:

Q.  So were you aware of his official relationship with the children?

A.  When I first met them, I just saw he was their dad.

Q.  Then what did you learn?

A.  I learned later that he was their stepfather.

Q.  And did you ever learn that he wanted to pursue a more official relationship with them, with the children, with Wren and Kendi?

A.  An adoption, yes.

Q.  And Wren and Kendi being Maria's children, correct?

A.  Yes.

Q.  And how was David and Maria's marriage, from your observation?

A.  At the beginning it was what I expected any marriage to be of a military family, you know, busy and there.  He always came home.  It was what I expected a marriage to be.

Q.  Do you recall anything happening to David in November 1996?

A.  That would be the truck accident.

Q.  Do you remember where that accident occurred?

JODY A. STEWART, Official Court Reporter

Seeger, D. - Direct                                                  562

A.  It was some place in Alabama, but I don't remember the exact spot.

Q.  And how do you know about this accident?

A.  Them coming over to our house, as in Maria or Wren -- I think it was Wren came over to our house and said that we were needed over there.

MS. McKEEL:  I'm going to object, Judge, to what Wren told her.  It's hearsay.

THE COURT:  Sustained.

Did you observe the accident?

THE WITNESS:  No.  I was in Georgia.  The accident was in Alabama.  We were told there was an accident, and they needed my husband.

BY MS. CHAVIS:

Q.  Did your husband leave to go to some place?

A.  Yes.  He left to go to Alabama and pick up David and possibly the vehicle, if it was drivable.

Q.  And did you see David when he returned?

A.  Yes, I did.

Q.  And what did you observe?

A.  He had a bandage on his head, and he was very out of it, was not talking coherently.

Q.  Did you know whether he had been in the hospital?

A.  Yes.  I knew he was in the emergency room and that they released him.

JODY A. STEWART, Official Court Reporter

Seeger, D. - Direct                                              563

Q.   And did you have an opinion about that?

A.   Yes.   I thought that was ridiculous.

          MS. McKEEL:  Objection.

          THE COURT:  Go ahead.

          MS. McKEEL:  Objection to her opinion.

          THE COURT:  Sustained.

BY MS. CHAVIS:

Q.   You had interactions with David at the time, when he first returned?

A.   Yes.   He was not talking coherently.   Like, he couldn't tell us what had happened.   He couldn't explain what had happened.   He was not coherent.

Q.   And did David describe how he was feeling, describe his physical state at that time?

A.   He had a headache, and he was having a hard time moving around.

Q.   And what did you observe in his behaviors or his actions?

A.   On that night or after?

Q.   Afterwards.

A.   He was short-tempered.   Sometimes he would say things that made me wonder was this the same David that I knew from before.

Q.   From before when?

A.   The accident.

          THE COURT:  How long had you known him then?

JODY A. STEWART, Official Court Reporter

Seeger, D. - Direct                                                    564

THE WITNESS:  It would have been right around two years.

BY MS. CHAVIS:

Q.  And from your observation, what was the impact of the change in David on the marriage, between him and Maria?

A.  Whereas David, when I would see him, would always have a smile on his face before the accident, no matter what time I saw him.  That wasn't always the case after.  He seemed to be more brooding and short-tempered.

Q.  Do you remember, or did anybody from the -- from David's legal team come to visit you in Fairbanks, Alaska, around 2008 or 2009?

A.  Yes, I seen Mr. Ford.

Q.  And did he interview you?

A.  Yes, both my husband and I, at a hotel room.

Q.  Did he videotape that interview?

A.  Yes, he did.

Q.  Were you subpoenaed to testify at trial?

A.  Yes, I was.

Q.  Did you come to Norfolk, Virginia, for the trial?

A.  Yes, we did.

Q.  When you arrived here in Norfolk for the trial, did you meet with David's lawyers?

A.  We met with one person that was a lawyer, and then Mr. Ford was there -- I don't remember the lawyer's name --

JODY A. STEWART, Official Court Reporter

Seeger, D. - Cross                                                    565

in a conference room at the inn where we were staying.

