588

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -
                                        )
UNITED STATES OF AMERICA,               )
                                        )
    v.                                  )    CRIMINAL ACTION NO.
                                        )    4:08cr16
DAVID ANTHONY RUNYON,                   )
                                        )
        Defendant.                      )
                                        )
                                        )
        AND                             )
                                        )
DAVID ANTHONY RUNYON,                   )
                                        )
        Petitioner,                     )    CIVIL ACTION NO.
                                        )    4:15cv108
    V.                                  )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        Respondent.                     )
                                        )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

DAY 4

Norfolk, Virginia

February 10, 2023

BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge

JODY A. STEWART, Official Court Reporter

589

APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Brian Samuels
               Lisa R. McKeel
               Assistant United States Attorneys
                   And
          DEPARTMENT OF JUSTICE
          By:  Carrie L. Ward
               Counsel for the United States

          FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE
          By:  Dana C.H. Chavis
               Helen Susanne Bales
               Assistant Federal Community Defender
                   And
          VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
          By:  Elizabeth J. Peiffer
               Counsel for the Defendant

JODY A. STEWART, Official Court Reporter

590

**I N D E X**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY HARRIS | 600 | 604 | | |
| MARK RUNYON | 606 | 640 | 687 | |
| DAVID THOMAS DOMBROWSKI | 694 | 769 | 788 | 791 |

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| NONE | |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 10 | 596 |
| 17 | 597 |
| 18 | 598 |
| 81 | 598 |
| 139 | 598 |
| 162 | 598 |
| 163 | 599 |

JODY A. STEWART, Official Court Reporter

(Hearing commenced at 11:59 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent, in case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The Government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Chavis, Ms. Peiffer, Ms. Bales, is the defendant ready to proceed?

MS. CHAVIS:  Yes, we are.  Good morning, Your Honor.

THE COURT:  Good morning.

Counsel, two matters.  What is the status of the cable, the missing cable?

MS. CHAVIS:  Your Honor, we conducted an exhaustive search of all of our hotel rooms, and we cannot find an errant cable that we believe would belong to the Court.  So there was nothing for us to return this morning.

THE COURT:  Are you still using a court cable?

MS. CHAVIS:  I'm sorry?

THE COURT:  Are you still using another court cable?

592

MS. CHAVIS:  Your Honor, no.  We don't have any cables of the Court's.

THE COURT:  So yours came in?

MS. CHAVIS:  Your Honor, we are not using a computer today.

THE COURT:  I was under the understanding that in order for you to be able to show your exhibits and to operate that equipment, you needed a cable and that Mr. Otero of IT had given you a cable when you were in your training, and then that's what delayed things yesterday, that it was not here, and it was baffling to the Court because the court is locked, and the cleaning people don't even get around where you are, where your cables would be. You said you were going to go look for it.  So you, A, didn't find it?

MS. CHAVIS:  Your Honor, my understanding is -- I did not do the computer setup, but my understanding is that there is a cable that belonged to the setup someplace, and that it is now missing.  And so we said that we would go back to our hotel room to see if perhaps it was mixed up in our belongings, and looked to see if a cable was mixed up in our belongings.  We did not find an errant cable in any of our hotel rooms.

THE COURT:  I understand that, but I understand that you were given another one, that it was set up with

JODY A. STEWART, Official Court Reporter

593

another cable by Mr. Otero yesterday so that you could go forward.

MS. CHAVIS:  We weren't given a cable.  He did bring in one yesterday so that we could set up the computer yesterday.

THE COURT:  Right.

MS. CHAVIS:  Yes, ma'am.

THE COURT:  So you did have another cable?

MS. CHAVIS:  No, it was connected to the system here, Your Honor.

THE COURT:  Is it still there?

MS. CHAVIS:  I don't know what it looks like.  I assume that it's still there, Your Honor.

THE COURT:  And that belongs to the United States?

MS. CHAVIS:  Of course, yes, ma'am.

THE COURT:  So you do have the cable that Mr. Otero brought in yesterday?  The second cable?

MS. CHAVIS:  I assume that one of these cables is the second cable, ma'am, yes.  But, Your Honor, I don't even know what the cable looks like.

THE COURT:  According to Mr. Otero, he wrote all of his notes down about what he did Monday, and that then the cable was gone yesterday, and that he put in a new cable, and you all were supposed to be ordering something from Amazon to -- instead of using the court equipment, the

JODY A. STEWART, Official Court Reporter

docking station or whatever, and the cable that you all were ordering from Amazon. Am I mistaken?

MS. CHAVIS: I believe that was if we were going to use a Mac computer, so we switched out instead of using a Mac computer, because that was going to cost over a hundred dollars for us to order the equipment that was necessary. We switched the Mac computer to a Windows-based computer.

THE COURT: So the bottom line is you have the equipment you need to go forward?

MS. CHAVIS: Yes, we do, Your Honor.

THE COURT: You still have the government equipment that Mr. Otero put on for the second time to allow you to go forward?

MS. CHAVIS: I'm not aware that anything is missing, Your Honor.

THE COURT: That was not the question. My question was, there was something missing yesterday, and Mr. Otero was here.

MS. CHAVIS: Yes.

THE COURT: He came back in and put a new cable in yet again.

MS. CHAVIS: Yes, he did.

THE COURT: That's my question. So you have not found the first cable, you have what you need today, and you are still operating with IT's cable put in yesterday.

595

MS. CHAVIS:  Except that we don't have a computer here today.  Nothing is hooked up.  I don't know what the cable looks like, so I can't represent to Your Honor exactly what is set up here on the table.  Your IT person was in the room this morning, Your Honor.  He did not indicate that anything was astray with the setup, so I can only assume that everything is good to go.

THE COURT:  It remains the IT equipment of the court?

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  Thank you.

I understand that you have some exhibits that you wish to move into evidence, that both sides have agreed to those exhibits; is that correct, Mr. Samuels?

MR. SAMUELS:  Your Honor, that's correct.  There is one caveat on one of the exhibits that I would like to discuss after Ms. Chavis moves them in, that I think will be reflective of what we had discussed at the time she discussed that exhibit with the witness, but other than that, that's correct.

THE COURT:  And, Ms. Chavis, if you want to come up now or at the end of the day, which do you prefer?

MS. CHAVIS:  Your Honor, we could go ahead and take care of this now, that would be fine.

THE COURT:  Don't just say the number.  Say the

JODY A. STEWART, Official Court Reporter

596

title of the exhibit because sometimes numbers can either be mistyped or misunderstood, and it's better to have both the number and what the exhibit is.

If you would check along, Mr. Samuels.

And, madam clerk, if they need to go more slowly, would you please let them know if you can't get this down.

THE CLERK:  Yes, Your Honor.

MS. CHAVIS:  The first item, Your Honor, is Defendant's Exhibit 10, which is also ECF number 165, a memorandum in support of motion for continuance and for hearing to schedule trial.  We would move that into evidence.

MR. SAMUELS:  No objection, Your Honor.

(Defendant's Exhibit 10 received in evidence.)

MS. CHAVIS:  The second item is Defense Exhibit 17, ECF number 240, a supplemental motion to continue capital sentencing hearing.  We would move that item into evidence.

MR. SAMUELS:  Your Honor, that is the one exhibit. There are two attachments to that exhibit.  One is Exhibit A, the affidavit of Sheila Mary Cronin, and the second is the neuropsychological preliminary report of Dr. Mirsky.

We don't have an objection to this exhibit coming in, but we would ask the Court to accept it for the limited, non-hearsay purpose that it was filed, but not considering those two attachments for the truth of the matter asserted.

597

They were certainly filed by Mr. Hudgins, but that was the issue we had raised at the time, that they shouldn't be considered for the truth of the matter asserted and should be admitted for that limited purpose.

MS. CHAVIS:  Your Honor, we would again just note that hearsay is permissible at a capital sentencing proceeding and that the Federal Rules of Evidence do not apply in a capital sentencing proceeding.  But with that, we would move this exhibit into evidence.

THE COURT:  I would move it with the caveats that Mr. Samuels has indicated, and in any event, these individuals were witnesses, as I understand it, at trial, were they not?

MR. SAMUELS:  No, Your Honor.  My understanding is Ms. Cronin will be a witness here.

THE COURT:  That's what I mean, she is going to be a witness here, and Mr. Mirsky is deceased.

MR. SAMUELS:  That's correct, Your Honor.

THE COURT:  So I will move it in with a limited purpose that at the time they were in the record for purposes of the continuance, but the Court granted the continuance, as I remember, based upon that information.

(Defendant's Exhibit 17 received in evidence.)

MS. CHAVIS:  Item number 18 is ECF number 242, a statement of counsel.  We would move that item into evidence,

598

please.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  Admitted.

(Defendant's Exhibit 18 received in evidence.)

MS. CHAVIS:  Item number 139 is Mr. Hudgins' letter to Dr. Merikangas regarding the Patterson and Montalbano reports.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit 139 received in evidence.)

MS. CHAVIS:  Defense Exhibit 81 is the video of Debbie Seeger.  We would move that into evidence.

MR. SAMUELS:  I believe that came in yesterday, Your Honor, but no objection.

THE COURT:  I think it's in.  If it's not, it is now.

(Defendant's Exhibit 81 received in evidence.)

MS. CHAVIS:  Thank you, Your Honor.

Defense Exhibit 162 is ECF Number 274, a motion to release test results to counsel.  I would move that into evidence.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit 162 received in evidence.)

MS. CHAVIS:  Defense Exhibit 163 is ECF number 275,

JODY A. STEWART, Official Court Reporter

an order granting motion to release test results to counsel. We would move that into evidence.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit 163 received in evidence.)

MS. CHAVIS:  Thank you.

THE COURT:  All right.

MR. SAMUELS:  Your Honor, may I raise just one matter before the witnesses start coming?

THE COURT:  Yes.

MR. SAMUELS:  Thank you.

Your Honor, as the Court had alluded to yesterday, and it appears that some of the testimony today is going to follow the same trajectory, the remand from the Fourth Circuit is rather limited, and I went back yesterday and looked at the Fourth Circuit opinion, and it referenced that the second issue certified for appeal was that Mr. Runyon contended that his counsel failed to provide him with effective assistance by failing to investigate adequately his brain injury and potential mental illness and introduce such evidence in mitigation.

So from the government's perspective, that is the scope of the remand here.  I understand today there may be some testimony, as there was yesterday, about the defendant's social history, his family history, his

JODY A. STEWART, Official Court Reporter

situation with his wife, his upbringing, and that sort of thing.  The government's position is that is outside of the scope of the remand.  We certainly understand that the Court can separate the wheat from the chaff, and the Court is the finder of fact and can make those determinations, but the United States does have a concern that some of this evidence that's going to be presented is going to go outside the scope of that remand, and I would note that at the outset, Your Honor.

THE COURT:  All right.

MS. BALES:  Your Honor, do you want us to proceed with the first witness?

THE COURT:  In a minute.  I want to look at something.

MS. BALES:  Thank you, Your Honor.

THE COURT:  You can call your first witness.

MS. BALES:  Your Honor, we call Captain Harris.

THE COURT:  Sir, if you could come forward and be sworn.

(Witness was sworn.)

JEFFREY HARRIS, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BALES:

Harris, J. - Direct                                                     601

Q.  Good afternoon, Captain Harris.

A.  Good afternoon.

Q.  Could you introduce yourself to the Court, please.

A.  My name is Jeff Harris.  I am a captain with the City of Bethel Police Department.

THE COURT:  City of?  I'm sorry, could you speak up a little bit?

THE WITNESS:  City of Bethel in Georgia.

BY MS. BALES:

Q.  And have you come to Norfolk to testify in this case before?

A.  I have.

Q.  Okay.  And I know it's been several years ago, but if the record reflected that you testified that Mr. Runyon had been a police officer in your force for a few months, you wouldn't have any reason to disagree with that, would you?

A.  No.  He worked with the City back sometime in, like, 1998.

MS. BALES:  Your Honor, this is in day 14 of the sentencing hearing when Captain Harris testified.

BY MS. BALES:

Q.  If the record reflected that you described the duties of a police officer, you don't know of any reason to dispute that, do you?

A.  No.

JODY A. STEWART, Official Court Reporter

Harris, J. - Direct                                                602

Q.  If the record reflected that you testified that a police officer must be able to analyze situations and make quick, reasonable decisions, you would not have any reason to dispute that?

MS. WARD:  Your Honor, if I could object to the form of the question, it's leading.

MS. BALES:  It is leading, Your Honor.  I'm attempting to advance the testimony.  I can certainly provide --

THE COURT:  I understand.  It's background leading. It's leading, but it's to move things along as background. So at this juncture, I'll let her do that.

MS. WARD:  Yes, Your Honor.

MS. BALES:  Thank you, Your Honor.

BY MS. BALES:

Q.  We talked for just a moment about what you testified to when you were here before.  I'd like to ask you a little bit of information about matters that you did not testify to.

Do you recall meeting with an investigator from Mr. Runyon's defense team prior to his trial?

A.  For the defense?

Q.  Yes.

A.  Yes, I do think I met with an investigator.

Q.  Okay.  Thank you.

And you talked with him about the topic of how

JODY A. STEWART, Official Court Reporter

Harris, J. - Direct                                                   603

Mr. Runyon did as a police officer?

A.   Yes.

Q.   Do you recall what you told that investigator was Mr. Runyon's ability to retain information?

A.   I'm sure we discussed his work performance and why he was no longer with the City, and I explained the process of how we hire and train, and basically he didn't work out with us. He resigned.

Q.   And did you discuss with that investigator how Mr. Runyon -- how well he did at learning new information?

A.   I did.

Q.   And what did you tell the investigator?

A.   From what I can remember, I didn't actually personally train him, myself.  He was just on a shift that I was in charge of.  We have officers called field training officers that train them.  Some stuff he retained, some stuff he didn't retain.  It seems like certain days you'd have to go back and start over where you started from day one to kind of get where you want to go.

        Part of our job as a police officer is not only -- you're trying to protect and serve the public, but you've got to get there.  If you can't learn the lay of the land, the geographics, that's one of the setbacks.  So a lot of times people have trouble learning the city.  I think there was areas that he had trouble with that.  I don't remember all of

JODY A. STEWART, Official Court Reporter

Harris, J. - Cross                                         604

those to be exact, but there were some issues.

Q.  So do you recall anything about telling the investigator any information about his ability to retain information?

A.  Yeah.  That was one of the things that was discussed when we would meet, discussing, you know, how he was progressing with his training.  They would get aggravated, the officers would that were training him, that they seemed to have to start over.  We can't progress if you keep going backwards.

Q.  Okay.  And if you had been asked about this information when you were on the stand before, you would have answered consistent with what you've testified now?

A.  Yes.

        MS BALES:  Okay.  Your Honor, may I have just a moment?

        We have no further questions at this time, Your Honor.

        THE COURT:  All right.  Cross-examination.

        MS. WARD:  Just one moment, Your Honor, please.

                    CROSS-EXAMINATION

BY MS. WARD:

Q.  Captain Harris, prior to swearing in as a police officer, you do have to undergo a lengthy amount of training?

A.  Yes.

Q.  And Mr. Runyon was successful in doing that?

A.  Yes, he was.

JODY A. STEWART, Official Court Reporter

Q.   And he did swear in as a police officer?

A.   Yes, he did.

Q.   In addition to the issues that you spoke of, he also had performance issues?

A.   Yes.

Q.   And the issues that you spoke of, you learned about that from other parties, from other people that supervised him directly?

A.   Well, he was on my team for a short period of time, during his training.  So I didn't see it first hand.  I have knowledge of it.  I mean, I didn't -- I was not in the car actually.  He was not in the seat beside me training.  The people that were doing it were on my shift.  So I was, overall, in charge of that shift, so I knew what was going on in the car, but I wasn't with him 24 hours a day.

Q.   I understand.  Thank you, Officer.

        THE COURT:  Anything else, Ms. Bales?

        MS. BALES:  Your Honor, we have no further questions, and we would ask that he be released.

        THE COURT:  Thank you, Captain Harris, for coming to testify.  Please don't discuss your testimony with anyone, and you are excused, and have a nice trip back to Georgia.

        THE WITNESS:  Thank you, ma'am.

        (Witness excused.)

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                          606

MS. CHAVIS:  Our next witness is Mark Runyon.

THE COURT:  Mr. Runyon, if you would please come forward and be sworn.

(Witness was sworn.)

MARK RUNYON, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Hello.

A.  Good morning.

Q.  Please tell us your name.

A.  My name is Mark Runyon.

Q.  And where do you live?

A.  I live in Marble Hill, Georgia.

Q.  You may want to pull the microphone close to your mouth. Thank you.

How do you know David Runyon?

A.  David Runyon is my brother.

Q.  And how many years apart are you from David Runyon?

A.  A little over two.

Q.  Are you younger or older than your brother?

A.  I'm the younger brother.

Q.  What is your first memory with your brother?

A.  I think it would be -- I don't really remember all of my childhood with my brother.  I get bits and pieces of it.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              607

There is a lot of it that is suppressed that I just -- I'll get triggered, and a memory will come up, and I deal with it then, but for the majority of my childhood, I don't remember a lot of things.

Q.  And why are parts of your memory suppressed?

A.  Because it sucked.

Q.  And who are your parents?

A.  My mother is Sue Runyon, or Suk Cha Runyon, and my father, um -- my stepfather is David Runyon, David Harrell Runyon, and he was my stepfather for the time that I was living in the house.  And then my birth father is David Dombrowski, and I didn't meet him until David's sentencing phase.

Q.  Why didn't you meet your birth father until David's sentencing phase?

A.  I was led to believe that he just wasn't around and didn't have any interest in knowing us, and that he didn't care about us.

Q.  Who led you to this belief?

A.  My mother.

Q.  After you met your birth father, did you realize you had seen him before in your life?

A.  Well, after I met my birth father, there was a period of reconnecting where we had discussed what he went through, and some of the things that he said triggered memories.  Like,

Runyon, M. - Direct                                                608

when I was a child, and I would -- there would be Christmas or Thanksgiving or a holiday, and we would get a call at the house, and as kids, we weren't allowed to answer the phone. And my mother would disappear into the bedroom and talk for a while and come out and be upset, and then we never really thought anything of it.  Come to find out later that was him trying to call and talk to us.

And I remember when I was in Fort Leonard Wood, and this is after the fact, but, you know, I remember my stepfather, David Runyon, going out and talking to somebody who was sitting in a car on my street, and turns out it was him.  It was David Dombrowski.

And, you know, as a kid, you know every person on the street, every house, every parent, every car that drives by.  It's a cul-de-sac neighborhood.  Everybody knows everybody, and I didn't know that guy, and I didn't know the car, and it stuck out in my head because my dad went out and talked to him.

A little while later the guy left, didn't really think anything of it.  You're a kid and you don't know anything better, but come to find out that was him.  So I learned that David Dombrowski actually was trying, and I was just being lied to.

Q.  And you mentioned being in Fort Leonard Wood.  What did your adopted father -- and I'm going to refer to him as David

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                609

H. Runyon to distinguish him from David Runyon, the defendant here.

What did David H. Runyon do for a living?

A.   He was a soldier.

MR. SAMUELS:  Your Honor, I'm going to object to the relevance of this background information as pertains to this witness.  I think he did testify at the penalty phase, and he testified rather extensively about his upbringing, and this does seem pretty far afield from the claim and the reasons that we are here today.

THE COURT:  Are you going to present any different testimony than was already presented?

MS. CHAVIS:  Yes, Your Honor.  I am mindful, or we are mindful of the Fourth Circuit remand, and we are attempting to and will provide new information to the Court in accordance with the remand.

This is very relevant to Mr. Runyon's mental health and, in particular, to information that is important for the expert witnesses.  All of his life history and social history is what forms Mr. David Runyon's life experiences and is the basis for his mental health and his subsequent mental illness.

THE COURT:  I will listen to it, and if it's relevant, I obviously will consider it, and to the extent it's duplicative, then that would have already been heard

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                           610

and presented, but I can manage to sort that out, the
relevance and if it's duplicative of what was presented by
the attorneys at the trial.

          Go ahead.

          MR. SAMUELS:  Thank you, Judge.

BY MS. CHAVIS:

Q.  And so what did David H. Runyon do for a living?

A.  David H. Runyon was a soldier.  He was a combat engineer.

Q.  And so what was your family's financial situation?

A.  It was always tight.  We didn't have a lot of money.
Rarely ever went out to eat.  Never really got, like,
name-brand clothes or shoes or anything like that.  It was
always tight.  A lot of our family activities revolved around
things like growing food, you know, collecting food, farming,
hunting, fishing.  Those were the things that we did as a
family.

          And looking back on it now, that's really relevant
in the sense that, you know, it taught us how to survive off
of a little, to make a lot out of a little, and, you know,
you spent money where you needed to, and you saved money
where you could.

Q.  What was the environment within your home?  What was that
like?

A.  Could you -- the environment in the home --

          THE COURT:  Just excuse me for a minute.

                    JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                        611

Who was in the home and what time period?

THE WITNESS:  The environment in the home, when I lived with David H. Runyon and my mother, Sue, like I said, a lot of my memories are boxed up.  They're suppressed.  But a lot of what I've been dealing with in unboxing those memories and dealing with the trauma that I've had, that I'm still dealing with today, was pretty bad, emotionally abusive.  I learned that emotional and physical abuse is part of a normal relationship, which I'm still sorting through today.

THE COURT:  Was David in the home at the time?

THE WITNESS:  Yes, he was.  David helped.  He was -- he tried to protect me when he could, but, you know, we were both living with the same monster.

BY MS. CHAVIS:

Q.  And who is the monster that you're referring to?

A.  My mother.

Q.  And why are you describing her as a monster?

A.  Emotionally, psychologically, physically abusive, flips on a dime.  You know, I think in modern terms we would say it's something along the lines of schizophrenic or psychopathic.  I'm still affected by it, and I'm still angry about it and hurt.

Q.  When you say she would flip on a dime, what would that look like?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                             612

A.   One minute she is giving you a hug, and then she gets mad, and she starts throwing shit, or she gets -- pardon me -- she gets mad.  Sometimes you get grounded.  Sometimes you're standing in the corner.  Sometimes it's corporal punishment.  Sometimes it is wait till your dad gets home.  Sometimes she breaks stuff or takes stuff away.  I guess I always thought it was just discipline that, you know, you are getting punished and you're getting in trouble, but looking at it now, that's just abuse.

Q.   If you had to wait until dad got home, what would happen?

A.   I think David H. Runyon took the role of discipline a lot because when Dad would discipline us, it's go to your room, he would come in and he would spank us.  You would pull down your pants and your underwear, and he would spank you with a belt or board, and if you moved, you got a couple of licks on your legs, and you'd come out with a red ass -- pardon me, a red butt, but the rest of it was -- he wasn't angry.  He was just doing discipline.

     Mom would get mad.  She'd chase you around the house with whatever she had, and that was anger.  And so I think my dad took it on himself to discipline us a lot more because it would be easier on us as kids, and it would be a lot easier to explain than if she got ahold of us and left marks and have to explain to other people what happened.

Q.   You mentioned being grounded.  What did that entail?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                613

A.   So, you know, part of the getting in trouble is, like, you never knew if you were going to be standing in a corner with marbles over your head or if you were going to get chased around the house or if you were going to get grounded, or what was going to happen.

But grounding wasn't, like, go to your room.  It was more like you're grounded for two weeks.  And when you are grounded, you got the house chores.  That means you are doing the dishes, you are sweeping the floors, You're doing the laundry, you're doing whatever needs to be done in the house.

And, you know, it was kind of like being ostracized from the family and going from a kid to a slave, you know.  We didn't have a broom and a mop, you know.  We had a bucket and a rag.  That's how we cleaned the floors.  It was three stories on the house, you know, the two upper stories and a basement.  So I remember if you get grounded, that just means that you are working for the next two weeks and there is no free time.

Q.   How old were you when you first ran away from home?

A.   I think the first time that I can remember was Germany, Hanau, Germany.  I was about five years old.  I packed up my leather backpack and walked to the train tracks.  I was going to be a hobo and live on the train.  That's better than what I was dealing with then.  I didn't even know what I was dealing with then.  So that was a prevalent pattern

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                614

throughout my childhood; a couple times a year I would run away.

Q.  Did David ever run away from home?

A.  No.  He was kind of the good kid.  I was the rotten one, so I caught a lot of flack.  I wasn't really one to -- I wasn't really one to hold my tongue or put up with it, you know.  I always thought it would be better just to leave.  I didn't feel loved, and I didn't feel wanted anyway, so what was the point.

Q.  And when you say David was the good kid, does that mean that he wasn't punished like you were?

A.  No.  He just caught less of it because he was, you know, just kind of mom's favorite, so he got a little more doting on, and I got in more trouble because I didn't really hide anything.  I was just kind of brazen about being a kid.

Q.  Did he witness you being punished, and did you witness when he was being punished?

A.  Yeah.  I mean, we both dealt with the same stuff, you know.  When I say he didn't get in as much trouble, he got -- maybe every two times I would get in trouble, he would get in trouble once; or every three times, he would get in trouble twice.  You know, we would end up both getting in trouble and looking at each other, like, okay, here we go, and, you know, you never knew what you were going to get, so...

Q.  Is it more difficult for you to be punished or to watch

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              615

your brother be punished?

A.  Well, you learn to not care about the punishment in the sense of, like, being punished.  You just deal with it and survive it and you move on and get through it, and you emotionally disconnect from it and physically disconnect from it.  You know, David and I were kind of like -- we were together in it.  We both dealt with it the best we could, and, you know, we had sympathy on each other, but for the most part, we both just, in retrospect, survived it.

Just for the record, when I look back at a lot of the stuff that we went through, I hate my mother, and she's alone and probably pretty close to dying, and I have no interest in ever seeing her again.  And she's wondering why she's alone, and it's because she made that.  She made us who we are today, and I hate her for it.

Q.  When was the last time you had contact with your mother?

A.  Physically seeing her or spoke to her on the phone?

Q.  When you spoke with her on the phone.

A.  She was trying to get me to come and help her pack her house in El Paso and move her back to Missouri to be close to my stepfather, her husband that she was separated from, David H. Runyon, and she wanted me to do that because it was getting hard for her to take care of herself, and, you know, she had been calling me maybe, like, once a year or every other year just to check in and see where I was at.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                          616

But I remember for a while after the trial, or after the sentencing, she would just, basically, call me up and say, I want you to come to the house and get everything and then take me out and, you know, drop me off on the side of the road, or I'll walk out in the ocean, or I'm going to go kill myself or just, you know, light a fire and, you know, it will be done, basically asking me to come help her knock herself off, I guess.

