800

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -
                                        )
UNITED STATES OF AMERICA,               )
                                        )
    v.                                  )    CRIMINAL ACTION NO.
                                        )    4:08cr16
DAVID ANTHONY RUNYON,                   )
                                        )
        Defendant.                      )
                                        )
                                        )
        AND                             )
                                        )
DAVID ANTHONY RUNYON,                   )
                                        )
        Petitioner,                     )    CIVIL ACTION NO.
                                        )    4:15cv108
    V.                                  )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        Respondent.                     )
                                        )
- - - - - - - - - - - - - - - - - - - -


                    TRANSCRIPT OF PROCEEDINGS

                            DAY 5

                      Norfolk, Virginia

                    February 13, 2023


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge


                JODY A. STEWART, Official Court Reporter

801

APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE
        By:  Brian Samuels
            Lisa R. McKeel
            Assistant United States Attorneys
                And
        DEPARTMENT OF JUSTICE
        By:  Carrie L. Ward
            Counsel for the United States

        FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE
        By:  Dana C.H. Chavis
            Helen Susanne Bales
            Assistant Federal Community Defender
               And
        VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
        By:  Elizabeth J. Peiffer
            Counsel for the Defendant

## I N D E X

| **GOVERNMENT'S WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| | | | | |

| **DEFENDANT'S WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| SHEILA CRONIN | 804 | 919 | 963 | |

JODY A. STEWART, Official Court Reporter

802

<u>**E X H I B I T S**</u>

**GOVERNMENT'S**
<u>**NO.**</u>                                                                              <u>**PAGE**</u>

1                                                                                  924
2                                                                                  929


**DEFENDANT'S**
<u>**NO.**</u>                                                                              <u>**PAGE**</u>

44                                                                                 886
47                                                                                 856
48                                                                                 864
82                                                                                 902
83                                                                                 864
85                                                                                 874
86                                                                                 816
86                                                                                 820
88                                                                                 821
102                                                                                910
118                                                                                848
120                                                                                917
121                                                                                834
166                                                                                871
168                                                                                884

JODY A. STEWART, Official Court Reporter

(Hearing commenced at 12:02 p.m.)

THE CLERK:  In case 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent, and case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, and Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Chavis, Ms. Bales, and Ms. Pfeifer, is the defendant ready to proceed?

MS. CHAVIS:  We are ready.  Hello, Your Honor.

THE COURT:  Hello.  Good afternoon.  I hope you had a nice weekend.

MS. CHAVIS:  Yes, thank you.  I hope you did as well.

THE COURT:  Your first witness, I understand that you are going to change witnesses for the day.  I got information, I thought that we were going to do a Zoom witness?

MS. CHAVIS:  Your Honor, our Zoom witness is tomorrow.

THE COURT:  I must have read it too quickly.  I called and my assistant said that it was today, but go

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        804

ahead.  Call your first witness.

          MS. CHAVIS:  Okay.  We call Sheila Cronin, please, Your Honor.

          THE COURT:  Good afternoon, Ms. Cronin.  If you would please come forward and be sworn.

          (Witness was sworn.)

          SHEILA CRONIN, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHAVIS:

Q.  Hello.

A.  Hello.

Q.  Please state and spell your name for the record.

A.  My name is Sheila Cronin, S-h-e-i-l-a, last name Cronin, C-r-o-n-i-n.

Q.  Are you familiar with David Runyon?

A.  Yes.

Q.  And how do you know David Runyon?

A.  I was the mitigation expert in his trial.

Q.  What is a mitigation expert?

A.  Well, mostly I would go by the ABA guidelines, as someone who has to investigate a complete psychosocial history of the client and to make any recommendations for experts that may be needed.

Q.  And what was your education and training when you began

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                       805

working as a mitigation expert on David Runyon's case in 2008?

A.   I had been a psychiatric and medical social worker for over 25 -- no, for 25 years, and then I started doing mitigation work in 1996.  And this case started in 2008.

Q.   Can you tell us what you did as a medical and psychiatric social worker.

A.   Well, for years I worked in hospitals with patients, and then I worked for seven years primarily doing psychiatric evaluations in an emergency department.

Q.   In conducting the psychiatric evaluations of patients, what does that entail?

A.   Well, it would entail patients who were brought in to the emergency department, and sometimes those would be folks who had tried to commit suicide.  Sometimes they were brought in by families if there was behavior that concerned them greatly.  Sometimes they were brought in by ambulance and sometimes by the police department.

        And I would sit down with them, sometimes for an hour or two, and do an evaluation, and once that was completed, I would make a phone call to the psychiatrist on call and give him my impression, and he would -- he or she, actually, would decide then whether the patient should be admitted for treatment.

Q.   So were you screening for mental illness in that

Cronin, S. - Direct                                                    806

position?

A.   Yes.

Q.   And how did you go about screening for mental illness?

A.   Well, for some cases, we knew there was mental illness or serious problems, especially if someone was brought in after an overdose, or any kind of a suicide attempt.  Other times they might be people who carried a chronic diagnosis, like schizoaffective disorder, schizophrenia, bipolar disorder, and it would be a matter of evaluating where they were in their illness and whether they needed help with medication to get them started or whether they needed to be hospitalized, to be stabilized.

Q.   Did you have special training to screen people for mental illness?

A.   I'd say I had it over the years, yeah.  Yeah.

Q.   And what would that have been?

A.   So that would have been working in hospitals, working with psychiatrists, whenever a patient needed more than just medical care with those patients.  And it's always been an area that I have been interested in.

Q.   In your job as a psychiatric social worker, was your performance evaluated on a regular basis?

A.   Yes.

Q.   And did you maintain that position until you decided to choose different employment?

Cronin, S. - Direct                                                                807

A.  Yes, I did.

Q.  When you began working on David Runyon's case in 2008, did you have any background in working on mental health investigations?

A.  Yes, I did.  I had 13 years.

Q.  In capital cases?

A.  In capital cases, yes.

Q.  And what is the role of a mitigation expert on the defense team?

          MS. McKEEL:  Your Honor, I'm going to object to the usage of the word "expert."  This witness has not been noticed as an expert.  It's my understanding, she is a specialist, a mitigation specialist.

          THE COURT:  Rephrase your question to ask her what is her role as a mitigation specialist.

BY MS. CHAVIS:

Q.  What is the role of a mitigation specialist?

A.  The role of a mitigation specialist is to obtain a full social history from the client and to identify family members, find out about his -- his or her entire life, obtain all the records that are possible to obtain, and then to meet with all of the patient's -- of the client's relatives, people who knew the client from birth on, and to go back several generations if at all possible.

Q.  When you met with the client and with relatives and other

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                              808

witnesses, about how often was your standard practice to meet with them?

A.   It was my standard practice to meet with them multiple times, because over the course of time, preparing for a trial, people generally, even though they feel comfortable with you and are upfront, you need to have a closer rapport with them because that's when you start learning the family secrets that they otherwise would not be going to mention on a one-time interview.

Q.   And when we say multiple times, does that mean -- well, what do you mean by multiple times?

A.   I mean multiple times.  If the client has relatives that are local, I might talk to them and visit with them three or four times a month.  If -- the travel is a little more complex, but I would still attempt to meet with them multiple times.

Q.   On many different occasions?

A.   Yes, that's correct.

Q.   Is part of the role of the mitigation expert to help prepare witnesses to testify?

A.   Yes.

Q.   How were you hired to work on David Runyon's case?

A.   I think that I was hired on that case probably at the recommendation of David Bruck.

        THE COURT:  I didn't catch that.

JODY A. STEWART, Official Court Reporter

THE WITNESS:  By David Bruck.

BY MS. CHAVIS:

Q.  And is there a particular attorney who hired you?

A.  Yes.  I was hired by Jon Babineau, who, at the time I was hired, would be handling the penalty phase, and, of course, also Lawrence Woodward, who was handling the guilt phase.

Q.  Is that how you understood the roles to be divided between the two attorneys?

A.  Yes, it was.

Q.  Did there come a time when Mr. Babineau left the case?

A.  Yes, there did, I think out of a conflict with an inmate at the jail that made it impossible for him to continue.

Q.  Did another lawyer take his place?

A.  Yes, he did.  Steve Hudgins took the place.

Q.  After Steve Hudgins became an attorney on the case, how was the work divided between Mr. Hudgins and Mr. Woodward?

A.  I think it was divided in the same way as had been done between Mr. Woodward and Mr. Babineau.

Q.  What was your understanding of Hudgins' experience working on capital sentencing and mental health investigations at that time?

A.  My understanding was that it was new to him.

Q.  And why was that your understanding?

A.  I think because of a couple of things.  The way he was chosen by Mr. Woodward.  There had been a comment made, well,

Cronin, S. - Direct                                          810

he wouldn't have been my first choice, but he was hired.  And then my communication --

MS. McKEEL:  Object to hearsay.

THE COURT:  I sustain that objection.  It's hearsay that's not really relevant.  It wasn't Mr. Woodward's choice.  The Court appointed Mr. Hudgins.

MS. CHAVIS:  Yes, Your Honor.  I'm just asking her what her understanding was based on.

THE COURT:  It is being offered, I believe, for the truth of that statement, and if you want to ask about it, Mr. Woodward has been here, and he's subject to being called back.  So if you want to inquire, and the Court determines it's relevant, Mr. Woodward would be the appropriate person to testify to any opinions he might have about his co-counsel.  I think he testified about some of them, but it's the Court's appointment, not Mr. Woodward's.

BY MS. CHAVIS:

Q.  What else formed your understanding?

A.  My meeting with Steve Hudgins.  He seemed interested in learning, but he had no previous experience in death cases.

Q.  What duties did you have when you started working on David Runyon's case?

A.  My duties were to start the mitigation investigation, which started with meeting with Mr. Runyon periodically, getting to know him, getting to know everyone who was in his

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                  811

life, getting to know his employment history, his military history, and then branching out from that to meet with his parents and get their history, and then his siblings and get their history, friends at various stages of his life, records from all the stages of his life.

Q.  Was there an investigator who was also working on David Runyon's case?

A.  Yes, there was.  It was Glenn Ford.

Q.  Was there a difference between the roles of you as the mitigation specialist and Glenn Ford as the investigator?

A.  Yes.  The investigators usually work the guilt phase of the trial.

Q.  Was Mr. Ford involved in the mitigation investigation in David Runyon's case?

A.  He was, to some extent, because when I accepted the case, I had to let it be known that I was also working on another case and would not be totally free to spend all my time on the Runyon case until that case had concluded.

Q.  Did you do anything to help guide Mr. Ford in his investigation of mitigation?

A.  I did.  For interviews that I knew he was going to do, I provided him with a list of questions that he could ask the people that he interviewed.  It was not the best interview because he was not skilled in drawing people out, so the questions were, like, did you do this, you know, yes or no.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                 812

It wasn't a terribly good interview.

THE COURT:  Which one wasn't a terribly good interview?

THE WITNESS:  The interviews that he did up in Alaska.

BY MS. CHAVIS:

Q.  After you and Mr. Ford interviewed a witness or the client, did you provide updates to the attorneys about what you had learned?

A.  Every meeting I had with every person that I interviewed was followed up by a report to the attorneys.

Q.  Were there -- while you were working on Mr. Runyon's case, did you have an opportunity to attend a training in New Orleans?

A.  It wasn't a -- they didn't call it a training.  It was called a bring-your-case conference, and I know that Steve Hudgins went, and, of course, I went.  Mr. Woodward chose not to go.  But we went and attended the conference.

It's basically a back and forth of people bringing their cases and kind of brainstorming, that maybe someone had experience that was similar to a case you were working on and would be able to give you some advice, and vice versa.  And the attorneys did that as well.

Q.  And did you and Mr. Hudgins present the David Runyon case to the trainers?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                             813

A.   I presented the case to the trainers because Steve had just been hired, and so I presented the basic case.

Q.   Did you receive feedback and recommendations from the trainers?

A.   Yes.

Q.   What were the next steps that were taken after you received feedback from the trainers?

A.   Well, probably -- I don't recall the specific things that they suggested, and I, of course, suggested things that would help other people, but I'm sure if they were very useful, I followed up on them.

Q.   What about the recommendations that were made to Mr. Hudgins?

A.   They were legal recommendations that I did not make very detailed notes of because that was something for the attorneys.

Q.   When you returned from the New Orleans conference, did you meet with Mr. Woodward to report about what had happened at the conference?

A.   Yes.  We had a team meeting.

Q.   And what, if anything, was reported?

A.   I reported what information that I had received that might be useful in the case.  Steve Hudgins didn't mention any of the suggestions that were given to him by other attorneys in the case.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                                 814

Q.   As part of your role in the case, did you visit with David Runyon?

A.   Yes, I did.

Q.   About how much did you visit with him?

A.   I probably visited with David, not as often as I have done in other cases, because of time limitations and travel, probably about six or seven times for very long, two-hour visits.

Q.   And did other members of the defense team visit with Mr. Runyon?

A.   Yes.

Q.   And how would you know when other members of the defense team visited him?

A.   Well, I know when Glenn Ford visited him -- and he would usually go the weeks I didn't go -- he would let me know what kinds of things were discussed and any information that was pertinent.

Q.   Was there a decision made on the team about how to assign responsibility for client contact before trial?

A.   Could you be more specific?  I'm not sure what you --

Q.   Did the team make -- designate a person to have client contact before the trial to conduct these interviews with the client, to answer the client's questions, to meet with the client before trial?

A.   Yes.  That would be me.

Cronin, S. - Direct                                                          815

Q.   You were the person?

A.   I was the person.  Although if you are talking about the guilt phase, that was probably Mr. Woodward or it was Glenn Ford.

Q.   And do you have knowledge of Mr. Woodward's visits with David Runyon?

A.   No, I don't.

Q.   Was there any type of protocol amongst the team for notifying each other after visits with the client?

A.   I don't know that there was a protocol for the attorneys or Glenn Ford.  My protocol has always been to do a long written report which is then shared with the attorneys.

Q.   That's your protocol in all of the cases that you've worked on?

A.   Yes.

Q.   Showing you Defendant's Exhibit 86 --

A.   Okay.

Q.   -- do you recognize this document?

A.   Yes.  It's a report of an interview with David on May 12th, 2008.

Q.   And who did you write this report to?

A.   I wrote it to Jon Babineau and to Lawrence Woodward.

          MS. CHAVIS:  I would move Defendant's Exhibit 86 into evidence, please.

          MS. McKEEL:  Your Honor, we have no objection that

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                          816

it comes in to show what Ms. Cronin did, but we do have an objection to the truth of the matter asserted in the documents, in the actual paragraphs that she's writing.

THE COURT:  Well, it's admissible, in my opinion, because it is relevant.  It's an issue of relevance, and to me, it's relevant as to what she reported to them because the issue here is what information they had that then they should follow up on.

So I would find this report to be relevant.  It may be hearsay, but it has a certain indicia of reliability. Whether everything in it is true, I don't think they are offering her for that.  You are offering it as a report that went to the attorneys.  I find it relevant for that purpose, because they then can follow up on it or not.  That's the way that I would say that the hearsay rule does apply in this proceeding, but the real issue on all of this is its relevance and whether it is something that the attorneys knew and should have followed up on.  That's the way I'm proceeding.

(Defendant's Exhibit 86 received in evidence.)

BY MS. CHAVIS:

Q.  I'm turning to Page 2 of your memorandum.

THE COURT:  The other thing I would note, they can cross-examine this witness about what's in this report and why she put it there.

Cronin, S. - Direct                                                    817

Go ahead.

BY MS. CHAVIS:

Q.  Can you please read the highlighted sentence.

A.  I'm not sure we have the whole page, but the one -- tell me if this is the one you want me to read.

"According to David, Dombrowski would come home from work and often beat his wife.  On one occasion, David attempted to stop him by biting him on the leg.  His father's response was to throw him across the room."

Q.  Who is Dombrowski that you're referring to?

A.  Dombrowski is David's biological father.

Q.  I'm turning to Page 4 of this document.  Can you please read the highlighted section.

A.  Yes.  "We had to end the interview at that point and told David that we would review the letter that he had prepared for us.  David said that the letter dealt with his problems following a motor vehicle accident while in the Army.  He said he was diagnosed with post-traumatic stress disorder in 1996 or 1997 due to the accident."

Q.  Was this your first meeting with David Runyon?

A.  I'd have to go back and look at the date.

Q.  Yes, ma'am.

A.  I believe it -- it was, yes.

Q.  Does it help to look at the first sentence of your memorandum?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        818

A.   Yes, it does, because that was when Lawrence Woodward accompanied me to the jail and introduced me to David.

Q.   I'm showing you what's marked as Defendant's Exhibit 87.

A.   Okay.

Q.   Do you recognize this document?

A.   It is another meeting with David, a report of it.

THE COURT:  I would just note for the record, so that Ms. McKeel doesn't stand up every time, that she would have a continuing objection to these, and I would make my same ruling each time.

BY MS. CHAVIS:

Q.   What is the date of the meeting with David Runyon?

A.   August 8th, 2008.

Q.   Could that perhaps be a 6 instead of an 8?  August 6th?

A.   I think it's August 8th.

Q.   Okay.  Oh, I'm sorry.  The letter is dated August 8th, correct?

A.   Yes.

Q.   And who's the letter to?

A.   It is a letter addressed to Jon Babineau and to Lawrence Woodward.

Q.   What is the meeting date with David Runyon?

A.   8-6-08.

Q.   And I'm just turning to Page 2 of this document.  Could you please read the highlighted.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    819

A.  "David was competitive and enjoyed sports.  He recalled that on one occasion, while playing football with other kids in the neighborhood, he ran backwards trying to catch a football and ran right into a telephone pole.  He was knocked unconscious for a few seconds or minutes, but then felt all right.  He did not go to a hospital or tell his parents what had happened."

And in the next paragraph -- do you want me to continue?

Q.  Yes, please.

A.  Okay.  "He recalled that when he was a student at Wentworth Academy, he was involved in a motor vehicle accident in which the windshield exploded and he ended up with glass fragments in his face, but he did not recall passing out."

"David said that he also lost consciousness during a military grenade simulation practice.  He passed out and then came to.  Someone in his group notified Sergeant Metzger, who asked David if he was okay or if he needed medical treatment.  David told him he was fine.  David was involved in another motor vehicle accident with a drunk driver when he was stationed at Fort Benning, Georgia.  David was taken to the emergency room where he passed out.  Following the attack (sic), he developed balance problems and dizziness.  He was treated with meclizine."

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                           820

Q.   I believe, Ms. Cronin, you may have said "following the attack."  Does that say "following the accident"?

A.   Following the accident, I'm sorry.

Q.   That's okay.  Thank you.

MS. CHAVIS:  Your Honor, I note that we went through noting the standing objection and your ruling.  I don't recall if I moved this into evidence.

THE COURT:  If you didn't, it's admitted.

MS. CHAVIS:  Thank you.

(Defendant's Exhibit 86 received in evidence.)

BY MS. CHAVIS:

Q.   I'm showing you Defendant's Exhibit 88.  Do you recognize this document?

A.   Yes.  This is another report on my meeting with David on September 13th, 2008.

Q.   Could you take a look at the meeting date with David again.  Check the date.

A.   9-23-08.

Q.   Yes.  And this report, who was it sent to?

A.   It was sent to Jon Babineau and Lawrence Woodward.

Q.   And I'm turning to Page 3.  What does that highlighted section say?

A.   "David again referred to his 1996 MVA and said that it was in Dadeville, Alabama, and that they had to use the Jaws of Life to get him out of the car."

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                                                      821

MS. CHAVIS:  I'd move Defendant's Exhibit 88 into evidence, please.

THE COURT:  All right.  That's admitted.

(Defendant's Exhibit 88 received in evidence.)

BY MS. CHAVIS:

Q.  Did you have communications with David Runyon other than jail visits?

A.  He occasionally wrote letters that I received.

Q.  How often would David write letters?

A.  It wasn't often, really.  He seemed to want to either finish making a point that he perhaps thought he didn't get across after a meeting or to add information.

THE COURT:  Did you say really often or not really often?

THE WITNESS:  I would say he did it maybe more than a few times.

THE COURT:  But when you started out, what did you say?  I just couldn't hear you.

THE WITNESS:  Oh, maybe a few times.

BY MS. CHAVIS:

Q.  And did you read the letters that David Runyon sent you?

A.  Yes.

Q.  And in reading his letters, did you become familiar with his handwriting?

A.  Yes, I did.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    822

Q.   Were David's letters helpful to you in any way?

A.   Yes, they were, for a couple of reasons.  At times they provided more detail about something, and other times they really gave me a better picture of David's mental health issues, in that he was markedly grandiose in a lot of -- in a lot of what he had to say; talked about saving multiple lives.  It was quite sad, really.

THE COURT:  Did he send these letters just to you?

THE WITNESS:  I think he may have sent some also to Mr. Woodward.

THE COURT:  Do you know?

THE WITNESS:  I don't know for -- well, I think he did, because I think Woody mentioned getting letters from David.

THE COURT:  Did you share the letters that you got --

THE WITNESS:  Yes, of course.

THE COURT:  -- from David with Mr. Woodward?

THE WITNESS:  Yes, I did.

THE COURT:  Anyone else?

THE WITNESS:  With Mr. Hudgins.

THE COURT:  But were these when Mr. Hudgins was in the case or Mr. Babineau?

THE WITNESS:  Well, if they were written when Mr. Babineau was in the case, they went to Mr. Babineau,

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    823

and, otherwise, they went to Steve Hudgins when he took over the case.

THE COURT:  Also Mr. Woodward?

THE WITNESS:  Yes.

BY MS. CHAVIS:

Q.  When a client writes a letter that contains a mix of facts and a mix of grandiose or delusional material, how are you able to distinguish between the two?

A.  It's -- it was fairly easy in the way he described these events, and his belief in life was to save people.  They were just so grandiose that they were obviously a product of an illness.

MS. McKEEL:  I'm going to object to opinion from the witness.

THE COURT:  Sustained.

THE WITNESS:  It was my job to provide an assessment of what I was reading.

THE COURT:  Did you make a diagnosis?

THE WITNESS:  This was all part of putting it all together.

THE COURT:  You will have to develop that, how she put it together, who she gave it to, where is it, that kind of thing.  It's too general, really.

THE WITNESS:  So those are in my reports.

THE COURT:  So everything would be in your reports?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                       824

THE WITNESS:  Yes, everything is in my reports.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  In addition to meeting with David Runyon, did you investigate and meet with other people?

A.  Yes, I did.

Q.  Who did you meet with?

A.  I met with initially his -- I met with his mother.  I met with his adoptive father.  I met with his biological father, and I met with his brother, and I met with his ex-wife, Maria.

