1119

```
          N THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
                  Newport News Division


- - - - - - - - - - - - - - - - - - - -
                                    )
UNITED STATES OF AMERICA,           )
                                    )
v.                                  )   CRIMINAL ACTION NO.
                                    )   4:08cr16
DAVID ANTHONY RUNYON,               )
                                    )
        Defendant.                  )
                                    )
                                    )
        AND                         )
                                    )
DAVID ANTHONY RUNYON,               )
                                    )
        Petitioner,                 )   CIVIL ACTION NO.
                                    )   4:15cv108
v.                                  )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Respondent.                 )
                                    )
- - - - - - - - - - - - - - - - - - -


                TRANSCRIPT OF PROCEEDINGS

                        DAY 9

                   Norfolk, Virginia

                  November 1, 2023


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge
```

JODY A. STEWART, Official Court Reporter

1120

APPEARANCES:

      UNITED STATES ATTORNEY'S OFFICE
      By:  Brian Samuels
          Lisa R. McKeel
          Assistant United States Attorneys
            And
      DEPARTMENT OF JUSTICE
      By:  Carrie L. Ward
          Counsel for the United States

      VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
      By:  Elizabeth J. Peiffer
          Robert Edward Lee, Jr.
            And
      ALI & LOCKWOOD LLP
      By:  Kathryn M. Ali
          Counsel for the Defendant

1121

**I N D E X**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| PETITIONER'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK CUNNINGHAM, PH.D., ABPP | 1144 | | | |

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| NONE | |

| PETITIONER'S NO. | PAGE |
|---|---|
| 31 | 1212 |
| 91 | 1334 |
| 99A | 1228 |
| 99B | 1229 |
| 127 | 1179 |
| 128 | 1177 |
| 150 | 1162 |
| 179 | 1174 |
| 180 | 1183 |
| 181 | 1182 |
| 188 | 1178 |

JODY A. STEWART, Official Court Reporter

1122

(Hearing commenced at 11:09 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, United States of America versus David Anthony Runyon.

Ms. McKeel, Mr. Samuels, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  Government is ready.

Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Peiffer, Ms. Ali, Mr. Lee, is the defendant ready to proceed?

MS. ALI:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.  Ms. Ali, who are the other individuals?  Is this the person who is working your computer?

MS. ALI:  Yes.

THE COURT:  Introduce her, please.

MS. ALI:  This is Kim Saunders, the paralegal in the office.

THE COURT:  What is her last name?

MS. ALI:  Saunders.

THE COURT:  Thank you.

Nice to have you, Ms. Saunders.

Sir, are you David Anthony Runyon?

JODY A. STEWART, Official Court Reporter

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Mr. Runyon, you are here today with your attorneys for the continuation of your *habeas corpus* hearing that began in February of 2023.  Is that your understanding?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Thank you.  Before we get started into the substance of calling witnesses, there were a couple of pretrial matters that I issued an order on on Friday, and I indicated that as soon as possible, which is today, that I would put the reasoning on the record and again reserve any option to reduce this to a more detailed written order.  I wanted you to have the two rulings in advance before going forward with your experts.

So I will give a little bit of a background, not very detailed since I think we all know the background of the case and have been here for some time.  As I said, the parties are well aware of the background of this matter, and the Court is going to only briefly review the relevant history here.

The Fourth Circuit mandates this Court to hold an evidentiary hearing to determine whether petitioner's trial counsel provided ineffective assistance by failing to "investigate and present evidence of his brain damage and mental health."  That's in *United States v. Runyon*, 994 F.3d

1124

192 at 212, and that was a Fourth Circuit 2021 case.  In accordance with the Fourth Circuit's mandate, the Court held an evidentiary hearing that began on February 7, 2023.  On the fifth day of the evidentiary hearing, the United States expressed concern that petitioner's *habeas* counsel at the time, but now prior *habeas* counsel, had failed to disclose relevant materials before the hearing, and further investigation revealed that petitioner's prior *habeas* counsel had, in fact, committed significant discovery violations as well as misrepresentations to the Court and the prosecutors.

The Court then continued the evidentiary hearing while the parties sorted through the late-disclosed materials, and the Court approved the withdrawal of two of the petitioner's prior *habeas* counsel from the Federal Public Defender's Office, Tennessee, and at that juncture left it up to that office to determine how to go forward with those counsel.  They were removed from this case.

The Court ultimately scheduled the resumption of the evidentiary hearing to begin today on November 1, 2023. There are three outstanding matters that the Court will now address prior to the start of this evidentiary hearing.  The first is the revised declarations of Dr. Merikangas.  On October 2nd, 2023, petitioner filed a notice of filing regarding supplemental and revised declarations of James R.

1125

Merikangas, M.D., that is ECF 854, which is the notice of filing, which included a supplemental and revised declaration of Dr. Merikangas as Exhibit A, and that's ECF Number 854-1.  That's the revised declarations.

The United States filed a response in opposition to the filing of the revised declaration on October 13, 2023.  That's ECF Number 861.  Petitioner filed a reply in support of filing the revised declaration on October 19th, 2023.  That's ECF Number 867.  The Court issued an order striking the notice of filing and revised declaration from the record on October 27, 2023, that's ECF Number 873, with the caveat that the Court's reasoning for striking Dr. Merikangas' revised declaration would be put on the record here.

In doing so, I will give a brief history of how we got to this point with Dr. Merikangas and the revised declaration because that would basically be required to put all this in context.  Dr. Merikangas reviewed the August 2009 MRI and PET scans in 2015.  He provided a declaration to petitioner's prior *habeas* counsel on February 4th, 2015, in which he stated that if he had testified in 2009, he would have testified that petitioner was a brain-damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process.  That's at ECF Number 511-2, and that is Dr. Merikangas's February 2015 declaration.

JODY A. STEWART, Official Court Reporter

1126

The February 2015 declaration was a significant factor in the Fourth Circuit's decision to remand petitioner's ineffective assistance of counsel claim for this evidentiary hearing.  I'm not going to read all the Fourth Circuit's opinion into the record.  I will cite it. I have mentioned it before on the record, and it is obviously of record.  That would be at *United States v. Runyon*, 994 F.3d 192, 205 to 207, and that's the 2021 Fourth Circuit opinion.

On January 23, 2023, petitioner moved to have Dr. Merikangas testify at the evidentiary hearing by video conference.  That's ECF Number 733.  In support of this motion, petitioner provided a supplemental sworn declaration from Dr. Merikangas dated February 3, 2023, and that is ECF Number 754-3, and that is his February 2023 declaration.

In the February 2023 declaration, Dr. Merikangas stated that after ordering the MRI and PET scans and preparing a brief report in 2009, he "did not hear anything further" from petitioner's trial counsel.  That is Id at 1. That is in the February 2023 declaration.

Dr. Merikangas also stated that he did not see the images of the brain scans until petitioner's prior or former *habeas* counsel provided them to him in 2015.  That is Id at the same place in his declaration.  The Court granted petitioner's motion to have Dr. Merikangas testify by

1127

videoconference at ECF Number 768, and Dr. Merikangas was scheduled to testify at the evidentiary hearing on February 14, 2023.

The evidentiary hearing was then disrupted by the revelation of overwhelming discovery violations before Dr. Merikangas could testify.  Among the late-discovered materials were records suggesting that Dr. Merikangas had reviewed petitioner's brain scans in August 2009, and that he had conferred with petitioner's trial counsel after ordering the brain scans in August 2009.

These records call into question the veracity of Dr. Merikangas's February 2015 and February 2023 declarations.  The prejudice created by the late disclosure of these records is clear.  During the evidentiary hearing, petitioner's prior *habeas* counsel questioned petitioner's trial counsel, Mr. Hudgins and Mr. Woodward, on their apparent failure to provide the requested brain scans to Dr. Merikangas.  Petitioner's prior counsel did not show Mr. Hudgins or Mr. Woodward the records from their files, and the United States did not have the records to be able to even refresh the witness's recollections.

These records are significant as they directly relate to petitioner's trial counsel's investigation of his brain damage and mental health.  Unfortunately, Mr. Hudgins has passed away.  He did so on September 19, 2023, so he

JODY A. STEWART, Official Court Reporter

1128

will never have an opportunity to provide his testimony with the benefit of reviewing these materials, which include his own files which *habeas* counsel had.

I will note that I was in the court, and the surprise on Mr. Hudgins' face and his demeanor were obvious to everyone in the courtroom when he found out about this matter, and he actually posed a question to counsel, "Well, do you have my files?"  And she said, "Yes," and he said, "Can I see them?"  I don't even think there was a reply.  If there was a reply, it was something like, We don't have them here at the hearing, they are back in the hotel or something.  I would have to look back, but it was a pretty distressing moment in the hearing to see the diminished demeanor and the look on Mr. Hudgins' face when he felt like he should have been able to see those things.  That's just an aside.  It's nothing that can be done about it now.

As the parties attempted to determine the scope of the discovery violation over the course of the next few months, the United States asked the Court that any late discovered material not be disclosed to witnesses until the parties had an opportunity to fully review them.  The Court granted this request as a fair remedy to the violation.  The obvious concern here was to prevent the party that committed the discovery violation from later benefitting from it.

However, following the close of renewed discovery,

JODY A. STEWART, Official Court Reporter

1129

petitioner's current *habeas* counsel provided Dr. Merikangas with the late-disclosed records, and he used these records as the basis of the revised declaration.  It's been represented to the Court they did not show him witness testimony but they did show him the records.

First, this clearly violated the purpose and spirit of the Court's prior order.  The evidentiary hearing was still going on.  While it was postponed, it was still in process, and Dr. Merikangas obviously would not have had the benefit of reviewing the later-disclosed materials had he testified in February.

At the resumption of the evidentiary hearing, he should have been in the same position that he would have been in in February.  This is especially important as the other party who could speak to these records, Mr. Hudgins, did not and will not have an opportunity to supplement his testimony.

The Court acknowledges that counsel's contention is that it provided Dr. Merikangas to ensure an accurate factual record for this resumption of the hearing.  However, the unfairness here remains obvious.  The prudent course of action would have been to at least seek the government's response prior to disclosing these records to Dr. Merikangas, and if there was opposition, to then seek the Court's input given that the Court had made the order

that it had.

Instead, allowing Dr. Merikangas to review the records and revise his statement has compounded the discovery violation and confused the record.  The Court has made every effort throughout to ensure that petitioner has a fair evidentiary hearing and disclosure of these records to Dr. Merikangas prior to Dr. Merikangas's testimony, the new exposure has now introduced additional prejudice.

The Court is also confused, frankly, with the representations of defense counsel as to the purpose of the revised declaration.  Petitioner apparently, and specifically states, "Does not intend to introduce the supplemental declaration as evidence or otherwise rely on it substantively."  That's Id at 1, and I'm referring back to your 867 where you said the only reason that you provided it in the records was to ensure a factual record, and that's ECF Number 867 at 4.

MS. ALI:  I'm sorry, Your Honor.

THE COURT:  I specifically read the declaration and it specifically says, and I quote, Petitioner, through counsel, specifically said that he "does not intend to introduce the supplemental declaration as evidence or otherwise rely on it substantively."  That's Id at 1. First, petitioner suggested that it does not matter that counsel provided these records to Dr. Merikangas because the

United States will have an opportunity to cross-examine Dr. Merikangas with the late-disclosed records "whether or not he is shown documents in advance."  That's Id at 4, note 6.

If petitioner does not intend to rely on the revised declaration, then the Court wonders why it was submitted.  It was abundantly clear that the United States would be able to and would want to cross-examine Dr. Merikangas with these records because they seem to directly contradict his sworn declarations from 2015 and February 2023.  So providing these records to Dr. Merikangas, if you're not going to use it, and you know there's upcoming cross-examination, it seems to the Court that this was just a ploy designed to prepare him for questions about his credibility rather than ensuring an accurate record.

All you were doing was preparing him, in my opinion, show you the records because this is what's coming at you.  You put a new declaration on the record, and you say, well, we are not going to use it, number one, and, by the way, the United States knows that you will and can cross-examine it.  So that is the reason the declaration was struck, because of what the Court would perceive as the prejudice and apparent lack of purpose in petitioner's case given that petitioner says he does not intend to introduce

it and admits that the United States can cross-examine on this, and ultimately this is a bench hearing, and I can certainly sort through it.  I know the discovery, I know what the witnesses have seen and heard, and I can sort through the testimony and determine credibility.

In any event, the late-disclosed materials, as I said, are going to be introduced anyway, and the United States is free to cross-examine Dr. Merikangas with them. So there is no reason whatsoever, under the representations of counsel and the way this has proceeded, for the supplemental affidavit to be of record.  You said you're not going to use it, you're not going to introduce it, and if United States can cross-examine on it, so there is no reason to have it, and because of the circumstances under which I have just reviewed, that is why I struck it from the record.

As I indicated, the Court now knows that Dr. Merikangas had the benefit of reviewing these materials, and the posture of this evidentiary hearing, in my opinion, has again been further altered as a result of these discovery violations that were compounded when the documents were then shown for a supplemental declaration from an expert who has now given basically a 180 degree supplement from the previous declarations.

But, in any event, fortunately, this is not something that has to be explained to a jury, this is a

bench trial, and so, in the Court's mind, the prejudice is minimized both to the United States and to the petitioner because the Court is capable of analyzing whether the late-disclosed materials and any other evidence that is introduced or has been introduced in the past hearing undermines Dr. Merikangas' credibility, and the supplemental affidavit or declaration is not necessary and is, frankly, surplusage at this point.

In regard to the motion *in limine*, I will briefly mention that. The Court denied the motion *in limine* by the United States on October 27, 2023. The United States filed the motion *in limine* as to certain proposed evidence and expert witnesses. That is ECF Number 859. Petitioner filed a response in opposition to the motion *in limine* on October 19th, 2023. That's ECF Number 866. On October 23, 2023, the United States informed the clerk that it did not intend to file a reply until it was ripe for decision, and the Court denied it in the order of October 27, 2023, so that you could be prepared with your experts and that the Court would put its reasoning on the record at this hearing. This is the reason that it was denied.

The United States previously sought to exclude post hoc experts and evidence of petitioner's psychosocial history during the evidentiary hearing in February. The Court considered the United States' arguments that such

1134

evidence was outside the scope of the Fourth Circuit's mandate, but the Court allowed petitioner to present the evidence.

At that time the Court stated its intention to properly sort through the evidence at the conclusion of the hearing. The United States' present motion *in limine* makes the same argument, that the proposed evidence is outside of the scope of the mandate. However, the United States now seeks a different ruling, but not different than what it sought before but for the Court to make a different ruling than it did before, and it argues on the basis is that the late-disclosed records are claimed dispositive.

However, even if they may be, the Court will have to sort that out after we've heard all of it. I am not privy to all of the discovery. I only know of the major, it looked like, matter that halted the hearing and then the follow-up with the Dr. Merikangas updated declaration.

The Court at this juncture sees no reason to change its prior rulings. The late-disclosed documents apparently, and are from what has been represented to the Court, significant, but I cannot determine that they are "claimed dispositive" so as to preclude introduction of additional evidence. The Court will weigh the late-disclosed records against the other evidence at the conclusion of the evidentiary hearing.

1135

There is a legitimate question as to whether evidence of psychosocial history is within the scope of the Fourth Circuit's mandate.  The issue for which the Fourth Circuit granted the certificate of appealability was "whether trial counsel provided ineffective assistance by failing to present evidence of Runyon's brain damage and mental health."  That's at ECF Number 607.  It's in the opinion.

The Fourth Circuit opinion required the Court to conduct a hearing on petitioner's claim that trial counsel failed to investigate and present evidence of his "brain damage and mental health."  That is specifically at 994 F.3d 192, 212, 2021 Fourth Circuit case.  Neither the issue certified for appeal nor the Fourth Circuit's mandate requires the Court to consider evidence of petitioner's psychosocial history.

However, the intent of the Fourth Circuit's mandate was to fully develop the evidentiary record.  That's what the Court is going to do.  The Court will fully evaluate that evidentiary record.  Evidence of psychosocial history may inform analysis of petitioner's mental health, and the Court will not impose a general exclusion of such evidence.  While the Court denied the motion *in limine* because it sought a blanket exclusion of psychosocial and post hoc evidence, the United States may still challenge the

JODY A. STEWART, Official Court Reporter

1136

relevance of any individual pieces of petitioner's evidence at the hearing.  So that is my ruling on the motion *in limine.*

The next thing that has occurred that I would put on record for the purposes of this hearing is that on October 30th, 2023, Mr. Robert Lee filed a notice of appearance on behalf of petitioner, and that's at ECF Number 874.  It has been filed and it is in writing.  Mr. Lee is the executive director of the Virginia Capital Resource Center, and he is here today at counsel table.

I will go through the rules on making an appearance.  The filing addressed to me and filed by the clerk starts with, "This letter is written to give notice on my appearance as counsel on behalf of petitioner, David Anthony Runyon, in the above matter."  I don't know that you can limit your purpose, "but for the limited purpose of assisting at the evidentiary hearing resuming on November 1, 2023.  I am licensed to practice in the Commonwealth of Virginia and admitted to practice in the Eastern District of Virginia."  So, therefore, you qualify.  You are not a *pro hac vice* admission.  You qualify as an admitted attorney in this case.  You go on to say that you are the executive director and you first appeared as counsel for Mr. Runyon in November 2021.  Ms. Peiffer was substituted as counsel to replace Michelle Brace when Ms. Brace retired from CRRC, and

1137

that stands for Capital Representation Resource Center.

I will go through the rules, the local rules of appearance.  This would be in local civil Rule 83.1.  It's the same rule in local criminal Rule 57.4.  The reason I'm going through this is that once an attorney is admitted, the attorney cannot pick and choose what they will be at.  It's the Court's decision.  You may not come in and out of hearings, because once you have made an appearance under our local rules, and that's local criminal Rule 57.4 and local civil Rule 83.1, subsection H, says, "Withdrawal of appearance:  No attorney who had entered an appearance in any civil action," and the other one says in a criminal action, "shall withdraw such appearance, or have it stricken from the record, except on order of the Court and after reasonable notice to the party on whose behalf said attorney has appeared."

So Mr. Lee from the Capital Resources Center -- I'm just going to say the Capital Resources Center.  That's the way I'm going to say it because it is too many words other than that -- has made an appearance, and under the Court's rules, he is now an attorney in the case.  He is properly admitted before this Court, and he, as you can see Ms. Peiffer and Ms. Brace, qualify as CJA attorneys.  That's the way you've been listed throughout these proceedings.

I would further note that in the hearing, if you

JODY A. STEWART, Official Court Reporter

1138

recall, back on June 16th, when we were going through Ms. Peiffer's motion to withdraw, the Court on a number of occasions mentioned that it would welcome Mr. Lee and his involvement.  It first appears starting on Page 10.  I'm just going to read excerpts of that transcript.  The Court said, "I'm still going to require the Capital Resource Center to be in this case, so you can let Mr. Lee know that."

On the next Page 11, "But that doesn't mean if you take leave, then Mr. Lee will have to step in, even if you take compassionate leave, you are still with the Resource Center."  That's what I'm saying to Ms. Peiffer.  I wasn't requiring you to step in but I was saying the Court would certainly welcome in Mr. Lee.

Being that you're from the same Center, and that you were admitted to practice, you qualify as a CJA attorney of this court.  Then on Page 14, I again was constantly talking about the continuity of representation, "But the continuity has to be there, and it has to be there now through you, and if not through you, through the Virginia Capital Resources Center.  Mr. Lee, the director of that center, is an attorney."

Towards the end of the transcript, I said that I approve of Mr. Lee, and I still do approve of Mr. Lee.  He provides great continuity to this case.  He is the executive

1139

director of that center and has been the person in charge of supervising and managing these cases to the knowledge of the Court.

So, Mr. Lee, you are now admitted, and you will be required to be in the case unless the Court would let you withdraw. I further want to mention two things in the letter that you wrote, because I don't want these things to be of record without the Court having taken note.

In the third paragraph of that record, you said, "Mr. Runyon's previous attempts to have assistance of his preferred counsel at the evidentiary hearing have failed." Well, I would make it clear that an indigent individual does not get their preferred CJA counsel. They don't get their counsel of choice. If you want your counsel of choice, you have to retain it. But if you are getting a CJA attorney, you're entitled to a qualified, competent counsel. So I don't want this to look like in any way that Mr. Runyon is somehow being denied an attorney of his choice, because he has qualified for CJA attorney representation, and he is entitled to, under the statute, which we have been through, at least one qualified attorney. In this case he now has three. So you do not get an attorney of your choice. You get a qualified, competent counsel. If there is something that is incompetent or unqualified, it has not been brought to my attention about the three attorneys that are here.

JODY A. STEWART, Official Court Reporter

1140

I'm not talking about the two previous attorneys from the Federal Public Defender's Office of Tennessee, but the Court has made all of those arrangements to move forward here with three qualified, competent counsel, and I don't want it to be of record that somehow he hasn't gotten his preferred counsel because he's not entitled to preferred counsel.

If he wants to retain counsel, he can, but he's entitled to, if it's CJA, qualified, competent counsel, and he now has three. I would also make the further comment that there is something in Mr. Lee's letter that does an aside, "Well, the United States has had three attorneys." Well, now you've got three, and you had three before. You had Ms. Peiffer, and you had two from the Federal Public Defender's Office of Tennessee. So you want it equalized out by head count, you've now got that equalized out. So that was something in your letter. So they have three; you have three. I would notice that Ms. Ward is from the Department of Justice and has not participated actively in this case this far. I don't know what her role is, but she 's qualified to be here on behalf of the United States. They can bring somebody in from the Department of Justice, and they've got two Assistant United States Attorneys from Newport News.

Finally, there was some type of insinuation about denying the motion to appoint Mr. Coburn, who Mr. Runyon

JODY A. STEWART, Official Court Reporter

1141

wanted.  I want to ask Mr. Runyon some questions about that because the Court is taken aback by some of these representations in here.

Mr. Runyon, if you would come up to the podium, please.  These questions will not deal with any type of substantive issue.  I just want to be sure that smoke screens are not being thrown up constantly on this record.

Mr. Runyon, who is Mr. Coburn?

THE DEFENDANT:  He's an attorney that wanted to represent me.

THE COURT:  Where is he located?

THE DEFENDANT:  Charleston.

THE COURT:  How many times have you spoken with him?

THE DEFENDANT:  Just once.

THE COURT:  Who brought him to you?  Did you find out about Mr. Coburn yourself or did somebody else inform you of Mr. Coburn?

THE DEFENDANT:  Someone else informed me.

THE COURT:  Who was that?

THE DEFENDANT:  My current counsel.

THE COURT:  So your current counsel called your attention to Mr. Coburn, and you've spoken with him once?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Was that in person?

JODY A. STEWART, Official Court Reporter

1142

THE DEFENDANT:  Yes, ma'am.

THE COURT:  You are saying Mr. Coburn is somebody that was introduced to you by your current habeas attorneys, and you've spoken to him once.  When was that?  Was it before the evidentiary hearing before that started or was it recently?

THE DEFENDANT:  It was right before the evidentiary hearing.

THE COURT:  What evidentiary hearing?

THE DEFENDANT:  I mean, right before the proceedings here in court.

THE COURT:  In here?

THE DEFENDANT:  Yes.

THE COURT:  Not in February?

THE DEFENDANT:  No.

THE COURT:  So it was right before the proceedings in here.  So it looks like it was sometime in October?

THE DEFENDANT:  Yeah, I believe so.

THE COURT:  You may be seated.

Counsel, I think that we are now ready to move forward.  All preliminary matters have been addressed, and we can start with the resumption of this hearing.  So you may call your next witness, Ms. Ali, Ms. Peiffer, or Mr. Lee.

MS. ALI:  Your Honor, may I just briefly address

JODY A. STEWART, Official Court Reporter

the record.

THE COURT:  Why?

MS. ALI:  Well, I just want to make sure the record is clear about Mr. Coburn.

THE COURT:  Mr. Coburn is past history. Mr. Coburn, you kept at the Court and at the Court from June, and you were told who the attorneys would be.  It was upheld by the Fourth Circuit, and I denied Mr. Coburn as an 11th hour, again, addition to the case, and as far as I'm concerned, that's over.  I wanted to be sure it was an 11th hour addition, and it was.  I've always said that Mr. Lee, and that's why I went back to the transcript, because he's with the Capital Resources Center, which has been in this *habeas* case throughout with Ms. Brace and Ms. Peiffer.  So I don't see any need for clarification of the record.

MS. ALI:  Understood, Your Honor.

THE COURT:  It's certainly not something that is going to be dispositive.  I just wanted to make sure, that this whole thing with Mr. Coburn came up at the 11th hour, as I knew it did, and that I had already ruled on it and that I was sure that he had been brought to Mr. Runyon, not that Mr. Runyon had gone online and found him or something by himself.  So I don't know that any clarification would help the matter because it's been ruled upon.

Ms. Peiffer, your witness.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1144

MS. PEIFFER:  Your Honor, we will call Dr. Mark Cunningham.

THE COURT:  All right.

(Witness was sworn.)

MARK CUNNINGHAM, PH.D., ABPP, called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. PEIFFER:

Q.  Good morning.

A.  Good morning.

MS. PEIFFER:  And just to start with a housekeeping matter, I believe perhaps the government and the Court have received copies of what we will be using later on presentation.  They are copies of a demonstrative exhibit.

MR. SAMUELS:  I got it at 4:30 yesterday, Your Honor.  I do have an objection to it.  I can take it up now or at the appropriate time.

THE COURT:  If it came, it wasn't shown to me.

MS. PEIFFER:  I apologize, Your Honor.

THE COURT:  I was in chambers well after-hours last night, and I did not get it.

MS. PEIFFER:  We brought a courtesy copy this morning in case the Court wanted to consult it.  The exhibit will appear on the screen, but we wanted the Court, as a

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1145

courtesy, to have a copy if notes were required or something like that.

THE COURT:  This apparently was something that was delivered this morning here?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  I've been here this morning, but it was just put up on the bench, so I have not had an opportunity to see it.  Apparently, Mr. Samuels has an objection to it, so I'll have to hear the objection.

I'm sorry, Dr. Cunningham.  You will have to step out.  I apologize.

THE WITNESS:  Yes, Your Honor.

(Witness excused.)

MS. PEIFFER:  Your Honor, I just wanted to clarify in case I was unclear.  What I'm speaking of are part of Dr. Cunningham's presentation.  It's just a PowerPoint slide that will be part of his presentation to the Court, and it's not an exhibit.  So we are not entering it into evidence, not an exhibit.  It's just a demonstrative that was intended to help move things along smoothly.  He covered -- as Your Honor notes, he is covering a lot of information, and we just wanted his presentation to be as streamlined as possible.

THE COURT:  Mr. Samuels.

MR. SAMUELS:  Your Honor, if the Court looks

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1146

through it, it's very substantive.  This is a 96-page slide deck that we were provided at 4:30 in the afternoon yesterday, and this harkens back to the penalty phase of the trial, which the Court will recall.  We were also provided with a slide deck of Dr. Cunningham shortly before trial, and I would also submit this somewhat compounds the discovery issues that have been an issue in this case.

You will see on the front of it, it is dated November of 2023.  Dr. Cunningham has been a noted expert in this case for some time, and yet we are just getting this very substantive slide deck that he is going to go through and serve as the basis of his testimony.  I certainly am familiar with the demonstrative exhibits, Your Honor.  We often see either a shell casing that a forensic expert might use or a diagram of an autopsy, but we do have a 96-page report.  That is getting a little far afield of just straight demonstrative exhibit, and it seems like Dr. Cunningham is going to be testifying off this.  I haven't had a fulsome opportunity to really review it, Your Honor, but if the Court even just looks to Page 11, there is reference on Page 11 to the ABA guidelines.  I don't know why Dr. Cunningham as a psychologist would be testifying about the ABA guidelines.

I think there are portions of this report that are just going to be objectionable and certainly relies on some

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1147

information that is not in the record yet.

THE COURT:  Where is the report that you got in February?  Did you get a demonstrative in February?

MR. SAMUELS:  No, Your Honor, we did not.

THE COURT:  You did not get a demonstrative in February?

MR. SAMUELS:  We have Dr. Cunningham's initial report that's from 2015, and then he did a brief supplement in January of 2023.  We did not have this until just yesterday afternoon.

THE COURT:  I'm familiar with both of those because the Court has both of those.

MR. SAMUELS:  It just seems to the government that if he was going to use it, it should have been prepared in February, not the day before we start this hearing.

THE COURT:  Well, the way that we will proceed is we will bring Dr. Cunningham in, and you can start through this PowerPoint.  But if these were matters that weren't in his disclosed report, in other words, if you're referring to things that aren't in his report, you have to disclose them, you have to disclose his opinion and his report, and you have to update it.

Your update was in February, and, frankly, there shouldn't have been any further updates unless it depended upon some of this new discovery, and I don't even know that

Cunningham, M. - Direct                                          1148

you would be entitled to update that because it was your discovery omission, but I know I did let the United States because it didn't get the discovery until after the hearing to go through and so forth.  But if you've got materials in here that go past a report, they're objectionable.

The other thing is, you need to lay for the record, don't just start in the report, have him say who he is and what he does and what his background is.  That all needs to be on the record.  If there is any appellate review of this, which there probably will be from either side, you need the expert's qualifications on the record.  Don't just start into something that says adverse developmental factors.

MS. PEIFFER:  I understand, Your Honor.  That was not my intention at all.  I was just trying to get the housekeeping matter out of the way before we started with Dr. Cunningham's testimony, and I wanted to be sure the Court was aware that we had provided the paper copy in case that was useful to the Court.  But I did not intend to just start without the typical introduction.  And the slides are in no way meant to be a supplemental report.  They track the information in his report, and they are not new information beyond the scope of the report.  So I just wanted to clarify that point as well.

THE COURT:  I think Mr. Samuels brought up something on Page 11, and he questions how this doctor would

Cunningham, M. - Direct                                        1149

be able to cite to that.  I think it was on Page 11, one of the pages.

MR. SAMUELS:  I believe it was Page 11 it talks about the ABA supplementary guidelines.  This will be an issue for Dr. Cunningham as well and that he moves into an area of the law quite frequently in his report, and that would be an area that we have issues.

THE COURT:  He is not going to testify as to areas on the law.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Unless he qualifies as a legal expert, and I don't know why the Court would need a legal expert.

MR. SAMUELS:  We received no notice of him as a legal expert, Your Honor.

MS. PEIFFER:  We don't tend to present him as a legal expert, Your Honor.  We plan to present him into the area of expertise, as I will voir dire him on, which is clinical and forensic psychology.

THE COURT:  Well, bring him in and qualify him, and I'll let him be cross-examined as to what kind of things he relies on.  So we will first get him qualified.

MR. SAMUELS:  Yes, Your Honor.

MS. PEIFFER:  Your Honor, may I provide Dr. Cunningham this copy, the same copy of his slides on paper for just ease of reference and smooth testimony?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1150

THE COURT:  You mean a copy of these before you qualify him?

MS. PEIFFER:  I can wait till after he qualifies. I was just trying to get the housekeeping done so we can move things along more efficiently.

THE COURT:  Once he is qualified and he starts testifying, you can give him what you think he needs to testify from, and then they can object.  The slides are going to come up on the screen in any event, aren't they?

MS. PEIFFER:  They are, Your Honor.

(The witness enters the courtroom.)

THE COURT:  Dr. Cunningham, I think we are ready to go, so you can go back on the stand.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You are under oath.

BY MS. PEIFFER:

Q.  Good morning.

A.  Good morning.

Q.  Could you please state your full name for the record.

A.  Mark Douglas Cunningham.

Q.  And what do you do for a living?

A.  I'm a clinical and forensic psychologist in private practice and also an independent research scientist.

Q.  Could you please explain what a clinical psychologist is.

A.  Clinical psychology is the evaluation and treatment of

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1151

psychological disorders.  It's what you might expect a psychologist to do in terms of interviewing, testing, providing psychotherapy services.

Q.   And what is a forensic psychologist?

A.   Forensic psychology is the application of psychological research and techniques to legal issues.  It's any way that psychology and science could be helpful with for some issue before the Court, and that's all the way from evaluation of parenting capabilities in child custody cases or psychological status and damages in a civil case or in criminal cases, things like competency to stand trial, mental state at the time of the offense or sentencing considerations.

