1373

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -
                                        )
UNITED STATES OF AMERICA,               )
                                        )
     v.                                 )     CRIMINAL ACTION NO.
                                        )     4:08cr16
DAVID ANTHONY RUNYON,                   )
                                        )
          Defendant.                    )
                                        )
                                        )
          AND                           )
                                        )
DAVID ANTHONY RUNYON,                   )
                                        )
          Petitioner,                   )     CIVIL ACTION NO.
                                        )     4:15cv108
     V.                                 )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
          Respondent.                   )
                                        )
- - - - - - - - - - - - - - - - - - - -


                TRANSCRIPT OF PROCEEDINGS

                       DAY 10

                  Norfolk, Virginia

                  November 2, 2023



BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge








                JODY A. STEWART, Official Court Reporter

1374

APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:   Brian Samuels
                Lisa R. McKeel
                Assistant United States Attorneys
                    And
          DEPARTMENT OF JUSTICE
          By:   Carrie L. Ward
                Counsel for the United States

          VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
          By:   Elizabeth J. Peiffer
                Robert Edward Lee, Jr.
                    And
          ALI & LOCKWOOD LLP
          By:   Kathryn M. Ali
                Counsel for the Defendant

JODY A. STEWART, Official Court Reporter

1375

## I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK CUNNINGHAM, M.D. | | 1377 | 1541 | |

## E X H I B I T S

| GOVERNMENT'S NO. | PAGE |
|---|---|
| 99 | 1437 |
| 101 | 1443 |
| 102 | 1437 |
| 103 | 1440 |
| 104 | 1445 |
| 107 | 1518 |
| 119 | 1541 |
| 122 | 1541 |
| 126 | 1508 |
| 131 | 1504 |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 95 | 1481 |
| 103 | 1485 |
| 104 | 1493 |

| COURT NO. | PAGE |
|---|---|
| 4 | 1530 |
| 5 | 1532 |

JODY A. STEWART, Official Court Reporter

1376

(Hearing convened at 11:05 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, the United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The government is ready.

Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Ali, Ms. Peiffer, Mr. Lee, is the defendant ready to proceed?

MS. ALI:  Yes.  Good morning, Your Honor.

THE COURT:  Good morning, counsel.

Sir, you are David Anthony Runyon?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  I believe you were going to start the cross-examination of Dr. Cunningham.

MS. ALI:  Your Honor, if I could raise one very quick housekeeping matter.  Dr. Merikangas is supposed to testify today.  Obviously, we are starting with Dr. Cunningham.  He is back at his hotel, but he can be here within 10 or 15 minutes.

THE COURT:  That's fine.

Dr. Cunningham, if you would please come forward

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1377

and take the stand again, and you are obviously still under oath.

THE WITNESS:  Yes, Your Honor.

MARK CUNNINGHAM, M.D., called by the Defendant, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good morning, Dr. Cunningham.

A.  Good morning.

Q.  How are you today?

A.  All right.  Thank you.

Q.  Very good.  Sir, I'd like to start with a little bit about your background.  I've got a list of your prior testimony that I've been provided with.  I'd like to start with that.

Madam clerk, could we turn the Elmo on, please.

Dr. Cunningham, we'll give that just a moment to warm up here.  Dr. Cunningham, do you recognize this list of your prior testimony from January of 2018 through October of 2023?

A.  I do.

Q.  And does this contain a list of all of the trials or hearings or depositions where you've given expert testimony in that five-year and change period?

A.  That's correct, to the best of my ability to reconstruct.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1378

Q.  You put this list together, sir?

A.  I did.

Q.  Sir, when I reviewed it, and it's a number of pages, it looks like it goes from Page 1 all the way to Page 6, and it looks like you actually signed it at the bottom; is that right?

A.  That's correct.

Q.  Okay.  On October 22nd, 2023?

A.  Yes.

Q.  By my count, Dr. Cunningham, this -- yesterday and today, it's about your 70th time testifying as an expert in the last five years.  Would you agree with that?

A.  I have not done a count, but I would accept that representation.

Q.  Okay.  And when I looked at it on a yearly basis, it looks like in 2018 you testified about 10 times.  Does that sound about right?

A.  If I can review the list, I could examine that.

Q.  Sure.

A.  Go to the next page, please.

Q.  Of course.

A.  That's correct, ten times.

Q.  Okay.  And I'm just getting these numbers from my review of the list, but in 2019 I noticed it was a few more times, looked like about 20 times.  Do you remember testifying more

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                           1379

in 2019?

A.   I don't have a recollection of the frequency of testimony in either of those years.

Q.   Okay.  In 2020 it was fewer times, probably because of COVID, maybe six times?

A.   Again, I'd have to look at the list.

Q.   You put the list together, didn't you, Dr. Cunningham?

A.   I did, but I didn't memorize it or do a count of it.

Q.   All right.  But if it's been about 70 times, and then in 2023, we will just skip ahead.

          THE COURT:  If you need to count, Dr. Cunningham, the list is there up on the screen.  It can be moved for you to count, if you're questioning Mr. Samuels' figures, because you signed it, and he got it from defense counsel?

          MR. SAMUELS:  I did, Your Honor.

          THE COURT:  Anyway, you certainly may count.  It's up there on the screen in front of you.

          THE WITNESS:  I'd be happy to do that, if you would like me to verify your numbers.

BY MR. SAMUELS:

Q.   Sure.  Let's do 2019.  If you don't remember the frequency in which you testified and you want to take a count, that's just fine.  So I've got -- again, we will start 2018, and move that one up, and then why don't you count for me how many times you provided expert testimony in 2019.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1380

A.  If you will move it up a little bit.

Q.  Yes, sir.

A.  The next page.  I can't see the top.

Q.  I'm sorry, sir.

A.  Yes, sir, it's about 19 or 20.  I lost count as we were playing with the top of the page.

Q.  Okay.  I had some trouble with the numbers myself.  Then in 2023, it looks like it's been about six times.  Let me pull that up.  That's easier to take a look at because we have got it all right there on the screen.  We go from the Williams case in 2022 down to the bottom.

Do you agree with that, about six times in 2023?

A.  That's correct.

Q.  One of those is the case I highlighted, Bryan Patrick Miller.  That was a death penalty case, was it not, sir?

A.  That's correct.

Q.  And Mr. Miller was sentenced to death by the Court?

A.  He was.

Q.  In that case you provided this adverse development testimony similar to what you provided yesterday; is that right?

A.  I analyzed adverse developmental factors in his background for the sentencing purposes.

Q.  And one of those factors that you identified for Mr. Miller was his youth and lack of brain maturity, right?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1381

A.   That's correct.

Q.   Because you testified that brain maturity is reached around age 25, Mr. Miller was younger than that, so to you that was an adverse factor?

A.   It was a limiting factor in his background.

Q.   And in so testifying, you also relied on some data from the Department of Justice indicating that the rates for homicides for people age 18 to 24 is twice that of the next group, 25 to 34; is that right?

A.   Yes, sir.

Q.   So Mr. Runyon was 36 when he committed this homicide, right?

A.   That's correct.

Q.   Is that a risk, a group according to the Department of Justice, that is even a lower category than 18 to 24 or 25 to 34?

A.   Age demographically, yes.

Q.   Okay.  So that factor was not available to you for Mr. Runyon?

A.   I did not consider youthfulness to be an available factor.

Q.   And, sir, this list here, it's just about a five-year snapshot, but I think you testified yesterday that you had testified hundreds of times over the past 20 years or so?

A.   Past 30 years.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                  1382

Q.   30 years?

A.   Or more, perhaps, 35.

Q.   But five years and change, 70 times testifying, that's about once a month you're going to a court somewhere and taking the stand as a witness.  Would you agree with me?

A.   On an average basis, yes.

Q.   And in between that time when you're going and testifying, you've got to do the research, and you've got to prepare your report that you're going to submit to the Court or to defense counsel, whoever has brought you on, right?

A.   That time in between would be engaged in evaluation functions and report writing or creating slides or preparing testimony.

Q.   And so many, many times you have been cross-examined by someone like me from the government?

A.   I have.

Q.   Sir, in the times that you've testified as an expert in capital cases, you have always been called to testify by the defense?

A.   That's correct.

Q.   And you've always been paid for your time and expertise; is that right?

A.   On almost every occasion.  Occasionally, I have done a *pro bono* case, but almost every occasion I've been paid.

Q.   So I think I heard you say yesterday your rate is $360

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                        1383

per hour?

A.  That's correct.

Q.  60 to 70 percent of your time is spent on capital case work?

A.  Not at this point.  It was at one time.

Q.  So at that time.  How long ago was that, sir?

A.  My involvement in capital cases has been decreasing for the past five or six years.

Q.  All right.  It had been replaced with something else, Dr. Cunningham?

A.  I do many other sorts of evaluations.  I do evaluations of mental state at time of offense, competency to stand trial, non-capital sentencing as well.

Q.  But back in 2009, when we had this trial, it would have been 60 to 70 percent?

A.  That's correct.

Q.  And so that's a few hundred thousand dollars a year that you are deriving from going around and preparing reports and providing testimony; is that right?

A.  From engaging in forensic function to around capital sentencing, that's correct.

Q.  All on defense requests?

A.  That's correct.

Q.  Do you ever turn down a request to testify?

A.  My calendar is too busy, I do.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1384

Q.   Just because of being busy, though?

A.   Yes, sir.

Q.   And your specialty, sir, kind of, I guess your bread and butter, if you will, is the violence risk assessment; is that right?

A.   That's where my scholarship is focused, but that's not most of what I do.

Q.   All right.  But many, many articles in your CV relate to the violence risk assessment?

A.   That's correct, for prison particularly.

Q.   The adverse developmental factors, you haven't done as much research on that that you've published that we see in your CV, correct?

A.   I've not done any empirical research on adverse developmental factors.  I've described literature in that area and other articles in literature reviews but not empirical research.

Q.   So you have done research yourself but you've picked from different scholars and different research subjects to kind of arrive at this theory?

A.   Yes, sir.

Q.   Some of that research is pretty old.  I think we saw yesterday that there was some articles you cited that were from the '80s and '90s?

A.   That's correct.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                      1385

Q.  Let me ask you, Dr. Cunningham, have you ever looked at a defendant's background and not found some issue that you would consider to be an adverse developmental factor that impacted the defendant in some way?

A.  No.

Q.  And, Doctor, no one lives a life that's free of trouble or challenges, right?

A.  Probably no one is absolutely free of that.

Q.  Okay.  And you're not saying, of course, that people can't rise above their past or their upbringings, are you?

A.  I don't view it as rising above.  I view that as them accessing protective factors and resources that allow them to compensate for or mitigate those adversities.

Q.  Well, Dr. Cunningham, have you run across situations where people who have alcoholic parents or relatives turn out to be teetotallers, they don't drink or touch the stuff at all?

A.  Yes, I have.

Q.  Have you run across situations where children of divorced parents place a high value on stability and relationships and marriage?

A.  I have.

Q.  Let's talk a little bit about your billing here, Dr. Cunningham.  I've got your bills from 2009.  We are going to review those.  I don't have anything more recent so I've

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1386

got to inquire.  What is the rate that you are billing to be here today?

A.  $360 per hour.

Q.  Who is paying that rate, sir?

A.  I believe that that's going to be submitted to the Court.

Q.  Was that the same rate --

MS. PEIFFER:  Objection.  This is irrelevant and outside the scope of direct.

THE COURT:  Overruled.  It's a factor you can consider in terms of the credibility.  It's in the standard instructions.  You can look at any bias, interest in the case that the witness may have.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  So, Dr. Cunningham, same rate yesterday, the $360 per hour?

A.  Yes.

Q.  So for the eight hours that we were here yesterday and you were reviewing that PowerPoint for us, several thousands that you will bill for that?

A.  Yes, sir.

Q.  And we will get to the PowerPoint in your report.  All the facts in there were found by someone else?

A.  Yes, sir, that's fair.

Q.  You didn't do any of the investigation that resulted in

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1387

that report?

A.  I only investigated the scholarly literature.  I did not independently investigate any of the facts specific to Mr. Runyon.

Q.  And you didn't do any follow-up on any of the written reports that you were given?

A.  That's correct.

Q.  You didn't pick up the phone and call any of these witnesses to see if there were any inconsistencies that could be reconciled or to get more information?  You didn't do any of that?

A.  That's correct.

Q.  And, sir, let me ask you, when you did that PowerPoint, when you prepare it, did you prepare it yourself, sir?

A.  I did.

Q.  You prepared every slide in there?

A.  There may have been a couple of slides that were edited by defense counsel staff based on the discussions that were going on as we prepared those slides.  I wasn't always with my hands on the computer if those slides were modified in some way.

Q.  So, Dr. Cunningham, when did you first prepare what I guess -- you tell me if I'm wrong -- is a draft of that PowerPoint?

A.  Prior to the February 2023 hearing.

Cunningham, M. - Cross                                              1388

Q.  So there's been a version of that PowerPoint that we spent eight hours yesterday on in existence since before February of 2023?

A.  Or in February.  I need to go back and look at exactly when that was created, but it would have been close into January or February of 2023.

Q.  When did you get that to defense counsel?

A.  In advance of the evidentiary hearing.  I don't recall the date without doing some investigation of my file, but it would have been before the evidentiary hearing.

Q.  Now, let me ask you about that, sir, because when you came in here yesterday, you knew a lot of dates.  Had you reviewed other files prior to coming here?

A.  Well, yes, sir.  I reviewed my billing file and committed some of that billing file to memory in terms of dates.  I did not try to commit to memory the date that I provided that file by correspondence to Susanne Bales.

Q.  So you provided it to Ms. Bales, and then was there a period of time where there were edits done to that PowerPoint?

A.  As I recall, that PowerPoint is dated -- that original draft is dated either February 22nd or 23rd, 2023.  After I did not go to the hearing, there were no edits that were made to it until I arrived here in Norfolk.

Q.  Well, how did that November 2023 date get on there, sir?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1389

A.  So that was one of the modifications in the slide deck to reflect the current date of the hearing that was made a couple of days ago.

Q.  What does this line at the bottom, is that like a copyright there?

A.  That's correct.

Q.  What's that for, sir?

A.  That's to discourage these files from being disseminated online to try to preserve it for a legal context as opposed to somebody simply taking it and distributing it as a web attachment or something.

Q.  Do you know what edits were made to the PowerPoint from you when you first produced it in February of 2023 until we saw it yesterday, November 1st, 2023?

A.  Most I could recognize, others I could identify if I compare the two files.

Q.  Was there a number of rounds of edits or just one round of edits?  Do you remember?

A.  We met and talked about my testimony Sunday, Monday, Tuesday, and so some edits might have occurred in any of those dates.

Q.  Now, Dr. Cunningham, did you know that myself, the government, did not get this PowerPoint until Halloween, 4:30 in the afternoon on Halloween, October 31st?

A.  I don't know when you received the final version or the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                    1390

first version either.

Q.   You know we never got the first version?

A.   I'm not aware of that.

Q.   But what you're telling us today is there was a version of this in existence since February of 2023?

A.   That's correct.

Q.   Tell us how long it put -- took you to put together the February version.

A.   I don't know those hours off the top of my head.  I didn't memorize that part of the bill.

Q.   Well, ballpark it for me.  Was it two hours, was it 15 hours?  For $360 an hour, you'd think that that would be important to note.

A.   It was a considerable amount of time because I was going back through the report and also going back through the records that had originally supported that report to refresh myself about the file since it had been seven or eight years since I had been in the file.  And so the PowerPoints would have been constructed in the course of that.  It's not unusual for a PowerPoint file alone, even after I've done that background review and refreshing, for just the construction of the file to take eight or ten hours.

Q.   And that would be when you were creating the February version?

A.   That's correct.

Cunningham, M. - Cross                                                        1391

Q.   And then you probably had to look at it some more and consult with defense counsel when you came out here to testify yesterday?

A.   Yes, sir.  Most of that time was not just spent looking at the PowerPoint but, rather, again, for me to go back through the voluminous records and files to refresh myself with them.

Q.   So I think you told us yesterday, you correct me if I'm wrong, that in this 2015 involvement in the case, you spent 50, 55 hours doing that report.  Does that sound close?

A.   Well, yes, sir.  Yesterday I testified that as best I can reconstruct from that billing file that I only have part of, it looks like I spent 54 hours at that time.  If there is more time than that, that's possible, but I just don't have the billing file for that.  We changed software.

Q.   So 54 hours that you have, there would be more but at least 54?

A.   Yes, sir.

Q.   What since then, in 2022 or 2023, how much total?

A.   So then in 2023 up to the -- being diverted from coming out here, I was actually on my way to the airport, up to that time I think there were 60 hours of time.

Q.   I'm sorry, 60 hours total or 60 hours additional?

A.   60 hours additional.

Q.   So that's 54 plus another 60, and then once you stopped

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                 1392

in February, how much since then?

A.   As of last night, 63.1.

Q.   63.1 since February?

A.   Yes.

Q.   Okay.  I've just got to understand this.  So February -- so we are at 54, and then we've got another 60.  That's over a hundred.  And then we've got another 60 on top of that?

A.   That's correct, little bit more than 60.

Q.   What was this third 60 spent on?

A.   Again, going back through the records and transcripts so that I would be familiar with them.

Q.   Okay.  So what we've got here is, by your estimation, over 150 hours you've spent on this since 2015?

A.   Yes, sir.  And I might also add, over the last several days, not yesterday but Monday and Tuesday, there were long days with defense counsel reviewing my findings and preparing testimony.  So it wasn't just my own independent review but also those hours as well, Sunday night, Monday, Tuesday.

Q.   Dr. Cunningham, I know you use PowerPoint quite a bit; is that right, sir?

A.   I do.

Q.   Do you know how in PowerPoint there is a notes feature where you can kind of put notes in below the slides?  Do you know that, sir?

A.   I do.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1393

Q.  Do you put notes in your slides?

A.  I do, typically.

Q.  Did you when you were preparing this PowerPoint?

A.  I did.

Q.  Do you know where those notes are today, sir?

A.  They're a part of the digital master of that file.

Q.  And what would those notes have consisted of?

A.  Those notes reflected questions that could be asked to elicit the information on the slides.

Q.  I'm glad you mentioned that, Dr. Cunningham.  I was going to ask you, do you remember when you testified in 2009 you had provided some PowerPoint slides for Mr. Hudgins?  Do you recall that?

A.  I do.

Q.  Did you give a script or a series of suggested questions to Mr. Hudgins?

A.  I believe I did.

Q.  Let me show you what I've marked for identification, Your Honor, as Government's Exhibit 130, which we got from trial counsel's file with the OAF number 6316.

        Do you recognize this, Dr. Cunningham?

A.  I do.

Q.  And is this the script that you provided Mr. Hudgins to ask you about on his examination?

A.  So this was a script for voir dire.  There were also

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1394

questions prepared to accompany each slide.

Q.   And, sir, the document that I have is some 14 pages.  But you would have provided questions about the entirety of your testimony; is that right, sir?

A.   As it accompanied the slides, yes --

Q.   Okay.

A.   -- and voir dire.

Q.   I see.  So -- and I'll move over here to Page 12.  This is a reference to testimony history.  What you're telling me is there were a separate set of questions that accompanied the PowerPoint slides that you provided to Mr. Hudgins?

A.   Yes, sir, in the notes pages.

Q.   And that would have been the same that you provided to defense counsel in this case?

A.   That's correct.

Q.   And you understand I've never seen those notes pages and I don't know what you have on the bottom of those slides?

A.   I'm not familiar with what you have.

Q.   Okay.

        THE COURT:  I'm just asking, Mr. Samuels, do you have any more than the Court has that I was given yesterday morning?

        MR. SAMUELS:  No, ma'am.  I'm not going to admit that, Your Honor.  I just wanted to show him for identification.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                        1395

THE COURT:  All right.  I've seen it.

BY MR. SAMUELS:

Q.  Dr. Cunningham, did you follow that practice in most of your cases when you prepare a PowerPoint?

A.  Yes, sir.

Q.  Do you provide a list of voir dire questions for defense counsel?

A.  I don't any longer.

Q.  Did you used to?

A.  At one point.

Q.  Including in 2009, you did?

A.  That's correct.

Q.  Do you provide a series of questions about the substance on the PowerPoint slides that you provided to defense counsel?

A.  The questions will elicit the information on the slides.

Q.  So you provided that in this case?

A.  Yes, sir.

Q.  You provided that in many other cases?

A.  Yes, sir.

Q.  Did Ms. Peiffer follow the script yesterday?

A.  Sometimes.

Q.  Sometimes.  Okay.

THE COURT:  When did she deviate?  She was standing there reading questions from pretty much a notebook, it

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                           1396

looked like.

THE WITNESS: Your Honor, my recollection is there were -- that the exam sometimes went directions that were not strictly based on the slides or that she was skipping slides or only picking up part of the slides, and so the inquiries then were modified depending on what she was then doing with it.

THE COURT: All right. Thank you.

BY MR. SAMUELS:

Q. So, Dr. Cunningham, if you are hired by defense counsel, they know they're going to get this type of presentation, right?

A. They may or may not. The defense counsel in this case was not aware that I had prepared slides -- that I had prepared questions to accompany the slides until Tuesday night, I think, Monday or Tuesday night. They didn't realize that there were notes pages accompanying the slides.

Q. Did -- when did they know that there were slides? I thought you said you provided the slides in February of 2023, or January or February?

A. To Susanne Bales. I don't know when this federal *habeas* team accessed or began to look at the slides.

THE COURT: Well, Ms. Peiffer was on the same habeas team with Ms. Bales. She's just from another office.

THE WITNESS: Again, my slides were being provided

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                        1397

to Susanne Bales.  I don't know how she distributed those within the team.

BY MR. SAMUELS:

Q.   Okay.  Well, when you sat down, you testified that you spent a number of days and a number of hours sitting down with defense counsel to review your presentation; is that right?

A.   That's correct, after I got here and also some zoom conferences in advance of that.

Q.   Did you use the notes on the slide as a template for the preparation?

A.   Not in those zoom conferences.  At that point we were looking at the slides and going over the report and talking about other issues.

Q.   But it's fair to say, Dr. Cunningham, that if you were hired in a case, in a capital case, and you're providing slides, you're also providing some assistance to defense counsel into how to elicit the information on the slides?

A.   That's correct, at least I offered to do that.  They would like for me to draft questions.

Q.   So if I've got the questions, and I've got the slides, I can stand here and just go 1 through 96 and ask questions that you have prepared as the expert?

A.   Yes, sir.  It does contribute to the efficiency of preparation and the testimony.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                        1398

Q.   It's a script, isn't it, Dr. Cunningham?

A.   Well, the attorney can follow it or not.  These are the questions that would elicit the information on the slides which the attorney may have difficulty formulating on his own to understand what information is here on the slide and what relevance does it have.

Q.   Okay.  And you offer a number of different types of testimony, if you will, or services in capital litigation; is that right, sir?

A.   I can perform different types of evaluations.

Q.   Okay.  Let's talk about in terms of evaluation.  You can do a violence risk assessment, right?

A.   For prison.

Q.   And in those violence risk assessments, if I recall from when we talked in 2009, that results in looking at kind of a base rate and then looking at other factors on a defendant or client to see where they fall among that base rate, right?

A.   Based on group statistical data of base rate, how often something happens, and also correlate would act to raise or lower that risk.

Q.   And in every case you've testified about violence in prison, you may have identified some risk, but it's always a lower risk on that base rate, right?

A.   No, sir.

Q.   You've testified that the risk is higher than the base

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1399

rate?

A.  Well, I've testified in cases that I've said the base rate doesn't apply.  For example, let's say there a defendant who has killed someone in prison.  The base rates of the violence among capital offenders who killed in the open community, that's a distinct group from the offender who has killed another inmate in prison.  And so those base rates would not apply to that offender.  Then we would be talking about what, obviously, that person is a significantly disproportionate risk in the general prison population.  So in those cases you are talking about security measures that could be brought to bear in containment.

Q.  And sometimes in those situations you are brought in to address what those security measures would be and how those security measures could successfully contain the defendant?

A.  That's correct.

Q.  Because, Dr. Cunningham, every time you go and testify and are paid by the defense, you are bringing something that helps the defense.  You would agree with me?

A.  If the defense is calling me to testify, they anticipate it will be helpful.  If they think it won't be helpful, then obviously I wouldn't be called to testify by the defense.

Q.  Okay.  But they think it's going to be helpful because of the opinions that you have rendered, correct?

A.  They will think it's helpful because of the findings that

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1400

I have reached regarding their defendant.

Q.  So that's the violence risk assessment, that's one piece, and you did that at the Runyon trial in 2009, right?

A.  I did.

Q.  Then another piece, another type of evaluation is what you did yesterday, assembling all of these influences in a defendant's life, all these factors and relating to a finding that these factors impacted the defendant in some way, right?

A.  So I wouldn't characterize it in that way.  I don't think that what I did was as simple.  Rather, I reviewed the records and reports about him to identify adversities that I then organized in the particular categories.

Q.  Synthesize, I think was the word we used yesterday, right?

A.  Yes, synthesize is a part of it.

Q.  And that, in very basic form, comes out to be a defendant who's had kind of a bad background or his function in the past that would affect him in some way going forward?

A.  Stated most simply, that's correct.

Q.  You've even used simpler terms.  You talk about in your report that these bad influences are like radiation for a defendant, right?

A.  Well, I describe that as an analogy for how history ends up affecting outcome.  The traumas and deprivations in childhood are like receiving massive doses of radiation.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1401

There may be some effects that seem to go away and then later on this individual may, many years later, ends up developing a cancer.  The cancer doesn't look anything like the radiation.  It's something that happens in response to that radiation.

