1580

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -
                                        )
UNITED STATES OF AMERICA,               )
                                        )
    v.                                  )   CRIMINAL ACTION NO.
                                        )   4:08cr16
DAVID ANTHONY RUNYON,                   )
                                        )
        Defendant.                      )
                                        )
                                        )
        AND                             )
                                        )
DAVID ANTHONY RUNYON,                   )
                                        )
        Petitioner,                     )   CIVIL ACTION NO.
                                        )   4:15cv108
    V.                                  )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        Respondent.                     )
                                        )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

DAY 11

Norfolk, Virginia

November 3, 2023

BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge

JODY A. STEWART, Official Court Reporter

1581

APPEARANCES:

      UNITED STATES ATTORNEY'S OFFICE
      By:  Brian Samuels
          Lisa R. McKeel
          Assistant United States Attorneys
              And
      DEPARTMENT OF JUSTICE
      By:  Carrie L. Ward
          Counsel for the United States

      VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
      By:  Elizabeth J. Peiffer
          Robert Edward Lee, Jr.
              And
      ALI & LOCKWOOD LLP
      By:  Kathryn M. Ali
          Counsel for the Defendant

1582

## I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SIDDHARTHA NADKARNI, M.D. | 1589 | 1725 | | |

## E X H I B I T S

| GOVERNMENT'S NO. | PAGE |
|---|---|
| NONE | |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 137 | 1640 |
| 154 | 1606 |
| 154A | 1727 |
| 202 | 1679 |

| COURT'S NO. | PAGE |
|---|---|
| 7 | 1795 |

JODY A. STEWART, Official Court Reporter

1583

(Hearing commenced at 2:03 p.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The government is ready.

Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Ail, Ms. Peiffer, Mr. Lee, is the defendant ready to proceed?

MS. ALI:  Yes.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.  Sir, you are David Anthony Runyon?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Mr. Runyon is here with his counsel, and we are ready to go forward.  You can call your next witness.

MS. ALI:  Thank you, Your Honor.  We call Dr. Siddartha Nadkarni.

MR. SAMUELS:  Your Honor, could I bring up one matter before Dr. Nadkarni comes in?

THE COURT:  Yes.

MR. SAMUELS:  Your Honor, at 11:55 last night we

JODY A. STEWART, Official Court Reporter

1584

got an e-mail from defense counsel that attached a similar type of document for Dr. Nadkarni that we had gotten yesterday and we had learned about for Dr. Cunningham. Certainly, we would have asked Dr. Nadkarni if he had gotten any type of preparation, and this is another example of his report being very heavily annotated by efforts of defense counsel.

We understand the defense has filed a notice on this stating their position. We got that at about 10:30 this morning as we were preparing to get ready to go. So we haven't fully reviewed that yet. But, Your Honor, we do think that this would have been required to provide to the United States, and to go through the reasons for that, but for the remedy of this, of getting this, we would submit that Dr. Nadkarni should not be allowed to use this document as he testifies.

Dr. Cunningham referred to this yesterday as a study aid, but once a witness takes this document that is heavily footnoted with a lot of sources and with substantive information on those sources, then it really does become a cheat sheet that Dr. Nadkarni would be using with information provided by defense counsel.

So we would object to Dr. Nadkarni using it. However, we believe we should be able to use it for cross-examination and impeachment about his knowledge of the

1585

sources of the document.  I wanted to bring that to the Court's attention and put that on the record before we started with Dr. Nadkarni.

THE COURT:  Ms. Ali.

MS. ALI:  Your Honor, we have no objection -- we don't plan to use the document.  He doesn't plan to rely on it during his testimony for the remedy the government just suggested.  We have no objection to it, with one caveat, which is that I don't think it's appropriate to call it impeach material because they can examine him about this.  But impeachment is required, you have to use the document adopted by the author, by the witness, and they can ask him whether he's adopted this, they can do that, but until they've established that, I don't think it is appropriate for impeachment.  They are certainly entitled to cross-examine him about it.  But I just wanted to clarify that.  But we don't have any objection to them examining him about it, and we don't plan to use it, and he doesn't plan to rely on it during his testimony.

THE COURT:  Well, they can certainly cross-examine about the sources, and they can ask him if he got the document.  I don't understand who this idea is coming from to give footnoted expert reports to experts as a, quote, "study aid."  I would tell you that under Rule 26(b)(4)(C), it provides that communications between the attorneys and

JODY A. STEWART, Official Court Reporter

1586

the experts, even if the study aid could be considered such a communication, it is excepted from this protection by Rule 26(b)(4)(C)(ii), which provides an exception for communications that, "Identify facts or data that the party's attorney provided and that the expert considered in forming the basis of the opinions to be expressed."

So you're providing him a document with communications to identify the data to basically footnote his data that he relied on in forming his opinions.  So you all keep trying to get around Rule 26, but you can't.  First, it's not attorney-client, and if it was, you should have filed the proper notices for the Court to look at.  We went through all of that.

You simply have not followed Rule 26, and I'm absolutely shocked that attorneys would take an expert report and document sources for him or her, or tell him or her these are the sources that you used.  But, in any event, whatever it is, it should have been produced, and I'm not going to change my ruling from yesterday.  My ruling stands.

You have violated Rule 26, and if it keeps on being violated, there could be more extreme measures taken by the Court.  I have no question in my mind that Rule 26 has been violated in many, many ways.  I went through it yesterday.  No matter what you call that study aid, it is, at minimum, from what you are saying, it is communication but it is not

1587

protected by Rule 26(b)(4)(C)(ii), which provides an exception for those communications that, quote, "Identify facts or data that the party's attorney provided that the expert considered in forming the basis of the opinions to be expressed."  So if he didn't consider it, that's one thing.  But you've provided it to him, and I guess you did a coaching session with him.

I'm not saying you can't do it, but I want you to be aware of your budget, and if the expert is going to present it, the Court is going to review these fees that have been approved, and if the experts are going to present 10, 15 hours of coaching, then the question is going to become, well, who did the coaching?  Because you are going to have to justify that through an affidavit to the Fourth Circuit.  I am locked into a budget now.  The Court is.  You had input to it, and it was approved by the Fourth Circuit budget attorney and the Fourth Circuit.

When you start exceeding over these amounts, you're going to have to start filing affidavits.  It's only reimbursable for attorneys, for attorneys' time that are in the case.  Then if your time doesn't match to an expert's time, and the expert's time is way over -- I'm not saying how it will be handled, but there's a problem here with spending hours and hours on teaching drills with experts that are being paid from a budget if that expert is going to

JODY A. STEWART, Official Court Reporter

1588

be billing for it.  As I understand it, here is an expert yesterday, Dr. Cunningham, who testified in hundreds.  He is basically a professional expert, and he's getting coaching sessions and edited reports, and he's reviewing all that, and he's charging for every hour of it, and he's the expert. He should have been prepared.

You should have given him all the materials he needed before the last hearing.  He should have been prepared.  This is not the inception of the hearing.  This is a continuation.  You had that February 2023 PowerPoint, and a PowerPoint is part of the summary that is part of the expert's opinion, and particularly, the overt questions on it.  That's part of the PowerPoint.  He sat here and said that.

Anyway, we will start with the cross-examination, but I think that you ought to take into account some of these things because the Court feels very strongly that there has been a violation.  I'm not talking about *Jencks* material.  *Jencks* material, that's a criminal rule.  I'm talking right now about violations of discovery, discoverable materials.

So you call Dr. Nadkarni, and we will go with the questioning.  If there is a point where you object, you can object, and I'll listen to your objection.

MS. ALI:  Yes, Your Honor.  Thank you.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1589

THE COURT:  Thank you.  Can you just tell me what exhibits you are going to start with?

MS. ALI:  I can, Your Honor.  Actually, it is Dr. Nadkarni's CV.  In your binder is an old version, and we have an updated version to provide the Court.

THE COURT:  Doctor, if you could please come forward and be sworn.

(Witness was sworn.)

SIDDHARTHA NADKARNI, M.D., called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ALI:

Q.  Good afternoon, Dr. Nadkarni.

A.  Good afternoon.

Q.  Could you please state and spell your name for the record?

A.  Sure.  Siddhartha is my first name.  It is S-i-d-d-h-a-r-t-h-a, and my last name is spelled N-a-d-k-a-r-n-i.  That's Nadkarni.

Q.  And what is your profession?

A.  I'm a medical doctor who is a neurologist and psychiatrist.

Q.  Could you please briefly give us the highlight of your educational background?

Nadkarni, S. - Direct                                    1590

A.   Sure.  I went to undergraduate institution, Brown University where I studied comparative literature and biology, and then I went to the University of Miami School of Medicine for four years from 1993 to 1997 followed by a six-year residency at NCU School of Medicine in a combined residency in neurology and psychiatry where I was in the first class of that combined residency with one other resident.

     After six years of training in neurology and psychiatry, I completed a one-year fellowship in clinical neurophysiology in epilepsy tract, and that's my education.

Q.   And how about your professional career, just the highlights?

A.   Sure.  So after I graduated from my fellowship at NYU, I stayed on NYU for 22 years after that -- or maybe 19 years after.  I was there from 1997 to 2022 where I did a combination of clinical practice, seeing patients, both in-patient and out-patient, on an epilepsy unit and then epilepsy division, seeing patients with neuropsychiatric conditions, and epilepsy.

     And the other part of my academic life was administering programs, educational leadership.  So I was the program director for many years of the clinical neurophysiology fellowship.  I was the program director of the combined residency in neurology and psychiatry for many

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1591

years.  I was the program director of the epilepsy fellowship as well as the director of the neuroscience curriculum for psychiatry residency training.  So a lot of my academic life was spent in administering training programs and teaching trainees.

Q.  About how much of your practice consists of seeing patients?

A.  Yeah.  So after 2022 I left NYU, and I went into private practice.  So now three weeks of the month I see patients in my private practice, and one week of every month I spend doing in-patient epilepsy at Hackensack University Medical Center where I run an epilepsy service for both pediatric and adult patients.  And the total amount of my practice that's spent on clinical medicine is probably 80 plus percent.

Q.  And how about when you were at NYU?  About how much of your practice then consisted of seeing patients?

A.  It's about the same.

Q.  And do you also do forensic consulting?

A.  I do, yes.

Q.  And does that make up the rest of your time?

A.  That makes up much of the rest of my time, yes.

Q.  Do you hold any board certifications?

A.  Yes.  I'm board certified in neurology and psychiatry, clinical neurophysiology, epilepsy, all from the American Board of Psychiatry and Neurology, as well as neuropsychiatry

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                            1592

and behavioral neurology from the United Council for Neurologic Subspecialties.

Q. What does it mean to be board certified?

A. It means you qualify to sit for and pass a national standardized examination after a period of residency training.

Q. You mentioned that you are board certified in neurophysiology. What is that?

A. Neurophysiology is the interrogation of the nervous system all the way from the muscle all the way up to the cortex of the brain. So it involves everything from EMGs, nerve conduction studies, evoke potential studies, electroencephalograms, magnetoencephalograms. It is the study of the function of the nervous system and interrogating its function.

Q. You are also certified in behavioral neurology. What is that?

A. Behavioral neurology is a field -- is a subspecialty of neurology that focuses on issues of present comportment, symptoms of cognition, symptoms of psychiatric symptomatology. Basically neuropsychology or behavioral neurology is a field that looks at the function of the brain and the behavioral aspects of that functioning, both in terms of symptoms and presentation.

Q. And how about neuropsychiatry? Is that different from

Nadkarni, S. - Direct                                                1593

psychiatry without the neuro prefix?

A.   Yes, it's different.  Yes.

Q.   And how does the neuropsychiatrist differ from a neurologist, who is not also a psychiatrist?

A.   So the way I like to explain this is that if you close one of your eyes, the world becomes kind of two-dimensional, and the thing that you get when you open both of your eyes is kind of a depth of vision.

        So, you know, doctors, we look at things through certain lenses, and there is a way a psychiatrist might look at a patient, there's a way a neurologist might look at a patient, but I think a neuropsychiatrist can actually use both and get a different perspective on the patient than somebody who might not be trained in the other field, especially when it comes to neuropsychiatric symptoms.

Q.   In addition to your clinical work, do you also do research and writing in the field of neurology and/or psychiatry?

A.   Yes, I have.

Q.   And are those publications reflected on your CV?

A.   Yes, they are.

Q.   Does your academic work have a particular focus?

A.   Yes.  So it's -- much of the writing that I've done has been in epilepsy.  I've written a chapter on epilepsy in traumatic brain injury for a traumatic brain injury textbook.

                    JODY A. STEWART, Official Court Reporter

I've been involved in multiple papers on cognitive and psychiatric symptoms in epilepsy populations. So mostly it focuses on neuropsychology and epilepsy.

Q. Can you just very briefly describe the nature of your current clinical practice?

A. Yes. It's what I mentioned before. So I have a private practice in Montclair, New Jersey, where I see patients in my office three weeks out of four. And then I also see patients in Hackensack University Medical Center one week of the month during that epilepsy in-patient location.

And then a very small part of my practice is also like a spiritual, teaching spiritual psychology practice that I've started doing in my private practice.

Q. And in your private practice, are the patients you are seeing seeking out help for neurological problems, psychiatric issues?

A. It's really a mix. So a small percentage of my patient population is probably straight neurology, a small percentage might be straight psychiatry, but the vast number of patients have combined neuropsychiatric symptoms, and many, many of them have epilepsy as well.

MS. ALI: Your Honor, I'd offer Dr. Nadkarni as an expert in neuropsychiatry and epilepsy.

THE COURT: Do you want to inquire?

MS. WARD: No, Your Honor, but I do have an

Nadkarni, S. - Direct                                          1595

objection, as to epilepsy.

THE COURT:  Okay.  You don't want to inquiry.  Go ahead and object.

MS. WARD:  I'm sorry, Your Honor.

THE COURT:  Can you come up to the podium and tell me your objection, please.

MS. WARD:  Yes, Your Honor.  Your Honor, if we are reviewing the scope of Dr. Nadkarni's report that was given to us dated 11-9-2022.

THE COURT:  Can you take me to that report in the documents.

MS. WARD:  Yes, Your Honor.  It's a Defense exhibit.  Give me just one moment.  I apologize.  I got the wrong copy.  Defense Exhibit 137.

THE COURT:  All right.  I'm on Defendant's Exhibit 137.

MS. WARD:  Thank you, Your Honor.  Your Honor, I'll start first with the request to qualify Dr. Nadkarni in epilepsy.  There is nothing in this document that would lend itself to a requirement of the relevance of an expert in epilepsy.  There is no functional background in his writing.  There is nothing referenced from his -- from the materials that he reviewed that would indicate epilepsy as a factor in this case.  There is no finding in this report that would indicate epilepsy may be a factor in this case, other than

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1596

one line that suggests they rule out epilepsy, and that's on Page -- I believe Page 7 of the exhibit, Your Honor.

THE COURT:  The pages aren't numbered.  I'll have to count to number 7.  I think I'm on 7.  As I say, they are not numbered.  Where approximately on the page?

MS. WARD:  At the very bottom of the page, Your Honor.  It's the same page as the list of 1 through 7, just a list 1 through 7, and number 7 says, "RO epilepsy," which I presume is rule out epilepsy, "likely focal."

THE COURT:  Can you show Dr. Nadkarni that?

MS. WARD:  Yes, Your Honor.

THE COURT:  Just put it on the screen. Dr. Nadkarni, you have "R/O epilepsy, likely focal."  What does that mean?

THE WITNESS:  Oh, that means that I think he has epilepsy, and I describe the seizures early in the report. It's a long description of multiple episodes of what I think are seizures.

THE COURT:  What does R/O mean?

THE WITNESS:  R/O means rule out epilepsy, likely focal.  That means that I can see epilepsy, and I want to do more diagnostic testing to figure out if it's focal epilepsy or generalized epilepsy.  It's sort of a term of art.

THE COURT:  Well, did you do any further testing?

THE WITNESS:  I asked for further testing, but it

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1597

wasn't granted.  I asked for EEG testing.

THE COURT:  So you didn't do any further testing to determine what it was, if it was there in either way?

THE WITNESS:  I was not afforded the opportunity to do further testing, but the diagnosis was based on history.

THE COURT:  Well, I will let him testify to the limited extent that he has here.  The diagnosis was based on history, but he was not able to do a personal examination.

THE WITNESS:  I'm sorry.  I did a personal examination of Mr. Runyon, but I didn't -- I asked the Court if we could do an EEG study, but that EEG study was never done.

THE COURT:  So that study.  So you would just have to establish that.  I'll let him testify as to what's in this report and what he would have needed to do but he didn't.

MS. WARD:  Yes, Your Honor.  Thank you.

THE COURT:  Is that the only objection?

MS. WARD:  I believe so.

THE COURT:  All right.  Ms. Ali.

MS. ALI:  Just to clarify, Your Honor, I'd offer Dr. Nadkarni as an expert in neuropsychiatry and epilepsy.  I know you just said you'd permit him to testify with the limitations you noted in epilepsy, but I wasn't sure on the neuropsychiatry if you had accepted him?

Nadkarni, S. - Direct                                                    1598

THE COURT:  Yes.  I qualify him as a neuropsychiatrist and in epilepsy, but he can only testify about that.  Obviously, I looked at his resume, and what he does, he qualifies as an expert, but he can only testify to the extent that he formed an opinion in this case about Mr. Runyon.  But I do qualify him in both fields.

MS. ALI:  Thank you, Your Honor.

BY MS. ALI:

Q.  Dr. Nadkarni, were you retained as an expert in this case?

A.  I was retained, yes.

Q.  Do you recall when that was?

A.  I believe it was in early 2021 originally.  I think there has been two teams on this case.  So I think the first team I think it was in the spring or February or March of 2021.

Q.  And who retained you?

A.  I believe it was the Federal Public Defender's office.

Q.  What were you asked to assess?

A.  I was asked to assess Mr. Runyon from a neurological and psychiatric perspective.

Q.  What does that mean?

A.  That means taking a history, looking at records, and doing an examination, and then coming up with an opinion of how his brain might be functioning.

Q.  And how does a neuropsychiatric exam differ from a

Nadkarni, S. - Direct                                          1599

neurologic exam?

A.  I think it includes a lot more than just a neurological exam would include, like a much more robust mental status examination, and the opposite is true, too, like a psychiatric examination is missing all of the neurological parts of the examination.  So it includes both of those things together.

Q.  Have you been admitted to testify as an expert in the field of neuropsychiatry before?

A.  Yes, I have.

Q.  About how many times?

A.  Probably 15 to 20 times.

Q.  Over what period of time?

A.  11 -- 12 years.

Q.  You've testified that you've conducted an in-person evaluation of Mr. Runyon.  Did you also review records concerning Mr. Runyon?

A.  Yes, I did.

Q.  And after you did both of those things, did you, to a reasonable degree of medical certainty, reach an opinion about David Runyon's neuropsychiatric functioning?

A.  Yes, I did.

Q.  And what were your opinions, at a high-level for now?

A.  Yes.  I found Mr. Runyon to be severely brain injured and have marked sort of frontal lobe dysfunction and a frontal

Nadkarni, S. - Direct                                          1600

lobe syndrome with many attendant psychiatric and cognitive diagnoses.

Q.   What sources did you rely on to evaluate Mr. Runyon to arrive at these conclusions?

A.   I relied on my interview of him, my examination of him, and then the records that I was provided, which included declarations and interviews of family and friends, other evaluators, diagnostic studies, school records, medical records from prison medical records, military medical records.  I'm sure that's not an exhaustive list.

Q.   Did you review those records before you examined Mr. Runyon?

A.   I did see some of them before I examined Mr. Runyon.

Q.   And is that typical of how you would perform an examine in your clinical practice?

A.   Yes.  If I get records before seeing a patient, I like to look through those.

Q.   And is that your practice or is that standard practice in your field?

A.   That's standard practice in the field.  That's what we teach our trainees to do.

Q.   What role do records play in your overall evaluation?

A.   They provide a lot of data points to make a diagnosis or come up with a picture of what you think is going on.  So they just provide history and other perspectives and also

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1601

sometimes collateral perspectives at different times in the history.

Q.  Is that true in your clinical practice or only when you are testifying to forensic people?

A.  Always in clinical practice also.

Q.  Generally speaking, does what you see in a patient's medical records or other records influence the way you conduct the in-person examination?

A.  Actually, it doesn't.

Q.  Does it have any impact on the examination?

A.  When I do an interview and examination, I have a very standardized sort of set of questions that I go through and structure that I go through.  So that's the way I do my assessments.

Q.  How significant is the in-person evaluation to your reaching conclusions about a patient or someone you're evaluating?

A.  It's one piece, but it can be a very important piece because it involves both history taking and my examination of the patient.  The actual examination can be very helpful.

Q.  And do neurologists use a standard examination format?

A.  Neurologists do, yes.

Q.  Can you walk us through what that looks like very briefly?

A.  Sure.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                             1602

Q.   Not with respect to Mr. Runyon but just what the format is.

A.   Yes.  The first thing you look at is a mental status examination.  There is only one mental status examination, but psychiatrists do a much longer version of it.  A neurologist focuses on a much shorter version of it, but the mental status examination involves the patient's appearance, how they are relating to you, are they forthright, meaning how well related they are, what's their eye contact like, what's their psychomotor status, what is the speech like, and then you get into mood, affect, thought content, thought process, cognition, insight, judgment, safety.  These are all parts -- the first part of the assessment, neuropsychiatric assessment.  That's the mental status exam.

       The next thing you do is the cranial nerve exam.  So there is the brain, and then there is the brainstem, which is just below, and from that brainstem a lot of nerves come out that supplies sensation and motor function to the face.

       Those are called the cranial nerves, and you look for, if the cranial nerves are functioning normally, and then you move on to the motor exam, testing strength and bulk and tone and reflexes, the sensation exam of the skin, coordination testing, which is cerebellar testing, gait testing, reflex testing, that sort of standard assessment.

Q.   Is there also part of the exam that relates to taking the

Nadkarni, S. - Direct                                          1603

patient's history?

A.   Right.  That's not really the exam, that's the history.

Q.   And what are -- what kinds of questions do you ask during that part?

A.   So that's also pretty structured.  You start with the identifying data of the patient, including the handedness, which is important in neurology, and some basic demographic information.

Then you move on to the chief complaint, which is the reason that you are being asked to see the patient.  In clinical practice, the patient will tell you that.  In forensic cases, it's almost always that you've been hired by the -- his legal team.  And then you get into the history of present illness, meaning exploring symptoms the patient might have or endures throughout their lives, both neurologically and psychiatrically.

And then past medical history, past surgical history, family history, developmental and social history, meaning birth history and developmental history, academics, social history, and then you look at allergies, medications, and then you move on to a physical examination.

Q.   Okay.  Moving back to the physical examination, does the standard neurological examination include a separate test for malingering?

A.   Yes.  The standard neurological examination is always

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                    1604

looking for malingering, yes, in the examination.

Q.   And do you have training to do that?

A.   Yes.

Q.   How do you look for malingering when you are conducting neurologic --

A.   You look for certain signs of malingering.  Like, there is typical signs of malingering, something like -- there is something called give-way weakness.  So you are testing somebody's strength.  Initially it's good, and then all of a suddenly it goes.  That's a classic malingering.  True weakness is slowly going down.

People who are trying to fake weakness almost always sort of give way.  This gait, oftentimes people have abnormal gaits when they are malingering.  They pretend that they can't walk right, and we call that the astasia-abasia, for example, which is somebody who is lurching from side to side but never falls down, which means it actually takes more coordination to do what they are doing.  They are trying to tell you that they can't walk right.

So these things are embedded in the examination.  There is multiple things like that.  In mental status examination, you look for people giving you the date off by one day.  That's a typical malingering kind of thing.  So in doing neurological and psychiatric assessments, we are sort of taught to look for these things.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1605

Q.  Did the examination you just described -- I'm sorry, did the examination you conducted of Mr. Runyon conform to the standard exam format you just described?

A.  Yes, it did.

Q.  Did you review Mr. Runyon's records before evaluating him?

A.  I reviewed some of them.

Q.  And how did that inform your evaluation of Mr. Runyon?

A.  In my personal interview with him, it didn't because I was just trying to get information from him.  So the first thing I did was get a history from him.

Q.  When did you examine Mr. Runyon?

A.  I believe it was in 2022 in June -- I'm sorry, 2021.  I might be off.

THE COURT:  It says here 7-25-22 at 10:00 a.m.

THE WITNESS:  I'm sorry, July, 2022.  Thank you.

BY MS. ALI:

Q.  That was many years after the crime; is that correct?

A.  That's correct.

Q.  And did you do anything to evaluate whether the findings you made in 2022 were present at the time of the crime?

A.  Well, I -- you know, I looked at records, and I looked at declarations of people that knew him back then and reports from other people, as well as his self-report.

Q.  Where did you examine Mr. Runyon?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                    1606

A.   I think it was Tidewater Regional Jail.  I think he was in Suffolk, Suffolk, Virginia.  Is that what it was?  Yeah.

Q.   And did you prepare a report summarizing the results of your examination and your overall findings?

A.   Yes, I did.

Q.   Can you pull up 154.

     Meant to do this earlier, but I'm showing the witness what's been premarked as Defendant's Exhibit 154.  Do you recognize this as a -- I'm sorry, this is the -- can I use the Elmo?  I'm sorry.

     THE COURT:  What is this?  The report.

     MS. ALI:  This is the old version.  I'm sorry, Your Honor.  I provided the Court an updated copy.

     THE COURT:  I think it's 137.

     MS. ALI:  His report is.  I neglected to put -- to offer his CV earlier.  I'm just trying to clean that up.

     THE COURT:  All right.  Go ahead.

     MS. ALI:  I can do it here.

     THE COURT:  Unless you want to go through it, I've read it.

     MS. ALI:  Okay.  Thank you, Your Honor.

     THE COURT:  I admit Defendant's Exhibit 154.

     (Defendant's Exhibit 154 received in evidence.)

BY MS. ALI:

Q.   Now moving on to Defendant's Exhibit 137.  Is this the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1607

report you prepared in Mr. Runyon's case, Dr. Nadkarni?

A.   Yes.  It looks like it, yes.

Q.   Does it have a date on it?

A.   11/9/2022.

Q.   And toward the bottom, is that your signature?

A.   That is my signature, yes.

Q.   How did your in-person assessment of Mr. Runyon begin?

A.   I met with him in the jail, and I introduced myself, letting him know that we are not sort of establishing a standard doctor/patient relationship, that I work for his legal team, that I was there to get information from him, and that I would be willing to answer any questions he had, and then we proceeded with the interview.

Q.   At the 30,000-foot level, can you describe your neuropsychiatric examination with Mr. Runyon?

A.   Yes.  Do you mean the history and the examination?

Q.   The neurologic examination.

A.   Yes.  So if we can scroll to that part of the page, but he -- Mr. Runyon had abnormality in his mental status examine, his cranial nerve exam, his reflex testing, and his motor exam.  He had abnormalities in multiple parts of his neurologic examination.

Q.   You described your standard exam format.  Did you start with the mental status evaluation with Mr. Runyon?

A.   I did.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1608

Q.   And what did you evaluate during the mental status examination?

A.   Again, appearance, relatedness, speech, eye contact, psychomotor status, mood, affect, thought content, thought process, cognition, insight, judgment, those things.

Q.   What were your findings upon Mr. Runyon's mental status exam?

A.   So I found Mr. Runyon to have some pressured speech.  His pressured speech means you have to interrupt him.  It doesn't necessarily mean that it is fast or loud.  And I found that he was -- he had, um -- he had what I would describe as confabulation.  He would tell stories that would sort of shift and change in detail and content, and that's sort of a typical thing to see when you're doing a mental status exam. If the patient has trouble filling in their story, they sort of make things up and tell tales.  That's what I saw in his mental status exam.

