1802

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - - -
                                    )
UNITED STATES OF AMERICA,           )
                                    )
    v.                              )   CRIMINAL ACTION NO.
                                    )   4:08cr16
DAVID ANTHONY RUNYON,               )
                                    )
        Defendant.                  )
                                    )
                                    )
        AND                         )
                                    )
DAVID ANTHONY RUNYON,               )
                                    )
        Petitioner,                 )   CIVIL ACTION NO.
                                    )   4:15cv108
    V.                              )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Respondent.                 )
                                    )
- - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

DAY 12

Norfolk, Virginia

November 6, 2023


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge







JODY A. STEWART, Official Court Reporter

1803

APPEARANCES:

    UNITED STATES ATTORNEY'S OFFICE
    By:  Brian Samuels
       Lisa R. McKeel
       Assistant United States Attorneys
         And
    DEPARTMENT OF JUSTICE
    By:  Carrie L. Ward
       Counsel for the United States

    VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
    By:  Elizabeth J. Peiffer
       Robert Edward Lee, Jr.
         And
    ALI & LOCKWOOD LLP
    By:  Kathryn M. Ali
       Counsel for the Defendant

JODY A. STEWART, Official Court Reporter

1804

**I N D E X**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SIDDHARTHA NADKARNI, M.D. | -- | 1806 | 1832 | |
| DANIEL A. MARTELL, PH.D. | 1859 | 1894 | 1909 | |
| JAMES R. MERIKANGAS, M.D. | 1916 | 1978 | | |

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| 89 | 2055 |
| 98 | 2059 |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 99D | 1841 |
| 145 | 1865 |
| 155 | 1918 |
| 160 | 1862 |
| 169 | 1942 |
| 176 | 1885 |
| 201 | 1890 |

JODY A. STEWART, Official Court Reporter

1805

(Hearing commenced at 10:03 a.m.)

THE CLERK:  In case number 4:15cv108, David Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, the United States of America versus David Anthony Runyon.

Ms. Ward, Mr. Samuels, Ms. McKeel, is the government ready to proceed?

MR. SAMUELS:  The Government is ready.

Good morning, Your Honor.

THE CLERK:  Ms. Ali, Ms. Peiffer, and Mr. Lee, is the defendant ready to proceed?

MS. ALI:  Yes.  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Samuels and the attorneys at your table; and good morning, Ms. Ali, and the attorneys with you.

You are David Anthony Runyon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I think everyone is here, and we are ready to proceed.  You can call Dr. Nadkarni.

(Witness entered the courtroom.)

THE COURT:  Good morning, Dr. Nadkarni.

THE WITNESS:  Good morning.

THE COURT:  You can go back on the stand, and you're still under oath.

THE WITNESS:  Thank you.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                                  1806

SIDDHARTHA NADKARNI, M.D., called by the Defendant, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Continued)

BY MS. WARD:

Q.  Good morning, Dr. Nadkarni.  How are you doing today?

A.  Good morning.  Well.

Q.  I want to ask you just a quick couple of questions.  Over the course of the weekend, did you take any time to prepare for your testimony today?

A.  I did.

Q.  How much time did you spend?

A.  Maybe two hours.

Q.  And was that alone or were you accompanied by anyone?

A.  That was alone.

Q.  And what items did you review?

A.  What's that?

Q.  Did you review documents?

A.  I reviewed my own report and documents that I had been given.

Q.  Do you recall which documents that you were given?

A.  I just reviewed the reports of Dr. Mirsky, Dr. Montalbano.  I reviewed some of the Army medical records and some of the Bureau of Prisons records.

Q.  And then when you say that you reviewed your own report,

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                                    1807

was that the one you prepared or was that the one that was annotated with footnotes?

A.   Not the annotated one.  I didn't have that one.

Q.   Thank you, Dr. Nadkarni.  I want to review a little bit, when we recovered your curriculum vitae, one question I forgot to ask was how much of your experience is in post-conviction cases?

A.   Oh, I would say the majority of my capital work is in post-conviction cases.

Q.   Okay.  Would you agree that the first step in a post-conviction case, you're hired many years after the incident, many years after the trial; is that usually right?

A.   Very often, yes.

Q.   The first step would be intake.  You would be receiving documents that are provided to you from *habeas* counsel; is that accurate?

A.   That's correct.

Q.   Do you typically review those before you do the exam with the client?

A.   I often review some of the documents I get before I examine the client.

Q.   And then you proceed, and you do your physical examination and the interview; is that accurate?

A.   That's correct.

Q.   In this case I think you said, if I remember right, it

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                          1808

was about two, two and a half hours with Mr. Runyon?

A.   Yes.

Q.   And your exam is very important to your opinion and your reports?

A.   I think it plays an important role, yes.

Q.   All right.  If I remember right, you testified earlier, or on Friday, that it was about 85 percent of your report?

A.   Oh, no, no, no.  The history and the examination in clinical practice make up 85 percent of the diagnosis when I see a patient in my office.  That's what I meant.  That's what I think I said.

Q.   Okay.  So in this case, in post-conviction cases, you're taking the input from the *habeas* counsel that gives you guidance as to what they've observed and what they think you might find in the record; is that fair?

A.   I don't think that usually is the case, honestly.  I just get a bunch of records that I'm asked to review and then form an opinion about the person's neuropsychiatric condition.

Q.   In this case you received a letter from Ms. Chavis that outlined her observations when she provided that information to you?

A.   I don't remember, but it's certainly possible.

Q.   And then once you have that information, once you've done your interview, you would go back, and you would try to corroborate claims of brain injury or symptoms of mental

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                          1809

illness with the record that you've been provided?

A.   Yes.  I try to see if the other examples of the same things we mentioned in other places.

Q.   And you try to find causation between some trigger points and his history to symptoms that you've seen?

A.   I think you get a whole picture, and then you make a medically reasonable conclusion about what that picture means.  So I'm a little bit -- I think causation is a little bit of a tricky -- I don't know exactly what that means, but, yes, you try to tell a story of what the events were that produced the neurologic problems the person has.

Q.   So when you were doing your interview with Mr. Runyon, you said that you brought your laptop; is that accurate?

A.   Yes, I believe that's true.

Q.   And that is where you were taking your notes throughout the course of the interview?

A.   Yes.

Q.   Can you just explain a little bit your style of question and answer with him?

A.   Well, it's usually the same with everybody.  So you start out with open-ended questions with this structure, that I gave earlier, in the back of my mind.  And then when you get something specific, you dive deeper down into the range of those symptoms, like the location, the duration, the evolution, what makes it better, what makes it worse.  So you

Nadkarni, S. - Cross (Continued)                                   1810

start out open-ended, and then you get to close out the questions. I hope that answers the question.

Q. Yes. Thank you. So, for example, when Mr. Runyon reported to you that there was an incident where he was hit in the head with the butt of a rifle, do you recall that?

A. I do.

Q. Did you ask any follow-up questions about that incident?

A. Yes. I asked him what the circumstances were around that incident.

Q. And did he provide those answers?

A. There weren't great details around that incident given.

Q. Do you recall what kind of questions you asked?

A. I don't. That was a long time ago, but I remember -- every time I get a story like that, I want as many as details as I can get around the incident.

Q. So for that one there were no -- there was no -- he couldn't remember?

A. There was his self-report, and I think he self-reported to other people also, but there was no other corroborating evidence for that event.

Q. I understand that, Dr. Nadkarni. My question for you is really did you document his inability to answer those questions?

A. Oh, I can't really document all the negatives. My report would be thousands of pages if I did that. I only -- I

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                              1811

document what are pertinent positives and what the person tells me, and where, you know -- where there is more detail, it's reported in the report where he can give me more detail.

Q.   Thank you, Dr. Nadkarni.  So you'd agree that in a post-conviction investigation like this, that the record review is extremely important to you?

A.   I agree.

Q.   And you'd want to see everything that's relevant to your investigation from a --

A.   Yes, and it never happens, honestly.  Like, it doesn't happen that I see everything I'd like to see, but, yes, I would like to see as much as possible.

Q.   So if somebody were -- let's talk about -- you documented a potential change of comportment in Mr. Runyon.  Do you recall that?

A.   I think he has -- yes, I think he's had a change in his comportment over his life.

Q.   So, for example, if his wife, Maria Runyon -- you were given her declaration, and she discusses a personality change following the 1996 car accident.  Do you recall that?

A.   I do.

Q.   So if she had given Grand Jury testimony where she testified in 2008 that there was no personality change, would you have wanted to see that information?

A.   I would like to see that.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                            1812

Q.  And you'd agree that not seeing that information takes away a data point for you?

MS. ALI:  Objection.  That mischaracterizes Ms. Runyon's Grand Jury testimony.

THE COURT:  She's on cross.  That's okay.  He can say yes or no.

THE WITNESS:  I'm sorry.  Can you repeat the question?

BY MS. WARD:

Q.  That would be an important data point for you to reach your final opinion?

A.  I think that could be.

Q.  Now, do you recall receiving a list of drugs that Mr. Runyon participated in?

A.  You know, I don't remember seeing which specific drug trials he was in, and I don't remember that now.  I don't remember getting that.  I may have.  I just don't remember that.

Q.  But you agree you were not given the medical records that accompanied those --

A.  I was not.  I was not.

Q.  If Mr. Runyon on the intake paperwork, for every one of those drugs that he's filled out paperwork, that said he did not have a history of head injuries, would you have wanted to see that information?

Nadkarni, S. - Cross (Continued)                          1813

MS. ALI:  Objection.  Calls for speculation.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  I think that -- I think he is highly incentivized to say that, because he couldn't get into the study, so I wouldn't take much stock of that.  He wouldn't be able to do the trial if he said that he had a head injury.  So, you know, in that situation, he had a very particular interest to perform the trial, and he would be excluded from it if he said -- you can't do a drug trial if you have a history of head injury, so I wouldn't take that into that much account.

BY MS. WARD:

Q.  But would you -- I wouldn't ask you to make a decision based on that here in the courtroom on the fly, but if it -- we are talking about medical documentation, so it's something that you would have liked to have seen?

A.  I don't think it would have played a big role in my opinion.  It would have been nice maybe to see it.

Q.  So you're familiar with the name Dr. James Merikangas?

A.  I am.

Q.  And he's also a board-certified neurologist and neuropsychiatrist who plays a role in this case?

A.  He is.

Q.  Okay.  You were given, from *habeas* counsel, his 2009 preliminary report; is that accurate?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                                    1814

A.   I believe so.

Q.   And he's the one that ordered the 2009 MRI and PET scans?

A.   He did ask for those, yes.

Q.   Okay.  Would you agree that a similarly qualified neurologist could also read the MRI that you've read and explained on Friday?

A.   I'm sorry.  I'm not sure what a semi-qualified neurologist is.

Q.   Well, Dr. Merikangas is a board-certified neurologist?

A.   Yes, correct.

Q.   So he would have the same abilities, training, experience to assess that MRI scan that you reviewed?

A.   As me, yes, but not as a neuroradiologist, correct.  He would have the same ability as I would as a neurologist to look at those scans.

Q.   Exactly.  Thank you, Dr. Nadkarni.  So if Dr. Merikangas found -- made entirely different findings when he did the review of those scans, is that information you would want to know before rendering your opinion here today?

A.   I would be curious to know what they thought, but I would trust my own eyes probably with what I saw.

Q.   Well, Dr. Merikangas did a neurological exam in 2009, but you were not provided the results of that exam; is that true?

A.   Yeah, I don't remember if I saw his exam in 2009.  I don't believe so.  I don't remember.  If I had his report

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                          1815

from 2009, then I saw his exam.  I mean, you have to show me the document, and I can take a look and see if I recognize it or not.  I'd have to refresh my recollection about that, if I saw his exam or not.

Q.  Can I ask you to slow down a little bit.

A.  Sure.  I apologize.

Q.  I have the same problem.  We will struggle together, Dr. Nadkarni.

THE COURT:  You said you had the same problem?

MS. WARD:  Fast speech, Your Honor.  I'm also trying to talk slower.

THE COURT:  I just wanted you to repeat it slowly because you do have that problem.

MS. WARD:  I'm working on it.

BY MS. WARD:

Q.  On your report you list one exam report from Dr. Merikangas, and it says the 2009 preliminary report. That's the only information that you received regarding Dr. Merikangas's findings; is that accurate?

A.  At the time I made my report, I believe that's all I had.

Q.  Okay.  So you did not receive any clinical or neurological exam reports from 2009 conducted by Dr. Merikangas?

MS. ALI:  Objection.  He's just testified that he received the neurological report, and if he received that,

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                              1816

then he received the results of the --

THE COURT:  Wait, please.  You can't testify like that.  You're now telling him what he's seen.  He didn't list it here.  She just asked him the question, you only listed his preliminary report.  Now she is following up with a question, and you can't now tell him what the answer is.  You're making a speaking objection.

Go ahead with your question.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  If Dr. Merikangas conducted an exam prior to the trial, and he concluded that his exam results were not abnormal, is that information that you would like to know before rendering your opinion?

A.  Yes, that would be information I'd like to know.

Q.  And the same for Dr. Merikangas's 2015 exam, you were not provided with that report either; is that right, Dr. Nadkarni?

A.  You know, I have seen documentation from Dr. Merikangas, but I think I'd have to -- you'd have to refresh my recollection about the documents to see if I can recognize if I have seen them or not.  I have definitely seen reports from Dr. Merikangas.

THE COURT:  You would have had to have listed them in this report?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                    1817

THE WITNESS:  Correct.

THE COURT:  You have to list your documents in your expert report.  If you want to look at that list and see what's there, that's fine, but it would certainly save time if there was a stipulation that it's not there.  There is a full list of documents, and an expert has to list their documents, and I would tell you it's not there.

THE WITNESS:  Okay.

THE COURT:  If you want to look at your pages of documents, you may do so, but I think you should be familiar with what you looked at.  You've got two pages here of 97 documents and then a couple of others that go up on another page.  You said you looked at your report this weekend.

Ms. Ali?

MS. ALI:  I just wanted to note, Your Honor, that I can't remember which court exhibit it is.  I think it is 4 or 5, but we provided the government an updated list.

THE COURT:  It's 137, is what we have been looking at.

MS. ALI:  We had provided to the government the list of updated disclosures in advance of the hearing.  I believe it is Court Exhibit 6.

THE COURT:  What we've been looking at all this time is 137.  That was his initial report from 11-9-2022.  So what is in number 6?  Pass it up to the Court, please.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                              1818

When did you give this?

MS. ALI:  We provided that, Your Honor, on October 24th, which is the date we had agreed, mutually agreed we would provide supplemental.

THE COURT:  Then ask him about this, then.  He hadn't signed it or adopted it in any way, but go ahead.  If you want to, go ahead and ask him about it.

MS. WARD:  Yes, Your Honor.  I was asking about 2009.  Dr. Merikangas's exam from 2009 has never been provided to anybody.

THE COURT:  Okay.  You can follow up through redirect, Ms. Ali, as to what has been provided and what has not been provided, and if you think this is important, you can follow up on it.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Nadkarni, did you receive both the MRI and the PET scan for review?

A.  I did not.

Q.  Which ones did you --

A.  I did not receive the PET scan for review.

Q.  Do you know why?

A.  I don't know why.

Q.  Do you know why you were not given an opportunity to review Dr. Merikangas's 2009 exam results?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                          1819

A.   I do not know why.

Q.   And I do want to ask about the 2009 MRI report.  So on Friday you testified that the 2009 MRI scan was of poor quality.  Why was that assessment of the quality not contained in your report?

A.   Because I didn't think it was actually important, because I have positive findings.  I saw it -- something anyway, so the quality actually is -- if I didn't see anything, I would say maybe I missed something because the quality was poor, but when I see things on an MRI that's positive, that, you know, sort of is important data, then the quality of the study is not as important.

Q.   So you'd agree that the exam -- the MRI scan was still sufficient for you to reach findings that there were some white matter hyperintensities present?

A.   That's correct.

Q.   And that is in 2009; is that right?

A.   I believe that MRI is from 2009.

Q.   And you'd agree that there are many things that could cause white matter hyperintensities?

A.   So you always have to think about the age of the patient, the conditions of the patient, and the history.  So it's not true that anything can cause white matter hyperintensities in anybody anytime, but lots of things can cause white matter hyperintensities in people over their life span.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                    1820

Q.   And some of that could be genetic disease?

A.   Yes.  In children they can have lots of leukodystrophies, genetic leukodystrophies that cause like confluent white matter hyperintensities and paraplegia and terrible diseases, terrible, terrible mitochondria and genetic diseases than can cause white matter hyperintensities.  Those are like widespread abnormalities in the white matter.

Q.   It could be -- I mean, they just could be caused by a great many things.  We are still learning quite a bit about white matter hyperintensities; is that a fair statement?

A.   I don't think that is true actually.  I think we have a pretty good idea about what causes white matter hyperintensities in different settings.

Q.   Okay.  In diagnosing traumatic brain injury, you'd have to corroborate -- not everybody that has a concussion is going to have resultant traumatic brain injury; is that a fair statement?

A.   I think these are very, very tricky terms to use in a lay fashion.  So concussion just means you have alteration in awareness with a blow to the head or not alteration in awareness, any neurological symptom, dizziness, vertigo, double vision, headache, nausea.  It can last for variable amounts of time, and traumatic brain injury means that the brain has suffered a trauma and has been injured.  So these two terms, I think concussion describes a syndrome of

Nadkarni, S. - Cross (Continued)                          1821

symptoms, a list of symptoms, and traumatic brain injury says that the brain has been injured.  These are pretty non-specific terms, and I don't think you should make a close -- I don't think it's -- it's not -- it's not appropriate to make connections between concussions and traumatic brain injury.  It's a loose association.

Q.  Okay.  Would you agree that not everybody that has some evidence of white matter hyperintensities would have resulting brain dysfunction?

A.  Oh, not everybody who has white matter hyperintensities has -- I'm sorry.  Did you say brain dysfunction?

Q.  Or executive dysfunction, you wouldn't have a resulting behavioral --

A.  Not everybody with white matter hyperintensities has executive dysfunction, that's correct.

Q.  So, again, you would turn back to the historical data, the record that you've received to make a determination whether -- if you see evidence of white matter hyperintensities, you're going to start looking for evidence of behavioral change?

A.  Well, I think in -- so if you see white matter hyperintensities at the cortical gray junction, that's enough for head injuries in that age group.  There is nothing else that really causes that.  The other cause for that is amyloid angiopathy, which happens in Alzheimer's patients at the age

JODY A. STEWART, Official Court Reporter

of 85.  So at that location, if you have punctate white matter, the history is unlikely to be important because very likely that person has had a traumatic head injury that has caused that location of those white matter hyperintensities.

Q.  Right, Dr. Nadkarni.  But once you've made that diagnosis, you've identified that there is something in Mr. Runyon's brain that cause a question, and you've identified some evidence of potential incidents that could cause head trauma, that's really not up for debate?

A.  That's correct.  Agreed.  Yes.

Q.  So at that point your next step would be to take a look at the historical record, the knowing information about Mr. Runyon, and see if you can find evidence of behavioral change, evidence of dysfunction?

A.  I'm asked to look for evidence of brain dysfunction when I look at the records and the person.  So, yes, I'm always looking for that.  Regardless of what an MRI shows or not, I'm always looking for that.

Q.  Exactly.  So what you see on the MRI is not going to be dispositive that there is a change in executive function or a behavioral change or mental defect; is that fair?

A.  I think what I can say about the white matter hyperintensities is that those in those locations is evidence for a head injury, and if you have enough head injury to cause those dots, it is very likely that this person has a

Nadkarni, S. - Cross (Continued)                              1823

frontal lobe syndrome, very, very likely.

Q.  Well, were you given the opportunity to review the sentencing testimony of all of Mr. Runyon's friends and family?

A.  I don't think I saw all of the testimony of all of the friends and family.  I saw some of it.  I don't remember seeing all of it.

Q.  Would you agree if anybody consistently reported that he was a kind and loving person, a good father, that that might be inconsistent with the findings of a personality change or an adverse mental defect?

        MS. ALI:  Objection, mischaracterizes the testimony.

        THE COURT:  Overruled.  Go ahead.  I'll remember the trial testimony and whether it's mischaracterized or not.  I think it's a little broad to say everybody.

        THE WITNESS:  I'm sorry.  Can you repeat the question?

BY MS. WARD:

Q.  If Mr. Runyon's family consistently described him as a good father before his trial, before and after the 1996 car accident, could that be inconsistent with the finding of dysfunction?

A.  If everybody that he knew said he was always on his best behavior and never made slips and never got angry, that would

Nadkarni, S. - Cross (Continued)                              1824

be an important piece of data for me to say if every single person he knew said he was perfectly composed all the time and never slipped and never lost his cool, and he was a great father and great husband, then, yes, that would be an important piece of data for me to look at.

Q.   And he was in confinement for quite a period of time before his trial.  So if the reports about his behavior in confinement was he was quiet, unassuming, not a behavioral issue, is that information that you would like to know before rendering your opinion about whether or not he -- the experiences of dysfunction or defect?

A.   I don't think that would make a difference to me honestly because routinely people with head injuries, when they end up in prison, the structure of the system contains a lot of their problems.  So that's something that I've seen in case after case.

Q.   And by many accounts Mr. Runyon is and was -- was and remains a very intelligent man?

A.   He's been shown to have a very high IQ.

Q.   Were you shown any of the guilt phase evidence that went to his substantial planning and premeditation in this case?

A.   I don't believe so.

Q.   If you -- would you have wanted to see evidence about how he spent weeks plotting the murder before rendering your opinion about dysfunction?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                                    1825

A.  Oh, I don't think that -- I've seen that over and over in people who plan out things far in advance.  So I don't think that would have made a difference in my opinion.

Q.  Well, would you have wanted to see evidence about how he lay in wait for his target before you rendered your opinion about whether he was experiencing dysfunction?

A.  I don't think just because he did that means that he wasn't experiencing dysfunction.

Q.  Were you able to look at any evidence about his conduct after the murder to conceal his crime?  Were you able to look at any evidence like that?

A.  Oh, I don't believe so.

Q.  Would you have wanted to see evidence of obstruction or hiding evidence or getting rid of the gun, efforts that would go to his understanding of the wrongfulness of his actions? Would you have wanted to see any of that evidence before rendering your opinion?

A.  I think my opinion was whether he was brain injured or not.  None of that would have changed my opinion.

Q.  So if there is evidence in reports about his consciousness of guilt, that wouldn't be information that would be helpful to you?

A.  I don't think I was asked questions about his consciousness of guilt or innocence.

Q.  Were you allowed to look at the jury special findings in

Nadkarni, S. - Cross (Continued)                                    1826

this case?

A.   Not that I can remember.

Q.   Did you discuss the nature of the crime with Mr. Runyon during your interview?

A.   I did.

Q.   And what did he tell you?

A.   He told me that he was -- he didn't do it, that he was in his hometown, that his cell phone pinged in his hometown, that he was set up later, and he was that -- he was not set up later, that they later found a picture of the co-defendants.  He said stuff about his age and honor and being prosecuted from a racist perspective, he believes that, and he believes he's been prosecuted incorrectly.  That's what he told me.

Q.   Is there a reason none of that information is in your report?

A.   That is in my report.

Q.   Dr. Nadkarni, you were given a list of 10 potential incidents that could cause head trauma and possibly brain injury; is that --

A.   I'd have to -- I think it was like nine or ten, yes.  If I could look at my report, I could be precise about that.

Q.   And you reviewed the reports from the time of trial so Drs. Patterson and Montalbano issued reports for the government.  You reviewed those; is that right?

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                                        1827

A.   Yes.  Yes.

Q.   And you reviewed Dr. Merikangas's preliminary report; is that right?

A.   Yes.

Q.   And you reviewed one of Dr. Nelson's preliminary reports; is that right?

A.   Can I look at my list of documents, please?  You asked me to do this from memory for 99 documents.  That is going to be very difficult.

Q.   List of the medical is on this page, if that's helpful.

A.   The records on that page, I think -- I think I missed one clerically about the 2009 MRI, but I think these represent the records that I looked at.

Q.   Would you agree that all of the trial level experts accepted as true that Mr. Runyon probably experienced at least one or more potential incidents that may have caused potential head trauma?

A.   I agree.

Q.   And would you agree that all of the trial level experts had the time to assess Mr. Runyon, maybe not all, Dr. Merikangas, Dr. Nelson, Dr. Montalbano had the opportunity to specifically assess and evaluate Mr. Runyon at the time of trial?

A.   Per the reports, yes.

Q.   And would you agree that those trial level experts found

Nadkarni, S. - Cross (Continued)                                    1828

that he was not clinically abnormal?

A.   Oh, I don't think that's true.

Q.   They didn't find anything so marked, no significant, significant diagnoses that would go to mitigation or aggravation?

A.   The data in Dr. Montalbano's report is very significant and abnormal.  The neuropsych abnormalities in his report are all over the place.  He mentions that himself.

Q.   You testified that the two blast injuries that Mr. Runyon reported to you from his time in the military were not corroborated by other sources?

A.   That's correct.

Q.   As well as being hit in the head with the rifle?

A.   That's correct.  I would put those separately, though.  I would rely on those two stories separately, actually.  The rifle, I would rely on much less.  The blast injuries, the richness of the detail and consistency with which he told the same story to multiple people, I think I would rely on somewhat more, if not a hundred percent.  But those aren't equally reliable to me, those two stories.

Q.   Let me ask you a quick question about that, then.  So if you were to remove those incidents, the blast injuries, the rifle butt, the multiple knock-outs in his childhood that went uncorroborated, if you were to remove those from your list of potential head injuries, are you still able to render

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                              1829

the same opinion that you gave?

A.   I think, if you don't mind, I'd like a little bit more specificity about the knock-outs in childhood that are uncorroborated.  Which ones do you mean?

Q.   Well, he reported the football incident where he ran into a telephone pole?

A.   Correct.

Q.   And claimed to lose consciousness while the other children played around him?

A.   Correct.

Q.   And then he just said knocked out many items playing football?

A.   Correct.  So all of those, I don't need any of those to still think that he was significantly brain injured.

Q.   Okay.  So my question to you is that, if we take out these self-reports of potential injury, the blast injuries, the rifle butt, the football knockout, the childhood knock-out, if we take all of those out, are you still able to render the same opinion that you gave?

A.   So the -- when you say childhood knock-outs, there was a severe head injury at the age of 3.  That is all we need. From there on out, he had a very severe head injury at the age of 3.  So I don't need any of the rest of them, actually.

Q.   Well, Mr. Runyon reported to you that he had -- that he had the incident with his father?

Nadkarni, S. - Cross (Continued)                                    1830

A.   And his mother reports it, and it's in multiple other reports.

Q.   Well, his mother reports it.  Wouldn't -- but his biological father denied that incident?

A.   Well, I think he's a drunk abuser.  I would expect him to say that, that he didn't do that.

Q.   Is it possible that Suk Cha Runyon's retelling of the story may manufacture a memory from Mr. Runyon because he was only 3 at the time the incident occurred?

         THE COURT:  I strike that question.  Most anything is possible.  That's to me not a proper question.  It would just be, has he talked with Suk Cha Runyon, has he assessed her veracity, that kind of thing, but anything is possible.  We are not dealing necessarily with possibilities on something like that.  Suk Cha Runyon testified, and you can argue that to the Court but not with this witness.

BY MS. WARD:

Q.   Dr. Nadkarni, were you given any medical information about a September 2009 concussive incident that Mr. Runyon suffered while he was in confinement?

A.   That does sound familiar to me.

Q.   You were given these records?

A.   It sounds -- the incident sounds familiar to me.  I can't point to which records those would be specifically.

         THE COURT:  2009 incident?

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Cross (Continued)                              1831

MS. WARD:  Yes, Your Honor.

THE WITNESS:  Is that the Bureau of Prisons records?

BY MS. WARD:

Q.  Likely, yes.

A.  Yeah, I was given Bureau of Prisons records, yes.

Q.  And that injury, after the murder, may have substantially contributed to the abnormalities you noticed in your physical exam in 2022?

A.  Oh, I think there is report of that face asymmetry prior to that, and there is report of his car accidents and rehab and torn muscles.  It's a lot of injuries prior to this injury in prison.

MS. WARD:  Just one moment, Your Honor.  I have no further questions.  Thank you, Your Honor.

Thank you, Dr. Nadkarni.

THE WITNESS:  Thank you.

THE COURT:  Ms. Ali.  I want you to understand that you're on redirect.  You would have to have objected that it went past your direct examination on cross-examination.  This is not an opportunity to re-ask everything that you did before to rehabilitate a witness.

The rule is that you can ask questions, if you have objected to things that went past your direct.  But don't otherwise repeat your direct examination.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                                    1832

REDIRECT EXAMINATION

BY MS. ALI:

Q.   Dr. Nadkarni, you were asked about Dr. Merikangas's 2009 exam of Mr. Runyon.  Do you recall whether Dr. Merikangas reported that Mr. Runyon was normal on that report?

A.   I don't recall what the report was.  I'd have to see it myself.  I don't recall the details of that.

Q.   Can we pull up what was previously admitted as Government's Exhibit, I believe it's 63.  Go to the next page.

       Is this the report of Dr. Merikangas from 2009 that you reviewed?

A.   Yes.

Q.   And what does Dr. Merikangas find in this report?

A.   He finds multiple scars in the face from -- multiple scars in his face.  He finds facial asymmetry.  Let's see. He finds hyperreflexia.  He finds hyperextensibility of the joints.  He says he has multiple head injuries dating from childhood, severe headaches, and requires brain imaging and an EEG, and that psychiatrically he was suffering from the effects of withdrawal from the experimental drugs that he was taking at the time, so he finds abnormals in his exam.

Q.   Can we go to the next page, please.

A.   Oh, yeah, he finds grandiose thinking, delusions, impaired executive functioning, and frontal lobe impairment.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                          1833

Q.   And are those findings from Dr. Merikangas's 2009 exam consistent with the findings in your 2022 exam of Mr. Runyon?

A.   Yes, very much so.

Q.   In what ways?

A.   They are the same.

Q.   And you were asked on cross about Maria Runyon's Grand Jury testimony.  Would seeing testimony about Mr. Runyon's personality have changed your determination that Mr. Runyon suffers from brain dysfunction?

A.   It would not.

Q.   Can someone with brain dysfunction be helpful sometimes?

A.   Yes.

Q.   Can someone with brain dysfunction be kind?

A.   Yes.

Q.   Can someone with brain dysfunction be intelligent?

A.   Yes.

Q.   Can someone with brain dysfunction be a good father who loves his children?

A.   Yes, absolutely.

Q.   Did you rely on any one single piece of evidence to reach your opinions about Mr. Runyon?

A.   No one single piece of evidence.

Q.   Do you ever rely on a single piece of evidence to make a clinical diagnosis?

A.   Never one single piece of evidence.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                                    1834

Q.   How much weight did you put on other experts' evaluations and testing of Mr. Runyon as compared to your own examination and finding?

A.   Only the most weight I put on other people's evaluation was in the raw data and the data -- the actual neuropsych testing.  So the MRI and the neuropsych testing show evidence of brain dysfunction.  And then the rest of the evaluators' information is useful.  But the abnormal brain is present without anybody else's evaluation, and just in the testing.

Q.   Based on testing, your own examining the MRI, that was sufficient for you to find that Mr. Runyon is brain injured?

A.   Correct.

Q.   And so what was the purpose of looking at the historical records then?

A.   Oh, it just gives you more data to figure out in what ways he was brain damaged and to help corroborate some of the things you find and also to see what other evaluators might have felt.  So whenever I form an opinion, you know, I rely on my own opinion, taking the whole picture into account generally more than any other individual person's evaluated a person.  But it wouldn't be right practice for me not to take into account whatever I've been given historically also as data points.

Q.   And did you specifically do anything to try to confirm whether the findings you made in 2022 were present around --

prior to or at the time of the crime?

A.   Yes.  So I looked at records right around the time of the crime and then sort of descriptions of things from before the crime, including academic records -- I'm sorry, testimony from other family and friends, his own reporting.

So in the aggregate, I think it's a very clear picture to me of significant head injury and marked vulnerability in the significantly impaired capacity to always make decisions correctly in terms of judgment.

Q.   You were asked on cross on Friday about Mr. Runyon's history or self-report of migraines.  Do you recall that?

A.   Yes.

Q.   And how important was Mr. Runyon's history and self-report of migraines to your opinion that Mr. Runyon is brain injured?

A.   Minor.

Q.   Why is that?

A.   Because people can have migraines for other reasons also. So it was -- it's a typical feature of post-head injury symptoms, so it makes sense to follow that, and his head injury was so young that I would clinically ascribe his migraines to that early head injury, but it wasn't a major point of data that I used to determine head injury.

