2071

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,                 )
                                          )
v.                                        )    CRIMINAL ACTION NO.
                                          )    4:08cr16
DAVID ANTHONY RUNYON,                      )
                                          )
          Defendant.                      )
                                          )
                                          )
          AND                             )
                                          )
DAVID ANTHONY RUNYON,                      )
                                          )
          Petitioner,                     )    CIVIL ACTION NO.
                                          )    4:15cv108
V.                                        )
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
          Respondent.                     )
                                          )
- - - - - - - - - - - - - - - - - - - - -


TRANSCRIPT OF PROCEEDINGS

DAY 13

Norfolk, Virginia

November 7, 2023


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge


JODY A. STEWART, Official Court Reporter

2072

APPEARANCES:

       UNITED STATES ATTORNEY'S OFFICE
       By:  Brian Samuels
            Lisa R. McKeel
            Assistant United States Attorneys
               And
       DEPARTMENT OF JUSTICE
       By:  Carrie L. Ward
            Counsel for the United States

       VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
       By:  Elizabeth J. Peiffer
            Robert Edward Lee, Jr.
               And
       ALI & LOCKWOOD LLP
       By:  Kathryn M. Ali
            Counsel for the Defendant

JODY A. STEWART, Official Court Reporter

2073

**I N D E X**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LARRY WOODWARD | 2201 | 2249 | -- | -- |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JAMES R. MERIKANGAS, M.D. (CONTINUE) | -- | 2075 | 2161 | 2182 |

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| 90 | 2239 |
| 91 | 2218 |
| 92 | 2108 |
| 93 | 2211 |
| 105 | 2243 |
| 112 | 2240 |
| 113 | 2241 |
| 114 | 2242 |
| 115 | 2217 |
| 126 | 2247 |
| 174 | 2275 |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 173 | 2275 |
| 177 | 2256 |

| COURT'S NO. | PAGE |
|---|---|
| | 2233 |
| 8 | 2233 |

JODY A. STEWART, Official Court Reporter

2074

(Hearing commenced at 11:05 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, and Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The Government is ready.

Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Ali, Ms. Peiffer, Mr. Lee, is the defendant ready to proceed?

MS. ALI:  We are.  Good morning, Your Honor.

THE COURT:  Good morning.

Sir, are you Mr. Runyon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  I think we are continuing with the cross-examination of Dr. Merikangas.  I think that he's in the back of the courtroom.

Dr. Merikangas, you can come forward and get back on the witness stand, and you are still under oath.

JAMES R. MERIKANGAS, M.D., called by the Defendant, having been previously duly sworn, was examined and

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                  2075

testified further as follows:

                   CROSS-EXAMINATION (Continued)

BY MR. SAMUELS:

Q.  Good morning, Dr. Merikangas.

A.  Good morning.

Q.  Sir, I know we jumped around a good bit yesterday, and I will try harder not to do that today.  I want to start in 2009 and then move onto your 2015 report and then finish what you did in 2023.  All right?

A.  Yes.

Q.  Let me just reorient us a little bit to the timeline 2009 because it was so long ago.

        Dr. Merikangas, you said yesterday that for a time you were not certain whether you were there to help with the trial or the penalty phase; is that right, sir?

A.  I don't recall saying that.

Q.  Okay.  Well, let me show you Government's Exhibit 44.  Dr. Merikangas, showing you Exhibit 44.  I may have referenced this yesterday, but I didn't have it available to show you.  Do you see this e-mail to yourself, sir?

A.  I see it, yes.

Q.  And it looks like the date at the bottom says 7-13-2009.  Do you see that, sir?

A.  Yes.

Q.  And so looking at that memo, it reflects that the guilt

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2076

phase of the Runyon trial is projected to end by July 22nd.

So, sir, at this point you were aware that you were being called to assist in the penalty phase of the trial; is that right?

A.   That's not what it says.  I was not aware.

Q.   Well, I'm asking you if looking at this e-mail, does that help refresh your recollection that you were called to go assist in the penalty phase?

A.   No.

Q.   Okay.  And it talks in here about that there is an effort being made to try and get you appointed and get additional time to collect records; is that right, sir?

A.   It says that.

Q.   So do you recall, Dr. Merikangas, whether you were retained to assist in either the guilt phase or the penalty phase?

A.   No.

Q.   I think you told us yesterday, sir, that you evaluated Mr. Runyon on July 29th, 2009, correct?

A.   Yes.

Q.   And you would not discuss the facts of the case with the defendant who pled not guilty?

A.   Yes.

Q.   Can we switch over to the Elmo.

Dr. Merikangas, I've used this as a demonstrative

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2077

earlier in the proceedings.  I'll just show it to you here when it comes up.

Showing you a calendar of August 2009, which we first used, Your Honor, in February 2023.  This is the same calendar we used as a demonstrative.

So, Dr. Merikangas, showing you this calendar for August 2009, you would have interviewed Mr. Runyon on Wednesday, July 29th?

A.  Yes.

Q.  And then prepared your report on Wednesday, August 5th?

A.  If you say so.

THE COURT:  What does that say?  Not if he says so. What does this say?

BY MR. SAMUELS:

Q.  Madam clerk, can we switch over again to the government system.  I'm sorry.

Ms. Jahn, can we pull up Government's Exhibit 63.

Now, this letter, sir, is dated August 6th, 2009, but it references a preliminary report that you authored dated August 5th; is that right, sir?

A.  Yes.

Q.  And in the report you indicate that your full report will follow the results of brain imaging on the second page there?

A.  Is that a question?

Q.  Yes, sir.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2078

A.  Yes.

Q.  And that was your intent to do so?

A.  Yes.

Q.  And down here, Dr. Merikangas, it references your impressions.  Let me go up a little bit further here.  You had looked at the lip sagging for Mr. Runyon; is that right, sir?

A.  Yes.

Q.  And at this time you were not able to offer a conclusion whether this was congenital or the result of beating sustained during childhood?

A.  Yes.

Q.  You couldn't tell either way, right?

A.  That's right.

Q.  So down at the bottom, when we get to your impression, you are not able to diagnose brain damage in this preliminary report, right?

        MS. ALI:  Objection.  Based on the lip sag or overall?

        MR. SAMUELS:  Overall, just what it says at the bottom of the report, Your Honor.

        THE WITNESS:  I did diagnose brain damage.

BY MR. SAMUELS:

Q.  Were you able to diagnose brain damage without seeing the scans?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2079

A.   Yes.

Q.   And what was that based on, sir?

A.   Based on his history of multiple head injuries, his current headaches, and the physical exam, not just on lip sag.

Q.   What else on the physical exam showed brain damage?

A.   He had hyperreflexia, and that went along with the history.

Q.   Is that diagnosis contained in your preliminary report, sir?

A.   Can you move down.

Q.   Yes, sir.

A.   And further down.

Q.   That's all there is, Dr. Merikangas.  It says, "Sincerely yours" at the bottom there.

A.   Okay.  I don't see that I've diagnosed brain damage here.

Q.   Okay.  Because at this time there was additional information that you wanted to gather?

A.   That's right.

Q.   And that included the brain scans, the MRI, and the PET scan?

A.   And the Army records and his medical records and his other records, none of which I had.

Q.   So you can't be conclusive of brain damage at this point at this level?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2080

A.    That's why it's called a preliminary report.

Q.    You would agree with me, you can't be conclusive at this point, right, sir?

A.    Yes.

Q.    And you also noted that he could be suffering from the effects of these experimental drugs; is that right, sir?

A.    That was in the differential diagnosis.

Q.    What does that mean, Dr. Merikangas, a differential diagnosis?

A.    As I explained yesterday, those are things that one considers that might be cause of the current problem, and one lists all of the things in one's mind that could cause that problem and then tries to logically or experimentally, or through other records, eliminate them until you arrive at the correct diagnosis.

Q.    And the problem that you're identifying, that you're kind of in search of a diagnosis for, was what, exactly?

A.    His behavior.

Q.    You indicate in here, sir, "His psychiatric evaluations including my own."  What psychiatric evaluation had you done at this point in 2009, sir?

A.    I had interviewed him.

Q.    And how did that interview lead to a determination that there was impairment?

A.    That was my impression when I interviewed him.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2081

Q.  Based on what, sir?

A.  Based on my interview.

Q.  I know, but what about the interview led you to conclude that there was some type of impairment?

A.  I can't tell you right now.  I don't have an instant recollection of all the interview.  I don't have a stenographic record here.

Q.  Dr. Merikangas, you do reference that he is presently either -- "He presently," want to quote it accurately, "is either in a fantasy world of grandiose wishful thinking or suffering from delusions."  Do you see that?

A.  I do.

Q.  How did you come to that conclusion?

A.  By talking to him.

Q.  Did you look at the reports of Drs. Montalbano and Dr. Patterson on that front?

A.  I did.

Q.  Did you see what they say about any delusional activity?

A.  I did.

Q.  Do you remember what they said?

A.  Vaguely.

Q.  What's your vague memory, sir?

A.  That they described a lot of thinking, a lot of behavior which was consistent with delusions and paranoia and PTSD and the history of head injury.

Merikangas, J. - Cross                                                2082

Q.  Ms. Jahn, if we could go to the report of Dr. Patterson, that is Government's Exhibit 55A.

Dr. Merikangas, looking at 55A, do you recognize that as the report of Dr. Patterson?

A.  I do.

Q.  Ms. Jahn, could we go to Page 21 of the report, please.

Dr. Merikangas, do you see this as referenced as Page 21 of 24 of the report of Dr. Patterson?

A.  Yes.

Q.  Highlighting this paragraph, the third paragraph down, what does that say about any delusional thinking by Mr. Runyon?

A.  He does report feeling he has been treated unfairly for clinical reasons at various jobs in the past.

Q.  That's the last sentence, sir.  What about the sentences before that?

A.  What about them?

Q.  Doesn't it say that Mr. Runyon was asked about delusional thinking or any thoughts that were not consistent with reality, such as having special powers?

A.  It does say that.

Q.  Doesn't Mr. Runyon reply, no, I definitely know I don't have special powers and laughed appropriately?

A.  It says that.

Q.  Does it also say there is no evidence of any thought

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2083

disorder, including delusions or disorganized thought processes, such as looseness of associations or flight of ideas during the psychiatric examination or historically?

A.   It says that.

Q.   So what on that do you base your support that Mr. Runyon was in a world of grandiose thinking or -- let me get the language right.  I'm sorry.  "Grandiose wishful thinking or suffering from delusions"?

        MS. ALI:  Objection.  He is showing him one paragraph of a 25-page report.  He didn't testify that this one paragraph was the basis.  I'm not going to go any further.

        THE COURT:  When you redirect, you can show him other paragraphs.  That's the way it's done.  But he's testified that he got this from these two reports, and Mr. Samuels is allowed to cross him on this.  You would certainly be allowed to redirect him and show him where it is in there, if it is.

BY MR. SAMUELS:

Q.   Dr. Merikangas, do you remember if it was elsewhere in the report that you based the determination of delusions on?

A.   Yes.  I don't rest upon Dr. Patterson's conclusions.  I disagree with Dr. Patterson and his conclusions.

Q.   Let me take you next to Exhibit 55B, the report of Dr. Montalbano.  Do you recognize this, sir, 55B, as the

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2084

Q.  report of Dr. Montalbano, dated June 27th, 2009?

A.  I do.

Q.  Let me take you to -- Ms. Jahn, if we could go to Page 22 of this 31-page report.

I see.  I'm sorry, Dr. Merikangas.  It's right in front of me here.  Sir, is there a reference in those top couple sentences on Page 22 regarding delusions or hallucinations and reality testing?

A.  Yes.

Q.  And what does it say that Dr. Montalbano found with respect to any delusions or hallucinations?

A.  It says he didn't elicit any.

Q.  Does it talk about reality testing?

A.  Yes.

Q.  What is reality testing, Dr. Merikangas?

A.  The ability to tell where you are and what you're doing.

Q.  And what's the finding of Dr. Montalbano on the reality testing?

A.  He said it appeared intact.

Q.  Did you make a different finding, Dr. Merikangas?

A.  I did.

Q.  And can you tell us what that's based on or where I can find it in your report?

A.  No.

Q.  Is that because it's not in your report, sir?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2085

A.   That's right.

Q.   Now, sir, after you submitted your report on August 5th, do you recall that I showed you yesterday some time sheets from Mr. Steve Hudgins, one of the attorneys?

A.   Yes.

Q.   And this was Defense Exhibit 158.  Do you recall that those time sheets reflected telephone conversations with you, sir, on a number of dates beyond August 5th?

A.   I recall that's what you asserted, but I recall that they were group discussions.

Q.   Do you recall that there were some reports of discussions on August 6th, August 10th, August 11th, and August 13th?

A.   I don't recall the dates.

Q.   But a number of discussions after you submitted your report?

A.   Yes, group discussions.

Q.   Do you remember at all what you discussed?

A.   No.

Q.   What would be your practice after doing a report of a defendant, in terms of having follow-up conversations with the lawyers on the case?

A.   I would tell them I need more information, that I still didn't have all the records, and that I needed to see the scans.

Q.   Let me --

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                            2086

A.   I wasn't prepared to give a final conclusion, and I was quite concerned that all this happened after the finding of guilty, because generally I'm contacted before the finding to see whether there is grounds for an insanity defense or some other defense, but that didn't happen in this case.  I was quite concerned, but I only had two weeks to prepare a report, and then I was not given the information.

Q.   Dr. Merikangas, when I asked you just a moment ago if you recalled what you discussed in those conversations, didn't you tell me you could not remember?

A.   That's right.  You are asking what my practice generally is.  That's the answer I gave you just now.

Q.   Your practice generally is to ask for more information?

A.   Yes.

Q.   Would your practice include discussing the results and findings of your examination?

A.   That's the practice when I have results and conclusions, but as you noticed in my report, I did not.  It was a preliminary report.

        THE COURT:  I'm confused, though.  You've got the time records that show that you asked for an MRI and the PET scan.  The paperwork has been admitted on that.  In your preliminary report you say you need those things.  Your time records show that you billed time for reviewing them, and then there is a note to a file, which we will hear about

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2087

later, which you've been shown, where an attorney says you read them and recommended not going forward at that point with any mental health issues.

Then you give an affidavit in 2015 that says, had you read them, you didn't say with other information, you specifically said, had you been able to read those and see them in 2009, you would have reached the same conclusion that you were reaching in 2015. Yet in 2009, there is evidence that you did read them, and there is also evidence in the attorneys' files that you recommended not going forward at that point. So how do you explain that?

THE WITNESS: I did not tell the attorney to not go ahead. I would never have done that in that circumstance, and I have no recollection of doing it, and I have no recollection of the other statements he attributed to me, which you showed me in a memo. I would not have said those things, and I don't recall saying those things.

BY MR. SAMUELS:

Q. Let me just put up the memo, if I could, for just a moment, Your Honor.

If we could put up Government's Exhibit 92. This is the memo we are talking about. Do you remember we discussed this yesterday, Dr. Merikangas?

A. Yes.

Q. And this does reflect, it looks like, the scans, you

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2088

don't have the scans yet at this point.  Do you see that, where it says, "Unless there is something glaring in the scan that would give a strong argument, he does not recommend presenting a mental health defense."  Do you see that?

A.  I see that.

Q.  Now, sir, what I wanted to ask you about this, I know I went through it substantively yesterday, it does reference that you were in Vermont on August 13th.  Do you see that?

A.  Yes.

Q.  Were you, in fact, in Vermont on that day?

A.  I think I may have been.  I don't recall.

THE COURT:  Well, what is in Vermont?

THE WITNESS:  I have a home in Vermont.

THE COURT:  So do you regularly go to that home?

THE WITNESS:  Not very regularly.  I have been there once in the last three years.

THE COURT:  Well, this was in 2009.  Did you go regularly in the summers?

THE WITNESS:  No.

BY MR. SAMUELS:

Q.  How would the attorneys -- and you were told that this memo came from one of the attorneys' files, right, sir?

A.  I was told that.

Q.  How would the attorneys know you were in Vermont?

A.  I don't speculate on how the attorneys know something.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                        2089

Q.  Well, wouldn't you have had to tell the attorneys you were in Vermont, sir?

A.  No.

Q.  How would they find that out?  Do you have any answer for us on that?

A.  They could call my office, and they could have been told, "Oh, he's in Vermont."  Doesn't have to come from me.  My location is not a secret.

Q.  I know you don't remember the substance of this memo, Dr. Merikangas, that was your testimony yesterday.

A.  I never saw this memo until very recently.

Q.  Yes, sir.  Do you deny that you had a conversation with the attorneys on August 13th, 2009?

A.  I don't deny.  I don't recall.

Q.  Sir, is it fair to say that if you had reviewed -- well, you did review the brain scans in 2009?

A.  Yes.

Q.  And wouldn't it have been your practice to update the lawyers after the receipt of the brain scans?

A.  If they were to call me about it, yes.

Q.  Why would the lawyers have to call you?  You're the expert doing the review, right, sir?

A.  Yes.

Q.  So wouldn't it have been your obligation as the expert to call the lawyers and tell them that you saw something in

Merikangas, J. - Cross                                              2090

those brain scans that was problematic?

A.   The only thing I remember is I had a great deal of difficulty reaching these lawyers and talking to them.  And I don't recall having any extensive conversations with them at all.  I merely spoke to the mitigation person.

Q.   Did you have any trouble e-mailing Mr. Hudgins?  He had your e-mail address, right?

A.   Does he have any e-mails from me that you are going to show me, because I don't think so.

Q.   You don't think there is any e-mails from you to Mr. Hudgins?

A.   I couldn't find any.

Q.   Okay.  I will find one for you shortly here, sir.  You don't recall that there was an e-mail -- let me see if I can do it right now.

     Let's go to Government's Exhibit 34.  Dr. Merikangas, is that your e-mail address right there?

A.   It used to be, yes.

Q.   Was it in 2009?

A.   Yes.

Q.   Are you e-mailing Mr. Hudgins at SHudgins@hrcoxmail.com?

A.   Yes.

Q.   And are you responding, it looks like it, an e-mail from him, all of this -- he sent you an e-mail on Friday, June 5th, you responded to an e-mail on Sunday, June 7th?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2091

A.   Yes.

Q.   And that's you writing to him, right?

A.   Yes.

Q.   So you did have a way to contact Mr. Hudgins, right?

A.   You're suggesting that because I sent an e-mail that he's reading them and responding to me?

Q.   What I'm asking, Dr. Merikangas, is you clearly reviewed the brain scans in 2009, correct?

A.   Again, I don't recall doing that, but it seems established that I must have.

Q.   You billed for it, right, sir?

A.   Yes.  That's the only record I have of that.  I don't know -- I don't have a report.  I don't know if I ever talked to him.  This doesn't prove that I spoke to him, and I don't see any reference to it in any of the e-mails that I sent.

Q.   You would agree that you billed for it, you did it, right, sir?

A.   I would agree that it's likely that I did.  I don't make those bills.  I presume that was correct.  I've been told that some of this that I've said -- based on other people is not correct.

Q.   I'm sorry.  Let me understand that.  You've been told that some of what is not correct?

A.   The affidavit or whatever declaration in February 2023 has a mistake in it saying that I didn't see the scans.  I

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2092

since learned that I probably saw the scans, based upon this bill, but I still have no record of seeing the scans except for that invoice.  I do not do the invoices.  Someone in my office does that.  So I cannot say for sure that I did or didn't.  I'm willing to accept that if it says there, that that was probably a mistake.

Q.  Well, if somebody knew that you had actually reviewed the scans, and they put in a declaration for you that you didn't review the scans, that's more than a mistake, isn't it, sir?

A.  But it's not what happened.

Q.  I'm sorry.  It's not what happened.  I don't understand.

A.  Well, you just made a statement, a hypothesis of what happened.  I don't know what happened.

        THE COURT:  Well, let me ask you this.  You're an expert.  You've been an expert for a number of years. You're retained for a purpose, and you indicate that you're the one who ordered these scans, and didn't you, under your duty as an expert, have a responsibility and a duty to proceed with what you said you were going to do and to report back to the attorneys?  Isn't that your duty as an expert?

        THE WITNESS:  Only if I had received the scans.  I just learned that I was probably in Vermont.  How did the scans get to me?  I have no way to read them in Vermont. And if that's the case, I don't know when I got around to

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2093

reading them or if I did at that time.  So I can't really --
these are all things that I don't recall, and I can't --
have any record of it.  I don't know -- I wanted to answer
these questions, but I don't have the answers.

THE COURT:  Let me ask you one thing.  You said you
don't go to Vermont very often.  Apparently, you were in
Vermont with that conversation, but you read the scans, by
your time records and billings, and you say in that
conversation, if I see anything in the scans, I'll let you
know.  Did you ever get back to the attorneys to let them
know you either, A, you didn't get the scans; B, you read
them, and you saw something; or, C, you didn't recommend
anything further?  You had to do something as an expert.

THE WITNESS:  I have no record of doing that, Your
Honor.  I was told that the case was over with, they were
not presenting any mitigation, my job is done.  And years
later, I think it was in 2012, I was told that just put away
the file, it's over with.  So I don't have any record of
talking to them, getting in any conversation discussing it,
and I certainly wouldn't have said the other things that are
referenced in that memo.

THE COURT:  Well, if you have no memory of any of
this, and yet we have records of these things, how is the
Court to gauge the weight of your testimony and your
credibility when you're not giving direct answers to the

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2094

questions, you're not remembering things, and the Court at this point has to weigh credibility and weight of testimony. This is the stage that we are at.

How does a Court do that when there are records that contradict the testimony that you are giving here in court, or I don't remember, or I didn't do it, maybe I didn't get them. I've got to judge your credibility and the weight of your testimony on a very crucial point.

THE WITNESS: My point is that memo is not my memo. It contains language that I would never have used based upon my practice and my memory of conversations I've had with attorneys after cases. I would not have said -- and they open you up to prosecution witnesses saying something else, I've never said anything like that. I have no record of those phone calls, and the phone calls that are referenced, three or four people seem to be on each of those phone calls. They have no notes of what happened in those phone calls.

THE COURT: Well, you don't know that.

THE WITNESS: They can't speak about someone else's records because I did not produce those records. I have no recollection of telling these people about the scans or conclusions. I do say in my preliminary report that this man has a brain problem and that it deserves further investigation, but that was two weeks before it was due. It

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2095

wasn't a lot of time, and I still didn't have the records of his extensive treatment of his brain injury, a year's treatment by the Army, by doctors who are not involved in any kind of litigation.

BY MR. SAMUELS:

Q.   Is your testimony, Dr. Merikangas, that Mr. Runyon had treatment in the Army for a brain injury?

A.   Yes.

Q.   And that was followed up for about a year?

A.   Yes.

Q.   Do you know where I could find that, sir?

A.   Yes.

Q.   Would you tell me, please?

A.   You can ask Ms. Ali for it.

Q.   You don't remember where it is or when it is or anything like that?

A.   There is a medical record from the Army, and every month he is seeing an Army doctor.  It's in the medical record from the Army.

Q.   For a brain injury?

A.   For his complaints of headache, vertigo, confusion following his car accident of 1996.  Those are symptoms of a brain injury.

Q.   And, again, at the time you did your 2009 report, since you didn't have the scans, you couldn't diagnose brain damage

Merikangas, J. - Cross                                              2096

at that time?  I think we talked about that.

          MS. ALI:  Objection.  That mischaracterizes the testimony.

          THE COURT:  Overruled.  You can ask the question.

          THE WITNESS:  I did not say that.

BY MR. SAMUELS:

Q.  You did not say make a finding of brain damage, I thought, in your 2009 report.  If I'm wrong, Dr. Merikangas, please correct me.

A.  You are wrong.  I don't say that you have to have a brain scan to diagnose a brain injury.  You diagnose brain injuries long before brain scans were even invented.

Q.  Let me be clear.

A.  I was actually a doctor in neurology before brain scans were invented, regularly diagnosing brain scans.  I don't need a brain scan to tell someone has had a brain injury, because if you've had a serious car wreck and afterwards you have headaches and vertigo, those are symptoms of a brain injury.

Q.  Let me be clear, sir.  You don't make a diagnosis of brain damage in your 2009 report; is that right?

A.  That's right.

Q.  Okay.  Well, if I'm using the incorrect language, I apologize.  But you don't make a diagnosis of brain damage because you don't have the scans yet?

Merikangas, J. - Cross                                                    2097

MS. ALI:  Objection.  That mischaracterizes his testimony.

MR. SAMUELS:  I'm just asking him, Your Honor.  I'm not trying to mischaracterize.

THE WITNESS:  The answer is no.

THE COURT:  He can ask the question and the witness can answer.  The witness said no, but I lost the question at this point.

You asked the difference between brain damage and brain injury?

MR. SAMUELS:  I asked if he had to have the scans to make a diagnosis of brain damage.

THE COURT:  Yes.  You say no, you don't have to?

THE WITNESS:  I say no.

BY MR. SAMUELS:

Q.  Okay.  Dr. Merikangas, let me just show you a couple of other things here.  If we could go to Government's Exhibit 91, please.

MS. ALI:  I'll object.  I understand the Court's ruling, that these are not records that he's seen, and I'm just making my record that he's not authenticated these documents, and they are not in evidence.

THE COURT:  Well, let's put it this way.  They were produced by you in the late discovery, and they can be authenticated either through Mr. Woodward or that they came

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2098

from the file kept in the regular course of business of the deceased attorney.  That's what I understand.  I don't know which ones these are.

MR. SAMUELS:  Your Honor, these are Mr. Woodward's billing records that he will testify about, and I wanted to show them to Dr. Merikangas so he could see there were multiple instances where this August 13th conversation was referenced.

THE COURT:  Well, I will let you question subject to Mr. Woodward's authentication that they are his records and his testimony about them, but you got the records.  They had the records.  You finally got them appropriately through late discovery, and you're entitled to ask the witnesses about them with the understanding that Mr. Woodward will be here to testify about them and how they were prepared or so forth.  Ms. Ali may cross-examine and question him on these records herself.

MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Merikangas, do you see that Mr. Woodward has referenced a telephone call with yourself, sir?  I see your name is spelled wrong here in this reference here as well.

A.  You're referring to the August 13th, '09?

Q.  Yes, sir.

A.  I see that.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2099

Q.   And do you see there is also reference to memo to file regarding Dr. Merikangas' interview?

A.   Yes.

Q.   Going down here a little bit further.  Again, there is this reference to the call with you the same date, right, sir?

A.   Didn't we just look at this?

Q.   It's just lower -- it's on the next page.  It's just a continuation of the record.

A.   I don't know what your question is.

Q.   Yes, sir.

        THE COURT:  Let's put it this way.  An attorney is entitled to examine on documents that are in the file that somebody hasn't seen, but he can ask the questions about them because they reference a conversation with you.  So whether or not you've seen it, the question becomes did you have the conversation, because it's referenced in the records.  Moreover, it shows that there may not have been multiple parties on the phone because it is separated out and goes forward to say calls with.  So I don't know.  Mr. Woodward can straighten that out.

        THE WITNESS:  You've showed me the same memo three times now, appearing in different places on this document.

BY MR. SAMUELS:

Q.   Dr. Merikangas, these are the records as we received from

                 JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2100

counsel.  This is the way they were organized.  I'm just showing you the entries on pages that reflect a conversation with you that day.

A.  I'm saying there is one entry that's replicated about three times.

Q.  Fair enough, sir.

A.  That's all I'm saying.  It is not like three different references.

Q.  Let me show you another form.  Let's go to Government's Exhibit 93, please.  If we go down to Page 10, please.

These are the records of Larry Woodward.  Do you see, Dr. Merikangas, these are in a slightly different form?

A.  Yes.

Q.  It's a different spreadsheet, just a different way it looks like the records are being kept.  Do you see that, sir?

A.  Yes.

Q.  Here on August 13th there is a reference, telephone calls with Dr. Merikangas, looks like half an hour.  Do you see that, sir?

