2292

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

```
- - - - - - - - - - - - - - - - - - -
                                    )
  UNITED STATES OF AMERICA,         )
                                    )
  v.                                )   CRIMINAL ACTION NO.
                                    )   4:08cr16
  DAVID ANTHONY RUNYON,             )
                                    )
          Defendant.                )
                                    )
                                    )
          AND                       )
                                    )
  DAVID ANTHONY RUNYON,             )
                                    )
          Petitioner,               )   CIVIL ACTION NO.
                                    )   4:15cv108
  V.                                )
                                    )
  UNITED STATES OF AMERICA,         )
                                    )
          Respondent.               )
                                    )
- - - - - - - - - - - - - - - - - - -
```

TRANSCRIPT OF PROCEEDINGS

DAY 14

Norfolk, Virginia

November 8, 2023

BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge

JODY A. STEWART, Official Court Reporter

2293

APPEARANCES:

      UNITED STATES ATTORNEY'S OFFICE
      By:  Brian Samuels
          Lisa R. McKeel
          Assistant United States Attorneys
             And
      DEPARTMENT OF JUSTICE
      By:  Carrie L. Ward
          Counsel for the United States

      VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
      By:  Elizabeth J. Peiffer
          Robert Edward Lee, Jr.
             And
      ALI & LOCKWOOD LLP
      By:  Kathryn M. Ali
          Counsel for the Defendant

2294

## I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GEOFFREY AGUIRRE, M.D., PH.D., | 2299 | 2390 | 2486 | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

## E X H I B I T S

| GOVERNMENT'S NO. | PAGE |
|---|---|
| 75 | 2314 |
| 133 | 2303 |

| DEFENDANT'S NO. | PAGE |
|---|---|
| NONE | |

| COURT'S NO. | PAGE |
|---|---|
| 9 | 2397 |
| 10 | 2453 |

JODY A. STEWART, Official Court Reporter

2295

(Hearing commenced at 11:09 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  Government is ready.

Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Peiffer, Ms. Ali, Mr. Lee, is the defendant ready to proceed?

MS. ALI:  We are.

Good morning, Your Honor.

THE COURT:  Good morning, Ms. Ali.

Let the record reflect that Mr. Runyon is here.

You are David Anthony Runyon?

THE DEFENDANT:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.

Counsel, before we proceed today, I want to go back to one matter that we discussed yesterday and to refresh my memory because my memory had been different than what Ms. Peiffer was offering to the Court.  If you would come back up to the podium, Ms. Peiffer.

Ms. Peiffer raised the issue or the matter of

JODY A. STEWART, Official Court Reporter

2296

putting a proffer of Ms. Barrett's testimony into the record on the assertion that the Court had denied her testimony. The Court did not deny her testimony, and I will go back and refer you to that portion of the transcript and read you what the Court ruled.  The Court ruled on the motion *in limine*.  The Court said she could testify as to the standards at that time, but she could not issue an opinion on the ultimate issue in this case, whether or not there had been ineffective assistance of counsel.  I'll read you that portion of the transcript and tell you where it is.  I also said yesterday she could testify, you have her listed, but we are certainly not going to take a proffer of Ms. Barrett on what the standards are at the time.  You're talking about law to a judge and law to other attorneys without her having to be cross-examined by the United States and questioned by the Court.  We are not going to start making it like a proffer as a brief.  I will read you what the Court's ruling was, and the Court stands by that ruling.  You have her listed, and if you want to call her, you can, the same as I said yesterday.

The transcript of proceedings was on day 5, February 13, 2023, and it was a conversation with Ms. Bales. We were talking about planning witnesses.  There was Dr. Nadkarni who was mentioned, but the important discussion and ruling, Ms. Bales starts speaking at the end of Page

JODY A. STEWART, Official Court Reporter

2297

984, and she says:

"Ms. Bales:  Okay.  Thank you, Your Honor.  Just listening to the Court speak, I think I need to clarify one issue.  Ms. Barrett, she is going to testify to the prevailing norms, and, you know, there is testimony in her declaration.  She does render" -- and I think this is a typo.  "She does render an appeal."  I think she means opinion, "that trial counsel was ineffective.

"The Court:  I'm not going to let her render that. She may not render an opinion on the ultimate decision.  She can testify as to the norms, and then you can argue that to the Court.  Under what she's testified and what occurred, that's why they are ineffective."  In other words, that's what you can argue.

The ultimate issue is up to the Court, the Fourth Circuit, but not up to Ms. Barrett to make an ultimate conclusion on this.  I finally ended that page, I said, "I'm going to let her testify as to what the standards are in her experience.  But when it comes to testifying on the ultimate question of whether they were effective or not effective, that's up to the Court and the courts."

So the motion *in limine* was there.  I have ruled upon it.  My ruling hasn't changed, and it's basically the same as it was yesterday.  You're not going to give this in a proffer of the law according to Jean Barrett, and you're

JODY A. STEWART, Official Court Reporter

2298

not going to give anything on the ultimate issue, but you certainly can offer her as a witness.  She can testify in her opinion what the standards were, but that is very important testimony from the standpoint of the need for examination.

Certainly, you can present it, the other side, the United States would cross-examine it, and the Court could obviously ask questions because you're dealing with somebody testifying about legal standards to the Court.

Do you have any questions over the Court's ruling?

MS. PEIFFER:  No, Your Honor.

THE COURT:  Well, I would suggest that you go back and look at this transcript of day 5 when the Court is addressing it.  It's basically over on the bottom of 984 through 985.  That remains my ruling as it was then.

Let's continue with your next witness.

MS. WARD:  Thank you, Your Honor.  The government calls Dr. Geoffrey Aguirre.

THE COURT:  Dr. Aguirre, if you will please come forward and be sworn.

(Witness was sworn.)

THE COURT:  Before we start, Ms. Ward, I'm going to remind you to keep your voice up and speak slowly and distinctly.  I'm going to ask you, Dr. Aguirre, to be sure you speak into the microphone and keep your voice up so we

Aguirre, G.  - Direct                                          2299

can hear you.  It's a big space we are in.

THE WITNESS:  Okay.

MS. WARD:  Yes, Your Honor.  Thank you.

GEOFFREY AGUIRRE, M.D., PH.D., called by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. WARD:

Q.  Dr. Aguirre, can you please give us your full name and spelling your last name for the record.

A.  My name is Geoffrey Aguirre, spelled A-g-u-i-r-r-e.

Q.  Thank you.  Would you tell us what is your current position?

A.  I'm a professor of neurology at the University of Pennsylvania and a member of the Hebrew Neurology Division of the hospital of the University of Pennsylvania.

Q.  How long have you held that position?

A.  Well, I've been on the faculty at Penn since 2004, and then moved up from assistant professor to associate to full professor over that time.

Q.  And what graduate degrees do you hold, Doctor?

A.  An M.D. and a Ph.D. in neuroscience.

Q.  And when did you obtain your degree?

A.  1999 and 2000.

Q.  In your practice do you also do research?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                            2300

A.   I do.

Q.   What is the focus of your research?

A.   I study higher level human brain function using principally magnetic resonance imaging techniques, so measurement of the brain using MRI imaging.

Q.   Do you also have a clinical practice?

A.   I do.

Q.   What is the nature of your clinical practice?

A.   So I'm an attending physician at the University of Pennsylvania Hospital, so that means I spend time running the consult neurology service but in the hospital.  I go around and see patients with neurologic disease, and I attend in the neurology residency clinic in that role, see patients principally with the neurology complaints in the outpatient setting.

Q.   And just to get a sense of the number of patients that you see, can you estimate the approximate number of patients that you would see annually?

A.   I think it's on the order of 200 to 300, but that is going to vary by year.

Q.   And when you say clinical, what does that mean?

A.   Clinical work involves seeing patients and taking history and ordering tests and evaluating results and providing appropriate care.

Q.   Does that involve any kind of examination?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2301

A.   Yes.

Q.   What kind?

A.   So I conduct a neurologic examination on -- a physical neurologic examination and a cognitive neurologic examination on every patient I see.

Q.   And does that involve any kind of testing?

A.   Yeah.  There are components of the behavioral neurology examination that involve tests of memory and cognition and language, and things like that.

THE COURT:  In what like that?

THE WITNESS:  Oh, and visual/spatial representation, test in frontal lobe function, test of coordination.

BY MS. WARD:

Q.   Thank you, Doctor.  If we can have Government's Exhibit 133.

THE COURT:  That's his CV, is it not?

MS. WARD:  It is, Your Honor.

THE COURT:  You can bring it up on the screen.

MS. WARD:  Not quite yet, Your Honor.

THE COURT:  I have a copy.

MS. WARD:  Thank you, Your Honor.

Madam Clerk, if I can use the Elmo.

BY MS. WARD:

Q.   Dr. Aguirre, I'm showing you what's been marked as

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                        2302

Government's Exhibit 133.  Are you familiar with this document?

A.  I am.

Q.  Can you please tell us what that is, please.

A.  This is my CV from January of this year.

Q.  In the copy that we have, I'll flip through it briefly so you can verify.  What's been marked as 133 is 17 pages.

THE COURT:  Is there a question?

MS. WARD:  I'm just letting him check each page, Your Honor, just to make sure it is full and accurate.

THE COURT:  I have 16 and a back page.  Doesn't have a number, but it would be Page 17.

MS. WARD:  Yes, Your Honor.

THE COURT:  Looks like it's an update for October 30th, 2023.

MS. WARD:  Yes, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, is that 17 pages, plus the list of testimony, is that a full and complete copy of your curriculum vitae?

A.  As of January my curriculum vitae and then my legal activity as of October, yes.

Q.  Okay.  Is it generally accurate and up to date?

A.  Yes.

MS. WARD:  Your Honor, I'd move to admit

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2303

Government's Exhibit 133.

THE COURT:  All right.  It's admitted.

MS. WARD:  Thank you, Your Honor.

(Government's Exhibit 133 received in evidence.)

BY MS. WARD:

Q.  Dr. Aguirre, what is the Center for Neuroscience and Society?

A.  That is a center at the University of Pennsylvania that draws faculty from multiple schools, the school of medicine, and the school of arts and sciences, from the law school, and the center focuses on topics related to the ethical, legal, and social implications of neuroscience advancements.

Q.  And do you hold a role within that organization?

A.  I'm the associate director of that --

Q.  And what does that -- I'm sorry.  Go ahead.

A.  That's it.  I'm just the associate director.

Q.  And what does that entail?

A.  I help organize events that the center sponsors on campus, invite speakers, advise the students that have educational activities within the center.

Q.  And what is the neurology residency program?

A.  The neurology residency program is the educational component of the neurology department that trains doctors after they've completed medical school in the practice of the specialty of neurology.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2304

Q.   And what is your role in that organization?

A.   I am associate director of their residency program.

Q.   And I should have asked, how long have you held these positions?

A.   Oh, I'd have to refer to my CV to be sure.  It's been some years, I think -- I believe at least a decade in these roles.

Q.   You said at least a decade?

A.   I think so, yes.

Q.   Thank you.  And what work do you do, Doctor, that involves reviewing brain images?

A.   Well, that happens in two settings.  So first -- perhaps three.  In a clinical setting, when I see patients, it's quite common to order brain imaging studies as part of our evaluation, and part of my role as a clinical neurologist, that is to review the results and the images from those studies and interpret them in terms of the clinical presentation of the patient.  That's one role in which I see these images.

         Most of my research makes use of MRI imaging as the key technique, and so we obtain brain scans on both healthy control populations and a variety of patient populations as part of that research, and so I'm frequently looking at brain images as part of conducting those research activities, and then I think a third setting I describe is an educational

Aguirre, G.  - Direct                                          2305

setting.  So we hold case conferences and teaching activities for neurology residents and for medical students in which we review neurological cases and look at brain imaging as part of that educational activity.

Q.  Dr. Aguirre, are you familiar with behavioral neurology?

A.  I am.

Q.  Can you please explain to the Court what that is?

A.  Behavioral neurology is a subspecialty of the practice of neurology.  So within the world of clinical neurology, there is a number of subspecialties focused on things like headaches or seizures or strokes, and behavioral neurology is yet another one of those subspecialties, and getting this discipline, which is also known as -- interchangeably as cognitive neurology, we focus on disorders of higher level cognitive function, so thinking, memory, language, spatial attention, disorders, so diseases that affect those components of cognition.

Q.  Can you explain to the Court what is a recognized subspecialty in neurology?

A.  Well, it's a bit of a complicated topic, but there is the -- there is an organization called the ACGME, which I believe stands for the American College of Graduate Medical Examiners, and that is an organization that certifies educational activities that physicians engage in after the level of medical school.  And in recent decades the ACGME has

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2306

set up programs to certify some subspecialties of neurology.

Q.  Are you, sir, recognized as a specialist in behavioral neurology?

A.  I suppose it depends on what's meant by recognized.  The ACGME does not have a separate category for behavioral neurology nor do they have such categories for headache or, I believe, mood disorders either because they principally focus on certifying subspecialties that have a procedural component in which the physician actually has to do a test on the patient using, you know, an instrument.

So they haven't created certification standards in the same way for these other specialties that lack procedures of this kind.

Q.  Is it fair to say that your expertise predates the initiation of these certification procedures?

A.  I think that's true.  I started my training in -- I started my -- completed my residency in 2004.  At that time there really -- this structure didn't exist for certification.

Q.  Does your research focus at all on behavioral neurology?

A.  So my research over some decades now focuses on various aspects of higher level cognitive function.  A lot of my work focuses on vision, but over the years I have done work on language, frontal lobe function, visual/spatial representations, that's information about how we represent

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2307

things in space, and the kinds of symptoms that arise after different kinds of neurologic disease.

Q.  And how does that factor into your professional experience and practice?

A.  Well, I suppose that there is a bit of a synergistic relationship that I see patients and learn things from them, and then that prompts questions that I study in the lab.

Q.  And, sir, are you a member of the Division of Behavioral Neurology at the University of Pennsylvania?

A.  I am.

Q.  And what does that mean?

A.  That means that I, along with a set of my colleagues, are recognized by the health system as being qualified to see patients with this particular set of diagnostic problems. One concrete example of that is that we are an example of the set of physicians that qualify to perform brain death examinations, whereas not all physicians are qualified to do so.

MS. WARD:  Your Honor, at this time the government seeks to offer Dr. Aguirre as an expert in neurology and behavioral neurology.

THE COURT:  This Court so qualifies him.

MS. WARD:  Thank you, Your Honor.

THE COURT:  Ms. Ali indicated she did not wish to inquire.

Aguirre, G.  - Direct                                              2308

                 MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, how much of your practice involves
consulting in criminal cases?

A.  Oh, not much.

Q.  Have you ever served as a consultant in a capital case?

A.  I have.

Q.  How many times?

A.  Well, let's see.  Over 15 years I think I have done
billable work in six cases.

Q.  You said six?

A.  Yes.

Q.  Thank you, Doctor.  And how many of those cases were you
working for the government?

A.  All of them.

Q.  Have you ever been contacted to consult with a defense
team?

A.  I have not.

Q.  What would you do if you got the call from a defense
attorney?

A.  Well, I'd be very happy to talk to them.

Q.  Have you ever testified in any capital proceedings?

A.  On one occasion.

Q.  And do you recall the name of that case?

A.  That was *U.S. versus Sampson*.


                 JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                            2309

Q.  Do you hold any personal views about the death penalty?

A.  I do.

Q.  Would you please explain a little bit about that to the Court.

A.  Well, I'm not particularly a supporter of the death penalty, and so given an opportunity, I would vote to remove it in the legal system.  But I find myself in a position that I'm also -- wish to advocate for accurate representation of neuroscience and medical information in a legal setting, at least as I view it, so I find those two things in conflict, and I end up coming on the side of testifying.

Q.  Thank you, Doctor.  It's true that you're not a neuroradiologist; is that accurate?

A.  That's right.  I'm not a neuroradiologist.

Q.  Can you please explain the difference between a neuroradiologist and neuroscientist or a neurologist like yourself?

A.  So a neuroradiologist is a medical specialty in which the physician focuses on the interpretation of images that are obtained of the brain and the central nervous system, more generally, and has their expertise entirely devoted to the acquisition and interpretation of those images.

        Neurologist actually has experience examining patients and interpreting the history that one would take from a patient, their examination, as well as integrating the

Aguirre, G.  - Direct                                         2310

findings from imaging of other studies.

Q.   Dr. Aguirre, what sort of problems do your clinical patients present with?

A.   Well, so they -- their symptoms are generally in the area of impairments in memory and learning and language function and impulse control and behavior and memory, things like that, and this is as a consequence of a variety of diseases, including things like dementing illnesses, such as Alzheimer's disease, strokes, seizures, traumatic brain injury, for example.

Q.   Would your practice include analyzing and studying brain images for some of those patients?

A.   Yes.

Q.   Are you familiar from your experience with the different methods that are used to obtain brain imaging?

A.   Yes.

Q.   And can you please explain some of those different methods.

A.   Well, briefly, MRI scanning is probably the most commonly used technique for making high quality structural images of the brain.  It could also be used to make other kinds of measurements, including functional measurements of the brain, which is another area that I use in my research.

          There are other imaging techniques, such as PET imaging or positron emission tomography imaging, which is a

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2311

way of measuring, I would say, broadly speaking, probably related to the activity of metabolic activity of nerve cells within the brain.  They can be used in other ways as well.

Q.  Dr. Aguirre, when were you first retained by the United States in this case?

A.  I think it was November of 2022.

Q.  And what is your hourly rate?

A.  $1,000 an hour.

Q.  I'm sorry?

A.  $1,000 an hour.

Q.  And how much have you billed approximately to date?

A.  I think it's about 22 hours.

Q.  Does that include your testimony?

A.  No, it does not include my testimony.

Q.  How much of that time, the 22 hours was from this week?

A.  Oh, I don't think -- 22 hours predating the current week.

Q.  Fair enough.  And how many hours have you spent working on the case this week?

A.  I'd have to try and tally it up in my head.  It is going to be on the order of another ten hours.

Q.  And you arrived here in Norfolk on Monday, November 6th; is that right?

A.  Yes.

Q.  How much of your time was spent consulting with us, with the Government counsel?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                    2312

A.   Let's see.  So we had about an hour or so meeting on Monday night and then another hour or two meeting on Tuesday morning.  Let's see.  And then I suppose a brief interaction this morning.

Q.   And prior to this week, we did not do consultations or prepare your testimony?

A.   No.

Q.   Were you asked to review images in this case?

A.   I was.

Q.   Is it fair to say that you were not asked to do neurocognitive testing in this case?

A.   I was not asked.

Q.   Did you perform any examinations?

A.   I did not.

Q.   Okay.  But you did review some material from the prior experts in this case?

A.   I did.

Q.   Do you recall the materials that you reviewed from 2009?

A.   Let's see.  There was reports from Drs. Mirsky, Merikangas and Montalbano, are an example of some of the materials I reviewed from that time.

Q.   Do you recall Dr. Patterson?

A.   I do.

Q.   Did you review the 2009 MRI scans?

A.   I did.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2313

Q.   Do you recall who ordered those scans?

A.   I don't know precisely who ordered them, but I believe they were ordered by the defense team.

Q.   I didn't hear.

A.   I believe it was a member of the experts, the defense team that arranged for the obtaining those MRI scans.

Q.   Thank you.  Dr. Aguirre, did you write a report in this case?

A.   I did.

Q.   Pull up Government's Exhibit 75.  Dr. Aguirre, are you familiar with this document?

A.   I am.

Q.   We will slowly scroll through -- I believe it is six pages -- to make sure it is full and accurate.  Is this the report that you prepared for this case?

A.   It is.  Looks good so far.  Yep.  Yes.  Yes.  That's it.

Q.   Is this a full and accurate copy of your report?

A.   I believe so, yes.

Q.   Is that your signature at the bottom of Page 6?

A.   It is.

Q.   And does this report accurately reflect your findings in this case?

A.   Yes.

        MS. WARD:  Your Honor, we'd move to admit Government's Exhibit 75.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2314

THE COURT:  All right.  It's admitted.

MS. WARD:  Thank you, Your Honor.

(Government's Exhibit 75 received in evidence.)

BY MS. WARD:

Q.  Dr. Aguirre, from the materials that you reviewed, do you know if any of the experts made findings regarding Mr. Runyon's purported history of head trauma?

A.  Yes.  So some of -- yes, the experts who -- the various experts offered opinions regarding at trial, yes.

Q.  From what you reviewed did any of those incidents stand out as potentially substantial episodes of trauma?

A.  Well, I think the incident in 1996 was the one that had the clearest documentation suggestive of an incident of head trauma.

Q.  Do you recall the incidents from Mr. Runyon's childhood?

A.  I recall a description of an event that perhaps took place at the age of 3 in which he was thrown or had a traumatic injury at the hands of his step-father or father.

Q.  Would you agree, from the materials that you read, that the trial experts generally accepted that Mr. Runyon experienced an incident of child abuse at approximately the age of 3?

A.  Yes.  So the reports I reviewed accepted that there was an injury that took place at the age of 3, yeah.

Q.  And that includes the reports that were generated in

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                            2315

2009?

A.  Yes.

Q.  By both government and the defense experts?

A.  Yes.

Q.  Did you agree and do you still believe they agreed that there was the possibility that Mr. Runyon suffered head or face trauma in that event?

A.  The events at the age of 3?

Q.  Yes.

A.  It's very hard to know.  I just don't really have a very clear understanding of actually what happened on that occasion or what evidence would be available to support the idea that there was, in fact, a traumatic injury.

Q.  Do you believe there was the possibility that Mr. Runyon may have lost consciousness in that incident?

A.  I suppose it's possible.  I really just don't know.

Q.  And you've read the reports of Dr. Merikangas and then Dr. Nedkarni's 2022 report; is that right?

A.  Yes.

Q.  Do you know if they attributed any physical injury to that incident?

A.  Right.  So a theme that appears in a number of these reports is the presence of weakness in the face, and that facial weakness in the description of this event from childhood is ascribed to this injury, to the traumatic event.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                2316

And in the end, I don't think that that -- the weakness that's described is very well explained by traumatic injury at that time.

Q.   Can I ask why you came to that opinion?

A.   So the facial weakness as described involves the side of the face, including the forehead, and that kind of pattern of weakness is caused by damage to the peripheral nerves, so the nerve after it's left the brainstem and is heading out towards supplying the muscles of the face.  So an injury to the substance of the brain itself wouldn't cause that kind of facial weakness.

What is much more common for both for kids and for adults is to have what's called a Bell's palsy, which is a type of weakness of the face where we don't know exactly what causes it, but we suspect it's a viral illness.  It is possible to have a traumatic injury that causes an injury to that peripheral nerve that supplies the face, but that's not a subtle injury.  That's a very big deal injury.

So that would be a traumatic injury that fractures the temporal bone of the skull and would be associated with typically prolonged loss of consciousness, hospitalization, potentially bleeding out of the ear.  So that kind of injury sufficient to fracture the temporal bone and cause a peripheral visual weakness strikes me as one that would be more than a dimly remembered story.  It would be a sort of

Aguirre, G. - Direct                                    2317

major component of his medical history.

Q. And do you recall, were there any reports as to whether Mr. Runyon's parents sought medical attention for him?

A. I didn't see any description of that.

Q. Which part of the brain, Dr. Aguirre, controls the face?

A. So up in the cortex or in the upper portion of the brain, there is something called the motor strip, which is located in a portion of the frontal lobe, and that's the area that has the neurons that control the muscles for the face.

Q. Would that be more in just the frontal lobe?

A. Well, it's at the very back of the frontal lobe. So there is a structure called the central sulcus that divides the parietal lobe from the frontal lobe, and right adjacent to that central sulcus is a portion of the brain, which is quite extensive, that controls all the muscle movement on the opposite side of the body, and the face occupies a fairly big piece of that representation of motor movement.

So if one -- if there was a lesion that was sufficient to cause weakness in the face as a consequence of damage to the brain, it would have to be a fairly substantially-sized lesion involving this part of the motor control area of the brain.

Q. And why is that?

A. Why is it that --

Q. Why would it have to be substantial?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2318

A.  Oh, just because it's a fairly big piece of brain.  There is a lot of neurons there that control, and we have a lot of control over the movement of our face.  So there is a large representation in the brain for controlling that aspect of the face.  There is an additional detail, and this gets in the depths of neurology, that a lesion that happens up here in the central part of the brain, cortex, wouldn't cause weakness in the forehead.  It would just cause weakness in the lower part of the face, which is another reason to doubt that the cause of the facial weakness is due to injury to the brain itself as opposed to damage to the peripheral nerve.

Q.  Did you find anything in the expert reports that would show, either in the historical reports or Mr. Runyon's self-reporting, a causal link between this incident and the resulting facial weakness?

A.  I think there was a description that sort of -- well, there is a description that the facial weakness dates to around the same time as this remembered episode of being thrown by the father, but I didn't see any other kind of causal description of a relationship between this.

Q.  So if you have a report of a potential incident that could have caused significant head trauma, what else would you look for before reaching that causal -- an opinion about the causation?

A.  Well, it would be helpful to see corroborating medical

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                2319

records dating from that time, changes in behavior or things after the injury took place that would suggest that there was an impairment of function or behavior in the period following the alleged injury.

Q.  Clinically, what would you expect to see if Mr. Runyon had a substantial brain injury at such a young age?

MS. ALI:  Objection, Your Honor.  None of this is in his report.  I'm happy to let him testify about it and cross-examine him about it, but if we are keeping to the same rules that have been applied, he is testifying way beyond the scope of what is specifically stated in his report.  I know I have made my position, and I think that's okay to go a little outside the bounds, but none of what he is testifying to is in his report.

THE COURT:  Well, he does talk about the episode. He lists that.  He reported at the bottom of Page 1, and then he talks about the facial asymmetry.  So let me hear the question again.

MS. WARD:  Yes, Your Honor.

BY MS. WARD:

Q.  Clinically, what would you expect to see if Mr. Runyon had a substantial brain injury at such a young age?

A.  Well --

MS. WARD:  Just one moment, Dr. Aguirre.

THE COURT:  I'll let that go forward because this

JODY A. STEWART, Official Court Reporter

is rebuttal, and it's in response to the testimony that the Court did let go in on Petitioner's direct case.  So it is proper testimony.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Would you like me to repeat it, Dr. Aguirre?

A.  No, I think I have it.  If there is a substantial traumatic brain injury at the age of 3, then one would expect to see a pattern of deficit to the behavior and function the years that follow.

Q.  Can you -- what would you be looking for?  Do you have examples?

A.  Yeah.  So missing developmental milestones, being held back in school, not being able to participate in outside of school activities, signs that the child is sort of falling behind the normal trajectory of growth and development in their intellectual and cognitive function.

