2509

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - - -
                                        )
UNITED STATES OF AMERICA,               )
                                        )
    v.                                  )    CRIMINAL ACTION NO.
                                        )    4:08cr16
DAVID ANTHONY RUNYON,                   )
                                        )
        Defendant.                      )
                                        )
                                        )
        AND                             )
                                        )
DAVID ANTHONY RUNYON,                   )
                                        )
        Petitioner,                     )    CIVIL ACTION NO.
                                        )    4:15cv108
    V.                                  )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        Respondent.                     )
                                        )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

DAY 15

Norfolk, Virginia

November 14, 2023

BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge

JODY A. STEWART, Official Court Reporter

2510

APPEARANCES:

       UNITED STATES ATTORNEY'S OFFICE
       By:  Brian Samuels
          Lisa R. McKeel
          Assistant United States Attorneys
            And
       DEPARTMENT OF JUSTICE
       By:  Carrie L. Ward
          Counsel for the United States

       VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
       By:  Elizabeth J. Peiffer
          Robert Edward Lee, Jr.
            And
       ALI & LOCKWOOD LLP
       By:  Kathryn M. Ali
          Counsel for the Defendant

JODY A. STEWART, Official Court Reporter

2511

**I N D E X**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NONE | | | | |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL L. LIPTON M.D. PH.D. | 2522 | 2592 | 2611 | |

**E X H I B I T S**

| GOVERNMENT'S NO. | PAGE |
|---|---|
| NONE | |

| DEFENDANT'S NO. | PAGE |
|---|---|
| 189 | 2528 |

JODY A. STEWART, Official Court Reporter

2512

(Hearing commenced at 10:03 a.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; in case number 4:08cr16, the United States of America versus David Anthony Runyon.

Mr. Samuels, Ms. McKeel, Ms. Ward, is the government ready to proceed?

MR. SAMUELS:  The Government is ready.

Good morning, Your Honor.

THE COURT:  Good morning.

THE CLERK:  Ms. Ali, Ms. Peiffer, Mr. Lee, is the defendant ready to proceed?

MS. ALI:  Yes.  Good morning, Your Honor.

THE COURT:  Good morning.

Sir, are you David Anthony Runyon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Counsel, Dr. Lipton isn't in the courtroom, is he?

MS. ALI:  No, ma'am.

THE COURT:  I just want to give you my ruling before you call him in to be a witness.  Again, I would reserve the option to put this in writing if appropriate at a later time, but I'm going to read the parameters into the

JODY A. STEWART, Official Court Reporter

2513

record so that we can proceed with the rebuttal testimony of Dr. Lipton.

At the conclusion of the evidentiary hearing on November 9, 2023, the United States orally moved to exclude defense rebuttal expert, Dr. Michael Lipton.  Petitioner objected, citing the lateness of the motion and the need for Dr. Lipton to rebut the testimony of the government's expert, Dr. Aguirre.

The Court ordered the parties to file simultaneous briefings on the issue by 9:00 a.m. on Monday, November 13, 2023.  The parties timely filed their position papers on the issue.  ECF Number 889 was the United States', a motion *in limine* to exclude defense rebuttal expert, and ECF Number 890 was the petitioner's response to the United States' oral motion to exclude petitioner's expert witness.  Through this ruling I'll refer to them as a motion *in limine* and the petitioner's response.  Both filings included Dr. Lipton's expert report as an attached exhibit, 889-1 and 890-1.

The United States argues that the Court should exclude Dr. Lipton as a rebuttal witness to Dr. Aguirre because he, meaning Dr. Lipton, presents a novel claim that expands the scope of petitioner's case in chief, and because he is an improper rebuttal witness to Dr. Aguirre.

The petitioner's response is that the United States has waived any objection to Dr. Lipton's testimony by

failing to object to the testimony earlier and that Dr. Lipton's testimony is relevant and important evidence for petitioner's claim. I'm not going to cite all the places in the response that these arguments are made. They're not particularly long responses, and they are there for reference if anyone wants to check this.

Throughout this proceeding, the Court notes that it has been inclined to include disputed evidence and to dissect the relevant from the irrelevant evidence at the conclusion of the proceedings.

Here, however, there is a clear risk that Dr. Lipton's testimony will go well beyond the limited role as a rebuttal witness. After reviewing Dr. Lipton's expert report, the Court finds that Dr. Lipton is an appropriate rebuttal expert but only to the extent that his testimony directly rebuts Dr. Aguirre's expert testimony and his expert report.

Specifically, the Court excludes any testimony that is only relevant to the performance prong of the *Strickland* inquiry. While petitioner's ineffective assistance of counsel claim necessarily involves some level of considering hypothetical situations, Dr. Lipton's theory to the performance of trial counsel is overly speculative and steps too far.

Petitioner argues that Dr. Lipton is relevant to

JODY A. STEWART, Official Court Reporter

2515

the performance prong of the *Strickland* inquiry because, if trial counsel had contacted Dr. Merikangas after he received petitioner's MRI in 2009, "Trial counsel would have learned that Dr. Merikangas identified white matter hyperintensities on the 2009 MRI scan, that the normal reading of the scan by the diagnostic radiologist should be given little to no weight, and that a neuroradiologist would have a superior ability to read the scans," and that's all in petitioner's response at Page 6.

First, this theory contradicts Dr. Merikangas's previous statements that he did not review the petitioner's MRI until 2015.

Second, assuming that Dr. Merikangas reviewed the MRI scans in 2009, which the evidence actually strongly suggests he did, there is no evidence that Dr. Merikangas would have informed trial counsel that they needed to further consult with a neuroradiologist.  In fact, Dr. Merikangas could not remember reviewing the MRI in 2009, and he did not testify that he would have recommended to trial counsel that further review by a neuroradiologist was necessary.

The idea that Dr. Merikangas would have recommended further review by a neuroradiologist, if trial counsel had called him, is based on the dubious assumption that is not supported by the evidence presented here.  Petitioner's

2516

hypothetical argument and theory that Dr. Merikangas would have made such a recommendation at the conclusion of the hearing is simply not supported by the evidence.  If that was going to be presented, then it should have been presented through Dr. Merikangas.  It's a hypothetical about Dr. Merikangas's conduct that was not brought out in Dr. Merikangas's testimony in the case in chief.

Furthermore, the argument that petitioner's trial counsel should have consulted a neuroradiologist is outside the scope of rebutting Dr. Aguirre's expert testimony. Dr. Aguirre's report only discusses whether petitioner's 2009 MRI and whether petitioner's expert reports suggest that petitioner actually had significant brain injury in 2009.  His report does not relate to the sufficiency of trial counsel's investigation of petitioner's possible brain injury.

Therefore, rebuttal testimony to Dr. Aguirre should be limited to questioning the medical conclusions of his report.  Any argument that a neuroradiologist was necessary to interpret the 2009 MRI or that trial counsel should have consulted the neuroradiologist, which would be outside the scope of rebuttal and should have been presented in petitioner's case in chief.  So you're asking this expert to posit on two areas:  Number one, what Dr. Merikangas would have done, and he was here to testify, and none of that

2517

testimony was asked of him, and, again, it's questionable whether he read them or not under his testimony.

Secondly, the argument that a neuroradiologist was necessary to interpret the 2009 MRI is not rebuttal to anything that Dr. Aguirre said. If that was going to be something you would have presented, you should have presented it in your case in chief, not as a rebuttal to Dr. Aguirre.

Dr. Lipton's testimony is relevant not because it relates to the scope of trial counsel's investigation, but because it is the type of expert that trial counsel could have hired to rebut government experts. That is, his relevance is based on the hypothetical scenario that, assuming trial counsel had chosen to present brain damage and mental health as a mitigating factor, and the government presented their own mental health expert, Dr. Lipton is the type of expert witness trial counsel could have hired to rebut the government expert.

Accordingly, Dr. Lipton's report is relevant to the extent that it questions the credibility of Dr. Aguirre's conclusions. For example, Dr. Lipton disagrees with Dr. Aguirre's conclusion that the 2009 MRI would have revealed an abnormal finding, if petitioner sustained a focal or diffuse brain injury sufficient to produce a lasting change in behavior, and his conclusion that changes

in mood or behavior following a concussion dissipate in approximately six months.  That's in Dr. Lipton's report at Page 3.  These directly refute claims that Dr. Aguirre made and are appropriate rebuttal testimony.

So, in other words, you're not being denied the rebuttal testimony, but it has to be appropriate to what Dr. Aguirre testified and to what Dr. Merikangas testified, and if you wanted to have this extra in, you should have presented it in your case in chief.  It's not rebuttal on these points now.

Dr. Lipton's report also states that the 2009 MRI shows "bifrontal encephalomalacia, a localized loss of brain volume."  That's his report at 2.  Although Dr. Aguirre found petitioner's 2009 MRI was unremarkable, his report does not discuss encephalomalacia.  The issue of encephalomalacia was first introduced by petitioner's counsel in Dr. Lipton's report.

Simply put, while Dr. Lipton's conclusion that the 2009 MRI showed bifrontal encephalomalacia could rebut Dr. Aguirre's finding that the 2009 MRI was unremarkable, encephalomalacia is only introduced by Dr. Lipton's report.  The issue of whether the 2009 MRI scan shows encephalomalacia is an issue for petitioner's case in chief, not rebutted, and, indeed, Dr. Nadkarni already provided testimony regarding encephalomalacia.

Petitioner cannot use Dr. Lipton on rebuttal to further expand the encephalomalacia issue.  Accordingly, the petitioner's counsel may ask Dr. Lipton about his conclusions from the 2009 MRI and why he disagreed with Dr. Aguirre's opinion, but counsel may not ask him about the encephalomalacia issue.

Given the above considerations, the United States' motion *in limine* to exclude Dr. Lipton is denied with the following limitations placed on Dr. Lipton's testimony:

Dr. Lipton's testimony will be strictly limited to rebutting Dr. Aguirre's medical conclusions.  When questioning Dr. Lipton, counsel should be prepared to specifically identify which portions of Dr. Aguirre's report counsel anticipates his elicited answer will rebut.

Counsel may not ask questions that are only relevant to the performance prong of the *Strickland* inquiry. This includes questions as to whether Dr. Lipton regularly consults with defense lawyers about potential brain injury, whether neuroradiologists regularly ask him to review their findings, or whether a neuroradiologist was necessary to interpret the 2009 MRIs.  Such questions are outside the scope of rebuttal testimony, and any relevant performance inquiry has already been established in petitioner's case in chief.

The United States argues that Dr. Lipton, as a

2520

neuroradiologist, is improper to rebut Dr. Aguirre's conclusion that petitioner would not suffer dysfunction resulting from his brain injury.  That's in their motion *in limine* at 14-15.  Dr. Lipton's report states that he has a "longstanding research program focused on the detection and characterization of traumatic injury to the brain and its effects on neurobehavioral functions."  That's in his report at 1.  At this stage the Court is satisfied that Dr. Lipton is qualified to testify to anomalies present on brain scans and describe resulting dysfunction to these anomalies, but the United States is welcome to question Dr. Lipton's conclusions during cross-examination in this regard.

So that is my ruling in regard to the motion *in limine* and the parameters that I set upon the testimony.

We can go ahead with Dr. Lipton's testimony, as set by the above parameters.

Ms. Ali.

MS. ALI:  Your Honor, before we bring him in, I understand the Court's ruling.  I think a key component of his rebuttal to Dr. Aguirre, who stated in his report and testified that despite finding white matter hyperintensities on the scan --

THE COURT:  I think that Dr. Lipton needs to step back out.

MS. ALI:  Dr. Aguirre's ultimate conclusion that

2521

the scan is unremarkable, Dr. Lipton's findings about encephalomalacia are directly responsive to that underlying, that key component, that key opinion in Dr. Aguirre's testimony and report.

I think that the critical component of what Dr. Lipton offers as a neuroradiologist, is the only neuroradiologist that looked at the scans, that finding, I understand that Dr. Aguirre didn't make that finding, but that's precisely the point, that this is responsive to Dr. Aguirre's conclusion that the scan is unremarkable, and I think at the end of his report he says there was no reason to believe that Mr. Runyon's neurologic health was anything but normal at the time of the crime.

I think the encephalomalacia is the critical finding in Dr. Lipton's report rebutting that. I understand the Court's ruling. I wanted to make that case, and at the very least I would ask that the Court permit us to make an oral proffer of the evidence about encephalomalacia, and, similarly, about the 2018 scan similar to what happened with Dr. Nadkarni.

THE COURT: Anything you want to add?

MR. SAMUELS: No, Your Honor. I would just add that, as we did in our pleadings, this is the very definition of kind of a new claim that has been added by the petitioner. It's not rebuttal to Dr. Aguirre. It is

Lipton, M. - Direct                                                2522

something that's new that's being added as it was with Dr. Nadkarni when he talked about it in his examination.

I think it was raised to some degree, as the Court referenced, with cross-examination with Dr. Aguirre, but it was not part of his testimony, and I think it's a new piece that is being couched in terms of rebuttal to try and introduce that, is not appropriate at this juncture.

THE COURT:  Well, we will proceed with his testimony, and then I'll decide whether you can do a proffer.

MS. ALI:  Okay.  Thank you, Your Honor.

THE COURT:  Dr. Lipton, if you would please come forward and be sworn.

(Witness affirmed.)

MICHAEL L. LIPTON M.D. PH.D., called by the Defendant, having been first duly affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ALI:

Q.  Good morning, Dr. Lipton.  Could you please state and spell your name for the record.

A.  Yes.  Michael, M-i-c-h-a-e-l, middle initial is L., Lipton, L-i-p-t-o-n.

Q.  What do you do for a living?

A.  I'm a neuroradiologist and a neuroscientist.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2523

Q.   Would you give us the highlights of your educational background, please.

A.   Okay.   So after finishing high school, I went to Boston University where I was in a combined accelerated undergraduate and medical school program, and I graduated with a bachelor of arts and doctor of medicine degree in 1990.

          After that I started my clinical training, which was first a year of internal medicine, sometimes called an internship, and then after that I did a four-year residency training in diagnostic radiology, immediately followed by two years of fellowship in neuroradiology.   And then after that time I completed a Ph.D. in neuroscience, which I received in 2007.

Q.   And how about your employment history, can you just give us the highlights there as well?

A.   Sure.   So I was employed during my training first, when I finished medical school, by Brookdale Medical Center in New York City.   After that I was employed as a resident and a fellow during my training by Montfiore Medical Center and Albert Einstein College of Medicine.   It's the same institution in New York City.

          After I completed my training in neuroradiology, I joined the faculty at the same institution, and I was employed by Montfiore and Albert Einstein College of Medicine

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2524

until May 31st of this year, at which time I moved to Columbia University in New York City.

Q.  And you touched on this briefly, but could you just tell us specifically, have you completed training in neuroradiology in particular?

A.  Yes.  So I've completed training in diagnostic radiology and in neuroradiology, which was -- the neuroradiology training is two years of fellowship training.

Q.  How much of your clinical practice is focused on the brain as opposed to the spine and other parts of the body?

A.  I would say it's about 85, maybe 85 to 90 percent.

Q.  And about how many brain MRI scans would you say you review in a typical year?

A.  It's definitely thousands.  I couldn't say off the top of my head.  I mean, for many years it was probably close to about 7- or 8,000 scans a year.  Since June I have more time to focus on my research, so I don't do quite as many, but it's still thousands of scans a year.

Q.  Do you hold any board certifications?

A.  Yes.  I am board certified by the American Board of Radiology and Diagnostic Radiology and in neuroradiology.

Q.  And what are your day-to-day responsibilities in your clinical practice?

A.  My practice location is predominantly in the hospital, which is New York Presbyterian, Columbia, New York City.  I

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                           2525

don't really go to any other locations, and my job is to interpret diagnostic imaging studies in the neuroradiology division.  That is, you know, as I said before, is mostly the brain.  The vast majority is the brain.  I do some spine imaging, I do some other imaging of the, you know, head and neck, but it's mostly brain, and it involves both supervising the way that these studies are done, so the MRI or CAT scan studies, specifying parameters that are used, and then interpreting those studies, issuing reports, and a big part of what I do is consulting with other clinicians who refer other clinicians and sometimes directly with patients, but mostly clinicians who refer patients to have those studies.

Q.  And when you prepare reports of the findings you make on imaging, does that include identifying the likely causes of these imaging findings?

A.  Yes.  So the radiology report that essentially always includes either a single impression of what the cause of the findings is, what the diagnosis is, or more often it's a differential diagnosis where we identify possible causes of the findings and then indicate which is the most likely.

Q.  In your experience at Columbia and previously at Einstein, who is qualified to interpret and report on brain scans?

A.  The only people that are credentialed by the hospital for that role are individuals who are trained and board certified

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2526

in both radiology, diagnostic radiology, and neuroradiology, as well as meeting whatever other criteria the hospital has for being on staff.

Q.  And you testified that your day-to-day responsibilities include consulting with or advising physicians from other subspecialties about imaging findings.  What are some of the reasons the physicians consult with you?

A.  Right.  So there could be several reasons.  Most often is that they are interested in understanding exactly what it is that I'm describing in the report.  Sometimes these are things that the other clinicians don't see in the images, or they don't really understand exactly what the report is referring to, and then it's typically a discussion as to what is the most likely diagnosis.

So it's basically a consultation where we discuss the patient, the other information that is available about the patient outside of the images, and come to a discussion on -- a determination as to what is the differential diagnosis and what's the most likely diagnosis.

Q.  And in an academic medical center like Columbia or Einstein or Penn, what's the difference between what you do as a neuroradiologist and what a diagnostic radiologist does?

A.  So diagnostic radiology is sort of the foundational certification, and in many specialties, including neuroradiology, there is then an additional certification on

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                         2527

top of that.  So diagnostic radiology is kind of the platform, and then there are other subspecialties which do not have a board certification attached to them, such as abdominal imaging.  But in the kinds of practices that I've worked in my entire career, everyone who is practicing in a given area, which is defined by the organ system or part of the body, has specific subspecialty training in that area.