Q.  About how long was that meeting?

A.  Five or ten minutes, not very long at all.

Q.  Did you testify at David's trial?

A.  I did not.

Q.  Had you testified, would you have provided -- and you were asked these same questions you were asked here today, would you have provided similar testimony?

A.  Yes, I would have, and maybe more, because I would have had a better memory.  It's been longer.

        MS. CHAVIS:  May I have a moment?  Thank you.

        Your Honor, before I sit down, I just want to make sure that -- I believe the video of Maria Runyon is Defense Exhibit 81.  I'd like to just make sure that -- I'm sorry, Ms. Seeger.  I just wanted to make sure that we do have a stipulation to the substance of that video coming in.

        THE COURT:  Yes, I think we've already seen it. Yes, it's in.

        MS. CHAVIS:  Thank you.  Okay.  Thank you.

                    CROSS-EXAMINATION

BY MS. McKEEL:

Q.  Good afternoon, ma'am.

A.  Hello.

Q.  How long did you know Maria and David Runyon in Georgia?

A.  It was about two and a half years, possibly three, but I

JODY A. STEWART, Official Court Reporter

Seeger, D. - Cross                                                      566

don't remember the exact months.

Q.   Would you speak up a little bit, please.

        THE COURT:   I heard you say about two and a half years, and then after that?

        THE WITNESS:   Possibly three.  I don't remember the exact month that we met or the exact month that -- well, I do remember the exact month that we moved, so, yeah, it would be May.

BY MS. McKEEL:

Q.   You remember talking to Investigator Ford, who came out to see you, and a videotape was made, right?

A.   Yes, ma'am.

Q.   Do you recall in the videotape talking about, in interviewing with Mr. Ford, that David and Maria had marital problems?

A.   Yes.

Q.   Okay.  And do you know when those marital problems began, from your observation?

A.   From my observation, it seemed like they began after the accident.  There might have been one or two things, like, you spent that much money, prior to that, you know, like a disagreement on money or something, but I never noticed anything prior to the accident.

Q.   So they had financial problems prior to the accident; is that right?

Seeger, D. - Cross                                                    567

A.   I would think that -- okay.  So, yes.

Q.   They had financial problems.

         Could David be controlling when you would observe him with Maria?

A.   Well, I think most husbands are controlling, but, yes, probably.

Q.   Do you recall saying on the videotape that around the car accident, that David wasn't scarred, disfigured, but he basically had whiplash-type symptoms and was in pain?  You've added to that today, but do you remember that from what you said previously?

A.   I think I remember the pain and the whiplash, but he did have a bandage on his head.

Q.   Because this interview was back -- it looks like it was back in 2008; is that correct?

A.   It was 2008 or 2009.  I don't remember the year.

Q.   I think the date that we have been given of the interview is November 9th, 2008.  Does that sound right to you, you and your husband?

A.   If you say that's what it is, I will say yes, because I don't remember the exact date.  I've already mentioned that.

Q.   Would you say your memory is better then, or is it better now?

A.   My memory probably would be better then, but, as I've thought about things, I probably remember more of certain

Seeger, D. - Cross                                          568

things.

Q.  Okay.  Because back then you just said whiplash type of injury, correct?

A.  If you say that's what I said, then, yes.  Whiplash and pain.

Q.  I'm sorry, ma'am?

A.  Whiplash and pain, back then.

Q.  Whiplash and pain.

And I think you were asked about some drugs, and you said that David Runyon was taking some drugs for pain; is that correct?