I told her -- when she said, come get the money.  I said, I don't want your money.  I want you to -- I still wanted her to be okay.  It's weird how you can love somebody and want somebody to be okay but still hate them.  I hated the things that she did.

THE COURT:  How long ago was that conversation?

THE WITNESS:  That was probably three or four years ago.  The moving her to Missouri was probably a year ago, maybe a little over that.  I remember that my wife, her mother was living with us, and she has -- had Alzheimer's and dementia, and she was living with us.  And my mother, I think, was trying to figure out where she was going to go and what she was going to do, and I told her that she couldn't stay with us because I was already taking care of somebody.

THE COURT:  This was about a year ago?

THE WITNESS:  Yeah, maybe a little more than a year

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                         617

ago.

BY MS. CHAVIS:

Q.  I want to take you back to when you were about 13 years old.  Did your father catch you smoking cigarettes?

A.  Yeah.

Q.  What happened at that time?  Do you want to take a moment?

A.  No.  I was at the bus stop and just hanging out with all of the wrong kids, you know, greasers, the leather jackets, you know, listening to Metallica and that kind of stuff, whatever.  I was hanging out with them, and I had been smoking at that point for maybe a month or two, a couple of months.

MR. SAMUELS:  I'm sorry, Your Honor.  I do object to the relevance of this.

THE COURT:  You need to establish the relevance.

This is just an incident with you and your father?

THE WITNESS:  This is an incident of me and my father and my mother and the home environment that we were in and abuse.

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  Go ahead.  I'll sort it out.

MS. CHAVIS:  This is the family discipline and the abusive environment that they lived in.

THE COURT:  I'll sort it all out.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                   618

MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.  So please tell us what happened when you arrived back home from school that day, after your father had caught you smoking cigarettes.

A.  They thought that -- well, my mother sat me down and said, "You want to smoke, let's smoke."  Thought that I would get sick by having cigarettes with her.  We smoked a couple of cigarettes together at the table, and she wasn't getting what she wanted, and so she got angry and made me eat the rest of the pack.

So after I finished eating the rest of the pack -- they were Winston Reds -- they sent me to my room, and I got sick, and I ran away and went to a friend's house.  He told me -- taught me how to throw up, and I drank a bunch of Pepto-Bismol.

And the next day I called and asked if I could come home, and they I said, "No.  You ran away.  Go."  So I went to a bus stop.  I got picked up by a detective at a Greyhound bus stop trying to buy a ticket, and I didn't really have enough money for the ticket, but I had about 60 bucks at the time, which I had set aside for an emergency, and I think the fact that a kid is starting to figure out that he has to set aside money to take care of himself because stuff happens like this, just figuring out how to survive, I think is

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                             619

pretty messed up.

THE COURT:  You were 13?

THE WITNESS:  Yes.

THE COURT:  And Mr. Runyon would have been 15, Mr. David Runyon?

THE WITNESS:  Yes.

THE COURT:  Was he still living in the home?

THE WITNESS:  Yes.

THE COURT:  When did he leave?

THE WITNESS:  I was 15, so he was 18.  It wasn't until we were in high school.  I mean, I was -- we were still living in the same house, so I think that was maybe '80 -- can you clarify when we were still living in the house or when the incident happened?  I think that incident happened like '86.

THE COURT:  You said you were 13 when this incident happened?

THE WITNESS:  Right.

THE COURT:  Then you mentioned something about leaving at 15?

THE WITNESS:  Yeah.  So leaving at 15 was after David graduated and he went to Wentworth Military.  My dad got stationed overseas to Korea, which I went with them as, you know, their child.  And when I was in Korea, I chose to leave for good.

JODY A. STEWART, Official Court Reporter

THE COURT:  All right.

THE WITNESS:  And choosing to leave for good involved dropping out of school, purchasing my own plane ticket, flying back to the United States into Dulles International Airport, and getting off the plane.

THE COURT:  I'm just trying to get a timeline.

THE WITNESS:  I understand.  15, I finally got away.

BY MS. CHAVIS:

Q.  You got away from your parents?

A.  Yes.

Q.  You have been on your own ever since you were 15?

A.  Yes.  And at 15, getting away from my parents felt like I had just gotten out of jail, and there was a lot of stuff that happened after.  You know, when I got off that plane, I didn't have a great life.  There was times when it was a loaf of Wonder Bread and ketchup from McDonald's; that was the week.  I remember stealing steaks off of a guy's grill, going through his yard and stealing a steak because I was hungry.

I worked two jobs.  I lived in a one-bedroom studio. At one point I lived in a cardboard box, a refrigerator box. I have been beaten.  I've been raped.  And I dealt with a lot of things that I shouldn't have had to, but it was still better than being at home.  Being at home taught me that I could survive anything, and being on the streets wasn't any

Runyon, M. - Direct                                            621

different.

Joining the military was probably the easiest I had had it, at 17.  You know, I had food every day, and I had money.  I got paid.  I got clothes, a place to sleep.  It was like a vacation.

Q.  Have you engaged in therapy to deal with the maladjustments caused by your childhood?

A.  I never sought out therapy.  I never knew that that wasn't life.  I knew I wanted better, and I tried to make a better life for myself.  I never really sought out therapy. I did do marriage counselling in my second divorce, and that opened a few things up, but the reality was, was there was -- it took a -- I ended up meeting somebody.

I was selling a sailing canoe that I had built, and she was a psychologist, therapist, and we had an interaction. She challenged me.  She challenged me and said that I had some issues, and she was right on the head, right on the money.

And she tried to get me to join a therapy group that she was doing, and I looked for excuses, the main one being financial.  I couldn't afford it.  She told me that she would not charge me, that she would take care of it.  And I think how some people adopt stray cats, she kind of adopted me for about a year and put me in the therapy group, and that year and a half is -- that was a start, and I'm still working

Runyon, M. - Direct                                        622

through all those things.  It got me into a place where I could actually start to see myself and start to love myself and accept myself and what happened and move forward, but it took some pretty intensive sessions for a year and a half.

MR. SAMUELS:  Judge --

THE COURT:  How long were you in the military?  So you weren't in the military when this was going on?

THE WITNESS:  No.  I was in the military from 17, so '91 to '98.  After the military, I got out and moved to Hawaii.  I had spent a short amount of time in Georgia.  After I got out of prison, I went to go stay with my brother and got on my feet in Atlanta, and then moved to Hawaii.

THE COURT:  You got out of prison?

THE WITNESS:  Yes.

THE COURT:  What were you in prison for?

THE WITNESS:  I was court-martialed in the military towards the end of my term, after I got back from Haiti.  I had some PTSD issues, and got into a fight with one person, which turned into a fight with everybody else that that person was with, which resulted in me pulling a gun and discharging a warning shot into the ground and telling them all to stay back, and I got court-martialed for that.

THE COURT:  I'm sorry?

THE WITNESS:  I got court-martialed for that.

BY MS. CHAVIS:

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                    623

Q.  And just to establish, further clarify the timeline a little bit with respect to your therapy sessions, when did that take place?

A.  That didn't take place until -- I would say that was right around a year after David's sentencing phase.

Q.  Thank you.

A.  I was -- just to clarify, when I was contacted by Sheila Cronin, I was still married to my ex-wife and living in the home with my children, and David's sentencing phase was something that I attended while I was still involved in that. I didn't meet Carol, the therapist, until about a year and a half later.

Q.  I want to go back when you and David were young and ask about when you would play football, and ask you about those circumstances, playing pickup football with the other children.

A.  Well, you know, David and I have always had a very physical upbringing and relationship.  We were always kind of competitive with each other.  We always played with each other, and whether it was pillow fighting or football, we were always out to knock each other's socks off.  I think that's just what you do when you're brothers.  We used to play pickup football, you know, and that was, you know, full contact, no pads, just the kids in the neighborhood get together on a grass field and beat the crap out of each

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                    624

other, play football.

Q.   And so when you say beat the crap out of each other, does that also involve being knocked out?

A.   A lot of times you'd get the wind knocked out of you, and you'd be on the ground for a while, and you would sit on the sidelines for a couple plays and then get back in the game, or you go home or -- you know.

     But I remember David bouncing off the telephone pole like a Ping-Pong ball, knocked him out cold, and I thought that was -- we were kids.  He thought it was fun.  He got up, shook it off and went and sat down, and the same thing, you know, you just keep going.

     We thought we were indestructible.  You don't really think anything of it.  But that's the kind of life that we had, and that's the kind of -- we have always been physical like that.  You just think you're bulletproof, I guess, when you're kids.

Q.   You had mentioned David attending Wentworth Academy after he graduated high school, and that that was -- I believe you mentioned that was around 1989; is that correct?

A.   Yeah.  I think it was '88 or '89 when he went to Wentworth and I went to Korea, so he was in Wentworth for a couple of years.

Q.   During that time period, was David in a car accident with your father's truck?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                    625

A.  First off, I was kind of mad at my dad for giving him the truck.

Q.  Why was that?

A.  Because it was a brand new truck.

MR. SAMUELS:  Judge, I would object to the lack of foundation for that, unless that can be established.

THE COURT:  You need to go back and lay a foundation.

BY MS. CHAVIS:

Q.  So you are telling us about your father giving David this truck?

THE COURT:  Wait.

You're in Korea?

THE WITNESS:  No.  Before we left Fort Belvoir, Virginia, and David went to Wentworth, my father got a new truck.  It was the first new vehicle that the family had ever had.  We always had a station wagon before.  And I remember my dad got this truck.  Both David and I liked the truck.  And when my dad got stationed in Korea, he put the truck in storage when David went to Wentworth.  Well, I found out later that he gave David the truck, which kind of upset me.

MR. SAMUELS:  Judge, again, how did he find out?  Did he find out by someone telling him?

THE WITNESS:  David H. Runyon told me.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                        626

MR. SAMUELS:  I would object to the hearsay on that, Your Honor.

MS. CHAVIS:  Your Honor, hearsay is allowable in federal capital sentencing hearings.

THE COURT:  It depends on the relevance.  I understand it can be, but, again, the Court rules on evidence.  Under the Rules, the key is, is the ruling in and of itself ultimately correct.  Things do have to be relevant.

First of all, your father, you say, and this is your stepfather, but the one we have talked about has gone to Korea?

THE WITNESS:  Yes.

THE COURT:  You went with him?

THE WITNESS:  I went with him.

THE COURT:  By the way, is your father still living?

THE WITNESS:  David H. Runyon is still living, that I know of.  I'm not in contact with him, and he hasn't been in contact with me since my mother and him separated.

THE COURT:  When was that?

THE WITNESS:  It was several years ago.  And let me back that up.  Actually, he did give me a phone call about a year ago to tell me not to come get my mother, and that he was going to take care of her.  She was trying to get me to

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                               627

come help her move, and I know that's a little confusing, but that conversation lasted about six seconds, and he told me not to come around, and he hung up on me.

But I haven't been in contact with my stepfather, David H. Runyon, for years.  Pretty much since this trial's been over and David was sentenced, I've had maybe two conversations with him, and he has no interest in speaking to me.

THE COURT:  Go ahead and ask your questions and I'll sort it out.  I don't know whether it's relevant, whether it's permissible hearsay.  There is hearsay permissible, but not all hearsay.  I'll sort it out.

MR. SAMUELS:  Judge, if I can just note, if some of that is hearsay, if some of it is coming from the defendant, there should be an indicia of reliability for any hearsay issues.  If it's coming from the defendant, we would argue it doesn't meet that.

THE COURT:  I agree, but I don't know how much weight this testimony will be given, the indicia of reliability, the relevance.  Let's just see what he says, and then I know as a judge I can sort it out.

MR. SAMUELS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Mr. Runyon, was there a point in time when you saw your brother and he had scars on his face?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              628

THE COURT: Now --

MS. CHAVIS: This is related, Your Honor. This is indicia of reliability for what -- for how he learned and knows about the car accident. It corroborates the car accident.

THE WITNESS: So my father gave my brother the truck, whether that's hearsay or whatever it seemed as. David wrecked the truck, and my father was upset about it. I heard that from him. The next time I saw my brother, he had scars on his face and on his forehead and on his cheeks, and that was from the accident.

That's when I was told about how bad the accident was and what -- how he basically tried to drive himself under a truck, under a tractor-trailer and got hurt. It was a pretty rotten accident.

MR. SAMUELS: Your Honor, if we could just establish how he learned that information. I understand the Court will sort it out, but I think it's important for the Court to know how he came by that information.

THE COURT: You can answer. You can tell us how you came by all of this information. You said something about David drove the truck under a tractor-trailer?

THE WITNESS: It was another larger truck. I think it was a tractor-trailer, but I learned about it, and David told me more about it when I saw David at Wentworth Military

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                               629

Academy.

THE COURT:  David drove the truck under the tractor-trailer?

THE WITNESS:  Well, that was the understanding, that he had got into an accident.

THE COURT:  And, again, tell us where you are getting all this information.

THE WITNESS:  From David Runyon, when I was visiting him at Wentworth Military Academy.

BY MS. CHAVIS:

Q.  Was your stepfather upset about the destruction of the family's brand new truck?

A.  He didn't really say much about it after that.  He was upset about it, and he kind of swept it under the rug and kind of -- they did that, where they would just keep things from me and not tell me what is really going on.

Q.  That's why you had to ask your brother what happened?

A.  Well, I asked him what happened to his face, why he was so ugly.

THE COURT:  You say he was at Wentworth at that time?

THE WITNESS:  Uh-huh.

THE COURT:  He was not in the military?

THE WITNESS:  Wentworth Military Academy.  That was around the time that he got his early commissioning to go

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                          630

into the military as a second lieutenant.  So he went to the military academy, and then after the military academy, he then got his commission to become an officer.

THE COURT:  Okay.  But the truck was when he was at Wentworth?

THE WITNESS:  Was when he was at Wentworth, yes, ma'am.

MR. SAMUELS:  Just to be clear, Your Honor, I think there is two separate accidents.  One we were talking about yesterday.  This is an earlier one they are talking about, I believe.

BY MS. CHAVIS:

Q.  So this would be sometime in what year?

A.  It would be '91.

Q.  That's well before the crime in this case?

A.  That is well before the second accident and my court-martial and everything and the second truck accident. So '91 I graduated basic training, and he was graduating Wentworth, and I went to go see him and watch him get his commission, and that's when he told me about it.

Q.  So we have talked about your court-martial.  At the time that you were being court-martial and you believed that you were going to go to prison, did you own a pickup truck?

A.  Yes.  I owned a '77 Ford F-250.  And bringing back, I think they have it recorded as an F-150, but I know it was a

Runyon, M. - Direct                                          631

F-250, SuperCab, four doors, eight-foot bed.  It was a big truck.

Q.  And can you describe the truck some more for us, so we can get an idea of what that pickup truck was like?

A.  Yeah, it was huge.  You know, it was a -- it's a full-size F-250, you know.  They haven't really shrunk much in size.  The difference is those older trucks were made of steel, and the thing was a tank.

It was big enough that when I bought it, the engine was blown, and I put another engine in it, and when I was putting another engine in it, which was a V-8 as well, it started raining, I had enough room under the hood that I climbed inside the truck, closed the hood and kept putting in the motor and drove the truck home that night.  You know, that thing was big.  You could literally walk around inside the engine bay with a V-8 in it.

Q.  And when you were preparing to go to prison, what plans did you make for your truck?

A.  Well, I asked my brother to come up and take all my belongings.  The writing was already on the wall, and I kind of knew what was going on.  I asked him to come up.  I packed all my stuff in there.  David came up to see me and gave me a hug and drive back.  He left that evening, and I found out later that he got hit.

THE COURT:  Where were you located?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              632

THE WITNESS:  I was stationed in Fort Campbell, Kentucky, at the time that I got in trouble, ma'am, and was court-martialed.  And David was in Fort Benning.  So David drove from Fort Benning, Columbus, Georgia, up to Fort Campbell, Kentucky, to pick up my truck and all of my belongings.

MR. SAMUELS:  Your Honor, if we could just get how he found out about that, how he found out about the accident.  Was it from his brother that told him?

THE COURT:  We are not at the accident yet.

MR. SAMUELS:  I'm sorry, Your Honor.

THE COURT:  I think he is at Fort Campbell. Mr. Runyon is at Fort Benning.  He's packing his belongings. He is calling his brother to come get his truck and his belongings.

MR. SAMUELS:  I'm sorry.  I thought I heard him say that's when he found out, after he got hit, but I'm sorry.

THE COURT:  Well, we could move it along a little faster, Ms. Chavis.

BY MS. CHAVIS:

Q.  So David came up to pick up your truck and your belongings, and you said good-bye for that time?

A.  Right.

Q.  Okay.  And then did you learn that David had been in an accident with your truck and not your belongings?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              633

A.   Yes.  To be honest with you, I can't exactly recall, but I'm pretty sure that it was Maria that called me and said that David was in an accident.

Q.   Okay.  Did you ever see your truck again?

A.   Yes.  I did see my truck again, but it didn't look like much of a truck when I saw it.  David had to deal with whatever happened after the accident, and I was in jail.  I didn't hear much from him, to the point that when I got out of jail, out of the military prison, I had to track him down and figure out where he was, and I showed up on his doorstep and tried to put my life back together.

I left David some things that I was trying to collect, my belongings, and there was some money involved and, you know, David didn't have the money.  He didn't have any of my belongings.  He didn't have my truck.  And, you know, he was transitioning out of the military, and I couldn't get a straight answer out of him as to what had happened.

I got conflicting information between him and Maria, and I just chalked it up to the -- he didn't want to tell me what had happened.  He told me there was an accident, but he didn't want to tell me all the details.  He didn't want to tell me what happened to all of my stuff, because I had guns, I had stereo equipment, I had furniture.  I had my life packed up in that truck.  I wanted to know where my stuff

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                    634

was.  I wanted to know where my money was in my bank didn't. I wanted to know what had happened, and I wasn't getting any clear answers.  I just assumed that he had taken it.

And I ended up getting a police report from the insurance company, and off of that police report, I got the officer's name and also got the name of the towing company that took my truck, and went to go try and find my stuff.  It was like digging up dinosaur bones, because it was a long time ago, and when I got there, there was nothing to find.

But when I found my truck, what was left of it, I couldn't see how somebody would survive that.  The front driver's side bumper of the truck was in the passenger's seat, almost touching where you pull the seat belt down.

THE COURT:  How long after the accident, and where had the truck been?

THE WITNESS:  The truck had been in the towing yard.

THE COURT:  For how long?

THE WITNESS:  At the tow company for almost a year. At that point it was scrap, and it was not usable for anything, and the tow company had it just sitting there. It's a little town in the middle of nowhere in Alabama, and this tow company was keeping it for scrap parts.

THE COURT:  Where in Alabama?

THE WITNESS:  I can't remember the name of the

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                    635

town, ma'am, but I do remember that there wasn't much left of the truck.

THE COURT:  Because they were using it for scrap?

THE WITNESS:  No, because it was destroyed.  Like I said, the front bumper of the driver's side was up in the passenger's seat.  I couldn't see how somebody could survive in that.

David had said, oh, he got cut out, they had to cut him out, and I thought he was full of crap, or full of it.  And it was bad.  And at that point, I moved on.  I figured, okay, well, all my stuff is gone, the truck is totaled, there is noting to do, just move on.  So David helped me.  I got on my feet, moved out, and moved on with my life.

BY MS. CHAVIS:

Q.  So after you left Georgia, you moved to Hawaii, correct?

A.  Yes.

Q.  And when is the next time that you saw your brother?

A.  My wedding.

Q.  Your wedding?

A.  Yes.  I got married, and invited him to my wedding along with my parents, David H. Runyon and my mother, you know, just trying to bury the hatchet.  I paid for them all to come out and come to the wedding, flew them all out to Hawaii, and was trying to, you know, make things like a family again and, yeah.  That was, you know, I got to spend some time with

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                     636

David away from Maria, and he was in good spirits and, you

know, I taught him how to scuba dive.  We went scuba diving.

We charted the whole -- the whole wedding party took a

charter, and, yeah, that was the next time I saw David.

Q.  When you taught him how to scuba dive, was there an

incident that occurred with respect to his health issues?

A.  Well, every time, you know, as an instructor, your

students have to fill out a medical questionnaire before you

get in the water.  And one of them was, you know, dizziness,

vertigo, and he asked me about it.  And I said, look, if you

put a yes there, then you can't dive, and I can't take you in

the water.  You have to go get a doctor's clearance.  I said,

are you having any issues with it?  He said sometimes.  And I

said, if you put it down, then I can't take you.  So I said

just mark it off, and I'll keep an eye on you.

Q.  So David informed you at that point that he had -- was

having dizziness issues and vertigo?

A.  Well, he was complaining about that stuff for a while,

but I would just -- I always just dismiss it as him, um,

whining and being -- you know, we'd always had that kind of

rough and tumble relationship with each other and, you know,

you're not allowed to get hurt, so when you get hurt, we just

mess each other about it, and I told him he was whining like

a little girl.  And that's kind of how I took a lot of what

he did.  There came a point where he wasn't my older brother

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                 637

anymore, that always had one up on me.  He was just a whiny little girl always complaining about stuff.  And, you know, the vertigo thing was -- I thought that he was just complaining, you know.  I didn't really understand what vertigo was until I had it and got it at one point and, you know, I kind of figured it out.  But I just assumed he was complaining.

Q.  So when you got vertigo, what did you experience?

A.  I was -- I got vertigo when I was working as a boat captain, and I had pulled all the people out of the water.  It was on a day trip where I was taking people snorkeling, and one minute I'm standing there calling everybody in, and the next minute I'm laying on the floor, and I can't tell which way is up, and, you know, I ended up getting hospitalized for it.

Q.  And you've mentioned that David had complained for a while about dizziness.  Were there other instances when he mentioned being dizziness and being afraid of falling?

A.  I think probably one of the first times that it really kind of -- you know, looking back at it, hit home, was after I had gotten out of the military from being court-martialed, I went to stay with David, and one of the first things I did was get out in the woods and go hunting.  And David told me a couple of places to go on Fort Benning, and he told me where the tree stands were, and he told me to make sure that I used

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                                638

the safety lanyard, that he had had vertigo before and it saved his butt when he was in the tree, and that to make sure that I used the safety lanyards, the tethers to tie on.

Q.   Is that unusual for him to have used a safety lanyard?

A.   Well, we are kind of invincible, you know, you are young and bulletproof and you don't need no stinking safety lanyard.  You know, that's kind of the mentality we always had.  It kind of stood out in my head because that was the first time you turn into a whiny little girl.

Q.   So is it fair to say that after you got out of prison David was different?

        MR. SAMUELS:  Objection to the leading.

        THE COURT:  Sustained.

BY MS. CHAVIS:

Q.   How would you describe David when you encountered him, after you got of prison, as compared to the David that you knew before you went into prison?

A.   Well, like I had said earlier, he wasn't my older brother anymore.

Q.   And you testified at David's capital trial, correct?

A.   Yes.

Q.   And before you testified, did you speak with David's trial attorneys?

A.   My primary point of contact was Sheila Cronin.  I can't ever really remember having a sit-down or talking with his

JODY A. STEWART, Official Court Reporter

Runyon, M. - Direct                                              639

attorneys, that let me know what was going on with the case or let me know what their ideas were.  They were a little preoccupied and didn't really let me know what was going on or talk to me that much.

Q.  Your mother also testified at trial, correct?

A.  Yes.

Q.  And after David was sentenced to death, did you speak with your mother?

A.  I did.  My step-dad, David H. Runyon --

        MR. SAMUELS:  I'm going to object to the relevance of the conversation with his mother after the verdict.

        THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  Okay.  Is there a point in time when your relationship or your standing in the family changed after David's trial?

        MR. SAMUELS:  Again, Your Honor, I'll object to relevance.

        THE COURT:  Sustained.

        MS. CHAVIS:  Your Honor, it goes to show the extent of the emotional abuse within the Runyon family.

        THE COURT:  This is after the fact, so this is -- you said after, so any emotional abuse after that, I would sustain it.  We've heard about it up through childhood and when they were living together.  If you are talking about after the verdict, it is irrelevant from a time standpoint.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                 640

THE WITNESS:  Ma'am, I understand it's irrelevant from the -- but even if it has nothing to pertain to this case, may I answer the question?

THE COURT:  No.  You'd have to talk to somebody else about that.

THE WITNESS:  Okay.

MS. CHAVIS:  May I have a minute, Your Honor?

THE COURT:  Yes.

MS. CHAVIS:  Thank you.

No further questions at this time.

THE COURT:  We are going to take a 15-minute recess.

(Recess from 1:22 p.m. to 1:41 p.m.)

THE COURT:  Mr. Samuels.

MR. SAMUELS:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Mr. Runyon, good afternoon.

A.  Good afternoon.

Q.  I don't know if you remember, sir, but I was the attorney for the government that questioned you back in 2009.  I'm sorry we are meeting under such circumstances.

Mr. Runyon, you had indicated that you were here and did testify for the penalty phase; is that right, sir?

A.  That is correct.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              641

Q.  And I believe you testified that after the penalty phase, about a year, year and a half after that, you underwent some therapy after meeting a woman; is that right, sir?

A.  That is correct.

Q.  And as a result of that therapy and some of those sessions, some of the memories that I think you testified were repressed, they started coming more to the surface?

A.  I would say that Pandora's box was opened.

THE COURT:  You need to speak up.

THE WITNESS:  I would say that Pandora's box was opened.

BY MR. SAMUELS:

Q.  And when Pandora's box was opened, the good, the bad, and the ugly, different things come out of that box?

A.  Yes, sir.

Q.  And to be clear, that's a process that's gone on over some period of years, since I think 2010, 2011, when it began?

A.  It was a little later than that, but, yes.  It's a process that I've been working through for the past five, six years.

Q.  Has it even been since 2015, 2016, sir?

A.  So I would say that it would be a little bit before that. My marriage was over in 2011.  I was separated, so it was probably 2012 to 2013 that this process started, and it's

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              642

still ongoing.

Q.   Yes, sir.  And I think you also testified that there were some actual events that triggered some recollections.  Specifically, you saw your birth father, and that triggered some memories of seeing him previously; is that right, sir?

A.   So the recollection of seeing him is, it's more the recollection of noticing my stepfather speaking to somebody in a vehicle that I didn't recognize that was sitting on the street outside of our home, a little ways down the street from where we were playing.

Q.   And that's a recollection that came up after the penalty phase as well; is that right, sir?

A.   So that recollection, it was always there, I just didn't have a context for it.  It was something that I knew had happened, but I didn't have a context for it, in the same way that I knew that somebody was calling on Thanksgiving and Christmas and around holidays, and my mother would get upset about it, but I had no context to really understand what it was.