Q.  Those are the family members that you met with?

A.  Yes.

Q.  Do you recall if you met with David Runyon's half-brother, Wren Fleming?

A.  No, I did not.

Q.  Do you recall if you talked with David Dombrowski, who is David Runyon's birthfather?

A.  Yes, I did.

Q.  And did you talk with David Dombrowski's sister, Patty Ann?

A.  No.

Q.  Was Mr. Runyon aware that you were investigating his social history and meeting with his family?

A.  Yes.

Cronin, S. - Direct                                                    825

Q.   At any point did he try to prevent you from doing that?

A.   No.

Q.   And did he provide you information that assisted you?

A.   Yes, he did.

Q.   I'm showing you what's marked Defendant's Exhibit 119.
Do you recognize this handwriting?

A.   Yes, I do.  It's a letter from David.

Q.   Do you recall receiving this letter from David Runyon?

A.   Yes, I do.

          MS. CHAVIS:  I'd move for the admission of
Defendant's Exhibit 119.

          MS. McKEEL:  Judge, do we have a date on this
document, when she received it?

          THE COURT:  Is it dated in any way?

BY MS. CHAVIS:

Q.   The back pages of this letter, my exhibit, is only copied
on one side, but this next page would be the back page of the
handwritten page.  And what does this appear to be?

          THE COURT:  It's a case.

BY MS. CHAVIS:

Q.   And do you see the date down here, when this case was
printed?

A.   Yes, I do.  That is March 19th, 2008.

Q.   Okay.  And if I can keep flipping through, again, it's
written on the back of this case, correct?


                    JODY A. STEWART, Official Court Reporter

A.   Yes.

Q.   Here's the date again?

A.   Looks like it's 3-19-2008.

Q.   Yes.  And that's the end of the letter.

          THE COURT:  Can you go back to the first page we were looking at.

          MS. CHAVIS:  Yes, ma'am.

          THE COURT:  He says here, "The Army doctor diagnosed me with vertigo and prescribed medication."

          THE WITNESS:  Yes, it's Meclizine.

          THE COURT:  Meclizine?

          THE WITNESS:  Meclizine, yes.  It's often given to people with vertigo.

          THE COURT:  Speak up, please.

          THE WITNESS:  I'm sorry.  It's often given to people with vertigo.

          THE COURT:  Did you follow up on this?

          THE WITNESS:  Yes.

          THE COURT:  How?

          THE WITNESS:  We obtained his medical records from the Army.

          THE COURT:  They contained this?

          THE WITNESS:  Yes, they did contain that.

          THE COURT:  Was it in the 1996 era?

          THE WITNESS:  Yes.  Well, the -- yeah.  The

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                   827

accident was in the fall of 1996, I believe in November.

THE COURT:  Right.

THE WITNESS:  And then he followed up numerous times with the Army physicians.

THE COURT:  Where are those Army records?

THE WITNESS:  We have the --

MS. CHAVIS:  Your Honor, those are exhibits that are coming up.

THE COURT:  That's fine.  They were referenced here, and I just wanted to be sure we followed up on them.

MS. CHAVIS:  Yes, we will.

THE COURT:  I don't have any other questions on this exhibit.

BY MS. CHAVIS:

Q.  So there is another highlighted sentence on the first page.  Would you please read that for us.

A.  Yes.  "The drunk driver that hit me in a head-on collision in Dadeville, Alabama, in the fall of 1996 almost took my life."

Q.  Then the second page of the handwritten letter, how does it begin?  Can you read the highlighted question there?

A.  It says, "Mrs. Cronin asked me about the night I went to the ER about three months after my car accident.  My neighbors were the Seegers, living in Alaska."

MS. McKEEL:  Your Honor, I'm going to object here.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        828

That date, March the 8th, 2008, they're saying that it came in.  I'm a little confused with some caselaw, I guess, that's mixed in there.  Is that a part of the exhibit?  But, nonetheless, Ms. Cronin did not come into the case until April of 2008.  So this is a month before.

MS. CHAVIS:  Yes, Your Honor, but --

THE COURT:  Wait just a minute.

Go ahead.  Finish what you were saying.

MS. McKEEL:  So I asked for a date.  They went to the bottom of -- it looks like there's multiple documents here, and then it looks like, in between pages, there's some caselaw that -- at the end of the caselaw is where they pointed to a date.  That date was March of 2008.  Ms. Cronin didn't come into the case until, I believe, April of 2008.

So trying to identify this document, it doesn't seem like -- that this is a document that -- when Ms. Cronin got it, I don't know, but she wasn't in the case in March of 2008.

THE COURT:  You need to establish when she got this, and under what circumstances, and why she got it.  I mean, that, I don't know.  You just showed her this document and asked her -- I think if she recognized -- if she knew his handwriting.  So can you lay a better foundation for the document?

MS. CHAVIS:  Yes, Your Honor.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    829

BY MS. CHAVIS:

Q.  Ms. Cronin, do you remember receiving this document during your representation of David Runyon?

A.  Yes, I do.

Q.  And did you receive it before the trial began in this case?

A.  Yes, I did.

THE COURT:  Well, approximately when?

THE WITNESS:  It was early in the case that I received that.

MS. CHAVIS:  Your Honor, I pointed to the date on the bottom of the page where the caselaw appeared because, as we know, when people are in prison, their resources are scarce, so they write on the paper that's available to them. This was written on the back of this caselaw, you know, that was printed out in March of 2008.  So that's around the time when this letter would have been written.  Whether it was a month or two later, it was at least written around that time.

THE COURT:  I'm going to admit it as something that Ms. Cronin received early on in her case investigation.

Does that comport with your testimony?

THE WITNESS:  Yes, that's correct, Your Honor.

THE COURT:  Then what did you do with it?

THE WITNESS:  What I did with it was two things.  I

Cronin, S. - Direct                                                      830

turned it over to, I guess at that time it was Mr. Babineau and Mr. Woodward, and I also started research to try and confirm that information that he shared.

THE COURT: Go ahead. We don't know the exact date, it's an approximate date, but it's before the trial, and it's early in her role as mitigation specialist.

BY MS. CHAVIS:

Q. Did you investigate information about David's biological parents' physical and mental health?

A. Yes, I did.

Q. And why did you do that?

A. Because I needed to learn about his upbringing from both of the parents, both from -- anything from health issues, pregnancy problems, delivery problems, health problems growing up, and the whole social situation of the family.

Q. Why are the parents' health problems relevant to David Runyon?

A. Because it goes to their capacity to parent David in a healthy way, and so that is always part of a mitigation investigation.

Q. Is there another reason why the parents' health problems could be relevant to David Runyon?

A. It is, because whether their problems might be genetically passed on to him. And there were just multiple issues to discuss whether there were any -- in general for

Cronin, S. - Direct                                                      831

people, whether there were any substance abuse issues, whether there is a history of violence, whether there is a history of post-traumatic stress disorder, whether the family lived a transient history, whether the parents were able to show the appropriate amount of nurturing and to raise those -- raise David to be a healthy human being.

Q.  As part of your investigation into the mental health of David's biological parents, did you interview David's mother, Suk Cha Runyon?

A.  Yes, I did.  I interviewed her twice.  The first was over a four-day period in her home.

Q.  And what did you observe about Suk Cha Runyon's mental health from those interviews?

A.  I observed that she appeared to have rapid-cycling bipolar disorder.

MS. McKEEL:  Your Honor, I'm going to object to -- respectfully, this witness, while she has a lot of experience, she is not a medical doctor or a psychiatrist to make a diagnosis of what someone has.  I think she can report on what she observes in the behavior, but she can't make that kind of diagnosis.  She has not been noticed as a psychiatrist or a medical doctor to give these kinds of opinions.

THE COURT:  I would sustain that objection.  Let her testify about what she observed, not any diagnosis that

Cronin, S. - Direct                                                    832

she made of these individuals.

THE WITNESS:  Okay.  What I observed of Suk Cha, when I asked her about her childhood, was how she immediately started to physically act out everything that happened to her.  And it started with her talking about when she was very young, preschool age, having to make a trip from North Korea to South Korea because her family had been well to do and they were targeted by the North Koreans.

And during that trip, which was mostly done at nighttime, some of it on a river, she observed the woman who was in the boat who had a crying child have to take that child and hold the child overboard because had they made any noise at all, the North Koreans would have seen them and shot them.

And as she was describing all of this, she was up from the chair, and she was animated, completely animated, manic, actually, and then she would collapse on the floor into tears.

BY MS. CHAVIS:

Q.  When you said she held the child overboard, what do you mean by that?

A.  I mean, it was a baby, and the mother of that child held the child, smothered the child, and let her fall into the water.  There was further along, when they were on the banks of the river, they were in a tunnel near where there was

Cronin, S. - Direct                                                            833

some bombing --

MS. McKEEL:  Excuse me, ma'am.  Excuse me.

I'm not sure why we need this whole story.  We are -- what she observed about her behavior, I think she said she'd acted it out, unless we are going to go through the whole story.

THE COURT:  What did she put in her interview notes?  Maybe that would be what she would have taken away and would have been pertinent, and she would have relayed to either Mr. Woodward or Mr. Babineau or Mr. Hudgins after this interview or after these interviews.

THE WITNESS:  Mr. Hudgins came with me to a second visit, not during that, but we traveled back there later.

THE COURT:  It's been a long time ago, too.  Maybe it's better to focus on the written notes of that meeting and go from there.

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 121.  Do you recognize this document?

A.  Yes, I do.  It is my interview over four days with Suk Cha Runyon.  It's the report that was sent to Jon Babineau and Lawrence Woodward.

Q.  What is the date on this report?

A.  Date on the report is December 22nd, 2008.

MS. CHAVIS:  I'd move for the admission of Exhibit

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                834

121.

THE COURT:  All right.

(Defendant's Exhibit 121 received in evidence.)

THE WITNESS:  That was the date of the report.  The date of the interviews were between November 15th and November 18th.  Just wanted to clarify that.

MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.  Turn to the last page of the report.  Can you tell us how many pages are here?

A.  17.

MS. CHAVIS:  We are not going to address all 17 pages, Your Honor.  I just have specific highlighted portions.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  Turn to Page 3.  And I'm not asking you to read this, but does this indicate that you are seeking to discuss Suk Cha's travels during the Korean War?

A.  Yes.

Q.  Okay.  I'm on Page 4.  Could you please begin here where it says, "When the group."

A.  "When the group neared the 38th Parallel, they were required to go through a tunnel."

Do you want me to --

Cronin, S. - Direct                                                    835

Q.   Just the highlighted portions.

A.   Okay.  "When the bombing stopped, Suk Cha saw a cousin the same age as her crawl out -- fall out from under her mother's dead body.  Suk Cha said, 'I keep remembering the blood on my cousin's hand.  One of her fingers was gone.'"

Q.   The next highlighted statement?

A.   "Once they crossed the 38th Parallel, they stayed in a refugee camp."

Q.   Could you please read the bottom paragraph, the portions that are highlighted.

A.   "According to Suk Cha, it was known at the time that some of the American soldiers raped teenage girls...Suk Cha was grabbed by a teenage girl in the house who quickly put a blanket around her and cradled her in her arms so that the soldiers would think that she had a baby.  In hindsight, Suk Cha is surprised that it worked and recalled it as an odd experience.  The other teenage girl in the house was not so lucky; she was taken to another room by a soldier and raped."

Q.   We now turn to Page 5.

A.   Okay.

Q.   If you could continue with the highlighting.

A.   "When she was approximately 12" -- now, should I finish that sentence?

Q.   Well, you can jump down to the next highlighted sentence. I'm just trying to establish the timeline here for the fall.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                          836

A.   "Her stepmother's involvement with the missionary group led to her sudden departure.  Suk Cha woke up one morning, and her stepmother was gone.  She never saw her again. Suk Cha was again tearful and said, 'She didn't even say good-bye.'"

"The next day Suk Cha's father brought home another woman, and there was a big party.  The woman was to be Suk Cha's new stepmother"..."The stepmother treated the children much differently when her husband was at work than when he was at home."

Is there anything at the top?  It didn't quite -- oh, okay.  All right.

Q.   And then it goes on to describe how she's treated by the stepmother, the second stepmother; is that correct?

A.   Yes.

Q.   Okay.

A.   "Later that day, the sister asked Suk Cha for a glass of water.  Unbeknownst to Suk Cha, her sister used the water to overdose and kill herself.  Suk Cha was extremely tearful in relating this tragic event and kept saying, 'I brought her the glass of water; I didn't know what she was going to do. I brought her the water.'"

THE COURT:  Then read the next line after the one you just read.  "Suk Cha said."

THE WITNESS:  Yes, ma'am.  "Suk Cha said that her

JODY A. STEWART, Official Court Reporter

Case 4:08-cr-00016-RBS-DEM    Document 898    Filed 12/14/23    Page 38 of 187 PageID# 9753

Cronin, S. - Direct                                                    837

father never hit or slapped her, but she did not see him slap her older brother" -- I'm sorry, "but she did see him slap her older brother on one occasion.  It happened the day that Suk Cha had her first period.  The stepmother told her father about it, and he mentioned it at the dinner table, saying that his little girl was now a woman."

THE COURT:  That's all.

BY MS. CHAVIS:

Q.  If you would turned to page 7.

A.  Okay.  "Suk Cha walked to school every day when her mother stopped giving her bus fare."

MS. McKEEL:  Your Honor, I'm going to object to just reading documents.  We had this happen earlier in the hearing, and the Court stopped the witness from reading documents.  I think the witness can be asked a question, and she can refresh her recollection, because these are her reports, if Ms. Chavis wants to get certain items of information out before the Court, but just to sit here and read -- it looks like Ms. Chavis has a number of tabs that we are going to sit and read the report out loud.

THE COURT:  Ask her a question rather than just to read something, and if she can't answer it, then you can refresh her recollection with the document.

MS. CHAVIS:  Okay.

THE COURT:  If there are things that you want the

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    838

Court particularly to take notice of, the document will be in evidence, and you can call those to the Court's attention.

BY MS. CHAVIS:

Q.  What was Suk Cha's second stepmother's relationship with Suk Cha?

A.  It was a very contentious relationship.  Her mother did not provide her with money to take a bus to school.  She often had Suk Cha's other brother, when there needed to be discipline, had her(Sic) beat her shoulders with a steel pipe, and Suk Cha has injuries in her shoulder.

Q.  Did Suk Cha ever tell her father about this abuse?

A.  No, she didn't, because she felt culturally it was not something she should do.

Q.  Did you learn about Suk Cha's pregnancy and the --

A.  Yes.

Q.  Can you tell us about that -- her pregnancy with David Runyon?

A.  Yes.  Yes.  She did not have an easy pregnancy.  She did not gain any weight throughout the pregnancy.  She did not have prenatal care.  She was apparently somewhat suspicious of that.  And she had several episodes of bleeding while she was traveling from Korea with her husband to the United States.  When she did finally deliver, there was a question of whether she would survive or the baby would survive, but,

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        839

fortunately, the baby did survive and was born healthy.

Q.   During one of those episodes of bleeding, was there the fear that she may have a miscarriage?

A.   Yes.

Q.   I'd like to jump forward in time to when Suk Cha is married to David Dombrowski.

A.   Okay.

Q.   Did she describe David Dombrowski's behavior towards her or David Runyon?

A.   The behavior changed when -- he had been a paratrooper or something.  He injured his back, and so he was moved to a desk job, and when that happened, according to Suk Cha, he started drinking very heavily.  He started gambling.  He would stay out till all hours, sometimes until the next morning.  When he did come home, there were just violent, shouting arguments and sometimes physical altercations.

Q.   And did she report to you a particular altercation between David Dombrowski where David Runyon was involved?

A.   Yes.  According to Suk Cha, what happened was that he took David by the arm and shoved him -- threw him against a wall.

Q.   And when they were living in Panama at that time -- Suk Cha, David Runyon, and David Dombrowski -- was there a change that occurred in David Runyon, a physical change?

A.   Yes, there was.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    840

Q.  What was that?

A.  He developed an asymmetrical smile, and it is possible that that was a sign of soft-tissue brain damage.  He didn't have it before they moved to Panama, and I did see a photo before they moved to Panama, and he didn't have the asymmetrical smile.

Q.  When you say that's a sign of neurological damage, are you --

MS. McKEEL:  Objection.

THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  Are you trained to recognize signs of neurological damage as a mitigation specialist?

MS. McKEEL:  Objection, Judge, again.

THE COURT:  She can't give diagnosis, but she can say what she learned in her investigation, and what she's saying is that there was a change in his facial smile from before he went to Panama until when he was arrested, and it was more or less a permanent-type change.

THE WITNESS:  Yes, it was.

BY MS. CHAVIS:

Q.  Is this a fact that you would report to a mental health expert in any one of your capital cases where you were conducting a mitigation investigation?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Q.   Would you also inform a mental health expert of your preliminary mental health screening assessment?

A.   Yes.

Q.   At some point in time, did Suk Cha attempt to commit suicide?

A.   Yes, she did.

Q.   Can you tell us about that, please.

A.   She told me that she felt helpless, she didn't know what to do about her husband's drinking, there wasn't enough money in the house because he was gambling all of it away, and she was becoming more and more despondent.  And she decided that she would commit suicide, and that she would do it by taking pills in two batches, because she wanted him to come home and see that she was starting to overdose, and she knew that if he showed some affection to the children, that the children would be all right, and that she could then follow through with taking the remainder of the pills and complete her suicide.

          THE COURT:  So this was after she had had her second child?

          THE WITNESS:  Yes.  Yes.

BY MS. CHAVIS:

Q.   How did Suk Cha describe her son, David Runyon?

A.   She described him as frail, as needing to be protected all the time; some could say controlled.  She was not

Cronin, S. - Direct                                                  842

terribly nice, in her description of her son.

Q.  Did she have a particular concern about her son, David Runyon?

A.  I think just concern -- I don't know if I'd call it concern.  She was overly protective.

Q.  Is there a document that I could show you that could refresh your recollection?

A.  Of course.

Q.  Would that document be this interview of Suk Cha Runyon?

A.  Yes.

Q.  I'm showing you Page 15.

A.  Okay.  Okay.

Q.  Does that refresh your recollection?

A.  Yes, it does.

Q.  Can you please tell us what Suk Cha's concern was about David?

A.  She described David as a very good boy who never gave her any trouble.  She worried about him a great deal because he did not --

        MS. McKEEL:  I'm going to object to the reading. If she could just answer the question after reading the material.

        THE COURT:  Read the passage and then just put it in your own words.

        THE WITNESS:  Okay.  Basically, that David would

                    JODY A. STEWART, Official Court Reporter

not stand up for himself in any situations.

BY MS. CHAVIS:

Q.  And by not standing up for himself, what else is she concerned about?  Why would he not stand up for himself?

A.  That he was -- well, basically, if he was fighting with someone -- and she provided an example with Mark -- if they fought, he would not fight back, and she would sometimes have to take his hand and -- physically take his hand and have him hit back.

Q.  Did she express a concern about David being vulnerable to others?

A.  Yes.  Because he was gullible and too kind.

Q.  And did Suk Cha like to keep -- well, regarding the way Suk Cha treated her house and the things within her house, how did she maintain her household with the children within the house?

A.  She maintained things had to be in a particular place, everything, and it was sort of her control issues, and she could be very harsh with the children when they were young and got fingerprints on the table or did anything like that.

Q.  And when you say she could be very harsh, what would happen if David touched the table and put his fingerprints on it?

A.  She would slap him.

Q.  And I just need to clear up one item with respect to this

Cronin, S. - Direct                                                              844

report.  You were describing for us, when there was the objection -- you were describing for us how Suk Cha was acting during your meeting, and I believe there was a question about whether that was contained within your report. So I wanted to point you to Page 2 of this report, this second paragraph on here.

Did you report to the attorneys Suk Cha's display of grandiosity and hysteria?

A.  Yes, I did.

Q.  I'd like to show you Defendant's Exhibit 48, which is also document number 511-25.  Do you recognize this document? And I'll flip through the pages to follow it.

A.  Yes, I did.  These are medical records of Suk Cha.

Q.  Did you receive these medical records as part of your mitigation investigation into David Runyon's case?

A.  Yes, I did.

MS. CHAVIS:  I'd move Defense Exhibit 48 into evidence.

MS. McKEEL:  Your Honor, I'm going to object at this point.  She can lay a little bit more foundation of where she got them from.  I'm just seeing handwriting on those documents.

THE COURT:  Lay a foundation of where you got them from, and remember that they are not necessarily being admitted for the truth of what's in there, but they are

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                845

being admitted on a relevance basis of what information the attorneys had or could have followed up on, and that's what I've been trying to make clear in my rulings and trying to make it even more clear now.  But go ahead.  We don't know where they came from or how you got them.

THE WITNESS:  Okay.  I followed the procedures to obtain medical records from the Army regarding Suk Cha Runyon.

BY MS. CHAVIS:

Q.  And you obtained these records from the Army?

A.  Yes, I did.

THE COURT:  Did you have to have her permission?

THE WITNESS:  She gave her permission, yes.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  I'm going to use the page numbers that are in the ECF header.  There are 15 pages of records, and I'd turn to Page 6 of 15.

THE COURT:  The ECF header is?  What's the basic number?

MS. CHAVIS:  511-25.

THE COURT:  This is Page 6 of 15?

MS. CHAVIS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  What is the subjective note on this report?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                      846

A.   The objective note?  "Bilateral upper extremities and bilateral lower extremities all four" -- I don't know what those next initials are -- "all four extremities within normal limits."

Q.   I'm sorry --

A.   Do you want what's on top of that?

Q.   Yes, the subjective note.

A.   Okay.  "43-year-old female complains of diffuse musculoskeletal pain with damp cold weather.  Reports ankle pain, knee pain, wrist and hand pain, and shoulder pain.  Not on exercise program."

Q.   Did you want to finish reading the objective notes?

A.   Diffuse -- okay.  "Pain with all resisted motions everywhere.  Diffuse body tenderness."

Q.   And I'm on Page 11 of 15 in the ECF header.  Do you see the date of this note?

A.   Yes.  It was May 1st, 1992.

Q.   And you can see that there's a line here that has been previously highlighted.  Could you please read that line.

A.   "She has no known history of peptic ulcer disease although she states that she had a couple of episodes of coughing up blood when she was pregnant."

Q.   And on Page 14 of 15 in the ECF header, what is the date of this health record?

A.   It looks like maybe March '93.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                      847

Q.   And can you tell us what the assessment indicates?

A.   "Peptic ulcer disease, moderate depression."

Q.   And this is Page 15 of 15.  This document, do you see the date on there?

A.   27 January 1993.

Q.   And is there information in this document that informs or informed your mitigation investigation?

A.   Yes.

Q.   What is that information?

A.   The assessment of depression and that she was not sleeping and had feelings of anhedonia, inability to concentrate, and very pessimistic mood.

Q.   In your standard practice as a mitigation specialist, are these facts that you would report to a mental health expert?