Q.   And how much of your time is spent on your clinical practice versus your forensic practice?

A.   So my practice is entirely court related, but my involvement in the courts is as a clinical psychologist.  In other words, I'm bringing my clinical psychology capabilities to bear on legal issues.  So I'm a clinical and forensic psychologist.  I'm not engaged in treatment activities at all.

Q.   Can you briefly give us the highlights of your educational background, Dr. Cunningham?

A.   Certainly.  I graduated with high honors from Abilene Christian University with majors in psychology and mass

JODY A. STEWART, Official Court Reporter

communications.  I then attended a doctoral training program in clinical psychology at Oklahoma State University.  That program was accredited by the American Psychological Association as a doctoral training site and received both my master's and Ph.D. in clinical psychology from Oklahoma State.

I did a one-year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland, where I was an active duty Naval officer and clinical psychology intern.  That internship was also accredited by the American Psychological Association.

I was then assigned as a staff psychologist at the Naval Submarine Medical Center in Groton, New London, Connecticut.  At that time the subs base there was the primary submarine facility on the East Coast, and I was an active duty Naval officer and staff clinical psychologist.  I was in that position for three and a half years.  While there, I did two years of part-time post-doctoral work at the Yale University School of Medicine and also taught college courses part time.

I left the Navy in 1981 to take a full-time academic position for a couple of years back in West Texas at Hardin-Simmons University.  Hardin, H-a-r-d-i-n - Simmons, S-i-m-m-o-n-s.  Taught a variety of psychology courses. Began a practice at the same time.  In 1983, I resigned that

Cunningham, M. - Direct                                          1153

academic position and have simply been in practice since that time, initially, almost entirely diagnostic and service providing.

I gradually began to be called upon by the courts to do court-related evaluations, and that became a bigger and bigger part of my practice. In 1995 I was board certified in forensic psychology, and by 2002, my practice was entirely court related, and I was no longer treating patients. I've participated extensively in continuing education and self-study since I left graduate school.

Q. Dr. Cunningham, going back to some of the things that you mentioned, you mentioned your service in the United States Navy. During your service did you receive any type of recognitions?

A. I did.

Q. What was that?

A. When I was at the post-doctoral training program at Yale, I was given the award as the outstanding trainee, and within the Navy I was decorated with the Navy commendation medal for meritorious service, which is a very unusual distinction for a junior officer to receive in its first assignment.

Q. And you also mentioned board certification. Can you clarify in what field you are board certified.

A. So I'm board certified in forensic psychology by the American Board of Professional Psychology, and I'm also board

Cunningham, M. - Direct                                          1154

certified in clinical psychology by the American Board of Professional Psychology.  That's the board certification organization that's recognized by the American Psychological Association.

Q.  Can you explain, please, what constitutes a board certification in forensic psychology?

A.  So board certification in forensic psychology is intended to reflect the highest standards of expertise and sophistication as psychology comes into the courtroom.  There are about 350 psychologists in the United States who hold that distinction.  It's a very arduous credential to pursue. The failure rate at the culminating oral examination is 40 percent.

Q.  And how many psychologists in the United States are board certified in forensic psychology?

A.  About 350.

Q.  How many psychologists in the United States are board certified in clinical psychology?

A.  About 1,200.

Q.  And where are you licensed to practice?

A.  So I'm licensed to practice psychology in Washington, Oregon, Texas, Louisiana, Alaska.  I apologize.  I'm licensed in 12 states.  At one time it was 22, so I'm trying to recall which ones I'm still licensed in as opposed to which ones I was licensed in historically.  If I could pull up a document

Cunningham, M. - Direct                                        1155

that has my letterhead on it, I could identify all the states.

MS. PEIFFER:  Does the Court find that necessary or can we stipulate to the number of states of Dr. Cunningham?

THE COURT:  I don't find it necessary.

MS. PEIFFER:  Does the government?

MR. SAMUELS:  No.

BY MS. PEIFFER:

Q.  We can move along.  To clarify, how many states are you licensed to practice in currently?

A.  12 states.

THE COURT:  Is Virginia one of them?

THE WITNESS:  No, ma'am.  There is a provision for temporary practice in Virginia.

THE COURT:  Go ahead.

BY MS. PEIFFER:

Q.  Do you have any experience providing testimony in capital sentencing proceedings?

A.  I do.

Q.  And about how many times have you testified in capital cases?

A.  I've testified at capital sentencings at the trial level about 200 and about 230 cases.  I don't have a specific count of capital post-conviction in federal *habeas*, but I anticipate it would easily be over a hundred.  I have

Cunningham, M. - Direct                                              1156

participated in about 60 Atkins determinations, having testified in all of those.  Then I would anticipate the total number of capital cases that I've testified in is someplace in the high 300s or mid-300s.

Q.  And additionally have you been involved in other cases not included in that total that were resolved prior to the trial so there was no testimony?

A.  Yes, many of those.

Q.  And of the approximate number of capital sentencing cases in which you've testified, could you provide an approximate number of how many were in the Federal Courts?

A.  It's approximately 60 were in a trial level in federal court.  I don't have a breakout of federal *habeas*, but I would anticipate that if I've testified in 30 or 40 easily in federal *habeas*, and then the other 170 or so cases that I've testified at trial were in state courts, and then again a significant number of post-conviction cases as well.

Q.  And looking at your testimony as a whole, are you called more often by the government or by the defense as a witness?

A.  By the defense.

Q.  Do you regularly undertake academic or research work related to clinical or forensic psychology?

A.  I do.

Q.  And can you briefly describe what this involved?

A.  Certainly.  So one aspect of that involvement is serving

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1157

as a peer reviewer for peer review journals.  My peer review activity is at the 97 percentile of scientists worldwide. Another aspect of my academic or scholarly involvement is in scholarly research and publishing, and that includes a text that I authored on evaluations at capital sentencing; about 15 or so chapters and edited textbooks that I've authored or co-authored; and somewhere around 35 peer reviewed scientific papers, some reflecting literature reviews, many of these reflecting original research and gathering of data.

Q.  What are your particular areas of scholarly interests in clinical and forensic psychology?

A.  Capital sentencing, rates and correlates of violence in prison, of behavior of capital offenders in prison, characteristics of capital offenders in prison, and also a separate area of distinguishing between extreme beliefs and delusional disorders.

Q.  Have you ever received recognition for your academic or research work in clinical or forensic psychology?

A.  I have.

Q.  Could you please briefly summarize and describe that for the Court.

A.  So I was recognized in 2005 with the Texas Psychological Association award for outstanding contributions to science. I was recognized in 2006 with the American Psychological Association award for distinguished contributions to research

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1158

and public policy.  That's an award that's given to one psychologist annually from the 80,000, 90,000 doctoral level psychologists in the APA.

I was recognized with the 2012 National Register of Health Service Providers' AM Wellner distinguished career award.  I was recognized in 2017 with a commendation by the John Maddox Prize Committee, an international committee sponsored by the journal "Nature" that provides recognition for promoting sound science in the face of resistance or hostility.

I was recognized in 2019 with the American Correctional Association distinguished contribution award, their highest honor.  I was recognized in November of 2022 with the American Academy of Forensic Psychology award to contributions to forensic psychology.

The academy is the scholarly association of the 350 board certified forensic psychologists, and that distinguished contribution award is given to one psychologist annually, sometimes not even annually for distinguished contributions.

Then finally I was named a fellow of the American Psychological Association in about 2006 or '07.  That's a distinction that requires election by the APA Council of Representatives that recognizes an outstanding contribution to the body of knowledge and practice of psychology on a

Cunningham, M. - Direct                                               1159

national level.

Q.  Do you teach in areas related to clinical or forensic psychology?

A.  I do.  To continue education, I don't hold a formal university appointment, but I teach psychologists and attorneys in the continuing education context.

Q.  And I am showing you what has been marked at this point as Petitioner's Exhibit 150.

THE COURT:  Is your monitor working?

MS. ALI:  No, Your Honor.  The one over there is working.

THE COURT:  Is your monitor working, Dr. Cunningham?

THE WITNESS:  Yes, Your Honor.

THE COURT:  It looks like the one in front of the defendant and Mr. Lee is working.  So Ms. Ali, if you want to go down there.

MS. ALI:  I can do that, Your Honor.  This one is also not working.

THE COURT:  You have the exact exhibit, don't you?

MS. PEIFFER:  I do, Your Honor.  I would need a moment because I have -- trying to streamline it, I planned to just look at the screen.

THE COURT:  Well, we can call IT and see what's going on, because if this is a problem, all the monitors

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1160

should be working.  Mine is working.  Mr. Samuels, the two over there are working?

MR. SAMUELS:  Our one is working.  That's our computer.

MS. PEIFFER:  Your Honor, if it's helpful to the Court, I was not the person who tested this, but it was tested earlier, and it was working.

THE COURT:  Are these court monitors?

THE CLERK:  Yes, Your Honor.

MS. PEIFFER:  Given a moment, we could proceed on paper.

THE COURT:  Let's see if we can get it fixed.  I'd rather take care of something now than have it persist and it slow things down.  So we will just sit here for a minute. It might be a quick fix.  So we will call IT.  It just may be something unplugged, particularly since it's all in this one area.  It's just two screens, and they are beside each other.  Dr. Cunningham is working, mine is working, the government's is working, the government's and Mr. Lee's is working, and the only one that isn't is the one at the podium with you and the one in front of Ms. Ali.  We will get somebody down to check the connections.  Hopefully it will only be something minor.

MS. PEIFFER:  We are trying to avoid shuffling papers as much as we can.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1161

THE COURT:  I understand.  You are doing a good job.

Someone is coming from IT, but they are not available right this minute.  So let's start with the first document, and then somebody will be in here.

MS. PEIFFER:  I just want to clarify, you want me to start with the first document on paper?

THE COURT:  Yes.  It's on all the screens, and you've got it in front of you, and Ms. Ali has it in front of her.  I've got it in paper, too, and on the screen.

MS. PEIFFER:  I understand.  I will try to minimize my paper shuffling in the meantime.

THE COURT:  That's all right.

BY MS. PEIFFER:

Q.  So, Dr. Cunningham, I'm showing you what has been marked as Petitioner's Exhibit 150.  Do you recognize this document?

A.  I do.  This is the cover page of my curriculum vitae as it was dated January the 3rd of 2023.

Q.  I'm just going to scroll through to show that the full document is Exhibit 150.  If you could just look at that, Dr. Cunningham, and confirm that it is your complete curriculum vitae.

A.  It is.  We are on Page 9.  I think it is 14 pages in all.

Q.  I think it may be 16 pages at this point.

A.  16.  Yes, this is my CV as of that date.  It would be

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1162

modified modestly currently as I'm not licensed in all of the states anymore that were listed on this CV.

Q.  Thank you for clarifying.  But this is your curriculum vitae as of January 3rd, 2003; is that correct?

A.  2023.

MS. PEIFFER:  I'm sorry.  Thank you, Dr. Cunningham.

I would move to admit Petitioner's Exhibit 150 into evidence.

THE COURT:  It's admitted.

(Petitioner's Exhibit 150 received in evidence.)

MS. PEIFFER:  At this point I would like to tender Dr. Cunningham as an expert in clinical and forensic psychology, qualified by knowledge, skill, experience, training, and education pursuant to Rule 702.

THE COURT:  Do you wish to inquire, Mr. Samuels?

MR. SAMUELS:  Your Honor, I have some questions about the scope of expertise.  I can do it now or I can do it on cross-examination.

THE COURT:  Which would you prefer?

MR. SAMUELS:  It's fine to do it now, Your Honor, just since we have it up.  It will be very brief, Your Honor.

THE COURT:  All right.

                    VOIR DIRE EXAMINATION

Cunningham, M. - Direct                                          1163

BY MR. SAMUELS:

Q.  Good afternoon, Dr. Cunningham.

A.  Good afternoon.

Q.  It's been some time.

A.  Yes, sir.

Q.  You are looking well.

A.  Thank you.  You as well.

Q.  Thank you, sir.  Dr. Cunningham, just a few questions for you.  You're being offered as an expert in clinical psychology and forensic psychology, correct?

A.  Yes, sir.

Q.  You are not being offered as an expert in psychiatry?

A.  That's correct.

Q.  Not neuropsychiatry?

A.  Correct.

Q.  Not neuropsychology?

A.  Correct.

Q.  Not neurology?

A.  Correct.

Q.  Not radiology?

A.  Correct.

Q.  You're not being offered as an expert in anything to do with the law, correct?

A.  Only as it interfaces with forensic psychology.

Q.  Okay.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                 1164

A.   Psychology is -- forensic psychology is that interface between psychology and the law.  So my evaluations are necessarily informed by legal principles and parameters.

Q.   Very good.  Let me ask a couple of questions about that, then.  You did not go to law school?

A.   Did not.

Q.   You are not a member of the bar?

A.   No, sir.

Q.   You do not teach any law schools as a regular faculty member?

A.   No.

Q.   Okay.  So your knowledge of the law is coming through your experience as a psychologist?

A.   Experience and study of case law and scholarly treatises about this interface between psychology and legal issues.

Q.   You do not hold yourself out as any type of legal expert?

A.   Only to the extent that it interfaces with forensic psychology or as it exists within forensic psychology.

Q.   I think I understood, sir, the two areas of interest that you primarily have lie in the field of capital sentencing; is that right?

A.   That's my research and scholarly interest primarily is capital sentencing, related also high-stake sentencing.  I have a paper on youthful sentencing, and then there is also this additional area on extreme beliefs and delusional

Cunningham, M. - Direct                                            1165

disorder.

Q.  Sir, I have your curriculum vitae, and that is dated January 3rd, '23.  It has a list of a number of publications that you have authored or contributed in.  Are there additional publications since January '23?

A.  I don't believe so.

Q.  Okay.  And a number of the publications that you have authored have been involved and deal with this issue of the risk of violence to capital defendants in prison; is that right?

A.  That's correct.

Q.  I think I also saw something in there about this other area, I think it's 19 in your peer reviewed articles on Page 6, "Differentiating Delusional Disorder From the Radicalization of Extreme Beliefs."  That's the second area you spoke of, right?

A.  Yes, sir.

        MR. SAMUELS:  Your Honor, I have no objection to Dr. Cunningham being tendered as an expert in criminal psychology or forensic psychology.  I reserve any objection to him testifying to any areas of the law because he doesn't have legal training, is not a lawyer, not a member of the bar, hasn't received any education, training that's been listed on that, and so if those areas come up, I would object to that, but no objection to his psychological

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                   1166

background.

THE COURT:  Well, I will qualify him as a clinical psychologist and a forensic psychologist in the field as board certified in that field, but if the opinions go too far into the law, you can object to them unless they are tied in with his expertise.

MR. SAMUELS:  Yes, Your Honor.

MS. PEIFFER:  Your Honor, I just want to preview. We are about to have a number of exhibits coming up, so I will use those on paper, but I will need a moment.  We are just pulling them from other sources.

THE COURT:  I've just gotten a note from IT that says that they are going to need to restart it, and it is going to take about 10 minutes.  So we will take a 10-minute recess, and they supposedly will be able to restart the system for all computer screens.

(Recess from 12:28 p.m. to 1:00 p.m.)

THE COURT:  I have been told that the technological difficulties are resolved, and that we will have someone available throughout the proceedings, including Friday evening.

Go ahead.

MS. PEIFFER:  Thank you, Your Honor.  Are you ready for me to continue?

THE COURT:  Yes.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1167

BY MS. PEIFFER:

Q.  Dr. Cunningham, when did you first become involved in Mr. Runyon's case?

A.  In early October 2008.

Q.  And who retained you at that time?

A.  Jon Babineau.

Q.  What kind of evaluation did Mr. Babineau ask you to perform in Mr. Runyon's case?

A.  Initially he requested that I do a violence risk assessment for prison.

Q.  And how do you remember that this is what you were retained to do?

A.  First, the case sheet that we opened that's dated October 1st, 2008, identifies the forensic function as RA, which is our abbreviation for risk assessment.

    Second, on, I believe it was on October 3rd, 2008, my office, at my direction, provided Jon Babineau with an estimate of my services to do a violence risk assessment for prison, which was 50 hours, and that's the customary estimate for a violence risk assessment for prison in a capital case inclusive of testimony.

    Subsequently, the records that I received were consistent with what I would request in doing a violence risk assessment for prison.  I was then appointed by the Court.  I have 450 hours as a future dangerousness expert, which is

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1168

another way of ascribing violence risk assessment for prison.

And then the interview that I was scheduled to do with Mr. Runyon on November the 20th, 2008, was set up for three hours, which is the time period that I would typically allot to do a violence risk assessment for prison interview. Were I instead interviewing regarding broad mitigation adverse developmental factors, I would have scheduled a much longer interview and more than one interview.

Q.  Do you recall --

A.  I could go on.  The discrepancy in that is that at some point in time, there was a consideration of me doing more than a violence risk assessment, although that was not followed up on.

Q.  Thank you, Dr. Cunningham.  And we will get into more detail on each of those pieces in a moment.  Do you recall how much contact you had with Mr. Runyon's trial counsel prior to the August 2009 capital sentencing trial?

THE COURT:  We need to be straight on counsel. Which counsel?  Because you said you worked with Mr. Babineau?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Go ahead.

THE WITNESS:  So I would characterize it as limited contact.  There were e-mail exchanges in the -- although brief e-mail exchange in the fall of 2008 and perhaps some

Cunningham, M. - Direct                                              1169

phone conferences as well.  I then met with Mr. Babineau and Mr. Woodward in Norfolk on November the 20th over lunch for a couple of hours.

Additional brief contacts through the production of a report on the violence risk assessment for prison findings that I had generated on February the 5th, 2009, and then the next interaction with counsel of substance was with Mr. Hudgins on my arrival to testify as we prepared my testimony.

THE COURT:  When was that?

THE WITNESS:  That was on -- I believe that was August the 20th of 2009.  There may have been a phone conference with him prior to that, but I did no work on the file, don't have any record of speaking to anyone from our notice on March the 12th that Mr. Babineau was no longer in the case until July the 13th, four months later, when Mr. Hudgins introduced himself by e-mail as the new counsel and inquired if I was still involved in the case.

BY MS. PEIFFER:

Q.  And in your experience, is that amount of contact with trial counsel typical for your practice in a capital case?

THE COURT:  Wait just a minute, because we have to separate out trial counsel.  You've got Mr. Babineau, and then we've got to look and find out.

MS. PEIFFER:  Your Honor, I may be able to assist

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1170

with that.  We have some exhibits coming up that may provide some more helpful information.

THE COURT:  So let's get the date that Mr. Hudgins came into the trial.  Mr. Babineau was in there in 2009, and that's an easy thing to look at the docket sheet and know when he came in.  So when you're dealing with two different attorneys, your contact is unusual.  If you have one attorney doing and another attorney leaves, and you have another attorney, you're talking about contact with attorneys but with different attorneys.

MS. PEIFFER:  Yes, Your Honor.  I believe some of the exhibits will help to clarify that a little bit because they will be specific about which attorneys are involved.

THE COURT:  All right.

MS. PEIFFER:  But if you would like me to preview the information, I believe that Jon Babineau is appointed on March 4th, 2008, and he moved to withdraw in February of 2009, and then Hudgins was appointed later in February of 2009, if my facts are correct, Your Honor.

THE COURT:  February 20th, 2009, was the appointment of Mr. Hudgins, and that's ECF Number 161.

BY MS. PEIFFER:

Q.  So in your experience is that amount of contact with trial counsel typical for you in a capital case?

A.  My contact with Mr. Babineau was typical if I'm only

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1171

doing a violence risk assessment for prison.

Q.   At some point did you prepare a report in advance of Mr. Runyon's 2009 capital sentencing trial?

A.   I did.

Q.   And I'm showing you what has been admitted as Government's Exhibit 14.  Do you recognize that document?

A.   I do.

Q.   Does this appear to be a true and accurate copy of the report you prepared prior to the August 2009 capital sentencing trial?  And we can scroll through it so you can see the full range of pages.

A.   Yes, it is.

Q.   And whose signature appears at the end of the document?

A.   My signature.

          THE COURT:  What exhibit number, please?

          MS. PEIFFER:  This was previously admitted as Government's Exhibit 14.

BY MS. PEIFFER:

Q.   And what is the date shown on the document?

A.   February 5th, 2009.

Q.   Is this date consistent with your recollection of the time --

          THE COURT:  Wait just a minute.  Government's Exhibit 14, when?

          MS. PEIFFER:  I'm sorry, Your Honor?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1172

THE COURT:  When was this exhibit admitted?

MR. SAMUELS:  It was in February, Your Honor.

MS. PEIFFER:  In February.

THE COURT:  I've got to then get to that exhibit list.

MS. PEIFFER:  Your Honor, I can provide the Court with a paper copy.

THE COURT:  I have a paper copy, but there are four or five binders, but they need to be labeled such so that I know the government's.  I'm looking at 14 but that was your 14.  That was Dr. Mirsky's letter.  So I'm trying to get the exhibits.  I've got them up here, and I'd like to follow along.  But the one that was on the screen was close to illegible; it was such small print and blurry.

MS. PEIFFER:  We have zoomed in slightly on the first page, if that is helpful.

THE COURT:  I've got the exhibit now.  Here it is.

MS. PEIFFER:  Thank you, Your Honor.

BY MS. PEIFFER:

Q.  Is this date of February 5th, 2009, consistent with your recollection of the time you provided your report to Mr. Runyon's trial counsel, Dr. Cunningham?

A.  As my recollection was refreshed by reviewing my billing records.  I wouldn't otherwise recall independently the date that I generated this.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1173

Q.   And looking at the first page of Government's Exhibit 14, who is the document addressed to?

A.   Jon Babineau, Esquire.

Q.   And what is the topic of your February 5th, 2009, report?

A.   The findings of my violence risk assessment for prison regarding Mr. Runyon.

Q.   Could you please briefly explain what a violence risk assessment is.

A.   So a violence risk assessment examined for likelihood that an individual will be violent in a specified context. It's also necessary in doing that assessment to specify the severity of violence that's being contemplated.  This evaluation was directed toward identifying the likelihood that Mr. Runyon would exhibit serious violence while confined for life in the Bureau of Prisons.

Q.   And is that the only topic that you addressed in this 2009 report?

A.   It is.

Q.   Prior to producing your report in 2009, you mentioned earlier, did you travel to Norfolk, Virginia?

A.   I did.

Q.   And at this point I will show you what has been marked as Petitioner's Exhibit 179.  Do you recognize this document?

A.   I do.

Q.   And could you describe what it is?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1174

A.   This is an invoice, detailed invoice for services that had been provided in the month of November 2008.  It's dated December 1st, 2008, and it reflects my detailed billing around that trip to Norfolk on November the 20th, 2008.

          MS. PEIFFER:  I would move to admit Petitioner's Exhibit 179 into evidence.

          MR. SAMUELS:  Your Honor, I don't have any objection to this particular exhibit.  I'll note for the Court that this comes in a series of new exhibits that we got from the petitioner, and I don't want to waive making any objection to those because they have all those exhibits, and they could have marked them in February.  We just got them over the last several months.  But I don't have any particular objection to this, and I do want to keep this moving along, but I may raise another objection later talking about petitioner getting in late-disclosed exhibits that they had already had for months or years.

          THE COURT:  This is one of the supplemental exhibits, and I will admit it with the caveat that you can object to any of the others if you think it's important and appropriate.

          MR. SAMUELS:  Thank you, Your Honor.

          (Petitioner's Exhibit 179 received in evidence.)

BY MS. PEIFFER:

Q.   And looking at the invoice on the screen, Dr. Cunningham,

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1175

when did you make that trip?

A.    November 20th, 2008.

Q.    And can you please describe everything that you did in terms of Mr. Runyon's case during your November 2008 trip.

A.    Yes.  So first I prepared files and materials for interview and travel, went to the airport, I believe it was VFW, checked in.  That took an hour and 10 minutes.  I worked on other files en route.  So I then did not bill for my flight time against this case.  I landed in St. Louis for a connecting flight that took 10 minutes.  I reviewed records, boarded the flight to Norfolk, and reviewed records en route for a total of two hours and 23 minutes.

      Then I landed in Norfolk, I got a rental car and went to conference with defense counsel.  And the total for that landing in Norfolk, getting the rental car, going to conference and then conferencing with them was three hours and 13 minutes.

Q.    Did you meet with Mr. Runyon during your November 2008 trip?

A.    I did not.

Q.    Do you recall why you did not meet with Mr. Runyon during that trip?

A.    Only that counsel elected for me not to interview him.  I don't recall the content of the conference.

      THE COURT:  When was this?  This was 2008?

Cunningham, M. - Direct                                    1176

THE WITNESS:  Yes, November 2008.

THE COURT:  This was Mr. Babineau?

THE WITNESS:  Yes.  I met with Mr. Babineau and Mr. Woodward over lunch for approximately two hours.

BY MS. PEIFFER:

Q.  And did the fact that you did not meet with Mr. Runyon, did that prevent you from doing your risk assessment analysis?

A.  Not a violence risk assessment for prison.

Q.  Why not?

A.  Because an interview of a defendant is a very, very minor component in a violence risk assessment for prison, because the factors that would raise or lower his risk of violence in prison are largely demographic or obtained from records.

Q.  And I'm now going to show you what has been marked as Petitioner's Exhibit 128.  We will zoom in a little bit.  Do you recognize this document, Dr. Cunningham?

A.  I do.

Q.  And can you describe in summary what these are.

A.  So this is an e-mail that I sent to Jon Babineau on December 11th, 2008.  This is in response to, I believe, a call from his office.  I may have spoken to him -- a call from his office requesting disclosure of potential testimony that could come under a mental health disclosure order in a capital case, and I then wrote a paragraph of what that

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1177

testimony would be projected to consist of.  There are two paragraphs.  One of them is a violence risk assessment for prison.

So I composed two paragraphs, each of them broadly generic in nature, the sort of thing that I would identify as disclosure about projected testimony in any capital case. One of those directed the violence risk assessment for prison, the other to broad adverse developmental factors that might be considered in mitigation.

MS. PEIFFER:  I would move to admit Petitioner's Exhibit 128 into evidence.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  All right.  128 is admitted.

(Petitioner's Exhibit 128 received in evidence.)

BY MS. PEIFFER:

Q.  Dr. Cunningham, prior to the August 2009 capital sentencing trial, did you conduct an evaluation of Mr. Runyon's mental health, including the existence of adverse developmental factors in his history and background?

A.  My mental health evaluation was confined to a violence risk assessment for prison.

Q.  And why is it that you did not do an analysis considering the impact of the adverse developmental factors on Mr. Runyon's history and background?

A.  I was not tasked by the defense attorneys to do that.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1178

Q.   I'm now going to show you what has been marked as Petitioner's Exhibit 188.  Do you recognize this document?

A.   I do.

Q.   What is this document?

A.   This is correspondence between my administrative assistant or practice coordinator at that time, who was Shannon Casey, with Mr. Babineau.  First on October the 3rd, there is an e-mail attaching my CV and fee schedule for his review, and then the second e-mail of that date reflects an estimate of my anticipated fees to do a violence risk assessment for prison of Mr. Runyon, inclusive of testimony.

        MS. PEIFFER:  I would move Petitioner's Exhibit 188 into evidence.

        THE COURT:  All right.  That's admitted.  That was an estimate of 50 hours for $15,000?

        THE WITNESS:  That's correct, Your Honor, at $300 per hour.

        (Petitioner's Exhibit 188 received in evidence.)

BY MS. PEIFFER:

Q.   Prior to Mr. Runyon's August 2009 sentencing trial, did trial counsel provide you materials concerning his social history that were relevant to analyzing his mental health?

A.   The records that I received were relevant to illuminating mental health-related issues pursuant to violence risk assessment for prison, not to support a broader analysis.

                JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1179

Q.   And what categories of materials was it your practice to request for the purpose of completing a violence risk assessment?

A.   It was my practice to request offense records, not the totality of the file but enough so that I could be familiar with the primary events of the offense, employment records, school records, correctional records, criminal history records.  Among those correctional records, of course, would be the pretrial jail records.

Q.   And at this point I will show you what has been marked as Petitioner's Exhibit 127.  Do you recognize this document?

A.   Yes.

Q.   What is this?

A.   This is the hard copy cover correspondence from Jon Babineau to me dated December 19th, 2008, reflecting that attached to this are copies of David Runyon's inmate records from the Portsmouth City Jail in response to his request for them and also in response to my request for them.

        MS. PEIFFER:  I would move to admit Petitioner's Exhibit 127 into evidence.

        MR. SAMUELS:  No objection, Your Honor.

        THE COURT:  It's admitted.

        (Petitioner's Exhibit 127 received in evidence.)

BY MS. PEIFFER:

Q.   I will now show you Petitioner's Exhibit 125, which has

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1180

already been admitted.  Could you please briefly describe what this is?

A.  This is the cover letter from Jon Babineau to me dated November the 12th, 2008, and this is a cover letter detailing the records that are being provided to me in that package.

Q.  So, Dr. Cunningham, in summary, what categories of records did you receive from trial counsel prior to Mr. Runyon's August 2009 capital sentencing trial?

A.  I received jail records, offense records, educational records, employment records.

Q.  At the time you provided your February 5th report, do you recall how soon after that date Mr. Runyon's capital trial was scheduled to begin?

A.  It was scheduled for March the 9th, as I recall.

Q.  And at some point did you learn that there had been a change in Mr. Runyon's counsel situation?

A.  I did.

Q.  And what was that change that you recall?

A.  On March the 12th we were notified by e-mail that Jon Babineau was no longer involved in the case and that Steve Hudgins had been appointed and providing me with Mr. Hudgins' address and perhaps telephone number.

          THE COURT:  Mr. Babineau was no longer involved in the case.  Do you know why?

          THE WITNESS:  I do not.  Only broadly that somehow

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1181

he was conflicted out.

THE COURT:  It was a conflict of interest.  It's in a letter to you.

THE WITNESS:  Yes.

THE COURT:  I just wanted the record to be clear that there was no problem with Mr. Babineau, it's just he developed a conflict, and he had to withdraw from the case.

BY MS. PEIFFER:

Q.  And are you aware whether Mr. Runyon's capital sentencing trial ultimately began in mid-March 2009?

A.  It did not.

Q.  How did you learn that the trial would not take place that March?

A.  On March the 13th I received an e-mail from my -- or my office received an e-mail from Mr. Woodward's office that the trial had been continued to June the 30th.

Q.  I will now show you what has been marked as Petitioner's Exhibit 181.  We will zoom in.  Do you recognize this document?

A.  I do.  This is the e-mail exchange that I had with Mr. Hudgins on July the 13th, 2009.

MS. PEIFFER:  I would move to admit Petitioner's Exhibit 181 into evidence.

MR. SAMUELS:  No objection, Your Honor.

THE COURT:  It's admitted.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1182

(Petitioner's Exhibit 181 received in evidence.)

BY MS. PEIFFER:

Q.   When were you first contacted by Mr. Hudgins?

A.   July the 13th, 2009.

Q.   And what was the substance of that communication?

A.   He was introducing himself as Mr. Runyon's attorney and giving me a brief summary that the trial had begun, asking if I was still available as an expert witness and that the sentencing phase might be -- there might be some delay between the end of the guilt phase and sentencing.

THE COURT:   At this point Mr. Runyon hadn't even been found guilty.  This was just in preparation for if he was found guilty?

THE WITNESS:   That's correct.  He was advising the trial had begun on June the 30th, and they expected the guilt phase to finish around July the 22nd.  So this is about two weeks into the trial.

BY MS. PEIFFER:

Q.   Did you ever supplement your February 5th, 2009, report in advance of the August 2009 capital sentencing trial in Mr. Runyon's case?

A.   No.

Q.   I'll now show you what has been marked as Petitioner's Exhibit 180.  Do you recognize this document?

A.   Yes.  This is my billing statement for the services

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1183

rendered through the conclusion of the sentencing phase.

MS. PEIFFER:  I would move to admit Petitioner's Exhibit 180 into evidence.

MR. SAMUELS:  No objection.

THE COURT:  It's admitted.

(Petitioner's Exhibit 180 received in evidence.)

BY MS. PEIFFER:

Q.  Dr. Cunningham, do you recall how much you billed for your services between February 5th, 2009, when you submitted your report, and August 14th, 2009?