And different people grow different cancers in different places.  That's a conceptual vehicle that I use to talk about or to orient the reader to how childhood experiences and development end up affecting dysfunctions and even criminality in adulthood.

Q.  Some people smoke for 60 years and don't end up with cancer, right?

A.  That's another analogy that I use, that only about 20 percent of lifetime heavy smokers get lung cancer, and that doesn't -- that goes to the idea of, well, everybody who has a bad background doesn't kill somebody.  Well, everybody is a lifetime heavy smoker doesn't get lung cancer.  The test is not 100 percent penetration, that that adversity always results in that outcome; rather, it's the comparison, it's the disproportionate incidents.  The lung cancer in non-smokers is 1 in 90, and lung cancer in lifetime heavy smokers is 1 of 4 or 5.  It's the difference between one and 4 and 1 and 90 that connects the cigarette smoking to the cancer.

Q.  And as I understand it, sir, it's a likelihood, not a

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1402

prediction, right?

A.  Yes, sir.

Q.  Just the same as violence in prison, you can't predict whether somebody's going to be violent.  This is a likelihood-type situation?

A.  That's correct.

Q.  Not a causal situation?

A.  Causal and likelihood are two different things.  The cigarette smoking is causing the cancer even though that cancer is only a likelihood.  So those two things are different concepts.

Q.  I see, sir.  And you give an opinion based on this based on your credentials and experience?

A.  My credentials reflect my training and expertise and experience.  I don't give an opinion based on my credentials, rather on the foundational knowledge that is brought to bear.

Q.  And, Dr. Cunningham, you charge a good bit of money for these services, correct?

A.  I do.

Q.  Sir, other than talking about the PowerPoint, what other materials did you review before you came to court yesterday?

A.  The entirety of the file.

Q.  The file as it existed in 2015?

A.  Yes, sir, as well as the additional two reports that were made available to me.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1403

Q.   Anything else you looked at?

A.   I don't think so.

Q.   Defense counsel provide you any updated information or anything additional?

A.   No.

Q.   And, sir, of course, you would agree with me that this information about adverse developmental factors, you didn't testify about any of this at the trial in 2009, right?

A.   That's correct.

Q.   Dr. Cunningham, can you point me to an e-mail, a letter, a conversation with defense counsel where you said you wanted to take this approach?

A.   That I wanted to take what approach?

Q.   The approach of testifying to adverse development factors?

A.   There was never an instance that I communicated that I want to do anything in any case.  There is no personal want that's involved in it.  I may be requested by counsel or by a party to provide an evaluation.  I will often clarify what sort of evaluation I might offer, but there is not a case where I want to do something.

Q.   But you are the expert, right, Dr. Cunningham?  You know what types of evaluations you can offer?

A.   That's correct, and I may describe that to counsel if they inquire.  They may already know what they want

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1404

evaluated.  But if the inquiry is vague, I may clarify what I can do to see what it is they desire for me to do.

Q.   Okay.  So let me ask you that.  Can you point to anything that shows that you were asking about or offering to do this type of evaluation for Mr. Runyon in 2008 or 2009?

A.   I don't recall the contents of my conversations with counsel about how it emerged that there was even consideration of mitigation in addition to a risk assessment.

Q.   But you know, Dr. Cunningham, that oftentimes a capital case will have multiple experts retained or assigned by the Court, correct?

A.   That's correct.

Q.   The work is spread around and sometimes the risk is spread around, correct?

A.   Yes, sir.

Q.   And the work and the fees in a case where a defendant is indigent, those are approved by the Court, you know that as well?

A.   Yes, sir.

Q.   The Court has to approve a budget and the Court has to approve billing?

A.   Yes, sir.

Q.   You were approved about $15,000 for you, right?

A.   Yes, 50 hours.

Q.   And if we look at what you've done in this adverse

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1405

development factor, it's been over 150 hours since 2015, right?

A.   Yes, sir.

Q.   So that's over 150 or so times 360, that's 40 to $50,000, correct?

A.   That's correct.

Q.   Much more than the 15,000 that you were approved for?

A.   It is a bigger number than I was approved for.

Q.   And, sir, you did the report in 2015, but then the next tranche of hours, the 60 hours leading up to the February hearing and then the 60 hours since then, that was a lot of time that was spent just reviewing what you'd already done in making the PowerPoint, right?

A.   Yes, sir, heavy on the review.  This is like a restudying for a final exam.

Q.   Okay.  So we paid multiple times for the same review and presentation?

A.   Not for the same presentation but for the same review.

Q.   And you would agree with me that you were never lined up to do this adverse development testimony in 2009?

A.   That's correct.

Q.   You were lined up as violent risk assessment, that is one of the areas of scholarly precedent?

A.   A violence risk assessment for prison, yes.

Q.   And do you remember in that case, Dr. Cunningham, we had

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1406

to take you out of order to testify?

A.   I didn't have an independent recollection of it, but I saw e-mails about that when I was reviewing the file.

Q.   I'll show you some of those e-mails, but you really were limited in what services that you could provide in that 2009 trial and the timeline situation, weren't you?

A.   Not if I had been tasked with it in October of 2008, but after that, by the time we had gotten into the spring of 2009, certainly I wouldn't have been able to do any work by that summer, so there simply wasn't time.

Q.   Dr. Cunningham, you had concluded, when you testified, that David Runyon had a lower risk of violence in prison; is that correct?

A.   A serious violence, that's correct.

Q.   Again, a likelihood, not a certainty?

A.   That's correct.

Q.   And this was offered for some mitigators that were presented in that case, right?

A.   I don't recall what that was about, whether they were calling me to rebut an aggravator or establish a positive prisoner evidence mitigator.

Q.   You're familiar with those terms.  I think you even used them in your February 2009 report; aggravating factors, mitigating factors, right?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                    1407

Q.  And, sir, did you know, and I just want to show you what I've marked here.  It's not marked, it's ECF Number 291. It's the special verdict form in the selection phase.

Do you see number 8 there, sir, "David Anthony Runyon did not present a risk of future violence or danger to the public while in prison for the rest of his life"?

A.  I do.

Q.  That was kind of one of the mitigators that your testimony would have gone to; would you agree with me?

A.  It is.

Q.  And you see that it's been X'd out, the jury did not accept that mitigator?

A.  Or determined not to consider it, as opposed to number 6 where there is a zero that none of them founded.  In this case number 8 is X'd out as if it was not submitted for a vote.

Q.  And, sir, this is one of the reasons why experts are kind of divvied up, so different experts can take on different areas; is that right?

A.  I'm not sure I follow the connection between this and divvying up the experts.

Q.  Sure.  Well, if a jury decides that they are not going to accept testimony that you provide as a mitigator, and they are not going to consider that, it may be better to have other experts engaged in the case, right?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                    1408

A.   Well, the indication that I take from this is not that they did not accept my testimony, but, rather, that they did not consider this consideration to be something they should apply in reaching a verdict, and so they simply X it out as a consideration.

Q.   Okay.  And, sir, you know that if you had testified to this adverse development factor, we might have been able to bring in government experts to rebut your testimony?

A.   Yes, sir.  I assume you could have brought in a rebuttal expert to rebut my testimony on violence risk assessment for prison, but that's always available in response to expert testimony.

Q.   Sure.  And some of these experts might have actually interviewed and examined the defendant?

A.   That's correct.

Q.   And you understand that took a consideration that trial counsel makes in deciding how they're going to present their case?

A.   I'm sorry.  I don't follow.

Q.   You understand whether or not the government might bring in rebuttal experts is a consideration trial counsel makes when deciding how to present their case?

A.   I wouldn't think they would.

Q.   And you see here that a number of additional mitigators were found by the jury in this case, right, Dr. Cunningham?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1409

You see that, a mitigator related to domestic violence and parental conflict?

A.   Yes.

Q.   Kindness and generosity?

A.   That's correct.

Q.   And then it goes onto the next page.  There is a number of other ones related to David Runyon's family and that his family will suffer harm if he is executed, correct?

A.   That's correct.

Q.   And, sir, do you know, Dr. Cunningham, that there were other defense experts engaged in this case?

A.   I'm aware of that.

Q.   Dr. Cunningham, do you see any inconsistency in offering the opinion that David Runyon is not a serious risk of violence in prison with one that you offered yesterday that he could be predisposed to some type of violent conduct because of his adverse development factors?

A.   I don't.

Q.   You see no inconsistency there?

A.   That's correct.

Q.   Okay.

A.   The risk of violence in the community is distinct from the risk of violence in prison.

Q.   Well, let's talk a little bit about how you were involved and retained in 2009.  By the time you got into the case,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1410

Dr. Cunningham, Evan Nelson had already been retained as a psychologist?

A.   That's correct.

Q.   Did you confer with Dr. Nelson at all?

A.   I did not.

Q.   He had been involved since May of 2008.  Did you know that?

A.   I did not.

Q.   Sheila Cronin was also involved as a mitigation specialist.  Did you know that?

A.   Yes.  I didn't know that at the time in 2009.  I know that now or subsequently knew that in 2015.

Q.   And you indicated you made a trip out to the Tidewater area in November of 2008?

A.   Yes.

Q.   You were supposed to interview the defendant?

A.   I was scheduled to.

Q.   You did not, though?

A.   I did not.

Q.   I'm showing you Government's Exhibit 8, which is already in evidence.  Sir, I think we looked at this yesterday.  Now, do you recognize this e-mail?

A.   I do.

Q.   Dr. Cunningham, it's an exchange between you and Mr. Babineau related to the notice that's going to be

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1411

provided to the Court as to what the testimony will be.  Do you see that?

A.  I do.

Q.  And, sir, in the first e-mail, 11:40 a.m. down at the bottom there, December 11th, you are saying anticipated testimony is going to be this development factor.  Did you have any information at the time to support that testimony?

A.  I had not been provided with any mitigation or background information on it at that time.

Q.  So, Dr. Cunningham, you're just forecasting that you will be able to provide this testimony without actually knowing whether there are any developmental factors?

A.  Yes, sir.  This assumes that there would be.  If there are not developmental factors, then clearly I would not be called and any notice would be unnecessary.  So this is -- this is the notice if I'm called.  I would only be called if those developmental factors were identified and were found to be significant enough to call me to testify.

THE COURT:  Let me just ask you a couple of questions, Dr. Cunningham.  At this point had you had discussions with Mr. Babineau about your testimony?

THE WITNESS:  Only that he -- I don't recall the content.  Apparently, there was a consideration of me testifying regarding mitigation.  I was never tasked to do that but there was consideration of it.  He had forwarded to

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1412

me the order for disclosure of mental health testimony.  I would have indicated that mental health testimony would include testimony about violence risk assessment for prison, might also include mitigation or adverse developmental factors, that if I were providing the violence risk assessment for prison, which I had not yet done, this is what that would look like if I were called to testify.

The same with the adverse developmental factors, this is what that would consist of broadly if I were called to testify.  Again, if I do a violence risk assessment for prison, and I identify that the numbers are excessive, that his probability is high, then I'm not going to be called, if there is no disclosure that's indicated.

THE COURT:  Because at that time you did not know of any delinquency, criminality and criminal violence other than the case at bar?

THE WITNESS:  That's correct.

THE COURT:  Go ahead.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, isn't the truth of it, though, that you always find some developmental factor?

A.  There has always been some developmental factor in the background of criminal defendants that I've been asked to do sentencing evaluations of.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1413

Q.  So you can always just say, hey, I can offer this kind of testimony, I haven't seen a scrap of paper about the client, but I know there is going to be something there?

A.  No, sir, that's not correct.

Q.  I thought you said you'd always found something?

A.  No, sir.  I never offer I can find something -- I can do this because I always find something.  That's never an offer that I extend.  I indicate that if they desire, this is an area that I can evaluate.

Q.  And I guess I'm looking at the result of it, Dr. Cunningham.  Isn't the result of those evaluations that you always do find some factor?

A.  That's correct.

Q.  So if I was a betting man, I could bet with pretty much a hundred percent certainty that if you were tasked to do this, you would find some factor?

A.  Yes, sir.  People from idyllic backgrounds almost never commit capital murder.

THE COURT:  I'm sorry.  I just didn't hear you.

THE WITNESS:  People from idyllic backgrounds, individuals who grow up under highly optimal circumstances without developmental adversity, making developmental adversity, almost never commit a capital murder.

BY MR. SAMUELS:

Q.  And by saying that, are you making the assumption, or

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1414

were you at the time, that David Runyon had committed this murder?

A.  My assumption, as an operating assumption going into a capital evaluation, is that the defendant is guilty as charged because I will not be called to provide this unless he's convicted or she's convicted.  So I always approach the evaluation as if this person is guilty of the crime.

Q.  You know David Runyon has steadfastly denied that he's been involved in this crime?

A.  I don't know what his current stance is on that.  I know historically he had that stance.

Q.  And he had that stance in various of the reports that you reviewed in preparation for your 2015 report?

A.  Yes.

        THE COURT:  Wait just a moment.

        MS. PEIFFER:  I don't believe he laid the foundation.  This is outside the scope of direct or anything that Dr. Cunningham has testified about.

        THE COURT:  He's on cross-examination, and he says we are talking about always finding some factor, and he's following up on that.  What he is asking is supported by the record, and he's on cross-examination.

        So you can go ahead.

        MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                        1415

Q.   So, Dr. Cunningham, you had read all these things from David Runyon -- we are going to go through your report, but you had read a lot of things from him and a lot of reports from him and a lot of reports about him when you prepared your report in 2015?

A.   Yes.

Q.   And even in his self-reports, he was denying he did this?

A.   That's correct.

Q.   And other folks were saying he was not admitting to the truth of it?

A.   That's correct.

Q.   But yet you relied on some of the things that David Runyon said as a basis for your report, didn't you, sir?

A.   Some, yes.

Q.   Okay.  So you're relying on somebody who has been found guilty, who has never been admitted to involvement in it, but you are relying on them as a good source for your doing your report?

A.   I'm relying that he made that report, and then I am examining other data to identify the extent that I would place weight on his description.

Q.   All right.  Going back to this e-mail, Dr. Cunningham, looking at the top part of it, this is where you list, "Jon, per my discussions with Wendy, I provide the supplemental summaries for your consideration."

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1416

A.  Yes.

Q.  Now, that reads as if you are offering him pieces of evaluation that he order off a menu.

A.  Well, no, sir.  I'm -- he has been tasked to provide a disclosure of mental health testimony.  I'm providing him a summary of what I anticipate my testimony would look like if called about either of those issues.  I'm not offering the service for consideration.  I'm offering the summary for his consideration.

Q.  Who is Wendy, sir, do you know?

A.  Somebody affiliated with Mr. Babineau or Mr. Woodward.

Q.  And, so, Dr. Cunningham, the Court has asked a question about the developmental factors too.  Other than that e-mail, I don't see the adverse developmental factors coming up in any correspondence or filing or anything in the 2009.  Would you agree with me, sir?

A.  Yes, sir.

Q.  Was it never raised again, you don't ever recall, you can't point me to anything?

A.  There is nothing hard copy in the file that I can identify, and I don't remember what the conversations were. I only know that this was under consideration because the face sheet of the case was altered along the way.

        THE COURT:  Excuse me, Mr. Samuels.  Before you go on, I was looking at the e-mail on the screen.  Can you tell

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1417

me what the exhibit number is in my book?

MR. SAMUELS:  Yes, Your Honor.  Government's Exhibit 8.

THE COURT:  All right.  Go ahead.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, showing you Government's Exhibit 9, which is actually the notice that was filed on 12-12-2018, document number 185, this was done the day after that e-mail exchange, and here there is a notice of Dr. Nelson.  Do you see that, sir?

A.  I do.

Q.  Do you see how it says Dr. Nelson will present a reliable social history of David Runyon and his family?

A.  Yes.

Q.  The social history will focus especially on the major influences that shaped David's life.  You see that, sir?

A.  I do.

Q.  Including factors that may have contributed to David Runyon's psychosocial development and functioning.  Sorry.

A.  I see that.

Q.  So would you agree with me, Dr. Cunningham, that the defense had an expert to look into David's background in some of the same areas that you testified about yesterday?

MS. PEIFFER:  Foundation.  Dr. Cunningham, as the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1418

government made very clear yesterday, and the Court ruled on it, was not involved in a legal capacity of the case.  He doesn't know what Dr. Nelson is doing or what counsel's decision is.

THE COURT:  But he's not asking about that.  As I understand the question, and if it's not correct, you'll need to rephrase it, Mr. Samuels.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I understood him to ask Dr. Cunningham, wasn't the notice given for Dr. Nelson concerning much of the same testimony Dr. Cunningham gave yesterday.  In other words, obviously what he's asking is that Mr. Hudgins or Mr. Babineau, or whoever was the defense counsel, had an expert covering that.  That's what he is asking, and he's entitled to ask it.

MS. PEIFFER:  But Dr. Cunningham has no basis for knowing what counsel were or not doing or what they did or did not decide.

THE COURT:  He's not asking what they decided.  He is not asking that.  You can certainly argue that.  He's asking, look at this notice that was sent out by counsel as to what Dr. Nelson was going to testify to, and didn't it cover what they say he was going to testify to.  He's not asking him whether he testified yet.  Besides the record will show that, but he's just asking, here's the notice,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1419

doesn't that cover much of what you've testified to

yesterday?  It's a simple question, and I overrule the

objection.  It's on an exhibit that's been admitted.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Go ahead.  Just ask it again.  If it's

different than what I understood it to be, then I will

reconsider the objection, but that's what I heard you ask

him.

MR. SAMUELS:  It was, Your Honor.  I'll try just to

simplify it.

BY MR. SAMUELS:

Q.  Dr. Cunningham, isn't some of that description there

about social history and major influences that shaped David

Runyon's life, isn't that at least some of what you covered

in your testimony yesterday?

A.  It likely is.  I don't know what he is envisioning in

terms of social history or how he would analyze it, but he

has been noticed as a psychologist to discuss or testify

regarding David's social history.

Q.  All right.  Now, Dr. Cunningham, did you review any of

the letters or reports that Dr. Nelson provided in this case?

A.  I don't recall that.

Q.  Okay.  I'm showing you what's been marked -- this isn't

admitted yet, Your Honor, but we've received it recently --

Government's Exhibit 119, a letter from Dr. Nelson dated

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1420

December 11th, 2008.

Do you remember seeing anything like this, sir, and if you don't, we will just move on.

A.  I don't recall seeing this.  I could look at the reference list that I have from my 2015 declaration, but I don't recall this.

Q.  Okay.  I've got your declaration right here, sir.  So showing you what is Defense Exhibit 31, Dr. Cunningham, and this is Page 5 of that exhibit.  What I see here, it looks like, in number 36, mental health evaluations - Dr. Evan Nelson, prelim report, MMPI-2?

A.  Yes.

Q.  Does this refresh your recollection whether you've seen this or not?

A.  It does not.  I don't know what the prelim report is referring to, as I look at this.

Q.  All right.

THE COURT:  But you testified yesterday that you had reviewed every one.  You testified about your report that you had reviewed.  That was actually the last question asked, and it was asked during the testimony, was this what you reviewed.  Now you're saying you don't recall reviewing it.

THE WITNESS:  Yes, ma'am, I don't -- the entire packet, if that's what we are describing, I was provided and

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                      1421

reviewed.  I don't have a complete recollection of each and every document that I looked at to necessarily recognize it. That's part of why I've been spending these hours going back through the file, is to try to bring this all back to my familiarity.  As I look at this, I may have seen it, but it doesn't immediately strike that familiarity recognition.

THE COURT:  But you testified before the Court that you prepared this report, you had reviewed all these documents, and even in the last question you were asked, you looked at each one of these, as Ms. Peiffer put them on the screen, and you said based on all of that, you would have done something.  Dr. Nelson is listed here, but you don't remember seeing that, reviewing that now?

THE WITNESS:  Your Honor, I may well have reviewed it.  I don't have a recollection of whether this is what I was referring to as the preliminary report in the records listing or if it was another document.  I simply don't recall.

MR. SAMUELS:  Your Honor, could I show him another document?

THE COURT:  Certainly.

BY MR. SAMUELS:

Q.  All right.  Dr. Cunningham, since you're not sure about that one, let me show you this one.  This is in evidence. This is Government's Exhibit 11.  This is a letter from

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1422

Dr. Nelson to Mr. Babineau dated February of 2009, basically summarizing his findings on Mr. Runyon, at least as of that date.  Do you remember this at all, sir?

A.  I do.

Q.  Did you review this and consider it in making your evaluation, sir?

A.  I did.

Q.  And do you recall Dr. Nelson having the opinion that Mr. Runyon had narcissistic tendencies?

A.  Yes.

Q.  And then, sir, I'll show you your report, which is Government's Exhibit 14, which was just a couple of days later, February 5th.  Do you see that, sir?

A.  I do.

Q.  I think we looked at that yesterday.  This is a report that your prepared in advance of your potential testimony, right?

A.  It is.

Q.  And at this time, February 5th, 2009, as you reviewed with us in pretty good detail yesterday, the trial was set for just a month later, I think sometime in March; is that right?

A.  That was my understanding.

Q.  So this report is what you're going to be limited to, right?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1423

A.  I assume so.

Q.  Well, Dr. Cunningham, you have been around a long time, and you certainly know that experts have to give disclosures under the rules as to what their testimony is going to be and what the basis for that testimony is, right?

A.  Yes, sir.  That's why I describe that I assume so. Exactly what the parameters would be at trial are going to be something that the judge rules on based on motions from the attorneys, and so that's -- typically, I would expect that I would be limited to the topic that I'm writing a report on, but ultimately that will be a determination of the Court.

Q.  Because otherwise if we don't have a report, it's not fair to the other side, we don't know what you're going to say, right?

A.  That's the philosophy of it that would be understood by attorneys.  Yeah, that's kind of a legal principle, a fairness and level playing field and notice.

THE COURT:  I don't understand what you're saying, not about the attorneys, but the report.  Let's put it this way.  You use the word "assume," but that would be what you would be prepared to testify for?

THE WITNESS:  Yes, ma'am.

THE COURT:  It sets the box within which you testify.  You can't go outside that box.  You might not be asked everything in that box, but it sets the box of your

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1424

testimony, does it not?

THE WITNESS:  Yes, ma'am.  I use the word "assume" because I have been advised by you that I am not a lawyer or a legal expert, and so I'm reluctant then to come forward affirmatively to say, yeah, that's how it is, because that's actually a legal conclusion.

THE COURT:  No, you're being asked as an experienced expert.  That was the basis of the question.  You were not being asked as a lawyer.  The question was, you're an expert, you've been an expert for over 30 years, you've testified in hundreds of cases as an expert, and this is your report.

The whole question, it's not really in my mind a terribly significant question, but it's just that when you know as an expert that you're giving that report to set the parameters of your testimony, whether or not you're asked all of that is another matter, but you're setting the parameters.  Is that why you do a report, or if that's not why you do it, tell the Court why you as an expert do the report.

THE WITNESS:  So, Your Honor, I prepare a report because it is requested.  If a report is not requested, then I typically wouldn't provide one.  The attorneys then may make use of that report for their own purposes.  They may read it and decide not to call me.  They may read it and

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1425

determine to call me but the rules of that jurisdiction don't require disclosure, that report in advance. They may read it and decide to call me, the rules do call for disclosure, and it's turned over. Those are all issues that I don't orient myself to or focus my work toward. My role is to do the evaluation, as I understand the psycholegal issues to be, write a report about that, if I'm requested to. What happens to that report, those exhibits, whatever it is after that, are in the hands of the attorney.

BY MR. SAMUELS:

Q. And so, sir, this is a five-page report. On your second page you go through the statutory factors and non-statutory aggravating factors, right? You list those out?

A. Yes.

Q. And then you start talking about prison violence and the concern of jurors for prison violence and some of the research there, right?

A. Yes.

Q. Then starting on Page 4, you start indicating a number of factors that would be associated with the reduced risk of prison violence for the defendant, correct?

A. That's correct.

Q. And these factors, such as his age, we talked about that a little bit earlier, the age rate in an actuarial concept, as defendants get older, that number goes down, right, for

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1426

individuals involved in violent crime?

A.  Yes, sir.  So crime in the community and violence in prison is inversely related to age.

Q.  And then you talked about education for Mr. Runyon, that's there in number B; you talk about, on number C, community employment, continued community relationships.  You talk about these as positive attributes of the defendant, correct?

A.  Not as positive attributes, as empirically-derived correlates that reduce his likelihood of violence in prison as compared to the base rate.

Q.  And you don't see any disconnect between you coming in and testifying about education, community employment, continuing community relationships, and what you testified yesterday about all these adverse factors of Mr. Runyon, you don't see any disconnect there?

A.  I do not.  The factors that are associated with violence in the open community are not the same as violence in prison.

Q.  And then on the last page, Page 6, you indicate, you signed it, and you anticipate that your testimony will be accompanied by numerous digital demonstrative exhibits, correct?

A.  I did.

Q.  That's the practice that we spent some time discussing, you would prepare a PowerPoint, provide that to defense

Cunningham, M. - Cross                                          1427

counsel?

A.   That's correct.

          THE COURT:  Can you go back to the community portion?

          MR. SAMUELS:  Yes, Your Honor.  Of course.

          THE COURT:  Go ahead.

          MR. SAMUELS:  Thank you, Judge.

          THE COURT:  It's admitted?

          MR. SAMUELS:  It is, Your Honor.

          THE COURT:  All right.

          MR. SAMUELS:  Yes, Government's Exhibit 14.

BY MR. SAMUELS:

Q.   Dr. Cunningham, as we discussed, I think there was nothing that you can point us to between that December 11th e-mail and that report that we read with any communications with defense counsel concerning what would be the scope of your testimony?