Q.   Is confabulation the same thing as lying?

A.   Lying, I think, is very different in my mind.

Q.   Can you explain the difference.

A.   Right.  So lying is when you know something is true and you intentionally say the opposite or something different. Confabulation is when you don't know what actually is real or not real and true or -- there is not good sort of information, and there are blind spots, which is very typical

Nadkarni, S. - Direct                                                    1609

of people with head injuries where they sort of fill those blind spots in with stories, and it's -- you know, we do this all the time. Like with our vision, when -- you know, when the -- where the nerve goes into the eyeball, there is no nerve cells. So we should be walking around looking at two black dots in our world all the time. But we don't because we fill in our vision. That's confabulation.

That is visual confabulation, but the same thing happens when people have head injuries and brain injuries because they don't take in information so well, and they don't process information so well, so at a later date, when they are trying to go back, sometimes they fill those things in with stories. Human beings don't like -- brains don't like to have these blind spots, and confabulation is the feature of that filling-in process.

Q. You mentioned pressured speech and confabulation. Did you notice anything else during the mental status examination?

A. He was grandiose. I mean, he would say things that were sort of -- he'd paint himself in a favorable light, and he was also slightly delusional, meaning he would talk about having superhuman powers or being able to predict the future or seeing evil coming. So these are all elements of mental status exam that were abnormal.

Q. Did these impairments strike you as significant?

Nadkarni, S. - Direct                                        1610

A.   Yes.

Q.   Why?

A.   Because part of my job is to see if the brain is functioning normally or abnormally, and this is a very abnormal functioning presentation.

Q.   You mentioned that you evaluated Mr. Runyon's thought content.  What does that mean?

A.   Thought content includes things like suicidal thinking. It's all the juicy stuff; hallucinations, delusions, suicidal ideation, homicidal ideations, obsession, compulsions, preoccupations.  So, yes, he didn't have suicidal or homicidal ideations.

Q.   Is thought content the same thing as thought process?

A.   Thought process is different.

Q.   How?

A.   So thought process is the way their sentences sound when they come out, meaning are they linear in the sentence that they are saying at the time?  So a mental status examination is a cross-section in a moment of time.  So in that moment of time, is the thought process linear, is what you are looking for, meaning can I tell the connection between thought A and thought B?  But that can change depending on different mental status when you do the mental status examination.  That's thought process.

Q.   So those were your observations of Mr. Runyon in 2022.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1611

Did you find any evidence in the record you reviewed corroborating whether Mr. Runyon exhibited these symptoms at the time of the crime?

A.   So, you know --

MS. WARD:  Your Honor, I object.  That question goes beyond the scope of what's included in his report.

THE COURT:  What's included in the report?

MS. WARD:  Yes, Your Honor.

THE COURT:  All right.  Can you respond?

MS. ALI:  Sure, Your Honor.  He will testify to the material that he reviewed, which include many records from the time of the crime in which informs overall conclusions in his report.  I'm getting there.  I'm laying the foundation for him to testify about what he did to explain why the findings he made in 2022 are relevant to Mr. Runyon's functioning around the time of the crime.

THE COURT:  Go ahead with the expectation that you are going to focus on what records he is talking about.

MS. ALI:  Yes, Your Honor.

BY MS. ALI:

Q.   Would you like me to repeat the question, Doctor?

A.   Please.

Q.   Did you find any evidence in the records you reviewed corroborating whether Mr. Runyon exhibited the same kinds of grandiosity and confabulation you noted in 2022 at the time

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1612

of the crime?

A.  There were records -- there were other evaluators that have evaluated him throughout this time period, and I think if you look at the mental status exams of almost any evaluator, it's a very similar picture.

THE COURT:  Be specific about who they are, because that can be important when we are relating back.  I think he was 51 when you interviewed him, and we are relating back a number of years from 2022 to, say, a period around 2007 to 2009.  So we need to know specifically which of your records.

THE WITNESS:  Okay.  So there were the Bureau of Prisons records, there are Army medical records that documents some of these findings.  There is also a social history, interview history, you know, with his family and peers that document some of his symptoms from a longer time ago.

BY MS. ALI:

Q.  You mentioned prison records.  Could we pull up Defendant's Exhibit 44, please.

Do you recognize this document, Dr. Nadkarni?

A.  Yes.

Q.  Is this something you reviewed in preparing your report?

A.  Yes.

Q.  And can you tell what the document is by looking at it?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1613

A.   This looks like -- it's from Portsmouth jail when he was there after -- I think a year after he was arrested, maybe.

Q.   And do you see a date on the document?

A.   12-2-2008.

Q.   Can we look, I think it's the last page.  There we go.

          MS. WARD:  Your Honor, the same objection that we made during Dr. Cunningham for this exhibit, that it references information that's just written and not contextually and not authenticated.  We don't know who authored it, we don't know anything about it, and it just references a provisional diagnosis.

          MS. ALI:  May I respond, Your Honor?

          THE COURT:  Yes.

          MS. ALI:  We do -- I'll ask him questions about this, but we can see who authored it.  We do know where it came from.  It is already admitted in evidence.  It's a record from the Portsmouth City Jail that was admitted as Defendant's Exhibit 44.  It's the medical records contemporaneous with the time of the crime that informed Dr. Nadkarni's evaluation of Mr. Runyon.

          THE COURT:  You say it was admitted at trial?

          MS. ALI:  No.  I'm sorry, admitted in the February proceeding.

          THE COURT:  All right.  Then go ahead and ask about it.

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1614

BY MS. ALI:

Q.  Did you review this document, Dr. Nadkarni, in preparing your report?

A.  I did.

THE COURT:  Madam clerk, was it admitted already?

THE CLERK:  Yes, Your Honor.

THE COURT:  Go ahead and ask about it, but I don't know that anybody ever testified from Portsmouth about it coming from the records, but I'd have to go back and look. Go ahead and ask your questions.

BY MS. ALI:

Q.  I'm sorry.  I don't recall if he answered the question I asked.  I asked whether he had reviewed the document in preparing this report.

A.  Yes.

Q.  And did you find anything notable about this document?

A.  Yes.

Q.  Can you explain what that was?

A.  I think this evaluator found a very similar mental status exam with mention of him being grandiose when he was rambling on, and she thought that he might have schizoaffective disorder or bipolar disorder.

THE COURT:  Who thought that?

THE WITNESS:  The author of this.  It's in Axis I. I'm sorry.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                           1615

THE COURT:  Who is the author of this document?

THE WITNESS:  It looks like somebody named Robertson MH at the bottom there.

BY MS. ALI:

Q.  Do you know what MH means?

A.  I'm not exactly sure.  I don't know if that means mental health.  I'm not sure.

THE COURT:  The document said he is not grossly psychotic.  He will be reevaluated in approximately one week with possible referral to Dr. Ignacio.  Do you know whether he was reevaluated in one week with a referral to Dr. Ignacio?

THE WITNESS:  I do not.

THE COURT:  You have not seen any record from Dr. Ignacio?

THE WITNESS:  Not that I can recall off the top of my head.

MS. ALI:  I'll represent, Your Honor, we didn't receive any.

THE COURT:  I'm not aware of any, either.

MS. ALI:  We are not, either.

BY MS. ALI:

Q.  You also mentioned Army records, Dr. Nadkarni.

A.  Yes.

Q.  Can we pull up Defendant's Exhibit -- these were

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1616

previously admitted as Defense Exhibit 122.  I believe they were also admitted as Government's Exhibit 26.

THE COURT:  All right.

MS. ALI:  The Court's indulgence.  The exhibit is not paginated, and so it is a little difficult to get to the right place.  If it is easier, I can do it on the Elmo.

THE COURT:  What is it?

MS. ALI:  This is Defense Exhibit 83, I believe.

THE COURT:  All right.

MS. ALI:  I'm sorry.  It's meant to be a sentence in 83.  I think I said the wrong number.  These are the Army medical records.

THE COURT:  Put it on the screen.  I have seen those before, so you can put them on the screen, and let's just look at them from the screen.

MS. ALI:  Okay.  It may be easier for me to use the Elmo just because the PDF is very large and getting to the right place might take some time.

BY MS. ALI:

Q.  Do you recognize this document, Dr. Nadkarni?

A.  Yes.

Q.  And is this part of the Army medical records that you testified you reviewed?

A.  That's correct.

Q.  And was there anything notable about this document?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1617

A.   Well, I think it was -- first of all, it's date was from August of 1995, and it talks about a motor vehicle accident that resulted in chronic infection in his face from glass entering his face.

Q.   And did that have any bearing on your understanding of Mr. Runyon's history or neurologic functioning?

A.   Yes, that this in 1995, there is already documentation of a motor vehicle accident with injury to the head.

Q.   This is all part of the same Exhibit 83, Defendant's Exhibit 83 Army records.  Is this part of another page of the Army records that you reviewed?

A.   Yes, it is.

Q.   And can you find a date on this document?

A.   This looks like 1996.  I can't see if that's a 12.  Can't exactly tell.  This looks like it is 1996, maybe 12.

Q.   I don't want to testify, but just so the record is clear, I think it's 12 November 1996.  Do you see that in the top left corner?

A.   Yes.

Q.   And what is this record establishing?

A.   This is also a medical note, and it looks like this describes another car accident that was a head-on collision that's mentioned here.

Q.   And did that have any impact on your understanding of Mr. Runyon's history or neurocognitive functioning?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1618

A.   Yes.  It looks like there was corroboration of head injuries dating back to the '90s.

Q.   Do you recognize this as part of the Army medical records that you reviewed?

A.   Yes.

Q.   And do you see a date on this document?

A.   This is December 2, 1996.

Q.   Do you see what the chief complaint written here is?

A.   MVA.

Q.   And do you know what that stands for?

A.   Motor vehicle accident.

Q.   And do you understand what the purpose of this document is?

A.   This looks like a screening form for symptoms that somebody did.

Q.   Relating to the motor vehicle accident?

A.   Correct.  So the chief complaint is motor vehicle accident, which means that that's the reason for the visit.

Q.   And this is dated approximately three weeks after the -- when he officially reported the accident?

A.   Yes, correct.

        THE COURT:  This is the same accident, though?

        THE WITNESS:  1996.

        THE COURT:  Yes?

        THE WITNESS:  Yes.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1619

BY MS. ALI:

Q.  One more.  Do you recognize this as another part of the Army medical record you reviewed?

A.  Yes.

Q.  And it's hard to make out, but there is a date -- I'll highlight it up here.  And then I think you can see the year below.  Can you tell when this record is from?

A.  January 9 -- is that 1997?

Q.  That's what it looks like to me.

A.  I can't really -- I don't know if there is a date somewhere else on there.

Q.  And do you see -- do you have an understanding of what this document is or what the purpose was?

A.  Yeah.  This is also a medical note talking about his symptoms and conditions in relationship to that motor vehicle accident in 1996.

THE COURT:  This is another follow-up?

THE WITNESS:  Correct.  Correct.  That's correct.

BY MS. ALI:

Q.  And if you look down here at the bottom, do you have an understanding of what A/P means?

A.  Assessment and plan.  So it's like a list of what the person thinks is going on.

Q.  And what does it say here about Mr. Runyon's --

A.  So --

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1620

Q.   I'm sorry -- assessment and plan?

A.   So it talks about him having symptoms at that time of insomnia, posttraumatic stress disorder symptoms, as well as depression.  I mean, this note also mentioned -- makes note that he's depressed.

Q.   And does it also indicate something about his memory?

A.   It mentions that he has memory loss, as well, correct.

Q.   Did you consider these Army medical records in your overall assessment of Mr. Runyon in his clinical history and brain functioning?

A.   Yes.

Q.   And those records all dated from before the time of the crime; is that right?

A.   Correct.

Q.   Does your finding of confabulation tell you anything about Mr. Runyon?

A.   Confabulation tells me that he -- he has what we call in our field an organic syndrome, which means that the brain is injured in some way and not functioning normally.  The most commonplace you see confabulation is in alcoholic dementia. It's Korsakoff dementia, and the second most common is traumatic brain injury.

Q.   Moving on to the portion of your assessment regarding cranial nerve.  What are you looking for when you assess the cranial nerve?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1621

A.   We are looking to see if those nerves coming out of the brain stem are functioning normally or not.

Q.   How do you test the cranial nerves?

A.   You test the sensation of the face.  You test eye movements.  You check for the excursion of the mouth, the tongue, how the tongue protrudes.  These are all ways to check; hearing.

Q.   And what did you find in your test of Mr. Runyon's cranial nerve?

A.   I found that he had an asymmetry in his face, and when I saw him, it looked like his -- the left side of his face was moving -- the asymmetry that I saw is the excursion on the left side of his face was slower than the right side of his face, so I documented what I saw.

I find it a little tricky to make a call about what the cause of asymmetry if somebody has a chronic facial problem.  So then I just describe what I see, which is that the left side went slower than the right side and that there was a definite asymmetry, a neurologic asymmetry to his face.

Q.   And is that visible on Mr. Runyon's face?

A.   Yes.  Even today.

Q.   Do you have any understanding of what the cause of Mr. Runyon's facial asymmetry was?

A.   Yes.  My understanding from reviewing the records is that that facial asymmetry was noted --

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                    1622

MS. WARD:  Lack of foundation.

MS. ALI:  I'm trying to lay the foundation here, Your Honor.

THE COURT:  Go ahead and try to lay it first and then ask.

THE WITNESS:  I believe it's from a head injury he suffered at a very young age of 3 three years old.

BY MS. ALI:

Q.  And what was the basis of your understanding?

A.  That's been reported by multiple evaluators as well as his mother in a social interview.

MS. WARD:  Your Honor, I object.  That answer is overbroad.

THE COURT:  I couldn't understand you.

MS. WARD:  I'm sorry.  He has multiple evaluators. It was overbroad and not specific.

THE COURT:  What evaluators are you talking about?

THE WITNESS:  I think that neurologists have seen him, Dr. Dudley.  I think neuropsychologists have seen him, Dr. Mirsky and Montalbano.  I believe there are asymmetries that are noted in his affect.

BY MS. ALI:

Q.  Did Mr. Runyon also self-report?

MS. WARD:  Your Honor, objection as to any consideration of materials related to Dr. Dudley in 2015,

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1623

not 2009 or prior to 2009, and he's not available to testify.

THE COURT:  He can't testify as to what Mr. Dudley has found.  It is Dr. Dudley or is it Mr. Dudley?

MS. ALI:  It is Dr. Dudley, Your Honor.

THE COURT:  If he did a report, and he can testify, that's fine.  But there is no way for the Court, as I said yesterday, when I wouldn't let Dr. Cunningham testify about what this witness's report was, I wanted to hear from the witness.

But it's their report, and I can then assess the weight and the credibility.  So don't go into a report of another.  I know you showed them to him, but don't go into the report of another expert because that expert can testify, and you can present that if that is your plan.

MS. ALI:  I understand the Court's ruling.  I won't go into that area.  I'll just note for the record that under Rule 703, Dr. Dudley's report is listed as a material that Dr. Nadkarni relied on.  It's something he considered in reaching his ultimate opinions.  I think under Rule 703 he should be entitled to testify about it if Dr. Dudley is not available.  Dr. Dudley retired.  That's in part why Dr. Nadkarni is here, but I understand the Court's ruling.

THE COURT:  Did you ever speak with Dr. Dudley about his report?

Nadkarni, S. - Direct                                                   1624

THE WITNESS:  I did not.

THE COURT:  Okay.  In other words, it was just something given to you.  So you don't know basically what he did and necessarily how he reached his conclusion.  You didn't talk to him?

THE WITNESS:  I did not talk to him, but I saw what he wrote.

BY MS. ALI:

Q.  Is it typical in your field to rely on the reports of other experts in coming to a conclusion about a patient?

A.  Yes.

Q.  And is that something that you do or is that something that all neuropsychiatrists do?

A.  I think all, that's a standard of care.

THE COURT:  But that's a standard of care, but if you are testifying on the opinion that you formed, you don't know whether the other person, is the Court or whoever is looking at it, this is not giving an opinion to another doctor or giving a treatment plan, this is giving an opinion from a medical expert to the Court, and you don't know how the Court would evaluate that opinion; is that correct?

THE WITNESS:  Yes.  I just -- if I'm given a document, I have to look at it and make an assessment about how valid it is and what, you know -- I -- when I write my report, I look at all the documents I'm given.  So I take

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1625

that into account when I make my opinion.

THE COURT:  It's different if it's a treatise and it's one used in the industry, and so forth, but just another report, I would have to be able to assess.  In order to give weight to that testimony, I have to be able to assess the credibility and the weight of the other report.  So he reviewed it, and it was something that helped him in his opinion, but he doesn't need to talk about it.

BY MS. ALI:

Q.  Were there other sources of information for your understanding that Mr. Runyon's facial asymmetry was caused by a head injury at age 3 other than Dr. Dudley?

A.  Yes.

Q.  And I believe you also -- in addition to the other evaluators, I believe you also testified that Mr. Runyon's mother had stated that in an interview?

A.  Yes, that's correct.

Q.  Did Mr. Runyon also self-report that to you?

A.  That's what I was going to say, yes, that he also told me that himself.

Q.  Can you tell me anything about the severity of the head injury based on the facial asymmetry you observed in Mr. Runyon?

A.  Yeah.  That would have to be an extremely severe blow to the head, strike to the head, to produce a nerve injury to

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1626

the facial nerve.

Q.  What's the effect on Mr. Runyon of his facial asymmetry, in terms of how he presents to the world?

A.  So, you know, the -- so the impact would, you know -- would have to be so hard that it would crush or damage or cut that facial nerve.  So in boxing when people knock people out, knocked out, they don't have facial injuries after that.  So that speaks to how extreme the injury was.

The asymmetry in the face, when people are evaluating your affect, what you look at is the face.  So if you have facial asymmetry, you might come across a smiling or a glib or off, or people might not be able to know how to -- that's why sometimes it's important to look at it from a neuropsychiatric perspective because somebody is not a neurologist might not notice necessarily and might think it's something else, like an affective problem.

Q.  Can you explain what you mean by affect?

A.  Affect is the emotional presentation of the patient.

THE COURT:  This is strictly a lay comment.  Most people's faces, at least from the Court's observations, are not perfectly symmetrical.  One eye is generally a little higher than another, or one smile is a little higher than the other.

In fact, many people comment all the time when you are looking at certain television newscasters and things

JODY A. STEWART, Official Court Reporter

that is something -- at least I have observed through the years, is that people's faces genetically are not necessarily perfectly symmetrical.  One eyebrow goes up higher than the other.

THE WITNESS:  You know, I've actually noticed the same thing on newscasters.  To me I wonder do we have a little facial, do they not have a little facial, and it's true, one can be bigger, one eye can look a little -- and that's -- there is a bell distribution of that in society for sure.  But when somebody has a facial nerve weakness, it goes way beyond that, very weak in one side of the face.

THE COURT:  I understand that, and a number of the reports have noted the droop on the left side, I believe.

THE WITNESS:  Right.

BY MS. ALI:

Q.  Understanding that many people aren't -- faces are not perfectly symmetrical, or is Mr. Runyon's more pronounced than average?

A.  Oh, he has a facial weakness.  There is a neurologic facial weakness.

Q.  Is the assessment of affect part of a standard neuropsychiatric exam?

A.  Yes.

Q.  And how is affect assessed?

A.  So affect is always in relation to mood, and if you think

Nadkarni, S. - Direct                                        1628

about mood as sort of a season, like winter, affect is what the day looks like.  So what does the person look like right now?  They might be depressed, but maybe they are smiling or they are light-hearted or whatever.  That is sort of what affect is, how they are presenting, which is the mood, which is the more chronic internal state.

Q.  How does someone with a flat affect present to people who don't know the reason for it?

A.  Can you say the question again?  I'm sorry.

Q.  How does somebody with a flat affect present to people who don't know why they have a flat affect?

A.  Right.  So, you know, when we move in the world, without even knowing it, unconsciously, we make assessments about the way people are behaving and the way they look and the way they are presenting themselves.  In somebody who has a facial asymmetry or looks like they have a flat affect, might stand out from the normal population as being odd or off or something wrong.

Flatness of affect means there is a lack of reactivity, right, that they don't have enough appropriate reaction to something that's being told, and it could be from, you know -- somebody might think it is from psychosis or depression or Parkinson's, lots of problems of flat affect.  So if somebody mistakes a facial weakness with flat affect, that is some of the things they might think about.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1629

Q.  Is that the kind of thing you would have explained to a jury in 2009?

A.  Yes, yes.  Dr. Bell described this in late 1800s facially.

THE COURT:  You weren't in the case in 2009?

THE WITNESS:  Correct.  But if I was, sorry.

BY MS. ALI:

Q.  The next step in the psychiatric testing you mentioned you did is motor function testing.  What does that involve?

A.  It involves testing the muscles.  So it's to see the muscle strength and muscle bulk and tone.

Q.  And what does muscle bulk and tone have to do with a person's neuropsychiatric health?

A.  Oh, it's part of the motor examination that's just part -- every time you do something on a neurologic examination, we are mapping it to part of the nervous system. So when I do motor testing, I'm mapping his function to the frontal lobes, right.  So different parts of the exam map to different parts of the neural axis than the central nervous system.

Both if you have loss of bulk, if you have atrophy in a muscle, it tells you that it's not -- it's unlikely to be a central nervous system problem, it's more likely to be a peripheral nervous system problem, meaning nerve root or the nerve itself is injured, and then you get atrophy of the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1630

muscle.  So a lack of atrophy means that it's not a peripheral nerve problem.

Q.  Did you make any findings in your motor exam of Mr. Runyon?

A.  I did.  Can we --

Q.  Can we put Defendant's Exhibit 137 up?

A.  He had -- when I examined him, he had weakness, and I believe he had left-sided weakness, but I just want to make sure I don't say that wrong.

        MS. ALI:  Your Honor, I meant to do this at the beginning.  I'll get into a rhythm.  I'd offer Defense Exhibit 137 at this time.

        THE COURT:  All right.

        MS. WARD:  I have several objections.

        THE COURT:  You have objections to 137?  Let me hear the objections.  Should they be outside of the presence of the witness?

        MS. WARD:  Yes, if you don't mind, Your Honor.

        THE COURT:  Then you just stand right outside, please.

        (Witness left the courtroom.)

        THE COURT:  You will need to come up to the podium and speak into the microphone.

        MS. WARD:  Thank you, Your Honor.  I'll start first with what I believe is Page 3 of Defendant's Exhibit 137,

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1631

the list of some of the materials that were reviewed and considered by Dr. Nadkarni.

THE COURT:  All right.

MS. WARD:  I think it was unclear from his testimony and is equally unclear from this list what documentation Dr. Nadkarni used to form the basis of his medical opinion.  For example, he looks at number 75 of the Nelson preliminary evaluation report.

MS. ALI:  I'm sorry, Your Honor.  Can you move it so I can see it on the screen.  Thank you.

MS. WARD:  Sure.  Sorry.  Then number 77, the evaluation of Dr. Patterson; 78, Dr. Montalbano, Dr. Mirsky preliminary report, and the list goes on, but the point being that he is looking at evaluations and opinions of other experts, and it doesn't appear that he was provided, from this list, with any of the underlying testing, raw data, or other facts that would be appropriate for relying on his opinion.

Additionally, he considers information such as Dr. Dudley's report and information that was created or obtained from 2015, and then moving forward, 2018, BOP medical records, and I would note that 2015 was the statutory -- under 2255, the statutory investigative period ended in 2015.

THE COURT:  You are speaking so quickly.  The

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                  1632

statutory period?

MS. WARD:  I'm sorry, Your Honor.  I would note that some of these documents, such as 96 and particularly 97, the BOP medical records from 2017 and 2018 would be irrelevant to an opinion for the purposes of this claim. Under 2255 the statutory investigative period would have ended in 2015.

THE COURT:  The statutory period?

MS. WARD:  For investigation.  I'm sorry.

THE COURT:  Would have been 2015 to '18?

MS. WARD:  Yes, Your Honor, and frankly, his exam in 2022, which documents whatever document.

THE COURT:  So the objection, just looking at the reports without looking at the underlying data and testing that gave way to those reports, that was the first part of the objection?

MS. WARD:  Yes, Your Honor.

THE COURT:  The second part was looking at medical records, prison records that were beyond the statutory period for the proper investigation?

MS. WARD:  Yes, Your Honor.

THE COURT:  I'll hear Ms. Ali on it.

MS. WARD:  I have a couple more.

THE COURT:  You do, okay.

MS. WARD:  Yes, Your Honor.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1633

THE COURT:  Wait just a minute, then.  Let me start numbering these.  Okay.

MS. WARD:  I'm putting up, this is not marked as an exhibit, Your Honor, but this is the supplemental or study aids that we received at 11:55 p.m.

THE COURT:  I haven't seen it.  No one has given it to me.

MS. ALI:  We have copies, Your Honor, if you would like it.

THE COURT:  I would like to see it.  Do you have one for the law clerk?

What about the study aid?

MS. WARD:  Thank you, Your Honor.  As Dr. Nadkarni was testifying, and when asked what materials he relied upon, and asked repeatedly to be specific in what experts he was referencing, he was generally unable to do so.  And I would note that this study aid is much more substantively annotated than what we saw with Dr. Cunningham yesterday. If you take, for example, footnote number 17, not only does it identify materials, Defense Exhibit 99 and the Mirsky background check, this is not listed on -- things are broken out on the list of materials that Dr. Nadkarni reviewed, but Mirsky's background packet is not identified on that list.

So it's very unclear if he -- it is just very unclear as to what that could mean, but more concerning is

JODY A. STEWART, Official Court Reporter

the parenthetical that explained to Dr. Nadkarni what he should find if he were to look back at these records, and that conflicted on this one particularly that conflicted with what he said he found as a causation of the facial asymmetry and was given that answer in a leading question from counsel.

So my objection is lack of foundation.  As he went through his findings, it failed to relate back with any specificity to things that he would have read or observed in his report.

THE COURT:  All right.  So those are your objections?

MS. WARD:  I have one more.

THE COURT:  Okay.

MS. WARD:  I believe this is on the last paragraph -- I'm sorry, the second to last paragraph of the final page, Your Honor.  Dr. Nadkarni is engaging in this assessment.  He is reaching a conclusion that is far afield from the scope of this claim.  In the last line of the second paragraph he finds capacity to conform was significantly impaired at the time of the crime.  So not only did that impugn the verdict, but it also goes to the question of competency that is not before this Court.

THE COURT:  The issue before this Court is whether the trial attorney should have presented in the mitigation

Nadkarni, S. - Direct                                        1635

phase any mental health or brain damage defense.  That's the issue before the Court.  We are not back on knowing right from wrong or being mentally impaired for the guilt or innocence or.  That's not at issue anymore in the case.  The case has gone up to the Supreme Court.  It didn't grant cert.  It's gone to both the Fourth Circuit and the Supreme Court on direct appeal.

We are now here on habeas corpus on this one narrow issue.  I feel like a broken record saying this all the time, but it's about the mitigation phase.  So I would strike any opinion that he would offer as to whether he was competent for the guilt or innocence phase of the trial.

MS. WARD:  Yes, Your Honor.

THE COURT:  If he tries to offer that opinion, it will be stricken from the record as irrelevant at this juncture.

MS. WARD:  Yes, Your Honor.

THE COURT:  Is there anything else?

MS. WARD:  No, Your Honor.  Thank you.

THE COURT:  Well, the way that I look at these objections -- wait till I finish in the way I look at them.  You can come up to the podium.  You may not want to respond to some of them.