Q.   Do you recall whether Mr. Runyon ever reported headache or migraine in medical records prior to the crime?

Nadkarni, S. - Redirect                                                1836

A.   Yes.   I believe there was mention of headaches even -- I think in the Portsmouth jail records, there might have been mention of headaches, and I think earlier also there is mention of him suffering from chronic headaches.  And in people's history, that have taken his history since, there is report of chronic headaches of that symptom also.

Q.   Do you recall whether Mr. Runyon ever reported headaches in -- when he was in the Army?

A.   Yes, he did.  Yes.  That's documented in those Army medical records also.

Q.   This is what's been marked as Petitioner's Exhibit 99D. Do you recognize this document?

A.   Yes.

Q.   Is this part -- what is this document?

A.   This looks like an Army medical record, and it's a medical -- it looks like a medical inquiry form for a system checklist.

Q.   And do you see a date on here?  I'll represent it's very difficult to make out, but can you at least tell what year it's from?

A.   Yeah.  It's 1997, is it September 8th -- some September something 1990 -- maybe 1997, I think.

Q.   And what does Mr. Runyon report?  Is it a self-report by Mr. Runyon?  Can you tell that from the document?

          MS. WARD:  Your Honor, I object.  We made the

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                   1837

objection of authentication.

THE COURT:  Where did this record come from?

MS. ALI:  This is part of the Army medical records. The other Army medical records were admitted as Petitioner's Exhibit 83.  This was part of that much larger document of 99.

THE COURT:  Well, why don't we go through it in 83, then.

MS. ALI:  Sorry.  This particular record was not appended to 83.  It is part of the same set of medical records, but for reasons that I'm not entirely sure about, it wasn't part of that.  This was included in the exhibit list from February as part of Exhibit 99, which is that very large document which was not admitted but pieces of that large exhibit have been admitted.  But this is something that he has included in his materials considered list and that he reviewed as part of the Army medical records.

THE COURT:  Let me get this straight.  It's part of that whole notebook exhibit that's not been admitted?

MS. ALI:  That whole notebook exhibit, Your Honor, contained what was also admitted as Petitioner's Exhibit 83. For some reason this document was not admitted along with 83 but was part of a broader set of Army medical records.  The entire 83 was subsumed within 99.  For whatever reason, when 83 was admitted in February, this piece of it was not, but

Nadkarni, S. - Redirect                                            1838

it was part of an exhibit that has been.

THE COURT:  How am I to know all this, given the violations that occurred?  Documents just appeared.  That he looked at it doesn't mean that he should have looked at it if it wasn't part of a record.  In other words, there have been so many records missing, so many records found, so many records produced.  I want to understand what you're saying.  Petitioner's 83 was admitted?

MS. ALI:  In February, yes.

THE COURT:  But this was not part of Petitioner's 83?

MS. ALI:  That's correct, Your Honor, but it was part of an exhibit that was offered in February.

THE COURT:  Let's take this one step at a time so that the record is clear.  83 was admitted in February, but this wasn't part of 83?

MS. ALI:  Correct.

THE COURT:  So then where did you come up with this?

MS. ALI:  I'm trying to be as clear as possible, Your Honor.  Exhibit 99, which was that very, very, large document, contained lots of things, including a full set of what then became separately admitted Defense Exhibit 83.  When that set of Army medical records was admitted as 83, I don't know why, this page was not included with it.  It is

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                        1839

included in 99, which was part of the exhibits provided and discussed in February.

The large document 99 was not admitted all together because it's a compilation of documents. Pieces of 99 have been admitted in this proceeding. This piece has not been admitted, but it was part of what everybody had in February when the hearing started and was produced and part of an exhibit that was on the February exhibit list.

THE COURT: But there was a question raised on this one. Let's find the document, because this case has been fraught with document problems. So let's find the document. If the Court admitted Document 83, but this wasn't in it, but now you tell me it's part of 83, but 83 is part of 99, then let's go to 99 and find it and see how it fits in the context of 99.

MS. ALI: Yes, Your Honor. It's the very last page of the Army medical records, Your Honor. It's the very last two pages of the Army medical records.

THE COURT: I'm waiting to see if they can find it. I would tell you that the date on it is not '71 or '77. If you turn over on the back, it's dated 9 September '97.

MS. ALI: That's correct, Your Honor.

THE COURT: That needs to be clear, because it's got a stamp.

MS. ALI: That's right, Your Honor.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                          1840

THE COURT:  So for clarity sake, the date of the document on the second page under A, Doctor, it looks like Earl Romitan, 9 September '97.

MS. ALI:  I'm happy to provide it.

THE COURT:  Well, providing it, if you didn't produce it.

MS. ALI:  It was produced, Your Honor.  It was in the binders from February before the February hearing began.

THE COURT:  Number one, you weren't here in February.  You just said that.  Number two, that is when we had all of the problems that arose, was in February with the bankers' boxes of documents in closets.  So that's why we had to continue this hearing.

So I want to be sure that it's something that we all had in February.

MS. ALI:  I think it's been resolved.  I don't think there is any concern that the document wasn't produced.  I think they just would like me to authenticate it as something he reviewed.  Do I have that right?

MS. WARD:  Yes.

THE COURT:  Then go ahead and do that.

BY MS. ALI:

Q.  Dr. Nadkarni, did you review this document as part of your review of the military medical records --

A.  Yes, I did.

JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                              1841

Q.  -- that you've testified about?

And do you have an understanding of what this report of medical history is?  Is this Mr. Runyon's self-report or a physician's?  Do you know that from looking at the document?

A.  This is somebody who is taking a history from Mr. Runyon and then producing this document.

MS. ALI:  I'd move to admit Petitioner's Exhibit 99D, Your Honor.

THE COURT:  Is there any objection?

MS. WARD:  Just not for the truth of the matter asserted, Your Honor, but something that he relied upon.

THE COURT:  All right.  That's fine.  It definitely has hearsay in it, but I'll admit it for something that Dr. Nadkarni relied upon, that's Petitioner's 99D.

MS. ALI:  I'll just say, Your Honor, I think this should fall within 803(4) as a statement of present symptoms or for medical diagnosis under the hearsay exception.

(Defendant's Exhibit 99D received in evidence.)

THE COURT:  Here is 99D.

BY MS. ALI:

Q.  Dr. Nadkarni, what symptoms reported in this document support a finding of head injury, if any?  And I can make it bigger if that would be helpful.

A.  So complaints of positional vertigo, insomnia, headaches. There is several here.  Trouble sleeping, depression,

Nadkarni, S. - Redirect                                               1842

excessive anxiety, loss of memory or amnesia, those are all symptoms that are consistent with head injury.

Q.   And does it also report head injury?

A.   Oh, correct.  Correct.  In this 1997 document, this head injury is affirmed in this document.

Q.   And this document is from before the time -- the time of the crime; is that correct?

A.   Yes.  Around ten years.

Q.   Turn to the second page of the document.  Is this a continuation of the history that's being taken in this medical record?

A.   Yes, that's correct.

Q.   And is there mention of the source of the head injury or what produced the head injury here?

A.   Yes.  The mention is made of a motor vehicle accident in 1996.  That actually required prolonged therapy following it.

Q.   And is there also a mention of mental health symptoms in this document?

A.   Oh, yeah.  So depression, post-traumatic stress, vertigo, dizziness, memory loss, blurry vision, and head injuries are all mentioned in this document.

           THE COURT:  The import of the document, Ms. Ali, is not necessarily the truth of what's in there, but if the document and military records that the trial attorneys either had or should have had, and then followed up on it,

                    JODY A. STEWART, Official Court Reporter

that's the issue here, is because this individual has only examined Mr. Runyon in 2022.

The key here to this document is it was there, it's in the military records, and either the trial attorneys knew, or if they didn't know, they should have known, and then what follow-up should they have done. That for the Court is the real determination. That's why the document would be important, and the fact that Dr. Nadkarni relied upon it, obviously, goes to his opinion, but the real import of that document is the availability to the trial attorneys.

BY MS. ALI:

Q.  Dr. Nadkarni, you were asked on cross-examination about the clinical trial drug list which appears on your materials considered. Do you recall that?

A.  Yes.

Q.  How important was that to your overall finding?

A.  That was actually not very important at all.

Q.  It was a record you were provided?

A.  Yes.

Q.  Did you consider Mr. Runyon's self-report of using alcohol in 1991 in reaching your conclusion?

A.  Not particularly.

Q.  How important was that to your overall finding?

A.  Not very important.

Q.  What is the impact of frontal lobe damage on the ability

Nadkarni, S. - Redirect                                                1844

to plan mundane things?

A.   So frontal lobe injury is -- can be patchy, and, you know, 90 percent of the things that people do with a frontal lobe injury is perfectly normal.  They can do -- they can make a sandwich, they can make dinner, they can go shopping, they can hold down jobs.  How well they do these things might be a question for me.  But they can do -- they live their lives.  It's not like they can't put their clothes on -- or, you know, most people with frontal lobe injuries can do their ADLs, for example, and function on a basic level.

Q.   When you say do their ADLs, what does that mean?

A.   I apologize, the activities of daily living.

Q.   And can people with executive functioning deficits sometimes follow the law?

A.   People with executive functioning deficits most of the time, I think, follow the law.

Q.   You've offered an opinion that Mr. Runyon's brain damage prevents him from making good judgment.  Is it your opinion that Mr. Runyon was destined to commit this crime because of his brain damage?

A.   Oh, not at all, I don't think that's the case.

          MS. WARD:  Objection.  Argumentative.

          THE COURT:  Sustained.

BY MS. ALI:

Q.   You were also cross-examined about your diagnosis of

                    JODY A. STEWART, Official Court Reporter

Nadkarni, S. - Redirect                                    1845

epilepsy in Mr. Runyon.

A.   Yes.

Q.   What evidence do you have for a diagnosis -- supporting a diagnosis of epilepsy?

A.   So I have evidence on his exam of frontal lobe injury, and also a history that's very consistent to an epileptologist, very consistent with epilepsy.

Q.   What symptoms are you referring to?

A.   So he has symptoms of waking up shaking in the middle of the night.  That has to be, you know, considered epilepsy until proven otherwise, and multiple nocturnal episodes of visual hallucinations, strained sensations, typical things that you see in focal epilepsy.

Q.   Does it surprise you that other examiners did not identify a diagnosis of epilepsy for Mr. Runyon?

A.   That does not surprise me because I don't think another epileptologist interviewed him, and probably weren't looking for a possible history of those symptoms.  Or, also, I think a lot of people wouldn't know how to interpret his nocturnal waking and shaking episodes if -- you know, without training in epilepsy, you might not consider it, you might not go there for seizures.

Q.   How does the epilepsy diagnosis fit into your overall picture of Mr. Runyon?

A.   I think it's a consequence of his head injuries, and I

Nadkarni, S. - Redirect                                          1846

think it could exacerbate the same symptomatology as frontal lobe injury has.  So, you know, the thing about these injuries is it's like -- if one tire is flat on a car, you know, the car is not going to function very well, but if something else happens because of that, it's going to function even worse.

So, you know, these are compounding co-morbid -- or not co-morbid, compounding conditions that come together.

MS. ALI:  The Court's indulgence.

Nothing further.

THE COURT:  Well, Dr. Nadkarni, thank you very much for returning today for your testimony.

Is there any need that he may be needed on any kind of recall, Ms. Ali, or can I dismiss him completely from your standpoint?

MS. ALI:  I think we can dismiss him, Your Honor. I just want to raise one matter, which I'm not sure if we should do it while he's on the stand.  It pertains to his testimony.

THE COURT:  Then don't raise it while he's on the stand.  You've got a contract with him, in any event, but I want to check with the United States.

Do you see any need from your standpoint to call him for your case?

MS. WARD:  No, Your Honor.  Thank you.

JODY A. STEWART, Official Court Reporter

1847

THE COURT:  Dr. Nadkarni, if you would step out for a minute, but in case I don't see you again, I thank you very much.  Are you going back to Montclair or is it somewhere else?

THE WITNESS:  Montclair.

THE COURT:  Have a good trip back to Montclair.

THE WITNESS:  Thank you so much.  It's always such a privilege to work with the Federal Government.  So thank you.

THE COURT:  Thank you.

(Witness excused.)

MS. ALI:  I just wanted to say, Your Honor, that the portions of his testimony that were excluded about -- he had put on his materials considered list, and his report contained some material about the 2018 BOP records and the 2018 MRI that the Court determined would be excluded from his testimony.  I just wanted to tell the Court that we intended to submit a proffer on that.  So I can do that before -- I just wanted to raise it while he was still here.

THE COURT:  Go ahead and submit a proffer on that.

MS. ALI:  Okay.  Thank you, Your Honor.

Can I check if the next witness is here, Your Honor?

THE COURT:  No.  You asked to submit a proffer, so submit a proffer on it while he's here.  Didn't you just say

JODY A. STEWART, Official Court Reporter

1848

you wanted to submit a proffer on something with Dr. Nadkarni?

MS. ALI:  Yes, Your Honor.  We were going to submit a written proffer.  We hadn't spoken to him because he was still under oath, and so we haven't had him review and sign it, but we intended to submit it in writing.

THE COURT:  You knew what you were trying to elicit from him.  You've prepped your witness.  We are not going to do things like that, submit a written proffer without any ability to examine the witness.  You prepped the witness. You asked the questions.  You knew what you expected him to say.  Give the Court a proffer.  Now is your opportunity. That's not the way we do proffers.

MS. ALI:  Yes, Your Honor.

THE COURT:  This is a bench hearing, so do you want to call him back in and have him give the proffer under oath and have him examined?

MS. ALI:  Yes, Your Honor.

THE COURT:  Is that the way you want to do it?  We are not going to be filing written proffers after the fact, and then somebody says as a result of that proffer, I want to call so and so.  So let's call him back in, and he is still under oath, and elicit the questions.  They can cross-examine on them.  We are going to finish the witnesses.  We are not going to leave things dangling.

JODY A. STEWART, Official Court Reporter

1849

MS. ALI:  I haven't discussed any of this evidence with him.

THE COURT:  It was part of the testimony you were going to present.  There was an objection, you didn't present it, but you were planning to present it.  So you wouldn't be able to discuss it with him in the middle of his testimony anyway.  So let's just put him on and ask the questions you were going to ask.

This is just part of the presentation that the objection was sustained to, and now you want to put it in a proffer, so that's what we are letting you do.

(Witness took the stand.)

THE COURT:  Dr. Nadkarni, the good news is that we get to see you again.  The bad news for you is that there is a little more testimony that needs to be asked.

BY MS. ALI:

Q.  Dr. Nadkarni, did you review a 2018 -- a set of 2018 BOP records concerning an MRI scan that Mr. Runyon had in 2018?

A.  I did.

Q.  And did you actually see the corresponding images?

A.  I did not.

Q.  Do you know why not?

A.  I wasn't provided a disk of the images.

Q.  And do you recall where the report came from that you reviewed, who prepared it?

1850

A.  I don't recall the name of the doctor, if I could refresh my recollection if I saw the document.  I just don't remember his name.  May have been Dr. Berns maybe.  I can't remember exactly.

Q.  And I'm showing you what's been premarked as Petitioner's Exhibit 161.  Is this the BOP record that you reviewed?

A.  Yes, it is.

Q.  Is this -- what is this document?

A.  This is a report of a brain MRI with and without contrast.

Q.  And does it have a date of when the MRI was taken?

A.  It was done on 4-24-2018.

Q.  And what does the report say about the results of that 2018 MRI?

A.  So it was -- the indications for this study were gait disturbance, meningioma or obstructive hydrocephalus, and it mentions that there is an area of focal loss of brain tissue, called encephalomalacia and associated possible post-hemorrhagic change in the frontal opercular region on the left, region on the left, which means in the frontal lobe where Broca's area is on the left side, there is a hole there in the frontal lobe.

Q.  Could you spell -- you said something area.  Could you repeat that and spell it.

A.  Opercular region, o-p-e-r-c-u-l-a-r.  That's like the

1851

part of the frontal lobe that sort of goes down and around and to the right -- I mean, down and around and underneath on the side of the frontal lobe.

Q.   You started by saying the indications for the study. What does that mean?

A.   That means the reason that somebody wanted to get an MRI.

Q.   And you mentioned that the study finds focal encephalomalacia.  What is that?

A.   That's a hole in the brain that's where tissue has been -- has died or been last.  Loss of brain tissue.

Q.   And is encephalomalacia an abnormal MRI finding?

A.   Encephalomalacia is always abnormal.

Q.   Can encephalomalacia be indicative of a minor brain injury?

A.   Never indicative of a minor brain injury.

Q.   Does the age of the patient have any bearing on that?

A.   When the encephalomalacia occurred, is that the question?

        THE COURT:  Yes, that's the first question.

        THE WITNESS:  The time of the injury, yes.  So if you have encephalomalacia at a young age, that's become compounded problem because the brain still has to develop, and now it's developing and missing a piece of itself.  So that means the development is also going to be abnormal. It's kind of a double whammy, if it happens at a very young age.

1852

BY MS. ALI:

Q.   Once there is a loss of brain tissue, like what you've described, can the brain repair itself?

A.   Never.  That's never going to get filled in.  That's permanently gone brain.

Q.   Can someone with encephalomalacia function normally?

A.   It's unusual.  They can seem superficially to function normally, but if somebody has encephalomalacia, and you do neuropsych testing on them and do neurologic exams on them and diagnostic studies, they will not be normal.

Q.   Is encephalomalacia evidence of a severe traumatic brain injury?

A.   Yes.

Q.   Always?

A.   Encephalomalacia, depending on the location, might be another thing, like if you have a hemorrhage.  It's evidence of a severe injury to the brain.  So if you have a hemorrhage, for example, or a stroke, you can have encephalomalacia.  If you have a tumor that's been cut out in that location, there is going to be encephalomalacia.  In this location where this is, it's almost certainly traumatic in this location.

Q.   Can we pull up the images.  I'm sorry.  Can you go back to the report.  I wanted to ask him one more thing.  Do you see who signed this report?

JODY A. STEWART, Official Court Reporter

1853

A.  So I guess my memory is still somewhat intact.  It looks like Dr. Berns.

Q.  Do you know what kind of doctor Dr. Berns is?

A.  He's a neuroradiologist.

Q.  And how do you know that?

A.  I believe neuroradiologists are generally ones who read these reports, and it was ordered in -- can you go back to the first page.  It was ordered at a radiological place.  So when it's done in this fashion, those are neuroradiologists who read these studies.

        THE COURT:  Would it be a radiologist or a neurologist?

        THE WITNESS:  A neuroradiologist.

        THE COURT:  All right.

        THE WITNESS:  Neuroradiologist is somebody who focuses on brain and spinal cord imaging.

BY MS. ALI:

Q.  Is a neuroradiologist a radiologist with specialized training in reading brain scans?

A.  Right.  So in radiology, there is GI radiologist, cardiac, lungs, you know, musculoskeletal.  A neuroradiologist focuses on the brain and the central nervous system and even the peripheral nervous system, but the nervous system imaging.

Q.  And that report was prepared by a BOP doctor not in

JODY A. STEWART, Official Court Reporter

1854

connection with this litigation; is that correct?

A.   That's correct.

THE COURT:   Is there anything in the report that you reviewed that says when this condition was evident?  Do you have any information whether this particular condition was evident before April 24, 2018, on a scan or from a medical report?

THE WITNESS:   Well, I have seen a reading of a previous study that saw it, but I can't -- based on this image, I can't date when this happened.  All I can say is that it's chronic.

THE COURT:   But you don't know when it happened, based on that study?

THE WITNESS:   Based on this 2018 study, I cannot say exactly when this happened, but I can say that it's chronic.

BY MS. ALI:

Q.   I'm showing you now the images from Mr. Runyon's 2009 MRI scan?

A.   Yes.

Q.   These are the images that you reviewed, and we've looked at on direct; is that correct?

A.   That's correct.

Q.   And do you see the evidence of encephalomalacia on this?

A.   I actually do see it here.  I missed it initially.

JODY A. STEWART, Official Court Reporter

MS. WARD:  At this point, Your Honor, we have gone far afield in what was included in Dr. Nadkarni's written report.

THE COURT:  Show me where it is in the report.

MS. ALI:  It's not in his report, Your Honor.  I was going to question him about that.

THE COURT:  If it's not in his report, you can't go into that now.  You know that.

MS. WARD:  I just point out, Your Honor, none of this about the 2018 scans, none of that was included in Dr. Nadkarni's written report.

MS. ALI:  That's not accurate, Your Honor.  That is in his report.

THE COURT:  Regardless, if this is not included in his report now, he can't go back, and it was not testified to earlier.  So let's just stick with the rules.  Take this off the screen, please.  You said it's not in his report, so move on to whatever else it is you want to ask him about the April 24, 2018, document, which is what you said you needed to have your proffer on.

BY MS. ALI:

Q.  I'm showing you what was admitted as Defendant's Exhibit 137.  This is Page 8.  The report is not paginated.

THE COURT:  Whose report?

MS. ALI:  This is Dr. Nadkarni's report.

JODY A. STEWART, Official Court Reporter

1856

THE COURT:  All right.  I've got to get to the page.  They're not numbered.  I want to see it in the book.  The first page is Page 1 where there is, Dear Ms. Hansen?

MS. ALI:  I believe so, Your Honor.  I'm not sure.  It's the second to last page of the report.

THE COURT:  That would be Page 9 by my count, but go ahead.  I'm on that page.  It's the second to the last page, apparently.  I think the United States is looking for it.

BY MS. ALI:

Q.  Do you discuss in your report, Dr. Nadkarni, the 2018 Bureau of Prisons MRI?

A.  I do.

Q.  And what do you say about it in your report?

A.  I say there is a finding of focal encephalomalacia from that reading.

Q.  Do you also discuss a 2017 CT scan of Mr. Runyon's brain?

A.  Yes, I do.

Q.  And what was the finding there?

A.  There is mention there was a cerebella infarct, a lacunar infarct in the left cerebellum.  So there is an injury to the cerebellum also.  That's also been mentioned in other studies, I believe.

THE COURT:  Let's just stick to what's in the report.

JODY A. STEWART, Official Court Reporter

1857

THE WITNESS:  Yes.

BY MS. ALI:

Q.   And what is a cerebellar/lacunar infarct?

A.   That means that -- infarct means that tissue has died again, same thing, and lacunar means a lake, essentially like a lake.  So it's like a lake of loss of tissue, lake of liquid.  When brain liquefies and dies, you have a little bit of liquid where the CSF, the cerebral spinal fluid, just fills in the space, and we call those lacunar infarcts.

The cerebellum is very susceptible to these in the context of head injury, or in very old age with vascular disease.

Q.   If there were encephalomalacia in the same place on Mr. Runyon's 2009 scan as indicated on the 2018 MRI report that we just reviewed, would that --

THE COURT:  Has he opined that here?  I think that is why we were all here.  He has opined that a 2009 MRI shows this, 2018 shows this, a prison report shows this, and a brain scan in 7-17.  There is nothing in here that I think relates to your question.  You're asking him to draw a conclusion that he hasn't drawn in his report.

MS. ALI:  I'm not, Your Honor.  I'm asking him a hypothetical question.

THE COURT:  It has to be in his report.  You can't just bring somebody in and start asking hypothetical

1858

questions.  It has to be based in the report.

MS. ALI:  Well, it's a hypothetical question to an expert about a piece of information that is in his report.

THE COURT:  He has to have that conclusion in there.  An expert can offer hypothetical opinions in his report, but you just can't start this at this point.  You're going past his report and notice thereof of his opinions.

BY MS. ALI:

Q.  Is the encephalomalacia found on the 2018 scan consistent with Mr. Runyon's history of traumatic brain injury?

A.  Yes.  Yes, it is.

MS. ALI:  Nothing further, Your Honor.

THE COURT:  Cross with the proffer.

MS. WARD:  Just one moment, Your Honor.

No questions, Your Honor.

THE COURT:  I think this is a dismissal, and so, again, have a nice trip back and enjoy your fall.

THE WITNESS:  Thank you so much.  Thank you.

(Witness excused.)

THE COURT:  We will take a 15-minute recess and then resume with your next witness, and you will be able to check on him or her, Ms. Ali.

MS. ALI:  Thank you, Your Honor.

(Recess from 11:32 a.m. to 11:56 a.m.)

THE COURT:  You can call your next witness.

Martell, D. - Direct                                           1859

Everyone is here, including the petitioner.

MS. ALI:  Your Honor, we call Dr. Daniel Martell.

THE COURT:  All right.

(Witness was sworn.)

THE COURT:  Good morning, Dr. Martell.

DANIEL A. MARTELL, PH.D., called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ALI:

Q.  Good morning, Dr. Martell.  Can you please state and spell your name for the record.

A.  My name is Daniel, A-l-l-e-n, Martell, M-a-r-t-e-l-l.

Q.  And what do you do for a living?

A.  I'm a forensic neuropsychologist.

Q.  Can you briefly describe your educational background for us.

A.  I did my undergraduate work at Washington and Jefferson College in Pennsylvania, majoring in psychology.  I then went to the University of Virginia in Charlottesville where I got my master's degree and my Ph.D. and did a minor specialization in behavioral science and the law at the University of Virginia School of Law.

Q.  And do you specialize in a certain subspecialty within psychology?

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1860

A.   Yes.  Neuropsychology.

Q.   Do you have particular training in neuropsychology?

A.   Yes.  I had training at the graduate school level, and then I went to New York University in Bellevue Hospital in New York City for my internship where I trained in neuropsychology there.  And then I did a one-year post-doctoral fellowship also at NYU in Bellevue, and a maximum-security hospital called Kirby Forensic Psychiatry Center where I specialized in -- I established a laboratory and specialized in neuropsychological evaluation.

Q.   Are there any other highlights from your professional background that you feel are relevant to your testimony today?

A.   Perhaps the greatest one is being board certified in forensic psychology.

Q.   And do you research and write in your area of expertise?

A.   Yes, I do.

Q.   Are those publications reflected on your CV?

A.   Yes, they are.

        THE COURT:  Does everyone have the document on their monitor?

        MS. ALI:  No.  I see it back here, but not any of these.

        THE COURT:  Do you have it, Doctor?

        THE WITNESS:  I have it in full screen, yes.


                    JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1861

THE COURT:  I have it in full screen.  But you don't have it on your individual screens?  Do you have it?

MR. SAMUELS:  No, ma'am.

THE COURT:  Do you?

MS. ALI:  No, ma'am.

THE COURT:  Has anybody tripped over a plug or anything?

MS. ALI:  Not to my knowledge.

THE COURT:  Well, it looks like we will have to call IT.  Just call and see if they can come right down, and we will all sit here and hope that it is something minor.

Let's do one little test.  Do you have that on the Elmo right now?

MS. ALI:  No, but I can put it there.

THE COURT:  Put it up, and let's see if it works on the monitors.

MS. ALI:  Okay.  I'll just put one page up.

THE COURT:  Works on mine.  Does it work on yours, Doctor?

THE WITNESS:  Yes.

THE COURT:  It doesn't work on the other screens here.  We will be in recess and stay close by.  As soon as everything is back up, we will convene.

(Recess from 12:06 p.m. to 12:19 p.m.)

THE COURT:  Ms. Ali, I understand everything is

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1862

working now.  You can continue your examination of Dr. Martell.

BY MS. ALI:

Q.  I think the last question I asked you was whether your publications are listed on your CV, and I'm now showing you what's been marked as Petitioner's Exhibit 160.  Do you recall this as a copy of your CV?

A.  I do.

Q.  Is this your current CV?

A.  Yes, it is.

        MS. ALI:  And I'd offer Petitioner's Exhibit 160, Your Honor.

        THE COURT:  All right.  That's admitted.

        (Petitioner's Exhibit 160 received in evidence.)

BY MS. ALI:

Q.  You testified that you're board certified.  What are your board certifications in?

A.  In forensic psychology.

Q.  And have you testified previously as an expert about neuropsychological impairments?

A.  Many, many times.

Q.  Approximately how many?

A.  It's approaching 300 times in my career.

Q.  Did you testify for the defense in all of those cases?

A.  No.

                    JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1863

Q.  A mix of prosecution and defense?

A.  Yes.  It varies from year to year, but I have always worked for both sides throughout my career.

Q.  Does that include in capital cases?

A.  Yes, it does.

Q.  What percentage of your forensic work is in death penalty cases?

A.  That's a good question.  Recently it's been quite a bit. I'd say maybe 60 percent of it.

Q.  And does that include cases in federal court?

A.  It does.

        MS. ALI:  Your Honor, I would offer Dr. Martell as a qualified expert in neuropsychology and forensic psychology.

        THE COURT:  Do you wish to examine him?

        MS. WARD:  No, Your Honor.

        THE COURT:  Then the Court accepts Dr. Martell as an expert in both of those areas.

BY MS. ALI:

Q.  Have you been retained by Mr. Runyon as an expert in his federal *habeas* proceeding?

A.  Yes.

Q.  And was that retention your first involvement in Mr. Runyon's case?

A.  No.

Martell, D. - Direct                                              1864

Q.   When were you first retained in Mr. Runyon's case?

A.   I was first retained by the government back in 2009.

Q.   And coming back to the current proceedings, what were you asked to examine in this case?

A.   Currently?

Q.   Yes.

A.   By whom?

Q.   Well, were you hired again by the government in federal *habeas* proceedings?

A.   Yes, I was.

Q.   And what were you asked to examine then?

A.   It's essentially the same questions.  I think the issue before the Court has changed.  So I was asked to review the neuropsychological testing specifically, and psychological testing, and offer opinions probably in rebuttal regarding whether those would have -- I mean, I guess the issue is ultimately being mitigating had they been presented.

Q.   And once you were retained by Mr. Runyon's *habeas* counsel, did you prepare a report?

A.   I did.

Q.   Can we pull up Exhibit 145.  Do you recall the date of that report?  I can pull it up for you.

A.   I think it's early February of 2023, but I don't know the exact date.

Q.   If it's dated February 3rd, 2023, does that match your

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1865

recollection?

A.   That does.

Q.   And was that February 3, 2023, report a full report?

A.   Well, I normally write a longer report.  We were in the bit of a time crunch, given that I had recently been released by the government and retained by the defense.  So this was produced quickly on the eve of trial and contained a summary of my opinions in the matter.

Q.   And at a high-level, what are those opinions?

A.   After reviewing the neuropsych data, it was my opinion that Mr. Runyon does show signs of brain impairment that's longstanding and fits nicely with the rest of his history and his neuroscientific evidence.  That's the gist of it.

Q.   And do you recognize this Plaintiff's Exhibit 145 as the report you prepared in this case?

A.   Yes.

        MS. ALI:  I'd offer Plaintiff's Exhibit 145.

        MS. WARD:  Your Honor, no objection to the report, but I will just note that this also relies on Dr. Dudley's 2015 area as well as the 2019 moving forward from the Bureau of Prisons' records.

        THE COURT:  All right.  I will admit his report, but the Court's previous rulings in those regards would stand.

        (Defendant's Exhibit 145 received in evidence.)


                        JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1866

BY MS. ALI:

Q.   What did you do to form your opinions in this case, Dr. Martell?

A.   I took a deep dive into the test data from both Dr. Montalbano and Dr. Mirsky.  Dr. Montalbano was the government's expert in the past, and Dr. Mirsky was the Defense Exhibit in the past.  Checking all their scores to be sure the tests were administered properly, that the scores were added up and turned into normative data based on proper norms.

Then I looked to see if the opinions expressed in their reports were consistent with what they had found in their data and with his history.

Q.   Do you recall when Dr. Montalbano and Dr. Mirsky administered the neuropsychological testing you were just referring to?

A.   I believe it was in 2009, and within about four months of each other.

Q.   Is it an accepted practice within the field of neuropsychology to rely on testing data performed by others?

A.   Yes.

Q.   Is that true only in forensic cases or also in clinical practice?

A.   In both.  In clinical practice it's common to have a test technician that actually administers the testing.  The

Martell, D. - Direct                                    1867

neuropsychologist will come in and interview the patient, and then we will take a look at the test data that the technician generates and form opinions and write reports about the patient.

Q.  Did you personally evaluate Mr. Runyon?

A.  I did not.

Q.  Did you ever administer any neuropsychological testing to him?

A.  None whatsoever.

Q.  Are you able to reach opinions to a reasonable degree of scientific certainty based on those other experts' testing data?

A.  I am, and the reason is because neuropsychological testing is highly standardized.  Everybody gives it the exact same weight, and if it's administered properly, any other doctor can rely on it the same way you could rely on a blood test or a brain scan to determine what's going on with someone's cognitive functioning.