A.  Yes.

Q.  And up above on August 11th there's a reference to review all psych reports and make notes to prepare for conference with Dr. Merikangas.  Do you see that?

A.  I do.

Q.  Down here a little bit further there is another reference

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2101

to memo to file regarding Dr. Merikangas' interview, half an hour.  Do you see that, sir?

A.  Yes.

Q.  So seeing the records I showed you yesterday, the records I showed you today, do you have any doubt that you would have had a conversation with counsel on August 13th?

MS. ALI:  Objection, calls for speculation.  You can ask him if he knows, but would have had.

THE COURT:  I don't find the question improper.  He's on cross-examination, and this is a hostile witness.

BY MR. SAMUELS:

Q.  Dr. Merikangas.

A.  Your question is do I have any doubt there was a phone call?

Q.  After seeing these records, I showed you one from Mr. Hudgins, showed you one from Mr. Woodward, we looked at the memo showing you were in Vermont, do you have any doubt that you had a conversation on August 13th?

A.  I don't know if I can rely on these records.  These records could be anything.  I don't know.  I may have had a phone call.  That's the best I can say.  I do know that things that I referenced in the phone call do not represent my speech because I've never said things like that.  That's what I know.  The rest of it is your assertion or hypothesis or I should speculate.  I don't want to speculate about it.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                             2102

Q.  Dr. Merikangas, to be fair, sir, you have had conversations with counsel where you've come to a decision that you won't testify, in the past, right?

A.  With other counsel, yes.

Q.  You don't remember what this conversation was about?

A.  That's right.

MR. SAMUELS:  Your Honor, at this time I would offer Government's Exhibit 92 into evidence.  This was the document that we had talked about the other day, the memo to file.  We had an agreement with counsel that these records did come from counsel's files so that there is not an issue as to authenticity.

I think it's shown that it relates to and is corroborated by these records from the other counsel, Mr. Hudgins and Mr. Woodward, that there was a phone call with Dr. Merikangas on that same day.  I'm not able to call Mr. Hudgins to come in here and further verify that record.  If there is a concern about hearsay, I'll offer it not for the truth of the matter asserted, just to reflect the phone conversation that was had with Dr. Merikangas.

THE COURT:  Well, I will admit it as long as Mr. Woodward verifies that there was a conversation that day with Dr. Merikangas and with Mr. Hudgins.

MR. SAMUELS:  I believe Mr. Woodward will verify there was a conversation because it's in his records, but I

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2103

don't know that he will say that's his memo.

THE COURT:  I know it's not his memo.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I know it's not his memo.  It is clearly a memo from Mr. Hudgins' file, and it can be authenticated if the conversation occurred.  Whether or not Mr. Hudgins wrote it down properly or not will depend upon the accumulation of the evidence and the credibility of the witnesses.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  It still remains upsetting to the Court that *habeas* counsel had these files and had these records which were contrary or at least raise questions over credibility and opinions and did not produce them.  This is from the file.  The individual is deceased.  He cannot testify about his file, but there is a lot of corroborating information here.  We've got his time records that says he read them.  We've got the conversations before, and that conversation says that Dr. Merikangas will get back to them after he's looked at the scans.  Then his records show that he read the scans.

There is corroboration of the conversation in Mr. Woodward's records.  I ultimately have to judge, as I've indicated before, that this isn't a question of ineffective assistance of experts, is a question of ineffective

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2104

assistance of counsel and what they knew and what they were told, and we will expand upon that with Mr. Woodward.  So what is your objection?

          MS. ALI:  I understand the Court's ruling.  I'd like to be able to make my objection to the admission of this document for the record, for preservation purposes. The memo to file is double hearsay.  There are two layers of hearsay in here.  Even if Mr. Hudgins were able to testify, he should not have been permitted to testify in the first layer here, which is Dr. Merikangas's alleged statements to trial counsel.

          There is no exception that that falls under it.  It doesn't come in under 804.  It shouldn't come in under 807. It is not a trustworthy statement.  It's a self-serving memo about their proposed strategy at trial.  I agree with you it's not an ineffective assistance of expert claims.  It isn't ineffective assistance of counsel claims, this is a self-serving memo, it's unreliable, and the case law says that Rule 807, the residual exception, is not a proper vehicle to remedy a discovery violation.

          I understand the history of the discovery violation.  We have tried to clean that up here.  We are doing our best to move things forward.  But admitting a document that should not be admitted is not an appropriate remedy for a discovery violation.

JODY A. STEWART, Official Court Reporter

THE COURT:  Let's go through what you've said first.  First of all, there is a real fallacy in what you say that it's something an attorney wrote.  If they don't write notes in the file, you will say they are ineffective, and if they do write contemporaneous notes, they are not admissible.  This corroborates effectiveness of counsel, keeping track of things in the file.

Now, let's go through each rule that you are saying because you've mentioned a lot of rules.  So let's look at each one on what you base this objection.  What's the first one?

MS. ALI:  This is double hearsay, Your Honor.  It's two layers of statements here.  The first is Dr. Merikangas's alleged statements to trial counsel in the phone call, which are out-of-court statements.  The second layer is whoever the author, presumably Mr. Hudgins' description of Dr. Merikangas's statements in the memo.

THE COURT:  So you've got double hearsay, but you've also got Rule 804, exceptions to the rule against hearsay when the declarant is unavailable as a witness under (4), cannot be present to testify at the trial or hearing because of death or then existing infirmity, physical illness, or mental illness.

It wouldn't be hearsay if Mr. Hudgins would fall under this exception, and to the extent he is saying that

Merikangas, J. - Cross                                              2106

this is something that was said directly to him, not repeated to him, hearsay is something that is repeated to you.  Mr. Hudgins can't testify.  The doctor can.  Then it's up to the Court to weigh that, because it's not hearsay if something is said directly to you.  It is when something is repeated to you.  So, consequently, you've got two people there.  Mr. Hudgins can't testify.  The other person, and we can listen and decide whether we believe him or not and whether it's hearsay or not, because I don't find it to be hearsay because two people are talking.  Hearsay is not what you said or you saw or you did.  This is something that Mr. Hudgins was engaged in.  So it is only hearsay because he can't testify, and he can't testify because he's deceased, and the doctor is now testifying about a conversation he had.

Now, you can question that conversation, and you've got ways to test it.  You've got time records.  You've had them all along since this went before the Fourth Circuit.  You have this memo to file that you've had all along.  You have Mr. Hudgins' full file.  You have Mr. Woodward's full file.  So I don't understand how it's hearsay on hearsay because at least one of the declarants is deceased.

Go to the next reason.

MS. ALI:  I'd just like to make my record, Your Honor.

Merikangas, J. - Cross                                          2107

THE COURT:  I've told you, you've made your record by objecting.  The Court doesn't have to be correct in its ruling as long as the ruling is ultimately correct.  But I want to know what rules you rely on.  You are just saying hearsay on hearsay.  What is hearsay on hearsay?

MS. ALI:  804, Your Honor.  Rule 804 lays out specific exceptions for when a declarant is unavailable that hearsay can come in, because on account of the unavailability, and none of those exceptions in 804(b) applies here.

THE COURT:  I'm saying 804(a).

MS. ALI:  Well, that explains, Your Honor, when a declarant is unavailable.  I'm not contesting that Mr. Hudgins is not available.  But 804(b) lays out the exceptions for when statements by an unavailable declarant come in, and none of those exceptions apply here.

MR. SAMUELS:  But, Judge, we are just offering this to show that the conversation was had.  It goes directly to Judge Hudgins' and Mr. Woodward's state of mind and the strategy they chose to employ here.  Judge Hudgins did testify about the decision not to use Dr. Merikangas, and so I don't think the hearsay issue is really the issue here.  It's a memo.  It's authentic.  It's something that is corroborated by the time records, and Mr. Hudgins and Mr. Woodward's own testimony about what strategy they

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2108

decided to do, if this reflects a conversation that they had with Dr. Merikangas, it doesn't matter if it's true or not. It was what was said to them, and the fact that it was said is enough to show that that is something that they considered.

We are not talking about -- when you get into whether it was true or not, that gets into the merits of what Dr. Merikangas has said.  It's a separate analysis to look at whether it was said or not, and that's what we are offering it for, whether it was said or not and the effect that would have on somebody like Mr. Hudgins and Mr. Woodward.

THE COURT:  I overrule the objection.

(Government's Exhibit 92 received in evidence.)

BY MR. SAMUELS:

Q.  I'd next like to go, Dr. Merikangas, to Government's Exhibit 61.  Sir, do you recall looking at this yesterday, the forms where you requested the MRI and PET scan?

A.  Yes.

Q.  And then this is actually the final report.  Going to the second page of that, sir, you see it says, "Impression: Normal brain MRI"?

A.  Yes.

Q.  And I just want to make sure I understand your testimony. Had you seen this report in 2009 or do you not recall?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2109

What's the situation here?

A.   I don't recall.

Q.   Do you recall any consultation with this Dr. Davis below here, sir?

A.   No.

Q.   That's something that you would often do, consult with the radiologist after a scan is done; is that right, sir?

A.   Yes.

Q.   You don't have any recollection of doing it in this case?

A.   No.

Q.   Would you agree with me that if this report was all that the attorneys had, there's not an indication for the attorneys to know that there is brain damage on the MRI?

A.   I don't understand the question.

Q.   Yes, sir.  I'll repeat it and rephrase it.  If the attorneys had this report, would there be any indication on the report that there was brain damage?

A.   If they had it, would there be an indication on the report?

Q.   If they had this report and reviewed it, do you see anything on this report that indicates it's anything other than the normal brain MRI?

A.   The report says it's normal, but the attorney should then ask their expert to look at the scan and tell them what the real answer is.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2110

Q.  And as we got through all this, sir, you did look at the scans, right?

A.  Not at this time.

Q.  Is your testimony that you don't know if you looked at the scans, sir?

A.  My testimony is I don't recall.

Q.  Okay.  Dr. Merikangas, you ordered the scans.  When you order brain scans, doesn't the actual report from the radiologist that initially reviewed the scans come to you, sir?

        MS. ALI:  Objection, calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  It often doesn't.  I asked for the disk.  I didn't ask for a report.

BY MR. SAMUELS:

Q.  Wouldn't it be common that you get a report, sir?

A.  What do you mean by common?

Q.  In your past experience.  You've ordered brain scans many times, right, Dr. Merikangas?

A.  Yes.

Q.  Don't you often get a copy of the report?

A.  I often do, if it's a clinical case, a patient I am treating, I will get a report.  But if it's a forensic case, I frequently don't.

Q.  And you see, Dr. Merikangas, this looks like this was

Merikangas, J. - Cross                                            2111

read by a Dr. Davis on August 13th, 2009, at 3:21 p.m.?

A.  Yes.

Q.  If we can go back to the Elmo.

       Just to orient us to the calendar again here, sir.
So August 13th, we see that's a Thursday.  Do you see that,
sir?

A.  Yes.

Q.  And then August 14th, which was a date up at the top of
this document, the test, was a Friday.  Do you see that?

A.  Yes.

Q.  August 17th is a Monday.  Do you see that?

A.  Yes.

Q.  August 17th was the date that's listed on your billing
for the review of the MRI and the PET scan.  Do you recall
that?

A.  Yes.  That's when the billing was.

Q.  Sir, would it have been possible that you were out of
town in Vermont this week of August 10th but returned on the
week of August 17th?

       MS. ALI:  Objection, calls for speculation.

       THE COURT:  Sustained.  Anything's possible.

BY MR. SAMUELS:

Q.  Do you know, looking back in 2009, do you remember your
schedule in 2009 in terms of going to Vermont?

A.  No.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                            2112

Q.   You have no recollection of how much time you spent there?

A.   That's right.

Q.   And Dr. Merikangas, if we could look at -- if we could switch back, Madam Clerk, and we could look at Government's Exhibit 98.  I'm almost ready to move on from 2009, sir. Just since we spent so much time on this, going back to your exam here in which you billed for.

Do you agree, Dr. Merikangas, that this bill wasn't paid, and so you sent another bill?

A.   Yes.

Q.   So it was important that you end up getting paid on this, right?

A.   Yes.

Q.   And in this bill it does indicate that the MRI and the PET review, it says 8-17-2009?

A.   Yes.

Q.   If you reviewed this on August 17th, 2009, would there be any reason you wouldn't have gotten back to defense counsel as to your findings?

A.   There is no way I could have talked about it on August 13th because the date of that memo that you just read to me many times today, if I didn't review until four days later, I could not have made those statements allegedly made in that memo by allegedly by Mr. Hudgins.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2113

He says he talked to me about it, the scan, et cetera. I didn't see the scan until four days later, and I wouldn't have said those things without the information.

Q. What I'm asking, sir, is if you did review the scan four days later on August 17th, is there any reason you wouldn't have reached out to defense counsel?

MS. ALI: Objection, calls for speculation.

THE COURT: No, it doesn't. He's an expert, and he's been retained. He's billing for it. So what would be the reason that he wouldn't reach out, if he billed for it, and then somebody is paying for something, and they don't give results of the review? You can ask the question.

BY MR. SAMUELS:

Q. Sir?

A. I have no record of reaching out to him. I have no e-mails to him. I have no record of phone calls. I would have given my final report after I received the rest of the records that I wanted, particularly the medical records. I was not basing my entire report on a scan, as I've testified yesterday and today. You can't make the diagnosis just from a scan. The history was there that he had head injuries, that he had treatment for them, and that it's clear, but I also testified today, I had a lot of trouble even getting in touch with Mr. Hudgins. I don't recall a single conversation with him.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2114

Q.  How is it, Dr. Merikangas, that you have no recollection at all of any of the conversations that you had with Mr. Hudgins unless I show you an e-mail or document, but you recollect that you had a hard time getting ahold of Mr. Hudgins?

A.  I recall the absence of communication with him.  I've never had such trouble communicating with an attorney and discussing things with him.  That I remember because that was exceptional.

Q.  Again, my question to you earlier was what would the reasons be that you didn't reach out after the result of the brain scan?

A.  Because the brain scan is not determinative.  I was waiting for the medical records.  But that's speculation.  I don't know.  Maybe I did reach out.  Maybe I didn't.  I don't recall.

        THE COURT:  Can you go back to the memo to the file.

        MR. SAMUELS:  Yes, Your Honor.  That is Government's Exhibit 92.

        THE COURT:  Can you put that on the screen.

        MR. SAMUELS:  I'll enlarge it, Judge.

        THE COURT:  You've read that, haven't you, Doctor?

        THE WITNESS:  I have, Your Honor.

        THE COURT:  Doesn't that indicate that as of the

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2115

13th you hadn't read the scan?

THE WITNESS:  That's right.

THE COURT:  So then your billing says you read it on the 17th.

THE WITNESS:  The billing says the 17th, but I don't know when I actually read it, whether that's when the scan was received, when I read it or not, because I don't do the billing.

THE COURT:  Does this indicate that you are going to get back to them, that you haven't read the scans, and you are going to get back to them?

THE WITNESS:  Yes, it does.

THE COURT:  Go ahead.

BY MR. SAMUELS:

Q.  Let's pull up Exhibit 63, please, which is Dr. Merikangas's 2009 report.

Dr. Merikangas, looking at the last line of your report, don't you say that the full report will follow the results of his brain imaging?

A.  Yes.

Q.  Did it, sir?

A.  No.

Q.  Why not?

A.  I don't know.

Q.  You would agree that it would be your obligation as the

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2116

expert to update the report with the results of the brain imaging?

A.   Not if they didn't want it.

Q.   Do you have any evidence that they didn't want the results of the brain imaging, sir?

A.   No.

Q.   They ordered the brain imaging that you asked them to order, correct?

A.   All I know is that I asked for the scans, and they got done.  I don't know how that was arranged.

Q.   I see.  Sir, just going back lastly, how did you walk away or how did you resolve -- let me ask it this way -- this issue about the experimental drugs, because I don't see that in any other reports?

A.   There was no resolution.

Q.   In your mind, is that still something that's a possibility?

A.   You're asking whether further evaluations and research up till today, is it still a possibility?

Q.   Do you still think that he could be suffering from the results of experimental drugs, sir?

A.   It's still a possibility.

Q.   Okay.

A.   Let me correct it.  At the time of the alleged crime, that's a possibility.  It's not a possibility right now, if

Merikangas, J. - Cross                                            2117

that's what you're asking.

Q.  And you are aware, Dr. Merikangas, that he took a number of those drugs, including the Wellbutrin, after the time of the crime in 2017?

A.  I'm not aware of the chronology of it.  I don't know if he actually took them.

Q.  Well, let's turn now to 2015.  Dr. Merikangas, is it fair to say that you had really no involvement in the case from 2009 to 2015?

A.  Yes.

Q.  Do you remember doing anything on it?

A.  No.

Q.  *Habeas* counsel had reached out to you in July of 2015; is that right, sir?

A.  I don't recall.

Q.  If we can put the Elmo back on, Madam Clerk.

Dr. Merikangas, I'm going to show you some documents and see if this helps with your recollection at all, sir.  Do you see this letter dated July 7th, 2015, from -- or to you from the Federal Defender Service of Tennessee?

A.  Yes.

Q.  Looking at this, does this help you recollect when you got involved in the case?

A.  No.

Q.  Okay.  It contains a number of pages of information,

Merikangas, J. - Cross                                            2118

Dr. Merikangas.  Do you see that?

A.  Yes.

Q.  And it goes on for several pages providing information about David Runyon.  Do you see that, sir?

A.  Yes.

Q.  Did you rely on this information, Dr. Merikangas?

A.  I don't recall.

Q.  Did you ask for this information?

A.  No.

Q.  And this is authored by Dana Chavis.  Did you understand Ms. Chavis to be one of the attorneys for Mr. Runyon?

A.  Well, I've since learned that.  It doesn't say attorney after her name right here.

Q.  Okay.

A.  Is it on the letterhead?  Her name is not on the letterhead either.  I don't know who she is.

Q.  Okay, sir.  Who did you have your contact with from the Federal Defender Services?  Do you remember that?

A.  No.

Q.  I've got another document that I will show you.  Here is another letter July 10th, 2015.  Do you see more information is being sent to you, sir?

A.  Yes.

Q.  This is the updated index and some WAIS testing performed by Dr. Montalbano?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2119

A.   Yes.

Q.   August 19th, 2015, some additional information?

A.   Yes.

Q.   Do you know -- I mean, it says in the parentheticals after them, but do you have any independent recollection of who these folks are and what they said?

A.   No.

Q.   Okay.  Down at the bottom here do you see how it says, "Dana C. Hansen Chavis, Assistant Federal Defender"?

A.   I see that.

Q.   So this is the lawyer that's been passing you all this information about David Runyon; is that right, sir?

A.   If you say so.

Q.   Well, that's what the document says, isn't it?  Signed by Ms. Chavis?

A.   Yes, it says here, assistant federal community defender. That's who sent the letter.

Q.   And she is providing all this information about David and his background?

A.   Yes.

Q.   Did you rely on any of this, sir?

A.   At that time?

Q.   Yes, sir.

A.   Do I say it in my report?

Q.   We will get to that, sir.  Do you recall whether you did

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2120

or not?

A.  I don't recall, no.

Q.  Okay.  September 9th, 2015, do you see additional information is being provided to you?

A.  Yes.

Q.  Dr. Merikangas, do you recall any urgency to do a report for evaluation for Mr. Runyon in 2015?

A.  No.

Q.  Then September 18th, 2015.  Do you see this letter from Ms. Chavis to you, sir?

A.  Yes.

Q.  I see reference to David Dombrowski interview notes and Maria Runyon declaration.  Do you see that?

A.  Yes.

Q.  Did you rely on those materials?

A.  I don't recall.

Q.  If it's not in your report, is it fair to say you did not rely on those materials?

A.  No.

Q.  I'm sorry.  I didn't understand.

A.  I don't understand what you mean by fair.  Fair or unfair?  What do you mean?

Q.  Is it all right to say, do you agree with me saying that if it's not in your report, then you didn't rely on the materials?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2121

A.   No.  I may have relied on it.  Maybe it is listed, maybe it isn't.  I don't know.  Can you show me the list?

Q.   Yes, I can.

A.   I think I have a large list of what I reviewed.

Q.   I do.

A.   Or what I referred to at least.

Q.   I see there is a number of items here.  Do you see that, sir?

A.   Yes.

Q.   And what we had looked at before, just to re-orient you, is David Dombrowski interview notes from September 14th, 2015.  Do you see that?

A.   I do.

Q.   And I'm looking down at the first page.  I don't see any interview notes referenced there.  Do you see any interview notes from David Dombrowski referenced there?

A.   No, I don't.  I see trial testimony.

Q.   Yes, sir.  Here is the next page.  I don't think I see any interview notes from David Dombrowski referenced there. Do you, sir?

A.   I haven't gone through these to check whether they are letters in this list coincide in any way.  I have no way of answering these questions.

Q.   Well, sure you do.  You can look right now at the screen, right, sir?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2122

A.   Well, then show me all the screens.

Q.   I am.  I thought we looked and agreed that on the first page there was no reference to Mr. Dombrowski.

A.   It says trial testimony.

Q.   There is no reference --

A.   Then it says progress notes from V.A. clinic.

Q.   No reference to interview notes from September 2015?

A.   No reference for interview notes.

Q.   How about on this next page, starting at number 11?

A.   I don't see any reference to interview notes from him.

Q.   Okay.  And there is Maria Runyon.  Doesn't look like there was any declaration from Maria Runyon, was there?

A.   I don't see it here.  How about the next page?

Q.   Sure.

A.   Don't see it.

Q.   Okay.  So if it's not there, would you agree that you didn't rely on it?

A.   No.

Q.   So would there be things in your report here that you relied on for your opinion that you don't list?

A.   That's possible.

Q.   Well, how are we to know what you relied on then?

A.   You are not able to tell from that.

Q.   So we don't know --

A.   May I ask a question, Your Honor?  When he uses the word

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                           2123

"relied," what does he mean?  What is the definition of "relied upon"?  There are things I look at that I read, but relying implies that there is some belief or faith.  I'm not sure what he means.

THE COURT:  Well, an expert report, under the rules, must include the authorities that you relied upon, you used to write your opinions.  In other words, you have to list the authorities that you used to form your opinions.  So I guess use the word "use," and then the attorney can ask you how much did you use it, what weight, whatever.

THE WITNESS:  That's my question, the weight.

THE COURT:  I'm not going to answer any further questions.  Everyone knows that the rules require a list of authorities that support the opinion or that you used or relied upon.  The wording of the rule, you want to read it out or whatever.

MS. ALI:  I'm happy to read it out.  I'm trying to get to it.

THE COURT:  We are getting to the point that a witness is asking questions of the Court and the attorneys and doesn't recall anything and is being quite, I will put on the record, defiant.

BY MR. SAMUELS:

Q.  Dr. Merikangas, did you prepare the list here, the list of records that were used in connection with your report,

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                        2124

sir?

A.  No.

Q.  Who did?

A.  I got this list from somewhere, but I certainly didn't type all this myself.

THE COURT:  It's in Rule 26.

MS. ALI:  I know.

THE WITNESS:  I don't know, but I didn't make the list.  I obviously got the list from somewhere else and pasted it in.

BY MR. SAMUELS:

Q.  Did you prepare this report, Dr. Merikangas, in terms of drafting it and putting it together?

A.  Let me see the rest of it.

Q.  Yes, sir.  So we looked at the list of the people and the items that were listed, 1 through 48, right?

A.  Yes.

Q.  I didn't skip anything there, right?

A.  I don't think so.

Q.  Okay.  And then there are some paragraphs when you talk about your examination.  Do you see that?

A.  Yes.

Q.  Did you prepare and put that in the report?

A.  I don't recall.  Can I see the next page?

Q.  Yes, sir.  It's just one more page, Dr. Merikangas.

JODY A. STEWART, Official Court Reporter

A.   These -- I can't tell whether this last two paragraphs are from my report of 2015 or whether they were generated for this particular document.

Q.   As you look at the report, that's your signature on it, right, sir?

A.   Yes.

Q.   Do you recall sitting and typing all this information in, sir?

A.   No.

Q.   Could this have been prepared by someone else?

A.   That's speculation there.  I don't recall.  I can't tell.

Q.   Let me ask you, if you didn't do it, who did?

        MS. ALI:  I just want to make sure the record is clear what the word "prepare" means, as in the typed word or the content of the report?

        THE COURT:  I understand.  I'm just reading the rules.  "The report must contain:  A complete statement of all opinions the witness will express and the basis for them; the facts or data considered by the witness in forming them; any exhibits that will be used to summarize or support them; the witness's qualifications, including a list of all publications authored in the previous ten years; a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and a statement of the compensation to be paid

Merikangas, J. - Cross                                         2126

for the study and testimony in the case."  That is what you have to disclose in the beginning.  Then it goes through pretrial disclosures.  We went through all of this.

MS. ALI:  That's not my point, Your Honor.  I was just trying to clarify.  Mr. Samuels is using the word "prepare" the report.  I was just trying to make a clarification whether when he means that, he means typing the report, or if the content of the report when he's asking the questions of Dr. Merikangas.

MR. SAMUELS:  Your Honor, I don't think I'm using language such as "prepare," "rely" that's unusual language in these settings.  It's the same language that I've used with every other expert witness in this case.  I think if Dr. Merikangas can answer those questions as to whether he prepared this report or not.

THE COURT:  Well, show him the report and ask him if this is his report and how it was put together.

Do you have the full report to give him, just to show him the report?  I can give him the one out of my notebook.

MR. SAMUELS:  Happy to, Your Honor, with the assistance of the court security officer.

BY MR. SAMUELS:

Q.  Do you recognize that, Dr. Merikangas?

A.  I prepared this report.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2127

Q.   Okay.  And I want to make sure I'm clear on this.  Did you type that report?

A.   I think I cut and pasted the list.

Q.   Okay.  And the information about the examination and your conclusions on the fourth page?

A.   I would have typed that.

Q.   I'm sorry?

A.   I typed that.

Q.   You typed that up?

A.   Yes.

Q.   Sir, were there notes you took when you prepared this report and examined the defendant?

A.   I have no notes.  I may have written down his blood pressure and a few things like that, but I don't take extensive notes.

Q.   Dr. Merikangas, I'll just show you my copy since you've got one, too.  You see in the first paragraph you say, you did not get to testify at trial, "But if I had, I would have testified that in my expert opinion he was a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process."  Do you see that, sir?

A.   Yes.

Q.   What would your determinations that he was brain damaged have been in 2009?  We are not talking about injuries, we are

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                            2128

talking about brain damage.

A.   I don't understand what you're asking.

Q.   Well, how would you have reached that conclusion that you would have been able to testify in July 2009 that he was brain damaged?

A.   Well, I had these 48 different things that I reference, and I had the results of the psychological testing, particularly that by Dr. Mirsky, which confirmed my original impression that what I observed in my 2009 examination was correct, and that had I been allowed to expand upon that, I would have come to those conclusions.  And if I had testified, I would have been able to answer those questions and be cross-examined on them and provide all the data.  That never happened.

Q.   You referenced in here, Dr. Merikangas, a psychotic thought process.  Would you agree with me that's not in your 2009 preliminary report?

A.   I would agree it's not there.  I just told you that that's a preliminary report, and it was subsequently brought up by the further testing that there was a psychotic process, and that's what I said in this report, that the -- may represent, may.

Q.   Just to be very clear, you never updated that 2009 report until 2015?

A.   That's right.

Merikangas, J. - Cross                                              2129

Q.  And you've listed all of these items that have been reviewed.  You would agree with me that you reviewed each and every one of these items?

A.  Yes.

Q.  Okay.  Did you look at any records from the drug studies that had been done?

A.  No.

Q.  Why not?

A.  I didn't have them.

Q.  Did you ask for them?

        MS. ALI:  Sorry.  Are we talking about 2009?

        MR. SAMUELS:  We are talking about 2015 report, did he look at any of the drug studies that had been done in 2000 -- or they were done earlier in 2009.

        THE WITNESS:  I don't recall asking for them.