Q.  And did you see any evidence of that in the reports that you reviewed?

A.  I didn't.  What I mostly saw was evidence of -- the description that he enjoyed going to school, that reportedly performed well in elementary school, that he engaged in activities outside of school, such as sports, including on a wrestling team, that he learned how to play the piano.  So these were all elements that would suggest a fairly normal

Aguirre, G.  - Direct                                        2321

developmental trajectory.

Q.  Mr. Runyon has reported in varying degrees episodes of head trauma during childhood, like playing football or wrestling.  What would you expect to find to corroborate those reports?

A.  Well, lots of folks have the experience of having hit their head at various times during their lives.  So it's a fairly common experience.  I suppose we could ask ourselves what would we look for to suggest or support the idea that there had been a substantial head injury capable of producing long-term change in behavior, cognitive function, and evidence for that would be evidence of medical care at the time, a change in the pattern of activities that the person engaged in in the period following.  Those would be the major things.

Q.  And did you see any of that in the reports or anything here?

A.  There is listed a number of descriptions of events in which there was a potential head injury, but all of those were fairly anecdotal without associated consequences or documentation that would support the idea that this was a head injury that rose to the level of even a concussion.

Q.  So even assuming Mr. Runyon suffered mild concussive incidents in childhood, were you able to form an opinion about the long-term impact of those types of incidents?

Aguirre, G.  - Direct                                                    2322

A.  So, again, having a concussion, or the milder blows to the head when one is a child, is a fairly common experience and not one that necessarily would be reflected in any sort of either functional performance or cognitive testing, and the main impression I had was that he made it through high school performing well, graduating with a 3.0, and doing well on the Armed Forces quantitative test, just around about the time in 1989 or so.

Q.  To your knowledge, was there any evidence that Mr. Runyon struggled with cognitive function prior to 1996?

A.  Not that I saw.

Q.  Let's fast-forward to 1996.  Mr. Runyon reported a motor vehicle accident in 1996.  Are you familiar with that report?

A.  Yes.

Q.  And what symptoms did he report as a result of that accident, to your knowledge?

A.  I have a description in the expert reports of symptoms of forgetfulness and irritability and disruption of sleep, all of which are suggestive of a concussion.

Q.  Do you recall any discussion of vertigo?

A.  Oh, yeah, and vertigo.

Q.  Can you explain what vertigo is to the Court?

A.  Vertigo is the sensation that you are moving or spinning even though you're stationary.

Q.  And what are some causes of vertigo?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                    2323

A.   There are many different causes of vertigo.  The one that's relevant here is that if you have a blow to the head, it can cause an imbalance in the vestibular system, which is the inner ear components that help you know where your body is in space and contribute to your balance.  There are lots of other potential causes of vertigo, but that's, I think, the main ones in here.

Q.   Did you reach any conclusions as to whether that 1996 car accident caused a concussive injury?

A.   I can't be certain.  There is a description -- reports of whether or not he lost consciousness varied, but the -- certainly, he had some physical injuries, including his knee and his shoulder.  It sounds like it's quite plausible that the airbag deployed in the car, if it had one.  So that would be a circumstance consistent with a mechanism of injury that could cause a concussion, and then he described a set of symptoms which are consistent with a concussion afterwards. So I take it on balance it's fairly likely that that was an event that produced a concussion.

Q.   And you understand that Mr. Runyon continued to report these symptoms of sleeplessness and vertigo for a period of months after the accident?

A.   That's right.

Q.   Clinically speaking, what does that tell you?

A.   Well, it's fairly typical.  Even though the injury is

JODY A. STEWART, Official Court Reporter

just in the moment, folks have these symptoms that go on for months afterwards.  What's generally true is that most people make a slow and steady recovery from the symptoms of a concussion, and in most cases on the order of around six months, that's when folks have started to recover from their symptoms.

Sometimes they can last a little bit longer, but what's described here, and that I have secondhand in these reports, is fairly typical of what a concussion looks like, with symptoms, many of which get better, some faster, some slower, some which persist a little bit longer.

Q.  Let's talk a little bit about the vertigo specifically. How long does it take -- generally, how long does it take to recover from vertigo?

A.  Well, I guess if I may address a close question of that, which is how long would it generally take for the symptom of vertigo to resolve following a concussion, and, again, for most folks it's on the order of six months or less or about that, sometimes a little bit longer, sometimes a little shorter.

There are some folks who go on to have a prolonged experience of vertigo after having a concussive injury, and our best medical understanding of that nowadays is that it's not that there is still injury to the balance systems of the brain, but instead people have developed a maladaptive sense

Aguirre, G.  - Direct                                    2325

of imbalance, and we call it persistent postural vertigo.

So some folks, unfortunately, have a persistent symptom of feeling unsteady, feeling like they are moving even though -- so the best of our understanding is the actual neurologic injury has healed at that point.

Q.   And how is that addressed if you have that presenting in a clinical patient?

A.   Yeah.  The main thing we try and get for folks is what's called vestibular rehab where they practice moving under different circumstances to effectively retrain their sense of balance.

Q.   In this case was there any reports or information that led you to your conclusion that Mr. Runyon was beginning to return to normal at around that six-month period?

A.   Well, again, what I have is kind of secondhand, but at least I found some descriptions of that he had returned to jump status in his role in the military, and some descriptions that he said that his memory had improved by that point.  So those were at least some elements to suggest that he was on a course of recovery.

THE COURT:  In other words, when you say jump status, would that be some type of airborne unit in the Army?

THE WITNESS:  My understanding was that he was in the military at that time, and after the injury was unable

JODY A. STEWART, Official Court Reporter

to perform some of his military duties, which included, to my understanding, jumping out of airplanes.  I think that's right.  And that but then after a period of time, he was about -- after about six months, he was able to then return to that activity.

BY MS. WARD:

Q.  And, Dr. Aguirre, contrasting that, what are the typical long-haul symptoms of concussive or traumatic brain injury?

A.  May I ask, do you mean for a typical in a concussive injury like this or for more severe injuries?

Q.  Let's start with more severe, and then we will talk about this one specifically.

A.  Okay.  Well, in folks who have -- there is a wild spectrum of the severity of a brain injury that somebody could have from a traumatic mechanism, and we call these mild traumatic brain injuries when folks have a blow to the head and have a period of time briefly -- when they have a brief period of time with an alteration in their level of consciousness, but then, though, as we know, lead to these months of disruption of dysfunction.  But there is a far larger spectrum of injuries that cause much more evidence of structural damage to the brain, bleeding within the brain, damage and depth to portions of the cortex, and those can lead to very evident disruptions of function that are quite permanent.  People will often have disruptions of memory of a

Aguirre, G.  - Direct                                    2327

particular type.  They will develop long-term memory impairment, so effectively amnesia, which is very characteristic of a consequence of having a more severe closed-head injury.  So real functional impairments can persist for folks after having a traumatic brain injury.

Q.  And then perhaps I don't understand the distinction, but how do you distinguish this particular type of reported incident?

MS. ALI:  Objection.  Clarification.  What type of reported incident?

MS. WARD:  The 1996 car accident.  I'm sorry.

THE WITNESS:  Yeah.  So my general impression of this 1996 accident was that it was what we might call a mild TBI, which despite its name is still a thing that can disrupt people's lives for many months.  But this seems like a mild TBI because he was treated and released from the hospital on the same night purportedly that this happened and that he made steady improvement and by six months was starting to reengage activities he had been in before.

And for mild TBI like this, for most folks they recover and go on with their normal life.  Occasionally there are folks who have some persistent symptoms, such as headache or vertigo, and there are treatments available, as I mentioned, for those.  For most folks a concussion like this is a thing that is disruptive for a period of time, six

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                                    2328

months, a year, but then they are able to return to their lives and have normal function.

BY MS. WARD:

Q.  Dr. Aguirre, do you have an opinion as to whether Mr. Runyon suffered one or more incidents of head trauma prior to the murder in 2007?

A.  Well, I think, as we reviewed this episode in 1996, I think there is pretty good documentation of that as an episode that was a traumatic brain injury, we'd call a mild TBI or concussion, and that was the one for which I defined in documentation.

Q.  And if you have reports of one or more incidents of head trauma, what does that mean to you from a clinical perspective?

A.  Well, it can account for the symptoms that the person had at the time of the injury.  You have one or two mild traumatic brain injuries, the general expectation is that this won't have a long-term measurable effect on the individual person.

Q.  When trying to determine if a head injury caused brain injury, what would you start looking for to corroborate that or to verify that?

A.  Okay.  So if one had the theory that a given episode, a given injury was sufficient to produce a long-term effect or permanent effect on intellectual or behavioral function, you

Aguirre, G.  - Direct                                              2329

would look for evidence that the person had a disruption in the function of their life so that there would be functional impairments in their day-to-day activities, and you would look for abnormalities on their neurologic examination, you would look for alterations in neuropsychological testing, you would look for evidence of structural changes on brain imaging.

Q.  So assessing the behavioral evidence first, what, if anything, did you see in this case to corroborate whether the head injuries led to brain injury?

A.  So by behavioral, may I ask, do we want to discuss first function in everyday life?

Q.  Yes.

A.  Okay.  So from what I can see, there was disruption of his life around the time of this concussion, but in the period following it, he continued to take on roles in different jobs and have advancement in these positions in the different roles he had, ultimately leaving different jobs because of what sounds like either stressors at home or conflict that he had with other people at the job.

     But at least the tasks that he was assigned to do in these different jobs, he seemed to be able to take care of quite well.  In fact, there was some reports that he described being bored in different roles he had because he found things he was doing a little bit too easy.  But he took

Aguirre, G.  - Direct                                        2330

on new jobs and new roles, learned new skills, and seemed to be functioning fairly well there.

Q.  So you read in many of the reports that Mr. Runyon suffers from grandiosity and delusions.  Can you explain, what is grandiosity from a clinical definition?

A.  So being --

MS. ALI:  Objection.  This is outside the scope of his report.  Again, I'm happy to cross him on it, if she wants to ask him about it, but where is this in the report?

THE COURT:  Well, she has him as a rebuttal witness.  This is part of the rebuttal of some of what you've done.  You can examine him on it.  I don't know that this is particularly important.

MS. ALI:  I'm just making the record that it's not in his report.

THE COURT:  That's fine.  You can cross-examine him on it.

BY MS. WARD:

Q.  Dr. Aguirre, what is grandiosity?

A.  Being grandiose is an example of a personality disorder where someone tends to inflate their personal role and descriptions of events and has an inflated view of their importance.

Q.  And did you see any information in the reports that would indicate that Mr. Runyon suffers from grandiose thoughts?

JODY A. STEWART, Official Court Reporter

A.  Well, so there is -- a number of the experts mention this as a feature of his personality, and one thing I'll say is that a number of the events that are described over the -- that describe events in which he might have sustained a head injury, have this property that they center Mr. Runyon in sort of a heroic or theatrically dramatic setting when these events are taking place, which I can imagine contributed to this impression that some of this description of the history might be inflated in some way.

Q.  And what are delusions?

A.  A delusion is a fixed belief about a thing that isn't supported by reality.

Q.  And did you find any evidence of delusions in the reports that you read?

A.  You know, not as much, and I think that's probably a little bit out of my scope of expertise, that that is getting into things that psychiatrists tend to focus on.

Q.  Can I ask you, are grandiosity and delusions, are those symptom markers of traumatic brain injury or impairment?

A.  No.

MS. ALI:  Objection, not in the scope of his report, and I understand that he is rebuttal, but he has met Dr. Nadkarni's report before he prepared his report, so anything that he wanted to put in to rebut Dr. Nadkarni could have gone in his report.  What they chose to put in

Aguirre, G.  - Direct                                        2332

his report, what he wrote in his report, was the scope of his rebuttal.  I'll let it go.  I'll cross him on it, but we didn't have notice that he was testifying on any of these issues.  It's not in his report.

THE COURT:  I think the question was, he answered they weren't in the scope of his expertise, and then she followed up on a question with that, and you went way outside of your reports.  I let everybody go.  I've opened the door for a lot by, if you look at Dr. Cunningham's, the answers go on sometimes for pages.  But, in any event, go ahead.  You asked the question, and I lost the second question when she stood up.

MS. WARD:  Yes, Your Honor.  Are these symptom markers of traumatic brain injury or impairment?

THE COURT:  He has been qualified as the expert in traumatic brain injury, and she's saying in his experience is this a marker.

MS. ALI:  He has been qualified as an expertise in neurology, Your Honor.

THE COURT:  Right.  He can answer it from the standpoint of his expertise as a neurologist and looking at what he's looked at in this case.  You can go ahead.

MS. WARD:  Thank you, Your Honor.  If I may, if I can just quickly comment and respond to the objection.  All of the experts did go far afield, as far as identifying

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                        2333

causation, linking the basis of their opinions to evidence in the record.  All of them went far beyond the written documents that were submitted.

THE COURT:  I understand.

MS. WARD:  Thank you, Your Honor.

MS. ALI:  I'm making the record that none of these opinions are contained in his report.  I understand that there were objections that the linking and the bases of the opinions and the opinions, when the petitioner's experts were testifying, but this is different.

These are new opinions that he is offering for the first time on the stand that are contained nowhere within the scope of the report.  I understand the Court's rulings. I'm prepared to cross him on it.  I will make do, but we didn't have notice that he was testifying on any of these topics, despite the fact that he was noticed as a rebuttal expert to Dr. Nadkarni and had Dr. Nadkarni's report before he prepared his report.

THE COURT:  Go ahead.

BY MS. WARD:

Q.  Dr. Aguirre, the behavioral neurologist, based on your experience and training, are grandiosity and delusion symptom markers of traumatic brain injury or impairment?

A.  No, they aren't.

Q.  And why not?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                      2334

A.   They are just not -- clinically, that's not what we see.
So we don't -- people who -- these are -- grandiosity, at
least, is a personality disorder.  We understand this is how
people are sort of wired in their -- from early ages.  They
display this kind of tendency to behave and have the
personality of a certain kind.  It's not traumatic brain
injuries cause somebody to become grandiose.

Q.   Are you familiar, sir, with the term "confabulation"?

A.   I am.

Q.   Can you please explain to the Court what that means.

A.   Confabulation is a clinical description of behavior that
patients engage in when they have amnesia, when they have an
impairment in their memory, and they attempt to fill in the
gaps of what they can't remember with fabricated details.

Q.   And based on the information that you've reviewed, do you
have an opinion as to whether Mr. Runyon has impaired memory?

A.   Actually, on neuropsychological testing, Mr. Runyon does
very well on tests of verbal memory.  So he doesn't have
findings suggestive of amnesia.  So I think it's doubtful he
actually has confabulation, *per se*.

Q.   Let's talk a little bit more about those neurological
tests.  Do you recall which doctor performed those tests and
reported the results?

A.   These are neuropsychological tests you are asking about?

Q.   Yes.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2335

A.   There were tests that were performed by Dr. Montalbano and Dr. Mirsky.

Q.   And do you recall anything specific in Dr. Montalbano's findings that would impact memory?

A.   Well, both -- so Dr. Montalbano found that performance on test of memory was really quite good, and it's for this conversation is worth noting there are different types of memory; there is short-term memory and what we might refer to as longer term memory.

          MS. ALI:  I'm going to object again, Your Honor. He has been noticed as a rebuttal to Dr. Nadkarni.  We are now talking about neuropsychological testing.  That was Dr. Martell.  Dr. Martell's report is not even listed on the materials considered list.

          THE COURT:  He didn't mention Dr. Martell.  He mentioned he reviewed the following materials.  That's on Page 1 of his report.  He's not talking about Dr. Martell, and I wouldn't let him talk about Dr. Martell because it's not listed as something he reviewed.

          MS. ALI:  He's talking about neuropsychological testing.  This is -- again, that was not the scope of Dr. Nadkarni's testimony.  We are way far afield of what he's here to provide.

          THE COURT:  Well, I heard him say that he was relying on others.  Who did you say?  You did not mention

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                    2336

Dr. Martell, did you?

THE WITNESS:  I did not.

THE COURT:  Who did you say?  I think you said Dr. Montalbano?

THE WITNESS:  Yes.  And Dr. Mirsky.

THE COURT:  And Dr. Mirsky.

MS. WARD:  If I may, Your Honor, we did provide -- realizing what we were facing in the experts that were presented over the course of this week, we did provide an updated list of materials that did include Dr. Martell's report.

MS. ALI:  Yesterday we got that.

THE COURT:  Have I gotten it?

MS. WARD:  No, Your Honor.  We just provided notice to defense counsel or *habeas* counsel.

THE COURT:  You did provide notice, and he is rebuttal.  Dr. Martell just testified, I believe, on Monday.

MS. WARD:  Yes, Your Honor.

MS. ALI:  They've had Dr. Martell's report since February, Your Honor, and yet we learned yesterday that they hadn't even provided him the materials.  He has not been noticed as a rebuttal witness to Dr. Martell.  It's totally outside the scope of his report.  We weren't even aware that he had been given Dr. Martell's report until yesterday.

THE COURT:  All right.  Well, I will sort it all

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2337

out.  I don't think that his being given Dr. Martell's report or his testimony in regard to Dr. Martell is going to be particularly important to the Court.  I want a full picture here as much as we can get.  We have been going on for the full year here now trying to get everything before the Court, and, as I said, I'll sort it out and determine which witnesses I find credible and which witnesses I find incredible, and you've got your doctors' reports, and you've been briefed by them, and you can certainly cross-examine. Let's move this on.

          MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, do you recall any of the test results that were specific, as far as Mr. Runyon's memory?

A.  Right.  So both the Mirsky 2009 report and the Montalbano 2009 report included administration of the WAIS, or Wexler Adult Intelligence Scale, and those tests include measures of memory function, and Mr. Runyon performed very well on those.

Q.  Can you tell the Court what is a digital span -- a digital span test?

A.  A digit span test is a test in which you're -- it's as if you are being asked to remember a telephone number.  So I give you a string of digits, and you have to repeat it back, and the list of digits gets longer and longer, and your job is to try and keep those in memory and repeat them back.

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                            2338

Q.   And what is that designed to test?

A.   It's a test of working memory function, which is the ability to hold onto a piece of information over a brief, undistracted delay and then provide it back.

Q.   Do you recall how Mr. Runyon performed on that test?

A.   As I recall, he did quite well.

Q.   Does confabulation generally attack short-term or long-term memory?

A.   Well, when people have confabulation, it happens in the setting of having an impairment in long-term memory, or, technically speaking, they have an impairment in the sorts of memory that is supported by a part of the brain called the hippocampus.  Informally, we could just call it long-term memory.

Q.   Do you have an opinion as to whether Mr. Runyon suffers from confabulation?

         MS. ALI:  Your Honor, I'll object again.  I understand the Court's ruling, but this -- he is now offering opinions that are not anywhere in his report.  If she wants to ask him to testify about topics, fine.  But he's offering opinions that he's never offered in the report that we don't have any notice of for the first time on the witness stand.

         THE COURT:  I sustain the objection.

BY MS. WARD:

                JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                        2339

Q.  Dr. Aguirre are you familiar with the term "disinhibition"?

        MS. ALI:  Object.  I'll object again.  This is nowhere in his report.  He is being asked all kinds of topics that are nowhere in his report.  If she wants to ask him, but he shouldn't be permitted to offer new opinions for the first time while he's testifying as a rebuttal witness when his report was disclosed months ago.  If they wanted him to testify about all this, they could have filed a supplement.  We are getting notice for the first time on the stand that he is offering opinions that we don't even have any awareness or notice of.

        MS. WARD:  Your Honor, if I may.  We were prepared to go forward in February with Dr. Aguirre, and very little of this would have been elicited, I imagine, in his direct examination at that time.  However, since that time we did not have any contact with Dr. Aguirre because we believed that the sequestration order of the Court should be applied fairly to both parties, so we did not update him.  We were not communicating with them.

        Then over the course of this week, every expert has testified far afield of what was in their reports.  They were finding links, they were finding causation, they were finding new bases.  There was flat out false information that Dr. Nadkarni terrified to that he does not attribute to

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2340

a source.  So in providing all of this -- I mean, this is our mental health expert.  We have expert after expert after expert testifying on many things, and as they responded to our objection beyond the scope of the written disclosures, they were allowed to expand on their findings and their opinions.  Dr. Aguirre is rebutting things that we did not know about up until yesterday morning.

MS. ALI:  He is rebutting things that are in Dr. Nadkarni's report.

THE COURT:  Let's do it this way.  Dr. Aguirre, would you step out for a minute?

THE WITNESS:  Yes.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Pass up the reports to me and show me where they are or tell me where to find them.  I've got 10 notebooks up here.

MS. ALI:  Well, his report was just entered.

THE COURT:  No, I want you to show me where you say that the opinion was in your report.

MS. ALI:  Sure.

THE COURT:  Because what she's arguing is that you went far afield, and the Court allowed you, on your expert reports, and she is now entitled to rebut them.  So show me.

MS. ALI:  I will do that.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                    2341

THE COURT:  Show me.  Say the exhibit number so we can all go to it, and not talk in generalities.

MS. ALI:  Dr. Nadkarni's report is Petitioner's Exhibit 137, Your Honor.

THE COURT:  All right.  Let me get to that.

MS. ALI:  And --

THE COURT:  I said let me find the exhibit.  I'm tired of everybody just talking in generalities before we can get on the page of the rule or the exhibit.

What exhibit did you say?

MS. ALI:  137, Your Honor.

THE COURT:  I've got the book.  Let me go to the exhibit.  Where is what you are talking about in this exhibit?

MS. ALI:  Well, what I am talking about, Your Honor, is that what Dr. Aguirre should be permitted to testify about are the opinions contained in his report. Whether he was disclosed as a rebuttal to Dr. Nadkarni -- the fact that he was disclosed as a rebuttal to Dr. Nadkarni does not mean he is permitted to testify to new opinions for the first time on the witness stand that were not in his report.

He had Dr. Nadkarni's report.  He wrote a rebuttal report responding to it.  That report should have contained all of the opinions he was prepared to offer on the stand.

JODY A. STEWART, Official Court Reporter

If he wanted to offer additional opinions that were not contained in his original report, then he was obligated under the rules to supplement that report.

THE COURT:  Please, wait just a minute.  I'm going to ask you two questions.  Did Dr. Nadkarni testify to that?  That's the issue.  Then was it in his report?

MS. ALI:  Yes, Your Honor.

THE COURT:  That's what I've asked you to show the Court.  In other words, I remember the testimony.  Now, if it was outside of his report, there was no way that they could have known in advance, and this has been going on continuously late into the evening every night.  So, in other words, if it was in his report that he prepared in 2022, which he testified from, and they didn't provide it, that's one thing.  If it's in response to his testimony that you went forward with that was outside of the report, there has certainly been no time for attorneys, experts, anybody to provide supplemental reports.  So show the Court where it is in this report.

MS. ALI:  I will, Your Honor, if I could have a moment.

THE COURT:  Yes, you can.

MS. ALI:  Your Honor, again we are dealing with the issue that Dr. Nadkarni's report is not paginated, but it's on page --

Aguirre, G.  - Direct                                      2343

THE COURT:  Start Page 1, 2, 3, is that considering all the pages or just where the substance of his report starts?

MS. ALI:  It's all the pages, Your Honor.  So page, I believe -- let me paginate my pages.  I can better direct you.

THE COURT:  The first page is an opening page.

MS. ALI:  That's right.

THE COURT:  Pages of what he reviewed, and then his actual report starts four pages in on my document.

MS. ALI:  Okay.  So beginning on Page 8, Your Honor, under the header of "Thought Content."  Dr. Nadkarni rendered the opinion that Mr. Runyon is grandiose with a strong component of what sounds like confabulation.  This is contained within his opinions in his November 9th, 2022, report.

On Page 9, in Paragraph 4 he discusses Mr. Runyon's executive function, reality testing, inhibition, impulse control, among other things.  These are also contained within his November 9th, 2022, report.

THE COURT:  There were three things you were asking about, Ms. Ward.  One was confabulation.  Is that correct?

MS. WARD:  Yes, Your Honor.

THE COURT:  And I sustained the objection on that.

MS. WARD:  Yes, Your Honor.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                2344

THE COURT:  The next one was what, delusions?  What was the next one?

MS. WARD:  Disinhibition.

THE COURT:  All right.  Where is disinhibition?

MS. ALI:  That's on Page 9, Your Honor.  I'll note that grandiosity and again confabulation are again discussed in the first paragraph on that page, but if Your Honor goes to Paragraph 4 on Page 9, he discusses Mr. Runyon's reality testing, executive functions, comportment, inhibition, which is the discussion of -- the same concept, and impulse control.  These are opinions contained within Dr. Nadkarni's report that he testified to.

THE COURT:  Okay.  Ms. Ward.

MS. WARD:  Yes, Your Honor.  I'm not really understanding the limitation on what we are rebutting Dr. Nadkarni.  This is our mental health -- I mean, he is a neurologist, as is Dr. Nadkarni and Dr. Merikangas.  He is a behavioral neurologist, identifying the clinical link between brain injury and what he received for executive functioning, that is all in his report.

The problem that I have is that every one of their mental health experts went far afield of what was written in their report, and they testified that sometimes the reports were deliberately off too.

MS. ALI:  That is --

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                             2345

MS. WARD:  I'm just arguing.

MS. ALI:  I'm sorry, but that totally mischaracterizes.

THE COURT:  Counsel, do not interrupt one another.

Go ahead, Ms. Ward.

MS. WARD:  But they were written deliberately to be very technical so that they could come in and testify what they meant by that.  That is just subject to interpretation, and the answers they provided on the stand in almost every category of their report was not -- was just not included in their report.

So Dr. Aguirre could not have been prepared to testify to disinhibition when they have one line that references disinhibition.

MS. ALI:  Your Honor, disinhibition is referenced in Dr. Nadkarni's report.  Dr. Aguirre is a neurologist.  He understands.

THE COURT:  Calm down.

MS. ALI:  I'm sorry, Your Honor.  He understands what disinhibition means.  Dr. Merikangas testified to this. Dr. Merikangas testified that the reflex testing he did on Mr. Runyon in 2009 and in 2015, and that we saw in his 1997 Army records, showed hyperreflexia, which is a sign of disinhibition.  If they want to argue that their neurologist doesn't understand what disinhibition is, or the tie-in to

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2346

the neurological exam, then that's their prerogative.

But to say that he didn't have notice that our experts were going to testify about disinhibition, when Dr. Merikangas's 2009 and 2015 report contains reference to hyperreflexia, which any neurologist would know is from disinhibition.  If they want to ask him if it is not, they can do that, and the word "inhibition" appears in Dr. Nadkarni's report.