The only people who would have only a diagnostic radiology certification would be individuals who are in a subspecialty where they don't have any additional board certification to pursue.

Q.  You've testified that you have both a medical degree and a Ph.D. in neuroscience.  How, if at all, did your training and experience in neuroscience impact your work as a medical doctor and vice versa?

A.  So there is a tremendous amount of what I would call cross-fertilization between my clinical medical expertise in neuroradiology and my scientific expertise in neuroscience in that as a clinician, I have a much broader and also much deeper understanding of brain structure, function, how these affect the brain to a level that physicians who went to medical school and did clinical training, which I did as well, don't have that depth of knowledge, and that informs very much what I -- the way that I interpret images and the way I interpret images in concert with other data of that

Lipton, M. - Direct                                          2528

patient's.

Then in the other direction, my clinical experience, the type of work that I do in the clinic and in the hospital is -- really seeds what I do in my research program.  So both -- in both of those areas there is a similar focus.

Q.  You also research and write in the field of neuroradiology and neuroscience?

A.  Yes, I do.

Q.  Are those publications listed on your CV?

A.  They are.

Q.  Can we pull up, please, Defense Exhibit 199.  This still lists you as Albert Einstein.  Thing is the slightly -- this is the CV we had in January, but does this accurately reflect the January version of your CV?

A.  It should, yes.

Q.  We can flip through it.

A.  Do I page through it?

Q.  We can page through it.

A.  This looks like what my CV looked like --

Q.  Okay.

A.  -- about a year ago.

MS. ALI:  I'd move to admit Defense Exhibit 189.

THE COURT:  It's admitted.

(Defendant's Exhibit 189 received in evidence.)

THE COURT:  Do you have an objection?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2529

                MR. SAMUELS:  No, ma'am.

                THE COURT:  It's admitted.

                MS. ALI:  Thank you, Your Honor.

BY MS. ALI:

Q.  Has your research focused on a particular area?

A.  Yes, it has.

Q.  And what is that area?

A.  So my research focus for more than two decades has been
on traumatic injury to the brain and the way it can be
depicted with imaging techniques, specifically MRI, and how
those imaging findings are related to the functional or
behavioral effects of people with traumatic brain injury
sustained.

Q.  Have you received grants from the government to support
your research?

A.  Yes.

Q.  And can you describe at a very high-level what kinds of
grants you received and for what kinds of research.

A.  So my research is predominantly funded by the National
Institutes of Health, specifically the National Institute of
Neurological Disorders and Stroke, and these are multi-year
research grants which are focused on understanding the nature
of what happens to the brain in the setting of mild and
especially mild repeated impacts to the head, how that can be
depicted with imaging, how these imaging findings relate to

                JODY A. STEWART, Official Court Reporter

the underlying biological mechanisms and to the

neurobehavioral or cognitive outcome that are affected in

those patients.

Q.   You mentioned mild traumatic brain injury.  What do you

mean?  Is that a clinical term?

A.   That is a clinical term.

Q.   Can you describe what that means in a clinical setting?

A.   Sure.  So traumatic brain injury is currently, and for

many, many years, has been classified based on severity at

the time of the injury as either mild, moderate, or severe.

So there are specific criteria in terms of either symptoms

the patient reports or signs that clinicians observe in the

patient which lead to that classification being mild,

moderate, or severe.  I don't know if I should go into what

those are or --

Q.   Well, let me ask you, what is the purpose of this

classification system of mild, moderate, and severe at the

time of injury?

A.   So the mild, moderate, severe classification is important

as a classification of acute traumatic brain injury, meaning

at the time or within the hours following the injury.  The

role of that classification is that it has been very useful

in predicting -- considering the very broad spectrum of

traumatic brain injury in people who died instantly to people

who may have mild symptoms that resolve very quickly.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2531

So that classification is very useful in identifying the likelihood that someone is going to survive the injury, that they will need neurosurgery, that they will need to be in an intensive care unit, but all things happening at the front end, at the early acute phase.  It's important to realize that it does not speak to and does not predict what the longer term outcome will be for patients who do survive.

Q.  And when you say it doesn't predict long-term outcomes, does that include people who have mild traumatic brain injury?

A.  Yes, absolutely.  So people with mild traumatic brain injury mean it's classified as mild at the time of the injury, or sometimes barely recognized at the time of the injury, they can go on to have significant disability as a result of that injury.

Q.  Have you ever testified as an expert witness, Dr. Lipton?

A.  Yes, I have.

Q.  And in how many of those cases were you retained as an outside expert versus testifying in more of a treating physician capacity?

A.  So I don't know the numbers as I sit here, but what I would say is that the vast, vast majority of times I'm testifying -- that I have testified is based on imaging that I performed on a patient, and it's less common, although you know, it does happen, you know, that I testify as an expert

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2532

being asked to review other things that I wasn't directly involved in at the time.

THE COURT:  So you're testifying as a fact witness for that patient, the patient that you've had?

THE WITNESS:  Yes.

THE COURT:  And you've reviewed the scan or treated?

THE WITNESS:  Typically, I actually was involved in supervising and interpreting the scan, and then while I may have reviewed other records related to the patient, I'm testifying about what those images show.

MS. ALI:  At this time, Your Honor, I'd offer Dr. Lipton as an expert in the field of neuroradiology and neuroscience.

MR. SAMUELS:  Your Honor, I do have a couple of questions, if I may.

THE COURT:  All right.

VOIR DIRE EXAMINATION

BY MR. SAMUELS:

Q.  Good morning, Dr. Lipton.

A.  Good morning.

Q.  Sir, I have your CV, your resume as well.  My copy is from January where it indicates that you were at Albert Einstein College of Medicine.  That's where you were probably at the time; is that right?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2533

A.   That's correct.

Q.   And you've had a long history there?

A.   That's correct.

Q.   It lists you as professor of radiology, psychiatry and behavioral science.  Does that sound right?

A.   That is correct.

Q.   You were not a psychiatrist, correct?

A.   I am not a psychiatrist.

Q.   Not a psychologist?

A.   No.

Q.   Do not practice as a neuropsychiatrist?

A.   I do not.

Q.   Do not practice as a neuropsychologist?

A.   I do not.

Q.   And regularly in your duties, you do not make use yourself of neuropsychological testing?

A.   Well, I actually make extensive use of neuropsychological testing.

Q.   Do you administer the testing, sir?

A.   Testing is administered under my supervision, but I just want to be clear, in a research setting, not in a patient care setting.

Q.   Thank you, sir.  That was my next question.  You had referenced, when you were establishing your qualifications, that a lot of what you do has to do with studies; is that

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                        2534

right, sir?

A.  I don't recall that that's what I said.  I'm not sure what you mean.

Q.  I'm sorry.  Maybe I have it down wrong.  What I'm trying to get at is do you see patients on an individual basis now, sir?

A.  So I'm a radiologist, so I deal with individual patients as a radiologist.  We don't typically see the patient face-to-face, but I review, as I indicated, scans and medical records and consult on the care of individual patients, not -- that's not a research setting, just to be clear.  That's an actual patient care setting in the hospital.

Q.  Is there a session that you are dealing with studies that is a research session or has a research aspect to it?

A.  I'm not sure what you mean by a session.

Q.  Well, is there a component of your research that involves studies?  There was a reference to studies that you made on your examination that I caught.

A.  I certainly do research, and I supervise several research studies, yes.

        MR. SAMUELS:  Your Honor, I have no objection to Dr. Lipton as a neuroradiologist.  I don't know that I heard anything specific in the field of neuroscience that would qualify him there, and I'm not sure where that would go to, but I have no objection to him as a neuroradiologist.

                    JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2535

THE COURT:  Well, he is qualified as an expert neuroradiologist at this point.  Anything else that you want to offer him as?

MS. ALI:  I can ask him more questions to try to lay the foundation for him to also be called as a neuroscientist, Your Honor, given the objection.

THE COURT:  You can do that.

BY MS. ALI:

Q.  Dr. Lipton, how much of your work is divided between your clinical neuroradiology practice and your neuroscience research?

A.  Presently about 60 percent of my time is research and about 40 percent of my time is clinical.  There is some administrative work that falls into both categories, I guess, but that's about the split.

Q.  And the research branch that you described, including from the NAH and other places, is that mostly in relation to your research -- your neuroscientist research laboratory?

A.  That's 100 percent related to my neuroscience lab.

Q.  And the research you described that you've been doing for more than two decades on traumatic brain injury and understanding the behavioral outcomes of traumatic brain injury or the functional implications, I think you said, of traumatic brain injury, that's obviously related to your clinical practice, but is that research performed in your

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                2536

capacity as a neuroscientist?

A.  Yes, it is.

Q.  Did your training and expertise as a neuroscientist impact your conclusions and your work in this case?

A.  Yes, it does.

Q.  And can you explain how.

A.  So my scientific work is related to understanding when somebody has an injury to the brain, what will change about the brain, and in particular what will change about the brain using imaging, and I should just underscore that neuroimaging is used by scientists extensively in addition to its use in clinical neuroradiology.

So my research is really about understanding the progression of what changes in the brain following an injury, how that's manifest in particular with neuroimaging, MRI in particular, and then how that relates to the functional neurobehavioral outcomes of a patient.

Q.  Can we please pull up Defense Exhibit 200 and go to the last page.  We will start with the first page.

Dr. Lipton, do you recognize this as a copy of your report in this case?

A.  Yes, I do.

Q.  And it's dated -- what's the date on the report?

A.  February 16, 2023.

Q.  If we could go to the last page.  Could you please read

JODY A. STEWART, Official Court Reporter

the last paragraph of your report.

A.   Yes.  "My opinions are made to a reasonable degree of medical certainty and are based on the materials I have reviewed and on my training, experience and expertise in the fields of neuroradiology, neuroscience, and traumatic brain injury."

MS. ALI:  At this time, Your Honor, I would re-tender Dr. Lipton as also an expert in neuroscience in addition to neuroradiology.

MR. SAMUELS:  Your Honor, could I ask one follow-up question?  I can do it from here.

THE COURT:  You can.

BY MR. SAMUELS:

Q.   Dr. Lipton, you are not a practicing neurologist, are you, sir?

A.   No, I'm not.

MR. SAMUELS:  Your Honor, it just seems a broad statement to be testifying as an expert in neuroscience. You've got all these different subspecialties.  I can make my objection at the appropriate time he is testifying, but this broad definition of neuroscience is outside what we have had in this case so far, but I think we've established he's not a neuropsychologist, not a neuropsychologist, not a neurologist.

THE COURT:  Not a psychiatrist, a psychologist, not

Lipton, M. - Direct                                          2538

a neuropsychologist.  He is qualified as a neuroradiologist, and then that's when the neuroscience came up.

Tell me just in words, that an ordinary judge or an ordinary jury would understand, what do you do as a neuroscientist?

THE WITNESS:  Yes.  So in the most basic way, I study the brain, and in particular in what I particularly do as a neuroscientist is I examine many patients who have injuries to the head, and then we do various testing on them, which includes MRI, includes cognitive assessments, behavioral assessments, there are blood tests that we do, and a host of many other types of measurements that then we look at to understand when someone has an injury what happens to their brain, and we do that with MRI, and then how does that relate to what happens to them in terms of their function.  So we are studying the connection between injury to the brain and behavior.  That's the focus of what I do.

THE COURT:  You said that when there was a brain injury that you look at it as the severity at the time of the injury, whether it was mild, moderate, or severe; is that right?

THE WITNESS:  So that is the classification at the time of the injury.  The focus of my work is on the mild traumatic brain injury part of the spectrum.  So I don't

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                        2539

look at people with very severe brain injuries in my research work.  I see them in the clinic all the time, but my research is focused on people with mild traumatic brain injury, which is also called concussion, and what that does to the brain and what it does to people's function.

THE COURT:  So basically you look at the mild brain injury and what it does to an individual's function?

THE WITNESS:  Yes.  What it does to their brain tissue and what it does to their brain function, both.

THE COURT:  Anything else you want to ask?

BY MR. SAMUELS:

Q.  Let me ask you this, Dr. Lipton.  You described looking at the MRI but also looking at a number of other pieces of information in your capacity as a neuroscientist with respect to patients; is that right?

A.  Well, as well as in my clinical practice.  It's not only through my neuroscience work that I look at things other than imaging.  I think I mentioned that earlier.

Q.  Then I guess my question is, have you looked at those other things with respect to the defendant, Mr. Runyon, in this case or has it been more strictly to the imaging?

A.  I've looked at what's listed on my report, which I did not review extensive medical records.  There are some things that I did review, which were reports from people who had treated him, the EMG and other brain MRI imaging.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2540

MR. SAMUELS:  Your Honor, obviously, we will be objecting to some of those latter categories of information because they are outside of the relevant time period here. I can cover this with objection to cross-examination, but it just seems like some of the things that Dr. Lipton said he looked at as a neuroscientist don't apply to his role in this case, but I have no objection to neuroradiology or the MRI piece of this, Your Honor.

THE COURT:  Well, he will go ahead and testify, and if you have an objection, make it.  You can also examine him on those objections, and then I'll determine what is the credible evidence and what is the relevant evidence and be able to sort that out.  Go ahead.  Be sure you make your objection and cross-examine him on any weaknesses that you feel or anything that doesn't relate to what's in this case or is beyond the scope.

MR. SAMUELS:  Yes, Your Honor.

MS. ALI:  And just to clarify, Your Honor, I'm not trying to offer Dr. Lipton as anything but what he testified that his expertise is in.  I'm not trying to offer him as a neurologist.  That would not be appropriate, but neuroscience is a separate discipline that he has a Ph.D. in and that he has been working in for decades.

So I just want to clarify that neuroscience is a separate discipline from neurology or neuropsychology or

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                        2541

neuropsychiatry, and I'm not trying to shoehorn him into any of those specialties but just to get him qualified as an expert in the areas in which he has been working for.

THE COURT:  Wouldn't that go past what Dr. Aguirre testified to in his specialty, and this was rebuttal?

MS. ALI:  Well, Your Honor, Dr. Aguirre testified about the behavior in his report, offers opinions about the likely behavioral and functional effects.

THE COURT:  I just asked you wasn't he a neuroradiologist?

MS. ALI:  He is a behavioral neuroradiologist.  I think he may also be a neuroscientist.

THE COURT:  Well, he was offered as a behavioral neurologist.

MS. ALI:  That's right.

THE COURT:  I'd have to go back and look at exactly what he was qualified in.

MS. ALI:  That's right, Your Honor.

THE COURT:  I thought this was going to be a rebuttal witness to him.

MS. ALI:  That's exactly right, Your Honor.  My only point is that in rebuttal to Dr. Aguirre testifying both about his findings on the imaging but also the likely functional effects of what he's identified on the imaging, we've brought Dr. Lipton who is an expert both in

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                        2542

neuroradiology for the imaging but also in neuroscience, the functional implications, the effects of that.

So he's a different kind of expert but offered directly in rebuttal to the two areas that Dr. Aguirre discusses in his report and testified about.

THE COURT:  Go ahead.

BY MS. ALI:

Q.  Dr. Lipton, have you been retained as an expert in this case by Mr. Runyon?

A.  Yes.

Q.  And do you recall approximately when you became involved in this case?

A.  I believe it was January of this year.

Q.  And what were you asked to do at a high-level?

A.  I was asked to review a brain MRI and some records and reports to discuss my findings, and then ultimately to write a written report describing my findings.

Q.  And did you reach any opinions based on your review of Mr. Runyon's 2009 MRI scan?

A.  I did.

Q.  And did you summarize those opinions in this report that's been marked as Defense Exhibit 200?

A.  I did.

MS. ALI:  And at this time, Your Honor, I would offer Defense Exhibit 200.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                      2543

MR. SAMUELS:  Your Honor, I would note our objection to anything in the report that references the materials past 2015 with the exception of Dr. Aguirre's report, I think that's items 4 through 7 that Dr. Lipton reviewed, as well as information in the report related to this encephalomalacia.  But I object to those portions of the report.  I know the Court can sort it out, but we would object to those portions as beyond the scope of rebuttal.

THE COURT:  Well, I sustain the objection.  I'm going to go back and correct one ruling that you mentioned to me on Friday because I have tried to keep everything to the relevant time period, and in particular here, this is rebuttal.

MS. ALI:  Just for clarification, so the portions of the report that are related to the 2009 MRI scan can be admitted?  I think Mr. Samuels' objection was to the 2018.

MR. SAMUELS:  It is.  There is also a portion in the report that references this bifrontal encephalomalacia from 2009.  We would object to that as well based on the Court's ruling.

THE COURT:  I already ruled on all that.  I'm not going to keep repeating myself.  I wrote a ruling, and I read it into the record.  I said that you could offer a proffer at a later time, but we are going ahead now on the rebuttal to Dr. Aguirre's report.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2544

MS. ALI:  Your Honor, the witness is not aware of the Court's ruling.

THE COURT:  Well, you are aware.

MS. ALI:  I understand.  I'm just -- I can -- I'll try to ask a question in a way that doesn't elicit testimony that's been ruled on, but I'm just clarifying that for the record that we have not spoken with him since the Court ruled this morning.

THE COURT:  I understand.

BY MS. ALI:

Q.  Dr. Lipton, without discussing the encephalomalacia finding, can you briefly summarize your opinions about the 2009 MRI, and then we will talk about those opinions in more detail but for now just the 30,000-foot overview.

A.  I'm not sure I understand what I'm being asked to do.

Q.  Other than the encephalomalacia that you identified on the scan, did you find anything else on Mr. Runyon's 2009 MRI scan?

A.  There are other findings, yes.

Q.  And what are those findings?

A.  So those findings are that there are areas of white matter hyperintensity, predominantly, almost exclusively located at a juxtacortical location, which means where the gray matter of the brain and the white matter of the brain abut each other, which is a characteristic location for the

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2545

occurrence of those abnormalities in the setting of trauma.