A.  Yes, there were pill bottles.

Q.  Do you recall after the accident David Runyon being upset about the driver that hit him in this accident?

A.  Yes.

Q.  And why was he upset?

A.  Because he was hit by a drunk driver.

Q.  Did you ever see David Runyon violent?

A.  After the accident?

Q.  Before the accident, after the accident?

A.  After the accident, I saw him lose his temper, yes.

Q.  Was Maria drinking during this time period, that you could see?

A.  I never -- no, I can't say that.  I saw her drink once.

Q.  Okay.  So in front of you, she was not drinking?

Seeger, D. - Cross                                                    569

A.   Just the one time.

Q.   Okay.  And you would go to church with her?

A.   Yes.

Q.   You would have coffee with her?

A.   Yes.

Q.   And then sometimes you went shopping with her; is that correct?

A.   Yes.

Q.   And then how often would you go out and eat with them?

A.   We did not go out to eat with them.  It would be, like, a barbecue, family-style, in-home eating, either at their house or our house.

Q.   How often in a week would you do that?

A.   I don't think it was once a week.  It would probably be more like once every other week or once every third week.  It was not a regular thing.

Q.   Was your husband and David Runyon good friends?

A.   They were just acquaintances.  My husband and David worked in two differently entire areas of Fort Benning, two entirely different jobs.

Q.   And so how much time would you spend with Maria and David Runyon, since when they moved there to when they left there? Every other week to eat.  What else would you do with them, that you observed David Runyon?

A.   If we had a game night.

JODY A. STEWART, Official Court Reporter

Seeger, D. - Cross                                                   570

Q.   I'm sorry?

A.   If our kids and us had a game night, played a board game or played cards.  Usually it would be cards.

Q.   How often would you do that in a week?

A.   It wouldn't be in a week.

Q.   I'm sorry, ma'am?

A.   It wouldn't be in a week.

Q.   It would not?

A.   It would be maybe in conjunction with our meal.

Q.   Okay.

A.   Or the time that we spent was more with Maria and the kids -- or the time I spent.

Q.   So when you were observing David Runyon during game night or eating, how many hours would that be?

A.   Probably two to three.

Q.   And so are you saying, then, that you only saw David and Maria Runyon and observed them during this time period once every other week?

A.   No.  But we would see them out in the yard playing with the kids, or we would see them going off for a walk, or often to the car to go for a drive for them to go someplace.  There is a community lot in between the two houses that we had, and so there was a lot of, like, kickball, or you have a croquet set that they would play -- the kids would play games, and then the parents would be on one side, and they would be on

JODY A. STEWART, Official Court Reporter

Seeger, D. - Cross                                              571

the other, and we would be cheering our kids on.

Q.   So this would involve other parents, too; is that correct?

A.   Mostly ours.  There was a couple of families that other kids would join in.

Q.   In playing in this community yard?

A.   Yes.

Q.   Is that right?

A.   Yes.  Or our kids would go down to the playground which was past ours, and so then there would be one parent, or our daughters would be there watching and -- or we would be there watching.

Q.   Did David Runyon go to church with you every Sunday?

A.   No.

Q.   How often would David Runyon go in this time period, to church with you all?

A.   He worked a lot of weekends, so I would probably say maybe once a month.

        MS. McKEEL:  I have no other questions, Judge.

        THE COURT:  Redirect?

        MS. CHAVIS:  I have no further questions.  I would ask that Ms. Seeger be released.

        THE COURT:  All right.  Ms. Seeger, thank you for coming from Alaska to testify, and you are released from testimony in this proceeding.  However, you cannot discuss

                JODY A. STEWART, Official Court Reporter

Seeger, R. - Direct                                          572

your testimony with anyone.  And we are going to take a break, and I'm assuming that your spouse will be the next witness, so, obviously, you can't discuss your testimony with him or anybody else.

(Witness excused.)

THE COURT:  Counsel, we will take a 20-minute recess, and then resume.

(Recess from 4:28 p.m. to 4:49 p.m.)

THE COURT:  If you would call your next witness.

MS. CHAVIS:  We call Robert Seeger.

THE COURT:  Mr. Seeger, if you would please come forward and be sworn.