Q.   Until after the trial; is that right, sir?

A.   Until after hearing the other side of the story.

Q.   Mr. Runyon, you have been, in addition to your trial testimony, you have been interviewed and made a number of statements about your background; is that right, sir?

A.   Could you be clearer on that?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                    643

Q.   Let me tell you what I have and see if that helps your recollection, okay, sir?

A.   Okay.

Q.   Mr. Runyon, I understand that you were interviewed by a Ms. Sheila Cronin sometime in December of 2008.  Does that sound right?

A.   I can't remember the exact date, you know.  I do remember being interviewed by Sheila Cronin.

Q.   And that was when you were living in Hawaii; is that right, sir?

A.   That is correct.

Q.   When Ms. Cronin came to interview you, was she with anyone else?

A.   Not that I know of.

Q.   My understanding, sir, is that Ms. Cronin met with you daily between December 4th, 2008, and December 7th, 2008.  Do you recall that, sir?

A.   I remember us meeting, but I don't remember the exact dates.

Q.   Were there a number of dates that you met with her, though, sir?

A.   Yes, there was.

Q.   And in those meetings, Ms. Cronin was asking you a number of questions about your background and your family; is that right, Mr. Runyon?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                  644

A.   That is correct.

Q.   And you were free, in talking with Ms. Cronin at that time; is that right, sir?

A.   I conveyed to Ms. Cronin everything that I could recollect.

Q.   Back in December of 2008?

A.   Correct.

Q.   What I have here, Mr. Runyon, is a nine-page report of interview from those sessions in December of 2008, from Ms. Cronin.  Have you ever seen that report, sir?

A.   I don't believe I have.

Q.   So that's not something that you would have reviewed before you came here today?

A.   I am not privy to what Ms. Cronin wrote, in the sense of I don't know what she wrote and didn't write.  If you say I had a nine-page report, I would have to defer an answer on that because I don't know what she wrote and what she didn't write.

Q.   Well, how about this, I'll show you the first page of the report, and you tell us whether that looks familiar to you at all, okay, sir?

A.   Sure.

        MR. SAMUELS:  May I do that, Your Honor, show him the first page?

        THE COURT:  Yes.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                               645

BY MR. SAMUELS:

Q.  Mr. Runyon, I'm showing you this report of interview dated December 16th, 2008.  Do you see that, sir?

A.  I do.

Q.  And it reflects an address of you, and I won't pronounce the name right, but it's somewhere in Hawaii, sir; is that right?

A.  That's correct.

Q.  Is that where you were living at the time in December of 2008?

A.  Yes.

Q.  And that report reflects daily sessions from December 4th, 2008, through December 7th, 2008.  Do you see that, sir?

A.  I do.

Q.  When you look at that, does that coincide with your memory about meeting with Ms. Cronin on a number of days in December of 2008?

A.  I would say that it seems that would be the case.  When you say -- I don't remember the exact dates, you know, and I don't remember the exact dates because when it happened, it happened.  If she recorded that it happened around that time period, then I would say that's probably right.  You're asking me to remember something that happened over ten years ago.

Runyon, M. - Cross                                          646

Q.  I understand, sir.  And we are going on your memory, Mr. Runyon, but do you remember it being multiple days?

A.  Yes, I do.  Yes.

Q.  Ms. Cronin came all the way out to Hawaii to talk with you?

A.  Correct.

Q.  But showing you that report, you didn't read that report before coming to court today?

A.  Not that I can think of.  I mean, it's like you ask me if I read something, and that looks like an official report, but I haven't been sitting down going over official reports.

Q.  Okay, sir.  And the reason I asked that question is because I thought in your direct examination you were talking about your F-250 truck.  Do you recall that?

A.  Correct.  So it had been brought up that I had a truck, and they said it was an F-150, and I said that's not right, that's an F-250.

Q.  So I thought when you said that, it sort of indicated that you had reviewed something before you came to testify today?

A.  That would be a mistake.

Q.  You did not review any document before you came to court today?

A.  Of course, you look at whatever you have, but, you know, the reality is, is that if I see something that is out of

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                        647

context, I will make the correction and state that I didn't have an F-150, I had an F-250.

Q.  When did you come in to testify, Mr. Runyon?

A.  When today?

Q.  For this proceeding, sir.  You came from Georgia?

A.  Yes.

Q.  When did you travel into Norfolk?

A.  I actually -- I think I was supposed to come on Tuesday but my -- David Dombrowski showed up on Monday, and I ended up coming up on Monday.

Q.  When you came up on Monday, have you reviewed any documents between Monday, arriving here, and Friday when you testified that would pertain to the case, sir?

A.  So for the most part I've been sitting in a hotel room waiting and, you know, hanging out with, you know, my father and, you know, we will wait until we are called to go, you know, get ready for trial, which actually didn't happen until last night.  So, you know, you're asking if I got to review a bunch of documents.  No, I got to sit around and wait until I was called.

        THE COURT:  But did the attorneys know you were here?

        THE WITNESS:  Yes, they did.  They were working, and I was letting them do their thing, so I figured when they needed me, they would call me.

                JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                   648

BY MR. SAMUELS:

Q.  Did the attorneys meet with you, sir?

A.  Last night.

Q.  When the attorneys met with you, did they give you anything to read or review?  I'll make it specific, when you met with the attorneys, did they give you anything to read or review?

A.  They had talked about what we might be talking about.

Q.  Were you given any documents or reports, sir?

A.  I wasn't given documents or reports.  We had a discussion about what we might talk about.

Q.  And just to be clear, and maybe I'm not asking it clearly enough, when you met with the attorneys, did you review any reports or any statements?

A.  I didn't have the papers on my side of the table.  They were talking to me about talking points.

Q.  They never gave you anything to review and said, please look at this report, that you recall?

A.  Yeah, so there was -- I think we were sitting at the table last night, and she said, do you remember this?  You know?  But there was -- I didn't get to sit there and read over a bunch of stuff.  So I'm sorry I can't give you a clear answer.

Q.  Well, apart from last night, at any time during the week you've been in Norfolk, have you reviewed any documents that

Runyon, M. - Cross                                               649

would pertain to your testimony here today, sir?

A.  No.

Q.  Mr. Runyon, the next document that I have is a copy of your testimony at the penalty phase.  Do you remember giving that?  I believe it was in August 2009, sir.

A.  If you say so.

Q.  It's about a 40-page transcript.  Have you reviewed that at all, sir?

A.  No, not really going over the transcript.

Q.  Have you ever seen the transcript of your testimony at the penalty phase?

A.  I'm not really interested in reliving a lot of what happens here, and to be honest with you, I -- a lot of this drags up a lot of things for me and isn't very pleasant.  So you're asking me to dig into things that I really -- I'm sorry about.

Q.  I understand.

        The next document that I have, Mr. Runyon, is a set of what look to be interview notes, and they're not dated.  You mentioned that Ms. Sheila Cronin had come and visited you, and we talked about that, in December of 2008, right, sir?

A.  Yes.

Q.  After the trial, did any defense investigator come to visit you, and let me narrow it down, sometime maybe in

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                  650

August or September of 2015?

A.  I'm not really sure on that, on 2015.  That was -- there was a lot of -- I was doing some therapy stuff at that time, and there was a lot of things that were being brought up, and I don't remember anybody but Sheila, to be honest with you, and so I can't really give you an answer.

Q.  Can I show you something else and see if it helps refresh your recollection?

A.  Sure.

Q.  Thank you.

        MR. SAMUELS:  Your Honor, may I show him something else?  Your Honor, I'm just going to use the screen if that's okay.

        THE COURT:  That's fine.

        MR. SAMUELS:  Thank you.

BY MR. SAMUELS:

Q.  Mr. Runyon, I'm showing you a set of what appear to be some notes of an interview with you, sir.  Before I ask about it, do you recognize that address, the 838 address in a different city in Hawaii than what we looked at with Ms. Cronin?

A.  So this looks like it would have taken place when I was living up Olinda Road.  Olinda Road is directly above Makawao, and the P.O. Box that's reflected there is where we keep my mail.  I was living off grid, and, you know, solar,

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                             651

water catchment, and really horrible driveway that rental cars can't come up.  So that would have been around that time.

Q.  Sir, looking at --

A.  That was also a time when I was heavily involved in the therapy.

Q.  Mr. Runyon, just to help orient us, the memo does say that you and your wife divorced three years ago.  Does that help put this in time frame for you at all, sir?

A.  So the divorce didn't take place until -- it wasn't finalized until 2014.  The separation happened in 2011.  It took four years to get a divorce with the contentious custody battle, so I had a four-year legal battle with my ex-wife to try to see my children.

Q.  Mr. Runyon, just looking at this report and the address on it and the reference to the divorce, does it help you recall at all if someone from your brother's defense team came out to Hawaii to interview you again?

A.  Yes, it would seem so, but I don't necessarily have a recollection of who that was, and I would say that because if I did have this -- if I did meet with somebody else, it didn't really make a big impact on me emotionally.  When I say emotionally, it didn't really stick out in my head.  It seems like it would be something like somebody is just doing a quick follow up.

Runyon, M. - Cross                                          652

Q.   The interview memorandum I have, sir, is nine pages, and it concludes with the description of your testimony at the sentencing phase.  Looking at that, I'll just show you that it is nine pages, here, sir, does that help you remember at all better the scope of that session and what occurred there, sir?

A.   It is so blurry, I can't see it right now.

Q.   I'm sorry.  Let's see if I can make that better.  There you go.

     Does that help at all, Mr. Runyon?

A.   Allow me to read this, please.

Q.   Yes, sir.

A.   So I did read it, and, you know, you said it was nine pages.  I'm not sure how somebody gets nine pages out of me talking, but it seems like, you know, that would be somewhat accurate.

Q.   Looking at that last page, does that help you remember any better who might have come to interview you, sir?

A.   No.

Q.   Do you remember anyone by the name of Michael Chavis?

A.   I remember Michael Chavis.

Q.   Was it Michael Chavis that came to Hawaii to interview you, sir?

A.   No.  He came later.

Q.   And you have no -- was it a man or a woman?  Who came to

Runyon, M. - Cross                                          653

interview you, sir?

A.  Well, you know, the woman that sticks out in my head is Sheila Cronin.

Q.  Again, just to orient you, I'm talking about after the trial, when you were living off the grid at that the different location.

A.  Uh-huh.  So you're talking about a period where, like I said, I was involved in therapy, and it was pretty intense therapy, and there were a lot of things that are still really confusing to me about that time period, and, you know, living off grid was -- a lot of it was by choice because there was a lot of things that I was having to go through where I wasn't fit for human consumption.  I was not fit to be talking with people because of unpacking the trauma that I had been dealing with and trying to sort through it and figure out how to be a human being.

So are you asking me to remember a discussion with somebody in which they got nine pages from that discussion, and it may have been an hour, it may have been two hours.  But did that person make an impression on me?  No.  I felt like I was just going over what I had already gone over with Sheila.

THE COURT:  This was after your divorce and after you had lost custody of your children?

THE WITNESS:  Just for the record, I never lost

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                          654

custody of my children.  I still have 50 percent legal custody, and the divorce is finalized, but there was a four-year period where I was fighting to keep custody of my children.

THE COURT:  Then, though, your ex-wife got permission to move back to Georgia with the children?

THE WITNESS:  Correct.  After I won the divorce hearing and the divorce was granted 50/50 custody, then she filed for relocation, and the Judge gave her relocation because her father basically said that he would provide for them.

THE COURT:  So this interview, obviously, was after that time period because it says in the paragraph that you had been divorced for three years, and it mentioned your wife moving back to Georgia, your ex-wife, with your -- I think it was three or four boys?

THE WITNESS:  So if that would have been the case, then it would have had to have been really recent that the divorce was finalized.  Like I said, the divorce didn't happen until 2014.  The separation happened in 2011.  So if you have the dates on there to look again, and it was somewhere in the later part of December of 2014, that would be really shortly after the divorce.

THE COURT:  No.  This said it was three years after, though.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                               655

You can put the paragraph back up.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  It says here, you have four boys, and you and your wife divorced three years ago.  So this would have been around 2017, then?

THE WITNESS:  No.  Because --

THE COURT:  This is not Sheila Cronin.  This is another interview.

THE WITNESS:  Okay.  Because the divorce didn't have until 2014.  I had been separated, so maybe whoever took the interview mistook separated for divorced.

THE COURT:  But it also mentions that you had come to grips with not having your boys with him, that she had taken them to Georgia.

THE WITNESS:  So this would have to have been somewhere in 2014, because that's when that happened.

THE COURT:  This says it is three years later.

THE WITNESS:  I understand what it says, but if it was -- if they are saying that this interview happened in 2014, I can't see on here any date where it said that this happened, but if this happened in 2014, then that would have been very recent.  So please allow me to read the rest of it.

THE COURT:  I think there could be some mix-up in the context here.  The first interview, that was with

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                        656

Ms. Cronin.  Then Mr. Samuels is asking you about another interview that occurred, and he was asking you whether a Mr. Chavis or someone else did it, and he was showing you this as a later interview.  This is not Ms. Cronin's.  If you can see at the top here, this mentions referring to her interview with you.  So somebody is looking back at that interview.  And then it says that you have four boys, you and your wife divorced three years ago, there was a contentious court battle, and your ex-wife was allowed to take the boys back to Georgia.  So this would be three years after your divorce.

So if your divorce was in 2014, would the time period have been around 2017, when this was occurring?

THE WITNESS:  So, you know, I remember speaking to Sheila Cronin, and then the next person that made an impact and that I gave statements to was Michael Chavis, I believe. I don't remember anybody else before Michael.

THE COURT:  Ms. Chavis.

MS. CHAVIS:  Yes, Your Honor.  I'm not sure what we are doing with this statement, but Mr. Runyon has said that he doesn't recognize this statement.  He doesn't remember giving any interview to a person during this time period. And if the statement is trying to be used for any type of impeachment, it hasn't been adopted by Mr. Runyon, and it would be improper for those purposes.  I would object to

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                          657

this being placed on the Elmo, where the facts are placed before the Court and are being reviewed when this type of information is improper.

THE COURT:  Where did you get it from, Mr. Samuels?

MR. SAMUELS:  I got it from Ms. Chavis, Your Honor.

THE COURT:  So it came in discovery from the defense?

MR. SAMUELS:  It did.  If Your Honor will look at it, it is the same format as the interview memo we were talking about yesterday.  I'm not trying to impeach Mr. Runyon with it yet.  I'm just trying to establish that the interview occurred, and seeing if this will refresh his recollection.  I put it on the screen for convenience purposes.  If the Court would rather me hand it to Mr. Runyon, I'm happy to do that, but I thought with no jury sitting here it was just more efficient to show it to Mr. Runyon in this way, and see if it helped him remember having this interview.  Certainly, I'm entitled to ask about his prior statements on this matter.

MS. CHAVIS:  And he said that he doesn't remember and he hasn't adopted or signed this statement.

I think under, Your Honor, the case of *Carnell Construction Corporation*, which would be at 745 F.3d 703, it's a Fourth Circuit case from 2014, for a statement to qualify as a witness's prior inconsistent statement, it must

Runyon, M. - Cross                                                        658

be one that the witness has made or adopted.

THE COURT:  I don't believe that he's offered it as a prior inconsistent statement.  I think that what I have heard so far, and the way I am taking it is, he is entitled to cross-examine on any previous statements that he's made.  This was produced by you as a previous statement of your witness, and he's entitled to cross-examine on it.  So far he has established that Mr. Runyon's memory is very poor.  That's basically, if there is any impeachment at all, he's establishing he doesn't remember it.  I don't think it's been adopted as his statement.  I don't think it's been offered for that.  It was offered to refresh his recollection, and apparently it hasn't done so.

THE WITNESS:  Your Honor --

THE COURT:  So it hasn't been admitted into evidence, but he's certainly entitled to show it and see if it refreshes his recollection.  He did say that Mr. Chavis did interview him at one point, so he has testified to that.  That's my ruling.

THE WITNESS:  Your Honor?

THE COURT:  Yes.

THE WITNESS:  This seems like a summary to me of multiple statements, and so I'm not disputing things that are said in this statement by any chance.  What I'm saying is that they are asking me to specifically recollect exactly

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              659

how the statement came about, and I'm not really sure how the summary came together.  I did make statements.  I did talk to people.  I stand by what I said, so -- but also understand this is a time period where a lot of my preconceived notions and beliefs were shaken.  I had to start dealing with, you know, that box that was opened.  I had to start dealing with the trauma that I had from the past.  I had to start understanding how to hold those in context, how to make peace.

THE COURT:  I understand.

BY MR. SAMUELS:

Q.  Mr. Runyon, what I'm trying to establish is how many different statements you provided, and that's why -- we first talked about the one with Ms. Cronin in December of 2008, you recall that, sir, right?

A.  I remember speaking to Ms. Cronin, yes.  She was the first person I spoke to.

Q.  Then the second document that I showed you was your trial testimony, when you came out here and testified in August 2009?

A.  Which is public record.

Q.  It is, yes, sir.

And what I was leading up to there, sir, is it looked like you had been interviewed at least one other time since then.  Was it more than one time, sir?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                            660

A.   I've seen Michael Chavis several times.

Q.   Several times where, sir?

A.   In Hawaii.

Q.   He's come out to interview you, sir?

A.   Yes.

Q.   In one of those sessions, did he present a declaration for you to sign?

A.   I'm not sure if I signed anything, to be honest with you. I remember that we had -- he took my statement and we talked about things.  You know, if he asked me to sign, I probably did.  And the reality is, is, you know, I don't mind given a sworn statement or signed statement.  So if he asked me to attest to it, then I would have.

Q.   Again, I'm just trying to establish your prior statements here, sir.  So if I could just show you what's marked as the declaration of Mark Runyon.  We're not going to go into the substance of it, sir, but I just want you to look at that and see if you recognize it for me.

A.   I recognize the content of it, yes.

Q.   The back page, which is 7 of 7, there is what looks to be, cut the blurriness down.

A.   I can recognize the signature, so I would attest that that was presented from me, then I signed that.  You know, whatever interview that I gave and whatever discussion was had, if it was put on paper and put it front of me, and it

Runyon, M. - Cross                                              661

was clear and factual, I would have signed it.

Q.   This says the 25th day of September 2015.  Does that help refresh your recollection at all in terms of when Mr. Chavis came and interviewed you, sir?

A.   So if I may, every couple of years somebody pops up from the court or this -- you know, this proceeding, and drags the skeleton back out of the closet.  So when they come, I deal with it then, I talk to them and move on.  It is not something I try and dwell on.  So if it happened, it happened.  2015 they came out, whoever came to gather the statement, however it came out, then that's what happened.  So I'm not arguing the validity of the statement.  I'm not arguing the contents of the statement.  If you're asking me to recollect every single thing that happened, then, you know, it's been almost a decade.

Q.   Let me ask you this.  Did you prepare a declaration yourself, sir, or did you just sign that, do you remember?

A.   I did not prepare that myself.  I did not write a statement, type it out, and put it in that the format, no. That is a summary of a conversation that was had.

Q.   Who presented the statement to you, sir?

A.   It probably would have been Michael.

Q.   Michael Chavis?

A.   It probably would have been, I'm not sure.  2015, that was around that time when there was a lot of other stuff

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                               662

happening.  So, you know, it wasn't Sheila Cronin.  I don't think she was on the case at the time.  It would have been somebody else from the office.  I don't know who it was.

Q.  Mr. Runyon, I just wanted to set the stage for what statements you provided.

I'd like to go back now to the time that you met with Sheila Cronin, and you certainly recall that, sir, right?

A.  Uh-huh.  Yes.

Q.  Thank you.

In the course of that interview, you did talk about your background and your family relationships?

A.  I talked about it, yes.

Q.  And you talked about your relationship with your brother?

A.  I did.

Q.  You talked about, with Ms. Cronin, that if you testified, the picture you painted of your family might be very different than the picture that your parents painted?

A.  Absolutely.

Q.  I believe you talked about David being a bit of a dreamer and reading philosophy.  Do you recall that, sir?

A.  I wouldn't say that, you know, David -- if he says -- if that reports says that he is a dreamer and a philosopher, I mean, he's always been -- he's always been like that, that would be a fair characterization.

Q.  Okay.  You talked about some of the issues with your

Runyon, M. - Cross                                              663

mother that you've, again, testified about today.  Do you recall that?

A.  Yes.

Q.  Do you recall talking about her disciplining and some of her outbursts?

A.  Yes.

Q.  Do you recall telling Ms. Cronin that you did not think that you and David were physically abused, but there was some emotional issues?

A.  That would be accurate at the time based on what I could recollect before I started unpacking that box, before I started doing therapy and dealing with the suppressed memories.

Q.  I think I understand, Mr. Runyon.

So when you met with Ms. Cronin, you were talking to her about what your understanding was at that time; is that right?

A.  Correct.

Q.  The box was not unpacked until after you separated, at least after 2011 is when that process started?

A.  Correct.

Q.  So details that may have emerged since then were not details that you had available to you to share with Ms. Cronin at the time in 2008?

A.  Correct.

Runyon, M. - Cross                                                    664

Q.   There were some facts that you explained to Ms. Cronin about your background and upbringing, though, correct?

A.   Yes.

Q.   Do you recall telling Ms. Cronin that David had wrecked your father's truck because he fell asleep at the wheel?

A.   That sounds accurate, and, you know, the truck accident, if I remember correctly, was David was off chasing a girl, and was trying to make it back, and he was tired and wasn't paying attention and had an accident.

Q.   I believe you testified about some scarring that you observed on David and asking him about that scarring, sir?

A.   On his face.

Q.   You did not tell that to Ms. Cronin, though, did you, sir?

A.   I don't believe Ms. Cronin broached that subject.

Q.   You did tell her about the car wreck, though, in 1991, correct?

A.   I did speak with her at length.  So exactly what I told her and what I didn't tell her, you're asking me to recall something that happened a decade ago.

Q.   If I showed you that portion of her report, would it help refresh your recollection at all, sir?

A.   It may.  It's probably her summarization of my statement. So if you're asking me to specifically agree to a statement, I can agree to the content of it, but I can't say that I said

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                665

exactly that same thing.  This is a summarization report.

Q.  Let's be fair, then.  I'll show you the statement and the portion, and you tell me whether that statement refreshes your recollection about what you told Ms. Cronin.  Is that fair?

A.  That's fair.

Q.  I'm showing you this interview statement, on Page 6 of the statement.  There is a reference here to, "His parents were back in Missouri but David was on the outs with his parents because he wrecked his father's truck when he fell asleep at the wheel."  Then there is no reference to any scarring.

I'm not asking you to adopt that statement, Mr. Runyon.  I just want to know if it refreshes your recollection about what you told Ms. Cronin.

MS. CHAVIS:  Is this an exhibit number.

MR. SAMUELS:  No.  I'm not offering it for evidence, Your Honor.  I'm just asking it refreshes his recollection about what he told her.

THE WITNESS:  Yes, it does.  That was -- in there it said it was 1991, which was around the time when David was graduating, I graduated basic training, went to go see him at Wentworth, and that's when I found out about the truck.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                        666

Q.   But looking at that, it doesn't contain any reference to the scarring.  Did you tell Ms. Cronin about the scarring?

A.   Probably not.  It didn't seem relevant at the time.

Q.   Mr. Runyon, did you talk with Ms. Cronin about some of the criminal history?  You did, didn't you?

A.   I did.

Q.   In fact, you testified about some of that history at the penalty phase of the trial, right?

A.   I did.  And just to be clear, you are talking about my criminal history.

Q.   Your criminal history.

A.   Okay.

Q.   When I'm talking about that, sir, I'm talking about the firearms charge that you served time in prison for, right?

A.   Correct.

Q.   You were court-martialed based on that?

A.   Correct.

Q.   Was there a theft charge as well that you had of military gear?

A.   There was a discrepancy, yes, and all that was disclosed to the Court.

Q.   That was talked about with Ms. Cronin, too, wasn't it?

A.   I believe so.

Q.   Do you recall talking with Ms. Cronin about David and Maria's marriage?

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                          667

A.   Yes.

Q.   Do you recall talking about his role as a father?

A.   Yes.

Q.   Do you recall talking about David's time in the military and it coinciding with your time in the military?

A.   Yes.  David's time in the military and my time in the military, we both started out as National Guard, and then we both -- I went active duty first, and then he went active duty later.  So there is -- when you say time in the military, just clarifying whether it's National Guard time or active duty time.

Q.   I have to narrow that down, you're right, sir.

Let me ask this.  Was there a time when you were both in the military, either National Guard or active duty, when you and David lived together for about a two-year period in the earlier 1990s?

A.   Yes.

Q.   Can you tell me when that time was, sir?

A.   I would say it would be between '92 and '93.

Q.   It would have been after David graduated from Wentworth Military Academy?

A.   Yes.  Because he got his early commissioning and then went to a National Guard unit, and then I transferred from my Virginia National Guard unit to the Kansas National Guard unit where he was.  I reclassified my MOS to 19 Delta, and we

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                            668

were basically in the same area, going to the same facilities and doing the same kind of stuff.

Q.  Mr. Runyon, do you recall talking in some detail about Maria Runyon and your opinion of her to Ms. Cronin?

A.  I believe I have to pretty much anybody who will listen.

Q.  And without going into --

THE COURT:  Pretty much?  I'm sorry, I just couldn't hear you.

THE WITNESS:  I said I believe I have talked to pretty much anybody who would listen about my opinion of Maria Runyon.

BY MR. SAMUELS:

Q.  Without going into exactly what you said, can you tell us, was that a negative opinion you would have expressed or a positive opinion?

A.  I have a negative opinion of her.

Q.  Do you recall talking to Ms. Cronin, that even though you hadn't seen your brother in a period of time, you wanted to do whatever you could to help your brother?

A.  He's my brother and I love him, and I would like to be able to help him in any way I can.

Q.  So when you were talking with Ms. Cronin, you provided all of the information that was available to you at that time period; is that fair to say, Mr. Runyon?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                   669

Q.  Additional information has come out since then.  You didn't have that at the time to provide to her?

A.  Additional information has come out based on my unpacking and sorting out the trauma.  So there are a lot of beliefs that I had that I challenged and had to really come to terms with, you know.  I thought that, you know, David had screwed me, basically, when I got out of the military.  In reality, that may not have been the case, so I have had to set aside my frustration with him and allow for healing to understand that stuff happens, and I don't know the answer, and I have no right to pass judgment on him.  So there are those types of things that have come out.

Q.  That was in respect to this issue with the money; is that right, Mr. Runyon?

A.  That was with respect to the issue with the money.  It also has to deal with the fact that I don't like Maria Runyon, but I have no right to judge her, and I have no right to judge what they went through, and I have no right to force my opinion on other people about them.