A.   Yes.

Q.   I'm showing you Defendant's Exhibit 118.  Do you recognize this document?

A.   Yes, I do.

Q.   What is the date of the document?

A.   March 17th, 2009.

Q.   And what is the document?

A.   The document is an e-mail to Steve Hudgins sharing with him information I received from David Bruck regarding the numerous articles available to show intergenerational transition of PTSD.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    848

MS. CHAVIS:  I'd move for the admission of Defense Exhibit 118.

THE COURT:  These are articles that you sent to David Bruck?

THE WITNESS:  No, these are -- David Bruck sent these articles to me, and I passed them on to Steve Hudgins.

THE COURT:  All right.  They're admitted.

(Defendant's Exhibit 118 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you Defense Exhibit 122.

MS. CHAVIS:  I believe this is already an exhibit that's been admitted.

THE COURT:  During her testimony?

MS. CHAVIS:  During a prior witness's testimony, Your Honor.

THE COURT:  If it has been admitted, then it's in evidence for whatever purposes then, and, again, I put a caveat on the purposes now, but, yes, if it's in evidence, it is.

BY MS. CHAVIS:

Q.  I'm turning to Page -- I'm sorry, and, again, can you just identify this for us?  Tell us what it is.

A.  It's the -- I reviewed David Runyon's medical records that we were able to obtain, and I summarized them in this report.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        849

Q.    Who did you summarize them for?

A.    I summarized them for Stephen Hudgins and Lawrence Woodward.

Q.    What is the date of this summary?

A.    May 5th, 2009.

Q.    I'm turning to Page 2.  Can you please read the highlighted part.

A.    "David's mother, a Korean War refugee, was severely traumatized as a child and suffers from post-traumatic stress disorder.  There is literature on the increased prevalence of post-traumatic stress disorder in children of refugee parents."

Q.    Based on your training and experience, what was the significance of the information that you obtained about Suk Cha to your investigation and planning of the mitigation theme for the sentencing phase?

A.    Well, it would be that, number one, she had a childhood that was filled with trauma and violence, and the exposure to that started when she was a very small child.  And we know that trauma at an early age makes it very difficult to -- for the brain development, particularly in areas of prefrontal cortex development, and Suk Cha --

        MS. McKEEL:  Your Honor, I'm going to object to any medical diagnosis she is going to go into, but she can certainly tell how it was important to her investigation to

turn over to the attorneys.

THE COURT:  I agree.  I don't know what the prefrontal cortex is, but go ahead, not on that but...

MS. CHAVIS:  Correct.

BY MS. CHAVIS:

Q.  Please don't give us any diagnosis, Ms. Cronin, but tell us the importance of this information to your investigation and in developing possible themes for the penalty phase.

A.  It goes to her capacity, having had the trauma herself as a child and on to her teen years.  It goes to her capacity to parent in a healthy way, to problem-solve in a healthy way. It sort of leaves someone in that situation always in a fight-or-flight mode in their life.  And she learned violence as a way of coping with problems, and that's never healthy for children.

Q.  Based on your training as a mitigation expert, did the information that you obtained about Suk Cha lead you to seek the assistance of another expert in this case?

A.  Yes, it did.

Q.  What type of experts did you think were needed in this case?

A.  I thought there were, well, two types of experts:  One would be the research expert on genetic transferring of PTSD; another one would be a culture expert regarding family life in Korea and that part of Suk Cha's upbringing concerning the

Cronin, S. - Direct                                                    851

family and who was in charge, because she never told her father what was going on, and I wanted to know if that was normal, that the family dynamic in a Korean family would make one never want to do anything that would dishonor the family.

Q.  Why would that be important in this particular case for David Runyon?

A.  Because I think he was raised with those beliefs.  He has said many times he would never do anything to dishonor his father and his parents.

Q.  And was the defense team having particular issues with respect to David Runyon having a position about the guilt phase of this case?  Did David Runyon have a particular position on the guilt phase of this case and what his defense was?

A.  Yes.  It may have played a role in that he was never wanted to do anything that would dishonor his family, and perhaps admitting guilt would do that.

Q.  I'm showing you Government's Exhibit 41.  Do you recognize this document?

A.  Yes.  It is an e-mail from David Bruck to the team, which would be me, Woody, and Steve Hudgins.

Q.  And down below it, is there another e-mail in that chain?

A.  Yes.

Q.  And who is that e-mail from?

A.  That e-mail is from me.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                          852

Q.   And who is it to?

A.   This is to Woody and Steve Hudgins and David Bruck.

Q.   And what is the date of that e-mail?

A.   The date of the e-mail is July 9th, 2009.

Q.   And in your e-mail -- I'm turning to Page 2 -- what are you indicating to the trial attorneys in this case?

A.   That I felt we needed to have the cultural expert to help us fully understand some of the parenting issues involved in David's development.

Q.   And if we go back to the first page --

THE COURT:  Let me just ask you something, Ms. Cronin.  This is after guilt has been determined; is this correct?

THE WITNESS:  I don't believe so.

THE COURT:  So you are, then -- going back, a minute ago you said that because of the Korean culture issues and so forth, that in the guilt phase, he didn't want to plead guilty.  Isn't that what you said?

THE WITNESS:  He didn't want to plead guilty.  And on separate occasions, he said he didn't want to do anything to dishonor his family, and so I felt that the two might have been connected.

THE COURT:  What I'm having trouble with, Ms. Chavis, and maybe you can explain it, but we are not dealing with the guilt phase here.  The jury found

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                          853

Mr. Runyon, as well as two of the co-defendants, guilty. Once the guilt phase is over, and we have gone through appeal, and we are on *habeas corpus*, the remand here is not about the guilt phase, it's about the penalty phase.

So why is her testimony about the guilt phase relevant? So you are going to repeat to a jury that he's really not guilty because he would never have done anything to dishonor his family after he's been found -- I'm not saying this, but her testimony is that this would be important to the guilt phase. We are not doing the guilt phase now.

MS. CHAVIS: Correct, Your Honor. It's relevant because the government's position is that Mr. Runyon's position of maintaining his innocence affects the penalty phase.

THE COURT: They are saying that, maintaining his innocence, but we are not going back. He has been found guilty, and they claim that he maintained his innocence. I'm not understanding what you are saying should have been presented to a jury through her testimony. It's what the information -- they have said why they didn't. They have given their reasons for what they presented.

MS. CHAVIS: Yes, Your Honor. The government is claiming that taking the position of innocence in the penalty phase is inconsistent with presenting mental health

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                854

mitigation.

THE COURT:  Then let's move on to that.  Her opinions about the guilt phase, they didn't present the cultural expert, and that would have had nothing to do with the guilt or innocence if there wasn't some type of -- it just didn't at this point.  We are way past the point of guilt or innocence here.  I'm having a hard time understanding the relevance of this testimony.

Yes, it ties into the penalty phase, a couple of the things that you said, perhaps the transfer of post-traumatic stress syndrome, but I'm having a hard time with this testimony where she is talking about the guilt phase and what they should have done.  I just am.

THE WITNESS:  Could I clarify?

THE COURT:  Not unless you're asked a question.

MS. CHAVIS:  Maybe one or two more questions on this, Your Honor, to clear it up, and I'll move on.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  Ms. Cronin, how would this information be relevant to the mental health mitigation investigation that you were attempting to conduct in developing themes and theories for the penalty phase defense?

A.  Okay.  Being raised by a Korean mother brings up what kind of culture he was exposed to, through that culture, and

Cronin, S. - Direct                                                    855

if it had been a defendant that was raised in a Russian culture, it's just -- that's just part of the overall evaluation of preparing for a penalty phase that you hope never happens.  But it's just -- would be an expected part of a mitigation investigation.

Q.  Ms. Cronin, do the ABA guidelines require consideration of a cultural expert?

A.  Yes, they do.

Q.  As part of your investigation into the mental health of David's biological parents, did you interview David's biological father, David Dombrowski?

A.  Yes, I did.

Q.  And as part of that investigation, did you obtain any records about David Dombrowski's mental health?

A.  Yes, I did.

Q.  I'm showing you Defendant's Exhibit 47, which is also ECF 511-17.  Do you recognize this document, Ms. Cronin?

A.  Yes, I do.  It's a mental health physician note that is part of David Dombrowski's medical records that we obtained.

Q.  You requested Mr. Dombrowski's records?

A.  Yes, I did.

Q.  And you received these records?

A.  Yes, I did.

        MS. CHAVIS:  Your Honor, I'd move for the admission of Defense Exhibit 47.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                856

THE COURT:  All right.

MS. McKEEL:  It's the same objection I've had previously, Judge.

THE COURT:  All right.  Go ahead.

(Defendant's Exhibit 47 received in evidence.)

BY MS. CHAVIS:

Q.   What is the date on this record?

A.   The date on this record is March 9th, 2009 -- I'm sorry, entry date March 9th.  It's printed on June 17, 2009.

Q.   I'm turning to Page 2 of this exhibit.  Up at the top there are a list of diagnoses.  Is there a diagnosis there that is relevant to your mitigation investigation?

A.   Yes.  "Major depression, recurrent."

Q.   And does this record on Page 1 reflect medications being prescribed to Mr. David Dombrowski?

A.   Yes, it does.  He is on a list of four different psychotropic medications; one for anxiety, one for anger and irritability, one for depression, and another one at bedtime for depression.

Q.   Is this all information that you would want to pass on to a mental health expert?

A.   Yes, it is.

Q.   Did you investigate information about David Dombrowski's upbringing?

A.   Yes, I did.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                857

Q.   And what did you find out?

A.   He was raised -- he also was raised in a very violent home.  His father, at age 15, was arrested for homicide and served a prison sentence until he was in his early 30s.  Then he married his wife, David Dombrowski's mother, who was somewhat developmentally disabled.  They had a number of children.  I believe it was eight children.

David Dombrowski was a twin, and he was the oldest. His father worked in construction, and when he came home, there was almost always a beating of his wife and sometimes the children, if they tried to interfere with their mother's beating.

David Dombrowski then, when he was 15, ended up in foster care.  He was working in a movie theatre and saw a gun.  He stole the gun, and he went back to the foster home, and the foster family's son was sharing a room with David Dombrowski.  They were fighting over the gun, and he shot David Dombrowski, and he almost died, was in the hospital. Then he was back home again, and he ended up leaving home as soon as he could.  And he joined the military.

Q.   Can you relate those experiences of David Dombrowski to Mr. David Runyon?

A.   I can because, once again, you have someone who grew up with violence, in addition to which Mr. Dombrowski served in Korea during the war, had to kill three enemy combatants, and

was constantly seeing their images.  And he also had a quick threat reflex that he described and would sometimes, with a noise, dive into whatever looked like was a shelter at the moment.  And that was a time in our history where PTSD was not yet readily identified and treated in the military.

Q.  This time after the Korean War?

A.  Yes.  Yes.  So you have all of that, and then his marriage to Suk Cha.  Then when his military role changed, here he was, didn't know how to cope, and he adopted his father's alcoholism.  And we know that tendencies towards that are also genetic.

Q.  And during your investigation, did you look into whether David had suffered any serious head injuries?

A.  From David Dombrowski or --

Q.  In general, did you investigate head injuries?

A.  Yes, I did.

          THE COURT:  To whom are you referring to now?

          MS. CHAVIS:  David Runyon.

          THE COURT:  We are off of Mr. Dombrowski?

          MS. CHAVIS:  Yes.

          THE WITNESS:  There are a lot of Davids in this case.

BY MS. CHAVIS:

Q.  Did you become aware of the head injury that occurred at the time that David was living with the biological father,

Cronin, S. - Direct                                                   859

with Mr. Dombrowski and Suk Cha?

A.  Yes, I did.

Q.  How old was David at that time?

A.  He could barely have been almost four.

Q.  And you told counsel about this injury?

A.  Yes, I did.

Q.  Were there any other serious head injuries that you learned about as your role as a mitigation expert in this case?

A.  Yes.  There was the one that David reported when he was a kid playing outside with other kids.  He was playing football.  He went to catch a football.  He was running backwards and hit his head on a pole.  He lost consciousness momentarily but didn't think it was a very big deal and never told anybody about it.

        THE COURT:  Go back to the age-four head injury. How did you learn about that?

        THE WITNESS:  I learned about it from his mother.

        THE COURT:  You said you learned about a head injury at age four.  Was he taken for medical care?

        THE WITNESS:  No, he was not.  But that's the incident that led to the asymmetrical smile.

        THE COURT:  That's the what?

        THE WITNESS:  It led to his asymmetrical smile.

        THE COURT:  All right.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                         860

BY MS. CHAVIS:

Q.  And you told counsel about the injury with running into the telephone pole?

A.  Yes, I did.  Everything I learned was shared with counsel in my reports.

THE COURT:  Did you ever find any medical records?  Could you verify any of this through medical records?

THE WITNESS:  We were able to -- not that injury because he never told anybody, but we were able to verify an automobile accident where he had to have glass -- he went through the windshield and had to have glass taken out of his forehead.

Then another one, it was a very serious accident where he was taken to a local hospital, and they no longer kept the records, but he was then following up with the Army for medical treatment and for months, and there was a lot of symptoms that were related to that accident.

THE COURT:  Just so that I'm clear.

THE WITNESS:  Sure.

THE COURT:  The age-four incident occurred when?

THE WITNESS:  That occurred when his biological father and mother were married and living in Panama.

THE COURT:  Okay.  You said there were no medical records on that?

THE WITNESS:  No.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                861

THE COURT:  The telephone pole, he never told anybody about?

THE WITNESS:  Never told anybody.

THE COURT:  What is the first automobile accident with the glass?

THE WITNESS:  Yeah --

THE COURT:  Were there medical records of that?

THE WITNESS:  Yes.

THE COURT:  Where were those?

THE WITNESS:  Those were included with his medical records that I obtained from the military, from the Army.

THE COURT:  The drunk driver incident, you said that was in the Army medical records?

THE WITNESS:  The initial treatment he had after the Jaws of Life pulled him out, he was initially treated at a local hospital at Dadeville, Alabama, but we were unable -- they no longer had the records there.  But he was told to follow up, since he was in the Army, with medical treatment there, and he did, and we found those records.

THE COURT:  So the two sets of records would be the glass automobile accident and the drunk driver accident with follow-up from the Army?

THE WITNESS:  Yes, ma'am.

THE COURT:  I think we need to be clear on these so that the record is clear and the Court is clear.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    862

MS. CHAVIS:  Thank you, Your Honor.

BY MS. CHAVIS:

Q.  I'm showing you Defense Exhibit 83.

THE COURT:  You need to focus it more.  It's too --
I can't read anything on it other than --

BY MS. CHAVIS:

Q.  Is that your writing on that page?

A.  Yes, it is.  It says, "Client Army medical records,
1994-1997."

THE COURT:  Are the actual records more clear?  I
can't -- now you've pulled the page.  Okay.

MS. CHAVIS:  I turned to the actual records so Your
Honor could see them and compare to see if it was more
clear.  I can put it back.

THE COURT:  No, that's fine.  I thought that was a
record, so it wasn't anything on there that I could read.

MS. CHAVIS:  Your Honor, I'm sorry.  This is a
picture of a file folder.

BY MS. CHAVIS:

Q.  Ms. Cronin, is this a picture of a file folder?

A.  Yes, it is.

Q.  Now, at the file folder tab, you have written?

A.  "Client Army medical records, 1994-1997."

MS. CHAVIS:  I see what Your Honor is saying
about -- the page underneath is bleeding through.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        863

THE COURT:  Yes.

MS. CHAVIS:  That is what Your Honor is referring to.

THE COURT:  But you can't read it.

MS. CHAVIS:  Exactly.

BY MS. CHAVIS:

Q.  I'm going to try to flip these records slowly.  Do you recognize these records?  Have you seen these before?

A.  Yes, I have.

THE COURT:  Would this be a good time to take a break, and then we will go through the records?

MS. CHAVIS:  Yes.

THE COURT:  Then, Ms. Cronin, you're in the middle of your testimony, so you can't discuss it with anyone.

THE WITNESS:  Of course.

THE COURT:  We will be on a 20-minute recess.

(Recess from 1:50 p.m. to 2:15 p.m.)

THE COURT:  Everyone is here.  Mr. Runyon is here with his attorneys.

You can resume, Ms. Chavis, with Ms. Cronin on the stand.

MS. CHAVIS:  Thank you.

Just one matter to tie up, Your Honor.  I did not move Defense Exhibit 48 into evidence, and I would like to do so right now.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    864

THE COURT:  Is that this exhibit?

MS. CHAVIS:  No, it was the Suk Cha medical records.

THE COURT:  Okay.  They're admitted.

(Defendant's Exhibit 48 received in evidence.)

MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.  Ms. Cronin, you recognize this exhibit?

A.  Yes, I do.

Q.  And what are they?

A.  It's David Runyon's Army medical records from 1994 to 1997.

Q.  How did you obtain these records?

A.  I went through the procedure that we use for all medical -- or for all military records.

Q.  You obtained these records from the military?

A.  Yes.

Q.  And you kept them in your file?

A.  I kept them in my file, and I passed them on to Steve Hudgins and Lawrence Woodward.  Everything I have, they have.

MS. CHAVIS:  I'd move for the admission of Defense Exhibit 83.

THE COURT:  They're admitted.

(Defendant's Exhibit 83 received in evidence.)

BY MS. CHAVIS:

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                      865

Q.   I'm showing you the first page.  Can you tell us the date on this medical record?

A.   August 7th, 1995.

Q.   And what does this record indicate?

A.   It indicates that David was having difficulty related to his automobile accident where glass was embedded in his forehead.

Q.   And does it give a relative time frame for when that accident may have occurred?

A.   Let me see here.  Five years previously.

Q.   Five years previous to?

A.   To this visit.

Q.   Okay.  Thank you.

        The next page that I've turned to, do you see the date on this health record?

A.   Yes, November 12th, 1996.

Q.   And can you please read what's in the highlighted sentences.

A.   "Patient was in the ER Saturday, 9 November 1996.  He was in an auto accident, was seen in civilian ER, was told to see Army MD Monday a.m."

Q.   Could you please read this?

A.   "Patient seen in Lakeshore Hospital, Dadeville, Alabama." "He was cut out of the truck and then seen -- and then sent to the hospital."  "The drunk driver hit the patient in a

Cronin, S. - Direct                                            866

head-on collision."

Q.   And what does this note indicate?

A.   He was driving a '77 Ford.  His car was totaled.

        THE COURT:  Was it a car?

        THE WITNESS:  I think the police -- no, the other driver was in an '87 four-by-four.

BY MS. CHAVIS:

Q.   The truck that David --

        I'm sorry, Your Honor.

        The vehicle that David was driving at the time, what kind of vehicle was it, do you know, that he was driving?

A.   I don't recall whether it was a car, or it might have been his brother's truck.  I'm not sure which one is which. I don't recall which one is which compared to the MVA when he had glass embedded in his forehead.

Q.   Okay.  What is the date on this health record?

A.   December 12, 1996.

Q.   What does it indicate in the highlights?

A.   The subjective is, "Status post MVA 9 November, head-on collision at a high-speed.  Was wearing a seatbelt, no air bag.  Symptoms of vertigo, was seen in ER couple of days ago," -- oh -- "couple of days ago and was started on meclizine."

Q.   This next health record, do you see the date on there?

A.   Yes.  It's January 9th, 1997.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                              867

Q.   And what is this record indicating?

A.   It's indicating that he was complaining of short-term memory loss and insomnia.

Q.   What does it indicate -- what does the very first line indicate that his visit is about?

A.   "Follow-up for accident, auto accident."

Q.   Down at the bottom of this page, what is indicated?

A.   "Also" -- I can't read the next word -- "complained also PTSD and life stressors as possible etiology for insomnia and memory loss."

Q.   Do you see the date on this document?

A.   Yes, I do.  February 5th, 1997.

Q.   And what does it indicate?

A.   It indicates "post-traumatic stress syndrome."

Q.   Does it indicate that there is going to be follow-up action?

A.   Yes, it does.  "Needs recommendations/states urgent/first sergeant wants paperwork ASAP."

Q.   And in the provider's note, what does it indicate?

A.   "Spoke with wife and counselor, Mr. Sweeny.  I will recommend/refer patient for further psyche eval and notify company commander that I recommend no job change or a profile at this time until psyche eval is complete.  Will call patient and inform him of this after notifying commanding officer."

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    868

Q.   Do you see the date on this record?

A.   It is August 27th, 1997.

Q.   And what does this record indicate?

A.   That he was experiencing positional vertigo.

Q.   Could you read the highlighted portion, please.

A.   November -- he describes -- "Since the MVA in November, describes three episodes of vertigo upon awakening.  Patient describes sleeping on his back and awakens with the room spinning.  Patient also has associated headaches that last three to four days in duration."

Q.   Does it indicate anything about medication?

A.   He is -- well, can you move the -- I don't know if I have the full --

Q.   In the same sentence.

A.   Oh, excuse me.  "Most recent episode was one day ago. Symptoms alleviated with meclizine."

Q.   Is this the type of information you would want to discuss with the mental health expert?

A.   Yes.

Q.   Did you have a conversation with trial counsel about David Runyon's head injuries?

A.   Yes.

Q.   And what occurred during that conversation?

A.   As I recall, they were discussing what to do about it and who to follow up with.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                         869

Q.   When you say who to follow up with, what do you mean?

A.   Whether he could have neuropsych testing.

Q.   Did the attorneys ask you to corroborate the head injuries?

A.   Well, I always -- whenever something is said, I look for corroboration, and that was obtaining the medical records in this case.

Q.   Did the attorneys specifically instruct you to corroborate the head injuries?

A.   No, I know it's part of my job to do that.

Q.   Did you receive any specific instructions regarding investigation, what types of investigation to perform?

A.   No.  I always follow the same way of investigating cases, according to the ABA Guidelines.

Q.   Did any witnesses speak with you or Mr. Ford about the 1996 car accident with the drunk driver?

A.   Yes.

Q.   Which witnesses were those?

A.   That would be his ex-wife, Maria.  That would also include his brother, Mark, and I believe the Seegers might have been aware of it.  And also when he was working for the Fayetteville Sheriff's Department, his employer there commented that David was constantly forgetting things and had to be reminded to do things, which might have enforced the short-term memory problems.

Cronin, S. - Direct                                                          870

Q.   I'm showing you Defendant's Exhibit 166.  Do you recognize that document?

A.   Yes, I do.

Q.   What is this document?

A.   This is a document of an interview with Captain Jeffrey Harris of the Fayetteville Police Department.

Q.   And who conducted this interview?

A.   Glenn Ford.

Q.   And did you receive a copy of these interview notes?

A.   Yes, I did.

         MS. CHAVIS:  I move for the admission of Defendant's Exhibit 166.