A.  I do.

Q.  And what was that?  How much did you bill?

A.  Nothing.

Q.  If you had been asked to supplement your February 5th, 2009, report before the August capital sentencing trial, would you have done so?

MR. SAMUELS:  Your Honor, I object to the speculation and relevance of that.

THE COURT:  Speculation, relevance.  Are we looking at 180?

MS. PEIFFER:  Yes, Your Honor.  I believe 180 is on the screen.  This is not the first page of 180.  We can scroll up.

THE COURT:  You will have to rephrase your question.  I sustain the objection.  I don't know where you

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1184

are going with this.  This actually shows the billing.  It shows the billing of $9,780.07.

BY MS. PEIFFER:

Q.  So if we could move to the third page of the exhibit. Towards the bottom we can zoom in on Section 17.

THE COURT:  This is from Mr. Cunningham, and it's going to Mr. Hudgins.  It's a balance due of $9,780.07.  I thought you just asked if he billed anything, and he said no.

MS. PEIFFER:  I'm sorry, Your Honor.  My question might have been unclear.  This exhibit is an invoice that began on August 14th, 2009, which is reflected in Section 17.  So we zoomed in on that.  And my question, which may have been unclear, was whether Dr. Cunningham billed for services between February 5th and August 14th, 2009.

THE COURT:  Well, then you were on an exhibit that did not pertain to that.  But, anyway, then I'll take that as your question, and his answer is no, but he then did bill for what he did after that with Mr. Hudgins.

MS. PEIFFER:  Yes, Your Honor.

BY MS. PEIFFER:

Q.  Dr. Cunningham, did you submit a bill that covered the period of August 14th to August 20th?

A.  I did.

Q.  Do you recall just generally in summary the work that you

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1185

did during that period on Mr. Runyon's case?

A.   Yes.  That reflected my review of the file, additional -- and Bureau of Prisons related materials to refresh myself, preparation of slides.  There may have been a phone conference.  I need to go back and look at the bill, if there was a phone conference with Mr. Hudgins during that time.  Then travel to Norfolk, meeting with Mr. Hudgins to review the slides and prepare my testimony, testify, go back to the airport, and fly home.

THE COURT:  You did actually testify --

THE WITNESS:  I did, yes, Your Honor.

THE COURT:  -- and was in a phase at the end of the trial that he had written to you before the guilt phase was over?

THE WITNESS:  That's correct.

THE COURT:  In that he said, I'm just looking ahead, and I think he actually used the word assuming a finding of guilt?

THE WITNESS:  Yes, Your Honor.

THE COURT:  That was back in June?

THE WITNESS:  That was July 13th.

THE COURT:  Well, let's look at 181 that we were looking at.  You are going all over the place with these documents.  So this says, "We begin trial and expect to finish July 27th."

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1186

THE WITNESS:  That's correct.

THE COURT:  Then he goes down and says, "Assuming a guilty finding," and then he tells you his purpose of contacting you is to testify at a later stage if there is a finding of guilt.

THE WITNESS:  Confirming my availability, and then I did confirm my availability.

THE COURT:  You are right, it was July 13th, but it was before the guilt phase was even over?

THE WITNESS:  That's correct.

THE COURT:  Go ahead.

BY MS. PEIFFER:

Q.  To the best of your recollection, Dr. Cunningham, did trial counsel ask you to -- why your report did not include a discussion of Mr. Runyon's mental health, including adverse developmental factors?

A.  Not that I recall.

THE COURT:  Had you ever been tasked with that?

THE WITNESS:  No, ma'am, not to my recollection. There had been a discussion of whether my role would be expanded, and that's reflected on the cover sheet of the case, and also in that disclosure that I provided, but I was not subsequently tasked to undertake that evaluation, so it appears that it was contemplated at one point.

THE COURT:  By whom?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1187

THE WITNESS:  By Mr. Babineau.

THE COURT:  So it was contemplated.  You were retained to do a violence risk assessment by Mr. Babineau. He contemplated the other but did not pursue it?

THE WITNESS:  That's correct.

THE COURT:  Then Mr. Hudgins contacted you -- I'm trying to get this chronology straight -- for your testimony for a violence risk assessment.  Nobody ever asked you to do the other, Mr. Babineau, Mr. Hudgins or anyone.  They were picking up on what you had already done?

THE WITNESS:  That's correct, Your Honor.  The only clarification I would make about them never asked me to, apparently there was a contemplation of that, and we reflected that on our case sheet, but I was not then tasked to do that.  I wasn't asked to undertake that evaluation.

THE COURT:  But, again, that was back with Mr. Babineau?

THE WITNESS:  That's correct.

BY MS. PEIFFER:

Q.  When you were appointed in Mr. Runyon's case during the period of 2008 to 2009, at that point did you have the expertise to conduct an evaluation of Mr. Runyon's mental health, including adverse developmental factors?

A.  I did.

Q.  And if you had been asked, would you have been willing

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1188

and able to conduct such an evaluation?

          MR. SAMUELS:  Your Honor, I'm going to object.  He said he wasn't asked to do that.  He wasn't appointed for that purpose by the Court.  There was this extended period between February and August he didn't work on the case. This is all speculation as to whether he was even asked when he was asked by Mr. Babineau and then by Mr. Hudgins, just limited to the violence risk assessment.

          THE COURT:  I sustain the objection.

BY MS. PEIFFER:

Q.  Dr. Cunningham, during this 2008 to 2009 time period, did you perform evaluations in capital cases, including their adverse developmental factors evaluation?

A.  I did.

          THE COURT:  About other defendants?

          THE WITNESS:  Yes, Your Honor.

          THE COURT:  Okay.

BY MS. PEIFFER:

Q.  How does the amount of contact you had with trial counsel in a case involving only a violence risk assessment compare to the amount of contact you have with counsel in cases when you are asked to conduct a more fulsome evaluation, including a client's history and background as related to the adverse developmental factors?

A.  That amount of contact is very different.

Cunningham, M. - Direct                                          1189

Q.  Why is that?

A.  Because that consultation evaluation regarding adverse developmental factors is much broader in scope.  It requires much more investigatory support and interaction.  It requires interfacing with the attorneys about the emerging mitigation themes and what direction they are wanting to go.  It involves communication about what other specialized expertise might need to be brought to bear based on what's emerging from the evaluation that I'm involved in.  So it is a much more interactive evolving process.

Q.  Can you briefly describe the typical process you would engage in to conduct an evaluation of adverse developmental factors?

THE COURT:  Is this in your opinion that you said you are going to be asking about?  You've given a disclosure.  Have you disclosed that you are going to be asking these types of questions?

MS. PEIFFER:  Your Honor, his report is about the adverse developmental factor analysis, and I'm simply starting to lay the foundation and have him describe what he does to prepare such a report, the things that he looks at, and we'll get to the report very shortly, but this is starting to lay the foundation for the type of inquiry that he does for that report.

THE COURT:  Go ahead for now.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1190

BY MS. PEIFFER:

Q.   So, Dr. Cunningham, could you please briefly summarize the typical process you engage in to conduct the type of evaluation of adverse developmental factors, including a client's history and background?

A.   Yes.  So it involves review of a comprehensive set of records to the extent that those can be obtained.  It involves extended interviewing of the defendant, interviews of immediate family members, as well as other third parties' retrieval of scientific scholarship that may inform the issues that are emerging, interfacing with the mitigation specialist to get additional support regarding records, summaries, contact information for third parties, communications with the attorneys about specialized evaluations that may need to be undertaken, review of the fruits of those evaluations, preparation of a report that may be much more extensive, and preparation of voluminous slides. It's not unusual in a capital case for me to illustrate my testimony with several hundred slides.

Q.   Dr. Cunningham, and how many hours would you typically estimate this type of investigation and report require from you?

A.   Through testimony, 90 to 130 hours with the potential that can be much more depending on what complexities may arise in the case.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1191

Q.  And typically what span of time does that require, measured in dates or weeks or months, to do this type of evaluation?

A.  The typical file we have for a year or two.  At the minimum period of time for me to get my part ready, if the whole mitigation package and records are delivered to me at the beginning, is about six months.

Q.  Why does it take so long?

A.  Because I've got to fit 130 hours into my schedule that already has significant demands on it; because it takes time to retrieve additional records or to identify additional third parties, to make interview trips, that it simply can't be done in a compressed period of time.

Q.  Dr. Cunningham, you mentioned speaking with third parties.  Why is that a part of your process?

A.  A forensic evaluation is characterized by multiple data points as opposed to just the person under consideration and interviewing them.  So that's a part of it.  In capital cases, interviews of those third parties are particularly important to develop a multi-generational family history, to identify things that happened in early childhood that the defendant would not have a first-person recollection of, to understand this individual's life and the family system from multiple perspectives, and then because histories of family dysfunction, deprivations, trauma are often not easily

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1192

disclosed.  Multiple interviews may be required, and you may need to interview broadly to get to the individuals who will be candid with you about that dysfunction.

Q.  To do this type of evaluation, what type of information do you typically need to receive from counsel?

A.  That comprehensive set of records, summaries of mitigation interviews that the mitigation specialist has performed, psychosocial histories, chronologies of this family system, sometimes abstracts that have been prepared to help guide and digest these voluminous records that may fill many binders in hard copy.  And then, as I said, the scholarly literature that may illuminate the implications that any given piece of history may have.

Q.  And is this the type of information experts in your field reasonably rely on to form opinions about the impact of adverse developmental factors in a person's background?

A.  It is.

Q.  In Mr. Runyon's case, did you receive these types of records prior to the August 2009 capital sentencing trial?

A.  Only a flash and aspect of them, as I described in terms of very limited school records, employment records.  Those are the sorts of historical records that would be a part of a broader mitigation package, but they were limited to just those.

          MR. SAMUELS:  Your Honor, I'm going to object to

JODY A. STEWART, Official Court Reporter

this, as to the relevance of this when he's just tasked with doing a violence risk assessment at the time of the trial and the penalty phase, and now we are going into all of this psychosocial history and family dysfunction that doesn't seem to relate to mental health and brain damage, that he wasn't asked to do at the time.

THE COURT:  It was Mr. Babineau who was in charge of it at the time.

MR. SAMUELS:  I would also note, Your Honor, that the notice that was filed, that his testimony was limited to at trial, which we already discussed his report, that February 5th, 2009, report, which is limited to violence risk assessment, and so he was not permitted at trial to discuss anything beyond what was in the report on February 5th, 2009.

MS. PEIFFER:  Your Honor, there are several points I'd like to address.

THE COURT:  Before you do, take me back.  You've gone back and forth on the exhibit.  There was an exhibit in here listing things that were sent to this individual.  What exhibit was that, that this individual was sent?

MS. PEIFFER:  Yes, Your Honor.  I believe it was 125 and 127, but let me just double-check.

THE COURT:  Let me take a look at those, please.

MS. PEIFFER:  Yes, Petitioner's Exhibit 125 and

Cunningham, M. - Direct                                          1194

127.

THE COURT:  You did get a master interview list from Sheila Cronin?

THE WITNESS:  That's correct.

THE COURT:  Who is on that master interview list?

THE WITNESS:  I don't recall, Your Honor, without looking at that document.

THE COURT:  You were sent those copies in November of 2008?

THE WITNESS:  That's correct.

THE COURT:  You got background records for David A. Runyon; is that right?

THE WITNESS:  All of these are regarding David Runyon.

THE COURT:  Well, did you follow up on any of those records and indicate to Mr. Babineau that you needed to do this further assessment?  Did you need to do it?

THE WITNESS:  No, ma'am.  Ultimately, for Mr. Babineau I still wanted employment records and educational records, but for a violence risk assessment for prison, I didn't need that broader psychosocial set of records.

THE COURT:  I'm sorry.  What were you going to say, Ms. Peiffer?

MS. PEIFFER:  Thank you, Your Honor.  I just wanted

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                         1195

to address two points raised by Mr. Samuels.  The first was about the notice of intent to present Dr. Cunningham's testimony, and part of what we are trying to clarify, and why the testimony was presented, is that on December 12th, counsel filed a Rule 12.2 notice.  This is Defense Exhibit 109.

THE COURT:  Let me see that exhibit, please.  I'm looking at Defendant's 109.  What is it?

MS. PEIFFER:  That is a Rule 12.2 notice of intent to present Dr. Cunningham's testimony.

THE COURT:  It's got Dr. Nelson, Dr. Cunningham and a neuropsychologist.

MS. PEIFFER:  So that notice -- and I just need to get to the right page, Your Honor.  One moment.

THE COURT:  Dr. Cunningham is on Page 2 of 5.

MS. PEIFFER:  Thank you very much.  So part of what we were trying to clarify for the Court and for the record is that this notice actually represents that Dr. Cunningham's testimony will also describe these adverse developmental factors in addition to the risk factors.

THE COURT:  But this was filed in 2008, and it was filed by Mr. Babineau, was it not?

MS. PEIFFER:  I believe so, Your Honor. Mr. Hudgins was on the case.  I don't recall who filed it.

THE COURT:  This is a 2008 notice for the trial,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1196

and it was filed by, as I understand it, Mr. Babineau and Mr. Woodward.

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  We are not here on Mr. Babineau.

MS. PEIFFER:  I understand, Your Honor.  What we are trying to do is to detail in as much -- with as much clarity as we can what happened because the claim is that Dr. Cunningham could have performed this other type of evaluation in our claim, and what we presented to the Fourth Circuit is that this would have been informative about Mr. Runyon's mental health.

THE COURT:  He could have but he didn't.  Did you argue Dr. Cunningham specifically to the Fourth Circuit?

MS. PEIFFER:  Yes, Your Honor, and his report is mentioned and recorded in the Fourth Circuit opinion.

THE COURT:  Tell me where in the opinion and what the quote is about it.

MS. PEIFFER:  It was cited by the Fourth Circuit in *United States versus Runyon*, 994 F.3d 192 at Page 206.

THE COURT:  Can you put it on the screen?  Do you have it?

MS. PEIFFER:  I do not have that as an exhibit.

THE COURT:  I think I have the opinion, Fourth Circuit opinion.

MS. PEIFFER:  We are trying to pull it up on the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1197

screen, Your Honor.

THE COURT:  I've got the opinion.  Trying to see the opinion of 12-23-20.

MS. PEIFFER:  Yes, I believe that it was subsequently replaced.  So there is a 2021 date, but it's the same opinion.

THE COURT:  What page?

MS. PEIFFER:  206.

THE COURT:  All right.  I don't have the pages.

MS. PEIFFER:  We are zooming on the screen, if that is helpful.  It is the last paragraph at the bottom.

THE COURT:  I've got to look at it in context.  I have the actual opinion that I received from the Fourth Circuit, and that is a part of our record in this court.  Do you have the actual opinion to give me from the Fourth Circuit?

MR. SAMUELS:  I've got it, Your Honor.  It's got some notations on it.

THE COURT:  I just want to read in context.  I'll give it back to you.

MR. SAMUELS:  Your Honor, you are talking about the ECF document, right?

THE COURT:  I've got the ECF document.  She keeps saying page something.  The ECF document does not comport with the published opinion that was in the Westlaw that she

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1198

has.

MR. SAMUELS:  Yes, Your Honor.

MS. ALI:  I've got the published opinion, Your Honor.

THE COURT:  Here is the one.  What page is it on now?

MS. PEIFFER:  The ECF or the published?

THE COURT:  The published opinion, which is what we have been struggling to get.

MS. PEIFFER:  206.

THE COURT:  All right.  What about it?

MS. PEIFFER:  Your Honor, I believe you asked me if Dr. Cunningham was mentioned in the Fourth Circuit opinion, so I wanted to point out that he was discussed.

THE COURT:  Yes, mentioned, but in the context. See, this is what bothers the Court, that he's mentioned. There is a lot mentioned in these opinions, but what is the issue?  We are coming down to the issue.  This was an opinion on the full *habeas corpus*, and what we are coming down to is the issue.

What does it say here?  He was a "psychologist who had originally testified at the penalty phase only to Runyon's lack of future dangerousness, also reevaluated Runyon's records in 2015.  He concluded that, 'Runyon suffered from a myriad of malignant formative influences

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1199

that he did not choose,' meaning that 'there are a number of adverse developmental and life trajectory factors...that singly and collectively increased the likelihood of his having adverse and criminally violent outcomes in adulthood.'  The developmental factors to which he referred included Runyon's head injuries and potential frontal-lobe damage.  Dr. Cunningham explained that the literature suggested that persons with the symptoms manifested by Runyon are 'impulsive,' and that 'once they become fixated on' a course of action, 'they seem to forget that any other action is possible.'  The literature also suggested that 'frontal lobe dysfunction may result in disruption of the evaluation of personal behavior, reduced problem solving and flexibility, and marked difficulty in reprogramming an ongoing chain of behavior.'"

        Now, in this section they first start with Dr. Merikangas.  They then go to Dr. Mirsky.  They then go to Dr. Cunningham, and then finally they say Dr. Richard Dudley.  So they are summarizing the evidence, but there is not a conclusion.  All you are telling me is something that is written here that's a summary of what occurred.  What was the conclusion about it?

        MS. PEIFFER:  Well, Your Honor, I might have misunderstood your question.  The Fourth Circuit remanded the case for consideration of this issue about whether there

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1200

was ineffective assistance of counsel to investigate and present mitigating evidence, including mental health and brain damage and psychosocial history.

Dr. Cunningham's report, which we will be getting to shortly, is about mental health and the adverse developmental factors are, as Dr. Cunningham will testify, related to Mr. Runyon's mental health and his functioning, and they include brain damage as one of those factors. I don't want to get ahead of myself. Dr. Cunningham will describe that much better than I.

MR. SAMUELS: Your Honor, can I respond?

THE COURT: Yes.

MR. SAMUELS: In the Fourth Circuit opinion, it says, and I'm looking at ECF document, and this is at the top of Page 25, it says, "In its present state, the record does not sufficiently support the government's argument that Hudgins made a strategic choice not to pursue potentially mitigating evidence after a reasonable investigation."

When the notice was filed, Mr. Babineau was on the case. When the letter -- because Dr. Cunningham can't testify beyond his report, and that report was submitted on February 5th, 2009. That report is Government's Exhibit 14, and that report is only violence risk assessment. That's why we objected at the penalty phase to Dr. Cunningham going beyond that report, and the Court sustained the objection.

JODY A. STEWART, Official Court Reporter

So by the time Hudgins got in the case, and that's why we are here because of what Hudgins did, that issue as to what Dr. Cunningham could testify to was resolved.  He could only testify based on the report.

I understand that Dr. Cunningham wants to come up here and say there was some prejudice, that that's where we are going because they didn't pursue this, but what they are doing is try to fault Mr. Hudgins for not having Dr. Cunningham ignore, but Dr. Cunningham was limited by the report that he had authored on February 5th, 2009, which again, is Government's Exhibit 14.  He could not go beyond that because that was the sum and substance of his disclosure to the government and to the Court.

MS. PEIFFER:  Your Honor, I believe we are getting beyond.  The purpose of Dr. Cunningham is to testify about the facts.  I don't think Dr. Cunningham was faulty anyway. I was trying to view, "Describe the state of the factual record that we have."  The ineffective assistance of counsel claim, this is the first indication that I've heard that the Court and the government believe that only Hudgins is concerned.

I mean, the testimony was presented at the hearing in February from Attorney Babineau and Attorney Woodward, and if it is only Hudgins that's being considered, that was a useful threat to know, but the ineffective assistance of

counsel claim involves the performances of counsel, and as Mr. Samuels just mentioned, there's a question about the decision-making, and that goes along with Hudgins in that investigation, and all of the things that Dr. Cunningham has is testifying about involve the investigation that was done in Mr. Runyon's case, and the investigation that could have been done, which as Mr. Samuels said, goes to the prejudice analysis, and that's why, of course, Dr. Cunningham submits a report in 2015, which we are getting to shortly.

THE COURT:  I understand, but if you look at the tenor of the Fourth Circuit case, they start on Page 208, and they talk about Mr. Hudgins, in this case the evidence that trial counsel Hudgins had in hand.  They are looking at it as ineffective assistance of trial counsel.

Now, yes, there is a certain history there because you can't overlook what went up to the time that he got in and what he received.  But ultimately the Fourth Circuit is coming down on the ineffective assistance of trial counsel and what they presented to the jury.

MS. PEIFFER:  Well, Your Honor, the inquiry about investigation and presentation, and to understand Hudgins' investigation, he inherited the case from, you know -- Attorney Woodward remained on the case throughout the duration of the pretrial period, and he inherited Mr. Babineau's files.  There was testimony about that.  And

Cunningham, M. - Direct                                              1203

assessing what Mr. Hudgins did to investigate just necessarily involved looking at what happened before he came into the case because he testified that he used those materials and relied on those materials.

MR. SAMUELS:  But the problem is, Your Honor, is that Dr. Cunningham can't say whether what Hudgins did was appropriate or not appropriate.

THE COURT:  I agree.

MR. SAMUELS:  That's all over his opinion, Your Honor.  It's all over his opinion that he has authored saying they could have done this more.  He did a bad job here.  He didn't pursue this enough.  That's not appropriate for him in the expert area that he's been qualified in, and that's where I think we are going on this, and that's why I object to him saying, I could have done this, I should have done this, I would have been offered the opportunity to do this, I could have done more.  That's not his purview to say that.

MS. PEIFFER:  Your Honor, the question I asked, I believe, was about what Dr. Cunningham looked at to complete this type of evaluation.  Within the next several questions I was going to get to his report where he completes this type of evaluation, and I was starting to lay the foundation for that.

THE COURT:  He completed that report for whom?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1204

MS. PEIFFER:  In 2015 for *habeas* counsel.

THE COURT:  Go ahead.  I will sort all this out. We will be here until next year at this time if we are going to belabor every one of these witnesses like this.  I will hear this, and I will sort it out.  I know what the Fourth Circuit said.  I know what the evidence was at trial.  I have been totally familiar with this record since 2008, so, consequently, we will just move on for now and go ahead, and I'll decide whether Dr. Cunningham's testimony is relevant or not.

MS. PEIFFER:  Yes, Your Honor.

BY MS. PEIFFER:

Q.  Dr. Cunningham, I had just asked you about your process and the type of information you received to do a mental health evaluation, including adverse developmental factors, and you had answered that question.

Is this the type of information that experts in your field reasonably rely on to form their opinions about assessing adverse developmental factors in a person's background?

A.  It is.

Q.  And in Mr. Runyon's case, did you receive these types of records?

A.  I did not.

THE COURT:  Can you wait a moment, please.  Do you

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1205

need this copy of the opinion back?  Is this the only one you have?

        MR. SAMUELS:  Your Honor, you're welcome to keep that.  We can get another copy, as long as you don't mind the writing on it.

        THE COURT:  There is no writing on it.  It is just some underlining here.

        MR. SAMUELS:  That's fine, Your Honor.

        THE COURT:  Has no personal writing or opinion on here.  I can get a copy, but I just don't want to slow the proceedings down.

        MR. SAMUELS:  Your Honor, we are fine with that.

        THE COURT:  If you need this to follow.

        MR. SAMUELS:  I do not.  I have an ECF copy.

        THE COURT:  I have the ECF copy, too, but we keep going into the opinion, so that's why I have a copy here. But I can give it back if you need it.

        MR. SAMUELS:  Not necessary, Your Honor.

        THE WITNESS:  I was only given a fractional aspect of the records.

BY MS. PEIFFER:

Q.  Dr. Cunningham, when you make evaluations of adverse developmental factors in capital cases, can you describe your role as an expert when you testified?

A.  So my role is to provide psychologically informed

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1206

categories to assist the jury in organizing and understanding the history that lay witnesses may have testified to.  And so part of my role is to meaningfully aggregate that into different types of developmental adversity.

Another aspect of it is to bring together the perspectives, histories that may have been provided by many different experts or many different lay witnesses in informing that category and also in describing the science that gives meaning to that.

In other words, in the absence of the science, hearing about someone being maltreated as a child may just sound like an abuse excuse.  It's the science that describes that, in fact, as that maltreatment occurs, the likelihood of ending up in life dysfunction and criminality and criminal violence markedly increases, you know, three, four, fivefold. So it's that science that allows those jurors to give informed weight to the history that they hear.

So, and additionally, because I'm not just taking the lay witnesses' reports, I'm also reviewing the records in an expert scientifically informed way, I'm able to bring that to bear, as well, to integrate that into these categories of developmental adversity that are being described.

Q.  And is that the type of information you include when you write a report concerning a defendant's background and adverse developmental factors?

Cunningham, M. - Direct                                                    1207

A.  It is, and that's the way this *habeas* report is organized, is aggregating this historical information into meaningful categories of developmental adversity and then describing what the science tells us about the meaning that that group of experiences that are organized under that particular adverse factor enters the "so what" question of why does this matter, how does it affect outcome.

Q.  Moving ahead in time to after Mr. Runyon's trial in 2009, did there come a point when you were asked again to work on his case?

A.  There was.

Q.  Were you asked to prepare another report?

A.  I was.

Q.  And when was that?  Do you recall?

A.  That was in 2015.

Q.  What were you asked to do in that report?

A.  At that time I was asked to review the trial-level mitigation file, as well as the investigations that had been undertaken by federal *habeas* counsel and the associated declarations and additional retrieval of records and analyze what could have been put on in regarding adverse developmental experiences, what could have been put on in that type of mitigation at trial and wasn't or was presented only fractionally.

Q.  I'm now going to show you a document that is marked as

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1208

Petitioner's Exhibit 31.  It's also ECF 511-8, for the Court's information.  Do you recognize this document?

A.  I do.

Q.  And what is this document?

A.  This is a declaration that I provided on September 25th, 2015, regarding the analysis that I just described of what could have been presented at the sentencing phase regarding Mr. Runyon's developmental adversities.  And as I did this report, to be transparent about what was presented at trial, whenever there was a historical fact or perspective that was presented at trial, I put that in italics in the report as compared to the normal text that demonstrates whatever else was unset at trial.

Q.  And scrolling ahead to the end of the report, is this declaration signed?

A.  It is.

Q.  And by whom was it signed?

A.  I signed it.

Q.  Do you recall who asked you to prepare this declaration?

A.  Yes.  The Federal Defender of the Eastern District of Tennessee.  I believe Susanne Bales was the attorney that I was interacting with.

Q.  And does this appear to be a true and accurate copy of a declaration you prepared in 2015?

A.  It does.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1209

MS. PEIFFER:  I would move to admit Petitioner's Exhibit 31 into evidence.

MR. SAMUELS:  Your Honor, I have some specific objections that I want to draw the Court's attention to.  I know the Court can sort this out, but if I could just be heard to lay this on the record, please.

THE COURT:  Yes, you can be.

MR. SAMUELS:  Thank you.  Your Honor, this is --

THE COURT:  It's not on the screen.  Let me go right to the exhibit.

MR. SAMUELS:  Thank you, Judge.  It is Defense Exhibit 31, Your Honor, if I didn't say that clearly. Sorry.

THE COURT:  All right.

MR. SAMUELS:  Thank you, Judge.  Your Honor, to put this in context, when we were back at the sentencing hearing in 2009, I had asked Dr. Cunningham a question about mitigation evidence on cross-examination, and that question was objected to.  The Court rightly found that to be an improper question because it draws for a legal conclusion in matters that the Court is going to deal with because Dr. Cunningham wasn't qualified to testify about what constitutes mitigation evidence.  But if the Court looked at this report, and I can start with Paragraph 7, Page 9 -- excuse me, Paragraph 9, Page 7, Your Honor.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1210

THE COURT:  I'm there.

MR. SAMUELS:  Your Honor, if the Court looks at conceptual considerations in Paragraph 9, Dr. Cunningham talks about, in the second sentence, "Moral culpability as a concept at the heart of mitigation."  He then cites a series of cases.  He goes on to essentially define what mitigation is, and he is not qualified to do that.  He is not a legal expert.  He's got no law degree or training in the law.  So that's one problem.

THE COURT:  So that's in his conceptual considerations?

MR. SAMUELS:  Yes, Your Honor.  Then beginning on Page 8, down on paragraph -- actually, starting on Paragraph 13, Your Honor, 13 all the way through 20, Dr. Cunningham includes a description of what the defense did in the case and an analysis of what the defense did, characterizing that the defense did not do a good job in explaining this, developmental experiences, saying that the defense did not present a coherent theory of mitigation, saying that the defense engaged in inadequate presentation mitigating the theory and its implications, and really just going through all that the defense did and didn't do.

I understand Dr. Cunningham can talk about what his findings are, but he is not a Strickland expert, Your Honor. He is not someone who can come in here and say this is what

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1211

the attorneys did, and this was not proper.  But that's what these paragraphs relate to in Paragraphs 13, really, through 23, including in Paragraph 23 on Page 11, where he says, "The defense did not explain or respond to testimony."  It's very critical of what the defense strategy was.

In the government's view, that's not the appropriate role for Dr. Cunningham to come in here and provide an analysis and criticism of what trial counsel did.  He can talk about his own opinions on the adverse development from reviewing all of the records he reviewed, but to go back and critique trial counsel is not the appropriate purview, Your Honor.

MS. PEIFFER:  Your Honor, if I could just add, I do not plan to ask Dr. Cunningham about that issue and that part of his report.

THE COURT:  Because it's really up to this Court and the Fourth Circuit to make the critique, and there was no finding of error on the instructions on mitigation and what constituted mitigation that the Court made to the jury.  In other words, the Court decides what constitutes mitigation evidence, so instructs the jury, and they look at that.  Then the question becomes whether the attorneys were ineffective for not presenting certain mitigation evidence.

But I agree with Mr. Samuels that Dr. Cunningham's critique of the attorney's performance is not any way

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1212

binding on the Fourth Circuit or this Court, and that he should steer away from the critique.  He can say what he could have done and why he thinks it's important, but not that the attorneys were, the words that he used, basically that they did not present or explain, and then he says that basically they should have.

So, consequently, I think you should stay away from his critique of what they should have done, just to say what could have been done.

MS. PEIFFER:  Understood, Your Honor.  Thank you.

THE COURT:  I think that's what you were saying to me or aiming to do.

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  All right.  That's fine.

MS. PEIFFER:  So I move to admit Petitioner's Exhibit 31.

THE COURT:  It's admitted with the caveat that I just ruled on, which are on the conceptual considerations citing the case law and then findings that start on Page 8, and Paragraph 13, they start at 12 and go over to the other page.  So stay away from his opinions about their performance, just what he could have done and that he is able to do.

MS. PEIFFER:  Yes, Your Honor.

(Petitioner's Exhibit 31 received in evidence.)

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1213

BY MS. PEIFFER:

Q.  So, Dr. Cunningham, going back to your 2015 declaration, could you please briefly describe and summarize what you reviewed and what you did to form your opinions about the adverse developmental factors.

A.  So this was a records- and file-based analysis that was based on as complete a set of background records on Mr. Runyon as had been developed in 2015, and also the declarations of numerous individuals who had been observers of his history.  And it also reflected the mitigation investigation that had been undertaken by Sheila Cronin and her summaries about that.  It contained additional interview summaries that federal *habeas* counsel had done and their investigation as well.  So it was a much broader and more complete file on which to analyze Mr. Runyon's history.

Q.  So I'm going to show you on the screen, starting with Page 3 of your report.  Are the materials you reviewed listed in your 2015 declaration?

A.  They are.

Q.  If you could just scroll through to Page 3 of 7.

A.  And I had left out transcripts and also expert records that I had the benefit of, and expert files.

Q.  So can you describe the types and categories of materials you relied on to prepare this declaration?

A.  So those categories would be historical records,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                            1214

summaries of investigation interviews, declarations of third parties, observers in his background, expert reports and their files, transcripts of the sentencing phase, and then offense-related records as well related to both Mr. Runyon as well as co-defendants.

Q.  Is that the type of material that you would typically rely on in creating a report regarding mental health in capital sentencings?

A.  Yes, particularly at an appellate stage.

Q.  I'd like to show you what has been marked as Petitioner's Exhibit 99.  So this is the first page of the exhibit.  We can scroll through.  It's a fairly lengthy document, but we can show you at least several pages.

Do you recognize this document as -- this is Page 8 of 907?

A.  I do.

THE COURT:  Wait just a minute.  I've got one binder that you go through 50, and then I start another binder with 101.  There are two more binders here.  Exhibit 99 starts with the affidavit of Sheila M. Cronin and goes on for the whole binder.  I guess it continues into the next one?