A.   That's correct.

Q.   And then, sir, from February 2009, I think you testified until August 2009, you didn't have a whole lot of involvement in the case?

A.   Virtually none except responding to Mr. Hudgins' e-mail.

Q.   Were you aware of other experts that had been retained in the case, like Dr. Bender or Dr. Halleck?

A.   Not that I recall.

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1428

Q.  Let me show you what's been admitted as Government's Exhibit 33.  Dr. Cunningham, this is an e-mail from Dr. Nelson to Mr. Hudgins.  Did you ever see this e-mail, sir?

A.  No, not that I recall.

Q.  Now, you had seen these e-mails from other experts, right?

MS. PEIFFER:  Objection.  Dr. Cunningham just testified that he doesn't recall ever seeing this e-mail. He is not on the exchange between Dr. Nelson and Attorney Hudgins.

MR. SAMUELS:  Judge, I think it's very relevant to what he had looked at and what he had been provided with in this case.

THE COURT:  Overrule the objection.

BY MR. SAMUELS:

Q.  Do you remember yesterday, Dr. Cunningham, when we reviewed that e-mail that you had seen from Dr. Mirsky, I believe it was on July 22nd, 2009?  Do you remember that?

A.  I do.

Q.  And even though that e-mail was not in a report form, you testified that you considered it?

A.  That's correct.

Q.  That e-mail had been provided to you by habeas counsel?

A.  That's correct.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1429

Q.   And this e-mail, as you're looking at it, was not provided to you?

A.   Not that I recall.

Q.   Would this have been something that you wanted to have, in terms of having all the information and opinions from other experts?

A.   I don't know.  It depends on what the content of it is.

Q.   If this e-mail was saying that it was a bad idea to call experts because it would come out that the defendant had lied about his involvement in the offense, and it related to his psychosocial background, wouldn't you have wanted to see that?

A.   I don't know that that would have influenced the workup that I did about whatever factors were present in his background and how this information -- and the significance of that -- this e-mail would go to a strategic consideration that defense counsel might have.  And so I can see where it would be relevant to a post-conviction proceedings, and I'm glad to take a look at it.  I haven't seen it yet.  I'm glad to actually read it in its entirety to see is this something that would have been relevant for me or not, and perhaps that's what I need to do before I comment about whether it is or is not.

Q.   Well, go ahead and take a look at it.  I'm happy to have you do that.  I guess the one -- well, go ahead and take a

Cunningham, M. - Cross                                        1430

look at it, and I've just got one question for you.  I don't want to rush you through it.

A.  Thank you.  (Reading).  If you can pull it up a little bit.

Q.  Of course.

A.  And if I can see the next page.

Q.  Of course.  Just the signature line, sir.

A.  Okay.  All right.  I've reviewed it.

Q.  Dr. Cunningham, I guess the question that I have for you on that is, you are taking and synthesizing all this information, a fellow expert's view that the defendant has lied to experts and lied to others.  That would be good for you to know in your own evaluation, wouldn't it?

A.  I assume that that was the case as I undertook the evaluation.  Again, I'm assuming for purposes of my evaluation that he would be guilty as charged had I'd undertaken this in 2009.  That would have been my operating assumption, meaning that he was not being candid or was lying about his involvement in the case, and so that increases the significance and the importance of an expert basing opinions on the history as provided by others and not simply David Runyon.

So, for example, a critical piece of history that he provides is this 1996 automobile accident.  So important then to confirm that that actually happened based on the reports

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1431

of Ms. Seeger and Maria Runyon, as well as to look at the medical records surrounding that so that that particular piece of information that he provided can be corroborated. So because he has lied about his involvement in the offense does not mean that he is lying about everything. It does mean that there is greater skepticism about his self-report and an increased need to seek other sources of data and corroboration for what he represents.

Q. But you would agree with me, Dr. Cunningham, that some of what he self-reported, there was no way to corroborate it?

A. That's correct.

Q. But yet some of what he self-reported, you used in your PowerPoint slides yesterday?

A. Primarily his report around head injuries, and then I also incorporated reports that he made to Dr. Dudley about his social experience and identity, I incorporated that.

Q. So, Dr. Cunningham, it is your testimony that you didn't have this, right?

A. I did not have this.

Q. And are you saying that you would not have wanted to know the views of another expert?

A. I would be happy to have considered this. I actually disagree with Dr. Nelson about the status of the case -- about what could have been put on in mitigation and whether using experts was a bad idea. So I disagree with his

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1432

analysis of the case.

Q.  I understand, but at this time in June of 2009, as we talked about, your testimony is just going to be prison violence, right?

A.  Well, that's correct.  But you are asking me about him and whether this would have been helpful.  This had nothing to do with prison violence and would not be helpful at all. Whether a defendant accepts responsibility for the crime and pleads guilty, gives a full confession, or whether they assert their innocence through trial, that's not predictive of serious violence in prison.  If he has a personality disorder, that is not predictive of serious violence in prison.  So what Dr. Nelson is describing doesn't illuminate that 2009 evaluation.

Q.  And, of course, in your 2009 evaluation, you never interviewed Mr. Runyon, right?

A.  That's correct.

Q.  So you were never asked or could never be asked whether he lied about the offense because your testimony was limited?

A.  No, sir.  I could have been asked if he lied about the offense, because the jury had convicted him, and he had purported that he was innocent.  I suppose that was available for you to ask me about on cross-examination at that time, if you were asserting that his lying about that increased his risk of violence in prison.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                       1433

So I was accepting at that time that he had not been forthcoming about that, and that was a part of the -- that was already incorporated in the risk assessment.

Q.  Let me ask you this.  In 2009, had you read any reports that said David Runyon lied to experts, in preparation for your testimony for violence risk assessment?

A.  No.

THE COURT:  While we are on Dr. Nelson, go back to the Exhibit Number 31 and the list of materials you relied upon.

MR. SAMUELS:  Yes, Your Honor.  I've got it right here.

THE COURT:  I'll just ask you, you've listed under Dr. Evan Nelson that you relied upon mental health evaluations - Dr. Evan Nelson, prelim report, and then you've put MMPI-2.  What is that?

THE WITNESS:  That's the Minnesota Multiphasic Personality Inventory, Second Edition, that Dr. Nelson had administered to Mr. Runyon, and this would have reflected the scoring data for the MMPI-2.

THE COURT:  If you don't know, you don't need to answer, but in this letter that you have been looking at, 33, he says, in the paragraph you were looking at before, the end of it where he is saying it would be better not to call me to testify, the last sentence says, "Mr. Runyon's

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1434

psych test data is not bad, but the issue of him being a

liar and an issue of psychopathy were likely to emerge from

the prosecutor's expert."  Is this the psych test that's

being referred to, if you know?

THE WITNESS:  It may be.  I don't know what else he

may have had access to in terms of psyche data.

THE COURT:  That's fine.  I just didn't know if

that was the psych test that you thought you had.

THE WITNESS:  It may be.  It may be something else.

THE COURT:  Well, do you know?  Well, go ahead.

THE WITNESS:  I don't know what other testing

Dr. Nelson had available to him.  If that's the only test

thing that he had available to him as the MPPI that he had

administered himself, then that would be what that refers

to.  I just don't know what he had access to.

BY MR. SAMUELS:

Q.  Dr. Cunningham, and then throughout that summer of 2009,

there were additional experts engaged, Dr. Mirsky and

Dr. Merikangas.  You are aware of that, sir?

A.  Yes.

Q.  Okay.  So at the time in 2009, sir, you had not reviewed

the government expert reports of Dr. Patterson and

Dr. Montalbano?

A.  That's correct.

Q.  Did you review in preparation for your 2015 report?

JODY A. STEWART, Official Court Reporter

A.  I did.

Q.  Now, sir, I'm going to move to August and talk a little bit about what you did.  I'm going to show you a series of exhibits.

THE COURT:  Are you starting on a new line of questioning?

MR. SAMUELS:  I am, Your Honor.

THE COURT:  There is a quick matter that I need to take care of, and we will just take a 15-minutes recess. This is not going to be a luncheon break, but it's something that needs to be taken care of.  Anyway, we will take a 15-minute recess now.

(Recess from 12:28 p.m. to 12:48 p.m.)

THE COURT:  Mr. Samuels, you can resume your cross-examination.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, when we took our broke, I think we were moving to August of 2009, and I'd like to show you a series of exhibits.  If it's at all easier for you, it should be in the book in front of you, but I'm going to show them on the screen as well, sir.

These are not in evidence, Your Honor, because they are part of the newer disclosures, but the first one I'll show you, Dr. Cunningham, is Government's Exhibit 99.  It

Cunningham, M. - Cross                                        1436

looks like it's a series of e-mails between someone named Amy Nguyen and Steven Hudgins.  Do you recognize that Amy Nguyen and her e-mail address, sir?

A.   I do.

Q.   And would you tell us who that is, please?

A.   That was an administrative assistant who worked with me in scheduling and processing of records.

Q.   Dr. Cunningham, were you aware that there was some back and forth about your schedule as we got closer to the time of the penalty phase and the expectation of your testimony, sir?

A.   I don't recall whether I saw these e-mails at that time. I'm not -- my staff was involved in coordinating my schedule and calendar.

Q.   But do you recognize the e-mail address, sir, as someone from your staff?

A.   Oh, I do.

          MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 99.

          THE COURT:  All right.

          MS. PEIFFER:  That's fine, no objections, but we just want to confirm that the version that is admitted is without highlights.

          MR. SAMUELS:  Yes.  This is just my copy.

          Your Honor, we've got the originals.

          THE COURT:  I'm looking at the book, and there are

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1437

no highlights on it.

MR. SAMUELS:  I'm sorry.

MS. PEIFFER:  Thank you.

(Government's Exhibit 99 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Cunningham, we will just go through these.  It looks like you had some other plans that you were going to be out of town for a period of time, it looks like right after the penalty phase; is that right, sir?

A.  That appears to be the case.

Q.  So let me next show you Government's Exhibit 102, which starts an e-mail chain again with Amy Nguyen from your office, but this is a few dates further on August 7th.  Do you recognize that address again, sir?

A.  I do.

MR. SAMUELS:  Your Honor, I would offer Government's Exhibit 102.

THE COURT:  There is handwriting on here, 600 Granby Street, that is all.  That's the courthouse address.

MR. SAMUELS:  Yes, Your Honor.  That's just the way we got it.

THE COURT:  That's admitted.

(Government's Exhibit 102 received in evidence.)

BY MR. SAMUELS:

Q.  It looks like again, Dr. Cunningham, that there is a

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1438

reference to having you come in to testify, and that's important your testimony not run over because you've got other schedule, right, sir?

A. That's correct.

Q. Then here on the first page, Mr. Hudgins is explaining to Ms. Nguyen that, "We've agreed to take you out of order. You are going to come in Wednesday, August 19th, and testify on the 20th." Do you see that, sir?

A. I do.

Q. There is a reference here to the "presentation materials (slide, or CD)...to disclose to the U.S. Attorney and for my own education."

That would be your PowerPoint that you presented at the penalty phase, sir?

A. That's correct.

Q. Then up at the top Ms. Nguyen says, "We will be in touch soon regarding the slides." Were you working on these slides up until the time of the penalty phase, do you remember, sir?

A. I was working on them in August.

Q. Okay.

THE COURT: Can you spell Nguyen for the court reporter.

MR. SAMUELS: I can, Your Honor. It is Amy Nguyen, and that is spelled N-g-u-y-e-n.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1439

Q.  Last scheduling e-mail I have for you, Dr. Cunningham. This is Exhibit 103, and this is just the order in which we received it starting OAF 13538, and then it does skip to 13540, but it appears to be additional communications regarding your scheduling.

Do you recognize the e-mail address for Melinda Cunningham, sir?

A.  I do.

Q.  And who is that?

A.  That's my late wife.

Q.  I'm sorry, sir.  And do you recall continuing communications about trying to get your schedule put together here?

A.  Yes.

THE COURT:  You are looking at 103, is just one page?

MR. SAMUELS:  It's the second page, Your Honor.

THE COURT:  I'm sorry.

BY MR. SAMUELS:

Q.  We prepared it just the way we got it.  There is a number of e-mails there.

A.  Let me clarify.  I recognize that that's what they are doing.  I wouldn't have been overseeing this e-mail traffic back and forth.  They were handling that themselves.

MR. SAMUELS:  Your Honor, I would go ahead and

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1440

offer Exhibit 103.

THE COURT:  All right.

(Government's Exhibit 103 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Cunningham, what I want to direct your attention to is on the third page of that exhibit, there is an exchange there, and I've highlighted a little bit of it -- that's not in the original, of course -- dated Tuesday, August 4th, 2009.  Do you see that, sir?

A.  I do.

Q.  Now, is that your e-mail address, the Mark9351@hotmail.com?

A.  Yes.

Q.  And what are you telling Mr. Hudgins in the first and second paragraph?  Can you just summarize that for us?

A.  I'm advising that I'm not available August 24, 25, or 26 because of preexisting international travel arrangements that I have in state capital case.  This is an area that should be in my testimony.  That would be August 18th through 20th, and it's possible that there is definitely -- allow my testimony in the first week of September, that I would be delayed in testifying there, and we are calling then to clarify what my testimony commitments are in this other case, and then I am identifying an alternative expert regarding violence risk assessment for prison.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1441

Q.  So this second paragraph that I've highlighted there, Dr. Cunningham, that alternative, as you describe, is if you are not able to come based on your schedule?

A.  That's correct.

Q.  You are offering another expert, this Dr. Tom Reidy?

A.  Reidy.  Thomas J. Reidy.

Q.  Excuse me.  And you are suggesting that Dr. Reidy could come in just a couple of weeks before the penalty phase and testify to many of the same areas that you could, sir?

A.  That's correct.

Q.  He would have been able to either build on what you've done or do his own work in that period of time?

A.  Well, there's a limited file of correlates.  I've already prepared slides.  He uses very similar slides or sometimes the same slides in his own testimony, and so it would be not a lot of hours required for him to review the relevant aspect of the file, and the exhibits are already prepared.

Q.  Because I think you told us at the trial, Dr. Cunningham, when I asked you, that most of your work on this case had been spent preparing that February 5th, 2009 report.  Do you recall that, sir?

A.  That would be accurate, but I don't recall the testimony specifically.

Q.  Okay.  Your testimony is that most of your time was spent doing that report?

Cunningham, M. - Cross                                                      1442

A.   That's correct, or reviewing the materials to prepare to do that report.

Q.   All right.  And do you remember testifying that you spent comparatively less time in the lead-up to your testimony in August of 2009?

A.   Again, I don't recall it specifically, but I think that would be accurate.

Q.   Let me just show you the pages of the transcript and see if that helps you refresh your recollection, sir.  This is of your penalty phase testimony on August 20th.  I'll show you, if you see at the top, it says M. Cunningham - cross.  This is on page 2169, and if you will see down there, starting at line 19, I asked you, "You prepared a report in this case dated February 5th, 2009; is that right?"  You see that line starting on line 19?

A.   I do.

Q.   Going down to line 25, you are starting to talk about the report?

A.   That's correct.  You had asked me if the report was submitted to try to convince the government to withdraw the notice of death against David Runyon, asked is that right, and I said I don't recall the purpose of the report.

Q.   And then it continues on the next page when you say, "I was asked to provide a report," and you were asked how much time you spent on the case before providing the conclusions

Cunningham, M. - Cross                                                    1443

in the five-page report.  Do you see that?

A.  I do.

Q.  And if you look at the answer starting on Page 4 down to 16, does that kind of help refresh your recollection about what you said you spent most of your time on?

A.  Yes.

Q.  And what did you spend most of your time on, the report or preparing for your testimony?

A.  The report.

Q.  And I think you said specifically you spent 15 to 20 hours up to the time of the preparation of the report and then another five to nine hours; is that right, sir?

A.  That's what I described, up to a couple of days before my testimony.

Q.  Dr. Cunningham, I'm going to show you what we have marked as Government's Exhibit 101.  It's been admitted as a separate exhibit number by the defense.  Do you see your billing statement there for August, sir?

A.  I do.

        MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 101.

        THE COURT:  It's admitted.

        (Government's Exhibit 101 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Cunningham, this is just for a week's time here,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1444

right, August 14th through August 20th?  I'll show you the next page.  It looks like August 20th as well; is that right, sir?

A.  That's correct.

Q.  I see on this, sir, that the rate and the hours are always rounded up to the nearest 10; is that right?

A.  They are rounded to the nearest 10.  I don't recall if that's up or just the nearest 10.

Q.  Well, on August 19th, three hours, 50 minutes, 3.25 rounded up to 3.3, right?

A.  I don't know that with specificity.  I know that it is rounded to the tenth, but I don't recall if it's rounded -- and particularly with this software -- to the closest tenth or up to a tenth.

Q.  And this report shows us that in August of 2009, just in that weeks' period, you spent 28.7 hours on the case of professional time in August of 2009; is that right?

A.  That's correct.

Q.  For the total of $8,610?

A.  That's correct.

Q.  So that would be more than the five hours you testified about in the penalty phase of the trial?

A.  No, sir.  If you will go back to my transcript, I'm describing the distribution of time up to a couple of days before trial.  There is a very -- and I think that's just

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1445

maybe four hours on the 14th.  Then there is a very significant amount of time that's involved coming to Norfolk, meeting with the attorney, testifying and going back.  That's where that bulk of time comes from.  So as I'm responding to you, I'm talking about my time, preparation prior to trial, and how that was distributed.  That did not include actually being here on the ground at that time.

Q.  I see.  And, Dr. Cunningham, you also at some point did provide your materials to Mr. Hudgins; is that right?

A.  I did.  I provided him the slide deck.

Q.  All right.  I'm going to show you Government's Exhibit 104.  Do you recognize that, sir?

A.  I have not seen this previously, but this is from my e-mail and reflects an e-mail to him.

          MR. SAMUELS:  Your Honor, I'd offer Government's Exhibit 104.

          THE COURT:  It's admitted.

          MR. SAMUELS:  Thank you, Judge.

          (Government's Exhibit 104 received in evidence.)

BY MR. SAMUELS:

Q.  And this is what we talked about at the beginning of your testimony, Dr. Cunningham, this PowerPoint with the notes having the suggested questions to be asked to elicit the information on the PowerPoint?

A.  That's correct.  If I could revise my answer.  I didn't

Cunningham, M. - Cross                                              1446

recognize this when I first saw it.  As I read the text of it, I realize that I was shown this a couple of days ago by defense counsel who gave me the exhibits that you might be using at trial that you had conveyed.

Q.  I'm sorry.  Because when we talked earlier, I thought you said that the only things that you had looked at in preparation for your testimony were the materials from back in 2015.  Was I mistaken on that?

A.  I had not thought about these exhibits as being a part of what I had additionally reviewed.

Q.  So did you review -- well, let me ask you this.  What did you review in preparation, that was provided to you by defense counsel, prior to coming here today?

A.  So I reviewed the file that I had in 2015, I reviewed the report, the reports of Dr. Nadkarni and Dr. Dudley.

Q.  That part I got.  You had told us that earlier this morning.

A.  Yes, sir.

Q.  What else?

A.  Otherwise, just this set of exhibits.

Q.  I'd ask you to be more specific.

A.  Well, as I recall, either yesterday morning or the day before, I was -- I was given a set of exhibits to look at, advised that these are ones that you had provided notice that you might be using in my examination.  And I pretty quickly

Cunningham, M. - Cross                                              1447

looked through those.

Q.  Were you given anything else by defense counsel from February 2023 up until a couple of days ago when you got some exhibits that the government had provided?

A.  My report, and part of it we were working with my report on over the several days before my testimony was to try to identify the sources of information for all of the statements that are in my report about Mr. Runyon's history, those that are not already attributed on the slide and even -- you know, on the report, and even though those are a specific source, I was working on that, and members of the defense staff were also working on that.  Ultimately, I was given a report that was footnoted with those sources.

Q.  Who gave you that, sir?

A.  One of the defense attorneys.  I don't recall which one.

Q.  So a member of the defense team looked at your PowerPoint and then gave it back to you with it footnoted; am I understanding that right?

A.  No, sir, the 2015 report.  I was going back through the 2015 report to source who was the -- from what document, from what declaration did each aspect of that history come from. As I was doing my own file review, I was engaged in that. The defense attorneys indicated that they would bring some resources to bear with that as well, and then ultimately I was given a -- that 2015 report, now footnoted with those

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1448

sources.

THE COURT:  Now, when was this?

THE WITNESS:  Tuesday evening, as I recall.

THE COURT:  So this was not the team from the defender's office in Tennessee?

THE WITNESS:  No, ma'am.

THE COURT:  But you gave them a report, this PowerPoint report back in February?

THE WITNESS:  Yes, Your Honor.  I had provided to Susanne Bales a PowerPoint dated either February 22nd or February 23rd, 2023.  I had provided that in advance of my going or starting to Norfolk to testify at that hearing.  I don't recall when -- how long before, but I had provided her that in advance, and it would have been either on or after February 22nd.  That's the date of the file.

THE COURT:  The PowerPoint here, did you add sources to that; is that what you're talking about?

THE WITNESS:  No, ma'am.  The PowerPoint here does not have sources on it.

THE COURT:  Well, sometimes it has Dr. Mirsky or Dr. So and so.

THE WITNESS:  Yes, ma'am.  That was already like that in February of 2023.

THE COURT:  I'm not understanding what he was given.  The attorneys gave him sources for things.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1449

MR. SAMUELS:  I think I understand, and can I ask the question, Your Honor, if I could?

THE COURT:  Yes.

BY MR. SAMUELS:

Q.  Dr. Cunningham, you are talking about this report, right?

A.  Yes, sir, my declaration.

Q.  So what you're telling us is that you had gone through the declaration to try to find the sources for all the information in the declaration?

A.  That's correct.

Q.  Because it's not always apparent where that information comes from, the body of the report?

A.  That's correct.

Q.  You summarize what you looked at in the front end, but then you just kind of put this narrative out there, and it doesn't say where it comes from?

A.  Well, I don't put it out there.

Q.  Not put it out there?

A.  The narrative is periodically sourced but not always sourced.

Q.  I'm not trying to trick you, Dr. Cunningham.  Forgive my unartful phrasing.  You list the sources, and then you describe -- in some cases you list generally, but you're not footnoting every area, correct?

A.  That's correct.  Sometimes I'm identifying the precise

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1450

source and even a Bates number, but more often I'm not.

Q.   Sir, what defense counsel has done here is they have given you this report back, and the report they have given you is footnoted, is sourced?

A.   Based on their work, and also as I'm reviewing my direct exam with them, I'm describing the sources as I recall them.

Q.   But they actually gave you a document like this?

A.   Ultimately, yes.

Q.   And that document had footnotes in it or places where you could identify the sources?

A.   Footnotes.

Q.   Did you go back and double-check each and every source?

A.   I did not.  I reviewed it.  I looked at the footnotes and who they were attached to and found them to be consistent with my recollection, but I didn't go back and double-check every footnote.

THE COURT:  Let me get this straight.  This is Defendant's Exhibit Number 31?

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  These front pages were just added?

MR. SAMUELS:  No, Your Honor.  What's happened here, if I can clarify to the Court, to my understanding, is that this is Dr. Cunningham's declaration provided in 2015.  That's the copy provided in 2015.  That's the copy given to the United States.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1451

What has happened is defense counsel and their team have gone through this report and sourced information from it and put footnotes or attributions from the file material, and they provided that to Dr. Cunningham so he would know where that information came from.

Is that what I'm understanding, Dr. Cunningham?

THE WITNESS:  Yes, sir.

THE COURT:  Do you have a copy of that?

THE WITNESS:  I do.

THE COURT:  Do you have a copy?

MR. SAMUELS:  No, ma'am.

THE COURT:  I'd like to see it.

MR. SAMUELS:  I would, too.

THE COURT:  So the copy that the Court has of your report that's been admitted, and the copy that Mr. Samuels has that's been admitted is not the same as you've just handed up to me because this has everything in here footnoted and sourced; is that correct?

THE WITNESS:  That's correct.

THE COURT:  You did not do that?

THE WITNESS:  I participated in it as I was describing the sources in reviewing my report and talking about my testimony.  There were defense team members that were taking notes in the course of that.  They were doing their own investigation as well, and ultimately I was

JODY A. STEWART, Official Court Reporter

provided with this footnoted report.

THE COURT:  Who on the defense team?

THE WITNESS:  I'm sorry?

THE COURT:  Who on the defense team?

THE WITNESS:  Was involved?  There were five or six people in the room as I was reviewing my testimony who were taking notes and participating.

THE COURT:  I want to know why this updated report that he testified from was not given to either the Court or to the United States.

MS. PEIFFER:  Your Honor --

THE COURT:  Before you start, I'm noting that it is reflecting as being document 511-8 filed 2-4-16, and it's not 511-8 filed 2-4-16 with the Court.  Someone's gone into it and put the meeting that it occurred and id., id., id., and social history.  Go ahead.

MS. PEIFFER:  That's correct, Your Honor.  This was not the copy of his declaration that was filed with the Court.  This is created as Dr. Cunningham was preparing his testimony, and we were trying to identify where sources came from, and he, as he testified, was doing the same thing, and we were trying to check and make sure that nothing was missing and everything was accurate.

It was based on the materials considered list from his report, so everything on those notes are reflected in

Cunningham, M. - Cross                                          1453

the materials considered, and he didn't testify from that report. He was doing his own work. I believe he testified he got that very late, and by that point his testimony had already been discussed, and he had been talking about what sources he was using, and we were trying to incorporate that into our product as well.