In terms of the reports, he can mention those reports, and then you can cross-examine him on, well, what

Nadkarni, S. - Direct                                      1636

did you look at beside the report?  That goes to the weight. I've made it clear the Court's feelings about one expert just reading another expert's report without really delving into, number one, it's not their area of expertise oftentimes; number two, what they relied on, by seeing the tests that they made, by talking to them.  They look at them, and they can say they looked at them, but to me that's something that a Court then has to say, well, what kind of weight does the Court give this testimony?

I think I've made it known that I don't find that particularly persuasive when one expert relies on something that another expert does without seeing the raw data, the test results, and so forth.  I will listen to the testimony, and you can present it.

In terms of the 2015 to 2018 period, I would grant that because you do have a statutory period that you have to do your investigations, and what he was saying about 1996, that was fine, and 1997, that was fine.  But going back, we are not looking at this from the standpoint of 2020 at a prison record or what's going on.

We are looking at this back at the time period that this occurred and what the attorneys and what they knew or could have known at that time period, whether they were deficient.  They could not know about a prison record that's occurring so many years later.  So I would grant that

JODY A. STEWART, Official Court Reporter

objection.

In terms of the study aid, as it's been called, I've said we will allow cross-examination on that, and that's where I think you have vigorous cross-examination. You made the statement, what are you relying on?  Okay. When you look at the study aid, what are you relying on? Why didn't you say that before, those kinds of things.  That is where you vigorously cross-examine the individual on, well, what did you rely on?  You made the statement.  Well, let's look at your study aid.  Well, why didn't you say that when you were asked?  Because you made a comment earlier that he could testify without his study aid and that it could be cross-examined.

It's an amazing thing when the Court sees this, having this many years' experience and sees this kind of product.  So it will end up being admitted, and it will end up being able to cross-examine on it.  So it's something, again, that falls within the rules.  Any attorney-client privilege, if you were even able to claim, it should have been noted a long time ago.

In any event, I don't even know if you were that prepared, certainly within two weeks.  That would have had to have been noticed, the document identified.  Again, this was produced late last night to the government attorneys and just now to the Court.

Nadkarni, S. - Direct                                          1638

So basically the reports, he testifies it goes to the weight and subject to cross-examination on what he saw in those reports.  Anything past 2018 would be past the statutory limit, and you can't ask about that.  The study aid is subject to cross-examination, and there will be nothing on opinion of his competency or anything else in terms of guilt or innocence, because that's not before the Court.

Do you understand the Court's rulings?

MS. ALI:  Yes, Your Honor.

THE COURT:  Is there anything else you want to say?

MS. ALI:  I just note one thing about what I think was the third issue, the statutory period.  I'm certainly not intending to elicit any information about Mr. Runyon's mental functioning at any point after the crime.

There is some evidence that comes in or evaluations that were done, Dr. Nadkarni's physical examination of Mr. Runyon was not until, I believe, 2021.  I'm not trying to establish Mr. Runyon's functioning in 2021, but the way that that informed his functioning and how it matches up with the evaluations that were done closer in time to the crime, to records that predate the time of the crime, so all of that testimony and evidence is meant to elicit information about Mr. Runyon's functioning at the time of the crime.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1639

So some of the information is dated later, but in all instances we are trying to tie it back.  Does it match?  Is it consistent over time?  Does anything about the symptoms in this time match up as corroborative of records that are existing at the time of the crime?

THE COURT:  Well, I kind of understand what you are saying, and I kind of don't.  But the bottom line is that I'm letting that testimony go forward.  Again, the time of his evaluation and the passage of time, when the individual is then 51 years old, and it was only a little over a year ago, that certainly goes to the weight of an individual's testimony.  But I'm letting him testify as to that.  He can't rely upon incidents or medical records, Bureau of Prisons' records on medical situations in 2020.

MS. ALI:  I understand the Court's ruling.

THE COURT:  We can bring the doctor back in.

MS. ALI:  May I just make one more clarification?  I'm sorry.  Ms. Ward mentioned Mirsky background packs that we cite in the report.

THE COURT:  What?

MS. ALI:  The Mirsky background pack, and I think she was suggesting that Dr. Nadkarni wasn't provided those materials.  The materials within those are just separately enumerated on his report.  So it's by another name, but all of those materials are included on his materials considered

JODY A. STEWART, Official Court Reporter

list.

THE COURT:  You will have to clear that up.

MS. ALI:  That's fine, Your Honor.

(Witness entered the courtroom.)

THE COURT:  Dr. Nadkarni, we cleared up everything to go forward.

THE WITNESS:  Thank you.

MS. ALI:  I'd offer Defense Exhibit 137, Your Honor.  That's Dr. Nadkarni's report.

THE COURT:  With the caveats that the Court has just ruled on, it's admitted subject to those rulings.

(Defendant's Exhibit 137 received in evidence.)

BY MS. ALI:

Q.  I believe where we left off is you were discussing what motor testing tells us about a person's neuropsychiatric health.  What did you find in your motor exam of Mr. Runyon?

A.  I found weakness on the left side, in his left arm, mainly, arm and hand, including left biceps muscle, the left triceps muscle, the left abductor digiti minimi, left hand and left arm, and no evidence of atrophy of the muscles in those groups.

Q.  Does that tell you anything about Mr. Runyon's neuropsychiatric help?

A.  It suggests that the weakness might be related to a central nervous system problem and not a peripheral nervous

system problem.

Q.  And what is the central nervous system?

A.  That's the brain and the spinal cord.

THE COURT:  But a central nervous system problem doesn't necessarily mean a psychiatric problem.  Many people have central nervous system problems.

THE WITNESS:  That's correct.  All different kinds of central nervous system problems.

BY MS. ALI:

Q.  Moving ahead to reflex testing, what are you looking for there?

A.  So, again, you are looking for if the reflexes are too brisk, quick, or too slow or absent.

Q.  And was there anything noteworthy about Mr. Runyon's reflex testing?

A.  Yes.  He had very brisk reflexes throughout, and all the reflexes tested biceps, triceps, patella reflex, ankle jerk reflexes, they were all brisk, fast.

Q.  And does that tell you anything about Mr. Runyon's neuropsychiatric functioning?

A.  Yes.  We call that an upper motor sign, and again, that points to the central nervous system.  I'm sorry.  There is more reflexes.  Do you want the whole?

Q.  Sure.

A.  I just talked about the deep tendon reflexes.  He also

Nadkarni, S. - Direct                                                    1642

had a Hoffman sign in both hands, which is another reflex and another upper motor neuron sign pointing to the central nervous system.

He also had a Hoffman that was asymmetrical.  It was more on the left than the right.  When I examined him, he had a palmomental reflex on the left side.  That's a test where you scratch the palm of the hand, and the chin muscle can twitch on the same side.  That's called a frontal release sign, and that's more specific than just the central nervous system.  That points to the frontal lobe, the contralateral frontal lobe.  So left palmomental sign implicates a deficit in the right frontal lobe.  That was the reflex testing.

Q.  You mentioned a Hoffman's sign.  For those of us who are not neurologists, what does that mean?

A.  I apologize.  If you flick the middle finger, these -- the forefinger and the thumb will come together.  It is a reflex.  It's a sign -- so some of these reflexes are signs of motor hyperreflexia, and some of the reflexes are signs of brain injury and brain degeneration, which the palmomental factors and -- so the Hoffman sign is for motor function.

The palmomental sign is a reflex that we have as infants.  So there are all these infantile reflexes that babies have that usually disappear around age 1.  And when there is an injury to the brain or of a dementia, very commonly as the dementia progresses, these signs come out

Nadkarni, S. - Direct                                              1643

again.  And we call them frontal release reflexes or frontal release signs because they are a sign of degeneration or injury to the frontal lobe.  So when you see it in an adult, it localizes to a problem in the frontal lobe.

Q.  You also mentioned hyperreflexia.  Can you explain that a little bit?  What are some -- I'm sorry, are there numerical scores -- I see on your report -- associated with hyperreflexia?

A.  Yes.  So normal reflexes are two or two plus.  Brisk reflexes are a three or four.  And the hyporeflexia, low reflexes are one or one plus.  So he had three plus diffuse hyperreflexia.

        MS. WARD:  Judge, I have an objection.  The testimony here goes forward beyond what is written into the report and doesn't identify with any -- with the specificity that he is giving out.  This report does not identify the testing that was done.

        So he is talking about frontal release reflex testing.  He's now explaining Hoffman testing and what that applies to.  So he's gone through several different things, but none of those are referenced or explained in this report, and we don't have any of the test data, results, notes, anything that would go to specific testing that was done. This was identified in the report as an evaluation.  So he's going far afield of what's written in it.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                           1644

THE COURT:  Did you do actual testing?

THE WITNESS:  I did all of these things.  This is my physical examination of Mr. Runyon that I'm describing.

THE COURT:  This is the physical examination?

THE WITNESS:  The neurological exams.

THE COURT:  Go ahead.

MS. ALI:  Okay.  If it would be helpful, Your Honor, all of these things are listed directly in his report.  We can turn to it.

THE COURT:  If you want to, you can.  But I'm just saying he's talking about his physical examination, and if you want to tie it over, you can do so.  If he had done things past a physical examination, and you're putting them into a machine or something like that, done an EKG which prints out a result.

MS. ALI:  I'm just trying to establish, Your Honor, that everything he testified to is listed right in his report.  If it would be -- Your Honor has the report.  It's been admitted, but if it would be helpful, I can have him walk through and point to everywhere.

THE COURT:  You have to decide how you want to present him.  I can't tell you what I want presented.  It's a long report.  There is just a long list, like in Dr. Cunningham's at the front, that says I relied on all this.  But it's not necessarily tied into, in this report,

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1645

the same as we were dealing with yesterday.  It's not tied into the findings.  It's just citation to them.  He just said it was from his physical examination.  I don't know if it was from anything else or not.

THE WITNESS:  This is physical examination we are talking about only.

THE COURT:  All right.

BY MS. ALI:

Q.  And did you recite the results of your physical examination in this report?

A.  Yes.  I was just explaining what those tests are.

Q.  Does this report contain all of the results, all of the physical examination that you did on Mr. Runyon?

A.  Yes.

Q.  And is this the format of the standard neurological exam that you would typically do either in forensic setting or clinical practice?

A.  Yes.

Q.  You testified about Mr. Runyon's motor function testing.  Does that appear in your report?

A.  It does.

Q.  You testified about Mr. Runyon's reflex testing.  Does that appear in your report?

A.  Yes, it does.

Q.  You testified about Mr. Runyon's cranial nerve, does that

Nadkarni, S. - Direct                                          1646

appear in your report?

A.  It does.

Q.  You testified about frontal release signs like the palmomental sign and the Hoffman sign.  Do you discuss those in your report?

A.  I do.  The Hoffman sign is not a frontal release sign.  The palmomental sign is a frontal release sign.

Q.  You testified that these -- that the hyperreflexia and your other observations suggests frontal lobe dysfunction.  Why do you believe his injury is to the front lobe and not the spine?

        MS. WARD:  And, Your Honor, that is really the point of the objection, is that he lists without context results of a physical examination but does not tie or list out any conclusions as to what that would mean in his report.

        THE COURT:  Well, take him to that page in the report.  He says that on his physical examination, this is what he concluded.  Now you've gone past that to why did you conclude this.

BY MS. ALI:

Q.  Can you turn to Page 7 of the report, please, and scroll to the bottom.  I'm sorry, you were on Page 7.  Just scroll down a little.

        THE COURT:  How many pages?

                JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1647

MS. ALI:  I'm going to be referring, Your Honor, to Page 7 and then over onto Page 8.

THE COURT:  All right.

MS. ALI:  I may have the page wrong.

BY MS. ALI:

Q.  Do you see, Dr. Nadkarni, something on the screen that says "impression"?

A.  Yes, I do.

Q.  And what is that part of your report meant to signify?

A.  So I think this is the part where all of those things get tied in together with my impression is being -- the format of these reports is pretty standard.  You do an interview, the history you explain, the exam you explain, and then you talk about your conclusions and what those things mean.  So this impression will tie these things together even on the next page.

Q.  And if we go to the next page at the top of Page 8, do you see the paragraph that starts, "His examination"?

A.  Correct.  So this is one of the paragraphs that explains all those things together.

Q.  And in this paragraph are you summarizing the conclusions of your physical exam and interview with Mr. Runyon?

A.  Correct.

Q.  As support for the paragraph on the prior page where you are summarizing your conclusions about Mr. Runyon?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1648

A.  That's correct.

Q.  And does the rest of Page 8 and over onto Page 9 continue to explain the basis of your opinion based on your physical exam and other materials that you reviewed?

A.  That's correct.

THE COURT:  Then I would note that in the report, when you were in the third paragraph, any brain scan from 2018 of the prison records, and a brain scan from 7-17 are in there.  Those we have stricken, outside of the statute of limitations.

MS. ALI:  I understand the Court's ruling.  I'd renew my objection that it's relevant to showing -- to the extent that Dr. Nadkarni can tie those findings back to information that would have been present at the time of the crime, it's relevant.  I agree that if there is no evidence suggesting that the 2018 findings are corroborative or relevant to information that was available at the time of the crime, that it's not.  But that's why I concluded here, not -- we are not trying to evaluate whether Mr. Runyon had a head injury in 2018.  We understand the inquiry here.

But I think to the extent that Dr. Nadkarni's testimony can tie information from that period back to the time of the crime should be considered in part of the record.  But I understand the Court's ruling.  I wasn't sure if the objection was -- had been ruled on.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1649

THE COURT:  You were going to where he did a physical examination and other objective testing, and then he goes into objective findings.  You are the one asking the questions.  I think that was in response to the objection.

MS. ALI:  It was, Your Honor.  I just wasn't sure if I could move on.

THE COURT:  Sure.

BY MS. ALI:

Q.  Dr. Nadkarni, is it your opinion that your observations on the physical exam suggests frontal lobe dysfunction?

A.  Yes, it is.

Q.  Why do you believe that the injury is to the frontal lobe and not the spine?

A.  Because -- so the exam point -- the exam findings and mental status examination, the palmomental sign, those things don't come from the C spine.

Q.  What is frontal lobe dysfunction?

A.  So that's a -- I'll try to be as brief as possible.  So there is basically four lobes to the brain:  Occipital for vision; parietal lobe for sensation, visual spatial functioning, awareness; temporal lobe, memory, emotion, auditory processing; and then the frontal lobe which has many, many functions.  The first function is motor function. So if I go to move my arm, the motor strip is in the frontal lobe.  The opposite side moves the opposite limb.  So that

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1650

points to the frontal lobe.  Then for behavioral neurology neuropsychiatry there is several functions in the frontal lobe that are very important, and they localize to certain anatomy.

So there is three big areas of sort of behavioral frontal lobe functioning that we think about as neuropsychiatrists:  One, the famous one is executive functioning, sort of -- that's located in the dorsolateral prefrontal cortex and is in the frontal lobe; and executive functioning is whatever like a CEO would do in a business, so planning, judgment, vision for the future, making decisions about who to keep, who not to keep in your company or in your life, about if I did this, what's going to be the consequence in the future?  That's executive functioning, and it's in the frontal lobe.

Another function of frontal lobe activity is inhibition.  So, you know, this is like I'm making a fist. If the brain is at the bottom, right above the eyes, the part of the brain that's right above the eyes is called the orbital frontal cortex.  So that part of the brain is like the brakes, meaning inhibits on behavior and allows us to function socially without getting in trouble.  So if I'm mad at my boss, and I want to say something, the thing that keeps me from saying it is that part of my brain, that frontal lobe.  That's inhibition.  And the last part is the middle of

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                    1651

the frontal lobe, which is like motivation, get up and go, activation.

So front lobe syndromes, when you have frontal local injuries, it's usually some combination of executive dysfunction, disinhibition/impulsivity, and difficulties with motivation and activation, and I'm definitely not doing the frontal lobe justice, but that's what -- that's basics.

Q.  You mentioned that frontal lobe dysfunction is tied to disinhibition and poor judgment.  Can you just tell us a little bit more about that.

A.  Yeah.  So, again, it's different parts of our brains do different things.  One big function of the frontal lobe is to assess -- so the world comes into our brains from the back: vision, touch, sensation, all of it travels to the back of the head and is sensory processing in the back of the head.

When stimuli are presented to us, we have decisions to make about those stimuli.  That happens in the frontal lobe.  In a multi-step process, there is like four steps to this process, but the final step is that the frontal lobe makes decisions about the salience and valence of a stimulus. Salience meaning how important is it to me, and valence meaning is it good or bad.

So that's the kind of determination that goes into making judgments and deciding what you want to do about your future.  So this function of the frontal lobe that's valence

Nadkarni, S. - Direct                                                    1652

and salience processing is -- all three of these domains can be execution, inhibition and motivation in frontal lobe injuries and brain injuries.

But one important part you asked me about judgment is this determination of the salience, valence, and how is it going to impact me in the future.  And when the frontal lobe doesn't work well, those decisions are not always made in the best way.

Q.  You also mentioned that the frontal lobe dysfunction is tied to impulsivities.  What does impulsivity mean from a neuropsychiatric perspective?

A.  Right.  Impulsivity is actually about motor function.  So when I said that stuff comes in the back and you make a decision in the front about what to do, the next step goes to the motor strip, meaning behavior.  Motor means moving in the world, right.  So that impulsivity means there is no step between the stimulus and the motor function.  Right.

There is no sort of sense of like, let me think a second, let me think, let me judge.  Impulsivity means you jump and do something without that little gap of assessing that valiance and salience, right to motor function.

Q.  Did any of the findings on Mr. Runyon's physical exam relate to disinhibition?

A.  Well, I think some of the way he was -- some of the way he was discussing his story and the sort of the confab -- he

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1653

was very willing to tell different kinds of stories at different times and didn't seem like he was being circumspect about what he was saying.  So I think that's an example of that.

Q.  And what about on the actual physical exam?  Are there parts of the physical exam that test for disinhibition or --

A.  The rest -- many parts of the rest of the physical exam point to frontal lobe dysfunction where that would be the case, right, the palmomental reflex, the weakness, the confabulation, those are all frontal lobe deficits.

Q.  Are people with executive functioning problems due to traumatic brain injury unable to follow a long-term plan?

A.  Not necessarily.

Q.  Could a person with brain damage, like what you identified in Mr. Runyon, plan a trip to be taken in the future, for example?

        MS. WARD:  Object to the leading.

        THE COURT:  All right.  Rephrase your question.

BY MS. ALI:

Q.  How does frontal lobe damage impact somebody's ability to plan a trip?

A.  So, you know, frontal lobe injury is pretty patchy, and you can have -- there are a lot of things that you can do that might be patchy and contextual, I would say.  So there are things that you can do that's a sequence, planning

Nadkarni, S. - Direct                                                      1654

activity sometimes, and then other times you might not be able to do the same things.  But just because you have frontal lobe injury doesn't mean you can't plan how to go shopping for dinner.

THE COURT:  Can you make detailed plans about how to get from one place to another and a list of things that you need to accomplish a task, and then you actually go through and accomplish that task?

THE WITNESS:  Yes.  I think that's true.  You can.

THE COURT:  That would be a high functioning frontal lobe?

THE WITNESS:  I don't think that's necessarily true.  I think people with pretty severe frontal lobe injury can do lots of like sort of like detailed planning also, depending on what the context is and what the task is.

BY MS. ALI:

Q.  Does executive functioning impact mundane planning?

A.  Sometimes it can, sometimes it doesn't.

Q.  You mentioned that you reviewed Mr. Runyon's medical records.  Did that include his history of head injuries?

A.  Yes.  Those are mentioned in multiple places.

Q.  And do you recall where those things are mentioned?

A.  I believe it's mentioned in the Bureau of Prisons records, in the Army medical records.  They are noted in his -- in other -- in Dr. Mirsky, Dr. Montalbano, Dr. Dudley.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1655

I think the history taking on the head injuries is seen in multiple different records, and including the social history and defamations of statement of his family and friends.

Q.  Did Mr. Runyon also self-report head injuries to you?

A.  Yes, he did.

Q.  Do you recall any specific head injuries that you saw records of --

A.  So --

Q.  -- or learned about during your examination of Mr. Runyon?

A.  So the head injury at the age of three, the 1990 car accident, the 1996 car accident.  There is also documentation of a blast injury with a grenade when he was at Wentworth Academy where he apparently was concussed, passed out, and dragged along the ground for a distance.

There is report -- there is some reporting of another blast, like a pyrotechnic injury, that he had, and then he self-reports multiple concussion-type injuries; playing football in the backyard and running into a telephone pole while playing football.  So those are several injuries that I heard about.

Q.  What was the earliest documented head injury in the sources you reviewed?

A.  At the age of 3.

Q.  And do you recall the details of that incident?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1656

A.   Yeah, the way that incident is described in multiple places is that his father came home intoxicated, got in a fight with his mother, and he tried to intervene in helping his mother and ended up sort of attacking his dad, trying to bite him in some places, as is mentioned, and then his father threw him -- I think the descriptions that I've seen are that he squeezed his head, and then he threw him against a wall, and that he was -- that he was reporting that he was unconscious at that time.

THE COURT:  Did you review any medical records of that incident?

THE WITNESS:  I did not.  I did not see any medical records about that incident.

BY MS. ALI:

Q.   Did you make any physical findings on the exam that you conducted of Mr. Runyon that corroborate that incident?

A.   Yes.  Facial asymmetry has been tied to that incident.

Q.   You mentioned a couple of car accidents, one in 1990, I believe you said.  Do you remember the details of that accident?

A.   Yes.  I believe he fell asleep at the wheel.  I have to get it.  I believe he fell asleep at the wheel in the 1990 car accident and had -- and lost consciousness and had a head injury.

Q.   Do you recall whether Mr. Runyon was attending the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1657

Wentworth Military Academy at that time?

A.   I believe that's the time frame, 1990, right, yes.

Q.   And do you know if Mr. Runyon reported any symptoms as a result of that head injury while he was at the Wentworth Military Academy?

A.   I think he mentioned difficulty concentrating afterwards, loss of motivation in academics, and I apologize, I think he also had maybe some vertigo at that time, maybe some tinnitus at that time, I think -- and anything more that I just don't recollect.  Those are the ones I remember.

        THE COURT:  Are there any medical records to review of that incident or did you review any?

        THE WITNESS:  I reviewed medical records that made note of that incident.

        THE COURT:  But no contemporaneous?

        THE WITNESS:  I don't believe I reviewed anything at the time of the car accident.

BY MS. ALI:

Q.   Did you go over one record that referred to that accident?

A.   Correct.

Q.   That was the Portsmouth -- I'm sorry, that was the Army records from 1995, I believe?

A.   Yes, correct.

Q.   You mentioned a 1996 car accident as well.  Do you recall

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1658

the details of that accident?

A.   Apparently, there was a head-on collision with a drunk driver, and it was so severe that he had to be extricated by the jaws of life from that car accident.  I think after that car accident there was sort of a notable, like his symptoms changed after that one, after that car accident.  He sort of had a change after that also.

Q.   Do you recall any specific symptoms flowing from that accident?

A.   I think he had sort of a change in his personality, he had irritability, he would get angry easy, poor frustration tolerance.

Q.   Dr. Nadkarni, can one single head injury cause significant brain damage?

A.   It happens all the time.

Q.   Is there a cumulative effect of head injury as well?

A.   Yes, there's true, too.

Q.   And can you explain what that cumulative effect is?

A.   Sure.  So one head injury can cause certain deficits, but all of these functions are sort of tied together intricately.  So if you have a deficit in one area, other parts of the frontal lobe might not work that well also.  If you have a second injury that injuries another part of the frontal lobe or the same part, it's not just additive, it's sort of -- it can be biorhythmic.  So it is easier to get head injuries and

Nadkarni, S. - Direct                                          1659

concussions after you have one or two, and the events are not just cumulative.  They can be more than the sum of their parts the more head injuries you have.  The best example of this is CTE in the NFL with repetitive concussions and, you know, people having dementia at very young ages because of cumulative head injuries.

Q.  Is that true of minor head injuries as well?  Is there a cumulative effect of minor head injuries?

A.  Yeah, I'm not sure what a minor head injury is.

Q.  Minor concussion?

A.  I mean, concussions -- I have patients who have concussions who've had symptoms for a long time and can't work.  But repeated concussions is what CT is.  Those would all be considered minor head injuries.

        There was a Penn State player who suicided at the age of 24, never had a reported concussion ever, and he had like Alzheimer's pathology on his brain.  So whatever you want to call minor head injury, I'm not sure if there is such a thing, especially repeated head injuries.

Q.  What is the effect of an early head injury like, for example, what you learned about Mr. Runyon at age 3?

A.  So that's sort of a double whammy.

        MS. WARD:  Your Honor, I would object to this as beyond the scope of his expertise.  Would be considered if he has a separate specialization.

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1660

THE COURT:  Well, he's testified about the age 3.
He didn't look at any medical records, and then he has
testified about the cumulative effect.  So I think it's
really duplicative testimony at this point.  We know about
the age 3, and I don't think he made any specific conclusion
about that itself.

THE WITNESS:  I think I did, and I'm sorry.

THE COURT:  Well, I'll hear it again.

THE WITNESS:  I'm sorry.

MS. ALI:  I was trying to ask a slightly different
question, Your Honor.  I'm not trying to establish -- he
testified about the head injury at age 3.

THE COURT:  The history all the way through.

MS. ALI:  That's right.

THE COURT:  The cumulative effect and how he got to
his conclusion to the last page.  If there is something
different, I'll listen to it.

BY MS. ALI:

Q.  The question I intended to ask is, is there something
unique about an early head injury and the impact on someone's
cognitive development?

A.  Yes.  That's an important point.

THE COURT:  Wait just a minute.

MS. WARD:  I do think that question goes directly
to if that's within the scope of his expertise.  He is a

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1661

neurologist and neuropsychologist but not specializing in pediatric neurology, which is very different.

MS. ALI: I'm happy to voir dire him. He testified that he got a specialty in pediatric patients. I'll just correct the record. I'm sorry.

THE COURT: My concern is where it's in the report that an early -- I don't see it as a specific conclusion in this report. That was my problem with the question.

I think he can testify that it occurred and it occurred with these other matters, and this is what led to certain conclusions that he made, if it is within his expertise, but I don't see a specific conclusion about the age 3 head injury.

MS. ALI: Your Honor.

THE COURT: He can tell us in his report if he made it. He can go to the report and say this is where I addressed it. He cannot give opinions outside of his written report produced to counsel and the Court.

MS. ALI: I'll just, for the record, Your Honor, I'll just lay down my response to that. The experts can elaborate on opinions that are in their report as long as they are not offering new opinions.

THE COURT: Let him show us where it is. You're now keying him in. That's why you want to elaborate on it. Show us where it is in the report, and we can review it from

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1662

that standpoint.  It's his report.

THE WITNESS:  I think I meant to imply -- I mean, not meant to imply, I think what I'm saying, when I use the "chronic" here, is my conviction that severely brain injured and suffers from chronic sequelae, I was referring to.

THE COURT:  Where are you, Doctor?

THE WITNESS:  I'm so sorry.  It's -- I don't know which paragraph it is because I can't move the screen.

THE COURT:  Do you know what page?

THE WITNESS:  It starts, "To a reasonable degree of medical certainty," the last paragraph on the last page -- or, no, second to last page.

MS. ALI:  On Page 8, Your Honor.

THE COURT:  Starts with, "To a reasonable degree"?

THE WITNESS:  Yes.

THE COURT:  That doesn't go to specifically the 3-year-old injury.  That's a conclusion based upon the composites of what are in here.

MS. ALI:  Can we go to Page 7 as well, please, where it says, "Impression."

THE WITNESS:  Here.

BY MS. ALI:

Q.  Do you discuss the fact that Mr. Runyon had head injuries from a very young age?

A.  Even prenatally in that history.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1663

Q.  Is that within the scope of your clinical training and practice to discuss what the effect of a head injury at a very young age is?