Q.  Have you testified in other cases where you did not personally evaluate the defendant?

A.  Yes.

Q.  And you said if it's administered properly, what do you do to check if the test has been administered properly?

A.  I do what I did in this case, which is to go through the data carefully, checking the scores, checking how items were

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1868

rated, and making sure that everything appears proper.

Q.  Are those 2009 data from Drs. Mirsky and Montalbano the primary basis for your opinions in this case?

A.  Yes.  Dr. Mirsky also did testing in 2015.  I don't have access to the raw data from that testing, but he did report all the scores in his report at that time.

Q.  And were those 2009 testing data sufficient for you to reach a conclusion about Mr. Runyon's cognitive functioning?

A.  Yes.

Q.  Is it possible that reviewing other records would change the opinions you offered in your report?

A.  Well, my opinions are based strongly in the data, and I also rely on history.  If pieces of the history were to change, it could have an impact, but mostly in trying to understand what is the root cause of any brain impairment he may have, what's the etiology.

Q.  You said if a piece of the history were to change, that could have an impact.  Would that have an impact on your interpretation of this data?

A.  No.  The data are what they are.

Q.  Were the types of tests that Dr. Montalbano and Dr. Mirsky administered in 2009 appropriate for the purpose of the examination?

A.  Yes, they were.

Q.  Were they the types of tests that experts in the field

Martell, D. - Direct                                                    1869

reasonably rely on to form opinions?

A.   Yes.

Q.   Was there anything in the findings of Dr. Montalbano and Dr. Mirsky that gave you confidence in the reliability of the testing?

A.   Well, there is a few things.  The first is both doctors administered tests to detect any effort at faking or malingering or not doing your best, and Mr. Runyon passed on all of those indicators for both doctors.  So this is one primary thing we always look at in a forensic case because there is such a motivation to malinger or fake a problem that you don't have.  He actually did the opposite.  He put a good shine on himself, tried to do his best on everything.  The other thing that gives me confidence is that both doctors achieved essentially the same findings.

Q.   And what were those findings?

A.   Essentially, Mr. Runyon has a very high IQ.  He functions in the above average to superior range in most all areas with the exception of processing speed.  This was found by Dr. Montalbano where processing speed was the lowest score that he obtained.  And then Dr. Mirsky used different technology, let's say.  He used different tests but got to the same conclusion identifying impairments in attention and concentration for which processing speed is an elemental part.

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1870

Q.  Did the fact that both Dr. Montalbano and Dr. Mirsky found similar deficits bear on your overall conclusion?

A.  Yes.  I consider this to be convergent evidence.  When two doctors working on different sides of the legal system generate the same results, that gives me higher confidence that what they are seeing is real, is the truth.

Q.  Does the fact that Dr. Montalbano and Dr. Mirsky reached different conclusions about that data change anything about your interpretation of the data themselves?

A.  No, it doesn't.  I think, you know, both doctors were careful to note that, you know, additional information could change their opinions, particularly Dr. Montalbano said, you know, he couldn't come to a conclusion, for example, on neuropsychological grounds because he didn't do any neuropsychological testing and said that might show greater insight into his neurocognitive functioning.

Q.  You said Dr. Montalbano didn't do a full battery of neuropsychological testing.  Do you know why not?

A.  Well, I don't believe he was a neuropsychologist or is a neuropsychologist.

Q.  I'm showing you what was previously admitted as Government 55B.  Do you recognize this document?

A.  Yes.  Yes, I do.

Q.  And what is it?

A.  This is the report that Dr. Montalbano prepared in 2009.

Martell, D. - Direct                                              1871

Q.  And you reviewed this in reaching your opinions?

A.  I did.

Q.  And can we pull up what was previously admitted as Defendant's Exhibit 157.  And did you -- do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is the report from 2009 from Dr. Mirsky.

Q.  And did you review and rely on this report in reaching your conclusions?

A.  Yes, I did.

Q.  I'm going to switch to the Elmo.  Do you recognize this document, Dr. Martell?

A.  I do.

Q.  And what is this?

A.  This is the mini mental status examination that Mr. Runyon took with Dr. Montalbano.

Q.  In 2009?

A.  That's correct.

Q.  And do you recognize this document?

A.  I do.

Q.  What is this document?

A.  It's the cover sheet from the validity indicator profile that was administered during the same examination.

Q.  That's another test that Dr. Montalbano administered?

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1872

A.   Yes.  That's specifically a test for faking or malingering.

Q.   And you testified that the results of that examination did not -- what were the results of that examination?

A.   That he was responding honestly but the data are valid.

Q.   And what is this document?

A.   This is the cover sheet from the Minnesota Multiphasic Personality Inventory-2.

Q.   What is that?

A.   It's a big word for a personality test.

Q.   Did Dr. Montalbano also administer this test?

A.   Yes, he did.

Q.   Now, looking at the last one.  Do you recognize this document?

A.   Yes.

Q.   What is this?

A.   This is the front page from the Wexler Adult Intelligence Scale-3 that Dr. Montalbano administered to Mr. Runyon in 2009.

Q.   And what is the -- I'll call it the WAIS?

A.   This is an IQ test.

Q.   And are these the -- when you refer to reviewing Dr. Montalbano's raw data, are those tests that we just reviewed what you're referring to?

A.   Yes, ma'am.

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1873

Q.   And do you recognize this document?

A.   I do.

Q.   Do you know what this is?

A.   I believe those are Dr. Montalbano's notes from his examination.

Q.   Are these Dr. Montalbano's notes or is it the different set -- I can flip through, if that would be helpful.

A.   That might help.  I'm not certain.  Okay.  No, this is Dr. Mirsky's data.  Yeah, sorry.

Q.   And do you have an understanding of what we are looking at on this document?

A.   This is notes that he took for himself that shows the tests that he gave and have some notes about the findings and the summary on one page.

Q.   I'll flip through it, but do you recognize this as the battery of neuropsychological tests that Dr. Mirsky administered?

A.   I do.

Q.   This is the Mirsky raw data from 2009 that you've referred to?

A.   That's correct.

Q.   And did you review and rely on those 2009 data in reaching your opinion?

A.   I did.

Q.   What was significant to you about Dr. Mirsky's test data?

Martell, D. - Direct                                              1874

A.   Well, the things that jumped out were, again, this pattern of a high level of verbal IQ.  He didn't test the entire IQ.  He only gave half the tests essential, but also significant impairments on two tests of the continuous performance test, which is a test of attention, concentration that requires efficient processing speed, and something called the Lafayette Pegboard, which is a fine motor dexterity test.

Q.   You said that Dr. Mirsky didn't test his entire IQ.  Do you know why?

A.   I don't know why.

Q.   Is there something called a practice effect with IQ testing?

A.   There is.  And that could be a reason that he didn't give the performance side, but practice effects involve both parts of the test, and he did give it just four months after Dr. Montalbano.  So, typically -- he knew that Dr. Montalbano had done it, he wouldn't have retested at all.  Typical, the rule of thumb is you wait a year before you give the test again.  So giving it within four months increases the chance that you will get higher scores the second time than you did the first time because of practice.

Q.   And did that happen here with Dr. Mirsky?

A.   Yes.

Q.   He retested the verbal part of the WAIS?

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1875

A.   Yes, he did.

Q.   You've testified that Dr. Montalbano administered IQ testing but didn't do a full battery of neuropsychological tests because he's not a neuropsychologist.  Is a psychologist who is not a neuropsychologist qualified to administer IQ testing?

A.   Absolutely.  That's what we call the standard battery in neuro -- in clinical psychology, is to give an IQ test, personality test, mental status exam, is sort of the building blocks of the clinical psychological exam.

Q.   And was the WAIS-3 the standard IQ testing instrument in 2009?

A.   Yes, it was.

Q.   What does the WAIS-3 measure?

A.   It measures various components of intelligence, of broadly or a full-scale IQ broken down into verbal and performance abilities or verbal and non-verbal, and those are further broke down into things like working memory, processing speed, perceptual organization, that sort of thing.

Q.   Did anything stand out to you about the results of Dr. Montalbano to the administration of the WAIS-3 for Mr. Runyon?

A.   It was valid, and, you know, the thing that stood out to me, especially -- you know, I considered because they are

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                           1876

both given in 2009, I considered Dr. Montalbano and Dr. Mirsky as essentially a single measure of his functioning at that time in 2009, even though two different doctors did it because they both got valid data.

So what was significant to me was that even though Mr. Runyon did quite well on the IQ test, his greatest area of weakness was in that processing speed area, which comports with what Dr. Mirsky found with the continuous performance test.

THE COURT:  What do you mean by processing speed?

THE WITNESS:  The speed at which you can mentally process what's happening.  For example, sitting in court listening to testimony and be able to process what you are hearing, understand what it is, and that you turn to counsel and say that's not right or that's not true, to do that in real-time, and it can be processing for different things, so that's auditory processing.  There could be visual processing, how quickly you can read the newspaper, how quickly you can scan for a certain word in a document. Those things go to the efficiency of your processing, both auditory and visual.

BY MS. ALI:

Q.  Did the processing speed score that Dr. Montalbano found on the WAIS-3 inform your opinions about Mr. Runyon's neural cognitive function?

Martell, D. - Direct                                              1877

A.   It did.  I mean, you know, to me an analogy might be a bodybuilder who's got a world class physique and competes but has an injury in one -- his right arm becomes atrophied.  So his right arm just looks normal where the rest of him is all Mr. America.  His right arm is normal compared to other people, but compared to himself, his right arm is a weakness.  It's an area of impairment, and that's the case here.  Mr. Runyon's IQ is at the 86th percentile, but his processing speed is in the 50s, about 30 points lower.  His highest scores in non-verbal IQ are in the superior range of the 95th percentile, making this difference between his non-verbal abilities and his processing speed even more dramatic.

Q.   Does the fact that Mr. Runyon performed well on other tests that Dr. Montalbano and Dr. Mirsky administered impact your opinion about whether Mr. Runyon is impaired?

A.   No.  Because I know that the data are valid.  I have confidence in that.  The fact that he has this area of impairment, this area of deficit, in the context of otherwise stellar performance, is notable and clinically significant.

Q.   Is reviewing medical records and clinical history part of the standard neuropsychological evaluation?

A.   Yes.

Q.   Did you do that in Mr. Runyon's case?

A.   I did.

Q.   If we could pull his report back up.

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1878

Are the materials you considered listed in your report?

A. They are.

Q. And is that what we are looking at here on the screen?

A. Yes. Those are the materials I reviewed.

Q. Did you find anything notable in Mr. Runyon's medical history?

A. The most notable thing are a series of traumatic brain injuries over the course of his life, beginning when he was 3 years old and was abused by his biological father, and then continuing to a number of sports accidents and car accidents and the blast injury from a grenade going off when he was in military training.

Q. Was this history of head injury important to your overall analysis?

A. It's important because it gives some context into why is it that he has this area of impairment when he's otherwise so highly functioning. What happened to the right arm that made it atrophy?

Q. If I'm understanding right, it doesn't tell you that there are impairments, that he had a history of brain injury?

A. No. It would be possible to have head injuries and not have impairment. But the fact that he does have that history helps us to understand why -- helps us to make sense of the neuropsych pattern that we have, which is -- you know,

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                              1879

processing speed, in particular, is vulnerable to head injury.

Q.   Is the -- are the results of the testing data consistent with the clinical history of head injury that you reviewed?

A.   Yes.

Q.   You've testified that the records you reviewed contained reports of numerous head injuries.  What is the impact of multiple head injuries in cognitive functioning?

A.   Well, if you have a single concussion, and it's not severe, you can generally return to normal within six months, and it's not a big deal.  But if you have multiple concussions, they become cumulative such that you can end up with more significant brain impairment because you had multiple hits.

         If you look at Mohammed Ali when he was a young man, he was verbose and over the top, and by the end of his life, he was quite impaired because of multiple head injuries.  We call this chronic traumatic encephalopathy.  So one head injury is not good but multiple head injuries are worse.

Q.   Can one head injury cause severe cognitive impairment?

A.   Depends on how severe it is.  Mild head injury, no.  But a severe head injury with a lengthy coma and structural brain damage, yes.

Q.   Does Mr. Runyon's clinical history change the way you interpreted the data from Dr. Montalbano and Dr. Mirsky?

Martell, D. - Direct                                           1880

A.   No.  The data are the data.  It just helps to understand the cause of what we see in the data.

Q.   Did anything else inform your opinion that Mr. Runyon suffers from longstanding brain dysfunction?

A.   Well, there were also brain scans, MRI scans done that had findings predominantly of white matter hyperintensities, which are small white spots in the brain matter.  They are very common findings, particularly as people get older, and they are seeing a variety of conditions, like dementia, like head injury, like certain anoxic, lack of oxygen to the brain kind of injuries.  So they are not specific to blast injury or to head injury, but they are commonly seen in those situations.

Q.   Did you actually review Mr. Runyon's 2009 MRI scan yourself, the images?

A.   I looked at them, yes.

Q.   And are you qualified to read MRI scans of the brain?

A.   I've seen enough of them that I can recognize things, but I'm not qualified to interpret it and write a report like a real doctor would do.

Q.   And would that typically be a neuroradiologist?

A.   Yes.

Q.   And do you often, though, review MRI reports or sometimes examine themselves when you are making a neuropsychological assessment?

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                  1881

A.   Quite often.   I rely on the report from the neuroradiologist, but then I also like to take a look at the scan and see if I can see what they see, where the impairment is, to what extent it involves white brain structures, that sort of thing.

Q.   Is that new to you or is that standard practice within the field of neuropsychology?

A.   I think that is quite standard practice.

Q.   What role did your review of the MRI play in your ultimate conclusion about Mr. Runyon's brain dysfunction?

A.   Well, it's another piece of the puzzle in that it shows that his -- there are abnormalities structurally in his brain.   Those abnormalities are consistent with head injury and blast injury in particular.   And those injuries are consistent with the neuropsychological profile that was obtained.   So it converges on the idea that head injury is the cause of the impairments that we see on the neurocognitive battery.

Q.   And what's the basis of your understanding of the significance of the white matter hyperintensities that were found on Mr. Runyon's 2009 MRI scan?

A.   Well, they can be benign.   In other words, you can have them and function pretty normally.   I had a scan some years ago.   I have them.   I think I function fairly normally.   But they can also interfere with cognitive functioning, depending

Martell, D. - Direct                                               1882

on their location and how many of them there are.

Q.  Do white matter hyperintensities tend to increase with age?

A.  They do.

Q.  More likely that somebody who is 80 have them than somebody who is 38?

A.  Correct.

Q.  What were the most important factors leading you to determine that Mr. Runyon suffers from longstanding brain dysfunction?

A.  Well, it would be two things.  One is the history because he's got a longstanding history from age 3 of brain injuries or head injuries, let's say.  And the second is the fact that the neuropsychological testing that Dr. Mirsky gave in 2009 is quite similar to the testing he gave again in 2015.

Some things changed a little.  His continuous performance test got better in many ways, but that deficit and processing speed was stable and reproducible.  And so that tells me that this has been a longstanding area of neuropsychological impairment for Mr. Runyon.

Q.  Can you determine, based on the materials you reviewed, where in the brain the dysfunction Mr. Runyon suffers from?

A.  Impairment and processing speed is generally a frontal lobe function.  The frontal lobes involve the highest level of cognitive functioning in the brain.

Martell, D. - Direct                                                1883

Q.  You testified at the outset that you were first retained by the United States in this case.  Do you recall when that was?

A.  In 2009.

Q.  And do you recall who first contacted you about serving as an expert for the United States in 2009?

A.  I think he is sitting in the room.

Q.  Is that Mr. Samuels here?

A.  Yes, yes, ma'am.

Q.  Do you recall what you were asked to do at the time of trial?

A.  It's been so long, I don't -- I have a specific recollection of what I was asked to do.  I know I was asked to look at the neuropsych data.  I know I was asked to look at a report from Dr. Cunningham and help develop some cross-examination questions at that time.

Q.  And when you referred to the neuropsych data just now, are you referring to the same 2009 data from Dr. Montalbano and Dr. Mirsky that we've been discussing?

A.  Yes.

Q.  And did you review that data at that time?

A.  I did.

Q.  Do you recall whether you were disclosed as a testifying expert by the government at the time of trial?

A.  I don't know that.

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                        1884

Q.  Can we pull up -- I'm sorry, Petitioner's Exhibit 176. This is an August 6, 2009, e-mail.  Do you have an understanding of what's happening in this e-mail?

A.  It looks like the government is turning over the CDs of experts, including me.

Q.  And can you flip to the next page.  I'm sorry.  Can you go to Dr. Martell's CV.  Was that your CV from 2009 attached to that e-mail?

A.  Yes, it was.

Q.  Is your role different when you're hired as a testifying expert versus when you're hired as a consulting expert?

A.  Quite different.

Q.  Can you explain that?

A.  When you're a consulting expert, you're not going to be testifying in the matter.  Your job is to be part of the team and to help that team win.  So I'll advise them on how to cross-examine other experts or strengths and weaknesses or how to proceed in the case, but it's a very collaborative advocacy role.

        When you're hired as a testifying expert, it's completely different.  I'm not part of the team.  I'm there to give an independent opinion based on what I see, and sometimes it helps and sometimes it hurts and most of the times it does both.  And then the job of the attorney that retained me is to decide how I help their case or don't, but

                    JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                          1885

I try not to be an advocate in that situation except for my own opinions.

Q.  Do you recall whether you reviewed any records in connection with your work for the government in advance of Mr. Runyon's trial in 2009?

A.  I know I reviewed some things.  I think it was all sent by e-mail, other than the test data, and that e-mail's been lost because it's been so long.  So I don't know exactly what.  I assume Dr. Cunningham's report was there, and I assume Dr. Montalbano and Dr. Mirsky's reports were there.

Q.  Did you search for those e-mails?

A.  I did.  AOL doesn't archive that far back.

MS. ALI:  Sorry.  I neglected to admit Petitioner's Exhibit 176.  This was the August 6, 2009, e-mail from the government transmitting Dr. Martell's CV that we were just discussing.

THE COURT:  All right.  That's admitted 176, Defendant's Exhibit 176.

(Defendant's Exhibit 176 received in evidence.)

BY MS. ALI:

Q.  If we could pull up Petitioner's Exhibit 201.  Do you recognize this document?

A.  I do.

Q.  What is it?

A.  That's the invoice for my work in August of 2009 on

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1886

Mr. Runyon's case.

Q.   And who were you invoicing?

A.   Mr. Samuels.

Q.   If we could turn to the next page.  Could you describe the entry on this invoice?

A.   It says DAM, that's me, Daniel A. Martell, that on July 27th of 2009, I spent two hours reviewing records.

Q.   Do you have any idea what records those were?

A.   Just what I previously testified to that would have been probably the reports of those three experts.

Q.   And what was the hourly rate?  What was your hourly rate that you were billing in that case in 2009?

A.   $450 an hour.

Q.   If we could turn to the next page.

            THE COURT:  You did not prepare any report?

            THE WITNESS:  I did not.  You didn't ask the question so I'm not going to go beyond that.  I did not prepare a report.

            THE COURT:  Is this your only billing?

            THE WITNESS:  I think there was one other one where I went through the test data.

            THE COURT:  What?

            THE WITNESS:  I analyzed the test data from the doctors.

BY MS. ALI:

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1887

Q.   You can turn to the next page, the prior page.  When is this invoice dated?

A.   This is September 17th of 2009.

Q.   And who are you invoicing in this invoice?

A.   Mr. Samuels again.

Q.   If we could turn to the next page.  Can you describe the entries on this invoice?

A.   So this would be review of the test data.

Q.   Is that the Dr. Montalbano and Dr. Mirsky 2009 testing data that we have been discussing?

A.   Yes.

Q.   And how much time did you spend reading that data?

A.   5.75 hours.

Q.   Is that a typical amount of time you would spend reviewing neuropsychological testing data like what Dr. Montalbano and Dr. Mirsky administered in 2009?

A.   Yes.

Q.   The next entry?  Sorry.

A.   It was record review.

Q.   And what's the date there?

A.   That was on August 17th of 2009, spent an hour.

Q.   And the last entry?

A.   The next date on August 18th, I did some research and then worked on some cross-examination questions for Dr. Cunningham.

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                          1888

Q.   And how much time did you spend doing that?

A.   Two hours.

Q.   So in total do you recall or can you construct from these records how much time you spent on the case in 2009?

A.   About ten hours.

Q.   On the August 18th entry where it says "Research; Cunningham cross-examination," do you know what research you performed?

A.   I anticipated it was research about things that Dr. Cunningham had in his report, looking for countervailing research that might challenge his opinion.

Q.   And were you paid by the United States for your time at trial -- I'm sorry, for your time in 2009?

A.   Yes, I was.

Q.   Did you testify at Mr. Runyon's trial?

A.   No, I did not.

Q.   Do you remember when you were told that the government didn't plan to call you to testify at trial?

A.   Not specifically, but it would have been sometime in July, I believe, certainly sometime near the end of these billing records.

Q.   Would it have been after your last billing record?

A.   That's a fair assumption.  I mean, it's possible because I was asked to take a look at Dr. Cunningham, but my understanding is that the neuropsych defense was withdrawn,

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                              1889

or it wasn't put forward, and then they may have shifted to ask me to look at Dr. Cunningham at that point.

Q.   Were you again retained as an expert in Mr. Runyon's case in his -- in the federal *habeas* proceeding?

A.   I was.

Q.   Who were you retained by initially?

A.   Ms. Cortez, I believe.  I'm sorry -- I was retained by the government again.

Q.   Do you recall when that was?

A.   I think it was early January of 2022.

Q.   And what were you asked to do by the United States in January of 2022?

A.   Basically what I had done back in 2009.  I was asked to take a look at the neuropsych data, look at the reports of the experts then and since, and look for opportunities for rebuttal.

Q.   Do you recall who from the United States contacted you?

A.   I believe it was Ms. Ward.

Q.   And do you recall if the United States provided you any materials to review when you were retained in 2022?

A.   I'm sure they did.  They would all be listed in the -- they may not all be listed in the 2009 report, but yes, they did provide material.

        MS. ALI:  Can you pull up Exhibit 145.

        I'm sorry, Your Honor.  Once again, I neglected to

                JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                    1890

admit Petitioner's Exhibit 201.  These were the 2009 invoices we were just reviewing.

MS. WARD:  Object on relevance, Your Honor.

THE COURT:  I don't know if they matter, but I'll admit them.

(Petitioner's Exhibit 201 received in evidence.)

BY MS. ALI:

Q.  What's the first document listed under the materials reviewed list in your February 2023 report?

A.  Expert synopsis.

Q.  And does it have a date next to it?

A.  It says January 5th, 2022.

Q.  Do you know what that document is referring to?

A.  It was a short document that listed the experts in the case and summarized their opinions.

Q.  Do you recall who provided that document to you?

A.  The government did.

Q.  Do you recognize this as the January 5th, 2022, expert synopsis that we were just discussing?

A.  Yes, I do.

Q.  And can you see at the top there where the claim is listed?  What's the description of the claim there?

A.  "Counsel rendered ineffective assistance by failing to investigate and present mitigating evidence regarding Runyon's psychosocial history, brain damage, and mental

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                               1891

health."

Q.  Do you have an understanding of what the purpose of this document was?

A.  I viewed it as a sort of summary of the history of the case, the opinions of the experts to date to maybe help me get up to speed.

Q.  And the experts who were described here, who is described here, which defense experts?

A.  Dr. Cunningham, Dr. Mirsky, Dr. Merikangas, Dr. Nelson. That's all I can see on this side.  Dr. Dudley, and then Dr. Patterson and Dr. Montalbano.

Q.  Do you recall if you were also sent some materials directly from Mr. Runyon's *habeas* counsel during the period when you were still retained by the United States?

A.  Yes, I did.

Q.  Do you recall what those documents were?

A.  I believe it was Dr. Mirsky's dataset, raw testing data, and the MRI scan on a CD.

Q.  And did you form an opinion of Mr. Runyon's neuropsychological functioning based on your review of those records and testing date while you were under retention by the United States?

A.  I did.

Q.  What was your opinion?

A.  Well, it would be the same opinions that are expressed in

JODY A. STEWART, Official Court Reporter

Martell, D. - Direct                                                      1892

my report.

Q.   And that you testified about today?

A.   Correct.

Q.   Did you share those opinions with counsel for the United States?

A.   I did.

Q.   How common is it that you're retained by one side in a capital case and end up reaching conclusions favorable to the other side?

A.   It's not common, but it happens with some regularity.

Q.   Did the United States ultimately release you as an expert after you told them that you believed Mr. Runyon suffered from longstanding brain dysfunction?

A.   Yes.

Q.   Do you recall when that was?

A.   I'd say sometime in the fall of 2023, just taking a guess.

Q.   Don't guess.

A.   Yeah.

Q.   Were you at some point then retained by Mr. Runyon's counsel?

A.   I was.

Q.   Do you recall --

A.   Yes.  I'm sorry, it would have been early in 2023, like early January.

Martell, D. - Direct                                                1893

Q.   That you were released by the United States?

A.   That I was released and then produced my report later for the hearing, yes.

Q.   How long was that February 2023 report that you testified about?

A.   About four pages.

Q.   And is that typical when you are preparing your report in a capital case?

A.   No.  I usually write a longer report.

Q.   And why didn't you write a longer report in this case?

A.   There just wasn't time to do that.

Q.   Did you, nevertheless, have enough information in February 2023 to state your opinion to a reasonable degree of scientific certainty?

A.   Yes.

Q.   And is your opinion that Mr. Runyon suffers from longstanding brain dysfunction based on facts and data and information that were available to you in 2009?

A.   Yes.

Q.   And had you been asked to offer an opinion based on those facts and data in 2009, would you have reached the same opinions as you've offered today?

         MS. WARD:  Object to that question, Your Honor, as relevance.

         THE COURT:  Overruled.  I'll let him testify to

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                              1894

that.  I mean, he can testify to that.  He would have been the government's witness at that point in time.  But I'll let you ask the question.

BY MS. ALI:

Q.  Would you like me to repeat the question?

A.  That would be nice.

Q.  Had you been asked to offer an opinion based on those facts and data in 2009, would you have reached the same opinions as you've offered today?

A.  I don't think I did reach opinions then, but in retrospect, I would have, yes.

MS. ALI:  Nothing further.

THE COURT:  All right.  Cross-examination.

MS. WARD:  Can I have just one moment?

Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. WARD:

Q.  Good afternoon, Dr. Martell.

A.  Good afternoon.

THE COURT:  I just wanted to ask just one clarifying question on your last answer.  The reason you didn't offer any opinion, I think it was in one of these reports, is that you were an expert for the government, and they didn't need to offer that evidence because the attorneys, the defense attorneys and the defense, were not

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                        1895

presenting that type of mental health, brain damage defense; is that your understanding?

THE WITNESS:  That's exactly right.

THE COURT:  All right.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Martell, you were not given any information, any copies of testimony, letters from David Runyon, anything like that for your review --

A.  No.

Q.  -- is that accurate?

A.  That's correct.

Q.  So your review is restricted to the prior expert testing and then their reports?

A.  That's right.

Q.  Were you given any preliminary reports, testing data, anything like that from Dr. Evan Nelson?

A.  No.

Q.  Or Dr. Scott Bender?

A.  No.

Q.  And, again, you weren't given any of David Runyon's notes that he was writing throughout the course of the trial to his attorneys?

A.  I was not.

Q.  We will focus, I think, primarily on the 2009 reports

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                                    1896

from Dr. Montalbano and Dr. Mirsky.  Both doctors took a self-report from Mr. Runyon; is that true?

A.   Yes.

Q.   And that was the source of the chronology of potential head trauma and brain injury?

A.   It was.

Q.   Were you given any documentation to corroborate any of those incidents?

A.   I didn't see anything to corroborate other than there was consistency of cross-examiners.

Q.   Consistency in that Mr. Runyon reported those incidents to various doctors?

A.   That's right.

Q.   Did you see anything in those reports where Dr. Montalbano or Dr. Mirsky identified corroborating sources?

A.   No.

Q.   And, again, since this time, neither the government nor *habeas* counsel has provided you with any additional information to help corroborate those incidents?

A.   That's correct.

Q.   I want to ask you a question.  You testified that for Mr. Runyon's processing speed is abnormal for him but still fell within normal ranges?

A.   For Dr. Montalbano, yes.

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                              1897

Q.   And can you explain what that means?

A.   Means that his scores were generally in the 50th percentile, which would be absolute normal, but that's compared to others.  When you compare him to himself, to his high-level of functioning, it's a weakness.

Q.   But compared to the general population, it's still fairly normal?

A.   Correct.

Q.   So to identify that as a defect or a dysfunction may be pathologically accurate for Mr. Runyon; is that a fair statement?

A.   Yes.

Q.   But then you would need to look for additional information to show how it manifests as a defect in his functioning; would that be fair?

A.   Well, the testing is the manifestation of it.  I mean, that's how we detected it, is from the testing that was done. So maybe I don't perfectly understand your question.

Q.   To see it manifest in his behaviors, would you be looking for corroboration or social evidence that it had an adverse impact on his behaviors?

A.   It would be good to do that.

Q.   So we are looking at a potential head injury from childhood at the age of 3.  If there was information available to you that he was a very good student, that he did

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                        1898

well in school, that he was well-liked by his teachers, would that be social information that would help you evaluate its impact on him?

A.   Yes.

Q.   And it would possibly be inconsistent with the idea that he is executively dysfunctioned?

A.   Well, you can have executive dysfunction and still do fairly well in school.  I mean, it's clear that he -- he's gifted intellectually, and so it's not a surprise that he did well in school.

Q.   And that he was fairly capable through school, through family, through career?

A.   Like I said, I haven't done a deep dive into that.  I understand he may be underachieved in his career goals and things that he did.  I think he worked for a time as a security guard.  He worked for a time as a police officer. He worked for a time in the military.  And none of it was particularly noteworthy.

Q.   But also not particularly unnoteworthy?

A.   True, I mean, he bombed out in his jobs.

Q.   You testified that evidence of longstanding brain dysfunction for self-reports of potential head injuries would be -- you would place more weight on those where there was common loss of consciousness?

A.   In terms of the severity of the head injury and the

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                                    1899

likelihood of it causing longstanding impairment, yes, and there are some of those that have reports of loss of consciousness.

Q.   But, again, those reports came from Mr. Runyon?

A.   To the best of my knowledge, yes.

Q.   And as far as the age 3 incident with his biological father, on at least one occasion he told one of the experts that you reviewed that he doesn't believe he lost consciousness in that incident?

A.   That's correct.

Q.   But it's also fair to say that at age 3 his memory may not be that reliable?

A.   There is a thing called infantile amnesia where we don't really remember anything before age 3.  He does have some physical stigmata from that assault, I'll call it, which lends some credence to something having happened.

Q.   But he attributed -- it was his self-report that attributed that he had facial asymmetry to that particular incident?

A.   Yes.

Q.   You didn't see any evidence to corroborate that causation?

A.   Only his own self-report.

Q.   Sure.  And a lot of your research focuses on blast injury and traumatic brain injury with service members; is that

Martell, D. - Cross                                                    1900

true?

A.    In the literature that I cite in my report is largely that.  I think I may have put extra emphasis on the blast injury.  At the time I was working with you on this, that seemed to be a salient event, and so that was top of mind when I prepared the report.

Q.    And that's something that you would expect to see some corroborating information.  If a soldier suffered a blast injury, either in training or on duty, you would expect to see some corroborating information about that incident?

A.    I would, yes.

Q.    And did you note any corroborating information in any of the expert reports you reviewed?

A.    I did not.

Q.    Were you provided anything to *habeas* counsel to indicate that there was corroboration?

A.    No.

Q.    So, again, most of these came from Mr. Runyon's self-report?

A.    Yes.

Q.    And when we were talking about this when you were a government expert, we were looking for information that might corroborate these self-reports, to connect these dots from potential incidence into potential dysfunction and to how it manifests for Mr. Runyon's behaviorally; is that fair?

Martell, D. - Cross                                                    1901

A.  Yes.  I probably asked you if we couldn't get military records or something that would reflect whether or not that happened.  I mean, the accounts of it sound legitimate to me, but I don't know for sure.

Q.  Would you agree that all of the experts in this case, even without evidence of corroboration, accepted that Mr. Runyon likely suffered at least one incident of potential head trauma?

A.  Yes.  I think everybody was in agreement of that.

Q.  And they all agreed to look at that to see if it had an impact on his -- well, his behavior?

A.  I don't know about the impact on the behavior as much as just -- certainly his behavior in the neuropsych lab, but I don't know about his behavior in the community.  In terms of the impact of the brain impairment on his behavior in the community, I didn't see a lot connecting those dots except maybe Dr. Montalbano toward the end of his report.