BY MR. SAMUELS:

Q.  And you did look at the presentence investigation report that's listed on Exhibit 43?

A.  Yes.

Q.  And that report indicated that Mr. Runyon had another assault or an injury sometime in 2009; is that right?

A.  Yes.

Q.  Okay.  And, sir, these references down here starting on 34, school records, medical records, what medical records did you look at?

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                2130

A.  I don't recall.

Q.  What military records did you look at?

A.  His Army records, including his treatment after the car accident of 1996.

Q.  Mental health evaluations, summary of prior testing, what was that?

A.  I'm not sure what that was.

Q.  Evan Nelson, Ph.D., what did you look at from Dr. Nelson?

A.  I don't recall.

Q.  Were you aware that there was another expert employed for a period of time named Dr. Scott Bender?

A.  No.

Q.  Did you look at anything from Dr. Bender at all?

A.  I don't recall.

Q.  You did an exam of Mr. Runyon the day before the report on September 24th, 2015?

A.  Is that what it says?

Q.  Yes, sir.  I'm showing you right on the screen.  Do you see that?

A.  Yes.

Q.  Do you know how long that took?

A.  No.

Q.  There's a reference to a five-hour glucose test.  Do you know if that was done?

A.  I have no record of it being done.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2131

Q.   Did you have notes of this exam, sir?

A.   I don't know.

Q.   And what also informed your exam is the fact that Mr. Runyon was assaulted in 2009; is that right?

A.   Yes.

Q.   And you learned that from the presentence report?

A.   Yes.

Q.   Okay.  Your conclusions or impressions are all listed on Page 4; is that right?

A.   When you say all listed, I may have other conclusions which are not listed.

Q.   Dr. Merikangas, do you understand that if you had other conclusions that aren't listed, it makes it difficult to know what your opinion is?

A.   I thought that's why I testify.

Q.   Well, do you understand that you've testified for a long time, and you know that the rules require that the opposing party be given a copy of your opinion?

A.   Yes.

Q.   And if you withhold opinions from the report, then there is a fairness issue.  Do you understand that, sir?

A.   I understand that, yes.  But I also understand that things may come up during discussions, like talking to you now, which maybe I didn't think about but which I can answer if asked that question.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2132

I can't anticipate all of the questions that I might be asked.  But I am willing to answer all that I may answer, even if it is not listed, if I'm asked by an attorney like yourself all these questions that I may or may not have answers to.

THE COURT:  I think the question, and if I'm wrong, we can reread it back.  I think the question was to you, basically, where is that conclusion in your report, and you had testified you may have other conclusions and opinions that aren't in your report.

THE WITNESS:  Yes, Your Honor, if I'm asked on other things which I didn't think of or I didn't mention.

THE COURT:  Let me ask you just one other quick question.  This report is done, or this report was done in 2015?

MR. SAMUELS:  Yes, Your Honor.  It was dated September 25th, 2015.

THE COURT:  What stage did you understand the case was active?

THE WITNESS:  What state?

THE COURT:  What stage in the proceeding?

THE WITNESS:  What stage?  I didn't know.

THE COURT:  Well, you knew you were corresponding with *habeas corpus* counsel, right?

THE WITNESS:  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2133

BY MR. SAMUELS:

Q.  Were you given an explanation as to why you were being brought back in the case six years later, sir?

A.  No.

Q.  Did you ask?

A.  No.

Q.  It indicates in here that you reviewed the MRI and the PET scan, and you found these multiple white matter hyperintensities; is that right?

A.  Yes.

Q.  That's all we have, that little paragraph there, those, I think, three sentences, are what we have in terms of your review of the scans, that's all we have to go on; is that right?

A.  Yes.

Q.  Would you agree that the MRI scan does not show signs of a prior substantial traumatic injury?

A.  No.

Q.  Would you agree that the PET scan, as you said, is non-diagnostic?

A.  Yes.

Q.  Would you agree that research has shown that the PET scan is really the best scan to see a functional image after a head injury?

A.  No.

Merikangas, J. - Cross                                              2134

Q.   Have you ever testified that that's the case, sir?

          MS. ALI:  Objection.  I don't know, testified that what's the case?

          MR. SAMUELS:  Testified that a PET scan is really the best scan to see a functional image after a head injury.

          THE WITNESS:  I thought you just said MRI.  I'm sorry.

BY MR. SAMUELS:

Q.   No, I'm sorry, sir.  Do you recall testifying that a PET scan is really the best scan to see a functional image after a head injury?

A.   I don't recall.

Q.   Would you like me to refresh your memory on that point?

A.   Would I like it?

Q.   Would you be agreeable to me refreshing your recollection on that front?

A.   I'm here to answer your questions.

Q.   Yes, sir.  Do you recall testifying in the Umana case in 2010?

A.   I don't recall.

Q.   Okay.  Do you recognize this reflecting a transcript of your testimony before Chief Judge Conrad at the time in 2010?

A.   Where did this take place?

Q.   It's in the United States District Court for the Western District of North Carolina, sir.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2135

A.   Oh, I see.  Yes, I recall now.

Q.   Okay.

A.   I see they spelled my name wrong again.

Q.   That seems to be an ongoing problem, doesn't it, Dr. Merikangas?

A.   It does.  I wonder about the accuracy of these reports --

Q.   I'm sure, sir.

A.   -- with mistakes like that.

        THE COURT:  They left out the I; is that correct?

        THE WITNESS:  Put a U instead of an A.

        THE COURT:  Sometimes they leave out the I.

        THE WITNESS:  They do all kinds of mistakes.

BY MR. SAMUELS:

Q.   And showing you a little further in here, sir.  Hadn't you indicated that there are many journal articles and references and many books who recommend that the PET scan is the best way to see a functional image after a head injury?

A.   At that time.

Q.   It has changed since then, Dr. Merikangas?

A.   Yes, it has.

        THE COURT:  What was the date on that transcript?

        MR. SAMUELS:  Yes, Your Honor.  That would be 2010. So that was closer in time, -- actually, it's after the trial in this case; is that right?

        THE WITNESS:  Yes.

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2136

BY MR. SAMUELS:

Q.  Dr. Merikangas, I'd like to talk just a little bit about these white matter hyperintensities.  Just the presence of white matter hyperintensities don't reveal brain damage on their own, do they?

A.  They don't.

Q.  And they don't reveal just by themselves a loss of cognitive function?

A.  That's right.  Unless they are in a site or a location that would cause that, but just in general, no.

Q.  Okay.  They don't tell you when an injury that might have resulted in the hyperintensities was sustained?

A.  They don't.

Q.  They're not that uncommon in adults, are they, sir?

A.  They're not.

Q.  And many, many people experience, I think what's called TBI, or traumatic brain injury, every year?

A.  Yes.

Q.  Some 2 million people?

A.  Well, I don't know the epidemiology numbers.

Q.  Generally, an episode of trauma sufficient to produce a meaningful brain injury also produces a lack of consciousness or loss of consciousness; is that right?

A.  Often.

Q.  And symptoms of concussions can gradually improve over

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2137

weeks until about six months in time; is that right?

A.   Usually.

Q.   And it is possible, as I think you've said before, to find brain abnormalities on scans of people who have no problem functioning at all?

A.   That's correct.

Q.   And I think you've said, even written before, that there is no structural or anatomical features that provide a simple explanation for complex human behavior?

A.   That's true.

Q.   You've written that, haven't you, Dr. Merikangas?

A.   I don't recall, but it's certainly true.

Q.   Dr. Merikangas, are you familiar at all with the publication called "Neurotrauma Reports"?

A.   Yes.

Q.   And I'm just showing you this article by Sarah M. Lippa. Have you heard of Dr. Lippa, who is a board certified clinical neuropsychologist?

A.   No.

Q.   And do you see this article dated -- I believe it's dated 2021?

A.   I see it.

Q.   Are you familiar with this at all, sir?

A.   No.

Q.   Did you do any continuing research on white matter

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2138

hyperintensities before you came to court today?

A.  No.

Q.  Did you before you testified yesterday?

A.  No.

Q.  I want to jump ahead to Dr. Lippa's conclusion here. Dr. Merikangas, this conclusion says that this study investigated the relationship of WMHs, white matter hyperintensities, and self-reported symptoms and cognition in active duty service members with a history of one or more mTBIs?

A.  Mild TBI.

Q.  What is a mild TBI, sir?

A.  Well, you have to go back to what she defines it as.

Q.  How would you define it?

A.  As one that doesn't produce unconsciousness more than about half an hour.

Q.  Unconsciousness of more than half an hour?

A.  That doesn't produce more than a half an hour.

Q.  Okay.  This says, "The findings built on past research that, in aggregate, suggests white matter hyperintensities are not meaningfully related to neurobehavioral symptoms, physical functioning, or cognitive performance in patients with a remote history of mTBI."  Do you see that, sir?

A.  I do.

Q.  Can you explain what that means for us?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2139

A.   It means that a mild brain injury may or may not produce a problem much later and that further research is needed.

Q.   And it says further, "Clinicians are encouraged to use caution when reporting such imaging findings.  Future longitudinal research should continue to investigate the relationship between vascular risk factors and long-term outcomes following TBI."  Do you see that?

A.   I see that.

Q.   What does that mean, the reference to clinicians using caution in reporting such imaging findings?

A.   That they shouldn't try to use it the way you're using them right now, as a either/or or a definitive answer to whether someone had a traumatic brain injury because they don't do that, and this simply reinforces what we have all known for years.

Q.   So you're not saying, Dr. Merikangas, that the presence of the white matter hyperintensities alone relate to cognitive performance on behalf of the defendant?

A.   I've said that multiple times today and yesterday.

Q.   Okay.  Going back to your report, sir.

A.   This one?

Q.   Your 2015 report, Dr. Merikangas.  I said I'd stay on time here, and I'm trying to.  The impression that you list there, result -- in auto accident results in a personality and mood change.  Do you recall where that came from?

Merikangas, J. - Cross                                    2140

A.   Yes.

Q.   Tell me where that information came from, sir.

A.   That came from collateral sources, interviews that are referenced.

Q.   Do you remember Maria Runyon, his ex-wife, talking about that at all?

A.   Yes, and the Army records, medical records from the Army, and the police employment records, all of them reference a personality change after his head injury, and Dr. Montalbano's history.

Q.   I see here on number 20, we have Maria Runyon, ex-wife, interview and trial testimony.  Do you see that, sir?

A.   Number 21 is Robin and Jim Carroll, friends of ex-wife.

Q.   I'm sorry.  Number 20, sir.

A.   I see that.

Q.   Is that all you had for Ms. Runyon?

A.   I don't recall.

Q.   If you had something else that would have supported this determination of a mood change, that would have been listed on your report, right?

A.   Not necessarily.

Q.   Dr. Merikangas, I'll show you this letter again. September 18th, 2015, you were sent a declaration.  Do you see that, sir?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2141

Q.   That declaration, would you agree, is not listed on this list with Maria Runyon?

A.   Yes.

Q.   So are we to take from that that you didn't consider it?

A.   No.

Q.   So, Dr. Merikangas, I can't really know what you considered based on this list, right?

A.   Right.

Q.   You've listed some things but you haven't listed everything?

A.   Apparently.

Q.   Did you consider Maria Runyon's Grand Jury testimony from 2008?

A.   I don't think I had that.

Q.   If that Grand Jury testimony indicated that she did not attribute any mood change to the accident but to bitterness about the accident, would you want to know that?

A.   Yes.

Q.   Sir, you go on to reference impaired executive function and other things.  In making that determination, do you consider this additional head injury in jail?

A.   Yes.

Q.   That occurred in 2009?

A.   Yes.

Q.   I think yesterday you used the word, when you testified,

Merikangas, J. - Cross                                            2142

"disinhibition"; is that right?

A.   Yes.

Q.   Okay.   That's not listed here in your report?

A.   No.

Q.   Okay.   You indicate that the psychological testing suggests paranoia and delusions.   Do you see that, sir?

A.   Yes.

Q.   Do you know that -- where that comes from?

A.   Yes.

Q.   Would you tell us, please.

A.   From Dr. Mirsky's report and from the MMPI report.

Q.   The MPPI report would indicate paranoia and delusions?

A.   Yes.

Q.   And this reference to PTSD, did you see a diagnosis of that, sir?

A.   I did, but I can't tell you where.   Somewhere in those things I looked at.

Q.   Dr. Merikangas, if we can now turn to -- I'm getting further along here, sir -- the declaration that you signed in February of 2023, okay?

A.   Yes.

Q.   And we discussed this a little bit yesterday.   But further on in this declaration you see here, as we discussed, that you've listed all these sources again, right?

A.   They listed them all.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2143

Q.   And this is the same thing as what we had in 2015; is that right?

A.   It looks like it.

Q.   So even though you're telling me that there is additional sources, those aren't listed there either?

A.   That's right.

Q.   So, again, in 2023, I don't know what you looked at?

A.   Correct.

Q.   And then here you've got a few paragraphs that are very similar to what you had in 2015, ending probably about here (indicating).  Do you recall that, sir?

A.   I don't recall, but I see it.

Q.   You see it.  Again, just to show you, I'm not trying to -- this is your 2015 report at the bottom, it ends, "Brain injuries, mood disorder, and PTSD."  Right up here in your 2023 declaration you've got, "Brain injuries, mood disorder, and PTSD."  Do you see that?

A.   Yes.

Q.   Then there is a line that says, "The history of PTSD affects his perceptions and ability to function in everyday life."  Do you see that?

A.   Yes.

Q.   Did you type that?

A.   No.  I didn't type any of this.

Q.   How was this report -- how is the information contained

JODY A. STEWART, Official Court Reporter

in your declaration, which you signed under penalty of perjury, how did that get in this declaration?

A.   I would be speculating.  I don't know.

Q.   Well, sir, it is the declaration that you signed, right, sir?

A.   But I can't answer that question because I don't know whether I told them this or whether they got this from other writings of mine, but I didn't type it.

Q.   You didn't type any of these paragraphs, sir?

A.   Not in this declaration.

Q.   Well, did you author any other report that contained these paragraphs?

A.   I don't know that I wrote a report that contains these.  I don't recall.

Q.   Do you see in here that you say -- well, it says in the first paragraph here, "He is vulnerable to be taken advantage of and manipulated."  Do you see that?

A.   Yes.

Q.   Did you offer that opinion?

A.   I think I did, but I don't recall explicitly, but that's a characteristic of brain damaged people.

Q.   But, Dr. Merikangas, do you see the problem here?  I can source up to this line here where everything else in the report comes from.  Anything above the line I can source to 2015 from you because you told me you did the 2015 report,

Merikangas, J. - Cross                                          2145

right?

A.   Yes.

Q.   Can you see the problem I'm having, is I don't know where any of this comes from that's below the line?

A.   And?

Q.   Can you tell me where it comes from?

A.   A lot of this comes out of textbooks.  A lot of this comes out of dissertations.  A lot of this comes out of other articles about brain injury.

Q.   Did you have involvement in putting this in here?

A.   I believe I did, yes.  I think I've probably told them all of this, but I didn't footnote all of this.  I didn't know footnotes were required.

        THE COURT:  Well, did you list them in your sources?  Because your sources are required.

        THE WITNESS:  A lot of my sources are my general education.  I have 50 years of medical practice and what I teach all the time.  I didn't realize that I had to footnote everything that I'd say.

        THE COURT:  Well, this was the declaration under penalty of perjury prepared for this proceeding before this Court.  Is that correct?

        THE WITNESS:  Yes.  And I find out there is at least one mistake in it, but the rest of it I stand by.  But I have not footnoted it.

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2146

BY MR. SAMUELS:

Q.   I guess what I'm asking, Dr. Merikangas, is how can you stand by this if you didn't put this together?

A.   Because as I read it, it's correct.

Q.   But when you read it for the first time, was it contained in this declaration like this?

A.   I do not recall.

Q.   This was just seven or eight months ago in February of 2023?

A.   I have written a whole lot of things since then, seeing patients or doing things every day.  I don't recall everything I have done over the past year.

Q.   So you can't tell me anything more -- you can't tell me if you saw this declaration or you participated in it in terms of putting this information?

A.   I clearly participated, but I can't tell you how I participated because I don't remember.

Q.   Well, okay.  Let's go through some of the substance.

          THE COURT:  Wait a minute, please.  How can the Court determine the weight and credibility to give this declaration if we don't know where the information, the source of it is, so you can go to the source?  In other words, that's the reason for the declaration and the report is so the Court, all the attorneys, not just the United States, can go to the sources to verify the information and

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2147

to see if it's a source that's used in the industry?  I think that's the problem that we are having.

THE WITNESS:  Is there a question pending?

THE COURT:  Yes, there was.  I was just trying to explain to you why Mr. Samuels is delving into all of this.

THE WITNESS:  May I answer this?  Because a lot of this is very boilerplate standard discussion of traumatic brain injuries.  It's found in any reference book or any text, and that it didn't occur to me it would be necessary to explain these things.  An astronomer doesn't have to explain that the sun rises in the east because everybody knows that.

BY MR. SAMUELS:

Q.  Let me explain to you the problem that I think we are having here, okay, sir?

A.  Yes.

Q.  So you testified that you didn't actually draft or put these words on this piece of paper.

A.  I testified I don't recall.  I obviously told them this, but I don't know in what manner I did it, whether I wrote something, whether I talked to them.  I do not recall.

Q.  Why do you say obviously you told them this?

A.  Because these are things that I would have said.

Q.  Well, you just said that these are things that are standard boilerplate from any textbook or dissertation or

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2148

article?

A.  That's what I would have said.

Q.  I guess the question is, are you sure that this information that's below the line came from you and not from some textbook or boilerplate or something else, and then you were just asked to sign off on it?

        MS. ALI:  Objection.  He testified that he didn't sign that part of the declaration.

        MR. SAMUELS:  But it's important to know how it got there, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  I don't know how it got there, and if I did, I would tell you.  I don't recall.

BY MR. SAMUELS:

Q.  I see, Dr. Merikangas.  Let me show you Government's Exhibit 30.  This is already in evidence.

        THE COURT:  I think it's time.  We need a 15-minute recess because we have been going for almost three hours.

        MR. SAMUELS:  I'm sorry, Your Honor.  I am trying to move along.

        THE COURT:  It is fine, but I think we need to take a 15-minute recess.

        (Recess from 12:46 p.m. to 1:04 p.m.)

        THE COURT:  All the attorneys are here, and Dr. Merikangas is on the stand, and the defendant is here.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2149

I think I said before the break almost three hours.  I think it just might have seemed like three, but it's only two, but we all needed a break.

MR. SAMUELS:  Yes, Your Honor.

BY MR. SAMUELS:

Q.  Dr. Merikangas, we have your 2023 declaration up here, and I was asking some questions, or starting to, below the line.  You see there is a reference here to Mr. Runyon being vulnerable to be taken advantage of and manipulated?

A.  Yes.

Q.  Let me show you, sir.  This is Government's Exhibit 30, an e-mail chain in June of 2009 between Mr. Woodward.  You know Mr. Woodward was one of his prior counsel, right?

A.  I don't recall.

Q.  And you see Ms. Cronin is listed there, too.  Do you remember who Ms. Cronin was?

A.  Yes.

Q.  And I think you said you had a lot of contact with Ms. Cronin; is that right?

A.  No.  I said I had some contact with her and more than I did with the attorneys.

Q.  Okay.  See at the bottom here, Dr. Merikangas, where Mr. Woodward is writing, "Steve/Sheila:  I received in today's mail and reviewed the DVD of David's interview of Virginia Pina regarding the domestic violence incident."  Do

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2150

you see that, sir?

A.   Yes.

Q.   Do you remember who Virginia Pina was?

A.   No.

Q.   If I represent to you that she was one of David Runyon's ex-girlfriends, does that help you at all?

A.   Does it help me remember?

Q.   Yes, sir.

A.   I don't remember the name.

Q.   Okay.  And do you see further it says, "It is not helpful to us" -- this being the DVD -- "and shows him to be manipulative"?

         MS. ALI:  Objection, he's not on this document. He's never seen this document.

         MR. SAMUELS:  Judge, we are on Government's Exhibit 30.  It's an admitted document reflecting a review of this video interview of Virginia Pina and some characterizations. I'd like to ask Dr. Merikangas if he would have liked to have seen the video, if he would have liked to have seen this e-mail where it's referring to David Runyon as being manipulative and calculating, when it says in the report he is vulnerable to be taking advantage of and manipulated.

         MS. ALI:  Well, the document is all hearsay.  I don't know if it was admitted for the truth.

         THE COURT:  It's been admitted.

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2151

MR. SAMUELS:  It has.

MS. ALI:  Was it admitted for the truth?

THE COURT:  Well, it's your responsibility as an attorney to know, whether you were here or not.  It's been admitted.  So whatever it was admitted for, that's what it's been admitted for.

MR. SAMUELS:  Really, what my questions are, is, did Dr. Merikangas know this, did he review this, would he have wanted to see this, the same type of questions.

THE COURT:  It's fine.  It's an e-mail from Larry Woodward to Sheila Cronin.  Larry Woodward is going to testify.  He said he knew Sheila Cronin, and he said he didn't have enough information, and he wanted all the information he could get, and that kind of thing.  So it does go to his testimony that he's already given, and there is nothing improper about the question, and the exhibit has been admitted.

MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  Dr. Merikangas, you see in here how it references David Runyon, in the attorney's opinion, being manipulative and calculating?

A.  Can you go back to that.  I don't see it here.

Q.  Sure.  See at the bottom of the page, it says, "It is not helpful to us and shows him to be manipulative," and then on

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                                    2152

the top of the next page it says, "and calculating."

A.   That's Attorney Woodward's opinion or Sheila Cronin's opinion?

Q.   Attorney Woodward's.

A.   So the Sheila Cronin at the bottom is not the signature on this?

Q.   No, Dr. Merikangas.  That's just included in the e-mail chain.  My question, sir, is did you get a DVD of David Runyon and Virginia Pina?

A.   No.

Q.   And if there was this DVD that showed David Runyon coaching Virginia Pina in this way it's been described, is that information you would have wanted?

A.   How are you characterizing this?  That it's a DVD of David Runyon?

Q.   I'll show you what the e-mail says, sir.  It's a DVD. Let me see if I can blow it up here.  It says, "of David's interview of Virginia Pina regarding the domestic violence incident."  Do you see that?

A.   Yes.

Q.   Okay.  "And it's not helpful to us and shows him to be manipulative and calculating."  Do you see that?

A.   Yes.

Q.   Would you have wanted to see that video, sir?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2153

Q.   Do you know why it wasn't provided to you?

A.   Do I know why it wasn't?

Q.   Yes, sir.

A.   No.  I didn't know it existed.

Q.   Let me next show you Government's Exhibit 20, which has already been admitted into evidence.  This is a memo from Sheila Cronin to counsel regarding the government's psychological evaluation that was done.  Memo looks like it was February 24th, 2009.  Do you see that?

A.   Yes.

Q.   On the second page of the memo, it said, on the second to last paragraph, the last sentence, "David said he did his best to cooperate with Dr. Montalbano, but he left a few of the questions on the MMPI blank because he felt they could be used against him no matter how he answered them."  Do you see that, sir?

A.   Yes.

Q.   Is this memo something that you were made aware of?

A.   No.

Q.   Is this something that you would want to know in assessing Mr. Runyon at all?

A.   No.

Q.   You would not want to know that he left questions blank because he thought they could be used against him?

A.   I knew that already.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2154

Q.  You knew that already?

A.  Yes.  The report of the MMPI in Dr. Montalbano's reference to it.  He says that he left out a lot of answers, and that goes to the validity of the MMPI report.

Q.  But would you have wanted to know that David's purpose for leaving out those questions is because he felt they could be used against him?

A.  The MMPI is a self-administered report, and that's why people leave out things routinely.

Q.  You already knew that, then?

A.  Yes.

Q.  Is that consistent with somebody being vulnerable to being taken advantage of and manipulated?

A.  Yes.

Q.  And what we've got in here is references to Mr. Runyon being taken advantage of and incapable of changing direction; is that right?

A.  Yes.

Q.  Dr. Merikangas, did you review all of the actual trial evidence or testimony when considering Mr. Runyon's conduct in the offense?

A.  No.

Q.  Would that have been something you would have wanted to know before making a determination that he was gullible and susceptible to being taken advantage of?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2155

A.   I would like to have seen that evidence but not for the reasons that you state.

Q.   Would that evidence of his conduct in the course of the investigation and the crime have assisted you in forming your opinion?

A.   It depends on who made the investigation and whose -- I'd have to judge more than what you're telling me.  I don't know where that information is coming from.

Q.   I'm talking about the evidence that would have been provided in the course of the trial.  The testimony and the exhibits that were presented to the jury, would that have been useful to you?

A.   It depends on who provided it and where they got that.

Q.   But you would have liked to have considered it if it showed David Runyon's conduct, wouldn't you, sir?

A.   Again, it would depend on who is providing it, because there is a lot of interested parties who may be presenting their own versions of things.

Q.   The last two paragraphs on this page, Dr. Merikangas -- we talked about all the paragraphs on the prior page that were below the line.  Would you know how these two paragraphs were prepared, sir, just these two paragraphs?

A.   The same answer as before, I don't know.

Q.   Okay.  And, again, you said you would have easily reached the same conclusions in 2009 if I had been provided the MRI

Merikangas, J. - Cross                                                    2156

scans.  Do you see that?

A.  Yes.

Q.  Ad you were provided the MRI scans?

A.  Eventually.

Q.  This five-hour glucose test that was referenced at the bottom, do you know if that was done?

A.  No.

Q.  Okay.  And, sir, you have described what I think you have characterized, and tell me if I'm wrong, as mistakes in this declaration; is that right?

A.  Yes.

Q.  If you had known the truth of the situation, that you had conversations with trial counsel, would you have signed this declaration?

A.  That's not the mistake I'm talking about.

Q.  See how you said, "I prepared a brief report dated August 5th, 2009"?  Right here, sir?

A.  Yes.

Q.  Then it says, "I did not hear anything further from Mr. Runyon's attorney."  Do you see that?

A.  Yes.

Q.  We looked at all these records of phone calls and everything else that showed that you did have contact with trial counsel after August 5th, 2009, right?

A.  I don't recall any of those.

JODY A. STEWART, Official Court Reporter

Q.   So would you still have signed this declaration even with all the reports that I've shown you today and yesterday?

A.   Yes, because I have no recollection of talking to them, and those notes are not in any way proof of that actually happened.

Q.   So, Dr. Merikangas, even though you say you don't recall, you would have sworn under penalty of perjury that you did not hear anything further from Mr. Runyon's attorney?

A.   I would have sworn that I don't recall having any contact with them, and I have no notes of conversations with them.

Q.   Is that what that says, I don't recall hearing anything from Mr. Runyon's attorney?

A.   Well, maybe it's not phrased properly.

Q.   Well, you understand that when you sign a document under penalty of perjury that is submitted to a Court, that that is very important to get the language correct?

A.   Yes.

Q.   So my question remains, if you had known of the records that I showed you today and yesterday, would you still have signed this declaration?

A.   No, not if I had known it, but I didn't know it.

Q.   And then it referenced, "Although I ordered the MRI and the PET scan, I never saw the images."  You've been shown some documents today and yesterday that calls that into question, doesn't, Dr. Merikangas?

Merikangas, J. - Cross                                                    2158

A.  Yes.  But this group sent me the disks.  They had the disks.

Q.  But, Dr. Merikangas, if you had seen your billing records from August of 2009 that showed a review of the MRI and the PET scans, would you have signed this document that said you never saw the scans?

A.  No.  But that was my recollection.

Q.  Dr. Merikangas, if the billing records, your billing records, if the records of the attorneys and the phone calls were withheld from you, would you consider that to be a problem?

        MS. ALI:  Objection, calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  If they were withheld from me?

BY MR. SAMUELS:

Q.  Yes.  If *habeas* counsel, in putting this declaration together, had all those documents that I showed you today and yesterday and didn't tell you about it, would you consider that to be a problem?