I just want to make two more notes.  Ms. Ward has said twice now that our experts testified that Dr. Nadkarni testified falsely.  She may have an argument that he wasn't able to support a piece of evidence in his report or tie in an opinion, but I don't think it's appropriate to say that he testified falsely, and she just said that the experts deliberately wrote their reports in a way that would be confusing to the Court.

I believe what the testimony was, was that they wrote the reports in a manner that was typical of their medical specialties.  Dr. Nadkarni is a -- 90 percent of what he does is clinical practice.  He is not a hired gun, for better use of the term.  He comes in, he does clinical practice.  He sees 10, 12 patients a day.  He wrote a report in the terms that are familiar to him as a physician.

To say that he deliberately wrote a report that would be confusing to the Court is just inappropriate.  She

JODY A. STEWART, Official Court Reporter

can argue that she doesn't understand what's in the report, but to say that it's deliberate is an inappropriate accusation, and that was not the testimony.

THE COURT:  You all can argue the weight and the credibility the Court should give to the experts.  But reports should be written so that either a jury can understand it or an ordinary judge can understand it.  So the key is whether the fact finder understands it.  That's your job as attorneys to secure reports and be sure you understand the report and can properly question the doctor on the report and then whether the trier of fact can make a conclusion of this on the testimony.  That's the whole reason for this process, not to just write reports in language that people don't know what it is without an explanation of it.

But be that as it may, I am not going to let her ask about the confabulation, I think is what it's called, because that is in the report.  I do not find specifically that the disinhibition --

MS. ALI:  Disinhibition.

THE COURT:  Disinhibition is directly in it, and he is qualified.  He said he knows what it is.  He can say what it is.  She can ask him about it, and then you can cross-examine on it.  Because these reports in many ways are streams of consciousness, very long, sentence after

Aguirre, G.  - Direct                                                    2348

sentence, there is this, there is this.  These findings taken together, frontal temporal circuits affecting right hemisphere, and then it keeps on going, and it says emotional assessment of inputs from the world.

This is pretty general information in some of these paragraphs tied into some very technical terms.  In any event, confabulation as a term was in this report.  I'm not going to let this neurologist testify to it in rebuttal.

I will let him testify as to the second concept.

MS. ALI:  I understand the Court's ruling.  I'm making my record.  I agree that he's permitted to testify, to elaborate on opinions that are contained within the four corners of his report.  I think that's perfectly appropriate.  But offering new opinions on the stand that he -- I'm not saying he couldn't have supplemented his response if he wanted to respond to Dr. Nadkarni's report.  He's a neurologist.  He certainly understands -- understood the content of Dr. Nadkarni's report.

I understand that the Court may find it technical, and I'll say it took me some time to understand what a lot of this meant, but he's a neurologist.  He read the report.  He knew what it meant.  He could have offered a supplemental opinion.  Should have been contained in his original report.  There is no question that he had Dr. Nadkarni's report when he wrote his.  But I understand the Court's ruling, but

Aguirre, G.  - Direct                                    2349

offering new opinions on the stand for the very first time, that he's never been given notice of, just goes way beyond the case law and the rule.

THE COURT:  Then what I will do is when I go back through all the opinions and testimony, I will strike anything that I don't find was appropriate evidence then for either side.  As I go through the record, because I let you all put a lot on the record, and I did it for a reason, I wanted a full record.  So, consequently, if you want me to go back through the transcripts, which I will do, and I can tie it in, and I will.  If not, it will not be relied upon.

So you're playing with a little bit of fire here because I can assure you that some of your experts went on *ad nauseam* about certain issues and was more than contained in their reports.  I let it go, and I let it go for a reason, because it's a bench matter.  If we had been before a jury, I would have stricken some of it because I don't think the jury would be capable of comprehending all of the terms that were used without being explained further in many situations.

All of these experts that have testified so far have gone beyond their reports.  Dr. Martell was one that basically stuck with what I expected him to testify to from what I had read.  But I would certainly say that Dr. Cunningham and Dr. Nadkarni went far afield on a number

Aguirre, G.  - Direct                                          2350

of occasions.  So I ruled on where you've got it specifically in the report.

I'm not going to let her ask about that.  I am going to let her ask about these other general assessments that are within his field and so that he can explain what the term means to him.  Whether or not I credit his testimony is another matter.  That's where we stand, and we need to move on with the testimony.

MS. WARD:  Thank you, Your Honor.

(Witness resumed the witness stand.)

THE COURT:  Dr. Aguirre, we will continue with the questioning.  Thank you for your patience.

MS. WARD:  Thank you, Your Honor.

Thank you, Dr. Aguirre.

BY MS. WARD:

Q.  Are you familiar with the term "disinhibition"?

A.  I am.

Q.  Did you see in the records that you reviewed, did you see any evidence of disinhibition in Mr. Runyon's history?

A.  Once he took the -- the term -- you mean -- so "disinhibition" might have a meaning in a behavioral sense that someone is disinhibited, that they are extraverted.  Is that the sense that you are asking about?

Q.  Let's tie it back to the neurological testing.  Did you see anything in the neurological testing that would lend

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                           2351

itself to disinhibition?  If I don't understand it, maybe explain to the Court what the clinical definition would be.

A.  I think the context in which this question arises is, so I understand it, there are aspects of the physical neurologic examination, reflexes, things like that, that might be related to a loss of the normal inhibition that the brain places upon the mechanisms of the spinal cord.

So someone might have an alteration in the properties of the physical neurologic examination and the limbs that would be related to or attributed to a loss of inhibition.  Is that the sense?

Q.  Yes, Dr. Aguirre.  Did you see anything in Mr. Runyon's test results that lend itself to a finding of disinhibition?

A.  Not in the sense that we just discussed, that is, a loss of an effect upon the spinal cord.

Q.  And why is that?

A.  Let's see, I think the question arises in the context of the physical examination performed by Dr. Merikangas in 2009 on Mr. Runyon.  That included a measurement of the reflexes and tone and --

MS. ALI:  I'm going to object again, Your Honor.  This was in Dr. Merikangas's report, and now he's opining about it.  It's not in his report.  I understand the Court's ruling, but he is now referring back to the opinion Dr. Merikangas offered in the report the government has had

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                            2352

since 2009.

THE COURT:  Well, on Page 2, he's talking about Dr. Merikangas.

MS. ALI:  But he doesn't discuss any of the neurologic exam findings, which is what he is now opining on.

THE COURT:  Well, we haven't gotten to the MRI scan yet, and he does, on Page 2 of the report, when he describes the forehead and the asymmetrical loop, and there's something else in here about Dr. Merikangas.

Go ahead.

MS. WARD:  Your Honor, if I may, Dr. Merikangas testified at length about disinhibition and creating a finding conclusion about his neurological testing, deep tendon reflex testing, things like that.  He led to the conclusion that was not offered in the written report.  So challenging that with a mental health expert, also a neurologist, would be appropriate in rebuttal.

THE COURT:  It is.  It's appropriate rebuttal evidence, there is no question.  The schedule that we've been on, in fact, sometimes you are not even entitled to know rebuttal witnesses.  There are rules that don't even require naming of rebuttal witnesses in civil cases.  So you've got him as a rebuttal witness.  Just go forward. You've got a continuing objection, Ms. Ali.

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                           2353

Just go forward.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, would it be helpful to pull up Dr. Merikangas's 2009 report so you can explain what you're referencing?

A.  Yes.

Q.  We can, on the computer, please, have Government's Exhibit 63 at Page 2.

THE COURT:  Let me get to it.  What exhibit did you say?

MS. WARD:  Exhibit 63, Your Honor.

THE COURT:  63.  Government's Exhibit 63?

MS. WARD:  Yes, Your Honor.

THE COURT:  I got it.  Had a cover letter.  Go ahead.

BY MS. WARD:

Q.  Yes.  If we could go to Page -- that's right.

Dr. Aguirre, is this what you are referencing when you discuss the test results that inform a finding of disinhibition?

A.  Yes.  So now I'm looking at what looks like the first page of Dr. Merikangas's 2009 report which includes a description of the so-called appendicular or peripheral neurologic examination, and this includes -- let's see -- his

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2354

deep tendon reflexes were symmetrically increased at three plus, and his palmomental and Babinski reflexes were absent. Then skipping a line about the comments regarding the mobility of the digits, then we arrive at gait, strength, coordination, and tone were normal, as was his sensory examination.

Q.  So in the context of disinhibition, what does this tell you?

A.  Well, I think -- I describe this as a normal neurologic examination.  On someone who is a bit younger, so in their 30s or 40s, they often have slightly brisker reflexes than folks who get older.  Someone has had a cup of coffee or they're a little bit more anxious, you will get reflexes which are symmetrically increased in this way.

But, importantly, the Babinski reflex was absent, so it's good to have an absent Babinski reflex because that is an indication that there is normal descending function from the brain down onto the spinal cord, and also of note, the tone was normal, and that's a description of the feeling of the baseline contraction of the muscles, and the muscles become stiffer, have increased tone if there is a loss of the normal inhibition of the brain onto the spinal cord.

Q.  And why does that matter?  Assessing the neurological test results, why does that matter when you are trying to determine whether it is evidence of a brain injury?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2355

A.   Well, you know, if there were abnormalities in these things, then that might lead you to look in the brain for macroscopic injuries or damages to that pathway that controls movement in the body.

Q.   And did you find evidence of that in this case?

A.   Not based upon the description of this right here, no.

Q.   Did you find it in other test results that were reported in the expert reports?

A.   I did not.

Q.   Are you familiar, Dr. Aguirre, with the term "impulsivity"?

A.   I am.

Q.   What is that?

A.   Well, this, like a lot of terms that we might run into, there is sort of a technical definition that we might use in a neurological testing context, and then there is the informal way that we might use that word.  So someone might be impulsive in the sense that they make reckless decisions or act with limited information, but there is also a technical sense in what -- having a defect of impulse control means the neurologic examination.

Q.   Is impulsivity a deficit?  Would that be fairly termed a deficit if it is following a head injury?

            MS. ALI:  Objection, leading.

            THE COURT:  Go ahead.

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2356

THE WITNESS:  Well, so someone can have a problem with inhibition or becoming impulsive after damage typically involving the frontal lobe, and that is a thing that can happen in the context of a traumatic brain injury.

BY MS. WARD:

Q.  And can you give some examples of what would help evidence that?

A.  Well, the kinds of things that one might test for within a neurologic context, there are specific neuropsychological tests of frontal lobe function which require someone to resist the urge to do the automatic thing, and a classic example of that is the neuropsychological test that's called the Stroop test.

Q.  And behaviorally, anecdotally, can you give some examples of what might --

A.  Sure.

Q.  -- impulsivity.

A.  So then if someone has an impairment in the aspect of frontal local function, the way that might manifest in their day-to-day life is that they will be unable to resist automatic impulses.  So if they see somebody wearing an ugly outfit, they will blurt out, "That is an ugly hat," or they will start eating dessert and skipping dinner because eating dessert is just sort of a more desirable thing to do in the moment, things like that.  So moment-to-moment loss of their

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2357

ability to suppress a prepotent or automatic response.

Q.   A prepotent.  What is a prepotent?

A.   So a prepotent response is sort of the thing that you would naturally or automatically do in response to a stimulus, so if exposed to something.  So that a classic example within neurology of this is that if you -- if an examiner takes off their glasses and puts it on the table, somebody with an impairment in this way would pick up the examiner's glasses and put them on their own face because that's where glasses go, even though it is a socially inappropriate thing to do.

Q.   Did you find anything in this case that would lend itself to a finding of an impulsivity disorder?

A.   Not in the sense of the neurologic sense of having a deficit in this function of the frontal lobe, and in particular I found some positive evidence in opposition to that.  So there was actually some neuropsychological testing results that would suggest that he did not have an impairment and impulse control in this way.

Q.   Did you see any evidence between 1997 and 2007 that would lend itself to further investigation into impulsivity issues?

A.   So we can imagine -- so during this period of time, as I recall, there were -- his aspects of his life were fairly chaotic, so troubles with relationships, with family, and trouble at work, and conflict with supervisors, and things

Aguirre, G.  - Direct                                         2358

like this.  It's not impossible but that could reflect a deficit in this kind of function.  So the way one would look into that is by performing testing and getting brain images and things like that.

Q.  And the testing was done in this case?

A.  Yeah.  We have both MRI scans, and we have neuropsychological testing.

Q.  In this case, Mr. Runyon's jury found him guilty of a long-planned conspiracy to commit murder for hire.  Are you familiar with the facts in this case?

A.  Yes.  I've read the description.

Q.  And, generally speaking, can you just, from your perspective, what were the circumstances of the offense?

A.  Well, as I understand it, this involved some discussion between Mr. Runyon and other parties to make a plan, to carry out this crime, and Mr. Runyon was involved in sort of investigating and selecting a location for it, that there was communication between the parties to coordinate the timing and the actions that were going to be performed and then discussion after the fact regarding how they would react to an investigation of it.

Q.  Do you recall any of Mr. Runyon's behaviors after the crime was committed?

A.  Well, the main thing -- well, not in great detail.  So if there is -- I think you'd have to supply me with some

Aguirre, G. - Direct                                          2359

examples of particular behaviors you'd want to discuss, but I don't have a great recollection of the details of that aspect of the case.

Q. If someone were taking efforts to conceal their crime, would that be evidence that you would want to consider in assessing an impulsivity disorder?

A. Sure. So efforts to -- so turns out that engaging in deception is a thing that requires a lot of impulse control. You have to be able to keep multiple -- you have to keep, you know, two separate stories straight. You have to be able to resist the urge to describe, you know, the facts as they are. So, yeah, concealment and deception is typically not compatible with someone having a marked deficit of impulse control.

Q. Do you have an opinion whether the circumstances of the offense aligned with the possibility of an impulsivity disorder are findings of an impulsivity disorder?

A. Yeah, they don't seem to be particularly suggestive of an impulse disorder, impulse control.

Q. I'm getting a little ahead of myself with this question, but can someone with a frontal lobe impairment and a resulting impulsivity disorder execute a complex plan over a long period of time?

MS. ALI: Objection. What is an impulsivity disorder? I mean, I don't think that's been established.

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                        2360

THE COURT:  Sustained.

THE WITNESS:  So, well --

THE COURT:  Wait.  She has to re-ask the question.

BY MS. WARD:

Q.  What is an impulsivity disorder?

A.  I think what is being described here is a --

MS. ALI:  Objection.  Who is this rebutting?  No one talked about an impulsivity disorder.  I'm not sure what we are doing here.

THE COURT:  There have been talk of impulse control.  Impulse control.  A lot of children don't have impulse control.  They will reach for the cookie before the broccoli.  They will do things impulsively.  That's why you have to watch them, impulsively run out into the street and put themselves in danger.

I'm not really sure, there are a lot of people who we see every day that don't have appropriate impulse control or appropriate societal manners and things like that.  They just impulsively interrupt, or they just impulsively run across the street.  So I'm not exactly sure how relevant impulsivity is here.

MS. ALI:  I'm just making it -- I just didn't understand the impulsivity disorder.  I hadn't heard him testify to that.  I don't think that is contained in any of the reports.  I understand the term "impulsivity."  She was

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2361

using the word "impulsivity disorder."

THE COURT:  Take disorder out of your question because we had a lot of testimony about "impulse control" but take out "disorder."

MS. WARD:  Yes, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, can someone with frontal lobe impairment and resulting loss of deficit of impulse control execute a complex plan over a long period of time?

A.  Well, I think it would be difficult, so folks who have frontal lobe damage and thus inability to control their impulses with evidence in speed distracted and not being able to execute on a long-term sequence of events or plans.

Q.  Dr. Aguirre, did you have the opportunity to review the 2009 MRI report?

A.  I did.

Q.  If we can pull up Government's Exhibit 61.  Are you familiar with this document, Dr. Aguirre?

A.  I am.

Q.  Do you understand that this document -- what is this page?  I'm sorry.  I'm at Page 3 of Government's Exhibit 61.

A.  Let's see.  This is the -- yeah, so Page 3 and now Page 4, this is the narrative component of a report of a radiologic interpretation of an MRI scan of the brain.

Q.  And when you say radiologic interpretation, what does

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                        2362

that mean?

A.   That means that typically when a clinical MRI scan is obtained, radiologists will interpret -- will provide an interpretation of the images that are collected and write down what they found, and that's what is contained in this document.

Q.   And did the findings of this report inform your decision or your findings at all?

A.   Well, it's -- yeah, so -- yes, it did.

Q.   How, Dr. Aguirre?

A.   So what's described here is an MRI scan of the brain that doesn't show evidence of marked structural injury.

Q.   Now, with receiving this report, would that be sufficient information for you to assess whether there was brain damage?

A.   Well, it is an important component in such a decision.  I would like to take a look at the images themselves as well.

Q.   And did you, in fact, take a look at the images that were taken in 2009?

A.   I did.

Q.   Okay.  And why did you look at them yourself?

A.   It's a standard part of interpreting the results of an MRI scan, is for the neurologist to review the images themselves and to engage in what is often called clinical correlation, try and relate the details of the images to the history and the exam findings for the patient.

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                           2363

Q.   Were the scans taken in 2009 of adequate quality?

A.   You know, they weren't perfect.  There is definitely motion that degraded some of the earlier sequences of images that were acquired.  So they had to collect several sets of images before they had a set that were of decent quality.  So I would say that there is a reasonable quality FLAIR image -- F-L-A-I-R is the acronym -- and a good quality T2 image as well as they had some diffusion weighted images that were of good quality.

Q.   I'll ask you, Dr. Aguirre, Dr. Merikangas is also a neurologist, testified that he typically reads his own scans when he orders them.  Is that common in your practice?

A.   Yes.

Q.   Would you need a neuroradiologist to interpret the images for you?

A.   I actually always -- so the interpretation of a neuroradiologist is always very helpful because they also have years of experience looking at these images and will contribute to my understanding at times with what I see.

        So I absolutely rely on the interpretations provided by a neuroradiologist as well.  In particular, they are quite well trained to systemically review all of the structures that are present within that image that are not the brain. So there is a lot that's on a brain scan that is not just brain, and that neuroradiologists are particularly valuable,

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                    2364

in my experience, in carefully inspecting those aspects of the image.

Q.  If you receive images in your own clinical practice, and you felt that you needed a second opinion, what would you do?

A.  Well, I would typically ask a colleague.  So that would either be -- I have colleagues in neurology who are quite expert at interpreting certain aspects of MRI scans or in certain disease states, or I might go discuss it with the neuroradiologist.

THE COURT:  But you would first review it?

THE WITNESS:  Yes, I would.

BY MS. WARD:

Q.  And you did review the reports of Dr. Merikangas and Dr. Nadkarni's interpretation of these scans?

A.  I did.

Q.  Okay.  And you were able to make findings about these scans as well; is that accurate?

A.  I was.

Q.  Would it help you if I pulled up an image of these scans?

A.  Yes, please.

Q.  Seems to have a technical error.  I will come back to that in just a little bit.

THE COURT:  Well, do you have them over there?

MS. ALI:  I don't know what she is talking about.

THE COURT:  We have been looking at them all along.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                        2365

          MS. ALI:  Right.  I'm sorry, Your Honor.  We have a subset of images that we've been using.  I don't know what they plan to use.  On the disk is 77 images, I believe.  We don't -- I have the disk.  It's pretty clumsy to pull up the entire disk.  We have been using demonstrative to show.  I'm not sure what they use, if it's the same that we have been using.

          MS. WARD:  It was just the three.

          MS. ALI:  The one we have.  We can pull that up. That's fine.

          THE COURT:  It's the same three we have been looking at.

          MS. WARD:  Yes, Your Honor.  I apologize.  That's my error.  Thank you.

BY MS. WARD:

Q.  For the record, this is the same demonstrative exhibit that was used in Dr. Merikangas's testimony and Dr. Nadkarni reflecting three static images.

          Dr. Aguirre, are you familiar with this exhibit?

A.  Yes.

Q.  Can you please tell us what this is?

          THE COURT:  Before you go.  It has FLAIR.  Is that what you were referring to before?

          THE WITNESS:  Yes, it is.

          THE COURT:  Go ahead.

                    JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                        2366

THE WITNESS:  So this is three horizontal or axial slices of volume of measurement of the brain obtained using an MRI scanner and the FLAIR or F-L-A-I-R sequence, and I'm prepared to describe a little bit about what these images show, if you like.

BY MS. WARD:

Q.  Let's start -- yes, please.  If you just touch the screen in front of you, you will be able to indicate to the Court what exactly you are referencing.

A.  Okay.  So, yeah, these are three, as I said, horizontal slices, and going from left to right, they start up high and then they go a little bit lower.  This is the front of the brain up here (indicating).  This is the back of the brain back here (indicating), and that's the left side of the brain (indicating) because neurologists do this stuff backwards, and it's the right side of the brain over there (indicating).

And there is a few -- the outside, the wrapping that you see on the outside of these damages are the soft tissues of the skull and the scalp.  Then the brain is there in the center.

The first thing I'd say about this is that this is a pretty health looking brain.  So at the time these images were acquired, I believe the defendant was 37 or 38 years old, somewhere about that.  There is -- you can see in the center of the image, there are these dark regions.  This

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                      2367

is -- these are the normal fluid-filled spaces in the center of the brain that are called the ventricles, and, you know, when we are quite young, the ventricles are small, and as we get older and the brain shrinks, the ventricles get bigger.

If someone has had extensive brain injury, the ventricle -- then the brain shrinks faster, and then the ventricles become larger commensurately, and these ventricles look like they are a reasonable size for someone who is Mr. Runyon's age at the time.  You can also see the substance of the brain.  How do I make the little green dots go away? I have green dots everywhere.  Thank you.

So we can also see the substance of the brain all the way around the cortex.  There's the gray matter, which is the thin covering on the outside of the brain, almost like the peel of an orange, and then there is the white matter, which is what's below and perhaps surprisingly the somewhat darker shade of gray on this image.

And you can see the brain is thrown into folds, and the space between the folds are called the soft side.  So another thing that one could look at to try and see evidence that there has been an injury to the brain is to see if the sulci are enlarged because when the brain is injured, that causes nerve cells to die, and the substance of the brain gets thin, and so the fluid-filled spaces get bigger.

I just invite us to examine the size of these

Aguirre, G.  - Direct                                        2368

fluid-filled lines, these sort of little black lines that we see around the image, and, you know, they are the same size up front that they are in the back, and about the same left to right, there is really not much of a difference there.  So all of this looks like a normal, structural brain.

So those aspects are all perfectly normal and reasonable appearing for somebody at this age.  There are other findings, which I could go on to describe, if you like.

Q.  Yes, please.

A.  So we can also see on here something that is referenced in the radiology report, and that's the presence of white matter hyperintensities.

So will you please erase the green dots again. Thank you.

So these slices also show punctate, which means point-like areas where the imaging signal is increased.  And so I'm going to put a little dot just below some examples of these little white dots.  I think I call that one a white dot, too.  So these are so-called T2 white matter hyperintensities, and these are things that in a perfectly normal brain that had absolutely no findings whatsoever, you would not see these.

Q.  What does it mean to you that we can see some?

A.  Well, these are -- these white matter hyperintensities are a remarkably common finding.  So it is very common for us

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2369

to see these white matter hyperintensities in brain scans that they obtain from healthy people.  In fact, some studies suggest that folks who are in this age range of their 30s to 40s, about a third of them have at least -- 30 or 40 percent of them have at least one of these dots and a substantial proportion of that population will have more than one of these dots.

So we see them very frequently in clinical practice. What I'll say about those white dots is that we know the number of different conditions and things that are associated with an increased probability of seeing some of those white dots.  So, for example, as people get older, they have more of these.  If people have high blood pressure or diabetes, they tend to have more of these.  People have migraine headaches have more of these.  There is some association between having concussions and having some of these dots, but it's really quite common.

One other thing I'll say about these dots, and I'll pause, is that they are clinically silent.  So what that means is that if you tomorrow developed one of these white dots, you won't know it.  You wouldn't have any symptoms which would go along with it.  Moreover, there is no behavioral test or physical exam thing that I can do that would tell me that you have one of these white dots.  So they are silent, and we see them quite frequently.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                           2370

Q.   Does the location of the white matter hyperintensities inform your assessment at all?

A.   You know, not especially.  They are distributed throughout the cortical white matter.  There is some thought that white matter hyperintensities that occur in the brainstem or in the deep basal ganglia and thalamic structures have a different association than those that -- throughout the cortex.

     But, as we say, the dots that we see at these locations, they are typically referred to as etiologically non-specific.  I apologize for that jargon.  It just means that we don't know what caused them.

Q.   We've talked a little bit, Dr. Aguirre, about minor traumatic brain injury.  What would you expect to see in images with a patient as presenting with a history of mild traumatic brain injury or injuries?

A.   Yes.  So somebody that has a history of having had a concussion, say, the possibilities are that you would see absolutely nothing, that their brain scan wouldn't be able to find a single abnormality on there, and that is often the case with conceptual imaging.

     There is some association in the literature of having more of these white dots or an increased probability of having one of these white dots if you had a concussive injury in the past.  Although, I will say recent reports,

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                    2371

just in the last two years, have called that a bit into question, and it's not even clear anymore that the presence of these white dots is enhanced in people who have had -- who have had a concussion compared to those who haven't.

MS. ALI:  I'll object, Your Honor.  None of those reports are cited in his report.

THE COURT:  I know.  It's after the fact.  I couldn't understand the last bit of his answer, that's the first thing.  I understood you said that later studies have shown, but I couldn't understand what you were saying after that.

THE WITNESS:  Let me try it again.  There is some lack of clarity within the medical literature as to how strong the association is between having had a history of concussion and the likelihood of seeing one of these white dots.

MS. ALI:  I was just pointing out.

THE COURT:  I understand, and I don't think it's particularly relevant here because we are looking back at 2009, and remember, it's the information that the attorneys had from their experts in 2009.

MS. WARD:  Yes, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, and again, basing this on the literature, data, expertise that would have been available in 2009, what

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Direct                                              2372

would you expect to see in images in a patient that has a reported history as something that's more than just mild head trauma?

A.   Right.  So some things you might find would be focal areas of damage to the brain, so areas where you can see shrinking or scarring, of a -- particularly in the frontal or temporal lobes associated with a traumatic brain injury, you might see that.  You can see evidence of deposition of old blood in the substance of the brain.  The technical term for that is hemosiderin, and blood has effects -- old blood, in particular, has effects upon the appearance of MRI scan images, and particular ways of using the MRI scanner more readily reveals the presence of that old blood or not.

There were images that were acquired in this 2009 study that were capable of showing the presence of old blood, although there are other sorts of images that could be obtained that might have been, in principle, more sensitive to the presence of old blood.  But at least on these images we don't see that.

THE COURT:  So on these images you did not see the presence of old blood?

THE WITNESS:  Did not see the presence of old blood.