Q.   And in addition to the -- reviewing the 2009 MRI images, did you also review other materials as listed in your report?

A.   I did.

Q.   And did you review those additional documents before or after you reviewed the 2009 MRI scan?

A.   After.

Q.   Did you form opinions about Mr. Runyon's brain based on your review of the 2009 imaging before or after you reviewed these other documents?

A.   Before.

Q.   You noted in your report some quality issues with the 2009 MRI scan, but do the images from the 2009 MRI, nonetheless, provide an adequate look at Mr. Runyon's brain such that you were able to reach conclusions to a reasonable degree of medical certainty?

A.   Yes.  All the conclusions that are in my report are substantiated by my review of the images.  There are issues with the image quality, and they likely obscure or limit the ability for us to see other abnormalities on the scan, but what we can see, we can see.

Q.   You also noted in your report that the history reported on the MRI report is trauma in 1996, several brain injuries. Does that history impact the way you review the scan or your finding?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2546

A.   It does.

Q.   And can you explain that for us, please.

A.   So in radiology, as well as neuroradiology, we always interpret the imaging findings in the context of the clinical information available for the patient, which is why in a clinical setting we always look at the medical records at the same time we look at the scan.

Q.   How, if at all, does the history change your opinion about what you actually see on the MRI scan?

A.   Well, it has no impact on what I see.  It has an impact only on the interpretation of the likely diagnosis or the diagnostic possibilities, depending on the case.

Q.   If we can please pull up the images.

     Dr. Lipton, are these the subset of the images from the 2009 MRI scan of Mr. Runyon's brain that you reviewed?

A.   These are three images from that study.

Q.   And before we get into your findings, can you please just orient us at a very basic level what are we looking at here?

A.   Sure.  So these are three images of his brain, and as it says in the lower right, this is from August 13, 2009. The -- when we look at the brain with MRI, we are actually looking at the brain as if we put the person's head like into a bread slicer, and we slice it up, and there is a set of slices.  In this case we know from looking at the image in the lower left that there were a total of 25 slices through

Lipton, M. - Direct                                        2547

his brain, and these slices are oriented such that if I was -- it was me setting there, they would be parallel to the floor.

On the left, left-hand slice is closer to the top of the head.  As we move to the middle and the right, they are progressively lower.  Altogether these slices are above the level of the eyebrow, more or less.  And the images we are looking at are listed as numbers 14 on the right, 17 in the middle, and 18 on the left.

Now, these images are one series of images from the MRI examination, so whenever an MRI exam of the brain or other body part is performed, there are actually many different types of images collected, at least four or six or so, and that was the case here.  This is only one set of images, and in looking at these images, we need to appreciate what they can show and what they can't show.

And so on these images, we see that there are -- if we look at the brain itself, before we talk about the abnormal findings, in looking at the brain -- is there any way for me to point to this or not really?

THE COURT:  Yes.  I think just put your finger there.

THE WITNESS:  Oh, okay.  Great.  So if you notice that when we look at this -- does it have to write?  So the little green cross is actually on the skull.  That's not the

Lipton, M. - Direct                                              2548

brain at all.  And if I take that pointer, and I put it over there, so the point that has the little pencil adjacent to it is at the surface of the brain.

Now, if you would look at the surface of the brain, it's not smooth.  It's this kind of undulating surface of hills and valleys, and we can see that when you look around the brain that there are these sort of -- that little black line going toward the middle from where the pen is, that is one of those grooves.  And we can see that underneath it there is a lighter shade of gray, so this sort of a black line and a lighter shade of gray surrounding it.  And then if we keep going -- so there is that lighter shade of gray. If we go deeper into the brain, it is a much darker shade of gray.

And then if we go way into the center, it is black. The black is fluid, which is present in cavities inside the brain called ventricles.  But the part that I want to clarify is that when you look at the brain itself, there is a very thin layer of what we call gray matter, which is this lighter shade of gray, is almost like a ribbon going over the surface of the brain.  Underneath the gray matter is the rest of the brain tissue, which is predominantly -- excuse me -- is white matter.  The white matter is dark, darker gray, and the gray matter is lighter gray on these types of images.

JODY A. STEWART, Official Court Reporter

So what's important in this case is -- is it possible to erase these?  Okay.  So if we look at these images, we will see that there are a few places sort of down and to the right of the pen, there is a little round white spot.  There is another one, but now the pen is kind of covering it, but if you take that away, you will see there is another little light spot there.

There is another one over here (indicating), which, again, the pen is covering it up.  There is another one just to the right of that.  The more we look, and especially if we come and look at the part of the image at the top, which is the front of the head behind the forehead, we see that there are actually many of these spots, these little white spots.

There is some here and here and here (indicating), and those are all very much at the surface of the brain except potentially for the one that I am pointing to there (indicating).  These are all actually immediately adjacent, they are right at the border of the gray matter and the white matter of the brain.  They are very small.  They are not normal because they are what we call higher intensity, they look whiter than the adjacent tissue, and there are many of them to a degree that would not be normal, and they are mostly in the front part of the brain.

BY MS. ALI:

Lipton, M. - Direct                                                    2550

Q.   I want to come back to gray matter and white matter, but I'll just note for the record, since this image won't be in the record, that I think you've identified two hyperintensities on what's listed as 18, image 18, four on image 17, and four on image 14; is that correct?

A.   Well, that's correct, but I haven't pointed out every single -- we could keep going.  There are many of them.

Q.   Okay.  Could you please -- you mentioned gray matter and white matter, but could you please explain for us just as simple as you can the difference between white matter and gray matter and what they do in the brain?

A.   Sure.  So the simplest way to understand this is that the brain is essentially an information processing machine, and it's much more complicated than that because the brain is composed of a specialized type of cell or neuron or a neurocell.  In the human brain there are on the order of a hundred billion neurons, and those nerve cells at the -- the way we are describing them here, they live in the gray matter of the brain.  So your hundred billion nerve cells are not distributed throughout your entire brain.  Those cells actually live in that very then layer, predominantly in that very thin layer over the surface of the brain.  Now, nerve cells are unique because they have a fine wire-like extension, which is called an axon, and that is essentially analogous to the nerve cell being a computer.  That needs to

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                           2551

send that information someplace or receive information, which occurs over that axon.  So all of the hundred billion nerve cells living out in the gray matter actually communicate with each other and with the rest of the body through these axons.

That's functionally the difference between gray matter, where the cells live, and white matter, which is comprised of bundles of these wire-like projections or axons. So it's almost like the computers on the network live out of the surface of the brain, and they connect to each other through the white matter.

Q.  How does the fact that you see white matter hyperintensities on multiple different slices of the MRI impact your confidence level in what you're seeing?

A.  So the -- both the number of abnormalities and the fact that we see them on multiple images, and I should point out these are three representative images.  These types of abnormalities are present on many other images, not only on these three images.  And seeing so many abnormalities across multiple images is very important in increasing the confidence, not just that they are present, because they are present because they are visible to me on seeing them, but the fact that they are an abnormality.  So this is way beyond anything that would be within the realm of normal in a 38-year-old, which was the age of Mr. Runyon at the time the MRI was done.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                        2552

Q.   Can you expand on that a little bit?  How does the number of white matter hyperintensities you identified in Mr. Runyon's 2009 scan bear on your opinions about whether they are of notable finding or show that the MRI is abnormal?

A.   So if we think about white matter hyperintensities, white matter hyperintensities occur in many different diseases, and to some extent they can occur in normal people who don't have any known brain disease.

But there is a big difference between what we see in a healthy person who happens to have some white matter hyperintensities and what we see here, and that has a lot to do with the number of abnormalities.  So we typically expect, in someone who is in his fourth decade, that he might have three or four white matter hyperintensities that are scattered through the brain for which there isn't a clear reason for them to be there.

But people who have so many white matter hyperintensities, that's not within the realm of normal. That's beyond the realm of normal, and there has to be some diagnostic explanation for that.  That would typically -- so the clinical setting, someone with this type of appearance of their brain, would typically then undergo an evaluation, workup, to understand what is the etiology of those findings, if all we knew was that they were there, and we don't have any other information about them.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                2553

Q.  You also testified about the location of the white matter hyperintensities on Mr. Runyon's scans.  How does that bear on your opinions about whether the white matter hyperintensities on the 2009 MRI are of notable finding or show an abnormality?

A.  So the main feature that says that they are clearly abnormal is the number, but the distribution of findings is very important because far and away from most common cause in general of white matter hyperintensities across the population is cerebral vascular disease, which is the same process that causes people to have heart attacks and is related to things like diabetes and high cholesterol.

What's important to recognize is that white matter hyperintensities occur in people with cerebral vascular disease, but they look totally different because they are located in a different part of the brain.  The characteristic appearance of white matter hyperintensities is that we get white matter hyperintensities that are on the edges of the ventricles along these two green lines that I am drawing and as well as over here (indicating).  So these areas do not have the appearance of someone with chronic cerebral vascular disease.  This appearance would be highly atypical for what otherwise in a vacuum would be a common cause of white matter hyperintensities.

There are certain disorders that are more likely to

Lipton, M. - Direct                                                2554

lead to white matter hyperintensities that are located predominantly at the juncture of the brain and white matter and that -- you know, one of the principal causes of that is trauma, and that has to do with specifically the biology of the brain, that another difference between gray and white matter is that the tissue composition is different.

So in a setting of an impact to the head or given a whiplash type of injury, the tissues, the gray and white matter, actually are accelerated with the impact to the head, but they accelerate, and they move at different rates. So they slide past each other creating what engineers call a shear force, and that shear force injury is characteristically occurring at the junction of gray and white matter. It also characteristically occurs in the frontal lobes, in the front part of the brain behind the forehead, which is at the top of the images in this case.

Q. You testified earlier that your clinical practice, much of what you do is either identify causes of findings or make what you call a differential diagnosis. Is that what you did here to arrive at the conclusion that these white matter hyperintensities present on the 2009 MRI scan are likely caused by a prior trauma?

A. Yes.

Q. Dr. Aguirre said in his report that there is -- and I'm quoting now -- "No plausible biological basis to claim that

Lipton, M. - Direct                                        2555

the white matter hyperintensities could be associated with a substantial alteration in behavior or cognition."

          Do you agree with that?

A.  I disagree with that.

          MS. ALI:  Can you explain why?

          MR. SAMUELS:  Your Honor, I'm going to object to that without some more foundation on fact of cognition. Dr. Lipton hasn't established any basis to render an opinion on functionality or cognition of Mr. Runyon.  He has just looked at the scan for the damage.

          THE COURT:  Go ahead and lay a better foundation.

BY MS. ALI:

Q.  Dr. Lipton, you've testified, when you were discussing your qualifications and your experience, that your research has been focused on determining effects of imaging findings; is that correct?

A.  Yes.

Q.  And you didn't reach conclusions about the particular effects on Mr. Runyon in this case; is that correct?

A.  That's correct.

Q.  Based on your training and experience, are you able to offer opinions about whether there was a plausible basis, as Dr. Aguirre -- no plausible basis as Dr. Aguirre says, that white matter hyperintensities could be associated with an alteration in behavior or cognition generally?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2556

A.  Yes.

MR. SAMUELS:  Your Honor, I would object again.  It is still speculative.  It is plausible, it's possible.  He hasn't looked at anything to see whether there is cognitive or functional effect like Dr. Aguirre did.  He's basing this on his research and saying it could have or couldn't have, but he is not making it individualized to the defendant, and that's where it should be at this stage.

THE COURT:  It does need to be individualized, and it has to be more than could have.

MS. ALI:  Your Honor, the "could have" language, the "plausible language" is Dr. Aguirre's conclusion.  I'm just asking whether he agrees or disagrees and can explain his disagreement with -- I'm not asking him the hypothetical.  That was language directly from Dr. Aguirre's report.  I'm happy to pull it up, if that's helpful.  I'm asking him to respond to a conclusion that Dr. Aguirre reached in his report.

THE COURT:  Well, pull it up, and let us see it.

MR. SAMUELS:  I would just note that was a conclusion reached after not only looking at the images but also looking at the neuropsychological testing and reports of function and behavior, and there has been no foundation that Dr. Lipton has looked at any of that.

MS. ALI:  Can we pull up Government's Exhibit --

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2557

THE COURT:  Again, I recall that portion of the report.  Mr. Samuels is correct.  It was established what Dr. Aguirre looked at, and so if you want to establish what he looked at and how he concluded this, that's two different things.  He based his opinion on having looked at certain things.

MS. ALI:  Not this particular opinion, Your Honor.  If I could just pull it up on the screen, and we could look at it.

THE COURT:  What is the exhibit?

MS. ALI:  Government's Exhibit 75, Your Honor.

THE COURT:  Let's just look at Government's Exhibit 75 without pulling it up on the screen.  Where in the report are you, Ms. Ali?

MS. ALI:  On Page 4 in Paragraph 3, I'm looking at the last two sentences of that paragraph.

Sentence that starts "These tiny."

THE COURT:  I see that.  He is referring to two doctors there.

MS. ALI:  He is earlier in the paragraph, Your Honor, but these two sentences, his opinion he is rendering in the last sentence is a general opinion about whether white matter hyperintensities can ever be associated with a substantial alteration in behavior or cognition.  I'm not asking Dr. Lipton to opine on Mr. Runyon specifically, and

that's not what Dr. Aguirre is doing in this paragraph.  He is saying his opinion and what he testified to.

THE COURT:  I can read it.  Well, he is your witness.  Don't lead him if you're going to ask this question.  He's testified as to the white dots, has he not?

MS. ALI:  Yes, Your Honor.

THE COURT:  Then ask him the question.  Don't put all of this into the question and say isn't that true or is that true.

BY MS. ALI:

Q.  How can the white matter hyperintensities located on -- or that you identified on Mr. Runyon's 2009 MRI, if at all, be associated with alteration and behavior or cognition?

A.  Because those white matter hyperintensities represent injury at the junction of the cell, the neuron cell and the axon I described, which disables to greater or lesser extent depending on how many of them there are, the network connections within that part of the brain.  So the information processing capacity of the brain is diminished because in order for us to do the things that we do, our neurons need to interact with and talk to each other.  These are indications that there is less physical connection from one neuron to the other.  The human brain doesn't have any Wi-Fi.  It has to be physically connected one cell to the other, and these areas indicate that there is injury to those

connections.

Q.   Based on your training and experience, do you have an opinion about whether there is a plausible biological basis to claim that these white matter hyperintensities on the 2009 scan could be associated with a substantial alteration in behavior or cognition?

MR. SAMUELS:  Your Honor, I still object to that as speculative.  Looking at the report from Dr. Aguirre, he is responding to the observations made by Dr. Merikangas and Nadkarni and saying that based on those observations, and he thinks that based on those, they are referring to a certain area, there is no plausible basis.  This really expands that question, I believe, to a speculative area.

MS. ALI:  Your Honor, he testified during his testimony that his general view, his opinion about white matter hyperintensities in general is that they are an unremarkable finding and a common finding.  I'm just asking Dr. Lipton to rebut that narrow bit of testimony on precisely this point, and I understand that in this paragraph he references Dr. Aguirre, the reports of Dr. Merikangas and Dr. Nadkarni, but the only thing he is referencing here is their finding that there are white matter hyperintensities on the scan.  He is not rebutting here any specific finding about Mr. Runyon's behavior or cognition.  He is making a general opinion about that based

Lipton, M. - Direct                                              2560

on his own --

THE COURT:  Well, we've heard a lot of testimony from your witnesses that these white matter hyperintensities can be on normal brains, that they don't necessarily show dysfunction or brain damage.  They can come on normal brains, and that many normal people, if you took the brain scans, would have them.

Now, Dr. Lipton has pointed out certain ones that he saw, and you can ask him his conclusions about the ones that he's pointed out.  But he can't form conclusions if he hasn't looked at the ones that Dr. Nadkarni and Dr. Merikangas looked at because that's what this conclusion is on.  He didn't look at those two, did he?

MS. ALI:  Yes, Your Honor.  In this paragraph.

THE COURT:  I'm not saying in this paragraph.  I'm saying Dr. Lipton.

MS. ALI:  Dr. Lipton, Dr. Merikangas and Dr. Nadkarni all looked at the same 2009 MRI scan, and that's the only thing referenced here that they are opining on.  They are not offering opinions about function in this paragraph.  All Dr. Aguirre is doing here is responding to the general point.

THE COURT:  Go ahead.  To move this on, go ahead and get your opinion out, and I'll let Mr. Samuels cross-examine on it, and I'll give it such weight as I

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2561

determine I should give it as rebuttal.

BY MS. ALI:

Q.  Based on your experience and training, Dr. Lipton, do you have an opinion about whether there is a plausible biological basis to claim that the white matter hyperintensities on Mr. Runyon's 2009 MRI could be associated with a substantial alteration in behavior or cognition?

A.  Yes, I do.

Q.  Dr. Lipton, did you identify any blood deposits on the images of Mr. Runyon's brain in the 2009 MRI scan?

A.  I did not.

Q.  And how, if at all, does that bear on your findings that the 2009 MRI reveals evidence of significant brain damage?

A.  Well, it has no bearing because there is no visible finding, but the interpretation of that negative finding has to be made with knowledge of the sensitivity of the test. And even if there were evidence of, as you call it, blood deposits, or we refer to sometimes as hemosiderin deposition present, this test would not show them, and it would be routine for a different test, which could have been done the same day, simply using slightly different types of images or perhaps a different MRI scanner, that that would show clear evidence of hemorrhage, even though the test that was performed showed nothing.  That's just a limitation of the way the test was done.

Lipton, M. - Direct                                          2562

MR. SAMUELS:  Your Honor, I would just object to Dr. Lipton's testimony that that test could have been done the same day with a different scanner.  He is not aware of the circumstances that were present when Mr. Runyon was examined.