(Witness was sworn.)

ROBERT SEEGER, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Hello.

A.  Hi.

Q.  Please tell us your name.

A.  Robert Seeger.

Q.  And where do you live, Mr. Seeger?

A.  Fairbanks, Alaska.

Q.  How do you know David Runyon?

A.  I know David from being stationed at Fort Benning, and

JODY A. STEWART, Official Court Reporter

Seeger, R. - Direct                                                    573

they lived in a house next to us.

Q.   About when did you meet David Runyon?

A.   1994.

Q.   And other than being his neighbor, what was your relationship with him?

A.   Our family would do things with their family together. Sometimes we would go to church.  Sometimes we'd just get together and barbecue or do some things like that.

Q.   You mentioned your family.  Who makes up your family?

A.   I have got four kids, one boy and three girls.  A lot of times my son -- he was about the same age as their boy, and so they would play together a lot of times and -- Thomas and Wren would play together.  The girls are a little older, so they would sometimes babysit the kids, the Runyon kids.

Q.   So you and David were both in the military.  Did you work together?

A.   No.  David's unit was down by the airfield.  The unit that I was in was about two miles away on Kelly Hill.

Q.   Did you help David with anything?

A.   A lot of times I worked on -- helped him with his car. Sometimes just some other construction projects, maybe hanging some shelves, things like that.

Q.   Did David display any gratitude to you for your help?

A.   Yes, he did.  He thanked me often, and he gave me a gift one time of a hammer that was autographed by Tim Allen.

                    JODY A. STEWART, Official Court Reporter

Seeger, R. - Direct                                              574

Q.   Who is Tim Allen?

A.   Tim Allen is the "Home Improvement - Tool Time" guy from T.V.

Q.   From T.V. back in the 1990s?

A.   Yes.

Q.   Did you see or observe David interacting with the children?

A.   Yes.  He would be playing just like kids -- dads do with their kids.  I think I remember him playing -- tossing the ball back and forth with Wren, also.

Q.   How would you describe David as a father?

A.   I would say he was pretty typical as far as taking time off for his kids.

THE COURT:  He was pretty technical?

THE WITNESS:  Typical as a father, playing with their kids.

BY MS. CHAVIS:

Q.   Do you recall anything happening to David in November 1996?

A.   Yes.  He did have an accident.  He went over to pick up the vehicle from his brother --

MS. McKEEL:  I'm going to ask to lay a foundation, how he knows.

THE COURT:  Lay your foundation.

THE WITNESS:  Okay.  As I went over to -- or as I

JODY A. STEWART, Official Court Reporter

Seeger, R. - Direct                                              575

heard about the accident, I was asked to go over and pick up David.  He had been injured in the accident and was at a hospital.

THE COURT:  So you were asked to pick up Mr. Runyon?

THE WITNESS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Where did you go to pick him up?

A.  This was almost 30 years ago, so I'm trying to -- I don't recall exactly where it was in Alabama, but it wasn't -- didn't seem too far away.

Q.  Was your memory better back then than it is today?

A.  I'd have to say yes.

THE COURT:  Where did you pick him up in Alabama, a place?  Like, was it a police station, a hospital?

THE WITNESS:  I recall a hospital or a clinic, Your Honor.

THE COURT:  So you went and picked him up at a hospital or a clinic?

THE WITNESS:  I think, yes.

THE COURT:  Do you remember the name of the hospital.

THE WITNESS:  I do not.

THE COURT:  Do you remember the location of it?

THE WITNESS:  I do not.

JODY A. STEWART, Official Court Reporter

Seeger, R. - Direct                                          576

THE COURT:  Go ahead.