Q.  Is it fair to say that even though you don't force your opinion, you certainly expressed your opinion to Ms. Cronin?

A.  Yes.

Q.  Is it fair to say that you had that opinion back when Maria and David were together in the mid-1990s?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                        670

Q.  Mr. Runyon, when you were speaking with Ms. Cronin, you did not mention this auto accident with your truck, did you, sir?

A.  I don't know if I mentioned it to her or not.  If it's in her statement or in her notes, then it was mentioned.  If it wasn't mentioned, it was because I didn't think it was relevant, the fact that I was angry with my brother and that he wrecked my truck.  It would have been more about me being angry with him, and maybe I just didn't want to be angry with him when I was talking to her.  If I did talk to her about it, then it would have to have been in context.

Q.  So just let me make sure that I understand where that falls in context.

    You were in prison when David had your truck or went to get your truck, correct?

A.  No.

Q.  No?

A.  I was in pretrial, and I was getting ready -- I was getting court-martialed, and David came up and got all my stuff.

Q.  Then it was about, I think a year later, you said, you actually saw your truck, after it had been in some impound lot for some time?

A.  So it was about a year after the accident, because he came and got the truck, I got notified he got in an accident,

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                671

then I went to jail shortly thereafter, and I was in for 11 months and 20 days, and got out and went directly to his place.

Q.   That's what I was going to ask next.  When you got out of prison, you went down to live with your brother for a couple of months; is that right?

A.   Correct.

Q.   You talked to Ms. Cronin about that?

A.   Yes, I did.

Q.   So you talked to Ms. Cronin about the time period of your court-martial and going to live with David, but you did not mention this accident?

A.   The accident of the truck?

Q.   Yes, sir.

A.   I'm not sure if I mentioned it to her or not, but I would say it probably came up, because one of the things I brought up was that I got out of prison, and I didn't have anything and David had it all, and I went to go down there to get it. I went to go find him and figure out what had happened.

I needed a place to stay.  I needed a way to get started.  I knew that he had my vehicles down there, and my stuff was supposed to be down there, so that's where I went. And I knew that he had wrecked the truck, so I knew that wasn't there.  He had sent me some pictures once upon time of another truck that he bought to replace it.  So all that is

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              672

pretty common knowledge.

Q.   Are you certain that it is something that you mentioned to Ms. Cronin, sir?

A.   If you're trying to ask if I remember every detail of the statement that I gave to her over ten years ago, I can't speak to the certainty.  What I can speak to is it's common knowledge, and it's been common knowledge throughout this trial, that David took my truck.

Q.   All right.  Well, if I show you -- could I show you this again, sir, this statement, just to see if it refreshes your recollection as to whether you told her or not?

A.   You can show me the statement, and if it's in there, then it's a summarization of our discussion, so I would agree with it.  I'm not trying to argue what's in the statement.

Q.   I understanding, sir.

        MR. SAMUELS:  Your Honor, may I show it to him?

        THE COURT:  Yes.

BY MR. SAMUELS:

Q.   Mr. Runyon, looking through this, sir, and just orienting you, there is a chronological basis to this, and so I'm looking here, sir, where you talk about 11 months in prison, upon release from prison, you took a Greyhound bus to Fort Benning to find David, and there is this expectation of the money.  Somewhere in there would have been where this accident happened; is that right, sir, just from a

chronological standpoint?

A.   Correct.

Q.   Is it possible if we don't see it summarized in the report, that you did not mention it to Ms. Cronin at the time?

MS. CHAVIS:  Objection, Your Honor.  This calls for speculation.  It's been asked several times, and he continues to say -- he has given his answer that this, again, is a summary of a conversation that occurred over several days.  I mean, he's not accountable for what somebody else writes in a summary report of these conversations.  I think he's been asked this question several times and provided his answer.

THE COURT:  All right.  That was a bit of a speaking objection, but, basically, it's been asked and answered is your objection, and, apparently, the document doesn't refresh his recollection on this, and so it's not in the report, and it hasn't refreshed his recollection, so move on.

MR. SAMUELS:  Yes, ma'am.

BY MR. SAMUELS:

Q.   Mr. Runyon, after you met with Ms. Cronin, you came and testified at the trial in 2009, correct?

A.   I believe so, yes.

Q.   And as we said, this is a matter of record.  I've got

Runyon, M. - Cross                                              674

your testimony here that goes from Page 2464 all the way,
including cross-examination, to 2508.  So that's about 44
pages of transcript.  Okay, sir?

A.  Okay.

Q.  You were on the stand for quite a while at that trial.
Do you remember that?

A.  Yes, I do.

Q.  And this isn't a summary.  This is word for word what you
said, correct?  And you were asked dozens and dozens of
questions by Mr. Runyon's trial counsel, Mr. Steve Hudgins.
Do you remember that?

A.  Correct.

Q.  And you went through a number of photographs as well.  Do
you recall that?

A.  I don't recall the photographs, but if they came up in
exhibits and they were shown, then, sure.  This is all part
of court record.

Q.  Yes, sir.

    Do you remember talking about a number of the same
things on the witness stand that you spoke about with
Ms. Cronin?

A.  Yes.

Q.  Do you remember talking about discipline from your
parents?

A.  I do.  And that context was, like I said, from what I had

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                           675

previously understood, before I started unpacking the box.

Q. That was based on what you had at the time?

A. Correct.

Q. You also talked about some of your work history and how it intersected with your brother?

A. Correct.

Q. And as I understood it, sir, you and David resided together for a couple of years when you were both in Kansas; is that right?

A. Yes.

Q. Then you stayed with him after you got out of jail in, I believe about 1998; does that sound right?

A. Yes.

Q. Two to three months?

A. Yes.

Q. You talked about what a great dad he was?

A. Yes.

Q. And when you were asked about the charges in the case, you said that this was not the David that you knew?

A. Correct.

Q. You didn't believe that David would do this crime?

A. Correct.

Q. Mr. Runyon, is that still the case?

A. I don't have an opinion on what the Court's already judged. In other words, I don't have the evidence. I don't

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              676

know.  And I actually was not part of, you know, his trial in terms of finding out if he did it or not.  I still don't have any evidence.  I still don't really know.  At this point, the relevancy of whether he did it or not is kind of irrelevant to me.  The only thing that's relevant is that I love him and I'm here for him.

Q.  And you want to help your brother however you can, sir?

A.  It would be natural for anybody to want to help their siblings and their loved ones.

Q.  Of course.

Mr. Runyon, again, since this is part of the record, there is no mention of any accidents that Mr. David Runyon had with your truck, sir, in your testimony, is there?

A.  You know, it's interesting because the statement that you showed mentioned that I went to Fort Benning to get my money back, and that's exactly what I did.  All of my belongings and all of my stuff was with David.

When David went to get my truck, he took all of my belongings.  He also got power of attorney.  And that's a military record.  He got a military power of attorney so he could handle my financial affairs while I was incarcerated.

So all of those things happened.  And my truck, my guns, my furniture, my stereo equipment, all of my personal belongings, every sock, every pair of pants that I had was gone.  And I went after it.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                    677

Q.   I guess what I'm asking, sir, is you talked about this accident that David had in your direct examination and how you saw the truck after that.  Do you remember that, sir?

A.   Correct.

Q.   And what I'm asking is, do you recall that you did not talk about that accident in your testimony at the penalty phase of the trial?

A.   I don't know if it ever came up in the testimony -- or in the accident phase or the -- the penalty phase of his trial.  I'm not sure if that came up or not.  You know, what came up was, you know, how I related to him.

        If you're asking for semantics, I'm not going to argue semantics with you.  I would simply say that I know the facts.  The facts are that he had my stuff, and I was upset with him about it.

Q.   Okay, sir.  We could certainly look through the transcript -- it's part of the record -- to see if you made any mention of the accident with the truck, correct?

A.   Correct.  You could.  And that answer would have been based off of what somebody had asked me.  So if I was led in a certain direction or not lead in a certain direction by the questions that were asked, I gave the answers to the best of my ability with what information I had.

Q.   All right, sir.  You don't recall testifying about any incident with footballs, playing football as a child, either,

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                          678

do you, sir?

A.   So I did not testify to that in his sentencing phase of the trial.  You know, the relevance of that would have seemed dubious at the time, and to be quite honest with you, I can go through my memory and find a lot of things that might be relevant now that didn't seem very relevant then, and that was based off of what I was asked.

Q.   All right, sir.  Fair enough.

Do you recall that you did not discuss any change in David in terms of dizziness or anything like that at the trial?

A.   That was never brought up at the trial, that I can remember.  Now, if you're asking me if somebody asked me if he had any medical issues, that was never brought up.  As a matter of fact, there were a lot of things that weren't brought up at the initial trial.

At the initial trial, I didn't speak to the attorneys, so, you know, I had no idea what they were asking, what context it was in, and to be quite honest with you, I gave the answers that I could at the time based off of what they asked.

THE COURT:  You did speak to Ms. Cronin, though?

THE WITNESS:  I did speak to Ms. Cronin.

BY MR. SAMUELS:

Q.   You don't remember whether you told her about the truck

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              679

accident or this dizziness or any kind of change in David?

A.   I wouldn't believe I would have talked to her about that because that was never asked of me.  So you're asking me to -- or let me rephrase that.  Ms. Cronin asked me to unpack a lifetime's worth of memories and summarize it.

Q.   You were trying to talk with Ms. Cronin about the highlights, the important things that happened over, as you said, a lifetime; is that right?

A.   Correct.

Q.   Ms. Cronin gave you plenty of opportunity to do that over the few days she was out there, didn't she, sir?

A.   If you ask me to impact a lifetime's worth on memories in a few days, they might miss a few details.

Q.   Of course.  But you would think the important details would rise to the surface, right, sir?

A.   That would depend on what's important, what's being asked.  So if Ms. Cronin was asking the specifics about David's mental health, physical health, you know, all those kinds of things, then maybe it would have come up.

     But what I got from her was Dave is in trouble, and the U.S. Government wants to give him the death penalty, and we're going to try and paint some type of an accurate picture and portrayal of your childhood, which is exactly the statements that I gave pertaining to the information that I had at the time.

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                            680

Q.  So let's say it this way.  If it wasn't asked --

MS. CHAVIS:  Your Honor, if he's going to ask the same question again, it's going to be about the third or fourth time we have heard this question.

MR. SAMUELS:  It's a different question, Your Honor, I promise.

THE COURT:  Go ahead.

BY MR. SAMUELS:

Q.  You didn't volunteer the information?

A.  I didn't volunteer a lot of information.

Q.  Okay.  Fair enough.

So then the trial ends, Mr. Runyon.  After the trial ended, beyond the unpacking process that we've described, had you done any research into the case or anything, sir?

A.  So the last time that I looked up the case was about -- there was the "Stars and Stripes" article out.  That was just before I came up here.  Up until then, I hadn't really Googled him.

Q.  And you mentioned that an investigator, Mr. Chavis, came to see you several times in Hawaii; is that right?

A.  Yes.

Q.  And in the course of some of those interviews, you talked about some things you hadn't discussed before; is that right?

A.  Yes.

Q.  And that was actually the first time that you brought up

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                    681

the issue with the truck accident; isn't that right, sir, the truck accident with your truck?

MS. CHAVIS:  Objection, Your Honor, we're going back into the same questioning that's already been asked and answered.

THE COURT:  Overruled.  Go ahead.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  This is the interviews with Mr. Chavis, not with Ms. Cronin, not with trial.  This is after, after you've been divorced.

Do you recall when you were interviewed multiple times by Mr. Chavis -- wasn't that the first chance that you told him about the accident with the truck?

A.  That may have been the first time that it was brought up, if it was brought up.

THE COURT:  So you didn't volunteer information to Mr. Chavis?

THE WITNESS:  He would ask questions, and I would give answers.  You know, there's reasons why I don't volunteer everything that's in my head.

BY MR. SAMUELS:

Q.  Let me ask about that, Mr. Runyon.  Is it fair to say that, in going through this unpacking process and this Pandora's box, that there's some guardedness that comes from

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                              682

that, in sharing information?

A.  I wouldn't say it's guardedness.  I would say I question the source.  And when I question the source, I look at it from multiple angles, then I decide how I want to sit with it.  But the facts are still the facts:  The truck still existed; the truck got wrecked; David wrecked the truck; David got hurt.  I didn't think anything of it.  I thought he was just whining like a little girl.  And I was mad at him for taking my money.

Q.  I think you told Mr. Chavis that, even though the truck accident occurred, you didn't think that David suffered any severe physical complications from the accident?

A.  I thought he was whining like a little girl, but I knew that that wasn't the same guy that I knew before.  And, honestly, I kind of blamed it on Maria.

Q.  That's what I was going to ask next.  Wasn't that really what you told Mr. Chavis, that you blamed any change on the pressures that occurred as a result from Maria?

A.  So I'm -- actually, I'm really happy that you're asking this question.

Q.  Yes, sir.

A.  Okay.  Relationships are really interesting.  I didn't understand why my brother would stay with a woman who treated him that way.  I didn't understand why he would put up with it and let her run him over and treat him the way that she

JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                          683

did.  I didn't understand that because I didn't have any context, until I got married to a woman who treated me almost the same way, and I didn't want to leave because I didn't want the leave my boys behind.  The only reason I chose to is so they wouldn't have that as an example of what a healthy relationship is supposed to be like.  My mother and my stepfather set that example for David and for me.  We both followed in that footstep.

Q.  Again, sir, this is part of the unpacking, just to set the stage for this; is that right?

A.  Correct.  So that judgment that I had for my brother was based off of family programming.  It was based off of what we were led to believe was normal and okay.  And I hated the relationship that my parents had, and, therefore, that transferred on to David's relationship with Maria.

Q.  All I'm trying to ask, Mr. Runyon, is, isn't that what you told Mr. Chavis, that you attributed any change in David to his toxic relationship with Maria Runyon?

A.  I would say that would be an accurate assessment at the time.

Q.  At the time when you were interviewed in the series of interviews sometime before this declaration, I guess, in 2015?

A.  Correct.

Q.  Okay.  And the declaration that you signed, that would

Runyon, M. - Cross                                               684

have been at the end of the interviews, right, or not necessarily?

A.   I'm not sure when the next time it was presented to me to sign.  I'm not sure if he did the interview and then went and typed it and brought it back for me to sign.

        THE COURT:  I'm sorry, I just didn't hear.  Your voice trailed off.

        THE WITNESS:  I said I don't believe I would have -- if he did the interview and then went home and typed it up and then brought it back the next day to sign it, I guess I would have signed it.  But in reality, I don't know when that interview was signed.  If he presented something to me to sign and I got to review it and then signed it, then it happened on whatever date it said it happened.

        THE COURT:  Because the line above it says the date, and under penalty of perjury.

        THE WITNESS:  Correct.

BY MR. SAMUELS:

Q.   Did you read the declaration before you signed it, sir?

A.   I did.

Q.   Okay.

A.   I read through it.

Q.   Do you remember, did you decide what to put in there, or was that decided by Mr. Chavis?

A.   It was a summarization of a long discussion.  So he wrote

                JODY A. STEWART, Official Court Reporter

Runyon, M. - Cross                                                      685

it up.  I went through it.  I didn't see anything objectionable, so I signed it.

Q.  When you spoke with Mr. Chavis, do you remember talking with him about the trial attorneys in this case?

A.  The trial attorneys in this case were never something that I had -- those guys never talked to me, you know.  They gave me -- it's like you're asking me to -- if I told Mr. Chavis about some great revelation that the -- or, you know, some great conversations that happened between me and the trial attorneys, in my honest opinion, those guys didn't really tell me much of anything or even tell me what was going on except for, come and help plead for your brother's life.

Q.  What I'm trying to ask is, did you express frustration or dissatisfaction with those trial attorneys to Mr. Chavis?

A.  I had no judgment of it one way or the other at the time.  And I had no judgment because I had no context.  I didn't know -- I still don't know what these guys are supposed to be doing and how they're supposed to do it.  You know, I'm not a lawyer.

Q.  You don't recall telling Mr. Chavis that the trial attorneys were just going through the motions and half-assed their sentencing presentation?

A.  I didn't feel like they really did much for him.

Q.  So you could have told Mr. Chavis that?

Runyon, M. - Cross                                                    686

A.   It's possible, yes.  And I probably did, because I really didn't have a high opinion of his lawyers.

Q.   And you don't have a high opinion of them today, sir?

A.   This process that I've dealt with, with Ms. Chavis and the legal team, has been far more interactive, and it has been far more transparent.

Q.   This process has occurred over a period of years, correct?

A.   Correct.

Q.   2015, or earlier, all the way up until today, 2023; is that right?

A.   Correct.

Q.   So it's fair to say that you are frustrated with these trial attorneys?

A.   I'm not frustrated with David's current legal team.

Q.   I'm sorry, sir.  You're frustrated with his former trial attorneys who defended him at the trial?

A.   I'm indifferent to them -- I don't feel like they did a good job; I don't feel like they did a bad job -- because I don't know what their job is.  I don't dislike them.  I don't hold animosity towards them.  To be honest with you, I'm sure they did the best they had with what they had in front of them.  And I feel like his current team is actually doing a good job.

          MR. SAMUELS:  Your Honor, if I could have just one

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                                    687

moment, please.

THE COURT:  Sure.

MR. SAMUELS:  Thank you, Judge.

Mr. Runyon, thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Redirect?

MS. CHAVIS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Mr. Runyon, I'm showing you the declaration that was referred to on cross-examination.  I ask you to look at Paragraph 27 where it says, "Following the car accident, David suffered dizzy spells and 'saw stars'."  And the next sentence says, "I noticed David's personality had changed, but I thought it was because of his marriage to Maria, which was very high conflict."

Is that correct?

A.  I do see it, and yes.

Q.  And this declaration is dated in September 2015, correct?

A.  Correct.

Q.  So you're saying here that you thought, at one point in time, that the personality change was because of the marriage to Maria, correct?

A.  Basically, that statement would be true, that I thought he was whooped and that she was calling the shots and running

Runyon, M. - Redirect                                                    688

all over him.  And that's not the guy I knew before.

Q.  And you've talked a lot about unpacking boxes due to therapy?

A.  Yes.

Q.  And that because you've unpacked boxes, you've remembered things from the past and have been able to talk about those things, correct?

A.  Yes.  In regards to David and his relationship with Maria and the feeling like he was whooped, and the judgments that came around that, was before I was really understanding why a father would endure what he did.  And, you know, there was a lot of chaos in that relationship and a lot of confusion, and I just attributed it to her being crazy.  But the fact that remains is that he's a very different person.  Whether he was in a relationship with her, if that was the reason, or if it was because of something else, I don't know the answer to that question.

Q.  Has -- I'm sorry.  I didn't mean to cut you off.

A.  So, you know, not being able to have a judgment of that is because it's not my place to judge, and I don't know the answer.  I don't know if he was whooped because he was in a relationship with a really domineering, overbearing woman that was abusive to him, or if he was just diminished in his mental capacity because he had an accident, which I refused to acknowledge in some ways and just told him he was being a

Runyon, M. - Redirect                                         689

girl.

Q.  Had somebody provided you a different lens with which to look at the circumstances, would you have been open to viewing the circumstances as other than David being whooped by Maria?

THE COURT:  Wait just a minute.

MR. SAMUELS:  Object to speculation, Your Honor.

THE COURT:  It's a hypothetical, speculative question.  The key is what he told Ms. Cronin, what the attorneys knew; that's why we are here.  We are not here for after the fact except what someone could have known at the time.  It's as simply as I can state it.  It's an improper question.  Strike it.

BY MS. CHAVIS:

Q.  Did Ms. Cronin discuss with you the issue of traumatic brain injury?

A.  That was not put in the forefront, and to be honest with you, I didn't view it through that lens.  So even if she did try to discuss it with me, I may have dismissed it because I just thought he was -- I thought that Maria was running the show.

And the reality is context is really important, and my judgment of my brother at that time was based off of me being angry and not having any sympathy for him or forgiveness for him and not being willing to look at what he

JODY A. STEWART, Official Court Reporter

Runyon, M. - Redirect                                                690

may have really been going through.

So a lens, if you would, the lens had changed its mind, unpacking more of the box and learning not to be angry and not to judge him and to accept him.

Q. Are you a person who can take in new information and change your mind?

MR. SAMUELS: Objection to the relevance of that, Your Honor.

THE COURT: Sustained.

THE WITNESS: I grow up a little bit every day, Your Honor.

THE COURT: All right.

BY MS. CHAVIS:

Q. The government discussed with you an interview by Sheila Cronin that took place over a few days; is that correct?

A. Correct.

Q. That was one meeting that occurred at one point in time over a few days, correct?

A. Correct.

Q. We've heard discussions about an investigator named Michael Chavis who has met with you, correct?

A. Yes.

Q. Mr. Chavis has met with you multiple times over several days each time; is that correct?

A. Yes.

Runyon, M. - Redirect                                                    691

Q.   And you've told Mr. Chavis more as a result of those multiple meetings over many days; is that correct?

A.   That would be correct.  When Sheila Cronin had contacted me, it was completely out of the blue.  I had never heard of her before, and she dropped the bomb that I was struggling to come to terms with and to understand.

     To be honest with you, I was a little bit distrustful with her because I didn't know who she was.  And the fact that she's an investigator for the government, and I didn't understand this whole process, I was reeling.  I didn't really know what to make of it.  And it happened, and a couple days later, she was gone.

     THE COURT:  You thought she was an investigator for the government?

     THE WITNESS:  Well, her card says mitigation investigator.  And now she was somebody who's talking to me about my brother.  And to be quite honest with you, you know, after she told me what she was doing, I spoke with her and -- you know, she started explaining the process to me, I spoke with her.  But all this information was new.  All of it was raw, and there was a lot of things that were gone over in a short amount of time, and then, poof, she's gone.

     THE COURT:  She was an investigator for your brother's attorneys.

     THE WITNESS:  Correct.  And the reality is, is this

Runyon, M. - Redirect                                                    692

is the first person that I met that's telling me about what happened.  I had no clue any of this was happening.  The first time that I get to find out what's going on about my brother is after he's already been convicted and they're trying to decide if they're going to put him to death.  I think it was a day late and a dollar short to get me involved in that game.  That's just my feelings.

BY MS. CHAVIS:

Q.  If somebody -- maintaining the metaphor of unpacking boxes, if somebody had come along and gently taken your hand and placed a box cutter within it and asked you a question and helped you open the box, would you have released answers to them?

        MR. SAMUELS:  Objection, speculation, Your Honor.

        THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  If Sheila Cronin had asked you the questions that you have been asked today, would you have provided those answers to her?

        MR. SAMUELS:  Objection, speculation.

        THE COURT:  Sustained.  What is important is that Sheila Cronin interviewed him and what he told Sheila Cronin.  And she will be testifying.  He said that his boxes became unpacked many years later.  So you're trying to get in things that are after the fact.  Or, either, you're being

Runyon, M. - Redirect                                                  693

critical of Sheila Cronin, which you can do that when she testifies.  But you're asking him a speculative, hypothetical question.

BY MS. CHAVIS:

Q.  When you testified at David Runyon's penalty phase, had you been asked these questions, would you have testified the same way you did today?

MR. SAMUELS:  Your Honor, I'm going to object.  He talked about all this unpacking that took place after the fact that has resulted in his testimony today.

MS. CHAVIS:  He did not testify that way --

THE COURT:  He did testify --

MS. CHAVIS:  -- that the unpacking resulted in today's testimony.  That's your testimony, Mr. Samuels.

THE COURT:  That is not Mr. Samuels's testimony.  I specifically heard Mr. Runyon say that he started unpacking all of this sometime, the earliest would have been 2011, when he was in his divorce situation, and that's when he started unpacking these boxes and opened up the Pandora's box, so to speak.

Is that correct, or do we need to go have the court reporter read it back?

THE WITNESS:  That would be correct.  It doesn't change -- it doesn't change the facts of what had happened in the sense that I know what happened with my brother and

JODY A. STEWART, Official Court Reporter

my possessions.  Those questions may not have been asked during that time.  There is no amount of unpacking in the future that would have changed that answer, that he wrecked my truck and all my stuff was gone.  I think that that's probably the crux of it.

MS. CHAVIS:  Those are all of the questions that I have, Your Honor.  I would ask that Mr. Runyon be released.

THE COURT:  All right.  Thank you, Mr. Runyon, for coming to testify.  You are now released from testimony in this proceeding.  I would tell you that, however, you may not discuss your testimony with anyone.  You are living, I believe you said, in Georgia.  I wish you a nice trip back to Georgia.  But you still may not discuss your testimony.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Your next witness.

MS. PEIFFER:  We would call David Dombrowski.

THE COURT:  All right.  Mr. Dombrowski, if you would please come forward and be sworn.

(Witness was sworn.)

DAVID THOMAS DOMBROWSKI, called by the Defendant, having been first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

                JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                    695

BY MS. PEIFFER:

Q.  Good afternoon, Mr. Dombrowski.  Could you please state your full name and spell your last name for the court reporter, please.

A.  David Thomas Dombrowski.  It's D-o-m-b-r-o-w-s-k-i.

Q.  And you might want to move your microphone a little bit closer.

A.  Is that better?

Q.  A little closer.

And how are you related to David Runyon?

A.  I'm his biological father.

Q.  I'm still having a little bit of trouble hearing you.

THE COURT:  We can turn the mic up a little bit.

BY MS. PEIFFER:

Q.  Are you also the biological father of Mark Runyon?

A.  Yes.  They're both my sons.

Q.  And who is the mother of David and Mark Runyon?

A.  Suk Cha Runyon, now.  It was Dombrowski.  Obviously, I was married to her.

Q.  Were you present throughout David and Mark's entire childhood, until the time they became adults?

A.  No.  We got divorced.  Mark was probably six, and David maybe three, I guess.  I think it's three years between them.

THE COURT:  David was how old?

THE WITNESS:  David, I want to say he was six.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              696

THE COURT:  Six.  And Mark?

THE WITNESS:  Mark, the younger one, was three.

BY MS. PEIFFER:

Q.  And just to clarify, Mr. Dombrowski, which of your sons is older?

A.  David.  David's the first born.

Q.  Thank you.

And after the divorce, did you retain your parental rights regarding David and Mark?

A.  No.  We got divorced, and it was agreed I would have visitation, but visitation just didn't materialize.  We were both military --

MS. McKEEL:  I can't hear the witness.

THE COURT:  You are going to have to speak up.

He said that he had visitation, but visitation just didn't materialize.

MS. McKEEL:  Thank you.

THE WITNESS:  I apologize for that.  Seems like I can do everything but put it in my mouth.

THE COURT:  You just need to speak as loudly as you can.

THE WITNESS:  I'll try.  Okay.  I'm sorry.