         MS. McKEEL:  Judge, I'm going to object to this.  Mr. Harris testified.  This is just, I guess, some type of interview they want to get in, but he's already testified here last week.  So this is hearsay.

         THE COURT:  Why didn't you ask Mr. Harris about all of this?

         MS. CHAVIS:  This is just to indicate that this is information that the investigators came across and then provided to trial counsel.  This is part of their role --

         THE COURT:  Well, I'll admit it for that purpose, not for the truth of the matter, but simply that they had this and they gave it to trial counsel, for what trial counsel would have known.  You're shaking your head yes?

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        871

MS. CHAVIS:  Yes, ma'am.  Yes.

(Defendant's Exhibit 166 received in evidence.)

BY MS. CHAVIS:

Q.  I apologize, I'm afraid that this might -- the quality might be too poor for you to read.  I had a different version of this in my notebook, and I don't see it.

A.  I will try to read it.  "He stated that in his opinion David had a problem retaining things.  He said every time they would start to go on with training, they would have to go back to the first day because David couldn't retain what he learned from the first day.  They would have to start from scratch on just about every day."

THE COURT:  These are notes that Mr. Ford made after talking with Mr. Harris?

THE WITNESS:  Yes, ma'am.

THE COURT:  Then you had them, and they were given to the attorneys?

THE WITNESS:  Yes.

THE COURT:  So these were not a contemporaneous interview with Mr. Harris, as it said in the beginning he had trouble recalling him at first from the pictures because there were no glasses?

THE WITNESS:  Correct.

THE COURT:  Then this is what he gave to the interviewee to give -- to the interviewer to give to the

Cronin, S. - Direct                                         872

attorneys?

THE WITNESS:  Correct, ma'am.

BY MS. CHAVIS:

Q.  And what did David's ex-wife, Maria Runyon, say about the motor vehicle accident in 1996?  What did you learn from her that informed your investigation?

A.  That David changed after that.  Again, his short-term memory, he was dizzy, he had terrible headaches, and he seemed more short-fused.  All of those symptoms were apparent.

Q.  Was anyone present with you during that interview of Maria Runyon, when she provided information about the vehicle accident?

A.  Yes.  Steve Hudgins was with me.

Q.  And you mentioned that Deborah and Robert Seeger also told you about the vehicle accident in 1996?

A.  They told Glenn Ford.

Q.  I'm showing you Defendant's Exhibit 85.  Do you recognize this document?

A.  Yes.  It's a report from Glenn Ford of a case note summary, 11-8-2008 through 11-12-2008.

Q.  And what is it reporting?

A.  It is reporting his interview in Alaska with Mr. and Mrs. Seeger.

Q.  I'm turning to Page 4 of this document.  I don't have

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                              873

these highlighted, but there are a series of bullet points on this page, correct?

A.   Correct.

Q.   Can you tell us what the first bullet point says?

A.   "When David's brother was in jail" --

THE COURT:  Wait just a minute.

MS. McKEEL:  Object to reading documents again. Two, this does not go for the truth of the matter asserted. It just goes to the fact that the Seegers were interviewed.

THE COURT:  The bottom line is, I'm letting you get the document in, but I don't need it read word for word to the Court.  The document will be in, and you can certainly argue these are things and the circumstances under which either Mr. Hudgins, Mr. Woodward, or both knew the information, but if we can highlight it rather than read all of these bullet points into the record.

MS. CHAVIS:  Yes, Your Honor.  No, I wasn't going to go through all of them, Your Honor.

BY MS. CHAVIS:

Q.   Ms. Cronin, what did you learn from Mr. Ford's interview?

A.   That David seemed to be in a lot of pain after his accident, that he was -- that he had changed.  He fought with his wife more frequently.  There were just problems.

THE COURT:  Who is this an interview with?

THE WITNESS:  This is an interview with -- I don't

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                              874

know if this one was with Mr. or Mrs. Seeger.

MS. CHAVIS:  We are on Page 4.  This is Page 3.

THE WITNESS:  With Debbie Seeger.

THE COURT:  Did she indicate in this interview summary how she knew these things?

THE WITNESS:  It's by observation.  They were friends with David and his wife, Maria.

THE COURT:  Go ahead.

BY MS. CHAVIS:

Q.  Does this document refresh your recollection about the type of vehicle that David was driving when he was hit by a drunk driver?

A.  I think he was driving his brother's truck.

MS. CHAVIS:  If I did not move for the admission of Defendant's Exhibit 85, I would like to do so now.

THE COURT:  All right.  With the same caveats.

(Defendant's Exhibit 85 received in evidence.)

BY MS. CHAVIS:

Q.  Did you inform Mr. Runyon's trial counsel about the corroboration that you found of the vehicle accidents?

A.  Yes, I did.

Q.  Was there anyone on the defense team who was qualified by training and experience to screen Mr. Runyon for the presence of mental or psychological disorders or impairments?

A.  I was equipped to identify that there were problems that

Cronin, S. - Direct                                                           875

needed follow-up.

Q.   Was there anyone else on the team that was so qualified?

A.   No.

Q.   Without providing a diagnosis, but based on your opportunities to visit with Mr. Runyon at the jail and other collateral information that you gathered about him, what were your impressions of him?

A.   My impressions were that, looking at his behavior and family situation and background in totality, there were problems that may have indicated a serious medical illness, a serious mental health issue, but there needed to be further workup of his head injuries to rule out a brain injury.

Q.   I'm showing you Defendant's Exhibit 34.  It's also document 511-4.  Do you recognize this document?

A.   I do.

Q.   What is it?

A.   It's my declaration.

Q.   I'm going to turn to the back of this declaration.  Do you remember that there is something attached to it?

A.   Yes.

Q.   So if I go to Page 9 of 14 of the ECF header on this document, do you recognize that handwriting?

A.   Yes, I do, that's David's handwriting.

Q.   Do you recognize this particular letter?

A.   Yes.  In this particular letter, he was providing a list

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                              876

of lives that he had saved.

MS. McKEEL:  Your Honor, I'm going to object.  This document was made in preparation for litigation.  I think the document is from 2016.  That is attached to a declaration.  So we don't have any idea when this document was made, but this document was made for litigation.

THE COURT:  Well, it was -- I'm not exactly sure I understand the objection.

MS. McKEEL:  It's not dated.  The document is attached to the declaration in 2016.  This document that's been attached to it is not dated.  So we don't know if counsel saw this document.  We don't know the date of this document.

BY MS. CHAVIS:

Q.  Ms. Cronin, do you remember when you received this letter?

THE COURT:  Wait just a minute.  Let's go to the declaration.  How did the declaration mention it or incorporate it?

MS. CHAVIS:  Yes, Your Honor.  It's in the paragraph.

THE COURT:  What is the number of this declaration?

MS. CHAVIS:  511-4.

THE COURT:  In these binders here?  I want to see the declaration.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                877

MS. CHAVIS:  Oh, the exhibit, 34.  Yes, Your Honor, of course, when I'm looking for something and it's right in front of me, I'm not finding the paragraph.  Maybe my co-counsel can assist me.

THE COURT:  You shouldn't be giving a declaration -- you can't just attach something to it.  You either have to incorporate it by reference, and you just don't attach something to it.  Let me just see if I can --

MS. CHAVIS:  My brilliant co-counsel found it that quickly, Your Honor.

THE COURT:  Pass the declaration up to me and let me see it, please.

MS. CHAVIS:  Sure.  It's Paragraph 7.

THE COURT:  So this is a declaration, when you said prepared for litigation, what you're saying is prepared for this hearing?

MS. McKEEL:  Yes, ma'am.

THE COURT:  So this is not a declaration that was part of the trial?

MS. McKEEL:  It was not, no, ma'am.

THE COURT:  So this was a part of something of the trial team.  So first let's establish on the record what something is with dates.

This is document 511-4.  It was filed 2-4-16, and this is the declaration of Ms. Cronin.  So this is after the

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                    878

fact of the penalty phase or the trial and why we are here?

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  Wait just a minute, please.

MS. CHAVIS:  Yes.

THE COURT:  This is something that she prepared in anticipation for this *habeas corpus*?

MS. CHAVIS:  Yes, Your Honor, that we prepared in anticipation.

THE COURT:  Yes.  And she signed it.

MS. CHAVIS:  Yes.

THE COURT:  What date did she sign it on?  Show her this page and ask if that's her signature and her date on Page 8.

BY MS. CHAVIS:

Q.  Ms. Cronin, is that your signature and the date on Page 8?

A.  Yes, it is.  Executed the 26th day of September 2015, and that is my signature.

THE COURT:  All right.  Let me have this back.

In what paragraph did she mention the notes?

MS. CHAVIS:  I believe it was 7.

THE COURT:  My concern with this is, this is something that you presented to the appellate court so that you could get this hearing.  Now you've got the hearing, based upon what you presented.  The appellate court did not

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        879

make any determination on this.  What it was, it was remanded back to this Court to determine whether counsel was ineffective for not having pursued certain defenses.  It is not Ms. Cronin's opinion about that counsel was the worst she'd seen and this, that, and the other.  This is just a declaration she prepared to get you back here.

Now, you can ask her any questions you want that predated what they did.  But I'm not going to admit a declaration prepared for this litigation on appeal, which is the whole reason it is back here to begin with, and she is here as a witness now to testify.  She can testify to anything that is relevant, if it is relevant to what counsel knew and didn't do.

But her opinion of it is not what's in front of the Court, and that's what she's saying in here, she is issuing her opinion that, one here is -- she's testified to a lot of this, about the severe trauma and his performance in the military and his relationships with his family.  She can testify as to what she learned on her investigation and to what she told the attorneys, but I'm not going to admit a declaration after the fact of the full three phases of trial and that was prepared in order to get the case back here for a hearing.

Now she is here to testify.  She's saying things like, her opinion, unlike anything she has ever experienced

Cronin, S. - Direct                                                          880

in a capital case.  These are her opinions.

I want to know what information she had and that it was conveyed to the attorneys.  Let me see that attachment, please.  In this paragraph, all it says is this is an example.  It doesn't say who she gave it to or --

MS. CHAVIS:  Yes, Your Honor.  Really the attachment was what I was focusing on and not the declaration.

THE COURT:  Can I see the attachment, please?

MS. CHAVIS:  Yes.

THE COURT:  Where is it referred to in this declaration?

MS. CHAVIS:  Paragraph 7.

THE COURT:  There's nothing in here that specifically says she gave this.  She says this is just an example of some of the things he did.  She doesn't say that she gave this to trial counsel.

MS. CHAVIS:  Yes, Your Honor.  That's why I want to question her about it because it is that document.  And my -- I see my error is using the copy that was filed with the Court, the ECF version.  I could have just used a blank version that was not filed with the Court and avoided all of this.  So I do just want to focus on the writings of David Runyon and what he told Ms. Cronin and what she then did with that information and how it informed the investigation.

JODY A. STEWART, Official Court Reporter

THE COURT:  But did this particular writing go to the attorneys?

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  It doesn't say that.  It just says this is an example and that she specifically remembered giving that to them.

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  Where did it come from?  First of all, I'm going to have this declaration marked "offered and refused" because this is not a proper document.  This declaration of Sheila Cronin has been offered as an exhibit, and it's been refused for the reasons that I've indicated.

MS. CHAVIS:  Perhaps, Your Honor, I could just add the next exhibit number sticker on the writings of David Runyon that was attachment A to that document that's been refused.

THE COURT:  I'm refusing admission of document 511, 14 pages, 1 through 4, and to the extent that you're going to offer this attachment, it will have to be labeled to be an entirely new exhibit, and before it's admitted, it has to have a proper foundation and be of relevance.

MS. CHAVIS:  Thank you.

THE COURT:  This can go back to Ms. Chavis.

What is this last page on this thing?  "FindLaw for Legal Professionals," "Page 5 of 5," is that part of what

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        882

you want in?

MS. CHAVIS:  From your description, Your Honor, it sounds like it's not something that I want in.

THE COURT:  The last page does not make any sense to me.  You might want to look at that.

MS. CHAVIS:  I see, Your Honor.  Yes, he just continued to write on this page.  It is his handwriting on the right-hand column and down below.  It's very tiny print.

THE COURT:  Is it simultaneously with what's on the other page?

MS. CHAVIS:  It's just more writing from Mr. Runyon.

THE COURT:  You can give it to the witness, if you want to show it to the witness, but she is going to have to properly authenticate it and it's got to be relevant.

MS. CHAVIS:  I'm putting defense sticker 168 on this document.

THE COURT:  Go ahead.

BY MS. CHAVIS:

Q.  Ms. Cronin, do you recognize that handwriting?

A.  Yes, I do.  It is David Runyon's handwriting.

Q.  Do you recognize those writings as something that you received from David Runyon?

A.  Yes.

Q.  And would you have received those writings before the

Cronin, S. - Direct                                          883

trial in this case?

A.   Yes.

Q.   Those are writings that you remember?

A.   Yes.

Q.   Would you have shared those writings with trial counsel?

A.   Everything that I do in a mitigation investigation, absolutely everything goes to trial counsel.  I don't really own or have personal ownership of anything.  It all has to go to counsel.

Q.   And is there information --

          THE COURT:  Just a minute.

          You have to answer the question.  Did you provide that document?

          THE WITNESS:  Yes, I did.

          THE COURT:  Because you can't just say I provided everything.  I mean, I don't know at this point how you could look back and know.  Maybe a document dropped out, or you see something that maybe you hadn't.  If she asks you the question, you have to answer it.

          THE WITNESS:  Yes, ma'am.  It was sent to counsel.

BY MS. CHAVIS:

Q.   Is there information within those writings that informed your mitigation investigation?

A.   Yes.

          MS. CHAVIS:  I move for the admission of

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        884

Defendant's Exhibit 168.

THE COURT:  All right.

(Defendant's Exhibit 168 received in evidence.)

BY MS. CHAVIS:

Q.  I'm showing you 168 again.  And you had mentioned in your testimony a list of lives that David Runyon -- or a list that David Runyon wrote of lives that he saved?

A.  Yes.

Q.  Does this appear to be that list?

A.  Yes, it does.

Q.  If I flip through the pages and we look down through the pages, can you tell me how many he's listed on here?

A.  Seven.

Q.  Seven is there.  Is this an example of the delusions of grandeur that you were talking about?

A.  Yes.

Q.  Is that information that you would want to talk about with a mental health expert?

A.  Yes.

Q.  Did your mitigation investigation involve collecting David Runyon's jail records?

A.  Yes, it did.

Q.  And did you receive jail records on David Runyon?

A.  Yes.

Q.  I'm showing Defendant's Exhibit 44.  Do you recognize

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                          885

this document?

A.   Yes, I do.

Q.   What is this document?

A.   It's records from the Portsmouth City Jail.

Q.   This document is also ECF Number 511-16, and I'm turning to Page 3 of 4.

     Ms. Cronin, what is this record telling us?  Do you need me to make it bigger?

A.   It's fine.  He is discussing a mustard gas ear injury.

     "The patient reports that on August 22nd, he had sudden onset of running nose, watery eyes, feeling sick. Patient thinks that he had mustard gas while in the military in 1990" -- I'm not sure of that date, maybe it is 1990 -- "while in training in Kansas."

Q.   What is the date of this document, this note?

A.   July 2nd, 2008.

Q.   I've turned the page to Page 4 of 4.  I'm going to pull it out just a little to try to get the whole page on here. Can you see a date on this document?

A.   It's 1-29-08.

Q.   And what is this document indicating?

A.   It's indicating that he was seen by a Dr. Kolongo because he believed that he had mustard gas in his head, in his sinuses.

     "Although he was genuinely cooperative, he intended

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                            886

to be somewhat grandiose.  His thoughts were flighty and rambled, and he verbalized some delusional material.  His insight and judgment were lacking and poor.  The diagnosis for Axis I is rule out schizoaffective disorder and rule out bipolar disorder."

THE COURT:  What did you -- the first, I just couldn't hear.

THE WITNESS:  Should I read the whole thing again?

THE COURT:  Yes, please.

THE WITNESS:  He was seen by Dr. Kolongo --

THE COURT:  No, not the whole thing, just the last.

THE WITNESS:  The diagnosis?

THE COURT:  Yes.

THE WITNESS:  "Axis I, rule out schizoaffective disorder and rule out bipolar disorder."

MS. CHAVIS:  I move for the admission of Defendant's Exhibit 44.

THE COURT:  That's admitted.

(Defendant's Exhibit 44 received in evidence.)

THE COURT:  This is a record that, again, who did it go to?

THE WITNESS:  It was obtained by Jon Babineau's office and provided to me in the permanent records.

BY MS. CHAVIS:

Q.  Is the information contained in those records information

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                              887

that you would want to talk about with a mental health expert?

A.   Yes.

Q.   Did David Runyon ever tell you that he did not have a mental health issue?

A.   No.

THE COURT:  Did you ever suggest to him that you thought he did?

THE WITNESS:  I don't know that I did.  I don't recall that.

BY MS. CHAVIS:

Q.   David Runyon knew that you were investigating his mental health?

A.   Yes, as part of my whole mitigation investigation, yes.

Q.   Did he voice any objections to that investigation?

A.   If I recall, it was initially -- he was initially taken aback by it, but as time went on, he didn't resist it.

Q.   Did David Runyon ever tell you that he did not want mental health mitigation presented at his penalty phase?

A.   No.

Q.   Based on the information in these records that we've just reviewed, what further steps do you think needed to be taken?

A.   He needed to have a psychiatric evaluation and a neuropsych evaluation and possibly medical tests to rule out any kind of head-trauma-caused brain damage.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                 888

THE COURT:  Who is this?

THE WITNESS:  David, the defendant.

THE COURT:  No, I know that, but who comes to this conclusion?

THE WITNESS:  That would be my conclusion.

THE COURT:  Okay.

MS. CHAVIS:  I asked her what would be the next steps based on this information.

THE COURT:  What would be the next step in her --

MS. CHAVIS:  In her investigation, yes.

BY MS. CHAVIS:

Q.  So as part of your role in this case as the mitigation expert, would you assist in locating mental health experts?

A.  Yes.

Q.  Did you do that in this case?

A.  Yes, I did.

Q.  Do you recall the names of the mental health experts that were involved in this case?

A.  I remember the first one was Dr. Evan Nelson, and he was contacted actually by Jon Babineau early on in the case.  I did not contact Dr. Nelson.  But after that, there was Dr. Merikangas, I believe; there was Dr. Mirsky, I believe. I may be blocking here.  I know their names.

Q.  What was Mr. Runyon's reaction to being evaluated by experts?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                       889

A.  He had no problem with that.

THE COURT:  Well, did you discuss it with him?

THE WITNESS:  Before I would discuss it with him, I would discuss it with the attorneys.

THE COURT:  You've got to be clear who he -- is he saying this to you, or this is something that you are assuming?

BY MS. CHAVIS:

Q.  Ms. Cronin, would you, when you set up an evaluation of your client, would you notify your client ahead of time?

MS. McKEEL:  I am going to object to a client.  I think she needs to ask specifically about this case.

THE COURT:  I agree.

MS. CHAVIS:  I will get there.

MS. McKEEL:  She didn't answer the Court's question, either.

THE COURT:  I know she did not.

THE WITNESS:  I would first take my recommendations to the attorneys, and I would then seek to find the appropriate experts, if the attorneys approved of that.  And then if they were going to come, either the attorneys and/or myself would tell David.

BY MS. CHAVIS:

Q.  So Mr. Runyon would have been advised of an expert evaluation before it took place?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    890

A.   Absolutely, yes.

Q.   Do you recall advising Mr. Runyon that an expert evaluation was going to take place?

A.   Yes.

         THE COURT:  Which one was that?

         THE WITNESS:  Dr. Merikangas.

BY MS. CHAVIS:

Q.   So David Runyon was evaluated by -- was he evaluated by Drs. Nelson, Merikangas, and Mirsky?

A.   Yes.

Q.   Was he also evaluated by two government experts?

A.   Yes, he was.

Q.   Did he discuss any of those evaluations with you after they occurred?

A.   Yes.  He was quite surprised that all of a sudden Dr. Montalbano showed up on a weekend.  This was one of the prosecutor's expert witnesses, and he had no warning about that evaluation.

         THE COURT:  I don't think that that's relevant testimony.  I don't know whether it was -- it was never brought to the Court's attention.  I imagine the attorneys scheduled and did these things, and it doesn't really make any difference as far as the Court is concerned.  Whether he showed up or not, it was either -- it was an attorney's responsibility -- I don't know whose it was -- or not.  I

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    891

see no reason to go into it unless it's got some relevance.

MS. CHAVIS:  Your Honor, it goes to the information communicated by Mr. Runyon regarding mental health examinations and his willingness to submit to mental health examinations, regardless of whether he was expecting them to occur or not.

THE COURT:  Well, he did submit to them.

MS. CHAVIS:  Yes, Your Honor.  I'm just attempting to make the record for that.

THE COURT:  I was going to tell you that you've done so much better today with the examination of professionals because you've remained focused and in control of the witnesses and so forth.  But this is getting a little far off field whether Dr. Montalbano called and said -- I don't understand the purpose of it.  Again, this is becoming a little unfocused, to me, and it's been very focused so far.

What's the purpose of the question?  Okay.  Let's assume he didn't know.

MS. CHAVIS:  Your Honor, it's to just establish his cooperation with the mental health investigation.

THE COURT:  Okay.  I will accept that he cooperated with the mental health evaluations.

BY MS. CHAVIS:

Q.  Were you aware of conversations with the attorneys

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    892

regarding Dr. Nelson's possible contributions to this case?

A.  I never saw Dr. Nelson's report.

THE COURT:  If she's not aware of it, she's not aware of it.  We've heard about Dr. Nelson, and I know what the attorneys testified to and what they knew.  So if she doesn't know, there is not a foundation for it.  If she does know, it is only repetitive, unless it is different than what has been presented to the Court.  The key here is what the attorneys knew and did.

MS. CHAVIS:  Yes, Your Honor, and whether or not their investigation was reasonable.

THE COURT:  I've got to determine that in the end, whether their investigation was reasonable based upon the knowledge.

MS. CHAVIS:  Yes, so that's why we are just attempting to present these facts to the Court and for the record.

THE COURT:  Well, you haven't established anything for her to testify to about Dr. Evans.

BY MS. CHAVIS:

Q.  You were aware that Dr. Nelson was an expert for the defense in this case, correct?

THE COURT:  I mean Dr. Nelson.  I keep wanting to call him Dr. Evans, but it is two last names.  It is Evan Nelson.

Cronin, S. - Direct                                                 893

MS. CHAVIS:  Yes, it is, Your Honor.

THE WITNESS:  Yes, I was aware.