MS. PEIFFER:  I don't have the binder in front of me, Your Honor, but it's 907 pages total.

THE COURT:  What is it?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1215

BY MS. PEIFFER:

Q.   Dr. Cunningham, can you describe what this document is?

A.   This is Sheila Cronin's mitigation file.

Q.   And if we keep scrolling through that, what is the first document?

A.   Following the affidavit of the first document is the social history.

Q.   And these documents are in a collection.  Do you recognize what this collection is?

A.   I do.

        MS. PEIFFER:  Considering the length of the document, can I show the expert the paper copy instead of scrolling through on the monitor?

        THE COURT:  Certainly.

        MS. PEIFFER:  Thank you.

BY MS. PEIFFER:

Q.   I think is a more efficient way to page through it, Dr. Cunningham, to see what the full document looks like.

        THE COURT:  It is two binders, at least that's what I have.

        MR. SAMUELS:  We are missing some pages, Your Honor, but we have two binders as well.

        THE COURT:  I have two binders up here that are full.  One says, on the front of it, Exhibit 99, Pages 1 through 450, and the other one says Exhibit 99, Pages 451

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1216

through 882.

MS. PEIFFER:  It is a very long document, Your Honor, 900 something pages.

THE COURT:  What is it?

BY MS. PEIFFER:

Q.  I'm just giving Dr. Cunningham a chance to look. Dr. Cunningham, when you're ready can you describe what this document is a compilation of?

A.  So this is ultimately the mitigation file of *habeas* counsel that includes Sheila Cronin's mitigation file, but then there is subsequent additions to it with her own investigation and expert reports and records.

Q.  And were you provided this document prior to drafting your report?

A.  I was.

Q.  Did you rely on the materials in this lengthy document as you were forming your opinions and reaching your conclusions?

A.  I did.

THE COURT:  I thought you said I wasn't.  Were you given this document before you formed your opinion?  What was your answer?

THE WITNESS:  In 2015, Your Honor, when the federal *habeas* counsel contacted me about identifying what could have been presented at trial, the materials that they provided me were this mitigation file representing their

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1217

file they put together.

THE COURT:  Some of this was presented at trial.

THE WITNESS:  Yes, ma'am.  For example, the transcripts of the trial were also provided to me.  So I was aware of what was presented at trial.  So then as I prepared my declaration and identified these factors, I indicated what aspects of the history were described at trial.  I placed that in italics in the report.

THE COURT:  But Sheila Cronin testified at trial.

THE WITNESS:  Yes, Your Honor.

THE COURT:  I'm not understanding what this document is, consisting of 882 pages, that he is being asked to identify.  That's the straightforward, simple question.  What is the document?

MS. PEIFFER:  You want me to answer the question?

THE COURT:  Well, I don't know.  You've got an exhibit that you've labeled 99 that consists of 882 pages, and you're asking him to go through it.  But I don't even know what the document is and what the purpose is of him going through it.

MS. PEIFFER:  I understand.  So this document, admittedly very lengthy, was provided to Dr. Cunningham.

THE COURT:  The whole document?

MS. PEIFFER:  Whole document, as part of what he reviewed and relied on to prepare his report in 2015.  And

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1218

so that -- because under Rule 703, he used this document, among others, and relied on all of the different parts of the document. He, for transparency, wanted to provide everything, so it is a very long document, and he reviewed and relied on them in creating his report and forming his opinions.

THE COURT: You reviewed all of these documents in here?

THE WITNESS: Yes, ma'am, that's my recollection.

THE COURT: How many hours did it take you?

THE WITNESS: I spent 54 hours in document review and preparation of the declaration.

THE COURT: That was this plus other documents?

THE WITNESS: Yes, Your Honor.

THE COURT: How much did you charge for all of that?

THE WITNESS: My billing rate is 360 per hour. I don't have a calculator with me on the stand.

THE COURT: I'm just being sure you actually went through all of these documents?

THE WITNESS: Well, yes, ma'am. To the best of my recollection, I went through all the documents that were provided.

THE COURT: But this document would have taken you approximately 50 hours?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1219

THE WITNESS:  That and the drafting the declaration.  I spent, as I can best reconstruct my billing file at that time, it appears to me that I spent 54 hours at that time.

THE COURT:  That would be reviewing the documents and preparing your report?

THE WITNESS:  That's correct.

THE COURT:  Go ahead.

BY MS. PEIFFER:

Q.  And, Dr. Cunningham, now that you've reviewed this document more carefully, I want to clarify, is this document something you reviewed and relied on in forming your opinion?

A.  It is.

MS. PEIFFER:  I would move to admit Petitioner's Exhibit 99 into evidence.

MR. SAMUELS:  Your Honor, I'm going to object. Dr. Cunningham can certainly say what he reviewed, and that's certainly within the purview of the rules, but admitting the underlying documents, some 900 pages of documents that just contain hearsay after hearsay after hearsay and substantive evidence, some of which was not available at the time of the trial, there were interviews in here from 2015, 2014, there is trial testimony transcript that he wouldn't have had availability to at the time.

He can say what he looked at, and it's all in his

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1220

declaration, but I don't think we need to admit 900 pages of substantive evidence.  It just wouldn't be done in a trial setting where an expert would come in and say this is what I looked at, but he wouldn't be able to admit all of that hearsay that the expert relied on.  He can rely on it, but it doesn't come in as additional substantive evidence.

THE COURT:  Where is his report?  Doesn't that lay out what he relied on?

MR. SAMUELS:  It does, Your Honor.  That's in Defendant's Exhibit 31.  I don't know if this is exactly the same, but it does list.

THE COURT:  I'm looking at 31.

MR. SAMUELS:  In binder 2.

MS. PEIFFER:  Your Honor, in case I have been unclear, I want to make clear that I'm not asking that every document be admitted for the truth.  We are seeking to introduce this document so that the Court could better judge.  The Court is tasked with reviewing Dr. Cunningham's testimony and his report, and we thought it could be helpful to the Court under Rule 703 to have materials that Dr. Cunningham relied on, and, you know, of course, there is no jury here, and the Court is capable of taking the documents for what they are worth.  This is part of the facts and data that Dr. Cunningham relied on to form his opinions.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1221

THE COURT:  Well, why don't we start with Page 1 of the document, and you can say he relied on it and what he took from it.  You are asking the Court to look at 882 pages of a document and decide that he looked at it, and he put it in his report or considered it in his report.  So we will just have to stay and go through 882 pages, and where there is hearsay and so forth.  You can't just throw in a document that's almost a thousand pages of reports when a lot of this has been in testimony.  Sheila Cronin testified.  In his report he's attached testimony.  He's got a very thorough report.  He's attached testimony, and now we are just going to admit a document that is replete with hearsay and inadmissible evidence.  So if he relied upon it, he needs to go through and say, you know, this is what I used, and this is how I used it.

This is just creating an unmanageable situation at this point when you introduce a document and say, well, 900 pages were there, and he went through them, and he formed an opinion.  Well, let's know what he used to form the opinion. If the opinion had been formed and had been presented to a jury, then that's what he would have to do.  Certainly wouldn't be able to present 992 pages to a jury or 882 through this witness.  Let's go.  He can verify whether he looked at the page or not, if he can remember it, and tell us under oath.  So go for it.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1222

MS. PEIFFER:  Just to clarify, Your Honor, I should ask him if he looked at each page and relied on it.

THE COURT:  Each document in here, yes.  Start with identifying the document, start with it, and we will go through it.

MS. PEIFFER:  If the Court would prefer, we can -- I tried to do this so that the Court and the government have everything, just in the interest of full transparency.  We can try to split it in document by document, and there are some particular documents that have already been admitted into the record and many that have not, and so we can try to streamline the process, we can try to focus on the ones that have not already been admitted that he relies upon.

THE COURT:  Because this is something that he prepared, the report is what he prepared that you had when you went to the Fourth Circuit, right?

MS. PEIFFER:  The report, yes, Your Honor.

THE COURT:  In 2015.  So that's the report that we are concerned with and what he relied upon, isn't it, at this juncture?

MS. PEIFFER:  The report, yes, Your Honor, and you had brought up, for example -- I don't want to run afoul of the Court's order, but he didn't rely on the February testimony because he had never seen or heard it.

THE COURT:  I understand.  But what I understand

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1223

you're presenting is for *habeas* counsel, and he said he worked with Ms. Bales, and that he prepared this other report, aside from the risk assessment, about his background and all the other factors that he has said are important for the second type of report that he would have prepared.  Then he prepared that report, and he listed the documents.  He prepared that report, that's number 31.  He prepared that report, and he listed the documents.  I have admitted, I believe, 31, with a caveat there about certain legal opinions and assessments of the attorneys.

Now, this is all the backup documentation.  But if it is, then we need to know what is really important in this backup documentation, what he really relied upon to form this report, because he condensed it, and he has a lot in his report.  But it is certainly not 882 pages.

MS. PEIFFER:  Yes, Your Honor.  We can attempt -- if it meets with the Court's approval and the government's, we have some documents, as I said, are already in evidence. We have some pieces that we can give that are pieces of Exhibit 99, and once we get to the substance of Dr. Cunningham's testimony, he will be discussing individual things that he relied on in forming each part of his opinion.

THE COURT:  Well, let's take a 30-minute luncheon recess, and you get with Ms. Ali and Mr. Lee and decide what

JODY A. STEWART, Official Court Reporter

it is you want to present in terms of the documents that he relied on.  All?  You do, you can do that.  We can go through every one of them, or you can present what you consider the pertinent, relevant ones for the purposes of this hearing.

MS. PEIFFER:  Thank you.

THE COURT:  The Court stands in recess for 30 minutes.

(Luncheon recess from 2:33 p.m. to 3:09 p.m.)

THE COURT:  Counsel, one thing that is bothering me, because I think sometimes we get confused between criminal and civil.  But in civil cases, the expert testifies, but his written opinion doesn't actually come in.  In other words, and I know you all are criminal attorneys, but this technically is a civil proceeding, and the way those proceedings work is you have to identify your expert, you have to identify the expert opinion and anything that that expert relies upon.  But if this were a jury trial, I would tell you that all of that does not go before a jury in a civil case.  The only thing that goes before a jury in a civil case would be the expert's opinion and maybe some demonstrative evidence or demonstrative exhibit.  But the expert testifies, these are my qualifications, this is my opinion as elicited from the attorney, not saying here is my opinion, go read it, and then they say what they relied

Cunningham, M. - Direct                                          1225

upon.

So we really get far afield when we start entering an expert opinion, because those aren't entered. The expert testifies about his or her opinion, and then after being cross-examined, the only thing that comes before the Court or the jury is what are your credentials, what is your opinion, and what is the basis for that opinion?

So this just goes so far afield of what the rules of evidence and procedure allow for experts. So I'm a little confused about why we would want to get all of this in, but maybe you really don't. That's where I'm going with this. I've admitted his opinion, and I'm going to read it and go through it, as I will for all of your experts because they've been presented to the Court, and I've actually read them in advance. This is when I started thinking about it.

In my 38 years' experience, I've never had anybody submit something like this with 800 pages that an expert looked at. That's for the expert to explain and for the attorney to get all of that out from the expert. But go ahead and tell me what it is you want to do, Ms. Peiffer.

MS. PEIFFER: Thank you, Your Honor. Thank you for giving us a little bit of time to get our thoughts straight and figure that out. We have decided that probably the most efficient thing to do is that we have picked out some parts of Exhibit 99 that are particularly useful, and we will

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1226

introduce them as we get to them, I think that
Dr. Cunningham relied on.  Just as a housekeeping, I'll
explain these.  We have five copies.  So we have paper
copies.  These are already in the exhibit binders as part of
Exhibit 99.  We thought for convenience, we could give a
copy to the government and the Court and Dr. Cunningham as
we go through.

We did not have time to put exhibit stickers on
everything, but we have one copy with an exhibit sticker,
and if it meets with the approval of the Court, we can
designate them for 99A, and these are already part of 99,
but we will use the smaller pieces and show them to
Dr. Cunningham as we go through the substance of his
opinion.

THE COURT:  Then you can get it straight with
Ms. Eubanks.  As long as we know, if she can get it straight
is 99A, B, C, D, and so forth.

MS. PEIFFER:  Yes.

THE COURT:  Okay.

MS. PEIFFER:  Is that acceptable?

THE COURT:  Yes.

MR. SAMUELS:  And, Your Honor, I think we would
probably have some objection to authenticity or hearsay.  My
understanding is the Court is going to look at those
documents, but we may just make them as they come in just to

Cunningham, M. - Direct                                              1227

preserve our objection.

THE COURT:  That's fine.

MR. SAMUELS:  Thank you, Judge.

BY MS. PEIFFER:

Q.  Dr. Cunningham, we left off with talking about the materials that you reviewed and relied on, and I am going to show you what has now been marked as Petitioner's Exhibit 99A.  That exhibit is also on the screen for ease of reference.

Dr. Cunningham, do you recognize this document?

A.  I do.

Q.  Could you please describe what this document is?

A.  These are David Runyon's high school and college records.

Q.  And is this one of the things that you relied on in forming your opinion?

A.  It is.

Q.  And is this an example of the type of the document that you would typically rely on in forming an opinion about adverse developmental factors?

A.  Yes.

MS. PEIFFER:  I would move to admit Petitioner's Exhibit 99A into evidence.

MR. SAMUELS:  Your Honor, just the objection that Dr. Cunningham didn't go and get these records.  He can't vouch that they are from the schools other than he's just

Cunningham, M. - Direct                                                   1228

reviewed them, but I understand the purpose of their

consideration, but just with that caveat.

THE COURT:  They would be hearsay without them

being authenticated.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I agree.  Go ahead.

(Petitioner's Exhibit 99A received in evidence.)

BY MS. PEIFFER:

Q.  I am now going to show Exhibit 99B.  Dr. Cunningham, do

you recognize this document?

A.  I do.

Q.  Could you please describe what it is?

A.  This is a file regarding David Runyon's military medical

records, and it reviews some abstracts of that and of a

digest for the first several pages in the beginning, as well

as his own description of his medical history and the

interview and then the actual medical records themselves.

Q.  You mentioned the digest.  Could you tell who created

that digest or where that digest came from?

A.  Yes.  That's on Sheila Cronin's letterhead.

Q.  And did you rely on this document in forming your

opinion?

A.  I did.

Q.  Is this an example of the type of document you would

typically rely on to form your opinion about adverse

Cunningham, M. - Direct                                          1229

developmental factors?

A.  Yes.

        MS. PEIFFER:  I would move to admit Petitioner's Exhibit's 99B into evidence.

        MR. SAMUELS:  Your Honor, this would be our same objection.  This is hearsay report of Sheila Cronin, what looks to be a statement, notes from the defendant, another interview report of another individual, and some medical records.  So, again, I understand the purpose of it, but our same objection to hearsay and authentication.

        THE COURT:  Well, I told the clerk to mark it admitted with the caveat that it contains unauthenticated hearsay.

        MR. SAMUELS:  Yes, Your Honor.  Thank you.

        (Petitioner's Exhibit 99B received in evidence.)

BY MS. PEIFFER:

Q.  Dr. Cunningham, you mentioned evaluation of adverse developmental factors in your 2015 report.  Can you briefly describe how those factors are relevant to capital sentencing.

A.  So those adverse developmental factors go to limitations in the resources that someone brings to their functioning decision-making of moral reasoning, self-control, behavior.  So those go to limitations in those resources.

Q.  And without getting into the details at this point, did

Cunningham, M. - Direct                                                    1230

you identify any such adverse developmental factors in David

Runyon's background?

A.   I did.

Q.   What did you find generally regarding the impact of these

developmental factors in Mr. Runyon's background and mental

health?

A.   I found that there were a myriad of factors, 18 specific

adverse developmental factors that singly and collectively

increase the likelihood of life dysfunction, criminality and

criminal violence in his behavior.

Q.   And we will be getting shortly to a more detailed

discussion of those factors, but before I do that, I wanted

to ask you about whether you ever provided another report

after your 2015 declaration in David Runyon's case?

A.   I did.

Q.   I'm showing you a document marked as Defendant's Exhibit

149.  Do you recognize this document?

A.   I do.

Q.   Could you please explain what it is.

A.   This is an addendum report that I provided to Susanne

Bales on January the 5th, 2023, after I had reviewed the

psychiatric evaluation report of Richard Dudley, M.D., dated

September 29th, 2015, and the neurology, psychiatry,

neurophysiology report of Siddhartha Nadkarni, M.D., dated

11-9-22.

Cunningham, M. - Direct                                           1231

Q.   Just paging through this, is this a true and accurate copy of your addendum?

A.   It is.

Q.   And what is the date on your addendum?

A.   January the 5th, 2023.

Q.   To whom did you address the addendum report?

A.   Susanne Bales with the Federal Defender Services of Eastern Tennessee.

Q.   And did you sign this report?

A.   I did.

        MS. PEIFFER:  I would move to admit Petitioner's Exhibit 149 into evidence.

        MR. SAMUELS:  Your Honor, this report dated January of 2023 looks like it relies on information that certainly wouldn't have been available at the time of trial, relying on a report of 2015 and November of 2022.  It's also completely conclusory.  There is no analysis or anything that we usually see in expert-type reports that links a conclusion to any kind of process, and we would object to it on those grounds.

        THE COURT:  Well, he'll need to testify from the report.  He's given this report, but I agree, he just can't say that based on certain reports his history includes, and he says community and disturbed, and he goes through four or five things, but he needs to say how he made these

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1232

decisions.

MS. PEIFFER:  Yes, Your Honor, and he will do that in his testimony.

THE COURT:  Lay the foundation, then, first for it.

MR. SAMUELS:  The problem, of course, Your Honor, is we don't have that.  We don't have that information as to how he made these decisions.  All we have is his conclusory report.

MS. PEIFFER:  Well, he is relying on the reports of other experts, which the government does have, and under Rule 702, he's relying on the facts and data as an expert in his field would do.

MR. SAMUELS:  He can do that, Your Honor, but we are still entitled to disclosure as to what his opinions are and how he came to those opinions, and that's what's absent from this report.

MS. PEIFFER:  They are defense experts, and Dr. Cunningham was provided copies with the report.  As he testified earlier, part of his job as the forensic psychologist is to look at all of the evidence, including the opinions of other experts, and to describe how everything comes together and to synthesize that information.

THE COURT:  Well, these other experts are going to testify.  Can't they testify about their conclusions?  He's

JODY A. STEWART, Official Court Reporter

looking at other people's conclusions and saying based on these, I conclude.  Well, you haven't even presented the other expert reports yet.  This is true, these are just conclusions here.  Why can't these other experts testify?

MS. PEIFFER:  Well, Your Honor, Dr. Nadkarni will be testifying.  We thought it more efficient to allow Dr. Cunningham to testify at one time.  As you know, we worked very hard to work out the schedules of testifying experts.

THE COURT:  It still has to be presented properly.  This just can't be opening the flood gates to throw in anything you want.  This is a report that says I reviewed the findings.  This is like bolstering up somebody else's report.  He's not here to do that.  He is here to give his opinions.  What he's doing, he is saying based on these reports, he's expanded the arena.  Is he going to sit here and go through every one of their reports and say what he relied on to expand his arena?  You can't stand up there and give conclusory testimony.  I will mark it.  It is not entered, it will be marked rejected, because any Court, anyone looking at this can see that he has supplemented findings to Ms. Bales based on two other experts that this Court has not heard in this proceeding, and then he's making just conclusions that his history includes these things.

I sustain the objection on this report until there

Cunningham, M. - Direct                                          1234

is a proper foundation laid for it to come into evidence.

MS. PEIFFER:  I would just note that under Federal Rule of 702, sorry -- Federal Rules of Evidence 702, Dr. Cunningham is permitted to rely on other experts because the rule provides he can provide testimony based on sufficient facts or data, and the notes to that rule of evidence specifically say that the term "data" is intended to encompass the reliability of other experts.

THE COURT:  First, we have to have the opinions of those experts.  How can I evaluate his opinion based on other experts that I haven't heard?

MS. PEIFFER:  I believe Dr. Cunningham will testify when we get to that point, which was my next question.

THE COURT:  Well, keep on going.  I don't know how much weight I'm going to put on that.  I'm listening to testimony from him about other experts, but I haven't heard from the other experts.  So he'll have to say precisely what it was that he relied upon, not just his conclusions to say I looked at these reports, and I made these conclusions, because that's what anybody looking at 149 would say, I looked at these reports.  That's the first paragraph.  Based on these reports and the associated history therein, I find transgenerational family dysfunction -- I'm just reading that in the beginning -- family and parenting, mother's inadequate bonding, community, peer alienation, and

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1235

rejection.  It is just a conclusion.  So I don't know how he concluded this except based on their reports.  He can base it on their reports, but we have to know what in their reports he based it on, and then where is this conclusion and basis in his report.

MS. PEIFFER:  Yes, and I believe that will be made clear, Your Honor.  I just want to note, because this was an addendum, it was meant to accompany his 2015 report where he lays out in great detail the things like the transgenerational factors, and we will get into that in a moment, but he summarizes them, I believe, at the beginning of the addendum because it is an addendum to his 2015 report where he, I believe, in 55 pages or so lays all of those out in great detail.

MR. SAMUELS:  Your Honor, he adds these two new categories.  He adds the new categories of community and disturbed trajectory.  Then on the second page, in 14 through 18, he lists what those are.  But there is no description, as you would have in an expert report, as to how he gets there.  We have been provided no disclosure as to what the process is used to get there.  So it's a problem not only of him conclusory but just inadequate disclosure as well.

MS. PEIFFER:  Well, an expert can elaborate on the opinions that they made in their report during the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1236

testimony.  He's not going to be expressing a new opinion today.  We will provide more details to answer questions, but he will be elaborating on the opinions that he provided in this addendum.

THE COURT:  Well, I'll let him testify about it and how he reached those opinions, and what kind of weight I give it is another matter.  In other words, this is just a conclusory two or three pages, and he can testify, as I said before, about his report, and then I will decide what weight to give it.  But the report itself is not self-explanatory and doesn't make sense without testimony, and I don't know how viable it is after I hear the testimony, depending upon what it is.

So you can ask him about this report, but at this juncture, I'm not admitting the report.  You can ask him about it and what conclusions he reached, and then I will just have to determine what weight to give his testimony.

MS. PEIFFER:  Yes.  I'll move on.

BY MS. PEIFFER:

Q.  Dr. Cunningham, did you rely on Dr. Dudley's and Dr. Nadkarni's reports in forming your opinions about Mr. Runyon?

A.  I did.

Q.  How?

A.  Dr. Dudley provided additional detail about Mr. Runyon's

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1237

interpersonal relationships and social interactions in his childhood and teams and adulthood that I have not previously had a descriptive detail about. He also described diagnostic findings from his in-person psychiatric evaluation.

I had not had the -- I've reviewed prior reports regarding Mr. Runyon but found this to be a broader and more comprehensive analysis of his psychological status and vulnerabilities, and so I incorporated the report of those diagnostic findings as part of a disturbed trajectory factor of mental health, psychological disorders, and neurocognitive disorders that Mr. Runyon had as an adult.

Q. And is this the type of information, reports from other experts, that you typically rely on in forming opinions about adverse developmental factors in a person's life?

A. It is.

Q. Dr. Cunningham, have you prepared a presentation summarizing and explaining your evaluation and findings regarding Mr. Runyon?

A. I have.

Q. Did you prepare a demonstrative slide to summarize your testimony?

A. I did.

Q. And do those slides accurately reflect the opinion you rendered in this case?

A. They do. They are necessarily an outline of that. The

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1238

full detail is in the 55-page report, but this represents an outline and a summary of those findings.

Q.   Would these slides be helpful to you in your testimony?

A.   They would.

Q.   Pull up the PowerPoint now.

        THE COURT:  You can go ahead.

        MS. PEIFFER:  Sorry.  Thank you, Your Honor.  I do mention, the government and the Court have paper copies of this presentation.

        THE COURT:  This is a demonstrative exhibit that just accompanies his testimony.  The testimony is the evidence?

        MS. PEIFFER:  Yes, Your Honor.  Would it be permissible to provide a paper copy to Dr. Cunningham as well?

        THE COURT:  Certainly.

        MS. PEIFFER:  I realize there are a lot of slides, and I believe the Court remarked on that earlier.  We will try to move as quickly as we can, being cognizant of the time.

BY MS. PEIFFER:

Q.   Dr. Cunningham, can you briefly summarize what you found regarding adverse developmental factors in David Runyon's life?

A.   Yes.  I found adverse factors in all five primary arenas

Cunningham, M. - Direct                                    1239

of analysis as we look at different arenas of developmental

factors, and those are transgenerational, neurodevelopmental,

family and parenting, community, and disturbed trajectory.

Q.  Are you able to name adverse factors within each arena,

which we will talk about in more detail later in your

testimony?

A.  I can.

Q.  Going to transgenerational factors, how many

transgenerational factors did you find in David Runyon's

background?

A.  I found two.

Q.  And how many neurodevelopmental or wiring adverse factors

did you find in David's background?

A.  Four.

        MS. PEIFFER:  Just a moment.  For the Court's

information, this is just a road map.  We will be talking

about them in more detail.

        THE COURT:  All right.

BY MS. PEIFFER:

Q.  How many family and parenting adverse developmental

factors did you find?

A.  Seven.

Q.  And how many community adverse developmental factors did

you find?

A.  Three.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1240

Q.   Finally, Dr. Cunningham, how many disturbed trajectory adverse developmental factors did you find?

A.   Two.

Q.   Dr. Cunningham, as you evaluated adverse developmental factors in David's life, what was the first arena that you focused on?

A.   The first arena was transgenerational.

Q.   What was the first adverse factor in the transgenerational arena?

A.   The first was transgenerational family dysfunction and distress.

Q.   Are the generations preceding David, for example, his extended family, relevant in some way to David's own outcome?

A.   They are very important.

Q.   How?

A.   Well, first, the child is predisposed through heredity in terms of vulnerabilities to substance abuse, mood disorder, many other psychological disorders and also is predisposed in terms of personality characteristics through heredity, whether or not they are adopted at birth, never meet the person, it's not about degree of association but instead simply the genetics that they've inherited, much like for heart disease and high blood pressure.

          MR. SAMUELS:  I'm going to object.  Dr. Cunningham is not a geneticist, he's not a medical doctor.  What's the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1241

foundation for him to be able to go through and say these are all inherent characteristics from his qualification as a forensic or clinical psychologist?

THE COURT:  You need to lay a foundation for that.

BY MS. PEIFFER:

Q.  Dr. Cunningham, did you review the research as it existed in 2009 about the relevance of a family history over generations to a person's development?

A.  I did.

Q.  And what does that research tell you?

A.  Well, that research is of a longstanding nature and describes the role that hereditary factors have in psychological disorders and in personality characteristics. The diagnostic manual that psychiatrists and psychologists use, the DSM now, DSM-5-TR, and including the DSM-IV-TR that was in place back in 2009, with each diagnostic category, there is a paragraph addressing hereditary components to it.

So from my clinical training, closing in on 50 years ago, to date, there has been an awareness of psychological disorders and traits having a hereditary aspect to it that's well-established in the field of developmental psychology, clinical psychology, psychiatry.  It's a standard part of taking a history as you try to identify what diagnosis is present in a particular individual and as you're trying to make a diagnostic differential between different conditions.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1242

Taking a family history of psychological disorders and traits is a standard part of the history that a psychologist takes.

Q.  And what does the research as it existed in 2009 tell you about family behavior patterns and whether those are multi-generational?

A.  That data reflects, or that research reflects the heredity is one mechanism by which family generations influence each other.  That's one piece, is heredity.  There are other pieces as well, or other perspectives as well. They are what are called scripts.  Scripts are the unwritten story of how your life is supposed to go.  It's the data that you're picking up from your observations of your own family, what you're told about your family history, observations of the community around you, that you're then formulating into kind of a map of how your life is supposed to proceed.

Those scripts may be very functional and positive. It was never on my radar screen at all not to finish high school, not to finish college, for that matter.  That's just part of the script.  Those scripts may be very maladaptive in nature.  For example, in my clinical practice, I had a 16-year-old girl who was pregnant and married whose mother was pregnant and unmarried at 16, whose mother before her was pregnant and unmarried in her mid-teens.

There is more going on than just this little girl's decisions in the back seat of a car.  This is a script of how

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                          1243

your life is supposed to go.  And those may be either positive or negative, and they're derived from that family observation and understanding of family history.

There is also modeling.  Modeling is when you catch yourself doing the things your parents did that you swore you never would.  It's imitation, whether you really wanted to do that or found it functional, it's the behavioral programming that occurs in childhood as you observe others behaving and then you adopt their behavior, their voice cadence, their mannerisms, all kinds of things, including the way they may interact with other people.

Then there's another mechanism, and that's sequential damage.  Sequential damages mean that Suk Cha was profoundly psychologically damaged as a child by what happened to her, by what happened to her in the Korean War, by the dislocations that happened in her own family.  So she grew up into early adulthood, and she is a damaged person.  Then she has children.  She has David and Mark, and she's a damaged mother, and she mothers them badly.  And as she does that, she damages the next generation, and they grow up as damaged people with their own limitations that are being exhibited in their behavior and then also in their parenting, and they may parent their children badly, and injure that next generation.

That's part of how you get damage from generation to

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                 1244

generation.  Then there is a broader perspective that has to

do with these transgenerational histories demonstrating a

concept in psychology called determinism, which is, as you

examine a family tree over time, and you identify how these

patterns are recurring, it demonstrates that the malfunction

or the dysfunction of any particular person is just not a

matter of their own wholly volitional choice.  They are being

influenced by this family system, by heredity, by scripts, by

modeling, by sequential damage.  So it's a case-specific

damage of determinism, which is fundamental to the science of

psychology.

Q.  Dr. Cunningham, just as a point of clarification, who is

Suk Cha?

A.  I'm sorry.  Suk Cha is David Runyon's mother, who was a

Korean national, married David Dombrowski in her early 20s,

became pregnant in Korea, immigrated to the United States.

That's his mother.

Q.  And who is David Dombrowski?

A.  David Dombrowski is David Runyon's biological father who

was a serviceman in Korea when he met Suk Cha.  He was a part

of the family -- he was part of David's contact family system

up to about age 4, and then the parents divorced, and in that

next year David Dombrowski abandoned or relinquished his

parental rights, functionally abandoned David and Mark and

did not see David again during his childhood or adulthood

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1245

until his trial.

Q.  Dr. Cunningham, when you are undertaking an investigation of adverse developmental factors for capital sentencing, why do you consider it important to do a transgenerational investigation?

A.  Because of the understanding that a psychologist has that this is a fundamental aspect of understanding human behavior, psychological disorders, personality traits, and also understanding something about how dysfunction may track along in a family system.

And so from that understanding of psychological and developmental science, when you have the capabilities and the resources, it's a good thing to have in a clinical evaluation and critically important in a high stakes forensic evaluation, to have that broader perspective about someone generationally, and as a psychologist working in a capital sentencing arena, I'm aware that that science has been informed a recommendation to take a family history back to the third generation.  That's back to the -- at least back to the grandparents as part of an investigation in a capital case.  That's the supplemental guidelines.

MR. SAMUELS:  Judge, I'm going to object.  He shouldn't be talking about the ABA guidelines.  It would be the duty of counsel to do.  That is not his role here.

THE COURT:  Sustained.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                            1246

BY MS. PEIFFER:

Q.  Dr. Cunningham, as you talk about genetic predispositions in David's family system, have you prepared a family tree to assist the Court's understanding?

A.  I have.

Q.  And what sources of information did you use to create this family tree?

A.  This is based on the mitigation investigation undertaken at the trial level and subsequently from federal *habeas*.  It includes the interviews of family members as well as their testimony.

Q.  Do you recall some of the family member interviews that you used to inform your creation of the family tree?

A.  I do.

Q.  And which were those?

A.  So this includes Sheila Cronin's mitigation investigation interviews of Suk Cha and David Dombrowski and also of David H. Runyon, the adoptive father.  It also includes the interviews that were done with Mark Runyon, the brother, and also described her interviews of David Runyon.  The expert reports also end up addressing this, also based on that same information, but basically interviews of Suk Cha, David Dombrowski, David H. Runyon, David Runyon, Mark Runyon.  I think that's the sources of this information.