THE COURT: But you have an obligation, you have a duty, if you alter a document that's been filed with the Court, and the expert gets it, I don't understand why you didn't produce that. It's not for you to source it. That's what he's supposed to do.

The expert is supposed to do their report, and that's why the questions were coming at him, well, where did you get that from? Where did you get that from? Because his report was, I think as was mentioned yesterday, kind of a continuous narrative without sources in it, and then when he went to the references that he included, he oftentimes couldn't relate it into a reference. What has happened is, this is somebody else's work, it's not just his work.

An expert is supposed to come in, they are supposed to write the report. They are supposed to know the sources. They are supposed to get the sources, and if they can't, then that's all what goes to the credibility and weight of an expert's testimony, is their ability to be able to know of what they speak and what they write and for everyone to

Cunningham, M. - Cross                                    1454

know the sources that they've used.  I believe all of you all know that rule.  This is, again, a very disturbing matter to the Court.

MS. PEIFFER:  Can I clarify, Your Honor?

THE COURT:  I want to mention one more thing.  You would lead him yesterday.  I just wanted to get through the testimony so I decided I wasn't going to say anything, but you would say, refer to, or aren't you referring to.  I can't do it song and verse because I don't have the transcript in front of me, but you would lead him.  Were you looking at this as you were questioning him?

MS. PEIFFER:  No, Your Honor.  I don't have a copy of that report with me, and I did not yesterday.  Can I now clarify for the Court?

THE COURT:  Yes.

MS. PEIFFER:  I just want to make clear the process.  And so what happened was that Dr. Cunningham was going through the materials he cited in his report and looking and comparing that back to his report and talking about what he cited.  And we did discuss that together in preparation for his testimony, and we were doing the same thing to see, okay, does it say that?  Yes.  That makes sense to understand and prepare for his testimony.  And in doing so, we created the report.  But Dr. Cunningham was also doing his own independent work.  He was checking the

Cunningham, M. - Cross                                        1455

sources, and it wasn't just that we created this report and handed it to him, and he didn't do his own work or looked back at the sources.  That is not what happened.

MR. SAMUELS:  But, Your Honor, he testified that he did not go back and look at all those sources.

THE COURT:  He did.  He just testified to that.  He just testified to it.

MS. PEIFFER:  Well, he did look at some of the sources, I believe, Your Honor.  I don't know that he looked at every single source listed on that, but it's my understanding that he looked at as many of those sources in preparing for his testimony.

THE COURT:  What we will do is we will mark this as Court Exhibit Number 1.  It's going to be admitted, because it's already been filed, and now it has been updated with cites.  Mr. Samuels can cross-examine him from this report and ask him what sources he looked at or not, because I just heard his testimony under oath and his testimony of how this document got prepared.  So you and I must have heard it differently.  But I'm going on what I heard from his testimony, was that he was in a room with attorneys and were going through it, and basically the attorneys then updated this document and gave it to him.  That is what I heard from him, and I will rely on my memory of what I just heard.  I'm going to make this Court Exhibit Number 1.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1456

We are going to take a break, and I'm going to have it copied so that everyone can have a copy of it because I can't print it off from CM/ECF because it's not the same document that's on CM/ECF.  So I've got a copy.  Do you have a copy of it?

MS. PEIFFER:  No, not with me, Your Honor.

THE COURT:  But you've got a copy?

MS. PEIFFER:  I believe I have one at the hotel.

THE COURT:  The clerk just said it would be Court Exhibit Number 3.  Apparently we've had a couple before.  So this would be Court Exhibit Number 3.  I would suggest that you get your copy, then.  You make arrangements to get your copy, since you've got one, and I'll have a copy made for Dr. Cunningham so he can testify, for the government, and for the Court.  We will use this that he has just passed up.

So I'm going to recess for about 10 minutes. You've got a workroom here with your documents, wherever it is.  I think you need to send someone to get it.  You've got your couple of, looks like, *pro bono* attorneys here, and you've got a paralegal here.  You've got three of you all. So you can make arrangements to get it, because it's quite a long document, and it's double-sided.  We will have to get it through a copy machine.

MR. SAMUELS:  Your Honor, I'd also like a copy of this PowerPoint where Dr. Cunningham has apparently put

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1457

questions on the PowerPoint, suggested questions.  That's a *Jencks* violation, Your Honor.

THE COURT:  I know.

MR. SAMUELS:  I would like a copy of that.

THE COURT:  Give me a copy of that, too.

MS. PEIFFER:  Can I clarify one point about the previous matter?

THE COURT:  You can, but at some point, why does this keep occurring?  Just present it as it is.  To go through an expert's report and add citations to it and give it to the expert and not give it to the Court or opposing counsel is not right.  If you did that, at least produce it as an update.  It's just not the kind of thing that's done. We are trying to get to the bottom of all of this, and it's very difficult.  The Court has to judge credibility and give weight.  I was trying to get that across yesterday.

How can I give credibility and weight to testimony and a report that has now been edited with sources on it, because that's what I just kept saying yesterday, what did you rely on?  I kept looking at this voluminous report without anything in it.

Go ahead, Ms. Peiffer.

MS. PEIFFER:  I just want to make sure the record is clear, Your Honor, that that report is what counsel prepared.  I believe that Dr. Cunningham relied on

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                    1458

additional information that was not added into that report.

THE COURT:  You can't prepare expert reports.  The expert has to prepare the report.  So this becomes a report that you prepared.  The expert has to prepare the report, not the attorney.

MS. PEIFFER:  Your Honor, I was clumsy in my language, I apologize.  We did not prepare the report.  I was just trying to indicate that the footnotes that were added were our own thoughts of where this information might have come from.  I believe Dr. Cunningham did his own work, and it wasn't a compilation of his work and what he testified about.  That was just our -- the footnotes were added by counsel.

THE COURT:  But the point is, an expert's report, and I'm not going to keep repeating this because these are straightforward rules and law, an expert's report is supposed to set forth the expert's opinion, the basis for that opinion, and the sources relied upon for that opinion because you are entitled to test that on cross-examination, if somebody relies on a treatise, if they rely on a document, that's just basic rules in law.

It's not attorney work product when an attorney goes into an expert's report and does the citations for the expert.  In other words, the expert report is required to include, and I indicated this yesterday, is required to

JODY A. STEWART, Official Court Reporter

include what that expert relied upon, and it's supposed to be in the report and available to counsel so they can test the expert's report on cross-examination by what was relied upon.  So you have to do that in your expert reports.  It's part of it.

I asked the question about all these references at the end.  Is this what you relied on?  Yes.  So, I mean, honestly, I feel the Court has been misled, and the prosecutors have been misled yet again.  I'm just disturbed by it, but I'm going to copy this, and I would like to see whatever PowerPoint and how that's been edited.  So could you pass that up to me, please.

MS. PEIFFER:  Well, I just wanted to clarify that for the Court, I don't have with me a copy of Dr. Cunningham's questions because I wrote questions.  I took the PowerPoint slides, and I had my notebook, much like Mr. Samuels did with questions, and for each slide I wrote my own question at the bottom of the slides.  Sometimes I was informed by the questions Dr. Cunningham had talked about with us, and many times I wasn't, and I added my own questions.  So the slides that I have with me are all of my own notes and my plans for questions.  They are not anything that Dr. Cunningham had sent to me.

MR. SAMUELS:  I just want to see the one that Dr. Cunningham sent with his projected questions because he

Cunningham, M. - Cross                                          1460

did testify that Ms. Peiffer sometimes did use the questions that he provided.

THE COURT:  It was what he testified, that his modus operandi is to give a PowerPoint presentation and together with suggested questions for the attorneys.

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  Did you get that?

MS. PEIFFER:  I believe so.  I had not realized that we received it, which was my mistake, until fairly recently in the proceedings, as Dr. Cunningham testified.

THE COURT:  Well, the Court didn't get the PowerPoint until yesterday morning, and I think that Mr. Samuels represented he got it in the afternoon of October 31st.

When did you have the PowerPoint?

MS. PEIFFER:  With Dr. Cunningham's questions?

THE COURT:  The PowerPoint itself.

MS. PEIFFER:  Or the one that was used as a demonstrative?  The one that was used as a demonstrative, we sent as soon as it was complete.

MR. SAMUELS:  Judge, she said it was a draft or something he prepared in February.  When was the first time they got any PowerPoints related to Dr. Cunningham?

THE COURT:  You were in the case in February, so give the Court the timeline of this PowerPoint.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1461

MS. PEIFFER:  I will do my best, Your Honor.  I will say that Dr. Cunningham was not my witness.  I did not seek and work on preparing for Dr. Cunningham until very recently.  He was supposed to be presented in February by Ms. Bales, and because I was working on other matters in other pieces of the case, I was not involved in preparing Dr. Cunningham.  I wasn't reviewing his materials prior to the February hearing.  After the February hearing, there was -- he was released from his contract, as the Court is aware.

THE COURT:  I'm not aware of any of that.

MS. PEIFFER:  I apologize.

THE COURT:  I don't want to know about his contract with you.  He's testified what he charged.  You have gotten a budget that was approved by the Court and the Fourth Circuit, and that's what I'm concerned about.  But I'm not concerned about your contracting with him and whether he was released or what.  He was released from testifying then, but he wasn't released from the case.

MS. PEIFFER:  I understand, Your Honor, and I'm just trying to answer your question about the timeline with as much detail as I can.

THE COURT:  Then go forward and try to do it.

MS. PEIFFER:  His contract had been with Tennessee.  So after Tennessee left -- the Eastern District of Tennessee

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1462

Federal Defender left the case, we were needing to obtain a new contract to work with Dr. Cunningham, was awaiting the budget, which was approved, I believe, and I don't recall exactly, but I believe it was in September.  At that point, once we got the contract, we began thinking about preparing Dr. Cunningham for testifying again, and so we started reviewing his materials.

As I said, I believe that I made a mistake.  I did not realize, and this was my mistake, that there was a copy of the PowerPoint that had questions in it until sometime -- Dr. Cunningham testified, I believe, that it was Tuesday, and, quite honestly, I know it was within the past few days. I don't remember the exact date, but it was very, very recently.

THE COURT:  He testified yesterday.  We are talking about when you got the PowerPoint.  He testified yesterday, Wednesday, and I think that you sent a copy of the PowerPoint, according to Mr. Samuels, on 10-31 in the afternoon, and it was apparently given to the courtroom deputy, and it was up here when I came into court on November 1.  I did not have it before I came into court.  It was left up here on my bench.

MS. PEIFFER:  Yes, Your Honor.  I believe I was talking about the PowerPoint that I thought you were asking about that had his questions.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1463

THE COURT:  Where is it?  That's the question.
Where is it?

MS. PEIFFER:  I don't have that with me.  I don't
have the information to answer the Court's question right
now about when I had it.

THE COURT:  Where is it?

MS. PEIFFER:  I believe it's on materials back at
the hotel.

THE COURT:  That's my question, was where is it?
Well, what we will do is we will take a 30-minute recess,
and if you need to get something to eat or whatever, you
should do that now, and I will have the copies made, this
document, and you can go back and get it at the hotel and
give it to me to look at.  You'll need to give it to
Mr. Samuels, but give it to me to look at before we make any
decisions on it.  All right?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  Anything else that anybody wants to
raise for the Court before we take a recess?

MR. SAMUELS:  No, Your Honor, not from the
government.

THE COURT:  Obviously, Dr. Cunningham, you can't
discuss any of this with the attorneys.  You're in the
middle of your testimony.  You can't have any conversation
with them at this point.

JODY A. STEWART, Official Court Reporter

THE WITNESS:  Yes, Your Honor.

THE COURT:  Until you are released from service, other than administrative matters, such as plane tickets and things like that, scheduling.

THE WITNESS:  Yes, Your Honor.

THE COURT:  The Court is in recess for 30 minutes.

(Luncheon recess from 1:30 p.m. to 2:17 p.m.)

THE COURT:  The Court was just notified that everybody was back except the petitioner's paralegal with petitioner's counsel, who will be back shortly.  But rather than hold things up any further, I thought that we could go forward.

We made the copies.  I don't know if you want to question about Court Exhibit Number 1.

MR. SAMUELS:  Is it Court Exhibit Number 3, Your Honor?

THE COURT:  Excuse me.  I'm going to have the clerk put a sticker on this now.  It did not have a sticker.  So Court Exhibit Number 3.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  Everybody is here including Mr. Runyon and Dr. Cunningham.

MR. SAMUELS:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. SAMUELS:  Thank you.

JODY A. STEWART, Official Court Reporter

BY MR. SAMUELS:

Q.   Good afternoon, Dr. Cunningham.

A.   Good afternoon.

Q.   Dr. Cunningham, when we took our break we were looking at this updated and revised report in terms of what's been added to it.  Let me show you what's been identified here as Court Exhibit 3.

         MS. PEIFFER:  Your Honor, I just want to clarify that this isn't a report, this is not Dr. Cunningham's report.  This is material that was created by counsel in preparation for testimony.  It was not intended to change Dr. Cunningham's report or the evidence such as his testimony.  He created a report, he listed the sources at the beginning.  He went over those sources multiple times yesterday.  He testified that he relied on those sources, and this did not change the report.  It just indicated where certain statements came from the materials relied on that he included at the beginning of his report.

         So to the extent that it characterizes a revised report, Dr. Cunningham never adopted this or changed his report.

         MR. SAMUELS:  Well, Judge, I think we should ask him about that because there are 400 footnotes on the report that's signed by him that does, in the government's view, change a report that he sat up there and reviewed and relied

Cunningham, M. - Cross                                          1466

on yesterday.

THE COURT:  However you characterize it.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Whether you characterize it as a revised report or Court Exhibit Number 3 or his original report, it has been updated, pursuant to his testimony today.  You can do that.  He testified yesterday, and he testified about what he relied on, and he was questioned on direct about what he relied on.  So it was all part of the direct testimony, this report and what he relied on to make the statements in the report, and the United States is certainly entitled to cross-examine him on what he relied on and these additions to the report.  Let's just put it this way.  They are added additions.  They are different from the report that was admitted into evidence that the Court had and that the prosecutor had.  So to the extent you object to the cross-examination, it certainly was all part of direct, you're right.  He testified to that.

Now, based on this, Mr. Samuels is entitled to cross-examine.

MS. PEIFFER:  Your Honor, I was not objecting to Mr. Samuels' ability to cross-examine Dr. Cunningham.  I was testifying that in terms of calling it a revised report, Dr. Cunningham didn't sign it.  This is document that was -- notations were added by trial counsel -- I'm sorry, by

JODY A. STEWART, Official Court Reporter

counsel, and work product.  Dr. Cunningham didn't do that, and it's not like he went back and reviewed it and signed the report.  It's not in his report.

THE COURT:  But he testified that the sources were added to his report.  It is not work product to add to a report that's coming into evidence.  We've gone through that.  Your work product is not to give an expert what his citations are.  Everyone's entitled to know that from the expert's report.

This does bear his signature on the original report.  He has testified how these citations got on there.  I overrule any objection because this is not attorney work product.  It simply is not.  Attorneys are not able to go into expert reports and add authorities.  The expert must do that.  And if the expert must do it, if it's the expert's report, and he's been examined on the authorities he relied on, they're entitled to cross-examine.  So I do not find it attorney work product, and if it is, it's improper attorney work product.  This matter is becoming tedious.

So you are saying it's your work product?  I think enough has been said about this.  As far as I'm concerned, it's digging a deeper hole in the record for you, but go ahead.  Say what you want to say.

MS. PEIFFER:  I'll just say two brief things. First of all, Dr. Cunningham's report and the materials he

Cunningham, M. - Cross                                          1468

relied on, which are cited on Pages 3 through 7 of his report, were not changed as he testified yesterday to those materials.  Second of all, this is not -- was not intended to create a report or to be entered into evidence.  This was just material that were created to aid in preparation.

THE COURT:  Go ahead, Mr. Samuels.  You can also go through.  They've cited this, but I certainly don't see them all in the references.  The citations that I've looked at don't necessarily coordinate with the references at the end of his report on Page 64.

MR. SAMUELS:  Yes, Your Honor.  I will ask about that.  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, these footnotes at the bottom of what looks to be your original report from 2015, were those added by you, sir?

A.  No, sir.

Q.  Dr. Cunningham, there are -- would you agree with me that starts footnote number one.  If we go to the end of the report, it looks like there are some -- let me get to it, sir -- do you see that, sir, showing you on Page 61, the Court Exhibit 3, 432 footnotes in the report.  Do you see that, sir?

A.  I see that.  I don't regard this as my report.  I see these as footnotes that have been added as a study aid from

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1469

my testimony preparation to the report that I prepared.  I don't consider this to be my report.  This is the study aid from my report.

Q.  So who was preparing the study aid for you?

A.  Defense counsel.

Q.  Now, sir, how was defense counsel able to go into the body of your report and add these footnotes at the bottom of the pages and throughout the report?

A.  They had my report.  They had the set of records that I relied on.  They -- the process, I assume, would be take a statement in my report.  Often I'm describing that as having been through the social history and that sort of thing.

Q.  Dr. Cunningham, I don't want you to assume.  What do you know?

A.  I only know that the footnotes reflect the materials provided to me that I list in the report itself.

Q.  How do you know that?  Did you go back and verify each one of these 432 footnotes?

A.  Not individually.  I looked through them and found them to be based on that.

Q.  Did you go back and review and correspond the footnote to the actual source material for any of the footnotes?

A.  For some, I did.

Q.  How many?

A.  I don't recall.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1470

Q.  Can you ballpark it for me?

A.  Maybe 20 to 40.

Q.  So 20 to 40.  So that's 5 to 10 percent of the footnotes you actually went back and verified those came from the source material?

A.  That's correct.  Others I recognized without needing to go back to the original source material.  Most of them I recognized.

Q.  How did this -- we will call it your footnoted report -- you said a study aid, right?

A.  That's correct.

Q.  Or a cheat sheet, perhaps?

A.  No, sir, a study aid.

        THE COURT:  When does an expert get a study aid? What is a study aid?

        THE WITNESS:  I was creating -- was in the process of doing that myself, Your Honor, as I was going back and looking at the report and the original records.  This was a mechanism to assist that process and facilitate it.

        THE COURT:  When you testified yesterday, what did you have in front of you?

        THE WITNESS:  During most of the testimony I had nothing in front of me, and a portion of that I had a binder opened that had this material in the flap, and then I would turn to the actual report, for example, as you asked me

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1471

questions about the body of my report.

THE COURT:  Can I see what was given back to you? I was supposed to have the original, and I don't.  What was given to me as one of the copies?  This one has holes punched in it.  Where is the one that was copied from?  Let me see what you have, Mr. Samuels.

MR. SAMUELS:  Yes, ma'am.  May I tender it?

THE COURT:  Yes.  I want to be sure everybody's got the same document that I have.  You can give it back.  Go ahead.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, would you explain for us how this report has been footnoted was prepared?

A.  This study aid was prepared by defense counsel and their staff.  I was not present as they were going through that process other than in my testimony -- in my testimony preparation, I would describe the source of the document.  I was aware of people taking notes as I was doing that preparation.  Whether that contributed to that or not, I don't know.

Q.  Did defense counsel have a Word version of your report that they would have been then able to go in and add these footnotes to?

A.  I don't know.  To my knowledge, I'd only forwarded a PDF.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                    1472

Q.   When did you first get this report that's got these footnotes in it, sir?

A.   This complete one was provided to me, I think, Tuesday night, a day or two before.  Another was provided to me that had very few footnotes, wasn't particularly helpful, and I have -- I think I had it overnight, just thumbed through to see how few there were and gave it back the next day.

Q.   Did you provide any commentary to defense counsel about how that first version wasn't very helpful?

A.   Only to that effect, that the footnotes were scattered and few, and sometimes just general, just social history without attributing it to who in Mr. Runyon's family had provided that aspect of the social history.

Q.   And so, Dr. Cunningham, when did you arrive in town, sir?

A.   Sunday night.

Q.   When you got into town Sunday night, did you review this footnoted study aid, to use your terminology, with defense counsel?

A.   No.  The first time I ever saw of even a fragmented version of this would have been probably sometime Monday and then received the one that was more fully annotated on Tuesday night.

Q.   When you went up to the stand yesterday to testify, did you have the footnoted version, the original version, which is Defense 31, or did you have both?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1473

A.    I had both.  I had been studying both of them in the hall before I came in, so it was with me.

Q.    Dr. Cunningham, I believe you testified that you spent some 60 hours between February of 2023 and yesterday in preparation for your work on this case and your testimony; is that right, sir?

A.    Yes.

Q.    What did that 60 hours consist of?

A.    Review of the -- well, review of the file and the 900,000 pages of materials, review of my reports.

Q.    I'm sorry.  Did you say 900,000 pages?

A.    No, 900 to a thousand pages of that, of that file, telephone conferences with defense counsel, zoom conferences with defense counsel, then traveling out here in 12-, 14-hour days since I've been here.

Q.    So it was represented that your contract with the federal defenders in Tennessee ended in February of 2023; is that right, sir?

A.    That's correct.

Q.    When did the new contract begin?

A.    I don't have a specific date.  Relatively recently, in that it had to go through a budget process.  It may not have been until August or September.

Q.    So that 60 hours was since August or September that you spent in preparation for this case?

Cunningham, M. - Cross                                              1474

A.   That's correct.

Q.   Does not include your time yesterday or does it?

A.   I think through last night I was at 63.1 hours.

Q.   And so if we take away the eight to ten hours yesterday, the 50 hours of time, if defense counsel is doing all the footnoting for you, what are you doing for that 50 hours, sir?

A.   Also, as I described, I was intensively reviewing this file.  I had conferences with defense counsel, with zoom conferences with additional review of the file.

Q.   How much of the time, and let's say it's 50 hours, was spent preparing with defense counsel?

A.   So there were -- and I can certainly retrieve my billing records to be precise, but there were several zoom conferences that were a couple of hours in length, some preparation review associated with those.  The travel to Norfolk began at about 5:00 a.m. on Sunday, got in about 7:30, met with defense counsel.  It was late in the evening, could have been 11:30.  Began on Monday, I set an early alarm to intensively begin reviewing things again, could have started at 5:00 or 6:00 a.m., and between my own review of materials that day and multiple meetings with defense counsel, that also ran to 9:00 or 10:00 at night, as I recall.

         So that could have easily been a 15-, 16-hour day.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1475

Yesterday was -- I mean, Tuesday was similar to that. Yesterday, again, I got up at 5:00 or so and began reviewing materials and then was here until 7:40, ended up being over sold in the hotel, had to go to a different hotel.  So probably until 8:30 last night.  That was probably another 14-hour day.

Q.  Dr. Cunningham, fair to say that once you got this report that had been footnoted, you did review it, you did use it as a study aid?

A.  I used it as a study aid.  Wasn't as helpful to me as I thought it might, but I used it.

Q.  Did you ask defense counsel to do that, or did they offer to do it?

A.  No.  I described that I was in the process of doing that, of going back to refresh myself on the source of all of the different historical descriptions in the report, and they indicated they might be able to assist with that.  I don't know if they or I suggested that a footnoting system would be one way to -- they could have handwritten notes on the report, typing in footnotes, was clear and easier to follow for all of us.

Q.  Dr. Cunningham, is this a common experience for you to having a report that is annotated by defense counsel and provided to you before you testify?

A.  No.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1476

Q.   Has it ever happened before?

A.   No.

Q.   You mentioned, Dr. Cunningham, that your contract started relatively recently.  I want to drill down a little bit on what you viewed in preparation to be here today, all right, sir.  And I understand you would have reviewed the 900 to a thousand pages of material as you had for your 2015 report; is that right?

A.   That's correct.

Q.   You mentioned some exhibits.  I'd like to get some clarity on what exhibits you reviewed in preparation to come here.

A.   There were no exhibits that I reviewed in preparation to come here.  Tuesday I think defense counsel handed me --

THE COURT:  Excuse me.  The paralegal is here.  You can give whatever you have or what you were asked to get.

You can go forward.  Wait just a minute.  She is talking.

MS. ALI:  I'm sorry, Your Honor.  Just to understand what we have.

THE COURT:  Right now we are on the footnoted report.

MS. ALI:  I understand that the slides are being brought.  They are taking a while to print.

THE COURT:  That's fine.  We will just go ahead

Cunningham, M. - Cross                                          1477

with this.

MS. ALI:  Sure.

THE COURT:  Is that okay?

MS. ALI:  Certainly fine with me, Your Honor.  I was just trying to understand what we had.

THE COURT:  That's fine.

You can go ahead, Mr. Samuels.  We are strictly on this, not on any PowerPoint.

MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Cunningham, going back to, in addition to this annotated report, you said you were given some documents on earlier this week?

A.  That's correct.  I think on Tuesday I was handed maybe half a dozen exhibits that reflected e-mail traffic around my travel out here that I was advised that you anticipated using as exhibits.

Q.  Were you given anything else to review, sir?

A.  I don't recall whether those exhibits addressed anything else besides the e-mail traffic, that they were, like I said, about a half a dozen exhibits that you had provided indicating that you anticipated using those in cross-examining me.

Q.  Were you provided with any exhibits from *habeas* counsel?

A.  No.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1478

Q.  Were you provided with any other information, no matter what the form, in preparation for your testimony today?

A.  So Sunday night I was having software problems accessing that 2015 set of records on my computer because I'd shipped it cloud accounts and couldn't access it.  Defense counsel provided me a link for that same digital file out of their system.

Q.  Any other information that you were given relating to the case or otherwise in preparation for your testimony?

A.  No.  I was advised that there were aspects of my -- of what I had been prepared to testify to that they were not going to review with me.  For example, the transgenerational history, they said, we are not going to review that with you.  Otherwise, there was nothing else about these hearings or process.