THE COURT:  It's got to be in his report that he was going to issue an opinion.  That's the whole issue here. Nobody is questioning the doctor's credentials.  We can go back and determine whether he can give a pediatric neurological opinion or not, but what you're asking, and I've asked to refer to that, it's not the specific conclusion.  What he's done is make a conclusion on all of his testimony, as I understand it.

MS. ALI:  I'll move on, Your Honor.  I think it is in his report.

THE COURT:  If you do, take us to it.

MS. ALI:  Okay.  I'm trying to do that here.

BY MS. ALI:

Q.  So in the "impression," do you discuss the impact of head injury at a young age in your impressions of Mr. Runyon?

A.  That was my intention.  I believe I do.  Maybe it's not clear, but that was -- yes, I think I do.

THE COURT:  Read it to us.

THE WITNESS:  I think the very young age is specific.  "David Runyon is a 51-year-old man who is multiply and severely brain injured starting at a very young age and carrying a genetic burden of mood disorders in both

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                    1664

parents, as well as being the product of an unmonitored pregnancy during which his mother sustained trauma to the abdomen." I put all of that stuff in there for a reason because that's important.

THE COURT: You combined it with everything else and you made a conclusion.

THE WITNESS: Okay.

THE COURT: If it's going to take this long to resolve, ask whatever question you want to get to the point.

BY MS. ALI:

Q. Was it important to your overall conclusions, Dr. Nadkarni, that you had determined that Mr. Runyon had suffered a head injury at a very young age?

A. Yes, because of the brain's development.

Q. You testified that Mr. Runyon was the source of information for some of the findings you made.

A. Yes.

Q. What role does self-reporting of medical history and injury play in your diagnosis?

A. So there are pieces of data that I have to access the validity for, and some might seem more valid and some might seem less valid when I take his self-reporting because of his confabulation and his head injury.

Q. In light of the fact that you found that Mr. Runyon confabulates, how do you take that into account when you're

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                            1665

deciding how much weight to give to David's self-reporting?

A.  So that's something we train people in and something that I've received training in.  Neurologists and psychiatrists routinely, when they take a history, try to see what they can rely on, what they can't rely on, in terms of veracity or accuracy, especially in the context of somebody who has a brain injury.

So if a story is told multiple times with different details, that sounds like confabulation to me, and that happened over and over again when I was speaking with Mr. Runyon.  If a story is told more consistently with rich detail, and maybe corroborated by other people over periods of time, I might give that some more validity in terms of symptoms that he might be experiencing.

In terms of his exam, that's just something that I find when I see him.  So that doesn't have to do with his self-reporting.

Q.  Are there parts of the exam that you did that cannot be faked?

A.  Yes.

Q.  And what are those parts?

A.  So the reflex testing, the weakness, the facial asymmetry, the palmomental sign, none of those are fakable.

Q.  And did you also find corroboration of your own conclusion in records dating back closer to the time of the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                         1666

crime?

A.  Yes.

Q.  If one incident of head injury didn't happen or happened differently from the way it was told to you, would that change your overall conclusions about Mr. Runyon?

A.  It would not.

Q.  Why not?

A.  Because there is hard evidence of frontal lobe dysfunction, and there is evidence of -- imaging evidence of abnormalities in the brain that are consistent with a significant head injury at some points.

          THE COURT:  What's the hard evidence?

          THE WITNESS:  Of frontal lobe dysfunction?

          THE COURT:  Yes.

          THE WITNESS:  I'm sorry.  The palmomental sign, the confabulation, the weakness on examination, and there is evidence for what I believe is head injury on his MRI in 2009.

BY MS. ALI:

Q.  Did you review any images of Mr. Runyon's brain as part of your evaluation?

A.  I did.

Q.  Does that include an MRI?

A.  Yes.

Q.  From 2009?

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1667

A.  Correct.

Q.  What is an MRI?

A.  MRI stands for magnetic resonance imaging.  It's when you put the brain in a magnetic field.  There is a lot of water in the brain, so when you put the brain in the magnetic field, the hydrogen atoms, ions line up in that magnetic field, and they flow in a certain way, and if there's a lesion, that flow is blocked, and you see it as a little white spot or some other sort of altered intensity from the background.

Q.  Are you qualified to read an MRI scan?

A.  I'm not qualified to report on an MRI scan, but I'm not a neuroradiologist, but I look at MRI scans all the time.

Q.  Is that typical of a neurologist?

A.  Yes.

Q.  What's the difference between reading an MRI and reporting an MRI?

A.  So looking at an MRI is just seeing what you see. Reporting an MRI is an official medical record.  That's an official medical opinion that goes in the medical record.

Q.  Only neuroradiologists report on an MRI?

A.  Only neuroradiologists should report on a brain MRI, but it's not always the case.

Q.  But you review MRI scans as part of your clinical practice?

Nadkarni, S. - Direct                                    1668

A.  I do look at my patients' MRI scans.

Q.  Did you receive education or training in how to review MRI scans?

A.  Yes.  We had like a once weekly radiology conference, all through six years of medical school.

Q.  How long have you been reviewing brain MRIs?

A.  Since '97.

Q.  During your 25 years on the NYU faculty, how many brain MRIs did you review in a typical year?

A.  Maybe -- I would say 400, 500, something like that.

Q.  How does that compare to the number of brain MRIs a neuroradiologist at NYU reviewed in one year?

A.  Oh, they are probably up to like 80 a day.  So 60 to 80 a day.  They go through those very quickly.

Q.  Many more than you look at?

A.  Orders of magnitude.

Q.  Do you have more confidence in a neuroradiologist's reading of a brain MRI than your own reading of a brain image?

A.  Yes.

Q.  Why?

A.  Because they are trained to read MRIs of the brain, and they've seen thousands and thousands and thousands more than I have.

Q.  Do you nevertheless have a high degree of confidence in

Nadkarni, S. - Direct                                          1669

your own reading of MRI scans?

A.  Yes.

Q.  In your clinical practice, when a neuroradiologist sees something in a scan that you don't, what do you do with that?

A.  I trust that.

Q.  You defer to them?

A.  Yes.

Q.  A hundred percent of the time?

A.  Yes.  If I have a question that I can't see what they are talking about, I might call them and ask them to explain it to me, but nearly -- I wouldn't take my opinion over a neuroradiologist, if they see something that I don't.

Q.  And are you particularly differential or is that a standard practice within your field?

A.  That's standard practice.

Q.  What about a radiologist who is not a neuroradiologist, do you have the same degree of confidence in their reading of a brain MRI as a neuroradiologist?

A.  I would not.

Q.  Do you have more or less confidence in a diagnostic radiologist's reading of a brain MRI than your own reading of a brain MRI?

A.  It would depend, but I think generally speaking I would trust myself as a neurologist and neuropsychiatrist looking at that than somebody who is not a neurologist, not a

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1670

neuroradiologist, and some other kind of radiologist.

Q.   If a radiologist with no subspecialty in neuroradiology read a brain MRI as normal, would that bear on your conclusion of a patient's health?

A.   If it was a non-neuroradiologist, I would need to see it myself to form an opinion.

Q.   Would that change if the radiologist reading the scan was a neuroradiologist?

A.   Yes.  I would still want to see it myself.

Q.   You testified that you do read brain MRIs in your clinical practice, but are there times when you would consult with a neuroradiologist?

A.   Yes.  Sometimes I see things that they don't see, and then I have to ask them about that.  So rarely in my career I have seen something that a radiologist might not have seen, and they change their report.  It happens once in a while, and then I would consult with them.  I would check and show the MRI back to them and say what about this.

Q.   What about if you have findings on an exam, but you don't see anything on an MRI scan?  Would you ever consult with a neuroradiologist in that circumstance?

A.   I may, yes.

Q.   What role does brain imaging play in the diagnosis of brain injury?

A.   Brain imaging helps localize the deficits, if they are

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                   1671

abnormal.  But very often in brain injury and head injury imaging is not as helpful; it doesn't show much.

Q.  Does the absence of a finding on an MRI tell you anything about somebody's cognitive functioning?

A.  No.

Q.  Does the presence of a finding on an MRI, an abnormality on an MRI tell you something about a person's cognitive functioning?

A.  It's highly suggestive of abnormal cognitive -- potential abnormal cognitive functioning.

Q.  Can someone be brain injured and have a normal MRI scan?

A.  It happens all the time.

Q.  Can someone be severely brain injured and have a normal MRI scan?

A.  Yes.

THE COURT:  Can have a normal MRI scan?  Is that your question?

MS. ALI:  Yes.

THE COURT:  Be severely brain injured and have a normal MRI scan?

THE WITNESS:  Yes.

THE COURT:  What other methods would you use to determine?

THE WITNESS:  Oh, because like a neuropsych testing, EEG testing, your examination of the patient, the

JODY A. STEWART, Official Court Reporter

way they live their lives, the decisions they make, the way they act with their family.  There is lots of -- I have patients who have lost their jobs and families, and their MRIs are normal, and they were hit from the head when they were 20 years old.

THE COURT:  Well, that doesn't mean they have a brain injury.  Maybe they lost their job for any other number of reasons.  I'm not a doctor, but how in the world can you have a significant brain injury without it showing on an MRI?

THE WITNESS:  So the Rusk Institute at NYU, they have like big day treatment programs for people with brain injuries who their lives are broken.  They can't work anymore, they are disabled, they can't maintain relationships.  Many of them have normal MRIs.  I saw many of those patients.  So you can have significant injury to the brain with a normal MRI.

BY MS. ALI:

Q.  Is that your opinion, Dr. Nadkarni, or is that generally accepted within the field of neurology or neuropsychiatry?

A.  I think it's accepted in the field of neuropsychiatry.

THE COURT:  Do you have any literature to that effect?

THE WITNESS:  I mean, I can look for it.

THE COURT:  You didn't include any in your report?

Nadkarni, S. - Direct                                          1673

THE WITNESS:  This is the way I -- I wasn't anticipating the question.

THE COURT:  I wasn't either, because it wasn't in the report.  But, in any event, just go ahead because people can lose jobs, have failed marriages, have trouble in their life and be depressed and maybe have some form of mental illness, maybe not to the point of brain injury or mood disorder, but they still have some functional problems because of things in their life, and that problem doesn't show up on an MRI.  But I can't imagine if somebody has significant brain injury, in other words, traumatic brain injury, it's not going to show up somehow on an MRI.

THE WITNESS:  It's common that people can have significant injury and not show up.  The injury that is in the brain often is in these white matter traps, and you might get these like punctate hemorrhages that you never see on an MRI, but the white matter is completely not working functionally because it's been sheared and twisted.  So it looks normal, but it doesn't conduct electricity normal, and those people have profoundly abnormal neuropsych testing, and EEGs can be slow but the structural MRI can look normal.

THE COURT:  This goes way past anything that's in the report.  Go ahead.

BY MS. ALI:

Q.  When were the MRI images of Mr. Runyon that you reviewed

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                    1674

taken?

A.   He had a 2009 MRI and I believe a 2018 MRI.

Q.   Was there anything notable about the quality of the 2009 MRI scan?

A.   I think it was slightly -- it was degraded by motion artifact.

        MS. WARD:  I object to scope.  This all is beyond the scope of the report.

        THE COURT:  You've got to enunciate, Ms. Ward.

        MS. WARD:  I'm sorry, Your Honor.

        THE COURT:  You didn't enunciate your words.

        MS. WARD:  I apologize.  I object.  This is beyond the scope of the reports.

        THE COURT:  Sustained.  You can ask him about the 2009.

        MS. ALI:  That's all I'm asking about, Your Honor.

        THE COURT:  Okay.

BY MS. ALI:

Q.   That was my question, was there anything notable about the quality of the 2009 MRI scan?

A.   Yes.  That was made, it was degraded by a motion artifact.

        THE COURT:  Wait just a minute, please.  Did he list that?

        MS. ALI:  It's on Page 8 of the report.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                             1675

THE WITNESS:  It's in the report.

MS. ALI:  At the top.

THE COURT:  Did he list it as source that he relied on?

MS. ALI:  It was not listed in materials considered, Your Honor.  We updated the materials considered and provided that to the government.  It's described in his report.  It's clear that he looked at it.

THE COURT:  When did you update the materials?

MS. ALI:  When we provided -- we agreed on an exchange date for updated disclosures.  He describes the MRI in his report.  It was a clerical error to leave it off the materials considered, but it is very clearly described in the body of the report.

THE COURT:  Where is the updated report?  I'm looking.

MS. ALI:  There was no updated report, Your Honor.  We provided a list of updated materials considered to the government.

THE COURT:  Where is that?  I don't have that.

MS. ALI:  I've got it here, Your Honor.  This was provided on October 24th.  Your Honor, it was a clerical error that this was left off.  The MRI is clearly described in the body of his report.  He has testified that he reviewed it before he prepared his report.  His findings on

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1676

the MRI are included in his report.  It's just a clerical error that it was left off the materials considered, but there is no prejudice.  It is clear that he reviewed it.  It's described in the report.

THE COURT:  Well, so when was this produced?  I'm looking at a one-page document, and it is a 2009 MRI imaging.  It's not in the list of documents relied on, but it says, "Dr. Nadkarni discusses these images in his report but inadvertently did not include them on his materials considered list."

You provided this when?

MS. ALI:  We had agreed on October 24th, Your Honor, which is the informal -- the date that we had informally agreed to exchange updated disclosures in advance of the hearing.

THE COURT:  Then I will make this Court Exhibit Number whatever it is.

MS. ALI:  I believe it's 5.

THE COURT:  What exhibit?

MS. ALI:  6.

THE COURT:  Court Exhibit Number 6 because I didn't have that and it's not part of the exhibit I have admitted.

Now, what is your objection, Ms. Ward?

MS. WARD:  Yes, Your Honor.  Paragraph on Page 8, it discusses the review of this 2009 MRI, make a finding and

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1677

medical conclusion about what it says.  There is nothing in here that discusses the quality or the nature of the scans themselves.

MS. ALI:  I'm not offering an opinion about the quality of the scans just -- I'm just laying a foundation for what he sees on the scan.

THE COURT:  Go ahead and ask your question again.

BY MS. ALI:

Q.  We've established, Dr. Nadkarni, that you reviewed the 2009 MRIs.  Was there anything notable about the quality of the 2009 MRI scans that you reviewed?

A.  Yes.  They were noted to be degraded by motion artifact.

Q.  Did you notice that when you, yourself, reviewed it?

THE COURT:  Degraded by what?

THE WITNESS:  Motion artifact.

BY MS. ALI:

Q.  What does that mean?

A.  So, you know, you have these stops still in the MRI, because if you move, those lines of hydrogen, you can't really figure it out.  So if the patient moves or a person moves in the MRI machine, you get artifact in the images that sometimes can degrade imagines or make it difficult to see things at the margins or in different places.  It wasn't the best quality MRI.  It was some mild motion artifact.

THE COURT:  Well, let me ask you this.  Was that

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                      1678

noted on the MRI, whoever read it?

THE WITNESS:  Yes.

THE COURT:  That it was degraded by motion?

THE WITNESS:  Correct.  It's in the report.

THE COURT:  In what report?

THE WITNESS:  In the 2009 MRI.

THE COURT:  Accompanying the MRI?

THE WITNESS:  Correct.

THE COURT:  All right.  Go ahead.

THE WITNESS:  Correct.

MS. ALI:  That was admitted -- it has not been admitted.  I'm happy to show it if the Court would like.

THE COURT:  What is that?

MS. ALI:  The MRI report.

THE COURT:  No.

MS. ALI:  We will get there.

THE COURT:  We will?  We are not there already?

MS. ALI:  The report itself.  I'm asking him about his own review of the images.

THE COURT:  Okay.

BY MS. ALI:

Q.  What did you observe on the 2009 MRI of Mr. Runyon?

A.  I saw white matter hyperintensities on that scan, so little white pixels in the white matter that I didn't think should be there for somebody his age.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                        1679

Q.   What are white matter hyperintensities?

A.   So if you think of the brain kind of like a peach, the cells and the neurons are on the outside, and they send cables or wires -- each one has one -- called axons, and they are insulated with fat called myelin.

So all of those fibers that come together in the brain, that's called white matter, and the reason it is called white matter is because if you take a slice of the brain and put it on the table, those axon tracts look white, and the cortex with the nerves all looks beige or gray.  So that's where that came from.  So it's the cables that connect different parts of the brain.  That's the white matter.

MS. ALI:  I'd move to admit Defendant's Exhibit 202, which is the actual disks of the MRI scan.  I discussed this with the government.  I don't think there is any objection to authenticity.  I don't plan to play the disk. It is sort of quasi to pull up.  It needs special software to be read, but I wanted it to be in evidence.

THE COURT:  Any objection?

MS. WARD:  No, Your Honor.

THE COURT:  It's admitted.

MS. ALI:  Thank you, Your Honor.

(Defendant's Exhibit 202 received in evidence.)

THE COURT:  I saw it in my book.

MS. ALI:  Okay.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1680

BY MS. ALI:

Q.   If we could display the images 14, 17 and 18.

THE COURT:  Are you moving on to another area?

MS. ALI:  I'm sorry?

THE COURT:  Are you moving on to another area?

MS. ALI:  Still within the MRI.

THE COURT:  Go ahead.

BY MS. ALI:

Q.   I'm showing you now some of the images for Mr. Runyon's 2009 MRI.  These are not all of the images that are taken in 2009; is that right?

A.   That's correct.

Q.   This is a selection of three images?

A.   That's correct.

Q.   And how do you typically review images in your clinical practice?

A.   So I get the MRI disk, and I just look at all the pertinent sequences, I look at the whole MRI, all the pictures.

Q.   Is it on a screen like this?

A.   It's not usually on a screen like this in a big room with lights.  It is a multi-high resolution screen and dark, turn the lights off.  It is a little bit easier to see things. Now, radiologists read in very dark rooms with very big beautiful machines.  So this isn't the ideal setting in which

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1681

to look at an MRI.

Q.  The images that we are looking at here all have a label AXL FLAIR P2.  Can you tell us what that means?

A.  Yes.  So when you do MRIs, you can slice the brain or look at it from different perspectives.  If you slice back going this way and back, that's a coronal cut.  If you slice it this way, that's a sagittal cut, and if you slice it like this, that's called an axial cut.  So this is an axial look at the brain.

Left is right and right is left on neuroimaging always.  It's just to add a little level of confusion.  And the FLAIR sequence means -- so when you put the brain in a magnet, you can set the magnet to certain settings that make certain parts of the brain look certain ways.

The most famous of these are called T2 or T1 images. T2 images have the CSF as white.  The flask case in the middle here is actually white.  T1 images, the CFS is black and FLAIR images is actually a T2 image where the CFS is made black on purpose so you can see white matter.  It is really made for white matter abnormalities and sequences, and they are routinely done in MRIs to look for white matter abnormalities.

THE COURT:  Who ordered these MRIs?

THE WITNESS:  I don't remember exactly who the ordering physician was.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1682

THE COURT:  We will get to that later, I guess.  We will find out who ordered them because I noticed they obviously were for Mr. Runyon in his case because the United States wouldn't have been able to order that kind of thing. I just didn't know who ordered them, is all I'm asking, and I'm sure it will come out or it should come out.

BY MS. ALI:

Q.  Could you please orient us in these images.  Just what are we looking at?  What part of the brain are we looking at? I don't even know the right question.  What are we looking at here?

A.   Right.  So the top of the image is the front of the head. The bottom of the image is the back of the head, but it's going from the bottom to the top.  So that means the left is the right and the right is the left.  And actually here for a lot of these, a little of lobes are being represented.

So the temporal lobe is seen in the right image, the frontal lobe, parietal lobe and occipital lobe in the right image.  These are very broad cuts at a level which you see multiple different lobes.  The outer rim, you can tell, there is a ribbon of a little bit of a more light colored and whiter kind of area.  That's the skin of the peach where the neurons live, and the darker part in the FLAIR sequence underneath that is the white matter.  So the cortex and white matter, the front is at the top and the back is at the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                   1683

bottom, and these are at different levels.  So you see different structures.

Q.  And do you see anything notable about this MRI scan?

A.  I do.  I see those white matter hyperintensities that I was talking about.

THE COURT:  The white what?

THE WITNESS:  White matter hyperintensities.

THE COURT:  Where are they?

THE WITNESS:  I don't know if it's possible --

MS. ALI:  Somebody is pointing.

THE WITNESS:  I'm pointing.  Actually, this one right here, this little pixel, this little white thing right here (indicating), that's a white matter abnormality at the white matter cortical juncture.  So that location is actually important because different kinds of white matter hyperintensities can have different implications for their causes.  So there is one there (indicating).

In this second image there is also one at a similar level.  This is a few slices later, so this is a different -- one, you don't see it on the other side.  This one also, there is one that's hard to see with this projection, but there is a small one at the cortical/subcortical junction up here also (indicating).  And then on the last image, there is one right here (indicating).

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1684

BY MS. ALI:

Q.  And the white matter hyperintensities that you located on each of these images, are those the same white matter hyperintensities being replicated over different images or just additional -- different additional white matter hyperintensities?

A.  These are each different regions.

Q.  Does a white matter hyperintensity always represent brain damage?

A.  Yes.  So it represents injury to the brain always.

Q.  Are they always abnormal?

A.  Yes, they are always abnormal.  I mean, I think I said before that if you do an MRI on somebody, what happens on a deceleration head injury, the problem is when you decelerate, that there is a torsional force to the brain, and these white matter tracts, these axons twist and shear, and you get these micro hemorrhages in different places, and those show up as these white matter hyperintensities.

These small little pixels in the white matter, that is a typical finding in head injury in this location especially.  This cortical/subcortical junction is a typical location for these kinds of white matter intensities born of head injuries.

Q.  I think you testified that white matter hyperintensities are non-specific.  What does that mean?

JODY A. STEWART, Official Court Reporter

A.   There are such things as non-specific white matter hyperintensities.  I didn't mean to testify that these were non-specific.  I think these actually are specific. Non-specific white matter hyperintensities are in a deeper location.  They are in a different location, and they can be from aging, microvascular disease, alcoholism, MS, strokes.

So they are just a different -- they are not in this pattern, and you definitely don't see them at this age.  And migraines also is much lower down.  The white matter hyperintensities in migraine that you can see is not at this cortical/subcortical juncture, which each one of these actually are.

Q.   Is the location of the white matter hyperintensities on Mr. Runyon's 2009 MRI scan a meaningful piece of information?

A.   They are very much so.  Yes.

THE COURT:  Let me just pose something.  This is just a thought process that I'm having.  Assuming these were done for Mr. Runyon's attorneys.  Mr. Runyon's attorneys were not experts, the same as you just said, Ms. Ali, because you weren't even sure how to ask the question.  The Court has shown its lay experience in regard to looking at this kind of MRI.

So attorneys get something like this done by an expert, then they depend upon what their expert is telling them, and you don't have anything called ineffective

Nadkarni, S. - Direct                                          1686

assistance of experts.

THE WITNESS:  They can.

THE COURT:  So I'm just making that as an observation, that we need to keep our eye on the issue and not be diverted in the proceedings.  I'm letting you go full rein here, and I've said for many reasons why I'm doing it, so you can't say you missed having anything in the record.

But still, ultimately it comes down to what counsel had, and what they knew, and what they could have known. Apparently, this MRI was done at the time, and whatever it is that Dr. Nadkarni is calling out, but I'm not sure that it was called to the attention of the trial attorneys.

MS. ALI:  May I go on, Your Honor?

THE COURT:  You can go on.  Just an aside, just a comment.

BY MS. ALI:

Q.  You testified that the location of the white matter hyperintensities on Mr. Runyon's 2009 scan was a meaningful

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1687

finding.  What does it tell you?

A.  It's sort of a typical place for post-head injury, shearing injuries to the white matter.

Q.  If you had a 38-year-old patient in your clinical practice, and you saw an MRI with white matter hyperintensities in the same location, what would you do with that information?

A.  If I saw this MRI on a 38-year-old patient, and I hadn't met the patient, I would ask about the history of head injuries because this MRI, to me, in a 38-year-old looks like he had some kind of injury to his brain, based on those white matter hyperintensities.

Q.  And what kind of information gathering would be important to make that further inquiry?

A.  Interview history, examination, medical records, collateral information, other diagnostic testing that may have been done.

Q.  Does that other diagnostic testing include neuropsychological testing?

A.  Neuropsychological testing, EEGs, other sorts of imaging.

Q.  Did you review all of those in this case?

A.  I didn't review any EEGs.  I didn't review any other functional imaging like PET scans or -- so I didn't review neuropsychological testing.

Q.  And you conducted your own neurological exam?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1688

A.  Yes, I did.

Q.  So you looked at the scan in that broader context?

A.  Yes.  It's part of the picture.

Q.  And is that also how you come to diagnose it in your clinical practice?

A.  Yes.

Q.  What did you conclude about Mr. Runyon based on that broader picture?

A.  Well, I think that everywhere I looked in his case, that everything I have seen points to a brain injury, frontal lobe injury and organicity, frontal lobe deficits, frontal lobe syndrome, whether it's the MRI -- I mean, the brain injury from the MRI and then frontal lobe abnormalities from my exam and frontal lobe deficits from neuropsych testing.

Q.  I think you used the word organicity.  What does that mean?

A.  Sorry.  There is a term we throw around that's not a term of art, called organic.  And if you ask any psychiatrist or neurologist, and you use the term "organic," they will know exactly what you are talking about, even though it is probably the wrong term to use, we use it all the time.

        What we mean by organic is that there is some identifiable injury to the brain that we can identify, that there is some sort of injury or degeneration to the brain that gives them sort of a frontal lobe flavor that's

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1689

different than depression, schizophrenia, schizoaffective disorder, anxiety disorder.

So all the psychiatric, quote-unquote psychiatric illnesses that people call psychiatric illnesses, when we say organic, we mean it's not just those things, that there is something wrong with this person's brain.  I don't like the word "organic" actually because schizophrenia is a brain disease, so is depression, so is anxiety.  That is not a fantasy.  They all happen in the brain.  If the brain doesn't function, you give medications that change brain chemistry that can help that.  These are all brain illnesses.  So I hope I answered the question.

Q.  Yes.  Thank you.  Did you review any other materials relating to the imaging of Mr. Runyon's brain?

A.  I believe I saw a report from an MRI from 2018.

Q.  Did you see the corresponding images of that --

A.  I did not see those images.

Q.  Do you recall where the report came from that you reviewed?

A.  2018, I think it was -- I think it was at the request of a neurologist, I believe.  I think he was in prison at the time, so I guess it's prison records or...

MS. ALI:  The Court's indulgence.  Sorry, Your Honor.

BY MS. ALI:

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1690

Q.   We are pulling up what was premarked as Defendant's Exhibit 161.

          THE COURT:  What is it?

          MS. ALI:  Are you asking me, Your Honor, or the witness?

          THE COURT:  I'm asking you.  You are pulling it up.

          MS. ALI:  This is the 2018 MRI report.  I understand that the Court has said he can't testify about it.

          THE COURT:  No, he can't.  That's an after-the-fact MRI report.  There could have been progression.  There are any number of things that may have changed.  No, we've got to go back to what was known or could have been known at the time that this trial occurred.  You are not going to go through a 2018 scan at this *habeas* hearing based upon ineffective assistance of counsel back in 2009.  You're just not.  So why are you putting it on the screen?

          MS. ALI:  Take it down.

          THE COURT:  It's not admitted, and he can't be asked questions about it.

BY MS. ALI:

Q.   Did you perform neuropsychological testing on Mr. Runyon?

A.   No, I did not.

Q.   Why not?

A.   I'm not a neuropsychologist.  Neuropsychologists perform

                 JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                           1691

their own psychological testing.

Q.  Do you have the training and experience necessary to understand the results of neuropsychological testing data and reported by others?