Q.  Most of the experts consistently, the resulting opinion was that he suffered likely some kind of personality disorder?

A.  Yes.

Q.  And manifesting with narcissistic tendencies?

A.  Yes.  People were kind of all over the map on what flavor of personality disorder he had.  But they all felt that there was something amiss about his personality function.

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                           1902

Q.   And at least one of the government experts found that there was nothing so extraordinarily mitigating or aggravating in Mr. Runyon's mental health assessments?

MS. ALI:  Objection.  That's a legal conclusion.

THE COURT:  I couldn't hear the whole question.  I think you said you weren't asking it as his opinion, you were asking if there was anything -- you just have to rephrase the question.  The court reporter asked to repeat. I've asked her to repeat it.

BY MS. WARD:

Q.   I lost my train of thought.  Just one second.  Is it a fair statement to state that the studies involving white matter hyperintensities is still evolving?

A.   Yes.

Q.   We have come a long way since 2009?

A.   We have.

Q.   So assessing the impact of potential white matter hyperintensities in 2009, can you kind of walk us through what that difference -- what we would have been looking for, what these doctors would have been looking for in 2009?

A.   Well, I'll preface my testimony by saying I'm not a neuroradiologist, okay.  So this is based on my knowledge as a neuropsychologist.  I don't want to be practicing medicine without a license.  But back in 2009, white matter hyperintensities were called unidentified bright objects

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                                    1903

among doctors, these little white punctate lesions in the brain. And not much was understood about them, although they were felt to be significant findings.

I think over time they have been documented to occur in specific types of disease, dementia. We mentioned people more likely to have them when they are older, head injuries. The literature that I cite in my report goes to blast injuries. The connection to blast injuries has come up more since the war in Iraq and all the improvised explosive devices that hurt military members.

So that has driven better understanding of those white matter hyperintensities, but I think the jury is still out. There is increasing evidence of their neurocognitive implications where they were -- like I said, sometimes they are benign, sometimes they are not, but when they are present, it is a significant finding that you then correlate with the totality of the circumstances.

Q. In 2009, Dr. Montalbano and Dr. Mirsky render their -- they did their testing, and they rendered their opinion and reports. Do you understand that there was another neurologist involved in the case at that time, Dr. Merikangas?

A. Yes.

Q. Dr. Merikangas was retained by the trial defense team as a pretrial expert?

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                                1904

A.  Yes, he was.

Q.  So to your knowledge and based on your experience, the results and evaluations collected by the neuropsychologist, if it shows like there might be some indicators of a neurological dysfunction, then what would the next step be to do with that information?

A.  Well, I think it stands on its own, but often, especially in death penalty context, there will be enough to get a brain scan to look, can we identify a hole in the Swiss cheese, because that's good for a jury to be able to point, that's the spot.  Often there is no hole, or sometimes there are little hyperintensities, but that's typically what will be done, you know, since about 2000, there will be enough for you to get brain scans in these cases.

Q.  And then the next set would be the neurologist would take over, the neuropsychologist would be that building block that identifies the potential diagnosis; is that fair?

A.  Yes.  The role of the neuropsychologist is really -- you know, because the brain scans show you the structural problems in the brain, but they don't tell you anything about the person's behavior or functioning, and that's where neuropsychology comes in, because we measure memory, attention, intelligence, verbal skills, processing speed, and personality and psychiatric disorder so that we can put some humanity on these machine-generated images.

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                              1905

Q.  And you were asked to review Dr. Merikangas's 2009 preliminary report and then his 2015 report?

A.  Yes.  As I recall, the 2015 is very short.  The 2009 was a little longer.

THE COURT:  Can I ask you a question?  What kind of doctor do you understand Dr. Merikangas to be?

THE WITNESS:  I understand him to be a neurologist.

THE COURT:  As a neuroforensic psychologist?

THE WITNESS:  Right.

THE COURT:  You identify some potential, I think this is right, holes in the Swiss cheese.  Would the next step then be to go to a neurologist?

THE WITNESS:  It could be to a neurologist, because often it's the neurologist that then would refer for the brain scan.  Typically psychologists don't refer for brain scans.  We can.

THE COURT:  That's what I mean.  In other words, the neurologist would then take it a step further to the brain scan?

THE WITNESS:  Correct.  Go to the neurologist who then gets the brain scan and puts the whole picture together.  Sometimes that will be a neurologist.  Sometimes that will be a neuropsychiatrist.

THE COURT:  But if Dr. Merikangas was a neurologist, and then he moved to get the brain scan, PET

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                              1906

scan, whatever, then that is an appropriate professional next step?

THE WITNESS:  Absolutely.  That's typical, both clinically and forensically.

THE COURT:  All right.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Can I use the Elmo?

Dr. Martell, I'm going to show you what's been marked as Government's Exhibit Number 92.

THE COURT:  Can you bring it up on the Elmo.

MS. WARD:  I'm trying, Your Honor.

MS. ALI:  I'll make the same objection we have been making.  I understand the Court has ruled but for preservation of the record.

THE COURT:  Your objection stands, and I overrule it for the same reasons.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Martell, you've had the opportunity to read some of Dr. Merikangas's materials?

A.  I think only his reports.

Q.  Only his report.  You have not seen this document before; is that fair?

A.  That's fair.

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                          1907

Q.   After the neuropsychologist -- and Dr. Merikangas and Dr. Montalbano both caveated their reports that indicated that further neurological testing would be necessary; is that true?

A.   That is true.

Q.   So Dr. Merikangas, as the defense neurologist, would likely be the right person to perform those examinations?

A.   Him or someone like him.

Q.   Would it have informed your opinion to know that after Dr. Merikangas did his examination and ordered the MRI that he found his exam of David was not abnormal?

MS. ALI:  Objection, misleading.

THE COURT:  Ask him to read this and ask him did he know about this and what effect it has on his opinions.

MS. WARD:  Yes, Your Honor.

THE COURT:  Go ahead.  But you are on cross, so you could have led a little bit.  In any event, go ahead and read that, Dr. Martell.

THE WITNESS:  Okay.  I've read it, and I understand it to say that he felt that neurologically Mr. Runyon was normal and that he was not telling him the truth and that absent some very bad injury or defect, he didn't see a defense.

BY MS. WARD:

Q.   And is that opinion something you also would have liked

JODY A. STEWART, Official Court Reporter

Martell, D. - Cross                                                1908

to review before you rendered your opinion here today?

MS. ALI:  Objection, speculation.  I understand the Court's ruled, but I'm making my record.

THE COURT:  He said the way he would interpret it. You can ask him if it would have been nice or not nice, but the point of it is what it is.

THE WITNESS:  Well, that's my answer.  Yes, it does say that.  I did not review it.  I would have liked to consider it.  I don't think it would change my opinion, based on the data, that he has brain abnormality, it just wasn't something that Dr. Merikangas detected with his neurological exam.

BY MS. WARD:

Q.  Fair enough.  Thank you, Dr. Martell.  And when you say you made the finding of brain dysfunction and deficit, the only deficit that was noted in the testing results you reviewed was the deficit in processing speed?

A.  That's the only true deficit.  Dr. Montalbano, I believe, had an error in his report where he had identified a problem with working memory.  He said he was impaired for working memory, but in the same sentence calls out his score at the 83rd percentile, which is not impaired.  So I think that was a typo or a mistake.  I originally caught the impaired part and then saw the score and said, no, that's a mistake.

MS. WARD:  Thank you, Doctor.  I appreciate your

Martell, D. - Redirect                                      1909

time.

          Thank you, Your Honor.

          THE COURT:  Redirect?

          MS. ALI:  Yes, Your Honor.  Just one moment.

                    REDIRECT EXAMINATION

BY MS. ALI:

Q.  Dr. Martell, you were asked on cross about white matter
hyperintensities.  You're not a neuroradiologist, correct?

A.  That's correct.

Q.  And you're not a neurologist?

A.  I am not.

Q.  Your understanding of white matter hyperintensities is
based on reviewing literature; is that correct?

A.  That's wisely correct, yes.

Q.  And some of that is cited in your report?

A.  Yes, it is.

Q.  You were also asked on cross about other experts'
references to personality disorder in Mr. Runyon; is that
right?

A.  Yes.

Q.  Did you evaluate Mr. Runyon for a personality disorder?

A.  No.

Q.  Did you diagnose him with a personality disorder?

A.  No.  We personally don't diagnose people we've never met.

Q.  Have you offered any opinion in this case about whether

                 JODY A. STEWART, Official Court Reporter

Martell, D. - Redirect                                          1910

Mr. Runyon suffers from a diagnosis of mental illness?

A.   I have not.

Q.   Your opinions are limited to verifying and interpreting neuropsychological testing data from both the government and the defense trial experts; is that right?

A.   In this case, yes.

Q.   Your discussion of a personality disorder in your report, is that just describing what other experts have indicated in their own reports?

A.   Yes.  Just so you know, I'm aware of it.  I've looked at that.

Q.   Do you have an understanding of whether personality disorders are diagnoses of exclusion?

A.   They are.  I mean, it's -- you would not diagnose a personality disorder if the problems you see, the behavior you see is better accounted for by a medical condition, a brain injury, some physical problem.

Q.   And is that set forth in the DSM?

A.   It is.

Q.   And what is the DSM?

A.   It's the "Diagnostic and Statistical Manual of Mental Disorders."

Q.   Was brain injury a rule-out for personality disorder in the DSM-IV-TR?

A.   It is to the extent that it would be considered for --

JODY A. STEWART, Official Court Reporter

Martell, D. - Redirect                                    1911

due to another medical condition, which would be the brain
injury.

Q.  Can you please pull up Government's Exhibit 63.

Dr. Martell, we are returning to Dr. Merikangas's
2009 report that you looked at and were asked about.

Could we go to the next page, please.

Do you have an understanding of whether
Dr. Merikangas concluded in this report, based on his
evaluation of Mr. Runyon, whether Mr. Runyon showed no signs
of abnormality or defect?  I can go to the next page.

THE COURT:  No, let him read it.

THE WITNESS:  If I could see the next page, please.
No, I mean, he found a fairly clean neurological exam, but
he did find impaired executive functioning suggesting
frontal lobe impairment as well as psychiatric issues.

THE COURT:  Wait just a minute.  Didn't he say that
the full report would come after further brain imaging?

THE WITNESS:  Yes, he did.

BY MS. ALI:

Q.  And does the finding of impaired executive functioning
suggest a frontal lobe brain impairment consistent with your
finding on the neuropsychological testing?

A.  Yes, it is.

Q.  Can you pull up Government's Exhibit 92.

We are looking again at the memo to file that

JODY A. STEWART, Official Court Reporter

Martell, D. - Redirect                                          1912

Ms. Ward showed you.  Do you have any idea who wrote this document?

A.  No.

Q.  Do you have any idea when it's dated?

A.  No.

Q.  Can you tell from the face of the document whether Dr. Merikangas wrote this document?

A.  Can't tell from that, although I do see it is referencing a call on August 13th of 2009.  So there is a date.

Q.  A call with Dr. Merikangas?

A.  Yes.

Q.  Does that indicate to you whether he is the author of this document?

A.  No.  It sounds like whoever the author was, was not Larry Woodward, but Larry Woodward was present, and Dr. Merikangas was on the call.

Q.  This is not Dr. Merikangas's summarizing his own views, this is somebody else?

THE COURT:  He's agreed to that.  He said that it appears to be a phone call.  This is why we can't keep repeating.  It says it's a phone call on August 13th, 2009, and that Larry Woodward, with Dr. Merikangas and somebody else, and Larry Woodward would have been there.

MS. ALI:  I'll move on, Your Honor.

THE COURT:  Yes.  That's what he said.  Is that

JODY A. STEWART, Official Court Reporter

Martell, D. - Redirect                                              1913

what you said?

THE WITNESS:  That is what I said, yeah.

BY MS. ALI:

Q.  Ms. Ward asked you whether the only deficit noted on the testing data from Dr. Montalbano and Dr. Mirsky was processing speed.  Was that deficit enough for you to conclude that Mr. Runyon suffered from brain dysfunction?

A.  It's enough in itself, given the disparity and the consistency over time, but I failed to include the Lafayette Pegboard, which was not indicator of something amiss in his brain function.

THE COURT:  What's the Lafayette Pegboard?

THE WITNESS:  So a fine motor test where they put little pegs into a board.  If you are working putting chocolates in a box like Lucy in the "I Love Lucy" show, those kind of fine motor coordination things are important for your occupational therapy and ability to function.  So this doesn't go to higher order cognitive processing, but it does go to differences on the two sides of the brain and the motor strip.

BY MS. ALI:

Q.  Ms. Ward asked you about certain records that you didn't have or might have wanted to review.  You didn't review other materials beyond what's listed in your report; is that right?

A.  That's correct.

JODY A. STEWART, Official Court Reporter

1914

Q.   And so you don't know whether there is or isn't corroboration for any particular fact that Ms. Ward asked you?

A.   I don't know.  I just know if there is, I haven't seen it.

MS. ALI:  That's all I have, Your Honor.

THE COURT:  All right.  Does anyone anticipate needing Dr. Martell further?

Ms. Ali?

MS. ALI:  No, Your Honor.

MR. SAMUELS:  No, Your Honor.

THE COURT:  Dr. Martell, thank you very much for coming to testify, and I know that you've got a function this evening?

THE WITNESS:  I've got a flight to Dallas.  I'm testifying in another matter tomorrow.

THE COURT:  Well, I hope that everything goes well, and I wish you a safe trip.  Again, we appreciate you coming here to testify.

THE WITNESS:  Most welcome.  Thank you.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Let me ask you, before you call the next person in, who is going to be your next witness?

MS. ALI:  Dr. Merikangas, Your Honor.  That went a

JODY A. STEWART, Official Court Reporter

1915

little faster.  I think he is here.  I'm not a hundred percent sure, but if we can have a few minutes just to make sure.

THE COURT:  Well, what I'm trying to decide is whether we take a 30-minute luncheon recess or whether we start with the witness.  That's the reason for my question.

MS. ALI:  Your Honor, whatever you would like.

THE COURT:  If he is here, let's go ahead and start him, and then we will look to taking a recess at the appropriate time a little later.

MS. ALI:  I apologize.  I left my Merikangas materials in the other room.  It will take me just a minute. I was not expecting to be quite thorough with Dr. Martell. I'm happy we were.

THE COURT:  Let's take a 30-minute luncheon recess, and everybody get ready for the examination of Dr. Merikangas.

(Luncheon recess from 1:36 p.m. to 2:12 p.m.)

THE COURT:  All right.  Ms. Ali.

MS. ALI:  We call Dr. Merikangas.

THE COURT:  Dr. Merikangas, would you please come forward.

(Witness was sworn.)

JAMES R. MERIKANGAS, M.D., called by the Defendant, having been first duly sworn, was examined and testified as

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1916

follows:

                       DIRECT EXAMINATION

BY MS. ALI:

Q.  Good afternoon, Dr. Merikangas.  Could you please
introduce yourself and spell your last name for the court
reporter.

A.  James Merikangas, M-e-r-i-k-a-n-g-a-s.  I'm a medical
doctor.

Q.  And what kind of medical doctor are you?

A.  I'm a neurologist and a psychiatrist.

Q.  And fair to call you a neuropsychiatrist?

A.  Yes.

Q.  What does a neuropsychiatrist do?

A.  Diagnoses and treats people who have disorders of the
brain or the spine or the peripheral nerves, but particular
emphasis on psychiatric manifestations of brain disease, but
also diseases like epilepsy, Alzheimer, multiple sclerosis,
and genital problems, cerebral palsy, traumatic brain
injuries.

          THE COURT:  Can you speak up just a little bit,
Doctor.

BY MS. ALI:

Q.  Is neuropsychiatry a combination of neurology and
psychiatry?

A.  Yes.

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                            1917

Q.   How is that different from psychiatry without the neuro
in front of him?

A.   Psychiatrists are medical doctors who don't do physicals,
don't do blood tests, don't do brain imaging, and primarily
deal with what you might call talk therapy or giving
psychotropic drugs.

Q.   Can you very briefly give us the highlights of your
educational background.

A.   I have a Bachelor of Science degree in physics, all in
which I served in the U.S. Navy.  They sent me to guided
missile school and nuclear weapons school.  After that I did
a year of postgraduate studies for premed, and then I went to
Johns Hopkins where I got my medical degree.  I then went to
Yale where I studied psychiatry and neurology.

      Then I became chief resident in neurology at Yale in
1973.  I then joined the faculty of the University of
Pittsburgh where I ran the emergency room, psychiatric
emergency room, EHE lab and diagnostic clinic, the brief
treatment unit.

      I then returned to Yale, joined the faculty, was in
practice there for about 25 years doing neurology and
psychiatry.  I then moved to the Washington, D.C. area,
joined the faculty first at Georgetown and now at George
Washington University where I'm clinical professor of
psychiatry and behavioral science.

Merikangas, J. - Direct                                          1918

Q.  For most of your career did you have a clinical practice where you saw patients?

A.  That was the majority of my career, yes.  But all that time I was also on faculty teaching.

Q.  Do you hold any board certifications?

A.  I'm board certified in neurology and board certified in psychiatry.

Q.  What's the significance of a board certification?

A.  Board certification is the additional credential after one has completed authorized specialty training, passed the written exam, and in my day passed the oral examination to say that you are actually an expert recognized by your peers in that specialty.

Q.  Can you pull up Petitioner's Exhibit 155, please.

    Dr. Merikangas, do you recognize this document?

A.  It's a copy of my curriculum vitae.

Q.  And when is it dated?

A.  2020.

Q.  Have there been any significant changes since then?

A.  Nothing significant.

    MS. ALI:  Your Honor, I'd move for admission of Petitioner's Exhibit 155.

    THE COURT:  All right.  It's admitted.

    (Defendant's Exhibit 155 received in evidence.)

BY MS. ALI:

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1919

Q.   Have you published any articles in scientific journals,
Dr. Merikangas?

A.   Yes.

Q.   And are those listed on your CV?

A.   Yes.

Q.   How about book chapters?

A.   I have, yes.

Q.   And are those also listed on your CV?

A.   Yes.

Q.   Have you ever been invited to give presentations or
lectures on the topic of traumatic brain injury?

A.   Yes.

Q.   Were any of those lectures about traumatic brain injury
in children?

A.   Yes.

Q.   Are those also listed on your CV?

A.   Yes.

Q.   Have you previously testified as an expert in the field
of neuropsychiatry?

A.   Yes.

Q.   Approximately how many times?

A.   Probably a hundred or so.

Q.   And is that in both state and Federal Court?

A.   Yes.

Q.   Have you ever testified for the prosecution in a criminal

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                         1920

case?

A.   Yes.

Q.   Have you ever testified for the prosecution in a capital case?

A.   Yes.

Q.   Did those cases involve questions about the defendant's brain function?

A.   Yes.

        MS. ALI:  Your Honor, at this time I would tender Dr. Merikangas to the Court as an expert in the field of neuropsychiatry.

        THE COURT:  Do you wish to examine?

        MR. SAMUELS:  I don't, Your Honor.

        THE COURT:  I qualify him as a neurologist and a psychiatrist and thereby a neuropsychiatrist.

BY MS. ALI:

Q.   Dr. Merikangas, do you recall when you were first contacted about this case?

A.   In 2009.

Q.   And who were you contacted by?

A.   I believe a mitigation specialist, Ms. Cronin, I think her name was.

Q.   What was your understanding of what your role in the case -- were you retained at that time?

A.   I wasn't retained immediately.

                  JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1921

Q.  Did you have an understanding of what you might be asked to do in this case?

A.  My understanding, my -- my idea was I'd be asked to deal with the mental problems of the defendant; brain problems or psychiatric problems.

Q.  You said you weren't retained right away.  Do you know why not?

A.  No.

Q.  Do you have a recollection of when you actually started working earnest on the case?

A.  After his conviction.

Q.  Could we pull up what was previously admitted as Petitioner's Exhibit 117.

        Can you see that, Dr. Merikangas?

A.  I see it now.

Q.  And is this -- what is this document?

A.  This is an e-mail to several potential witnesses.

Q.  And what's the date on that e-mail?

A.  It's July 22nd, 2009.

Q.  And who is sending this e-mail?

A.  Stephen Hudgins.

Q.  And what does it indicate as to the status of Mr. Runyon's case?

A.  That he was eligible for the death penalty.

Q.  Does it list a date -- a deadline for when mental health

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                            1922

reports are due?

A.  August 6, 2009.

Q.  That's about two weeks after the date of this e-mail; is that right?

A.  That's right.

Q.  That's two weeks to get to the jail to see Mr. Runyon, conduct your evaluation, and write your report?

            MR. SAMUELS:  Object to the leading, Your Honor.

            THE COURT:  Sustained.

            THE WITNESS:  Yes.

BY MS. ALI:

Q.  Is that a typical amount of time that you typically have to conduct an evaluation and prepare a report in a capital case?

A.  No.

Q.  Is it shorter or longer?

A.  Much shorter.

Q.  Did you examine Mr. Runyon in 2009?

A.  I did.

Q.  And did you prepare a report summarizing the findings of that examination?

A.  Only a preliminary report.

Q.  I'll show you what was previously admitted as Government's Exhibit 63, was also admitted as Defense Exhibit 21.

Merikangas, J. - Direct                                              1923

Do you recognize this as the preliminary report that you prepared in Mr. Runyon's case in 2009?

A.   Yes.

Q.   When is it dated?

A.   August 5th, 2009.

Q.   And is this the only report you prepared in Mr. Runyon's case in 2009?

A.   Yes.

Q.   You said that this was a preliminary report only.  How do you know that this report was meant to be preliminary?

A.   Because it states it in the report.

Q.   Did you prepare this report after you examined Mr. Runyon?

A.   Yes.

Q.   Do you recall when you examined Mr. Runyon or can you determine that from the report?

A.   It says in the report it was July 29th, 2009.

Q.   And where did that examination take place?

A.   In the Portsmouth City Jail.

Q.   Prior to conducting the examination, did you review any materials or sources?

A.   I reviewed two reports.

Q.   And which reports were those?

A.   A psychologist, Paul Montalbano; and psychiatrist, Raymond Patterson.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1924

Q.   What did your July 29th, 2009, examination of Mr. Runyon involve?

A.   It involved doing a neurologic examination, which is a specialized kind of physical examination, neurologic examination.

Q.   What's the purpose of a neurological examination?

A.   It's to try to determine what, if anything, is wrong with the brain by looking at the body and having certain tests for reflexes, sensation, coordination, and the ability to perform tasks.

Q.   What information do the results of a neurological examination provide that neuropsychological testing does not?

A.   Neuropsychological testing is a test which is done with speech or with pencil and paper kind of testing, which does not actually touch the body, doesn't test reflexes, doesn't test sensation, doesn't test the cranial nerves, doesn't do brain imaging, doesn't do blood tests, all of which are done by neurologists.

Q.   What information do the results of a neurological exam provide that brain imaging does not?

A.   Braining imaging gives you -- depending on which kind -- gives you a anatomic picture or a functional picture or a picture of electrical activity of the brain.

        The physical examination actually looks at what we call input/output exam where you give a reflex, sends a

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1925

signal to the nervous system, which gives a response --
excuse me, or asks the patient to do a task, like walking or
touching your finger, touching his nose, going back and
forth, or examining the cranial nerves, for instance, seeing
whether his sense of smell is intact, testing their eyes,
their vision, eye motion, swallowing, a whole bunch of
standardized features.

Q.   You said that some brain imaging showed the anatomy of
the brain.  What kind of imaging does that?

A.   A CAT scan or MRI scan.

Q.   And you said that other brain imaging shows the
functional or the function of the brain.  What kind of
imaging is that?

A.   A PET scan, positron emission tomogram is one type.

Q.   And finally you said that other kinds of brain scans show
the electrical function of the brain.  What is that?

A.   Electroencephalogram measures the resting, electrical,
spontaneous activity of the brain.

Q.   And is that sometimes referred to as an EEG?

A.   Yes.

Q.   Does a neurological exam typically follow a standard
pattern?

A.   It's very stereotypic, yes.

Q.   And is that just your practice or is that standard within
the field of neurology?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                              1926

A.   That's standard in the field of neurology.

Q.   Did you follow that stereotypic pattern when you examined Mr. Runyon?

A.   Generally, but within limitations caused by his being in jail, probably wearing a jumpsuit.

Q.   And why is it that neurologic examinations are typically performed the same way each time?

A.   Well, because they are very complicated.  They involve a lot of different tests, and if you don't do it in the same way each time, you are going to forget something.

Q.   And is it fair to describe it as sort of a ritual?

A.   Yes.

Q.   And is this your ritual or is this -- do all neurologists basically follow the same ritual?

A.   Well, it's ritual as followed by all neurologists, and I know this because I used to administer the board exam in neurology and see whether people knew how to do this ritual.

Q.   Do you change what you do during the neurologic examination based on information you may have learned about the person being examined in advance of the exam, for example, through medical records?

A.   I do.

Q.   Do you still conduct the full neurologic exam regardless of what you see in the record?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1927

Q.  So in what way do you change what you might do based on the record?

A.  Well, you may want to be a little more detailed.  If you have information of a specific kind of lesion or disability or disease already, then you might want to further investigate the features of that particular disease.

Q.  Did you make certain observations of Mr. Runyon during your examination of him in 2009?

A.  I did.

Q.  Let's start with your physical observations, if we can. Did you note anything about his face or head?

A.  His head was smaller than normal.  It was 57 and a half centimeters in circumference.

Q.  Anything else?

A.  That he had lots of scars on his head and face, and that the shape of his face -- the shape of his eye and his lip were different than normal.

Q.  Is that the description of his forehead not wrinkling, his facial expression, and the lip sagging that you describe in your report?

A.  Yes.

Q.  Is that abnormal?

A.  Yes.

Q.  Does it tell you anything about his neurocognitive functioning?

Merikangas, J. - Direct                                          1928

A.   Not really.

Q.   Did you draw any conclusions about what caused this facial asymmetry?

A.   I had a thought that because he had been injured multiple times, this was a peripheral nerve injury.  I did not rule out that it was a brain injury.

Q.   And did Mr. Runyon tell you that he had been -- that the asymmetry had resulted in an injury?

          MR. SAMUELS:  Object to the leading, Your Honor.

          THE COURT:  Sustained.

BY MS. ALI:

Q.   How did you come to understand that Mr. Runyon's facial asymmetry was caused by an injury?

A.   It was mentioned in the reports that I had read by Montalbano and Patterson, and it was confirmed by my questioning of Mr. Runyon.

Q.   To sustain a peripheral nerve injury that causes permanent facial asymmetry, how significant would the trauma have to be?

A.   It would be very significant because the nerves in the face are contained within the skull and to provide the innervation to the muscles that control your eyes and your face and your lips.

Q.   And what part of the body would the trauma be to sustain an injury like that?

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1929

A.  To the face and head.

Q.  You testified just a moment ago that your understanding that the facial asymmetry likely resulted from an injury -- an injury when Mr. Runyon was a child comes from other expert reports and statements from witnesses.  Are those the sorts of things that experts in your field would typically rely on to ascertain the cause of an injury like this?

A.  Yes.  Doctors almost always rely on the history told to them by the patient and previous medical records, if they are available, or if not available, collateral information from people who observed the patient in other settings.

Q.  And what is your understanding of the incident that caused Mr. Runyon's facial asymmetry?

A.  That when he was a toddler, his father threw him against the furniture, striking his head and face and causing damage to the peripheral nerve.

       MR. SAMUELS:  Your Honor, I'll object to that unless he knew that at that time because I don't see that listed in his report.

       THE COURT:  Sustained.  Ask him how he knows it.

BY MS. ALI:

Q.  And how did you come to that understanding, Dr. Merikangas?

A.  Because it was in the reports of others, and not everything that I observed is listed in this preliminary

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1930

report.

Q.  And when you say the reports of others, are those the reports that are listed in your report?

A.  Montalbano and Patterson.

Q.  And is the incident that you just described consistent with the facial asymmetry you observed of Mr. Runyon?

A.  Yes.

Q.  Can facial asymmetry like what you noted in your report also result directly from a brain injury?

A.  Yes.

THE COURT:  You say would or could?

MS. ALI:  Could.

THE COURT:  I was clarifying.

BY MS. ALI:

Q.  Would there be a way to determine whether the cause was brain damage or to rule out nerve damage?

A.  Yes.

Q.  How might you do that?

A.  Several ways.  One is to do an electromyogram and nerve conduction study.  The other is to do brain imaging with a CAT scan or an MRI scan.

Q.  And is an electromyogram sometimes referred to as an EMG?

A.  Yes.

Q.  If an EMG determined that there was no nerve damage to the 7th cranial nerve, would that rule out nerve damage as

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1931

the cause of facial asymmetry?

A.   It would rule out local nerve damage, but it wouldn't rule out brain damage that innervates that nerve.

Q.   Moving on from the physical observations, what was the next step of your exam?

A.   The test of his reflexes, his cranial nerves, his sensation, his strength, coordination, were all parts of the exam after that.

Q.   What are the cranial nerves?

A.   The nerves in the head.  Cranial one is the nerve of smell, the olfactory nerve.  Two is vision.  Three, four and six are eye motions.  Five is also muscles to the face, and seven is facial expression.  Eight is the nerve of hearing, which has two parts, the vestibular and the acoustic.  Nine, 10, 11 and 12 have to do with swallowing and speech, and the vagus nerve, which innervates some of the internal organs.

Q.   And what did you observe regarding Mr. Runyon's cranial nerves?

A.   That except for the ones that had to do with the facial asymmetry, they were normal.

Q.   And which cranial nerve has to do with facial asymmetry?

A.   Five and seven.

Q.   Does that mean that Mr. Runyon does not have brain damage?

A.   I'm sorry.  I didn't hear.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1932

THE COURT:  Just ask him what does it mean.  Just explain to us.  You've got this paragraph in words, Doctor.  What does it mean?  Where do you mention the particular cranial nerves?

THE WITNESS:  His cranial nerves, of which there are 12 pairs, including sense of smell, were normal except as noted above, in other words, as noted in the facial asymmetry, which are five and seven.  In other words, this preliminary examination is written so that other neurologists would understand.  It's not written for laymen to read and try to figure out.

THE COURT:  Because that's C5 and 7 listed there.

THE WITNESS:  That's because they aren't listed, but they have to do with the facial asymmetry.

THE COURT:  All right.

BY MS. ALI:

Q.  After testing the cranial nerves, what's next in the exam?

A.  I tested his ability to walk, his gait, his station, which is how can he stand, and his muscular strength with moving his arms, squeezing my fingers with his hands, and his reflexes, deep tendon reflexes and pathological reflexes.

Q.  Did you make any observations regarding Mr. Runyon's deep tendon reflexes?

A.  They were all increased.  They were not normal.  They

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1933

were hyperreflexia.

Q.  What, if anything, does that tell you about Mr. Runyon's
neurocognitive functioning?

          MR. SAMUELS:  Your Honor, I'm going to object
unless it's in the report.

          THE COURT:  He just said he observed that.  I'll
let you ask him.  This is a preliminary report, and he
didn't tell the attorneys or anybody what it meant.  He ends
up with certain things were normal and certain were this,
and then he gives an impression, and then he says he needs
further testing.  So what is your question?  What does it
mean, but don't tell him what it means in your question.

          MS. ALI:  My question was what, if anything, did
that tell you about Mr. Runyon's cognitive functioning?

          THE WITNESS:  That he suffers from disinhibition
from the central nervous system; namely, the brain, to the
peripheral nervous system; namely, the spinal cord and the
nerves that control his reflexes.

BY MS. ALI:

Q.  When you say disinhibition, do you mean motor function?

A.  Yes.

Q.  And does that have any impact more generally?

A.  Yes.

Q.  Can you describe that for us?

          MR. SAMUELS:  Your Honor, I know he's going to

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1934

describe.  I understand the Court's ruling.  I just want to object for the record.  This is not in the report.  There is no reference to disinhibition or anything like that.

THE COURT:  I agree.  There isn't.  He's given a preliminary report that just goes to Mr. Hudgins.  Then there was never any final report to the Court.  There are discussions, but did you do an updated report?

THE WITNESS:  No, Your Honor.

THE COURT:  Go ahead.

MS. ALI:  Well, Your Honor, I have a response to that.  I don't want to argue it in front of the witness, but about the report and its relevance for the proceedings.

THE COURT:  Well, you may be able to go into it later, but let's get to the crux of this.  Let's follow through what he did here and what occurred, and then if you've got good reason to follow up on things, we can take that up later, okay.

MS. ALI:  I understand, Your Honor.  I'm trying to get him to explain -- I agree with you that it's difficult to understand from the face of the report.