A.  Yes.

Q.  Do you feel like you have been misled in signing this declaration, sir?

        MS. ALI:  Objection, relevance.  What is the relevance of his view of what prior counsel did and whether that's a problem.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                          2159

THE COURT:  It's quite relevant.  They were *habeas* counsel, and they are the ones that he did the declaration for.  I overrule the objection.

THE WITNESS:  I don't think I was misled.  I think this is a mistake.

BY MR. SAMUELS:

Q.  If something is intentional that's being withheld from someone, do you still consider that a mistake, sir?

A.  No.

Q.  You consider what was done here a mistake even though the records existed?

A.  Yes.

Q.  Lastly, Dr. Merikangas, just got one more document for you, which would be -- the Court's indulgence, Your Honor. Do you remember, Dr. Merikangas, that you signed another supplemental and revised declaration; is that right, sir?

A.  Yes.

Q.  Did you have any involvement in putting that declaration together, sir?

A.  I think I've already testified that I reviewed it with Ms. Ali.

Q.  Was it reviewed before you saw it for the first time?

MS. ALI:  Objection.  I don't even understand.

THE COURT:  I sustain the objection.  I didn't understand.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Cross                                              2160

MR. SAMUELS:  Let me rephrase it.  I'm sorry, Your Honor.

BY MR. SAMUELS:

Q.   When you saw the declaration for the first time, did you have any knowledge about what would be in it beforehand?

A.   Yes.

Q.   How did you have knowledge of that, sir?

A.   I had phone calls with Ms. Ali.

Q.   And those phone calls resulted in the creation of that declaration?

A.   I can't tell you about the creation of the document.  I can tell you that I spoke with Ms. Ali on a couple of occasions and that I saw the document, and I saw that it was correct, and then I corrected the mistake that appeared in this earlier document.

Q.   And, again, you view that as a mistake, you don't view that as an intentional withholding of information?

A.   That's right.

Q.   And, Dr. Cunningham, again, you would agree with me that you did no updated report in 2009?

A.   I'm not Dr. Cunningham.

Q.   Excuse me, Dr. Merikangas, no updated report beyond your August 5th, 2009, report?

A.   That's right.

MR. SAMUELS:  Your Honor, may I have just one

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                        2161

moment?

Your Honor, thank you.  That's all I have for Dr. Merikangas.

THE COURT:  Ms. Ali, redirect.

I think one of the *pro se* attorneys has passed a question up for you.

REDIRECT EXAMINATION

BY MS. ALI:

Q.  Dr. Merikangas, you were asked on cross about the 2009 MRI report prepared by the doctor at Harbor View Health Center in 2009.  Do you recall that?

A.  Yes.

Q.  And if that report were prepared by a diagnostic radiologist rather than a neuroradiologist, how much weight would you put on the findings in that report?

A.  Not very much.

Q.  I'm showing you -- do you recognize this as the 2009 MRI report that you've been looking at?

A.  Yes.

Q.  This was admitted as Government's Exhibit 61.

A.  Yes.

Q.  And do you see the name here at the bottom of who signed that?

A.  I do.

Q.  Do you have an understanding of what kind of doctor

Dr. Davis is?

MR. SAMUELS:  Your Honor, I'm going to object. Dr. Merikangas said he never got this.  He never reviewed it.  He doesn't know.  He doesn't have any memory of it.

MS. ALI:  He was asked questions about it for 20 minutes on cross.

MR. SAMUELS:  I don't see how he could have an understanding beyond the document if he doesn't remember whether he reviewed the document.

MS. ALI:  Well, he testified he did review it.  He has seen it now.  I'm responding to questions that were asked on cross.

THE COURT:  Go ahead and ask him the question, but if he says he wouldn't put much weight on it, and he's requested this, then that would be even more evidence that he should look at the results of the MRIs himself.

In other words, if he got the report or he didn't get the report, one way or the other, that puts more emphasis on the fact that he ordered them, and as far as the Court is concerned, as a retained expert, he should have followed up and looked at it.  You can ask him if he knows Dr. Davis.  I don't know who Dr. Davis is, but you can ask him that.  But if he doesn't know the doctor, and he says he wouldn't put much weight in it, then why wouldn't he follow up, where are my MRI reports that I ordered?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                                    2163

BY MS. ALI:

Q.   Why wouldn't you put weight on the MRI report of a diagnostic radiologist, Dr. Merikangas?

A.   They are generally not skilled in looking at images of the brain.

Q.   Do you have more confidence in your own ability to look at a brain MRI than a diagnostic radiologist with a specialty in breast imaging?

A.   Yes.

Q.   You were asked by Mr. Samuels on cross about the reports of Drs. Montalbano and Patterson.  I want to just show you some pages from those reports.  We will start with Dr. Patterson's report.  This was admitted as Government's 55A.  Do you recognize this as the report of Dr. Patterson that we have talked about?

A.   Yes.

Q.   And you testified on cross that you didn't rely on Dr. Patterson's conclusions but you relied on some of the information contained in his report; is that right?

A.   Yes.

Q.   And you were specifically asked about delusions and hallucinations.  This is Page 21 --

A.   Yes.

Q.   -- of Dr. Patterson's report.  Is there anything in this report that supports your finding that Mr. Runyon suffers

Merikangas, J. - Redirect                                          2164

from delusions?

A.   Yes.

Q.   And can you tell us what that is?

A.   Well, he has the idea that he can hear things that aren't there.  He's having auditory and visual hallucinations.

Q.   And do you see Dr. Patterson's conclusion here that his perception of reality appeared unimpaired?

A.   Yes.  That conflicts with his description of what he observed.

Q.   This is Page 22 of Dr. Patterson's report?

A.   Yes.

Q.   Do you see anything on this page that supports your conclusions about Mr. Runyon's mental health or neurocognitive state?

A.   Yes.

Q.   And can you describe for us what that is?

A.   Well, he describes he looks at himself as a hero type, and he has delusions of grandeur.  He also says that he has saved people.  He does hero-type jobs, very sacrificing person, not afraid of dying.  Then he does have nightmares and fears, and he has some clear problems with his grasp on reality here.

Q.   Moving to Dr. Montalbano -- and, I'm sorry, were those some of the pieces of information from Dr. Patterson's report that you relied on in forming your conclusions in your 2009

Merikangas, J. - Redirect                                              2165

report?

A.  Yes.

Q.  And again in your 2015 report?

A.  Yes.

Q.  Moving to Dr. Montalbano's report.

        I'm sorry, Your Honor.

        I'm showing you, is this the report of Dr. Montalbano that we've been discussing?

A.  Yes.

Q.  This was admitted as Government's 55B.

        I'll move on, Your Honor.  I can't find my place but I'll come back to this.

        THE COURT:  All right.

BY MS. ALI:

Q.  You were asked on cross, Dr. Merikangas, about Maria Runyon's Grand Jury testimony, and I believe you said that you might have liked to see that in forming your opinion?

A.  Yes.

Q.  How would Maria Runyon's assessment of the cause of Mr. Runyon's personality change after the accident have impacted your conclusions, if at all?

A.  If she said it occurred after the head injury of 1996, that would be informative.

Q.  You were also asked by Mr. Samuels about whether the word "disinhibition" appears in either your 2009 or 2015 reports.

Merikangas, J. - Redirect                                    2166

Do you recall that?

A.  Yes.

Q.  And you agreed with Mr. Samuels that you don't use that word in your report?

A.  Yes.

Q.  Does your report discuss evidence or findings suggestive of disinhibition?

        MR. SAMUELS:  I'm going to object to the leading, Your Honor.

        THE COURT:  Sustained.

        THE WITNESS:  Yes.

        THE COURT:  Take him to his report.  You are asking a question that suggests the answer.  Take him to the report, ask him to read it, and then follow up with what he means.

BY MS. ALI:

Q.  Is there anything on this -- we are on Page 3 of your report.  Is there anything here --

        THE COURT:  Page 3.  What's the exhibit?

        MS. ALI:  This is the 2015 report.  This is Defendant's Exhibit 21, Your Honor.

        THE COURT:  All right.  Go ahead.

BY MS. ALI:

Q.  What, if anything, in your report supports your conclusion that Mr. Runyon suffers from disinhibition?

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                    2167

A.  His abnormal reflexes and the ankle clonus suggests disinhibition from the central nervous system.

MR. SAMUELS:  Your Honor, I object.  That is not in one of those paragraphs here.

THE COURT:  Show us where it is in the report.  So we are all on the same page now.  We are on the report of September 25, 2015; is that correct?

MS. ALI:  That's right, Your Honor.

THE COURT:  So tell us where that is in the report.  It's not a very long report.

MS. ALI:  He is trying to draw it on the screen.

THE WITNESS:  I marked it.

BY MS. ALI:

Q.  Can you read what you're referring to, Dr. Merikangas?

A.  "Deep tendon reflexes are abnormal.  Biceps 4 plus on the right, 3 plus on the left.  Triceps 3 plus on the right, two plus on the left.  Brachioradialis, 3 plus on the right, 2 plus on the left.  Both ankles and patellar reflexes four plus with ankle clonus, right greater than left."  And then "Romberg is positive with falling back to the right."  So this indicates that his --

MR. SAMUELS:  Your Honor, I object.  There is no way that you can look at that and see if there is any reference to disinhibition.  How are we to know what that means?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                    2168

MS. ALI:  He is testifying based on his 50 years of experience.

THE COURT:  But this is his report.  Where is it in the report?

MS. ALI:  He is explaining the meaning of these findings he makes in his report.  He conducted a neurological exam.  He put it in terms that are, you know, clinical terms.  He's explaining what these things mean, which he has not been permitted to testify to yet.

THE COURT:  I'll let you ask the question.  I'll let him explain.  You objected.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  I will let you recross on it.

MR. SAMUELS:  Thank you, Judge.

BY MS. ALI:

Q.  Can you explain, Dr. Merikangas, what does deep tendon -- an abnormal deep tendon reflex finding have to do with disinhibition?

A.  As I discussed yesterday, the nerve cells in the brain, the neurons can either stimulate or inhibit or do nothing. And if the lack -- the inhibition that causes the deep tendon reflexes to increase, and these are not only increased, they are asymmetrically increased, which also indicates that one side of the brain is different from the other.  They should be symmetrical.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                              2169

And the Romberg is a test of standing up with your eyes closed, and if you tend to fall back, that's an abnormality of inhibition as well because you generally get a signal from your body if you are starting to tilt, and then you have to inhibit that.  So all of these are signs of inhibition.  Any neurologist reading this would know that's what it meant.

Q.  You said all of these are signs of disinhibition?

A.  Yes.  In other words, he's disinhibited.  He lacks the inhibition.

THE COURT:  He lacks inhibition?

THE WITNESS:  Yes.  He's disinhibited.

THE COURT:  What about being old?  Doesn't it depend on the age?  A lot of older people who stand up and close their eyes and hold their hands out might fall backwards.

THE WITNESS:  Well, that's abnormal.  He is 38.  So that is very abnormal.

BY MS. ALI:

Q.  Would that also be abnormal for somebody who is 45?

MR. SAMUELS:  Objection to the leading, Your Honor.

BY MS. ALI:

Q.  How would your conclusion change if the person you were evaluating was several years older than 38?

A.  Someone were older than 38 and have these signs, I'd

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                    2170

probably do an MRI scan of their brain.

Q.  How, if at all, does disinhibition found on a neurologic exam have to do with behavior, disinhibition and behavior?

A.  People with disinhibition tend to be impulsive and to lack judgment, and generally you would then investigate their frontal lobe of the brain for its function and some of the other tests that were subsequently done, particularly by Dr. Mirsky evaluating those things.

Q.  Can you go to the 2009 report.  Do you recall whether you made similar findings on your 2009 report?

A.  I did find increased deep tendon reflexes in the 2009 report as well.

MR. SAMUELS:  And just because we are on a different report, Your Honor, I will just note my objection to that as well because it is not included in the report.

MS. ALI:  It is part of the same exhibit, but I take your point.

THE COURT:  It's in a different report.

MS. ALI:  Different report, same Defense Exhibit 21.

THE COURT:  I'll let you examine on that specific, the disinhibition.

MR. SAMUELS:  Yes, Your Honor.

BY MS. ALI:

Q.  Is this your 2009 report, Dr. Merikangas?

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                                    2171

A.   It's in there also, yes.

Q.   And can you point us to where that is in this report?

A.   His deep tendon reflexes were symmetrically increased at
three plus.

Q.   And how does that impact your understanding of
Mr. Runyon's inhibition or disinhibition in 2009?

A.   That it was present in 2009 as well as in 2015.

Q.   Does that finding have any impact on your overall
conclusions about Mr. Runyon's cognitive functioning?

A.   Yes.

Q.   How?

A.   It goes along with the other findings of the change in
his personality and his mental status as indicated by the
MMPI, the comments made by both Dr. Patterson and
Dr. Montalbano, it all comes together.  This is simply one
factor of it.

Q.   You've testified several times that you found -- you
relied on, in 2015, in preparing your 2015 report, medical
records from Mr. Runyon's time in the Army; is that right?

A.   Yes.

Q.   I want to show you portions of what's been previously
admitted as Defense Exhibit 83.  Do you recognize this as one
of the Army medical records you reviewed to reach your
conclusions in 2015?

A.   Yes.

Merikangas, J. - Redirect                                           2172

Q.  And did you have this document before you prepared your preliminary report in 2009?

A.  No.

Q.  Is there anything -- what, if anything, in this document bears on your overall assessment of Mr. Runyon?

A.  Well, I'm told December 1996 report seeing a motor vehicle accident head-on collision.

THE COURT:  Can you speak up just a little bit.

THE WITNESS:  On December 12th, 1996, it says, Status post motor vehicle accident, head-on collision, (high-speed) and said vertigo was seen in ER.  And then numbness which starts in both hands and radiates to shoulders, shooting pain, sensations across body.  And then it goes on to describe the neurologic exam, and it describes that he has -- going to get a workup for vertigo and paresthesias.

BY MS. ALI:

Q.  And do you see -- I'm showing you another part of what was previously admitted as Defendant's Exhibit 83.  The date is hard to make out.  I can represent to you it's January 9th, 1997.

THE COURT:  There are a lot of records.  I would like to follow along, but I can't.  Does it have a Bates stamp?

MS. ALI:  It doesn't have a Bates stamp.  I can

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                          2173

tell you it's page 55 of a 90-page document.

THE COURT:  I'll do my best.

MS. ALI:  I think the records are in chronological order, Your Honor.

THE COURT:  All right.

BY MS. ALI:

Q.  Is this another medical record from Mr. Runyon's time in the Army that you reviewed in forming your conclusion?

A.  Yes.

Q.  And is there anything notable about this document?  I can zoom in a little bit.

A.  It's a follow-up for his motor vehicle accident and discusses his previous complaints of vertigo and shoulder numbness and insomnia.

Q.  And how about here?

A.  He has memory loss.

Q.  And how about --

A.  Here it says PTSD and memory loss and symptoms of depression.

Q.  Is this a document that you relied on to form your conclusions in 2015?

A.  Yes.

Q.  And did you have this document when you evaluated Mr. Runyon and prepared your preliminary report in 2009?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                                 2174

Q.  You did have this document in 2009?

A.  No, no, no, not 2009.  2015.  There is also a diagram there of his deep tendon reflexes showing they're increased in his lower extremities compared to the upper.

Q.  And this was in 1997; is that right, Dr. Merikangas?

A.  Yes.

Q.  And is that consistent with your finding in 2009?

A.  Yes.

Q.  How does that impact your conclusion about when Mr. Runyon's brain dysfunction began?

A.  Well, since I found it in 2009, that's when I saw it. But it apparently got worse in '96, 1996, because these were the Army records following that brain injury.

Q.  And just to make sure that's clear, you found similar findings in --

        MR. SAMUELS:  Your Honor, I'm going to object to the leading.  His testimony should stand.

BY MS. ALI:

Q.  Was this report from before or after you evaluated Mr. Runyon?

A.  This is after.

Q.  We will go back to the date here, Dr. Merikangas.  This is January 9th, 1997.

A.  All right.  This is before.  I'm sorry.

Q.  And how do these findings of Mr. Runyon's deep tendon

Merikangas, J. - Redirect                                          2175

reflexes on this 1997 evaluation compare to your findings in 2009?

A.   These are after his motor vehicle accident, and they are the same as I discovered in 2009.  He had increase in his lower extremities.

Q.   And this report was prepared -- to the best of your knowledge was this report -- do you know why this -- what the provenance of this document, why this document was prepared?

A.   He was seeing doctors for follow-up for his head injury and his complaints of vertigo, memory loss, insomnia and depression.

Q.   I'm showing you another page from the Defense Exhibit 83 from the Army medical records.  Can you see the date here, Dr. Merikangas?

A.   5th of February 1997.

Q.   And what is this record discussing?

A.   Says he has post-traumatic stress syndrome, states recommendation, states urgent.

Q.   And was that a document that you had before you prepared your 2009 report?

A.   No.

Q.   This is another page of the 2009 -- I'm sorry, the Defense Exhibit 83, Army medical records.  Can you see the date on this document, Dr. Merikangas?

A.   August 27th, 1997.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                        2176

Q.  And do you have an understanding of about how long after the motor vehicle accident that is?

A.  This is a month -- or two months afterwards.

Q.  I'll represent to you that the motor vehicle accident was in November of 199 --

MR. SAMUELS:  Leading, when she is telling him.

THE COURT:  It is.

THE WITNESS:  This automobile accident was 1996 so this is -- I thought it was July 1996, and this is August 1997.

BY MS. ALI:

Q.  And what is the -- do you see -- what does this say here?

THE COURT:  I've got a record here August, the same date, and it's not the same record.  Hold on.  Now I have this record from 8-27-99.  There is one behind it for 8-27-97.  Go ahead.

THE WITNESS:  It says that the patient, that he asked the question, "Does this patient need a head CAT scan, question mark."  And they give a diagnosis of positional vertigo, and they go on to describe that he has headaches that lasts, and he also has tinnitus, or does it say -- no, no, it says without tinnitus, I'm sorry.  It's hard to read. He's having headaches and vertigo.

BY MS. ALI:

Q.  And this is the second page of that document, is that

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                    2177

right, same date?

A.  Yes.  He has vertigo, and it's noted that he is a good historian.

Q.  Do you have a clinical understanding of what that means?

A.  That means he's good at describing what's wrong with him. He is apparently reliable.

THE COURT:  Go back.  She's highlighted things on there.  But go back to that page.  She's highlighted positional vertigo.  Do you see where it says, PE, physical exam, unremarkable?

THE WITNESS:  Down at the bottom?

THE COURT:  No.  Right above the positional vertigo, that was a provisional diagnosis, but look at the writing above that.

THE WITNESS:  Yes.  It says PE - unremarkable, skull films taken.

THE COURT:  Keep reading.

THE WITNESS:  "Skull films taken at time of motor vehicle accident were normal.  Please evaluate.  Does this patient need a head CAT scan?  Current prescription is meclizine 25 milligrams every eight hours."  That was the referring doctor.  Family practice sending that for the consultation.

BY MS. ALI:

Q.  How, if at all, does the fact that skull films taken at

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                    2178

the time of the motor vehicle accident were normal, as
reported in the document, bear on your conclusion?

          THE COURT:  Does he know.

          MS. ALI:  Well, I said how, if at all.  I'm trying
to ask the question in a way that's not leading, Your Honor.
Does he know?

BY MS. ALI:

Q.  Do you know whether skull films were taken at the time of
the motor vehicle accident?

A.  Yes.

Q.  Do you know, or are you just reading that here?

A.  It says the skull films were taken.  I haven't seen them.

Q.  How does a normal skull film at the time of an accident
bear on your overall conclusions about neurocognitive
functioning?

A.  It doesn't.

Q.  And how about an unremarkable physical exam?

A.  It doesn't.

Q.  Showing you, this was admitted as Petitioner's 99D.  Do
you see the date on this document?  Again, it's hard to read.
It looks to me like September 1997.

A.  Yes.

Q.  And do you have an understanding of what is being
reported in this document?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                          2179

Q.  And what does it say?

A.  It says, "Poor health.  Presently on meclizine for some kind of potential vertigo.  Sleeplessness and constant pain in joints."  Then it goes on to describe frequent or severe headaches, dizziness or fainting spells, and frequent trouble sleeping, depression or excessive worry, loss of memory or amnesia, head injury.

            THE COURT:  What is this?

            MS. ALI:  This is 99D, Your Honor.  This was a piece of the medical records that was left off of 83 but that was admitted yesterday separately as 99D.

            THE COURT:  Can you look at the top of the record.  Go to the top of that record, please.  It's in this record.

            MS. ALI:  It is in 83?

            THE COURT:  Yes.

            MS. ALI:  Then we caused a lot of headache for nothing yesterday.

            THE COURT:  I'm looking at it right here.

            MS. ALI:  It wasn't in my copy.  I don't think it was in the government's copy.

            THE COURT:  It's in the Court's copy.

            MS. ALI:  Well, go ahead.  Well now it's been there twice.

            THE COURT:  All these things you are saying, this is him giving his history; is that correct?  You know,

                    JODY A. STEWART, Official Court Reporter

Merikangas, J. - Redirect                                                    2180

you're shifting pages.  We need some conclusion on that last set because he was referred to his family practice physician on August 27th.  You were just cherry-picking things out of it.  They continued on his neuro:  Positional vertigo, referred to family practice medicine, M.D.  We went through things, but actually the conclusion, it's in evidence, but I just wanted to note that I'm trying to go through the record that you're on, and then we've moved on quite a few pages to another one that actually is in my packet.

BY MS. ALI:

Q.  Dr. Merikangas, do you have an understanding of when Mr. Runyon left the Army?

A.  He was in just for a couple of years.

Q.  I'm sorry.  One more page here, same document that we were just looking at.

          THE COURT:  Okay.

BY MS. ALI:

Q.  Do you see anything notable on this page?

A.  Yes.

Q.  Can you tell us what that is?

A.  It says, "Motor vehicle accident in Alabama summer of '96."

Q.  How about down here?

A.  It says that he has dizziness, vertigo, memory loss, depression, posttraumatic stress syndrome.

Merikangas, J. - Redirect                                              2181

Q.   And the date on that document?

A.   Is September 9th, 1997.

Q.   Did you have that document before you prepared your
preliminary 2009 report, Dr. Merikangas?

A.   I did not.

Q.   Is that something that -- how did that document inform
your conclusions when you did get it in 2015?

A.   It confirmed my impression that he had a serious head
injury with symptoms.

        THE COURT:  Did you ever give that impression to
Mr. Woodward or Mr. Runyon or Ms. Cronin?

        THE WITNESS:  The impression that I gave in my
preliminary report is what I gave.

        THE COURT:  All right.

BY MS. ALI:

Q.   Can we switch to the computer system, please.  Thank you.

        We are looking again at Defense Exhibit 2009, this is
your -- I'm sorry, 21.  This is your August 5th, 2009 report
again; is that right?

A.   Yes.

Q.   If we scroll down to the bottom here, is this where you
shared your impression -- your preliminary conclusions about
Mr. Runyon's neurocognitive functioning with trial counsel?

A.   Yes.

Q.   You testified that you don't recall the details of every

                JODY A. STEWART, Official Court Reporter

Merikangas, J. - Recross                                          2182

document that you reviewed in forming your conclusions in

2015; is that correct?

A.  Yes.

Q.  Did you have sufficient information in 2015 to reach

conclusions to a reasonable degree of medical certainty?

A.  Yes.

          MS. ALI:  The Court's indulgence.

          That's all I have, Your Honor.

          THE COURT:  You can follow up on those one or two

areas.

          MR. SAMUELS:  Yes, Judge.

                    RECROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Dr. Merikangas, good afternoon again, sir.

      Madam Clerk, do we have the Elmo up and running?

      Sir, Ms. Ali asked you about your 2015 report, and

that was produced to Ms. Chavis who was an assistant federal

community defender, correct?

A.  Yes.

Q.  And you understood that this report was being produced in

connection with a *habeas corpus* proceeding?

A.  I don't pretend to understand *habeas corpus*.  I thought

it was some sort of appeal.

Q.  You see, sir, the language at the top indicates that this

report was actually filed with the Court on October 2015.  Do

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Recross                                                    2183

you see that?

A.   I see that.

Q.   You knew that the report was being done so it could be submitted to the Court?

A.   Yes.

Q.   All right.  And so it's addressed to Ms. Chavis, and you know it's going to the Court?

A.   Yes.

Q.   We talked about what you looked at before when I asked you about that, of course.  But this was the paragraph that Ms. Ali focused on.  Is there anything in that paragraph that says "disinhibition"?

A.   No.

Q.   You said something about any neurologist looking at that would know that that's what it meant, right?

A.   Yes.

Q.   But the audience for this report was Ms. Chavis, right?

A.   It was -- the Court is the audience.

Q.   And so there is nothing in this paragraph that would tell the Court what you've testified about disinhibition, is there?

A.   Not unless the Court knew some neurology.

Q.   And then if we go to your 2009 report, which was Government's Exhibit 63.  You see that, sir?  Do you recognize that as your 2009 report?

Merikangas, J. - Recross                                              2184

A.  Yes.

Q.  And, sir, there is nothing in here that references disinhibition, is there?

A.  No.

Q.  And you also understood that this report was being prepared for counsel to submit to the Court?

A.  No.  It was prepared for counsel, and he could do what he likes with it.  It's preliminary, and I wouldn't expect the preliminary report to be sent to the Court.

Q.  And, Dr. Merikangas, my last question here is, you said it's preliminary.  It's preliminary because you say up here, you don't have the scans, right?

A.  That was one reason.

Q.  Are there any other reasons listed that it's preliminary?

A.  That I didn't have all of these other records.

Q.  Where is that listed in the report?

A.  It's not.

Q.  The only thing that is listed is that it's preliminary because you don't have the scans in this paragraph right here, right, where it says, "These tests have yet to be accomplished and, therefore, this is a preliminary report"?

A.  Yes.

Q.  And then the last page, "Full report will follow the results of his brain imaging," correct?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Merikangas, J. - Recross                                           2185

Q.  No reference in here to records?

A.  No reference in records.

        MR. SAMUELS:  Thank you, sir.

        THE WITNESS:  I said I wait the chronology of his drugs.  That's a record.  That's in there.  I never got that.

BY MR. SAMUELS:

Q.  Forgive me.

        THE COURT:  There is no request for any further records?

        MR. SAMUELS:  Not in the report, correct.

        MS. ALI:  He just testified that there was a request for further records in there.

        THE COURT:  For what?

        MS. ALI:  We turn to the next page.

        THE COURT:  I've read this about ten times now. He's asking for the follow-up of the brain imaging.

        MS. ALI:  But the first full sentence on the page, and I'm not going to testify for him, but it says what it says.  He is awaiting other records.

        THE COURT:  Chronology and details of the drugs involved.

        MR. SAMUELS:  Can I ask one last question, Your Honor?

        THE COURT:  I accept that.  Then he said he never

                    JODY A. STEWART, Official Court Reporter

followed up on it at any time, even in 2015.  So it is what it is.

MR. SAMUELS:  That's all I have, Judge.  Thank you.

THE COURT:  Can I excuse Dr. Merikangas?

MS. ALI:  Yes, Your Honor.  Thank you.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  Well, Dr. Merikangas, I know you've been here for a while, and you are now excused from testifying or being here in the case.  Please don't discuss your testimony until the matter is over.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Is Mr. Woodward here?

MS. McKEEL:  Yes, Judge.

THE COURT:  We will start him, and then in about 30 minutes, we will take a recess.

MR. SAMUELS:  Yes, Your Honor.

MS. PEIFFER:  Can I address briefly a few matters before we do this?

THE COURT:  Pardon?

MS. PEIFFER:  May I just address one very brief housekeeping matter before Mr. Woodward takes the stand?

THE COURT:  Yes.