THE COURT:  Let me ask you about these green dots. As I understand, the right is the left and the left is the

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2373

right, from an imaging standpoint, but you've got the green dots in basically the same place on the first two images. Is that the same white matter or not?

THE WITNESS:  Could I ask the green dots be removed.

Your Honor, you're referring to that dot and that dot (indicating)?

THE COURT:  Yes.

THE WITNESS:  Are you asking is it the same continuous finding?

THE COURT:  Are they the same or are they different?

THE WITNESS:  They are discrete.  They are different.  They just happen to be spatially similar locations.

THE COURT:  All right.  Thank you.

BY MS. WARD:

Q.  Dr. Aguirre, what is your assessment of the presence of these white matter hyperintensities in these 2009 scans?

A.  So, as I said, we frequently see these, even in folks who are, you know, 38 years old.  A typical thing that we will do is when we see these, say, oh, maybe the person has migraines.  That's a very usual sort of response.  We ask, hey, does the person have migraines?  But they're not themselves an indication that we would actually find anything

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2374

on examination related to these points of signal.

Q.  Dr. Aguirre, do you know whether Mr. Runyon suffered a head injury while in confinement after these images were taken?

A.  I've seen reference to that, but I really -- I haven't reviewed any primary records that describe that.

Q.  Could a potential, subsequent head injury have any impact on his 2015 neurological testing?

A.  Yes.

Q.  Do you have occasion as reporting a clinical history of head injuries or incidents and -- I know you have scans like these in front of you.  What would be the next step in your assessment?

A.  Well, if -- one reaction would be to say, I don't see anything.  I don't see any macroscopic injury to the brain suggestive of an injury of sufficient severity to produce a long-lasting change in behavior or function, but if one wanted to understand more, you'd have a physical examination and neuropsychological testing and understand a little bit more about what their function is like.

Q.  What would be the purpose of the neurological testing?

A.  Well, so neuropsychological testing is a way of measuring several aspects of thinking and memory, and you could look to see -- if one wanted to test the theory that there was damage to a particular part of the brain, say the frontal lobe,

Aguirre, G.  - Direct                                      2375

you'd look at these scans and say, well, I really don't see any frontal lobe damage, but perhaps let's also take a look and see if there is some abnormalities on neuropsychological testing that would lead me to reconsider that impression.

Q.  I ask you, do the scans alone, is that sufficient for you to reach a diagnosis about whether Mr. Runyon suffered from brain damage?

A.  We are going to be -- I'm going to be a little careful on the meaning of brain damage.  So what I'll say is these scans alone would lead me to not suspect that this person has meaningful impairments in intellectual or behavioral function.

Q.  Let's talk a little bit more about the neuropsychological testing that was conducted in 2009.  Do you recall what the test results were back in 2009?

A.  There were two discrete sets of tests; those performed by Dr. Mirsky and those performed by Dr. Montalbano.  Both performed a WAIS, Wexler Adult Intelligence Scale, test, and Dr. Mirsky collected some additional neuropsychological testing tests.

Q.  When was that?

A.  I'm sorry?

Q.  When was Dr. Mirsky's additional testing?

A.  Oh, no, the 2009 testing I'm referring to.  So in the 2009 testing session, Dr. Mirsky obtained both this WAIS

Aguirre, G. - Direct                                          2376

intelligence test and some additional tests, which I can name.

THE COURT:  Now we are going into Dr. Mirsky and the tests there.  Let's take a 15-minute recess and come back.

MS. WARD:  Yes, Your Honor.  Thank you.

(Recess from 1:09 p.m. to 1:27 p.m.)

THE COURT:  Ms. Ward, you can continue.

MS. WARD:  Thank you, Your Honor.

Thank you, Dr. Aguirre.

BY MS. WARD:

Q.  We were getting ready to discuss that neuropsychological testing that was conducted by Drs. Mirsky and Dr. Montalbano in 2009.  If we heard testimony from other experts that those test results showed deficits, would you agree with that statement?

A.  Yeah, I would not.  There were not clear deficits on those tests.

Q.  Let's talk specifically about the pegboard test.  Can you explain to us what that is?

A.  So the pegboard test, I think that was the Purdue pegboard test, is one of a few examples of tests of manual dexterity, so being able to move a disk up a rail on a platform.  I think it was originally invented to figure out if factory workers could quickly sort things.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                    2377

Q.  And what opinion do you have about Mr. Runyon's results on that test?

MS. ALI:  I'll just note my continuing objection, and he's offering opinions that don't -- are not contained anywhere in his report.

THE COURT:  They are rebuttal to what's been given, and the Court accepts them and has explained that ruling.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Do you have an opinion about Mr. Runyon's pegboard test results?

A.  As I remember, it was one of the test results that differed from all the others in that it was not in the high range -- actually, if we pull up the exhibit, I could refresh my memory on what exactly his score was.

Q.  If we can pull up Government's Exhibit 55B, Dr. Montalbano's report.  Are you familiar with this report, Dr. Aguirre?

A.  I am.  I believe the result you are looking for is well towards the end.

Q.  I'm sorry.

A.  I believe the result you are looking for is well towards the end, if it's in that Montalbano report.

THE COURT:  I would note that both of these reports have been testified to numerous times throughout and have

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2378

just been listed in materials that experts reviewed.  But go ahead.  I remember the pegboard testimony.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Is this where we find that information, Dr. Aguirre?

A.  Yes.  Perhaps, although it's possible actually that's the Mirsky report that contains the pegboard test, not Montalbano.  If you scroll down a little bit more, we will see.  I think actually -- what you are looking for is contained within Mirsky.

Q.  I'll come back to that so we don't have to flip through back and forth.  Can I ask you, did you form -- if there were testimony that Mr. Runyon was -- exhibited deficits on the CPT testing -- did you review the CPT testing in Dr. Montalbano's report?

A.  I believe the CPT testing was in Dr. Mirsky's report, and I did.

Q.  Can you put Government's Exhibit 36.  This is Government's Exhibit 36, the 2009 Dr. Mirsky report.  Are you familiar with this document, Dr. Aguirre?

A.  I am.

Q.  Is this the results that you were discussing?

A.  Yes.  If you scroll down a little bit further, there is the CPT, and I think a little bit past that is the Purdue pegboard test.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2379

Q.   Looking at Page 3 of Government's Exhibit 37.  Please give us your opinions regarding the continuous performance test.

A.   Okay.  So the continuous performance test is an example of a simple sort of test where someone is required to monitor for an infrequent event, and really it's a test that tests the limits of your ability to maintain attention on a thing and quite boredom over a long period of time.

So there is different forms of it where you have to detect different things, either visual things or sounds and different ways that it's manipulated.  But what's described here is that Mr. Runyon had trouble with this particular test, which required him to maintain attention over a period of time, monitoring for these infrequent events.

Q.   What, if anything, does that tell you about Mr. Runyon's possible deficits?

A.   Well, in and of itself, not an awful lot.  So people can have deficits on the CPT for a few different reasons.  Actually, commonly used as a measure of attention deficit disorders.  But what we also know is that if people are sleepy, they are really quite impaired at this continuous performance test.  In fact, it's used as a measure of impairments that are due to sleep deficits.  So as an isolated impairment, it doesn't necessarily indicate or strongly indicate the presence of brain damage.  It could be

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2380

indicative of ADHD or simply being sleepy.

Q.   Let's talk about the pegboard test.  Is that reflected on this document, Dr. Aguirre?

A.   I believe on the next page.

Q.   I'm sorry.  Looking at Page 4 of Government's Exhibit 37.

A.   Keep scrolling.  We were not there yet.

Q.   I apologize.

A.   There it is.

Q.   It's on Page 5?

A.   Yes.

Q.   Okay.

A.   So, yeah, so there we see that there is an impairment on this measurement of being able to perform a manual dexterity task.  Again, in and of itself, this is not -- so this test does not strongly localize any particular area of the brain. So somebody has trouble with this, it doesn't allow you to conclude that there is one particular area of the brain or one particular kind of injury that they sustained.

        And my impression of this test in particular, and the neuropsychological testing generally was that it didn't show a pattern of findings suggestive of brain injury, simply, instead, a normal variation in strength and weaknesses were all better at some things and poor at some other things.  In this case he seemed to be not very good at this one particular pegboard test.

What you would typically do then is look to see does that correlate with impairments in daily life which would relate to manual dexterity.  So coordination with the hands. And, you know, I noted from the record that he learned piano as a kid and had a job rigging parachutes, which both of those seem to require some degree of dexterity.  So I didn't think too hard that this was an indication of a deficit.

MS. ALI:  Your Honor, I understand the Court's ruling about his ability to testify beyond the opinions contained in his report, but I will just note for the record he has been qualified as an expert as a neurologist, not as a neuropsychologist, and he's now testifying in some detail about these results.  Just making my record on that.

THE COURT:  Well, Dr. Mirsky is deceased, and his testing has been referred to any number of times.  It's important for the Court to hear.

MS. ALI:  I understand, Your Honor.  I'm just making a note that he is a neurologist.  The government wanted to call a neuropsychologist, I guess they had Dr. Martell, but they could have done that.

THE COURT:  Well, I will listen to him as a neurologist and how he's interpreting this as a neurologist.

MS. WARD:  If I may qualify that, Your Honor.  He was also qualified as an expert in behavioral neurology.

THE COURT:  I understand.

Aguirre, G.  - Direct                                                    2382

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, if we heard testimony that Mr. Runyon demonstrated deficits in processing speed, do you have any opinions about that?

A.  So, let's see, I think that claim might be based upon the score that was present within the Montalbano 2009 report which observed that of his above average score results, his processing speed was in the least above average.  And so, again, I'll note that his performance on that aspect of the psychometric testing still was above average and not markedly out of line with his other test results.  And, moreover, if you scroll up a little bit on this Mirsky report, at the top of the page we see the results of his Trail Making Test. Trail Making is another neuropsychological test in which someone is required to draw lines between alternating letters and numbers, one form of it, and what was observed, he was very fast on this interspatial task, task on this other more complex task.

So, again, while he had sort of a distribution of scores on the individual components of his testing, there wasn't a pattern of impairment across the entire set of testing to indicate that he had particular difficulty with processing speed.

Q.  Dr. Aguirre, what is your holistic assessment of the

JODY A. STEWART, Official Court Reporter

neuropsychological testing completed in 2009?

A.   My overall impression was that Mr. Runyon performed very well on his testing.  One thing that I thought was notable is that there are some specific tests of frontal lobe function which are on the page directly in front of us.  This includes the Wisconsin Card Sorting Test where he -- where the test results indicate correct responses, no for segregate errors.

So the Wisconsin Card Sorting Test requires a person to deduce the rules of a card game that are never told to them, and then, moreover, to update their understanding of those rules when the rules change unexpectedly.  And it's a sensitive test for impairment to the frontal lobe function where people get stuck on the old rule.  But here Mr. Runyon performed well on that and didn't commit any of the so-called perseverative errors that are indicative of frontal lobe function.

He also performed well on the Stroop test here, which is a test that requires one -- we had talked earlier about impulse controls.  This requires one to inhibit the prepotent impulse, the need to name the ink color that words are written in, not what the word has written down.  So in the test, for example, the word "red" would be written in blue ink, and one is required to name the color blue without saying out loud the word "red," which is written down.  It's actually quite difficult.

Aguirre, G. - Direct                                        2384

MS. ALI:  Your Honor, none of this was testified to.  I understand that he has been permitted to go beyond the scope of his report, but none of this was testified to by Dr. Martell, who is a neuropsychologist.  Ms. Ward set it out Dr. Martell about all of this, and then he could have rebutted it, but none of this testimony came in.  She didn't ask Dr. Martell about the Stroop test or the Trail Making Test.  It didn't come up in any testimony, so we are now not only far beyond what is contained in his report, but we are beyond the testimony from the neuropsychologist who testified, the only neuropsychologist who testified in this case.

MS. WARD:  And I'd just point out that in Dr. Aguirre's report at the bottom of Page 4 moving into Page 5.

THE COURT:  Slow down, please.

MS. WARD:  I'm sorry.  I would note in Dr. Aguirre's report, Government's exhibit, at the bottom of Page 4 and going into Page 5 of Exhibit 75, he does go into some detail about the results of these tests.

THE COURT:  I was looking at another exhibit. What's the Government's exhibit number?

MS. WARD:  75, Your Honor.

THE COURT:  What page?

MS. ALI:  You are looking at a different report

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                   2385

than I am.

THE COURT:  This is January 19, 2023.

MS. ALI:  That's what I'm looking at, Your Honor. She is looking at a January 17th.  I don't know if that was a draft or something else, but what is on her page is not on my page.

MS. WARD:  Just a moment, Your Honor.  I apologize for that, Your Honor.  I got confused.  I'm not sure but I'll move on.

THE COURT:  I will note there is an absence of persistent changes in behavior, which is a major part of this expert's report, going through some of Dr. Mirsky's observations and Dr. Montalbano.  In any event, he was on behaviors.  Some of the other matters, you were fine on that.  But you withdraw the last question?

MS. WARD:  Yes, Your Honor.

THE COURT:  All right.

BY MS. WARD:

Q.  Let's move forward.  After reviewing neuropsychological testing, you indicated that you would use that information to determine whether it correlates to a pattern of behavior?

A.  Yes.

Q.  And did you find anything, patterns of note in the information you received about Mr. Runyon?

A.  Overall what I'd say is that the imaging, the

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                          2386

neuropsychological test reports, the descriptions of the events that had happened over his life, all inform this overall impression that he had a concussion in 1996 that he made substantial recovery from, that there is no change in his overall intellectual and behavioral function as a consequence of that event.

Q.  Thank you, Dr. Aguirre.  Let's discuss very quickly the methodology.  So when you have a patient that reports with a history of head injury or trauma, clinically speaking, what is the next step, just generally?

A.  Well, it depends a little bit on the problem that we are trying to solve.  But, generally speaking, an evaluation of a patient who has a complaint of a head injury and perhaps a complaint of some changes immediately following it, would be to obtain their history, get imaging results, and do neuropsychological testing.

Q.  And what would be the purpose of the neuropsychological testing?

A.  People often have trouble describing in their personal lives what are true impairments that they have in their function versus things that they perceive about themselves that aren't working as well as they would like.  So, for example, it's quite common for people to express concern that their memory is not working adequately, but, in fact, when tested formally, it's revealed that their memory is working

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                                2387

quite well, and, instead, what they have is concern regarding their memory but without actually an objective impairment in memory.  So that's why neuropsychological testing is often beneficial to help understand the symptoms that a person describes.

Q.  And after the person describes the symptoms, you do neurological testing to confirm whether they are present in that individual?

A.  Yes.  It helps us understand what the objective deficits in intellectual function are.

Q.  And what information would you need to see if it correlates or manifests in that particular defendant?

A.  Well, if we try and put -- we ask ourselves, is it the case that abnormalities in or strengths on neuropsychological testing agree with or don't agree with details of function that people provide in their day-to-day life.  So do those things seem to go together or not, and then further we'd ask, if we do think that there is an impaired area of function, can we identify a structural abnormality in brain scanning which would account for these changes.

Q.  And that would be the role of the imaging?

A.  That's right.

Q.  So in this case, when you put that together, did you find a report that would trigger a certain neuropsychological testing?  Is that what you would have done in a clinical

JODY A. STEWART, Official Court Reporter

assessment?

A.  Well, in a clinical assessment, if somebody had a concussive injury, say, so this is now a hypothetical, but if somebody had a concussive injury, and they presented with complaints or concerns regarding their thinking, we would get brain imaging and neuropsychological testing to try and understand the nature of their troubles.

Q.  And in this case did the neurological -- did the neuropsychological testing corroborate the history of brain injury or head trauma, in your opinion?

A.  Yeah.  The way I put this together is that I did not find evidence in the materials that I reviewed that there was a brain injury that produced a measurable impairment in intellectual function and behavior.

Q.  Did the MRI imaging, did that inform your assessment?

A.  So the MRI imaging was helpful in that it showed that the structure of the brain appeared healthy and normal, and there was no focal areas of damage to suggest an injury of sufficient severity to produce these alterations in behavior -- to produce an alteration in behavior.

Q.  Did you see any evidence that would correlate the reported history of injuries or symptoms and the resulting brain dysfunction or impairment?

MS. ALI:  Objection, leading.

THE COURT:  Overruled.  Go ahead.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Direct                                              2389

THE WITNESS:  Could you repeat the question, please?

BY MS. WARD:

Q.  Did you see evidence that correlates between the reported symptoms, the reported injuries, and a resulting brain dysfunction or impairment?

A.  I did not find evidence in support of a brain dysfunction or impairment, and which is not atypical for someone who has a history of a concussion.

Q.  And how much of your opinion is informed by the reports of Mr. Runyon's behavior between 1996 and 2007?

A.  Between 1996/2007, not deeply informed but somewhat informed.  I mean, there was -- let me stop there.  Not deeply informed/somewhat informed.

Q.  And why is that?

A.  Well, his life did seem fairly chaotic during that time, and so it's a little hard for me to know what actual deficits and intellectual function or behavioral function might be proposed to have been present during that period, though I did see evidence that he was taking on jobs and advancing in roles and was leaving those jobs for reasons that were similar to those that caused him to have -- to leave jobs prior to this 1996 potentially concussive injury, and that throughout this period of time, both prior to 1996 and after, he would tend to leave roles due to interpersonal conflicts,

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                    2390

typically with superiors, which suggested to me that his intellectual function allowed him to do these jobs but that personality conflicts led him to have to ultimately leave these roles.

Q.   Based on the information that was available in 2009, Dr. Aguirre, did you see any evidence of another brain injury or defect?

A.   I did not.

Q.   Did you see any social reports or behavior reports that would indicate any other type of brain injury or defect?

A.   No, I did not.

          MS. WARD:  Can I have just one moment, Your Honor?

          THE COURT:  All right.

          MS. WARD:  That's it, Your Honor.  Thank you.

          THE COURT:  Cross-examination, Ms. Ali.

                    CROSS-EXAMINATION

BY MS. ALI:

Q.   Good afternoon, Dr. Aguirre.

A.   Good afternoon.

Q.   How many hours have you spent preparing for this case, including both your report and preparing for your testimony?

A.   So I think it was at 22 hours before I got on the plane to come down here, and I would need a moment to tally up how much time I've spent since arriving, but it's on the order of 10 or 12 hours.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2391

Q.   And that was at $1,000 an hour; is that right?

A.   Yes.

Q.   And who is paying for your work in this case?

A.   The -- this team here.  I don't know how I refer to them.
The U.S. side.

Q.   And the last time you testified in a capital case was in
2016; is that right?

A.   I think so, if that's *U.S. versus Hanson* you're referring
to, yes.

Q.   And your hourly rate in that case was $250 an hour; is
that right?

A.   Yes.

Q.   Did you practice your direct examination when you met
with counsel for the government?

A.   You are going to have to explain what you mean by that.

Q.   Did you do question and answer to prepare for today?

A.   No.  We had sort of more of like a general discussion of
the themes that we would cover and the topics and roughly
what order they were in, but we didn't actually, in any
sense, rehearse specific questions and my responses.

Q.   Did counsel provide you any materials in preparation for
your testimony?

A.   Yeah, apart from the exhibits that we have been kind of
going over.

Q.   Did counsel provide you any materials in preparation for

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                    2392

your testimony?

        THE COURT:  What time frame?

BY MS. ALI:

Q.  At any point in preparation for today's testimony, so since you provided your report, has counsel provided you with any material?

A.  I think there were additional -- so since I prepared my report, I think there were additional -- sorry -- exhibits that I was provided with, but I would have to --

Q.  Is that right?

A.  I think you provided me with an additional document or two, but I can't remember what those were specifically because that was -- oh, yeah, exactly, Dr. Lipton's report, for example.

Q.  And that's not listed on your materials considered in your report?

A.  No, because that report dates from January of this year.

Q.  Are there any other materials that are not listed in your materials considered in your report that you've reviewed or been provided with?

A.  It would help me if we could take a look at my report with the list.

Q.  Sure.  If we could pull up Government's Exhibit 75.

A.  Okay.  Let's see.  So Mirsky, 2009, Patterson, Montalbano.  Okay.  Right.  So there was the report from

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2393

Dr. Lipton, which I had a chance to review, and then there was also a document, which I think was described as like a note to file, which regarded some discussion, I believe, between defense attorneys and reporting of a call with Dr. Merikangas.

Q.   Do you also recall being provided a summary, a synopsis that counsel for the government created?

A.   Is that -- so you are referring to -- so synopsis.  So when we went over the -- I guess that's not a material that I actually retained.  So when we went over the themes of the topics that we could discuss, there was a document that we referred to which had an ordering of the things that we would cover, but that was not a document that I had outside of that meeting.

Q.   Is this the document you were referring to?

        THE COURT:  Well, did you see the document?

        THE WITNESS:  I did.  So we are referring now, just to make sure we are clear, this is talking about -- this document, I don't recognize, I don't think.

BY MS. ALI:

Q.   You don't recall that this was provided to you before you prepared your report?

A.   Oh, so this is a document -- maybe that's right.  This is a document like a -- the summary to the expert witness document?  Is that how it would have been titled?

                JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2394

THE COURT:  Well, what is it, Ms. Ali?

MS. ALI:  It's a synopsis that counsel for the government prepared and provided to Dr. Aguirre.  It's not listed on the materials considered list.  I'm just trying to understand whether he reviewed this and considered it in preparing his opinion.

THE COURT:  This is just the issues that would be coming up.  It says here the issues that would be coming up.  You can enter if you want, but I'm not sure the point that you're making.  I was understanding your question to be since he came here, and I understood that he got a note to file.  What was the other thing you said you got?

THE WITNESS:  A report from Dr. Lipton.

THE COURT:  A report from Dr. Lipton and the note to file that we are all familiar with.  That's the way I understood the question.  Now, you need to rephrase it because I didn't understand the question.  That's all I'm asking you to do.

MS. ALI:  I asked a follow-up question, whether there was anything other than those things we had just discussed, and other than the things listed on materials considered list in Government's Exhibit 75 that he was provided or reviewed in connection with his work on this case.

THE COURT:  You've shown him this.  His answer is,

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                2395

I think he said I don't recall, but I'll let you ask him again. In any event, if he's seen it and reviewed it, but you have to ask him the question.

MS. ALI: That's all I'm trying to establish, Your Honor.

BY MS. ALI:

Q. Have you seen this document before?

A. I can't be certain, but I do have a memory that when I was sent materials to review, way back then, this would have been in November or so of 2022, there was associated with that what I regard almost like a table of contents. It's possible that this document you are showing me here is that thing, but I have a fairly dim memory of it.

THE COURT: Fairly what kind of memory?

THE WITNESS: Dim.

THE COURT: Do you want me to admit it as a Court exhibit?

MS. ALI: Why not.

THE COURT: Okay. That's fine.

MS. ALI: I think we are up to 9 or 10, but I'm not sure.

THE COURT: Pass it up. The way he says he has a dim memory, and he's not sure, but I'll take it based upon the testimony.

MS. ALI: I'll just clarify for the Court, this was

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2396

something that the government provided to at least Dr. Aguirre and Dr. Martell when he was retained as their expert in connection with their preparation of their report that was then turned over to us.

THE COURT:  What is your position on this document? I'm not sure what it is.

MS. WARD:  Yes, Your Honor.  We disclosed -- we have disclosed that we provided this document along with Ms. Chavis's 2015 letter that they sent to their experts outlining the issues of what they observed.  These were given very, very early as we were negotiating -- consulting -- preconsulting with Dr. Aguirre to determine what areas he might be able to elicit.

THE COURT:  Is there a letter from Ms. Chavis somewhere here?

MS. WARD:  It was disclosed.  I'd have to look to see if we have it.

MS. ALI:  The government entered that letter, and I can't remember which exhibit it was, but that has been shown to witnesses.

THE COURT:  What?

MS. ALI:  The government entered the letter from Ms. Chavis I think that Ms. Ward is referring to.  I don't recall what exhibit number it was, but I'm not arguing this wasn't disclosed.  I'm just trying to establish if it is in

Aguirre, G.  - Cross                                        2397

his materials considered list and what he's reviewed and what he didn't.

THE COURT:  If it came with a cover letter, I'd like to see the cover letter.

MS. WARD:  It did not, Your Honor.  That was it. It was just -- it was the original materials.  If I can proffer, it was -- these are the issues that we think would happen on this claim as we were discussing the scope of his potential consultation.

THE COURT:  So, in other words, this is what you send an expert saying these are the issues before the Court, and this is what we are looking for testimony on, and he may or may not be able to give it, and you may or may not retain him?

MS. WARD:  Yes, Your Honor.

THE COURT:  Then that's what it is, not particularly important at this stage, and his testimony is that he has a dim memory of it, and we will enter it as Court Exhibit 9.

(Court Exhibit 9 received in evidence.)

BY MS. ALI:

Q.  Did counsel show you Dr. Nadkarni's testimony in these proceedings in preparation for your testimony today?

A.  No.

Q.  Did counsel show you any other testimony from his *habeas*

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2398

proceedings?

A.  No.

Q.  Did you provide any documents or information to the government other than your January 19th, 2023, report?

A.  No, at least not that I recall.

Q.  Did you write your report yourself?

A.  Yes.

Q.  Did anyone else participate in the drafting of your report?

        THE REPORTER:  I didn't hear you.

        THE WITNESS:  No.  Sorry.  I'll speak up.

        THE COURT:  Let the question finish and then the answer and vice versa.

BY MS. ALI:

Q.  Did anyone provide input into your report?

A.  No.

Q.  Your report is six pages long; is that right?

A.  Yes.

Q.  Is that typical of what you prepare when you're asked to offer opinions in capital cases?

A.  I'm not tracking -- I haven't done this a lot, and in -- I don't think I've actually had the opportunity to produce many reports.  Largely, it's a matter of discussing with counsel the particular materials and test results that they are drafting, and it doesn't actually yield a report.

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                2399

Q.  You testified on direct, and Ms. Ward showed you your testimony list that's dated October 30th, 2023.  Is that this document?

A.  Yes.

Q.  And you testified that it was up to date and accurate as of October 30th, 2023; is that right?

A.  Yes.

Q.  And this is a list of cases in which you were retained by the government?

A.  Not exclusively.  There are cases here where there are medical/legal cases as well.

Q.  Let me rephrase.  In the criminal cases listed here, you were retained by the government?

A.  Yes.

Q.  I want to just highlight one entry that's this *United States versus Carlo Wilson* where it says "document review." Do you see that?

A.  Yes.

Q.  Did you write "document review" next to it?

A.  Yes.

Q.  Do you recall that you also prepared a report --

THE COURT:  Can you wait just a minute, please. Where is this document?  Have you given it to us?