THE COURT:  Sustained.

BY MS. ALI:

Q.  In 2009 was the technology available to do testing to identify hemosiderin deposits on an MRI scan?

A.  Yes.  It had been available for decades.

Q.  Is it possible that Mr. Runyon did experience a hemorrhage, it's just not visible on the images of the 2009 MRI?

A.  Absolutely.

MR. SAMUELS:  I object.  That's speculation if he's not seen the evidence.

THE COURT:  Sustained.  Let me ask you this, Dr. Lipton.  If attorneys don't know these things, they are hiring experts, you would agree to that, the normal attorney, who is not a doctor, who is not a neurologist, who is not in your field?

THE WITNESS:  Many doctors don't know these things, but, yes.  I would not expect attorneys to know this.  Some do, but I wouldn't expect them necessarily to.

THE COURT:  Maybe somebody who specializes in this

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                        2563

type of injury.  But from the standpoint of, let's just say a criminal defense attorney, maybe a civil attorney that has a brain injury case, but let's stick to a criminal defense attorney giving someone a defense, and they hire an expert, let's just say that they hire a person who has a specialty in neurology, forensic psychology, would that individual be expected to order these tests?  In other words, they're the ones ordering the test.

THE WITNESS:  Yes.

THE COURT:  So what would you expect that person to order?  If you've got an expert, and they've put in an order for a brain scan, what would you expect them to put in at a threshold level?

THE WITNESS:  So what I would expect, because I see this every day, is that they would order an MRI of the brain, which would be done according to a routine brain MRI protocol.  And in many locations, the protocol, for example, that was executed, we only looked at some of the images, but these images would constitute a routine brain MRI protocol.

But I wouldn't expect someone, such as the specialty you described, to have the knowledge or experience to know to order that these tests should be done in a specific way, and that would really require someone with more expertise.  So likely they would order a brain MRI, it would go to some -- patient would go to some MRI center,

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2564

have a routine brain MRI done, and I see this all the time. It comes back to me, and I have to tell the neurologist, well, you don't have a complete exam.  The reason you don't see the hemorrhage is because you haven't done the right test, so and that's -- a neurologist doesn't know that. They need the expert opinion to get them to do the test correctly.

THE COURT:  So the neurologist wouldn't know to ask for all these other tests.  So obviously as an attorney is depending on a neurologist, they wouldn't know to ask for it?  You are saying a neurologist, forensic psychologist orders a straight MRI, and they read it, how then do they know?  You're saying that they may not know, you see that every day, to order these further tests and the protocols.

THE WITNESS:  They would read it.  That's not my experience that the forensic psychologist would read the MRI.

THE COURT:  They get a reading, though, they get it back, and they look at it?

THE WITNESS:  Correct.

THE COURT:  They get back the report, and they certainly look at the MRI?

THE WITNESS:  Yes.

THE COURT:  They charge for reading it?

THE WITNESS:  Yes.  The forensic psychologist, I

Lipton, M. - Direct                                               2565

doubt it.

THE COURT:  No, I said a neurologist forensic psychologist.

THE WITNESS:  I don't think a neurologist -- I'm not an expert in what neurologists bill for, but I don't think they bill for the interpretations of the tests.  But at the end of the day, the answer to the question is that these specialists consult with people like myself.  They come to experts to ask for advice about what is on the image and what might not be on the image and what's the best way to work it up.

THE COURT:  So you would expect that if an MRI were ordered by a neurologist forensic psychologist, that there would be a process after that to follow through to see what's there?

THE WITNESS:  That they would consult with someone who could give them more information about the meaning of the scan, yes.

THE COURT:  All right.

MS. ALI:  I want to be clear about what we are arguing and what we are not -- I'm not trying to establish that different tests should have been done.  I don't know if it makes sense for me to, with Dr. Lipton on the stand.

THE COURT:  If you are going to try to key in testimony, no, it's not appropriate to do it while he's on

Lipton, M. - Direct                                        2566

the stand.  I asked a straightforward question that's based upon the evidence that we have received thus far.  Now you continue with your question.

BY MS. ALI:

Q.  Dr. Lipton, are you aware of the statement Dr. Aguirre made in his report that because the 2009 MRI showed no hemosiderin deposits, that supports the finding that the 2009 MRI is unremarkable?  What's your opinion of that statement by Dr. Aguirre?

A.  In the setting of that MRI, which was done for trauma, that's an error, because the absence of evidence, when the test couldn't provide the evidence, is not evidence that that finding is not present.

Q.  In addition to the images, I think you said you also reviewed a report of the 2009 MRI of Mr. Runyon's brain from the time the scans were done; is that correct?

A.  Yes.

Q.  And if we could pull up Government's Exhibit 61, please.  Is this the 2009 MRI report that you reviewed?

A.  Yes, it is.

Q.  And do you know who authored this report?

A.  Says Kirstin Fiona Davis, M.D.

Q.  Do you have an understanding of who Dr. Davis is and what her training, experience has been?

        MR. SAMUELS:  Judge, I'm going to object.  That's

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2567

got to call for a hearsay response and any information he's got about Dr. Davis, unless there is more of a foundation established.

THE COURT:  Agreed.

BY MS. ALI:

Q.  Did you take any steps to determine Dr. Davis's board certifications?

A.  Yes, I did.

Q.  And what steps did you take?

A.  I went to the public-basing portal of the American Board of Radiology, and I looked her up by name and confirmed by practice location.  There was only one person with this name, and she has board certification --

THE COURT:  Can I ask you, before you say that, when did you do this?

THE WITNESS:  I did this before -- it's cited in my report.  I did this before I wrote my report.

THE COURT:  All right.  Go ahead.

THE WITNESS:  So I -- and I found that she is board certified in diagnostic radiology.  She does not have any additional certification.  I also looked at her faculty physician page for the -- I don't remember off the top of my head -- but for the -- where her main practice is, and she is a specialist in breast cancer imaging.

MR. SAMUELS:  Your Honor, I'm going to object to

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2568

that as well.  Going up and looking on the web to try and find out who Dr. Davis is, is an end-run way to try and criticize the performance of Dr. Davis without her ever having been called here, without any information being presented by her.

And I don't think that's an appropriate way to get that information in.  It's based on hearsay.  It's based on information that's not been properly authenticated, and I don't think it's appropriate for Dr. Lipton to be opining as to a doctor that he's never met or knows her qualifications.

THE COURT:  Well, I'll let him testify that he looked her up, and this is what he found.  But nobody's called Dr. Davis to question her and ask her about her experience and ask her about the imaging that she actually did in her report.  To me that would have been appropriate to present in the case in chief.

But I'll let him testify that he looked her up, and this is what he found.  But that's doesn't speak to how many images she's looked at, how many images she's looked at of this sort, the equipment there, and so forth, because there has been nobody from Harbor View.  It's just been the pieces of paper.

BY MS. ALI:

Q.  Could we pull up Defense Exhibit 203, please, and go to Page 3 -- starting at Page 5.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2569

Is this -- does this -- do you recognize what this document is, as a general matter?

A.   Yes.

Q.   What is this?

A.   This is the standard output that anyone can get from going to the American Board of Radiology.  They have a publicly accessible portal, and you can look up a physician and access their board certification and maintenance of certification status.

Q.   And you testified that -- is this what you looked at before you wrote your report, not this exact version, I know the date on here is October.

A.   Yes.

Q.   The writing of the document is similar to what you looked at before you prepared your report; is that correct?

A.   This is exactly what I accessed.

THE COURT:  Well, this is dated October 24.

THE WITNESS:  Well, not the date.  Everything else is the same, but I accessed it prior to when I issued my report in February 2023.

THE COURT:  But this report that you looked up, it doesn't have ratings by other doctors.  I mean, let's face it, there are a lot of physicians out there, as there are a lot of lawyers and many professionals.  Some of them are better at their professions.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                  2570

THE WITNESS:  Could I clarify one thing?  I'm not saying anything about her.  I'm sure she is an outstanding radiologist.  She has no training or certification in neuroradiology.  That's all I'm making of this.  She has a basic certification, as I do in diagnostic radiology.  I would not hold myself as an expert at breast imaging.  I don't even do breast imaging.  She is certified in diagnostic radiology.  She has no training or certification in neuroradiology.  That is the only piece of information I'm taking from this, and I'm sure she's highly skilled. I'm not casting any aspersions on Dr. Davis by any means.

MS. ALI:  I'd move to admit this page of Defense Exhibit 203.

MR. SAMUELS:  I object, Your Honor.  I don't think it has been properly authenticated.

THE COURT:  I sustain the objection.  He testified. His testimony is on record, and it's in his report.  The page itself is not admissible.

BY MS. ALI:

Q.  Can you pull up Government's Exhibit 61, then, please. Did Dr. Davis report any of the findings that you've described in your report, Dr. Lipton?

A.  Let me just look again just to be sure.  She did not.

Q.  How, if at all, does that influence your opinion of what you see on the 2009 MRI scan?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2571

A.   It doesn't change anything about what I said of the scans.

Q.   Why not?

A.   My findings are my findings.  I look at a lot.  I'm a specialist in brain imaging.  This doctor is not.  But more importantly, in the context of routine evaluation of imaging studies, in my own hospital as well, the focus of clinical reports is I'm describing actionable findings, things that might be addressed to impact the treatment of a patient.

So, you know, what doctors are doing, and especially when general radiologists are looking at brain imaging, they are looking to rule out acute problems in the treatment, whether it's hemorrhage or stroke or a subdural hematoma, something, a tumor, something like that.

So that is -- that's really the main reason why this would be a routine occurrence for me in looking at many studies that come from outside my own institution, that is it's very common that there are findings on images that are not in the report.

Q.   Are any of the findings that you made on Mr. Runyon's 2009 MRI what you called clinically actionable?

A.   Not in the sense that anything specific could be done to treat them, no.

Q.   Based on your training and experience, do you have an opinion about what bearing, if any, the visual subtleties of

Lipton, M. - Direct                                                    2572

an abnormality on an MRI has on the functional implications of that abnormality?

A.   It depends on the abnormality, but, importantly, in the white matter, there is a great disconnect between size of abnormalities and functional implications.  So when I teach about this, I like to say that in the white matter of the brain, the size of the lesion doesn't matter because the problem when you have an injury in the white matter is the disruption of the brain network.  It's not just the location of the abnormality itself.

When someone has, as a contra example, when someone has a stroke, they lose a piece of their brain without losing that network connectivity.  They typically lose a very specific function; they can no longer move their hand or their leg.  But there are other functions, especially things that depend on network function like cognitive function remain intact; whereas, people who have injuries to the white matter have much more widespread effect because it's the brain network that's affected.

Q.   What is your opinion of Dr. Aguirre's conclusion that a focal brain injury would appear as a visible area of scarring in the brain?

A.   Well, that contains at least one important error.

Q.   What is that?

A.   Which is that scarring does not occur in the brain, that

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2573

the pathologic process of scar formation simply does not occur in the brain.  There are inflammatory responses, something called gliosis or astrogliosis, but scarring does not occur in the brain, and in the setting of injury, there can be reactive changes in the brain, but typically with a focal brain lesion, such as a contusion that ultimately leads to encephalomalacia, there would not typically be very much visible in the way of any kind of reactive effect.  But scarring itself just does not occur in the brain.

Q.  What is your opinion of Dr. Aguirre's opinions that a focal brain injury would appear as a loss of the normal structure of the brain?

A.  That is true.

Q.  And what is your opinion of Dr. Aguirre's conclusion that a significant brain injury would cause atrophy or shrinking of the entire volume of the brain?

A.  So, possibly, right.  So, but importantly, we have to recognize what that means.  So there is abundant evidence that brain injuries in general do cause shrinkage of the entire volume of the brain.  But in the category, especially of mild traumatic brain injury, that atrophy is not visible. It's detected by quantitative methods that can measure the brain volume, and it's not something that the human eye detects unless the injury is very severe where there can be dramatic shrinkage.

Lipton, M. - Direct                                                    2574

Q.  Dr. Aguirre also refers to the fact that this 2009 MRI report found that the ventricles in sulci are normal in size, shape, and position as evidence that the 2009 MRI scan is normal.  Do you have an opinion about that?

MR. SAMUELS:  Your Honor, I'd object unless -- is this in his report?

MS. ALI:  It is in his report.

THE COURT:  Take us to where it is in his report. What number is it?

MS. ALI:  His report, Your Honor, is Defense Exhibit 200.

THE COURT:  I think I've got it right here.

MS. ALI:  The question refers specifically to a statement made in Dr. Aguirre's report, which is Government's Exhibit 75.

THE COURT:  Did he make the statement in his report?

MS. ALI:  Dr. Lipton?

THE COURT:  Yes.

MS. ALI:  He responds to the statement in his report, Your Honor, and this is on Page 2 and on to Page 3 as well.

MR. SAMUELS:  Your Honor, I just ask, because there are certain portions of Dr. Lipton's report where there are quotes from Dr. Aguirre and then there is response.  I just

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                2575

don't recall this being quoted portion from Dr. Aguirre in Dr. Lipton's report.  If I'm in error, I'm happy to be corrected.

THE COURT:  I'm on Page 2 of his report.

MS. ALI:  So I don't know that he uses the magic words that are in Dr. Aguirre's report, but his -- the conclusions and the discussion in the first full paragraph on Page 2 and then the last paragraph on Page 2 carrying over onto Page 3 are directly responsive to Dr. Aguirre's -- this quote in Dr. Aguirre's report, and that is directly -- that is rebuttal evidence, Your Honor.  It doesn't need to use the same quote from Dr. Aguirre's report.

THE COURT:  I'm not seeing.  You are talking around a lot of things without pinpointing.  Let's look at Dr. Aguirre's report.  What is he responding to?  Do not read it, just tell us where it is.

MS. ALI:  It's Government's Exhibit 75, Your Honor.

THE COURT:  Okay.

MS. ALI:  I'm on Page 3 in the last paragraph.

THE COURT:  All right.  Sentence starting with what?

MS. ALI:  "A substantial, diffuse injury."

THE COURT:  Okay.  Then take me over to Dr. Lipton's report.

MS. ALI:  So now we are at Defense Exhibit 200.  We

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2576

are on Page 2, his finding on the first full paragraph of Page 2, which where he discusses loss of brain volume.

THE COURT: I hope I'm looking at the right report. This was written for Ms. Bales on February 16, 2023?

MS. ALI: Yes, Your Honor. Yes. I'm skipping over these three sort of sentences at the top. The sentence that starts, "The finding from the 2009 MRI."

THE COURT: I've got that.

MS. ALI: So Dr. Aguirre on Page 3 -- sorry, I'm just trying to link them up.

THE COURT: Let me read that one.

Then what is on Page 3?

MS. ALI: So Dr. Aguirre talks about the shrinking or loss of brain volume, and that's discussed on Page 2 of Dr. Lipton's report, and then again discussing -- responding to Dr. Aguirre's findings about the MRI on the bottom of Page 2, the last paragraph, which carries over onto Page 3 where the sentence -- it's really the whole paragraph. It's a long paragraph, but in particular the sentence that starts about five lines down on Page 3, "It is plainly erroneous to state."

THE COURT: I'm back on Page 2 right now on the last paragraph. You mentioned that.

This appears to go somewhat to the question that I was asking. I'll read it. "The fact that the findings in

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                            2577

Mr. Runyon's brain may visually appear subtle and may not have been recognized consistently by other physicians should not be taken to mean that these findings are not significant," and then it goes on, and it talks about subtle findings, but that, "due to TBI commonly have entirely normal appearing MRI examinations."

I'm not exactly sure what you were getting at. It was the question I was trying to ask a bit ago, that if an expert that someone has hired, it appears normal, apparently there are physicians that aren't as trained as Dr. Lipton could miss these. I'm not sure what question you're asking. If you're trying to get into the area that I said you shouldn't get into.

MR. SAMUELS: And that's my concern, Your Honor, because if the Court looks at the first full paragraph of Page 2.

THE COURT: I did.

MR. SAMUELS: There is that language there and then the parenthetical that follows that seem to be directly where we were heading here, perhaps going indirectly where the Court said we couldn't go directly.

THE COURT: That's what I'm looking at.

MS. ALI: I'm trying -- I'm trying to avoid the areas where the Court has ruled we can't go into, but I also -- that -- if I can't ask the question, I just ask that

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                         2578

we leave a portion of Dr. Aguirre's report unrebutted despite the fact that Dr. Lipton has offered opinions directly responsive.

THE COURT:  It is a part of Dr. Aguirre's report rebutted, and remember I told you, you could do a proffer.

MS. ALI:  Okay, Your Honor.  I can wait.

THE COURT:  Remember, I told you that at the beginning, that if you felt there were matters that you wanted on the record, and he hadn't covered by my ruling that it had to be limited to rebuttal testimony, and things that the Court felt you should have put in your case in chief, you can do it through a proffer.

MS. ALI:  Yes, Your Honor.

BY MS. ALI:

Q.  Picking up, I think, on the Court's question a moment ago, is it possible that a brain injury or a disease that leads to impairment might not be visible on an MRI at all?

A.  Absolutely.

Q.  Can that be true of traumatic brain injury?

A.  Yes.  The most common appearance on MRI for a patient who has disability, typically cognitive disability due to a traumatic brain injury, is that the exam is entirely normal. It's remarkable when we see anything in a patient with traumatic brain injury.

Q.  And when you say when you see anything, you are referring

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                           2579

to an MRI scan; is that correct?

A.   Yes.

Q.   To make a diagnosis of traumatic brain injury, is there a requirement that there be an abnormal MRI finding?

A.   No, absolutely not.  And the presence of imaging abnormalities on MRI, depending on the classification system, will make the injury more severe than a mild traumatic brain injury that are different classifications.