BY MS. CHAVIS:

Q.  At the time, did you observe the vehicle that David was in?

A.  I do not recall that.

Q.  Did you observe -- David Runyon drove back with you, then, to Fort Benning?

A.  Yes.

Q.  And you would have observed his injuries then?

A.  Yes.  I recall he had some kind of bandage on his head, is what I remember.

Q.  Do you remember any other injuries?

A.  I do not.

Q.  And, again, your memory would have been better back then than it is today?

A.  Yes.

Q.  Did you ever speak to anyone from David's legal team prior to 2009?

A.  Yes, I recall a Mr. Ford.

Q.  And where were you when you spoke with Mr. Ford?

A.  He came up and talked to us in Alaska.

Q.  Do you remember Mr. Ford's job title?

A.  I do not.

Q.  Were you subpoenaed to appear at David Runyon's capital trial?

Seeger, R. - Direct                                                      577

A.  Yes.

Q.  Were you flown from Fairbanks, Alaska, to Norfolk, Virginia, for the trial?

A.  Yes.

Q.  When you arrived here in Norfolk, do you remember if you met with anybody from David's legal team?

A.  Yes.  Again, I remember meeting with Mr. Ford.

Q.  Do you remember meeting with anybody else?

A.  No.

Q.  Did you testify at David Runyon's trial?

A.  No, I was told I wasn't needed.

Q.  Who told you that?

A.  Mr. Ford.

Q.  Had you been asked to testify at David Runyon's trial and been asked the questions that you were asked here today, would you have provided the same answers?

A.  I think I would have had a better recollection.

Q.  And with a better recollection, would you have provided more detailed answers?

A.  Yes.

THE COURT:  Did Mr. Ford videotape you?

THE WITNESS:  I know he videotaped my wife.  I don't remember if he videotaped me.

THE COURT:  Did he take a statement?  Did he write a statement of what you said?

JODY A. STEWART, Official Court Reporter

Seeger, R. - Cross                                          578

THE WITNESS:  Yes.  I think I recall that, yes, Your Honor.

THE COURT:  All right.

MS. CHAVIS:  May I have just one minute, please?

Thank you.

CROSS-EXAMINATION

BY MS. McKEEL:

Q.  Good afternoon, Mr. Seeger.

A.  Good afternoon.

Q.  I'll pick up where Judge Smith left off there.

Investigator Ford took a statement from you; is that right?

A.  I'm sorry, say again.

Q.  Investigator Ford took a statement from you?

A.  I believe so, yeah.

Q.  Was your wife present?

A.  Yes.

Q.  And there was a videotape.  Do you remember seeing that?

A.  I think I remember seeing that, yes.

Q.  Do you know why you weren't on the videotape?

A.  Probably because most of the time, being that David and I were in different units, I wasn't home a lot.  I was out in the field a lot.  The type of unit that I was in was a forward support, and we had got deployed to Saudi Arabia and Kuwait, so I was not home as much as the rest of my family.

Seeger, R. - Cross                                                579

Q.  Okay.  Do you remember how long you knew David Runyon?

A.  I'd have to say from '94 to '97.

Q.  All right.  And you were saying you were in Saudi Arabia during some of that time; is that right?

A.  Yes.  We were called up to go over with the 24th Infantry.

Q.  How often, when you were in Georgia, at Fort Benning, before you left to go to Saudi Arabia, how often did you see David Runyon?

A.  That's hard to say because we worked on weekends also sometimes.  I'd have to say a couple times a week.

Q.  About once a week?

A.  Yeah.

Q.  And what would be the occasion that you would see him that once a week, and how long would you be with him?

A.  Getting home, just maybe going over with the kids and spending some time, or maybe he wanted me to work on his car a little bit with him.

Q.  How long would that be?

A.  Each time?

Q.  Yes, sir.

A.  Probably anywhere from 30 minutes to an hour.

Q.  Okay.  Because you did not work with him, correct --

A.  Correct.

Q.  -- at any point?

JODY A. STEWART, Official Court Reporter

Seeger, R. - Cross                                                      580

Now, do you recall talking with Mr. Ford and what you said to Mr. Ford?