BY MS. PEIFFER:

Q.  That's much better.  If you can make sure you are speaking into the microphone, I think that helps a lot.

Dombrowski, D. - Direct                                                697

Were you a member of the military during your -- some point in your life?

A.  Oh, yeah.  I joined the Army in August 1967, and I retired in December of 1988; 20 years and a couple of months.

THE COURT:  20 years?

THE WITNESS:  Yes, sir.

BY MS. PEIFFER:

Q.  Were you ever deployed as part of your service?

A.  On several places.  I was deployed in Panama, of course, Korea first, Panama, Germany, yes.

Q.  And during that first deployment in Korea, how did you come to meet Mr. Runyon's mother?

A.  I just happened to meet her, that's all.  I was at a post outside of mine, and we met.  She was working in a tailor shop, and I was going to go in and get fitted, just shopping, window shopping, and I found her, working.

Q.  Adjust your microphone.

A.  Okay.

Q.  How did your relationship with Suk Cha develop?

A.  We just kind of hit it off, and eventually we got married.

Q.  And at some point did she become pregnant?

A.  Yeah.  That's where Dave came along, yeah.

Q.  And what kind of prenatal care was she getting during the first part of her pregnancy, do you recall?

Dombrowski, D. - Direct                                                    698

A.   She didn't get any.

          MS. McKEEL:  I'm going to object to relevancy of prenatal care.  We have no allegation of any issues with prenatal care.  That's not the scope of this evidentiary hearing.

          THE COURT:  Sustained.

          MS. PEIFFER:  May I respond, Your Honor?

          THE COURT:  Yes, but first of all, you have to establish that he knows what she was getting.  I assume, if he was in the military, if she was getting any, it would be military.  But you haven't shown that he knows.

          MS. PEIFFER:  I can lay a foundation.  But as to the relevance, that is an important part.  It's part of the expert reports that were quoted by the Fourth Circuit, and it's part of the subject of the remand.  It will be part of the later testimony.

          THE COURT:  Then quote the reports to me, then.  Prenatal care?

          MS. PEIFFER:  The care that he received prenatally affects -- will go towards instances regarding mental illness and brain damage.

          THE COURT:  Where is it in any report that's been before the Court?  I mean, the case has been going on for years, and there is a lot of documents.  But if you're going to ask a question like that, where is it in the Fourth

JODY A. STEWART, Official Court Reporter

Circuit's opinion?  I didn't see anything in the Fourth Circuit's opinion.  I didn't see anything in the reports that have come before the Court that there is any issue of prenatal care.

MS. PEIFFER:  Yes, Your Honor.  It's in Dr. Cunningham's report.  Dr. Cunningham's report was quoted by the Fourth Circuit, although it -- the Fourth Circuit did not quote that piece of the report.  It is part of Dr. Cunningham's report, which is Defendant's Exhibit 31.  I'm pulling up the precise page citation for you, Your Honor.

THE COURT:  I know the Fourth Circuit's opinion.  So they cited Dr. Cunningham's report.  There is nothing in the Fourth Circuit opinion about prenatal care.  If you want to show me the report and how you're tying it in, that's another thing.

MS. PEIFFER:  So Dr. Cunningham's report, which is part --

THE COURT:  You're not going to show that in front of the witness before you ask a question.  You can pass it up to me if you would like.

MS. PEIFFER:  Yes, Your Honor, of course.  This is Dr. Cunningham's report.  Would you like the full report?

THE COURT:  I want to see what you're talking about, in prenatal.  If I need it in more context, I will

Dombrowski, D. - Direct                                          700

ask you.

There is nothing in here about prenatal care. There is something about minimal weight gain and near miscarriage in utero. I don't think that necessarily -- there are a lot of problem pregnancies. I don't know that this witness's testimony about prenatal care, however many years ago -- if anything, if it's relevant, I don't know what kind of weight it would have in a proceeding like this. This witness is not a doctor.

MS. PEIFFER: Yes, Your Honor.

THE COURT: Are you going to show something else?

MS. PEIFFER: Yes, I have a further page for you. It's from the same report, on Page 29. It just provides a little bit more detail from Dr. Cunningham.

These are all factors that were cited as neurodevelopmental issues reported on by Dr. Cunningham whose testimony will be presented at a later time pursuant to the Court's order about order of presentation of witnesses.

THE COURT: Dr. Cunningham can say where he got this information from and why he's referring to it. But you would have to lay a foundation that this individual knows anything about this matter or if Suk Cha Runyon relayed -- I just don't know where you're going with Mr. Dombrowski on this.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    701

You haven't laid a foundation that he even knows, and if he does, what is the extent of his knowledge; did he ever accompany anybody on their appointments and things like that. You can't just, out of the blue, ask a conclusory question about what kind of prenatal care did somebody get. Ask him if he knows. Ask him what his experience was with his spouse during the pregnancy.

MS. PEIFFER: Yes, Your Honor.

BY MS. PEIFFER:

Q. Mr. Dombrowski, do you know if your wife received prenatal care while she was pregnant with David?

A. I know she did not. We had several arguments about that before David was born. She didn't want to see -- she didn't trust American Army doctors, and she just didn't want to go. She got pretty sick quite a few times, weight loss, vomiting, spotting, and I just insisted. I took her to the doctor.

Q. So at some point she received prenatal care?

A. Yeah. We're talking -- it was, like, maybe a month, six weeks before the actual delivery before she actually saw a doctor.

Q. So during the earliest part of her pregnancy, do you know if she was receiving prenatal care?

A. No. I never took her. She wouldn't go. She wouldn't go to a doctor. We knew she was pregnant, and that was it.

Q. How do you know she didn't go to a doctor,

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                          702

Mr. Dombrowski?

A.  Well, because she didn't drive.  If she went anywhere, I took her.  And I didn't take her to the doctor's until I had to force her to go.

Q.  When were these conversations that you had with your wife about whether or not she was going to go to the doctor?

A.  It was obviously in our home there in Killeen, Texas, but the point is that she just wouldn't go, and I finally had to just basically force her to go.

Q.  How was her weight during the pregnancy?

A.  Well, that was part of the issue.  It was the obvious problems; the spotting, the weight loss, the vomiting all the time, just unable to keep her food down.  So I took her.

Q.  How much was she eating while she was pregnant with David?

A.  Bad diet.  I'm sorry.  She's from Korea, and her staple is Kimchi and rice, and it might be a good staple there, but with American foods, it didn't work.  That was my opinion, but that's what she ate.

Q.  So did you have conversations with her about the issues, like her weight, during the pregnancy?

A.  Well, only in the sense of being concerned that she didn't -- or was losing weight and not even maintaining.  Yeah, there was actually arguments, and not just conversation, there was a full-blown argument.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                      703

Q.   During the time, were you having any financial issues?

A.   Yeah.  I was a corporal in the Army.  You don't make a lot of money as a corporal.  I used to work outside the house doing odd jobs, even the lawn boy routine, cutting somebody else's grass so I got a few bucks extra.

Q.   And when David was born, were you present at the hospital?

A.   Oh, yeah.

Q.   And were there any issues at the time of David's birth that you were told about?

A.   I was chastised, if you will, for not having her come to the doctors in the first place and waiting so long.  It was almost a breech-type birth, that they could have avoided certain issues.  Of course, I don't know what that would be, but that's what they told me.  There was a possibility --

          THE COURT:  Wait.

          MS. McKEEL:  Object to what other people told him.

          THE COURT:  You weren't present during the birth?

          THE WITNESS:  I was.

          THE COURT:  While the baby was being born?

          THE WITNESS:  Oh, physically born, no.  They wouldn't let me go in for that very reason.  It was complications.

          MS. PEIFFER:  Your Honor, I believe this is a present-sense impression.  It's what he was being told at

                    JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          704

the event or immediately after the event by the doctors who are describing it to him.

THE COURT:  You can ask it.  I'm not sure he's a very convincing witness but...

MS. PEIFFER:  I believe Mr. Dombrowski had finished his answer.

THE COURT:  I didn't hear it.  Something about he was told there was -- I don't know what he was told.

MS. PEIFFER:  Then I will reask it.  Thank you.

BY MS. PEIFFER:

Q.  Were there any issues at David's birth?

A.  The issue was argument, *per se*, as to why I didn't bring her in sooner for the doctors even to help her with her pregnancy at all.  There was no -- I guess no word of prenatal because she wasn't there.  She wouldn't go to the doctors.  They were upset with me because I didn't make her come before then, and with the birth, the day he was born, I was still catching flack for that because there was complications with it that they could have prevented had I caused her to come in before then, before the initial time that I took her to the doctors.  I mean, it was described to me as a near-breech birth.  That's about it.

THE COURT:  All right.  Go ahead.

BY MS. PEIFFER:

Q.  And during David's early childhood, when he was a baby

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          705

and the first several years of his life, did you spend time with David?

A.  Of course.  It's my first born and proud to have him and so on.  I'm a happy father.  We bonded pretty good.  We were always, you know -- it was a typical, I think you might say, father-son newborn relationship.

Q.  Was David healthy as an infant and in the first several years of his life?

A.  Not really.  I mean, he was born small.  He didn't have an appetite.  There was issues with -- you know, it was constant regurgitation.  It was almost like he had colic or something; that's to be expected.  I figured this was just part of the process.  But he got pretty excessive, and I did take him to the doctor for that.

Q.  Were there issues with the amount of time he was -- or the amount of time he was crying?

A.  Well, he was always crying.  That's -- again, I attributed that to colic issues and all that.  But it didn't matter, you know, whether it was just before we thought it was feeding time or anywhere after.  He just -- he was a crying baby.

Q.  And how was Suk Cha with David when he was a baby?  What was she like as a mother?

A.  We had some issues about that because she was kind of -- it was like she was afraid of him.

MS. McKEEL:  I couldn't hear you.  She what?

THE WITNESS:  She was afraid of him.  She had -- I don't know what you call it -- motherhood syndrome, fear of the baby.  I don't know what you'd call that, the term, but that's what it was.  She acted like she was afraid to even hold him.

BY MS. PEIFFER:

Q.  So instead of describing the colic, could you describe what you observed and why you thought that she was afraid, and what you observed in her interactions with him.

A.  Well, as far as the interactions, it was standoffish. Instead of cradling the baby, coddling it, if you will, trying to comfort it, it was always at a distance.  I mean, half the time she literally -- she might have it on her knee and just supporting him, but to -- even though he's crying, instead of coddling him and trying to comfort him, she didn't -- just didn't want to hold him.

Q.  Based on your observation, did she seem like she had connected emotionally to David or to Mark?

A.  No.  The bonding, if you will, mother-child bonding didn't seem to be there at all, because I think -- because of the way she acted all the time, not, you know, embracing him, holding him like you see mothers holding babies all the time. For her, it was always on the couch, on her knee, anywhere but literally holding him to her body, if you will.  She

Dombrowski, D. - Direct                                               707

was -- that was a rarity, to see her actually holding onto him.

Q.  Can you describe a little more about what you meant about how it was unusual to you, from your observation, about how she held David as a baby.

A.  Well, I think that -- my perception, you know, of mommas holding a baby is to literally, you know, cradling in their arms next to their body kind of thing --

Q.  What did Suk Cha --

A.  -- and it wasn't happening.

Q.  I'm sorry, Mr. Dombrowski.

How did Suk Cha hold David?

A.  How did she hold him?  It was always at a distance. Rarely did -- I mean, picking him up out of the crib or whatever, yeah, it would be there, but even then, it was a quick transfer to where she wasn't holding him.

Q.  Did Suk Cha discipline David when he was a child?

A.  Discipline?  Every kid needs discipline, and there was a routine of -- the problem is it was excessive.  Kids are going to pick up a bottle of water off the table or a thing off of the coffee table or push a centerpiece or whatever, and she got really upset.  Everything -- she didn't want the baby touching anything.  And, of course, as soon as they moved it, it was one of those two, three, four times slapping on the hand or the shoulder, the face, whatever happened to

Dombrowski, D. - Direct                                              708

be close, you know.

Q.   About how old was David when she began using physical punishment?

A.   It was somewhere, you know, I guess about the one-year mark in the sense of actual, let's say, serious disciplining. But there was plenty of times before that.  I mean, she was -- I guess you would say she believed in corporal punishment because everything he did that was a dissatisfaction to her was, you know -- warranted smacking on the arm, the hand, the head, whatever.  Whatever part was available, she'd just smack it.

Q.   And what kind of things would she use to smack him?

A.   Sometimes it was just her hand, but plenty of times -- there were plenty of times that, you know, she would pick up a ruler or a cooking spoon, if she's in the kitchen or at the dining room table.  She used wooden spoons for a lot of her cooking.  It was nothing to see her pick up that wooden spoon and smack him on the head or on the shoulders or the arm or hand or whatever.  And it wasn't just, you know, a quick bop, so to speak.  I mean, it was bam, bam, bam, bam, you know, four or five times, just quick repetition.

Q.   Could you tell how hard she was hitting David?

A.   Well, you hear smacks, and smacks is just that.  But, I mean, she's actually broken wooden spoons from the kitchen smacking on him, and the spoon would break.  I mean,

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                709

that's -- that's pretty bad, to my opinion.  I mean, when I caught or saw it, you know, it was an immediate, knock that off now.

Q.  Do you recall, when you saw her hitting him with the spoon and the spoon broke, where she would have been hitting him?

A.  Well, she actually got -- the first time that I -- she hit him in the side of the head, the top of the side of the head here, because, you know, he was in the high chair at the table and just -- she was up from behind him on the right side.  She hit him with the spoon, and it broke.  I thought she was going to actually poke him with the broken part of the spoon because she didn't seem like she was going to stop.

Q.  What kinds of things caused her to hit David?  What was she reacting to?

A.  It didn't matter what was going on.  Whatever he did, you know -- like I said before, you know, if he reaches for something or grabbed something, she would smack him.  Get your hand off of that.  Leave that alone.

As far as he is concerned, he didn't eat.  She would smack him with a spoon just because he wouldn't eat.  She's force-fed him before, and I mean, to the point of actually making him vomit.  And, you know, that obviously don't sit well with me, and it didn't then.  I was quite upset about it.  I'd make her stop.

Dombrowski, D. - Direct                                              710

Q.   On that occasion you're describing where she force-fed and made him throw up, what did she do after that happened? How did she react?

A.   Well, she was mad at me because I made her stop.  It was like she didn't really realize that she was hurting him or could be hurting him.  It just -- she didn't really care. She was just responding to a dislike.

Q.   Did she do anything after he was ill to react to that?

A.   I'm sorry?

Q.   After he was ill, how did she react to that?  What did she do next?

A.   Oh, she didn't care.  She just -- she was upset then because he vomited on the table.  It didn't matter.  She was all upset.  She yanked him out of the chair and scooted him on the floor.  She was upset because she had to clean the table.

Q.   Did you ever notice any physical evidence on David after these incidents?

A.   Yeah.  There was the red, swelling marks, you know, kind of common with being hit with something or hitting your arm against something.  Bruises would show up later.

Q.   And just to clarify, about how old was David when you saw these things happening?

A.   We're talking from a year on.  It's not, you know, something that stopped and started, and that was the only

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                            711

incident.  It was routine with her.

THE COURT:  Did you report this type of abuse to any authorities?  You're in the Army.

THE WITNESS:  Well, there was a thing of, you know, reporting a concern, but they didn't take it as abuse to say -- they didn't think it was any big issue.  Well, moms always get mad, they always do things like that.

THE COURT:  Who did you report this to?

THE WITNESS:  I reported it to a judge advocate, which is basically military police.

THE COURT:  So you claim you reported it to the Judge Advocate Corps about the abuse of your wife?

THE WITNESS:  About the abuse to my son, yes.

THE COURT:  Did you ever take him for medical help, then?

THE WITNESS:  No.  I didn't see any medical issues. I mean, to them -- well, there's a bruise, he got hurt, okay.

THE COURT:  You kind of ran those words together.

THE WITNESS:  Okay.  You know, to them, it was just a matter of, you know, well, he got bruised, he got hurt, he's okay.

THE COURT:  Did you take him in?

THE WITNESS:  No, I didn't take him there to physically show them or take him to a doctor to say I think

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                712

he's being -- he's suffering from physical abuse.  I didn't do that.

THE COURT:  So there wouldn't be a medical record of that?

THE WITNESS:  No.

BY MS. PEIFFER:

Q.  So, Mr. Dombrowski, what did you do when you saw Suk Cha doing these things?  How did you react?

A.  Well, I'd stop her, I mean, if it's just pulling her away from the child or pulling David away from her.  But just basically, I -- her and I had several verbal confrontations.  It was, like, you know, you're just not going to keep doing this to my kid.  This is crazy.  You don't act like that.  He's a baby.  But that all just went over her head.  To her, that's what she's supposed to do, and that's what she did.

Q.  How did she react to you when you would confront her about that?

A.  We argued all the time, a total argument all the time.  You know, sometimes she'd try to slap me around.

Q.  Did you observe behaviors in David and Mark that informed you of how they felt about Suk Cha?  What did you observe?

THE COURT:  Put a time period on it.

BY MS. PEIFFER:

Q.  During this time period when they were young children.

A.  Well --

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    713

MS. McKEEL:  When she says they are young children, what age group are we talking about?

THE COURT:  When you were still living -- I assume you're asking him of his observations?

MS. PEIFFER:  Yes.

THE COURT:  When you were still living with Suk Cha and your two boys, that's the time period, not things that you discussed after the fact, but that's the time period.

THE WITNESS:  No.  No.

MS. PEIFFER:  That's correct, Your Honor.

BY MS. PEIFFER:

Q.  The question is what did you observe in David and Mark during this time period that informed you of how they felt about Suk Cha?

A.  In short, they were afraid of her.  You know, it was lots of issues about reaction.  I mean, they would -- Mom would -- they'd hear her coming down the hall, just from the bedroom or whatever, and they'd be sitting with me on the couch, maybe watching T.V. or playing with something, and as soon as they heard Momma, it was kind of a startled, uh-oh, here she comes kind of reaction.

Q.  I didn't hear you, Mr. Dombrowski.  Did you say that was a startled reaction?

A.  A startled, yeah.  It would be, like, uh-oh, here she comes.  Basically they were afraid of their mom.

Dombrowski, D. - Direct                                            714

Q.   And when you were present and Suk Cha hit David, how did he respond?

A.   Oh, I mean, he -- to the point -- I mean, he would actually -- don't hit me.  Don't hurt me, is really the word he used routinely.  He was afraid of her.  Mama stop, mama stop, dont.  Those were echoes of -- I'd tell her, hey, stop hitting him, stop hitting him, leave him alone, don't hurt him.  And so he just echoed the same thing back.  The sad thing is, he is a child, and he is picking up words in that kind of format, I guess you'd say.

Q.   How did you punish the children?

A.   I spanked them.  I mean, if they were messing up, I spanked them, but it was my hand across their butt, padded hopefully with a diaper.  I mean, I was spanking them to discipline them, not to hurt them.

Q.   Do you remember any times or an example of a time when maybe you got particularly aggressive and did hurt David?

A.   I hate to say it, but yeah.  But it was -- it was a confrontation with her.  I mean, making them stop in the course of the thing.  David was a big one for holding onto a leg.  He'll walk up and hold the leg, don't hurt Mommy, kind of thing, and -- or hold my leg, whichever be the case.  There was a couple of times, you know, that I would reach down and just kind of push him away.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          715

THE COURT:  So he was holding your leg saying, don't hurt Mommy?

THE WITNESS:  Yeah.  Yeah, that would happen, and vice versa, you know, hold her leg saying, don't hurt Mama, too, or don't hurt Daddy.  He was good with that.  Either way, he didn't care.  He just didn't want fighting.  He recognized conflict, and he didn't want it to happen.

BY MS. PEIFFER:

Q.  And in these times when David would try to intervene, are you describing something that happened multiple times, Mr. Dombrowski?

A.  At least three or four, that I can think of off the top of my head.

Q.  And when you pushed him away, what happened?

A.  Well, in the heat of the moment, you kind of don't control your temper or your strength.  And, I mean, there were times when I would push him away, and, of course, most of the time this happened literally in a -- like a hallway between bedrooms and so forth.  So, you know, he'd hit the wall or the floor or both.

THE COURT:  He did what?

THE WITNESS:  He would bounce off the wall or the floor, because you're just pushed him, and you're in just a little area like that, a couple of feet away difference.  Unfortunately, you know, he would lose his balance at the

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          716

same time I'm pushing him, and he would hit the wall.

BY MS. PEIFFER:

Q.   What part of his body hit the wall?

A.   Well, his back, shoulders, head.  I mean, pretty much the upper torso.

Q.   Do you recall another incident when you were disciplining David and his head hit the wall?

A.   Yeah, I do.  It was in one particular where -- you know, you put the kid to bed at eight o'clock, whatever, and he just kept getting up out of bed and coming down the hall.  He didn't want to go to bed.  He didn't want to go to bed.  And I do remember specifically.  You know, I'd pick him up at the door, turn him around, go to bed, take him and put him in bed.  And after about the fourth or fifth time of this, I picked him up right there at the door, and I just literally flipped him across -- halfway across the room into the bed. I mean, if he landed in the bed, that's fine, but he didn't. He did hit his head on the headboard.  He seemed to be all right at the time, but it doesn't matter, I still did it.

Q.   And which part of his body hit --

A.   His head hit the headboard because I was throwing him up to his pillows.

Q.   What was it like living with Suk Cha during this time period when David and Mark were small children, David was under the age of six?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          717

A.  Well, chaotic, at best, you could say.  I mean, it was always turmoil and always seemed to stem around the way she did or didn't treat the kids.  I just couldn't -- I mean, I wasn't any better, putting my kid in the bed like that, but the constant problems with the smacking on her side, with, you know -- because he wouldn't eat or because he moved stuff off the coffee table or whatever.  I mean, it got to a point I told her, just take all that junk and throw it away, put it on the shelf where he can't reach it and you've got no reason to smack him, if it bothers you that bad.  She wouldn't do that either.  But the fact of the matter is...

Q.  How did Suk Cha react when things weren't exactly the way she wanted them to be or expected them to be?

A.  Spoiled.  She was confrontational.  You know, it's got to be her way.  Well, she was just dogmatic about everything. Anything that got moved, she wanted it wherever it was.  It didn't matter.  I could move it, and she'd say, didn't I ask you to leave that alone?

THE COURT:  What?

THE WITNESS:  Didn't I ask you to leave that alone? Because I moved her doily there with a Hummel on it or something.

Obviously, if it's the kids moving it, they got spanked.  Many a times, you'd yank them by the arm and, just literally that, twirl them away, just because she didn't

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              718

want them messing with whatever she had down there.  She liked her knickknacks.  She liked her toys, and she didn't want no one messing with them.

BY MS. PEIFFER:

Q.  So if David touched something that she didn't want him to touch, how did she react to David?

A.  Like I said, she would twirl him away, smack his arm or hand, and just make him, you know -- it was a constant process.  Anything she didn't like they were doing, they got smacked.  It's just that simple.

Q.  Smacked with what?

A.  Well, mostly with her hand, but there was, like I said before, plenty of times it was that ruler or that wooden spoon or whatever happened to be available, it really didn't matter, a backscratcher.

Q.  Did there come a time when you moved outside of the United States again with Suk Cha and David and Mark?

A.  We went to Panama, that's the only other overseas place that we had gone to.

Q.  And at that time when you moved to Panama, how was your relationship with Suk Cha at that point?

A.  It was passable.  We were okay.  I mean, we were still having arguments about the kids, but we were okay.

        THE COURT:  What year was that?

        THE WITNESS:  Oh, boy.  I want to say early '80s,

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              719

'81, '82, somewhere in there, I think.

BY MS. PEIFFER:

Q.  Do you remember about how old David was?  Is that an easier way to estimate the time frame?

A.  Yeah, I guess so.  No, I have to take it back.  It's not the '80s.  It's probably about '76.  David at that point, I want to say, was somewhere between two and three, so...

THE COURT:  So Mark, then, would have just been a newborn?

THE WITNESS:  Pretty much, yes.  Yeah, Mark wasn't very old when we went there at all.

BY MS. PEIFFER:

Q.  When you were living in Panama, did there come a point when you began to avoid Suk Cha?

A.  I developed a pattern of just staying away from the house.  I had been reclassified for medical reasons from my primary job, and it got to a point that every time I went home, all I was running into was more confrontation about the kids, or about something she thought I should have done or had done or whatever, and I just avoided the confrontation and didn't go home.  I'd end up in a club somewhere or just sit down with the guys -- I'd go to the old company and sit down with the guys in the rec room and watch T.V. with them rather than go home and argue with her.

Q.  And some of the nights when you stayed out late, what did

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    720

you do?  Did you drink?

A.  Oh, I did, yeah.  I got in trouble for drinking in that time period, I really did.  I was out quite a bit drinking. I'd stay out all night sometimes.

Q.  What do you mean you got in trouble?

A.  Because I was drinking.  Not as in -- I mean, I got in trouble to the point of almost being an alcoholic, put it that way.

Q.  So you would have said that drinking had became a problem for you at that time?

A.  Yeah, I definitely did, and I had a gambling problem, too, because in Panama they got three or four major casinos. If I had a few bucks, I would go up to the casino, like, and have drinks on the house and just gamble.  But I stayed away from the house.  I was fine.

Q.  Did any of your arguments with Suk Cha ever get physical?

A.  Yeah.  Not to the point of, like, fistfights, but definitely physical restraints.  I mean, she would come after me because I was stopping her from doing something to the kids, or sometimes because I didn't come home the night before kind of thing, but I expect it.  But it was more like pinning her to the wall or pinning her on the couch where she couldn't keep swinging at me or something.  It wasn't -- it was no fistfight, in my side.  It was just confining her, that's all.

Dombrowski, D. - Direct                                                721

Q.  And just to follow up on what you testified to earlier, were there times when David was present for these physical fights?

A.  Unfortunately, yeah.  Yeah.  He saw a lot of that. That's the problem.  That was just an extension of what had been going on for all his life.

THE COURT:  Well, how old was he?

THE WITNESS:  He was just a couple of years, three years maybe, four, five.  When we -- when he left Panama, he was six, and that was the whole other situation.  And basically he was just barely three when we got to Panama. In that whole time factor, the house was just chaotic, period, all the time, and mostly because of my arguing with her about stopping the way she was treating him, and the opposite point was that she just thought that smacking the kid was the thing to do, and I just couldn't tolerate it.  I couldn't stop her, so I stayed away.

THE COURT:  Her argument with you about your lifestyle?

THE WITNESS:  Well, the argument about the lifestyle was -- that particular choice of lifestyle that I adapted was just trying to get away from it myself.  It's not good.  It's not right.  It did happen.

BY MS. PEIFFER:

Q.  And when you and Suk Cha argued, what would David do?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    722

What did David do?