BY MS. CHAVIS:

Q.  Did you have any direct contact with Dr. Nelson?

A.  No, I did not.

Q.  Did the attorneys involve you in any strategy regarding Dr. Nelson?

A.  No.

Q.  Did the attorneys ask you to convey information with Dr. Nelson?

A.  No.

Q.  Did the attorneys ask you to have any --

Do you recall a neuropsychologist named Scott Bender ever being involved in this case?

A.  I recall the name, but I don't recall anything about his involvement.

Q.  The attorneys never asked you, from your memory, to have any contact with Dr. Bender?

A.  No, not that I recall.

Q.  Do you recall what involvement Dr. Mirsky had in this case?

A.  Dr. Mirsky is a psychologist and a neurologist, and I believe he was contacted to evaluate David both from a psychological standpoint and neurologically.

Q.  And were you instructed to have a conversation with

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        894

Dr. Mirsky to provide him information?

A.  Yes, I did.

Q.  And did you provide him information?

A.  Yes, I did, but most of it was limited to his availability to do the evaluation, and there was some back and forth with that, but whether -- you know, it took a while -- and I needed to get back with the attorneys and say, do you still want him?  Here is his schedule.  We need to set this up.

Q.  I think my question may have been unclear.

So you provided Dr. Mirsky information about scheduling an evaluation of David Runyon?

A.  Yes, I did.

Q.  Okay.  Let me ask a better question.

Did you provide Dr. Mirsky background information about David Runyon's social history?

A.  Yes, I did.

Q.  Did you have discussions with Dr. Mirsky about David Runyon's social history?

A.  I probably did.  I usually do in those circumstances.

Q.  Okay.  So the attorneys did involve you with Dr. Mirsky?

A.  Yes.

Q.  Okay.  Do you remember Dr. Mirsky making recommendations?

A.  I believe I do, yes.

Q.  Okay.  Do you recall what involvement Dr. Merikangas had

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                         895

in this case, that he was an expert?

A.  Yes.  I -- it took me a while to get a copy of his report, and Steve Hudgins finally sent it to me.  I don't remember specific recommendations.  I know he had some concerns about the drug trials that David had worked in, and we had already investigated those.

Q.  And when you said he had concerns about the drug trials, who is "he"?

A.  Dr. Merikangas.

Q.  And did you have any conversations with Mr. Hudgins about Dr. Merikangas' concerns about the drug trials?

A.  Yes, I did, because that was something I had already addressed and talked to the drug companies about to attempt to get a list of what drug trials were involved, and in three -- I think it was three or four of the cases, they were drugs that were benign in terms of causing any -- having any mental side effects.  But the other issue is, there was no way to learn whether David received those drugs or whether he was part of the control group that got a placebo.

Q.  Did you relay that information to Dr. Merikangas?

A.  I don't -- I was late in getting his report, but I certainly addressed it with Steve Hudgins.

Q.  I'm showing you Defendant's Exhibit 117.  Do you recognize this document?

A.  Yes, I do.

Cronin, S. - Direct                                                      896

Q.   What is it dated?

A.   It is dated July 22nd, 2009.

Q.   And who is it from?

A.   It is from Steve Hudgins to Evan Nelson, Allan Mirsky, James Merikangas, and to me.

Q.   And what is this e-mail?  What message is it conveying?

A.   He is conveying that on that day the jury determined that David is eligible for the death penalty, and the Judge scheduled the trial of that matter for August 19th at 10:00 a.m.

     Do you want me to continue?

Q.   Well, if you can go down to the very end, what does it indicate?

A.   Okay.  "The Court has said that defense case will begin on Monday, August 24th, so we will be bringing our non-expert witnesses in over the weekend.  I will keep you informed."

Q.   Is there anything about this e-mail that surprised you?

A.   It's -- well, I think what surprised me is the plan to bring the witnesses in over the weekend, right before the penalty phase started, because that really limited the amount of time that was available to prepare the witnesses to testify.

     THE COURT:  They had all been interviewed before, though.

     THE WITNESS:  They had been interviewed by me, but

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                       897

not all of them had met the attorney.

THE COURT:  But they had been interviewed by someone on behalf of the defendant at the time?  And if you had interviewed them, you'd have written up an interview record as would have Mr. Ford.  So it's not the first time that somebody's talking to them.

THE WITNESS:  No, but my experience has been that there is more time allotted to prepare witnesses to testify, and there is a plan on who goes in what order, in order for the jury to understand the life story of how --

THE COURT:  How do you know what the plan was for who to go in what order?  That was the attorneys' decision, was it not?

THE WITNESS:  Well, usually a lot of this is my decision and recommendation as well because I have spent time with the witnesses.

THE COURT:  Mr. Ford had spent some time with them, too.

THE WITNESS:  That's right.

THE COURT:  And Mr. Hudgins had been on at least one of the interviews you've talked about.

THE WITNESS:  Right.

THE COURT:  And even on some others.

THE WITNESS:  He had been in one other.

THE COURT:  Okay.  Go ahead.

Cronin, S. - Direct                                                    898

BY MS. CHAVIS:

Q. Did you notice anything about the recipients of this e-mail?

A. Yeah. I was surprised that Evan Nelson was listed, because I had no indication or knowledge that Evan Nelson was still involved in the case.

Q. Who did you think were the defenses' experts in the case at that time?

A. Dr. Mirsky and Dr. Merikangas.

MS. CHAVIS: I move for the admission of Defendant's Exhibit 117, please.

THE COURT: It's admitted.

BY MS. CHAVIS:

Q. Mr. Runyon underwent brain scans in this case?

A. Yes.

Q. And do you have knowledge about his reaction to undergoing these brain scans?

A. I don't have knowledge of his reaction, and I also never saw the results.

Q. Did you have any discussions with the attorneys about these brain scans or the results?

A. It was a matter of waiting on them, and everything was crushed into a very narrow time frame, and I never got word that they actually received the results.

Q. Never got word from who?

Cronin, S. - Direct                                                           899

A.   From Mr. Woodward or Mr. Hudgins.

Q.   I'd like to ask you about the government's experts.  Do you recall whether they had experts in this case?

A.   Yes, they did.

Q.   Do you remember who they were?

A.   One was Dr. Patterson, and I'm blocking on the other one.  Then the name that I didn't know is a Dr. Martell, possibly.

Q.   Okay.  And how are you coming up with the name Dr. Martell right now?

A.   I'm coming up with it because I think it was in the record somewhere, but it wasn't anything that was -- that I had any knowledge of going into the penalty phase.

Q.   Were you aware that Dr. Montalbano and Patterson completed their written reports?

A.   I'm aware they completed written reports but that they were not to be -- they were under seal until there was a guilty plea.

          THE COURT:  A guilty plea?

          THE WITNESS:  I'm sorry, a verdict.  I'm sorry.

BY MS. CHAVIS:

Q.   I'm going to go back to the names of the experts, just to clarify, because there are so many experts involved in this case.  You mentioned a Dr. Martell.

A.   I heard the name.  I don't remember anything about it except that he was going to be a prosecution witness.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                           900

Q.   Did you hear that name recently?

A.   Yes.

Q.   You heard that name recently?

A.   Yes.

Q.   Did you hear that name before trial?

A.   No.

Q.   Okay.

A.   Not at all.

          THE COURT:   Irrelevant.

BY MS. CHAVIS:

Q.   I'm showing you what's marked as Defendant's Exhibit 82.
I'm going to turn it on its side so the writing is the
correct orientation.  Do you recognize this document?

A.   I do.  It was copies of government psyche reports sent to
me from Steve Hudgins.

Q.   And whose writing is on the outside of this document?

A.   That's my writing.

Q.   And this is an envelope that's addressed to you?

A.   Yes, it is.

Q.   And I believe you just said it was from Steve Hudgins?

A.   Yes, correct.

Q.   And if I just flip quickly through this, the very first
page, does that refresh your recollection about the name of
the other government witness?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                901

Q.   And what was the name of that government witness?

A.   Paul Montalbano.

THE COURT:  Didn't you say him before?

THE WITNESS:  Yes.  That was the first evaluation that David had.

THE COURT:  She's already said it.

MS. CHAVIS:  Yes, Your Honor.  She just didn't remember when I asked her a couple questions before.

THE COURT:  She remembered.  Please let's don't do asked and answered.  That's more or less a waste of time.  I distinctly heard Ms. Cronin say, name him as one of the witnesses.  Isn't that correct?

THE WITNESS:  Yeah.  He was the one who did for the government the first -- not the first, but the government's first evaluation of David, but I heard about from David.

BY MS. CHAVIS:

Q.   So I flipped through to the second report that's contained in this envelope.

A.   Raymond Patterson?

Q.   Yes, ma'am.  Do you remember receiving these documents?

A.   Yes.

MS. CHAVIS:  I move for the admission of Defendant's Exhibit 82.

MS. McKEEL:  No objection, Your Honor.

THE COURT:  They're admitted.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    902

(Defendant's Exhibit 82 received in evidence.)

THE COURT:  It was Raymond Patterson that she didn't remember, that she didn't say.

MS. CHAVIS:  Oh, so that's my poor memory.

THE COURT:  Yeah.

MS. CHAVIS:  Thank you.

BY MS. CHAVIS:

Q.  Did you -- when you received those reports, did you review the reports of Dr. Montalbano and Dr. Patterson?

A.  I did.

Q.  Did you have a conversation with Mr. Hudgins and Mr. Woodward about those reports?

A.  No.

Q.  Do you recall receiving advice about those reports from David Bruck?

A.  Yes, I do.  That they reviewed them and thought that they weren't all that bad, really, because some of the things that they found were --

MS. McKEEL:  I'm going to object to this going on. How does this relate to the trial counsel, and who is "they"?

THE COURT:  I sustain the objection.  You can call Mr. Bruck, but, I mean, you haven't laid a foundation for this.  She is now talking about something with Mr. Bruck.

MS. CHAVIS:  It's information, feedback that they

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        903

received on these expert reports, so that would be information that is gathered in furtherance of the mental health investigation.

THE COURT:  She got the feedback from David Bruck. David Bruck is the one who got the feedback.  Now you are getting into some problems.

They knew about the reports.  This is something they knew about.  There is no legal requirement that they discuss them with Ms. Cronin, that the Court is aware of. Apparently, they got the reports, uncontested.  They had the information, uncontested.  Apparently, they discussed them with David Bruck.  David Bruck has not told that to the Court.  Then apparently David Bruck discussed it with Ms. Cronin.

First of all, it is hearsay, but it's not relevant because it doesn't matter what David Bruck discussed with her.  It's what the attorneys discussed, and they didn't discuss it with her.  You can call David Bruck if you want. You listed him.

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 111.  Do you recognize this document?

A.  Yes.  It's David Bruck's response to having received the previously mentioned report, the government reports.

Q.  And who is receiving this e-mail?

JODY A. STEWART, Official Court Reporter

A.  I'm receiving it.  Woody is receiving it, and Steve Hudgins is receiving it.

MS. CHAVIS:  I'd move for the admission of Defendant's Exhibit 111.

MS. McKEEL:  I believe it's already admitted.

THE COURT:  I think it's already admitted.  I recognize that.

Madam clerk, isn't it already admitted?

MS. CHAVIS:  Defense 111?

THE COURT:  It wasn't.  Mr. Hudgins was testifying, but for some reason you must have overlooked admitting it. But I have seen, I know.  I would have admitted it with Mr. Hudgins' testimony, but it was certainly addressed in Mr. Hudgins' testimony.

MS. CHAVIS:  So I'd move to admit it.

THE COURT:  It's admitted, yes.

BY MS. CHAVIS:

Q.  Did Attorney Woodward or Attorney Hudgins ever ask you about narcissistic personality disorder?

A.  No.

Q.  Were you familiar with the DSM diagnosis and criteria for narcissistic personality disorder?

A.  Yes.

Q.  Were you aware of why David Runyon worked at the drug study?

Cronin, S. - Direct                                                    905

MS. McKEEL:  Objection, it calls for hearsay, what David Runyon told her.

THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  As part of your mitigation investigation, did you become aware of why David Runyon worked at the drug studies?

A.  Yes.

Q.  And why was that?

A.  He worked at the drug studies because he -- he needed income, but he also felt that by participating in drug --

MS. McKEEL:  Objection, this is hearsay from David Runyon.

THE COURT:  Did you pass this on to the attorneys?

THE WITNESS:  If we discussed it, it was probably in my reports.

THE COURT:  Well, then if there is a report, bring up the report.  You were the mitigation specialist.  You were hired.  You were paid.  You said you discussed this. If you discussed it, you would have put it in writing; is that correct?

THE WITNESS:  Correct.

THE COURT:  Then let's bring forward her report. If this is part of your records, then show her the record.

BY MS. CHAVIS:

Q.  In your experience is that information --

JODY A. STEWART, Official Court Reporter

THE COURT:  It doesn't matter if it was in her experience, if she hasn't done it or if she has done it.  We are talking many, many, many years ago.  If she's done it, and you've got it, you've been on this case for years, pull it up and ask her about it.  If you don't have a record of it, and she says, well, she would have, but she would have sent it on.  We are not going to go this many years later over a witness saying, well, I must have, and, yes, I did, and then I've got to determine whether or not this was passed on to attorneys.  She either did or she didn't, and there is either a record of it or there is not a record of it.

MS. CHAVIS:  Yes, Your Honor.  I did not prepare that record for court today, and I do not have the entire case with me, as we don't have our computers so...

THE COURT:  Don't stand there and make that kind of excuse in court, you don't have your computer.  You've got your computers available to you in your hotel rooms.  You know the Court rules on computers.  Stop making excuses.  Either you have it or you don't have it.

So answer me, do you have it or you don't have it?

MS. CHAVIS:  I don't have it with me right now, Your Honor, no.

THE COURT:  Go ahead.

BY MS. CHAVIS:

Cronin, S. - Direct                                                                907

Q.   Were you present at the penalty phase?

A.   Yes, I was.

Q.   And was the evidence presented there evidence that David was a good person who helped people?

A.   Yes.

Q.   You previously testified that Investigator Ford interviewed some witnesses related to the sentencing phase of the trial, and I think you indicated that he was brought in because you were also working on another case, correct?

A.   That's correct.

Q.   Okay.  And you also indicated that you -- was there another reason that he was working on part of the mitigation case?

A.   No.  I believe that was it.  It was that I still had an unfinished case that I had to spend a good bit of time with, and then I think at that point it was Woody's decision that he would go to Alaska and do those interviews.

Q.   And were you kept informed of the timeline in the case and of the trial dates?

A.   Well, no, because I remember feeling pretty overwhelmed that it was coming up so fast, and that I was asked then to prepare an affidavit for a motion for a continuance.

Q.   And in terms of what you felt like you needed to do to complete your mitigation investigation and prepare -- help prepare the attorneys for the penalty phase, do you feel like

Cronin, S. - Direct                                                         908

you had an adequate amount of time?

A.   No.

Q.   As a result of not having enough time, what were you unable to do?

A.   I was unable to re-interview the important witnesses, because it's always been my experience that, even though they may be cooperative and tell you a lot of things, that that's still only part of the story.  There has to be more trust established, and then you get more information and more details.  And there was no time to go back and do that in this case.

Q.   And who were some of those important witnesses that you wanted to re-interview?

A.   His mother, his biological father, his adoptive father, Mark Runyon, his brother, Maria.  I had one interview with her that I wasn't at all happy with.

Q.   And why weren't you happy with that interview?

A.   Because during the interview she had been drinking, and I didn't trust everything she said when she was under the influence of alcohol.

Q.   I'm going to show you Defendant's Exhibit 102.  Do you recognize this document?

A.   Yes.  It's a report of an interview with David's brother, Mark Runyon, conducted December 16th, 2008.

Q.   And does this state the dates of the interviews that you

had with Mark, David's brother?

A.   Yes.  I met with him daily in Maui, where he lived, between December 4th and December 7th, and we had several conversations by phone.

Q.   And it is indicating here that you met -- where did you meet with Mark?

A.   The first time was at a Korean restaurant.  Now, it's always better to meet with someone in their home environment, and that was not possible with him.  His wife -- or at least these were his given reasons, that his wife was ill with Lupus, and he also was out in the field working on his job, and the only time we could meet was in between his being called in to work.  He worked on phone lines and would have to go and repair those.

Q.   Okay.  So those are the reasons why you met him in public and not in private?

A.   Right.

Q.   And this indicates that Mark did get a few calls for work?

A.   Yes.

Q.   Okay.  And it also indicates that you had met with him for four days, you got a few calls.  Does that mean three of the four days were cut short for work purposes?

A.   Yes.

Q.   This interview took place December 16th, 2008, correct?

Cronin, S. - Direct                                                   910

A.  Correct.

Q.  Do you remember when the penalty phase of the trial was?

A.  That was August 2009.

Q.  No one had gone to interview Mark since then, correct?

A.  Correct.

        MS. CHAVIS:  I move to admit Defendant's Exhibit 102, please.

        THE COURT:  All right.  It's admitted with the same caveats as before.

        (Defendant's Exhibit 102 received in evidence.)

BY MS. CHAVIS:

Q.  I'm going to show you Government's Exhibit 64.  Do you recognize this document?

A.  I do.

Q.  And what is its date?

A.  The date of it is August 7th, 2009.

Q.  What is this document?

A.  It is a memo that I was going to be sending along in full form, letting them know that I had an extremely productive meeting with David where he shared a lot of information about his family life that he had not shared before, a good bit of it was negative.

Q.  Negative in what way?

A.  It's as if his defenses were down from the constant, I had an ideal family, an ideal father, and my parents were

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                    911

wonderful, and he kind of dropped that façade and was more honest about what he experienced growing up.

THE COURT:  You mean before he hadn't told you about his family relationships?  I thought you testified that his mother had told you.

THE WITNESS:  His mother, but he had never -- they were always a wonderful, happy, warm family, in David's perceptions of -- in what he told me, and it was overidealized, and I suspected it was.  And during this meeting, he sort of let it all hang out in terms of what his life was really like.

THE COURT:  Was that in your previous reports?

THE WITNESS:  That it was overidealized?  Yes.

THE COURT:  His perfect family life?

THE WITNESS:  Yeah, it was.

THE COURT:  You say it's there?  Because I saw a lot in there where you had put conversations, and it wasn't a perfect life.

THE WITNESS:  It was much better than what I got during this interview.  And I doubted a lot of what he said, mostly because I thought he wanted to believe that he came from a very healthy, happy family, and the more we learned, the more we realized that really wasn't the case.

THE COURT:  Did you write a more detailed report on this or not?

Cronin, S. - Direct                                                        912

THE WITNESS:  Yes, I did.

THE COURT:  This is already in evidence.  This came through with Mr. Woodward, I believe, and I believe that's Mr. Woodward's handwriting on there.

MS. CHAVIS:  Yes, Your Honor.

THE COURT:  He testified to it.  You can pull it down and show it.

BY MS. CHAVIS:

Q.  Can you read that handwriting?

A.  Okay.  Let's see.  "How does living up to his mother's expectation and stress and pressure of that mitigate a murder for hire?"  Would you like me to answer that?

Q.  Is that a question that you can answer?

MS. McKEEL:  Your Honor, objection, speculation.

THE COURT:  Sustained.  I just wanted it to be clear that, number one, this was already in here, and Mr. Woodward has given the Court his opinion of this, and she's now saying she wants to discuss it more and do more, and I wanted it to be clear that this is in and in through Mr. Woodward.  Now, if she gave him some report that we haven't seen, move on to that.

BY MS. CHAVIS:

Q.  Did Mr. Woodward ever ask you this question?

A.  No.

Q.  And when you say in the e-mail that David was more open

Cronin, S. - Direct                                                      913

and honest, did you mean also that that meant that he was being dishonest with you previously?

A.   No.  I wouldn't call it dishonest.  I would call it his need to believe that he came from a very healthy, happy family.

MS. CHAVIS:  Your Honor, Government's Exhibit 65 is the memo.

BY MS. CHAVIS:

Q.   Ms. Cronin, is this the memorandum that accompanied that e-mail?

A.   Yes, it is.

Q.   Does that indicate the same report?

A.   Yes, it does.  It's just a more elaborate report of the meeting.

Q.   This is the two-page memo?  One and two.

Is that an example of why repeated interviews are necessary in mitigation investigation?

A.   Yes, absolutely.

Q.   Compared to other cases that you've worked on, how much time did you spend interviewing people for David Runyon's case?

A.   I would say 20 to 25 percent of the normal time that is spent on the other 13 cases that I did.

Q.   In your experience as a mitigation specialist, do you help trial counsel to prepare witnesses to testify at the

Cronin, S. - Direct                                                    914

sentencing phase?

A.   Yes, I have.

Q.   What does that entail?

A.   It entails meeting with them.  If they hadn't met the attorneys before, say they were out of the country, introducing them.  The attorney would sit down and talk with them for a while, getting them comfortable with the process, and in general tell them what kinds of things that he'd be asking about them and to allay any fears they have.

Q.   Did you have attorneys prepare witnesses in this case to testify?

A.   Yes.  Although very minimal time was spent with the witnesses, maybe 10 to 15 minutes each.

        THE COURT:  That was with you and the attorney and the witness?

        THE WITNESS:  Yes, ma'am.

BY MS. CHAVIS:

Q.   And why was such a short amount of time spent with the witnesses?

        THE COURT:  Calls for speculation, unless she knows.

        THE WITNESS:  Well, I know --

        MS. McKEEL:  Objection, it calls for speculation.

        THE COURT:  I sustain it.

BY MS. CHAVIS:

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                        915

Q.  Ms. Cronin, do you know why you only spent 10 minutes with the witnesses preparing for trial?

A.  Because --

THE COURT:  She only did.

BY MS. CHAVIS:

Q.  Why you and Mr. Hudgins only spent 10 minutes with the witnesses?

A.  Because he had other obligations that weekend, and there was no time, and it was the day before trial, and it was very, very rushed.

Q.  What was one of those obligations?

A.  Obligations?

Q.  That Mr. Hudgins had?

A.  Well, there are two weekends where we wanted to get together for all hands on deck to discuss the case.  One weekend it was a wedding that he was at all day, and I believe, if my memory serves me correctly, that that Saturday before the trial started, he had a motorcycle, and he was participating in a Shriner's parade.

Q.  Had you asked Mr. Hudgins for more time to prepare the witnesses?

A.  I had.  And he sort of brushed it off and said it wasn't needed.

Q.  Was Mr. Woodward there at all to help prepare the witnesses?

Cronin, S. - Direct                                                       916

A.  No.

Q.  And when it comes to preparing witnesses, does that involve making sure that the witness is at the correct place at the correct time?

A.  You mean in terms of the order of witnesses?

Q.  I mean, for the actual witness preparation.

A.  Yes.

Q.  So if there is a witness preparation, you're involved because you've arranged for those meetings?

A.  Yes.

Q.  I'm showing you what's marked as Defendant's Exhibit 120. Do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  It's a subpoena list that I provided to counsel.