Q.  Without needing to repeat, you began to talk about

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1247

David's family tree several questions ago, but could you briefly explain this chart?

A.    Certainly.  So on the chart the males are rectangles and the females are oval.  On the left-hand side is the paternal family system, and this is the biological family system, not the adoptive family system.  So the paternal side of David Runyon's father is on the left and the maternal family is on the right.

Now, the mitigation summaries and Suk Cha's reports to Sheila Cronin, at least as they are memorialized, don't include the names of her family members, and so that's why they're identified not by first name but instead by relationship to David Runyon, the defendant.

And we start at the very top with the great grandfather.  This would be Suk Cha's father.  He has a red cross on his name or his box because he was murdered by the North Koreans in the beginning of the Korean War.  Then the next generation as we are looking at -- this is David Runyon's grandparents' generation.  This would be Suk Cha's mother and father, and alternatively, or variously David Dombrowski's mother and father.  So over on the paternal side, David Dombrowski's parents, these are David Runyon's parents are Tony Dombrowski and Eleanor.

Then over on the maternal grandparents' side, there is the grandfather and grandmother.  Suk Cha's mother dies a

week after she is born, and that's why she has that black cross on her. So Suk Cha is then raised by a step-mother who's there from her earliest memory until she is 12 years old.

Step grandmother gets involved in a cult and apparently religious organization, and there is a precipitous divorce, exit. She is suddenly just not there one day, and the following day there is a new step-mother who is present. So we've got step-mother one who -- and, of course, this is a step-grandmother to David Runyon. The step-mother one that's there with Suk Cha to age 12 and then step-mother two who is there after that.

Suk Cha's parents apparently have five children. Suk Cha is the youngest of those. I know there is an uncle and aunt. I don't know the genders of the other two, and that is why they have a different shape. I don't know if they are rectangles or ovals.

Then I'm moving Suk Cha down by dotted line so that we can then represent her role as David's -- as a parent figure for David. On the other side with Tony Dombrowski, David Dombrowski is the second of nine children. He's actually only 20 minutes younger than his older brother.

So Jimmy and David are twins. And then we have these other children that follow them. And the dotted line then comes down to David so we can then represent him in this

Cunningham, M. - Direct                                              1249

navicular family system.  Suk Cha is first with David Dombrowski.  Then after their marriage ends, she is then with David H. Runyon.  David H. Runyon has a dotted square, but it is not a genetic relation.  He is a part of the family system but is not genetic.

You also see that dotted circle around the two step-grandmothers, so they are part of the family system, don't have a hereditary relationship to David Runyon.  David Dombrowski has an initial marriage that -- or he believes it's a marriage that I don't have depicted on here that precedes Suk Cha.  He marries, he goes to Korea.  Then he is advised that, in fact, the woman he married had not yet had divorce finalized, so that marriage is annulled, but he is first with Suk Cha.  Then he is with Oderay Alverola, and they have a child Anthony.  That ends in divorce after about 13 years, as I recall, and then he marries Carol.

There are two children of David and Suk Cha.  There is David who is born in 1971, January of '71, and Mark who was born in August of 1973.  So he is two and a half years younger.  Both boys born in the United States after Suk Cha and David come to the United States.

Q.  Reviewing this family tree, I want to ask you some issues in David's family system over the generations.  Who in David's family had a history of alcohol and drug abuse, and what were your sources for this information?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1250

A.  So this is alcohol and/or drug abuse, and that includes Tony Dombrowski.  The source of information for that is David Runyon's father, David Dombrowski, who I will call Dombrowski.  We've got too many Davids so I will refer to him as Dombrowski from here.

So Dombrowski is the source of information about his family system.  He provides some of that information to Sheila Cronin, and then when he is interviewed by the federal *habeas* investigators, there is additional -- significant additional detail and textures that come out about the dysfunctions in this family system.

I identify alcohol and/or drug abuse.  Because of those ways the family systems influence each other, from a hereditary standpoint, alcohol or drug abuse in a family system increases the likelihood of either alcohol and drug abuse and/or mood disorder.  There is a cross-hereditary vulnerability that is present between those.  So as we see this in the family system, it increases the likelihood of this kind of problem and/or a mood disorder.

Q.  Did you identify another disorder in David's family system that stressed the family and impacted resources?

A.  I did.

Q.  And please tell us what information you found about this, and as you do what the sources of your information were.

A.  So there is also intellectual deficiency that's on the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1251

paternal side of the family.  Eleanor, by Dombrowski's descriptions, sounds as if she is a person with mild intellectual disability, that she requires structure, that she is very dependent on her husband.  She is pretty simple, doesn't have a life outside the house, a number of -- very passive in her responses, a number of descriptions from Dombrowski that point to that.

Then two of her children, Freda and Catherine, are intellectually disabled and have had some institutional support.  Sheila Cronin, in the family history, identified that there were two other daughters -- there were actually four daughters who were intellectually disabled, two at least moderately and two more mildly.

In the subsequent interviews, the federal *habeas* did with David Dombrowski, he only identified two of his sisters as being intellectually disabled, and so it may be that he was focused on the most severe and didn't -- for whatever reason I -- so for that reason, I only coded two of them as intellectually disabled.  Now, even Dombrowski has issues.  He was learning-disabled in school and struggled with the subjects so there are some neurocognitive processing issues, learning disabilities that he has as well but not intellectual deficiency.

THE COURT:  Who is this?

THE WITNESS:  This is David's father, Dombrowski,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1252

had difficulty in school and learning disabilities and required additional instruction in some areas but has been a functional adult.

BY MS. PEIFFER:

Q.  Did you identify another factor that stressed this family system?

A.  I did.  Another one is being a war refugee.  If I could back up to that last one just in terms of its implications. So as David -- as Dombrowski is raised by a mother who is intellectually deficient, and as she has children who were special needs as well, that sharply limits the quality of nurturance and mothering that Dombrowski receives as he grows up, as well as him having kind of a light version of some of this himself with his learning disabilities.  So that's why this is coded as a dysfunction or distress, because it has reduced the resources that were available to parent him.

So then the next factor that is contributing to the distress is being war refugees, and this involves step-grandmother one, who is the one who is fleeing with Suk Cha out of North Korea when Suk Cha is five years old and going through extraordinarily arduous experiences, as are these children who are fleeing with her out of North Korea.

So this not only is a significantly traumatizing and damaging experience in Suk Cha's childhood, that's part of her being a damaged person who then parents David badly and

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1253

damages him and his brother as well, but it also goes to the idea that this family system has very limited resources available to it, limited resources for Suk Cha because these people have been damaged by this experience, and also as an extended family who might have been some support to David Runyon as he was coming up.  Instead, there is alienation within this family system.

Q.  What were your sources for that information?

A.  Suk Cha.

Q.  Did you identify evidence of mood disorders in David's family system?

A.  I did.

        THE COURT:  Let me ask you this.  Mr. Runyon did very well in high school.  It looks like it's all A pluses, As, Bs, B pluses and maybe two or three Cs.  So what you're talking about the slowness apparently didn't follow down. He didn't need special courses or whatever.  I've just looked at his high school transcript.

        THE WITNESS:  Yes, ma'am.  As I reviewed his transcript, and it might be helpful for me to take a look at that.

        THE COURT:  I thought you had.

        THE WITNESS:  Yes, ma'am, and to point to you specifically.  There are years where he is getting several Ds in his class.  He gets D pluses at times.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1254

THE COURT:  That's not until junior college.  In high school, what I'm saying is that this is a very good record.  I'm looking at A minus, C minus, B plus, B plus, A plus, B, here is a C, another C, and then a B plus, and I think that's an A plus, some of them are smeared, a C plus, an A.

I mean, there is not anything that shows a slow person who is on the order of Eleanor's children that you have described.  There are different situations when he went, which the Court has heard about factually when he went to Wentworth Military Academy.  In other words, you have to tie this into his life situation where he was then and when he went to Wentworth Military and when he went to Wichita State.  So I'm just saying it wasn't evident in his adolescence to adult years that he was in any way slow or generationally slow the way you've compared.  I don't see it.

THE WITNESS:  And that's correct, Your Honor.  I did not identify him as being learning disability as an adverse factor or cognitively limited as an adverse factor.  I did identify that these issues in the paternal family system, this deficiency impacted Dombrowski, his father, and that limited Dombrowski's ability to parent him effectively during the five years that he's there and contributed to the abandonment as well.  So that's this idea that the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1255

generations are not simply affecting each other through heredity but also by these other processes that I described.

BY MS. PEIFFER:

Q.  Did you identify evidence of new disorders in David's family?

A.  I did.  Those individuals include Dombrowski, his father; Suk Cha, his mother.  Both of them had been treated for mood disorders, including with medication from mood disorders.  His brother Mark has evidence of mood disorders.

THE COURT:  What is a mood disorder?  If I ask you to define mood disorder, is it just somebody gets angry, somebody is sad?

THE WITNESS:  No, ma'am.  That is a clinical diagnosis that these folks have received from major depression or bipolar disorder.  So by mood disorder I mean major depression, bipolar disorder, dysthymic disorder.  Schizoaffective disorder is on that continuum as well.  Those are all different expressions of former mood disorders.  And these individuals, David, Suk Cha and David Runyon have all been diagnosed with mood disorders.  His brother Mark has shown evidence of mood disorder, and I would need to look back at my notes to recall if he has been medicated for that.

BY MS. PEIFFER:

Q.  Dr. Cunningham, could you please identify the sources of

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1256

the information in this slide.

A.   Yes.  So David Dombrowski acknowledged his treatment for mood disorder.  I also have reviewed a medical record that identifies that he was getting treatment for mood disorder.

Similarly with Suk Cha, I have reviewed medical records on her that reflect her being treated for this, as well as descriptions of her that are consistent with somebody who has mood disorder.

David has been diagnosed with schizoaffective disorder by Dr. Nadkarni, by Dr. Dudley.  There is a 2008 medical record from the jail that is also considering whether he has schizoaffective disorder.

MR. SAMUELS:  Your Honor, I'm going to object.  I know that he is saying that from other doctors, but certainly Dr. Cunningham hasn't rendered that diagnosis. These other doctors that he referenced are far afield from the time of trial, in 2015 and 2022.  So he's been recognized, I suppose, but that can't be his opinion because he hasn't examined the defendant at all.

THE COURT:  Sustained.

BY MS. PEIFFER:

Q.   Just to clarify, Dr. Cunningham, I'm not asking you to diagnose Mr. Runyon.  What are you describing when you are talking about the history of mood disorders?

A.   So I have not undertaken a personal evaluation of David

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1257

Runyon to make a diagnostic formulation.  I'm describing that
there are records of others who have evaluated him who
reflect these diagnoses.

Q.   And what is the generational significance of these mood
disorder diagnoses?

A.   As this is present in his family system, it increases his
own susceptibility to mood disorder, as does the alcohol
abuse in his family history.

Q.   And did you find other generational dysfunction or
distress in David's family system?

A.   I did.  I also found histories of physical abuse.  That's
reflected with the black arrows, with the arrow running from
the perpetrator to the victim, and that includes Tony
Dombrowski, the paternal grandfather on David Dombrowski,
David Runyon's father, then David Dombrowski to David, Suk
Cha to David, and also Suk Cha to Mark.  Then David Runyon's
instances of domestic violence are reflected in that black
arrow as he has had a couple of charges.

On Suk Cha's side of the family, her
step-grandmother -- her step-mother, David Runyon's
step-grandmother, whose step-mother was physically abusive
and enlisted Suk Cha's older brother to physically abuse her
under the step-mother's direction.

Then the dotted red arrows reflect community
violence that that person has exhibited.  Tony Dombrowski was

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1258

sentenced to prison at age 15 for carrying out a hit on behalf of a mobster by the name of Tony LeBarbara, I believe the name is, in Chicago, and was subsequently then in prison until his mid-30s.  Tony Dombrowski also -- David Dombrowski, his son, leaves a pipe bomb in the local bar because the bar owner was blackmailing Tony Dombrowski.  Dombrowski -- David Dombrowski sat at the table with his father as Tony Dombrowski is assembling pipe bombs.

THE COURT:  These are grandparents?

THE WITNESS:  That's right.  Tony Dombrowski is the grandparent of then David Dombrowski, the son, his -- David Runyon's father has had instances of community violence as well, including road rage where he pulls a driver out of a car and begins beating him up for cutting him off.

BY MS. PEIFFER:

Q.  Could you please describe your sources for this information?

A.  Yeah.  So the violence on the paternal side of the family, David Dombrowski, when interviewed, is describing this history of violence from his father and also his sister, Patty, when she is drinking.  He is describing his own history of violence, although he denies physically abusing David.  That's reported by Suk Cha.

Suk Cha is describing her own history of being victimized by physical abuse.  Mark Runyon is describing Suk

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                            1259

Cha's physical abuse of him and David.  There are -- and then Mark Runyon is also describing his own community violence. David's community violence is, of course, reflected in this conviction, and there are a couple of domestic violence reports that support the black arrow.

Q.  Dr. Cunningham, I'm now going to show you what's been marked as Petitioner's Exhibit 99C.

THE COURT:  This is 99 what?

MS. PEIFFER:  99C.

MR. SAMUELS:  And, Judge, I thought we had gone over this before, and this has been objected to during Ms. Cronin's testimony because it is just replete with hearsay.

MS. PEIFFER:  This is not being introduced for its truth.  It's being introduced because, as Dr. Cunningham will testify, it was part of the materials that were provided to him and what he relied on to form his opinions.

THE COURT:  But if it wasn't introduced through Sheila Cronin, and it's coming from her file, that's, again, removed once more to go through it with Dr. Cunningham.

It wasn't allowed for Sheila Cronin because of the hearsay, so the Court has found that its probative value is not such that it outweighs the prejudicial effect of hearsay.  You're just handing him a document that's prepared by Sheila Cronin, and it was prepared for Steve Hudgins and

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1260

Larry Woodward, but it wasn't introduced because it contained hearsay.

MS. PEIFFER:  I believe, Your Honor, this is being introduced in a different way because Dr. Cunningham is an expert.  So I under the Federal Rules of Evidence 703, I'm going to ask him if he based his opinion on this, and if he would reasonably rely on information like this and under those -- depending on his answer to these questions, it would be admissible under Rule 703.

MR. SAMUELS:  But, Your Honor, we are just putting the expert imprimatur on this document, and because he is an expert, he is able to get up there and recite everything it said.  I don't think that's the point of the exception of the hearsay rule for an expert because an expert is supposed to use something to tailor his findings or opinions or conclusions.  But all we have just seen in the last several slides is Dr. Cunningham just going through the entire family history of David Runyon as if it is gospel when it comes from all these other individuals that we have not heard or he's just reviewed reports from.  They are hearsay.

THE COURT:  They have testified, a lot of them.

MR. SAMUELS:  Many of them have, Your Honor, yes.

THE COURT:  Let me look at the rule for a minute.
"If the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1261

if their probative value in helping the jury" -- they talk about the jury here, that's the way the rule is written -- "evaluate the opinion substantially outweighs their prejudicial effect."

I think you ought to be careful here, because you've got a judge that is evaluating the opinion, and it would certainly go to the weight that the Court would give the opinion. If Dr. Cunningham says, yes, I rely on things like this, and the Court has already excluded it, then it would seem that when the Court is weighing it, if it was before a jury, the Court most likely would exclude it because certainly the value to a jury would be outweighed by its prejudicial value since it's just a calculation made by Ms. Sheila Cronin. Sheila Cronin can be examined on it, to the extent that it's not prejudicial hearsay. So what I'm saying is you've got Sheila Cronin. She's testified. She wasn't allowed to testify about this. She had to testify about what she knew and so forth. I'm not going to go back over that ruling, it's been too long ago, but it's on the record. So then we say because Dr. Cunningham is an expert, we are going to let him rely on it. Well, to me, and I've got to judge his credibility, it may well diminish his opinion. So you go ahead and rely on it, and then I will determine the weight to give an opinion that relies on information such as this.

JODY A. STEWART, Official Court Reporter

MS. PEIFFER:  And I just want to add, I agree Your Honor hit on a very important distinction between the judge and your ability to determine the value of something and the jury, and the Supreme Court has explicitly said that the Federal Rules of Evidence do not place restriction on the relevance of this type of information because it's presumed that a judge, unlike a jury, would understand the limited reason for the underlying information.

THE COURT:  What are you reading from?

MS. PEIFFER:  That's a quote from *Williams versus Illinois*, 567 U.S. 50, Pages 69 to 70.

THE COURT:  Yes.  But that's a case.  That's not in the rules.  I thought you were saying that there was something in the rules to that effect.  That's just case law concerning how a judge can evaluate evidence.

MS. PEIFFER:  Yes.

BY MS. PEIFFER:

Q.  So to go back, Dr. Cunningham, have you had an opportunity to look at Petitioner's Exhibit 99C?

A.  I have.

Q.  Do you recognize this document?

A.  I do.

Q.  Could you please describe what it is?

A.  This is the social history regarding David Anthony Runyon prepared by Sheila Cronin pretrial.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1263

Q.   Was this one of the things that you relied on in forming your opinion about adverse developmental factors in David Runyon's life?

A.   It is.

Q.   Is this the type of material that an expert in your field would typically rely on to form opinions about adverse developmental factors?

A.   For purposes at a post-conviction or federal *habeas*, I would rely on it for that purpose.  If I were investigating this at a trial level, then I would interview these individuals myself.  But at a post-conviction or federal *habeas*, this is typical to rely on.

THE COURT:  Well, let me ask you this.  This was a document prepared for Mr. Hudgins and Mr. Woodward, who were the trial attorney, and they had this.

THE WITNESS:  Yes, Your Honor.

THE COURT:  They interviewed a lot of these people, and a lot of these people testified.  So this is just testimony that does not comport with what the record reflects here.  This is prepared for them.  They then followed up on much of this.  I'm not going to go through all of it.

But it was before the Court, and it's on the record where they went back and got records and his military time and the brothers.  So you're saying that this isn't

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1264

something you rely on after the fact in *habeas*, you would rely on it in forming that initial opinion, working with these attorneys, who had gotten this information?

THE WITNESS:  So I guess yes and no, Your Honor. So I'm describing that this is information that I'm assuming that if I interviewed these individuals, they would tell me this, or if they were questioned sufficiently specifically, in other words, if the attorneys are using this to work through all of this information, that they can extract this from the witnesses themselves in testimony.

THE COURT:  But let me ask you this.  You didn't do these interviews?

THE WITNESS:  That's correct.

THE COURT:  Sheila Cronin did?

THE WITNESS:  Yes, ma'am.

THE COURT:  So you're taking this from a report prepared for trial attorneys by somebody who testified at trial and testified earlier in this hearing, and so you don't know anything about Sheila Cronin's interviews?  You just know what's in this paper?

THE WITNESS:  That's correct.

THE COURT:  I'm not going to allow it.  It's been before the Court.  He said that he would rely on this if he were preparing something for trial.  Now, how is he relying on it now for a *habeas* opinion?  But it was in trial.  We've

Cunningham, M. - Direct                                              1265

heard testimony from Cronin.  We've heard testimony from Hudgins and Woodward about Cronin.  We've heard testimony about a lot of the records in here.  We've heard testimony about a lot of the people in here.  What is the basis for Dr. Cunningham to now testify about forming -- if you do, I don't put much weight on his opinion formed on a second level.  He wasn't with Ms. Cronin.  You don't know Ms. Cronin, do you?

THE WITNESS:  I do not.

THE COURT:  He doesn't know Ms. Cronin.  He wasn't with Ms. Cronin.  He doesn't know whether it's accurate or not.  He's just being given a piece of paper with some opinions in it, and he doesn't know any of these people.  He knows the attorneys, perhaps, Mr. Woodward and Mr. Hudgins.

THE WITNESS:  Yes.

THE COURT:  But he doesn't know Ms. Cronin, so he is being given this on a habeas case and saying take this as true, rely on it as an expert, and form an opinion.  Is that what you are telling me?

MS. PEIFFER:  Partly, Your Honor, and part of the reason that we tried to get Exhibit 99 admitted in its totality so Your Honor could properly judge the credibility of Dr. Cunningham, is that he didn't just rely on this report.  He relied on many, many, many sources.

THE COURT:  You just go ahead and put it all in,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1266

and I'll put what weight I think it merits.  I've made my views clear, and Dr. Cunningham doesn't even know Ms. Cronin.  You couldn't even get it in through Ms. Cronin, but you go ahead and put it all in, and let's see where it lands.

MS. PEIFFER:  Thank you.  I just wanted to add one additional thing.  We were not permitted to show Dr. Cunningham the testimony from the evidentiary hearing, so he doesn't have -- he could have reviewed that information, but we were prohibited from showing it.

THE COURT:  You are, and you still are, and I'm not going to revisit that ruling.

MS. PEIFFER:  I just wanted to note you mentioned in the hearing testimony several times, but he was not allowed.

THE COURT:  We heard the hearing testimony.  I didn't say he heard the hearing testimony.  I said we have heard all of that.  We heard much of it at trial, and we heard it again in the habeas hearing.  You are twisting what the Court is saying.  I never said that he heard the testimony, and I've made my ruling, and I'm not going to revisit it.

BY MS. PEIFFER:

Q.  Dr. Cunningham, you briefly looked at the social history report of Sheila Cronin just now, Exhibit 99C?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1267

A.  Just now I briefly looked at it.

THE COURT:  I'm sorry, Dr. Cunningham?

THE WITNESS:  So I have spent a lot of time with the document, so I haven't just briefly looked at it in total.  I have briefly looked at it just now to verify this is the social history.  I was just clarifying "briefly looked at it."

BY MS. PEIFFER:

Q.  Thank you for clarifying.  Was this the only source you relied on in forming your opinion about David Runyon's background?

A.  No.

Q.  Are there any factors for which Sheila Cronin's social history was the only source that you had for your opinion?

A.  No.

Q.  Is it typical in your practice that you rely on multiple sources of information?

A.  It is.

Q.  Why?

A.  To provide corroboration, to examine an issue from various perspectives, to get a fuller understanding of an event or relationship or history.

Q.  And that is something that experts in your field typically do in creating this kind of evaluation?

A.  That's correct.

JODY A. STEWART, Official Court Reporter

THE COURT:  What else did you rely on?

THE WITNESS:  I also relied on the testimony that these witnesses gave at trial, even though limited.  That limited aspect corroborated the fuller descriptions that were in Sheila Cronin's report.  I relied on records of, for example, the medical records of David Dombrowski or Suk Cha, the subsequent interviews that were done of them with federal *habeas* counsel.  Even things like the school records and employment records go to demonstrate the accuracy or the care that Sheila Cronin was addressing in her own summary, as I find those records and my analysis of them to be consistent with her description of the history.

BY MS. PEIFFER:

Q.  Dr. Cunningham, I'm going to show you your report from 2015, starting on Page 3.

THE COURT:  What exhibit number?

MS. PEIFFER:  31.

BY MS. PEIFFER:

Q.  So this list, interview binder, can you please describe what that is?

A.  So that's a list of the records that are kind of a primary binder that I often call an interview binder.  These are perhaps the most primary of the records.  So I may have other binders with me.  I may place the -- some of the more salient ones in an interview binder.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1269

Q.   So numbers one and two you describe that you reviewed affidavits.  Can you describe what those are?

A.   Yes.  So those are the affidavits of observers of Mr. Runyon, and those include items 1 and 2.  Then there are also declarations number 7 through 16 that represent additional declarations, and there may be others as we go.

Q.   I just want to note that the 7 through 16, it looks like there are -- maybe number 13 is not a declaration; is that correct?

A.   I'm sorry.  That's an interview of Suk Cha, yes.

Q.   And 14?

A.   And, I apologize, yes, so there is -- so affidavits or declarations are 1 and 2, 8, 9, 10, 11, 12, 15, 16 on this page.

Q.   And number 3, 4 and 5 are mitigation packets.  Could you please describe what those are?

A.   Those are interviews and investigation materials that were done by federal *habeas* counsel.

Q.   All right.  Moving on to number 17, can you please describe what that source you relied on was?

A.   Yes.  So these are the notes that were made by Jessica Johnson of the interviews of a meeting of David and Carol Dombrowski.  This is the federal *habeas* investigation.

        THE COURT:  Who was Jessica Johnson?

        THE WITNESS:  An investigator working with the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1270

federal defender.

BY MS. PEIFFER:

Q.  Go to the next page.  You just mentioned speaking about number 2.  For number 1, what was that source that you relied on?

A.  That was an affidavit of Sheila Cronin.

Q.  And number 3?

A.  Number 3 is a memo to counsel, a phone call to Jon Babineau, Lawrence Woodward regarding the adoptive father David Harold Runyon dated 8-21-08.

Q.  For numbers 4, 5 and 6 on this page, what did you rely on?

A.  These are trial testimony transcripts.

Q.  Number 7?

A.  Is Suk Cha's medical records.

Q.  And what was item number 8 that you relied upon?

A.  This is a clinic record for David Dombrowski.

Q.  Items number 9 and 10 each have two sub points.  Can you describe what those items you reviewed were?

A.  Yes.  In each case one is an interview summary and the second is their trial testimony transcript.

Q.  And number 11?

A.  This is a brief interview of Michael Grbic and also an interview -- I think his was by phone -- and then also an interview with his parents.  As I recall, he was a classmate

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1271

of David Runyon.

Q.   And what about number 12?

A.   These are the Kansas Department of Corrections employee records for David Runyon.

Q.   And 13 and 14?

A.   These -- 13 is a letter from a former employer that's undated, and then 14 is a letter from David Dombrowski regarding his re-enlistment in the Army.

Q.   So and number 15?

A.   This is the interview summary of Thomas Preston, a U.S. Army friend.

Q.   And 16 has two items.

A.   Yes.  Both an interview that's undated and also the trial testimony transcript.

Q.   And so now that we have read part of the list, are there certain people, for example, the people described in number 17 where you see their names multiple times?

A.   Yes.

Q.   So that's the page you already reviewed, Page 3, and then Page 4.  When you see those people's names multiple times, what does that indicate to you?

A.   That they were interviewed on more than one occasion, or that there is a trial transcript available of what they had to say.

Q.   Thank you.  Picking back up, what did you review and rely

Cunningham, M. - Direct                                                1272

upon as part of 18?

A.   Number 18 were two Army friends, Larry Eaglebear and Edgar Hannaman.

Q.   And what did you decide to rely upon in number 19?

A.   Number 19, these are the interview summaries with Maria Runyon in 2008, and then there is her trial testimony transcript, and then there are friends of hers that were interviewed, Robin and Jim Carroll.

Q.   And number 20?

A.   This is the Captain Jeffrey Harries.  This is David's supervisor at the Fayetteville Police Department.

Q.   And what did you review as item 21?

A.   That was the Fayetteville Police Department employment records about David Runyon, including the disciplinary letters of reprimand, memos to file about his job performance.

Q.   What do you describe in item 22 and 23 -- 22?

A.   So 22 is an interview summary regarding Maria -- I'm sorry, regarding Robin Carroll, who is a friend of Maria Runyon.

Q.   It looks like there may be two items of part of 23.  What were those?

A.   So this is an interview of Thomas Kumorowski in 2009 and then his trial testimony transcript.

Q.   And it looks like number 24 also has multiple items.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                               1273

Could you describe what those are?

A.   Yes.  So there is an interview -- again an interview summary from Phyllis Provost and then her trial testimony. She's the ex-wife of Tom Kumorowski.

Q.   And what was item 25 that you relied on on this page?

A.   This is a police affidavit executed by Maria Runyon regarding a domestic violence complaint in February of 2001.

Q.   All right.  Moving on to the next page.  What did you review that's currently listed as item 26 that you relied on?

A.   This is David Runyon's resume.

Q.   And 27, it looks like there are two items?

A.   Yes.  This is Virginia (Ginny) Pina, former girlfriend. It has her interviewed summary and then her trial testimony.

Q.   And what about number 28?

A.   It's a handwritten letter from David to Sarah, who was a girlfriend at the time of his arrest.

Q.   And number 29?

A.   Chad Costa, it's an interview summary of that interview of him.  He was a friend.

Q.   And what about number 30?

A.   30 is a list of the clinical trials that David Runyon participated in that Sheila Cronin created a list of.

Q.   Okay.  And number 31?

A.   That's a statement of George Koski who sold David the revolver in this case.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1274

Q.   And the category of -- what category generally for item 32, 33, and 34 were you relying on?

A.   So 32 are school records on David Runyon beginning in high school through his college.

33 are medical records focusing on 1996 following the automobile accident on November 9th, 1996.  These are the military records beginning on November the 12th, and then 34 are military records, a limited file, not the totality of what we would expect to see with military records but a limited set of those.

Q.   So just generally items 35, 36, 37, 38, 39 and 40, what category generally do those items fall in?

A.   These are mental health experts and their test results and reports.

Q.   And did you review and rely on these other reports of data and information from other experts?

A.   I did.

Q.   What is number 41?  Did you rely on this?

A.   That's correct.  That's the presentence report.

Q.   And then 42?

A.   Those are writings in David Runyon's journal at 2006 and 2007.

Q.   And 43, what was it that you reviewed?

A.   Those are memos of pretrial interviews with Dave Runyon.

Q.   And by David Runyon, you mean the petitioner?

Cunningham, M. - Direct                                                    1275

A.   I do.

Q.   And number 44?

A.   This is correspondence that David Runyon provided pretrial, a list of lives and kind of a narrative about the circumstances of people's lives who he regarded that he had saved, a letter to David Dombrowski, his biological father, a letter to mitigation specialist Sheila Cronin summarizing his perspectives on his history and also letters to his attorneys.

Q.   And 45, what are you describing that you relied on in that item?

A.   This is -- are transcripts of the guilt phase closing argument, the eligibility phase arguments, and the penalty phase arguments.

Q.   And 46?

A.   Is the direct appeal opinion that summarizes the facts of the case.

Q.   So can you read the heading of these items at the beginning of each set?

A.   Yes.  So the sentencing phase transcripts of proceedings. There is the guilt phase closing arguments, July 22nd, 2009. Then the witnesses on August 19th, August 20th, August 24th, August 25th, August 26th, and 27th.

Q.   And did you review and rely on said testimony and the transcripts of the court proceedings?

Cunningham, M. - Direct                                                    1276

A.   I did.

Q.   So that is the list that started your 2015 report.  Are these items all things that you reviewed and relied on in creating your report in forming your opinion?

A.   They are.

Q.   And as part of your general practice in creating these reports, do you judge the credibility of different sources?

A.   I always have that under consideration of what's the accuracy of the information that I'm receiving.  It's always under scrutiny.

Q.   Can you describe just briefly how you determine how much weight to give various sources that you review?

A.   Certainly.  Part of that is a consistency.  If they are interviewed multiple times over time, how consistent is the history that they provide?  Another is --

          MR. SAMUELS:  Your Honor, I'm going to object to Dr. Cunningham's expertise to judge credibility.  That seems to be something that's outside his scope as an expert.

          THE COURT:  Sustained.

          MR. SAMUELS:  Thank you.

BY MS. PEIFFER:

Q.   Dr. Cunningham, is it part of your practice to determine how much weight to give information that you receive when you're doing an evaluation?

A.   It is.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1277

Q.  Can you describe, go back to describing -- I know you were in the midst of that -- things that you consider important as you were doing that, in forming your opinion?

MR. SAMUELS:  Your Honor, I think that's the same objection, just going through it a different way to try to get to how he determines who is providing the information and who is not.

THE COURT:  I see a different twist to the question, so go ahead, and then I'll listen very carefully. I see a different twist.  I don't want to say what it is because I don't want to key the witness for a response.

THE WITNESS:  So I describe consistency in reports over time.  Another variable is overlap or corroboration with what's described by other observers or reporters. Another is face validity, the likelihood that the events under description would fit with this person's, an actual time and place, that kind of thing.

THE COURT:  I don't know what you mean by face validity.

THE WITNESS:  That someone -- so as David Runyon describes concussive injuries, was he ever actually in the military?  Would he have undergone training?  That's a least -- that's the most simple level of, was he somewhere where this might have happened?

Then things like is it unusual to have

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1278

post-concussive effects after a significant automobile accident or head injury or that kind of thing.  Those are sort of face validity of, is what's being described consistent with what we might expect to see or could potentially have happened.