Q.  So, Dr. Cunningham, it sounds fair to say that you spent this week, a number of long days, in preparation for your testimony; is that right, sir?

A.  That's correct.

Q.  Number of multi-hour days with defense counsel preparing to be here today?

A.  Yes, and yesterday.

Q.  And yesterday, sir, yes, sir.

    Dr. Cunningham, I'd like to go to your report here and talk a little bit about that.  And what I'd like to do,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1479

sir, is -- I don't know that it matters which we look at this tab or the other one, but these were the list of the sources that you had listed in your report; is that right, sir?

A.   Yes.

Q.   Was there anything else, any other information that you were given to review by *habeas* counsel other than the information that you have listed in your report?

A.   No.

Q.   I'm talking about former *habeas* counsel back in 2015?

A.   Only the reports of Dr. Dudley and Dr. Nadkarni that I had been -- commented on in a supplemental report.

Q.   That was after the fact?  After the preparation of your 2015 report?

A.   That's correct.  That wasn't until early 2023.

Q.   Dr. Cunningham, I'm just going to show you a couple of letters here and see if you recognize them.  This is Defense Exhibit 95.  Have you seen this before, Dr. Cunningham?  Do you recognize this?

        THE COURT:  You said it's Defense Exhibit?

        MR. SAMUELS:  It's a defense exhibit, yes, ma'am.

        THE COURT:  Okay.

        THE WITNESS:  Yes.

BY MR. SAMUELS:

Q.   What is this, Dr. Cunningham?

A.   This is a letter from -- I think it's someone affiliated

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1480

with the *habeas* -- the prior *habeas* defense team describing their observations and experiences as they interviewed David.

Q.  And is this information that you reviewed in preparation for your report?

A.  I did.

Q.  Did you list it on your report?

THE COURT:  I need to get to that.  I've got many notebooks up here.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Number 95?

MR. SAMUELS:  Yes, Your Honor.  Then for the Court's convenience, I was also going to go through 103, 104 and 105, all defense exhibits.

THE COURT:  I've got the notebook.  You're on 95?

MR. SAMUELS:  95, Your Honor.

THE COURT:  I'm on 95.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, this letter is dated July 7th, 2015.  I think your report was dated September of 2015, the one that you signed September 25th.  Does that sound right, sir?

A.  That's correct.

Q.  And so looking at this letter July 7th, does this help you recall how and when you were retained to be involved in doing a report for Mr. Runyon?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1481

A.   That would have been, as I described, I think I was retained in June of 2015.  This is July 2015.

Q.   What were you asked to do at that time, sir?

A.   To identify adverse developmental factors that could have been presented at Mr. Runyon's sentencing phase 2009.

Q.   Did you tell defense counsel that you would be able to do that or was it a, well, let me look at the record and see if there are any?

A.   I was asked to identify what, if any, adverse developmental factors, records and descriptions supported that could have been identified and their implications discussed that were not at his sentencing phase.

Q.   So, Dr. Cunningham, this letter, and let me show you, it's Exhibit 95, it is signed -- it's a several page letter. It's signed by Ms. Chavis from the Federal Defender Services of Tennessee.  Do you see that, sir?

A.   I do.

        MR. SAMUELS:  Your Honor, I'm going to go ahead and offer this, Defendant's Exhibit 95.

        THE COURT:  All right.  It's admitted.

        MR. SAMUELS:  Thank you, Judge.

        (Defendant's Exhibit 95 received in evidence.)

BY MR. SAMUELS:

Q.   Do you see here, Dr. Cunningham, how this letter reviews some information about David?

JODY A. STEWART, Official Court Reporter

A.   It does.

Q.   Did you consider all this information?

A.   I reviewed it.  I did not find it to be applicable to the focus of my evaluation.

Q.   Was there anything in the letter about David that caused you to have any concern about the other self-reports that he had?

A.   Well, I already had concerns about his other self-reports.  There is nothing here in particular that oriented me toward concerns of his self-report in addition to that.

Q.   Well, Dr. Cunningham, you had described yesterday in some detail how you get these sources of information and you review them, and you kind of compare one against the other, and you look for external things, right?

A.   Yes.

Q.   When you are getting a letter from Mr. Runyon's attorney, is that a little more difficult to review because it's coming from a party that's got an interest in Mr. Runyon?

A.   Well, I can certainly consider who it is, who is writing the letter.  I don't know who Ms. Chavis is, whether she is an investigator or an attorney who is on the case.  But I simply find the contemporaneous mental health and presentation descriptions of him and his thought processes not to be part of the focus of my evaluation, which was

Cunningham, M. - Cross                                          1483

historical on those adverse developmental factors.

Q.   So if you got engaged in June, this is July 7th, and your report is at the end of September, that's a pretty tight time frame for doing a report like this, isn't it, sir?

A.   It is.

Q.   Because I think you described for us yesterday that sometimes these reports take six months or a year and a hundred to 130 hours to put together?

A.   Well, that would be if I were tasked with working this up at sentencing.  In a -- and it's different in a federal *habeas* context, particularly if that's going to be records based.

Q.   Dr. Cunningham, have there been other occasions where you've testified in the sentencing phase and then come back and testified as well in a *habeas* phase?

A.   I have.

        THE COURT:  A question came to mind while you were just testifying, Dr. Cunningham.  You said in *habeas* cases it's different, it would be records based?

        THE WITNESS:  It might be.

        THE COURT:  Did you ask Ms. Chavis or anyone from the Federal Public Defender's office where in the record you could verify this information that she sent you, such as he wrote songs for Lady Gaga, and that's in the letter, and he ate large sacks of apples?  Did you ask her where all this

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1484

came from?  I mean, if it's record based for *habeas*, did you check whether any of this was in a record?

THE WITNESS:  No, ma'am.  This is about their experience of his current mental status.  That is not the focus of my evaluation.  The focus of my evaluation was the adverse developmental factors that were historically present and the implications that those had, as well as describing the diagnostic findings of those during neurological and neuropsychological testing or evaluating him for mental illness.

So this description might be something that would be relevant for Dr. Nadkarni or Dr. Dudley and their evacuation of his diagnostic status, particularly for major psychological disorders like schizoaffective disorder, which they identified.  My focus was not a diagnostic evaluation.  It was historical.  This material did not inform that historical evaluation.

THE COURT:  Thank you.

BY MR. SAMUELS:

Q.  Let me next show you, Dr. Cunningham, Defendant's Exhibit 103, looks like a little over a month later.  Do you recognize this, sir?

A.  Yes.

Q.  Was this another letter that had been sent to you containing additional background information?

Cunningham, M. - Cross                                          1485

A.  Beyond the original packet that I was sent.

Q.  And this reflects that it contains a number of different affidavits, some of which are awaiting signature?

A.  Yes.

         MR. SAMUELS:  Your Honor, I'd offer Defense Exhibit 103.

         THE COURT:  That is in another notebook for that?

         MR. SAMUELS:  Yes, ma'am.

         THE COURT:  I'm on 103.

         MR. SAMUELS:  All right.  We would offer that, Your Honor, letter from Ms. Chavis to Dr. Cunningham.

         THE COURT:  That's admitted.

         (Defendant's Exhibit 103 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Cunningham, on the second page we see that Dana Chavis is an assistant federal community defender, that she's one of the lawyers.  Do you see that, sir?

A.  I see that.

Q.  Now, it looks like it indicates that there are these draft -- not draft but unsigned affidavits being sent to you?

A.  Yes.

Q.  And then interview notes but no -- do you know who did the interviews?

A.  Not as I look at this now.

Q.  Okay.

JODY A. STEWART, Official Court Reporter

A.  It may be reflected on that document, but not as I look at it now.

Q.  And then there is actually some substantive information about Scotty Fleming and his relationship to all this.  Did you review that, sir?

A.  I saw that, yes.

Q.  Dr. Cunningham, do you remember, was there kind of a rush to put all this together to get it to you so that you could get your affidavit done by September 2015?

A.  I don't recall the timeline and what pressures there may have been around that timeline.

Q.  Did you follow up on any of these individuals personally or just review the notes or the unsigned affidavits?

A.  I only reviewed the materials.  I did not follow up.

Q.  Do you know who did the materials, who put these affidavits together?

A.  I don't know the specific person.  If this is a federal *habeas* stage, it would be someone with the Eastern Tennessee Public Defenders.

Q.  I was going to ask you, do you know whether the lawyers put the affidavits together or the actual witnesses did?  Do you know?

A.  I've never seen an affidavit that the actual witness prepared in a federal *habeas* or post-conviction context.

        THE COURT:  Well, let me ask you, the declarant,

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1487

the person giving the affidavit has to sign it.

THE WITNESS:  Oh, yes, ma'am.  I mean in terms of, doesn't appear that they handwrote it or typed it themselves.  It looks like one that was prepared, typed for them based on their earlier interview or statement that they then apparently signed.

THE COURT:  They are signed, you are talking about signed affidavits?

THE WITNESS:  Yes, ma'am.  I have seen before instances where the affidavits were unsigned and reflected as such on my records listing.

THE COURT:  But that unsigned affidavit wasn't in evidence, to your knowledge?  I'm not following what you say.

THE WITNESS:  Sometimes in the materials that I review, in post-conviction or federal *habeas*, there may be affidavits or declarations that are not signed or are pending signature.  Others will have been executed.  Very often, before I end up testifying, those affidavits have been signed.

BY MR. SAMUELS:

Q.  Do you know if they were in this case?

A.  I would need to go back and look at them.

Q.  But these references here on Court Exhibit 3, Defendant's Exhibit 31, those seem to reflect the substances of the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1488

letters on Defense Exhibits 95 and 103, correct?

A.  I'm sorry.  I've lost the questions, tracking what you are describing.

Q.  Unartfully phrased, sir.  You see how there is references on the interview binder, for example, to Deborah Seeger and Robert Seeger affidavits, correct?

A.  Yes.

Q.  And those were the subjects of some of these letters that we just reviewed, particularly the letter on Defense Exhibit 95, Deborah Seeger, affidavit awaiting signature; Robert Seeger, the affidavit awaiting signature, correct?

A.  Yes, sir.

Q.  But you don't know without looking whether those were actually signed or not?

A.  My recollection from review of the material is that they were, but I would need to look back at that to confirm it. Typically on my list, if it's unsigned, I'll identify it as unsigned.

Q.  Would you have gotten another letter from defense counsel indicating that the affidavit was signed?

A.  Or provided with that.

Q.  Do you know whether it would have been accompanied by a letter or not?

A.  I don't.

        THE COURT:  Wait.  I'm confused now because in your

Cunningham, M. - Cross                                                    1489

report, when you listed your sources, you listed those individuals. I have to go back to your report, but I recall their names being there. So when you listed there their names, what did you look at? Did you look at files or signed affidavits under oath? Did you look at unsigned affidavits provided to you? In other words, this is dated August 19, 2015, and your report was done, what, in September? I don't have it in front of me.

THE WITNESS: September 25th.

THE COURT: 25th. All right. Between this letter and when you did your report, and you listed those as sources, as I recall, again, I'm doing this from memory because there is so much up here, and I don't have it right now, but I'll get it, I recall that they are in there. Did you use signed or unsigned affidavits?

THE WITNESS: I can't speak with certainty without looking back at that. I know I cite Deborah Seeger in the report with a Bates number so that that specific document could be referenced. Whether the specific document that I'm referencing with that Bates number is signed or unsigned, I would need to go to that Bates number to look.

THE COURT: Would you use an unsigned affidavit to do an expert report? You said you didn't talk to the person, so you'd have to have some information from them, and you've got here on this piece of paper that it was an

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1490

unsigned affidavit sent to you in August.

THE WITNESS:  I would consider an unsigned affidavit that was provided as part of a mitigation packet much like an interview summary that was provided on a mitigation witness interview, that these are the salient points of history provided by that person in the interview.

The accuracy of that is enhanced as that person reviews it and signs it, and says, yeah, that's what I said. But as a summary of a history that may have been taken from that individual, I may use it for that purpose.

THE COURT:  I'm looking at Page 3 now.

MR. SAMUELS:  Yes, ma'am.  I got it on the screen.

THE COURT:  Okay.  The first entries there are the affidavit of Deborah Seeger and the affidavit of Robert Seeger, and yesterday in your testimony you went through that these were the things that you relied on.

Ms. Peiffer put them up on the screen, and you said go to the next, go to the next, and we went all the way to the top of Page 7, and I commented on it being on Page 7 yesterday, and this is what you said that you relied on to form that last opinion that you made yesterday.

Now, did you use a signed affidavit or do you do your expert opinions based upon unsigned affidavits?

THE WITNESS:  Your Honor, I can only answer that it is my custom, instruction to my staff, who assist me, to

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1491

identify the affidavit as unsigned in a reference listing if it is.  I have not committed this entire thousand pages to memory of exactly what was signed and what wasn't.  In this instance it would be easy enough to turn to that record so that this is not simply a memory contest but -- a memory test but, instead, to go to that record and identify if it is signed or not.

BY MR. SAMUELS:

Q.  I'm not trying to make it a memory contest, Dr. Cunningham.

A.  Then if I could take a look at it, I can answer the question.

        THE COURT:  I don't know that there is a signed affidavit.  That's the problem.  I'll just be blunt with you, Dr. Cunningham.  I don't know if there was a signed affidavit.

        THE WITNESS:  Yes, ma'am.  If I could see the digital file or a copy of it, I could identify whether that's the case.

        MR. SAMUELS:  We will take a look at that.

        Your Honor, could I ask a couple of other questions about this list?

        THE COURT:  Keep going.

BY MR. SAMUELS:

Q.  Dr. Cunningham, certainly there were things on here that

Cunningham, M. - Cross                                              1492

wouldn't be signed, right, like those interview notes down 17, those wouldn't be signed, right?

A.   That's correct.

Q.   And the interview with Suk Cha, that wouldn't be signed?

A.   That's correct.

Q.   So declarations, affidavits, would those be interchangeable for you, sir?

A.   Yes.

Q.   And those should be signed, right?

A.   If it ends up being an actual declaration, it would be signed.

Q.   And there would be situations where you start writing your report based on the unsigned document, and then you get the signed one before the report is complete?

A.   That can occur.

Q.   Do you put this -- in terms of preparing these reports, you mentioned your staff.  What role did they have in preparing these reports?

A.   They catalog the reference as they come in and make the listings of them.

Q.   It's 55 pages.  Who types the rest of it?

A.   The rest of it I typed myself.

Q.   Every bit of it you typed from the ending in the listing of the records all the way to the end and the list of references?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1493

A.   That's correct.  I would take their listing of the records that they had cataloged and base that into the report.

Q.   Let me next show you Defendant's Exhibit 104, looks like another letter to you, this time dated September 9th, 2015.  You see that, sir?

A.   I do.

Q.   Again, signed by Ms. Chavis from the federal defender?

A.   Yes.

          MR. SAMUELS:  Your Honor, we would offer 104.

          THE COURT:  All right.  That's admitted.

          (Defendant's Exhibit 104 received in evidence.)

BY MR. SAMUELS:

Q.   Dr. Cunningham, on this one, September 9th, 2015, so that's about two weeks before you signed your report, right?

A.   Yes.

Q.   So this is -- in terms of the process of that, have you started writing the report or do you wait till everything comes in?

A.   Sometimes I have it all as I begin.  Other times I am beginning with what I have and then supplement and revising that with new information.

Q.   Okay.  So we see this again referred to on Page 3 of your report, the declaration of Cat Voss, the declaration of Scott Linker.  Dr. Cunningham, you know who Cat Voss was, don't

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1494

you, sir?

A.  I do.

Q.  You relied in the declaration of Cat Voss?

A.  That's among the materials that I considered.

Q.  Did you look to see whether that declaration was different from the statement of facts that she entered in support of her guilty plea in this case?

A.  It is not the same.

Q.  You don't list the statement of facts there, do you?

A.  Well, I don't know that I've seen the statement of facts. It is certainly different than the evidence would suggest in the case and what she seemed to have pled to.

THE COURT:  I'd like to see those so that I can follow.  I'm looking at what he relied on.  Where is Cat Voss in there?

MR. SAMUELS:  Yes, Your Honor.  This is in the expert report, Page 3, and if the Court looks, it says "Interview binder," and then number 7, the declaration of Cat Voss.

THE COURT:  I see that now.

MR. SAMUELS:  I'm looking to see, Your Honor, whether there was a statement of facts of Cat Voss.

BY MR. SAMUELS:

Q.  Do you recall if one was in here or not, Dr. Cunningham?

A.  I don't recall that.  I simply recall that the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1495

declaration seemed to not accept the degree of responsibility that her plea would suggest.

THE COURT:  The statement of facts would have been filed, and I would just tell you this as a matter of law. The statement of facts entered the matter of record in this case.  Her statement of facts is filed under oath together with her plea agreement, and so that is a statement under oath by the individual.  Did you ever get a declaration under oath from her where you say it's different from her statement of facts?

THE WITNESS:  I did not see the statement of facts. Her declaration seemed inconsistent with what I understood the facts of the case to be.

THE COURT:  The sworn statement of facts is like an official record document.

THE WITNESS:  Yes, ma'am.

THE COURT:  I think you were just talking about what you understood and not what probation said.

THE WITNESS:  The facts of the case today.

BY MR. SAMUELS:

Q.  Dr. Cunningham, of course, a lot of the items on your list here were not prepared or completed until 2015 or at least after 2009; is that right?

A.  That's correct.

Q.  Some of it was in existence in 2009, but certainly some

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1496

of these affidavits and declarations that you're getting

right up until the time your report is done, they're not done

until 2015?

A.   That's correct.

Q.   You don't know how they were done, who participated in

those interviews to complete those affidavits?

A.   Sometimes the author of it -- well, yeah, I don't know

how the affidavits were done.  I would have thought you were

going to introduce those.

        THE COURT:  So that the record is correct, on the

exhibit that was just entered, 104, and I'm not saying you

admitted it, I just saw it and wanted to put it on record.

It does review a Deborah Seeger declaration and a Robert

Seeger declaration that was signed and replaced the Bates

number.

        MR. SAMUELS:  Yes, Your Honor.  I see that, too.

        THE COURT:  So apparently from this letter there

were declarations, or at least that's what this says.

        THE WITNESS:  Yes, ma'am.  It may be that the

affidavits were unsigned and then replaced by the signed

declarations.

        THE COURT:  Well, that's what the letter says.  I

haven't seen that, to my knowledge.  I haven't seen any

declarations.  I just wanted the record to be clear that on

the next letter, September 9, Ms. Chavis does reference a

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1497

signed declaration by each of the Seegers.

BY MR. SAMUELS:

Q.  And the last one of these letters I'd like to show you, Dr. Cunningham, is Exhibit 105.  Do you see that?  I'm sorry, sir.  I have the wrong one.

Dr. Cunningham, do you recall getting the interview notes of Mr. Dombrowski pretty close in time to when you completed your report, sir?

A.  I do.

Q.  And the Dombrowski meeting notes, are those the source of what we see here like beginning on footnote 96, is that from those meeting notes?

A.  Yes.

Q.  And so that material that's provided in September of 2015 --

THE COURT:  Let me have you pause.  If you will back up to the top of the sheet of the page so I can see number 96.

BY MR. SAMUELS:

Q.  Yes, sir.  On federal *habeas* interview?

A.  Yes.  That is probably preferring to and the LeBarbara history was provided in that 2015.

Q.  That's a set of notes that you got in September, just about two weeks or so before your report was finalized; is that right?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                        1498

And I found what I need.  Your Honor, this is part of Exhibit 105, the letter to Dr. Cunningham.

Do you see that, sir?

A.  I do.

Q.  Letter September 18th, 2015, to you and including those Dombrowski interview notes and a Maria Runyon declaration. Do you see that, sir?

A.  I do.

Q.  And you considered both those notes and the declaration as part of putting your report together?

A.  I did.

Q.  The Dombrowski meetings notes were sent to you on September 18th.  Your report was signed a week later, September 25th?

A.  Yes, sir.

Q.  And so as we see here, this forms the basis for a number of pieces of information just on this page, right?

A.  Yes.  Each sentence -- it's all the same story about LeBarbara, and that sort of thing, but each sentence is separately footnoted.

THE COURT:  You've got to talk about what page you're on and what exhibit.  Now you are back on the footnoted version, which is Court Exhibit 3?

MR. SAMUELS:  Yes, Your Honor.  I'm sorry.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1499

Q.  I'll start on Court Exhibit 3, it's page -- it starts on Page 19 with footnote 96, which is the Dombrowski name.  You recall we discussed that, Dr. Cunningham?

A.  Yes.

Q.  Then it continues on to the next page, which is Page 20, we see a break on 125, but then on 126 it picks up with Dombrowski meeting notes.  Do you see that, sir?

A.  I do.

        THE COURT:  Count the number of entries, please.

        MR. SAMUELS:  Yes, Judge.

        THE COURT:  I'm asking Dr. Cunningham.  It says study.  Study.  What is it?

        THE WITNESS:  Study aid.

BY MR. SAMUELS:

Q.  How many footnotes are contained on Page 20 that relate to the Dombrowski notes that you got a week before your report was signed?

A.  If you will push the page up just a little bit.

        THE COURT:  First of all, it starts on Page 19.

        MR. SAMUELS:  It does, Your Honor.

        THE COURT:  It starts on footnote 96 and 97, and then it goes to Dombrowski meeting.

        THE WITNESS:  There are about 15 on Page 19.

BY MR. SAMUELS:

Q.  Then if we move over to Page 20, do those continue on

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1500

Page 20 as well, sir?

A.   Yes.  There are 11 on Page 20, and then it picks up again with two more.  There are 13 on Page 20.

Q.   Then on Page 21 --

THE COURT:  Wait.  Please.  I count 12 from 113 to 124.

THE WITNESS:  Then we pick up with two more.

THE COURT:  Yes.  I count 12, not 11, is what I was saying.

MR. SAMUELS:  Yes, Your Honor.

THE WITNESS:  My subtractions or additions.

THE COURT:  Mine is not that good either, so I wanted to be sure.

THE WITNESS:  These simply reflect that number of sentences because every sentence is footnoted.  There were 19 sentences about this story on one page and 14 sentences about this story on the next page.

THE COURT:  Then on Page 21.

THE WITNESS:  There are more, yes.

THE COURT:  How many there?

THE WITNESS:  That is 16.

BY MR. SAMUELS:

Q.   The entire page, right, sir?

A.   Yes.

THE COURT:  I count 17.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1501

THE WITNESS:  17.

BY MR. SAMUELS:

Q.  This is Page 22, sir.  They continue.  Dombrowski is the source for all this information?

A.  Yes, and that would be 19 sentences.

Q.  I would withdraw them, Dr. Cunningham, but it's fair to say that he's the source for -- for the pages we looked at a good bit of information in here?

A.  He is the source of -- as I testified, he is the source of all of the information about the paternal family system, either to Sheila Cronin or the federal habeas counsel.  The only source providing paternal extended history is Dombrowski.

Q.  So my point is, sir, that letter with his notes was sent to you on September 18th.  So you probably got it thereafter, right?

A.  Yes.

Q.  And then you were able to take and incorporate that all into your signed report and your findings within a week's time?

A.  Yes, sir.

Q.  And did you do any verification of the information that he provided?

A.  Not independently, no.

Q.  And you didn't have a signed declaration or affidavit

Cunningham, M. - Cross                                          1502

from him?

A.  I did not.

Q.  You just had notes that were done by the same agency and attorneys that were representing, whether it's the attorneys that are investigators, that are representing David Runyon?

A.  That's correct.

            THE COURT:  This is all out of the Public Defender's office of Tennessee?

            THE WITNESS:  Yes, Your Honor.

            MR. SAMUELS:  Your Honor, this letter that I have showed Dr. Cunningham was part of Exhibit 105.  I'll find it in just a moment here.

BY MR. SAMUELS:

Q.  But, Dr. Cunningham, you agreed that you were sent that information on September 18th?

A.  Yes.

            MR. SAMUELS:  I'm sorry.  This is part of 105.  I'd like to admit that page, Your Honor.

            THE COURT:  The whole exhibit consists of that page in my book.  105 has a letter dated September 18th to Dr. Dudley, dated September 18th to Dr. Cunningham, and September 18th to Dr. Merikangas.  Then it also has September 18th to Dr. Mirsky with the Dombrowski, and then basically the Bates number on that attachment starts at 937. This is what is all in my exhibit.  It goes to 955.  It ends

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1503

with the signed declaration of Maria Runyon.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Do you want the whole thing?

MR. SAMUELS:  I just need that page, but it doesn't matter.  If it is clearer to submit the whole thing, that's fine.

THE COURT:  I think it's cleaner to admit one page.

MR. SAMUELS:  That's fine, too, Judge.

THE COURT:  So you want this letter, September 18th, 2015, to Dr. Cunningham admitted?

MR. SAMUELS:  Yes, ma'am.

THE COURT:  What would be the next exhibit number for the government?

MR. SAMUELS:  I believe it is 131, Your Honor.

THE COURT:  All right.  That would be 131.

MS. PEIFFER:  I'm sorry.  Just to clarify, it is just Page 2.

THE COURT:  That's all he wants admitted is the September 18th -- if you want to admit others, you can.

MS. PEIFFER:  Okay.  But just Page 2?

THE COURT:  He is just admitting Page 2.

MS. PEIFFER:  All right.

THE COURT:  So that will be Government's Exhibit what, madam clerk?

THE CLERK:  131.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1504

THE COURT:  All right.  Do you have that?

THE CLERK:  Yes, Your Honor.

MR. SAMUELS:  Thank you, Judge.