A.  I can read neuropsychological reports and come to conclusions about the findings.

Q.  In your clinical practice do you rely on other clinicians' test results to reach diagnoses?

THE COURT:  Where are you going now?  Is it outside of his qualification that you've offered him for?

MS. ALI:  No, Your Honor.  He lists these materials in his report, and he discusses the results of neuropsychological testing in the report.  It's part of the information that informed his overall conclusions about Mr. Runyon.  He didn't perform the neuropsychological testing, he just had the information that experts in his field have.

THE COURT:  Go ahead.

BY MS. ALI:

Q.  In your clinical practice do you rely on other clinicians' test results to inform diagnoses?

A.  Yes.  All the time; EMGs, EEGs, neuropsych testing, MRI reads from neuroradiologists.

Q.  And is that the standard of care in medicine?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1692

Q.   What is the relevance of neuropsychological testing to a neuropsychiatric diagnosis?

A.   Oh, it can be very helpful in, again, localizing deficits in people.  Neuropsychological testing is not really an opinion as such.  It is actually normal testing, like an EMG is a test, there's validity to those tests in the way they are administered.  It's like an MRI.  It's like objective testing of brain function.  So it can tell -- you can help localize where the brain function is abnormal or if it's abnormal or not.

Q.   Do you sometimes refer your patients for neuropsychological testing?

A.   Yes.  All the time.

Q.   Why?

A.   Well, every epilepsy surgery, you have to have a baseline and a neuropsychological test done.  If I have a patient who has cognitive complaints, ADHD, for example, neuropsych testing is helpful there.  If somebody has cognitive deficits or disinhibition or irritability, I would definitely get neuropsych testing.  The reason is not just to find the deficits but also to find the strengths of the person so you can use the strengths to overcome the deficits.  So neuropsych testing is helpful from a diagnostic, prognostic and therapeutic angle.

Q.   Did you review neuropsychological test results in your

Nadkarni, S. - Direct                                        1693

assessment of Mr. Runyon?

A.  Yes, I did.

Q.  And whose neuropsychological testing did you review in this case?

A.  I think -- I think there were two sort of formal reports of neuropsychological testing:  One from Dr. Mirsky and one from Dr. Montalbano.

Q.  And did you do anything to verify the validity of their testing?

A.  I think they do that.  They verify the validity of their testing.

Q.  And do you recall what they said about the validity of the results?

A.  Oh, I think they said that the results were valid, he passed malingering test, he didn't try to fake the symptoms. They mentioned all those things.

Q.  Can we pull up what was previously admitted as Government's Exhibit 36.  This is Dr. Mirsky's 2009 report.

        THE COURT:  We had all that in 2009, didn't we? Didn't all that come in in 2009?

        MS. ALI:  It's in evidence, Your Honor.

        THE COURT:  Mirsky came in, Montalbano.

        MS. ALI:  It's something he relied on, Your Honor. It's part of the bases of his opinions that he's testifying about today.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1694

THE COURT:  Okay.  I want to be given correct information here.  Did those reports and that testimony come in in 2009?

MS. ALI:  No, Your Honor.  They were admitted as part of the February hearing, but none of that came in at the 2009 trial.  They were available.  They were completed before the trial.

THE COURT:  So these are the 2009 reports from Mirsky and Montalbano?

MS. ALI:  That's right, Your Honor.

THE COURT:  They came in at the beginning of February of this year?

MS. ALI:  They were admitted, that's right, yeah.

THE COURT:  That's what I mean, they were admitted then.  I just wanted the basis.  I want to be sure the record is correct.

MS. ALI:  Yes, they were admitted, Your Honor, to show the effects they would have had on trial counsel.  Not Dr. Mirsky nor Dr. Montalbano testified.

THE COURT:  Dr. Mirsky is now deceased.

MS. ALI:  That's right, Your Honor.

THE COURT:  Well, if we are going to go into those, I think we have been going about three hours.  It's time to take a 15-minute recess, and then we will go into the continuation of Dr. Nadkarni's testimony.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                            1695

The Court stands in recess for 15 minutes.

(Recess from 4:53 p.m. to 5:20 p.m.)

THE COURT:  All counsel are here, Mr. Runyon is here, and Dr. Nadkarni is on the stand.

You can continue your examination.

MS. ALI:  Thank you, Your Honor.  Before I continue the questioning, Mr. Samuels has asked me to clarify one point for the record, which I'm happy to do.  We were talking about the 2009 reports of, I think, Drs. Mirsky, Montalbano and Patterson, and I said that they were admitted in the February proceeding for their effect on trial counsel, and he just asked me to make clear on record that they were not admitted for the truth of the matter asserted, which I'm happy to do.

THE COURT:  Yes.  That was the correct ruling, and I'll clarify something, but it's a distinction without a difference really.  The statute of limitations ruling is different from the irrelevancy, frankly, of the 2018 MRI. The statute of limitation is one that says on pro hac investigations, he would have had two years.

The real substance of a 2018 MRI is not what anybody had in 2009 or could have had in 2009, because you've got a progression over the years, and all these experts have indicated that this can easily be progressive from that first 3-year-old injury cumulative all the way up.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                         1696

I'm just saying 2018 MRI is not relevant to what the attorneys knew or could have known in 2009.  We've got that MRI.

Go ahead.

MS. ALI:  I think I've made my points on that, Your Honor, I won't belabor them, but I'll just note my continuing objection to it, but I understand.

BY MS. ALI:

Q.  Before we took the break, we had been talking about the neuropsychological testing, but I want to go back just for one quick cleanup question.  Before I go there, I had asked you, when we were looking at the scans of Mr. Runyon's brain, what white matter -- I think I forgot to ask you what white matter hyperintensities are.  So if you could just explain that.

A.  I think you may have asked that.  I can repeat myself. So the white matter hyperintensities are, when there is evidence of that shearing injury to the white matter. Sometimes you can see these punctate white matter deficits in relationship to having treat -- in relation to that shearing of the white matter at that juncture, the cortical bay juncture especially.

Q.  And what do they indicate?

A.  They indicate injury to the axons, to the white matter of the brain.

Nadkarni, S. - Direct                                    1697

Q.   If we could pull back up what was previously admitted as Government's Exhibit 36.  This is Dr. Mirsky's 2009 report. Did you review this report and consider it as part of forming your opinions in this case, Dr. Nadkarni?

A.   Yes, I did.

Q.   And if we could next pull up what was previously admitted as Government's Exhibit 55B.  This is the 2009 report of Dr. Paul Montalbano.  Did you also review this document in connection with forming your opinions in the case?

A.   Yes, I did.

Q.   Do you know what kind of doctors Drs. Mirsky and Montalbano are?

A.   I believe they are neuropsychologists.

Q.   And do you know from reviewing their reports whether they conducted neuropsychological testing of Mr. Runyon in 2009?

A.   Yes.

Q.   And did you review the types of neuropsychological tests that these doctors performed on Mr. Runyon in 2009?

A.   Yes, I did.

Q.   Based on your training and expertise, did they strike you as the types of tests that neuropsychologists administer to assess cognitive functioning?

A.   Yes.

Q.   How did the test that Dr. Montalbano and Dr. Mirsky performed factor into your overall assessment of Mr. Runyon?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1698

THE COURT:  Do you know who ordered those tests or had access to them at the time?

THE WITNESS:  I believe Dr. Mirsky was a defense witness or expert, and Dr. Montalbano was a prosecution, but I don't know who -- that's all I know about that.

THE COURT:  I'm asking whose expert were they at the time the tests were ordered?

THE WITNESS:  Yeah, I'm not a hundred percent sure about that.  I think there was -- I vaguely heard that there may have been an expert that changed sides, but I don't know.  I can't answer that question.

THE COURT:  That will come out in the hearing. Again, it's relevant to what the defense attorneys knew and had access to at that time.

THE WITNESS:  Sure.

BY MS. ALI:

Q.  Dr. Nadkarni, do you know who hired Dr. Mirsky in advance of trial?

A.  I thought it was his counsel.

Q.  Mr. Runyon's counsel?

A.  Mr. Runyon's counsel.

Q.  And do you know who hired Dr. Montalbano in advance of trial?

A.  I believe it was the prosecutor's office.

Q.  Do you have any idea what trial counsel had access to in

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1699

terms of the testing or the reports of either of those

experts?  Is that within the scope of what you are here to

testify?

A.   No, no, I'm not aware of that.

Q.   How did the tests that Dr. Montalbano and Dr. Mirsky

performed factor into your overall assessment of Mr. Runyon?

A.   So they corroborated my opinion of frontal lobe

dysfunction, both sets of testing.

Q.   And how did they do that?

A.   So they showed the very specific deficits and specific

frontal lobe functions; both attention, processing speed,

working memory.  There were deficits -- those functions are

housed in the frontal lobe, so I think those were all shown

to be defective.

Q.   Was there a difference between Mr. Runyon's verbal and

performance IQ scores?

A.   There was a difference between the verbal and IQ scores,

yes.

Q.   What does that tell you about?

         MS. WARD:  Your Honor, if I may, I'd just like a

point of clarification.  It's been used a little colloquy,

but Dr. Nadkarni is testifying as to what he read in the

reports, not the actual testing or the raw data that was

collected by either doctor.

         THE COURT:  Sustained.

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1700

BY MS. ALI:

Q.  Dr. Nadkarni, were you able to determine from the face of the reports what kinds of tests Dr. Montalbano and Dr. Mirsky performed?

A.  Yes.

Q.  And did Dr. Montalbano and Dr. Mirsky report the results of those tests in their reports?

A.  Yes.  They mentioned the test specifically.

Q.  And in some instances did Dr. Mirsky and Dr. Montalbano also include things like raw scores --

A.  They did.

Q.  -- other detailed findings from their testing?

A.  I'm sorry, they did.

Q.  And are the types of reports -- types of information that were contained in Dr. Mirsky's and Dr. Montalbano's reports the types of data you would normally review in your clinical practice when evaluating neuropsychological testing results?

A.  Yes.

Q.  Do you typically, in your clinical practice, review the raw data from neuropsychological testing or the report from the neuropsychologist?

A.  I don't routinely review raw data.

Q.  You rely, as a routine matter of practice, on the reports prepared by neuropsychologists?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1701

Q.   And I believe you were testifying that there was a difference between his verbal and performance IQ scores.  Can you tell us whether that had any bearing on your opinions about Mr. Runyon?

A.   It did have a bearing on my opinion, and in Dr. Montalbano's report, the verbal IQ was much lower than the performance IQ, and that split is significant.

Q.   Why?

A.   Because there shouldn't be more than one or two standard -- one or two standard deviations of difference between performance and verbal.  So verbal IQ is sort of a proxy for left brain function.  Performance IQ is a proxy for right brain function.  Both hemispheres should be pretty close in their functioning.

     Splits have lots of meaning, like the other direction split of non-verbal learning disorder split where the verbal IQ is very high and the performance IQ is low, is typical of high functioning autism, for example.  So splits are significant, and they tell us that one part -- that there is one part -- one hemisphere may not be working as well as the other hemisphere.

Q.   Did you also review the results of testing concerning working memories?

A.   Yes.

Q.   What is working memories?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1702

A.   Working memory is actually not really memory.  Working memory is the ability to hold one thing in place, go and get other information in relation to that thing and then use that information.

     The example we use is, you know, if you ask somebody to say the alphabet backwards, many people will say ZYX, wait a minute, XSTUV -- so holding in place going forward and coming back, that's working memory.  That's a frontal lobe function.

Q.   If we could pull up Exhibit 55B again.  Sorry, Government's Exhibit 55B.  Try to find where this is, I'm sorry.

     This is the report of Dr. Montalbano.  If we could turn -- the number at the bottom of the page that's 520 -- I'm sorry, there is actually a page at the top, Page 24 of the report.

     Is this the result of the working memory test that you reviewed?

A.   I believe that is in here, yes, and the verbal performance split, the verbal as well and the performance 122.

Q.   And what did Dr. Montalbano conclude about Mr. Runyon's working memory?

A.   That it was impaired along with the processing speed.

Q.   And if we turn to the next page, Page 25 of the report,

Nadkarni, S. - Direct                                           1703

does Dr. Montalbano say here anything about that -- in other words, on Page 24 he reports the percentile score.  Does he reach a conclusion about Mr. Runyon's working memory on Page 25?

A.  He says his working memory index score placed him at the 81st percentile, which does suggest significant deficits in short-term memory.

Q.  Was that a meaningful finding in your overall evaluation of Mr. Runyon?

A.  Yes.

Q.  Why?

A.  Because that's hard evidence of memory deficits, which working memory localizes the frontal lobes again.

Q.  And when you say hard evidence, you are referring to neuropsychological testing results?

A.  Right.

Q.  And do neuropsychiatrists generally in the field rely on neuropsychological testing as hard evidence, as you put it, of cognitive functioning?

A.  Yes.  So neuropsychological testing results are very important actually.  So if we take the example, for example, of like -- let's go back to the NFL and a player who, like, has had a concussion.  So the way they decide on the sideline, uses neuropsych testing.  These patients who have CTE and repetitive concussions in NFL, they will have

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1704

neuropsych deficits, both acutely and chronically, and they will have normal MRIs, even though they have CTE, and you do brain slicing in a postmortem, you see holes in Alzheimer's. But the MRI can look normal, the neuropsych testing is more.

So their MRIs can be normal, and the brain slice can look like it has Alzheimer's on the pathology, but the neuropsych testing will also be abnormal. So EEG, neuropsych testing show functional elements, not structural elements.

The brain can be completely normal looking, and the neuropsych testing, EEG can be abnormal. So the neuropsych testing is very valuable for a neuropsychiatrist in multiple different settings.

BY MS. ALI:

Q. Did you identify any symptoms of brain injury in Mr. Runyon?

A. I think you told me about several symptoms that he was still having.

Q. And what were those?

A. They are in my report, if we can look at that, but he talked about difficulties with memory, headaches, vertigo. He notes irritability, difficulty with problem solving, multi-tasking, complex problem solving, to name a few.

Q. If we turn to --

A. Right. So he also described the sort of disorganization of his thoughts, where his thoughts collide. He, himself,

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                 1705

notes that his processing speed is not as fast as it was; it is slowed.  I think I mentioned -- word finding issues, that's another one I didn't mention that, and that's a left frontal function.  That complaint changes in the way he interacts with other people and presents himself; tinnitus, which is ringing in the ear; and then he has these sort of shooting pains down his right arm and hand in the distribution of what would be cervical level 3 or 4.

Q.   The first one you mentioned is colliding thoughts.  What does that mean?

A.   I think Mr. Runyon's thought process isn't sort of a normal linear thought process always, and I think in his brain I think what he is describing is disorganization of thoughts.  Sometimes I think he can sound like he is linear and making sense, and if you look at the mental status exams from other people, sometimes he seems like he is linear, sometimes he seems like he is rambling and not making sense.  But I think that reflects an inner state of like disorganization of thought.  That's what I think that means.

Q.   Did you observe this in Mr. Runyon or is this just something he told you?

A.   So he had a linear thought process when I was talking to him in that moment, but that's just a thought process.  But what he was telling me was sort of jumping around topic-wise from one thing to another.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1706

Q.  You also mentioned, I think, parallel processing.  What is that?

A.  Parallel processing is like what I described with working memory, doing sort of two things at one time.

Q.  In your observation of Mr. Runyon and his self-report to you, is it consistent with the neuropsychological testing we just looked at?

A.  Yes, it is.

Q.  And you also mentioned multi-tasking.  I think we all know what that means, but how did you observe that in Mr. Runyon?

A.  So multi-tasking is another sort of parallel processing, and he reported that to me, and he -- you know, he said that he used to be able to do that, and he couldn't do that anymore.

Q.  You also listed changes in comportment.  What does that mean?

A.  Comportment means the way you present yourself to the world.  So there was a change in the way he did that after those car accidents that he had when he became irritable. The famous case in neurology is Phineas Gage who had a tamping iron go through his frontal lobes.

THE COURT:  Is that mentioned in your report?

THE WITNESS:  It's not.

THE COURT:  Go ahead.  It's an interesting story.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                        1707

Go ahead.

THE WITNESS:  I'm just trying to explain what comportment means.  So that tamping rod went through those areas, the orbital front cortex, the medial frontal and the dorsal lateral.  All three areas got hit, and the thing that his friends said about him after that was that he was no longer Gage, meaning personality change was the central feature of these frontal lobe injuries, head injuries.  And I think comportment change just means that, that his behavior changed, his style of interacting with the world changed.  He was more short fused.

BY MS. ALI:

Q.  Would you diagnose somebody with a traumatic brain injury based solely on a personality change?

A.  Not solely on a personality change.

Q.  Is it relevant to the evaluation?

A.  Yes.

Q.  I believe you also testified that Mr. Runyon exhibited some signs of being short tempered and irritable.  Do you have an understanding of whether that has anything to do with brain function?

A.  Yeah.  It's very commonly a feature of frontal lobe injury.

Q.  And how about word finding issues?  What does that mean?

A.  It means difficulty coming up with a word that you want

Nadkarni, S. - Direct                                              1708

to say something.  That's in the left frontal lobe in a place called Broca area, B-r-o-c-a, in the left frontal operculum, is where language is.  So if you have frontal lobe injury, word finding issues might be a problem.  It's a subtle sign of aphasia.

THE COURT:  These are your observations when you were examining him?

THE WITNESS:  These are his active brain injury symptoms.

THE COURT:  When you examined him?

THE WITNESS:  Yes.  So he did have difficulty coming up with words when I was talking to him, but this list is not my observation.  This list is his -- so symptoms are what he tells me, and signs are what I observed.  This is a list of symptoms that he told me.

THE COURT:  So these were self-reports?

THE WITNESS:  Correct.  That's correct.

BY MS. ALI:

Q.  You also listed C3/C4 issues and nerve radicular symptoms in his right arm and hand.  How is that significant, if at all?

A.  It is just one of the neurologic symptoms that he had, so I listed it there.

THE COURT:  I think we went through that before.

BY MS. ALI:

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                        1709

Q.   Okay.  You testified just a moment ago you relied on Mr. Runyon's self-reports to identify symptoms.  Why is it important to ask a patient about symptoms?

A.   Because oftentimes they can give a level of detail to what their symptoms are that other people can't give.  It's also their subjective experience.  That's a very important thing, is what their subjective experience might be and what their symptoms are.

Q.   You evaluate many people who are brain damaged; is that right?

A.   Yes.

Q.   Are they good self-reporters of information?

        THE COURT:  Well, you talking about every one of them?

BY MS. ALI:

Q.   Do people with brain damage sometimes have trouble self-reporting symptoms?

A.   Some people with brain damage sometimes have trouble.

Q.   And are some people with brain damage good self-reporters of their own clinical history?

A.   Sometimes they can be.

Q.   Is considering self-reporting a standard part of the neuropsychiatric assessment?

A.   Of course, yes.

Q.   Did you make any diagnoses stemming from traumatic brain

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1710

injury?

A.   Yes.   I think he has several diagnoses as a result of his traumatic brain injuries.

THE COURT:  But these are diagnoses you've made in 2022?

THE WITNESS:  Correct.  When I saw him, correct.

THE COURT:  At one point when you asked him his moods, did he say I'm depressed, I'm facing the death penalty?

THE WITNESS:  Yeah.

THE COURT:  So that would have some effect on an individual for that many years, would it not?

THE WITNESS:  I mean, I can't imagine what that's like, facing that.

THE COURT:  I rephrase that.  I think he said he was on death row, which is still the same thing, can clearly be a depressing situation.

BY MS. ALI:

Q.   You reached some diagnoses that I think you concluded stemmed from Mr. Runyon's history of traumatic brain injury. What were those diagnoses?

A.   They are listed here.  So, first of all, cognitive deficits from the traumatic brain injury itself, that's what I mean by chronic sequelae; PTSD, post-traumatic stress disorder; I think he qualifies for schizoaffective disorder,

Nadkarni, S. - Direct                                    1711

bipolar secondary to head injury; migraines, post-traumatic migraines; organic personality; and frontal lobe syndrome, which are similar; and then epilepsy.  I don't know if there is a -- is it at the end of the list?  Yes.

Q.  You mentioned post-traumatic stress disorder.  Is that a diagnosis that you made of Mr. Runyon?

A.  No, that was in the records.

Q.  Do you recall where it was in the records?

A.  I think it dates back all the way to the Portsmouth jail reports, I believe, is mentioned of PTSD, Army records is mentioned of PTSD, yeah.  And he reports symptoms of PTSD also.

Q.  He reported them to you?

A.  Yeah.

Q.  Is there a relationship between post-traumatic stress disorder and traumatic brain injury?

A.  Often they can travel together just because the head injuries are often traumatic.  So sometimes they can occur -- co-occur, but what's really interesting is, for post-traumatic stress disorder, which is fascinating, is that usually you have to be exposed to a life- or limb-threatening situation, and there is a lot of sort of interesting discussion about this, but when you have a brain injury where you lose consciousness and have no recollection of the events, the question becomes have you been exposed to a

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                           1712

traumatic experience or not.

And the literature shows that actually even in the absence of remembering what happened, people who have TDIs, a portion of them develop PTSD even without remembering.  So in neuropsychiatry, it's, again, this might be, to borrow a phrase, a distinction without a difference.  The question is does the traumatic brain injury cause the PTSD or is it the trauma that causes the injury and independently cause -- that's a debate, but they often travel together.

Q.  Can someone develop PTSD from a car accident?

A.  Yes.

Q.  What are the typical symptoms of PTSD?

A.  Nightmares, flashbacks, which means reliving the experience, hypervigilance, anxiety, panic attacks, being easily triggered to avoid any stimuli that might be triggering.

Q.  Did you observe or learn about any of these symptoms in Mr. Runyon?

A.  Yes.  He described having nightmares and flashbacks in the past.

THE COURT:  Did he say how far back, was he still having them?

THE WITNESS:  I believe in my recollection that's tied to the 1996, after the 1990 or 1996 -- the car accident, I think is when, around that time he started

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1713

developing those symptoms.

BY MS. ALI:

Q.  You also mentioned -- what's written here is R/O epilepsy, likely focal.  What does the R/O signify?

A.  So what -- when I made a diagnosis of epilepsy, when I use R/O, what I mean is I'd like to see further testing to say where the epilepsy is starting from, further characterizing the syndrome.

        So epilepsy can be generalized or focal, and what I mean there is I need more testing, and I would like to get an EEG to characterize the epilepsy syndrome that might be there.  But I listed it there because I think he has epilepsy, and all those seizures that are listed at the beginning of the report is multiple episodes.

        THE COURT:  I'm sorry.  I missed, the beginning of what?

        THE WITNESS:  In the beginning of the report I list a bunch of seizures that I think he's been having.

BY MS. ALI:

Q.  What does focal epilepsy mean and how does that differ, if it does, from generalized epilepsy?

A.  So there are two kinds of epilepsies; generalized and focal.  Epilepsy is a syndrome that presents with Paroxysmal seizures or spasms, and generalized epilepsy is more common in children.  It's more genetic.  It's more benign.  It --

JODY A. STEWART, Official Court Reporter

usually kids grow out of it.

Focal epilepsy means that there has been some injury to the brain or some lesion in the brain, like a brain tumor or a stroke or an encephalitis or some injury to some part of the brain where one little part of the brain is abnormal and is epileptic, and it can start making seizures. So focal means in one area, and generalized means the EEG shows spikes all over the brain. Focal epilepsies can result from head injuries.

Q. How do you diagnose epilepsy?

A. The epilepsy diagnosis is made by history. So 85 percent of what we base the diagnosis on is the history, and then the exam might be a little bit helpful. But somebody who has a normal examination and has a good history for epilepsy, the diagnosis is done, actually.

You might do further testing to further characterize your opinion, like an MRI or an EEG, but there are places where, you know -- there are places where these things are inaccessible, and these diagnoses are routinely made clinically based on the history.

Q. You mentioned an EEG. What is that?

A. It's an electroencephalogram. So gram means to measure, and encephalo is the brain. So it's measuring the electrical activity of the brain.

Q. And what's the purpose of an EEG?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                1715

A.   The EEG -- so, you know, if you open the hood of your car and take a picture, that's like an MRI, the structural picture of the engine.  But if you hook it up to a computer and see like how everything is working and how it is functioning, that's what an EEG will help show you, is the functional aspect of the tissues.

So we have patients with epilepsy who have abnormal, very abnormal EEGs and routinely have normal MRIs.  It happens all the time.  So EEG tells you the functional information about the person.

Q.   I'm sorry.  I just want to make sure I heard you right. You said you could have somebody with an abnormal EEG and a normal MRI?

A.   Almost all temporal lobe epilepsy patients have that situation; normal MRI, abnormal EEG.

Q.   And in that instance would you diagnose the particular disorder despite the normal MRI?

A.   In which instance?  I'm sorry.

Q.   If you had an abnormal EEG and a normal MRI?

A.   I think the point is we don't use either one of those for diagnosis.  So the diagnosis is based on history.  But If somebody has temporal lobe spikes, the chance of having seizures is 95 percent.

Q.   And do all people with epilepsy have seizures that we might know from sort of common picture of the seizure with a

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1716

violent shaking and things like that?

A.  Most people don't know -- most seizures are not that.  So those convulsions where people are shaking their body, biting their tongue, peeing on themselves, those are called generalized type chronic convulsions.  That's the final big common pathway.

Way before that people can have all different kinds of spells.  So in generalized epilepsy, there is certain kinds of seizures like absence seizures (indicated) where somebody just stops talking, starts looking around, lip smacking like I just did.  That can be an absence seizure.  It happens in kids all the time.  And if they do it a lot, people then, like going in and out, but that's epilepsy.  That's absence epilepsy.

Complex partial seizures have like dream-like states and déjà vu and nocturnal spells and rising sensations or floating sensations or out-of-body experiences.  So temporal epilepsy can have abnormal smells also.  So the focal epilepsy is the symptoms depend on where the seizures are starting.  If it's a front local epilepsy, they might have motor movements at night.  If it's a temporal lobe epilepsy affecting the limbic system, we call those hypomotor seizures.  They are more subtle.  They are psychic experiences, actually, déjà vu or dream-like states.  Very often people with epilepsy have events at nighttime, odd

Nadkarni, S. - Direct                                        1717

spells at nighttime or feel they are shaking at nighttime or waking up in panic, in dream-like states or seeing things. Visual hallucinations are suspicious for neurological illness also. So epilepsy does not have to be -- epileptic seizures do not have to be convulsions. There is a wide variety of spells that can cause -- that can be epileptic.

Q. Could someone be having a seizure and not themselves know it?

A. And that's the case usually.

Q. And could somebody be having a seizure that's not visual to other people who are around them?

A. Yes, a hundred percent.

THE COURT: You can ask all these questions, but I don't have any idea the importance of them to the issue in this case. But I would remind you, I'm listening to it all and let you create all these questions in the record, but it's coming on 6:00, and you are repeating things, and you are going into areas of, well, if somebody has this kind of seizure or that kind of seizure, and it's just kind of all dropping out there.

But at some point the Court is going to stop this evening. It's not going to go past 8:00. You're the one that is extending this and extending this. The Court is not going to be open this weekend. There are door problems, there are carpeting problems. You can't even get in and out

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1718

of the back door, will be chained.

Once Dr. Nadkarni is here, he is going to be here. You are the one that's really kind of running, guiding the ship right now, Ms. Ali, as to what's really important and what's not important to get in through this witness.

Certainly, the United States is going to have an appropriate time to cross-examine.  So some of these questions, I don't know why we are going into all stages of epilepsy.  What does he have?  If he does, did he have it in 2009?  I think you've covered all that, and why do we need to know about grandma seizures and biting tongues and all those kinds of things?  But you're just going on and on.  So you're going to be the architect of the happiness of this witness when he has to come back on Monday, because that's what's going to happen, I think.