THE COURT:  Not difficult to understand.  It's just that it's a preliminary report that doesn't take it to the next level, and he says why he doesn't take it to the next level.  I can understand it.  He didn't reach conclusions here about it.  Now you are asking him for conclusions about

Merikangas, J. - Direct                                    1935

it, and he didn't reach conclusions in this report other than to say that some things were normal, something was hyperextendable, and I let you ask if that was motor function.  Just keep on proceeding on what he did.

MS. ALI:  Yes, Your Honor.

THE COURT:  Then we'll come back later if you need to follow up on things.

MS. ALI:  I understand, Your Honor.  I'm trying to elicit from him based on his experience and expertise in the field of neuropsychiatry what these things in his report mean and the implications of them.  He lists the findings from his neurological exam and report.  He's simply testifying based on his experience what it means.

THE COURT:  *Habeas* counsel listed him as an expert in 2015, and you've listed him as an expert here.  If you've got expert reports that say this, then ask about those.  In other words, you're trying to make explanations for something back in 2009, but you had him as an expert in 2015.  You've listed him as an expert now.  If you have expert reports that were made for the previous *habeas* counsel in 2015, and knew, then ask questions about those.

But don't ask him what he meant back in 2009 written to an attorney because it is what it is.  It's a preliminary report, and it says what it says.  He doesn't interpret it.  So don't ask him now because he did not give

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1936

that information to the attorneys in 2009 in his report.  If you've got a report that is from 2015 or even now that draws conclusions, go for it.  You can ask him those things.  But not based on a preliminary report, what did you mean, if he didn't say what he meant to the attorneys at the time.  That was the attorney he was writing to.  He was writing to Mr. Hudgins.

MS. ALI:  Again, I don't want to make my argument in front of the witness, Your Honor, but I think this goes to the core of the proceedings.

THE COURT:  I think it does, too, so don't argue in front the witness.  Go ahead.  I told you how to proceed.  You can go ahead chronologically with what happened.  You can ask him questions.  If you have an expert report, and you have follow-up on this, then you're entitled to do so.  Nobody is excluding you from that, Ms. Ali.

Nobody is excluding you from asking about any updated expert report that you produced and have done in 2015, any representations that were made to the Fourth Circuit from that report, and any current report you have.  You may certainly ask about them.  The Court gives you free rein in that regard as long as it's in the report.  But you're taking a 2009 report and trying to extrapolate from it things that are not here.  That is my ruling.

BY MS. ALI:

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1937

Q.   Did you also make a preliminary psychiatric observation when you evaluated Mr. Runyon in 2009 in addition to your neurologic exam?

A.   I think the next page shows that.  I did.

Q.   Did you make a preliminary psychiatric observation in addition to your neurologic exam?

A.   Yes.

Q.   And what did you conclude?

A.   I concluded that he had a psychiatric problem, that he had -- I stated -- may I quote what it says?  "He personally is either in a fantasy world of grandiose wishful thinking or suffering from delusions.  He clearly has impaired executive functioning suggestive of frontal lobe brain impairment."

THE COURT:  What is your next sentence, Doctor?

THE WITNESS:  "Full report will follow the results of his brain imaging."

BY MS. ALI:

Q.   You testified that this was just a preliminary report. Did you, nevertheless, have enough information to make preliminary findings regarding Mr. Runyon's brain functioning?

A.   Yes.

Q.   And what were those preliminary findings?

THE COURT:  Well, where are they?

MS. ALI:  The next sentence, Your Honor.  Second to

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                      1938

last sentence of his report.

THE COURT:  Well, he read the last sentence.

MS. ALI:  The sentence -- I don't want to testify for the witness, Your Honor, but it's the second to last sentence of the report that I'm asking about.

THE COURT:  He just read that.

MS. ALI:  I'm sorry.  I missed it.  I heard him read the sentence prior to that.

THE COURT:  He read -- he started with the sentence, basically, "He presently."  Isn't that the sentence you started with?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And read through to the end.

MS. ALI:  Okay.  I apologize, Your Honor.  I missed the executive functioning sentence.

THE COURT:  He did read that.

BY MS. ALI:

Q.  What was your understanding in 2009 at the time you prepared your preliminary report with respect to whether Mr. Runyon was brain damaged?

A.  That he was clearly brain damaged, and that it impaired his executive functioning, and that usually refers to frontal lobe impairment, and that he suffered from delusions.

Q.  And what was the basis of those findings?

A.  My clinical impression, from seeing hundreds of patients

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                    1939

and interviewing them and the information contained in the
reports of Montalbano and Patterson, which describe the
symptoms of those conditions but failed to give the
conclusions that they would result in.

Q.  And are those the kinds of facts or data that experts in
the field of neuropsychiatry typically rely on?

A.  I typically consult a neuropsychologist to quantify
different aspects of brain functioning, yes.

Q.  Do you have training to assess when self-reporting is
accurate?

A.  Yes.

Q.  Is that sort of standard part of neurological
examinations?

A.  Yes.

Q.  What are the typical hallmarks of impaired executive
functioning?

A.  Executive functioning covers a lot of things.  The
hallmarks are poor planning, poor impulse control, poor
judgment.

        MR. SAMUELS:  Again, I'm going to object because
it's not in the report.  I know it may be in another report,
and maybe he can describe that when we get to the other
report, but it's not in 2009, which has been written not to
another neurologist but to Mr. Hudgins.

        THE COURT:  Sustained.

Merikangas, J. - Direct                                          1940

BY MS. ALI:

Q.  You've testified that your 2009 report was not a final report.  Why was that?

A.  Because I indicated that I wanted to get an MRI scan and a PET scan of Mr. Runyon's brain to try to find objective evidence through the things that had been discovered on physical exam and neuropsychological testing and my psychiatric impression in order that I could then produce a report which would further describe his impairments.

Q.  And did you, in fact, order brain imaging after your examination?

A.  I did.

Q.  Do you know if an MRI scan was completed in 2009?

A.  It was.

Q.  Do you know if a PET scan was completed in 2009?

A.  It was.

Q.  Do you know if an EEG was performed in 2009?

A.  It was not.

Q.  Showing you what was previously admitted as Petitioner's Exhibit 93.  Do you recognize this document?

A.  Yes.

Q.  Is that your letterhead and that is your handwriting?

A.  Yes.

Q.  And what is this?

A.  It's a transmittal form for the prescriptions for the MRI

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                                          1941

and the PET scan.

Q.   Is there a date on there?

A.   It is the 30th of July 2009.

Q.   Was that the day after you examined Mr. Runyon?

A.   Yes.

Q.   Do you see at the bottom -- I'm sorry.  Can you go to the next page.

Do you see at the bottom -- did you -- where it says "Note:  Please give copy of films or CD images," and something's crossed out there?

A.   Yes.

Q.   Did you cross out "to patient"?

A.   Yes.

Q.   And what did you write there?

A.   I said to give a copy to me, to Dr. Merikangas.

Q.   Was that your typical practice?

A.   Yes.

Q.   Why?

A.   Because I always look at my own scans.

Q.   Do you mean as opposed to just reviewing a report?

A.   Yes.

Q.   Do you know if you received those 2009 MRI scans in 2009?

A.   I do now.

Q.   Do you specifically -- do you have an independent recollection of that?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                              1942

A.   No.

Q.   I'll show you what's been marked as Petitioner's Exhibit 169.  If we could go to the next page.

     Do you recognize this document, Dr. Merikangas?

A.   Yes.

Q.   What is it?

A.   It's a copy of an invoice.

Q.   From you?

A.   From me to Mr. Hudgins.

Q.   And when is it dated?

A.   It's dated the 30th of August 2009.

     MS. ALI:  I'd move for admission, Your Honor, of Defense Exhibit 169.

     MR. SAMUELS:  No objection, Your Honor.

     THE COURT:  Admitted.

     (Defendant's Exhibit 169 received in evidence.)

BY MS. ALI:

Q.   And what did you bill the attorney for in this document?

A.   I billed for the examination at the jail on July 29th and the review of the medical records on July 25th, 2009, and MRI and PET, two scans, on 8-17, August 17th, 2009.

Q.   And is that date, August 17th, 2009, next to the MRI and PET, the date you reviewed those scans?

A.   I don't know.

Q.   Do you prepare -- at that time did you prepare your own

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                         1943

billing invoices?

A.   No.

Q.   Who prepared your invoices in 2009?

A.   I don't know specifically, but generally I had in my office a part-time worker who was doing post-graduate work at the National Institute of Health as a part-time job working for a doctor.

Q.   You testified that you don't have an independent recollection that you received the scans or reviewed the scans in 2009.  How did you come to the conclusion that you did review them?

A.   Well, because this shows that I did.  The invoice says that I did.

THE COURT:  The invoice is prepared from what?  I mean, somebody just doesn't make up an invoice.  Do they prepare it from your records?

THE WITNESS:  I don't know how this particular one was prepared.  Often they will be prepared because I said I did it or there is a record or the person has watched me do it.  I don't know how this was prepared.

BY MS. ALI:

Q.   Do you recall signing a declaration in February of 2023?

A.   Yes.

Q.   And do you recall that in that declaration you stated you had not received or reviewed these 2009 scans in 2009?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                            1944

A.  Yes.

Q.  Why did you submit that declaration?

A.  That was prepared by the *habeas* attorneys at that time, and I was relying upon their review of the records.  I had no record, no independent record or recollection.

THE COURT:  So you signed the declaration that they prepared without an independent recollection?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Mr. Samuels, is this one of the documents you received in late discovery?

MR. SAMUELS:  It is, Your Honor.

THE COURT:  All right.  In other words, they had the record?

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Did you tell them that you needed to see the records?

THE WITNESS:  I told them nothing.

THE COURT:  But you just signed the declaration?

THE WITNESS:  I assumed that was correct.  I had no recollection of seeing these scans, and I certainly did not prepare a report, I didn't send any to Mr. Hudgins, and I apologize if I was mistaken.

BY MS. ALI:

Q.  Is it your usual practice, Dr. Merikangas, to sign declarations without closely reviewing the information?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1945

MR. SAMUELS:  Your Honor, I'm going to object to the leading.

THE COURT:  Sustained.

BY MS. ALI:

Q.  Did you submit any other declarations for this case?

A.  Yes.

Q.  And when was that?

A.  That was, I think, last month.

Q.  What was the purpose of that declaration?

A.  To correct the mistake in the February declaration.

Q.  I'd like to move back to the scan.

THE COURT:  Wait.  How many declarations did you do?

THE WITNESS:  Two.

THE COURT:  So you did one for the 2015 proceeding. I'm confused now about he said to correct the 2023.

MS. ALI:  There was a 2015 report.  We will get there.  He then submitted a February --

THE COURT:  Declaration for this proceeding?

MS. ALI:  Yes, and another right before this hearing in November.

THE COURT:  Now I'm following what two declarations we're on.

BY MS. ALI:

Q.  In 2009, Dr. Merikangas, how would you have received MRI

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1946

scans?

A.   Usually by FedEx.

Q.   On a physical disk?

A.   On a CD.

Q.   Is it possible that you received them electronically?

A.   No.

Q.   And when you receive scans on a disk, how do you review those scans?

A.   I look at them in my PC desktop.

Q.   Do you also have a laptop computer?

A.   I do, but that doesn't allow me to look at CD -- not, CDs, of scans because they use a program called DICOM, which is not compatible with Apple computers.

Q.   And is your laptop an Apple computer?

A.   Yes.  My laptop is an Apple.

Q.   Was that true in 2009?

A.   Yes.

Q.   Where did you live in August 2009, Dr. Merikangas?

A.   Chevy Chase, Maryland.

Q.   And do you recall whether you were at home in Maryland in August of 2009?

A.   I don't have an independent recollection.

     THE COURT:  Were you employed outside of the home or you worked outside of the home, too, didn't you?

     THE WITNESS:  Yes, Your Honor.  I have a home in

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1947

Vermont, and I think she is getting to the fact that I was probably in Vermont in August.

BY MS. ALI:

Q.  If you were in Vermont in August, is it possible you would have received the scans by now in Vermont?

A.  It's possible.  It may have been forwarded from Chevy Chase, Bethesda.

        THE COURT:  Anything is possible.

BY MS. ALI:

Q.  If you did receive the scans in Vermont, could you have viewed them on your -- did you have a way to view the scans in Vermont?

A.  No.

Q.  Do you recall if you were shown a report by a radiologist concerning these 2009 scans in 2009?

A.  I recall that I wasn't.

Q.  If you had been made aware of a diagnostic radiologist reading of the 2009 scan, is that something you would rely upon?

        MR. SAMUELS:  Objection to leading.

        THE COURT:  It's leading, and he said he did not recall, didn't you?  Did you get anything from a radiologist or not?

        THE WITNESS:  I didn't receive anything from a radiologist except I may have received these CDs, but I

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1948

didn't receive any written report, Your Honor.

BY MS. ALI:

Q.  In your clinical practice do you typically rely on diagnostic radiologist reports of brain MRIs?

A.  When I'm doing my own patients on MRIs, I look at the MRI scan myself, and I don't rely upon the diagnostic radiologist unless it's someone I know is qualified or is a neuroradiologist with qualifications.

Q.  Why is that?

A.  Because ordinarily radiologists are not equipped generally to look at finer points of brain images, and I've seen too many mistakes done by conventional radiologists.

Q.  Do you rely in your clinical practice, or when you had a clinical practice, did you rely on the reports done by neuroradiologists of brain MRIs?

A.  Very occasionally.

        THE COURT:  But you are a neuropsychiatrist, so you have the ability to totally look at these yourself, do you not?

        THE WITNESS:  I do, yes, Your Honor.

BY MS. ALI:

Q.  Do you recall whether you ever discussed the MRI scans with Mr. Hudgins or any other member of Mr. Runyon's legal team?

A.  I don't recall.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1949

Q.  You testified that you did not prepare a final report concerning Mr. Runyon in August 2009.  Why was that?

A.  I don't know.  I apparently wasn't asked to.

Q.  Do you recall whether you received the scans from trial counsel or directly from the hospital?  Do you know?

A.  I don't know.

Q.  Did you sometime in 2009, when you would cross that out on the MRI form, receive scans directly from the place that was performing the imaging?

A.  That's the usual procedure.

Q.  When was the first time you actually remember reviewing Mr. Runyon's 2009 MRI scans?

A.  I don't remember reviewing them.

Q.  I'm sorry.  I don't mean back at the time in 2009, but did there come a time when you reviewed them in these *habeas* proceedings?

A.  I reviewed them, I think, in 2015.

Q.  About how long have you been reviewing brain MRIs?

A.  Ever since they were available.  I was the co-owner of the first MRI scanner in the State of Connecticut prior to Yale University Hospital having it.

        THE COURT:  Prior to what?

        THE WITNESS:  Prior to Yale, where I was on the faculty.  I had an MRI scan with my partners prior to the Department of Radiology at Yale.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                              1950

BY MS. ALI:

Q.  Do you recall about how many images are on the disk of Mr. Runyon's 2009 MRIs?

A.  I don't recall, but the usual would be about 50.

Q.  If I told you there were 30 slices front back, 25 top to bottom, and 22 left to right, does that sound typical of an MRI?

        MR. SAMUELS:  Your Honor, it is all leading.

        THE COURT:  He answered the question.  I think he said about 50, didn't he?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  What you're saying doesn't really contradict.

        MS. ALI:  I'll move on, Your Honor.

BY MS. ALI:

Q.  What is the purpose of having so many images when an MRI is taken?

A.  The images are called slices.  In other words, you have a three-dimensional object but you're looking at it in two dimensions.  So you are cutting slices through it, and you are stacking all these slices together through this 3D object, and the only way you can look at it is to have these sometimes five millimeter thick images throughout the scan from top to bottom and from left to right and from front to back to get an accurate picture of the anatomy of the brain.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1951

Q.  And what's the purpose of having these different types of
slices, the front to back, top to bottom, left to right that
you described?
A.  So you can locate where in the brain you see an
abnormality.
Q.  Is it sometimes the case that there is an abnormality
that appears in one place but not others?
A.  Yes.
Q.  Is it sometimes the case that an abnormality replicates
over several slices?
A.  Yes.
Q.  How does the quality of imaging influence how visible a
particular abnormality appears on the scans, if at all?
A.  It has a great deal to do with it.  The scans in 2009
were not as powerful as they are today, and the motion of the
patient interferes with the quality of the image, and the
technique of the technician changes the image.  And the
equipment that they have, the make and model and brand of the
scanner has a lot to do with the image.  And then to look at
it, looking at it on a stand-up desktop PC like I would do at
home, is not as precise as the larger monitor and more
powerful computers that you will find in a hospital or in a
professional radiologist office, which is one reason I
frequently consult with radiologists when there's a question.
Q.  Can we pull up what was previously admitted as

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1952

Government's Exhibit 61.  Do you recognize this document,
Dr. Merikangas?

A.   Yes.

Q.   Is this the -- what is this document?

A.   This is the reading of Mr. Runyon's MRI scan that was
done at Harbor View Medical Center on the 13th of August
2009.

Q.   Does this report say anything about the quality of the
scan?

A.   Doesn't seem to identify the power of the equipment used.

Q.   Does it discuss whether anything else may have impacted
the quality of the scan?

A.   It says was limited by motion.

Q.   What does that mean?

A.   That means that if you didn't hold still, and that if
you're moving, the scans are quite degraded.

        THE COURT:  If you see a scan, and you don't think
it's adequate, don't you ask for a follow up?

        THE WITNESS:  I do, Your Honor.

        THE COURT:  So you wouldn't opine on a scan that
you didn't think was adequate?

        THE WITNESS:  That's right, Your Honor.

BY MS. ALI:

Q.   Do you have -- was this scan adequate to make findings
about Mr. Runyon's MRI?

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                                1953

A.   The lesions could be seen on this scan but not with the fine detail that a better scan would have provided.

          THE COURT:  You mean a better scan at the time?

          THE WITNESS:  Yes, Your Honor.

BY MS. ALI:

Q.   I'm showing you some of the images from Mr. Runyon's 2009 MRI.  Just to make sure the record is clear, I'm showing a selection of images, not every image.

          THE COURT:  Are these the same three you have been showing all along?

          MS. ALI:  Yes, Your Honor.

BY MS. ALI:

Q.   The writing is very small.  If I could just identify what they say at the top.  It's each of the images that at the top says "AXL FLAIR P2.  Do you have an understanding of what that means?

A.   Yes.

Q.   And what does that mean?

A.   AXL means that the slice is in the plane of if you were wearing a hat.  There would be a slice across the front to back of the head as if you cut off the top of the head.

Q.   And can you just orient us in these images and tell us what we are looking at?

A.   Well, the right side of the picture is actually the left side of the brain because you're looking at it from the feet

Merikangas, J. - Direct                                           1954

towards the top of the head.  So it's a little confusing that way, and that the convoluted outer aspects inside the circular white area is the cortex of the brain.  The black area in the middle is the ventricles of the brain, and the gray here, the basal ganglia of the brain, I mean, the dark gray.  The lighter gray is the white matter of the brain. And you can see some lesions here.

Q.  And when you say lesions, what are you referring to?

A.  I'm referring to the scar tissue and the encephalomalacia.  And it's not a proper use of the term lesions but his lateral ventricles are also --

THE COURT:  You are speaking too low.  You dropped your voice.

THE WITNESS:  I'm sorry.  His lateral ventricles are too big.  He has the white matter lesion that I can see.

THE COURT:  Just a minute.

MR. SAMUELS:  Your Honor, all I've got is a 2015 report that says multiple white matter hyperintensities on the MRI.  He is using a lot of language and a lot of diagnoses that I don't have on the report, and I would object to that unless he can point it out to us where that is on the report that he made these type of observations.

THE COURT:  Show it again.  Take us to the report and not just the images.  The other thing is, I was going to say, I'm the one that's got to decide about the case.  He's

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                           1955

got to point to something.  I'm just looking at three images.

MS. ALI:  I'm getting there, Your Honor.

THE COURT:  Well, let's go to what report you're on.

BY MS. ALI:

Q.  When you reviewed the scan in 2015, did you make findings about -- do you note anything on Mr. Runyon's 2009 MRI scan?

A.  I believe in my report I did.  I didn't do a separate reading on these scans.  I just included some of the findings in my report.

Q.  And just a moment ago you testified that you identified white matter hyperintensities on these scans; is that right?

A.  Just now, yes.

THE COURT:  Let me ask you.  When you looked at these, did you have an "aha" moment, like, I've seen these before, or did you look at the date on them?  Did you ever question yourself about now brain scans are being given to you, you had seen them before and when were they taken?  Did you ask when they were taken?

THE WITNESS:  Well, it says on it when they were taken.

THE COURT:  And you know you had ordered some then?

THE WITNESS:  I knew I had ordered them, and these were taken chronologically after I ordered them.  I can see

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                1956

on the scan the abnormalities which I mentioned in my report.

THE COURT:  You know when they were taken, and you know they were of Mr. Runyon, and you know that you ordered scans of him on those dates at that time.

THE WITNESS:  Well, I don't know whether these are the scans I ordered, but they're after the date when I ordered them.

THE COURT:  Well, all I can tell you is this is all that's in the record for 2009.  That's what I can tell you from the standpoint of having been the judge on this the entire time.  These are the only ones in the record for 2009.

THE WITNESS:  Then they are the ones that I ordered.

THE COURT:  I mean, only ones in the record in 2009.

MR. SAMUELS:  I'm sorry, Your Honor.  He seemed to be describing a number of different issues other than the white matter hyperintensities, and that's all that's in the report.

THE COURT:  Let's go to the report.

MS. ALI:  If we can pull up Defense Exhibit 21.

BY MS. ALI:

Q.  Dr. Merikangas, were you also retained as an expert in

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1957

2015 in these *habeas* proceedings?

A.  Yes.

Q.  And did you again evaluate Mr. Runyon?

A.  Yes.

Q.  Why did you evaluate him again?

A.  Because the previous time I saw him was brief, and the report was preliminary.  I didn't get to follow through, and I wanted to see him again to try to learn more, and I was given a great deal of records, which I was not given the first time.

Q.  You were given records in 2015 that you were not given in 2009?

A.  Yes.

Q.  And did you prepare a report of your findings in 2015?

A.  Yes.

Q.  Is that what we are looking at here, what's been admitted as Defense Exhibit 21?

A.  Yes.

          THE COURT:  Let me take a look at that.  Have you listed all those records you were given in this report?

          THE WITNESS:  Yes, Your Honor.

          THE COURT:  You've made a general statement that you were given records that you hadn't been given before and you've listed all those in this?

          THE WITNESS:  I reviewed them all, Your Honor.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                              1958

THE COURT:  Which one of these books?

MS. ALI:  It should be Defense 1, the first book, and Defense Exhibit 21.  Both is 2009 and 2015 report.

THE COURT:  I'm pulling that notebook now.  This is Defendant's Exhibit 21 dated September 25, 2015?

MS. ALI:  That's right, Your Honor.

THE COURT:  All right.

BY MS. ALI:

Q.  Do you recognize this document, Dr. Merikangas, as your 2015 report in this case?

A.  Yes.

Q.  How did the results of your 2015 neurological evaluation compare to your findings in 2009?

A.  They are very similar.

Q.  You testified that you had more records and history in 2015.  Was there anything in particular that stood out to you?

A.  Yes.

Q.  What was that?

A.  The Army records that showed that he spent about a year in follow-up after his serious motor vehicle accident, the records of his employment that showed that he was terribly unreliable and didn't have a job very long at any time, and the description of his difficulties, particularly with females and other friends.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                    1959

MR. SAMUELS:  Again, Your Honor, none of those observations are included in the report other than the reference to records.

MS. ALI:  He lists all those materials in his report, Your Honor, and he reaches conclusions based on those materials.

THE COURT:  Take him to the materials, ask him what they were.  So if he just made a conclusion, what did he make the conclusion on which records?

BY MS. ALI:

Q.  You testified that the Army records were relevant to your conclusions.  Why was that?

A.  Because it contained medical reports of his complaints of vertigo, headache, confusion, and the difficult things you see after a concussion.

MR. SAMUELS:  Again, Your Honor, I just don't see that anywhere in the report.  I just see a reference to medical records, but there is no discussion of those records and how they relate to any conclusions or opinions that Dr. Merikangas may hold.

MS. ALI:  You want me to put the records on the screen, Your Honor?

THE COURT:  He's made a listing here saying that he examined voluminous records, reports and affidavits and interview notes since 2009, including the following, and

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                    1960

it's like your other reports that were done in 2015, there is then just this mass list.  This has 48 different things that he reviewed, and now he's written a general report.  Has this one been footnoted?

MS. ALI:  No, Your Honor.

THE COURT:  Has this one been supplied with questions, like we had questions on one of them from the experts?

MS. ALI:  No, Your Honor.

THE COURT:  Then the report itself consists of four paragraphs.  So you're going to have to elaborate.  It's what I was trying to say before.  In order for a Court to assess weight and credibility, the Court has to know the opinion and what it was based on because that opinion has to be tested through cross-examination or through an examination of the record that was relied upon.  That's the problem here.  There are voluminous records with no specific references.

You can't just say, well, I relied on these voluminous records, and this is my conclusion, because that can't be tested.  It could be a lot in those records.  He doesn't seem to be able to remember a lot of things back in 2009, and his conclusions were the crux of why the Fourth Circuit decided what it decided.

MS. ALI:  I'm just making my record, Your Honor.  I

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                         1961

know that Dr. Merikangas's opinions were a part of the basis of the remand, but I disagree that it's the crux.  I understand Your Honor's opinion.

THE COURT:  I will write an opinion, and I will say what is important or not important, but it certainly played a huge part, and that was because of what occurred in 2009. So it certainly did play a big part in that opinion, and I won't repeat all that now.

Go ahead.  You've got to tie in these opinions and what he's concluding in 2015 to what records he reviewed. He said he got a lot more records.  We don't know exactly what he was shown in 2009.  We only know what he did and a conversation that he potentially had.

MS. ALI:  I'll establish that, Your Honor.

BY MS. ALI:

Q.  In 2009 did you have -- what records did you have at the time of your report?

A.  The only records I had in 2009 were Montalbano's report and Patterson's report.  I had none of the background information.  I had none of these records that are listed in this report.

THE COURT:  But you had the same examination.  You had your physical examination, which goes to the first two paragraphs.  Just look at your report from 2015.  Your first two paragraphs are basically the same as before except it's

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                                          1962

a new physical examination.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Then you say you reviewed these PET scans and brain MRI done in 2009.

THE WITNESS:  Yes.

THE COURT:  That's where we were on your questioning.

BY MS. ALI:

Q.  If you look, Dr. Merikangas, at your report on this first page, do you see certain records listed?

A.  Yes, and also the second page.

Q.  If we could go to the second page, and I think the third page as well.  How many records are listed here?

A.  48.

Q.  Did you review all of those records in informing your opinion in this case?

A.  I did.

Q.  Did you rely on all of those records in informing your opinions in this case?

A.  Yes.

Q.  In addition to the -- you mentioned the Army records and the employment records.  Did you also have access from 2015 to neuropsychological testing data?

A.  Yes.

Q.  How, if at all, did that bear on your opinions in this

Merikangas, J. - Direct                                        1963

case?

A.   It has a large part to do with my opinions.  Dr. Mirsky did the neuropsychological testing, and he, unfortunately, has departed, but he was the preeminent neuropsychologist in the United States at that time, former chief of neuropsychology at the National Institute of Mental Health, and someone I've known for many years.

            THE COURT:  I'm sorry.  You said 2015?

            THE WITNESS:  Yes, Your Honor.

            MR. SAMUELS:  Your Honor, the problem is he makes these conclusions, but he doesn't say how any neuropsych data he got from Dr. Mirsky led to the conclusions that he makes.  So my objection really, on some of this, he is going outside the scope of his report.  He can say what he concluded, but he's not showing the report how he got there.

            There is no reference to how he considered -- evidence that he considered it, but there is no reference in the last paragraphs, the second to last paragraphs, as to how that neuropsych data played any role from Dr. Mirsky in his assessments.

            THE COURT:  I agree.  It doesn't say, but I listened to his testimony.

            MR. SAMUELS:  Yes, Your Honor.

BY MS. ALI:

Q.   How, if at all, did the neuropsychological testing data

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                    1964

bear on your opinions in this case?

A.   It establishes objectively his frontal lobe dysfunction
and his paranoia.

Q.   And is his neuropsychological testing data something that
neuropsychiatrists rely on in the ordinary course of clinical
practice?

A.   Yes.

Q.   Is neuropsychological testing data something that informs
neuropsychiatric conclusions about a patient or someone being
examined?

A.   In part, yes.

Q.   You testified that you examined Mr. Runyon again in
2015 -- sorry, Your Honor.  Just a moment.

      How did your findings on the neurologic exam of
Mr. Runyon in 2015 compare to your findings in 2009?

A.   They were quite similar.  There were some changes, which
I think it indicated in the report might have been from a
subsequent head injury.

Q.   And is the report that you prepared in 2015 typical of a
report of a neurologic exam?

A.   Yes.

Q.   Is that typical to you or is that standard within the
field of neurology?

A.   That's standard in the field.

Q.   And is this typical of a report that you typically

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1965

prepare in criminal cases that you're engaged to do forensic work in?

A.  Yes.

Q.  Including in capital cases?

A.  Yes.

Q.  In addition to the Army medical records, the employment records, and the neuropsychological testing, what else, if anything, was important to your conclusions about Mr. Runyon?

A.  My review of these scans.

Q.  If we could return to the images.  You testified that you -- and having your report, that you see white matter hyperintensities on these images; is that correct?

A.  Yes.

Q.  And do you see white -- where -- can we --

A.  Is there a way for me to point?

Q.  I think you can draw on the screen with your finger.

A.  There is one (indicating).

Q.  Just making -- for the record he is drawing a circle around one on the image on the far left, one on the image in the middle, and I think in two places on the image on the far right.

     Are these white matter hyperintensities you identified on these scans in each of those three images the same white matter hyperintensity replicating over different slices or are those different white matter hyperintensities?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                         1966

A.   They are different.

Q.   What is a white matter hyperintensity?

A.   I guess a layman's answer would be scar tissue.

Q.   And where in the brain are the white matter hyperintensities on Mr. Runyon's scan located?  What are we looking at here?

A.   You are looking at the deep white matter.

Q.   And does that tell you anything about their cause?

A.   Not explicitly.  There are several different causes possible.

Q.   Is the location -- how, if at all, does the location of the white matter hyperintensities bear on your overall findings?

A.   It's quite typical for a traumatic brain injury.

Q.   If you were seeing a 38-year-old patient in a clinical setting with a self-reported history of head injury, and you identified white matter hyperintensities like this on his imaging, what would you do with that information?

A.   I would file under corroboration that he had a serious brain injury, and he was left with scarring in his brain.

Q.   Would it be enough to make a diagnosis of brain injury?

A.   Not by itself.  You have to have the clinical history as well.

Q.   And when you say clinical history, what are you referring to?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                                  1967

A.   The history refers to what happened in the past.

Q.   How, if at all, does your own neurologic exam bear on the overall picture of Mr. Runyon's cognitive functioning?

A.   That the abnormality of his reflexes also is corroborative of a diffuse brain injury and something called disinhibition.

Q.   And the abnormality of the reflexes that you describe in your 2015 report, did you also find those in 2009?

A.   Yes.

Q.   And are those included in your 2009 report?

A.   Yes.

Q.   Can you explain what you mean by disinhibition?

A.   That the nerve cells in the brain, the neurons, just three things they do.  They can stimulate, they can inhibit, or they can do nothing, and it's all there is.  But if they are tilted the wrong way, or if they are somehow abnormal, and they are not able to inhibit things, then you have increased reflexes, poor impulse control, and depending on locations in the brain, difficulty with movement, difficulty with thinking, difficulty with perceiving.

     It's all based on anatomy and the function of the brain, has to do with where are these abnormalities.  And there are often many abnormalities which you cannot see or what you know from other scientific experiments over the last few hundred years where the problem might be.  The brain,

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1968

however, is connected.  Everything is connected.  So you can't say that something in this particular area produces this particular symptom.  It's much more complicated than that.

Q.  Do you look -- how does your assessment of -- strike that.

What did you conclude about Mr. Runyon's neurocognitive functioning in 2015?

A.  That he was a brain damaged individual, which probably had both developmental or genetic precursors and --

MR. SAMUELS:  I object to that, Your Honor, because there is nothing about genetic precursors in this report.

THE COURT:  Sustained.

THE WITNESS:  Should I continue my answer?

BY MS. ALI:

Q.  Yes, Dr. Merikangas.

THE COURT:  No, not about genetic precursors.