MS. PEIFFER:  The petitioner has several proffers

in writing to submit about evidence that was not -- that was prohibited from being testified about previously during the hearing by the Court's rulings.  We have written proffers.  I plan to file them in the docket tonight.  But if it -- when Court has adjourned, if the Court and the government prefer, I can provide written copies now and file.

THE COURT:  If you were going to present a proffer, and you wanted to present a proffer, you have to let the Court know because I have to determine how much weight to put on that proffer.  The proffer is subject the same way as we did before, to examination.  You're not just going to now fill in the record with proffers that no one has had an opportunity to hear or examine.

I made that clear.  I don't know which witness it was.  I think it might have been the first witness.  But whoever it was, if you've got proffer, you've got to call those witnesses back.  You can file whatever you want, but I'm going to strike them from the record because I don't know whether that witness would have testified and to what.  I can't judge the credibility of that proffer.  I don't know.  You're just putting on the record something that you think might have occurred.  If you want a proffer, you ask the Court, May I give a proffer?  If it's a jury, the Court sends the jury out and takes the proffer on record.  If it's bench only, the Court hears the proffer on record.

JODY A. STEWART, Official Court Reporter

If it's not a jury and it's a judge, you ask to give a proffer. I let you give a proffer. I'm not going to let you go back now and have all these *pro se* counsel sitting here helping you write all these proffers that the Court can't even evaluate. It's not the way we are going to do this. I'm going to hear the witnesses, and I'm going to evaluate the witnesses, and I'm not going to accept proffers of evidence that could have been presented to the Court.

MS. PEIFFER: I understand your ruling, Your Honor. I just want to add two notes to make the record. The first is that these are not proffers of expert witnesses who appeared and testified before the Court. One of them is for Ms. Barrett, and the proffer is regarding testimony that the Court ruled in response to the government's motion *in limine* could not be presented.

In the interest of economy and efficiency, because we are not presenting other testimony from Ms. Barrett, we didn't think it wise to bring her to the Court and have her testify just about the proffer, and that was why we submitted it in writing. It's very similar to her report. That was why that proffer, we chose not to fly Ms. Barrett to Norfolk only to proffer the information that the Court had already ruled could not come in.

THE COURT: You listed Ms. Barrett as a witness. Then you said you weren't going to call her. You listed

2189

her.  You can call her.  I'm not going to accept a proffer.  Go back to your witness list.  I don't have it in front of me, but I know Ms. Barrett is on there.

MS. PEIFFER:  That's correct, Your Honor.

THE COURT:  Your option is to call her, and just because you don't want to fly her here to do that, that doesn't mean that the Court is bound to take a proffer.  I ruled he could testify but on a limited basis just not to ultimate legal standards.

MS. PEIFFER:  I understand, and I think I may need to clarify, Your Honor.  I believe I just described it poorly.  I'm not indicating that we are proffering testimony from Ms. Barrett in lieu of her testimony that she could have presented for the Court.  The testimony that we would like to present by proffer is testimony that the Court ruled during the previous evidentiary hearing in February at Transcript 984 to 985.

THE COURT:  You mean you're just getting around now to doing this from a hearing in February?  That's unacceptable.  You had the hearing in February.  If you wanted something more on the record there, you should have filed a motion with the Court.  You can't just come in now eight months later.  Ms. Barrett testified before.  If you want to renew her testimony or present what she would have testified to, you can bring her here.  You listed her as a

JODY A. STEWART, Official Court Reporter

2190

witness for this hearing.  I've got your witness list.  Let me look at it.  I know there has been an updated one.

MS. PEIFFER:  I'm not disputing that, Your Honor. She was initially on the witness list, and we determined that because the testimony that we would have elicited from her, as she described in her report, had already been barred by the Court, that we would not bring her.

THE COURT:  What is it?  You are speaking in circles.  You are talking about something back in February?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  So enlighten the Court.

MS. PEIFFER:  Of course.  The government filed a motion *in limine* to preclude the testimony of Jean Barrett. That was ECF Number 728.  That was filed, I believe, on January 1st, 2023, and the Court orally ruled during that February portion of the evidentiary hearing that the testimony about Ms. Barrett's opinion on whether Mr. Runyon's trial counsel performed reasonably would not be permitted, and the proffer pertains to her testimony on that issue that the Court has ruled we could not present.

THE COURT:  She is an attorney?

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  Another attorney was going to give the Court an opinion about whether Mr. Runyon's trial attorneys were ineffective?  I believe my ruling was that that's a

2191

determination from the Court based upon what information they had or should have had, and it would be improper for an attorney to stand up and tell that decision to the Court.

You can argue that to the Court, but it's not evidence in a case. That would be your argument based upon the evidence that is before the Court, based upon what Mr. Hudgins and Mr. Woodward had. You can argue that to the Court, but it certainly doesn't become a proffer of evidence. I said it was improper evidence, and it is improper evidence, and I stand by that ruling. You do not have an attorney come in and testify as to the Court's ultimate decision and role. She was going to come in and say you should have done this, you should have done this, you should have done this. That's your job. It's your job to present your evidence and then argue that to the Court, as far as the Court is concerned. That is your job.

MS. PEIFFER: I understand your ruling, Your Honor, and I'm just doing this because I have to make a record.

THE COURT: Why do you have to make a record? If my ruling is wrong, my ruling is wrong, appeal it. Why do you have to make a record? It's simple. I ruled that an attorney cannot come in and give that opinion to the Court. You are offering her as an expert opinion, an expert lawyer opinion, and my ruling was quite simple. It was just that, no, that's an improper expert.

JODY A. STEWART, Official Court Reporter

2192

It's the Court's opinion whether there has been ineffective assistance and then ultimately the Fourth Circuit and perhaps ultimately the Supreme Court, but it's not Ms. Barrett's opinion over whether there has been an ineffective assistance of counsel, and that is improper evidence in a case like this.  I ruled it out, and I continue to rule it out, and I'm not going to take a proffer of it.  If my ruling is wrong, the ruling is wrong.  The ruling isn't what the substance of her testimony is, it's that she's giving an opinion on the ultimate issue.  You represented that she was an expert witness, she was going to give an opinion to the Court on the performance of the attorneys.  I stand by that ruling.  If you want to call her for some other purpose, you've listed her as a witness, and you can call her.  But a proffer of her testimony is still irrelevant.  I rule any proffer of the testimony irrelevant to these proceedings.

MS. PEIFFER:  I understand, Your Honor.  Just one more comment.

THE COURT:  I'm not accepting it as evidence.  It is irrelevant.  I'm telling you a proffer is evidence in the case, and it is not proper, relevant evidence in this case.  It's irrelevant what an attorney would opine.  I guess you could get ten attorneys, and they might all opine something different, but it is ultimately up to the Court to

determine, or a Court, either this Court at a threshold level or a higher Court later, to determine whether there has been ineffective assistance.  That's the ultimate issue.

MS. PEIFFER:  I understand, Your Honor.  Just one more note on the other potential proffer, is that I attempted to make a proffer orally, and I was told that I should move on, and so we are submitting them in writing so that we did not belabor the point in front of the Court.

THE COURT:  What was that?  Be specific.

MS. PEIFFER:  Yes, Your Honor.  So for witness example Scott Linker, who testified before this Court in February.  On Page 540 of the transcript, I said, "May I present his testimony as a proffer...if the Court will accept it?"  And the Court said, "First I want you to lay a foundation for this witness and the question you're asking him," and then I responded, "Your Honor, the foundation is the same.  It hasn't changed," and the Court said, "Then I'm not going to allow it, if all the testimony is going to be is Mr. Runyon told him, and he has nothing else to go on other than Mr. Runyon told him."

THE COURT:  I stand by my ruling.

MS. PEIFFER:  I understand that, Your Honor.

THE COURT:  I stand by my ruling, and we are not going to start adding into the record some eight months later.  That segment of testimony is over, and my rulings

JODY A. STEWART, Official Court Reporter

2194

are done, and we are not going to now start adding to the record after I've ruled. I've ruled. You've got an objection. You've got a ruling.

MS. PEIFFER: I understand, Your Honor, but for the record for the Fourth Circuit, I have to put in what his testimony would be, and I was told I could not do that orally.

THE COURT: If my ruling was wrong, it was only what Mr. Runyon had told him, so be it. So my ruling would have to be wrong. In other words, it's an evidentiary ruling. If my ruling is wrong, then we'd have to go back and take his testimony. If my ruling is correct, the proffer doesn't control the ruling at the threshold level.

MS. PEIFFER: I understand, Your Honor, but without another Court, Fourth Circuit knowing what that testimony would be.

THE COURT: Why do they need to know? All they need to know is what you represented to this Court it was. You represented to this Court that you wanted that testimony in because it was what Mr. Runyon had told him, and I said that's not proper testimony. Mr. Runyon can testify as to what he told somebody, but not somebody else coming into court. I'm not looking at the ruling right now. It's just like me here ruling on all these other things, that it's not proper evidence. You don't get a proffer of evidence on

JODY A. STEWART, Official Court Reporter

2195

everything that's been ruled on or excluded.

In other words, it's my ruling that counts.  I ruled that it was not proper evidence, and if I am wrong, and clear error, then it can be sent back.

But putting a proffer on at this juncture, it's the ruling that counts, not what he was going to say.  It's the ruling that counts.

MS. PEIFFER:  I understand, Your Honor.  And I'll just add briefly that without the substance of the testimony, it's difficult for another Court to determine whether the ruling was correct, but I understand.

THE COURT:  How can a trial judge conduct a hearing like this over months and days without making rulings, and then if on every ruling that you don't prevail on, you then want to put something else on the record.  The Court stands by its rulings, and if the ruling is wrong, then the ruling is wrong, and there can be a remedy for it.  If you wanted to proffer it, why didn't you?  You will have to go back and get the transcript and give me the pages.  I don't even know, from what you've said all you did was offer it, and I said Ms. Barrett is not a proper witness.  That was my ruling, and on this one I said, the evidence is not being admitted.  That it wasn't a proper witness because it didn't offer reliable, relevant testimony, and there was a way you could get it in.  Those are just evidentiary rulings in a

JODY A. STEWART, Official Court Reporter

2196

case.

MS. PEIFFER:  I understand, Your Honor.  But because I couldn't ask him further questions, the substance of his testimony isn't in the record.  I believe you requested the page of the transcript.  I'd be happy to provide that.

THE COURT:  If you understand, then let's move on.  Let me just mention something else.  We are not here on Mr. Linker's testimony.  We've got the medical records.  I've heard all these experts.  I've let this hearing go far afield so that everything could be part of the record.  We are here on whether his trial counsel was ineffective.  The Fourth Circuit made it clear it was a narrow issue.  One of the concerns, all along, has been that this be taken far afield.  Mr. Linker's testimony, he's not an expert.

MS. PEIFFER:  Mr. Linker, Your Honor, was Mr. Runyon's brother-in-law, and the testimony at issue was just about a description that Mr. Runyon gave him wrong -- in the 1990s about a blast explosion.

THE COURT:  Then I said you had to lay a foundation, and you said you couldn't.

MS. PEIFFER:  You sustained the foundation.

THE COURT:  You have given me an isolated page.  Where is the page before it?  This is meaningless without the page before it.  What day was this?  You were getting

JODY A. STEWART, Official Court Reporter

2197

daily copy then because the Tennessee Federal Public Defender was paying for it, so if you needed to do something, I would have suggested that it be done back then. So you can't go back now and try to cover every one of their mistakes, if it was one.  Besides, you were in the case then.

MS. PEIFFER:  Yes, Your Honor.

THE COURT:  You were the person examining.

MS. PEIFFER:  That's correct, Your Honor.  I was submitting it now because before the close of our witnesses, just as a matter for the record.  I certainly did not intend for this to draw proceedings out any further today.

THE COURT:  Well, you have drawn the proceedings out.

MS. PEIFFER:  I apologize, Your Honor.  My job is to make the record, and I was just trying to do so.

THE COURT:  It was your job to lay a foundation. You handed up 548 and 549.  It looks like Ms. Ward is doing the examining.  You've handed up 546, 547, 548 and 549.  Let me see if I can go back and find 540.  Ms. Ward was doing that examination on those pages.

All right.  This is what it was all about.  You were offering Mr. Linker as his brother-in-law to testify about, it looks like, injury he received in the military. All I said to you is, you've got to lay a foundation for how

JODY A. STEWART, Official Court Reporter

2198

he knew this, not just what Mr. Runyon told him.  That was my ruling, and we have gone on pages with this.  I said that was my ruling, and you said, I understand.  I went on.  I said, I can't help it if you all are not able to respond to the Court's rulings.  I make the same ruling here.  You have got to lay a foundation of how he knew, other than just Mr. Runyon telling him so.  It's a fairly clear ruling, I think.

"Ms. Peiffer:  I understand your ruling, Your Honor.  And the purpose of this testimony is to show what trial counsel could have learned had they asked Mr. Linker, and then could have pursued in a reasonable investigation and presented to jurors.  That is part of the issue that is clearly before this Court on the remand.

"The Court:  Trial counsel have testified that Mr. Runyon told him these things."  We have gone through all this testimony.  "The same as, apparently, he told other people, and they did not pursue it.  They tried.  They couldn't find it.  So all you are doing is asking him what Mr. Runyon told him.  Mr. Runyon told -- they couldn't put" -- there is a pause of some kind.  "They couldn't put this witness on to just, again, Mr. Runyon told."  But the part of the question before the Court is, I just said that you had to put on a foundation.  That was the foundation.  So my ruling was one of foundation.  It wasn't one of the

JODY A. STEWART, Official Court Reporter

2199

substance of what he was going to say.  Basically the attorneys had testified they knew about this, and they tried for the records.  All that was on the record, and you were able to cross-examine him.  I'm saying all this because I don't want these things taken out of context.  You have to look at the context.  You had a hearing.  You had all these witnesses, you had his counsel, and the counsel had testified what they did and what they didn't do.  Then you were trying to bring in Mr. Runyon to offer testimony about what Mr. Runyon told his brother-in-law.  Number one, Mr. Runyon could testify to it, but the attorneys had testified what Mr. Runyon told him.  So if Mr. Runyon didn't tell them about it, then they couldn't know.  The fact that Mr. Linker knew, they were depending on Mr. Runyon to tell him.

But, in any event, you never put forward a foundation for him to testify, and that was the issue.  This isn't about what his testimony is.  Assuming you are correct, it's about the military.  Assuming you are correct.  This is that you weren't able to lay a foundation.  That's an attorney's job.  That's an evidentiary ruling, and it does not require a proffer.  It was not testimony that the Court struck, not testimony that the Court didn't allow because of its substance.

You can't just offer testimony without a

2200

foundation.  That is an evidentiary ruling, and a proffer on this is not appropriate, and I will not accept a proffer from this in February now in November.  You were even getting daily copy back then.  If Mr. Linker was here, that's when you should have offered it.  But to come back this many months and try to offer a proffer of someone who you could have said, well, let me offer a proffer, but you didn't.  In any event, it's an evidentiary foundational ruling, and there is no foundation that's been put on this record.  So if you had a foundation, you had to lay that before you got the testimony.

Now what you are trying to do is get in his testimony through a proffer for which you had not laid a foundation for.  The Court will not accept a proffer without the proper foundation having been laid.

All right.  You can give this back.  So I stand by my rulings on both of those witnesses and will not accept a written proffer after the fact at this juncture in the hearing.

If you want to call Mr. Linker, and think you can lay a foundation, you can do that.  I'll let you do that.  Call Mr. Linker and lay a foundation now.  There is no way you can change the situation with the attorney.  So that's my ruling for the second time or third time.

Would you call Mr. Woodward, please.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                        2201

MR. SAMUELS:  Yes, Your Honor.

(Witness was sworn.)

LARRY WOODWARD, called by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. McKEEL:

Q.  Good afternoon, sir.  Would you state your name, please.

A.  My name is Lawrence Woodward.

Q.  Mr. Woodward, were you one of two counsel that represented the defendant and the petitioner here at trial?

A.  I was.

Q.  And was co-counsel Steve Hudgins at the time of trial?

A.  Yes.

Q.  Can you please -- you were appointed by the Court, correct?

A.  I was.

Q.  Can you please tell us how you get paid when you were appointed by the Court.

A.  I get paid by keeping my time and writing down the various tasks that I perform on the case.  Obviously, I do that internally in my office, and then in a case like this, the Court allows what's called interim billing.  So periodically I would -- my paralegal would take the data that I had, you know, put down for what I did, put it on the form

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                2202

that was in use at the time.  That process has changed over time, submitted to the Court.  The Court would review it.  If there were questions?  You know, I've done a ton of CJA cases.  Sometimes there is question, sometimes there is not, and then the Court approves it and sends it forward, and I get a check.

Q.  Okay.  And you did that in this case; is that correct?

A.  I did.

Q.  I'm going to show you the government's exhibit book because some of these documents are multiple pages, just so you can look at them, and then we can look at the screen.

     If we could bring up Government's Exhibit 93, please.  Do you recognize this document, sir?

A.  Yes.  I mean, I recognize that as a billing record from my office.  That would not be a bill that I sent to the Court.  That would be my, at the time, the internal billing.

Q.  Because you report to your firm the hours that you spend on appointed cases; is that correct?

A.  Report -- well, yes.  I mean, I report to the firm, yes.  I put in my time.  I put in a time slip every day that I work.

     THE COURT:  So, in other words, it's a contemporaneous recording of time so that you can then later submit it for approval, because the Court doesn't allow you to submit daily bills or monthly or weekly.  You have to

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    2203

submit them at certain intervals?

THE WITNESS:  Yes, ma'am.  When I say contemporaneously, it's not -- to be clear, it's not contemporaneously like right at the moment I'm doing it.  So, for example, on a given day, if I'm not -- if I'm in a trial, then obviously it's an hourly billing case.  Usually my time slip would reflect X hours in trial.  On any given day I might work on several different cases, and I do my billing at the end of the day.  Sometimes I do it the next morning for what I did the prior day, but it's certainly contemporaneous in that sense.  It's not contemporaneous like in the exact moment that I'm doing whatever I'm doing.

BY MS. McKEEL:

Q.  Okay.  If you could, if you open the government's book and look at Exhibit 93, it has multiple pages.  So I just want you to be able to tell us what these documents are.

A.  Okay.  Well, the first pages of 1 through 4 are my firm's internal bills.  I don't recognize the handwriting.  I just don't recognize that handwriting.  That's not my handwriting, the pen and ink under the stuff.  Then it looks like what's marked in red is Page 5 through 14, are worksheets that would have been attached to a bill that I would send in to Judge Smith or send in to the Court that gets reviewed by the -- I think it is Ms. Tyree, and then the Court ultimately is the final approval on.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2204

Q.  And is that document called out-of-court worksheet?

A.  Yes.

Q.  So let's go, if you will look at your screen now, the third page on Exhibit 93, do you know whose handwriting that is?

A.  I don't.  I mean, I don't want to guess.  I presume it's my long-time paralegal, but I don't know that.  I don't recognize that handwriting.  It's not mine.

            THE COURT:  It's just numbers, isn't it?

            THE WITNESS:  Yes, ma'am.  I don't know what that is.  It's not my writing.  Correct answer to the question is I do not know whose handwriting it is.

BY MS. McKEEL:

Q.  So the beginning of this document, we are starting on June 30th, 2009; is that correct?

A.  Yes.

Q.  If we can go to Page 2 of that document, please.  You can see it on the screen?

A.  Yes.

Q.  Let's go down to July 20th of 2009.  Do you see that date, sir?

A.  Yes.

Q.  And tell us what you did on that date.

A.  On that date it looks like I met with -- you moved it. Okay.  It looks like I met with Mr. Hudgins, and we began

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    2205

some preparation for sentencing.  I spent, you know, an hour
and 45 minutes or so doing that.  Yeah.

Q.  If you go down to 7-27-2009, what did you do on that
date?

A.  Well, I mean, again, I don't remember.  Reading my
records, I worked on the sentencing, which included reviewing
psych reports, reviewing a letter apparently that had come in
from Mr. Runyon, and working on some sentencing prep.  Again,
that looks like I spent about an hour and 45 minutes of the
workday.

Q.  So by July 27, what has happened in the trial phase?

A.  Well, obviously, I don't remember.  Going by this, the
guilt, what we call in these kind of cases, the
guilt/innocence phase is over, and there is -- everybody, we
had a break between that, and we began to focus on getting
ready for the sentencing phase.

Q.  And there were some guidelines set by the Court during
this time period about mental health; is that right?

A.  Yes.

Q.  So during this time period when you say you review psych
reports, what are you reviewing?

A.  Well, I mean, that would be some reports that we would
have gotten about Mr. Runyon's psychological condition.  To
be fair, Mr. Hudgins was mainly in charge of that, but
obviously I wouldn't have written down that I reviewed them

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    2206

if I didn't review them.  I can't tell you what the reports
were.

Q.  If we go to Page 3, please, the top of the page.  Take
you to August the 10th.

A.  Okay.

Q.  You see that?  On August the 10th, and then the 11th,
what were you working on during this phase?

A.  I was working on sentencing, you know.  The things that
are reflected there are all summaries of things that I would
have done those days.  Looks like we were spending time,
Mr. Hudgins and I, working on the witnesses, possible psych
testimony.

        There was preparation for, I recall, with a doctor,
various phone calls with Mr. Hudgins.  I would say, just so
the Court understands -- I got ready to say the jury -- the
order that those things are on there doesn't mean the order I
did them in.  I mean, it just means I did them at some point
in time that day.  Like where it says review government's
proposed instructions, that could have happened before or
after the call with Steve.  The order I write them down is
not necessarily the order I do them in.

Q.  On August the 11th, there is a reference to
Dr. Merikangas.  Can you tell us what you wrote?

A.  It's review psych reports and make notes to prepare for a
conference with Dr. Merikangas.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2207

Q.  And the conference with Dr. Merikangas, was that in person or over the telephone?

A.  I don't -- as I indicated, I don't remember ever meeting Dr. Merikangas and I -- so it had to be over the telephone. I know there is a record in here that says we had a phone call, but I don't remember the call, but if we hadn't had one, I would have written down that we had one.

Q.  If you will go to August the 13th.  What is the first thing you write down there?

A.  Telephone calls with Dr. Merikangas.  I don't remember. I don't know if that is one or more.  It says plural, but worked on some stipulations.  The first thing I wrote down was the telephone call with Dr. Merikangas.

Q.  And just a few lines down, it says something about a memo.  Do you see that?

A.  Let me see.  Yes.  Memo to file regarding Dr. Merikangas' interview.

Q.  Did you write a memo or do you recall?

A.  The way you word that question, yes, I wrote a memo, or I wouldn't have billed for it, but I don't recall it, if that answers your question.

Q.  Let's go down, if we could go down a little bit further to August the 16th.  So that's the 13 th.  We are going to show you, make it a little bit bigger for you to read, for August the 16th.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2208

A.   Okay.  Got you.

Q.   You see that?  Go to the very last entries you make on August the 16th.

A.   Review report of Cunningham.

THE COURT:  The one before that.

THE WITNESS:  I'm sorry.  You said -- memo to file regarding mental health interview/evidence and interview with Dr. Merikangas.

BY MS. McKEEL:

Q.   So that's a second memo you're writing on this date; is that correct?

A.   Right.  That's a second memo or entry to the file.  I don't think that indicates that I spoke to Dr. Merikangas again, but that is -- yes, that's the second one that would have been done.

Q.   If we could turn next to the -- go to the out-of-court worksheet, Page 9, please.

A.   Okay.  I got it here in the notebook.

Q.   Okay.

A.   Page 9.

Q.   You see the handwriting on the right-hand section of the document?  You see handwriting?

A.   Yes.

Q.   Is that your handwriting?

A.   I don't believe -- no, that's not my handwriting.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                2209

Q.  Your long-time paralegal, Tina Heath; is that right?

A.  Yes.  Tina is my long-time paralegal.

Q.  Do you think that's her writing?

A.  I can't imagine who else that it would be because, as you can see from what you showed me previously, I wrote down like a gross amount of time.  So like on some of those entries I wrote down six hours.  It's hard to tell from our internal records how much of that time was spent on each task, and the court form requires that, you know, you put a little bit more precision about these kind of categories across the top, interviews, obtain records.  So that's what Tina would take my entry and put it in there.  Then, yeah, I mean, that's what I think that is.

Q.  On the 28th you say again that you worked -- you are working on the sentencing and you're reviewing the psych records; is that correct?

A.  Yes.

Q.  Let's go to the next page, Page 10, please.  I take you to August the 11th.  What did you -- again, what are you writing here on the out-of-court worksheet?

A.  Well, I've got 1. -- written on there is 1.6 hours to review all the psych reports, make notes to prepare for conference with Dr. Merikangas, and then it's a half-hour for talking to Steve on the phone.

Q.  And that's Steve Hudgins, your co-counsel?

JODY A. STEWART, Official Court Reporter

A.  My co-counsel.

Q.  Go look at August the 13th.  Who do you have a telephone call with?

A.  Dr. Merikangas.

Q.  And what did you bill for that?

A.  30 minutes, a half hour.

Q.  We can go to the next page, 11.  August the 13th continues?

A.  Right.

Q.  Do you see where you say you wrote a memo to the file?

A.  Yes.

Q.  If we can go to the next page.  12, please.  Then August the 16th, did you write another memo to the file regarding Dr. Merikangas?

A.  I did.

Q.  And how long did that memo take you to write?

A.  30 minutes or so.  Just so it's clear in the record, it's .6 -- I mean, the hour is divided into tenths.  So it's, you know, every --.4 would be approximately 20 to 25 minutes.  .5 is, yeah.

Q.  So after you meet with Dr. Merikangas or talk to him on the phone, write a memo, during this time period in August, do you then meet with Sheila Cronin, your mitigation specialist, and Steve Hudgins on August the 17th?

A.  Yeah.  Yes, on August 17th I met with Sheila and Steve

Woodward, L. - Direct                                              2211

Hudgins a bunch of times, but clearly I did on August 17th.

MR. SAMUELS:  Your Honor, the United States would move into evidence Government's Exhibit 93.

THE COURT:  All right.  It's admitted.

MR. LEE:  Your Honor, I object to that.  He says it is not a final record, I guess it is not a final record, and it's -- the handwriting is not his.  I don't object to him testifying about how it refreshes his recollection, but it's not even established that it's an accurate final record of his billing.

THE COURT:  Well, it is what it is, but it's made contemporaneously, and I'm going to accept the records for what they are.  They are records that are kept for the Court.  All court-appointed attorneys keep them, and then they submit them to the Court as backup for their -- some form of it is backup for the billing.

This is reliable from the contemporaneous nature of it.  We are talking about 2009, so I am going to admit it for what it is with the understanding that somebody else may have, the paralegal may have filled in some times and whatever from his notes, and so forth.  I'll put whatever weight I deem appropriate on it.

(Government's Exhibit 93 received in evidence.)

THE COURT:  It will depend to the extent it is corroborated, too.  Just because he says it's there, it's

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2212

not elsewhere and can't locate it, then it wouldn't hold
much weight.

MS. McKEEL:  Yes, ma'am.

BY MS. McKEEL:

Q.  If you take a look in the government's notebook, Exhibit
94.

A.  Okay.

Q.  It's a multiple-page document; is that correct?

A.  Yes.

Q.  How many pages?

A.  It is 13 pages.

Q.  Is this, again, one of your out-of-court worksheets that
you submitted to the Court?

A.  Yes, I believe that it is.  I'm not familiar with the
stamp draft on there, but it could have been a draft that was
done and reviewed.

Q.  If we could go to Page 7 of this report.  Again, on
August the 10th, August 11th and August the 13th, you are
working with -- dealing with mental health experts and
Dr. Merikangas again; is that correct?

A.  Yes.  I want to be clear when somebody -- you said this
refreshes.  I don't remember -- I mean, these are my records.
I see this, but I don't remember it.  I mean --

Q.  But you made records?

A.  I made records at the time, yes.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2213

Q.  Are they truthful records that you submitted to the
Court?

A.  Exactly right, yes, absolutely.  My time slips and
records to the Court are truthful.

THE COURT:  You certify those records when you send
them to the Court?