MS. ALI:  Ms. Ward showed it to him.  I don't recall if it's entered into evidence.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2400

MS. WARD:  It is the final page, Your Honor.  It's Government's Exhibit 75.

THE COURT:  I just was looking at 75 in my book.

MS. WARD:  I'm sorry, it's 133.  My mistake.

THE COURT:  All right.  It's 133 of the CV?

MS. WARD:  Yes.

THE COURT:  I've got it.

BY MS. ALI:

Q.  Do you recall that you also prepared a report in the *Carlo Wilson* case?

A.  To be honest, I have trouble remembering, but I think that could very well be true.

Q.  If I represent to you that you -- the report was filed in 2022 in the Eastern District of Michigan, do you have any reason to doubt that?

A.  I don't.

Q.  On direct examination you defined yourself as having a subspecialty in behavioral neurology; is that right?

A.  Yes.

Q.  And you're certified by the American Board of Neurology?

A.  As a neurologist, yes.

Q.  And the American Board of Neurology lists -- has certain listed subspecialties; is that right?

A.  Correct.

Q.  And behavioral neurology is not one of them?

Aguirre, G.  - Cross                                                2401

A.  Correct.

Q.  And you're not certified in any of the American Board of Neurology subspecialties; is that right?

A.  Correct.

Q.  Including epilepsy?

A.  That's true, yes.

Q.  Brain injury medicine?

A.  Correct.

Q.  Neurodevelopmental disability?

A.  Correct.

Q.  You're also not a radiologist?

A.  I'm not a radiologist.

Q.  You're not a neuroradiologist?

A.  No, I'm not.

Q.  I'll ask you, you're not a neuropsychologist either?

A.  I'm not a neuropsychologist.

Q.  You mentioned that you've got a clinical practice.  Is that about 10 percent of your time that you spend on clinical practice?

A.  It's 15 percent these days.

Q.  And your scientific work has not focused primarily on traumatic brain injury; is that fair to say?

A.  Not principally.  It's been a thing I have worked on over the years.

Q.  We can pull up your CV, which is Government's Exhibit

JODY A. STEWART, Official Court Reporter

133.

On the first page of your CV you provide a narrative description of your work.  Do you see that?

A.  I do.

Q.  And it states that your scientific work is in the area of translational vision science; is that accurate on your CV?

A.  Yes.

Q.  It doesn't say anything about traumatic brain injury?

A.  It does not.

Q.  It doesn't say anything about mental illness?

A.  No.

Q.  Your work is devoted almost exclusively to vision problems or at least as described here in your CV?

A.  Well, I wouldn't say exclusively, but I think, yes, the narrative section describes my principal focus being translational vision science.

Q.  And if we turn to Page 6 of your CV, we've got the beginning of your publication list.  We can scroll through. I think there are 115 in total and then some additional editorials and things listed underneath.  Of those 115 publications, only a couple have anything to do with traumatic brain injury, is that right, or focus on traumatic brain injury?

A.  That's right.

Q.  Two, is that fair to say?

Aguirre, G.  - Cross                                                    2403

A.  Yes.

Q.  And the first one of those is 106, I think, and that was published in 2022; is that right?

A.  Correct.

Q.  And you're listed -- you're not the primary author on that study?

A.  No.

Q.  Is the second of these 111, "The symptoms associated with headache in youth"?

A.  That's right.

Q.  That was -- there is no date here.  Do you recall when this was?

A.  Yes.  So it's listed here in January submitted.  It is now in press.

Q.  Published?

A.  2023.

Q.  And, again, you're not the primary author?

A.  I'm not.

Q.  Anything else on here that is related to traumatic brain injury?

A.  Not in the publication list, no.

Q.  Nothing on your publication list about mental health sequelae from brain injury?

A.  Let's go no.

Q.  And if you look back at the narrative description of your

Aguirre, G.  - Cross                                                    2404

experience on Page 1 of your specialties, it states that magnetic resonance imaging (MRI) is an important technique in my studies.  But most of your research actually involves the reading of functional MRI, not MRI; is that right?

THE COURT:  Well, first provide what's the difference between functional.  I don't understand the question, the difference between functional MRI and what other kind of MRI.

MS. ALI:  I can do that first and come back to this question.

THE COURT:  Yes.  Ask if there is a difference first.

BY MS. ALI:

Q.  Is there a difference, Dr. Aguirre, between FMRI, functional MRI, and MRI?

A.  Yes.  Would you like me to explain?

THE COURT:  Yes, please.

BY MS. ALI:

Q.  I've got questions about it, but you can explain.

A.  You can use MRI scanner to take pictures of the brain in different ways, and functional MRI is a technique that is used to acquire pictures that are sensitive to changes over time in the level of neural activity in different parts of the brain, and those images are typically acquired along with structural MRI scans, which show the anatomy of the brain.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2405

Q.  And just to clarify for the Court, the images that you reviewed --

        THE COURT:  Clarify not only for the Court, but for the record.

BY MS. ALI:

Q.  For the record, the images that you reviewed of Mr. Runyon's 2009 -- the 2009 brain imaging, those are MRI images, not FMRI images; is that correct?

A.  Correct, or infrastructural MRI images.

Q.  And an FMRI is used to help run statistical computations that help identify brain function; is that right?

A.  One conducts statistical analyses of functional MRI data to ask questions about brain function.

Q.  FMRI images do not contain functional visible images like a regular MRI image?

A.  It's a nuance topic, but let me say the structure of the brain is not easily visible in a functional MRI.

Q.  Let me ask it this way.

        THE COURT:  Let me ask a question here.  In your review of the records, did Dr. Merikangas or anyone order a functional MRI?

        THE WITNESS:  Not that I saw.

        THE COURT:  So there was no functional MRI in 2009?

        THE WITNESS:  There were, as I understand it, no functional measurements were made as part of this case.

Aguirre, G.  - Cross                                              2406

THE COURT:  So as far as I'm concerned, again, it's what the attorneys knew from their experts.  They were depending on their experts.  Now you are going to say there should have been a functional MRI.  Where does that come from in this?

MS. ALI:  I'm not making that argument, Your Honor. I'm establishing Dr. Aguirre's qualifications or not to be a finding on the issues in the case.  I'm just trying to establish what it is that his expertise is in.

THE COURT:  He's explained the difference but there was no functional MRI in this case.

MS. ALI:  That's precisely my point, Your Honor.

THE COURT:  So let's move on.

BY MS. ALI:

Q.  If you look back -- I'm sorry, let me go back to my initial -- well, let me ask it this way.  Reading an FMRI image is different than reading an MRI image; would you agree with that?

THE COURT:  You are now asking about a functional MRI.  We don't have a functional MRI.

MS. ALI:  Your Honor, my point is that I'm trying to establish that Dr. Aguirre's expertise is in reading functional MRIs.  He has been called as a rebuttal to the reading of an MRI scan, and this goes directly on his qualifications.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                2407

THE COURT:  Then that's where you're moving, then move to that direction.  He's been asked about his experience reading MRIs, then move on to that question.  Now that you've established what a functional MRI is, ask him what is his experience and what it entails.

BY MS. ALI:

Q.  Most of your research, Dr. Aguirre, involves the reading of functional MRIs, not MRIs; is that right?

A.  That's right.

Q.  And your profile page on your Pennsylvania website says, "The majority of my research uses bold FMRI"; is that right?

A.  That's a true statement about the majority of my research.

Q.  And turning to your clinical work, which I think you testified takes up 15 percent of your time, how many patients -- I'm sorry -- I think you testified on direct you see about 200 patients a year; is that right?

A.  Yeah, 200 to 300, somewhere in that range.

Q.  And you conduct neurological examinations of all those patients?

A.  Yes.

Q.  How many of those patients are dealing with traumatic brain injury if you count concussions and mild traumatic brain injury?

A.  So this will be a very rough estimate because I'm not

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                      2408

quite sure, but let's go with 30 a year.

Q.  So 15 percent?

A.  Well, 10 percent-ish.

Q.  And you agree that a neurological examination doesn't rule out a traumatic brain injury, a normal neurologic examination?

A.  I can't agree to that.  We would have to put some boundaries on what we mean by traumatic brain injury.

Q.  Let me ask it a different way.  A normal neurological exam would not end the inquiry about whether or not somebody has suffered a traumatic brain injury?

A.  There are -- it would not be possible to have a severe traumatic brain injury in a normal neurologic examination. It is true that someone could have a history of a mild traumatic brain injury and subsequently have or even at the time have a normal neurologic examination.

Q.  Let's say a patient --

THE COURT:  It's possible, but what is the degree of certainty?

THE WITNESS:  Let's see.  It's entirely compatible some could have -- let's try that, entirely compatible that someone could have a normal neurologic examination in the setting of having had a concussion in the past or even relatively recently.

BY MS. ALI:

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2409

Q.  Let's say a patient walks into your clinic at Penn, and you suspect the person might have a traumatic brain injury based on clinical history.  Neurologic exam is normal or mostly normal, would you sometimes send that patient to another department for further investigation or testing?

A.  It would really depend an awful lot on what their symptoms are, what the trouble is.  If somebody came in and said, I had a concussion, and now I'm feeling fine, then we wouldn't do much more.  But if you would like to offer me an example of a particular type of problem that the person would have that would guide my answer.

Q.  If you have reason to suspect that the person had a severe head injury, and the neurologic exam was normal, would you sometimes send that patient for further investigation or testing?

A.  Yes, that could happen.  I can think of circumstances under which that could happen.

Q.  And that would often include getting imaging of the brain?

A.  Yes.

Q.  You would not do that imaging yourself, I think you testified on direct?

A.  Oh, I see what you mean.  So, yes, right, the imaging would be, the patient would be referred to the radiology department to have an MRI scan.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2410

Q.  Your job is to order the studies?

A.  Yes.

Q.  That's the standard procedure in a neurology clinic, not to do the testing yourself, but you refer the patient out to a radiology clinic?

A.  Yes.

Q.  That would be, if it's a brain injury, to a neuroradiologist at Penn; is that correct?

A.  Yes, at Penn we have neuroradiologists to evaluate these MRI scans of the brain.

Q.  And you testified on direct that neuroradiologists have specialized training in reading brain MRIs?

A.  Yes, they do.

Q.  And you put a great deal of confidence in their reading of the brain MRI?

A.  I rely upon information provided by neuroradiologists.

        THE COURT:  I missed your last few words.

        THE WITNESS:  I'm sorry.  I'll restate it.  I rely upon information provided by neuroradiologists.

BY MS. ALI:

Q.  Would you have a higher degree of confidence in the reading of a brain MRI by a neuroradiologist at Penn than you would of a diagnostic radiologist with a specialty in breast imaging?

A.  Yes, I would.

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                          2411

Q.  So going back to the hypothetical patient.  You send the patient to radiology, and when the patient comes back to you, do you typically receive the scan itself along with the report from the neuroradiologist?

A.  Yes.

Q.  Do you then review the images yourself or you just rely on the neuroradiologist report?

A.  No, I review the images myself.

Q.  And about how often do you agree with the neuroradiologist report?

A.  Oh, I'd say the -- the clear majority of the time.

Q.  When you testified in the *Sampson* case in 2016, I think you said you agreed 95 percent of the time.  Does that sound about right?

A.  Yes.

Q.  And in the 5 percent of the time, or roughly that, that you disagree, would you then typically discuss the issue with the neuroradiologist?

A.  Yes.  Well, not every time but on some occasions we would.

Q.  Have you ever had a case where a neuroradiologist said to you or expressed a strong opinion or read a report as abnormal, and you said, I disagree based on my own reading of the scan, I'm just going to let the patient go?

A.  Well, I think "let the patient go" is a bit cavalier, but

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2412

there have been times that neuroradiologists have identified what they feel is an abnormality on the scan, but my clinical judgment is that it is what we might call an overread, that the neuroradiologist has interpreted something as abnormal that's not actually abnormal, and in that case I follow my own judgment in that situation.

Q.  And are you more likely to follow your own judgment in that situation when the finding is subtle as opposed to evidence of a severe head injury?

A.  Yes.

Q.  If a neuroradiologist -- if you got a neuroradiologist report back with a scan, with a finding of encephalomalacia, would you subject Pennsylvania to liability by ignoring that finding and telling the patient they are normal?

MS. WARD:  Your Honor, if I may, this is outside the scope, and it's irrelevant to the evidence of the 2018 report.

MS. ALI:  What's irrelevant?

THE COURT:  I sustain the objection.  It's a little bit argumentative, too.  You are saying you would just discharge a patient when they have a problem?  I mean, again, the question is a bit cavalier.  Can you rephrase it?

MS. ALI:  I will, Your Honor.

BY MS. ALI:

Q.  If a neuroradiologist -- if you got a neuroradiologist

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2413

report that said -- had a finding of bifocal encephalomalacia, would you ignore that finding based on your own reading of the scan?

A.  That question would require --

MS. WARD:  Again, Your Honor.

THE COURT:  Go ahead and answer.  I may strike the question and the answer because there is no evidence in 2009 that this was the case.  That's the problem.  The ruling has been it's not what somebody knew in 2018, it's what they knew in 2009.  I'll let him answer, but I don't know that it's relevant.  Go ahead and answer.

THE WITNESS:  Thank you.  In answering your question, I'm going to imagine a scenario in which a -- I refer a patient for an MRI scan, and the neuroradiologist says, look, I found evidence of encephalomalacia at this part of the brain, and then I look closely at those images, and I can't see it myself, then I would probably discuss it with my colleague, and say, can you show me what it is that you see as encephalomalacia?  If I still remain unconvinced that an abnormality is present, then I would follow my judgment moving forward.

BY MS. ALI:

Q.  And what do you mean by "following your judgment moving forward"?

A.  I would -- if I did not have findings that overall

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                        2414

suggested that there had been a particular diagnosis or a particular disease, then I would treat the patient accordingly.

Q.  Let's pull your report back up that's Government's Exhibit 75.  You list at the top of your report in the second paragraph the purpose of your report, and specifically you say at the top of Page 1 that the purpose of your review was to determine whether there was evidence to support two assertions.  Can you read those two assertions for us?

A.  Yes.  Number one, "Mr. Runyon suffered a brain injury prior to the instant offense of April 2017."  Number two, "This brain injury produced an alteration in behavior that persisted until April 2017."

Q.  And at the beginning of your work in this case you received certain information from the government; is that right?

A.  Materials, yes.

Q.  And you reviewed Mr. Runyon's 2009 MRI scan as we've established?

A.  Yes.

Q.  You reviewed reports of MRI scans from Mr. Runyon from 2009, and your materials considered list also list a 2018 -- I'm sorry, a 2020 BOP Health Services Problems list which contains reference to a 2018 MRI; is that correct?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2415

Q.  And you also reviewed reports from other expert witnesses in this case, those are listed here on your first page of your report?

A.  Yes.

Q.  You also testified earlier that you subsequently received Dr. Lipton's report?

A.  Yes.

Q.  Did you receive any other reports from other experts in this case other than what is listed on this page and Dr. Lipton?

A.  I don't believe so.

Q.  Do you recall receiving declarations from Dr. Merikangas?

A.  Oh, okay.  So I will say the Merikangas materials are kind of confusing to me because there are reports from 2009 and then other reports that seem to be commenting on things from 2009, so I couldn't say for certain.  We would have to look at a specific document, and I can tell you if I recollect it or not.

Q.  Okay.  One of the stated goals of your report, as we just reviewed on Page 1, is to consider whether there was any evidence that Mr. Runyon suffered a brain injury prior to the crime; is that right?

A.  Yes.

Q.  And other than that BOP Health Services Problems list from 2020 that you mentioned on your materials considered,

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                          2416

you didn't review any of Mr. Runyon's medical records; is that right?

A.  I did not.

Q.  You didn't review Mr. Runyon's school records?

A.  I did not.

Q.  Not his employment records?

A.  I did not.

Q.  Other than what other experts reported as listed in your materials considered list, you didn't review any materials concerning Mr. Runyon's social history or childhood?

A.  I did not.

Q.  You did not review the underlying neuropsychological testing data from the government's trial expert, Dr. Montalbano?

A.  By underlying you mean the sort of raw score sheets that might have been generated.

Q.  That's right.

A.  I did not.

Q.  And same question for Dr. Mirsky, you did not review the underlying raw data from his neuropsychological testing?

A.  I did not.

Q.  Other than the materials listed in your report, you didn't review any materials concerning any of Mr. Runyon's head injuries listed in your report?

A.  No, I did not review other materials apart from the ones

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                              2417

listed.

Q. You didn't review his Army medical records, for example?

A. I did not.

Q. You didn't review records from the Portsmouth jail?

A. I did not.

Q. You didn't review any declarations or testimony from Mr. Runyon's family and friends concerning any of these incidents?

A. I did not.

Q. At any point did you request those records from counsel?

A. I didn't know that was a thing I could do. But, no, I did not.

Q. Do you recall when you reviewed the expert reports that are listed here, they had -- some of them had long lists of materials that had been provided to them, including all of those things we just talked about?

A. Yes. I saw this long list. My understanding was that there were restrictions upon the materials I was allowed to see, and so I had been given what I was supposed to see.

Q. And what's the basis of that understanding that you have?

A. It's fairly informal, but I think just in conversations with the prosecution team.

Q. You had an understanding based on your conversations with the government that you were not permitted to ask for Army medical records or other things about Mr. Runyon's background

Aguirre, G.  - Cross                                          2418

and childhood?

A.  Well, I'll say -- I'm not sure what I'm allowed to ask for or not.  I didn't realize it was a possibility that I could ask for more materials.  I also had the general sense that there was some -- that the structure -- for example, that I wasn't supposed to see things after certain dates.  So I'm aware that there had been sort of general legal maneuver regarding materials that different witnesses were allowed to see, so I just presumed the list of materials that I received were the listed materials that I was supposed to have.

Q.  When you see a patient in your clinical practice, is their clinical history important to you?

A.  Yes.

Q.  So if a patient brought medical records suggesting a history of head injuries and brain injuries dating back a number of years, that's something you would consider in making a clinical judgment?

A.  Yes.

Q.  You testified about the term "clinical correlation" on direct.  Do you remember that?

A.  Yes.

Q.  And to establish a clinical correlation for a patient, you first do a neurological examination; is that right?  You might?

A.  Well, the first thing you do is you get the history, but

Aguirre, G.  - Cross                                              2419

then you do a neurologic examination.

Q.  Okay.  So first the history, then a neurological examination.  You didn't do a neurological examination of Mr. Runyon in this case?

A.  I did not.

Q.  You've never met Mr. Runyon?

A.  I have not.

Q.  You also would review the patient's medical history, including pertinent medical records; is that right?

A.  When seeing a patient you would review their medical history, yes.

Q.  You didn't do that here either?

A.  I did not.

THE COURT:  What are you talking about when you would review that?  I just wasn't clear when you would be reviewing that.

THE WITNESS:  I believe I'm being asked the question in my regular course as a clinician, if I were to see a patient, would I review their medical history, and my answer was yes.

THE COURT:  I just wanted to be sure I understood the content.

BY MS. ALI:

Q.  I'm sorry.  I don't remember if he answered the question?

A.  The answer was yes, I would typically review medical

JODY A. STEWART, Official Court Reporter

history.

Q.  Okay.  And you didn't do that in this case either other than what was listed in reports by other experts in the case?

A.  I only have the materials described here.

Q.  You list on your materials considered list, and your report discusses a 2017 CT scan, a 2018 MRI scan of Mr. Runyon's brain, but you didn't review either of those scans yourself; is that right?

A.  No, I did not.

Q.  And, in fact, you didn't even review the MRI or CT reports that were prepared; is that right?

A.  No, I --

Q.  You were only given this health services problems list as listed here?

A.  That's right.

Q.  Can we pull up -- do you recognize this as the health services problems list that you reviewed and listed on your materials considered in your report?

        MS. WARD:  Again, Your Honor, I would object to questioning on the topic.  This information was provided because it's referenced in the expert report, but Dr. Aguirre was not asked about anything subsequent to 2015.

        MS. ALI:  It's in his report.  He discusses this record.  He lists it on his materials considered, and he gives opinions about it in his report.

Aguirre, G.  - Cross                                                2421

MS. WARD:  It's in his report because it's responsive to the other reports, but we've objected and pending the Court's ruling on the 2018 evidence.  It's in everybody's report but it's been stricken and not discussed in testimony.

THE COURT:  The issue is, and I was rereading the Fourth Circuit opinion, or portions of it a minute ago, is whether the counsel made a reasonable strategic decision or not in 2009.  So why are we going to spend time at this hearing now going through all of this in 2018?

MS. ALI:  I'm just trying to establish, Your Honor, that the only medical record he was provided by the government to review in connection with all of his work in this case is this single four-page document from 2020 from the Bureau of Prisons.  That's all I'm trying to establish here.

THE COURT:  Well, it says this on the front that he was given that, but I don't see any opinions based on it.

MS. ALI:  Well, he discusses it, Your Honor, on Page 4 of his report.  He discusses, in the second to last paragraph, there is a paragraph about the Bureau of Prisons Health, this document.

THE COURT:  Page 4.  But he says "as Dr. Nadkarni notes."  You can ask this, but I'm going to put little to no weight on this because this is just not the mandate from the

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2422

Fourth Circuit.  Your experts went past the mandate for the Fourth Circuit.  I'll let you ask him about this paragraph alone.

MS. ALI:  I'm trying to establish, Your Honor, that he was asked -- the first thing that his report says he was asked to do is determine whether Mr. Runyon suffered a brain injury prior to April 2007.  He testified he didn't receive any records other than this document.  I'm just trying to establish that this is the only medical record he received. He said he didn't recall what the document was on the page. I'm just trying to establish this is the document he received that's listed in the materials considered, and I'll move on.

THE COURT:  All right.  Then just ask him and get an answer.

BY MS. ALI:

Q.  Is this the document that we've been discussing that's listed on your materials considered list?

A.  Yes.

Q.  In your clinical practice would you rely on a summary document like that if you were being asked to render a diagnosis or an opinion about an MRI scan without seeing the report itself or the images themselves?

A.  In my clinical practice I would desire more information regarding an MRI scan test than a simple one-sentence

Aguirre, G.  - Cross                                              2423

summary.

          THE COURT:  But the only MRI scan test listed in there was the 2018; am I correct?

          MS. ALI:  That's right, Your Honor.

          THE COURT:  So let's move on.

BY MS. ALI:

Q.  Turning to your opinions in this case, your report discusses several -- we can pull that back up, Government's Exhibit 75 -- your report discusses several, you call them mechanisms of injury, incidents by which Mr. Runyon could have suffered a traumatic brain injury; is that right?

A.  Yes.

Q.  And you agree that at least one or more of these incidents -- you say this on Page 1 -- could have produced a traumatic brain injury by itself?

A.  Yes.

Q.  And you discussed with Ms. Ward at some length on direct this incident at age 3 in Mr. Runyon's clinical history?

A.  Yes.

Q.  And you describe that as an altercation with his father at age 3; is that right?

A.  Yes.

Q.  And you note in your report that "recall of memories" -- this is now moving on to Page 2 -- "in adulthood from this early period of life is famously unreliable"; is that

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2424

correct?

A.  Yes.

Q.  And you note that the narrative doesn't include a description of resulting medical care?

A.  Right.

Q.  You don't disagree that someone can suffer a traumatic brain injury even if they don't seek medical care?

A.  It's not impossible.

Q.  Not everyone who needs medical care seeks it or obtains it?

A.  Fair enough.  Yes.

Q.  As a toddler, Mr. Runyon was 3 years old, it wouldn't have been up to him to seek medical care; is that correct?

A.  Correct.

Q.  He would have been dependent on his parents?

A.  Correct.

Q.  And people may have reasons for failing to seek medical care, even in the case of a serious injury?

A.  Correct.

Q.  Particularly in instances of domestic abuse?

A.  Yes.

Q.  And child abuse in particular?

A.  Yes.

Q.  Your report says that the details of this incident are likely to remain difficult to corroborate, but I think we

Aguirre, G.  - Cross                                              2425

just established you never asked whether there was
corroborating evidence of this head injury at age 3; is that
right?

A.  I did not ask -- yeah, did not ask for additional
materials.

Q.  You relied on the documents counsel provided to you to
render the opinions in your report?

A.  Yes.

Q.  If that incident were well-corroborated, would that be
relevant to your evaluation of whether the incident happened?

          MS. WARD:  I'd object to that question, Your Honor.

          THE COURT:  Sustained.  He's testified what he saw
and what he did, and, frankly, the questions you were asking
are obvious, things you read in the paper every day.  So
it's just not a relevant question.  He said he didn't, he
didn't look at any, and he hasn't looked at any, and he's
testified about it, and he got it from the other reports,
and obviously there are reasons people don't report domestic
abuse.  You just need to move on from that.  It's
establishing nothing new for you, as far as the Court is
concerned.

BY MS. ALI:

Q.  You don't disagree, Dr. Aguirre, that a 3-year-old being
thrown into a wall by an adult could cause a severe head
injury?

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                          2426

A.  Yes, it could.

Q.  You discuss in your report that Mr. Runyon attributes this event to a lifelong asymmetry in the appearance of his face; is that right?

A.  Yes.

Q.  And you posited on direct that perhaps Mr. Runyon had a Bell's palsy that instead caused that facial asymmetry; is that right?

A.  Yes.

Q.  You didn't see anything in the record you reviewed in any of these reports or anything else that corroborated Bell's palsy in Mr. Runyon, other than his facial asymmetry?

A.  Right, the description, other than the description of the exam.

Q.  And correct me if I'm wrong, but I believe your testimony was that he couldn't have had a peripheral nerve injury without a skull fracture.  Was that your testimony?

A.  Couldn't.  The mechanism -- I offered one way that one could have ended up with a peripheral seventh nerve injury as a consequence of a traumatic injury, but I don't think I meant to imply that that was the only way that one could end up in that circumstance.

Q.  And you didn't see any evidence in anything that you reviewed that Mr. Runyon was born with a facial asymmetry?

A.  Not that I saw.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2427

Q.  You pointed out in your report that Dr. Nadkarni and Dr. Merikangas both identified facial asymmetry in Mr. Runyon; is that right?

A.  I did.

Q.  And but one of the government's trial experts both identified the facial asymmetry.  Do you remember that?

A.  Yes.  I think so, yes.

Q.  That was Dr. Patterson?

A.  Okay.  Yes.

Q.  You reviewed his report?

A.  Yes.

Q.  And you didn't note that in your report, you just listed Dr. Nadkarni and Dr. Merikangas?

A.  Yes.

Q.  And Dr. Patterson's description of the facial asymmetry is consistent with Dr. Merikangas's as being on the right side; is that correct?