Q.   What do your findings on Mr. Runyon's 2009 MRI scan reveal about the extent of his brain injury?

A.   Well, it reveals that it's bilateral, meaning on both sides of the brain, and predominantly involves the frontal lobes and in particular what is called the pre-frontal cortex, which is sort of the front of the frontal lobe, which are the front part of the brain beyond the forehead, and it's at multiple locations.

Q.   And are the injuries or the findings you made on the 2009 MRI likely to show the full extent of Mr. Runyon's brain injuries?

A.   No, certainly not.  And can I explain why that is the case?

Q.   I think so.  If we get into a place --

A.   So the -- you know, when I say that the most common finding on MRI in a patient who clearly has traumatic brain injury with associated disability, functional problems, the

implication of that normal MRI is not that the brain is normal. We know from autopsy studies and other studies that the pathology, what's wrong with the brain in traumatic brain injury, is largely microscopic, and it can't be detected with MRI.

When we do see something on MRI, it's just what we can see, and I typically refer to this as just being the tip of the iceberg. There is a lot more going on in the brain that's beyond the reach of the MRI scan, just as a CAT scan of the brain of Mr. Runyon would probably, with respect to these white matter hyperintensities, look entirely normal. It doesn't mean that it's not. It just means that the test can't see it. And in the setting of traumatic brain injury, the clinical inference is that the normal appearance of the brain is simply due to the fact that the pathology related to the injury is microscopic and not detectable.

Q. Based on your training and experience, do you have an opinion of how multiple head injuries impact the brain?

A. Yes. That's a major focus of my research program for me.

Q. And can you explain what your understanding is about the effects of multiple head injuries?

A. So it's not my -- it's not just my understanding. The scientific consensus is that when someone has one brain injury, be it a concussion or a more severe injury, that their brain is then more susceptible to two things. One of

Lipton, M. - Direct                                              2581

them is later changes on neurodegenerative disease, but, importantly, they are also more vulnerable to having worse effects from a subsequent injury, and one of the cornerstones of managing patients with traumatic brain injury is avoiding additional impacts to the head.

So the injuries don't simply add up one on top of the other, but the subsequent injuries are going to have a disproportionate effect relative to what they might have caused if they occurred in a vacuum with no prior injury.

Q.   And when you say effect, are you referring to functional effects?

A.   I'm referring to both causing pathology in the brain, actual problems with the brain tissue and functional effects.

Q.   Dr. Aguirre offered a conclusion that changes in cognitive function resulting from a traumatic brain injury, quote, "are not confined to a single act but instead impact every effect of behavior."

Based on your experience and training and research, do you have an opinion about Dr. Aguirre's opinion?

A.   Well, if it's not typical that they impact every aspect of behavior, behavior is extremely diverse, and what's remarkable about traumatic brain injury is that the behavioral effects in individual people differ from person to person.  So it's definitely complex and will affect different people in different ways.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                        2582

It wouldn't be true to say that every aspect of a person's behavior would be affected in the same way or even would be affected at all.  Typically patients with traumatic brain injury have strengths and weaknesses in terms of their cognitive function and behavior following an injury.

Q.  Dr. Aguirre also offered an opinion that, I'm quoting, "If Mr. Runyon had sustained a focal or diffuse brain injury sufficient to produce a lasting change in behavior, this MRI scan would be expected to reveal an abnormal finding."  Do you have an opinion based on that opinion?

A.  Well, his MRI does reveal an abnormal --

MR. SAMUELS:  I object to that, Your Honor, because Dr. Aguirre had looked at material and information that went just beyond the brain scan.  So I think that opinion has to be put in that context.

MS. ALI:  Again, Your Honor, here -- with respect to this particular conclusion that Dr. Aguirre draws in his report as Government's Exhibit 75, and this opinion appears on Page -- I'm sorry.  I'm looking for it here.  It's on Page 3 under the same heading we were looking at before, "An unremarkable MRI scan of the brain," the second sentence starting with, "Mr. Runyon had."

THE COURT:  That's the third sentence.

MS. ALI:  The third sentence.  He's not offering an opinion here based on the other materials he reviewed.  He's

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                        2583

sort of posing a hypothetical in answering it as a general matter, and my question is limited to responding to this general opinion, which is not specific to -- he doesn't say, for example, based on my review of the neuropsychological testing or the neurology -- neurological exam, I find that Mr. Runyon didn't.  He's talking about it as a general matter about what would be expected to -- you could see on an MRI scan in somebody with behavioral changes, and I'm simply asking Dr. Lipton to respond to that.

            THE COURT:  Look at the next page, the full paragraph there.

            MS. ALI:  I'm sorry.  Which paragraph?

            THE COURT:  It's Page 4, Paragraph 2.

            MS. ALI:  Where he says he agrees with the reports.

            THE COURT:  He made a conclusion there.  What were you going to say, Mr. Samuels?

            MR. SAMUELS:  I was just going to say, Your Honor, that that discussion of the MRI scan follows a lengthier discussion where Dr. Aguirre goes through all of the claim of injury of Mr. Runyon.  So, again, I think we take these statements, but it doesn't include some of the -- and I can cover it on cross-examination, but I don't think it includes the full context of Dr. Aguirre's report.

            THE COURT:  Why don't you cover it on cross-examination, that way we will move it along.

                    JODY A. STEWART, Official Court Reporter

MR. SAMUELS:  Yes, Your Honor.

BY MS. ALI:

Q.  Dr. Lipton, Dr. Aguirre in his report opines that, "If Mr. Runyon had sustained a focal or diffuse brain injury sufficient to produce a lasting change in behavior, this MRI scan would be expected to reveal an abnormal finding."

Do you have an opinion about that opinion that Dr. Aguirre has rendered?

A.  I certainly do.  That's completely erroneous.

Q.  And can you explain that in a little more detail, please.

A.  Well, I think I've already said that in a patient with disability, meaning cognitive behavioral dysfunction due to traumatic brain injury, the most common appearance of the MRI is normal, that in some people we do see things, and that may indicate a higher level of severity, but MRI is never a rule-out for trauma, ever, in the current clinical practice of medicine, and that's been the case for decades.  That's not something new.

Q.  I'd like to ask you just a few questions about Dr. Aguirre's views on concussion.  In his report, this is at Page 3 of his report -- I'm sorry, this is page -- yeah, Page 3 of his report, Dr. Aguirre says that concussions "result in stereotyped change in mood and behavior that resolves over an approximately six-month period."

Based on your expedience and training and research,

Lipton, M. - Direct                                                2585

do you agree with that assertion?

A.   I disagree.

Q.   And can you explain why?

A.   That's completely inconsistent with numerous studies on the outcomes following concussion, which indicate that, you know, in the range of more than half of the people who have sustained concussion, which is a synonym for mild trauma brain injury, and who have normal imaging, less than half of those people have resolution of symptoms at six months, and more than 30 percent of them have symptoms which never -- and dysfunction which never fully remit.

Q.   Was that also the scientific consensus in 2009?

A.   Yes, absolutely.

          MR. SAMUELS:  Your Honor --

          THE WITNESS:  I even published on it in 2009.

          MR. SAMUELS:  The study that is listed in Dr. Lipton's report is a 2022 study for this proposition. If there is other studies, we haven't been provided with them.

          THE COURT:  So you say it was listed, a study in 2009.  Why didn't you include it in your report?

          THE WITNESS:  I just put in as a for instance, the most recent study that has looked at a very large population, but this is not new.  This has been the state of the science related to concussion for decades.  It's

                    JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                      2586

really -- frankly, it's an archaic concept that concussion is just a transient disturbance that goes away in everybody after six months.  We know that's not the case, and that's been repeatedly demonstrated that a subset of people with concussion, 30 percent or more will have persistent symptoms that never remit.

THE COURT:  But the science and the knowledge of concussions has changed tremendously over the last decade or so?  You read all the time about how people didn't know what the brains of football players looked like, and now they are operating, and some are even donating their brains.  So you couldn't tell it from objective type tests at the time.  Would you agree?  Or am I being too simplistic?

THE WITNESS:  I think that is oversimplifying in a couple of areas.  First of all, and this is -- what you are talking about is the main focus of what I've done for 20 years.  I studied repetitive head and back in athletes.  The concern about concussion and sport-related impacts has definitely become much more recognized in the public in general, and I think as a result physicians who, unfortunately, had limited understanding have become more recognized about this.  But going back to 2005, I mean, the CDC had public information campaigns to raise awareness about the fact that concussion is a brain injury, and the criteria for diagnosis and for -- when I talk about the

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                    2587

duration of symptoms, those are things that --

THE COURT:  I'm going to stop you.  I have to stop you there because we don't have any of those studies or whatever before us.  I'm just an ordinary judge, and I am not familiar with that literature unless someone shows it.  I'm not going to accept general testimony on literature.

THE WITNESS:  I would say those studies are cited in the paper that I cited.  You can look at them.

BY MS. ALI:

Q.  In other words, studies predating 2009 are cited in the 2022 study?

A.  Studies predating the 2022 study are cited as the background and the basis for that study.

Q.  Can a head injury that does not result in a loss of consciousness cause long-term cognitive changes?

A.  Absolutely.

Q.  And how well understood was that in 2009?

A.  That was recognized in 2009.

Q.  And how -- in your experience, do people sometimes experience head injuries for which they don't seek medical treatment?

A.  That's very common.

MR. SAMUELS:  Your Honor, if we were back in 2009, and they had called Dr. Lipton as a rebuttal witness, I would be objecting to so much of this is not individualized

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                              2588

to Mr. Runyon, and every question is, can it affect this population, can it affect this, but it is not individualized.

THE COURT:  Sustained.  Could have, would have, possible, but let's stick to the person and the injury at hand.

MS. ALI:  Understood, Your Honor.  Dr. Aguirre reaches conclusion about the -- whether these head injuries likely happened or whether they were serious based on -- he renders an opinion that he doesn't believe some of these head injuries listed in his report that is on Page 1, moving onto Page 2 of his report, whether they happened at all based on the fact that doctor -- I'm sorry, that Mr. Runyon didn't seek medical treatment apparently at the time of the injuries.  And so I'm just trying to elicit testimony responsive to these points in Dr. Aguirre's report.

MR. SAMUELS:  But that was all individualized to Mr. Runyon.  Dr. Aguirre had looked at certain records.  He looked at certain testing.  He looked at things with respect to Mr. Runyon, and this is testimony that is just general in nature.

MS. ALI:  That's not accurate, Your Honor.  He did not look at any of those things with respect to the existence of the head injury.

THE COURT:  Well, I'll make that decision.  I have

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                                 2589

the reports.

MS. ALI:  I'm not clear on the Court's ruling.  I'm sorry.

THE COURT:  I have Dr. Aguirre's.  I have Dr. Lipton's.  I'm listening to them.

MS. ALI:  I just mean with respect to my question. I know there was an objection.  I don't know if it was sustained or overruled.

THE COURT:  I can't remember what your question was.  I think the objection was simply that you weren't tying it to this specific case.  In other words, you were saying in general somebody goes out and falls on the sidewalk.  You weren't tying it to Mr. Runyon.  That was the objection, and that's what I sustained.

BY MS. ALI:

Q.  Do you agree, based on your review of the 2009 MRI scan and the other materials listed in your report with Dr. Aguirre's conclusion that, "There is" -- I'm quoting now -- "no particular reason to have suspected in 2009 that Mr. Runyon was anything but normal in his neurologic health"?

A.  I disagree.

Q.  And what is the basis for your disagreement?

A.  That his MRI is abnormal, as I've described.  There were other findings as well.

THE COURT:  In the 2009 MRI?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                        2590

THE WITNESS:  Yes, the 2009.

THE COURT:  Because you can't base it on anything, any MRIs after that.

THE WITNESS:  Should I discuss that?

THE COURT:  She just asked a very broad question, and anything done past the time of 2009 to 2015, 2018, those are things listed in your report, so your question has to be strictly on the 2009 MRI.

MS. ALI:  And it was, Your Honor.

THE COURT:  No later formed opinions on MRIs done later.

MS. ALI:  That's right.  And he testified earlier that his opinion of the 2009 MRI was formed before he looked at any other record.

THE COURT:  Okay.  But I heard it phrased a little differently than that.  So it's the way I heard it.

MS. ALI:  I'll ask it again, and I'll make clear that it's narrow.

BY MS. ALI:

Q.  Do you agree, based on your review of the 2009 MRI scan, with Dr. Aguirre's conclusion that, "There is no particular reason to have suspected in 2009 that Mr. Runyon was anything but normal in his neurologic health"?

A.  I disagree.

Q.  And I think you already answered this, but I'll ask

JODY A. STEWART, Official Court Reporter

Lipton, M. - Direct                                          2591

again.  What is the basis for your disagreement?

A.  The abnormalities on the 2009 MRI.  Am I permitted to describe all the abnormalities?  I mean, that's part of it.

THE COURT:  Not unless the question is asked and not unless it's a proper question.  You said based on what you testified, and I heard about the white matter hyperintensities.

MS. ALI:  Well, he identifies other abnormalities in his report.  The Court has excluded that.  I understand we will be able to make a proffer about it, but I think that's what he is getting at, is that he has identified other abnormalities, but he's not testified about them, but I think he's trying to establish that.

THE COURT:  We will get to them.  If there is proper testimony in there, then it will be considered.

MS. ALI:  I understand also the Court's prior ruling about the 2018 record.  I do think Dr. Lipton is differently situated than any other expert to testify about those.

THE COURT:  This has to be based on the performance of counsel in 2009 and what they knew or should have known, and it cannot be based on later MRIs to say, oh, we go back and now we see this and this, because there has been testimony that things can develop over time.  Maybe things have a cumulative effect.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                    2592

I have made that ruling throughout the case, and it's going to stand now.  This is based upon ineffective assistance of counsel in 2009, what they ordered, what they had, and what they knew.

MS. ALI:  I understand the Court's ruling.  As I said, I think that Dr. Lipton is differently situated.  I don't want to go into the argument while he is on the stand, but there are several aspects of his report.  We are not arguing anything about what the trial counsel should have known what was on the 2018 scan, but the findings on the 2018 scan are relevant to the finding on the 2009 scan and other opinions in both Dr. Aguirre's report and Dr. Lipton's rebuttal report.  I'm happy to go into more detail, but I'm careful not to do that.

THE COURT:  Not at this point.

MS. ALI:  Nothing further, Your Honor.

THE COURT:  We will take a 15-minute recess and then begin cross-examination.

(Recess from 12:16 p.m. to 12:41 p.m.)

THE COURT:  Mr. Samuels.

MR. SAMUELS:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. SAMUELS:

Q.  Good afternoon, Dr. Lipton.

A.  Good afternoon.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                               2593

Q.   Dr. Lipton, just so we are clear on what you reviewed and what you didn't review, you did not review any results of neuropsychological testing for Mr. Runyon, did you, sir?

A.   Only to the extent that they had been referenced in other reports that I reviewed.

Q.   Okay.  No test results that you recall reviewing?

A.   No.

Q.   And you did not review or made aware of a description of the offense at issue in this case, were you, sir?

A.   No.

Q.   And so I'm clear, Dr. Lipton, you are not here to provide a connection between what you saw on the MRI images and the behavior of Mr. Runyon, correct?

A.   Not directly to his behavior, no.

Q.   You don't know what his behavior was, right, sir?

A.   I did not assess it myself, correct.

Q.   And I think you mentioned earlier that a lot of times when somebody comes in to do an MRI, there is some information about trauma or some issue that's presented at the beginning; is that right, sir?

A.   Correct.

Q.   That's why MRI is not a rule-out because you have some information going in?

A.   No, that's not true.

Q.   But in most cases you do have some information as to why

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                2594

the MRI is being done?

A.   We typically have some information.

Q.   And then there would be additional things that are looked at after the MRI is done, correct?

A.   I mean, in my own practice I typically am referring other things at the same time that I'm reviewing the MRI.  That's part of my report.

          THE COURT:  I'm sorry.  I couldn't hear you.

          THE WITNESS:  It becomes -- excuse me.  It becomes part of my report.

BY MR. SAMUELS:

Q.   Is that because you're looking for a connection between what you see on the MRI and any form of dysfunction?

A.   It's because I'm looking for the clinical context to put together with the imaging findings.

Q.   And in this case you don't really have a clinical context; is that right, sir?

A.   For that MRI, all I have is the description of organic brain syndrome and prior trauma.

Q.   And the description of prior trauma is just a general description, isn't it, Dr. Lipton?

A.   I believe it was a year, I think it was 1996.

Q.   Okay.  You don't have the specifics of what that trauma is?

A.   Not from the report, no.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                          2595

Q.   All right.   And we will go through what exactly you looked at in just a minute.   Let me just cover some preliminary areas, sir.   I have your -- madam clerk, can you turn on the Elmo, please.

     Dr. Lipton, I think you mentioned that you were retained in this case in January of '23; is that right, sir?

A.   I believe so -- as best as I can recall.

Q.   Do you know who your contact was at the time?

A.   It was -- it's the name at the top of the report, which is Ms. Bales.   I think it is Susanne.

Q.   Ms. Susanne Bales?

A.   I believe so.

Q.   And what is the fee that you charged for your work in this case, sir?

A.   I bill by the hour.   $550 per hour.

Q.   Would you tell us how much time you've billed thus far in this case, sir?

A.   I don't know the exact title, but we -- so I think in this case I had a conference call for between one and two hours, a meeting that was about four hours, another conference call that was about an hour, and then on Sunday I met again for about two hours or so.

     THE COURT:   You say in this case, do you mean just in this segment or in the whole case?

     THE WITNESS:   So in the -- in the prior segment, I

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                    2596

don't remember how many hours I billed, but it was a lot

less.  I mean, it was reviewing the records, we met for

about an hour or so, and then I wrote my report.  So that --

I don't know, maybe it was five hours.

BY MR. SAMUELS:

Q.  And that would have been the January/February 2023 time

period?