A.  Not specifically, no.

Q.  Okay.  If I have your interview here, and you didn't talk about the accident, would that be what you remember?

A.  I don't recall much about the accident.

Q.  You don't recall much about the accident at all; is that right?

A.  Correct.

Q.  Because you testified here you remember seeing a bandage on his head, but you didn't tell that to Mr. Ford back in 2008, did you?

A.  I don't recall.

Q.  You don't recall.  Okay.

You gave a declaration to *habeas* counsel on August 24th, 2015.  Do you remember that, sir?

A.  What is a *habeas* counsel?

Q.  That would be these ladies over here.

A.  Yes.

Q.  Do you remember that?

A.  Yes.

Q.  They probably have a team, maybe.  Maybe you didn't see them, but do you remember getting back into this case after all of these years?

A.  Yes, I do remember.

JODY A. STEWART, Official Court Reporter

Seeger, R. - Cross                                                       581

Q.   Who came to see you?

A.   I think it was Michael.

Q.   Who?

A.   Michael.

Q.   I'm sorry.  I don't know who that is.

A.   I'm sorry.  The man sitting.

Q.   What is his name?

A.   Michael Chavis.

Q.   He came to see you?

A.   Yes.

Q.   And did you write up this declaration on your own?  Did you type it out?

A.   No, I did not.

Q.   You did not.  Okay.  Because in the declaration you make a different statement.  You say that you went to Alabama -- that David was in a car accident, he went to Alabama and got his brother's truck, and that you picked him up, and he was in a bad accident.  You didn't tell that to Mr. Ford, though, when he interviewed you; is that correct?

A.   To the best of my knowledge, no.

Q.   Why didn't you?

A.   I don't recall.

Q.   Was it not important then and now it's become important because David Runyon has been sentenced to a death sentence?

         MS. CHAVIS:  Objection, Your Honor.  She hasn't

                        JODY A. STEWART, Official Court Reporter

Seeger, R. - Cross                                                    582

even established that he was asked the question.

          THE COURT:  Don't argue with the witness.  Just ask him why it's become important to him, because he did testify earlier that his memory would have been better back in 2009, and if he had testified then, and the interview with Mr. Ford would have preceded the 2009 and his testimony here.  So ask him why it is that he didn't mention it and has his memory improved.

          MS. McKEEL:  Yes, ma'am.

BY MS. McKEEL:

Q.  You said you didn't mention it in 2008 to Mr. Ford when David was under the charges.  Why is it that you remember it afterwards in 2015 when another counsel sent -- Mr. Chavis came to see you?

A.  I guess I can't answer that question.  I'm sure, like all of us, our memories kind of come and go with different things that trigger it.

Q.  But your memory would have been better in 2008; is that correct?

A.  I would think so.

Q.  When is the last time you saw David Runyon?  What year?

A.  That would have to be in 1997.

          MS. McKEEL:  That's all the questions I have, Judge.

          THE COURT:  Ms. Chavis.

                    JODY A. STEWART, Official Court Reporter

Seeger, D. - Recross                                                    583

REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Mr. Seeger, when Mr. Ford interviewed you, do you remember him asking you any questions about a car accident?

A.  I don't specifically remember that, no.

        MS. CHAVIS:  Thank you.

        THE COURT:  Anything further?

        MS. McKEEL:  Just ask this, Judge.

RECROSS-EXAMINATION

BY MS. McKEEL:

Q.  Were you sitting there with your wife when she was talking with Mr. Ford?

A.  Yes.

Q.  She talked about an accident.  Do you remember that?

A.  Yes.

Q.  But you didn't say anything about the accident to Mr. Ford?

A.  I don't recall.

        MS. McKEEL:  Thank you, Judge.

        MS. CHAVIS:  Just ask that Mr. Seeger be excused.

        THE COURT:  All right.

        MS. CHAVIS:  Thank you.