A.   David was a -- like we talked before, he was a clinger. He loved to come and hold onto you, especially when he was nervous or afraid, and when her and I would argue, that would happen.  He was nervous or afraid or both.  And it was, you know -- that's where some of that pushing away and hitting walls or falling on floors kind of thing happened anyway.

Q.   Did Suk Cha and the children eventually leave Panama?

A.   Oh, yeah, they left alright.  They were ordered by my commanders to.

THE COURT:  To do what?

THE WITNESS:  I had a situation, military-wise, where I was promised, and did actually get, a promotion. But she didn't think that the grade status was sufficient and went to my commanding general's office and, you know, uninvited, unannounced, and just went in there and blurted out her complaints.  You don't go to a commanding, two-star, three-star general's office unannounced.

The ending point is the retribution came to be, get your -- your dependents are going to leave the command. Where you send them, I don't care.  Where do you want to send them, is where -- the only question he asked me.  Of course, they went back to Killeen, Texas, which is the only place she knew in the continental U.S.  So we chose to send her back there.  It was because she was ordered out of the

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                  723

command.

The command considers dependents accompanying a service member as a privilege.  If dependents don't conform or they don't behave, so to speak, they create problems, situations, we don't need that in our Army.  We've got too many problems.  You are a soldier.  That's your first obligation.  Your dependents are going to be sent back if they create problems.

BY MS. PEIFFER:

Q.  What eventually happened between you and Suk Cha?

A.  We got a divorce because of that -- well, not because of that, because of the overall situation, but that led to, again, part of my military problems and experience of physical caused me to be medivacked from Panama to Fort Sam Houston, Texas.  And two days after I got to Fort Sam Houston, I got divorce papers in the mail.

THE COURT:  Why were you medivacked?

THE WITNESS:  Back injuries.  I was a paratrooper, and I had injuries in Fort Hood, Texas, first, from an armored personnel carrier accident.  Ended up when I went to Panama because I carried a P-profile identifier, parachuter's identifier in my MOS, in my job title description, they put me in the only airborne company they had there.  We made Hollywood jumps, and I got injured.  The parachute malfunctioned and I got dragged across the swamp

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                      724

and messed my back up and so on.  So I ended up being reclassified out of the 11 Bravo, which is an infantry MOS, into a finance office.  And the finance office part is where we had all these problems with the command and me being promised a promotion, and I was doing a captain's job as a buck instead of a staff sergeant.

THE COURT:  So you complained?

THE WITNESS:  No.  I knew what was going on, and I did get promoted from buck sergeant to staff sergeant by the Department of the Army cutoff scores and the way they go about promoting people based on board scores and testing and so on.  But she didn't see that as enough, because I was already on that list, and she thought I should have made an 87 and 86.  But I was okay with all of that, but she didn't understand that process.  So she thought going to my commanding general was what she was supposed to do.  That didn't work.  That is how she ended up being sent out of the command.

BY MS. PEIFFER:

Q.  Mr. Dombrowski, have you ever sought mental health treatment?

A.  Yeah.

MS. McKEEL:  I'm going to object about his mental health treatment.

THE COURT:  I don't know why it's relevant.

Dombrowski, D. - Direct                                              725

MS. PEIFFER:  This is part of our claim six of our petition, and there are numerous examples in the reports of Dr. Cunningham and Dr. Dudley that are before the Court about the relevance of the family history of mental illness. Would you like me to provide those pages?

MS. McKEEL:  Your Honor, I know Mr. Samuels stood up at the beginning of court today to talk about the scope of this hearing.  The Fourth Circuit remand was very specific:  "Failing to investigate adequately his brain injury and potential mental illness and introduce such evidence in mitigation during the penalty phase of his trial."  That's a quote from the Fourth Circuit.  That's what we are here for.  We have gone far afield, but I would ask that nothing to do with his mental health illness, whatever he's going to say, is relevant to this proceeding.

THE COURT:  I'll listen to it.  He's been all over the place.  It's not chronological.  We have gone from -- when I asked why you were medivacked and -- go ahead and ask him about it, and we will establish a time period, and establish when he got divorced and why he gave up custody or lost custody of his children.  Go ahead and ask him.

MS. PEIFFER:  Yes.  Just for the purposes of the record, the relevance of his mental illness will be discussed in further expert testimony but is also the subject of Dr. Cunningham's report and Dr. Dudley's.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    726

THE COURT:  Did they interview him?

MS. PEIFFER:  I don't believe so, Your Honor, but they had records and information about him and relied upon that and discussed in their reports why it's relevant.

THE COURT:  I'm not familiar with that, but I'll take this conditionally, and then if that's something they relied on.  I read the reports and so forth, but, you know, it's like you are just throwing all these things out.  We will listen to the experts and see what they actually did rely on.

Go ahead.

MS. McKEEL:  Judge, if I may be heard.  What this type of evidence is going to is not what the Fourth Circuit said.  They are going intergenerational mental illness; that's not the claim here.  So that's what all of this is going to.

THE COURT:  Well, I'm going to -- I will sort it out, and you go ahead and ask Mr. Dombrowski about his mental health conditions.

MS. PEIFFER:  Yes.

THE COURT:  Establish when he sought it and for what reasons and so forth.

MS. PEIFFER:  Yes.  Those are part of my questions, Your Honor.

THE COURT:  Go ahead.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                               727

BY MS. PEIFFER:

Q.   Have you ever sought mental health treatment,
Mr. Dombrowski?

A.   I have.  I was directed sometime after I left the service
because I had anger issues.  I knew I had anger issues before
I ever left the service, but they weren't addressed as such.

Q.   And to clarify, where were you working when you first
sought treatment for anger management?

A.   I was working for the "Montgomery Advertiser" newspaper
in Montgomery, Alabama.

Q.   That was after you left the service?

A.   Yeah, that would be probably end of '90, maybe early '91.
I retired from the service in '87.

Q.   And why did you seek mental health treatment?

A.   Well, my boss said it was her way or the highway.  I was
having issues with my co-workers.  I had been hired as a
single copy supervisor.  In other words, I had seven
districts throughout the entire state that were under me.  I
was hired to that position because I was less than polite
when it comes to saying, this is your job, you get it done,
or you go home, I don't need you.  If I've got to do your job
for you, or I've got to keep calling you to tell you how to
do the job, you can go home.  I can find somebody to do the
job.  In short, I was very direct and very emphatic of what I
expected.  I ran an iron ship.  That's why she hired me.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                            728

Q.  Just to clarify something you said, Mr. Dombrowski, you said that your boss asked you to seek mental health treatment; is that correct?

A.  She sent me to mental counselling for anger management issues.

Q.  And during the time after you left the military, did you sometimes become involved in violent incidents?

A.  Pretty much.  I was a loose cannon.  It didn't matter.  You know, it was my way or the highway kind of thing.  You do what you're supposed to, and if you get in my way, that's fine, I'll take care of it.  But I knew I had real problems even before I went to work as a manager for the company because I used to drive, you know, standard morning paper routes, delivering newspapers to homes and newspaper routes and so on.  And one particular instance comes to mind.  Everything is done at the job, and I was sitting home.  I had my wife with me.

          THE COURT:  This is another wife?

          THE WITNESS:  This is a previous wife.  She died six, seven years ago, the one I'm referring to in this particular instance.

          A guy just come across, coming in traffic.  He was in a Jeep, and he just cut right across from me and pulled into the -- I want to say it was a Hardee's or some fast food place on the corner.  I mean, I don't care if anybody

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    729

pulls across the road in front of me, but we were ten feet.
I slammed my brakes and did three or four donuts, and, you
know, all but wrecked because this guy cut me off or crossed
in front of me.

BY MS. PEIFFER:

Q.   What did you do, Mr. Dombrowski?

A.   I reacted like any other knucklehead probably did.  I
turned around right there in the middle of the road and
pulled up behind him and pulled him out of his Jeep and beat
the crap out of him because he put me and my wife in danger,
if you will.  We almost had a head-on wreck because he wanted
to get to the Hardee's.  Really?

Q.   Have you ever been diagnosed with any other mental health
issues other than the anger management?

A.   Well, after I seen this counselor that the company sent
me to, I would go to -- I went to -- I finally used my V.A.
stuff and went for help.  Basically, it was depression,
anxiety, you know, just all of those things that go with
anger management and anger issues, you know, how I lived my
life.  I was just unhappy with it, and I couldn't deal with
it.

Q.   And so do you recall being diagnosed with particular
issues after those appointments?

A.   Well, I was diagnosed with -- what do you call it?
Depression and just anxiety.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    730

THE COURT:  When was this diagnosed.

THE WITNESS:  Ma'am?

THE COURT:  You said the anger issues were in the early '90s.

THE WITNESS:  Yes, ma'am.

THE COURT:  When were these other diagnoses?

THE WITNESS:  Very shortly after, because my company wasn't going to keep me going to their counsellors knowing I had V.A. entitlements, could get help elsewhere besides at their expense, so I was kind of directed to seek other help, and I did.  That's how I ended up going into the V.A. to try to get some counselling.

THE COURT:  This was in the '90s?

THE WITNESS:  Yes, ma'am.

BY MS. PEIFFER:

Q.  Were your prescribed medication for the depression and anxiety?

A.  Yeah.  Yeah.  Prozac and Buspirone, or however they call it.  I'm still on those meds now some, what, 30 years later.

Q.  Mr. Dombrowski, I'd like to change course a little and ask you some questions about your own upbringing.

THE COURT:  Okay.  So we are going into another area now, so this would be a good time to take a break.  Please be cognizant that we are going to finish this witness this evening, so everybody govern themselves accordingly.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                        731

The Court will take a 20-minute recess.

(Recess from 3:59 p.m. to 4:23 p.m.)

THE COURT:  Ms. Peiffer.

BY MS. PEIFFER:

Q.  Mr. Dombrowski, I'd like to ask you a few questions about your own upbringing.  Where did you grow up?

A.  I was born and raised in Chicago, Illinois.

Q.  You may need to adjust the microphone.

A.  I was born and raised in Chicago, Illinois.

Q.  Who were your parents?

A.  Eleanor Dombrowski, my mother, and Anthony, or Tony, Dombrowski, my father.

Q.  Speak into the microphone a little, Mr. Dombrowski.

THE COURT:  If you get it too close, it will muffle.

BY MS. PEIFFER:

Q.  How many children did your parents have together?

MS. McKEEL:  Your Honor, I'm going to object to the witness's background and the relevance to this proceeding.

THE COURT:  She is claiming it is heredity.

MS. PEIFFER:  Your Honor would you like the citations from Dr. Cunningham's report?

THE COURT:  No, but can you just move it along.  If what you are trying to ask him -- do we have to go through his whole childhood?  Did he have any genetic or mental

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                732

health defects?  Get to the point that you're trying to make.

I understand that you are now trying to go back through all of the genealogy and whether there had been any mental health problems in the family, so if that's what you're trying to get at and it is something that Dr. Cunningham is going to say that he interviewed and did all this, because he had to come up with that opinion from some reason, then it may be of relevance.  But, please, let's move it along.  Let's don't go through from when he was 1 to 20.  Has he had any problems?  Were there problems in the family?

MS. PEIFFER:  That is certainly what I plan on focusing on, Your Honor.  Every question --

THE COURT:  Please get to the focus.  You've just got to move this along.  We don't need to know every single event of his childhood.

MS. PEIFFER:  Yes, Your Honor.  And all of the things that I will ask him about are things, just to clarify, not that Dr. Cunningham interviewed him about, but things that the experts, including Dr. Cunningham and Dr. Dudley, cite in their reports.  So all of the factors and the questions that I've been asking are going to those points.  If you need specific citations to those reports and where each topic is covered, I'm happy to --

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    733

THE COURT:  No, I'm not going to belabor the record with that at this point in time.  It is time to move on.

Who did he talk to?  Who was he interviewed by?

MS. PEIFFER:  Who was Mr. Dombrowski interviewed by?

THE COURT:  Yes.  Anybody?  Was there any ability for the attorneys to even know about Mr. Dombrowski?  He kind of flew the coop, so to speak.

MS. PEIFFER:  I'm sorry, Your Honor, do you mean prior to trial?

THE COURT:  I'm not answering your questions, Ms. Peiffer.  I'm telling you that you've got to establish -- this is all about what the attorneys should have known and should have done, so the basis for having pursued Mr. Dombrowski, who has been out of Mr. Runyon's life all of these years, and that there was an interview of him.  You know, just connect the dots and get to the points here.

MS. PEIFFER:  I'm happy to go out of order, if you would like, Your Honor, and establish that.

THE COURT:  I'm happy for you to move along.

MS. PEIFFER:  Absolutely.

BY MS. PEIFFER:

Q.  How many children did your parents have together, Mr. Dombrowski?

A.  There were eight of us.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                734

Q.   And when you were growing up, did you live with your
mother?

A.   Yeah, my mother and father, yes.

Q.   Did you have an opportunity to observe your mother's
intellectual functioning while you were living with her?

A.   Best I can say is that she was slow.

          THE COURT:  She was what?

          THE WITNESS:  Slow.

BY MS. PEIFFER:

Q.   Can you describe what you mean by that?

A.   I mean that she -- it took specific constant
directions -- directions.  Dad always had to leave notes on
the fridge or make sure, you know, to remind her to do, I
don't know, take chicken out of the refrigerator or freezer
for dinner tonight kind of thing, but it was routine.  She
had to be told what to do pretty much all the time.

Q.   And what would happen if someone told your mother
something that wasn't true?

A.   She probably would believe them just because she had no
reason not to.

          MS. McKEEL:  Objection, speculation.

BY MS. PEIFFER:

Q.   Did you have an opportunity to observe the way your
mother interacted with members of your family and with you?

A.   I got lost.  Please repeat that.

                    JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                             735

Q.  Of course.

     Did you have an opportunity to observe how your mother interacted with you and with other members of the family?

A.  My mother was a loving mother.  She was always there for us in that sense.

Q.  And how did your mother react if she was told something that was not true?  Did she realize that it was not true?

A.  Not necessarily.  I mean, it would have to be something pretty obvious to not be true for her to think that it wasn't true.

Q.  Was your mother able to drive?

A.  No.  No.  Dad had to take her everywhere.  She couldn't drive.  She didn't know how to drive.

     THE COURT:  She didn't drive because she didn't have a license, or she wasn't -- did she ever try to get a license?

     THE WITNESS:  That part I'm not aware of.  I just know she didn't drive, and she couldn't drive a car.

     THE COURT:  All right.  How old are you?

     THE WITNESS:  What, now?

     THE COURT:  Yes.

     THE WITNESS:  73.

     THE COURT:  So your mother would have come along in what eras, the '20s, '30s, '40s?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                        736

THE WITNESS:  I want to say she was born in '34.

THE COURT:  And she didn't drive?

THE WITNESS:  She didn't drive, no.

THE COURT:  But you don't know whether she didn't drive because she was not competent or incapable, mentally, or because she didn't get a license?

THE WITNESS:  I would say she just didn't know how to drive.

THE COURT:  And how many cars did you have?

THE WITNESS:  We had one.  We only had one car, but there were several road trips and things, experiences, if you will, as family goes on.  We drove all the way to California.  Dad had to do all the driving because she didn't know how to drive.

BY MS. PEIFFER:

Q.  Did your mother pay the bills or handle the money in the house?

A.  No.  Dad was strictly keep cooking, bottle washer, so to speak, when it come to that kind of stuff.  He handled all the finances.

Q.  Why was that?

A.  I don't think she could manage a checkbook, but I don't know.  That was just Dad's insistence.

Q.  How was your mother's memory?

A.  Probably as bad as mine.  I shouldn't have said that.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          737

MS. McKEEL:  I'm sorry.  I didn't hear that.

THE WITNESS:  I'm sorry.  I made a snide comment to myself, said probably as bad as mine, but I'm sorry.  I shouldn't have said that.

BY MS. PEIFFER:

Q.  How was your mother's memory?

THE COURT:  He said as bad as his.

BY MS. PEIFFER:

Q.  How did you know that her memory wasn't good?

A.  Well, she had to have -- they had reminder notes on the fridge all the time, you know.  It was literally a Monday, Tuesday, Wednesday thing all the way on the calendar, on the fridge, like a calendar, that she had to, you know, chicken is today, pork chops, tomorrow, you know, don't forget to take them out of the freezer or whatever.

Q.  Did your mother have a social life outside of the house?

A.  Not really.  I mean, as in no.  The only person she socialized with was her sister.

THE COURT:  Did she go to church?

THE WITNESS:  No.

THE COURT:  So it was just family?

THE WITNESS:  It was just in the house unless we went to visit her sister, Frieda.

BY MS. PEIFFER:

Q.  Who did your mother depend on the most to help her with

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                           738

her daily routine and her daily life?

A.   She depended a lot on the refrigerator.

Q.   And what person did she depend on to help her?

A.   Well, it was, you know, notes on the fridge.  Dad usually put them on, but, you know, every once in awhile it was like if I had a school project or something going on, I'd put the reminder for the permission slip or something of that nature, but if it wasn't on that board, she didn't know that she had -- I mean, she used that board religiously.  It helped her keep track of what she had to do for the day.

Q.   Did your mother have a schedule or a routine, typically?

A.   Yeah.  Her routine was to check that calendar.

Q.   And what would happen if something unexpected happened, or her schedule got thrown off because of something that wasn't planned for or expected in the day?

A.   We had several issues.  Unfortunately, I wasn't the best of kids in school either, but, you know, if she got called at the school because of a school disciplinary problem or a doctor called to say, you know, you need to see any one of the sisters or brothers, whatever, any normal testing, it didn't matter, it just threw her out of the routine, and if that happened, she usually ended up calling my dad or something.  He is on a construction site somewhere, so he's got to go into the shed and answer the phone and see what she wants and needs.  It's usually something that could have

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                739

waited till the next day, but it doesn't matter, you know, disrupt his scheduling of work, if you will, and, of course, he was pretty PO'd about that.

Q.  How did your dad react when he was upset about your mother doing that?

A.  Well, it was at a minimum a tongue-lashing, but a lot of times it was arguments.  I mean, he would slap her around, literally, in the sense of -- I didn't see it, but, you know, when you are told to go in the other room, out of the kitchen, and you hear slap, slap, slap, and you go back in there and there is tears and bruises on the face or red marks on the face, you figure she got slapped around.

Q.  So how often would that happen?

A.  Pretty frequently.

Q.  And did you ever react to that?  How did you react?

A.  Well, I guess I would pull a David, and was always running in, trying to get her separated from him, you know. I'd charge him like a bull, you know, you leave Mom alone, whatever.  And, of course, he'd come after me, so that was fine.

Q.  Going back to your mother, what was she like with you and your siblings?

A.  I'm not following.  What was she like with us?  She was loving.  She was caring.  I mean, she always had a minute for us, you know.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                740

Q.   Did any of your siblings have limited intellectual functioning like your mother did?

A.   Yeah.  I got the two last children, if you will, Frieda being the youngest, and Catherine the second from the youngest.  Catherine was the most functional.  She's probably closest to my mom in sense of functionality.  She needed the guidance.  It is routine of constant, you know, all right, go over here and do this, all right, mix that with that.  Did you make up your bed?  You know, put your shoes away.  It was a constant thing of telling her what to do because you don't -- she didn't think to do those things on herself, her own.

Q.   Could Catherine attend school?

A.   Catherine was in regular school just for, like, the first and second grade.  She had to go to -- what do they call it?  It was a special-ed school.

Q.   How was Catherine's speech?  Was there anything unusual about her speech?

A.   She had full thoughts and expressions, but everything was slow and drawn out.

Q.   How was Catherine's intellectual functioning, from what you observed, as compared to your mother's?

A.   Pretty similar.  Pretty similar.  They both needed that guidance, that little issue of direction, which way to go, what to do, what to do first and what to do second.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    741

Q.   And what about Frieda?  You mentioned your sister Frieda also had limited intellectual functioning.

A.   Unfortunately, Frieda is way down the totem pole. She's -- I want to say right now she is about 58 and still has only the intellect of maybe a 7- or 8-year-old.  That's what the doctors tell us anyway.  She is a definite handful. You've got to take her everywhere, and, you know, if she's got to go to the bathroom, you have to direct her to the bathroom, that kind of thing.

Q.   Did you or any of your siblings have, besides Catherine and Frieda you mentioned, have trouble learning at school?

A.   First off, between my brother and myself, both of us -- one of us failed the third grade, and the teacher decided she didn't want to break us up, so we stayed in third grade again.  It wasn't necessarily anything.  I don't know.  But I'm still a little bit slow on that, always have been.  But it's just not necessarily anything major, just the fact that we needed a little extra help to have things done right.

Q.   What kind of grades did you get?

A.   Grades?  I didn't need any doctors or whatever, but I don't know how to tell you.  Can we -- I'm not sure --

Q.   That's okay.  We will move on.

A.   -- what you are trying to say or ask.

Q.   We can move on.

        THE COURT:  Did you graduate high school?

                     JODY A. STEWART, Official Court Reporter

THE WITNESS:  Did I graduate high school?

THE COURT:  Yes.

THE WITNESS:  No.  I got a GED while I was in the Army.

THE COURT:  All right.

BY MS. PEIFFER:

Q.  Can you describe your twin brother, Jimmy, how he was?

A.  Well, at the risk of sounding wrong, just say he was a scoundrel.

Q.  What do you mean by that?

A.  I'm sorry.  He was a ladies' man that thought everybody and everything was supposed to be his, and he pretty much took what he wanted when he wanted.  I'm in the Army in Germany, and I get summoned to a tax court for 12 different jobs that I never had while I was in Germany, and the jobs are in the continental U.S.

He used my Social Security number and name and all that on any work he did and stuff like that.  I know from other sisters, I guess you call it hearsay, things going on with him where he's scammed people out of their houses or their properties, you know, stole their I.D., went and got a loan on somebody else's house or something like that.  And that was the kind of stuff he had been doing for years.

Q.  What was your father like?

A.  He is hardcore.  He was just a mean man.

Dombrowski, D. - Direct                                      743

Q.  Did he ever use alcohol?

A.  He was an alcoholic, yeah.  That's kind of how I was able to recognize my own problems later because I knew what his were.  He was a functional alcoholic in that sense.  He went to work every day, and in construction, that's still pretty tough, but come the evenings, and especially weekends, he was out there chugging away.  He'd got drunk every weekend. Monday morning he is right back on the schedule.

Q.  Did your family move a lot when you were growing up?

A.  As a kid, yeah.  We moved a lot because my dad, like I mentioned, he was in construction.  He didn't believe in driving 15, 20, 30 minutes beyond that to go to work in the morning.  He was on a factory job that was going to take three or four months, we moved to get him within a short distance so he didn't have to drive a long distance every morning back and forth.  And he just thought that was fine. But, yeah, we did a lot of moving because of that.

Q.  Was your father ever incarcerated?

A.  As a juvenile.  He killed somebody and ended up, because of his age, he ended up in Boys Town, Nebraska.

Q.  You mentioned that your father was a juvenile when that occurred.  Do you know what kind of people your father was involved with and associating with?

            THE COURT:  I didn't hear him mention he was a juvenile.  I missed that.

                    JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              744

THE WITNESS:  He was like 14, 15 years old when he ended up in Boys Town, Nebraska, because he -- he ended up in Boys Town instead of a regular prison because he was only 15 or 14 or whatever.

THE COURT:  Okay.

BY MS. PEIFFER:

Q.  And do you know the kind of people that your father was involved with around that time when he first got incarcerated?

A.  Well, the name Tony LaBarbara has been in our life all our life because that's who he was involved with as a kid. That's who he was involved with when all of this came about for him going to jail.  He was facing, you know, the accountant teamster mobster guys.

Q.  When you say him, Mr. Dombrowski, to clarify --

A.  Tony LaBarbara.  He was a teamster, if you will, out of Chicago.

Q.  And what did your father do for Mr. LaBarbara?

A.  Well, that's how he ended up shooting this guy and killing him, and that's why he ended up in the thing.  But that was a bad situation, obviously, overall.  But Tony wouldn't leave him alone.  That's why I said earlier that, you know, Tony LaBarbara came in our life by discussion all our life.  He didn't want to let him go, i.e., he found out my dad got out, was free, and he wanted him to go back to

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          745

work for him, and he wouldn't do it.

Q.  And when you say go back to work for him, what was your father's job, or what role did he play during the time he did work for him?

A.  If you want to go back to T.V. stuff, he was a "Wise Guy."  He was the enforcer, and he would call himself that, you know.  He was the enforcer.  He was the one that took care of the jobs, whatever the boss told him to do.

Q.  And you said that LaBarbara wanted your father to come back to work for him.  What was the time frame?  How old were you when this was happening?

A.  We are talking -- I mean, we are talking really young, myself, as five, six, or six or eight, maybe, at the maximum. All of that going in there, because I remember being in catechism, you know, started and having to move, you know. And later, we were actually divided up as kids to other -- his other sisters and other people that knew him, and so forth.  The family was just kind of separated for a while, and that came to be because Tony told him, it didn't matter, Tony LaBarbara told him it didn't matter, you are coming back to work because, you know, I know you got family, you want to protect them, so you come back to work, and we'll worry about that.

And so he just separated us, and then he would go out and argue with Tony.  And, I mean, every time LaBarbara

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                      746

showed up, it was -- to me, the obvious point, you're coming back to work for me.  All right.  He would say no.  The next thing you know, he would just go out and find one of his other hit men, if you will, or whoever was working for Tony at the time, and he'd mess them up, just beat them up, disable them for a while.

Q.  So to clarify, Mr. Dombrowski, when you said that Mr. LaBarbara wanted your father to go back to working for him, did he agree?

A.  Oh, no.  That was the whole point of why he would go find one of Tony LaBarbara's people and mess him up, just to say, you know, if you're going to come after me, no, then I'm not coming back.  And you can find someone else to replace this guy, too.  That's -- that was the summation of it.

THE COURT:  I didn't understand.

THE WITNESS:  He was a gangster, that's all.

THE COURT:  I didn't understand your testimony when you said he separated us up.  So you all were separated as children?

THE WITNESS:  We were separated because the threat was made that he was going to hurt the family, so he separated the family to say, okay, if you don't know where they are, you can't hurt them.

THE COURT:  So you didn't always live with your mother, your father, and your children, and your brothers

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    747

and sisters the way you testified earlier?

THE WITNESS:  Well, actually, we did, but we are talking a couple of months' time that I'd go, like, with my Aunt Viola or Aunty Olive or wherever he decided to move me.

THE COURT:  You are just mumbling away.  I can't understand a thing you're saying.