Q.  And what is the purpose of this list?

A.  For -- well, they are the ones that issue the subpoenas.

Q.  You're providing them?

A.  With the list of people that we need to testify.

        MS. CHAVIS:  Okay.  I move for the admission of Defendant's Exhibit 120.

        THE COURT:  Can I see the top of it, please?

        MS. CHAVIS:  Yes, ma'am.

        THE COURT:  What is the date on this?

        THE WITNESS:  May 2nd, 2009.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                  917

THE COURT:  You are offering it for what, the list of suggested subpoenas that she gave to Mr. Hudgins and Mr. Woodward?

MS. CHAVIS:  Yes, ma'am.

THE COURT:  I'll admit it for that.

(Defendant's Exhibit 120 received in evidence.)

BY MS. CHAVIS:

Q.  Were there any witnesses that showed up to testify at trial but who were sent home?

A.  Yes, there were.

Q.  And whose decision was it to send those witnesses home?

A.  That was either Mr. Woodward's or Mr. Hudgins'.

Q.  And in your understanding, why was that decision made?

A.  I don't know why that decision was made.

THE COURT:  Isn't that the attorney's decision to decide who to testify and who not to testify?

THE WITNESS:  Yes, ma'am.

THE COURT:  That's a strategic decision that they make for one reason or another; is that correct?

THE WITNESS:  That would be correct, and it wasn't shared with me.

THE COURT:  All right.

BY MS. CHAVIS:

Q.  Were you present when there was a discussion regarding the closing argument of the penalty phase, the discussion

JODY A. STEWART, Official Court Reporter

Cronin, S. - Direct                                                918

between Mr. Woodward and Mr. Hudgins?

A.   My recollection is that Mr. Hudgins --

MS. McKEEL:  Objection.  The question is, was she present.

THE WITNESS:  I'm getting to that.

THE COURT:  Well, you need to get to it.  Yes or no, were you present?

THE WITNESS:  Yes.

THE COURT:  Now what occurred?

THE WITNESS:  What occurred was Mr. Hudgins had been questioning folks that came to testify, and I think Your Honor was upset with him for not speaking up loudly, and I think the result was that he seemed somewhat --

MS. McKEEL:  Objection, her opinion.

THE WITNESS:  Okay.  He appeared humiliated, and I recall that in the room where the defense counsel was, that we were given in preparing the case, he asked Woody to give the closing.

MS. CHAVIS:  Your Honor, may I have one minute, please?

THE COURT:  Sure.

MS. CHAVIS:  Thank you.

THE COURT:  Did he express humiliation, or you're just saying he appeared humiliated?

THE WITNESS:  He appeared humiliated.  That was

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    919

my -- he appeared humiliated.

THE COURT:  Because a judge asked him to speak up?

THE WITNESS:  Yeah.  Well, nobody could hear him. I couldn't hear him either when he was asking questions.  I don't know what he was asking people, and I was, I think, in the second row back there.

THE COURT:  So you say he appeared humiliated because he was being asked to speak up?

THE WITNESS:  Yeah.

THE COURT:  So as a result of that, he asked Mr. Woodward if he would do the closing argument?

THE WITNESS:  Yes, ma'am.

MS. CHAVIS:  No more questions at this time.

THE COURT:  We will take a 15-minute recess and then resume with cross-examination.

(Recess from 3:58 p.m. to 4:20 p.m.)

THE COURT:  Cross-examination.  Everybody is here, including Mr. Runyon.

CROSS-EXAMINATION

BY MS. McKEEL:

Q.  Good afternoon, Ms. Cronin.  You told this Court, when you were testifying a little bit earlier, that you had an inadequate amount of time to prepare.  I'd like to show you what's Government's Exhibit 1, please.  Do you see this, ma'am?

Cronin, S. - Cross                                                            920

A.   Yes.

Q.   You do see it?

A.   Pardon me?

Q.   You saw it?

A.   Yes.

Q.   You see it on the screen?  That is -- is that an e-mail from you, Sheila Cronin?  Is that your e-mail address?

A.   Yes, it is.

Q.   And what's the date on this e-mail?

A.   April 10th, 2008.

Q.   Okay.  Is this the day that you first got into the case?

A.   I'm not sure if that's the date where I was in the case because I'm sending Mr. Babineau information about me.  I don't know if that was the specific date that it was agreed upon that I would work for them.

Q.   Okay.  So you're attaching in this e-mail your resume to Mr. Babineau; is that correct?

A.   That's correct.

Q.   If we could go to the second page, please.  And here in your resume, you list out all your experience up until that time; is that correct?

A.   Correct.

Q.   Do you think you got into the case before this date, April the 10th?

A.   I don't think so, no, if I was sending that information.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    921

Q.   Because you put your resume with it, and you also say you are going to send him a formal letter with your rates; is that correct?

A.   That's correct.

Q.   And you billed for all of your time, correct?

A.   Right.

Q.   And then how did you submit your bills?

A.   It was a computer form that I completed every month.

Q.   So everything you did, you had your own billing, and then you sent it to an attorney, or did you send it to the Court?

A.   I sent it to Woody, who submitted it to the Court.

Q.   Okay.  All right.  And then you got paid for everything, all of your hard work, correct?

A.   Yes, correct.

          THE COURT:  Let me ask something.  Apparently you testified in something, about 30-some cases?

          THE WITNESS:  13.

          THE COURT:  13?  And that was 13 -- go back on this, please.  So that was 13 at the time, so that's four.

          THE WITNESS:  Right.  There were -- I'm sorry.

          THE COURT:  Those were four that you had been the primary.

          THE WITNESS:  Primary, that's right.

          THE COURT:  Then the other five you had collaborated on?

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      922

THE WITNESS:  That's correct.

THE COURT:  What would you consider yourself here, a primary or collaborator?

THE WITNESS:  Primary.

THE COURT:  Now, let me ask you something else. Were all of these state cases in California?

THE WITNESS:  Yes, they were.

THE COURT:  Had you ever worked on a federal case?

THE WITNESS:  No.

THE COURT:  Did you understand that a federal case is in three segments, three separate segments, and each has to be held separately?

THE WITNESS:  No, Your Honor, I don't -- I don't think -- I'm not aware of that, so I don't think it was ever explained to me.

THE COURT:  Did you understand that if it's a jury trial, the same jury has to stay with that case the entire time; you can't have one on the guilt or innocence phase and another jury on the mitigation and another on the penalty?

THE WITNESS:  No, that -- I mean, I do understand that because that's also the way it is in state cases.

THE COURT:  So it's in three segments in state?

THE WITNESS:  I'm not sure what you mean by the three segments.

THE COURT:  Well, in federal court, it's three

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      923

separate segments of trial.  Separately you have guilt and innocence.

THE WITNESS:  Okay.

THE COURT:  Once that's determined, then you move on to a second segment, and then you move on to a third segment, and it's all the same jury.

THE WITNESS:  Well, I get that, but when you say -- how -- okay, I'm used to the guilt phase being one part, and then there is the penalty phase.  So I'm missing what one of those phases is.  I think I don't understand.

THE COURT:  It's called the mitigation phase in federal court.  And finally, it's the imposition phase.

In any event, do you understand the difficulty of keeping 12 individuals together over at least a three-month period?

THE WITNESS:  Yes, I do.

THE COURT:  So was it impressed upon you that this has to happen and the investigation has to go forward?

THE WITNESS:  Yes, it was, but it was my understanding, and expectation, that the penalty phase, the penalty investigation, I'm sorry, would go on longer before even the first phase of the trial happened.

THE COURT:  You can go ahead.  When I saw that, I wanted to establish the number of cases and also that they were all in California and they were state cases.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                       924

MS. McKEEL:  Thank you.

BY MS. McKEEL:

Q.  I see from your resume, it looks like you have an address at the top that is in Norfolk, Virginia, but you're the owner of Cronin Group Investigations based out of San Francisco, California; is that right?

A.  It is based out of there, but I had just moved here, yes.

Q.  Okay.  And so are you still conducting these kinds of investigations for death penalty cases?

A.  No, I'm not.  After this case, I worked another two and a half years for the southeast Public Defender in Virginia, and I am now retired.

Q.  Thank you.

MS. McKEEL:  Your Honor, the United States would move to introduce Exhibit Number 1.

THE COURT:  It's admitted.

MS. McKEEL:  Thank you, Judge.

(Government's Exhibit 1 received in evidence.)

BY MS. McKEEL:

Q.  So your experience, when you say you had an inadequate amount of time to investigate, has totally been in California and not in Virginia?

A.  Yes.  But my experience in Virginia after this case also was --

Q.  Okay.

Cronin, S. - Cross                                                      925

THE COURT:  Wait just a minute.  It was in state court?

THE WITNESS:  Yes.

BY MS. McKEEL:

Q.  This is your only federal case; is that correct?

A.  Yes, that's correct.

Q.  Okay.  So you got to travel and do your investigation; is that correct?

A.  Yes.

Q.  Where did you travel to?

A.  On this investigation?

Q.  Yes, ma'am.

A.  I was in Missouri, I was in Kansas, I was in Oklahoma, and I was also in Hawaii.

Q.  Did you go to Alaska?

A.  No.

Q.  Glenn Ford went to Alaska?

A.  That's correct.

Q.  Okay.  And you -- all of those places -- when did you start traveling?

A.  I started traveling in December.

Q.  In the summer?

A.  No, December.

Q.  December.  Okay.

So you got in the case -- thank you.  So you got in

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    926

the case in April 2008, and your first travel was in December of 2008?

A.    Yes.  But keep in mind when I started this case, I was also working on another state case.

Q.    In California?

A.    No.  Actually this one was in Virginia and Florida.

Q.    Okay.  So you had some obligations?

A.    Yes, I did.

Q.    When did you free up from those obligations so you could start working on this case?

A.    It was probably a few months after.

Q.    A few months after April, that first e-mail we just admitted into evidence, April 8, 2008?

A.    Yeah.  I was kind of working both cases at the same time.

Q.    Okay.  So you also -- you had a telephone, correct?

A.    Correct.

Q.    You could call witnesses, couldn't you?

A.    It is never a good idea to talk to witnesses over the phone.  The standard has always been in-person interviews. You just don't get information, very much of it at all, over the phone.

Q.    I understand, but you could call people, because you did have a telephone at the time to call them?

A.    I would call them, but I would not do an interview over the phone, no.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      927

Q.  You had a number of meetings with David Runyon, correct, at the jail?

A.  I did.

Q.  How many times did you meet with him, do you recall?

A.  Probably six times.

Q.  And during that time period, in the beginning -- I'm going to show you Government's Exhibit 2, if you will look at the screen.

    August the 8th now.  We've jumped a few months into 2008.  You came up with this master interview list, and this document --

    We can go to the last page to just refresh her recollection how long this document is.

    Looks like this document is 13 pages long.  Is that correct?

A.  That's correct.

Q.  So what is this intent you are sending on August the 8th, 2008, to Jon Babineau and Lawrence Woodward?  A master interview list, what is your intent in this?

A.  My intent in this is to hopefully locate all of these witnesses and interview all of these witnesses.

Q.  How would you get this information that you put in this master interview list to the attorneys?

A.  Two places:  One was from talking to David.  The other was the government had done a lot of records of their own

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      928

that were sent to Lawrence Woodward, and I reviewed all of those records.

Q. You did review the government's records?

A. Yes, I did.

Q. The government sent guilt and innocence records but also mitigation records. Did you review all of those?

A. Yes, I did.

Q. So you obtained a lot of information from this. If we could go to Page 4. At the bottom of the page, it says "Clinicians." You reference there counselors and psychiatrists and a name unknown.

A. Right.

Q. So you say here, "Diagnosed him with PTSD." This is now August the 8th, 2008. Where did you get that information from?

A. That they diagnosed him with PTSD? Probably from medical records that I was able to obtain.

Q. What medical records from the defense were you able to obtain by now to write that he was diagnosed with PTSD?

A. It actually might have been David telling me that.

        MS. McKEEL: We would move to admit Government's Exhibit 2. I'm told it's admitted already. Oh, it's not? We would move to admit Government's Exhibit 2.

        THE COURT: That's the one we are looking at?

        MS. McKEEL: Yes, ma'am.

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                        929

        THE COURT:  I thought it was admitted, too, but that's fine.

        (Government's Exhibit 2 received in evidence.)

BY MS. McKEEL:

Q.  Now, in the beginning, in speaking with David, I think you said six times, and then Ms. Chavis showed you an e-mail after the guilt and innocence phase, and in August of 2009, when you say he's honest, up until that time, though, wasn't he telling you he had a great life?

A.  He was.  And --

Q.  And you were reporting that to the attorneys, right?

A.  Yes.  Everything he told me was reported to the attorneys.

Q.  You were asked a question about the government's experts, Dr. Montalbano and Dr. Patterson.  I'd like to show you Government's Exhibit 20.  If we could go to the second page.

        Ms. Cronin, I'm going to point out to you where -- if you go to the top of the page, the first full paragraph, I want to take you to the second full paragraph.

A.  The second full paragraph?

Q.  Yes, ma'am.  It starts off with "Dr. Montalbano told David."

A.  Yes.

Q.  "David said" -- then if you go down to the very end where it says, "David did his best," can you read that.

Cronin, S. - Cross                                                    930

A.    "David said that he did his best to cooperate with Dr. Montalbano, but he left a few questions on the MMPI blank because he felt they could be used against him no matter how he answered them."

Q.    If we go back to the first page, please.  This Government's Exhibit Number 20 is dated February 24th, 2009.  Do you see that, ma'am?

A.    Yes.

Q.    So would you agree that, still, in February, David Runyon is being somewhat evasive with people working on the case?

A.    I don't -- well, I don't know.  I don't know that I'd say that.  I don't know what David knew about the MMPI, but they are very subjective tests, and someone can come out deceitful on one day and completely honest the next day depending what mood they're in when they take the MMPI.

Q.    Did you tell David that?

A.    No, I did not.

Q.    I understand that's your explanation.  I'm talking about David Runyon and not being forthcoming with information.  That certainly seems to suggest, when he says he deliberately didn't answer questions from Dr. Montalbano because they could be used against him, you don't call that evasive?

A.    No, I don't.

        THE COURT:  How would you label it?  Manipulative?

        THE WITNESS:  No.  I would label it that he had

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      931

concerns about the particular questions he was asked.

THE COURT:  Let me ask you this.  If someone can approach a test like that, and you indicate it's done, how does one rely on the results?  How reliable are the results if it's subject to that kind of -- the word I would use is "manipulation."

THE WITNESS:  Well, in these days, there's a lot of questions about the MMPI and the accuracy of the MMPI, so it didn't particularly bother me.  And he knew he was being evaluated by a government psychologist.

BY MS. McKEEL:

Q.  So it's okay not to tell the truth?

A.  He just didn't answer some questions.  People often, in tests, will not answer a question.  It's not really indicative of anything.

Q.  But didn't Dr. Merikangas also want the MMPI?

A.  They look at it, yes.

Q.  So it has some value, correct?

THE COURT:  What does MMPI stand for again, please?

THE WITNESS:  Minnesota Multiphasic Personality Inventory.

THE COURT:  All right.

MS. McKEEL:  Your Honor, we would move to introduce Government's Exhibit 20.

THE COURT:  It's admitted.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    932

MS. McKEEL:  I'm told it's admitted already, Judge.

THE COURT:  I think what's happened is some of these have been admitted in the defendant's case, and then you've both got duplicates.  So just be sure they're admitted, and I think it has happened.  We recognized that with Ms. Chavis before.  We said it's okay that she has an exhibit she wanted and she wanted her number or whatever.

MS. McKEEL:  Yes, ma'am.

THE COURT:  Sort it all out with the clerk.  As I say, just be sure that you've got whatever number is on them that it is an exhibit you moved for admission and the Court admitted it.

MS. McKEEL:  Yes, ma'am.

BY MS. McKEEL:

Q.  Ms. Cronin, I'd like to show you Government's Exhibit 21. We've jumped in time to April the 7th of 2009.

A.  Okay.

Q.  Tell us what we are looking at here.

A.  An updated mitigation interview list.

Q.  I just want to clarify something here.  The first person you've got, Maria Suzanne Fleming.  Is that also -- is she also known as Maria Runyon?

A.  Yes, it is.

Q.  I'm going to go to the second page, please.  So you correct me if I'm wrong.  This is updating the attorneys on

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                        933

potential mitigation for them to use at trial; is that
correct?

A.   It's a list of what I've done so far.  It doesn't
indicate that I might not do something again.  But the first
interviews have been completed with these folks.

Q.   I want to go down where it says the heading
"Girlfriends."  It says Teresa Linker and Scott.  It says,
"Refused."  What does that mean?

A.   It means that they refused to be interviewed.

Q.   And then if we can go to Page 7.  You see where it says
at the bottom "Fort Benning Clinicians."

A.   Yes.

Q.   You see where it says, "Pending receipt of military
records"?

A.   Yes.

Q.   So does that mean on April the 7th, 2009, you have not
received the military records?

A.   Correct.

Q.   Okay.  But still you note here David is diagnosed with
PTSD?

A.   Yes.

Q.   By this point, you don't have any records for that; is
that correct?  You are still relying on David Runyon to tell
you that; is that correct?

A.   Yes.

Cronin, S. - Cross                                                          934

MS. McKEEL:  Your Honor, we move to introduce Government's Exhibit 21.

THE COURT:  It's admitted.

BY MS. McKEEL:

Q.  You said a little bit earlier that you had looked at the government -- what the government had given over in discovery that Mr. Woodward gave you.  Do you remember that?

A.  Yes.

Q.  So Government's Exhibit 23, please.  Do you see this, ma'am?

A.  I do.

Q.  This is dated April the 8th.  What is it that we are looking at?

A.  What you're looking at is the list of clinical trials that I was able to confirm from the pharmaceutical companies.

Q.  So these are the medications.  So you go through all those records --

A.  Yes.

Q.  -- and then you list the medications.

If we go to Page 2, please.

And it says "Part Two."  "He may not have actually participated in these trials."

What does that mean?

A.  It could have meant that when I contacted the pharmaceutical company, that they didn't have any record that

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    935

he participated in those trials.

Q.   Okay.  If we go back to Page 1, and I think you've already testified to this, but you said there is actually no way of knowing if David Runyon took any of these medications during the drug trials because they were double-blind; is that correct?

A.   Yes, that's correct.

Q.   I'd like to show you Government's Exhibit 79.

THE COURT:  Wait just a minute, please.

Where did you get the first list, and then you come up with a second list that says he may not have actually participated in some of these?

THE WITNESS:  Well, I contacted each individual pharmaceutical testing place and looked at the years that they did the testing with when David said that he was working for them.  These were the best confirmation that the drug companies were able to give me.

THE COURT:  So the first list is the one that David gave you, and the second list represents ones that you could not confirm?

THE WITNESS:  No.  The first list is the ones that the pharmaceutical firms gave me.  Then the second list is drugs that were done during that time period that I don't know whether he actually was participating in those trials.

THE COURT:  Could I see the second list, please?

Cronin, S. - Cross                                                      936

THE WITNESS:  The second page, the last page.

THE COURT:  Are any of those duplicated on the first page?  I'm just confused about what your two lists are.

THE WITNESS:  Well, what I did was I contacted each -- there are multiple pharmaceutical firms who conducted cases during that time period, and they were able to give me a list of those cases.  But during that time period, they also tested for the drugs on the following pages, but I couldn't get confirmation that David participated in any of those.

THE COURT:  But the ones on the first page, you got confirmation that he participated in them?

THE WITNESS:  That's correct.  We don't know whether he had the drug or the placebo.

THE COURT:  And the second page, you just couldn't get confirmation?

THE WITNESS:  Correct.

THE COURT:  Now I understand.

BY MS. McKEEL:

Q.  Thank you, ma'am.

I want to show you Government's Exhibit 79.  The government did give over, Ms. Cronin, Parexel, Covance, Bristol-Myers Squibb.  Do you remember all those, going through all those records?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                          937

A.  I do.

Q.  If we could go to -- and when you look at each of those drug studies that David Runyon went to --

A.  Yes.

Q.  -- and the time amount that he had to go, he had to fill out, each time, a medical history; is that true?

A.  I believe so, yes, but those are confidential.

Q.  And did you look at those?  Because they were provided. Did you look at all of those?

A.  They weren't -- they didn't provide that.  I didn't have HIPAA -- I mean, they don't list who got what, you know.

            THE COURT:  What's your objection?

            MS. CHAVIS:  Your Honor, I object to these records, the authentication of these records coming from, I guess, the drug companies that we don't know exactly where they -- I'm sorry.

            THE COURT:  Excuse me.  Go ahead.

            MS. CHAVIS:  I'm objecting to the authentication and foundation for these records.

            THE COURT:  Well, this is why I'm allowing the testimony, is there has been an indication that the attorneys should have looked into some of these drug trials more.  Their investigator is saying that she did, and the United States has said, didn't you have all of these records?  Maybe you need to lay a better foundation.  If you

Cronin, S. - Cross                                                938

know that the government gave the defense certain records or established, she says -- I really don't know that she is saying all that, that she is saying that she -- did you see records or not?

THE WITNESS:  I don't know that I saw these particular records.  I know that I made contact, phone contact with every single firm in order to track down which drug tests were being done during the period that David said he was participating in the tests.

THE COURT:  Well, how did you get the names of the companies?

THE WITNESS:  I looked it up.  I found the companies, and I called, and I said this is the kind of information I need, who should I speak to?  I mean --

THE COURT:  All right.

BY MS. McKEEL:

Q.  Well, did you get the records, the names of the companies from the records the United States provided to the defense team during discovery?

A.  I don't remember.  If I saw them, I would have used them.

THE COURT:  And you didn't use them?

THE WITNESS:  I don't know.  I don't remember.  It was 15 years ago.

BY MS. McKEEL:

Q.  If I could get you to take a look at just some of the

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      939

records and see if it refreshes your recollection.

You said you knew David Runyon's handwriting.  Do you see his handwriting at the top where it says "Name, David A. Runyon"?

A.  I'd have to look at some of his other records to confirm that this was David's handwriting.

Q.  Look at number 2.  "Have you ever been injured in a serious accident or motor vehicle accident?"  What does David Runyon on this piece of paper say?

A.  He says no.

Q.  What's the date of this?

A.  5-9-05.  But I don't know what this questionnaire is -- why did he fill this out?  Where does it -- you know.  Was it a job application?

Q.  We will take you to page 2, if that refreshes your recollection.

A.  Okay.

Q.  Is that a little bit better?

A.  Yeah.

Q.  That's David Runyon's handwriting, correct?

A.  Yes.

Q.  Every drug study, because of legal liability, he had to fill out these records.  Do you now recall, looking at these medical records for every study that he did, he was required to fill these out?