MR. SAMUELS:  Your Honor, I still think that whole piece is speculation.  There is no way for him to judge that other than common sense, I suppose.

THE COURT:  I think he is saying the factors that he uses to determine whether he's going to rely on that information for his report.  He doesn't know whether they're credible or not credible.  He's just saying these are the factors that I'm comparing; there are two sources, no source, one source.  The spatial validity, I guess, it happened in the Army, and you were in the Army at the time, that kind of thing.  So I've heard it.

BY MS. PEIFFER:

Q.  Pulling up your slide show again --

A.  There are other factors as well, but we don't have to cover all of them.

Q.  But can you summarize them briefly?

A.  Sure.  So as the number of people increase who are describing the same thing, that's another factor.  The extent to which the person over embellishes, that would be a factor that would detract credibility.  If the description --

Cunningham, M. - Direct                                          1279

THE COURT:  You used that word "credibility" again.

THE WITNESS:  I'm sorry.

THE COURT:  How do you know if somebody is over embellishing?  Without hearing the person and seeing the person, how do you know if they are over embellishing, just by looking at a piece of paper or an interview?

THE WITNESS:  If innumerable head injuries are described, then that goes toward a history that's over embellished because a very unusual number are being reported, or if the symptoms are unusual and overly numerous that are being detailed from an injury, that would be a potential marker that this person is gilding the lily or that there is an over embellishing of the history that's being provided.

If there are descriptions of accompanying psychological disorder.  For example, as Suk Cha is extraordinarily animated and tangential and circumstantial in reporting some aspect of her history, that would be a factor to take into consideration.

MR. SAMUELS:  Your Honor, how did you know if she is animated?  You've never met her or seen her.  The only time, he's read a transcript?

THE COURT:  How do you know that?

THE WITNESS:  Well, Sheila Cronin provided detailed descriptions of Suk Cha's demeanor and behavior in the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                      1280

course of the interviews.  Did the same with David H. Runyon

in talking about his demeanor and the extent to which he

emoted.  So she was providing not simply the historical

information but also behavioral descriptions at the time.

THE COURT:  This is a personal observation, is it

not?  I mean, what's animated to one person, if the person

is a particularly animated person, the other individual may

seem rather dull.

THE WITNESS:  Well, yes, Your Honor.  And I

apologize.  The animation is my term.  I don't recall Sheila

Cronin using the word "animated."  What she was describing

is accelerated pressured speech, standing up and acting out

events, being highly emotive, being very -- telling a story

where anger was present, seeming to get enraged all over

again.  She's describing behaviors associated with the

descriptions.

BY MS. PEIFFER:

Q.  Dr. Cunningham, when you are looking at a description

like that, are you also comparing it to other things you have

about that witness in the record, perhaps primary sources or

records or things like that?

A.  That's correct.

Q.  Can you describe that process?

A.  Yes.  So another aspect of it is, is the record.  So

David Runyon, for example, says he is involved in an

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1281

automobile accident in 1996.  On -- in November -- on November 12th, 1996, he goes into the emergency room.  He is describing a recent history of an accident.  He's describing the experience of vertigo and other symptoms.  Those symptoms are then described in subsequent medical records as persisting over time.  All of that, those records then go to increasing the weight that's given to their having been in an automobile accident that he was in that had some sequelae attached to it.

Q.  In returning to your slide presentation, I think we were just about to move to slide 18.

THE COURT:  I would just as an aside note that the judge herself has observed many of these people in court.  Suk Cha Runyon testified in the first trial.  David Dombrowski testified.  Maria Runyon testified.  So the Court has heard these people directly, and again some of them in this *habeas* proceeding.  So the Court has many of its own observations about these witnesses, and, as I say, people observe differently and have different experience and abilities of judging the credibility of an individual and whether their affectations are real emotions.  But I would say that a number of these people, I'm not going to name them all, the Court has directly heard them once and sometimes twice.

So I know who we are talking about, and looking at

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1282

trial testimony, just the cold paper of trial testimony does not necessarily -- I'm making a comment now on the evidence -- does not necessarily comport with the demeanor and the other observations that you make for credibility while a person is on the stand.

BY MS. PEIFFER:

Q.   So for slide 18, Dr. Cunningham, did you find other generational pathology in David's family system?

A.   I did.

Q.   And could you please describe what that was and state your sources.

A.   So that is a history of prison, confinement, and that is reflected by the vertical lines through that shape.  That history for Jimmy Dombrowski, the paternal uncle, came from David Dombrowski, his brother.  Mark Dombrowski described his own confinement in federal custody for just less than a year, and, of course, Mark Runyon described that, and, of course, David Runyon is in custody now.

Q.   And moving on to the next slide, to give just a brief road map, I want to go through some of these transgenerational dysfunctions that you talked about in more detail.  What did you learn about David's paternal grandfather, Tony Dombrowski, and please describe your sources for that information.

A.   This information came from David Dombrowski, David

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1283

Runyon's father, and this, to the federal *habeas* investigator -- this is not part of Sheila Cronin's information -- that as a teenager he was a enforcer or hit man for Anthony LeBarbara, that Tony was charged with a gangland murder at age 15 and released in his mid-30s, apparently got an early release because he participated in a tuberculosis medical trial, clinical trial.

The siblings, David and his siblings, were sent to live with relatives for an extended period of time during his childhood because LeBarbara was trying to force Tony back into carrying out mob activities.  Tony was resisting that, and they were making threats against him and his family. Tony was a very aggressive violent man who operated under a mob mentality, and he would speak to David Dombrowski about his mob ties when he was drunk, only when drunk.

Q.   What else did you learn about Tony Dombrowski, David's paternal grandfather?

A.   That he was a severe alcoholic who regularly beat Eleanor.  He worked every day but was drunk every night and on weekends.

Q.   He degraded Eleanor as he beat her.  He would beat David Dombrowski when he attempted to interfere in those beatings. David Dombrowski tells the story of having beaten up a boy who was bullying him, and that boy's father then came to confront them, wanting the Dombrowski family to pay the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1284

medical bills that happened because David Dombrowski had beaten up this other boy, and actually walked -- this other man walked into the house.  Tony Dombrowski beat him in the house, beat him outside, knocked him down the stairs, that there was a very significant beating that occurred.

Then he also described an event of a local bar owner who -- where Tony frequented, who was apparently blackmailing Tony or preparing to about his present history or was going to create some problem with him about his history, and Tony was assembling pipe bombs on the kitchen table, and enlisted David Dombrowski to assist him with that.

THE COURT:  Let me just get this straight for a minute.  This information came from an investigator for the prior *habeas* counsel out of the District of Tennessee?  What was the person's name, and who were they interviewing?

THE WITNESS:  They were interviewing David Dombrowski and his current wife, Carol.

THE COURT:  So they are interviewing David Dombrowski, but what you have testified about would be about the paternal grandfather, David's father.

THE WITNESS:  David Dombrowski's recollections and reports about his father, Tony.

THE COURT:  All right.  Who is doing this interview of David Dombrowski that you're going through?

THE WITNESS:  This is Jessica, and I'm blocking on

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1285

her last name.

          MS. PEIFFER:  We can pull up, please, Petitioner's
Exhibit 31, Page 3.

          THE COURT:  I was just establishing that this was
quite a bit removed.  In other words, the paternal
grandfather is deceased.  This is an interview of his son,
who is then Mr. Runyon's father, and the interview is by
someone who this Court is not familiar with because that
individual never appeared.  There was one investigator, a
Mr. Chavis, but other than Mr. Chavis, who apparently was
Mrs. Chavis' husband, there were no other interviewers that
testified or came before the Court.  So this is really
information that's getting removed, and these interviews are
occurring in 2015, if I'm understanding all this.

          THE WITNESS:  Yes.

BY MS. PEIFFER:

Q.  I'll give you a minute to look at that, Dr. Cunningham.

A.  Investigator's name is Jessica Johnson.

          THE COURT:  Did you ever meet her?

          THE WITNESS:  I did not.

          MR. SAMUELS:  Your Honor, during the trial, of
course, we objected to a lot of the information about Suk
Cha, when she was going to North Korea and all this stuff
because it wasn't relevant to the mitigating factors.  I
understand this is part of Dr. Cunningham's opinion, and

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                            1286

that's why we are kind of letting it go, but had it been at
trial, we certainly would be objecting to it as beyond the
mitigators.

THE COURT:  That's something that the Court has to
decide, whether the mitigation strategy that has been
chosen, that was chosen by defense counsel, I made that
clear, what the strategy was and why they chose it and
whether that was reasonable and effective and was it
prejudicial or not.  So I think that's where we go with
this.  Of course, again, part of the key here is
Dr. Merikangas because that was one of the major reasons
that the mitigation strategy didn't take a certain turn.

BY MS. PEIFFER:

Q.  And moving on to the next slide, what did you learn about
David's paternal grandmother, and can you please identify
your sources for that?

A.  The source on this is David Dombrowski, David Runyon's
father, as he's describing his observations of his own
mother.  Most of this information was obtained from the
federal *habeas* interview, although the same general notion of
her being limited was described to Sheila Cronin.  I've
already addressed some of these features of Eleanor
Dombrowski and her being limited and child-like and gullible
and routine dependent.

Q.  Let's turn to David's father, David Dombrowski.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1287

THE COURT:  We are on Page 23.  Are you going through all 85 pages here?

MS. PEIFFER:  Yes -- well, yes, Your Honor.  I actually believe I have more than 85 pages, but I think my printout might be slightly different.

MR. SAMUELS:  I have 96, Your Honor.

MS. PEIFFER:  I was concerned.  But, yes, Your Honor, we have 96 pages to go through that represent Dr. Cunningham's report and his finding.

THE COURT:  Go ahead.

BY MS. PEIFFER:

Q.  So we are on 22.  In turning to David's father, David Dombrowski, could you please describe what you learned about his childhood and the sources for that information?

A.  So this came from David Dombrowski himself as he's recounting his own history.  Some of this he described in both interviews with Sheila Cronin and said in the federal *habeas*.  There is some additional detail that was in the federal habeas summary that Sheila Cronin did not memorialize.

He described being a slow learner with difficulty in reading and math.  He repeated the grade in elementary school.  His father enlisted him to go to the bar with him where he would sit in the bar and wait till his father was ready to come home, and then he would drive him home, at ten

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1288

years old.  He would, at about age 12, would pull his wagon down to the bar, load it up with beer, and bring it back to sell beer at his father's poker parties.

He began to run away at age 10, though he kept going to school when he would run away.  He would just go to school in the same clothes.  Children's Services got involved, and he spent two years in a group home and then a foster family. The significantly traumatizing event in this life additionally involved, he worked in a movie theatre as a teenager.  He stole -- it was a handgun in a manager's coat, that he had bumped into the coat and felt something there, took it out, thought this was interesting that they had guns, so he stole it.  He took it home with him, put it in his room.  The foster family that he was living with, a boy, the son of that foster family found the gun.  Dombrowski came into the room and may have tried to get the gun back from him, and in any case, he ended up being shot in the chest.

THE COURT:  Who are we talking about now?  David Dombrowski?

THE WITNESS:  David Dombrowski was shot in the chest with the gun that he had taken home.

THE COURT:  So we are still on David and what his father is doing to him?

THE WITNESS:  No, ma'am.  This is David Dombrowski himself, David Runyon's father, and he's only talking about

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1289

his own history.  So David himself is running away.  He's escorting his father home in the bar.

THE COURT:  So we are still talking about his father?

THE WITNESS:  Only that he is in the bar with his father.  Then after he's out of the household and with a foster family, he steals a gun from the coat of the theatre manager where he works, takes it home.  Another child in the household ends up shooting him in the chest with it, and he's hospitalized for several weeks, has some post-traumatic effects, as he describes them after that, of sense of futility about his life and whether he lives, and he even joined the military after that.

BY MS. PEIFFER:

Q.  What did you learn about David Dombrowski's early adulthood and what were your sources for that information?

A.  This is, again, coming from David Dombrowski.  He described that serving with the U.S. Army in North Korea along the DMZ, that he shot three North Korean soldiers and was traumatized and recurrent memories about them and began to drink to deal with that experience.

He married Suk Cha after only dating her a few months after -- on the rebound from the woman who he could not be -- where the marriage was annulled.  With Suk Cha, he was drinking alcoholically.  He would drink in the casino

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1290

where the drinks were cheap, and he would then lose his paychecks in the casino.  Suk Cha described that he would come in drunk, and that he would beat her when he was drunk.

He described that they were both very aggressive, volatile, angry, and that she would get physical with him as well.  He denied ever being violent with David but acknowledged that he was also abusing pain medications with the alcohol and often blacked out and didn't know what had happened when he was drinking.

Q.  What else did you learn about David Dombrowski's life outcomes and what were your sources for those?

A.  He and Suk Cha divorced in 1975, and that next year he relinquished his parental rights.  He was subject to workplace violence and also road rage.  In 1991 he began treatment with the V.A. and has been maintained on anti-depressants for major depression since that time.  He also carries a diagnosis for PTSD, and that's not just from him.  That's also from the V.A. records.

He was estranged from his own family.  He knows that his father died at age 66 from cirrhosis.  He doesn't know when or how his mother died.  He's estranged from his siblings.

Q.  And turning to David Runyon's maternal family, could you please describe what you learned about this side of his family system and identify the sources of that information.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1291

A.   So this history came from Suk Cha to Sheila Cronin, and she testified to -- just began to testify a little bit about Korea and then would stop.  Her maternal -- this is her grandfather was executed by the North Koreans.  Her family, apparently, had been affluent and educated and was targeted. Also executed was his wife's family for hiding him.  Suk Cha's mother died a week after giving birth to Suk Cha, who was her fifth child.

       The first step-mother of Suk Cha is the one who carried them out of North Korea and that whole traumatic sequence.  She apparently became involved with a missionary group.  Suk Cha characterized it as a cult to Sheila Cronin, and then she was suddenly gone one day.  The next day a new step-mother was present.

Q.   And what else did you learn about Suk Cha's experience with her second step-mother, and what was the source for that information?

A.   This is Suk Cha's description to Sheila Cronin, that the step-mother treated her very badly, that she would not give her money to pay for school, that she enlisted Suk Cha's older brother to beat her, and sometimes pretty brutally, using a pipe.  Suk Cha ran away to relatives who hid her to escape the household.

Q.   As you talk about the family issues and the issues of war and refugee trauma in the life of Suk Cha's siblings, can you

Cunningham, M. - Direct                                              1292

describe what you learned and what your sources were for that information?

A.  So this comes from Suk Cha who described that with the step-mother encouragement, her older brother pulled her hair out, hit her, dragged her out of the house, and the last violence he used a lead pipe to beat her shoulders.

        Suk Cha's older sister, David Runyon's maternal aunt, attempted to cheat Suk Cha out of her inheritance, and this was thwarted by their being stationed in Korea, and Suk Cha actually physically showing up.

Q.  Turning to Suk Cha, more specifically herself, could you provide additional context for her childhood and how the war impacted her and what your sources were for this information?

        THE COURT:  Let me ask you.  Have you seen anything where all of this information you're testifying about was known to Mr. David Runyon, the petitioner, the defendant? You're saying it's generational, and it's all there.  I imagine anybody in this room could go back through generations and find various things, but you never know what you're going to find if you go back.  But you first have to go back.  So is there any evidence that you've seen that all these things you've been testifying about from Ms. Cronin came from various people that you don't know, and you don't know Ms. Cronin, ever was relayed to David Runyon?

        THE WITNESS:  So the history of the Dombrowski side

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1293

of the family would not have been known to David Runyon because he was not in contact with David Dombrowski to be advised of that.  Dombrowski left when he was four to five years old, and he had no contact with him after that.

I don't recall Suk Cha addressing Dombrowski's history before she met him in Korea.  So the effect that it has on David Runyon would not be by having heard the story. It would be by David Dombrowski having been damaged and then parenting him badly and ultimately abandoning him, subjecting him to this trauma, the traumas of his early childhood, and it would have impacted him in terms of heredity, in terms of susceptibility to mood disorder, as well as personality disturbance.

THE COURT:  Heredity is one thing.  Generational trauma is another.  Let me just ask you this.  His father, Mr. Dombrowski, left when he was what, four years old?

THE WITNESS:  Yes, ma'am.

THE COURT:  He never had contact again with him until this trial?

THE WITNESS:  That's correct.

THE COURT:  So you have no way of knowing whether all of this that we heard about the paternal grandfather and his father and all this gang war and shooting in the chest ever got to David Runyon?  You haven't interviewed him and found that out, have you?

JODY A. STEWART, Official Court Reporter

THE WITNESS:  No, ma'am.  And I don't anticipate that he knows or knew -- certainly didn't know that specific knowledge before this offense.  The impact of the trauma generationally would not be by the oral history provided to him.  The generational trauma and experience, and even his grandfather's mob affiliations and the rest, would be first a function of heredity in terms of personality traits.  Whether he ever heard the stories or not, that's how heredity works, and by susceptible to mood disorder.

The generational trauma would also be expressed by sequential damage, that David Dombrowski was damaged by this, that's who was his father in these first very formative first four years of his life, this very damaged person, who is then acting out on Suk Cha in a damaged sort of way and also with David, and so there is -- and then ultimately abandons him, and David is left with that experience, too, of having been abandoned by his father and making his self-definitions as somebody who was unlovable and unimportant.

THE COURT:  But he had a good relationship with his step-father, did he not?

THE WITNESS:  The relationship was not hostile. David H. Runyon was very remote, very reserved without feelings -- or that he would express, isn't showing up to his sports events.  Mark Runyon is describing him as

Cunningham, M. - Direct                                        1295

essentially socially disfluent and very socially and interpersonally detached, was as if there was no relationship of substance.

THE COURT:  Well, both Mark Runyon and David Dombrowski have testified before the Court.  You've never met either one of them?

THE WITNESS:  I have not.

BY MS. PEIFFER:

Q.  So returning to Suk Cha specifically, could you provide additional context for her childhood, the impact that the war had on her, and describe your sources for this information?

A.  Well, in addition to the murders and her family system of her grandparents and her grandmother's family, they had a very tumultuous and disturbing and traumatic escape to South Korea.  The -- she recalled that the step-mother tied them together so they would not get separated in this crush of apparently this mass of people.  They took jewelry and money along for bribes along the way, and then this continues on the next slide.

They subsisted on edible vegetables they found along the way as they are crossing rice patties.  She described an event of trying to transit one point on a boat, and the baby crying that was then held -- starting to cry, it was then held under the water by the mother in order not to alert the soldiers who might hear it and begin to shoot at them.

Cunningham, M. - Direct                                              1296

And the -- her observation of the ongoing grief of this mother who had had to drown her own baby.  Suk Cha described a part of this, that they -- they come near the 38th parallel, that their group was bombed, and that in the course of that, an aunt was killed and her 5-year-old -- the 5-year-old child, the daughter of that aunt crawled out from under the body in the aftermath with one of her fingers blown off, just horrific experiences.

Q.  And what did you learn about how those experiences you described impacted Suk Cha and her temperament and relationship capacity and what were your sources for that?

A.  So there is additional descriptions that I have here of other traumas that she had.

Q.  I apologize.

THE COURT:  So we are going to read every line of this exhibit into the record, demonstrative exhibit?

MS. PEIFFER:  Well, I think beyond reading, Dr. Cunningham is providing additional information, but this is all information that was in his report, and so if -- I believe if I understood your description correctly earlier this afternoon, that these are all things that he needs to talk about independently of his report.

THE COURT:  You could ask a direct question, and he could give a direct answer.  This is just reading along.  We got something in front of him.  He's pretty much reading it

Cunningham, M. - Direct                                          1297

into the record.  But if you want to be here until tomorrow this time, we are going to keep on going until we finish him.

BY MS. PEIFFER:

Q.  So please continue to describe what you learned about Suk Cha's experience as a refugee.

A.  That along the way some of their group were raped by American soldiers, that there was one scene where that came very close to them, the soldiers came -- or were approaching them in a sexually provocative matter saying sexy, sexy, sexy, and the teenage girl that was near her grabbed Suk Cha in a blanket like she was a baby and acted like she was holding her or nursing her.

So they moved on then to another teenage girl who was raped instead of the one that Suk Cha was with, potentially spared Suk Cha as well.  Then separate from those, in terms of the impacts from the impacts that this had on her and her own temperament, later, as Suk Cha is in her late teens, and the step-mother puts the grandmother, the paternal grandmother out of the house, Suk Cha goes back to the house to engage her in a brawl, in a mutual combat to -- over having put the grandmother out.

Q.  What was your source for that information?

A.  Suk Cha described that.

THE COURT:  Described that how?  You said she

Cunningham, M. - Direct                                          1298

described it.  She didn't meet with you, did she?

THE WITNESS:  No.  She described this to Sheila Cronin.

THE COURT:  So all this is, again, Ms. Cronin.  So when you say Suk Cha described it, I want you to be clear and say she described it to Ms. Cronin, and I'm basing it from what Ms. Cronin observed.

THE WITNESS:  Yes, Your Honor.

THE COURT:  If that's not the case, then you need to let us know, because all of this is coming in from Ms. Cronin's report that the Court didn't let Ms. Cronin testify about when she was here to testify.  But because you're an expert, Ms. Peiffer is insisting that you go through all of this so that Ms. Cronin's report comes in, despite it being inadmissible evidence.

BY MS. PEIFFER:

Q.  Dr. Cunningham, could you please continue to describe how these experiences impacted Suk Cha in terms of her temperament and her relationships?

A.  Certainly.  So Suk Cha, by her description to Sheila Cronin, participates in the transfer of ownership of the tailor shop that she works in.  She gets employed there. They are doing a lot of business with the base in the military.  So Suk Cha describes that a military officer, who befriended her, goes in to say essentially the tailor shop

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1299

now needs to belong to Suk Cha.

Then she hires the former owner as -- as her employee and that she participates in that forcible transfer of the business.  Sequentially, and I'll talk about this with descriptions from David Dombrowski, she did not appear to bond or display nurturance with her children and that she was volatile and aggressive in the home.  That's also described by Mark Runyon.

Q.  And what else did you learn about Suk Cha's relationships?

A.  I'm sorry.  David Dombrowski is describing that to Sheila Cronin and federal *habeas* investigators, as is Mark Runyon. None of that is described in there.  I'm sorry.  What was the next question?

Q.  And what else did you learn about Suk Cha's limitations and what were your sources for that information?

A.  So David Dombrowski described to Sheila Cronin, and Suk Cha also acknowledged this to Sheila Cronin, that she went on -- and there was testimony I think to this effect as well, David Dombrowski, that she went to his command in Panama and was screaming and cussing and demanding that they transfer him.

Also, in Panama, she was depressed and had formulated a plan to take an overdose, a suicidal overdose in front of David Dombrowski with the children present.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1300

Ultimately, her timing was off as he loitered before he came in, and the children were not present, and she was overpowered by the sedation effect of the medications, ended up being hospitalized for five or six days.

That description goes both to her own susceptibility to a mood disorder.  The display that she was going to put on in this regard has the personality disturbance quality to it as she is attempting to go manipulate the situation and put on a display.

She then, when she gets back to the states, she divorces Dombrowski in February of 1976 and marries David H. Runyon six weeks later, which is -- points to some judgment impulsivity on her part that she is acting so quickly, as well as dependency needs.

THE COURT:  So anybody who marries quickly after a divorce has judgment impulsivity?

THE WITNESS:  It is generally not advisable to marry somebody within six weeks.  That does raise questions about judgment, for someone to act that quickly after a divorce.  It's not that it is -- indicative of that, she would want more information, but that's not a well-advised sequence.

THE COURT:  From whose standpoint?  The people who marry?  Maybe they've had a long-term relationship?  Your moral judgment?  When you say it's ill-advised, who's

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1301

opinion is that, and why is that an expert opinion?  Because somebody marries shortly after a diverse, maybe that's why they wanted the divorce.

THE WITNESS:  Yes, ma'am.  In this instance Suk Cha is coming out of a marriage where she is -- a high conflict marriage with somebody who is alcoholic and gambling his paycheck away, and where she has significant instability in her own life reflected with this depression and suicidal gesture out of the history of childhood instability and trauma, then meets someone here in the states, and on short acquaintance, moves forward to marry that individual very shortly on the heels of leaving this last relationship that she was in, and with two youngsters who also may need some time to adapt to how rapidly the changes are coming in their life.

And so in the totality of that context for Suk Cha to marry quickly, I think from a clinical standpoint is rushed and has elements of judgment impulsivity in it and is also broadly insensitive to how many changes these kids are being put through.

THE COURT:  Maybe she's doing it to seek solace from a rough marriage that she had and to seek safety and security for her children.  There are a lot of reasons people do things.  And to just make a clinical judgment that, you know, there is some impulsive judgment here, I

Cunningham, M. - Direct                                                1302

mean, from what you said, she was in a poor marriage.  Maybe she had known Mr. Runyon longer than you think.  Maybe she was looking for security for her children and for herself.  You don't have any way of knowing that, do you?

THE WITNESS:  I don't know all of this.  I have no history from her or Mr. Runyon that they had known each other previously.  They both describe a relatively short acquaintance.  His own history was pretty interpersonally isolated in his own relationship history.  I don't have all the -- I don't have complete information.  I do have information that raises concerns about her moving quickly in this way.

THE COURT:  But it turned out to be a marriage of some longevity, has it not?

THE WITNESS:  The marriage had longevity.  I don't think that they are still together, but it has had longevity.  Mark Runyon described the relationship as being devitalized, that he never saw any affection exchanged between them.  There was no evidence of emotional intimacy.  There was a pretty high frequency of conflict, although it was behind closed doors.  Suk Cha continues to be very volatile and unstable in her reactions, including destroying the house recurrently and episodes that happened once or twice a year.

So the relationship endured, but the description of

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1303

it doesn't sound very vitalized.

THE COURT:  Nobody knows what goes on behind closed doors, and there are different types of relationships.  Some people are very affectional, some aren't.  If you look back into, you might want to say the Victorian days, there was certainly exterior coldness.  That doesn't mean there was an interior coldness.  To be speculating on what type of marriage someone has, when you don't know, and that they married in six months, and that shows a breach of judgment, I find it to be very speculative, particularly based upon interviews of individuals that you haven't even talked to or observed.

I'm just commenting on this, as a federal judge can.  I just find it to be very speculative when you haven't even interviewed the individuals, asked them these questions, and you're relying on interviews of Sheila Cronin back in 2008/'09 in making judgments about people getting married six months or shortly after they have been divorced and that they are putting trauma on their children, and people have lots of reasons.  If you look at anybody's life, you'd find a lot of reasons to do things that maybe shouldn't be judged from the outside but more from the inside of the person.

THE WITNESS:  Yes, Your Honor.  I was simply correct it was after six weeks, not six months.  And the

JODY A. STEWART, Official Court Reporter

observations or the descriptions that I have from what was going on inside the family came from Mark Runyon, who was living with his parents during that time.  So it's his first firsthand observations.  It's not that I am blindly speculating about what's occurring in the household, but, instead, this is illuminated by Mark Runyon's description as well as by the estrangement and detachment that happens between David H. Runyon and Suk Cha and both of their sons as they move into their teenage years.

THE COURT:  I'm going to make one more comment. The Court heard testimony from Mark Runyon.  He testified before this Court in 2009.  So this isn't 2015 and looking back.  David H. Runyon testified before this Court.  Suk Cha Runyon testified before this Court.  They were all presented by defense counsel.  They were presented and they testified. Maria Runyon testified.  That was Mr. Runyon's former wife. Maria Runyon, Mark Runyon, Suk Cha Runyon, David H. Runyon and David Dombrowski in 2009, which is not 2015, and based on somebody's interviews from somebody who had never met the individuals, never seen them testify in person, never been able to judge their body language, and is basing all of this on Sheila Cronin's report and I guess federal investigator

Cunningham, M. - Direct                                                  1305

from the Federal Public Defender in Tennessee.  Again, I'm letting you present it.  It goes to the weight and the credibility of the witness.

BY MS. PEIFFER:

Q.  Dr. Cunningham, just to clarify, the marriage that you were describing, was that a significant factor in forming your ultimate opinions about David Runyon's life?

A.  No.

Q.  Speaking of Mark, David Runyon's brother, how did the factors you describe regarding Mr. Dombrowski and Suk Cha and their family turmoil and their parenting, how did that play out in Mark's life, and what were your sources for this?

A.  So this is his description to Sheila Cronin and also to the federal *habeas* investigator, that he has always felt detached from others.  He described that he came back from Korea independently at age 15, and was at that point emancipated, lived with a former employer for a few months and then was on his own.  He was living out of a car.

He has had a volatile temper himself and has assaulted employer with a baseball bat.  His own history includes depression and periods of heavy drinking and symptoms of PTSD as an early adult.  He was arrested for domestic violence during the divorce.  And then he was in a fistfight in the barracks in the military that he described.  Some other people jumped in.  He had had a handgun there in

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1306

the barracks that he said he discharged in the air.  He was court-martialed and sentenced to 11 months in prison, which he served.

Q.  Dr. Cunningham, turning to the next transgenerational factor you found in David's background, what was that?

A.  That was hereditary predisposition to psychological disorder and maladaptive personality traits.

THE COURT:  Let me ask a question, Ms. Peiffer. You are planning to call Richard Dudley?

MS. PEIFFER:  No, Your Honor.  Mr. Dudley has retired and was not available to be called by the time of the hearing -- by the time we were preparing for the hearing in 2023.

THE COURT:  I don't know that I'm going to let testimony then go forward about his report if the Court can't hear what he is saying.  This, again, is this witness saying I looked at this.  He doesn't know the validity of Dr. Dudley's findings, and it's, again, just hearsay based upon another report.  He can say he looked at it, and you can say this is the report, but if he doesn't have firsthand knowledge of that report or having spoken with Dr. Dudley, and you're not going to present Dr. Dudley, I'm not going to let it come in this way.

Now, you going to call Dr. Nadkarni?

MS. PEIFFER:  Yes.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1307

THE COURT:  The Court has heard Sheila Cronin, and that was basically what a lot of this was.  I'll hear Dr. Nadkarni, but if you're not calling Dr. Dudley, then I'm not going to let somebody else testify about Dr. Dudley's expert opinions when that report didn't form them.  He's just reviewed them.  I can review them myself.  But I'm just not going to let that testimony in.  It is getting out of hand and too far removed to let an expert come in here and just summarize all these reports.  He's sat here for hours now summarizing Sheila Cronin.  That's what this has all been about, and the Court has heard a lot of this from the witnesses themselves.

So when you get into this hereditary predisposition, if you're not going to present a report, and the Court can't assess that report from the doctor, then you may not ask this witness about it.  If you bring the doctor in, you can call him in rebuttal.  If you want to call Dr. Cunningham in rebuttal, you may do that.  But certainly not to give another doctor's report, and that's what he is planning to do, I suspect.

BY MS. PEIFFER:

Q.  So using this family tree, could you illustrate the presence of substance abuse and mood disorder and maladaptive behaviors you identified in David's family system and what your sources were for that information?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1308

A.  So I think that I've -- as I went through this the first time, I described those hereditary elements of the vulnerability that substance abuse has for not only substance use but mood disorder.

I've also talked about the personality pathology that has been evident in the family system from the paternal grandfather, the paternal uncle, from David Dombrowski, and I've also described those -- both the mood disorder and personality issues on Suk Cha's side of the family.

Q.  So have the scientific studies at the time around 2009 by that point, did they examine the role that heredity plays in the presence of mood disorders?

A.  Yes.

Q.  Could you describe briefly what those studies generally found.

A.  To the presence of mood disorder and/or alcoholism in a family system increases --

MR. SAMUELS:  Your Honor, I'm going to object.  I don't think there has been any evidence that David Runyon had any alcohol issues or substance abuse issues.  I don't know that there has been any evidence of any, and it definitely hasn't come out in the evidentiary hearing that he had a mood disorder.

THE COURT:  Sustained.  It's never been presented to the Court.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1309

MS. PEIFFER:  Your Honor, Dr. Cunningham was -- if he had finished, he was going to, I believe, testify about that mood disorders and alcoholism can sometimes lead to diagnoses because of hereditary -- of mood disorders in future generations.  He wasn't necessarily going to talk about a future generation being predisposed to develop alcoholism.