(Government's Exhibit 131 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Cunningham, going back to your report, which I'm showing you is Court Exhibit 3, did you review -- you talked about the notes of Mr. Dombrowski.  Did you review trial testimony from him as well?

A.  I did.

Q.  Okay.  And how about trial testimony from Suk Cha Runyon and Maria Runyon?

A.  I did.

Q.  Did you review any Grand Jury testimony?

A.  Not that I recall.

Q.  Was any Grand Jury testimony provided to you?

A.  Not that I recall.

Q.  Now do you remember yesterday, sir, you testified that Maria Runyon was the source for some of the information about David having a changed personality?

A.  Yes.

Q.  So if she had testified in the Grand Jury that it was not the accident but his frustration over the fact that he was hit that resulted in the change.  That is not something you have seen, sir?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1505

A.  It's not.

Q.  Would you have wanted to see all her statements if she provided different information before the Grand Jury than in how she testified at trial or provided in a post-trial declaration?

A.  Yes.

Q.  What direction or request had you given the federal defenders in terms of what information to provide to you, sir?

A.  I don't recall making a request for Grand Jury testimony or even being aware that it existed.

Q.  Let me show you what's been marked as Government's Exhibit 126.

        This has not been put into evidence yet, Your Honor. It's a new document.

        Do you see this exchange, Dr. Cunningham, from Mr. Woodward and Mr. Hudgins in June of 2009?

A.  Give me just a minute to look at it.

Q.  Yes, sir.

        MS. PEIFFER:  Objection to foundation.  It goes to -- that Dr. Cunningham ever saw this document before.

        THE COURT:  That's what he just asked him.  He just asked him had he seen it.  That's exactly the question that he asked.

        MS. PEIFFER:  Exactly.  There is no evidence that

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1506

he had, so for him to testify about this information.

THE COURT:  He hasn't asked him to testify about the information yet.  He's asking if he saw the document. It's a document that you all produced, let's just put it, the overlooked discovery during the first phase where we had to continue everything to today, the however many bankers boxes that were found in closets.  You were asking him was he given this document?

MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  For the record, it's stamped Runyon 0AF 4602, and then it is also stamped DR 1332, indicating that it was a recent disclosure to us.

Have you seen this, Dr. Cunningham?

A.  No, not that I recall.

Q.  Sir, this has some information about Maria Runyon and Robin Carroll.  Would you have wanted to know this background information about these two individuals, because they are listed on your sources for your report?

A.  Certainly additional context about them would be helpful in evaluating their observations.

MR. SAMUELS:  Your Honor, I'd offer 126.

THE COURT:  126 or 125?

MR. SAMUELS:  It's 126, Your Honor.

MS. PEIFFER:  Objection.  Dr. Cunningham was not

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1507

the author of this document.  He didn't see this document, and he can't -- it's hearsay.

MR. SAMUELS:  Well, Your Honor, I think we can wait till Mr. Woodward comes.  If the Court wants, we can conditionally admit it, but I do think this was a document that we got late.  We couldn't ask Ms. Cronin about it.  We couldn't ask Mr. Hudgins about it.  There is no issue as to the authenticity of the document.  The point is that it contains information about two individuals that are in Dr. Cunningham's report that he never saw.

THE COURT:  At this point I'll conditionally admit it, if you're requesting authentication, and Mr. Woodward can come in and authenticate the document, and so you can ask, assuming you had this information.  Hypothetical question is appropriate to an expert.

MR. SAMUELS:  Thank you, Judge.  We will follow up with that as well with Mr. Woodward, although my understanding is, and that's what I point out these Bates number, I think we had agreed that these documents did come from attorney files that were provided late to the United States.

THE COURT:  Well, I think that she's not contesting that.  She's shaking her head that she is not contesting. She is contesting that it was produced to you.  She's contesting the proper authentication of it.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                  1508

MR. SAMUELS:  Yes, Your Honor.  Again, I'm just offering it for whether it's information Dr. Cunningham considered or would have wanted to know.

(Government's Exhibit 126 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Cunningham, going back to your report, you had also considered the sentencing phase transcripts; is that right, sir?

A.  That's correct.

Q.  Did you look at anything on the guilt phase, sir?

A.  Just the summary of the closing arguments.

Q.  Wouldn't you have wanted to know what the jury based its determination on, that Mr. Runyon had engaged in substantial planning?  Was that not important to you?

A.  It isn't that it's unimportant.  It was outside the focus of my evaluation, which was looking at adverse developmental factors.  The jury's determination of the quality of planning that he engaged in might be different from my own evaluation of the sufficiency and judgment associated with his plan.

Q.  Sir, I'm not asking you about the jury verdict, I'm just asking you if it would have been important for you to see evidence that was presented?

A.  No, sir, not necessarily.  It depends on what I was tasked to do.  If I was tasked to evaluate his mental state at the time of offense, then that information in great detail

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1509

could be very important.  As I'm evaluating adverse developmental factors that had a formative influence on him and their implications of the offense detail, doesn't inform that history.

Q.  It was not important to you to look at the evidence on what the defendant's conduct was in the crime; is that what I understand, sir?

A.  No, sir.  I haven't said that.  The degree of detail of reviewing the guilt phase was not necessary for me to have, to develop an understanding of his basic participation in this crime.

Q.  Let me show you next, Dr. Cunningham, what's been admitted as Government's Exhibit 63.  This is the report of Dr. Merikangas, sir.  Now, you did review this report, right?

A.  I did.

Q.  And this reference on here to delusions caused by experimental drugs, did you review any lists of the drugs that had been provided to the defendant in his work as a research subject?

A.  I did.

Q.  Did you review any other records from the drug companies where Mr. Runyon would have indicated what his health or medical status was?

A.  No.

Q.  Were those not provided to you, sir?

Cunningham, M. - Cross                                          1510

A.  Not that I recall.

Q.  And, Dr. Cunningham, were you aware -- you had reviewed the information from Suk Cha Runyon, including her background; is that right, sir?

A.  That's correct.

Q.  Had you reviewed the trial transcript where she was prohibited from going into that background?

A.  Yes.

Q.  Let me show you, Dr. Cunningham, what's been marked as Government's Exhibit 92.  You see this, sir?

A.  I do.

        MS. PEIFFER:  Objection.

        THE COURT:  He said he'd seen it.

        THE WITNESS:  No.

        THE COURT:  Are you talking about number 92?

        MR. SAMUELS:  Yes, Your Honor.

        THE COURT:  He said he's seen it, and he looked at Dr. Merikangas on his list of things that he relied upon.

        THE WITNESS:  I haven't seen this memo, Your Honor. I saw Dr. Merikangas's report.

        THE COURT:  Then he didn't see this.

        THE WITNESS:  I don't recall having seen this memo. I'd have to look back at my listing.  I don't recall it as I look at it now.

        MS. PEIFFER:  Objection.  This is double hearsay,

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1511

Your Honor.  Dr. Cunningham's just testified him not seeing this memo to file.  He is not mentioned in the file, and it's not -- I'm sorry in the memo, it is not about him.  It is about a call reportedly to Dr. Merikangas.  And Merikangas's alleged statements to trial counsel are out-of-court statements, and the author of the statement in the memo is another out-of-court statement and has nothing to do with Dr. Cunningham.

MR. SAMUELS:  Judge, it is not offered for the truth of the matter asserted, but I'm entitled to ask him what he reviewed, what he considered, what he obtained with respect to the other experts in the case.  This, of course, is the document that we got that resulted in the lengthy continuance here.  I don't think there is an authentication issue, but I'm certainly going to ask Dr. Cunningham did he look at this very contrary opinion from Dr. Merikangas.

THE COURT:  I'm going to let you do it because this whole matter has ended up revolving around Dr. Merikangas and what was withheld in regard to him by petitioner's counsel, and if he saw it, he did.  If he didn't, he can say he didn't, and he can read it and ask if that would have made a difference.  He can always be asked a hypothetical question.

So go ahead.

MR. SAMUELS:  Thank you, Judge.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1512

MS. PEIFFER:  Can I add one thing, Your Honor?

THE COURT:  Yes.

MS. PEIFFER:  What we could contest, I understand what you are saying about discovery issue, but to show an unrelated witness this memo, that is not an appropriate remedy for a discovery violation.  The Court should focus on prejudice and -- the hearsay exception is not the way to remedy a discovery violation, and that's what the government is asking to do by showing Dr. Cunningham this memo to file.

THE COURT:  He is saying he relied on Dr. Merikangas, and yet he did not get all the materials and things that Dr. Merikangas had said due to the discovery violation.  Dr. Merikangas can testify as to this, but I'll listen to this witness's testimony, and if it would have made a difference to him, and it goes to his credibility and whether he would form the same opinion.  In any event, I'm saying that he can testify to it, and you can get it in if you want through Dr. Merikangas.  He can say the conversation happened or not.

MR. SAMUELS:  Your Honor, just for clarification, it's a memo that we got from the discovery violation from Mr. Hudgins' file reflecting the phone call with Dr. Merikangas.  Of course, I can't now ask Mr. Hudgins about it.

THE COURT:  I understand that.  This was when

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1513

Mr. Hudgins was just totally taken back when Ms. Chavis told him he had his file, and he said, "You have my file?"  And he asked to see it, and he wasn't given it.  In any event, I've made my ruling.  I'm letting the questions go forward under this situation in the case.

MS. PEIFFER:  Just to preserve for the record, Your Honor, Dr. Merikangas did not write this memo, so it doesn't necessarily represent -- and the government will have an opportunity to ask him any questions about this, but at this point the record does not reflect that this was created by Dr. Merikangas or that Dr. Merikangas said these things.

THE COURT:  Well, I'll conditionally admit this testimony, and after Dr. Merikangas testifies, you can move to strike his testimony elicited, if you so desire, by Mr. Samuels of Dr. Cunningham.

MS. PEIFFER:  Yes, ma'am.

MR. SAMUELS:  I want to ask Mr. Woodward about this, as well, Your Honor, because he is referenced too.  I would ask the Court to withhold the ruling until he testifies.

THE COURT:  I will conditionally admit this testimony that you're eliciting so he won't have to come back over this one thing, if you want him back, because he may already have to come back.  So I will conditionally allow the testimony.  They can move to strike it after the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                        1514

testimony of Dr. Merikangas and/or Larry Woodward.

          MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Cunningham, in the time we have been discussing this,
have you had a chance to review this at all?

A.  Quickly.

          THE COURT:  I saw you reading it.

          THE WITNESS:  Yes, ma'am, I was reading it.

          THE COURT:  Just a paragraph.

          THE WITNESS:  Yes.

BY MR. SAMUELS:

Q.  Sir, would this have been -- if this information had come
from Dr. Merikangas, would you have wanted to know this?

A.  Yes.

Q.  Was this provided to you, sir?

A.  No.

Q.  Would this have any effect on your opinion, sir?

A.  It would raise questions about how to interpret his
findings and report, if this seems to disavow that.

Q.  Thank you.  Dr. Cunningham, you had referenced a number
of materials from Dr. Nelson.  Do you recall that, sir, and
we discussed it previously?

A.  Yes.  Well, two materials from Nelson.  There was a
preliminary report and also MMPI-2.

Q.  Let me show you Government's Exhibit 22, which is also

Cunningham, M. - Cross                                          1515

not in evidence yet.  Dr. Cunningham, did you ever get a set
of notes from Dr. Nelson?

A.   No.

Q.   And these notes go a number of pages, reflecting some
interviews by Dr. Nelson with David Runyon.  Would you have
wanted to have that, sir?

A.   Yes.

Q.   Would that have been helpful to you in undertaking your
evaluation?

A.   I would like to have been able to consider it.

Q.   Dr. Cunningham, I'm almost through here, sir.  I did want
to ask you, but I don't want to spend a lot of time on these.
If I could show you a new exhibit, Government's Exhibit 107.
If it's easier to look at the book in front of you, sir,
that's fine.  Do you recognize this as one of your bills in
the case, sir?

A.   I do.

Q.   And it's a number of pages, but let me just flip through
some of them.  Do you recognize this as additional billing?

A.   Yes.

Q.   And I think we've also got some billing.  This may have
been that case sheet you were talking about; is that right,
sir?

A.   That's correct.

Q.   And that shows that the rate you were approved at $300 an

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                              1516

hour for 15,000 total approved?

A.   That's correct.  The case sheet doesn't have any yellow
highlighting on it, but that otherwise reflects the case
sheet.

Q.   And the original doesn't have highlight either, Your
Honor.

     And this would have been completed in October just
when you were retained, sir?

A.   It was originally filled out in October.  At a later
point Jon Babineau was crossed out, and the note says
conflicted out 2-23-09.

Q.   Okay.

A.   And Steve Hudgins' name is written in, the replacement.

          THE COURT:  What exhibit are you on?

          MR. SAMUELS:  This is on 107, Your Honor.  It's a
number of materials that we got related to Dr. Cunningham.

          I won't go through it page by page, but I just
wanted to show you enough to have you be able to identify
it, sir.

          THE COURT:  Yes.  I haven't seen the cross-out.  I
guess it's on a later page.

          MR. SAMUELS:  Yes, Your Honor.  It would be on Page
13, Your Honor.

          THE COURT:  That's fine.  I see it now.

BY MR. SAMUELS:

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1517

Q.  Then, Dr. Cunningham, we see the list of materials that you reviewed, sir?

A.  Yes.  As provided -- that was the records we had in our possession as of November 19th, 2008.

Q.  Sir, is that what you were able to use to do that 2009 report, sir?

A.  I've added additional records that were provided from the Portsmouth City Jail and also eventually the Newport jail. There may have been some additional record that was in the interim.  I don't recall.

Q.  Sir, again, I'm just -- I want to move this along, but this just reflects some records that you did in January of 2009?

A.  That's correct.

Q.  This is what I wanted to show you, Dr. Cunningham.  So this bill on February 2009, this would reflect the work that went into that report that you did; is that right, sir?

A.  If I could see the last billing sheet as well.

Q.  Of course.  The one for January, sir?

A.  Yes.

Q.  If you will just give me a moment, I'll find it.

        THE COURT:  Do you have it in front of you?  Do you have your binder in front of you?

        THE WITNESS:  I have -- I don't know if I've -- is that what you have here?  Is this the binder?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1518

          MR. SAMUELS:  That is the binder, and the exhibit is 107, sir.  I think I've got what you are looking for on the screen, if that's helpful.  The January billing that you wanted to see, Dr. Cunningham, is on Page 11.

          THE WITNESS:  I was looking back to see what time I had spent in the file prior to that.

          MR. SAMUELS:  Yes, sir.

BY MR. SAMUELS:

Q.  Again, this is the order in which we got it, so there are some records for November, but those would be probably further on.

A.  I have arranged these same materials in chronological order.  Could I look at my own?

Q.  Of course.  I can show you on the screen your November billing, if you'd like to see that, sir.

A.  I will just look back at the invoice history.

Q.  No problem.  Dr. Cunningham, I assume you just have the invoices for 2009, not the ones for '15 or '23?

A.  That's correct.

          MR. SAMUELS:  Your Honor, while he is looking through, I would offer Exhibit 107, the records related to Dr. Cunningham.

          THE COURT:  All right.  I'll admit those.

          MR. SAMUELS:  Thank you.

          (Government's Exhibit 107 received in evidence.)

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1519

THE WITNESS:  The time that I have spent in records review in November associated with going out to Norfolk and also then reviewing the file afterwards, that would have been incorporated into my preparation -- or that would have been also a part of my preparation for providing the report that I submitted on February the 5th.

Then I reviewed records for a short period of time in mid-January.  Then on February the 2nd, I am sitting down to actually put the record together over those few days, over the 2nd, 3rd, 4th and 5th, but that would have also benefitted from the earlier time that I had spent with that record back in November.

BY MR. SAMUELS:

Q.  And back in November, sir, as you referenced, it looks like you were flying out there -- flying up here, I should say, to Norfolk to prepare to interview David Runyon on November 20th, 2008?

A.  That's correct.

Q.  But that interview got waved off?

A.  That's correct.

Q.  That was decided when you got here?

A.  I don't -- I didn't know about it until I got here.  What had been decided in advance, I can't speak to.

Q.  You were just informed you would not be interviewing him?

A.  Yes.

Cunningham, M. - Cross                                          1520

Q.  And the interview you were going to do was a risk
assessment interview?

A.  For prison, risk assessment for prison.

Q.  I see.  And so then we jump forward to January, we've got
the review of the records for 20 minutes, and then we've got
some additional time where you actually do the report; is
that right, sir?

A.  That's correct.

Q.  Okay.  Dr. Cunningham, getting back to the 2015 report,
and we are wrapping up here, you had reviewed the materials
on Suk Cha Runyon, David H. Runyon, and David Dombrowski,
correct?

A.  Yes.

Q.  And as you testified yesterday, you had found Suk Cha to
be damaged, I think is the word you used; is that right?

A.  Yes.

Q.  And I think you found his adoptive father and his
biological father to be damaged as well?

A.  I don't know that I would characterize David H. as
damaged but rather interpersonally limited, relationship
limited.  Dombrowski I would consider damaged.

Q.  And, Dr. Cunningham, you read their trial testimony,
particularly Suk Cha's?

A.  I did.

Q.  And do you remember how she ended her testimony?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                    1521

A.   With a plea of sorts, as I recall.

Q.   And yet you would have come in here and told the jury that she was damaged?

A.   Well, yes, sir.  Her plea or wanting to get a word in at the end doesn't rebut whether or not she is developmentally damaged and whether or not she was quite limited as a mother as a result.

Q.   Going back to your report one last time.

          THE COURT:  One thing.  As I recall, one of the mitigators that the jury found was, you know, his need to be with his family or something like that.  They found the family mitigator in there for him, and she had made a plea, a parent's plea, or whatever you want to call it, for one of the mitigators.  So damaged or not, the plea must have had some effect on the jury because she was the key family member who, says here it is now on the screen, "Suk Cha Runyon, the mother of David Anthony Runyon, will suffer emotional harm if her son is executed.  Number of jurors to find, 12."

          THE WITNESS:  That's correct.

BY MR. SAMUELS:

Q.   Dr. Cunningham, did you review all the trial testimony and just the sentencing phase in the case, sir?

A.   As I testified, I would have reviewed the sentencing phase.  I reviewed the closing arguments of the guilt phase.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                                1522

Q.   Do you remember who the last defense witness was in that case?

A.   I don't.

Q.   Looking down to the bottom, do you see Phyllis Provost, sir?

A.   I do.

Q.   Do you recall her testimony, sir?

A.   Not with specificity.

Q.   Did you consider it?

A.   As I prepared my report, I considered all of this information.  I don't recall her having observations about his developmental period, although I would need to look back at that testimony.

Q.   Do you recall if she had observations about what his current status was, sir?

A.   My recollection was her observations were more of him as an adult than --

        THE COURT:  More what, I'm sorry?  I couldn't hear you.

        THE WITNESS:  More of him as an adult as opposed to his developmental period that I was primarily focused on.

BY MR. SAMUELS:

Q.   Do you recall what her observations were of him as an adult?

A.   I would need to look back again.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1523

Q.  Showing you her transcript from August 25th, Phyllis Provost, direct.  Do you see there when she is asked how does he interact with three children?  "Very patient.  With David what you see is what you get.  A genuine person.  He was so openly caring, very patient.  He was patient with John as well."

A.  I see that.

Q.  And you reviewed that?

A.  I did.

Q.  And then on the following page, 25 and 22, line 9, she is asked, "What did David Runyon do that was significant to John, their autistic son?"  She described to me, "Accept him as he was, and he was patient.  He relaxed himself, his body posture, and he would be welcoming and accepting of John."  Did you review that?

A.  I did.

Q.  And then lastly, sir, Ms. Provost was asked at the end of her direct examination if she could describe for the jury David Runyon, the characteristics of him, would you want to be aware of?  Did you see her response and consider that?

A.  I did.

Q.  And do you see how she says on line 9 that he was living his life in gratitude, he was a joy to have around, quiet, gentle, fun, generous, kind.  Those are the words that come to my mind when I think about him.  He wanted to help.

JODY A. STEWART, Official Court Reporter

Did you consider that?

A.  I did.

Q.  Dr. Cunningham, would it be fair to say that that description of David would have been different than the one that you provided of him as the product of a damaged family?

A.  No, sir, I don't consider it so.  I think that David, like many people, is like Swiss cheese.  There is cheese, and there is holes.  The holes in his life are very significant and a result of identifiable adverse factors that I have specified.  I recognize that there are also -- there is also cheese.  He kept striving to go to school, be in a relationship, get a job, interact with children.

So it wasn't as if he wasn't trying and didn't have cheese that he was working with.  The holes were simply present, as well, and ultimately tragically.

Q.  You say all this without ever interviewing him?

A.  That's correct.

Q.  And without ever interviewing any of these family members that had these influences on him?

A.  That's correct.

MR. SAMUELS:  Your Honor, may I have just one moment?

THE COURT:  Yes.  I've got to do an *in camera* review of the PowerPoint, and I think they have copies of it now.  So it might be a good time to take a quick break so I

can review it and decide how we are going forward with it.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I've got a copy of the notated PowerPoint that was done in February of 2023.  Have you ever seen this?

MR. SAMUELS:  I have not, Your Honor.

THE COURT:  Well, we will take a 15-minute recess, and I will review this and decide how we will proceed.

MR. SAMUELS:  Yes, Your Honor.

(Recess from 3:44 p.m. to 4:09 p.m.)

THE COURT:  The first thing that I'm going to start with is Federal Rule of Civil Procedure 26(a)(2).  It's called disclosure of expert testimony.  I won't read the whole rule.  I would hope that you all would have been familiar with it, but apparently it has been broken many times thus far in the case.

It talks about disclosure of expert testimony, and witnesses who must provide a written report.  So (2), and that goes down to (B), and it says here, "A complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; any exhibits that will be used to summarize or support them," i.e., a demonstrative Exhibit; "the witness's qualifications, including a list of all publications...a list of all of the cases in which,

Cunningham, M. - Cross                                          1526

during the previous four years, the witness testified as an expert at trial or by deposition; and a statement of the compensation to be paid for the study and testimony in the case."

So at a threshold level, focusing only on this demonstrative exhibit, and as you can see, this obviously supports the disclosure of any of the sources, the basis for the reasons of the opinion. There are other requirements that you have to list, treatises, and things like that. But, in any event, it certainly goes to this, we will call it the study guide, is that what it was called?

THE WITNESS: Study aid, Your Honor.

THE COURT: I just never heard that term before, but it certainly applies to the study aid that was annotated with footnotes of the basis for the opinion and the source of that opinion. More importantly, it relates to this demonstrative exhibit, this PowerPoint. That is certainly an exhibit that's been used to summarize and support the opinion. That's exactly what it is, a demonstrative exhibit that's being used to summarize or support the opinion. The opinion is evidence, and this exhibit supports or summarizes it.

If you look at the demonstrative exhibit, it fits that definition.

You look so puzzled, Ms. Peiffer?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1527

MS. PEIFFER:  Your Honor, I disagree but I'm just waiting to respond.

THE COURT:  Well, go ahead and disagree after I've ruled, but, in any event, I find that it does fall within demonstrative exhibit, and it does fall within a disclosure that should have been made.

First of all, it is clear that this first exhibit, the one that has the questions on it, three things:  Number one, it was prepared in February of 2023, so it should have been produced in the discovery before.  Certainly should have been produced by the discovery deadline here.

So I see no reason why it was not produced until the evening before or the day of to the Court, evening before to the other side.  This exhibit contains more slides.  This particular exhibit is 174 pages.  Obviously, some of the pages have been deleted from the PowerPoint.

Then it is clear that what has been used in setting up the PowerPoint, there is a note section, I'll call it. The Court is familiar with that.  The note sections are part of the PowerPoint.  It's just you can annotate it below.  I actually went on the computer and looked at how this is done.  I went through it with my law clerk.

So this was part of the PowerPoint, suggested questions.  So these questions would lead the Court to think that, well, Dr. Cunningham, in this way is saying this is a

Cunningham, M. - Cross                                        1528

question that my PowerPoint -- that my testimony elicits. And certainly, as far as I'm concerned, this is an exhibit that should have been produced before the February hearing, and certainly if late produced, it has now been edited.  It is shorter.  I'm not saying there is anything wrong with the edits.  I have compared the pages here, and there are more pages in the first exhibit than there are here.

But this has been trimmed down, but it is duplicative in many respects of the first one, which if the case had gone forward without the previous discovery violations, this should have already been produced in discovery under the rules, and it wasn't.

So, consequently, there was a discovery violation in regard to this document, which is 11 -- that has been run today, 11-2-23 that's at the top.  But it was prepared with a copyright symbol, Mark D. Cunningham, February 2023, and I'm going to hand this to Dr. Cunningham and ask him to identify this as what he did give to the attorneys in February of 2023 for the hearing then.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Would you have e-mailed to them?

THE WITNESS:  I would have.

THE COURT:  This is not accompanying an e-mail but apparently it would have been e-mailed.  That's the metadata section; is that correct?  In other words, you got your

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1529

PowerPoint, then you put your metadata in?

THE WITNESS:  I don't know that you would call it metadata, Your Honor.  It's just part of the note pages.  So you can either pull up the note pages individually, like that reflects, or on any given PowerPoint slide, if you drag up the bottom of it, there is a place that you can type in notes.

THE COURT:  I used the term "metadata."

THE WITNESS:  As I understand, a metadata is what you can't actually see in front of you but it's somehow digitally buried inside the file.

THE COURT:  This you can actually see.

THE WITNESS:  This is right there.  This is overt data.