MS. ALI:  I'm nearly done, Your Honor.

THE COURT:  Remember the government still has cross-examination.

BY MS. ALI:

Q.  Dr. Nadkarni, do you have an opinion about whether Mr. Runyon has epilepsy?

A.  I believe he does.

Q.  And do you have an opinion about when he developed epilepsy or how far back his symptoms of epilepsy --

A.  He described even in childhood these nocturnal spells, so

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                              1719

I suspect he's had it for a long time undiagnosed.

Q.   To the best of your knowledge, did Mr. Runyon ever have an EEG?

A.   Not that I'm aware of.

Q.   Is it possible that Mr. Runyon is faking the symptoms that led you to diagnose him with epilepsy?

A.   I don't think that's possible, at least in my estimation, I don't think that's possible the way he told me those symptoms.

Q.   What do you mean by that?

A.   They are very specific for temporal lobe epilepsy.  They are very, very specific for -- especially visual hallucinations and the nocturnal dream-like state and the shaking at night, those are very, very in line with temporal lobe epilepsy.

Q.   Are there consequences from untreated epilepsy?

A.   Yes.  You can have cognitive effects, psychiatric effects, the same kinds of problem that you can have from a brain injury.  Each seizure is like another little injury to the brain, so...

Q.   You also mentioned migraines.  Are those related to traumatic brain injury?

A.   You can have post-trauma migraines from after a head injury.

Q.   Meaning they are a symptom, not a cause of brain injury?

Nadkarni, S. - Direct                                          1720

A.   A consequence of brain injury.

Q.   And you also mentioned schizoaffective disorder, bipolar type.  What is that?

A.   That's a disorder where people have both psychotic symptoms like delusions and hallucinations and mood symptoms but can have psychotic symptoms in the absence of mood symptoms for at least two weeks.  Then it becomes a syndrome of schizoaffective, which is like schizophrenia plus a mood disorder.

Q.   Does the diagnosis of schizoaffective disorder have anything to do with traumatic brain injury?

A.   Schizoaffective disorder, mood disorders can be a consequence of traumatic brain injury.

Q.   Do you know when Mr. Runyon began exhibiting symptoms of schizoaffective disorder?

A.   So he describes again these odd experiences from his teenage years even.  Some of his -- like, you know, I think it's after in his early 20s, I think he started having symptoms of some of these mood symptoms; depression, depressive symptoms.  Definitely in 2009 there was a note made that he had depression at that time, but what he describes to me dates back to farther back.

Q.   You mentioned the note from 2009.  Are you referring -- switch to the Elmo.  This is Defense Exhibit 44, was previously admitted.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                        1721

A.   Yes.

Q.   Is this -- this is the Portsmouth jail records in 2008;
is that what you were referring to?

A.   That's right, I'm sorry, 2008.

Q.   And does it list an Axis I diagnosis of schizoaffective
disorder?

A.   And bipolar.  Schizoaffective disorder and bipolar
disorder.

        THE COURT:  Is this the one we looked at before?

        MS. ALI:  Yes.

        THE COURT:  We have gone through this before.  We
have gone through it.  You've said what was in it.  We don't
know who the person was.  It looks like it was some type of
medical assistant, and we don't know if there was any
follow-up.  Now, this is cumulative.

BY MS. ALI:

Q.   Is schizoaffective disorder recognized in the DSM?

A.   Yes.

Q.   Did you consider Mr. Runyon's family history in making
your diagnosis of schizoaffective disorder?

A.   Well, he has a genetic predisposition for mood disorder.
Both of his parents have been reported to suffer from mood
disorders.

Q.   You also mentioned organic personality syndrome.  What is
the diagnosis of organic personality syndrome?

Nadkarni, S. - Direct                                    1722

A.   I think I mentioned this before, that it's not really --
like a stand-alone psychiatric illness, but it's a
personality change due to a brain injury.

          THE COURT:  I thought you just went through these
seven.  Are you going through them again?

          MS. ALI:  I haven't, Your Honor.

          THE COURT:  You asked him.  I was looking at the
page when you went through each one of these; traumatic
brain injury, post-traumatic stress.  You went right through
the order down to R/O epilepsy, likely focal, and that's
when I said why are we going into all of this.  You went
through each of these categories, if you go back and look at
this record.  Why didn't you finish what you wanted to ask
about the categories when you went through it?

          MS. ALI:  I have not asked this question, Your
Honor.

          THE COURT:  You might not have asked the question,
I don't know, but you went through these seven categories.

          THE WITNESS:  There is another list that looks
similar.

          THE COURT:  It's my observation.  I think if you
look at the record, you will see that you went through every
one of these seven down to the epilepsy when I made a
comment.  Now you are going to start back through them and
ask more questions.  Why didn't you finish each one?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                          1723

BY MS. ALI:

Q.  If someone has a known history of traumatic brain injury, is it appropriate to diagnosis them with a personality disorder?

A.  I don't believe that's appropriate.

Q.  And is there any literature that supports that?

A.  I think the idea is for personality Axis II disorder is that you can't make those diagnoses if there is another explanation for those disorders.

Q.  Do you know if the DSM-IV says anything about that?

A.  I think the DSM makes that point for a lot of illnesses but not better explained by other disorders, and that's the way we are taught.

Q.  What is your opinion to a reasonable degree of medical certainty concerning your neuropsychiatric assessment of Mr. Runyon?

A.  Well, I think he suffered multiple severe head injuries from a young age, and they had both developmental and neuropsychiatric and neurocognitive effects.  They affected his frontal lobe functioning, his judgment, decision-making. I think he's pretty severely brain injured and with frontal deficits.

        THE COURT:  When did you form this opinion?

        THE WITNESS:  When I got the records and met with him in 2022.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Direct                                                    1724

BY MS. ALI:

Q.  And was your opinion based on your own observations of Mr. Runyon in 2022 and also records dating back towards the time of the crime?

A.  Yes, that's correct.

Q.  And in some instances did you look at records that predated the crime?

A.  Yes.

Q.  And did those records inform your opinions in this case?

A.  Yes, they did.

Q.  And had you been asked to give your opinion in 2009, would the opinion you just rendered have been your opinion to a reasonable degree of medical care?

THE COURT:  How can he say that when he's also basing it on things after 2009?  You'd have to go back now and limit all of it to what happened before 2009 and not on any current interview, just on what was known in 2009.

How can somebody make an opinion in 2022 based on 2009 when they just finished testifying about many things that occurred after 2009; other experts' reports that were made afterwards, his interview or examination was about a year ago, a little over a year ago.  That would lend no credibility to his testimony if he says that he could make the same opinion in 2009 that he's made now.  If he can, then let him say it.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                           1725

          MS. ALI:  Nothing further for me, Your Honor.

          THE COURT:  All right.  Cross-examination.

          MS. WARD:  Yes, Your Honor.  Just one moment,

please.

                    CROSS-EXAMINATION

BY MS. WARD:

Q.  Good evening, Dr. Nadkarni.

A.  Good evening.

Q.  Let me go back to -- we have your curriculum vitae there

as provided today and admitted Defendant's Exhibit 154.  When

did you create that version of your curriculum vitae?

A.  I think there might be a date.  It might have been 11 --

it was after I left NYU, so it was in 2022 at some point.

There might be a date on the CV.  I don't remember it.

          THE COURT:  There is no date.  I do notice the last

article in there was 2022.  So it might have been updated.

          THE WITNESS:  It was after February of 2022.

That's when I left NYU.

BY MS. WARD:

Q.  And when did you provide that to *habeas* counsel?

A.  I'm not sure -- can I see which version you are looking

at?  I think they asked me for an updated CV when they came

on the case.  I don't know exactly when that was provided to

them.  I have it on the screen.  So it was in the last few

months.

                JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                       1726

Q.   It wasn't this week?

A.   I don't believe it was this week.

Q.   It wasn't yesterday?

A.   No.

Q.   And it wasn't this morning?

A.   It was not this morning.

Q.   I'd like to just show you what was described as your list of legal cases that you testified to in the past five years. Are you familiar with this document, Dr. Nadkarni?

A.   I am.

Q.   Is this accurate and up to date?

A.   I believe so.  I may have -- I think this is a comprehensive list, but I can't be a hundred percent sure about that, but all of these are true.

Q.   Are any of these state cases?

A.   Let me see.  Well, some of these are like civil rights cases.  So, yeah, I think some of these may be state cases, but I really -- I didn't put that here, so I don't know which ones are which.

Q.   Is there a reason that you don't list full party names or captions or case numbers?

A.   Honestly, they asked me for what cases I have done, so I made a list of them, and most of my practice is a clinical practice, so I gave them the names of the cases that I have done.

Nadkarni, S. - Cross                                      1727

Q.  If at any point -- did habeas counsel ever come back to you after you gave them this list of cases and ask you to clarify the different captions or case numbers?

A.  They did not.

THE COURT:  Where is this list of cases?

MS. WARD:  Your Honor, this is just what was provided by *habeas* counsel.

THE COURT:  This needs to be 154A.  So if you would pass that up, because there is no list of cases on this, and those are part of expert reports and qualifications.  So the Court would like to see them.  I just think it ought to be part of the record.  There are different types of cases. Thank you.

(Defendant's Exhibit 154A received in evidence.)

BY MS. WARD:

Q.  All those -- you said they were not all capital cases?

A.  They are not all capital cases.

Q.  Do you have a rough number or percentage of how many of those are capital cases?

A.  Maybe -- I would say 50 percent or more, 50, 60 percent.

Q.  I believe you testified that you were originally contracted to work on this case in 2021?

A.  I believe that's correct.

Q.  Were you getting any paperwork or documentation in 2021?

MS. ALI:  Objection, Your Honor.  What's the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1728

relevance of this?  These are attorney-client -- attorney
work product.  I'm not sure where this is going.

THE COURT:  Sustained.

BY MS. WARD:

Q.  You started reviewing the materials to prepare this
particular report in September of 2022?

MS. ALI:  Objection.  I don't think that was his
testimony.

THE COURT:  Just ask him when he started reviewing
materials.  When did you start reviewing materials in
preparation?

THE WITNESS:  That was probably sometime in 2021.

BY MS. WARD:

Q.  You did review a bulk of documentation from Ms. Dana
Chavis in September of 2022?

A.  I don't remember that.

Q.  You generated your report in November of 2022?

A.  I believe that's correct, yes.

Q.  Dr. Nadkarni, is the 97 items that are listed on your
report everything that you reviewed to prepare your opinion?

A.  That's correct.

Q.  Are you familiar with the persons identified on this
list?

A.  I'm sorry?  My list of sources?

Q.  Yes, Doctor.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                               1729

A.   I didn't know any of them personally.  Some of them --
no, I'm not familiar with any of those people outside of this
case.

Q.   Do you know who Sheila Cronin was?

A.   I believe she was an interviewer, an investigator for the
legal -- defense legal team.

Q.   Do you recall who Robert Lockwood was?

A.   I can't recall that off the top of my head.

Q.   Or Charles?

A.   I'm sorry?

        THE COURT:  Speak up, please, into the microphone
so he can hear, and we can hear and move things along.

        MS. WARD:  Yes, Your Honor.

BY MS. WARD:

Q.   Do you recall who Charles Ferguson was?

A.   These names sound familiar to me, but I don't recall
those documents specifically.

Q.   Maria Runyon?

A.   Yes.  I remember that name.

Q.   And who is she?

A.   I believe she is his ex-wife.

Q.   And the materials you reviewed with her heavily informed
your opinion?

A.   I'm sorry.  Could you repeat that?

Q.   The materials that you reviewed from Maria Runyon heavily

                JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1730

informed your report?

A.   I wouldn't say they heavily informed my report.

Q.   You reviewed Maria Runyon's trial testimony?

A.   Yes, I believe I did.

Q.   You reviewed Maria Runyon's interview notes?

A.   Yes.

Q.   Those were collected by habeas counsel or habeas
investigators?

A.   Yes.

Q.   You reviewed her declaration that was prepared in 2015?

A.   Yes.

Q.   Were you given an opportunity to review her Grand Jury
testimony?

A.   I can't remember.

Q.   Did you ever come to hear what she testified to in this
evidentiary hearing?

A.   In this?  No, no, I haven't heard anything about that.

Q.   You reviewed interview notes from a Ms. Virginia Pina?

A.   I think so.  I'd have to look at my list of documents.  I
just don't know them off the top of my head all of these
names and documents, but I can just confirm that with my
list, if I can look at my report, I can tell you who I --
which records I looked at.

Q.   This is Page 2.

A.   Uh-huh.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1731

Q.   Is that clear enough for you to see, Doctor?

A.   Yes.  Thank you.

Q.   Page 2 of Defendant's Exhibit 137.  Do you see materials down at the bottom of that page referencing Virginia Pina?

A.   Yes.

Q.   Were you ever given a video to review?

A.   I was not, that I can recall, no.

Q.   Were you ever given e-mails or documentation from anybody on the defense team or experts that called David Runyon's performance in that video manipulative or controlling?

A.   Not that I can recall.

Q.   That's Page 3 of the report.  You see at the top, sir, that you -- you reviewed clinical trial drug list?

A.   Yes.

Q.   Were you ever provided or given the opportunity to review the intake data or any of the medical documentation that was -- that accompanied those trial drug list?

A.   I was not.

         THE COURT:  Do you know what types of drugs he was in clinical trials for?

         THE WITNESS:  I really don't know the specifics.  I just know that he did a bunch of those.

BY MS. WARD:

Q.   Earlier today we were provided with another copy of your report that was annotated with footnotes and citations.  Have

Nadkarni, S. - Cross                                              1732

you been able to see that document?

A.  I did see that document, yes.

Q.  And when did you first see that document?

A.  It may have been about a week ago, something like that.

Q.  And how did you receive that?

A.  I believe that was sent to me in a -- it was mailed to me.

Q.  Did you participate in the annotations?

A.  I did not.

Q.  Was it received in full or were changes made throughout the week?

THE COURT:  You received it in the mail?

THE WITNESS:  Uh-huh.

THE COURT:  You reviewed it?

THE WITNESS:  I did look at that document.

THE COURT:  Had you ever received anything like this before from attorneys?

THE WITNESS:  I have.

THE COURT:  Go ahead.

BY MS. WARD:

Q.  Everything was cited for you?

A.  I'm sorry?

Q.  All the citations and the parenthetical annotations and the footnotes were provided by *habeas* counsel?

A.  I assume so.  They were there, so -- and they are the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                            1733

ones who gave them to me.

Q.  You did not do that?

A.  I did not make any of those footnotes.

Q.  You testified you received the document last week?

            THE COURT:  Wait just a minute.

BY MS. WARD:

Q.  You received this document from counsel last week?

A.  Yes, that's correct.

Q.  Did you bring it with you when you traveled here?

A.  I think I did.  I think it was in the binder that had some materials in it, yes.

Q.  And what day did you arrive here?

A.  I arrived here Wednesday night.

            THE COURT:  Did you review this document before your testimony?

            THE WITNESS:  I mean, it's my own report so I reviewed my own report.  I, frankly, didn't look at those footnotes very much at all, honestly.  I spent maybe five or ten minutes looking at those footnotes.

            THE COURT:  They were part of your report.

            THE WITNESS:  My report was there.  They footnoted it.  I found those footnotes to be like something they were doing for their own purposes, for their own process.  So I didn't pay much attention to those footnotes at all.

BY MS. WARD:

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1734

Q.  Have you spent any time this week preparing your
testimony?

A.  I have.

Q.  How much time have you spent this week?

A.  Seven this week.  So this week I would say eight to ten
hours.

Q.  Was that alone or were you assisted by --

A.  Both.

Q.  In the course of those reviews did anybody else use the
copy of the annotated report?

        MS. ALI:  That actually calls for speculation
unless he knows.  She hasn't laid the proper foundation.

        THE COURT:  Ask him if to his knowledge was anybody
using it.

BY MS. WARD:

Q.  Dr. Nadkarni, are you aware whether anybody was using a
copy of the annotated report during your preparations?

A.  I'm not aware of anybody using it.

        THE COURT:  Were you put through like a test drive,
a little mock trial asking you questions?

        THE WITNESS:  Most of it was actually -- it felt
like sort of an education for the trial team about head
injuries and what we are doing.  They definitely said they
wanted me to go over things they might ask in direct and
things I might get in cross, and we did talk about some of

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1735

these things, but a lot of it was like understanding his

condition.

          THE COURT:  And you were able to explain that from

your report?

          THE WITNESS:  Correct.

BY MS. WARD:

Q.  Were you doing any preparations yesterday?

A.  Yes, some.

Q.  And was that accompanied by others?

A.  Yes.

Q.  How much time did you spend yesterday?

A.  I have this all written down, so let me just think.

Maybe six hours.

Q.  What time did that start?

          MS. ALI:  Objection.  She can ask what preparation

but we are getting into.

          THE COURT:  Overruled, because it could go to other

issues that are not substantive, but *pro bono* is *pro bono*.

Paid is paid.  Go ahead.

BY MS. WARD:

Q.  What time did you start preparing with other counsel

yesterday?

A.  I think we did half an hour at like 9:30 to -- 9:20 to

9:50.  It was two hours from 11 to 1.  I had patients

yesterday also I was seeing virtually, and then from maybe

Nadkarni, S. - Cross                                              1736

1:30 to 6:00, something like that, and maybe there was like a half an hour at the end of the day.  So I don't know.  Maybe six hours, five or six hours, something like that.

THE COURT:  This is with you with counsel, who you understood to be counsel?

THE WITNESS:  Correct.

BY MS. WARD:

Q.  Did any of this occur after 8:00 p.m.?

A.  I think there was a meeting after 8:00 p.m., yes.

Q.  Yesterday did you provide any additional documentation to any of your counsel?

A.  No.

Q.  Had you provided any additional material over the course of the week?

A.  Not that I can remember.

Q.  Dr. Nadkarni, what is your hourly rate?

A.  My standard hour -- my hourly rate in this case is $600 an hour.

Q.  Do you know to date how many hours you've billed?

A.  So there is two parts of this because the first team has finished.  There was an invoice for that.  You want me to include that?

Q.  Yes, please.

A.  How many hours total?

Q.  Yes.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                1737

A.  Have I spent on this?

Q.  Yes, Doctor.

A.  Probably somewhere around 70 hours, maybe 75 hours between both teams.

Q.  And how much of that was after February of 2023?

A.  25, 26 hours.

Q.  How much of that 25 to 26 hours was after August of 2023?

A.  Most of it is after that.

Q.  Was there any time spent between August and October of 2023?

        MS. ALI:  Objection.  He just answered that question.

        THE COURT:  She asked about the time after February, and then she asked after August, I believe.

        MS. ALI:  It doesn't matter.

BY MS. WARD:

Q.  Prior to that time the 25 to 26 hours was between August and October?

A.  I think the bulk of that time was in that time, yes.

        THE COURT:  This doesn't include your time yesterday and your time today?

        THE WITNESS:  Right.

        THE COURT:  Is that correct?

        THE WITNESS:  That's correct.

BY MS. WARD:

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1738

Q.  Have you submitted any invoices or billing statements to date?

A.  For the first team I did, yes.  Not to this team.

Q.  Do you have an approximate total so far of what you will bill in this case?

A.  Well, I think I just said $600 an hour, and it's up to 26 hours of prep plus testimony today.  So we can do the quick math, I guess.  I don't know.  Thirty, 32 hours times 600.

Q.  Is that in addition to the 70 hours you testified to earlier?

A.  No, that's including the first team and the second time. So that's a total.  So, yeah, for this team it will be 30, 32 hours.

Q.  I'd like to talk to you a little bit about your evaluation of David Runyon.  I believe it was on July 22nd, 2022, and that took place inside the Western Tidewater Regional Jail?

A.  Yes, that's correct.

Q.  Your report indicates that you started at 10:00 a.m.  Do you recall what time you completed the evaluation?

A.  Not right now.  I don't recall.

Q.  Do you have an approximate number of hours?

A.  Usually it's, you know, two, two and a half hours, something like that.

Q.  Can you describe the physical environment on conditions

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1739

of the exam?

A.   I can't remember if we were definitely -- we were allowed to be alone, I'm pretty sure.  I believe he was uncuffed when I examined him.  I just can't remember if we were in a single room or a larger common space.  But I think those were the conditions of the testing.

Q.   Were there opportunities to take breaks?

A.   I don't think we took a break.

Q.   In the course of the exam, the title of medical interview and examination?

A.   Yes.

Q.   You call that later a neurological evaluation?

A.   Yeah.  What I did was an neurologic evaluation, correct.

Q.   And a physical examination?

A.   A neurological examination, neuropsychiatric examination.

Q.   And you testified earlier that you did standardized testing to perform your exams?

A.   Yes.  The format of my exam is pretty standardized in terms of how people do neuropsychiatric examination.

Q.   Do you come prepared with certain questions?

A.   No.

Q.   You don't come with any written materials?

A.   I do not.

Q.   Are any part of the exam, exams that Mr. Runyon would be filling anything out?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1740

A.   Mr. Runyon would be -- I'm sorry.  I didn't hear the question.

Q.   Is there any written test or interviews where he would be writing down answers?

A.   I did a MoCA test on him, Montreal cognitive assessment. That's a piece of paper.

Q.   And did he fill that out?

A.   He did.

Q.   Did you provide any of that to habeas counsel?

A.   I don't know if I provided it to habeas counsel.  I can't remember.  I may have provided it to the previous team.  I just don't -- I don't remember.

Q.   Probably easy if I just go one by one.  The MoCA 26 exam, what is that?

A.   What is the MoCA or what does the score mean?

Q.   What is the MoCA?

A.   The MoCA is the Montreal cognitive assessment.  It's a brief bedside neuropsychological or office-based neuropsychological test that tests different parts of the brain, different parts of the -- localizing, testing the different parts of the brain.  That's what the MoCA is.

Q.   And in your report you indicated that Mr. Runyon missed two on recall, one on date, and one on abstraction.  Do you have a documentation of what those questions were?

A.   Yeah.  The abstraction question was what the similarity

Nadkarni, S. - Cross                                                    1741

between a watch and a ruler.  I don't remember which two he missed on recall.  What was the other thing you mentioned?

Q.   One on date?

A.   Yeah.  I don't remember what he told me about the date.

Q.   The motor -- on the physical exam did you bring any equipment?

A.   I did.

Q.   How did you record your results?

A.   On my laptop.

Q.   So you brought a laptop in with you.  Were you able to reference materials during the course of the exam?

A.   I don't reference.  I'm just taking a history.

Q.   You took detailed notes throughout the course of the exam?

A.   Yeah.  That becomes my report.  I take a history.  So chief complaint, history, I write that as I'm talking to the person.

Q.   Did you provide that to any of the counsel?

A.   I don't -- no, I provided them with a report.

Q.   Did you bring anything, any kind of medical equipment or anything like that that you would use to measure or --

A.   Sure, the reflex hammers, tuning forks, stethoscopes.

Q.   Did the MoCA reveal any written test that you administered?

A.   I believe that was the only written test they -- in

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                        1742

writing that I made him do.

Q.  Are each of the other exams that you administered, they are the list of standardized testing.  Did you just not bring the questions or the checklist?  Is there a checklist?

A.  There is no checklist.  If you go to a neurologist's office, you don't want to see the neurologist, do I do this, do I do this?  You just examine a patient, and you take a history.

Q.  Is it just your standard practice that you developed your procedure over time?

A.  This is what we teach all residents, all medical doctors. There are medical doctors who go through like, you know, checklists about when you see patients.  That's not the way it's done.

Q.  But would it be fair to say you have a mental checklist?

A.  I think, yeah.  I think there is a structure in my mind about how to do it.  Like I said before, chief complaint, history, all that stuff is in my head, for sure.

Q.  Do you have any references to any of your report that would indicate where those standards -- where are those standards found?

A.  They are found in Bates', which is a textbook of clinical medicine.  They are found when you teach first-year medical students how to do it, review history in the textbook.  You can find it there.  You can find them in neurology textbooks.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1743

They are in tons of places, and people spend years and years in neurology training getting teaching on how to do these things.

So this is like all of medicine goes this way.  This format of like history taking is standardized throughout medicine pretty much.

Q.  Have you reviewed the other expert reports prior to your interview with David Runyon?

A.  I'm not sure which ones you're referring to.

Q.  I would like to be clear as to which ones you did review. You reviewed a 2009 report from Dr. Evan Nelson?

A.  I have to look at my -- yeah, I believe so.  I have to look through this.  Dr. Nelson's name does sound familiar, but I don't know.  It's not on this page, looks like, that I can see.

Q.  Page 3 of your report.

A.  Let's see.  Yes.  Number 75.

Q.  Then did you review -- you did not receive a second report from Evan Nelson from 2008?

A.  I didn't -- no.

Q.  You reviewed one MMPI, number 76?

A.  Yes.

Q.  Did you review an MMPI that was created in 2009?

A.  I think there was an MMPI done by another neuropsychologist in 2009.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1744

Q.  Did you review that?

A.  I reviewed the report of a neuropsychologist.

Q.  But you did not review the underlying MMPI?

A.  I did not look at the MMPI itself, no.

         THE COURT:  You did not review what?

         THE WITNESS:  The MMPI.  It's a test.

BY MS. WARD:

Q.  And it's fair to say that for Dr. Patterson and Dr. Montalbano, you reviewed their reports, but you did not review any of their testing data?

A.  No.  I looked at the data they presented in their reports, they presented in their reports, and scores and all those things.

Q.  But you didn't do an independent review?

         THE COURT:  In other words, you reviewed their report.  You didn't review the actual testing that they did?

         THE WITNESS:  No.

         THE COURT:  Except to the extent that it was in the report?

         THE WITNESS:  Right.  Exactly.  The testing they put in the report.  So I looked at that.

BY MS. WARD:

Q.  Having reviewed the reports of Dr. Patterson and Montalbano and Dr. Merikangas's preliminary report, you understand that they did not rely or review the MMPI from

                JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                           1745

2008, the one that you reviewed?

MS. ALI:  Objection.  Calls for speculation.  She hasn't laid the foundation for that question.

MS. WARD:  He just said he reviewed all the reports, and they were referencing the underlying data.

THE COURT:  In reviewing their report, ask him the question.

BY MS. WARD:

Q.  In reviewing your reports, they did not rely on this 2008 MMPI that you were given to review?

A.  Whose reports are you asking me about?  I'm sorry.

Q.  Dr. Montalbano and Dr. Patterson.

A.  I have to refresh my recollection of Dr. Patterson's report.  I'm sure I did look at it, but Dr. Montalbano, I don't believe, reviewed an MMPI from him before, not that I remember.

Q.  In reviewing Dr. Mirsky's preliminary report, you also did not review any data or test results?

A.  I think in that report also there are test results that are listed in the report.

Q.  As you synthesize them?

A.  I don't know about -- there is a way to do a neuropsychological report, which is you can report the raw score and the percentile for the test.  That's the data.

Q.  You did not review Dr. Merikangas's 2015 report?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                        1746

A.  I'd have to look at my list.  I don't remember.  I'd have to look at his documents.  I don't remember that.

Q.  You can take a look.

A.  Thank you.  You can tell me if there was a report.  Okay.  It doesn't look like it.  It doesn't look like that.

Q.  I'd like to pull up Government's Exhibit 92.

MS. ALI:  Objection, Your Honor.  Dr. Nadkarni, this has nothing to do with his document.  It only came in yesterday through Dr. Cunningham.  We continue that objection.  This document is something that is not on Dr. Nadkarni's materials considered list.

THE COURT:  That's the key.  It's not on his considered list.  It was on Dr. Cunningham's list.

MS. ALI:  It was not, Your Honor.  Dr. Cunningham never seen that document before.

THE COURT:  Well, it's a key document, came in through Dr. Cunningham.