THE WITNESS:  He had a traumatic brain injury that caused permanent damage to his brain and that the testing of the neuropsychology and the neurologic exam and his history of his life were all consistent with his impaired functioning as a result of these brain injuries.

BY MS. ALI:

Q.  What were the most important pieces of information you needed to reach those opinions?

Merikangas, J. - Direct                                        1969

A.   Well, the most important is the abnormal neuro exam, the neuropsychological testing, and the brain imaging, and the medical record.

Q.   When you say the medical record, what are you referring to?

A.   Particularly the Army medical records which were contemporaneous and totally objective.

        THE COURT:  How do you know they are totally objective?

        THE WITNESS:  I meant they were not produced by a prosecution or a defense expert.

        THE COURT:  They are simultaneous, but there were opinions in there by the examiners.

        THE WITNESS:  They were observations and opinions by medical personnel.

        THE COURT:  Exactly, I understand now what you mean.  They weren't by any of the attorneys or anybody that had an interest in the outcome?

        THE WITNESS:  That's correct, Your Honor.

BY MS. ALI:

Q.   To the best of your knowledge was Mr. Runyon seeking medical treatment in what those records are reflecting?

A.   Yes.

Q.   You mentioned that Mr. Runyon's history of head injury was important to your overall findings.  Does that include

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1970

information self-reported by Mr. Runyon?

A.   Yes.

Q.   And what specifically did you consider about his history?

A.   Which of the accidents or --

Q.   (Nods head.)

A.   Well, the report of his head injury when he was 3, the report of multiple concussions when he was a child playing football.

        MR. SAMUELS:  Your Honor, I object because that's not in the report.  The 3-year-old is but the concussions playing football are not.

        THE COURT:  Sustained.

BY MS. ALI:

Q.   You mentioned the -- you were listing several head injuries.  You started with the 3-year old.  There was an objection.  Can you pick up?

        THE COURT:  There wasn't an objection to the 3-year-old.

        MS. ALI:  No, I'm sorry.

        THE COURT:  That's in the report.

        MS. ALI:  That's right.

BY MS. ALI:

Q.   You testified to the head injury when he was 3, and then can you pick it back up from there.

A.   I believe that the football injuries are in the previous

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1971

reports that I reviewed, and also the car accidents,

particularly the one of November 9th, 1996, which was a

serious car accident.  And he was -- after that, between 2009

and 2015 exam when he was assaulted in jail.  I don't have

the date of that exam.

            THE COURT:  But that would have been after the

crime here.

            THE WITNESS:  Yes, Your Honor, but it's explaining

why my examination of 2015 was different from the 2009.

            THE COURT:  Okay.

BY MS. ALI:

Q.  Do you have an understanding of whether that head injury,

when he was assaulted in jail, post-dated the MRI imaging

from 2009?

A.  My understanding is it did.

Q.  When you were evaluating self-reported head injuries, how

do you determine whether and how much weight those

self-reports should be given?

A.  Well, as you know, doctors frequently -- I'd say always

depend on a patient coming to them with a complaint, and the

ways to determine in a forensic setting whether this is true

or not, is to give an MMPI or other tests of reliability and

truthfulness.

            There is something called a lie scale in the MMPI,

and the various times that Mr. Runyon took the MMPI, it

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                        1972

showed that he was not malingering, not lying.  And several different of his examiners said he was a good historian, including the Army records.  I don't know which of the other doctors said that he was a good historian.  I think it was the jail doctor, was very good report from one of the jail doctors.  No one suggested he was malingering or lying.

THE COURT:  How does that tie into being delusional?

THE WITNESS:  She asked me not about delusions but about whether he was telling the truth.

THE COURT:  When people have delusions, they aren't always telling the truth, are they?  I don't understand the difference between somebody is delusional and why delusional is something that is true.

THE WITNESS:  A delusion is true to that person.  It doesn't have a basis in external theology, is not believed by the majority of other people.

BY MS. ALI:

Q.  Based on your experience and training, were you able to reach any conclusions about the reliability of Mr. Runyon's clinical history of head injury?

A.  My conclusion was that history of his head injury was quite reliable.

Q.  If one or more of the head injuries that were described in the various expert reports that you reviewed didn't happen

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1973

or happened differently than reported, would that alter your overall conclusions about Mr. Runyon's neurocognitive functioning?

A.   I think it's established that he has a disorder of neurocognitive functioning.  It might change opinions about the etiology of that, but the neurocognitive functioning deficit is there.

Q.   Before seeing Mr. Runyon's MRI scan, were you able to reach at least a preliminary opinion about Mr. Runyon's neurocognitive functioning?

          THE COURT:  At what point in time?

          MS. ALI:  In 2009 at the time you prepared your preliminary report?

          THE WITNESS:  Yes, that suggested he was brain damaged.

BY MS. ALI:

Q.   That's the opinion you give in that 2009 preliminary report?

A.   Yes, prior to seeing any brain images.

Q.   In your clinical practice are there ever times when you consult with a neuroradiologist about MRI scans?

A.   Yes.

Q.   In what circumstances do you consult with a neuroradiologist?

A.   Where there is a questionable lesion, and I want to be

Merikangas, J. - Direct                                    1974

absolutely sure that it is what I am seeing, and also to get another opinion on what might be causing it, and to use the better equipment to generate the picture, in other words, a larger monitor or more powerful computer, and the ability to modify the contrast or the brightness of an image, which is not available on a home PC.

Q. Do neuroradiologists sometimes see things on MRI scans that you do not?

A. Yes.

Q. And is that in part because of the better technology you just described?

A. Yes.

Q. Is there any other reasons?

A. He might be smarter than I am.

Q. About how many brain scans do you think -- if you know, a neuroradiologist at, let's say, Columbia University would review in a typical year?

A. Oh, probably a thousand.

Q. Is that more than the number you would review in a typical year?

A. Yes.

Q. Are you more likely to recommend consulting a neuroradiologist in situations where you are reading a brain scan that's contested?

A. Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                      1975

Q.  Or where the finding is subtle?

MR. SAMUELS:  Object to the leading, Your Honor.

THE COURT:  Sustained.

BY MS. ALI:

Q.  Did you draw any conclusions in your 2015 report about the effects of the head injuries you identified on Mr. Runyon's cognitive functioning?

A.  Yes.

Q.  And what was that conclusion?

THE COURT:  Where is it, first of all?

MS. ALI:  It's on page -- I'm sorry, up on the screen, but let me pull it up in hard copy.  It's the last page of his 2015 report.  I think it's Page 4, Your Honor.

BY MS. ALI:

Q.  Did you reach any finding about the effect on Mr. Runyon of the head injuries and the -- that you identified and the neurologic exam results?

A.  Yes.

Q.  And what was that conclusion?

A.  That he had brain damage and that he had personality and mood changes, particularly from the injury of November 9th, 1996, that he had impaired executive functioning and decision-making, and that he had paranoia and delusions suggested by the psychological testing, and that others had diagnosed him as possibly having post-traumatic stress

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                          1976

disorder.

Q.   Do you recall your report about paranoia and delusions, were those conclusions drawn by other experts or how did you come to those conclusions?

A.   It was drawn from the descriptions and the data provided within their reports, not so much on their conclusions.

Q.   Did you rely on the inputs in their report?

A.   Yes.

Q.   What are the hallmarks of impaired executive functioning?

A.   The major one is the impairment in functioning in one's life and making bad decisions or being impulsive or sticking to bad decisions even though we all said they were not good, and having the inability to exercise proper judgment from weighing the consequences or the outcome of various actions you might take, and having changes in mood control, ability to control one's emotions, and the ability to produce successful plans, maintain employment, to maintain personal relationships.  All those things are --

MR. SAMUELS:  Your Honor, I just object.  This is not in the 2015 report.  I know there is some in the 2013 declaration that he offered, but it is not in 2015.

MS. ALI:  Your Honor, he's elaborating on an opinion that is squarely within his report, and I know -- I'm not going to repeat the whole argument, but I think under the case law he's permitted to testify beyond -- to

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Direct                                    1977

elaborate on opinions that he's offered in his report.  He is not offering new opinions.  He is simply explaining the opinions that are in his report.

THE COURT:  I'll let him go on, but at some point there's been a lot of talking from a lot of experts outside of their reports.

BY MS. ALI:

Q.  How, if at all, does executive functioning relate to the concept of impulsivity?

A.  It relates to the ability to control one's emotion.  It relates to the ability to stop, think, and not do something which you shouldn't do.

The executive functioning is what separates human beings from lower animals, that they can look at a situation, analyze it, and make a judgment about it and act or not act, but losing control over any of those factors is what is called poor executive functioning, and that's a function of the front lobe of the brain primarily, although not exclusively.  The cerebellum is also involved.

THE COURT:  Does that impaired executive functioning encompass an inability to make detailed and long-term plans and carry them out?

THE WITNESS:  No, Your Honor.

THE COURT:  Why?

THE WITNESS:  They can still make detailed plans

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                1978

and carry them out.  They may not be good plans.

BY MS. ALI:

Q.  Do you recall whether any of the other expert reports you reviewed address the concept of impulsivity as you just described it?

A.  I don't think that anybody went into that detail.

Q.  Can someone with poor executive functioning have a high overall IQ?

A.  Yes.

Q.  Can someone with a high overall IQ have frontal lobe damage?

A.  Yes.

         MS. ALI:  That's all I have, Your Honor.

         THE COURT:  All right.  We will take a 15-minute recess and then go into the cross-examination.

         MR. SAMUELS:  Yes, Your Honor.

         (Recess from 3:49 p.m. to 4:06 p.m.)

         THE COURT:  Everyone is here, counsel, Mr. Runyon, Dr. Merikangas, and we are ready for cross-examination.

         MR. SAMUELS:  Thank you, Your Honor.

                         CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good afternoon, Dr. Merikangas.

A.  Good afternoon.

Q.  Sir, you are aware, are you not, that there has been a

Merikangas, J. - Cross                                    1979

claim in this case that those brain scans never got to you in 2009.  Were you aware of that?

A.  No.

Q.  There has also been a claim in this case that after you examined Mr. Runyon, the trial counsel just stopped communicating with you?  Were you aware of that?

A.  I'm not aware of those claims.

Q.  You would agree with me that neither of those claims are true?

A.  If I don't know about them, I can't judge whether they're true or not.

Q.  Well, after you did your examination of Mr. Runyon in 2009, and I believe that was July 29th, 2009, does that sound about right?

A.  Yes.

Q.  And then you prepared a report on August 15th, 2009; is that right?

A.  Yes.

Q.  You did have communications with trial counsel after you prepared your report, didn't you?

A.  I have no recollection of that.

Q.  Would there be something that I could potentially show you that might help refresh your recollection?

A.  Perhaps.

Q.  We will get to that.  There has also been a claim that

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                               1980

you never looked at the brain scans in 2009.  That claim is not true, is it?

A.  That claim?

Q.  The claim, the assertion, the statement, that you did not look at brain scans in August of 2009, that's not true, is it?

A.  I think I looked at them, but I don't have a recollection of looking at them.

Q.  But you got records that you looked at them, right?

A.  Recently discovered.  There is an invoice that says I looked at them, but I have no recollection of looking at them.

Q.  You looked at the records and you billed for looking at the records, right?

A.  That's what the bill says, yes?

Q.  You would want your billing to be accurate, right, sir?

A.  I would.

Q.  So if it showed that you looked at two scans and billed $100 for the MRI and $100 for the PET scan, that would be accurate, correct?

A.  Yes.

Q.  Dr. Merikangas, we are going to get into this history a little bit, but I want to cover some preliminary matters with you first.  Sir, I believe you testified on direct examination that you have testified both for the government

Merikangas, J. - Cross                                    1981

and the defense; is that right?

A.  Yes.

Q.  But it's not an equal amount, is it, sir?

A.  No.

Q.  In fact, you've testified over a hundred times, would you agree with me?

A.  Yes.

Q.  My numbers are probably a little bit dated, but the numbers I've seen is it's been over 95, 97 times for the defense and just a couple of times for the prosecution.  Does that sound right?

A.  In criminal cases, yes.

Q.  In criminal cases for the defense?

     Sir, I've got your recent testimony list here.  Let's just take a look at it.

     Madam clerk, if I could have the Elmo, please.

     There we go.  Dr. Merikangas, this is your latest testimony list that I've been provided of all your testimony from I guess early 2009 up to the present.  Does this look right to you, sir?

A.  Yes.

Q.  And there is a number of situations where it looks like you testified in murder cases.  I see State of Alabama versus Marc Stone.  Do you see that, sir?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                         1982

Q.   Who did you testify for on behalf of in that case?

A.   The defendant.

Q.   Did you make a finding that the defendant had some form of brain damage or impairment?

A.   I don't recall.

Q.   Okay.  Well, if you were testifying for the defendant, you would have made some sort of finding or opinion that we can assume was favorable to the defendant, can't we?

A.   You may assume that.

          THE COURT:  That's confusing to me.  This is just 2019, and it was a murder case.  That's a significant case.  You don't remember it?

          THE WITNESS:  I don't remember it, Your Honor.

BY MR. SAMUELS:

Q.   Let me take you a little bit forward, Dr. Merikangas.  Next murder case I see is July 30th, 2021, State of Indiana versus Salyers.  Do you see that, sir?

A.   Yes.

Q.   Do you recall on which party's behalf you were called to testify in that case?

A.   The defendant.

Q.   And do you recall in that case if you made a determination of brain damage or some other form of impairment?

A.   I don't recall.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        1983

Q.  Now, sir, that's just two years ago.

A.  That was a bifurcated question.  Other impairment may include psychosis, depression, some other mental illness in addition to brain damage.

Q.  Let me clarify the question.

A.  Please.

Q.  Do you recall if you made a finding of some sort of impairment with respect to Mr. Salyers?

A.  I don't recall.

Q.  You don't recall whether you made a finding of impairment at all?

A.  I don't recall.

Q.  I see.  Well, let's go a little further forward.  Let's go to January 23, this year, State of Virginia versus -- I'm going to mess this name up -- Josus Coreas-Ventura.  Do you see that, sir?

A.  Yes.

Q.  Did you testify by video testimony in court in Roanoke, Virginia?

A.  Yes.

Q.  Was that another murder case?

A.  Yes.

Q.  What party called you to testify in that case?

A.  The defense.

Q.  And did you make any finding of impairment with respect

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              1984

to that defendant?

A.   Yes.

Q.   What was the finding of impairment you made, sir?

A.   He was brain damaged.

Q.   I next see, going down a couple more months, State of Illinois versus Caleb Rallings in Chicago, court testimony in manslaughter case.  Do you see that?

A.   Yep.

Q.   What party called you on that case, sir?

A.   The defense.

Q.   And did you make a finding of impairment with respect to Mr. Rallings?

A.   Yes.

Q.   What was that finding?

A.   He had an endocrine disorder and delirium.

        THE COURT:  And what?

        THE WITNESS:  Endocrine disorder and delirium, specifically dehydration and hyperglycemia.

BY MR. SAMUELS:

Q.   And so we talked about a few cases.  You just remember the cases in 2023; is that right, Dr. Merikangas?

A.   That's the only one I remember details of.

Q.   And I think you said you don't remember if you even made a finding of impairment in the cases in 2021 and 2019?

A.   I don't.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              1985

Q.   Is there any reason for that, sir?

A.   That I'm 84 years old.

Q.   All right.  Is it fair to say, Dr. Merikangas, though, that in the majority of criminal cases on which you have testified on behalf of the defendant, you have found some sort of mental or brain impairment?

A.   That's not only fair but accurate.

Q.   And these individuals that you are evaluating, just like Mr. Runyon here, you're not -- they're not your patients in the sense of you treating them?

A.   Generally.

Q.   Your approach with patients would be much more ongoing and thorough evaluations and treatment?

A.   No.

Q.   It would not be more thorough?

A.   It may be more ongoing but not more thorough.

Q.   Sir, have you ever -- that you can recall -- looked at a defendant in a murder case where you've been called on to consult and not found some level of impairment?

A.   Yes.

Q.   What was the name of that case, sir?

A.   I saw a patient for the prosecution in federal court in Washington, D.C., and determined that they had an impairment that was a mental impairment, not a brain damaged impairment, if that's what you mean, and I did that for the prosecution,

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                            1986

and they dismissed the charges after that.

Q.  And I'm sorry if my question wasn't clear, Dr. Merikangas.  My question was, for the cases in which you've been called on by the defense, okay, sir, and I think you told us that that's in the high 90s.  There is a hundred cases in the high 90s; is that right?

A.  That's right.

Q.  So of those cases, those high 90s cases, have you ever looked at a case and not found some level of impairment by the defendant?

A.  That would not be in list of people whom I testified because the lawyers would not ask me to testify if I didn't find something wrong with the patient.

Q.  I see.  You consulted in cases where you haven't testified, sir?

A.  Yes.

Q.  And if you do see a problem with an exam of the patient, you would tell the lawyers, right?

A.  Yes.

Q.  And the lawyers may well decide that it wouldn't be a good idea to call you to the stand if you didn't see some impairment?

A.  That's up to them.

Q.  You would consult with the lawyers on this part, right?

A.  I would express my opinion of whether the patient had a

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          1987

problem and what it was, and it would be up to them to decide what to do.

Q.  You would have a discussion or a dialogue with the lawyers?

A.  Not necessarily.

Q.  You wouldn't just look at a patient and not communicate with the lawyers at all, would you, sir?

A.  I may send a report.  I don't have to have a dialogue to send a report.

Q.  But there have been situations when you haven't been called that you have had a discussion with the lawyers about whether you've seen an impediment that you could testify to?

A.  I imagine so.  I can't give you a specific.

Q.  So, Dr. Merikangas, if you testified over a hundred times, and you've probably been cross-examined by someone like me of 95, 97 times?

A.  Not someone like you.

Q.  Okay, sir.  Somebody in my position?

        THE COURT:  I won't ask if that's a compliment.

        MR. SAMUELS:  I won't follow up on that, Your Honor.

BY MR. SAMUELS:

Q.  I've reviewed some of your examinations in some prior cases, sir.  Let me get a couple of these out of the way.

        Dr. Merikangas, is it fair to say that you do not

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              1988

think the death penalty is effective?

A.  Well, it certainly causes people to die.

Q.  Well, let me ask it a different way.  I'm trying to ask the question in the way you have been asked in the past.  Is it fair to say you think it should be abolished?

A.  I think it should be maintained in certain situations. Like I served in the Navy, and if someone is a traitor, I'm in favor of the death penalty, and I was prepared to kill people when I was in the Navy.  I had at my fingertips weapons of mass destruction.  That's the death penalty.

Q.  Dr. Merikangas, did you testify in the case of United States of America versus William Merriweather, Jr., a 2000 -- let me get the date.  It was on August 2nd, 2011, in Birmingham, Alabama?  Does that ring a bell?

A.  Vaguely.

Q.  Were you asked questions about whether you have a personal opinion as to whether there should be a death penalty?

A.  I don't recall.

Q.  Were you asked a question, would you prefer that the death penalty be abolished?

A.  I don't recall.

Q.  Let me just see if I can refresh your recollection, sir. This is a transcript United States v. Merriweather, a competency hearing before Judge Proctor.  Do you see that,

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          1989

sir?

A.  I see that.

Q.  Okay.  It looked like a competency hearing.  There was still questions about the death penalty, Dr. Merikangas.

A.  It wasn't a death penalty case.  It is a competency hearing.

Q.  Do you see where you are listed as a witness in the case, sir?

A.  I see I'm listed as a witness.  Doesn't say what case.

Q.  Okay.

THE COURT:  It's part of the same transcript.  The case has been identified.  Is there any question this is part of the same transcript?

MS. ALI:  Not from me.  I don't have a copy, but I trust him he is showing the right document.

BY MR. SAMUELS:

Q.  Do you see the question there, "Would you prefer that the death penalty be abolished?"

A.  Yes.

Q.  Do you see that your answer is, "I would, yes."

A.  Yes.

Q.  Have you given that type of testimony in other cases, sir?

A.  I don't think so.

Q.  Oh, you don't think so?  Do you remember testifying in a

Merikangas, J. - Cross                                      1990

case called John Charles McCluskey in 2013?  Let me show you the caption, sir.

A.  I don't recall this case.

Q.  Okay.  Let me just see if I can show you just a couple more pages if it would refresh your recollection.  Just see here, sir, on the first page there is a discussion, and it references you, Dr. Merikangas.  "You are still under oath. We are ready to proceed with your examination."  Do you see that, sir?

A.  Yes.

Q.  That's the same oath you're under today, right, Dr. Merikangas?

A.  I presume so.

Q.  You know, sir, don't you, sir, you have taken the same oath every time to tell the truth in the courtroom?

A.  In different states it may be different.  I don't know.

Q.  Let me take you to 8748 of that transcript.  Here, sir, do you see you are asked --

        THE COURT:  What case is this one?

        MR. SAMUELS:  Yes, Your Honor.  This is United States of America versus John Charles McCluskey.  It is a case in United States District Court for the District of New Mexico, and it is the punishment phase, the eligibility phase on October 24th, 2013.

        THE COURT:  All right.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              1991

BY MR. SAMUELS:

Q.  You see, Dr. Merikangas, where there is a highlighted series of questions by Mr. Warbel, "Doctor, are you against the death penalty?"  And then you respond, "Not in all cases."  Do you see that, sir?

A.  I think I said that today as well.

Q.  Then the follow-up question is, "You have testified before that you think it should be abolished."  Your response is, "Yes.  I think it's not a very effective deterrent."

A.  I see that.

Q.  So showing you that, sir, does it refresh your recollection that you have testified your views about the death penalty in other cases?

A.  Well, it says what it says, but I don't recall saying it.

Q.  You don't hold that view, sir?

A.  My view is that it's not very effective at preventing murder because the states in America that have the death penalty have a higher murder rate than the states that don't. I think that's what I mean by effective as a crime deterrent.

It's not very effective.

Q.  But you would maintain, Dr. Merikangas, that any view you hold on the death penalty, you would be able to set those aside in your role as an expert?

A.  Is that a leading question?

Q.  I'm allowed to lead, sir.  It's on cross-examination.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                             1992

A.    Repeat the question.

Q.    Of course.  You would maintain, I assume, that you can set aside your views on the death penalty when you are testifying as an expert in a case?

A.    Yes.

Q.    Let's talk about your work in this case, Dr. Merikangas.

      Tammy, if we can take the Elmo down and switch it to the government system, I'd sure appreciate it.

      Dr. Merikangas, you were asked some questions about this.  You were, I believe, contacted by Sheila Cronin in early June 2009; is that right, sir?

A.    I think so.

Q.    Let's pull up Government's Exhibit 28, please.

      Sir, showing you Government's Exhibit 28 previously admitted, you see an exchange between yourself and Ms. Cronin.  I assume that is your e-mail address neuropsych2001@hotmail.com?

A.    It was at that time.

Q.    And there is a section in there about getting involved in the case.  Do you see that?

A.    Yes.

Q.    And I believe that after you got involved, Dr. Merikangas, you suggested that Dr. Mirsky join the team?

A.    It may have been the other way around.  It may be that he was contacted, and then he suggested me.  I don't recall

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          1993

which.

Q.   Let's take a look.  Let's go to Government's Exhibit 29.
Showing you this e-mail that's been previously admitted,
Dr. Merikangas, looking at where it says the
neuropsych e-mail from Tuesday, June 2nd, 2009, and I know
you're not on this e-mail, sir, but if you look at this where
it says that the neuropsychologist, that Dr. Merikangas
suggested to do the testing is Allan Mirsky.  Does that help
refresh your recollection about whether you might have
suggested Dr. Mirsky?

A.   I believe it says what it says.

Q.   Doesn't help refresh your recollection, sir?

A.   No.

Q.   You have worked cases with Dr. Mirsky before, right?

A.   Yes.

Q.   Including the William Merriweather case that I talked
about previously?

A.   I don't recall if he was on that case.

Q.   And do you remember how much time you initially requested
or estimated in the case?

A.   No.

Q.   Let's go to Government's Exhibit 34.  Looking at Exhibit
34, Dr. Merikangas, how much time did you estimate that you
would need in the case?

A.   20 hours.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    1994

Q.  Now, when you testified on direct examination, I thought you had said that there wasn't a lot of time in this case; is that right?

A.  That's right.

Q.  But this estimate, you would agree with me, comes from you, that you would need 20 hours?

A.  That's right.

Q.  Okay.

A.  The amount of time is two weeks.

Q.  And in June of 2009, where it was two and a half months until the penalty phase, you're just estimating 20 hours?

A.  That's right.

Q.  You didn't say 40 or 80 or a hundred hours?

A.  It says what it says.  20 hours was an estimate.

Q.  And that came from you, sir?

A.  Yes.

Q.  All right.  What would that 20 hours consist of?

A.  Reading all those records that I never received.

Q.  Well, I thought you testified that you just read the reports of Drs. Patterson and Montalbano?

A.  But then in 2015 you saw that I finally got the records which I had requested, what was it, 48 different documents, which I was not given the first time.  I didn't have the Army records.  I didn't have the police reports.  I didn't have anything except Montalbano and Patterson.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        1995

Q.  Can you point me to some document where you requested those records, sir?

MS. ALI:  Objection.

THE COURT:  No, the question is appropriate.  He said he didn't get the documents he requested.  Well, where is his record of what he requested?  He hasn't shown that he's remembered certain things going back, so he says he didn't get the documents he requested.  Well, what did he request?  If he can't remember, then is there a document that will show the request?  You can't accuse somebody of not sending you documents that you request if you don't have a record of what you requested, or you can't remember what you requested.  And, if counsel has such a document, it should be shown to the witness to refresh recollection.

THE WITNESS:  It is my practice to request that I see all of those records, Your Honor, and I don't have it in writing that I requested that when I tell people I want to see all of the records.

BY MR. SAMUELS:

Q.  We just got your memory of that today, sir; is that right?

A.  No.  I'm saying this is my practice in hundreds of cases, I always request -- I want to see the police report.  I want to see all the medical records.  If possible, I want to see his birth records.  I would like to see the family records.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    1996

I was like to see what your mitigation expert has learned about the history.  I want to see all the records.  That is my practice.

Q.  I'm asking specifically with this case, is there anything you have to point me to that shows that?

A.  I just told you I have nothing in writing because that's what I always do.

Q.  These communications, Dr. Merikangas, were in June of 2009, but you didn't actually get appointed until July 22nd, 2009.  Does that sound right, sir?

A.  Yes.

Q.  Do you recall what your rate of pay was?

A.  I think it was $3,000 a day for visits out of state or out of town, and I'm not sure what the hourly rate was in those days.

Q.  I'm going to show you another exhibit, sir.  Can we go to Government's Exhibit 35, please, Ms. Jahn.

And this is a motion for your appointment, Dr. Merikangas.  That's the motion that covers it.  But let me go to the next page here, which I believe -- we will go to your fee schedule in a moment.  You had talked about and admitted your resume, but it's also attached to this document.  I want to ask you a couple of things about it, sir.

If we could go, Ms. Jahn, to Page 5.  It's easier for me to scroll down.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        1997

Can you see that?

A.  I see that.

Q.  Dr. Merikangas, can you follow me on the screen?  Okay. Can you see your CV up there?

A.  I do.

Q.  Does it look like what you had as your CV in 2009?

A.  Yes.

Q.  And this CV, as does the CV we looked at previously, does have a list of some of the articles that you have published; is that right, sir?

A.  Can you show me?

Q.  Yes, sir.  Let's go down, for example, to Page 21.  We start to see a series on the top, sir, and then a series of miscellaneous publications.  Do you see that?

A.  Yes.

Q.  And here we see in 2002, "Hitler:  Diagnosis of a Destructive Prophet."  Do you see that?

A.  These are book reviews.

Q.  That's a book review.  I see, sir.  Let me slide down to Page 30, please.  Looking at Page 30, Dr. Merikangas, and I'm looking a little bit down the page here, I see some references to "Mental Health Issues in Death Penalty Defense" for the National Institute for -- it says "trail advocacy meeting."  I assume that is "trial advocacy meeting"?

A.  I guess so.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              1998

Q.   Is that a speech you gave, sir, or a seminar you
participated in?

A.   That's a lecture.

Q.   Looking at mental health issues in death penalty defense?

A.   Yes.

Q.   And then right below it "Mental Health Issues in *habeas*
Appeals"?

A.   Yes.

Q.   Okay.  Page 31, Ms. Jahn.

          This just continues, right, sir, "Representing a
Death-Sentenced Client in Federal Post-Conviction
Proceedings," more lectures again, sir?

A.   Yes.

Q.   Going down again at the bottom of 2003, "Mental Health
Issues in Criminal Defense," is that a speech that you gave,
sir?

A.   Yes.

Q.   Then I've got two more pages here.

          Ms. Jahn, I'll move it down myself.

          Okay.  Paris, France, July 2005, "Prosecutorial
Misconduct in Capital Cases - Hubris, Arrogance, and the
Abuse of Power."  Is that a speech you gave, sir?

A.   Yes.  In Paris, France.

Q.   Is that a title you came up with?

A.   Is it a what?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          1999

Q.  A title you came up with?

A.  Yes.

Q.  And down a couple of entries below, "Brain Imaging" and "Prosecutorial Misconduct," National Seminar on the Development and Integration of Mitigation Evidence.  Do you see that, sir?

A.  Yes.

Q.  Another speech you gave?

A.  Yes.

Q.  Dr. Merikangas, seeing these speeches, you're not in a position to identify prosecutorial misconduct, are you, sir?

A.  Yes, I am.

Q.  You are?

A.  I know it when I see it.

Q.  Do you maintain, sir, that you have no bias against the prosecution or the government in a capital case?

A.  I have no bias.  I have a bias against misconduct.

Q.  I see.  And you're able to determine that?

A.  Yes.

Q.  Do you have legal training, sir?

A.  Yes.

Q.  I didn't catch that when we were going through your series of qualifications.  Have you gone to law school?

A.  I have not gone to law school.  I went to Navy justice school, Uniform Code of Military Justice.  I served on

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2000

court-martials in the Navy.  I don't know if that counts as legal training.

Q.  That's what you feel enables you to identify prosecutorial misconduct?

A.  No.  I think common sense and the literature on prosecutorial misconduct allows me to do that.

Q.  Enough for you --

A.  Maybe you should listen to that lecture, and then you will understand how one determines prosecutorial misconduct. It's when they conceal evidence, when they lie, or when they do other things that are unethical.

Q.  You said lie.  So making a false statement in a court, you would consider that to be misconduct?

A.  I think that is part of it, yes.

Q.  In an effort to mislead another party?

A.  Well, that's the general thing, yes.

THE COURT:  You said withholding of evidence, did you say that?

THE WITNESS:  *Brady* violations.

THE COURT:  What about any defendants or defense counsel misconduct?  What about withholding discovery?  What about withholding materials, have you ever seen that?

THE WITNESS:  I haven't personally seen that.

THE COURT:  Would you know that when you see it?

THE WITNESS:  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2001

BY MR. SAMUELS:

Q.  You would agree with me that that subverts the truth-finding function of our justice system just the same?

MS. ALI:  Objection, calls for speculation.

THE COURT:  He's gone on with his opinions now, even telling Mr. Samuels that he needs to read an article. I'll allow the question.

MR. SAMUELS:  Thank you, Judge.

THE WITNESS:  What was the question?

BY MR. SAMUELS:

Q.  Of course.  Withholding evidence, making false statements, that kind of conduct on behalf of a defendant would have the same impact of subverting the justice system as a *Brady* violation?

A.  I presume so, but I'm not a lawyer.

Q.  You wouldn't know it when you see it?

A.  No.

Q.  I see, sir.  Let's go down.  I've got your fee schedule up here.  Is this the fee schedule that you had at the time, sir?

A.  Is there a date on this?

Q.  Yeah.  It's part of your CV that was filed with the Court on June 9th, 2009.  Do you see that?

THE COURT:  So the record is clear, this is a sealed motion by David Anthony Runyon's counsel that was

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2002

filed with the Court on 6-9-2009, and the Court entered the

order to seal the *ex parte* motion on 6-9-2009, and that's

207.  So both the 206 and 207 that he's been referring to

are part of the docket record in this case both entered on

6-9-2009.

          MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Merikangas, what fee does it indicate that your

billing rate is, sir?

A.  You want me to read this out loud to you?

Q.  Yes.  Tell me what your billing rate is for a

neuropsychiatric examination like you were called to do in

this case?

A.  $5,000 each day away.  I believe in this case I charged

3,000.

Q.  You charged less in this case, right, sir?

A.  Yes.

Q.  Do you know why you charged less?

A.  I think I was informed that the fee schedule was

suggested by the attorneys.