THE WITNESS:  Yes, ma'am.

BY MS. McKEEL:

Q.  Go to the next page, please, Page 8.  Again, you note on
August the 13th a memo to the file regarding Dr. Merikangas;
is that correct?

A.  Yes.

Q.  Go to Page 9, please.  August the 16th, a second memo to
file you've written here; is that correct?

A.  Yes.

MS. McKEEL:  Your Honor, we would introduce
Government's Exhibit 94.

THE COURT:  You have the same objection?

MR. LEE:  I do.  These are not records that he
submitted to the Court.  These are worksheets that were kept
in his office and never was presented to the Court.

THE COURT:  The information from these is submitted
to the Court because you have to have backup on your CJAs,
CJA vouchers, don't you?

THE WITNESS:  Yes, Your Honor.  Let me say this.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    2214

When I -- at that time in the history of the CJA process here, these -- a worksheet had to be -- there was a cover sheet that had like the gross amount of time on it.

THE COURT:  Right.

THE WITNESS:  You had to submit worksheets.  Now, whether I can say this particular worksheet got submitted, by looking -- in looking at these, having seen the handwriting before, it doesn't refresh my memory about the events, but it's likely this one would have been one that got submitted because it had been typed as opposed to handwritten in there because I would review them.  But the bills didn't -- if I just sent in a bill that said I worked 200 hours and did all this stuff, it would never make it to the Court, that Ms. Tyree would bounce it back and say send the worksheets.

THE COURT:  Let me just explain it this way, and I have them all.  I keep everything I approve, everything that you all have submitted.  I don't just put it into an e-voucher system.  I keep it.  So let me just explain.  You do have to submit worksheets that show your time.  It then goes through a court clerk, Lisa Tyree, who has been here for years.  She then checks the numbers, and if she finds any discrepancy, I would venture that this is Lisa Tyree's adding things up and checking these, because if you notice, each of them have the same handwriting at the end, and then

JODY A. STEWART, Official Court Reporter

that's been added up, most likely, for this grand total, if you look at it.

But, in any event, worksheets do have to be submitted, and they are part of his attorney file.  So I'm going to admit them with the caveat that they are what they are and that he did the work, and they certainly, if nothing else, they are corroborative.  I'm going to admit them.  You have an objection, but I will assure you that you do have to submit worksheets with CJA vouchers, whether it be here or to the Fourth Circuit or whatever.

They have been submitted throughout the case, and I have kept a running total of everything that has been spent both on experts and attorneys.  I've got a whole file drawer.  I'm not going to go in right now and check it and see if these are in there.

MR. LEE:  Your Honor, just to clarify the objection.  We have the records, too, that we are dealing with during this.  So I don't object to them.  I just object to the handwriting on them.

THE COURT:  All right.  Well, I accept that he doesn't know, and maybe the adding isn't even accurate.  But I'm just going to accept them for the entries that they are and that's what he submitted, and he doesn't remember this many years ago having made these entries.

MS. McKEEL:  Thank you, Judge.  I would just say,

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                              2216

Judge, the United States is never a party to seeing billing from attorneys.

THE COURT:  I know you aren't.

MS. McKEEL:  So what we've got, we got this as late discovery.  This was part of the violation, and so we had asked Ms. Ali could she get the CJA billing for us.  She asserted these were complete records.  So that's what we are relying on because we have no knowledge of this except when this appeared in late discovery.

THE COURT:  I understand.  It's *ex parte*.  The billing process for CJA attorneys is *ex parte* and is approved by the Court, and at a certain level on certain cases by his attorneys with the Fourth Circuit, and that is what has been properly done throughout this case, at least on the CJA submissions.

MS. McKEEL:  Thank you, Judge.

BY MS. McKEEL:

Q.  I'm going to show you Government's Exhibit 115.  This is, Mr. Woodward, another billing out-of-court worksheet.  Do you see the date that starts on this billing sheet?

A.  Looks like that starts on July the 6th of 2009.

Q.  Again, if we go to Page 4 of this document, on August the 10th, August 11th, and August the 13th.  Do you see those?

A.  Yes.

Q.  Again, telephone calls and memos; is that correct?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                      2217

A.  Yes.

        MS. McKEEL:  Your Honor, we'd introduce this as Government's Exhibit 115.

        THE COURT:  That's admitted with all the same caveats.

        (Government's Exhibit 115 received in evidence.)

        MS. McKEEL:  Finally with regard to these worksheets, Judge, Government's Exhibit 91.

        THE COURT:  Can you just repeat the numbers now because we can check with the clerk.

        MS. McKEEL:  Yes, ma'am.

        THE COURT:  Let me go to 91.

        MS. McKEEL:  This is the last billing sheet, Judge, 91.

BY MS. McKEEL:

Q.  Do you recognize that, Mr. Woodward?

A.  Yes.  That looks like it would be one of my internal -- doesn't look like a court sheet to me.  It looks like one of our internal.

Q.  So there is a date and then there is some initials. Whose initials are they?

A.  Those are my initials.

Q.  And this starts on what date?

A.  July the 14th, 2009.

Q.  And if we can, please, let's go to the second page, the

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                            2218

very top of that page.  Again, these dates are August 11th, 13th, and 16.  Do you note then again about your calls with Merikangas and your memos?

A.  I don't know if this is again -- I know that once it might be printed off, so, but it's the same, yeah, same data as one of the other ones you showed me.

MS. McKEEL:  Your Honor, we move to introduce Government's Exhibit 91.

THE COURT:  91 is admitted.

(Government's Exhibit 91 received in evidence.)

BY MS. McKEEL:

Q.  Mr. Woodward, you said you don't recall the conversation with Dr. Merikangas.  I'm going to show you Government's Exhibit 92, which has been admitted.  Ask you, sir, please read this.

MR. LEE:  Sorry, Your Honor.  Just for clarification, it was admitted contingent on Mr. Woodward's testimony.

THE COURT:  Yes.  It was admitted, and Mr. Woodward could testify as to whether the conversation took place.

THE WITNESS:  Okay.

BY MS. McKEEL:

Q.  Do you see that, sir?

A.  I do see that.

Q.  Okay.  Does that refresh your recollection any?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2219

A.  Only as to the date and the time, that there was a call
with Dr. Merikangas.  I just don't remember the call.  Seeing
this confirms my billing records that there was a call.  But
I'm just being honest, as I sit here, I do not remember
talking to Dr. Merikangas, but I stand by, I wouldn't have
written down, then billed the government if I hadn't.

Q.  Well, you wrote two memos in your file.  Did you destroy
the memos?

A.  No, I didn't destroy any memos.  I turned my file over to
Mr. Runyon's past -- next counsel, and I don't have those --
I didn't copy them.  I don't have those memos.  I don't
want -- my memos to the file would not necessarily -- I mean,
in my language a memo to a file and notes to file are sort of
interchangeable.  So I would have made some notes and put
them in my file.

        Again, I don't remember, sitting here, but just to
demonstrate, when I do -- this is my transcript from a prior
testimony.  I would have had a file that said mental health
or Dr. Merikangas or psych evals.  That would have been stuck
in a little manila or brown folder like this inside of a
bunch of bankers' boxes.  But I don't have those memos
anymore.

Q.  You don't have them?

        THE COURT:  Who would you have turned them over to?

        THE WITNESS:  I turned them over -- it would

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                              2220

either -- I think it would have been Michelle Brace, Your Honor.  It could have been Jane -- I'm blanking on her name.  She took over the appeal.  She was from South Carolina, Jane.  She was a lawyer that worked on the appeal for a while, and -- but my main big file that was a bunch of bankers' boxes, and I believe I testified previously, Your Honor, at some point Mr. Hudgins also gave me a portion of his file.  I turned everything I had over to Ms. Brace, and I haven't had any access or know what happened to any of it since then.  Yeah, so that's who I turned it over to, Mr. Runyon's counsel.

BY MS. McKEEL:

Q.   Before you testified in February, beginning of our evidentiary hearing, did the petitioner's counsel, *habeas* counsel, show you your files?

A.   No.  I had a meeting with them, that they showed me some e-mails -- they showed me some -- I don't remember what it was.  We met in my office.  It was not -- I don't know who all was there.  It wasn't these -- I don't remember if Mr. Lee was there or not.  But they showed me some things that like a few pages of paper they were going to ask me.  My file was 15, 20 bankers' boxes of stuff.  They didn't show me that.

Q.   But they talked to you about Dr. Merikangas?

A.   Yeah.  They asked me at that meeting.  I think I

Woodward, L. - Direct                                    2221

testified that they asked me about that, as I recall at that
meeting.

Q.  And did they show you your billing records?

A.  No.  No, I didn't look at my billing records.

Q.  So with regard to this document, just a portion of this,
he relayed he did not believe we were in a good position to
present a mental health defense as it would open up the
government presenting their version of the mental health
picture, so he does not feel we have a strong case.  Do you
have some recollection of that and the decisions that you and
Mr. Hudgins made?

A.  Let me answer that question this way.  I have a
recollection, as I said before, that the experts that we had
gotten were not, in our opinion, helpful.  Mr. Hudgins had
dealt with them more than me, so I don't want to misstate
that I remember this call, but I certainly remember talking
to Mr. Hudgins and to Ms. Cronin about whether it was smart
to present or whether it would be helpful to Mr. Runyon to
present a mental health defense.

Q.  Do you remember Dr. Bender?

A.  I remember the name.  I mean, I remember --

Q.  Is he from UVA?

A.  I believe.

Q.  Dr. Nelson, do you remember him?

A.  Well, yeah, I know Dr. Nelson.  I had -- as I recall, I

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2222

might have had a little bit of interaction with him in the transition between Babineau and Hudgins, but -- I mean, I had known Dr. Nelson from other work in other cases, yeah.

Q.   Is it fair to say that you continued to work through the mental health defense up until the time of August the 13th when you had that phone call with Dr. Merikangas?

A.   Well, I would say we worked on it up until that time and after that time.  We continued to --

Q.   -- investigate?

A.   -- think about it and consider it and decide.  Yeah, I mean, I don't think we stopped thinking or working on it just of this call, but, sure, we worked on it until -- I can't pick a date when a decision was made not to call them, but there were some deadlines that we had to do things by.  I don't remember those off the top of my head, but, yes.

Q.   So if by this point on your phone call of August 13th, 2009, do you know if the MRI or PET scan had been performed yet?

A.   I do not.

Q.   If you look down a little bit further in this memo to file for Mr. Hudgins, do you see where you said -- you say that unless there is something glaring in the MRI or PET scan?

A.   Yeah, I mean, I see that there, yeah.

Q.   Do you have any recollection of those tests being

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                    2223

performed by August the 13th?

A.  I could not tell you if they had been performed by then. I have a recollection that they were ultimately performed at some point, but I don't know if it was done by this date or not.  Mr. Hudgins was handling that, doing all that, getting that set up.

Q.  So this memo to file from Mr. Hudgins, anything that you read in there that you have a dispute with or think it's inaccurate?

MR. LEE:  Your Honor, he can't remember it.

THE COURT:  Well, the problem is, is that Mr. Hudgins is deceased, and Mr. Hudgins, nobody gave him his file before he testified, and he actually wanted it.  So now we have a situation where we have the file of the deceased attorney who is under the allegations of ineffective assistance of counsel.  So the best we have is the co-counsel.

Now, if he doesn't remember or the only thing that supports this is his billing records, but if he doesn't have an independent recall of conversations, then he can't testify to them, and we will just have to put in Mr. Hudgins' records, since they were his file, as records kept in the regular course of business, and they're not hearsay under the statute because the declarant's unavailability is his death, and everybody knew that he had

JODY A. STEWART, Official Court Reporter

prostate cancer, and the delay is not because of Mr. Hudgins or Mr. Woodward.

So the way I would look at this, if he has a recollection of it, or can tie it into his bills, that's something to consider.  To the extent he doesn't remember it, the records will just have to stand on their own, and they will have whatever weight they can be given.

MR. LEE:  My point is he already testified that he doesn't remember it.

THE COURT:  I was just going to ask one question about that in general.  Do you recall, and I'm not going to ask you what you discussed right now, but do you recall you were a team, you were getting ready to go to the final phase where the death penalty was going to be decided, and do you recall any conversations you and Mr. Hudgins had and why you didn't proceed with any type of mental health defense?  That's really what the Court is tasked with, and I'm not asking you what they were or whatever, but that's really the way this testimony needs to go forward for the Court to understand it.

If he can't remember, he can't remember.  It's kind of like the last witness, he couldn't remember.

THE WITNESS:  Let me answer your question this way.  I don't remember specific -- I certainly remember that Mr. Hudgins -- and I believe I testified to this before --

Woodward, L. - Direct                                          2225

was primarily responsible for this aspect of the case.  But we were operating as a team, and he asked me to review the reports and see what I thought about them, and we had a number of conversations.

I mean, Mr. Hudgins and I talked about this daily, sometimes several times a day and over the week.  So we certainly weighed it, looked at it and concluded that it would not be smart based on -- or not be a good mitigation plan based on what we understood or I understood the experts were saying.

I would have to say this, Your Honor.  My recollection is that I was getting -- what I recall is what Steve or Mr. Hudgins was telling me about the experts.  I remember reading the reports.  I do not remember this phone call.  Obviously, I was on it, but I certainly remember that we had some -- many conversations about it.

This memo, I don't believe I ever saw this till yesterday.  The government sent me some exhibits to look at to prepare.  I don't ever remember seeing this until yesterday.  Yes, we certainly discussed it and considered it and went through and got and retained the experts and had the testing done.  We did all that.

THE COURT:  Well, the testimony is, and what I will accept is that Mr. Woodward has not seen this.  He does not remember the details.  It's something that is reflective,

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                              2226

but not the substance of it, in his time record, and it is part of Mr. Hudgins' file.  That's the way it was produced. That's the basis upon which the Court will accept it.

MS. McKEEL:  If I can ask this question, Judge.

BY MS. McKEEL:

Q.  Given your strategy, what you all decided to present at the sentencing phase, is this inconsistent with that?

A.  No.  We clearly decided not to present a mental health defense.  There is no question.  That is obvious.  That is not inconsistent with our strategy.

THE COURT:  We do need a quick luncheon recess. You can't discuss your testimony with anyone, Mr. Woodward, now that you're on the stand.

THE WITNESS:  Yes, ma'am.

THE COURT:  We will take a 30-minute luncheon recess.

(Recess from 3:05 p.m. to 3:38 p.m.)

THE COURT:  All the attorneys and Mr. Runyon are here, and Mr. Woodward is on the stand.  You can proceed.

MS. McKEEL:  Thank you, Judge.

BY MS. McKEEL:

Q.  I'd like to show you Government's Exhibit 97.  We were on the topic of Dr. Merikangas and your meetings.  You responded a little bit earlier in the other exhibits, your billing records, that you met with Sheila and Steve.  Do you recall

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2227

that in your billing records?

A.   I do.

Q.   Take a look at this exhibit and read that, please.

A.   Okay.

Q.   Does that refresh your recollection with regard to meeting with Steve and Sheila about what Dr. Merikangas said and what your strategy was going to be?

A.   I guess marginally.  I have never seen this e-mail before, but it certainly --

Q.   David Bruck is who?

A.   David Bruck is a very experienced capital case attorney who was helping us with our resource counsel in this case. I've known Mr. Bruck for decades.

Q.   So this e-mail from Sheila and David Bruck is dated August the 18th.

A.   Okay.

        THE COURT:  The question is, does it refresh your recollection, not that you've seen it before or not but whether it refreshes your recollection?

        THE WITNESS:  Well, it certainly refreshes my recollection that we were preparing for sentencing.  The only, I guess, detail that it really refreshes me on is Suk Cha, I believe, is Mr. Runyon's mother, and this does refresh my recollection that there was a big discussion about whether or not to call her as a witness.

                    JODY A. STEWART, Official Court Reporter

But, yeah, I mean, I think that -- I certainly thought that we should, you know, limit the social history. Yes, Your Honor, I guess it refreshes my recollection that we were working on sentencing issues.

BY MS. McKEEL:

Q.  And it talks with regard to Dr. Merikangas, and then it talks about the social history you all were going to present?

MR. LEE:  Objection, leading.

MS. McKEEL:  I thought we were on cross, Judge.

THE COURT:  You called him as your witness.

MS. McKEEL:  We did, Judge, but I think when we learned of the violations at the last hearing, that the Court decided that we could bring back -- because this is all new that Mr. Woodward could not have testified to.

THE COURT:  I see what you're saying.  In other words, you are bringing him back.  They did the direct on him, and you're bringing him back.

All right.  I'll let you go on cross.

MS. McKEEL:  Thank you, Judge.

BY MS. McKEEL:

Q.  So with regard then to the Dr. Merikangas paragraph with Sheila and David, and then you are talking about the social history, is what Sheila is telling David consistent with what you all decided to do, and this is August the 18th, just a few days before the sentencing phase began; is that correct?

Woodward, L. - Direct                                            2229

THE COURT:  Let me ask you this.  Sheila Cronin had already testified, so she didn't see any of this.  You may end up having to bring her back, I don't know.

MS. McKEEL:  That's correct, Judge.  Sheila Cronin had already testified.

THE WITNESS:  I can answer your question this way, Ms. McKeel.  Seeing that paragraph, the first one that starts with, "I met," certainly refreshes my recollection or confirms my recollection that we did not think it was a good idea to call Dr. Merikangas.  So it refreshes my recollection to that degree.  I don't know whose handwriting that is.  It is not mine.

MS. McKEEL:  Judge, we would introduce Government's Exhibit 97.

MR. LEE:  Your Honor, we object again.  It's not authenticated, and there is handwriting from some anonymous, unknown person.

MS. McKEEL:  Judge, I keep hearing defense counsel say it's not authenticated.  We had an agreement that these documents are authenticated.  They may object for other reasons, but not on authentication.  So I'm not sure why we are getting that objection.  We got these documents late.  They are part of the discovery violation.  So this document came from the attorneys' files.

MR. LEE:  Your Honor, we didn't agree that the

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                      2230

documents came from the attorneys' files.  That doesn't authenticate it for admission to evidence.

THE COURT:  When you say you had an agreement on authentication, I need to see that if you do have an agreement on that.

MS. McKEEL:  Judge, it's my understanding that we had e-mails back and forth -- I'm not sure we brought them -- with Ms. Ail about the authentication issue, and that we agreed to with them.  He may not agree on some other reasoning but not authentication.

THE COURT:  This is going to be an objection on all of them.  If you've got an agreement, they were late.  All of these should have been produced, and they should have been produced before the witnesses testified.  They certainly should have been produced before Ms. Cronin testified.

Some of her testimony did not comport with this. Documents apparently weren't shown witnesses who were testifying that had things to do with their testimony, and now the witness has testified, and here's a document that she wrote, and she expresses an opinion in it in an e-mail. It's a pretty strong opinion.  I know who Ms. Cronin was, and I know what was going on with her.  I remember her testimony.  It compounds everything when at first you don't do things correctly under the rules, because this is a very

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2231

important document.

MS. McKEEL:  If I can just ask, do we not have an agreement with authentication of documents?

MS. ALI:  I can read it from the e-mail, Your Honor.

THE COURT:  I would like to see the e-mail.

MS. ALI:  Sure.  It's a long e-mail chain, so I can note where the relevant portion is.

THE COURT:  Note, and then I may want to read the whole e-mail.

MS. ALI:  That's fine, Your Honor.  If I could just explain the black -- there is color coding.  I'm not going to have a copy of it, but I can try to walk the Court through it, and then hand it up.  It's an e-mail chain.  We are going back and forth.  So we are responding to each other in different colors.

THE COURT:  Did you agree or not agree?

MS. ALI:  We agreed -- what it says -- what I said is, "To make sure our position is clear, we have agreed that the documents have come from trial counsel's files but (like you) reserve our rights to object to admissibility."  That was the agreement that we had reached.  We weren't going to object if this didn't come from trial counsel's files, but that the document is hearsay or otherwise couldn't be authenticated, like when there is handwriting, we reserve

Woodward, L. - Direct                                      2232

our right.

THE COURT:  Let me see that.  This is what you've got marked here?

MS. ALI:  I think I put a box around.

THE COURT:  You did.  This is what it says.  "We appreciate your agreeing to the authenticity of exhibits from trial counsel's files.  We will reciprocate as to authenticity in general, but admissibility would be subject to issues of relevance."  This is certainly relevant -- "and the aforementioned late disclosure issues (if a prior witness should have admitted -- and we may object).  To make sure our position is clear, we have agreed that the documents have come from trial counsel's file, but (like you) reserve our rights to object to admissibility."

Also, but authentication is a separate. Authentication is something that can be waived. Authentication is different from admissibility. Admissibility goes to relevance, other matters. Authentication is something that is required before any questions are even asked.

You have said right here that you reserve our rights to object to admissibility.  Also, we noted that in certain disclosures you maintained that redactions were necessary because there were communications involving *habeas* counsel.  But you were seeking to include such unredacted

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2233

communications between Steve Hudgins and Dana.

MS. ALI:  I think that's a separate issue, Your Honor.  We are going back and forth on a host of different issues trying to get ready for the hearing.  I was just trying to make the point that the agreement we had was just that we were not going to contest that anything came from trial counsel's files if it came from trial counsel's files.

THE COURT:  I view this as admitting to the authenticity of these documents.  They came from trial counsel's file, and, frankly, this one should have been given to them before they testified, before Ms. Cronin testified.  This is crucial what's in this document.  This is crucial to the issue that was represented to the Fourth Circuit on appeal.  It is crucial.  It should not have been withheld from the United States.  It should not have been withheld for cross-examination of the witness.  This is something she wrote, and she testified contrary to what's on this.  The violation gets more egregious.  I'm going to make this exchange right here with the block on it as Court Exhibit Number, what is it?

THE CLERK:  Number 8.

THE COURT:  Number 8.

(Court Exhibit 8 received in evidence.)

THE COURT:  Now, in terms of the authenticity, there will be no further objections to authenticity because,

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    2234

in my opinion, you have agreed to it.

Now, in terms of what the testimony is, it is, if they remember, they remember.  If they don't, they don't.  In terms of writing on it, if we don't know whose writing it is, then it's not relevant to the Court.  But you can't -- if I don't know who wrote this, unless we call back Ms. Cronin, and nobody recognizes this, then it's as if it's not on the document.  I can certainly sort that out.  A jury cannot, but I can.  The substance of this e-mail, in fact, it specifically says, "Dr. Merikangas felt that David was lying to him and that opening the door for Montalbano and Patterson could do a lot of damage."

That's the main crux of this hearing that we have been here for so many days.  In other words, Dr. Merikangas, and he was not a very good witness in the Court's assessment.  He seemed not to remember, not to know, where did he get this opinion, where did he get that opinion.  This is a contemporaneous e-mail written on August 18, 2007.  It's a contemporaneous document with present sense impressions.  It comes from Sheila Cronin, and we know her role in the case.  It goes to David Bruck, and we all know his role in the case.  That's of record.

I'm admitting this e-mail.  I overrule any authenticity objections.

MS. ALI:  Ask one question, Your Honor.  I have not

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                2235

reviewed the Court Exhibit 8 before I handed it up.  I don't recall whether it had my own writing.

THE COURT:  If it did, you handed it up, and I'm going to admit it.  I'm only admitting that one portion.

MS. ALI:  I would offer to bring a clean copy to replace the exhibit.

THE COURT:  You can bring the clean copy, and I'll take a look at it.  I will see because there is a block around it.  It's clear.

MS. ALI:  I just didn't flip through the whole document.  I don't remember if I had work product on there.  I'm sorry, any handwritten notes, Your Honor, on the copy that I handed up.  I didn't flip through before I handed it up.

THE COURT:  Let me see if there are handwritten notes on it.  There is nothing handwritten on here that I see.

MS. ALI:  I just didn't remember, Your Honor.

THE COURT:  There is nothing handwritten, and correspondence between counsel.  So the only work product would be if you have had written notes, but it's an e-mail between counsel agreeing over these exhibits that were produced during late discovery.  So the violation actually just becomes more egregious as we go along.  Go ahead.

MS. McKEEL:  Thank you, Judge.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2236

BY MS. McKEEL:

Q.  Mr. Woodward, with regard to, you stated that this refreshes your recollection.  Was it a concern for you and Mr. Hudgins that if you all called Dr. Merikangas, and that it would open up the door to Montalbano and Patterson, and it would show a lot of damage to your mental health case?

A.  Absolutely.  Absolutely.  It's always a balancing concern that, you know, my view was, and I know from speaking with Mr. Hudgins, you only call a witness if you feel like the strength is going to -- or the benefit is going to outdo the damage, and Dr. Merikangas both had been subject to cross-examination, and, of course, then the government could have called rebuttal witnesses.  So, of course, that was a concern.

Q.  That's why you did your strategy; is that right?

A.  Absolutely.

Q.  Now, the next two paragraphs talk about what you thought, "Woody thinks," she says, "Woody feels," in those next two paragraphs.  Are those paragraphs accurate?  Did she summarize accurately how you felt and what you thought?

A.  Yes.  I mean, I would explain it this way.  That's certainly what I would have said during the meeting, and I think to give it some context, the meetings are not me or anybody sitting around dictating what's going to be done.  It's a discussion.  Steve's there.  He's an experienced

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2237

lawyer.  I'm there for whatever I'm worth.  Ms. Cronin is there, and everybody is talking about the risk and benefit of doing anything in sentencing.  Certainly, I sometimes play devil's advocate.  So this certainly -- I didn't get this e-mail, but it certainly rings true to me to a number of strategy discussions that we would have had, yeah.

Q.   Show you Government's Exhibit 90.  Take a look at this e-mail, please.

A.   Okay.

Q.   Is this an e-mail you received from David Bruck on August the 2nd, 2009?

A.   Yes.

Q.   Is that your e-mail address, sir?

A.   Well, it says Larry Woodward, but I'm sure it came to me. Larry Woodward is not my e-mail address, but, yes, I'm sure I got this.  I don't recall getting it.

        THE COURT:  Well, don't a lot of e-mails have the names on them?  We all get e-mails every day and some of them have e-mail addresses, some of them don't.  I get them every day.  When it comes to me, it just says my name on it.

        THE WITNESS:  Yes, I would say this came to me.

BY MS. McKEEL:

Q.   Okay.  And here again, you, Mr. Bruck, Sheila Cronin and Steve Hudgins, you are talking strategy here with regard to Merikangas and Mirsky; is that correct?

                 JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                          2238

A.  I would say that this was something that David Bruck sent suggesting a strategy.  I don't know if I responded to it or not, but it certainly, yes, an e-mail from Mr. Bruck about a possible way to handle strategy.

Q.  In fact, the second to last paragraphs says, "Of course, the final decision about the mental health witnesses doesn't have to be made until you're into your case" assuming that you provide the notices and reports, correct?

A.  That's what it says.

Q.  So you and your team just continued to strategize and work on the strategy of what you were going to present in that sentencing phase of the trial; is that correct?

A.  That's correct.

Q.  Like to show you Government's Exhibit Number 112, please. Do you know whose handwriting this is, sir?

A.  That is my handwriting.  Let me make sure it is one page. Yes, that's my handwriting.

Q.  What are these your notes of?

A.  Let me see.  I mean, I can't be a hundred percent sure because they're not dated, but they're certainly my notes about defense tactics and strategy -- not defense, sentencing tactics and strategy of things that should we do them, should we not do them, you know.  They're like discussion points for a meeting.

Q.  So in this e-mail here, just the second line says,

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                              2239

"Thoughts of Cunningham opening the door to Patterson, Montalbano."  That suggests that it corresponds to Government's Exhibit 97 and 90, is that correct, those last two e-mails you looked at --

A.   Yes.

Q.   -- about strategy?

A.   The first line says, "Check with Steve Hudgins."  So it does correspond, but what this is, is me making a list of things that I wanted to discuss with Steve about what we ought to do.