A.  That agrees with my recollection, but I'd have to take a look to be certain.

Q.  You didn't note that in your report?

A.  I did not.

Q.  So you say in your report that you're unable to reconcile these conflicting descriptions between Dr. Nadkarni and Dr. Merikangas, but you didn't note that Dr. Patterson's description comported with Dr. Merikangas's?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2428

A.   It's true.  That would be the tie breaking vote.

Q.   And you don't dispute that the facial asymmetry exists; is that right?

A.   I do not dispute it.

Q.   And you didn't dispute that it doesn't matter, frankly, whether it's on the right side or the left side, it's an abnormality --

A.   No, I would actually disagree with that.  There were attempts in, I think, in Dr. Nadkarni, for example, in his report to field an argument that there was damage to a hemisphere of the brain, and the side on which the facial weakness occurred, you then look in the opposite side of the brain if you wanted to claim that there was a brain-based injury as the cause of the weakness.

       So I don't think it was entirely immaterial to the claims that were tried to be made.

Q.   You don't dispute that a peripheral nerve injury to the seventh cranial nerve could cause facial asymmetry?

A.   Oh, I don't dispute that.

Q.   And you don't dispute that an injury, an incidence of abuse could cause that brain injury?

A.   I don't dispute that.

Q.   And to cause that kind of injury to the face would have to be a significant event?

A.   Yes.

Aguirre, G.  - Cross                                            2429

Q.  You agree, as well, that a brain injury at age 3 could have significant developmental effects on a person?

A.  It could.

Q.  You also discuss a 1996 car accident that you say probably resulted in a brain injury.  You said, I think on direct, that the only evidence you found in the records you reviewed corroborated only that incident?  The only corroborating record you saw was about the 1996 car accident, not any of the other head injuries you list in your report?

A.  Yes.

Q.  Your conclusion about that 1996 injury is that the description is consistent with Mr. Runyon having suffered a concussion in that incident?

A.  Yes.

Q.  And you base that in part on the fact that Mr. Runyon sought medical treatment and underwent, as you say in your report, four to five months of physical therapy after the accident?

A.  In part on that.

Q.  How long did Mr. Runyon continue to seek medical treatment for the sequelae of that accident after that accident?

A.  I don't think I know that precise number.

Q.  That's not relevant to your assessment about how severe the injury was?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                            2430

A.   It's relevant, but I don't think I had access to a month-by-month description of his mental history from that time.

Q.   If a patient suffers a head injury and continues to complain of symptoms and seek treatment months or years later, that's relevant to your assessment of whether they suffered a traumatic brain injury?

A.   Yes.

Q.   You note that Mr. Runyon -- you note in your report that Mr. Runyon experienced symptoms such as vertigo, memory loss, and irritability after the accident?

A.   Yes.

Q.   You didn't review any declarations, though, from people close to Mr. Runyon who described the impact of the 1996 car accident on his functioning and behavior?

A.   I did not.

Q.   Do you recall seeing those declarations and interviews listed in other experts' reports?

A.   Not specifically, but I would accept that those were listed.

Q.   And you've established you didn't review Army medical records showing that he sought treatment from memory loss a year after the accident?

A.   I did not see records to that effect.

Q.   You didn't see Army records suggesting a diagnosis of

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                          2431

PTSD and depression as a follow-up for the auto accident a year after the accident?

MS. WARD:  Object, Your Honor.  That mischaracterizes the evidence in the record.

THE COURT:  Sustained.

BY MS. ALI:

Q.  You didn't review Army medical records showing he sought treatment for numbness and other symptoms months after the 1996 car accident?

A.  I did not.

Q.  You agree that a persistent and severe headache can be sequelae of traumatic brain injury?

A.  I do.

Q.  You testified that dizziness and vertigo can be a sequelae of traumatic brain injury?

A.  Yes.

Q.  And you agree that depression or anxiety or PTSD can also be a follow-on from a traumatic brain injury?

A.  Yes.

Q.  Same goes for memory loss?

A.  Yes.

Q.  Are you familiar with the traumatic brain injury clinic at Penn?

A.  Yes.

Q.  It's part of the neurology department?

Aguirre, G. - Cross                                    2432

A.  Yes.

Q.  Are you part of the traumatic brain injury clinic at Penn?

A.  I am not.

Q.  You see at the top there it says "Penn Medicine"?

A.  Yes.

Q.  I'll represent to you that this is a printout from Penn's website from the traumatic brain injury clinic.  Do you have any reason to doubt that?

A.  I do not.

Q.  And here do you see where it says "symptoms of TBI"?

A.  I do.

Q.  TBI stands for traumatic brain injury?

A.  Yes.

Q.  And under "mild symptoms" we have things like dizziness. Do you see that?

A.  Yes.

Q.  Changes in sleep patterns?

A.  Yes.

Q.  Trouble with memory?

A.  Yes.

Q.  Sleep disturbances?

A.  Yes.

Q.  And then down here, severe symptoms, headaches that worsen?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2433

A.   Would you scroll it up for me.

Q.   Oh, I'm sorry.

A.   Thank you.

Q.   There you go.  Headaches that worsen -- severe symptoms, and do you see headaches that worsen or won't go away?

A.   Yeah.

Q.   Seizures?

A.   Yes.

Q.   Weakness or -- I think that's meant to say "or" but you can --

A.   Yeah, weakness or numbness in the extremities.

Q.   And do you agree generally with what's written here?

A.   I do with the caveat that this is a patient-facing document as opposed to a clinical document.

THE COURT:  It's a patient what kind of document?

THE WITNESS:  It's a document that's meant to be consumed by patients as opposed to a description of clinical management practices.

THE COURT:  I understand.

BY MS. ALI:

Q.   And you didn't review medical records to determine whether Mr. Runyon reported any of those symptoms we just looked at after the 1996 car accident or any of his other head injuries?

A.   No.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2434

Q.  You also say on Page 2 of your report that you didn't find reference to any medical records in the reports by other experts.

If we could pull his report back up.

Do you see where it says that?

A.  If you draw my attention to the line that we are discussing.

Q.  Sure.  It says, "If contemporaneous medical records arising at the time of the car accident are available, I have not had an opportunity to review them, and I cannot find reference to such medical records in the reports by other experts."

A.  That's right.  I think my memory of the sentences I'm referring to, so when I say at the time of the car accident, a medical record of his treatment on the day of the car accident.

Q.  Is it your testimony that the only medical record that would be relevant to evaluating that accident would be records from the same day of the accident?

A.  No.  It would just be one helpful record.

Q.  It would be relevant to you if two days after the accident he sought treatment for issues stemming from the car accident?

A.  Yes.

Q.  It would be relevant to you that a year later he was

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                2435

continuing to seek treatment for issues stemming from that accident?

A. Yes.

Q. And I'm showing you, this is the report of Dr. Nadkarni. Do you recognize this?

A. I do.

Q. And if we flip to his materials considered list, 97 items long, do you see reference -- several references to different kinds of medical records?

A. Yes.

Q. And I'm now showing you the September 2015 report of Dr. Merikangas. Do you recognize this?

A. I do.

Q. And we are now looking at his materials considered list, a little bit shorter. I think there is 48 items in total.

A. Yes.

Q. Do you see references here to several different medical records?

A. Yes, although it's a little vague. What does medical records refer to?

Q. It says medical records?

A. It does.

        THE COURT: It says military records.

        THE WITNESS: It does.

        THE COURT: But you don't know which ones?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2436

THE WITNESS:  I don't know what that refers to.

BY MS. ALI:

Q.  Number 35 is medical records and number 36 is military records?

A.  Yes.

Q.  You agree, Dr. Aguirre, that a concussion can occur even when someone doesn't lose consciousness?

A.  Yes.

Q.  But it's your testimony that someone can't have a head injury that causes long-term brain dysfunction unless they lose consciousness?

A.  I don't think it's as actual as that.  I would say that when injuries -- head injuries that are sufficient to cause long-term injury almost always are associated with a loss of consciousness.

Q.  Are you familiar with the AANS, the American Association of Neurological Surgeons?

A.  Yes.

Q.  And I'm going to direct you to the web page from the AANS.  And if you look at the highlighted portion under where it says "causes," do you see that?

A.  I do.

Q.  And can you read the highlighted portion for us.

A.  Yes.  It says, "Many people assume that concussions involving passing out or a loss of" -- wait.  Oh, let me try

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                  2437

it again.  "Many people assume that concussions involving passing out or loss of consciousness, but this is not true. In many cases, people with a concussion never lose consciousness.  In several cases, external signs of head trauma, such as bleeding, may also be absent."

Q.  Do you disagree with that?

A.  I don't.

Q.  And moving down on the page under "symptoms," can you read the green highlighted portion?

A.  Yes.  "Even mild concussion should not be taken lightly. Neurosurgeons and other brain injury experts emphasize that although some concussions are less serious than others, there is no such thing as a minor concussion.  In most cases, a single concussion should not cause permanent damage.  A second concussion soon after the first one does not have to be very strong for its effects to be permanently disabling."

Q.  Do you agree, Dr. Aguirre, that multiple concussive events can have a cumulative effect on the brain?

A.  I could agree to that, although I don't wish to link that statement with that green highlighting piece that you just had there.

Q.  Okay.

A.  So I would not want the audience to take the impression that those two statements are linked.  So what's being described in this final sentence, if I may, is that there is

Aguirre, G.  - Cross                                          2438

such a -- there is a phenomenon that if someone has a concussion and that is still in the recovery phases of that first concussion and exhibiting symptoms from it, if they have a second concussion during that window, they can suffer a more severe injury associated with brain swelling, called second impact syndrome.  It's a reason why serial concussions close together have this particular risk.

A separate topic is there is a cumulative effect of having concussions that are spaced out in time, and we might also agree that concussions spread out in time also have a cumulative effect, but that's not what is being referred to in this green highlighted area.

Q.  Okay.  Thank you for clarifying.  Let's go back to the last thing you said.  Can concussions spread out over time also have a cumulative effect?

A.  Yes.

THE COURT:  Again, I want to remind everybody, we are not dealing with can and possibilities.  We are dealing with a reasonable degree of medical certainty.

BY MS. ALI:

Q.  Is it your opinion to a reasonable degree of medical certainty that multiple concussions, even when spread out over a period of time, can have a cumulative effect?

THE COURT:  Can.  He said that.  He has agreed with what you said.  Multiple concussions can.  Is that correct?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2439

THE WITNESS:  Yes.  I agree with the statement.

BY MS. ALI:

Q.  We've talked about the incident of abuse at age 3 and the 1996 car accident, but you noted several other incidents of head injury in your report as well?

THE COURT:  Are you going to go into those?  I think it's time to take a luncheon recess because most people have not had a snack at least.

I would tell you that you can't discuss your testimony on the break.  There is a snack bar, I think it's on the second floor, and I'm not saying that's particularly nutritious, but it is there for you.  It's there if you like nabs and so forth.

The Court stands in recess for 30 minutes.

(Luncheon recess from 2:58 p.m. to 3:33 p.m.)

THE COURT:  Everyone is here, Mr. Runyon, all the counsel, and Dr. Aguirre is on the stand.  You can continue, Ms. Ali.

BY MS. ALI:

Q.  Good afternoon again.  I think where we left off is you had testified about the incident of abuse at age 3 in the 1996 car accident, but your report also lists several other incidents of head injury; is that right?

A.  Yes.

Q.  And one of those is playing football as an adolescent; is

JODY A. STEWART, Official Court Reporter

that right?

A.  Yes.

Q.  And you recall that Mr. Runyon reported being knocked out playing football?

A.  Yes.

Q.  And is that description consistent with somebody who suffered a concussion?

A.  Yes.

Q.  You also list Mr. Runyon's proximity to a simulated hand grenade explosion.  We can pull up Government's Exhibit 75, and this is on Page 1.

Proximity to a simulated hand grenade explosion during his time in the military as a potential mechanism of injury?

A.  Yes.

Q.  And Mr. Runyon also reported being knocked out during this incident?

A.  Yes.

Q.  You recall that?

A.  Yes.

Q.  And is that description also consistent with someone who suffered a concussion?

A.  Yes.

Q.  You also discuss a 1990 car accident; is that right?

A.  Yes.

Aguirre, G. - Cross                                                    2441

Q.   And you say that it's described by Dr. Nadkarni as being associated with a loss of consciousness but that this event was omitted on other occasions when Mr. Runyon was asked to provide an account of head injuries.  Do you see that on Page 2?

A.   Yes.

Q.   But you also reviewed Dr. Mirsky's 2009 report; is that correct?

A.   Yes.

Q.   That is listed on your materials considered?

A.   Yes.

Q.   And Mr. Runyon also reported this 1990 car accident to Dr. Mirsky in 2009.  Do you recall that?

A.   Not explicitly but I accept that that is present.

Q.   You also note that Dr. Nadkarni -- this is again on Page 2 of your report -- it says, "Dr. Nadkarni refers to medical records regarding this car accident in 1990."  That's citing Dr. Nadkarni's report at Page 9.  And you say, If contemporaneous medical records arise at the time of the accident are available, I have not had an opportunity to review them?

A.   Yes.

Q.   I think we've established counsel didn't provide you those medical records before you prepared your report; is that right?

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                     2442

MS. WARD:  I'm going to object, Your Honor.  There is no facts in evidence on medical records contemporaneous to the 1990 incident.

THE COURT:  Sustained.

MS. ALI:  May I respond, Your Honor?

THE COURT:  Sustained.

BY MS. ALI:

Q.  Do you recall reading a transcription in Dr. Nadkarni's report or elsewhere that Mr. Runyon had reported that as a result of that 1990 car accident he had glass in his face?

A.  I remember hearing that assertion.  I'd have to look at the documents to make sure it is from Mr. Nadkarni.

THE COURT:  Can you refer him?

MS. ALI:  Yes, Your Honor.

BY MS. ALI:

Q.  I'll show you on the Elmo.  This is Dr. Nadkarni's report that we looked at earlier.

A.  Yes.

Q.  I'm turning to Page 5 at the very bottom.  There is a paragraph number 7.  Do you see that paragraph --

A.  I do.

Q.  -- that's highlighted?

A.  Yes.

Q.  It says, "Fall of 1990.  In school, he fell asleep at the wheel of his car and ran head-on into the end of a

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2443

semi-truck.  The windshield burst into shards that cut his face and left lacerations" -- and turning to Page 6, "which stayed for years and caused infections, et cetera.  He was unconscious for some of the accident, but he remembers some parts of the ordeal well."

Do you recall seeing that -- does this refresh your recollection that this is in Dr. Nadkarni's report?

A.  Yes.

Q.  And I'm showing you what's part of Defense Exhibit 83. This is part of the Army medical record.

It's Page 36 of the -- it's not paginated, Your Honor.  I know we talked about this before.  But I'm just going to show this one page on the screen.

Do you see the date on here, Dr. Aguirre?

A.  I do.  I haven't seen this document before.  Yeah, so have to zoom out and see more of it.

Q.  Sure.  There is attention between making --

A.  Let's stay at the top.

Q.  I'm happy to show you the whole document.  Do you see the date at the top of the document?

A.  I do.

Q.  And what?

A.  Is that 1995?  Is that 7 August '95?  Is that --

Q.  That's right.  And do you see the description here?  It's handwritten.  It's a little hard to read, but I can zoom in

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2444

for you if it's helpful.

A.   Yes.   Give me just a second to try and interpret this.
So 24-year-old male with probable IIC -- I'm not sure what
that means -- on forehead between brows.   Patient states
cysts becomes inflamed intermittently with purulent drainage.
First patient noted something following motor vehicle
accident at which time multiple pieces of glass became
imbedded.   Patient feels may something have -- may have
foreign body.   Please evaluate, I think.

Q.   Is this consistent with the description in Dr. Nadkarni's
report, and he's reporting the glass from the windshield from
an earlier car accident?

           THE COURT:   You're testifying now.   It's not on
that document.   He has a dermatology appointment, does he
not?

           MS. ALI:   That's right, Your Honor.

           THE COURT:   This is the 1995 car accident.

           THE WITNESS:   It strikes me that in both
Dr. Nadkarni's report and in this document Mr. Runyon is
giving a similar description of his attribution of an event
in 1990 and his attribution of the cause of a skin lesion.

BY MS. ALI:

Q.   The cause of which was?

A.   Which Mr. Runyon asserts is the cause of the skin
lesions.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2445

Q.   But the triggering event that Mr. Runyon self-reported was a motor vehicle accident; is that right?

A.   Yes.  Yes.

Q.   And you've never seen that document before?

A.   I have not.

Q.   You also refer to incidents reported to Dr. Nadkarni where Mr. Runyon was involved in a pyrotechnic explosion and was hit with a butt of a rifle.  Do you recall that in your report?

A.   I do.

Q.   And you discount these incidents because there is no report of loss of consciousness?

A.   That's not the only reason that I -- that's one reason why I discounted those incidents.

Q.   Mr. Runyon -- are you aware that Mr. Runyon reported to several other experts that both incidents did cause loss of consciousness?

A.   I was not aware of that.

         THE COURT:  Wait.  What did you say?

         THE WITNESS:  I was not aware of that.

BY MS. ALI:

Q.   You say in your report -- this is at Page 3.  Again, pull up Government's Exhibit 75 -- that it would take hundreds of subconcussive injuries to produce persistent diffuse injury to the brain and that Mr. Runyon did not have a history of

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                  2446

such an accumulation of injuries; Is that correct?

A.   Maybe.  Can we take a look at my sentence?

Q.   Sure.  It's the last paragraph before the heading "An unremarkable MRI scan of the brain."

THE COURT:  How about the page?

MS. ALI:  It's Page 3.

THE WITNESS:  Okay.  So what I wrote there is a little different from the words that you said.  What I wrote was, "While a large number (hundreds) of subconcussive injuries are now understood to produce persistent, diffuse injury to the brain (for example, as is seen in boxers and football players), Mr. Runyon did not have a history of such an accumulation of injuries."

What I'm referring to there is the literature on CTE, chronic traumatic encephalopathy, but that statement does not necessarily imply that it's not possible that a smaller number of subconcussive injuries could also produce a diffuse injury to the brain.  So hundreds is not a necessary component of that sentence.

BY MS. ALI:

Q.   So it's your testimony that a number could be smaller than hundreds, the subconcussive injuries can produce persistent diffuse injuries to the brain?

A.   Yes.

Q.   And you're specifically referring here on Page 3 to

Aguirre, G.  - Cross                                              2447

subconcussive injuries as opposed to concussive injuries; is
that correct?

A.  Yes.  Yes.

Q.  And you agree that many fewer concussive injuries can
cause persistent diffuse injury to the brain than
subconcussive injuries?

A.  Yes.

Q.  Subconcussive injuries are, by definition, below the
concussion threshold?

        THE COURT:  Why don't you ask him what they are
rather than telling him what they are.

        MS. ALI:  I'm on cross-examination, Your Honor.

        THE COURT:  I know, but you can still ask a direct
question rather than testifying.  Just ask him what it is.

BY MS. ALI:

Q.  Can you explain the difference for us, Dr. Aguirre,
between a subconcussive injury and a concussive injury?

A.  So a subconcussive injury is a blow to the head that does
not result in a formal diagnosis of a concussion yet
nonetheless can constitute an injury.

Q.  People can have -- can people have a subconcussive injury
and not be aware of it in the moment?

A.  I think you would be aware that you hit your head, but
you might not feel -- not be aware of neurologic symptoms as
a consequence.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2448

Q.  On Page 2 of your report, you say, "Overall, I judge there is no documentation to support that these events produced a meaningful brain injury"; is that right?

A.  Yes.

Q.  Is meaningful brain injury a clinical term?

A.  It is not.

Q.  What do you mean by that?

A.  What I'm trying to distinguish is between the notion that you could have -- we need a threshold defining what we mean by brain injury because there could be such a trivial insult that it has no effects whatever, nonetheless we call it.  So what I'm trying to reach for here is this idea that you would have a brain injury sufficient to produce a long-lasting change in cognition or behavior, and that might be true either individually or perhaps in some, the probable head injury.

Q.  And you're making this judgment that there is no documentation to support that the events described in your report produced a meaningful brain injury based on the limited set of records included on your materials considered list; is that right?

A.  Yes.

Q.  Let's talk a little bit about your opinions about concussions and mild traumatic brain injury.  In your report you say -- I'm trying to find the page.  Give me just a

JODY A. STEWART, Official Court Reporter

moment -- that a concussion -- this is on Page 3, "Concussions are a common, non-focal neurologic injury that result in a stereotyped change in mood and behavior that resolves over an approximately six-month period."  Do you see that?

A.  Yes.

Q.  And is it your view that the effects of a concussion are almost always resolved after about six months?

A.  Almost always might be a little strong.  I think I write the great majority resolve over approximately six months.

Q.  Are you familiar with the study that was published last year about -- a major study about mild traumatic brain injury?  This is published in a JAMA network.  I can put it in front of you.

A.  There are many such studies.

THE COURT:  He is going to have to be familiar with it for you to ask him questions about it.  So show it to him and ask him.

MS. ALI:  I will show it to him.  I'll note that Dr. Merikangas was presented with several articles that he said he'd never seen before, and he was questioned about them.

THE COURT:  So we are doing the same thing here. You are showing him an article and ask if he is familiar with it.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2450

            Just go ahead, please.

BY MS. ALI:

Q.  Are you familiar with JAMA?

A.  I am.

Q.  And what is that?

A.  It is the Journal of the American Medical Association.
It's a well-regarded medical journal.

Q.  Are you familiar with this particular paper?

A.  I am not.

Q.  Can you read the title of it for me?

A.  "Outcomes in patients with mild traumatic brain injury
without acute intracranial traumatic injury."

Q.  And is the JAMA Network Open a peer reviewed medical
journal, do you know?

A.  I think it is, yeah.

Q.  And all of the authors on this paper are either Ph.D.s or
M.D.s; is that right?  I'm sorry.  There is actually one J.D.
I don't know what she is doing there, but --

A.  Yes, with the exception of ADS, everyone else is, and
JOP.  Actually, there is an MS there, too.

Q.  Okay.

            THE COURT:  You need to follow the rules, and the
rules are that if an expert has relied upon a treatise, then
you can question them about it.  Not only is it not listed
as something he relied upon, you're now putting something up

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2451

that he says he's not familiar with.  Yes, he's familiar with JAMA.  So is the Court.  But you're going to now start getting in evidence from an article that he's not familiar with.

MS. ALI:  I understand your ruling, Your Honor. I'll note that the government put a number of articles in front of our witnesses that they testified they weren't familiar with, and they were permitted to question the witnesses about them based on their own understanding and expertise.  I'm happy to let him read the study and testify about it, but I'll move on.  I understand the Court's ruling.

BY MS. ALI:

Q.  We will pull up his report again, please, to Page 3.  You draw a conclusion, Dr. Aguirre, on Page 3 that you say, "In the great majority of cases, the symptoms of concussion improve gradually over weeks and are resolved after six months," and you say that your understanding of Mr. Runyon is consistent with that general understanding; is that right?

A.  Yes.

Q.  And you cite in two bullet points underneath that two pieces of evidence supporting that conclusion.  The first of these is that, "He described how the jump" -- I assume the jump out of an airplane; is that right?

A.  That was my understanding.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                        2452

Q.  -- "pulled everything back into place and essentially healed him."  But jumping out of an airplane can't heal brain injury symptoms; is that right, Dr. Aguirre?

A.  I agree.

Q.  And the second piece of evidence you say is that Mr. Runyon reported in 2009 to Dr. Montalbano, so 13 years after the 1996 accident, that his memory had improved but he still gets vertigo at times; is that right?

A.  Yes.

Q.  I want to move on to your review of Mr. Runyon's 2009 MRI scans.

THE COURT:  Before you go, can you pass that article up to the Court because I'm going to mark it as a Court exhibit.

MS. ALI:  Sure.

THE COURT:  This is an article dated August 17, 2022.  So it would be certainly literature and studies done after what is before this Court.  The reason articles were put before your experts is on many occasions they were trying to testify after something had occurred.  So you're implying that the Court has allowed them to do something and is not allowing you.  You presented voluminous testimony of not only what occurred up to 2009 but what occurred after 2009, and so consequently this particular literature, this expert is not testifying about this article in 2022 that

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                        2453

would concern a 2009 incident, particularly when he has not read it before.  Not only has he not seen it, but this is not relevant to the issue at hand because the attorneys could not have had this, nor could the experts have had it back in 2009.  So please make this Court Exhibit Number 10.

(Court Exhibit 10 received in evidence.)

MS. ALI:  Your Honor, the article that the government showed to both Dr. Martell and Dr. Merikangas was from 2021 about white matter hyperintensities.

THE COURT:  That's fine.  But they were testifying after the fact.  Dr. Cunningham was even at the trial to testify.

MS. ALI:  Dr. Aguirre is a rebuttal witness in these *habeas* proceedings.

THE COURT:  I understand.  Do you want us to continue to have a dialogue back and forth?  I've said my reasoning.  If you are now trying to impeach him -- that would be the only thing you would be doing -- I accept his unfamiliarity with the articles.  You are shaking your head. I've made a ruling, and I had reasons for making the rulings.

You submitted experts that went on and on, and I probably shouldn't have let them go on, and it was after the fact, and they were testifying about what they could do after the fact, after Dr. Merikangas had supposedly, from

Aguirre, G.  - Cross                                          2454

the late-produced discovery, told Mr. Hudgins and
Mr. Woodward's he didn't recommend that they go forward.
After all of this information from their files was produced,
you've come up with experts that are taking things all the
way to 2018 and beyond.

        So if their expert opinions said that at that point
of trial they were not correct, that's different.  I'm not
going back over all the Court's rulings and testimony
presented.  But at the time it was considered appropriate,
and right now I don't consider belaboring this witness
because of a 2022 article that he's not familiar with.  It's
now Court Exhibit Number 10, and you can argue it however
you want in the future.

BY MS. ALI:

Q.  I want to move on, Dr. Aguirre, to a review of
Mr. Runyon's 2009 MRI scans.  You testified earlier that a
neuroradiologist reviews and interprets many more brain scans
than you do in your clinical practice?

A.  Yes.

Q.  And you reviewed the images from Mr. Runyon's 2009 MRI
scan, and your overall impression of that scan is that it's
unremarkable; is that correct?

A.  Yes.

Q.  Your report states that a substantial traumatic brain
injury is associated with deposits of old blood inside the

Aguirre, G.  - Cross                                                2455

brain, which is called hemosiderin?

A.  Yes.

Q.  And you note that findings of Dr. Davis and Cheshire -- can you go to the next page, please -- that there was no susceptibility artifact to suggest hemosiderin on Mr. Runyon's 2009 scan; is that correct?