A.  Right.  Yes.

Q.  And then you submitted a bill, and you had closed out

that portion of your work?

A.  Closed out?  I mean, it was still open-ended -- I didn't

know that anything had changed.  I did submit a bill for the

work I had done, and then I hadn't heard anything further

until I heard about it again.

Q.  When did you hear about it again, Dr. Lipton?

A.  You know, I don't know if I know.  I think it was in the

spring, but I really don't remember the exact timing.

Q.  And most of the time that you spent in this segment, we

will call that this hearing and the things attendant to it,

was that closer in time to where we are now, November of

2023?

A.  Yes.  It's basically all October and November.

Q.  And just so, because when we talked before I wasn't sure

what segment you referred to.  Just in this segment, in the

October/November time period, how much time would say you've

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                              2597

spent?

A.   That was what I said originally.  I think prior to October, I really didn't spend any time that I would bill for, was like scheduling or when it might potentially -- I might be needed.  So really in the scope of October, there was like a meeting which was between one and two hours, another meeting which was about four hours.  So that's five to six hours.  There was another one-hour meeting, that's seven hours, and another two hours the other day, so about nine hours altogether.

Q.   Okay, sir.  So in these meetings was there preparation for your testimony today?

A.   There was discussion of my findings, which you know, I assume was preparing for today.

Q.   All right.  And, Doctor, this is the list of prior testimony that I've been provided.  Would this be current as of right now, sir, or would this be back in February 2023?

A.   This would have been prepared in, I guess, February 2023.

Q.   And, sir, these are all the times you've testified in the last five years, sir?

A.   Yes, they are.

Q.   Nothing in 2018 or '19?

A.   That's before the last five years.

Q.   Well, it's 2023, and if we go back five years, it would be 2018.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                2598

A.   I'm sorry.

            MS. ALI:  Clarify.  The rule requires four years.
I'm not -- I'm just clarifying that.

            MR. SAMUELS:  All right.

BY MR. SAMUELS:

Q.   Was there testimony in 2019, sir?

A.   There probably was.

Q.   These type of cases that are listed here, sir, all we
have is the name of the plaintiff.  Were these all -- were
these civil cases, were they criminal cases, were they mixed?

A.   These are all civil cases.

Q.   And were you retained as an expert in each one of these
cases?

A.   In a few of them.  In most of them it was a patient that
I had seen, and I was testifying about my findings.

Q.   And when you were testifying for these patients, were you
testifying, as you've done today, based on your review of MRI
imaging?

A.   On my review of MRI imaging and in some case if I was
asked to look at other either prior imaging studies or
sometimes other records about the patient.  It would depend.

Q.   And if it was an actual patient, you would likely have
more information about that patient, is that right, sir, than
you do today?

A.   Well, at the time I would do the MRI and issue my

                    JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                  2599

clinical MRI report for these types of patients, I would typically not have much information beyond whatever referring diagnosis was written on the referral by a referring physician. If it would be a patient that, you know, had a long medical history in my institution, then I might have access to their medical records. But that's only a small number of people.

Q. Dr. Lipton, these are all civil cases, as you said. Have you testified in criminal cases before?

A. Once.

Q. And when was that, sir?

A. I couldn't say the year.

Q. All right.

A. I just don't remember exactly.

Q. Was it the *Sampson* case?

A. It was *Sampson* case, yes.

Q. Maybe back in 2016?

A. Yeah, something like that.

Q. And that case were you called by the government or the defendant?

A. By the defendant.

Q. That was a capital case, sir?

A. It was.

Q. Dr. Lipton, do you have any views on the death penalty, sir?

Lipton, M. - Cross                                              2600

A.  No.

          MS. ALI:  Objection, relevance.

          MR. SAMUELS:  It potentially could go to bias, Your Honor.

          THE COURT:  It's an appropriate question.  Goes to weight, bias.

          MR. SAMUELS:  Thank you, Judge.

BY MR. SAMUELS:

Q.  No opinions one way or the other, sir?

A.  No.

Q.  And so now let's look, Dr. Lipton, I believe this is Defense Exhibit 200, if I'm right.  These are the items that you received to look at in this case, items 1 through 8?

A.  That is correct.

Q.  And when you got these items, were you given any direction as to what you should look at first and how you should review that?

A.  So I didn't receive them all at the same time.  The first thing that I received was the MRI and the MRI report, and I was asked to look at that and provide my opinion on that. And then I was given additional records, which are listed here, I reviewed those, we discussed them, and then I wrote my report.

Q.  Did you write your report between when you looked at the MRI and when you received the other materials or after you'd

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                            2601

received everything?

A.   No.   I wrote the report after I had reviewed everything.

Q.   But as I think you described on direct examination, you made your opinion about the 2009 MRI based solely on that MRI, sir?

A.   That's correct.

Q.   No other materials that you looked at?  Did you look at Dr. Merikangas's report from August of 2009, do you recall?

A.   I don't believe so.  I don't believe so, but I'm not a hundred percent sure.  It's possible I could have seen it.

Q.   Possible you could have seen that report in connection with the August 14th, 2009 -- and that's the report itself, sir, right, the MRI was done the day before on August 13th?

A.   I don't recall.  I'd have to look at the image.

         MS. ALI:  Just to clarify, the day before what?

         MR. SAMUELS:  I'm sorry, Your Honor.  The MRI report was August 14th, 2009.  The MRI images are actually August 13th, the day before.

         THE COURT:  Yes.  That's what I understood.

BY MR. SAMUELS:

Q.   And then after you had looked at that, the materials from 2009, do you recall in what order you received these other materials, sir?

A.   I don't explicitly recall.  I would assume I received them at the same time.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                    2602

Q.   The Dr. Merikangas report from September of 2015 does reference the August 2009 MRI.  Do you remember if you looked at that before, at the same time you reviewed the MRI report?

A.   No.  That would be after I reviewed the MRI report.

Q.   Okay.  And so, Dr. Lipton, you also had an opportunity to review Dr. Aguirre's report; is that right, sir?

A.   I did.

Q.   And you were asked a number of questions about that report.  Sir, are you in a position to respond to Dr. Aguirre in terms of his review of the neuropsychological testing of Mr. Runyon?

A.   No.

Q.   And are you in a position to respond to Dr. Aguirre's review of the background of the trauma that's indicated, sir?

A.   Can you be more specific?

Q.   Sure.  Are you in a position to respond to Dr. Aguirre's review of Mr. Runyon's claims of how he sustained various traumatic incidents?

A.   You mean the circumstances of those?

Q.   Yes, sir.

A.   No.

Q.   And so are you in a position to respond to Dr. Aguirre when he looks to see whether there was a change in cognition behavior that persisted until 2007 with Mr. Runyon?

A.   Not specifically about his cognition.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                        2603

THE COURT:  Just try to keep your voice up.

To WITNESS:  Sure.  I'm sorry.

BY MR. SAMUELS:

Q.  When Dr. Aguirre concludes that, "The government's version of the events around the instant offense" -- I'm reading from the bottom of Page 6 of his report, "are consistent with intact planning and impulse control, and are inconsistent with the pervasive and disordered changes in cognitive function that would be found in someone with a brain injury," are you in a position to directly respond to that, sir?

A.  I think I can respond in part.

Q.  Just the part with the brain injury?

A.  The part about assessing competence or ability -- cognitive abilities generically based on the simple fact of the brain injury.

Q.  I'm sorry, sir.  I'm talking about specifically with respect to Mr. Runyon.  You're not in a position to respond to that?

A.  I think I am in a position to respond to the inference about Mr. Runyon's MRI, if that's what he is referring to.

Q.  No, sir.  I'm talking about when Dr. Aguirre talks about, "The government's version of the events around the instant offense are consistent with intact planning and impulse control," you're not in a position to respond to that, are

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                    2604

you, sir?

A.   Not that portion, no.

Q.   And you're not really in a position to respond to any specific changes in cognitive function for Mr. Runyon; is that right, sir?

A.   Correct.

Q.   Dr. Lipton, you have studied concussions and the impact of mild traumatic brain injury -- well, let me split those up and use the correct terms.  You've studied the impact of mild traumatic brain injury for a long time, right, sir?

A.   Yes.

Q.   That's one of your areas of specialty?

A.   It is.

Q.   And that includes the real concern a lot of parents have of kids' hitting soccer balls?

A.   No, not -- kids hitting soccer balls is not -- doesn't fit into the category of mild traumatic brain injury.

Q.   Okay.

A.   I could explain why.

Q.   I'm mischaracterizing it, I'm sure.  You have done a lot of studies involving soccer-related injuries, is that fair to say, or soccer-related impact?

A.   I wouldn't call them injuries.  I would say that we studied the effects of -- the cumulative effects of multiple impacts in the context of soccer play.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                      2605

Q.   And when you are looking at the cumulative impacts, you look at hundreds of impacts; is that right, sir?

A.   Potentially hundreds or thousands.

Q.   And, in fact, you've said before that most people do fully recover from a concussion over the days or weeks, right?

A.   Most.

Q.   Most people do.  There is a minority of folks who don't, right?

A.   Somewhere between 30 and 50 percent or so would be the best estimate currently.

Q.   30 to 50 percent.  Was the estimate lower back in 2009, sir?

A.   I think 30 percent was pretty much the estimate in 2009.

Q.   And in terms of recovery, we would look at whether there is a change in behavior or some other form of identifiable dysfunction; is that fair to say?

A.   It would be either symptoms or signs, depending on the injury.  There is a lot of variability for each person.

Q.   And that's a good way to phrase it, sir, so we would be looking at some sort of symptoms on behalf of the patient?

A.   Symptoms or signs.  Signs meaning things that can be observed or seen during testing.  Some patients report a lot of symptoms.  Some patients report no symptoms, but they have dysfunction that's detectable if you examine them.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                         2606

Q.   And when you are talking about dysfunction that's detectable if you examine them, are you talking about neuropsychological tests?

A.   That would be one way to assess it.

Q.   Okay.  And actually, Dr. Lipton, I found a clip of you talking about discussions in August of 2009, and do you remember then, sir, that there was an article that came out, I think it was in Radiology magazine, back in August of 2009?

A.   Yes, I published an article in 2009.

Q.   And that was about the use of the DTI to look for brain damage resulting in concussion; is that right, sir?

A.   I would phrase it differently.

Q.   Of course.

A.   It was to identify brain pathology associated with cognitive dysfunction in people who had sustained concussion or mild traumatic brain injury.

Q.   And, again --

A.   Most without loss of consciousness.

Q.   When we use the word "cognitive dysfunction," we are looking at something in the person's behavior or as a result of symptoms or signs that you've described?

A.   Well, in that particular -- if you want to focus on that particular study, that was looking at specific cognitive tests.  It was looking at executive function and memory predominantly.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                    2607

Q.   Again, things that we can test on a patient?

A.   Yes.

Q.   On an individual patient?

A.   Yes.

Q.   And you again had said that most people are going to be fine after a concussion?

A.   Most people will recover, at least apparently to their baseline, yes.  Most.

Q.   And you talked in that clip about impaired executive function, and that would be trouble doing some of the things we take for granted, right?

A.   That's true.

Q.   Dealing with a new assignment at work?

A.   Could be.

Q.   Keep a shopping list in your memory?

A.   That could be.

Q.   And I believe you talked about some of your findings in that study as a first step; is that right, sir?

          MS. ALI:  Objection.  I don't understand the question.

          THE WITNESS:  I don't either.

BY MR. SAMUELS:

Q.   Sure.  Let me ask it this way.  This research on concussions and the effect on individuals, that's a continuing area of study; is that fair to say?

Lipton, M. - Cross                                                  2608

A.   Yes, it is.

Q.   And that's something you even focused on for the last 20 years, right?

A.   Approximately.

Q.   Including the last ten years?

A.   Yes.

Q.   And certainly your resume, which is about 49 pages, includes a lot of your efforts in that area over just the last ten years?

A.   Yes.

Q.   And so we could look through that resume and see how many articles you've published, how many grants that you've been given, how many symposiums that you've spoke at; is that right, sir?

A.   Yes.

Q.   And some of that reflects kind of the continuing research and the continuing development of the signs over that time period?

A.   It does.  At least I hope it does.

Q.   On your resume, sir, when it talks about these grants, there's a line that says "effort"?

A.   Yes.

Q.   What does that mean?

A.   That is the percent of my time, which is sort of the percent of a 40-hour workweek that I am supported by the

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                    2609

grants to work on.

Q.  If we could pull up Government's Exhibit 61, please, Ms. Jahn.

     Dr. Lipton, I'm showing you Government Exhibit 61. These are the actual orders for the MRI and the PET from Dr. Merikangas.  When you looked at the report, did you see this portion of the request?

A.  Of which report?

Q.  I'm sorry, sir.  Let me be clear.  Of the actual MRI report from Harbor View Health Center.  Did you see the actual ordering of those scans?

A.  I believe I did.  I don't remember specifically.  I'd have to look at the file that I actually have, but I believe so.

Q.  And showing you, sir, Dr. Merikangas -- you don't know Dr. Merikangas, do you, Dr. Lipton?

A.  I do not.

Q.  Neurology, psychiatry and neuropsychiatry, it would be common for a neurologist to review MRI scans, correct?

A.  It is common for them to review them, yes.

Q.  And showing you just a portion of the report here, "The history of trauma 1996, several brain injuries," is this the information that you had when you started to look at the MRI, sir?

A.  In addition to the admitting diagnosis.  I mean,

JODY A. STEWART, Official Court Reporter

Lipton, M. - Cross                                                        2610

everything on this form is what I had, yeah.

Q.  In these findings here, sir, based on the MRI that was done, are there findings here that you do agree with?

A.  Yes.

Q.  Okay.  Based on this report and what information that's in it, there is no reason to think that there is any abnormality in Mr. Runyon's MRI, would you agree with me there, Dr. Lipton?

A.  From reading the report?

Q.  Yes, sir.

A.  I agree.  I believe the impression is that it's normal.

Q.  Down on the next page here, sir.  And I did note, I wanted to ask you, sir, there is a reference here to, I think this should be corona and axial gradient echoes exam limited by motion.  Do you see that?

A.  I do.

Q.  What does that mean, Dr. Lipton?

A.  Well, that's actually erroneous unless that doctor had something I didn't see because there are no gradient echo images included on this exam.  Those are the images that are sensitive to bleeding.  So I'm not quite sure what she's referring to.  I think she is referring to a different set of images that are called T1 weighted images.

Q.  And as you indicated in your report, when you actually looked at the MRI images, you identified some of these issues

Lipton, M. - Redirect                                        2611

as may visually appear subtle; is that right, sir?

A. Yes.

Q. And again, sir, based on your review, you are not able to draw any lines for us between what you see on the MRI and the conduct and behavior of Mr. Runyon individually?

A. Not directly in the imaging findings.

        MR. SAMUELS: Your Honor, may I have just one moment?

        That's all I have for Dr. Lipton, Your Honor.

        THE COURT: All right. Redirect.

                    REDIRECT EXAMINATION

BY MS. ALI:

Q. Dr. Lipton, Mr. Samuels asked you some questions about the study about soccer headers; is that right?

A. Yes.

Q. And was the soccer study that he was referring to dissecting something called subconcussive injuries?

A. That is correct.

Q. And is there a -- can you describe whether there is a distinction between concussive injuries and subconcussive injuries?

A. Yes. So concussion, which is a synonym for mild traumatic brain injury, it's the same thing, is diagnosed by an episode of trauma, like an impact to the head, associated with specific signs and symptoms, meaning things the patient

                JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                          2612

reports or things that we observe.

In the context of the study that you're referring to, subconcussive impact mean there are impacts to the head which do not produce symptoms or signs and do not lead to a diagnosis of concussion.  So those individuals don't have a concussion.  We are looking at the longer term implication of having many impacts to the brain over time, even though they don't cause concussion.

Q.  Mr. Samuels also asked you and referred to your research listed on your CV about whether concussion is a continuing area of study.  Do you remember that?

A.  I do.

Q.  And does the fact that concussion and head injury, more generally, is a continuing area of research mean that there was no scientific consensus about the functional effects of concussion in 2009?

A.  Absolutely not.

Q.  Mr. Samuels also showed you the 2009 MRI report and asked you whether there were certain findings on the report that you agree with.  Do you remember that?

A.  I do.

Q.  Does the fact that you agree with certain findings on the MRI report change anything about your own impression or interpretation of the 2009 MRI report?

A.  It does not.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                        2613

Q.  Mr. Samuels also asked you about one of Dr. Aguirre's opinions, and there were two parts to the statements he was focused on, and I want to ask about the second part that Mr. Samuels was not focused on.

Dr. Aguirre says that, based on Mr. Runyon's MRI scan, you would expect there to be findings on the MRI and without those you would not expect pervasive and disordered changes in cognitive function.  Do you agree with that?

A.  I do not agree with that.

MS. ALI:  That's all I have, Your Honor, other than the proffer, which should I do that now?

THE COURT:  All right.  We will do the proffer. Obviously, you will have an opportunity to cross-examine the proffer.

MR. SAMUELS:  Thank you, Judge.

BY MS. ALI:

Q.  Dr. Lipton, you state in your report that Mr. Runyon's 2009 MRI scan shows bifrontal encephalomalacia; is that right?

A.  Yes.  Some of my -- I'm sorry.

Q.  Yes.  What does that mean?

A.  So encephalomalacia is loss of brain tissue due to injury, and it's specifically loss of brain tissue due to injury in a specific location, meaning it's not loss of volume -- it's not atrophy of the whole brain.  It's at a

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                           2614

specific location.

Q.  And does encephalomalacia immediately appear on an MRI scan after somebody has a brain injury?

A.  No, it does not.  It's a chronic finding that takes at least many months, if not a year or more to completely develop.

Q.  And when there is a loss of brain tissue, can that ever heal?  Does the brain heal itself?

A.  Brain does not heal or regenerate.  Specifically, the neurons that are lost in the human brain bears no evidence at all that those can ever be recovered.  So whatever capacity is lost is gone.