        THE COURT:  Mr. Seeger, thank you for coming here from Alaska, and you are now excused.  You should not discuss your testimony with anyone, and have a nice trip

584

back.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Your next witness.

MS. CHAVIS:  Your Honor, we are done with witnesses for today.

THE COURT:  We are not done with our court time.

MS. CHAVIS:  Well, we don't have any other witnesses lined up to present for today, Your Honor.

THE COURT:  Well, who's your first witness, then, tomorrow?

MS. CHAVIS:  Our first witness for tomorrow will be Jeffrey Harris.

THE COURT:  Where is Mr. Harris now?

MS. CHAVIS:  He is coming in from Georgia.

THE COURT:  Well, as I told you, we are going to move this along.  So don't let this happen again because we've got at least another 45 minutes of trial schedule to go.  I will accept that you don't have any further witnesses for today, and we will go into recess.

Is there anything further for the Court to take care of, Mr. Samuels?

MR. SAMUELS:  Your Honor, could we just clarify it would just be additional lay witnesses tomorrow, there won't be any experts?  Let me ask that question?

JODY A. STEWART, Official Court Reporter

585

MS. CHAVIS:  Yes, and, Your Honor, in light of your statement that you just made, I should note that we only have three witnesses scheduled for tomorrow, and then Monday we have Ms. Cronin scheduled, and then we begin with our expert witnesses on Tuesday, February 14th.  That's because of the difficulty in scheduling our experts.

THE COURT:  Tuesday?  Nobody said we weren't going to be in trial on Monday.

MS. CHAVIS:  Yes.  We do have Ms. Cronin on Monday, the 13th.  We expect her to be a lengthy witness.

THE COURT:  Where is Ms. Cronin now?

MS. CHAVIS:  Ms. Cronin now is in Florida.

THE COURT:  Well, she actually should be here tomorrow because these three witnesses, how long are they going to take?

MS. CHAVIS:  I'm sure they won't take the whole day, Your Honor.

THE COURT:  All right.  We are going to move this along, and I'm telling you that we are.  First of all, this courtroom is set for a month-long trial beginning the beginning of March.  We are going to keep to a schedule, and if you have to get somebody in here, you are going to have to get somebody in here.

If we get to the point where these days aren't being filled, then we will go to weekends.  We are going to

JODY A. STEWART, Official Court Reporter

586

do what we have to do.  I want that clear to everybody.  So as far as I'm concerned, Ms. Cronin should have been here today and be ready to go today or tomorrow, and it's quite disappointing to the Court that we've finally convened, and we didn't do a full day as planned.  You have three lay witnesses tomorrow that won't take up the whole day.

MS. CHAVIS:  Yes, Your Honor.  We have done our best to try to anticipate the length of testimony, and Mr. Runyon's entire legal team is here from out of state. We are living out of the hotel, so we are very motivated to get this hearing done as quickly as possible and return to our homes as well.  So we are on the same page as Your Honor in trying to quickly but fully present our evidence to the Court.

THE COURT:  Well, I'm going to be checking with you, and if I feel you should have another witness here, I'm going to tell you.  Tomorrow you are going to go through your schedule.  We are going to go through this witness schedule and the government's, and if there is going to be somebody, you will have to rearrange.  You just will. Because we are not going to just say, well, they are under subpoena.  They are your experts.  They have to be here, and I told you this before, and I meant what I said.  So this is going to move along.  We are going to finish this.

If you have to bring somebody in and rearrange

JODY A. STEWART, Official Court Reporter

587

their travel, you will have to do it.  You will be under a court order to do it because this has been difficult enough to set.  The record is clear with how hard it was to lock you all into a date.  We are locked into a date, and those dates are very firm.

The Court is in recess until noon tomorrow.

(Hearing adjourned at 5:11 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

X_____/s/_____x

Jody A. Stewart

X_____2-9-2023 _____x

Date

JODY A. STEWART, Official Court Reporter