THE WITNESS:  We are only talking a couple of months that this particular circumstance where we -- I would be shuffled from one aunt to another to another just -- and we all kept on the move, so to speak, to make sure -- Dad was just trying to make sure that he didn't know where we were so he couldn't hurt anybody in the family, and he sought out Tony LaBarbara's people and made sure that they understood he wasn't going back to work for him, and he did what he had to do to stop them from agitating him or chasing the family.

THE COURT:  This is just a small period of time?

THE WITNESS:  Yeah, four or five months overall. Mostly the summer.  Even when I went to school, I was walked back and forth to school by my aunts and stuff in a totally different area.

BY MS. PEIFFER:

Q.  Just to clarify, Mr. Dombrowski, the small period of time is when you lived with -- outside of your home, not when your father was involved in a situation with LaBarbara; is that

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                               748

correct?

A.   Right.  When the threats were made against the family, he dispersed the family out amongst other family members to keep us out of harm's way.

THE COURT:  How often did this happen?

THE WITNESS:  This was just that one incident. Tony LaBarbara got the message.

THE COURT:  So it's just one time, like a two-month period.

THE WITNESS:  Well, it's closer to five, but still...

BY MS. PEIFFER:

Q.   And how did your father usually solve problems that he had with people?

A.   He was a physical guy.

MS. McKEEL:  I'm going to object on the basis of the witness's knowledge of how his father solved, I'm not sure what kind of problem.

THE COURT:  I agree.  He wasn't there.  He wasn't at work.  How does he know how his father solved problems? You have to focus your questions on what problems you're talking about.

BY MS. PEIFFER:

Q.   So when your father had a conflict with somebody, what was his reaction?  How did he react?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              749

A.  Well, he usually --

        MS. McKEEL:  Objection to what conflict is.  Who is he reacting to?

        MS. PEIFFER:  I can lay a foundation.

        THE COURT:  You have to.

        MS. PEIFFER:  I was trying to move things along.

        THE COURT:  You just can't ask a question out of the blue, how does somebody solve conflict, without putting it into context.  You have conflicts every day in your life, and there are various kinds of conflicts.

BY MS. PEIFFER:

Q.  Mr. Dombrowski, for example, you testified about how your father got LaBarbara to leave him alone.  How is that?

A.  Well, he would just find one of Tony LaBarbara's peoples and mess them up.  That's all.  Beat them up, whatever.  And, I mean, every time Tony LaBarbara approached him and threatened him --

        MS. McKEEL:  I'm going to object.  I understand we are going with this intergenerational, but how is this witness's father's criminal history relevant to genetic mental illness?  And we haven't even established -- he is talking about a mobster.  Was he around and physically present to see how his father dealt with other mobsters?  I mean, it seems this witness is just getting information from wherever.

                JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                        750

THE COURT:  This has gone way far afield, and I would sustain that objection.  We are way afield of the history of mental health unless you're suggesting that it's an appropriate way to conflict-solve to go out and beat somebody up.  I don't even know what you're doing.  If I don't know what you're doing, then it's obviously not being very successful in your examination.  What's the relevance of this?

MS. PEIFFER:  The relevance, I believe Ms. McKeel's objection was regarding Mr. Runyon's grandfather's violence.  Is that your question, Your Honor?

THE COURT:  No.  You are asking him how he conflict-solved.  You haven't put it in any kind of context.  You haven't even shown that he was there when the conflict was solved.

MS. PEIFFER:  Okay.

THE COURT:  At this point you are hearsay on hearsay on hearsay.

BY MS. PEIFFER:

Q.  Mr. Dombrowski, did you ever see your father involved in violence?

A.  I've seen him punch quite a few people out.

Q.  Can you describe an example of that, what you mean?

A.  I'm not sure what to say.  I don't know how to explain this.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    751

MS. McKEEL:  I couldn't hear.

THE WITNESS:  I don't know how to explain what she is asking.

BY MS. PEIFFER:

Q.  Okay.  I can ask you another question.

With the children in the house, with you and your siblings, was your father strict?

A.  Very.  I mean, he ruled with an iron fist.  It was his way or the highway literally, in the sense, you know, get out if you're not going to follow my rules.  I got out.

Q.  And if somebody didn't follow his rule, how did he respond?  What did he do?

A.  Well, I'd like to say it was spanking, but there were beatings.  He just constantly -- it was a routine for him to smack all of us, just that simple, because we didn't do the things what he said to do or didn't do it at all.

Q.  Can you describe what you mean by they weren't spankings, they were beatings?

A.  Oh, I'm talking about fists, not, you know, open-hand slaps or whatever, fists, chase you around the house till he'd catch you and then beat the crap out of you, literally, I mean, pounding, you know.  I guess he thought he was a big guy, you know.  I'm sorry.  I shouldn't say that.

Q.  Did your father drink?

A.  Oh, yeah.  He was, like I mentioned before, he was a

Dombrowski, D. - Direct                                              752

full-blown alcoholic.

            MS. McKEEL:  Object about the father --

            THE COURT:  Asked and answered.  I agree.

BY MS. PEIFFER:

Q.  Is your father deceased?

A.  Yes.

Q.  Do you know what the cause of his death was?

A.  Yeah.  He died from cirrhosis of the liver, some --
couple years after he finally quit drinking because of the
disease.

Q.  When you were a child, did you ever accompany your father
to bars?

A.  Oh, yeah.  I was his travel buddy and driver.  I mean, I
could -- he taught me how to drive just so I could drive him
to the bar and back home.

Q.  And how old were you when he taught you how to drive so
you could drive him back from the bar, approximately, if you
don't remember the exact age?

A.  I was probably 10, 11 years old.  I could drive.  It
wasn't that far, but I could drive him.  That's what I was
told to do, and I did.

Q.  And how often did you accompany him, approximately, so
that you could drive him home from bars in the evening?

A.  That was kind of a weekend routine.

Q.  While you were at the bars, did you do things to make

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              753

money?

A.  Not --

        MS. McKEEL:  I'm going to object to all this bar talk.  David Runyon, their client, has no alcohol-related issues, so I don't know how this is relevant to any type of genetic disposition at this point.  David Runyon has no drug or alcohol problems.

        MS. PEIFFER:  Your Honor, this is covered on Dr. Cunningham's report, Exhibit 31 at Page 12.

        THE COURT:  I'm going to sustain the objection because there is no evidence to show that there was any evidence or drug problems in regard to Mr. Runyon.

BY MS. PEIFFER:

Q.  Do you recall your father having a disagreement with the bar owner of the bar that he frequented?

A.  That was one very specific, yeah.  We -- I say we because he had a confrontation with a guy.  He used to have what would have been weekly poker parties, or every other weekend, but with the guys from work at the house.  So he would go down to this one bar, just a couple of blocks away from the house, and we got the beer from there.  And I'd go down with the wagon, load the wagon up, and pull it back and so on.  That was kind of my job while they were playing poker, is to keep the beer coming.

Q.  And just to respond to the Court's ruling,

                JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                754

Mr. Dombrowski, can you focus on the disagreement that your father had with the owner of the bar and how your father reacted to the disagreement, what he did next?

A.   Well, it was -- you know, somewhere along the line, they had an argument, and he refused to sell them anymore beer or Dad refused to buy it anymore.  Anyway, the point is that there was a kind of -- he threatened to expose my dad to his boss about his history, record, and so forth, and it didn't set well.  He got mad at him, came home, whatever, and, you know, he'd just tell me, well, I'm going to fix that SOB, and so on.  Next thing I know, he's sitting there with gunpowder packing a lead pipe just making pipe bombs.

Q.   Were you involved in that project?

A.   Oh, yeah.  He just -- I just sat there and watched him, and that's what he told me.  Are you going to sit there and watch?  You might as well do something.  So I started helping him make them.  I didn't know what I was doing, but a couple of weeks later, the place went up in flames.  I presume that's what happened.  I don't know, but I suspect it was. He didn't have the pipe bombs anymore.

Q.   You testified earlier about some incidents where your father and your mother were having conflicts and you tried to intervene; is that correct?

A.   That's correct.

Q.   And when you intervened, what would you do?

Dombrowski, D. - Direct                                               755

A.   It would just be a matter of --

        MS. McKEEL:  Objection to the relevancy here.

        THE COURT:  Well, you know, because we are listening to the testimony, A, doesn't make it relevant, and ultimately the Court is only going to consider relevant testimony and whatever weight the Court gives it.  We are probably just better off to move along, and I will sort out the relevancy.  That it's in evidence doesn't make it relevant.

        MS. McKEEL:  Yes, ma'am.  And, too, we have no indicia of reliability on any of his testimony.

        MS. PEIFFER:  May I continue?

        THE COURT:  Yes.

BY MS. PEIFFER:

Q.   And what did you do to intervene in these arguments?

A.   They would just be -- you know, trying to get between them to stop them or pushing myself just so he would stop pushing her.  Let him attack.  He would come after me instead of her.  That was good.  I'd run around the dining room table a few times, get up underneath, whatever, I'd hit the door and see him tomorrow.

Q.   And what did you do after you -- you said see him tomorrow.  So what do you mean by that?

A.   I usually didn't come back that night.

Q.   Where did you go?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              756

A.   Sometimes a friend's house.  Usually sometimes right back in the same hallway and just curl up on the steps and go to sleep, or some gangway, or somebody's steps at the house or somewhere, a garage, somebody's garage.  It didn't matter.  I just wasn't going to go back into a fight.

Q.   And what happened on the occasions when you were not quick enough to escape your father?

A.   Oh, I got a pretty severe thrashing, put it that way.  Unfortunately, he insists, just like any other man, if you will -- of course, I was just a kid, but it didn't matter to him.

Q.   What was it like living in the home with your father?  How did it make you feel?

A.   I was intimidated.  He couldn't come home without me wondering what is going to happen next.  I'd be in the bed already, and I'd be worried because he is in the living room arguing with Momma waiting for him to come into the bedroom, you know.  That was the routine.  He would snatch us up out of them bunk beds in a second, just for the sake of doing it.  I mean, it was -- or I -- of course report cards, that was always bad timing, but, you know, why didn't you do this?  Doesn't matter.

Q.   You mentioned that your -- earlier in your testimony, that your father was physically abusive to your mother.  Was he emotionally abusive to her?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                          757

A.   Well, yeah.  It was -- you know, when you are always talking down to somebody, that's pretty much it, you know. You stupid this, you dummy that, don't you know this, don't you know that.  That was pretty verbally abusive.

Q.   And as a child, did you ever have issues where you were physically violent with somebody?

A.   I got into schoolyard fights routinely, put it that way.

Q.   Did anyone ever get injured during those conflicts?

A.   Oh, yeah.  Every once in awhile I got the better of them, and in a case, the thought crosses of one incident, Bobby Canada and his brother always picking on us at the little local candy store on the corner.  I finally got the better of him, and I didn't let him up until he couldn't get up, and I went off.

     And sometime that afternoon, early evening, his father showed up at the house, just walked in.  I mean, he didn't knock.  He just literally walked in.  And, fortunately, Dad was home early but -- he didn't walk in, he barged in.  But, anyway, they ended up in a confrontation, and Dad beat the heck out of him, kicked him down the stairs and all, because we were in a second-floor apartment.  He kicked him down the stairs all the way and told him not to come back, freak.  The guy never came back, but he was all upset because he wanted me to pay -- wanted him to pay the doctor bills for the injury on the kid.

                    JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                         758

Q.   When you say doctor bills, what do you mean?

A.   Well, the guy took his kid to the doctor's because he was beat up, bloody, whatever, and, I mean, all the times I've been beat up and bloodied by the kid didn't make any difference, but the fact that I finally got to him, okay.

He wanted me -- he wanted my dad to pay the doctor bills, and that wasn't going to happen.  But the mere fact that he came to the house the way he did -- dad takes care of business.  He doesn't let anybody disrespect his house, his home, his family.

Q.   And you mentioned earlier that, on occasions, you ran away.  Did child services ever get involved?

A.   Oh, I ended up in the system as a habitual runaway because stuff like that happened.  I just never stayed there. I wouldn't take it anymore.  I decided I'd had enough.

Q.   Where did you go after you were taken out of your home?

A.   Nowhere particular.  I ended up in the system.  I ended up in Chicago there, place called Mission of Our Lady of Mercy.  It's a court-designated place, I guess, for home -- it's a group home.  I ended up there a little over a year, I guess.

Q.   And where did you go after that?

THE COURT:  What age were you?

THE WITNESS:  15, 16.

THE COURT:  So you weren't in your house the whole

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              759

time you were growing up?

THE WITNESS:  No, 15, 16, I was out of the house. I was in the juvenile system.

THE COURT:  Doing what?

THE WITNESS:  Juvenile system.

THE COURT:  So you were a habitual runaway?

THE WITNESS:  Correct.

THE COURT:  You were in the juvenile system by the time you were 15?

THE WITNESS:  Right.

BY MS. PEIFFER:

Q.  Were you placed in foster care at that point, Mr. Dombrowski?

A.  I was in foster care -- well, the Mission of Our Lady of Mercy was considered a foster care home.  I went into private foster care -- my brother was in foster care, as well, for the same problems.  He lived with the family in Waukegan, Illinois.  The family invited me to live with them as well. We went through the court systems, and they placed me up there as a partial child to that family up in Waukegan.

Q.  Did you eventually have to leave that home?

A.  Yeah.  I had a job in the movie theatre as an usher and clean up, obviously.  Anyway, when I was cleaning up, I end up coming across the -- the manager's gun in his office and took it, like a dummy, and had it there in my foster home

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                    760

under my bed, under my pillow.  And I caught my foster brother, Bobby, holding -- you know, he had the gun, and I walked in on him and startled him, and he ended up shooting me because, by backing up, it was just reflex.  Anyway, I got shot at the house.  Then his older brother by a couple of years, I sent him across the street to call the ambulance, and I waited downstairs for help to show up.

Q.  I'm going to skip ahead a little bit chronologically, Mr. Dombrowski, and take you -- ask you a couple of questions about the time you were in the military in Korea.

Do you recall anything particularly difficult that you had to do during your service there or that made a particular impression on you?

A.  Well, Korea's duties, if you will, was obviously North, South Korea and the Imjin River, 38th Parallel, all that, and I --

THE COURT:  Madam court reporter, can you get this down?  Are you getting this down?

THE REPORTER:  Yes, ma'am.

THE COURT:  Because it's a lot of mumbling.

THE WITNESS:  I'm sorry.

BY MS. PEIFFER:

Q.  You can move the microphone a little bit, Mr. Dombrowski.

A.  Okay.  So, anyway, we were at -- in Korea on the Imjin River, the 38th Parallel there, and we were constant -- you

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                         761

know, what they call Skogie, which is just our post position over the river, or actual Dangjin, the other side, which is -- we had several instances of, it's called infiltration and several times you're firing at targets.

MS. McKEEL:  Your Honor, I object.  His being a wounded warrior has nothing to do with genetic mental illness.

THE COURT:  Well, most of it has had nothing to do with genetic mental illness.

Can you tell us what this has to do with genetic mental illness?

MS. PEIFFER:  I was laying a foundation, Your Honor, for him to talk about his own mental health issues, further describe some of his own mental health issues.

MS. McKEEL:  Your Honor, I'm going to object to that.  We have spent probably a good 45 minutes on his mental illness.

THE COURT:  What does his wounded warrior situation have to do with genetic mental health illness?

MS. PEIFFER:  I'm not talking about him being a wounded warrior.  The testimony would be about his own mental health issues, and one of them relates to his experience -- don't want to say what they are before the witness has had an opportunity to testify about them, but they relate to his experiences in Korea partly.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                762

THE COURT:  Yes, but that doesn't relate to genetics.  That's an experience that he has had in his life experiences.  It doesn't relate to a genetic issue.  If it does, then please enlighten the Court how it does.

MS. PEIFFER:  It's part of Mr. Runyon's psychosocial history as part of the claim, and it's one of the things that was considered by the experts.

MS. McKEEL:  Judge.

THE COURT:  Wait just a minute.  You said Dr. Cunningham hasn't even reviewed this person.  He's talking about genetic, hereditary mental illness. Mr. Dombrowski is getting ready to talk about separate life experiences that have affected his mental state.

MS. PEIFFER:  I understand that, Your Honor.

THE COURT:  So that is not genetic.  That is not hereditary.  That is something that happened to him.

MS. PEIFFER:  First of all, Your Honor, trauma is hereditary, but on Pages 25 --

THE COURT:  Wait.  Trauma is not hereditary. Trauma happens to a person.  Maybe you have trauma when you're born, but trauma happening after you are born to one of your parents is not a hereditary condition.

MS. PEIFFER:  It actually is, Your Honor.  I'm not a psychological expert, but I can tell you what Dr. Cunningham says.  At ECF Number 478-8, Pages 25 through

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                  763

27, he lists four reasons why these factors are relevant to Mr. Runyon. Would you like me to continue?

THE COURT: No. I'm going to let you keep digging down into this hole, and I will pursue it. Since I have to make decisions, I will require these documents, to read all of this testimony and tell the Court if that's what they're talking about, and if they are, how.

Because you want Dr. Cunningham to be reading all of this testimony and then responding. Is this what you're talking about? You're talking about his father's trauma in Korea well after he's born? I think you're going to find, and maybe you won't, but I don't think these experts are going to read this testimony and say, yes, that's what we were talking about and what we think the Court ought to hear and the jury ought to have heard.

Then the question becomes, effectiveness of counsel at this level.

MS. PEIFFER: Your Honor, just to clarify, the trauma that I am trying to offer Mr. Dombrowski about was before Mr. Runyon was born. It was not after he was born, just to clarify for the record.

THE COURT: You said it was physical trauma that then affected his later mental state. It's not something he was born with. I'm going to let you ask it because I am going to pursue this as long as we have to. These experts

JODY A. STEWART, Official Court Reporter

can read this testimony and then they can tell the Court how this is relevant to what they were talking about, because I don't see its relevancy.

So I will ask the experts to help me, since I have to ultimately decide this.  In other words, all these experts are going to come in, or at least Dr. Cunningham, and say this is what I referred to, and I am going to have him, and I'm going to direct you that you are not to discuss this testimony with him because this testimony has occurred in this hearing, and testimony of one witness is not going to be discussed with another.

You are the ones who moved to sequester the witnesses.  The witnesses are sequestered, and I am going to instruct you tonight at the end of this, as well as your whole team, as well as the government's team, that any testimony that has occurred here is not to be reviewed with a potential witness coming before the Court.

Their testimony is what they prepared before they came to court, except to the extent that the government has to rebut certain things that they might know about until all this occurred.  But I will tell you that I'm not going to have your witnesses reading and discussing testimony that your other witnesses have given because you've sequestered them, number one.

Number two, I'm going to require them to, since

Dombrowski, D. - Direct                                              765

I've got to make these findings; and then number three, they can tie it up and try to explain to the Court how it's relevant over the job that this Court has to do now in determining ineffective assistance of counsel based on a mental health issue of Mr. Runyon.

So if that's the way you want to proceed, if that's how you all choose to be effective counsel, go for it.

MS. PEIFFER:  Yes, Your Honor.  Just to clarify, I want to make sure I understand the Court's ruling.

THE COURT:  I'm not answering questions about my ruling.  I am tired of you all asking me questions.  I've ruled.  I don't even have to explain evidentiary rulings under the rule.  All I have to do is rule.  I don't have to explain to you, nor do I even have to be correct on my basis as long as the ruling is ultimately correct.  That's hornbook law.

MS. PEIFFER:  Yes, Your Honor.

BY MS. PEIFFER:

Q.  So, Mr. Dombrowski, going back to your time in the military in Korea, you were starting to describe some situations that were particularly impactful on you about the things you had to do during your military service there that made an impact on you.

A.  Okay.  I think we are -- things that just -- when you're in the DMZ or the foxhole protecting, guarding the DMZ, we

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                              766

get notices from top, our operations center that there is activity, because we have sensoring devices in that zone that tells us if there is something out there. More often than not it's a rabbit or a deer or something like that. But the obvious point is the North Korean people will get in there. They tunnel through. They do whatever they do, and we are advised about it. I have had several alerts and fired on and was fired upon from those detective notifications. So, you know, it weighs on me just as there is another human life involved.

I killed them, and they carried them off, and I saw them later. It doesn't matter. I shot somebody. I'm there doing a job, but I was going to leave the military in that form for that same reason, but --

Q. And were you also shot at, Mr. Dombrowski, during that time?

A. Oh, yeah. Yeah. That's -- like I said, I was fired upon and I returned fire.

Q. Did that continue to affect you even after you left the military?

A. Oh, I think about it all the time. I mean, it's just part of -- it's the military, you know. You don't forget it just because you left the service.

Q. And what are some of the ways that it continued to affect you in your regular life, these experiences that you had?

Dombrowski, D. - Direct                                                767

A.   It haunts me.  I mean, I have nightmares about it.  Not so much lately, but there was several years after, even after being out of the service, you know.  It's just a haunting thing, that's all.

Q.   And did you have difficulty in sometimes your reaction to things that resulted from the shooting incident that you were involved in, in Korea?

A.   Well, you're always on alert, that's all.  You constantly -- I mean, people get startled.  I get startled very easily.  It don't take much.  Don't walk up beside me and not know about it because I will turn -- some people pull away.  I don't.  I go toward whatever it is, and people get hurt, and it's supposed to happen.  I mean, that's just a -- a built-in reflex.

Q.   Can you describe or give an example of what you mean by you get startled by things?

A.   Well, a side noise can bother me.  It just doesn't take much, that's all.  I've had -- I was at home on leave, and we went to the EMP, me and my dad and I at the time.  Two, three blocks from the house we are walking, a car backfires.  I don't know it is a car.  I hear something that sounds like a gunshot.  Okay, I'm ducking.  I'm in the city street in Chicago at home, visiting dad, going to the grocery store, and I'm ducking.  For what?  I'm not in a combat zone anymore, but I'm still there.  It's just common.  It's

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Direct                                                        768

instinctive reaction.

Q.   And, Mr. Dombrowski, we are going to move on to just a couple of more questions about David Runyon's capital trial and what happened afterwards.  Did you testify at that trial?

A.   Yeah, I did.

Q.   Do you recall meeting with anyone before you testified at the trial?

A.   Yeah.  There were two different people that actually -- one was, I don't know -- I don't know what -- she was like part of the team, I guess.  We had an extensive conversation about the overall trial aspect.

Q.   And this was a woman that you met with before the trial?

A.   A woman.  It was Sheila somebody.  I don't remember what her last name was, Colon or something like that.

Q.   And do you recall meeting with David's trial attorneys at all before the trial?

A.   Yeah.  But I didn't see much of them, to be honest.  It was a quick, you know, 10 or 15-minute just before court.

Q.   At those meetings with the attorneys, did they talk with you about the subject matter of your testimony or ask you questions about what you would testify about?

A.   No, not really.  It was, we are going to ask you a few questions, just tell us what -- what you know, and to the best of your ability, and that was it.  That was pretty much all the direction I ever got.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                          769

Q.   When you met with people in the time before David's trial, did you answer all of the questions that you were asked?

A.   Oh, yeah.

Q.   When you were testifying, did you answer all of the questions that you were asked there?

A.   I believe so.

Q.   Did you ever speak to David's attorneys after he was convicted and sentenced to death?

A.   No.  I didn't have that privy.

Q.   Let me clarify the question.  I apologize.

So we were talking about before his trial, and then after his trial he was convicted and sentenced to death.

A.   Uh-huh.

Q.   Did you meet with people, attorneys or investigators working on his post-conviction *habeas* case?

A.   Well, it was a new team, I think.  And yeah, we went through an extensive question/answer session.

Q.   And at some point did you give a sworn declaration that you signed?

A.   I did.

MS. PEIFFER:  No further questions.

THE COURT:  Ms. McKeel.

MS. McKEEL:  Thank you, Judge.

CROSS-EXAMINATION

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                          770

BY MS. McKEEL:

Q.   Good evening, Mr. Dombrowski.  Why would you leave your two small boys with Suk Cha if she abused them the way that you have testified today in front of Judge Smith?

A.   Well --

Q.   If you could, sir, please speak into the microphone.  I'm having trouble hearing you.

A.   I'm sorry about that.  It's -- it was a broken home, just that simple.

Q.   I'm sorry.

A.   It was a broken home.

Q.   So you thought you would abandon your boys to her?

A.   Well, I don't consider that I abandoned them.

Q.   You gave up your parental rights, didn't you?

A.   Well, I did to an individual that I spoke with, really didn't know much about him, but I spoke with him.  The man had asked me to adopt them, Mr. David H. Runyon.  I had met him sometime later and felt that it was a good decision.  He was -- you know, I was only going on summation prior, yes, I gave it up based on his request and her request on a telephone call.  But when I talked with him, I was convinced by conversation that he was a good man.

Q.   And you decided never to try to see your children again, didn't you?

A.   No, that would be totally untrue.  I've made several

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                                  771

attempts to contact them and was never given the right to visit, call or talk or whatever. I had the fortune of being able -- I had located the Runyon family while I was at Fort Leonard Wood, Missouri. I was in the finance office at the time, and because of that I had -- I worked in what's called the in and out processing. All personnel records, finance records for personnel that worked in or at the command came through my station. I, coincidently, ran across his record, a record with Runyon on it and pursued it to identify that it was him.

I waited a couple of weeks later to look for documentation for a quarters assignment, housing assignment on post. I went to the quarters area and just parked, watched the kids several times, just playing outside. I was content to see they were okay. I was in a little cul-de-sac that ran across last -- and was caught.

Q. Is this the same story you told us when you testified when Ms. Peiffer was asking you questions, that same one incident or is this a different incident?

A. I don't even know what incident you're referring to. I'm sorry.

I'm talking about how I regained or acquired any kind of contact with my sons and Mr. Runyon to, again, affirm that my decision seemed to be all right in the sense of not abandoning my children to a stranger, but good enough that he

Dombrowski, D. - Cross                                        772

was a decent man.

He approached me while I was in this cul-de-sac parked, watching the kids play.  He approached me, identified himself and asked me who I was and what I was doing there.  A good man.  He was taking care of his neighbor or whatever.  But I told him who I was, why I was there, and everything was fine.  He just identified himself, and I identified -- we identified who I was, and those kids were mine, and he was -- he knew who the kids were and didn't seem to be anybody --

Q.  Mr. Dombrowski, do you recall being interviewed by Sheila Cronin?  You said a lady.  Do you recall if her name was Sheila Cronin?

A.  Cronin, right.

Q.  And do you recall being interviewed by her and giving your life history, much of what you've told Judge Smith today?

A.  Yeah.

Q.  All right.  Do you also recall talking to her about the violence with Suk Cha in the house or non-violence?

A.  Yeah, we -- we had pretty much the same conversations we have been having today.

Q.  So you told Ms. Cronin a lot of what you said today, correct?

A.  Yes.

Q.  But you also told Ms. Cronin that you completely denied

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                          773

ever striking David or Mark; is that correct?