Cronin, S. - Cross                                                      940

A.  I don't know if I've seen these records.  I don't remember.

Q.  So if you didn't see them, then maybe the attorneys didn't see them?

A.  I don't know.  I really don't know.  It would have saved me some time calling people.

        THE COURT:  I'm confused on what you did to find out the information, because these records came from somewhere.

        MS. McKEEL:  Judge, the United States gave all of these records to the defense in discovery, and all of these records the defendant had, *habeas* counsel should have, and they were provided.  So they were medical records, because each of these studies, because of legal liability, the person that's going to be involved in the studies has to fill out on their medical history.

        THE COURT:  I understand that.  Your proffer is that the government had them, and they produced them in discovery to defense counsel?

        MS. McKEEL:  We produced them in discovery to defense counsel in the very beginning of this case.

        THE COURT:  At the beginning of the case?

        MS. McKEEL:  Yes, ma'am.

        THE COURT:  Now, what do you want to say, Ms. Chavis?

        MS. CHAVIS:  I'm objecting to her testimony about

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    941

what the purpose of these records is for.  Regarding the legal liability, there is nothing on these documents that indicates anything about that.

THE COURT:  Well, I don't understand your objection.  But, in any event, the point is, again, what the attorneys knew, and there was never any discovery violations brought up to the Court in this regard, and it is the Court's understanding, having been the trial judge, that proper discovery was produced, and the defense attorneys had these.

Ms. Cronin has testified that she had access to the defense files.  Now she is saying that was 15 years ago, and I don't know that I remember, but you remember all this other stuff.  Well, if you would have seen something this significant, you wouldn't have remembered it?

THE WITNESS:  I think if I had seen it, it would have saved me a lot of time, and so I don't think that I -- I don't recall seeing this in the volumes of records.

BY MS. McKEEL:

Q.  Let's go to Page 3 of this document.  Do you see under where it says, "Name, David Runyon," and then, "Screen test 8-30-04," and this is medical history.  Can you read what medical history David Runyon is --

A.  Wait a minute.  Wait.  Where is the -- okay.  Says, "Muscle weakness right side, vasectomy 1996, wisdom tooth

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    942

extracted, hay fever," and I can't read the last one.  I
don't know what that says.

Q.  Go to Page 5, please.  You see question 6?  "Do you have
any other medical, dental, psychiatric or psychological
problem not previously disclosed by this form?"  The mark is
no, correct?

A.  That's correct.

Q.  And then the date on this form?

A.  Is 8-30 -- is that '04?  Yes, '04.

        MS. McKEEL:  Your Honor, we would move to introduce
Exhibit 79.

        THE COURT:  Does it have all these forms?

        MS. McKEEL:  Yes, ma'am.  It's the whole packet.

        THE COURT:  I'm going to admit it because it's what
the attorneys knew.  Again, I'm not admitting it for the
truth of the matter, but this is what the attorneys have.
I'm going to direct you at some point, I don't know what
you're planning to do, but it seems to me that Mr. Babineau,
Mr. Hudgins, and Mr. Woodward may need to come back to
verify that, yes, they had these in their files, because
that's very important.  If they had these and they didn't
question their authenticity or that they came to know in the
regular course of business, and they have them, I would be
interested in what they say or whether they gave them to
Ms. Cronin because that's a matter of credibility.

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    943

There are some very important issues here because what we are talking about, all along here, is what the attorneys knew as they developed their strategy, and in developing their strategy, what could they rely on and what they couldn't rely on and how far they should have gone with some of these other matters.

That's the whole reason we are going to be here for weeks, ultimately, and the whole reason that this is now however many years later.  So it's very important.  Go ahead.

MS. McKEEL:  Yes, ma'am.

THE COURT:  Is there something you want to say? You are standing there, Ms. Chavis, looking in the distance.

MS. CHAVIS:  Well, yes.  I was just going to state that, just for our objection for the record, that Ms. Cronin does not remember seeing these records, and she did not testify that the trial attorneys received them.

THE COURT:  She's what?

MS. CHAVIS:  She did not testify that the trial attorneys received them.

THE COURT:  Then I will conditionally admit them, for purposes of her testimony, with the recall of the attorneys indicating -- that's what I was saying.  I probably wasn't as articulate as I should have been, but that's what I was saying.  I want to hear from these

Cronin, S. - Cross                                                    944

attorneys if they had these in their records and, as the next step, whether they gave them to Ms. Cronin or not. Because then you're dealing with memory issues, and why do you remember more things, some things today, and then not another day when these are absolutely crucial records when it comes to Mr. Runyon himself filling out a record, a medical history and a medical record, after everything that we've heard.

Go ahead.

BY MS. McKEEL:

Q.   But what was just admitted were Bristol-Myers Squibb records.   But there were -- did you look at the Parexel records?

A.   I looked -- well, I didn't see these records, you know. Whether I missed them in error, you know, there were volumes and volumes and so much information that had to be followed up on.  I can tell you that if I had seen them, it would have saved me a considerable amount of time in finding these pharmaceutical firms and contacting them regarding all these tests.

Q.   Let's look at Government's Exhibit 26, please.  You see this document, ma'am?

A.   I do.

Q.   What's the date on this?

A.   May 5th, 2009.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                        945

Q.   And tell us what we are looking at here.

A.   You are looking at the summary of David's military medical records from 1994 to 1997.

Q.   So you finally get them at this point, and it's May the 5th, a little more than a month before trial, correct?

A.   Yes.

Q.   Let's go to Page 2.  Do you see your segment of this report that says April 1994 to November 1996?

A.   Yes.

Q.   You're saying that David passed his entrance physical and had no -- he's reported no major medical problems during this period; is that correct?

A.   That's --

        MS. CHAVIS:  Objection, Your Honor.  That's not what this document says.  It doesn't say that David Runyon reported no major medical problems.

BY MS. McKEEL:

Q.   Okay.  You've got the records, so who is reporting on this record that you're writing that there is no major medical problems during this time period?

A.   I am reading what's in the medical record.

Q.   So during this time, then, we know that, you've testified to earlier, that you testified about a football injury when he was a little boy, correct?

A.   Correct.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    946

Q.  You've testified about some blast injuries when he was at Wentworth Academy, correct?

A.  Correct, yes.

Q.  But here it says there is no major medical problems; is that correct?  That's your writing?

A.  I'm writing what the record says for that date.

Q.  So records?

A.  His entrance routine physical says that, and I'm writing it down.

Q.  So the records indicate that there is no major medical problems with the defendant when he is entering the military; is that correct?

A.  That's -- yes.  I'm not -- yes.

Q.  I'll take you now up until June of 2009, right before we are starting trial, Exhibit 28.  Do you recognize that, ma'am?

A.  Yes, I do.

Q.  And then you are here attaching, it looks like, Dr. Merikangas's fee schedule, correct?

A.  Correct.

Q.  And so tell us what you did to get Dr. Merikangas.

A.  What I did?

Q.  Yes, ma'am.

A.  I contacted him by phone.

Q.  So you knew him?

JODY A. STEWART, Official Court Reporter

A.   I didn't know him.  It was probably David Bruck who suggested him.  I was new to Virginia and really didn't know who was who in terms of doing these evaluations.

Q.   So you hadn't used him before in your death penalty cases out in California?

A.   No.

Q.   So you're trying to assess -- you are telling the attorneys here about Dr. Merikangas on June the 2nd, 2009; is that correct?

A.   Right.

        MS. McKEEL:  Move to admit Government's Exhibit 28.

        THE COURT:  It's admitted.

BY MS. McKEEL:

Q.   Government's Exhibit 29, again, on Tuesday, June the 2nd, tell us what this e-mail is about and who you are sending it to.

A.   This is an e-mail that I sent to Woody and Steve Hudgins, and the subject is neuropsychologist, and I tell them that Dr. Merikangas has suggested that the testing should be done by Allan Mirsky at NIH.

Q.   Did you know Dr. Mirsky?

A.   No.

Q.   You didn't.  Okay.  In fact, you think David Bruck gave that to you again?

A.   I don't think so.  No, I think I was going by

Cronin, S. - Cross                                                      948

Dr. Merikangas's recommendation when I spoke to him.

Q.  Did you know at that time how many times Dr. Merikangas had testified in capital murder cases?

A.  No, I did not.

Q.  Did you know he's opposed to the death penalty?

A.  I didn't.

Q.  You didn't?

A.  No.

Q.  Here, you are following through on your job, and you are telling the attorneys and you are helping them line up these doctors; is that right?

A.  That's correct.

        MS. McKEEL:  We move to admit Government's Exhibit 29.

        THE COURT:  It's admitted.

BY MS. McKEEL:

Q.  Let's go to Government's Exhibit 30, please.  Take a look at that, ma'am.

A.  Yes.

Q.  And this is for Larry Woodward, but you have sent on that same date an e-mail to the attorneys; is that right?

A.  Yes, I did.

Q.  Have you finished reading?

A.  Yeah.

Q.  I was letting you finish read.

Cronin, S. - Cross                                                      949

So Larry Woodward is writing you back, Sheila, "He's going to request approval for the new experts and work with them.  I think we both feel that it's most likely that our sentencing case will not be based on psychiatric/psychological impairment but we will continue to explore it"; is that correct?

A.  Yes.

Q.  So the attorneys were still working to explore it on June the 4th, 2009; is that correct?

A.  That's correct.

MS. McKEEL:  Your Honor, we introduce Government's Exhibit 30.

THE COURT:  It's admitted.

BY MS. McKEEL:

Q.  Let's look at Government's Exhibit 41.  What's this e-mail about?  Looks like there is two e-mails here.  You're writing, it looks like, Steve and Woody?

A.  Yes.

Q.  And then on Page 2 of that document, and this is July the 9th, 2009, what's the last thing you say to them?

A.  Regarding the high school teachers?

Q.  Under number 7.

A.  Yes.

Q.  You say, "We really need as much time as you can justify asking for"; is that correct?

Cronin, S. - Cross                                                        950

A.   Yes.

Q.   And did Mr. Hudgins ask for time, additional time at this point?

A.   I don't recall if that's when I was asked to do the affidavit or not.  I know I was asked to do it because they were asking for a continuance, but I don't specifically recall the dates of that.

        MS. McKEEL:  Your Honor, we move to introduce Government's Exhibit 41.

        THE COURT:  It's admitted.

BY MS. McKEEL:

Q.   Let's go to Government's Exhibit 42.  Can you see that, ma'am?

        Can we make it bigger, please?

A.   Thank you.  I'm sending an e-mail to Steve Hudgins and Woody and also Glenn Ford and David Bruck indicating that, "Dr. Merikangas can come down to evaluate David after July 20th."

Q.   So you all are still continuing to work on this part of the mitigation case, correct?

A.   Correct.

        MS. McKEEL:  We move to introduce Government's Exhibit 42.

        THE COURT:  It's admitted.

BY MS. McKEEL:

                JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                           951

Q.  If we can go to Government's Exhibit 52, this might help you with some -- remembering some times.  You see the date there, July 20th?

A.  Correct, yes, I do.

Q.  Can we make the e-mail a little bit bigger for Ms. Cronin.

The very first thing you are saying, "As far as the affidavit goes," so why don't you take a minute to refresh your recollection and tell us what's going on here.

A.  Okay.  Let me read it a second.

Yes.

Q.  It says here about your affidavit, what you were just talking about.

A.  Correct.

Q.  So is this right here, it looks like, Mr. Hudgins is still continuing to get Dr. Merikangas appointed and still working, and he is asking for a continuance; is that correct?

A.  That's correct.

MS. McKEEL:  I think that's already been admitted, Judge.

THE COURT:  If not, 52 is admitted.

BY MS. McKEEL:

Q.  Now, Ms. Cronin, it's becoming, at this time after the guilt and innocence phase, where you testified a little bit earlier, that David Runyon is finally being honest with you

Cronin, S. - Cross                                                  952

about his family life; is that correct?

A.  That's correct.

Q.  So all the way from when you started this case up until after guilt or innocence, David Runyon still has not been forthright with information that could be helpful; isn't that correct?

A.  I think learning what I did about the family dynamics, my impression was that he wasn't yet able to face that he had a very difficult childhood, and he finally was able to do that, which is often the case with both defendants and witnesses.

Q.  I understand that's your opinion.  My question was that he wasn't being forthright even up until after he's found guilty?

A.  I just can't characterize it that way because I don't believe it.

Q.  You went out to Hawaii to interview Mark Runyon; is that correct?

A.  Correct.

Q.  I think that's Defense Exhibit 102, and I can put that back up here for you.  Do you see that, ma'am --

A.  Yes, I do.

Q.  -- Defendant's Exhibit?

     I can pass this to you, but I think you testified earlier that Mark Runyon told you about his brother's accident.  If you could just point it out in this document

Cronin, S. - Cross                                                        953

about where he told about the accident, the 1996 accident.

A.   He must have told me during a follow-up telephone call, but I knew that it was either Mark's truck that was in the accident when the glass was in his forehead --

Q.   That's two different accidents.

A.   Yes, it is two different accidents.

Q.   Right?  The glass in the forehead accident -- and that's why I want to make sure we go over what exactly we are talking about here.

     The glass in the forehead accident is from when he was in Wentworth Academy, correct?

A.   Correct.

Q.   So the 1996 accident is the accident that involved getting Mark Runyon's truck?

A.   Okay.

Q.   You testified that he told you about that 1996 accident. Is it in your report?

A.   Well, he told me at some point that it was his truck.

          THE COURT:  We've been sitting here, and you have read the whole report, right?

          THE WITNESS:  Just about, yes.

          THE COURT:  Go ahead and finish and tell us if it's in there.

          THE WITNESS:  It's not in here.

BY MS. McKEEL:

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    954

Q.  Now, you said earlier, when I asked you if you had a telephone and did you call people to interview them, you said you didn't like to do that.  Now are you saying that you had a telephone call that was a follow-up with Mark Runyon where you learned this information?

A.  It may have been a telephone call.  It may have been when he arrived to testify he mentioned it.  I don't recall, but I know he told me that.

Q.  Did you make a report of that?

A.  Did I make a report of that?

Q.  Yes, ma'am.

A.  It might be in my social history, but I know that that was the situation.

        THE COURT:  Did you know from somebody else telling you?

        THE WITNESS:  I don't remember, Your Honor.  I really don't.

        THE COURT:  Basically, at this juncture, we have no written report of that?

        THE WITNESS:  It might be somewhere, but I'd have to look through all my reports.

        THE COURT:  I will tell you that at this point we don't have anything in writing for the Court.

        THE WITNESS:  Okay.

        THE COURT:  From you on that.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                           955

THE WITNESS:  Okay.

BY MS. McKEEL:

Q.  Ms. Cronin, were you able to review your file before you testified today?

A.  Yes, some of the file, not the entire file.

Q.  How did you review it?

A.  Well, Dana sent me -- they have the records, and they sent me the file with -- that had my reports in it.

Q.  So Ms. Chavis actually sent you your mitigation file, or your file, whatever it was?

A.  Right.

Q.  So you were able to look at it ahead of time?

A.  Yes, I was.

Q.  Okay.  The injuries that we are talking about, Ms. Chavis showed you the -- I'll put it back up here for you, Defense Exhibit -- I believe that's 83.  Do you remember looking at that?  It was a copy of a file?

A.  Yes.

Q.  Sort of looked funny?

A.  The medical records from 1994 to 1997.

Q.  Okay.  I'm going to take you and show you this page out of the report records there.  Do you see where I have highlighted on that report?

A.  Yes.

Q.  Let's see what -- this is a report of medical history.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                              956

What's this from?

A.   This is from 26 May 1994.

Q.   Does David Runyon report he has a head injury?

A.   No, he doesn't.

THE COURT:  What is this one?

MS. McKEEL:  Where it's highlighted, Judge, right here.

THE COURT:  What record is it?

MS. CHAVIS:  Objection.

MS. McKEEL:  The record is Defense Exhibit 83, Judge.

THE COURT:  All right.

BY MS. McKEEL:

Q.   I'd like to show you the next page of that medical report.  Do you see 16 and 19 have been highlighted?  The defendant has checked no.  Can you read what those two questions were where he checked no?

A.   "Have you ever been treated for a mental condition?"  The second one is, "Have you ever been a patient in any type of hospitals?"

Q.   And Mr. Runyon reported no; is that correct?

A.   He did.  I can't see the date of this.  23 December 1991.

Q.   This is Page 2 of what you just read, report of medical history.

A.   But this was 1991.  The accident, the motor vehicle

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      957

accident came after that.

Q.  The 1996 accident, but the accident you testified to --

THE COURT:  Wait just a minute.  You all are misreading this document.  There is a question 23, and there is a 1 out beside it, and then there is, beside 23, something in writing.  So I don't understand all these others have checked no, and then he here, on 24, he goes back to no.  He has no on 22.  On 23, he circled other reason, and he put a 23 out in the margin.  So I'm not understanding the question or where we are with this.

MS. McKEEL:  My questions were 16 and 19 of what the defendant reported on injuries on hospital stay.

THE COURT:  You asked her the date, and she said 23 December 1991.  This is not the 23rd of December 1991.

MS. McKEEL:  This is Page 2 of the medical report dated May 26, 1994.

THE COURT:  Exactly.

BY MS. McKEEL:

Q.  So the blast injuries, or the accident from Wentworth Academy, he doesn't list on this document, correct?

A.  Correct.

Q.  I'd like to show you another page within that document, "Screening note."  This looks like it is dated August the 7th, 1995.

A.  Okay.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    958

Q.   He is being screened for skin problems.  Can you tell us what this is?  Can you see it all, ma'am?

A.   Yes, I can.  On his forehead, yes.  That's related to the accident where he -- his head went through the windshield, and he's developed skin problems on his forehead related to that.  He had to have pieces of glass removed from his forehead.

Q.   Where does it say "accident" on here?  If you could point that out for us, please.

A.   I can't move it up.  It doesn't, but there are other areas in the medical record that do address that.

Q.   Next page of that report.  Isn't this report here -- it says, "Patient was involved in a motor vehicle accident resulting in glass embedded in his face five years ago."  So this is David Runyon's report, correct?

A.   No, it's the medical report stating what David told them.

Q.   Stating what he told them.

     You were shown this document, and you read just a portion of it when you were questioned by Ms. Chavis.  But see where I have highlighted?

A.   Yes.

Q.   Doesn't that mean no loss of consciousness?

A.   We don't know.

Q.   Had a collision, no.  You don't know what that is right there?  Is that what you're saying?

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                      959

A.  I know what it says.

Q.  No loss of consciousness, correct?  That's what's reported, correct?

        THE COURT:  Ms. Cronin, let her finish.  Same for each of you.

        Don't talk over because the court reporter can't hear it.  Her question to you is, she's highlighted no LCX, and she's asking you, doesn't that mean to you no loss of consciousness?

        THE WITNESS:  Yes, it does.

BY MS. McKEEL:

Q.  I'm going to show you -- and I've highlighted it for you so you can get right to it.  We see a reference to PTSD.

A.  Uh-huh.

Q.  This, again, is David Runyon relaying his -- what he believes his conditions to be to a doctor, correct?  It's not a diagnosis of PTSD, correct?

A.  Correct.

Q.  Then you were shown this document for the proposition that there was a diagnosis of PTSD, but it just means, "In re," meaning regarding what he's complaining of, post-traumatic stress syndrome, correct?

A.  I think that would -- I don't know that it's just self-reported.  I think that whoever is writing this does think he needs an urgent recommendation.

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                    960

Q.  Ma'am, isn't it true that you did not ever find, other than these medical reports, a diagnosis of PTSD?  Is that true?

A.  That would be true.

Q.  You never found corroboration that there were blasts from Wentworth Academy, did you?

A.  No, we didn't.

Q.  You didn't find any medical records, ER records of this automobile accident when he was at Wentworth Academy, did you?

A.  No.

Q.  And with regard to the 1996 automobile accident, you didn't find those hospital records, either, did you?

A.  No, they have been destroyed.

Q.  Any record would be destroyed, I think that the -- what *habeas* counsel has proposed to us, any record, if it existed, would be destroyed, not that they existed and they were destroyed.  Wouldn't that be correct?

A.  Yes and no.  I mean --

Q.  How about the court case where the person was prosecuted because David said, in some of your reports, that he was pretty mad about the person getting off light.  Did you get court records from a person who was prosecuted?

A.  No.

Q.  You received Dr. Merikangas's and Mirsky's reports; is

JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                          961

that correct?

A.   Correct.

Q.   In your declaration, which is Defense Exhibit 34, you state --

          THE COURT:  Was that the one that I didn't let in?

          MS. McKEEL:  I'm just showing her for impeachment purposes, Judge.

          THE COURT:  All right.

BY MS. McKEEL:

Q.   Did you state in your declaration that was sent before the appellate court that the counsel did not share those reports?

A.   I think they did, but I had forgotten when I had prepared that.

          THE COURT:  Wait just a minute.  That's important. You say you had forgotten.  This was a sworn declaration, and you said that, "Counsel did not share those with me from Dr. Mirsky, and I don't remember if I every knew what the report said."

          THE WITNESS:  This declaration was done a long time ago before I had a chance to review my records.

          THE COURT:  What is the date on the declaration? Isn't this the one that the Court rejected from evidence?

          MS. McKEEL:  It was.  You rejected it, Judge.

          I'm just going for a point of impeachment, that's

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Cross                                                              962

all.

BY MS. McKEEL:

Q.  You see the date?

A.  Yes.

Q.  Is that your signature?

A.  That's my signature.

THE COURT:  So when you say before you had a chance to review, you mean for this hearing?

THE WITNESS:  No, I mean during the court case.

THE COURT:  Which court case?  Because in 2015, the original court case was over.  This is the time period when it's on what we call collateral, *habeas corpus*.

THE WITNESS:  Yes.

THE COURT:  You just finished saying this was before you had a chance to review your records.  You are talking about the review that you made before you came to testify here?

THE WITNESS:  Yes.  I mean, but this was before I had a chance to review my records.

THE COURT:  Okay.  But you are talking about review your records after the trial?  This is after the trial.

THE WITNESS:  It was after the trial set a long time ago, and I didn't have my records.

THE COURT:  Well, when did you review them?

THE WITNESS:  I reviewed them probably just within

JODY A. STEWART, Official Court Reporter

Cronin, S. - Redirect                                                        963

the last two months.

THE COURT:  I just wanted to establish what she was talking about.  So you signed this declaration.  Was it just given to you to sign?

THE WITNESS:  Yes.

MS. McKEEL:  I have no further questions, Judge.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. CHAVIS:

Q.  The declaration was given to you to sign after we had several conversations about this case, correct?

A.  Correct.

Q.  And when the declaration was given to you to sign, you were told that if -- to please read it, and if there were any discrepancies, to let us know?

A.  Yes.

Q.  So the declaration was based on your best memory at the time?

A.  Yes, it was.

THE COURT:  You know that has been presented to a federal court?