THE COURT:  But we are talking about Mr. Runyon.  We are talking about Mr. Runyon, the defendant, the petitioner, and whether there is brain damage or this mental health issue, and if there has never been presented to the Court evidence of alcoholism or a mood disorder, where is that coming from, just that he might have had it, he might get it?  But there has never been any showing whatsoever that he had either one of those.  You have to have a foundation, let's just put it that way.  That's hornbook evidentiary law.  You've got to have a foundation.

MS. PEIFFER:  Your Honor, as I said, I'm not saying that David Runyon had alcoholism.  The research that Dr. Cunningham was about to testify about in heredity was about how alcoholism and mood disorder in a previous generation is hereditary and not necessarily expressing as alcoholism, which I'm not saying David Runyon has, it can lead to people inheriting mood disorders.

THE COURT:  Any of that could be possible.  We are

JODY A. STEWART, Official Court Reporter

not dealing in "it might be possible."  Is it more likely than not, and did he have it?  If he had it, then this would be an explanation and something that someone could have gone into to explain to the Court, the jury and whatever.  But there has never been evidence that he was an alcoholic. There has never been evidence of a mood disorder. Possibilities, anything is possible.

        You've got to show that it relates.  This is the defendant.  He is the one that has been convicted by the jury, and what the issue is now is was there proper mitigation from the trial attorneys.  If somebody isn't an alcoholic, and somebody doesn't have a mood disorder, you would have never been able to present that to a jury.  So you've got to show that this is not just based on a generational analysis that might carry through generations but that it did carry through.  In other words, it did. It's present.  So you first have to lay the foundation before I'm going to let you go through with all of this testimony about, well, it's possible, but there is no evidence of it.  It's not evidence that the attorneys failed to present.  What is the evidence in this record of it?

        MS. PEIFFER:  Yes, Your Honor.  I was trying not to supply Dr. Cunningham testimony because I'm sure he can say it better than I, so I apologize in speaking in generalities.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1311

THE COURT:  Ask him if he has direct evidence, not hypothetical evidence but direct evidence, and then he can form hypotheticals.  Does he have any evidence whatsoever that Mr. Runyon has a problem with alcohol or mood disorder?

BY MS. PEIFFER:

Q.  Dr. Cunningham, from your review of material, did you learn that some had diagnosed David with a mood disorder?

A.  Yes.

Q.  And what did you learn from your review of materials?

A.  In 2008 there is a jail medical record that raises schizoaffective disorder as a diagnostic consideration.

MR. SAMUELS:  That jail record was never repeated by any of these experts up in through 2009.  So I would question that being the basis for him saying David Runyon has been diagnosed with a mood disorder.

THE COURT:  It was a Portsmouth City Jail record, as I recall.

MR. SAMUELS:  Yes.

THE COURT:  That's not a proper foundation.  If it's a Portsmouth City Jail record, you have to first call in somebody from the Portsmouth City Jail and why that was written down and so forth.  It wasn't really a diagnosis. It was a suggestion.  I know the record.  I can see it. It's not in front of me, but I can still see and remember the record.  I can see the handwriting on it.  I've been

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1312

with this case for a long time, and I can tell you it's from the Portsmouth City Jail after this case started, and there was never any evidence presented that that was ever taken to a diagnosis. So ask him if there is something else. I'll rely on that record for my ruling.

BY MS. PEIFFER:

Q. Dr. Cunningham, is it typical, in your evaluations of adverse developmental factors, that you also look at reports of other experts?

A. It is.

Q. Is that something that is a typical practice in this field?

A. It is.

Q. Is that something that you do when you're examining patients clinically in your own practice?

A. It is.

Q. And in part of your preparation for evaluating the adverse developmental factors in David Runyon's background, did you review the report or the report of an expert who identified that David had a mood disorder?

A. I did.

        THE COURT: Who was the expert?

        THE WITNESS: Dr. Siddhartha Nadkarni diagnosed that in his report November 9th, 2022, and Dr. Richard Dudley diagnosed that.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1313

THE COURT:  They will have to present testimony, and you will have to bring Dr. Cunningham back before I'm going to let him go down that road of testifying about the diagnosis of another expert.

BY MS. PEIFFER:

Q.  Dr. Cunningham, could you describe the -- what the scientific studies in 2009 described about hereditary in the presence of mood disorders?

A.  Hereditary factors are a very powerful influence on the development of a mood disorder.  Depending on the degree of relationship and the nature of the mood disorder, it might be two- to five-fold greater or likelihood in the presence of a family history of that mood disorder.

Q.  And, Dr. Cunningham, what is the next arena of adverse developmental factors you investigated in David's background?

A.  The next arena is neurodevelopmental factors.

Q.  What is the first neurodevelopmental or wiring adverse factor you identified?

A.  The first factor is the minimal weight gain and pregnancy and near miscarriages in utero.

Q.  Could you please describe what you learned about Suk Cha's pregnancy with David, and as you do identify your sources.

MR. SAMUELS:  Your Honor, I'm going to object to Dr. Cunningham talking about these neurodevelopmental

Cunningham, M. - Direct                                              1314

factors unless he can lay a foundation as an expert.

THE COURT:  Sustained.

BY MS. PEIFFER:

Q.  Dr. Cunningham, in your assessment of adverse developmental factors, what is the source for identifying the factor that you look for when you're completing an evaluation?

A.  So broadly, in undertaking a psychological evaluation, the first focus in the individual's history, apart from the family history, is the issues that may have to do with pregnancy or birth.  And so that's the first area of clinical inquiry, of whether there were complications in the pregnancy or any complications that happened with childbirth.  Those complications may -- are associated with increased incidents of neurodevelopmental issues in childhood, in self-control and modulation behavior, delinquency, and in teenage years, and so that early developmental focus is a starting place for taking a psychologically relevant history and trying to understand the development of the disorder or problems in an individual's life.

MR. SAMUELS:  Your Honor, I'll just note that Dr. Cunningham indicated on voir dire he is not a neurologist, not a neuropsychiatrist.  I question his expertise in an area of medical development like this that was not brought out when he was qualified.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1315

          THE COURT:  Sustained.

BY MS. PEIFFER:

Q.  Dr. Cunningham, approximately how many adverse developmental factor evaluations have you done?

A.  Hundreds.

Q.  Can you provide a ballpark?

A.  So it is -- so this is typical and standard in doing any sentencing evaluation where issues in mitigation are being considered, neurodevelopmental factors are always a part of that.  I have participated in probably 30 or 40 easily Miller-related evaluations where you were looking at sentencing considerations of youthful offenders, as well as sentencing evaluations in non-capital cases and in non-Miller cases.

          I would think I've easily done 200 evaluations of adverse developmental factors relevant to sentencing.

          THE COURT:  You are saying relative to sentencing?

          THE WITNESS:  Yes, ma'am.  That's the place in forensic psychology that this is most likely to come into focus.  Now, it may be a part of the history in other forensic evaluations as well, as you are looking at the development of other disorders, and when I was in clinical practice seeing patients heavily for 20-plus years, those developmental considerations were part of my assessment of children and adults, routinely took a history related to

Cunningham, M. - Direct                                              1316

pregnancy- and childbirth-related complications, have repeatedly gone to the literature to do literature reviews about the implications of various pregnancy and childbirth-related complications and the problems that that may subsequently result in.

        MR. SAMUELS:  Your Honor, just because he reads something about that doesn't mean he's had training or experience or education in these areas of scientific expertise.

        MS. PEIFFER:  May I ask a question?

        THE COURT:  Go ahead.

BY MS. PEIFFER:

Q.   Dr. Cunningham, can you please describe your training and experience and how that relates to your -- to how you evaluate the presence of a neurodevelopmental factor?

A.   Certainly.  So part of the training of a psychologist is courses and training and supervision regarding child development and disorders that are a part of early childhood, including taking histories of pregnancy-related complications and in becoming familiar with the literature around that. And so this is part of the -- this is part of the training and area of expertise of clinical psychology, particularly as it goes to the etiology of various developmental problems that a child may exhibit.

        I have augmented that across my career by doing what

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                         1317

professionals do to remain abreast and maintain expertise, by doing literature reviews and reviewing journal articles. So this is a standard part of the self-education that psychological and medical professionals participate in after they leave that formal training period that involved training in child development.

Q. And just to clarify --

THE COURT: Wait just a minute, please. Where in your report do you mention those particular articles, because attorneys in getting reports and the Court are entitled to know the treatise or the literature upon what you base your report, and I notice that you have references starting on Page 51 of your report. So tell us which ones you are referring to that you've read to make that opinion now before the Court. You've got them. That is a requirement of an expert report.

You can't just say, oh, I've read lots of scientific and articles in my field. We've all read lots of articles, but everyone is entitled to know what article, and that can be tested through cross-examination and pulling the article and whether it's something that is relied upon by someone in the field to form the opinion that they are forming. So you've got your references on Page 55. What are you talking about?

THE WITNESS: Yes, ma'am. If I could turn to the

Cunningham, M. - Direct                                          1318

body of the report, that would let me identify whether I footnoted at that time.

THE COURT:  I don't believe you did.  I've looked through the report.  You might have, but I don't believe that you put your articles that you read in your report.  If you did, I must have overlooked them, and I could easily have, it's a very long report.

THE WITNESS:  Let me just turn to that to see if I did.

MS. PEIFFER:  Page 31, perhaps.

THE COURT:  Don't lead him.

THE WITNESS:  I don't believe I cite to a study on Page 29 of my report, bottom of the page, regarding the implications of his mother describing that she gained no weight and did not seek prenatal care until late in the pregnancy.

THE COURT:  You did or did not?

THE WITNESS:  I did not cite a reference.

THE COURT:  Look back on Page 51.  You've listed all your references.  See if you see something there.

THE WITNESS:  No, ma'am.  I would have cited it in the body of the report.  All of the references that are at the end of the report are cited somewhere in the course of the report, I believe.  And so if I have not cited it in the body of the report, then I wouldn't expect to find it in the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1319

reference list.

BY MS. PEIFFER:

Q.  Dr. Cunningham, do you cite references related to -- and articles or scholarships related to the neurodevelopmental chapters in your report?

A.  To some of them, yes.  I thought this was sufficiently self-evident that it didn't require a cite, that for a mother not to gain weight in the pregnancy was deleterious to a fetus, or that not seeking prenatal care until the third trimester was risky, or as both Suk Cha and David Dombrowski both described the doctors expressing concern about whether Suk Cha and/or David would survive the delivery, that that aspect of the history and its implications was self-evident.

        THE COURT:  But you don't have any statistical studies or anything in here.  You are just saying I thought that was common knowledge.  Well, it may not be common knowledge to a lot of people.  They are not doctors.  They don't know these things.  So we are not talking about something in an expert's report that's common knowledge.

        THE WITNESS:  No, ma'am.  I thought that it would be.  As a psychologist, I anticipated that I would not need scholarly support for something that would be professionally self-evident, like the mother not gaining any weight during a pregnancy.

        MR. SAMUELS:  Yes, Your Honor.  It's not within the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1320

scope of his expertise as a psychologist because this is medical information.

THE COURT:  Not only that, it's getting into neurological information, and there are other experts on the neurological that are key.  He is not qualified as a neurologist.  He simply is not qualified as a neurologist.

MS. PEIFFER:  Yes.  I was not trying to suggest that he was, Your Honor.

BY MS. PEIFFER:

Q.  But the question I would ask is, are these types of prenatal issues something that psychologists, such as a clinical psychologist like yourself, would consider and practice as part of the analysis of risk factors in a person's situation?

A.  They are.

Q.  Can you please describe?

THE COURT:  You say in a person's situation.  Make it specific to Mr. Runyon's situation.

MS. PEIFFER:  Of course.  I'm sorry.  I thought you wanted to hear about his expertise.

BY MS. PEIFFER:

Q.  So, Dr. Cunningham, could you describe what you learned about Suk Cha's pregnancy with David and what your sources for that information were.

A.  So these sources of this information, let me take them

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1321

one at a time, that she received no prenatal care until the second trimester, that was from David Dombrowski to the federal *habeas* interviewer.

The near miscarriage at four months gestation was described by Suk Cha to Sheila Cronin.  She also described to Sheila Cronin that she was unable to keep food down and gained no weight during the pregnancy.  David Dombrowski reported that the doctors did not expect her or thought that David and her might not survive labor and delivery.

I believe that Suk Cha referenced this.  He describes that to the federal *habeas* interview.  My recollection is they she described it to Sheila Cronin.

Q.  And are these types of issues an aspect of developmental study by psychologists such as yourself?

A.  Yes.

Q.  What did the research in 2009 say about the impact of this?

MR. SAMUELS:  Your Honor, I'm going to object. Unless there is something in his report -- I didn't see it -- that referenced this and enabling him to give his opinion.

THE COURT:  Sustained.

BY MS. PEIFFER:

Q.  Dr. Cunningham, directing your attention to the next slide, what is the next adverse neurodevelopmental factor you

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1322

identified in David's background?

A.   The next factor is head strike and blast injuries, including a motor vehicle accident with subsequent personality change.

Q.   And just to clarify, was assessing head trauma and its facts the main purpose of what you were doing as a clinical and forensic psychologist evaluating Mr. Runyon's case?

A.   No.  This is only 1 of 18 factors that I considered or that I have identified in his background.

Q.   And did you -- are you going to describe the sources of the information that you considered?

A.   I will.

Q.   So did you learn about any head strikes that David suffered from growing up, and where did you learn this information?

A.   So Suk Cha described an incident when David was two or three years old of Dombrowski intoxicated, picking him up by the arm and throwing him across the room, that David's asymmetrical smile developed in the aftermath of that incident.  This account has been relayed to David, who has described it to a number of different experts as an early life event.

David has described to Dr. Patterson and several other of the experts a loss of consciousness at age 5 from running into a telephone pole while he was turned back to

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1323

catch a ball.

He has described to Dr. Nadkarni, as I recall, a couple of other football, sandlot football-related instance of loss of consciousness, and has also described incidents of being knocked out while wrestling, having loss of consciousness, and these are to -- in a number of the different expert reports that cite to his history of head injuries.

Q.   And did you learn of any additional head strikes?

A.   I did.

Q.   Could you describe those and the sources that you used for that information.

A.   So there was an incident in 1990 where he fell asleep at the wheel and ran into the back of a semi-truck, and that's a report that he may have -- I'm trying to recall the specific origins of that, whether that was to Sheila Cronin or to one of the experts.  There a medical record in 1995 that addresses this where he is giving a history of having been involved in an automobile accident five years before.

MR. SAMUELS:  Your Honor, I would object to any of this source from the defendant.  It is self-serving.

THE COURT:  We all know about this already, anyway. All of this is on the record.

MS. PEIFFER:  I understand, Your Honor, but I -- but these are things that Dr. Cunningham considered as part

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1324

of forming his opinion.

THE COURT:  Are you saying about what now?  Where are we now, neurologically again?

MS. PEIFFER:  We are talking about a neurodevelopmental, which is not the same as neurological, an adverse developmental factor.

THE COURT:  Neurodevelopmental.  How is that part of his field?

MS. PEIFFER:  It's one of the many adverse developmental factors that he looks at.

THE COURT:  He can look at them all he wants, but it has to be part of his expertise and what he's qualified to testify before this Court.  He is not qualified to testify as a neurologist.

MS. PEIFFER:  And I understand that, Your Honor. I'm not trying to present neurologist information through Dr. Cunningham.  We have others who will testify about that type of information.  But Dr. Cunningham's role was -- would have been, and what he did in his report, was to synthesize these many adverse developmental factors, and what that meant for David's functioning and development.  And to properly synthesize the factors, he had to consider all of the circumstances, and to make his findings, he considered information from many different sources.

THE COURT:  He can synthesize all the factors he

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                            1325

wants, but if he's not qualified as an expert to testify about the synthesizing of all of the factors, he's not.  I mean, what you're trying to do is make him an expert, a neurologist right now, and he's not qualified as an expert neurologist.  So what are you saying, just because the factors are there, and he's a clinical and forensic psychologist, he should be able to render all of these other opinions?  There are rules.

We are going to take a 15-minute recess.  You need to notify anybody that is expecting you that you may be delayed this evening.  The Court stands in recess for 15 minutes.

(Recess from 5:57 p.m. to 6:16 p.m.)

THE COURT:  Ms. Peiffer, you can continue.

BY MS. PEIFFER:

Q.  Dr. Cunningham, I believe we were on slide 44 when we left off, and you were describing information that you reviewed about head strikes that David Runyon has suffered.

A.  Yes.

Q.  And can you describe, as I believe you had started to describe, this information, and could you please identify the sources?

A.  Yes.  Regarding this 1990 wreck, he had advised other experts about an accident where he had glass in his face. There is a medical record in 1995 that describes his

Cunningham, M. - Direct                                          1326

presentation with a cyst in his forehead that they are taking glass out of with his report to the medical personnel at that time of having been involved in an automobile accident five years previous.

Q.  And did you learn of any other head injuries or head trauma that David suffered and what were your sources for that information?

A.  I did.  Again, this is reported to, I think, Dr. Mirsky pretty early on, and then subsequent evaluators, that he was concussed by a grenade simulator exploding as he bent over it, and that the experience of a flash and flying back and loss of consciousness.  And then that, as he was dragged from the scene, he was dragged by his feet with his head apparently bouncing.

Then that same year there was an episode of pyrotechnics with a short detonation cord that he had a concussion where he was -- he was picked up and thrown into a tree by the explosion.

Q.  And what were your sources of this information?

A.  Let me see if I can identify that for you.  This would have been a report to an expert.  So the reports of the loss of consciousness from explosions to military training were in reports to Dr. Patterson, Dr. Montalbano and Dr. Mirsky and then subsequently to Dr. Dr. Nadkarni, as I recall.  And then Dr. -- not only the report but Dr. Mirsky then sent

JODY A. STEWART, Official Court Reporter

correspondence to Steve Hudgins where he describes his concern with this history of concussions and both in the car accident and also the blast injuries.

Q.   Dr. Cunningham, did you review information about any other head injury that was notable to you in David's history --

A.   I did.

Q.   -- as well as your source?

A.   So the incident is a November 9th, 1996, head-on collision with a drunk driver, and that is described by lay witnesses who were aware of that history, Deborah Seeger, Maria Runyon, his spouse at that time describes this, and then he has -- it's also in Sheila Cronin's social history. He has also described this to each expert who has inquired about head injuries.

Q.   Did you review any records that informed your analysis of this chapter?

A.   I did.  The hospital record of March the 9th, at that time he was taken to the hospital from this accident, was not available to me, but there are military medical records beginning on November the 12th that describe his history within a few days of prior being involved in an automobile accident and his symptoms that he's presenting to them with of vertigo and dizziness and -- he continues to complain about these in consultations across the next six or eight

Cunningham, M. - Direct                                             1328

months, short-term memory problems.  He's also treated for muscle and joint sprain kinds of issues, goes to the physical therapy as well.  So there is a whole series of medical records in the months following this that are detailing the sequela from this accident.

Q.  And in your role as a psychologist, is this the type of information you would typically rely on when making this sort of evaluation?

A.  It is.

THE COURT:  Did you interview Mr. Runyon?

THE WITNESS:  I did not.

THE COURT:  Would you typically, in forming an opinion, interview the individual?

THE WITNESS:  Yes, ma'am.  If I were undertaking an evaluative interview, I would typically interview the defendant.  Now, I don't always interview the defendant in taking a history because there is -- there may be significant information available from third parties and from records, but optimally I would interview a defendant and ask him about this as well as seeking this third-party information and medical records.

BY MS. PEIFFER:

Q.  Dr. Cunningham, did you feel -- when you put this factor in your report, did you feel like you had information to support your conclusions?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1329

A.   I had information to support that there was a significant
head strike that occurred in November 1996, based on the
records and multiple third-party reports as well as his
self-description as given to various medical and
psychological experts.

        MR. SAMUELS:  Judge, I object to Dr. Cunningham
being able to place any kind of medical significance on
these head strikes because it's outside the field of his
expertise.

        THE COURT:  Sustained.

BY MS. PEIFFER:

Q.   Dr. Cunningham, in your clinical practice is information
about a patient's head injuries the type of information you
would consider significant to your analysis?

        MR. SAMUELS:  Your Honor --

        THE COURT:  Just a minute.

        MR. SAMUELS:  -- just saying that as part of his
clinical practice doesn't mean it's within his expertise.
He's not trained as a neurologist, a neuroradiologist, any
of these fields.

        THE COURT:  I sustain the objection.  Let's move
on.

BY MS. PEIFFER:

Q.   Dr. Cunningham, I'm showing you what has been marked as
Petitioner's Exhibit 91.  Do you recognize this document?

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1330

A.  I do.  I'm sorry.  I haven't seen it yet.  I recognize the slide.

Q.  Petitioner's Exhibit 91.  Do you recognize this document?

A.  Yes.  This is correspondence -- yes, I recognize it.

Q.  What is this?

A.  This is correspondence from Allan Mirsky to Stephen Hudgins, an e-mail dated July 23rd, 2009.

          THE COURT:  Have you spoken with Dr. Mirsky?

          THE WITNESS:  I have not.

          THE COURT:  Is he still alive?

          THE WITNESS:  I do not know.

          MS. PEIFFER:  Dr. Mirsky is deceased.

          THE COURT:  I know that.

          MS. PEIFFER:  I'm sorry.  I thought you were asking me.

          THE COURT:  I was asking Dr. Cunningham.  You have never spoken to him, and Dr. Mirsky is now deceased.

          MS. PEIFFER:  Yes, Your Honor.

          THE COURT:  So how do we test that opinion *vis-à-vis* Dr. Cunningham's knowledge?  He just read another opinion.

          MS. PEIFFER:  I was going to ask him is this -- as a psychologist, would you typically rely on information from other mental health professionals and take that into account when forming conclusions about your own opinions?

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1331

MR. SAMUELS:  Judge, all we have here is an e-mail. We don't have any report or any corroboration that Dr. Cunningham spoke with or traded any communication with Dr. Mirsky.  This is just an e-mail.

THE COURT:  I agree.  I mean, this is going so far afield of what an expert can testify about.  He's never met Dr. Mirsky.  He's never talked to Dr. Mirsky.  Dr. Mirsky is now deceased.  If he had a conversation with Dr. Mirsky and met him and talked about his conclusions, but all he's doing is saying, well, I looked at this, I looked at that.  He can say that all he wants, but it's diminishing the weight of his testimony.  Your testimony isn't going to hold the weight when all you have done is look at other people's work and the quality of their work has not even been, in many instances, presented to this Court.

So, I mean, he's relying strictly, as he indicated, on third-party information.  Mr. Runyon's been available. He's never interviewed Mr. Runyon.  He's relied on all these other experts, and he's got this lengthy report, and it's nothing that he did himself other than look at everything else, and as you say, synthesize it.

So, I mean, I sustain the objection on that.

MS. PEIFFER:  Your Honor, that Rule of Evidence 702 says experts can testify about testimony based on facts or data, and the rule -- the notes to the rule say that that

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1332

encompasses reliable -- means of other experts, and that's what Dr. Cunningham is being asked about.

THE COURT:  One thing, we can't test the reliability of some of these other experts, that's number one.  Remember the caveat in the rule, there is still a balancing test that a Court can go through, whether the probative value outweighs the prejudice.  It has little probative value, in the Court's mind.  You are just going through a litany, from a clinical psychologist, that if you get married within so much time, and that's not good, and it's just a lot of other opinions here.  Some of them hold weight, but you keep on going, and it makes many of them not hold weight.  I'm letting you do it.  I've opened the door to you, and I should control this more.

MS. PEIFFER:  I understand.  We will try to move things along, Your Honor.

THE COURT:  You need to because we are going to be here until all this is done.  I'm not going to be able to abide by you all's schedule and what you want all the time. I will recognize them and tell them they have to be here.

Once they are here testifying, they will be under a court order when they return because you all have not properly estimated the amount of time that it's going to take for these witnesses.  We are on Page 45 of a 96-page document, and it's 6:30, and we took a 30-minute lunch break

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                    1333

and two 15-minute recesses.

          MS. PEIFFER:  Understood.

BY MS. PEIFFER:

Q.  Dr. Cunningham, could you describe the information that
you considered about David Runyon's prior head impact and
glass injuries?

A.  In regard to this document, to this correspondence?

Q.  Not to the correspondence, I apologize.  We are putting
your slide show up.

          THE COURT:  I will tell you, I've read this e-mail.
I'm aware of it.  I think you have it in evidence.  If you
don't, you can certainly move it into evidence, but I'm
aware of it.  It's just something that's there.

          MS. PEIFFER:  Your Honor, I don't believe it is in
evidence, so I would move Petitioner's Exhibit 91 into
evidence.

          THE COURT:  Do you have any objection?

          MR. SAMUELS:  Just I don't have an objection other
than if it's not for the truth of the matter asserted
because we can't talk to Dr. Mirsky, and it's hearsay.

          THE COURT:  I agree.  You're right.  We can't talk
to him, and it is hearsay.  Mr. Hudgins is deceased.  He
can't even say whether he got it.

          MR. SAMUELS:  Your Honor, it may be in the part of
the government exhibit here, but I'm sure we admitted it

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1334

with that same limitation, that you would have gone to what trial counsel knew and understood.

THE COURT:  I'll admit 91 for that purpose for what trial counsel knew and heard from Dr. Mirsky.

(Defendant's Exhibit 91 received in evidence.)

BY MS. PEIFFER:

Q.  Dr. Cunningham, moving along to the last neurodevelopmental factor, what did you learn from experts who evaluated Mr. Runyon about reported neuropsychological dysfunction?

A.  That he exhibited neuropsychological dysfunction based on their testing and clinical analysis.

Q.  As an expert in the field of psychology, is this the type of information you would reasonably rely on in forming an opinion?

A.  It is.

Q.  Dr. Cunningham, based on your knowledge and experience, can you describe whether a dysfunction in the brain, such as in the frontal lobe, has an adverse impact on development?

MR. SAMUELS:  Judge, this is all neurological.

THE COURT:  Sustained.  That's showing a frontal lobe and a brain, and it is outside of his area of expertise.  This is right in front, it says, "The frontal lobe is the area of the brain responsible for higher cognitive functions."

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                   1335

You have not laid any foundation for it.  He's not a neurologist, and you would have to lay a foundation, not just that he looked at somebody else's report.  If he doesn't have any knowledge of it, and it's outside of his expertise, he can't testify about it.  You've got other neurologists to testify.

BY MS. PEIFFER:

Q.  Dr. Cunningham, within the field of psychology, have you reviewed research about frontal lobe dysfunction and its impact?

A.  I have.

MR. SAMUELS:  I'm sorry.  This is an indirect way of trying to get to the same type of testimony.

THE COURT:  Sustained.

BY MS. PEIFFER:

Q.  Dr. Cunningham, in your report, did you rely on information and research about neuropsychological deficits and how that impacts a person's functioning?

A.  I did and concluded that because brain behavior relationships are fundamental to the science of psychology and to my training as a clinical psychologist and experience as a forensic psychologist.  So it isn't just the psychologists deal with emotional things that have nothing to do with the brain.  Our training involves courses in psychophysiology and in brain structures and anatomy, and the

JODY A. STEWART, Official Court Reporter

study of disorders that include ways in which brain disturbances may affect behavior and functioning.

MR. SAMUELS:  Your Honor, if that's going to be the testimony, I think I should be able to voir dire him on his experience in the field of neurology or neuroradiology or neuropsychology.

THE COURT:  I agree.  Before you proceed with these next 40 some slides, and we are right now into neurophysiological dysfunction, at least I was on slide 49, and we've gone a little past that, I'm not sure.

MS. PEIFFER:  Your Honor, I may be able to simplify matters.  I didn't have any further questions about that.

MR. SAMUELS:  Well, Your Honor, then I object to the testimony where he was describing his expertise and knowledge in the areas of the brain when he's not been so qualified.

THE COURT:  If you're going to rely on his expertise and knowledge of the brain and the training in that area, Mr. Samuels would be entitled to voir dire.

MS. PEIFFER:  The Court's indulgence for one moment.

THE COURT:  All right.

(Ms. Peiffer conferring with Ms. Ali).

MS. PEIFFER:  We will move on, Your Honor.

THE COURT:  All right.

Cunningham, M. - Direct                                        1337

BY MS. PEIFFER:

Q.   Dr. Cunningham, you also developed another neurodevelopmental adverse factor based on your own research and David's background.  Could you describe what this is?

A.   Chronic stress in childhood.

Q.   What did you learn about experiences related to chronic stress in David's background, and will you be describing this more later in your testimony?

A.   I will.  Those areas of chronic stress include deficient maternal bonding, paternal alcoholism, observed domestic violence, emotional neglect, physical and emotional abuse, father abandonment, extended absences of adoptive father, recurrent moves, and transcultural relocation.

Q.   Dr. Cunningham, what is the next area of adverse developmental factors that you investigated in David's background?

A.   Family and parenting.

Q.   And what relevance does a person's childhood family relationships have for their adult behavior?

A.   Because they are formative in their effect on someone's psychological development and interpersonal relationships with affects that endure across a lifetime.

Q.   And can you describe the source of this information that you're describing?

A.   So this is well-established in the psychological

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1338

literature, but it is also embraced by the FBI's behavioral science unit and the U.S. Department of Justice and research that they have sponsored.

MR. SAMUELS:  Objection to that.

THE COURT:  Were you going to question whether it was referenced in his report?

MR. SAMUELS:  Yes.

THE COURT:  Where are those sources referenced in your report?

THE WITNESS:  Let me turn to that.  So on Page -- let's see.  On Page 32 of my report under "implications of chronic stress in childhood," there are a number of references, and the full cites are in the reference list at the end.

THE COURT:  Where is this FBI and whatever you are talking about?  Madam court reporter, could you please read back the sources that were indicated?  They were said very quickly, something about an FBI profile and --

THE REPORTER:  So this is well-established in the psychological literature, but it is also embraced by the FBI's behavioral science unit and the U.S. Department of Justice and research that they have sponsored.

THE WITNESS:  I'm sorry.  I was on the wrong page, Your Honor.

THE COURT:  You said it was well-documented in the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1339

psychological literature and the FBI, the Department of Justice.  You named those as two sources for this.

THE WITNESS:  Your Honor, I can retrieve a full cite for you.  I'm not sure if it's cited in the reference list of my report.  Actually, the second line, "The influence of a family environment on the child's social development lasts a lifetime."  That's on Page 51 in the reference list.  Cantelon, S.L. (1994).  "Family strengthening for high-risk youth, Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.  Fact Sheet Number 8."

THE COURT:  All right.  That says family strengthening for high-risk youth.  That is not the FBI.  I don't know what Department of Justice Fact Sheet 8 is, and where is that referenced in here?

THE WITNESS:  So the slide 58 simply has U.S. Department of Justice.  The full cite for that conclusion about the influence of a family environment comes from Cantelon 1994.

THE COURT:  And that's about the family strengthening for high-risk youth?

THE WITNESS:  That's the specific issue that's being addressed, and this is being identified as a broad developmental principle as they're examining that family strengthening.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1340

THE COURT:  Where is Fact Sheet 8?  Where is that?

THE WITNESS:  That's a publication from the Office of Juvenile Justice and Delinquency Prevention of the U.S. Department of Justice.  I don't have that with me on the stand, but that's one of their publications.

THE COURT:  Mr. Runyon was an adult, was he not, when this happened?

THE WITNESS:  That's correct.

BY MS. PEIFFER:

Q.  Dr. Cunningham, what was the first adverse family and parenting factor you identified in David's background?

A.  The first is his mother's inadequate bonding.

Q.  I understand we are trying to move things along here.  Do you discuss this factor in your report?

A.  I do.

Q.  And could you briefly describe some of the most important things that you observed about and that you learned about how this factor impacted David's life?

A.  That Suk Cha was observed to not hold or be affectionate with her children, that she was unable to soothe David as a young child or seemed not to know how to do that, that that lack of bonding was observed by David Dombrowski -- he observed that -- that she seemed not to be bonded to them.

Her subsequent relationship with them, particularly as they got older, confirmed that lack of bonding as she

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1341

was -- as she was estranged from them and seemed to take little effort in trying to maintain a relationship.

Q.   Dr. Cunningham, could you describe what the research shows or showed in 2009 about maternal bonding and psychological development?