THE COURT:  So this is overt data.  This was sent to counsel, petitioner's counsel in February of 2023.  As far as I'm concerned, it's part of the discovery that should have been produced; and moreover, there is no excuse for having then given the PowerPoint to the Court the day of the presentation, but, more importantly, to the United States Attorney the day before.  I'm going to have this exhibit, with the overt data on it, and this was all prepared by you?

THE WITNESS:  It was.

THE COURT:  As being prepared by Dr. Cunningham, and you sent it to them for the February 2023 hearing?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1530

THE WITNESS:  That's correct.

THE COURT:  It was prepared by Dr. Cunningham.  It was sent to petitioner's counsel for the 2023 hearing, and this is his work on here, and it's his questions.  To the extent they match, I don't know.  I haven't gone back and looked at notes or a transcript or anything such as that. So I don't know whether the questions match or follow Ms. Peiffer's questions.  All I know is that the questions are on here.  They were overt.  They were part of the document that he produced.  He produced it to petitioner's counsel in discovery for discovery and the previous hearing, and it was not produced, and I would find that it should have been, and it is yet another discovery violation.

Under the rules, it is supposed to be produced, and so, consequently, this is going to be Court Exhibit Number 4.  If there is something you want to add to this, Ms. Peiffer, before I have a copy given to the United States, you need to come to the podium and let the Court know.

(Court Exhibit 4 received in evidence.)

MS. PEIFFER:  Thank you, Your Honor.  Just briefly, a couple of points, Your Honor.  The first is that the slide or the PowerPoint we are talking about are not discovery. The discovery order was about trial counsel's files, and these have nothing to do with trial counsel's files, since

JODY A. STEWART, Official Court Reporter

they weren't created at any time before the trial.  They have nothing to do with the discovery order.  They were not produced in discovery because they were not subject to that discovery order.

THE COURT:  Let me stop you for a minute.  You are always, under Rule 26, it's called duty to disclose a general provisions governing discovery.  So you're saying now that you're not controlled by the Federal Rules of Civil Procedure and Rule 26 of the discovery rules?  A lot of courts don't even issue discovery orders.  They just say the federal rules are in effect.  Are you saying you are not subject to that?

MS. PEIFFER:  That is not what I'm saying.  I was about to get to Rule 26, Your Honor, the Federal Rules of Civil Procedure.  I wanted to note his opinions and the sources, as we've discussed before, are contained in his 2015 report.  This is in reference to the annotations that are the other matter before the Court.

THE COURT:  The 2015 report, that's what we call the study aid.  That's the study aid, is what it's been called, where he added footnotes.  This is the demonstrative exhibit that was prepared.  So let's keep it all straight.  One is his expert report that has been then annotated with footnotes that he calls a study aid, and so that's one.  I've already ruled on that.  It is in evidence as Court

Cunningham, M. - Cross                                          1532

Exhibit Number 3.

Now we are on this PowerPoint presentation that is then obviously printed off, which is what we have been going through all the time.  I'm also going to make a Court Exhibit, so it is here, Court Exhibit Number 5, the one that was produced late, and Court Exhibit Number 4 would be the one that you should have produced previously, and the other that you didn't produce timely in this matter.

(Court Exhibit 5 received in evidence.)

MS. PEIFFER:  Yes, Your Honor.  For clarity, I was not referring to his -- the annotated noted study aid is not his 2015 report.  He did not create that.  He did not sign that.  So there is a distinction between those two things. I just wanted to make that clear.

THE COURT:  His what?  He said he participated in it and that he had never received anything like that before. I'm not going to go back over it.  I'm simply not going to keep repeating myself.  It's a violation, and it's an egregious one, as far as the Court is concerned, for attorneys to give to an expert a report that's annotated with footnotes, and he says in all of his years as an expert, he's never had anybody do that.  So I'm not going back through all that.  The record stands, and the document stands for itself.  What we are on now is the PowerPoint.

MS. PEIFFER:  Yes, Your Honor.  I just was noting

Cunningham, M. - Cross                                          1533

that because Federal Rule of Civil Procedure 26 pertains to both.  Federal Rule of Civil Procedure 26(a) pertains to initial disclosures, and 26(b) applies to trial preparation. These materials are trial preparation material, and they are materials that were created by presentation for presenting this evidentiary hearing.  Under the 2010 amendments to the Federal Rule of Civil Procedure 26, draft materials and communications between experts and counsel are protected by the work product privilege, and that's what these things are.

THE COURT:  Wait.  I'm going to stop you right there because you are misrepresenting.  Dr. Cunningham just said that he sent this to the attorneys for the hearing. This was what was going to be presented at the hearing through his testimony.

He didn't do this as trial prep or hearing prep. He sent it to you for what he was going to testify to before the hearing.  Isn't that what you did, Dr. Cunningham?

THE WITNESS:  These were the proposed exhibits, both back in -- when I sent these out in February and then as they were subsequently transmitted to counsel.  It's always up to the attorney whether they are going to use these exhibits or not.  These are exhibits that could accompany and illustrate my testimony.  They may be edited and reduced.  There may be discussions about condensing the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                            1534

content that's on them.  So as they are forwarded to the attorneys, they are a draft document.  It may not end up being exactly what is presented in court.

THE COURT:  But you did these as an exhibit to summarize and support your report, did you not?

THE WITNESS:  I did, proposing that -- but I wasn't necessarily anticipating that it would be presented in exactly this way.  I'm saying here is a slide deck that can illustrate and accompany my testimony and hit the high points of my report.  That was the intention of it.

THE COURT:  Thank you.  As far as I'm concerned, they were sent to -- and it's right in this rule -- "any exhibits that will be used to summarize or support them," and they were going to use.  This is what was sent in February, and he was scheduled to testify and was called back, and this was never presented.  We were in the hearing.  Then this is what was for this hearing that you gave at the 11th hour, and these are required disclosures of expert testimony for trial.

So you can keep on arguing, and I will listen, but to me I can't see them as anything else.  As far as I'm concerned, they should have been disclosed under the Court's discovery order.  But go ahead.

MS. PEIFFER:  I will just note a few more things briefly for the record, Your Honor.  This is a draft.  As

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1535

the Court noted, this is not what was used and presented. It wasn't ever presented or intended to be an exhibit. It was just a demonstrative. We never moved to admit it into evidence, and that was never the intention.

These types of draft materials, which is very different from what was presented, as the Court observed, through Dr. Cunningham's testimony, are exactly what the commentary to Rule 26 describes, and the commentary describes that there was this change. It was amended to provide work product protection against discovery regarding draft expert disclosures and reports, and the reasoning was that the committee was told that routine discovery into attorney expert communication has undesirable effects, and so they made this amendment.

There was a concern that because disclosure of interactions would have to be produced that that would hamper the ability of attorney to consult with their experts, and, therefore, the rule was amended to provide work product protection to these materials, these draft materials, and this is precisely the kind of materials that the rule and the commentary are describing because it's a draft.

THE COURT: Well, I do disagree with you on that because they support his report. He filed the report. It would be different if you decided not to use an expert, not

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1536

to file a report, not to call the expert.  But this report that has been testified to in court and then annotated with footnotes later, in conjunction with the expert who had never had that done before, was filed in this Court on 2-4-16 as document 511-8.  We have gone through that.  This was his report.  In other words, what we were here for eight hours yesterday was going through Exhibit Number 31.  Exhibit Number 31 is his report.  You made a decision.  You filed the report.  No one is ever saying you can't consult with an expert.  Nobody is ever saying that you have to file a report if you're not going to use the expert.  Nobody is saying that you can't work with the expert in terms of determining whether you want to use them or not.  You listed him as a witness.  You listed him both times as a witness for this hearing, and you filed an expert report.  Then what this PowerPoint is, is exhibits that will be used to summarize and support the testimony and the report.

So as far as the Court is concerned, it is not attorney-client work product.  Dr. Cunningham did this, and he did it to support his testimony from his expert report.  So I would overrule your objection.

MS. PEIFFER:  Yes, Your Honor.  Just to my notes, this is not an exhibit.  It was a demonstrative, and it was disclosed as soon as it was ready, and we maintain that's a draft of word product, both of the report with the notations

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1537

and these slides that were produced to the Court.

THE COURT:  Look at the federal rule under demonstrative exhibits.  That's what a demonstrative exhibit is.  A demonstrative exhibit is a summary of large compilations, documents.  It can be a summary, it can be a chart, and it is not admitted into evidence.  That's what a demonstrative exhibit is.  But you still have to produce the summary chart under Rule 26.

So I know that a demonstrative exhibit doesn't come into evidence.  That's what a demonstrative exhibit is.  But that doesn't mean that a demonstrative exhibit doesn't have to be produced to the other side and doesn't have to be produced under Rule 26 when the demonstrative exhibit is based upon a filed expert report and is going to support testimony given in court.  Opposing counsel can then cross-examine on it.

MS. PEIFFER:  Yes, Your Honor.  We produced the demonstrative as soon as it was ready.

THE COURT:  I understand that.  I know that you edited it.  I'm not criticizing you for editing it.  I don't know what you edited out.  I just saw the same pages.  Pages that you gave were in the other document.  It just had many more.  I know that you gave it when you got it, but that doesn't mean it was timely.  When you finally prepared it, that doesn't mean it was timely.  I haven't sanctioned you

Cunningham, M. - Cross                                          1538

for that.  I'm just saying I'm going to admit it, and I believe you have a copy, and I would appreciate it if you would give a copy to Mr. Samuels, the witness.  How many copies do you have?

MS. ALI:  We have four, Your Honor.

THE COURT:  If you would give one, Ms. Ali, to Mr. Samuels, and one to the witness and the law clerk and the courtroom deputy.  I have what you gave to me.

Mr. Samuels, how do you want to proceed?

MR. SAMUELS:  Your Honor, I would like a few minutes to look over this.

THE COURT:  This is what I suggest.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I will allow redirect on everything that's gone forward so far just to keep things moving, and then we can take a break, and you can limit any cross-examination to the newly admitted exhibit.

MR. SAMUELS:  Thank you, Judge.  I just have a few other questions to finish up, and then I'll be done except this.

THE COURT:  Finish everything up except this newly admitted demonstrative exhibit.

MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Cunningham, good afternoon, sir.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                           1539

A.   Good afternoon.

Q.   Sir, you recall yesterday that there were a number of adverse developmental factors that you listed that you relied on, correct, sir?

A.   Yes.  18 in total.

Q.   18 in total, but there were a number that you were not permitted to provide testimony on, you recall that?

A.   I do.

Q.   And even though you weren't permitted to provide testimony on that, I assume you still hold the same opinion that you expressed yesterday, even taking those factors away?

A.   That's correct.

Q.   Again, that opinion relies on all the materials you reviewed, those available in 2008, those available in 2015, or in between?

A.   And my understanding of the associated science.

Q.   And if materials were produced in 2015, or interviews were done in 2015, you don't necessarily know the reason why they were done in 2015 or why they were different from what was done in 2008?

A.   That's correct.

Q.   Sir, if there was additional information that called into question the materials you relied on, you would want to know that, right, sir?

A.   I would.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Cross                                          1540

Q.   That could affect your opinion?

A.   Certainly.

Q.   Thank you.

          MR. SAMUELS:  Your Honor, the last two is just a
housekeeping matter.  I neglected to move in Government's
Exhibit 122 and Government's Exhibit 119, Your Honor.  These
are the materials from Dr. Nelson.  One is a letter dated
December 11th, 2008, and one is a series of Dr. Nelson's
notes, both of which were shown to Dr. Cunningham, both of
which he said he didn't review but would have liked to have
had that information, and I would like them admitted for
that basis.  These were recently provided discovery
materials, Your Honor.

          THE COURT:  Ms. Peiffer.

          MS. PEIFFER:  Your Honor, Dr. Cunningham said he
hadn't seen or reviewed them.  They can presumably come in
through another witness, but they should not be admitted
through Dr. Cunningham who said that he hadn't seen them.

          THE COURT:  I disagree.  It supports the
cross-examination.  He specifically said yes, he would have
liked to have seen them, and he hadn't.  You produced them
in discovery.  You have them in your files.  I'm going to
admit them.

          MR. SAMUELS:  Thank you, Judge.  119 and 122, and
that's all I have for right now.

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                        1541

(Government's Exhibits 119 and 122 received in evidence.)

THE COURT:  I want to make one clarification for the record.  The demonstrative exhibits have come in as Court Exhibits 4 and 5.  They do not come into evidence.  They are not admitted into evidence as part of the case itself.

They are admitted to support the cross-examination.  In other words, they go to the weight and the credibility, but the exhibit itself, it's the testimony of the expert that is evidence, and the demonstrative exhibit can be used in cross-examination and redirect because they do directly go to credibility and weight of the expert and the expert's opinion.

Ms. Peiffer, you can cross-examine on everything that has occurred thus far.

REDIRECT EXAMINATION

BY MS. PEIFFER:

Q.  Good afternoon, Dr. Cunningham.

A.  Good afternoon.

Q.  I think this will be fairly brief.  Are adverse developmental factors an individualized determination?

A.  Yes.  Those adverse developmental factors are specific to a particular person.  As I identify and testify about them, they are specific to that defendant.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                        1542

Q.  So as part of your analysis, do you go through and count the factors that don't exist for a particular person?

A.  No.  My focus is on what's present that was damaging, not all the ways that might have been damaged and did not occur.

Q.  And does it affect your opinion or force you to reach an opinion that there was not a disturbed trajectory of a defendant's life and functioning and decision-making if there are some adverse developmental factors that don't exist, for example, youth?

A.  Oh, no.  The disturbed trajectory is in response to the factors that are present.  If additional factors were there, they would have had some additive of cumulative effect.  But because Mr. Runyon is not youthful does not detract from the impact the adverse developmental factors had on his trajectory through the checkered life adjustment and then culminating in this offense.

Q.  And do you ever testify for a party or in support of a particular issue, Dr. Cunningham?

A.  No.  I may be called by one party or the other.  They may find my findings to be helpful or not, but I'm not testifying for them.

Q.  Has the government ever asked you to testify in a capital case?

A.  They have not.

Q.  What about in a non-capital case?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                        1543

A.   Yes.

Q.   Would you bill and receive payment for your services whether -- no matter what your opinion in the case and whether it's helpful or not to the party who has retained you?

A.   I bill for my time, not for my testimony.  If the point that a party wants to cut me loose, the meter would stop.  If I have already gotten a retainer, sometimes in a civil case, then I refund the rest of the retainer.

Q.   And going back to your analysis and your evaluation of adverse developmental factors, in how many cases, approximately, have you done an evaluation like that?

A.   Of adverse developmental factors?

Q.   Yes.

A.   More than 300.

Q.   And why is an evaluation like this significant to understanding an individual like David Runyon's functioning and development?

A.   Because it illuminates the resources the person brought to their decision-making.  That notion of the resources someone brought to their functioning and decision-making is one of four primary sentencing considerations as understood by forensic psychologists.

Q.   By the time counsel typically seek your assistance regarding an evaluation of adverse developmental factors, is

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1544

it typical that counsel has started to work on the case or done some investigation before they come to you?

A.   It's typical there has been some.  If it's a non-capital case, there may have been relatively little.  In a capital case, sometimes I'm retained almost as soon as the person is arraigned, but then that case may sit dormant for many months or even over a year as a mitigation investigation is underway before I'm then activated to begin work in the case.  And then sometimes by then it's resolved and the file is simply closed.

Q.   And, Dr. Cunningham, you mentioned a mitigation investigation.  Are the materials that are obtained during an investigation, including reports by that investigator, materials that you typically rely on in forming your opinion?

A.   So at a trial phase, as I would get those materials, I would use those to orient myself to the individual's history and to the family members who are involved and then would proceed to interview those individuals directly.  Now, there are instances where, let's say, the mitigation investigation summaries reflect interviews of 30 people, and I then come back to interview the 10 that I identify as being most significant or important to me.

As I do that, I will review with that individual the summary that has been written about them from that mitigation investigator for them to identify line by line whether that

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1545

information is accurate.  If I've done that with ten persons, and those interview summaries have been righteous, I then have confidence about the other 20 for the people that I have not reviewed.

If I do those interviews and there are many discrepancies that that interview summary has gotten wrong, then I set that aside, not only for this person but then I don't end up utilizing those other 20 either, because I put the needle down, I found them not to be accurate.  So at a trial level, I am very actively involved in doing my own interviews and use that mitigation summary as a road map or kind of an orientation as I'm beginning that I sort of know what some of the theories are as we start.

Q.  And what about when the case is in a different posture and you're not performing interviews?

A.  So if -- there are occasions in post-conviction and federal *habeas* where I may be asked to do the very thing that I've done at trial and interview everybody.  There are other instances at post-conviction or federal *habeas* where I may be given the mitigation investigation that has been done and the interview summaries that have been collected and declarations and records, the same sort of package that I have here, and asked to identify essentially, assuming that this information is correct, and assuming testimony that could be sponsored that would reflect this, then as an expert, what would you do

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1546

in identifying the adverse developmental factors?  What would your testimony be about why this matters about the science?

And so then I prepare that sort of report under that set of assumptions.  Often that report is part of the foundation to seek an evidentiary hearing, where at that hearing I wouldn't be the only person testifying, I assume, but, in fact, those individuals could be called to testify.

Q.  And would it be possible to turn on the screen, please.

Dr. Cunningham, I'm going to show you Government's Exhibit 119 when the screen comes on.  So, Dr. Cunningham, I believe you testified that this was something that you relied on in your report; is that correct?

A.  Yes.

Q.  And you have no recollection as seeing any other report from Dr. Nelson; is that correct?

A.  I have seen a document where -- because I recognize the paragraph, unless it's in here, and it may be further into this, I remember Dr. Nelson's characterization of Mr. Runyon being a wannabe, and that may by further along in this document, it may be in one of the ones that the government showed me.

Q.  I'm going to show you what was marked as Defendant's Exhibit 31.  If you could go to Page 5, please.  So, Dr. Cunningham, we can zoom in around number 36 perhaps.

A.  I see that.

Cunningham, M. - Redirect                                          1547

Q.   Okay.  And there you describe the materials that you reviewed from Dr. Nelson?

A.   That's correct.

Q.   And how many preliminary reports or other reports or correspondence did you review?

A.   There is only one, and the MMPI data.

Q.   As an expert in clinical and forensic psychology, have you been allowed to amend the report after you submitted your first report in the past?

A.   I don't know that I would use the word "allow."  I have amended reports that I filed, supplemented, or alternatively identified something that was an error that I then filed addendum to say I need to correct something that was in this other report.

Q.   And if you did file an amended report, could that change the substance of your testimony if you were permitted to testify about the new information?

A.   Certainly.  Often in a report I will have a line that says, "My findings and figures may be supplemented or modified by additional information that is made known to me." My findings and opinions are always subject to what's the available data, and if there is new data that comes in that alters a finding or opinion, then I'm going to incorporate that and make that change.

          THE COURT:  Did you file an amended report in this

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1548

case?

THE WITNESS:  No, ma'am.  It's a supplemental report.

THE COURT:  That's the only thing you did is the supplemental?

THE WITNESS:  Yes, ma'am.  I got three reports: I've got the violence risk assessment report in 2009, this primary declaration from September 25th of 2015, and then a supplemental report filed on January the 5th of '23.

THE COURT:  All we have seen?

THE WITNESS:  Yes, ma'am.

THE COURT:  So there was no amended report.  So I don't know about the relevance of those questions.

MS. PEIFFER:  Yes, Your Honor.  My next question is going to be about looking back to 2009.

BY MS. PEIFFER:

Q.  Did you amend the report that you filed prior to Mr. Runyon's capital sentencing?

A.  No.

Q.  I believe that the government previously asked you about someone such as David Runyon being predisposed to violence. When you were talking about adverse developmental factors, are you talking about a predisposition to violence?

MR. SAMUELS:  Object to the leading, Your Honor.

THE COURT:  Just make it a straightforward

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1549

question.

BY MS. PEIFFER:

Q.  Is your evaluation of adverse developmental factors synonymous with predisposition to violence?

THE COURT:  It is still leading.  Just ask him a straightforward question.  Ask him what it is.

BY MS. PEIFFER:

Q.  Dr. Cunningham, could you please describe the purpose and what you do you when you are evaluating the adverse developmental factors in someone's history and background?

A.  So I'm identifying factors that limit or impair the resources that they would bring to their functioning decision-making, moral reasoning, that sort of thing.  Those impairments may create additional vulnerability or risk for different types of dysfunction.

So, for example, if someone were intellectually disabled, that would be a major impairment about their reasoning and functioning and decision-making that they would have bought to bear and all of their functioning, including a criminal offense.

Now, intellectual disability doesn't predispose them to violent crime, but it certainly is a limiting and impairing factor and there in the context where that crime occurs.  And so the previous position invokes a notion of a personality proclivity or decisional proclivity, and this

JODY A. STEWART, Official Court Reporter

evaluation of adverse developmental factors in the impairing or limiting nature that these may have is not simply a personality predisposition or proclivity but is more broadly -- it may put them at greater risk for violence or may simply undermine the quality of calculus and reasoning and weighing and values that they bring to all of their conduct, including the criminal offense.

Q.   And in this case you have testified that you wrote the report in 2009 and found that Mr. Runyon does not present a violent risk in prison?

A.   That the risk of serious violence was low, not that there was no risk.

Q.   Thank you for clarifying.  And then your second report, of course, was about these adverse developmental factors. Could you briefly describe how to reconcile those two opinions?

A.   Certainly.  So the adverse developmental factors play a very fundamental role in who ends up in criminal behavior and in criminal violence.  And so those experiences and the life perceptions and personality disorders that may arise out of those experiences and genetic susceptibilities, those things broadly increase life dysfunctions and also increase the likelihood of criminality and criminal violence.  So that's in the community.

          Now, now you go to prison, and prison is a very

Cunningham, M. - Redirect                                          1551

structured context.  For someone who is generally dysfunctional in the open community and the resources they bring to bear, they may be fine in prison because there is not much that's required of them, there is so much structure.

And almost everybody in prison has a history of developmental adversities.  That's part of the trajectory that took them to prison.  Well, it is simply a statical maxim that if you have a characteristic that is virtually ubiquitous in a given environment, it will fail to predict the rare act.

So serious violence in prison is an infrequent event, but histories of adversity and childhood are almost universal among prison inmates.  So that history of adversity that is present among many of those people, almost all of them, that's not going to then allow you to predict who is going to be violent in prison and who is not.  Mostly none of them are going to be seriously violent, in spite of that history.  And further, even persons who have histories of violence in the open community, not just adversity, but histories of serious violence in the open community, even a past homicide before their current conviction, not only does a current conviction of homicide not predict serious violence in prison but prior arrests for violent crime don't predict serious violence in prison.

So they predict in the open community, got a history

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1552

of adversity, got a history particularly of violence in the community, that individual is at much increased risk of violence in the community.  Neither of those things are predictive of violence in prison.  They seem like they would be.  You would intuitively think they are, but when you actually examine the data, they're not.

Q.  And if asked, would you be able to testify about both things in a single proceeding?

A.  Certainly.  And have.

Q.  How frequently have you testified about both of those subjects, estimating, if that's necessary?

A.  In more than half of the capital cases, I would estimate I have testified about both of those things, both adverse development and violence risk assessment for prison.

THE COURT:  What you have said, though, is one is not dependent upon the other.  They are two separate subjects?

THE WITNESS:  Exactly.  One of them, most simply, is how did we get here to this capital offense?  The other one is where we go from here.  The factors that are associated with those are very different from each other.

THE COURT:  Right.  So, in other words, it's not that they have to go together, it's just that they can go together.  You can opine on both?

THE WITNESS:  Yeah.  And I may advise counsel of

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1553

that.  I can do an analysis of adverse developmental factors broadly mitigation, or I can do violence risk assessment for prison, or I can do both.

BY MS. PEIFFER:

Q.  And speaking of your -- I believe what we are calling the study aid, I have a couple of questions, Dr. Cunningham.  Did the inclusion of the note or the footnotes change the substance of your report or your testimony regarding what materials you relied on in forming your opinion?

A.  No.

Q.  Was it your testimony at this hearing based on your own review of your opinion?

        MR. SAMUELS:  I'm going to object.  This is leading, it's bolstering.  They're the ones that did the notes.  I don't think they should be able to lead him through it and ask him about it in this way.

        MS. PEIFFER:  Your Honor, it seems to be an issue and a concern that this somehow changed his opinion, and I am simply trying to clarify whether that was the case.

        THE COURT:  He said it didn't change his opinion, but it was certainly part of his opinion, was it not, what you relied on?

        THE WITNESS:  My study and preparation involved probably an hour or two of review of that study aid, looking at what footnotes were attached to what in the report.  As I

Cunningham, M. - Redirect                                           1554

was testifying, I didn't have anything open during most of that testimony, not the report, not anything.

As you asked the questions, Your Honor, about the case, and then I turned to the report, because it was in the flap, I first pulled out the study aid.  Then I realized late, because of the footnotes, the pages don't match.  So put that aside and opened up my binder so that I could be on the same page.  So my testimony was not aided by either largely by either the report or the study aid, as I was giving that live.  That was from my own recollections.

I had spent one or two hours looking at the study aid in reviewing what sources -- and found while -- if I had a recollection of a piece of data, often it came from more than one place.  The study aid tended to just identify one.

THE COURT:  You testified earlier under oath that you had them both there while you were testifying.

THE WITNESS:  With me.  They were with me in a binder.

THE COURT:  He just held up the blue binder.

BY MS. PEIFFER:

Q.  And did -- when you testified on direct and discussed the basis of your opinion, were those the bases of your opinion or was it what was on the document?

A.  The basis of my opinion is what's reflected in that 2015 declaration of those three or four pages of sources.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1555

Q.  And was this study aid intended by you to alter your opinion?

        MR. SAMUELS:  Objection to leading, Your Honor.