MS. ALI:  But it's not a document.

THE COURT:  But it was asked.  I'm recalling now, it was asked if they had seen it, would it change their opinion.  I believe that was the context.  I'll let her ask it in the same context.  It's a key document.  It was produced.

MS. ALI:  I understand, Your Honor.

THE COURT:  I'm going to let her show it to him and

Nadkarni, S. - Cross                                          1747

ask him the same as for Dr. Cunningham, for the same reason that I did Dr. Cunningham.  It is not listed, and what she is going to ask him is what was asked yesterday.  Had you seen it, would it have changed your opinion?  She's on cross-examination, and this is a document that you produced. Go ahead.

BY MS. WARD:

Q.  Dr. Nadkarni, have you ever seen this document?

A.  I have never seen this document.

Q.  If you wouldn't mind reading quietly to yourself, would you have liked to have received this document before forming your opinion?

A.  Okay.  I've read it.

Q.  Is that a document you would have liked to have received before forming your opinion?

A.  You know, I don't think I would -- I mean, I would like to receive as much information that's available, but I don't think I would rely on this document much at all.  This is somebody said or had a call with somebody else.  There is like a lot of telephone being played here, so I wouldn't trust anything that's said in this document because I would want to talk to the original person who is making that comment.  This is like somebody talking about a conversation they had with somebody else.  This is not a document that I would rely on.  Of course, I want to see as many documents as

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1748

possible.

THE COURT:  But you would certainly want to then talk to Dr. Merikangas?  You said you don't want to just see a memo to file but you would want to understand whether that occurred, would you not?

THE WITNESS:  It is very rare that we get to get other experts' sort of full opinions in these cases.  I would always like to know what other experts would be thinking.  This sounds to me like a legal question and not like a brain injury question.  He is talking about his defense.  That's really out of my purview.

Like, I don't know what kind of a -- I don't know what kind of -- I think he is making comments that they can't put on a certain kind of defense, and I don't know if I can speak to that and what he was thinking at the time, and this is like a conversation between two other people.  I don't know if I can make a comment about that.

BY MS. WARD:

Q.  Let me ask you this.  You reviewed a lot of material, like Sheila Cronin's social history, which in summary, they've got other interviews and statements that she's gathered from witnesses or persons that may or may not be related to the case.

A.  Uh-huh.

Q.  And you considered all of that when you were forming your

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1749

opinion?

A.   Yes.  So I considered her professional interviews of those people in his life when she interviewed them in person, yes.  I mean, some of those things also you have to take with a grain of salt.  The practice of looking at documents is you can't believe everything and can't not believe everything, so you have to use your judgment in deciding what's important and what's not important or what is relevant or valid or not.  So I would want to see this, yes, but I don't think this would change anything that I believe.

Q.   Start with some of your findings, Dr. Nadkarni.  I believe this is Page 4 of your report.

A.   I apologize for that.

Q.   This language about seizures, there is no record of complaints of seizures in the medical record and documents that you reviewed?

A.   No.  I think some of these things are described in other places.  Visions.  He describes strange experiences to other people.

Q.   Do you recall him describing any of these experiences in 2009?

A.   He said some of these experiences he had even as a teenager, even when he was -- even in school age, he said he had some of these experiences.

Q.   Do you recall who he said that to?

Nadkarni, S. - Cross                                        1750

A.   To me.

Q.   But you didn't see that in any of the materials that were provided to you before 2009?

A.   I think there were descriptions of strange sensory symptoms moving around his body, like his left side or numbness or tingling moving around.  There were definitely descriptions of things, nocturnal events and premonitions of evil, and all of that kind of stuff, I think, has been documented in other places by other evaluators as well.

            THE COURT:  Do you know where?

            THE WITNESS:  I believe in -- I think Dr. Dudley's report might mention some of these things, I believe.

BY MS. WARD:

Q.   And Dr. Dudley's report is from 2015?

A.   I think that's right.

Q.   The migraine you say he suffered since he was in his 20s, that was not in any medical records prior to 2009?

A.   The timing of that is his self-report, the date of the -- the 20s is from his self-report.

Q.   But the term "migraine" was a professional term of art?

A.   Migraines are a description of a type of seizure -- I mean, type of headache, I apologize.  I take that back, type of headache.

Q.   It's a type of headache but it requires certain diagnostic criteria?

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1751

A.  Yes, that's correct.

Q.  And it is the most common.  It is an extraordinarily common neurologic disorder?

A.  I don't know if I used those words.  I mean, headaches are common.  Tension headaches are much more common than migraines.  Migraines are not that common of a head injury, though, actually, compared to all the other syndromes.

THE COURT:  You are speaking very quickly.  I know the day is long, but what were you saying about -- I heard headaches and much more common than migraines.

THE WITNESS:  I said there are other headache types that are much more common than migraine.  Tension headaches are much more common than migraines, for example.  Migraine is not as common as other -- as tension headaches, for example.

BY MS. WARD:

Q.  And in this case he is self-reporting very wide headaches, meaning they moved?

A.  Meaning that the symptoms can be unilateral on either side.  Migraine comes from like the French hemicrania, so it's half the head.  So it could be on the left side or the right side.

Q.  You reviewed the reports of Dr. Montalbano and Dr. Patterson?

A.  Yes, I believe I did.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1752

Q.  And neither one of them diagnosed migraine -- as migraines?

        MS. ALI:  Objection, Your Honor.  Dr. Patterson is a psychiatrist.

        THE COURT:  This is in symptoms.  I think she is going through symptoms now.  It is a symptom.  This is something that a psychiatrist would certainly notice whether you have migraines or headaches or whatever.  This is not necessarily a diagnosis.  This is in his symptoms section of his report.  I don't know whether the other doctors saw that as a symptom or as a diagnosis or what, but that was the question.  He said he looked at the report, and I think the question was, was that noted in those reports.  Let's just keep it general.  I mean, was that your question?

        MS. WARD:  Yes, Your Honor.  I'd like to clarify it a bit, if I could.

        THE COURT:  All right.

BY MS. WARD:

Q.  You identified symptoms of migraines.  Do you recall where you got that information?

A.  From Mr. Runyon.

Q.  From Mr. Runyon.  You didn't see it any of the documents that you reviewed?

A.  Oh, I think there is mention of headaches going back even to records from the Army, and I believe from the Bureau of

Nadkarni, S. - Cross                                          1753

Prisons from 2009.  I think there is mention of headaches going back farther.

Q.  If I told you that in your annotated report you cite to Merikangas's preliminary report, does that sound accurate?

MS. ALI:  Objection.  His testimony was that he didn't cite to it.  I understand she is entitled to cross-examine.

THE COURT:  He said he's seen this.  It's time now. The court security officer will come and get this.  Identify this as what you received from your attorneys and that you said you viewed and looked at.  Is that the document with the number?

THE WITNESS:  This is the annotated document.

BY MS. WARD:

Q.  In the annotated document you identify the source of this information as Merikangas's preliminary report.

A.  I didn't identify anything in the annotations.  I didn't look at those annotations.

THE COURT:  You said you looked at them.

THE WITNESS:  I apologize.  I looked at them for five to ten minutes.  I didn't cross-check them.  I didn't check if they were right.  I didn't go through.  I feel bad because somebody spent a lot of time doing that.  So I felt a little guilty about it, but, honestly, I don't have time to do that.  It wasn't in my mind.  In my mind I have the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1754

picture is clear of what I want to say, and I thought those annotations were more to help counsel, so to make it clear for them.

Because this neuropsychiatry stuff is difficult and complicated. I think they were trying to figure -- I think they were trying to do it for themselves. I didn't use those -- so I didn't even know those were Merikangas' footnote, honestly. I don't remember that.

BY MS. WARD:

Q. Well, that's my question, that this is complicated. So you are identifying records that you've reviewed that indicate reports of headaches?

A. Yes.

Q. And some of these indicate roving or variable headaches that may move?

A. I don't know what you mean by headaches that may move.

Q. Well, headaches that make a difference in different areas of the brain or parts of the head?

A. Yeah. So migraines are always on one side of the head or the other.

THE COURT: Then headaches are also, correct, something because he does list Merikangas. You said he had not listed him, but he has. I'm checking. He does list him. It's number 82. But he did list him. Merikangas, M.D., preliminary report. So I thought I had seen it. In

Nadkarni, S. - Cross                                              1755

any event, he did list it since I was corrected before.  He

just had not seen that particular document, and the issue is

would it have changed his opinion.  But let's keep going.

BY MS. WARD:

Q.  Is there a distinction between a migraine and a clinical

diagnosis and headaches?

A.  Migraines are a type of -- sub-type of headache like

chocolate is a sub-type of ice cream.

Q.  You have it listed as a symptom, but migraines doesn't

populate in Dr. Montalbano or Dr. Patterson's report?

A.  I wouldn't expect necessarily a psychiatrist or a

neuropsychologist, definitely, to take a detailed history of

headaches or migraines or anything like that.  That's not

surprising to me.  That's not what they focus on.  Although

it's true, it should be in the past medical history if they

are asking, if they asked about those symptoms, but I'm not

sure they are asking about those symptoms.

Q.  But you would expect a neurological expert to be accurate

when citing other materials or source materials?

A.  I think there is variability in people's examinations,

interviews at different moments of time, and I rely on

myself, on my own impression the most, and what I see and

what I read and what -- how I interpret that.  And then other

peoples' impressions I take into account for sure, but they

don't generally trump my impression.

Nadkarni, S. - Cross                                        1756

THE COURT:  Well, you said you didn't go behind the reports and look at the actual testing.  So how do we know what you relied on or you didn't rely on?

THE WITNESS:  It's in the reports.  We can both see what I relied on.  It's right there.

THE COURT:  I know, but the reports are voluminous, and you even said that the footnotes were overwhelming to you.  You are now saying I looked at these things.  I did not look at the back-up support documents, the testing and so forth, and I read them and made my own opinion.  But how do we know the extent to which you relied on, because you haven't cited them in your report?  You have a list of things you relied on, and you've done a very long narrative.

THE WITNESS:  Right.

THE COURT:  Now this document's come through, which would tell you where it was, but how will I know, in assessing your testimony, what you put weight on and what you didn't, because I'm going to see all of these reports?

THE WITNESS:  Right.  So I reviewed all of these documents that are in my report, and I used them to make my report.  This annotated document about which symptoms come from where, this was done in like 2021 to 2022.  I have gotten these documents for a long time.  So I have been looking at these documents for a long time and putting this report together.  But I didn't -- you know, this footnoted

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                           1757

report, I didn't look at these footnotes about -- when I said -- the Merikangas report I had, but I didn't look at the footnote about Merikangas saying that that's where the headache is.  I didn't look at that.

THE COURT:  But that's the reason why the Court has to have some knowledge of what the expert relied upon.  So when we look at your list of sources, we don't know what you relied on and what you said, well, I read it.  You just said, I form my own opinion, and I don't accept everything.

So what we are trying to find out is when you formed your own opinion, what did you put weight on?  Because we are going to see all of these documents, and I can't tell from your opinion.  You've got your opinion, you've got a long list of sources.  So you looked at them, but looking at them and basing your opinion on them are two different things.

THE WITNESS:  Right.

THE COURT:  But then I can look at something and say I'm going to rely on it.  This report implies that you relied on all of that.  That's what an expert report is supposed to be, what you relied upon to make your opinion.

THE WITNESS:  Right.  That's right.  I hear you.  I hear you.  I did rely on those sources.  If I can look at whichever document you are talking about to refresh my recollection, I'm happy to talk about it.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1758

THE COURT:  You can probably just look at the annotated one from your attorney.  They tell you where it is.

THE WITNESS:  Well, I don't think I have the reports, though, and the annotations.

BY MS. WARD:

Q.  I'd like to pull up Government's Exhibit 63.

Dr. Nadkarni, this is Dr. Merikangas's August 6, 2009, report and is listed on your documents reviewed?

A.  This does look familiar, yes.

Q.  I want you to take a look at that first paragraph.  It says, "Mr. Runyon suffered from migrainous headaches, attention deficit disorder, post-traumatic stress disorder."

A.  Yes.

Q.  He's referencing that to Dr. Patterson and Dr. Montalbano's reports?

A.  Yes, correct.

Q.  None of those conditions were listed in either of those doctor reports?

THE COURT:  What?

MS. WARD:  Those conditions were not listed or identified in Dr. Montalbano or Dr. Patterson's reports?

THE WITNESS:  I'd have to look at those reports.  I can't remember off the top of my head which is listed in which report.  That's going to be very difficult with a

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                           1759

hundred documents.  If you want to show me, I can see if it's true or not.  And this is somebody else's report also.  This is not mine.

THE COURT:  Well, did you look at the MRI, the PET scan, the EEG?

THE WITNESS:  I did not look at the EEG; I did not look at a PET scan.  I looked at MRIs.

THE COURT:  All right.

BY MS. WARD:

Q.  When you received this report, if you see a comment like that that shows an evaluation or diagnosis based on another expert's report, would you cross-reference that?

A.  I look at the records to see how consistently evaluators record report things that they think should be valid that I can access from their writings.  That's the reality of it.  I'm sorry, could you repeat the question.  I apologize.  What was your question?

Q.  You are looking for data points?  When you receive all of the information, you look through and you look through data points; is that right?

A.  I look at all the data to get a picture or a story of what's going on neurologically with the person.  That's what I'm doing.

Q.  If you identify something as a symptom, like migraines or seizures, you would look through all of the materials to see

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1760

if there is a reference, particularly by the expert witnesses in the case?

A.   I may cursory look to see if other people -- are you talking about in clinical setting or a forensic setting?

Q.   I'm talking in this case.  What would you do when you are preparing for a case like this?

A.   Yeah, so I read the records, and I see if things have been mentioned in other places that I see also.  But I rely on my -- on the information that I gather both from him and from the records.  So all of that is -- I guess I'm not understanding your question really.  I apologize.

Q.   I'll move on.  In this report, Dr. Merikangas, a neurologist, ordered the MRI that you reviewed?

A.   I'm sorry.  Are you asking me?

Q.   Is that right?

A.   I guess so, yes.  I think so.

Q.   Well, you reviewed Dr. Merikangas's preliminary report. We just had it on the screen.  Are you familiar with his qualifications?

A.   I believe he's double boarded in neurology and psychiatry.  That's what I've heard.

Q.   So when you are reviewing his report from the original exam, you just testified that different experts provide different -- they are building blocks, and they provide different foundations, and a neuropsychologist is going to do

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                    1761

the testing.  Neurologist is going to play a different role.

So and this neurologist is reviewing the testing from other neuropsychologists and psychiatrists, would you cross-reference that?

A.  It would be one data point, sure.

Q.  And if it's not there, would that weaken the reliability of Dr. Merikangas's original report?

A.  I don't think that would weaken his original report, not in my opinion.

Q.  If he miscites a diagnosis found in another expert's report?

A.  I mean, I think that kind of thing -- I would take the full of the report and see how much sense it makes and how much gathering, good data gathering there is, or what the impression, how it seems, but, you know, if it's a misciting of one -- I'm not going to throw somebody's -- I have to take the whole thing into account, I think.

THE COURT:  I guess the bottom line becomes, when you are doing an expert report, I'm going to make this really simplistic, but based on my review of such and such, my expert opinion, my conclusion is based on my examination of Mr. Runyon, I concluded the following, and then you put all those conclusions together, having relied on them, and come out with an opinion.

Here, it is very difficult.  You've come out with a

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1762

final opinion, but I, frankly, can't look at your report and know precisely what you based it on.  Just listing sources in the beginning doesn't tell the Court, and I've ultimately got to decide this, what you based these very important opinions on.  Is it just your examination of Mr. Runyon?  If it's based on all these things you've listed, did you take parts of them or other parts of them?  It's very difficult.

THE WITNESS:  I think in my report I mentioned exactly neuropsych testing, MRI test.  Like the things that I rely on are in my narrative here and also not just the list in the beginning.  I think I mentioned all of those things, too.

THE COURT:  Go ahead.

BY MS. WARD:

Q.  Where we are confused, Dr. Nadkarni, is that your report mentions these very generally, but it doesn't cite to whether it was Dr. Mirsky or Dr. Merikangas or Dr. Nelson or a different opinion by any of these doctors or another expert. So you reviewed many reports that synthesize and incorporate their own testing and data.  It is not clear in your report which one you are relying on.

A.  So I'm sorry.

Q.  That's been my question.  So if you are writing into your report that this is migraines, and the only reference to migraines is a miscitation of another expert --

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1763

MS. ALI:  Objection, Your Honor.

MS. WARD:  -- does that change your --

MS. ALI:  He testified -- we had lengthy testimony about his own observations and that it was self-reported to him.  It's not -- he didn't say Dr. Merikangas.  He testified the basis of his own interviews with Mr. Runyon. You are mischaracterizing his testimony.

THE COURT:  I agree with what you are saying, Ms. Ali.  He did mention that it was self-reported by Mr. Runyon, but the problem is he's just made this blanket list of things, the same as Dr. Cunningham did, and there were other matters regarding migraines in that blanket listing.  What did he rely on for that conclusion, and if he didn't rely on something else that he's listed that have migraines, why didn't he?

In other words, to just say I looked at all these 84 documents or interviews or whatever, and these are my conclusions.  What she's doing is testing the conclusion. Yes, it is clear that Mr. Runyon self-reported migraines, but did it come from any of these other sources that he looked at?  That's I think the issue.

MS. ALI:  I understand, Your Honor.  I just wanted to clarify the record that his testimony was that he -- it was self-reported to him, it wasn't just relying on Dr. Merikangas.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                           1764

THE COURT:  I agree, and then she's trying to figure out if he did rely or not.

MS. ALI:  She can do that.  I just wanted to clarify the record.

BY MS. WARD:

Q.  Mr. Runyon's reported to you that he has headaches?

A.  Yes.

Q.  And they were at some frequency?

A.  Yes.

Q.  But he did not report, in any of the material that you were given to review, a chronic history of headache?

A.  I believe I did see mention of headaches in records from the Army, from -- I think there was a mention of headaches in the Bureau of Prisons records.  So I think there are -- I think there is a history of headaches that he's had, it's documented elsewhere.

Q.  I agree with you, and I agree that in the Army records in 1995 he reported multiple headaches?

A.  Yes.

Q.  You didn't see anything following that, no subsequent medical records that would document a chronic history of headaches?

A.  From '95, at least from before '95, he had headaches.  I didn't see anything that I can remember specifically about migraines after that that I can remember off the top of my

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1765

head.

Q. Is it fair to say that he reported a long history of headaches to you?

A. It is fair to say that.

Q. And is it fair to say that there is one documentation before 2009 and one Army record where he reports for treatment for headaches?

A. I think that's true.

Q. And there was no other corroborating medical information to document a chronic history of headaches?

A. I think chronic means like from -- you know, in 1995 he was having headaches, and he reported to me that he was having headaches. So that makes it a chronic sort of history of headaches.

Q. I agree with the self-reporting. I'm asking you did you see anything else besides that one 1995 medical note that indicated chronic history, just to corroborate?

A. Oh, I can't recall that. I can't recall that language that indicated a chronic history of migraines anywhere else. That, I can't recall.

Q. And then the professionally diagnostic term "migraine" does not show up in these records?

A. I don't think I remember seeing the term "migraine" actually.

Q. Is it fair to say that the records say headaches?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1766

A.   I think it does say headache.

Q.   And it doesn't say migraine?

A.   I didn't see migraine in the record.

Q.   And does the medical record that you reviewed from the Army was a period of time when he was being separated from service involuntarily?

A.   Yeah, his Army record -- I believe he was in the Army twice, if I'm not mistaken.  And I think he re-enlisted, and -- I can't remember the specific circumstances of his discharge, but I thought he had two honorable discharges from the Army, but he did have some difficulty in the Army, I think, with people.

Q.   You understood that he was separating in 1996?  The record that you reviewed is at the time he was separating from the service?

A.   I think that's right.  It was around the time he was leaving the Army, that's correct.

Q.   And he was upset about that; he didn't want to leave?

A.   Yeah, I don't remember that detail.

Q.   And you've testified in some military cases?

A.   Have I testified in military cases?

Q.   (Nods head.)

A.   Not -- maybe about two.

Q.   And Veterans Affairs?

A.   No.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                    1767

Q.  No TBI for soldier benefits cases?

A.  No.

Q.  So, to your knowledge, are you aware of documenting medical record to support claims for benefits after separation?

A.  Yeah.  Like I worked at the V.A., so I know about service connection and all that kind of stuff, and that what you need to get 30 percent, 50 percent, with all that connected for service resources in the V.A.

Q.  And at the time of separation soldiers are encouraged to go to the doctor, report any conditions that might be service connected?

        MS. ALI:  Objection.  She hasn't laid a foundation.

        THE COURT:  Sustained.

BY MS. WARD:

Q.  If you know, based on your experience with the Veterans Affairs?

A.  I have no idea.

Q.  You reviewed the medical documentation from separation to help document any sort of service issue?

        MS. ALI:  Objection, lack of foundation.

        THE COURT:  Sustained.  Where are you going with it?  Let's get to the point.  You can argue to the Court later if there are military records there, and he is getting something for PTSD, or he's not.  I mean, you know, the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1768

records are the records, and you can argue it later.  You're not going to get it from this witness.

MS. WARD:  Yes, Your Honor.  I'm done on this.

BY MS. WARD:

Q.  In your report under the paragraph that identifies seizures, you discuss hallucinations or delusions?

A.  Yes.  Can I just take a look at that just to refresh my recollection?

THE COURT:  You want to look at the annotated version?

THE WITNESS:  At least to refresh it.

THE COURT:  You can look at the annotated version.

THE WITNESS:  I don't -- I'm sorry.  I forgot the question.

BY MS. WARD:

Q.  Under the paragraph for seizures, you're describing events that's hallucinations or delusions?

A.  I don't think so much delusions.  I think I'm describing hallucinations, déjà vu, and dream-like states and episodes of shaking at nighttime.

Q.  When you identify visions of a child and an angel, is that something he self-reported to you?

A.  He reported that to me, right.

Q.  Did you see any of these in the medical records or any of the materials that were provided?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                        1769

A.   I don't think I saw visions of angel anywhere else.

Q.   His wife did not report or discuss any night terrors or hallucinations or these symptoms?

A.   Not that I recall.

Q.   Or any family members?

A.   Not that I remember.

Q.   And then when you reviewed the reports of Dr. Montalbano, Mr. Runyon was asked about hallucinations, and he expressed a clear understanding of hallucinations and denied any history of hallucination or delusion.  Do you recall that?

A.   Yeah, I'm not sure if Dr. Montalbano was specifically asking about auditory hallucinations, which is usually a neuropsychologist/psychiatry question is for auditory hallucinations.  I don't know if he had a practice about asking visual hallucinations, which are much more of a neurological problem.  So I don't know.  I can't speak that. But I don't believe anybody else has elicited this history from him.

Q.   Okay.  Particularly in 2009, there was not -- that was not information that he conveyed to the expert?

A.   Correct.

Q.   And it was not conveyed through social history and interviews?

A.   Yeah, I don't know if somebody took this kind of history from him.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1770

Q.  Go down to the paragraph that's marked "psychiatry."

A.  Uh-huh.

Q.  In 4A you discuss symptoms that seem to indicate substance abuse, alcohol abuse?

A.  Yeah, I think he was abusing alcohol at that time.

Q.  And can I ask you where you got that information?

A.  That was his self-report.

Q.  And that was conflicting by a lot of his social history reports?

A.  Well, I think in general he doesn't -- he's not somebody who drinks or uses drugs a lot, but I think there were periods in his time when he was down when he was drinking more.

Q.  Dr. Montalbano, Dr. Patterson address that anywhere in their report, and he denied ever abusing alcohol or drugs?

A.  But I don't think he was a chronic alcoholic.  I think he drank more than he should when he was feeling down.

        THE COURT:  More than he should have when?

        THE WITNESS:  When he was feeling down, when he was depressed, he would drink more.  That's in 4(a).  So he would drink by himself, and he became very depressed.  He was never suicidal.

        THE COURT:  That was in 1991?

        THE WITNESS:  Right.  After the breakup of the fiancée.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1771

BY MS. WARD:

Q.  Do you recall in the document you reviewed that number 5, I'll just read it to you.  Wait.  You have a report from Dr. Nelson where he told Dr. Nelson that he had shooed alcohol abuse because of his family history?

A.  Can I see number 5?  I'm sorry.

Q.  The military number 5.

A.  I'm sorry.  I'm not sure what you are referring to.  I thought we were looking at the document under "psychiatry."

Q.  We are.  I was just going to read it to you.

A.  I'm sorry.  Go ahead.

Q.  I'll come back to that.  I'm not sure if I have a copy of the exhibit.

          THE COURT:  You mumbled.

          MS. WARD:  I'm sorry.  I'll come back.  I'm not sure I have a copy of the exhibit right in front of me.

BY MS. WARD:

Q.  Take a look at, I think this is Page 4 of the report that starts with the "brain injuries."

A.  Uh-huh.

Q.  When you are describing the numbered list, are these things that were reported to you?

A.  They were reported and some of them are corroborated in the records.

Q.  I'm sorry.  I didn't hear you.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1772

A.   They were reported to me, and some of them are
corroborated in the records also.

Q.   Do you find -- I'll ask the initial question.  Did you
find evidence of all of the head injury that you list in this
report?

A.   Well, for some of them the only, quote-unquote, evidence
would be his self-reporting and my exam findings, but if
that's what you mean.

Q.   Let's start with the brain injury, the claimed head
injury at age 3.

A.   Uh-huh.

Q.   What was the source of that report?

A.   That was the social history, interview with the mother
and David self-reporting, and that is, again, echoed
through multiple -- it is told the same way through multiple
evaluators that mentioned that story.

Q.   Do you recall who reported that David's father squeezed
David's head and hit him?

A.   That was -- I think that was him who told me that.

Q.   And Mr. Dombrowski denied that instance ever occurred?

A.   I believe that's correct, yes.

Q.   And Suk Cha, Mr. Runyon's mother, describes the incident
as being swung by the wrist and heaved across the room?

A.   I think that's correct.  I believe they left shortly
after that, her and the children.  She took them out of the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                    1773

house.

Q.  But their report of head injury came from an internal question by Mr. Cronin.  Mrs. Runyon never actually said that, is that right, to your recollection?

A.  Oh, I think he was thrown across the room and hit a wall, I think was the description.  So I'm not sure if there was a specific mention of the head made contact with the wall in Suk Cha's declaration.  I wouldn't be surprised if that wasn't specifically stated that way.

Q.  Do you recall David Runyon reporting to prior experts that his dad hit him, but he didn't recall hitting his head?

A.  I recall him telling other experts that his dad hit him in the head.  I recall that.

Q.  You recall him denying ever passing out?

A.  I'm sorry.  Can you say that again.

Q.  Do you recall David Runyon denying losing consciousness in that incident?

A.  I don't remember what he said about that part of that incident.  He told me that he lost consciousness, and he was passed out on the floor.  So that's what he told me.

Q.  That was a self-report to you?

A.  That was a self-report to me, yes.

Q.  Again, Dombrowski denies that it occurred?

A.  Yes, I think that's true.

Q.  Suk Cha has reported that incident in different -- with

variable -- with variable details?

A.  I think the thing about that incident is it is actually reported pretty consistently in multiple places, and I think the facial asymmetry she also reports happened after that.

Q.  I'd like to ask you about that actually.  I'm going to take you to the same paragraph, but on your annotated report. So we are looking at -- at the top of the page -- I'm sorry, at the top of the page it says, "His mother reports that this incident resulted in facial asymmetry."