Q.  I see.

A.  They negotiated that.

Q.  Let's take a look at Government's Exhibit 54, please.  I

believe, Dr. Merikangas, this is another court order that

references that your fees will be capped at $7,500.  Do you

Merikangas, J. - Cross                                                        2003

see that, sir?

A.   Yes.

Q.   That was the fee limitation, not $3,000.  Do you see that?

A.   I'm seeing that for the first time, yes.

Q.   But based on the fee schedule that we looked at, a day here doing examination would have been $5,000; is that right?

A.   Yes.

Q.   Okay.  Up until February of this year, sir, I actually had none of your billing.  Can you tell me what you've been paid in this case overall?

A.   No.

Q.   Why not?

A.   Because I haven't added it up.

Q.   Well, let's talk about it.  So in 2009 I think your billing was about 3,800.  Does that sound right?

A.   I think that's what it says on the forms you showed me.

Q.   And then you were engaged again in 2015, correct?

A.   Yes.

Q.   What was the billing that you did in 2015?

A.   I don't know.

Q.   Did you submit that billing?

A.   I don't know.

Q.   Were you paid for your work in 2015?

A.   I don't know.

Merikangas, J. - Cross                                          2004

Q.   You just don't remember, sir?

A.   I don't know.

Q.   2023, when did you get reengaged for this phase of the case, sir?

A.   I believe in September.

Q.   September of?

A.   This year.

Q.   Of 2023.  Now, if you remember, we were set to have you testify by videoconference back in February of 2023.  Do you remember that?

A.   That was the previous attorneys, I believe.

Q.   Yes, but it was still you, sir, you were still involved?

A.   Then I misunderstood your question.

Q.   My question was didn't you get involved even earlier, weren't you involved in 2022 or early 2023?

A.   Yes.

Q.   And how much did you bill for that involvement?

A.   I don't know.

Q.   And then did you stop being involved in February 2023?

A.   I don't recall continuing, no.

Q.   When did you pick back up?

A.   September this year.

Q.   How did that happen, sir?

A.   Ms. Ali contacted me.

Q.   And do you know what you quoted or billed to be here for

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2005

your testimony today, sir?

A.  I think I quoted $400 an hour.

Q.  And do you know how many hours you've spent on this?

A.  No.

Q.  When did you get into town, sir?

A.  I got into town at 1:00 today.

Q.  And you have been last week as well; is that right?

A.  That's right.

Q.  How long did you spend here last week?

A.  Tuesday night until Friday morning.

Q.  So all day Wednesday?

A.  Or was it Thursday night?  Tuesday night until Thursday night.

Q.  So all day Wednesday, all day Thursday?

A.  Yes.

Q.  Did you bill for those two full days?

A.  Not yet.

Q.  Are you going to?

A.  Yes.

Q.  $400 an hour?

A.  Yes.

Q.  And did you engage in preparation on those days?

A.  Did I engage in preparation?

Q.  Preparation for your testimony today, sir?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2006

Q.   What form did that preparation take?

A.   Reading a lot of records.

Q.   What kind of records?

A.   All kinds of records, including the previous reports, the reports of Mirsky, Patterson, Montalbano, Aguirre.

Q.   Did you have any sessions where you sat down with *habeas* counsel and kind of went over your testimony?

A.   I did.

Q.   And how many?

A.   I'm not sure.

Q.   How long were they?

A.   At various times during the day.  I don't have a record of that.

Q.   What was the format?

A.   The format is what I just described.

Q.   Well, I'm sorry, sir.  I understood you to say you sat down and reviewed a bunch of records, but did you sit down with counsel or someone on counsel's staff and do kind of a question-and-answer session?

A.   Somewhat.

Q.   What does somewhat mean?

A.   It means yes and no.  It means sometimes I looked at them, sometimes I was given records to look at, some I didn't have with me.

Q.   Were you given any questions that you might face, sir?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2007

A.  No.

Q.  No one sat down and asked you a series of questions to prepare you for today?

A.  No.

Q.  So the first time that you heard Ms. Ali's question was when you came here into court today?

A.  Yes.

THE COURT:  While we are on this, you submitted a second declaration, do you recall, before trial to this court?

THE WITNESS:  Yes.

THE COURT:  Who did you meet with to submit that declaration and who drafted it?

THE WITNESS:  Ms. Ali.

THE COURT:  Did you draft it?

THE WITNESS:  No.

THE COURT:  What did you do, just sign it?

THE WITNESS:  I read it.

THE COURT:  All right.

THE WITNESS:  And I was shown the invoices that I had not seen, which pointed out that I had, in the past, in 2000 -- whatever it was on those bills -- go through those things.  Therefore, I said I must have looked at them. That's the first time I was reminded of that.  That's why I corrected the February declaration.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2008

BY MR. SAMUELS:

Q.  But you didn't draft that declaration, the one that was filed in, I think it was early October, sir?

A.  No.

Q.  Who drafted it?

A.  Ms. Ali.

Q.  Did you have any participation in what went in it?

A.  I looked at it after it was drafted.

Q.  So after it was completed, you looked at it and agreed to sign it?

A.  Yes.

Q.  You didn't make any edits or there were no drafts of it?

A.  No.

Q.  How was it transmitted to you, sir?

A.  It was handed to me.

Q.  Where?

A.  In Chevy Chase, Maryland.

Q.  You were visited by *habeas* counsel in Maryland?

A.  Yes.

Q.  Okay.  Was the declaration discussed when you signed it, sir?

A.  Yes.

Q.  Okay.  We may come back to that in a little bit, Dr. Merikangas.  I want to take you back to 2009 because I want to try to keep this chronological so I can hopefully

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2009

refresh some of your recollection.

Sir, do you remember when you were appointed in 2009, you were not able to go see Mr. Runyon until July 29th?

A.  I don't recall when I was appointed.

THE COURT:  We just went over that.  You were appointed 6-9-2023, the Court entered an order.

THE WITNESS:  I wasn't informed of that, Your Honor.

BY MR. SAMUELS:

Q.  If we could go to Government's Exhibit 58, please, Ms. Jahn.

Sir, showing you Exhibit 58, an e-mail dated July 22nd from Mr. Hudgins back and forth to you, sir.  Do you see how you were indicating you've got to go Wednesday, July 29th?

A.  Yes.

Q.  Do you recall what, if any, preparation you had done before that date, sir?

A.  I don't recall.

Q.  All right.  Let's go to Government's Exhibit 63 and talk about your report here, sir.  Dr. Merikangas, you recall you discussed this report a little bit with Ms. Ali?

A.  Yes.

Q.  And to be clear, this was a report that you provided to Mr. Hudgins, the lawyer in this case?

Merikangas, J. - Cross                                            2010

A.  Yes.

Q.  You're not writing to another neurologist, you are writing to the attorney in this case, Mr. Hudgins?

A.  Yes.

Q.  And even though I understand it's a preliminary report, you would certainly want this to be as accurate as it could be, right?

A.  What do you mean?

Q.  Well, you would want a report that was submitted to counsel, that might go to the Court, to be accurate?

        THE COURT:  What exhibit number is this so I can look at the whole letter?

        MR. SAMUELS:  Yes, Your Honor.  It's Government's Exhibit 63.

        THE COURT:  All right.  Let me get that.

        MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  Let me take you back to my question, Dr. Merikangas.  In submitting this report reflecting your examination so far, you would want this report to be accurate?

A.  Yes.

Q.  You would want this report to be correct in every way?

A.  Yes.

Q.  This indicates that you examined Mr. Runyon at the Portsmouth City Jail on July 29th, 2009.  How long did that

Merikangas, J. - Cross                                                  2011

exam take, sir?

A.   Probably an hour and a half, but I don't have a record of it.

Q.   Now, when you do examinations, you do take some notes, don't you, sir?

A.   Usually.

Q.   And you probably keep -- or do you?  What do you do with those notes?

A.   I take notes afterwards.  I don't take notes while I'm examining someone.

Q.   And do those notes reflect your findings on the physical examination, sir?

A.   Yes.

Q.   Now, I'd like to start with the first paragraph.  You indicate that the only two reports that you've reviewed are the reports of Dr. Montalbano and Dr. Patterson; is that right?

A.   Yes.

Q.   Dr. Montalbano on June 27th, 2009, although I think that's actually the date of the report, not the date of the examination.  Do you recall that?

A.   It's a report by Montalbano on June 27th, yes.

Q.   And then Raymond Patterson on February 4th, that one is actually the date of the interview, not the date of the report.  Do you recall that?

Merikangas, J. - Cross                                              2012

A.   Well, it's the date I got from his report.

Q.   I see.  And you said that those evaluations suggested that Mr. Runyon suffered from migraine-like headaches, attention deficit disorder, and post-traumatic stress disorder; is that right?

A.   Yes.

Q.   You stand by that?

A.   Yes.

Q.   So I have the reports of Dr. Patterson right here, Dr. Montalbano.  These are Government's Exhibits 55A and 55B. Sir, if I looked through these reports, one is by Dr. Patterson dated June 24th, 2009, 24 pages.  Then I've got 55B, which is the report of Dr. Montalbano dated June 27th, 2009.  That is 31 pages.  Would you accept those representations, Dr. Merikangas?

A.   That you have the page numbers correct?

Q.   Yes, sir.

A.   Yes.  Maybe I should look at them and see because --

        MR. SAMUELS:  Of course.

        THE WITNESS:  You have accused me of not looking at things.

BY MR. SAMUELS:

Q.   Very good, sir.  Let's pull up Government's Exhibit 55A, start there.

        THE COURT:  Well, it might be easier if he had a

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2013

paper copy.  Whatever would facilitate and make it easier

and quicker, that's what we should do.

MR. SAMUELS:  Let's do the paper copy then, Your

Honor.  With the assistance of the court security officer, I

will offer Dr. Merikangas Government's Exhibit 55A and 55B.

Since you've got those, let's go back to Exhibit 63 on the

screen.

BY MR. SAMUELS:

Q.  Did I get the page numbers right, Dr. Merikangas?

A.  I'm looking.

Q.  I see.

A.  31 and 24.

Q.  Just what I said, right?

A.  Yes.

Q.  Can I assume, based on your report here, that we would be

able to look through those two reports there I've handed you

and find some reference to migraine-like headaches, attention

deficit disorder, and post-traumatic stress disorder?

A.  All of those or do you want to ask those individually?  I

believe migraine is mentioned specifically.

Q.  Okay.  And attention deficit disorder, how about this?

A.  That may be my conclusion based upon their observations.

Q.  How about post-traumatic distress disorder?

A.  Same answer, I'm not sure.  I'd have to look through it

all and parse it.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2014

Q.  So as I understand it, you don't know if those actual terms are in the reports of Patterson, Montalbano?

A.  I don't know if they are.  I don't rely upon their diagnosis.  I was looking at the observations.

Q.  So do you know where this reference to migraine-like headaches, attention deficit disorder, and post-traumatic stress disorder comes from?

A.  I'd have to look through them to find out.

Q.  I won't ask you to take the time to do that, sir.  Let's see, looking down here, this includes your examination of Mr. Runyon; is that right, sir?

A.  2009?

Q.  Yes, sir.

A.  Yes.

Q.  Do you see this sentence that says, "He had multiple scars on his head and face from trauma, including an automobile accident that rendered him unconscious and contributed to his PTSD."  Do you see that?

A.  Yes.

Q.  Which automobile accident is that?

A.  The one where he describes picking glass out of his face. There's the 1996 accident.

Q.  That's your memory, that the 1996 one involves picking the glass out of the face?

A.  That's what I recall.

Merikangas, J. - Cross                                              2015

Q.   Okay.  And your recollection is that he was actually rendered unconscious there?

A.   Yes.

Q.   And that there was a diagnosis of PTSD?

A.   No.  I don't say that it was a diagnosis.  I had the impression he had PTSD, and it's contributed to it.

Q.   Where did you get the impression that he had PTSD?

A.   From reading these other reports and talking to him.

Q.   You also spoke with Mr. Runyon, and you did -- did you do some type of interview with him in addition to the physical exam?

A.   I spoke to him during the duration of doing the physical exam.

Q.   Did you talk to him about the offense?

A.   No.

Q.   Not at all?

A.   No.

Q.   Is that standard that you wouldn't ask a patient, that you're examining for mental health examination, about the offense involved, sir?

A.   If someone is pleading guilty, then I ask about the offense.  If someone says they didn't do it, there is no point in asking about the offense.

Q.   Okay.

A.   And plus, as you pointed out, you can't believe

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                      2016

everything that people tell you.

Q.   Yes, sir.  Let me take you to the bottom of this report, sir.  I don't know that we hit on this in direct examination. Here you list your impression, which I take it are your kind of initial findings; is that right?

A.   It's my impression.

Q.   Does that have some meaning because I've seen that word a lot, impression, on expert reports in the last few days.

A.   Yes.

Q.   What significance does that have?

A.   It means it's not proven.  It means that it's a thought. It means something to be evaluated.

Q.   Because --

A.   It's part of a differential diagnosis, which is a medical term for putting together conclusions from all of the observations and listing in your head the possibilities that may exist and trying to eliminate those which aren't right to arrive at those which are.  That's an impression.

Q.   And in this impression you mentioned these multiple head injuries, beatings in childhood and current severe headaches. Did he tell you about these headaches?

A.   Yes.

Q.   At the time of the examination?

A.   Yes.

Q.   And you reference that he requires brain imaging and an

Merikangas, J. - Cross                                           2017

EEG?

A.  Yes.

Q.  There never was an EEG, was there, sir?

A.  Not to my knowledge.

Q.  You never ordered one, did you?

A.  I was told it wasn't authorized.

Q.  Who told you that, sir?

A.  The lawyers.

Q.  Is that in writing or documented anywhere?

A.  No.

Q.  Okay.  Here you say, to continue, "His psychiatric evaluations, including my own, suggest that at the time of the crime in question, he was suffering from the effects of, or withdrawal from, the experimental drugs that he was taking as a paid experimental subject."  Do you see that, sir?

A.  Yes.

Q.  So you thought that this was due to some sort of drug interaction that he was having?

A.  No.  I said that was a possibility.

Q.  How do you come to that possibility, Dr. Merikangas?

A.  Because when one is taking all kinds of experimental drugs, it's a possibility.

        THE COURT:  What was he taking?  Did you familiarize yourself with his clinical trials?

        THE WITNESS:  I found out later that he took about

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2018

eight different kinds of drugs.

BY MR. SAMUELS:

Q.  Let me show you, Dr. Merikangas, Government's Exhibit 23.
This is a clinical drug trial list.  Looking through those
drugs, would any of those drugs would have caused what you
described as psychiatric issues for Mr. Runyon?

A.  Some of them could have.

Q.  Which ones?

A.  Number 1 and number 6 and number 10.

          THE COURT:  Would you enlarge it?

          MR. SAMUELS:  Yes, Your Honor.  I was just trying
to get the entire list up, if that's helpful.

          THE COURT:  That's good.

          THE WITNESS:  Now, the other drugs that aren't
identified, it's impossible to tell.

BY MR. SAMUELS:

Q.  In fact, on the first list it's kinds of hard to tell,
too, because we don't actually know if David took the drugs?

A.  That's right.

Q.  So what kind of follow-up did you do to determine whether
this possibility, that he was taking experimental drugs, was
causing some sort of harm?

A.  In 2009 I did no follow-up because they dropped the case.
They didn't present it in mitigation.  They didn't ask me to
testify.  I didn't get to do any of the things I normally

                 JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2019

would have done.

Q.  Dr. Merikangas, do you know that you're the only expert that's raised this experimental drug idea?

A.  I don't know that.

Q.  Is there anything that you can tell us that you're basing that on, sir?

A.  I'm basing it on my knowledge of psychopharmacology.

Q.  Sir, at the time that you interviewed Mr. Runyon, did you look at any evidence from the trial?

A.  No.

Q.  And, again, you claim that you asked for those records, and they were never given to you?

A.  That's right.

Q.  Did you get any medical records at the time?

A.  No.

Q.  It says -- if we could go back to Government's Exhibit 63.  You say at the bottom here that you are waiting the details, chronology and details of the drugs.  Anything you can point to where you asked for that chronology?

A.  Just that I asked them for it.  I didn't write down.

Q.  It says, "Full report will follow the results of his brain imaging."  Do you see that?

A.  Yes.

Q.  Okay.  And you did ask Mr. Hudgins to order some -- a series of tests; is that right?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2020

A.  A MRI and PET scan.

Q.  Let's go to Government's Exhibit 60, please.

     I'm scrolling down here, Dr. Merikangas.  This is your order for the MRI and the PET scan; is that right, sir?

A.  No.  That's for the MRI.

Q.  The MRI.

A.  That's for the PET scan.

Q.  That's for the PET scan.  You never talked about the PET scan in your direction examination.  Did you look at the results?

A.  Today?

Q.  No, sir, back in 2015?

A.  You say I never talked about it in my direct, you mean the direct today?

Q.  Yes, sir.

A.  No, I didn't.

Q.  You never looked at these?

A.  I didn't talk about it today.  What is your question?

     THE COURT:  Wait just a minute.  Just rephrase your question so they have the right chronology.  He wants to know the chronology, what time period you are talking about.

BY MR. SAMUELS:

Q.  The PET scan and the MRI were done in 2009?

A.  Yes.

Q.  Your billing records show that you did review those?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2021

A.  Yes.

Q.  And you reviewed them in 2009?

A.  Yes.

Q.  And then you talked about the MRI in your 2015 report?

A.  Yes.

Q.  Were there any findings with respect to the PET scan?

A.  My recollection is it was nondiagnostic.

Q.  What does that mean?

A.  That means you couldn't look at it and make a diagnosis.

Q.  Was there any reason for that, that you recall, sir?

A.  Yes.

Q.  What was that?

A.  That the disk I got could not be visualized properly, and it was not dramatically abnormal enough so that just looking at it on a PC would give you the answer.  The disks can be various ways.  Some of them can be adjusted for contrast, brightness, and so forth, and this one apparently could not be.

Q.  And you remember that, Dr. Merikangas?

A.  I'm telling you what the word "non-diagnostic" means.

Q.  I see, sir.  So, Dr. Merikangas, you ordered the PET scan and the MRI after you examined Mr. Runyon, correct?

A.  Yes.

Q.  And then where we pick this up again is you signed this declaration in February of 2023.  Do you recall that, sir?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                2022

A.   Yes.

Q.   Let me show that to you -- and, madam clerk, if I could
have the Elmo again.

         Dr. Merikangas, do you recognize this, sir, as that
declaration you signed?  It was filed as an attachment to a
pleading, Document 754-3 was the actual filing filed on
February 3rd, 2023?

A.   I recognize the declaration.

Q.   Okay.  Goes one page and then a second page, and we will
go through this, sir, a third page, a fourth page, and then a
fifth page.  Do you see that?

A.   Yes.

Q.   Now, Dr. Merikangas, that is -- did you sign that, sir?

A.   I did.

Q.   What's the date you signed it?

A.   February 2nd, 2023.

Q.   It says you declare under penalty of perjury that the
foregoing is true and correct.

A.   Yes.

Q.   You are aware of what language like that means, the
penalty of perjury, right, sir?

A.   Yes.

Q.   That means that you're saying that this is complete and
fully truthful?

A.   That was my belief.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2023

Q.  And you're saying you declare it that it's -- all of the foregoing is true and correct.  You see that, sir?

A.  That the foregoing is true and correct.

Q.  The foregoing meaning the entire document?

A.  Yes.

Q.  And you recall the disk was submitted in connection with the request to have you come and testify by video?

A.  I don't know that.

Q.  You didn't know this was done in connection with that, sir?

A.  No.

        THE COURT:  Well, I will tell you that it was because I was the one who had to make the decision, and it's a court document bears an ECF number at the top, if you go down.

        MR. SAMUELS:  Yes Your Honor.

        THE COURT:  It shows ECF Document 754-3 filed 2-3-23, and it's Page 1 of 5, and it was an exhibit for that request.

        MR. SAMUELS:  Yes, Your Honor.

        THE COURT:  It was given in support, not really an exhibit but support of your request.

BY MR. SAMUELS:

Q.  And looking here today, Dr. Merikangas, you agree that's your declaration, you reviewed it, you signed it under

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2024

penalty of perjury?

A.  Yes.

THE COURT:  Where is it in the book?  I wanted to look at it because there is something that I'm interested in in there.

MR. SAMUELS:  It's not an actual exhibit, Your Honor, but I can tender a copy to the Court.

THE COURT:  Well, I can run it up on my docket.

MR. SAMUELS:  I have extra copies, Your Honor.

THE COURT:  Okay.  I would like to see it because it's reported on the docket.

MR. SAMUELS:  It is, Your Honor.

THE COURT:  It was part of the proceeding as we entered it in February.  Go ahead.  Are you still asking questions about it?

MR. SAMUELS:  I am, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Merikangas, it looks like this kind of follows the initial report you did in 2009.  There is a second paragraph that talks about you did two reports in this case, correct?

A.  Yes.

Q.  And then it talks about your first report that you did that we just discussed, that was Government's Exhibit 63, right?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2025

Q.  And then there is a reference here in 2009, your impression that Mr. Runyon was suffering from delusions of grandiose.  Do you see that, sir?

A.  Yes.

Q.  There is no reference to this experimental drug stuff. That gets dropped, right?

A.  Yes.

Q.  And then here is the part I want to focus on.  You see after that it says, "I did not hear anything further from Mr. Runyon's attorney."  Do you see that?

A.  Yes.

Q.  "Mitigation investigator Sheila Cronin was my main contact with the trial defense team."  Do you see that?

A.  Yes.

Q.  "Although I ordered the MRI and the PET scan, I never saw the images.  A disk of the scans was not in my file.  The first time I saw the imaging was when *habeas* counsel subsequently provided a copy to me."

A.  Yes.

Q.  That information is not true, is it, sir?

A.  Apparently not.

Q.  Well, you know it's not true, don't you, Dr. Merikangas?

A.  I just know what was shown me on the invoice.  I have no recollection of this, and this was what I believed at the time.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2026

Q.   Dr. Merikangas, how did this get put together, this declaration?

A.   I told you.  It was written by the attorneys in that *habeas*.

Q.   Of course, this is some 13 years and change, I guess, after your actual exam of Mr. Runyon, correct?

A.   Yes.

Q.   And the attorneys presented this to you.  How did they do that, sir?

A.   I think they e-mailed it to me.  Maybe -- they must have mailed it if I signed it.

Q.   You reviewed it, sir?

A.   Yes.

Q.   Dr. Merikangas, do you understand how important this is that you are declaring under penalty of perjury here that you had no contact with Mr. Runyon's attorney after your August 5th, 2009, report?

A.   Now you are telling me it's that important?  I don't recall speaking to Mr. Runyon's attorneys.  I spoke to Sheila Cronin.

          THE COURT:  You spoke to Sheila Cronin after the MRIs, after the MRI and the PET scan?

          THE WITNESS:  I am not sure.

BY MR. SAMUELS:

Q.   And you're claiming in here, Dr. Merikangas, that you

Merikangas, J. - Cross                                                    2027

never saw those scans?

A.   That was my understanding and belief at the time.

          THE COURT:  At what time?

          THE WITNESS:  At the time of this declaration.  I had no recollection of seeing these scans.  I didn't have them in my file until they sent them to me.  The attorney sent me the disks.  I didn't have the disks.  They sent me the disks.

          THE COURT:  When you say "they," you are talking about the *habeas* attorneys?

          THE WITNESS:  Yes, the 2023 *habeas* attorneys sent me the disks.  They had the disks.  I didn't have the disks.

BY MR. SAMUELS:

Q.   You had your billing records, though, right, sir?

A.   I hadn't seen my billing records at the time of doing this declaration.

Q.   Wouldn't it have been important to go back and verify that, sir?

A.   No, because I trusted these attorneys.

Q.   So it wasn't important to you to verify what was said in here?

A.   I presumed that since they sent me the disks, they had the disks.  I didn't recall seeing the MRIs.  I had no record of writing a report about the MRIs.  I had not seen the billing records at all ever, and I did my best when I signed

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2028

this.

Q.  What did you do to verify the information in here, sir?

A.  I just read it, and I didn't do anything to verify it except to read it and say this looks right.  It's my recollection that there was not any discussion about it.

Q.  Let me ask you, Dr. Merikangas, because, you know, it does go on -- I'm skipping forward to Page 3 here.  All of this looks -- pretty much looks like what we talked about for year 2015 report, would you agree with me there?  You list the records, and then there is kind of the discussion of your examination of Mr. Runyon?

A.  It looks like it was just lifted in whole from my report.

Q.  But then, sir, here is where we get a little different. Do you see that the paragraphs starting on the third paragraph, "Mr. Runyon suffers delusional, grandiose thinking."  Do you see that?

A.  Yes.

Q.  Who wrote that?

A.  I presume they are quoting me.

Q.  Well, Dr. Merikangas, I thought you said you didn't have any involvement in putting this declaration together here, sir?

A.  I didn't say that.

        THE COURT:  Well, did you?

        THE WITNESS:  I don't recall.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2029

THE COURT:  This was just back in February of this year.  What was your participation in this affidavit, declaration?

THE WITNESS:  Your Honor, I don't recall.  I am working every day in lots of different things.  Now, I don't have any specific recollection of this particular document except that the lawyers sent it to me.  It seemed right.  It looks like what I did, and I don't have any specific recollection of these particular phrases.

BY MR. SAMUELS:

Q.  Let me put this in context for you, Dr. Merikangas, because I want this to be clear, okay?

A.  Yes.

Q.  Here is your 2015 report.

A.  Yes.

Q.  You spent some this afternoon discussing that.  You recall that?

A.  Yes.

Q.  I think it's Defendant's Exhibit 21.  I think that's the right number.  At the end of the report, you have this paragraph about reviewing the MRI and PET scan.  Do you see that?

A.  Yes.

Q.  You have an impression there.  You see that?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                2030

Q.   That impression ends with -- and let me come back to that because I thought you told us before that the impression just means some suggestions, it's not something that's a conclusion?

A.   That's right.

Q.   So we can't take that impression necessarily as your concrete opinion, it's just your impression?

A.   That's right.

Q.   Okay.  So what we have here, then, is you see how these kind of line up, sir?

A.   Yes.

Q.   The one in the top is from 2023, and it's got that stuff about the MRI and the PET scan.  And then it's got this stuff about -- you see it ends with PTSD, and then there is another line, "Mr. Runyon's history of PTSD affects his perceptions and ability to function in everyday life."  Do you see that?

A.   Yes.

Q.   Then, Dr. Merikangas, it goes on and on and on.

          THE COURT:  Well, it is no longer impressions. These are conclusions; is that correct?

          THE WITNESS:  No.  This is the explanation of what those things may do to affect this man's behavior. Obviously, I had explained this to them, and they have written it down.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2031

Q.   When -- so let me ask it this way.  You did not draft this?

A.   No.

Q.   You did not put all this language on here?

A.   I think I produced the language.  How it got in here, I was not involved in drafting the document.  I was given a completed document that, obviously, this is my description, which I gave here today, about executive functioning and people with frontal lobe and brain damage.

Q.   But you see, Dr. Merikangas, how it looks like -- you can see how one would look at this and think that words are perhaps being put in your mouth that's giving you to sign. Can you see that, sir?

A.   No.

Q.   I mean, they put in there that you never talked to trial counsel after the 2009 exam, right?

A.   I do not recall speaking to trial counsel after the exam.

Q.   But you trusted them.  You didn't do any follow-up to see whether you did or not?

A.   Which trial counsel are you talking about?

Q.   I'm talking about you trusting prior *habeas* counsel when they put in this declaration that you never had any other contact with trial counsel back in 2009?

A.   That's right.

Q.   You didn't do any going back and looking at your records

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2032

to see if you had meetings with them or anything?

A.   I did not recall any meetings with them.  I have no record of meetings with them.  I have no billing of records meeting with them.  No phone call records of them.  Nothing to go back to look at.

Q.   When they said in there that you didn't review the MRI and the PET scan until 2015, you didn't go back and check on that?

A.   They sent me the disks to review in 2015, the 2015 -- they sent me the disks for this report, this 2023 thing, they sent me the disks.  I didn't have the disks.

Q.   So based on that, do you know how all this other information that looks like it's building up to your information or opinion, if you will, sir, do you know how this got in here?

A.   Obviously, they are quoting me.  I don't know how it got in there.

Q.   When you say "obviously," how do we know that, sir?

A.   Because it's my language.  I recognize my language.  I don't know how it got in there.

        THE COURT:  So you're saying, then, that all of this is true?  You're saying that it's your language, and you've given it under penalty of perjury.  So everything in this document, then, is true and correct under penalty of perjury?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                            2033

THE WITNESS:  Your Honor, I don't know if it is or not.  I'm just saying that in answer to this question, that particular language and references is clearly my language.  I don't know how it got there, but it's something I must have written or told them.

BY MR. SAMUELS:

Q.  But you agree with me, it's a pretty big deal for us to get a declaration signed under penalty of perjury from an expert, right?

A.  Yes.

Q.  We think we can rely on that?

A.  Yes.

Q.  And we've just talked about there is information in there that's not right?

A.  Yes.

Q.  Is that the only information in there that's not right?

A.  I don't know.

THE COURT:  You understand that this goes to a Court?  This declaration came to this Court.  The 2015 declaration went to a Fourth Circuit Court of Appeals, and these declarations are representations under penalty of perjury.

THE WITNESS:  This is the only paragraph that I know was a mistake.  I don't know about all the rest of it.

THE COURT:  I'd like you to turn to Page 5, please.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                     2034

I know you're not there yet, but read the first two sentences out loud on Page 5.

MR. SAMUELS:  Let me pull it up.

THE COURT:  Read the first two sentences.

THE WITNESS:  "While my 2015 report is more detailed than my 2009 preliminary report, I would have easily reached the same conclusion in 2009 if I had been provided the MRI scans.  The images on the 2009 MRI indicate that Mr. Runyon is brain damaged."

THE COURT:  Right beneath that, you sign that under penalty of perjury that you were not provided the MRI scans and you would have easily reached the same conclusion.  Is that correct?

THE WITNESS:  I stand by not receiving the MRI scans prior to writing my 2009 preliminary report.

THE COURT:  That's not the issue.  The 2009 was a preliminary report, and you then ordered MRI and PET scans.

THE WITNESS:  Yes.

THE COURT:  The 2009 was a preliminary report, and the issue is whether you read those scans and whether the attorney followed up on anything, and you've said here that had you been provided with them, you would have easily reached the same conclusions in 2009 that you did in 2015.  Is that what you're saying?

THE WITNESS:  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                    2035

THE COURT:  Under penalty of perjury?

THE WITNESS:  I think we demonstrated today that I did not see the MRIs before I ordered it.

THE COURT:  Excuse me.  You couldn't have possibly seen an MRI before you ordered it.

THE WITNESS:  The 2009 report was written before the scans were done.

THE COURT:  But it was a preliminary report that you were going to follow up with scans; is that correct? Yes or no?

THE WITNESS:  Yes.

BY MR. SAMUELS:

Q.  And you got the scans, right, Dr. Merikangas?

A.  I don't know when I got them.  I have a billing record, which was provided to me recently.  It has the August 17th date on it.  I don't know when I got the scans or whether that was the date it was done.

Q.  Let me show you some other things, see if this will help. Let's talk first about the issue of whether you had any other contact with trial counsel because in there you said no, I didn't.  Right?

A.  I've no record of it.

Q.  I'm going to show you some time sheets, Dr. Merikangas, and these are time sheets that we got from the defense. These are time sheets, it's Defendant's Exhibit 158, and

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                  2036

there are time sheets from Stephen A. Hudgins.  Do you see

that, sir?

A.  I do.

Q.  Okay.  And on these time sheets, we see a number of

instances where counsel for Mr. Runyon has conversations with

you.  We see 7-22, we see 7-29.  Do you see that, sir?

A.  Yes.

Q.  Dr. Merikangas, all I'm trying to do here is to show you

some of this to see if any of this helps refresh your

recollection about the contact that you had with trial

counsel.  See here is 8-6-2009, teleconference,

Dr. Merikangas, David Bruck, Woodward.  Are those names

familiar, sir?

A.  Bruck is familiar.

Q.  8-10, this is after the exam.  Teleconference

Dr. Merikangas.  And each time there are units of time there.

An hour on August 6th, six-tenths of an hour on August 10th.

Do you see that, sir?

        MS. ALI:  Objection, Your Honor.  I don't think it

is clear from the record that that was one teleconference

or -- out of six.  It is not clear.

        THE COURT:  Whether it was one or ten, they lasted

an hour.

        MS. ALI:  Well, I'm saying it's not clear whether

that's a teleconference with Dr. Merikangas, another one

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2037

with Mr. Bruck, another one with Mr. Woodward, or they all

spoke together.