Q.   A little bit further down, if you go a little bit further down the document, please, it says two people should testify. Is that DR, David Runyon, and you draw a line that says no.

A.   It says, "Does Sheila testify?  Does David Runyon testify," and it looks like my little paren there is my -- again, I don't know when -- I would look at that and say, it's probably after I had talked to Steve about these things. I put the "no" there, but I can't be a hundred percent sure. That's a few years later.

Q.   This is your handwriting, correct?

A.   This is my handwriting.

        MS. McKEEL:  Your Honor, we'd introduce Government's Exhibit 90 and 112, please.

        THE COURT:  They are admitted.

        (Government's Exhibits 90 and 112 received in

                    JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                              2240

evidence.)

MS. McKEEL:  Thank you.

BY MS. McKEEL:

Q.  Pull up Exhibit 113.  Do you know whose notes these are?

A.  Yes.  They are mine.

Q.  Those are your notes, too.  And the top of the document says what?

A.  Closing argument -- "David Runyon - closing argument."

Q.  I think you testified previously that Steve's primary responsibility was working on some of those -- the mental health witnesses during the phase, the sentencing phase of trial, and but you ultimately did the closing argument; is that right?

A.  I did.

Q.  Is that what these notes are?

A.  Yes.  These are notes of my thoughts of things to perhaps say during closing argument, yes.  I don't know that this is my final notes of the closing argument.  Certainly, me working on it and thinking about it.

Q.  In here just tell us, if you would, you don't have to read them all, but tell us what you -- your thoughts were on this closing argument.  Abe Lincoln?

A.  That's a -- Abe Lincoln had a quote that said, you know, a kind justice is better than a swift judgment, or something like that.  I mean, yeah, I was just thinking of things to

JODY A. STEWART, Official Court Reporter

both point out the facts, engage with the jury, try to, you know, weave everything in that we were doing.  I mean, that's like a sloppy looking note.  This is the classic seeing the sausage made, not eating the sausage here.

MS. McKEEL:  Your Honor, we'd introduce Government's Exhibit 113.

THE COURT:  All right.  It's admitted.

(Government's Exhibit 113 received in evidence.)

BY MS. McKEEL:

Q.  Let me show you Government's Exhibit 114.  You can look at the book if you'd like because it's a multiple-page document, if you'd like to see it all.

A.  Yep.  I got it.

Q.  Do you know whose notes these are?

A.  Scanning through this, I believe that these are Mr. Runyon's notes.  It's like he's writing something to Steve and I about ideas that he had, questions he had, just a summary of a lot of things, is what it looks like.

Q.  This is a 20-page document, is it not?

A.  Yes.

Q.  If you look through these pages, Mr. Runyon was very involved in his defense, wasn't he?

A.  Well, yeah.  Without even -- Mr. Runyon was always very involved in his defense.  He was very bright.  He talked a lot about legal strategies.  So, yeah, but I would say that

this is an example of that.  But it's not -- I don't base the fact he was involved in his defense just on this document, but it certainly illustrates that point.

Q.  And did you recall him taking copious notes throughout the trial?

A.  I don't really recall that, but it wouldn't surprise me. I don't recall it as I sit here today, but he certainly liked to write and give Steve and I things, and even Jon Babineau, that he wanted us to consider and do.

MS. McKEEL:  Your Honor, we'd introduce Government's Exhibit 114.

THE COURT:  All right.  It's admitted.

(Government's Exhibit 114 received in evidence.)

BY MS. McKEEL:

Q.  I'd like you to take a look at Government's Exhibit 105. Do you know what this document is?

A.  Yes.  This looks like -- it's obviously the defense list of witnesses for the sentencing hearing.  That is on the back here, that is my handwriting, and it looks like I'm just checking off who was called and maybe making a quick little note about who they are, obviously.  I would have also been taking notes during their testimony, but this is a witness list.  The ones that are scratched through were not called.

Q.  Okay.  Look at numbers 10 and 11.  It looks like what's been crossed through is Robert Seeger and Deborah Seeger.  Do

Woodward, L. - Direct                                           2243

you see that?

A.   I do see that.

Q.   Why weren't they called?  Do you recall that?

A.   Well, again, I don't recall it, but what I wrote was "gun; fighting with Maria," which would indicate to me that there was something about them that we made a decision, you know, not to call them, that I don't remember those details at this point, though.

Q.   So correct me if I'm wrong, these are your notes of the defendant's list of witnesses and what you wrote beside them either checkmarks or scratch or called and not called and your notes of why.  Is that accurate?

A.   Yeah, my summary, my rule, my note of why, who they were and what they were called for, and if they weren't called, why they weren't called.

        MS. McKEEL:  Your Honor, we'd introduce Government's Exhibit Number 105.

        THE COURT:  It's admitted.

        (Government's Exhibit 105 received in evidence.)

BY MS. McKEEL:

Q.   I'd like you to take a look at Government's Exhibit 126. Do you see that, sir?

A.   I do.

Q.   Do you recall that you had problems with witnesses and getting witnesses to come and testify for David Runyon?  Do

                  JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                              2244

you recall that?

A.   In general, yes.  I mean, we have problem with every --
but, yes, I mean, there were certainly witnesses that were --
some were harder to contact and less willing to come testify
than others, for sure.

Q.   So with regard to this particular e-mail, Maria Runyon,
and it talks -- Sheila has talked with them.  Sheila is the
person that goes out and talks to these witnesses for you; is
that right?

A.   Yes.  Sheila talked to them.  Steve went with her to
interview some.  I don't know who or who.  Some of them I
didn't travel because we weren't doubling the travel.  But I
talked to some of them on the phone.  But, yeah, they
certainly had been interviewed.

Q.   Did you read Maria Runyon's Grand Jury testimony?

A.   Yes.  If it was provided in discovery or *Jencks* in this
case, I read it.

Q.   In fact, on your last Exhibit 105, Maria Runyon is your
first witness, right?  So it looks like despite this e-mail,
you all got her there to testify; is that correct?

A.   Yes.  Apparently, so.  I don't remember her, but, I mean,
I'm sure if I wrote that she testified, she should be in the
transcript as testifying.

Q.   Okay.  And with regard to Maria Runyon, would it be fair
to say that at different points during this trial that she

Woodward, L. - Direct                                                 2245

may have been antagonistic to David Runyon but eventually came around?

A.   I don't really remember that, Lisa.  I mean, I -- what I remember about that Steve and Sheila were doing, that I remember there was a lot of dysfunction in Mr. Runyon's family.  I don't have anything specific that she was antagonistic towards him, but --

Q.   You don't recall the Grand Jury testimony?

A.   I don't recall her Grand Jury testimony.  It was 14 years ago, no.

Q.   Specifically with regard to this 1996 accident, this car accident, did you all try to find records to verify David Runyon's self-report of that car accident?  Like, was there a police report?  It's been reported that it was a hundred miles an hour, and he was hit head-on.  Was there a police report that you ever found or hospital records?

A.   To my knowledge, there was not.  Again, I'm not trying to sound like a broken record.  Steve and -- I was -- yes, I know Steve and Sheila were looking for a series of different records.  Some we found, some we never found.

Q.   And with regard to Maria Runyon's Grand Jury testimony, do you recall that she says that David's personality didn't change afterwards.  He was mad at the guy who hit him.  Do you remember that?

A.   I don't remember that.

Woodward, L. - Direct                                            2246

MS. McKEEL:  Your Honor, we'd introduce Government's Exhibit 126.

THE COURT:  Go back to 105.

THE WITNESS:  Yes, ma'am.

THE COURT:  Look at number 7.  That individual, does that say called?

THE WITNESS:  Number 7?

THE COURT:  Yes.

THE WITNESS:  Yeah.  What I have got checked is "called - friend - Maria's brother."  So I think that's what I put.

THE COURT:  So he was, as I recall, a defense witness at the trial?

THE WITNESS:  Again, yes, ma'am.  That was my shorthand.  I checked off who they called.  I haven't reviewed the sentencing transcript, but I believe based on my notes, he was called.

THE COURT:  Interesting.  It was the one you claimed you couldn't lay a foundation for.

THE WITNESS:  I'm sorry?

THE COURT:  That's just an aside.  There was a representation earlier to the Court for another matter, and there was a difficulty with laying a foundation, and I don't understand the difficulty, but the individual attorney was not able to do so.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                           2247

But there is testimony there, but that would have easily provided a foundation for later testimony, I would assume. I'd have to look at it. Such a voluminous record, I wanted to make sure that it was clear that he had been available and had been called.

THE WITNESS: Well, again, Your Honor, the transcript would be the best, but my records indicate. I don't think I would have checked it if we hadn't called him.

THE COURT: I understand. The transcript is the best record of it.

MS. McKEEL: Judge, I'm almost finished. We are going to wrap up here.

THE COURT: What number?

MS. McKEEL: I'm sorry, 126.

THE WITNESS: Is there a question?

MS. McKEEL: No, I finished asking you questions. I move to admit it.

THE COURT: That's admitted. I may have admitted it, but I was still looking back thinking about the trial witnesses.

(Government's Exhibit 126 received in evidence.)

BY MS. McKEEL:

Q. Let's go back to the document Judge Smith was just referring to, 105. So to wrap things up here, your strategy, because the mental health strategy did not work out, your

JODY A. STEWART, Official Court Reporter

Woodward, L. - Direct                                                    2248

strategy then was to bring the defendant's friends from all over, correct?

A.  Friends and family, yes.

Q.  Friends and family.  And some of these people knew David Runyon from long ago; is that correct?

A.  Yeah.  My understanding is we had a pretty good cross-section of people that knew him at different stages of his life.  Again, I'm sure the record would reflect that I did the direct examination of some of these witnesses.  But, yes, we certainly tried to get as many people that would say favorable things about him as possible.

Q.  In fact, you called friends from the military academy; is that correct?  I think Mr. Larry Carr Eaglebear was from the military academy, if I recall correctly?

A.  Well, again, I don't recall, but I've got -- he was a friend, but if he was from the military academy, I don't know that but --

Q.  You had a reverend you called, correct?

A.  Looks like we did.

Q.  You had a number of deputies from the Portsmouth Sheriff's Office; is that right?

A.  Yes.

Q.  So, Mr. Woodward, given what you've read with this new discovery and what's been produced since the first hearing that began in February, isn't it fair to say that the mental

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                          2249

health experts were weak?  In fact, Dr. Merikangas said not to use him, and you went with the best strategy of presenting a good, wholesome person who may or may not have done something bad?

A.   Yeah.  I would answer that question this way.  I certainly concluded, based on my review of it, and I don't remember speaking to Merikangas, and Steve's input, that our best strategy was not to present a mental health defense and to present a defense of a different sort, as we have discussed.

MS. McKEEL:  That's all I have, Judge.

THE COURT:  All right.  You can examine Mr. Woodward.

MR. LEE:  Thank you, Your Honor.

Good afternoon, Your Honor.

CROSS-EXAMINATION

BY MR. LEE:

Q.   Good afternoon, Mr. Woodward.

A.   Mr. Lee.

MR. LEE:  I also have a binder for Mr. Woodward to refer to.  Some of the exhibits that I'm entering are going to be the same as some of the Government's exhibits, they are just going to be Defense exhibit number.  Sorry about that.

THE COURT:  Just so I get them because I don't have the same binder.  Mine are spread out over these nine or ten

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2250

binders.

BY MR. LEE:

Q.   Mr. Woodward, I just wanted to go over, and there were a number of things that Ms. McKeel addressed with that I want to follow up and ask you questions about.

A.   Sue.

Q.   The first question, you testified that you and Mr. Hudgins operate as a team; is that right?

A.   Yes.

Q.   And so any of the pleadings or motions or things submitted to the Court, whether you submitted them or Mr. Hudgins submitted them, you agree that they were accurate and truthful and there was nothing that you were concerned about that was filed with the Court?

A.   Well, no.  I would answer -- I certainly didn't file anything that I was concerned about and I -- I didn't remember seeing anything Mr. Hudgins filed that caused me any concern.

Q.   Okay.  Thank you.

A.   I mean, I think we consulted on most of them if it was something administrative about moving a date or something.  But, yeah, we spoke a lot.

Q.   And decisions that you made, you were aware, although -- sorry, again.  Although Mr. Hudgins was taking primary, on-the-ground interest in the sentencing phase, you were

Woodward, L. - Cross                                              2251

aware of what he was doing, correct?

A.  Yes.

Q.  And you made decisions together; is that right?

A.  Yes.

        MS. McKEEL:  Your Honor, I'm going to object.  I was on cross.  I could lead.  This is -- they're not on cross.  I don't want to keep jumping up and down, but just prolongs the hearing today.

        THE COURT:  I don't find any of the questions thus far objectionable.  Go ahead.

        MR. LEE:  Thank you, Your Honor.

BY MR. LEE:

Q.  You mentioned on direct that you had dealt with Dr. Nelson; is that right?

A.  Yeah.  I mean, yes, I believe that I had.  My memory is, is that I had some communications in this case with Dr. Nelson when Jon Babineau was in the case, but I don't have any specifics.

Q.  Okay.  And he was retained as a forensic psychologist, right?

A.  I believe that's right.

Q.  And based on his evaluation of Mr. Runyon, he recommended that a neuropsychologist be retained?

A.  I don't recall that, if that's what his recommendation is.  I mean, just so you know, when Jon Babineau was -- we

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                       2252

had the case split up the same way when Jon was in as when
Steve came in.  So Jon was dealing primarily with Dr. Nelson,
but -- so I don't recall what specific recommendations he
made.  If you say his report says that, I can't dispute it.
Q.  Okay.  Take a look at Defense Exhibit 126.  It's been
admitted into evidence.
A.  126.
        THE COURT:  Can that be put up on the screen?
        THE WITNESS:  I got it.
BY MR. LEE:
Q.  Can you take a look at that and see where Mr. Nelson,
it's a letter, December 2nd, 2008, from Dr. Nelson to
Mr. Babineau.
A.  Yes.
Q.  And he says, "Based on my evaluation of Mr. Runyon, I
recommend you get the District Court to authorize a
neuropsychological evaluation."
A.  Correct.
Q.  Does that refresh your recollection about being aware of
that decision or that development?
A.  Well, again, to answer consistently, it doesn't refresh
me remembering it, but I can look at this document and tell
that it came to Jon.  Jon gave it to me.  Up in the right
under December 2nd, those are my initials, so the LHW, Jr.,
so that is indicative that he had gotten the letter and given

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2253

it to me, and I looked at it.  So obviously I saw it even though it wasn't addressed to me.

Q.  And do you recall that Dr. Nelson never rendered a final opinion about whether Mr. Runyon had any kind of brain damage or mental illness?

A.  I don't remember that.

Q.  He was never provided the results of Mr. Runyon's neuropsychological testing, was he?

A.  I don't know.  I didn't provide it to him.  Now, whether Mr. -- I mean, we moved on from Dr. Nelson, but I don't know what was provided to him.

THE COURT:  I believe that Mr. Babineau was called and testified about all of this.  So if he doesn't remember, again, Mr. Babineau and Mr. Hudgins have testified.

MR. LEE:  I'm just going to quickly touch base about his memory on a few other items, if you don't mind, Your Honor.

THE COURT:  No, I don't.

BY MR. LEE:

Q.  He was never provided Mr. Runyon's neurological testing, as far as you know?

A.  I don't know if it was or not.

Q.  And he was never provided the detailed social history that you developed before the August 2009 hearing; is that correct?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                        2254

A.   Well, on that one I don't believe Dr. Nelson was ever provided it because at that point I don't think we were using Dr. Nelson anymore when we got up to sentencing.  I don't remember when, but at some point, I think after Steve came -- I think we moved on, or Steve got different -- I know he got different people, so in 2009, I doubt Dr. Nelson was provided anything.

Q.   Including the MRI scans; is that right?

A.   I don't know when they were done, but, no, I don't know whether -- I don't think Dr. Nelson got them, but I don't know.

Q.   You were also asked about Dr. Bender.  Do you remember that name?

A.   I remember -- I remember the name, and I know he's a doctor that was -- I don't know of his specialty.  I don't recall.

Q.   He was a neuropsychologist from UVA?

A.   Again, I -- yeah, okay.  I don't remember ever talking to Dr. Bender or interacting with him, but I remember that he was somebody that was working on the case and that, you know, was a doctor.

Q.   I'm just going to ask you to look at Government's Exhibit 13, which was admitted as well, a February 5th, 2009 --

A.   13.

Q.   -- e-mail from Mr. Babineau.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                2255

A.  Do I have 13?  Is it 13 or 113?

Q.  13.

A.  Mine goes 5, 10, 18.  Is it in the back?  Let me see.

Q.  You may just have to look on the screen.  I'm sorry.

A.  Okay.  Let's see.  February 5th.  I see that.  I don't know that I've ever seen this before.  It doesn't ring a bell.  It doesn't look like I was copied on it, unless I'm missing it, but yeah.

Q.  Okay.  Ultimately you replaced Dr. Bender with Dr. Mirsky.  Do you recall that?

A.  I remember that Dr. Mirsky got involved, yes.  I don't remember him.  Yeah, I remember Dr. Mirsky came in.

Q.  Okay.  Do you recall that Dr. Bender never evaluated Mr. Runyon?

A.  I don't.

Q.  I ask you to look at Defense Exhibit 177.

A.  Okay.

Q.  And this is an e-mail dated May 26th of 2009 from Dr. Bender to Mr. Hudgins.

A.  Okay.

Q.  And if you can see in the second e-mail down there, the one that was sent at 4:28 p.m., Mr. Hudgins represents that the trial date is quickly approaching, so I think it's best if we go ahead and schedule David's evaluation with Dr. Bender.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                          2256

A.  I mean, I don't know what you are asking me.  I mean, If you want, just to give it some context, I don't believe I got this, but, I mean, while we were working -- I mean, I wasn't involved in every call and e-mail.  Steve was getting experts.  He was experting the case.  I mean, he would sometimes ask me if I'd heard of a guy because I have done this or knew somebody, but, I mean, yeah, this says what it says, but I don't think I've ever seen this before.

Q.  I understand.  I just wanted to ask if you were aware of it.

MR. LEE:  Your Honor, I move this to be admitted under the Court's ruling last Friday that materials can come in under the exception for the declarant unavailable.  This is an e-mail to Mr. Hudgins.

THE COURT:  It's admitted.

(Defendant's Exhibit 177 received in evidence.)

THE COURT:  Did you object?  Were you going to?

MS. McKEEL:  Well, Judge, I'm not sure why it's being admitted.  Is the reason because Mr. Hudgins is deceased?  The 804(a) reason?

THE COURT:  I don't know that it's relevant. That's my problem.

MR. LEE:  I think I get -- at least I'll wrap up my point.

THE COURT:  I know all about Dr. Nelson.  I know

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                           2257

all about Dr. Bender.  I know about Dr. Mirsky.  I know all about Dr. Merikangas because most of this came out with Mr. Babineau, and then Mr. Hudgins before, but he was not retained, as I understand it.  If he was, they decided not to use him.  I don't know the point because they did get a neuropsychologist, Dr. Merikangas.

MR. LEE:  I just wanted to close this up with one more document, Your Honor.

BY MR. LEE:

Q.  Mr. Woodward, if you could look at Defendant's Exhibit 196.  And this is an e-mail sent the same day, May 26, 2009, from Mr. Hudgins to Dr. Bender.  And you can see at the -- it's about a half an hour after the previous e-mail at 5:07, and Mr. Hudgins tells Dr. Bender that we may be taking a different tact in Mr. Runyon's case?

A.  Just so the record is clear, resource counsel would have been David Bruck, not me.  I was not -- David Bruck was our resource counsel.

Q.  Very good.

A.  So, but again, I know that -- I mean, David Bruck knows a lot about experts, and I know Steve was -- he was helping Steve, but I don't see this -- I didn't see this.

THE COURT:  This is a note?

MR. LEE:  Yes.

BY MR. LEE:

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2258

Q.   You also testified on direct that you worked through a lot of the mental health evidence, and you were doing that for a period of several months; is that correct?

A.   I don't know if it was several months, but certainly when the guilt/innocence phase was over, we pivoted to sentencing, and I, you know, got everything, read it and looked at it and was talking to Steve about using it, and, yeah, I mean, I certainly was involved in the decision.

Q.   Do you remember the names of the experts for the government?

A.   I remember Patterson and Montalbano, but to be clear, I only remember them because I saw -- I wouldn't have remembered them if I hadn't seen the e-mails.

Q.   And Dr. Patterson is a psychiatrist and Dr. Montalbano is a psychologist.  Does that --

A.   If you -- yeah.

Q.   I'm going to ask you to look at Government's Exhibit 55A.

A.   Defense, you mean?

Q.   Government's Exhibit 55A.

A.   Government's Exhibit 55A.  Is that in this book here?

Q.   I think it's in the front.

A.   You have Government's exhibits in here, too.  I got you. I see it on the screen.

Q.   And can you confirm -- if you would scroll down.

     Do you see the date around the middle of the page on

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                               2259

which Dr. Patterson conducted an interview with Mr. Runyon?

A.  Let's see if I can find it.  Which number is it?

Q.  It's on the second page right kind -- it's above the numbers, the paragraph above the numbered list.

A.  Yeah, on February 4th, 2009.  I see that there now.

Q.  Now, I'd like you to look briefly at Government's Exhibit 55B, and we are going to go to Page 6 here.

A.  All right.

Q.  And we are looking for the date of the clinical interview of Dr. Montalbano with Mr. Runyon.

A.  Yeah, I see it.  Looks like it is there under -- what's that Roman numeral, 27?

Q.  Correct.

A.  Interviews by Dr. Montalbano.

Q.  And what's the date?

A.  It looks like it is 2-20-09 and 2-21-09.

Q.  And those two dates, February 4th of 2009 and February 20th were very early in the development of the case, wouldn't you agree?

A.  I can't -- it doesn't feel like it was.  I can't remember when I got appointed, but it was -- you know, it was somewhat early on.  It wasn't the eve of trial, I'll grant you that.

Q.  Mr. Hudgins wasn't appointed until February 20th of 2009, right?

A.  If you -- okay.

JODY A. STEWART, Official Court Reporter

Q.   And subsequent motions that you filed for continuances made clear that you were -- you had a lot of work to do before you'd be prepared for the sentencing phase of the case.  Is that a fair characterization?

A.   Sure.

MS. McKEEL:  Judge, I'm going to object to leading.

THE COURT:  That's fine.  You can ask a more direct question on that one.

BY MR. LEE:

Q.   Do you recall the bases for your continuance motions?

A.   Well, I think that -- I don't recall specifically, but I think we would have needed time to prepare, you know, after Mr. Babineau got out.  We probably just needed time to prepare in general, and certainly there was a more of a retooling, or more -- if, you know, I was already fairly up to speed on the factual background and the -- that part of it, but we had somebody new taking over the mental health part.  So, sure.

Q.   But you testified earlier that the pleadings that were filed in this case were honest and truthful representations of the facts of the case, right?

A.   As far as I know.  I never filed anything I didn't think it was honest and trustful.

THE COURT:  Just for the record, Mr. Babineau had a conflict, and it caused a terrible delay in the case, from

Woodward, L. - Cross                                              2261

the Court's standpoint, because he had to get out, and the

Court had to continue it.  I believe it was set for March

3rd, and so that was the main reason, as I recall as the

trial judge, for the continuance, was that Mr. Babineau

developed a direct conflict, and so he had to be removed.

We went through all that.  Then the trial had to be taken

off the docket for March 3rd.  I think that's the date.  I'm

not looking at a docket sheet right now, but that sticks in

my mind as being the day that we were going to go forward,

and then Mr. Hudgins came in.

          MR. LEE:  Very good, Your Honor.

BY MR. LEE:

Q.  In February of 2009, there had -- Mr. Runyon had not been

evaluated neurologically or neuropsychiatrically by the

defense, had he?

A.  I don't know.  I mean, if you say he had -- I just -- I

mean, I really -- you know, I understand you're asking me.  I

was not the primary lawyer on that.  Mr. Babineau would know.

Assumes the way you are asking the question, the answer is

no.  But you are asking me do I know that sitting here today,

no, I don't know that.

Q.  And Mr. Runyon had not had neurological scans done as of

February 2009, as far as you know?

A.  As far as I know, no.  I mean, I don't know if he had it

or not.

                    JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                 2262

Q.  I'd ask you to look at Government's Exhibit 55B again.

A.  Okay.

Q.  I'm going to go to Page 30.

A.  Okay.

        MS. McKEEL:  Your Honor, I'm going to object to going into these reports.  My cross, this is now redirect. I didn't go into these reports.

        MR. LEE:  Your Honor, she asked him whether he went through all the mental health evidence.  I'm trying to get some responses about exactly what they did on that.

        THE COURT:  Well, the problem is that you called Mr. Woodward in your direct case.  You called Mr. Hudgins, and their testimony was there.  You had them on direct. Then we had this discovery violation, and that kind of turned things around as to modes of examination.

        So the Court was letting them go on cross-examination, but you're not really on cross-examination.  You would be at this point limited to what she asked about, not reestablishing things, going over things that have already been established.  You are limited to what was asked.

        MR. LEE:  She asked him did you work through mental health evidence, you know, think about it, consider it, over this period of time.  I'm just trying to get a little bit of detail.

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                2263

THE COURT:  Then go ahead.

BY MR. LEE:

Q.  Do you see on Page 30 where Dr. Montalbano says that only a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction?

A.  Which paragraph is that?  Is it the one starts, "Mr. Runyon flatly denied?"  Which paragraph?

Q.  I believe that is, and it's the last sentence of that paragraph.

A.  Okay.  There we go.  Yeah, I see that.

Q.  Do you know whether in -- or did you know in 2009 whether brain damage is a rule-out for a diagnosis of personality disorder?

A.  Ask me that question.  Did I know what?

Q.  Did you know in 2009 whether brain damage is a rule-out for diagnosing personality disorder?

A.  I mean, I don't know if I knew that 14 years ago or not. I knew enough to ask somebody that did know if I needed to, like an expert.  But I don't know if I knew it.

Q.  Were you aware under the DSM-IV in 2009 that that was the manual used by mental health professionals in diagnosing mental disorders?

A.  Sure.  I was -- I mean, I didn't know the number, but I knew DSM, had been around forever.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2264

Q.   Sure.  And you're aware that that manual is used and --
for health -- mental health professionals follow.

          MS. McKEEL:  Object to the relevancy.

          THE COURT:  Sustained.

          MR. LEE:  Your Honor, I'm following up on what they
knew about mental health evidence that they had before them.
Again, she testified that they went over this stuff, they
considered it.

          THE COURT:  He said he knew about the manual, but
if he needed something, he would call an expert.

          MR. LEE:  I just wanted to ask him about whether he
knew what the importance of the manual was to experts,
following the precepts of the manual.

          THE COURT:  Well, that probably depends upon what
kind of expert, but go ahead and ask him.

BY MR. LEE:

Q.   Are you aware that mental health professionals need to
follow the precepts of the DSM so that there is a general
consistency in diagnosis among mental health professionals?

A.   I would answer that this way.  I know that's what mental
health professionals say, but I know from 40 years of
experience that's not how it works, because they have the
same data and come to different conclusions frequently.

Q.   Okay.  I'm not talking about the conclusions, just to be
clear.  I'm talking about the process, what a diagnosis is?

                    JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                          2265

THE COURT:  He's answered your question.

MS. McKEEL:  Judge, Mr. Woodward is not a psychologist.

THE COURT:  He answered the question.  He said in his 40 years' experience, yes, they were supposed to use it, but they used it, and they came to different conclusions.

THE WITNESS:  Yes, Your Honor.  To be clear, certainly the DSM has a set of standards that if there is certain findings, that can lead to certain diagnoses, but it's not -- I mean, my experience, it's not a cookbook. It's -- the first test is who's doing -- who's reading the test, who is analyzing the person, what findings they make. But certainly all mental health experts rely to some degree on DSM.  I'm not debating that point.