A.  Yes.

Q.  You agree with that finding?

A.  Yes.

Q.  Do you recall what scanner or scanning technique was used to take the 2009 images?

A.  So scanner was a 1.5 Tesla scanner.  I don't know the model.

Q.  And a 1.5 Tesla scanner isn't sensitive enough to pick up hemosiderin deposits from prior scanners; is that right?

A.  That's not right.  You could absolutely detect hemosiderin using a 1.5 Tesla scanner.  I'll stop there.

Q.  It's your testimony that you don't need susceptibility weighted images using a 3 Tesla scanner to see that?

A.  It's possible to see the effect of hemosiderin using a 1.5 Tesla scanner and to see it on sequences.  So your question identifies the -- or identifies the existence of different kinds of images that could be acquired on an MRI scanner, some of which are more or less sensitive to the presence of hemosiderin, and I would -- I would -- and it is

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                               2456

the case that there are some sequences, for example, a susceptibility weighted image acquired on a 3 Tesla scanner which would be the most sensitive way of detecting hemosiderin.

However, that does not mean it is impossible or not even -- or it doesn't mean that one cannot detect the presence of hemosiderin on a 1.5 Tesla scanner and with other kinds of pulse sequences.  So to summarize, it would be possible that hemosiderin could have been seen in the 2009 scan, my opinion is, but that there are -- that it is also true that there are other kinds of examinations that could have been done that would be more sensitive to the presence of that.

Q.  You note in your report at Page 4 that as is the usual practice for imaging studies performed on clinical equipment, Mr. Runyon's images were reviewed by radiologists, and then in parenthesis you say (Kirstin Fiona Davis, M.D. and Glenn Cheshire, M.D.)  Do you see that in your report?

A.  Yes.

Q.  And you state also on Page 4 that you agree with the interpretations of those radiologists, Dr. Davis and Dr. Cheshire?

A.  Yes.

Q.  You also testified, I believe on direct, that these doctors found, like you did, and like everybody else has

Aguirre, G.  - Cross                                              2457

looked at the scans, white matter hyperintensities on the scans; is that right?

A.  Yes.

Q.  They actually didn't, though.  I'm going to show you the Government's Exhibit 61.  This is the results of the MRI scans.  Do you see on here any mention of white matter hyperintensities?

A.  I don't.

Q.  And can we go to the next page.  What is the impression of the scan?

A.  Normal brain MRI.

Q.  And Dr. Davis is not a neuroradiologist, do you know that?

A.  I'll take your word for it.

Q.  I'll show you.  Can we pull up Petitioner's Exhibit 203. This is her online biography.

            MS. WARD:  Your Honor, I object.

            THE COURT:  Can't we just agree?

            MS. ALI:  I'd like to enter the exhibit, Your Honor.  It's on our exhibit list.

            THE COURT:  Go ahead.  We have known this all along, at least it's been evident to the Court from all the questions.  I'm going to let her ask it.  It will just move things along.

            MS. WARD:  Yes, Your Honor.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2458

BY MS. ALI:

Q.  Do you see underneath -- on the left side of the screen it has her name, and then what does it say underneath there?

A.  Breast imaging.

Q.  And if you read the rest of the page, do you have an understanding of what her specialty is?

A.  I can read it.

Q.  Take the time you need.

A.  Yeah, up to how far I can read in those paragraphs, it describes role in breast imaging is her specialty.

Q.  Go to the next page and the next page.

        MS. WARD:  Just make one comment about this exhibit, Your Honor.  I think there is a lack of foundation as far as the information in the document itself.  We all agree that Dr. Davis, we all agree she was a diagnostic radiologist, but as for the rest of this, I mean, I'm not -- this is the right person, but there is just nothing in here to corroborate that this is the doctor that we are talking about from 2009.

        THE COURT:  Let me look at the document and see where it came from and the date on it, and so forth.  What exhibit number is it?

        MS. ALI:  This is Petitioner's 203, Your Honor.

        THE COURT:  Let me look at it.

        MS. ALI:  The first two pages are her online

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                        2459

profile, and the third page is her board certification list.

THE COURT:  Let me look at your Exhibit 203, please.

MS. ALI:  Yes, Your Honor.  Should be the exhibits -- the most recent set of exhibits.

THE COURT:  I'm just going to comment on things as I start through it.  First of all, wherever it came from, it's not authenticated, and this is not one upon which you had an agreement for authentication.

Number two, it has dated 10-24-23 at 5:02 p.m.  So somebody printed it off of an Internet site, it looks like.  Just go backwards through the pages.  The last page of the exhibit just shows an American Board of Radiology, board certification dated October 24, 2023, going through 3-1-2067.

The next page is October 24, 2023, at 5:02 p.m., and it's just basically a blank sheet of paper, and then the next pages indicate academic appointments and medical schools and internships and employment, but there is no dates of the employment on here.  You might be able to show me something that's on here, but I'm not seeing anything on this document that I'm looking at that shows that she was employed at this facility at that time.  It's not authenticated.  It's something coming off of an Internet site, we don't know what site, and there is nothing here to

Aguirre, G.  - Cross                                        2460

show that she was the radiologist back in 2009.

MS. ALI:  I can establish that fact, Your Honor, and then I can move on.  This is a minor point.  I'm happy to move on.

THE COURT:  All right.  So you just want to move on now from this document?

MS. ALI:  Well, I'd like to ask him about her board certification.  Then I'll establish that she -- I can show him the radiology report that we were just looking at with her name on it.

THE COURT:  We can all do that ourselves.  You can argue that to the Court.

MS. ALI:  That's fine, Your Honor.

BY MS. ALI:

Q.  Can we put up Government's Exhibit 61, please.  Do we see at the bottom here it says -- this is the 2009 MRI scan -- MRI report.  I'm sorry.  Do you recognize the document, Dr. Aguirre?

A.  Yes.

Q.  And do you see at the bottom of the page where it says "read by"?

A.  Yes.

Q.  And what's the name there?

A.  Kirstin Fiona Davis.

Q.  And at the top of the page it says attending doctor.  Do

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2461

you see that?

A.  I do.

Q.  And what's the name there?

A.  Glenn M.D. Cheshire, I presume Glenn Cheshire.  MD is out of place there.  I'm not sure.

Q.  Do you know whether Dr. Cheshire is a neuroradiologist?

A.  I don't.

Q.  I'll represent to you he is a family medicine doctor. I'm happy to -- I can.  I'm trying to make things efficient, Your Honor.

THE COURT:  I know you are trying to make things efficient, and you're trying to do it through documents that may not be admissible.  There is a difference in efficiency and following the rules.

MS. ALI:  I'm not planning to admit this document, but I'll show it to him, Your Honor.

THE COURT:  If it's not authenticated, you can't just show him the document.  Is it the same kind of document?

MS. ALI:  It is, Your Honor.  It says U.S. News Health Report, just shows his specialty.

THE COURT:  Let me see it.  You can't just go through the Internet and go through publications and pull things and not have them authenticated.  The bottom line is I get the point.  I have been sitting here.  I get the point

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                           2462

that it was ordered, it was out of Harbor View, that it was read by two radiologists, that you contend were not specialized.  You've had your experts testify, and you've had him testify.  This is dated 11-7.

MS. ALI:  The point I'm trying to establish, Your Honor, is that Dr. Davis is a radiologist, not a neuroradiologist, and Dr. Cheshire is a family medicine doctor, not a radiologist, not board certified in radiology.

THE COURT:  I know you're trying to establish the point, but you've got to have proper evidence.  You can't testify to it.  You're giving unauthenticated documents that have been printed off of the Internet, so you cannot do that.

In other words, I know what you're trying to do.  That's not the point.  The point is whether you're doing it properly through proper evidence.  This is a printout dated 11-7-23 at 9:52 a.m., and, again, it just shows the doctor.  It shows that they are currently in that practice.  There's nothing on here that is admissible.

MS. ALI:  I'll move on, Your Honor.

BY MS. ALI:

Q.  You agree with me, Dr. Aguirre, that a family medicine doctor is not qualified to review a brain MRI?

A.  I agree.

Q.  If you were having a neurologic issue and had an MRI of

Aguirre, G.  - Cross                                                      2463

your brain, you would not want a family doctor to be reading
your scan?

A.   I would not.

Q.   You note in your report, though -- can we go back to his
report.

          THE COURT:  Let me just ask you this.  If you were
the doctor that had ordered this and received it and you saw
who read it, you would question it, wouldn't you?  Or you
would at least look at the images?

          THE WITNESS:  I would at least look at the images.

          THE COURT:  So, in other words, the doctor who
ordered it and then received the films would be the one to
look at the films and check and verify the reading of it?

          THE WITNESS:  Yes.

BY MS. ALI:

Q.   When you receive a report from a neuroradiologist,
though, it's something you review and consider in your
overall assessment of the patient?

A.   You said something.  Was the something that I --

Q.   If you sent out a patient for imaging at the
neuroradiology clinic, or whatever it's called at Penn, and
they come back with a report from a neuroradiologist, that
report, in addition to the images themselves, is something
you would review and consider in your overall assessment of
the patient; is that right?

Aguirre, G.  - Cross                                          2464

A.  Yes, I would.

Q.  Page 4 you say -- okay.  So back at the top of Page 4 you say, "As is the usual practice for imaging studies performed on clinical equipment, the images...were reviewed by radiologists"?

        THE COURT:  So we are back on which document now?

        MS. ALI:  This is Government 73, Your Honor.  This is Dr. Aguirre's report.  I'm sorry, 75, and we are on Page 4.

        THE COURT:  All right.

BY MS. ALI:

Q.  You describe other people's findings of the MRI in your report, and you also identified white matter hyperintensities on Mr. Runyon's 2009 MRI scan; is that correct?

A.  Yes.

Q.  Let's pull up those images, the same set of images you were looking at with the government.  And specifically in your report you identify white matter hyperintensities on places 17 and 18 of the FLAIR sequence; is that correct?

A.  Yes.

Q.  And when we looked at the images earlier today, and you were putting the green dots on the screen, you also identified one on image 14, is that right, all the way on the right?

A.  Yeah.  That could be another example.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                            2465

Q.  Which was not referenced in your report?

A.  It was not.

Q.  And can I draw on the screen?

So I think -- well, you tell me if I'm drawing in the right places.  I think you had identified -- I didn't mean to put two dots there.  One here where the red dot is?

A.  Yes.

THE COURT:  I see three.

MS. ALI:  Well, clumsiness, and not trying to overrepresent what's on there.  If we can erase that, I can try again.

BY MS. ALI:

Q.  Right near there (indicating)?

A.  Yes.

Q.  Got it right this time?

And another one here (indicating) that I think you identified?

A.  Yes.

Q.  I think you also identified one here or near there (indicating)?

A.  I don't believe I did in our prior discussion.  It was one towards the left -- there you go.

Q.  Okay.  All right.  So we have them on images 18, 17 and 14 in this series?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                         2466

Q.  Understanding your testimony that white matter hyperintensities are common and non-specific, you don't disagree that they can be an indication of traumatic brain injury?

A.  I don't disagree.

Q.  They can be a remarkable finding in people with neurologic injury?

A.  I'm not sure I know how to answer that question.  Yeah, I'm not quite sure what you mean by that question or by that statement.

Q.  I'll ask it a different way.  In a 38-year-old patient with a significant clinical history of head injury and abnormal neuropsychological testing, the presence of white matter hyperintensities on an MRI scan in the deep white matter of the brain could be relevant to your overall assessment of the patient?

A.  In that hypothetical and not necessarily endorsing that that describes my impression of the current circumstance of this case, then I would agree it would help with understanding the presentation.

Q.  You can't determine from looking at an MRI whether someone has brain damage.  I think you testified that on direct; is that right?

A.  If I said exactly that, I don't know if that's precisely right, it is possible to have brain injuries that are not

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                                2467

evident on an MRI scan.

Q.  In other words, you can have brain injuries and a normal MRI scan?

A.  Yes.

THE COURT:  A neurologist psychiatrist should follow up on that if they felt there was brain injury; is that correct?  I'm not understanding.  If you can have it, is there a standard whereby then you follow up on it?

THE WITNESS:  Yes.  So in the circumstance of a patient who you -- has an abnormal exam and abnormal findings, a history suggestive of a neurologic injury, a normal -- I should say a normal MRI scan, there is lots of different kinds of pictures and lots of different kinds of tests one can do with an MRI.  But if you had a normal MRI scan, one would then try and think of other diseases that could account for the symptoms while still having an abnormal MRI scan.  But that would be -- it's a relatively unusual circumstance that you would encounter that.

BY MS. ALI:

Q.  Moving away from Mr. Runyon's 2009 MRI scan but based on your experience as a neurologist, do you have an understanding of whether a finding of encephalomalacia on a brain MRI is enough on its own to diagnose a traumatic brain injury?

A.  In the context of the right history, you can have

encephalomalacia from causing other than a traumatic brain injury, but it would be consistent with.

Q.  And a mild focal concussion doesn't produce encephalomalacia?

A.  Correct.  I'm sorry -- a mild?

Q.  A mild concussion?

A.  Yeah, I disagree with the word "focal," so a mild concussion does not.

Q.  And encephalomalacia means a loss of brain tissue; is that correct?

A.  Yes.

Q.  And that's permanent?

A.  Yes.

MS. WARD:  Again, Your Honor, I would object.  This is all related to the language in the 2018 document.

THE COURT:  We are dealing with what was known or should have been known in 2009 by the attorneys. Dr. Merikangas was their expert then.  I've let you go into it with your experts, but we are just not going to keep going into 2018.  It's on the record.  It's what you knew or should have known in 2009 and whether the attorney made reasonable judgments, strategic judgments, reasonable interviews, reasonable investigations, and whether their performance was deficient in that regard.  They couldn't have had what you had in 2018, at least their doctor didn't

Aguirre, G.  - Cross                                    2469

order it and didn't ask for it.

          MS. ALI:  Ms. Ward made clear with Dr. Aguirre that he had seen Dr. Lipton's report who opines about encephalomalacia on the 2009 MRI scan.

          THE COURT:  Then go to the 2009 MRI scan then and ask him about that.

          MS. ALI:  I'll move on, Your Honor.  I'm just trying to make the point that encephalomalacia is not only relevant to the 2018 scan.

          THE COURT:  You can make that point.  If that's the point you want to make, make it, but that's what I'm saying.  If you can relate it, make the point, you can certainly go forward with it.

BY MS. ALI:

Q.  Dr. Aguirre, you note on Page 4 of your report, Government 75, that Mr. Runyon also had what was described as a non-diagnostic PET scan in 2009?

A.  Yes.

Q.  And the existence -- a non-diagnostic PET scan doesn't mean there was no brain injury; is that right?

A.  No.  I interpret that as it might not have been a good quality scan.

Q.  You don't know what it did or did not show?

A.  I don't know.

Q.  Moving on to the portion of your report about

                    JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2470

Mr. Runyon's cognition and behavior.  I think you testified on direct that your knowledge of this is secondhand; is that correct?

A.  Yes.

Q.  And you said in your report and testified that you didn't find evidence that any of Mr. Runyon's head injuries resulted in a change in cognition and behavior that persisted until 2007, correct?

A.  Correct.

Q.  And you based that on the materials listed in your 2023 report?

A.  Yes.

Q.  You never spoke with Mr. Runyon or examined him?

A.  I did not.

Q.  You never spoke with any of his family or friends who knew him before 2007?

A.  I did not.

Q.  And you say on Page 2 of your report that there is no associated report from any of these head injuries described of medical treatment or altered neurologic function.  That, too, is based exclusively on the list of materials listed in your report; is that correct?

A.  Yes.

Q.  And if there were records that showed altered neurologic function prior to the time of the crime, that might have been

Aguirre, G. - Cross                                          2471

relevant to your assessment in the case?

A.  Yes.

Q.  Might have been part of your conclusion?

A.  Yes.

Q.  You note in your report that Mr. Runyon's intellectual function is well above average, but you agree that a person can have above average intellectual functioning and still suffer a brain injury that impacts cognition and behavior; is that right?

A.  In the sense that someone could be at a high level and then drop down a little bit as a consequence of injury, yes.

THE COURT:  If I understand you, then, that they can be high-level IQ or high functioning, but if they had the brain injury, that would drop down?

THE WITNESS:  That it could drop them down a little bit, and they could still be at a high level, just not as high as they were prior to the injury.

THE COURT:  All right.

BY MS. ALI:

Q.  Does traumatic brain injury always affect IQ?

A.  No.

Q.  You testified about Dr. Montalbano and Dr. Mirsky's neuropsychological testing results, and you testified -- well, let me start this.  You don't administer neuropsychological testing as a neurologist, correct?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                              2472

A.  Well, we actually administer portions of neuropsychological tests as part of our evaluation in the behavioral neurology clinic, so elements of this we do do ourselves.

Q.  And you -- we talked about the fact that Dr. Montalbano, if we could pull up Government 55B to Page 24, please.  If we look at the scores here, you noted that the processing speed at the bottom is in the 58th percentile; is that right?

A.  Yes.

Q.  Are you familiar with the concept of idiographic comparison?

A.  I don't know that term.

Q.  Do you understand that -- you are not familiar with that term in the context of neuropsychological testing results?

A.  Can I hear it again idiographic --

Q.  -- comparison?

A.  No, I don't know that term.

Q.  And do you recall that Dr. Mirsky, who also tested Mr. Runyon in 2009, also noted significant processing speed deficit?

A.  Yes, he -- in 2009 report -- could we take a look at the 2009 report for Dr. Mirsky?

Q.  Sure.

        THE COURT:  Go back to the other one for a minute. When we're looking at this, and it says perceptual

JODY A. STEWART, Official Court Reporter

Aguirre, G. - Cross                                             2473

organization, index score 130, 121-135 as a confidence interval and a percentile rank of 98, what does that mean to you?

THE WITNESS: That means that he performed very well on those aspects of the test.

BY MS. ALI:

Q. And if we look down at processing speed, it's a 58; is that right?

A. Yes.

Q. Pretty big differential between the processing speed and the perceptual organization score?

A. Yes.

Q. These are the -- we are now looking at Page 3 of Dr. Mirsky's 2009 report, he talks about -- he reports severe impairment, severe impairment, very impaired score on tests in attention and concentration; is that right?

A. Yes, although this is not the processing speed that we were talking about before.

Q. You testified on direct that perhaps the reason Mr. Runyon did poorly on the processing speed test with Dr. Montalbano was that he was sleepy?

A. That's not correct. I testified that his poor performance on this thing, the CPT, and our opinion his performance test could be potentially attributable to sleepiness.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2474

Q.  Do you recall whether Dr. Mirsky said anything about whether Mr. Runyon was sleepy during the test or any -- did you find any evidence of that other than the score itself?

A.  I found that in Dr. Montalbano's report for 2009, that there were complaints of being sleepy.

Q.  During the testing?

A.  No, just generally that he was suffering from poor sleep during this period of time as he was incarcerated.

Q.  Did you see in either Dr. Montalbano or Dr. Mirsky's report any indication that the results of his testing were impacted by his generally poor sleep during that period?

A.  I didn't see -- right, those experts did not offer that opinion.

Q.  And did you -- before you looked at the Mirsky and Montalbano result, did you examine the -- whether they gave any validity test, about the validity of the test?

A.  I did, yes.

Q.  And what did they report in those?

A.  They felt that the tests were valid.

Q.  And do you recall whether they said anything about the amount of effort that Mr. Runyon put forth during the testing?

A.  They described he put good effort in.

Q.  Can we go to Defense Exhibit 61, please.  This is Dr. Mirsky's 2015 report.  Your report discounted

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                             2475

Dr. Mirsky's continuous performance test results because --
on the 2009 testing because of the improvement Mr. Runyon
showed on that same battery of tests when Dr. Mirsky retested
him in 2015; is that fair to say?

A.  Yes.

Q.  So if we are looking at the 2015 report on Page 3, do you
see that, like Dr. Montalbano in 2009, Dr. Mirsky finds
impairments in processing speed?

A.  Now in 2015 he does, but he does not describe that, as I
recall, in 2009.

Q.  Do you recall whether he administered these tests in
2009, the same battery of tests?

A.  Let's see.  He -- in both 2009 and 2015 he administered
the WAIS, the W-A-I-S test, and he administered the CPT in
both of those occasions.  There was some additional testing
that Dr. Mirsky performed in 2015 that were not present in
the 2009 exam.

Q.  And you don't note in your report the -- can we go to
Page 6 of Dr. Mirsky's report.  This is, again, the 2015
report.  He says Mr. Runyon's ability to perform non-verbal
tasks falling in the category of processing speed, and
then there is an -- put an ellipses there.

A.  Can you zoom in on the bit we are talking about.  I'm not
on the page yet.

Q.  The first paragraph, the third sentence.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2476

A.   Beginning, "It seems reasonable" or "such improvement"?

Q.   The "on the other hand."

A.   I'm sorry.  I'm in the wrong paragraph.  Can you wave the pointer.

Q.   Yeah.  Let me try to -- starting right here (indicating).

A.   Oh, here is the first part.  Correct.  "On the other hand, however" -- I'll read it.  "On the other hand, however, his ability to perform on non-verbal tasks falling in the category of "processing speed," i.e., coding, cancelation, symbol search, Shaffer-Mirsky Cancelation Test, are generally in the impaired range."

Q.   And you didn't mention that in your 2023 report?

A.   Because this was from 2015, and I had trouble interpreting these results after that time had elapsed.

Q.   But you used the 2015 Mirsky results to discount the 2009 Mirsky results; is that correct?

A.   I did, for the improvement in CPT.

Q.   You testified with Ms. Ward about that there had been some evidence of personality disorder found in Mr. Runyon's history.  Do you recall that?

A.   That's right.  I'm aware that several experts described elements of a personality disorder.

Q.   You did not diagnose a personality disorder in Mr. Runyon?

A.   I did not.

Aguirre, G.  - Cross                                                    2477

Q.   And I think you agreed, tell me if I'm wrong, that some mental health effects can flow from a traumatic brain injury?

A.   Yes.

Q.   People can develop depression or PTSD or other psychiatric illness as a sequelae of the traumatic brain injury?

A.   Yes.

Q.   And are you aware that -- are you familiar with the DSM?

A.   Yes.

Q.   And that's the diagnostic -- okay.  I'll represent to you that in 2009 the DSM that was in place was the DSM-IV-TR. Does that sound correct to you?

A.   Sounds right.

Q.   And are you aware that in the DSM to diagnose a personality disorder, you first have to rule out a brain injury?  Are you aware of that?

A.   I'm aware that that's a general principle for many psychiatric disorders, that showing that there is not a otherwise explanatory organic illness.

Q.   I'll show you -- this is the -- that look like this?

A.   It is.

Q.   And here we have the chapter on personality disorders. Do you see that?

A.   I do.

Q.   This is Page 685, moving on to Page 686, and we have the

Aguirre, G.  - Cross                                                        2478

header that says "Diagnostic Features," and is this highlighted text generally what you are describing about rule-outs in the DSM?

A.  Yes.

Q.  "The pattern is not better accounted for as a manifestation or consequence of a general medical condition in forensically head trauma"?

A.  Yes.  I agree those are the words there.  I don't want to offer myself as an expert in psychiatry or diagnosing personality disorders.

Q.  You note in your report -- can I have Exhibit 75 -- that Mr. Runyon's unsatisfactory work performance, both before and after his 1996 car accident, led you to doubt that the accident produced a persistent change in behavior; is that right?

A.  Yes.

Q.  And your understanding of his work performance is based solely on what you've read in Dr. Montalbano's and Dr. Patterson's report?

A.  Yes.

Q.  And you don't know whether they had all of the evidence of his work performance before and after, you just -- you read what they said and you rendered an opinion based on that?

A.  Yes.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                           2479

Q.   You don't disagree that people who suffer frontal lobe injuries can have difficulties with employment and other relationships like what Mr. Runyon displayed?

A.   People -- yes, people with front local injuries can result in cognitive changes that can have effects upon their functioning in day-to-day life, including at work.

Q.   And if Mr. Runyon suffered a brain injury that occurred before the 1996 car accident, that could explain that poor job performance and issues with relationships; is that correct?

A.   If it was -- I'm sorry, if it were the case that there was a brain injury antecedent to all this, then that produced this injury that we just described of a frontal lobe injury with changes in behavior, then, yes, that could account for job performance.

Q.   You state in your report that -- I think it's on Page 6 -- that changes in cognitive function as a result of the traumatic brain injury is, quote, "impact every aspect of behavior."  But it's not your opinion that people with traumatic brain injury function abnormally in every aspect of their life; is that right?

A.   Right.  That's right.

Q.   Your description of frontal lobe damage on Page 6 about hoarding shiny objects and skipping dinner and eat desert, not all people with frontal lobe damage do those things?

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                                    2480

A.   No.  It would depend a little bit -- that's right, the front lobe is a big part of the brain, and injuries to different parts of the frontal lobe produce different patterns of cognitive and behavioral change, and only a particular set of lesions that produce impairment in impulse control tend to produce these sort of behaviors that I'm describing there.

Q.   You also testified on direct that grandiosity is not either an indicator or a sequelae of head injury.  Do you recall that?

A.   Yes.

Q.   And you said, I believe to the Court, was clinically that's not what we see.  Do you have a citation in the literature for that conclusion?

A.   No, just my impression from my experience as a practitioner, that it's not an association that I have, that grandiosity is associated with head injury.

Q.   And you're a neurologist, not a neuropsychiatrist; is that correct?

A.   That's correct, and even more so, not a psychiatrist.

Q.   Not a psychiatrist.

     You also testified on direct that it's your opinion that it's doubtful that Mr. Runyon has confabulation, *per se*. Do you recall that?

A.   Yes.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Cross                                          2481

Q.  And is that opinion based on -- I think you testified that that was based on your recollection that he performed well on memory tests in the neuropsychological testing?

A.  Yes.

Q.  Is that the only basis of that opinion?

A.  That's the principal basis of that opinion. Confabulation is a behavior that appears in a setting of amnesia.  So it's just very hard to describe a behavior as confabulation *per se* in the setting of highly -- intact memory performance.

        THE COURT:  I thought you didn't want questions about confabulation?

        MS. ALI:  My argument, Your Honor, was that that was outside the scope of his report and so he shouldn't be permitted to testify about it.  But he was permitted to testify about it on direct, and so I'm cross-examining him about it the same way that the Court ruled they could do that.

        THE COURT:  Go ahead.

BY MS. ALI:

Q.  Switch back to the Elmo.  I'm showing you again Dr. Nadkarni's report.  And do you have an understanding of what kind of doctor Dr. Nadkarni is?

A.  I believe his specialty is epilepsy.

Q.  If I represent to you that he is a neuropsychiatrist,

                    JODY A. STEWART, Official Court Reporter

does that comport with your recollection?