Q.  What is the difference, if any, between encephalomalacia and a loss of brain volume?

A.  Well, loss of brain volume is a more generic term.  So in people as they age, when we get into our 70s, 80s and hopefully beyond, our brain volume does decrease overall. That's not encephalomalacia.

Encephalomalacia specifically means that there has been a localized injury to part of the brain, and that there has been loss of brain tissue.  So it is a loss of volume in the sense that some of the brain is lost, but it's not a generalized loss of volume.  It's specifically death of a piece of the brain, which is then reabsorbed by the body and is missing.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                                    2615

Q.  Can you pull up the images, please.

     This is the same set of images we looked at earlier.
Can you identify for us on these images where you identified
encephalomalacia on Mr. Runyon's 2009 MRI scan, just looking
for now at these three images?

A.  Sure.  So in looking at these images, the image on the
right, if I can -- see if this works.  So I am just drawing a
line on the surface of the brain, and I am drawing a line on
the surface of the brain, if I can do this (indicating).  If
we do the same thing on the other side, as best as I can --
can we delete that one without deleting everything?  That's
not right.

     MS. ALI:  There is a mouse here.  I don't know if
we can use that.

     THE CLERK:  If you touch the right corner.

     THE WITNESS:  Great.  I can delete it.  I can erase
it.  That's interesting.  Okay.  Let's see now.  Okay.  So
all I'm doing here is I am outlining the surface -- this one
is not -- okay.  So all I'm doing is drawing a line over the
surface of the brain, and it's important to realize when we
look at medical images like MRI, the patient's left is on
the right, and the patient's right is on our left.  So there
is an L over here and R over here (indicating).

     So in looking at the left side of his body, you can
see how this green line makes like a divot.  So the

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                         2616

fullness, the convexity that we see on the line on the right-hand side is not present on the left-hand side.  There is part of his frontal lobe which should be filling in -- let's see if this will work.  So this area -- so the area between green and red should have -- at least partially should be filled with brain tissue.  What we are seeing is that black is fluid, and what happens inside the brain is when there is loss of brain volume, the size of the skull and the contours of the skull don't change.  The brain gets smaller, and the space is taken up by fluid, which is the same fluid they take out when they do a spinal tap.  And we see that fluid inside of the ventricle.  This is a normal location to have fluid, but having fluid in the location on his left side is not normal.

There is a smaller area, which is seen on the left-hand image, which is the dark area on the right side.  And this is the smaller area of the encephalomalacia on the right frontal lobe.

BY MS. ALI:

Q.  Is the fact -- you said there is a larger area that we see on the image all the way to the right and then a smaller area that we see in the image on the left, is that describing two different areas of encephalomalacia?

A.  Those are two different areas of encephalomalacia, and the pattern of having on one side of the head a smaller area,

Lipton, M. - Redirect                                        2617

on the other side a larger area, is actually a very characteristic pattern of traumatic injury.

Q.   Can you describe that in more detail?

A.   All right.  So the medical term for this is coup-contrecoup injury, and what happens is when there is an impact to the head, let's say on the right-hand side, there can be injury because the impact causes the skull to move against the brain.  The brain is floating inside the skull in fluid, and so when the skull moves, the brain doesn't respond immediately.  So there can be an impact of the skull on the brain, but what happens due to that impact is the brain accelerates, and it actually hits the skull on the inside of the skull on the opposite side.

Brain tissue is very soft.  It's softer than a Jello Roll, if anyone remembers a Jello Roll.  So when the brain moves through the skull, it compresses and twists and stretches, and by hitting the opposite side, so if the impact would be, for example, in the right frontal area, then that would send the brain to hit the skull on the opposite side, and typically the location of the impact paradoxically has a smaller area of injury.  That's the coup injury, and the contrecoup injury is a larger area of injury, which is on the opposite side of the head.

Q.   In which part of the brain are both areas of encephalomalacia that you identified?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                        2618

A.   The frontal lobes.  There may be a small involvement of
the left temporal lobe, but it's predominantly the frontal
lobes.

Q.   If we can go to the next image, please.

A.   That's remarkable.  Kind of superimposes.

          MR. SAMUELS:  I'm going to object to these because
I don't think any of these were shown to the other experts.

          THE COURT:  I haven't seen these.

          MS. ALI:  They weren't shown to other experts, Your
Honor, because none of the other experts testified about
encephalomalacia, and that's the finding on these images.
So these images are from the 2009 MRI that the government
has had since 2015.  They are just an additional set of
images.

          THE COURT:  But this is what should have been in
your case in chief.  This is what we were talking about
earlier.  This was a rebuttal witness to Dr. Aguirre, and
there has been no testimony from any witness about these
particular images, and that was the whole issue, was that
you can't introduce new evidence that you should have
presented in your case in chief.

          I'll allow his testimony that he has given so far
as rebuttal to put on the record, but you're now showing
images that even the Court hasn't seen.  If you wanted them
shown, you should have shown them in your case in chief,

                    JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                          2619

established what they were.  You had all these doctors here.  This is the first time they have come up.

MS. ALI:  These images, Your Honor, show encephalomalacia.  Dr. Aguirre in his report looked at these images as part of all of the images he looked at when he rendered his opinion.  Dr. Lipton's opinion that the scan shows encephalomalacia is a direct rebuttal to Dr. Aguirre's opinion that there is no volume loss, that there is no atrophy, that the scan is unremarkable.  That's direct rebuttal to Dr. Aguirre's conclusions on that front.

The fact that the other experts -- there would have been no basis to show these images to the other experts because what we were showing the other images was for the white matter hyperintensities, which are apparent on that first set of three images.  These are specific to the encephalomalacia.

MR. SAMUELS:  That's why it's a new claim, Your Honor.

THE COURT:  It is a new claim.

MS. ALI:  It is not a new claim, Your Honor.

THE COURT:  It's a new claim.  You didn't show it to the other experts.  If you needed that as expert testimony, then you should have called Dr. Lipton in your case in chief, if he's the only one you had.  But not now offering it as rebuttal to Dr. Aguirre.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                          2620

Go ahead, but I ruled that, and I'll make it a point, that this is the first time that these images, there are four here, are being seen by the Court or by anyone that so far has testified.

MR. SAMUELS:  Your Honor, if I can make clear, we did not have the MRIs since 2009.

MS. ALI:  2015 is what I said.

MR. SAMUELS:  No, we didn't have it in 2015 either. We didn't have it until the commencement of the evidentiary hearing.  We didn't have the MRI until it was sent to Dr. Aguirre.  So it's not like we have had these for years.

MS. ALI:  I'm sorry.  So should I take these down? I'm unclear.

THE COURT:  I'm letting him testify on the encephalomalacia, but you should take down images that haven't been, again, properly produced.  They haven't been testified to on a rebuttal witness.  You can offer that he saw things.  We have seen where he circled it before.  But to start with new images at this point, if you were going to show him part of your case in chief and part of something that would have been provided to the other side in advance of those particular witnesses testifying, whoever you were going to get to do it.  So move on.

MS. ALI:  I will move on.  I just want to make clear that the images that were shown here, the government

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                    2621

has had.  Those are on the 2009 MRI scan.  They are a status version because I thought that would be easier than loading up the disk itself and running special software to show it. But there is no -- I don't think there is an objection we didn't provide the images.  The images the government has had on the disk.  I'll move on, but I just wanted to clarify that.

THE COURT:  On the full disk?

MS. ALI:  On the full disk.

THE COURT:  All right.  Go ahead.

BY MS. ALI:

Q.  Dr. Lipton, we looked at one place of the MRI where you identified encephalomalacia.  Did you identify encephalomalacia on additional slices of the MRI you reviewed?

A.  So just to clarify, each area on encephalomalacia was shown on one of the three slices, but it is apparent on many images across the entire study which would be on the CD.

THE COURT:  But we did see the three on the three slides?  The three slides that you started with and you were showing us?

THE WITNESS:  Those did show it, but I think the point is that those aren't the only two images that show it, that it's visible on more than just two images.

THE COURT:  All right.

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                    2622

BY MS. ALI:

Q.   How does the fact that you see encephalomalacia on multiple slices of the MRI impact your confidence level, in your opinion?

A.   Oh, it is essential.  That's why when we do MRI, we collect multiple images, multiple types of images.  The images slice the brain in different directions, and by seeing the finding reproduced across those different images in the same place, that's how we have confidence that it's a real finding.

Q.   Based on your training and experience, do you draw any conclusions about the likely cause of encephalomalacia on the 2009 MRI scan?

A.   This is almost certainly due to traumatic injury.

Q.   And what leads you to that conclusion?

A.   Well, for encephalomalacia there is a limited differential diagnosis, and we can rule out two things, well, right away.  One is surgery, and I can rule out surgery because I can see that he hasn't had a hole in the craniotomy in his skull.  Another is radiation injury, which I'm not aware of him -- that there is any history of that.  Would be quite unlikely for radiation injury to affect two disparate locations of the brain in this way.

        The major causes of encephalomalacia are stroke and trauma.  The pattern of the -- where the finding is in the

Lipton, M. - Redirect                                           2623

brain is essential to making that distinction.  In order for encephalomalacia to be due to a stroke, it has to conform to a very specific part of the brain, which matches the part of the brain served by a known cerebral artery.  And when stroke happens, there is a blockage in an artery.  The brain tissue doesn't get enough oxygen, and it dies off.  And the brain tissue that dies off corresponds to what we call a vascular territory.  These are very highly regular and reproducible, and in this case, the encephalomalacia does not correspond to a vascular territory.

In fact, even more than that, he has areas on two sides of his brain.  The only way he could have had strokes on two sides of his brain would really be to have a serious heart disease, like a valve infection or atrial fibrillation, which would lead to emboli.

The only other real possibility in a differential diagnosis is infection.  And the type of infection would be a very severe brain infection called cerebritis, which typically is a complication of meningitis, and it leads to infection of the brain tissue and death of that tissue.  That's quite unusual, and it's particularly unlikely that would occur in two separate locations.

So based just on the imaging findings alone, this is not likely to be any of those other things, and because it hits this coup-contrecoup bilateral but different size

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                              2624

distribution, that's characteristic of traumatic

encephalomalacia.

Q.  What degree of confidence do you have in your opinion

that Mr. Runyon's 2009 MRI scan shows bifrontal

encephalomalacia?

A.  I have complete confidence.  It's very clear.

Q.  And what is the basis for that certainty?

A.  The findings that I showed you and the fact that in

looking at the entire exam, which I described in my report,

this is visible on multiple images that slice the brain in

different ways, that have different types of what we call

image contrast, that the same finding is there.

Q.  Can you tell, based on Mr. Runyon's 2009 scan, when the

head injury that caused the encephalomalacia was sustained?

A.  In terms of timing, all I can say is that this is a

chronic finding, meaning it's at least close to, if not more

than a year old, and it could be many years old.

Encephalomalacia, once it's developed, which, again, takes at

least many months, it doesn't heal.  It doesn't get better.

        So once it's there, it's going to stay that way for

the rest of his life.  Going back in time, I couldn't tell

you when exactly prior to, let's say, a year or so prior to

the MRI that it occurred.

Q.  And you said that encephalomalacia doesn't -- the brain

doesn't heal itself, encephalomalacia doesn't improve over

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                          2625

time.  Based on your review of the 2009 scan, what would you expect a repeat scan done later to show?

A.  It would show the same finding.  Depending on how the scan was done, if it was done in a way that was sensitive for detection of blood, I would expect in this case for us to see evidence of hemosiderin deposition.

Q.  And you'd expect to see the encephalomalacia as well?

A.  The encephalomalacia would be unchanged.

Q.  Do you have an opinion whether the bifrontal encephalomalacia visible on Mr. Runyon's 2009 MRI scan is consistent with a head injury sustained during a car accident?

A.  It is.

MR. SAMUELS:  Your Honor, I object to that.  He doesn't have specific information to render that opinion.

THE COURT:  Well, this whole testimony, there has never been mention of encephalomalacia throughout the hearing before now on questionable rebuttal, what are we on, seven days of testimony, plus what we had, I think, six or seven back in February, and there has never been one mention of it.  You have all these experts, and if it is so obvious, somebody should have testified in your case in chief.

To bring it up on the last day as rebuttal doesn't pass "a smell test" at minimum.  It's undercutting.  You just don't do things like that.  If you were going to elicit

Lipton, M. - Redirect                                          2626

encephalomalacia as a rebuttal witness, and you knew about it, why didn't you do it, and I cannot come up with any explanation.  The testimony we are hearing here is a proffer only.

But as a proffer, it has never been presented throughout this whole hearing that started in February, and has now gone on, this is the seventh day in November on the continued hearing, the last witness on rebuttal, I do not understand why it hasn't been presented.  He hasn't examined Mr. Runyon's records.  The only thing he's mentioned is a 1996 car accident.  If he was going to go into all this, why didn't he examine all of the medical records?  You had those.  I don't understand.  Why didn't you ask Dr. Merikangas about why he didn't do this?  Why didn't you ask your other experts about it?

MS. ALI:  Your Honor, I suspect if I had done that, I would have an objection that it is outside the scope of their reports.

THE COURT:  You could have done a supplemental report.  They did those reports back in February, most of them.  You always had an opportunity.  On the discovery schedule, you could have at least tried for a supplemental report.  There is nothing that says you can't supplement an expert's report.

Now, you might not get it through, but this report

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                              2627

was done a long time ago.  You could have filed supplemental reports.

MS. ALI:  Your Honor, our experts were not retained until after the discovery period until sometime in September, I think in some case for October.

THE COURT:  I'm tired of arguing with you on every ruling.  You argue with every ruling the Court makes, as if you don't understand.  You can do supplemental reports, and you know it.  You have been a law clerk in this court.  You have been a practitioner.  You know you can do supplemental reports.  Sometimes they are done at the very end, but you've had this expert, and you claimed it was a rebuttal expert, but a rebuttal expert has to be rebutting the expert that you knew was a rebuttal, and that's Dr. Aguirre.  He doesn't mention this anywhere.  As far as I'm concerned, this is basically improper rebuttal.  You are raising something for the first time that as an effective counsel, it should have been in your case in chief.

Now you are raising it on terms and testimony that this Court hadn't heard from anybody else through a litany of expert testimony, and the expert testimony didn't start until November 1.  If you were going to present this, and it was very important, it should have been presented, and you should have done a supplemental expert report, and you should have given full and proper notice, and you should

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                                    2628

have done it in your case in chief.

It is new evidence coming in on the last day, and that is my ruling.

BY MS. ALI:

Q.   How likely is it, Dr. Lipton, that someone who suffered a mild traumatic brain injury, like a concussion, would have encephalomalacia on their MRI scan?

A.   Highly unlikely.

Q.   On Page 3 of his report, Dr. Aguirre says that, A focal brain injury would appear as a loss of the normal structure of the brain.  Do you agree with that?

A.   Yes.

Q.   And do we have the -- did you make a finding such as that in this case?

A.   That is what the encephalomalacia represents.

Q.   And Dr. Aguirre also says on Page 3 that a significant brain injury would cause atrophy of the volume of the brain. We discussed this on direct, but do you agree with that?

A.   Yes, it would.  But there is a -- there are distinctions between global atrophy, which typically would be present but would not be visually apparent.  Encephalomalacia is technically -- is a loss of brain volume but it's localized.

Q.   And did you make such a finding here?

A.   Yes.

Q.   Dr. Aguirre also refers to the fact that the 2009 MRI

JODY A. STEWART, Official Court Reporter

Lipton, M. - Redirect                                              2629

report found that the ventricle in sulci are normal in size, shape and position as evidence that the 2009 MRI scan is unremarkable.  Do you agree with that?

A.   Partially.

Q.   Can you explain what parts you do and don't agree with?

A.   So the ventricles are grossly normal in size.  The sulci are grossly normal with the exception of the areas of encephalomalacia where there is a much larger amount of space than should be present.

Q.   Do you agree with Dr. Aguirre's general conclusion that the absence of certain findings on the MRI mean that the MRI is normal?

A.   No -- that the MRI is normal?

Q.   Yes.  That Mr. Runyon's brain is normal?

A.   So the absence of findings on MRI never means that the brain is normal or never can be taken as evidence that the brain is normal.

Q.   What are the typical ways, based on your experience and training, both in your clinical practice and as a neuroscientist, what are the typical ways that frontal lobe encephalomalacia impact brain function?

A.   So frontal encephalomalacia or frontal lobe injury in general is associated with impairments of function of frontal networks, which affect many different areas of function, including attention, executive function, mood regulation,

JODY A. STEWART, Official Court Reporter

Lipton, M. - Recross                                              2630

impulse control, personality, working memory.

Q.   Based on your training and experience, is someone whose MRI shows encephalomalacia more likely to experience brain dysfunction than someone whose MRI scan is normal following a traumatic brain injury?

A.   Yes.

          MS. ALI:  Nothing further, Your Honor.

          THE COURT:  All right.  Cross on the proffer.

          MR. SAMUELS:  Thank you, Judge.

                    RECROSS-EXAMINATION

BY MR. SAMUELS:

Q.   Good afternoon again, Dr. Lipton.

A.   Good afternoon.

Q.   That last question Ms. Ali asked you, do you recall that, sir?

A.   Yes.

Q.   And it was a someone question, right?  It was a, is someone who's got this encephalomalacia more likely to.  Do you recall that, sir?

A.   Yes.

Q.   That wasn't related to Mr. Runyon, was it?

A.   Well, I would say the same thing about Mr. Runyon because he has encephalomalacia.

Q.   But you don't know that Mr. Runyon has experienced any brain dysfunction, correct, sir?

                    JODY A. STEWART, Official Court Reporter

Lipton, M. - Recross                                              2631

A.   I don't directly know that, no.

Q.   You don't indirectly know it either, do you, Dr. Lipton?

A.   There are -- in some of the reports that I looked at, there are descriptions of dysfunction.

Q.   You were talking about the reports of Dr. Merikangas?

A.   Yes.

Q.   And then any other reports that you can think of, sir, that you will be talking about?

A.   That's the only one that I reviewed other than Dr. Aguirre.

Q.   I see.  Okay.  And you know, of course, that Dr. Aguirre went further in his report with the discussion of the neuropsychological tests?