A.   I may have, but I --

Q.   I'm sorry?

A.   I said I may have, but I don't know.

Q.   You may have said that?  Is what you are saying something different today to Judge Smith?

A.   I'm saying I know I did that, and I may not have admitted that to her.  I may not have been recalled it.  Created and been selected.  The fact of the matter is, I did, and I'm not proud of that but it did happen.

Q.   In fact, Ms. Cronin specifically asked you about throwing David across the room.  Her notes indicate, her social history for the trial team is that you denied ever doing so.

A.   I don't recall that.  I know I did it.

Q.   Didn't you also tell her that you had a memory problem and you had occasional blackouts?

A.   I did.

Q.   You had a bad drinking problem, didn't you?

A.   I did.

Q.   You were an alcoholic?

A.   I'm not now.

Q.   I understand not now, but were you an alcoholic?

A.   I believe I was turning into one, yeah.

Q.   So when you lived with Suk Cha, you were drinking and gambling, weren't you?

Dombrowski, D. - Cross                                    774

A.  Yeah.

Q.  And that was upsetting to Suk Cha, wasn't it?

A.  Of course.

Q.  In fact, when you came home from drinking and gambling, she would be mad at you, wouldn't she?

A.  Yeah.  That's true.

Q.  And didn't you tell Ms. Cronin that Suk Cha would get you up against the wall, and she would be using her hands against you, and that Davy would come and hold onto his mom and tell you not to hurt mommy?  Do you remember that?

A.  We went over that right today, yeah.

Q.  Do you remember testifying at the trial, the trial of the penalty phase for your son?

A.  I was there.

Q.  Well, I'd like to show you the trial transcript, if you need to refresh your recollection, sir.

Do you take medication now?

A.  I do.

Q.  What kind of medication do you take?

A.  I take Prozac, Buspirone, and a zillion vitamins.

Q.  I'm sorry, sir?

A.  And a zillion vitamins.  Prozac, Buspirone, and a zillion vitamins.

Q.  Vitamins.  Any other medication?

A.  No.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              775

Q.  No?  Okay.

Do you recall testifying that, when asked -- this is on the very first page of 2340, asking about how much contact you had with David Runyon, and your answer was, "I hadn't seen him since he was 5, and he is now 38.  I last saw him in May."

Would that be the sum of your relationship with your son up until that time period?

A.  As far as seeing him.

Q.  Yes.  So from the age of 5 up until he was 38 and standing trial in this court, you had no relationship with him; is that correct?

A.  Other than when I was observing him at that -- the folks at the house, yeah.

Q.  You never shared any of your family history with him, correct?

A.  I had no contact because I wasn't allowed to contact by Suk Cha.  I had -- every phone number I had was always listed.  There was never an attempt by anybody to contact me until all of this came about.

THE COURT:  What was your answer?  Read his question and his answer in trial and ask him if that was his testimony.

MS. McKEEL:  Yes, ma'am.

BY MS. McKEEL:

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                          776

Q.   "Question" -- this is on that very first page, the first full page of the transcript.

          "Question:  And you have not had contact with him for years up until recently?

          "Answer:  Right."  This is on line 23.

     "Right.  I haven't seen him since he was about 5, and he is now 38.  I saw him last May."

A.   Uh-huh.  Okay.

Q.                "Question:  For the first time?

          "Answer:  For the first time in all of that time, I visited him in the county jail where he is being held."

     That was your answer, right?

A.   Okay.

Q.   Going back to Suk Cha's pregnancy, and I'll take you to Page 2349.  The page numbers, sir, are on the top right-hand of the page.

A.   I saw it earlier.  Okay.

Q.   When you were in Korea, isn't it true that Suk Cha was in Korea without you for four to five months during her pregnancy?

A.   No.  No.

Q.   Go down, if you could, go down to 19.

          Question is:  "You came back.  How long did she have to stay before she was able to come?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                          777

"Answer:  It wasn't that long, probably four or five months at the max."

A.  Yeah.

Q.  Do you remember that?

A.  Because we --

Q.  So you weren't --

THE COURT:  Please stop talking over each other. Mr. Dombrowski, she gets to finish the question, and you get to finish your answer, but don't interrupt while she's asking a question.

BY MS. McKEEL:

Q.  So you weren't present during four to five months of her pregnancy; is that correct?

A.  I was -- she was in Korea four to five months before she got to the States.  I wasn't there because I was in the States.  We were arranging for her visas and passports, and so forth.  So that would be correct, but it's a valid consideration as to why.  I can't put her in my suitcase.

THE COURT:  Well, we are not asking you why.  You testified about her pregnancy and your observations thereof. Nobody's asking you why or saying that your reason for not being there wasn't valid.

This is what's called impeachment testimony.  In other words, you've testified today that you were with her, you tried to get her to go to the doctor, you were there,

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              778

and now it turns out, from your sworn testimony at trial --

THE WITNESS:  I see where you're going with that.

THE COURT:  That's all I'm telling you, is nobody is criticizing you for not having been there.  The fact is you weren't there for legitimate reasons.

THE WITNESS:  When she got to the States, there was a good month, six weeks that she just refused to go to the doctor.  That four or five months before that, I couldn't be there for that pregnancy, because, one, I mean, she just had to go through the normal routine of getting passports, visas, and so forth, and that's all we were waiting for.

BY MS. McKEEL:

Q.  So let's go to the subject of Suk Cha's discipline now. If you will go to Page 2352 of that transcript.

A.  Okay.  I'm there.

Q.  The top of that page, line 2, you said, "She was a little bit shaky.  And then go to five "Answer:  On discipline forms."

Do you remember saying that her way of disciplining was slapping their hands?

A.  Among others, yeah.

Q.  All right.  And you can look through the next few pages, because you were asked specifically about how she disciplined the children.  Did you ever, ever testify to what you have testified in here today about all the abuse that you say Suk

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                                779

Cha did?  Take a look at your testimony.

A.  Well, you asked for me so I don't know that I said anything other than what you've got here because apparently that's what it is.  The fact that I don't say she slapped his head or whatever doesn't mean it didn't happen.  I just didn't happen to say it that particular time.  I'm sorry.

Q.  You've testified earlier that the punishment was corporal punishment with spoons, smacks on the head, smacks on the shoulder.  You said he had scar marks after being hit, but, sir -- and you can take a look at it, that's why I gave it to you -- did you ever say anything, testify when you were asked by Mr. Runyon's attorney any of that at trial in front of that jury?

A.  I guess not.  I testified to the fact that he was being kicked.

Q.  Okay.  So why the change?  Have you been prepared by somebody to come here today to testify?

        THE COURT:  Wait.  Wait.  What did I tell you all earlier.

        THE WITNESS:  I did it again.  I'm sorry.

        THE COURT:  The court reporter cannot get this down, and we can't conduct a trial with everybody interrupting and talking over each other.

        Go ahead, Ms. McKeel.

BY MS. McKEEL:

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              780

Q.   My question might be a little long.  I'm trying to lay a
foundation for you, sir.

A.   I'm sorry.

Q.   Because your testimony today is so drastically different
from what you testified in 2009, my question is:  Has someone
prepared you or shown you something to make you say something
so different today?

A.   I'm telling you what I know.  I'm telling you who I am
and what I observed and what happened.

Q.   Well, why didn't you say that before?

A.   Well --

Q.   You told Ms. Cronin that.

A.   Okay.

Q.   Well, you didn't tell her about all the physical abuse
but you told her about some things.  When you were asked by,
I think Mr. Hudgins, you didn't say any of that, did you?

A.   That's his lawyer?

Q.   Yes, sir.

A.   Well, we didn't have much time to talk.  There was 10 or
15 minutes at best.  It didn't come up in prior questions,
I'm sorry, that I can recall.

THE COURT:  This isn't about your talking in
advance.  This is about you are in a courtroom in this
courthouse in trial, and your son, your biological son is on
trial, has been found guilty of murder, and you are

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                          781

testifying before a jury, and Mr. Hudgins asked you that
question.  You did not testify as to all of this that you've
testified to today.  So what has caused the change to make
either, A, your memory better this many years later?  Have
you been prepped?

THE WITNESS:  Oh, no.

THE COURT:  Or told what to say by anybody?

THE WITNESS:  No, absolutely not.  I speak from
what I know.  Nobody has told me to say anything.
Absolutely not.

THE COURT:  Why didn't you say it back then?

THE WITNESS:  I think it would stand to logic that
sometimes you just can't say or remember everything when
you're under a direct questioning, so to speak.  You can't
say five years of history in 20 minutes.

THE COURT:  Nobody had you on a timer.

THE WITNESS:  Well, it's a state of mind, not a
practicality that I can remember everything, whether I'm
asked for 20 minutes or two hours.  There is only so much
you can make or remember or say at one given time.

THE COURT:  Let's put it this way.  You weren't on
a timer at trial, and you didn't say it.

THE WITNESS:  I wasn't saying that I was.  I've got
a five-year flow of recall in my mind, and I can't recall or
say everything that happened.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                                    782

THE COURT:  But you've filled hours this afternoon with testimony.

THE WITNESS:  It's multiple years later and a lot of water under the bridge and, you know, I don't know what to tell you in that regard.  I've had that much more years to think about all that's happened.  I have a situation that I have to deal with, with my son, what happened, what didn't happen, what was my fault, what wasn't my fault, what caused this, what caused that, all kinds of speculations, and, yeah, so it came up in question, and I answered it.  It doesn't mean it didn't happen before or it means I didn't recall it before.

BY MS. McKEEL:

Q.  Did you tell Sheila Cronin that you feel totally responsible for David's situation, that you were willing to bear your soul to the jury if it would help David?  Do you recall telling Ms. Cronin that?

A.  I probably would have said something like that because that's how I am.  I mean, it is not really in the sense of "to help David" as in I'm going to say anything to get him out of trouble.  No, I'm going to say what I know, and I'm going to do all that I can.  I'm certainly not going to lie. I'm sorry.  I can't do that in the sense of just blatantly lie and tell somebody something that's a downright lie.

Q.  Mr. Dombrowski, how long have you been in Norfolk,

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              783

Virginia, for this proceeding?

A.  Since Monday.

Q.  Monday?

A.  (Nods head.)

Q.  Who have you been staying with?

A.  I've been in a hotel.

Q.  A hotel.  And who else is in that hotel, as far as any trial team members or other witnesses?

A.  I --

        MS. PEIFFER:  Objection, this is far outside the scope of direct.

        THE COURT:  Overruled.

        THE WITNESS:  You are saying, you're asking?

BY MS. McKEEL:

Q.  Who else is in the hotel with you staying there during this proceeding from your son's trial -- your son's team, *habeas* team, and any witnesses?

A.  There's several people there, but I understand --

Q.  Name them, sir.

A.  I can't name them.  I don't know most of their names, to be frank with you.  I know my son is there.

        THE COURT:  Your son, Mark?

        THE WITNESS:  My son, Mark; my grandson, David, his -- oh, my God, I can't remember the boy's name now.  His half-brother, if you will.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              784

BY MS. McKEEL:

Q.  Have you all discussed the case?

A.  Excuse me?

Q.  Have you all discussed this case?

A.  I was reviewing previous testimony, yes.

Q.  You did review some testimony?

A.  Yes.

Q.  What did you review?

A.  Stuff like this, just like what you gave me here.

Q.  Oh, you've reviewed your trial transcript?

A.  Not this trial.  I don't remember seeing this.

Q.  I'm sorry.  What have you reviewed?

A.  Statements that I made before.

Q.  To Ms. Cronin, you've reviewed those statements?

A.  Uh-huh.

Q.  How about were you interviewed by Michael Chavis?

A.  Michael Chavis was an interviewer, yeah, in the sense that --

Q.  I'm sorry?

A.  -- he made arrangements for all of us being here and doing what we've got to do.

Q.  How many times have you been interviewed since your son received the death penalty, regarding this case?

A.  I'm not sure what you mean.  I've seen several people here, Mike Chavis --

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                                    785

Q.  And you discussed the case?

THE COURT:  Let him finish.

MS. McKEEL:  Yes, ma'am.

THE WITNESS:  I've talked with Michael.  I've talked with her.

THE COURT:  Who is her?

THE WITNESS:  Her.  I'm sorry.  I forgot your name again.

BY MS. McKEEL:

Q.  Is that Ms. Peiffer, this young lady?

A.  Yes.

Q.  Talked to Ms. Pfeifer.  Who else have you talked to?

A.  My son, Mark.  I don't know.

Q.  And you all have discussed this case and your testimony; is that correct?

A.  No.  No.  We are not discussing testimony.  You asked me who I talked with that was in the hotel.  That's who I talked with.  I didn't say anything about discussing the case.  I have not, quote, discussed it.  We are here to figure out what's going on, why, and that's all I know.

Q.  But you've reviewed, I guess, some materials that Sheila Cronin produced.  So you knew what your statements were to Ms. Cronin; is that right?

A.  I do.

Q.  And then you made a declaration.  Did you make that to

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              786

Mr. Chavis?

A.  That is what I'm referring to.

        THE COURT:  Wait.  I want you each again --

        THE WITNESS:  Here I go again.  I'm sorry.

        THE COURT:  Okay.  Start again.

        You reviewed with Ms. Cronin, and I think you said yes, and then you were going to something else.

        MS. McKEEL:  Yes, ma'am.

BY MS. McKEEL:

Q.  Then did you review your declaration with Mr. Chavis?

A.  No.

Q.  You didn't?

A.  No.

Q.  Did Mr. Chavis take your declaration?  Is that the person who took it, that Ms. Peiffer referred to, your declaration at the end when she was questioning you?

A.  I don't know who took the declaration.  I just know it's all -- it was handed to me as the previous declaration.

Q.  Did you prepare that?  Did you type it up yourself?

A.  No, hell, no.  Sorry.

        THE COURT:  Ms. Peiffer.

        MS. PEIFFER:  I believe there is some confusion and some clarification is needed.  I think lay people maybe don't understand the difference between declaration and notes and memorandum, and it might be helpful to clarify to

                        JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Cross                                              787

Mr. Dombrowski which items you are talking about.

BY MS. McKEEL:

Q.  Let me show you.  Take a look at the screen.

A.  Yeah.

Q.  Do you see that, sir?  Let me go to the last page for you.

A.  Yeah, ten pages.  I know.

Q.  Do you see that?

A.  I do.

Q.  That was signed September 23rd, 2015?

A.  Uh-huh.

Q.  Again, that's called a declaration.

A.  That's what I said I signed.

Q.  Who prepared this declaration for you?

A.  I don't know.

Q.  How many times did they interview you?

A.  I don't know what you mean.

        MS. McKEEL:  That's all the questions I have, Judge.

        THE COURT:  Let me just clarify a couple of things with you, Mr. Dombrowski.  At the hotel you are staying at, are these attorneys staying at that hotel?  You said you talked to Ms. Peiffer.

        THE WITNESS:  I don't know if she's staying at that hotel.  I have talked to her at the hotel, but I don't know

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Redirect                                          788

where she's staying.

THE COURT:  So you've talked to her at the hotel?

THE WITNESS:  Uh-huh.

THE COURT:  When did you talk to her?

THE WITNESS:  When?

THE COURT:  Uh-huh.

THE WITNESS:  It was just in passing except for going over this declaration thing.

THE COURT:  Was it last night?

THE WITNESS:  I saw her last night, yes.  But like I said, we were going over that declaration.

THE COURT:  Have you been handed any transcripts of other people's testimony to look at?

THE WITNESS:  Oh, no, no.  Nor have I given mine to anybody else.

THE COURT:  The only thing you've reviewed, then, were your statements?

THE WITNESS:  Correct.  This is the first time I have seen this or anything like that.

THE COURT:  All right, Ms. Peiffer.

MS. PEIFFER:  Just briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MS. PEIFFER:

Q.  I have a small number of questions for you, Mr. Dombrowski.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Redirect                                          789

Earlier today you were asked about your wife, Suk Cha's pregnancy. And although you may not have been together for her whole pregnancy, did you talk with each other, and did she tell you her impressions and her feelings about the medical care she was receiving during that pregnancy?

A.   Her medical care was non-existent until about five or six months -- excuse me, five or six weeks after she got to the States.

Q.   Is that something that the two of you discussed together?

A.   She refused to go to the doctors. I mean, she was there. I wanted her to go to the doctor right off to get checked because she said she didn't feel good, whatever. It didn't matter. She needed to go to the doctor to establish, and she just refused. Once she started doing all this spotting and bleeding and all of that, some five, six months -- weeks, sorry, after she got to the States, she finally went.

Q.   Those issues that you just mentioned, like the bleeding and the issues of gaining weight, those are things that you yourself observed and spoke about with your wife?

A.   That's why I kind of made her go, yes.

Q.   And when you met prior to trial with Ms. Cronin, do you recall how many times you met with her or exactly what was discussed at this point?

A.   I don't think I saw her but that one time.

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Redirect                                          790

Q.  When you met with counsel, his attorneys, David's attorneys before trial, did they talk to you about the kind of things you would testify about and the kind of information they would ask you about and prepare you for your testimony at that level?

A.  No.  I saw the attorney just 10 or 15 minutes before we actually went into court.  It was like -- I think I said earlier, it was just, you know, don't worry too much about it, just go ahead and answer the questions, and --

        THE COURT:  He told you to tell the truth?

        THE WITNESS:  Of course.  And I've been telling the truth.  I will not lie.  I don't have reason to, it's just not going to happen.

BY MS. PEIFFER:

Q.  So your recollection is that any meetings that you had with the attorneys were brief; is that correct?

A.  Very.

Q.  Had you ever testified at a capital trial or a death penalty sentencing before that?

A.  No.

Q.  Did you have any idea what they were looking for, the level of detail that you would need to provide?

A.  I didn't know what to expect.  I was just there.

Q.  Was it an emotional experience for you to testify at your son's trial?

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Recross                                                791

A.   Oh, yeah, of course, just like it is right now.  Just nerve-racking.

Q.   I'm just going to show you this document that Ms. McKeel showed you.

A.   Uh-huh.

Q.   Do you recognize this document?

A.   I do.

Q.   Were you given a copy of this document?

A.   Yeah.  This is what I referred to that I was saying I had seen previous.  This is the only previous that I've seen.

Q.   This is the document you were talking about?

A.   Yes.  And it's 10 pages, and the last page has only one little line on it.

Q.   That's correct.  I'm going to show it to you right now.

A.   Yeah, that.

Q.   You can see that you signed that in 2015, correct?

A.   That's my signature.

Q.   Before you signed this document, did you review it to make sure that it was correct and that you agreed with everything that it said?

A.   I did.

     MS. PEIFFER:  No further questions, Your Honor.  I'd ask that he be released.

     MS. McKEEL:  I have one specific question, Judge.

               RECROSS-EXAMINATION


                JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Recross                                                    792

BY MS. McKEEL:

Q.  Sir, if you could go to Page 2351 of the transcript, line 6.

"QUESTION:  At that point was her health okay, so far as her pregnancy and all was concerned?

"ANSWER:  Nothing really major with her pregnancy."

Do you see that?

A.  I see it.  I don't know what the questions preceding it say at that point.

Q.  That's what you said, correct?

A.  What point?  I don't know what you're referring to.

Q.  Question -- go to line 6.

A.  Yeah, that's not what I mean.

Q.  "Question:  At that point" --

        I'm sorry?

                "QUESTION:  At that point was her health
    okay as far as her pregnancy and all is concerned?
                "ANSWER:  Well, you know, she still had
    some problems, and as much as, you know, just the
    pregnancy, obviously, presents it own sorts.  Nothing
    really that major, now that she is let on to anyway."
    Do you recall saying that?

A.  I recall what this shows.  My point of order, if you will, is I don't know what you're talking about at that point.  When was at that point?  Are they -- is this --

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Further Redirect                                    793

MS. McKEEL:  Those are all the question I have.

THE WITNESS:  Was this five months ago?  At what point?  At what point?  After she saw the doctor, she was okay?  Just normal stuff?  Or was it when she got to the States?  I don't know what the question is preceding that.

THE COURT:  Well, read the question.

THE WITNESS:  Well, okay.  Yeah, as far as I know.  Because all of the issues that became obvious were after I picked her up at the airport.  I didn't see her for five months before that.

THE COURT:  Anything else?

MS. PEIFFER:  Yes, Your Honor, just to provide some context.

THE COURT:  Is it from the transcript?

MS. PEIFFER:  Yes, ma'am.  It's from the page before what Ms. McKeel was reading from.

THE COURT:  All right.  Go ahead.

FURTHER REDIRECT EXAMINATION

BY MS. PEIFFER:

Q.  So this is from the page before the transcript that Ms. McKeel, 2350.

A.  Okay.

Q.  2350, and line 5 --

A.  Okay.

Q.  -- of your testimony.  Can you read that paragraph,

JODY A. STEWART, Official Court Reporter

Dombrowski, D. - Further Redirect                                      794

please.

A.   It says, "Well, she almost didn't get there."  Again, I don't know what that is referring to.  "They thought she was going to have a miscarriage at the airport, and they tried to -- well, they tried."  I don't get it.  I lost it.  "They stopped her from getting on the flight."  Okay.  "They took her to the airport -- from the airport, I should say, to the hospital and get medically checked out and so."

           THE COURT:  So this was when she was coming over to the States?

           THE WITNESS:  That's what it looks like.

           THE COURT:  All right.  How many months pregnant was she at that time?

           THE WITNESS:  Probably five, four or five.  I'm sorry.  Were you addressing that to me?

           THE COURT:  Yes.

           THE WITNESS:  About four or five months.

           MS. PEIFFER:  Nothing further, Your Honor.  I just wanted to clarify that.  I would ask that Mr. Dombrowski be released.

           THE COURT:  Mr. Dombrowski, you are now released from testifying as in this hearing.  However, I do instruct you that you may not discuss your testimony with anyone.  Do you have any questions?

           THE WITNESS:  Okay.  No questions.

THE COURT:  You have a nice trip back home.

THE WITNESS:  Am I able to talk beyond once all of this is over?

THE COURT:  You will have to communicate with the attorneys, and they would have to let you know.

THE WITNESS:  So, in essence, kind of like a gag order, don't talk about it?

THE COURT:  Exactly.

THE WITNESS:  Okay.  I just wanted to clarify it.

THE COURT:  Let's clarify it.  You've got an instruction not to discuss your testimony with anyone until further notice.

THE WITNESS:  10-4.

THE COURT:  You're excused.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Counsel, that brings us to the end of this trial day.  As I understand, we will be resuming on Monday with Ms. Cronin.  That's what the attorney said yesterday.

I do want to note a couple of things for counsel.

Number one, no one is to discuss with any other witness what another witness has testified to.  I want to reiterate that to the counsel, except if it is to go into a rebuttal area.  You are able to discuss a rebuttal area, but

JODY A. STEWART, Official Court Reporter

you may not, Counsel, tell another witness, discuss with another witness, or give a transcript of testimony to any other upcoming witness.

Counsel, is that clear?

MS. BALES:  Your Honor, that is clear, and we have not done that, just for the record.  But we understand that.

THE COURT:  I just want to make it clear, and that includes any experts.  I make that clear because of the Court's remark today, and I will ask each witness if they have seen any testimony from this proceeding.  So as I've told you, I am going to have Dr. Cunningham review this testimony and discuss with the Court the relevancy of it, and if this is what he had in mind when he mentioned that kind of information, and I do not want that discussed with him in advance.

I will be asking him if the attorneys or anyone else has mentioned the testimony of any other witness, and, in particular, testimony of Mr. Dombrowski.  I will ask and I will find it to be an ethical violation if my instruction is violated, and it's a reportable ethical violation.  That's the first thing.

The second thing is, I'm extremely disappointed in counsel from yesterday.  When we got to the end of the trial day, there was a representation to the Court that there were no other witnesses available, and it appears that there were

797

at least the witnesses that have testified this afternoon, they were available, both Mr. Runyon and Mr. Dombrowski.  It appears that they had not yet been prepared by counsel, but that wasn't my question.  My question was, do you have any other witnesses available.  I was specifically told no.  I find that to be very, very disappointing.

Ms. Chavis, Ms. Peiffer, Ms. Bales, is there anything else for the Court to take care of this afternoon?

MS. PEIFFER:  Nothing further, Your Honor.

MS. BALES:  None, Your Honor.

THE COURT:  Is there any question about the Court's instructions?

MS. BALES:  Your Honor, we will certainly follow the Court's instruction, and we encourage the Court to confirm that with Dr. Cunningham.  I would note an objection to the instruction because typically Dr. Cunningham would listen to the witnesses' testimony at the sentencing hearing, and that is a part of what he relies on in forming his opinion.  But, anyway, we will certainly honor the Court's directive.

THE COURT:  Number one, this isn't a sentencing hearing.

Number two, there was no request for experts to sit in and listen to the testimony.  In fact, the motion for sequestration of witnesses was not limited in any way, and

JODY A. STEWART, Official Court Reporter

it came through Ms. Chavis.  So there has been no request, no information for the witnesses to sit here.

This is not a sentencing hearing.  This is to determine the effectiveness of counsel, and you have based a lot of what you have presented to the Court on his previous report and what the Fourth Circuit indicated the Court should be hearing.  That doesn't have anything to do with him then reviewing the testimony here and giving an impression to the Court about testimony that has been elicited by your team.

So this is not a sentencing hearing.  It is an entirely unrelated proceeding at this point.  It is a proceeding on a *habeas corpus* hearing on one limited issue of effectiveness of counsel.  Again, I reiterate no one has asked, and I have seen no experts, that I'm aware of, from either side being here in court.

Is that correct, Ms. McKeel?

MS. McKEEL:  Yes, ma'am.

THE COURT:  Anything else from your team?

Ms. Chavis, do you have any questions?

MS. CHAVIS:  No, Your Honor, I do not.

THE COURT:  Ms. Peiffer?

MS. PEIFFER:  No questions, Your Honor.

THE COURT:  Ms. Bales, anything else?

MS. BALES:  No.  No, thank you, Your Honor.

799

Ms. McKeel, any questions?

MS. McKEEL:  No, Judge.  We are done for the day.

THE COURT:  Ms. Ward, any questions?

MS. WARD:  No, Your Honor.  Thank you.

THE COURT:  Mr. Samuels, any questions?

MR. SAMUELS:  No.  Thank you, Your Honor.

THE COURT:  Court stands in recess until 12 noon on Monday.

(Hearing adjourned at 6:04 p.m.)


                    CERTIFICATION


    I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.



        X_____/s/_____x

                  Jody A. Stewart

                  X_____2-10-2023 _____x

                        Date


JODY A. STEWART, Official Court Reporter