THE WITNESS:  Yes, I do.

BY MS. CHAVIS:

Q.  And when we talked with you about David Runyon's case, you asked us for your case file, didn't you?

Cronin, S. - Redirect                                                    964

A.  Yes, I did.

Q.  And when you asked us for a copy of your file, we gave it to you, correct?

A.  Correct.

        THE COURT:  When?  When did you ask?  Time period.

BY MS. CHAVIS:

Q.  When we recently discussed this case?

A.  Yes.

        THE COURT:  For this hearing?

        MS. CHAVIS:  Yes, Your Honor.

        THE WITNESS:  Yes.

BY MS. CHAVIS:

Q.  The government was talking about the document where you wrote about David becoming more honest?

A.  Yes, correct.

Q.  And that document indicates that he's becoming more honest about his feelings?

A.  Correct.

Q.  With respect to his family?

A.  Correct.

Q.  But that doesn't mean that he was still not reporting to you facts --

        MS. McKEEL:  Objection, leading.

BY MS. CHAVIS:

Q.  -- about this case, correct?

JODY A. STEWART, Official Court Reporter

Cronin, S. - Redirect                                    965

THE COURT:  Sustained.

BY MS. CHAVIS:

Q.  Was he still reporting facts to you about his case and his family?  I'll show you Defendant's Exhibit 86.

THE COURT:  Rephrase your question.  I'm a little bit confused at this point on your question.

MS. CHAVIS:  Yes, ma'am.  I'll do it this way.

BY MS. CHAVIS:

Q.  I'm showing you Defendant's Exhibit 86.  What is the date of this document?

A.  It is May 12th, 2008.

Q.  And what is it?

A.  It is a report of a meeting with David, is my first meeting with David.

Q.  And can you please read the highlighted sentences.

A.  "According to David, Dombrowski would come home from work and often beat his wife.  On one occasion, David attempted to stop him by biting him on the leg.  His father's response was to throw him across the room."

Q.  So was David providing you with facts about his life history from day one?

A.  Yes.

Q.  He just wasn't sharing his feelings about his family, correct?

MS. McKEEL:  Objection, leading.

JODY A. STEWART, Official Court Reporter

Cronin, S. - Redirect                                              966

THE WITNESS:  Well, yes, that's true.

THE COURT:  This doesn't portray a perfect family?

THE WITNESS:  No, it doesn't.

BY MS. CHAVIS:

Q.  With respect to Government's Exhibit 23, this was the clinical trial drug list that the government asked you about?

A.  Yes.

Q.  There were questions regarding where you received information to compile these lists from.  Does Page 2 of that list indicate a source of information?

A.  It says, "Based on other information from the journal."

Q.  Does that refresh your memory as to where you may have received information about the companies that David worked?

A.  It may have been from his documents or not.  It must have been something because of the phrasing "based on other information in the journal."

THE COURT:  Clarify "journal" because we can see it, but it's not on the record.  You referred earlier to David's journal, have you not?

THE WITNESS:  Yes, but I don't know -- okay. "Clinical trials noted in David's journal."  And based on information in the journal, these -- these are the trials in 2006 and 2007.

BY MS. CHAVIS:

Q.  That appears that's where you received the information

JODY A. STEWART, Official Court Reporter

Cronin, S. - Redirect                                            967

from regarding the drug companies, David's journal?

A.   Yes.

Q.   I believe you mentioned seeing a report from
Dr. Merikangas; is that correct?

A.   That's correct.

Q.   Was that a preliminary report or a final report?

A.   I think it was a final report.

Q.   There were questions about interviewing Mark Runyon.  Is
there a difference between interviewing people who have
experienced trauma and interviewing people who have not
experienced trauma?

A.   Well, when you interview people to start, you don't know
whether they have experienced trauma or not.  And when you
have any indication that they might have, you tread lightly
on it and maybe ask some questions that might allow them to
feel comfortable discussing their trauma.  You do it that
way.

Q.   Fair to say that it takes more time when you're
interviewing people with trauma?

A.   Yes.

Q.   Show you Government's Exhibit 26.  You recognize this
document?

A.   Yes, I do.

Q.   This is the -- what is this document?

A.   This document is the military medical record review

Cronin, S. - Redirect                                                     968

between 1994 and 1997.

Q.  And the government asked you a question from this
document.  If I can just find the place in here.

          MS. CHAVIS:  Your Honor, can we have one brief
moment?

          THE COURT:  Is this Exhibit Number 26 that we
already read the whole one?

          MS. CHAVIS:  I found it.  My co-counsel pointed it
out to me yet again.

          THE COURT:  Are you on number 26?

          MS. CHAVIS:  Yes, ma'am.

BY MS. CHAVIS:

Q.  Page 2, the government pointed to this passage?

A.  Uh-huh.

Q.  Right here?

A.  Yes.

Q.  Indicating that, "David passed his entrance physical and
had no major medical problems during this period," correct?

A.  Correct.

          THE COURT:  Then it goes on to say -- what does it
state?  This is your summary, is it not?

          THE WITNESS:  Yes, it is.

          THE COURT:  It says, "He was seen in the family
practice for allergic rhinitis, pneumonitis, sinusitis and
allergic reaction to antibiotics."

                    JODY A. STEWART, Official Court Reporter

Cronin, S. - Redirect                                                969

THE WITNESS:  That's correct.

THE COURT:  You don't list anything else during that period?

THE WITNESS:  No.

BY MS. CHAVIS:

Q.  Down at the bottom of the page, what are you listing?

A.  A motor vehicle accident.

Q.  That's the one with the drunk driver from 1996?

A.  Yes.

Q.  The government showed you a few documents that where David was filling out applications for jobs, correct?

A.  Correct.

THE COURT:  For jobs or drug studies?  Which one are you referring?

MS. CHAVIS:  Yes, there were job applications for drug studies, and then there was the entrance form to enter into the military.

THE COURT:  Be specific.

MS. CHAVIS:  Yes, Your Honor.

BY MS. CHAVIS:

Q.  Those were not -- and David did not report medical issues in those applications for jobs in the drug studies or to enter the military, correct?

A.  That's correct.

Q.  On his medical record, you've seen that he does report

JODY A. STEWART, Official Court Reporter

Cronin, S. - Redirect                                                        970

his medical problems?

A.  Yes.

        THE COURT:  Where is that?  You're talking in such generalities, and it's confusing, at least for me and the record.  What are you talking about where he reports?  He didn't report them in the drug studies.  He didn't report them in his entrance examination, and you just blanketly say you've seen other records.  Refer to the exhibit numbers.  Refer to the records.  This needs to be very specific.

        MS. CHAVIS:  Yes, in the medical records which are Exhibit 83.

        THE COURT:  Put this on the screen.  Is this your 83?

        MS. CHAVIS:  Yes.  It has the cover with the file folder, Your Honor.

        THE COURT:  Is that what you are referring to, Ms. Cronin?

        THE WITNESS:  Yes.

        THE COURT:  I want the record, because when we go back and look at a long record, and you say yes, I need to know what you're referring to.

        Are you familiar with that document.

        THE WITNESS:  Yes, I am.  Medical records 1994 to 1997.

        THE COURT:  All right.  That's in evidence.

JODY A. STEWART, Official Court Reporter

BY MS. CHAVIS:

Q.  In your experience as a mitigation specialist, have you encountered where people will not report medical problems on employment applications, yet report them to medical professionals?

A.  Yes.

MS. McKEEL:  Relevancy, Judge.

THE COURT:  Sustained.  We are dealing here with what were on the forms, and they speak for themselves, and what the attorneys knew, not what people's tendencies are. That's what we are going to go on, again, what the records were and what the attorneys saw.

BY MS. CHAVIS:

Q.  When you assessed all of these records in your mitigation investigation, do you take that into account, the purpose of the forms that David Runyon is filling out?

A.  Yes.

THE COURT:  Did you mention that in your reports?

THE WITNESS:  That particular sentence, no, I did not.

BY MS. CHAVIS:

Q.  Did the attorneys ever raise issues with you about those job applications?

A.  No.

MS. CHAVIS:  May I have one moment?

972

THE COURT:  Yes.

MS. CHAVIS:  Thank you.

Nothing further.

THE COURT:  Can I excuse Ms. Cronin?

MS. CHAVIS:  Yes, Your Honor.  Thank you.

THE COURT:  Ms. Cronin, thank you for coming to testify today.

THE WITNESS:  You're welcome.

THE COURT:  As far as the Court is concerned, you are excused from service in this case, for this hearing, and you are in the middle of your testimony, so you cannot discuss your testimony with anyone else.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Thank you very much.  Have a nice day.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Counsel, that brings us to the end of our trial day.  Is there anything further for the Court to take care of this evening, Mr. Samuels?

MR. SAMUELS:  Yes, Your Honor.  Could I be heard on two things briefly?

THE COURT:  All right.

MR. SAMUELS:  Your Honor, as the Court knows, one of the issues in the case has been what was in counsel's trial file and what communications were there.  We presented

JODY A. STEWART, Official Court Reporter

973

a number of e-mails during our examinations of Mr. Woodward and Mr. Babineau and Mr. Hudgins, and defense counsel did as well.  And we had asked for e-mails relevant to the claim in the course of discovery.  That's one authority for the type of documentation.

The other should be *Jencks* materials that should go to the United States after the witnesses of the defense have testified.  When we came in today, we got this e-mail, Defendant's Exhibit 167, which has not been entered into evidence in the case, but it's not an e-mail that was provided to the United States either.  If the Court looks at it, it's an e-mail exchange with David Bruck that occurred on August 4th, 2009, and it directly relates to the schedule of Mr. Cunningham, who was one of the doctors and the expert that testified for the defense.  It also relates to talking about witnesses.  This is a document that went back and forth between Mr. Hudgins, Mr. Woodward, and Ms. Cronin. This is a document that we should have gotten, in the government's view, Your Honor.

I'm concerned when we are trying to establish what counsel knew, what they didn't know, there were motions made that the United States should be providing *Jencks* material, and certainly we made requests for reciprocal materials.

Rule 8, which governs these hearings, also provides that Rule 26.2 applies in these hearings under the Federal

Rules of Criminal Procedure, which requires reciprocity. When I get something like this today, I'm concerned when we don't have this type of e-mail, and I wonder what else is there.  So I think there should be a direction that we should be provided with any of these e-mails relating to the claim, which this clearly is.

THE COURT:  What exhibit number is that?

MR. SAMUELS:  Defendant's Exhibit 167, Your Honor.

THE COURT:  You were not provided with it?

MR. SAMUELS:  Just this morning.

THE COURT:  I need to have a copy of it.

MR. SAMUELS:  Yes, ma'am.  I can provide this copy to the Court.

THE COURT:  All right.

All right, Ms. Chavis.

MS. CHAVIS:  Yes, Your Honor.  When I provided that to the government this morning, they indicated that they believed they had not received it from us previously.  I do not have a listing of all of the documents that we did provide to the government, but we've provided many, hundreds if not thousands of documents to the government.  So I do not have a specific recollection of whether or not that particular page was provided to the government or not.  I did not attempt to introduce that document today, Your Honor, because of the government's objection to me

JODY A. STEWART, Official Court Reporter

975

previously.

THE COURT:  Well, number one, it's not in evidence.

MR. SAMUELS:  It's not, Your Honor.  I just want to make sure if there is other e-mails like that, we should have them as part of *Jencks* materials.

THE COURT:  I understand that.  My reaction to it is, it cannot come in through the United States if they haven't produced it, and they couldn't bring it in through, I guess they were going to try with Ms. Cronin's testimony.

MR. SAMUELS:  I would assume so, Your Honor, because it seems to relate in that second paragraph to the scheduling of witnesses and the time that was available, so it seems like that is where it would come in.

THE COURT:  But they didn't produce it for Mr. Woodward or any of the other attorneys?

MR. SAMUELS:  Correct, Your Honor.

THE COURT:  I will take it and look at it overnight and decide if there is anything further I'm going to do.

You said there were two matters that you needed to take up?

MR. SAMUELS:  Yes, Your Honor.  In this one, my understanding, and I wanted to raise this now because my understanding is that Dr. Merikangas is going to testify tomorrow via Zoom, and so it may be better that I raise this now, and then if there is something we need to talk about

JODY A. STEWART, Official Court Reporter

tomorrow, we can.  So I'm not asking for relief.  I just wanted to give the Court kind of a heads-up.

Dr. Merikangas has provided essentially three different reports, and the first report is the report that's dated August 5th, 2009.  That report has been admitted into evidence.  I think it's a Defense Exhibit.  I know it's a Government's Exhibit.  That's the report that he did pending the penalty phase.

There is another report that Dr. Merikangas did that's dated September 25th, 2015, and that's a report that was prepared, and the Court can see that it was filed in connection with the *habeas* filing in this case.  My understanding is that Dr. Merikangas will testify, had I had these scans, this is what my conclusions would have been. He does another examination of the defendant, and we may have some issues with respect to any post-trial examination that he does again, but we've had that report for a long time, since 2015.

Then on Friday, before the start of the hearing, and the Court can see this was attached to the defendant's response -- I guess it would have been the defendant's reply to the motion to take Dr. Merikangas via videoconference -- there is another declaration from Dr. Merikangas, and this one is dated February 2nd, 2023.  I think he signs it.  My concern is, this report has more details in it.  It has more

information.  He amplifies kind of his discussion and conclusions.

It's a report that we just got on Friday, and it's a report that was filed seven and a half years after the *habeas* filing and then, of course, over a dozen years after the trial, and if their intent is to get into portions of this report in 2023, that were not contained in the earlier reports in 2015 and 2009, the United States will object to this late disclosed information and any new information that Dr. Merikangas is providing that's contained in this declaration.

Again, I just wanted to put the Court on notice as to what I thought the chronology was, and counsel as well, so that if this issue does arise tomorrow.

THE COURT:  It's attached.  I know the motion.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  I can find it by looking at it attached to the motion?

MR. SAMUELS:  Yes, ma'am.  And, Judge, I have copies of any of these, if the Court would like them.

THE COURT:  Yes, I do want copies.

MR. SAMUELS:  Again, the three documents are the initial report of Dr. Merikangas, which has already been admitted into evidence, and then there is document 478-2 filed October 5th, 2015, and document 754-3 filed February

978

3rd, 2023.

THE COURT:  Let me hear what Ms. Chavis has to say.

MR. SAMUELS:  Thank you, Judge.

MS. CHAVIS:  Yes, Your Honor.  Regarding the most recent document that was filed in support of the motion, that was filed just as grounds in support of our motion so that Dr. Merikangas could testify by video.  We were attempting to lay a ground, the complete grounds for the reasons why there was the necessity for Dr. Merikangas to testify via video conference.

That declaration, while it may contain some more details, which would be beneficial to the prosecution to have ahead of Dr. Merikangas' testimony, while it might provide more details, it doesn't provide any new information.

THE COURT:  Well, the way we are going to proceed, if Dr. Merikangas does testify and is providing new information, the United States should so advise the Court, and the Court will stop his testimony.  Then at some point we will go back and evaluate that testimony, and, as I said in my order, if he has to be recalled, if he has to be called in person, I made an order that said at this juncture I would allow him to testify by video, but it's going to be very difficult to start and stop videos and cut someone out.

So if there is an objection, and it turns out to be

979

meritorious, you've got to tell the other side about these things.  He can't just start expanding in a couple of pages, expanding opinions.  If he is offering new opinions with new details, then that's going to be another matter.

So you will need to so advise the Court.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  If he's going outside of what you feel you've been properly provided, and we will proceed from there.

Is there something you want to say, Ms. Bales?

MS. BALES:  Yes, Your Honor.  I have a couple of brief matters.  First, I wanted to update the Court on what we think the schedule will be this week.  The Court may recall it allowed Dr. Cunningham to move his testimony days until next week.  So that opens up probably some time tomorrow, and then also on Wednesday.  We think that Dr. Merikangas will probably be a one-day witness, and we do not have any proof to offer the Court on Wednesday.  That was the day that Dr. Cunningham was going to testify.

THE COURT:  Well, you'd better get some.  What are your alternatives?  Besides, there was a misrepresentation to the Court last week about the availability of witnesses when I was told there were none available; it's just they hadn't been prepped.  That doesn't make them unavailable.

Then in the testimony I find out a couple of

980

witnesses had been here since Monday.  I've let that go for now, but we've got to move this matter along.  I don't know if there is somebody else that you are planning on scheduling.  You can go through your list with me.  I don't understand why there is not somebody else here that could move.  I don't know who else you're planning to call, but what you're saying right now is you've got Dr. Merikangas tomorrow?

MS. BALES:  Your Honor, I believe the rest of the proof in the case is expert proof, and that's what makes it difficult.  We have attorney Jean Barrett.  We plan to present her testimony on Thursday.  Then we have Dr. Nadkarni.

THE COURT:  I don't know that I have agreed to that testimony yet.  I think there is an objection to that.  I mean, she's going to tell the Court what she thinks capital counsel should be doing?

MS. BALES:  She's going to offer testimony on what the standard of care is for a capital case and what the prevailing norms were at that time.  That's the primary thrust of her testimony, and we did offer caselaw in support of her testimony, and the government had also objected that she was going to testify to the ultimate conclusion, and the rules of evidence do not allow inclusion of an expert for that reason.  So we anticipate presenting her testimony,

JODY A. STEWART, Official Court Reporter

assuming the Court will allow it.

THE COURT:  It's discretionary with the Court, is it not, Ms. Bales?

MS. BALES:  Which part, Your Honor?

THE COURT:  You said you cited law.  It's discretionary with the Court whether to allow the testimony.

MS. BALES:  Well, I mean evidence rules generally are the Court's -- within the Court's discretion.

THE COURT:  Just answer my question.  You know good and well that it is discretionary within the Court whether to allow her, and that's what the caselaw that you cited indicates.

MS. BALES:  Yes, Your Honor.

THE COURT:  That was the question.

MS. BALES:  Okay.  Understood.

If the Court declines to admit her testimony, we would like to present her for an offer of proof on that day.

Dr. Nadkarni, he is presenting at a conference on Thursday, and it is a conference of other neuropsychiatric fellows, and that conference lasts all day.  So the soonest we could present him is on Friday.  We do apologize to the Court for that.

The government had approached us about allowing Aguirre to go, government expert Dr. Aguirre to testify next Tuesday -- I'm sorry, next Wednesday.  I need my calendar.

982

There is a gap between Dr. Martell and Dr. Cunningham. There is a one-day gap there.  The government had asked if they could present their witness there.  It is a little bit out of turn, but we would agree to that, recognizing we do need to move, you know.  The Court has expressed concern about that.  It is hard when you have experts.

THE COURT:  I understand, Ms. Bales.  At one point in my life, maybe many years ago, I've been where you are. So I understand the difficulty on scheduling, and particularly with experts, whether you're in a civil or a criminal case.

MS. BALES:  So we just wanted to let the Court know about that.  We did reach out to our experts to try to re-work that and just couldn't really find a solution that was practical and that would actually move things along quicker, other than the government's suggestion.

THE COURT:  This is what I understand that you've said where we are, and that is that tomorrow we are going forward with Dr. Merikangas, and that should take the day. Is that what you're saying to me?

MS. BALES:  To be candid, I don't anticipate it taking the full day, but it certainly should not take more than a day.

THE COURT:  Then you're saying on Wednesday you don't have an available witness?

MS. BALES:  Correct.

THE COURT:  On Thursday you're planning Ms. Barrett?

MS. BALES:  Yes, Your Honor.

THE COURT:  On Friday you're planning Dr. Nadkarni?

MS. BALES:  Yes, Your Honor.

THE COURT:  You will endeavor to see if there is anyone that can fill in on Wednesday, and in the meantime maybe the government will look to that, too, I don't know. I'm not requiring them to.  But any agreements that you all can come to in terms of ordering the witnesses, I would appreciate it.  This is a bench matter, and I can certainly sort burdens of proof and who's offering what to prove what, so it's not as if it's confusing to a jury.  I've got the witness list, and I've reviewed them.  So I'm just going to leave it like that.  The hour is late, and so we will adjourn for the evening.  I appreciate the, let's just call it, heads-up, Ms. Bales.  I do understand the difficulties of scheduling on something this long.

MS. BALES:  If I could just bring up one more matter, Your Honor.  I apologize, and I'll try to be brief. The Court ordered last week that we could not provide our experts with transcripts from the hearing, and the Court mentioned that in the context of Dr. Cunningham.

I wanted to ask if the Court would allow

JODY A. STEWART, Official Court Reporter

Ms. Barrett to review the trial attorney testimony.  We have provided her with the trial attorney declarations that we have, but that was really -- their testimony obviously covers a lot more material than what is in the declarations, and we would ask the Court to consider allowing us to provide Ms. Barrett with that material.  It would make her testimony go more quickly.

THE COURT:  My answer is you may not under any circumstances provide their testimony.  I am the one who has to evaluate their testimony and determine the ultimate issue.  That is going way far afield of someone testifying about what are the prevailing standards.  She has been going a step further and evaluating that, and under no circumstances is she to be provided with the testimony of the attorneys in this case or any other witness.  My ruling is across the board.  This is where I am hearing the evidence.  This is where I'm making the decisions.  I'm going to make it from the testimony that I hear, that you all are presenting.  I'm not going to have Ms. Barrett or anyone else evaluating the testimony that is otherwise up to me to determine the weight, the credibility, and the legal standards to which to apply it.  So the answer is no.

MS. BALES:  Okay.  Thank you, Your Honor.

Just listening to the Court speak, I think I need to clarify one issue.  Ms. Barrett, she is going to testify

985

to the prevailing norms, and, you know, there is testimony in her declaration.  She does render an appeal that trial counsel is ineffective.

THE COURT:  I'm not going to let her render that. She may not render an ultimate decision.  She can testify as to the norms, and then you can argue that to the Court. Under what she's testified and what occurred, that's why their ineffective.  This is up for this Court, the Fourth Circuit, whoever, but not up to Ms. Barrett to make an ultimate conclusion on this.

The Fourth Circuit has remanded this to me to hear the evidence and make a decision, and, frankly, I've been a judge on the bench for over 36 years, and I do not want to hear Ms. Barrett coming in and telling the Court what she thinks of their trial testimony or the ultimate issue.  I am going to let her testify as to what the standards are in her experience.  But when it comes to testifying on the ultimate question of whether they were effective or not effective, that's up to the Court and the courts.

MS. BALES:  Thank you, Your Honor.

THE COURT:  All right.  Then if there is nothing further, we will be in recess until noon tomorrow.

(Hearing adjourned at 6:04 p.m.)

CERTIFICATION

JODY A. STEWART, Official Court Reporter

986

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


        X_____/s/_____x

                    Jody A. Stewart

                X_____2-13-2023 _____x

                        Date

JODY A. STEWART, Official Court Reporter