A.   So the quality of nurturing that a child receives in the first two years of life are the most important psychological events that will happen in the child's entire life, because out of the quality of that emotional nurturance and bonding, the child is growing the emotional arms that they will use to hold people with for the rest of their life.

It's a very critical period of time for the development of that capability.  That capability to care and resonate and empathize with and be authentically intimate with others, and even to value them as other citizens, is not something that you're taught.  It's something that you absorb, and that absorbing critically occurs during the first couple of years of life.

When that doesn't happen, then -- so it's out of that very close nurturing bonding -- bonded relationship typically to momma, it could be grandma, could be a father, but enduring single human being that a stable identity is formed, that someone develops the capacity for affective emotional self-regulation, capacity for empathy, responsible social behavior.  All of those things are outgrows of the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1342

quality of attachment and bonding in the first couple of years of life.

Q.  Dr. Cunningham, what was the next adverse family and parenting fact that you identified in David's background?

A.  A mother's emotional neglect and rejection.

Q.  Can you summarize what you learned about this adverse developmental factor?

A.  That Suk Cha was not affectionate or demonstrative at all, that her physical contact was so infrequent that when Mark would sit on her lap, it felt strange to him.  He realized as early as five years old that he was not loved in the way that other children are, and began to run away at that age.

He described that he and David took very different approaches to her coldness and remoteness and lack of affection, that Mark gave up and got in her face.  He had this kind of oppositional resistant approach, and David kept seeking her approval and affirmation and would lie about his expressions -- he was trying to be somewhat autonomous with lying, try to hide it so as not to generate her disapproval.

Q.  What relevant facts did you learn about David Dombrowski related to this factor?

A.  In terms of his emotional neglect and rejection, when he was -- while he was still involved in David's life in the first four years, he was routinely a drunk when he came in

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1343

and often absent either with his work duties or in the casino, and then he abandoned David when David was five years old.

Q.   Dr. Cunningham, without restating some of the things that you described earlier, I believe when asked by the Court about David H. Runyon, can you describe just summarizing the facts you learned about David H. Runyon relevant to this factor?

A.   That he seems to have been emotionally isolated and encapsulated much of his life, that he was emotionally unavailable to David and Mark, emotionally and conversationally.

Mark described him as being completely detached from everybody in the family, and they would take fishing trips, would go fishing for four hours in an afternoon but maybe ten words would be spoken, that there was not actual interaction that was occurring in those times.

Q.   What did the research in 2009 indicate about the impact of childhood neglect as an adverse developmental factor?

A.   That the neglect is more psychologically injurious and has a greater association with criminality and criminal violence than being actively abused, that the emotional malnutrition of just never getting the emotional groceries ends up being more damaging than periodically having somebody go off on you.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1344

Neglect is a broad spectrum risk factor for psychological disorders and life function of all sorts. It markedly increases the likelihood of behavior problems not just in childhood but a violent and criminal behavior in adolescence and adulthood.

Q.   Dr. Cunningham, what is the next adverse family and parenting factor you identified in David's background?

A.   Physical and emotional abuse.

Q.   So understanding we are trying to pick up the pace, could you summarize what you learned about Suk Cha in regard to this factor?

A.   So these are observations of David Dombrowski during David Runyon's preschool years where she was volatile and reactive and over punished for typical childhood behaviors, and her expectations of her children were not anchored to their developmental level, and then she overreacted to what she perceived as their not following the expectations that she would set for them, and that the boys were terrified of her.  This he described to the federal *habeas* investigator. Some of this he described to Sheila Cronin, but in greater detail to the federal *habeas* investigator.

THE COURT:  Who is this?

THE WITNESS:  David Dombrowski.

THE COURT:  I thought you said the federal.

THE WITNESS:  Dombrowski described this to the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                        1345

federal *habeas* investigator.  He also described some of this to Sheila Cronin, but provided some additional detail to the federal *habeas* investigator.

THE COURT:  That was Ms. Johnson?

THE WITNESS:  Yes, Jessica Johnson.

BY MS. PEIFFER:

Q.  And, Dr. Cunningham, what did you learn about David Dombrowski in relation to this factor?

A.  That according to Suk Cha, while intoxicated, he was abusive to David and to her, and this incident that occurred, Suk Cha related this, and then it's also in Dr. Patterson's report and other places, of him holding David by the wrist and heaving him across the room when he was 2 or 3.

Q.  I spoke over you.  Would you repeat that last part?

A.  That occurred when David was age 2 or 3.

Q.  And what about David H. Runyon?

A.  He use -- according to Mark, he used a paddle with holes drilled in it.  There were actually two paddles.  One did not have the holes drilled in it, it broke, so the next paddle had holes drilled in it.  He described a paddle that was like five or six inches wide, eight or ten inches long, perhaps longer.

Q.  Could you briefly summarize what their research in 2009 indicated about when the full effect of childhood traumatic experiences become evident?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1346

A.   The conclusion is that the effects of trauma are not just evident or not just damaging in childhood, *per se*, but may have a sleeper effect.  There is an analogy that is utilized by one scholar in the area of rheumatic fever, that it appears that the child may have recovered from rheumatic fever and then later in adulthood developed significant heart problems, congestive heart failure, that there has been a sleeper effect on the damage that was done by the trauma, and analogizes that the same way the emotional damage that is done by traumatic experiences in childhood may not have expression until many years later.

Q.   And, Dr. Cunningham, is there research from the Department of Justice concerning this adverse developmental factor?

A.   There is.

Q.   And can you briefly describe that?

A.   So this is a longitudinal study that was initiated by Dr. Cathy Widom back in the late 1970s and eventually came under the sponsorship of the U.S. Department of Justice where they had almost 900 substantiated cases of abuse and neglect and began following them, as well as a matched control group even from the same classrooms and neighborhoods, and now have followed them 15 to 24 years later, and they found that the maltreated children were almost five times more likely to be arrested as juveniles, they were twice as likely to be

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1347

arrested as adults, and they were just over three times more likely to be arrested for violent offenses in adults.

Q.  Dr. Cunningham, what is the next adverse family and parenting factor you identified in David's background?

A.  His father's alcohol abuse.

Q.  And what did you learn about that?

A.  That Dombrowski drank heavily in the casino while gambling, came home intoxicated in the early morning hours, that he was not only alcohol dependent during the marriage to Suk Cha but also for the 15 years after that.

Q.  And could you briefly summarize what the research in 2009 describes about the effects of this factor?

A.  The parental alcohol abuse is another one of these broad spectrum risk factors or childhood radiation.  It has inheritability implication that I described.  It's a pathological model for how you go about dealing with your life and relationships.

      MR. SAMUELS:  Your Honor, I'm going to object to this.  There is no evidence that David Runyon had any kind of alcohol problem, and Dombrowski was out of his life at age 5.  How does this connect to him?

      MS. PEIFFER:  I believe that is what Dr. Cunningham is explaining.

      THE COURT:  He can try to explain.  I don't understand.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                             1348

THE WITNESS:  So this is an inherited susceptibility to mood disorder out of a family history of alcoholism, including parental alcoholism.  As Dombrowski is an alcoholic and coming in drunk, even though David is a preschooler, that doesn't mean that the effects of that and the modeling of that aren't being imprinted, kind of an uncritical, almost preverbal kind of level in his life.  He's certainly subject to psychological injury from that even though he is 2, 3 or 4, maybe even greater injury, psychological injury because of that.  And that parental alcoholism, that experience is a broad spectrum risk factor for problem -- dysfunctions in adulthood, from relationship problems to self-control issues to self-esteem problems, psychological disorders, and criminal behavior.

THE COURT:  We are not really just talking about dysfunction.  There are a lot of dysfunctional people out there, but -- and a lot of functional people and some in between.

But what we are talking about are three things:  Number one, Mr. Runyon, to his credit, was not an alcoholic.  So it didn't go with him into adulthood.  Number two, he has not been diagnosed with any mental illness, and what we are really looking at is brain damage.  He doesn't have a diagnosable mental illness that was there.  He doesn't have alcoholism.  The issue is brain damage.  We are talking

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1349

about brain damage to the point that it causes dysfunction, and he's not an alcoholic, and he hasn't been diagnosed with a mental illness.  We went through that at least an hour ago.

So I'm not going to belabor it anymore, but you can pursue it.  But unless somebody can show me something that is reliable in the record of either one of those things, it's not before the Court.

MS. PEIFFER:  Your Honor, I'd just like to note or request perhaps that the testimony from Dr. Cunningham regarding Dr. Nadkarni's diagnosis of mood disorder could be accepted on a conditional basis.  There is no jury, and I know the Court is very capable of assessing and untangling the effect of this evidence, and Dr. Nadkarni will be testifying on Friday.  We just had, in terms of trying to be efficient and schedule our experts and move it along, we had to set things up in that order.

THE COURT:  You can elicit some from him, but I'll let you call him back in rebuttal if you don't think you've covered it properly because I do need to hear from Dr. Nadkarni.

BY MS. PEIFFER:

Q.  Dr. Cunningham, what is the next adverse family and parenting factor you identified in David's background?

A.  Parental volatility, marital conflict, and family

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1350

violence.

Q. Could you briefly summarize what you learned about this factor from David's parents during his childhood.

A. That both, Dombrowski and Suk Cha, were very volatile in their emotional reactions. Dombrowski -- Suk Cha says -- beat her and also abused David when drunk. David would try to restrain him. Mark described -- well, Dombrowski described his observations during David's early childhood that Suk Cha was quickly agitated and would spin out of control, throw a dish at him, got frustrated with anything. The can opener didn't work fast enough, she would throw it, that her volatility in the household had everyone on eggshells.

Q. Could you summarize what else you learned about Suk Cha related to this factor?

A. Mark's recollection, so this extends then in the years after that, after Dombrowski, that Suk Cha would have meltdowns one or two times a year where she would scream and yell, break every dish in the house. She broke the television by throwing a dish into it.

        He characterized she could destroy her room in 30 seconds. She could be set off by anything, including things like David H. Runyon not getting the military assignment that she hoped that he would. David would try to calm her to keep the peace, would physically hold her as a kid, try to comfort

Cunningham, M. - Direct                                          1351

her to try to soothe her volatility.

Q.   Could you briefly summarize what the research in 2009 indicated about the impact of this adverse developmental factor?

A.   So broadly the role of parents is to be emotionally stable themselves so that they're able to have a regulatory effect over the child's emerging and limited ability to regulate its own emotions.

So the adult sets structures and soothes the child. When the parents are volatile, and as the child -- at a role reversal, the child is trying to soothe the parents, then the world is turned on its head, and the experience of the world that the child has is one of being out of control, and the external structures aren't there to help him regulate himself.

Now, that's kind of what's happening psychologically in this family system in terms of outcomes.  Children that are exposed to parental violence are impacted in terms of psychological damage on par with them being physically maltreated themselves.  So to watch it happen to another family member is as injurious as having it directed toward them.

There has been a study that the Department of Justice has sponsored looking at the effects of different types of family violence, and that being spouse abuse, a

Cunningham, M. - Direct                                          1352

climate of violence and hostility, and child abuse, and found
that there was a dose-response effect, that as you added on
more types of family violence within those categories, an
increasing percentage of the males ended up exhibiting
significant violence.

Q.   Dr. Cunningham, what is the next adverse family and
parenting factor you identified in David's background?

A.   Abandonment by his biological father.

Q.   And could you just describe the most important highlights
of what you learned about this factor?

A.   Certainly.  So Dombrowski relinquished his parental
rights and abandoned David in 1995 (sic).  David would have
been 4 at the time.  This abandonment was in spite of knowing
that Suk Cha was volatile and not bonded to David and was
even abusive of him.  And that abandonment was particularly
damaging because even as an alcoholic, Dombrowski had greater
parental capability to soothe David than Suk Cha did, and
then that's a message that David is carrying forward into his
life about being unlovable and unworthy and unimportant to
his father.

Q.   And what did the research in 2009 say about the impact of
this adverse developmental factor?

A.   That the absence of a father is a very -- absence of a
father role is a very significant event in a child's life,
even if there is somebody else who is there, that that loss

JODY A. STEWART, Official Court Reporter

of biological father, especially after he's been there for four or five years, is a significant rupture in this child's experience.

Q.   Dr. Cunningham, what is the last family and parenting adverse developmental factor that you identified in David's background?

A.   Residential stability.

Q.   And could you please just very briefly summarize the progression of David's moves during his childhood.

A.   So two years in Ft. Hood, two years in Panama, six weeks with grandma, then go to Germany for four plus -- four to five years, back to Ft. Leonard Wood but one year in base housing, another year moving out to a more rural area of a Nebo Mission, then back to base housing again.  Then a year in Korea, then back to high school at Ft. Belvoir, and then going to Wentworth Academy.

Q.   Could you briefly summarize what the research in 2009 showed about the impact of this adverse developmental factor?

A.   So stability is a critically important experience in childhood, and that includes stability in the household itself as well as trying to limit the changes of school and residence and that kind of thing that a child has cycled through, and the stability of that external structure gradually moves from the outside to the inside where it contributes to this person being able to better structure and

control themself, importantly in terms of what's outside the house, and it's disruptive by moves, that as a child forms enduring friendships and participates in sports teams, those are the first lessons in citizenship.  That's before you learn to value people that are not your blood kin.  Those are critically important experiences.

Now, as David's home experience was characterized by emotional neglect from both parents, that then increased his dependence on external relationships that might have compensated for that; friendships, neighbors, coaches, teachers that took an interest in him over time.  Because the family was recurrently moving, it disrupted that opportunity as well.

Q.  Dr. Cunningham, what is the next arena of adverse developmental factors you investigated in David's background?

A.  Community factors.

Q.  What is the first adverse community factor you identified?

A.  Familial and transcultural relocation.

Q.  And could you please describe your finding about this adverse developmental factor as it relates to Suk Cha, and in the interest of time, stop before you continue over on to some overlap on the next slide.

A.  Okay.  So again, Suk Cha's experience is important because this illuminates the resources that she could bring

Cunningham, M. - Direct                                      1355

to bear, both at the beginning of David's life and also the challenges that she's facing over time as she is undergoing these transcultural relocations as she's trying to be a parent.  So, you know, first she is a wartime traumatic refugee.  Then she's abandoned by her step-mother and has a punitive rejecting second step-mother.  Then in late adolescence she is emancipated without family support, without any Korean-based support.  She marries Dombrowski and emigrates to Ft. Hood, not as if she moved with her whole family.  Then she is stationed in Panama with Dombrowski. Then back in the U.S. and divorces Dombrowski and marries Runyon.  Then is stationed in Germany.

Q.  So what did you find in regard to David and this factor? And when you're describing this, could you please describe what the color coding on this slide means?

A.  So the color coding, the blue coloring is a transcultural re-location or transcultural experience, and the red are familial relocations or changes in the -- or dislocations in the structure of his home and family.

So early childhood, he's a Korean-American at Ft. Hood.  Then he is in an emotionally neglectful, alcoholic, high conflict family.  Then moves to a central American country.  Then back to the United States with his parents' divorce, and he's abandoned by Dombrowski, has a new father figure and starts kindergarten at his grandparents' house.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1356

Then moves to a European country with Suk Cha and David H. and his brother Mark.  Then back to the U.S., Ft. Leonard Wood and has three residences in three years.  Then moves to an Asian country with the family with there being extended family conflict during that time and attending a Korean school.  Then moves back to the U.S., and then is separated from the family as he goes to Wentworth Academy, and they go back to Korea again.

Q.  And what did the research in 2009 indicate about the impact of this factor?

A.  So each one of these moves is straining the adaptational capacity of a child, and that adaptational capacity is limited.  And as you overstrain that by putting them through one dislocation or change in family configuration or experience or country or move, each time you do that, you are steadily depleting those adaptive reserves, and the effect of that is psychologically injurious to the child.

Q.  Dr. Cunningham, what is the next adverse community factor you identified in David's background?

A.  David's experience as a Korean-American.

        MR. SAMUELS:  Your Honor, I don't see this in my report on 31.

        THE COURT:  Do you have 89, Page 89?

        MR. SAMUELS:  I'm sorry, Your Honor.  I have the PowerPoint slide, but I thought that the PowerPoint was all

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                    1357

related to the report, and I don't see the Korean-American
in the report.

THE COURT:  I see what you're saying.

MS. PEIFFER:  I believe it's covered in the
addendum.

MR. SAMUELS:  Your Honor, we rejected this
addendum.  It didn't come in the January 2023 addendum.

THE COURT:  This is the addendum that we were
talking about earlier with just conclusory?

MR. SAMUELS:  That's all I see is one reference to
Korean-American experience, peer animation, rejection, but I
don't see any explanation, nothing like what's on the slide
here.

THE COURT:  No, there isn't.  This is the one where
the Court ruled earlier that all it does is say
transgenerational and neural development, family parenting,
community.  It's a two-page report that just lists these
categories, and then says the factors under them, the same
thing as we had on the slide, and then this just says
Korean-American experience, and there is nothing in the main
report, is what I believe is being said.

MR. SAMUELS:  I don't see it, Your Honor.

THE COURT:  So, in other words, the requirement was
that report was a summary report, that the Court would let
you go through this demonstrative exhibit as long as it was

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1358

based in what he had said was his opinion.

MS. PEIFFER:  Yes.  But, I believe, Your Honor, I raised earlier in the proceedings the scope of expert testimony issue and that Dr. Cunningham can elaborate on his opinions during his trial testimony.

THE COURT:  Well, what are you basing it on?  There is nothing in his main opinion about it, nothing in his references, and the only mention is a number with three words after it.  Let me turn back to it.  It is on Page 2 of the summary report that says "community," number 15, and it has three words, "Korean-American experience."  Doesn't say where that comes from.  It doesn't say the basis of it.  It says nothing.  It just says, "15, Korean/American experience," and nowhere that he has presented does he expand on what he meant by that, how he came up with it, and so forth.  That's the objection, as I understand it, Mr. Samuels?

MR. SAMUELS:  That's correct, Your Honor.

THE COURT:  So show the Court where in his detail, I know that he gives great detail, where did this suddenly come from in his summary report in January?

MS. PEIFFER:  Your Honor, the Court, as the Court noted, he talks about this factor on Page 2 of his addendum report.

THE COURT:  But what you have done is you've said

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                           1359

this is a demonstrative exhibit.  Now you are basically reading it into the record.  On this demonstrative exhibit it has bullet points under "Korean-American experience" that are not found anywhere in his report.  That's as simple as I can make the ruling.  In other words, you kept kind of running end-runs, and the Court said, okay, you can use your demonstrative exhibit, but you have to tie it into the expert report.  You cannot just use the summary.  For hours you have gone through this demonstrative exhibit, and he's reading off of it.  There is nowhere in these reports, the bullet points on the Korean-American experience that are here.  If you can show them to the Court, you can certainly proceed.  If you can't, then I sustain the objection.

MS. PEIFFER:  Yes, Your Honor.  I would also direct the Court to the middle of Page 49 where Dr. Cunningham is describing David's experience as a Korean-American first generation.

MR. SAMUELS:  Your Honor, I don't think that talks about what the bullet points are on the slide.

THE COURT:  No, it doesn't.  Bottom line is that he talks about Germany, moving around, "Created additional challenges to David's ability to form a secure identity and stable value system."  He says he is the "first generation Korean-American with the mixed and sometimes conflicting cultural expectations."  It says he "grew up in a household

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1360

with two very different cultures.  Because of the abandonment of Dombrowski," which we've gone through, "and the passivity/withdrawal of his adoptive father (Runyon), Suk Cha's Korean cultural heritage would have dominated the home.  The surrounding community, however, was western European (in Germany) or American."  It just says, "The many conflicting cultural norms."  It certainly doesn't have these bullet points here for you to then put into the record.

MS. PEIFFER:  Your Honor, I just want to add to that, on Page 48 some of the information about David's mother Suk Cha overlaps.  I should have flagged earlier.

THE COURT:  We have gone through all of this.  I think that we have gone through Suk Cha's volatility and bonding failures and cross-cultural stress.  These are what made her a difficult parent.  This is not about the specifics on this page about a Korean-American experience.

MS. PEIFFER:  Well, it says facts are already described, as the Court represents.  I can skip to asking Dr. Cunningham to summarize what the impact would be of this factor.

MR. SAMUELS:  Your Honor, he shouldn't be able to summarize on the impact if he hasn't properly disclosed it.

THE COURT:  I sustain the objection.  It's not in there.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                            1361

BY MS. PEIFFER:

Q.  Dr. Cunningham, what is the next adverse community factor you identified in David's background?

A.  Peer alienation and rejection.

MR. SAMUELS:  Your Honor, this isn't in there either, the same thing.

THE COURT:  Agreed, unless you can show me.  You are now going into what I call the sympathy factor in all of this, your sense of being a loner and those kinds of things, and it's not in the report.  That's the problem.  The sympathy factors are okay, but it's got to be in the report, and it's not there.  Unless you can show me, I'm going to sustain the objection, and we are going to move on.  I have read these reports.  Look at the third bullet point. Nothing in the report about that.

MS. PEIFFER:  Your Honor, I believe this is another one that was included in the addendum.

THE COURT:  Okay.  I sustain the objection.

BY MS. PEIFFER:

Q.  Dr. Cunningham, what is the next adverse developmental factor you investigated in David's background?

MR. SAMUELS:  Your Honor, this is the same objection.  These are included in the addendum, but it's just 17 and 18:  Interpersonal and relationship dysfunction, and 18, serious neurocognitive and psychological disorders,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1362

but there is no explication of those at all unlike what's on the following slide.

MS. PEIFFER:  Well, Page 3 of his addendum report goes into detail about factor number 18.  And factor number 17 has been detailed throughout his initial report as well as discussed in the addendum.

THE COURT:  You talked about the mother's inadequate bonding.

MS. PEIFFER:  I'm sorry, Your Honor?

THE COURT:  The next Page 3 is where we get into Dr. Richard Dudley and Dr. Nadkarni.  I said you can call them, and if you do, you can call Dr. Cunningham in rebuttal as a witness after I've heard that.

All this is, he concludes this, "On Page 4 of my previous report, I noted a hereditary vulnerability to Mr. Runyon's family system to maladaptive personality characters and mood disorder.  The evaluations by Dr. Dudley and Dr. Nadkarni point to these risks being realized by Mr. Runyon."

As I've said, we have not heard from one of the doctors, Dr. Nadkarni, and we may well not hear from the other.  So I don't know what you're talking about in here that would support this now being read into the record about adverse developmental factors.

Again, 17 and 18 summary points, it's just a few

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                              1363

words that appear on that supplemental report, interpersonal and relationship dysfunction, and in 18, serious neurocognitive and psychological disorders, they are just summary words on a piece of paper with no support in his written report.

MS. PEIFFER:  Yes, Your Honor.  And regarding Dr. Nadkarni, I would request for the Court to allow Dr. Cunningham to testify and accept it conditionally on Dr. Nadkarni's testimony so that the Court -- Dr. Cunningham is CJA appointed, and so that we wouldn't have to have a situation in which he has to return.

THE COURT:  And aren't all the experts CJA appointments?  Because I've got to understand it.  This is where you are getting into complicated expert testimony.  But it's hard to sort it out when there are objections, if I haven't heard the other expert testimony.  I'm in charge of the control of the presentation of the evidence, even though it's a bench trial, and my answer is no.  He can return after Dr. Nadkarni and/or Dr. Dudley testify.

MS. PEIFFER:  Yes, Your Honor.  I realized I neglected to enter Dr. Cunningham's addendum into evidence.

THE COURT:  I rejected it.

MR. SAMUELS:  We have, Your Honor.

MS. PEIFFER:  I'm sorry.  I thought the ruling was that I could return to it at the end after he had testified

about the factors.

THE COURT:  Well, the report says nothing more than what you just put on the record.  This is not a proper report.  It's just not a proper report.  Number 149 is not a proper expert report.  It's just a two-page list of conclusions that are not all supported by his original report, and he's pretty much read all of this into the record.  It is not a proper report.

I will make this number 149.  I will put it on the record as rejected, not admitted.  I can't imagine anyone looking at this and finding that it's a proper expert report.  It's just a bunch of summary statements and a summary chart, and it's based upon the other two experts.

Now, again, if you want to recall him, once these experts have come in, I'll reconsider it.

MS. PEIFFER:  Understood, Your Honor.  I just want to -- I understand what you're saying about the report being very brief and summary in nature, and I just want it specified, I believe that's why it was styled an addendum because it is meant to accompany and be several extra pages appended to his original report, not a stand-alone report in and of itself.

THE COURT:  I want to make a comment.  I have let you get all of that in except what wasn't in the original report.  The Court has sat here for hours, and you have

Cunningham, M. - Direct                                          1365

gotten it all in.  You've gotten it all in through reading this demonstrative exhibit, and when there was an objection that it wasn't in the main report, that's when the objection was sustained.  So you have gotten it in.  So don't say it's just an addendum.  It's an addendum but it doesn't say anything.  If all it is is an addendum to highlight the report, you've been able to get all of that in.  But you can't then add an addendum and add these couple of new categories and never have opined about them except to put them as a bullet point.

BY MS. PEIFFER:

Q.  Dr. Cunningham, how did this adverse developmental factor that you found existed in Mr. Runyon's background together impact a person's mental health, including raw materials and resources that he brings to functioning and decision-making?

A.  It significantly limited and impaired the resources that he could bring to decision making.

Q.  Do the opinions that you offered on Mr. Runyon's mental health and the effect of these adverse developmental factors on functioning and decision-making reflect the opinions you would have offered if asked to opine on this in 2009?

MR. SAMUELS:  Judge, I'm going to object to that because a lot of what he's looked at has been in 2014 and 2015 and trial testimony that he wouldn't have had access to in 2009.  There is a lot of things that he looked at that he

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                          1366

would not have had available to him in 2009 to be able to remedy that opinion.

THE COURT:  Sustained.  You have to be very specific.

MS. PEIFFER:  Your Honor --

THE COURT:  No.  You have to ask the question that says if you, in 2009, had what was there in 2009, not what was there after 2009.  One of the judges of the Fourth Circuit said this is the danger when you look at something way back after the fact.

MS. PEIFFER:  Yes, Your Honor.  I'd just like to clarify because the claim at issue is based in part on lack of investigation.  So the purpose of Dr. Cunningham looking at all of these sources and reaching his opinion is that if he had been provided these same materials in 2009, he could have reached the same conclusions in 2009.  We are not disputing that he was not provided these materials in 2009.  That is the crux of the claim and the issue of ineffective assistance of counsel that was brought to the Fourth Circuit.

THE COURT:  No, the issue is what counsel had in 2009 and what they knew in 2009, and then based upon that, were they ineffective?  That's the issue.  There is a line in the Fourth Circuit, you don't have to pursue every single line of investigation and defense, but what you do is you

Cunningham, M. - Direct                                        1367

look at what those attorneys had, what they could have had investigated based upon what they had, and then if they were ineffective, and I'm paraphrasing now.  But I'm not going to let you go back into studies and things that were just not part of what they had and are after-the-fact.  Now, I'm just not.

          MS. PEIFFER:  Your Honor, the claim in Mr. Runyon's 2255 petition was that counsel rendered ineffective assistance by failing to investigate, and so Dr. Cunningham's opinion is based on the type of information that he would have had had counsel performed the type of investigation that we allege is necessary.

          THE COURT:  Then go through the pieces of information one by one.  You've asked questions all over the block, Ms. Peiffer, and I'm not going to let you just say a summary question like that.  Point to his testimony and point to what he has referred to and if he had that.

          MS. PEIFFER:  Well, Your Honor, the analysis is cumulative, not asking Dr. Cunningham or the Court to look at each piece of information individually in isolation.  Its value is together because that would be the full picture.

          THE COURT:  Well, ask him what he would form that opinion on, because his testimony had been so ranging and so all over the block that I don't know what your question encompasses.  That's the problem.  I don't know what your

                   JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1368

question is.  It's a question like, Are you really a good person?  Yes.  I mean, it's one of those leading questions that, of course, he is going to say, well, I would have formed this opinion.  But I want to know why he would have formed it, and I can't determine that on the testimony that's here.  So just go say what would your opinion be and go through everything that he would have used.

BY MS. PEIFFER:

Q.  Could I have Petitioner's Exhibit 31, Page 3.

Dr. Cunningham, I'm going to show you on the screen and scroll through the information that you said you relied on in forming your opinion in this matter.  You just let me know when you're ready for the next screen.

A.  I'm ready.

Q.  Let me know when you're ready for the next screen.

A.  You may need to scroll up just a little bit.

Q.  Thank you.

A.  All right.  I'm ready.

And scroll up, please.

Next page.

Scroll up, please.

Next page.

THE COURT:  What page are you on now?

MS. PEIFFER:  I believe 7.

THE COURT:  The top of the page.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Direct                                                1369

THE WITNESS:  Okay.  I've reviewed that.

BY MS. PEIFFER:

Q.  Dr. Cunningham, was this -- were these sources things that you relied upon in reaching your conclusion that you just described and described in your 2015 report?

A.  Yes.  This and additional information that was described in the addendum report.

Q.  And if you had this same information in 2009, would you have reached the same opinion about Mr. Runyon's mental health and the effect of adverse developmental factors on his functioning?

MR. SAMUELS:  Your Honor, again, just object.  Some of this information was simply not available.

THE COURT:  Not available.  The key to the question is what information was available, had you had.  You've just gone through a list, but you haven't identified what was available and what wasn't available.

If you had had the information available in 2009 that you have reviewed now to do your report, which opinion would you have formed?  If a research paper wasn't done until 2015, or some study or an interview, you've just gone through a list, maybe all of it was available in 2009, and if it was, it was, but just establish.  That's all I'm asking you to do, is to say, if you had the information you've relied on for your report, and it existed in 2009,

JODY A. STEWART, Official Court Reporter

1370

what would your opinion have been?

        MS. PEIFFER:  Thank you, Your Honor.

BY MS. PEIFFER:

Q.  If you had the information available that you relied on for your report and it had been available in 2009, what would your opinion have been?

A.  What I've described in the reports that I filed.

        MR. SAMUELS:  Your Honor, just note our objection to the addendum report.

BY MS. PEIFFER:

Q.  Dr. Cunningham, just one question.  So when you wrote your report in 2015, it did not include the addendum; is that correct?

A.  That's correct, because I have not yet reviewed those two additional expert reports.

Q.  And setting the addendum aside just for a moment, what conclusion did you reach about how adverse factors affected Mr. Runyon's functioning and decision-making.

A.  I identified 14 factors that I believe significantly limited and impaired his functioning and decision-making in 2007 at the time of the offense.

        MS. PEIFFER:  The Court's indulgence for just a moment, please.

        Nothing further, Your Honor.

        THE COURT:  All right.  Thank you, Ms. Peiffer.

JODY A. STEWART, Official Court Reporter

1371

Mr. Samuels, do you want to do the cross-examination this evening or tomorrow?

MR. SAMUELS:  I'd rather do it in the morning, Your Honor.

THE COURT:  I'm going to let you do that because it's already 7:35 tonight, and I think it's best that we start fresh with the cross-examination and any redirect.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Now, Dr. Cunningham, what that means for you is that you have to be here tomorrow morning at 11:00 a.m.

THE WITNESS:  Yes, ma'am.

THE COURT:  You cannot discuss your testimony thus far with anyone, and that also includes any of the attorneys or anyone associated with this case.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  I will be asking you that question as I do of witnesses when you start your testimony, have you discussed it with anybody, and you'll be under oath before the Court.

THE WITNESS:  Yes, Your Honor.

THE COURT:  I do wish you a nice evening.

Ms. Peiffer.

MS. PEIFFER:  Just to be completely clear, Your Honor, I just wanted to put something on the record and

JODY A. STEWART, Official Court Reporter

1372

before you.  We will have to communicate with Dr. Cunningham about travel arrangements and changing his flights.  We will not discuss his testimony, but just to make clear that we will have to discuss with him.

THE COURT:  That's fine.  I meant substantively. You can certainly speak to him and say hello and work with his travel arrangements.  That's totally fine.

MS. PEIFFER:  Thank you, Your Honor.

THE COURT:  Then if there is nothing further, we will be in recess in this case until 11:00 a.m. tomorrow morning.

(Hearing adjourned at 7:34 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


X_____/s/_____x

Jody A. Stewart

X_____11-6-2023 _____x

Date


JODY A. STEWART, Official Court Reporter