        THE COURT:  Sustained.  He said you did it and gave it to him.

        MS. PEIFFER:  Yes, Your Honor.  I just wanted to ask him if that changed his opinion in any way.

        THE COURT:  That was not the way you asked the question.

        MS. PEIFFER:  Thank you for pointing that out.

BY MS. PEIFFER:

Q.  Dr. Cunningham, did the study aid change your opinion in any way?

        MR. SAMUELS:  Still leading, Your Honor.

        THE COURT:  How did the study aid affect your opinion?

        THE WITNESS:  Should she ask or --

        THE COURT:  I'm asking you.  I'm phrasing the question so it's not leading.

        THE WITNESS:  It did not.  It perhaps reduced my anxiety just a little bit as I found the degree of memorization I was facing to be daunting, and so -- because that was underway, that may have reduced my anxiety about trying to remember everything.  Ultimately, I found that I was having to rely on my own memory, and it didn't affect

                    JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1556

the opinions at all.

THE COURT:  I will say this, that certainly the prosecution should have been entitled to it so they could have gone to those documents.  I'm not going to repeat all the testimony from yesterday.  It was hours of this generalized testimony, and where did you form that opinion, and had it been available in advance, someone could have checked those citations and what was there because some of those citations refer to some pretty skimpy documents.  I'm just telling you.  I've looked at the documents in this case.  I've been with the case since its inception.  So it may not have changed his opinion, but it is what it is.

BY MS. PEIFFER:

Q.  Dr. Cunningham, did the declaration of David Runyon's co-defendant, Cat Voss, impact your opinion regarding the adverse developmental factors in David's life?

A.  It did not.

Q.  Dr. Cunningham, you were asked on cross about Maria Runyon and her assessment of personality change.  If that factor were removed from your analysis of the neural developmental adverse factor, would it change your opinion about whether or not the factor is present in David's life?

MR. SAMUELS:  I don't think he was allowed to testify about that factor.  That was the neurodevelopment that dealt with the brain damage.  I don't think he was

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1557

allowed to testify about that.

THE COURT:  I sustain the objection.  He wasn't.

MS. PEIFFER:  But he was asked on cross specifically about Maria Runyon and the personality change component of her declaration, which was what Dr. Cunningham cited in that factor.

MR. SAMUELS:  Those are questions designed to elicit what he would rely on and whether or not there was differences in other materials that he should have seen.

THE COURT:  The objection is sustained.

BY MS. PEIFFER:

Q.  Dr. Cunningham, you were shown during your cross-examination a document that was called memo to file. Do you have knowledge of whether this accurately reflected Dr. Merikangas's view?

A.  I have no knowledge of that.

Q.  Dr. Cunningham, how were you able to reach your opinion and make conclusions you form in your report without meeting with David Runyon?

A.  Well, a mitigation investigation of adverse factors is a historical investigation.  That history is available from a number of sources.  The defendant is one source of that.  May not be the most candid source, may not be the most knowledgeable source.  The key is not where you get it from but the quality of it and the number of reporters and that

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1558

sort of thing.

If you have sufficient history developed from other sources, then you can extract the adverse developmental factors from that history.  In other words, the issue is, to go back to the radiation analogy, was this child radiated?  You don't have to interview the child, now an adult, about were you radiated as a child.  Do you remember it?  Do you think that connects to your cancer now?  The issue is, is there a reliable record that you were radiated, not your self-report.  So this history can be reliably synthesized by reliance on other data besides the defendant's self-report.

Q.  In terms of self-reporting, do you sometimes rely on that type of information in your field of psychology to form opinions?

A.  Yes.  Largely clinical psychology practice is based on the self-report of the patient.  There is not access to other sources of information because of confidentiality.  In forensic psychology, self-report is not the only source or at least very rarely is the only source.  Instead, you're gathering multiple data points to illuminate the issue before you.

Q.  And can you briefly describe whether you do anything to try to corroborate information from self-report?

A.  I can.

Q.  And what is that?

Cunningham, M. - Redirect                                              1559

MR. SAMUELS:  Judge, I think this was all covered on direct.

THE COURT:  I do.  I'm looking at Rule 403 when someone is needlessly presenting cumulative evidence.  That's why excluding relevant evidence for prejudice, confusion, waste of time, or other reasons.

MS. PEIFFER:  Yes, Your Honor.  I was asking this because he was specifically asked about David's self-reporting and David's representations during cross-examination, and, therefore, I thought it was within the scope of the redetect.

THE COURT:  He was asked about it, but you're not eliciting anything new, are you?  Just go ahead.  We will needlessly waste time if we keep on like this.  But at some point somebody needs to read these rules of evidence and procedure because this is a *habeas corpus* proceeding, which is a civil proceeding, and these rules apply.  Somebody needs to read them and know what they say because it's getting frustrating to the Court to have rules of evidence and procedure not being followed.

MS. PEIFFER:  Yes, Your Honor.  I was just responding to the scope of the cross, and I was not sure what Dr. Cunningham's answer would be.  I was trying to clarify that for the Court.

THE WITNESS:  My reliance on David's self-report

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1560

was largely around the history of head injuries.  The rest of his social history was obtained from other individuals, and even that history of head injuries I sought to corroborate with the records and with third-party reports.

MS. PEIFFER:  Court's indulgence.

No further questions.

THE COURT:  All right.  I do want, for a clear record, although I will note whether a trial judge rules on evidentiary matters and procedural matters, as long as the ruling is correct, the correct rule does not necessarily have to be cited.  In other words, as long as the ruling is correct, that prevails.  My ruling was correct under the disclosure of expert testimony, but I wanted to add to it because I think if somebody would focus on these rules, or anybody in this case would, the first thing I would call to your attention is that the demonstrative evidence rule, is what we call, is Rule 1006, summaries.  The title of it is "summaries to prove content."

Then you go over to what I was telling you, and I had to listen to a very long argument, which I did.  It says, "Any exhibit that will be used to summarize or support them."  So exactly what I referred to in the disclosure of expert testimony is summaries.

The next thing is under there, I was under disclosure of expert testimony, (B), and then one is initial

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1561

disclosure.  Two is disclosure of expert testimony.  Three is pretrial disclosures.  If you look at pretrial disclosures, there is a time in there, time for pretrial disclosures so that another side can object to the pretrial disclosures.

Also, I would call your attention to what Ms. Peiffer was arguing, which is the attorney/client privilege, and that is found in part (4), and it says, "Trial preparation:  Experts," and yes if you're preparing, you decide not to use an expert, you don't, and then it says, "Claiming privilege or protecting trial-preparation materials," if you're withholding something that's discoverable, you have to claim that privilege, and then you have to expressly make that claim, and you have to describe the nature of the documents, the conditions under which it should be protected, and you have to produce the information under a claim of privilege, or a protection is trial material, there are requirements for that.

So you all seem to think that somehow this is like a criminal case where you have certain disclosures.  This is a civil case, and you've got experts in it.  This is the disclosure of expert testimony.  I would just call your attention to read the entire rule and not to cherry-pick it. It's Rule 26, duty to disclose, and (a) is required, it's disclosures.  (a)(1) is the initial disclosure.  (a)(2) is

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1562

the disclosure of expert testimony.  (a)(3) is pretrial disclosures.  (a)(4) would be the form of disclosures.  Then you have, under (b) is discovery scope and limits.

So then under (b) part of the rule, it goes over and there is a discovery scope and limits.  You go over to (b)(4), and that's where you have trial preparation: Experts, and (5) claiming privilege or protecting trial-preparation materials.  The amendment you were talking about refers to a different section of the rule.

You were reading from the advisory notes, and it refers to a different section of the rule.  Rule 1006 is specifically entitled "summaries," and that's exactly what the document was, the PowerPoint.  That's exactly what it is.  It's a summary of voluminous material, and it was in support of his full, very lengthy expert report.  So I would just add those rules because sometimes attorneys or staff going through records don't pay attention to the precise rules.  I want to be sure that those rules are on record. They are all in the federal rule book.

So, frankly, some of the testimony could have been excluded completely in terms of having failed to disclose because the rule itself sets up the disclosure, as did the Court's discovery order, and it is discoverable material, and it should have been disclosed.

We can take a break now, and then you can come

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1563

back.  I know you're going to need some time to look at this document.

MR. SAMUELS:  I am, Your Honor.  I'll try and move quickly, Judge.

THE COURT:  Well, do what you can.  You all need to give a realistic estimate of what time your experts are going to take because the rate we are going we will be here until the first of the year, and we are just going to keep going and keep going, but there are other schedules.

If the witness is here, I will recognize the witness.  I will tell them that they are now under a Court order to appear in this case, and they will have to contact the attorney, and the Court is going set the schedule.  But you're not giving realistic estimates of how long you are going to be taking to examine these witnesses.  That's the main problem, is the length of the examination.  The cross can't be predicted because it's based upon the direct.

So half of them here have been non-disclosures, non-production, and an unrealistic estimate of what the direct examination is going to be, and if you've got the witness tomorrow, Ms. Peiffer, that you have been talking about, bring them in here, and I'll recognize them.  But we are going to finish Dr. Cunningham, and if we take whoever the person is tomorrow, and we can't finish them, I'll recognize them, and they will be here on Monday.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1564

So you need to govern yourself accordingly because you all are not setting realistic schedules, is the bottom line for a proceeding like this with all these hundreds of documents and the lengthy testimony that you are presenting.

I'm not keeping you from presenting it, but it's going to be done in a way that is tolerable to the other people. There are people here that aren't attorneys. There is a concern for marshals. There is a concern for court reporters. There is a concern for court staff. At some point there has to be a realistic presentation and not cumulative.

The Court stands in recess. Do you need 30 minutes?

MR. SAMUELS: 20 would be fine, Your Honor.

THE COURT: Stand in recess for 20 minutes.

(Recess from 5:15 p.m. to 5:38 p.m.)

THE COURT: Everyone has returned, and the defendant is here, and Dr. Cunningham is on the stand.

MR. SAMUELS: May I proceed, Your Honor?

THE COURT: Yes, you may.

MR. SAMUELS: Thank you, Judge.

BY MR. SAMUELS:

Q. Dr. Cunningham, good afternoon. I think we can still say good afternoon.

A. Good afternoon or evening.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1565

Q.   Getting close, sir.  I won't keep you long.  I just have a few questions for you.  Dr. Cunningham, you've got a copy of, I believe it's Court Exhibit 4 --

A.   Yes.

Q.   -- which is the PowerPoint that you had provided to *habeas* counsel in February of 2023; is that right, sir?

A.   That's correct.

Q.   Approximately how long did it take you to put this together, do you know, Dr. Cunningham?

A.   I'd have to go back and look at the billing statement.

Q.   Okay.  Any way you can just estimate it for us?

A.   Someplace between 10 and 20 hours.

Q.   When you put this together do you put these notes of the proposed questions in the body of the PowerPoint as you're building it?

A.   Typically not.

Q.   You go through and do that afterward, sir?

A.   I build all the slides and then I go back through and add the questions.

Q.   Sir, again, Dr. Cunningham, I'm not going to go through all these cites because we have been through the ones that relate to your testimony, and there are some others that have been removed.  But are there some slides in here that you're able to use from presentation to presentation?

A.   There are.

Cunningham, M. - Redirect                                          1566

Q.   And looking through this PowerPoint presentation, you would agree with me that it's 174 pages?

A.   That's correct.

Q.   And I didn't add them all up, sir, but the great majority of the slides have one or more questions on them; would you agree with me?

A.   Yes, there is one or more on every slide.

Q.   Okay.  And --

A.   Except a few that are animated, I think, that don't have slides -- there may be a few graphic models that don't have questions because the first question elicits the whole series.

Q.   I see, sir.  And would you agree with me that at least some of these questions you did hear yesterday while you were testifying on direct examination?

A.   Some I did.

Q.   And would you agree with me that this PowerPoint would almost be akin to a teaching aid for a lawyer who doesn't know much about your area of expertise?

A.   Yes, that's correct.

         THE COURT:  That's basically why you do it?

         THE WITNESS:  Well, I do it -- well, as I'm coming -- so I teach attorneys about capital sentencing issues and evaluations at capital sentencing.  Some of these slides I've used in those CLEs as I teach attorneys, not the

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                            1567

case specific ones but some of the conceptual ones.

BY MR. SAMUELS:

Q.   I'm sorry, Dr. Cunningham.  One moment, please.  You do one of these in every case where you testify about adverse developmental factors, sir?

A.   There have been a few Miller cases where I did not because my testimony was going to be so brief, wasn't requested.  But in every capital case that I've been involved in on either violence risk assessment or adverse developmental factors, in all of those cases at the time I testified it was accompanied by slides.

Q.   And so once you set this out in February 2023, when did you next pick it back up, sir?

A.   August.  Maybe not until August 14th or so.  I'd have to, again, look at the billing record but I think it was about August 14th.

Q.   And, Dr. Cunningham, if you've got this comprehensive slide deck with all these questions prepared and suggested, I guess I don't understand why you had to have hours and hours of meetings before you testified today?

A.   Some of that was going over my testimony, practicing it.  Some of it was discussing what else would be cut from this.  Sometimes in the midst of that review of my testimony there would be digressions to talk about case-specific facts or perspectives, but they were -- every day it seemed like there

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                         1568

was two or three two- or three-hour meetings about my testimony and the materials, and then I'm intensively reviewing on my own apart from that.

Q.   And you said you underwent some practices of your testimony, Dr. Cunningham?

A.   That's correct.

Q.   And was that a situation where you sat down and one of the attorneys went through the questions that they would ask of you?

A.   That's correct.

Q.   And was there a kind of a mock cross-examination as well?

A.   There was.

Q.   Again, you're a very, very experienced witness, right, Dr. Cunningham?

A.   I would say so.

Q.   Do those prep sessions, going through the practice, do they help reduce any anxiety you might feel?

A.   I wouldn't say anxiety.  I don't feel anxiety by testifying.  They familiarize me with the approach the attorney is taking.  I have a tendency to be wordy, and so the -- throw out encouragement from the attorneys either on direct or my cross to be briefer was well taken.

Q.   Yes or no answers on cross, that sort of thing, right? Do you ever get feedback on those practice sessions, Dr. Cunningham?

Cunningham, M. - Redirect                                        1569

A.   Well, I'm described to be a little briefer about that.
That would be the primary feedback.

Q.   I'm saying, do you get feedback?

A.   Do I get feedback?

Q.   Yes.

A.   Yeah, sometimes I wouldn't understand the question or the
question would open up a whole arena that we haven't gotten
to yet, and so I would say maybe a better, I don't know how
to answer that question.  Perhaps if you ask me this, I could
answer that.

Q.   Sure.  Well, in these prep sessions where you're
practicing for your testimony, is there a give and take where
you're discussing how things might be asked or how things
might be answered?

A.   To some extent.  Some of the sessions early on, there was
quite a bit of give and take, and later as we went through
it, it was more of a run-through.

Q.   How many sessions were there?

A.   As I said -- well, Sunday night, I guess, there was one
long session of discussion.  Again, I could look at my
billing records because it reflects what is in conference and
when I'm reviewing independently.  But there were probably at
least two a day.

Q.   Two a day where you sat down and --

A.   At least met to discuss to look at the slides, to look at

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                              1570

my report, the testimony, how it would be elicited, yes.

Q.  Do you remember how many specific sessions there were where it was almost a mock examination where the attorney was asking you the questions, and you were answering, how many sessions were there?

A.  One or two, I think.

Q.  One or two.  Okay.

A.  In all of it, the slides were up a lot.  But in terms of an actual run-through, maybe one or two.

Q.  Was it a typical preparation for you or more extensive than you've had in other cases, sir?

A.  This was more extensive.

Q.  Do you have any reason for that, sir?  Let me ask it a better way.  Who was driving the extensiveness of the preparation?

A.  I was at their disposal.  It wasn't driven by me.

        THE COURT:  You say "their."  Who do you mean "their"?

        THE WITNESS:  So typically five or six defense counsel would be in a room as we are conferencing, sometimes just a couple, but often five --

BY MR. SAMUELS:

Q.  Five or six?

A.  Of staff people.  I don't know who is paralegal and who is an attorney, but there would be sometimes five or six

Cunningham, M. - Redirect                                        1571

people in the room.

Q.  How many different people were asking you questions?

A.  Typically just one, although others might then make a comment or participate in the discussion.  But typically one person is asking the questions, if we are doing some sort of preparation for the actual testimony.

Q.  Dr. Cunningham, again, just skimming through the packet here, there are some slides that have citations to publications on them, but I didn't really notice any publications referenced in the notes.  Would you agree with me, sir?

A.  That's correct.  The notes are just the questions.  They say not -- that's not annotating with publications or sources.

Q.  Okay.  And there were a few questions about what the research was, but that was not certainly on every slide, you would agree with me there?

A.  That's correct.

Q.  Dr. Cunningham, I'm winding down here.  Does it cost, in terms of time and effort, more to do one of these adverse development packets than it does a violence risk assessment?

A.  Yes, sir, significantly more time is involved.

Q.  And I think you testified that you've done this on 300 times?

A.  Regarding adverse developmental factors?

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                              1572

Q.   Yes, sir.

A.   Yes, about 300 times.

Q.   In every one of those 300 times you have found some amount of adverse developmental factors?

A.   There has always been some developmental adversity.

Q.   You've also testified that in about half your capital cases -- well, you've testified far more than 300 times, haven't you, Dr. Cunningham?

A.   About, I would say, 300 times regarding developmental adversity.

Q.   And then I recall you were asked a question, I can't remember if it was the Court or Ms. Pfeifer, about how many times you have testified for violence risk assessment and for development factors.  Do you remember that?

A.   Yes.

Q.   And that was -- what was that number, sir?

A.   I thought about half of the capital cases where I've testified, I've done both, both developmental adversity and violence risk assessment for prison.

Q.   Are there more times when you testified about violence risk assessment?

A.   No.  I mean, I have testified -- so when I do violence risk assessment alone, that has been perhaps -- 20 percent of the capital cases I've testified in have been just about violence risk assessment, not about developmental adversity.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                          1573

Q.   Again, your understand, Dr. Cunningham, that in any case where you're testifying for an indigent defendant, there is a budget and a fee structure?

A.   Yes.

Q.   And so it is less expensive for you to do a violence risk assessment?

A.   It is.

Q.   And if you do both, that -- both violence risk assessment and developmental factors, that can be a considerable amount of money?

A.   So if I do both, it isn't as if it's an additive.  It isn't 50 plus the 90 to 130.  If I'm doing both, it probably adds 15 or 20 hours to the total, not 50, because there is some overlap of activity.  What occurs is I'm going through the reference for both purposes.  I'm conferencing with the attorneys for both purposes.  When I come out to testify, it's for both purposes.  If there is an interview trip to go see the defendant, it's for both purposes.  And so there is overlap then in the activities so that it doesn't add as much time to the total.

Q.   Because I think in your violence risk assessment, your cap was about 15,000 for 50 hours, right?

A.   That's correct.

Q.   Then as we discussed, it's been -- my math is right -- over 170 hours that you've spent on the adverse developmental

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                    1574

factors?

A.   Yes, sir, because we keep coming back to it over a period of time of many years.  Had we done all of this in 2015, then there would not have been significant additional time that I needed to go all the way back through and review the file all over again to try to load it for this kind of final exam, oral, I guess is what we could call this.

          THE COURT:  What?

          THE WITNESS:  Orals, sort of like sitting for your doctoral orals where all of it has to be committed to memory, and you can be asked anything ranging here and there.  So in the face of preparation for the orals, repeatedly over this period of time, then I have to reload all of it again.

BY MR. SAMUELS:

Q.   Fair enough.  I think you are going a bit above me, Dr. Cunningham, but you would agree with me that in each incident when you've had to either prepare for the original report or for the orals, as you said, it was about 50 hours or so?

A.   Yes, sir.

Q.   Okay.  And you understand, of course, that there are resource limitations on providing funds to experts, particularly if there is multiple experts in a case?

A.   I understand.

JODY A. STEWART, Official Court Reporter

Cunningham, M. - Redirect                                               1575

MR. SAMUELS:  Your Honor, may I have just one moment?

THE COURT:  Yes.

MR. SAMUELS:  Thank you.  That's all I have for Dr. Cunningham, Your Honor.  Thank you.

THE COURT:  All right.  Redirect?

MS. PEIFFER:  No, Your Honor, but I just have one quick housekeeping matter, if Dr. Cunningham is finished.

THE COURT:  Yes.  Do you plan to call him any further?

MS. PEIFFER:  No, Your Honor.

THE COURT:  So I'm going to dismiss him.

Ms. Ali, you in agreement?

MS. ALI:  Yes, Your Honor.

THE COURT:  Mr. Lee?

MR. LEE:  Yes, Your Honor.

THE COURT:  Dr. Cunningham, I hope this is good news, but, in any event, the Court does excuse you from further appearance at this juncture in this particular hearing.

THE WITNESS:  Thank you.

THE COURT:  I wish you a very safe trip back to Texas, and it's nice to see you again.

THE WITNESS:  Good to see you, Your Honor.

THE COURT:  Thank you for coming.

JODY A. STEWART, Official Court Reporter

1576

THE WITNESS:  Thank you.  Appreciate your patience.

THE COURT:  One more thing.  I know you know this because you testified.  You can't discuss your testimony with anyone else without the permission of the Court at this point.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.  Until the case is over.

THE WITNESS:  Yes, Your Honor.

(Witness excused.)

THE COURT:  Ms. Peiffer.

MS. PEIFFER:  Thank you, Your Honor.  I just wanted to clarify something the Court said earlier and clarify that the witness schedule for tomorrow, currently Dr. Nadkarni is the one that we plan to call tomorrow.  That agree with the Court's order?

THE COURT:  All right.  Because I know you had Dr. Merikangas, and I didn't know if you wanted me to recognize him.  If you do, I will.  I just want to make that option available to you.

MS. PEIFFER:  I appreciate that, Your Honor.  I believe Dr. Nadkarni's schedule is much trickier, and we are going to go ahead and call Nadkarni tomorrow, and I just wanted to make the government and the Court aware.

THE COURT:  All right.

MS. ALI:  Can I add one thing, Your Honor?  We

JODY A. STEWART, Official Court Reporter

1577

haven't spoken to Dr. Merikangas so I don't know what his schedule will be to call him next week, so we will get back to the Court.  Hopefully, I'll have an answer tomorrow.  I hope we will be able to keep him in order, but I haven't had a chance to speak with him.

THE COURT:  Okay.  But if you don't elect for me to recognize him and tell him he has to be here, and we are moving on, and he can't be here, you are doing that at your risk.

MS. ALI:  You mean if we don't call him tomorrow?

THE COURT:  Well, hypothetically, you don't call him tomorrow, and then you want to call him at some other time, but you keep moving with witnesses, I don't know what your plans are, and you haven't talked to him, and then you would want to call him a week from Tuesday, and he's not available, then he's not available.

MS. ALI:  I understand, Your Honor.  Our goal is to call him as soon as possible, but it was difficult to get Dr. Nadkarni sorted out.  So we would like to go forward with him and put Dr. Merikangas on the stand if we can get him.

THE COURT:  All right.  Counsel, as I told you earlier this week, and without going into great detail, I do have an out-of-town funeral, and I'm going to go to it early in the morning and then come back.  We will start at 2:00.

JODY A. STEWART, Official Court Reporter

1578

Unless something occurs that I'm not expecting, which always can be, I do plan to start at 2:00 tomorrow. So we will be in recess until 2:00 tomorrow.

Was there anything else from you? I saw you with a post-it note.

MR. SAMUELS: Yes, Your Honor. I was just trying to decipher it. I just wanted to make a couple of housekeeping things that I could just put on the record, if I could. I'm not asking the Court to take any action. We had not provided Dr. Aguirre, who was our rebuttal expert, with any of the materials during this period between February and today.

I think we are going to go ahead and provide him with the materials from Dr. Lipton, who I understand is the defense expert, because we assumed that there was a sequestration, but I understand that certain experts have been provided material, so we think we ought to be able to provide Dr. Aguirre the other expert disclosures and reports, and we intend to do so.

THE COURT: They did.

MR. SAMUELS: Yes, ma'am.

THE COURT: So you can. The sequestration was that they couldn't sit in during the testimony of other witnesses or be provided the testimony of other witnesses. But to the extent I meant to do otherwise, I didn't, and so you can

JODY A. STEWART, Official Court Reporter

1579

provide that.

MR. SAMUELS:  Thank you, Judge.  Then the last item would be, we do intend to call Larry Woodward or Mr. Woodward back to address certain items.  We have not shown him anything, but we would like to be able to show him some of the things that we've talked with him about on examination, and that seems appropriate given all the materials that have been shown to some of the defense witnesses.

THE COURT:  Well, I'll think about it, but I will tell you that I was concerned about what was shown to Dr. Merikangas, and, again, what has been shown.  There was another situation, too.  I've got to go back through my notes, but I do have some concern over what may have been shown.  I just have to think about it.  It is 6:00 now, and Mr. Woodward isn't going to be here tomorrow?

MR. SAMUELS:  I understand, Your Honor.  We will hold off.  He had asked us that.  We have told him we can't tell you anything.

THE COURT:  Remind me of it, please.

MR. SAMUELS:  I will.  Thank you for your indulgence, Your Honor.

THE COURT:  If there is nothing further, the Court stands in recess on this case until 2:00 tomorrow.

(Hearing adjourned at 5:59 p.m.)

JODY A. STEWART, Official Court Reporter

1580

CERTIFICATION

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


X_____/s/_____x
Jody A. Stewart
X_____11-13-2023 _____x
Date

JODY A. STEWART, Official Court Reporter