A.  Correct.  That's correct.

Q.  And it's footnoting with a parenthetical to explain that. You did not add the footnote?

A.  No.  I don't think I even looked at this footnote so.

Q.  Can you take a look at footnote number 17, sir.

A.  Yeah, I see that.

Q.  The parenthetical indicates that Suk Cha actually reported that she believed -- what she thinks the cold floor caused nerve paralysis on one side of the face and that the asymmetrical smile developed while they were in Panama.

A.  I'm sorry.  Is there a question?

Q.  Do you recall, now that you see this in the annotated citations to your material provided by counsel --

A.  Yeah, what this tells me is that he had injury to his nerve.  I wouldn't take Suk Cha's opinion about how that happened as a neurologist -- as a neurological disorder.  But

Nadkarni, S. - Cross                                              1775

this tells me that it looks like he had injury to that nerve, and that he had asymmetric smile.  We know that this incident happened in Panama, so I don't think that's -- none of that is shocking or surprising.

Q.  Let's back up just a little bit.  We know that David Runyon reported an incident to you that may have happened in Panama.

A.  And that his mother reports.

Q.  Well, his mother reports a slightly different incident.  But in Panama, yeah, at the age of 3, in the custody of his mother, but your finding is that his mother reports causation.  His mother reports this incident resulted in facial asymmetry?

A.  Right.  I guess that "resulted" word, that is a very specific word.  What I meant is that she reported that this facial asymmetry was a result that happened right after this injury.  It was directly connected to this injury.

Q.  Do you recall where you got that information?

A.  I mean, that's the way I read her interview.  Like, this cold floor, I think, was referring to the same incident.

Q.  Let's pull up Government's Exhibit 129.  Let's go to Page 15, please.  If you look at the second paragraph.

A.  Yeah.  I think if you look at this paragraph, I think that the, "However, given the physical abuse from his father, it is possible it could have been caused by an injury," I

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1776

think that's the way I read that sentence, that paragraph.
She seems to think that it was from him being curled up on
the floor, on a cold floor outside the bathroom.  I don't
know what the context of that is or when that happened.  But
I think the point of this is that he developed an
asymmetrical smile in Panama, and there was a lot of abuse
going on in Panama also.

Q.  Well, you understand that this particular document was
created by Ms. Sheila Cronin, the mitigation expert?

A.  Yes.

Q.  And this is her synthesizing interview that she is
conducting?

A.  Yes.

Q.  And this references part of Suk Cha's interview?

A.  Correct.

Q.  And those are two different -- those are separated in the
recollection, and they are not combined by Suk Cha, at least,
as the same incident?

A.  I read this as saying that there could be possibly two
explanations for this facial asymmetry coming from her.
That's the way I read these sentences, that it could have
been from an injury.  So that's the way I read that.  And
there is a description of him being flung at that time, and
his own self-report also talks about that.

Q.  Alternatively, this could be Sheila Cronin's insight into

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1777

what would be required for further investigation?

A.   I suppose that's possible.

Q.   So it's difficult to say just by reading this alone that there is a causal nexus between the purported incident with David's father and the facial asymmetry?

A.   I don't even make that by reading this paragraph.  I don't even make that as certain -- you can't certainly say that based on this paragraph, that's true.

Q.   And there are no other incidents reported of physical abuse towards Mr. Runyon?

A.   Oh, I thought that in various histories that were taken, I thought there was report of an abusive household, and that he was actually beaten up also.  I think people had mentioned that.

Q.   Let's go to the same document, please.  Let's go to Page 24.  This is a synopsis prepared by Sheila Cronin of David Dombrowski's biological father's recollection of the incident.  Do you see in the second to final paragraph on this page, about midway through, Dombrowski completely denies ever striking David or Mark?

A.   Uh-huh.

Q.   If we go to Page 35, this is the synopsis of Mark Runyon, David's brother, at the very bottom of this page, if you take a look at that, "Mark did not think that he and David were physically abused" and "it was all emotional abuse"?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1778

A.   I'm sorry.  Is there a question?

Q.   I'm asking you, you believe that there were points in the record that indicated that David Runyon suffered additional physical abuse in the home?

A.   Yeah, I think there are other places.  I don't know if they are in this -- they are not in what you are showing me now, that's correct.

Q.   Can you identify where I can find that?

A.   I believe those -- I believe those are in some of the neuropsychological testing reports, and I recollect seeing that he came from an abusive household.  I'm not sure if that is Dr. Dudley's report.

Q.   I'd like to stay away from Dr. Dudley's report since it came in 2015.

A.   That may be what I'm thinking of.

          THE COURT:  Slow down, and don't talk over each other.

          MS. WARD:  Yes, Your Honor.

          THE COURT:  Go ahead, and don't talk over each other.

BY MS. WARD:

Q.   Is there a place other than Dr. Dudley that you can recall report of physical abuse?

A.   No.

Q.   Do you recall in Dr. Merikangas's report that he said it

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1779

may be congenital?

A.  I don't recall that line, but I don't doubt that he put that in there potentially.

Q.  And facial asymmetry can be caused by any number of things?  I mean, there are many things that might result in facial asymmetry?

A.  Well, not the kind that Mr. Runyon has.

Q.  But facial asymmetry could be caused by viral infection?

A.  No, that injury can be caused by lots of things.  Facial nerve injury can be caused -- viral infections are one of them, yes.

Q.  Let's talk fairly generally.  Let's not talk about Mr. Runyon specifically because you believe it is attributed to nerve damage.

A.  Okay.

Q.  Let's talk generally about other sources of facial asymmetry.  They can be caused by viral infections?

A.  Yeah.  It's a vague question, but I suppose that's true.

Q.  And it could be caused by trauma?

A.  Yes, that's true.

Q.  It could have been caused by infection?

A.  I feel like you're switching.  It could have been caused by infection, or it doesn't happen that people get infections and get facial asymmetry?

Q.  Does it happen?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                      1780

A.   It can happen that people get infections and get facial
asymmetry.
Q.   But facial asymmetry could be caused by things like
immunological disorders?
A.   Facial nerve injury can happen from lots of different
problems, and you cut the facial nerve, that is an injury.
If you have inflammation, that is an injury.  Many, many
things can cause facial nerve injuries.  Not many things at
that age, by the way.  It is unusual at a young age to have a
Bell's palsy or an idiopathic facial nerve weakness.  Very
unusual.  But lots of things can cause -- the most common
cause is Bell's palsy, which is an idiopathic facial nerve
problem, but very, very unusual in a 3-year-old.
Q.   And Bell's palsy is usually the diagnosis when you cannot
identify the detectable cause?
A.   Well, Bell's palsy is a very specific set of findings and
all those things, so it depends on all of that.
Q.   And you agree that facial asymmetry also impacts his
forehead, to Mr. Runyon?
A.   Yes, it does.
Q.   Go back to the next brain injury report.  You see
Paragraph 2 on Page 4 of the report, you're indicating under
the paragraph "brain injuries" section -- sorry, brain
injury, number 2 is, "Age 5 years old."  And that is "David
was playing football," and ran into a telephone pole.  Is

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1781

that -- did you learn about that incident through self-report?

A.  Yes.

Q.  And that was from Mr. Runyon?

A.  Yes.

Q.  Did you see that reported by anybody else other than Mr. Runyon in the materials that you reviewed?

A.  I did not.

Q.  He did report that incident to both Dr. Montalbano and Dr. Patterson, so there was some history?

A.  I just don't remember that.

Q.  Okay.  At the third, discussing playing high school football and knocked out a lot, several times, is that from self-reporting?

A.  That is also from self-reporting.

Q.  And there was nothing in his family social history, the interviews, the medical records to support that, that corroborated this?

A.  Not that I can remember, but I've been wrong earlier today so.

Q.  And Mr. Runyon actually didn't report these types of injuries to Dr. Mirsky, Dr. Merikangas, Dr. Patterson or Dr. Montalbano?

A.  I don't remember those being in the reports.

Q.  But you wrote the report in 2009?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1782

A.  I mean, I don't want to waste the Court's time.  I just -- I don't remember, but I don't think so.

Q.  What about number 4, he self-reported to you that he was concussed by a hand grenade?

A.  Yes.  And that's documented in a later -- I'm sorry, this one is not documented.  Yes, he self-reported this to me.

Q.  He reported -- do you recall that he reported this to Dr. Montalbano?

A.  Yes, I think he's reported it to other people.

Q.  Well, do you recall he did not report that incident to Dr. Patterson or, as far as we know, in the materials you reviewed of Dr. Mirsky?

A.  I did notice that this incident was in some place and was not reported in other places, yes.

Q.  Were you able to find any reference to this by any corroborating witnesses, records, Army records, medical records?

A.  I was not.  I was not provided anything to corroborate.

Q.  And the Army record that you reviewed 1996, when he was discussing vertigo, he only mentioned one potential incident.  That's the 1996 motor vehicle accident?

A.  I'd have to look at the record.

Q.  Go to number 5.  We are talking about the pyrotechnic explosion.  Is that another one that self-reported to you?

A.  That's correct.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1783

Q.   When you reported this incident to Dr. Montalbano, do you recall that David Runyon reported he was stunned but did not lose consciousness?

A.   I'd have to refresh my recollection.

Q.   Can I have Government's Exhibit 55B, please.  Page 20.  Page 20 you see in the paragraph toward the end --

A.   It looks like he was -- he lost consciousness.  After losing consciousness, he was dragged to the woods by two soldiers.  He was knocked out, quote-unquote.  He lost consciousness.

Q.   To clarify, there is two potential incidents from Wentworth Academy.  He reported being knocked out by a hand grenade, which you have listed in Paragraph 4.

A.   Correct.  That's what I thought you were talking about.

Q.   And then number 5 right below, is that the pyrotechnic where he reported to the -- that he was stunned but didn't -- did not believe he passed out?

A.   So that means he had a concussion but he didn't lose consciousness.

Q.   Can you definitely diagnose a concussion or would you need more information?

A.   Concussion means any alteration in awareness and neurologic symptoms from a blast or head injury.  That's the definition of concussion.  So this already has it.

Q.   You wouldn't need any other information to define the

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                            1784

word "stunned"?

A.  I think that means that there is an alteration in his
mentation somehow.  I don't know the quality of that, but
that's what I would presume that means.

Q.  Wouldn't you want to ask Mr. Runyon what that means to
him?

A.  Sure, if he was available.

Q.  But --

        THE REPORTER:  I can't understand you.

BY MS. WARD:

Q.  Diagnose a concussion?

A.  A concussion is defined as any head injury that has any
neurologic symptom associated with it.  So whether that's
loss of consciousness, dizziness, vertigo, double vision,
insomnia, those are all concussions.

Q.  Okay.  Go back to your report.  Paragraph 6 on this page,
you are discussing tear gas?

A.  That is self-reporting.

Q.  Self-reporting.  Why would that self-report -- why is
that listed under brain injury?

A.  This many things I list here that he's reported himself
because when you -- if you inhale tear gas, there is a
potential for an injury of the brain.

Q.  But your report doesn't indicate that he inhaled tear
gas.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1785

A.  He told me he suffocated and passed out from getting tear gas.  If you pass out, that is a potential injury to the brain from a toxic substance.

Q.  You agree that he has never reported this incident before?

A.  I don't believe I saw that reported anywhere else that I remember.

Q.  There is no medical records to document that?

A.  I don't think so.

Q.  There is no reference --

A.  I apologize.  There is a record that says that he had an episode of sudden redeyes, tearing, sudden onset of this stuff that was tied to, I believe, this tear gas event that happened previously.  There is a medical record that says that he had been exposed to tear gas in the past, and then -- and he thinks that this is what's happening to him now again.

        THE COURT:  Where is that medical record?

        THE WITNESS:  It's one of like the follow-up visits, I think, in the Army medical records where he's seeing a practitioner, and he's having this sudden runny nose and redeyes and tearing, and I think -- I believe he says to him, I think this is related to this thing that happened to me before with this tear gas.  I think it's in the Army medical records, I believe.

BY MS. WARD:

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                            1786

Q.  He reported that this incident with tear gas happened in 1990?

A.  That's correct.

Q.  And there is no continuing things of chronic injury or defect caused by this injury?

A.  No.

Q.  Let's go to number 7.  In the fall of 1990, Mr. Runyon reported to you that there was a motor vehicle accident?

A.  Yes.

Q.  It cut his face and left lacerations?

A.  Yes.

Q.  Were you able to corroborate that report?

A.  Yes.  There is multiple notes of him having infected cyst in his face that refer to this glass in his face later on, that he got treatment for it in follow-up visits.

Q.  I'm sorry.  Did you say multiple references to this?

A.  I think there is more than one medical note in there about him having an infected cyst in his face that was reference to this glass that was in his face chronically.

Q.  If we could take a look at Government's Exhibit 26.  I'm sorry.  This is the medical note that you are referring to, Dr. Nadkarni?

A.  This is one of them.  I believe I saw more than one of these.

Q.  In this case this is David Runyon reporting what he

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                      1787

believes is the cause of the cyst; is that accurate?

A.  No, this is a report of an inflammatory lesion on his forehead and his nose that was caused by a motor vehicle accident as a result because of glass in his face.

Q.  What's the date on this report?

A.  If I can find the date.  Well, I'm really having a problem here.

Q.  At the very top in the right-hand corner.

A.  Sorry.  7 August '95.  Sorry.  7 August 1995.

Q.  Is David Runyon's report to providers; is that right?

A.  I don't see where you're -- it says David Runyon's report to providers, I don't see that anywhere.  I'm sorry.

THE COURT:  Was he diagnosed with acne?

THE WITNESS:  I think one of the diagnoses was acne.  That means just an inflamed, infected pimple skin, probably a cyst in the skin.  I think he had a lot of that, actually, after this last stuff.

BY MS. WARD:

Q.  Sir, at the top of the report David Runyon is indicating that he believes there is glass debris that remains in his skin, agitating his skin.  Is that right?  Is that your understanding of this document?

A.  With pus coming out of it, yes.

Q.  But there is no doctors' notes or diagnosis where they found extraneous debris and glass?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1788

A.  I don't know about that.  This is a consultation report, so the top of this report is the person who is giving the reason for the consultation, and the bottom of the report is somebody else who is writing the consultation report.  So, yeah -- what's the question?  I'm sorry.

Q.  Isn't it a diagnosis that this cyst was caused by glass and debris?

A.  Oh, I think that's what they are implying here.

Q.  Based on David Runyon's self-report to the provider?

A.  24-year-old white man with history consistent with recurrent inflammatory lesions to the forehead and nose for five years, involved in a motor vehicle accident resulting in glass embedded in the face five years ago, some glass -- I can't read that -- after motor vehicle accident, patient has recurrent cyst to forehead since -- I can't say -- since something, I don't know.  That paragraph makes it sound like they are tying those two things together, to me the way I read that as a clinician.

Q.  You read it as from the accident from five years prior to this visit?

A.  Yeah, but the chronic skin condition was caused by all this glass that's coming up again all these years later, that's correct.  Otherwise, why are they telling you a history of glass in the face, if he just has acne and a cyst?  There is no reason to mention any of that.  The point is I

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1789

think they are tying these two together, chronic dermatologic
problems from this glass in the face.

Q.   Well, you'd agree, Dr. Nadkarni, that cyst or skin rash
is an anomaly, right, can be caused by many things, like
allergies?

A.   I'm not a cyst specialist so I feel uncomfortable
answering these questions about what causes cysts.  I'm not a
dermatologist, but you can ask me, and I can --

Q.   Okay.

          THE COURT:  Let's move on.

          MS. WARD:  I got it.  Yes, Your Honor.

BY MS. WARD:

Q.   In this case you do have some information that David
Runyon had an allergy to sulfa?

A.   I think I did -- I did see that, and in other places it
says no drug allergies.  So that was a variable report also.

Q.   But David Runyon reported it resulted in skin rashes, is
that right, to your recollection?

A.   Can I see my report and see if that's in there and under
allergies, if I have allergies in there.

          THE COURT:  You have your report.

          THE WITNESS:  It's right here on the screen.

          THE COURT:  Okay.

          THE WITNESS:  Yeah.  I wanted to see the page.
Yeah, so he said he had rashes from sulfa drugs, right.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                          1790

BY MS. WARD:

Q.  And, to your knowledge, based on the information that you were provided, there was no other corroborating evidence that the glass was embedded in his skin?

        THE COURT:  No other what?

BY MS. WARD:

Q.  There was no other evidence of glass embedded in his skin?

A.  I believe there is a similar note in other places in the medical records when he comes back with more cystic acne kind of symptoms where they make mention of it again.

Q.  You didn't review any materials that would corroborate the accident occurred itself?

A.  I think these materials corroborate that the accident likely occurred.  I can't -- I can't be a hundred percent sure of any of -- I mean, nobody can be a hundred percent sure all the time.  But I think the aggregate, if you look at these notes, I think the aggregate is that he has a chronic skin condition from that accident with glass in his face.

Q.  But there were no social history report that would indicate that he suffered a severe accident in 1990?

A.  I don't remember.

Q.  Go to number 8, brain injury, listed in your report. Mr. Runyon also has concussion in the military, being hit in the head with a rifle?

                JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                    1791

A.    Self-report.

Q.    And there was no other information on that?

A.    Correct.

Q.    Then number 9.  I'm sorry, the motor vehicle accident at number 10.  Mr. Runyon self-reported to you and others that he was hit head-on at more than 100 miles an hour?

A.    Yes.

Q.    Is that correct?

A.    I don't think he reported a hundred miles an hour to me, but I've seen him report a hundred miles an hour to other people.

Q.    He was hit in the back of the head by speakers?

A.    I don't think I got that history out of him.  I did see that mentioned in other places.

Q.    Do you recall that David Runyon claimed to you was extricated from the vehicle with a jaws of life?

A.    Yes, I do.

Q.    Do you also recall in the medical records that you reviewed that he was treated and released?

A.    Yes.

Q.    And that there were no medical records from the hospital?

A.    I don't remember seeing records after that.  I don't know if there were or not, but I don't remember seeing records after that accident.

Q.    If we could pull up Government's Exhibit 129, Page 51.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                                1792

This again is Sheila Cronin's social history and report of her summarized interviews.  In the middle of that first paragraph, do you see where it says, "Tests done at the hospital did not reveal any head injury"?

A.  I'm sorry, is this the Cronin --

Q.  Yes.

A.  I'm sorry.  Where are you referring to?

Q.  On the fourth line, she reports that, "He lost consciousness, but tests done at the hospital did not reveal any head injury."

A.  Yeah, I have no idea what that -- I don't think there is any test to reveal head injuries.  I don't know what that is referring to.  There is no test to rule out head injury. That is just a historical -- you can't do like a -- there is no like MRI or whatever to rule out a head injury.  So I don't know what test they are referring to there.

Q.  You received this as a document that you should consider in support of the claims of brain injury; is that accurate?

A.  I reviewed all the records and came to my conclusion that he is a very brain injured person, so I'm not sure about any given document how I would use it for what purpose, but I reviewed the whole records and came to that conclusion.

        THE COURT:  Well, let me ask you this.  If you as an expert don't know, you came to that conclusion, and you can't point to the documents, how would attorneys know?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross                                              1793

THE WITNESS:  Well, I think I do point to documents, multiple documents in my report of what I used. I think I just don't understand what the question is here. There is no test for head injury.  So I don't know what the sentence means that he was sent home from the hospital and said that -- I just can't make sense of that sentence as a neurologist.

THE COURT:  Doesn't an MRI, a brain scan, don't those test for head injury?

THE WITNESS:  No.  I mean, those are to see if there is a hemorrhage or if there is a skull fracture.  But, like I said, like lots of -- all those CTE football players have normal MRIs but abnormal pathologies.

THE COURT:  A hemorrhage is a head injury, isn't it?

THE WITNESS:  Usually it is not a head injury. Usually a hemorrhage is a stroke or something else.

THE COURT:  So you're saying that people in your field, and when people are being tested for head injuries, an MRI or a scan of the brain is not the way you do it?

THE WITNESS:  You almost always want to get an imaging, but not for diagnostic purposes.  So anybody who comes to the ER having had a concussion on a field will get a CAT scan because you don't want to make sure they don't have blood in their brain and they don't have a skull

JODY A. STEWART, Official Court Reporter

1794

structure.  But it's independent -- that CAT scan has nothing to do with whether they had a concussion or not.  It is independent.  So there is no test to do when somebody has a head injury.  You can just see if there is like hemorrhaging or fractures or whatever.  But, you know, a head injury is the historical diagnosis.

THE COURT:  Are you finishing up on number 10 on that page now?

MS. WARD:  Yes, Your Honor.

THE COURT:  We are coming to the closing hour here. It is 8:00.  It looks like to me you are going page by page through this.  Is that correct?

MS. WARD:  Yes, Your Honor.

THE COURT:  In other words, you are going to continue to go through the report?

MS. WARD:  I have quite a few questions left, Your Honor.

THE COURT:  Well, this is going to bring us to the end of our trial day.  It's 8:00, and, obviously, Ms. Ward has a few pages.  We are into the report.  Other than the list of materials, we are two and a quarter pages through, and we have, it looks like, four and two-thirds pages to go. We have been going now for six hours, and I think you've been going now for a couple of hours, and the petitioner's counsel went for at least four.

JODY A. STEWART, Official Court Reporter

So, in any event, it's time to adjourn.  We are not going to stay here any longer this evening.  And I do want to take care of some housekeeping matters very quickly before we adjourn.

Doctor, you can't go.  I've got to check with the attorneys.  First of all, this annotated with sources that were supplied to Dr. Nadkarni is going to be Court Exhibit Number 7.  He identified as what he received.  So this is number 7, Madam Clerk.

(Court Exhibit 7 received in evidence.)

THE COURT:  The other is that Mr. Woodward yesterday, you inquired about preparing Mr. Woodward.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Certainly, you can prepare him, the same as the petitioner's counsel have clearly done.  You can prepare him by showing him record documents in advance of the hearing.  It was done with Merikangas, and we won't go back into that now, but they were shown.  You're not going to use the declaration.  They were shown so he could be prepared for his cross-examination.

MR. SAMUEL:  Yes, Your Honor.

THE COURT:  He was cross-examined without him having the benefit of the documents that were produced after this hearing started in February, his time records at minimum, and we will find out what else.  But he is prepared

1796

for his cross-examination now, and so I've made my ruling on that.  But, obviously, petitioner's counsel, and I think yesterday they had given Dr. Cunningham Number 104.  That came out yesterday that he said petitioner's counsel had shown him this record in preparing for his cross-examination.  So that was on the record yesterday.  Yes, it was to prepare him for his cross-examination.

So I'm just saying that a couple of witnesses here have been prepared for their cross-examination, but at minimum, that aside, at minimum both parties can prepare their witnesses by showing them record documents in advance.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I've made the caveat yesterday that I probably meant to make a broader ruling, but I didn't, and you can't show them the testimony, but you can show them record documents in advance.  In fact, you can in any kind of hearing or trial, you can prepare your witness and show them record documents, particularly for their direct testimony when you call them.

When Mr. Woodward and Mr. Hudgins were called by the Petitioner, you reserved your right to call them when the United States presented its case.  You can certainly prepare Mr. Woodward for his testimony by showing him record documents, in particular the discovery to the United States that was violated by previous counsel.  So you can show him

JODY A. STEWART, Official Court Reporter

1797

that.  Also, he is entitled to see his own testimony that he gave.  He's entitled to see that.  It's testimony that he's given.  It's his, so he is entitled to see that.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  So you may prepare him for examination as you could any witness.  You may show him documents to prepare him, and in particular you certainly may show him these documents that were produced through egregious discovery violations on behalf of petitioners' counsel, and he may see his own hearing testimony.

To the extent you can examine him on Mr. Hudgins' testimony, that will not be hearsay because under Rule 804(a)(4), exception to the rule against hearsay when the declarant is unavailable as a witness, and (4) says cannot be present or testify at the trial or hearing because of death or an existing infirmity, physical illness, or mental illness.

Mr. Hudgins has now passed away from cancer. Everybody knew that he was ill, and so his testimony is not hearsay, nor his file, and Mr. Woodward is entitled to see his file, if that was produced to you during the late discovery.

MR. SAMUELS:  We do have some billing records from Mr. Woodward that were produced later on that we would like to show him.

JODY A. STEWART, Official Court Reporter

1798

THE COURT:  You can.  You can review it with him, because those were produced in the late discovery, and this billing record is how the Merikangas incident arose, that was the catalyst for some of this now.

So do you have any questions about my ruling, Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  The only question I would have is that we may have the rebuttal expert, Dr. Nadkarni.

THE COURT:  I think I've ruled on that already yesterday.  I ruled that both Dr. Merikangas and Mr. Cunningham and this witness have seen other expert reports, and I thought I did that last night, that you could certainly provide the expert reports and any late-discovered records to him.

MR. SAMUELS:  And we will, Your Honor.  My one question was, to the extent that Dr. Nadkarni has testified or deferred in his report in a little bit -- in addition to his report, would we be able to show Dr. Aguirre Dr. Nadkarni's testimony, if we chose to?  Because that is part of his opinion that he provided.

THE COURT:  When is Dr. Aguirre going to testify?

MR. SAMUELS:  Dr. Aguirre, we intend to produce him, Your Honor.  We are still evaluating that, but I think it would be next Tuesday or Wednesday.  I'm not sure we

JODY A. STEWART, Official Court Reporter

1799

would do this but I'm just raising this to the Court.

THE COURT:  I don't see a problem with it considering that it's been going on the whole time in this case, every expert has been shown every other expert report and told what they opined, what it was based upon, and it's rebuttal.

MR. SAMUELS:  That would be the basis for it, Your Honor, just so that he would know Dr. Nadkarni's opinion and could address it.

THE COURT:  That's become the *modis operandi* here.

MR. SAMUELS:  Thank you, Your Honor.

THE COURT:  We are starting at 10:00 a.m. on Monday, as I understand.

Ms. Ali, I know you have Dr. Martell; is that correct?

MS. ALI:  That is correct, Your Honor.

THE COURT:  Once you have retained an expert, and you've got an agreement for them to testify, Dr. Nadkarni is here, and he's under a court order now to appear at 10:00 a.m. on Monday morning.  But he has, I think, a social engagement starting something in the evening that evening, but whatever it is, it is.

MS. ALI:  He is testifying in court the following day.

THE COURT:  He will have to let the judge down

JODY A. STEWART, Official Court Reporter

1800

there know that he is testifying here.  You can't be in two federal courts at once.  Once you start your testimony, you have to finish it.  If you need me to contact the judge, I'll be glad to do it and verify it.  But you can't be in two places at once.  We have been going at this now for quite a while.

We shouldn't even be here had it not been for the discovery violations that caused this continuance.  So at this juncture we are here, we are going forward, and we are going to be in court every day next week except Friday.  Friday is Veteran's Day.  We will be here Monday, Tuesday, Wednesday, and Thursday, and Monday we will start at 10:00.

All right.  Dr. Nadkarni, I'm sorry.  I hope you have a nice trip back this evening and weekend.  It is lovely up there.

THE WITNESS:  True.  Thank you.

THE COURT:  I do wish you a nice weekend, and I thank you for your indulgence, and you will have to leave here for Montclair and come to beautiful Norfolk on Monday.

THE WITNESS:  Sounds good.  Thank you.

THE COURT:  When I adjourn, you will be excused for the night.

Is there anything else from the government for the Court to address this evening?

MR. SAMUELS:  No, Your Honor.  Thank you.

JODY A. STEWART, Official Court Reporter

1801

THE COURT:  Ms. Ali, anything further?

MS. ALI:  No, Your Honor.

THE COURT:  All right.  The Court stands in recess until 10:00 a.m. Monday.

(Hearing adjourned at 8:08 p.m.)

CERTIFICATION


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



        X_____/s/_____x
                      Jody A. Stewart
                 X_____11-19-2023 _____x
                          Date

JODY A. STEWART, Official Court Reporter