            THE COURT:  Well, just let him look at the records

and see if it refreshes.  The 8-6 entry says, "File

Dr. Merikangas report.  Telephone call Dr. Merikangas,

D. Bruck, Woodward."  So you can ask Mr. Woodward.  You can

follow up on that because we can't follow up on it with

Mr. Hudgins since he's now deceased.

BY MR. SAMUELS:

Q.  You see here is 8-11, telephone call with witness, and

then there is a reference to you, sir, on 8-11.  Do you see

that?

A.  I see that.

Q.  Then here, and this is an important one, "Teleconference

with Dr. Merikangas, .5."  Do you see that?

A.  I do.  I see my name is spelled wrong, also --

Q.  Yes.

A.  -- on all of these.

            THE COURT:  Well, it's you, isn't it?

            THE WITNESS:  I presume it's me, but I have no

recollection, and I have no record of these phone calls.

BY MR. SAMUELS:

Q.  All right.  Let me show you -- but you would agree with

me that the records of the phone calls that I showed you

there, they are all a series of phone calls on the day after

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                            2038

and going down after you did your exam, August 6th, August 10th, August 11th, August 13th?  Right?

A.  Yes.

Q.  And it would be typical for you to talk with attorneys after you did your exam?

A.  Yes.

Q.  Let me show you Government's Exhibit 92.

        If we can switch over, Madam Clerk.

        Dr. Merikangas, let's take a look at this.  This is Government's Exhibit 92.  It's a memo to file.  Do you see this?

        MS. ALI:  Objection.  I'm just making the same objection that I've made when it comes to other witnesses that aren't on the document.

        THE COURT:  All right.  Well, this certainly goes to test credibility, but I make the same ruling.

        MR. SAMUELS:  Yes, Your Honor.

        THE COURT:  You can also ask Larry Woodward about it.  I've indicated that.  We know he is going to be a witness.

BY MR. SAMUELS:

Q.  Sir, this was a memo that we got from trial counsel's file.  And do you see how it references that Larry Woodward, and it's from Steve Hudgins, had a conference call with you regarding your evaluation of David Anthony Runyon.  You see

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                2039

that, sir?

A.   But I don't see a date on this memo.

Q.   I'm glad you reference that.

A.   I don't see who wrote it.

          THE COURT:  Let's just put it this way.  It was produced on late discovery by petitioner's counsel who had it in their file, and that is how it has come about.  It was produced by them because they had files of the attorneys, and you can ask Mr. Woodward about it, and you can use anything from Mr. Hudgins' file to support it, but it does have a date on it.  It has a date and a time that the call took place.

BY MR. SAMUELS:

Q.   Do you see the date and time there, it's the next line, Dr. Merikangas, 3:30 p.m. on August 13th?

A.   I see that.

Q.   Okay.  And it referenced that you were in Vermont.  Is that where you were in August of 2009?

A.   I might have been.

Q.   Okay.  Would you take a moment and just -- it's not long -- just review the next several sentences, sir?

A.   Yes.

Q.   You finished reviewing it?

          THE COURT:  I think you need to review the whole memo.

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2040

THE WITNESS:  I'm a very fast reader, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Merikangas, part of the reason you can read it so fast is because you've seen it before, right?

A.  Yes.

Q.  When did you see it?

A.  I saw it last week.

Q.  Who showed it to you?

A.  Ms. Ali.

Q.  What were the circumstances?

A.  Showing me files.

Q.  Was this document highlighted in any way, sir?

A.  No.

Q.  You don't recall addressing this document in the declaration that you signed?

A.  Which declaration?

Q.  The most recent declaration, sir.  I think it was indicated as your revised supplemental declaration.

A.  I don't recall highlighting it, no.

Q.  You don't recall it being mentioned in there, sir?

A.  Can you show me that declaration?  I don't recall this being in there.

Q.  Yes, sir.  Can we switch over, please.

Okay.  Dr. Merikangas, let me show you, and I want to make sure I show you the whole thing here.  This is a

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2041

supplemental and revised declaration that we received from you, sir, 854-1 is the ECF number, filed October 2nd, 2023. Do you see that?

A.  Yes.

Q.  Do you recognize it?

A.  Yes.

Q.  Do you remember signing this?

A.  Yes.

Q.  Did you write it?

A.  No.

Q.  Who wrote it?

A.  Ms. Ali, I believe.

Q.  Did you have any involvement in writing it?

A.  No.  I told you already I reviewed it after it was written.

Q.  You see in Paragraph 7 where you indicate -- or Ms. Ali indicates, and you signed it, that, "I also recently reviewed records from Mr. Hudgins, Mr. Woodward from the time of trial, which refreshed my recollection that I spoke with trial counsel on August 13th, 2009."

A.  Yes.

Q.  Now, I thought you told us that you had no memory of any of these conversations.

A.  That's correct.

THE COURT:  Wait.  Now I'm confused.  You've

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2042

testified today under oath repeatedly that you had no

memory, and yet in this, you're saying that your

recollection has been refreshed, but you still testified

today under oath that you had no memory, even while you were

testifying.

        THE WITNESS:  Refreshing recollection and being

shown a document, perhaps, to me mean the same thing.

BY MR. SAMUELS:

Q.  No, Dr. Merikangas.  You've testified a hundred times.

You know what refresh your recollection means, don't you,

sir?

A.  I do now.  You instructed me.  I understand.

Q.  It means that if you're shown a document that can help

you remember something about the event?

A.  Well, I'm sorry.  I did not remember talking to

Mr. Hudgins.

Q.  So this reference here that --

A.  No.  In August of 2009, I don't recall speaking to him.

Q.  Okay.  Let's go back to the government system, if we can,

now that we've looked at it in your revised supplemental

declaration.

        93, please.  Actually, I think it's 92.

        Dr. Merikangas, you would agree with me that this

memorandum is at odds with your 2009 report?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2043

Q.  Let me take you through it because it's important to know this.

THE COURT:  I don't know whether it is 2009 or 2015.

MR. SAMUELS:  2009.  Probably both reports, Your Honor, actually.

THE COURT:  All right.

BY MR. SAMUELS:

Q.  It indicates that this call took place on August 13th. Do you see that, sir?

A.  Yes.

Q.  It indicates that you relayed -- you did not believe the defense was in a good position to present a mental health defense.  Do you see that?

A.  Yes.

Q.  Do you agree with that, sir?

A.  Well, at this time the trial was over.  He had already been found guilty.

THE COURT:  No.  He had been found guilty, but you weren't hired for the guilt phase.  This was a different phase.  The death penalty hadn't been imposed on August 13th.  The jury was in another phase at that point in time. You testified earlier when you testified in mitigation stages and guilt stages.

THE WITNESS:  To me a mental health defense is a

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2044

defense not a mitigation.  In other words, the defense is before a guilty verdict.  So this doesn't make sense to me.

BY MR. SAMUELS:

Q.  Well, let's go on, Dr. Merikangas.  It says, "He does not feel we have a strong case of any defect in David.  He does not believe it would be wise to present the mental health defense."  Do you see that?

A.  I see that.

Q.  Do you disagree that you may have said that?

A.  Yes.

Q.  You think that's wrong?

A.  "That" meaning?

Q.  "That" meaning what it says there, that you were recommending to the defense that they not present mental health in mitigation?

A.  It doesn't say mitigation.  I don't think that I would have said this.  This does not sound like something I say.  I don't recall saying this, and there is nothing in here about mitigation.

Q.  Dr. Merikangas, you understand, you're not -- we are not saying you're the author of this document.  You understand that?

A.  But it seems to be saying something I said that is not something I would have said.

Q.  Well, mental health defense, mental health mitigation,

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2045

the idea here is you have been retained at this point to potentially testify in the penalty phase of the trial, you understood that?

A.  I'm not sure what I understood at that because I was told that I was helping with mental health in general.  The fact that this happens after the guilty is very strange.  That's never happened --

Q.  Dr. Merikangas, I can go back.  I know we showed it to you.  Do you remember getting an e-mail from Mr. Hudgins that basically said the jury found him guilty.  We are getting ready for the next stage?

A.  Yes.

Q.  That was in July of 2009.  This is a month later in August.

A.  That's why it makes no sense to me that they are talking about a mental health defense.

        THE COURT:  Why did you then go examine him?  So you still went and examined him, and you still ordered an MRI and a PET scan.  So you are a very intelligent, educated person who's been an expert witness for years in these cases, and you are doing the examination and tests for a reason.  So if you thought it was futile at that stage, then it would have been your obligation to let them know.  You've got the e-mail, you proceeded to examine him, you proceeded to order tests, and then this telephone call took place

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2046

after the test.  You say in here that, and it is after you've examined him, and you say that there is no strong case of any defect in David, and it's not wise to go forward, whether it's a mental health defense or mitigation, you are saying it's not wise at that point to go forward.  I don't understand what you are saying.

MS. ALI:  Your Honor, I just want to clarify.  This is not him, his words in the document.  This is a summary of somebody else's understanding or -- I don't know what it is, but it is not Dr. Merikangas's own words.

THE COURT:  I will agree on three things.  I will agree with you that this is a memo to file, and it was from the attorney file; I will agree with you that it was produced by petitioner's counsel, the previous *habeas* counsel; and, number three, I will agree the problem is the declaration and the penalty of perjury.

He's saying he would have reached the same decision in 2009 that he reached in 2015 had he been able to read these.  So he is saying he didn't read them.  He didn't see them.  So this is proper impeachment evidence, and it can be verified, and the Court can then give whatever weight it deems appropriate after Mr. Woodward testifies and we see these files that were not shown before.

So as far as the Court is concerned, this is something he can be cross-examined on, and the problem is

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2047

these declarations.  The problem is the 2015 declaration and the recent declaration before this Court under penalty of perjury.

MS. ALI:  I agree he can be cross-examined, Your Honor.  I'm not objecting to the cross-examination of the document.  I disagree, it is our position he cannot be impeached with this document.  It is not his own statement that he's adopted.  He can be cross-examined on it, he can be asked about it, but under the rule of evidence, he cannot be impeached with a statement that is not his own and that he hasn't formally adopted.

THE COURT:  You can certainly argue this later. You will have an opportunity to redirect this witness, and you can ask him all the questions you want about this document.  But it certainly, in the Court's mind, goes to his credibility given where it came from and given his billing sheets.  It corroborates the billings that have been presented that he reviewed these.  So you can certainly redirect him.  But I ruled before cross-examination can go forward, and you agreed with that, and I'm letting it go forward, whether it be for impeachment or credibility, it is proper cross-examination given the source of this document and how it came about to even be given in the late discovery.  Go ahead.

MR. SAMUELS:  Thank you, Judge.

Merikangas, J. - Cross                                           2048

BY MR. SAMUELS:

Q.  Dr. Merikangas, do you disagree that you told trial counsel it would not be a good idea to present mental health in mitigation?

A.  I disagree.

Q.  Do you disagree that you told trial counsel that there was not a strong case of any defect on David Runyon?

A.  That, I agree with.

Q.  Do you disagree you told trial counsel that you did not believe they would be wise to present the mental health defense in mitigation?

A.  No, I don't agree with that.  I would not have said that, because I stated that he was brain damaged, he has executive problems, and all of that would be useful in mitigation.  I would not have said this.

Q.  Dr. Merikangas, do you agree that you may have told trial counsel, or that you did tell trial counsel that the exam was not abnormal?

A.  I did not tell them that.

Q.  You agree that you told trial counsel that David did not tell you the truth?

A.  I did not tell them that.  I don't see that in my report. Do you?

Q.  No, sir, I don't.  Do you agree that you told trial counsel that unless there was something glaring in the MRI or

Merikangas, J. - Cross                                                2049

the PET scan that would give a very strong argument, you would not recommend presenting a mental health defense?

A.   I don't agree with that.

Q.   And looking at the last line, that even if there was some defect shown in the scans or testing, do you disagree that you told them it would be a risk that they would have to weigh as to whether to present a mental health defense?

A.   I disagree with that also.

Q.   You understand, Dr. Merikangas, that we will have prior counsel come in here and review this, sir?

A.   I don't care if we have to bring in to say that, but I would not have said these things.

Q.   And, sir, remember at the beginning of your cross-examination we talked about how you are called by a number of parties where you sometimes don't testify?

A.   Yes.

Q.   And in situations like that, you will often have a conference or discussion with defense counsel advising them it may not be a good idea to use you?

A.   That's if there is no defect.  But in this case we have a man who is brain damaged, has executive malfunctions, and who shows on his MMPI and other tests that he has some paranoia and a suggestion of delusions.

Q.   But, Dr. Merikangas, at the time of this conversation, you -- you're writing that his impairment is based on

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2050

experimental drugs?

A.  No, I did not.  I said that's one of the things to be considered.

Q.  That's the only thing that you wrote to be considered, right?

A.  No.

MS. ALI:  Objection, mischaracterizes.

THE COURT:  Sustained.  I don't believe his testimony was that.  He said it was a possibility.  He didn't say it was the only reason.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Mischaracterizes the clinical drug trial evidence.

BY MR. SAMUELS:

Q.  You didn't have the MRI at that time?

A.  Which time?

Q.  At the -- on August 13th, you were -- let me ask it this way.  When you had your report done on August 5th, you didn't have the results of any brain scans at that time, you were just getting to the point to order them?

A.  I ordered them on the 30th of July.

Q.  After you saw Mr. Runyon?

A.  Yes.

Q.  And then in your report on August 5th, you referenced that a full report would follow those scans?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2051

A.   Yes, and I never wrote a full report.

Q.   Why didn't you write a full report, Dr. Merikangas?

A.   Probably because I didn't have the scans.  Probably because they did not want it.  Probably because they said he's already been found guilty.  I don't know.  I'd write a report if they'd asked me.

Q.   But bottom line, sir, looking at this memo, you disagree with what's in here?

A.   I disagree with what's written in the memo, yes.  This does not sound like my language.

Q.   You claim you never made this recommendation to trial counsel?

A.   I don't recall this recommendation.  Of what I say, it does not sound like something that I would say.

Q.   Sir, that's not my question.  I'm talking about the substance of it, not whether or not it captures your vernacular or the way you talk.  The substance of this, do you deny telling trial counsel the substance of what's in here?

A.   I deny telling the trial counsel that there is no mitigation, because there was mitigation.  I said that in my preliminary report that there are things here that could be mitigated, but I don't see the word "mitigation" here.  I see mental health defense.

Q.   Let's go to Government exhibit -- well, let's start with

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2052

Government's Exhibit 89, please.

          Dr. Merikangas, showing you Exhibit 89, which is dated September 10th, 2009, do you recognize this as a letter to you from Mr. Hudgins regarding your voucher for your fee?

A.  I recognize it.  I don't recall getting it.

Q.  Okay.  How about this next page here, sir?  And let me enlarge it a little bit.  Do you see how you are referenced, says the payee on line 17?

A.  Yes.

Q.  Whose writing is that, sir?

A.  It's not mine.

Q.  How about the signature?  That's the signature of the attorney.

A.  That's not mine.

Q.  Okay, sir.  Do you recognize the customer invoice that's attached to this?

A.  Yes.

Q.  And that's your firm, sir?

A.  Yes.

Q.  Now, what's listed on here, Dr. Merikangas, is your examination of David Runyon on July 29th, correct?

A.  Yes.

Q.  And medical records, it looks like, those were reviewed July 25th?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2053

Q.  And then there is a reference to the MRI and the PET scan, August 17th, 2009, correct?

A.  Yes.

Q.  And so, sir, based on what we have here, would there be any other data than August 17th, 2009, that you would have actually reviewed those scans?

A.  This looks like four days after the memo you showed me.

Q.  Yes, sir.  Which is before the trial started.

A.  I don't think I could have talked about the MRI and PET before I saw them, as that memo would suggest.

Q.  Sir, if you remember, the memo was conditional on the MRI and the PET scan, and it said, unless there is something very glaring in there, you would recommend not doing a mental health defense.  I know you disagree with that, but that's what the memo says.

        THE COURT:  I think that what the doctor is referring to is the memo to file with the date August 13th.

        MR. SAMUELS:  Yes, Your Honor.

        THE COURT:  I know he is saying that this is four days later.

        MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  But this quantity of two and this amount of $100, that would be reflective of it being a review done of the MRI and the PET, right?

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2054

A.  Yes, it would.

Q.  Okay.  Well, was there any communication that you had back with trial counsel as to what you saw in the MRI and the PET scan?

A.  I do not recall.

Q.  Do you have any records that would have shown that?

A.  No.

Q.  Dr. Merikangas, if you looked at the MRI and the PET scan and said this is really a problem, it shows brain damage, why wouldn't you have reached out to trial counsel to tell them this?

A.  I don't know.  I have no records.

Q.  But you would agree that it would be incumbent on you as the expert, who gets the scans and reviews the scans, to reach out to trial counsel and tell them there was a problem here?

A.  Maybe I did.  I don't have a record.

Q.  You understand it would have been your obligation to do so?

A.  Yes.

Q.  Certainly, if you looked at this on August 17th and seen a problem, you would have wanted to reach out to trial counsel to tell them this?

A.  Yes.

          MR. SAMUELS:  Your Honor, I'd offer Government's

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2055

Exhibit 89, which is the same as the Defense Exhibit -- I forget the number but similar to the Defense Exhibit.

THE COURT:  It's admitted.

MR. SAMUELS:  Thank you.

(Government's Exhibit 89 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Merikangas, do you recall that this bill for $3,800 was not paid right away?

A.  I found out recently that it was past due, and it was a year later that it got paid.

Q.  And the only thing I want to ask you about this, this neuropsychiatric examination for $3,000, that's less than the rate that you have quoted in your materials.  Do you realize that, sir?

A.  Yes.

Q.  Is it possibly less because you weren't going to be able to offer testimony?  Was there any kind of reduction there?

MS. ALI:  Objection.  Calls for speculation.

MR. SAMUELS:  I'm just asking if he knows, Your Honor, what the reason for it being less than the 5,000 that's quoted on his material.

THE COURT:  Don't make it in the form of an argument.  Just make it as a direct question.  Does he know any reason?

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2056

Q.   Do you know of any reason why it would have 3,000 as opposed to 5,000 like quoted in your materials?

A.   No.

Q.   Let's next go to Government's Exhibit 98.  Showing you Exhibit 98, Dr. Merikangas, do you see that this is a letter from Mr. Hudgins to you dated July 8th, 2010?

A.   Yes.

Q.   And here, in the attorney's statement, it indicates neuropsychiatric examination, review of MRI and PET scans. Do you see that?

A.   I do.

Q.   And down here there is a reference to payee.  Do you recognize that writing, sir?

A.   It's not mine.

Q.   How about the signature there?  It says signature of claimant/payee.

A.   That could be mine.

Q.   Okay.  Then here we go down to the invoice.  Do you see it's a similar looking invoice also dated August 30th, 2009, invoice number 1601?  Do you see that, sir?

A.   Yes.

Q.   And you see how it is stamped past due?

A.   Yes.

Q.   Would that have been stamped like that by your office, sir?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2057

A.   I imagine so, but I don't have a direct knowledge of that.

Q.   Okay.  So this time, Dr. Merikangas, we still have the comprehensive neuropsychiatric examination, 7-29.  You see that?

A.   I see that.

Q.   Then we have medical record review 7-25-2009.  You see that?

A.   Yes.

Q.   And then MRI and PET, 8-17-09.

     And this time we have "review" added after that.  Do you see that?

A.   I do.

Q.   That was not on the prior bill that we looked at for 2009.  Do you recall that, sir?

A.   Yes.

Q.   Do you know why?

A.   No.

Q.   But again, looking at this bill, does this refresh your recollection at all as to what you did after you reviewed the PET scan and the MRI?

     MS. ALI:  Objection.  He's answered this over and over again.

     THE COURT:  Well, I'm going to let him ask it again because this is a different voucher, and it says right up

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2058

here, "Description of work, review psychiatric examination, review of MRI and PET scan," and right below that he has said it looks like his signature, certainly matches others in the record. So I'm looking at the voucher that has accompanied this, and I'm going to let Mr. Samuels ask that question.

BY MR. SAMUELS:

Q. But you would agree with me that this indicates a review of those scans?

A. That's what it indicates.

Q. And so the declaration that we saw which said you never saw the scans, that's not accurate?

A. The declaration of February 2023 --

Q. Well, sir, we can say the letter report that you did in September 2015 and the declaration of February 2023 both indicated that you hadn't seen the scan.

       MS. ALI: Objection. February 2015 report, that is misleading.

       THE COURT: Just ask him on either one of those dates.

BY MR. SAMUELS:

Q. On -- well, let's start with the 2023 declaration. You indicated you hadn't seen the scans?

A. That's what it says, yes, but I was mistaken.

Q. Because you didn't go back to verify, sir?

Merikangas, J. - Cross                                                  2059

A.  I had no records with which to verify.

Q.  You trusted the *habeas* counsel?

A.  I did.

Q.  If I could have the Elmo, please.

         THE COURT:  Are you moving for admission number 98?

         MR. SAMUELS:  Yes, Your Honor.  I would move for admission.

         THE COURT:  98 is admitted.

         (Government's Exhibit 98 received in evidence.)

BY MR. SAMUELS:

Q.  Dr. Merikangas, I just have a couple of more things I was hoping I could show you to help refresh your recollection on something.  Do you recall that Ms. Ali showed you the actual final report of the MRI and the PET scans, the actual paper reports, sir?

A.  Which paper report?

Q.  It was the paper report of the -- I believe it was just the MRI that was done in 2009 by the local radiologist?

A.  Who was that?

Q.  That was, looks like Dr. Davis.  Do you remember seeing that, sir?

A.  I saw a report from Harbor View hospital.

Q.  Yes, sir, that's the one I'm talking about.  Do you remember seeing that?

A.  I do.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                         2060

Q.   Okay.  Sir, I've marked this for identification as Government's Exhibit 132.  It's very small.  I'm going to make it larger for you here.  But do you see up at the top here, sir, it says, "1-31-2022, defense discovery disclosure, Merikangas trial file."  Do you see that?

A.   What was the date?

Q.   Sure.  Up at the top it says January 31st --

A.   Yes, I see that, right.

Q.   -- Merikangas' trial file.

      Dr. Merikangas, at some point did you turn over any documents to *habeas* counsel, do you believe, sir, like your interview notes, initial notes, that sort of thing?

A.   No.  No.

Q.   You don't recall that, sir?

A.   No.

Q.   Do you see down at the bottom where it says, "MRI of brain report dated 8-14-2009"?

A.   Yes.

Q.   Do you see that file?

A.   Yes.

Q.   And then what I have here, sir, is that report that you looked at previously, and see how it has a fax header on the top that says -- looks like it says August 14, 2009?

A.   Yes.

Q.   Now, seeing that that file is listed on your trial file

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2061

disclosures, and then seeing this report with the fax header
on it for August 14th, 2009, does that help you remember
whether you got this report, which was actually done on
August 13th, 2009, the following day on August 14th, 2009?

MS. ALI:  Objection, lack of foundation.  I don't
think he testified at all about the trial file or where that
came from.

THE COURT:  We may have to inquire about that after
he testifies, but he can ask if this refreshes his
recollection.

THE WITNESS:  My recollection of the report or my
recollection of seeing it?  What are you -- what are you
asking?

BY MR. SAMUELS:

Q.  Let me break it down for you, sir.  You see how this is
dated at the bottom August 13th, 2009?

A.  Yes.

Q.  That's when the scans were actually done?

A.  Yes.

Q.  And then up at the top here, it looks like it was faxed
August 14th, 2009.  Do you see that?

A.  I don't see a fax number.

Q.  Well, do you see there is the fax header part up there,
sir?

A.  I don't know that's a fax header.  It's a date stamp of

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2062

some kind, but I don't know what it is.

Q.  Date stamp of some kind.  What I'm asking, sir, is does this help refresh your recollection as to when you might have received this report?

A.  No.

Q.  Okay.  And you would agree with me that this report said normal brain MRI?

A.  Yes.

        THE COURT:  Is that in evidence?

        MR. SAMUELS:  It is, Your Honor, but I think it's in Government's Exhibit 61.  But I don't know if it has the fax header on it.  We may have to go back on that.

        THE COURT:  All right.

        MR. SAMUELS:  I will tell the Court that this document does come from this file here that's at the bottom with the header at the top.

        THE COURT:  Save that because in a few minutes we are going to discuss that document, what it is and where it came from.

        MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Merikangas, would it be --

        MS. ALI:  I'm sorry.  Can we have a copy of that document?  It's not on the exhibit list and wasn't included.

        MR. SAMUELS:  Of course.  It's something we got

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2063

from defense counsel, but I'm happy to make a copy, Your

Honor.

THE COURT:  Was this one of the discovery documents you got?

MR. SAMUELS:  It was not a discovery violation thing.  It was a discovery thing we got much earlier.

MS. ALI:  I don't know what we are looking at.

MR. SAMUELS:  I'll be happy to make a copy for Ms. Ali.

THE COURT:  You got it from defense counsel earlier on.  They should have a copy.

MR. SAMUELS:  Yes, Your Honor, in January of 2022.

THE COURT:  Anyway, be sure and give a copy to Ms. Ali, and then if you have any questions, Ms. Ali, you can look for it.

MS. ALI:  I just want to be able to see it.

THE COURT:  That's fine.

BY MR. SAMUELS:

Q.  Dr. Merikangas, very likely that you could have gotten the reports from the radiologist before actually getting the scans?

A.  No.

Q.  No?

A.  Generally they send the disk.

Q.  But it's not likely that you would have actually

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2064

gotten -- I mean, you got this report at some point, didn't you?

A.  I don't recall.

Q.  Well, you talked about it with Ms. Ali in your direct examination.  Do you recall looking at that report at some point?

A.  In September of this year.

Q.  You're saying -- I'm sorry, sir.  Let me make this clear. Let's pull up Government's Exhibit 61, if we could.

This is 61, and this is kind of a combined exhibit, sir.  You see it's got your request for the MRI and the PET scan.  You see that, sir?

A.  I do.

Q.  Okay.  And then down here is that same report.  Actually, does have the August 14th header up there, with the normal brain MRI.  You remember seeing this at some point, right, sir?

A.  I don't recall it being attached to my requisitions.  I wouldn't have done that.

Q.  No, sir.  It's a combined exhibit.  I'm just asking do you remember seeing this final report?

A.  No.

Q.  You never saw this?

A.  I saw it -- I see it now.  I saw it last month, but I don't recall seeing it in 2009.

JODY A. STEWART, Official Court Reporter

2065

THE COURT:  Is this a good stopping place?

MR. SAMUELS:  It is, Your Honor.

THE COURT:  Dr. Merikangas, we are going to end our trial day now.  It's approaching 6:00, and we have been here since 10:00 this morning.  I would tell you that you're in the middle of your testimony, and you may not discuss it with anyone, and that includes the attorneys, the *habeas* attorneys, and you may not discuss your testimony or any further documents or anything with them.  You can certainly review anything that's in your possession, but you may not discuss your testimony or any documents with any of the attorneys or anyone on their behalf.  So I would tell you that, and you need to be back at 10:00 a.m. in the morning.  So I'll excuse you for now.

THE WITNESS:  Yes, Your Honor.

MR. SAMUELS:  Are we starting at 10:00 or 11:00?

THE COURT:  We can start at 11:00 if you want.

MR. SAMUELS:  That's fine.

THE COURT:  Let's start at 11:00 then.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  We are starting at 11:00.  The attorneys are coming across the water, and I guess it's election day, and I encourage everyone to vote.  I hope that if you're not from this area, you have voted early voting.

(Witness excused.)

JODY A. STEWART, Official Court Reporter

2066

THE COURT:  Can you put it back on the screen because there are entries on that document that I don't believe have been produced, to my knowledge.  You might want to check with Ms. Peiffer.  Where did this document come from?

MR. SAMUELS:  I'll tell the Court this is what we got in disclosure from prior *habeas* counsel in January of '22, and there was a folder, and it was this Merikangas trial file folder, and it was all these documents.

THE COURT:  Does it have his notes?

MR. SAMUELS:  It does have some of his notes, Your Honor, Merikangas notes, additional notes, interview notes.

THE COURT:  So you're not missing any of them?

MR. SAMUELS:  I'm not missing this, no, Your Honor.

THE COURT:  I didn't know if there had been any further violations.

MR. SAMUELS:  No.  We have it.

THE COURT:  I didn't want there to be an implication that there had been any further violation.

MR. SAMUELS:  No, I'm not implying that at all, Your Honor.

THE COURT:  Okay.  Is there anything else, Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  Thank you.

THE COURT:  Counsel, let's get some idea of

2067

schedule here because there needs to be some realistic estimate of the testimony of an individual.

This expert has been here, he said, since last Tuesday. Well, clearly, you weren't going to get to him Wednesday with Dr. Cunningham, and Dr. Cunningham went two days. Clearly, you weren't going to get to him Friday with Dr. Nadkarni. So you've got to have an estimate. You've got your questions. I can see that you're not following a script, you are picking up on them and whatever, but you know what questions you are going to ask. The Court has to have some realistic idea, because if you're planning on an expert a day, you are not going to be getting through an expert a day the rate we are going.

MS. ALI: He is our last witness in our case in chief, Your Honor. Just to clarify the timeline, he got here I think -- I'll be honest, the days are fuzzy for me at this point, but I think he arrived Tuesday night. We had plans to have him start testifying Thursday morning. I don't think anybody anticipated Dr. Cunningham's testimony going as long as it did.

We have tried to make up ground since then, but he got here late Tuesday night. He was here Wednesday. We weren't sure -- we didn't want to be in a situation if Dr. Cunningham ended early on Wednesday, and we didn't have him here, so that's why he was here. We were trying to make

JODY A. STEWART, Official Court Reporter

2068

sure we could keep things moving.

He left when it was clear on Thursday night that we were not obviously going to get to him, and Dr. Nadkarni had a more difficult schedule, so then he went home.  Now he's here again.  We will finish with him sometime tomorrow, and then that will be it for us until rebuttal.

THE COURT:  Then you need to be ready to go forward, Mr. Samuels.  I would tell you that one of our judges died over the weekend, Judge Doumar, who's sat in this courtroom, and his funeral is at 11:00 a.m. on Thursday.  It is here in town, but there are some of us that are honorary pallbearers that have to be at the service, and right now I'm going to try to be back here by 2:00 again, if I can, so we can keep things moving.

MR. SAMUELS:  I think we are going to be okay, Your Honor.  I think we will have Mr. Woodward tomorrow after Dr. Merikangas, and then to the extent the -- I don't know if we will get to Dr. Aguirre, but if we call him, he would be either later tomorrow or possibly Wednesday, and then that's what we have.

THE COURT:  Today is Monday.

MR. SAMUELS:  Today is Monday.

THE COURT:  I'm with Ms. Ali.  I'm losing days.

MR. SAMUELS:  It is blurring together.

MS. ALI:  Whatever day you told me it was.

JODY A. STEWART, Official Court Reporter

THE COURT:  That's fine, because we will have tomorrow.

MR. SAMUELS:  We will.

THE COURT:  Then we will have Wednesday, and it may work out so we don't have to do Thursday.

MR. SAMUELS:  I think we are all hoping that, Your Honor.

THE COURT:  I want to give you some advance notice. I don't know how long you're going to take, but there are going to be some days where we will be in trial on the 13th and the 14th, and up until 1:30 on the 15th, and we will be in trial on the 16th, but I will be out of state for a family wedding leaving on the 17th, not to return until the 20th.  So I hope that we can be finished by the 17th.

MR. SAMUELS:  I think we'd all face family mutiny if we went that long, Your Honor.

THE COURT:  Then you're into Thanksgiving week.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  I just want to apprise you of that. Let's see.  We've got certainly time next week.  I know you've got somebody coming in on the 14th?

MS. ALI:  Yes, Your Honor.

THE COURT:  Who is that?

MS. ALI:  That's Dr. Lipton.

THE COURT:  Is he going to be a day witness?

JODY A. STEWART, Official Court Reporter

2070

MS. ALI:  At most.  He is a rebuttal so sort of depends where the testimony goes, but I certainly don't expect him to be longer than a day.

THE COURT:  I just wanted you to know about the schedule because I had obviously not planned on Thursday of this week, and then you have the holiday, and actually there is even construction in the courthouse over these weekends and holidays.  But I just wanted to apprise everybody of that schedule.  So we will give it our all tomorrow, which is Tuesday.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  We will start at 11:00.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  Then the Court stands in recess until 11:00 a.m.

(Hearing adjourned at 6:05 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

X_____/s/_____x

Jody A. Stewart

X_____11-27-2023 _____x

Date

JODY A. STEWART, Official Court Reporter