BY MR. LEE:

Q.  Thank you.  Will you look now at Defendant's Exhibit 182.

A.  Yes.  Okay.

Q.  And do you see that this is an e-mail from Sheila Cronin to you and Mr. Hudgins?

A.  Yes.  I see, yes, it was.  I do see that.

Q.  Do you recognize your e-mail address?

A.  I do.

MR. LEE:  Your Honor, I'd move admission of Defendant's Exhibit 182.

MS. McKEEL:  Objection, relevancy.  It looks like

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                            2266

it's from a third party.

THE COURT:  What is the relevancy?

MR. LEE:  Well, Your Honor, get into the body of the e-mail, but basically it's an e-mail where Mr. Woodward and Mr. Hudgins received information that could have been used to impeach Dr. Montalbano.

THE COURT:  Well, Dr. Montalbano wasn't called.

MR. LEE:  Yes, but the government's also argued that they were worried about Dr. Montalbano testifying.

THE COURT:  Just ask him about the e-mail.  We will be here forever.  Just ask him about the e-mail.  It was their strategy.  Now, whether or not their strategy was good or bad or whatever is another matter.  So they had a ground to impeach him.  That doesn't mean that they felt they could impeach him, or that they wanted the other testimony in. But go ahead.  It will save time.

BY MR. LEE:

Q.  My only question is did you or anyone representing Mr. Runyon follow up on the information contained -- that was forwarded to you in that e-mail?

A.  I don't recall following up on it, but certainly it would have been my practice, that if we had gone with the mental health evaluation, I would have gone out and got everything I could find about the government's experts and then prepared. You used the term impeach, cross -- to cross-examine them

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                          2267

would be what I'd say.

Looking at this e-mail, I don't recall it, but it seems that this was the case where the defense in that case didn't even put on mental health evidence.  But, obviously, if the government is calling an expert, you get everything you can find about the expert, and you try to impeach him and cross-examine him and discredit him in front of the jury.

Any witness that's hurting your client, you try and discredit them in front of the jury, of course.  But if you're asking me did we follow up and go get all these pleadings and read them and prepare to cross-examine him in July, I didn't do that.  I mean, I don't know if Steve did or not.

Q.  Thank you.  Among the mental health evidence that you had leading up to the August 2009 sentencing was Dr. Mirsky's report.  Do you recall that?

A.  I recall that we had it.

Q.  Did you review Dr. Mirsky's report?

A.  I believe I did.  When I say -- I believe I read all of the reports that we had.

Q.  If you take a look at Government's Exhibit 36.  This has been admitted.

A.  Okay.

Q.  You had Dr. Mirsky's CV before August of 2009?

A.  I'm sure we did, yeah.

Woodward, L. - Cross                                          2268

Q.  Do you remember that he was the creator of the
continuance performance test, which is a standard measure for
assessing sustained attention in neuropsychology?
A.  I don't remember.
Q.  Do you recall there was a former chief of the laboratory
of psychology and psychopathology at the National institute
of Health?
        MS. McKEEL:  Relevancy, Judge.
        THE COURT:  Sustained.  He said he doesn't recall.
        THE WITNESS:  I don't recall anything about his CV.
I know we would have had it because we could never have
gotten to Court to approve him as an expert unless we
submitted his CV, but if your purpose is to ask me did I sit
down and do a comparison of qualifications amongst experts,
no.  I mean, I didn't do that, and I don't know if Steve did
or not.  If we had gone to the sentencing hearing with the
mental health stuff, Steve would have been the person that
was -- have been presenting that.  And as I testified
before, I relied heavily on his impressions of that.
BY MR. LEE:
Q.  Dr. Mirsky administered psychological testing to
Mr. Runyon, correct?
A.  Apparently he did, based on this report.
Q.  And if you look at Government's Exhibit 36 at Page 5,
under the heading "summaries and conclusions - preliminary."

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2269

MS. McKEEL:  Judge, I'm going to object.  We are on redirect, and it seems like what is going on now is that the petitioner's counsel are taking advantage of their discovery violations and going and backing, wrapping around with now Mr. Hudgins is deceased, all they can do is ask Mr. Woodward, and he's testified numerous times that Mr. Hudgins was responsible for that.  They put him on in direct, Mr. Hudgins.  This is redirect, and so what it looks like counsel is going to do is just going into all these conclusions on all these reports, which they did earlier.  This is redirect.

THE COURT:  It was done earlier.  We are not going to go back through all of these reports.  We will do based upon what he knows, and then if you want to put all, we will put in Mr. Hudgins' file, and you all can argue from that if you want.  But if it's not his file, and he doesn't know, he can't answer a question about it.  It's all there.  You had Mr. Hudgins.  You called him as your witness, and you had all these documents at the time.  You called Mr. Woodward, and you had all these documents.  That's been the whole problem here.  We would have been through with this in February, and we would have had the benefit of Mr. Hudgins, frankly.

But now what you are doing is trying to take advantage, in my opinion, of your discovery breach.  You had

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                            2270

these documents.  You had a chance to ask Mr. Hudgins.  You had a chance to ask Mr. Woodward.  When he says he doesn't know, you're not going to go into something that he doesn't know and just read things into the record.  You can argue the things that have been admitted.  You can argue that to me, and you can argue that to another Court.  You can argue the admitted documents, but there is no reason to go into all this with Mr. Woodward when he says he doesn't know.

MR. LEE:  And, Your Honor, what I intended to do is to follow up in this question about trial counsel looking at the mental health evidence and considering it and talking about it and working through it and the representations that were made on cross.  I would go through these phrases, these terms that the experts used, and ask whether Mr. Woodward, or to his knowledge, anybody else on the defense team went and found out what that meant.

THE COURT:  Why didn't you do it on direct?  You had these documents.  Why didn't you do this on direct testimony?

MR. LEE:  Well, I'm just trying now to follow up on the representations that they -- Mr. Woodward's statement, we considered these materials through all this time.

THE COURT:  He has given you general information, that's it.  Now you are trying to go back through all the things you wished you would have done but you didn't do it

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                          2271

because you knew the other side didn't have it.  When I say you, I don't mean you *per se* but the team you were on.  So I'm not going to let you go back through all of these documents and have Mr. Woodward read them into the record.  The documents can be admitted, as I've indicated, and you can argue from there.

MR. LEE:  Your Honor, there has been representations or arguments made earlier today about no one would know what these words meant.  So my questioning -- and it would be through a couple of lines, but would be, did you ask anyone what that meant?  Did you do any research?  Did you do any investigation?

THE COURT:  But that was from your witness that nobody knew what the words meant.  Those were questions to your witness as part of your case as part of your burden.  That's how they came up.  This is a different posture.  This is Mr. Woodward re-testifying after you called him as a witness in February on direct, because of the discovery violation, he's here now.  He said they generally discussed, and, Mr. Lee, you are experienced enough to know that in a case like this, one of the reasons that you have two attorneys is so that things are divided.  They are divided.  One attorney can't handle the presentation of everything with guilt and innocence, everything of mitigation, and everything of imposition of the death penalty and all of the

JODY A. STEWART, Official Court Reporter

experts.

He said what his role was, and he said to the extent that he discussed things with Mr. Hudgins. I'm not going to let you go back through all these reports. I will admit them, and you can argue from them, but we are not going to go back through all of this with Mr. Woodward after you've had him on direct.

MR. LEE: I just wanted to be clear about where I was going.

THE COURT: It seems like to me you are going back through all the reports. If that's not where you're going, then go another tact, then.

BY MR. LEE:

Q. Dr. Mirsky never submitted a final report; is that correct?

A. I don't know if he did or not. I mean -- and, you know, I would say this. I did not -- I mean, we decided, based mainly on the conversations with Steve. I'm not -- I mean, I listened to him. I respected him. I wasn't inexperienced myself. I knew the benefits and the dangers of mental health. I didn't go do -- I didn't trial prep the witnesses. I didn't do that. And I don't think Steve did that because we weren't planning to call them, if that was the nature of did we do research, and, you know, I didn't prep them to testify because they weren't testifying.

Woodward, L. - Cross                                                    2273

Q.   Okay.  Can I ask you to look at Defense Exhibit 41.  This has been previously admitted.  It's a September 18th, 2009, letter from Dr. Mirsky to Mr. Hudgins.

A.   Okay.  I'm not sure.  I mean, I couldn't say for sure.  I don't recall seeing this before, but I might have.  I mean, it doesn't look like --

Q.   I ask you then to look at the next to the last sentence of the second paragraph in which --

A.   "Such damage"?  It starts "such damage"?

Q.   The paragraph that begins, "While serving"?

A.   So the language such damage, is that --

Q.   Sorry, the next sentence after that.

A.   Yeah, again, I -- I see that language there.  I can't swear under oath I never read this letter.  I don't recall reading it, and I don't know what Mr. Hudgins did to follow up with Dr. Mirsky.

Q.   You just don't remember if the letter was shared with you or not?

A.   I don't.  Specifically this letter, I don't remember.

Q.   Would you agree that the last sentence represents that Dr. Mirsky is referring to a report given to him by Mr. Hudgins about the MRI and PET?

A.   That's the way it appears to read to me, you will report to me.  I would take that to mean that Mr. Hudgins had reported something to the doctor.

Woodward, L. - Cross                                              2274

Q.   Thank you.  Turning to Dr. Merikangas and leaving his report aside, like Dr. Mirsky, Dr. Merikangas never filed a final report either, did he?

A.   Again, I don't know what he -- I don't know.  If you say he did, I guess he did.  I don't know if he did or not.  Same answer.

Q.   I'd like to spend a minute looking at your billing records.

A.   Sure.

Q.   If you look at Defense Exhibit 173 and Defense Exhibit 174.

A.   All right.  Okay.

Q.   Just take a look.  Do you recognize this as your billing records?

A.   Yeah.  This is my -- some of my billing records.

          MR. LEE:  Your Honor, I'm going to move to admit these.  I think these are similar to what the government had, but not the same, but I'm just going to refer to them.

          THE COURT:  They have already been admitted.  They have been admitted, so we wouldn't need to admit them twice.  It would just make the record even bulkier.

          MR. LEE:  Thank you, Your Honor.

          THE COURT:  You can ask the clerk.  What exhibit number is it, Madam Clerk?  The government admitted it as?

          MR. LEE:  I'm not sure.  These are not -- there is

                    JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                    2275

no handwriting on these or anything like this.  I prefer that we just admit our exhibits.

THE COURT:  Admit Defendant's Exhibit Number 173 and 174.

MR. LEE:  And 174.

(Defendant's Exhibits 173 & 174 received in evidence.)

BY MR. LEE:

Q.  If you take a look at Exhibit 173, and you will see that you record telephone calls on these billing records, right?

A.  Yeah.  I mean, my practice is if it's a substantive -- I mean, I don't -- yes, I record phone calls when I feel like they accomplish some legal purpose, not just a call.  Yeah, I mean, I have certainly recorded phone calls.

Q.  If you look through, there is 11 pages of Exhibit 174. If you could just flip through quickly.  I'm going to ask you to confirm that there are no entries for telephone calls with Dr. Mirsky, no entries with telephone calls with Dr. Cunningham, and one entry for Dr. Mirsky.

A.  Well, I'm flipping through them, but I can tell you from memory, I don't remember ever talking to Dr. Mirsky.  I don't believe I ever did talk to him.  So it certainly shouldn't be.  I mean -- and with Dr. Cunningham, I think I testified before I knew him.  I recall that Steve and I met with Dr. Cunningham at a restaurant outside of the Portsmouth City

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2276

Jail one day --

Q.   Right.

A.   -- that he had seen Mr. Runyon.

          MR. LEE:  That's fine.  Thank you.

          THE COURT:  Let him finish his answer.

          THE WITNESS:  Yeah.  If you look on your -- I don't know, they are not paginated, Page 4, you have the phone call with Dr. Merikangas.  And when I originally testified about that, before I saw Steve's memo, obviously, that was a scheduled, you know, 3:30, call me, that was a scheduled call.  But, no, I don't -- I don't think I have ever said I talked to Mirsky or Cunningham.

BY MR. LEE:

Q.   Let me be clear.  We are looking at Exhibit 174.

A.   174.  I'm sorry.  I thought you said 173.  Okay.  Well, same.  Look, what 174, and nothing gets translated perfectly.  173 is the raw data that gets put onto 174, which is the sheet that comes to the Court for me to get paid.  So 173 and 174 should pretty much match up.  The difference is 174, the form the Court was using back at that time, had these columns along to write where you had to sort of niche in what you did, and if you look at my internal billing records, I just wrote down everything I did, and then it gets split out.  But, no, I don't think I ever talked to Mirsky on the phone.  I don't think I ever talked to Cunningham on the phone.

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2277

BY MR. LEE:

Q.  Okay.  And if you look at Page 7 of 11.

A.  In 174?

Q.  Correct.

A.  Okay.

Q.  You will find on August 13th, a single entry of telephone calls with Dr. Merikangas.

A.  Yep.

Q.  First, you'd agree that entry indicates that it's just a call between you and Dr. Merikangas, right?

A.  Well, yeah.  It does.  It doesn't say Dr. Merikangas and Steve Hudgins.

Q.  And you'd also indicate that that entry is, I think you mentioned this before in testifying, but it indicates that there was more than one call?

A.  Yes.

Q.  Do you remember how many calls there were?

A.  My memory -- I don't remember any calls.  I mean, but after seeing this in context with Steve's, and I don't know what happened to my memos, but seeing Steve's memo, it looks like we had a single call that day at 3:30, but I don't certainly remember multiple calls.  I don't even remember one call.  I saw a memo, and I see my billing records, and I would not have written down and billed the Court for something I didn't do.  So take all that and put it together,

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                        2278

I believe I was on the call with Steve and Dr. Merikangas.

THE COURT:  In other words, drawing inferences from everything that's in front of you?

THE WITNESS:  It appears I did talk to Dr. Merikangas with Steve.

BY MR. LEE:

Q.  But that's not what the entry reflects?

THE COURT:  You can argue that with me later.

MR. LEE:  Very good.

THE COURT:  I've seen all the documents, the memo that Mr. Hudgins did.  I've seen all these billing records, and I'll make the conclusion at the appropriate time.

BY MR. LEE:

Q.  Also now on Page 8 of 11 in the same Defense Exhibit 174.

A.  Okay.

Q.  The third line down is an entry for August 13th, "Memo to file regarding Dr. Merikangas' interview."  Do you see that?

A.  I do.

Q.  Your other entries on your time sheets all seem to include some kind of action, a verb, something that you are doing.  You travel to the jail, you research sentencing instructions.  You review the memo from Sheila Cronin.  This is on August 8 -- 12th -- or you're reviewing documents and CDs on August 14th.  But this entry doesn't have any kind of action, right?

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2279

THE COURT:  Which entry?

MR. LEE:  The third line down on Page 8 of 11 for document 174.

THE WITNESS:  To me making a memo is an action, but I'm not -- I'm not going to debate English with you, but I think that reflects what I did.  I made -- the first one is I called Mr. Samuels about something.  I worked on an exam.  I did a memo.  I traveled to the jail.

BY MR. LEE:

Q.  But the entry doesn't say making a memo.

MS. McKEEL:  I'm going to object.  This is his witness, and he is arguing with his witness.

THE COURT:  This is nit-picking.  It doesn't say making a memo.  Let's don't get into the semantics of the English.  If you want to argue that, he's got a telephone call.  That's an action.  He is working on an exam.  That's an action.  A memo to the file, that's an action.  He didn't say I met with.  It just says meeting.  Meetings is a noun, the same as memo is a noun.  Meeting with, telephone call, that's a noun.  He is not starting everything with verbs, and every one of these is an action.  Research on sentencing instructions.  If you want to argue that to the Court, but please don't argue that with a witness.

MR. LEE:  Your Honor, I was simply trying to get him to explain the absence of that, of any action there.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2280

THE WITNESS:  Let me say this.  If you are implying that I made that up, I find that problematic.  I would not have written down and sent this Court something saying I did something I didn't do.  I made the call.  I did the memo.  You all took my file.  The memos aren't around.  You find out where they are.  I did the memos.  If you are implying that I didn't, I find that offensive, and I'm just going to say that, and you can do with it what you want.

BY MR. LEE:

Q.  If I was implying that, I wouldn't blame you for finding offense.  I was absolutely not doing anything like that.  I wanted to try to clarify whether -- it is not clear to me from looking at this line whether you read the memo or conversed about the memo or --

A.  When I say memo to the file, that is something that I would have prepared.  It could have been handwritten.  I could have typed it and stuck it in the file.  But when I say memo to the file, in my language, that means I did a memo to the file.

Q.  I was trying to get that point of clarification.

The term "memo to the file" doesn't come up very often in your billing records, right?

A.  Yes.  I don't -- I don't write many memos to the file.  Look, I don't bill -- I mean, you know, if I write down two sentences saying, you know, Steve called me to talk about the

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2281

case, I mean, I just don't write a memo about everything I do.  So you're right, I would think they are not in here very often.  And I would expect when you look through my file, or whoever looked through it, you probably didn't find many memos.  You saw my -- ready for you and all the public to see my note keeping ability is already well-documented in this case.

Q.   And just another question about the memo to the file regarding Dr. Merikangas' interview, that could have been preparing for an interview with Dr. Merikangas, couldn't it?

A.   You know, it could, but I believe that -- have to look back at the record.  I thought that somebody showed me something today where I prepared.

            THE COURT:  They did.

            THE WITNESS:  I mean, I didn't just jump on that call and notice.  I mean, I thought I saw something earlier where I had prepared some stuff to talk to him about, but I don't have these records memorized.

            THE COURT:  Go back to the other page.  First of all, there is an entry that he's preparing for an interview.  This is the kind of cross-examination that doesn't get anywhere because the Court can see through it.  You are trying to throw up what I consider a "red herring."  There is an entry on here, you turn the page over, that says he is preparing for an interview with Dr. Merikangas.  Then he's

                JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2282

got a memo regarding Dr. Merikangas' interview.  Then he's got the contemporaneous entry and to Mr. Hudgins' file for August 13, 2009.

So you've got three pieces of paper, and any trier of fact, anybody making a decision, can draw reasonable inferences from the evidence that's admitted.  I don't even know what point you're trying to make.  It could have been this, it could have been that, you are talking 14 years ago.  So you turn the page over and show him, because that's not fair to be showing him one piece of paper when you know on the other page what it says.  Show him the page before that.

THE WITNESS:  It's 8-11-09.

BY MR. LEE:

Q.  Yeah, I think you testified to that.

A.  8-11-09, it looks like I prepared -- and as I said before, I'm not trying to hide anything.  I had a call with Steve Hudgins that day, and the order I write -- so what this says to me, and, again, I don't specifically remember, is that Steve had probably scheduled a meet with Dr. Merikangas.  He says, hey, Woody, review the reports, let's talk about what we ought to talk about to him.  I'm like, sure.  So it looks like on the 11th I reviewed the reports.  I made some notes to prepare.  I talked to Steve.  And then on the 13th we did the call.  That's what this -- if you look at my -- your Exhibit 173 on August 11th.

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2283

Q.  My only point is you had testified earlier you don't remember writing the memo?

A.  Like I say, I don't remember the call.  I just know that I -- that I wouldn't have billed for that if I didn't do it.

Q.  I realize it is speculative, Your Honor, but there was a Dr. Merikangas interview with Mr. Runyon that had happened like a week earlier.

A.  Right.  I mean, you know, like I said.

        THE COURT:  Wait.  This is his time, not Dr. Merikangas.

        MR. LEE:  I'm just saying that he could be writing a memo or could be a memo he is reviewing.

BY MR. LEE:

Q.  I'll just leave it.  You don't remember writing the memo, Mr. Woodward?

A.  I don't.  That's fair.  I don't have a specific memory of what writing or what I wrote in the memo.  That's true.

Q.  You testified earlier you don't have a memory of the substance of Government's Exhibit 92, the, quote, memo to file?

A.  That's Steve's memo?

Q.  No, the memo that the government presented about --

A.  Can I just see.

Q.  -- about a phone call with Dr. Merikangas.

A.  No, that's right.  I don't believe -- and I don't

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                              2284

know there would have been any -- I don't believe I ever saw that memo until yesterday, and that -- I don't have any memory, as I said.  It lines up with my records, and I don't think Steve would have written in there that I was on the call if I wasn't.  But we certainly did a call on August 13th, per my billing records.

THE COURT:  In your billing records?

THE WITNESS:  From my, yeah, I billed for the call.

BY MR. LEE:

Q.  In December of 2008 you filed a Rule 12.2 notice disclosing Dr. Mark Cunningham as an expert witness.  Do you recall that?

A.  Generally.  I know we were consulting and had Dr. Cunningham.

Q.  I'm going to ask you to look at Government's Exhibit 9.

A.  Okay.  It's up there.

Q.  If you look on Page 2 of that exhibit.

MR. LEE:  Your Honor, this is filed as ECF 135.

BY MR. LEE:

Q.  You see that you describe Dr. Cunningham as an expert whose testimony will describe developmental factors in Mr. Runyon's background, correct?

A.  Yeah, I mean, yeah.  Yes.

Q.  Will you look now at Government's Exhibit 14.

MS. McKEEL:  Your Honor, at this point this is

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2285

beyond the scope of my cross, because I didn't go into Dr. Cunningham at all.  I'm not sure where we are going with Dr. Cunningham.

THE COURT:  I sustain the objection.

MR. LEE:  Again, Your Honor, she went through -- she said did you look at all this mental health evidence?  Did you consider it?  Were you working with all this stuff?

THE COURT:  I sustain the objection.  Dr. Cunningham wasn't mentioned.  You've had Dr. Cunningham.  You've had him on direct.  You've had him over and over, and he filed this notice on Dr. Cunningham.  The notice says what it says.

MR. LEE:  That's right, but on cross, they went and asked whether they had been reviewing mental health evidence during this period, including Dr. Cunningham, who is a mental health expert.

MS. McKEEL:  He was called.  I didn't ask about Dr. Cunningham.  Defense called him at trial.

MR. LEE:  This is something that came up on cross.  If it's redirect.

THE COURT:  What came up?  Ask the question, and I will decide.

BY MR. LEE:

Q.  Tell you what, the point I'm getting to here is that Dr. Cunningham was given notice to testify to adverse

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2286

developmental factors.  Then he went into the report that was simply about risk assessment for violence in prison.  When it came to trial, the defense tried to present testimony from Dr. Cunningham about adverse developmental factors, and my question is, what happened in between?

THE COURT:  Are you entitled to know that from the standpoint of attorney-client relationship?  You can argue that to the Court.  What is your entitlement to know?  You've gotten their files.  What is the grounds on which you are then entitled?  You could have asked Dr. Cunningham what happened.

MR. LEE:  Well, because they brought up on cross.

THE COURT:  You could have asked Dr. Cunningham what happened.  You didn't ask him.  So there is no reason to be asking Mr. Woodward, if you didn't ask Dr. Cunningham.

MR. LEE:  We could have asked that, but on cross-examination they brought up.

THE COURT:  When?

MR. LEE:  Just a half an hour ago.

THE COURT:  They brought up Dr. Cunningham?  I never heard his name.

MR. LEE:  They brought up that they spent this time in -- in the spring and early summer of 2009 working with mental health evidence and analyzing it and considering it, and my question is here is how did this happen that they

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                           2287

presented a notice that Dr. Cunningham would present certain

opinion testimony, it came up at trial, although nothing

happened leading up to that to -- for Dr. Cunningham to do

that report or for anybody to supplement his report or

something like that.

         THE COURT:  Number one, you could have asked that

of Dr. Cunningham.  Number two, now you are getting into

what they decided, and Dr. Cunningham said, oh, he would

have been glad to do, I think, two reports, But a lot of

times he is only asked to do one.  Even if Mr. Woodward

knows.  Do you even know the answer to this?

         THE WITNESS:  Your Honor, could he ask that?  I'd

like to get this over with.  What is the specific question?

Ask.  If you would give me some -- I'd like to just answer

what I know about Dr. Cunningham so I don't get called

again.

         THE COURT:  That's fine.  Just answer what you

know.

         THE WITNESS:  What is the question?

BY MR. LEE:

Q.  Were you aware when -- that Dr. Cunningham's report was

limited to a violence risk assessment for Mr. Runyon in

prison?

A.  So let me start with the notes.  When you file a notice

in a case like this, as you well know, the notice you file it

Woodward, L. - Cross                                          2288

as broadly as possible.  You throw in there that somebody is going to testify to everything they might ever testify to so you don't get jammed up if you then come to court, and the prosecutor said, well, you didn't notify -- you didn't give us notice that he might testify to that.

My recollection is, after working with Dr. Cunningham, and Steve, again, I believe examined Dr. Cunningham and prepared Dr. Cunningham, that his best judgment was the best thing Dr. Cunningham could do for Mr. Runyon was this risk assessment.  I was not -- I didn't -- I don't remember what Dr. Cunningham's report said, but that's what I know about Dr. Cunningham.  But certainly, I mean, if you look at expert notices in this case and any case, any lawyer that doesn't file it real broadly is not doing what they are supposed to do.  So the fact that that's in there, I mean, I'm glad to see that it was because maybe we looked at it for that.

Q.  Also, you are aware that an expert wouldn't be able to testify to an opinion that wasn't included in his report?

A.  Sure.  You do a notice, engage the expert, they do their job, they tell you here is what I can say, then pursuant to the Court's deadlines, you file the report.  That's right.

Q.  And so did it surprise you when Mr. Hudgins asked questions about -- to Dr. Cunningham about Mr. Runyon's developmental history, even though Dr. Cunningham's report

JODY A. STEWART, Official Court Reporter

Woodward, L. - Cross                                                    2289

did not describe or give an opinion about Mr. Runyon's developmental history?

A.   I don't know if it surprised me or not.

MS. McKEEL:  Judge, we are going far afield here. We are here on a scope of, basically, petitioner has made Dr. Merikangas not getting scans and this social history part of the petition.

All right.  Now we are going into trial strategy about not presenting something else Dr. Cunningham could do, which Dr. Cunningham spent two days here during this part of the hearing.  So this doesn't have anything to do with their claim.

THE COURT:  Also, it could have been asked of Mr. Hudgins.  He's now talking about something that Mr. Hudgins did at trial, and he had Mr. Hudgins here. You've had Mr. Hudgins on direct.  You had Mr. Hudgins here. You could have asked Mr. Hudgins a question.  You didn't ask Mr. Hudgins the question, and it's too late now.

So this is not something Mr. Woodward has said; that that was Mr. Hudgins' role.  He was here.  You didn't ask him.  Move on.

MR. LEE:  Can I have one minute?

THE COURT:  Yes.

MR. LEE:  That's all, Your Honor.

MS. McKEEL:  No questions, Judge.

JODY A. STEWART, Official Court Reporter

2290

THE COURT:  Can I excuse Mr. Woodward?

MS. McKEEL:  Yes, ma'am.

THE COURT:  Thank you, Mr. Woodward.  You are excused.  Don't discuss your testimony until we resolve this hearing.

THE WITNESS:  That will be the easiest order I've ever followed, Your Honor.  Thank you.

(Witness excused.)

THE COURT:  Are you going to have the doctor ready tomorrow?

MR. SAMUELS:  We will, Your Honor.  That would be our preference.

THE COURT:  It is, because I know that there are people here that need to, as I keep encouraging everyone to vote, I still think I have a few people that need to go, and it's 5:20 now.  I don't want to start an expert tonight at this late hour.  You have him ready to go for tomorrow?

MR. SAMUELS:  We do, Judge.  He will be our last witness, Your Honor.

THE COURT:  Then we will adjourn.  Do you think you can finish him tomorrow?

MR. SAMUELS:  I do.

THE COURT:  Then we will adjourn until 11:00 a.m. tomorrow morning.

MR. SAMUELS:  Thank you, Judge.

JODY A. STEWART, Official Court Reporter

2291

(Hearing adjourned at 5:19 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.

X_____/s/_____x

Jody A. Stewart

X_____11-29-2023 _____x

Date

JODY A. STEWART, Official Court Reporter