A.  Yes.

Q.  He probably says it here -- there you go.

A.  Okay, yes.

Q.  And the neuropsychiatrist is a neurologist and a psychiatrist; is that correct?

A.  Yes.  I think -- I recall from his training that he trained in a -- yes, in a joint neurology type of program, of which there are a couple of examples.

Q.  He is a neurologist?

A.  Yes.

Q.  I want to just very quickly go through Dr. Nadkarni's neurologic exam of Mr. Runyon.  I'm not asking you to explain what these things mean, I'm just asking whether you know what they mean as a neurologist, and if you feel you need to explain, that's fine.  I'm not trying to trick you.  I'm just trying to be efficient here.

A.  Okay.

Q.  Do you have an understanding of what a mental status examination is?

A.  Yes.

Q.  Do you have an understanding of what speech, somewhat pressured means from a neurologic perspective?

A.  Yes.

Q.  Do you have an understanding of what the word "affect"

means?

A.   Yes.

Q.   And is thought content a phrase you're familiar with --

A.   Yes.

Q.   -- as a neurologist?

A.   Yes.

Q.   How about cognition?

A.   Yes.

Q.   Are you aware of what a typical cranial nerve exam consists of?

A.   Yes.

Q.   Do you have an understanding of what these things mean under -- next to the category "motor"?

A.   Yes.

Q.   And you understand the findings here, you can interpret that as a neurologist?

A.   Yes.

Q.   And I can -- why don't you read the rest of the page and tell me if you have an understanding until here --

A.   Sure.

Q.   -- of what these terms mean as a neurologist?

A.   Yes.  Each of these are categories of the elemental neurologic examination.  I'm familiar with these terms.

Q.   And when you say elemental, you mean the standard neurologic examination?

Aguirre, G.  - Cross                                              2484

A.  Specifically elements of examination of the physical body
components of the neurologic examination as opposed to
thought and conscious.

Q.  You testified on direct that you have been engaged by the
Department of Justice in a number of cases, I think you said
six --

A.  Yes.

Q.  -- something like that?

And you've specifically done work for the unit of the
Department of Justice that prosecutes capital cases?

A.  Yes.

Q.  You gave deposition testimony in the case of Nicolas
Cruz.  Do you recall that?

A.  I do.

Q.  And I'm showing you -- it is very small -- *State of
Virginia versus Nicholas Cruz.*  Is that the cover sheet of
your deposition transcript from that case?

A.  Yes.

Q.  April 2022?

A.  Yes.

Q.  And in that deposition -- I'll go to Page 25 -- did you
testify in that case that -- in that case you were asked to
provide a statistical assessment of neuroimaging; is that
right?

A.  Well, not only that but that was an element what they

JODY A. STEWART, Official Court Reporter

wanted me to review.

Q.  And you testified in that case that documentation of the -- you can look at your testimony -- of the charged offense would generally not be relevant to your overall assessment.  Do you recall that, and you see that on the screen?

A.  Yes, in the context of the thing that I was asked to review in this case.

Q.  And you testified, though, that sometimes documentation of medical history or history of injuries might be relevant?

A.  Yes.

Q.  And birth records might be relevant?

A.  Yes.

Q.  And school records might be relevant?

A.  Yes.

Q.  In that deposition you testified that the primary reason you had been engaged by the Department of Justice is --

THE COURT:  I thought this was in Broward County. What's the cover sheet?

MS. ALI:  It is, Your Honor.  I'm sorry.  I understand.

THE COURT:  It says here -- one of us talk at a time.  It says in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.  So it's not the Justice Department.

Aguirre, G.  - Redirect                                              2486

BY MS. ALI:

Q.  Were you engaged by the State of Texas in that case --
I'm sorry, the State of Florida in that case?

A.  Yes, I was.

Q.  That's my mistake.  And in that case you were asked to
provide testimony about statistical analysis of the brain
image, and you say my particular area of expertise and focus
is in refuting those statistically questionable practices; is
that right?

A.  Yes.

Q.  And so in that case reviewing records was not
particularly important?

A.  That's right.

Q.  But the defense hasn't made, to the best of your
knowledge, any statistical claims in this case; is that
right?

A.  Not to my knowledge.

        MS. ALI:  Just a moment, Your Honor.  I'll clean
up, but nothing further, Your Honor.

        THE COURT:  Redirect.

        MS. WARD:  Yes, Your Honor, very brief.

                    REDIRECT EXAMINATION

BY MS. WARD:

Q.  Dr. Aguirre, when we first consulted to determine whether
you would be a relevant expert witness in this case, did you

                JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Redirect                                                    2487

understand at that time that the claim was that -- that

Dr. Merikangas, the trial-level neurologist, had not been

able to review these MRI scans?

A.  I don't -- you might have to reask that.  I don't

remember that feature of our early conversation.

Q.  Well, is it fair to say that you were asked to review the

evidence as it existed at the time in 2009?

A.  Yes.

Q.  And then -- and you were given a report of the experts

that reviewed the evidence and relied upon the known evidence

available in 2009?

A.  Yes.

Q.  And in there, they all generate something that's true,

that Mr. Runyon suffered some history of head trauma.

A.  Yes.

Q.  And then you were asked to do the same.  Just assume it's

true that there is some history of head trauma?

A.  Yes.

        MS. ALI:  Objection.  That's not what it says in

the first page of his report.

        THE COURT:  Well, you can argue that to me.

BY MS. WARD:

Q.  And when you were asked to review the brain scans, was

that to see whether you could determine if there was

corroboration of a potential defect in the brain?

Aguirre, G.  - Redirect                                    2488

A.  Yes.

Q.  And if you did find evidence of some defect, were you asked to state there was evidence of behavioral change to evidence dysfunction?

A.  Yes.

Q.  And is that typically what you would do in your clinical assessment when you have a patient reporting with a history of potential head trauma?

A.  Yes.

Q.  In this case did the scan show evidence of substantial injury?

A.  Did not.

Q.  So with that background, being asked to accept as true that there was a history of head traumas, would further details of a 1996 motor vehicle accident impact your opinion regarding Mr. Runyon's dysfunction in 2007?

A.  Well, after having accepted the idea that the 1996 event resulted in a mild concussion -- or in a mild traumatic brain injury, or also known as a concussion, then that would give me most of what I would need to interpret then the brain images that we had and the subsequent questions regarding behavior.

Q.  And there was a substantial amount of time between the car accident in 1996 and the murder in 2007?

A.  Years, yes.

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Redirect                                              2489

Q.  So moving from the hypotheticals of what could be, let's talk about Mr. Runyon specifically.  What is the key piece of missing information in this case that prevents you from being able to find evidence of dysfunction?

MS. ALI:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  What is the key -- would you ask the question again, please?

BY MS. WARD:

Q.  Sure.  Yes, Dr. Aguirre.  When you're doing your assessment, the allegations are assertions of potential trauma, you have the neuropsychological testing, and then you have the brain scans.  After reviewing all of those, what is the last thing that you would review to determine if there is a dysfunction manifesting in Mr. Runyon?

A.  Like the neuropsychological testing.

Q.  And did you do that in this case?

A.  Yes.

Q.  Was there evidence of dysfunction?

A.  There was not.

Q.  And why is that specifically?

A.  Because he performed well on these tests and had intact frontal lobe function on the tests that assessed that aspect of the cognition.

Q.  And does the absence of any records or self-report

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Redirect                                          2490

between 1996 and 2007 have any impact on your opinion?

A.  I don't have that information so -- I'm not aware of any other information that would be important for me to know, but I can't discount the possibility that such information could exist that it would be useful.

Q.  Well, let's say it doesn't, there is no self-reports of medications, doctors' visits, medical visits, additional head trauma between 1996 and 2007.

          MS. ALI:  Objection, calls for speculation.

          THE COURT:  Overruled.

          THE WITNESS:  Then that would be -- that's helpful to know because then there would be no other substantiating evidence for the possibility of behavioral alteration or prolonged symptoms related to prior head injury.

          THE COURT:  He's an expert, and he can be asked a hypothetical question.  If you have other evidence that you can argue to the Court that it was an improper hypothetical question, as ruled earlier on an expert, you can raise it.

          MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Can I have Government's Exhibit 92, please.

          MS. ALI:  I'll note a continuing objection to this exhibit.  I know the Court's admitted it, but this is the document he's never seen until prep in this case.

          THE COURT:  He was shown it.  He said he was shown

                    JODY A. STEWART, Official Court Reporter

Aguirre, G. - Redirect                                                 2491

it at the beginning, and this was the late-disclosed
discovery.  He wrote a doctor's report, and he saw this
report.

MS. ALI:  I'm just making my continuing objection.

THE COURT:  All right.

BY MS. WARD:

Q.  Dr. Aguirre, have you seen this document before?

A.  Yes.

Q.  Based on the information available to the experts in
2009, and based on your assessment of the information that
you've reviewed in this case, would you agree -- would you
have agreed with this opinion in 2009?

MS. ALI:  I'm sorry.  What opinion?  This is a
lawyer writing a memo.  What opinion are we talking about in
here?

MS. WARD:  I'll orient to the specific line.

BY MS. WARD:

Q.  About halfway down.

THE COURT:  She's talking about Dr. Merikangas's
recommendation to the lawyers.  That's what I've assumed you
are talking about.

MS. WARD:  Yes, Your Honor.

THE COURT:  Not the lawyer's opinion, but the
opinion that Dr. Merikangas relayed to them in this
telephone call.  This was not something that the United

JODY A. STEWART, Official Court Reporter

Aguirre, G.  - Redirect                                    2492

States had and could have shown Dr. Aguirre back when he did his report because this was withheld discovery.  Go ahead and ask the question.

MS. WARD:  Thank you, Your Honor.

BY MS. WARD:

Q.  Dr. Aguirre, would you have agreed with this opinion in 2009?

THE COURT:  Not whatever the attorneys ultimately did but with what Dr. Merikangas was reporting to them.

THE WITNESS:  What I take to be the question is, there was a sentence here that describe -- based on the key phrase, he opened the conversation by saying his exam of David was not abnormal and that David did not tell him the truth.  He stated that unless there is something glaring in the MRI or PET scan that would give us a very strong argument, he does not recommend presenting a mental health defense.

So now my words, while I can't offer an opinion regarding the choice of a lawyer in this situation, what I can say is that as a neurologist, if the exam was normal, and the history did not have a well-established substantial traumatic brain injury, then it's true that there is nothing glaring in the MRI scan, I would suggest that there was not evidence to support an argument that there is a sufficient neurologic injury to account for behavior, for a change in

JODY A. STEWART, Official Court Reporter

2493

behavior.

MS. WARD:  Thank you, Your Honor.  No further questions.

THE COURT:  All right.  Thank you, Dr. Aguirre, for coming to testify.  Don't discuss your testimony until we've concluded the matter, and have a nice trip back to Philadelphia.

THE WITNESS:  Great.  Thank you.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Is there anything else for today, Mr. Samuels?

MR. SAMUELS:  Judge, there are two brief issues that I wanted to raise with the Court.  In terms of where we are, Your Honor, the United States is finished with its case in response, and I understand that what we have next week is the proposed testimony of Dr. Lipton.

Your Honor, I do have some concerns about Dr. Lipton and his relevance.  I'm happy to put those on paper, but briefly, Your Honor, what we have in this case and what the playing field has always been, initially it was that Dr. Merikangas never looked at the scans, and so no one looked at the scans, and that would have shown some sort of injury or some other issue.

So we've had in this case, Your Honor, we've had a

JODY A. STEWART, Official Court Reporter

2494

number of experts come in and look at the scans, and we've had neurologists, we had Dr. Aguirre, and we had Dr. Merikangas, and we had Dr. Nadkarni.  We had neuropsychologists, Dr. Martell, there is reference to Dr. Mirsky, of course, and then we've had psychiatrists, Dr. Cunningham, and psychologists, Dr. Patterson and Montalbano.

But now what the defense is purporting to do is to call a new type of expert, this neuroradiologist who apparently is going to look even deeper and apply a higher level of expertise and magnification on these scans.  The problem I have from that and my point of relevance, Your Honor, is all of these experts were able to look at the scans and make findings.  Some of them said yes, the scans showed a little bit of movement.  But I've looked at each and every expert report, and none of those expert reports say we would have recommended that a neuroradiologist look at the report.

In fact, in the declaration of Mr. Hudgins that was submitted to the Fourth Circuit before we ever found out about this late-disclosed discovery, Mr. Hudgins is asked about do you know the difference between a radiologist and a neurologist, but this idea of a neuroradiologist coming in to give us an even deeper view of this, is only something that has really arisen since we now understand that the

2495

scans were reviewed by a neurologist.

So I'm not trying to spring this on the Court or counsel and ask the Court to make a decision now.  We do have a few days until Dr. Lipton comes, but I do have real concerns about his relevancy given the posture of the case and given the claims that are made.

There was no claim that a neuroradiologist should have been consulted or asked for to look at these scans.  This is something that I would submit has been somewhat bootstrapped onto the testimony of these various experts.  We've had all these different neurologists and neuropsychologists look at the scan.  We had Dr. Martell, Dr. Merikangas, Dr. Aguirre, Dr. Nadkarni.  Four different experts all looked at the scans and said they were able to render some sort of conclusions based on those.

Bringing in an outside expert of a different caliber, to me, just doesn't appear to be relevant based on the testimony we've heard so far and the claims that are made in the case.  That's the first point I want to make, Your Honor.

THE COURT:  Let me just check something.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  Just to remind everybody of a Supreme Court case, and it was cited in the Runyon opinion.  It was in Judge Wilkinson's opinion, and he's quoting.  He's

JODY A. STEWART, Official Court Reporter

2496

talking about the Supreme Court's decision in *Strickland*, and it's on Page 219.  This is just a comment on the case, the Court, parenthetical in *Strickland*:  "Further mandated that judges should rarely second guess strategic decisions by counsel.  'Choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'"  That's a quote from Page 690 of the opinion.  "And this duty to investigate does not include the duty to look under every conceivable rock for potential evidence.  With limited time, lawyers must make difficult decisions about what to investigate depending on the circumstances.  'In any ineffective case, a particular decision not to investigate must be directly assessed for the reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.'"  That's from *Andrus v. Texas*, 140 S.Ct. 1857 at 1881.  The point being is that we are looking at this case, and I've tried to say it over and over, the posture of it in 2009, what Mr. Hudgins and Mr. Woodward's, but primarily Mr. Hudgins, because he was on this part of the case, knew or should have known at that point in time.  Frankly, it's a travesty, in the Court's mind, that Mr. Hudgins was not allowed to respond to these materials in his file, and they were withheld.  They were withheld intentionally, as far as the Court is concerned, by Petitioner's counsel at that time.

JODY A. STEWART, Official Court Reporter

Ms. Chavis clearly knew about them.  Ms. Bales did when this was occurring.  I'm not going to go back through the eruption and disruption that occurred in February.

Now Mr. Hudgins is dead, and he doesn't even have a chance to go back and look at his file and verify his memo, verify his time sheets, and they had them all along.  The problem is now you're implying that there is not a rock that should have gone unturned.

There has never been any establishment that this is the type of expert one should have, particularly when Dr. Merikangas was a neurologist psychiatrist.  That's what he was, and he had a noted background.  He was Yale educated.  He had taught at Yale.  He had an absolutely exemplary background at the time he was retained.

He now seems to not remember anything and has changed on his opinion for the reasons he stated.  But those MRIs were ordered.  The MRI was there.  The PET scan was there.  He billed and took the money for reading them, and then had these conversations with the lawyers, particularly Mr. Hudgins.  The time is there, the time sheets are there, and now you want to go back and add even another expert without the indication that should have been pursued. Because somebody is available and because they are there does not mean they should be pursued.

So I'm going to hear Ms. Ali, and I may have you

2498

all write this, but this is a totally different area of expertise that is being explored, and perhaps, if it should have been explored, Dr. Merikangas or one of these other experts should have come forward and said it should be explored.

I'm not talking about after-the-fact experts. I'm talking about the posture of the case in 2009. Now you are coming in with a theory. I don't know what you are coming in with or whether it is proper rebuttal to Dr. Aguirre.

This comes down to ineffective assistance of counsel and meeting both prongs. You have to meet both prongs. So, consequently, I have real reservations about the expenditure of the time and the money for this expert if they're not going to add anything of relevant value to the case and the decisions that this Court has to make. This has been a disturbing factor to the Court ever since February and what was not produced by the actions of the Federal Public Defender of Tennessee was subterfuge, if it can be described. I'm not saying that Ms. Ali or Ms. Peiffer or Mr. Lee -- Ms. Peiffer was in the case, and I'm not saying she knew about it, but she was still in the case, and she was aware -- not aware before the fact but was there when all of this happened. That's what I'm trying to say.

So it's just something that I know the Federal

2499

Public Defender in Tennessee has pursued it, and it may be something that needs to be pursued further at some point in time.  But we need to first get through these proceedings before pursuing those matters further.

Now, I'll let Ms. Ali respond.  First, what is your second matter?

MR. SAMUELS:  Your Honor, the other area that I wanted to bring out, since we are done with our, really, first week here of the hearing, is there was much made in the pleadings and in some of the hearings we had about some of the paucity of representation of Mr. Runyon and that he wanted certain specific counsel, and there was a constant theme that the government had these three lawyers, and two of the lawyers have been involved since the front of this.

I just think it's important to note for the record that not only does the defendant have three lawyers at the table here, but there are a number of other individuals who I believe are lawyers in a *pro se* capacity that have been here throughout the proceedings and available to the defense and his legal team, and I think they were referenced by some of the witnesses as well.  Every day there have been four to six individuals there.  I just think it is important to note for the record that these individuals are here, they've been present every day, and they are additional resources for Mr. Runyon to draw on.  I say that only in response to the

JODY A. STEWART, Official Court Reporter

2500

many complaints and representations that have been made on that front. I just think it's important to note it for the record, Your Honor.

THE COURT: Well, I'll make a couple of brief comments on that. First of all, in the first proceeding, Mr. Runyon had three attorneys. He had Ms. Peiffer, he had Ms. Bales, they were all admitted, and he had Ms. Chavis. In this proceeding he has had three attorneys. He has had Ms. Ali, and she has a new associate attorney. I'm not saying they are here or not, but he's had Ms. Peiffer and then Mr. Lee. So the petitioner has had three attorneys for these proceedings at both junctures. That's number one. Number two, I count just at the moment six individuals sitting in the court behind Petitioner's counsel. I can have them stand up and identify themselves, but I think they are the contingent from Covington that the Court said could assist *pro se*. They have assisted. At one point I even noted a note coming up.

They obviously assisted in the preparation of the witnesses because the witnesses, as you say identified them when we had, let's just say, a question and answer session. Then we have all these annotated reports.

So, consequently, there has been more than adequate help. I think it is important to put on the record because we've had a whole row full of either attorneys or paralegals

JODY A. STEWART, Official Court Reporter

that have been in and out the entire time that the proceeding is going on.

So you make a very good point.  It's of record now.  It's nothing improper.  The Court said they could appear *pro se*.  I know that they wanted to be in *pro hac vice*.  They wanted a mandamus.  But the Court's remedy was ruled to be adequate by the Fourth Circuit.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  That Ms. Peiffer would stay in, and that the attorneys do not need to be admitted, and there were reasons that the Fourth Circuit said, just the shear manageability of a proceeding if for nothing else.  They have been here, and they have been *pro se* counsel the entire time.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  Ms. Ali, you can respond to what he is saying about your need, that you are bootstrapping, Dr. Lipton?

MS. ALI:  Lipton, Your Honor.

THE COURT:  Dr. Lipton.  That you are bootstrapping him, and that it's irrelevant, and it's not a necessary expert.

MS. ALI:  I will do my best, Your Honor.  This is the first I'm hearing of this, so I'll make my points.  First of all, the first thing on that is that Dr. Lipton was

noted in February in advance of this proceeding.  He has been -- they have known he was -- we planned to call him since before the February hearing since all of that happened.  They have had his report.  He is on our witness list.  We mentioned him repeatedly when discussing the logistics of this hearing.

We've specifically made accommodation to come back next week, which I am grateful for, for him to be able to testify, and this is the first time that they have ever raised this objection to his testimony, which it should be raised at this point.  If they have an objection to his testifying, they should have raised it in February when he was first disclosed.

There is no objection that he wasn't disclosed on time.  They disclosed Dr. Aguirre as their rebuttal expert, and Dr. Lipton was disclosed as to rebuttal to him on schedule.  I will confess I don't know if it was a mutually agreed schedule or if it was set by the Court, but I don't think there is any allegation that it wasn't done on time.

Our argument in the case, as the Court knows, is that counsel didn't carry the investigation into Mr. Runyon's brain injury and mental health to its conclusion, and we are not trying to reconstruct -- we are trying to reconstruct what they should have done in a reasonable investigation.

2503

Your Honor read the quote from Judge Wilkinson in his dissent in the Fourth Circuit opinion, but the key to that quote is the after-throw investigation piece, and that's what we are trying to develop here.  I understand the government can make its argument about what was and wasn't reasonable.  We will do that.  That is what we are here to argue about.

But on prejudice, we have a capital case here.  We have had several doctors, including their own expert, Dr. Aguirre, just now, testify that he routinely relies and defers to neuroradiologist's reading of brain scans, and it seems that we need to have this neuroradiologist.  I don't expect his testimony to be long, but he will come in and testify as to what he sees on that 2009 MRI scan.

They've had his report since January, I believe, as late as February -- I don't have it in front of me -- but he's been on their radar since then, and this is the first time this has ever raised it.  We are almost to the end here.  He is scheduled to come.  He has travel arrangements to come on Tuesday to testify.  I'm happy to brief it, Your Honor.

THE COURT:  Who in your group of experts have said this is necessary?

MS. ALI:  I don't have the transcript, Your Honor, so I don't want to overrepresent what was stated, but my

recollection is that Dr. Merikangas, Dr. Nadkarni, and Dr. Aguirre at least, perhaps Dr. Martell, I'm not sure, all testified that a neuroradiologist is who was qualified to read brain MRI scans and to write reports of brain MRI scans, and that that is the specialty that they defer to.

So are they able to look at a scan and see what they see?  Yes.  But they defer.  Dr. Aguirre testified that if imaging is needed, it goes to a neuroradiology clinic, and the reports are written by a neuroradiologist, and that's what he defers to.

THE COURT:  That's not the gist of it.  In certain circumstances, you would do that.  I recall the testimony. The key is that makes Dr. Merikangas even more deficient, because if he read the scan and didn't see anything, it makes him even worse than not remembering.

He said he didn't recall so many times. Dr. Merikangas is the one who, it looks like, threw the case totally off balance.  As I said, there is no ineffective assistance of experts, and Dr. Merikangas, if he thought he needed that, then before he told them that the MRI was okay, don't quote me word for word, but he would be the one who would then have sought that, and he didn't.  So it really makes what he did worse than it already is.

I will obviously go back and review the testimony, but this testimony seemed incredible.  His testimony has

little to no weight because he recalls little to nothing, despite documents that he says show otherwise. Now, I'll go back and review that. Then he gives an entirely different opinion that was part of this *habeas* proceeding to the Fourth Circuit from 2015.

You've had the files of the attorneys. You've had the time sheets of the attorneys. You had that note to file that Mr. Hudgins had made, and you plunged forward -- I'm not saying you, I'm using it as a generic for counsel -- plunged forward with these arguments about Dr. Merikangas and got a declaration contrary to what was right in front of you in a file.

So in offering this new evidence, you may even be hurting the case even more because this just says one more deficit for Dr. Merikangas, if the Court finds that he said what he said to Mr. Woodward and Mr. Hudgins, and that would be an expert they were depending on. They didn't have to get every expert in every field. They were depending on him.

What was his condition from all of this in 2009? The testimony has also been that you could have been one way in 2009, but as time goes on, but it's what he could formulate in 2009, he's had an injury in prison, and some of these other things could have been exacerbated.

MS. ALI: Dr. Lipton's testimony is about the 2009

2506

MRI scan, Your Honor.  I just want to make that clear.
That's what his report is about, and that's what his
testimony will be about.  Again, I don't have the transcript
in front of me, Your Honor, so I don't want to -- I don't
want to misstate the testimony, but my recollection of the
testimony, not only from Dr. Merikangas but also from
Dr. Nadkarni, also from Dr. Aguirre now, and I think
Dr. Martell, though I'm not sure about that, is that they
all would consult with a neuroradiologist.  If they read a
scan, it's a subtle finding, perhaps, and they go out and
consult.

So the argument here, Your Honor, is that there is
no evidence in the record that Dr. Merikangas and trial
counsel spoke after he had the scan.  I understand that the
Court has raised and the government has raised a number of
times during this hearing the discovery violations.  I
understand that.

THE COURT:  They are serious.  They are egregious.
If the government had done that -- this is egregious.  Not
just a little discovery violation.  It was 40 bankers' boxes
with all this information with the attorneys' files, their
time sheets, their notes to file.  Now, Mr. Hudgins is
deceased.  Look at it from a rational perspective.

MS. ALI:  I'm not attempting to minimize the
violation, Your Honor.  I understand.  What I'm trying to

2507

argue is that the actual evidence that came out of that late-disclosed discovery, I'm not excusing that.  I wasn't involved.  I'm here to try to move things forward and carry this through the end of the hearing.  But the late-disclosed discovery, we have the time sheets, we have the memo to file.  There is no evidence there that trial counsel and Dr. Merikangas spoke after he had the scans, and so the testimony is that they would have -- the testimony from all these experts is that especially when a scan is done -- again, I don't want to -- I'm not trying to mischaracterize.

THE COURT:  Let's handle it this way without going back over everything again.  I'll let each of you brief it, the issue of whether he should testify, and you need to have the briefs filed on or before 9:00 a.m. Monday morning.

MS. ALI:  Simultaneous briefing, Your Honor?

THE COURT:  Simultaneous briefing.

MR. SAMUELS:  Yes, Your Honor.

THE COURT:  The time is such that I'm not going to put one party to the task of working over the holiday and the weekend and not the same task to the other side.

So in terms of the briefing, you can file simultaneous briefs on this by 9:00 a.m. Monday morning, and I'll get back to you, maybe not in writing, but at least verbally as to whether he should come to testify.  That's the best that we can do on this time schedule.

JODY A. STEWART, Official Court Reporter

2508

Then is there anything else?

MR. SAMUELS:  There is not, Your Honor.  Thank you.

THE COURT:  Ms. Ali, is there anything else?

MS. ALI:  No, Your Honor.

THE COURT:  Then we stand in recess on this case until 10:00 a.m. on Tuesday morning.

(Hearing adjourned at 5:21 p.m.)

CERTIFICATION

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


    X_____/s/_____x

               Jody A. Stewart

               X_____12-5-2023 _____x

                    Date

JODY A. STEWART, Official Court Reporter