          MS. ALI:  Objection.  That's not in Dr. Aguirre's report, and he's not reviewed Dr. Aguirre's testimony where he was permitted to testify about that.

          MR. SAMUELS:  Sorry, Judge.  I think it was.

BY MR. SAMUELS:

Q.   You've read Dr. Aguirre's report?

A.   I have.

Q.   And you're aware that Dr. Aguirre did review the formal neuropsychological testing of Mr. Runyon?

          MS. ALI:  Objection.  He reviewed the reports of Dr. Montalbano and Mirsky, not the neuropsych testing.

          MR. SAMUELS:  The reports of Dr. Montalbano and

                    JODY A. STEWART, Official Court Reporter

Lipton, M. - Recross                                              2632

Mirsky had direct information about the neuropsychological testing that Dr. Aguirre reviewed, Your Honor.  I'll move on, Your Honor.

BY MR. SAMUELS:

Q.  You did not review any of those reports?

A.  No.

Q.  You did not review any of the results of the neuropsychological testing?

A.  I did not.

THE COURT:  Did you review any reports by doctors who had reviewed them or performed them?

THE WITNESS:  I don't recall, as I sit here, what exactly Dr. Mirsky said, but that would be all that I had seen.

THE COURT:  Go ahead.

MR. SAMUELS:  Thank you, Judge.

THE COURT:  You only reviewed, I think it was a Dr. Paine?

THE WITNESS:  Oh, I did review Dr. Paine's, but I don't believe he addressed neuropsychological testing.  He did make a diagnosis of traumatic injury.

THE COURT:  We haven't heard from Dr. Paine.  I'm just saying that the two you were referring to were not in the list of what he reviewed.

BY MR. SAMUELS:

JODY A. STEWART, Official Court Reporter

Lipton, M. - Recross                                            2633

Q.  And the encephalomalacia, sir, you were able to see that on the images, even though they were -- the quality was more problematic?

A.  Absolutely.

Q.  Okay.  And that did factor into your opinion of the abnormality of the brain images, sir?

A.  I don't follow the question.

Q.  You testified, did you not, that the MRI revealed various abnormalities?

A.  Yes.

Q.  And you tied those abnormalities into various hypothetical questions.  You recall that?

A.  I tied them in?

Q.  It was suggested to you in various questions that these abnormalities could lead to this or to that, with respect to various generic individuals.  Do you remember that, sir?

A.  I mean, I don't remember -- I'm not sure specifically what you are referring to.

Q.  Let me try and make it -- what I'm driving at here, sir, is when you considered the abnormalities that you saw in the MRI images in 2009, are you with me so far, Dr. Lipton?

A.  Yeah.

Q.  Were you able --

A.  Are you specifying certain abnormalities and not other abnormalities?

JODY A. STEWART, Official Court Reporter

Lipton, M. - Recross                                                    2634

Q.  That's what I'm saying, sir.  When you rendered your opinions, were you considering all of those abnormalities that you saw or are you able to separate them in some way?

A.  Well, he has two types of abnormalities, which are both highly consistent with trauma.  So together they make it even more highly likely that they are post-traumatic.

Q.  So you consider the encephalomalacia.  Were you also considering the white matter hyperintensities?

A.  Well, of course.  I looked at the whole exam.

Q.  I see.  Yes, sir.  And did you see any finding of encephalomalacia in any of the other materials that you looked at in 2009 or 2015?

A.  No.

Q.  Did you, sir?

A.  I think I answered.  I said no.

Q.  I'm sorry.  I didn't hear you.

        THE COURT:  What was the question?

        MR. SAMUELS:  The question was, Your Honor, did he see any findings of encephalomalacia in any of the other materials he looked at in 2009 or 2015, 2015 being the report of Dr. Merikangas, Your Honor.

        THE COURT:  Okay.  He said he did not.

        MR. SAMUELS:  He did not.

BY MR. SAMUELS:

Q.  Again, sir, encephalomalacia is a localized area; is that

                    JODY A. STEWART, Official Court Reporter

right, sir?

A.   It's a localized loss of brain volume due to injury, yes.

Q.   Would you normally see some level of hemorrhaging associated with that, sir?

A.   You may or may not.  It is common, but you may or may not, and you will only see it if you do the imaging in a way that's able to detect it.

Q.   You did not see any evidence of hemorrhaging in this case, though, right, sir?

A.   No, on an exam, again, that's not sensitive for detection of hemorrhage.

MR. SAMUELS:  That's all I have, Judge.  Thank you.

THE COURT:  Redirect?

MS. ALI:  No, Your Honor.

THE COURT:  All right.  Then thank you, Dr. Lipton, for coming to testify.  I wish you a nice trip.  Are you going back to New York?

THE WITNESS:  I have to go to Washington.

THE COURT:  Well, I wish you a nice trip to Washington.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Counsel, do you know of any other matters or evidence that's to come before the Court?  I have two issues that I want to clear up from rulings, and I'm

going to set a schedule for proceeding forward.  Is there anything else that anyone can think of?

MR. SAMUELS:  Not from the United States, no, Your Honor.

MS. ALI:  No, Your Honor.

THE COURT:  Well, let me clear up two rulings so that they will be clear on the record.  On November 7, 2023, during the examination of Dr. Merikangas, the United States showed Dr. Merikangas a recent academic publication that questioned whether white matter hyperintensities are related to neural behavior symptoms.  I, frankly, didn't record the name of the article.  It had been recently published, I think within the last three years, and I don't recall the exact date of the publication.

Dr. Merikangas testified that he had not read the article and was not familiar with its conclusions, and I believe, at least my notes indicated, that Ms. Ali objected to introducing the article because Dr. Merikangas was not familiar with it.

Again, I didn't record the exact specific objection, but I think that's what it was.  From my recollection and my notes, I overruled the objection and allowed Dr. Merikangas to examine the article.  I frankly don't even recall or wrote in my notes the exact comments about the article except that he admitted that it

JODY A. STEWART, Official Court Reporter

2637

contradicted his conclusions in the 2015 report.

In any event, the introduction of the article, in my opinion, was not particularly noteworthy and had little to no impact in terms of discrediting Dr. Merikangas's 2015 report.

Then on November 9, 2023, during cross-examination of Dr. Aguirre, petitioner showed Dr. Aguirre a recent article from the Journal of American Medical Association, that's JAMA, that discussed symptoms following traumatic brain injury, and the article, as I recall, was "Functional recovery symptoms and quality of life, one to five years after traumatic brain injury," and it was published on March 20, 2023.  I think I've got these right.  If I don't, I think it's close enough or you all can correct me.

Petitioner offered the article in question to claim that Dr. Aguirre's 2023 report, that mild TBIs did not cause long lasting behavioral or cognitive changes.  Dr. Aguirre stated that he had not previously seen the article, and the Court excluded the article from hearing.  Ms. Ali called to the Court's attention at that time that I had allowed an article previously for the government to offer in cross-examination that had a later publication on it.

I went through my notes, and if this isn't what you are talking about, you can explain it now after I finish ruling.  As far as I'm concerned, I did go back and look,

JODY A. STEWART, Official Court Reporter

2638

and I do agree that the Court's rulings as to introducing these articles were inconsistent.  The Court allowed the United States to introduce a current article to question some conclusions that Dr. Merikangas made in his 2015 report and that were repeated in his 2023 declaration.  The Court did not allow petitioner to introduce a 2023 article to question the conclusions that Dr. Aguirre had made in his 2023 report.

When I went back and looked at them, I don't see a distinction between introducing these articles because they both go to the continuing validity of the expert's scientific conclusions that neither establish what the expert would have known in 2009.

So, consequently, I strike the cross-examination of Dr. Merikangas, that testimony in that regard.  I strike that testimony from the record because it was not allowed for cross-examination of Dr. Aguirre.  Frankly, I don't see any prejudice in any of it.  It didn't tell the Court anything the Court didn't already know or had heard.  But I am going to strike the testimony from Dr. Merikangas that I allowed when I didn't allow it for Dr. Aguirre.

Is that what you were talking about, Ms. Ali.

MS. ALI:  I believe so, Your Honor.  I don't have all of that, but I think that's right.

THE COURT:  Well, I went back through all of my

JODY A. STEWART, Official Court Reporter

2639

notes, it was a long weekend, and I don't have a transcript or anything, so all I did was go back through my notes, compare them with my law clerk, and that was what I was able to come up with. So I want that to be a consistent and fair ruling for both sides.

MS. ALI: I appreciate it, Your Honor. I was definitely referring to Dr. Merikangas. I just can't recall whether it was shown to any of the other witnesses. I don't have a transcript either, but I understand the Court's ruling.

THE COURT: I don't believe it was, but, in any event, I wanted to make the rulings consistent.

The other thing that I did want to mention, there has been this submission of the memo to file as Government's Exhibit 92, and I would like to go through some of the matters there. Throughout the hearing, the petitioner has continually objected to the introduction of Government's Exhibit 92. That's Mr. Hudgins' memo to file which provides details of a phone call that trial counsel had with Dr. Merikangas on August 13th, 2009.

Petitioner has argued that it should not be admitted because it is hearsay without a valid exception in the Federal Rules of Evidence. I think I have previously mentioned one exception, but I want to go through my full ruling on that. As I indicated, the important thing is that

2640

an evidentiary ruling is correct ultimately because the trial judge cannot always perfectly cite the rules on quick matters; otherwise, trials would never go forward.

The Court overruled the petitioner's objection, but it has not yet fully explained the reasons for doing so and why it is admissible under the residual exception to the rule against hearsay in Federal Rule of Evidence 807.  To be admissible under Rule 807, the hearsay statement must not be admissible under another exception in Rule 803 or 804 unless it meets the following requirements:  "The statement is supported by sufficient guarantees of trustworthiness -- after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and, two, it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."

The Court finds that Government's Exhibit 92 is supported by sufficient guarantees of trustworthiness. First, there is no debate that the memo came from Mr. Hudgins' file.  In fact, it was produced in the discovery that caused the continuation of this hearing, and it came from his files, and no one has disputed that.  The memo was prepared contemporaneously at the time the call occurred in accordance with the attorney's regular practice memorializing oral conversations.

This exhibit was part, as I mentioned, of the late-discovered evidence, and petitioner has agreed not to question the source of these documents.  The August 13, 2009, call between trial counsel and Dr. Merikangas is also supported by other corroborating evidence.  Mr. Woodward's internal billing reports and court invoices show that he spoke with Dr. Merikangas on August 13th, 2003.

Mr. Woodward's records show that the August 13th call was noteworthy enough that he also prepared a memo to file regarding the call, although this memo has not been found or produced from his files.

Mr. Woodward also stated that the content of Government's Exhibit 92 is consistent with his recollection that trial counsel decided not to pursue a mental health defense after learning of Dr. Merikangas' recommendation or opinion.

Additionally, Government's Exhibit 92 states that Dr. Merikangas was in Vermont at the time of this call. Dr. Merikangas's testimony as to whether he was in Vermont at the time was frankly inconsistent, which much of his testimony was.

On direct examination he said it was unlikely he viewed the brain scans prior to the penalty phase because he was in Vermont in August 2009, and he did not have a way to view the scans in Vermont.  However, on cross-examination,

JODY A. STEWART, Official Court Reporter

2642

Dr. Merikangas inexplicably could not remember whether he was in Vermont in August 2009 or not.

Despite this conflicting testimony, Dr. Merikangas owned a vacation home in Vermont at the time and vacationed there.  The statement in GX92 that Dr. Merikangas was in Vermont during the call shows that Mr. Hudgins knew the specific detail about where Dr. Merikangas was, and it is unlikely that he would have put that in a memo to the file if he hadn't learned it during or where he was during that call.  That would be an unusual thing to put in a memo, if the call had not occurred.

The evidence is also more probative than any other piece of evidence that the United States could reasonably obtain.  The sufficiency of trial counsel's investigation into petitioner's mental health defense, as has been repeatedly said, is a key issue in this case, and the content of the August 13th call is a significant part of the investigation and forms a significant part from the testimony, to what extent we would get it, from Mr. Hudgins, is unknown and not possible now, but have been able to get it from Mr. Woodward that they determined 14 years ago to take another tact in regard to presenting mitigation evidence.

So a significant part of the investigation that the Court is being called on here to evaluate and has been asked

2643

to determine what actions trial counsel took, which occurred over 14 years ago.  As I've said, Dr. Mirsky has died, Mr. Hudgins, who is a key witness in this case, has died, and documentary evidence that supports and is supported and collaborated by other documentary evidence from files is particularly important now as the relevant witness's memories are, either, A, not there, because of death; or, B, have faded with time.

Clearly, Dr. Merikangas had a lot of trouble remembering.  He couldn't remember what he did.  So the persons in the memo had an opportunity to review it, and nobody tended to remember the details of the call, so the memo itself is very important.

Other potential documentary evidence regarding the content of the August 13th call, specifically Mr. Woodward's memo, have not been located.  It would be interesting to the Court where that is, and if somebody has carefully looked through those files, if you had time records and you had a memo to file, but it hasn't been produced.  Thus, Mr. Hudgins' contemporaneous memo regarding the call is more probative of trial counsel's investigation than any other available piece of evidence at this juncture.

So, accordingly, the Court finds that Government 92 satisfies both prongs of Federal Rule of Evidence 807, and to be sure, the residual exception to the hearsay rule is

2644

narrow and only applies to exceptional cases, and this is certainly an exceptional case.  See *United States versus Kim*, 595 F.2d 755 at 755, is a District of D.C. case, 1979. I'm of the opinion that this is an exceptional case given the circumstances that the Court has reviewed with the death of Mr. Hudgins, the poor memory or death of the experts that were involved, such as Dr. Merikangas at the time, and Dr. Mirsky is no longer here, as is Mr. Hudgins isn't here. The evidence at issue could have been properly authenticated if petitioner's prior *habeas* counsel had not failed to disclose it and if the declarant had not passed away during the ensuing continuance.  This is exactly the type of unique situation that could not have been anticipated by the Federal Rules of Evidence and that warrants the invocation of the residual exception.  An example is *United States v. Mathis*, 559 F.2d 294 at 299.  It's a Fifth Circuit 1977 case, which found that the purpose of the residual exception is "to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new situations which may not be pigeon-holed elsewhere."  This is certainly that situation, and the declarant is deceased and no longer available, but would have been available had the evidence been properly produced when it was supposed to be produced before the February hearing.  So that is my update.  I wanted to put both of

JODY A. STEWART, Official Court Reporter

2645

those matters on the record.  Again, I would reserve the option to reduce them to writing, as appropriate.

Now, the only other thing I have is a schedule, and I will give you this schedule for how we are going to proceed.  Any requests for transcripts from the court reporter must be made on or before November 30th, and the court reporter shall file such transcripts no later than December 15th, 2023.  These transcripts, as I understand it, are very lengthy.  I haven't seen anything, but her estimations are very lengthy.  They involve quite a number of medical terms and are going to take quite a bit of time to be prepared.  On top of that, there is a holiday ensuing. The Thanksgiving week is in that period.

I would also note that this court is at least one court reporter down for now.  All of our court reporter spots are not filled.  We are filling them, but we are one court reporter down.  I would also note that in a recent civil case over in Newport News before Chief Judge Davis, that case with retained attorneys had daily copy, and that takes two court reporters to do that.  One court reporter can't be all day and then prepare the transcript at night.

So we had two court reporters tied up in one case that just ended yesterday.  We are down one court reporter. It's a holiday season, and so the court reporters that we have have been filling in for other judges and magistrate

JODY A. STEWART, Official Court Reporter

2646

judges when they have duties that would normally be assigned to a District Judge.

So this gives you plenty of time to decide what you need in terms of transcripts, but you must get the request in November 30th, and the court reporter should have them all filed on or before the 15th of December.  Then I'm going to have you present simultaneous trial or hearing memos on January 15th, to set out proposed findings of fact and proposed conclusions of law.

So that's going to be the schedule going forward. After I get the proposed findings of fact and conclusions of law, we may or may not reconvene for argument.

Are there any questions about the schedule, Mr. Samuels?

MR. SAMUELS:  No, Your Honor.  Thank you.

THE COURT:  Ms. Ali, any question about the schedule?

MS. ALI:  Only about page limits, Your Honor, for the briefing.

THE COURT:  Whatever the page limits are under the rule.  If you are going to go over, you've got to file a motion well in advance and get the Court's approval.

MS. ALI:  Okay.

THE COURT:  I think it's in the rules, isn't it?

MR. SAMUELS:  Yes.

JODY A. STEWART, Official Court Reporter

2647

MS. ALI: Okay. I'll take a look. I don't know about post-hearing briefing if there is specific rules there, but I'll take a look.

THE COURT: It's just like you're filing a memo. In any event, the rules are there. If it doesn't, then I'll go look, and I'll set a page limit for you, because I'm not entertaining 200 pages a piece. So if the rules don't specifically say, then I'll have Ms. Eubanks send you an e-mail saying the Court has determined these are the page limits, and do not ask for a response. It's going to be simultaneous briefings. What you say are the proposed findings of fact and conclusions of law.

Then, I wish you all a safe and healthy upcoming holiday season, and we will await your filings in January. The Court stands in recess.

(Hearing adjourned at 2:07 p.m.)

JODY A. STEWART, Official Court Reporter

2648

<u>CERTIFICATION</u>


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



X_____/s/_____x
                Jody A. Stewart
                X_____12-14-2023 _____x
                        Date

JODY A. STEWART, Official Court Reporter